# EXHIBIT 6

CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA

NEW YORK, NY 10006-1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS
LONDON · MOSCOW · FRANKFURT · COLOGNE
ROME · MILAN · HONG KONG · BEIJING

Writer's Direct Dial. (212) 225-2850
E-Mail: edavis@cgsh.com

MARK A WALKER
LESLIE B SAMUELS
EDWARD F GREENE
ALLAN G SPERLING
EVAN A DAVIS
LAURENT ALPERT
VICTOR I LEWKOW
LESLIE N SILVERMAN
ROBERT L TORTORIELLO
A. RICHARD SUSKO
LEE C BUCHHEIT
JAMES M PEASLEE
ALAN L BELLER
THOMAS J MOLONEY
WILLIAM F GORIN
MICHAEL L RYAN
ROBERT P DAVIS
YARON Z REICH
RICHARD S LINCER
JAIME A EL KOURY
STEVEN G HOROWITZ
ANDREA G PODOLSKY
JAMES A DUNCAN
STEVEN M LOEB
DANIEL S STERNBERG
DONALD A STERN
CRAIG B BROD
SHELDON H ALSTER
WANDA J. OLSON
MITCHELL A LOWENTHAL
DEBORAH M BUELL
EDWARD J ROSEN
JOHN PALENBERG
LAWRENCE B FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E AUSTIN
SETH GROSSHANDLER
WILLIAM A GROLL
JANET L. FISHER

DAVID L SUGERMAN
HOWARD S ZELBO
DAVID E BRODSKY
ARTHUR H KOHN
RAYMOND B CHECK
RICHARD J COOPER
JEFFREY S LEWIS
FILIP MOERMAN
PAUL J SHIM
STEVEN L WILNER
ERIKA W NIJENHUIS
LINDSEE P GRANFIELD
ANDRES DE LA CRUZ
DAVID C LOPEZ
CARMEN A CORRALES
JAMES L BROMLEY
PAUL E GLOTZER
MICHAEL A GERSTENZANG
LEWIS J LIMAN
LEV L DASSIN
NEIL Q WHORISKEY
JORGE U JUANTORENA
MICHAEL D WEINBERGER
DAVID LEINWAND
JEFFREY A ROSENTHAL
ETHAN A KLINGSBERG
MICHAEL J VOLKOVITSCH
MICHAEL D DAYAN
CARMINE D BOCCUZZI JR
JEFFREY D KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J RAYMOND
LEONARD C JACOBY
SANDRA L FLOW
FRANCESCA L ODELL
WILLIAM L MCRAE
JASON FACTOR
MARGARET S PEPONIS
LISA M SCHWEITZER

KRISTOFER W HESS
JUAN G GIRÁLDEZ
DUANE McLAUGHLIN
BREON S PEACE
MEREDITH E KOTLER
CHANTAL E KORDULA
BENET J O'REILLY
DAVID AMAN
ADAM E FLEISHER
SEAN A O'NEAL
GLENN P McGRORY
CHRISTOPHER P MOORE
JOON H KIM
MATTHEW P SALERNO
MICHAEL J ALBANO
VICTOR L HOU
RESIDENT PARTNERS

SANDRA M ROCKS
ELLEN M CREEDE
S DOUGLAS BORISKY
JUDITH KASSEL
DAVID E WEBB
PENELOPE L CHRISTOPHOROU
BOAZ S MORAG
MARY E ALCOCK
GABRIEL J MESA
DAVID H HERRINGTON
HEIDE H ILGENFRITZ
KATHLEEN M EMBERGER
NANCY I RUSKIN
WALLACE L LARSON JR
JAMES D SMALL
AVRAM E LUFT
ELIZABETH LENAS
DANIEL ILAN
CARLO DE VITO FISCICELLI
RESIDENT COUNSEL

September 15, 2010

BY HAND

Hon. George B. Daniels, U.S.D.J.
United States District Court for the
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

Re: *Fairfield Sentry Limited v. HSBC Private Bank (Suisse) SA et al.,*
10-cv-06602 (GBD) (JCF); *Fairfield Sentry Limited v. HSBC Securities Services
(Luxembourg) SA,* 10-cv-06590 (GBD) (JCF); *Fairfield Sentry Limited v. FS/HSBC
Private Banking Nom et al.,* 10-cv-06589 (GBD) (JCF); *Fairfield Sentry Limited et al.
v. Robinson & Co. et al.,* 10-cv-06588 (GBD) (JCF); *Fairfield Sentry Limited et al. v.
HSBC Private Bank (Guernsey) Ltd. et al.,* 10-cv-06591 (GBD) (JCF); *Fairfield Sentry
Limited v. CDC IXIS et al.,* 10-cv-06557 (GBD) (JCF); *Fairfield Sentry Limited et al.
v. Cacesis Bank Luxembourg et al,* 10-cv-06550 (GBD) (JCF); *Fairfield Sentry
Limited v. Citibank NA London and Beneficial Owners of the Accounts held in the
Name of Citibank NA London 1-1000,* 10-cv-06548 (GBD) (JCF);
*Fairfield Sentry Limited et al v. Citibank (Switzerland) Zurich et al.,* 10-cv-06547
(GBD) (JCF); *Fairfield Sentry Limited v. Zurich Capital Markets Company et al.,* 10-
cv-06623 (GBD) (JCF); *Fairfield Sentry Limited et al v. BNP Paribas Securities
Services Luxembourg et al.,* 10-cv-06559 (GBD) (JCF); *Fairfield Sentry Limited v.
BNP Paribas Luxembourg SA et al.,* 10-cv-06552 (GBD) (JCF); *Fairfield Sentry
Limited v. ABN AMRO Schweiz AG et al.,* 10-cv-06640 (GBD) (JCF); *Fairfield Sentry
Limited v. ABN AMRO Schweiz AG et al.,* 10-cv-06641 (GBD) (JCF)

Dear Judge Daniels,

Hon. George B. Daniels, p. 2                                        September 15, 2010

      This firm represents many of the named defendants in the above-captioned actions, which plaintiffs commenced in New York state court by filing summonses with notice, with no complaints, as the New York CPLR allows. Plaintiffs then purported to remove the actions to this Court on September 3 and 7, 2010, but have not yet filed their complaints, which of course they must do under the Federal Rules of Civil Procedure. We intend to move for remand to state court on behalf of our clients in a timely manner, but need first to have plaintiffs' complaints to do so. Therefore, we respectfully request that the Court direct plaintiffs to file their complaints in these actions by September 27, 2010, and set a briefing schedule for the remand motions, providing for the parties to submit their principal briefs and supporting papers on October 4 and 25, and for defendants to submit their reply papers on November 8.

      The actions are brought by Fairfield Sentry Limited, the largest of the so-called "feeder funds" that sold shares to investors and then invested the proceeds with Bernard L. Madoff Investment Securities, LLC. Fairfield Sigma Limited, an indirect feeder fund that invested in Fairfield Sentry, is a co-plaintiff in several of the actions. Both funds are in liquidation in the British Virgin Islands.

      Between April and July of this year, the funds commenced more than 140 actions in the Supreme Court of the State of New York, New York County. The initial pleading filed to commence each of the actions was a summons with notice, rather than a complaint. On June 14, 2010, the liquidators for the funds filed a petition in the U.S. Bankruptcy Court for the Southern District of New York to have the BVI liquidation proceedings recognized as foreign main proceedings under Chapter 15 of the U.S. Bankruptcy Code, and that petition was granted on July 22, 2010.

      On September 3 and 7, 2010, plaintiffs purported to remove many of New York State actions to this Court, including those captioned above. In most of these cases, plaintiffs had filed no complaint prior to removal. Despite the passage of almost two weeks, plaintiffs still have not yet filed any complaints.

      Our clients intend to seek orders remanding these actions back to state court, and/or abstaining from them in favor of proceedings pending in state court. *See* 28 U.S.C. §§ 1334 (c), 1447, and 1452(b). The primary ground for remand is that this Court lacks subject matter jurisdiction over plaintiffs' claims under § 1334. We will also seek remand on other grounds, but must do so within thirty days of removal. *See* 28 U.S.C. § 1447(c); *Orange County Water District v. Unocal Corp.*, 584 F.3d 43, 50 (2d Cir. 2009). Accordingly, we intend to move by October 4, 2010.

      The remand and abstention analysis depends in large part upon the nature of plaintiffs' claims, which we do not yet know because plaintiffs have filed no complaints. For example, the Court cannot determine whether plaintiffs' claims "arise under" federal law, as we suspect they do not, based on complaints plaintiffs filed in state court in a few companion actions. Therefore, complaints are necessary to brief and decide these issues.

      We regret the need to burden the Court with this request. We do so only because this morning plaintiffs' counsel backed out of a substantially-agreed stipulation to the

Hon. George B. Daniels, p. 3                                    September 15, 2010

relief we seek.  She admitted that plaintiffs were tactically refraining from filing
complaints in these actions because they wish to file complaints directly with the
Bankruptcy Court, even though the actions are now before the District Court.  That
gambit is plainly improper.  Plaintiffs have asked this Court to refer the actions to the
Bankruptcy Court, but this Court has not yet granted that request, which is unwarranted
and which we intend to oppose.  Plaintiffs should not be permitted to circumvent this
Court's consideration of plaintiffs' request for referral, which this Court can efficiently
address only after it decides pursuant to our remand motions whether these cases belong
in federal court at all.   In addition, referral to Bankruptcy Court now only would require
defendants to move to withdraw the reference pursuant to 28 U.S.C. 157(d), requiring the
Court to address the same jurisdictional issues that will be addressed in our motions to
remand or abstain.

        Accordingly, we respectfully request that the Court direct Plaintiffs to file
complaints in the above-captioned actions by September 27, 2010, and enter the briefing
schedule proposed above.  Further, we respectfully request that our clients' time to
answer or otherwise respond to the complaints be set for thirty (30) days after the Court
issues a ruling on the motions.

        We make these requests without prejudice or waiver of any rights or defenses,
including without limitation defenses based upon lack of personal jurisdiction or
improper service of process.


                                Respectfully submitted,


                                CLEARY GOTTLIEB STEEN & HAMILTON LLP


                                By _____


                                Evan A. Davis, a Member of the Firm

                                *Attorneys for Defendants HSBC Private Bank*
                                *(Suisse) SA, HSBC Securities Services*
                                *(Luxembourg) SA, HSBC Bank USA NA, HSBC*
                                *Private Bank (C.I.) Limited, HSBC Private Banking*
                                *Nominee 1 (Jersey) Limited, Robinson & Co.,*
                                *Caceis Bank Luxembourg, CDC IXIS, Citibank NA*
                                *London, Citibank (Switzerland) Zurich, Citibank*
                                *(Switzerland) AG, Citigroup, Citivic Nominees*
                                *Limited, BNP Paribas Securities Services*
                                *Luxembourg, BNP Paribas Luxembourg SA, BNP*

Hon. George B. Daniels, p. 4                                    September 15, 2010

*Paribas (Suisse) SA, BNP Paribas (Suisse) SA Ex*
*Fortis, and BNP Paribas (Suisse) SA Private*

cc:  All counsel of record

EXHIBIT 7

**BR**OWNRUDNICK

Seven
Times
Square
New York
New York
10036
*tel* 212.209.4800
*fax* 212.209.4801

KERRY L. QUINN
direct dial: 212-209-4819
fax: 212-938-2860
kquinn@brownrudnick.com

September 16, 2010

**BY FACSIMILE AND HAND**

The Honorable George B. Daniels
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10017

Re:     *Fairfield Sentry Ltd. v. HSBC Private Bank (Suisse) SA et al.*, 10-cv-06602 (GBD) (JCF);
        *Fairfield Sentry Ltd. v. HSBC Sec. Servs. (Luxembourg) SA*, 10-cv-06590 (GBD) (JCF);
        *Fairfield Sentry Ltd. v. FS/HSBC Private Banking Nom et al.*, 10-cv-06589 (GBD) (JCF);
        *Fairfield Sentry Ltd. et al. v. Robinson & Co. et al.*, 10-cv-06588 (GBD) (JCF); *Fairfield
        Sentry Ltd. et al. v. HSBC Private Bank (Guernsey) Ltd. et al*., 10-cv-06591 (GBD)
        (JCF);  *Fairfield Sentry Ltd. v. CDC IXIS et al.,* 10-cv-06557 (GBD) (JCF); F*airfield
        Sentry Ltd. et al. v. Cacesis Bank Lux. et al*, 10-cv-06550 (GBD) (JCF); *Fairfield Sentry
        Ltd. v. Citibank NA London et al.*, 10-cv-06548 (GBD) (JCF); *Fairfield Sentry Ltd. et al.
        v. Citibank (Switz.) Zurich et al.*, 10-cv-06547 (GBD) (JCF); *Fairfield Sentry Ltd. v.
        Zurich Capital Mkts. Co. et al.*, 10- cv-06623 (GBD) (JCF); *Fairfield Sentry Ltd. et al. v.
        BNP Paribas Sec. Srvs. Lux. et al.*, 10-cv-06559 (GBD) (JCF); *Fairfield Sentry Ltd. v. ;
        BNP Paribas Lux. SA et al.*, 10-cv-06552 (GBD) (JCF); *Fairfield Sentry Ltd. v. ABN
        AMRO Schweiz AG et al.*, 10-cv-06640 (GBD) (JCF); *Fairfield Sentry Ltd. v. ABN
        AMRO Schweiz AG et al*.,10-cv-06641 (GBD) (JCF)

Dear Judge Daniels:

        This firm represents Fairfield Sentry Ltd. (in liquidation) ("Sentry") and Fairfield Sigma
Ltd. (in liquidation) ("Sigma"), Plaintiffs in the above-referenced actions (the "Actions"), each
of which has been removed from New York State court to this Court for referral to the United
States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  We
write in response to a letter sent by Defendants on September 15, 2010 (attached as Exhibit A)
seeking an order directing Plaintiffs to file complaints in the Actions by September 27, 2010.

        As explained below, Defendants' letter is an attempt to exploit a short administratively-
caused delay in Plaintiffs' ability to file complaints with the Bankruptcy Court to, in effect, attain
a withdrawal of the reference to the Bankruptcy Court without a proper motion or cause
therefore.  Defendants' efforts should be disregarded, and the Actions should continue to be
referred to the Bankruptcy Court in accordance with the July 10, 1984 Standing Order of

Referral of Cases to Bankruptcy Judges (the "Standing Order"). Moreover, the Court can be assured that the Plaintiffs will file complaints as soon as it is administratively possible to do so and that Plaintiffs have, in the interim, offered to provide copies of the complaints to the Defendants. Accordingly, Defendants have absolutely no need of the relief they purport to seek and no entitlement to the actual relief that that they hope, improperly, to obtain.

The following background is provided should the Court seek further context with regard to the Actions or the assertions made by the Defendants in the September 15 letter.

## Factual Background

Sentry, Sigma and their sister fund, Fairfield Lambda Limited ("Lambda," collectively, the "Funds") are investment funds incorporated in the British Virgin Islands ("BVI") that functioned, prior to December of 2008, as so-called "feeder funds" to Bernard Madoff's brokerage firm, Bernard L. Madoff Investment Securities, LLC ("BLMIS"). Following exposure of the Madoff fraud, the Funds were put into liquidation in the BVI. The current court-appointed liquidators of the Funds (the "Liquidators") are prosecuting these Actions and others on behalf of the Funds as part of the Liquidators' statutory and fiduciary duties to recover assets for the Funds' estates for ultimate distribution to claimants in the Funds' BVI liquidation proceedings.

In furtherance of those duties, on June 14, 2010, the Liquidators filed petitions in the Bankruptcy Court for recognition of the BVI liquidation proceedings as "foreign main proceedings" under Chapter 15 of Title 11 of the United States Bankruptcy Code, styled *In re Fairfield Sentry Limited, et al., Debtors in Foreign Proceedings*, Case No. 10-13164 (BRL) (the "Chapter 15 Cases"). The matter was assigned to Honorable Burton R. Lifland, who is presiding over all Madoff-related matters, including the liquidation of the BLMIS Estate pursuant to the Securities Investor Protection Act of 1970 ("SIPA"), as overseen by the United States Trustee Irving Picard (the "Madoff Trustee"). On July 22, 2010, Judge Lifland entered an order (the "Recognition Order") granting recognition of the Funds' BVI liquidation proceedings as "foreign main proceedings" under Chapter 15. The Liquidators thereafter became entitled to remove state court actions related to the Chapter 15 Cases to the Bankruptcy Court and to commence new actions related to the Chapter 15 Cases in the Bankruptcy Court.

Among the actions originally commenced in New York State court prior to the Recognition Order are actions, such as the Actions involving Defendants, to recover redemption payments made to Fund shareholders (the "Redeemers") prior to the exposure of the Madoff fraud. As alleged in complaints that the Funds have filed, payments made to Redeemers were based on crucial mistakes regarding the actual assets of the Funds at the relevant time and the source of the monies that BLMIS transferred to the Funds.

The Funds began filing actions against Redeemers in the United States in April of 2010. At that time, all of those actions were commenced in the Supreme Court of the State of New York. Following the July 22 Recognition Order, all previously-filed actions, to the extent that the Liquidators intended to pursue those actions, were removed to the District Court pursuant to

U.S.C. §§ 1334 and 1452. In total, 59 actions against Redeemers have been removed from state court. We understand that all of the removed actions are in the process of being referred to the Bankruptcy Court. Indeed, most of the actions, including nearly all of the Actions involving Defendants, have already had referral orders entered, and we understand that referral orders are in the process of being entered in the remainder of the cases.

Following the Recognition Order, the Liquidators commenced additional actions against Redeemers in the Bankruptcy Court in connection with the Chapter 15 Cases. As of today's date, 25 actions against Redeemers have been commenced in the Bankruptcy Court, with seven more actions to be filed tomorrow and more to follow in the coming weeks. Thus, once the removed actions are referred to the Bankruptcy Court, approximately 100 separate actions against Redeemers will be docketed as adversary proceedings in the Chapter 15 Cases. As we have discussed with counsel for Redeemers, we intend to seek procedural consolidation and coordination of all of these actions for pre-trial purposes, entry of a scheduling order, and implementation of a case management order to facilitate the administration of these and other actions.

## The "Relief" That Defendants Purport To Seek From This Court

In their July 15 letter, Defendants purport to seek entry of an order directing Plaintiffs to file complaints in the Actions by September 27, 2010. Plaintiffs have, however, already agreed to provide Plaintiffs with complaints on an even more accelerated schedule.

In this situation, the "relief" that Defendants seek is unrelated to any delay in the filing of complaints.[1] Defendants' letter is, instead, an effort to disrupt this Court's ordinary and orderly process of referral of bankruptcy-related cases to the appropriate Bankruptcy Court. Defendants' suggestion that this Court must consider a "request" for referral to the Bankruptcy Court is contrary to both the Standing Order and the referral process that has been followed to date in removed actions. Pursuant to the Standing Order, matters arising under, in, or related to Title 11 are *automatically* referred to the Bankruptcy Court. The referral process is not subject to the district court's prior consideration of a defendant's substantive argument in favor of remand. Arguments about jurisdiction should be addressed to the Bankruptcy Court in the first instance— by way of an appropriate motion to remand. *See, e.g., AHT Corp. v. Bioshield Tech., Inc., et al.*

---

[1]    Defendants inappropriately suggest that Plaintiffs are delaying filing complaints as a "tactical…gambit." Putting aside Defendants' false characterizations and accusations, Defendants are simply wrong, and willfully ignoring the administrative reality of the referral process. As Plaintiffs explained to Defendants before they filed their letter, the removed actions are still working their way through this Court's docketing and referral process. Because of the volume of removals, the clerk's office is still processing notices of removal, assigning docket numbers, entering orders of reference and then closing the district court dockets. It appears that any pleadings other than the notice of removal and corporate disclosure statement are being deleted from dockets when the dockets are closed after referral. Thus, it makes no sense to file complaints on these dockets. Instead, we will file complaints as soon as the Bankruptcy Court assigns adversary proceeding numbers. To resolve Defendants' concerns about receiving complaints in time to file motions to remand, we offered to provide Defendants with copies of the complaints that will be filed. Indeed, we offered to provide these complaints by the end of this week, well in advance of the deadline that Defendants are asking this Court to impose.

The Honorable George B. Daniels
September 16, 2010
BR Page 4

*(In re AHT Corp.)*, 265 B.R. 379, 391 (Bankr. S.D.N.Y. 2001) ("[O]f course, because this Chapter 11 case and all proceedings under, in or related to it have been referred to this Bankruptcy Court by reason of this District's standing order dated July 10, 1984, it is for this Court [the Bankruptcy Court] to make the determination whether the requirements for mandatory abstention have been met."); *Kassover v. Prism Venture Partners*, Adv. Proc. 05-02437 (Lifland, J.) (granting motion to remand, and remanding action directly to New York State court).

The substance of Defendants' jurisdictional arguments will be addressed at the appropriate time, after Defendants have made a proper motion in the Bankruptcy Court, but suffice it to say that the Actions are ones over which this Court and the Bankruptcy Court have jurisdiction and are properly referred to Judge Lifland as the judge presiding not only over the Funds' Chapter 15 Cases but also the liquidation of the BLMIS estate.[2]

\*   \*   \*

For the foregoing reasons, the Defendants' request for relief should not be granted and the Actions should continue to be referred to the Bankruptcy Court in accordance with the Standing Order.

Respectfully submitted,

Kerry L. Quinn

Attachment

cc:   Hon. Burton R. Lifland (by email & hand)
      Evan A. Davis, counsel to Defendants (by email & U.S. mail)

---

[2]   The administration of the Funds' Chapter 15 Cases is intertwined with the BLMIS liquidation for, among other reasons, the fact that the Sentry is a defendant in adversary proceedings brought by the Madoff Trustee as well as a claimant against the BLMIS estate.

# EXHIBIT 8

M-10-468

U.S. DISTRICT COURT
FILED
JUL 11 1984
S. D. OF N.Y.

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

Pursuant to Section 157(a) of the Bankruptcy Amendments and Federal Judgeship Act of 1984, any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 are referred to the bankruptcy judges for this district.

So Ordered,

_____
ROBERT J. WARD
Acting Chief Judge

July 10, 1984



MICROFILM
JUL 11 1984

# EXHIBIT 9

**APPENDIX B**

**SUBSCRIPTION DOCUMENTS**

## FAIRFIELD SENTRY LIMITED SUBSCRIPTION DOCUMENTS

**Instructions**

    A.  **All subscribers**.  Provide all information requested in the Subscription Agreement and execute in the appropriate place on the signature page.

    B.  **Items to be delivered by All Subscribers**.

        (i)             Completed and signed Subscription Agreement.

        (ii)    U.S. dollar denominated funds in the amount of the full purchase price for Shares.  Wire transfer funds for the full amount of the subscription to the Fund's escrow account at:

> HSBC Bank USA
> New York, NY
> United States of America
> SWIFT:  MRMDUS33
> Fed Wire:  021001088

| | |
|---|---|
| Account Name: | Citco Bank Nederland N.V., Dublin Branch |
| Account Number: | 000306487 |
| Swift: | CITCIE2D |

| | |
|---|---|
| For Further Credit To: | |
| Account Name: | Fairfield Sentry Limited – Class B |
| Account No.: | IE33CITC00000020856801 |
| By Order of: | (Name of Subscriber) |

        (iii)   Subscription documents should be delivered or sent by courier to Fairfield Sentry Limited –Class B, c/o Citco Fund Services (Europe) B.V., Telestone 8 –Teleport, Naritaweg 165, 1043 BW Amsterdam, P.O. Box 7241, 1007 JE Amsterdam,  The Netherlands; fax no.: (31-20) 572-2610.

Name of Subscriber: _____

Amount of Subscription: $_____

## SUBSCRIPTION AGREEMENT

## (NON-UNITED STATES OF AMERICA SUBSCRIBERS ONLY)

## FAIRFIELD SENTRY LIMITED

## CLASS B SHARES - ONLY

Fairfield Sentry Limited
c/o Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands
Telephone: (31-20) 572-2100
Facsimile: (31-20) 572-2610

Dear Sirs:

     1.    <u>Subscription.</u>  The undersigned ("Subscriber") hereby subscribes for voting, participating Class B Shares, each with a par value U.S. $0.01 per share (the "Shares") of Fairfield Sentry Limited (the "Fund"), an international business company organized under the laws of the Territory of the British Virgin Islands ("BVI"). The Shares will be offered at the initial offering price of U.S. $1,000 per Share. After the initial closing, the Shares will be offered at a price equal to the net asset value ("Net Asset Value") per Share as of the opening of business on the effective date of purchase. The Shares have identical rights and privileges in all respects (including the right to one vote per Share). All capitalized terms used in this Subscription Agreement (the "Agreement") that are not defined herein have the meanings set forth in the Fund's Confidential Private Placement Memorandum (as amended from time to time, the "Memorandum"). Subscriber subscribes for that number of Shares that can be purchased for the subscription amount above. Subscriber subscribes for the Shares pursuant to the terms herein, the Memorandum, and the Fund's Memorandum of Association and Articles of Association (collectively, the "Fund Documents"). All references herein to "dollars" or "$" are to U.S. dollars.

     2.    <u>Acceptance or Rejection</u>.  If the Fund accepts this subscription, Subscriber shall become a shareholder of the Fund and be bound by the Fund Documents. The minimum initial subscription is $100,000. The Board of Directors, in its sole discretion, may accept subscriptions of a lesser amount or establish different minimums in the future. The Board of Directors, in consultation with Fairfield Greenwich (Bermuda) Ltd. (the "Investment Manager"), may reject a subscription for any reason or no reason. Subscriptions shall become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund. If rejected, the Fund shall promptly return the subscription funds, with any interest actually earned thereon, and this Agreement shall be void.

     3.    <u>Payment of Subscription Funds</u>.  Subscription funds should be wired to the Fund at the following account, concurrently with the delivery of this Agreement to the Fund. In order to comply with anti-money laundering regulations applicable to the Fund and Citco Fund Services (Europe) B.V. (the

"Administrator"), the sample bank letter attached hereto as Schedule A MUST be completed by the financial institution which will be remitting the subscription moneys on behalf of the subscriber.

> HSBC Bank USA
> New York, NY
> United States of America
> SWIFT: MRMDUS33
> Fed Wire: 021001088

| | |
|---|---|
| Account Name: | Citco Bank Nederland N.V., Dublin Branch |
| Account Number: | 000306487 |
| Swift: | CITCIE2D |

| | |
|---|---|
| For Further Credit To: | |
| Account Name: | Fairfield Sentry Limited – Class B |
| Account No.: | IE33CITC00000020856801 |
| By Order of: | (Name of Subscriber) |

4. <u>Delivery of Subscription Agreement</u>. Subscriber should fax and mail an executed, completed copy of this Agreement to the Administrator at the above facsimile number and address, with a copy to the Manager at Fairfield Greenwich (Bermuda) Ltd., Par La Ville Place, 14 Par La Ville road, 3rd Floor, Hamilton, Bermuda.

5. <u>Status Representations</u>.

a. <u>SEC Regulation S</u>. Subscriber is not a "U.S. Person" under Regulation S of the U.S. Securities and Exchange Commission (adopted under the U.S. Securities Act of 1933, as amended (the "1933 Act")) because (a) if an individual, Subscriber is not a resident of the United States of America or its territories or possessions (the "U.S.") or "resident alien" as defined under the U.S. income tax laws, and (b) if an entity, Subscriber is not any of the following: (i) a partnership or corporation organized or incorporated under U.S. law; (ii) an estate of which any executor or administrator is a U.S. Person; (iii) a trust of which a trustee is a U.S. Person; (iv) any agency or branch of a foreign entity located in the U.S.; (v) a partnership or corporation organized under non-U.S. law but formed by a U.S. Person principally for the purpose of investing in securities not registered under the 1933 Act (unless organized and incorporated, and owned, by accredited investors as defined in Rule 501 under the 1933 Act who are not natural persons, estates or trusts); (vi) a non-discretionary or similar account (other than an estate or trust) held by a dealer or other fiduciary for a U.S. Person; or (vii) a discretionary or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated or (if an individual) resident in the U.S.

Subscriber acknowledges that, except with the consent of the Fund, the Shares may not be owned by a U.S. Person, that the Shares will not at any time be held for the account or benefit, directly or indirectly, of any U.S. Person, and that, except with the consent of the Fund, the Subscriber will not resell, reoffer or transfer any Shares or any interest therein to any person, including a U.S. Person or any non-U.S. Person subject to the above restrictions. Subscriber acknowledges that reoffers, resales or any transfer of the Shares is subject to the limitations imposed by the Fund's Articles of Association and may be made only in compliance with applicable securities laws and only with the prior written consent of the Board of Directors which may, in its sole discretion, decline to issue any Shares to, or register Shares in the name of, any person, and the Subscriber will not transfer any of its Shares except on the books of the Fund and acknowledges that the Shares shall be transferable only to investors who are eligible to purchase Shares in

3

the Fund as described above and in the Memorandum.   Subscriber understands that the Fund may compulsorily repurchase such Shares in accordance with the Fund Documents.

        b.        <u>CFTC Regulation 4.7</u>.  Subscriber is not a "U.S. Person" under Regulation 4.7 of the U.S. Commodity Futures Trading Commission (adopted under the U.S. Commodity and Exchange Act of 1974, as amended) ("Rule 4.7") because (a) if an individual, Subscriber is not a resident of the U.S., and (b) if an entity, Subscriber is not (i) a partnership, corporation or other entity (other than an entity organized principally for passive investment) organized under U.S. law or with its principal place of business in the U.S.; (ii) an entity (whether organized under U.S. or non-U.S. law) that is organized principally for passive investment and that is beneficially owned 10% or more by U.S. Persons or persons who are not otherwise "qualified eligible persons", as defined in Rule 4.7;  (iii) an estate or trust the income of which is subject to U.S. income taxation regardless of source; or (iv) a pension plan for the employees, officers or principals of an entity organized or with its principal place of business in the U.S.

        c.        <u>Professional Investor Status</u>.  Subscriber is a "Professional Investor" within the meaning of the BVI Mutual Funds Act of 1996 of the BVI, because Subscriber's net worth (in the case of a natural person, either individually or jointly with spouse) exceeds US$1,000,000, and Subscriber consents to being treated as a Professional Investor for the purpose of investing in the Fund.

        d.        <u>Employee Benefit Plans</u>. Investment in the Fund by "Employee Benefit Plans", as defined under the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), may be limited to less than 25% of the total capital of the Fund (excluding investments by the Investor). To help determine whether investment by Subscriber is included in the 25% limitation, Subscriber has initialed here (_____) if it is an Employee Benefit Plan (such as a retirement account, corporate pension or profit sharing plan, or governmental retirement plan). If the Subscriber at any time becomes an Employee Benefit Plan, the Subscriber shall forthwith inform this to the Fund.

If the Subscriber is an insurance company investing the assets of its general account in the Fund, less than 25% of the Subscriber's general account constitutes assets of an Employee Benefit Plan (as determined under Section 401(c) of ERISA).  If the Subscriber is such an entity and at any time 25% or more of its general account constitute assets of an Employee Benefit Plan, the Subscriber shall forthwith disclose to the Fund the amount of Employee Benefit Plan assets held in its general account.  By signing this Subscription Agreement, the Subscriber expressly acknowledges that the Fund may require that the Subscriber redeem its Shares and withdraw from the Fund if 25% or more of the Subscriber's general account constitutes assets of an Employee Benefit Plan.

        6.        <u>Related Professionals</u>.
                (Subscriptions cannot be accepted if this section is not completed)

Please indicate the name of the person at the Fairfield Greenwich Group with whom this subscription is associated.
Name: _____

Please indicate the name, if applicable, of the person and/or entity who acts as an advisor with respect to this subscription.

Name of Advisor:

_____

Name of Advisor's firm or organization:

_____

4

Not Applicable: _____

      7.     <u>Receipt of Fund Documents and Other Documents</u>.  Subscriber has received and read a copy of the Memorandum.  Subscriber acknowledges that in making a decision to subscribe for Shares, Subscriber has relied solely upon the Fund Documents and independent investigations made by Subscriber and has not relied on any representation inconsistent with the information in the Fund Documents.  Subscriber is not relying on the Fund, the Fund's Board of Directors, administrator, the Investment Manager, or any other person or entity with respect to the legal, tax and other economic considerations involved in this investment other than the Investor's own advisers.  The Subscriber's investment in the Shares is consistent with the investment purposes, objectives and cash flow requirements of the Subscriber and will not adversely affect the Subscriber's overall need for diversification and liquidity.

      8.     <u>Subscriber Sophistication and Financial Condition</u>. Subscriber has such knowledge and experience in financial and business matters that it is capable of evaluating the risks of this investment. Subscriber has obtained sufficient information from the Fund or its authorized representatives to evaluate such risks and has consulted with the Subscriber's own advisors and is fully informed as to the legal and tax requirements within the Subscriber's own country (countries) regarding a purchase of the Shares. Subscriber is not relying on the Fund or the Board of Directors, or any other person or entity with respect to the legal, tax and other economic considerations involved in this investment other than the Subscriber's own advisers.  Subscriber has not relied on any person as a purchaser representative in connection with that evaluation.  Subscriber has evaluated the risks of investing in the Fund, understands there are substantial risks of loss incidental to the purchase of Shares and has determined that the Shares are a suitable investment for the Subscriber.  Subscriber's investment is consistent with its investment purposes and objectives and cash flow requirements, and will not adversely affect Subscriber's overall need for diversification and liquidity.

Subscriber understands that (a) the Fund's operating history is not a prediction of its future success; (b) no governmental agency has passed upon the Shares or made any findings or determination as to the fairness of this investment; and (c) the representations, warranties, agreements, undertakings and acknowledgments made by the Subscriber in this Agreement will be relied upon by the Fund, the Board of Directors, the Investment Manager and the Administrator in determining the Subscriber's suitability as a purchaser of Shares and the Fund's compliance with various securities laws, and shall survive the Subscriber's becoming a shareholder of the Fund.

All information which the Subscriber has provided to the Fund or the Administrator concerning the Subscriber, the Subscriber's status, financial position and knowledge and experience of financial, tax and business matters, or, in the case of a Subscriber that is an entity, the knowledge and experience of financial, tax and business matters of the person making the investment decision on behalf of such entity, is correct and complete as of the date set forth herein.

The Subscriber irrevocably authorizes the Fund and/or the Administrator to disclose, at any time, any information held by the Fund or the Administrator in relation to the Subscriber or his investment in the Fund to the Investment Manager or any affiliate of the Investment Manager or the Administrator.

      9.     <u>Redemptions</u>.  Subscriber is aware of the limited provisions for redemptions and has read the section in the Memorandum entitled "Transfers, Redemptions and Termination."  Subscriber has no need for liquidity in this investment, can afford a complete loss of the investment in the Shares and can afford to hold the Shares for an indefinite period of time.  Subscriber understands that the Fund will

generally redeem Shares as of the last day of each month (the "Redemption Date"); provided that the redemption request is received by the Administrator in proper form no later than 5:00 p.m. Amsterdam time on a date that is at least 15 business days prior to the Redemption Date.

10.     Valuations.  Subscriber understands that the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's investments and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value.

11.     Beneficial Owner.  Subscriber acknowledges, or if the Subscriber is acting as agent, representative or nominee for a subscriber (a "Beneficial Owner"), the Subscriber has advised the Beneficial Owner that (a) the Investment Manager, on behalf of the Fund, may enter into agreements with placement agents or other sales relationships to market the Fund providing for a payment from the Investment Manager to the particular placement agent for the introduction, out of the fees the Investment Manager receives from the Fund.

12.     Investment Intent.  Subscriber is buying the Shares solely for investment purposes and not with a view to distribute, subdivide or resell the Shares.

13.     Subsequent Subscriptions.  If Subscriber subscribes for additional Shares at a later date, Subscriber shall be deemed to have re-executed this Agreement in subscribing for those Shares.

14.     Registration of Shares; Certificates.  The Shares issued to Subscriber will be registered on the Fund's books in the name of Subscriber and not any nominee.  Shares will be issued in registered, book-entry form.

15.     Binding Nature of Agreement.  This Agreement shall be binding upon Subscriber and its heirs, representatives, successors and permitted assigns, and shall inure to the benefit of the Fund's successors and assigns.  The Agreement shall survive the acceptance of the subscription.  If Subscriber consists of more than one person, the Agreement shall be the joint and several obligation of each person.

16.     Governing Law.  This Agreement shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions.

17.     Legal Representation.  Subscriber understands that the Law Offices of Andrew E. Goldstein acts as U.S. counsel to the Fund and as counsel to the Investment Manager and its affiliates. Subscriber also understands that, in connection with this offering of Shares and subsequent advice to the Fund, the Law Offices of Andrew E. Goldstein will not be representing the shareholder, and no independent counsel has been engaged by the Fund to represent the shareholders.

18.     Authority.  Subscriber's execution, delivery and performance of this Agreement are within its powers, have been duly authorized and will not constitute or result in a breach or default under or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which Subscriber is a party or by which it is bound, and, if Subscriber is not an individual, will not violate any provision of the incorporation papers, by-laws, indenture of trust or partnership agreement, as may be applicable, of the Subscriber. The signature on this Agreement is genuine, and the signatory, if Subscriber is an individual, has legal competence and capacity to execute the Agreement, or, if Subscriber is not an individual, the signatory has been duly authorized to execute the Agreement, and the Agreement constitutes a legal, valid and binding obligation of Subscriber, enforceable in accordance with its terms.

19.   <u>New York Courts</u>. Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.  Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records.  Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

20.   <u>Office of Foreign Assets Control</u>.  (A)   Subscriber understands and agrees that the Fund prohibits the investment of funds by any persons or entities that are acting, directly or indirectly, (i) in contravention of any applicable laws and regulations, including anti-money laundering regulations or conventions, (ii) on behalf of terrorists or terrorist organizations, including those persons or entities that are included on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Treasury Department's Office of Foreign Assets Control[1] ("OFAC"), as such list may be amended from time to time, (iii) for a senior foreign political figure, any member of a senior foreign political figure's immediate family or any close associate of a senior foreign political figure[2], unless the Fund, after being specifically notified by Subscriber in writing that it is such a person, conducts further due diligence, and determines that such investment shall be permitted, or (iv) for a foreign shell bank[3] (such persons or entities in (i) – (iv) are collectively referred to as "Prohibited Persons").

(B)   Subscriber represents, warrants and covenants that: (i) it is not, nor is any person or entity controlling, controlled by or under common control with Subscriber, a Prohibited Person, and (ii) to the extent Subscriber has any beneficial owners[4] or is acting as agent or nominee in connection with this investment, (a) it has carried out thorough due diligence to establish the identities of such beneficial owners, (b) based on such due diligence, Subscriber reasonably believes that no such beneficial owners are Prohibited Persons, (c) it holds the evidence of such identities and status and will maintain all such evidence for at least five years from the date of Subscriber's complete redemption from the Fund, and (d) it will make available such information and any additional information requested by the Fund that is required under applicable regulations.

---

[1]   The OFAC list may be accessed on the web at http://www.treas.gov/ofac.

[2]   Senior foreign political figure means a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation.  In addition, a senior foreign political figure includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.  The immediate family of a senior foreign political figure typically includes the political figure's parents, siblings, spouse, children and in-laws.  A close associate of a senior foreign political figure is a person who is widely and publicly known internationally to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

[3]   Foreign shell bank means a foreign bank without a physical presence in any country, but does not include a regulated affiliate.  A post office box or electronic address would not be considered a physical presence.  A regulated affiliate means a foreign shell bank that: (1) is an affiliate of a depository institution, credit union, or foreign bank that maintains a physical presence in the United States or a foreign country, as applicable; and (2) is subject to supervision by a banking authority in the country regulating such affiliated depository institution, credit union, or foreign bank.

[4]   Beneficial owners will include, but shall not be limited to: (i) shareholders of a corporation: (ii) partners of a partnership; (iii) members of a limited liability company; (iv) investors in a fund of funds; (v) the grantor of a revocable or grantor trust (vi) the beneficiaries of an irrevocable trust; (vii) the individual who established an IRA; (viii) the participant in a self-directed pension plan; (ix) the sponsor of any other pension plan; and (x) any person being represented by the Subscriber in an agent, representative, intermediary, nominee or similar capacity.  If the beneficial owner is itself an entity, the information and representations set forth herein must also be given with respect to its individual beneficial owners.  If Subscriber is a publicly-traded company, it need not conduct due diligence as to its beneficial owners.

7

(C)     If any of the foregoing representations, warranties or covenants ceases to be true or if the Fund no longer reasonably believes that it has satisfactory evidence as to their truth, notwithstanding any other agreement to the contrary, the Fund may, in accordance with applicable regulations, freeze Subscriber's investment, either by prohibiting additional investments, declining or suspending any redemption requests and/or segregating the assets constituting the investment, or Subscriber's investment may immediately be redeemed by the Fund, and the Fund may also be required to report such action and to disclose Subscriber's identity to OFAC or other authority.  In the event that the Fund is required to take any of the foregoing actions, Subscriber understands and agrees that it shall have no claim against the Fund, the Investment Manager, the Administrator, and their respective affiliates, directors, members, partners, shareholders, officers, employees and agents for any form of damages as a result of any of the aforementioned actions.

(D)     Subscriber understands and agrees that any redemption proceeds paid to it will be paid to the same account from which Subscriber's investment in the Fund was originally remitted, unless the Fund, in its sole discretion, agrees otherwise.

(E)     If any of the foregoing representations cease to be true, Subscriber will promptly notify the Fund of the facts pertaining to such changed circumstances.

21.     <u>Anti-Money Laundering</u>.  Subscriber represents that the subscription funds are not the direct or indirect proceeds of drug trafficking or other such criminal conduct or activity.  Subscriber understands that, as part of the responsibility of the Fund and Administrator for protection against money laundering, the Administrator may require a detailed verification of Subscriber's identity.  Depending on the circumstances of each application, a detailed verification might not be required where Subscriber makes the payment from an account held in Subscriber's name at a recognized financial institution; or the application is made through a recognized intermediary.  These exceptions will only apply if the financial institution or intermediary referred to above is within a country recognized as having sufficient anti-money laundering regulations.  For example, an individual may be required to produce a copy of a passport or identification card duly certified by a notary public, together with evidence of his/her address such as a utility bill or bank statement and date of birth.  In the case of entity subscribers, this may require production of a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or the equivalent), and the names, occupations, dates of birth and residential and business addresses of all directors.  The Administrator and the Fund reserve the right to request such information as is necessary to verify the identity of Subscriber.  In the event of delay or failure by Subscriber to produce any information required for verification purposes, the Administrator may refuse to accept the subscription and the subscription monies relating thereto or may refuse to process a redemption request until proper information has been provided.  Subscriber further agrees that the Fund and any other service provider shall be held harmless and indemnified against any loss arising as a result of a failure to process the subscription or redemption or Subscriber's rejection if such information as has been required by the parties referred to has not been provided by Subscriber.

22.     <u>Confidentiality</u>.   The Fund may disclose the information about Subscriber that is contained herein as the Fund deems necessary to comply with applicable law or as required in any suit, action, or proceeding.

23.     <u>Indemnification</u>.  Subscriber agrees to indemnify and hold harmless the Fund and any of its service providers, and any partner, manager, officer, director, shareholder, agent, employee or affiliate thereof, against any loss, liability or expense relating to (a) any misrepresentation or breach of covenant by Subscriber herein or in any other document furnished by Subscriber in connection with its subscription

8

or (b) any action for securities law violations instituted by Subscriber which is finally resolved by judgment against Subscriber.

Subscriber acknowledges that each director and officer of the Fund is entitled to be indemnified out of the assets of the Fund against all costs, losses or expenses arising from mistakes of judgement or any action or inaction that the person reasonably believed to be within the scope of the authority granted to him, provided that such actions or inactions did not constitute gross negligence, willful misconduct or breach of fiduciary duty.

24.   Enforceability.  If any provision hereof is invalid or unenforceable under any applicable law, it shall be deemed inoperable to that extent (and modified to the extent necessary to comply with that law) and its invalidity or unenforceability shall not affect any other provision hereof.

25.   Currencies.  If Subscriber subscribes in a currency other than U.S. Dollars, Subscriber agrees that the Fund may sell such subscription funds at the market rate for that currency and that the Shares will be issued to the value of the proceeds, minus the reasonable costs relating to the sale.

26.   Appointment of Revocable Proxy.  Subscriber hereby designates and appoints the Administrator, with full power of substitution, as its true and lawful proxy and attorney-in-fact for the purpose of voting the Shares subscribed for herein or otherwise acquired as said proxy may determine on any and all matters which may arise at any meeting of shareholders and upon which such Shares could be voted by shareholders present in person at that meeting.  This proxy may be revoked by the owner of record of the Shares hereby subscribed for, either personally or by presentation of a subsequently executed proxy at any meeting of shareholders, or by written notice to the Administrator at the above address (or such other address as the Fund or the Administrator shall furnish in writing to a Shareholder) received before the meeting.

27.   If Subscriber is acting as a Representative.  If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder.  Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder.  Subscriber also agrees to indemnify the Fund, the Investment Manager and the Administrator and their respective directors, members, partners, officers and agents for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained herein, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

If the Subscriber enters into a swap, structured note or other derivative instrument, the return from which is based in whole or in part on the return of the Fund (the "Swap") with a third party (a "Third Party"), the Subscriber represents and warrants that with respect to a Third Party entering into a Swap:  (a) the Third Party is authorized under its constitutional documents (e.g., certificate of incorporation, by-laws, partnership agreement or trust agreement) and applicable law to enter into the Swap and would also be so authorized to invest directly into the Fund; (b) the Third Party has received and reviewed a copy of the Memorandum and the Agreement; (c) the Third Party acknowledges that the Fund and its affiliates are not responsible for the legality, suitability or tax consequences of the Swap and that the Subscriber is not an agent of the Fund; and (d) the Third Party is an "eligible swap participant" and a "qualified eligible person" under Commodity Futures Trading Commission rules, and an "accredited investor" under Regulation D promulgated under the 1933 Act and a "qualified purchaser" under the Investment Company Act of 1940 and is eligible to receive "hot issues" because it is not a restricted person as

9

contemplated under the rules of the National Association of Securities Dealers, Inc. Subscriber also agrees to indemnify the Fund, the Investment Manager and their respective officers and agents for any and all costs, fees and expenses (including legal fees and disbursements, fines, and amounts paid in settlement) in connection with any damages resulting from the Subscriber's misrepresentation or misstatement contained herein. Nothing herein constitutes an agreement or statement by the Fund as to the legality of a Swap or the suitability of a Swap for the Third Party.

28.    Country-Specific Disclosures. Subscriber has reviewed the country-specific disclosures in the Memorandum.

29.    Additional Information. The Fund may request from the Subscriber such additional information as it may deem necessary to evaluate the eligibility of the Subscriber to acquire Shares, and may request from time to time such information as it may deem necessary to determine the eligibility of the Subscriber to hold Shares or to enable the Fund to determine its compliance with applicable regulatory requirements or its tax status, and the Subscriber agrees to provide such information as may reasonably be requested.

Subscriber agrees to notify the Fund promptly if there is any change with respect to any of the information or representations made herein and to provide the Fund with such further information as the Fund may reasonably require.

This Agreement may be executed through the use of separate signature pages or in any number of counterparts. Each counterpart shall, for all purposes, constitute one agreement binding on all the parties, notwithstanding that all parties do not execute the same counterpart.

30.    Subscriber Information and Execution.

a.    Amount of Subscription. U.S. $_____.

b.    Registration of Shares. The Shares issued to Subscriber are to be registered in the Fund's books in the name of (insert name and address):

_____

_____

c.    Written Communications. All written communications from the Fund to Subscriber should be sent to Subscriber at the following address (insert address):

_____

_____

d.    Telephone, Fax and Email. Telephone: _____

Fax: _____ Email: _____

e.    Domicile, Etc. Subscriber, if an individual, is a citizen of _____

_____ and a resident of _____. Subscriber, if an entity, is

organized under the laws of _____ and has its principal place of business in

_____.

      f.    <u>Authorized Persons</u>.  The names of the persons authorized by Subscriber to give and receive instructions between the Fund and Subscriber, together with their signatures, are set forth below.  Such persons are the only persons so authorized by Subscriber until further notice to the Fund by any one of such persons:

| Print Name | Signature |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

      The Administrator and the Fund are each hereby authorized and instructed to accept and execute any instructions in respect of the Shares to which this Agreement relates given by Subscriber in written form or by facsimile.  If instructions are given by Subscriber by facsimile, Subscriber undertakes to send the original letter of instructions to the Administrator and the Fund, and Subscriber agrees to keep each of them indemnified against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon facsimile instructions.  The Administrator and the Fund may rely conclusively upon and shall incur no liability in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons.

      g.    <u>Redemption Payments</u>.  Until further notice from Subscriber to the Fund, signed by any authorized person listed above, redemption or other payments by the Fund to Subscriber should be wired only to Subscriber and only as follows (please print or type):

      Bank name: _____

      Bank address: _____

      ABA or CHIPS number: _____

      Account name: _____

      Account number: _____

      For further credit: _____

h.   <u>Financial Institution Wiring/Paying Subscription Monies.</u>

Name: _____

Address: _____

Name of account at financial institution being debited for subscription payment: _____

Number of such account: _____

i.   <u>Execution.</u>   In witness whereof, Subscriber has executed this Agreement on the date set forth below:

Date: _____, 200_

<u>For individuals</u>

Print name: _____

Signature: _____

<u>For entities</u>

Print name: _____

Print name of authorized signatory: _____

Print title of authorized signatory: _____

Signature: _____

12

## SCHEDULE A

PLEASE GIVE THIS LETTER TO YOUR FINANCIAL INSTITUTION AND HAVE THEM RETURN
IT TO THE ADMINISTRATOR AT THE SAME TIME THAT THE SUBSCRIPTION MONIES ARE
WIRED.

### SAMPLE LETTER

[to be placed on letterhead of the financial institution remitting payment]

Date

**Via mail and facsimile:** (31-20) 572-2610
Fairfield Sentry Limited
Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands

Dear Sirs

**RE:    FAIRFIELD SENTRY LIMITED (the "Fund") - CLASS B**

1.    Name of Remitting Financial Institution:
2.    Address of Remitting Financial Institution:
3.    Name of Customer:
4.    Address of Customer:
5.    We have credited your account at [Bank], Account Number [number] for [amount] by order of [subscriber]
      on [date].

The above information is given in strictest confidence for your own use only and without any guarantee,
responsibility or liability on the part of this institution or its officials.

Yours faithfully,

Signed:                    _____

Full Name:                 _____

Position:                  _____

**For additional information, please contact the Administrator at Citico Fund Services (Europe)
B.V., Telestone 8 – Teleport, Naritaweg 165, 1043 BW Amsterdam, The Netherlands, Telephone:
(31-20) 572-2100, Facsimile:  (31-20) 572-2610.**

A-1

# REDEMPTION REQUEST FORM
## INSTRUCTIONS

### CLASS B SHARES - ONLY

This form should be saved and may be used by a shareholder wishing to redeem Class A Shares in the Fund.  Redeeming shareholders should complete and return this form, including the information on page RR-3.

> FAIRFIELD SENTRY LIMITED
> c/o Citco Fund Services (Europe) B.V.
> Telestone 8 – Teleport
> Naritaweg 165
> 1043 BW Amsterdam
> Telephone:  (31-20) 572-2100
> The Netherlands
> Fax:  (31-20) 572-2610
> **Dated (month, day, year):  _____,_____,_____**

Dear Sirs:

       I hereby request redemption, as defined in and subject to all of the terms and conditions of the Confidential Private Placement Memorandum, as it may be amended from time to time (the "Memorandum"), of Fairfield Sentry Limited (the "Fund"), of ____ Class B Shares, representing [part/all] of my Class B Shares in the Fund.  I understand that redemption will only be effective as of the close of business on the last day of any calendar month, upon at least fifteen (15) calendar days' prior written notice.  Except as otherwise provided in the Memorandum, payment of the redemption proceeds will be made within thirty (30) days after the effective date of redemption.

       I hereby represent and warrant that (i) I am the true, lawful and beneficial owner of the Shares of the Fund to which this Request relates, with full power and authority to request redemption of such Shares; and (ii) I am not a "U.S. Person" (as that term is defined in the  Memorandum).  These Shares are not subject to any pledge or otherwise encumbered in any fashion.  My signature has been guaranteed by a commercial bank acceptable to the Fund.

**Wire Transfer Instructions (to be completed by redeeming shareholder):**

_____

Bank Name

_____

Bank Address

_____

ABA Number

_____

Account Name

_____

Account Number

**SIGNATURES MUST BE IDENTICAL TO NAME(S) IN WHICH SHARES ARE REGISTERED**

**ENTITY SHAREHOLDER** (OR ASSIGNEE)

**INDIVIDUAL SHAREHOLDER(S)**
PARTNERSHIP, CORPORATION (OR ASSIGNEE) OR TRUST

_____
Name of Registered Owner of Shares

_____
Name of Subscriber

_____
Address

_____
Address

_____
Signature (of individual or assignee)

_____
Signature (of partner, authorized  corporate officer or trustee)

_____
Name and Title

_____
Please Print Name and Title

_____
Date

_____
Date

_____
Signature (of individual or assignee)

_____
Signature (of partner, authorized  corporate officer or trustee)

_____
Name and Title

_____
Please Print Name and Title

_____
Date

_____
Date

_____
Signatures guaranteed by:

# REDEMPTION INFORMATION

## SHARE REGISTRATION

_____
Name

_____
Address

_____
Country of Residence

_____
Telephone

_____
Telephone (Evenings)

_____
Fax

## BANK FOR TRANSFER OF REDEMPTION

_____
Name

_____
Address

_____
Country of Residence

_____
Telephone

_____
Telephone (Evenings)

_____
Fax

## MAILING (POST) INFORMATION
(if other than address of registration)

_____
Name

_____
Address

_____
Country of Residence

_____
Telephone

_____
Telephone (Evenings)

_____
Fax

===================================================================

[To be completed by the Fund]

THIS SUBSCRIPTION APPLICATION IS HEREBY ACCEPTED BY FAIRFIELD SENTRY LIMITED

Date: _____, 200_

Name of authorized signatory: _____

Title of authorized signatory: _____

Signature: _____

Subscriber's name: _____

===================================================================

# Short Form Subscription Agreement
## For Existing Shareholders

**CLASS B SHARES - ONLY**

**FAIRFIELD SENTRY LIMITED**
c/o Citco Fund Services (Europe) B.V
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands
Telephone: (31-20) 572-2100
Facsimile: (31-20) 572-2610

## SHORT FORM SUBSCRIPTION AGREEMENT – CLASS B SHARES - ONLY

**THIS APPLICATION IS TO BE USED ONLY BY EXISTING REGISTERED SHAREHOLDERS OF FAIRFIELD SENTRY LIMITED PURCHASING ADDITIONAL SHARES IN THE SAME REGISTERED NAME. <u>IT MAY NOT BE USED BY NEW SUBSCRIBERS.</u>**

The undersigned Subscriber (1) is an existing shareholder in Fairfield Sentry Limited ("Fund"), (2) has previously delivered a fully executed Subscription Agreement to the Fund, and (3) desires to subscribe for additional Class B Shares ("Shares") in the Fund.  By executing in the space below, the undersigned shareholder hereby (1) requests that the Fund accept this short form subscription in lieu of completing an entirely new Subscription Agreement for the additional Shares, (2) reaffirms each and every representation and covenant made by the undersigned in the original Subscription Agreement as of the date hereof, subject only to the changed information set forth below, and (3) represents that if the Subscriber is an entity, the person executing this Agreement has the full power and authority under the Subscriber's governing instruments and has been authorized to do so and the Subscriber has the full power and authority under its governing instruments to acquire Shares of the Fund.

**Please contact the Administrator prior to sending documents or funds to ascertain whether the Fund is accepting additional capital.   New Subscription Information:**

Subscriber: _____

Contribution Date: _____, 200_

Additional Contribution Amount: U.S. $_____ Class B Shares

Changes to Subscription Agreement:     [ ] None

                                               [ ] Yes, as follows:

_____

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement on this ___ day of _____, 200_.

**Corporate, Partnership, Trust or Account Subscribers**        **Individual Subscribers**

_____      _____

Name of Entity (Print)                                     Name (Print)

By: _____              _____

            Signature                                   Signature

_____        _____

            Name (Print)                           Name of Joint Purchaser, If Any (Print)

_____        _____

            Title                                      Signature

Telephone: _____        Telephone: _____

Fax: _____        Fax: _____

SUBSCRIPTION ACCEPTED AS OF _____, 200_.

RR-3

FAIRFIELD SENTRY LIMITED

By: _____

    Name: _____

    Title: _____

EXHIBIT 10

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
E-mail: dsheehan@bakerlaw.com
Marc E. Hirschfield
E-mail: mhirschfield@bakerlaw.com
Mark A. Kornfeld
E-mail: mkornfeld@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | **AMENDED COMPLAINT** |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> FAIRFIELD SENTRY LIMITED, | Adv. Pro. No. 09-01239 (BRL) |

GREENWICH SENTRY, L.P.,
GREENWICH SENTRY PARTNERS, L.P.,
FAIRFIELD SIGMA LIMITED, FAIRFIELD
LAMBDA LIMITED, CHESTER GLOBAL
STRATEGY FUND LIMITED, CHESTER
GLOBAL STRATEGY FUND, IRONGATE
GLOBAL STRATEGY FUND LIMITED,
FAIRFIELD GREENWICH FUND
(LUXEMBOURG), FAIRFIELD
INVESTMENT FUND LIMITED,
FAIRFIELD INVESTORS (EURO)
LIMITED, FAIRFIELD INVESTORS
(SWISS FRANC) LIMITED, FAIRFIELD
INVESTORS (YEN) LIMITED, FAIRFIELD
INVESTMENT TRUST, FIF ADVANCED,
LTD., SENTRY SELECT LIMITED,
STABLE FUND, FAIRFIELD
GREENWICH LIMITED, FAIRFIELD
GREENWICH (BERMUDA), LTD.,
FAIRFIELD GREENWICH ADVISORS
LLC, FAIRFIELD GREENWICH GP, LLC,
FAIRFIELD GREENWICH PARTNERS,
LLC, FAIRFIELD HEATHCLIFF CAPITAL
LLC, FAIRFIELD INTERNATIONAL
MANAGERS, INC., FAIRFIELD
GREENWICH (UK) LIMITED,
GREENWICH BERMUDA LIMITED,
CHESTER MANAGEMENT CAYMAN
LIMITED, WALTER NOEL, JEFFREY
TUCKER, ANDRÉS PIEDRAHITA, MARK
MCKEEFRY, DANIEL LIPTON, AMIT
VIJAYVERGIYA, GORDON MCKENZIE,
RICHARD LANDSBERGER, PHILIP
TOUB, CHARLES MURPHY, ROBERT
BLUM, ANDREW SMITH, HAROLD
GREISMAN, GREGORY BOWES,
CORINA NOEL PIEDRAHITA, LOURDES
BARRENECHE, CORNELIS BOELE,
SANTIAGO REYES, JACQUELINE
HARARY

Defendants.

I.      NATURE OF THE ACTION ............................................................. 1

II.     JURISDICTION AND VENUE ......................................................... 4

III.    BACKGROUND ............................................................................... 5

IV.     TRUSTEE'S POWERS AND STANDING ..................................... 10

V.      DEFENDANTS .............................................................................. 12
        A.      The Feeder Funds................................................................ 12
        B.      FGG Affiliates .................................................................... 16

VI.     FGG AND ITS HISTORICAL RELATIONSHIP WITH FGG ........................ 79
        A.      Noel and Tucker Meet Madoff and Make Their First Investments
                With BLMIS ........................................................................ 81
        B.      Noel and Tucker Expand FGG's Offerings to U.S. Investors and
                Piedrahita Joins the Partnership ......................................... 81
        C.      FGG's Operations .............................................................. 83

VII.    THE DEFENDANTS' ROLE IN FACILITATING THE FRAUD .................... 84
        A.      The Defendants' Investment Strategy................................ 85
        B.      The Defendants Facilitate the Scheme Through Marketing and
                Sales ................................................................................... 87
        C.      The Defendants Serve as a Gatekeeper for Madoff to Ensure
                Investors Would Not Find Out the Truth ............................ 87
        D.      FGG Conspires with Madoff to Hide from the SEC Madoff's True
                Involvement with the Feeder Funds..................................... 90
        E.      The Defendants Deceive Their Investors by Telling Them They
                Were Performing Extensive and Top of the Line Due Diligence,
                But They Were Doing No Such Thing .................................. 94

VIII.   THE DEFENDANTS WERE CONSTANTLY FACED WITH
        EVIDENCE OF A FRAUD, BUT CHOSE NOT TO REVEAL THAT
        EVIDENCE ..................................................................................... 98
        A.      The Defendants Learn that BLMIS's Auditor is a Single Person in
                a Strip Mall Office ............................................................. 99
        B.      The Defendants Regularly Received Information That Made It
                Clear Madoff Was Lying About His Alleged Trades and
                Performance ...................................................................... 105

IX.     THE DEFENDANTS WERE WILLING TO IGNORE THE RED
        FLAGS; THEIR INVESTORS AND CONSULTANT WERE NOT .............. 130
        A.      FGG Does Everything It Can to Mollify Investor Concerns as
                Opposed to Performing Independent Inquiry Into the Possibility of
                Fraud ................................................................................. 131

i

B.      FGG's Consultant Tells the Defendants Madoff May Be a Fraud ........ 133

X.      DESPITE YEARS OF SEEING INDICIA OF FRAUD, THE
        DEFENDANTS CONTINUED TO FUNNEL BILLIONS TO MADOFF ....... 136

        A.      2006:  GS Is Expanded and GSP Is Created .......................................... 136

        B.      2007:  Leveraged Note Programs ......................................................... 136

        C.      2008:  The Emerald Funds ................................................................... 137

XI.     THE AFTERMATH ......................................................................................... 139

XII.    PEOPLE WILL TELL:  OH THIS WAS FRAUD, THERE IS NOTHING
        WE COULD HAVE DONE ............................................................................. 141

        A.      The Barron's and MAR/Hedge Articles Are Published in 2001 .......... 142

        B.      Tightening Industry Standards ............................................................. 144

        C.      It Was All Over the Street:  Madoff Was Suspected of Being a
                Fraud ................................................................................................... 146

XIII.   THE DEFENDANTS' MOTIVATION WAS BOUNDLESS AVARICE ....... 154

XIV.    THE TRANSFERS ........................................................................................... 156

        A.      Transfers from BLMIS to the Feeder Funds ......................................... 156

        B.      Transfers from the Feeder Funds to the FGG Affiliates,
                Management Defendants, and Sales Defendants ................................... 158

COUNT ONE:  TURNOVER AND ACCOUNTING – 11 U.S.C. § 542 ..................... 160

COUNT TWO:  PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE)
        – 11 U.S.C. §§ 547(b), 550(a)(1), AND 551 ...................................... 161

COUNT THREE:  PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE)
        – 11 U.S.C. §§ 547(b), 550(a)(1), AND 551 ...................................... 162

COUNT FOUR:  PREFERENTIAL TRANSFERS (SUBSEQUENT
        TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a)(2), AND 551 ........................ 164

COUNT FIVE:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
        – 11 U.S.C. §§ 548(a)(1)(A), 550(a)(1), AND 551 ......................... 166

COUNT SIX:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
        – 11 U.S.C. §§ 548(a)(1)(A), 550(a)(1), AND 551 ......................... 167

COUNT SEVEN:  FRAUDULENT TRANSFERS (SUBSEQUENT
        TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(A), 550(a)(2), AND 551 .............. 168

COUNT EIGHT:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
        – 11 U.S.C. §§ 548(a)(1)(B) , 550(a)(1), AND 551 ............................ 170

COUNT NINE:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
        – 11 U.S.C. §§ 548(a)(1)(B) , 550(a)(1), AND 551 ......................... 171

COUNT TEN:  FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
– 11 U.S.C. §§ 548(a)(1)(B) , 550(a)(2), AND 551...........................................172

COUNT ELEVEN:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
– NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ..........................174

COUNT TWELVE:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
– NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ..........................175

COUNT THIRTEEN: FRAUDULENT TRANSFER (SUBSEQUENT
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND
551...........................................................................................................177

COUNT FOURTEEN:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
– NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ..........................178

COUNT FIFTEEN:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
– NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ..........................179

COUNT SIXTEEN:  FRAUDULENT TRANSFER (SUBSEQUENT
TRANSFEREE) –NEW YORK DEBTOR AND CREDITOR LAW §§
273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND
551...........................................................................................................180

COUNT SEVENTEEN:  FRAUDULENT TRANSFERS (INITIAL
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ...........181

COUNT EIGHTEEN:  FRAUDULENT TRANSFERS (INITIAL
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ...........182

COUNT NINETEEN:  FRAUDULENT TRANSFERS (SUBSEQUENT
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND 551 ...........183

COUNT TWENTY:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
– NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR
279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ........................................185

COUNT TWENTY-ONE:  FRAUDULENT TRANSFERS (INITIAL
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ...........186

COUNT TWENTY-TWO:  FRAUDULENT TRANSFERS (SUBSEQUENT
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), 551....................187

COUNT TWENTY-THREE:  UNDISCOVERED FRAUDULENT TRANSFERS
(INITIAL TRANSFEREE) – NEW YORK CIVIL PROCEDURE LAW
AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR
LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544,
550(a)(1), AND 551 ........................................................................................ 188

COUNT TWENTY-FOUR:  UNDISCOVERED FRAUDULENT TRANSFERS
(INITIAL TRANSFEREE) – NEW YORK CIVIL PROCEDURE LAW
AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR
LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544,
550(a)(1), AND 551 ........................................................................................ 190

COUNT TWENTY-FIVE:  UNDISCOVERED FRAUDULENT TRANSFERS
(SUBSEQUENT TRANSFEREE) – NEW YORK CIVIL PROCEDURE
LAW AND RULES 203(g), 213(8), NEW YORK DEBTOR AND
CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§
544, 550(a)(2), AND 551 ................................................................................ 191

COUNT TWENTY-SIX:  OBJECTION TO THE DEFENDANTS' CUSTOMER
CLAIMS ........................................................................................................... 193

COUNT TWENTY-SEVEN:  UNJUST ENRICHMENT ........................................... 194

COUNT TWENTY-EIGHT:  CONVERSION............................................................. 195

COUNT TWENTY-NINE:  MONEY HAD AND RECEIVED .................................. 196

COUNT THIRTY:  AIDING AND ABETTING FRAUD............................................ 197

COUNT THIRTY-ONE:  AIDING AND ABETTING BREACH OF
FIDUCIARY DUTY ........................................................................................ 208

1.      Irving H. Picard, Esq. (the "Trustee"), as trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act §§ 78aaa *et seq.*, by and through his undersigned counsel, for this Amended Complaint, states as follows:

## I.      NATURE OF THE ACTION

2.      The Defendants named in this Amended Complaint worked in conjunction with BLMIS and Madoff to commit, and exponentially expand, the single largest financial fraud in history.  Serving as one of Madoff's largest marketing and investor relations arms, the Defendants were active participants in, and substantially aided, enabled, and helped sustain Madoff's Ponzi scheme.  Every dollar the Defendants purportedly "earned," and every dollar they kept to unjustly enrich themselves, was *stolen money*.  Every asset the Defendants own that originated from the purported management and performance fees drawn from fictitious returns is in fact *Customer Property*, as defined by statute,[1] and must be returned to the Trustee for equitable distribution to BLMIS customers.

3.      This is a case in which sophisticated hedge fund investment advisers and promoters engaged in a systematic, purposeful enterprise with Madoff to maintain and profit from a fraud and wrongly enrich themselves.  The Defendants had actual and constructive knowledge of Madoff's fraud and cannot deny their knowledge of many "red flags" indicating the likelihood of that fraud.  This case goes well beyond "red flags."

---

[1] SIPA § 78*lll*(4) defines "Customer Property" as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

1

4.      The Defendants did not properly, independently, and reasonably perform due diligence into the many red flags strongly indicating Madoff was a fraud.  The Defendants did exactly the opposite.  The Defendants misled regulators, investors, and potential investors and generally looked the other way, focusing only on self-interest and profit.  Among many other things, the Defendants:

a.      failed to perform as independent investment advisers and fiduciaries, serving by their own admission as an extension of BLMIS's marketing and customer relations operation;

b.      knowingly and explicitly conspired with Madoff to deceive the Securities Exchange Commission (the "SEC") by misrepresenting the true nature of their respective investment advisory roles and by intentionally misstating Madoff's role;

c.      ascribed inconsistent roles to Madoff depending on the circumstances. Sometimes the Defendants claimed Madoff was merely a broker-dealer executing the Defendants' own investment strategy.  At other times, the Defendants said Madoff was an investment adviser acting as an agent. And still at other times, the Defendants claimed BLMIS was acting as a principal in performing investment adviser functions;

d.      provided false security to their investors through false marketing materials, and shielded Madoff from direct inquiries.  The Defendants discouraged customers, potential customers, and others from performing direct due diligence on Madoff, intentionally removed references to him from their offering memoranda and marketing materials, and in all respects served as a "gatekeeper" in order to prevent unwanted inquiries;

e.      performed no real due diligence on Madoff's one-person auditing firm before or even after one of their investors likened BLMIS to another Ponzi scheme.  Some of the individual Defendants not only ignored the fact that Madoff's auditing firm lied to them, but perpetrated their own fraud by knowingly misleading investors and potential investors about the auditing firm's size, reputation, and capabilities;

f.      ignored basic, standard industry statistical analyses of Madoff's consistent returns over nearly two decades that should have led them to reasonably conclude the returns were manufactured.  The lack of any volatility ever, even in often volatile markets, was an obvious sign of fraud.  The Defendants utilized the consistent lack of volatility as a banner to promote the success of their own funds;