**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| In re: | **Chapter 15 Case** |
| **Fairfield Sentry Limited, et al.,** | **Case No. 10-13164 (BRL)** |
| **Debtors in Foreign Proceedings.** | **Jointly Administered** |

---

|  |  |
|---|---|
| **Fairfield Sentry Limited (In Official Liquidation), acting by and through the Foreign Representatives thereof,** | |
| **Plaintiffs,** | |
| **-against-** | **Adv. Pro. No. 10-03633 (BRL)** |
| **HSBC Private Bank (Suisse) SA and Beneficial Owners of the Accounts Held in the Name of HSBC Private Bank (Suisse) SA 1-1000,** | |
| **Defendants.** | |

---

|  |  |
|---|---|
| **Fairfield Sentry Limited (In Official Liquidation), acting by and through the Foreign Representatives thereof,** | |
| **Plaintiffs,** | |
| **-against-** | |
| **HSBC Securities Services (Luxembourg) SA and Beneficial Owners of the Accounts Held in the Name of HSBC Securities Services (Luxembourg) SA,** | **Adv. Pro. No. 10-03630 (BRL)** |
| **Defendants.** | |

| | |
|---|---|
| Fairfield Sentry Limited (In Official Liquidation), acting by and through the Foreign Representatives thereof, ) ) ) ) | |
| Plaintiffs, ) ) | |
| -against- ) ) | Adv. Pro. No. 10-03629 (BRL) |
| FS/HSBC Private Banking Nom and Beneficial Owners of the Accounts Held in the Name of FS/HSBC Private Banking Nom 1-1000, ) ) ) ) ) | |
| Defendants. ) ) | |

| | |
|---|---|
| Fairfield Sentry Limited, et al. (In Official Liquidation), acting by and through the Foreign Representatives thereof, ) ) ) ) ) | |
| Plaintiffs, ) ) | |
| -against- ) ) | Adv. Pro. No. 10-03628 (BRL) |
| Robinson & Co. and Beneficial Owners of the Accounts Held in the Name of Robinson & Co. 1-1000, ) ) ) ) | |
| Defendants. ) ) | |

---

Fairfield Sentry Limited, et al. (In Official
Liquidation), acting by and through the
Foreign Representatives thereof,

    Plaintiffs,

  -against-

HSBC Private Bank (Guernsey) LTD and
Beneficial Owners of the Accounts Held in the
Name of HSBC Private Bank
(Guernsey) LTD 1-1000,

    Defendants.

---

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Adv. Pro. No. 10-03631 (BRL)

---

Fairfield Sentry Limited, et al. (In Official
Liquidation), acting by and through the
Foreign Representatives thereof,

    Plaintiffs,

  -against-

Caceis Bank Luxembourg and Beneficial
Owners of the Accounts Held in the Name of
Caceis Bank Luxembourg 1-1000,

    Defendants.

---

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Adv. Pro. No. 10-03624 (BRL)

**Fairfield Sentry Limited (In Official Liquidation),**
**acting by and through the**
**Foreign Representatives thereof,**

    **Plaintiffs,**

   **-against-**

**CDC IXIS and Beneficial Owners of the Accounts**
**Held in the Name of CDC IXIS 1-1000,**

    **Defendants.**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Adv. Pro. No. 10-03754 (BRL)**

---

**Fairfield Sentry Limited (In Official Liquidation),**
**acting by and through the**
**Foreign Representatives thereof,**

    **Plaintiffs,**

   **-against-**

**Citibank NA London and Beneficial Owners of**
**the Accounts Held in the Name of**
**Citibank NA London 1-1000,**

    **Defendants.**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Adv. Pro. No. 10-03622 (BRL)**

---

**Fairfield Sentry Limited, et al. (In Official**
**Liquidation), acting by and through the**
**Foreign Representatives thereof,**

    **Plaintiffs,**

   **-against-**

**Citibank (Switzerland) Zurich, et al.**

    **Defendants.**

)
)
)
)
)
)
)
)
)
)
)
)
)

**Adv. Pro. No. 10-03640 (BRL)**

_____

Fairfield Sentry Limited (In Official Liquidation), )
acting by and through the )
Foreign Representatives thereof, )
)
          **Plaintiffs,** )
)
          **-against-** )    **Adv. Pro. No. 10-03634 (BRL)**
)
Zurich Capital Markets Company and )
Beneficial Owners of the Accounts Held in the )
Name of Zurich Capital Markets )
Company 1-1000, et al., )
)
          **Defendants.** )
_____

_____

Fairfield Sentry Limited, et al. (In Official )
Liquidation), acting by and through the )
Foreign Representatives thereof, )
)
          **Plaintiffs,** )
)
          **-against-** )    **Adv. Pro. No. 10-03627 (BRL)**
)
BNP Paribas Securities Services )
Luxembourg and Beneficial Owners of the )
Accounts Held in the Name of BNP Paribas )
Securities Services Luxembourg 1-1000, )
)
          **Defendants.** )
_____

|  |  |  |
|---|---|---|
| Fairfield Sentry Limited (In Official Liquidation), acting by and through the Foreign Representatives thereof, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| -against- | ) ) | Adv. Pro. No. 10-03626 (BRL) |
| BNP Paribas Luxembourg SA and Beneficial Owners of the Accounts Held in the Name of BNP Paribas Luxembourg SA 1-1000, | ) ) ) ) ) | |
| Defendants. | ) ) | |

|  |  |  |
|---|---|---|
| Fairfield Sentry Limited, et al. (In Official Liquidation), acting by and through the Foreign Representatives thereof, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| -against- | ) ) | Adv. Pro. No. 10-03636 (BRL) |
| ABN AMRO Schweiz AG, et al., | ) ) ) | |
| Defendants. | ) ) | |

| | |
|---|---|
| Fairfield Sentry Limited (In Official Liquidation), acting by and through the Foreign Representatives thereof, <br><br> Plaintiffs, <br><br> -against- <br><br><br> ABN AMRO Schweiz AG, et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

        **Adv. Pro. No. 10-03635 (BRL)**

## DECLARATION OF CHARLES J. KEELEY, III, IN SUPPORT OF MOVING DEFENDANTS' MOTION TO REMAND AND FOR ABSTENTION

I, Charles J. Keeley, III, declare as follows:

1. I am a member of the bar of this Court and an associate at Cleary Gottlieb Steen & Hamilton LLP, counsel for Defendants HSBC Private Bank (Suisse) SA, HSBC Securities Services (Luxembourg) SA, HSBC Bank USA NA, HSBC Private Bank (C.I.) Limited, HSBC Private Banking Nominee 1 (Jersey) Limited, Robinson & Co., Caceis Bank Luxembourg, CDC IXIS, Citibank NA London, Citibank (Switzerland) AG, Citigroup, Citivic Nominees Limited, BNP Paribas Securities Services Luxembourg, BGL BNP Paribas, BNP Paribas (Suisse) SA, BNP Paribas (Suisse) SA Ex Fortis and BNP Paribas (Suisse) SA Private (collectively, the "Moving Defendants"), in the above-captioned actions (the "Actions"). I respectfully submit this declaration in support of Moving Defendants' Motion to Remand and for Abstention (the "Motion").

2. Annexed hereto, at the number tabs indicated, are true and correct copies of the following documents referred to in the Memorandum In Support of the Motion:

| **Exhibit 1** | Request for Judicial Intervention, *Fairfield Sentry Limited v. Safra Nat'l Bank of New York*, Index No. 650645/2010 (N.Y. Sup. Ct. Aug. 19, 2010) (Docket No. 7) |
|---|---|
| **Exhibit 2** | Notice, Claim No.: BVIHC (COM) 404/2009 Between Fairfield Sentry Limited and Banco General SA/Banca Privada et al. (E. Caribbean Sup. Ct., High Ct. of Justice, Virgin Islands, Commercial Div. Nov. 18, 2009) |
| **Exhibit 3** | Complaint, *Fairfield Sentry Ltd. v. Fairfield Greenwich Grp.*, No. 601687/2009 (N.Y. Sup. Ct. May 29, 2009) (Docket No. 2) |
| **Exhibit 4** | Fairfield Sentry Ltd.'s Mem. of Law In Support of Its Motion to Remand ("Fairfield Sentry's Remand Motion"), *Fairfield Sentry Ltd v. Fairfield Greenwich Grp.*, 09 Civ. 5650 (VM)(THK) (S.D.N.Y. July 10, 2009) (Docket No. 10) |
| **Exhibit 5** | Decision Granting Fairfield Sentry's Remand Motion, *Fairfield Sentry Ltd. v. Fairfield Greenwich Grp.*, 09 Civ. 5650 (VM)(THK) (S.D.N.Y. Dec. 23, 2009) (Docket No. 89) |
| **Exhibit 6** | Fairfield Sigma Limited, Confidential Private Placement Memorandum (Feb. 16, 2006), attached as Ex. A to the Declaration of Kenneth Krys, *In re Fairfield Sentry Ltd., et al.*, No. 10-13164 (BRL) (Bankr. S.D.N.Y. June 14, 2010) (Docket No. 3) |
| **Exhibit 7** | Amended Complaint, *Picard v. Fairfield Sentry Ltd., et al.*, No. 09-1239 (BRL) (Bankr. S.D.N.Y. July 20, 2010) (Docket No. 23) (excerpted) |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 4, 2010.

_____
Charles J. Keeley, III

## **EXHIBIT 1**

# REQUEST FOR JUDICIAL INTERVENTION

Supreme Court  COURT. New York  COUNTY INDEX NO. DATE PURCHASED:

650645/2010  6/16/2010

| For Clerk Only |
|---|
| IAS entry date |
| Judge Assigned |
| RJI Date |

PLAINTIFF(S):
FAIRFIELD SENTRY LIMITED,
FAIRFIELD SIGMA LIMITED

DEFENDANT(S):
SAFRA NATIONAL BANK OF NEW YORK,
BENEFICIAL OWNERS OF THE ACCOUNTS HELD IN THE NAME
OF SAFRA NATIONAL BANK OF NEW YORK 1-1000

Date issue joined: _____  Bill of particulars served (Y/N):  [  ] Y  [ **x** ] N

## NATURE OF JUDICIAL INTERVENTION (check ONE box only AND enter information)

[ **x** ]  Request for preliminary conference

[  ]  Note of issue and/or certificate of readiness

[  ]  Notice of motion (return date:_____)
Relief sought _____

[  ]  Order to show cause
(clerk enter return date:_____)
Relief sought

[  ]  Other ex parte application (specify: _____)

[  ]  Notice of petition (return date:_____)
Relief sought _____

[  ]  Notice of medical or dental malpractice
action (specify:_____)

[  ]  Statement of net worth

[  ]  Writ of habeas corpus

[  ]  Other (specify: _____)

## NATURE OF ACTION OR PROCEEDING (Check ONE box only)

### MATRIMONIAL

| | | |
|---|---|---|
| [  ] | Contested | -CM |
| [  ] | Uncontested | -UM |

### COMMERCIAL

| | | |
|---|---|---|
| [  ] | Contract | -CONT |
| [  ] | Corporate | -CORP |
| [  ] | Insurance (where insurer is a party, except arbitration) | -INS |
| [  ] | UCC (including sales, negotiable instruments) | -UCC |
| [ **x** ] | *Other Commercial See Attached | -OC |

### REAL PROPERTY

| | | |
|---|---|---|
| [  ] | Tax Certiorari | -TAX |
| [  ] | Foreclosure | -FOR |
| [  ] | Condemnation | -COND |
| [  ] | Landlord/Tenant | -LT |
| [  ] | *Other Real Property | -ORP |

### OTHER MATTERS

| | | |
|---|---|---|
| [  ] | *_____ | -OTH |

## TORTS

Malpractice

| | | |
|---|---|---|
| [  ] | Medical/Podiatric | -MM |
| [  ] | Dental | -DM |
| [  ] | *Other Professional | -OPM |
| [  ] | Motor Vehicle | -MV |
| [  ] | *Products Liability | -PL |
| [  ] | Environmental | -EN |
| [  ] | Asbestos | -ASB |
| [  ] | Breast Implant | -BI |
| [  ] | *Other Negligence | -OTN |
| [  ] | *Other Tort (including intentional) | -OT |

### SPECIAL PROCEEDINGS

| | | |
|---|---|---|
| [  ] | Art. 75 (Arbitration) | -ART75 |
| [  ] | Art. 77 (Trusts) | -ART77 |
| [  ] | Art. 78 | -ART78 |
| [  ] | Election Law | -ELEC |
| [  ] | Guardianship (MHL Art. 81) | -GUARD81 |
| [  ] | *Other Mental Hygiene | -MHYG |
| [  ] | *Other Special Proceeding | -OSP |

**Check "YES" or "NO" for each of the following questions:**

Is this action/proceeding against a

| YES | NO | | YES | NO | |
|---|---|---|---|---|---|
| | [ ✗ ] | Municipality (Specify_____) | | [ ✗ ] | Public Authority: (Specify_____) |

| YES | NO | |
|---|---|---|
| ✗ | [ ] | Does this action/proceeding seek equitable relief? |
| | [ ✗ ] | Does this action/proceeding seek recovery for personal injury? |
| | [ ✗ ] | Does this action/proceeding seek recovery for property damage? |

**Pre-Note Time Frames:**
(This applies to all cases except contested matrimonials and tax certiorari cases)

Estimated time period for case to be ready for trial (from filing of RJI to filing of Note of Issue):

Expedited: 0-8 months          Standard: 9-12 months          ✗ Complex: 13-15 months

**Contested Matrimonial Cases Only:** (Check and give date)

Has summons been served?          No          Yes, Date _____

Was a Notice of No Necessity filed?          No          Yes, Date _____

**ATTORNEY(S) FOR PLAINTIFF(S):**

| Self Rep.* | Name | Address | Phone # |
|---|---|---|---|
| | Brown Rudnick LLP | Seven Times Square, NY, NY 10036 | (212) 209-4800 |

**ATTORNEY(S) FOR DEFENDANT(S):**

| Self Rep.* | Name | Address | Phone # |
|---|---|---|---|
| | Sullivan & Cromwell LLP | 125 Broad Street, NY, NY 10004 | (212) 558-4000 |

*Self Represented: parties representing themselves, without an attorney, should check the "Self Rep." box and enter their name, address, and phone # in the space provided above for attorneys.

**INSURANCE CARRIERS:**

**RELATED CASES: (IF NONE, write "NONE" below):**

| Title | Index # | Court | Nature of Relationship |
|---|---|---|---|
| See attached | | | |

I AFFIRM UNDER PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.

Dated:  August 18, 2010

_____
(SIGNATURE)
Robinson B. Lacy, Sullivan & Cromwell LLP

_____
(PRINT OR TYPE NAME)
Safra National Bank of New York

_____
ATTORNEY FOR

ATTACH RIDER SHEET IF NECESSARY TO PROVIDE REQUIRED INFORMATION

## Attachment to Request for Judicial Intervention

### Nature of Action or Proceeding

In the present action, Plaintiffs Fairfield Sentry Limited and Fairfield Sigma Limited (the "Fairfield Funds") seek to recover money they paid to redeem their own shares on the ground that they were mistaken concerning their net asset values. They allege that they were mistaken concerning their net asset value because they were misled concerning the value of their investments by Bernard L. Madoff Investment Securities LLC ("BLMIS").

### Related Cases

Safra National Bank of New York is aware of the following related actions, all of which are pending in this Court. The Fairfield Funds have recently commenced additional related actions in the United States Bankruptcy Court for the Southern District of New York.

| In the following action, Fairfield Sentry Limited seeks to recover the management and performance fees that it paid to the entities and individuals responsible for the operation of the fund on the ground that those payments were based on its net asset value, and its net asset value was improperly inflated based on misleading statements by BLMIS. | |
| --- | --- |
| **Index No.** | **Case** |
| 601687/2009 | FAIRFIELD SENTRY LIMITED v. FAIRFIELD GREENWICH GROUP |

| The following two actions are derivative actions in which investors in funds affiliated with the Fairfield Funds assert that persons and entities responsible for the management of the funds (and, on information belief, management of the Fairfield Funds) breached their duties to the funds in connection with the funds' investments with BLMIS. Among other things, plaintiffs in these actions seek to recover fees paid to the defendants on the ground that those payments were based on the funds' net asset value, and their net asset values were improperly inflated based on misleading statements by BLMIS. The plaintiffs also allege that the defendants failed to perform proper due diligence on BLMIS. | |
| --- | --- |
| **Index No.** | **Case** |
| 600469/2009 | FERBER v. FAIRFIELD GREENWICH GROUP |
| 600498/2009 | PIERCE v. FAIRFIELD GREENWICH GROUP |

| The following action is a derivative action in which investors in Fairfield Sentry Limited assert that persons and entities responsible for the management of the fund breached their duties to the fund in connection with the fund's investments with BLMIS. Among other things, plaintiffs in this action seek to recover fees paid to the defendants on the ground that those payments were based on the fund's net asset value, and their net asset values were improperly inflated based on misleading statements by BLMIS. The plaintiffs also allege that the defendants failed to perform proper due diligence on BLMIS. | |
| --- | --- |
| 601511/2009 | MORNING MIST HOLDINGS LIMITED v. FAIRFIELD GREENWICH GROUP |

The following actions were commenced by the filing of a summons and notice, and complaints have only been filed in a small number of these cases. Based on the available information, in each of these cases the Fairfield Funds seek to recover money they paid to redeem their own shares on the ground that they were mistaken concerning their net asset values, as in the present action.

| Index No. | Case |
|-----------|------|
| 650228/2010 | FAIRFIELD SENTRY LIMITED v. HSBC SECURITIES SERVICES (LUXEMBOURG) S.A. |
| 650273/2010 | FAIRFIELD SENTRY LIMITED v. PICTET & CIE |
| 650274/2010 | FAIRFIELD SENTRY LIMITED v. BANQUE SUDAMERIS |
| 650275/2010 | FAIRFIELD SENTRY LIMITED v. MERRILL LYNCH BANK (SUISSE) SA |
| 650276/2010 | FAIRFIELD SENTRY LIMITED v. ZCM ASSET HOLDING COMPANY (BERMUDA) LIMITED |
| 650277/2010 | FAIRFIELD SENTRY LIMITED v. CITCO GLOBAL CUSTODY NV |
| 650278/2010 | FAIRFIELD SENTRY LIMITED v. SG HAMBROS BANK & TRUST (GUERNSEY) LTD. |
| 650279/2010 | FAIRFIELD SENTRY LIMITED v. HSBC PRIVATE BANK (SUISSE) SA |
| 650280/2010 | FAIRFIELD SENTRY LIMITED v. CREDIT SUISSE LONDON NOMINEES LTD. |
| 650281/2010 | FAIRFIELD SENTRY LIMITED v. EFG BANK |
| 650285/2010 | FAIRFIELD SENTRY LIMITED v. FIDULEX MANAGEMENT |
| 650286/2010 | FAIRFIELD SENTRY LIMITED v. HYPOWISS PRIVATE BANK GENEVE SA |
| 650287/2010 | FAIRFIELD SENTRY LIMITED v. ALTVANTAGE ABSOLUTE RETURN MASTER FUND LTD. |
| 650288/2010 | FAIRFIELD SENTRY LIMITED v. JAIME ROA |
| 650289/2010 | FAIRFIELD SENTRY LIMITED v. ATLANTIC SECURITY BANK |
| 650290/2010 | FAIRFIELD SENTRY LIMITED v. BANCO ATLANTICO (BAHAMAS) |
| 650291/2010 | FAIRFIELD SENTRY LIMITED v. BANK JULIUS BAER ZURICH |
| 650292/2010 | FAIRFIELD SENTRY LIMITED v. BLUBANK LTD. |
| 650293/2010 | FAIRFIELD SENTRY LIMITED v. KREDIETBANK FOR CUSTOMERS ACCOUNT |
| 650294/2010 | FAIRFIELD SENTRY LIMITED v. CREDITO PRIVATO COMMERCIALE SA |
| 650295/2010 | FAIRFIELD SENTRY LIMITED v. LLOYDS TSB BANK/MIAMI |
| 650296/2010 | FAIRFIELD SENTRY LIMITED v. DELTA NATIONAL BANK AND TRUST CO. |
| 650297/2010 | FAIRFIELD SENTRY LIMITED v. DEUTSCHE BANK TRUST |

| | |
|---|---|
| | COMPANY AMERICA |
| 650298/2010 | FAIRFIELD SENTRY LIMITED v. QUILVEST SWITZERLAND LTD. |
| 650299/2010 | FAIRFIELD SENTRY LIMITED v. SICO LTD |
| 650300/2010 | FAIRFIELD SENTRY LIMITED v. EFG BANK EUROPEAN FINANCIAL GROUP |
| 650301/2010 | FAIRFIELD SENTRY LIMITED v. SNS GLOBAL CUSTODY |
| 650302/2010 | FAIRFIELD SENTRY LIMITED v. UKFP (ASIA) NOMINEES |
| 650303/2010 | FAIRFIELD SENTRY LIMITED v. UBS PRIVATE BANKING NOMINEES |
| 650304/2010 | FAIRFIELD SENTRY LIMITED v. WALL STREET SECURITIES SA |
| 650305/2010 | FAIRFIELD SENTRY LIMITED v. WESTAM LTD. |
| 650309/2010 | FAIRFIELD SENTRY LIMITED v. WESTPORT CAPITAL INVESTMENTS |
| 650310/2010 | FAIRFIELD SENTRY LIMITED v. BK MORGAN STANLEY AG |
| 650311/2010 | FAIRFIELD SENTRY LIMITED v. SG PRIVATE BANKING (SUISSE) SA |
| 650312/2010 | FAIRFIELD SENTRY LIMITED v. SOCGEN NOMINEES (UK) LIMITED |
| 650313/2010 | FAIRFIELD SENTRY LIMITED v. HAMBROS GUERNSEY NOMINEES |
| 650314/2010 | FAIRFIELD SENTRY LIMITED v. BANCO SANTANDER (GUERNSEY) LIMITED |
| 650315/2010 | FAIRFIELD SENTRY LIMITED v. ZURICH CAPITAL MARKETS COMPANY |
| 650316/2010 | FAIRFIELD SENTRY LIMITED v. BENEFICIAL OWNERS OF THE ACCOUNTS HELD IN THE NAME OF CGC (NA) 1-1000 |
| 650329/2010 | FAIRFIELD SENTRY LIMITED v. BANCO ATLANTICO GIBRALTAR |
| 650330/2010 | FAIRFIELD SENTRY LIMITED v. CITIBANK (SWITZERLAND) ZURICH |
| 650352/2010 | FAIRFIELD SENTRY LIMITED v. LACROZE JUAN JOSE MR |
| 650396/2010 | FAIRFIELD SENTRY LIMITED v. CAPITAL FAR EAST LIMITED |
| 650400/2010 | FAIRFIELD SENTRY LIMITED v. LOMBARD ODIER DARIER HENTSCH & CIE |
| 650405/2010 | FAIRFIELD SENTRY LIMITED v. GIOBELA LTD. |
| 650406/2010 | FAIRFIELD SENTRY LIMITED v. ARBITRAL FINANCE INC |
| 650407/2010 | FAIRFIELD SENTRY LIMITED v. BROWN BROTHERS HARRIMAN & CO |
| 650408/2010 | FAIRFIELD SENTRY LIMITED v. LOANA LTD |
| 650409/2010 | FAIRFIELD SENTRY LIMITED v. AXA ISLE OF MAN A/C L & C |
| 650410/2010 | FAIRFIELD SENTRY LIMITED v. CITIBANK NA LONDON |

| 650411/2010 | FAIRFIELD SENTRY LIMITED v. BARCLAYS BANK SA MADRID |
|---|---|
| 650412/2010 | FAIRFIELD SENTRY LIMITED v. UBS CAYMAN REF GREENLAKE ARBITRAGE |
| 650413/2010 | FAIRFIELD SENTRY LIMITED v. ROBINSON & CO |
| 650414/2010 | FAIRFIELD SENTRY LIMITED v. ZANY INTERNATIONAL AVV |
| 650415/2010 | FAIRFIELD SENTRY LIMITED v. FIBI BANK (SWITZERLAND) |
| 650416/2010 | FAIRFIELD SENTRY LIMITED v. CACEIS BANK LUXEMBOURG |
| 650417/2010 | FAIRFIELD SENTRY LIMITED v. CREDIT SUISSE (BAHAMAS) |
| 650418/2010 | FAIRFIELD SENTRY LIMITED v. LANDIS HOLDINGS LTD |
| 650419/2010 | FAIRFIELD SENTRY LIMITED v. DEUTSCHE BANK (SUISSE) SA GENEVE |
| 650420/2010 | FAIRFIELD SENTRY LIMITED v. BANCO ITAU EUROPA LUXEMBOURG SA |
| 650421/2010 | FAIRFIELD SENTRY LIMITED v. BK SAL OPPENHEIM JR & CIE |
| 650422/2010 | FAIRFIELD SENTRY LIMITED v. BARCLAYS BANK (SUISSE) SA |
| 650426/2010 | FAIRFIELD SENTRY LIMITED v. GILBEY INVESTMENTS |
| 650427/2010 | FAIRFIELD SENTRY LIMITED v. EQUATOR INTERNATIONAL LIMITED |
| 650431/2010 | FAIRFIELD SENTRY LIMITED v. SCHRODER & CO BANK AG |
| 650433/2010 | FAIRFIELD SENTRY LIMITED v. CREDIT AGRICOLE (SUISSE) SA |
| 650539/2010 | FAIRFIELD SENTRY LIMITED v. ATU FUND ADMINISTRATORS (BVI) LTD |
| 650636/2010 | FAIRFIELD SENTRY LIMITED v. WORLD STRATEGY LTD |
| 650637/2010 | FAIRFIELD SENTRY LIMITED v. BNP PARIBAS SECURITIES SERVICES LUXEMBOURG |
| 650641/2010 | FAIRFIELD SENTRY LIMITED v. BARFIELD NOMINEES LTD GUERNSEY |
| 650644/2010 | FAIRFIELD SENTRY LIMITED v. DRESDNER BANK LATEINAMERIKA AG |
| 650646/2010 | FAIRFIELD SENTRY LIMITED v. BANQUE SCS ALLIANCE SA |
| 650647/2010 | FAIRFIELD SENTRY LIMITED v. STAALBEWAARBEDRIJF B.V. |
| 650648/2010 | FAIRFIELD SENTRY LIMITED v. ABU DHABI COMMERCIAL BANK |
| 650649/2010 | FAIRFIELD SENTRY LIMITED v. HSBC PRIV BK JERSEY |

| | |
|---|---|
| 650650/2010 | FAIRFIELD SENTRY LIMITED v. CREDIT SUISSE NOM A/C GIB |
| 650651/2010 | FAIRFIELD SENTRY LIMITED v. MARTELLO NOMINEES LIMITED |
| 650652/2010 | FAIRFIELD SENTRY LIMITED v. MURDOCH & CO |
| 650687/2010 | FAIRFIELD SENTRY LIMITED v. AL NAHYAN MANSOUR B ZAYED |
| 650688/2010 | FAIRFIELD SENTRY LIMITED  v. HSH NORDBANK SECURITIES SA |
| 650907/2010 | FAIRFIELD SENTRY LIMITED v. TDB INVESTMENT CO |
| 650931/2010 | FAIRFIELD SENTRY LIMITED v. CDC IXIS |
| 650932/2010 | FAIRFIELD SENTRY LIMITED v. GUERNROY LTD |
| 650933/2010 | FAIRFIELD SENTRY LIMITED v. FORTIS (ISLE OF MAN) NOMINEES LTD |
| 650934/2010 | FAIRFIELD SENTRY LIMITED v. NORTHERN NAVIGATION AMERICA INC |
| 650935/2010 | FAIRFIELD SENTRY LIMITED v. HERITAGE BANK |
| 650936/2010 | FAIRFIELD SENTRY LIMITED v. SOMERS DUBLIN LTD |
| 650937/2010 | FAIRFIELD SENTRY LIMITED v. URS GUSS MANAGEMENT |
| 650938/2010 | FAIRFIELD SENTRY LIMITED v. FIRSTRAND NOMINEES LIMITED |
| 650939/2010 | FAIRFIELD SENTRY LIMITED v. HERMANN ROHRER |
| 650940/2010 | FAIRFIELD SENTRY LIMITED v. BETESH AND MIZRACHI |
| 650941/2010 | FAIRFIELD SENTRY LIMITED v. RULISEL INV CORP |
| 650942/2010 | FAIRFIELD SENTRY LIMITED v. TRICOUNSEL INC |
| 650943/2010 | FAIRFIELD SENTRY LIMITED v. ALMEL LTD/PACIFIC INTER |
| 650944/2010 | FAIRFIELD SENTRY LIMITED v. ROYAL BANK OF CANADA TRUST COMPANY |
| 650945/2010 | FAIRFIELD SENTRY LIMITED v. BANQUE DE COMMERCE ET DE PLACEMENTS |
| 650946/2010 | FAIRFIELD SENTRY LIMITED v. WESTON SECURITIES LIMITED |
| 650947/2010 | FAIRFIELD SENTRY LIMITED v. PANTHERSVILLE ASSOC INC |
| 650948/2010 | FAIRFIELD SENTRY LIMITED v. SEABRIDGE ADVISORS LTD |
| 650949/2010 | FAIRFIELD SENTRY LIMITED v. BANCO BILBAO VIZCAYA ARGENTARIA |
| 650982/2010 | FAIRFIELD SENTRY LIMITED v. CLEARSTREAM BANKING A/C CASH |
| 650983/2010 | FAIRFIELD SENTRY LIMITED v. CREDIT SUISSE FIDES (ZURICH) |
| 650984/2010 | FAIRFIELD SENTRY LIMITED v. DEUTSCHE BANK (CAYMAN) |
| 650985/2010 | FAIRFIELD SENTRY LIMITED v. DEUTSCHE BANK AG |

| | |
|---|---|
| | SINGAPORE |
| 650986/2010 | FAIRFIELD SENTRY LIMITED v. TENSYR LIMITED |
| 650987/2010 | FAIRFIELD SENTRY LIMITED  v. FS/ANDBANC ANDORRA |
| 650988/2010 | FAIRFIELD SENTRY LIMITED  v. FS/BANCA PRIVADA ANDORRA |
| 650990/2010 | FAIRFIELD SENTRY LIMITED  v. FS/FORTIS BANQUE LUXEMBOURG |
| 650991/2010 | FAIRFIELD SENTRY LIMITED v. FS/HSBC PRIVATE BANKING NOM |
| 650992/2010 | FAIRFIELD SENTRY LIMITED  v. ING BANK (SUISSE) SA |
| 650994/2010 | FAIRFIELD SENTRY LIMITED v. GROSVENOR INVESTMENT MANAGEMENT LTD |
| 650995/2010 | FAIRFIELD SENTRY LIMITED  v. HANSARD EUROPE LTD |
| 650996/2010 | FAIRFIELD SENTRY LIMITED  v. INVESTEC BK SWITZERLAND |
| 650997/2010 | FAIRFIELD SENTRY LIMITED v. HONTAI LIFE INSURANCE CO LTD |
| 650998/2010 | FAIRFIELD SENTRY LIMITED v. HSBC INT TRUSTEE SUB A/C |
| 650999/2010 | FAIRFIELD SENTRY LIMITED  v. HSBC PRIVATE BANK (GUERNSEY) LTD |
| 651000/2010 | FAIRFIELD SENTRY LIMITED v. JP MORGAN TRUST COMPANY (CAYMAN) |
| 651001/2010 | FAIRFIELD SENTRY LIMITED  v. KB (CI) NOMINEES LTD |
| 651002/2010 | FAIRFIELD SENTRY LIMITED  v. KB (CI) NOMINEES LTD |
| 651003/2010 | FAIRFIELD SENTRY LIMITED v. LTD EDITIONS MEDIA INC |
| 651004/2010 | FAIRFIELD SENTRY LIMITED v. MEJIA MONZON CLARA INES |
| 651006/2010 | FAIRFIELD SENTRY LIMITED  v. NOMURA INTERNATIONAL PLC |
| 651007/2010 | FAIRFIELD SENTRY LIMITED  v. POLIS SA |
| 651008/2010 | FAIRFIELD SENTRY LIMITED  v. UBS LUXEMBOURG SA |
| 651009/2010 | FAIRFIELD SENTRY LIMITED v. UBS AG NEW YORK |
| 651010/2010 | FAIRFIELD SENTRY LIMITED v. STONEHAGE FUND ADMINISTRATORS |
| 651011/2010 | FAIRFIELD SENTRY LIMITED v. SKIPS AS PEGASUS |
| 651012/2010 | FAIRFIELD SENTRY LIMITED v. QATAR INSURANCE COMPANY |
| 651013/2010 | FAIRFIELD SENTRY LIMITED v. STRINA LUISA AND GRAZIELA STRINA |

# EXHIBIT 2

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**VIRGIN ISLANDS**
**COMMERCIAL DIVISION**

Claim No: BVIHC (COM) 7/2009



FILED
Registrar's Office
NOV 1 8 2009
Virgin Islands
at 4:20

Between



Fairfield Sentry Limited (in Liquidation)

**Claimant**

and

Banco General SA/ Banca Privada

**First Defendant**

and Others (See Attached Schedule)

**Second – Thirty First Defendants**

**Claim Form**

The Claimant, FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) of Romasco Place, Wickhams Cay I, Road Town, Tortola, British Virgin Islands claims against the Defendants:

1.    Restitution severally from the Defendants of the sums set out against each of their names in the attached schedule, amounting in aggregate to the sum of US$36,862,658.02 and paid by the Claimant under a mistake of fact as to the amount payable to each of the Defendants upon the redemption of the various Defendants' shareholdings in the Claimant during November 2003 Alternati··· such other sum as the Court thinks fit;

2.    Interest on the said sum to be assessed;

3.    Further or other relief; and

4.    Costs.

**NOTICE TO THE DEFENDANTS – See the notes served with this claim form**

This claim form must contain or have served with it either a statement of claim or a copy of a court order entitling the claimant to serve the claim form without a statement of claim.

If you do not complete the form of acknowledgement of service served on you with this claim form and deliver or send it to the court office (address below) so that they receive it within 14/21 days of service of this claim form on you, the Claimant will be entitled to apply to have judgment entered against you. The form of acknowledgement of service may be completed by you or a legal practitioner acting for you.

You should consider obtaining legal advice with regard to this claim

This claim form has no validity if it is not served within 6 months of the date below unless it is accompanied by an order extending that time.

Dated the 18th day of November 2009

Robert Nader
FORBES HARE
Legal Practitioners for the Claimant

The Claimant's solicitors are Forbes Hare, Palm Grove House, P.O. Box 4649, Road Town, Tortola. Tel: 494 1890. Fascimile: 494 1316

The court office is at Main Street, Road Town, Tortola, British Virgin Islands telephone number 468 5808, Fascimile 494 6664. The office is open between 8:30am and 4:30pm Monday to Friday except public holidays.

The Claimant's address for service is c/o Forbes Hare, Palm Grove House, P.O. Box 4649, Road Town, Tortola. Tel: 494 1890. Fascimile: 494 1316

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION

Claim No: BVIHC (COM)    /2009

Between

Fairfield Sentry Limited (in Liquidation)

Claimant

and

and Banco General SA/ Banca Privada

Defendant

and Others (see Schedule)

Second – Thirty First Defendants

SCHEDULE OF DEFENDANTS

|  | Name | Address | Date | Amount (US$) |
|---|---|---|---|---|
| 1) | Banco General SA/ Banca Privada | c/o Celideth Guevara, Wall Street Securities Building, Calle Aquilano de la Guardia, Panama, Republic of Panama. | 19/11/03 | 108,573.84 |
| 2) | Bank Julius Baer & Co Limited | Bahnhofstrasse 36, Postfach  CH-8010 Zurich, Switzerland | 19/11/03 | 19,110.07 |
|  |  |  | 19/11/03 | 38,220.13 |

| | | | | |
|---|---|---|---|---|
| | | | 19/11/03 | 217,854.75 |
| | | | 19/11/03 | 229,320.79 |
| 3) | Bank Morgan Stanley AG | Bahnhofstrasse 92, 8023, Zurich, Switzerland | 19/11/03 | 703,642.19 |
| 4) | Bankmed (Suisse) SA | 3 Rue du Mont-Blanc, 1201 Geneva, Switzerland | 19/11/03 | 47,775.17 |
| | | | 19/11/03 | 51,597.18 |
| 5) | Banque Colbert Luxembourg SA FBO Arab Investor Fund of Funds | B.P. 736, L-2017, R.C. Luxembourg B 34726 | 19/11/03 | 299,999.37 |
| 6) | Barclays Bank SA | Matteo Innuria 15, 28036, Madrid, Spain | 19/11/03 | 301,681.06 |
| 7) | Blubank Ltd | Apartado 87-0553, Panama 7, Republic of Panama | 19/11/03 | 323,839.18 |
| 8) | Caja de Ahorros y Monte de Piedad de Madrid | Paseo de la Castellana 189, 3e Planta, 28046, Madrid, Spain | 19/11/03 | 2,181,060.50 |
| 9) | Melrose Investments Ltd | Maria Del Cocorro de Garces, 785 Park Avenue (8E), New York NY10021, USA | 19/11/03 | 25,000.00 |
| 10) | Citco Global Custody NV - Reinvest | Citco Global Security Services Ltd, 2600, Cork Airport Business Parke, Kinsale Road, Cork, Ireland | 19/11/03 | 2,985,947.81 |
| 11) | Citco Global Custody NV- Cash | Citco Global Security Services Ltd, 2600, Cork Airport Business Parke, Kinsale Road, Cork, Ireland | 19/11/03 | 100,002.98 |
| | | | 19/11/03 | 126,212.43 |
| | | | 19/11/03 | 225,317.23 |
| | | | 19/11/03 | 800,004.69 |
| | | | 19/11/03 | 2,039,044.04 |
| | | | 19/11/03 | 2,040,286.20 |
| | | | 19/11/03 | 2,149,997.09 |
| | | | 19/11/03 | 2,985,947.81 |
| | | | 19/11/03 | 4,000,004.35 |

| | | | | 71,118.11 |
|---|---|---|---|---|
| 12) | Citivic Nominees Ltd | Citigroup NA, 1st Floor, North Quay, Dublin, Ireland | 19/11/03 | 139,503.48 |
| 13) | Coutts (USA) International | Suite 2300, 701 Brickell Avenue, Miami, Florida 33131, USA | 19/11/03 | 30,002.80 |
| 14) | Credit Suisse (Luxembourg) SA A/C LEU Prima Global Fund | PO Box 40, L-2010, Luxembourg | 19/11/03 | 100,002.98 |
| 15) | Credit Suisse London Nominees Ltd | 5 Cabot Square, London E14 4QR, United Kingdom | 19/11/03 | 519,354.26 |
| 16) | Deutsche Bank (Suisse) SA | PO Box 1416, CH-1211, Geneva 1, Switzerland | 19/11/03 | 209,255.22 |
| 17) | Firstrand Nominees Limited | PO Box 7283, Pretoria, South Africa | 19/11/03 | 143,067.51 |
| | | | 19/11/03 | 367,572.56 |
| 18) | Hyposwiss Private Bank Geneve SA | 7 Rue des Alpes, Case Postale 1380, CH-1211, Geneva 1, Switzerland | 19/11/03 | 74,309.49 |
| 19) | Stonehage SA | Rue du Puits-Godet 12, PO Box 126, CH-2005 Neuchatel, Switzerland | 19/11/03 | 383,644.13 |
| 20) | Lloyds TSB Bank Plc | One Biscayne Tower, Suite 3200, 2 South Biscayne Boulevard, Miami, Florida 33131, USA | 19/11/03 | 473,920.08 |
| | | | 19/11/03 | 262,362.10 |
| | | | 19/11/03 | 369,903.99 |
| | | | 19/11/03 | 239,315.36 |
| | | | 28/11/03 | 369,903.99 |
| 21) | Merrill Lynch Bank (Suisse) SA | 18 Rue des Contamines, CH-1211, Geneva 3, Switzerland | 19/11/03 | 366,607.51 |
| 22) | PRS International (Cayman) Ltd | 801 Brickell Avenue, 16th Floor, Miami, Florida, 33131 | 19/11/03 | 100,002.98 |
| 23) | Quilvest Switzerland Ltd | Stockerstrasse 23, CH-8002, Zurich, Switzerland | 19/11/03 | 578,079.50 |
| 24) | SG Private Banking (Suisse) SA | PO Box 220, Avenue de Rumine 20, CH-1001, | 19/11/03 | 143,325.50 |

| | | | | |
|---|---|---|---|---|
| | | Lausanne | | |
| 25) | SNS Global Custody BV REF SNS Bank | Pettelaarpark 120, Postbus 70053, 5201 DZ'S Hertogenbosch, the Netherlands | 19/11/03 | 119,437.91 |
| 26) | UKFP (Asia) Nominees Ltd | Unit D, 10F Greenwich Centre, 260 Kings Road, Fortress Hill, Hong Kong | 19/11/03 | 29,563.27 |
| | | | 19/11/03 | 38,009.92 |
| 27) | W.J.G Aalders Junior | Westplein 5, 3016 BM Rotterdam, the Netherlands | 19/11/03 | 249,997.88 |
| 28) | ZCM Asset Holding Company (Bermuda) Ltd | c/o BNP Paribas Securities Corp, 787 Seventh Avenue, New York, NY 10019 USA | 19/11/03 | 135,003.06 |
| 29) | Zeban Nominees Ltd | c/o Barclays Private Bank Limited, Eagle Court, Lynch Wood, Peterborough, United Kingdom | 19/11/03 | 270,598.53 |
| 30) | Banco Atlantico Bank & Trust Ltd (Bahamas) | c/o FT Consultants Ltd, PO Box N-3932, Nassau, Bahamas | 21/11/03 | 8,791,184.55 |
| 31) | Lombard Odier Darier Hentsch & Cie | 11 Rue de la Corraterie, Case Postale 1211, Geneva 11, Switzerland | 24/11/03 | 287,176.52 |
| | TOTAL | | | $36,862,658.02 |

**The Eastern Caribbean Supreme Court**
**In the High Court of Justice**
**Virgin Islands**
**Commercial Division**

Claim No: BVIHC (COM)     /2009

Between

### Fairfield Sentry Limited (in Liquidation)

**Claimant**

and

### Banco General SA/ Banca Privada

**First Defendant**

**And Others**

**Second to Thirty First Defendants**

---

## CLAIM FORM

---

Forbes Hare
P.O. Box 4649
Road Town
Tortola
British Virgin Islands
Tel: (284) 494 1890
Fax: (284) 494 1136
Legal Practitioners for the Claimant

**EXHIBIT 3**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

FAIRFIELD SENTRY LIMITED

Plaintiff,

-vs-

FAIRFIELD GREENWICH GROUP, FAIRFIELD
GREENWICH (BERMUDA) LIMITED, FAIRFIELD
GREENWICH ADVISORS, LLC, FAIRFIELD
GREENWICH LIMITED, FAIRFIELD
INTERNATIONAL MANAGERS, INC., WALTER
M. NOEL, JR., JEFFREY TUCKER, ANDRES
PIEDRAHITA, AMIT VIJAYVERGIYA, BRIAN
FRANCOUER, LOURDES BARRENCHE,
CORNELIS BOELE, PHILIP TOUB, RICHARD
LANDSBERGER, CHARLES MURPHY, ANDREW
SMITH, DANIEL LIPTON, MARK MCKEEFRY,
HAROLD GREISMAN, SANTIAGO REYES,
JACQUELINE HARARY, ROBERT BLUM,
CORINA NOEL PIEDRAHITA, MARIA TERESA
PULIDO MENDOZA, and JOHN DOES 1-20

Defendants.

Index No. _____

Date Purchased

09601687

Plaintiff Designates New York
County as the place of trial.

The basis of venue is the residence
of at least one of the parties.

**SUMMONS**



FILED
MAY 29 2009
NEW YORK
COUNTY CLERK'S OFFICE

To:    The Above-Named Defendants

> YOU ARE HEREBY SUMMONED to answer the complaint in this action, and to

serve a copy of your answer on the attorneys for plaintiff within **twenty (20) days** after the

service of this summons exclusive of the day of service (or within thirty (30) days of the

completion of service where service is made in any other manner than personal delivery within

New York State); and in case of your failure to appear or answer, judgment will be taken against

you by default for the relief demanded in the complaint.

New York County is designated as the basis of venue pursuant to CPLR §§503(a),(c) because at least one of the Defendants resides in New York County.

New York, New York
May 29, 2009

SEWARD & KISSEL LLP

Michael J. McNamara
Jack Yoskowitz
Walter A. Naeder

One Battery Park Plaza
New York, New York 10004
(212) 574-1200
Attorneys for Plaintiff Fairfield Sentry Limited

Defendants' Addresses:

**See Attached Schedule A**

SK 25528 0043 999757

2

# Schedule A

FAIRFIELD GREENWICH GROUP
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

FAIRFIELD GREENWICH (BERMUDA) LIMITED
Suite 606
12 Church Street
Hamilton, Bermuda HM11

FAIRFIELD GREENWICH ADVISORS, LLC,
919 Third Avenue
New York, New York 10022

FAIRFIELD GREENWICH LIMITED,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

FAIRFIELD INTERNATIONAL MANAGERS, INC.,
Fairfield International Managers, Inc.
2 Soundview Drive
Greenwich, CT 06830

WALTER M. NOEL, JR.,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

JEFFREY TUCKER,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

ANDRES PIEDRAHITA,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

AMIT VIJAYVERGIYA,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

BRIAN FRANCOUER,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

LOURDES BARRENCHE,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

3

Supreme Court Records OnLine Library -  page 3 of 45

CORNELIS BOELE,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

PHILIP TOUB,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

RICHARD LANDSBERGER,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

CHARLES MURPHY,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

ANDREW SMITH,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

DANIEL LIPTON,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

MARK MCKEEFRY,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

HAROLD GREISMAN,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

SANTIAGO REYES,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

JACQUELINE HARARY,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

ROBERT BLUM,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

4

Supreme Court Records OnLine Library - page 4 of 45

CORINA NOEL PIEDRAHITA,
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

MARIA TERESA PULIDO MENDOZA
c/o Fairfield Greenwich Advisors LLC
919 Third Avenue
New York, New York 10022

JOHN DOES 1-20
Addresses Unknown

5

Supreme Court Records OnLine Library - page 5 of 45

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| FAIRFIELD SENTRY LIMITED | Index No. _____ |
| Plaintiff, | |
| -vs- | |
| FAIRFIELD GREENWICH GROUP, FAIRFIELD GREENWICH (BERMUDA) LIMITED, FAIRFIELD GREENWICH ADVISORS, LLC, FAIRFIELD GREENWICH LIMITED, FAIRFIELD INTERNATIONAL MANAGERS, INC., WALTER M. NOEL, JR., JEFFREY TUCKER, ANDRES PIEDRAHITA, AMIT VIJAYVERGIYA, BRIAN FRANCOUER, LOURDES BARRENCHE, CORNELIS BOELE, PHILIP TOUB, RICHARD LANDSBERGER, CHARLES MURPHY, ANDREW SMITH, DANIEL LIPTON, MARK MCKEEFRY, HAROLD GREISMAN, SANTIAGO REYES, JACQUELINE HARARY, ROBERT BLUM, CORINA NOEL PIEDRAHITA, MARIA TERESA PULIDO MENDOZA, and JOHN DOES 1-20 | **VERIFIED COMPLAINT** 09601687 **TRIAL BY JURY DEMANDED** |
| Defendants. | |



Plaintiff Fairfield Sentry Limited (the "Fund"), by its attorneys, Seward & Kissel

LLP, as and for its Verified Complaint against Defendants, alleges as follows:

The factual allegations herein are based upon the Fund's personal knowledge and

business records, and information obtained during the course of the investigation by its counsel,

including a review of pleadings and exhibits filed by government authorities, including the plea

allocution of Bernard L. Madoff, Defendants' business records, and the findings of Irving Picard,

Esq., the court-appointed Bankruptcy Trustee presiding over the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS").

## NATURE OF THE ACTION

1.     The Fund, the largest victim of the fraud perpetrated by Bernard L. Madoff ("Madoff"), brings this action to recover, among other things, in excess of $919 million in investment management and performance fees that the Fund paid Defendants based on inflated net asset value reports derived from the Fund's investments with BLMIS and C&M Trading ("CMT").

2.     The Fund sought to obtain capital appreciation of its assets through investing with Madoff in his "split strike conversion" strategy, which supposedly entailed, from time to time, the purchase and selling of (a) baskets of equity securities that were intended to correlate to the S&P 100 index, and (b) put and call option contracts with a notional value that approximately equaled the market value of the baskets of securities. Subject to certain guidelines and restrictions prepared by the Fairfield Entity Defendants, as defined below, CMT and BLMIS were supposed to have implemented the "split strike conversion" strategy. The Fund's investments with Madoff are referred hereinafter as the "SSC Investments."

3.     The Fund is in direct privity with a number of the Fairfield Entity Defendants, which served, *inter alia*, as the Fund's investment adviser and risk manager from November 1990 through May 29, 2009. In connection therewith, the Fairfield Entity Defendants had fiduciary and contractual obligations to use their best efforts to perform the Fund's day-to-day investment activities, and to supervise the activities of Madoff, BLMIS and CMT. Specifically, the Fairfield Entity Defendants had an obligation to independently verify and examine the existence of trade and option hedging transactions reflected in the account statements and trade tickets that the Fairfield Entity Defendants received from Madoff. While the Fund is aware that other lawsuits have been brought against some or all of the Defendants,

2

the Fund believes it is in the best position to bring this action and has standing to assert direct claims against Defendants.

4.      In consideration for their services, the Fairfield Entity Defendants received: (a) starting in May 2004, a fixed monthly management fee in an amount equal to 1%, per annum, of the Fund's Net Asset Value (as further described below), and (b) from inception, a quarterly performance fee in an amount equal to 20% of the net appreciation of the Fund's Net Asset Value (as further described below).

5.      The Fairfield Entity Defendants recorded the Fund's Net Asset Value and appreciation on certain reports and performance sheets (the "Net Asset Value Reports") based on information received from Madoff. During the period 2002 to 2008 alone, the Fund paid $919,476,832 in management and performance fees based on the Net Asset Value Reports prepared by, or prepared under the supervision of, the Fairfield Entity Defendants.

6.      As the world now knows, Madoff was arrested on December 11, 2008 on criminal charges that he violated federal securities laws by operating a multi-billion dollar "Ponzi" scheme. Upon arrest, Madoff told FBI agents that there was no innocent explanation for his crimes. Consequently, the Fund lost approximately $7.0 billion, which was invested with Madoff as of December 11, 2008.

7.      On March 10, 2009, the United States Attorney for the Southern District of New York filed a criminal Information against Madoff, which alleged that, among other things, "Madoff failed to honor his promises to BLMIS clients by, among other things, failing to invest the BLMIS investment advisory clients' funds in securities as he promised." See United States v. Madoff, 09-CR-213, Docket No. 38 (Information ¶5). Further, Madoff "created and caused to be created a broad infrastructure at BLMIS to generate the impression and support the appearance that BLMIS was operating a legitimate investment advisory business in which client

3

funds were actively traded as he promised, and to conceal the fact that no such business was actually being conducted." Id. ¶ 10. Moreover, Madoff caused "BLMIS employees to, among other things, communicate with clients and generate false and fraudulent documents including, but not limited to, monthly account statements and trade confirmations that purportedly reflected the purchases and sales of securities that Madoff claimed had been conducted on behalf of BLMIS's clients." Id.

8.      On March 12, 2009, in his plea allocution, Madoff admitted, among other things, that (a) his "fraud began in the early 1990s," (b) he "misrepresented to clients, employees and others, that [he] purchased securities for clients in overseas markets," (c) he never "executed trades on behalf of [his] investment advisory clients," and (d) he falsified "trading confirmations and client account statements that reflected the bogus transactions and positions [he] created and sent to clients purportedly involved in the split strike conversion strategy." See United States v. Madoff, 09-CR-213 (S.D.N.Y), Docket No. 50 at 2-3.

9.      On March 12, 2009, Madoff waived indictment and pled guilty to all 11 counts in the Information, namely (a) securities fraud, (b) Investment Adviser fraud, (c) mail fraud, (d) wire fraud, (e) international money laundering to promote unlawful activity, (f) international money laundering to conceal and disguise the proceeds of unlawful activity, (g) money laundering, (h) false statements to the government authorities, (i) perjury, (j) false filing with the SEC, and (k) theft from employee benefit plan. See United States v. Madoff, 09-CR-213, Docket No. 50.

10.      Madoff's admissions contradict the Net Asset Value Reports and other financial information that the Fairfield Entity Defendants prepared and provided to the Fund concerning the value of the SSC Investments. Accordingly, from the outset of its relationship with Defendants, the Fund paid, and Defendants received, hundreds of millions of dollars in the

4

form of management and performance fees based on inflated Net Asset Value Reports. Defendants must return these management and performance fees to the Fund.

11.     Based on the foregoing, Defendants have been unjustly enriched and the Fairfield Entity Defendants have violated their contractual obligations, fiduciary duties and duties of due care to, *inter alia*, supervise and conduct due diligence on Madoff, and independently verify the source of information of the Net Asset Value Reports – *i.e.*, the existence of trades and option contracts as reflected in the BLMIS and CMT trade tickets and account statements. Defendants owe restitution, with interest, to the Fund, together with other damages and relief as described below.

## PARTIES

12.     The Fund is a company duly incorporated on October 30, 1990 under the International Business Companies Act of the British Virgin Islands, automatically re-registered on January 1, 2007 as a business company under the BVI Business Companies Act of 2004 of the British Virgin Islands, and recognized as a professional fund under the 1996 Mutual Funds Act of the British Virgin Islands. The Fund's principal place of business is in the British Virgin Islands. The Fund commenced operations on December 1, 1990.

The Fairfield Entity Defendants

13.     Defendant Fairfield Greenwich Group ("FGG") was founded in 1983 and is a de facto partnership or partnership by estoppel. FGG claims to be an experienced alternative asset manager and an independent employee-owned firm with 23 partners. As of October 2008, FGG claimed to have $16 billion of assets under management -- $7.3 billion of which was purportedly in the Fund and the rest in various other investment funds. FGG's principal place of business is in New York and maintains an office at 919 Third Avenue, New York, New York 10022.

5

14.     Defendant Fairfield Greenwich Limited ("FGL") is a company

incorporated and existing under the laws of the Cayman Islands. From at least December 31,

2001 to July 1, 2003, FGL served as the Fund's investment and risk manager pursuant to an

investment management agreement, under which it was compensated in the form of management

and performance fees. From July 1, 2003 to December 11, 2008, FGL was compensated as the

Fund's placement agent in connection with the offering of the Fund's shares pursuant to private

placement memoranda. Further, as the parent company of Fairfield Greenwich (Bermuda) Ltd.,

FGL has also received a portion of investment and performance fees paid to FGBL (as defined

below) since July 2003. FGL is registered as a foreign company authorized to conduct business

in New York County. FGL maintains an office in New York.

15.     Defendant Fairfield Greenwich (Bermuda) Ltd. ("FGBL") is a company

incorporated and existing under the laws of Bermuda with its principal place of business at 12

Church Street, Suite 606, Hamilton, Bermuda, HM 11. FGBL is affiliated with FGG and is a

wholly owned subsidiary of FGL. From at least July 1, 2003 to December 11, 2008, FGBL was

the Fund's investment and risk adviser pursuant to an investment management agreement, under

which it was paid management and performance fees. FGBL conducts business in New York

and certain of its employees are based in New York.

16.     Defendant Fairfield Greenwich Advisors LLC ("FGA") is a limited

liability company organized under the laws of the State of Delaware and it is registered to do

business in New York. FGL is the sole member and owner of FGA. From at least July 1, 2003

to December 11, 2008, pursuant to investment management agreements, FGA received a

percentage of the management fee paid to FGBL for bearing certain of the Fund's internal and

operational expenses. FGA's principal place of business is in New York.

Supreme Court Records OnLine Library -  page 11 of 45

17.     Fairfield International Managers, Inc. ("FIM") is a company organized in Delaware. FIM served as the Fund's initial investment manager starting in November 1990 under an investment management agreement. FIM is an owner of FGL. As an owner of FGL, and as the Fund's previous investment and risk manager, FIM has been paid management and performance fees on the SSC Investments. FIM conducts business in New York.

18.     FGG, FGL, FGBL, FGA, and FIM are referred herein as the "Fairfield Entity Defendants."

The Fairfield Controlling Partner Defendants

19.     Defendant Walter M. Noel, Jr. ("Noel") is a founding partner of FGG and serves on the Fund's Board of Directors. Based on Defendants' business records, Noel is a principal and/or controlling person of the Fairfield Entity Defendants and has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Noel has received a percentage of the management and performance fees paid to the Fairfield Entity Defendants, and he is liable to the Fund in his capacity as a principal and/or controlling person of the Fairfield Entity Defendants. Noel maintains a residence in New York and conducts business in New York.

20.     Defendant Jeffrey Tucker ("Tucker") is a founding partner of FGG and oversees FGG's business operations. Based on Defendants' business records, Tucker is a principal and/or controlling person of the Fairfield Entity Defendants and has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Tucker has received a percentage of the management and performance fees paid to the Fairfield Entity Defendants. Tucker maintains a residence in New York and conducts business in New York.

21.     Defendant Andres Piedrahita ("Piedrahita") is a controlling partner of FGG and serves as the President and Director of FGBL. Based on Defendants' business records, Piedrahita is a controlling person and/or owner of the Fairfield Entity Defendants and has an

7

equity share of FGG and/or investment funds managed by FGG. Accordingly, Piedrahita has received a percentage of the management and performance fees paid to the Fairfield Entity Defendants. Piedrahita conducts business in New York.

22.     Noel, Tucker and Piedrahita are herein referred as the "Fairfield Controlling Partner Defendants."

The Fairfield Partner Defendants

23.     Defendant Amit Vijayvergiya ("Vijayvergiya") is a citizen of Canada. Vijayvergiya is the Managing Director and Chief Risk Officer of FGBL. Vijayvergiya joined FGBL in 2003 and was responsible for the Fund's risk management. Based on Defendants' business records, Vijayvergiya has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Vijayvergiya has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Vijayvergiya conducted business in New York.

24.     Brian Francouer ("Francouer") is a Director of FGBL. In connection therewith, on information and belief, Francouer has received a share of the management and performance fees paid to FGBL, and he has conducted business in New York.

25.     Lourdes Barranche ("Barrenche") is a partner in FGG. According to Defendants' business records, Barrenche has been with FGG since 1997, she is an international sales specialist and has marketed FGG's investment funds. Barranche has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Barranche has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Barranche is based in FGG's New York office.

26.     Cornelis Boele ("Boele") is a partner in FGG. According to Defendants' business records, Boele has been with FGG since 1997 and oversees the marketing efforts of the offshore funds of FGG in the Benelux region and markets throughout Europe. Boele has an

8

equity share of FGG and/or investment funds managed by FGG. Accordingly, Boele has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Boele is based in FGG's New York office.

27. Philip Toub ("Toub") is a partner in FGG. According to Defendants' business records, Toub has been with FGG since 1997 and is a member of FGG's Executive Committee. Toub markets FGG's offshore funds and assists in the development of new products. Toub has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Toub has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Toub is based in FGG's New York office.

28. Richard Landsberger ("Landsberger") is a partner in FGG. According to Defendants' business records, Landsberger joined FGG in 2001 and he is a member of FGG's Executive Committee. Landsberger is responsible for business development and general management issues in Europe and Asia and directly markets products to FGG's global institutional client base. Landsberger has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Landsberger has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Landsberger is based in FGG's London office. On information and belief, Landsberger conducts business in New York.

29. Charles Murphy ("Murphy") is a partner in FGG. On information and belief, Murphy joined FGG in 2007. According to Defendants' business records, Murphy is a member of FGG's Executive Committee and is responsible for strategy and capital markets business for FGG. Murphy has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Murphy has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Murphy is based in FGG's New York office.

9

30.     Daniel Lipton ("Lipton") is a partner in FGG.  According to Defendants' business records, Lipton joined FGG in 2002 and he serves as its Chief Financial Officer.  Lipton was involved in preparing the Fund's financial statements and Net Asset Value Reports.  Lipton has an equity share of FGG and/or investment funds managed by FGG.  Accordingly, Lipton has received a share of the management and performance fees paid to the Fairfield Entity Defendants.  Lipton is based in FGG's New York office.

31.     Mark McKeefry ("McKeefry") is a partner in FGG.  According to Defendants' business records, McKeefry joined FGG in 2003 and he serves as its Chief Operating Officer and General Counsel.  McKeefry has an equity share of FGG and/or investment funds managed by FGG.  Accordingly, McKeefry has received a share of the management and performance fees paid to the Fairfield Entity Defendants.  McKeefry is based in FGG's New York office.

32.     Harold Greisman ("Greisman") is a partner in FGG.  According to Defendants' business records, Greisman joined FGG in 1990 and he evaluates alternative asset investments and managers.  Greisman has an equity share of FGG and/or investment funds managed by FGG.  Accordingly, Greisman has received a share of the management and performance fees paid to the Fairfield Entity Defendants.  Greisman is based in FGG's New York and London offices.

33.     Santiago Reyes ("Reyes") is a partner in FGG.  According to Defendants' business records, Reyes joined FGG in 1996 and is head of FGG's Miami office.  Reyes markets FGG's offshore funds worldwide.  Reyes has an equity share of FGG and/or investment funds managed by FGG.  Accordingly, Reyes has received a share of the management and performance fees paid to the Fairfield Entity Defendants.  On information and belief, Reyes conducts business in New York.

10

34.     Jacqueline Harary ("Harary") is a partner in FGG. According to Defendants' business records, Harary markets FGG's funds worldwide and is involved with selection of investment managers and product development. Harary joined FGG in 1997 and has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Harary has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Harary is based in FGG's New York office.

35.     Robert Blum ("Blum") was a Managing Partner and Chief Operating Officer of FGG from 2000 to 2005. According to Defendants' business records, Blum continues to share in the profits of FGG and/or investment funds managed by FGG. Accordingly, Blum has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Blum was based in FGG's New York office.

36.     Corina Noel Piedrahita ("Corina Piedrahita") is a partner in FGG. According to Defendants' business records, Corina Piedrahita markets FGG's funds and has an equity share of FGG and/or investment funds managed by FGG. Accordingly, Corina Piedrahita has received a share of the management and performance fees paid to the Fairfield Entity Defendants. Corina Piedrahita conducts business in New York.

37.     Maria Teresa Pulido Mendoza ("Mendoza") is a partner in FGG. On information and belief, Mendoza is head of FGG's global sales and is based in New York. According to Defendants' business records, Mendoza has an equity share of FGG and/or investment funds managed by FGG, and she has received a share of the management and performance fees paid to the Fairfield Entity Defendants.

38.     John Does 1-20 are unknown partners, officers or employees of FGG who received a share of the management and performance fees paid to the Fairfield Entity Defendants.

11

Supreme Court Records OnLine Library  -  page 16 of 45

39. The FGG partners referred in paragraphs 23 through 37 are hereinafter referred as the "Fairfield Partner Defendants," and with the exception of Vijayvergiya, are named here because they received management and performance fees, which were based on inflated Net Asset Value Reports prepared by, or prepared under the supervision of, the Fairfield Entity Defendants.

40. On information and belief, according to testimony given to the Commonwealth of Massachusetts Office of the Secretary of the Commonwealth Securities Division (the "Securities Division"), and as alleged in the Securities Division's securities fraud administrative complaint against FGA and FGBL (the "Securities Division Complaint"), filed on April 1, 2009, Tucker, Vijayvergiya and Lipton were the three individuals most directly responsible for conducting due diligence on Madoff and BLMIS.

41. According to FGG's business records and his testimony to the Securities Division, Noel focused on marketing activities and was not involved in conducting due diligence on Madoff and BLMIS. Securities Division Complaint at p. 18.

## JURISDICTION AND VENUE

42. Defendants are subject to personal jurisdiction under CPLR §§ 301 and 302. Defendants either reside, conduct, or conducted business, within the State. Further, FGG, FGA and FGL maintain their principal place of business in New York.

43. Venue is proper in this county pursuant to CPLR § 503(a) and (c), and § 509.

12

## BACKGROUND

### The Fund's Investment Objective

44.     The Fund sold shares to qualified, experienced and sophisticated investors ("Shareholders") through a private placement memorandum, as amended from time to time, ("PPM") and subscription agreements. On January 12, 1995, the Fund's shares were listed on the Irish Stock Exchange in Dublin, Ireland.

45.     From its inception in or about December 1990, the Fund sought to appreciate its assets almost exclusively through the SSC Investments. Accordingly, the Fund entered into certain customer agreements with Madoff and opened limited discretionary brokerage accounts with CMT and BLMIS.

46.     Subject to certain trading authorization directives and option agreements, Madoff was authorized to determine the price and timing of stock and option transactions suitable for the SSC Investments.

47.     As of December 11, 2008, approximately 99% of the Fund's assets were allocated to the SSC Investments. Under the investment management agreements, the Fairfield Entity Defendants had wide discretion as to the allocation of the Fund's investments.

### The Fairfield Entity Defendants Failed to Supervise Madoff

a.      Duty to Exercise "Best Efforts" Under the Investment Management Agreements

48.     FIM was the Fund's first investment manager under an investment management agreement dated November 15, 1990 (the "November 15, 1990 IMA"). Under that agreement, FIM established a brokerage account on behalf of the Fund with CMT, which received an allocation of the Fund's assets for the purpose of trading in equity and options on securities. See November 15, 1990 IMA ¶ 1. The November 15 1990 IMA provided, inter alia, that FIM "*shall use its best efforts to monitor the performance and activities of CMT.*" Id. ¶ 2.

13

(emphasis added). FIM was paid a 20% performance fee on appreciation of the Fund's Net Asset Value from investments with Madoff. Id. ¶ 7. No management fee was charged. The November 15, 1990 IMA provides that it "shall be governed and construed in accordance with the laws of New York." Id. ¶ 8. A copy of the November 15, 1990 IMA is attached as Ex. 1.

49.    On or about October 1, 2002, the Fund and FGL entered into an Amended and Restated Investment Management Agreement, which was in effect until June 30, 2003 (the "October 1, 2002 IMA"). Under that agreement, FGL agreed, among other things, to manage the SSC Investments and use its *best efforts to monitor the activities and performance of [BLMIS] and any [non-BLMIS] investments*." October 1, 2002 IMA ¶ 2 (emphasis added). The Fund paid FGL a 20% performance fee based on the Fund's net asset appreciation generated from the SSC Investments. Id. at ¶ 7(a). No management fee was charged under the agreement. Id. Like the November 15, 1990 IMA, the October 1, 2002 IMA provided that it shall be construed and governed in accordance with the laws of the State of New York, without regard to the principles of conflicts of laws thereof. Id. ¶ 14. A copy of the October 1, 2002 IMA is attached as Ex. 2.

50.    On October 1, 2004, the Fund executed an Investment Management Agreement with FGBL (the "October 1, 2004 IMA"). The October 1, 2004 IMA superseded an investment management agreement entered into between the Fund and FGBL on July 1, 2003 (the "July 1, 2003 IMA") to reflect the conversion of Class B Shares into Class A Shares and the redesignation of Class A Shares as Shares of the Fund.[1] Prior to October 1, 2004, Class B Shares were charged both a 20% performance fee and a 1% management fee. Class A Shares were charged only the 20% performance fee. Effective October 1, 2004, on the recommendation of the Fairfield Entity Defendants, it was decided that a 1% monthly management fee and a 20%

---

[1]    The October 1, 2004 IMA and July 1, 2003 IMA provide that they shall be construed under the laws of Bermuda.

14

quarterly performance fee shall be charged to all of the Fund's shares. Consequently, the

Fairfield Entity Defendants were paid a management fee based on the Fund's assets under

management regardless of whether a profit on those assets was realized. Copies of the July 1,

2003 IMA and the October 1, 2004 IMA are attached as Ex. 3 and Ex. 4, respectively.

   51. Under the October 1, 2004 IMA, FGBL was required to use "best efforts"

to (a) manage the Fund's investment portfolio, (b) oversee the Fund's day-to-day investment

operations, (c) act as the Fund's investment adviser, (d) provide information to the Fund and

Shareholders, and (e) supervise the activities of BLMIS, the Fund's auditors,

PricewaterhouseCoopers LLP ("PricewaterhouseCoopers"), and the Fund's administrator and

custodian, Citco Fund Services (Europe) B.V. and Citco Bank Nederland, N.V., Dublin Branch,

respectively, and collectively hereinafter referred to as "CITCO." See October 1, 2004 IMA, ¶ 2.

Section 2 of the July 1, 2003 IMA mirrors that of the October 1 2004 IMA.

   52. By notice dated May 29, 2009, the Fund formally terminated its

investment and risk advisory relationship with the Fairfield Entity Defendants.

   b. Lack of Due Care and Duty to Safeguard the Fund's Assets

   53. To determine the Fund's Net Asset Value and net appreciation, BLMIS

mailed paper trade tickets and monthly account statements to the Fairfield Entity Defendants and

CITCO. The trade tickets and monthly account statements listed the securities and options that

Madoff had purportedly purchased and sold on the Fund's account.

   54. As investment and risk advisors, a crucial obligation of the Fairfield Entity

Defendants was to conduct risk control procedures to safeguard the Fund's assets under the

custody of Madoff. As represented to the Fund and Shareholders, the Fairfield Entity

Defendants purported to (i) maintain full transparency of the Fund's BLMIS accounts, (ii)

independently verify the existence of the Fund's assets and the prices and account values of the

15

BLMIS accounts, and (iii) examine option hedges and conduct risk oversight using certain metrics.

55.     Besides the paper trade tickets and the monthly account statements, the Fairfield Entity Defendants received scant information on the activities of BLMIS with respect to the Fund's account and assets -- in contrast to the Fairfield Entity Defendants' representations that it maintained full transparency of the Fund's BLMIS accounts.

56.     Had the Fairfield Entity Defendants in fact maintained full transparency of the Fund's BLMIS accounts, and had they independently verified the pricing and positions in Madoff's trade tickets and account statements, they would have discovered that no securities, option contracts, or United States Treasury Bills, had been purchased on the Fund's account over the past 18 years.

57.     Given the fact that Madoff and BLMIS did not execute any trades on the account of his investment advisory clients, including the Fund, the Fairfield Entity Defendants failed to fulfill their contractual obligations to use "best efforts" to supervise the operations of BLMIS and oversee the day-to-day investment activities of the Fund.  Moreover, the Fairfield Entity Defendants did not adequately verify the Fund's assets under the custody of Madoff.  Nor did they maintain ongoing transparency with respect to the Fund's accounts with BLMIS.

58.     Accordingly, the Fairfield Entity Defendants recklessly disregarded their duties as the Fund's risk and investment advisor and their actions and inactions constitute gross negligence.

16

**The Fund Paid Performance and Management Fees Based on Inaccurate Information
Prepared Under the Fairfield Entity Defendants' Supervision**

59.      Under the October 1, 2004 IMA, FGBL was paid a fixed monthly management fee in an amount equal to one-twelfth of one percent (0.0833%) of the Net Asset Value of the Fund as calculated by CITCO under FGBL's supervision. Net Asset Value was defined, as a general matter, as the Fund's total assets including all cash and cash equivalents, securities positions valued at closing prices, the liquidation value of option positions, less total liabilities of the Fund.

60.      Under all of the investment management agreements, the Fairfield Entity Defendants were paid a quarterly performance fee in an amount equal to 20% of the amount of the net realized and unrealized appreciation in the Fund's Net Asset Value of each Share in such calendar quarter. The Net Asset Value per Share was determined by dividing the Fund's Net Asset Value by the number of Shares then in issue. See The Fund's Memorandum of Association, Articles of Association, ¶ 11. The quarterly performance fee was calculated by CITCO under the Fairfield Entity Defendants' supervision.

61.      FGBL paid FGA a monthly fee in an amount equal to one-fortieth of one percent of the Fund's Net Asset Value for bearing certain of the Fund's internal accounting and operational expenses. See October 1, 2004 IMA ¶ 9

62.      Information relating to the Net Asset Value of the Fund was recorded in the Net Asset Value Reports and in the Fund's unaudited financial statements and audited financial statements. This information was prepared under the Fairfield Entity Defendants' supervision.

63.      Based on the Fund's financial statements for the past 7 years, the Fairfield Entity Defendants received $919,476,832 in management and performance fees:

17

| Year | Performance Fees | Management Fees | Total |
|---|---|---|---|
| Through November 2008 | $97,373,819 | $65,930,013 | $163,303,832 |
| 2007 | $116,257,000 | $67,322,000 | $183,479,000 |
| 2006 | $107,779,000 | $50,465,000 | $158,244,000 |
| 2005 | $87,225,000 | $51,127,000 | $138,352,000 |
| 2004 | $81,278,000 | $21,549,000 | $102,827,000 |
| 2003 | $80,515,000 | $5,221,000 | $85,736,000 |
| 2002 | $83,591,000 | $3,844,000 | $87,435,000 |
| **Total for the above period** | *$654,018,819* | *$265,458,013* | **$919,476,832** |

64.     In addition, under certain deferred fee agreements, the Fairfield Entity Defendants elected to defer certain management and performance fees derived from the SSC Investments, which were recorded on the Fund's financial statements as a liability in the amount of $26 million.

65.     Based on FGG's business records, for 2007 alone, Piedrahita was paid $45.60 million, Tucker was paid $30.67 million, Noel was paid $30.67 million, which amounts were, in part, derived from the fees paid by the Fund on the account of the SSC Investments.

66.     Further, each of the Fairfield Partner Defendants received compensation derived from fees paid by the Fund on the account of the SSC Investments.

**Madoff's Admissions Confirm That the Fund Wrongfully Paid Fees Based On Inflated Net Asset Value Reports And Defendants Were Unjustly Enriched**

67.     On December 11, 2008, Madoff was arrested and charged with running a "Ponzi" scheme in violation of United States securities laws.  The SEC also filed a civil

18

complaint in the United States District Court for the Southern District of New York seeking injunctive relief and to have BLMIS placed in receivership. <u>SEC v. Madoff</u>, 08 Civ 1079 (S.D.N.Y).

  68. By Order dated December 15, 2008, Irving Picard, Esq. was appointed the Trustee in charge of presiding over the liquidation of BLMIS under the Securities Investor Protection Act, 15 U.S.C. § 78aaa, et seq. ("SIPA") and the United States Bankruptcy Code.

  69. On February 20, 2009, during a public meeting with customers and creditors of BLMIS held in the United States Bankruptcy Court for the Southern District of New York, the Trustee reported that his investigation had revealed, among other things, that BLMIS had not traded or purchased any securities on the account of any customer, including the Fund, for at least the past 13 years.

  70. Subsequent to his February 20, 2009 report, the Trustee has represented in pleadings with the United States Bankruptcy Court that there are no records of BLMIS having cleared a single purchase or sale of securities at the Depository Trust Company or any other trading platform on which BLMIS could have reasonably traded securities. Nor has the Trustee found evidence that BLMIS ever purchased or sold any of the options that Madoff claimed to have purchased on customer statements. <u>See</u> <u>e.g.</u>, <u>Picard v. Fairfield Sentry Limited, et al.</u>, Adv. Proc. No. 09-1239 (BRL) (Docket No. 1, Complaint ¶ 20).

  71. Further, as noted, Madoff has admitted and pled guilty to, among other things, securities fraud violations for (a) not trading on the account of his investment advisory clients and (b) running a ponzi scheme since the 1990s. <u>See</u> <u>supra</u> ¶¶ 7-8.

  72. On March 18, 2009, the SEC charged the auditors of BLMIS, David G. Friehling and his firm, Friehling & Horowitz, CPAs, P.C. ("F&H"), with committing securities fraud by representing that they had conducted legitimate audits, when in fact they had not.

19

According to the SEC, F&H enabled Madoff's Ponzi scheme by falsely stating, in annual audit reports, that F&H had audited the financial statements of BLMIS when in fact, F&H "merely pretended to conduct minimal audit procedures," and "failed to document his purported findings" which would have shown BLMIS owed "tens of billions of dollars in additional liabilities to its customers and was therefore insolvent." See, SEC Charges Madoff Auditors with Fraud, Litigation Release No. 20959 (March 18, 2009).

73.     On March 18, 2009, the United States Attorney for the Southern District of New York charged David G. Friehling, the auditor of BLMIS, with securities fraud, aiding and abetting investment adviser fraud, and four counts of filing false audit reports with the SEC.

74.     In sum, Madoff's admission of guilt reveals that the Net Asset Value Reports contained false information, and the Fund erroneously paid hundreds of million of dollars in the form of management and performance fees to Defendants based on inaccurate information.

## FIRST CLAIM
*(Breach of Fiduciary Duty and Duty of Care against the Fairfield Entity Defendants; the Fairfield Controlling Partner Defendants; and Vijayvergiya)*

75.     Plaintiff realleges paragraphs 1 through 74.

76.     Independent of the investment management agreements, the Fairfield Entity Defendants owe a fiduciary obligation and a duty of care to the Fund as its investment and risk adviser and agent from November 1990 to May 29, 2009, including a duty to report accurate information concerning the SSC Investments.

77.     In addition, the Fairfield Controlling Partner Defendants and Vijayvergiya owed fiduciary obligations and a duty of care to the Fund by virtue of their positions and roles vis-à-vis the investment and risk operations of the Fund as described and represented in the Fund's private placement memorandum.

20

78.     In connection with the management of its investment portfolio and risk management operations, the Fund reposed confidence on the Fairfield Entity Defendants, the Fairfield Controlling Partner Defendants, and Vijayvergiya, and the Fund reasonably relied on their expertise and knowledge.

79.     The Fairfield Entity Defendants, the Fairfield Controlling Partner Defendants and Vijayvergiya were grossly negligent and recklessly disregarded their fiduciary duties by their conduct and inaction, including, but not limited to:

(a)     Failing to take appropriate steps over the course of 18 years to independently verify that trades on the Fund's accounts were actually executed and option contracts were actually sold and purchased as reflected in the monthly account statements and trade tickets issued by Madoff, BLMIS and CMT;

(b)     Failing to safeguard the Fund's assets in the custody of Madoff, BLMIS, CMT, and conduct risk oversight over Madoff, BLMIS and CMT;

(c)     Failing to perform adequate due diligence on Madoff, BLMIS and CMT;

(d)     Collecting management and performance fees based on inflated Net Asset Values Reports prepared by, or prepared under the supervision of, the Fairfield Entity Defendants; and

(e)     Failing to supervise CITCO and PricewaterhouseCoopers, each of which prepared and delivered to the Fund inaccurate audited financial reports and other financial information.

21

Supreme Court Records OnLine Library - page 26 of 45

80.     By reason of the foregoing, the Fund is entitled to compensatory damages in an amount to be calculated at trial, but not less than $919,476,832, including the return of all performance and management fees paid dating back to November 1990.

## SECOND CLAIM
### (Breach of Contract as against the Fairfield Entity Defendants)

81.     Plaintiff realleges paragraphs 1 through 80.

82.     The Fund entered into certain investment management agreements, all of which provided, *inter alia*, that the Fairfield Entity Defendants shall use their "best efforts" to supervise Madoff, BLMIS and CMT. <u>See</u> November 15, 1990 IMA, ¶ 2; October 1, 2002 IMA ¶ 2; July 1, 2003 IMA, ¶ 2; and October 1, 2004 IMA, ¶ 2.

83.     Pursuant to ¶ 2 of the July 1, 2003 IMA and the October 1, 2004 IMA, the Fairfield Entity Defendants were required to use "*best efforts*" to oversee the Fund's day-to-day investment activities, act as the Fund's investment adviser, provide accurate information to the Fund, and supervise the activities of the Fund's auditors and CITCO.

84.     The SIPA Trustee has found no evidence that the investment advisory arm of BLMIS settled any trade on the account of any customer, including the Fund, and Madoff has admitted that he did not execute a single trade on the account of his investment advisory clients since the early 1990s and that he falsified trade confirmations, account statements and other information provided to clients involved with the "split strike conversion" strategy, such as the Fund.

85.     All information prepared by, or prepared under the supervision of, the Fairfield Entity Defendants concerning the Fund's Net Asset Value was inaccurate.

86.     Given these facts, the Fairfield Entity Defendants did not use "best efforts" in supervising Madoff and carrying out their investment and risk adviser duties under the

22

investment management agreements.  The Fairfield Entity Defendants could not have used "best efforts" because -- over the course of 18 years -- Madoff did not place one single legitimate trade on the account of the Fund.  The Fairfield Entity Defendants did not perform adequate asset-verification procedures, namely the Fairfield Entity Defendants did not confirm with independent sources whether Madoff was actually trading on the account of the Fund as he purported to be doing through trade tickets and account statements, nor did the Fairfield Entity Defendants inquire with relevant option exchanges, or over-the counter option counterparties, to spot check or confirm that Madoff purchased or sold option contracts on behalf of the Fund.

87.     The Fairfield Entity Defendants' conduct and inaction constitute gross negligence and reckless disregard for their duties as an investment and risk adviser under Sections 2 of the October 1, 2004 IMA, July 1, 2003 IMA, October 1, 2002 IMA, and the November 15, 1990 IMA.

88.     As a result, the exculpatory and indemnification provisions of the October 1, 2002 IMA (§ 9), July 1, 2003 IMA (§10), and the October 1, 2004 IMA (§10) are inapplicable and unenforceable.

89.     By reason of the foregoing, the Fund is entitled to compensatory damages in an amount to be calculated at trial, but not less than $919,476,832, including the return of all performance and management fees paid dating back to November 1990.

### THIRD CLAIM
*(Unjust Enrichment as against all Defendants)*

90.     Plaintiff realleges paragraphs 1 through 89.

91.     From the outset of their relationship, the Fund has paid, and Defendants have received, management and performance fees based on inflated Net Asset Values Reports on the account of the SSC Investments.

23

92.     The Fairfield Entity Defendants had an obligation, as the Fund's investment adviser and risk control agent, to independently verify pricing and positions reflected in the BLMIS and Madoff account statements. The Fairfield Entity Defendants failed to do so. Instead, they simply imported Madoff's false numbers to the Net Asset Value Reports and were paid performance and management fees based on those reports.

93.     As owners, controlling persons and partners of the Fairfield Entity Defendants, each of the Fairfield Controlling Partners Defendants and the Fairfield Partner Defendants received a pro rata share of the management and performance fees that the Fund paid to the Fairfield Entity Defendants derived from the SSC Investments.

94.     Because each of the Defendants received a share of the more than $919 million dollars of fees which the Fund mistakenly paid based on inflated Net Asset Value Reports, Defendants have been unjustly enriched at the Fund's expense and are holding monies, which in good conscience and under principles of equity, should be returned to the Fund.

95.     Defendants should each make restitution with interest to the Fund and must return all management and performance fees based on the Fund's Net Asset Value Reports.

## FOURTH CLAIM
### *(Constructive Trust as against all Defendants)*

96.     Plaintiff realleges paragraphs 1 through 95.

97.     The Fairfield Entity Defendants, the Fairfield Controlling Partner Defendants and Vijayvergiya owed fiduciary obligations and a duty of care to the Fund, and they have been unjustly enriched as a result of receiving management and performance fees based on overstated Net Asset Value Reports.

24

Supreme Court Records OnLine Library - page 29 of 45

98. Each of the Fairfield Partner Defendants enjoyed a confidential relation of trust with the Fund, and each has been unjustly enriched by receiving compensation based, in part, on inflated Net Asset Value Reports.

99. Under agreements and other promises, the Fairfield Entity Defendants represented to the Fund that they would use their best efforts to supervise the activities of Madoff, BLMIS and CMT, and that they would independently verify the underlying information of the Net Asset Value Reports on which management and performance fees were calculated and paid.

100. Relying on inflated Net Asset Value Reports and other financial reports and information prepared by, or prepared under the supervision of, the Fairfield Entity Defendants, the Fund paid management and performance fees over the past 18 years -- which were then distributed on a pro-rata share to the Fairfield Controlling Partner Defendants and the Fairfield Partner Defendants. Therefore, Defendants are holding monies, which in good conscience and under principles of equity, should be returned to the Fund.

101. By reason of the foregoing, the Fund is entitled to a constructive trust imposed on all moneys and other property within the possession, custody or control of each Defendant, including on (a) all management fees received by Defendants, (b) all performance fees received by Defendants, and (c) all assets or compensation received by Defendants in connection with the business of FGG and all of its affiliates.

### FIFTH CLAIM
*(Rescission of the Investment Management Agreements Based on Mutual Mistake)*

102. Plaintiff realleges paragraphs 1 through 101.

103. The Fund and the Fairfield Entity Defendants entered into the investment management agreements under the material mistaken assumption that the Fund's assets would be

25

invested pursuant to a legitimate "split strike conversion" investment strategy, and they believed that Madoff was a legitimate money manager at the time the investment management agreements were executed.

104. From the outset of the Fund's relationship with the Fairfield Entity Defendants, the Fund mistakenly paid management and performance fees based on inaccurate Net Asset Value Reports prepared from false BLMIS trade tickets and monthly account statements.

105. Based on the foregoing, the October 1, 2004 IMA, July 1, 2003 IMA, October 1, 2002 IMA, and the November 15, 1990 IMA should be rescinded and the Fund is entitled to restitution with interest in an amount to be determined at trial, but not less than $919,476,832.

## SIXTH CLAIM
### (Accounting as against all Defendants)

106. Plaintiff realleges paragraphs 1 through 105.

107. Under Section 2 of the October 1, 2004 IMA, the Fund is entitled to an accounting of all financial information relating to the Fund, including compensation paid to each Defendant. The Fund has requested information as to all fees paid on the account of the SSC Investments. Defendants have refused to provide it.

108. Moreover, given that the Fund and each Defendant enjoyed a confidential relationship of trust, each Defendant must account for the management and performance fees that they each have received based on the illusory Net Asset Value Reports.

109. The payment of management and performance fees was not justified and a complete accounting should be ordered.

26

## SEVENTH CLAIM
### *(Judgment Declaring That The Fund Does Not Owe Any Amounts to the Defendants)*

110.    Plaintiff realleges paragraphs 1 to 109.

111.    Under the Amended and Restated Deferred Fee Agreement, dated July 1, 2003, and the Second Amended and Restated Deferred Fee Agreement, dated December 31, 2008, between the Fund and FGBL (the "Deferred Fee Agreement"), the Fairfield Entity Defendants elected to defer the payment of certain management and performance fees derived from the SSC Investments (the "Deferred Fees").

112.    As of December 31, 2008, the Fairfield Entity Defendants estimated that the Deferred Fees were approximately $26 million, and they were recorded on the Fund's books as a liability.

113.    By reason of the foregoing, because the Deferred Fees are based on non-existent Net Asset Values, the Fund is entitled to a judgment declaring that (a) the Fund does not owe Deferred Fees to the Fairfield Entity Defendants under the investment management agreements and/or the Deferred Fee Agreement, and (b) the Deferred Fees are an asset of the Fund.

## RELIEF REQUESTED

WHEREFORE, the Fund requests that the Court grant judgment as follows:

(1)    For count one against the Fairfield Entity Defendants, the Fairfield Controlling Partner Defendants and Vijayvergiya, restitution in an amount of no less than $919,476,832 million plus statutory interest, and compensatory damages to be calculated at trial;

(2)    For count two against the Fairfield Entity Defendants, restitution in the amount of no less than $919,476,832 million plus statutory interest, and compensatory damages to be calculated at trial;

27

(3) For count three against all Defendants, restitution in the amount of no less than $919,476,832 million plus statutory interest;

(4) For count four against all Defendants, a constructive trust over all assets, property, and/or cash currently in the custody and control of each Defendant;

(5) For count five against all Defendants, rescission of the October 1, 2004 IMA, July 1, 2003 IMA, October 1, 2002 IMA, and the November 15, 1990 IMA, and restitution in the amount of no less than $919,476,832;

(6) For count six against all Defendants, an accounting of all of the management and performance fees received by each Defendant from the Fund;

(7) For count seven against all Defendants, a judgment declaring that (a) the Fund does not owe any Deferred Fees to any Defendant, and (b) the Deferred Fees are an asset of the Fund; and

(8) Such other, further and different relief as the Court deems just and proper, including costs, and attorneys' fees, and disbursements of this action.

Supreme Court Records OnLine Library -  page 33 of 45

SEWARD & KISSEL LLP

By: _Jack Yoskowitz_
     Michael J. McNamara
     Jack Yoskowitz
     Walter A. Naeder

One Battery Park Plaza
New York, New York 10004
(212) 574-1200

Attorneys for Plaintiff Fairfield Sentry Limited

SK 25528 0043 984355

29

# VERIFICATION

STATE OF NEW YORK       )

                                 )     ss:

COUNTY OF NEW YORK     )

       JACK YOSKOWITZ, being duly sworn, deposes and says:

1.      I am a member of the law firm of Seward & Kissel LLP, United States counsel for Plaintiff Fairfield Sentry Limited.  I make this Verification because Plaintiff is a foreign corporation.

2.      I have read the foregoing Verified Complaint and know its contents.  The Verified Complaint is true to the best of my knowledge.

3.      My knowledge and the grounds for my belief as to all matters in the Verified Complaint are derived from my investigation of the facts, which includes a review of Plaintiff's business records, Defendants' business records, pleadings and exhibits filed by government authorities, Bernard L. Madoff's plea allocution, and the findings of Irving Picard, Esq., the court-appointed Bankruptcy Trustee presiding over the liquidation of Bernard L. Madoff Investment Securities LLC.

_____
Jack Yoskowitz

Sworn to before me this
25ᵗʰ day of May 2009

_____
Notary Public

IRA J. ARONSON
Notary Public, State of New York
No. 01AR4732833
Qualified in New York County
Commission Expires September 30, 20 10

SK 25528 0043 999773

1

## INVESTMENT MANAGEMENT AGREEMENT

Agreement dated as of October 1, 2004, between Fairfield Sentry Limited, a British Virgin Islands international business company (the "Fund"), having its registered office at Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands, and Fairfield Greenwich (Bermuda) Limited, a company organized under the laws of the Bermuda (the "Investment Manager"), having an office at 14 Par La Ville Road, 3rd Floor, Hamilton Bermuda..

WHEREAS, the Fund wishes to obtain the investment management services of the Investment Manager, and

WHEREAS, the Investment Manager is willing to provide such advice and services on the terms and conditions set forth below,

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the parties hereby agree as follows:

1.      The Fund hereby retains the Investment Manager to manage the investment of its assets as contemplated by and described in the Confidential Private Placement Memorandum of the Fund, dated October 1, 2004, and as such Confidential Private Placement Memorandum may be further amended (the "Memorandum"). All capitalized terms not defined herein shall be defined as set forth in the Memorandum. Such management will include, but shall not be limited to the utilization of a nontraditional options trading strategy described as "split strike conversion" (the "SSC Investments"). The Investment Manager may, in its sole and exclusive

discretion, allocate a portion of the Fund's assets to alternative investment opportunities other than the SSC Investments (the "Non-SSC Investments"); provided, however, that the amount so allocated to the Non-SSC Investments in the aggregate shall not exceed an amount equal to 5% of the Net Asset Value of the Fund (measured at the time of investment in each Non-SSC Investment vehicle) and no single allocation shall exceed $50 million at the time it is made. The identification of, and terms of the Fund's investment in, the Non-SSC Investments shall be in the sole and exclusive discretion of the Investment Manager. The Investment Manager is authorized to negotiate, among other things, risk control and performance guidelines, lock-up periods and fees incident to the Non-SSC Investments; provided that the fees paid in connection with the Non-SSC Investments shall not cause an increase in the amount of the fees to be paid by the Fund pursuant to this Agreement.

2.      The activities engaged in by the Investment Manager on behalf of the Fund shall be subject to the policies and control of the Fund's Directors. Subject to such direction and the investment policies set forth in the Memorandum, the Investment Manager shall use its best efforts to (a) seek suitable investment opportunities and manage the investment portfolio of the Fund; (b) perform or oversee the day-to-day investment operations of the Fund; (c) act as investment adviser for the Fund in connection with investment decisions; (d) provide information in connection with the preparation of all reports to the Fund's shareholders described in the Memorandum; and (e) arrange for and oversee the services of the Fund's administrator, custodian(s), auditors and counsel to act on behalf of the Fund; provided, however, that the Investment Manager is not authorized to enter into agreements in the name of the Fund with such providers of services.

2

3.     Within 5 days after the end of each of the first three weeks of each month and within 10 days after the end of each month or fiscal quarter of the Fund, as the case may be, the Investment Manager shall send to the Fund weekly and monthly valuations of the SSC Investments and the Non-SSC Investments.  The Investment Manager shall cause any and all documentation respecting such investments to be sent to the Fund. The Investment Manager shall be available at all times, upon reasonable notice, for consultation with the Directors of the Fund in connection with the investments of the Fund.

4.     The Investment Manager shall for all purposes be an independent contractor and not an agent or employee of the Fund, and the Investment Manager shall have no authority to act for, represent, bind or obligate the Fund except as specifically provided herein.

5.     The Investment Manager may delegate its duties hereunder or assign this Agreement in its entirety to a wholly-owned subsidiary or an affiliate without the further consent of the Fund.

6.     All investments of the Fund shall at all times conform to and be in accordance with the requirements imposed by:

     (a)     any provisions of applicable law; and

     (b)     provisions of the Certificate of Incorporation, Memorandum of Association, and Articles of Association of the Fund, as amended from time to time.

3

The Fund shall furnish the Investment Manager with a copy of the Certificate of Incorporation, Memorandum of Association and Articles of Association, of the Fund as in effect at the commencement of this Agreement and, thereafter, shall promptly furnish the Investment Manager with copies of such documents as they may be amended from time to time.

7.      The Fund shall bear, for each year, all expenses in maintaining the Fund's offices and all other expenses incurred in the operation of the Fund, including the ordinary and necessary expenses related to the Fund's investment and trading activities (including transactional costs, escrow and custodial fees), all insurance expenses, all legal and auditing fees, and fees and expenses relating to any extraordinary circumstances, such as tax examinations and litigation involving the Fund.

8.      The Fund shall pay the Investment Manager, as full compensation for the services performed by the Investment Manager and the facilities furnished by the Investment Manager, a fixed monthly management fee in an amount equal to one-twelfth of one percent (0.0833%) of the Net Asset Value (as defined in the Memorandum) of the Fund as of the first day of each monthly period, after giving effect to any subscriptions for the Fund's shares accepted as of the first day of such month (the "Management Fee"), which shall be paid monthly in arrears, and a quarterly performance fee payable after the last day of each calendar quarter, in an amount equal to 20% of the amount of any New High Net Profits (as defined in the Memorandum) of the Fund (the "Performance Fee"). Shares of the Fund shall be subject to the payment of the Performance Fee for the portion of each calendar quarter that they are issued and outstanding. For the purposes hereof, the value of the net assets of the Fund and its Net Asset Value per Share (as defined in the Memorandum) shall be computed in the manner specified in the Memorandum for

4

the computation of the value of such net assets in connection with the determination of the redemption price of its shares. Payment of the Performance Fee shall be made to the Investment Manager on or after the last day of each calendar quarter of each year; payment of the Management Fee shall be made within ten (10) days after the month for which such Management Fee has accrued. Each payment for services to the Investment Manager shall be accompanied by a report of the Fund, prepared either by the Fund or by an established firm of independent public accountants, which shall show the amount properly payable to the Investment Manager under this Agreement, and the manner of computation thereof. Notwithstanding the foregoing, in the event that, as of the end of any calendar year, the aggregate amount of original investments in Non-SSC Investment vehicles exceeds the aggregate Net Asset Value of the Non-SSC Investment vehicles (before deduction of the Fund's share of fees payable to the Non-SSC Investment vehicles) (such excess being collectively referred to as the "Non-SSC Investment Loss"), the Investment Manager will reduce the amount of its Performance Fee payable at subsequent quarter end by an amount equal to the Non-SSC Investment Loss. The portion of the Performance Fee that is reduced will be carried forward. In the event that the SSC Investment Loss is, in whole or in part, subsequently recouped by Non-SSC Investment vehicles, the Fund shall pay the Investment Manager such portion of the Performance Fee that was previously reduced to cover Non-SSC Investment Losses in addition to the Performance Fee otherwise payable for any quarter.

The Investment Manager and the Fund may supplement this Agreement at any time to provide for the deferred payment of all or any portion of the fees to be paid to the Investment Manager pursuant to this Agreement.

5

Supreme Court Records OnLine Library - page 40 of 45

9. The Investment Manager will render the services set forth in this Agreement at its own expense, including without limitation, the salaries of employees necessary for such services, the rent and utilities for the facilities provided, and other advisory and operating expenses, except as assumed by the Fund in paragraph 7. The Investment Manager shall pay Fairfield Greenwich Advisors LLC an expense reimbursement in an amount equal to 15% of the Management Fee for bearing certain of the Fund's internal accounting and operational expenses. Payment of this amount shall be made within 10 business days after the last day of each calendar quarter, is contingent on the Investment Manager's receipt of the full amount of the Management Fee during such calendar quarter and shall be proportionately reduced to the extent the Management Fee is not paid to the Investment Manager in any such calendar quarter.

10. (a) The Investment Manager shall not be liable for any error of judgment or for any loss suffered by the Fund in connection with the subject matter of this Agreement, except loss resulting from willful misfeasance, bad faith or gross negligence in the performance of the Investment Manager's obligations and duties, or by reason of the Investment Manager's reckless disregard of their obligations and duties hereunder.

(b) The Investment Manager, its directors, officers and employees, agents and counsel (each, an "Investment Manager Indemnitee"), shall not be subject to, and the Fund shall indemnify to the fullest extent permitted by law and hold each Investment Manager Indemnitee free and harmless from and against, any and all claims, demands, liability or expenses for any loss suffered by the Fund arising out or any act or omission of an Investment Manager Indemnitee relating to the Fund, except to the extent such act or omission constitutes willful

6

misconduct, or reckless disregard of the duties of the Investment Manager or on the part of the Investment Manager Indemnitee.

11.     The Investment Manager and each of its respective shareholders, directors, employees and officers, may engage simultaneously with their investment management activities on behalf of the Fund in other businesses, and may render services similar to those described in this Agreement for other individuals, companies, trusts or persons, and shall not by reason of engaging in such other businesses or rendering of services for others be deemed to be acting in conflict with the interests of the Fund.

12.     This Agreement shall be in full force and effect on the date of this Agreement and shall continue until the termination by either party on written notice ten days prior to the end of any calendar quarter.  During the period between the date when notice of termination is deemed given hereunder and the effective date of termination, the rights, powers and duties of the Investment Manager shall remain in full force and effect but shall be subject to the right of the Fund to direct the liquidation of any investment, which direction shall be given in writing or by telex.

13.     Any notice required to be given hereunder shall be in writing and shall be sent by registered or certified air mail, postage prepaid, with return receipt requested, or by means of telecopy or other wire transmission (with request for assurance of receipt in a manner typical with respect to communications of that type), to the Fund and Investment Manager at the respective addresses indicated in the Offering Memorandum, or to such other addresses as the parties may hereafter direct in writing.  The effective date of any notice given by mail shall be ten days after the date of mailing thereof; any notice to any party having a telecopy or telex

7

Supreme Court Records OnLine Library -  page 42 of 45

number for the receipt at its address for notice hereunder of messages by transmission by telecopy or telex shall be deemed given when transmitted by telecopy or telex addressed to such party at such telecopy or telex number.

14.     This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, and shall not be modified, except in writing, nor assigned by either party without the consent of the other party.

(Remainder of page intentionally left blank)

8

Supreme Court Records OnLine Library -  page 43 of 45

15.    This Agreement shall be construed and governed in accordance with the laws of Bermuda, without regard to the principles of conflicts of laws thereof.

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed as of the day first above written.

FAIRFIELD SENTRY LIMITED

By: _____
Name:  Walter M. Noel, Jr.
Title:  Director


FAIRFIELD GREENWICH (BERMUDA) LTD.

By: _____
Name:  Andres Piedrahita
Title:  Director


Agreed to an accepted for purposes
of Paragraph 9 only:
FAIRFIELD GREENWICH ADVISORS LLC

By: _____
Name:  Jeffrey H. Tucker
Title:   President

9

Supreme Court Records OnLine Library -  page 44 of 45

INDEX NO.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

FAIRFIELD SENTRY LIMITED

Plaintiff,

-vs-

FAIRFIELD GREENWICH GROUP, FAIRFIELD
GREENWICH (BERMUDA) LIMITED, FAIRFIELD
GREENWICH ADVISORS, LLC, FAIRFIELD
GREENWICH LIMITED, FAIRFIELD
INTERNATIONAL MANAGERS, INC., WALTER M.
NOEL, JR., JEFFREY TUCKER, ANDRES
PIEDRAHITA, AMIT VIJAYVERGIYA, BRIAN
FRANCOUER, LOURDES BARRENCHE,
CORNELIS BOELE, PHILIP TOUB, RICHARD
LANDSBERGER, CHARLES MURPHY, ANDREW
SMITH, DANIEL LIPTON, MARK MCKEEFRY,
HAROLD GREISMAN, SANTIAGO REYES,
JACQUELINE HARARY, ROBERT BLUM,
CORINA NOEL PIEDRAHITA, MARIA TERESA
PULIDO MENDOZA, and JOHN DOES 1-20

Defendants.

SUMMONS AND VERIFIED COMPLAINT

SEWARD & KISSEL LLP

Attorneys for Plaintiff
Fairfield Sentry Limited

One Battery Park Plaza
New York, New York 10004
(212) 574-1200

## EXHIBIT 4

Michael J. McNamara (MM-8378)
Jack Yoskowitz (JY-3935)
Walter A. Naeder (WN-8541)
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, NY 10004
T:  (212) 574-1200
F:  (212) 480-8421

*Attorneys for Fairfield Sentry Limited*

UNITED STATES DISTRICT COURT
SOURTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ANWAR et al., <br><br>                   Plaintiffs, <br><br>      vs. <br><br> FAIRFIELD GREENWICH GROUP et al. <br><br>                  Defendants. | 09 Civ. 0118 (VM)(THK) |
| FAIRFIELD SENTRY LIMITED, <br><br>                   Plaintiff, <br><br>      vs. <br><br> FAIRFIELD GREENWICH GROUP et al. <br><br>                  Defendants. | 09 Civ. 5650 (VM)(THK) |

**FAIRFIELD SENTRY LIMITED'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION TO REMAND TO STATE COURT AND TO VACATE
THE CONSOLIDATION ORDER**

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF THE CASE.................................................................................................. 3

ARGUMENT…....................................................................................................................... 4

I.     THE COURT SHOULD REMAND THE ACTION FOR LACK
OF SUBJECT MATTER JURISDICTION ..................................................................... 4

     A.     FGA Bears the Burden of Proof...................................................................... 4

     B.     This is Not a Mass Action.............................................................................. 5

     C.     CAFA'S Exclusions Also Preclude Jurisdiction................................................ 8

     D.     The Company Should Be Awarded Costs........................................................ 8

II.     THE COURT SHOULD VACATE THE ORDER OF CONSOLIDATION.................... 9

     A.     The Standard For Consolidation ........................................................................ 9

     B.     Consolidation Would Strip the Company's Right to Prosecute
Its Separate and Distinct Claims Against the Fairfield Defendants.................... 10

     C.     Consolidation Would Unduly Delay the Prosecution of the
Company's Direct Claims................................................................................. 11

CONCLUSION...................................................................................................................... 13

# TABLE OF AUTHORITIES

## CASES

Page

*Abrams v. Donati*
66 N.Y.2d. 951; 489 N.E.2d 751(1985)……………………………………………....7

*Anwar v. Fairfield Greenwich Ltd*
2009 U.S. Dist. LEXIS 37077 (S.D.N.Y. 2009) ……………………………...…...7

*Blockbuster, Inc. v. Galeno*
472 F.3d 53 (2d Cir. 2006) ...........................................................................................4

*Chiropractic Neurodiagnostic, P.C. v. Allstate Ins. Co.*
No. 08-CV-2319, 2009 U.S. Dist. LEXIS 5822 (E.D.N.Y. 2009) …………………….…..5

*In Re Currency Conversion Fee Antitrust Litig.*
2009 U.S. Dist. LEXIS 53265, (S.D.N.Y. 2009)……….…………………..……….……….…..9

*Devlin v. Transportation Commc'ns Int'l Union*
175 F.3d 121, (2d Cir. 1999)……………………………….…………………..……….....9,10

*Federal Ins. Co. v. Tyco Int'l. Ltd.*
422 F. Supp. 2d 357 (S.D.N.Y. 2006)…………………………….…………..…….…..5

*Garber v. Randell*
477 F.2d 711 (2d Cir. 1973)…………………………………………………….... 10

*Gordon v. Elliman*
306 N.Y. 456; 119 N.E.2d 331 (1953)……………………….…………..…...…….7

*Hart v. General Motors Corp.*
129 A.D.2d 179; 517 N.Y.S.2d 490 (1st Dept 1987)……………………..……...7

*Johnson v. Celotex Corp.*
899 F.2d 1281; 517 N.Y.S.2d 490 (2d Cir. 1990)…………...……………….…….9

*Johnson v. Manhattan Railway Co.*
289 U.S. 479, 53 S. Ct. 721 (1933) ……………………………………………..10

*Katz v. Realty Equities Corp.*
521 F.2d 1354, (2d Cir. 1975)……………………………….…..………….……9

*Lowendahl v. Balt. And Ohio R.R. Co.*
247 A.D. 144; 287 N.Y.S. 62 (1st Dep't 1936)………………….…..………….....6-7

*Lupo v. Human Affairs Int'l*
28 F.3d 269 (2d Cir. 1994)…………………………………………..…….……….…5

*Martin v. Franklin Capital Corp.,*
546 U.S. 132; 126 S. Ct. 704 (2005)…………………….…..……….….…………….9

*In Re Methyl Tertiary Butyl Ether ("MTBE") Prods.*
488 F.3d 112 (2d Cir. 2007)………………………………………….….…….………5

*In re Morris*
82 N.Y.2d 135; 623 N.E.2d 1157 (1993)……………………….……….….…..……6

*Palm Harbor Homes, Inc. v. Walters*
No. 08-CV-196, 2009 WL 562854 (M.D. Ala. 2009) ……………………………………6

*Primavera Familienstiftung v. Askin,*
1996 U.S. Dist. LEXIS 12683 (S.D.N.Y. 1996)……………………………...……….7

*In re Repetitive Stress Injury Litig.*
11 F.3d 368 (2d Cir. 1993)………………………………….……………..……..……9

*Segal v. Varonis Systems, Inc.*
601 F. Supp. 2d 551 (S.D.N.Y 2009)..……………….…………………….….…..……….5

*Scottish Air Int'l. v. British Caledonia Group*
PLC, 81 F.3d 1224 (2d Cir. 1996)………….…..……………………….…………..…..7

*Tanoh v. Dow Chem. Co.,*
561 F.3d 945 (9th Cir. 2009)……………………………………………….……..……6

*Transeastern Shipping Corp. v. India Supply Mission,*
53 F.R.D. 204 (S.D.N.Y. 1971)…………………………………..………………………9

*Vaughn v. LJ International, Inc.*
174 Cal. App. 4th 213; 94 Cal. Rptr. 3d 166 (Cal. Ct. App. 2009)…..………………………7

*Webb v. Goord*
197 F.R.D. 98 (S.D.N.Y. 2000)……………………………….……………………..9,10

## STATUTES AND RULES

28 U.S.C. § 1332(c)……………………………………………….………………….6, n.4

28 U.S.C. § 1332(d)(9)(b)……..……………………………………….......................8

28 U.S.C. § 1332(d)(11)(B)(i)………………..………………………..………….1, 2, 6

28 U.S.C. §1447(c)…………………………………………..…..……...1, 4, 8

15 U.S.C. § 78u-4(b)(3)(B)………………………………………….…...............…...11

Fed. R. Civ. P. 42(a)..........…………………………………………....…….............…...9

Plaintiff Fairfield Sentry Limited (the "Company") respectfully submits this memorandum of law in support of its motion to (1) remand this action back to state court under 28 U.S.C. § 1447(c) for lack of subject matter jurisdiction, and (2) vacate the consolidation order, filed on June 25, 2009, Docket No. 177, under sections 2 and 7 of this Court's Consolidation Order and Order for Appointment, dated January 31, 2009, Docket No. 40 (hereinafter the "Standing Consolidation Order").[1]

## PRELIMINARY STATEMENT

This is a straightforward case in which the Company seeks, among other things, the return of management and performance fees which it erroneously paid to its former investment and risk managers, Defendants Fairfield Greenwich Group, Fairfield International Managers, Inc., Fairfield Greenwich Limited, Fairfield Greenwich Advisors LLC and Fairfield Greenwich (Bermuda) Ltd. (the "Fairfield Entity Defendants"), based on inflated net asset value reports derived from the Company's investments with Bernard L. Madoff Investment Securities LLC ("BLMIS").[2]  Fairfield Greenwich Advisors LLC's ("FGA") sole basis for removal is that this case involves a "mass action" under the Class Action Fairness Act of 2005 ("CAFA").  *See* Notice of Removal, dated June 19, 2009, ("NoR") ¶ 4.  As detailed below, because CAFA is inapplicable, this Court lacks subject matter jurisdiction.

Contrary to FGA's contention, this case is not a "mass action" under 28 U.S.C § 1332(d)(11)(B)(i)("mass action" means any civil action "in which monetary relief claims of 100 or more persons are proposed to be tried jointly ...")(emphasis added).  The Company is the only plaintiff in this case and it has asserted *direct* state law claims against the Fairfield Defendants

---

[1]      Unless otherwise noted, references to Docket No. are to *Anwar v. Fairfield Greenwich Group et al.*, 09-cv-0118 (hereinafter "*Anwar*").

[2]      Defendants also include certain partners and principals of the Fairfield Entity Defendants, who received a portion of the management and performance fees (Defendants will be collectively referred to herein as the "Fairfield Defendants").

for (1) breach of the investment management agreements between the Company and certain of the Fairfield Entity Defendants, (2) breach of the fiduciary duties and duties of care owed to the Company, and (3) equity arising from the Fairfield Entity Defendants' disbursement of management and performance fees to their partners and principals.  There is no dispute that the Company -- and only the Company -- has privity and standing to assert these direct claims.

FGA's representation that the Company brought these claims on behalf of its shareholders is misleading and contradicted by the plain allegations of the Company's Verified Complaint.[3]  NoR ¶ 6(f).  This is not a derivative action brought by shareholders on behalf of the Company.  Further, FGA's contention that CAFA's 100-Person requirement can be met simply because the Company has more than 100 shareholders and recoveries will be passed on to them (NoR ¶ 6(f)) is baseless.  The number of individuals holding shares in the Company is irrelevant because none of them are plaintiffs in this action.  FGA's tortured interpretation of a "mass action" ignores the plain language of 28 U.S.C. § 1332 (d)(11)(B)(i), invalidates a bedrock principle of corporate law that a corporation is a separate and distinct entity, and urges the Court to engage in an extraordinary expansion of the subject matter jurisdiction of the federal courts not envisioned by Congress.  Under FGA's view, literally any company, public or private, with more than 100 shareholders could be deprived of its chosen forum and haled into federal court.  That is not the intent of CAFA.

To the extent the Court finds that CAFA provides the Court subject matter jurisdiction over this action, deconsolidation with *Anwar* is appropriate because the Company has asserted separate and distinct claims from those asserted by the *Anwar* class action plaintiffs – who do not, and cannot, assert derivative claims on behalf of the Company.  Therefore, Co-

---

[3]        A copy of the Verified Complaint is attached as Ex. A to the NoR.

Interim Lead Counsel for the class is not competent to represent the interests of the Company as contemplated by sections 12, 14 and 15 of the Standing Consolidation Order.  Further, under the current case management order and the Fed. R. Civ. P. 26(f) discovery plan filed by certain parties in *Anwar*, the Company's action may be paralyzed as the Fairfield Defendants have taken the extreme positions that no individual consolidated pleading needs to be answered, and no discovery should be taken until the Court resolves issues relating to the filing of a future Second Amended Consolidated Complaint and the resolution of a discovery stay under the Private Securities Litigation Reform Act ("PSLRA").  Such delay would be prejudicial to the Company.

## STATEMENT OF THE CASE

The Company is a company duly incorporated under the International Business Companies Act of the British Virgin Islands, and its principal place of business is in the British Virgin Islands.  *Verified Complaint* filed May 29, 2009 ("*Compl.*"), ¶ 12.  Beginning from November 1990 through May 2009, certain of the Fairfield Entity Defendants were retained as the Company's investment and risk adviser in connection with the Company's investments with Bernard L. Madoff Investment Securities LLC ("BLMIS").  *Compl.* ¶ 3.  In connection therewith, the Fairfield Entity Defendants oversaw the day-to-day investment operations of the company.  *Id.*  In consideration for their services, the Fairfield Entity Defendants received: (a) starting in May 2004, a fixed monthly management fee in an amount equal to 1%, per annum, of the Company's net asset value, and (b) from inception, a quarterly performance fee in an amount equal to 20% of the net appreciation of the Company's net asset value.  *Id.* ¶ 4.  Partners and/or controlling persons of the Fairfield Entity Defendants received a portion of the management and performance fees. *Id.* ¶¶ 19-37.

The Company's net asset value was recorded on net asset value reports (the "Net Asset Value Reports"), which were prepared under the supervision of the Fairfield Entity

Defendants based on the account statements and information that BLMIS provided to the

Fairfield Entity Defendants.  *Compl.* ¶ 5.  On March 12, 2009, Bernard Madoff admitted that he

began his fraud in the 1990s and pled guilty to 11 counts of securities fraud.  *Id.* ¶ 8.

Madoff's admissions contradicted the Net Asset Value Reports.  Accordingly,

from the outset of its relationship with Defendants, the Company paid, and Defendants received,

hundreds of millions of dollars in management and performance fees based on inflated

information.  *Id.* ¶ 10.  The Company is entitled to recover these fees.

**Procedural History**

The Company's Verified Complaint was filed in the New York Supreme Court, County

of New York on May 29, 2009, and it was removed by FGA to this Court on June 19, 2009.  By

Order dated June 25, 2009 (Docket No. 177), this action was consolidated with *Anwar* under the

Standing Consolidation Order and the Civil Case Management Plan and Scheduling Order issued

by this court on March 11, 2009 (Docket. No. 69) (the "CMO").  Thus, this motion is timely

under Section 7 of the Standing Consolidation Order and 28 U.S.C. § 1447(c).  Affidavit of Jack

Yoskowitz, sworn to July 10, 2009 ("Yoskowitz Aff.") ¶¶ 2-3.

## ARGUMENT

## I.

## THE COURT SHOULD REMAND THE ACTION
## FOR LACK OF SUBJECT MATTER JURISDICTION

### A.     FGA Bears the Burden of Proof

FGA bears the burden of establishing subject matter jurisdiction under CAFA.

*Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 58 (2d Cir. 2006) ("we hold that CAFA did not change

the traditional rule and that defendant bears the burden of establishing federal subject matter

jurisdiction"); *Anwar v. Fairfield Greenwich Ltd.,* 09 Civ 118 (VM)(THK), 2009 U.S. Dist.

LEXIS 37077, *12 (S.D.N.Y. May 1, 2009).  Moreover, "when the removal of an action to federal court is contested, 'the burden falls squarely upon the removing party to establish its right to a federal forum by 'competent proof.'" *Federal Ins. Co. v. Tyco Int'l. Ltd.*, 422 F. Supp. 2d 357, 368 (S.D.N.Y. 2006)(internal citation omitted).

Federal courts construe the removal narrowly and there is a strong presumption against removal.  *Lupo v. Human Affairs Int'l., Inc.,* 28 F. 3d 269, 274 n.16 (2d Cir. 1994) ("In light of the congressional intent to restrict federal jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability."); *Chiropractic Neurodiagnostic, P.C. v. Allstate Ins. Co.*, No. 08-CV-23 19, 2009 U.S. Dist. LEXIS 5822, *7-8 (E.D.N.Y. Jan. 26, 2009) (remanding case removed under CAFA, explaining that "any doubts" must be "resolved against removability 'out of respect for the limited jurisdiction of the federal courts and the rights of states.'") (quoting *In re Methyl Tertiary Butyl Ether ("MTBE") Prods.*, 488 F.3d 112, 124 (2d Cir. 2007)).  *See also Segal v. Varonis Systems, Inc.*, 601 F. Supp. 2d 551, 552-53 (S.D.N.Y. 2009) ("A plaintiff is the 'master of the complaint' and may preclude removal by electing to disregard available federal dimension of a claim and asserting only a distinct state law cause of action").  FGA cannot meet its burden.

### B.        This is Not a "Mass Action"

FGA concedes, as it must, that this is not a "class action."  NoR ¶ 4.  Instead, FGA argues that this case is a "mass action" given that the Company has more than 700 shareholders, notwithstanding the undisputed fact that not one of them is a plaintiff in this case. NoR ¶ 4, 6(f).  See also Ex. B to NoR.  CAFA defines a "mass action" as

> any civil action ... in which *monetary relief claims of 100 or more persons are proposed to be tried jointly* on the ground that the plaintiffs' claims involve common questions of law or fact, except

that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under [section 1332](a).

28 U.S.C. § 1332(d)(11)(B)(i) (emphasis added).

From the face of the Verified Complaint it is clear that there is only *one* plaintiff, and the Company asserts claims on its own behalf.  Contrary to FGA's representation (NoR ¶ 6(f)), the Company does not assert individual claims on behalf of 100 or more persons -- much less claims of 100 persons that are proposed to be tried jointly.  The absence of 100 claimants in the Verified Complaint is fatal to any "mass action" jurisdiction under CAFA.  *Tanoh v. Dow Chem. Co.*, 561 F.3d 945, 953 (9th Cir. 2009) (affirming remand because CAFA's "mass action" provision did not permit removal of various cases, each of which asserted claims of fewer than 100 plaintiffs).  *Palm Harbor Homes, Inc. v. Walters*, No. 08-196, 2009 U.S. Dist. LEXIS 17740, *4 (M.D. Ala. Mar. 5 2009) (declining to extend jurisdiction under CAFA where, as here, the action was filed by a single corporate plaintiff).

Further, to find that the 100-person requirement is met merely because a private or public corporation has more than 100 shareholders would ignore well-settled corporate law that the corporation is a distinct legal entity separate from its shareholders.[4]  It is "the accepted principle that a corporation exists independently of its owners, as a separate legal entity, that the owners are normally not liable for the debts of the corporation, and that it is perfectly legal to incorporate for the express purpose of limiting the liability of corporate owners."  *In re Morris*, 82 N.Y.2d 135, 140 (1993).  Corporate separateness is the principle "[a]round [which] the entire body of corporation law is built.  It is accepted in theory and practice and ingrained in our legal and economic systems.  Courts will not lightly disregard the corporate entity."  *Lowendahl v.*

---

[4]        By way of analogy, for diversity purposes, a corporation is deemed to be a citizen of the State where it was incorporated or the State where it has its principal place of business.  28 U.S.C. § 1332(c).  The citizenship of its non-party individual shareholders is irrelevant.

*Balt. And Ohio R.R. Co.*, 247 A.D. 144, 154 (1st Dep't 1936). We are not aware of, and FGA has not cited to, any authority permitting the piercing of the corporate veil to count the number of *non-party* shareholders of a company to satisfy CAFA's 100-person requirement. The corporate form should be respected here.

It is also well-established that shareholders have no standing to assert individual claims predicated on mismanagement resulting in the diminution of value of their shares. Those claims belong to the corporation. *Gordon v. Elliman*, 206 N.Y. 456, 466 (1953); *Abrams v. Donati*, 66 N.Y.2d 951, 953 (1985); *Primavera Familienstiftung v. Askin*, 1996 U.S. Dist. LEXIS 12683, *42 (S.D.N.Y. 1996) ("Claims based on corporate mismanagement or third-party action that resulted in diminution of share value belong to the corporation and can only be brought by it."). Therefore, not one of the Company's shareholders has standing to assert the direct claims that the Company has asserted in the Verified Complaint.

Moreover, because the Company has taken action to recover its losses, no shareholder of the Company has standing to bring a derivative lawsuit here on behalf of the Company under British Virgin Islands law. Under the well-settled "internal affairs" doctrine, *Hart v. General Motors Corp.,* 129 A.D.2d 179, 183 (1st Dep't 1987), *Scottish Air Int'l. v. British Caledonia Group, PLC*, 81 F.2d 1224, 1234 (2d Cir. 1996), a BVI company shareholder's right to commence a derivative action is governed by British Virgin Islands law. *See e.g. Vaughn v. LJ International, Inc.*, 174 Cal. App. 4th 213 (Cal. Ct. App. 2009) (observing that the BVI Business Companies Act is the statute that specifically addresses shareholder derivative actions, and noting that Section 184C of the Act restricts derivative actions where, as here, the company has commenced proceedings to enforce its rights). No shareholder of the

7

Company has obtained the proper leave from a British Virgin Islands court to assert such claims.[5]

In sum, because the Company is the proper and sole plaintiff in this action, the Company's action is not a "mass action" under CAFA.

### C.    CAFA's Exclusions Also Preclude Jurisdiction

Remand is also proper because the Company's claims implicate its internal affairs and the duties that the Fairfield Defendants owed to the Company.  CAFA provides that subject matter jurisdiction under section § 1332(d)(2) shall not apply to any class action that solely involves a claim:

> that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized ....

28 U.S.C. § 1332(d)(9)(B).

Here, jurisdiction is precluded by 28 U.S.C. § 1332(d)(9)(B).  The Company seeks to recover damages from, and the return of management and performance fees paid to, the Fairfield Defendants who were responsible for the day-to-day operations and management of the Company's investments with BLMIS.

### D.    The Company Should be Awarded Costs

Under 28 U.S.C. § 1447(c), the Court "may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."  In evaluating such relief, the Court properly considers whether the removing party "lacked an objectively

---

[5]      In fact, that precise issue is presently before the New York State Supreme Court.  On May 15, 2009, Morning Mist Holdings Ltd. and Miguel Lomeli (the "*Morning Mist*" Plaintiffs), purported shareholders of the Company, filed a proposed derivative shareholder lawsuit on behalf of the Company.  Simultaneous with that complaint, the *Morning Mist* Plaintiffs filed under a separate index number a petition seeking leave to pursue a derivative action on behalf of the Company in accordance with the laws of the British Virgin Islands.  *Morning Mist Holdings Ltd. and Miguel Lomeli v. Fairfield Sentry Ltd.,* Index No. 601527/09 (Sup. Ct. N.Y. County).  On July 2, 2009, the Company filed opposition papers and answered the petition.

reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). Here, there was no reasonable basis for the removal given that this action is clearly not a "class action" nor a "mass action" as those terms are defined by CAFA.

**II**

**THE COURT SHOULD VACATE THE ORDER OF CONSOLIDATION**

The consolidation order should be vacated for two principal reasons: (a) as detailed above, the Court lacks subject matter jurisdiction, and (b) consolidation with the massive putative *Anwar* class action will cause delay, in effect merge the Company's claims with the class action plaintiffs in violation of the "no merger" rule, and prejudice the Company.

**A.      Standard for Consolidation**

Federal Rule of Civil Procedure 42(a) empowers the Court to consolidate actions when there are common questions of law or fact to avoid unnecessary costs or delay. *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990). The burden is on FGA -- as the proponent for consolidation -- to demonstrate that consolidation is appropriate by showing the commonality of factual and legal issues in different actions. *Webb v. Goord*, 197 F.R.D. 98, 101 (citing *In re Repetitive Stress Injury Litig.*, 11 F.3d 368, 374 (2d Cir. 1993)); *In re Currency Conversion Fee Antitrust Litig.*, 2009 U.S. Dist. LEXIS 53265, *6 (S.D.N.Y., June 18, 2009)(citing *Transeastern Shipping Corp. v. India Supply Mission*, 53 F.R.D. 204, 206 (S.D.N.Y. 1971)).

The "district court must examine 'the special underlying facts' with 'close attention' before ordering a consolidation." *In re Repetitive Stress Injury Litig.*, 11 F.3d at 374 (quoting *Katz v. Realty Equities Corp.*, 521 F.2d 1354, 1361 (2d Cir. 1975)). Moreover, the only purpose of consolidating actions is to promote judicial economy, specifically to "expedite trial and eliminate unnecessary repetition and confusion." *Devlin v. Transportation Commc'ns Int'l*

9

*Union*, 175 F.3d 121, 130 (2d Cir. 1999). Judicial economy, however, must be balanced against considerations of equity and "efficiency cannot be permitted to prevail at the expense of justice." *Devlin*, 175 F.3d at 130. Where the benefits of consolidation are outweighed by prejudice to a party, actions should not be consolidated. *Garber v. Randell*, 477 F.2d 711, 714 (2d Cir. 1973); *Webb*, 197 F.R.D. at 10.

A close look at the underlying facts and the case management orders of *Anwar* warrants that this action be deconsolidated from the *Anwar* class action.

**B.      Consolidation Would Strip the Company's Right to Prosecute Its Separate and Distinct Claims Against the Fairfield Defendants**

It is undisputed that the Company has standing to prosecute its direct claims against the Fairfield Defendants. *See supra* at p. 7. However, the terms of the controlling case management orders in *Anwar* would in effect eliminate the Company's right to prosecute its claims in violation of the "no merger" rule. *Johnson v. Manhattan Railway Co.*, 289 U.S. 479, 496-97 (consolidation does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another).

The Standing Consolidation Order appointed counsel for the *Anwar* class action plaintiffs as Interim Co-Lead Counsel to "act on behalf of all Plaintiffs in the consolidated cases." (Standing Consolidation Order ¶ 12).[6] It also provides that Interim Co-Lead Counsel "shall have sole authority" over briefing of motions, pretrial activities and plan for trial, settlement negotiations, and matters concerning the prosecution and/or resolution of the consolidated actions. *Id.* ¶ 14. On April 24, 2009, the Consolidated Amended Complaint was filed (Docket.

---

[6]      The Company notes that the CMO and the Standing Consolidation Order are a product of negotiations between counsel for the *Anwar* class action plaintiffs and counsel for certain of the defendants, which occurred before the Company was consolidated in *Anwar* as a plaintiff.

10

No. 116) asserting direct claims of shareholders against entities and individuals related to

Fairfield Greenwich Group, and entities related to Citco Fund Services (Europe) B.V.

The Consolidated Amended Complaint does not, and cannot, purport to assert derivative

claims on behalf of the Company.[7]  Nor do the *Anwar* class action plaintiffs, or any other

shareholder of the Company for that matter, have standing to pursue a derivative action on behalf

of the Company under British Virgin Islands law.  *See, supra*, p. 7.

Therefore, the Company has asserted direct claims against the Fairfield Defendants,

which are separate and distinct from the claims asserted by the class action plaintiffs.  To be

sure, no purported shareholder of the Company (nor its counsel) is competent to act on behalf of

the Company in the consolidated actions.

## C.      Consolidation Would Unduly Delay the Prosecution of the Company's Direct Claims

On May 29, 2009, a Joint Rule 26(f) Discovery Plan was filed, which stated that Interim

Co-Lead Plaintiff would seek leave to file a Second Consolidated Amended Complaint to

include claims under the federal securities law claims under the PLSRA, which imposes a stay of

discovery while a motion to dismiss is pending.  Specifically, the statute states, "in any private

action arising under [federal securities law], all discovery and other proceedings shall be stayed

during the pendency of any motion to dismiss, unless the court finds upon the motion of any

party that particularized discovery is necessary to preserve evidence or to prevent undue

prejudice to that party." 15 U.S.C. § 78u-4(b)(3)(B).  By Order dated July 7, 2009 (Docket. No.

---

[7]         By notice of removal dated May 28, 2009, FGA removed a proposed shareholder derivative action on behalf of the Company to this Court. *Morning Mist Holdings, Ltd. v. Fairfield Greenwich Group, et al.,* 09 Civ 5012, Docket No. 1.  On June 8, 2009, the Morning Mist Plaintiffs moved to remand this action to state court.  *Id.* Docket No. 9.  On June 9, 2009, the proposed shareholder derivative action was consolidated with *Anwar. Id.* Docket No. 11.  On June 24, 2009, the *Morning Mist* Plaintiffs moved to vacate the consolidation order and to appoint their counsel as Co-Lead Derivative Counsel in *Anwar. Id.,* Docket No. 13.  The Company objects to any appointment of Co-Lead Derivative Counsel as premature given that the issue is pending before the New York State Supreme Court.

178) the Court appointed counsel for the *Anwar* plaintiffs as lead plaintiffs given that they plan to file a second amended consolidated complaint to include PSLRA claims and to "vigorously" pursue those claims. <u>See</u> <u>also</u> Stipulation Adjourning Deadline to Respond to the Complaint, dated June 9, 2009 (Docket No. 168).

Further, under the CMO, the Fairfield Defendants apparently are only obliged to respond or answer to the Amended Consolidated Complaint, and not to any individual complaints. CMO Section 6 states "Defendants shall respond *only* to the Consolidated Amended Complaint; no response is due to any *individual complaints that are consolidated* into the Consolidated Action." (emphasis added). Thus, the Company will be further prejudiced by consolidation because the Fairfield Defendants have taken the position that they have no obligation to answer individual complaints under the CMO. *See* Yoskowitz Aff. Ex. A (Mark Cunha's June 9, 2009 letter to the Court).

In addition, the Discovery Plan contemplates a stay of discovery pending the resolution of issues relating to the PSLRA stay. While the PSLRA stay should not apply to the Company's action as it involves state law claims and does not implicate state or federal securities law claims, it appears that the Fairfield Defendants would nonetheless seek to stay discovery under the Discovery Plan, and further delay the prosecution of the Company's claims.

## CONCLUSION

For the foregoing reasons, the Company's motion should be granted and costs should be awarded to the Company.

New York, New York
July 10, 2009

SEWARD & KISSEL LLP

By: ___s/Jack Yoskowitz____
Michael J. McNamara
Jack Yoskowitz
Walter A. Naeder
One Battery Park Plaza
New York, NY 10004
T:  (212) 574-1200
F:  (212) 480-8421
mcnamara@sewkis.com
yoskowitz@sewkis.com
naeder@sewkis.com

*Attorneys for Fairfield Sentry Limited*

SK 26729 0002 1012402

13

# **EXHIBIT 5**

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: *12·23·09*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------ X
PASHA S. ANWAR, et al.,              :
                                     :
               Plaintiffs,           :    09 Civ. 0118
                                     :    09 Civ. 2366 (Ferber)
     - against -                     :    09 Civ. 2588 (Pierce)
                                     :    09 Civ. 5012 (Morning Mist)
FAIRFIELD GREENWICH LIMITED,         :    09 Civ. 5650 (Sentry)
et al.,                              :
                                     :    **DECISION AND ORDER**
               Defendants.           :
------------------------------ X

**VICTOR MARRERO, United States District Judge.**

## I.  BACKGROUND

Plaintiffs in numerous actions consolidated by this Court
for pretrial proceedings assert claims for financial losses
allegedly arising from the fraudulent scheme perpetrated by
Bernard L. Madoff. Four of those cases were originally filed
in New York State Supreme Court, New York County, and removed
to this Court[1] by the defendants, Fairfield Greenwich Group,
Fairfield Greenwich Limited, Fairfield Greenwich (Bermuda)
Ltd., and Fairfield Greenwich Advisors LLC ("FGA")
(collectively, "Defendants"), pursuant to 28 U.S.C. §§ 1332
and 1441, as amended by the Class Action Fairness Act of 2005
("CAFA"). In the instant motion, Plaintiffs in Ferber,
Pierce, Morning Mist, and Sentry (collectively, "Plaintiffs")

---

[1] The four removed cases were separately filed as Ferber v. Fairfield
Greenwich Group, et al., No. 09 Civ. 2366 ("Ferber"); Pierce et al. v.
Fairfield Greenwich Group et al., No. 09 Civ. 2588 ("Pierce"); Morning
Mist Holdings Ltd. et al. v. Fairfield Greenwich Group et al., No. 09 Civ.
5012 ("Morning Mist"); and Fairfield Sentry Limited v. Fairfield Greenwich
Group, et al., No. 09 Civ. 5650 ("Sentry").

seek to remand their cases to state court on the grounds that under CAFA the Court lacks subject matter jurisdiction over these actions, and thus that the cases were improperly removed. Plaintiffs also request an award of attorney's fees and costs incurred in connection with their remand motions.

By Order dated November 13, 2009, Magistrate Judge Theodore H. Katz, to whom the consolidated action has been referred for supervision of pretrial proceedings, issued a Report and Recommendation (the "Report"), a copy of which is attached and incorporated herein. The Report finds that Pierce was filed in state court by one limited partner or shareholder, and Ferber and Morning Mist by two such persons, as derivative actions brought on behalf and for the benefit of the respective corporate entities named as nominal defendants. Sentry was filed as a direct action by the corporate entity asserting claims against the named defendants. In either event, Plaintiffs state that any recovery from the litigation would be paid to the corporate entity, and thus that legally each of the actions essentially involves only one plaintiff. On this basis, Plaintiffs contend that because under CAFA federal court removal jurisdiction extends only to cases involving a plaintiff class of at least 100 persons, the applicable standard is not met in these cases.

In response, Defendants argue that it is not the

-2-

derivative nature of the actions that matters, but the number of beneficial equity holders of the respective entities, and that a count of such individuals as class members would qualify these cases as a "mass action" for the purposes of CAFA.

The Report rejects Defendants' argument as "astoundingly expansive" (Report at 13) because reaching the requisite number of 100 class members would entail counting multiple tiers of "investors in investors." (Id. at 12.) Reviewing legislative history and relevant case law under CAFA and the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. §§ 77p, 78bb, the Report finds no support for Defendants' theory, and concludes that neither the derivative actions in Ferber, Pierce and Morning Mist, nor the direct action in Sentry, are subject to CAFA. Accordingly, the Report recommends that Plaintiffs' motions in each of the four actions be granted and the cases be remanded. The Report further recommends that Plaintiffs' request for attorney's fees and costs be denied.

Defendant FGA filed timely objections to the Report challenging its findings and conclusions and opposing an award of attorney's fees and costs. Specifically, FGA contends that the Report hinges on a misinterpretation of CAFA, and that it is the number of underlying claimants or persons whose claims

-3-

are proposed to be tried jointly that must reach at least 100 for the class action to qualify under CAFA as a mass action. The objections otherwise reiterate the arguments raised in the parties' underlying motion papers and addressed in the Report. Plaintiffs filed responses supporting adoption of the Report, except for its recommended denial of counsel fees and costs.

For the reasons stated below, the Court adopts the recommendations of the Report in their entirety.

## II. **STANDARD OF REVIEW**

A district court evaluating a Magistrate Judge's report may adopt those portions of the report to which no "specific written objections" are made as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous. Fed. R. Civ. P. 72(b)(2); Thomas v. Arn, 474 U.S. 140, 149 (1985); Greene v. WCI Holding Corp., 956 F. Supp. 509, 513 (S.D.N.Y. 1997). "Where a party makes a 'specific written objection ... after being served with a copy of the [magistrate judge's] recommended disposition,' however, the district court is required to make a de novo determination regarding those parts of the report." Cespedes v. Coughlin, 956 F. Supp. 454, 463 (S.D.N.Y. 1997) (citing United States v. Raddatz, 447 U.S. 667, 676 (1980)); Fed. R. Civ. P. 72(b). The Court is not required to review any portion of a Magistrate Judge's report

$-4-$

that is not the subject of an objection. <u>See</u> <u>Thomas</u>, 474 U.S. at 149. A district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the Magistrate Judge. <u>See</u> Fed. R. Civ. P. 72(b)(3); <u>DeLuca v. Lord</u>, 858 F. Supp. 1330, 1345 (S.D.N.Y. 1994).

Having conducted a <u>de</u> <u>novo</u> review of the full factual record in this litigation, including the pleadings, and the parties' respective papers submitted in connection with the underlying motion and in this proceeding, as well as the Report and applicable legal authorities, the Court concludes that the findings, reasoning, and legal support for the recommendations made in the Report are warranted. The Court has examined Defendants' objections in light of the record and finds them without merit. The issues Defendants raise in opposing Plaintiffs' motions and in their objections to the Report are thoroughly and carefully addressed in the Report in terms consistent with the Court's own <u>de</u> <u>novo</u> review of the facts and the applicable law.[2] Accordingly, for substantially the reasons set forth in the Report, the Court adopts the

---

[2] Two cases not cited in the Report but recently decided in other districts applying the CAFA removal provisions support the Court's conclusion. <u>See</u> <u>Kitazato v. Black Diamond Hospitality Invest., LLC</u>, CV. No. 09-00271, 2009 WL 3824851 (D. Hawaii Nov. 13, 2009); <u>California Pub. Employees Retirement Syst. v. Moody's Corp.</u>, No. C 09-3628, 2009 WL 3809816, *7 (N.D. Cal. Nov. 10, 2009) (noting that the action does not qualify for removal under CAFA because "it does not concern numerous named plaintiffs who are electing to try their claims together. CalPERS individual beneficiaries have not made any direct claims in this action; rather, the sole plaintiff in this case is CalPERS itself.")

Report's factual and legal analyses and determinations, as well as its recommendations, in their entirety as the Court's ruling on Plaintiffs' underlying motions.

## IV. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the Report and Recommendation of Magistrate Judge Theodore H. Katz dated November 13, 2009 (Docket No. 297) is adopted in its entirety as the Court's ruling on the motions (Case No. 09 Civ. 0118, Docket Nos. 88, 90, 181; Case No. 09 Civ. 5012, Docket No. 9) of plaintiffs in Ferber v. Fairfield Greenwich Group, et al., No. 09 Civ. 2366 ("Ferber"); Pierce et al. v. Fairfield Greenwich Group et al., No. 09 Civ. 2588 ("Pierce"); Morning Mist Holdings Ltd. et al. v. Fairfield Greenwich Group et al., No. 09 Civ. 5012 ("Morning Mist"); and Fairfield Sentry Limited v. Fairfield Greenwich Group, et al., No. 09 Civ. 5650 ("Sentry"), to remand these actions to State Court, and the objections of defendant Fairfield Greenwich Advisors LLC (Docket No. 307) are DENIED; and it is further

-6-

**ORDERED** that the Clerk of Court is directed to remand the Ferber, Pierce, Morning Mist and Sentry actions to the New York State Supreme Court, New York County, and to withdraw any pending motions on the docket sheets of these actions.

**SO ORDERED.**

Dated:     NEW YORK, NEW YORK
           23 December 2009



Victor Marrero
U.S.D.J.

-7-

PASHA ANWAR, et al.,
v.
FAIRFIELD GREENWICH LIMITED, et al.

09 Civ. 0118

Report and Recommendation of
Magistrate Judge Theodore H. Katz
dated November 13, 2009

Attachment to the Court's
Decision and Order
dated December 23, 2009

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
PASHA ANWAR, et al.,                 :

                    Plaintiffs,      :        09 Civ. 0118 (VM)(THK)

                                     :

        -against-                    :

                                     :        **REPORT AND RECOMMENDATION**

                                     :
FAIRFIELD GREENWICH LIMITED,         :
et al.,                              :

                    Defendants.      :

                                     :
------------------------------X

**TO: HON. VICTOR MARRERO, UNITED STATES DISTRICT JUDGE.**
**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

        This consolidated case arises out of several actions filed
against Defendants Fairfield Greenwich Group, Fairfield Greenwich
Limited, Fairfield Greenwich (Bermuda) Ltd., and Fairfield
Greenwich Advisors LLC (together, "Defendants"),[1] following
Defendants' financial losses in connection with the widely-
publicized fraudulent scheme perpetrated by Bernard L. Madoff. The
four actions at the core of the instant motion, <u>Ferber v. Fairfield
Greenwich Group, et al.</u>, No. 09 Civ. 2366 ("<u>Ferber</u>"), <u>Pierce et al.
v. Fairfield Greenwich Group et al.</u>, No. 09 Civ. 2588 ("<u>Pierce</u>"),
<u>Morning Mist Holdings Ltd. et al. v. Fairfield Greenwich Group, et
al.</u>, No. 09 Civ. 5012 ("<u>Morning Mist</u>"), and <u>Fairfield Sentry
Limited v. Fairfield Greenwich Group et al.</u>, No. 09 Civ. 5650
("<u>Sentry</u>"), were originally filed in New York State Supreme Court,
three as derivative actions. Defendants removed these cases to

---

        [1] The various Plaintiffs also assert claims against certain
individual partners and principals of Defendants, their auditors,
and administrators.

this Court pursuant to 28 U.S.C. §§ 1332 and 1441, as amended by the Class Action Fairness Act of 2005 ("CAFA" or the "Act"). The District Judge to whom the cases were assigned (Hon. Victor Marrero) consolidated them, along with other actions filed in this Court against Defendants, and referred the action to this Court for general pretrial supervision.

Presently before the Court are motions by the Plaintiffs in Ferber, Pierce, Morning Mist, and Sentry (together, "Plaintiffs," without Sentry, "Derivative Plaintiffs") to remand those actions to state court for lack of subject matter jurisdiction. Plaintiffs also request attorneys' fees and costs in connection with these motions.[2]  For the reasons that follow, the Court recommends that Plaintiffs' motions be granted and each of the four cases be remanded to state court, but that the requests for attorneys' fees and costs be denied.[3]

## BACKGROUND

On December 10, 2008, Bernard L. Madoff ("Madoff") shocked the global financial community when he confessed to running a multi-

---

[2] By Memorandum Opinion and Order, dated May 1, 2009, this Court granted Defendants' request for limited discovery on the issue of subject matter jurisdiction with respect to Ferber and Pierce.  See Anwar v. Fairfield Greenwich Ltd., No. 09 Civ. 118 (VM) (THK), 2009 WL 1181278, at *5 (S.D.N.Y. May 1, 2009).

[3] In light of the Second Circuit's decision in Williams v. Beemiller, Inc., 527 F.3d 259 (2d Cir. 2008), this Court cannot issue a final order remanding the actions to state court.  See Williams, 527 F.3d at 266 (holding that "[a] motion to remand is not a 'pretrial matter' under § 636(b)(1)(A), and a magistrate judge presented with such a motion should provide a report and recommendation to the district court that is subject to de novo review under Rule 72").

2

billion dollar Ponzi scheme through his investment firm Bernard L. Madoff Investment Securities, LLC ("BLMIS"). Since as early as the 1990s, Madoff systematically reported fictional assets and profits to investors in BLMIS; when earlier investors sought to collect their "profits," Madoff simply paid them out of the capital received from newer investors. In essence, BLMIS was worth nothing more than the paper on which Madoff prepared his monthly statements to investors. On March 12, 2009, Madoff pled guilty to 11 counts of securities fraud.

Among Madoff's largest victims were Greenwich Sentry, L.P. ("GS"), its successor, Greenwich Sentry Partners, L.P. ("GSP"), and Fairfield Sentry Limited ("FSL," together with GS and GSP, the "Funds"), investment funds within the penumbra of Defendant Fairfield Greenwich Group. The Fairfield Greenwich Group is a self-described "global family of companies" that offers a variety of single manager funds, multi-strategy funds, and fund-of-funds to investors. (See Pierce Complaint ¶ 16; Ferber Complaint ¶ 15; Morning Mist Complaint ¶ 22; Sentry Complaint ¶ 13.) Simply put, GS, GSP, and FSL are corporate entities set up by Defendants as pooled investment vehicles, and Defendants are corporate entities that advised, managed and maintained them.

Defendants, in their role as, inter alia, investment manager of the Funds, directed all or almost all of the capital invested in the Funds - some billions of dollars - to BLMIS for investment. When BLMIS was exposed as a Ponzi scheme, the Funds, and, in turn, the investors in the Funds, lost virtually all of their

3

investments.[4]    Defendants, however, had for years received management and performance fees in connection with these investments which, among other things, Plaintiffs now seek to recover under various tort and contract theories.

Plaintiffs in <u>Ferber</u> are two limited partners of GS, who commenced a derivative action in state court on February 13, 2009. The <u>Ferber</u> action was brought "in the name of and for the benefit of Greenwich Sentry and its Limited Partners." (<u>Ferber</u> Complaint ¶ 1.) Plaintiff in <u>Pierce</u> is a limited partner of GSP, who commenced a derivative action in state court several days later, on February 17, 2009. The <u>Pierce</u> action was similarly brought "in the name of and for the benefit of Greenwich Sentry Partners and its Limited Partners." (<u>Pierce</u> Complaint ¶ 1.) Plaintiffs in <u>Morning Mist</u> are two shareholders of FSL, a British Virgin Islands Company, who commenced a derivative action in state court on May 15, 2009. The <u>Morning Mist</u> action was brought "in the name of and for the benefit of Fairfield Sentry." (<u>Morning Mist</u> Complaint ¶ 1.) Finally, Plaintiff in <u>Sentry</u> is FSL,[5] who commenced a direct action

---

[4] GS and GSP are limited partnerships, and thus, their investors are limited partners who purchased limited partnership interests. FSL is a British Virgin Islands Company, and thus, its investors are shareholders, who purchased shares in FSL.

[5] On July 21, 2009, the British Virgin Islands High Court entered an order granting an application for the liquidation of FSL and appointing Christopher Stride and Kenneth Krys, of Krys Associates, as the joint liquidators of FSL ("Liquidators"). (<u>See</u> Letter from Jack Yoskowitz, Esq., dated Aug. 14, 2009.) On October 2, 2009, the Liquidators requested to be substituted as plaintiffs in <u>Sentry</u>. (<u>See</u> Letter from David J. Molton, Esq., dated Oct. 2, 2009.) On October 14, 2009, this Court granted the Liquidators' request. <u>See</u> Order, dated Oct. 14, 2009. This

on May 29, 2009, "to recover, among other things, in excess of $919 million in investment management and performance fees that [FSL] paid Defendants based on inflated net asset value reports derived from [FSL]'s investments with BLMIS and C&M Trading." (Sentry Complaint ¶ 1.)

Defendants removed each of these actions to this Court, pursuant to CAFA. Plaintiffs subsequently moved to remand the actions to state court, arguing that these actions do not meet the requirements of CAFA. (See Ferber's Memorandum of Law, dated Apr. 8, 2009 ("Ferber Mem."), at 1; Pierce's Memorandum of Law, dated Apr. 14, 2009 ("Pierce Mem."), at 1; Morning Mist's Memorandum of Law, dated June 8, 2009 ("Morning Mist Mem."), at 1; Fairfield Sentry Limited's Memorandum of Law, dated July 10, 2009 ("FSL Mem."), at 2.) In opposition, Defendants argue that "[c]laims brought by or for the benefit of hundreds of investors in funds associated with the Fairfield Greenwich Group to recover losses arising from the Madoff Ponzi scheme are 'mass actions' under CAFA and therefore were properly removed to this Court." (Defendant FGA's Opposition to the Motions to Remand By the Ferber, Pierce, Morning Mist and Sentry Plaintiffs, dated July 27, 2009 ("Opp. Mem."), at 1.)

## DISCUSSION

## I. Legal Standards for Removal and Remand

---

substitution has no effect on the outcome of the instant motion. Thus, in this Opinion, the Court will continue, for simplicity's sake, to refer to the plaintiff in Sentry as FSL.

A defendant who seeks to remove a civil action to federal court must timely file a notice of removal in the district court. 28 U.S.C. § 1446(b).  In addition, a defendant may only remove an action from state court if the case could have been originally filed in federal court.  See 28 U.S.C. § 1441(a); Vera v. Saks & Co., 335 F.3d 109, 113 (2d Cir. 2003).  Thus, removal is prohibited unless there is federal subject matter jurisdiction.    See Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 107 S. Ct. 2425, 2429 (1987); see also Vera, 335 F.3d at 113 ("A district court must remand a case to state court 'if at any time before final judgment it appears that the district court lacks subject matter jurisdiction.'") (quoting 28 U.S.C. § 1447(c)).

On a motion to remand, the party seeking removal bears the burden of establishing to a "reasonable probability" that removal is proper.  See Blockbuster, Inc. v. Galeno, 472 F.3d 53, 58 (2d Cir. 2006); DiTolla v. Doral Dental IPA of New York, 469 F.3d 271, 275 (2d Cir. 2006); see also Wilds v. UPS, Inc., 262 F. Supp. 2d 163, 171 (S.D.N.Y. 2003) (noting that "the party seeking remand is presumed to be entitled to it unless the removing party can demonstrate otherwise") (quoting Bellido-Sullivan v. AIG, Inc., 123 F. Supp. 2d 161, 163 (S.D.N.Y. 2000)).  Any doubts regarding the propriety of removal are resolved in favor of remand, and "federal courts construe the removal statute narrowly."   Lupo v. Human Affairs Int'l, Inc., 28 F.3d 269, 274 (2d Cir. 1994) (quoting Somlyo v. J. Lu-Rob Enters., Inc., 932 F.2d 1043, 1045-46 (2d Cir. 1991)); see also Fernandez v. Hale Trailer Brake & Wheel, 332 F.

6

Supp. 2d 621, 623 (S.D.N.Y. 2004).

Here, none of the parties disputes that Defendants timely removed all four actions.  Rather, Plaintiffs argue that this Court lacks subject matter jurisdiction under CAFA.

## II.  Subject Matter Jurisdiction Under CAFA

### A.  Legal Standard

CAFA establishes federal subject matter jurisdiction for certain matters filed as "class actions" under Rule 23 of the Federal Rules of Civil Procedure, or an equivalent state provision. See 28 U.S.C. § 1332(d)(1)(B).  Jurisdiction only extends to cases that include a plaintiff class of at least 100 members, who satisfy minimum diversity and an amount in controversy requirement of $5,000,000, as set forth in §§ 1332(d)(2)-(10).  In addition, even if not styled as a "class action," a lawsuit filed in state court may still be "deemed to be a class action removable" to federal court under CAFA if it qualifies as a "mass action," and otherwise meets the criteria in §§ 1332(d)(2)-(10).  See id. § 1332(d)(11). CAFA defines a "mass action" as a suit "in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact."  Id. § 1332(d)(11)(B)(i).

To meet the minimum diversity requirement of CAFA, it is sufficient that "any member of a class of plaintiffs is a citizen of a State different from any defendant." Id. § 1332(d)(2)(A). Alternatively, minimum diversity may be satisfied if either (1) "any member of a class of plaintiffs is a foreign state or a

7

citizen or subject of a foreign state and any defendant is a citizen of a State," or (2) "any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state." Id. § 1332(d)(2)(B)-(C).

To meet the amount in controversy requirement of $5,000,000, CAFA permits an aggregation of the claims of all class members. See id. § 1332(d)(6). In the case of a "mass action," however, "jurisdiction shall exist only over those plaintiffs whose claims" exceed $75,000. Id. § 1332(d)(11)(B)(i). Thus, CAFA envisions a scenario under which a federal court has jurisdiction over the "mass action," but the claims of those individual plaintiffs whose amount in controversy falls below $75,000 may be remanded to state court. See id.; see also S. Rep. No. 109-14, at 42 (2005), as reprinted in 2005 U.S.C.C.A.N. 3, 40.

If a defendant has successfully met his burden of demonstrating the propriety of removal, see Blockbuster, Inc., 472 F.3d at 58, a plaintiff may still prevail on a motion to remand upon a showing that one of CAFA's enumerated exceptions applies. See New Jersey Carpenters Vacation Fund v. Harborview Mortgage Loan Trust, 581 F. Supp. 2d 581, 588 (S.D.N.Y. 2008). CAFA's exceptions preclude federal subject matter jurisdiction over "any class action that solely involves a claim . . . (A) concerning a covered security . . . ; (B) that relates to the internal affairs or governance of a corporation or other form of business enterprise . . . ; or (C) that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or

8

pursuant to any security . . . ."  28 U.S.C. § 1332(d)(9)(A)-(C) (emphasis added).  If a complaint contains a claim implicating one of CAFA's exceptions, but also involves other non-excepted claims, the case should remain in federal court.  See, e.g., Puglisi v. Citigroup Alternative Invs., No. 08 Civ. 9774 (NRB), 2009 WL 1515071, at *2-3 (S.D.N.Y. May 29, 2009) (holding that no CAFA exception applied when, despite the fact that the case involved the internal affairs of a business enterprise, the complaint also alleged "improper marketing and promotion of the fund at issue").

B.    The Parties' Claims

Plaintiffs here do not dispute that the minimal diversity requirement of CAFA is met.  Nor do they claim that the aggregate amount in controversy is less than $5,000,000.[6]  Rather, Derivative Plaintiffs argue that CAFA "manifestly does not confer . . . jurisdiction over *derivative* actions" brought on behalf of a corporate entity by one, or in the case of Pierce and Morning Mist, two, limited partners or shareholders of a nominal defendant. (See Ferber Mem. at 1; Pierce Mem. at 1; Morning Mist Mem. at 1.) Similarly, in Sentry, FSL argues that CAFA does not confer jurisdiction over "*direct* state law claims against the . . . Defendants" brought by the corporate entity itself (FSL). (See FSL Mem. at 2.)   In Plaintiffs' view, any recovery would go to the

---

[6] Plaintiffs in Ferber, Pierce, and Morning Mist do, however, argue that the individual limited partners or shareholders in GS, GSP, and FSL may have suffered losses less than $75,000.  Given this Court's lack of subject matter jurisdiction over the entire action, see infra, the Court need not address this argument.

9

Funds, and, thus, there is only one plaintiff in each action.  (See Ferber Mem. at 5; Pierce Mem. at 6; Morning Mist Mem. at 6; FSL Mem. at 6.)

In response, Defendants contend that these four cases are "mass actions" under CAFA, since they were brought "for the benefit of [over 100] investors in a non-operating hedge fund."  (Opp. Mem. at 1.)  According to Defendants, GSP (and by implication GS) is made up of over 100 beneficial owners,[7] and FSL has over 700 shareholders.  (See id. at 10-11.)  Thus, Defendants propose an interpretation of CAFA that would require this Court to infer the existence of multiple plaintiffs when, in fact, there are, at most, only two.

### 1. The Derivative Actions - Ferber, Pierce, and Morning Mist

The question of whether a derivative action brought on behalf of a corporation or partnership in which there are over 100 investors qualifies as a "mass action" under CAFA is a matter of first impression in this Court.  Derivative Plaintiffs argue that the obvious answer to this question is that it does not, because "[t]o qualify as a 'mass action,' a case must involve 'monetary relief claims of 100 or more persons [that] are proposed to be tried jointly.'"  (See Derivative Plaintiffs' Reply Memorandum of

---

[7] Defendants offer little in the way of the number of limited partners in GS.  For purposes of this Opinion, the Court will assume that the counting for GS mirrors that of GSP, since GSP is GS's successor fund.  In any event, the Court rejects Defendants' counting method, and thus, this omission is of little consequence.

Law, dated Aug. 21, 2009 ("Deriv. Pl.'s Reply Mem."), at 2 (quoting 28 U.S.C. § 1332(d)(11)(B)).) On its face, <u>Ferber</u> is a derivative action brought by two limited partners of GS to recover losses on behalf of GS. (<u>See Ferber</u> Complaint ¶ 1.) Similarly, <u>Pierce</u> is a derivative action brought by one limited partner of GSP, GS's successor fund, to recover losses on behalf of GSP. (<u>See Pierce</u> Complaint ¶ 1.) Finally, <u>Morning Mist</u> is a derivative action brought by two shareholders of FSL to recover losses on behalf of FSL. (<u>See Morning Mist</u> Complaint ¶ 1.) Therefore, the named plaintiffs in <u>Ferber</u>, <u>Pierce</u>, and <u>Morning Mist</u> fall woefully short of the 100-person requirement of CAFA.

Defendants, however, ask the Court to look beyond the derivative nature of <u>Ferber</u>, <u>Pierce</u>, and <u>Morning Mist</u>, and count each of the "beneficial equity holders" in the Funds as individual plaintiffs in a larger "mass action." (<u>See</u> Opp. Mem. at 9.) The Court rejects Defendants' approach and holds that derivative actions are not "mass actions" subject to federal court jurisdiction under CAFA.

To reach CAFA's requirement of 100 plaintiffs, Defendants focus on the 700 shareholders of FSL in the <u>Morning Mist</u> action.[8] For GSP, Defendants first look to the limited partners and then go further, since GSP currently has only 29 limited partners. (<u>See</u> Declaration of Paul J. Sirkis, dated July 27, 2009 ("Sirkis

---

[8] Defendants appear to make similar arguments with respect to <u>Sentry</u>. As <u>Sentry</u> is a direct claim brought by FSL itself, that action is discussed in further detail, <u>infra</u>.

Decl."), ¶ 2.)

To overcome this hurdle, Defendants ask the Court to disregard the investors of record in GSP, and instead count the underlying "beneficial equity holders" of those 29 limited partners. Because some of the investors of record in GSP are other corporate entities, as opposed to individuals, Defendants argue that, for purposes of CAFA counting, the Court should include this second tier of investors (i.e., the investors in the investors). For example, eight limited partners of GSP are themselves other partnerships and trusts. Defendants count both the beneficiaries of those trusts and the partners of those partnerships as alleged "class members." (See id. ¶¶ 5-6.) Thus, eight limited partners become upwards of sixty "class members" through Defendants' two-tiered approach. (See id. ¶ 7.) Nevertheless, Defendants still find themselves short of CAFA's 100-person threshold.

In continuing their ascent up the CAFA ladder, Defendants propose counting yet a *third* tier of investors. In other words, Defendants count the investors in investors in investors in GSP, stopping only - as far as the Court can tell - because they eventually reached their target of 100. As a clarifying example, Defendants generously count each of the individual members of an LLC, that serves as the general partner of a partnership, that, in turn, is a limited partner in GSP. (See Amended Declaration of Paul J. Sirkis, dated July 31, 2009 ("Sirkis Am. Decl."), Exhibit ("Ex.") 54.) Defendants, through this triple-tiered counting method, conclude that there are a total of 109 current "beneficial

12

equity holders" in GSP.  (See Further Supplemental Declaration of Paul J. Sirkis, dated September 8, 2009 ("Sirkis Further Supp. Decl."), ¶ 5.)

The reach of CAFA simply does not extend this far, and the Court declines to adopt Defendants' astoundingly expansive approach.  Cf. Lupo, 28 F.3d at 274 (noting that "federal courts construe the removal statute narrowly").[9]

### a.    CAFA, Its Legislative History, and the Relevant Case Law

Notwithstanding their counting flaws, Defendants insist CAFA permits removal of derivative actions that could indirectly benefit

---

[9] Although the Court does not accept Defendants' premise, it is questionable whether Defendants' counting method is at all accurate.  For example, Defendants list one particular limited partner as two individuals who allegedly invested "as joint tenants," despite the fact that the corresponding subscription agreement was executed by an individual limited partner, with the designated space for any "joint tenant" left blank.  (See Sirkis Decl. ¶¶ 2(xv), 7; Sirkis Am. Decl. Ex. 15; see also Supplemental Declaration of Paul J. Sirkis, dated Aug. 17, 2009 ("Sirkis Supp. Decl."), Ex. 15, at 8 ("Individual Ownership" box checked off).)
    Defendants denote another limited partner as three individuals, who also invested "as joint tenants."  (See Sirkis Decl. ¶¶ 2(xii), 7.)  Derivative Plaintiffs, however, have since pointed out that two of those three individuals are now deceased.  (See Affidavit of Frank E. Pierce III in Support of Motion to Remand, dated Aug. 21, 2009.)  When a joint tenant dies, the surviving tenants own the entirety of the property.  See In re Covert, 97 N.Y.2d 68, 75, 735 N.Y.S.2d 879, 884 (2001).
    Finally, the two plaintiffs in Pierce, limited partner Frank E. Pierce, and limited partner Frank E. Pierce IRA, are counted by Defendants as two separate "class members."  (See Sirkis Decl. ¶¶ 2(x)-(xi), 7.)  But should this Court look to the "beneficial equity holders," as Defendants suggest, Mr. Pierce is clearly the only "beneficial equity holder" for both limited partners.
    The Court also notes that Defendants themselves have already amended their original count from 111 to 109, further calling into question their counting method and its underlying support. (See Sirkis Further Supp. Decl. ¶ 5.)

over 100 investors, because recovery by GS, GSP, or FSL might ultimately trickle down to the limited partners or shareholders. (See Opp. Mem. at 9.)  In order to adopt the expansive reading of CAFA proposed by Defendants, the Court must be persuaded, at the very least, that there is some language in the statute, legislative history, or relevant case law that supports such an interpretation. Indeed, there is none.

The first step in statutory interpretation is to "look to the statute's plain meaning; if the language is unambiguous, we will not look farther."  See Estate of Pew v. Cardarelli, 527 F.3d 25, 30 (2d Cir. 2008) (citing Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 1149 (1992)).  CAFA defines a "mass action" as a case in which "monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact . . . ."  See 28 U.S.C. § 1332(d)(11)(B)(i) (emphasis added).  On this basis alone, Defendants' argument is unavailing.  The claims in each of these actions are brought by no more than two partners or shareholders on behalf of one entity, not "100 or more persons" as the statute clearly requires.

Although the statute is clear and unambiguous, the legislative history also does not support Defendants' argument.  The Senate Report on CAFA delineates the Act's three purposes: (1) "to assure fair and prompt recoveries for class members with legitimate claims;" (2) "to restore the intent of the Framers by expanding federal jurisdiction over interstate class actions;" and (3) "to

14

benefit society by encouraging innovation and lowering consumer prices." S. Rep. No. 109-14, at 30, as reprinted in 2005 U.S.C.C.A.N. at 29. Removing derivative actions to federal court simply because the corporate entity on whose behalf recovery is sought is made up of more than 100 shareholders or limited partners would further none of these causes.

But despite the clear and unambiguous statutory language and the intent of the Act's drafters, Defendants selectively quote from CAFA's legislative history in an effort to support their bid for removal. Defendants argue that the "100 or more persons" need not be named plaintiffs, because CAFA was designed to "strongly favor the exercise of federal diversity jurisdiction over class actions with interstate ramifications." (See Opp. Mem. at 6 n.6 (quoting S. Rep. No. 109-14, at 35, as reprinted in 2005 U.S.C.C.A.N. at 34).) Defendants' argument misses the point and effectively puts the cart before the horse. While Congress intended to put "interstate cases of national importance" before the federal courts, a removing defendant must still establish to a "reasonable probability" that the express requirements of CAFA are met. See Blockbuster, Inc., 472 F.3d at 58. In other words, Defendants must first show that the action consists of claims of "100 or more persons [that] are proposed to be tried jointly." See 28 U.S.C. § 1332(d); see also Greenwich Fin. Servs. Distressed Mortgage Fund 3, LLC v. Countrywide Fin. Corp., No. 08 Civ. 11343 (RJH), 2009 WL 2499149, at *6 (S.D.N.Y. Aug. 14, 2009) (stating that "Congress did not grant this Court jurisdiction over all class actions having a

15

'national impact'"); 151 Cong. Rec. S1081 (daily ed. Feb. 8, 2005) (statement of Sen. Lott) ("Let's be clear.  We are only talking about those cases . . . in which there are at least 100 plaintiffs . . . .") (emphasis added).  Defendants have not met their burden here.

Derivative Plaintiffs - as well as plaintiffs in any action - are the "master[s] of the complaint," free to "preclude removal by electing to disregard an available federal dimension of a claim." Segal v. Varonis Sys., Inc., 601 F. Supp. 2d 551, 552 (S.D.N.Y. 2009) (quoting Caterpillar, 482 U.S. at 392, 107 S. Ct. at 2425). Defendants maintain that the Court should disregard Plaintiffs' election to file derivative claims. As support, Defendants contend that Congress included "mass actions" in CAFA to "prevent plaintiffs from circumventing federal subject matter jurisdiction through artful pleading."[10]  (See Opp. Mem. at 7.)  Although Congress noted that "mass actions are simply class actions in disguise," this comment was targeted at plaintiffs who "propos[e] a class that appears to be gerrymandered solely to avoid Federal jurisdiction." See S. Rep. No. 109-14, at 36, 47, as reprinted in 2005 U.S.C.C.A.N. at 36, 44.

---

[10] "Artful pleading" is a legal doctrine, recognized by the Second Circuit as a "drafting technique that may also be characterized as creative concealment, a 'corollary to the well-pleaded complaint rule, [which] prevents a plaintiff from avoiding removal by framing in terms of state law a complaint the real nature of which is federal, regardless of plaintiff's characterization, or by omitting to plead necessary federal questions in a complaint.'" Sung v. Wasserstein, 415 F. Supp. 2d 393, 397 (S.D.N.Y. 2006) (quoting Marcus v. AT&T Corp., 138 F.3d 46, 55 (2d Cir. 1998)).

16

Here, Derivative Plaintiffs have not crafted an evasive complaint or concealed the true nature of their claims. Derivative Plaintiffs have simply opted to file derivative claims, as they are free to do. See S. Rep. No. 109-14, at 37, as reprinted in 2005 U.S.C.C.A.N. at 36 (noting that "if the class definition and claims appear to follow a 'natural' pattern, that consideration would favor allowing the matter to be handled by a state court").

CAFA's legislative history makes clear that Congress envisioned "mass actions" as claims by multiple plaintiffs "consolidated by State court rules," but not otherwise pled as class actions. See 151 Cong. Rec. S1151 (daily ed. Feb. 9, 2005) (statement of Sen. Reid). More specifically, Congress drafted the "mass action" provision of CAFA primarily to cover actions brought by multiple plaintiffs in states such as Mississippi that "do not provide a class action device." See 151 Cong. Rec. S1081 (daily ed. Feb. 8, 2005) (statement of Sen. Lott); see also 151 Cong. Rec. S1235-36 (daily ed. Feb. 10, 2005) (statement of Sen. Durbin) ("And I understand . . . that these so-called mass actions are currently filed only in Mississippi and West Virginia. . . . I agree with the proponents that the scope of th[e] [mass action provision] is limited."). As the Senate Report on the statute noted, "lawsuits that resemble a purported class action should be considered class actions . . . ." S. Rep. No. 109-14, at 35, as reprinted in 2005 U.S.C.C.A.N. at 34. Recent case law further supports the intent of the Act's drafters. See Bullard v. Burlington N. Santa Fe Ry. Co., 535 F.3d 759, 762 (7th Cir. 2008) ("Think of 15 suits, with (say)

17

10 plaintiffs each, that are proposed to be tried jointly.  The prospect of a single trial with 150 plaintiffs would convert all 15 suits into one 'mass action' under § 1332(d)(11)(B) . . . .").

A derivative suit is neither a claim by multiple plaintiffs "consolidated by State court rules," nor a "class action in disguise."  A derivative suit is a separate and distinct type of suit, long-established under New York law, as a vehicle for recovery by a corporation or other business enterprise:

> Suing as a stockholder the plaintiff's right of action is a derivative one.  He sues, not primarily in his own rights, but in right of the corporation.  The wrongs of which he complains are wrongs to the corporation.  They were not aimed at him and did not involve his personal, individual rights.  He suffers as a member of the corporation, and it is the party to sue for and recover damages for the wrongs, or equitable relief against the frauds alleged.

Alexander v. Donohoe, 143 N.Y. 203, 211 (1894).  In fact, "[a]n individual shareholder has no right to bring an action in his own name and in his own behalf for a wrong committed against the corporation, even though the particular wrong may have resulted in a deprecation or destruction of the value of his corporate stock." Solutia Inc. v. FMC Corp., 385 F. Supp. 2d 324, 331 (S.D.N.Y. 2005) (citations omitted); accord Bank of Am. Corp. v. Lemgruber, 385 F. Supp. 2d 200, 224 (S.D.N.Y. 2005).  The fact that any recovery here would go to the corporate entities undermines Defendants' argument that the derivative actions are "really" class actions.  See Primavera Familienstiftung v. Askin, No. 95 Civ. 8905 (RWS), 1996 WL 494904, at *15 (S.D.N.Y. Aug. 30, 1996) ("Claims based on corporate mismanagement or third-party action that resulted in

18

diminution of share value belong to the corporation and can only be brought by it."); see also Arlia v. Blankenship, 234 F. Supp. 2d 606, 612 n.2 (S.D. W. Va. 2002) ("[I]n a state derivative suit for misappropriation of information, as with all other derivative claims, any recovery goes to the corporation, not the shareholders. . . . This is another example of why the derivative claim here is not, contrary to the defendants' arguments, 'really' a shareholder class action . . . .") (citing Diamond v. Oreamuno, 24 N.Y.2d 494, 301 N.Y.S.2d 78 (1969)).

Given the dearth of case law on the treatment of a derivative action under CAFA, Defendants cite La. ex rel. Caldwell v. Allstate Ins. Co., 536 F.3d 418 (5th Cir. 2008), in support of their position. (See Opp. Mem. at 11.) Caldwell, however, supports remand, rather than removal, of the derivative actions. In Caldwell, the Attorney General of Louisiana filed an antitrust action in state court parens patriae, for the benefit of individual insurance policyholders. See Caldwell, 536 F.3d at 422-23. After the defendants removed the action to federal court under CAFA, the plaintiff moved to remand, arguing that the state of Louisiana was the only plaintiff. See id. at 423. In denying the plaintiff's motion, the court held that, although styled as an action brought by one plaintiff, the Attorney General was "only a nominal party" and the numerous policyholders were the "real parties in interest." See id. at 428. The Fifth Circuit based its decision on a state statute denoting the policyholders as the "real parties in interest" for the treble damages sought in the antitrust action.

19

See <u>id.</u> at 429 (citing La. Rev. Stat. Ann. § 51:137).

Here, as in <u>Caldwell</u>, the state statutes giving a shareholder or limited partner authority to bring a derivative action designate the corporate entity as the "real party in interest."  <u>See, e.g.</u>, N.Y. Bus. Corp. Law § 626(a) (A shareholder's derivative action "may be brought in the right of a domestic or foreign corporation to procure a judgment in its favor."); N.Y. P'ship Law § 121-1002(a) (A limited partner's derivative action "may be brought in the right of a limited partnership to recover a judgment in its favor."). Notwithstanding the statutory language, Defendants have, in fact, argued - and, in effect, conceded - that individual investors in the Funds have no right to bring a direct action. (<u>See</u> Letter to the Court from Mark G. Cunha, dated Oct. 9, 2009, at 7 n.7 (arguing that Plaintiffs in a related, but separate, class action proceeding against Defendants "improperly have brought their claims directly rather than derivatively, despite the fact that the alleged injuries were sustained by the [Funds] and only indirectly, if at all, by Plaintiffs as a result of their equity holdings").)[11]

        b.   <u>The Securities Litigation Uniform Standards Act</u>

Defendants note that the Securities Litigation Uniform

---

[11] Further, one cannot overlook the Fifth Circuit's discussion of CAFA's legislative history, in which Congress "considered and rejected an amendment that would have exempted class actions filed by state attorneys general from removal under CAFA." <u>See</u> <u>Caldwell</u>, 536 F.3d at 424 (citing 151 Cong. Rec. S1163-64 (daily ed. Feb. 9, 2005) (statement of Sen. Hatch)). By way of analogy, Congress never "considered and rejected" the exclusion of derivative actions from the grasp of CAFA. Nor did it need to since derivative actions are separate and distinct from class actions. <u>See</u> <u>supra</u>.

Standards Act ("SLUSA"), which provides for removal to federal court of certain securities fraud class actions, expressly excludes derivative actions. See 15 U.S.C. §§ 77p, 78bb. Defendants seize upon CAFA's absence of an enumerated exclusion for derivative actions as alleged proof that Congress intended such actions to fall into the jurisdictional arms of the Act. (See Opp. Mem. at 10-11.) In essence, Defendants argue that the Court should infer meaning from Congress's silence in CAFA, in light of the express language in SLUSA, enacted seven years earlier. Leaving aside the obvious question of why a different statute's language is relevant to construing CAFA, it is not surprising that Congress found it necessary to address derivative actions in SLUSA, a statute targeting cases involving securities fraud. Moreover, a comparison of SLUSA and CAFA further underscores why Congress may have included a carve-out for derivative actions in SLUSA, but not CAFA.

SLUSA defines a class action, in part, as "any single lawsuit in which . . . damages are sought on behalf of more than 50 persons or prospective class members." 15 U.S.C. §§ 77p, 78bb (emphasis added). SLUSA, had it not expressly carved out derivative actions, would have undoubtedly left room for interpretation with its vague "on behalf of" language.[12] CAFA, on the other hand,

---

[12] Judge Marrero, in Sung v. Wasserstein, 415 F. Supp. 2d 393 (S.D.N.Y. 2006), recognized this potential problem in considering whether SLUSA required remand of a derivative claim. See Sung, 415 F. Supp. 2d at 407. Judge Marrero agreed that, in light of SLUSA's definition of a class action, "the Court might be tempted to ignore" the derivative nature of the claim. Id. at 408. Yet, due to the statute's enumerated exclusion of derivative actions, the case was remanded to state court. See id.

21

defines a "mass action," in part, as a suit "in which monetary relief <u>claims of 100 or more persons</u> are proposed to be tried jointly." 28 U.S.C. § 1332(d)(11)(B)(i) (emphasis added). CAFA's drafters made clear that the mass action provisions only cover "those cases . . . in which there are <u>at least 100 plaintiffs</u>." 151 Cong. Rec. S1081 (emphasis added). Therefore, it is of limited significance that Congress did not draft an exclusion for derivative claims in CAFA.

In a sur-reply brief, Defendants also argue that, in the absence of an express "counting provision" in CAFA (as in SLUSA), the Court may effectively ignore the derivative nature of the claims and consider the underlying investors in GS, GSP, and FSL as the "real parties in interest." (<u>See</u> Defendant FGA's Sur-Reply to Derivative Plaintiffs' Reply in Support of Their Motions to Remand, dated Sept. 8, 2009 ("Sur-Reply Mem."), at 3.) Under SLUSA, "a corporation, investment company, pension plan, partnership, or other entity, shall be treated as one person or prospective class member, but only if the entity is not established for the purpose of participating in the action." 15 U.S.C. § 78bb(f)(5)(D). CAFA has no comparable provision. Thus, Defendants claim that CAFA's silence on the issue of counting can be inferred to mean that a corporation need not be treated as one person.

In this Court's view, the failure of Congress to say what is obvious in black letter law - that a corporate party to a lawsuit is considered one entity or person - does not mandate an interpretation of CAFA that views a corporate entity as the sum of

22

its investors. Moreover, securities fraud class actions typically involve corporate entities, making Congress's decision to address their counting an obvious one. In any event, and as noted above, SLUSA defines a "covered class action" as a single lawsuit in which "damages are sought on behalf of more than 50 persons or prospective class members." 15 U.S.C. §§ 77p, 78bb (emphasis added). CAFA contains no such "on behalf of" language, and therefore, it was unnecessary for Congress to spell out an enumerated counting provision.[13]

Accordingly, based on the plain language of the statute and the legislative history, the Court rejects Defendants' position and holds that derivative actions are not "mass actions" subject to federal court jurisdiction under CAFA.[14]

    2.    The Direct Action - Sentry

---

[13] In support of their argument, Defendants cite State of Oregon v. Oppenheimerfunds, Inc., No. 09-cv-6135, 2009 WL 2517086 (D. Or. Aug. 14, 2009). (See Sur-Reply Mem. at 3.) As that case was decided under SLUSA, it is not relevant to the instant motions.

[14] Derivative Plaintiffs also argue that these cases fall under an enumerated exception to CAFA jurisdiction, namely that the actions "solely involve a claim . . . that relates to the internal affairs or governance of a corporation or other form of business enterprise." See 28 U.S.C. § 1332(d)(9)(B). Because Defendants have failed to meet their burden to show to a "reasonable probability" that these cases are "mass actions" under CAFA, the Court need not address the exceptions to CAFA. The Court notes, however, that it is likely the exception would not apply, since (1) Derivative Plaintiffs make allegations of improper marketing in addition to their claims regarding the internal affairs of Defendants, see Puglisi, 2009 WL 1515071; and (2) Derivative Plaintiffs also filed claims against third-party auditors and administrators, and thus, cannot show that these actions "solely involve a claim" regarding the internal affairs of the Funds. See 28 U.S.C. § 1332(d)(9)(B).

Sentry, a direct claim brought by FSL itself, can be disposed of rather easily. Defendants claim that Sentry is "essentially an action to recover losses on behalf of the shareholders of the Fund." (Opp. Mem. at 6.) However, the sole plaintiff in Sentry is FSL, a British Virgin Islands Company. FSL filed a direct claim to recover losses that accrued directly to FSL. There are no allegations in the Sentry complaint that the action is brought "on behalf of" FSL's shareholders. Even under the most liberal interpretation of CAFA, this case simply does not fall within the statutory definition of a "mass action."

As FSL correctly argues, "[t]he number of individuals holding shares in [FSL] is irrelevant because none of them are plaintiffs in this action." (Sentry Mem. at 2.) If the Court adopts Defendants' position, "literally any company, public or private, with more than 100 shareholders could be deprived of its chosen forum and haled into federal court." (Id.)

A direct action by a plaintiff corporation or other business enterprise, alleging harm to it by a defendant, is an action that belongs exclusively to the corporation. See Lemgruber, 385 F. Supp. 2d at 224 (noting that "any breach of fiduciary duty claims arising out of injuries to the corporation in most cases may only be brought by the corporation itself or derivatively on its behalf") (citation omitted); accord Abrams v. Donati, 66 N.Y.2d 951, 953, 498 N.Y.S.2d 782, 783 (1985) (same). And it is for this reason that any shareholder seeking to bring a claim on behalf of a corporation must first make a demand of the board to initiate the

24

suit. <u>See</u> N.Y. Bus. Corp. § 626(c). This Court will not transform an otherwise direct claim by a single plaintiff into a "mass action," simply because the company's shareholders may ultimately derive some benefit from the litigation.

FSL correctly notes that Defendants bear the burden of proof in opposing remand, and Defendants' "unremarkable averment" that FSL has more than 700 shareholders is insufficient to support removal of the direct claims in <u>Sentry</u>. (<u>See</u> Reply Memorandum of Law in Further Support of Fairfield Sentry Limited's Motion for Remand to State Court, dated Nov. 6, 2009 ("Sentry Reply Mem."), at 8.) This is not a case in which the claims of 100 or more persons are proposed to be tried jointly.

For these reasons, and those enumerated in Section II.B.1, <u>supra</u>, the Court agrees with FSL that direct claims brought by a single corporation are not subject to CAFA.[15]

### III. Attorneys' Fees

Plaintiffs in all four actions request an award of attorneys' fees and costs. (<u>See</u> Ferber Mem. at 8-9; Pierce Mem. at 9; Morning Mist Mem. at 9; Sentry Mem. at 8-9.) Pursuant to 28 U.S.C. § 1447(c), "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." The Supreme Court has held that "absent unusual circumstances, attorney's fees should not be awarded when the removing party has an objectively reasonable basis

---

[15] Given this conclusion, the Court need not address FSL's arguments regarding CAFA's exceptions to federal subject matter jurisdiction.

for removal." Martin v. Franklin Capital Corp., 546 U.S. 132, 141, 126 S. Ct. 704, 708 (2005).

Plaintiff's motion gives the Court pause. Defendants' position on removal is directly contradicted by the plain language of CAFA. In their bid for removal, however, Defendants raised novel issues of law that required this Court to interpret a recently enacted federal statute. Defendants directed the Court's attention to both SLUSA's express exclusion of derivative actions and its counting provision, and noted the absence of such language in CAFA. Without any clear authority in this Circuit addressing the issues raised in the remand motions, the Court is reluctant to characterize Defendants' arguments as objectively unreasonable. Accordingly, the Court recommends that Plaintiffs' requests for attorneys' fees and costs be denied.

**CONCLUSION**

For the reasons stated above, this Court recommends that Plaintiffs' motions be granted and that each of the four actions be remanded to state court. The Court further recommends that Plaintiffs' requests for attorneys' fees be denied. Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this report to file written objections. See also Fed. R. Civ. P. 6(a), (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Victor Marrero, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of

26

time for filing objections must be directed to Judge Marrero. Failure to file objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466, 475 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully Submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated:     November 13, 2009
           New York, New York

27

# **EXHIBIT 6**

*Confidential Private Placement Memorandum*

**FAIRFIELD SIGMA LIMITED**
*A British Virgin Islands International Business Company*

*Securities Offered:  Redeemable Voting Shares*

*Minimum Investment per Subscriber: 200,000 EUR*

*Purchase Price per Share: Net Asset Value per Share*

*Investment Manager:*
*Fairfield Greenwich (Bermuda) Ltd.*

*Administrator:*
*Citco Fund Services (Europe) B.V.*

THE DIRECT OR INDIRECT SALE OF SHARES OF FAIRFIELD SIGMA LIMITED TO CITIZENS, NATIONALS OR RESIDENTS OF, OR INSTITUTIONS OR OTHER ENTITIES ORGANIZED, CHARTERED OR RESIDENT IN THE UNITED STATES OF AMERICA IS EXPRESSLY PROHIBITED.

THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK.  THEY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES LAWS OF ANY JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS.  THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE FUND'S ARTICLES OF ASSOCIATION. THE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY, NOR HAS ANY SUCH AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.

*This Private Placement Memorandum is dated as of February 16, 2006*

**Fairfield Greenwich (Bermuda) Ltd.**

# COMMODITY POOL OPERATOR EXEMPTION

THE INVESTMENT MANAGER HAS FILED A CLAIM OF EXEMPTION FROM REGISTRATION AS A COMMODITY POOL OPERATOR ("CPO") WITH THE UNITED STATES COMMODITY FUTURES TRADING COMMISSION ("CFTC") IN CONNECTION WITH PRIVATE INVESTMENT FUNDS WHOSE PARTICIPANTS ARE ACCREDITED INVESTORS, AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT OF 1933, CERTAIN FAMILY TRUSTS AND CERTAIN PERSONS AFFILIATED WITH THE INVESTMENT MANAGER. AT ALL TIMES, THE FUND WILL UTILIZE FUTURES SUCH THAT EITHER (1) NO MORE THAN 5% OF ITS ASSETS ARE USED TO ESTABLISH COMMODITY INTEREST POSITIONS OR (2) THE NOTIONAL VALUE OF ITS COMMODITY INTEREST POSITIONS DOES NOT EXCEED 100% OF THE FUND'S LIQUIDATION VALUE.

UNLIKE A REGISTERED CPO, THE INVESTMENT MANAGER IS NOT REQUIRED TO DELIVER A DISCLOSURE DOCUMENT AND A CERTIFIED ANNUAL REPORT TO PARTICIPANTS IN THE FUND. THE CFTC HAS NOT REVIEWED OR APPROVED THIS OFFERING OR ANY DISCLOSURE DOCUMENT FOR THE FUND.

## CERTAIN SUMMARY INFORMATION

The voting redeemable shares offered hereby (the "Shares") will be issued only on the basis of the information in this Confidential Private Placement Memorandum and any attachments hereto (the "Memorandum"). No other information about Fairfield Sigma Limited (the "Fund") has been authorized. Any investment in the Fund on the basis of information that is not contained, or which is inconsistent with, the information herein shall be solely at your risk. The delivery of this Memorandum does not imply that any information herein is correct at any time after the date hereof.

You should inform yourself of the legal requirements and tax consequences within the countries of your residence or domicile for the purchase, holding or sale of the Shares, and any foreign exchange restrictions. Shares that are bought by persons not entitled to hold them in accordance with the provisions herein may be compulsorily redeemed. No Shares may be transferred without the prior written consent of the Fund's Directors.

The distribution of this Memorandum may be restricted by law in certain countries. You must inform yourself of and observe any such restrictions. You should review the Country-Specific Notices contained in the Memorandum for any applicable notices for your countries of residence or domicile. This Memorandum does not constitute an offer or solicitation to any person in any jurisdiction in which the offer or solicitation is not authorized, or to any person to whom it is unlawful to make the offer or solicitation.

No person is authorized to give any information with respect to the Fund unless authorized by the Directors. This Memorandum supersedes any written or verbal information relating to the Fund.

You should not construe this Memorandum as legal or investment advice. You should consult your own attorneys, accountants and other advisers regarding this investment.

This Memorandum describes certain documents relating to this investment, including various executed and unexecuted documents and certain statutes, rulings and regulations. Such summaries do not purport to be complete and are qualified in their entirety by reference to the full text of those documents, statutes, rulings and regulations.

You and your investment representatives are invited to ask questions of and to obtain additional information from the Administrator or Investment Manager (Fairfield Greenwich (Bermuda) Ltd.) concerning the Fund, including additional information to verify the completeness or accuracy of the information in this Memorandum.

The Fund is incorporated as an International Business Company under the International Business Companies Act of the British Virgin Islands. The Fund constitutes a "professional fund" as defined in the Mutual Funds Act, 1996 (as amended) of the British Virgin Islands (the "BVI Act") and as such is required to be and is recognized under the provisions of the BVI Act. Such recognition does not entail supervision of the investment performance or portfolio of the Fund by the Financial Services Commission of the British Virgin Islands (the "BVI") which accepts no responsibility for the financial soundness of the Fund or the correctness of any statements or opinions expressed herein. There is no financial obligation or compensation scheme imposed on or by the Financial Services Commission of the BVI in favor of or available to the investors in the Fund.

As an entity regulated under the BVI Act, the Fund will be subject to the supervision of the Financial Services Commission in the BVI, which is authorized by the BVI Act to direct the Fund to furnish information or provide access to any records, books or other documents which it deems necessary to ascertain compliance with the BVI Act or any regulations made under the BVI Act.

The BVI Act provides that the Fund's certificate of recognition may be cancelled if, among other things, the Fund has breached the BVI Act or any regulations or codes of conduct or conditions of its certificate, has been convicted of an offense, is carrying on business in a manner detrimental to its investors or to the public interest, or is declared bankrupt or is being wound up or dissolved.

Because the Fund is a professional fund under the BVI Act, the Shares may be held only by persons who are "professional investors" within the meaning of the BVI Act and on the basis that the initial investment in the Fund by each of its shareholders is not less than U.S. $100,000. A professional investor is any person whose ordinary business involves, whether for his own account or for the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund, or who has signed a declaration that he, whether individually or jointly with his spouse, has a net worth in excess of $1,000,000 or its equivalent in any other currency and that he consents to being treated as a professional investor.

This is a private offering, made only on delivery of this Memorandum to the prospective investor whose name appears on the cover hereof. This Memorandum may not be reproduced or used for any other purpose. Any distribution of this Memorandum in whole or in part, or the divulgence of any of its contents, is unauthorized. By accepting delivery of this Memorandum, you agree to return it to the Fund if you do not invest.

# FUND DIRECTORY

*THE FUND*

Fairfield Sigma Limited
c/o Codan Trust Company (B.V.I.) Ltd.
P.O. Box 3140
Romasco Place, Wickhams Cay
Road Town, Tortola
British Virgin Islands

*INVESTMENT MANAGER*

Fairfield Greenwich (Bermuda) Limited
37 Reid Street
1st Floor
Hamilton, Bermuda
Telephone: 441-292-5401
Facsimile: 441-292-5413

*ADMINISTRATOR; REGISTRAR*
*AND TRANSFER AGENT*

Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands
Telephone: (31-20) 572-2850
Facsimile: (31-20) 572-2610

*U.S. COUNSEL*

Law Offices of Andrew E. Goldstein
488 Madison Avenue, 16th Floor
New York, New York 10022

*BRITISH VIRGIN ISLANDS COUNSEL*

Conyers Dill & Pearman
Romasco Place, Wickhams Cay 1
P.O. Box 3140
Road Town, Tortola
British Virgin Islands

*AUDITORS*

PriceWaterhouseCoopers
Marten Meesweg 25
3068 AV Rotterdam
The Netherlands

*PAYMENT BANK*

Citco Bank Nederland, N.V. Dublin Branch
Custom House Plaza, Block 6
International Financial Services Centre
P.O. Box 6639
Dublin 1
Ireland
Telephone: 353 (0) 1 636 7100
Facsimile: 353 (0) 1 636 7102

_**CUSTODIAN**_

Citco Global Custody N.V.
Telestone 8 – Teleport
Naritaweg 165
1043 BV Amsterdam
The Netherlands
Telephone: (31-20) 572-2200
Facsimile: (31-20) 572-2625

## TABLE OF CONTENTS

FUND DIRECTORY ........................................................................................................................ v
SUMMARY ................................................................................................................................... 1
THE FUND .................................................................................................................................... 4
MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS ........................................ 4
INVESTMENT POLICIES .......................................................................................................... 8
OFFERING OF THE SHARES .................................................................................................... 10
FEES, COMPENSATION AND EXPENSES ............................................................................. 14
CUSTODIAN AND BROKERAGE ............................................................................................ 15
ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT ............................................... 16
RISK FACTORS ........................................................................................................................... 17
POTENTIAL CONFLICTS OF INTEREST ............................................................................... 22
DESCRIPTION OF SHARES ...................................................................................................... 23
DIVIDEND POLICY .................................................................................................................... 23
TRANSFERS, REDEMPTIONS AND TERMINATION .......................................................... 23
ANTI-MONEY LAUNDERING REGULATIONS ..................................................................... 25
ANTI MONEY-LAUNDERING POLICIES ............................................................................... 25
TAX CONSIDERATIONS AND EXCHANGE CONTROL AND ERISA ................................ 27
LEGAL MATTERS ...................................................................................................................... 28
MISCELLANEOUS ..................................................................................................................... 29

# SUMMARY

The following Summary is intended to highlight certain basic information which is set forth more fully elsewhere in this Confidential Private Placement Memorandum and, accordingly, should be read in conjunction with such detailed information.

## The Offering

| | |
|---|---|
| Issuer | Fairfield Sigma Limited (the "Fund") is organized as an international business company under the laws of the Territory of the British Virgin Islands (the "BVI"). The registered office of the Fund is located in the BVI. |
| Securities Offered | The Fund's redeemable voting shares, denominated in Euros (the "Shares"), are being offered hereby at a price equal to the Net Asset Value (as hereinafter defined) as of the opening of business on the date of such issuance (generally the first business day of every month). |
| | The Shares will be offered to subscribers who desire to invest in Fairfield Sentry Limited and to hedge the currency exposure to the Euro resulting from the Fund holding assets (i.e., shares in Fairfield Sentry Limited) denominated in U.S. dollars. |
| Offerees | Purchasers who are not citizens, nationals or residents of, or institutions or other entities organized, chartered or resident in, the United States. See "OFFERING OF THE SHARES." |
| Minimum Subscription | The minimum initial subscription per investor is 200,000 EUR, unless the Fund deems it advisable to permit subscriptions for a lesser amount provided that such lesser amount shall at all times be no less than the EUR equivalent of US $100,000. Following his initial investment, a shareholder may make additional investments in amounts of not less than 75,000 EUR. |
| Maximum Capitalization | The Fund will not accept a subscription tendered for Shares at a time when the number of its outstanding Shares is 5,000,000. |
| Subscription Procedures | It is preferable that subscriptions be made by wire transfer. However, subscriptions may be made by mail if necessary. Subscriptions received during any calendar month prior to the fifth to the last business day of the month will ordinarily be accepted, subject to the discretion of the Manager, as of the first business day of the following month, i.e., subscriptions received between March 1 and March 25 will be accepted as of April 1. Subscriptions will become irrevocable to the subscriber on the fifth to the last business day of the month in which such subscription is received by the Fund. |
| Solicitation | There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by |

1

| | |
|---|---|
| of Subscriptions | the Fund or through the assistance of unaffiliated placement agents and money managers. Such unaffiliated placement agents and money managers may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned by Fairfield Greenwich (Bermuda) Ltd. ("FGBL"), as Investment Manager, which they may rebate to their clients. FGBL or an affiliate may also charge a placement fee of up to 3% on such subscriptions, provided that total placement fees do not exceed 5%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent or FGBL and such amounts will not constitute part of the assets of the Fund. |
| Business Objective of the Fund | The Fund will seek to achieve capital appreciation of its assets by purchasing shares in Fairfield Sentry Limited ("FSL"), a British Virgin Islands international business company, which principally utilizes an options trading strategy described as "split strike conversion". FSL is an affiliate of the Fund and the investment manager, Fairfield Greenwich (Bermuda) Ltd. |
| | The Fund will allocate a small portion of its assets to a nonaffiliated bank (the "Bank") to provide a currency overlay program designed to hedge the currency exposure of its Shareholders resulting from the Fund holding assets denominated in U.S. Dollars. The Fund's obligations to the Bank with respect to the currency hedging activities may be collateralized from time to time through a pledge of the assets underlying the Shares (i.e., the Fund's shares in FSL). In order to perfect this pledge of assets, the Fund's shares in FSL may be held in the name of the Bank. In that event, the Bank will be permitted to take any and all appropriate action with respect to these FSL shares at any time in the event of a default on the part of the Fund with respect to its obligations to the Bank. |
| Investment Manager | Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or the "Manager"), a corporation organized under the laws of Bermuda, serves as the Fund's investment manager and is the Investment Manager of FSL. It is the wholly-owned subsidiary of Fairfield Greenwich Limited ("FGL"), an exempted company organized under the laws of the Cayman Islands, which previously served as the investment manager of the Fund. FGL's main principals are Walter M. Noel, Jr., Jeffrey H. Tucker, and Andres Piedrahita. Mr. Noel is also a Director of the Fund (see "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS"). FGBL expects to register as an investment adviser with the Securities and Exchange Commission under the Investment Advisers Act of 1940 in early 2006. The Manager has claimed an exemption under Commodity Futures Trading Commission ("CFTC") Rule 4.13(a)(3) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Fund that |

would otherwise be applicable absent such an exemption.

| | |
|---|---|
| Directors | Walter M. Noel, Jr., Jan R. Naess and Peter P. Schmid are the Directors of the Fund. They are also the Directors of FSL. |
| Citco | Citco Fund Services (Europe) B.V., an affiliate of The Citco Group Ltd., acts as administrator, registrar and transfer agent for the Fund. |
| Dividend Policy | It is anticipated that the Fund will not declare any dividends; rather, income will be reinvested and will be reflected in the Net Asset Value of the Shares. |

## Sale, Redemption and Exchange Of Shares

| | |
|---|---|
| Redemption at the Option of a Shareholder | A shareholder of the Fund, on fifteen (15) calendar days' notice, may cause his Shares to be redeemed as of the last business day of any month. A shareholder is not required to hold his Shares for any minimum period of time in order to exercise his redemption privilege. |
| Compulsory Redemption | The Fund reserves the right to call all or a part of a shareholder's Shares for redemption at any time for any reason or for no reason. |
| Sales | The Fund will offer its Shares on a continuous basis. Subscriptions received during any calendar month prior to the fifth to the last business day of the month will ordinarily be accepted, subject to the discretion of the Manager, as of the first business day of the following month, i.e., subscriptions received between March 1 and March 25 will be accepted as of April 1. Subscriptions will become irrevocable to the subscriber on the fifth to the last business day of the month in which such subscription is received by the Fund. |

## Compensation and Expenses

| | |
|---|---|
| Expenses | The Fund will bear, for each year, all continuing offering costs; all ordinary legal and auditing fees; all registrar, transfer agent and administration fees; all insurance expenses; and all expenses in maintaining the Fund's office and all other expenses incurred in the operation of the Fund, if any, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund, as well as all fees and all ordinary and necessary expenses related to the Fund's investment and trading activities. Transactional costs will be included in FSL's calculation of profit and loss and therefore will be indirectly borne by the Fund. The costs incident to the currency hedging program will be borne by the Fund. Fairfield Greenwich Advisors LLC, an affiliate of the Manager, will receive an annual expense reimbursement from the Fund, payable quarterly, in an amount equal to 0.0375% of the Fund's Net Asset Value (0.15% on an annual basis) as of the last day of each calendar quarter, for providing certain administrative |

3

services and back-office support to the Fund.

| | |
|---|---|
| Management Fee | The Fund does not directly pay the Manager a management fee. However, as investment manager of FSL (in which substantially all of the Fund's assets are invested), the Manager will receive from FSL a monthly management fee in an amount equal to one-twelfth of one percent (1.0% per annum) of FSL's Net Asset Value before the FSL Performance Fee (as defined), as calculated at the opening of the first day of each calendar month, which will include subscriptions for shares accepted by FSL as of the first day of the month. This fee is payable monthly in arrears. |
| Performance Fee | The Fund does not directly pay the Manager a performance fee. However, as investment manager of FSL (in which substantially all of the Fund's assets are invested), the Manager will receive from FSL, for each calendar quarter, a performance fee (the "FSL Performance Fee") with respect to each share outstanding during such calendar quarter in an aggregate amount equal to 20% of any new high net profit, i.e., new appreciation, allocable to its shares, subject to reduction in connection with certain offsets with respect to each share. FSL shares which are either purchased or redeemed during a calendar quarter shall be subject to the payment of a FSL Performance Fee only for the portion of the calendar quarter during which such shares were outstanding. The FSL Performance Fee will only be paid on "new appreciation" in FSL's Net Asset Value allocable to the shares. |

## THE FUND

### Description

The Fund was incorporated in the Territory of the British Virgin Islands ("BVI") as an international business company on March 19, 1997. The registered office of the Fund is c/o Codan Trust Company (B.V.I.) Ltd., P.O. Box 3140, Romasco Place, Wickhams Cay, Road Town, Tortola, British Virgin Islands.

Shareholders will have the right to redeem part or all of their voting shares (the "Shares"), or purchase additional Shares, on a monthly basis (See "TRANSFERS, REDEMPTIONS AND TERMINATION").

## MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS

### The Fund

The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, any officers of the Fund and other

persons or entities with management or administrative responsibilities to the Fund. None of the Fund's Directors own an equity interest in the Fund.

The Directors of the Fund are as follows:

**Walter M. Noel, Jr.,** over 30 years of experience in the investment business. From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm. From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank. Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its international private banking business. Since founding The Fairfield Greenwich Group, an affiliate of the Fund's investment manager, Fairfield Greenwich (Bermuda) Ltd., in 1983, Mr. Noel has been a director or general partner of a variety of its funds, including Fairfield Sentry Limited, directing marketing activity, and originating various of The Fairfield Greenwich Group's business opportunities. Mr. Noel graduated from Vanderbilt University in 1952, received a Master of Arts in Economics from Harvard University in 1953, and graduated from Harvard Law School in 1959.

**Jan R. Naess,** received a Bachelor of Arts degree in 1981 and a Masters degree in Economics in 1983 from the University of Oslo. From 1983 to 1987, he was employed in the Economic Research Department of R.S. Platou a.s. in Oslo, a leading shipbrokering firm. In 1987, Mr. Naess joined with R.S. Platou a.s. to form R.S. Platou Asset Management a.s., which was instrumental in the sale and purchase of 15 bulk carriers from 1987 to 1989. In 1989, Mr. Naess liquidated his interest in R.S. Platou Asset Management a.s. and formed PAN Shipping Ltd., a shipowning/operating and project development company, which merged with Northern Navigation International Limited ("NNI") in 1991. Mr. Naess is a Vice-President of NNI, a Liberian corporation, which is in the business of investing in and managing shipping assets. He serves as a Director of several funds with which The Fairfield Greenwich Group is affiliated, including Fairfield Sentry Limited.

**Peter P. Schmid,** received a Swiss Federal Certificate of Capacity in 1968. Mr. Schmid was employed by Credit Suisse from 1968 to 1986. From 1975 to 1977, he was employed in Credit Suisse's International Portfolio Management Department in Zurich. After a brief posting in Credit Suisse's New York office, Mr. Schmid was in charge of the Bank's representative office in Rio de Janeiro from 1977 to 1984. From 1984 to 1986, Mr. Schmid was Vice President in charge of Credit Suisse's Latin American Private Banking Desk in Geneva. Mr. Schmid has been an independent investment adviser since April 1986. He is President of Peter Schmid (Portfolio Management), P. Schmid & Associés, S.A., Rock Ltd. and Armor S.A. Mr. Schmid is a Director of several funds with which The Fairfield Greenwich Group is affiliated, including Fairfield Sentry Limited.

## The Investment Manager

The Fund's investment manager is Fairfield Greenwich (Bermuda) Ltd. ("FGBL or the "Manager"), a corporation organized in Bermuda, which was incorporated on June 13, 2003. It is responsible for managing the Funds' investment activities, monitoring its investments and maintaining the relationship between the Fund and Fairfield Sentry Limited and with its escrow agent, custodian, administrator and transfer agent. The Manager is the wholly-owned subsidiary of Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands

("FGL"), which previously served as the investment manager of the Fund and Fairfield Sentry Limited.

The Fairfield Greenwich Group ("FGG"), of which the Manager is an affiliate, was established in 1983 and has approximately $9 billion employed in alternative asset management funds. Throughout its history, the firm has internally managed its own alternative asset funds and selectively identified external managers for affiliations where it serves as a marketing and distribution partner, and obtains underlying portfolio information for monitoring and client communication purposes.

The Manager and its affiliates currently serve as investment or administrative manager to approximately twenty funds, and have exclusive distribution arrangements with several others. FGG maintains its offices in New York, with a significant presence in London. Marketing and client support offices are located elsewhere in the United States, Europe, and Latin America. FGG's London entity is licensed and subject to the supervision of FSA, and another FGG affiliated entity is registered as a broker-dealer in the United States.

The Manager expects to register as an investment adviser with the Securities and Exchange Commission under the Investment Advisers Act of 1940 in early 2006. In addition, the Manager has claimed an exemption under Commodity Futures Trading Commission ("CFTC") Rule 4.13(a)(3) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Fund that would otherwise be applicable absent such an exemption.

Following is biographical information on the founders, principal officers and certain other key employees of FGG:

**Walter M. Noel Jr.** His background is summarized under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS -The Fund".

**Andres Piedrahita** founded Littlestone Associates in 1991, which merged with FGG in 1997. Mr. Piedrahita directs the Group's European and Latin American activities. Mr. Piedrahita has over 15 years of experience in the investment business. Prior to the merger, Mr. Piedrahita was the Director and President of Littlestone Associates, Inc. (1991-1997). He was previously a Vice President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals (1987-1990). Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc. in New York (1981-1987). He received his Bachelor of Arts degree from Boston University's School of Communications.

**Jeffrey Tucker** has over 30 years of experience in investment related businesses. Mr. Tucker was an attorney with the Securities and Exchange Commission from 1970 to 1978. From 1975 to 1978, he was an Assistant Regional Administrator of the SEC's New York regional office, with supervisory responsibility for approximately half of its enforcement program. Mr. Tucker entered private practice in 1978 as a partner in the law firm Tucker, Globerman & Feinsand, where he remained until 1987. He specialized in securities and transactional matters, with a principal focus on limited partnership offerings. Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & Co. (Limited Partnership) ("Kolber"), a registered broker-dealer. At Kolber, Mr. Tucker was responsible for the development and administration of the firm's affiliated private investment funds. FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities. Throughout FGG's development, Mr. Tucker has been

6

responsible for directing its business and operational development and has been a director or general partner of a variety of its investment funds. Mr. Tucker received his Bachelor of Arts degree from Syracuse University and his JD from Brooklyn Law School.

Harold Greisman is the Chief Investment Officer of FGG, focusing on manager selection and risk oversight. Mr. Greisman has over fifteen years of experience in the investment business. Prior to joining FGG in 1990, Mr. Greisman was an Associate in the Capital Markets Group of Continental Bank (1984-1985) and then worked for DNB Capital Corporation (1985-1990), a proprietary private equity and venture capital operation controlled by Den Norske Bank. Mr. Greisman began his career at Johnson & Higgins, a large industrial insurance brokerage (1978-1982). Mr. Greisman received his Bachelor of Arts degree from Tufts University and his MBA degree from the Stern School of Business at New York University.

The backgrounds of the Directors and key officers of the Manager are set forth below:

Andres Piedrahita is a Director and the President of the Manager. His background is set forth above under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS-The Investment Manager".

Brian Francoeur is a Director of the Manager. Mr. Francoeur joined Citco Fund Services (Bermuda) Limited in 2001 and currently serves as its Managing Director. From 1999 until joining Citco, he was the Chief Financial Officer of CCS Group Limited, a computer cabling and network company based in Hamilton, Bermuda, and from 1997 to 1999 was a Senior Portfolio Manager with Olympia Capital (Bermuda) Limited, a fund administration company in Bermuda. Mr. Francoeur qualified as a chartered accountant in 1994 and was employed by Ernst & Young in Bermuda from 1995 to 1997.

Amit Vijayvergiya is Vice President and the Risk Manager of the Manager and focuses on manager selection and risk management for the Fund. He has been employed by the Manager since 2003. Mr. Vijayvergiya has over 9 years of experience in asset management, risk management and operations research. Prior to joining the Manager, from 2000 to 2003, Mr. Vijayvergiya managed MAV Hedge Advisors, a family office investing in traditional and alternative investment managers. From 1998 to 2000, he was the General Manager of LOM Asset Management ("LOM AM"), where he oversaw the management of $160 million in assets. At LOM AM, Mr. Vijayvergiya structured and managed several multi-manager funds and served on the firm's management and investment committees. He began his business career in 1994 with a position in operations research at Canadian National Railways. Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification.

The Manager will not have any beneficial interest in the Fund, although FGL and certain of its principals have beneficial interests in Fairfield Sentry Limited, with which the Fund will invest.

7

Pursuant to the Investment Management Agreement between the Fund and the Manager, the Manager is not liable for any error of judgment or for any loss suffered by the Fund unless such loss resulted from the Manager's willful misfeasance, bad faith, gross negligence or reckless disregard of its obligations and duties. (See "RISK FACTORS").

## INVESTMENT POLICIES

The Fund seeks to obtain capital appreciation of its assets by primarily investing in Fairfield Sentry Limited, a British Virgin Islands corporation ("FSL"). FSL principally utilizes a nontraditional options trading strategy described as "split strike conversion". This strategy has defined risk and profit parameters which may be ascertained when a particular position is established. Set forth below is a description of the "split strike conversion" strategy.

The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the sale of out of the money S&P 100 Index call options in an equivalent contract value dollar amount to the basket of equity securities, and (iii) the purchase of an equivalent number of out of the money S&P 100 Index put options. An index call option is out of the money when its strike price is greater than the current price of the stock; an index put option is out of the money when the strike price is lower than the current price of the index. The basket typically consists of approximately 35 to 40 stocks in the S&P 100.

The logic of this strategy is that once a long stock position has been established, selling a call against such long position will increase the standstill rate of return, while allowing upward movement to the short call strike price. The purchase of an out of the money put, funded with part or all of the call premium, protects the equity position from downside risk.

A bullish or bearish bias of the positions can be achieved by adjustment of the strike prices in the S&P 100 Index puts and calls. The further away the strike prices are from the price of the S&P 100 Index, the more bullish the strategy. However, the dollar value underlying the put options always approximates the value of the basket of stocks.

The options transactions executed for the benefit of FSL, and indirectly, the Fund, may be effected in the over-the-counter market or on a registered options exchange. (See "POTENTIAL CONFLICTS OF INTEREST").

The Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities ("BLM") through accounts maintained at that firm. The accounts are subject to certain guidelines which, among other things, impose limitations on the minimum number of stocks in the basket, the minimum market capitalization of the equities in the basket, the capitalization weightings of each security in the basket, the minimum correlation of the basket against the S&P100 Index, and the permissible range of option strike prices. Subject to the foregoing guidelines, BLM is authorized to determine the price and timing of stock and option transactions in the account. The services of BLM and its personnel are essential to the continued operation of the Fund, and its profitability, if any.

<u>Currency Hedge</u>

In an effort to manage the U.S. Dollar exposure of the Fund's shareholders, the Manager has established an account at a nonaffiliated bank (the "Bank") to hedge the currency exposure of the

shareholders resulting from the Fund holding assets denominated in U.S. Dollars. Generally, the Manager will apply a passive strategy designed to immunize investors against U.S. Dollar declines by seeking to continuously hedge the currency exposure utilizing foreign exchange instruments. The Fund may hedge its currency exposure through the purchase or sale of any foreign exchange instrument including forward contracts, currency option transactions and other derivatives. Obligations owed to the Bank may be collateralized from time to time by a pledge of the assets underlying the Shares (i.e., the Fund's FSL shares). The cost incident to managing the currency exposure of the shareholders will be reflected in the Net Asset Value of the Shares.

Other Investments

The Manager, as the investment manager of FSL, may in its sole and exclusive discretion allocate a portion of FSL's assets (never to exceed, in the aggregate, 5% of FSL's assets at the time of investment) to alternative investment opportunities other than FSL (the "Non-SSC Investments"). It is anticipated that the Non-SSC Investments will be allocated to new investment vehicles managed by experienced management teams establishing themselves in new investment businesses ("Emerging Managers"), with no single allocation exceeding $50 million at the time it is made. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines or for cause. The Manager and FSL generally share in fees received by portfolio managers of Non-SSC Investments from investors other than FSL. FSL will pay fees with respect to the Non-SSC Investments at a rate that will not exceed FSL's rate of fees (in certain cases, this may be accomplished by the Manager subsidizing, from its own moneys, the fees charged on these assets by Non-SSC Investment managers).

In certain circumstances, the performance fee paid at the FSL level may be reduced for particular calendar quarters for certain Non-SSC Investment Losses, as defined below. See "POTENTIAL CONFLICTS OF INTEREST" and "FEES, COMPENSATION AND EXPENSES-Performance and Management Fees".

In order to ensure that the Fund will not be subject to United States federal income taxation on trading gains from the disposition of certain investments, the Fund will not invest in any "United States real property interest" (including, for example, certain interests in any U.S. Corporation that is a "United States real property holding corporation"), as such terms are defined under the U.S. Internal Revenue Code of 1986 (the "Code") and the Treasury Regulations promulgated thereunder. See "TAX CONSIDERATIONS AND EXCHANGE CONTROL."

The Fund may invest some of its assets in short-term U.S. government obligations, certificates of deposit, short-term high grade commercial paper and other money market instruments, including repurchase agreements with respect to such obligations, money market mutual funds and short term bond funds. In order to ensure that substantially all of the interest earned by the Fund will not be subject to United States federal withholding taxes, any investment in an obligation of a U.S. person or entity (other than in certificates of deposits in banks) primarily will be in an instrument (i) which is issued and purchased at a discount from its face amount, which is not otherwise interest bearing, and which has a term of no more than 183 days from the date of issuance or (ii) which is in registered form and which is issued after July 18, 1984. See "TAX CONSIDERATIONS AND EXCHANGE CONTROL."

## Investment Restrictions

With the exception of the Fund's investment in FSL, which will be on an unrestricted basis, the Fund will observe the investment restrictions set forth in the articles of association which are summarized here:

a) no more than 10% of the Net Asset Value of the Fund will be invested in the securities of any one issuer (other than any government or governmental agency);

b) the Fund may not hold more than 10% of the issued securities of any one class of securities in any issuer (other than any government or governmental agency);

c) no more than 10% of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty (other than any government or governmental agency), in each case calculated at the time of investment;

d) no more than 10% of the Net Asset Value of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

e) the Fund will not invest in the securities of any issuer if the directors and officers of the Fund and the Manager collectively own in excess of 5% of such securities;

f) the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

g) the Fund will adhere to the general principle of diversification in respect of all of its assets;

h) the Fund will not invest directly in real property;

i) the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) to any issuer (other than any government or governmental agency) except with the consent of the custodian of the Fund's assets; and

j) no more that 10% of the Net Asset Value of the Fund will be invested in physical commodities.

The investment restriction set out in (c) above will not apply to transactions with any counterparty which advances full and appropriate collateral to the Fund in respect of such transactions.


## OFFERING OF THE SHARES

The Fund is offering up to 5,000,000 voting shares, denominated in Euros (the "Shares"), at a price equal to the Net Asset Value per Share (as defined) as calculated as of the opening of business on the date of issuance (generally the first business day of every month). The Fund initially sold what are now its Shares in December 1999 at an initial offering price of 100 EUR.

The Shares may not be sold directly or indirectly to (i) natural persons who are citizens, nationals, or residents of, or institutions or other entities organized, created, formed, chartered or

resident in, the United States of America, (ii) entities as to which any person or entity described in (i) above is, directly, or indirectly, a beneficiary, fiduciary, grantor or decedent, or (iii) institutions or other entities owned, in whole or in part, directly or indirectly by the persons or entities described in (i) or (ii) above ("U.S. persons"). No Shares may be subject to an option held by a U.S. person. Any transfer of Shares to a U.S. person is prohibited and will be subject to immediate and compulsory redemption by the Fund. (See "TRANSFERS, REDEMPTIONS AND TERMINATION - Transfers").

The minimum initial purchase by each subscriber is 200,000 EUR, unless the Fund deems it advisable to permit subscriptions for a lesser amount provided that such lesser amount shall at all times be no less than the EUR equivalent of US $100,000. The Fund may reject any subscription, in whole or in part, in its discretion. All subscriptions, once made, are irrevocable to the subscriber.

All proceeds from the sale of Shares will be received by the Fund in trust and will be deposited by the Fund into segregated interest bearing accounts in the Fund's name at the Fund's bank, Citco Bank Nederland N.V. Dublin Branch.

After the initial closing, the Fund will offer its Shares on a continuous basis at a price equal to the Net Asset Value per Share as calculated as of the opening of business on the date of issuance of such Shares. Subscriptions received during any calendar month prior to the fifth to the last business day of the month will be accepted, in the sole discretion of the Manager, as of the first business day of the following month. Thus, for example, subscriptions received between January 1 and January 25 will be accepted as of February 1, assuming the 29th-31st are business days. The Fund reserves the right, in its discretion, to accept any subscription prior to such first day. Subscriptions shall become irrevocable to the subscriber on the fifth to the last business day of the month in which such subscription is received by the Fund.

There are no underwriting arrangements with respect to the offering of Shares. All solicitations of subscriptions will be made directly by the Fund or through the assistance of unaffiliated placement agents and money managers, who may charge a placement fee of up to 5% of the total amount of the subscriptions for Shares sold, and/or share in the fees earned by the Manager, which they may rebate to their clients. FGBL or an affiliate thereof may also charge a placement fee of up to 3% on such subscriptions, provided that total placement fees do not exceed 5%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent and such amounts will not constitute part of the Fund's assets.

Net Asset Value Defined

The Net Asset Value of the Shares is the value of the Fund's assets as calculated in accordance with the International Financial Reporting Standards and the Memorandum and Articles of Association of the Fund.

Notwithstanding the foregoing:

(i) in the case of extraordinary circumstances which warrant a different valuation of any securities, such as an inability to liquidate existing positions, such securities will be valued at such prices as the Directors shall determine; and

(ii) the amount of any distribution or dividend made shall be a liability of the Fund from the day when the distribution or dividend is declared until it is paid.

All decisions on the valuation of assets and liabilities and determination of Net Asset Value shall be made by the Fund's Board of Directors.

Net Asset Value per Share is defined as the Net Asset Value divided by the number of Shares then outstanding.

The difference between the Net Asset Value of the Fund and the Net Asset Value of FSL will be directly related to the results of, and charges incident to, the currency hedging trading account maintained with respect to the Fund's Shares.

The Net Asset Value of the Fund will be calculated on a monthly basis by the Fund's administrator, Citco Fund Services (Europe) B.V.

Pursuant to the Fund's Article of Association, the Fund may suspend the calculation of its Net Asset Value for the whole or any part of any period:

(a) during which any stock exchange or over-the-counter market on which any significant portion of the investments of the Fund are listed, quoted, traded or dealt in is closed (other than customary weekend and holiday closing) or trading on any such stock exchange or over-the-counter market is restricted; or

(b) when circumstances exist as a result of which in the opinion of the Directors it is not reasonably practicable for the Fund to dispose of investments or as a result of which any such disposal would be materially prejudicial to the shareholders; or

(c) when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the investments or other assets of the Fund cannot reasonably or fairly be ascertained; or

(d) during which the Fund is unable to repatriate funds required for the purpose of making payments due on redemption of Shares or during which any transfer of funds involved in the realization or acquisition of investments or payments due on redemptions of Shares cannot in the opinion of the Directors be effected at normal rates of exchange.

Any such suspension shall take effect at such time as the Directors shall declare but not later than the close of business on the business day next following the declaration, and thereafter there shall be no determination of the Net Asset Value per Share of the Fund until the Directors shall declare the suspension at an end, except that such suspension shall terminate in any event on the first business day on which (a) the condition giving rise to the suspension shall have ceased to exist; and (b) no other condition under which suspension is authorized under the Fund's Articles of Association shall exist. Each declaration by the Directors pursuant to this paragraph shall be consistent with such official rules and regulations (if any) relating to the subject matter thereof as shall have been promulgated by any authority having jurisdiction over the Fund and as shall be in effect at the time. To the extent not inconsistent with such official rules and regulations, the determination of the Directors shall be conclusive. Whenever the Directors shall declare a suspension of the

determination of the Net Asset Value per Share, then as soon as may be practicable after any such declaration, the Directors shall give notice to all shareholders stating that such declaration has been made. At the end of any period of suspension as aforementioned the Directors shall give notice to all shareholders stating that the period of suspension has ended.

<u>Who Should Purchase/Subscription Procedure</u>

This offering is limited to non-U.S. persons who have the ability to speculate in high risk securities and for whom such a purchase is suitable in light of such person's financial condition. The Fund will require as a condition to the acceptance of a subscription that the subscriber represent and warrant that he is not a U.S. person.

Prospective subscribers should inform themselves as to the legal requirements within their own countries for the purchase of Shares and any foreign exchange or tax considerations relevant to such purchase.

As part of the Fund's responsibility for the prevention of money laundering, the Fund will require detailed verification of a prospective investor's identity to be included with its subscription application.

An individual will be required to produce a certified copy of a passport or identification card. Corporate applicants will be required to produce a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or other documents evidencing the existence of the legal entity), the register of directors or an excerpt from the trade register held at the relevant chamber of commerce and the signatory card verifying the authority of officers to sign on behalf of the corporate entity. Trusts and other entities which subscribe to the Fund must demonstrate organizational documents which verify the existence of the entity and which verify the authority of one or more signatories to sign subscriptions on behalf of the entity.

The Fund reserves the right to request such further information as is necessary to verify the identity of an applicant. In the event of delay or failure by the applicant to produce any information required for verification purposes, the Fund may refuse to accept the application and the subscription moneys relating thereto.

In order to subscribe for Shares, subscribers must complete and sign the Share Application Form included in the Subscription Documents which accompany this Memorandum, and indicate the EUR amount of Shares that are being purchased and mail them to Fairfield Sigma Limited, c/o Citco Fund Services (Europe) B.V., Telestone 8 - Teleport, Naritaweg 165, 1043BW Amsterdam, The Netherlands; fax no.: (31-20) 572-2610.

Subscription funds of investors purchasing Shares should be wire transferred to the Fund's account at:

*Intermediary Bank – SWIFT Field 56*
KBC Bank N.V., Brussels
BIC: KREDBEBB


*Account with Institution – SWIFT Field 57*
Account Name: Citco Bank Nederland N.V. Dublin Branch

International Bank Account Number (IBAN): BE96 4809 5884 4705
BIC: CITCIE2D

*Beneficiary Customer -SWIFT Field 59*
Beneficiary Account Name: Fairfield Sigma Limited
Beneficiary IBAN: IE95 CITC 0000 0020 8584 01

*Reference – SWIFT Field 70*: Name and Full Address Subscriber:

## FEES, COMPENSATION AND EXPENSES

### Expenses

The Fund bears all of the continuing offering costs and all other expenses incurred in the operation of the Fund, if any, including the ordinary and necessary expenses directly related to its investment and trading activities (including the costs incident to the currency trading hedging account), all administration fees, all insurance expenses and all legal and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund. Transactional costs will be included in FSL's compensation of profit and loss and will, accordingly, be indirectly borne by the Fund. The Fund pays Fairfield Greenwich Advisors LLC, an affiliate of the Manager, an annual expense reimbursement charge of 0.15% of the Fund's Net Asset Value, payable quarterly in an amount equal to 0.0375% of the Fund's Net Asset Value as of the last day of each calendar quarter, for providing certain administrative services and back-office support to the Fund.

### Performance and Management Fees

The Manager does not receive either a management fee or a performance fee from the Fund. The Manager does receive a monthly management fee from FSL (in which substantially all of the Fund's assets are invested) in an amount equal to one-twelfth of one percent (1.0% per annum) of FSL's net asset value before the FSL Performance Fee (as defined), as calculated at the opening of business on the first business day of each calendar month, which will include subscriptions for shares accepted by FSL as of the first business day of the month. This fee is payable monthly in arrears.

In addition, the Manager receives a quarterly performance fee from FSL in an amount equal to twenty percent (20%) of the amount of any new high net profits, i.e., new appreciation, earned by FSL (the "FSL Performance Fee"). In the event that, as at the end of any calendar quarter, the aggregate amount of original investments in Non-SSC Investment vehicles exceeds the aggregate net asset value of FSL's interests in Non-SSC Investment vehicles (before deduction of FSL's share of fees payable by the Non-SSC Investment vehicles ) (such excess being referred to as the "Non-SSC Investment Loss"), the Manager will reduce the amount of the FSL Performance Fee payable at subsequent quarter end by an amount equal to the Non-SSC Investment Loss. The portion of the FSL Performance Fee that is reduced to cover the Non-SSC Investment Loss will be carried forward. In the event the Non-SSC Investment Loss is, in whole or in part, subsequently recouped by Non-SSC Investment vehicles, FSL will pay the Manager such portion of the FSL Performance Fee that was previously reduced to cover the Non-SSC Investment Losses, in addition to the FSL Performance Fee otherwise payable in any quarter.

<u>Salaries and Other Personnel Expenses</u>

Mr. Noel will not be compensated for serving as a director of the Fund, but he and representatives of the Manager will be reimbursed by the Fund for any out-of-pocket expenses they may incur in attending meetings of the Board of Directors or of shareholders. The directors not affiliated with the Manager, of which there are two at the present time, will each be paid a fee of $5,000 per annum by the Fund together with their out-of-pocket expenses in attending meetings of the Board of Directors or of shareholders.

## CUSTODIAN AND BROKERAGE

<u>Custodian</u>

Citco Global Custody N.V. has been appointed as Custodian by the Fund.

The Custodian will be entrusted with the safe custody of certain financial investments of the Fund pursuant to a custody agreement made and entered into between the Fund and the Custodian. The Custodian shall exercise only custody functions on behalf of the investments of the Fund. It does not act as sponsor of the Fund or assume special controlling duties other than those related to its custody functions. The Custodian does not warrant the contents of this Memorandum, nor is it involved in the management, administration or Net Asset Value calculation of the Fund. The Custodian may make use of sub-custodian and depositories in the exercise of its functions. The Fund may appoint other custodians to provide custody services to the Fund. The services of the Custodian to the Fund may be terminated by either the Fund or the Custodian, inter alia, at any time, subject to 90 days prior written notice.

The Custodian shall have no responsibility to initiate, appear in, prosecute or defend any legal or equitable proceedings relating to the stocks, bonds, other securities or property held by the Custodian on behalf of the Fund under the custody agreement. The Custodian shall have no responsibility to initiate any proceeding or engage the services of any third party for the collection of overdue amounts owing to the Fund in connection with any stocks, bonds or other property held by the Custodian under the custody agreement. If, at the request of the Fund, the Custodian agrees to appear in, prosecute or defend any such legal or equitable proceedings, either in the Custodian's name or in the name of its nominee, the Custodian shall first be indemnified to its satisfaction against damages and expenses (including attorney's fees) which may be sustained or incurred by the Custodian in so acting.

Where sub-custodians are appointed, the Custodian must exercise reasonable skill, care and diligence in the selection of sub-custodians and is responsible to the Fund for the duration of the appointment of each sub-custodian, for satisfying itself as to the ongoing suitability of the sub-custodians to provide custodial services to the Fund. In addition, the Custodian must maintain an appropriate level of supervision over the sub-custodians and make appropriate enquiries, from time to time, to confirm that the obligations of the sub-custodians continue to be completely discharged.

## Brokerage

It is expected that the Manager and the Non-SSC Investment managers will generally allocate brokerage business on the basis of best available execution and in consideration of such brokers' provision of brokerage and research services. The Manager and the Non-SSC Investment managers may also utilize brokers with which the Non-SSC Investment managers are affiliated.

In selecting brokers or dealers to execute transactions, the Manager and the Non-SSC Investment managers typically will not solicit competitive bids and will not have an obligation to seek the lowest available commission cost. It generally will not be the practice of Managers or the Non-SSC Investment managers to negotiate "execution only" commission rates, and thus the Fund may be deemed to be paying for research and other services provided by the broker which are included in the commission rate. Research furnished by brokers may include, but is not limited to, written information and analyses concerning specific securities, companies or sectors; market, financial and economic studies and forecasts; financial publications; statistic and pricing services, as well as discussions with research personnel, along with hardware, software, data bases and other technical and telecommunication services and equipment utilized in the investment management process. Research services obtained by the use of commissions arising from such transactions may be used by the Manager or the Non-SSC Investment managers in their other investment activities.

The Manager and the Non-SSC Investment managers may also be paying for services other than research that are included in the commission rate. These other services may include, without limitation, office space, facilities and equipment; administrative and accounting support; supplies and stationery; telephone lines, usage and equipment and other items which might otherwise be treated as an expense of the Manager or the Non-SSC Investment managers. To the extent the Manager or the Non-SSC Investment managers utilizes commissions to obtain items which would otherwise be an expense of the Manager or the Non-SSC Investment managers, such use of commissions in effect constitutes additional compensation to the Money Manager. Certain of the foregoing commission arrangements are outside the parameters of Section 28(e) of the Securities Exchange Act of 1934 which permits the use of commissions or "soft dollars" to obtain "research and execution" services. Finally, since commission rates are generally negotiable, selecting brokers on the basis of considerations which are not limited to applicable commission rates may result in higher transaction costs than would otherwise be obtainable.

## ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT

Pursuant to an agreement between Citco Fund Services (Europe) BV ("Citco" or the "Administrator") and the Fund, Citco serves as the administrator for the Fund, under the overall direction of the Fund's Board of Directors. As administrator, Citco has the responsibility for furnishing the day to day administrative services which the Fund may require, such as: accounting services; maintaining the Fund's books and records; preparation of reports and accounts; calculation of Net Asset Value and fees; communications with shareholders and/or governmental bodies; paying the Fund's expenses; providing suitable facilities and procedures for handling dividends and distributions (if any) and the orderly liquidation and dissolution of the Fund, if required.

To the extent that Citco relies on information supplied by the Fund, any investee fund of the Fund or any brokers engaged by the Fund, in connection with making any of the aforementioned calculations, Citco's liability for the accuracy of such calculations is limited to the accuracy of its computations. Citco shall not be liable for the accuracy of the underlying data provided to it.

Pursuant to the Administration Agreement, dated as of February 20, 2003, between the Fund and Citco, the Fund has agreed to indemnify Citco its subsidiaries, affiliates, directors and other officers, shareholders, servants, employees, agents and permitted delegates under the Administration Agreement, against any and all liabilities, obligations, losses, judgments and expenses of any kind or nature whatsoever (collectively, the "Claims" and, individually, a "Claim") which may be imposed on, incurred by or asserted against any of them arising (other than by reason of negligence, bad faith, fraud or dishonesty on the part of Citco or such other indemnified party) out of the provision of services under the Administration Agreement. Similarly, Citco will indemnify the Fund from and against any Claim which arises directly out of the negligence, bad faith, fraud or dishonesty of its obligations on the part of Citco in connection with its provision of services under the Administration Agreement. The Administration Agreement may be terminated by either party on 90 days' prior written notice; provided, however, that the Administration Agreement may be terminated forthwith by notice in writing by either party if the other party (a) commits a material breach of the Administration Agreement and fails to cure such breach within 30 days after notice from the non-defaulting party; or (b) enters into involuntary liquidation or if a receiver is appointed over any of its assets.

## RISK FACTORS

Among the substantial risk factors involved in a purchase of Shares in the Fund are the following:

1. **Trading Risks.** Substantial risks are involved in the trading of equity securities and options. Market movements can be volatile and are difficult to predict. U.S. Government activities, particularly those of the Federal Reserve Board, can have a profound effect on interest rates which, in turn, substantially affects securities and options prices, as well as the liquidity of such markets. Politics, recession, inflation, employment levels, trade policies, international events, war and other unforeseen events can also have significant impact upon the prices of securities and options. A variety of possible actions by various government agencies also can inhibit the profitability of the Fund's business or can result in losses. Such events, which can result in huge market movements and volatile market conditions, create the risk of catastrophic losses for the Fund.

Various techniques are employed to attempt to reduce a portion of the risks inherent in the trading strategies utilized on behalf of the Fund. The ability to achieve the desired effect through a particular technique is dependent upon many factors, including the liquidity of the market at the desired time of execution. Thus, substantial risk remains that the techniques employed on behalf of the Fund by FSL and the Non-SSC Investment managers cannot always be implemented or effective in reducing losses. At various times, the markets for exchange-listed equity securities and options and/or other securities may be "thin" or illiquid, making purchases or sales of securities at desired prices or in desired quantities difficult or impossible. In addition, options prices are extremely volatile. The volume and volatility of trading in these markets depends in part on general public interest and public opinion concerning economic conditions as well as the liquidity provided by marketmakers and specialists. The liquidity of the market may also be affected by a halt in trading on a particular futures or securities exchange or exchanges. Illiquid markets may make it difficult to get an order executed at a desired price.

2. **Dependence Upon Principals and Key Employees of the Manager and BLM.** The services of the Manager's principals and key employees and BLM are essential to the continued operations of FSL and the Fund. If their services were no longer available, their absence would have an adverse impact upon an investment in the Fund. The key employees of the Manager will allocate a small

portion of FSL's assets between and among the Non-SSC Investment managers. The Fund will be dependent on the continued presence of these key employees in connection with identification of the recipients of these allocations and the monitoring of the Non-SSC Investments.

3. **Conflicts of Interest.** The Manager and the Non-SSC Investment managers receiving allocations of FSL's assets, and their respective principals and affiliates, are presently affiliated with and may in the future form and manage, or provide other services to, other investment entities (including without limitation investment partnerships, investment companies and mutual funds) with substantially the same or different objectives as those of the Fund. They may also make investments in securities for their own accounts. In addition, the Manager functions as the investment manager for unregistered foreign investment companies in addition to the Fund. Such activities could detract from the time that the Manager and its principals allocate to the affairs of FSL and the Fund. The Manager will obtain certain business and financial benefits from FSL's investments in the Non-SSC Investments which may result in a conflict of interest between the Manager and FSL in the selection of, and allocation of assets between and among the Non-SSC Investments. See "POTENTIAL CONFLICTS OF INTEREST".

4. **Conflicts of Interest-Transaction Executions.** The broker-dealer through which FSL conducts its "split strike conversion" transactions, in its role as a market maker, may effect transactions in equity securities with the Fund as principal. This may provide such broker-dealer with the ability to use the Fund's assets to enhance its equities market-making function.

5. **Competition.** The securities industry, including market-making activities and transactions effected in connection therewith, is very competitive. Competition from other persons or entities involved in activities similar to those of the Fund can restrict the ability of the Fund to acquire positions at the prices deemed most beneficial to its overall trading strategies. Many such competing persons or entities are better capitalized and have more experience in trading than the Fund. Moreover, the widespread use of computer-assisted trading systems for trading strategies can alter trading patterns or affect execution of trades to the detriment of the Fund.

6. **Regulated Industries.** The securities and commodities industries are highly regulated. The Fund will not be directly subject to regulation by the SEC, national securities exchanges, the CFTC or the Federal Reserve Board. However, the SEC and CFTC regularly review the practices and procedures of the securities and commodities industries, and the marketplace in general, and from time to time revise rules and regulations pertaining thereto. The exchanges engage in similar reviews and at times revise their rules. There can be no assurance whatsoever that any rules and regulations promulgated by the SEC, the CFTC, the Federal Reserve Board, or the various securities exchanges or statutory amendments to the Securities Exchange Act of 1934 or the Commodity Exchange Act will not adversely impact the Fund.

7. **Clearing Firm Loss or Insolvency.** If a clearing firm utilized in connection with accounts maintained on behalf of FSL was to become insolvent, the Fund could have some or all of these positions closed out without its consent. All of FSL's positions may not be closed out under these circumstances, yet delays or other difficulties may be experienced in attempting to close out or exercise options positions. Widespread insolvency among clearing firms that clear securities options could also impair the ability of the Options Clearing Corp. (the "OCC") to honor all exercises, in spite of the system of safeguards which the OCC has in place. Such widespread insolvency could result in substantial losses to the Fund.

8. **Over-the-Counter Options Transactions.** A portion of the options transactions effected on behalf of the Fund may utilize the over-the-counter market for their execution. Trading index options in the over-the-counter market is subject to counter-party risk and is without the protections

afforded by transactions effected through the Options Clearing Corporation, a registered options exchange.

9. **Option Buyer's Risk of Loss of Entire Investment.** An option is a wasting asset which becomes worthless when the option expires. As the remaining life of an option shortens with the passage of time, its value is reduced until it reaches zero upon expiration. This means that the option buyer who neither sells it in the secondary market nor exercises it prior to expiration will lose his entire investment in the option.

10. **Arbitrage Transactions.** Among the many risks of arbitrage transactions are that two or more buy or sell orders may not be able to be executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction. Also, the transaction costs of arbitrage transactions can be especially significant because separate costs are incurred on each component of the combination. Consequently, a substantial favorable price movement may be required before a profit can be realized.

11. **Combination Transactions.** At various times, the Fund, through its investments in FSL and the Non-SSC Investments, may engage in spreads or other combination options transactions involving the purchase and sale of related options contracts, in various combinations. Such transactions are considerably more complex than the purchase or writing of a single option. The following are among the many risks of combination option transactions: the difficulty that may be involved in attempting to execute simultaneously two or more buy or sell orders at the desired prices; the possibility that a loss could be incurred on both sides of a multiple options transaction; and the possibility of significantly increased risk exposure resulting from the hedge against loss inherent in most spread positions being lost as a result of the assignment of an exercise to the short leg of a spread while the long leg remains outstanding. Also, the transaction costs of combination options transactions can be especially significant because separate costs are incurred on each component of the combination. This can have the effect of requiring a substantial favorable price movement before a profit can be realized.

12. **Trading Decisions Based on Trend Analysis.** Certain of the trading decisions made on behalf of the Fund are based on the use of computer pricing models to identify apparently overpriced or underpriced options in relationship to an assumed norm. In addition, analyses of price and other fluctuations over time may be relied upon which utilize charts and computers in order to discern and predict trends. Trading based on such analyses is subject to the risks that options premiums will not increase or decrease as predicted by the analyses, or that trades dictated by the analyses may not be executed in time to take advantage of the price disparities. This latter risk is likely to materialize when numerous market makers use similar analyses, all of which dictate the desirability of executing identical or similar contracts. In the past, there have been periods without identifiable trends and, presumably, such periods will continue to occur. Trading models or analyses that depend upon the forecasting of trends will not be profitable if there are not identifiable trends of the kind that the models or analyses seek to follow. Any factor which would make it more difficult to execute trades in accordance with the models or analyses signals, such as a significant lessening of liquidity in a particular market, would also be detrimental to profitability.

13. **Assignment of Puts or Calls.** Substantial losses may result under certain circumstances if a hedged position becomes a long or short position due to the assignment of the short put or short call portion of the hedged position. Under normal market conditions, the remaining portion of the previously hedged portion may be liquidated or otherwise adjusted to limit exposure to price changes. Suspension of trading of the option class or underlying securities followed by a price gap at the reopening of trading might result in substantial losses. The same would be true given an illiquid market such as that of October 1987.

19

14. **Prohibition of Exercise Rights.** The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading in the option has also been halted, holders and writers of that option will be locked into their positions until one of the two restrictions has been lifted.

15. **Compensation Arrangements of Non-SSC Investments.** The Non-SSC Investment managers will generally be compensated through incentive arrangements. Under these arrangements, the Non-SSC Investment manager may benefit from appreciation, including unrealized appreciation in the value of the Non-SSC Investment, but may not be similarly penalized for decreases in the value of such investment vehicle. Such fee arrangements may create an incentive for the Non-SSC Investment managers to make purchases that are unduly risky or speculative. In most cases, however, the Fund anticipates that FSL will invest in Non-SSC Investments where the manager is required to recoup prior losses before any performance-type fee is payable in respect of current gains. To the extent that an accrual for an incentive fee is reflected in the net asset value of shares of a Non-SSC Investment vehicle, then, if such accrual is reversed by the Non-SSC Investment vehicle as a result of subsequent depreciation in the value of such investment, all of the shares of FSL and, accordingly, the Fund, will benefit from the reversal of the accrual, including Shares purchased after the Non-SSC Investment vehicle made the accrual. Further, to the extent that the FSL Performance Fee is reduced by the Non-SSC Investment Loss amount, then if such reduction is repaid in part or in whole by FSL due to recoupment of losses by Non-SSC Investment vehicles, the net asset value of all shares of FSL and, accordingly, the Fund then outstanding will be reduced, including Shares purchased after the reduction of the FSL Performance Fee.

16. **Risks of Leverage.** The Non-SSC Investment vehicles in which the Fund invests may borrow funds in connection with their investment strategies. A particular Non-SSC Investment vehicle may not be subject to any limitation in the amount of its borrowings, and the amount of borrowings that the Non-SSC Investment vehicle may have outstanding at any time may be large in comparison to its capital.

The use of leverage may provide the Non-SSC Investment vehicle with the opportunity for greater capital appreciation, but at the same time will increase the Non-SSC Investment vehicle's, and indirectly the Fund's, exposure to capital risk and higher current expenses. Moreover, if the assets of the Non-SSC Investment vehicle are not sufficient to pay the principal of, and interest on, the Non-SSC Investments vehicle's debt when due, the Fund could sustain a total loss of its investment in the Non-SSC Investment vehicle.

The Fund may enter into borrowing arrangements on a short-term basis, including through the use of a line of credit. Such borrowing may result in the borrower taking custody of, or placing liens on, the assets of the Fund.

17. **Possibility of Misappropriation of Assets.** When FSL invests with Bernard L. Madoff Investment Securities or in a Non-SSC Investment vehicle, it will not have custody of the assets so invested. Therefore, there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund.

18. **Sole Proprietor Non-SSC Investment Managers.** Some of the Non-SSC Investment vehicles to which FSL may allocate capital will consist of investment operations with only one principal. In such cases, if that individual's services became unavailable to the Non-SSC Investment vehicle, the Fund might sustain losses.

19.     **Experience of Non-SSC Investment Managers.** While certain of the Non-SSC Investment managers have had extensive experience in trading securities generally and with their specific investment strategies, they have had little experience in investing and trading on behalf of a pooled investment vehicle, in utilizing certain of the investment strategies to be employed on behalf of the Fund or in managing an account as large as that anticipated for the Non-SSC Investments. In that regard, as the assets of the Non-SSC Investment vehicles increase, it is not known what effect, if any, this will have on the trading strategies utilized on their behalf or their investment results.

20.     **Emerging Managers.** As the Non-SSC Investment vehicles generally will be in an early stage of formation or operation, this can pose a number of operational and other issues. For example, in its early stages the Non-SSC Investment manager may have little capital available to cover expenses and, accordingly, may have difficulty attracting qualified personnel. Competing investment managers have a larger number of qualified management and technical personnel and benefit from a larger capital base.

21.     **Lack of Liquidity.** Certain of the investments in the Non-SSC Investments will be subject to lock-up provisions which will limit the ability of FSL to withdraw capital from such investment. While such lock-up period may be subject to early release for breach of risk control or performance guidelines or for cause, there can be no assurance that FSL, and therefore the Fund, will not sustain additional losses while such lock-up period remains in effect.

22.     **Exchange Rate Risk.** The Fund will maintain its assets in U.S. dollars. The Fund has established an account which will effect transactions in the currency market in an effort to hedge against such risks as they pertain to the Euro, which is the functional currency of the Fund. There can be no assurance that such transactions will be successful in protecting the shareholders against this exchange rate risk. In addition, a hedge may be established in anticipation of new subscriptions. In the event such new subscriptions are not made, the hedge positions will be unwound and the transaction costs will be borne by the existing shareholders.

23.     **Forward Trading in Currencies.** The Fund may engage in a substantial amount of trading in forward contracts, swaps and other similar instruments with respect to currencies ("Forward Contracts"). Forward Contracts are not traded on exchanges; rather, banks and dealers act as principals in these markets. Forward trading is substantially unregulated; there is no limitation on the daily price movements of Forward Contracts. The principals who deal in the forward markets are not required to continue to make markets in the Forward Contracts they trade. There have been periods during which certain participants in the forward markets have refused to quote prices for Forward Contracts or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell. The Fund will trade Forward Contracts through a limited number of entities, and as a result liquidity problems might be greater in the Fund's forward trades than they would be were trades to be placed through a larger number of forward market participants. The imposition of credit controls by governmental authorities might also limit such forward trading to less than that which the manager of the account would otherwise recommend, to the possible detriment of the Fund.

In respect of its forward trading, the Fund is subject to the risk of the inability or refusal to perform with respect to such contracts on the part of the principals or agents with or through which the Fund trades. Any such failure or refusal, whether due to insolvency, bankruptcy or other causes, could subject the Fund to substantial losses. The Fund will not be excused from the performance of any Forward Contracts into which it has entered due to the default of third parties in respect of other forward trades which in the Fund's trading strategy were to have substantially offset such contracts.

Currency forwards prices are volatile. Price movements of these contracts are influenced by, among other things: government trade, fiscal, monetary and exchange control programs and policies; national and international political and economic events; and changes in interest rates. Governments from time to time intervene in the currency markets with the specific intent of influencing prices directly.

24. **Currency Account.** The Bank managing the Fund's currency hedging account may, from time to time, receive a pledge of the assets underlying the Shares as collateral for the Fund's obligation in the currency hedging account. In the event such a pledge is in effect and the Fund is unable to pay all or a portion of its obligations to the Bank in connection with the currency hedging account, all or a portion of the assets underlying the Shares (i.e., the Fund's FSL shares) may be forfeited.

## POTENTIAL CONFLICTS OF INTEREST

The Manager, and its principals may form and manage other investment entities (including without limitation investment partnerships, investment companies, mutual funds and offshore funds) in the future with substantially the same or different objectives as those of the Fund. They may also make investments in securities for their own accounts. Such activities could detract from the time they allocate to the affairs of the Fund. Similarly, Messrs. Naess and Schmid, the non-affiliated directors, have other business interests and will not devote their entire time to the Fund's affairs. See also "RISK FACTORS". In connection with FSL's Non-SSC Investments, the Manager and its affiliates may obtain financial and business benefits, including but not limited to: (i) additional investment capacity in Non-SSC Investment strategies, which may be made available to other clients of the Manager, (ii) compensation from Emerging Managers in connection with placement of such additional investment capacity, and/or (iii) sharing in the equity or cash flows of the entire investment business (FSL and non-FSL related) of such Emerging Managers. The Manager or an affiliate thereof will share with FSL, through FSL Performance Fee offset, an amount equal to the greater of (i) 50% of cash flows generated by equity held by the Manager or an affiliate thereof in the businesses of Emerging Managers and (ii) 10% of all revenues accruing to the Manager or an affiliate thereof directly from its association with Non-SSC Investment Vehicles (the "Shared Cash Flow Amount"). Despite this sharing, the arrangements described in this paragraph may result in a conflict of interest between the Manager and the Fund.

Because FSL and the Fund were organized by the Manager, the fees paid by the Fund to the Manager were not the result of arms-length negotiation.

The Fund may engage placement agents to market the Fund. If you are introduced to the Fund by an agent, you should expect it to be paid by the Manager for the introduction, out of the fees the Manager receives from the Fund. You should also expect the agent to have an incentive to recommend that you remain an investor in the Fund, since the agent will likely be paid a portion of the Manager's fees each year that you remain an investor.

Because Mr. Noel is a principal of the Manager as well as a Director of the Fund, he may have an incentive to take actions as a Director that favors the Manager over the Fund.

Citco Fund Services (Europe) B.V., Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody N.V. are affiliates.

Each service provider to the Fund shall pay regard to its obligation to act in the best interest of the Fund and the Directors of the Fund will ensure that all potential conflicts of interest are resolved fairly and in the interest of the shareholders. When allocating investment opportunities, the Manager will ensure that all such investments are allocated in a fair and equitable manner.

## DESCRIPTION OF SHARES

The Fund is authorized to issue up to 5,000,000 shares in one class, with a par value of .01 EUR (the "Fund Shares"). The Fund has an authorized share capital of 50,000 EUR. The Fund Shares will be issued in book entry form, unless delivery of the Fund Shares in registered form is requested. Fund Shares will not be issued in bearer form. Each Fund Share, when issued, will be fully paid and nonassessable.

Holders of Fund Shares are entitled to one vote per share and will participate on a pro rata basis in the assets of the Fund on liquidation and in dividends and other distributions as declared.

## DIVIDEND POLICY

Since the business objective of the Fund is directed toward achieving capital appreciation, it is anticipated that the Fund will not declare any dividends or make any distributions to its shareholders. Subject to the foregoing and to applicable law, the Fund's Board of Directors will have sole discretion in determining the amount and frequency of dividend distributions, if any.

## TRANSFERS, REDEMPTIONS AND TERMINATION

<u>Transfers</u>

NO SALE OR TRANSFER OF SHARES WILL BE PERMITTED WITHOUT THE FUND'S CONSENT; HOWEVER, SHARES MAY BE REDEEMED AS OF THE LAST BUSINESS DAY OF EACH CALENDAR MONTH OF EACH YEAR ON 15 CALENDAR DAYS' NOTICE TO THE FUND.

Any sale or transfer of a shareholder's entire interest in any Shares or any transfer of Shares by operation of law must be submitted to the Fund for consent and will not be effective until such consent is given by the Fund. Any other dealing with Shares by way of assignment, pledge, mortgage or otherwise is prohibited unless consented to by the Fund and any attempt to do so without first obtaining the Fund's consent, which may be withheld in the sole and exclusive discretion of the Fund, will constitute grounds for compulsory redemption of the Shares concerned as of the next permissible redemption date (as described below) and the imposition of a processing charge of 2% of the Net Asset Value with respect to such redemption. Any application to record a transfer of Shares, including an application to record a transfer by operation of law, if not approved by the Fund within 30 days, also will be treated as an application to redeem the Shares in question as of the next permissible redemption date and will be subject to a processing charge per share of 2% of the Net Asset Value per Share. The processing charge will be retained by the Fund.

THE DISPOSITION OF SHARES TO U.S. PERSONS (AS DEFINED UNDER "OFFERING OF SHARES") WITHOUT THE PRIOR WRITTEN APPROVAL OF THE FUND IS EXPRESSLY PROHIBITED, AND THE FUND SHALL HAVE THE RIGHT COMPULSORILY

AND IMMEDIATELY TO REDEEM ANY SHARES HELD FOR ANY REASON BY U.S. PERSONS.

<u>Redemptions at the Option of the Shareholders</u>

A shareholder may cause part or all of his Shares to be redeemed as of the last business day (i.e., being any day not a Saturday or a Sunday, that is not a public holiday or a day on which banks are generally authorized or obliged by law or regulation to close in the Netherlands, the Republic of Ireland or the United States of America) of each calendar month of each year, provided that the Fund shall be in receipt of written notice of redemption for at least fifteen (15) calendar days prior to such redemption date. In the Fund's discretion, a shareholder requesting redemption of part of his Shares may be required to redeem all of his Shares unless such shareholder notifies the Fund to cancel the redemption. A Shareholder is not required to hold his Shares for any minimum period of time to exercise his redemption privilege.

<u>Compulsory Redemption</u>

The Fund reserves the right to call all or a part of a shareholder's Shares for redemption at any time for any reason or no reason. Except as set forth above, no processing charge will be imposed with respect to any Shares so compulsorily redeemed.

<u>Redemptions - General Information</u>

Redemptions will be at the Net Asset Value per Share calculated as of the last business day of the month of redemption, subject to any applicable processing charge, as described above. If notice of intent to voluntarily redeem is not received by the Fund within the prescribed period of time, then in the Fund's discretion, the redemption date may be deferred to the end of the next following permissible redemption period, unless the shareholder notifies the Fund to cancel the redemption and the Directors consent to such cancellation. Except in the case of extraordinary circumstances, such as an inability to liquidate existing positions, or the default or delay in payments due the Fund from brokers, banks or other persons, payment on redemptions will be made within 30 days after the redemption date. The Fund will not pay interest to the redeeming shareholder on any payment.

Shareholders bear the risk of any decline in Net Asset Value from the date notice of intent to redeem is given until the redemption date. In addition, the Fund may temporarily suspend any redemption during any period that the Fund has suspended the calculation of its Net Asset Value (see "OFFERING OF THE SHARES-Net Asset Value Defined"). Requests for redemption can be made by use of the form included in the Subscription Documents which accompany this Memorandum.

<u>Termination</u>

The shareholders may, by a majority vote, elect to wind up and dissolve the Fund at any time. If the Fund's Board of Directors determines that it would be in the best interests of the Fund to wind up and dissolve the Fund at any time, it will recommend to the shareholders that they vote to do so, and will submit a plan of dissolution for approval by the shareholders.

## ANTI-MONEY LAUNDERING REGULATIONS

As part of the Fund's responsibility for the prevention of money laundering, the Manager and its affiliates, subsidiaries or associates may require a detailed verification of a shareholder's identity, any beneficial owner underlying the normal ownership of the Shares and the source of the payment for the Shares.

The Manager reserves the right to request such information as is necessary to verify the identity of a subscriber and the underlying beneficial owner of a subscriber's or a shareholder's Shares in the Fund. In the event of delay or failure by the subscriber or shareholder to produce any information required for verification purposes, the Manager may refuse to accept a subscription or may cause the redemption of any such shareholder from the Fund. The Fund, without notice, may suspend the redemption rights of such shareholder if the Fund or the Manager reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, the Manager or any of the Fund's other service providers.

Each subscriber and shareholder shall be required to make such representations to the Fund as the Fund and the Manager shall require in connection with such anti-money laundering programs, including without limitation, representations to the Fund that such subscriber or shareholder is not a prohibited country, territory, individual or entity listed on the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") website and that it is not directly or indirectly affiliated with, any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programs. Such shareholder shall also represent to the Fund that amounts contributed by it to the Fund were not directly or indirectly the proceeds of criminal conduct or derived from activities that may contravene U.S. federal, state or international laws and regulations, including anti-money laundering laws and regulations.

## ANTI MONEY-LAUNDERING POLICIES

To ensure compliance with statutory and other generally accepted principles aimed at the prevention of money-laundering, the Fund and/or the Administrator may require a detailed verification of a prospective investor's identity. Although the Fund and/or the Administrator reserve the right to request a detailed verification of a prospective investor's identity, a detailed verification should not be necessary if:

- the prospective investor makes a subscription payment from an account held in their own name at a Qualified Financial Institution (a "QFI"); or

- the prospective investor is introduced by a QFI and that QFI provides written assurance to the Fund and/or the Administrator that it has established the identity of the prospective investor and holds evidence of that identity.

A QFI is defined as a financial institution which is:

- established in a European Union (EU) member state and subject to the EU Money Laundering Directives; or

- established in one of the countries which make up the Financial Action Task Force and/or is subject to regulation which complies with the FATF Recommendations. Such countries are Argentina Australia, Austria, Belgium, Brazil Canada, Denmark,

Finland, France, Germany, Greece, Hong Kong, Ireland, Italy, Japan, Luxembourg, Mexico, the Netherlands, New Zealand, Norway, Portugal, Russian Federation, Singapore, South Africa, Spain, Sweden Switzerland, Turkey, the United Kingdom, and the United States.

Prospective investors who DO NOT make the subscription payment from an account held in their own name at a QFI and who are NOT introduced by a QFI will be required to provide the following documentation, as relevant to their status.

Individual Investors will be required to provide the following information:

- full name;

- permanent address;

- a certified copy of their passport or national identity card;

- a bank reference letter; and

- verification of address.

Partnerships will be required to provide the following information:

- a mandate from the partnership authorizing the subscription and conferring authority on those persons executing the subscription agreement; and

- the identities of at least two partners and of all those authorized to issue instructions.

Corporate entities that are quoted on a stock exchange in an EU member country or in one of the QFI prescribed countries or that are known to be the subsidiary of such a quoted company will be required to provide the following information:

- the original or certified copy of the certificate of incorporation or similar document;

- a list of the directors' names, occupations, addresses and dates of birth; and

- properly authorized mandate of directors authorizing the subscription and conferring authority on those persons executing the subscription form.

Where the prospective investor to the transaction is a corporation that is a private company, the following additional information will need to be provided:

- certified passport copies or national identity card copies of at least two directors; and

- a list of names and addresses of shareholders holding 10% or more of the issued share capital of the company and in the case of individual shareholders, their occupations and dates of birth.

When a significant shareholder of a private company (25% or more) is a body corporate, information will need to be provided from the company regarding the ultimate beneficial ownership of that particular body corporate. If the ultimate beneficial owner(s) of that particular body corporate is (are) individual(s), such individual(s) will need to provide the information that is required from individual investors and outlined above.

Furthermore, subscriptions will be cross checked against lists held by various international agencies in order to establish that the persons or entities subscribing have not been blacklisted or wanted in connection with a criminal investigation. Such international agencies include the Bahamas Financial Intelligence Unit, the Central Bank of Ireland, the FBI, the Bank of England and the US Treasury Department's Office of Foreign Assets Control (OFAC). Other agencies will be consulted as and when appropriate.

Finally, it should be noted that redemption payments will only be paid to a bank account held in the name of the registered owner of the Shares and that any transferee will have to furnish the same information (and enter into a subscription agreement) which would be required in connection with a direct subscription in order for a transfer application to be considered by the Administrator.

Pending the provision of evidence satisfactory to the Administrator as to the identity of any prospective investor, the evidence of title in respect of Shares may be retained at the absolute discretion of the Administrator. If, within a reasonable period of time following a request for verification of identity, the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the Shares applied for in which event application moneys will be returned without interest to the account from which such moneys were originally debited. Alternatively, if the Fund has issued Shares to an investor prior to all identification documentation being provided, such investor will not be able to redeem any Shares so issued until it has provided all required identification documents.

Financial institutions which have been duly qualified and authorized to exercise their activity in their respective countries as a bank and which are subject to internationally recognized anti money-laundering legislation may subscribe for Shares on behalf of their clients.

## TAX CONSIDERATIONS AND EXCHANGE CONTROL AND ERISA

### Tax Considerations and Exchange Control

As of the date of this Memorandum, the Fund is exempt from all provisions of the Income Tax Act of the British Virgin Islands, including with respect to all dividends, interests, rents, royalties, compensation and other amounts payable by the Fund to persons who are not persons resident in the BVI. Capital gains realized with respect to any shares, debt obligation or other securities of the Fund by persons who are not resident in the BVI are also exempt from the provisions of the Income Tax Act of the British Virgin Islands. No estate, inheritance, succession or gift tax, rate, duty, levy or other charge is payable by persons who are not persons resident in the BVI with respect to any shares, debt obligations or other securities of the Fund.

There are no exchange control restrictions in the BVI. Accordingly, the Fund will be free to acquire, to hold and to sell any foreign currency and securities without restriction.

The Fund's gains from its trading in stocks, options or other investments should not be subject to United States federal income, branch or withholding taxes because the Fund expects that it

will not be engaged (or treated as engaged) in a "trade or business" in the United States, or treated as a personal holding company, for United States federal income tax purposes. Any dividend income received by the Fund from U.S. corporations generally will be subject to United States federal withholding taxes. Although substantially all of the interest earned by the Fund from sources within the United States is expected to be of the type which will not be subject to United States federal income, branch or withholding taxes, the Fund may earn interest from time to time that could be subject to United States federal income, branch or withholding taxes (although it is not expected that the amount of such taxes would be material). In addition, with respect to Shares held by non-U.S. persons who are not engaged in a "trade or business" in the United States (as defined under the Internal Revenue Code, the "Code"), such persons should not be subject to United States federal income, branch or withholding taxes (i) on dividends paid to them by the Fund and (ii) on the redemption of their Shares by the Fund. The Fund expects that it will not be subject to state and local taxes in the United States on its income or capital. Because of the absence of full guidance under state and local law, however, this result is not entirely clear. The conclusions in this paragraph are based on the Code and existing laws, judicial decisions and administrative regulations, rulings and practice in the United States, all of which are subject to change.

Prospective subscribers should consult their professional advisors on the possible tax consequences of subscribing for, buying, holding, selling, transferring or redeeming Shares under the laws of their country of citizenship, residence or domicile.

### ERISA

The Fund may accept subscriptions from individual retirement accounts ("IRAs"), Keogh plans, pension or profit-sharing plans, governmental plans, entities that invest the assets of such accounts or plans and/or other benefit plan investors (all such entities are herein referred to as "Benefit Plan Investors"). The Fund does not anticipate that its assets will be subject to ERISA because it intends to limit the investments in the Fund by Benefit Plan Investors (both U.S. and non-U.S.) to less than 25% of the value of any class of equity interests of the Fund, excluding from this calculation any non-Benefit Plan Investor interest of that class held by the Manager, persons affiliated with the Manager or their employees. No subscriptions for Shares made by Benefit Plan Investors will be accepted and no transfers of Shares will be permitted to the extent that the investment or transfer would result in the Fund exceeding this 25% limit. In addition, because the 25% limit is to be calculated upon every subscription to or redemption from the Fund, the Fund has the authority to require the redemption of all or some of the Shares held by any Benefit Plan Investor if the continued holding of such Shares, in the opinion of the Directors, could result in the Fund being subject to ERISA.

## LEGAL MATTERS

Legal matters in connection with this offering have been passed upon for the Fund in the United States by Andrew E. Goldstein, Esq., 488 Madison Avenue, 16th Floor, New York, New York 10022, and in the British Virgin Islands by Conyers Dill & Pearman, Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands.

# MISCELLANEOUS

<u>Reports and Financial Statements</u>

The Fund's fiscal year will end on December 31, except that the Fund's final fiscal year will terminate on the date the Fund commences to wind up and dissolve. The Fund will keep its books on an accrual basis. Audited financial statements of the Fund will be mailed to shareholders at their registered addresses, normally within 120 days after year-end. At the same time, each shareholder shall be furnished with an annual report of the Fund, which will include the Net Asset Value of the Fund and the Net Asset Value per Share at the end of the year, and such other information as the Fund, in its discretion, determines to be necessary or appropriate. Shareholders also will receive unaudited quarterly letters with respect to the Fund's financial performance.

1) <u>General</u>

a) No Share or loan capital of the Fund is under option or agreed, conditionally or unconditionally, to be put under option.

b) Shares in the Fund are in registered form. Temporary documents of title will not be issued.

c) Except of their ownership of Shares, none of the Directors or any connected person has any interest in the Share or loan capital of the fund, the existence of which is known to, or could with reasonable diligence be ascertained by, the relevant Director.

d) None of the Directors has a service contract with the Fund and no such contract is proposed, although, Walter M. Noel, Jr. is a principal of the Manager.

e) No loan or guarantee has been granted or provided by the Fund to or for the benefit of any Director.

f) None of the Directors or any member of their respective immediate families has or has any interest in any transaction or transactions which are or were unusual in their nature or conditions or significant in the business of the Fund and which have been effected by the Fund since its incorporation.

g) As of the date of this Confidential Private Placement Memorandum, the Shares have commenced operations, but no dividends have been declared.

h) The Fund has no loan capital outstanding, no loan capital created but unissued, no loans or any other borrowing or indebtedness or any contingent liabilities, nor has it given any guarantees.

2) <u>Litigation and Arbitration</u>

The Fund is not engaged in any legal or arbitration proceedings and no legal or arbitration proceedings are known to the Directors to be threatened by or against the Fund.

3) <u>Memorandum and Articles of Association</u>

Pursuant to Paragraph 4 of the Fund's Memorandum of Association, the Fund may engage in any act or activity that is not prohibited under any law for the time being in the BVI. As such,

the Fund may carry on business as an investment company. The Fund's Memorandum and Articles of Association may be amended by a resolution of Directors or a resolution of shareholders.

The Memorandum and Articles of Association of the Fund provide that no director or officer of the Fund shall be liable for the acts, receipts, neglects or defaults of any other director or officer, or for joining in any receipt or act for conformity, or for any loss or expense happening to the Fund through the insufficiency of deficiency of title to any property acquired by order of the directors for or on behalf of the Fund, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Fund shall be invested, or for any loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default, or oversight on his part, or for any other loss, damage, or misfortune whatever which shall happen in relation to the execution of the duties of his office or in relation thereto, to the extent permitted by law.

The Memorandum and Articles of Association of the Fund further provide that each director or officer of the Fund shall be indemnified by the Fund against, and it shall be the duty of the directors out of the funds of the Fund to pay all costs, losses, and expenses which any director or officer may incur or become liable for by reason of any contract entered into, or act or thing done by him as such director or officer, or in any way in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Fund, and have priority as between the shareholders over all other claims but only if such director or officer acted honestly and in good faith with a view to the best interests of the Fund and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

4) **Directors**

   a) The number of Directors shall not be less than one (1) or more than twenty (20).

   b) The remuneration of Directors shall be fixed from time to time by the Board. Currently the director who is affiliated with the Manager does not receive compensation as a Director. The two Directors not affiliated with the Manager are each paid $25,000 per annum.

   c) None of the Directors has a service contract, existing or proposed with the Fund, although Walter M. Noel, Jr. is a principal of the Manager.

   d) There is no retirement age for Directors.

   e) The Directors may vote on any transaction in which they have a material interest if they first disclose the nature of their interest to the Fund.

   f) The Directors may, by resolution of Directors, fix the emoluments of the Directors with respect to services to be rendered in any capacity to the Fund.

   g) The Directors may exercise the powers of the Fund to borrow money and to mortgage or charge its undertakings, property and uncalled capital or any part thereof, to issue debentures, debenture stock and offer securities whenever money is borrowed as security for any debt, liability or obligation of the Fund.

h) No Director has

- any unspent convictions in relation to indictable offenses;

- been adjudged a bankrupt, entered into a voluntary arrangement with creditors or had a receiver appointed to oversee any asset of such Director;

- been the director of any company which, while he was a director with an executive function or after 12 months after he ceased to be director with an executive function, had a receiver appointed or went into compulsory liquidation, creditors voluntary liquidation, administration or company voluntary arrangements, or made a composition or arrangements with its creditors generally or with any class of its creditors;

- been a partner of any partnership which, while he was partner or within 12 months after he ceased to be a partner, went into compulsory liquidation, administration or partnership voluntary arrangement or had a receiver appointed to oversee any partnership asset;

- had any public criticism by statutory or regulatory authorities (including recognized professional bodies); or

- been disqualified by court from acting as a director or from acting in the management or affairs of any company.

## 5) <u>Borrowing Powers</u>

The Board may exercise all the powers of the Fund to borrow money, give guarantees and to mortgage, pledge or charge all or part of its undertaking, property and uncalled capital and to issue debentures and other securities, whether outright or as collateral security for any liability or obligation of the Fund.

## <u>Documents Available for Inspection</u>

Copies of the following documents will be available for inspection at the Fund's registered office in the British Virgin Islands during usual business hours on any weekday (Saturdays, Sundays and holidays excepted):

a) the Memorandum and Articles of Association of the Fund;

b) the material contracts of the Fund with service providers;

c) the British Virgin Islands Mutual Funds Act, 1996;

d) when available, the latest financial statement of the Fund;

e) audited accounts as of the close of the last immediately fiscal year;

f) Auditors letter of consent; and a list of all past and present directorships and partnerships held by each director over the past five years.

## COUNTRY-SPECIFIC NOTICES

Australia. No offer for subscription or purchase of the Shares offered hereby, nor any invitation to subscribe for or buy such Shares, has been made or issued in Australia, otherwise than by means of an excluded issue, excluded offer or excluded invitation within the meaning of Section 66(2) or 66(3) of the Corporations Law. Accordingly, the Memorandum has not been lodged with the Australian Securities Commission. Further, the Shares offered hereby may not be resold in Australia within a period of six (6) months after the date of issue otherwise than by means of an excluded offer or excluded invitation as described above.

Bahamas. The Shares may not be offered or sold or otherwise disposed of in any manner to persons deemed by the Central Bank of the Bahamas as resident for exchange control purposes, unless such persons deemed as resident obtain the prior approval of the Central Bank of the Bahamas.

Belgium. The information in this Memorandum may not be disclosed to the public in Belgium, the Shares may not be offered, sold, transferred or delivered in or from Belgium as part of their initial distribution or at any time thereafter, directly or indirectly, other than to persons or entities mentioned in Article 3 of the Royal Decree of January 9, 1991 Relating to the Public Characteristic of Operations Calling for Savings and on the Assimilation of Certain Operations to a Public Offer (Belgian Official Journal of January 12, 1991). Therefore, the Shares are exclusively designed for credit institutions, stock exchange companies, collective investment funds, companies or institutions, insurance companies, and/or pension funds acting for their own account only.

Brazil. The Shares have not been, and will not be, registered with the Comissão de Valores Mobiliarios and may not be offered or sold in Brazil except in circumstances which do not constitute a public offering or distribution under Brazilian laws and regulations.

British Columbia and Ontario, Canada. The Memorandum constitutes an offering of the securities described therein only in those jurisdictions and to those persons where and to whom they may be lawfully offered for sale, and therein only by persons permitted to sell such securities. The Memorandum is not, and under no circumstances is to be construed as, an advertisement or a public offering of the securities described therein in Canada. No securities commission or similar authority in Canada has reviewed or in any way passed upon the Memorandum or the merits of the securities described therein, and any representation to the contrary is an offense. If the Memorandum, together with any amendment thereto, contains an untrue statement of a material fact or omits to state a material fact that is required to be stated or is necessary in order to make any statement therein not misleading in the light of the circumstances in which it was made (a "Misrepresentation") and it was a Misrepresentation on the date of purchase, purchasers in British Columbia and Ontario to whom the Memorandum was sent or delivered and who purchase Shares shall have a right of action against the Fund for rescission (while still the owner of such shares) or alternatively, for damages, exercisable on written notice given not more than 90 days subsequent to the date of purchase, provided that the Fund will not be liable: (a) if the purchaser purchased such Shares with knowledge of the Misrepresentation; (b) for all or any portion of any damages that the Fund proves do not represent the depreciation in value of such Shares as a result of the Misrepresentation; and (c) for amounts in excess of the price at which such Shares were sold to the purchaser. The foregoing summary is subject to the express provisions of either the Securities Act (British Columbia) or the Securities Act (Ontario), whichever the case may be, and reference is made to the complete text of such provisions.

Brutish Virgin Islands. The Shares offered hereby may not be sold to or purchased by persons resident in the British Virgin Islands, but may be sold to British Virgin Islands international business companies.

Cayman Islands. No invitation may be made to the public in the Cayman Islands to subscribe for the Shares unless the Fund is listed on the Cayman Islands stock exchange. Cayman Islands exempted and ordinary non-resident companies and certain other persons engaged in offshore business, however, may be permitted to acquire Shares.

Chile. The Shares have not been, and will not be, registered with the Superintendencia de Valores y Seguros (the Chilean Securities Commission) and may not be offered and sold in Chile except in circumstances which do not constitute a public offering or distribution under Chilean laws and regulations.

Republic of China. No invitation to offer for, or sale of, the Shares shall be made to the public in China or by any means that would be deemed public under the laws of China. The offer of Shares is personal to the investor to whom the Memorandum has been addressed by the Fund. Business entities incorporated under the laws of China (excluding foreign investment business entities) shall apply for approval from the Chinese government authorities before purchasing the Shares. Furthermore, all business entities incorporated under the laws of China and Chinese citizens residing in China shall obtain the prior approval from the Chinese Foreign Exchange Authority before purchasing Shares.

Costa Rica. The Shares have not been, and will not be, registered with the Comision Nacional de Valores (the Costa Rican Securities Commission) and may not be offered or sold in Costa Rica except in circumstances which do not constitute a public offering or distribution under Costa Rican laws and regulations.

Ecuador. The Shares have not been, and will not be, registered with the Superintendencia de Companias del Ecuador (the Ecuadorian Securities and Exchange Commission) and may not be offered and sold in Ecuador except in circumstances which do not constitute a public offering or distribution under Ecuadorian laws and regulations. This communication is for informative purposes only; it does not constitute a public offering of any kind.

France. "Cette note d'information n'a pas été soumise au visa de la Commission des Opérations de Bourse. Par conséquent, ni cette note d'information, ni tout autre document promotionnel se rapportant aux intérêts ne pourront être communiqués au public ou utilisés dans la cadre de toute offre de souscription ou de vente des intérêts en France et les intérêts ne peuvent être émis, offerts ou cédés de toute facon en France. Les investisseurs doivent agir pour leur propre compte. Le vente, directe ou indirecte, au public des instruments financiers acquis sera faite conformément aux dispositions les concernant." This Memorandum has not been submitted to the Commission des Operations de Bourse in France. Accordingly, neither this Memorandum nor any other offering materials relating to the Shares may be available to the public or used in connection with any other offer for subscription or sale of the Shares in France, and the Shares may not be issued, offered or otherwise sold in France. The sale, direct or indirect, in the public of the purchased financial instruments will be made in compliance with all requirements in relation thereto.

Germany. Any person who is in possession of the Memorandum understands that no action has or will be taken which would allow an offering of the Shares to the public in Germany. Accordingly, the Shares may not be offered, sold or delivered and neither the Memorandum nor any

other offering materials relating to the Shares may be distributed or made available to the public in Germany. Individual sales of the Shares to any person in Germany may only be made according to German securities, tax and other applicable laws and regulations.

Greece. The Shares may not be offered or sold in any manner that constitutes an offer or sale to the public in the Hellenic Republic within the laws and regulations from time to time applicable to public offers or sales of securities.

Hong Kong. No action has been taken to permit an offering of the Shares to the public in Hong Kong and, accordingly, no copy of this Memorandum may be issued, circulated or distributed in Hong Kong other than (i) exclusively to persons whose business involves the acquisition, disposal or holding of securities, whether as principal or agent, or (ii) otherwise in circumstances that do not constitute an invitation to the public for the purpose of the Protection of Investors Ordinance (Chapter 335 of the Laws of Hong Kong).

Ireland. It is not the intention of the Fund to advertise or market the Shares in Ireland, and no such marketing will take place without the prior approval in writing of the Central Bank of Ireland.

Isle of Man. The Fund is not a recognized collective investment scheme for the purposes of Sections 12 or 13 of the Financial Services Act 1988 (the "FS Act") of the Isle of Man and is accordingly subject to the prohibition on the promotion of collective investment schemes as contained in Section 1(1) of the FS Act. Accordingly, the Memorandum may only be issued or passed on to any person in the Isle of Man by way of the two limited exceptions to this general prohibition contained in Section 1(2) of the FS Act and the Financial Supervision (Promotion of Unregulated Schemes (Exemption)) FS Regulations 1992 (the "Exemption Regulations"). Under Regulation 3(2) of the Exemption Regulations, any advertisement issued in the Isle of Man in connection with the Fund must contain a statement either (a) that participants in the Fund are not protected by any statutory compensation scheme; or (b) that participants in the Fund are protected by a statutory compensation scheme and particulars sufficient to identify the compensation arrangements.

Israel. The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution which would be other than a private placement. The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent. Israeli residents, other than those considered "exemption holders" under the General Currency Control Permit, 1978, require a special permit from the Israeli Controller of Foreign Currency in order to purchase the Shares.

Italy. This Memorandum may not be distributed to members of the public in Italy. The Italian Commission Nazionale per la Societa e la Borsa has not authorized any offering of the subscription of Shares in the Fund; accordingly, Shares may not be offered or sold in Italy or to residents thereof except as permitted by Italian law. With respect to any potential purchaser or transaction subject to Italian law, this Memorandum is for the sole use of the person who has requested it and whose name appears on the cover page hereof (the "Prospective Buyer") and may not be disclosed, in whole or in part, to any person other than the Prospective Buyer and the Prospective Buyer's authorized agents. This Memorandum may not be copied in whole or in part. The Prospective Buyer, by accepting delivery of the Memorandum, agrees to return it to the Fund if such Prospective Buyer does not undertake to purchase the securities offered hereby.

**Japan.** Under Article 23-14 Paragraph 1 of the Securities Exchange Law (the "SEL"), the purchase of Shares cannot be made unless the purchaser agrees to the condition that it will not make an assignment of the Shares to any person other than a non-resident of Japan (having the same meanings as defined in Article 6, Paragraph 1(6) of the Foreign Exchange and Foreign Trade Control Laws), except for the case that all the Shares (excluding the Shares assigned to non-residents of Japan) are assigned to one person. Furthermore, disclosure under the SEL has not been made. The Shares will not be registered under the SEL. The offer and sale of the Shares in Japan may be made only in accordance with an exemption available under the SEL and with all other applicable laws and regulations of Japan.

**Jersey.** The Memorandum relates to a private placement and does not constitute an offer to the public of Jersey to subscribe for the Shares offered hereby. No regulatory approval has been sought to the offer in Jersey. The offer of the Shares is personal to the person to whom the Memorandum is being delivered by or on behalf of the Fund, and a subscription for the Shares will be accepted only from such person. The Memorandum may not be produced or used for any other purpose, nor be furnished to any other person other than those to whom it has been so delivered.

**Korea.** The Memorandum is not, and under no circumstance is to be construed as, a public offering of securities in Korea. Neither the Fund nor the investment manager is making any representation with respect to the eligibility of any recipients of the Memorandum to acquire the Shares under the laws of Korea, including without limitation the Foreign Exchange Management Act and regulations thereunder. The Shares have not been registered under the Securities and Exchange Act of Korea and none of the Shares may be offered, sold or delivered, or offered or sold to any person for re-offering or resale, in Korea or to any resident of Korea except pursuant to applicable laws and regulations of Korea.

**Liechtenstein.** The Shares are offered to a narrowly defined category of investors, in all cases under circumstances designed to preclude a public solicitation. The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

**Luxembourg.** The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution that would be other than a private placement. The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

**Netherlands.** The Shares may not be solicited, acquired or offered, directly or indirectly, in or from the Netherlands, and this Memorandum may not be circulated in the Netherlands to any individuals or legal entities as part of the initial distribution or anytime thereafter, except to individuals or legal entities who or which trade or invest in subjects of investment ("Beleggingsobjecten") in the conduct of a profession or trade, including banks, brokers, securities institutions, insurance companies, pension funds, investment institutions, other institutional investors and other parties, including treasury departments of commercial enterprises and finance companies which are regularly active in the financial markets in a professional manner (a "Professional Market Party" and/or "Professional Market Parties") investing in subjects of investment as described in Article 1 of the Exemption Regulation of October 9, 1990 issued pursuant to Article 14 of the Investment Institutions Supervision Act (Wet Toezicht Beleggingsinstellingen) of June 27, 1990, as amended from time to time (the "Investment Institutions Act"), and the respective accompanying Memoranda thereto of the Minister of Finance of the Netherlands. In the event of a solicitation, acquisition or offering made to or by Professional Market Parties and therefore exempt from the

general prohibition as provided for in the Investments Institutions Act, no subsequent offering of the Shares in a "secondary offering" by such Professional Market Parties to persons other than such Professional Market Parties may be made.

New Zealand. The Memorandum has been prepared solely for and the offer made in it is made solely to habitual investors (being persons defined in Section 3(2)(a)(ii) of the New Zealand Securities Act 1978).

Norway. The Memorandum has not been filed with the Oslo Stock Exchange in accordance with the Norwegian Securities Trading Act, Section 5-1, and may therefore not be distributed to more than fifty potential investors in Norway.

Oman. The Memorandum and the Shares are not available to any member of the public and are restricted to investors having an existing business relationship with the Fund. Application for the Shares made by or on behalf of investors not having an existing relationship with the investment manager will not be accepted. Any investor that considers purchasing the Shares offered by the Memorandum should consult a professional adviser before doing so.

Panama. The Shares have not and will not be registered with the Comision Nacional de Valores (the National Securities Commission) of the Republic of Panama under Cabinet Decree No. 247 of 1970 ("Panama's Securities Laws") and may not be offered or sold in a primary offering within Panama, except in certain transactions exempt from the registration requirements of Panama's Securities Laws.

Russia. The Shares are not intended to be sold or offered in (or on the territory of) the Russian Federation or to Russian residents and the Memorandum has not been registered with, and will not be registered with, the Federal Securities Markets Commission of the Russian Federation.

Singapore. The Memorandum has not been registered with the Registrar of Companies in Singapore and the Shares will be offered in Singapore pursuant to an exemption invoked under Sections 106c and 106d of the Companies Act, Chapter 50 of Singapore ("Singapore Act"). Accordingly, the Shares may not be offered or sold, nor may the Memorandum or any other offering document or material relating to the Shares be circulated or distributed, directly or indirectly, to the public or any member of the public other than (1) to an institutional investor or other body or person specified in Section 106c of the Singapore Act, or (2) to a sophisticated investor specified in Section 106d of the Singapore Act, or (3) otherwise pursuant to, and in accordance with the conditions of, Section 106e(2) of the Singapore Act or any other applicable exemption invoked under Division 5a of Part IV of the Singapore Act.

South Africa. The Shares are for your acceptance only and may not be offered or become available to persons other than yourself and may not be publicly offered, sold or advertised in South Africa and the Memorandum may only be circulated to selected individuals.

Spain. This Memorandum has not been and will not be registered with la Comision Nacional del Mercado de Valores of Spain and may not be distributed in Spain in connection with the offering and sale of participations without complying with all legal and regulatory requirements in relation thereto.

Switzerland. This Memorandum has been prepared for private information purposes of interested investors only. It may not be used for and shall not be deemed a public offering of Shares.

No application has been made under Swiss law to publicly market the Fund in or out of Switzerland. The Shares are not subject to the Swiss Investment Fund Act and are therefore not subject to supervision by the Federal Banking Commission and, accordingly, may not be advertised publicly. Therefore, no public offer of the Shares or public distribution of this Memorandum may be made in or out of Switzerland. This Memorandum is strictly for private use by its holders and may not be passed on to third parties.

United Kingdom. The Fund is an unrecognized collective investment scheme for the purposes of the Financial Services and Markets Act of 2000 of the United Kingdom (the "Act"). The promotion of the Fund and the distribution of this Prospectus in the United Kingdom is accordingly restricted by law.

The content of this Prospectus has not been approved by an authorized person and such approval is, save where this Prospectus is directed at or issued to the types of person referred to above, required by Section 21 of the Act. Acquiring Shares may expose an investor to a significant risk of losing all of the amount invested. The Fund is a limited liability company and any person who acquires Shares will not thereby be exposed to any significant risk of incurring additional liability. Any person who is in any doubt about investing in the Fund should consult an authorized person specializing in advising on such investments.

Uruguay. The Shares correspond to a private issue and are not registered with the Central Bank of Uruguay.

**APPENDIX A**

**SUBSCRIPTION DOCUMENTS**

## FAIRFIELD SIGMA LIMITED
## SUBSCRIPTION DOCUMENTS

Instructions

A.    All subscribers:  Provide all information requested in the subscription request and execute in the appropriate place on the signature page.

B.    Items to be delivered by All Subscribers.

   (i)    Completed and signed Subscription Agreement.

   (ii)   Wire transfer funds for the full amount of the subscription in Euros only to the Fund's account at:

**Intermediary Bank – SWIFT Field 56**
KBC Bank N.V., Brussels
BIC: KREDBEBB

**Account with Institution - SWIFT Field 57**
Account Name: Citco Bank Nederland N.V. Dublin Branch
International Bank Account Number (IBAN): BE96 4809 5884 4705
BIC: CITCIE2D

**Beneficiary Customer –SWIFT Field 59**
Beneficiary Account Name: Fairfield Sigma Limited
Beneficiary IBAN: IE95 CITC 0000 0020 8584 01

**Reference – SWIFT Field 70**: Name and Full Address Subscriber

   (iii)   Subscription documents should be delivered or mailed to Fairfield Sigma Limited, c/o Citco Fund Services (Europe) B.V., Telestone 8 – Teleport, Naritaweg 165, 1043 BW Amsterdam, The Netherlands; fax no.: (31-20) 572-2610.

Name of Subscriber: _____

Amount of Subscription: _____ EUR

## SUBSCRIPTION AGREEMENT

## FAIRFIELD SIGMA LIMITED

Fairfield Sigma Limited
c/o Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands
Telephone: (31-20) 572-2850
Facsimile: (31-20) 572-2610

Dear Sirs:

1.    Subscription.  The undersigned ("Subscriber") hereby subscribes for redeemable, voting, participating shares, each with a par value 0.01EUR per share (the "Shares"), of Fairfield Sigma Limited (the "Fund"), an international business company organized under the laws of the British Virgin Islands (the "BVI").  The Shares will be offered at a subscription price per Share equal to the Fund's Net Asset Value per Share as of the opening of business on the effective date of purchase.  The Shares have identical rights and privileges in all respects (including the right to one vote per Share).  All capitalized terms used in this Subscription Agreement that are not defined herein have the meanings set forth in the Fund's Confidential Private Placement Memorandum, as amended from time to time (the "Memorandum").  Subscriber subscribes for that number of Shares that can be purchased for the subscription amount above.  Subscriber subscribes for the Shares pursuant to the terms herein, the Memorandum, and the Fund's Memorandum of Association and Articles of Association (collectively, the "Fund Documents").

2.    Acceptance or Rejection.  If the Fund accepts this Subscription, Subscriber shall become a shareholder of the Fund and bound by the Fund Documents.  The minimum initial subscription is 200,000 EUR.  The Board of Directors, in it sole discretion, may accept subscriptions of a lesser amount or establish different minimums in the future.  The Board and Citco Fund Services (Europe) B.V. (the "Administrator"), may reject this subscription, in whole or in part, for any reason.  Subscriptions shall become irrevocable to the subscriber on the fifth to the last business day of the month in which such subscription is received by the Fund.  If rejected, the Fund will promptly return the subscription funds, with any interest actually earned thereon, and this Subscription Agreement will be void.

3.    Payment of Subscription Funds.  Subscription funds should be wired to the Fund at the following account, concurrently with the delivery of this Subscription Agreement to the Fund. In order to comply with anti-money laundering regulations applicable to the Fund and Citco Fund Services (Europe) B.V. (the "Administrator"), the sample letter attached hereto as Schedule A MUST be completed by the financial institution which will be remitting the subscription moneys on behalf

of the subscriber.

*Intermediary Bank – SWIFT Field 56*
KBC Bank N.V., Brussels
BIC: KREDBEBB

*Account with Institution - SWIFT Field 57*
Account Name: Citco Bank Nederland N.V. Dublin Branch
International Bank Account Number: BE96 4809 5884 4705
BIC: CITCIE2D

*Beneficiary Customer –SWIFT Field 59*
Beneficiary Account Name: Fairfield Sigma Limited
Beneficiary International Bank Account Number (IBAN): IE95 CITC 0000 0020 8584 01

*Reference – SWIFT Field 70*: Name and Full Address Subscriber:

    4.   <u>Delivery of Subscription Agreement</u>. Subscriber should fax and mail an executed, completed copy of this Subscription Agreement to the Fund at the above facsimile number and address, with a copy to the Manager at the following address: Fairfield Greenwich (Bermuda) Ltd., 12 Church Street, Suite 606, Hamilton, Bermuda, fax no. 441-292-5413.

    5.   <u>Status Representations</u>.

        a.   <u>SEC Regulation S</u>. Subscriber is not a "U.S. Person" under Regulation S promulgated under the Securities Act of 1933, as amended (the "1933 Act"), because (a) if an individual, Subscriber is not a resident of the United States of America or its territories or possessions (the "U.S.") or a "resident alien" as defined under the U.S. income tax laws, and (b) if an entity, Subscriber is not any of the following: (i) a partnership or corporation organized or incorporated under U.S. law; (ii) an estate of which an executor or administrator is a U.S. Person; (iii) a trust of which a trustee is a U.S. Person; (iv) any agency or branch of a foreign entity located in the U.S.; (v) a partnership or corporation organized under non-U.S. law but formed by a U.S. Person principally for the purpose of investing in securities not registered under the 1933 Act (unless organized and incorporated, and owned, by accredited investors, as defined in Rule 501 promulgated under the 1933 Act who are not natural persons, estates or trusts); (vi) a non-discretionary or similar account (other than an estate or trust) held by a dealer or other fiduciary for a U.S. Person; or (vii) a discretionary or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated or (if an individual) resident in the U.S.

        b.   Subscriber acknowledges that, except with the consent of the Fund, the Shares may not be owned by a U.S. Person, that the Shares will not at any time be held for the account or benefit, directly or indirectly, of any U.S. Person, and that, except with the consent of the Fund, the Subscriber will not resell, reoffer or transfer any Shares or any interest therein to any person, including a U.S. Person or any non-U.S. Person subject to the above restrictions. Subscriber acknowledges that reoffers, resales or any transfers of the Shares is subject to the limitations imposed by the Fund's Articles of Association and may be made only in compliance with applicable securities laws and only with the prior written consent of the Board of Directors, which may, in its sole discretion, decline to issue any shares to, or register shares in the name of

any person, and the Subscriber will not transfer any of its shares except on the books of the Fund and acknowledges that the Shares shall be transferable only to investors who are eligible to purchase shares in the Fund as described above and in the Memorandum. Subscriber understands that the Fund may compulsorily repurchase such Shares in accordance with the Fund Documents.

      c.   **CFTC Regulation Sec. 4.7**. Subscriber is not a "U.S. Person" under Regulation Sec. 4.7 promulgated under the U.S. Commodity Exchange Act of 1974, as amended, ("Rule 4.7") because (a) if an individual, Subscriber is not a resident of the U.S., and (b) if an entity, Subscriber is not (i) a partnership, corporation or other entity (other than an entity organized principally for passive investment) organized under U.S. law or with its principal place of business in the U.S.; (ii) an entity (whether organized under U.S. or non-U.S. law) that is organized principally for passive investment and that is beneficially owned 10% or more by U.S. Persons or persons who are not otherwise "qualified eligible persons" as defined in Rule 4.7; (iii) an estate or trust, the income of which is subject to U.S. income taxation regardless of source; or (iv) a pension plan for the employees, officers or principals of an entity organized or with its principal place of business in the U.S.

      d.   **Professional Investor Status**. Subscriber is a "Professional Investor" within the meaning of the BVI Mutual Funds Act of 1996 of the BVI, because (i) Subscriber declares that his ordinary business involves, whether for his own account or the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property of the Fund, or (ii) Subscriber's net worth (in the case of a natural person, either individually or jointly with spouse) exceeds US$1,000,000, or its equivalent in the Subscriber's local currency, and Subscriber consents to being treated as a Professional Investor for the purpose of investing in the Fund.

      e.   **Employee Benefit Plans**. Investment in the Fund by "Employee Benefit Plans", as defined under the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), may be limited to less than 25% of net asset value of each class of Shares of the Fund (excluding investments by the Investor. To help determine whether investment by Subscriber is included in the 25% limitation, Subscriber has initialed here (_____) if it is an Employee Benefit Plan (such as a retirement account, corporate pension or profit sharing plan, or governmental retirement plan). If the Subscriber at any time becomes an Employee Benefit Plan, the Subscriber shall forthwith inform this to the Fund.

If the Subscriber is an insurance company investing the assets of its general account in the Fund, less than 25% of the Subscriber's general account constitute assets of an Employee Benefit Plan (as determined under Section 401(c) of ERISA). If the Subscriber is such an entity and at any time 25% or more of its general account constitute assets of an Employee Benefit Plan, the Subscriber shall forthwith disclose to the Fund the amount of Employee Benefit Plan assets held in its general account. By signing this Subscription Agreement, the Subscriber expressly acknowledges that the Fund may require that the Subscriber redeem its Shares and withdraw from the Fund if 25% or more of the Subscriber's general account constitutes assets of an Employee Benefit Plan.

6. **Related Professionals.**
(Subscriptions cannot be accepted if this section is not completed.)

(i)     Please indicate, if applicable, the name of the person at Fairfield Greenwich Group with whom this subscription is associated.

Name:_____

Not Applicable: _____

(ii)    Please indicate, if applicable, the name of the person and/or entity who acts as an advisor with respect to this subscription.

Name:_____

Not Applicable: _____

7.     <u>Receipt of Fund Documents and Other Documents</u>. Subscriber has received and read a copy of the Memorandum. Subscriber acknowledges that in making a decision to subscribe for Shares, Subscriber has relied solely on the Fund Documents and any independent investigation of the Subscriber, and has not relied upon any representation inconsistent with the information in the Fund Documents. Subscriber is not relying on the Fund, the Fund's Board of Directors, administrator, Investment Manager, or any other person or entity with respect to the legal, tax, and other economic considerations involved in this investment other than the Subscriber's own advisers. The Subscriber's investment in the Shares is consistent with the investment purposes, objectives and cash flow requirements of the Subscriber and will not adversely affect the Subscriber's overall need for diversification and liquidity.

8.     <u>Subscriber Sophistication and Financial Condition</u>. Subscriber has such knowledge and experience in financial and business matters that it is capable of evaluating the risks of this investment. Subscriber has obtained sufficient information from the Fund or its authorized representatives to evaluate such risks and has consulted with the Subscriber's own advisors and is fully informed as to the legal and tax requirements of the Subscriber's own country regarding the purchase of the Shares. Subscriber is not relying on the Board of Directors, or any other person or entity with respect to the legal, tax and other economic considerations involved in this investment other than the Subscriber's own advisers. Subscriber has not relied on any person as a purchaser representative in connection with that evaluation. Subscriber has evaluated the risks of investing in the Fund, understands there are substantial risks of loss incidental to the purchase of the Shares and has determined that the Shares are a suitable investment for it. Subscriber's investment is consistent with its investment purposes and objectives and cash flow requirements, and will not adversely affect Subscriber's overall need for diversification and liquidity. Subscriber can afford a complete loss of this investment, and can afford to hold the Shares for an indefinite time.

Subscriber understands that (a) no governmental agency has passed upon the Shares or made any findings or determination as to the fairness of this investment; and (b) the representations, warranties, agreements, undertakings and acknowledgments made by the Subscriber in this Subscription Agreement will be relied upon by the Fund, the Board of Directors, the Investment Manager and the Administrator in determining the Subscriber's suitability as a purchaser of Shares and the Fund's

compliance with various securities laws, and shall survive the Subscriber's becoming a shareholder of the Fund.

All information which the Subscriber has provided to the Fund or the Administrator concerning the Subscriber, the Subscriber's status, financial position and knowledge and experience of financial, tax and business matters, or, in the case of a Subscriber that is an entity, the knowledge and experience of financial, tax and business matters of the person making the investment decision on behalf of such entity, is correct and complete as of the date set forth herein.

The Subscriber irrevocably authorizes the Fund and/or the Administrator to disclose, at any time, any information held by the Fund or the Administrator in relation to the Subscriber or his investment in the Fund to the Investment Manager or any affiliate of the Investment Manager or the Administrator.

9.     Redemptions.  Subscriber is aware of the limited provisions for redemptions and has read the sections in the Memorandum entitled "Transfers, Redemptions and Termination." Subscriber has no need for liquidity in this investment, can afford a complete loss of the investment in the Shares and can afford to hold the Shares for an indefinite period of time.  Subscriber understands that the Fund will generally redeem Shares as of the last day of each month (the "Redemption Date"); provided that the redemption request is received by the Administrator in proper form no later than 5:00 p.m. Amsterdam time on a date that is at least 15 calendar days prior to the Redemption Date.

10.     Valuations.  Subscriber understands that the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's investments and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value.

11.     Beneficial Owner.  Subscriber acknowledges, or if the Subscriber is acting as agent, representative or nominee for a subscriber (a "Beneficial Owner"), the Subscriber has advised the Beneficial Owner that (a) the Investment Manager, on behalf of the Fund, may enter into agreements with placement agents or other sales relationships to market the Fund providing for a payment from the Investment Manager to the particular placement agent for the introduction, out of the fees the Investment Manager receives from the Fund.

12.     Investment Intent.  Subscriber is buying the Shares solely for investment purposes and not with a view to distribute, subdivide or resell the Shares.

13.     Subsequent Subscriptions.  If Subscriber subscribes for additional Shares at a later date, Subscriber shall be deemed to have re-executed this Subscription Agreement in subscribing for those Shares.

14.     Registration of Shares; Certificates.  The Shares issued to Subscriber will be registered on the Fund's books in the name of Subscriber and not any nominee.  Share certificates will not be issued to Subscriber unless it so requests in writing.

15.     Pledge of Underlying Fund Assets.  The Subscriber hereby agrees that the assets underlying his/its Shares (the "Pledged Assets") shall be pledged as collateral to the entity-extending credit to the Fund in connection with the line of credit and the currency trading account described in

the Memorandum (the "Pledgee"). The undersigned further agrees that such Pledgee may take any and all action with respect to the Pledged Assets, in the event the Fund fails to pay any amounts owed to such Pledgee on account of the Shares, without notice, including, but not limited to ordering the sale of any of the Pledged Assets at any time that there is a default in the Fund's obligations and applying the proceeds of such sale in payment of any debt owed by the Fund, to such Pledgee on account of the Shares, and that any action taken by the Pledgee with respect to such Pledged Assets shall not be deemed a waiver as to any other action available to the Pledgee with respect to such obligations.

16.    Binding Nature of Agreement. This Subscription Agreement shall be binding upon Subscriber and its heirs, representatives, successors and permitted assigns, and shall inure to the benefit of the Fund's successors and assigns. The Subscription Agreement shall survive the acceptance of the subscription. If Subscriber consists of more than one person, the Subscription Agreement shall be the joint and several obligation of each person.

17.    Governing Law. This Subscription Agreement shall be governed and enforced in accordance with New York law, without giving effect to its conflict of laws provisions.

18.    Legal Representation. Subscriber understands that the Law Offices of Andrew E. Goldstein acts as U.S. counsel to the Fund, and as counsel to the Investment Manager and its affiliates. Subscriber also understands that, in connection with this offering of Shares and subsequent advice to the Fund, the Law Offices of Andrew E. Goldstein will not be representing the shareholder, and no independent counsel has been engaged by the Fund to represent the shareholders.

19.    Authority. Subscriber's execution, delivery and performance of this Subscription Agreement are within its powers, have been duly authorized and will not constitute or result in a breach or default under or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which Subscriber is a party or by which it is bound, and, if Subscriber is not an individual, will not violate any provision of the incorporation papers, by-laws, indenture of trust or partnership agreement, as may be applicable, of the Subscriber. The signature on this Subscription Agreement is genuine, and the signatory, if Subscriber is an individual, has legal competence and capacity to execute the Subscription Agreement, or, if Subscriber is not an individual, the signatory has been duly authorized to execute the Subscription Agreement, and the Subscription Agreement constitutes a legal, valid and binding obligation of Subscriber, enforceable in accordance with its terms.

20.    New York Courts. Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Subscription Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding, by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records. Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

21.     Office of Foreign Assets Control. (A) Subscriber understands and agrees that the Fund prohibits the investment of funds by any persons or entities that are acting, directly or indirectly, (i) in contravention of any applicable laws and regulations, including anti-money laundering regulations or conventions, (ii) on behalf of terrorists or terrorist organizations, including those persons or entities that are included on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Treasury Department's Office of Foreign Assets Control[1] ("OFAC"), as such list may be amended from time to time, (iii) for a senior foreign political figure, any member of a senior foreign political figure's immediate family or any close associate of a senior foreign political figure[2], unless the Fund, after being specifically notified by Subscriber in writing that it is such a person, conducts further due diligence, and determines that such investment shall be permitted, or (iv) for a foreign shell bank[3] (such persons or entities in (i) – (iv) are collectively referred to as "Prohibited Persons").

(B)     Subscriber represents, warrants and covenants that: (i) it is not, nor is any person or entity controlling, controlled by or under common control with Subscriber, a Prohibited Person, and (ii) to the extent Subscriber has any beneficial owners[4] or is acting as agent or nominee in connection with this investment, (a) it has carried out thorough due diligence to establish the identities of such beneficial owners, (b) based on such due diligence, Subscriber reasonably believes that no such beneficial owners are Prohibited Persons, (c) it holds the evidence of such identities and status and will maintain all such evidence for at least five years from the date of Subscriber's complete redemption from the Fund, and (d) it will make available such information and any additional information requested by the Fund that is required under applicable regulations.

(C)     If any of the foregoing representations, warranties or covenants ceases to be true or if the Fund no longer reasonably believes that it has satisfactory evidence as to their truth, notwithstanding any other agreement to the contrary, the Fund may, in accordance with applicable regulations, freeze Subscriber's investment, either by prohibiting additional investments, declining or suspending any redemption requests and/or segregating the assets constituting the investment, or Subscriber's investment may immediately be redeemed by the Fund, and the Fund may also be required to report such action and to disclose Subscriber's identity to OFAC or other authority. In the event that the Fund is required to take any of the foregoing actions, Subscriber understands and agrees that it shall have no claim against the Fund, the Investment Manager, the Administrator, and

---

[1]     The OFAC list may be accessed on the web at http://www.treas.gov/ofac.

[2]     Senior foreign political figure means a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a senior foreign political figure includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure. The immediate family of a senior foreign political figure typically includes the political figure's parents, siblings, spouse, children and in-laws. A close associate of a senior foreign political figure is a person who is widely and publicly known internationally to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

[3]     Foreign shell bank means a foreign bank without a physical presence in any country, but does not include a regulated affiliate. A post office box or electronic address would not be considered a physical presence. A regulated affiliate means a foreign shell bank that: (1) is an affiliate of a depository institution, credit union, or foreign bank that maintains a physical presence in the United States or a foreign country, as applicable; and (2) is subject to supervision by a banking authority in the country regulating such affiliated depository institution, credit union, or foreign bank.

[4]     Beneficial owners will include, but shall not be limited to: (i) shareholders of a corporation; (ii) partners of a partnership; (iii) members of a limited liability company; (iv) investors in a fund of funds; (v) the grantor of a revocable or grantor trust (vi) the beneficiaries of an irrevocable trust; (vii) the individual who established an IRA; (viii) the participant in a self-directed pension plan; (ix) the sponsor of any other pension plan; and (x) any person being represented by the Subscriber in an agent, representative, intermediary, nominee or similar capacity. If the beneficial owner is itself an entity, the information and representations set forth herein must also be given with respect to its individual beneficial owners. If Subscriber is a publicly-traded company, it need not conduct due diligence as to its beneficial owners.

7

their respective affiliates, directors, members, partners, shareholders, officers, employees and agents for any form of damages as a result of any of the aforementioned actions.

(D) Subscriber understands and agrees that any redemption proceeds paid to it will be paid to the same account from which Subscriber's investment in the Fund was originally remitted, unless the Fund, in its sole discretion, agrees otherwise.

(E) If any of the foregoing representations cease to be true, Subscriber will promptly notify the Fund of the facts pertaining to such changed circumstances.

22. Anti Money-Laundering. Subscriber represents that the subscription funds are not the direct or indirect proceeds of drug trafficking or other such criminal activity, including actions that contravene the anti-money laundering laws and regulations of any country. Subscriber understands that, as part of the responsibility of the Fund and Administrator for protection against money-laundering, the Administrator may require a detailed verification of Subscriber's identity. Depending on the circumstances of each application, a detailed verification might not be required where Subscriber makes the payment from an account held in Subscriber's name at a recognized financial institution; or the application is made through a recognized intermediary. These exceptions will only apply if the financial institution or intermediary referred to above is within a country recognized as having sufficient anti money-laundering regulations. For example, an individual may be required to produce a copy of a passport or identification card duly certified by a notary public, together with evidence of his/her address such as a utility bill or bank statement and date of birth. In the case of entity subscribers, this may require production of a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or the equivalent), and the names, occupations, dates of birth and residential and business addresses of all directors. The Administrator and the Fund reserve the right to request such information as is necessary to verify the identity of Subscriber. In the event of delay or failure by Subscriber to produce any information required for verification purposes, the Administrator may refuse to accept the subscription and the subscription monies relating thereto or in the case where the Shares have already been issued, the Subscriber acknowledges and agrees that it will not be able to redeem any Shares so issued until proper identification information has been provided. Subscriber further agrees that the Fund and any other service provider shall be held harmless and indemnified against any loss arising as a result of a failure to process the subscription or redemption if such information as has been required by the parties referred to has not been provided by Subscriber.

23. Confidentiality. The Fund, the Investment Manager and the Administrator may disclose the information about Subscriber that is contained herein as the Fund deems necessary to comply with applicable law or as required in any suit, action, or proceeding.

24. Indemnification. Subscriber agrees to indemnify and hold harmless the Fund, the Investment Manager and the Administrator and any other service provider to it, and any partner, manager, officer, director, shareholder, agent, employee or affiliate thereof, against any loss, liability or expense relating to any misrepresentation or breach of covenant by Subscriber herein or in any other document furnished by Subscriber in connection with its subscription.

25. Enforceability. If any provision hereof is invalid or unenforceable under any applicable law, it shall be deemed inoperable to that extent (and modified to the extent necessary to comply with that law) and its invalidity or unenforceability shall not affect any other provision hereof.

26.    Currencies.  Subscriber acknowledges that it is subscribing in a currency other than U.S. Dollars, Subscriber agrees that the Fund may sell such subscription funds at the market rate for that currency and that the Shares will be issued to the value of the proceeds, minus the reasonable costs relating to the sale.

27.    Appointment of Revocable Proxy.  Subscriber hereby designates and appoints the Administrator with full power of substitution, as its true and lawful proxy and attorney-in-fact for the purpose of voting the Shares subscribed for herein or otherwise acquired as said proxy may determine on any and all matters which may arise at any meeting of shareholders and upon which such Shares could be voted by Shareholders present in person at that meeting.  This proxy may be revoked by the owner of record of the Shares hereby subscribed for, either personally or by presentation of a subsequently executed proxy at any meeting of Shareholders, or by written notice to the Administrator at the above address (or such other address as the Fund or the Administrator shall furnish in writing to a Shareholder) received before the meeting.

28.    If Subscriber is acting as a Representative.  If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder.  Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder.  Subscriber also agrees to indemnify the Fund, the Investment Manager, the Administrator and their directors, members, partners, officers and agents for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained herein, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Subscription Agreement or perform the obligations hereof.

If the Subscriber enters into a swap, structured note or other derivative instrument, the return from which is based in whole or in part on the return of the Fund (the "Swap") with a third party (a "Third Party"), the Subscriber represents and warrants that with respect to a Third Party entering into a Swap:  (a) the Third Party is authorized under its constitutional documents (e.g., certificate of incorporation, by-laws, partnership agreement or trust agreement) and applicable law to enter into the Swap and would also be so authorized to invest directly into the Fund; (b) the Third Party has received and reviewed a copy of the Memorandum and the Subscription Agreement; (c) the Third Party acknowledges that the Fund and its affiliates are not responsible for the legality, suitability or tax consequences of the Swap and that the Subscriber is not an agent of the Fund; and (d) the Third Party is an "eligible swap participant" and a "qualified eligible person" under Commodity Futures Trading Commission rules, and an "accredited investor" under Regulation D.  Subscriber also agrees to indemnify the Fund, the Investment Manager and their officers and agents for any and all costs, fees and expenses (including legal fees and disbursements, fines, and amounts paid in settlement) in connection with any damages resulting from the Subscriber's misrepresentation or misstatement contained herein.  Nothing herein constitutes an agreement or statement by the Fund as to the legality of a Swap or the suitability of a Swap for the Third Party.

29.    Country-Specific Disclosures.    Subscriber has reviewed the country-specific disclosures contained in the Memorandum.

30.    Additional Information.  The Fund may request from the Subscriber such additional information as it may deem necessary to evaluate the eligibility of the Subscriber to acquire Shares,

9

and may request from time to time such information as it may deem necessary to determine the eligibility of the Subscriber to hold shares or to enable the Fund to determine its compliance with applicable regulatory requirements or its tax status, and the Subscriber agrees to provide such information as may reasonably be requested.

Subscriber agrees to notify the Fund promptly if there is any change with respect to any of its information or representations made herein and to provide the Fund with such further information as the Fund may reasonably require.

This Subscription Agreement may be executed through the use of separate signature pages or in any number of counterparts. Each counterpart shall, for all purposes, constitute one agreement, binding on all parties, notwithstanding that all parties do not execute the same counterpart.

    31.    Subscriber Information and Execution.

        a.    Amount of Subscription. _____ EUR.

        b.    Registration of Shares. The Shares issued to Subscriber are to be registered in the Fund's books in the name of (insert name and address):

_____

_____

        c.    Written Communications. All written communications from the Fund to Subscriber should be sent to Subscriber at the following address (insert address):

_____

_____

        d.    Telephone, Fax and Email: Telephone:

Fax: _____ Email: _____

        e.    Domicile, Etc. Subscriber, if an individual, is a citizen of

_____ and a resident of _____. Subscriber,

if an entity, is organized under the laws of _____ and has its principal

place of business in _____.

        f.    Authorized Persons (for Subscribers that are not corporate entities). The names of the persons authorized by Subscriber to give and receive instructions between the Fund

and Subscriber, together with their signatures, are set forth below. Such persons are the only persons so authorized by Subscriber until further notice to the Fund by any one of such persons:

| Print Name | Signature |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

The Administrator and the Fund are each hereby authorized and instructed to accept and execute any instructions in respect of the Shares to which this Subscription Agreement relates given by Subscriber in written form or by facsimile. If instructions are given by Subscriber by facsimile, Subscriber undertakes to send the original letter of instructions to the Administrator and the Fund, and Subscriber agrees to keep each of them indemnified against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon facsimile instructions. The Administrator and the Fund may rely conclusively upon and shall incur no liability in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons.

For corporate entities, please provide an authorized signatory list which must include the name(s) and specimen signature(s) of the person(s) who are authorized by Subscriber to give and receive instructions between the Fund and Subscriber.

g. <u>Redemption Payments</u>. Until further notice from Subscriber to the Fund, signed by any authorized person listed above, redemption or other payments by the Fund to Subscriber should be wired only to Subscriber and only as follows (please print or type):

Bank name: _____

Bank address: _____

ABA/ CHIPS/ BIC Codes: _____

Account name: _____

Account number: _____

For further credit: _____

    h.    <u>Financial Institution Wiring/Paying Subscription Monies.</u>

Name: _____

Address: _____

Name of account at financial institution being debited for subscription

payment:

_____

Number of such account: _____

    i.    <u>Execution.</u>  In witness whereof, Subscriber has executed this Subscription
Agreement on the date set forth below:

Date: _____, 20___

<u>For individuals</u>

Print name: _____

Signature: _____

<u>For entities</u>

Print name: _____

Print name of authorized signatory: _____

Print title of authorized signatory: _____

Signature: _____

[To be completed by the Fund]

THIS SUBSCRIPTION AGREEMENT IS HEREBY ACCEPTED BY FAIRFIELD SIGMA LIMITED

Date: _____, 20___

Name of authorized signatory: _____

Title of authorized signatory: _____

Signature: _____

Subscriber's name: _____

PLEASE GIVE THIS LETTER TO YOUR FINANCIAL INSTITUTION AND HAVE THEM RETURN IT TO THE ADMINISTRATOR AT THE SAME TIME THAT THE SUBSCRIPTION MONIES ARE WIRED.

### SAMPLE LETTER

[to be placed on letterhead of the financial institution remitting payment]

Date

**Via mail and facsimile:** (31-20) 572-2610
Fairfield Sigma Limited
Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands

Dear Sirs

### RE: FAIRFIELD SIGMA LIMITED (the "Fund")

1.  Name of Remitting Financial Institution:
2.  Address of Remitting Financial Institution:
3.  Name of Customer:
4.  Address of Customer:
5.  We have credited your account at [Bank], Account Number [number] for [amount] by order of [subscriber] on [date].

The above information is given in strictest confidence for your own use only and without any guarantee, responsibility or liability on the part of this institution or its officials.

**Yours faithfully,**

Signed:_____

Full Name:_____

Position:_____

**For additional information, please contact the Administrator at Citco Fund Services (Europe) B.V., Telestone 8 – Teleport, Naritaweg 165, 1043 BW Amsterdam, The Netherlands, Telephone: (31-20) 572-2850, Facsimile: (31-20) 572-2610.**

## REDEMPTION REQUEST FORM

**INSTRUCTIONS**

This form should be saved and may be used by a shareholder wishing to redeem Shares in the Fund. Redeeming shareholders should complete and return this form, including page RR-3.

FAIRFIELD SIGMA LIMITED
c/o Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165 1043BW Amsterdam
P.O. Box 7241
1007 JE Amsterdam
The Netherlands

Telephone no.: (31-20) 572-2850
Fax no.: (31-20) 572-2610

_____, 20___

Dear Sirs:

　　　　I hereby request redemption, as defined in and subject to all of the terms and conditions of the Confidential Private Placement Memorandum, as it may be amended from time to time (the "Memorandum"), of Fairfield Sigma Limited (the "Fund"), of _____ shares, representing [part/all] of my shares in the Fund. I understand that redemption will only be effective as of the close of business on the last day of any calendar month, upon at least fifteen (15) calendar days prior written notice. Except as otherwise provided in the Memorandum, payment of the redemption proceeds will be made within thirty (30) days after the effective date of redemption.

　　　　I hereby represent and warrant that (i) I am the owner of the shares of the Fund to which this request relates, with full power and authority to request redemption of such shares; and (ii) I am not a "U.S. person" (as that term is defined in the Memorandum). These shares are not subject to any pledge or otherwise encumbered in any fashion. I acknowledge that my redemption will not be effective unless and until the release of any pledge of the assets underlying the shares in effect in connection with the Fund's currency hedging account described in the Memorandum. My signature has been guaranteed by a commercial bank acceptable to the Fund.

**Wire Transfer Instructions (to be completed by redeeming shareholder):**

_____
Bank Name

_____
Bank Address

_____
ABA/ CHIPS/ BIC Code

_____
Account Name

_____
Account Number

**SIGNATURES MUST BE IDENTICAL TO NAME(S) IN WHICH SHARES ARE REGISTERED**

**ENTITY SHAREHOLDER (OR ASSIGNEE)**

**INDIVIDUAL SHAREHOLDER(S) PARTNERSHIP, CORPORATION (OR ASSIGNEE) OR TRUST**

_____
Name of Registered Owner of Shares

_____
Name of Subscriber

_____
Address

_____
Address

_____
Signature (of individual or assignee)

_____
Signature (of partner authorized corporate officer or trustee)

_____
Please Print Name and Title

_____
Please Print Name and Title

_____
Date

_____
Date

_____
Signature (of individual or assignee)

_____
Signature (of partner authorized corporate officer or trustee)

_____
Please Print Name and Title

_____
Please Print Name and Title

_____
Date

_____
Date

_____
Signatures guaranteed by:

# REDEMPTION INFORMATION

## SHARE REGISTRATION

_____
Name

_____
Address

_____
Country of Residence

_____
Telephone

_____
Telephone (Evenings)

_____
Fax

## MAILING (POST) INFORMATION
(if other than address of registration)

_____
Name

_____
Address

_____
Country of Residence

_____
Telephone

_____
Telephone (Evenings)

_____
Fax

## BANK FOR TRANSFER OF REDEMPTION

_____
Name

_____
Address

_____
Country of Residence

_____
Telephone

_____
Telephone (Evenings)

_____
Fax

[To be completed by the Fund]

THIS REDEMPTION REQUEST IS HEREBY ACCEPTED BY FAIRFIELD SIGMA LIMITED

Date: _____, 200_

Name of authorized signatory: _____

Title of authorized signatory: _____

Signature: _____

Subscriber's name: _____

RR-4

# Short Form Subscription Agreement
## For Existing Shareholders

**FAIRFIELD SIGMA LIMITED**
c/o Citco Fund Services (Europe) B.V.
Telestone 8 - Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands
Telephone: (31-20) 572-2850
Facsimile: (31-20) 572-2610

## SHORT FORM SUBSCRIPTION AGREEMENT

**THIS APPLICATION IS TO BE USED ONLY BY EXISTING REGISTERED SHAREHOLDERS OF FAIRFIELD SIGMA LIMITED PURCHASING ADDITIONAL SHARES IN THE SAME REGISTERED NAME. IT MAY NOT BE USED BY NEW SUBSCRIBERS.**

The undersigned Subscriber (1) is an existing shareholder in Fairfield Sigma Limited ("Fund"), (2) has previously delivered a fully executed Subscription Agreement to the Fund, and (3) desires to subscribe for additional shares in the Fund. By executing in the space below, the undersigned shareholder hereby (1) requests that the Fund accept this short form subscription in lieu of completing an entirely new Subscription Agreement for the additional shares, (2) reaffirms each and every representation and covenant made by the undersigned in the original Subscription Agreement as of the date hereof, subject only to the changed information set forth below, and (3) represents that if the Subscriber is an entity, the person executing this Subscription Agreement has the full power and authority under the Subscriber's governing instruments and has been authorized to do so and the Subscriber has the full power and authority under its governing instruments to acquire shares of the Fund.

Please contact the Administrator prior to sending documents or funds to ascertain

whether the Fund is accepting additional capital.   New Subscription Information:

Subscriber: _____

Contribution Date: _____, 200_

Additional Contribution Amount: _____ EUR

Changes to Subscription Agreement:  [ ] None
                                    [ ] Yes, as follows:

_____

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement on this ___ day of _____, 200_.

**Corporate, Partnership, Trust or Account Subscribers**   **Individual Subscribers**

_____          _____
Name of Entity (Print)                Name (Print)

By: _____         _____
    Signature                         Signature

_____          _____
Name (Print)                          Name of Joint Purchaser, If Any (Print)

Title _____     Signature _____

Telephone: _____     Telephone: _____

Fax: _____     Fax: _____

E-mail:_____

SUBSCRIPTION ACCEPTED AS OF _____, 200_.

**FAIRFIELD SIGMA LIMITED**

By: _____

     Name: _____

     Title: _____

# **EXHIBIT 7**

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
E-mail: dsheehan@bakerlaw.com
Marc E. Hirschfield
E-mail: mhirschfield@bakerlaw.com
Mark A. Kornfeld
E-mail: mkornfeld@bakerlaw.com


*Attorneys for Irving H. Picard, Esq., Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br><br>        v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>        Debtor. | **<u>AMENDED COMPLAINT</u>** |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>        Plaintiff,<br><br>        v.<br><br>FAIRFIELD SENTRY LIMITED, | Adv. Pro. No. 09-01239 (BRL) |

GREENWICH SENTRY, L.P.,
GREENWICH SENTRY PARTNERS, L.P.,
FAIRFIELD SIGMA LIMITED, FAIRFIELD
LAMBDA LIMITED, CHESTER GLOBAL
STRATEGY FUND LIMITED, CHESTER
GLOBAL STRATEGY FUND, IRONGATE
GLOBAL STRATEGY FUND LIMITED,
FAIRFIELD GREENWICH FUND
(LUXEMBOURG), FAIRFIELD
INVESTMENT FUND LIMITED,
FAIRFIELD INVESTORS (EURO)
LIMITED, FAIRFIELD INVESTORS
(SWISS FRANC) LIMITED, FAIRFIELD
INVESTORS (YEN) LIMITED, FAIRFIELD
INVESTMENT TRUST, FIF ADVANCED,
LTD., SENTRY SELECT LIMITED,
STABLE FUND, FAIRFIELD
GREENWICH LIMITED, FAIRFIELD
GREENWICH (BERMUDA), LTD.,
FAIRFIELD GREENWICH ADVISORS
LLC, FAIRFIELD GREENWICH GP, LLC,
FAIRFIELD GREENWICH PARTNERS,
LLC, FAIRFIELD HEATHCLIFF CAPITAL
LLC, FAIRFIELD INTERNATIONAL
MANAGERS, INC., FAIRFIELD
GREENWICH (UK) LIMITED,
GREENWICH BERMUDA LIMITED,
CHESTER MANAGEMENT CAYMAN
LIMITED, WALTER NOEL, JEFFREY
TUCKER, ANDRÉS PIEDRAHITA, MARK
MCKEEFRY, DANIEL LIPTON, AMIT
VIJAYVERGIYA, GORDON MCKENZIE,
RICHARD LANDSBERGER, PHILIP
TOUB, CHARLES MURPHY, ROBERT
BLUM, ANDREW SMITH, HAROLD
GREISMAN, GREGORY BOWES,
CORINA NOEL PIEDRAHITA, LOURDES
BARRENECHE, CORNELIS BOELE,
SANTIAGO REYES, JACQUELINE
HARARY

Defendants.

I.      NATURE OF THE ACTION ............................................................. 1

II.    JURISDICTION AND VENUE ..................................................... 4

III.   BACKGROUND .......................................................................... 5

IV.   TRUSTEE'S POWERS AND STANDING ..................................... 10

V.    DEFENDANTS ........................................................................... 12

     A.     The Feeder Funds................................................................ 12

     B.     FGG Affiliates .................................................................... 16

VI.   FGG AND ITS HISTORICAL RELATIONSHIP WITH FGG ......................... 79

     A.     Noel and Tucker Meet Madoff and Make Their First Investments With BLMIS .......................................... 81

     B.     Noel and Tucker Expand FGG's Offerings to U.S. Investors and Piedrahita Joins the Partnership ...................... 81

     C.     FGG's Operations ................................................................ 83

VII.  THE DEFENDANTS' ROLE IN FACILITATING THE FRAUD .................... 84

     A.     The Defendants' Investment Strategy...................................... 85

     B.     The Defendants Facilitate the Scheme Through Marketing and Sales .......................................................... 87

     C.     The Defendants Serve as a Gatekeeper for Madoff to Ensure Investors Would Not Find Out the Truth..................... 87

     D.     FGG Conspires with Madoff to Hide from the SEC Madoff's True Involvement with the Feeder Funds........................ 90

     E.     The Defendants Deceive Their Investors by Telling Them They Were Performing Extensive and Top of the Line Due Diligence, But They Were Doing No Such Thing ................... 94

VIII. THE DEFENDANTS WERE CONSTANTLY FACED WITH EVIDENCE OF A FRAUD, BUT CHOSE NOT TO REVEAL THAT EVIDENCE............................................................................ 98

     A.     The Defendants Learn that BLMIS's Auditor is a Single Person in a Strip Mall Office ............................................. 99

     B.     The Defendants Regularly Received Information That Made It Clear Madoff Was Lying About His Alleged Trades and Performance .......................................... 105

IX.   THE DEFENDANTS WERE WILLING TO IGNORE THE RED FLAGS; THEIR INVESTORS AND CONSULTANT WERE NOT .............. 130

     A.     FGG Does Everything It Can to Mollify Investor Concerns as Opposed to Performing Independent Inquiry Into the Possibility of Fraud .................................................... 131

|   | B. | FGG's Consultant Tells the Defendants Madoff May Be a Fraud ........ 133 |

X.    DESPITE YEARS OF SEEING INDICIA OF FRAUD, THE DEFENDANTS CONTINUED TO FUNNEL BILLIONS TO MADOFF ....... 136

     A.    2006: GS Is Expanded and GSP Is Created ......................................... 136

     B.    2007: Leveraged Note Programs ......................................................... 136

     C.    2008: The Emerald Funds .................................................................... 137

XI.    THE AFTERMATH .................................................................................... 139

XII.    PEOPLE WILL TELL: OH THIS WAS FRAUD, THERE IS NOTHING WE COULD HAVE DONE ........................................................................ 141

     A.    The Barron's and MAR/Hedge Articles Are Published in 2001 .......... 142

     B.    Tightening Industry Standards .............................................................. 144

     C.    It Was All Over the Street: Madoff Was Suspected of Being a Fraud ....................................................................................................... 146

XIII.    THE DEFENDANTS' MOTIVATION WAS BOUNDLESS AVARICE ....... 154

XIV.    THE TRANSFERS ...................................................................................... 156

     A.    Transfers from BLMIS to the Feeder Funds ......................................... 156

     B.    Transfers from the Feeder Funds to the FGG Affiliates, Management Defendants, and Sales Defendants ................................... 158

COUNT ONE: TURNOVER AND ACCOUNTING – 11 U.S.C. § 542 .................... 160

COUNT TWO: PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a)(1), AND 551 ...................................................... 161

COUNT THREE: PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a)(1), AND 551 ...................................................... 162

COUNT FOUR: PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a)(2), AND 551 ........................ 164

COUNT FIVE: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(A), 550(a)(1), AND 551 ......................................... 166

COUNT SIX: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(A), 550(a)(1), AND 551 ......................................... 167

COUNT SEVEN: FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(A), 550(a)(2), AND 551 ............... 168

COUNT EIGHT: FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(B) , 550(a)(1), AND 551 .................................... 170

COUNT NINE: FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(B) , 550(a)(1), AND 551 ......................................... 171

COUNT TEN:  FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
– 11 U.S.C. §§ 548(a)(1)(B) , 550(a)(2), AND 551............................................ 172

COUNT ELEVEN:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
– NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ........................... 174

COUNT TWELVE:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
– NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ........................... 175

COUNT THIRTEEN:  FRAUDULENT TRANSFER (SUBSEQUENT
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND
551.................................................................................................................... 177

COUNT FOURTEEN:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
– NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ........................... 178

COUNT FIFTEEN:  FRAUDULENT TRANSFER (INITIAL TRANSFEREE)
– NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278
AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ........................... 179

COUNT SIXTEEN:  FRAUDULENT TRANSFER (SUBSEQUENT
TRANSFEREE) –NEW YORK DEBTOR AND CREDITOR LAW §§
273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND
551.................................................................................................................... 180

COUNT SEVENTEEN:  FRAUDULENT TRANSFERS (INITIAL
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ........... 181

COUNT EIGHTEEN:  FRAUDULENT TRANSFERS (INITIAL
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ........... 182

COUNT NINETEEN:  FRAUDULENT TRANSFERS (SUBSEQUENT
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), AND 551 ........... 183

COUNT TWENTY:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
– NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR
279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ......................................... 185

COUNT TWENTY-ONE:  FRAUDULENT TRANSFERS (INITIAL
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 ........... 186

COUNT TWENTY-TWO:  FRAUDULENT TRANSFERS (SUBSEQUENT
TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§
275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(2), 551.................... 187

COUNT TWENTY-THREE:  UNDISCOVERED FRAUDULENT TRANSFERS
(INITIAL TRANSFEREE) – NEW YORK CIVIL PROCEDURE LAW
AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR
LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544,
550(a)(1), AND 551 ...................................................................................... 188

COUNT TWENTY-FOUR:  UNDISCOVERED FRAUDULENT TRANSFERS
(INITIAL TRANSFEREE) – NEW YORK CIVIL PROCEDURE LAW
AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR
LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544,
550(a)(1), AND 551 ...................................................................................... 190

COUNT TWENTY-FIVE:  UNDISCOVERED FRAUDULENT TRANSFERS
(SUBSEQUENT TRANSFEREE) – NEW YORK CIVIL PROCEDURE
LAW AND RULES 203(g), 213(8), NEW YORK DEBTOR AND
CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§
544, 550(a)(2), AND 551 .............................................................................. 191

COUNT TWENTY-SIX:  OBJECTION TO THE DEFENDANTS' CUSTOMER
CLAIMS ....................................................................................................... 193

COUNT TWENTY-SEVEN:  UNJUST ENRICHMENT ........................................... 194

COUNT TWENTY-EIGHT:  CONVERSION ............................................................ 195

COUNT TWENTY-NINE:  MONEY HAD AND RECEIVED ................................... 196

COUNT THIRTY:  AIDING AND ABETTING FRAUD ............................................ 197

COUNT THIRTY-ONE:  AIDING AND ABETTING BREACH OF
FIDUCIARY DUTY ...................................................................................... 208

1.      Irving H. Picard, Esq. (the "Trustee"), as trustee for the substantively consolidated

liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and

Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act §§ 78aaa *et seq.*, by

and through his undersigned counsel, for this Amended Complaint, states as follows:

## I.      <u>NATURE OF THE ACTION</u>

2.      The Defendants named in this Amended Complaint worked in conjunction with

BLMIS and Madoff to commit, and exponentially expand, the single largest financial fraud in

history.  Serving as one of Madoff's largest marketing and investor relations arms, the

Defendants were active participants in, and substantially aided, enabled, and helped sustain

Madoff's Ponzi scheme.  Every dollar the Defendants purportedly "earned," and every dollar

they kept to unjustly enrich themselves, was *stolen money*.  Every asset the Defendants own that

originated from the purported management and performance fees drawn from fictitious returns is

in fact *Customer Property*, as defined by statute,[1] and must be returned to the Trustee for

equitable distribution to BLMIS customers.

3.      This is a case in which sophisticated hedge fund investment advisers and

promoters engaged in a systematic, purposeful enterprise with Madoff to maintain and profit

from a fraud and wrongly enrich themselves.  The Defendants had actual and constructive

knowledge of Madoff's fraud and cannot deny their knowledge of many "red flags" indicating

the likelihood of that fraud.  This case goes well beyond "red flags."

---

[1] SIPA § 78*lll*(4) defines "Customer Property" as "cash and securities . . . at any time received, acquired, or held by
or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such
property transferred by the debtor, including property unlawfully converted."

4.     The Defendants did not properly, independently, and reasonably perform due diligence into the many red flags strongly indicating Madoff was a fraud. The Defendants did exactly the opposite. The Defendants misled regulators, investors, and potential investors and generally looked the other way, focusing only on self-interest and profit. Among many other things, the Defendants:

a.     failed to perform as independent investment advisers and fiduciaries, serving by their own admission as an extension of BLMIS's marketing and customer relations operation;

b.     knowingly and explicitly conspired with Madoff to deceive the Securities Exchange Commission (the "SEC") by misrepresenting the true nature of their respective investment advisory roles and by intentionally misstating Madoff's role;

c.     ascribed inconsistent roles to Madoff depending on the circumstances. Sometimes the Defendants claimed Madoff was merely a broker-dealer executing the Defendants' own investment strategy. At other times, the Defendants said Madoff was an investment adviser acting as an agent. And still at other times, the Defendants claimed BLMIS was acting as a principal in performing investment adviser functions;

d.     provided false security to their investors through false marketing materials, and shielded Madoff from direct inquiries. The Defendants discouraged customers, potential customers, and others from performing direct due diligence on Madoff, intentionally removed references to him from their offering memoranda and marketing materials, and in all respects served as a "gatekeeper" in order to prevent unwanted inquiries;

e.     performed no real due diligence on Madoff's one-person auditing firm before or even after one of their investors likened BLMIS to another Ponzi scheme. Some of the individual Defendants not only ignored the fact that Madoff's auditing firm lied to them, but perpetrated their own fraud by knowingly misleading investors and potential investors about the auditing firm's size, reputation, and capabilities;

f.     ignored basic, standard industry statistical analyses of Madoff's consistent returns over nearly two decades that should have led them to reasonably conclude the returns were manufactured. The lack of any volatility ever, even in often volatile markets, was an obvious sign of fraud. The Defendants utilized the consistent lack of volatility as a banner to promote the success of their own funds;

g.  regularly received Madoff's trade confirmations reflecting implausible equities trading volumes and percentages, as well as options trading volumes that were impossible, as they greatly exceeded the entire volume of reported options trading on the relevant exchanges. The Defendants never questioned how trading at such massive volumes could not leave a "footprint" in the market or otherwise impact pricing;

h.  represented that the massive options trading that was part of Madoff's purported strategy was made through over-the-counter trades with individual counterparties, even though the trade confirmations the Defendants received from BLMIS reflected exchange traded options, not over-the-counter trades. The Defendants never knew the identity of a single options trade counterparty, nor did they investigate the counterparties' ability to perform their obligations under the trade agreements;

i.  willingly entered into an investment relationship with Madoff that prevented all of the traditional, independent checks and balances seen in the investment advisory business. Madoff served as investment adviser, prime broker, valuation agent, sub-custodian, as well as executing broker, and all compliance and supervisory functions at BLMIS were performed by Madoff's family. This structure was tailor-made for perpetrating fraud – Madoff could readily misappropriate assets without any independent oversight – but the Defendants never questioned it;

j.  despite representing Madoff's investment strategy as their own for nearly two decades, the Defendants' internal communications indicate they never understood the strategy;

k.  knew for many years that their investors, market experts, due diligence experts, and even their own consultant (hired to review BLMIS transactions) had grave suspicions Madoff and the investment strategy were a sham;

l.  touted and marketed their due diligence process as being the best, as well as the "value added" service that justified fees greater than those of many of their competitors, when, in fact, the Defendants failed to perform even a modicum of reasonable due diligence;

m.  turned a blind eye to Madoff's fraudulent activities for the simple reason that the Defendants' continued prosperity and very existence was directly and exclusively tied to Madoff – if he was exposed as a fraud, their vast empire would collapse; and

n.  acted as Madoff's *de facto* partners by failing to act as fiduciaries and by lending their resources, marketing, reputation, protection, and undying allegiance to Madoff. The Defendants, along with many others,

knowingly and actively aided Madoff, causing a catastrophic growth of the fraud and deepening of BLMIS's insolvency, the result of which was billions in damages to thousands of customers.

5.     Through this Amended Complaint the Trustee seeks the return of all Customer

Property belonging to the BLMIS estate, in the form of redemptions, fees, compensation, and

assets; as well as all damages, including but not limited to compensatory and punitive damages,

caused by the Defendants' misconduct; and the disgorgement of all funds and properties by

which the Defendants were unjustly enriched at the expense of BLMIS's customers.

## II.     **JURISDICTION AND VENUE**

6.     The Trustee brings this adversary proceeding pursuant to his statutory authority

under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 502(d), 542, 544, 547, 548(a), 550(a),

and 551 of 11 U.S.C. §§ 101 (the "Bankruptcy Code"), the New York Fraudulent Conveyance

Act (N.Y. Debt. & Cred. § 270 (McKinney 2001)), New York Civil Practice Law and Rules

(McKinney 2001), and other applicable law, for turnover, accounting, preferences, fraudulent

conveyances, unjust enrichment, conversion, money had and received, aiding and abetting fraud,

aiding and abetting breach of fiduciary duty, consequential and punitive damages, and objection

to the customer claims filed by some of the Defendants.  The Trustee seeks, among other things,

to set aside all avoidable transfers, collect damages caused by the Defendants, preserve the stolen

Customer Property for the benefit of BLMIS customers, and recover *all* stolen Customer

Property from the Defendants, in whatever form it may now or in the future exist.

7.     This is an adversary proceeding brought in the Court in which the main

underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding") is pending.  The

Securities Investor Protection Corporation ("SIPC") originally brought the SIPA Proceeding in

the United States District Court for the Southern District of New York as *Securities Exchange*