Fairfield Sentry Ltd., et al., v. Theodoor GGC Amsterdam, et al., AP No. 10-03496, Administratively Consolidated

**EXHIBIT D TO MOTION TO AMEND COMPLAINTS IN CERTAIN REDEEMER ACTIONS**

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | **Chapter 15 Case** |
| ) | |
| **FAIRFIELD SENTRY LIMITED, et al.,** ) | **Case No. 10-13164 (BRL)** |
| ) | |
| Debtors in Foreign Proceedings. ) | **Jointly Administered** |
| ) | |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION)** ~~and~~**,** ) **FAIRFIELD SIGMA LIMITED (IN LIQUIDATION) and FAIRFIELD LAMBDA** LIMITED (IN LIQUIDATION), acting by and through the Foreign Representatives thereof, and **KENNETH KRYS** and **JOANNA LAU**, solely in their capacities as Foreign Representatives and Liquidators thereof, ) | |
| ) | **Adv. Pro. No. 10-03628 (BRL)** |
| Plaintiffs, ) | ~~FIRST~~**SECOND** AMENDED COMPLAINT |
| -against- ) | |
| **ROBINSON & CO.** and **BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF ROBINSON & CO. 1-1000, including without limitation BENEFICIAL OWNERS OF ACCOUNTS ASSOCIATED WITH A/C 0254145 and A/C 0088997,** ) | |
| ) | |
| Defendants. ) | |

Fairfield Sentry Limited ("Sentry"), Fairfield Sigma Limited ("Sigma") and

Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the

"Debtors"), by and through Kenneth Krys and Joanna Lau (together with their predecessors, the

"Foreign Representatives"), and Kenneth Krys and Joanna Lau (together with ~~Sentry and Sigma~~the Funds, the "Plaintiffs"), solely in their capacities as the Foreign Representatives and Liquidators of the liquidation proceedings involving the Funds pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This action and similar actions are brought by the Plaintiffs, with the approval of the BVI Court, to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008.

2.      The Funds were created as a means for private investment in managed accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that Bernard L. Madoff used to perpetrate his massive Ponzi scheme.  Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss Franc investments) through purchase of shares of Sentry.  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held by BLMIS for Sentry.  As stated in their offering materials, the Funds' investment objective was to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3.      It is now known that these types of feeder funds were essential to the perpetration of Madoff's Ponzi scheme.  In order for the Ponzi scheme to operate, Madoff required a

continuous flow of new investors and investments to be able to satisfy redemption requests from early investors. Feeder funds, such as Sentry, brought new investors into this scheme, allowing Madoff to make payments to early investors and thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.     From the Funds' inception until the disclosure of Madoff's fraud in December 2008, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares were transferred (either directly in the case of Sentry or indirectly through Sentry in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff. Prior to December 2008, the voting, participating shares of Sentry ($.01 par value per share), Sigma (€01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value." Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each fund, net of certain expenses ("Net Asset Value").

5.     From time to time, in order to make payments to investors for redemption of Shares ("Redemption Payments"), Sentry made withdrawals from its BLMIS accounts. At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by BLMIS for Sentry. The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which was calculated based on the assets that the Funds believed were being held, and investments that were being made, by BLMIS for Sentry's account.

6.     As the world now knows, Madoff was operating a massive Ponzi scheme through BLMIS. Thus, at all relevant times, the money that Sentry transferred to BLMIS was not

invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses. Further, none of the securities shown on statements provided to Sentry by BLMIS were in fact purchased for Sentry. Additionally, none of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of sales of securities or other investments. Instead, such amounts represented the monies of more recent investors into the Madoff scheme.

7.    In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent, and the Funds were insolvent at the time Redemption Payments were made or they were rendered insolvent by those payments. As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the actual Net Asset Value of Shares redeemed.

8.    At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of his fraud. Similarly, the Redemption Payments that the Funds made to redeeming shareholders were not made in the ordinary course of any business or for any legitimate purposes. Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as the source of these payments was not the sales of securities, or return of investments, as contemplated by those documents. Rather, the payments were derived from uninvested monies of other BLMIS investors or other uninvested deposits made by Sentry in BLMIS, but in either event, they represented the fraudulent and ill-gotten gains of Madoff's Ponzi scheme, distributed by BLMIS to Sentry. These payments and other payments made to BLMIS investors were crucial in

4

perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9.      During the period from and after May 17, 2004~~,~~ through November 19, 2008, following the receipt by ~~Sentry and Sigma~~the Funds of notices of redemption, ~~Sentry and Sigma~~the Funds made Redemption Payments to Defendant Robinson & Co. ("Robinson & Co.") aggregating USD $~~16,829,995.79~~16,890,567.78.  At the time such payments were made, ~~Sentry and Sigma~~the Funds mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption.  In fact, however, as stated, the Redemption Payments made to Robinson & Co. far exceeded the actual Net Asset Value of the Shares redeemed.  Moreover, the source of these Redemption Payments was not, as ~~Sentry and Sigma~~the Funds believed them to be, proceeds of the liquidation of securities or investments held for their accounts.  Instead, any amounts obtained ~~directly or indirectly by Sentry and Sigma~~by the Funds from BLMIS to make Redemption Payments to Robinson & Co. were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

10.      Upon information and belief, Robinson & Co. has either retained the Redemption Payments made to it by ~~Sentry and Sigma~~the Funds for its own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities for whom Robinson & Co. may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (the "Beneficial Shareholders," together with Robinson & Co., the "Defendants").  Based on ~~Sentry and Sigma's~~Fund records, some or all of the Redemption Payments may have been paid to an account holder or holders associated with A/C 0254145 and A/C 0088997.

5

11.     Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value.  As of December 2008 and presently, Sentry, Sigma, and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

12.     The Funds' actual assets are far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against each of them.  In particular, claims have been asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (BRL) (the "BLMIS Adversary Proceeding").

13.     As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee seeks to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.  This amount is alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud.  The BLMIS Trustee alleges that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.  At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.  Monies received from BLMIS to fund Redemption Payments thereby gave rise to alleged liabilities and subjected the Funds to claims that the Funds were and are unable to pay or that caused the Funds to become insolvent and/or deepened their existing insolvency.

14.    Unless Redemption Payments paid to shareholders are recovered for the Funds' estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may be made against them.   Moreover, to the extent such liabilities and claims must be satisfied solely from the Funds' current assets, Defendants will have been unjustly enriched as they will not bear their proportionate share of such liabilities and claims, but rather will retain a windfall at the expense of other shareholders and creditors of the Funds.

## JURISDICTION AND VENUE

15.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re Fairfield Sentry Limited, et al., No. 10-13164 (BRL), pending in this Court.   Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, SIPA Liquidation No. 08-1789 (BRL).   Pursuant to the standing order of reference of the United States District Court for the Southern District of New York, dated July 10, 1984, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

16.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2).   Should the Court determine this to be a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

7

17.    This Court has jurisdiction over Robinson & Co. and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure because Robinson & Co. and the Beneficial Shareholders, on information and belief, conducted investment transactions from within or directed to the United States.

18.    Moreover, this Court has jurisdiction over Robinson & Co. and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more Subscription Agreements Robinson & Co. entered into with ~~Sentry and Sigma~~the Funds (collectively, the "Subscription ~~Agreement~~Agreements").

19.    The Subscription Agreements provide for, *inter alia*, the irrevocable submission by Robinson & Co. to the jurisdiction of the New York courts with respect to any proceeding with respect to said agreement and ~~Sentry and Sigma~~the Funds and Robinson & Co.'s consent to service of process by the mailing of such process, as provided therein.   In particular, the Subscription Agreements provide as follows:

> New York Courts.    Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records.  Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

20.    Furthermore, by executing the Subscription Agreements, Robinson & Co. agreed to all terms and conditions contained therein, including the express provision that any agreement made by Robinson & Co. in the Subscription Agreement would also apply to any other person for whom Robinson & Co.  was subscribing as trustee, agent, representative, or nominee – i.e.,

all Beneficial Shareholders.  Moreover, by executing the Subscription Agreements, Robinson &

Co. represented that it had all requisite authority from Beneficial Shareholders to execute and

perform any and all obligations on their behalf, and also agreed to indemnify ~~Sentry and~~

~~Sigma~~the Funds for any damages resulting from an assertion by a Beneficial Shareholder that

Robinson & Co. lacked proper authorization to enter into the Subscription Agreement or perform

the obligations thereof.  Specifically, the Subscription Agreements provide as follows:

> <u>If Subscriber is acting as a Representatives</u>.  If Subscriber is subscribing as
> trustee, agent, representatives, or nominee for another person (the "Beneficial
> Shareholder"), Subscriber agrees that the representations and agreements herein
> are made by Subscriber with respect to itself and the Beneficial Shareholder.
> Subscriber has all requisite authority from the Beneficial Shareholder to execute
> and perform the obligations hereunder.  Subscriber also agrees to indemnify the
> Fund . . . for any and all costs, fees and expenses (including legal fees and
> disbursements, fines and amounts paid in settlement) in connection with any
> damages resulting from Subscriber's misrepresentation or misstatement contained
> here, or the assertion of Subscriber's lack of proper authorization from the
> Beneficial Shareholder to enter into this Agreement or perform the obligations
> hereof.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

**Plaintiffs**

22.    Sentry, a British Virgin Islands company, was organized in 1990 under the

International Business Company Act of the British Virgin Islands and was subsequently re-

registered as a business company under the BVI Business Companies Act 2004. Sentry's

registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1,

Road Town, Tortola, BVI.  Sentry is currently in liquidation in proceedings commenced on April

21, 2009 in the BVI Court.

23.    Sigma, a British Virgin Islands company, was organized in 1990 under the

International Business Company Act of the British Virgin Islands and was subsequently re-

registered as a business company under the BVI Business Companies Act 2004. Sigma's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.  Sigma is currently in liquidation in proceedings commenced on April 23, 2009, in the BVI Court.

24.    Lambda, a British Virgin Islands company then known as Fairfield Henry Limited, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004.  Lambda's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.  Lambda is currently in liquidation in proceedings commenced on February 27, 2009, in the BVI Court.

25.    24. The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and behalf of the Funds or in their own official names.  On April 23, 2009, the BVI Court issued an order appointing Christopher Stride (Ms. Lau's predecessor) as liquidator of Lambda (the "Lambda Appointment Order").  On July 21, 2009, the BVI Court issued an order appointing Mr. Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order").  On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and Ms. Lau's appointment as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order" and, together with the Lambda Appointment Order and the Sentry & Sigma Appointment Order, the "BVI Appointment Orders").  The Foreign Representatives have been authorized by the BVI Court to bring, in their capacities as Foreign Representatives and liquidators of the Funds, this action and the claims

herein, including the avoidance claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

26. ~~25.~~ Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property.   After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15.  On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

27. ~~26.~~ Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code.   Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a).  Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds assets that are located

within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the BVI Proceedings.

**Defendants**

28. 27. Robinson & Co. was, at all relevant times, a member of ~~Sentry and Sigma~~the Funds and a registered holder of Shares.  Upon information and belief, Robinson & Co.  is a corporate entity organized under the laws of Bermuda and having its registered address at The Bank of Bermuda Ltd., P.O. Box HM 1020, 6 Front Street, HM 11 Hamilton, Bermuda. Robinson & Co. subscribed for the purchase of Shares by entering into one or more Subscription Agreements  with  ~~Sentry  and  Sigma~~the  Funds  (collectively,  the  "Subscription ~~Agreement~~Agreements").  All purchases of Shares by Robinson & Co. were subject to the terms of the Subscription ~~Agreement~~Agreements.

29. 28. Defendants "Beneficial Owners of the Accounts Held in the Name of Robinson & Co." - i.e., the Beneficial Shareholders - are, as noted, any persons or entities having a beneficial ownership or interests in Shares of ~~Sentry and/or Sigma~~the Funds issued to Robinson & Co. and on whose behalf Robinson & Co. was acting as trustee, agent, representative, or nominee (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders"). Based on ~~Sentry and Sigma~~Fund records, some or all of the Redemption Payments made to Robinson & Co. may have been paid to an account holder or holders associated with A/C 0254145 and A/C 0088997.

**NOTICE PURSUANT TO FED. R. CIV. P. 44.1**

30. 29. Certain or all of the issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

12

## FACTUAL ALLEGATIONS

### Role of Feeder Funds In Madoff Fraud

31.    ~~30.~~ Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

32.    ~~31.~~ As discussed above, Sentry, Sigma and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

### Calculation of Net Asset Value and Shareholder Redemption Payments

33.    ~~32.~~ Substantially all of the money (some 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy.  In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each

Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

34. 33. In calculating each of the Funds' Net Asset Value, the Funds used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry. Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to purported cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and other documents to calculate the Net Asset Value of the Shares.

35. 34. In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the accounts was based on misinformation and fictitious account statements.   None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred.   Indeed, no investments of any kind were ever made by BLMIS for Sentry.   At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious.   Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

36. 35. From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts.  The Funds believed that the amounts provided in connection with such withdrawals represented proceeds from the

sale or liquidation of securities or investment positions held by BLMIS for the account of Sentry. In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud. At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud. The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose. Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.

37. 36. Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme. At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

**Redemption Payments Made or Transferred to Defendants**

38. 37. During the six-year period prior to the commencement of this action, Robinson & Co. received Redemption Payments totaling USD $16,829,995.79 16,890,567.78 from Sentry and Sigma the Funds in respect of Shares tendered for redemption.

39. 38. The dates and amounts of each Redemption Payment received by Robinson & Co. from Sentry are set forth on Exhibit A. The dates and amounts of each Redemption Payment received by Robinson & Co. from Sigma are set forth on Exhibit B. The dates and amounts of

each Redemption Payment received by Robinson & Co. from Lambda in this period are set forth on Exhibit C.

40. ~~39.~~ In exchange for each Redemption Payment, each of which constitutes a transaction between Robinson & Co. and ~~Sentry and Sigma, Sentry and Sigma~~the relevant Fund, the relevant Fund received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by ~~Sentry and Sigma~~the relevant Fund.

41. ~~40.~~ Upon information and belief, Robinson & Co. and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**Exposure of Madoff's Fraud**

42. ~~41.~~ On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  See United States v. Madoff, No. O8-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

43. ~~42.~~ On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS.  See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a

permanent injunction and continuing relief against him, including a permanent freezing of his assets.

44.    43. In March 2009, Madoff pleaded guilty to the criminal charges brought against him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal.  Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised.  Instead, those funds were deposited in a bank account at Chase Manhattan Bank.  When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

45.    44. Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

46.    45. Madoff is now serving a 150-year sentence in federal prison.

**The Funds' Estates in Liquidation**

47.    46. Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values.

As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

48.    47. In 2009, the Funds were put into liquidation proceedings in the BVI.

49.    48. On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding").  The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

50.    49. On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding").  The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

51.    50. On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings").  The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

52.    51. As alleged above, the BVI Court issued orders – the BVI Appointment Orders –appointed the Foreign Representatives as liquidators of the Funds.  Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

53.    52. The BVI Appointment Orders grant the Liquidators all powers set forth in Section 186, Schedule 2 of the BVI Insolvency Act, including, but not limited to, the following:

  a.  to pay any class of creditors in full;

  b.  to make a compromise or arrangement with creditors or persons claiming to be creditors, or having or alleging that they have any claim against the Funds, whether present or future, certain or contingent, ascertained or not;

18

c.      to compromise any claims, debts or liabilities capable of resulting in claims or debts whether present or future, certain or contingent, ascertained or not, between the Funds and any person or entity, and to compromise questions in any way relating to or affecting the assets or the liquidations of the Funds;

d.      to commence, continue, discontinue, or defend any action or other legal proceeding in the name and on behalf of the Funds in the BVI or elsewhere;

e.      to carry on the Funds' business so far as may be necessary for its beneficial liquidation;

f.      to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the Funds or for which the Funds may be rendered liable;

g.      to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the Funds and a contributory or alleged contributory or other Funds or person apprehending liability to the Company;

h.      to deal with all questions in any way relating to or affecting the assets or the winding up of the Funds to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it;

i.      to sell or otherwise dispose of property of the Funds;

j.      to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents;

k.      to use the Funds' seal;

l.      to draw, accept, make and endorse any bill of exchange or promissory note in the name and on behalf of the Funds;

m.      to borrow money, whether on the security of assets of the Funds or otherwise;

n.      to take out in an official capacity letters of administration for any deceased member or past member or debtor, or to do any other act necessary for obtaining payment of any money due from a member or past member or debtor;

o.      to call meetings of the creditors or members for (i) the purpose of informing the creditors or members concerning the progress of or other matters arising in the liquidation; (ii) the purpose ascertaining the views of creditors or members on any matter arising in the liquidation; or (iii) such other purposes connected with the liquidation as the liquidators considers fit;

p.      to appoint a solicitor, accountant or other professionally qualified person to assist in the performance of the liquidators' duties;

q.      to appoint an agent to do any business that the liquidators are unable to do themselves, or which can be more conveniently done by an agent;

r.      to apply to the BVI Court for directions concerning any matter arising out of the exercise of any of the liquidators' powers; and

s.      to do all things incidental to any of the liquidators' powers.

54.     53. The Foreign Representatives must seek BVI Court approval before they can exercise any of the first five powers enumerated in the BVI Appointment Orders.  *See* BVI Act § 186(3) ("The Court may provide that certain powers may only be exercised with the sanction of the Court.").  The Foreign Representatives may exercise all of the other powers enumerated in the BVI Appointment Orders without prior BVI Court approval.

55.     54. With the express authorization of the BVI Court, the Foreign Representatives filed petitions in this Court on June 14, 2010 seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15 of the Bankruptcy Code.  On July 22, 2010, the Bankruptcy Court issued the Recognition Order, which, among other things, specifically entrusted the Foreign Representatives with the administration and realization of the Funds' assets located in the United States, including any and all claims and causes of action belonging to the Funds.

56.     55. Acting in accordance with authority afforded to them by the Recognition Order and with the duties and powers afforded to them as liquidators under the BVI Insolvency Act, and with the approval of the BVI Court, the Foreign Representatives have brought this and

similar actions on behalf of the Funds, and/or in their capacities as liquidators of the Funds, to recover Redemption Payments made to the Funds' investors in the years prior to the exposure of the Madoff fraud.

57. ~~56.~~ On December 9, 2010, the BVI Court issued an order authorizing the Foreign Representatives to assert claims seeking: (i) a declaration that the Redemption Payments were unfair preferences under Section 245 of the BVI Insolvency Act and were undervalue transactions under Section 246 of the BVI Insolvency Act, and (ii) an order setting aside the Redemption Payments, restoring the Funds to the position that they would have been had the Redemption Payments not been paid and such further and other relief as the Foreign Representatives deem necessary.

**Claims Against the Funds in the BLMIS Liquidation**

58. ~~57.~~ On December 15, 2008, a trustee was appointed for the liquidation of the BLMIS estate.  Proceedings for such liquidation are pending in the Bankruptcy Court for the Southern District of New York under the caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, SIPA Liquidation No. 08-1789 (BRL).

59. ~~58.~~ On May 18, 2009, the BLMIS Trustee commenced the BLMIS Adversary Proceeding against Sentry and other defendants.  In the BLMIS Adversary Proceeding, the BLMIS Trustee seeks to recover approximately $3.2 billion from the Funds and others on account of transfers that BLMIS allegedly made to Sentry and, through Sentry, to Sigma, Lambda and other persons during the six year period preceding the filing of the BLMIS liquidation proceedings.  These transfers are alleged by the BLMIS Trustee to have been preferential transfers under Section 547 of the Bankruptcy Code and/or fraudulent transfers

under Sections 544 and 548 of the Bankruptcy Code and applicable state law.  The BLMIS Adversary Proceeding is currently pending and the claims asserted therein are unresolved.

60. ~~59.~~ At present, without recovery of Redemption Payments made to shareholders, the Funds' assets are not sufficient to satisfy contingent and non-contingent liabilities of the Funds' estates, including payments that could be due and owing to the BLMIS Trustee for distribution to Madoff victims in the BLMIS liquidation proceedings.  The Redemption Payments that were made to Defendants were mistaken payments and avoidable transactions, and generally represent assets of ~~Sentry and Sigma's~~the Funds' estates that Defendants are not entitled to keep.

### FIRST CLAIM
***(Unjust Enrichment- Against Robinson & Co.)***

61. ~~60. Sentry and Sigma~~The Funds (acting by the Foreign Representatives, in their capacities as liquidators of ~~Sentry and Sigma~~the Funds and on behalf of ~~Sentry and Sigma~~the Funds) repeat and allege again the allegations contained in paragraphs 1 through ~~59~~60 above as if set forth herein.

62. ~~61.~~ As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Robinson & Co., each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as ~~Sentry and Sigma~~the Funds mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

63. ~~62.~~Robinson & Co. did not provide valuable consideration to ~~Sentry and Sigma~~the Funds in exchange for each of the Redemption Payments received by it.

64. 63. Upon information and belief, Robinson & Co. received and retained Redemption Payments in excess of amounts paid by it for the purchase of Shares of and in Sentry and Sigmathe Funds.

65. 64. By reason of its receipt of monies deposited by other BLMIS investors or previous deposits made by Sentry with BLMIS, Robinson & Co. has been unjustly enriched to the detriment of Sentry and Sigmathe Funds and other shareholders and creditors of Sentry and Sigmathe Funds.

66. 65. It would offend principles of equity and good conscience to permit Robinson & Co. to retain the Redemption Payments it received from Sentry and Sigmathe Funds.

67. 66. The Foreign Representatives, in their capacities as liquidators of Sentry and Sigmathe Funds and on behalf of Sentry and Sigmathe Funds, are entitled to recover from Robinson & Co. an amount equal to the Redemption Payments received by it from Sentry and Sigmathe Funds.


## SECOND CLAIM
### *(Unjust Enrichment- Against Beneficial Shareholders)*

68. 67. Sentry and SigmaThe Funds (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigmathe Funds and on behalf of Sentry and Sigmathe Funds) repeat and allege again the allegations contained in paragraphs 1 through 6667 above as if set forth herein.

69. 68. Upon information and belief, Robinson & Co. may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for Beneficial Shareholders.

23

70.    69. Upon information and belief, Robinson & Co. may have paid to or credited some or all of the Redemptions Payments received by it from Sentry and Sigma the Funds to accounts of Beneficial Shareholders.  As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Robinson & Co., each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as Sentry and Sigma the Funds mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

71.    70. The Beneficial Shareholders did not provide valuable consideration to Sentry and Sigma the Funds in exchange for any portion of any of the Redemption Payments received by them.

72.    71. Upon information and belief, some or all of the Beneficial Shareholders received and retained Redemption Payments in excess of amounts paid by them for the purchase of Shares.

73.    72. To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Robinson & Co. in its capacity as trustee, agent, representative, or nominee for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of Sentry and Sigma the Funds and other shareholders and creditors of Sentry and Sigma the Funds.

74.    73. It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by Sentry and Sigma the Funds.

24

75. ~~74.~~ The Foreign Representatives, in their capacities as liquidators of ~~Sentry and Sigma~~the Funds and on behalf of ~~Sentry and Sigma~~the Funds, are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them.

## THIRD CLAIM
### (Money Had and Received-Against Robinson & Co.)

76. ~~75. Sentry and Sigma~~The Funds (acting by the Foreign Representatives, in their capacities as liquidators of ~~Sentry and Sigma~~the Funds and on behalf of ~~Sentry and Sigma~~the Funds) repeat and allege again the allegations contained in paragraphs 1 through ~~74~~75 above as if set forth herein.

77. ~~76.~~ As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Robinson & Co., each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as ~~Sentry and Sigma~~the Funds mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

78. ~~77.~~ Robinson & Co. did not provide valuable consideration to ~~Sentry and Sigma~~the Funds in exchange for each of the Redemption Payments received by it.

79. ~~78.~~ Upon information and belief, Robinson & Co. received and retained Redemption Payments in excess of amounts paid by it for the purchase of  Shares.

80. ~~79.~~ By reason of its receipt of monies representing the deposits of other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud, Robinson & Co. has been unjustly enriched to the

25

detriment of ~~Sentry and Sigma~~the Funds and other shareholders and creditors of ~~Sentry and Sigma~~the Funds.

81. ~~80.~~ Furthermore, Robinson & Co. was not entitled to receive the Redemption Payments because the amounts of each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Robinson & Co. for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares.

82. ~~81.~~ To the extent that Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of ~~Sentry and Sigma~~the Funds and on behalf of ~~Sentry and Sigma~~the Funds, the loss will be disproportionately and unjustly borne by ~~Sentry and Sigma~~the Funds and other shareholders and creditors of ~~Sentry and Sigma~~the Funds.

83. ~~82.~~ It would offend principles of equity and good conscience to permit Robinson & Co. to retain the Redemption Payments it received from ~~Sentry and Sigma~~the Funds.

84. ~~83.~~ The Foreign Representatives, in their capacities as liquidators of ~~Sentry and Sigma~~the Funds and on behalf of ~~Sentry and Sigma~~the Funds, are entitled to recover from Robinson & Co. an amount equal to the Redemption Payments received by it from ~~Sentry and Sigma~~the Funds.

## FOURTH CLAIM
### *(Money Had and Received-Against Beneficial Shareholders)*

85. ~~84. Sentry and Sigma~~The Funds (acting by the Foreign Representatives, in their capacities as liquidators of ~~Sentry and Sigma~~the Funds and on behalf of ~~Sentry and Sigma~~the Funds) repeat and allege again the allegations contained in paragraphs 1 through ~~83~~84 above as if set forth herein.

26

86. 85. Upon information and belief, Robinson & Co. may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for Beneficial Shareholders.

87. 86. Upon information and belief, Robinson & Co. may have paid to or credited some or all of the Redemptions Payments received by it to accounts of Beneficial Shareholders. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Robinson & Co., each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of these Redemption Payments was not, as Sentry and Sigmathe Funds mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

88. 87. The Beneficial Shareholders did not provide valuable consideration to Sentry and Sigmathe Funds in exchange for any portion of any of the Redemption Payments received by them.

89. 88. Upon information and belief, some or all of the Beneficial Shareholders received and retained Redemption Payments in excess of amounts paid by them for the purchase of Shares.

90. 89. To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Robinson & Co. in its capacity as trustee, agent, representative, or nominee for Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of Sentry and Sigmathe Funds and other shareholders and creditors of Sentry and Sigmathe Funds.

27

91. ~~90.~~ Furthermore, Beneficial Shareholders were not entitled to receive any portion of the Redemption Payments paid to Robinson & Co. upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for Beneficial Shareholders because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received for redemption of Shares to be in excess of the actual Net Asset Value of such Shares.

92. ~~91.~~ To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of ~~Sentry and Sigma~~the Funds and on behalf of ~~Sentry and Sigma~~the Funds, the loss will be disproportionately and unjustly borne by ~~Sentry and Sigma~~the Funds and other shareholders and creditors of ~~Sentry and Sigma~~the Funds.

93. ~~92.~~ It would offend principles of equity and good conscience to permit Beneficial Shareholders to retain the Redemption Payments made by ~~Sentry and Sigma~~the Funds.

94. ~~93.~~ The Foreign Representatives, in their capacities as liquidators of ~~Sentry and Sigma~~the Funds and on behalf of ~~Sentry and Sigma~~the Funds, are entitled to recover from Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them.

### FIFTH CLAIM
### *(Mistaken Payment-Against Robinson & Co.)*

95. ~~94. Sentry and Sigma~~The Funds (acting by the Foreign Representatives, in their capacities as liquidators of ~~Sentry and Sigma~~the Funds and on behalf of ~~Sentry and Sigma~~the Funds) repeat and allege again the allegations contained in paragraphs 1 through ~~93~~94 above as if set forth herein.

96. ~~95.~~ As described above, ~~Sentry and Sigma~~the Funds made each of the Redemption Payments to Robinson & Co. under the mistaken belief that the amounts paid to

28

Robinson & Co. represented the proceeds of the sale of securities and investments held for Sentry in accounts established with BLMIS.

97. 96. Upon information and belief, however, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to Robinson & Co. represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

98. 97. The Redemption Payments, while benefiting Robinson & Co., were made to the detriment of Sentry and Sigmathe Funds and other shareholders and creditors of Sentry and Sigmathe Funds.

99. 98. Additionally, Robinson & Co. was not entitled to receive the Redemption Payments because, as was unknown to Sentry and Sigmathe Funds, the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Robinson & Co. for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares. In these circumstances, the Redemption Payments should be returned for the benefit of Sentry and Sigmathe Funds, their creditors and the current holders of Shares in Sentry and Sigmathe Funds.

100. 99. Robinson & Co. did not provide valuable consideration to Sentry and Sigmathe Funds in exchange for each of the Redemption Payments received by it.

101. 100. Upon information and belief, Robinson & Co. received and retained Redemption Payments in excess of amounts paid by it for the purchase of Shares.

102. 101. To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigmathe Funds and on behalf of

29

~~Sentry and Sigma~~the Funds, the loss will be disproportionately and unjustly borne by ~~Sentry and Sigma~~the Funds and other shareholders and creditors of ~~Sentry and Sigma~~the Funds.

103.    ~~102.~~ It would thus offend principles of equity and good conscience to permit Robinson & Co. to retain the Redemption Payments.

104.    ~~103.~~ The Foreign Representatives, in their capacities as liquidators of ~~Sentry and Sigma~~the Funds and on behalf of ~~Sentry and Sigma~~the Funds, are entitled to recover from Robinson & Co. a sum in an amount equal to the Redemption Payments received by it from ~~Sentry and Sigma~~the Funds.

### SIXTH CLAIM
#### *(Mistaken Payment-Against Beneficial Shareholders)*

105.    ~~104. Sentry and Sigma~~The Funds (acting by the Foreign Representatives, in their capacities as liquidators of ~~Sentry and Sigma~~the Funds and on behalf of ~~Sentry and Sigma~~the Funds) repeat and allege again the allegations contained in paragraphs 1 through ~~103~~104 above as if set forth herein.

106.    ~~105.~~ As described above, ~~Sentry and Sigma~~the Funds made each of the Redemption Payments to Robinson & Co. under the mistaken belief that the amounts paid to Robinson & Co. represented the proceeds of the sale of securities and investments held for Sentry in accounts established with BLMIS.

107.    ~~106.~~ However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to Robinson & Co. represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

108. ~~107.~~ Upon information and belief, Robinson & Co. may have paid to or credited some or all of the Redemption Payments received by it to accounts of Beneficial Shareholders. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Robinson & Co., each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as ~~Sentry and Sigma~~the Funds mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

109. ~~108.~~ Additionally, Beneficial Shareholders were not entitled to receive any portion of the Redemption Payments received by Robinson & Co. upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for Beneficial Shareholders because, as was unknown to ~~Sentry and Sigma~~the Funds, the amounts transferred with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by Robinson & Co. for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares.

110. ~~109.~~ The Beneficial Shareholders did not provide valuable consideration to ~~Sentry and Sigma~~the Funds in exchange for any portion of any of the Redemption Payments received by them.

111. ~~110.~~ Upon information and belief, some or all of the Beneficial Shareholders received and retained Redemption Payments in excess of amounts paid by them for the purchase of Shares.

112. ~~111.~~ The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of ~~Sentry and Sigma~~the Funds and other shareholders and creditors of ~~Sentry and Sigma~~the Funds.

113. ~~112.~~ It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

114. ~~113.~~ The Foreign Representatives in their capacities as liquidators of ~~Sentry and Sigma~~the Funds and on behalf of ~~Sentry and Sigma~~the Funds are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them.

## SEVENTH CLAIM
### (Constructive Trust-Against all Defendants)

115. ~~114. Sentry and Sigma~~The Funds (acting by the Foreign Representatives, in their capacities as liquidators of ~~Sentry and Sigma~~the Funds and on behalf of ~~Sentry and Sigma~~the Funds) repeat and allege again the allegations contained in paragraphs 1 through ~~113~~114 above as if set forth herein.

116. ~~115.~~ As described above, upon receipt of a redemption request, ~~Sentry and Sigma~~the Funds made each of the Redemption Payments to Robinson & Co. based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the actual Net Asset Value of redeemed Shares.

117. ~~116.~~ As alleged above, the Redemption Payments represented money deposited with BLMIS by other BLMIS investors or previous deposits of Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.  The source of these Redemptions Payments was not, as ~~Sentry and Sigma~~the Funds mistakenly believed, proceeds from the sale of securities and investments held by BLMIS for the account of Sentry.

118. ~~117.~~ Upon information and belief, Robinson & Co. may have paid some or all of the Redemptions Payments it received to Beneficial Shareholders.

119. ~~118.~~ By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of ~~Sentry and Sigma~~the Funds and other shareholders and creditors of ~~Sentry and Sigma~~the Funds.

120. ~~119.~~ Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Robinson & Co. for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares.

121. ~~120.~~ It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

122. ~~121.~~ By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from ~~Sentry and Sigma~~the Funds for the benefit of the Foreign Representatives and ~~Sentry and Sigma~~the Funds and other shareholders and creditors of ~~Sentry and Sigma~~the Funds.

## EIGHTH CLAIM
### (Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against Robinson & Co.)

123. ~~122.~~ The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of ~~Sentry and Sigma~~the Funds, repeat and allege again the allegations contained in paragraphs 1 through ~~121~~122 above as if set forth herein.

124. ~~123.~~ Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an

insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

125.    124. A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

126.    125. The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) …causes the company to become insolvent." BVI Insolvency Act, § 244(2).

127.    126. For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" under the BVI Insolvency Act if: "(c) either (i) the value of the company's liabilities exceeds its assets, or. . . (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act, §§ 8, 244(3).

128.    127. For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and

ending on the appointment of the administrator or, if the company is in liquidation, the liquidator . . . ." BVI Insolvency Act § 244(1).

129. ~~128.~~ The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed." BVI Insolvency Act, § 244(1). Thus, the vulnerability period, for each of the Funds, ~~commences~~is the ~~two-year~~ period commencing two years prior to the application for the appointment of Liquidators for each Fund and ~~ends~~ending on the date of the appointment of the liquidators of each Fund.

130. ~~129.~~ A "connected person" is:

(1) …one or more of the following

(a) a promoter of the company;

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act, § 5 (emphasis added).

131. ~~130.~~ Redemption Payments aggregating $6,036,921.59 were made by Sentry to Robinson & Co. during the two-year period prior to the application for appointment of the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

35

132. 131. Redemption Payments aggregating $291,756.74 were made by Sigma to Robinson & Co. during the two-year period prior to the application for appointment of the Liquidators of Sigma in the BVI Liquidation Proceedings (the "Sigma Vulnerability Period").

133. 132. During the Sentry Vulnerability Period and the Sigma Vulnerability Period (the "Sentry and Sigma Vulnerability Periods"), Sentry and Sigma were insolvent or were rendered insolvent by the making of Redemption Payments.

134. 133. Each of the Redemption Payments made during the Sentry and Sigma Vulnerability Periods ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

135. 134. Robinson & Co. was a shareholder (i.e., a member) of Sentry and Sigma during the Sentry and Sigma Vulnerability Periods and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

136. 135. Each of the Vulnerability Period Payments put Robinson & Co. in a better position than it would have been in had such Payment not been made.

137. 136. Because Robinson & Co. was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Vulnerability Period Payments were "insolvency transactions" and, "did not take place in the ordinary course of business." Further, even were this not presumed, the Vulnerability Period Payments were not made in the ordinary course of any business of Sentry and Sigma, nor were they made for any legitimate business purpose, in that, among other things, each Vulnerability Period Payment was determined and paid based on a fictitious Net Asset Value and was made incidental to and as a necessary part of Madoff's Ponzi scheme.

138. ~~137.~~ Each of the Vulnerability Period Payments was made following receipt by Sentry and Sigma of a notice of redemption in respect of Shares.  Following the receipt by Sentry and Sigma of a notice of redemption by Robinson & Co. and until such time as Robinson & Co. received the Vulnerability Period Payment that became due and payable by reason of Robinson & Co.'s redemption of Shares, Robinson & Co. was a "creditor" of Sentry and Sigma as defined in the BVI Insolvency Act, as Robinson & Co. would have had an admissible claim against Sentry and Sigma in the BVI Liquidation Proceeding had the Vulnerability Period Payment not been made.

139. ~~138.~~ Further, upon information and belief, Robinson & Co. may assert claims against Sentry and Sigma in this action or elsewhere which, if proven, allowed and/or admitted, would make it a "creditor" of Sentry and Sigma as defined by the BVI Insolvency Act.

140. ~~139.~~ By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of ~~Sentry and Sigma~~the Funds, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to recover from Robinson & Co. an amount equal to the Vulnerability Period Payments received by Robinson & Co. from Sentry and Sigma.

### NINTH CLAIM
*(Unfair Preference Pursuant to Section 245 of the BVI
Insolvency Act - Against Beneficial Shareholders)*

141. ~~140.~~ The Foreign Representatives, in their capacities as Foreign Liquidators of ~~Sentry and Sigma~~the Funds, repeat and allege again the allegations contained in paragraphs 1 through ~~139~~140 above as if set forth herein.

142. 141. Upon information and belief, Robinson & Co. may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreement in the capacity of trustee, agent, representative, or nominee for Beneficial Shareholders.

143. 142. Upon information and belief, Robinson & Co. may have paid to or credited some or all of the Redemptions Payments received by it to accounts of Beneficial Shareholders.

144. 143. To the extent that any money that Robinson & Co. received in connection with the Vulnerability Period Payments was transferred to Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry and Sigma the Funds, are entitled to avoid and set aside such further transfer by Robinson & Co. to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them.

## TENTH CLAIM
### *(Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act - Against Robinson & Co.)*

145. 144. The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry and Sigma the Funds, repeat and allege again the allegations contained in paragraphs 1 through 143 144 above as if set forth herein.

146. 145. Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction with a person if (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a) the company enters into the transaction in good faith and for the purposes of its

business; and (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that (a) the transaction was an insolvency transaction; and (b) subsection (2) did not apply to the transaction.

147. 146. During the Sentry and Sigma Vulnerability Periods, all assets purportedly held by BLMIS for Sentry and other investors were non-existent, and Sentry and Sigma were insolvent or rendered insolvent by the Vulnerability Period Payments. Thus, each of the Vulnerability Period Payments qualifies as an "insolvency transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of the BVI Insolvency Act.

148. 147. Sentry and Sigma received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sentry and Sigma received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry and Sigma to Robinson & Co. for each of the Vulnerability Period Payments.

149. 148. Robinson & Co. was a shareholder (i.e., a member) of Sentry and Sigma during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

150. 149. Because Robinson & Co. was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Vulnerability Period Payments were "insolvency transactions" and, "did not take place in the ordinary course of business." Further,

even were this not presumed, the Vulnerability Period Payments were not made in the ordinary course of any business of Sentry and Sigma, nor were they made for any legitimate business purpose, in that, among other things, each Vulnerability Period Payment was determined and paid based on a fictitious Net Asset Value and was made incidental to and as a necessary part of Madoff's Ponzi scheme.

151. ~~150.~~ By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of ~~Sentry and Sigma~~the Funds, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and to recover from Robinson & Co. an amount equal to the Vulnerability Period Payments received by Robinson & Co. from Sentry and Sigma.

## ELEVENTH CLAIM
### *(Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act - Against Beneficial Shareholders)*

152. ~~151.~~ The Foreign Representatives, in their capacities as ~~Foreign Representatives and~~ liquidators of ~~Sentry~~the Funds and ~~Sigma~~on behalf of the Funds, repeat and allege again the allegations contained in paragraphs 1 through ~~150~~151 above as if set forth herein.

153. ~~152.~~ Upon information and belief, Robinson & Co. may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreement in the capacity of trustee, agent, representative, or nominee for Beneficial Shareholders.

154. ~~153.~~ Upon information and belief, Robinson & Co. may have paid to or credited some or all of the Redemptions Payments received by it to accounts of Beneficial Shareholders.

155. ~~154.~~ To the extent that any money that Robinson & Co. received in connection with the Vulnerability Period Payments was transferred to Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of ~~Sentry and Sigma~~the Funds, are entitled to avoid and set aside such further transfer by Robinson & Co. to

40

the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.      On the First, Third and Fifth, judgment in favor of Plaintiffs and against Robinson & Co. allowing the Plaintiffs to recover an amount equal to the Redemption Payments received by Robinson & Co., plus interest;

B.      On the Second, Fourth and Sixth Claims, judgment in favor of Plaintiffs and against Beneficial Shareholders allowing the Plaintiffs to recover an amount equal to any portion of any Redemption Payments received by Beneficial Shareholders, plus interest;

C.      On the Seventh Claim, imposition of a constructive trust on Redemption Payments; and

D.      On the Eighth and Ninth Claims:

   a.      a declaratory judgment in favor of the Foreign Representatives and against Robinson & Co. and the Beneficial Holders that the Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

   b.      judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Vulnerability Period Payments; and

   c.      judgment pursuant to Section 249 of the BVI Insolvency Act against Robinson & Co. and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest.

E.      On the Tenth and Eleventh Claims:

   a.      a declaratory judgment in favor of the Foreign Representatives and against Robinson & Co. and the Beneficial Holders that the Redemptions Payments made during the vulnerability period constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

       b.       judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemption Payments made during the vulnerability period; and

       c.       judgment pursuant to Section 249 of the BVI Insolvency Act against Robinson & Co. and the Beneficial Holders in the amount of the avoided Redemption Payments received by them or for their benefit, plus interest.

F.       Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses;

G.       Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
       March ___, 2011

BROWN RUDNICK LLP

By: ___/s/ David J. Molton_____
       David J. Molton
       May Orenstein
       Daniel J. Saval
       Kerry L. Quinn

Seven Times Square
New York, New York 10036
Telephone: 212.209.4800
Facsimile: 212.209.4801

*Attorneys for the Foreign Representatives*

# EXHIBIT A

*Redemption Payments Received by Defendants from Sentry*
*From May 17, 2004 Through November 19, 2008*

| Payment Date | Redemption Payment | No. of Shares |
|---|---|---|
| May 17, 2004 | $1,209,066.89 | 1,238.2000 |
| May 17, 2004 | $1,576,044.37 | 1,614.0200 |
| June 17, 2004 | $2,161,472.85 | 2,199.0500 |
| February 16, 2005 | $881,635.87 | 855.2400 |
| May 13, 2005 | $9,613.15 | 9.2000 |
| December 19, 2005 | $4,467,866.18 | 4,083.2800 |
| April 20, 2006 | $7,927.35 | 7.0500 |
| August 14, 2006 | $28,295.27 | 24.3700 |
| September 14, 2006 | $7,020.00 | 6.0000 |
| November 14, 2006 | $70,975.21 | 60.0000 |
| January 16, 2007 | $81,400.32 | 67.6500 |
| May 16, 2007 | $700,000.00* | 565.8371 |
| July 19, 2007 | $1,195,818.98* | 955.5750 |
| August 17, 2007 | $50,140.11* | 40.0000 |
| August 17, 2007 | $167,242.34* | 133.4200 |
| October 16, 2007 | $676,237.34* | 532.6650 |
| December 19, 2007 | $381,452.13* | 296.0100 |
| January 17, 2008 | $77,496.76* | 60.0000 |
| June 17, 2008 | $77,157.06* | 58.2000 |
| July 15, 2008 | $32,288.54* | 24.3700 |
| July 15, 2008 | $105,994.38* | 80.0000 |
| July 31, 2008 | $66,720.16* | 50.0000 |
| August 18, 2008 | $240,192.56* | 180.0000 |
| September 16, 2008 | $49,872.74* | 37.1100 |
| October 15, 2008 | $87,789.26* | 65.0000 |
| November 19, 2008 | $2,128,519.238* | 1,576.9400 |

* Denotes Redemptions in the Sentry Vulnerability Period.

**EXHIBIT B**

***Redemption Payments Received by Defendants from Sigma
On March 18, 2008***

| Payment Date | Redemption Payment | No. of Shares |
|---|---|---|
| March 18, 2008 | $291,756.74* | 991.3500 |

* Denotes Redemptions in the Sigma Vulnerability Period.  All $USD amounts are based on the exchange rate as of the date of the Redemption ~~Payment~~Period.  However, upon application of a different exchange rate, as may be required by applicable law, the amount of damages may be different.

**EXHIBIT C**

*Redemption Payments Received by Defendants from Lambda*
*From March 24, 2005 Through February 16, 2007*

| Payment Date | Redemption Payment | No. of Shares |
|---|---|---|
| March 24, 2005 | $19,946.22 | 131.08 |
| February 16, 2007 | $40,625.77 | 255.00 |

All $USD amounts are based on the exchange rate as of the date of the Redemption Period. However, upon application of a different exchange rate, as may be required by applicable law, the amount of damages may be different.