Hearing Date: June 26, 2012 at 10:00 a.m.
Objection Deadline: June 8, 2012 at 4:00 p.m.
Reply Deadline: June 15, 2012 at 4:00 p.m.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FAIRFIELD SENTRY LIMITED, et al.,<br><br>    Debtors in Foreign Proceedings. | Chapter 15 Case<br><br>Case No. 10-13164 (BRL)<br><br>(Jointly Administered) |
| FAIRFIELD SENTRY LIMITED, et al. (In Liquidation),<br>acting by and through the Foreign Representatives thereof,<br><br>    Plaintiffs,<br><br>    v.<br><br>THEODOOR GGC AMSTERDAM, et al.,<br><br>    Defendants. | Adv. Pro. No. 10-03496<br><br>(Administratively Consolidated) |

This objection is submitted in the following Adversary
Proceedings:

| | | | |
|---|---|---|---|
| 10-03635 | 10-03636 | 10-03753 | 10-03758 |
| 10-04095 | 10-03780 | 11-01250 | 11-01258 |

**OPPOSITION OF THE UBS DEFENDANTS TO THE FOREIGN REPRESENTATIVE'S
MOTION SEEKING LIMITED RELIEF FROM ORDER STAYING REDEEMER
ACTIONS AND ENTRY OF ORDER DIRECTING DEFENDANTS TO MAKE
EXPEDITED INITIAL DISCLOSURES ON BENFICIAL HOLDERS AND
AUTHORIZING AMENDMENT TO COMPLAINT IN REDEEMER ACTIONS**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 48th Floor
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile:  (212) 351-4035

*Attorneys for Defendants UBS Fund Services
(Cayman) Limited, UBS Deutschland AG, UBS
Fund Services (Ireland) Limited, UBS Jersey
Nominees Limited, UBS Luxembourg SA,
UBS AG New York, and UBS AG Zurich*

June 8, 2012

# TABLE OF CONTENTS

Page

STATEMENT OF FACTS ................................................................................................. 2

ARGUMENT .................................................................................................................... 5

I.    THE STAY ORDER SHOULD NOT BE DISTURBED ........................................ 5

    A.    The Circumstances Giving Rise to the Stay Order Have Not Changed to
        Warrant Lifting It .......................................................................................... 5

    B.    Any Time Constraints Are Solely of the Foreign Representative's Own
        Making ........................................................................................................... 5

    C.    Filing Amended Pleadings is Not a Reason to Lift the Stay ........................ 6

II.   THE BANKRUPTCY RULES DO NOT AUTHORIZE THE RELIEF SOUGHT ................ 6

III.  THE COURT CANNOT COMPEL THE DISCOVERY SOUGHT BEFORE
     DETERMINING A NUMBER OF THRESHOLD ISSUES .................................. 6

    A.    The Court Must Determine Whether It Has Subject Matter Jurisdiction Before
        Considering the Disclosure Request .............................................................. 7

    B.    The Court Must Determine Whether It Has Personal Jurisdiction Before
        Considering the Disclosure Request .............................................................. 7

    C.    The Court Must Determine Whether Service of Process was Sufficient Before
        Considering the Disclosure Request .............................................................. 7

IV.   THE SWISS DEFENDANTS WERE NOT PROPERLY SERVED ....................... 9

V.    THE GERMAN DEFENDANTS WERE NOT PROPERLY SERVED ................. 9

    A.    The Foreign Representative Violated the Hague Service Convention by
        Attempting to Serve the German Defendants through International Registered
        Mail ............................................................................................................... 10

    B.    The Foreign Representative Violated the Hague Service Convention by
        Failing to Serve the German Defendants with a German Translation of the
        Documents ..................................................................................................... 11

VI.   CONSIDERATIONS OF COMITY REQUIRE DENYING THE FOREIGN
     REPRESENTATIVE'S REQUEST FOR DISCLOSURE ..................................... 12

    A.    Ordering the Requested Disclosure Would Likely Cause Defendants to
        Violate Swiss Law ........................................................................................ 15

    B.    Ordering the Requested Disclosure Would Likely Cause Defendants to
        Violate Luxembourg Law .............................................................................. 15

    C.    Ordering the Requested Disclosure Would Likely Cause Defendants to
        Violate Jersey Law ........................................................................................ 15

    D.    Ordering the Requested Disclosure Would Likely Cause Defendants to
        Violate Cayman Law ..................................................................................... 15

    E.    Ordering the Requested Disclosure Would Likely Cause Defendants to
        Violate German Law ...................................................................................... 18

    F.    Ordering the Requested Disclosure Would Likely Cause Defendants to
        Violate Irish Law .......................................................................................... 21

CONCLUSION ................................................................................................................ 23

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Darden v. DaimlerChrysler N. Am. Holding Corp.*,
  191 F. Supp. 2d 382 (S.D.N.Y. 2002) ....................................................................... 8

*DeJames v. Magnificence Carriers, Inc.*,
  654 F.2d 280 (3d Cir. 1981) ..................................................................................... 9

*Delta Constructors, Inc. v. Roediger Vacuum, GmbH*,
  259 F.R.D. 245 (S.D. Miss. 2009) ......................................................................... 10

*Dynegy Midstream Servs. v. Trammochem*,
  451 F.3d 89 (2d Cir. 2006) ....................................................................................... 7

*Fairfield Sentry Ltd. v. Theodor GGC Amsterdam*,
  Adv. Pro. No. 10-03496 (BRL) (Bankr. S.D.N.Y. Oct. 19, 2011) ......................... 4

*Flo & Eddie, Inc. v. Settler*,
  No. 08-80356-CIV, 2008 WL 4938407 (S.D. Fla. Nov. 19, 2008) ................... 11, 12

*In re Bank of Credit and Commerce Int'l (Overseas) Ltd. (in liquidation)*,
  1994-95 CILR 56 (Grand Court Jan. 26, 1994) ..................................................... 18

*In re Bankamerica Trust and Banking Corp.*,
  1992-93 CILR 574 (Grand Court Nov. 5, 1993) .................................................... 16

*In re Baycol Prods. Litig.*,
  MDL No. 1431, 2003 WL 22023449 (D. Minn. Mar. 21, 2003)...................... 20, 21

*In re S. African Apartheid Litig.*,
  643 F. Supp. 2d 423 (S.D.N.Y. 2009) .................................................................... 10

*Low v. Bayerische Motoren Werke, A.G.*,
  449 N.Y.S.2d 733 (1st Dep't 1982) ........................................................................ 11

*Lyman Steel Corp. v. Ferrostaal Metals Corp.*,
  747 F. Supp. 389 (N.D. Ohio 1990)................................................................... 11, 12

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
  116 F.R.D. 517 (S.D.N.Y. 1987) ............................................................................ 13

*Motorola Credit Corp. v. Uzan*,
  388 F.3d 39 (2d Cir. 2004) ..................................................................................... 13

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*,
  484 U.S. 97 (1987)..................................................................................................... 7

*Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*,
  418 B.R. 75 (Bankr. S.D.N.Y. 2009)........................................................................ 9

*Porsche v. Super. Ct.*,
  177 Cal. Rptr. 155 (1981) ......................................................................................... 9

*Richbell Info. Servs., Inc. v. Jupiter Partners L.P.*,
  816 N.Y.S.2d 470 (1st Dep't 2006) ........................................................................ 13

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Salerno v. Lecia, Inc.*,
   No. 97-CV-973S(H), 1999 WL 299306 (W.D.N.Y. Mar. 23, 1999)................................. 20, 21

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*,
   482 U.S. 522 (1987).................................................................................................... 13

*Tournier v. National Provincial & Union Bank of England*
   1 K.B. 461 (1924) ...................................................................................................(192421

*UJB Fin. Corp. v. Wiesman*,
   No. 92 Civ. 1060 (CSH), 1992 WL 58864 (S.D.N.Y. Mar. 17, 1992)................................... 16

*Volkswagenwerk Aktiengesellschaft v. Schlunk*,
   486 U.S. 694 (1988)..................................................................................................... 8

**Statutes**

Fed. R. Civ. P. 4(f)(1) ....................................................................................................... 8, 11

Fed. R. Civ. P. 4(f)(2) ......................................................................................................... 9

Fed. R. Civ. P. 4(f)(3) ......................................................................................................... 11

Fed. R. Civ. P. 4(h) ........................................................................................................... 8

Fed. R. Civ. P. 26.............................................................................................................. 6

**Other Authorities**

Hague Service Convention art. 1 .......................................................................................... 8

Hague Service Convention art. 2 .......................................................................................... 10

Hague Service Convention art. 5 .......................................................................................... 10

Hague Service Convention art. 19 ......................................................................................... 10

The UBS Defendants,[1] by and through their undersigned attorneys, respectfully submit this memorandum of law for the limited purpose of opposing the Foreign Representative's Motion Seeking Limited Relief from Order Staying Redeemer Actions and Entry of Order Directing Defendants to Make Expedited Initial Disclosures on Beneficial Holders and Authorizing Amendment to Complaints in Redeemer Actions (the "**Motion**"), filed on May 25, 2012, by Plaintiffs Fairfield Sentry Limited ("**Fairfield Sentry**"), Fairfield Sigma Limited, and Fairfield Lambda Limited (together, the "**Fairfield Funds**"), by and through Kenneth Krys, in his capacities as liquidator of the Fairfield Funds and Foreign Representative of the Fairfield Funds' foreign liquidation proceedings (the "**Foreign Representative**"), in each of the above-referenced adversary proceedings.

Without waiving any of their defenses, including lack of personal jurisdiction, the UBS Defendants hereby join in, adopt, and incorporate by reference all applicable arguments set forth in:

- the Opposition of Banco Santander (Suisse) S.A., Banque SYZ & CO S.A., Mirabaud & Cie Banquiers Privés and Crédit Andorrà, filed June 8, 2012, in various adversary proceedings, including Adv. Pro. No. 10-03509 (the "**Cravath Opposition**");

- the Opposition of HSBC Institutional Trust Services (Asia) Limited, Robinson & Co., HSBC Private Banking Nominee 1 (Jersey) Limited, HSBC Securities Services (Luxembourg) S.A., HSBC Private Bank (Guernsey) Limited, HSBC Private Bank (Suisse) S.A., HSBC Bank USA, N.A., Banco Nominees (IOM) Limited, HSBC Guyerzeller Trust Co. AG, HSBC Securities (Panama) S.A., HSBC International Trustee Limited, Somers Nominees (Far East) Limited, and HSBC Bank Bermuda Limited, filed June 8, 2012, in various adversary proceedings, including Adv. Pro. No. 10-03619 (the "**Cleary Opposition**");

- the Opposition of Korea Exchange Bank , National Bank of Kuwait S.A.K., Citibank Korea, Inc., HSBC Seoul Branch, and Kookmin Bank, filed June 8, 2012, in various

---

[1] UBS Fund Services (Cayman) Limited ("**UBS Cayman**"), UBS Deutschland AG ("**UBS Deutschland**"), UBS Fund Services (Ireland) Limited ("**UBS Ireland**"), UBS Jersey Nominees Limited ("**UBS Jersey**"), UBS Luxembourg SA ("**UBS Luxembourg**"), UBS AG New York, and UBS AG Zurich ("**UBS Zurich**") (together, the "**UBS Defendants**").

adversary proceedings, including Adv. Pro. No. 11-01486 (the "**K&S Opposition**"); and

- the Opposition of Caceis Bank and Caceis Bank Luxembourg, filed June 8, 2012, in various adversary proceedings, including Adv. Pro. No. 10-03624 (the "**Caceis Opposition**").

The UBS Defendants submit this separate opposition to highlight the relevant facts insofar as the Motion pertains to the UBS Defendants, including various foreign privacy laws to which the UBS Defendants are subject in their home jurisdictions and which may be violated if this Court grants the relief requested in the Motion.

## STATEMENT OF FACTS

1.  The Foreign Representative commenced actions in New York against the UBS Defendants, among other defendants in similar actions, seeking to recover the proceeds of payments they allegedly received in connection with the redemption of the UBS Defendants' shares in the Fairfield Funds.

2.  The affidavits of service filed by counsel to the Foreign Representative indicate that International Registered Mail was the sole method of service for the complaints filed against UBS Cayman, UBS Deutschland, UBS Ireland, UBS Jersey, UBS Luxembourg, and UBS Zurich.[2] The UBS Defendants have not yet responded, and are not yet required to respond, to the complaints.

3.  In addition to filing complaints against the UBS Defendants in New York, the Foreign Representative also commenced proceedings against certain of the UBS Defendants in

---

[2]  *See, e.g.*, Aff. of Service of Second Am. Compl. against UBS AG New York, UBS Zurich and UBS Jersey, dated June 17, 2011, Adv. Pro. No. 10-03635 (Dkt. No. 91); Aff. of Service of Second Am. Compl. against UBS AG New York, UBS Zurich and UBS Jersey, dated June 17, 2011, Adv. Pro. No. 10-03636 (Dkt. No. 92); Aff. of Service of First Am. Compl. against UBS Cayman, dated Apr. 27, 2011, Adv. Pro. No. 10-03758 (Dkt. No. 14); Aff. of Service of First Am. Compl. against UBS Cayman, dated Mar. 23, 2011, Adv. Pro. No. 10-04095 (Dkt. No. 8); Aff. of Service of First Am. Compl. against UBS Luxembourg, dated Mar. 23, 2011, Adv. Pro. No. 11-01250 (Dkt. No. 7); Aff. of Service of First Am. Compl. against UBS Deutschland, dated Mar. 23, 2011, Adv. Pro. No. 10-03753 (Dkt. No. 15); Aff. of Service of Compl. against UBS Ireland, dated Mar. 29, 2011, Adv. Pro. No. 11-01258 (Dkt. No. 6).

the British Virgin Islands (the "BVI").  In the BVI proceedings, as in the actions pending before

this Court, the Foreign Representative seeks to recover the proceeds of payments the UBS

Defendants allegedly received in connection with redeeming their shares in the Fairfield Funds.

4.    On July 28, 2011 and July 29, 2011, a preliminary issues hearing took place in the

BVI High Court to determine two of the defenses asserted in the BVI proceedings, the "Article

11" defense and the "good consideration" defense.  Article 11(1) of Fairfield Sentry's Articles

of Association provides that "[a]ny certificate as to the Net Asset Value per Share or as to the

Subscription Price or Redemption Price therefor given by or on behalf of the Directors shall be

binding on all parties."

5.    In the BVI actions, the defendants involved in the preliminary issues proceedings (the

"PI Defendants")[3] argued that the elements of Article 11(1) were satisfied when their shares in

the Fairfield Funds were redeemed, and the legal effect of the provision prevents the Foreign

Representative from attempting to go behind, disturb or recalculate the Net Asset Value.  The PI

Defendants also argued that, irrespective of the Net Asset Value per share, they gave good

consideration for Fairfield Sentry's payment of the redemption price for the shares and that this

provides them with a complete defense to the Foreign Representative's claims.

6.    On September 16, 2011, Justice Edward Bannister delivered the preliminary issues

judgment.  In effect, Justice Bannister determined the good consideration issue in favor of the

PI Defendants and the Article 11 issues in favor of Fairfield Sentry.  As a result of the court's

decision on good consideration, it granted summary judgment dismissing the claims against all

of the PI Defendants on October 10, 2011.

7.    The Foreign Representative subsequently appealed the good consideration decision

and the resulting summary judgment, and the PI Defendants, including UBS Luxembourg, UBS

---

[3]  Included among the PI Defendants were UBS Luxembourg, UBS Cayman and UBS AG New York.

Cayman and UBS AG New York, appealed Justice Bannister's decision on the Article 11

defense.  Both appeals were heard in the Eastern Caribbean Supreme Court on January 17-18,

2012, and the court is expected to issue a ruling on June 13, 2012.  The current position in the

BVI is therefore that there are no extant clawback claims against the PI Defendants.  If upheld,

the BVI judgment will provide a complete defense to the Foreign Representative's claims in

these actions.

      8.    On October 19, 2011, this Court issued an amended order staying the actions pending

developments in connection with separate but related judicial proceedings, including the BVI

proceedings and appeal.  Docket No. 418 (Amended Order Staying Redeemer Actions, *Fairfield*

*Sentry Ltd. v. Theodor GGC Amsterdam*, Adv. Pro. No. 10-03496 (BRL) (Bankr. S.D.N.Y. Oct.

19, 2011) (the "**Stay Order**")).  Although the Foreign Representative is permitted to

"participat[e] in settlement discussions [or] enter[] into settlement, tolling or any other type of

agreements," the Stay Order provides that "all proceedings in the actions . . .  are stayed . . . ."

Stay Order ¶ 5.

      9.    On May 25, 2012, the Foreign Representative filed the instant Motion, requesting that

the Court lift the Stay Order for the purpose of issuing an order compelling the UBS

Defendants, and all defendants in similar actions, to disclose to the Foreign Representative

within 10 days after entry of the order:

> the names and, if known, the addresses, telephone numbers, facsimile numbers
> and email addresses for:
>
>     i.     any person or entity on whose account or for whose benefit such
>            Defendant subscribed for or held shares of the Funds that were
>            redeemed in exchange for redemption payments identified in
>            exhibits to complaints filed in Redeemer Actions; and
>
>     ii.    any other person or entity known by a Defendant to have received
>            the payments or any portion of payments identified in exhibits to
>            complaints filed in Redeemer Actions by virtue of such person

4

> having a beneficial interest in shares redeemed in exchange for
> such payments.

*See* Proposed Order attached to Motion.

10. The Foreign Representative asserts that he is entitled to this relief under Federal Rule of Civil Procedure 26(a)(1)(A) (made applicable in these actions by Federal Rule of Bankruptcy Procedure 7026).  Motion ¶ 34-37.  As a sanction for a defendant's failure to comply with the requested order, the Foreign Representative suggests "waiver of any type of conduit or change-in-position defense on the basis of the transfer or remittance of redemption payments to Beneficial Holders," *id.* at ¶ 38, although the proposed Order that the Foreign Representative submitted with the Motion did not specify any sanction for failure to comply.

## ARGUMENT

## I.   THE STAY ORDER SHOULD NOT BE DISTURBED

### A.   The Circumstances Giving Rise to the Stay Order Have Not Changed to Warrant Lifting It

11. For the reasons stated in Section I.A of the K&S Opposition, the UBS Defendants oppose the Motion on the grounds that the reasons underlying the Stay order have not changed since the order was first entered.

### B.   Any Time Constraints Are Solely of the Foreign Representative's Own Making

12. For the reasons stated in Section I.B of the K&S Opposition, the UBS Defendants oppose the Motion on the grounds that any time constraints the Foreign Representative faces in seeking the identities of customers or beneficiaries are solely of his own making.

### C.    Filing Amended Pleadings is Not a Reason to Lift the Stay

13. For the reasons stated in Section I.C of the K&S Opposition, the UBS Defendants

oppose the Motion on the grounds that filing amended pleadings is not a sufficient basis for

lifting the Stay Order.

## II.    THE BANKRUPTCY RULES DO NOT AUTHORIZE THE RELIEF SOUGHT

14. For the reasons stated in Section IV of the Cravath Opposition, the UBS Defendants

oppose the Motion on the grounds that Federal Rule of Civil Procedure 26 (made applicable by

Federal Rule of Bankruptcy Procedure 7026) does not authorize the relief sought by the Foreign

Representative.  Among other things, and as set forth in Section IV of the Cravath Opposition:

- Rule 26 only requires the disclosure of information "that the disclosing party may use
to support its claims or defenses."  Fed. R. Civ. P. 26.  It does not require the UBS
Defendants to disclose information that the Foreign Representative seeks solely for
the admitted purpose of identifying additional defendants.

- Rule 26 disclosures are not required at this stage of the proceedings—prior to motions
directed at the complaints, before any Rule 26(f) conference has taken place and
when the actions are subject to a court-ordered stay.

- The Foreign Representative fails to meet the procedural prerequisites associated with
its discovery motion.

- The Foreign Representative's demand that the defendants be precluded from asserting
certain defenses as a sanction for non-compliance with the requested disclosures
exceeds the relief permitted by the Bankruptcy Rules.

## III.    THE COURT CANNOT COMPEL THE DISCOVERY SOUGHT BEFORE
    DETERMINING A NUMBER OF THRESHOLD ISSUES

15. For the reasons stated in Section I.B of the K&S Opposition and in Sections I-II of

the Cleary Opposition, the UBS Defendants oppose the Motion on the grounds that the Court

must resolve preliminary jurisdictional questions, including subject matter jurisdiction, personal

jurisdiction and insufficiency of service of process, before it can allow discovery under Rule 26

or exercise judicial power over the defendants.

**A.      The Court Must Determine Whether It Has Subject Matter Jurisdiction
Before Considering the Disclosure Request**

16. For the reasons stated in Section II of the Cleary Opposition, the UBS Defendants

oppose the Motion on the grounds that the Court cannot grant the relief requested therein until it

resolves questions concerning its subject matter jurisdiction to hear these actions.

**B.      The Court Must Determine Whether It Has Personal Jurisdiction Before
Considering the Disclosure Request**

17. For the reasons stated in Sections III.A, B.1,3-4 of the Cleary Opposition, the UBS

Defendants oppose the Motion on the grounds that the Court cannot grant the relief requested

therein until it resolves questions of the Court's personal jurisdiction over the UBS Defendants.

Among other things, and as set forth in above-referenced sections of the Cleary Opposition:

- The Subscription Agreement provides no basis for personal jurisdiction in this case
  because the "Consent to Jurisdiction Provision" only applies to jurisdiction in New
  York State courts and only applies to disputes "with respect to" the Subscription
  Agreement.  Because the Foreign Representative has filed suit in federal court, and
  the claims concern the Articles of Association, not the Subscription Agreement, these
  actions fall outside the scope of the Consent to Jurisdiction Provision.

- The Foreign Representative's complaints and proposed amendments fail to establish a
  *prima facie* basis for this Court to assert personal jurisdiction independent of the
  Subscription Agreement

**C.      The Court Must Determine Whether Service of Process was Sufficient Before
Considering the Disclosure Request**

18.  It is well-settled that "[b]efore a federal court may exercise personal jurisdiction over

a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital

Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987); *see also Dynegy Midstream Servs. v.

Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006).

19. Federal Rules of Civil Procedure 4, made applicable to these adversary proceedings

by Federal Rule of Bankruptcy Procedure 7004(a)(1), governs service of a summons and

complaint on an individual or corporation in a foreign country.  Rule 4(h) establishes that "a

7

foreign corporation . . . must be served:  (1) in a judicial district of the United States . . . or (2) at

a place not within any judicial district of the United States, in any manner provided by Rule 4(f)

for serving an individual, except personal delivery."   Fed. R. Civ. P. 4(h).  Rule 4(f) provides, in

relevant part, that service may be effected outside of the United States "by any internationally

agreed means of service that is reasonably calculated to give notice, such as those authorized by

the Hague Convention."  Fed. R. Civ. P. 4(f)(1).

20. The Hague Convention on the Service Abroad of Judicial and Extrajudicial

Documents (the "Hague Service Convention") applies "in all cases, in civil or commercial

matters, where there is occasion to transmit a judicial or extrajudicial document for service

abroad."  Hague Service Convention, art. 1; *see also Volkswagenwerk Aktiengesellschaft v.
Schlunk*, 486 U.S. 694, 705 (1988) ("compliance with the [Hague Service] Convention is

mandatory in all cases to which it applies"); *Darden v. DaimlerChrysler N. Am. Holding Corp.*,

191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002) ("Because service on a foreign corporation requires

the transmittal of a judicial document abroad, the [Hague Service Convention] applies and

preempts contrary state law").

21. The Hague Service Convention applies in this case because the Foreign

Representative has attempted to effect service on the UBS Defendants in various jurisdictions

that are signatories to the Hague Service Convention, including Switzerland, Germany, Ireland,

Luxembourg.  To serve defendants outside the U.S. with summonses and complaints, the Foreign

Representative used International Registered Mail,[4] a method of service to which many Hague

Service Convention signatories, including Switzerland and Germany, have expressly objected.[5]

---

[4]  *See supra*, note 2.
[5]  The U.S. State Department has specifically advised that "American courts have held that formal objections to
service by mail made by countries party to a multilateral treaty or convention on service of process . . . are
honored as a treaty obligation, and litigants should refrain from using such a method of service."  U.S. Dep't of

8

22. Where, as here, a signatory has "made a formal objection to Article 10(a), thereby prohibiting transmission of judicial documents directly to persons abroad," service by International Registered Mail is "insufficient to satisfy Rule 4(f) and the Hague Convention." *Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 418 B.R. 75, 82-83 (Bankr. S.D.N.Y. 2009) (Lifland, J.) (Switzerland's objection to Article 10(a) rendered service by mail insufficient); 1993 Advisory Committee Notes, Fed. R. Civ. P. 4(f)(2) ("Service by methods that would violate foreign law is not generally authorized.").

## IV.    THE SWISS DEFENDANTS WERE NOT PROPERLY SERVED

23. The Foreign Representative attempted to serve UBS Zurich in Switzerland by International Registered Mail, as attested to in the Affidavits of Service filed with this Court by the Foreign Representative's counsel.[6]  For the reasons stated in Section III.C of the Cleary Opposition, the UBS Defendants oppose the Motion on the grounds that the Foreign Representative's attempt to serve UBS Zurich in Switzerland by International Registered Mail was ineffective and, as a result, the court lacks personal jurisdiction.

## V.    THE GERMAN DEFENDANTS WERE NOT PROPERLY SERVED

24. The Foreign Representative attempted to serve UBS Deutschland in Germany by International Registered Mail.[7]  Germany is a party to the Hague Service Convention, and it is among the contracting states that have expressly objected to service by postal channels under Article 10(a).  Because the Foreign Representative's method of service did not comply with the

---

State, Service of Legal Documents Abroad (citing *DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280 (3d Cir. 1981); *Porsche v. Super. Ct.*, 177 Cal. Rptr. 155 (1981)), *available at* http://travel.state.gov/law/judicial/judicial_680.html (last visited June 8, 2012).

[6]  *See, e.g.*, Aff. of Serv. of Am. Compl. against UBS AG New York, UBS Zurich and UBS Jersey, dated Oct. 20, 2010, Adv. Pro. No. 10-03635 (Dkt. No. 53); Aff. of Serv. of First Am. Compl. against UBS AG New York, UBS Zurich and UBS Jersey, dated Apr. 7, 2011, Adv. Pro. No. 10-03635 (Dkt. No. 78); Aff. of Service of Am. Compl. against UBS AG New York, UBS Zurich and UBS Jersey, dated Oct. 20, 2010, Adv. Pro. No. 10-03636 (Dkt. No. 53); Aff. of Service of First Am. Compl. against UBS AG New York, UBS Zurich and UBS Jersey, dated Apr. 7, 2011, Adv. Pro. No. 10-03636 (Dkt. No. 79).

[7]  *See* Aff. of Service of First Am. Compl. against UBS Deutschland, dated Mar. 23, 2011, Adv. Pro. No. 10-03753 (Dkt. No. 15).

Hague Service Convention and, by extension, the Federal Rules of Civil Procedure, this Court

lacks personal jurisdiction over defendants domiciled in Germany, such as UBS Deutschland.

> **A.    The Foreign Representative Violated the Hague Service Convention by Attempting to Serve the German Defendants through International Registered Mail**

25.   Germany's domestic law prohibits foreign litigants from directly serving German

nationals because service of process is regarded as an extension of the state's sovereign power

that may not be performed by foreign private persons.  *See* U.S. Dep't of State, Judicial

Assistance Germany ("[A]ttempts at service by mail, are considered illegal in Germany and an

affront to its judicial sovereignty.").[8]  Accordingly, pursuant to the Hague Service Convention,

service may only be effected through Germany's Central Authority or by any means otherwise

permitted by German law.  Hague Service Convention, art. 2, 5, 19.

26.   Because service by mail in Germany is not authorized by "any internationally agreed

means of service" and is not an "other means not prohibited by international agreement,"

attempts to serve by mail violate the Hague Service Convention in addition to Federal Rules of

Civil Procedure 4(f)(1) and 4(f)(3).  "As Germany has objected to service by judicial agent, by

mail, or by diplomat, service via the Central Authority is the *only* means by which an American

plaintiff may serve a German defendant."  *In re S. African Apartheid Litig.*, 643 F. Supp. 2d 423,

432 (S.D.N.Y. 2009) (emphasis original) (citing Hague Service Convention, art. 13); *see also*

*Delta Constructors, Inc. v. Roediger Vacuum, GmbH*, 259 F.R.D. 245, 248 n.4 (S.D. Miss. 2009)

("Germany has specifically rejected the validity of service by mail, or any other mode of service

other than through the Central Authority").

27.   Courts in the United States have expressly concluded that attempts to serve German

defendants by mail are insufficient because "service by registered mail is not an authorized

---

[8]   *Available at* http://travel.state.gov/law/judicial/judicial_648.html (last visited June 6, 2012).

means of service of process against a German citizen or corporation." *Flo & Eddie, Inc. v. Settler*, No. 08-80356-CIV, 2008 WL 4938407, at *1 (S.D. Fla. Nov. 19, 2008) (granting German corporation's motion to quash service); *Low v. Bayerische Motoren Werke, A.G.*, 449 N.Y.S.2d 733, 735 (1st Dep't 1982) (finding service by mail to German defendant ineffective because Germany filed an objection to Article 10 of the Hague Service Convention); *Lyman Steel Corp. v. Ferrostaal Metals Corp.*, 747 F. Supp. 389, 401 (N.D. Ohio 1990) (granting defendants' motion to quash service of process where the summons and complaint were served by registered mail).

28.  The Foreign Representative may assert that service was valid because certain of the Subscription Agreements contain a consent to jurisdiction provision providing for service by certified or registered mail.  Even assuming that the German defendants signed such a Subscription Agreement, this provision does not cure the defects in the Foreign Representative's improper service.  As an initial matter, the consent provision is inapplicable to this dispute for the reasons set forth in Section III.A of the Cleary Opposition, *supra* ¶ 17.

29.  Further, like Switzerland, Germany does not allow parties to circumvent by contract the methods of service prescribed by the Hague Service Convention.  Because the interest protected by German law—as well as Germany's objection to service by postal channels—is German sovereignty rather than private personal interests,[9] a litigant's prior consent to service by mail does not cure the insufficiency of service through postal channels.

> **B.    The Foreign Representative Violated the Hague Service Convention by Failing to Serve the German Defendants with a German Translation of the Documents**

30.  The Foreign Representative's attempted service also fails because the complaints and summonses that the Foreign Representative attempted to serve on UBS Deutschland were not

---

[9]  *See supra*, note 8.

11

"accompanied by German translations," as expressly required by the Hague Service Convention. *See* Declaration of the Federal Republic of Germany ("Formal service . . . shall be permissible only if the document to be served is written in, or translated into, the German language.").[10]

31. Courts have long-recognized that where service of process is attempted in Germany, it is a required element of proper process under the Hague Service Convention to comport with Germany's translation requirement. *Flo & Eddie, Inc.*, 2008 WL 4938407, at *1 (granting motion to quash service where, in addition to attempting service by registered mail, "the documents attempted to be served were not translated into German, as is also required by the Hague Convention"); *Lyman,* 747 F. Supp. at 399 ("[The Hague Service Convention] requires the papers served by the central authority to be written in or translated into one of the official languages of the nation addressed—here, the official language is German.") (citing Hague Service Convention, art. 5).

## VI. CONSIDERATIONS OF COMITY REQUIRE DENYING THE FOREIGN REPRESENTATIVE'S REQUEST FOR DISCLOSURE

32. For the reasons previously set forth, *supra* ¶ 14, Federal Rule of Civil Procedure 26 does not entitle the Foreign Representative to the requested disclosures. Accordingly, because the disclosures are not authorized under U.S. law, there is no conflict with the foreign laws that also prohibit the UBS Defendants from complying with the Foreign Representative's request. Indeed, disclosing the information requested by the Foreign Representative would likely require a violation of foreign privacy, data protection and bank secrecy laws in many of the jurisdictions in which the UBS Defendants are located and expose the UBS Defendants to civil and/or criminal sanctions.

---

[10]   *Available at* http://www.hcch.net/index_en.php?act=status.comment&csid=402&disp=resdn (last visited June 6, 2012).

33. Even if U.S. law permitted the disclosures sought by the Foreign Representative, considerations of comity would warrant denying the request for this information.  In determining whether to prohibit discovery in light of a conflict with foreign law, the Supreme Court has made clear that courts must engage in a "particularized analysis of the respective interests of the foreign nation and the requesting nation."  *Societé Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 543-44 (1987).

34. In *Aérospatiale*, the Supreme Court cited the following factors, which are reflected in the Restatement (Third) of Foreign Relations Law § 442(1)(c), as being relevant to any comity analysis:  (1) the importance of the documents or information requested to the litigation; (2) the degree of specificity of the request; (3) whether the information originated in the U.S.; (4) the availability of alternative means of retrieving the information; and (5) the extent to which noncompliance with the request would undermine important interests of the U.S., or compliance with the request would undermine the important interests of the state where the information is located.  *Id.* at 544 n.28.  In addition, courts in the Second Circuit may also consider the hardship of compliance on the party or witness from whom discovery is sought and the good faith of the party resisting discovery.  *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987).

35. The Second Circuit has held that it is a "fundamental principle of international comity" that a state "'may not require a person to do an act in another state that is prohibited by the law of that state or the law of the state of which he is a national.'" *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) (citing Restatement (Third) of Foreign Relations Law § 441); *accord Richbell Info. Servs., Inc. v. Jupiter Partners L.P.*, 816 N.Y.S.2d 470, 475 (1st Dep't 2006) (applying balancing test to address comity concerns).

13

36. More recently, on February 26, 2012, the American Bar Association ("ABA") House of Delegates passed a resolution urging U.S. courts to "consider and respect, as appropriate, the data protection and privacy laws of any applicable foreign sovereign, and the interests of any person who is subject to or benefits from such laws, with regard to data sought in discovery in civil litigation."  Declaration of Jennifer C. Halter, dated June 8, 2012 ("**Halter Decl.**"), Ex. A (ABA Resolution 103).[11]

37. Consistent with the Supreme Court's holding in *Aérospatiale* and the law of this Circuit, the ABA's recommendation that courts consider "the interests of any person who . . . benefits from such laws," *id*., requires this Court to examine not only the potential hardship faced by the UBS Defendants, but also the privacy interests of the Beneficial Owners whose confidential information the Foreign Representative seeks.

38. The Fairfield Funds' Subscription Agreement expressly required the subscriber to acknowledge that "except with the consent of the Fund, the Shares may not be owned by a U.S. Person."  Subscription Agreement ¶ 5(a).  As a result, the Beneficial Owners are likely all non-U.S. individuals or entities with a substantial interest in upholding the privacy rights conferred upon them by the jurisdictions in which the UBS Defendants operate.

39. Further, as stated in Section IV.B of the Cleary Opposition and Sections III-IV of the Caceis Opposition, the UBS Defendants oppose the Motion on the grounds that an analysis of the *Aérospatiale* and Restatement factors warrants denial of the Motion under well-settled principles of comity.

---

[11]  In passing Resolution 103, the ABA stated that it "seeks to restore the true balancing function of *Aérospatiale* by urging federal and state courts to carefully consider, and appropriately respect, the Data Protection and Privacy laws of foreign countries as they concern the disclosures of data subject to protection by the laws of those countries." *Id*. Ex. B (ABA Section on International Litigation Report to Resolution 103), at 2.  The Report and Resolution 103 are also available at www.abanow.org/2012/01/2012mm103/ (last visited June 6, 2012).

A.    **Ordering the Requested Disclosure Would Likely Cause Defendants to Violate Swiss Law**

40. UBS Zurich is incorporated in Switzerland and has its primary place of business in that jurisdiction.  For the reasons stated in Section IV.A.1 of the Cleary Opposition, the UBS Defendants oppose the Motion on the grounds that compliance with the Foreign Representative's requested disclosure would likely cause UBS Zurich to violate the laws of its home jurisdiction.

B.    **Ordering the Requested Disclosure Would Likely Cause Defendants to Violate Luxembourg Law**

41. UBS Luxembourg is incorporated in Luxembourg and has its primary place of business in that jurisdiction.  For the reasons stated in Section IV.A.2 of the Cleary Opposition and Sections II-IV of the Caceis Opposition, the UBS Defendants oppose the Motion on the grounds that compliance with the Foreign Representative's requested disclosure would likely cause UBS Luxembourg to violate the laws of its home jurisdiction.

C.    **Ordering the Requested Disclosure Would Likely Cause Defendants to Violate Jersey Law**

42. UBS Jersey is incorporated in Jersey and has its only place of business in that jurisdiction.  For the reasons stated in Section IV.A.5 of the Cleary Opposition, the UBS Defendants oppose the Motion on the grounds that compliance with the Foreign Representative's requested disclosure would likely cause UBS Jersey to violate the laws of its home jurisdiction.

D.    **Ordering the Requested Disclosure Would Likely Cause Defendants to Violate Cayman Law**

43. UBS Cayman is incorporated in the Cayman Islands and has its only place of business in that jurisdiction.  For the reasons stated herein, the UBS Defendants oppose the Motion on

the grounds that compliance with the Foreign Representative's requested disclosure would

likely cause UBS Cayman to violate the laws of its home jurisdiction.

44. The information requested by the Foreign Representative could subject UBS Cayman

to liability under the Confidential Relationships (Preservation) Law (2009) (the "Preservation

Law"). Halter Decl. Ex. C. The Preservation Law prohibits the disclosure of "confidential

information," such as the identities and contact information of the Beneficial Owners that

"arises in or is brought into the [Cayman] Islands." *See id.*

45. Section 5 of the Preservation Law provides for criminal penalties associated with

violations of the statute's disclosure prohibitions. Specifically, Section 5 provides:

> (1)  Subject to section 3(2), whoever –
>     (a) being in possession of confidential information however obtained-
>         (i) divulges it; or
>         (ii) attempts, offers or threatens to divulge it; or
>     (b) willfully obtains or attempts to obtain confidential information,
> is guilty of an offence and liable on summary conviction to a fine of five thousand
> dollars and to imprisonment for two years.
> . . . .
> (4) Whoever being a professional person, entrusted as such with confidential
> information, the subject of the offence, commits an offence under (1), (2) or (3) is liable
> to double the penalty therein prescribed.

*Id*. §5(1), (4).

46. Section 3(2) of the Preservation Law provides for certain exceptions to the

prohibitions on disclosure, none of which are applicable to the Cayman defendants in this

action. These exceptions have been narrowly construed, and a party who believes that none of

the exceptions may apply must first seek directions from the Grand Court of the Cayman

Islands as to whether the disclosure is permitted under the Preservation Law and, if so, the

scope of any disclosure. *See, e.g.*, *id.* Ex. D (*In re Bankamerica Trust and Banking Corp.*,

1992-93 CILR 574 (Grand Court Nov. 5, 1993) (Harre, C.J.)); *see also UJB Fin. Corp. v.

Wiesman*, No. 92 Civ. 1060 (CSH), 1992 WL 58864, at *2 (S.D.N.Y. Mar. 17, 1992) (ordering

the parties to apply to the Grand Court of the Cayman Islands for directions concerning the

disclosure of a list of shareholders).  As set forth in Section 4 of the Preservation Law:

> (1) Whenever a person intends or is required to give in evidence in . . . any
> proceeding . . . any confidential information within the meaning of this Law, he shall
> before so doing apply for directions and any adjournment necessary for that purpose
> may be granted.

> (2)  Application for directions under subsection (1) shall be made to, and be heard and
> determined by, a Judge of the Grand Court sitting alone and *in camera* . . . .

> (3)  Upon hearing an application under subsection (2), a Judge shall direct –
> (a) that the evidence be given;
> (b) that the evidence shall not be given; or
> (c) that the evidence be given subject to conditions which he may specify
> whereby the confidentiality of the information is safeguarded.

Halter Decl. Ex. C, §4(1), (2), (3).

47. In narrowly applying the exceptions to the Preservation Law, the courts have cited to

the Cayman Islands' strong interest in upholding the statute's prohibitions on disclosure,

particularly with respect to confidential information provided by bank customers.  *Id.* Ex. D, at

583.  In denying a bank's application under Section 3(2)(b)(v) to provide information to the

U.S. Internal Revenue Service, the Grand Court concluded that "the preservation of this

confidentiality and the confidence in it on which the economy of the Cayman Islands so

substantially relies outweighs the interests of the IRS in enforcing its *John Doe* summons."  *Id.*

48. Section 3(2)(b)(v) permits disclosure by "a bank in any proceedings, cause or matter

when and to the extent to which it is reasonably necessary for the protection of the bank's

interest, either as against its customers or as against third parties in respect of transactions of the

bank for, or with, its customer."  *Id*. Ex. C, §3(2)(b)(v).  The Grand Court of the Cayman

Islands has interpreted Section 3(2)(b)(v) to allow for the disclosure of customer information if

(1) the disclosure is ***necessary*** to protect the ***bank's interest***; and (2) the bank is a ***party*** to the

litigation in which the information is sought. *Id*. Ex. E (*In re Bank of Credit and Commerce Int'l (Overseas) Ltd. (in liquidation)*, 1994-95 CILR 56 (Grand Court Jan. 26, 1994) (Harre, C.J.)) (emphasis added).

49. In this case, the narrow exceptions to the Preservation Law are inapplicable to the Foreign Representative's requests for disclosure.  For the reasons set forth in Section IV of the Cravath Opposition, the disclosure is not "necessary" under Rule 26.  Moreover, as set forth in Section IV.B.3 of the Cleary Opposition, the information sought by the Foreign Representative "bears no relevance to the Foreign Representative's case against the [defendants], but rather to a contemplated case that the Foreign Representative might eventually file, either in the United States or a foreign jurisdiction, against currently unidentified persons."  For these reasons as well, it is clear that the requested information is not "necessary" nor is it sought to protect interest of UBS Cayman.  Rather, the Foreign Representative seeks the disclosure for his own purposes—to identify and sue additional defendants.   Moreover, because of the open jurisdictional questions, it is far from clear that UBS Cayman can properly be considered a "party" for purposes of the Preservation Law.

> **E.    Ordering the Requested Disclosure Would Likely Cause Defendants to Violate German Law**

50. UBS Deutschland is incorporated in Germany and has its only place of business in that jurisdiction.  For the reasons stated herein, the UBS Defendants oppose the Motion on the grounds that compliance with the Foreign Representative's requested disclosure would likely cause UBS Deutschland to violate the laws of its home jurisdiction.

51. The Foreign Representative's request for disclosures implicates UBS Deutschland's obligations to its customers under German bank secrecy laws.  Under Germany's bank secrecy laws, which derive from the contractual relationship between the financial institution and

customer, UBS Deutschland is prohibited from disclosing the identities of its customers.  In the absence of an order from a court of competent jurisdiction, a bank inquiry (in limited circumstances), or the customer's consent, disclosing confidential customer information would expose UBS Deutschland to civil liability to its affected customers.

52. The disclosures requested by the Foreign Representative could also subject UBS Deutschland to liability under the German Data Protection Act (*Bundesdatenschutzgesetz*) (the "BDSG") and Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data, adopted by the European Union on July 24, 1995 (the "EU Directive").  Halter Decl. Exs. F, G.    The BDSG and the EU Directive apply to any "personal data" that is collected, stored or processed by an entity with a place of business in Germany, such as UBS Deutschland.  *See id.* Ex. F, §(5); Ex. G, art. 4.  "Personal data" is defined broadly as "any information concerning the personal or material circumstances of an identified or identifiable natural person," and would therefore include the identifying information requested by the Foreign Representative.  *See id.* Ex. F, §3(1).

53. The BDSG serves to protect "individuals against infringement of their right to privacy as the result of the handling of their personal data."  *Id.* §1.  The BDSG further establishes that the collection, processing and use of personal data are presumptively prohibited unless otherwise permitted.  *Id.* §4(1) ("The collection, processing and use of personal data shall be lawful only if permitted or ordered by this Act or other law, or if the data subject has provided consent.").  Violations of the BDSG are subject to prosecution as administrative or criminal offenses and are punishable by fines or imprisonment of up to two years.  *Id.* §§43-44.

54. The BDSG, as a general manner and in accordance with the EU Directive, prohibits the transfer of personal data to any jurisdiction outside of the European Union and the European Economic Areas that does not provide for rules on data protection functionally equivalent to those of the European Union, *i.e.*, those jurisdictions that are viewed as not providing for "an adequate level of data protection." *Id.* §4b(2).  Courts in the U.S. have recognized that "safeguards for the maintenance of personal data within the United States are viewed by courts in European Union countries as insufficient when compared to the level of protection provided by European law."  *See Salerno v. Lecia, Inc.*, No. 97-CV-973S(H), 1999 WL 299306, at *3 (W.D.N.Y. Mar. 23, 1999).

55. Although there are exceptions to the restrictions placed on the transfer of personal data by the EU Directive and the BDSG, they are not applicable to the present circumstances. Under Section 4c of the BDSG, personal data can be transferred to jurisdictions that fail to meet the "adequacy" standard for data protection if, for example, "the data subject has given his/her consent" or "the transfer is necessary or legally required on important public interest grounds, or for the establishment, exercise or defence of legal claims."  Halter Decl. Ex. F, §4c(1), (4). Here, the customers have not provided consent to disclose the information and, for the reasons previously set forth, *supra* ¶ 49, the requested disclosures are not necessary.

56. Courts in the U.S. have recognized that Germany has a significant interest in upholding its privacy laws.  *See, e.g.*, *In re Baycol Prods. Litig.*, MDL No. 1431, 2003 WL 22023449, at *6 (D. Minn. Mar. 21, 2003) (denying motion to compel personnel documents located in Germany based on German privacy laws); *Salerno*, 1999 WL 299306, at *3 (concluding that plaintiff would not be entitled to discovery even if collateral estoppel did not bar reconsideration of the issue).

57. In *Baycol*, the court conducted an *Aérospatiale* analysis and concluded that "Germany's interest in protecting the privacy of [private] information outweighs the Plaintiffs' claimed interests in this litigation."  *Baycol*, 2003 WL 22023449, at *6 ("When a foreign party relies on foreign law to resist production of discoverable information, a court should balance its interests with the interests of the foreign sovereign.").

58. Similarly, in *Salerno*, the court concluded that discovery of the "personal data" plaintiff requested "is precluded by Directive 95/46/EC and by the German Act on Data Protection."  1999 WL 299306, at *3.  In reaching that conclusion, the court was persuaded by the German defendant's position that "there are serious legal ramifications for those entities that disclose personal information in contravention of European Union and German data protection laws."  *Id.*

### F.   Ordering the Requested Disclosure Would Likely Cause Defendants to Violate Irish Law

59. UBS Ireland is incorporated in Ireland and has its only place of business in that jurisdiction.  For the reasons stated herein, the UBS Defendants oppose the Motion on the grounds that compliance with the Foreign Representative's requested disclosure would likely cause UBS Ireland to violate the laws of its home jurisdiction.

60. Ireland has applied the rule adopted by the English Court of Appeal in *Tournier v. National Provincial & Union Bank of England*, 1 K.B. 461(1924) , which held that a banker owes his customer a legal duty of confidentiality not to disclose information to third parties and that any breach of this duty could give rise to liability in damages if loss results.  The details of the *Tournier* case and its implications are discussed further in the Declaration of Nuno Manuel Camilo Santos Costa, submitted in connection with the Cleary Opposition, and is incorporated herein by reference.

21

61. UBS Ireland is also subject to the Irish Data Protection Act of 1988, amended by the Irish Data Protection (Amendment) Act of 2003.  The purpose of the amendment was "to give effect to Directive 95/46/EC of the European Parliament."  Halter Decl. Ex. H (Irish Data Protection (Amendment) Act of 2003, Introduction).

62. The Irish Data Protection Act imposes certain requirements on the collection, processing and transfer of any data classified by those laws as "personal data" or "sensitive personal data" that is stored within the jurisdiction of Ireland.  The Irish Data Protection Act therefore prohibits disclosure of the type of information requested by the Foreign Representative.

63. Although the Irish Data Protection Act's restrictions can be overridden by court order, the order must come from a court of competent jurisdiction.  As previously set forth, this Court lacks competent jurisdiction over UBS Ireland.  Disclosure pursuant to an order of a court lacking jurisdiction therefore would likely violate the laws of Ireland and expose UBS Ireland to damages.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

Dated:  New York, New York
         June 8, 2012

GIBSON, DUNN & CRUTCHER LLP

By: /s/   Jennifer C. Halter
     Marshall R. King (MK-1642)
     Jennifer C. Halter (JH-7032)
     200 Park Avenue, 48th Floor
     New York, New York 10166-0193
     (212) 351-4000

*Attorneys for Defendants UBS Fund
Services (Cayman) Limited, UBS
Deutschland AG, UBS Fund Services
(Ireland) Limited, UBS Jersey Nominees
Limited, UBS Luxembourg SA,
UBS AG New York, and UBS AG Zurich*