# Exhibit B

**REPORT**

*"Commerce among nations should be fair and equitable."* Benjamin Franklin

*"Cross-border discovery has become a major source of international legal conflict, and there is no clear, safe way forward. At the heart of these conflicts are vastly differing notions of discovery and data privacy and protection. And the frequency and intensity of these conflicts is heightened by an expanding global marketplace and the unabated proliferation of Electronically Stored Information ('ESI')."* [1]

## I. Introduction

With the exponential increase in the global reach of corporations and other commercial entities, an increasing number of disputes in U.S. courts involve protected data situated in and subject to the laws of foreign countries, many with notions of privacy and disclosure that differ from or are much stricter than those in the United States. Those notions of privacy are, quite frequently, given less than due consideration by courts in the United States. Yet, the daily interfaces essential to cross-border commerce and dialogue, including through electronic information transfers, call for recognition of the exigencies of other legal systems, and where warranted, application of their privacy and data protection laws.

The U.S. Supreme Court recognized the need to respect non-U.S. law in the discovery context of civil litigation at least as far back as 1987, when it held in *Aerospatiale v. District Court of Iowa*,[2] that international comity compels "American courts (to) take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state."[3]

More recently, the need for consideration of the interests of non-U.S. litigants in an age of interconnected commerce was emphasized by U.S. District Court Judge John Gleeson, who wrote in *In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,* "by its very nature, international comity sometimes requires American courts to accommodate foreign interests even where the foreign system strikes a different balance between opposing policy concerns."[4]

As both *Aerospatiale* and *In Re Payment Card Interchange Fee* recognize, protecting data privacy and disclosing information for purposes of litigation and arbitration need not be mutually exclusive. Properly applied, U.S. law already provides a clear and workable standard for resolving the conflict. Nevertheless, U.S. courts have often misapplied the standard and ruled

---

[1] *The Sedona Framework® for Analysis of Cross-Border Conflicts: A Practical Guide to Navigating the Competing Currents of International e-Discovery and Data Privacy* (Public Comment Version August 2008) (hereinafter "Sedona Framework") at 1, available at www.thesedonaconference.org.
[2] Société Nationale Industrielle Aérospatiale and Société de Construction d'Avions de Tourisme v. United States District Court for the Southern District of Iowa, 482 U.S. 522 (1987)
[3] *Id.* at 546. The Court set forth a five-factor balancing test for the application of non-U.S. data protection law, discussed in greater detail below.
[4] 05-MD-1920 (JG)(JO) (E.D.N.Y. August 27, 2010) at *19-20.

**103**

that the needs of the proceeding before them inevitably must take precedence over the privacy and data protection concerns of other nations. Litigants often face a Hobson's Choice: violate foreign law and expose themselves to enforcement proceedings that have included criminal prosecution[5], or choose noncompliance with a U.S. discovery order and risk U.S. sanctions ranging from monetary costs to adverse inference jury instructions[6] to default judgments. The current state of jurisprudence in this regard, then, is inconsistent with promotion of rule of law, as it facilitates violation of law, either abroad or here.

In a time in which the world has, in the words of the author Thomas L. Friedman, become "flatter,"[7] that is, more closely connected over shorter time-distances than at any previous point in its history, failure to give—or to appear to give—due recognition to the concerns of privacy and data protection of other nations can result in a host of negative consequences. The courts of other countries may take a similarly hardened view of U.S. laws and regulations to the detriment of U.S. litigants in their courts. Rulings by courts here and abroad that may be seen as parochial or insufficiently accommodating of interests and mores of other legal regimes could stymie the growth of global commerce, including the cross-border movement of personnel and the hiring of local employees.

This resolution seeks to restore the true balancing function of *Aerospatiale* by urging federal and state courts to carefully consider, and appropriately respect, the Data Protection and Privacy laws of foreign countries as they concern the disclosures of data subject to protection by the laws of those countries.

## II. Overview of the Issue

In practice, U.S. courts rarely take cognizance of foreign privacy statutes (including data privacy laws and bank secrecy legislation, as well as the so-called "blocking" statutes) in a manner that might delay, limit or preclude pre-trial discovery. A litigant who, concerned about violation of privacy and data protection laws in countries with applicable jurisdiction, declines to follow the U.S. discovery order to produce the data or documents may face severe sanctions that can result in the imposition of costs or other penalties that can lead to loss of the case.[8]

---

[5] *See, e.g., In re Advocat Christopher X*, Cour de Cassation, Chambre Criminelle, Paris, Dec. 12, 2007, No. 07-83228.(conviction for violation of France's Blocking Statute and imposition of monetary fine affirmed).
[6] In instructing a jury on an adverse inference, the court advised the jurors that they may presume that the information not produced at trial would be adverse to the position of the party who had the responsibility to produce it. *See Zubulake v. UBS Warburg LLC ("Zubulake IV")*, 220 F.R.D. 212, 219-222 (S.D.N.Y. 2003).
[7] Friedman, Thomas L., *The World Is Flat* (Metropolitan Books 2007).
[8] See *Lyondell-Citgo Refining, LP v. Petroleos de Venezuela, S.A*, 2005 WL 1026461 (S.D.N.Y. 2005), in which the defendant, faced with a court order to produce minutes of a meeting of the Board of Directors, which would have violated Venezuela's Special Law Against Information Systems Crimes, as the minutes evidenced the locations of named individuals (Directors) at a location and on a date certain, accepted an adverse inference instruction. Violation of The Special Law Against Systems Crimes entailed criminal sanctions. See also *United States v. Vetco*, 691 F.2d 1281 (9th Cir. 1981); *Richmark Corp. v. Timber Falling Consultants,* 959 F.2d 1468 (9th Cir. 1992). *Cf., Zubulake v. UBS Warburg, LLC,* 229 F.R.D. 422 (S.D.N.Y. 2004) *("Zubulake V),* the trial court denied a motion to set aside the verdict of a jury in a gender discrimination matter had awarded $29.3 million in less then thirty minutes, following an adverse inference instruction. See also *The Pension Committee of the University of Montreal Pension Plan, et. al. v. Banc of America Securities, LLC*, et. al., No. 05 Civ. 9016, 2010 U.S. Dist. LEXIS 4546, at *1-2 (S.D.N.Y. Jan. 15, 2010) (Amended Order); *Qualcomm v. Broadcom,* 2008 WL 66932 (S.D. Cal. Jan. 7, 2008)

At least one court has recognized that there is another way. In the 2001 case of *In re Vitamins Litigation*,[9] the court crafted a means by which it would work with the parties to "safeguard defendants from liability" under Swiss and German law, while at the same time assessing the potential harm to plaintiffs if production of the information were to be denied.[10] Most U.S. courts, though, reflexively default to the perceived procedural needs of the litigation over the potential risks to the litigants under foreign privacy and data protection laws. Global commerce has advanced considerably since 2001, making the need for such balanced solutions as urged by this resolution that much more imperative.

Understanding the nature of the conflict between expansive U.S. notions of discovery in civil litigation (on the one hand) and restrictive concepts of data protection under foreign law (on the other) requires a grasp of the fundamental legal, historic and cultural national interests at stake. Critical to the dispute over data flow and disclosure is the notion of privacy. A right to privacy is explicitly enshrined in the constitutions of countries as diverse as Belgium, Japan, and Brazil. For European counties, in particular, the notion of privacy is bound up with human rights principles, in particular under the *European Convention for the Protection of Human Rights and Fundamental Rights*, as it has been interpreted by the European Court of Human Rights in Strasbourg,[11] and the *Charter of Fundamental Rights of the European Union*[12]

For European Union Member States, data protection and privacy legislation must comply with *Directive 95/46/EC of the European Parliament and of the Council on the Protection of Individuals with Regard to the Processing of Personal Data and on the Free Movement of Such Data* (hereafter the "Directive"). The Directive, and the opinions of the bodies charged with interpreting and implementing it, such as the EC Article 29 Working Party on Data Protection, clearly reflect the primacy of individual privacy. The Directive binds EU Member States and establishes a "floor" for privacy.[13] E.U. Member States may enact enabling legislation that is stricter than the Directive, and many have done so. In addition, many jurisdictions outside the E.U. have adopted the Directive in part, or have modeled their laws upon the EC Privacy Directive to a significant degree.[14] Thus, the EC Privacy Directive is a good place to begin this analysis.

---

($6,000,000 costs assessed, adverse inference instruction given, patents sued upon held unenforceable due to discovery abuses, and attorneys referred for discipline for failure to produce emails as directed by court).
[9] No. 99-197TFH, 2001 WL 1049433 (D.D.C. June 20, 2001).
[10] *Sedona Framework* at 24.
[11] Article 8 of the European Convention for the Protection of Human Rights and Fundamental Freedoms explicitly recognizes that "[e]veryone has the right to respect for his private and family life, his home and his correspondence" and that "[t]here shall be no interference by a public authority with the exercise of this right except such as is in accordance with the law and is necessary in a democratic society in the interests of national security, public safety or the economic well-being of the country, for the prevention of disorder or crime, for the protection of health or morals, or for the protection of the rights and freedoms of others." These provisions have been interpreted and applied by the European Court of Human Rights in a number of significant cases, including in the field of data protection. See generally http://www.echr.coe.int/echr/homepage_EN.
[12] Art. 8(1): "Everyone has the right to the protection of personal data concerning him or her." See generally www.europarl.europa.**eu/charter**/pdf/text_en.pdf
[13] Correspondingly, HIPAA provides a minimal standard for medical privacy protection in the United States.
[14] Privacy and data protection laws in many parts of the world are, to greater or lesser degrees, modeled on the European Union Privacy Directives. *See, e.g.*, Chile, *Law for the Protection of Private Life* (Law 19,628 1999); Argentina: *Law for the Protection of Personal Data* (Law 25,321 2000); Japan: *Personal Information Protection Act* (Law n. 25,326 2000); *Personal Information Protection and Electronic Documents Act*, S.C. 2000 Ch. 5 (Can). *Sedona Framework, supra* note 43, at 3-4.

**103**

Three relevant factors bear emphasis. First, the definition of "Personal Data" protected under the EC Privacy Directive is broad, covering any data that may be traced to an identifiable person.[15] E-mail, the most sought form of electronic evidence in litigation and arbitration, is considered "Personal Data" by the European Commission, and subject to all restrictions on transfer in the Directive and Member States' enabling legislation, including the possibility of criminal sanctions.[16] Second, under the Directive, Personal Data may not be transferred beyond the European Economic Area (the E.U. Member States plus Switzerland, Norway, Iceland and Liechtenstein) to a country with lesser standards of Personal Data protection without consent of the data subject, unless certain protections are in place, such as those afforded by the U.S. Safe Harbor Program (which was painstakingly negotiated with E.U. authorities) or in Model Clauses approved by all E.U. Member States in data transfer agreements.[17] Currently, the European Commission considers only five countries to have acceptable standards of data protection and privacy, and the United States is not among them.[18] Third, a number of EU Member States have enacted "blocking statutes" specifically preventing the transfer of certain categories of data for use in foreign judicial proceedings (discussed in greater detail below). Some of these provisions carry criminal sanctions.[19]

To take another example of the primacy of privacy beyond the United States, Canadian law takes a much more expansive view of privacy than does U.S. law. To illustrate, a Canadian business desiring to film its parking lot for security purposes would have to implement a plan that limits the individuals with access to the film to security personnel and select others, limits the use to security purposes, provides for a limited retention period, and so forth.[20] Uses exceeding those in the plan could subject the collecting parties to liability under Canadian laws. Privacy laws in Canada exist at both the federal and provincial levels of government. There are two federal privacy statutes: the Privacy Act[21], which is intended to protect the privacy of personal information held by government agencies, and the Personal Information Protection and

---

[15] EU Data Protection Directive defines personal data as "any information relating to an identified or identifiable natural person ('data subject'); an identifiable person is one who can be identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to his physical, physiological, mental, economic, cultural or social identity." *See Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995* on the protection of individuals with regard to the processing of personal data and on the free movement of such data, Official Journal L 281, 23/11/1995 P. 0031– 0050, available in English at http://eurlex.europa.eu/LexUriServ/LexUriServ.do?uri=CELEX:31995L0046:EN:HTML (hereinafter "the Directive").

[16] *See, e.g.,* Italy: Italian Law 196/2003.

[17] Neither the U.S. Safe Harbor Program nor the Model Clauses in data transfer agreements permit onward transfer or Personal Data, such as to courts or counsel.

[18] Countries considered to have equivalent standards of privacy are Argentina, Canada, Israel, Switzerland, and Uruguay.

[19] *See, e.g.,* Switzerland: Swiss Penal Code Articles 271 and 273. Privacy laws carry criminal penalties outside the European Union. See *Lyondell-Citgo Refining, LP v. Petroleos de Venezuela, S.A*, 2005 WL 1026461 (S.D.N.Y. 2005), in which the defendant, faced with a court order to produce minutes of a meeting of the Board of Directors, which would have violated Venezuela's Special Law Against Information Systems Crimes, as the minutes evidenced the locations of named individuals (Directors) at a location and on a date certain, accepted an adverse inference instruction. Violation of The Special Law Against Systems Crimes entailed criminal sanctions.

[20] Guidance on Covert Video Surveillance in the Private Sector, http://www.priv.gc.ca/information/pub/gd_cvs_20090527_e.cfm.

[21] Privacy Act, R.S.C, 1985, c. P-21, http://laws-lois.justice.gc.ca/eng/acts/P-21/index.html.

Electronic Documents Act[22] ("PIPEDA"), which is intended to protect the privacy of personal information held by non-governmental organizations.[23] "Personal information" is defined under PIPEDA as "information about an identifiable individual, but does not include the name, title or business address or telephone number of an employee of an organization."[24]

The combined effect of these kinds of restrictions on parties in U.S. litigation can be significant. The whipsaw of competing requirements engendered by discovery demands to foreign litigants in U.S. courts, or those with non-U.S. data, can subject to them to the Hobson's Choice that may lead them to ask the following question, when faced with a U.S. court order requiring production in litigation: "Do you prefer I go to jail here, or there?"

Yet another key element in the conflict over data transfers for litigation is the fundamental distinction in the role of pretrial information exchange in civil law countries versus common-law jurisdictions. The scope of pre-trial discovery under U.S. law is as wide as it is deep, even permitting discovery of evidence that is not necessarily admissible and may never see the light of a courtroom. In civil jurisdictions, parties exchange electronic data and paper documents in a process known as "Disclosure." The court directs each party to disclose materials that support its case or, in some instances, the adversary's case. This information most often is stated with significant specificity.

There have been attempts in Europe to accommodate U.S interests, in the interest of international comity and facilitating global commerce. *Derogations,* or exceptions, exist in most civil law jurisdictions, and common-law countries to permit the transfer of Personal Data for U.S. litigation as long as it is conducted through the process specified in the country's laws, such as enabling legislation for the Hague Convention on the Taking of Evidence Abroad.[25] This treaty was the factual predicate for the Court's consideration in *Aerospatiale.* The Hague Convention instituted a uniform procedure for the issuance of "letters of request" (a/k/a "letters rogatory"). Letters of request are petitions from a court in one nation to a designated central authority in another, requesting assistance from that authority in obtaining relevant information located within its borders. France, in particular, has instituted an expedited consideration procedure under Article 2 of the Hague Convention to handle requests for pre-trial discovery.[26]

In 2008, the EC Article 29 Working Party on Data Protection published Working Document WP158, in which the needs of data transfer for U.S. litigation were explicitly recognized, and a procedure was set forth for culling Personal Data to be transferred and filtering it for sensitive information and data that are not relevant to the claims in the U.S. lawsuit. In this way, the Working Party explained, the interests of U.S. litigation could be accommodated, while the intrusion on the privacy of the data subjects could be minimized.[27] In 2009, the French data

---

[22] Personal Information and Electronic Documents Act, S.C. 2000, c.5 ("PIPEDA"), http://laws-lois.justice.gc.ca/eng/acts/P-8.6/index.html.
[23] Links to the various provincial privacy laws are available on the website of Office of the Privacy Commissioner of Canada, .http://www.priv.gc.ca/resource/prov/index_e.cfm.
[24] PIPEDA, Section 2, http://laws-lois.justice.gc.ca/eng/acts/P-8.6/FullText.html.
[25] *Hague Evidence Convention on the Taking of Evidence Abroad in Civil or Commercial Matters*, Mar. 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, 847 U.N.T.S. 231 (1972) (hereinafter "Hague Evidence Convention").
[26] Articles 733 through 748 of the *Nouveau Code de Procedure Civile.*
[27] European Union Article 29 Data Protection Working Party, Working Document 1/2009 on Pre-trial Discovery for Cross Border Civil Litigation 8 (WP 158, 2009), available at

5

protection authority, the CNIL, published an opinion in which it, too, acknowledged the necessity of Personal Data transfers for U.S. litigation, and set forth the means by which the disclosures could take place in accordance with French law.[28]

Nonetheless, U.S. courts "have generally rejected the interests of civil law jurisdictions in protecting their data from U.S.-based discovery."[29] Even where a need for privacy and confidentiality is recognized, federal and state judges tend to rely on protective orders and confidentiality stipulations to protect privacy and secrecy. While "attorneys' eyes only" provisions are familiar here, they are foreign to non-U.S. litigants and are viewed with suspicion, at the least. That suspicion is not unwarranted: given the preeminence that U.S. courts ascribe to the custom of "open courts," the protected information, whether or not subject to a protective order or a confidentiality stipulation, would become public if attached as exhibits to a publicly-filed motion, or introduced into evidence at trial. Accordingly, such orders and agreements do not necessarily reassure the holders of non-U.S. information that is subject to protection that confidentiality will be assured or that the non-disclosure requirements of the home country will be honored.

### III.     The Problem In U.S. Courts

In practice, U.S. courts rarely enforce the prohibitions of foreign privacy statutes (including data privacy laws and bank secrecy legislation, as well as the so-called "blocking" statutes) in a manner that would preclude or limit pre-trial discovery sought pursuant to the Federal Rules of Civil Procedure.[30] When U.S. courts have stayed production or ordered litigants to resort to other means to seek production (*e.g.*, under the Hague Evidence Convention), it is typically because they have concluded that (1) the information is not important to the case or is available elsewhere; (2) the producing party likely would face criminal prosecution for producing the information; (3) the foreign country's interest in protecting its information is vitally important; or, (4) more likely, a combination of all of these considerations.[31]

In considering the risk of hardship to the producing party, U.S. courts tend to consider insufficient the fact that production of the information would be illegal in the foreign country and, instead, require a strong indication that hardship would *in fact* result in the particular case.[32]

---

http://ec.europa.eu/justice_home/fs/privacy/index_en.htm (hereinafter "E.U. Working Document"). The Working Document also stated, however, that the derogation in Articles 7 (c) and 7(f) for disclosures of personal information in compliance with a legal obligation may not apply to obligations imposed by non-E.U. states. *Id.* at 9.

[28] *Délibération n°2009-474 du 23 juillet 2009 portant recommandation en matière de transfert de données à caractère personnel dans le cadre de procédures judiciaires américaines dites de "Discovery."* [Opinion No. 2009-474 of July 23, 2009, Making Recommendations about the Transfer of Personal Data in American Discovery Proceedings.] available in English at http://www.cnil.fr/english.

[29] *Sedona Framework* at 17.

[30] *See* James Chalmers, *The Hague Evidence Convention and Discovery Inter Partes: Trial Court Decisions Post-Aérospatiale*, 8 Tul. J. Int'l & Comp. L. 189, 190-91 (2000); Jenia Iontcheva, *Sovereignty on our Terms*, 110 YLJ 885, 887 (2001); *see also*, *Hagenbuch v. 3B6 Sistemi Elettronici Industriali S.R.L.*, No. 04 C 3109, 2005 U.S. Dist. LEXIS 20049, *17-18 (N.D. Ill. Sept. 12, 2005).

[31] *See, e.g., In re Westinghouse Elec. Corp. Uranium Contracts Litigation*, 563 F.2d 992, 998-99 (10th Cir. 1977); *cf. In re Baycol Products Litigation*, 348 F.Supp.2d 1058, 1059-61 (D. Minn. 2004) (holding Hague Convention procedure applied because Convention was only way to obtain requested discovery and foreign law did not necessarily prohibit such discovery); Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197 (1958).

[32] *See Cochran Consulting, Inc.* v. *Uwatec USA, Inc.*, 102 F.3d 1224, 1231 (Fed. Cir. 1996).

In assessing the competing interests of the relevant jurisdictions, U.S. courts frequently conclude that, while a foreign country's general interest in protecting information of its nationals is legitimate, it does not suffice to preclude or restrict production.

There are several types of non-United States legislation to which a litigant might be subject in responding to discovery requests in connection with proceedings in the United States, including blocking statutes, data privacy legislation, and bank secrecy laws.[33] Ultimately, however, U.S. courts rarely sustain an argument that these laws limit or excuse compliance with a discovery request under U.S. procedures, such as the Federal Rules of Civil Procedure.[34]

### A.    Discovery "Blocking" Statutes Around the Globe

U.S. courts typically use the term "blocking statute" to refer to foreign laws that limit or prevent disclosure in connection with proceedings in other jurisdictions of documents and information located in the foreign country.[35] Various countries have enacted some form of "blocking" statutes, including Australia, Canada, France, Japan, Sweden, The Netherlands, the United Kingdom, and Japan.[36] The most restrictive of these may be the French blocking statute, French Penal Code law No. 80-538 of July 16, 1980. The statute prohibits "any person to request, to investigate or to communicate in writing, orally or by any other means, documents or information relating to economic, commercial, industrial, financial or technical matters leading to the establishment of proof with a view to foreign administrative or judicial proceedings or as a

---

[33] There is a host of other foreign laws that restrict the collection or distribution of information under various circumstances. Some courts refer to these laws as blocking statutes; but, unlike the blocking statutes discussed below, they are not designed merely to block discovery in connection with foreign legal proceedings, but rather were enacted for some other purpose. *See, e.g., Reinsurance Co. of America, Inc.* v. *Administratia Asigurarilor de Stat*, 902 F.2d 1275 (7th Cir. 1990) (discussing a Romanian service secrets law); *Richmark Corp.* v. *Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992) (considering a Chinese state secrets act); *In re Westinghouse Elec. Corp. Uranium Contracts Litig.*, 563 F.2d 992, 998-99 (10th Cir. 1977) (discussing a Canadian law regulating the dissemination of information relating to nuclear energy). Courts tend to employ the same analytical criteria to assess efforts to invoke these protections in response to discovery requests in United States litigation as they employ to adjudicate challenges to discovery requests under the types of legislation discussed below. *See, e.g., Richmark*, 959 F.2d at 1474-75. As a result, as in the case of challenges based on blocking statutes, data privacy laws and bank secrecy legislation, U.S. courts tend to order production despite the prohibitions of these other types of privacy statutes. *See Richmark Corp.*, 959 F.2d at 1475-78; *U.S. v. Vetco, 691 F.2d 1281, 1287 (9th Cir. 1981)*; *Alfadda v. Fenn, 149 F.R.D. 28, 40 (S.D.N.Y. 1993)*; *Reino De Espana* v. *American Bureau of Shipping*, 2005 WL 1813017, No. 03-CIV-3573 (LTS/RLE), at *9 (S.D.N.Y. August 1, 2005).

[34] *See* James Chalmers*, The Hague Evidence Convention and Discovery Inter Partes: Trial Court Decisions Post-Aérospatiale*, 8 Tul. J. Int'l & Comp. L. 189, 190-91 (2000); Jenia Iontcheva, *Sovereignty on our Terms*, 110 YLJ 885, 887 (2001).

[35] *See* The Sedona Conference, *Framework for Analysis of Cross-Border Discovery Conflicts*, 17-22 (2008). In recent years, some courts have referred to any foreign statute that regulates the collection and dissemination of data as a "blocking statute," although this is not technically correct. *See* Joe Baker, *District Court Orders Production Despite German Data Protection Act,* Georgetown Law Center E-Discovery Blog, http://www.law.georgetown.edu/cleblog/post.cfm/district-court-orders-production-despite-german-data-protection-act (March 18, 2001).

[36] *See* Marc J. Gottridge and Thomas Rouhette, *Blocking Statutes Bring Discovery Woes*, N.Y. Law Journal, n.6 (April 30, 2008).

part of such proceedings."[37] Violations of this statute can be punished by imprisonment for up to six months and a fine of up to €18,000.[38]

Punishment under the French blocking statute had been considered rare. However a criminal conviction has brought new attention to the risks of ignoring that law. In 2007, a French lawyer was convicted of, and fined €10,000 for, violating the blocking statute in connection with discovery in proceedings involving the California Insurance Commissioner.[39] Courts in the United States nevertheless continue to hold that the risk of prosecution under the French blocking statute is not significant.[40] In *In re Global Power Equipment Group Inc.*, the court nonetheless held that the risk of prosecution under the French blocking statute was not significant. While the responding party identified one case (*Christopher X*) in which the French blocking statue had been used to prosecute a French national for engaging in discovery without following the Hague Convention, it had, according to the court, identified only *one* case.[41]

### B. United States Courts' Analysis of Conflicts Between U.S. Discovery Requirements and Foreign Discovery and Blocking Statutes

Discovery in civil proceedings in the federal courts in the United States is governed primarily by the Federal Rules of Civil Procedure.[42] Those discovery requirements are considered among the most extensive of the pre-suit disclosure requirements of any jurisdiction.[43] This broad scope of discovery can conflict with foreign privacy, data protection or "blocking" statutes. Litigants subject to obligations under both U.S. discovery requirements and disclosure restrictions under the laws of other jurisdictions may apply to the U.S. court to limit or excuse compliance with aspects of the U.S. discovery procedures or to conduct discovery under alternative procedures, such as the Hague Convention. Yet U. S. courts have, for the most part, have defaulted to the Federal Rules of Civil Procedure in a manner not entirely consistent with the requirements of the *Aeropsatiale* balancing test.

The *Aerospatiale* Court observed that "the concept of international comity requires in this context a more particularized analysis of the respective interests of the foreign nation and the requesting nation than petitioners' proposed general rule [mandating resort to Hague Convention procedures in the first instance] would generate."[44] The Court held that, in conducting this analysis, courts should give appropriate deference to relevant legislation and particularities of other jurisdictions:

---

[37] Bates C. Toms III, *The French Response to the Extraterritorial Application of United States Antitrust Laws*, 15 Int'l L. 585 (1981); *Soletanche & Rodio, Inc.* v. *Brown & Lambrecht Earth Movers, Inc.*, 99 F.R.D. 269, 273−74 (N.D. Ill. 1983).
[38] *See id.*
[39] *See In re Advocat Christopher X*, Cour de Cassation, Chambre Criminelle, Paris, Dec. 12, 2007, No. 07-83228.
[40] *See In re Global Power Equipment Group Inc.*, 2009 WL 3464212 at *15.
[41] *Id.*
[42] *See In re Automotive Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 300 (3d Cir. 2004).
[43] *See* Rule 26(b)(1), Fed.R.Civ.P. ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.").
[44] Société Nationale Industrielle Aérospatiale and Société de Construction d'Avions de Tourisme v. United States District Court for the Southern District of Iowa, 482 U.S. 522 at 543-44 (1987) (notes omitted).

> American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position. . . . In addition, we have long recognized the demands of comity in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation. . . . *American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state*. (emphasis supplied).[45]

The *Aerospatiale* decision identified certain criteria as relevant to this comity analysis, referring to the considerations set out in the *Restatement of Foreign Relations Law of the United States* (Revised) § 437(1)(c).[46] Those considerations include: (1) The importance to the litigation of the information requested; (2) the specificity of the request; (3) whether the information originated in the United States; (4) whether alternative means exist to obtain the information; and (5) whether the interests of the United States outweigh the interests of the foreign jurisdictions in maintaining confidentiality.[47] The party opposing discovery bears the burden of proof on these considerations.[48] U.S. courts often have added a factor to this test to address the potential hardship that a producing party might suffer from compliance with the discovery requests.[49]

Notwithstanding these factors, and the Supreme Court's admonition in *Aerospatiale* that courts should assess carefully the competing interests of the relevant jurisdictions, in practice, courts in the United States rarely uphold the requirements of a foreign "blocking" statute to prohibit or limit production pursuant to discovery requests under the Federal Rules of Civil Procedure.[50] Frequently, the courts' rationale is that foreign discovery "blocking" statutes are overly broad and designed to thwart American-style discovery.[51] Some courts, though, have, applied the

---

[45] *Id.* (citing *Hilton* v. *Guyot*, 159 U.S. 113 (1895)).
[46] (Tent. Draft No. 7, 1986) (approved May 14, 1986) ("Restatement").
[47] *See id.* at 544 n.28. *See also Richmark Corp.* v. *Timber Falling Consultants*, 959 F.2d 1468, 1474-75 (9th Cir. 1992) (noting that *Aerospatiale* endorsed this non-exhaustive test based on the Restatement).
[48] *See Strauss* v. *Credit Lyonnais, S.A.*, 249 F.R.D. 429, 435 (E.D.N.Y. 2008); *In re Perrier Bottled Water Litig.*, 138 F.R.D. 348, 354 (D. Conn. 1991).
[49] *See id. (*citing *U.S.* v. *Vetco*, 691 F.2d 1281, 1289-90 (9th Cit. 1981)) (describing several factors taken into account by the 9th Circuit.); *In re Air Cargo Shipping Servs. Antitrust Litig.*, -- F.R.D. --, 2010 WL 1189341, No. 06-MD-1775, at *2 (E.D.N.Y. March 29, 2010).
[50] *See, e.g., In re Air Cargo Shipping Servs.*, 2010 WL 1189341 at *3-4; *In re Global Power Equipment Group Inc.*, 2009 WL 3464212 at *1, *16; *Bodner* v. *Paribas*, 202 F.R.D. 370, 375 (E.D.N.Y. 2000); *MeadWestvaco Corp.* v. *Rexam PLC*, 2010 WL 5574325, No. 1:10cv511 (GBL/TRJ), at *2 (E.D. Va. December 14, 2010); *Remington*, 107 F.R.D. at 644.
[51] *See MeadWestvaco Corp.*, 2010 WL 5574325 at *2 (concluding that that the French blocking statute is "overly broad and vague" and finding that it should not be afforded much deference); *Bodner*, 202 F.R.D. at 375 ("as held by numerous courts, the French Blocking Statute does not subject defendants to a realistic risk of prosecution, and cannot be construed as a law intended to universally govern the conduct of litigation within the jurisdiction of a United States court."); *In re Global Power Equipment Group Inc.*, 2009 WL 3464212 at *15-16 (compelling discovery pursuant to the Federal Rules of Civil Procedure and holding that the French Blocking Statute "does not subject defendants to a realistic risk of prosecution"); *In re Air Cargo Shipping Servs.*, 2010 WL 1189341 at *3-4 (declining to provide protection mandated by the French "blocking" statute even though there was no bad faith on the part of the producing party and there existed a risk of prosecution by the French government because of the importance of the requested documents to the outcome of the case, the occurrence of only one prosecution under the French statute and the prior production of similar information U.S. courts).

**103**

Hague Convention procedures.[52] In addition, a New Jersey court has held that courts should apply the Hague Convention before invoking state or federal procedural rules if a party opts to seek discovery pursuant to Hague Convention procedures, unless compliance will cause undue prejudice.[53]

### (a)    Balancing of National Interests

U.S. courts often state that they consider as the most important factor in the Restatement test the balancing of national interests.[54] When analyzing blocking statutes, however, courts tend to conclude that this factor weighs heavily in favor of unrestrained enforcement of the discovery requests because of the courts' view that the *raison d'être* of "blocking" statutes is to protect foreign nationals from discovery in external proceedings.[55] In contrast, U.S. courts tend to describe the competing United States interest in terms of allowing the orderly resolution of disputes, vindicating the rights of plaintiffs, or enforcing United States law and to find that interest to be controlling in the resolution of the discovery dispute.[56]

This resolution seeks to provide guidance to courts by urging them to give consideration to the national interests behind the non-U.S. statutes and weigh them in the manner the Supreme Court directed in *Aerospatiale*. The result of a failure to do so may impede the orderly flow of electronic commerce between nations by, among other things, provoking non-U.S. courts to harden their attitude with regard to the application of U.S. law.[57]

### (b)    Importance of Documents to the Case

When analyzing the importance of the documents to the matter, "where the outcome of litigation does not stand or fall on the present discovery order, or where the evidence sought is cumulative of existing evidence, courts have generally been unwilling to override foreign secrecy laws."[58] Yet, when courts consider the evidence to be "directly relevant" to the case, they generally conclude that this factor weighs in favor of production.[59] It is predictable that courts will apply this reasoning in many civil litigation contexts, such as employment discrimination cases, commercial contract disputes or Foreign Corrupt Practices Act litigation.

---

[52] *See In re Perrier Bottled Water Litig.*, 138 F.R.D. 348 (D. Conn. 1991) (granting a protective order directing the application of the procedures set forth in the Hague Convention).

[53] *See Husa v. Laboratoiries Servier S.A.*, 326 N.J. Super. 150, 152, 156, 158 (App. Div. 1999) (reversing the trial court's decision not to use the Hague Convention procedures where the plaintiffs sought to take the depositions of individuals living in France).

[54] *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 1189341 at *4.

[55] *See id*; *Remington Prods., Inc. v. N. Amer. Philips Corp.*, 107 F.R.D. 642, 651 (D.C. Conn. 1985).

[56] *See In re Air Cargo Shipping Servs.*, 2010 WL 1189341 at *2 (characterizing the interest of the United States as enforcing antitrust laws, which are "essential to the country's interests in a competitive economy."); *In re Global Power Equipment Group Inc.*, 2009 WL 3464212 at *14 (holding that the United States has a substantial interest in "the prompt, economical and orderly administration of its bankruptcy cases"); *Richmark*, 959 F.2d at 1477 (finding that the United States' interest was in vindicating the rights of plaintiffs and enforcing the judgments of U.S. courts).

[57] See, ABA Resolution 113A Report and Recommendation, available at http://www.americanbar.org/content/dam/aba/administrative/house_of_delegates/resolutions/2011_hod_annual_meeting_113a.authcheckdam.doc; Resolution approved at http://www.americanbar.org/content/dam/aba/administrative/house_of_delegates/resolutions/2011_hod_annual_meeting_daily_journal_FINAL.authcheckdam.pdf. *See also,* Mackinnon v. Donaldson, [1986] Ch. 482, 494 (Justice Hoffman for the court: "If you join the game you must play according to local rules."

[58] *Richmark Corp.*, 959 F.2d at 1475; *see also In re Westinghouse Elec. Corp. Uranium Contracts Litigation*, 563 F.2d at 999.

[59] *See, e.g., In re Global Power Equipment Group Inc.*, 2009 WL 3464212 at *13, *16; *Richmark*, 959 F.2d at 1475.

### (c) Specificity of the Request

In assessing the specificity of the disputed requests, courts tend to look more favorably on specific, rather than generalized, requests for information.[60] However, even if a large amount of information is requested, U.S. courts generally will require compliance with the requests, if the courts consider them limited in time or scope,[61] despite the second *Aerospatiale* criterion that courts should consider the *specificity of the request* in deciding whether to apply non-U.S. law.[62]

### (d) Location of the Information

In analyzing the factor of the location of information, courts typically will look to whether the requested information is located only within the foreign country, and whether it originated there.[63] The courts also may consider the location of the individual or entity with custody or control of the information.[64]

### (e) Alternate Means of Obtaining the Information

In determining whether there is an alternate means of obtaining the information, U.S. courts generally look to whether the information can be easily obtained elsewhere without violating foreign law.[65] In the Ninth Circuit, courts have specified that they will consider as an appropriate alternative only those sources that yield information that is "substantially equivalent" to the requested production.[66]

### (f) Hardship to the Producing Party

U.S. courts have been inconsistent in requiring compliance with a discovery request if it would expose the producing party to criminal penalties in a foreign country.[67] If there has never or seldom been a prosecution under the "blocking" statute, a court likely will not hold that this factor favors enforcing a prohibition on, or limitation of, the requested production.[68] U.S. courts have considered more seriously specific circumstances that indicate that the party likely would suffer punishment from compliance with the disputed discovery requests[69], though in one case a defendant faced with almost certain prosecution was left with no practical choice but to decline to follow the court's production and order and, instead, to accept the sanction of an adverse inference instruction.[70] The current resolution seeks to redress this unfortunate situation by urging courts to take appropriate consideration of the jeopardy in which a failure to apply foreign data protection law may place a litigant.

---

[60] *See Richmark*, 959 F.2d at 1475.

[61] *See id.*

[62] Notes 59-61, *supra*.

[63] *See id.*; *Reinsurance Co. of America* v. *Administratia Asigurarilor de Stat*, 902 F.2d 1275, 1281 (7th Cir. 1990).

[64] *See In re Global Power Equipment Group Inc.*, 2009 WL 3464212 at *13.

[65] *See Richmark Corp.*, 959 F.2d at 1475.

[66] *See Id*; *Vetco*, 691 F.2d at 1290.

[67] *See Richmark*, 959 F.2d at 1477; *Reinsurance Co. of America, Inc.*, 902 F.2d at 1280 (noting that hardship should be considered when determining whether to enforce production).

[68] *See In re* Air Cargo Shipping Servs., 2010 WL 1189341 at *3 (noting that the French "blocking" statute has been used to prosecute only one individual, under distinguishable circumstances that did not involve a U.S. court order for discovery); *In re Global Power Equipment Group Inc.*, 2009 WL 3464212 at *15 (holding that the risk of prosecution under the French blocking statute was not significant because the responding party identified only one case, *Christopher X*, in which it had been used); *Remington*, 107 F.R.D. at 647 (noting that the Dutch blocking statute had never resulted in a prosecution).

[69] *See Cochran Consulting, Inc.* v. *Uwatec USA, Inc.*, 102 F.3d 1224, 1231 (Fed. Cir. 1996) (declining to require discovery, in part, because "the threat of Swiss sanctions was explicit.").

[70] *Lyondell-Citgo Refining, LP v. Petroleos de Venezuela* 2005 WL 1026461 (S.D.N.Y. 2005); *See also* note 13, *infra*.

11

IV.     **Data Privacy Statutes**

Data privacy statutes are laws enacted by governments to protect certain types of personal information.[71] For example, in the EU Data Protection Directive of 1995, the European Union requires that all member states enact laws protecting the collection, processing and dissemination of data outside of the EU.[72] This directive limits the ability of litigants even to preserve information for compliance with discovery requests, let alone disclose that information, in United States litigation.

U.S. courts typically analyze applicability of foreign data privacy law to discovery requests under the Federal Rules of Civil Procedure under the same balancing approach that they use in adjudicating efforts to invoke the protections of "blocking" statutes.[73] One could argue, however, that U.S. courts should give more deference to foreign legislation in balancing the national interests underpinning data protection statutes than they do in assessing requested recognition in U.S. litigation of discovery "blocking" statutes, and some courts have done so.[74]

   A.     **U.S. Court Decisions Regarding Data Privacy Statutes**

Yet, the relatively sparse case law indicating respect for foreign data privacy law still reflects an aversion to foreign data privacy statutes and an inclination by United States courts to order traditional discovery even when it conflicts with that legislation.[75] In at least one case, however, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation* the court was willing to block discovery based upon a balancing of national interests. Plaintiffs in *Payment Card* alleged that certain companies had engaged in activities in the United States that violated American antitrust laws, and sought discovery of materials held by the defendants that were produced during a European Union investigation for similar antitrust violations in the EU by the same companies.[76] The EU agency instructed the defendants not to release this material and intervened as *amicus curiae*, arguing that such materials had to be kept confidential to encourage cooperation and honesty in future investigations.[77] Siding with the defendants and the EU

---

[71] *See* Colleen Conry and Shannon Capone Kirk, *Discovery Double-Bind: Compliance With US Discovery Obligations and Foreign Data Privacy Laws*, Third International Pharmaceutical Regulatory and Compliance Congress and Best Practices Forum, Rome (May 2009).

[72] *See* Directive 95/46/EC of the European Parliament and of the Council on the Protection of Individuals with Regard to the Processing of Personal Data and on the Free Movement of Such Data (October 24, 1995).

[73] *See, e.g.*, *In re Vitamins Antitrust Litig.*, 2001 WL 1049433, No. 99–197 (TFH), at *4-5 (D.D.C. June 20, 2001) (applying Restatement standard to adjudicate applicability of German and Swiss data protection laws to Federal Rules of Civil Procedure); *Columbia Pictures Indus.* v. *Bunnell*, 2007 WL 2080419, No. CV 06-1093 (FMC/JCX), at *12 (C.D. Cal. May 29, 2007) (ordering production of server logs potentially in violation of a Dutch data privacy statute because of the importance of the documents to the case and a lack of alternate means to obtain the information).

[74] *See Volkswagen, A.G.* v. *Valdez*, 909 S.W.2d 900, 902 (Tex. 1995) (noting that German privacy rights are considered by some "equal in rank to the right of freedom of speech" and finding that the trial court abused its discretion in ordering production in violation of German law); *In re Vitamins*, 2001 WL 1049433 at *14 (opining that "the Court must carefully consider the sovereign interests" at issue).

[75] *See* James Chalmers, *The Hague Evidence Convention and Discovery Inter Partes: Trial Court Decisions Post-Aérospatiale*, 8 Tul. J. Int'l & Comp. L. 189, 190-91 (2000); Jenia Iontcheva, *Sovereignty on our Terms*, 110 YLJ 885, 887 (2001); *Columbia Pictures Indus.*, 2007 WL 2080419 at *12-13; *In re Lernout & Hauspie Secs. Litig.*, 218 F.R.D. 348, 352-53 (D. Mass. 2003); *but see Volkswagen, A.G.* v. *Valdez*, 909 S.W.2d at 902-03.

[76] , No. 05-MD-1720 (JG)(JO), 2010 WL 3420517, *1-4 (E.D.N.Y. Aug. 27, 2010).

[77] *Id.* at *1-4, *9.

agency, the court held that the EU's "interest in confidentiality outweighs the plaintiffs' interest in discovery of the European litigation documents."[78]

V.  **Bank Secrecy Statutes**

Various countries have enacted statutes specifically designed to protect against disclosure of banking information.[79] Typically, U.S. courts invoke the same Restatement criteria in determining whether to sustain those protections in response to U.S. discovery as they apply to discovery objections premised on "blocking" statutes and data protection legislation.[80]

Some U.S. courts have recognized that protecting bank secrets can be a valid interest of a foreign country.[81] Nonetheless, in evaluating that interest courts, focus upon whether the foreign government has specifically objected to the discovery order.[82] U.S. courts also take into consideration in balancing competing interests any applicable exceptions to the foreign law and any ability of a banking customer to waive secrecy,[83] and thus frequently enforce U.S. discovery requirements over challenges predicated on foreign bank secrecy statutes.[84] For example, in one federal court decision, the court ordered production of the requested information in violation of a French bank secrecy statute, finding that the documents potentially showing that the producing party was aware that it was assisting a terrorist organization were vital to the outcome of the case, the request was narrowly tailored, the only other way to obtain the information was through the Hague Convention, and both the United States and France have a strong interest in protecting against terrorism.[85]

---

[78] *Id.* at *9; *see also In re Rubber Chemicals*, 486 F. Supp. 2d 1078 (N.D. Cal. 2007) (reaching similar outcome to ensure integrity of EU leniency program that "allows cartel participants to confess their wrongdoing in return for prosecutorial leniency").

[79] *See, e.g., Strauss* v. *Credit Lyonnais, S.A.*, 249 F.R.D. 429, 435-36 (E.D.N.Y. 2008) (addressing French bank secrecy laws); *Minpeco, S.A.* v. *Conticommodity Servs., Inc.*, 116 F.R.D. 517, 529 (S.D.N.Y. 1987) (considering Swiss bank secrecy laws); *U.S.* v. *Davis*, 767 F.2d 1025, 1035 (2d Cir. 1985) (examining Cayman Islands law).

[80] *See, e.g., Strauss*, 249 F.R.D. at 438.

[81] *See id.* at 525; *Davis*, 767 F.2d at 1035.

[82] *See Strauss*, 249 F.R.D. at 438; *Davis*, 767 F.2d at 1035 ("The absence of any objection by the Cayman government to the subpoena and subsequent order ... is significant."); *U.S.* v. *Vetco, Inc.*, 691 F.2d at 1289 (concluding that U.S. interest in discovery outweighed interests underlying Swiss statutes because the case did not involve "a totally Swiss interest in confidentiality").

[83] *See Strauss*, 249 F.R.D. at 438; *Davis*, 767 F.2d at 1035 (noting that a Cayman Islands banking privacy statute did not "provide a blanket guarantee of privacy").

[84] *See Davis*, 767 F.2d at 1033-36; *Strauss*, 242 F.R.D. at 210-24; *Bodner*, 202 F.R.D. at 375; *In re Grand Jury Proceedings*, 532 F.2d 404, 409 (5th Cir. 1976); *Alfadda v. Fenn*, 149 F.R.D. 28, 40 (S.D.N.Y. 1993).

[85] *See Strauss*, 242 F.R.D. at 210-24. However, in balancing competing considerations, the court in *Minpeco* did not require production in conflict with Swiss bank secrecy statutes because it determined that the balance was nearly level, and a great deal of similar information had already been produced by other parties. *See Minpeco*, 116 F.R.D. at 523-38. The district court found that, although the United States had a compelling interest in enforcing its antitrust and commodities fraud statutes, compliance with the disputed discovery requests would expose the producing party to the risk of not only imprisonment, but also of administrative sanctions, including the revocation of the bank's license. Further, the Swiss government had submitted to the court written objections to the requested discovery; and the producing party was no longer a primary defendant to the case, as a result of which it could not avoid production and the consequent foreign risks by settling the litigation. *See id.* at 537. Ultimately, the court concluded that a determining factor in the balance was that the requested discovery was largely cumulative and, therefore, unnecessary because a significant amount of information already had been produced. *See id.* at 537-39.

**103**

VI. **CONCLUSION**

Privileging the interests of U.S. litigants to discovery without due regard to the requirements of the relevant foreign legislation often places parties in the perilous situation of having to choose between inconsistent legal requirements and perhaps to incur sanctions under one legal system or the other.  Permitting broad discovery in disregard or even defiance of foreign protective legislation can ultimately impede global commerce harm the interests of U.S. parties in foreign courts and provoke retaliatory measures.  The American Bar Association, in pursuit of its mission to uphold the rule of law, therefore urges U.S. courts to respect the obligations of litigants to follow *all* laws applicable to their positions in the litigation and, where possible in the context of the proceedings before them, permit compliance with non-U.S. data protection and privacy laws.

Respectfully Submitted,

Michael E. Burke, Chair
ABA Section of International Law
February 2012

**103**

# GENERAL INFORMATION FORM

Submitting Entity: Section of International Law

Submitted By: Michael E. Burke, Chair, Section of International Law

1. <u>Summary of Resolution(s)</u>.
   This Resolution requests the ABA to urge U.S. courts to take into consideration and respect non-U.S. data protection and privacy laws that affect the litigants before them concerning data that is subject to preservation, disclosure or discovery. In practice, U.S. courts rarely take cognizance of foreign privacy statutes (including data privacy laws and bank secrecy legislation, as well as the so-called "blocking" statutes) in a manner that might delay, limit or preclude pre-trial discovery. As a result a litigant who, concerned about the consequences of violation of privacy and data protection laws in countries with applicable jurisdiction, declines to follow the U.S. discovery order to produce protected data or documents may face severe sanctions that can result in the imposition of costs or other penalties that can lead to loss of the case.

   The current Resolution seeks to address the untenable Hobson's Choice in which the current state of jurisprudence, in this time of accelerating global commerce and concomitant data flows, places litigants.

2. <u>Approval by Submitting Entity</u>.
   Yes, the Section of International Law Council approved the R&R on October 15, 2011.

3. <u>Has this or a similar resolution been submitted to the House or Board previously</u>?
   We are unaware of any similar resolution that has previously been submitted to the House or Board.

4. <u>What existing Association policies are relevant to this resolution and how would they be affected by its adoption</u>?
   This Resolution does not affect any existing policies of the Association. It promotes the proper application of the well-established doctrine of comity and its approach is consistent with the approach of Resolution 113A, which was approved by the House of Delegates in August 2011, and the approach to consideration of privacy imperatives in law enforcement investigatory activities in Proposed Resolution 105.

5. <u>What urgency exists which requires action at this meeting of the House</u>?

6. <u>Status of Legislation</u>. (If applicable)
   N/A

7. <u>Brief explanation regarding plans for implementation of the policy, if adopted by the House of Delegates.</u>
Subject to consultation with the GAO and with their assistance, if the House of Delegates adopts the resolution, we would plan on sending copies of it and the report to the Judicial Conference of the United States as well as to similar U.S. state judicial conferences, as well as the American and Federal Judges Association, and similar U.S. state bodies.

8. <u>Cost to the Association</u>. (Both direct and indirect costs)
None known.

9. <u>Disclosure of Interest</u>. (If applicable)
N/A

10. <u>Referrals</u>.

    This resolution is being provided to other ABA entities for support. It is being provided to the following ABA entities for possible co-sponsorship:

    All Sections and Divisions.

11. <u>Contact Name and Address Information</u>. (Prior to the meeting)

    Kenneth N. Rashbaum, Esq.
    Chair, Data Protection and Privacy Team,
    International Litigation Committee
    Rashbaum Associates, LLC
    515 Madison Avenue, Suite 500
    New York, New York 10022
    Tel: 212-421-2823
    Fax: 212-308-7677
    krashbaum@rashbaumassociates.com

12. <u>Contact Name and Address Information</u>. (Who will present the report to the House?)

    Michael H. Byowitz
    Section Delegate to the HOD
    Wachtell Lipton Rosen & Katz
    51 West 52nd Street
    New York, Ny 10019-6119
    Tel: 212-403-1268
    Fax: 212-403-2268
    mhbyowitz@wlrk.com

# EXECUTIVE SUMMARY

1. Summary of the Resolution

This Resolution requests the ABA to urge U.S. courts to take into consideration and respect non-U.S. data protection and privacy laws that affect the litigants before them concerning data that is subject to preservation, disclosure or discovery. In practice, U.S. courts rarely take cognizance of foreign privacy statutes (including data privacy laws and bank secrecy legislation, as well as the so-called "blocking" statutes) in a manner that might delay, limit or preclude pre-trial discovery. As a result a litigant who, concerned about the consequences of violation of privacy and data protection laws in countries with applicable jurisdiction, declines to follow the U.S. discovery order to produce protected data or documents may face severe sanctions that can result in the imposition of costs or other penalties that can lead to loss of the case. The current Resolution seeks to address the untenable Hobson's Choice in which the current state of jurisprudence, in this time of accelerating global commerce and concomitant data flows, places litigants.

2. Summary of the Issue that the Resolution Addresses

U.S. courts have often misapplied the standard on application foreign data protection and privacy laws and ruled that the needs of the proceeding before them inevitably must take precedence over the privacy and data protection concerns of other nations. Litigants often face a Hobson's Choice: violate foreign law and expose themselves to enforcement proceedings that have included criminal prosecution, or choose noncompliance with a U.S. discovery order and risk U.S. sanctions ranging from monetary costs to adverse inference jury instructions to default judgments. The current state of jurisprudence in this regard, then, is inconsistent with promotion of rule of law, as it facilitates violation of law, either abroad or here. In addition permitting broad discovery in disregard or even defiance of foreign protective legislation can ultimately impede global commerce may impede the orderly flow of electronic commerce between nations by, among other things, provoking non-U.S. courts to harden their attitude with regard to the application of U.S. law.

3. Please Explain How the Proposed Policy Position will address the issue

Protecting data privacy and disclosing information for purposes of litigation and arbitration need not be mutually exclusive. Properly applied, U.S. law already provides a clear and workable standard for resolving the conflict. This resolution seeks to provide guidance to courts by urging them to give consideration to the national interests behind the non-U.S. laws and weigh and apply in a manner that demonstrates respect for those laws and the principles of international comity.

4. Summary of Minority Views

None known at this time.