# Exhibit D

**[1992–93 CILR 574]**

**IN THE MATTER OF BANKAMERICA TRUST AND BANKING CORPORATION (CAYMAN) LIMITED**

**IN THE MATTER OF BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION**

GRAND COURT (Harre, C.J.): November 5th, 1993

*Confidential Relationships—protection of bank's interests—divulging information under order of foreign court—bank cannot rely on Confidential Relationships (Preservation) Law, s.3(2)(b)(v) to disclose confidential information under order of foreign court so as to avoid contempt proceedings*

*Confidential Relationships—protection of bank's interests—divulging of information under order of foreign court—preservation of confidentiality in Cayman Islands outweighs interests of foreign Revenue in enforcing summons fishing for confidential information—court may especially refuse to permit bank's disclosure if other avenues available for Revenue to acquire information*

The applicant applied for an order permitting it to disclose confidential information to the US Internal Revenue Service.

The applicant, a US bank with a subsidiary in the Cayman Islands, was issued with a *John Doe* summons by the US Internal Revenue Service for the purpose of identifying (for possible tax liability) persons who had transferred or received large sums during a specified period. The summons did not identify the persons but requested the bank to produce both foreign and domestic records in respect of these transfers or receipts.

Under US law, transactions taking place at the bank's Cayman subsidiary were deemed to be within the scope of the summons and failure to comply with it meant that the bank could be compelled, on threat of sanction, including being found in contempt of court, to produce the relevant documents. The bank advised the Internal Revenue Service and the US court that the documents were protected from disclosure by Cayman banking confidentiality laws but undertook to produce the documents in respect of which it had the customer's consent to disclosure. It also sought to satisfy the summons as well as it could from its records within the United States. It made the present application to the Cayman court in an effort to resolve the matter and to discharge its obligation under US law to make all efforts in good faith to secure production of the documents.

It submitted in favour of disclosure that (a) the common law

1992–93 CILR 575

principles on the exceptions to a banker's duty of confidentiality were applicable in the Cayman Islands through s.3(2)(b)(v) of the Confidential Relationships (Preservation) Law; and (b) accordingly, obedience to the foreign subpoena should prevail over the duty of secrecy, because the bank had a genuine and legitimate interest of its own to obey the subpoena since it was issued pursuant to the law of the country to which it was subject and the fear of being held in contempt was genuine and not unreasonable.

**Held,** dismissing the application:

(1) Section 3(2)(b)(v) of the Confidential Relationships (Preservation) Law restated the common law exceptions to a banker's duty of confidentiality. The provision was not intended to operate so as to enforce process emanating from another jurisdiction, *i.e.* to permit disclosure from a bank properly subject to the foreign jurisdiction which has ordered it, so that the bank might escape possible contempt proceedings. Whether such disclosure should be permitted would still have to be decided in the exercise of its discretion by the Cayman court under s.3A (page 581, line 10 – page 582, line 15).

(2) In spite of the predicament in which the bank might be placed, there were overriding considerations for not permitting the disclosure. The preservation of confidentiality was a cornerstone of the banking business and the preservation of this principle and the confidence in it on which the economy of the Cayman Islands so substantially relied, outweighed the interests of the US Internal Revenue Service in enforcing its *John Doe* summons. Moreover, since the summons lacked any reference to specific persons as the subject of investigation, it clearly amounted to "fishing" for

information, a feature which was in itself an unreasonable exercise of purported extraterritorial jurisdiction. It had also not been shown that important interests of the United States would be undermined by non-compliance or that the information sought was of vital interest to the investigation. On the other hand, there was evidence that the bank had already been able to assist substantially from its records within the United States and there was in place between the two countries a fabric of relationships, notably through the Mutual Legal Assistance Treaty, whereby confidentiality might be lifted in carefully defined instances. In the light of these considerations it would be wrong to authorize the disclosure and the application would be dismissed (page 582, line 36 – page 583, line 17; page 583, lines 27–32).

**Cases cited:**
(1) *Att. Gen.* v. *Bank of Nova Scotia*, 1984–85 CILR 418, *dicta* of Summerfield, C.J. applied.
(2) *Mackinnon* v. *Donaldson, Lufkin & Jenrette Secs. Corp.*, [1986] Ch. 482; [1986] 1 All E.R. 653, *dicta* of Hoffmann, J. applied.
(3) *Norway's (State of) Application, In re (No. 2)*, [1990] 1 A.C. 723; [1989] 1 All E.R. 745.
(4) *R.* v. *Grossman* (1981), 73 Cr. App. R. 302; 1981–83 MLR 20, *dicta* of Lord Denning, M.R. applied.

1992–93 CILR 576

(5) *Tournier* v. *National Provncl. & Union Bank of England Ltd.*, [1924] 1 K.B. 461; [1923] All E.R. Rep. 550, *dictum* of Leggatt, J. applied.
(6) *X A.G.* v. *A Bank*, [1983] 2 All E.R. 464; [1983] 2 Lloyd's Rep. 535, considered.

**Legislation construed:**
Confidential Relationships (Preservation) Law (Law 16 of 1976), s.3(2)(b)(v), as substituted by the Confidential Relationships (Preservation) (Amendment) Law, 1979 (Law 26 of 1979), s.3: The relevant terms of this sub-section are set out at page 579, lines 12–21.
s.3A(3), as added by the Confidential Relationships (Preservation) (Amendment) Law, 1979 (Law 26 of 1979), s.4:
   "Upon hearing an application under sub-section (2) a Judge shall direct—
   (a)   that the evidence be given, or
   (b)   that the evidence shall not be given; or
   (c)   that the evidence be given subject to conditions which he may specify whereby the confidentiality of information is safeguarded."

*N. Timms* for the applicant;
*M. Marsden, Acting Solicitor General*, as *amicus curiae*.

**HARRE, C.J.:** The background which has led to this very important application must be set out in some detail if the issues are to be understood. On June 15th, 1988 the US Internal Revenue Service ("IRS") issued a summons to Bank of America
25  National Trust & Savings Association ("the bank") seeking records relating to transfers of $9,500 or more by any person during any 90-day period between the United States, the Cayman Islands, Hong Kong, and certain other locations during the calendar years 1986 and 1987. The bank is a national banking
30  association organized under the laws of the United States with branches and subsidiaries there and in various locations around the world. One of its subsidiaries, wholly but indirectly owned, is BankAmerica Trust & Banking Corporation (Cayman Ltd) ("Cayman Trust").
35     Because Cayman Trust is wholly owned by the bank, docu-

ments located at the Trust are deemed under United States law to be within the legal control of the bank to the extent that the bank can be compelled, on threat of sanction, including being found in contempt of court, to produce the documents in response to a
40  subpoena issued to the bank. The summons issued by the IRS was for the purpose of determining the possible US tax liability of

1992–93 CILR 577

persons who transferred or received the funds. Such a summons, which is known as a "*John Doe* summons," does not identify the persons in respect of whose liability it is issued and it can only be served on the authority of an order from a US court.
5      Various domestic records were produced to the IRS between 1988 and 1990 and in October 1990 the IRS requested the bank to produce both foreign and domestic records underlying some 1,500 transfers of funds. In January 1991 the IRS filed a motion in the US District Court for the Northern District of California
10  seeking to enforce its summons in relation to these transfers. At that stage the only category of documents concerning which agreement had not been reached were those located in Hong Kong and no documents held by Cayman Trust had been called for. There is a relationship between the course of events in
15  respect of Hong Kong and the present proceedings, and I shall describe the salient features of those events.
    The bank took the position that it could not be required to produce the documents located in Hong Kong because of the application of the Hong Kong banking confidentiality laws. The
20  IRS argued to the contrary and on May 24th, 1991 the District Court ordered that the bank must produce the documents notwithstanding Hong Kong law. In response to this order the Government of the United Kingdom issued a diplomatic note of protest to the United States. The Governments of Hong Kong
25  and the United Kingdom issued special directions to the bank prohibiting it from complying with the summons. The bank consequently filed a motion with the District Court asking that the enforcement order be vacated or modified and undertook to pursue other avenues by which it might be able to produce the
30  requested documents without violating Hong Kong law.
    On March 11th, 1992 the District Court found that the actions of the Hong Kong and UK Governments demonstrated their substantial governmental interest in enforcing their confidentiality laws and that interest, in the circumstances, outweighed
35  the IRS interest in enforcing its *John Doe* summons. In so doing they applied the balancing test found in the *Restatement (Third) of the Foreign Relations Law of the United States, cap. 442* (1987). The court accordingly modified its order to "eliminate the possibility that the bank might be sanctioned for failing to

40     produce the Hong Kong bank records sought by the IRS" but that
       the bank must extend "all good faith efforts" to attempt to

       produce the records. It directed the bank to file periodic status
       reports summarizing its efforts so that the courts could monitor
       the bank's compliance.
          The bank first learned that the IRS was seeking under its
5      summons documents located at the Cayman Trust on May 22nd,
       1991. It advised the IRS and the District Court that the
       documents were protected from disclosure by banking confiden-
       tiality laws but undertook to produce the documents where it
       had a consent to disclosure from the relevant customer of the
10     bank. It was also in March 1992 that the IRS filed a second
       motion to enforce its summons, this time in relation to documents
       for transfers to or from Cayman Trust. The bank opposed this,
       arguing that the District Court's ruling as to the Hong Kong
       documents applied equally strongly to the documents located in
15     the Cayman Islands. As *amici curiae* the Governments of the
       United Kingdom and the Cayman Islands submitted a brief to the
       court opposing the IRS position.
          That brief argued the following three main points: (a) the June
       14th, 1988 and May 24th, 1991 orders, as applied to Cayman bank
20     records, are inconsistent with international law and comity; (b)
       the balance of relevant factors favours the substantial interests of
       the Governments of the United Kingdom and the Cayman
       Islands in enforcing the Cayman Confidential Relationships
       (Preservation) Law; and (c) the court should give deference to
25     Cayman law in light of the ongoing and successful co-operation
       between the Government of the Cayman Islands and the US
       Government in criminal prosecution and investigations. The IRS
       withdrew its March 11th, 1992 motion before it was heard in the
       District Court and over the ensuing months the bank produced
30     further records from within the United States. On the basis of
       these and other documents the IRS is seeking the production of
       documents located in the Cayman Islands. The bank has mailed
       letters to its customers whose records are currently being sought
       asking whether they will consent to the bank producing their
35     records and has not produced to the IRS any documents located
       at the Cayman Trust for customers who have not given their
       consent to disclosure.
          The IRS had intended to refile its motion to enforce its
       summons with respect to the documents at the Cayman Trust but
40     has now decided not to do so until after the resolution of these
       Grand Court proceedings. If the District Court were to grant the

motion the bank could be subject to substantial penalties for non-compliance. It has made the present application to the Grand Court in an effort to find a resolution to this matter and to discharge its obligation under US Law to undertake all good faith
5    efforts to secure production of the documents.

The arguments of the bank in favour of disclosure are threefold. The first involves consideration of the common law rule in *Tournier* v. *National Provncl. & Union Bank of England Ltd.* (5) and, as a distinct but closely related matter, the
10    applicability of the exemption in s.3(2)(b)(v) of the Confidential Relationships (Preservation) Law, which reads as follows:

> "(2) This Law has no application to the seeking, divulging, or obtaining, of confidential information—
> . . .
15    (b) by or to—
> . . .
> (v) a bank in any proceedings, cause or matter when and to the extent to which it is reasonably necessary for the protection of the bank's interest, either as against its
20    customers or as against third parties in respect of transactions of the bank for, or with, its customer. . . ."

I recently concluded in another matter that, notwithstanding the observation to the contrary of my learned predecessor, Summerfield, C.J. in *Att. Gen.* v. *Bank of Nova Scotia* (1), the words
25    "any proceedings, cause or matter" in the above passage did not have application only in relation to proceedings, causes or matters within these Islands. I shall be delivering reasons in that matter shortly, and shall not anticipate them here.

The apparent purpose of s.3(2)(b)(v) was to import the
30    exception to the general common law rule as to banking confidentiality which was expressed in identical words by Atkin, L.J. in *Tournier* into the penal provisions of the Confidential Relationships (Preservation) Law. It was therefore appropriate for the bank to invite me to consider the common law principles
35    and to submit that if the equivalent exception to the *Tournier* rule applied, s.3(2)(b)(v) should be construed to the same effect. It was acknowledged on its behalf that in the light of the facts which I have described it was faced with advancing arguments which had failed in *X A.G.* v. *A Bank* (6) and with the decision in *Att.*
40    *Gen.* v. *Bank of Nova Scotia* (1).

In *X A.G.* two corporate customers of an American bank

1992–93 CILR 580

applied for an injunction to restrict the bank from producing documents relating to their accounts pursuant to a subpoena issued by a grand jury and upheld by a US District Court. The

injunction to restrain disclosure was granted.

5    The converse case arose in *R.* v. *Grossman* (4), where an order was made *ex parte* under s.7 of the Bankers' Books Evidence Act 1879 on Barclays Bank Ltd. at its head office in London, requiring it to allow the Inland Revenue to inspect and take copies of an account maintained by an Isle of Man company with
10    Barclays Bank's branch in the Isle of Man. An application for a similar order had previously been made to the court of the Isle of Man and had been refused. The Court of Appeal set aside the inspection order. In the words of Lord Denning, M.R. (73 Cr. App. R. at 308):
15    "It seems to me that the court here ought not in its discretion to make an order against the head office here in respect of the books of the branch in the Isle of Man in regard to the customers of that branch. . . .
    Any order in respect of the production of the books ought
20    to be made by the courts of the Isle of Man—if they will make such an order. It ought not to be made by these courts. Otherwise there would be danger of a conflict of jurisdictions between the High Court here and the courts of the Isle of Man. That is a conflict which we must always avoid. . . . It
25    seems to me that, although this court has jurisdiction to order the head office here to produce the books, in our discretion it should not be done."

*R.* v. *Grossman* (4) was applied in *Mackinnon* v. *Donaldson, Lufkin & Jenrette Secs. Corp.* (2), which was referred to by
30    Summerfield, C.J. in the *Bank of Nova Scotia* case (1), by way of an observation that many of the principles set out in the judgment of Hoffmann, J. were appropriate and supported the approach adopted in *Bank of Nova Scotia.* One such principle was the following ([1986] 1 All E.R. at 658):
35    "The need to exercise the court's jurisdiction with due regard to the sovereignty of others is particularly important in the case of banks. Banks are in a special position because their documents are concerned not only with their own business but with that of their customers. They will owe their
40    customers a duty of confidence regulated by the law of the country where the account is kept. That duty is in some

1992–93 CILR 581

countries reinforced by criminal sanctions and sometimes by 'blocking statutes' which specifically forbid the bank to provide information for the purposes of foreign legal proceedings. . . . If every country where a bank happened to
5    carry on business asserted a right to require that bank to produce documents relating to accounts kept in any other such country, banks would be in the unhappy position of

being forced to submit to whichever sovereign was able to apply the greatest pressure."

10  Returning to the *Bank of Nova Scotia* case, I can respectfully adopt the following from the judgment of Summerfield, C.J. on the scope of s.3(2)(b)(v) of the Confidential Relationships (Preservation) Law (1984–85 CILR at 429–430):

> "One situation this provision does not contemplate is one
15 where the bank discloses confidential information to a foreign court, *e.g.* in answer to a subpoena issued by that court, or otherwise than in accordance with the provisions of the Confidential Relationships (Preservation) Law, in order to escape possible contempt proceedings. Why in the world
20 would the legislature give a bank, and a bank alone, that latitude to undermine the operation of this Law? No reasonable construction of the provision would allow that course.
>
>   In this case the first defendant is not a party to any
25 proceedings (except these) in relation to the subject-matter with which this application is concerned, either here or abroad, but it has been served with a subpoena to produce some of the material with which this application is concerned. Where the bank, or anyone else for that matter, is
30 served with a subpoena requiring the disclosure of confidential information then its correct course is to make application pursuant to s.3A of the Confidential Relationships (Preservation) Law and abide by any final order that emerges. I do not see how the provisions of s.3(2)(b)(v) are in any way
35 relevant to the circumstances disclosed so far."

  In my view that applies also in the present case. If s.3(2)(b)(v) were extended to matters of the enforcement of process emanating from another jurisdiction, it would allow all the carefully crafted safeguards in s.3A to be bypassed completely.
40 At that point, and in the light of the obviously intended relationship between s.3(2)(b)(v) and the rule in *Tournier* (5) it

---

is, I think, appropriate to refer to and adopt what was said by Leggatt, J. in *X A.G.* (6). It had been argued that, on the basis of *Tournier*, obedience to the foreign subpoena should prevail over the duty of secrecy, because the bank had a genuine and
5 legitimate interest of its own to obey the subpoena since it was issued pursuant to the law of the country to which it was subject and the fear of being held in contempt was genuine and not unreasonable. On that point, Leggatt, J. said this ([1983] 2 All E.R. at 479):
10  "Suffice to say that the protection which the bank seeks appears to me to be different in character from that which

was contemplated in the *Tournier* case, where the circumstances before the court were totally different."

15 This case falls to be decided as an exercise of discretion under s.3A. Before turning to that, I will refer briefly to another matter which was raised.

It is conceded that in England the High Court can have jurisdiction in a fiscal matter under the Evidence (Proceedings in other Jurisdictions) Act 1975 (see *In re State of Norway's*
20 *Application (No. 2)* (3)). I do not think that case takes me any further than that. The State of Norway was following the procedure set out in an English statute, which gave effect to a negotiated treaty. It is a wholly different situation where a foreign state seeks even conditionally to enforce one of its own orders in
25 the face of the confidentiality laws of another country. The cases to which I have already referred indicate the unwillingness of English courts to do this.

I revert, then, to the exercise of my discretion. If the application is refused, the bank will be placed, without blame, in
30 a position where it may suffer very substantial penalties. It may not come to that and it would be quite wrong for me to speculate on what course an American court might take. It is appropriate, however, to acknowledge the action of the IRS in postponing its enforcement proceedings until the decision of this court is known,
35 as indicating a reluctance to seek action that would be directly contrary to Cayman law. Nevertheless the bank remains in jeopardy, in spite of the efforts which have been made on its behalf in argument before me.

It cannot be ruled out that other banks might find themselves in
40 the same unhappy position, but on the other hand the preservation of confidentiality is a cornerstone of their business. In my

---

1992–93 CILR 583

judgment the preservation of this confidentiality and the confidence in it on which the economy of the Cayman Islands so substantially relies outweighs the interests of the IRS in enforcing its *John Doe* summons. The summons itself lacks reference to any
5 specific person as the subject of IRS investigation. Its clear purpose is to identify individuals for such investigation. That is "fishing" and, in my view, that feature is in itself an unreasonable exercise of purported extraterritorial jurisdiction. Moreover, there is evidence that the bank has already been able to assist the
10 IRS substantially from its records within the United States. It has not been shown that important interests of the United States will be undermined by non-compliance or that the information sought is of vital interest to the investigation. Moreover, there is now in place a fabric of relationships, notably through the Mutual Legal
15 Assistance Treaty between the United States and the Cayman

Islands, whereby confidentiality may be pierced, but only in carefully defined instances.

20   I referred in the course of this judgment to the arguments presented by the Government of the United Kingdom and the Cayman Islands as *amici curiae* and it would be otiose for me to refer to them in any detail as they will in any event be considered by the US court. I have, of course, studied them carefully. Moreover, certain of the arguments which I have considered in relation to the *Tournier* (5) rule and the applicability of the
25   exception under s.3(2)(b)(v) are also, in my judgment, relevant to the exercise of my discretion under s.3A.

   It would be quite wrong, in my judgment, in the light of all the factors to which I have referred, for me to authorize disclosure to the IRS in evidence of the confidential information referred to in
30   the originating summons by the bank or the Cayman Trust. My direction in accordance with s.3A(3) of the Confidential Relationships (Preservation) Law is that this evidence shall not be given.

*Order accordingly.*

Attorneys: *Maples & Calder* for the applicant; *Government Legal Dept.*