# EXHIBIT B

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) **Chapter 15 Case** |
| | ) |
| **FAIRFIELD SENTRY LIMITED, et al.,** | ) **Case No. 10-13164 (SMB)** |
| | ) |
| Debtors in Foreign Proceedings. | ) **Jointly Administered** |
| | ) |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION),** acting by and through the Foreign Representatives thereof, and **KENNETH KRYS and CHARLOTTE CAULFIELD,** solely in their capacities as Foreign Representatives and Liquidators thereof, | ) **Adv. Pro. No. 11-01255 (SMB)** |
| Plaintiffs, | ) |
| -against- | ) **NOTICE OF FILING OF PROPOSED AMENDED COMPLAINT** |
| **CHING-YANG HUANG, CHIN-HUAH SHIH and BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF CHING-YANG HUANG 1-1000,** | ) |
| Defendants. | ) |

**PLEASE TAKE NOTICE** that Fairfield Sentry Limited ("Sentry"), by and through

Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "Foreign

Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry, the

"Plaintiffs"), solely in their capacities as the Liquidators of Sentry and the Foreign

Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited, and

Fairfield Lambda Limited pending before the Commercial Division of the Eastern Caribbean

High Court of Justice, British Virgin Islands, hereby file the enclosed proposed amended complaint in the above-captioned adversary proceeding (the "Proposed Amended Complaint").

PLEASE TAKE FURTHER NOTICE that a clean copy of the Proposed Amended Complaint is filed herewith as Exhibit A.

PLEASE TAKE FURTHER NOTICE that a document showing the Proposed Amended Complaint redlined against the operative complaint in the above-captioned adversary proceeding is filed herewith as Exhibit B.

Dated: New York, New York
       September 7, 2016

BROWN RUDNICK LLP

By:   /s/ David J. Molton
      David J. Molton
      May Orenstein
      Daniel J. Saval

Seven Times Square
New York, New York 10036
Telephone: 212.209.4800
Facsimile: 212.209.4801

*Attorneys for the Foreign Representatives*

# EXHIBIT A

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 5 of 133

REDACTED WITH REDACT-IT

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 15 Case |
| | ) |
| **FAIRFIELD SENTRY LIMITED, et al.,** | ) Case No. 10-13164 (SMB) |
| | ) |
| Debtors in Foreign Proceedings. | ) Jointly Administered |
| | ) |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION),** acting by and through the Foreign Representatives thereof, and **KENNETH KRYS** and **CHARLOTTE CAULFIELD,** solely in their capacities as Foreign Representatives and Liquidators thereof, | ) ) ) ) ) ) Adv. Pro. No. 11-01255 (SMB) |
| Plaintiffs, | ) ) |
| -against- | ) SECOND AMENDED COMPLAINT ) |
| **CHING-YANG HUANG, CHIN-HUAH SHIH** and **BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF CHING-YANG HUANG 1-1000,** | ) ) ) ) |
| Defendants. | ) |

Fairfield Sentry Limited ("Sentry"), by and through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "Foreign Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and the Foreign Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for

their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This action and similar actions are brought by the Plaintiffs, with the approval of the foreign court having jurisdiction over the matter, to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008.

2.      The Funds were created as a means for private investment in managed accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that Bernard L. Madoff used to perpetrate his massive Ponzi scheme. Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS. Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss Franc investments) through purchases of shares of Sentry. Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held by BLMIS for Sentry. As stated in their offering materials, the Funds' investment objective was to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3.      It is now known that these types of feeder funds were essential to the perpetration of Madoff's Ponzi scheme. In order for the Ponzi scheme to operate, Madoff required a continuous flow of new investors and investments to be able to satisfy redemption requests from early investors. Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS), brought new investors into this scheme, allowing Madoff to make payments to early investors and

2

thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.    From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares was transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff.  Prior to December 2008, the voting participating shares of Sentry ($.01 par value per share), Sigma (€.01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value."  Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund, net of certain expenses ("Net Asset Value").

5.    From time to time, in order to make payments to investors for the redemption of Shares ("Redemption Payments"), Sentry generally made withdrawals from its BLMIS accounts. On occasion, Sentry made Redemption Payments directly from amounts on hand invested by other subscribers in the Funds.  At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by BLMIS for Sentry.  The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which was calculated based principally on the assets that the Funds believed were being held, and investments that were being made, by BLMIS for Sentry's account.

6.    As the world now knows, Madoff was operating a massive Ponzi scheme through BLMIS.  Thus, at all relevant times, the money that Sentry transferred to BLMIS was not

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 8 of 133

REDACTED WITH REDACT-IT

invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses. Further, none of the securities shown on statements provided to Sentry by BLMIS were in fact purchased for Sentry. Additionally, none of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of sales of securities or other investments. Instead, such amounts represented the monies of more recent investors into the Madoff scheme.

7.    In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent, and the Funds were insolvent at the time Redemption Payments were made or they were rendered insolvent by those payments. As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

8.    At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of his fraud. Similarly, the Redemption Payments that the Funds made to redeeming shareholders were not made in the ordinary course of any business or for any legitimate purposes. Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and

simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme. These payments were crucial in perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9.    During the period from and after July 19, 2007 through November 19, 2008, following the receipt by Sentry of notices of redemption, Sentry made Redemption Payments to accounts held in the name of Defendant Ching-Yang Huang ("Huang") aggregating USD $276,462.00.

10.    At the time such payments were made, Sentry mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption. In fact, however, as stated, the Redemption Payments made to Huang far exceeded the Net Asset Value of Shares redeemed that would have been calculated based on the true facts existing at that time or any relevant time. Moreover, these Redemption Payments did not, as Sentry intended, represent the proceeds arising from the profitability of or to continue investment in BLMIS. Instead, any amounts obtained directly or indirectly by Sentry from BLMIS to make Redemption Payments to Huang generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

11.    Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them, and, at all relevant times, the Funds were unable to pay their debts as they fell or would fall due. Indeed, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.

12.    In particular, claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (SMB) (the "BLMIS Adversary Proceeding").  As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.  This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud. The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.  At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

13.    On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda.  The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and further increased the amount of those liabilities.  In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their

6

existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

14.    Upon information and belief, Huang has either retained the Redemption Payments made to him/her by Sentry for his/her own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities, including but not limited to Chin-Huan Shih, for whom Huang may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with Huang, the "Defendants").

15.    Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value.  As of December 2008 and presently, Sentry, Sigma, and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

16.    Unless Redemption Payments paid to shareholders are recovered for the Funds' estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may be made against them; further, recoveries of Redemption Payments will increase distributions to the Funds' investors who have been harmed .  Moreover, to the extent such liabilities and claims must be satisfied solely from the Funds' current assets, Defendants will have been unjustly enriched as they will not bear their proportionate share of such liabilities and claims, but rather will retain a windfall at the expense of other shareholders and creditors of the Funds.

## JURISDICTION AND VENUE

17.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re

Fairfield Sentry Limited, et al., No. 10-13164 (SMB), pending in this Court. Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, SIPA Liquidation No. 08-1789 (SMB). Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

18.    This is a core proceeding under 28 U.S.C. § 157(b)(2).[1]  Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

19.    This Court has jurisdiction over Huang and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney 2008) because Huang and the Beneficial Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and, upon information and belief, maintaining bank accounts in the United States, and in fact receiving Redemption

---

[1]    Although the District Court, in In re Fairfield Sentry Ltd., No. 1:11-mc-00224-LAP, 458 B.R. 665 (S.D.N.Y. 2011), held that causes of action alleged by the Plaintiffs in other cases before this Court— causes of action that are similar or the same as those alleged in this complaint—are not core proceedings, this determination may be subject to appeal. In any event, plaintiffs submit that the causes of action in this complaint, which include, *inter alia*, allegations regarding transfers of property that were directed into the territorial jurisdiction of the United States, render the claims asserted in this complaint core in accordance with the District Court's decision.

10-03635-jpm   Doc 144-2   Filed 10/26/16   Entered 10/26/16 10:41:02   Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE   Pg 13 of 133

REDACTED WITH REDACT-IT

Payments in those United States-based accounts.   Huang and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, upon information and belief, designated United States-based bank accounts to receive their Redemption Payments from the Funds and actively directed Redemption Payments at issue in this action into those bank accounts.   Huang and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.   Huang and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

20.     Moreover, this Court has jurisdiction over Huang and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more agreements for the subscription of Shares that Huang entered into with Sentry

21.     Huang, upon information and belief, entered into a Subscription Agreement with Sentry on or about July 24, 2003 (the "Initial Subscription Agreement") pursuant to which it subscribed for a total of 95.12 Shares.   Subsequent to entering into the Initial Subscription Agreement, Huang, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry on or about January 6, 2004 and October 1, 2004 pursuant to which he/she subscribed for 301.23 additional shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement.   The Initial Subscription Agreement and the Subsequent Subscription Agreements are collectively referred to herein as the "Subscription Agreements."

22.     The Subscription Agreements provide for, *inter alia*, the irrevocable submission by Huang to the jurisdiction of the New York courts with respect to any proceeding with respect to said agreement and Sentry and Huang's consent to service of process by the mailing of such process, as provided therein.  In particular, the Subscription Agreements provide as follows:

> <u>New York Courts</u>.   Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.   Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records.  Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

23.     Furthermore, by executing the Subscription Agreements, Huang agreed to all terms and conditions contained therein, including the express provision that any agreement made by Huang in the Subscription Agreements would also apply to any other person for whom Huang was subscribing as trustee, agent, representative, or nominee – <u>i.e.</u>, all Beneficial Shareholders. Moreover, by executing the Subscription Agreements, Huang represented that s/he had all requisite authority from Beneficial Shareholders to execute and perform any and all obligations on their behalf, and also agreed to indemnify Sentry for any damages resulting from an assertion by a Beneficial Shareholder that Huang lacked proper authorization to enter into the Subscription Agreements or perform the obligations thereof.   Specifically, the Subscription Agreements provide as follows:

> <u>If Subscriber is acting as a Representative</u>.  If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute

10

and perform the obligations hereunder. Subscriber also agrees to indemnify the Fund . . . for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

### Plaintiffs

25.    Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

26.    The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names. On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "Lambda Appointment Order"). On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order"). On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order"). On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds. On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the

11

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 16 of 133

REDACTED WITH REDACT-IT

"Second Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, and the Supplemental Appointment Order, the "BVI Appointment Orders").    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claims herein, including the avoidance claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

27.    Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property.    After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15.    On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

28.    Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code.    Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a).    Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section

1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the proceedings before the BVI Court.

**Defendants**

29.    Huang was, at all relevant times, a member of Sentry and a registered holder of Shares.  Upon information and belief, Huang is an individual who maintains an address at 13F, No. 10, Lane 163, Jhensin Road, Kaohsiung, Taiwan R.O.C.  Huang subscribed for the purchase of Shares by entering into one or more Subscription Agreements with Sentry.  All purchases of Shares by Huang were subject to the terms of the Subscription Agreements.

30.    Defendants "Beneficial Owners of the Accounts Held in the Name of Ching-Yang Huang" - i.e., the Beneficial Shareholders, are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry issued to Huang and on whose behalf Huang was acting as trustee, agent, representative, or nominee.

31.    Based on Sentry records, some or all of the Redemption Payments made to Huang may have been paid to an account holder or holders associated with Chin-Huan Shih, an individual maintaining an address at 13F, No. 10, Lane 163, Jhensin Road, Kaohsiung, Taiwan R.O.C.

**NOTICE PURSUANT TO FED. R. CIV. P. 44.1**

32.    Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 18 of 133

REDACTED WITH REDACT-IT

## FACTUAL ALLEGATIONS

### A.    Role of Feeder Funds In Madoff Fraud

33.    Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

34.    As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

### B.    Calculation of Net Asset Value and Shareholder Redemption Payments

35.    Substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy.  In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each

Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

36.     In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry.   Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

37.     In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements.   None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred.   Indeed, no investments of any kind were ever made by BLMIS for Sentry.   At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious.   Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

38.     From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS).

15

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 20 of 133

REDACTED WITH REDACT-IT

The Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or to continue investment in BLMIS. In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud. At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud. The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose. Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.

39.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme. At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

**C.    Redemption Payments Made or Transferred to Defendants**

40.    During the period from and after July 19, 2007 through November 19, 2008, Huang received Redemption Payments totaling USD $276,462.00 from Sentry in respect of Shares tendered for redemption.

41.    At Huang's directions and instructions, some or all of the Redemption Payments were received at, upon information and belief, designated United States-based bank accounts.

16

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 21 of 133

REDACTED WITH REDACT-IT

42.     The dates and amounts of each Redemption Payment received by Huang from Sentry, and the Huang bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.

43.     At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.   In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between Huang and Sentry, Sentry received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry.

44.     Upon information and belief, Huang and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**D.     Citco Did Not Issue Any Certifications of Net Asset Value in "Good Faith"**

45.     Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share . . . given in good faith by or on behalf of the Directors shall be binding on all parties."   During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").   On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").   The Privy Council did not, however, address whether such Certificates were given "in good faith."   In carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "Citco") acted with a lack of good faith in giving the Certificates.

17

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 22 of 133

REDACTED WITH REDACT-IT



10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 23 of 133

REDACTED WITH REDACT-IT



10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B - Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 24 of 133

REDACTED WITH REDACT-IT





REDACTED

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B - Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 26 of 133

REDACTED WITH REDACT-IT



10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 27 of 133

REDACTED WITH REDACT-IT



*REDACTED*



10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B - Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 29 of 133

REDACTED WITH REDACT-IT



10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 30 of 133

REDACTED WITH REDACT-IT



*REDACTED*



REDACTED

74.     By virtue of the foregoing conduct, Citco issued the Certificates without good faith.  The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

**E.     Exposure of Madoff's Fraud**

75.     On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  See United States v. Madoff, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

76.     On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS.  See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 32 of 133

REDACTED WITH REDACT-IT

77.    In March 2009, Madoff pleaded guilty to the criminal charges brought against him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal.  Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised.  Instead, those funds were deposited in a bank account at Chase Manhattan Bank.  When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

78.    Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

79.    Madoff is now serving a 150-year sentence in federal prison.

## F.    The Funds' Estates in Liquidation

80.    Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values.  As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

81.    In 2009, the Funds were put into liquidation proceedings in the BVI.

82.     On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding").  The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

83.     On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding").  The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

84.     On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings").  The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

85.     As alleged above, the BVI Court issued orders – the BVI Appointment Orders – appointing the Foreign Representatives as liquidators of the Funds.  Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

86.     The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry's estate that Defendants are not entitled to keep.

## FIRST CLAIM
### (Unjust Enrichment - Against Huang)

87.     Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 86 above as if set forth herein.

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 34 of 133

REDACTED WITH REDACT-IT

88.    As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Huang, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.   The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

89.    Huang did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by him/her, in that he/she received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

90.    By reason of his/her receipt of monies represented as amounts deposited by other BLMIS investors or monies deposited by the Funds' subscribers, for amounts far in excess of the amounts that it would have received had the Net Asset Value of Shares been calculated based upon the true facts existing at that time or any relevant time, Huang has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

91.    It would offend principles of equity and good conscience to permit Huang to retain the Redemption Payments he/she received from Sentry.

92.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from Huang an amount equal to the Redemption Payments received by him/her from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

30

## SECOND CLAIM
### (Unjust Enrichment - Against Beneficial Shareholders)

93.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 92 above as if set forth herein.

94.    Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

95.    Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her from Sentry to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS. Instead, Redemption Payments were made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

96.    The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

97.    To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Huang in his/her capacity as trustee, agent, representative, or nominee for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

31

98.    It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by Sentry.

99.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

### THIRD CLAIM
### *(Money Had and Received - Against Huang)*

100.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 99 above as if set forth herein.

101.    As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Huang, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

102.    Huang did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by him/her, in that he/she received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

103.    By reason of his/her receipt of monies which generally represented the proceeds arising from or to continue investment in BLMIS, which the world now knows was operated by

32

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 37 of 133

REDACTED WITH REDACT-IT

Madoff as a Ponzi scheme. Huang has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

104.    Furthermore, Huang was not entitled to receive the Redemption Payments because the amounts of each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Huang for his/her redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

105.    To the extent that Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

106.    It would offend principles of equity and good conscience to permit Huang to retain the Redemption Payments his/her received from Sentry.

107.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from Huang an amount equal to the Redemption Payments received by him/her from Sentry,  or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FOURTH CLAIM
### *(Money Had and Received - Against Beneficial Shareholders)*

108.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 107 above as if set forth herein.

33

109.    Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

110.    Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

111.    The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

112.    To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Huang in his/her capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

113.    Furthermore, the Beneficial Shareholders were not entitled to receive the Redemption Payments paid to Huang upon the redemption of Shares issued to him/her in his/her capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value which caused the payment received for redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

34

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 39 of 133

REDACTED WITH REDACT-IT

114.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

115.    It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments made by Sentry.

116.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from the Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time .

## FIFTH CLAIM
### (Mistaken Payment - Against Huang)

117.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 116 above as if set forth herein.

118.    As described above, Sentry made each of the Redemption Payments to Huang under the mistaken belief that the amounts paid to Huang represented the proceeds arising from the profitability of or to continue investment in BLMIS and were based upon the Net Asset Value of Shares redeemed based upon the true facts at that time.

119.    Upon information and belief, however, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to Huang represented, in fact, money deposited with BLMIS by other

BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

120.    The Redemption Payments, while benefiting Huang, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

121.    Additionally, Huang was not entitled to receive the Redemption Payments because, as was unknown to Sentry, the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Huang for his/her redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.  In these circumstances, the Redemption Payments should be returned for the benefit of Sentry, their creditors and the current holders of Shares in Sentry.

122.    Huang did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by him/her, in that he/she received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

123.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

124.    It would thus offend principles of equity and good conscience to permit Huang to retain the Redemption Payments.

125.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from Huang a sum in an amount equal to the Redemption

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 41 of 133

REDACTED WITH REDACT-IT

Payments received by him/her from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SIXTH CLAIM
### *(Mistaken Payment - Against Beneficial Shareholders)*

126.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 125 above as if set forth herein.

127.    As described above, Sentry made each of the Redemption Payments to Huang under the mistaken belief that the amounts paid to Huang represented the proceeds arising from the profitability of or to continue investment in BLMIS.

128.    However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to Huang represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

129.    Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

130.    Additionally, the Beneficial Shareholders were not entitled to receive the Redemption Payments received by Huang upon the redemption of Shares issued to him/her in his/her capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 42 of 133

REDACTED WITH REDACT-IT

because, as was unknown to Sentry, the amounts transferred with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by Huang for his/her redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

131.    The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

132.    The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

133.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and Sigma and other shareholders and creditors of Sentry.

134.    It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

135.    The Foreign Representatives in their capacities as liquidators of Sentry and on behalf of Sentry are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount

of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SEVENTH CLAIM
### (Constructive Trust - Against all Defendants)

136.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 135 above as if set forth herein.

137.    As described above, upon receipt of a redemption request, Sentry made each of the Redemption Payments to Huang based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

138.    As alleged above, the Redemption Payments generally represented the proceeds arising from or to continue investment in what the world now knows was Madoff's Ponzi scheme.  Accordingly, these Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of (or to continue investment in) BLMIS.

139.    Upon information and belief, Huang may have paid some or all of the Redemption Payments he/she received to the Beneficial Shareholders.

140.    By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

141.    Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Huang for

his/her redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

142.    It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

143.    By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry for the benefit of the Foreign Representatives and Sentry and other shareholders and creditors of Sentry.

### EIGHTH CLAIM
*(Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against Huang)*

144.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 143 above as if set forth herein.

145.    Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 45 of 133

REDACTED WITH REDACT-IT

146.    A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

147.    The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) . . . causes the company to become insolvent."  BVI Insolvency Act § 244(2).

148.    For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c) … (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act §§ 8, 244(3).

149.    For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator . . . ."  BVI Insolvency Act § 244(1).

150.    The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed."  BVI Insolvency Act § 244(1).  Thus, the vulnerability period, for each of the Funds, is the period commencing two years prior to the application for the appointment of the Liquidators for each Fund and ending on the date of the appointment of the liquidators of each Fund.

151.    A "connected person" is:

(1) … one or more of the following:

(a) a promoter of the company;

41

10-03635-jpm   Doc 144-2   Filed 10/26/16   Entered 10/26/16 10:41:02   Exhibit B - Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE   Pg 46 of 133

REDACTED WITH REDACT-IT

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act § 5 (emphasis added).

152.    Redemption Payments aggregating USD $276,462.00 were made by Sentry to Huang during the two-year period prior to the application for appointment of the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

153.    During the Sentry Vulnerability Period, Sentry was insolvent or was rendered insolvent by the making of Redemption Payments.

154.    Each of the Redemptions and/or Redemption Payments made during the Sentry Vulnerability Period ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

155.    Huang was a shareholder (i.e., a member) of Sentry during the Sentry Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

156.    Each of the Vulnerability Period Payments put Huang in a better position than it would have been in had such Payment not been made.

157.    Because Huang was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were

10-03635-jpm   Doc 144-2   Filed 10/26/16   Entered 10/26/16 10:41:02   Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE   Pg 47 of 133

REDACTED WITH REDACT-IT

"insolvency transactions." Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent. This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, i.e. using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers). Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in BLMIS. On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

158.    In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of any business" of Sentry. Even were this not presumed, the same would follow in that, among other things, each Vulnerability Period Payment represented a distribution of monies (including fictitious profits) from Madoff's Ponzi scheme or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

159.    Each of the Vulnerability Period Payments was made following receipt by Sentry of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles. Following the receipt by Sentry of a notice of redemption by Huang, Huang became a contingent creditor. Upon the subsequent redemption of Huang's shares and until such time as Huang received the Vulnerability Period Payment, Huang was a "creditor" of Sentry with an admissible claim against Sentry in any subsequent liquidation of Sentry had payment of the

Redemption Price not been made, albeit that post-liquidation Huang would have been deferred to outside creditors.

160.   By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to recover from Huang an amount equal to the Vulnerability Period Payments received by Huang from Sentry.

## NINTH CLAIM
### (Unfair Preference Pursuant to Section 245 of the BVI
### Insolvency Act - Against Beneficial Shareholders)

161.   The Foreign Representatives, in their capacities as Foreign Liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 160 above as if set forth herein.

162.   Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

163.   Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders.

164.   To the extent that any money that Huang received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to avoid and set aside such further transfer by Huang to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability

Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## TENTH CLAIM
### (Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act - Against Huang)

165.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 167 above as if set forth herein.

166.    Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction with a person if (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a) the company enters into the transaction in good faith and for the purposes of its business; and (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that (a) the transaction was an insolvency transaction; and (b) subsection (2) did not apply to the transaction.

167.    During the Sentry Vulnerability Period, all assets purportedly held by BLMIS for Sentry and other investors were non-existent, and Sentry was insolvent or rendered insolvent by the Vulnerability Period Payments as alleged in paragraph 157 above.    Thus, each of the

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 50 of 133

REDACTED WITH REDACT-IT

Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of the BVI Insolvency Act.

168.    Sentry received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sentry received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry to Huang for each of the Vulnerability Period Payments.

169.    Huang was a shareholder (i.e., a member) of Sentry during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

170.    Because Huang was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions."   Further, there is a statutory presumption that the Vulnerability Period Payments were not made in good faith and for the purposes of the Funds' business with reasonable grounds to believe that they would benefit the Funds.  Even were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious profits from a Ponzi scheme such as BLMIS.

171.    By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and to recover from Huang an amount equal to the Vulnerability Period Payments received by Huang from Sentry.

## ELEVENTH CLAIM
### (Undervalue Transaction Pursuant to Section 246 of the
### BVI Insolvency Act - Against Beneficial Shareholders)

172.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 171 above as if set forth herein.

173.    Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for Beneficial Shareholders.

174.    Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders.

175.    To the extent that any money that Huang received in connection with the Vulnerability Period Payments was transferred to Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to avoid and set aside such further transfer by Huang to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act

## TWELFTH CLAIM
### (Breach of Contract - Against Huang)

176.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 175 above as if set forth herein.

177.    Huang, upon information and belief, entered into the Initial Subscription Agreement with Sentry, on or about July 24, 2003, pursuant to which Huang subscribed for a

total of 95.12 Shares.  Huang's subscription for shares was made pursuant to the terms of the

Initial Subscription Agreement itself as well as the terms of the other documents referred to

therein, namely; (i) Sentry's Private Placement Memorandum (as amended from time to time);

and (ii) Sentry's Memorandum of Association and Articles of Association (the "Articles").

Subsequent to entering into the Initial Subscription Agreement, Huang, upon information and

belief, entered into the Subsequent Subscription Agreements with Sentry on or about January 6,

2004 and October 1, 2004 pursuant to which he/she subscribed for 301.23 additional shares on

the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription

Agreement.  The Initial Subscription Agreement, together with the Subsequent Subscription

Agreements, including all of the terms and provisions incorporated therein by reference to the

Private Placement Memorandum (as amended from time to time) and the Articles, are

collectively referred to herein as the "Fund Documents."

178.    The Fund Documents provide for the calculation of the redemption price for

Shares (the "Redemption Price") based on the "Net Asset Value per Share."  Net Asset Value per

share is to be determined by the directors of Sentry as of the relevant valuation day "by dividing

the value of the net assets of [Sentry] by the number of Shares then in issue [.]" Articles at 11(1).

179.    The Fund Documents provide that in determining the Net Asset Value per share

for each class of shares issued, the value of the net assets of the Fund is to be adjusted "to take

into account any dividends, distributions, assets or liabilities" attributable to such class of shares.

Articles at 11(1).  Pursuant to the Fund Documents, each subscriber, including Huang

acknowledges that "the value of its Shares and redemptions thereof, and the performance of the

Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's

48

investment and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value." See Initial Subscription Agreement ¶ 10.

180.    With respect to the valuation of different types of assets, the Fund Documents prescribe methods of valuation that are, however, subject to the exercise of the judgment and discretion by the Directors of Sentry.  For example, with respect to the valuation of assets consisting of securities, the Fund Documents prescribe methods of valuation based on price and market data, provided however that "[i]f the Directors determine that [any of the prescribed methods of valuation] does not fairly represent its market value, the Directors shall value such securities as they determine and shall set forth the basis of such valuation in writing in the Company's records[.]"  Articles at 11(3)(b).

181.    With respect to the value of any shares of stock held by Sentry in an "investment company," the Fund Documents provide for valuation "in accordance with the manner in which such shares are valued by such investment company" provided however that "the Directors may make such adjustments in such valuations the Directors may from time to time consider appropriate."  Articles at 11(3)(c).

182.    With respect to assets that have been "realised or contracted to be realised" the Fund Documents provide for the inclusion of the assets receivable in respect of such realization, provided however that "if the value of such assets is not then known exactly then its value shall be as estimated by the Directors."  Articles at 11(3)(e).

183.    Additionally, the Fund Documents provide that "notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion, warrant a different valuation of any securities, such securities will be valued at such prices as the Directors shall determine."  Articles at 11(3)(f).

49

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 54 of 133

REDACTED WITH REDACT-IT

184.    The Fund Documents provide that any "certificate" as to the Net Asset Value per Share or as to the Redemption Price that is given in good faith by or on behalf of the Directors "shall be binding on all parties."  Articles at 11(1).

185.    No Certificate was provided in good faith by or on behalf of the Directors to Huang in respect of any Net Asset Value determination made while Huang was a member of the Fund or in respect of any Redemption Payment made to Huang.

186.    Pursuant to the Fund Documents, at any time prior to the good faith issuance and receipt of a Certificate, the Redemption Price calculated in respect of the redemptions by Huang and paid to Huang remains subject to adjustment, recalculation and redetermination based on, *inter alia*, the foregoing identified provisions of the Fund Documents.  Upon the true interpretation of the Fund Documents, the same contained an implied term for repayment of any over-payments, and/or such a term is to be implied on the basis of obviousness and/or as being necessary for the business efficacy of the Fund Documents and/or to give effect to the reasonable expectations of the parties.

187.    Upon information and belief, Huang received the Redemption Payments listed on Exhibit A in respect of Shares submitted for redemption.

188.    Subsequent to December 8, 2008, Sentry has determined that the Net Asset Value calculations upon which Redemption Payments were made to Huang included assets not held by or on behalf of Sentry at the time of the making of such payments and, additionally, that such Net Asset Value calculations failed to account for and make appropriate deduction of liabilities of Sentry existing at the time such payments.  For these and other reasons, such Net Asset Value calculation substantially overstated the net asset value of the assets of Sentry.

189.    To the extent that Huang has received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, Huang is contractually obligated to return amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

190.    Following determination by the Fund that Redemption Payments made to Huang had been calculated on the basis of an overstated Net Asset Value, demand has been made on Huang to return excess and overpaid Redemption Payments to the Fund.

191.    Huang has failed and refused to repay to the Fund the amount that, under the Fund Documents, he/she is contractually required to repay to the Fund.

192.    The failure of Huang to make the repayment requested constitutes a breach of the Fund Documents for which Sentry is entitled to the award of damages.

## THIRTEENTH CLAIM
### (Breach of Contract - Against Beneficial Shareholders)

193.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 192 above as if set forth herein.

194.    Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

195.    Each Beneficial Shareholder authorized Huang to enter into the Fund Documents on his, her or its behalf and to bind the Beneficial Shareholder to the agreements and representations contained therein to the same extent as had the Beneficial Shareholder executed the Fund Documents on his, her or its, own behalf.

196.    Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her from Sentry to accounts of the Beneficial Shareholders.

197.    To the extent that any Beneficial Shareholder has received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, such Beneficial Shareholder is contractually obligated to return amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

198.    Following determination by the Fund that Redemption Payments made to Huang had been calculated on the basis of an overstated Net Asset Value, demand was made on the Beneficial Shareholders by demand on Huang for the return of excess and overpaid Redemption Payments.

199.    The Beneficial Shareholders have failed and refused to repay to the Fund the amounts that, under the Fund Documents, they are contractually required to repay to the Fund.

200.    The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the Fund Documents for which Sentry is entitled to the award of damages.

## FOURTEENTH CLAIM
### (Breach of Implied Covenant of Good Faith and Fair Dealing - Against Huang)

201.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 200 above as if set forth herein.

202.    Following determination by the Fund that Redemption Payments to Huang had been made on the basis of an overstated Net Asset Value, demand was made to Huang to return excess and overpaid Redemption Payments to Sentry.

203.    Huang has failed and refused to make the requested repayment to Sentry.

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 57 of 133

REDACTED WITH REDACT-IT

204.    By retaining the Redemption Payments to which Huang is not entitled, Huang has deprived Sentry of the benefit of its bargain and has subverted the Fund Documents.

205.    The failure of Huang to make the repayment requested constitutes a breach of the covenant of good faith and fair dealing that inheres in the Fund Documents for which Sentry is entitled to the award of damages.

### FIFTEENTH CLAIM
### *(Breach of Implied Covenant of Good Faith*
### *and Fair Dealing - Against Beneficial Shareholders)*

206.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 205 above as if set forth herein.

207.    Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

208.    Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her from Sentry to accounts of the Beneficial Shareholders.

209.    Following determination by the Fund that Redemption Payments made to Huang had been calculated on the basis of an overstated Net Asset Value, demand was made on the Beneficial Shareholders by demand on Huang for the return of excess and overpaid Redemption Payments.

210.    The Beneficial Shareholders have failed and refused to make repayment to Sentry.

211.    By retaining the Redemption Payments to which they are not entitled, the Beneficial Shareholders have deprived Sentry of the benefit of its bargain and have subverted the Fund Documents.

212.    The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the implied covenant of good faith and fair dealing that inheres in the Fund Documents for which Sentry is entitled to the award of damages.

## SIXTEENTH CLAIM
### *(Declaratory Judgment - Against All Defendants)*

213.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 212 above as if set forth herein.

214.    An actual and justiciable controversy exists between the Plaintiffs and the Defendants with respect to the obligation of the Defendants to repay to the Funds all or a portion of amounts received by them as excess or overpaid Redemption Payments under circumstances where:

(i)    the Net Asset Value per share calculation upon which the Redemption Price was paid, directly or indirectly, to any Defendant has been subsequently adjusted, recalculated or redetermined in accordance with the Fund Documents;

(ii)    the resulting adjusted, recalculated and redetermined Redemption Price is less than the Redemption Price paid to the Defendant;

(iii)    prior to such adjustment, recalculation or redetermination, no binding Certificate has been issued by the Fund; and

(iv)    Citco issued no Certificates in good faith.

54

215.    The harm to Sentry is real and immediate because, a result of the failure and refusal of the Defendants to make repayment, Sentry has become insolvent and is presently unable to pay its debts as they fall or will fall due.

216.    Plaintiffs have no adequate remedy at law.

217.    Pursuant to 28 U.S.C. § 2201 et. seq., Plaintiffs are entitled to a declaration by this Court declaring that, pursuant to the Fund Documents, each Defendant must repay Sentry that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First, Third and Fifth Claims, judgment in favor of Plaintiffs and against Huang allowing the Plaintiffs to recover an amount equal to the Redemption Payments received by Huang, plus interest, or, in the alternative, an amount equal to the amount of the Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

B.    On the Second, Fourth and Sixth Claims, judgment in favor of Plaintiffs and against Beneficial Shareholders allowing the Plaintiffs to recover an amount equal to any portion of any Redemption Payments received by the Beneficial Shareholders, plus interest, or, in the alternative, an amount equal to any portion of the Redemption Payments received by the Beneficial Shareholders less the amount of such portion that such Beneficial Shareholders would

have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

    C.    On the Seventh Claim, imposition of a constructive trust on Redemption Payments;

    D.    On the Eighth and Ninth Claims:

        i.    a declaratory judgment in favor of the Foreign Representatives and against Huang and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

        ii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

        iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against Huang and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest.

    E.    On the Tenth and Eleventh Claims:

        i.    a declaratory judgment in favor of the Foreign Representatives and against Huang and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments made during the vulnerability period constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

        ii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments made during the vulnerability period; and

        iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against Huang and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest.

    F.    On the Twelfth and Fourteenth Claims, judgment against Huang and in favor of the Plaintiffs in an amount to be determined at trial;

    G.    On the Thirteenth and Fifteenth Claims, judgment against the Beneficial Shareholders and in favor of the Plaintiffs in an amount to be determined at trial;

H.     On the Sixteenth Claim, a declaratory judgment against the Defendants and in favor of the Plaintiffs that, under the Fund Documents, the Defendants must repay that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry;

I.     Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

J.     Granting Plaintiffs such other and further relief as the Court deems just and proper.

10-03635-jpm   Doc 144-2   Filed 10/26/16   Entered 10/26/16 10:41:02   Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE   Pg 62 of 133

REDACTED WITH REDACT-IT

Dated: New York, New York
September 7, 2016

                              BROWN RUDNICK LLP


                              By:   /s/ David J. Molton
                                    David J. Molton
                                    May Orenstein
                                    Daniel J. Saval
                              Seven Times Square
                              New York, New York 10036
                              Telephone: 212.209.4800
                              Facsimile: 212.209.4801

                              *Attorneys for the Foreign Representatives*

REDACTED WITH REDACT-IT

# EXHIBIT A

REDACTED WITH REDACT-IT

### *Redemption Payments Received by Defendants from Sentry*
### *From July 19, 2007 Through November 19, 2008*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| July 19, 2007 | $11,450.53* | 9.15 | Bank of Kaohsiung Ming Chen Branch, Taiwan |
| January 17, 2008 | $109,787.08* | 85.00 | Bank of Kaohsiung Ming Chen Branch, Taiwan |
| November 19, 2008 | $155,224.49* | 115.00 | Bank of Kaohsiung Ming Chen Branch, Taiwan |

\* Denotes Redemptions in the Sentry Vulnerability Period.

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.

# EXHIBIT B

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B - Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 66 of 133

REDACTED WITH REDACT-IT

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign* ~~Representative~~Representatives

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | ) Chapter 15 Case |
| | ) |
| **FAIRFIELD SENTRY LIMITED, et al.,** | ) Case No. 10-13164 |
| | ) (~~BRL~~SMB) |
| **Debtors in Foreign Proceedings.** | ) |
| | ) Jointly Administered |
| | ) |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION),** acting by and through the Foreign ~~Representative~~Representatives thereof, and KENNETH KRYS and CHARLOTTE CAULFIELD, solely in ~~his capacity~~their capacities as Foreign ~~Representative~~Representatives and ~~Liquidator~~Liquidators thereof, | ) |
| | ) |
| | ) |
| | ) |
| | ) Adv. Pro. No. 11-01255 |
| | ) (~~BRL~~SMB) |
| | ) |
| | ) |
| | ) ~~FIRST~~SECOND |
| **Plaintiffs,** | ) AMENDED COMPLAINT |
| | ) |
| -against- | ) |
| | ) |
| **CHING-YANG HUANG, CHIN-HUAH SHIH and BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF CHING-YANG HUANG 1-1000,** | ) |
| | ) |
| | ) |
| **Defendants.** | ) |

Fairfield Sentry Limited ("Sentry"), by and through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "Foreign Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and the Foreign Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors")~~, by and through Kenneth Krys (together~~

with his predecessors, the "Foreign Representatives"), and Kenneth Krys (together with Sentry, the "Plaintiffs"), solely in his capacity as Liquidator of the Funds and the Foreign Representative of the liquidation proceedings involving the Funds pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This action and similar actions are brought by the Plaintiffs, with the approval of the foreign court having jurisdiction over the matter, to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008.

2.      The Funds were created as a means for private investment in managed accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that Bernard L. Madoff used to perpetrate his massive Ponzi scheme.  Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss Franc investments) through purchases of shares of Sentry.  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held by BLMIS for Sentry.  As stated in their offering materials, the Funds' investment objective was to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3.      It is now known that these types of feeder funds were essential to the perpetration of Madoff's Ponzi scheme.  In order for the Ponzi scheme to operate, Madoff required a

2

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 68 of 133

REDACTED WITH REDACT-IT

continuous flow of new investors and investments to be able to satisfy redemption requests from early investors.  Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS), brought new investors into this scheme, allowing Madoff to make payments to early investors and thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.      From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares werewas transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff.  Prior to December 2008, the voting, participating shares of Sentry ($.01 par value per share), Sigma (€.01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value."  Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund, net of certain expenses ("Net Asset Value").

5.      From time to time, in order to make payments to investors for the redemption of Shares ("Redemption Payments"), Sentry generally made withdrawals from its BLMIS accounts. On occasion, Sentry made Redemption Payments directly from amounts on hand invested by other subscribers in the Funds.  At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by BLMIS for Sentry.  The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which was calculated based

REDACTED WITH REDACT-IT

principally on the assets that the Funds believed were being held, and investments that were

being made, by BLMIS for Sentry's account.

6.    As the world now knows, Madoff was operating a massive Ponzi scheme through

BLMIS.  Thus, at all relevant times, the money that Sentry transferred to BLMIS was not

invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise

misappropriated by Madoff for unauthorized uses.  Further, none of the securities shown on

statements provided to Sentry by BLMIS were in fact purchased for Sentry.  Additionally, none

of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of sales of

securities or other investments.  Instead, such amounts represented the monies of more recent

investors into the Madoff scheme.

7.    In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi

scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent,

and the Funds were insolvent at the time Redemption Payments were made or they were

rendered insolvent by those payments.  As a result, at all relevant times, the Net Asset Value of

the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for

amounts far in excess of the actual Net Asset Value of Shares redeemed that would have been

calculated based upon the true facts existing at any relevant time.

8.    At all relevant times, all payments made from BLMIS to Sentry and other feeder

funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of

his fraud.  Similarly, the Redemption Payments that the Funds made to redeeming shareholders

were not made in the ordinary course of any business or for any legitimate purposes.  Those

Redemption Payments did not conform to or follow the terms of the Funds' Subscription

Agreements, Articles of Association and/or other offering documents, as the source of these

4

~~payments was not the sales of securities, or return of investments, as contemplated by those documents.   Rather, the payments were derived from uninvested monies of other BLMIS investors or other uninvested deposits made by Sentry in BLMIS, but in either event, they represented the fraudulent and ill-gotten gains of~~they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff~~'s~~ as a Ponzi scheme~~, distributed by BLMIS to Sentry~~.   These payments ~~and other payments made to BLMIS investors~~ were crucial in perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9.      During the period from and after July 19, 2007 through November 19, 2008, following the receipt by Sentry of notices of redemption, Sentry made Redemption Payments to accounts held in the name of Defendant Ching-Yang Huang ("Huang") aggregating USD $276,462.00.

10.     At the time such payments were made, Sentry mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption.  In fact, however, as stated, the Redemption Payments made to Huang far exceeded the ~~actual~~ Net Asset Value of ~~the~~ Shares redeemed that would have been calculated based on the true facts existing at that time or any relevant time.   Moreover, ~~the source of~~ these Redemption Payments ~~was~~did not, as Sentry ~~believed them to be,~~ intended, represent the proceeds ~~of the liquidation of securities or investments held for their accounts~~ arising from the profitability of or

REDACTED WITH REDACT-IT

to continue investment in BLMIS.  Instead, any amounts obtained directly or indirectly by Sentry from BLMIS to make Redemption Payments to Huang generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

11.     Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them, and, at all relevant times, the Funds were unable to pay their debts as they fell or would fall due.  Indeed, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.

12.     In particular, claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (BRLSMB) (the "BLMIS Adversary Proceeding").  As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.  This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud. The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.  At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

6

13.     On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court ~~of~~for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda.  The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and further increased the amount of those liabilities.  In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

14.     Upon information and belief, Huang has either retained the Redemption Payments made to him/her by Sentry for his/her own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities, including but not limited to Chin-Huan Shih, for whom Huang may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (~~the~~ individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with Huang, the "Defendants").

15.     Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value.  As of December 2008 and presently, Sentry, Sigma, and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

10-03635-jpm   Doc 144-2   Filed 10/26/16   Entered 10/26/16 10:41:02   Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE   Pg 73 of 133

REDACTED WITH REDACT-IT

16.    Unless Redemption Payments paid to shareholders are recovered for the Funds'
estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may
be made against them; further, recoveries of Redemption Payments will increase distributions to
the Funds' investors who have been harmed .  Moreover, to the extent such liabilities and claims
must be satisfied solely from the Funds' current assets, Defendants will have been unjustly
enriched as they will not bear their proportionate share of such liabilities and claims, but rather
will retain a windfall at the expense of other shareholders and creditors of the Funds.

## JURISDICTION AND VENUE

17.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b),
as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise
under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re
Fairfield Sentry Limited, et al., No. 10-13164 (BRLSMB), pending in this Court.  Additionally,
pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which
incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States
Code, jurisdiction is also proper in this Court because this action also relates to the consolidated
liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the
caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC,
SIPA Liquidation No. 08-1789 (BRLSMB).  Pursuant to the Amended Standing Order of
Reference of the United States District Court for the Southern District of New York, dated
January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11
of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for
adjudication.

18. This is a core proceeding under 28 U.S.C. § 157(b)(2).[1]  Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

19. This Court has jurisdiction over Huang and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney ~~2001~~2008) because Huang and the Beneficial Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and, upon information and belief, maintaining bank accounts in the United States, and in fact receiving Redemption Payments in those United States-based accounts.  Huang and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, upon information and belief, designated United States-based bank accounts to receive their Redemption Payments from the Funds and actively directed Redemption Payments at issue in this action into those bank accounts.  Huang and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.  Huang and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

---

[1]  Although the District Court, in In re Fairfield Sentry Ltd., No. 1:11-mc-00224-LAP, 458 B.R. ~~655~~665 (S.D.N.Y. 2011), held that causes of action alleged by the Plaintiffs in other cases before this Court—causes of action that are similar or the same as those alleged in this complaint—are not core proceedings, this determination may be subject to appeal.  In any event, plaintiffs submit that the causes of action in this complaint, which include, inter alia, allegations regarding transfers of property that were directed into the territorial jurisdiction of the United States, render the claims asserted in this complaint core in accordance with the District Court's decision.

10-03635-jpm   Doc 144-2   Filed 10/26/16   Entered 10/26/16 10:41:02   Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE   Pg 75 of 133

REDACTED WITH REDACT-IT

20.     Moreover, this Court has jurisdiction over Huang and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more ~~Subscription~~ agreements for the subscription of Shares that Huang entered into with Sentry (collectively, the "Subscription Agreements").

21.     Huang, upon information and belief, entered into a Subscription Agreement with Sentry on or about July 24, 2003 (the "Initial Subscription Agreement") pursuant to which it subscribed for a total of 95.12 Shares.  Subsequent to entering into the Initial Subscription Agreement, Huang, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry on or about January 6, 2004 and October 1, 2004 pursuant to which he/she subscribed for 301.23 additional shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement.  The Initial Subscription Agreement and the Subsequent Subscription Agreements are collectively referred to herein as the "Subscription Agreements."

22.     ~~21.~~ The Subscription Agreements provide for, *inter alia*, the irrevocable submission by Huang to the jurisdiction of the New York courts with respect to any proceeding with respect to said agreement and Sentry and Huang's consent to service of process by the mailing of such process, as provided therein.  In particular, the Subscription Agreements provide as follows:

> <u>New York Courts</u>.  Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then

appearing on the Fund's records.  Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

23.    22. Furthermore, by executing the Subscription Agreements, Huang agreed to all terms and conditions contained therein, including the express provision that any agreement made by Huang in the Subscription Agreements would also apply to any other person for whom Huang was subscribing as trustee, agent, representative, or nominee – i.e., all Beneficial Shareholders. Moreover, by executing the Subscription Agreements, Huang represented that s/he had all requisite authority from Beneficial Shareholders to execute and perform any and all obligations on their behalf, and also agreed to indemnify Sentry for any damages resulting from an assertion by a Beneficial Shareholder that Huang lacked proper authorization to enter into the Subscription Agreements or perform the obligations thereof.   Specifically, the Subscription Agreements provide as follows:

> If Subscriber is acting as a Representative.  If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder.  Subscriber also agrees to indemnify the Fund . . . for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

24.    23. Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

### Plaintiffs

25.    24. Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B - Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 77 of 133

REDACTED WITH REDACT-IT

registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

26. 25. The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names. On April 23, 2009, the BVI Court issued an order appointing Christopher Stride (Ms. Lau's predecessor) as liquidator of Lambda (the "Lambda Appointment Order"). On July 21, 2009, the BVI Court issued an order appointing Mr. Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order"). On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and Ms. the appointment of Joanna Lau's appointment as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order" and, together with the Lambda Appointment Order and the Sentry & Sigma Appointment Order, the "BVI Appointment Orders"). On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds. On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, and the Supplemental Appointment Order, the "BVI Appointment Orders"). The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claims herein, including the avoidance claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

27. 26. Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property.  After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15.  On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

28. 27. Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code.  Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a).  Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the BVI proceedings before the BVI Court.

13

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 79 of 133

REDACTED WITH REDACT-IT

**Defendants**

29. 28. Huang was, at all relevant times, a member of Sentry and a registered holder of Shares. Upon information and belief, Huang is an individual who maintains an address at 13F, No. 10, Lane 163, Jhensin Road, Kaohsiung, Taiwan R.O.C. Huang subscribed for the purchase of Shares by entering into one or more Subscription Agreements with Sentry (collectively, the "Subscription Agreements"). All purchases of Shares by Huang were subject to the terms of the Subscription Agreements.

30. 29. Defendants "Beneficial Owners of the Accounts Held in the Name of Ching-Yang Huang" - i.e., the Beneficial Shareholders , are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry issued to Huang and on whose behalf Huang was acting as trustee, agent, representative, or nominee (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders").

31. 30. Based on Sentry records, some or all of the Redemption Payments made to Huang may have been paid to an account holder or holders associated with Chin-Huan Shih, an individual maintaining an address at 13F, No. 10, Lane 163, Jhensin Road, Kaohsiung, Taiwan R.O.C.

**NOTICE PURSUANT TO FED. R. CIV. P. 44.1**

32. 31. Certain or all of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands. Plaintiffs intend to rely upon the applicable laws of that territory.

14

REDACTED WITH REDACT-IT

## FACTUAL ALLEGATIONS

### A.    Role of Feeder Funds In Madoff Fraud

33. 32. Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry.  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

34. 33. As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

### B.    Calculation of Net Asset Value and Shareholder Redemption Payments

35. 34. Substantially all of the money (someup to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy. In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 81 of 133

REDACTED WITH REDACT-IT

each Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

36. 35. In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry. Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to purported, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

37. 36. In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements. None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred. Indeed, no investments of any kind were ever made by BLMIS for Sentry. At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious. Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

38. 37. From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS).

16

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 82 of 133

REDACTED WITH REDACT-IT

The Funds believed that the amounts provided in connection with such withdrawals represented the proceeds ~~from the sale or liquidation of securities or~~arising from the profitability of or to continue investment ~~positions held by~~in BLMIS ~~for the account of Sentry~~.  In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.  At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud.  The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose.  Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.

39. ~~38.~~ Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme.  At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

**C.    Redemption Payments Made or Transferred to Defendants**

40. ~~39.~~ During the period from and after July 19, 2007 through November 19, 2008, Huang received Redemption Payments totaling USD $276,462.00 from Sentry in respect of Shares tendered for redemption.

41.    At Huang's directions and instructions, some or all of the Redemption Payments were received at, upon information and belief, designated United States-based bank accounts.

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 83 of 133

REDACTED WITH REDACT-IT

42. 40. The dates and amounts of each Redemption Payment received by Huang from Sentry, and the Huang bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.

43. 41. At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.  In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between Huang and Sentry, Sentry received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry.

44. 42. Upon information and belief, Huang and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**D.      Citco Did Not Issue Any Certifications of Net Asset Value in "Good Faith"**

45.      Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share . . . given in good faith by or on behalf of the Directors shall be binding on all parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").  The Privy Council did not, however, address whether such Certificates were given "in good faith."  In

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 84 of 133

REDACTED WITH REDACT-IT

carrying out this responsibility, the Administrators and affiliated Citco companies within Citco

Group Limited (collectively, "Citco") acted with a lack of good faith in giving the Certificates.



*REDACTED*

19

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 85 of 133

REDACTED WITH REDACT-IT



10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 86 of 133

REDACTED WITH REDACT-IT





*REDACTED*



*REDACTED*

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 89 of 133

REDACTED WITH REDACT-IT



REDACTED WITH REDACT-IT



*REDACTED*

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 91 of 133

REDACTED WITH REDACT-IT



REDACTED WITH REDACT-IT



10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B - Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 93 of 133

REDACTED WITH REDACT-IT



REDACTED

74.    By virtue of the foregoing conduct, Citco issued the Certificates without good faith.  The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

**E.    Exposure of Madoff's Fraud**

75.    43. On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  See United States v. Madoff, No. O808-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

76.    44. On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS. See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 94 of 133

REDACTED WITH REDACT-IT

permanent injunction and continuing relief against him, including a permanent freezing of his assets.

77.    45. In March 2009, Madoff pleaded guilty to the criminal charges brought against him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal.  Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised.  Instead, those funds were deposited in a bank account at Chase Manhattan Bank.  When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

78.    46. Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

79.    47. Madoff is now serving a 150-year sentence in federal prison.

**F.    The Funds' Estates in Liquidation**

80.    48. Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values.

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 95 of 133

REDACTED WITH REDACT-IT

As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

81.    49. In 2009, the Funds were put into liquidation proceedings in the BVI.

82.    50. On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding"). The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

83.    51. On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding"). The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

84.    52. On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings"). The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

85.    53. As alleged above, the BVI Court issued orders – the BVI Appointment Orders – appointed appointing the Foreign Representatives as liquidators of the Funds. Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

54. The BVI Appointment Orders grant the Liquidators all powers set forth in Section 186, Schedule 2 of the BVI Insolvency Act, including, but not limited to, the following:

   a. to pay any class of creditors in full;

   b. to make a compromise or arrangement with creditors or persons claiming to be creditors, or having or alleging that they have any claim against the Funds, whether present or future, certain or contingent, ascertained or not;

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 96 of 133

REDACTED WITH REDACT-IT

e. to compromise any claims, debts or liabilities capable of resulting in claims or debts whether present or future, certain or contingent, ascertained or not, between the Funds and any person or entity, and to compromise questions in any way relating to or affecting the assets or the liquidations of the Funds;

d. to commence, continue, discontinue, or defend any action or other legal proceeding in the name and on behalf of the Funds in the BVI or elsewhere;

e. to carry on the Funds' business so far as may be necessary for its beneficial liquidation;

f. to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the Funds or for which the Funds may be rendered liable;

g. to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the Funds and a contributory or alleged contributory or other Funds or person apprehending liability to the Company;

h. to deal with all questions in any way relating to or affecting the assets or the winding up of the Funds to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it;

i. to sell or otherwise dispose of property of the Funds;

j. to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents;

k. to use the Funds' seal;

l. to draw, accept, make and endorse any bill of exchange or promissory note in the name and on behalf of the Funds;

m. to borrow money, whether on the security of assets of the Funds or otherwise;

n. to take out in an official capacity letters of administration for any deceased member or past member or debtor, or to do any other act necessary for obtaining payment of any money due from a member or past member or debtor;

o. to call meetings of the creditors or members for (i) the purpose of informing the creditors or members concerning the progress of or other matters arising in the liquidation; (ii) the purpose ascertaining the views of creditors or members on any matter arising in the liquidation; or (iii) such other purposes connected with the liquidation as the liquidators considers fit;

p. to appoint a solicitor, accountant or other professionally qualified person to assist in the performance of the liquidators' duties;

q. to appoint an agent to do any business that the liquidators are unable to do themselves, or which can be more conveniently done by an agent;

r. to apply to the BVI Court for directions concerning any matter arising out of the exercise of any of the liquidators' powers; and

s. to do all things incidental to any of the liquidators' powers.

55. The Foreign Representatives must seek BVI Court approval before they can exercise any of the first five powers enumerated in the BVI Appointment Orders. *See* BVI Act § 186(3) ("The Court may provide that certain powers may only be exercised with the sanction of the Court."). The Foreign Representatives may exercise all of the other powers enumerated in the BVI Appointment Orders without prior BVI Court approval.

56. With the express authorization of the BVI Court, the Foreign Representatives filed petitions in this Court on June 14, 2010 seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15 of the Bankruptcy Code. On July 22, 2010, the Bankruptcy Court issued the Recognition Order, which, among other things, specifically entrusted the Foreign Representatives with the administration and realization of the Funds' assets located in the United States, including any and all claims and causes of action belonging to the Funds.

57. Acting in accordance with authority afforded to them by the Recognition Order and with the duties and powers afforded to them as liquidators under the BVI Insolvency Act, and with the requisite court approval by the foreign court having jurisdiction over the matter , the

Foreign Representatives have brought this and similar actions on behalf of the Funds, and/or in their capacities as liquidators of the Funds, to recover Redemption Payments made to the Funds' investors in the years prior to the exposure of the Madoff fraud.

58. On December 9, 2010, the BVI Court issued an order authorizing the Foreign Representatives to assert claims seeking: (i) a declaration that the Redemption Payments were unfair preferences under Section 245 of the BVI Insolvency Act and were undervalue transactions under Section 246 of the BVI Insolvency Act, and (ii) an order setting aside the Redemption Payments, restoring the Funds to the position that they would have been had the Redemption Payments not been paid and such further and other relief as the Foreign Representatives deem necessary. On December 5, 2011, the Court of Appeal of the Eastern Caribbean Supreme Court, sitting as an appellate court of the BVI Court, issued an Order giving the Foreign Representatives sanction to continue to pursue claims in the United States, including both common law claims and claims under Sections 245 and 246 of the BVI Insolvency Act.

86. 59. At present, without recovery of Redemption Payments made to shareholders, the Funds' assets are not sufficient to satisfy contingent and non-contingent liabilities of the Funds' estates. The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry's estate that Defendants are not entitled to keep.

## FIRST CLAIM
### *(Unjust Enrichment - Against Huang)*

87. 60. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 59 86 above as if set forth herein.

10-03635-jpm   Doc 144-2   Filed 10/26/16   Entered 10/26/16 10:41:02   Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE   Pg 99 of 133

REDACTED WITH REDACT-IT

88. 61. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Huang, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

89. 62. Huang did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by him/her.

63. Upon information and belief, Huang, in that he/she received and retained Redemption Payments made for amounts far in excess of amounts paid by him/her for the purchaseNet Asset Value of Shares of and in Sentryredeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

90. 64. By reason of his/her receipt of monies represented as amounts deposited by other BLMIS investors or previous deposits made by Sentry with BLMISmonies deposited by the Funds' subscribers, for amounts far in excess of the amounts that it would have received had the Net Asset Value of Shares been calculated based upon the true facts existing at that time or any relevant time, Huang has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

91. 65. It would offend principles of equity and good conscience to permit Huang to retain the Redemption Payments s/he/she received from Sentry.

92. 66. The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from Huang an amount equal to the Redemption Payments received by him/her from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 100 of 133

REDACTED WITH REDACT-IT

Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SECOND CLAIM
### *(Unjust Enrichment - Against Beneficial Shareholders)*

93. 67. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 6692 above as if set forth herein.

94. 68. Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

95. 69. Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her from Sentry to accounts of the Beneficial Shareholders. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Huang, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of These Redemption Payments wasdid not, as Sentry mistakenly believed, represent the proceeds from the sale of securities or investments held by BLMIS for the account of Sentry. arising from the profitability of or to continue investment in BLMIS. Instead, Redemption Payments were made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

96. 70. The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for any portion of any of the Redemption Payments or any portion thereof received by them.

35

71. Upon information and belief, some or all of the Beneficial Shareholders, in that they received and retained Redemption Payments made for amounts far in excess of amounts paid by them for the purchase Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

97. 72. To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Huang in his/her capacity as trustee, agent, representative, or nominee for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

98. 73. It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by Sentry.

99. 74. The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## THIRD CLAIM
### *(Money Had and Received - Against Huang)*

100. 75. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 74 99 above as if set forth herein.

101. 76. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Huang, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 102 of 133

REDACTED WITH REDACT-IT

fraud.   The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

102. ~~77.~~ Huang did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by him/her.

~~78. Upon information and belief, Huang,~~ in that he/she received ~~and retained~~ Redemption Payments made for amounts far in excess of ~~amounts paid by him/her for~~ the ~~purchase~~ Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

103. ~~79.~~ By reason of his/her receipt of monies ~~representing the deposits of other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud,~~ which generally represented the proceeds arising from or to continue investment in BLMIS, which the world now knows was operated by Madoff as a Ponzi scheme. Huang has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

104. ~~80.~~ Furthermore, Huang was not entitled to receive the Redemption Payments because the amounts of each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Huang for his/her redemption of Shares to be in excess of the ~~actual~~ Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

105. ~~81.~~ To the extent that Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

106. 82. It would offend principles of equity and good conscience to permit Huang to retain the Redemption Payments s/he his/her received from Sentry.

107. 83. The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from Huang an amount equal to the Redemption Payments received by him/her from Sentry., or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FOURTH CLAIM
### *(Money Had and Received - Against Beneficial Shareholders)*

108. 84. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 83 107 above as if set forth herein.

109. 85. Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

110. 86. Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Huang, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of These Redemption Payments was did not, as Sentry mistakenly believed, represent the proceeds from the sale of securities or investments held by arising from the profitability of or to continue investment in BLMIS for the account of Sentry.

38

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 104 of 133

REDACTED WITH REDACT-IT

111. 87. The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for any portion of any of the Redemption Payments or any portion thereof received by them.

88. Upon information and belief, some or all of the Beneficial Shareholders, in that they received and retained Redemption Payments made for amounts far in excess of amounts paid by them for the purchase Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

112. 89. To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Huang in his/her capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

113. 90. Furthermore, the Beneficial Shareholders were not entitled to receive any portion of the Redemption Payments paid to Huang upon the redemption of Shares issued to him/her in his/her capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received for redemption of Shares to be in excess of the actual Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

114. 91. To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 105 of 133

REDACTED WITH REDACT-IT

115. 92. It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments made by Sentry.

116. 93. The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from the Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time .

## FIFTH CLAIM
### *(Mistaken Payment - Against Huang)*

117. 94. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 93116 above as if set forth herein.

118. 95. As described above, Sentry made each of the Redemption Payments to Huang under the mistaken belief that the amounts paid to Huang represented the proceeds of the sale of securities and investments held for Sentry in accounts established with BLMIS. arising from the profitability of or to continue investment in BLMIS and were based upon the Net Asset Value of Shares redeemed based upon the true facts at that time.

119. 96. Upon information and belief, however, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to Huang represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

120. ~~97.~~ The Redemption Payments, while benefiting Huang, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

121. ~~98.~~ Additionally, Huang was not entitled to receive the Redemption Payments because, as was unknown to Sentry, the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Huang for his/her redemption of Shares to be in excess of the ~~actual~~ Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time. In these circumstances, the Redemption Payments should be returned for the benefit of Sentry, their creditors and the current holders of Shares in Sentry.

122. ~~99.~~ Huang did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by him/her. ~~–~~

~~100. Upon information and belief, Huang,~~ in that he/she received ~~and retained~~ Redemption Payments made for amounts far in excess of ~~amounts paid by him/her for~~ the ~~purchase~~ Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

123. ~~101.~~ To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

124. ~~102.~~ It would thus offend principles of equity and good conscience to permit Huang to retain the Redemption Payments.

125. ~~103.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from Huang a sum in an amount equal to the

41

Redemption Payments received by him/her from Sentry., or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SIXTH CLAIM
### *(Mistaken Payment - Against Beneficial Shareholders)*

126.  104.  Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 103125 above as if set forth herein.

127.  105.  As described above, Sentry made each of the Redemption Payments to Huang under the mistaken belief that the amounts paid to Huang represented the proceeds of the sale of securities and investments held for Sentry in accounts established witharising from the profitability of or to continue investment in BLMIS.

128.  106.  However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to Huang represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

129.  107.  Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Huang, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of These Redemption Payments wasdid not, as Sentry mistakenly believed, represent the

proceeds ~~from the sale of securities or investments held by~~arising from the profitability of or to continue investment in BLMIS ~~for the account of Sentry~~.

130.    ~~108.~~ Additionally, the Beneficial Shareholders were not entitled to receive ~~any portion of~~ the Redemption Payments received by Huang upon the redemption of Shares issued to him/her in his/her capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because, as was unknown to Sentry, the amounts transferred with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by Huang for his/her redemption of Shares to be in excess of the ~~actual~~ Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

131.    ~~109.~~ The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for ~~any portion of any of~~ the Redemption Payments or any portion thereof received by them.

~~110. Upon information and belief, some or all of the Beneficial Shareholders~~, in that they received ~~and retained~~ Redemption Payments made for amounts far in excess of ~~amounts paid by them for~~ the ~~purchase~~Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

132.    ~~111.~~ The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

133.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will

43

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 109 of 133

REDACTED WITH REDACT-IT

be disproportionately and unjustly borne by Sentry and Sigma and other shareholders and creditors of Sentry.

134. ~~112.~~ It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

135. ~~113.~~ The Foreign Representatives in their capacities as liquidators of Sentry and on behalf of Sentry are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them~~.~~, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SEVENTH CLAIM
### *(Constructive Trust – Against all Defendants)*

136. ~~114.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~113~~135 above as if set forth herein.

137. ~~115.~~ As described above, upon receipt of a redemption request, Sentry made each of the Redemption Payments to Huang based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the ~~actual~~ Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

138. ~~116.~~ As alleged above, the Redemption Payments generally represented ~~money deposited with BLMIS by other BLMIS investors or previous deposits of Sentry with BLMIS, never invested but rather misused and misappropriated as part of~~the proceeds arising from or to continue investment in what the world now knows was Madoff's ~~fraud. The source of~~Ponzi

44

scheme. Accordingly, these Redemption Payments ~~was~~did not, as Sentry mistakenly believed, represent the proceeds ~~from the sale of securities and investments held by~~arising from the profitability of (or to continue investment in) BLMIS ~~for the account of Sentry~~.

139. ~~117.~~ Upon information and belief, Huang may have paid some or all of the Redemption Payments ~~s/~~he/she received to the Beneficial Shareholders.

140. ~~118.~~ By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

141. ~~119.~~ Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Huang for his/her redemption of Shares to be in excess of the ~~actual~~ Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

142. ~~120.~~ It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

143. ~~121.~~ By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry for the benefit of the Foreign Representatives and Sentry and other shareholders and creditors of Sentry.

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 111 of 133

REDACTED WITH REDACT-IT

## EIGHTH CLAIM
### (Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against Huang)

144. ~~122.~~ The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through ~~121~~143 above as if set forth herein.

145. ~~123.~~ Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

146. ~~124.~~ A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

147. ~~125.~~ The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) ~~...~~ . . . causes the company to become insolvent."  BVI Insolvency Act~~,~~ § 244(2).

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B - Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 112 of 133

REDACTED WITH REDACT-IT

148. 126. For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c) … (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act, §§ 8, 244(3).

149. 127. For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator . . . ." BVI Insolvency Act § 244(1).

150. 128. The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed." BVI Insolvency Act, § 244(1). Thus, the vulnerability period, for each of the Funds, is the period commencing two years prior to the application for the appointment of the Liquidators for each Fund and ending on the date of the appointment of the liquidators of each Fund.

151. 129. A "connected person" is:

(1) … one or more of the following:

(a) a promoter of the company;

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

> (h) a trustee of a trust having as a beneficiary a person who is, apart from this
> paragraph, a connected person.

BVI Insolvency Act, § 5 (emphasis added).

152. ~~130.~~ Redemption Payments aggregating USD $276,462.00 were made by Sentry to Huang during the two-year period prior to the application for appointment of the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

153. ~~131.~~ During the Sentry Vulnerability Period, Sentry was insolvent or was rendered insolvent by the making of Redemption Payments.

154. ~~132.~~ Each of the Redemptions and/or Redemption Payments made during the Sentry Vulnerability Period ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

155. ~~133.~~ Huang was a shareholder (i.e., a member) of Sentry during the Sentry Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

156. ~~134.~~ Each of the Vulnerability Period Payments put Huang in a better position than ~~s/he~~ it would have been in had such Payment not been made.

157. ~~135.~~ Because Huang was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions~~" and "did not take place in the ordinary course of business~~." Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent. This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, i.e. using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for

48

investing those monies and also withdrawing monies from BLMIS to pay redeemers).  Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in BLMIS.  On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

158.   In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of any business" of Sentry, nor.  Even were they made for any legitimate business purpose,this not presumed, the same would follow in that, among other things, each Vulnerability Period Payment was determined and paid based on arepresented a distribution of monies (including fictitious Net Asset Value and was made incidental to and as a necessary part ofprofits) from Madoff's Ponzi scheme. or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

159.   136.  Each of the Vulnerability Period Payments was made following receipt by Sentry of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles.  Following the receipt by Sentry of a notice of redemption by Huang, Huang became a contingent creditor. Upon the subsequent redemption of Huang's shares and until such time as Huang received the Vulnerability Period Payment that became due and payable by reason of Huang's redemption of Shares, Huang was a "creditor" of Sentry as defined in the BVI Insolvency Act, as Huang would have hadwith an admissible claim against Sentry in the BVIany subsequent liquidation Proceedingof Sentry had the Vulnerability Period payment not been madeof the Redemption Price not been made, albeit that post-liquidation Huang would have been deferred to outside creditors.

137. Further, upon information and belief, Huang may assert claims against Sentry in this action or elsewhere which, if proven, allowed and/or admitted, would make him/her a "creditor" of Sentry as defined by the BVI Insolvency Act.

160. 138. By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to recover from Huang an amount equal to the Vulnerability Period Payments received by Huang from Sentry.

## NINTH CLAIM
### *(Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against Beneficial Shareholders)*

161. 139. The Foreign Representatives, in their capacities as Foreign Liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 138160 above as if set forth herein.

162. 140. Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

163. 141. Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders.

164. 142. To the extent that any money that Huang received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to avoid and set aside such further transfer by Huang to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability

10-03635-jpm   Doc 144-2   Filed 10/26/16   Entered 10/26/16 10:41:02   Exhibit B - Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE   Pg 116 of 133

REDACTED WITH REDACT-IT

Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## TENTH CLAIM
### *(Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act - Against Huang)*

165.   143. The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 142167 above as if set forth herein.

166.   144. Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction with a person if (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a) the company enters into the transaction in good faith and for the purposes of its business; and (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that (a) the transaction was an insolvency transaction; and (b) subsection (2) did not apply to the transaction.

167.   145. During the Sentry Vulnerability Period, all assets purportedly held by BLMIS for Sentry and other investors were non-existent, and Sentry was insolvent or rendered insolvent by the Vulnerability Period Payments as alleged in paragraph 157 above. Thus, each

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 117 of 133

REDACTED WITH REDACT-IT

of the Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of the BVI Insolvency Act.

168.   146.  Sentry received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sentry received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry to Huang for each of the Vulnerability Period Payments.

169.   147.  Huang was a shareholder (i.e., a member) of Sentry during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

170.   148.  Because Huang was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" and "did not take place in the ordinary course of business." Further, even were this not presumed, there is a statutory presumption that the Vulnerability Period Payments were not made in the ordinary course of any business of Sentry, nor were they made for any legitimate business purpose, in that, among other things, each Vulnerability Period Payment was determined and paid based on a fictitious Net Asset Value and was made incidental to and as a necessary part of Madoff's good faith and for the purposes of the Funds' business with reasonable grounds to believe that they would benefit the Funds.  Even were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious profits from a Ponzi scheme such as BLMIS.

171.   149.  By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to an order avoiding and setting

aside the Vulnerability Period Payments and to recover from Huang an amount equal to the Vulnerability Period Payments received by Huang from Sentry.

## ELEVENTH CLAIM
### *(Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act - Against Beneficial Shareholders)*

172. ~~150.~~ The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through ~~149~~171 above as if set forth herein.

173. ~~151.~~ Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for Beneficial Shareholders.

174. ~~152.~~ Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders.

175. ~~153.~~ To the extent that any money that Huang received in connection with the Vulnerability Period Payments was transferred to Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to avoid and set aside such further transfer by Huang to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act

## TWELFTH CLAIM
### *(Breach of Contract - Against Huang)*

176. ~~154.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~153~~175 above as if set forth herein.

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 119 of 133

REDACTED WITH REDACT-IT

177. 155. Huang, upon information and belief, entered into athe Initial Subscription Agreement with Sentry, on or about July 24, 2003 (the "Initial Subscription Agreement") , pursuant to which the SubscriberHuang subscribed for a total of 95.12 Shares (the "Shares"). Huang's subscription for shares was made pursuant to the terms of the Initial Subscription Agreement itself as well as the terms of the other documents referred to therein, namely; (i) Sentry's Private Placement Memorandum (as amended from time to time) (the "PPM"); and (ii) Sentry's Memorandum of Association and Articles of Association (the "Articles"). Subsequent to entering into the Initial Subscription Agreement, upon information and belief, Huang, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry on or about January 6, 2004 and October 1, 2004 pursuant to which he/she subscribed for 301.23 additional shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement. The Initial Subscription Agreement, together with the Subsequent Subscription Agreements, including all of the terms and provisions incorporated therein by reference to the PPMPrivate Placement Memorandum (as amended from time to time) and the Articles, isare collectively referred to herein as the "Subscription Agreement".Fund Documents."

178. 156. The Subscription Agreement providesFund Documents provide for the calculation of the redemption price for Shares (the "Redemption Price") based on the "Net Asset Value per Share." Net Asset Value ("NAV") per share is to be determined by the directors of Sentry as of the relevant valuation day "by dividing the value of the net assets of [Sentry] by the number of Shares then in issue [.]" Articles at 11(1).

179. 157. The Subscription Agreement providesFund Documents provide that in determining NAVthe Net Asset Value per share for each class of shares issuesissued, the value

54

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 120 of 133

REDACTED WITH REDACT-IT

of the net assets of the Fund is to be adjusted "to take into account any dividends, distributions, assets or liabilities" attributable to such class of shares.  Articles at 11(1).  Pursuant to the ~~Subscription Agreement~~Fund Documents, each subscriber, including Huang acknowledges that "the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's investment and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value." See Initial Subscription Agreement~~,~~ ¶ 10.

180.    ~~158.~~ With respect to the valuation of different types of assets, the ~~Subscription Agreement prescribes~~Fund Documents prescribe methods of valuation that are, however, subject to the exercise of the judgment and discretion by the Directors of Sentry.  For example, with respect to the valuation of assets consisting of securities, the ~~Subscription Agreement prescribes~~Fund Documents prescribe methods of valuation based on price and market data, provided however that "[i]f the Directors determine that [any of the prescribed methods of valuation] does not fairly represent its market value, the Directors shall value such securities as they determine and shall set forth the basis of such valuation in writing in the Company's records[.]"  Articles at 11(3)(b).

181.    ~~159.~~ With respect to the value of any shares of stock held by Sentry in an "investment company," the ~~Subscription Agreement provides~~Fund Documents provide for valuation "in accordance with the manner in which such shares are valued by such investment company" provided however that "the Directors may make such adjustments in such valuations the Directors may from time to time consider appropriate."  Articles at 11(3)(c).

182.    ~~160.~~ With respect to assets that have been "realised or contracted to be realised" the ~~Subscription Agreement provides~~Fund Documents provide for the inclusion of the assets

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 121 of 133

REDACTED WITH REDACT-IT

receivable in respect of such realization, provided however that "if the value of such assets is not then known exactly then its value shall be as estimated by the Directors."   Articles at 11(3)(e).

183.    161.  Additionally, the ~~Subscription Agreement provides~~Fund Documents provide that "notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion, warrant a different valuation of any securities, such securities will be valued at such prices as the Directors shall determine."   Articles at 11(3)(f).

184.    162.  The ~~Subscription Agreement provides~~Fund Documents provide that any "certificate" as to the ~~NAV~~Net Asset Value per Share or as to the Redemption Price that is given in good faith by or on behalf of the Directors "shall be binding on all parties."   Articles at 11(1).

185.    163.  No Certificate ~~issuable under the Subscription Agreement (a "Redemption Price Certificate")~~ was provided in good faith by or on behalf of the Directors to Huang in respect of any ~~NAV~~Net Asset Value determination made while Huang was a member of the Fund or in respect of any Redemption Payment made to Huang.

186.    164.  Pursuant to the ~~Subscription Agreement~~Fund Documents, at any time prior to ~~this~~the good faith issuance ~~of a Redemption Price~~and receipt of a Certificate, the Redemption Price calculated in respect of the redemptions by Huang and paid to Huang remains subject to adjustment, recalculation and redetermination based on, *inter alia*, the foregoing identified provisions of the ~~Subscription Agreement.~~Fund Documents.  Upon the true interpretation of the Fund Documents, the same contained an implied term for repayment of any over-payments, and/or such a term is to be implied on the basis of obviousness and/or as being necessary for the business efficacy of the Fund Documents and/or to give effect to the reasonable expectations of the parties.

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B - Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 122 of 133

REDACTED WITH REDACT-IT

187. ~~165.~~ Upon information and belief, Huang received the Redemption Payments listed on Exhibit A in respect of Shares submitted for redemption.

188. ~~166.~~ Subsequent to December 8, 2008, Sentry has determined that the ~~NAV~~Net Asset Value calculations upon which Redemption Payments were made to Huang included assets not held by or on behalf of Sentry at the time of the making of such payments and, additionally, that such ~~NAV~~Net Asset Value calculations failed to account for and make appropriate deduction of liabilities of Sentry existing at the time such payments.  For these and other reasons, such ~~NAV~~Net Asset Value calculation substantially overstated the net asset value of the assets of Sentry.

189. ~~167.~~ To the extent that Huang has received Redemption Payments in excess of the ~~NAV~~Net Asset Value of the Shares redeemed, Huang is contractually obligated to return amounts in excess of the ~~actual NAV~~Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

190. ~~168.~~ Following determination by the Fund that Redemption Payments made to Huang had been calculated on the basis of an overstated ~~NAV~~Net Asset Value, demand has been made ~~to~~on Huang to return excess and overpaid Redemption Payments to the Fund.

191. ~~169.~~ Huang has failed and refused to repay to the Fund the amount that, under the ~~Subscription Agreement~~Fund Documents, he/she is contractually required to repay to the Fund.

192. ~~170.~~ The failure of Huang to make the repayment requested constitutes a breach of the ~~Subscription Agreement~~Fund Documents for which Sentry is entitled to the award of damages.

**THIRTEENTH CLAIM**
*(Breach of Contract - Against Beneficial Shareholders)*

10-03635-jpm   Doc 144-2   Filed 10/26/16   Entered 10/26/16 10:41:02   Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE   Pg 123 of 133

REDACTED WITH REDACT-IT

193. ~~171.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~170~~192 above as if set forth herein.

194. ~~172.~~ Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the ~~Subscription Agreements~~Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

195. ~~173.~~ Each Beneficial Shareholder authorized Huang to enter into the ~~Subscription Agreement~~Fund Documents on his, her or its behalf and to bind the Beneficial Shareholder to the agreements and representations contained therein to the same extent as had the Beneficial Shareholder executed the ~~Subscription Agreement~~Fund Documents on his, her or its, own behalf.

196. ~~174.~~ Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her from Sentry to accounts of the Beneficial Shareholders.

197. ~~175.~~ To the extent that any Beneficial Shareholder has received Redemption Payments in excess of the ~~NAV~~Net Asset Value of the Shares redeemed, such Beneficial Shareholder is contractually obligated to return amounts in excess of the ~~actual NAV~~Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

198. ~~176.~~ Following determination by the Fund that Redemption Payments made to Huang had been calculated on the basis of an overstated ~~NAV~~Net Asset Value, demand was made on the Beneficial Shareholders by demand on Huang for the return of excess and overpaid Redemption Payments.

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B - Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 124 of 133

REDACTED WITH REDACT-IT

199. ~~177.~~ The Beneficial Shareholders have failed and refused to repay to the Fund the amounts that, under the ~~Subscription Agreement, he, she or it is~~<u>Fund Documents, they are</u> contractually required to repay to the Fund.

200. ~~178.~~ The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the ~~Subscription Agreement~~<u>Fund Documents</u> for which Sentry is entitled to the award of damages.

## FOURTEENTH CLAIM
### *(Breach of Implied Covenant of Good Faith and Fair Dealing - Against Huang)*

201. ~~179.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~178~~<u>200</u> above as if set forth herein.

202. ~~180.~~ Following determination by the Fund that Redemption Payments to Huang had been made on the basis of an overstated ~~NAV~~<u>Net Asset Value</u>, demand was made to Huang to return excess and overpaid Redemption Payments to Sentry.

203. ~~181.~~ Huang has failed and refused to make the requested repayment to Sentry.

204. ~~182.~~ By retaining the Redemption Payments to which Huang is not entitled, Huang has deprived Sentry of the benefit of its bargain and has subverted the ~~Subscription Agreement~~<u>Fund Documents</u>.

205. ~~183.~~ The failure of Huang to make the repayment requested constitutes a breach of the covenant of good faith and fair dealing that inheres in the ~~Subscription Agreement~~<u>Fund Documents</u> for which Sentry is entitled to the award of damages.

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 125 of 133

REDACTED WITH REDACT-IT

## FIFTEENTH CLAIM
### *(Breach of Implied Covenant of Good Faith*
### *and Fair Dealing - Against Beneficial Shareholders)*

206. 184. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 183205 above as if set forth herein.

207. 185. Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription AgreementsFund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

208. 186. Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her from Sentry to accounts of the Beneficial Shareholders.

209. 187. Following determination by the Fund that Redemption Payments made to Huang had been calculated on the basis of an overstated NAVNet Asset Value, demand was made on the Beneficial Shareholders by demand on Huang for the return of excess and overpaid Redemption Payments.

210. 188. The Beneficial Shareholders have failed and refused to make repayment to Sentry.

211. 189. By retaining the Redemption Payments to which they are not entitled, the Beneficial Shareholders have deprived Sentry of the benefit of its bargain and have subverted the Subscription AgreementFund Documents.

212. 190. The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the implied covenant of good faith and fair dealing that inheres in the Subscription AgreementsFund Documents for which Sentry is entitled to the award of damages.

**SIXTEENTH CLAIM**
*(Declaratory Judgment - Against All Defendants)*

213. ~~191.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~190~~212 above as if set forth herein.

214. ~~192.~~ An actual and justiciable controversy exists between the Plaintiffs and the Defendants with respect to the obligation of the Defendants to repay to the ~~Fund~~Funds all or a portion of amounts received by them as excess or overpaid Redemption Payments under circumstances where:

(i)    ~~(i)~~ the ~~NAV~~Net Asset Value per share calculation upon which the Redemption Price was paid, directly or indirectly, to any Defendant has been subsequently adjusted, recalculated or redetermined in accordance with the ~~Subscription Agreement~~Fund Documents;

(ii)    ~~(ii)~~ the resulting adjusted, recalculated and redetermined Redemption Price is less than the Redemption Price paid to the Defendant; ~~and~~

(iii)    ~~(iii)~~ prior to such adjustment, recalculation or redetermination, no ~~Redemption Price~~binding Certificate has been issued by the Fund~~.~~; and

(iv)    Citco issued no Certificates in good faith.

215. ~~193.~~ The harm to Sentry is real and immediate because, a result of the failure and refusal of the Defendants to make repayment, Sentry has become insolvent and is presently unable to pay its debts as they fall or will fall due.

216. ~~194.~~ Plaintiffs have no adequate remedy at law.

217. ~~195.~~ Pursuant to 28 U.S.C. § 2201 et. seq., Plaintiffs are entitled to a declaration by this Court declaring that, pursuant to the ~~Subscription Agreements~~Fund Documents, each

61

REDACTED WITH REDACT-IT

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 127 of 133

Defendant must repay Sentry that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First, Third and Fifth Claims, judgment in favor of Plaintiffs and against Huang allowing the Plaintiffs to recover an amount equal to the Redemption Payments received by Huang, plus interest; or, in the alternative, an amount equal to the amount of the Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

B.    On the Second, Fourth and Sixth Claims, judgment in favor of Plaintiffs and against Beneficial Shareholders allowing the Plaintiffs to recover an amount equal to any portion of any Redemption Payments received by the Beneficial Shareholders, plus interest; or, in the alternative, an amount equal to any portion of the Redemption Payments received by the Beneficial Shareholders less the amount of such portion that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

C.    On the Seventh Claim, imposition of a constructive trust on Redemption Payments; and

D.    On the Eighth and Ninth Claims:

i.    a declaratory judgment in favor of the Foreign Representatives and against Huang and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

      bii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

      ciii.    judgment pursuant to Section 249 of the BVI Insolvency Act against Huang and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest.

E.    On the Tenth and Eleventh Claims:

      ai.    a declaratory judgment in favor of the Foreign Representatives and against Huang and the Beneficial Holders that the RedemptionRedemptions and/or Vulnerability Period Payments made during the vulnerability period constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

      bii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the RedemptionRedemptions and/or Vulnerability Period Payments made during the vulnerability period; and

      ciii.    judgment pursuant to Section 249 of the BVI Insolvency Act against Huang and the Beneficial Holders in the amount of the avoided RedemptionVulnerability Period Payments received by them or for their benefit, plus interest.

F.    On the Twelfth and Fourteenth Claims, judgment against Huang and in favor of the Plaintiffs in an amount to be determined at trial;

G.    On the Thirteenth and Fifteenth Claims, judgment against the Beneficial Shareholders and in favor of the Plaintiffs in an amount to be determined at trial;

H.    On the Sixteenth Claim, a declaratory judgment against the Defendants and in favor of the Plaintiffs that, under the Subscription AgreementsFund Documents, the Defendants must repay that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry;

I.    Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

J.    Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
September 7, 2016

BROWN RUDNICK LLP


By:   */s/ David J. Molton*
   David J. Molton
   May Orenstein
   Daniel J. Saval
Seven Times Square
New York, New York 10036
Telephone: 212.209.4800
Facsimile: 212.209.4801

*Attorneys for the Foreign*
~~*Representative*~~*Representatives*

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B - Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 131 of 133

REDACTED WITH REDACT-IT

# EXHIBIT A

REDACTED WITH REDACT-IT

*Redemption Payments Received by Defendants from Sentry*
*From July 19, 2007 Through November 19, 2008*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| July 19, 2007 | $11,450.53* | 9.15 | Bank of Kaohsiung Ming Chen Branch, Taiwan |
| January 17, 2008 | $109,787.08* | 85.00 | Bank of Kaohsiung Ming Chen Branch, Taiwan |
| November 19, 2008 | $155,224.49* | 115.00 | Bank of Kaohsiung Ming Chen Branch, Taiwan |

* Denotes Redemptions in the Sentry Vulnerability Period.

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.

10-03635-jpm    Doc 144-2    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit B -
Citigroup Global Markets Limited Proposed Amended Complaint_REDACTE    Pg 133 of 133

REDACTED WITH REDACT-IT

| **Summary report:** | |
|---|---|
| **Litéra® Change-Pro TDC 7.5.0.127 Document comparison done on 9/7/2016 2:31:40 PM** | |
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://WORKSITE/WorkSiteUS/60585324/2 | |
| **Modified DMS:** iw://WORKSITE/WorkSiteUS/60585324/4 | |
| **Changes:** | |
| Add | 530 |
| Delete | 467 |
| Move From | 17 |
| Move To | 17 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1031 |