# EXHIBIT C

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>**FAIRFIELD SENTRY LIMITED, et al.,**<br><br>    Debtors in Foreign Proceedings.<br><hr>**FAIRFIELD SENTRY LIMITED (IN LIQUIDATION),** acting by and through the Foreign Representatives thereof, and **KENNETH KRYS and CHARLOTTE CAULFIELD,** solely in their capacities as Foreign Representatives and Liquidators thereof,<br><br>               **Plaintiffs,**<br><br>    -against-<br><br>**CITIGROUP GLOBAL MARKETS LIMITED** and **BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF CITIGROUP GLOBAL MARKETS LIMITED 1-1000,**<br><br>               **Defendants.** | **Chapter 15 Case**<br><br>**Case No. 10-13164 (SMB)**<br><br>**Jointly Administered**<br><br><br><br><br><br>**Adv. Pro. No. 11-02770 (SMB)**<br><br>**NOTICE OF FILING OF PROPOSED AMENDED COMPLAINT** |

**PLEASE TAKE NOTICE** that Fairfield Sentry Limited ("<u>Sentry</u>"), by and through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "<u>Foreign Representatives</u>"), and Kenneth Krys and Charlotte Caulfield (together with Sentry, the "<u>Plaintiffs</u>"), solely in their capacities as the Liquidators of Sentry and the Foreign Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited, and

Fairfield Lambda Limited pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands, hereby file the enclosed proposed amended complaint in the above-captioned adversary proceeding (the "Proposed Amended Complaint").

    **PLEASE TAKE FURTHER NOTICE** that a clean copy of the Proposed Amended Complaint is filed herewith as Exhibit A.

    **PLEASE TAKE FURTHER NOTICE** that a document showing the Proposed Amended Complaint redlined against the operative complaint in the above-captioned adversary proceeding is filed herewith as Exhibit B.

Dated: New York, New York
       September 20, 2016

                           **BROWN RUDNICK LLP**

                           By:   */s/ David J. Molton*
                                David J. Molton
                                May Orenstein
                                Daniel J. Saval

                           Seven Times Square
                           New York, New York 10036
                           Telephone: 212.209.4800
                           Facsimile: 212.209.4801

                           *Attorneys for the Foreign Representatives*

# EXHIBIT A

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**FAIRFIELD SENTRY LIMITED, et al.,**<br><br>    **Debtors in Foreign Proceedings.** | )  **Chapter 15 Case**<br>)<br>)  **Case No. 10-13164 (SMB)**<br>)<br>)  **Jointly Administered**<br>)<br>) |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION),** acting by and through the Foreign Representatives thereof, and **KENNETH KRYS and CHARLOTTE CAULFIELD,** solely in their capacities as Foreign Representatives and Liquidators thereof,<br><br>               **Plaintiffs,**<br><br>        -against-<br><br>**CITIGROUP GLOBAL MARKETS LIMITED and BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF CITIGROUP GLOBAL MARKETS LIMITED 1-1000,**<br><br>               **Defendants.** | )<br>)<br>)<br>)<br>)  **Adv. Pro. No. 11-02770**<br>)  **(SMB)**<br>)<br>)  **SECOND AMENDED**<br>)  **COMPLAINT**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

    Fairfield Sentry Limited ("Sentry"), by and through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "Foreign Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and the Foreign Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending before the Commercial Division

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 6 of 128

REDACTED WITH REDACT-IT

of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for
their complaint against Defendants, allege the following based on personal knowledge or
information derived from the Funds' books and records or from other sources, including, *inter
alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This action and similar actions are brought by the Plaintiffs, with the approval of
the foreign court having jurisdiction over the matter, to recover payments made to shareholders
for the redemption of shares in the Funds prior to December 2008.

2.      The Funds were created as a means for private investment in managed accounts
with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that
Bernard L. Madoff used to perpetrate his massive Ponzi scheme.  Sentry was the largest of all so-
called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect
BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss
Franc investments) through purchases of shares of Sentry.  Sentry's account statements with
BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held
by BLMIS for Sentry.  As stated in their offering materials, the Funds' investment objective was
to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of
Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3.      It is now known that these types of feeder funds were essential to the perpetration
of Madoff's Ponzi scheme.  In order for the Ponzi scheme to operate, Madoff required a
continuous flow of new investors and investments to be able to satisfy redemption requests from
early investors.  Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and
Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS), brought

2

new investors into this scheme, allowing Madoff to make payments to early investors and thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.    From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares was transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff.  Prior to December 2008, the voting participating shares of Sentry ($.01 par value per share), Sigma (€.01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value."  Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund, net of certain expenses ("Net Asset Value").

5.    From time to time, in order to make payments to investors for the redemption of Shares ("Redemption Payments"), Sentry generally made withdrawals from its BLMIS accounts. On occasion, Sentry made Redemption Payments directly from amounts on hand invested by other subscribers in the Funds.  At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by BLMIS for Sentry.  The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which was calculated based principally on the assets that the Funds believed were being held, and investments that were being made, by BLMIS for Sentry's account.

REDACTED WITH REDACT-IT

6.      As the world now knows, Madoff was operating a massive Ponzi scheme through BLMIS.  Thus, at all relevant times, the money that Sentry transferred to BLMIS was not invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses.  Further, none of the securities shown on statements provided to Sentry by BLMIS were in fact purchased for Sentry.  Additionally, none of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of sales of securities or other investments.  Instead, such amounts represented the monies of more recent investors into the Madoff scheme.

7.      In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent, and the Funds were insolvent at the time Redemption Payments were made or they were rendered insolvent by those payments.  As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

8.      At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of his fraud.  Similarly, the Redemption Payments that the Funds made to redeeming shareholders were not made in the ordinary course of any business or for any legitimate purposes.  Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from

4

investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme.  These payments were crucial in perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9.    During the period from and after October 14, 2005 through November 19, 2008, following the receipt by Sentry of notices of redemption, Sentry made Redemption Payments to accounts held in the name of Defendant Citigroup Global Markets Limited ("CGML") aggregating USD $130,000,000.

10.    At the time such payments were made, Sentry mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption.  In fact, however, as stated, the Redemption Payments made to CGML far exceeded the Net Asset Value of Shares redeemed that would have been calculated based on the true facts existing at that time or any relevant time.  Moreover, these Redemption Payments did not, as Sentry intended, represent the proceeds arising from the profitability of or to continue investment in BLMIS.  Instead, any amounts obtained directly or indirectly by Sentry from BLMIS to make Redemption Payments to CGML generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

11.    Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them, and, at all relevant times, the Funds were unable to pay their debts as they fell or

would fall due.  Indeed, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.

12.     In particular, claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (SMB) (the "BLMIS Adversary Proceeding").  As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.  This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud. The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.  At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

13.     On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda.  The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments,

REDACTED WITH REDACT-IT

and other creditors of the Funds, and further increased the amount of those liabilities.  In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

14.    Upon information and belief, CGML has either retained the Redemption Payments made to it by Sentry for its own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities for whom CGML may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with CGML, the "Defendants").

15.    Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value.  As of December 2008 and presently, Sentry, Sigma, and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

16.    Unless Redemption Payments paid to shareholders are recovered for the Funds' estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may be made against them; further, recoveries of Redemption Payments will increase distributions to the Funds' investors who have been harmed.  Moreover, to the extent such liabilities and claims must be satisfied solely from the Funds' current assets, Defendants will have been unjustly enriched as they will not bear their proportionate share of such liabilities and claims, but rather will retain a windfall at the expense of other shareholders and creditors of the Funds.

REDACTED WITH REDACT-IT

## JURISDICTION AND VENUE

17.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re Fairfield Sentry Limited, et al., No. 10-13164 (SMB), pending in this Court.    Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, SIPA Liquidation No. 08-1789 (SMB).    Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

18.    This is a core proceeding under 28 U.S.C. § 157(b)(2).[1]    Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

19.    This Court has jurisdiction over CGML and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney 2008) because CGML and the Beneficial Shareholders

---

[1]    Although the District Court, in In re Fairfield Sentry Ltd., No. 1:11-mc-00224-LAP, 458 B.R. 665 (S.D.N.Y. 2011), held that causes of action alleged by the Plaintiffs in other cases before this Court—causes of action that are similar or the same as those alleged in this complaint—are not core proceedings, this determination may be subject to appeal.  In any event, plaintiffs submit that the causes of action in this complaint, which include, inter alia, allegations regarding transfers of property that were directed into the territorial jurisdiction of the United States, render the claims asserted in this complaint core in accordance with the District Court's decision.

8

REDACTED WITH REDACT-IT

purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and maintaining bank accounts in the United States at JP Morgan Chase NA, and in fact receiving Redemption Payments in those United States-based and/or New York-based accounts.    On information and belief, CGML also has subsidiaries or affiliates doing business in the United States and/or conducts business itself in the United States.  CGML and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, designated United States-based and/or New York-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those bank accounts.  CGML and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.  CGML and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

20.    Moreover, CGML has waived any objection to personal jurisdiction in an action brought by the BLMIS Trustee in the U.S. in the United States Bankruptcy Court for the Southern District of New York, Adversary Proceeding Number 10-05345 (BRL), in connection with claims that the BLMIS Trustee has asserted for the same Redemption Payments being claimed in this action.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

9

## PARTIES

### Plaintiffs

22.    Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

23.    The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names. On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "Lambda Appointment Order"). On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order"). On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order"). On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds. On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, and the Supplemental Appointment Order, the "BVI Appointment Orders"). The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having

10

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 15 of 128

REDACTED WITH REDACT-IT

jurisdiction over the matter to bring this action and the claims herein, including the avoidance
claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

24.     Pursuant to the BVI Appointment Orders, the Foreign Representatives are
responsible for all aspects of the Funds' businesses, including, among other things, custody and
control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of
the Funds, any deeds, receipts or other documents, and the power to compromise claims,
commence litigation and to dispose of property.    After obtaining BVI Court approval, the
Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title
11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as
"foreign main proceedings" under Chapter 15.    On July 22, 2010, this Court issued an order (the
"Recognition Order") granting that recognition.

25.     Pursuant to the Recognition Order, the Foreign Representatives were
automatically afforded relief available under 11 U.S.C. § 1520, including application of the
Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as
well as the ability to operate the Funds' business and exercise the rights and powers of a trustee
under Sections 363 and 552 of the Bankruptcy Code.    Moreover, the Bankruptcy Court
specifically granted additional relief in the Recognition Order to the Foreign Representatives
pursuant to 11 U.S.C. § 1521(a).    Such relief includes, but is not limited to: (i) staying any
actions, proceedings or execution against the Funds' assets to the extent not stayed under Section
1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning
the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign
Representatives with the administration and realization of the Funds' assets that are located

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 16 of 128

REDACTED WITH REDACT-IT

within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the proceedings before the BVI Court.

**Defendants**

26.    CGML was, at all relevant times, a member of Sentry and a registered holder of Shares.  Upon information and belief, CGML is a corporate entity organized under the laws of the United Kingdom and having its registered address at Citigroup Centre, 33 Canada Sq. Canary Wharf, London  E14 5LB, United Kingdom.  CGML subscribed for the purchase of Shares by entering into one or more written agreements with Sentry.

27.    Defendants "Beneficial Owners of the Accounts Held in the Name of Citigroup Global Markets Limited" - i.e., the Beneficial Shareholders, are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry issued to CGML and on whose behalf CGML was acting as trustee, agent, representative, or nominee.

## NOTICE PURSUANT TO FED. R. CIV. P. 44.1

28.    Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

## FACTUAL ALLEGATIONS

A.    **Role of Feeder Funds In Madoff Fraud**

29.    Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials,

Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

30.     As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**B.     Calculation of Net Asset Value and Shareholder Redemption Payments**

31.     Substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy.  In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

32.     In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry.  Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 18 of 128

REDACTED WITH REDACT-IT

addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

33.    In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements.    None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred.    Indeed, no investments of any kind were ever made by BLMIS for Sentry.    At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious.    Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

34.    From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS). The Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or to continue investment in BLMIS.    In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.    At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of

his fraud.  The payments from BLMIS to Sentry were not payments made in the ordinary course

of or as part of any business, nor did they have a legitimate business purpose.  Similarly, the

Redemption Payments were not made for any legitimate purposes or in the ordinary course of

any business.

35.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi

scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of

Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to

the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme.  At all relevant

times, the Funds were insolvent when the Redemption Payments were made or were rendered

insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

**C.    Redemption Payments Made or Transferred to Defendants**

36.    During the period from and after October 14, 2005 through November 19, 2008,

CGML received Redemption Payments totaling USD $130,000,000 from Sentry in respect of

Shares tendered for redemption.

37.    At CGML's directions and instructions, CGML received all of its Redemption

Payments at its bank account with JP Morgan Chase NA in New York.

38.    The dates and amounts of each Redemption Payment received by CGML from

Sentry, and the CGML bank accounts to which each Redemption Payment was made, are set

forth on Exhibit A.

39.    At the time those Redemption Payments were made, the Funds had insufficient

assets and were unable to pay their debts as they would fall due.  In exchange for each

Redemption Payment, each of which constitutes or forms part of a transaction between CGML

and Sentry, Sentry received no consideration or consideration of a value that, in money or

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 20 of 128

REDACTED WITH REDACT-IT

money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry.

40.     Upon information and belief, CGML and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**D.     Citco Did Not Issue Any Certifications of Net Asset Value in "Good Faith"**

41.     Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share . . . given in good faith by or on behalf of the Directors shall be binding on all parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").  The Privy Council did not, however, address whether such Certificates were given "in good faith."  In carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "Citco") acted with a lack of good faith in giving the Certificates.





*REDACTED*



*REDACTED*



*REDACTED*



*REDACTED*



REDACTED



*REDACTED*



*REDACTED*



*REDACTED*

*REDACTED*

70.    By virtue of the foregoing conduct, Citco issued the Certificates without good

faith.  The Funds were the primary victims of Citco's conduct and its lack of good faith in

issuing the Certificates.

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C - Huang Proposed Amended Complaint_REDACTED    Pg 30 of 128

REDACTED WITH REDACT-IT

E.    **Citibank NA Knew or Should Have Known of the BLMIS Fraud**[2]

71.    By no later than June 2007, and likely several years earlier, Citigroup had knowledge of the possibility of Madoff's Ponzi scheme. Citigroup's Global Head of Options Strategy and Global Head of Equity Derivatives Research, Leon Gross, was responsible for making recommendations to investors on equity derivatives and other assets. Upon information and belief, Gross had the opportunity to meet and befriend Harry Markopolos, a fellow member of the financial industry. Markopolos is a certified financial analyst who, for many years, had been asserting that Madoff was most likely operating a Ponzi scheme and that BLMIS's investment advisory business was a complete fraud.

72.    Markopolos reached out directly to Gross via e-mail in June 2007, informing Gross of Markopolos's suspicions regarding an unspecified leveraged swap that provided exposure to Madoff. Markopolos made his suspicions regarding Madoff clear stating, "[w]e all know how Ponzi schemes turn out." Upon information and belief, Markopolos and Gross had additional oral and written communications before December 10, 2008, in which Madoff's fraud was specifically discussed.

73.    Years before the collapse of BLMIS, and before the June 2007 email, Gross met with Markopolos at Citigroup's and its affiliates' New York offices. During that visit, Markopolos showed Gross a description of Madoff's "split-strike conversion" strategy and historical returns generated by that trading strategy as reported by a Madoff Feeder Fund, which, upon information and belief, was Sentry.

---

[2]The allegations set forth in Paragraphs 41 through 45 of this Complaint are made by the Foreign Representative upon information and belief based on allegations set forth in the complaint filed by the Madoff Trustee in Picard v. Citibank N.A., 10-05345 (Bankr. S.D.N.Y.). Upon information and belief, the allegations of the BLMIS Trustee are based on an extensive investigation and the analysis of documentary evidence as well as other sources.

74.    Markopolos asked Gross whether the strategy that was described could result in the returns claimed.  Within minutes, Gross concluded that Madoff's strategy as described could not generate the returns indicated by the Madoff Feeder Fund.  Gross attempted to reconcile the discrepancy he saw between the strategy as described and the returns supposedly generated by the strategy, but could not resolve the discrepancy. Gross quickly concluded that the claimed returns were not in fact generated by the Madoff strategy as described.  Gross relayed his conclusion to Markopolos that same day.

75.    Gross and Markopolos also discussed whether others at Citigroup were familiar with Madoff trading in the equity and options markets.  That same day, before Markopolos left Citigroup's and its affiliates' offices in New York, Gross asked around various desks at Citigroup and its affiliates and quickly determined that no trader at Citigroup and its affiliates on the index trading desk was trading options with BLMIS, nor were they aware of BLMIS trading OEX options.  Gross also asked salespeople at Citigroup if they knew BLMIS as a customer or as someone who is active in the market, to which the salespeople told Gross "no."

76.    Upon information and belief, Citigroup obtained more information placing it on inquiry notice that Madoff was making fraudulent transfers when Brian Leach became the Chief Risk Officer for Citigroup and its affiliates in or around March 2008. Prior to joining Citigroup and its affiliates, Leach had been the Chief Risk Officer and Co-Chief Operating Officer of Old Lane L.P., a multi-strategy hedge fund which was acquired by Citigroup in 2007.

77.    Leach was previously the Risk Manager for Institutional Services Business at Morgan Stanley.  Upon information and belief, Leach was employed at Morgan Stanley when the firm internally blacklisted Madoff-related investments due to concerns of fraud and other

27

wrongdoing.  Shortly after Leach became Citigroup's Chief Risk Officer, Citigroup began to immediately unwind its BLMIS trades and rid itself of any and all remaining Madoff exposure.

78.    CGML served as trustee, agent, representative, nominee or custodian for the Beneficial Owners in connection with their investments in the Funds, including, by:  subscribing to Shares of Sentry on behalf of the Beneficial Owners, maintaining custody of the Shares as record shareholders, paying redemption proceeds from the Shares of Sentry to the Beneficial Owners, and otherwise exercising control over the Shares of Sentry.

79.    Further, each of the Subscription Agreements, executed by CGML, manifested the Beneficial Owners' consent for CGML to act on behalf of and subject to the Beneficial Owners' control.

80.    In executing the Subscription Agreements, CGML accepted and agreed to act on behalf of the Beneficial Owners.

81.    Accordingly, the Beneficial Owners had the same knowledge as CGML regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

**F.    Exposure of Madoff's Fraud**

82.    On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  See United States v. Madoff, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

83.    On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing

fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS.  See

SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC

submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a

permanent injunction and continuing relief against him, including a permanent freezing of his

assets.

84.    In March 2009, Madoff pleaded guilty to the criminal charges brought against

him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December

11, 2008, I operated a Ponzi scheme through the investment advisory side of my business,

Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective
> clients who wished to open investment advisory and individual trading accounts
> with me that I would invest their money in shares of common stock, options and
> other securities of large well-known corporations, and upon request, would return
> to them their profits and principal.  Those representations were false because for
> many years up and until I was arrested on December 11, 2008, I never invested
> those funds in the securities, as I had promised.  Instead, those funds were
> deposited in a bank account at Chase Manhattan Bank.  When clients wished to
> receive the profits they believed they had earned with me or to redeem their
> principal, I used the money in the Chase Manhattan bank account that belonged to
> them or other clients to pay the requested funds.

85.    Madoff further confessed to covering up his fraud by fabricating false trade

confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my
> investment advisory clients, I knowingly caused false trading confirmations and
> client account statements that reflected the bogus transactions and positions to be
> created and sent to clients purportedly involved in the split strike conversion
> strategy, as well as other individual clients I defrauded who believed they had
> invested in securities through me. The clients receiving trade confirmations and
> account statements had no way of knowing by reviewing these documents that I
> had never engaged in the transactions represented on the statements and
> confirmations.

86.    Madoff is now serving a 150-year sentence in federal prison.

**G.    The Funds' Estates in Liquidation**

87.    Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values. As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

88.    In 2009, the Funds were put into liquidation proceedings in the BVI.

89.    On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding"). The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

90.    On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding"). The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

91.    On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings"). The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

92.    As alleged above, the BVI Court issued orders – the BVI Appointment Orders – appointing the Foreign Representatives as liquidators of the Funds. Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C - Huang Proposed Amended Complaint_REDACTED    Pg 35 of 128

REDACTED WITH REDACT-IT

93.    The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry's estate that Defendants are not entitled to keep.

## FIRST CLAIM
### *(Unjust Enrichment - Against CGML)*

94.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 93 above as if set forth herein.

95.    As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to CGML, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.   The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

96.    CGML did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by it, in that it received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

97.    By reason of its receipt of monies represented as amounts deposited by other BLMIS investors or monies deposited by the Funds' subscribers, for amounts far in excess of the amounts that it would have received had the Net Asset Value of Shares been calculated based upon the true facts existing at that time or any relevant time, CGML has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

98.    It would offend principles of equity and good conscience to permit CGML to retain the Redemption Payments it received from Sentry.

31

REDACTED WITH REDACT-IT

99.     The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from CGML an amount equal to the Redemption Payments received by it from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by CGML less the amount of redemption payments that CGML would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SECOND CLAIM
### (Unjust Enrichment - Against Beneficial Shareholders)

100.     Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 99 above as if set forth herein.

101.     Upon information and belief, CGML may have subscribed to all or some portion of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

102.     Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it from Sentry to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.  Instead, Redemption Payments were made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

103.     The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 37 of 128

REDACTED WITH REDACT-IT

redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

104.    To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to CGML in its capacity as trustee, agent, representative, or nominee for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

105.    It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by Sentry.

106.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## THIRD CLAIM
### (Money Had and Received - Against CGML)

107.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 106 above as if set forth herein.

108.    As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to CGML, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.   The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 38 of 128

REDACTED WITH REDACT-IT

109.    CGML did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by it, in that it received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

110.    By reason of its receipt of monies which generally represented the proceeds arising from or to continue investment in BLMIS, which the world now knows was operated by Madoff as a Ponzi scheme, CGML has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

111.    Furthermore, CGML was not entitled to receive the Redemption Payments because the amounts of each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by CGML for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

112.    To the extent that Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

113.    It would offend principles of equity and good conscience to permit CGML to retain the Redemption Payments it received from Sentry.

114.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from CGML an amount equal to the Redemption Payments received by it from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by CGML less the amount of redemption payments that CGML

34

REDACTED WITH REDACT-IT

would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FOURTH CLAIM
### *(Money Had and Received - Against Beneficial Shareholders)*

115.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 114 above as if set forth herein.

116.    Upon information and belief, CGML may have subscribed to all or some portion of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

117.    Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.  These Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

118.    The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

119.    To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to CGML in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 40 of 128

REDACTED WITH REDACT-IT

120.    Furthermore, the Beneficial Shareholders were not entitled to receive the Redemption Payments paid to CGML upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value which caused the payment received for redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

121.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

122.    It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments made by Sentry.

123.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from the Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FIFTH CLAIM
### *(Mistaken Payment - Against CGML)*

124.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 123 above as if set forth herein.

REDACTED WITH REDACT-IT

125.    As described above, Sentry made each of the Redemption Payments to CGML under the mistaken belief that the amounts paid to CGML represented the proceeds arising from the profitability of or to continue investment in BLMIS and were based upon the Net Asset Value of Shares redeemed based upon the true facts at that time.

126.    Upon information and belief, however, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to CGML represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

127.    The Redemption Payments, while benefiting CGML, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

128.    Additionally, CGML was not entitled to receive the Redemption Payments because, as was unknown to Sentry, the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by CGML for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.  In these circumstances, the Redemption Payments should be returned for the benefit of Sentry, their creditors and the current holders of Shares in Sentry.

129.    CGML did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by it, in that it received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 42 of 128

REDACTED WITH REDACT-IT

130.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

131.    It would thus offend principles of equity and good conscience to permit CGML to retain the Redemption Payments.

132.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from CGML a sum in an amount equal to the Redemption Payments received by it from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by CGML less the amount of redemption payments that CGML would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

### SIXTH CLAIM
*(Mistaken Payment - Against Beneficial Shareholders)*

133.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 132 above as if set forth herein.

134.    As described above, Sentry made each of the Redemption Payments to CGML under the mistaken belief that the amounts paid to CGML represented the proceeds arising from the profitability of or to continue investment in BLMIS.

135.    However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to CGML represented, in fact, money deposited with BLMIS by other

10-03635-jpm   Doc 144-3   Filed 10/26/16   Entered 10/26/16 10:41:02   Exhibit C -
Huang Proposed Amended Complaint_REDACTED   Pg 43 of 128

REDACTED WITH REDACT-IT

BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

136.    Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.   These Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

137.    Additionally, the Beneficial Shareholders were not entitled to receive the Redemption Payments received by CGML upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because, as was unknown to Sentry, the amounts transferred with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by CGML for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

138.    The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

139.    The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

140.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

141.    It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

142.    The Foreign Representatives in their capacities as liquidators of Sentry and on behalf of Sentry are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SEVENTH CLAIM
### *(Constructive Trust - Against all Defendants)*

143.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 142 above as if set forth herein.

144.    As described above, upon receipt of a redemption request, Sentry made each of the Redemption Payments to CGML based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

145.    As alleged above, the Redemption Payments generally represented the proceeds arising from or to continue investment in what the world now knows was Madoff's Ponzi

40

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 45 of 128

REDACTED WITH REDACT-IT

scheme. Accordingly, these Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of (or to continue investment in) BLMIS.

146.    Upon information and belief, CGML may have paid some or all of the Redemption Payments it received to the Beneficial Shareholders.

147.    By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

148.    Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by CGML for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

149.    It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

150.    By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry for the benefit of the Foreign Representatives and Sentry and other shareholders and creditors of Sentry.

## EIGHTH CLAIM
### *(Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against CGML)*

151.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 150 above as if set forth herein.

152.    Section 245 of the BVI Insolvency Act provides:

41

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

153.    A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

154.    The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) . . . causes the company to become insolvent."  BVI Insolvency Act § 244(2).

155.    For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c) . . . (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act §§ 8, 244(3).

156.    For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 47 of 128

REDACTED WITH REDACT-IT

ending on the appointment of the administrator or, if the company is in liquidation, the liquidator

. . . ." BVI Insolvency Act § 244(1).

157.    The "onset of insolvency" is defined as: "the date on which the application for the

appointment of the liquidator was filed." BVI Insolvency Act § 244(1). Thus, the vulnerability

period, for each of the Funds, is the period commencing two years prior to the application for the

appointment of the Liquidators for each Fund and ending on the date of the appointment of the

liquidators of each Fund.

158.    A "connected person" is:

(1) . . . one or more of the following:

(a) a promoter of the company;

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in
paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this
paragraph, a connected person.

BVI Insolvency Act § 5 (emphasis added).

159.    Redemption Payments aggregating USD $100,000,000 were made by Sentry to

CGML during the two-year period prior to the application for appointment of the Liquidators of

Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

160.    During the Sentry Vulnerability Period, Sentry was insolvent or was rendered

insolvent by the making of Redemption Payments.

43

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 48 of 128

REDACTED WITH REDACT-IT

161.    Each of the Redemptions and/or Redemption Payments made during the Sentry Vulnerability Period ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

162.    CGML was a shareholder (i.e., a member) of Sentry during the Sentry Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

163.    Each of the Vulnerability Period Payments put CGML in a better position than it would have been in had such Payment not been made.

164.    Because CGML was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions."   Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent.  This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, i.e. using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers).  Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in BLMIS.  On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

165.    In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of any business" of Sentry.  Even were this not presumed, the same would follow in that, among other things, each Vulnerability Period Payment represented a distribution of monies (including fictitious profits) from Madoff's Ponzi

44

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 49 of 128

REDACTED WITH REDACT-IT

scheme or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

166.    Each of the Vulnerability Period Payments was made following receipt by Sentry of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles.  Following the receipt by Sentry of a notice of redemption by CGML, CGML became a contingent creditor.  Upon the subsequent redemption of CGML's shares and until such time as CGML received the Vulnerability Period Payment, CGML was a "creditor" of Sentry with an admissible claim against Sentry in any subsequent liquidation of Sentry had payment of the Redemption Price not been made, albeit that post-liquidation CGML would have been deferred to outside creditors.

167.    By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to recover from CGML an amount equal to the Vulnerability Period Payments received by CGML from Sentry.

## NINTH CLAIM
### *(Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against Beneficial Shareholders)*

168.    The Foreign Representatives, in their capacities as Foreign Liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 167 above as if set forth herein.

REDACTED WITH REDACT-IT

169.    Upon information and belief, CGML may have subscribed to all or some portion
of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for the
Beneficial Shareholders.

170.    Upon information and belief, CGML may have paid to or credited some or all of
the Redemption Payments received by it to accounts of the Beneficial Shareholders.

171.    To the extent that any money that CGML received in connection with the
Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign
Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are
entitled to avoid and set aside such further transfer by CGML to the Beneficial Shareholders and
to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability
Period Payments received by them, and the Foreign Representatives, in their capacities as
liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

### TENTH CLAIM
*(Undervalue Transaction Pursuant to Section 246 of the*
*BVI Insolvency Act - Against CGML)*

172.    The Foreign Representatives, in their capacities as Foreign Representatives and
liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through
171 above as if set forth herein.

173.    Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction
with a person if (a) the company makes a gift to that person or otherwise enters
into a transaction with that person on terms that provide for the company to
receive no consideration; or (b) the company enters into a transaction with that
person for a consideration the value of which, in money or money's worth, is
significantly less than the value, in money or money's worth, of the consideration
provided by the company; and (c) in either case, the transaction concerned (i) is
an insolvency transaction; and (ii) is entered into within the vulnerability period.

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C - 
Huang Proposed Amended Complaint_REDACTED    Pg 51 of 128

REDACTED WITH REDACT-IT

(2) A company does not enter into an undervalue transaction with a person if (a) the company enters into the transaction in good faith and for the purposes of its business; and (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that (a) the transaction was an insolvency transaction; and (b) subsection (2) did not apply to the transaction.

174.    During the Sentry Vulnerability Period, all assets purportedly held by BLMIS for Sentry and other investors were non-existent, and Sentry was insolvent or rendered insolvent by the Vulnerability Period Payments, as alleged in paragraph 164 above. Thus, each of the Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of the BVI Insolvency Act.

175.    Sentry received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sentry received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry to CGML for each of the Vulnerability Period Payments.

176.    CGML was a shareholder (i.e., a member) of Sentry during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

177.    Because CGML was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions." Further, there is a statutory presumption that the Vulnerability Period

47

Payments were not made in good faith and for the purposes of the Funds' business with reasonable grounds to believe that they would benefit the Funds.  Even were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious profits from a Ponzi scheme such as BLMIS.

178.    By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and to recover from CGML an amount equal to the Vulnerability Period Payments received by CGML from Sentry.

**ELEVENTH CLAIM**
***(Undervalue Transaction Pursuant to Section 246 of the
BVI Insolvency Act - Against Beneficial Shareholders)***

179.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 178 above as if set forth herein.

180.    Upon information and belief, CGML may have subscribed to all or some portion of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

181.    Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

182.    To the extent that any money that CGML received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to avoid and set aside such further transfer by CGML to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability

48

Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## TWELFTH CLAIM
### *(Breach of Contract – Against CGML)*

183.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 182 above as if set forth herein.

184.    CGML, as a Subscriber in Sentry, is bound by Sentry's Memorandum of Association and Articles of Association, as amended from time to time (the "Articles").

185.    The Articles provide for the calculation of the redemption price for Shares (the "Redemption Price") based on the "Net Asset Value per Share."  Net Asset Value per share is to be determined by the directors of Sentry as of the relevant valuation day "by dividing the value of the net assets of [Sentry] by the number of Shares then in issue [.]" Articles at 11(1).

186.    The Articles provide that in determining the Net Asset Value per share for each class of shares issued, the value of the net assets of the Fund is to be adjusted "to take into account any dividends, distributions, assets or liabilities" attributable to such class of shares. Articles at 11(1).

187.    With respect to the valuation of different types of assets, the Articles prescribe methods of valuation that are, however, subject to the exercise of the judgment and discretion by the Directors of Sentry.  For example, with respect to the valuation of assets consisting of securities, the Articles prescribe methods of valuation based on price and market data, provided however that "[i]f the Directors determine that [any of the prescribed methods of valuation] does not fairly represent its market value, the Directors shall value such securities as they determine

49

and shall set forth the basis of such valuation in writing in the Company's records[.]" Articles at 11(3)(b).

188.    With respect to the value of any shares of stock held by Sentry in an "investment company," the Articles provide for valuation "in accordance with the manner in which such shares are valued by such investment company" provided however that "the Directors may make such adjustments in such valuations the Directors may from time to time consider appropriate." Articles at 11(3)(c).

189.    With respect to assets that have been "realised or contracted to be realised" the Articles provide for the inclusion of the assets receivable in respect of such realization, provided however that "if the value of such assets is not then known exactly then its value shall be as estimated by the Directors."   Articles at 11(3)(e).

190.    Additionally, the Articles provide that "notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion, warrant a different valuation of any securities, such securities will be valued at such prices as the Directors shall determine." Articles at 11(3)(f).

191.    The Articles provide that any "certificate" as to the Net Asset Value per Share or as to the Redemption Price that is given in good faith by or on behalf of the Directors "shall be binding on all parties."  Articles at 11(1).

192.    No Certificate was provided in good faith by or on behalf of the Directors to CGML in respect of any Net Asset Value determination made while CGML was a member of the Fund or in respect of any Redemption Payment made to CGML.

193.    Pursuant to the Articles, at any time prior to the good faith issuance and receipt of a Certificate, the Redemption Price calculated in respect of the redemptions by CGML and paid

to CGML remains subject to adjustment, recalculation and redetermination based on, *inter alia*, the foregoing identified provisions of the Articles. Upon the true interpretation of the Articles, the same contained an implied term for repayment of any over-payments, and/or such a term is to be implied on the basis of obviousness and/or as being necessary for the business efficacy of the Articles and/or to give effect to the reasonable expectations of the parties.

194.    Upon information and belief, CGML received the Redemption Payments listed on Exhibit A in respect of Shares submitted for redemption.

195.    Subsequent to December 8, 2008, Sentry has determined that the Net Asset Value calculations upon which Redemption Payments were made to CGML included assets not held by or on behalf of Sentry at the time of the making of such payments and, additionally, that such Net Asset Value calculations failed to account for and make appropriate deduction of liabilities of Sentry existing at the time of such payments. For these and other reasons, such Net Asset Value calculation substantially overstated the net asset value of the assets of Sentry.

196.    To the extent that CGML has received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, CGML is contractually obligated to return amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

197.    Following determination by the Fund that Redemption Payments made to CGML had been calculated on the basis of an overstated Net Asset Value, demand has been made on CGML to return excess and overpaid Redemption Payments to the Fund.

198.    CGML has failed and refused to repay to the Fund the amount that, under the Articles, it is contractually required to repay to the Fund.

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 56 of 128

REDACTED WITH REDACT-IT

199.    The failure of CGML to make the repayment requested constitutes a breach of its contractual obligations under the Articles for which Sentry is entitled to the award of damages.

## THIRTEENTH CLAIM
### *(Breach of Implied Covenant of Good Faith and Fair Dealing - Against CGML)*

200.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 199 above as if set forth herein.

201.    Following determination by the Fund that Redemption Payments to CGML had been made on the basis of an overstated Net Asset Value, demand was made to CGML to return excess and overpaid Redemption Payments to Sentry.

202.    CGML has failed and refused to make the requested repayment to Sentry.

203.    By retaining the Redemption Payments to which CGML is not entitled, CGML has deprived Sentry of the benefit of its bargain and has subverted the Articles.

204.    The failure of CGML to make the repayment requested constitutes a breach of the covenant of good faith and fair dealing that inheres in the Articles for which Sentry is entitled to the award of damages.

## FOURTEENTH CLAIM
### *(Declaratory Judgment - Against All Defendants)*

205.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 204 above as if set forth herein.

206.    An actual and justiciable controversy exists between the Plaintiffs and the Defendants with respect to the obligation of the Defendants to repay to the Funds all or a portion

REDACTED WITH REDACT-IT

of amounts received by them as excess or overpaid Redemption Payments under circumstances where:

    (i)    the Net Asset Value per share calculation upon which the Redemption Price was paid, directly or indirectly, to any Defendant has been subsequently adjusted, recalculated or redetermined in accordance with the Articles;

    (ii)    the resulting adjusted, recalculated and redetermined Redemption Price is less than the Redemption Price paid to the Defendant;

    (iii)    prior to such adjustment, recalculation or redetermination, no binding Certificate has been issued by the Fund; and

    (iv)    Citco issued no Certificates in good faith.

207.    The harm to Sentry is real and immediate because, as a result of the failure and refusal of the Defendants to make repayment, Sentry has become insolvent and is presently unable to pay its debts as they fall or will fall due.

208.    Plaintiffs have no adequate remedy at law.

209.    Pursuant to 28 U.S.C. § 2201 et. seq., Plaintiffs are entitled to a declaration by this Court declaring that, pursuant to the Articles, each Defendant must repay Sentry that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First, Third and Fifth Claims, judgment in favor of Plaintiffs and against CGML allowing the Plaintiffs to recover an amount equal to the Redemption Payments received

by CGML, plus interest, or, in the alternative, an amount equal to the amount of the Redemption Payments received by CGML less the amount of redemption payments that CGML would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

B.      On the Second, Fourth and Sixth Claims, judgment in favor of Plaintiffs and against the Beneficial Shareholders allowing the Plaintiffs to recover an amount equal to any portion of any Redemption Payments received by the Beneficial Shareholders, plus interest, or, in the alternative, an amount equal to any portion of the Redemption Payments received by the Beneficial Shareholders less the amount of such portion that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

C.      On the Seventh Claim, imposition of a constructive trust on Redemption Payments;

D.      On the Eighth and Ninth Claims:

      i.      a declaratory judgment in favor of the Foreign Representatives and against CGML and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

      ii.     judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

      iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against CGML and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

E.      On the Tenth and Eleventh Claims:

      i.      a declaratory judgment in favor of the Foreign Representatives and against CGML and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

    ii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

    iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against CGML and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

F.    On the Twelfth and Thirteenth Claims, judgment against CGML and in favor of the Plaintiffs in an amount to be determined at trial;

G.    On the Fourteenth Claim, a declaratory judgment against the Defendants and in favor of the Plaintiffs that, under the Articles, the Defendants must repay that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry;

H.    Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

I.    Granting Plaintiffs such other and further relief as the Court deems just and proper.

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 60 of 128

REDACTED WITH REDACT-IT

Dated: New York, New York
        September 20, 2016

                        **BROWN RUDNICK LLP**

                        By: /s/ David J. Molton
                              David J. Molton
                              May Orenstein
                              Daniel J. Saval

                        Seven Times Square
                        New York, New York 10036
                        Telephone: 212.209.4800
                        Facsimile: 212.209.4801

                        *Attorneys for the Foreign Representatives*

# EXHIBIT A

REDACTED WITH REDACT-IT

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 62 of 128

*Redemption Payments Received by Defendants from Sentry*
*From October 14, 2005 Through November 19, 2008*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| October 14, 2005 | $30,000,000 | 28,067.27 | JP Morgan Chase Bank NA, New York |
| April 14, 2008 | $60,000,000* | 46,048.35 | JP Morgan Chase Bank NA, New York |
| November 19, 2008 | $40,000,000* | 29,634.50 | JP Morgan Chase Bank NA, New York |

* Denotes Redemptions in the Sentry Vulnerability Period.

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.

# EXHIBIT B

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 64 of 128

REDACTED WITH REDACT-IT

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign* ~~*Representative*~~*Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 15 Case |
| | ) |
| **FAIRFIELD SENTRY LIMITED, et al.,** | ) Case No. 10-13164 |
| | ) (~~BRL~~SMB) |
| Debtors in Foreign Proceedings. | ) |
| | ) Jointly Administered |
| | ) |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION),** acting by and through the Foreign ~~Representative~~Representatives thereof, and KENNETH KRYS and CHARLOTTE CAULFIELD, solely in ~~his capacity~~their capacities as Foreign ~~Representative~~Representatives and ~~Liquidator~~Liquidators thereof, | ) |
| | ) |
| | ) |
| | ) |
| | ) Adv. Pro. No. 11-02770 |
| | ) (~~BRL~~SMB) |
| | ) |
| | ) ~~FIRST~~SECOND |
| Plaintiffs, | ) AMENDED |
| | COMPLAINT |
| -against- | ) |
| | ) |
| **CITIGROUP GLOBAL MARKETS LIMITED** and **BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF CITIGROUP GLOBAL MARKETS LIMITED 1-1000,** | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | |

Fairfield Sentry Limited ("Sentry"), by and through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "Foreign Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and the Foreign Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," together

REDACTED WITH REDACT-IT

with Sentry and Sigma, the "Funds" or the "Debtors"~~), by and through Kenneth Krys (together with his predecessors, the "Foreign Representatives"), and Kenneth Krys (together with Sentry, the "Plaintiffs"), solely in~~ ~~his capacity as Liquidator of the Funds and the Foreign Representative of the liquidation proceedings involving~~ ~~the Funds~~ pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.        This action and similar actions are brought by the Plaintiffs, with the approval of the foreign court having jurisdiction over the matter, to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008.

2.        The Funds were created as a means for private investment in managed accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that Bernard L. Madoff used to perpetrate his massive Ponzi scheme.  Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss Franc investments) through ~~purchase~~purchases of shares of Sentry.  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held by BLMIS for Sentry.  As stated in their offering materials, the Funds' investment objective was to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3.    It is now known that these types of feeder funds were essential to the perpetration of Madoff's Ponzi scheme.  In order for the Ponzi scheme to operate, Madoff required a continuous flow of new investors and investments to be able to satisfy redemption requests from early investors.  Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS), brought new investors into this scheme, allowing Madoff to make payments to early investors and thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.    From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares were was transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff.  Prior to December 2008, the voting, participating shares of Sentry (\$.01 par value per share), Sigma (€.01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value."  Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund, net of certain expenses ("Net Asset Value").

5.    From time to time, in order to make payments to investors for the redemption of Shares ("Redemption Payments"), Sentry generally made withdrawals from its BLMIS accounts. On occasion, Sentry made Redemption Payments directly from amounts on hand invested by other subscribers in the Funds.  At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 67 of 128

REDACTED WITH REDACT-IT

BLMIS for Sentry.  The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which was calculated based principally on the assets that the Funds believed were being held, and investments that were being made, by BLMIS for Sentry's account.

6.     As the world now knows, Madoff was operating a massive Ponzi scheme through BLMIS.  Thus, at all relevant times, the money that Sentry transferred to BLMIS was not invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses.  Further, none of the securities shown on statements provided to Sentry by BLMIS were in fact purchased for Sentry.  Additionally, none of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of sales of securities or other investments.  Instead, such amounts represented the monies of more recent investors into the Madoff scheme.

7.     In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent, and the Funds were insolvent at the time Redemption Payments were made or they were rendered insolvent by those payments.  As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the actual Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

8.     At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of his fraud.  Similarly, the Redemption Payments that the Funds made to redeeming shareholders were not made in the ordinary course of any business or for any legitimate purposes.  Those

4

Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as ~~the source of these payments was not the sales of securities, or return of investments, as contemplated by those documents.  Rather, the payments were derived from uninvested monies of other BLMIS investors or other uninvested deposits made by Sentry in BLMIS, but in either event, they represented the fraudulent and ill gotten gains of~~they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff~~'s~~ as a Ponzi scheme ~~distributed by BLMIS to Sentry~~.  These payments ~~and other payments made to BLMIS investors~~ were crucial in perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9.      During the period from and after October 14, 2005 through November 19, 2008, following the receipt by Sentry of notices of redemption, Sentry made Redemption Payments to accounts held in the name of Defendant Citigroup Global Markets Limited ("CGML") aggregating USD $130,000,000.

10.     At the time such payments were made, Sentry mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption.  In fact, however, as stated, the Redemption Payments made to CGML far exceeded the ~~actual~~ Net Asset Value of ~~the~~ Shares redeemed that would have been calculated based on the true facts existing at that time or any relevant time.  Moreover, ~~the source of~~ these Redemption

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C - Huang Proposed Amended Complaint_REDACTED    Pg 69 of 128

REDACTED WITH REDACT-IT

Payments ~~was~~did not, as Sentry ~~believed them to be,~~intended, represent the proceeds ~~of the liquidation of securities or investments held for their accounts~~arising from the profitability of or to continue investment in BLMIS.  Instead, any amounts obtained directly or indirectly by Sentry from BLMIS to make Redemption Payments to CGML generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

11.    Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them, and, at all relevant times, the Funds were unable to pay their debts as they fell or would fall due.  Indeed, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.

12.    In particular, claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (~~BRL~~SMB) (the "BLMIS Adversary Proceeding").  As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.  This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud. The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.  At all relevant times, monies that the Funds

6

REDACTED WITH REDACT-IT

received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

13.    On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court ~~of~~for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda.  The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and further increased the amount of those liabilities.  In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

14.    Upon information and belief, CGML has either retained the Redemption Payments made to it by Sentry for its own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities for whom CGML may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (~~the~~ individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with CGML, the "Defendants").

15.    Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value.  As of December 2008 and presently, Sentry, Sigma, and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

7

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 71 of 128

REDACTED WITH REDACT-IT

16.     Unless Redemption Payments paid to shareholders are recovered for the Funds' estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may be made against them; further, recoveries of Redemption Payments will increase distributions to the Funds' investors who have been harmed.  Moreover, to the extent such liabilities and claims must be satisfied solely from the Funds' current assets, Defendants will have been unjustly enriched as they will not bear their proportionate share of such liabilities and claims, but rather will retain a windfall at the expense of other shareholders and creditors of the Funds.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re Fairfield Sentry Limited, et al., No. 10-13164 (BRLSMB), pending in this Court.  Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, SIPA Liquidation No. 08-1789 (BRLSMB).  Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C - Huang Proposed Amended Complaint_REDACTED    Pg 72 of 128

REDACTED WITH REDACT-IT

18.    This is a core proceeding under 28 U.S.C. § 157(b)(2).[1]  Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

19.    This Court has jurisdiction over CGML and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney ~~2001~~2008) because CGML and the Beneficial Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and maintaining bank accounts in the United States at JP Morgan Chase NA, and in fact receiving Redemption Payments in those United States-based and/or New York-based accounts.   On information and belief, CGML also has subsidiaries or affiliates doing business in the United States and/or conducts business itself in the United States.  CGML and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, designated United States-based and/or New York-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those bank accounts.  CGML and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in

---

[1]    Although the District Court, in In re Fairfield Sentry Ltd., No. 1:11-mc-00224-LAP, 458 B.R. ~~655~~665 (S.D.N.Y. 2011), held that causes of action alleged by the Plaintiffs in other cases before this Court—causes of action that are similar or the same as those alleged in this complaint—are not core proceedings, this determination may be subject to appeal.  In any event, plaintiffs submit that the causes of action in this complaint, which include, *inter alia*, allegations regarding transfers of property that were directed into the territorial jurisdiction of the United States, render the claims asserted in this complaint core in accordance with the District Court's decision.

connection with the claims alleged herein.  CGML and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

20.    Moreover, CGML has waived any objection to personal jurisdiction in an action brought by the BLMIS Trustee in the U.S. in the United States Bankruptcy Court for the Southern District of New York, Adversary Proceeding Number 10-05345 (BRL), in connection with claims that the BLMIS Trustee has asserted for the same Redemption Payments being claimed in this action.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

**PARTIES**

**Plaintiffs**

22.    Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.  Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

23.    The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names.  On April 23, 2009, the BVI Court issued an order appointing Christopher Stride (Ms. Lau's predecessor) as liquidator of Lambda (the "Lambda Appointment Order").  On July 21, 2009, the BVI Court issued an order appointing Mr. Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order").  On September 6, 2010, the BVI Court

10

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 74 of 128

REDACTED WITH REDACT-IT

issued notices acknowledging Mr. Stride's resignation and ~~Ms.~~ the appointment of Joanna Lau~~'s~~ ~~appointment~~ as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order" ~~and, together with the Lambda Appointment Order and the Sentry & Sigma~~ ~~Appointment Order, the "BVI Appointment Orders"~~).  On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds.  On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, and the Supplemental Appointment Order, the "BVI Appointment Orders").  The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claims herein, including the avoidance claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

24.     Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property.  After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15.  On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

25.     Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the

11

10-03635-jpm   Doc 144-3   Filed 10/26/16   Entered 10/26/16 10:41:02   Exhibit C - Huang Proposed Amended Complaint_REDACTED   Pg 75 of 128

REDACTED WITH REDACT-IT

Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code.   Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a).   Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the ~~BVI~~ proceedings before the BVI Court.

**Defendants**

26.   CGML was, at all relevant times, a member of Sentry and a registered holder of Shares.   Upon information and belief, CGML is a corporate entity organized under the laws of the United Kingdom and having its registered address at Citigroup Centre, 33 Canada Sq. Canary Wharf, London  E14 5LB, United Kingdom.   CGML subscribed for the purchase of Shares by entering into one or more written agreements with Sentry.

27.   Defendants "Beneficial Owners of the Accounts Held in the Name of Citigroup Global Markets Limited" - i.e., the Beneficial Shareholders—, are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry issued to CGML and on whose behalf CGML was acting as trustee, agent, representative, or nominee ~~(individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders")~~.

12

### NOTICE PURSUANT TO FED. R. CIV. P. 44.1

28.    Certain or all of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

### FACTUAL ALLEGATIONS

**A.    Role of Feeder Funds In Madoff Fraud**

29.    Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

30.    As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**B.    Calculation of Net Asset Value and Shareholder Redemption Payments**

31.    Substantially all of the money (someup to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or

13

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 77 of 128

REDACTED WITH REDACT-IT

through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy. In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

32.    In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry. Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to purported, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

33.    In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements. None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred. Indeed, no investments of any kind were ever made by BLMIS for Sentry. At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious. Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of

14

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C - Huang Proposed Amended Complaint_REDACTED    Pg 78 of 128

REDACTED WITH REDACT-IT

securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

34.    From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS). The Funds believed that the amounts provided in connection with such withdrawals represented the proceeds from the sale or liquidation of securities or arising from the profitability of or to continue investment positions held by in BLMIS for the account of Sentry.  In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.  At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud.  The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose.  Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.

35.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme.  At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

**C.     Redemption Payments Made or Transferred to Defendants**

36.     During the period from and after October 14, 2005 through November 19, 2008, CGML received Redemption Payments totaling USD $130,000,000 from Sentry in respect of Shares tendered for redemption.

37.     At CGML's directions and instructions, CGML received all of its Redemption Payments at its bank account with JP Morgan Chase NA in New York.

38.     The dates and amounts of each Redemption Payment received by CGML from Sentry, and the CGML bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.

39.     At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.  In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between CGML and Sentry, Sentry received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry.

40.     Upon information and belief, CGML and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**D.     Citco Did Not Issue Any Certifications of Net Asset Value in "Good Faith"**

41.     Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share . . . given in good faith by or on behalf of the Directors shall be binding on all parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the

16

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 80 of 128

REDACTED WITH REDACT-IT

"Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").   The Privy Council did not, however, address whether such Certificates were given "in good faith."  In carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "Citco") acted with a lack of good faith in giving the Certificates.



REDACTED



*REDACTED*



*REDACTED*



*REDACTED*



*REDACTED*



REDACTED



*REDACTED*



*REDACTED*

*REDACTED*

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 89 of 128

REDACTED WITH REDACT-IT



*REDACTED*

70.    By virtue of the foregoing conduct, Citco issued the Certificates without good faith.  The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

**E.    Citibank NA Knew or Should Have Known of the BLMIS Fraud**[2]

71.    41.  By no later than June 2007, and likely several years earlier, Citigroup had knowledge of the possibility of Madoff's Ponzi scheme.  Citigroup's Global Head of Options Strategy and Global Head of Equity Derivatives Research, Leon Gross, was responsible for making recommendations to investors on equity derivatives and other assets. Upon information and belief, Gross had the opportunity to meet and befriend Harry Markopolos, a fellow member

---

[2] The allegations set forth in Paragraphs 41 through 45 of this Complaint are made by the Foreign Representative upon information and belief based on allegations set forth in the complaint filed by the Madoff Trustee in Picard v. Citibank N.A., 10-05345 (Bankr. S.D.N.Y.).  Upon information and belief, the allegations of the BLMIS Trustee are based on an extensive investigation and the analysis of documentary evidence as well as other sources.

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 90 of 128

REDACTED WITH REDACT-IT

of the financial industry.  Markopolos is a certified financial analyst who, for many years, had been asserting that Madoff was most likely operating a Ponzi scheme and that BLMIS's investment advisory business was a complete fraud.

72.  42. Markopolos reached out directly to Gross via e-mail in June 2007, informing Gross of Markopolos's suspicions regarding an unspecified leveraged swap that provided exposure to Madoff.  Markopolos made his suspicions regarding Madoff clear stating, "[w]e all know how Ponzi schemes turn out." Upon information and belief, Markopolos and Gross had additional oral and written communications before December 10, 2008, in which Madoff's fraud was specifically discussed.

73.  43. Years before the collapse of BLMIS, and before the June 2007 email, Gross met with Markopolos at Citigroup's and its affiliates' New York offices. During that visit, Markopolos showed Gross a description of Madoff's "split-strike conversion" strategy and historical returns generated by that trading strategy as reported by a Madoff Feeder Fund, which, upon information and belief, was Sentry.

74.  44. Markopolos asked Gross whether the strategy that was described could result in the returns claimed.  Within minutes, Gross concluded that Madoff's strategy as described could not generate the returns indicated by the Madoff Feeder Fund.  Gross attempted to reconcile the discrepancy he saw between the strategy as described and the returns supposedly generated by the strategy, but could not resolve the discrepancy. Gross quickly concluded that the claimed returns were not in fact generated by the Madoff strategy as described.  Gross relayed his conclusion to Markopolos that same day.

75.  45. Gross and Markopolos also discussed whether others at Citigroup were familiar with Madoff trading in the equity and options markets.  That same day, before

27

Markopolos left Citigroup's and its affiliates' offices in New York, Gross asked around various desks at Citigroup and its affiliates and quickly determined that no trader at Citigroup and its affiliates on the index trading desk was trading options with BLMIS, nor were they aware of BLMIS trading OEX options.  Gross also asked salespeople at Citigroup if they knew BLMIS as a customer or as someone who is active in the market, to which the salespeople told Gross "no."

76. 46. Upon information and belief, Citigroup obtained more information placing it on inquiry notice that Madoff was making fraudulent transfers when Brian Leach became the Chief Risk Officer for Citigroup and its affiliates in or around March 2008. Prior to joining Citigroup and its affiliates, Leach had been the Chief Risk Officer and Co-Chief Operating Officer of Old Lane L.P., a multi-strategy hedge fund which was acquired by Citigroup in 2007.

77. 47. Leach was previously the Risk Manager for Institutional Services Business at Morgan Stanley.  Upon information and belief, Leach was employed at Morgan Stanley when the firm internally blacklisted Madoff-related investments due to concerns of fraud and other wrongdoing.  Shortly after Leach became Citigroup's Chief Risk Officer, Citigroup began to immediately unwind its BLMIS trades and rid itself of any and all remaining Madoff exposure.

78. CGML served as trustee, agent, representative, nominee or custodian for the Beneficial Owners in connection with their investments in the Funds, including, by:  subscribing to Shares of Sentry on behalf of the Beneficial Owners, maintaining custody of the Shares as record shareholders, paying redemption proceeds from the Shares of Sentry to the Beneficial Owners, and otherwise exercising control over the Shares of Sentry.

79. Further, each of the Subscription Agreements, executed by CGML, manifested the Beneficial Owners' consent for CGML to act on behalf of and subject to the Beneficial Owners' control.

80.    In executing the Subscription Agreements, CGML accepted and agreed to act on behalf of the Beneficial Owners.

81.    Accordingly, the Beneficial Owners had the same knowledge as CGML regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

**F.    Exposure of Madoff's Fraud**

82.    48. On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  See United States v. Madoff, No. O808-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

83.    49. On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS.  See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

84.    50. In March 2009, Madoff pleaded guilty to the criminal charges brought against him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective
> clients who wished to open investment advisory and individual trading accounts

with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal. Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised. Instead, those funds were deposited in a bank account at Chase Manhattan Bank. When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

85.  51. Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

86.  52. Madoff is now serving a 150-year sentence in federal prison.

**G.    The Funds' Estates in Liquidation**

87.  53. Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values. As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

88.  54. In 2009, the Funds were put into liquidation proceedings in the BVI.

89.  55. On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding"). The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C - Huang Proposed Amended Complaint_REDACTED    Pg 94 of 128

REDACTED WITH REDACT-IT

90. ~~56.~~ On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding"). The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

91. ~~57.~~ On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings"). The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

92. ~~58.~~ As alleged above, the BVI Court issued orders – the BVI Appointment Orders – ~~appointed~~ appointing the Foreign Representatives as liquidators of the Funds. Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

~~59. The BVI Appointment Orders grant the Liquidators all powers set forth in Section 186, Schedule 2 of the BVI Insolvency Act, including, but not limited to, the following:~~

~~a. to pay any class of creditors in full;~~

~~b. to make a compromise or arrangement with creditors or persons claiming to be creditors, or having or alleging that they have any claim against the Funds, whether present or future, certain or contingent, ascertained or not;~~

~~c. to compromise any claims, debts or liabilities capable of resulting in claims or debts whether present or future, certain or contingent, ascertained or not, between the Funds and any person or entity, and to compromise questions in any way relating to or affecting the assets or the liquidations of the Funds;~~

~~d. to commence, continue, discontinue, or defend any action or other legal proceeding in the name and on behalf of the Funds in the BVI or elsewhere;~~

~~e. to carry on the Funds' business so far as may be necessary for its beneficial liquidation;~~

10-03635-jpm   Doc 144-3   Filed 10/26/16   Entered 10/26/16 10:41:02   Exhibit C - Huang Proposed Amended Complaint_REDACTED   Pg 95 of 128

REDACTED WITH REDACT-IT

f. to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the Funds or for which the Funds may be rendered liable;

g. to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the Funds and a contributory or alleged contributory or other Funds or person apprehending liability to the Company;

h. to deal with all questions in any way relating to or affecting the assets or the winding up of the Funds to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it;

i. to sell or otherwise dispose of property of the Funds;

j. to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents;

k. to use the Funds' seal;

l. to draw, accept, make and endorse any bill of exchange or promissory note in the name and on behalf of the Funds;

m. to borrow money, whether on the security of assets of the Funds or otherwise;

n. to take out in an official capacity letters of administration for any deceased member or past member or debtor, or to do any other act necessary for obtaining payment of any money due from a member or past member or debtor;

o. to call meetings of the creditors or members for (i) the purpose of informing the creditors or members concerning the progress of or other matters arising in the liquidation; (ii) the purpose ascertaining the views of creditors or members on any matter arising in the liquidation; or (iii) such other purposes connected with the liquidation as the liquidators considers fit;

p. to appoint a solicitor, accountant or other professionally qualified person to assist in the performance of the liquidators' duties;

q. to appoint an agent to do any business that the liquidators are unable to do themselves, or which can be more conveniently done by an agent;

32

r. to apply to the BVI Court for directions concerning any matter arising out of the exercise of any of the liquidators' powers; and

s. to do all things incidental to any of the liquidators' powers.

60. The Foreign Representatives must seek BVI Court approval before they can exercise any of the first five powers enumerated in the BVI Appointment Orders. *See* BVI Act § 186(3) ("The Court may provide that certain powers may only be exercised with the sanction of the Court."). The Foreign Representatives may exercise all of the other powers enumerated in the BVI Appointment Orders without prior BVI Court approval.

61. With the express authorization of the BVI Court, the Foreign Representatives filed petitions in this Court on June 14, 2010 seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15 of the Bankruptcy Code. On July 22, 2010, the Bankruptcy Court issued the Recognition Order, which, among other things, specifically entrusted the Foreign Representatives with the administration and realization of the Funds' assets located in the United States, including any and all claims and causes of action belonging to the Funds.

62. Acting in accordance with authority afforded to them by the Recognition Order and with the duties and powers afforded to them as liquidators under the BVI Insolvency Act, and with the requisite court approval by the foreign court having jurisdiction over the matter , the Foreign Representatives have brought this and similar actions on behalf of the Funds, and/or in their capacities as liquidators of the Funds, to recover Redemption Payments made to the Funds' investors in the years prior to the exposure of the Madoff fraud.

63. On December 9, 2010, the BVI Court issued an order authorizing the Foreign Representatives to assert claims seeking: (i) a declaration that the Redemption Payments were unfair preferences under Section 245 of the BVI Insolvency Act and were undervalue

33

10-03635-jpm   Doc 144-3   Filed 10/26/16   Entered 10/26/16 10:41:02   Exhibit C -
Huang Proposed Amended Complaint_REDACTED   Pg 97 of 128

REDACTED WITH REDACT-IT

transactions under Section 246 of the BVI Insolvency Act, and (ii) an order setting aside the Redemption Payments, restoring the Funds to the position that they would have been had the Redemption Payments not been paid and such further and other relief as the Foreign Representatives deem necessary.   On December 5, 2011, the Court of Appeal of the Eastern Caribbean Supreme Court, sitting as an appellate court of the BVI Court, issued an Order giving the Foreign Representatives sanction to continue to pursue claims in the United States, including both common law claims and claims under Sections 245 and 246 of the BVI Insolvency Act.

93.     64. At present, without recovery of Redemption Payments made to shareholders, the Funds' assets are not sufficient to satisfy contingent and non-contingent liabilities of the Funds' estates.   The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry's estate that Defendants are not entitled to keep.

## FIRST CLAIM
### *(Unjust Enrichment - Against CGML)*

94.     65. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 6493 above as if set forth herein.

95.     66. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to CGML, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.   The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

96.     67. CGML did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by it.

34

68. Upon information and belief, CGML, in that it received and retained Redemption Payments made for amounts far in excess of amounts paid by it for the purchase Net Asset Value of Shares of and in Sentry redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

97. 69. By reason of its receipt of monies represented as amounts deposited by other BLMIS investors or previous deposits made by Sentry with BLMIS monies deposited by the Funds' subscribers, for amounts far in excess of the amounts that it would have received had the Net Asset Value of Shares been calculated based upon the true facts existing at that time or any relevant time, CGML has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

98. 70. It would offend principles of equity and good conscience to permit CGML to retain the Redemption Payments it received from Sentry.

99. 71. The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from CGML an amount equal to the Redemption Payments received by it from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by CGML less the amount of redemption payments that CGML would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SECOND CLAIM
### *(Unjust Enrichment - Against Beneficial Shareholders)*

100. 72. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 71 99 above as if set forth herein.

101. 73. Upon information and belief, CGML may have subscribed to all or some portion of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

102. 74. Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it from Sentry to accounts of the Beneficial Shareholders. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to CGML, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of These Redemption Payments was did not, as Sentry mistakenly believed, represent the proceeds from the sale of securities or investments held by BLMIS for the account of Sentry. arising from the profitability of or to continue investment in BLMIS. Instead, Redemption Payments were made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

103. 75. The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for any portion of any of the Redemption Payments or any portion thereof received by them.

76. Upon information and belief, some or all of the Beneficial Shareholders, in that they received and retained Redemption Payments made for amounts far in excess of amounts paid by them for the purchase Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

104. 77. To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to CGML in its capacity as trustee, agent, representative, or nominee

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 100 of 128

REDACTED WITH REDACT-IT

for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

105. 78. It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by Sentry.

106. 79. The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## THIRD CLAIM
### *(Money Had and Received - Against CGML)*

107. 80. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 79106 above as if set forth herein.

108. 81. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to CGML, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

109. 82. CGML did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by it.

83. Upon information and belief, CGML, in that it received and retained Redemption Payments made for amounts far in excess of amounts paid by it for the purchaseNet Asset Value

of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

110. 84. By reason of its receipt of monies representing the deposits of other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of which generally represented the proceeds arising from or to continue investment in BLMIS, which the world now knows was operated by Madoff's fraud as a Ponzi scheme, CGML has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

111. 85. Furthermore, CGML was not entitled to receive the Redemption Payments because the amounts of each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by CGML for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

112. 86. To the extent that Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

113. 87. It would offend principles of equity and good conscience to permit CGML to retain the Redemption Payments it received from Sentry.

114. 88. The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from CGML an amount equal to the Redemption Payments received by it from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by CGML less the amount of redemption payments that CGML

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 102 of 128

REDACTED WITH REDACT-IT

would have received had the Net Asset Value been calculated based upon the true facts existing
at the time.

## FOURTH CLAIM
### *(Money Had and Received - Against Beneficial Shareholders)*

115. 89. Sentry (acting by the Foreign Representatives, in their capacities as liquidators
of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in
paragraphs 1 through 85 114 above as if set forth herein.

116. 90. Upon information and belief, CGML may have subscribed to all or some
portion of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for
the Beneficial Shareholders.

117. 91. Upon information and belief, CGML may have paid to or credited some or all
of the Redemption Payments received by it to accounts of the Beneficial Shareholders. As
alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption
Payments to CGML, each of such payments consisted of monies deposited with BLMIS for
investment, but never invested and instead misappropriated as part of Madoff's fraud. The
source of These Redemption Payments was did not, as Sentry mistakenly believed, represent the
proceeds from the sale of securities or investments held by arising from the profitability of or to
continue investment in BLMIS for the account of Sentry.

118. 92. The Beneficial Shareholders did not provide valuable consideration to Sentry
in exchange for any portion of any of the Redemption Payments or any portion thereof received
by them.

93. Upon information and belief, some or all of the Beneficial Shareholders, in that they
received and retained Redemption Payments made for amounts far in excess of amounts paid by

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 103 of 128

REDACTED WITH REDACT-IT

~~them for~~ the ~~purchase~~Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

119. ~~94.~~ To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to CGML in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

120. ~~95.~~ Furthermore, the Beneficial Shareholders were not entitled to receive ~~any portion of~~ the Redemption Payments paid to CGML upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value~~,~~ which caused the payment received for redemption of Shares to be in excess of the ~~actual~~ Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

121. ~~96.~~ To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

122. ~~97.~~ It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments made by Sentry.

123. ~~98.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from the Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them~~,~~, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Beneficial Shareholders less the

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 104 of 128

REDACTED WITH REDACT-IT

amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FIFTH CLAIM
### *(Mistaken Payment - Against CGML)*

124. ~~99.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~98~~123 above as if set forth herein.

125. ~~100.~~ As described above, Sentry made each of the Redemption Payments to CGML under the mistaken belief that the amounts paid to CGML represented the proceeds ~~of the sale of securities and investments held for Sentry in accounts established with BLMIS,~~ arising from the profitability of or to continue investment in BLMIS and were based upon the Net Asset Value of Shares redeemed based upon the true facts at that time.

126. ~~101.~~ Upon information and belief, however, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to CGML represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

127. ~~102.~~ The Redemption Payments, while benefiting CGML, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

128. ~~103.~~ Additionally, CGML was not entitled to receive the Redemption Payments because, as was unknown to Sentry, the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by CGML for its redemption of Shares to be in excess of the ~~actual~~ Net Asset Value of such Shares that would have been calculated based upon the true facts existing at

41

10-03635-jpm   Doc 144-3   Filed 10/26/16   Entered 10/26/16 10:41:02   Exhibit C - Huang Proposed Amended Complaint_REDACTED   Pg 105 of 128

REDACTED WITH REDACT-IT

that time or any relevant time.  In these circumstances, the Redemption Payments should be returned for the benefit of Sentry, their creditors and the current holders of Shares in Sentry.

129.   104. CGML did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by it.

105. Upon information and belief, CGML, in that it received and retained Redemption Payments made for amounts far in excess of amounts paid by it for the purchaseNet Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

130.   106. To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

131.   107. It would thus offend principles of equity and good conscience to permit CGML to retain the Redemption Payments.

132.   108. The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from CGML a sum in an amount equal to the Redemption Payments received by it from Sentry., or, in the alternative, an amount equal to the amount of all Redemption Payments received by CGML less the amount of redemption payments that CGML would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SIXTH CLAIM
### (Mistaken Payment - Against Beneficial Shareholders)

133.    109. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 108132 above as if set forth herein.

134.    110. As described above, Sentry made each of the Redemption Payments to CGML under the mistaken belief that the amounts paid to CGML represented the proceeds of the sale of securities and investments held for Sentry in accounts established with arising from the profitability of or to continue investment in BLMIS.

135.    111. However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to CGML represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

136.    112. Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to CGML, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of These Redemption Payments wasdid not, as Sentry mistakenly believed, represent the proceeds from the sale of securities or investments held byarising from the profitability of or to continue investment in BLMIS for the account of Sentry.

137.    113. Additionally, the Beneficial Shareholders were not entitled to receive any portion of the Redemption Payments received by CGML upon the redemption of Shares issued

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 107 of 128

REDACTED WITH REDACT-IT

to it in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because, as was unknown to Sentry, the amounts transferred with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by CGML for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

138.    114.    The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for any portion of any of the Redemption Payments or any portion thereof received by them.

115. Upon information and belief, some or all of the Beneficial Shareholders, in that they received and retained Redemption Payments made for amounts far in excess of amounts paid by them for the purchase Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

139.    116.    The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

140.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

141.    117.    It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 108 of 128

REDACTED WITH REDACT-IT

142. 118. The Foreign Representatives in their capacities as liquidators of Sentry and on behalf of Sentry are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SEVENTH CLAIM
### *(Constructive Trust - Against all Defendants)*

143. 119. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 118 142 above as if set forth herein.

144. 120. As described above, upon receipt of a redemption request, Sentry made each of the Redemption Payments to CGML based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the actual Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

145. 121. As alleged above, the Redemption Payments generally represented money deposited with BLMIS by other BLMIS investors or previous deposits of Sentry with BLMIS, never invested but rather misused and misappropriated as part of the proceeds arising from or to continue investment in what the world now knows was Madoff's fraud. The source of Ponzi scheme. Accordingly, these Redemption Payments was did not, as Sentry mistakenly believed, represent the proceeds from the sale of securities and investments held by arising from the profitability of (or to continue investment in) BLMIS for the account of Sentry.

146. ~~122.~~ Upon information and belief, CGML may have paid some or all of the Redemption Payments it received to the Beneficial Shareholders.

147. ~~123.~~ By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

148. ~~124.~~ Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by CGML for its redemption of Shares to be in excess of the ~~actual~~ Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

149. ~~125.~~ It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

150. ~~126.~~ By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry for the benefit of the Foreign Representatives and Sentry and other shareholders and creditors of Sentry.

## EIGHTH CLAIM
### *(Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against CGML)*

151. ~~127.~~ The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through ~~126~~150 above as if set forth herein.

152. ~~128.~~ Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an

46

insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

153.   129. A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

154.   130. The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) . . . causes the company to become insolvent."  BVI Insolvency Act, § 244(2).

155.   131. For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c) . . . (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act, §§ 8, 244(3).

156.   132. For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and

47

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 111 of 128

REDACTED WITH REDACT-IT

ending on the appointment of the administrator or, if the company is in liquidation, the liquidator

. . . ."  BVI Insolvency Act § 244(1).

157.    ~~133.~~The "onset of insolvency" is defined as: "the date on which the application

for the appointment of the liquidator was filed."  BVI Insolvency Act~~,~~ § 244(1).  Thus, the

vulnerability period, for each of the Funds, is the period commencing two years prior to the

application for the appointment of the Liquidators for each Fund and ending on the date of the

appointment of the liquidators of each Fund.

158.    ~~134.~~A "connected person" is:

(1) ~~. . .~~one or more of the following:

(a) a promoter of the company;

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in
paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this
paragraph, a connected person.

BVI Insolvency Act~~,~~ § 5 (emphasis added).

159.    ~~135.~~Redemption Payments aggregating USD $100,000,000 were made by Sentry

to CGML during the two-year period prior to the application for appointment of the Liquidators

of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

160.    ~~136.~~During the Sentry Vulnerability Period, Sentry was insolvent or was

rendered insolvent by the making of Redemption Payments.

48

10-03635-jpm   Doc 144-3   Filed 10/26/16   Entered 10/26/16 10:41:02   Exhibit C -
Huang Proposed Amended Complaint_REDACTED   Pg 112 of 128

REDACTED WITH REDACT-IT

161. 137. Each of the Redemptions and/or Redemption Payments made during the Sentry Vulnerability Period ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

162. 138. CGML was a shareholder (i.e., a member) of Sentry during the Sentry Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

163. 139. Each of the Vulnerability Period Payments put CGML in a better position than it would have been in had such Payment not been made.

164. 140. Because CGML was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" and "did not take place in the ordinary course of business." Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent.  This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, i.e. using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers).  Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in BLMIS.  On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

165.  In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of any business" of Sentry, nor.  Even were they made for any legitimate business purpose, this not presumed, the same would follow in that,

49

REDACTED WITH REDACT-IT

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 113 of 128

among other things, each Vulnerability Period Payment was determined and paid based on a represented a distribution of monies (including fictitious Net Asset Value and was made incidental to and as a necessary part of profits) from Madoff's Ponzi scheme. or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

166. 141. Each of the Vulnerability Period Payments was made following receipt by Sentry of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles. Following the receipt by Sentry of a notice of redemption by CGML, CGML became a contingent creditor. Upon the subsequent redemption of CGML's shares and until such time as CGML received the Vulnerability Period Payment that became due and payable by reason of CGML's redemption of Shares, CGML was a "creditor" of Sentry as defined in the BVI Insolvency Act, as CGML would have had with an admissible claim against Sentry in the BVI any subsequent liquidation Proceeding of Sentry had the Vulnerability Period payment not been made of the Redemption Price not been made, albeit that post-liquidation CGML would have been deferred to outside creditors.

142. Further, upon information and belief, CGML may assert claims against Sentry in this action or elsewhere which, if proven, allowed and/or admitted, would make it a "creditor" of Sentry as defined by the BVI Insolvency Act.

167. 143. By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 114 of 128

REDACTED WITH REDACT-IT

recover from CGML an amount equal to the Vulnerability Period Payments received by CGML from Sentry.

## **NINTH CLAIM**
### *(Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against Beneficial Shareholders)*

168. 144. The Foreign Representatives, in their capacities as Foreign Liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 143167 above as if set forth herein.

169. 145. Upon information and belief, CGML may have subscribed to all or some portion of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

170. 146. Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

171. 147. To the extent that any money that CGML received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to avoid and set aside such further transfer by CGML to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 115 of 128

REDACTED WITH REDACT-IT

**TENTH CLAIM**
*(Undervalue Transaction Pursuant to Section 246 of the*
*BVI Insolvency Act - Against CGML)*

172.  148. The Foreign Representatives, in their capacities as Foreign Representatives

and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1

through 147171 above as if set forth herein.

173.  149. Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction
with a person if (a) the company makes a gift to that person or otherwise enters
into a transaction with that person on terms that provide for the company to
receive no consideration; or (b) the company enters into a transaction with that
person for a consideration the value of which, in money or money's worth, is
significantly less than the value, in money or money's worth, of the consideration
provided by the company; and (c) in either case, the transaction concerned (i) is
an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a)
the company enters into the transaction in good faith and for the purposes of its
business; and (b) at the time when it enters into the transaction, there were
reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is
entered into pursuant to the order of a court or tribunal in or outside the Virgin
Islands.

(4) Where a company enters into a transaction with a connected person within the
vulnerability period and the transaction falls within subsection (1)(a) or
subsection (1)(b), unless the contrary is proved, it is presumed that (a) the
transaction was an insolvency transaction; and (b) subsection (2) did not apply to
the transaction.

174.  150. During the Sentry Vulnerability Period, all assets purportedly held by

BLMIS for Sentry and other investors were non-existent, and Sentry was insolvent or rendered

insolvent by the Vulnerability Period Payments, as alleged in paragraph 164 above. Thus, each

of the Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency

transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of

Section 246 of the BVI Insolvency Act.

52

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 116 of 128

REDACTED WITH REDACT-IT

175. 151. Sentry received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sentry received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry to CGML for each of the Vulnerability Period Payments.

176. 152. CGML was a shareholder (i.e., a member) of Sentry during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

177. 153. Because CGML was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" and "did not take place in the ordinary course of business." Further, even were this not presumed, there is a statutory presumption that the Vulnerability Period Payments were not made in the ordinary course of any business of Sentry, nor were they made for any legitimate business purpose, in that, among other things, each Vulnerability Period Payment was determined and paid based on a fictitious Net Asset Value and was made incidental to and as a necessary part of Madoff's good faith and for the purposes of the Funds' business with reasonable grounds to believe that they would benefit the Funds. Even were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious profits from a Ponzi scheme such as BLMIS.

178. 154. By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and to recover from CGML an amount equal to the Vulnerability Period Payments received by CGML from Sentry.

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 117 of 128

REDACTED WITH REDACT-IT

## ELEVENTH CLAIM
### *(Undervalue Transaction Pursuant to Section 246 of the*
### *BVI Insolvency Act - Against Beneficial Shareholders)*

179. 155. The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 154 178 above as if set forth herein.

180. 156. Upon information and belief, CGML may have subscribed to all or some portion of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

181. 157. Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

182. 158. To the extent that any money that CGML received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to avoid and set aside such further transfer by CGML to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## TWELFTH CLAIM
### *(Breach of Contract - Against CGML)*

183. 159. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 158 182 above as if set forth herein.

184. 160. CGML, as a Subscriber in Sentry, is bound by Sentry's Memorandum of Association and Articles of Association, as amended from time to time (the "Articles").

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 118 of 128

REDACTED WITH REDACT-IT

185. 161. The Articles provide for the calculation of the redemption price for Shares (the "Redemption Price") based on the "Net Asset Value per Share." Net Asset Value ("NAV") per share is to be determined by the directors of Sentry as of the relevant valuation day "by dividing the value of the net assets of [Sentry] by the number of Shares then in issue [.]" Articles at 11(1).

186. 162. The Articles provide that in determining NAVthe Net Asset Value per share for each class of shares issuesissued, the value of the net assets of the Fund is to be adjusted "to take into account any dividends, distributions, assets or liabilities" attributable to such class of shares. Articles at 11(1).

187. 163. With respect to the valuation of different types of assets, the Articles prescribe methods of valuation that are, however, subject to the exercise of the judgment and discretion by the Directors of Sentry. For example, with respect to the valuation of assets consisting of securities, the Articles prescribe methods of valuation based on price and market data, provided however that "[i]f the Directors determine that [any of the prescribed methods of valuation] does not fairly represent its market value, the Directors shall value such securities as they determine and shall set forth the basis of such valuation in writing in the Company's records[.]" Articles at 11(3)(b).

188. 164. With respect to the value of any shares of stock held by Sentry in an "investment company," the Articles provide for valuation "in accordance with the manner in which such shares are valued by such investment company" provided however that "the Directors may make such adjustments in such valuations the Directors may from time to time consider appropriate." Articles at 11(3)(c).

55

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C - Huang Proposed Amended Complaint_REDACTED    Pg 119 of 128

REDACTED WITH REDACT-IT

189. ~~165.~~ With respect to assets that have been "realised or contracted to be realised" the Articles provide for the inclusion of the assets receivable in respect of such realization, provided however that "if the value of such assets is not then known exactly then its value shall be as estimated by the Directors."  Articles at 11(3)(e).

190. ~~166.~~ Additionally, the Articles provide that "notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion, warrant a different valuation of any securities, such securities will be valued at such prices as the Directors shall determine."  Articles at 11(3)(f).

191. ~~167.~~ The Articles provide that any "certificate" as to the ~~NAV~~Net Asset Value per Share or as to the Redemption Price that is given in good faith by or on behalf of the Directors "shall be binding on all parties."  Articles at 11(1).

192. ~~168.~~ No Certificate ~~issuable under the Articles (a "Redemption Price Certificate")~~ was provided in good faith by or on behalf of the Directors to CGML in respect of any ~~NAV~~Net Asset Value determination made while CGML was a member of the Fund or in respect of any Redemption Payment made to CGML.

193. ~~169.~~ Pursuant to the Articles, at any time prior to ~~this~~the good faith issuance ~~of a Redemption Price~~and receipt of a Certificate, the Redemption Price calculated in respect of the redemptions by CGML and paid to CGML remains subject to adjustment, recalculation and redetermination based on, *inter alia*, the foregoing identified provisions of the Articles.  Upon the true interpretation of the Articles, the same contained an implied term for repayment of any over-payments, and/or such a term is to be implied on the basis of obviousness and/or as being necessary for the business efficacy of the Articles and/or to give effect to the reasonable expectations of the parties.

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 120 of 128

REDACTED WITH REDACT-IT

194. 170. Upon information and belief, CGML received the Redemption Payments listed on Exhibit A in respect of Shares submitted for redemption.

195. 171. Subsequent to December 8, 2008, Sentry has determined that the NAVNet Asset Value calculations upon which Redemption Payments were made to CGML included assets not held by or on behalf of Sentry at the time of the making of such payments and, additionally, that such NAVNet Asset Value calculations failed to account for and make appropriate deduction of liabilities of Sentry existing at the time of such payments.  For these and other reasons, such NAVNet Asset Value calculation substantially overstated the net asset value of the assets of Sentry.

196. 172. To the extent that CGML has received Redemption Payments in excess of the NAVNet Asset Value of the Shares redeemed, CGML is contractually obligated to return amounts in excess of the actual NAVNet Asset Value that would have been calculated based upon the true facts existing at the relevant time.

197. 173. Following determination by the Fund that Redemption Payments made to CGML had been calculated on the basis of an overstated NAVNet Asset Value, demand has been made toon CGML to return excess and overpaid Redemption Payments to the Fund.

198. 174. CGML has failed and refused to repay to the Fund the amount that, under the Articles, it is contractually required to repay to the Fund.

199. 175. The failure of CGML to make the repayment requested constitutes a breach of its contractual obligations under the Articles for which Sentry is entitled to the award of damages.

57

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 121 of 128

REDACTED WITH REDACT-IT

## THIRTEENTH CLAIM
### *(Breach of Implied Covenant of Good Faith and*
### *Fair Dealing - Against CGML)*

200. ~~176.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~175~~199 above as if set forth herein.

201. ~~177.~~ Following determination by the Fund that Redemption Payments to CGML had been made on the basis of an overstated ~~NAV~~Net Asset Value, demand was made to CGML to return excess and overpaid Redemption Payments to Sentry.

202. ~~178.~~ CGML has failed and refused to make the requested repayment to Sentry.

203. ~~179.~~ By retaining the Redemption Payments to which CGML is not entitled, CGML has deprived Sentry of the benefit of its bargain and has subverted the Articles.

204. ~~180.~~ The failure of CGML to make the repayment requested constitutes a breach of the covenant of good faith and fair dealing that inheres in the Articles for which Sentry is entitled to the award of damages.

## FOURTEENTH CLAIM
### *(Declaratory Judgment - Against All Defendants)*

205. ~~181.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~180~~204 above as if set forth herein.

206. ~~182.~~ An actual and justiciable controversy exists between the Plaintiffs and the Defendants with respect to the obligation of the Defendants to repay to the Funds all or a portion of amounts received by them as excess or overpaid Redemption Payments under circumstances where:

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 122 of 128

REDACTED WITH REDACT-IT

(i)    the ~~NAV~~Net Asset Value per share calculation upon which the Redemption Price was    paid, directly or indirectly, to any Defendant has been subsequently adjusted, recalculated or redetermined in accordance with the Articles;

(ii)    the resulting adjusted, recalculated and redetermined Redemption Price is less than the Redemption Price paid to the Defendant; ~~and~~

(iii)    prior to such adjustment, recalculation or redetermination, no ~~Redemption Price~~binding Certificate    has been issued by the Fund~~.~~; and

(iv)    Citco issued no Certificates in good faith.

207.    ~~183.~~The harm to Sentry is real and immediate because, as a result of the failure and refusal of the Defendants to make repayment, Sentry has become insolvent and is presently unable to pay its debts as they fall or will fall due.

208.    ~~184.~~Plaintiffs have no adequate remedy at law.

209.    ~~185.~~Pursuant to 28 U.S.C. § 2201 et. seq., Plaintiffs are entitled to a declaration by this Court declaring that, pursuant to the Articles, each Defendant must repay Sentry that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First, Third and Fifth Claims, judgment in favor of Plaintiffs and against CGML allowing the Plaintiffs to recover an amount equal to the Redemption Payments received by CGML, plus interest~~,~~; or, in the alternative, an amount equal to the amount of the Redemption Payments received by CGML less the amount of redemption payments that CGML would have

received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

   B.    On the Second, Fourth and Sixth Claims, judgment in favor of Plaintiffs and against the Beneficial Shareholders allowing the Plaintiffs to recover an amount equal to any portion of any Redemption Payments received by the Beneficial Shareholders, plus interest; or, in the alternative, an amount equal to any portion of the Redemption Payments received by the Beneficial Shareholders less the amount of such portion that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

   C.    On the Seventh Claim, imposition of a constructive trust on Redemption Payments; and

   D.    On the Eighth and Ninth Claims:

        i.    a.    a declaratory judgment in favor of the Foreign Representatives and against CGML and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

        ii.    b.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

        iii.    c.    judgment pursuant to Section 249 of the BVI Insolvency Act against CGML and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

   E.    On the Tenth and Eleventh Claims:

        i.    a.    a declaratory judgment in favor of the Foreign Representatives and against CGML and the Beneficial Holders that the Redemption Payments made during the Redemptions and/or Vulnerability Period Payments constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 124 of 128

REDACTED WITH REDACT-IT

> ii. ~~b.~~        judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the ~~Redemption Payments made during the~~Redemptions and/or Vulnerability Period Payments; and
>
> iii. ~~c.~~        judgment pursuant to Section 249 of the BVI Insolvency Act against CGML and the Beneficial Holders in the amount of the avoided ~~Redemption~~Vulnerability Period Payments received by them or for their benefit, plus interest~~.~~;

F.        On the Twelfth and Thirteenth Claims, judgment against CGML and in favor of the Plaintiffs in an amount to be determined at trial~~.~~;

G.        On the Fourteenth Claim, a declaratory judgment against the Defendants and in favor of the Plaintiffs that, under the Articles, the Defendants must repay that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry;

H.        Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

I.        Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
September 20, 2016

**BROWN RUDNICK LLP**

By: /s/ ~~May Orenstein~~David J. Molton_____
    David J. Molton
    May Orenstein
    Daniel J. Saval

Seven Times Square
New York, New York 10036
Telephone: 212.209.4800
Facsimile: 212.209.4801

*Attorneys for the Foreign*
*~~Representative~~Representatives*

10-03635-jpm    Doc 144-3    Filed 10/26/16    Entered 10/26/16 10:41:02    Exhibit C -
Huang Proposed Amended Complaint_REDACTED    Pg 126 of 128

REDACTED WITH REDACT-IT

**EXHIBIT A**

REDACTED WITH REDACT-IT

***Redemption Payments Received by Defendants from Sentry***
***From October 14, 2005 Through November 19, 2008***

| **Payment Date** | **Redemption Payment** | **Number of Shares** | **Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction**[+] |
|---|---|---|---|
| October 14, 2005 | $30,000,000 | 28,067.27 | JP Morgan Chase Bank NA, New York |
| April 14, 2008 | $60,000,000* | 46,048.35 | JP Morgan Chase Bank NA, New York |
| November 19, 2008 | $40,000,000* | 29,634.50 | JP Morgan Chase Bank NA, New York |

\* Denotes Redemptions in the Sentry Vulnerability Period.

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.

REDACTED WITH REDACT-IT

| Summary report: Litéra® Change-Pro TDC 7.5.0.127 Document comparison done on 9/20/2016 8:55:15 AM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://WORKSITE/WorkSiteUS/60616233/2 | |
| **Modified DMS:** iw://WORKSITE/WorkSiteUS/60616233/4 | |
| **Changes:** | |
| Add | 464 |
| Delete | 387 |
| Move From | 14 |
| Move To | 14 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 879 |