**BROWN RUDNICK LLP**
David J. Molton
Daniel J. Saval
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
(212) 209-4800

*Counsel for the Foreign Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 15 Case |
| | ) | |
| **Fairfield Sentry Limited, <u>et al.</u>,** | ) | **Case No. 10-13164 (SMB)** |
| | ) | |
| Debtors in Foreign Proceedings. | ) | Jointly Administered |
| | ) | |

## DECLARATION OF WILLIAM HARE IN
## <u>SUPPORT OF MOTION FOR LEAVE TO AMEND</u>

I, William Hare, do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

1.      I am a founding partner of the law firm Forbes Hare, based in the British Virgin Islands.

2.      I graduated in 1992 with a Bachelor of Arts (Honours) from Newcastle University in politics and economics. Following the Common Professional Examination (in which I received a commendation), I undertook the Bar Vocational Course at the Inns of Court School of Law (in which I was in graded "very competent"). I subsequently completed and obtained a masters degree in law from University College London (LLM with merit).

3.      I was called to the Bar of England and Wales (Inner Temple) in 1994 (now non-practising in that jurisdiction). Following practice at the English Bar, I moved in 1999 to

the British Virgin Islands to work as senior litigation counsel at the then largest law firm in the Eastern Caribbean. I was called to the Bar of the Eastern Caribbean Supreme Court in 1999, and am admitted with full audience rights in the British Virgin Islands, Anguilla, Grenada and St Kitts and Nevis circuits. Since 1999 I have regularly litigated before the first instance courts of the Eastern Caribbean, the Eastern Caribbean Court of Appeal, the Judicial Committee of the Privy Council (the "Privy Council") (the final appellate court in London for the Eastern Caribbean Supreme Court) and the Caribbean Court of Justice (the final court of appeal from the courts of certain Caribbean States (though not the BVI).

4.    In 2005 I founded the law firm Forbes Hare. My practice in the BVI primarily involves insolvency and litigation involving offshore companies, investment funds and trusts. Much of the insolvency work I have been involved with since 1999 has involved cross-border aspects, and includes the offshore components of a number of large international insolvency proceedings. I have previously provided expert evidence on foreign law for numerous courts, including the courts of the State of New York and United States Bankruptcy Courts.

5.    Since their original appointment in July 2009, my firm has advised the Liquidators[1] of Fairfield Sentry Limited ("Sentry"), Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited (Lambda) (together, the "Funds"). Forbes Hare's role has included, in addition to advising the Liquidators on matters relating to the liquidations generally, representing the Funds at all stages of the litigation in the British Virgin Islands in which restitutionary claims have been asserted by the Funds to recover overpaid redemption

---

[1] In this declaration, references to the "Liquidator" or "Liquidators" are to Kenneth Krys, Ms Charlotte Ward-Caulfield in their capacities as Liquidators of Funds or to the previously appointed liquidators of the Funds. On 23 April 2009, the High Court of the Virgin Islands, Commercial Division (the "BVI Court") made an order appointing Christopher Stride as the sole liquidator of Lambda. Subsequently, the BVI Court made an order appointing Kenneth Krys as a liquidator of Sentry and Sigma, jointly with Christopher Stride, on 21 July 2009. When Christopher Stride resigned as liquidator of the Funds he was replaced by Ms Joanna Lau. The relevant appointments of Ms Lau and Kenneth Krys in September 2010 were effected by resolutions of the creditors of the Funds. On 24 November 2011, Ms Lau resigned as a liquidator of all three Funds, in accordance with the provisions of section 189 of the Act. From that date until 23 June 2014, Kenneth Krys acted as the sole liquidator of all three Funds. Subsequently, on 23 June 2014, following an application made on behalf of Mr Krys, Ms Charlotte Emma Ward-Caulfield was appointed by the BVI Court as a joint liquidator of each of the three Funds.

moneys.    That litigation, which I shall refer to as the "BVI Redeemer Claims", is the subject

of this declaration and I shall describe it below.  At all times from the date of issue of the BVI

Redeemer Claims I have been the partner of Forbes Hare with overall supervision of their

conduct.  My role has included appearing on behalf of the Funds, usually with specialist

counsel, at most of the key hearings in the BVI Redeemer Claims.

6.    The purpose of this declaration is to provide the US Court with an overview of

the BVI Redeemer Claims and their procedural history, and in particular, the nature of the

"preliminary issues" that were adjudicated in the BVI courts and ultimately by the Privy

Council.

**Background and Nature of the BVI Redeemer Claims**

7.    I am aware that the US Court will be substantially familiar with the

background to the liquidation of the Funds as a result of the ongoing ancillary Sentry Chapter

15 Proceedings before it.  I have nevertheless set out certain background below, because it is

relevant to the pleading of the BVI Redeemer Claims and the issues which were before the

BVI court in determining those claims.

8.    Each of the Funds was incorporated and operated as a collective open-ended

investment fund in the British Virgin Islands under the Mutual Funds Act 1996.  Sentry,

Sigma and Lambda were originally incorporated respectively on 30 October 1990, 20

November 1990 and 7 December 1990.

9.    In essence, the Funds operated as "feeder funds", investing through Bernard L

Madoff Investment Securities ("**BLMIS**") in New York.  As is now well known, BLMIS was

in fact a Ponzi scheme.   The Funds operated from about 1990 until 2008.  Sentry's assets

were purported to be worth approximately US$7.3 billion immediately before the Madoff

fraud was revealed, based on its last published net asset value.  Lambda and Sigma invested

solely into Sentry (they were sub-funds of Sentry). Sentry's stated aim (in its private placement memoranda) was to invest at least 95% of its assets with BLMIS.

10.    Investments were made into each of the Funds by way of subscribing for shares in the relevant Fund. Investors could realise their investment(s) by redeeming some or all of their shares in the relevant Fund. Investments and subscriptions to and from the Funds were made pursuant to the terms of various "Fund Documents" which comprised, *inter alia,* the following documents (I have not exhibited each of these documents, to avoid duplicating material which I believe will be presented to the Court during the course of this briefing):

a.    the Funds' respective Memoranda and Articles of Association which contained detailed provisions regulating subscriptions into and redemptions out of the Funds. Sentry's Memoranda and Articles were amended from time to time, but the amendments are not material for the purposes of this declaration. The most recent version of Sentry's memorandum and articles of association was dated 10 October 2003. (A true and correct copy of Sentry's Memorandum and Articles of Association, dated 10 October 2003 is attached hereto as Exhibit F.) Sigma and Lambda's memoranda and articles of association were at all material times in substantially the same form in material respects as those of Sentry;

b.    from during the year 2003[2] and onwards, a subscription agreement entered into by each investor individually and the relevant Fund at the time of their original investment. From the information available to the Liquidators it appears that the vast majority of investors signed a subscription agreement, which I shall refer to as the "Long-form Subscription Agreement" which was explicitly governed by New York law and which included a term by which the

---

[2] Prior to 2003 contractual documentation relating to subscription appears to have differed.

relevant subscriber agreed to the jurisdiction of federal and state courts in New York for the resolution of disputes. In some cases, the Liquidators were not able to locate a Long-form Subscription Agreement for a particular investor;

c.     where an investor made additional subscriptions, it typically entered into a shorter form agreement at the time of each subsequent subscription. Under these "Short Form Agreements", the subscriber expressly reaffirmed all of the representations and covenants made in its Long-form Subscription Agreement; and

d.     the Private Placement Memoranda ("PPMs") issued by the Funds to investors and prospective investors at various times.

11.     Both the price paid by investors to the Funds when subscribing for shares and the moneys received by investors from the Funds when redeeming shares were determined by reference to the Net Asset Value (or "NAV") of the relevant Fund, as determined by the Funds' administrators. The NAV was to be determined "as at" certain dates, which were the "Dealing Days", namely the last business day of a month for redemptions and the first business day of the next month for subscriptions. Upon request investors were entitled to subscribe for or redeem shares on specified Dealing Days, in return for a subscription payment or redemption payment based on the Funds' NAV per share.

12.     From the outset of the liquidations of the Funds, it was clear to the Liquidators that there were potentially significant claims by the Funds against a variety of persons. It appeared to the Liquidators that it was worth exploring whether any claims lay to recover the significant redemption payments which had been paid out to investors and former investors over the lives of the Funds: as is inherent in the nature of a Ponzi scheme, those investors who withdrew their investments in the Funds before the Madoff fraud was revealed escaped

without loss and indeed generally made fictitious profits[3]. The loss resulting from the Madoff fraud fell entirely on those investors who were still invested in the Funds when the fraud came to light, whose money had effectively been used to continue the Ponzi scheme and pay the prior redeemers and/or other investors in BLMIS.

13.    In the early period following their appointment, the information that was available to the Liquidators to analyse the merits of any potential claims by the Funds was extremely limited.    However, once the Liquidators had access to the Funds' bank statements (which they obtained reasonably early in the liquidations), they identified the redemptions that had occurred.  The Liquidators were conscious that limitation periods were running in respect of any claims.  Although the Liquidators sought, wherever practical, to enter into agreements with potential defendants to "toll" the running of a limitation period or "stay" claims (where issued) against them, it was always apparent, however, that it would be impractical to enter into such agreements with all possible "redeemer" defendants, due to the sheer number of them.

14.    In the case of common law claims for restitution of the redemption payments, there was a risk that the six year limitation period[4] might be held to run from the date on which the redemption payment was made[5].  In the circumstances, there was a clear risk that any delay in issuing claims against redeemers could lead to certain claims becoming time barred.

15.    For that reason, in the months following their appointment, the Liquidators gave instructions to file urgent "protective claims" (i.e. to protect their position against potential expiring limitation periods) in the BVI Court against those investors who had

---

[3]  Fictitious in the sense that they were supposed to represent investment gains made by BLMIS in investing the Funds' money, when of course no such investment gains were ever in fact made.

[4]  The applicable period under BVI law.

[5]  The limitation period (of six years) in respect of statutory avoidance claims starts from the date of commencement of a liquidation, so time did not start running in respect of those claims until 2009.

redeemed in late 2003 and early 2004. As detailed below (see paragraph 19), the Funds also later issued a small number of claims against individual investors. Those claims sought restitution of the redemption payments which were made to investors on the basis of mistake as to the true NAV of the Funds. These are the BVI Redeemer Claims, which are the subject of this witness statement. (A true and correct copy of a sample statement of claim in BVI(COM)2010/30 is attached hereto as Exhibit A.)

16.     In the first months of the liquidation the Liquidators had not seen the Long-form Subscription Agreement which was apparently entered into by the vast majority of investors and which included a choice of law and jurisdiction clause in favour of New York. Once the Long-form Subscription Agreement became known, the Liquidators determined that any redeemer claims against a defendant for whom a Long Form Subscription Agreement could be located should be issued in New York. The claims against redeemers in New York are referred to as the "US Redeemer Claims". The US Redeemer Claims assert, in addition to causes of action in restitution, causes of action under the BVI statutory avoidance provisions and in contract. Accordingly the US Redeemer Claims raise some issues that did not feature in the BVI Redeemer Claims.

**The Commencement of the BVI Redeemer Claims**

17.     As I have explained above, the BVI redeemer claims were commenced in late 2009 and early 2010 in order to deal with the imminent risk of expiring limitation periods in respect of redemption payments which took place in late 2003 and 2004.

18.     Six "omnibus claims"[6] were filed on behalf of Sentry, seeking restitution of redemption payments made between October 2003 and February 2004[7].

---

[6] Against multiple defendants.

[7] Claim No BVIHC (COM) 357 of 2009 (covering redemptions made in October 2003); Claim No BVIHC (COM) 404 or 4057 of 2009 (covering redemptions made in November 2003); Claim No BVIHC (COM) 425 of 2009 (covering redemptions made in December 2003); Claim No BVIHC (COM) 5 of 2010 (covering

19.     Subsequently, the majority of claims against redeemers were filed in the US. However, a small number[8] of further claims on behalf of the Funds (mainly against individual defendants) continued to be filed in the BVI.  That occurred only where no Long-form Subscription Agreement could be located, and no other significant ties linking the relevant defendant to the United States could be identified.   Each of the claims was substantially in the same form as the omnibus claims referred to above.

20.     In total, the Liquidators filed 33 separate claims against 74 defendants in the BVI, seeking the recovery of sums amounting to approximately US$1.45 billion[9].

21.     Under the Eastern Caribbean Civil Procedure Rules, 2000 it is a requirement that a claimant must obtain permission of the Court to serve a claim on any defendant who is not within the jurisdiction. Where such permission is obtained, the claim form must be served within 12 months of its being filed[10] and, if not served within that time, the claim lapses as against any defendant who was not validly served.  Although extensions of time for service can in certain circumstances be granted, there must be "special" and "compelling" reasons to do so.  In the circumstances, in order to preserve the protective effect of issuing the BVI Redeemer Claims, it was necessary to serve them on the named defendants. Permission to serve outside the jurisdiction was granted by orders of the BVI Commercial Court dated 14 May 2010.   We then instructed a service agent to coordinate service on the various defendants across multiple jurisdictions.  That service took place largely over the course of the latter half of 2010, although a number of the claims were never served.

---

redemptions made in January 2004); Claim No BVIHC (COM) 15 of 2010 (covering redemptions made in February 2004); and Claim No BVIHC (COM) 30 of 2010 (covering redemptions made in March 2004).

[8] Twenty-seven claims in total.

[9] Of which the majority in value was a claim against two particular defendants, with the other claims totalling only in the region of USD US$300 million.  A number of the claims were never in fact served.

[10] Where a claim is not being served outside the jurisdiction its validity is a shorter six month period.

**Commencement of the Preliminary Issues Proceedings**

22.     Between January and March 2011, the majority of defendants to the omnibus BVI Redeemer Claims filed Statements of Defence in the BVI proceedings, pleading various defences to the claims brought.  (A true and correct copy of a sample statement of defence in BVI(COM)2010/30 is attached hereto as Exhibit B.)

23.     The BVI court has the power, as part of its general power of case management, to order a trial of "preliminary issues" (Eastern Caribbean Civil Procedure Rules, rule 26.1(2)(i)).  Preliminary issues are usually specific and carefully defined issues, the determination of which is likely to resolve the case altogether or to prompt the settlement of the litigation as a whole. Preliminary issues are usually questions of law, decided on agreed or assumed facts.  The rationale for preliminary issues is that if a claim is bound to fail if certain issues are decided against the claimant, and those issues are capable of being decided in isolation without a full trial of facts, it is more cost effective and a better use of judicial resources to decide those issues before allowing a claim to proceed to a full contested trial of fact.  Traditionally, however, the BVI Courts (and English courts whose procedure the BVI Courts tend to follow) have been reluctant to order determination of preliminary issues. There are a number of well known pitfalls to the preliminary issues procedure, which are discussed in depth in the case law referenced below, and were cited by the Funds in the BVI Redeemer Claims.

24.     On or about 8 March 2011, certain groups of defendants to claims applied to the BVI Court to determine as preliminary issues certain issues relating to certification and, separately, whether good consideration had been given for the redemption payments (these issues are described further below).  (A true and correct copy of a sample notice of application for determination of preliminary issues is attached hereto as Exhibit C.)  For ease of reference, in this declaration, I shall refer to the ensuing proceedings on those applications

as the "Preliminary Issues proceedings", and to the "Preliminary Issues Defendants" (i.e. those defendants to the BVI Redeemer Claims who brought and participated in the Preliminary Issues proceedings).

25.     The Preliminary Issues Defendants were represented by four different BVI law firms, and therefore they are sometimes referred to in the documents from the Preliminary Issues proceedings by groupings according to the firm representing to them [11].   The Preliminary Issues Defendants adopted a common position in virtually all respects throughout the Preliminary Issues proceedings.

26.     The Funds opposed the BVI Court making a direction for the determination of preliminary issues on the following grounds:

a.      there was a substantial risk that enormous cost and delay would be involved in litigating the Preliminary Issues proceedings through to a potential ultimate appeal to Privy Council; and

b.      that they would not be dispositive of the claims and, in particular, factual points might need to be determined in order to dispose of the proposed issues.

27.     Additionally, the Funds indicated that if, despite their opposition, the Preliminary Issues proceedings were to go ahead, the Liquidators of the Funds would wish to have the opportunity to undertake a substantial document review exercise in order to provide proper disclosure relevant to the factual issues.

28.     I describe further below the positions taken by the respective parties in this regard because I believe it is apparent from that context that there was, from the outset, a substantial risk that the Preliminary Issues proceedings would not be determinative of the issues between the parties, despite the large expenditure of time and money by all involved. The Funds' counsel expressly warned of this risk in their submissions at every opportunity.

---

[11] *I.e.*, as the Harneys Defendants; the Maples and Calder Defendants; the Ogier Defendants and the O'Neal Webster Defendants

29.    Before I address these points, however, I will provide a brief procedural history of the Preliminary Issues proceedings.  I will refer below to a number of documents from the BVI Redeemer claims and the Preliminary Issues proceedings.  There were a vast number of documents filed in these proceedings, and I do not intend to burden the US Court with the full record.  I have therefore sought to confine my references to documents which demonstrate primarily:

a.    what the scope of the Preliminary Issues proceedings was (i.e. what issues were and were not decided by the BVI Court); and

b.    how it was that the scope of the Preliminary Issues proceedings came to be defined.

**Preliminary Issues – Procedural History**

30.    Following the applications by Preliminary Issues Defendants, and in light of the Funds' opposition to them, the BVI Commercial Court heard argument as to the appropriateness of the proposed Preliminary Issues.  The hearing took place before the Honourable Justice Edward Bannister QC ("Bannister J") on 18 April 2011.  (A true and correct copy of excerpts from the Privy Council record on appeal, including excerpts from the transcript of application for preliminary issues, 18 April 2011, is attached hereto as Exhibit L.)  Both the Funds and the four groups of Preliminary Issues Defendants were represented at the hearing.  The positions taken by the parties in advance of the hearing were summarised in their respective skeleton arguments[12].  (A true and correct copy of Defendants' skeleton argument in support of application for preliminary issues is attached hereto as Exhibit G.  A true and correct copy of the Funds' skeleton argument in opposition to the application for preliminary issues is attached hereto as Exhibit H.)

---

[12] The Funds filed a skeleton argument and the Preliminary Issues Defendants filed a joint skeleton argument.

31.     Having heard argument, Bannister J reserved his decision.  At a further hearing on 20 April 2011 he delivered his judgment and made an order for directions.  (A true and correct copy of excerpts from the Privy Council record on appeal, including the transcript of decision on application for preliminary issues, 20 April 2011, is attached hereto as Exhibit L.)  The order of 20 April 2011 directed that the following matters be tried as Preliminary Issues:

a.      whether various documents issued to investors constituted certificates of NAV, within the meaning of the Funds' Articles (and related issues) (the "Certification" issues); and

b.      whether redeeming investors gave good consideration for the redemption payments by surrendering their shares, such that no claim could lie in restitution in respect of those payments (the "Good consideration" issue).

32.     By his order of 20 April 2011, Bannister J also stayed all of the BVI Redeemer Claims pending the final decision in respect of the Preliminary Issues proceedings.

33.     The Funds appealed the order of 20 April 2011.  The appeal was rejected on the basis that the order of 20 April 2011 was a "case management decision" of the type that appellate courts in the British Virgin Islands are very reluctant to disturb.

34.     The trial of Preliminary Issues therefore went ahead on 28 and 29 July 2011.

35.     On 16 September 2011, Bannister J handed down an order and judgment in the claim no. BVIHC (Com) 30/2010 known as *Fairfield Sentry Limited (in liquidation) v Bank Julius Baer & Co Ltd & 33 Others* and seven other claims holding, *inter alia*, that: (1) the Preliminary Issues Defendants had given good consideration for the relevant redemption payments in redeeming their shares and this was an absolute bar to the claims asserted by the Claimant; and (2) the various documents relied on by the Preliminary Issues Defendants did not constitute "Certificates" of Net Asset Value pursuant to Article 11(1) of the Articles.

36.     Further, on 10 October 2011, Bannister J refused the Funds' application to adjourn a consequent summary judgment application to permit them time to investigate matters of good faith relating to the Defendants and ordered that claim number BVIHC (Com) 2010/30 be dismissed as against those defendants who were parties to the Preliminary Issues proceedings.   Summary judgment was then granted in favour of each of the Preliminary Issues Defendants[13] on the grounds that the claim against them, in the light of Bannister J's decision on the Preliminary Issues, was bound to fail as then pleaded.   (A true and correct copy of the Judgment in respect of application for summary judgment, 10 October 2011 is attached hereto as Exhibit P.)   Both the Funds and the Defendants appealed the Preliminary Issues first instance judgment and the Funds also appealed against the Summary Judgment order.   Those appeals can be summarised as follows:

  a. the Defendants appealed the finding that there were no binding certificates within the meaning of article 11 of the Articles of Association;

  b. the Funds appealed the finding that in redeeming their shares the Defendants had given good consideration for the payment of the redemption monies received such as to preclude the recovery of any part of that price by the Funds (Preliminary Issue (iv)); and

  c. the Funds also appealed against the Summary Judgment decision dismissing its claims against the Defendants.

37.     Following oral argument, on 13 June 2012, the Eastern Caribbean Court of Appeal handed down a reserved[14] decision dismissing both appeals, albeit on slightly different analyses than those of Bannister J at first instance.

---

[13] Although the order was not finally settled until 12 June 2012.

[14] "In the BVI courts, a reserved decision is one which is not delivered immediately following oral submissions by the parties, but instead after an adjournment during which the Court has time to consider its decision and reasoning.  Typically in such circumstances the Court will deliver a written judgment.  In the case of the Eastern Caribbean Court of Appeal's decision in respect of Preliminary Issues, for example, the hearing of oral argument took place on 17-18 January 2012 and judgment was delivered on 13 June 2012.

38.     I will not provide a detailed analysis of the judgment of Bannister J dated 16 September 2011 or the Court of Appeal dated 13 June 2012, or how they may have impacted upon the US Redeemer Claims, because both have now been superseded by subsequent appeals (by both sides to the litigation) to the Privy Council (the highest level of appeal from the British Virgin Islands).  The Privy Council gave its opinion on 16 April 2014 and (in effect) decided both appeals against the Funds.  (A true and correct copy of the Privy Council Judgment, 16 April 2014 is attached hereto as Exhibit Q.)

39.     I will deal with the Privy Council's decision further below.

**Liquidators' Opposition to Preliminary Issues**

40.     As I have explained above, the Funds' Liquidators opposed the direction for Preliminary Issues from the outset.  The Funds' position was set out in their skeleton argument for the hearing which took place on 18 April 2011 (see Ex. H).

41.     The Funds contended that preliminary issues were not appropriate in the circumstances of the case.  The Funds referred the BVI Court to a number of authorities which described the potential pitfalls of preliminary issues and indicated the courts' general reluctance to direct preliminary issues where there is some substantial dispute as to the facts, where the questions of law are not simple, where the process is likely to add to the costs and length of legal proceedings; and/or where there is some likelihood of an appeal (see skeleton argument, paragraph 15).[15]

42.     The Funds also argued further that substantial document review and disclosure (discovery) would be required before the court could make a determination as to whether particular documents were "certificates" of NAV (see paragraph 16 of the Funds' skeleton

---

[15] The following authorities were cited to the BVI Court:  <u>Allen v Gulf Oil Refining Ltd</u> [1981] AC 1001 per Lord Wilberforce at 1010-1011; <u>Lonrho Plc v Fayed</u> [1992] 1 AC 448 per Lord Bridge at 470; <u>Tilling v Whiteman</u> [1980] AC 1 per Lord Wilberforce at 18; <u>Windsor Refrigerator Co Ltd v Branch Nominees Ltd</u> [1961] CH 375 per Lord Evershed MR at 396; <u>Customs and Excise Commissioners v Zoological Society of London</u> [1999] All ER (D) 778 per Lightman J; and <u>Nyembo v Refugeee Appeals Tribunal and another</u> [2007] IESC 25.

argument). At the time, there might have been documents in the Liquidators possession which they had not yet reviewed which would provide relevant factual background. The Liquidators estimated that they had (at that time) 500,000 documents in their possession and that they would require at least twelve weeks to complete a document review and "disclosure" (*i.e.*, discovery) exercise (see skeleton argument, paragraph 21). It was also possible, if not probable, that the Liquidators might in due course obtain further documents which would be factually relevant to the claims[16].

43.    The Defendants took the position that the Preliminary Issues were questions of pure law (see, for example, Ex. G hereto, paragraph 28-30 (skeleton arguments [17])). Nevertheless, initially it was common ground as between the Funds and the Preliminary Issues Defendants that some disclosure would be required – the disagreement was as to the scope of disclosure required and the length of time which the Funds should be afforded (see paragraph 26 of the Defendants' skeleton argument). The Preliminary Issues Defendants took the position that disclosure could be completed within just 9 days.

44.    At the hearing of 18 April 2011, counsel representing the Funds at that hearing, Mr Michael Gadd, further elaborated on the Funds' objections to Preliminary Issues. He repeatedly noted the risk that if preliminary issues were decided on hypothetical facts, documentary evidence which was discovered in the future could shed new light on matters and necessitate re-examination of the issues (see, for example, Ex. L at p.995 and p.1001-2 of

---

[16] Indeed, as it turned out the Liquidators obtained documents relating to the question of whether certificates of NAV were given in good faith in the summer of 2014, several years after the commencement of the Preliminary Issues proceedings.

[17] Paragraph 29: "The PI Defendants state that, for the purposes of the Good Consideration Defence, irrespective of the NAV per share, by surrendering their shares in Fairfield Sentry the PI Defendants gave good consideration for Fairfield Sentry's payment of the redemption price for the shares, and that this provides a complete defence to Fairfield Sentry's claims in all of the clawback actions." Paragraph 30: "The PI Defendants emphasise that this proposed preliminary issue is a very narrow one. They do not ask the Court to re-calculate the NAV per share of Fairfield Sentry. That exercise would not be suitable for a trial of preliminary issues and will not be necessary if the PI Defendants succeed on either of the proposed preliminary issues. They only invite the Court to decide whether the surrender of the shares, as bundles of rights, was good consideration whatever the NAV per share may have been."

Privy Council Record of Appeal (Transcript, 18 April 2011)).  He also suggested it would be inappropriate to make findings on difficult points of law divorced from their full factual context (see id. at 995-999).  In response to queries from the Court I spoke directly to the background as to the vast scope of the disclosure exercise which would be required (id. at 1012-1013) and the likely cost and timescale for doing so.  Counsel further suggested that a "test case" of all of the issues, rather than isolating out particular preliminary issues would be a more appropriate manner to deal with the claims (id. at 1014).

45.    Following the submissions made on behalf of the Funds, counsel for the Preliminary Issues Defendants gave brief replies.  In response to the Court's reaction to the Funds' submissions, they shifted positions as to the necessity of disclosure. Counsel for the Preliminary Issues Defendants argued that disclosure was "unlikely to be" a "worthwhile process" (id. at 1035-36)[18].  Counsel for the Defendants also suggested that "special facts" could be dealt with by leaving a carve out to allow for factual points to be brought back before the Court after points of general principle had been dealt with (id. at 1037-39).

46.    Bannister J delivered judgment on 20 April 2011.  (A true and correct copy of the Judgment of Bannister J, 20 April 2011 and the Order of Bannister J, 20 April 2011 is attached hereto as Exhibit N.)  The judgment was very brief and did not give detailed reasons for ordering preliminary issues, nor did it engage with the authorities which the Funds had cited to caution against preliminary issues, save for saying:

47.    *"The pitfalls of directing preliminary issues are well known and have been alluded to in numerous judgments handed down by judges at all levels and in many jurisdictions.  I do not need to cite from these judgments."* (see Ex. N paragraph 12 (Judgment, 20 April 2011))

---

[18] Although, I note that David Lord QC, counsel for the Ogier defendants, dissented and continued to maintain the need for at least some disclosure (see Ex. L at page 1041, Privy Council record (Transcript, 18 April 2011)).

**Factual Issues Expressly Carved Out of Preliminary Issues**

48.     Bannister J did take pains to make clear that the preliminary issues he directed were intended to be points of pure law (see, for example, Ex. N paragraph 19 (Judgment, 20 April 2011)[19]).   Indeed, in an apparent effort to allay the Funds' objections, that (in effect) the Preliminary Issues proceedings necessarily engaged contextual issues of fact which were not yet capable of determination, *Bannister J expressly carved out questions of fact from the scope of the Preliminary Issues to be determined by the BVI Court and preserved the Funds' right to argue that the Preliminary Issues were not determinative in relation to particular Defendants because of previously unknown facts*.   This can be seen from paragraphs 18[20] and 22(3)[21] of the judgment dated 20 April 2011.   This carving out of factual questions was reproduced in the directions order dated 20 April 2011.   Further, Bannister J suggested, at the 20 April hearing, that it would be open to the Funds to raise factual issues at a later date, and in particular at the hearing of applications for summary judgment which might follow on from the determination of the Preliminary Issues proceedings (see Ex. L, page 1061 (Transcript, 20 April 2011)).

49.     In light of the suggestion that the Funds might raise factual points at an application for summary judgment immediately following the Preliminary Issues proceedings, the Liquidators of the Funds sought permission to conduct an exercise of reviewing the documents in their possession for the purposes of evidence in the preliminary

---

[19] "So far as concerns the consideration defence, it seems to me that once it is decided that there should be a preliminary issue on the Article 11 (1) defence, nothing is lost in delay or costs by also  determining the pure point of law which is involved in the consideration defence." [emphasis added].

[20] "... I accept that what seems now to be improbable or irrelevant may turn out when more is known to be both probable and relevant. In order to cater for this possibility I propose that my order in respect of the Article 11(1) preliminary issue should be in a form which does not extinguish it."

[21] In which, the judge ordered that a determination in respect of the Certification Issue against the Funds "shall not debar the [Funds] from subsequently asserting on the basis of a fact or facts not actually known to the Liquidators of the Claimant at the time of the hearing of [the Certification Issue] that notwithstanding the determination of that question a particular defendant is liable to repay to [Funds] all or some part of any redemption monies paid to that defendant".

issues.  Under the terms of their appointment order, the Liquidators did not strictly require the permission of the Court in order to engage in a document review exercise.  However, the document review process would have been an expensive exercise (then estimated at approximately US$250,000), and the Court's approval of any fees in respect of the exercise would be required before they could be paid from the estates of the Funds.  Bannister J refused permission for the Liquidators to examine the Funds' documents (see id. at 1063-64).

50.     The Funds sought to appeal the direction that Preliminary Issues should be determined and the refusal to order disclosure.  First, they sought and were refused leave to do so from Bannister J (see id. at 1062-63).   They then sought leave to appeal from the Court of Appeal, which was refused on paper, without a hearing.  Finally, the Funds requested reconsideration of the application leave to appeal application at a hearing which took place immediately before the trial of preliminary issues.

51.     On appeal, the Funds once again drew the Court of Appeal's attention to the authorities which suggest caution in ordering preliminary issues, and which Bannister J had not engaged with in his 20 April 2011 judgment.  (A true and correct copy of the Funds' skeleton argument in the appeal of the direction for determination of preliminary issues is attached hereto as Exhibit I.)  The Funds' skeleton argument also explained, by reference to those authorities, why the BVI Redeemer Claims were not appropriate cases for the determination of preliminary issues (see Ex. I at paragraph 15-29 (appeal skeleton argument)).

52.     The Preliminary Issues Defendants opposed the appeal, largely on the grounds that the order of 20 April 2011 was a case management decision of the type with which appellate courts should typically be reluctant to interfere.

53.     The Court of Appeal sided with the Preliminary Issues Defendants.  On 22 July 2011 it held that it ought not to disturb a case management decision which was not

"obviously wrong"[22].   Given that  reasoning, the Court of Appeal did not engage in any substantive analysis as to the merits of the Preliminary Issues procedure and whether it was likely to lead to the just and expeditious disposal of the BVI Redeemer Claims.

**Rejection of Summary Judgment Adjournment**

54.    After the Court delivered its judgment in relation to Preliminary Issues, the Defendants sought Summary Judgment on the basis that there was no reasonable prospect of the Funds successfully prosecuting the claims in light of the judgment dated 16 September 2011.

55.    The application for summary judgment came on for hearing on 27 September 2011 and summary judgment was granted by the judgment and order of Bannister J dated 10 October 2011.   (A true and correct copy of the Judgment in respect of application for summary judgment, 10 October 2011 is attached hereto as Exhibit P.)

56.    The Funds' position was that the application for summary judgment should be adjourned in order to permit them time for further factual investigation and, if appropriate, to make amendments to the claims before a final judgment.   The Funds' position was summarised thus by Bannister J:

> Sentry has put in evidence a fifth affidavit made by one of its Joint Liquidators.  It explains that the Joint Liquidators have, since the end of June of this year, had access to information in the possession of Mr Madoff's SIPA Trustee, so that (if such information is in the Trustee's hands) they are in a position to obtain information about any of the defendants to these proceedings.   They exhibit copies of two complaints made by the Trustee against (among others) two of the defendants to the present proceedings (not ABN Amro). These complaints make various allegations of actual or constructive knowledge of Madoff"s fraud and (as I understand it) of profiting from it.   The Joint Liquidators say that with sufficient time, they

---

[22] The Court of Appeal did not give full written reasons for its determination.  However, the Court was in effect upholding an earlier decision "on the papers" by a single judge of the Court, Justice of Appeal Davidson Baptiste.  Justice of Appeal Baptiste did provide written reasoning in a judgment dated 31 May 2011.  (A true and correct copy of the Judgment of the Honourable Justice of Appeal Davidson Baptiste, dated 31 May 2011 is attached hereto as Exhibit O.)

> may be able to discover material which will enable them to plead that particular redeemers did not receive the redemption monies in good faith. . . .
>
> The Joint Liquidators also suggest that, based upon this material, they may be able to mount additional claims against some or all of the redeemers for example, in knowing receipt. They therefore ask for an adjournment in order to review the Trustee's materials and, if they strike gold, to seek permission to amend, before final judgment is given. Mr Brindle QC cited possible limitation defences accruing if the present proceedings are dismissed and the Joint Liquidators have to start afresh as well as a risk that **Henderson v Henderson** points may be taken against them if they have to start fresh proceedings to bring any new claims which they may be able to support as a result of their examination of the Trustee's material ."

57.    Bannister J rejected the application for an adjournment with the rather brief reasoning that "something may turn up" was not an answer to an otherwise successful application for summary judgment[23].

**Final Determination of the Preliminary Issues**

58.    The Preliminary Issues were finally determined by the Privy Council in the decision of Lord Sumption dated 16 April 2014. (A true and correct copy of the Privy Council Judgment, 16 April 2014 is attached hereto as Exhibit Q.)

59.    Lord Sumption's judgment was on a fundamentally different basis from those of the Courts below. Both the Commercial Court and the Court of Appeal had found in favour of the Funds on one issue (the Certification issue): they found that certain documents presented by the Preliminary Issues Defendants were not certificates of NAV issued by or on behalf of the Funds, within the meaning of Article 11 of the Funds' Articles of Association. However, they had both found against the Funds on the other preliminary issue: that is they both found that, notwithstanding the absence of a certificate of NAV, the surrender of shares by the Defendants had been "good consideration" for the redemption monies paid over to them, so as to preclude a restitutionary claim.

---

[23] Judgment, 10 October 2011, paragraph 22

60.     The Privy Council decided both issues against the Funds, but in a manner which inextricably linked the two issues.

61.     By way of very brief summary[24], the Privy Council determined that the various documents put forward by the Defendants did constitute certificates of NAV (despite the apparent lack of formality on their face).  Further, because certificates of NAV had been issued, the redeeming investors were in principle contractually entitled to redemption payments on the basis of that certified NAV (notwithstanding any errors in its calculation).  Finally, because the redemption payments were (on this analysis) paid pursuant to a contractual obligation, and discharged that obligation, there was good consideration for the redemption payments, and that was sufficient to defeat a claim in restitution.

62.     The difference in the reasoning was significant.  Under the Privy Council's reasoning, the "good consideration" defence was entirely dependent on the existence of binding certificates of NAV.  This was not the case under the reasoning in either the first instance or Court of Appeal judgments.  Following the Privy Council judgment, therefore, questions of fact relating to whether or not certificates of NAV were issued in good faith were capable of bringing claims outside of the scope of the Privy Council's judgment.  The same questions of fact would not have been relevant under the reasoning adopted by the lower courts, because the certificates of NAV were not relevant to the dismissal of the claims.

63.     In the final sentence of the judgment of the Privy Council, Lord Sumption invited the parties to agree an appropriate form of declaration on the preliminary issues.  Various drafts were traded between counsel and it became clear that the parties were not agreed as to the form of declarations.  There were essentially four points of disagreement, which were summarised in written submissions submitted to the Privy Council by the Funds and by the Preliminary Issues Defendants in May 2014. The key issue of disagreement was

---

[24] I understand that a declaration will be given by Gabriel Moss QC which will deal with some of the legal issues arising out of the Privy Council's decision in more detail.

whether or not the finding that certain documents were certificates of NAV should be qualified by reference to the requirement (to be found in Article 11) that the certificates had been "given in good faith". The crux of the arguments on this point can be found in paragraphs 7-21 of the Preliminary Issues Defendants' submissions (see Ex. J) and paragraphs 3, 6-11 of the Funds' submissions (see Ex. K).

64.     The Funds took the position that no declarations were necessary because the judgment of the Privy Council was clear as to its effect. However, the Funds submitted in the alternative that if declarations were to be made, any reference to certificates should include the wording "if given in good faith". The Funds argued that the issue of good faith was expressly not before the Court on the determination of the Preliminary Issues. That is because, as set out above, in directing a determination of Preliminary Issues the Court had expressly preserved the Funds' right to argue that a claim fell outside of the scope of the Preliminary Issues because of some previously unknown fact. (See Ex. K paragraph 3, 6-11.)

65.     The Preliminary Issues Defendants, on the other hand, argued that declarations were necessary in order to ensure that that the preclusive effect of the decision should not be limited to where the certificates were "issued in good faith". The Preliminary Issues Defendants argued that the Preliminary Issues proceedings were intended to be determinative of the issues on the claim and to avoid the need for a trial of factual issues. (See Ex. J paragraphs 7-21).

66.     The Privy Council, having considered those submissions, ultimately decided *not* to issue any declarations on the Preliminary Issues – in line with the Funds' position in the written submissions. This was reflected in paragraph 3 of its final order, which was issued on 8 October 2014. (A true and correct copy of the Privy Council Order, 8 October 2014 is attached hereto as Exhibit R.)

67.    In theory, it remained open for the Funds to continue to pursue the BVI Redeemer Claims, if amended to allege that the certificates of NAV were not given in good faith, against those defendants who had not already obtained summary judgment.  However, the Preliminary Issues Defendants now benefit from summary judgment in the BVI Redeemer Claims with respect to the claims made against them for the redemptions which are the subject matter of those claims.  Of the remaining defendants against whom the BVI Redeemer Claims could be continued, a substantial number had not submitted to the jurisdiction, may not have been successfully served, and/or may have been wound up or struck off as companies in the intervening years (or are otherwise of doubtful financial standing).

68.    Accordingly, the Liquidators of the Funds decided, on a cost-benefit analysis, that there was insufficient prospect of achieving value from the BVI Redeemer Claims which would outweigh the significant cost of their pursuit.   In the circumstances, the Liquidators considered that the Funds should take steps to discontinue the claims insofar as they had not already been concluded by way of summary judgment.  They were given permission and directions to do so by the order the Honourable Justice Sher QC dated 25 May 2016 and notices of discontinuance have now been served on all defendants to the BVI Redeemer Claims.   The discontinuance of the BVI Redeemer Claims has been effected strictly without prejudice to the continuance of claims elsewhere (including, for the avoidance of doubt, the US Redeemer Claims).

**Good faith Issue in the Section 273 Proceedings**

69.    For completeness I should note that the question of whether the good faith issue remains open to the Funds is one that was debated at length during the hearing on 23-26 March 2015 of applications (the "Section 273 Applications") which were brought by a number of defendants to the US Redeemer Claims pursuant to s.273 of the BVI Insolvency

Act.   The Section 273 Applications were an attempt to seek relief from the BVI court to prevent the Liquidators from causing the continuation of the US Redeemer Claims.

70.   The BVI Court dismissed the Section 273 Applications.  (A true and correct copy of the Judgment of Leon J dated 11 March 2016 is attached hereto as Exhibit S.)   In doing so, it concluded in its judgment dated 11 March 2016 that, along with various other issues, it was for the US courts to consider in the first instance whether to hear the good faith arguments (paragraphs 97 and 124 of Leon J judgment).

71.   The applicants in the Section 273 Applications have appealed to the Court of Appeal.  The appeals are listed to be heard in the week commencing 21 November 2016.  The Court of Appeal has already given sanction to the Liquidators to continue the US Redeemer Claims, by an order dated 27 June 2016 (and subsequently perfected in an Amended Certificate of Result of Appeal issued on 30 June 2016).

72.   Sanction is an approval of the BVI Court in respect of certain steps or actions taken by the Liquidators.  Sanction is required pursuant to the terms of their appointment order, in order that the Liquidators may meet certain costs from the estate of the company in liquidation.  Sanction is relevant only to the question of whether a liquidator(s) can recover his costs of litigation from an insolvent estate.  It does not affect whether a liquidator does or does not have authority to bring the relevant litigation (see *Kenneth M Krys v Farnum Place LLC (BVIHCMAP2013/0014, 18 February 2014,* at paragraph 10 – this also accords with the law and practice in England: see *Dublin City Distillery v Doherty* [1914] A.C. 823, 859-860 per Lord Parker; re *London Metallurgical Company* [1897] 2 Ch 262 and *In re a Debtor (No 26A of 1975)* [1985] 1 WLR 6).

**Appended Documents**

73.   A true and correct copy of a sample statement of claim in BVI(COM)2010/30 is attached hereto as Exhibit A.

74.     A true and correct copy of a sample statement of defence in BVI(COM)2010/30 is attached hereto as Exhibit B.

75.     A true and correct copy of a sample notice of application for determination of preliminary issues is attached hereto as Exhibit C.

76.     A true and correct copy of the notice of Appeal regarding direction for determination of preliminary issues, 4 May 2011 is attached hereto as Exhibit D.

77.     A true and correct copy of the notice of Application for summary judgment, 20 September 2011 is attached hereto as Exhibit E.

78.     A true and correct copy of Sentry's Memorandum and Articles of Association, dated 10 October 2003 is attached hereto as Exhibit F.

79.     A true and correct copy of Defendants' skeleton argument in support of application for preliminary issues is attached hereto as Exhibit G.

80.     A true and correct copy of the Funds' skeleton argument in opposition to the application for preliminary issues is attached hereto as Exhibit H.

81.     A true and correct copy of the Funds' skeleton argument in the appeal of the direction for determination of preliminary issues is attached hereto as Exhibit I.

82.     A true and correct copy of Defendants' submissions to the Privy Council as to the appropriate form of declarations is attached hereto as Exhibit J.

83.     A true and correct copy of the Funds' submissions to the Privy Council as to the appropriate form of declarations is attached hereto as Exhibit K.

84.     A true and correct copy of excerpts from the Privy Council record on appeal, including excerpts from the transcript of application for preliminary issues, 18 April 2011, and the transcript of decision on application for preliminary issues, 20 April 2011, is attached hereto as Exhibit L.

85.     A true and correct copy of the transcript of summary judgment application, 10 October 2011 is attached hereto as Exhibit M.

86.     A true and correct copy of the Judgment of Bannister J, 20 April 2011 and the Order of Bannister J, 20 April 2011 is attached hereto as Exhibit N.

87.     A true and correct copy of the Judgment of the Honourable Justice of Appeal Davidson Baptiste, dated 31 May 2011 is attached hereto as Exhibit O.

88.     A true and correct copy of the Judgment in respect of application for summary judgment, 10 October 2011 is attached hereto as Exhibit P.

89.     A true and correct copy of the Privy Council Judgment, 16 April 2014 is attached hereto as Exhibit Q.

90.     A true and correct copy of the Privy Council Order, 8 October 2014 is attached hereto as Exhibit R.

91.     A true and correct copy of the Judgment of Leon J dated 11 March 2016 is attached hereto as Exhibit S.

Executed on the 21st day of October, 2016

*/s/ William Hare*_____
William Hare