# EXHIBIT B



THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION

Claim No. BVIHC (COM) 30/2010

B E T W E E N :-

FAIRFIELD SENTRY LIMITED (in Liquidation)

Claimant

- and -

BANK JULIUS BAER & CO LIMITED and others

Defendants

---

**DEFENCE OF**

**(1) CREDIT SUISSE LONDON NOMINEES LIMITED,
THE SEVENTH DEFENDANT, and**

**(2) BUCKMORE NOMINEES LIMITED,
THE TWENTYFIFTH DEFENDANT**

---

1.    In this Defence the Seventh Defendant will be referred to as "CSLN" and the Twentyfifth Defendant will be referred to as "BNL", together "the CS Defendants".

2.    Paragraphs 1, 2 and 3 of the Statement of Claim are admitted.

3.    Although it is admitted that it was the intention that 95% of the Claimant's funds were to be invested with Bernard L. Madoff Investment Securities LLC ("BLMIS"), it is not admitted whether this in fact happened. Accordingly, paragraph 4 of the Statement of Claim is not admitted.

4.    Save that it is admitted that the CS Defendants subscribed for shares in the Claimant, paragraph 5 of the Statement of Claim is denied. The CS Defendants' subscription for and/or redemption of shares in the Claimant was made in the CS Defendants' capacity as sub-custodians for the CS Defendants' clients who wished to invest in shares in the Claimant.

<u>PARTICULARS</u>

(1)    In relation to the Claimant's claim in respect of CSLN's redemption in the
sum of US$1,994,006.38 in March 2004, CSLN acted as sub-custodian for
Credit Suisse (Zurich) AG ("CSZ") whose clients wished to invest in hedge
funds. The redemption requests for the relevant shares were in fact sent by
CSZ and the redemption monies were in fact paid direct to CSZ (at the
direction of CSLN). CSLN does not know the identity of any of CSZ's said
clients. CSZ's clients were however the ultimate recipients of the redemption
proceeds (or the equivalent thereof) which are claimed by the Claimant.

(2)    In relation to the Claimant's claim in respect of BNL's redemption in the sum
of US$680,216.60 in March 2004, BNL acted as sub-custodian for Credit
Suisse London Branch ("CSUK") whose clients wished to invest in hedge
funds. Kiloran Trust Company Limited as trustee of the Cumelem Trust was
the ultimate recipient of the redemption proceeds (or the equivalent thereof)
which are claimed by the Claimant.

5.    In the premises, CSLN was acting at all material times as agent for CSZ (which was
CSLN's principal) and BNL was acting at all material times as agent for CSUK (which
was BNL's principal). References to "CSLN" and "BNL" in this pleading are to be
taken as references to them as agents for their respective principals.

6.    At all material times the Claimant had actual or constructive knowledge that the CS
Defendants were acting as agents for principals. In this regard the CS Defendants
will rely on the subscription and redemption documentation in respect of the
subscription for and the redemption of the relevant shares. Insofar as may be
necessary, the CS Defendants will also rely on the fact that the general practice in
the hedge fund industry was (and indeed still is) that the subscribing shareholder will
in the usual course be the agent of a third party principal. By reason of the premises,
the CS Defendants were to the Claimant's knowledge acting in each case as the
agent of a disclosed principal.

7.    Paragraph 6 of the Statement of Claim is admitted, save that in each case the CS
Defendants were acting as agents as hereinbefore pleaded.

2

8.    Paragraph 7 of the Statement of Claim is admitted.  The Claimant's Articles of
Association ("the Articles") provided that the net asset value ("the NAV") per share
was to be determined by the directors of the Claimant and calculated pursuant to the
formula set out in article 11 of the Articles.  Article 11(1) provided (amongst other
things) as follows:-

>    "Any certificate as to the Net Asset Value per Share or as to the Subscription Price or
>    Redemption Price therefore given in good faith by or on behalf of the Directors shall
>    be binding on all parties."

9.    Paragraph 8 of the Statement of Claim is admitted and averred insofar as it relates to
the calculation of the NAV and the amounts determined to be payable to the CS
Defendants.  Save as aforesaid paragraph 8 of the Statement of Claim is not
admitted.

10.   The NAV had been calculated in accordance with the formula set out in article 11 of
the Articles, and the NAV had been properly determined by the Claimant's directors
in accordance with the provisions of article 11 of the Articles.    Further, the
Claimant's directors had certified, in accordance with Article 11(1) of the Articles, the
NAV per share for the purposes of the Redemption Price of the shares in the
Claimant which the CS Defendants held as agent as hereinbefore pleaded (each of
CSLN's and BNL's shareholdings and, where the context so permits, both CSLN's
and BNL's shareholdings, are hereinafter referred to as "the Shares").  By reason of
the premises, and by reason of the provision in article 11(1) of the Articles referred to
in paragraph 8 above, the NAV so determined is binding on the Claimant and on the
CS Defendants, and there is no basis upon which the Claimant can now seek to go
behind, disturb or recalculate the NAV so determined.

11.   Without prejudice to paragraph 10 above, it would in any event be impossible and/or
wholly impractical to attempt to recalculate the NAV now.   Even if it was possible or
permissible to recalculate the NAV now, and contrary to that which is pleaded in the
Statement of Claim, the NAV was greater than a nil or nominal value even if the facts
and matters alleged by the Claimant in respect of the Madoff Ponzi scheme are true.

12.   The sums transferred to the CS Defendants were transferred to them in their
capacity as agents for the principals identified in paragraph 4 above.  Immediately
upon transfer to them, or very soon after the transfers to them, the CS Defendants

3

paid over the relevant sums in full (subject to the deduction of any due commission) to their relevant principals.

13.    Paragraphs 9, 10, 11 and 12 of the Statement of Claim are each denied. The CS Defendants require the Claimant to prove each and every fact and matter alleged in paragraphs 9 – 12 of the Statement of Claim.

14.    The CS Defendants set out in the remainder of this pleading certain positive defences to the claims made against them in the Statement of Claim. Each of these defences applies to the Claimant's claim for restitution for unjust enrichment as pleaded in paragraph 11 of the Statement of Claim, and also to the Claimant's seemingly alternative claim, pleaded in paragraph 12 of the Statement of Claim (although not claimed in the Amended Claim Form), that the Claimant is entitled to "set aside the redemption of the Defendants' shares" (whatever that may mean) on the grounds that the payment to the CS Defendants were effected under a mutual mistake. Insofar as the Claimant claims any rescission against the CS Defendants or either of them (which is unclear from the Statement of Claim, but in any event impermissible), the CS Defendants will say that the remedy of rescission is neither appropriate nor possible on the facts alleged against them.

### Defence (1) – No mistake in the NAV

15.    The Claimant is not entitled to raise any allegation that the NAV was calculated under a mistake of fact, whether as alleged or at all. In this regard the CS Defendants rely on the following.

(1)    The facts and matters pleaded in paragraphs 8 –10 above. The Claimant is accordingly prevented by the terms of article 11 of the Articles from alleging that there was a mistake in the calculation of the NAV. The NAV per share for the purposes of the CS Defendants' redemption of the Shares is to be taken as that determined and certified by the Claimant's directors when their respective shares were redeemed, and the Claimant is estopped by contract from asserting otherwise. Further or in the alternative, and without prejudice to the aforesaid, events and knowledge acquired subsequent to the determination and certification of the NAV are completely irrelevant.

(2)    The Claimant is estopped by representation from alleging that there was a mistake in the calculation of the NAV per share or that the Shares should be

4

redeemed at a Redemption Price other than that calculated on the basis of the NAV per share as determined and certified by the Claimant's directors. The determination and certification by the Claimant's directors of the NAV per share for the purposes of the Redemption Price of the Shares, and the communication of the NAV per share so determined and certified, constituted representations of fact by the Claimant, which the Claimant intended the CS Defendants to act upon, that the NAV per share was that as determined and certified by the Claimant's directors, and also that the determination and certification of the NAV had been correctly calculated. In reliance on those representations, the CS Defendants redeemed the Shares at the Redemption Price (which was calculated on the basis of the NAV per share as determined and certified by the Claimant's directors) in accordance with the provisions of article 10 of the Articles, and paid over the redemption proceeds (which they received from the Claimant) to their principals (as pleaded above). By so doing, each of the CS Defendants acted to its detriment. By reason of the premises, it would be inequitable for the Claimant to go back on its representations (especially after such a long passage of time between the date of payment over and now). The Claimant is accordingly estopped from denying that the NAV per share is anything other than that as determined and certified by the directors of the Claimant, or that the Redemption Price for the Shares is anything other than the Redemption Price paid by the Claimant to each of them.

(3)     The Claimant is estopped by convention from alleging that there was a mistake in the calculation of the NAV. In this regard, when the CS Defendants redeemed the Shares, both the Claimant and the CS Defendants acted on the same assumed state of facts, namely that the NAV per share as determined and certified by the directors of the Claimant for the purposes of the Redemption Price was as stated and was correct. Each of the CS Defendants thereupon redeemed the Shares at the Redemption Price (which was calculated on the basis of the NAV per share as determined by the Claimant's directors) in accordance with the provisions of article 10 of the Articles, and paid over the redemption proceeds to its principal (as pleaded above). By reason of the premises, it would be unjust or unconscionable to allow the Claimant to go back on the assumed state of facts (which had been acquiesced in by both the Claimant and the CS Defendants), especially after the passage of such a long period of time between the date of payment over and now. By reason of the premises, the Claimant is estopped by convention

from asserting that the NAV per share is anything other than that as determined and certified by the directors of the Claimant.

16.    By reason of the premises there was no mistake in the NAV – or at any rate no mistake in the NAV upon which the Claimant is entitled to rely – and so the Claimant's claim must fail *in limine*.

17.    Further or in the alternative, it is denied that at any time prior to December 2008 (when the Madoff fraud was discovered) the NAV per share was anything other than that as determined and certified by the Claimant's directors. In particular it is denied that the NAV per share prior to December 2008 was nil or a nominal value. In this regard, the CS Defendants rely on the fact that the value of the Claimant's shares was the amount for which they could have been purchased, sold or redeemed on any particular date. Prior to December 2008 that amount was the (full) value as determined and certified by the Claimant's directors from time to time.

**Defence (2) – The CS Defendants have not been unjustly enriched at the Claimant's expense**

18.    The redemption proceeds paid by the Claimant to the CS Defendants in respect of the Shares were paid to discharge, and did discharge, a debt owed by the Claimant to each of the CS Defendants. In this regard, once the Claimant had accepted the CS Defendants' requests to redeem the Shares, the Claimant became indebted to each of them for the amount of the Redemption Price of their respective Shares.

19.    In consideration of each of the CS Defendants redeeming its Shares and relinquishing its rights as a shareholder in accordance with the Articles, the Claimant discharged the debt which it owed to that Defendant by paying to it the Redemption Price for its Shares. By reason of the premises, each of the CS Defendants has given good consideration for the Claimant's payment, with the consequence that the CS Defendants have not been unjustly enriched at the Claimant's expense.

20.    Further and in any event, the Claimant is put to strict proof that the monies used to pay the Redemption Price were monies to which the Claimant was lawfully and beneficially entitled. If the Claimant is unable to prove this, then the Claimant cannot be heard to say that either of the CS Defendants has been unjustly enriched at the expense of the Claimant.

6

### Defence (3) – the Claimant assumed the risk of the alleged mistake

21.  As pleaded above, it is admitted that the intention was that at least 95% of the
Claimant's assets would be invested with BLMIS.  So far as the CS Defendants are
aware, the Claimant used the entirety of the subscription monies which the CS
Defendants had paid to the Claimant to invest with BLMIS.

22.  The Claimant was at all material times aware of the risk that BLMIS might
misappropriate monies placed by the Claimant with BLMIS for investment.   In this
regard the CS Defendants rely on the express and/or implied warnings to this effect
given by Claimant in the Private Placement Memoranda issued by the Claimant from
time to time offering for sale the Claimant's shares to investors ("the PPMs").   The
risk that BLMIS might misappropriate monies placed by the Claimant with BLMIS for
investment must in any event have been obvious to the Claimant.

23.  Accordingly, at the time when the Claimant's directors determined and certified the
NAV per share, and at the time when the Claimant paid the Redemption Price for the
Shares to the CS Defendants, there was a clear and obvious risk that the Claimant's
assets with BLMIS had been misappropriated, that the values of those assets were
fictitious and that the Claimant's NAV was as a consequence overstated.
Notwithstanding this risk, the Claimant undertook no or no adequate checks or other
due diligence on BLMIS to verify BLMIS' systems, operations and overall *bona fides*.

24.  In such circumstances, and having expressly and/or impliedly acknowledged the
obvious risk of the misappropriation of assets by BLMIS, once the Claimant chose to
pay the Redemption Price to the CS Defendants without having undertaken any
checks or due diligence in relation to BLMIS and the status of the redemption monies
which the Claimant had received from BLMIS, the Claimant is to be treated in fact
and in law as though it had assumed the risk that it was mistaken about BLMIS' *bona
fides*.

25.  Further or in the alternative, and in the face of the CS Defendants' honest claim for
payment of the Redemption Price, the Claimant intentionally paid the Redemption
Price to the CS Defendants having expressly declined to investigate the obvious risk
that BLMIS might have misappropriated the Claimant's assets.  As a consequence,
the Claimant is to be taken to have chosen to waive all inquiry into the *bona fides* of

BLMIS and so itself assume the risk that it may have been mistaken about the *bona fides* of BLMIS.

26.    By reason of this voluntary assumption of risk on the part of the Claimant, the Claimant is not entitled to recover the Redemption Price from the CS Defendants or either of them on the grounds of mistake, whether as alleged or at all.

### Defence (4) – Estoppel by negligence

27.    It was an implied term of the respective agreement by which CSLN and BNL subscribed for shares in the Claimant that the Claimant would exercise reasonable skill and care when investing CSLN's and BNL's monies, both at the time of the initial investment and during the life of the investment. Further or in the alternative, there existed between the Claimant and each of them a relationship of sufficient proximity such that it is fair, just and reasonable that the Claimant owed the CS Defendants a duty in tort to exercise reasonable skill and care when investing the monies provided by the CS Defendants. In addition, the CS Defendants will, as necessary, rely in support of the duty of care and the proximity which existed between the Claimant and the CS Defendants on the various PPMs issued from time to time by the Claimant.

28.    Without prejudice to the generality of the duties pleaded in paragraph 27 above, in pursuance of its obligation to act with reasonable skill and care, and/or as incidents of that obligation and/or by way of further implied terms of the agreement, the Claimant owed the following specific duties to the CS Defendants and each of them:

(1)    to undertake appropriate due diligence and other checks on BLMIS, its operations and systems to ensure that BLMIS had adequate controls and procedures in place to prevent any misappropriation of monies invested with BLMIS;

(2)    to inform the CS Defendants if there were in the Claimant's reasonable opinion any shortcomings in BLMIS' operations and systems.

29.    Further it was reasonably foreseeable, if the Claimant did not exercise the requisite degree of skill and care, that the Claimant's investments with BLMIS (including the monies which the CS Defendants had given to the Claimant for investment) would or might be lost, and that the CS Defendants would thereby suffer loss and damage.

30.   In breach of the duties owed by the Claimant to the CS Defendants, the Claimant:-

    (1)    failed to undertake any or any adequate due diligence or other checks in relation to BLMIS, its operations and systems;

    (2)    failed to inform the CS Defendants or either of them of the numerous shortcomings in BLMIS' operations and systems;

    (3)    nevertheless, invested monies with BLMIS, including the CS Defendants' monies.

31.   Had the Claimant not been in breach of duty as pleaded in paragraph 30 above, the Claimant would have discovered the fraud being practised by BLMIS on investors. In particular, the Claimant's breaches of duty led CSLN and BNL to believe that the NAV had been correctly calculated and properly reflected the Claimant's underlying value. By reason of the Claimant's breaches of duty pleaded in paragraph 30 above, BLMIS was able to, and did, misappropriate the monies which had been invested with it, including monies invested with it by the Claimant (which included the monies given by the CS Defendants to the Claimant for investment with BLMIS).

32.   By reason of the premises, the Claimant is estopped by its negligence from asserting any claim in mistake (or otherwise) against either of the CS Defendants. In particular, the Claimant is estopped by its negligence from asserting facts contrary to the CS Defendants' belief as pleaded in paragraph 31 above. In this regard, each of the CS Defendants relies on the legal principle that when one of two persons must suffer a loss as a result of the fraud of a third person, the person whose negligence is the cause of the loss must bear that loss. It was the Claimant's negligence which caused and/or failed to prevent the losses now being claimed by the Claimant against the CS Defendants (which arose in the context of the fraud of BLMIS), and it is therefore the Claimant which must bear that loss as between the Claimant and the CS Defendants. Accordingly, the Claimant's claim against the CS Defendants must necessarily fail.

## Defence (5) – Ministerial receipt/payment over

33.   As pleaded in paragraphs 4 – 6 above, at all material times each of CSLN and BNL was acting as the agent of a disclosed principal.

34.  The CS Defendants received the sums referred to in paragraph 4 above in their capacity as agents, and they paid the monies over to their relevant principals in good faith and many years before receiving notice either of BLMIS' fraud or of the Claimant's claim herein.

35.  In the circumstances, the Claimant is not entitled to claim or make any recovery against the CS Defendants or either of them, whether as alleged or at all.

## Defence (6) – Change of position

36.  Further or alternatively, if (which is denied) the CS Defendants were initially unjustly enriched, each of them has in good faith changed its position as a consequence of the receipt of the monies claimed by the Claimant such that it would now be inequitable and/or unconscionable to require each of them to make restitution of any of those sums.

37.  In reliance on the receipt of the Redemption Price from the Claimant, and in good faith, each of the CS Defendants changed its positions by paying the entirety of the redemption monies to its relevant principals.

38.  Further, the CS Defendants paid the monies over approximately 7 years ago. Given the passage of time it will in practical and/or legal terms be very difficult (if not impossible) for either of the CS Defendants to reclaim these monies from their principals. The CS Defendants are also hampered by the fact that both now have in their possession relatively little by way of relevant documentation.

39.  It would in those circumstances be inequitable and/or unconscionable for the CS Defendants to be required to make restitution from their own resources in respect of any of the redemption monies which they received from the Claimant.

## Defence (7) – Set Off

40.  If (which is denied) the Claimant is entitled to any recovery from the CS Defendants or either of them, then the CS Defendants will seek to set off in extinction or reduction of such recovery the subscription monies paid by them in respect of the Shares on the basis that if the redemption monies were paid under a mistake of fact and are recoverable, then so were the subscription monies which are equally

recoverable by the CS Defendants from the Claimant. Accordingly, the value of the Claimant's claim must therefore be limited to the "profit" element of the investment. Further, CSLN will seek to set off the value of the shares which it still holds in the Claimant.

### Interest and the Claimant's prayer for relief

41.     The Claimant is not entitled to interest, whether as claimed in paragraph 13 of the Statement of Claim or at all.

42.     If (which is denied) the Claimant is entitled to any interest from the CS Defendants, the period from which interest should run should not commence prior to the date of the issue of the Claim Form. Prior to this date the CS Defendants did not know, and could not reasonably have been expected to know, that the Claimant was likely to make a claim against them.

43.     The Claimant is not entitled to the relief claimed against the CS Defendants or to any other relief.

Dated this 16th day of December 2010.

Dirk Van Heck
Maples and Calder
Legal Practitioners for the Seventh and Twentyfifth Defendants

The Seventh and Twenty-Fifth Defendants' address for service is c/o Maples and Calder, P O Box 173, Sea Meadow House, Road Town, Tortola, British Virgin Islands. Tel: (284) 852-3000 Fax: (284) 852-3097. Ref: ADI/659767.

### Certificate of Truth

I, John Larkin director of the Seventh and Twentyfifth Defendants, certify that the Seventh and Twentyfifth Defendants believe that the facts set out in this Defence are true.

John Larkin
Dated this 16th day of December 2010

THE EASTERN CARIBBEAN
SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION

Claim No. BVIHC (COM) 30/2010

B E T W E E N :-

FAIRFIELD SENTRY LIMITED (In
Liquidation)

Claimant

- and -

BANK JULIUS BAER & CO LIMITED
and others

Defendants

_____

**DEFENCE OF**

**(1) CREDIT SUISSE LONDON
NOMINEES LIMITED,
THE SEVENTH DEFENDANT, and**

**(2) BUCKMORE NOMINEES
LIMITED,
THE TWENTYFIFTH DEFENDANT**

_____

Maples and Calder
Sea Meadow House
Road Town
Tortola
British Virgin Islands
Tel: +1 284 852-3000
Fax: +1 283 852-3097
(Ref: ADI/659788.001/650787.001)
Legal Practitioners for the Seventh
and Twentyfifth Defendants