# EXHIBIT G

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION



Claim No. BVIHC (COM) 30/2010

B E T W E E N :-

FAIRFIELD SENTRY LIMITED (in Liquidation)

Claimant/Respondent

- and -

BANK JULIUS BAER & CO LIMITED and others

Defendants/Applicants

---

**JOINT SKELETON ARGUMENT OF THE DEFENDANTS
WHO HAVE ISSUED APPLICATIONS FOR THE TRIAL OF
PRELIMINARY ISSUES IN THE "CLAWBACK" ACTIONS
(HEARING ON 18 APRIL 2011)**

---

*A suggested Reading List accompanies this skeleton.
Reading time estimate: 2-3 hours*

## Introduction

1.    This joint skeleton argument is filed on behalf of all of those Defendants who have issued applications for the trial of preliminary issues[1] in the "clawback actions". The "clawback actions" are the 15 actions so far issued in this Court by Fairfield Sentry in the wake of the Madoff fraud in which Fairfield Sentry seeks restitution of monies allegedly paid to the Defendants by mistake.

2.    The Defendants who have issued applications for the trial of preliminary issues in the clawback actions ("the PI Defendants") are represented by Maples and Calder ("the M&C Defendants"), Ogier ("the Ogier Defendants"),

---

[1] Pursuant to CPR Part 26.1(2)(e)

Harney Westwood & Riegels ("the Harneys Defendants") and O'Neal Webster ("the O'Neal Defendants"). Appendix 1 to this skeleton relates to the M&C Defendants and identifies which of the M&C Defendants are parties to which actions and the amount in US$ which is claimed against each M&C Defendant. Appendix 2 to this skeleton provides the same information in relation to the Ogier Defendants, Appendix 3 in relation to the Harneys Defendants and Appendix 4 in relation to the O'Neal Defendants.

3.     Fairfield Sentry was the largest of the "feeder funds" which invested monies with Bernard L. Madoff Investment Securities LLC ("BLMIS") on behalf of its shareholders. The defendants to the clawback actions are the various shareholders who redeemed their shares in Fairfield Sentry between 1997 and 2008. The 15 clawback actions are in common form and raise the same issues.

4.     The PI Defendants apply[2] for the trial of preliminary issues which are specifically designed to save considerable time and costs and further the Overriding Objective. Appendix 5 to this skeleton summarises which PI Defendants have issued applications for trial of the preliminary issues in which clawback actions. In the event that the PI Defendants win either of the two preliminary issues, the claims against all of the Defendants to the clawback actions must fail and the clawback actions will be at an end. In the event that the PI Defendants lose both of the preliminary issues, the time and money spent trying the preliminary issues will not have been wasted because the issues would have had to be decided anyway and the trial of the remaining issues will be commensurately shorter.

5.     Not every defendant in each of the 15 clawback actions has issued applications for the trial of preliminary issues (that would obviously be

---

[2] The M&C Defendants issued the first application on 2 February 2011 in action 30/2010. Applications for the trial of preliminary issues have been issued by various of the PI Defendants in 8 of the 15 clawback actions, namely actions 357/2009, 404/2009, 425/2009, 5/2010, 15/2010, 30/2010, 153/2010 and 20/2011.

wasteful of costs and would lead to unnecessary duplication). However, all
defendants in all of the 15 clawback actions who have been served with the
proceedings are aware of the applications for the trial of preliminary issues
and either support them in one form or another or at the very least do not
oppose them[3].

6.      Indeed, and perhaps rather tellingly, the only party which opposes the trial of
the preliminary issues is Fairfield Sentry itself. As explained in more detail
below, Fairfield Sentry's opposition to the trial of the proposed preliminary
issues is unsound and seems to be driven more by the realisation that it is
likely to lose the trial of the preliminary issues than by any principled
objection.

**Background**

7.      Fairfield Sentry is a BVI registered company which was put into liquidation
by this Court on 21 July 2009. In September 2009 Fairfield Sentry issued the
first of the clawback actions (336/2009). The individual clawback actions
have been brought against varying numbers of defendants who subscribed for
shares in Fairfield Sentry and then subsequently redeemed their shares. In the
first series of clawback actions Fairfield Sentry seeks to recover redemption
monies paid to all redeemers in each month between September 2003 and
March 2004,[4] and so generally speaking there are multiple defendants to those
early clawback actions[5] who face a claim for the redemption proceeds paid to
them in the particular month in question. In the later clawback actions
Fairfield Sentry seeks to recover all redemption monies paid to individual
redeemers over many years, and so there is generally only one defendant to
the later clawback actions. For example, in action 20/2011 one of the M&C

---

[3] Tab 17 of Core Bundle 1 contains correspondence showing the notifications to the defendants and their
responses (where received).
[4] With one clawback action covering one month
[5] There are approximately 30 defendants to each one

Defendants, Credit Suisse London Nominees Ltd. ("CSLN"), is the only defendant, but Fairfield Sentry seeks to recover the sum of US$803,962,073 representing all redemption monies paid to CSLN between January 1997 and October 2008[6].

8.    The claim by Fairfield Sentry in each clawback action is identical[7] and is based on an alleged mistake in the calculation of the Net Asset Value ("NAV") of the shares redeemed by the defendants.    Fairfield Sentry's Articles of Association[8] ("the Articles") stipulated that the price at which the shares were to be redeemed by shareholders should be calculated with reference to the NAV of Fairfield Sentry, and the Articles also set out detailed provisions about how the NAV was to be calculated[9].

9.    Fairfield Sentry alleges that the NAV was calculated under a mistake of fact as, unbeknown to Fairfield Sentry, BLMIS was in fact operating a Ponzi scheme and Fairfield Sentry's investments in BLMIS were lost from the date of Fairfield Sentry's investment in BLMIS[10].    Fairfield Sentry alleges that as a result its NAV was at all times a nil or nominal value and so the aggregate redemption sums should have been nil or nominal, with the consequence that the defendants have been unjustly enriched at its expense and that the defendants are liable to make restitution to Fairfield Sentry of the amounts paid to them when they redeemed their shares.

10.    Accordingly, the sole cause of action against the defendants in each of the clawback actions is a claim for unjust enrichment based on an alleged mistake in the calculation of its NAV.

---

[6] This composite claim against CSLN also includes all of the sums claimed against CSLN in the other clawback actions to which CSLN is a defendant.
[7] An example statement of claim in action 30/2010 is at Core Bundle 1 tab 11
[8] Core Bundle 1 tab 1
[9] Article 11
[10] Paragraph 9 of the Statement of Claim in Core Bundle 1 tab 11

11.    The PI Defendants have all served Defences and broadly speaking the individual defences taken are similar.  By way of example, the Defences filed by the M&C Defendants to date[11] are all in materially the same form and plead 7 different defences, as follows:-

(1) No mistake in the calculation of the NAV: this defence is based on Article 11 of the Articles which (the Defendants say) prevents Fairfield Sentry from alleging that there was a mistake in the calculation in the NAV ("the Article 11 Defence").

(2) The Defendants, by surrendering their shares in Fairfield Sentry, gave good consideration for the redemption proceeds ("the Good Consideration Defence").

(3) Fairfield Sentry assumed the risk of the alleged mistake.

(4) Fairfield Sentry is estopped by its own negligence from asserting any claim in mistake.

(5) The Defendants paid the redemption proceeds to their principals and so are entitled to rely on the defence of ministerial receipt/payment over.

(6) The Defendants changed their position in good faith.

(7) If Fairfield Sentry is entitled to recover anything, it is only entitled to recover the difference between the Redemption Price and the Subscription Price of the shares.

---

[11] The M&C Defendants have filed Defences in 6 of the 7 clawback actions to which they are a party. CSLN's Defence in action 20/2011 is not yet due but will be pleaded in similar terms to the other Defences. CSLN has requested an extension of time for service of its Defence in action 20/2011 until the question of preliminary issues has been resolved (Core Bundle 2 tab 4 p203).

12.     Fairfield Sentry has not served any Replies.

## The proposed preliminary issues

13.     It is clear from the above that the PI Defendants have a number of different
defences to the claim in mistake brought by Fairfield Sentry, some of which
will require detailed factual investigation and involve complicated issues of
law. Maples and Calder have estimated[12] that a full trial of all of the issues in
just one of the clawback actions will take between 6 and 7 weeks and very
possibly longer, even with robust case management decisions[13]. The other PI
defendants agree with this estimate. The M&C Defendants' costs alone of a
full trial are likely to exceed US$2 million.[14]

14.     The clawback actions therefore cry out for the trial of preliminary issues if
suitable preliminary issues can be identified which (i) are potentially
dispositive of all the clawback actions; (ii) can be tried rapidly, (iii) can be
tried at a considerably reduced cost as compared with a full trial, and (iv) will
not cause any material prejudice to the parties by being tried as preliminary
issues.

15.     The PI Defendants have identified 2 preliminary issues which satisfy the
above criteria, namely the Article 11 Defence and the Good Consideration
Defence.

## The Article 11 Defence

16.     The Article 11 Defence is based on Article 11 of Fairfield Sentry's Articles
which makes provision for the determination of the NAV. Article 11(1)

---

[12] Paragraph 17 of Ben Mays' witness statement dated 2 February 2011 (Core Bundle 1 tab 3).
[13] These could include choosing representative sample or lead cases for trial – such as was done in *Ashmore
v British Coal Corporation* [1990] 2 QB 338 and in the *Interest Rate Swaps Litigation* (10 June 1992,
unreported, per Hirst J) – and staying the remainder of the clawback actions.
[14] Paragraph 18 of Mr Mays' witness statement dated 2 February 2011 (Core Bundle 1 tab 3).

provides that the NAV per Share shall be determined by Fairfield Sentry's Directors at the close of business on each Valuation Day and stipulates how the NAV is to be calculated. Article 11(1) then goes on to provide:

> *"Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties."*

17.    The PI Defendants submit that the elements[15] of the above quoted provision in Article 11(1) were satisfied when the various defendants redeemed their shares in Fairfield Sentry, and that the legal effect of the above provision is to prevent Fairfield Sentry from attempting to go behind, disturb or recalculate the NAV as so determined by the directors of Fairfield Sentry.

18.    If the conditions in Article 11(1) are satisfied, it is a question of pure law whether Article 11(1) has the effect for which the PI Defendants contend. In this regard the existing case law supports the PI Defendants' position. First there is the decision of Rawlins J (as he then was) in the case of *In the Matter of Livingston International Fund Ltd. (In Liquidation)* (unreported, 19 May 2004, BVI High Court of Justice) who held that the liquidators were not entitled to recalculate the NAV once it had been certified by the directors (see paragraphs 20 – 24 and 72 – 85 of the judgment). Second there is the decision of Bell J to the same effect in the Supreme Court of Bermuda in the case of *In the Matter of Stewardship Credit Arbitrage Fund Ltd.* [2008] Bda L.R. 67 (see paragraphs 46 – 51 of the judgment). In addition, the PI Defendants will say that under clause 11(1) of the Articles Fairfield Sentry bore the risk of an overstatement of the NAV in connection with the redemptions and that, in accordance with the principles in *Springwell Navigation Corporation v JP Morgan Chase Bank* [2010] EWCA Civ 1221 (English Court of Appeal) at paragraphs 141 – 171 and *Cassa di Risparmio della Repubblica di San*

---

[15] Leaving aside good faith, as to which see paragraphs 21-22 below

*Marino SpA v Barclays Bank Ltd.* [2011] EWHC 484 (English Commercial
Court) at paragraphs 487 – 509, Fairfield Sentry is estopped by contract (*viz.*
the terms of Article 11(1)) from asserting that the NAV was incorrectly
calculated.

19.    The above cases provide strong support for the PI Defendants' submission
that the resolution of the Article 11 Defence as a preliminary issue is highly
likely to bring the clawback actions to a swift end because, if the conditions in
Article 11(1) are satisfied, then as a matter of law Fairfield Sentry cannot go
behind, disturb or recalculate the NAV as determined by the Directors of
Fairfield Sentry.

20.    As regards whether the conditions in Article 11(1) are satisfied, the only
relevant dispute between the parties is whether or not certificates as to the
NAV within the meaning of Article 11(1) were given by or on behalf of
Fairfield Sentry's Directors.  This is a very narrow dispute which can be easily
resolved simply by the Court examining examples of the relevant
documentation and other material promulgated by or on behalf of Fairfield
Sentry's Directors and deciding whether or not that documentation and other
material amounted to the giving of certificates within the meaning of Article
11(1).  The documentation and material in question is not extensive and is
identified in paragraph 16 of Mr Kite's witness statement dated 8 March
2011[16].   If any oral evidence is necessary at all it will necessarily be brief
given the limited dispute between the parties.

21.    In their applications for preliminary issues[17], the Harneys Defendants have
correctly made it clear that the trial of the preliminary issues in relation to the
Article 11 Defence will not require this Court to make any finding about
whether or not Fairfield Sentry's Directors in fact acted in good faith for the

---

[16] Core Bundle 1 tab 7
[17] For example at Core Bundle 1 tab 6

purposes of Article 11(1)[18]. This is because, for the following reasons, it does not matter in the present context whether or not the Directors acted in good faith:

(1) if the Directors did not act in good faith then Fairfield Sentry's claim must necessarily fail because a claim in mistake can only succeed if the payor was genuinely mistaken (and so acted in good faith); further and in any event, Article 11(1) is not to be construed as enabling Fairfield Sentry to rely on its own bad faith in order to defeat what would otherwise be a good defence under Article 11(1)[19];

(2) if (as Fairfield Sentry must be taken to allege and therefore this Court should assume for the purposes of the argument) the Directors did act in good faith, then the only issues to be determined for the purposes of the Article 11 Defence are whether certificates within the meaning of Article 11(1) were given by or on behalf of the Directors and, if so, whether Article 11(1) provides a complete defence to the claim.

22.    So, and assuming the Article 11(1) Defence is a good one, the PI Defendants will win whether or not Fairfield Sentry's Directors acted in good faith. If the Directors acted in bad faith the PI Defendants win under paragraph 21(1) above.   If the Directors acted in good faith the PI Defendants win under paragraph 21(2) above.  In these circumstances, the PI Defendants submit that the Court should not make any findings in relation to good faith, which is not relevant for the purposes of the trial of the proposed preliminary issues in relation to the Article 11 Defence.  There is no need for the Court to do so, and an examination of this issue would involve substantial disclosure and oral evidence, requiring a much longer trial.

---

[18] The PI Defendants have not admitted in their Defences that Fairfield Sentry acted in good faith.
[19] By analogy with the cases which hold that it is a general principle of contractual construction that the parties intended that neither should be able to rely on his own breach of duty to obtain a benefit under a contract -- for a recent review of the authorities in this area see per Vos J in *Extra MSA Services Cobham Ltd. v Accor UK Economy Hotels Ltd.* [2011] EWHC 775 (Ch) at paras. 23 - 34.

23.   Accordingly, the criteria set out in paragraph 14 above are clearly satisfied. The Article 11 Defence is suitable to be taken as a preliminary issue and will potentially be dispositive of all of the clawback actions. The Article 11 Defence can be tried rapidly[20] and the PI Defendants estimate that it will only take between 3 – 4 days to try. The cost of trying the Article 11 Defence will be considerably less than the cost of a full trial. Further, none of the parties will suffer any material prejudice if the trial of the Article 11 Defence is tried as a preliminary issue: the stay of the remaining issues in the clawback actions will be relatively short and, in the event that the defendants lose the trial of the preliminary issues, the time and cost will not have been wasted because these issues have to be tried anyway and the trial of the remaining issues will be commensurately shorter.

24.   In addition to that, the BVI court is obviously best placed to decide these preliminary issues as they are matters of BVI law. Some of the PI Defendants are facing claims against them by Fairfield Sentry in New York as well as the BVI, but not all of the PI Defendants are facing claims in New York. For example, none of the M&C Defendants are facing claims in New York or in any jurisdiction other than the BVI. Further, Fairfield continues to file claims in the BVI, the latest manifestation being the new claim brought against CSLN in this Court in action 20/2011 on 11 March 2011 in which Fairfield Sentry claims in excess of US$800 million from CSLN. These claims cannot be left hanging over the PI Defendants' heads for any longer than is absolutely necessary. Having chosen to litigate these claims in the BVI, it is incumbent on Fairfield Sentry to cooperate in achieving as swift a resolution of the claims in the BVI as possible. This is so irrespective of what claims Fairfield

---

[20] The PI Defendants have proposed a timetable to bring the preliminary issues on for trial in June of this year. This timetable, of which Fairfield Sentry has been on notice since 2 February, is realistic and achievable.

Sentry is bringing against the PI Defendants in other jurisdictions.[21] The proposed preliminary issues will have to be addressed by the BVI Court at some stage. Because they are questions of BVI law, it is best for the BVI Court to address these issues before they fall to be considered by Courts in other jurisdictions.

25.    Further, a ruling on the proposed preliminary issues will, as a matter of BVI law, create a *res judicata* or issue estoppel as between the parties which is likely to have the beneficial effect of saving time and costs being expended in related litigation in other jurisdictions. This Court's ruling on the proposed preliminary issues will also bring certainty in early course so that the parties know where they stand. This will bring obvious commercial benefits to all parties. In short, the ordering of the trial of the proposed preliminary issues will be entirely in accordance with the Overriding Objective of dealing with cases justly, proportionately, expeditiously and saving expense.

26.    In its evidence[22] (which was served over one month late[23]) Fairfield Sentry's sole objection[24] to the Article 11 Defence being taken as a preliminary issue is the contention that the liquidators are not satisfied that they are currently in a position to provide full disclosure in relation to the Article 11 Defence because they have been unable to obtain all the documents that they require from Citco, it might take them several more months to do so and it will involve them in a lot of work. Aside from the fact that, on its face, this supposed objection could at the very most only provide Fairfield Sentry with

---

[21]. One of the most recently issued claims, action 19/2011, is a claim against a Harneys Defendant, Martello Nominees Ltd ('MNL'), for US$62.6 million. Having discontinued proceedings issued against MNL in New York, and having chosen not to pursue an action threatened against MNL in Guernsey, Fairfield Sentry has finally decided to bring its claims against MNL in the BVI. MNL has accepted service of the BVI proceedings.

[22] Third witness statement of Kenneth Krys dated 8 April 2011 (Mr Krys has filed witness statements in materially identical terms in response to all the PI Defendants' applications for the trial of preliminary issues). Core Bundle 1 tab 16.

[23] Maples and Calder gave Forbes Hare an extension of time until 4 March 2010 to serve evidence on behalf of Fairfield Sentry. No evidence was served by Forbes Hare until 8 April 2011, and even then no explanation or excuse was given for the long delay.

[24] Paragraphs 10 and 13 of Mr Krys' third witness statement. Core Bundle 1 tab 16.

grounds to argue that a longer period should be given for disclosure (rather than providing Fairfield Sentry with the basis for a wholesale objection to the Article 11 Defence being taken as a preliminary issue), in fact Fairfield Sentry's point on disclosure is a bad one for the following reasons:-

(1) As Mr Krys correctly acknowledges in the final sentence of paragraph 7 of his third witness statement, the issue for Article 11 purposes is what documents have been provided to the defendants. Those documents are narrow in scope, they are common to all of the defendants (the documents are basically in standard form, although there may be some minor variations in the form and content of documents given to the various defendants) and, importantly, they have been specifically identified in paragraph 16 of Mr Kite's witness statement dated 8 March 2011. So the key disclosure on this issue is in fact going to be disclosure given by the defendants rather than by Fairfield Sentry.

(2) The issue for disclosure purposes therefore turns on what documents were supplied to the defendants rather than what documents Citco may have or what efforts Fairfield Sentry may or may not be going to make in order to obtain documents from Citco. The disclosure to be given will not be extensive as the categories of documents are limited.

(3) Fairfield Sentry has provided no explanation to support its claim that it needs to review every one of the 500,000[25] pages of documentation referred to by Mr Krys in paragraph 9 of his third witness statement in order to comply with its disclosure obligations for the purposes of the Article 11 Defence. This is no more than scaremongering on the part of Fairfield Sentry. Once the issue is properly understood, it is clear that Fairfield Sentry's disclosure obligations are not nearly as great as Mr Krys would suggest.

---

[25] The existence of these 500,000 pages gives a good indication of just how long and complicated a full trial will be (in particular as regards the issues of knowledge and negligence) and why the trial of the proposed preliminary issues is so important in the context of the overall litigation and the overriding objective.

(4) There is no reason why Fairfield Sentry should not be able to comply with its disclosure obligations in the timeframe put forward by the PI Defendants. Apart from saying that a substantial production of documents was received in March 2011, Mr Krys does not say when the 500,000 pages were received, or how they were organized, or what work has already been done on them. Fairfield Sentry has been aware of the Article 11 Defence from the outset of the litigation (it is referred to in its evidence and skeleton argument for permission to serve the proceedings outside the jurisdiction[26]) and Fairfield Sentry has been aware since 4 February of the application to have the Article 11 Defence heard as a preliminary issue. Fairfield Sentry has therefore had plenty of time to analyse the relevant documents. Accordingly, any extra time which the Court may see fit to give Fairfield Sentry for disclosure should be strictly limited and should not be allowed to hold up the trial of the preliminary issues on the Article 11 Defence.

(5) On any view, Fairfield Sentry's point on disclosure does not justify rejecting the PI Defendants' application for the trial of preliminary issues in relation to the Article 11 Defence. Moreover, Fairfield Sentry has provided no other reason at all as to why the Article 11 Defence should not be taken as a preliminary issue.

27. The PI Defendants accordingly invite the Court to order the trial of the following issues in relation to the Article 11 Defence:-

"(1)Whether any certificates within the meaning of Article 11(1) of the Claimant's Articles of Association ("the Articles") were given by or on behalf of the Claimant's Directors in connection with the Defendant's redemption of shares in the Claimant ("the Shares").

---

[26] See paragraphs 24 – 27 of Mr Mays' witness statement in Core Bundle 1 tab 3 where the relevant passage from Fairfield Sentry's skeleton argument is set out.

> *(2) Whether Article 11(1) of the Articles provides the Defendant with a complete defence to the claims brought by the Claimant in this action based on contractual allocation of risk and/or contractual estoppel."*

The Good Consideration Defence

28.    The criteria identified in paragraph 14 above are also satisfied as regards the second proposed preliminary issue, the Good Consideration Defence.  The Good Consideration Defence does not involve any disputed issues of fact.  It is an issue of pure law.  If decided in the Defendants' favour it will bring an end to all of the clawback actions.

29.    The PI Defendants state that, for the purposes of the Good Consideration Defence, irrespective of the NAV per share, by surrendering their shares in Fairfield Sentry the PI Defendants gave good consideration for Fairfield Sentry's payment of the redemption price for the shares, and that this provides a complete defence to Fairfield Sentry's claims in all of the clawback actions. In this regard the PI Defendants will rely on *Barclays Bank Ltd. v W.J. Simms Son & Cooke (Southern) Ltd.* [1980] QB 677 at 695 and subsequent cases (see also *Goff & Jones, The Law of Restitution* 7th edition (2007) at Chapter 41).

30.    The PI Defendants emphasise that this proposed preliminary issue is a very narrow one. They do not ask the Court to re-calculate the NAV per share of Fairfield Sentry.  That exercise would not be suitable for a trial of preliminary issues[27] and will not be necessary if the PI Defendants succeed on either of the proposed preliminary issues[28].  They only invite the Court to decide whether the surrender of the shares, as bundles of rights, was good consideration whatever the NAV per share may have been.

---

[27] Moreover, the Article 11 Defence proceeds on the basis that it is not permissible to re-calculate the NAV per share.

[28] Nor do the PI Defendants ask the Court to determine in the trial of the preliminary issues whether good consideration was given in any other way, such as by the surrender of a right to claim rescission of their original subscriptions.

31.    The resolution of the Good Consideration Defence can be measured in terms
of hours (rather than days) and so can be easily accommodated in the 3-4 day
estimate for the trial of the preliminary issues referred to above.

32.    The sole objection[29] taken by Fairfield Sentry to the Good Consideration
Defence being tried as a preliminary issue is that whichever party loses on the
issue is likely to appeal and so this would lead to a delay in the trial of the
main action and significant additional costs.  This objection is misconceived
because, if sound, it would mean that no court would ever order the trial of a
preliminary issue for fear of an appeal by the losing party.  The reality is that
the Good Consideration Defence is likely to be the subject of an appeal
whether or not it is tried as a preliminary issue (which could be concluded by
this summer) or as part of the main action (in which case it will take between
18 and 24 months to conclude).   If the PI Defendants win the Good
Consideration Defence as a preliminary issue considerable time and costs will
have been saved as compared to a full trial.  If Fairfield Sentry wins the Good
Consideration Defence as a preliminary issue, then the only downside is, at
the very most, the risk of a relatively small delay in the main trial.   The
balance is clearly in favour of taking the Good Consideration Defence as a
preliminary issue.

33.    The PI Defendants accordingly invite the Court to order the trial of the
following issue in relation to the Good Consideration Defence:-

*"Whether, irrespective of the Net Asset Value per share, the Defendant, by
surrendering the Shares, gave good consideration for the Claimant's payment
of the redemption Price thereof, and if so, whether this constitutes a complete
defence to the claim."*

---

[29] Paragraph 15 of Mr Krys' Third Witness Statement.  Core Bundle 1 tab 16.

**Proposed directions for the trial of the preliminary issues**

34.    The PI Defendants are concerned to ensure that the preliminary issues are tried as leanly, efficiently and as quickly as possible and that there is no unnecessary duplication of effort or cost.

35.    Various of the PI Defendants have issued applications for the trial of preliminary issues in 8 out of the 15 clawback actions[30], namely action nos. 357/2009, 404/2009, 425/2009, 5/2010, 15/2010, 30/2010, 153/2010 and 20/2011.

36.    There are a number of defendants in these 8 clawback actions who have not issued applications for the trial of preliminary issues.[31]    There are also 7 clawback actions in which no applications for the trial of preliminary issues have (yet) been issued.    These are action nos. 336/2009, 9/2011, 10/2011, 18/2011, 19/2011, 21/2011 and 22/2011.

37.    The PI Defendants accordingly invite the Court to order the trial of preliminary issues in those 8 actions where applications have been issued[32]. The effect of such an order will be to bind all parties[33] to those 8 actions to the Court's order on the trial of the preliminary issues, thus (under BVI law) creating a *res judicata* and/or issue estoppel between Fairfield Sentry and all defendants in these 8 clawback actions.

---

[30] See Appendix 5 to this skeleton.
[31] Although, as noted above, no defendant opposes the trial of preliminary issues.  Those defendants who have been served with proceedings have been notified of these applications by the PI Defendants, but either have chosen not to appear or have indicated that they may appear on the hearing on 18 April and support the preliminary issues (eg Farara Kerins at Core Bundle 1 tab 17, penultimate page ).
[32] Although there will be the trial of preliminary issues in 8 actions simultaneously, the issues and the documents for each action are the same and so in practice the trials can easily be accommodated in the 3-4 day time estimate for trial.
[33] This is so whether or not a particular defendant has issued an application for the trial of preliminary issues or whether or not any particular defendant chooses to participate in the trial of preliminary issues. See by way of analogy the directions given by the English Court of Appeal in *Jafari-Fini v Skillglass Ltd.* [2005] EWCA Civ. 356 at paras. 58 and 60.

38.    The PI Defendants also invite the Court to stay[34] pending the resolution of the
preliminary issues (i) the remaining issues in the 8 clawback actions where
applications for the trial of preliminary issues have been made, (ii) the
remaining 7 clawback actions, (iii) any future clawback actions which might
be issued between now and the resolution of the preliminary issues, and (iv)
any present or future clawback actions issued by Fairfield Sigma or Fairfield
Lambda[35].

39.    As regards those 7 clawback actions where no applications for the trial of
preliminary issues have been made,  the parties to those actions will be bound
by the results of the preliminary issues in the 8 clawback actions in
accordance with the principle in *Wytcherley v Andrews* (1871) LR 2 P&D
327, namely that if a person, knowing what was happening in litigation, is
content to stand by and see his battle fought by somebody else in the same
interest he should be bound by the result and not be allowed to reopen the
case.    This principle is founded on justice and common sense and is of
universal application – see *Nana Ofori Atta II v Nana Abu Bonsra II* [1958]
AC 95 at 102 (PC) and *House of Spring Gardens v Waite* [1991] 1 QB 241
(English Court of Appeal).    The PI Defendants also refer to *Ashmore v British
Coal Corporation* [1990] 2 QB 338 at 348 - 349 where the English Court of
Appeal held that it was an abuse of process for parties in cases not chosen as
the lead or sample cases to re-litigate the issues decided by the court in the
lead/sample cases.

40.    That leaves open the question of who, apart from Fairfield Sentry, should
participate in the trial of the preliminary issues.    In principle all defendants in
the 8 clawback actions should have a right to be heard on the trial of the
preliminary issues.    However it is plainly unnecessary that they should all
participate.    There will inevitably be considerable and unnecessary duplication

---

[34] Under CPR Part 26.1(2)(q).
[35] Fairfield Sigma and Fairfield Lambda were sister funds of Fairfield Sentry with materially identical
Articles of Association to those of Fairfield Sentry.    The proposed preliminary issues are equally applicable
to any clawback actions by Fairfield Sigma and Fairfield Lambda.

of effort and costs if all defendants participate, and the trial of the preliminary issues would become far too unwieldy and expensive. This must be avoided at all costs.

41.  So far as the PI Defendants are concerned, unnecessary duplication can be avoided by sensible co-operation between the legal teams, who are themselves each representing a number of different defendants. Such co-operation has already occurred, for example, in the preparation of this skeleton argument. The lawyers for the PI Defendants propose to work together closely to ensure that as much time and money as possible can be saved.

42.  As regards directions for bringing the preliminary issues to trial, in their application notice dated 2 February 2011 the M&C Defendants proposed directions which would have resulted in the matter being ready for trial by 13 June 2011. Fairfield Sentry has been on notice of these directions since 2 February and, although there has been a delay in obtaining a hearing date for this hearing, a trial date in June 2011 is still achievable. The PI Defendants have accordingly proposed a fresh timetable[36] which is designed to ensure the parties are ready for the trial of the preliminary issues by June 2011.

**Dominic Chambers QC**
**Arabella di Iorio**
For the M&C Defendants

**David Lord QC**
**Robert Foote**
**Claire Goldstein**
For the Ogier Defendants

**Mark Hapgood QC**
**Phillip Kite**
**Kissock Laing**

---

[36] In CSLN's application notice dated 28 March 2011 in action 20/2011 which is the same as the timetable proposed by the Harneys Defendants in their application notice dated 8 March 2011.

For the Harneys Defendants

**Lord Falconer QC**
**Paul Webster QC**
**Nadine Whyte**
For the O'Neal Defendants

# APPENDIX 1

| Action Number | M&C Defendant[37] | Claim (US$) |
|---|---|---|
| (1)  336/2009 | - | - |
| (2)  357/2009 | Credit Suisse (Luxembourg) SA | 7,649,001 |
| (3)  404/2009 | Credit Suisse (Luxembourg) SA | 100,002 |
|  | Credit Suisse London Nominees Ltd | 519,354 |
| (4)  425/2009 | Credit Suisse London Nominees Ltd | 782,706 |
|  | Credit Suisse AG Nassau Branch | 24,966 |
|  | Credit Suisse Nominees (Guernsey) Ltd | 392,413 |
|  | Credit Suisse (Luxembourg) SA | 350,002 |
| (5)  005/2010 | Credit Suisse Nominees (Guernsey) Ltd | 392,413 |
|  | Credit Suisse (Luxembourg) SA | 179,997 |
| (6)  015/2010 | Credit Suisse (Luxembourg) SA | 499,996 |
| (7)  030/2010 | Credit Suisse London Nominees Ltd | 1,994,006 |
|  | Buckmore Nominees Ltd | 680,216 |
| (8)  153/2010 | - | - |
| (9)  009/2011 | - | - |
| (10) 010/2011 | - | - |
| (11) 018/2011 | - | - |
| (12) 019/2011 | - | - |
| (13) 020/2011 | Credit Suisse London Nominees Ltd | 803,962,073 |
| (14) 021/2011 | - | - |
| (15) 022/2011 | - | - |

---

[37] The M&C Defendants here listed are companies in the Credit Suisse Group of companies (Credit Suisse London Nominees Ltd. and Buckmore Nominees have formally applied for the trial of preliminary issues, but all of the Credit Suisse defendants support the application). In addition, Maples and Calder act for a number of other defendants who also support the application for preliminary issues.

## APPENDIX 2

| Action Number | Ogier Defendant | Claim (US$) |
|---|---|---|
| (1)  336/2009 | - | - |
| (2)  357/2009 | EFG Bank SA<br>SG Private Banking (Suisse) SA | 210,928<br>188,201 |
| (3)  404//2009 | Lombard Odier Darier Hentsch & Cie<br>SG Private Banking (Suisse) SA | 287,176<br>143,325 |
| (4)  425/2009 | Lombard Odier Darier Hentsh & Cie<br>Mirabaud & Cie | 558,792<br>648,942 |
| (5)  005/2010 | - | - |
| (6)  015/2010 | Pictet & Cie | 109,488 |
| (7)  030/2010 | EFG Bank SA<br>EFG Bank European Financial Group SA<br>Pictet & Cie<br>SG Private Banking (Suisse) SA | 82,597<br>25,245<br>39,996<br>367,647 |
| (8)  153/2010 | - | - |
| (9)  009/2011 | - | - |
| (10) 010/2011 | - | - |
| (11) 018/2011 | - | - |
| (12) 019/2011 | - | - |
| (13) 020/2011 | - | - |
| (14) 021/2011 | - | - |
| (15) 022/2011 | - | - |

| | | |
|---|---|---|
| (9)   009/2011 | Trincastar Corp. | 11,311,799 |
| (10) 010/2011 | - | - |
| (11) 018/2011 | - | - |
| (12) 019/2011 | - | - |
| (13) 020/2011 | - | - |
| (14) 021/2011 | - | - |
| (15) 022/2011 | - | - |

# APPENDIX 3

| Action Number | Harneys Defendant[38] | Claim (US$) |
|---|---|---|
| (1) 336/2009 | - | - |
| (2) 357/2009 | Bank Julius Baer & Co Ltd | 1,792,705 |
| | Quilvest Finance Ltd | 831,066 |
| | SNS Global Custody BV | 26,404 |
| (3) 404/2009 | Bank Julius Baer & Co Ltd | 504,505 |
| | Caja de Ahorros y Monte de Piedad de Madrid | 2,181,060 |
| | Deutsche Bank (Suisse) SA | 209,255 |
| | Lloyds TSB Bank | 1,715,405 |
| | Quilvest Finance Ltd | 578,079 |
| | SNS Global Custody BV | 119,437 |
| (4) 425/2009 | Bank Julius Baer & Co Ltd | 149,995 |
| | SNS Global Custody BV | 179,498 |
| | Quilvest Finance Ltd | 1,374,582 |
| | Deutsche Bank (Suisse) SA | 499,997 |
| (5) 005/2010 | Bank Julius Baer & Co Ltd | 363,980 |
| | SNS Global Custody BV | 157,028 |
| | Quilvest Finance Ltd | 4,972,325 |
| | ABN AMRO Fund Services (Isle of Man) Nominees Ltd | 750,000 |
| | The Public Institution for Social Security | 20,000,000 |
| (6) 015/2010 | Bank Julius Baer & Co Ltd | 1,149,471 |
| | SNS Global Custody BV | 136,154 |
| | Quilvest Finance Ltd | 114,013 |
| | Martello Nominees Ltd | 2,569,047 |
| | Deutsche Bank Trust Company Americas | 435,990 |
| (7) 030/2010 | Bank Julius Baer & Co Ltd | 1,491,199 |
| | SNS Global Custody BV | 770,617 |
| | Lloyds TSB Bank | 486,763 |
| | Martello Nominees Ltd | 700,001 |
| | ABN AMRO Fund Services (Isle of Man) Nominees Ltd | |

---

[38] Two of the Harneys Defendants listed here (the Public Institution for Social Security and Atlantic
Alternative Fund Ltd.) were only served with proceedings comparatively recently and so have not issued
applications for the trial of preliminary issues.

|  |  |  | 2,000,002 |
|---|---|---|---|
| (8) | 153/2010 | Wise Global Fund Ltd | 5,947,229 |
| (9) | 009/2011 | - | - |
| (10) | 010/2011 | Atlantic Alternative Fund Ltd | 1,366,389 |
| (11) | 018/2011 | - | - |
| (12) | 019/2011 | Martello Nominees Ltd | 62,655,842 |
| (13) | 020/2011 | - | - |
| (14) | 021/2011 | - | - |
| (15) | 022/2011 | - | - |

## **APPENDIX  4**

| Action Number | O' Neal Webster Defendants | Claim (US$) |
|---|---|---|
| (1)  336/2009 | - | - |
| (2)  357/2009 | - | - |
| (3)  404/2009 | - | - |
|  | - | - |
| (4)  425/2009 | UBS (Cayman Islands) Ltd | 199,997.05 |
|  | UBS AG New York | 763,907.21 |
|  | UBS (Cayman) Limited | 1,999,999.19 |
| (5)  005/2010 | UBS AG New York | 559,246.21 |
|  | UBS (Cayman) Limited | 500,003.62 |
| (6)  015/2010 | UBS (Luxembourg) SA | 38,597.39 |
| (7)  030/2010 | UBS (Cayman) Limited | 2,000,002.00 |
|  | UBS (Luxembourg) SA | 38,791.78 |
| (8)  153/2010 | - | - |
| (9)  009/2011 | - | - |
| (10) 010/2011 | - | - |
| (11) 018/2011 | - | - |
| (12) 019/2011 | - | - |
| (13) 020/2011 | - | - |
| (14) 021/2011 | - | - |
| (15) 022/2011 | - | - |

## **APPENDIX 5**

| Action No | Defendant/Applicant | Law Firm |
|---|---|---|
| 357/2009 | (11)  EFG Bank SA | Ogier |
| | (15)  Quilvest Finance Limited | Harneys |
| | (18)  SG Private Banking (Suisse) SA | Ogier |
| 404/2009 | (8)   Caja de Ahorros y Monte de Piedad de Madrid | Harneys |
| | (16)  Deutsche Bank (Suisse) SA | Harneys |
| | (24)  SG Private Banking (Suisse) SA | Ogier |
| | (31)  Lombard Odier Darier Hentsch & Cie | Ogier |
| 425/2009 | (7)   UBS (Cayman Islands) Ltd | O'Neal Webster |
| | (13)  UBS AG New York | O'Neal Webster |
| | (15)  Lombard Odier Darier Hentsch & Cie | Ogier |
| | (19)  UBS (Cayman) Limited | O'Neal Webster |
| | (21)  Mirabaud and Cie | Ogier |
| 5/2010 | (4)   SNS Global Custody BV | Harneys |
| | (13)  UBS AG New York | O'Neal Webster |
| | (21)  UBS (Cayman) Limited | O'Neal Webster |
| 15/2010 | (16)  Pictet & Cie | Ogier |
| | (20)  UBS (Luxembourg) SA | O'Neal Webster |
| | (22)  Deutsche Bank Trust Company Americas | Harneys |
| 30/2010 | (1)   Bank Julius Baer & Co Ltd | Harneys |
| | (5)   EFG Bank SA | Ogier |
| | (7)   Credit Suisse London Nominees Ltd | Maples and Calder |
| | (10)  Lloyds TSB Bank | Harneys |
| | (11)  Martello Nominees Limited | Harneys |
| | (20)  ABN AMRO Fund Services (Isle of Man) Nominees Ltd | Harneys |
| | (23)  EFG Bank European Financial GR Switzerland | Ogier |
| | (25)  Buckmore Nominees Limited | Maples and Calder |
| | (26)  UBS (Cayman) Limited | O'Neal Webster |
| | (27)   Pictet & Cie | Ogier |
| | (30)   SG Private Banking (Suisse) SA | Ogier |
| | (34)  UBS (Luxembourg) SA | O'Neal Webster |
| 153/2010 | Wise Global Fund Limited | Harneys |
| 20/2011 | Credit Suisse London Nominees Limited | Maples and Calder |