# EXHIBIT J

JCPC 2012/0061, 2013/0058, 2013/0059, 2013/0060 and 2013/0061

## IN THE JUDICIAL COMMITTEE OF THE PRIVY COUNCIL

## ON APPEAL FROM THE EASTERN CARIBBEAN SUPREME COURT

## COURT OF APPEAL, TERRITORY OF THE VIRGIN ISLANDS

B E T W E E N:

### FAIRFIELD SENTRY LIMITED (in liquidation)

Claimant / Appellant / Respondent

and

QUILVEST FINANCE LIMITED
CAJA DE AHORROS Y MONTE DE PIEDAD DE MADRID
DEUTSCHE BANK (SUISSE) SA
SNS GLOBAL CUSTODY BV
DEUTSCHE BANK TRUST COMPANY AMERICAS
BANK JULIUS BAER & CO LIMITED
LLOYDS TSB BANK
MARTELLO NOMINEES LIMITED
ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED
WISE GLOBAL FUND LIMITED
LOMBARD ODIER & CIE
MIRABAUD & CIE
SG PRIVATE BANKING (SUISSE) SA
EFG BANK SA
EFG BANK EUROPEAN FINANCIAL GROUP SA
PICTET & CIE
CREDIT SUISSE LONDON NOMINEES LIMITED
BUCKMORE NOMINEES LIMITED
UBS AG NEW YORK
UBS (CAYMAN) LIMITED
UBS (CAYMAN ISLANDS) LIMITED
UBS (LUXEMBOURG) LIMITED

Defendants / Respondents / Appellants

---

## DEFENDANTS' SUBMISSIONS ON TERMS OF DECLARATIONS

---

## JUDICIAL COMMITTEE OF THE PRIVY COUNCIL
### 2012/0061; 2013/0058; 2013/0059; 2013/0060; 2013/0061

**FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) (APPELLANT) -v-
ALFREDO MIGANI AND OTHERS (RESPONDENTS)**

**LOMBARD, ODIER & CIE AND OTHERS (APPELLANTS) -v-
FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) (RESPONDENT)**

**CREDIT SUISSE LONDON NOMINEES LIMITED AND ANOTHER (APPELLANTS) -v-
FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) (RESPONDENT)**

**UBS AG NEW YORK AND OTHERS (APPELLANTS) -v-
FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) (RESPONDENT)**

**QUILVEST FINANCE LIMITED AND OTHERS (APPELLANTS) -v-
FAIRFIELD SENTRY LIMITED (RESPONDENT)**

---

### INDEX OF DOCUMENTS IN SUPPORT OF
### DEFENDANTS' SUBMISSIONS ON TERMS OF DECLARATIONS

---

| TAB | DOCUMENT |
|-----|----------|
| 1 | Defendants' Submissions on Terms of Declarations |
| 2 | Draft Order in Council |
| 3 | *Alghussein Establishment v Eton College* [1988] 1 WLR 587, HL |
| 4 | Lewison, *The Interpretation of Contracts* (5th edition, 2011) at 7.10 |
| 5 | PI Defendants' Skeleton Argument in support of application for trial of Preliminary Issues dated 13 April 2011 |

<u>JCPC 2012/0061, 2013/0058, 2013/0059, 2013/0060 and 2013/0061</u>

<u>IN THE JUDICIAL COMMITTEE OF THE PRIVY COUNCIL</u>

<u>ON APPEAL FROM THE EASTERN CARIBBEAN SUPREME COURT</u>

<u>COURT OF APPEAL, TERRITORY OF THE VIRGIN ISLANDS</u>

B E T W E E N :

**FAIRFIELD SENTRY LIMITED (in liquidation)**

<u>Claimant / Appellant / Respondent</u>

and

**QUILVEST FINANCE LIMITED**
**CAJA DE AHORROS Y MONTE DE PIEDAD DE MADRID**
**DEUTSCHE BANK (SUISSE) SA**
**SNS GLOBAL CUSTODY BV**
**DEUTSCHE BANK TRUST COMPANY AMERICAS**
**BANK JULIUS BAER & CO LIMITED**
**LLOYDS TSB BANK**
**MARTELLO NOMINEES LIMITED**
**ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED**
**WISE GLOBAL FUND LIMITED**
**LOMBARD ODIER & CIE**
**MIRABAUD & CIE**
**SG PRIVATE BANKING (SUISSE) SA**
**EFG BANK SA**
**EFG BANK EUROPEAN FINANCIAL GROUP SA**
**PICTET & CIE**
**CREDIT SUISSE LONDON NOMINEES LIMITED**
**BUCKMORE NOMINEES LIMITED**
**UBS AG NEW YORK**
**UBS (CAYMAN) LIMITED**
**UBS (CAYMAN ISLANDS) LIMITED**
**UBS (LUXEMBOURG) LIMITED**

<u>Defendants / Respondents / Appellants</u>

---

**DEFENDANTS' SUBMISSIONS ON TERMS OF DECLARATIONS**

---

1.    In its judgment delivered on 16 April 2014, the Board concluded that:

    a.    The PI Defendants' appeals against the decision of Bannister J and the Court of Appeal on Preliminary Issues 1, 2 and 3 should be allowed.

    b.    Sentry's appeal against the decision of Bannister J and the Court of Appeal on Preliminary Issue 4 should be dismissed.

2.    The Board invited the parties to agree an appropriate form of declaration on the four Preliminary Issues.

3.    The parties have agreed an appropriate form of declaration on Preliminary Issues 1 and 2 but regrettably[1] have been unable to reach agreement on the declarations in relation to Preliminary Issues 3 and 4.

4.    These submissions set out the PI Defendants' position on the points of disagreement. The accompanying document entitled "Draft Declarations" records the terms of the four Preliminary Issues, the agreed declarations on Preliminary Issues 1 and 2, and the respective proposals of the parties on Preliminary Issues 3 and 4.

5.    The four matters that are (or may be)[2] in dispute are:

    a.    Should references to the preclusive effect against Sentry of certificates given under Article 11 be confined to certificates given "*in good faith*"?

    b.    Should the declaration on Preliminary Issue 3 refer to the effect of a certificate as between Sentry and "*a Defendant*" or "*a redeeming or redeemed Member*"?

---

[1] Following a meeting between counsel on 2 May 2014, the PI Defendants have been waiting for more than 10 days for Sentry to clarify its position with regard to the declarations. No such clarification has been forthcoming, despite the fact that the Registrar informed the parties on 17 April 2014 that the agreed declarations were required no later than 3 working days before 19 May 2014. The PI Defendants have therefore been obliged to incur the costs of preparing these submissions in order to request the decision of the Board on the outstanding issues.

[2] The PI Defendants do not know whether point (c) is in dispute.

c.  Should the declaration on Preliminary Issue 3 refer only to the publication or delivery of "*a PRK-1 certificate*" (i.e. one of the actual documents exhibited to the affidavit of Mr Kite by reference to which the preliminary issues were ordered) or also to the publication or delivery of "*a document in the form of a PRK-1 certificate*"?

d.  Is there any need for a declaration on Preliminary Issue 4 (the Good Consideration issue)? If so, what should be the terms of that declaration?

6.  The PI Defendants' position, in summary, is that:

a.  References to the preclusive effect against Sentry of certificates given under Article 11 should not be confined to certificates given "*in good faith*".

b.  The declaration on Preliminary Issue 3 should refer to "*a redeeming or redeemed Member*", consistently with the way in which the issue itself is formulated.

c.  The declaration on Preliminary Issue 3 should refer to the publication or delivery of "*a PRK-1 certificate, or of a document in the form of a PRK-1 certificate*", again consistently with the way in which the issue itself is formulated.

d.  Since the Board has decided that the appeal on Preliminary Issue 4 should be dismissed, no declaration is necessary on that issue. Alternatively, any declaration should be in the same terms as the declaration made by Bannister J and upheld by the Court of Appeal.

## Good faith

7.  The disagreement in relation to good faith arises in respect of Preliminary Issue 3 (and also in respect of Sentry's proposed declaration on Preliminary Issue 4).

8.  In essence, Preliminary Issue 3 asks whether a certificate given under Article 11 precludes Sentry from asserting that the certified Redemption Price

exceeded the 'true' Redemption Price and that the excess is recoverable from the former shareholder.

9.    The parties agree that the Board has answered this question affirmatively. However, Sentry (having never previously taken the point) now insists that the answer should be limited to cases in which the relevant certificate has been given in good faith.

10.    The PI Defendants oppose the introduction of this qualification, which appears to imply that if the certificates were not given in good faith Sentry may, after all, be entitled in principle to recover the redemption payments to the extent of the alleged excess. If that were correct, the astonishing result would be that Sentry would be in a better position if its own directors or agents acted in bad faith towards the PI Defendants than if they acted in good faith.

11.    It is unclear whether Sentry seriously contends that it can escape the contractual consequences of the issue of a certificate by relying on its own bad faith, or how any such reliance on bad faith could be reconciled with the plea of mistake on which Sentry's claims in restitution are founded.

12.    By paragraphs 1 and 3 of his order dated 10 October 2011 [Volume 1, pages 44-48], Bannister J dismissed the claims brought against the PI Defendants in the 8 actions in which the preliminary issues were tried. No further appeal by Sentry against the dismissal of those claims is possible. However, other claims brought by Sentry in the British Virgin Islands for the recovery of redemption payments have yet to be formally dismissed. Also, as the Board is aware, there are more than 300 actions pending in the United States Bankruptcy Court in which similar causes of action are alleged by Sentry against numerous defendants, including some of the PI Defendants. At present, these actions remain subject to a stay, and it is not yet clear whether Sentry will attempt to pursue them.

13.    In these circumstances, it would be unfortunate if the Board were to make a declaration in terms that could be construed as meaning that Sentry would, or

might, be entitled take advantage of the bad faith of its own directors or agents in order to deprive its former shareholders of a defence under Article 11.

14. It is, of course, acknowledged that Article 11(1) [Volume 2, page 328] refers to a certificate "*given in good faith*" by or on behalf of the directors of Sentry. But it is a general principle of construction that a contract will be construed so far as possible in such a manner as not to permit one party to it to take advantage of his own wrong: see Lewison, *The Interpretation of Contracts* (5th edition, 2011) at 7.10 and, for example, *Alghussein Establishment v Eton College* [1988] 1 WLR 587, HL.

15. So Article 11(1) is not to be construed as enabling Sentry to use its own bad faith to found restitution claims against the former shareholders. The requirement for good faith in Article 11(1) is there to protect subscribing shareholders against the possibility that the directors might in bad faith certify an overstated NAV per Share and/or Subscription Price, and to protect redeeming shareholders against the possibility that the directors might in bad faith certify an understated NAV per Share and/or Redemption Price. It is not there to protect Sentry in the opposite situations.

16. The PI Defendants took this point of construction both in paragraph 21 of their skeleton argument for the hearing on 18 April 2011 at which Bannister J ordered the trial of preliminary issues [copy provided herewith] and in paragraph 62 of their skeleton argument for the trial itself on 28 and 29 July 2011 [Volume 6, page 1869]. Sentry has never sought to argue that it was wrong or (until now) that the answer to Preliminary Issue 3 should be qualified in relation to good faith. On the contrary, Sentry's position before the Board was that there was no dispute about the answer to Preliminary Issue 3. In paragraph 6 of its Article 11 Case, Sentry stated:

> "*There is no longer any dispute about the third issue: Fairfield accepts that if (contrary to its main case) any of the Documents is a 'certificate' within Article 11, then the Company cannot maintain a cause of action based on restitution for the purpose of recovering any overpayment so certified.*"

17. It is important to distinguish the question of principle, as to whether bad faith would negate the preclusive effect against Sentry of an Article 11 certificate, from the question of fact as to whether Sentry's directors or agents acted in good faith.

18. The latter (factual) question never formed part of the preliminary issues. It was clear from the outset that it would not do so: see paragraph 21 of the PI Defendants' skeleton argument for the hearing on 18 April 2011. Indeed it was to avoid the need for a trial of such factual issues that a trial of preliminary legal issues was sought and ordered.

19. However, the former (legal) question falls squarely within Preliminary Issue 3, because an affirmative answer to that question would alter the answer to Preliminary Issue 3 from (in substance) 'Yes' to 'Yes unless the certificate was given in bad faith'. This question of principle would have been before the Board if Sentry had taken a different position on Preliminary Issue 3. Having answered Preliminary Issue 3 in the way that it did, Sentry cannot now seek to re-open that issue by inserting references to good faith into the declarations.

20. The PI Defendants did not make submissions to the Board on the issue of good faith. There was no need for them to do so, because their case is that bad faith on the part of the directors or agents of Sentry would make no difference to the preclusive effect against Sentry of an Article 11 certificate, and Sentry had not advanced any argument to the contrary. If Sentry considered that, in the event that the documents relied upon by the PI Defendants were held to be certificates, the answer to Preliminary Issue 3 should be qualified by reference to good faith, then it was for Sentry to raise the point.

21. Accordingly, the PI Defendants invite the Board to order that there should be no qualification in relation to good faith either in the declaration on Preliminary Issue 3 or in the declaration, if any, on Preliminary Issue 4.

**Defendant / Redeeming or Redeemed Member**

22.  Preliminary Issue 3 asks whether the publication or delivery of an Article 11
certificate to a "*redeeming or redeemed Member*"[3] precludes Sentry from
asserting that money paid to "*that redeeming or redeemed Member*" exceeded
the 'true' Redemption Price and is recoverable as to the excess from "*such
redeeming Member*" [Volume 1, page 15].

23.  The PI Defendants submit that the declaration on Preliminary Issue 3 should
follow the terms of the issue itself by referring throughout to "*a redeeming or
redeemed Member*", rather than to "*a Defendant*" as Sentry has proposed.
Otherwise, the fact that the Board's answer appears to be narrower than the
terms of the question may give the impression that the Board contemplated that
the effect of a certificate might differ according to whether or not the redeeming
or redeemed Member happens to be a defendant in these proceedings. There
is no justification for such a limitation when the Board's reasoning on the
certification issue is plainly applicable to the relationship between Sentry and all
its present and past Members.

24.  In paragraph 24 of his judgment dated 20 April 2011 [Volume 1, page 9]
Bannister J offered the parties an opportunity to propose amendments to his
formulation of the preliminary issues, but neither Sentry nor the PI Defendants
took up that offer. If Sentry considered that Preliminary Issue 3 was too broadly
drafted, the time to say so was then, not now.

**Documents in the form of a PRK-1 Certificate**

25.  The short point here is that the declaration on Preliminary Issue 3 should refer
not only to the effect of the specific contract notes, statements of account and
e-mails that were the subject of Preliminary Issues 1 and 2 (referred to in the

---

[3] The point of this distinction is that the shareholder may have ceased to be a Member by the time the
certificate is issued and the Redemption Price is paid, because Article 10(1)(a) [Volume 2, page 324]
provides for the shares to be redeemed on the Dealing Day.

draft declarations as "PRK-1 certificates"),[4] but also to all other contract notes, statements of account and e-mails in the same form.

26.   It is appropriate for the declaration to be expressed in these wider terms, because Preliminary Issue 3 is itself not limited to the specific documents that were placed before the Court by way of example. Preliminary Issue 3 concerns the effect of "*a document containing substantially the same items of information as a [PRK-1 certificate]*".

27.   The Board's judgment (e.g. at paragraph 28) plainly applies to all documents in the relevant categories and not solely to the examples that happened to be exhibited to the affidavit of Mr Kite. The inclusion in the declaration on Preliminary Issue 3 of the words "*or of a document in the form of a PRK-1 certificate*" will properly reflect this and will ensure that the declaration fully answers the question that has been asked.

## Good Consideration

28.   Preliminary Issue 4 was:

> "*Whether a redeeming Member of the Claimant in surrendering its shares gave good consideration for the payment by the Claimant of the Redemption Price and, if so, whether that precludes the Claimant from asserting that the money paid to that Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member*" [Volume 1, page 15]

29.   Bannister J declared that the answer to this question was '*Yes and Yes*' [Volume 1, page 32]. The Court of Appeal upheld his order [Volume 1, page 118]. The Board has decided that Sentry's appeal against the decision of Bannister J and the Court of Appeal on Preliminary Issue 4 should be dismissed.

30.   As the Board expressed it in paragraph 6 of its judgment, the question was whether the PI Defendants have a defence on ground that by surrendering

---

[4] The PRK-1 certificates are at Volume 1, pages 451-469.

their shares they gave good consideration for the money that they received on redemption.

31. In its discussion of restitution (i.e. the Good Consideration issue), the Board stated in paragraph 19 of its judgment:

> "*It follows that the Fund's claim to recover the redemption payments depends on whether it was bound by the redemption terms to make the payments which it did make. That in turn depends on whether the effect of those terms is that the Fund was obliged upon a redemption to pay (i) the true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or (ii) the NAV per share which was determined by the Directors at the time of redemption. **If (ii) is correct then, the shares having been surrendered in exchange for the amount properly due under the Articles, the redemption payments are irrecoverable.**"* (emphasis added)

32. The Board went on to hold, in paragraph 24, that the NAV per Share on which the Redemption Price was based was the NAV per Share determined by the Directors at the time of redemption. In other words, the second of the two alternatives identified in paragraph 19 was correct. The PI Defendants accordingly submit that the final words of paragraph 19 encapsulate the Board's conclusion on Preliminary Issue 4, which is that, the shares having been surrendered in exchange for the amount properly due under the Articles, the redemption payments are irrecoverable.

33. Thus the Board gave the same affirmative answer to Preliminary Issue 4 as had been given by the courts below, and for that reason the Board concluded that the appeal on Preliminary Issue 4 should be dismissed.

34. Since the Order in Council will provide that the appeal on Preliminary Issue 4 is to be dismissed, the PI Defendants are content that there should be no declaration on this issue, which will have the effect that the declaration made by Bannister J (and upheld by the Court of Appeal) on Preliminary Issue 4 will stand.

35. Alternatively, the PI Defendants submit that, in consequence of the dismissal of the appeal, a declaration should be made in the same terms as below, simply stating that the answer to Preliminary Issue 4 is "*Yes and Yes*".

36. Sentry has proposed that instead it should be declared in answer to Preliminary
Issue 4 that:

> "On the true construction of the Articles, to the extent that a Defendant
> was paid an amount equivalent to the Redemption Price determined by
> means of a PRK-1 Certificate issued in good faith by or on behalf of the
> directors in relation to the Defendant's redemption request, it was thereby
> paid the sum that was contractually due to it. To that extent (as was
> common ground between the parties) receipt by a Defendant of that sum
> did not give Fairfield Sentry a claim to restitution of any portion thereof."

37. The PI Defendants object to this proposed declaration, which:

    a.    conflates Preliminary Issue 4 entirely with the question of certification;

    b.    introduces a further unacceptable limitation in respect of good faith;

    c.    departs from the terms of Preliminary Issue 4 in referring to a
"Defendant" rather than a "redeeming Member";

    d.    appears to treat the answer to Preliminary Issue 4 as common ground
when it was not; and

    e.    disregards the fact that the appeal on Preliminary Issue 4 is to be
dismissed.

38. The PI Defendants readily acknowledge that the Board regarded the Good
Consideration issue as closely related to the certification issue (paragraph 6 of
the judgment). The reason for this was that the Board construed the
certification provision in Article 11 as referring to the ordinary transaction
documents that would necessarily be generated and communicated to the
Member at the time of subscription or redemption (paragraph 24 of the
judgment). Hence, in respect of any subscription or redemption, there would
always be an Article 11 certificate given to the Member at the time.

39. This is not, however, a reason to obscure the result of the Good Consideration
appeal by substituting for the declaration of Bannister J on Preliminary Issue 4
a declaration which conceptually elides the Good Consideration issue with the
question of certification. While the two issues are related, it is submitted (for the

reasons given above) that the conclusion on the Good Consideration issue to which the Board's analysis of the Articles led was that "*the shares having been surrendered in exchange for the amount properly due under the Articles, the redemption payments are irrecoverable*". Accordingly, and given that the appeal on Preliminary Issue 4 is to be dismissed, the Order in Council should either make no declaration on Preliminary Issue 4 (allowing the declaration made by Bannister J to stand) or should make a declaration in the same terms as Bannister J, namely "*Yes and Yes*".

MARK HAPGOOD QC

PHILLIP KITE

ALAN ROXBURGH

For Quilvest Finance Ltd, Caja de Ahorros y Monte de Piedad de Madrid, Deutsche Bank (Suisse) SA, SNS Global Custody BV, Deutsche Bank Trust Company Americas, Bank Julius Baer & Co Ltd, Lloyds TSB Bank, Martello Nominees Ltd, ABN AMRO Fund Services (Isle of Man) Nominees Ltd and Wise Global Fund Ltd

DAVID LORD QC

ROBERT CHRISTIE

For Lombard Odier & Cie, Mirabaud & Cie, SG Private Banking (Suisse) SA, EFG Bank SA, EFG Bank European Financial Group SA and Pictet & Cie

LAURENCE RABINOWITZ QC

ARABELLA DI IORIO

MAXIMILIAN SCHLOTE

For Credit Suisse London Nominees Ltd and Buckmore Nominees Ltd

LORD FALCONER QC

PAUL WEBSTER QC

For UBS AG New York, UBS (Cayman) Ltd, UBS (Cayman Islands) Ltd and UBS (Luxembourg) Ltd

13 May 2014

**JCPC 2012/0061, 2013/0058, 2013/0059,
2013/0060 and 2013/0061**

**IN THE JUDICIAL COMMITTEE OF THE
PRIVY COUNCIL
ON APPEAL FROM THE EASTERN
CARIBBEAN SUPREME COURT
COURT OF APPEAL, TERRITORY OF
THE VIRGIN ISLANDS**

**B E T W E E N:**

**FAIRFIELD SENTRY LIMITED**
**(in liquidation)**

**and**

**QUILVEST FINANCE LIMITED**
**and others**

_____

**DEFENDANTS' SUBMISSIONS ON
TERMS OF DECLARATIONS**

_____

JCPC 2012/0061, 2013/0058, 2013/0059, 2013/0060 and 2013/0061

**IN THE JUDICIAL COMMITTEE OF THE PRIVY COUNCIL**

**ON APPEAL FROM THE EASTERN CARIBBEAN SUPREME COURT**

**COURT OF APPEAL, TERRITORY OF THE VIRGIN ISLANDS**


B E T W E E N:

**FAIRFIELD SENTRY LIMITED (in liquidation)**

**Claimant / Appellant / Respondent**

and


**QUILVEST FINANCE LIMITED**
**CAJA DE AHORROS Y MONTE DE PIEDAD DE MADRID**
**DEUTSCHE BANK (SUISSE) SA**
**SNS GLOBAL CUSTODY BV**
**DEUTSCHE BANK TRUST COMPANY AMERICAS**
**BANK JULIUS BAER & CO LIMITED**
**LLOYDS TSB BANK**
**MARTELLO NOMINEES LIMITED**
**ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED**
**WISE GLOBAL FUND LIMITED**
**LOMBARD ODIER & CIE**
**MIRABAUD & CIE**
**SG PRIVATE BANKING (SUISSE) SA**
**EFG BANK SA**
**EFG BANK EUROPEAN FINANCIAL GROUP SA**
**PICTET & CIE**
**CREDIT SUISSE LONDON NOMINEES LIMITED**
**BUCKMORE NOMINEES LIMITED**
**UBS AG NEW YORK**
**UBS (CAYMAN) LIMITED**
**UBS (CAYMAN ISLANDS) LIMITED**
**UBS (LUXEMBOURG) LIMITED**

**Defendants / Respondents / Appellants**

_____

**DRAFT DECLARATIONS**

_____

1.  In respect of the first preliminary issue set out in the Schedule to the Order of the Honourable Mr Justice Bannister dated 20 April 2011, namely

    *"Whether any (and, if so, which) of the documents copies of which are exhibited at pages 2 to 17 inclusive of exhibit PRK-1 to the affidavit of Phillip Kite sworn in the proceedings the short title and first reference to which is Fairfield Sentry Limited (in liquidation) –v- Bank Julius Baer & Co Limited and others BVIHC(COM) 30/2010 on 8 March 2011 (or copies of any further documents which may be exhibited to any witness statement made in connection with this issue) (**"the documents"**) is a certificate within the meaning of Article 11(1) of the Articles of Association of the Claimant (**"Article 11(1)", "the Articles"**)"*

    IT IS DECLARED that each of the documents copies of which are exhibited at pages 2 to 16 inclusive of exhibit PRK-1 is a certificate within the meaning of Article 11(1) ("a PRK-1 certificate").

2.  In respect of the second preliminary issue set out in the Schedule to the Order of the Honourable Mr Justice Bannister dated 20 April 2011, namely

    *"If the answer to (1) is yes, whether any (and, if so, which) of the documents is*

    *(a) a certificate as to the Net Asset Value per share ('NAV') or*
    *(b) a certificate as to Redemption Price*

    *within the meaning of the Articles"*

    IT IS DECLARED that each of the documents copies of which are exhibited at pages 10 to 16 inclusive of exhibit PRK-1 is a certificate as to the Net Asset Value per Share within the meaning of the Articles and IT IS FURTHER DECLARED that each of the documents copies of which are exhibited at pages 2 to 11 inclusive of exhibit PRK-1 is a certificate as to the Redemption Price within the meaning of the Articles.

3.  In respect of the third preliminary issue set out in the Schedule to the Order of the Honourable Mr Justice Bannister dated 20 April 2011, namely

    *"If the answer to (2)(a) or (b) is yes:*

    *Whether the publication or delivery by the Claimant*

    *(a) as a matter of information only, or*

2

(b) in connection with a redemption request

*of a document containing substantially the same items of information as a document identified as falling within (2)(a) or (b) above to a redeeming or redeemed Member of the Claimant precludes the Claimant from asserting that money paid to that redeeming or redeemed Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member.*

*For the purposes of this issue 'document' includes emails and materials accessible on a website maintained by the Claimant or Citco Fund Services (Europe) BV or Fairfield Greenwich Group.*"

IT IS DECLARED that the answer to this preliminary issue is

**[PI Defendants' proposed declaration]**

"In both case (a) and case (b), the publication or delivery by the Claimant to a redeeming or redeemed Member of the Claimant of a PRK-1 certificate, or of a document in the form of a PRK-1 certificate, precludes the Claimant from asserting that money paid in accordance with the stated Redemption Price or Net Asset Value per Share to that redeeming or redeemed Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming or redeemed Member."

**[Sentry's proposed declaration]**

"In both case (a) and case (b), the publication or delivery by the Claimant to a Defendant of a PRK-1 certificate, if given in good faith, precludes the Claimant from asserting that money paid in accordance with the stated Redemption Price or Net Asset Value per Share to that Defendant on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from the Defendant in question."

4.    In respect of the fourth preliminary issue set out in the Schedule to the Order of the Honourable Mr Justice Bannister dated 20 April 2011, namely

*"Whether a redeeming Member of the Claimant in surrendering its shares gave good consideration for the payment by the Claimant of the Redemption Price and, if so, whether that precludes the Claimant from asserting that the money paid to that Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member"*

3

IT IS DECLARED that the answer to this preliminary issue is

**[PI Defendants' proposed declaration (if any – see submissions)]**
"Yes and Yes".

**[Sentry's proposed declaration]**
"On the true construction of the Articles, to the extent that a Defendant was paid an amount equivalent to the Redemption Price determined by means of a PRK-1 Certificate issued in good faith by or on behalf of the directors in relation to the Defendant's redemption request, it was thereby paid the sum that was contractually due to it. To that extent (as was common ground between the parties) receipt by a Defendant of that sum did not give Fairfield Sentry a claim to restitution of any portion thereof."

<u>JCPC 2012/0061, 2013/0058, 2013/0059,
2013/0060 and 2013/0061</u>

<u>IN THE JUDICIAL COMMITTEE OF THE
PRIVY COUNCIL</u>
<u>ON APPEAL FROM THE EASTERN
CARIBBEAN SUPREME COURT
COURT OF APPEAL, TERRITORY OF
THE VIRGIN ISLANDS</u>

**B E T W E E N:**

**FAIRFIELD SENTRY LIMITED**
**(in liquidation)**

**and**

**QUILVEST FINANCE LIMITED**
**and others**

---

**DRAFT DECLARATIONS**

---

JCPC 2012/0061
JCPC 2013/0058
JCPC 2013/0059
JCPC 2013/006~~1~~0
JCPC 2013/006~~0~~1

# AT THE COURT AT WINDSOR CASTLE

### The 28th day of April 2014

PRESENT

### THE QUEEN'S MOST EXCELLENT MAJESTY

### IN COUNCIL

The following report of the Judicial Committee of the Privy Council was read—

"Having considered ~~an~~ appeal~~s~~ praying Your Majesty to reverse, alter or vary
the judgment of the Eastern Caribbean Court of Appeal (British Virgin Islands)
dated 1 June 2013 or to grant further relief, in the matter between

### Fairfield Sentry Limited (In Liquidation)
*Appellant*

- and -

### Alfredo Migani and others
*Respondents*

and in the matter between

### (1) Lombard, Odier & ~~CIE~~Cie and others
### (2) Credit Suisse London Nominees Limited and another
### (3) Quilvest Finance Limited and others
### (4) UBS AG New York and others
*Appellants*

- and -

### Fairfield Sentry Limited (in Liquidation)
*Respondent*

and having heard submissions from the parties, we have agreed to report to Your
Majesty as our opinion that

1.    the appeal should be allowed ~~in~~on preliminary issues 1, 2 and 3 except as
      to information posted on the Citco website;

2.    the appeal should be dismissed on preliminary issue 4;

3.    the declarations in the Schedule to this Order should be granted; and

4.    the parties have 21 days in which to make written submissions on costs. ""

**HER MAJESTY** was pleased by and with the advice of Her Privy Council to approve the report and to order that those charged with administering the Government of the British Virgin Islands and all others whom it may concern are to ensure that it is punctually observed and obeyed.

*Clerk of the Privy Council*

The Weekly Law Reports 20 May 1988

587

1 W.L.R.

A                            [HOUSE OF LORDS]


\*ALGHUSSEIN ESTABLISHMENT    .    .    .    .    APPELLANTS

                              AND

B    ETON COLLEGE .    .    .    .    .    .    .    RESPONDENTS


1988    March 7, 8, 9;              Lord Bridge of Harwich, Lord Elwyn-Jones,
        May 5                       Lord Ackner, Lord Goff of Chieveley
                                    and Lord Jauncey of Tullichettle

C

*Contract—Construction—Presumption against taking advantage of own
wrong—Building agreement—Lease for 99 years—Express words
providing for grant of lease on wilful default—Whether party
entitled to take advantage of own wrong*

D          By an agreement in writing dated 30 June 1978, the
      defendants, as landlords, agreed with S. Ltd., the predecessors
      in title of the plaintiffs, to grant a lease for 99 years at a ground
      rent, of land in London on terms which provided, inter alia:
           "3b . . . the tenant shall . . . as soon as is reasonably
           practicable following all necessary licences . . . use its best
           endeavours to commence and proceed diligently with the
           development" of a block of flats.    ,
E     Clause 4 provided:
           that if for any reason due to the wilful default of the tenant
           the development shall remain uncompleted by 29 September
           1983 the lease shall forthwith be completed . . . " in the
           terms provided by the agreement.
      On 12 March 1983 the agreement with the consent of the
F     defendants was assigned to the plaintiffs. By 1984 the
      development had not begun and in October 1984 the defendants
      purported to treat the agreement as repudiated because of the
      failure to commence and complete the development. The
      plaintiffs brought an action claiming specific performance of the
      obligation to grant a lease, and the defendants counterclaimed
      possession of the site. Sir Nicolas Browne-Wilkinson V.-C. on
      a preliminary issue held that the plaintiffs were not entitled to
G     rely on the proviso to clause 4 of the agreement. On appeal by
      the plaintiffs, the Court of Appeal affirmed that decision.
           On appeal by the plaintiffs:—
           *Held*, dismissing the appeal, that the well known rule of
      construction, that there was a presumption that a party to a
      contract could not be permitted to take advantage of his own
H     wrong as against the other party, applied, in the absence of an
      express provision to contradict the presumption, as much to a
      party who sought to obtain a benefit under a continuing contract
      on account of his breach, as it did to a party who relied on his
      breach to avoid a contract and thereby escape his obligations;
      that the terms of the proviso to clause 4 were not apt to
      displace that rule of construction and that, therefore, the
      plaintiffs were not entitled to invoke the proviso to obtain the
      grant of the lease (post, pp. 589A–D, 591D, 594B–D, 595C–D, F).

The Weekly Law Reports 20 May 1988

588

Alghussein Establishment v. Eton College (H.L.(E.))          [1988]

*New Zealand Shipping Co. v. Société des Ateliers et Chantiers
de France* [1917] 2 K.B. 717; [1919] A.C. 1, C.A. and H.L.(E.)
applied.

Decision of the Court of Appeal affirmed.

A

The following cases are referred to in the opinion of Lord Jauncey of
Tullichettle:

*Cheall v. Association of Professional Executive Clerical and Computer Staff*
[1983] 2 A.C. 180; [1983] 2 W.L.R. 679; [1983] I.C.R. 398; [1983] 1 All
E.R. 1130, H.L.(E.)
*Doe d. Bryan v. Bancks* (1821) 4 B. & Ald. 401
*Malins v. Freeman* (1838) 4 Bing. N.C. 395
*New Zealand Shipping Co. v. Société des Ateliers et Chantiers de France*
[1917] 2 K.B. 717; [1919] A.C. 1, C.A. and H.L.(E.)
*Quesnel Forks Gold Mining Co. Ltd. v. Ward* [1920] A.C. 222, P.C.
*Rede v. Farr* (1817) 6 M. & S. 121

B

C

The following additional cases were cited in argument:

*Canada Steamship Lines Ltd. v. The King* [1952] A.C. 192; [1952] 1 All
E.R. 305, P.C.
*Grey v. Pearson* (1857) 6 H.L.Cas. 61, H.L.(E.)
*Hongkong Fir Shipping Co. Ltd. v. Kawasaki Kisen Kaisha Ltd.* [1962] 2
Q.B. 26; [1962] 2 W.L.R. 474; [1962] 1 All E.R. 474, C.A.
*Hughes v. Palmer* (1865) 19 C.B.N.S. 393
*Liverpool City Council v. Irwin* [1977] A.C. 239; [1976] 2 W.L.R. 562;
[1976] 2 All E.R. 39, H.L.(E.)
*Magdalen Hospital v. Knotts* (1879) 4 App.Cas. 324, H.L.(E.)
*Photo Production Ltd. v. Securicor Transport Ltd.* [1980] A.C. 827; [1980] 2
W.L.R. 283; [1980] 1 All E.R. 556, H.L.(E.)
*Printing and Numerical Registering Co. v. Sampson* (1875) L.R. 19 Eq.
462, C.A.
*Roberts v. Davey* (1833) 4 B. & Ad. 664
*Shepherd (F.C.) & Co. Ltd. v. Jerrom* [1987] Q.B. 301; [1986] 3 W.L.R.
801; [1986] I.C.R. 802; [1986] 3 All E.R. 589, C.A.

D

E

F

APPEAL from the Court of Appeal.

This was an appeal by leave dated 7 May 1987 of the House of Lords
(Lord Bridge of Harwich, Lord Mackay of Clashfern and Lord Goff of
Chieveley) by the plaintiffs, Alghussein Establishment, from the judgment
dated 9 February 1987 of the Court of Appeal (Fox, Dillon and Woolf
L.JJ.) dismissing an appeal by the plaintiffs from the judgment and
order dated 9 July 1986 of Sir Nicolas Browne-Wilkinson V.-C., declaring
that upon the true construction of an agreement dated 30 June 1978
made between the defendants, Eton College, and Suregrand Ltd., and
in particular clause 4 thereof, and upon the assumption that the plaintiffs
(the assignees of Suregrand Ltd.) were on 29 September 1983 and at all
material times thereafter in wilful default of their obligations under the
agreement and for that reason the development thereby contemplated
remained uncompleted, the plaintiffs as opposed to the defendants were
not entitled to insist on the grant of a lease of the land the subject of
the agreement.

The facts are set out in the opinion of Lord Jauncey of Tullichettle.

G

H

*Donald Keating Q.C.* and *Kirk Reynolds* for the plaintiffs.
*John Mowbray Q.C.* and *William Poulton* for the defendants.

The Weekly Law Reports 20 May 1988

589

1 W.L.R.        Alghusseln Establishment v. Eton College (H.L.(E.))

A        Their Lordships took time for consideration.

5 May.  LORD BRIDGE OF HARWICH. My Lords, I have had the
advantage of reading in draft the speech of my noble and learned friend
Lord Jauncey of Tullichettle. I agree with it and for the reasons he
gives I would dismiss the appeal.

B        LORD ELWYN-JONES. My Lords, I have had the advantage of reading
in draft the speech of my noble and learned friend Lord Jauncey of
Tullichettle. I agree with it and for the reasons he gives I would dismiss
the appeal.

C        LORD ACKNER. My Lords, I have had the advantage of reading in
draft the speech of my noble and learned friend Lord Jauncey of
Tullichettle. I agree with it and for the reasons he gives I would dismiss
the appeal.

D        LORD GOFF OF CHIEVELEY. My Lords, I have had the advantage of
reading in draft the speech of my noble and learned friend Lord Jauncey
of Tullichettle. I agree with it and for the reasons he gives I would
dismiss the appeal.

E        LORD JAUNCEY OF TULLICHETTLE. My Lords, this appeal relates to
the construction of a clause in an agreement relating to development of
land between the respondents and a company Suregrand Ltd. who later
assigned their rights and obligations to the appellants. It may be said at
the outset that the relevant part of the clause is of a most unusual
nature the like of which will seldom be encountered in practice.

The respondents own a valuable site in Elsworthy Road in the
London Borough of Camden. On 30 June 1978 they entered into an
F        agreement with Suregrand whereby in consideration of payment to them
of the sum of £150,000 they undertook to grant to Suregrand (1) a lease
of the site and the development to be erected thereon, and (2) a licence
to enter upon the site for the purpose of undertaking the development.
In the agreement the respondents are described as the landlord and
Suregrand as the tenant. Clause 3(a) provides that the tenant shall use
G        its best endeavours to obtain all necessary licences, permissions,
approvals and consents in respect of the development and clause 3(b)
provides, inter alia, that the tenant undertakes:

"as soon as is reasonably practicable following all necessary licences
permissions consents and approvals having been obtained as
aforesaid to use its best endeavours to commence and proceed
H        diligently with the development in accordance with such licences
permissions consents and approvals and complete the development
to the reasonable satisfaction of the surveyors . . . ."

Clause 4, with which this appeal is primarily concerned, is in the
following terms:

"Upon the proper issue of the certificate of practical completion
referred to in clause 3(a) hereof the landlords will forthwith grant

590

Lord Jauncey
of Tullichettle     Alghussein Establishment v. Eton College (H.L.(E.))          [1988]

A

and the tenant shall forthwith accept and execute a counterpart of
the lease *provided that* if for any reason due to the wilful default of
the tenant the development shall remain uncompleted on the 29th
day of September 1983 the lease shall forthwith be granted and
completed as aforesaid but without prejudice to the provisions of
clause 3 hereof."

B

The lease referred to in the agreement and of which a draft is
appended thereto is for 99 years and contains no covenant to build.
Indeed its provisions assume that the site will have been developed
before the commencement of the 99 year term.

On 12 March 1979 Suregrand, with the consent of the respondents,
assigned to the appellants their rights under the agreement for the sum
of £310,000. The respondents aver that during the summer and autumn
C
of 1979, in 1980 and in 1982 they, through their solicitors, pressed the
appellants to commence work on the site but to no avail. They further
aver that on 8 August 1984 they wrote to the appellants stating that
unless active steps were commenced immediately to pursue the
development they would seek to rescind the agreement. The appellants'
solicitors replied to that letter stating inter alia that the "target was a
start of works in the very near future." No such start was made and by
D
letter of 23 October 1984 the respondents' solicitors informed the
appellants that the Agreement was terminated because of the appellants'
repudiation thereof which they accepted.

On 6 November 1984 the appellants commenced the present action
claiming *first* that they had never repudiated the agreement, *second* that
because of economic factors it had not been reasonably practicable to
E
start the development and alternatively that if they were in wilful default
the respondents were bound to grant to them a lease in the terms of
clause 4. When the case came for trial before Sir Nicolas Browne-
Wilkinson V.-C. it became apparent that the evidence was likely to
range over a wide field and that its ambit might be restricted if certain
questions of law could be answered in advance. The Vice-Chancellor
identified two such questions namely (first) whether it was open to the
F
appellants to say that it was not reasonably practicable to commence and
proceed with the development simply on the grounds that such
development, if entered into, would not have been profitable to them or
could only have been carried out at a loss to them, and (second)
whether, if it were to be established that the development remained
uncompleted on 29 September 1983 due to the wilful default of the
G
appellants, they, as opposed to the respondents, were entitled to insist
on a grant of a lease under the proviso to clause 4 of the agreement.
The Vice-Chancellor answered both these questions in the negative and
the Court of Appeal unanimously reached the same conclusion. The
appeal to this House is concerned solely with the second question.

Before considering the judgments in the courts below it is important
H
to emphasise that the preliminary question now before this House is not
capable, whichever way your Lordships decide it, of finally disposing of
this litigation. The crucial issue will remain to be resolved as to whether
or not there was a repudiation of the agreement by the appellants.
Neither that issue nor any of the subsidiary issues which may arise in
consequence of the resolution of that issue are before your Lordships. I
well understand the Vice-Chancellor's concern to narrow the ambit of

591

1 W.L.R.          Alghussein Establishment v. Eton College (H.L.(E.))          Lord Jauncey
                                                                              of Tullichettle

A   the trial and the first question he decided certainly has done so, but in
    relation to the second question with hindsight one can see that, as
    sometimes happens with preliminary questions which the parties bring
    up to your Lordships' House, the intended shortcut may prove in the
    end only to have prolonged the proceedings.

        In answering the second question the Vice-Chancellor expressed a
    strong suspicion that the word "Not" in the proviso to clause 4 had been
B   omitted so that it should have read "provided that if for any reason *not
    due to wilful default of the appellant . . . ."* Nevertheless, reluctantly
    and in the absence of any claim for rectification, he concluded that his
    suspicion did not go far enough to entitle him as a matter of construction
    to insert the word in the proviso. However relying upon *New Zealand
    Shipping Co. v. Société des Ateliers et Chantiers de France* [1919] A.C. 1
C   he concluded that the appellants, if in wilful default, could not rely on
    their own wrong to found a legal right. That, said the Vice-Chancellor,
    appeared to be a principle which could not be tolerated whatever the
    clear words of the contract might say. In the Court of Appeal, Dillon
    L.J., with whom Woolf and Fox L.JJ. agreed, concluded, in the light of
    the authority cited, that as a matter of construction the proviso to clause
D   4 had to be read subject to the implied condition that the party seeking
    to found on the proviso was not himself in default.

        My Lords it is well established by a long line of authority that a
    contracting party will not in normal circumstances be entitled to take
    advantage of his own breach as against the other party. In *Rede v. Farr*
    (1817) 6 M. & S. 121, Lord Ellenborough C.J. said, at pp. 124–125:

E       "In this case, as to this proviso, it would be contrary to an universal
        principle of law, that a party shall never take advantage of his own
        wrong, if we were to hold that a lease, which in terms is a lease for
        twelve years, should be a lease determinable at the will and pleasure
        of the lessee; and that a lessee by not paying his rent should be at
        liberty to say that the lease is void. On this principle, even if it
F       were not borne out so strongly as it is by the current of authorities,
        it would be sufficient to hold that the lease was only void as against
        the lessee, not against the lessor."

        In *Doe d. Bryan v. Bancks* (1821) 4 B. & Ald. 401, 402 a lease of a
    coal mine contained the following proviso:

G       "Provided also, and it is mutually agreed between the parties
        hereto, that the aforesaid works should commence and begin within
        one year from the date thereof, and *if the same should stop or cease
        working at any time two years, this lease shall be* deemed void to all
        intents and purposes."

    Bayley J. said, at pp. 406–407:

H       "I am of opinion, that the true construction of the proviso in this
        lease, 'that it shall be null and void to all intents and purposes upon
        a cesser of two years,' is, that it shall be voidable only at the option
        of the lessor, and that it does not lie in the mouth of the lessee,
        who has been guilty of a wrongful act, in omitting to work in
        pursuance of his covenant, to avail himself of that wrongful act, and
        to insist, that thereby the lease has become void to all intents and
        purposes."

592

Lord Jauncey
of Tullichettle          Alghussein Establishment v. Eton College (H.L.(E.))          [1988]

Holroyd J. concluded that the tenant could not insist that his own act          A
amounted to a forfeiture and Best J. said, at pp. 409–410:

> "Besides, I take it to be an universal principle of law and justice,
> that no man can take advantage of his own wrong. Now it would
> be most inconsistent with that principle, to permit the defendant to
> protect himself against the consequences of this action, by afterwards
> setting up his own wrongful act at a former period."          B

In the *New Zealand Shipping* case in the Court of Appeal [1917] 2
K.B. 717, Viscount Reading C.J. said, at pp. 723–724:

> "Unless the language of the contract constrains the Court to hold
> otherwise, the law of England never permits a party to take
> advantage of his own default or wrong. In *Malins v. Freeman*
> (1838) 4 Bing. N.C. 395, 399 Coltman J. said: 'It is so contrary to          C
> justice that a party should avoid his own contract by his own wrong,
> that unless constrained, we should not adopt a construction
> favourable to such a purpose.' That appears to me to be the true
> underlying principle of the cases in which the word 'void' has been
> construed as if it meant voidable. Unless there are clear words to
> the contrary, a clause making a contract void must be read subject          D
> to the condition that the party who is seeking to set up the
> invalidity is not himself in default."

And Scrutton L.J. said, at p. 724:

> ". . . I think that clause 12 and all other clauses are to be read
> subject to an overriding condition or proviso that the party shall not          E
> take advantage of his own wrong, and therefore is estopped from
> alleging invalidity of which his own breach of contract is the cause."

On appeal to this House, Lord Finlay L.C. said [1919] A.C. 1, 8:

> "Questions of this sort have often arisen in case of provisions that a
> lease should be void on non-payment of rent or non-performance of
> covenants by the lessee. It has always been held that the lessee          F
> could not take advantage of his own act or default to avoid the
> lease, and the expression generally employed has been that such
> proviso makes the lease voidable by the lessor, or void at the option
> of the lessor. The decisions on the point are uniform, and are
> really illustrations of the very old principle laid down by Lord Coke
> (Co. Litt. 206b) that a man shall not be allowed to take advantage          G
> of a condition which he himself brought about."

The speech of Lord Atkinson contained the following passage, at
p. 9:

> "It is undoubtedly competent for the two parties to a contract to
> stipulate by a clause in it that the contract shall be void upon the          H
> happening of an event over which neither of the parties shall have
> any control, cannot bring about, prevent or retard. . . . But if the
> stipulation be that the contract shall be void on the happening of an
> event which one or either of them can by his own act or omission
> bring about, then the party, who by his own act or omission brings
> that event about, cannot be permitted either to insist upon the
> stipulation himself or to compel the other party, who is blameless,

593

1 W.L.R.          Alghussein Establishment v. Eton College (H.L.(E.))          Lord Jauncey
of Tullichettle

A      to insist upon it, because to permit the blameable party to do either
would be to permit him to take advantage of his own wrong, in the
one case directly, and in the other case indirectly in a roundabout
way, but in either way putting an end to the contract.
"The application to contracts such as these of the principle that a
man shall not be permitted to take advantage of his own wrong thus
B      necessarily leaves to the blameless party an option whether he will
or will not insist on the stipulation that the contract shall be void on
the happening of the named event. To deprive him of that option
would be but to effectuate the purpose of the blameable party.
When this option is left to the blameless party, it is said that the
contract is voidable, but that is only another way of saying that the
C      blameable party cannot himself have the contract made void, cannot
force the other party to do so, and cannot deprive the latter of his
right to do so. Of course, the parties may expressly or impliedly
stipulate that the contract shall be voidable at the option of either
party to it. I am not dealing with such a case as that."

       In the Privy Council case of *Quesnel Forks Gold Mining Co. Ltd. v.
       Ward* [1920] A.C. 222 the Board had to consider a provision in a mining
D      lease for forfeiture in the event of the lessee ceasing for two years to
carry on mining operations. In giving the advice of the Board Lord
Buckmaster said, at p. 227:

       "If the covenant does not effect this, then, although the word used
is 'void,' the meaning is 'void at the option of the lessor,' or in
other words 'voidable.' Their Lordships have no hesitation in saying
E      that that is the true meaning of the covenant. Substantial obligations
are imposed upon the lessee under the terms of the lease; and it
would not be consistent with the ordinary rules of construction
applicable to such a document to hold that these obligations could
be completely avoided by the lessee omitting to perform any work.
It is of course possible so to frame a lease that this must be the
F      effect, and it would result that the term was then a term which
ended on the happening of a condition solely in the power of a
lessee. This, however, is not the language used in the lease."

       He later referred to the *New Zealand Shipping* case [1919] A.C. 1 as
authority for well known rules of construction. Finally in *Cheall v.
G      Association of Professional Executive Clerical and Computer Staff* [1983]
2 A.C. 180 Lord Diplock referring to the *New Zealand Shipping* case
said, at pp. 188–189:

       "In the course of the speeches, which are not entirely consistent
with one another, reference was made by all their Lordships to the
well known rule of construction that, except in the unlikely case
H      that the contract contains clear express provisions to the contrary, it
is to be presumed that it was not the intention of the parties that
either party should be entitled to rely upon his own breaches of his
primary obligations as bringing the contract to an end, i.e. as
terminating any further primary obligations on his part then
remaining unperformed. This rule of construction, which is
paralleled by the rule of law that a contracting party cannot rely
upon an event brought about by his own breach of contract as

The Weekly Law Reports 20 May 1988

594

Lord Jauncey
of Tullichettle            Alghussein Establishment v. Eton College (H.L.(E.))            [1988]

having terminated a contract by frustration, is often expressed in    A
broad language as: 'A man cannot be permitted to take advantage
of his own wrong.'"

Mr. Keating for the appellants submitted that the *New Zealand
Shipping* case [1919] A.C. 1 and all the other relevant authorities were
concerned with questions involving avoidance of a contract and they had
no application to a case such as this where the continuance of the    B
contract was involved. There was, he said, a fundamental difference
between a provision which allowed the party to rely on his own wrong
to avoid a contract and a provision which entitled him to enjoy a
contractual benefit because of his wrong. I do not consider that this
argument is sound. Although the authorities to which I have already
referred involve cases of avoidance the clear theme running through    C
them all was that no man can take advantage of his own wrong. There
was nothing in any of them to suggest that the foregoing proposition was
limited to cases where the parties in breach were seeking to avoid the
contract and I can see no reason for so limiting it. A party who seeks to
obtain a benefit under a continuing contract on account of his breach is
just as much taking advantage of his own wrong as is a party who relies    D
on his breach to avoid a contract and thereby escape his obligations.

Mr. Mowbray for the respondents accepted that if the proviso to
clause 4 fell to be construed literally he must fail. However, he
maintained that if the literal meaning were modified as a matter of
construction to take account of the inconsistency and absurdity which
would arise in relation to the agreement as a whole if the literal meaning
prevailed, he could succeed. He further maintained that the principle    E
that no man can take advantage of his own wrong was either a rule of
construction which was subject only to express contrary provisions in the
contract or alternatively an absolute rule of law and morality which
operated as an estoppel whatever parties had agreed. In this case I do
not think that the two arguments on construction can properly be
separated. Furthermore although an absolute rule of law and morality    F
would render unnecessary any detailed consideration of the provisions of
the agreement I prefer to start by considering the effect of the principle
as embodied in a rule of construction.

My Lords, the proviso to clause 4 appears not only to be at odds
with the preceding part of the clause but inconsistent with the principal
provisions of clause 3. When Dillon L.J. in the Court of Appeal    G
described it as "a half-baked clause" I do not think that he was
overstating the matter. Sub-clauses (a) and (b) of clause 3 provide that
the tenant shall first of all obtain the necessary licences permissions etc.
for the development and as soon as reasonably practicable thereafter
shall commence, proceed with diligently and complete the development.
No time limit for completion is provided in the agreement but in both    H
sub-clauses (a) and (b) the tenant is taken bound to use his best
endeavours to perform the obligations and the parties clearly intended
that he would not waste time in proceeding to completion. Clause 4
provides for the immediate grant of a lease by the landlord upon the
proper issue of the certificate of practical completion. The draft lease
relates to the "piece of land with buildings standing thereon" and, as I
have already remarked, the provisions clearly contemplate that the

595

1 W.L.R.          Alghussein Establishment v. Eton College (H.L.(E.))          Lord Jauncey
                                                                                  of Tullichettle

A    development will have been completed by the commencement of the
     term. In that situation it is not surprising that it contains no covenant to
     build. So far the pattern of clauses 3 and 4 of the agreement is entirely
     coherent. The proviso to clause 4 however upsets this pattern. On a
     literal construction a tenant who has failed to complete or even to start
     the development due to his wilful default by 29 September 1983 is
     entitled to demand that a lease be granted to him, whereas a tenant who
B    has done his best to complete but has failed through no fault so far so do
     would not on that date be entitled to a lease. This is, to say the least of
     it, a bizarre result. If the obligation to complete the development in
     clause 3(b) were not to be implied in any lease so granted but were to
     remain, as the literal reading of the words might suggest, an obligation
     under the agreement the matter would be even more bizarre because the
C    landlord would have no remedy under the lease for failure to develop
     during its currency and would be left with the limited remedy of
     damages under the agreement. Even if it were appropriate to imply the
     provision of clause 3(b) into any lease to be granted under the proviso
     to clause 4, and I make this assumption without deciding the matter one
     way or the other, there remains the question whether in the words of
     Lord Diplock in the *Cheall* case [1983] 2 A.C. 180, 189 the agreement
D    contains clear express provisions to contradict the presumption that it
     was not the intention of parties that either should be entitled to rely on
     his own breach in order to obtain a benefit. I find no such clear express
     provision. Although the proviso refers specifically to the wilful default
     of the tenant it does not state that the tenant should be entitled to take
     advantage thereof. It is one thing for wilful default of a party to be
     made the occasion upon which a provision comes into operation but it is
E    quite another thing for that party to be given the right to rely on that
     default. Furthermore it is not disputed that a lease granted under the
     proviso which contained no covenant to build would render the whole
     scheme unworkable. In that situation it is reasonable to assume that if
     the parties had intended in this extraordinary proviso to displace the
     presumption they would have expressly imported clause 3(b) into any
     such lease rather than leaving it to possible but uncertain implication.
F    All in all I have no doubt that the terms of the proviso were not apt to
     displace the rule of construction and I consider that the Vice-Chancellor
     and the Court of Appeal were correct in concluding that the appellants
     were not entitled to invoke the proviso to clause 4.
        It only remains to refer to the respondents' argument that there is an
     absolute rule of law and morality which prevents a party taking
     advantage of his own wrong whatever the terms of the contract. My
G    Lords I do not find it necessary to deal with this. For my part I have no
     doubt that the weight of authority favours the view that in general the
     principle is embodied in a rule of construction rather than in an absolute
     rule of law. However, that is not to say that there cannot be situations
     such as self-induced frustration, to which Lord Diplock referred in the
     *Cheall* case, where an absolute rule exists. It is neither necessary nor
     would it be profitable to explore the matter further in this case.
H       For the reasons given I would therefore dismiss the appeal.

                                         *Appeal dismissed with costs.*

     *Solicitors: Argles & Court, Maidstone, Kent; Peake & Co.*

                                                           J. A. G.

> "this case is concerned with Foxtons' standard terms. Accordingly, one should lean in favour of a construction which favours their client, particularly in the field of domestic estate agency contracts, where the agent is an expert, often professionally qualified, and normally legally advised, and the client will normally be a lay person who will not seek legal advice on those terms."

## 10.    PARTY NOT TO TAKE ADVANTAGE OF OWN WRONG

**A contract will be construed so far as possible in such a manner as not to 7.10 permit one party to it to take advantage of his own wrong.**

This principle has a long history, and can be traced back to Lord Coke's day.[218]

In *Rede v Farr*[219] a tenant who had failed to pay his rent asserted that by reason of a proviso for re-entry which said that the lease would be void in the event of breach of obligation his lease was at an end. Lord Ellenborough said:

> "In this case, as to this proviso, it would be contrary to an universal principle of law, that a party shall never take advantage of his own wrong, if we were to hold that a lease, which in terms is a lease for twelve years, should be a lease determinable at the will and pleasure of the lessee; and that a lessee by not paying his rent should be at liberty to say that the lease is void."

This formulation suggests that it is a rule of law. However, the decision could be justified on the basis that the court was construing the word "void" in the proviso for re-entry as meaning "voidable". In *New Zealand Shipping Co v Societe des Ateliers et Chantiers de France*,[220] Lord Atkinson seems to have treated it as a matter of construction. He said:

> "It is undoubtedly competent for the two parties to a contract to stipulate by a clause that the contract shall be void upon the happening of an event over which neither of the parties shall have any control, cannot bring about, prevent or retard. . . . But if the stipulation be that the contract shall be void on the happening of an event which one or other of them can by his own act or omission bring about, then the party, who by his act or omission brings that event about, cannot be permitted either to insist upon the stipulation himself or to compel the other party, who is blameless, to insist upon it, because to permit the

---

[218] In Co Litt 206b, Lord Coke says: "If a man make a feoffment in fee, upon condition that the feoffee shall re-infeoff him before such a day, and before the day the feoffor disseise the feoffee, and hold him out by force until the day be past, the state of the feoffee is absolute; for the feoffor is the cause wherefore the condition cannot be performed, and therefore shall never take advantage for non-performance thereof. And so it is if A be bound to B that JS shall marry Jane G before such a day, and before the day B marry with Jane, he shall never take advantage of the bond, for that he himself is the mean that the condition could not be performed. And this is regularly true in all cases." Lord Coke also mentions the principle at Co Litt 148b in its Latin form: "*nullus commodum capere potest de injuria sua propria.*"
[219] (1817) 6 M. & S. 121.
[220] [1918] A.C. 1.

blameable party to do either would be to permit him to take advantage of his own wrong, in the one case directly, and in the other case in a roundabout way, but in either way putting an end to the contract."

In the same case, Lord Finlay L.C. seems to have treated the principle as a rule of law, while Lord Wrenbury treated it as a question of construction. In *Cheall v APEX*,[221] in commenting on the *New Zealand* case, Lord Diplock spoke of:

> "the well known rule of construction that, except in the unlikely case that the contract contains clear express provisions to the contrary, it is to be presumed that it was not the intention of the parties that either party should be entitled to rely upon his own breaches of his primary obligations as bringing the contract to an end."

He described "this rule of construction" as being paralleled by the "rule of law" that a contract cannot be brought to an end by self-induced frustration. The principle may be seen as an aspect of the principle of interpretation that leans against interpretations that produce unreasonable or absurd consequences that could not have been intended.[222]

It is considered that the principle as applied in England and Wales and Australia[223] is one of construction rather than of law, and may be ousted by the express terms of the contract.[224] In *Gyllenhammar & Partners International Ltd v Sour Brodogradevna Industrija*[225] a shipbuilding contract stated that it was subject to the builder declaring that a guarantee had been obtained; and also declaring that all necessary permissions and approvals had been obtained. It went on to say that if these had not been obtained within 30 days of the date of the contract then the contract should become null and void. Hirst J. held that this language was sufficiently clear to oust the principle. He said:

> "So far as the *New Zealand* and *Cheall* cases are concerned, it seems to me that the express terms of art. 23 exclude the general rule of construction, since sub-cl. (a) and (c) could not operate in the absence of a breach by the party concerned, thus rendering reliance on the general rule impossible for the same

---

[221] [1983] 2 A.C. 181. See also the dissenting judgment of Donaldson L.J. [1983] Q.B. 126 at 144.
[222] *Financial Ombudsman Service v Heather Moor & Edgecomb Ltd* [2009] 1 All E.R. 328, per Stanley Burnton L.J.
[223] *Suttor v Gundowa* (1950) 81 C.L.R. 418 at 441; *Gange v Sullivan* (1966) C.L.R. 418 at 442; *Hope Island Resort Holdings Pty Ltd v Jefferson Properties (Qld) Pty Ltd* [2005] QCA 315; *Gold City Developments Pty Ltd v Portpride Pty Ltd* [2010] WASC 148.
[224] *Micklefield v SAC Technology Ltd* [1990] 1 W.L.R. 1002. However, in *Kensland Realty Ltd v Whaleview Investment Ltd* [2001] HKCFA 57, the Court of Final Appeal of Hong Kong doubted the correctness of this case, because relevant Australian authority was not cited. The Australian cases are *Peter Turnbull & Co Pty Ltd v Mondus Trading Co (Australia) Pty Ltd* (1953–53) 90 C.L.R. 235 and *Mahoney v Lindsay* (1981) 55 A.J.L.R. 118. But in *Decoma UK Ltd v Haden Drysys International Ltd* [2006] EWCA Civ 723 reaffirmed the view that the principle is one of construction only, although *Kensland Realty* does not appear to have been cited. The same appears to be true in Australia. In England and Wales the question has now been resolved by *BDW Trading Ltd v JM Rowe (Investments) Ltd* [2011] EWCA Civ 548.
[225] [1989] 2 Lloyd's Rep. 430.

reasons as it was impossible for the plaintiff to rely on APEX's r. 14 in the *Cheall* case."

In *Decoma UK Ltd v Haden Drysys International Ltd*[226] the Court of Appeal held that the words of a "crystal clear" clause in a contract could not be overridden by the principle. In *Petroplus Marketing AG v Shell Trading International Ltd*[227] Andrew Smith J. said:

"It is a general principle of construction that prima facie it will be presumed that the parties intended that neither should be entitled to rely on his own breach of duty to obtain a benefit under a contract, at least where the breach of duty is a breach of an obligation under that contract: see Chitty on Contracts, Vol 1 at para 12–082. This is sometimes presented not as a matter of contractual construction but an implied contractual term that a right or benefit conferred upon a party shall not be available to him if he relies upon his own breach of the contract to establish his claim: Chitty on Contracts Vol 1 at para 13–012. However analysed, the principle is not inflexible or absolute: it may be displaced by express contractual provision or by the parties' intention to be understood from the express terms: *Richco International Ltd. v Alfred C. Toepfer International GMBH.*"[228]

He held on the construction of the particular contract that the principle had been displaced by the terms of the contract. In *The Law Debenture Trust Corporation Plc v Elektrim SA*[229] Sales J. also applied the principle as one of construction. Thus English law continues to take the view that the principle is one of interpretation rather than a rule of substantive law. In *BDW Trading Ltd v JM Rowe (Investments) Ltd*[230] Patten L.J. said:

"Although there has been a certain amount of academic discussion as to whether the principle has the status of a rule of law which is imposed upon the parties to a contract almost regardless of what they have agreed, it is now clear as a matter of authority that the application of the principle can be excluded or modified by the terms of the contract and that its scope in any particular case will depend upon the construction of the relevant agreement."

This may be taken to have settled the question up to the level of the Court of Appeal.

However, the Court of Final Appeal of Hong Kong has held that the principle may be given effect either as a principle of construction or as a rule of law, according to what is appropriate in the circumstances[231]; and this has been followed at first

---

[226] [2006] EWCA Civ 723.
[227] [2009] EWHC 1024 (Comm).
[228] [1991] 1 Lloyd's Rep. 136, 144.
[229] [2009] EWHC 1801.
[230] [2011] EWCA Civ 548; *Office of Fair Trading v Ashbourne Management Services Ltd* [2011] EWHC 1237 (Ch).
[231] *Kensland Realty Ltd v Whale View Investment Ltd* [2001] HKCFA 57.

7.10                        Chapter 7—The Canons Of Construction

instance in England.[232] If applied as a rule of substantive law, the principle precludes the wrongdoer from taking advantage of his own wrong however clearly the contract may appear to entitle him to do so.[233]

The cases thus far referred to concern claims that a contract has been terminated entirely. However, the principle has a broader application. Thus in *Harmsworth Pension Funds Trustees Ltd v Charringtons Industrial Holdings Ltd*,[234] it was held that for the purpose of assessing rent under a rent review clause, the tenant must be assumed to have complied with its repairing covenant, for otherwise it would be taking advantage of its own breach of covenant in order to depress the rent which would otherwise be payable.

So also in *Alghussein Establishment v Eton College*,[235] an agreement for lease contained a covenant by the intending lessee to build. A clause in the agreement provided that if for any reason due to the wilful default of the tenant the development should remain uncompleted by a certain date the lease should forthwith be completed. The House of Lords held that the tenant was not entitled to take advantage of his own wilful default in securing a benefit under a continuing contract, namely the obtaining of the lease. Lord Jauncey of Tullichettle said:

> "Although the authorities to which I have already referred involve cases of avoidance the clear theme running through them is that no man can take advantage of his own wrong. There was nothing in any of them to suggest that the foregoing proposition was limited to cases where the parties in breach were seeking to avoid the contract and I can see no reason for so limiting it. A party who seeks to obtain a benefit under a continuing contract is just as much taking advantage of his own wrong as a party who relies on his breach to avoid a contract and thereby escape his obligations."

However, in order to bring the principle into operation, the relevant breach of duty must be a duty owed by one party to the other under the terms of the contract. Thus where the contract imposes no obligations on one party to it (for example because it is a unilateral contract, such as an option) there is no room for the principle to operate.[236] In addition, breach of a duty whether contractual or non-contractual to a stranger to the contract will not suffice.[237]

It is also necessary to show that the contractual rights or benefits which the party in question is seeking to assert or claim arise as a direct result of that party's prior breach of contract.[238]

---

[232] *Rother District Investments Ltd v Corke* [2004] 1 E.G.L.R. 47. In the light of *BDW Trading Ltd v JM Rowe (Investments) Ltd* [2011] EWCA Civ 548, this must be taken to have been wrong on this point.

[233] *Kensland Realty Ltd v Whale View Investment Ltd*, above, doubting *Micklefield v SAC Technology Ltd* [1990] 1 W.L.R. 1002.

[234] (1985) 49 P. & C.R. 297.

[235] [1988] 1 W.L.R. 587.

[236] *Little v Courage Ltd* (1994) 70 P. & C.R. 469, CA.

[237] *Cheall v APEX* [1983] 2 A.C. 180.

[238] *Kensland Realty Ltd v Whale View Investment Ltd* [2001] HKCFA 57; *Nina's Bar Bistro Pty Ltd v MBE Corporation (Sydney) Pty Ltd* [1984] 3 N.S.W.L.R. 613.

378

In order to displace the principle there must be "a clear contractual intention to be gathered from the express provisions of the contract".[239] The contractual intention is to be decided by the application of the ordinary principles applicable to the interpretation of contracts and the implication of terms.[240]

*Illustrations*

1.    A lease of a mine contained a forfeiture clause which provided that the lease would be void if the lessee ceased to mine for two years. It was held that the word "void" should be construed as meaning "voidable at the option of the lessor" and did not entitle the tenant to put an end to the lease.

*Quesnel Forks Gold Mining Co Ltd v Ward*[241]

2.    A share option scheme provided for employees of subsidiaries of a public company to acquire shares in the company at favourable prices. The scheme was open only to employees. The company sold one of its subsidiaries to a third party, and an employee of the former subsidiary claimed that the company could not take advantage of its own wrong in selling the subsidiary to defeat the exercise of his option. It was held that the company owed no obligation to the employee not to sell the subsidiary, and consequently the sale was not a wrong for that purpose.

*Thompson v ASDA-MFI Group Plc*[242]

3.    A lease contained a covenant by the tenant to register assignments within a stipulated time. In a licence to assign, sureties guaranteed performance of the tenant's covenants by the assignee. A proviso to the licence stated that it was to become void if the assignment was not registered in accordance with the covenant. The assignment was not so registered. It was held that the sureties remained liable because they had guaranteed performance by the assignee of the tenant's covenant to register the assignment, and they could not rely on their own breach of covenant caused by the failure to register the assignment in order to avoid liability.

*Cerium Investments Ltd v Evans*[243]

4.    An agreement for the sale of shares gave the seller the option to repurchase the shares, completion to take place on the option completion date. The contract provided that all rights attaching to the shares should vest in the seller on the option completion date. The seller exercised the option but was unable to complete on the option completion date. It was held that since the failure to complete was

[239] *Richco International v Alfred C. Toepfer International* [1991] 1 Lloyd's Rep. 136.
[240] *BDW Trading Ltd v JM Rowe (Investments) Ltd* [2011] EWCA Civ 548.
[241] [1920] A.C. 222. See also *Doe d. Bryan v Bancks* (1821) 4 B. & Ald. 401.
[242] [1988] 2 W.L.R. 1093.
[243] [1991] 1 E.G.L.R. 80, CA.

due to the seller's wilful default, the contract should be construed so as not to permit him to take advantage of his own wrong. Accordingly the buyer continued to be able to vote the shares as he chose.

*JRRT (Investments) Ltd v Haycraft* [244]

**5.** A contract for the sale of land provided for completion at 1 p.m. on September 2. Time was of the essence. The contract also provided for payment of the completion monies to be by cashiers' orders or cheques in favour of such person as the vendor might direct. One hour and 47 minutes before the time for completion, the vendor issued a direction about how the completion monies were to be apportioned. That was a breach of an implied term to the effect that a direction had to be given at a time which enabled the purchaser to comply with it before completion. Consequently the vendor was not entitled to insist on strict compliance with the completion deadline, and a tender of the purchase monies six minutes late was a valid tender.

*Kensland Realty Ltd v Whale View Investment Ltd* [245]

## 11.  CONTRACT TO BE CONSTRUED SO AS TO BE LAWFUL

**7.11  Where the words of a contract are capable of two meanings, one of which is lawful and the other unlawful, the former construction should be preferred.** [246]

This principle is based on the proposition that "the parties are unlikely to have intended to agree to something unlawful". [247] It has also been said to be an aspect of the principle of construction "that leans against interpretations that produce unreasonable or absurd consequences that could not have been intended". [248] Sir Edward Coke [249] expressed the principle thus:

"It is a general rule, that whensoever the words of a deed, or of one of the parties without deed, may have a double intendment, and the one standeth with

---

[244] [1993] B.C.L.C. 401.
[245] [2001] HKCFA 57.
[246] Referred to with approval in *Global Network Services Pty Ltd v Legion Telecall Pty Ltd* [2001] NSWCA 279, per Mason P., dissenting and by the Court of Appeal of Alberta in *Lust v Foundations For the Future Charter Academy* [2007] 409 A.R. 90. It was also referred to with approval in *Landlord Protect Ltd v St Anselm Development Company Ltd* [2008] EWHC 1582 (Ch) where the principle was said to accord with the general principle that a court should seek to uphold, rather than to defeat, the parties' contract. The first instance decision was reversed by the Court of Appeal on other grounds: [2009] 2 P. & C.R. 9. Compare the European Principles of Contract Law para.5:106: "An interpretation which makes the terms of the contract lawful, or effective, is to be preferred to one which would not".
[247] *BCCI v Ali* [2002] 1 A.C. 251 at 269, per Lord Hoffmann.
[248] *Financial Ombudsman Service v Heather Moor & Edgecomb Ltd* [2009] 1 All E.R. 328, per Stanley Burnton L.J.
[249] Co.Litt. 42a.

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION

Claim No. BVIHC (COM) 30/2010

B E T W E E N :-

FAIRFIELD SENTRY LIMITED (in Liquidation)

Claimant/Respondent

- and -

BANK JULIUS BAER & CO LIMITED and others

Defendants/Applicants

---

### JOINT SKELETON ARGUMENT OF THE DEFENDANTS WHO HAVE ISSUED APPLICATIONS FOR THE TRIAL OF PRELIMINARY ISSUES IN THE "CLAWBACK" ACTIONS (HEARING ON 18 APRIL 2011)

---

*A suggested Reading List accompanies this skeleton.*
*Reading time estimate: 2-3 hours*

## Introduction

1.    This joint skeleton argument is filed on behalf of all of those Defendants who have issued applications for the trial of preliminary issues[1] in the "clawback actions". The "clawback actions" are the 15 actions so far issued in this Court by Fairfield Sentry in the wake of the Madoff fraud in which Fairfield Sentry seeks restitution of monies allegedly paid to the Defendants by mistake.

2.    The Defendants who have issued applications for the trial of preliminary issues in the clawback actions ("the PI Defendants") are represented by Maples and Calder ("the M&C Defendants"), Ogier ("the Ogier Defendants"),

---

[1] Pursuant to CPR Part 26.1(2)(e)

1

Harney Westwood & Riegels ("the Harneys Defendants") and O'Neal Webster ("the O'Neal Defendants"). Appendix 1 to this skeleton relates to the M&C Defendants and identifies which of the M&C Defendants are parties to which actions and the amount in US$ which is claimed against each M&C Defendant. Appendix 2 to this skeleton provides the same information in relation to the Ogier Defendants, Appendix 3 in relation to the Harneys Defendants and Appendix 4 in relation to the O'Neal Defendants.

3.     Fairfield Sentry was the largest of the "feeder funds" which invested monies with Bernard L. Madoff Investment Securities LLC ("BLMIS") on behalf of its shareholders. The defendants to the clawback actions are the various shareholders who redeemed their shares in Fairfield Sentry between 1997 and 2008. The 15 clawback actions are in common form and raise the same issues.

4.     The PI Defendants apply[2] for the trial of preliminary issues which are specifically designed to save considerable time and costs and further the Overriding Objective. Appendix 5 to this skeleton summarises which PI Defendants have issued applications for trial of the preliminary issues in which clawback actions. In the event that the PI Defendants win either of the two preliminary issues, the claims against all of the Defendants to the clawback actions must fail and the clawback actions will be at an end. In the event that the PI Defendants lose both of the preliminary issues, the time and money spent trying the preliminary issues will not have been wasted because the issues would have had to be decided anyway and the trial of the remaining issues will be commensurately shorter.

5.     Not every defendant in each of the 15 clawback actions has issued applications for the trial of preliminary issues (that would obviously be

---

[2] The M&C Defendants issued the first application on 2 February 2011 in action 30/2010. Applications for the trial of preliminary issues have been issued by various of the PI Defendants in 8 of the 15 clawback actions, namely actions 357/2009, 404/2009, 425/2009, 5/2010, 15/2010, 30/2010, 153/2010 and 20/2011.

wasteful of costs and would lead to unnecessary duplication). However, all defendants in all of the 15 clawback actions who have been served with the proceedings are aware of the applications for the trial of preliminary issues and either support them in one form or another or at the very least do not oppose them[3].

6.    Indeed, and perhaps rather tellingly, the only party which opposes the trial of the preliminary issues is Fairfield Sentry itself. As explained in more detail below, Fairfield Sentry's opposition to the trial of the proposed preliminary issues is unsound and seems to be driven more by the realisation that it is likely to lose the trial of the preliminary issues than by any principled objection.

## Background

7.    Fairfield Sentry is a BVI registered company which was put into liquidation by this Court on 21 July 2009. In September 2009 Fairfield Sentry issued the first of the clawback actions (336/2009). The individual clawback actions have been brought against varying numbers of defendants who subscribed for shares in Fairfield Sentry and then subsequently redeemed their shares. In the first series of clawback actions Fairfield Sentry seeks to recover redemption monies paid to all redeemers in each month between September 2003 and March 2004,[4] and so generally speaking there are multiple defendants to those early clawback actions[5] who face a claim for the redemption proceeds paid to them in the particular month in question. In the later clawback actions Fairfield Sentry seeks to recover all redemption monies paid to individual redeemers over many years, and so there is generally only one defendant to the later clawback actions. For example, in action 20/2011 one of the M&C

---

[3] Tab 17 of Core Bundle 1 contains correspondence showing the notifications to the defendants and their responses (where received).
[4] With one clawback action covering one month
[5] There are approximately 30 defendants to each one

Defendants, Credit Suisse London Nominees Ltd. ("CSLN"), is the only defendant, but Fairfield Sentry seeks to recover the sum of US$803,962,073 representing all redemption monies paid to CSLN between January 1997 and October 2008[6].

8.    The claim by Fairfield Sentry in each clawback action is identical[7] and is based on an alleged mistake in the calculation of the Net Asset Value ("NAV") of the shares redeemed by the defendants. Fairfield Sentry's Articles of Association[8] ("the Articles") stipulated that the price at which the shares were to be redeemed by shareholders should be calculated with reference to the NAV of Fairfield Sentry, and the Articles also set out detailed provisions about how the NAV was to be calculated[9].

9.    Fairfield Sentry alleges that the NAV was calculated under a mistake of fact as, unbeknown to Fairfield Sentry, BLMIS was in fact operating a Ponzi scheme and Fairfield Sentry's investments in BLMIS were lost from the date of Fairfield Sentry's investment in BLMIS[10]. Fairfield Sentry alleges that as a result its NAV was at all times a nil or nominal value and so the aggregate redemption sums should have been nil or nominal, with the consequence that the defendants have been unjustly enriched at its expense and that the defendants are liable to make restitution to Fairfield Sentry of the amounts paid to them when they redeemed their shares.

10.    Accordingly, the sole cause of action against the defendants in each of the clawback actions is a claim for unjust enrichment based on an alleged mistake in the calculation of its NAV.

---

[6] This composite claim against CSLN also includes all of the sums claimed against CSLN in the other clawback actions to which CSLN is a defendant.
[7] An example statement of claim in action 30/2010 is at Core Bundle 1 tab 11
[8] Core Bundle 1 tab 1
[9] Article 11
[10] Paragraph 9 of the Statement of Claim in Core Bundle 1 tab 11

11. The PI Defendants have all served Defences and broadly speaking the individual defences taken are similar. By way of example, the Defences filed by the M&C Defendants to date[11] are all in materially the same form and plead 7 different defences, as follows:-

(1) No mistake in the calculation of the NAV: this defence is based on Article 11 of the Articles which (the Defendants say) prevents Fairfield Sentry from alleging that there was a mistake in the calculation in the NAV ("the Article 11 Defence").

(2) The Defendants, by surrendering their shares in Fairfield Sentry, gave good consideration for the redemption proceeds ("the Good Consideration Defence").

(3) Fairfield Sentry assumed the risk of the alleged mistake.

(4) Fairfield Sentry is estopped by its own negligence from asserting any claim in mistake.

(5) The Defendants paid the redemption proceeds to their principals and so are entitled to rely on the defence of ministerial receipt/payment over.

(6) The Defendants changed their position in good faith.

(7) If Fairfield Sentry is entitled to recover anything, it is only entitled to recover the difference between the Redemption Price and the Subscription Price of the shares.

---

[11] The M&C Defendants have filed Defences in 6 of the 7 clawback actions to which they are a party. CSLN's Defence in action 20/2011 is not yet due but will be pleaded in similar terms to the other Defences. CSLN has requested an extension of time for service of its Defence in action 20/2011 until the question of preliminary issues has been resolved (Core Bundle 2 tab 4 p203).

12.    Fairfield Sentry has not served any Replies.

**The proposed preliminary issues**

13.    It is clear from the above that the PI Defendants have a number of different
defences to the claim in mistake brought by Fairfield Sentry, some of which
will require detailed factual investigation and involve complicated issues of
law.  Maples and Calder have estimated[12] that a full trial of all of the issues in
just one of the clawback actions will take between 6 and 7 weeks and very
possibly longer, even with robust case management decisions[13].  The other PI
defendants agree with this estimate.  The M&C Defendants' costs alone of a
full trial are likely to exceed US$2 million.[14]

14.    The clawback actions therefore cry out for the trial of preliminary issues if
suitable preliminary issues can be identified which (i) are potentially
dispositive of all the clawback actions; (ii) can be tried rapidly, (iii) can be
tried at a considerably reduced cost as compared with a full trial, and (iv) will
not cause any material prejudice to the parties by being tried as preliminary
issues.

15.    The PI Defendants have identified 2 preliminary issues which satisfy the
above criteria, namely the Article 11 Defence and the Good Consideration
Defence.

The Article 11 Defence

16.    The Article 11 Defence is based on Article 11 of Fairfield Sentry's Articles
which makes provision for the determination of the NAV.  Article 11(1)

---

[12] Paragraph 17 of Ben Mays' witness statement dated 2 February 2011 (Core Bundle 1 tab 3).
[13] These could include choosing representative sample or lead cases for trial – such as was done in *Ashmore
v British Coal Corporation* [1990] 2 QB 338 and in the *Interest Rate Swaps Litigation* (10 June 1992,
unreported, per Hirst J) – and staying the remainder of the clawback actions.
[14] Paragraph 18 of Mr Mays' witness statement dated 2 February 2011 (Core Bundle 1 tab 3).

provides that the NAV per Share shall be determined by Fairfield Sentry's Directors at the close of business on each Valuation Day and stipulates how the NAV is to be calculated. Article 11(1) then goes on to provide:

> "*Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties.*"

17.    The PI Defendants submit that the elements[15] of the above quoted provision in Article 11(1) were satisfied when the various defendants redeemed their shares in Fairfield Sentry, and that the legal effect of the above provision is to prevent Fairfield Sentry from attempting to go behind, disturb or recalculate the NAV as so determined by the directors of Fairfield Sentry.

18.    If the conditions in Article 11(1) are satisfied, it is a question of pure law whether Article 11(1) has the effect for which the PI Defendants contend. In this regard the existing case law supports the PI Defendants' position. First there is the decision of Rawlins J (as he then was) in the case of *In the Matter of Livingston International Fund Ltd. (In Liquidation)* (unreported, 19 May 2004, BVI High Court of Justice) who held that the liquidators were not entitled to recalculate the NAV once it had been certified by the directors (see paragraphs 20 – 24 and 72 – 85 of the judgment). Second there is the decision of Bell J to the same effect in the Supreme Court of Bermuda in the case of *In the Matter of Stewardship Credit Arbitrage Fund Ltd.* [2008] Bda L.R. 67 (see paragraphs 46 – 51 of the judgment). In addition, the PI Defendants will say that under clause 11(1) of the Articles Fairfield Sentry bore the risk of an overstatement of the NAV in connection with the redemptions and that, in accordance with the principles in *Springwell Navigation Corporation v JP Morgan Chase Bank* [2010] EWCA Civ 1221 (English Court of Appeal) at paragraphs 141 – 171 and *Cassa di Risparmio della Repubblica di San*

---

[15] Leaving aside good faith, as to which see paragraphs 21-22 below

*Marino SpA v Barclays Bank Ltd.* [2011] EWHC 484 (English Commercial Court) at paragraphs 487 – 509, Fairfield Sentry is estopped by contract (*viz.* the terms of Article 11(1)) from asserting that the NAV was incorrectly calculated.

19.  The above cases provide strong support for the PI Defendants' submission that the resolution of the Article 11 Defence as a preliminary issue is highly likely to bring the clawback actions to a swift end because, if the conditions in Article 11(1) are satisfied, then as a matter of law Fairfield Sentry cannot go behind, disturb or recalculate the NAV as determined by the Directors of Fairfield Sentry.

20.  As regards whether the conditions in Article 11(1) are satisfied, the only relevant dispute between the parties is whether or not certificates as to the NAV within the meaning of Article 11(1) were given by or on behalf of Fairfield Sentry's Directors.  This is a very narrow dispute which can be easily resolved simply by the Court examining examples of the relevant documentation and other material promulgated by or on behalf of Fairfield Sentry's Directors and deciding whether or not that documentation and other material amounted to the giving of certificates within the meaning of Article 11(1).  The documentation and material in question is not extensive and is identified in paragraph 16 of Mr Kite's witness statement dated 8 March 2011[16].  If any oral evidence is necessary at all it will necessarily be brief given the limited dispute between the parties.

21.  In their applications for preliminary issues[17], the Harneys Defendants have correctly made it clear that the trial of the preliminary issues in relation to the Article 11 Defence will not require this Court to make any finding about whether or not Fairfield Sentry's Directors in fact acted in good faith for the

---

[16] Core Bundle 1 tab 7
[17] For example at Core Bundle 1 tab 6

purposes of Article 11(1)[18]. This is because, for the following reasons, it does not matter in the present context whether or not the Directors acted in good faith:

(1) if the Directors did not act in good faith then Fairfield Sentry's claim must necessarily fail because a claim in mistake can only succeed if the payor was genuinely mistaken (and so acted in good faith); further and in any event, Article 11(1) is not to be construed as enabling Fairfield Sentry to rely on its own bad faith in order to defeat what would otherwise be a good defence under Article 11(1)[19];

(2) if (as Fairfield Sentry must be taken to allege and therefore this Court should assume for the purposes of the argument) the Directors did act in good faith, then the only issues to be determined for the purposes of the Article 11 Defence are whether certificates within the meaning of Article 11(1) were given by or on behalf of the Directors and, if so, whether Article 11(1) provides a complete defence to the claim.

22.    So, and assuming the Article 11(1) Defence is a good one, the PI Defendants will win whether or not Fairfield Sentry's Directors acted in good faith. If the Directors acted in bad faith the PI Defendants win under paragraph 21(1) above.    If the Directors acted in good faith the PI Defendants win under paragraph 21(2) above.    In these circumstances, the PI Defendants submit that the Court should not make any findings in relation to good faith, which is not relevant for the purposes of the trial of the proposed preliminary issues in relation to the Article 11 Defence.    There is no need for the Court to do so, and an examination of this issue would involve substantial disclosure and oral evidence, requiring a much longer trial.

---

[18] The PI Defendants have not admitted in their Defences that Fairfield Sentry acted in good faith.
[19] By analogy with the cases which hold that it is a general principle of contractual construction that the parties intended that neither should be able to rely on his own breach of duty to obtain a benefit under a contract – for a recent review of the authorities in this area see per Vos J in *Extra MSA Services Cobham Ltd. v Accor UK Economy Hotels Ltd.* [2011] EWHC 775 (Ch) at paras. 23 - 34.

23.    Accordingly, the criteria set out in paragraph 14 above are clearly satisfied.
The Article 11 Defence is suitable to be taken as a preliminary issue and will
potentially be dispositive of all of the clawback actions.  The Article 11
Defence can be tried rapidly[20] and the PI Defendants estimate that it will only
take between 3 – 4 days to try.  The cost of trying the Article 11 Defence will
be considerably less than the cost of a full trial.  Further, none of the parties
will suffer any material prejudice if the trial of the Article 11 Defence is tried
as a preliminary issue: the stay of the remaining issues in the clawback actions
will be relatively short and, in the event that the defendants lose the trial of the
preliminary issues, the time and cost will not have been wasted because these
issues have to be tried anyway and the trial of the remaining issues will be
commensurately shorter.

24.    In addition to that, the BVI court is obviously best placed to decide these
preliminary issues as they are matters of BVI law.  Some of the PI Defendants
are facing claims against them by Fairfield Sentry in New York as well as the
BVI, but not all of the PI Defendants are facing claims in New York.  For
example, none of the M&C Defendants are facing claims in New York or in
any jurisdiction other than the BVI. Further, Fairfield continues to file claims
in the BVI, the latest manifestation being the new claim brought against
CSLN in this Court in action 20/2011 on 11 March 2011 in which Fairfield
Sentry claims in excess of US$800 million from CSLN.  These claims cannot
be left hanging over the PI Defendants' heads for any longer than is absolutely
necessary.  Having chosen to litigate these claims in the BVI, it is incumbent
on Fairfield Sentry to cooperate in achieving as swift a resolution of the
claims in the BVI as possible.  This is so irrespective of what claims Fairfield

---

[20] The PI Defendants have proposed a timetable to bring the preliminary issues on for trial in June of this
year.  This timetable, of which Fairfield Sentry has been on notice since 2 February, is realistic and
achievable.

Sentry is bringing against the PI Defendants in other jurisdictions.[21] The proposed preliminary issues will have to be addressed by the BVI Court at some stage. Because they are questions of BVI law, it is best for the BVI Court to address these issues before they fall to be considered by Courts in other jurisdictions.

25.    Further, a ruling on the proposed preliminary issues will, as a matter of BVI law, create a *res judicata* or issue estoppel as between the parties which is likely to have the beneficial effect of saving time and costs being expended in related litigation in other jurisdictions. This Court's ruling on the proposed preliminary issues will also bring certainty in early course so that the parties know where they stand. This will bring obvious commercial benefits to all parties. In short, the ordering of the trial of the proposed preliminary issues will be entirely in accordance with the Overriding Objective of dealing with cases justly, proportionately, expeditiously and saving expense.

26.    In its evidence[22] (which was served over one month late[23]) Fairfield Sentry's sole objection[24] to the Article 11 Defence being taken as a preliminary issue is the contention that the liquidators are not satisfied that they are currently in a position to provide full disclosure in relation to the Article 11 Defence because they have been unable to obtain all the documents that they require from Citco, it might take them several more months to do so and it will involve them in a lot of work. Aside from the fact that, on its face, this supposed objection could at the very most only provide Fairfield Sentry with

---

[21]. One of the most recently issued claims, action 19/2011, is a claim against a Harneys Defendant, Martello Nominees Ltd ('MNL'), for US$62.6 million. Having discontinued proceedings issued against MNL in New York, and having chosen not to pursue an action threatened against MNL in Guernsey, Fairfield Sentry has finally decided to bring its claims against MNL in the BVI. MNL has accepted service of the BVI proceedings.

[22] Third witness statement of Kenneth Krys dated 8 April 2011 (Mr Krys has filed witness statements in materially identical terms in response to all the PI Defendants' applications for the trial of preliminary issues). Core Bundle 1 tab 16.

[23] Maples and Calder gave Forbes Hare an extension of time until 4 March 2010 to serve evidence on behalf of Fairfield Sentry. No evidence was served by Forbes Hare until 8 April 2011, and even then no explanation or excuse was given for the long delay.

[24] Paragraphs 10 and 13 of Mr Krys' third witness statement. Core Bundle 1 tab 16.

grounds to argue that a longer period should be given for disclosure (rather than providing Fairfield Sentry with the basis for a wholesale objection to the Article 11 Defence being taken as a preliminary issue), in fact Fairfield Sentry's point on disclosure is a bad one for the following reasons:-

(1) As Mr Krys correctly acknowledges in the final sentence of paragraph 7 of his third witness statement, the issue for Article 11 purposes is what documents have been provided to the defendants. Those documents are narrow in scope, they are common to all of the defendants (the documents are basically in standard form, although there may be some minor variations in the form and content of documents given to the various defendants) and, importantly, they have been specifically identified in paragraph 16 of Mr Kite's witness statement dated 8 March 2011. So the key disclosure on this issue is in fact going to be disclosure given by the defendants rather than by Fairfield Sentry.

(2) The issue for disclosure purposes therefore turns on what documents were supplied to the defendants rather than what documents Citco may have or what efforts Fairfield Sentry may or may not be going to make in order to obtain documents from Citco. The disclosure to be given will not be extensive as the categories of documents are limited.

(3) Fairfield Sentry has provided no explanation to support its claim that it needs to review every one of the 500,000[25] pages of documentation referred to by Mr Krys in paragraph 9 of his third witness statement in order to comply with its disclosure obligations for the purposes of the Article 11 Defence. This is no more than scaremongering on the part of Fairfield Sentry. Once the issue is properly understood, it is clear that Fairfield Sentry's disclosure obligations are not nearly as great as Mr Krys would suggest.

---

[25] The existence of these 500,000 pages gives a good indication of just how long and complicated a full trial will be (in particular as regards the issues of knowledge and negligence) and why the trial of the proposed preliminary issues is so important in the context of the overall litigation and the overriding objective.

(4) There is no reason why Fairfield Sentry should not be able to comply with its disclosure obligations in the timeframe put forward by the PI Defendants. Apart from saying that a substantial production of documents was received in March 2011, Mr Krys does not say when the 500,000 pages were received, or how they were organized, or what work has already been done on them. Fairfield Sentry has been aware of the Article 11 Defence from the outset of the litigation (it is referred to in its evidence and skeleton argument for permission to serve the proceedings outside the jurisdiction[26]) and Fairfield Sentry has been aware since 4 February of the application to have the Article 11 Defence heard as a preliminary issue. Fairfield Sentry has therefore had plenty of time to analyse the relevant documents. Accordingly, any extra time which the Court may see fit to give Fairfield Sentry for disclosure should be strictly limited and should not be allowed to hold up the trial of the preliminary issues on the Article 11 Defence.

(5) On any view, Fairfield Sentry's point on disclosure does not justify rejecting the PI Defendants' application for the trial of preliminary issues in relation to the Article 11 Defence. Moreover, Fairfield Sentry has provided no other reason at all as to why the Article 11 Defence should not be taken as a preliminary issue.

27.    The PI Defendants accordingly invite the Court to order the trial of the following issues in relation to the Article 11 Defence:-

"(1) Whether any certificates within the meaning of Article 11(1) of the Claimant's Articles of Association ("the Articles") were given by or on behalf of the Claimant's Directors in connection with the Defendant's redemption of shares in the Claimant ("the Shares").

---

[26] See paragraphs 24 – 27 of Mr Mays' witness statement in Core Bundle 1 tab 3 where the relevant passage from Fairfield Sentry's skeleton argument is set out.

*(2) Whether Article 11(1) of the Articles provides the Defendant with a complete defence to the claims brought by the Claimant in this action based on contractual allocation of risk and/or contractual estoppel."*

The Good Consideration Defence

28.    The criteria identified in paragraph 14 above are also satisfied as regards the second proposed preliminary issue, the Good Consideration Defence. The Good Consideration Defence does not involve any disputed issues of fact. It is an issue of pure law. If decided in the Defendants' favour it will bring an end to all of the clawback actions.

29.    The PI Defendants state that, for the purposes of the Good Consideration Defence, irrespective of the NAV per share, by surrendering their shares in Fairfield Sentry the PI Defendants gave good consideration for Fairfield Sentry's payment of the redemption price for the shares, and that this provides a complete defence to Fairfield Sentry's claims in all of the clawback actions. In this regard the PI Defendants will rely on *Barclays Bank Ltd. v W.J. Simms Son & Cooke (Southern) Ltd.* [1980] QB 677 at 695 and subsequent cases (see also *Goff & Jones, The Law of Restitution* 7th edition (2007) at Chapter 41).

30.    The PI Defendants emphasise that this proposed preliminary issue is a very narrow one. They do not ask the Court to re-calculate the NAV per share of Fairfield Sentry. That exercise would not be suitable for a trial of preliminary issues[27] and will not be necessary if the PI Defendants succeed on either of the proposed preliminary issues[28]. They only invite the Court to decide whether the surrender of the shares, as bundles of rights, was good consideration whatever the NAV per share may have been.

---

[27] Moreover, the Article 11 Defence proceeds on the basis that it is not permissible to re-calculate the NAV per share.
[28] Nor do the PI Defendants ask the Court to determine in the trial of the preliminary issues whether good consideration was given in any other way, such as by the surrender of a right to claim rescission of their original subscriptions.

14

31.    The resolution of the Good Consideration Defence can be measured in terms of hours (rather than days) and so can be easily accommodated in the 3-4 day estimate for the trial of the preliminary issues referred to above.

32.    The sole objection[29] taken by Fairfield Sentry to the Good Consideration Defence being tried as a preliminary issue is that whichever party loses on the issue is likely to appeal and so this would lead to a delay in the trial of the main action and significant additional costs. This objection is misconceived because, if sound, it would mean that no court would ever order the trial of a preliminary issue for fear of an appeal by the losing party. The reality is that the Good Consideration Defence is likely to be the subject of an appeal whether or not it is tried as a preliminary issue (which could be concluded by this summer) or as part of the main action (in which case it will take between 18 and 24 months to conclude). If the PI Defendants win the Good Consideration Defence as a preliminary issue considerable time and costs will have been saved as compared to a full trial. If Fairfield Sentry wins the Good Consideration Defence as a preliminary issue, then the only downside is, at the very most, the risk of a relatively small delay in the main trial. The balance is clearly in favour of taking the Good Consideration Defence as a preliminary issue.

33.    The PI Defendants accordingly invite the Court to order the trial of the following issue in relation to the Good Consideration Defence:-

"*Whether, irrespective of the Net Asset Value per share, the Defendant, by surrendering the Shares, gave good consideration for the Claimant's payment of the redemption Price thereof, and if so, whether this constitutes a complete defence to the claim.*"

---

[29] Paragraph 15 of Mr Krys' Third Witness Statement. Core Bundle 1 tab 16.

## Proposed directions for the trial of the preliminary issues

34.    The PI Defendants are concerned to ensure that the preliminary issues are tried as leanly, efficiently and as quickly as possible and that there is no unnecessary duplication of effort or cost.

35.    Various of the PI Defendants have issued applications for the trial of preliminary issues in 8 out of the 15 clawback actions[30], namely action nos. 357/2009, 404/2009, 425/2009, 5/2010, 15/2010, 30/2010, 153/2010 and 20/2011.

36.    There are a number of defendants in these 8 clawback actions who have not issued applications for the trial of preliminary issues.[31]  There are also 7 clawback actions in which no applications for the trial of preliminary issues have (yet) been issued.  These are action nos. 336/2009, 9/2011, 10/2011, 18/2011, 19/2011, 21/2011 and 22/2011.

37.    The PI Defendants accordingly invite the Court to order the trial of preliminary issues in those 8 actions where applications have been issued[32]. The effect of such an order will be to bind all parties[33] to those 8 actions to the Court's order on the trial of the preliminary issues, thus (under BVI law) creating a *res judicata* and/or issue estoppel between Fairfield Sentry and all defendants in these 8 clawback actions.

---

[30] See Appendix 5 to this skeleton.
[31] Although, as noted above, no defendant opposes the trial of preliminary issues. Those defendants who have been served with proceedings have been notified of these applications by the PI Defendants, but either have chosen not to appear or have indicated that they may appear on the hearing on 18 April and support the preliminary issues (eg Farara Kerins at Core Bundle 1 tab 17, penultimate page ).
[32] Although there will be the trial of preliminary issues in 8 actions simultaneously, the issues and the documents for each action are the same and so in practice the trials can easily be accommodated in the 3-4 day time estimate for trial.
[33] This is so whether or not a particular defendant has issued an application for the trial of preliminary issues or whether or not any particular defendant chooses to participate in the trial of preliminary issues. See by way of analogy the directions given by the English Court of Appeal in *Jafari-Fini v Skillglass Ltd.* [2005] EWCA Civ. 356 at paras. 58 and 60.

16

38.    The PI Defendants also invite the Court to stay[34] pending the resolution of the
preliminary issues (i) the remaining issues in the 8 clawback actions where
applications for the trial of preliminary issues have been made, (ii) the
remaining 7 clawback actions, (iii) any future clawback actions which might
be issued between now and the resolution of the preliminary issues, and (iv)
any present or future clawback actions issued by Fairfield Sigma or Fairfield
Lambda[35].

39.    As regards those 7 clawback actions where no applications for the trial of
preliminary issues have been made,  the parties to those actions will be bound
by the results of the preliminary issues in the 8 clawback actions in
accordance with the principle in *Wytcherley v Andrews* (1871) LR 2 P&D
327, namely that if a person, knowing what was happening in litigation, is
content to stand by and see his battle fought by somebody else in the same
interest he should be bound by the result and not be allowed to reopen the
case.    This principle is founded on justice and common sense and is of
universal application – see *Nana Ofori Atta II v Nana Abu Bonsra II* [1958]
AC 95 at 102 (PC) and *House of Spring Gardens v Waite* [1991] 1 QB 241
(English Court of Appeal).  The PI Defendants also refer to *Ashmore v British
Coal Corporation* [1990] 2 QB 338 at 348 - 349 where the English Court of
Appeal held that it was an abuse of process for parties in cases not chosen as
the lead or sample cases to re-litigate the issues decided by the court in the
lead/sample cases.

40.    That leaves open the question of who, apart from Fairfield Sentry, should
participate in the trial of the preliminary issues.  In principle all defendants in
the 8 clawback actions should have a right to be heard on the trial of the
preliminary issues.  However it is plainly unnecessary that they should all
participate.  There will inevitably be considerable and unnecessary duplication

---

[34] Under CPR Part 26.1(2)(q).
[35] Fairfield Sigma and Fairfield Lambda were sister funds of Fairfield Sentry with materially identical
Articles of Association to those of Fairfield Sentry.  The proposed preliminary issues are equally applicable
to any clawback actions by Fairfield Sigma and Fairfield Lambda.

of effort and costs if all defendants participate, and the trial of the preliminary issues would become far too unwieldy and expensive. This must be avoided at all costs.

41.    So far as the PI Defendants are concerned, unnecessary duplication can be avoided by sensible co-operation between the legal teams, who are themselves each representing a number of different defendants. Such co-operation has already occurred, for example, in the preparation of this skeleton argument. The lawyers for the PI Defendants propose to work together closely to ensure that as much time and money as possible can be saved.

42.    As regards directions for bringing the preliminary issues to trial, in their application notice dated 2 February 2011 the M&C Defendants proposed directions which would have resulted in the matter being ready for trial by 13 June 2011. Fairfield Sentry has been on notice of these directions since 2 February and, although there has been a delay in obtaining a hearing date for this hearing, a trial date in June 2011 is still achievable. The PI Defendants have accordingly proposed a fresh timetable[36] which is designed to ensure the parties are ready for the trial of the preliminary issues by June 2011.


**Dominic Chambers QC**
**Arabella di Iorio**
For the M&C Defendants

**David Lord QC**
**Robert Foote**
**Claire Goldstein**
For the Ogier Defendants

**Mark Hapgood QC**
**Phillip Kite**
**Kissock Laing**

---

[36] In CSLN's application notice dated 28 March 2011 in action 20/2011 which is the same as the timetable proposed by the Harneys Defendants in their application notice dated 8 March 2011.

18

For the Harneys Defendants

**Lord Falconer QC**
**Paul Webster QC**
**Nadine Whyte**
For the O'Neal Defendants

# APPENDIX 1

| Action Number | M&C Defendant[37] | Claim (US$) |
|---|---|---|
| (1)  336/2009 | - | - |
| (2)  357/2009 | Credit Suisse (Luxembourg) SA | 7,649,001 |
| (3)  404/2009 | Credit Suisse (Luxembourg) SA<br>Credit Suisse London Nominees Ltd | 100,002<br>519,354 |
| (4)  425/2009 | Credit Suisse London Nominees Ltd<br>Credit Suisse AG Nassau Branch<br>Credit Suisse Nominees (Guernsey) Ltd<br>Credit Suisse (Luxembourg) SA | 782,706<br>24,966<br>392,413<br>350,002 |
| (5)  005/2010 | Credit Suisse Nominees (Guernsey) Ltd<br>Credit Suisse (Luxembourg) SA | 392,413<br>179,997 |
| (6)  015/2010 | Credit Suisse (Luxembourg) SA | 499,996 |
| (7)  030/2010 | Credit Suisse London Nominees Ltd<br>Buckmore Nominees Ltd | 1,994,006<br>680,216 |
| (8)  153/2010 | - | - |
| (9)  009/2011 | - | - |
| (10) 010/2011 | - | - |
| (11) 018/2011 | - | - |
| (12) 019/2011 | - | - |
| (13) 020/2011 | Credit Suisse London Nominees Ltd | 803,962,073 |
| (14) 021/2011 | - | - |
| (15) 022/2011 | - | - |

---

[37] The M&C Defendants here listed are companies in the Credit Suisse Group of companies (Credit Suisse London Nominees Ltd. and Buckmore Nominees have formally applied for the trial of preliminary issues, but all of the Credit Suisse defendants support the application). In addition, Maples and Calder act for a number of other defendants who also support the application for preliminary issues.

## APPENDIX 2

| Action Number | Ogier Defendant | Claim (US$) |
|---|---|---|
| (1)  336/2009 | - | - |
| (2)  357/2009 | EFG Bank SA | 210,928 |
|  | SG Private Banking (Suisse) SA | 188,201 |
|  | Barclays Bank (Suisse) SA | 268,886 |
|  | ZCM Asset Management Holding | 20,000 |
| (3)  404//2009 | Lombard Odier Darier Hentsch & Cie | 287,176 |
|  | SG Private Banking (Suisse) SA | 143,325 |
|  | Merrill Lynch Bank (Suisse) SA | 366,607 |
|  | BankMed (Suisse) SA | 47,755 |
|  |  | 51,597 |
|  | Barclays Bank SA | 301,681 |
|  | Zeban Nomines Ltd | 270,598 |
|  | ZCM Asset Management Holding | 135,003 |
|  | Hyposwiss Private Bank Geneve SA | 74,309 |
| (4)  425/2009 | Lombard Odier Darier Hentsh & Cie | 558,792 |
|  | Mirabaud & Cie | 648,942 |
|  | Merrill Lynch Bank (Suisse) SA | 2,915,887 |
| (5)  005/2010 | BankMed (Suisse) SA | 76,167 |
|  | ZCM Asset Management Holding | 1,400,002 |
|  | Hyposwiss Private Bank Geneve SA | 35,440 |
|  | Banco Santander (Suisse) SA | 1,757,938 |
| (6)  015/2010 | Pictet & Cie | 109,488 |
|  | Merrill Lynch Bank (Suisse) SA | 60,003 |
|  | BankMed (Suisse) SA | 60,912 |
|  | ZCM Asset Management Holding | 75,000 |
| (7)  030/2010 | EFG Bank SA | 82,597 |
|  | EFG Bank European Financial Group SA | 25,245 |
|  | Pictet & Cie | 39,996 |
|  | SG Private Banking (Suisse) SA | 367,647 |
|  | BankMed (Suisse) SA | 167,138 |
|  | Barclays Bank (Suisse) SA | 49,529 |
|  | Banque de Commerce et de Placements | 132,156 |
| (8)  153/2010 | - | - |

| | | |
|---|---|---|
| (9)  009/2011 | Trincastar Corp. | 11,311,799 |
| (10) 010/2011 | - | - |
| (11) 018/2011 | - | - |
| (12) 019/2011 | - | - |
| (13) 020/2011 | - | - |
| (14) 021/2011 | - | - |
| (15) 022/2011 | - | - |

# APPENDIX 3

| Action Number | Harneys Defendant[38] | Claim (US$) |
|---|---|---|
| (1) 336/2009 | - | - |
| (2) 357/2009 | Bank Julius Baer & Co Ltd | 1,792,705 |
| | Quilvest Finance Ltd | 831,066 |
| | SNS Global Custody BV | 26,404 |
| (3) 404/2009 | Bank Julius Baer & Co Ltd | 504,505 |
| | Caja de Ahorros y Monte de Piedad de Madrid | |
| | | 2,181,060 |
| | Deutsche Bank (Suisse) SA | 209,255 |
| | Lloyds TSB Bank | 1,715,405 |
| | Quilvest Finance Ltd | 578,079 |
| | SNS Global Custody BV | 119,437 |
| (4) 425/2009 | Bank Julius Baer & Co Ltd | 149,995 |
| | SNS Global Custody BV | 179,498 |
| | Quilvest Finance Ltd | 1,374,582 |
| | Deutsche Bank (Suisse) SA | 499,997 |
| (5) 005/2010 | Bank Julius Baer & Co Ltd | 363,980 |
| | SNS Global Custody BV | 157,028 |
| | Quilvest Finance Ltd | 4,972,325 |
| | ABN AMRO Fund Services (Isle of Man) Nominees Ltd | |
| | | 750,000 |
| | The Public Institution for Social Security | 20,000,000 |
| (6) 015/2010 | Bank Julius Baer & Co Ltd | 1,149,471 |
| | SNS Global Custody BV | 136,154 |
| | Quilvest Finance Ltd | 114,013 |
| | Martello Nominees Ltd | 2,569,047 |
| | Deutsche Bank Trust Company Americas | 435,990 |
| (7) 030/2010 | Bank Julius Baer & Co Ltd | 1,491,199 |
| | SNS Global Custody BV | 770,617 |
| | Lloyds TSB Bank | 486,763 |
| | Martello Nominees Ltd | 700,001 |
| | ABN AMRO Fund Services (Isle of Man) Nominees Ltd | |

---

[38] Two of the Harneys Defendants listed here (the Public Institution for Social Security and Atlantic Alternative Fund Ltd.) were only served with proceedings comparatively recently and so have not issued applications for the trial of preliminary issues.

|      |          |                              |            |
|------|----------|------------------------------|------------|
|      |          |                              | 2,000,002  |
| (8)  | 153/2010 | Wise Global Fund Ltd         | 5,947,229  |
| (9)  | 009/2011 | -                            | -          |
| (10) | 010/2011 | Atlantic Alternative Fund Ltd| 1,366,389  |
| (11) | 018/2011 | -                            | -          |
| (12) | 019/2011 | Martello Nominees Ltd        | 62,655,842 |
| (13) | 020/2011 | -                            | -          |
| (14) | 021/2011 | -                            | -          |
| (15) | 022/2011 | -                            | -          |

## APPENDIX 4

| Action Number | O' Neal Webster Defendants | Claim (US$) |
|---|---|---|
| (1)  336/2009 | - | - |
| (2)  357/2009 | - | - |
| (3)  404/2009 | - | - |
| (4)  425/2009 | UBS (Cayman Islands) Ltd | 199,997.05 |
| | UBS AG New York | 763,907.21 |
| | UBS (Cayman) Limited | 1,999,999.19 |
| (5)  005/2010 | UBS AG New York | 559,246.21 |
| | UBS (Cayman) Limited | 500,003.62 |
| (6)  015/2010 | UBS (Luxembourg) SA | 38,597.39 |
| (7)  030/2010 | UBS (Cayman) Limited | 2,000,002.00 |
| | UBS (Luxembourg) SA | 38,791.78 |
| (8)  153/2010 | - | - |
| (9)  009/2011 | - | - |
| (10) 010/2011 | - | - |
| (11) 018/2011 | - | - |
| (12) 019/2011 | - | - |
| (13) 020/2011 | - | - |
| (14) 021/2011 | - | - |
| (15) 022/2011 | - | - |

# APPENDIX 5

| Action No | Defendant/Applicant | | Law Firm |
|---|---|---|---|
| 357/2009 | (11) | EFG Bank SA | Ogier |
| | (15) | Quilvest Finance Limited | Harneys |
| | (18) | SG Private Banking (Suisse) SA | Ogier |
| 404/2009 | (8) | Caja de Ahorros y Monte de Piedad de Madrid | Harneys |
| | (16) | Deutsche Bank (Suisse) SA | Harneys |
| | (24) | SG Private Banking (Suisse) SA | Ogier |
| | (31) | Lombard Odier Darier Hentsch & Cie | Ogier |
| 425/2009 | (7) | UBS (Cayman Islands) Ltd | O'Neal Webster |
| | (13) | UBS AG New York | O'Neal Webster |
| | (15) | Lombard Odier Darier Hentsch & Cie | Ogier |
| | (19) | UBS (Cayman) Limited | O'Neal Webster |
| | (21) | Mirabaud and Cie | Ogier |
| 5/2010 | (4) | SNS Global Custody BV | Harneys |
| | (13) | UBS AG New York | O'Neal Webster |
| | (21) | UBS (Cayman) Limited | O'Neal Webster |
| 15/2010 | (16) | Pictet & Cie | Ogier |
| | (20) | UBS (Luxembourg) SA | O'Neal Webster |
| | (22) | Deutsche Bank Trust Company Americas | Harneys |
| 30/2010 | (1) | Bank Julius Baer & Co Ltd | Harneys |
| | (5) | EFG Bank SA | Ogier |
| | (7) | Credit Suisse London Nominees Ltd | Maples and Calder |
| | (10) | Lloyds TSB Bank | Harneys |
| | (11) | Martello Nominees Limited | Harneys |
| | (20) | ABN AMRO Fund Services (Isle of Man) Nominees Ltd | Harneys |
| | (23) | EFG Bank European Financial GR Switzerland | Ogier |
| | (25) | Buckmore Nominees Limited | Maples and Calder |
| | (26) | UBS (Cayman) Limited | O'Neal Webster |
| | (27) | Pictet & Cie | Ogier |
| | (30) | SG Private Banking (Suisse) SA | Ogier |
| | (34) | UBS (Luxembourg) SA | O'Neal Webster |
| 153/2010 | Wise Global Fund Limited | | Harneys |
| 20/2011 | Credit Suisse London Nominees Limited | | Maples and Calder |