# EXHIBIT L

# Her Majesty in Council

## ON APPEAL

### From the Eastern Caribbean Supreme Court
### In the Court of Appeal Territory of the Virgin Islands

Consolidated High Court Civil Appeals No's. 41-52, 54-56, 58-61 and 62 of 2011
(Claim No's BVIHC(COM) 357/2009, 404/2009, 425/2009, 5/2010, 15/2010,  30/2010, 153/2010 & 20/2011)

**BETWEEN:**

**1) QUILVEST FINANCE LIMITED (appeal no. 41)**
**2) CAJA DE AHORROS Y MONTE DE PIEDAD DE MADRID (appeal no. 42)**
**3) DEUTSCHE BANK (SUISSE) SA (appeal no. 42)**
**4) SNS GLOBAL CUSTODY BV (appeal no. 43)**
**5) DEUTSCHE BANK TRUST COMPANY AMERICAS (appeal no. 44)**
**6) BANK JULIUS BAER & CO LIMITED (appeal no. 45)**
**7) LLOYDS TSB BANK (appeal no. 45)**
**8) MARTELLO NOMINEES LIMITED (appeal no. 45)**
**9) ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED (appeal no. 45)**
**10) WISE GLOBAL FUND LIMITED (appeal no. 46)**
**11) LOMBARD, ODIER, DARIER, HENTSCH & CIE (appeals no. 47 & 48)**
**12) MIRABAUD & CIE (appeal no. 47)**
**13) SG PRIVATE BANKING (SUISSE) SA (appeals no. 48, 49 & 50)**
**14) EFG BANK SA (appeals no. 49 & 50)**
**15) EFG BANK EUROPEAN FINANCIAL GROUP SA (appeal no. 49)**
**16) PICTET & CIE (appeals no. 49 & 51)**
**17) CREDIT SUISSE LONDON NOMINEES LIMITED (appeals no. 52, 54, 55 & 56)**
**18) BUCKMORE NOMINEES LIMITED (appeal no. 54)**
**19) UBS AG NEW YORK (appeals no. 58 & 60)**
**20) UBS (CAYMAN) LIMITED (appeals no. 58 & 59)**
**21) UBS (CAYMAN ISLANDS) LIMITED (appeal no. 60)**
**22) UBS (LUXEMBOURG) LIMITED (appeals no. 59 & 61)**
*Appellants in Appeals 41-52, 54-56 & 58-61/ Respondents in Appeal no. 62*

**-and -**
**FAIRFIELD SENTRY LIMITED**
**(in Liquidation)**
*Respondent in Appeals No. 41-52, 54-56 & 58-61/Appellant in Appeal no. 62*

**APPEALS AGAINST THE DECISION OF THE COURT OF APPEAL OF THE EASTERN
CARIBBEAN SUPREME COURT DATED 13 JUNE 2012**

# RECORD OF PROCEEDINGS

# Volume 3

**Agents for the Parties.**

| | |
|---|---|
| **MACFARLANES LLP** | **BLAKE LAPTHORN LLP** |
| **20 Cursitor Street** | **Watchmaker Court** |
| **London EC4A 1LT** | **33 St. John's Lane** |
| | **London EC1M 4DB** |
| **London agents for Forbes Hare** | **London agents for Ogier Solicitors** |
| **Representing Fairfield Sentry Limited** | **Representing** |
| **(in Liquidation)** | **11th–16th Appellants** |

| | |
|---|---|
| **HERBERT SMITH FREEHILLS LLP** | **LATHAM & WATKINS (LONDON) LLP** |
| **Exchange House** | **99 Bishopsgate** |
| **Primrose Street** | **London** |
| **London EC2A 2EG** | **EC2M 3XF** |
| **London agents for Maples & Calder** | **London Agents for Harney Westwood & Riegels** |
| **Representing** | **Representing** |
| **17th & 18th Appellants** | **1st-10th Appellants** |

**GIBSON, DUNN & CRUTCHER LLP**

**Telephone House**

**2-4 Temple Avenue**

**London EC4Y 0HB**

**London agents for O'Neal Webster**

**Representing**

**19th–22nd Appellants**

**INDEX**

**TO RECORD OF PROCEEDINGS**

| No. | Description of Document | Date | Page No. |
|-----|------------------------|------|----------|

**VOLUME 3**

Transcripts

58.    Transcript of Applications for Trial of the Preliminary Issues    18,20.04.2011    885-1066

THE EASTERN CARIBBEAN COURT

IN THE HIGH COURT OF JUSTICE

VIRGIN ISLANDS

(COMMERCIAL DIVISION)

CLAIM NO. BVIHC (COM) 357/2009
FAIRFIELD SENTRY LIMITED (In Liquidation)
AND
ALFREDO MIGANI & 22 OTHERS

CLAIM NO. BVIHC (COM) 404/2009
FAIRFIELD SENTRY LIMITED (In Liquidation)
AND
BANCO GENERAL SA/BANCA PRIVADA & 30 OTHERS

CLAIM NO. BVIHC (COM) 425/2009
FAIRFIELD SENTRY LIMITED (In Liquidation)
AND
JULIAS BAER & CO LIMITED & 26 OTHERS

CLAIM NO. BVIHCV (COM) 5/2010
FAIRFIELD SENTRY LIMITED (In Liquidation)
AND
BANK JULIUS BAER & CO LIMITED & 26 OTHERS

CLAIM NO. BVIHC (COM) 15/2010
FAIRFIELD SENTRY LIMITED (In Liquidation)
AND
ARBITRAL FINANCE INC & 23 OTHERS

CLAIM NO. BVIHC (COM) 30/2010
FAIRFIELD SENTRY LIMITED (In Liquidation)
AND
BANK JULIUS BAER & CO LTD & 33 OTHERS

CLAIM NO. BVIHC (COM) 153/2010
FAIRFIELD SENTRY LIMITED (In Liquidation)
AND
WISE GLOBAL FUND LIMITED

CLAIM NO. BVIHC (COM) 20/11
FAIRFIELD SENTRY LIMITED (In Liquidation)
AND
CREDIT SUISSE LONDON NOMINEES LIMITED

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

## TRANSCRIPT OF CHAMBERS PROCEEDINGS

Monday, 18th April, 2011
10:11 a.m. to 2:25 p.m.

BEFORE:   HON. MR. JUSTICE EDWARD BANNISTER, Q.C., Judge

Government of the British Virgin Islands
Court Reporting Unit
Road Town, Tortola
British Virgin Islands

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

```
APPEARANCES:              FORBES HARE
                          Chambers
                          Road Town, Tortola
                          British Virgin Islands
                          BY:  MR. MICHAEL GADD and
                          MR. WILLIAM HARE
                          On behalf of the Claimant

                          MAPLES AND CALDER
                          Chambers
                          Road Town, Tortola
                          British Virgin Islands
                          BY:  MR. DOMINIC CHAMBERS, Q.C.
                          and MS. AREBELLA DI IORIO
                          For the M&C Defendants

                          OGIER
                          Chambers
                          Road Town, Tortola
                          British Virgin Islands
                          BY:  MR. DAVID LORD, Q.C.,
                          and MS. CLAIRE GOLDSTEIN
                          For the Ogier Defendants

                          HARNEY WESTWOOD & RIEGELS
                          Craigmuir Chambers
                          Road Town, Tortola
                          British Virgin Islands
                          BY:  MR. MARK HAPGOOD Q.C.,
                          MR. PHILLIP KITE and
                          MR. KISSOCK LAING
                          For the Harneys Defendants

                          O'NEAL WEBSTER
                          Chambers
                          Road Town, Tortola
                          British Virgin Islands
                          BY:  MR. LORD FALCONER Q.C.,
                          MR. PAUL WEBSTER, Q.C. and
                          MS. NADINE WHYTE
                          For the O'Neal Webster Defendants

                              * * *
```

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

P-R-O-C-E-E-D-I-N-G-S

\* \* \*

(Matter resumes at 10:11 a.m.)

THE CLERK:                    BVIHCV 357 of

2009 - Fairfield Sentry Limited vs. Alfredo Migani, et

al; BVIHCV 404 of 2009 - Fairfield Sentry Limited vs.

Banco General SA/Banca Privada, et al; BVIHCV 425 of

2009 - Fairfield Sentry Limited vs. Bank Julius Baer

and Co. Ltd., et al; BVIHCM 15 of 2010 - Fairfield vs.

Arbitral Finance Inc., et al; BVIHCM 153 of 2010 -

Fairfield Sentry Limited (In Liquidation) vs. Wise

Global Fund Limited; BVIHCM 20 of 2011 - Fairfield

Sentry Limited (In Liquidation) vs. Credit Suisse

London Nominees Limited.

THE COURT:                    Mr. Chambers.

MR. CHAMBERS:                 May it please

Your Lordship, on these applications for the trial of

preliminary issues, I appear with my learned friend,

Ms. di Iorio, for Defendants who are members of the

Credit Suisse Group Companies, and who are represented

by Maples and Calder.

My learned friends, Mr. Lord, Mr. Fay and

Ms. Goldstein, appear for Defendants who are

represented by Ogier.

My learned friends, Mr. Hapgood, Mr. Kite

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

and Mr. Laing, appear for Defendants who are represented by Harneys.

And my learned friends, Lord Falconer, Mr. Webster and Miss Whyte appear for Defendants who are represented by O'Neal Webster.

My learned friends, Mr. Gadd and Mr. Hare, appear for Fairfield Sentry, the Claimant, and the Respondent to these applications.

THE COURT:                Okay.

MR. CHAMBERS:                Your Lordship should have a joint skeleton argument from the Defendants --

THE COURT:                Which I've read.

MR. CHAMBERS:                -- a skeleton argument from Fairfield Sentry --

THE COURT:                Which I've read.

MR. CHAMBERS:                -- two core bundles, two main bundles, two authorities bundles, and the reading list.

THE COURT:                I've looked at some of the authorities.  I've looked at the material I was asked to read in advance.  I haven't looked at anything else.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

MR. CHAMBERS:                My Lord, that's very helpful.

My Lord, the purpose of these applications is to assist Your Lordship in furthering the overriding objective in these actions.  The consequence of the active case management, which we invite Your Lordship to adopt today, will be to ensure that at an early stage these cases are dealt with justly, expeditiously and cost effectively.

My Lord, the starting point is the claims themselves, all of which are in common form.  The Statements of Claim in each of the 15 clawback actions are commendably short, and we have put in Core Bundle 1 an example from Action 30/2010 which Your Lordship has read.  I'm not going to take Your Lordship to that, but I would just note the Statements of Claim in all 15 actions are the same.

THE COURT:                Yes.

MR. CHAMBERS:                The sole claim in each action is a claim for unjust enrichment based on an alleged mistake in the calculation of the net asset value.  And as Your Lordship will have seen from the Defences, the Defendants have taken a number of different defences to that claim, but what we have been able to do is to identify two of those defences as

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

being suitable for the trial of a preliminary issue.

Those two defences have become known as the Article 11

defence --

          THE COURT:           Yes.

          MR. CHAMBERS:          -- and good

consideration defence.

          If I could, first of all, start by taking

Your Lordship to Core Bundle 1 at Tab 1 to show Your

Lordship the terms of Article 11 of Sentry's Articles

of Association.  Your Lordship will find Article 11 on

page 12, and the heading is "Determination Of Net Asset

Value".

          "Net asset value" is defined on page 2,

meaning "the net asset value per Share determined in

accordance with Article 11."

          Article 11(1) is then split up into three

parts.  The first part reads:

          "The Net Asset Value per Share of each

class shall be determined by the Directors as at the

close of business on each Valuation Day or on such

other occasions as may be required by these Articles

and on such other occasions as the Directors may from

time to time determine."

          The second part reads:

          "The Net Asset Value per Share shall be

calculated at the time of each determination by
dividing the value of the net assets of the Fund by the
number of Shares then in issue or deemed to be in issue
and by adjusting for each class of Shares such
resultant number to take into account any dividends,
distributions, assets or liabilities attributable to
such class of Shares pursuant to Paragraph (2) of
Article 4, all determined and calculated as hereinafter
provided."

And then the third part which is the
important part for present purposes:

"Any certificate as to the Net Asset
Value per Share or as to the Subscription Price or
Redemption Price therefor given in good faith by or on
behalf of the Directors shall be binding on all
parties."

So, My Lord, Article 11(1) is split into
three parts. The first part is determination of the
NAV; the second part is the calculation of the NAV, and
the third part provides for the NAV to be binding.

It may be helpful if I just spend a
couple of minutes outlining for Your Lordship the
parameter and natures of the Article 11 Defence.

In our submission, Article 11(1) is
designed to achieve certainty in the NAV as certified



by or on behalf of the Directors.  And the NAV only
ceases to be binding if the Directors have certified
the NAV in bad faith.  In all other cases the NAV is
binding on all parties.  So the shareholders bear the
risk of an understated NAV and Fairfield Sentry bears
the risk of an overstated NAV.  So if, for example, the
NAV was negligently overstated, Fairfield Sentry bore
that risk, and we say the same result follows if the
NAV is overstated as a result of a mistake.  And
similarly, if there had been a negligent understatement
of the NAV or the understatement of the NAV had been as
a result of a mistake, then the Shareholders bore that
risk.

So the purpose of Article 11 is to
achieve commercial certainty and business efficacy, and
that conclusion precisely accords with the approach of
Justice Rawlins in the Livingston International Fund
case, and by Justice Belle in the Stewardship Credit
Arbitrage Fund case, where in both cases it was held
that the NAV could not be recalculated because of
articles which are in similar form to our Article 11.
And, in fact, in the Stewardship Credit Arbitrage Fund
case the relevant article is in materially identical
terms to our Article 11(1).

Now I don't propose to take Your Lordship

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

to those cases, but what we do say is that those cases
provide strong support for our contention that by
taking the Article 11 defence as a preliminary issue,
the clawback actions will come to a swift end.

My Lord, under the Article 11 defence,
the only relevant factual dispute between the parties
is whether or not certificates within the meaning of
Article 11 were given by or on behalf of Fairfield
Sentry's Directors.

Now that is a very narrow, factual
dispute, which is capable of resolution, we say, by the
Court examining a limited number of documents.

Now those documents had been identified
by Mr. Kite in Paragraph 16 of his witness statement.
I'm not going to ask Your Lordship to turn that up,
because my learned friend, Mr. Hapgood, is going to
deal with those documents, because they're his clients'
documents.

THE COURT:                    Right.  That's
very sensible.

MR. CHAMBERS:                 So I'm going to
ask him to take you through those.

But what we do say is that, if Your
Lordship does order the trial of the preliminary issue
in relation to Article 11, there is going to have to be

disclosure of relevant documents on both sides.

Now so far as the Defendants are concerned --

THE COURT:                    I don't want to interrupt unless necessary, but why, if Mr. Kite has already identified these documents -- you, as I understand it, are contending they're sufficient for your purposes.

MR. CHAMBERS:                    My Lord, yes.

THE COURT:                    Why do we need any further disclosure?

MR. CHAMBERS:                    Yes.  What I was going to say is, our disclosure is going to be confined to those five categories of documents.  We don't see the need for any further disclosure.

THE COURT:                    That's all right.  So what about the liquidators?

MR. CHAMBERS:                    Yes, well, what Fairfield Sentry says --

THE COURT:                    So you don't seek disclosure?

MR. CHAMBERS:                    My Lord, what --

THE COURT:                    In your draft order you've got a provision for disclosure two weeks

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

ago.

MR. CHAMBERS:                Yes, My Lord,
that's correct.   Obviously because the application was
issued in February.   But we are saying there would be
disclosure on both sides, and certainly Fairfield
Sentry say that they have documents which are
potentially relevant to the Article 11 issue.

If Your Lordship goes to my learned
friend's skeleton at Paragraph 10, Your Lordship will
see there that Fairfield Sentry identifies classes of
documents which they say are potentially relevant and
they'd like to disclose.   Now they say they can make
that disclosure within 12 weeks.

THE COURT:                Just two
points.   They're saying that they might have documents
which show that although printouts, if I can use that
neutral expression, were generated, they perhaps
weren't generated on behalf of.   That's one of the
points that's raised.

MR. CHAMBERS:                I'm not sure if
that's one of the points.   Yes, I mean, certainly when
Mr. Hapgood takes you to the documents he will show you
the Citco documents and he will show you Fairfield
Greenwich Bermuda documents.

THE COURT:                Well,

Mr. Hapgood will deal with it.

      MR. CHAMBERS:           My Lord, could I then ask Your Lordship to turn to Paragraph 21 of my learned friend's skeleton where he there says in the final paragraph that they suggest, that the liquidators suggest that if a preliminary issue is ordered, then they would require 12 weeks in which to disclose the relevant documents.

      My Lord, what we say is the points taken on disclosure by Fairfield Sentry do not provide any justification for refusing to order a preliminary issue.  The points on disclosure go no further than simply providing a basis perhaps for more leisurely disclosure exercise than that proposed by the Defendants.

      My Lord, moving on from disclosure of documents, we have identified in our joint skeleton why we submit it is appropriate for the Article 11 defence to be taken as a preliminary issue.  And we have set that out into Paragraphs 23 to 25 of our skeleton.

      Could I just ask Your Lordship to keep that open and then take my learned friend's skeleton and go to Paragraph 18 where, what my learned friend says in Paragraph 18 --

      THE COURT:        Right.  Carry

on.

MR. CHAMBERS:                -- is that:

"The Liquidators' contention is that, unless disclosure, inspection and (possibly) exchange of witness statements has taken place, it cannot confidently be determined that this is a suitable case for the determination of preliminary issues."

My Lord, we do not accept that, and we say for the reasons set out in Paragraphs 23 to 25 of our skeleton, those paragraphs make out an overwhelming case for the trial of preliminary issues in relation to Article 11.

My Lord, could I now take Your Lordship to Paragraph 15 of my learned friend's skeleton where in that paragraph he identifies a number of old English cases in support of the contention that Your Lordship should not order the trial of preliminary issues.

My Lord, those cases were decided under the old Rules of the Supreme Court, Order 33. Now, we say that those English cases are not to the point because they were all decided under Order 33, rule 3 which made provision for points of law to be tried as preliminary issues on the basis of assumed facts rather than decided facts.

Now we've had Order 33 copied so Your

Lordship can see the rules under which the English

cases were decided, and as Your Lordship may recall

from practice pre-1999 at the bar, Order 33 contained

two provisions for the trial of preliminary issues.

I could ask Your Lordship to take the

authorities bundle.  That's the Defendant's authorities

bundle.  I'm hoping Your Lordship will find it at Tab

14.

THE COURT:                  I've got it.

Yes, Tab 14.

MR. CHAMBERS:               Tab 14.

THE COURT:                  I suppose

nowadays you can apply for summary judgment.

MR. CHAMBERS:               My Lord, yes.

THE COURT:                  This isn't

particularly helpful.

MR. CHAMBERS:               Well, certainly

nowadays one could apply for summary judgment.

THE COURT:                  So do we need

to go through this?

MR. CHAMBERS:               Well, My Lord,

the difference here, and I'm going to come on to submit

in a moment, what we are going to be asking Your

Lordship to do is to try both the facts and the law as

preliminary issues.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

THE COURT:                    Yes.  Well, I
do see that.

MR. CHAMBERS:                 My Lord, this
is from the Supreme Court Practice 1999, the last
edition before the new English CPR came in.

THE COURT:                    That's right.

MR. CHAMBERS:                 Order 33, if I
can ask Your Lordship to go to page 643 under rule 3:

"The Court may order any question or
issue arising in a cause or matter, whether a fact or
law or partly of fact and partly of law, and whether
raised by the pleadings or otherwise, to be tried
before, at or after the trial of the cause or matter,
and may give directions as to the manner in which the
question or issue shall be stated."

Now in practice, that power was largely
used to try preliminary issues of law --

THE COURT:                    Yes.

MR. CHAMBERS:                 -- based on
assumed facts.  And that is what all of the cases
relied on by Fairfield Sentry were concerned with.
Every single case was a preliminary point of law where
the facts remained to be decided at the trial.

THE COURT:                    You say that's
what went wrong in those cases.



COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

MR. CHAMBERS:                    Yes.

THE COURT:                       Arguably what went wrong.

MR. CHAMBERS:                    My Lord, yes.

If Your Lordship goes over to page 644, Your Lordship will see the commentary, and on the second main paragraph on the page --

THE COURT:                       Yes.

MR. CHAMBERS:                    -- it starts:

"Under this rule the Court has power to try a preliminary question of law at the outset.  Such question may have been raised on the pleadings and may be ordered to be tried on the pleadings or on a case stated or an agreed statement of facts", etc.

THE COURT:                       Yes.

MR. CHAMBERS:                    And then one paragraph down:

"The House of Lords has strongly protested against the practice of the Court of first instance allowing preliminary points of law to be tried before and instead of first finding the facts, since this course frequently adds to the difficulties of Courts of Appeal and tends to increase the cost and time of legal proceedings"...

And there's a reference to Tilling and

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

<u>Whiteman</u>, one of the cases relied on by Fairfield
Sentry.

THE COURT:                Yes.

MR. CHAMBERS:             And then I
don't think I need read anymore of that.

So that was the first power.  The second
power is contained in Order 33, rule 4 which Your
Lordship will find on page 645.

"In every action begun by writ"...

THE COURT:                You could have
gone on to the next paragraph, I suppose, couldn't you?

MR. CHAMBERS:             "Where for the
purposes of deciding questions of law it is necessary
or desirable to ascertain the facts beyond those that
appear in the pleadings, the Court should not order the
trial of those questions as a preliminary point of
law"...

THE COURT:                That's in an
earlier case.  Anyway.

MR. CHAMBERS:             The equivalent
of what we are seeking to do is really the old Order
33, rule 4 on page 645.

THE COURT:                Split trial,
yes.

MR. CHAMBERS:             "In every

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

action begun by writ, an order made on the summons for
directions shall determine the place and mode of the
trial; and any such order may be varied by a subsequent
order of the Court made at or before the trial."

And then 2:   "In any such action
different questions or issues may be ordered to be
tried at different places or by different modes of
trial", and then the important part, "and one or more
questions or issues may be ordered to be tried before
the others."

And if Your Lordship just goes over to
646 --

THE COURT:                    Yes.

MR. CHAMBERS:                 -- in the
commentary, under the Paragraph 33/4/10, "Separate
trials of separate issues", it says:

"Paragraph 2 should be read together with
rule 3," which is what we've just done, "since they
both deal with the general power of the Court to order
the separate trials of separate issues or questions."

And then further down, just a couple of
lines down:

"The main types of orders made under
these rules are (i) the separate trial of a preliminary
point of law," and that's Order 33, rule 3, and then

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

(ii) "the separate trial of preliminary issues or questions," and that's Order 33, rule 4.

THE COURT:                    Yes.

MR. CHAMBERS:                 And then the next paragraph I think we can skip, and then paragraph down one which starts:

"On the other hand, these rules provide the machinery for avoiding"...

THE COURT:                    You say we should skip it, but it does say, "generally speaking, such an order should only be made in exceptional circumstances"...

MR. CHAMBERS:                 But, My Lord, it does say that, indeed, but that's by reference to the old cases.

THE COURT:                    True.

MR. CHAMBERS:                 And what we say is it's the Carl Zeiss Stiftung case which is the modern authority on this, or it's modern of the Rules of the Supreme Court.

"On the other hand, these rules provide the machinery for avoiding the trial of unnecessary issues or questions, by isolating particular issues or questions for separate trial and thus eliminating or reducing delay and expense in the preparation and the

trial of issues or questions which may ultimately never arise for trial or which otherwise warrant being separately tried. An order should therefore be made for the separate trial of a preliminary issue, example, a point of law, which, if decided in one way is likely to be decisive of the litigation, and it is not necessary that the decision should be such as to dispose of the entire action whichever way it is decided."

That's Carl Zeiss.

"Such an order may have the beneficial effect of expediting the hearing of the substantial issue in the action, eliminating the need for the discovery of documents and evidence on the other issues, and producing a substantial saving of costs."

So, My Lord, it's the equivalent of that provision which is relevant for present purposes, because we are asking the Court to make determinations, both as to the facts and the law, and what we are asking for, by our applications, is a full trial of the preliminary issues in advance of a full trial of the remaining issues in the action.

Now the cases relied on by Fairfield Sentry are not dealing with that, and so they had no bearing in present circumstances.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

My Lord, that's what I was proposing to say about the Article 11 defence.

So far as the good consideration defence is concerned, Your Lordship will see what we say in Paragraphs 28 to 33 of our skeleton in relation to the consideration, and as we understand it, Fairfield Sentry's only objection is the possibility of an appeal.

THE COURT:                    Well, that must apply to both.

MR. CHAMBERS:                As we understand it, it does seem to apply to both.  It's put in the skeleton in relation to good consideration, but I'm sure they will say to both.

We say that the possibility of an appeal cannot be a reason to shy away from ordering a preliminary issue if Your Lordship is otherwise minded to do so.

The good consideration defence or the Article 11 defence are going to have to be tried at some point.  All we are saying is that they should be tried in advance of the other issues in the action, and the possibility of an appeal, we submit in principle, has no bearing on when the issue should be tried.  If the issues are going to be tried in such a way that

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

they are potentially dispositive of the action, then
they should be tried in order to save time and expense,
and if there is going to be any appeal, that appeal is
likely to be very narrow and very rapid, given the
narrow nature of the preliminary issues themselves.

So we say, as matter of principle, the
appeal makes no difference, and what Your Lordship
should concentrate on is finding a way of dealing with
these cases in a swift, cost-effective manner, which
has the potential to save considerable sums of money
and time.

My Lord, the final matter I wanted to
deal with was proposed directions in the event that
Your Lordship is minded to order a preliminary issue,
and we deal with that in Paragraphs 34 and following.
And could I just draw your attention just to one
matter, and that is Paragraph 38 of our joint skeleton,
where, I should just say, that in Paragraph 37 we're
inviting Your Lordship to order the trial of
preliminary issues in relation to those eight actions
where applications have been made.

And Paragraph 38 we're inviting the Court
to stay, pending the resolution of the preliminary
issues, the remaining issues and the eight clawback
actions, the remaining seven clawback actions, and any

future clawback actions which might be issued and any
present or future clawback actions issued by Fairfield
Sigma or Fairfield Lambda.

And as footnote 35 we have said that
"Fairfield Sigma and Fairfield Lambda were sister Funds
of Fairfield Sentry with materially identical Articles
of Association to those of Fairfield Sentry."

And just for Your Lordship's note, those
Articles of Association appear in Core Bundle 2, at Tab
4, page 89.  That's for Sigma.  And Lambda is Core
Bundle 2, Tab 4, page 133.

Article 11 is in the same terms as
Fairfield Sentry.

And just so Your Lordship is aware, two
clawback actions have been issued by Sigma and Lambda,
both against my clients, Credit Suisse London Nominees,
who is the only Defendant to both actions.  That's
Action 28 of 2011, and Action 29 of 2011.  And
certainly we would be asking Your Lordship to encompass
those two actions within any order for a preliminary
issue.  We appreciate, obviously, that the Claimant is
different, but they are sister Funds and are
represented by Forbes Hare.  So we'll ask that those
two actions be included in the order.

THE COURT:                Could I

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

actually make orders in respect of actions which
haven't been brought?  I mean, I suspect that I could
direct the Liquidators not to pursue such and such an
order.

MR. CHAMBERS:          Yes.  I mean,
the actions have been brought.  It's just that we
haven't yet issued a formal application for preliminary
issue.

THE COURT:          You mentioned
future actions.

MR. CHAMBERS:          Yes.  So far as
future actions are concerned.

THE COURT:          Doesn't it pan
out that perhaps people will take notice of the
decision and will be at risk as to costs if they start
challenging it?

MR. CHAMBERS:          Yes.  My Lord,
that must be right.

THE COURT:          I mean, I'm
just wondering whether formal orders are needed.  I
mean, you'd say it's an abuse, won't you?

MR. CHAMBERS:          We wouldn't say
it's an abuse necessarily to bring the action.  What
we're thinking of is future actions between now and the
resolution of the preliminary issues.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

THE COURT:                I see.  You'd say that.

MR. CHAMBERS:              Yes.  Apology, if that's not clear.

THE COURT:                You do in print, but I haven't understood that.  Yes, okay.

MR. CHAMBERS:              So what we are saying is in the interim, there's no reason why they shouldn't pursue the action, but once they do they're automatically stayed pending the resolution of the preliminary issues.

My Lord, finally, in terms of the timing of disclosure, as we know Fairfield Sentry have asked for 12 weeks.  We're obviously disappointed at the length of time they need, because that would mean a trial in the autumn if there was a 12-week disclosure timetable, but given where we are now, so far as my clients are concerned, they are content with that.

THE COURT:                You are content with 12 weeks?

MR. CHAMBERS:              We will be content with the 12-week disclosure window, because that will then set us on course for a trial in the autumn.

THE COURT:                They say it's

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

going to take 1,400 hours of work to do that.

MR. CHAMBERS:                Yes.  But
that's in their evidence, My Lord.  In their skeleton
they appeared to have updated the position by saying
they'll make the relevant disclosure in 12 weeks.
That's Paragraph 21.  So I'm reading Paragraph 21 as
being an update in the position and on their part to
give the relevant disclosure in 12 weeks.

THE COURT:                But, I mean,
they're going to have to get that work approved as
remuneration.  I'll listen to what Mr. Gadd says about
that.  I don't suppose they would do it out of their
own pocket.

MR. CHAMBERS:                No.  They would
certainly have to get approval for that, My Lord, yes.

THE COURT:                They might want
advance approval.

MR. CHAMBERS:                So, My Lord,
unless you have any questions, those are my submissions
on behalf of Credit Suisse.

THE COURT:                Just one
question.

You brush off, if I may say so the
prospect of appeal.  You may want to deal with this in
reply, but the Court of Appeal here is incredibly busy.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

911

It's overworked. It can't get appeals through with the same sort of speed which I can do because I've only got one matter at a time to deal with. But if you go to the Court of Appeal and wait, as you might do, the thick end of a year for an answer, and they're against you, you're going to go to the Privy Council, aren't you? And by the time we've done all that, we probably lost -- I mean, I just had a case here where a preliminary issue went all the way to the Privy Council and failed, and I can't, but Miss Di Iorio will be able to tell you what the delay was in that, because it was absolutely enormous.

Now, meanwhile, the liquidation, meanwhile there's a liquidation or three liquidations on this stance, and they had to be attended to, so costs will run up merely by the fact of delay. And all that goes on and then we come back and start the trial over again. Isn't that an important -- you say, I'm parroting you, you said appeal is irrelevant. But is it really irrelevant, this prospect?

MR. CHAMBERS: My Lord, it's a question of balancing what one is potentially saving by an order for preliminary issues. What one is potentially saving is a large amount of time and costs. What one is losing is perhaps 18 months if the matter

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

went all the way to the Privy Council.

      THE COURT:       I think that's optimistic.  Never mind.

      MR. CHAMBERS:      Perhaps two years.  Because the appeal itself would be relatively short.  I mean, if the preliminary hearing itself is going to be three or four days one would hope that any appeal which either side wanted would be --

      THE COURT:      It's not the length of the hearing.  It's getting the hearing.

      MR. CHAMBERS:      Yes.

      My Lord, I appreciate that.  I mean, obviously so far as delay is concerned, if at the end of the day Fairfield Sentry succeed in their actions, they would be compensated by interest.

      I appreciate that costs will be running up, but what we anticipate is the actions will be stayed pending any appeal, and, therefore, those costs would be relatively minimal.

      But it's a balancing exercise between what really can be saved by the preliminary issue trial, and that's why we made reference to the two cases of Justice Rawlins and Justice Belle to show Your Lordship the law is on our side so far as Article 11 is concerned.  It's really the factual issue about whether

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

there were certificates, and we will submit that --

        THE COURT:          At the moment I

haven't understood why that is a factual issue, not at

the moment.

        MR. CHAMBERS:        As we

understand it, My Lord, it's simply because the other

side say that the particular documents in question were

not certificates.  We say there's no magic in the term

"certificates".

        THE COURT:         Why is it a

factual issue in this case?  It's a legal issue the way

you're putting it.

        MR. CHAMBERS:        Yes.  Well,

it's perhaps a mixed question of fact and law.

        THE COURT:         That's what you

say, but, I mean, this is just certificate.  Hold it up

to the light.

        MR. CHAMBERS:        Well, My Lord,

yes.  We would say a certificate is very

straight-forward.  It is just a statement made by or on

behalf of the directors and it has a value.

        THE COURT:         I think there

is the other point that if they are certificates they

may not have been given in accordance with -- sorry,

they may not have been duly authorized, in other words,

not on behalf of.

        MR. CHAMBERS:           Yes.

        THE COURT:           At the moment
that seems to be quite a difficult argument.  It rather
lacks your point about bone fides.  I mean, it scarcely
might have been a mistake if these certificates were
unauthorised.  When I say these certificates, I'm not
prejudging that.  I haven't looked at these documents.

        MR. CHAMBERS:           It's also
difficult on the pleadings.  I hate taking pleading
points, but certainly there have been no replies served
by Fairfield Sentry.

        So, My Lord, those are my submissions.

        THE COURT:           Thank you very
much.

        Mr. Lord.

        MR. LORD:           My Lord, I
don't intend to repeat the submissions that
Mr. Chambers has made, which I gratefully adopt.  I'm
also very conscious of the last three personnel to
follow me, therefore I intend to be as brief as I can
and actually going to largely highlight small
distinctions between the submissions of the five Ogier
Defendants for whom I act and the other Defendants.

        I should also say, My Lord, Ogier do act

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

for other Defendants in these actions who have not

applied for the trial of preliminary issues.  I

understand that at least some of those have entered

into Standstill Agreements.

Mr. Fay is here, and, if necessary, can

address you on behalf of those Defendants, but as I

understand the position again, none of them oppose this

application.

And, My Lord, turning to the preliminary

issues themselves, there are three differences between

the preliminary issues proposed by my clients and the

preliminary issues proposed by my learned friend

Mr. Chambers' clients.

Well, the first, I think, is completely

non-contentious, which is Mr. Chambers, in his

application, refers to the subscription and the

redemption of shares.  And, My Lord, none of the rest

of us have included the reference to subscription, and

I understand Mr. Chambers does not press for that to

form part of the preliminary issue.  So I think we're

all ad idem that the first preliminary issue should

simply refer to redemption, and insofar as disclosure

is concerned, disclosure need only be relevant insofar

as it relates to the question of redemption.

My Lord, our second preliminary issue,

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

which is the one that refers to whether or not there is
a complete defence, does not include the reference to
contractural assumption of risk and contractural
estoppel, whereas, I think one of my learned friends'
applications do.

   THE COURT:    You better show
me that.

   MR. LORD:    Well, it's Core
Bundle 1, Tab 4.  It's our application.

   THE COURT:    Yes.

   MR. LORD:    And you'll see
1(b):

   "Whether Article 11(1) provides the
Applicants/Defendants with a complete defence to the
claims made against the Applicants/Defendants."

   And if you turn to Tab 2 in the bundle,
you'll see Mr. Chambers' issue, which is in the Draft
Order, number 2, the same, but he adds on the words
"based on contractural allocation of risk and/or
contractural estoppel."

   THE COURT:    Mm-hmm.

   MR. LORD:    And, My Lord,
it's a very small point, but our preference would be
not to include those words, because they seem to me to
be an unnecessary fetter on the way Your Lordship may

decide to determine the point, and certainly if one looks at the Bermuda case, which I don't propose we turn up right now, Mr. Justice Belle does not refer to his decision in the terms of contractural assumption.

THE COURT:               It seems to be argument rather than proposition.

MR. LORD:                My Lord, absolutely.

It's a very small point, but we would rather, if Your Lordship gives is the order for preliminary issue, not to include those words.

My Lord, third point, is we have not included in our application notices the issue based on good consideration.  We have pleaded such a defence, and our position, so Your Lordship is clear, is we have absolutely no objection to the proposed preliminary issue, and if the Court thinks it's appropriate to order it, then we will participate in it and we will be bound by it.

THE COURT:               And the difficulty about the good consideration, I didn't put this to Mr. Chambers, so he's free to reply, the difficulty about good consideration, I mean, I read those mind-boggling paragraphs from Goff and Jones, but this does seem to be terribly fact-sensitive.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

MR. LORD:                My Lord, I'm probably the most inappropriate person to answer that, because I'm the one out of the four of us who is not advocating that.

THE COURT:              I know you are. But, I mean, I regret not having -- suppose Mr. Chambers can deal with that. Do you want to do it now?

MR. CHAMBERS:           My Lord, yes, certainly.

The way that we framed the issue is not, in fact, fact-sensitive. In fact, there's no dispute as to fact at all, because what we are saying is the mere surrendering of the shares is itself sufficient consideration for the purposes of the Defence.

So, in fact, there is no dispute as to facts and there are no facts to be found. It's specifically done on the basis it is just the surrendering of the shares, irrespective of their value. It doesn't matter whether they have no value or full value.

THE COURT:              The passages in Goff and Jones seem to be tied in with mistake; whether Uncle Arthur changed his will, who knew.

MR. CHAMBERS:           Yes.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

If Your Lordship wants to take up our authorities bundle, we've got the Goff and Jones extract there. I don't know if Your Lordship saw it. It's in Tab 13 of our authorities bundle.

THE COURT: Yes, I've read this this morning.

MR. CHAMBERS: Yes, Paragraph 41-001, the second paragraph on the page:

"However, there is another defence, distinct from that of bone fide purchase, which is a defence to a personal claim."

And then there's a quotation from Mr. Justice Robert Goff in Barclays Bank and Simms.

"It is a defence that "[a] payment is made for good consideration", and then goes on, "in particular if the money is paid to discharge, and does discharge, a debt owed to the payee...by the payer or by a third party by whom he is authorized to discharge the debt."

And the if one goes over the page to 41-002 the learned authors say that:

"A number of questions about the scope of the defence of good consideration have not been definitively answered.

(1) Good consideration is not

consideration in its classical meaning, formulated in
the context of the law relating to the formation of a
contract, namely, detriment to the promisor mirrored by
benefit to the promisee."

And then 2, and this perhaps is the more
relevant one:

"Is the payment made for good
consideration, no matter how trivial the value of that
consideration?"

And then there is, it goes on:

"Or, has been suggested by analogy with
defence of change of position, should it be a defence
only pro tanto to the extent of the value of the
consideration provided?  That may be the more
acceptable principle.  But in Aiken v Short and Lloyds
Bank Independent Insurance, and comparable American
authorities, the consideration in law which the
defendant provided was the surrender of a valid claim.
The claim may well have been, and normally was in fact,
worthless.  But in both cases there is no discussion of
the value of that claim, and there may be considerable
difficulties in determining its value."

So for the purpose of our good
consideration defence, we invite Your Lordship to
proceed on the basis it doesn't matter what the value

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

of the shares were that were redeemed.  All that
matters for good consideration is the fact of the
shares being redeemed, and that really is a very short
point, and, in our submission, it's not fact-sensitive.
It's a pure one of law.

        THE COURT:        All right,
thank you.

        MR. CHAMBERS:        Does that
assist Your Lordship?

        THE COURT:        No, that's
fine.

        Sorry, Mr. Lord.

        MR. LORD:        My Lord, in
Paragraph 20 of the Liquidator's skeleton, reference is
made to the fact that some of the Defendants do not
plead change of position as a defence.  Now those
Defendants are the Ogier's Defendants, who Your
Lordship should know, in fact, have not pleaded three
defences that are being pleaded by the other
Defendants.  They are change of position, estoppel by
representation and the agency defence.

        And, My Lord, the reason for that is that
all of my clients are Swiss banks, and, therefore,
subject to the provisions of Swiss law, which prohibits
a Swiss bank from disclosing the identity of its

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

customer and, indeed, makes that a criminal offence.

Now to be completely candid with Your
Lordship, the position is still being considered by my
client, and it may be that if the preliminary issues
are not ordered, or if they are ordered, they are won
by the Claimants, at least some of the Ogier Defendants
may amend to plead some or all of those defences.

Now, My Lord, in those circumstances the
Court would have to grapple with the Swiss law
provisions and consider what to do about disclosure,
whether redactions were appropriate, etc., etc.  And,
My Lord, I only raise that to make, first of all, to
make clear the position of my client, and, secondly, to
point out that that is another potential issue that
will arise if preliminary issues are not ordered, but
may be avoided if they are ordered, and if the
Defendants are successful in relation to them.

My Lord, could I just, two minutes on
disclosure.  Your Lordship may not have seen, because I
think it was only signed on Friday, but just for Your
Lordship's note, in Tab 7 of CB2 is a witness
statement, second witness statement of Miss Goldstein,
which in effect --

THE COURT:                I've just seen
that.

MR. LORD:                        -- in effect,

confirms we have the same sort of arguments that

Mr. Hapgood is going to take you through.

My Lord, the importance of disclosure is

why, when Your Lordship said to Mr. Chambers, raised

the spectre of summary judgment, of course the

difference between a preliminary issue and summary

judgment is we get disclosure.  And Your Lordship,

Mr. Hapgood will address you on our disclosure.

As far as disclosure from the Claimants

are concerned, that would be limited to documents

relating to the certifying of the NAV.  And, My Lord, I

don't know what documents there are.  I suspect there

may not be very many, but they might include the

following.

They might include documents, including

board minutes in which the board approved the documents

that contained NAV calculations.  They might include

documents pursuant to which the board delegates the

right to calculate the NAV to others, and in particular

Citco.  It might include audited financial statements

that refer to or approved the NAVs for any period.  And

they also might include all documents evidencing

discussions and communications about the finality of

the NAV determinations under Article 11.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

And I raise, for example, and this is pure speculation, there may be communications with shareholders who, for example, subscribed in November 2008, and then when Mr. Madoff was arrested, complained, and it may well be that Fairfield's response was, tough luck, because Article 11 is binding.

Now if those documents exist, then obviously they would be of huge assistance to the Court.  So, My Lord, there does need to be disclosure from the Liquidators, but there is an element of scaremongering about how onerous that task will be.

THE COURT:            You call it scaremongering.  How could I just disregard Mr. Krys' affidavit --

MR. LORD:            You can't.

THE COURT:            -- and say he's not telling the truth?

MR. LORD:            My Lord, I'm sure he's telling the truth about the number of documents.

THE COURT:            If he's got to go through 100,000 documents, it's like a mathematical text book.  How many donkeys do you have to move ten tons of soil or three feet of clay or something like

that.

MR. LORD:                     My Lord, yes.
But where that will take us as long as they fear.

THE COURT:                    Which depends
how opaque they are.  I mean, if it's just a roomful
that you actually have to fight your way into, it would
be terribly hard.  If they're sorted by some
sub-categories it may not be as hard as it sounds.  I'm
sure that Mr. Gadd will assist.

MR. LORD:                     Mr. Gadd will.

My Lord, as far as my client is
concerned, we would urge that these preliminary issues,
if Your Lordship is minded to order them, should be
heard as soon as possible, and our very strong
preference would be for that to be before the long
vacation, although we'll have to see what Mr. Gadd says
as to whether or not that is feasible.

So, My Lord --

THE COURT:                    So you're not,
in your case, you're not content to rely on Mr. Kite's
list?

MR. LORD:                     My Lord, no.

THE COURT:                    You want more.

MR. LORD:                     As I understand
it, Mr. Chambers is saying the same.  There needs to be

disclosure by the Liquidators.

THE COURT:                    Right.

MR. LORD:                     My Lord, for
those reasons, the reasons advanced by Mr. Chambers,
the reasons in our joint skeleton, that's why we urge
Your Lordship to order determination of the Article 11
issue, at least.

MR. HAPGOOD:                  Yes.  May it
please Your Lordship.

Could I ask Your Lordship to go to
Schedule 5 to the joint skeleton argument of the
Applicants?

THE COURT:                    Yes.  That's a
very helpful schedule.

May I say this application has been
extremely well prepared.  It's been a pleasure to look
at what's been done.

I'm looking at Appendix 5.

MR. HAPGOOD:                  Now, Your
Lordship will see from Appendix 5 that Harneys and I
represent ten Applicants, ten different institutions
spread across six of the eight actions, and each client
has applied only once.  By each client there has been
only one application with a view to simplifying things.

THE COURT:                    Yes.

MR. HAPGOOD:                    But it's very
important Your Lordship understands that the issues at
stake here are of enormous importance for all ten
Applicants, because if one were to get into the
territory of there being orders that the direct
investors make restitution back to Fairfield Sentry,
those parties are going to have the most enormous
complexities in relation to recovering monies from the
clients on whose behalf they invested.

Your Lordship will appreciate that most
of the Defendants weren't investing as part of their
own in-house portfolio investments.  They were
investing monies which had been supplied to them by
their own clients.

THE COURT:                    Yes, I do know.

MR. HAPGOOD:                    And, therefore,
any suggestion, for example, there could be a test
action would be wholly unacceptable to the ten clients
represented by Harneys.  We would suggest by far the
better way of doing it is that each of those clients
should have their interests represented so long as we
satisfy you that we're taking a responsible approach to
representation and we're making every possible effort
to agree our submissions and to avoid duplications.

THE COURT:                    What test

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

actions are you identifying?

MR. HAPGOOD:                    Well, I say
that because Mr. Gadd has suggested that he's going to,
just this morning, we had no notice at all, that he's
going to invite you to direct that there be one test
action involving all issues except change of position.

I don't think that's before you today,
because were that to be suggested, there would have to
be an application on that because we want to put in
some evidence.  But that's a radically different
approach --

THE COURT:                    Yes, it is.

MR. HAPGOOD:                    -- and one
which I'm, in a sense, just foreshadowing, will be
strongly opposed by the Harneys clients.

Now, could I then ask you, please, to go
back to Schedule 3 on page 23.  Could I ask you first,
please, to note the footnote, footnote 38.

There are two Harneys clients.  They are
the Public Institution for Social Security and the
Atlantic Alternative Fund, who were only served with
proceedings comparatively recently.

Now, no decision has yet been taken as to
whether they're going to seek to apply to be
represented at any hearing of preliminary issues, but I

simply indicate that that may be the instructions which Harneys receive on behalf of those two recently joined Defendants.

THE COURT:                    Mm-hmm.

MR. HAPGOOD:                   Just in case it helps, in total there are 21 Applicants, and in total there are 31 claims against the 12 Harneys clients.

And the last point I wish to make by way of introductory background is to ask you, please, to go to page 11 of our skeleton argument, footnote 21, and that we are very concerned about the huge hemorrhage of costs and the way in which, in our perception, Fairfield Sentry is just wasting costs.

If one looks at the position of Martello Nominees Ltd., proceedings were originally commenced against Martello in New York.  And Martello then went to the expense of defending that, and then those proceedings were discontinued.

Now what happened next is, in fact, recorded at Schedule 3.  There were then two claims made in the BVI against Martello.  That's in 015/2010, a claim for 2.5 million odd --

THE COURT:                    Yes.

MR. HAPGOOD:                   -- 030/2010, a claim for 700,000.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

So at that point Martello understood that Fairfield Sentry was accepting that BVI was the appropriate jurisdiction to hear these claims and Martello filed a Notice of Appearance.

The next thing that happened was that Martello received a letter from Fairfield Sentry's lawyers threatening to institute a claim for $62 million in Guernsey. That's a third jurisdiction that is shot at.

THE COURT:                    Right.

MR. HAPGOOD:                    So that led to more costs being incurred, and I know this because I was asked to advise on how to resist Guernsey as a jurisdiction, and eventually the Liquidators then gave up on Guernsey and they've now brought that $62 million claim here in the BVI in separate proceedings. It's number 19 of 2011.

But, I mean, this is an absolutely chaotic way to conduct litigation, and one of our appeals today, put it quite bluntly, is for Your Lordship to get a grip on all this and take the obvious route to bring these very ambitious claims to an early end.

THE COURT:                    Yes.

MR. HAPGOOD:                    Now, may I now

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

deal with the documentation exhibited by Mr. Kite?

I'd like to start, if I may, by showing you the procedure for redemption as contained in the Articles, Core Bundle 1, Tab 1.

THE COURT:                    Yes.

MR. HAPGOOD:                  I need to go through this, because otherwise it's rather difficult to understand some of the documentation.

The Articles are found immediately behind the Memorandum.

THE COURT:                    I'm looking at Article 10; is that right?

MR. HAPGOOD:                  Could I take you back a little more to the interpretation provisions of Article 1?

THE COURT:                    Of course.

MR. HAPGOOD:                  We first got the definition of "Dealing Day" which means:

"With respect to subscriptions the first business day following a Valuation Day, and with respect to redemptions a Valuation Day, and/or, in either case, such other day or days in addition thereto or in substitution therefor as may from time to time be determined by the Directors either in any particular case or generally."

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

So, when we're dealing with redemptions, Valuation Day and Dealing Day have the same meaning.

Now, two pages on, the foot of the page, foot of page 3, is a definition of "Valuation Day" which means:

"The last business day of a month and/or such other day or days in addition thereto or in substitution therefor as may from time to time be determined by the Directors either in any particular case or generally, but so that there shall be at least one Valuation Day in each month."

THE COURT:                    Yes.

MR. HAPGOOD:                  So, in a sense, it's the usual structure that you first give notice of a wish to redeem, and although it's not in this document, it happens to be in the Client Placement Memorandum, it must be at least 15 days before the next Valuation Day or you then step into Valuation Day after that.

In other words, if one had given notice to redeem on the 18th of April, your relevant Valuation Day would be the 31st of May.

Now from that, may we, please, move on to Article 10(1)(a), "Redemption of Shares."

"Subject to the provisions of the

Memorandum, these Articles and the Act are subject as hereinafter provided, the Company shall on receipt by it or its authorized agent of a request in writing (or in such other form as the Directors may determine) by a Member (the "Applicant") specifying the number and class of Shares to be redeemed redeem or purchase all or any portion of the Shares registered in the Applicant's name provided that".

Just pausing there, no doubt amongst the 500,000 documents Citco have are going to be that first triggering letter saying we wish to redeem the following number of shares on the following date.

THE COURT:                    Yes.

MR. HAPGOOD:                    "(a) Subject as hereinafter provided, the redemption or purchase of Shares pursuant to this Article shall be made on the Dealing Day on which, or immediately following the day on which, the written request is received provided that the said request is received on or before the Dealing Time."

THE COURT:                    Yes.

MR. HAPGOOD:                    And then going on to (c):

"Subject as hereinafter provided, payment shall be made to the Applicant in the Base Currency in

respect of the redemption or purchase of Shares.  Any
amount payable as aforesaid to the Applicant shall be
payable as soon as practicable after the relevant
Dealing Day, being normally 30 days plus other possible
periods."

In fact, it was doing it rather less than
30 days in the case of Fairfield Sentry.

Then moving on to Article 10(2) on page
10:

"The Redemption Price for each Share
shall be the Net Asset Value per Share (as determined
in accordance with Article 11) as at the close of
business in Amsterdam, The Netherlands on the Dealing
Day on which such redemption is effected less such sum
(if any) as the Directors may consider represents the
appropriate provision for fiscal and sale charges which
would be incurred on the sale of assets of the Company,
in each case rounded to the nearest minimum integral
unit of the Base Currency."

And so one knows from the Articles that
the NAV is going to be determined by, in the event,
Citco Fund Services Euro BV through Citco's Amsterdam
office.

THE COURT:                    Mm-hmm.

MR. HAPGOOD:                  And then if one

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

935

goes back to, on to Article 11, to which you've already
been shown, you've got, in effect, a two-staged
process.

The first which is purely internal to
Fairfield Sentry is the determination or calculation of
the NAV.  That's the first two paragraphs within 11.1.

THE COURT:                It tells you
who is to do it and how it's done.

MR. HAPGOOD:              Indeed.

THE COURT:                It tells you
the BV organ of the Company does it.

MR. HAPGOOD:              Yes.

THE COURT:                And it sets out
the Article.

MR. HAPGOOD:              Absolutely,
absolutely.

And then in the third paragraph, "any
certificate", including the word "any" really means
"all", it says:

"All certificates as to the NAV per Share
or as to the Subscription Price or Redemption Price
therefor given in good faith by or on behalf of the
Directors shall be binding on all parties."

So there are three things that can be
certified, the NAV, Subscription Price or the

Redemption Price.  And as you will see in the documents

exhibited by Mr. Kite, there are various documents

which certify the NAV and various documents which

certify redemption price as one would expect, because

if you got hold the NAV, one gets redemption price.

And certainly it would be part of our

case that any preliminary issues that the Articles

plainly contemplate, that these matters will be

certified, and that's the obvious way for business to

be conducted.  Once you've determined the NAV, you will

naturally move on to certify that NAV and the

consequences of which implies an inconsequential

redemption price.

THE COURT:                Redemption

Price is dealt with in 10(2); isn't it?

MR. HAPGOOD:              Yes, it is,

indeed.

THE COURT:                So it's binding

on all parties.

MR. HAPGOOD:              Yes, it's

binding on all parties, and those words are obviously

critical.  But, of course, since it is Fairfield, that

is, Fairfield or its agent, in this case Citco, that's

preparing the calculation, that, of course, in a sense,

is there in part to protect Fairfield itself from

claims, well, you over certified the NAV when I
subscribed.  And so it's partly a one-way test, which
is why we say good faith just doesn't come into the
preliminary issues, because obviously Fairfield is
asserting its own good faith, and its claim for
mistake.

      THE COURT:             Yes.

      MR. HAPGOOD:         And if it was
acting in bad faith, then the whole claim falls to the
ground in any event.  So it's a rather neat symmetry to
the point.

      Now before I come on to the -- My Lord,
that can please go away, Core Bundle 1.

      Now before I come on to Exhibits PRK-1,
could I show you one of the, so far as we can discover,
only two English authorities on the meaning of the word
"certificate".

      I hope it's -- has it got into His
Lordship's authorities bundles?  I think it may be
loose.  It's a case called Rexhaven Ltd v Nurse and
Alliance & Leicester Building Society.

      THE COURT:           Yes, I've got
it.  Thank you.

      MR. HAPGOOD:         I'm very
grateful.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

This is a decision of Judge Colyer Q.C. sitting as a Deputy Judge of the Chancery Division. And if you please go to page 2 of the transcript, could I please ask Your Lordship to read the section headed "facts" --

THE COURT:                    Yes.

MR. HAPGOOD:                  -- and the first holding, just the first holding.

THE COURT:                    Yes.

(Court complies.)

That's unsurprising.

MR. HAPGOOD:                  So it's a mortgagee seeking to set aside a possession order on the basis that the monetary claim on which it was based wasn't valid in law.

THE COURT:                    Couldn't be recovered.

MR. HAPGOOD:                  Yes.

Now the lesser, which was held to be a certificate, is found at page 4.  It's extremely short, but five lines from the bottom of the page:

"It would seem that the defendant tenant, or perhaps a number of the tenants"...

THE COURT:                    I've read it.

MR. HAPGOOD:                  If you then

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

please go to page 8.

THE COURT:                    It followed a
detailed breakdown of the figures.

MR. HAPGOOD:                    Exactly, and
the word "detailed" is important, as you will see from
the way the judge dealt with this.

Now the judgment on the certificate point
is at page 8 starting with the second or the
pre-penultimate full paragraph which is "I deal with
the certificate point.  Clause 4(e)(i)"...

Could I ask you to read that and over to
the third of the way down the next page ending words,
"and there was no good certificate in this case."

THE COURT:                    I do, first.
That's fine.

MR. HAPGOOD:                    Yes, please,
yes.

THE COURT:                    Thank you.

(Court complies.)

Yes, I've read that.

MR. HAPGOOD:                    The judge
really makes three points about the nature of a
certificate.  The first towards the foot of page 8, the
last sentence in the last full paragraph:

"Clearly however, "a certificate" is a

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

document."

And I'm sure it would be common ground it's got to be something in writing to be a certificate.

The next two points in the last full paragraph I shall read are first, that a certificate has got to have a degree of precision.

THE COURT:                Yes.

MR. HAPGOOD:                And, secondly, it's got to be a formal statement in writing of the precise amount or amounts.  But critically --

THE COURT:                Where does it say that?

MR. HAPGOOD:                Half way through that last full paragraph.

THE COURT:                Yes.  I don't see "amount or amounts".

MR. HAPGOOD:                It says, the sentence starting, "I accept, however, the propositions that Mr. Neuberger" --

THE COURT:                Yes, sorry. Yes, I've got it.

MR. HAPGOOD:                And his conclusion was that that point had no hope of success in the action.  I didn't get beyond the -- that's the

very last sentence of that paragraph.  It didn't get up
to the threshold of a real prospect of success.

        THE COURT:          Mm-hmm.

        MR. HAPGOOD:       And, of course,
by necessary inference the decision is saying you
certainly don't need to have a document headed
"Certificate" in order for a written document to
function as a certificate.

        THE COURT:         No.  But is
that suggested?

        MR. HAPGOOD:       Well, I think
it is suggested.

        THE COURT:         They say it's
common ground that there's no express use of the word
"certificate".

        MR. HAPGOOD:       And that's
common ground here.  We don't suggest that --

        THE COURT:         Well, that's
what I said.

        MR. HAPGOOD:       Yes.  So that's
the background.  Can I just show you the documents?  I
do this just so you can see --

        THE COURT:         Yes, I see.
Thank you.

        MR. HAPGOOD:       -- so you can

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

understand we are dealing with a very uniform type of documentation.  All the Defendants have put in evidence to say that their clients received this kind of documentation and really it's pretty simple stuff.

Now one's got to distinguish two different forms of communications sent out by or on behalf of Fairfield.  The first is communications to all shareholders regardless of whether they were redeeming their shares in the amount in question, and those were, in fact, communications about the NAV.

There are three types of that communication, and, second, there are two types of additional communications sent to shareholders who were actually redeeming in the month in question.

Now, in terms of the communications sent out to all shareholders, there were first e-mails sent out by Citco Fund Services Euro BV, the Administrator, typically in the third week of the month.

Mr. Kite has exhibited three examples. Now for this My Lord needs Core Bundle 2, Tab 2.  Pages 12, 13 and 14 are examples of this kind of document.

Now, these three, these three examples were all sent to Martello Nominees Ltd., one of the Defendants who's made an application in these proceedings.

The first one is to Maria Thoumine.  It's
from AMS which is Amsterdam at CFS Citco Funds Services
Client Desk, dated 16th January, 2004; subject,
Fairfield Sentry Limited - Class A - final NAV.

"Dear Sirs.

Please be advised that the final net
asset value per share of Fairfield Sentry Limited -
Class A is USD 957.8430 as at December 31st, 2003.

Should you have any questions or require
further information, please do not hesitate to contact
us.

Yours sincerely."

The next two are in iden --

THE COURT:                  Mr. Hapgood,
sorry.  Are you saying, which I think you are, that
this is just communicating with members to keep them up
to date?

MR. HAPGOOD:                No.  I'm saying
this is a certificate.

THE COURT:                  Sorry.  Are you
saying this was sent generally to members?

MR. HAPGOOD:                Yes, I am, yes.

THE COURT:                  Yes.  I mean,
the problem I have with that is that Article 11 speaks
of binding between the parties which suggests that the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

certificate that's being referred to is something which is an integral part of some transaction, otherwise you don't get part in it.

MR. HAPGOOD:                    Indeed, My Lord, and I accept that, but the point is this, that if you are redeeming in circumstances in which the relevant valuation date is 31st of December, 2003, in your case this does become part of the documentation for the transaction.  The fact it's sent to all sorts of other shareholders who are not redeeming is neither here nor there.

THE COURT:                    Right.

MR. HAPGOOD:                    Now pages 13 and 14 are very similar.  They went to Jackie Le Galloudec of Martello Nominees Limited.  The only difference is that in these two e-mails in the text of the message the word "final" is in Italics, no doubt to give it added emphasis.

THE COURT:                    True.

MR. HAPGOOD:                    So that's general communication type one.

Now the second type is in the form of e-mails sent out by Fairfield Greenwich Bermuda Limited who acted as investment manager, and there's two examples of this in the bundle, pages 15 and 16.  Can I

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

start with page 16, as it's rather more legible as a copy.

THE COURT:                    Yes.

MR. HAPGOOD:                  It's from Gordon McKenzie at fggus.

THE COURT:                    Mr. Hapgood, I haven't got 15.  I go from 14 to 16.

MR. HAPGOOD:                  Oh, right.

THE COURT:                    Mr. Kite's bringing up so --

MR. HAPGOOD:                  Thank you.  I'm very sorry about that.

Page 16 is from Mr. McKenzie.

THE COURT:                    Yes.

MR. HAPGOOD:                  "15th of April, 2004.  Conversation, Fairfield Sentry final NAV, 31st of March, 2004.  Posted to, Pricing Information.  Subject, Fairfield Sentry final NAV".

And you can see next there's a PDF document attached to it.

THE COURT:                    Yes, there is.

MR. HAPGOOD:                  "Final NAV, information, March PDF."

Then beneath that there's a text summary of the returns.  "Sentry A, NAV," and then the figure

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

is given.  "Month to date," and that's the increase.

"And year to date", and that's the increase in year to

date.  The same for Sentry B.

THE COURT:                "If you do not

wish to receive periodic messages such as this one in

future, please click the box."

MR. HAPGOOD:                Exactly.  So

you didn't have to receive this, and it may be relevant

to investigate how many clients did and how many did

not receive it, how many Defendants did not.  But the

point is, all this isn't really capable of being

subject to dispute.  It's simply a question of

preparing a schedule which would list under each of the

five categories which Defendant received which of those

documents.

THE COURT:                Yes.

MR. HAPGOOD:                I mean, it's a

tedious task, but it's not a difficult task.

THE COURT:                I do find it

difficult.  I mean, I'm not deciding obviously.  I do

find some difficulty in applying the word "certificate"

to what is really a form of e-mail and news letter.  I

mean, that's what it is.  But I've heard what you said.

MR. HAPGOOD:                You've got the

point, My Lord, yes.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

And then lastly on page 17, and I don't know if Your Lordship's got a more legible copy of this document --

THE COURT:                    No, I haven't.

MR. HAPGOOD:              Has that been handed up?

(Document passed to Court.)

THE COURT:                    Right.

MR. HAPGOOD:              Now this is also from the files of Fortess (Isle of Man) Nominees Limited who are now ABM Amro Fund Services (Isle of Man) Nominees Limited, and this is Citco's web site. And, in fact, it was a practice of Fortess Isle of Man to print off a copy of the web site and put it on the client file at the date of each redemption. And what this has, it has two NAVs, one for the 31st of December, 2003, that's the top entry, and the bottom is the NAV at 31st November, 2003.

THE COURT:                    30th.

MR. HAPGOOD:              Sorry, 30th November, 2003, sorry, and then part of the services it could value, they updated the NAV each week so you can track what was happening to investments.

THE COURT:                    Yes.

MR. HAPGOOD:              Again, a

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

general communication, but with a clear and precise,
and we would say, formal statement of the NAV at two
particular dates.

Now, can we then move on to the kind of
documentation generated in relation to particular
redemptions?  First, there are redemption
confirmations.  Now, those are to be found at pages 1
to 9 of the exhibit, 2 to 9 of the exhibit.

THE COURT:                    Yes.

MR. HAPGOOD:                  Now, it's
obviously at a hearing, the precise sequence --

THE COURT:                    I have uneven
numbers again.

MR. HAPGOOD:                  I'm sorry.

I'm told with this exhibit, it has been
handed to your Clerk.  Is that right?

THE COURT:                    Is this the one
which was substituted?

MR. HAPGOOD:                  It should have
been.

THE COURT:                    I think Ms. Di
Iorio has got a copy.

MR. HAPGOOD:                  Now just to get
the sequence of events right, does Your Lordship have a
legible copy of page 2?

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

THE COURT:                    I'm just
putting this in.  Yes, I do.  Thank you.

MR. HAPGOOD:                    Now, this is a
redemption confirmation.  You see those words in the
square box beneath the bold type "Fairfield Sentry
Limited Class A".

THE COURT:                    Yes, I've got
that.

MR. HAPGOOD:                    Now, if we just
look at the, follow through the dates underneath that,
the valuation NAV date was 30th September, 2003.  So
this was a redemption request made on or before the
15th of September, 2003.

The trade date, which is, I think, meant
to be the dealing date --

THE COURT:                    That word is
"trade"?

MR. HAPGOOD:                    "Trade", yes,
"trade date".  It's given as 1st October, 2003.

Now, just pausing in the chronology at
that point, if you then go to the top of the document
at the top right, the date of the document itself, I
think, is October the 10th, 2003.

THE COURT:                    Yes.

MR. HAPGOOD:                    And then going

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

back to the bit beneath the box, the expected payment
date was October 14th, 2003.   And here we come to the
bit of a point related to this transaction, number of
voting shares redeemed 189.08; redemption price,
$913.0327.   That leads to the gross redemption
proceeds, net redemption proceeds, and proceeds paid to
date.

      Now, that, we say, is plainly Citco
certifying --

      THE COURT:                 Which Citco is
it?   Is this NV?

      MR. HAPGOOD:          Citco Fund
Services Euro, NV.

      THE COURT:                 Right.

      MR. HAPGOOD:          The
Administrators.   They're the Administrators, My Lord.

      THE COURT:                 Yes.

      MR. HAPGOOD:          Or managers,
yes.

      And they had express authority under the
Administration Agreement to publicize the NAV, and
investors were told that in the Client Final Placement
Memorandum.

      THE COURT:                 Yes.

      MR. HAPGOOD:          So this is

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

really, looking at the point Your Lordship raised,

well, what about individual transactions, so here is a

clear, formal, precise statement from Citco at the

redemption price for this parcel of shares.  We say,

well, that's the end of it.  That's obviously a

certificate and redemption price.

        THE COURT:               Well, I mean,

I'm prepared to go as far as to say it looks like one.

        MR. HAPGOOD:           Yes.  Well, I

think I, maybe I have to accept that.

        So this is the sort of documentation Your

Lordship will have before you at any hearing of

preliminary issues.  There are several more of these in

the bundle.

        Now, perhaps if I may say so, it's this,

in my case each of my ten clients have already

retrieved these documents to enable Counsel to settle

the Defence.  So we've got all the documents already.

        So, in effect, we've got ten clients,

each of which is going to produce one set of documents

for the one transaction in respect of which they're

making application.  If we then exclude multiple copies

of the Placement Memorandum, entire disclosure for the

ten Harneys clients who represent nearly fifty percent

of all Applicants by number would probably fit into one

file.  So any suggestion that you're going to be
drowned with documentation on a hearing of preliminary
issues is, with respect, entirely unrealistic.

   THE COURT:    Your clients
have obviously kept good records.

   MR. HAPGOOD:    They have.

   THE COURT:    Others may be
in --

   MR. HAPGOOD:    There will no
doubt be some stragglers who can't produce documents,
and there may then be a question of whether inferences
need to be drawn, but, of course, as Your Lordship
mentioned this morning, one could approach from it on
the basis that you simply rule, in a sense in the
abstract, that documents issued by Citco in the form of
redemption confirmation stating redemption price are
certificates in Article 11.1.  And then there may be a
sifting process to find out if there's any Defendants
who can't track such documents and there may then have
to be a further investigation, factually, as to whether
they received them and have just lost them or misfiled
them or whatever, or if they've never received them at
all.

   But I suspect that the documentation will
show -- I mean, Citco is bound to have had business

practices, and the inference must be that they followed these business practices in relation to every redeeming shareholder.  That's why the number 500,000, and put Your Lordship (unclear) any view about this, I understand that, but, in fact, it's not anything like as blood curdling as it seems at first hearing, because there will be thousands of these documents and account statements and general notices or e-mails to shareholders.

I mean, the case of Credit Suisse London Nominees Limited, they have about 500 redemptions which, if each redemption generated ten documents, I mean, you are going to get a lot of documents.  But the point is, it's not going to help Your Lordship to look at the same type of document a hundred times.

The last type of document is the monthly account statements.  Examples are at page 10 and 11. The one at page 11, certainly in my bundle, is a rather clearer copy.  Again, I don't want to say --

THE COURT:                11 is better, is it?

MR. HAPGOOD:                11 is better in my bundle, yes, My Lord, yes.

THE COURT:                Yes.  Well, let's look at that.

MR. HAPGOOD:                    And it's --

THE COURT:                      These are
monthly account statements?

MR. HAPGOOD:                    Yes, they're
monthly account statements.  This is for Wise Global
Fund Limited.  That's the sole Defendant in Action 153
of 2010.

And so you get information under three
heads, fund net asset values.  So you then get a
statement of net asset value at the opening of the
month and the closing price.  You then get the account
value, and that would record any increase or decrease
from the value of the portfolio.  And then there's a
summary of activity, would be actual transactions in
question.  For example, that has a heading "Net Asset
Value Per Unit".  Because what we will really ask Your
Lordship to look at is if we reconstruct, just to have
the transactions, you will see that there is, there are
numerous statements of the NAV and there are certainly,
one or two statements of the redemption price.

So it is, when we say in our skeleton
that, first, there's very little factual dispute, I say
at this stage it is very difficult to see how there can
be any real factual dispute.  It's just a question of
deciding as a matter of law what the real consequences

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

of those facts are, and I would urge you to discount as

highly speculative any suggestion that there could be

an issue about Citco's authority.  I mean, if Fairfield

Sentry delegated the administration of the Fund, and

the process of doing the paperwork for redemptions and

subscriptions to Citco, Citco must have had authority

to certify NAVs.  Citco calculated the NAV in

Amsterdam.

So that really doesn't -- I mean, I can't

imagine that there's going to be communications between

Fairfield and Citco adding to what's in the

Administration Agreement on this very topic.  But I

accept that Fairfield Sentry must be given some time

for disclosure.  Perhaps I can come on to that topic

now.

I've already explained that disclosure is

a limited exercise so far as the Harneys Defendants are

concerned.  Now, as regards the Claimant's position on

this, we are highly sceptical about the concerns they

express in relation to giving disclosure.  We accept

that those concerns can't be properly weighed without

having a basic understanding, at the very least, of the

kind of documentation Citco has disclosed, and above

all, the form in which that documentation was

organized.  I mean, it might have been organized by



COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

calendar month.  It might have been organized by
reference to the identity of the redeeming shareholder.
It might have been organized in different ways, but it
seems to us, as a matter of practical politics, that
the position facing Your Lordship is that Fairfield
Sentry are saying we need more time.

          Since I don't know, since Mr. Krys hasn't
really disclosed enough about the actual position for
us to make intelligent submissions as to why they don't
need more time, I think what we can say at this stage
is that on this application it's up to Fairfield Sentry
to make good their request for 12 weeks, and if Your
Lordship feels that it's 12 weeks, so be it.  But we
would then, if that were to be the case, we would urge
Your Lordship to find a hearing date in the month of
October this year, if at all possible, if you're with
us on the basic point of a trial of preliminary issues.

          Twelve weeks would take you to mid July.
The parties would then have time to consider the best
way to present, saw and pool documentation, and,
indeed, agree a statement of facts, which is now
becoming a routine part of commercial litigation in
London.  It's proved to be very helpful, because the
judge --

          THE COURT:                Could it be

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

agreed?  I mean, as I understand Mr. Chambers and perhaps Mr. Lord, he wants a trial of facts rather than an agreed statement of facts.  He came from the other end.

MR. HAPGOOD:            No, no.  Very well.  We want a trial of facts.  We certainly don't want a trial on the basis of assumed facts, but it may help the form --

THE COURT:            Oh, yes, I see that.

MR. HAPGOOD:            -- to have agreement as to what the disclosure has revealed in terms of which parties have disclosed what kind of documentation.

THE COURT:            Mm-hmm.

MR. HAPGOOD:            Now, I mean, I could spend some time picking holes in the Claimant's past and present evidence about the problems they've got, but I think it's not profitable to say anything more about that until Your Lordship has heard from Mr. Gadd.

THE COURT:            That's right.

MR. HAPGOOD:            That then leaves the last point, which is the suitability of this matter for trial as a preliminary issue.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

Can I just emphasize two points about this at the outset. This is one of those cases where if there is going to be a trial of all issues you are looking at a vast piece of litigation, and by vast I mean months, not weeks. And the reason for that is that the action raises three absolutely enormous questions. The first is, was Fairfield Sentry under a mistake.

THE COURT:                 What's meant by "mistake" anyway?

MR. HAPGOOD:                 Well, that's a very interesting question, My Lord, and the House of Lords looked at that in the Deutsche Bank case, and there had been other cases about it, and all, English law has got to the point of saying that there comes a point of doubt which negates mistake, i.e., the choice is not between complete mistake, complete knowledge. There comes a point somewhere in the spectrum where a party has sufficient doubt in his mind that it cannot be said that he was any longer acting under a mistake.

Now there is all sorts of evidence which is being slung at Fairfield Sentry by Mr. Picard which raises a very great deal of smoke in all this, and, indeed, we've seen documents which our own clients have which raise massive questions about what Fairfield

Sentry knew about Madoff's business.

THE COURT:                    Well, I wasn't
really thinking of that.  I was thinking that, I mean,
it's probably a waste of time mentioning it, but since
I started speaking, I'll finish.

I've put this point to Mr. Gadd in the
past.  If I decide to buy an expensive holiday because
I think my bank balance is x positive and I then
discovered that it's y negative, can I recover the
money from the travel agent --

MR. HAPGOOD:              Yes.

THE COURT:                -- because I've
made a mistake?

MR. HAPGOOD:              Yes.

THE COURT:                Well, I would
have thought that -- they thought they had X dollars in
the bank; they only had minus y.

MR. HAPGOOD:              You certainly
can't recover it.  But that is --

THE COURT:                Why not?

MR. HAPGOOD:              Because the
travel agent is given good consideration.

THE COURT:                Well, you could
always get it back because there may be a notice period
or something like that.

MR. HAPGOOD:                    Yes.

THE COURT:                      I don't know.
I mean, I just find it very difficult to understand
what sort of mistake is in issue here.  I mean, this is
for, you know, 16 years down the line.

MR. HAPGOOD:                    Absolutely,
yes.

But, I mean, our position is that this is
an absolutely hopeless claim of mistake, because the
contract obviously allocates the risk of error where
Fairfield is paying a redeeming shareholder.  It
allocates the risk of overpayment to Fairfield.  It's
absolutely obvious.  It allocates the risk of
underpayment on redemption to a redeeming shareholder
on subscription.  It allocates the risk of a subscriber
overpaying to the subscriber and it allocates the risk
of a subscriber underpaying to Fairfield.  And you've
got to have finality in these matters.

And one of the points that Your Lordship
must and should take into account, I'll come back to
what there is involved in a trial, but there's also an
element of urgency in this, because if you look at what
Fairfield is saying here, they're saying, right, you
put your money into a BVI fund by way of buying
redeemable shares, and years after you've been paid

out, not even limited to six years, from what Fairfield
is saying, years after you've been paid out you can be
ordered to repay.  Well, if that's right, then
investing in BVI funds carries a degree of risk which
is much higher than was ever understood in the past,
and is unquantifiable.  So this does need to be sorted
out.

And also, from my clients, there's a
whole problem of what they do in relation to their
banking clients, their investment clients for whom they
were acting.  Are they meant now to try and utterly
block funds?  It would be right to clients to say,
well, we may have a claim back over against you, you've
got to put money to one side.  It would be an absolute
nightmare trying to unwind this, and that's the point
that was made in the Bermuda Supreme Court that the
notion of trying to unwind all of this is just, it's
such a non-starter, really.  It's so complex you will
have to unwind subscriptions.

THE COURT:                Well, that's
the property on an indemnity point.

MR. HAPGOOD:                Well, yes, but
even that point is -- I mean, that provides a cap, but
it doesn't provide an exact measure of the
restitutionary claim, because quite apart from -- the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

second large area is the whole question of whether the

Defence have changed their position, and that is a

factual inquiry in relation to every Defendant

separately, and quite possibly in relation to separate

clients of that Defendant separately.   It is months of

investigation.

        And then, thirdly, you have a highly

complex question of, if in principle there should be an

order for repayment, what was the extent of the

Defendants', on this premises, unjust enrichment.   And

you've got to remember the Defendants were not buying

Madoff securities and Fairfield was not just buying

Madoff securities either.   Fairfield had other

investments, so it's quite impossible to say that the

shares being redeemed were worthless because, I accept,

it was only a very small part of the overall fund, but

Fairfield had genuine valuable assets.   So you'd have

to look at each redemption date, what the value of

those other assets was.

        So we say there really is also, there's

an inherent urgency in this, and it's one of those

cases, and I'm going to give you some recent examples,

if I may, very shortly, in which a point which can

easily be severed and determined as the trial of one

issue in advance of other issues could save months of

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

litigation and tens of millions of costs in US dollars, tens of millions.

Can I conclude by giving you three examples, and obviously it's very easy cherry-picking this area, and, in fact, all the cases cited by Fairfield Sentry are highly fact-sensitive, and in order, it's perfectly good reason to say, well, actually, on these facts it wasn't a very sensible course.

One of the problems is that in all the cases that they've relied upon, however the preliminary issue is determined, it would not have been dispositive of the whole proceedings, which is one important quality of a preliminary issue.

This would only take a very short time.

Does Your Lordship have a copy of Ashmore and Corporation of Lloyd's before you, in front of you?

THE COURT:                Ashmore and Corporation of Lloyd's?

MR. HAPGOOD:               Yes.  Has it been handed up?

THE COURT:                Yes.  Yes, I have it.

MR. HAPGOOD:               I'm grateful.

Could I ask Your Lordship to read the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

headnote?

THE COURT:                    Yes.

MR. HAPGOOD:                    The leading

judgment is given by Lord Templeman, and all the other

Lordships agreed, although Lord Roskill had a bit of

his own.

Lord Templeman -- if I can ask you to

note, first of all, page 451, letter F, Lord Templeman

noted:

"Before Mr. Justice Gatehouse decided to

order preliminary issues of law he considered the

dangers involved in that course and the guidance of

this House in Tilling and Whiteman, [1980] Appeals

Cases, page 1."

That is one of the authorities cited by

Fairfield Sentry at Tab 6 of their authorities bundle.

THE COURT:                    Yes, I've

looked at that.

MR. HAPGOOD:                    "In my opinion,

when a judge alive to the possible consequences,

decides that a particular course should be followed in

the conduct of the trial in the interests of justice,

his decision should be respected by the parties and

upheld by an appellate court unless there are very good

grounds for thinking that the judge was plainly wrong."

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

And then if you please go on to page 453, could I ask you to read from letter G to the end of the judgment over the page.

THE COURT:                    Yes.

(Court complies.)

I mean, this is all, this is almost sort of more so, isn't it, since --

MR. HAPGOOD:                    Much more so, yes.

THE COURT:                    -- since the overriding objectives became fashionable.

MR. HAPGOOD:                    Absolutely.  So if one stands back and looks at this, you've got huge litigation with two big issues.  One is, do the Society of Lloyd's owe a duty of care to names to report on deficiencies or failings of managing agents and members' agents.  Secondly, if so, was Lloyd's in breach of that duty.

Well, obviously, because the breach of duty issue would involve a massive investigation into the IMX spiral, how much Lloyd's knew about it, how it actually operated, you've got to decide the duty of care point first.  And the House of Lords said appellate Court should support the trial judge who takes a decision of that sort.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

And we're at 1992 now, and I think one's starting to see the full impact of the way that, the culture which was changing at that stage to make preliminary issues become much more common, certainly in English procedural orders.

Now the next case, if you have the Barings judgment, this is <u>Barings PLC (In Liquidation) v Coopers & Lybrand</u> --

THE COURT:                    Yes.

MR. HAPGOOD:                    -- and <u>Barings Futures (Singapore) and Mattar</u>.  Mattar was a partner in Deloittes.

Again, could I just give you the setting for this.

THE COURT:                    I was in this case.

MR. HAPGOOD:                    You were in it?

THE COURT:                    Only as a sort of --

MR. HAPGOOD:                    I was also in the Barings Japan.

THE COURT:                    I wasn't (unclear).  Carry on.

MR. HAPGOOD:                    Well, I was in Barings Japan.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

And the position was, that the -- when we looked to start a trial, the judge said, well, look, if Deloittes are right, Deloittes said we have a complete Defence by way of security of action because Mr. Jones of Barings Singapore signed fraudulent, this is a, fraudulent management letters and their representations.  The House of Lords has now decided that fraud trumps everything else in terms of causation and negligence.  So if we can prove that Mr. Jones was fraudulent, then the whole trial goes off, and Mr. Justice Evans-Lombe said that's very sensible, because we can avoid what was in the end, I think, a six-months trial if Deloittes are right in its defence. And so there was, the main trial was then adjourned and there was a trial lasting several days about this part of the case.

Now in the event, as you'll see from the last page after a lot of evidence and a complex judgment, Deloittes' defence failed, and so we got back on with the main action.  But looking at the time when the preliminary issue was ordered, it made every sense to do it, when it had nothing with us at all, so it wasn't an appeal in any event, but it made every sense because had Deloittes been right, it would have saved a huge amount of time and costs and court time.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

Another example, the recent decision of
Mrs. Justice Foster at first instance in Springwell.
This is an extract from her first judgment.  Now this
was a 68-day trial.  The Defendants' costs at the end
of it exceeded 24 million pounds sterling.

You can see from the index at the start
of this extract, the complexity of the issues in the
case.  And all I ask you to note is that Paragraph 742,
having kindly complimented counsel and solicitors, just
above two lines from the bottom:

"Whilst with the benefit of hindsight, I
consider that it might have been preferable to have
tried some key issues as preliminary issues, that is
perhaps an easier call to make at the end of a trial,
rather than at the beginning."

THE COURT:                Yes.  She's
right, isn't she?

MR. HAPGOOD:                She is right.
But, as it happens, Springwell was quite a difficult
case for preliminary issues because there were so many
of them and it would have been difficult to tie down
anything which would have brought litigation to an
early end.

I'm just showing you this to try and
counterbalance the very negative impression indicated

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

969

by learned friend's authorities towards preliminary issues, when, in fact, they are now being used very commonly.

Now this case is surely the plainest example of where a preliminary issue should be ordered of certainly anything I have ever seen, because a short argument, and no one is suggesting more than three to four days, could avert a trial that is going to last months and months and cost tens of millions of dollars.

Of course I accept the point about delay, although one's got to be quite careful about what assumptions one makes about when a full action will be ready to come on for trial. Because I think we would be looking at 2013.

THE COURT:                 That might be right. I mean, I don't find that a surprising estimate. I haven't thought about it. It can come on a lot later if you go to Privy Council.

MR. HAPGOOD:                 Well, it would depend what orders the Court made about whether the main thing should be stayed right pending final appeal. You could say after Court of Appeal. But if Your Lordship held in favour of the Applicants and the Court of Appeal affirm that decision, it might have been right to say, well, the prospects of that being

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

overturned at the Privy Counsel is so remote that you should get on now and prepare for the main action. There are ways of dealing with these things.

THE COURT:                    Yes, there are.

MR. HAPGOOD:                    But whatever view, however pleasant one is about an appeal, the fact is, the potential benefit of reversing a trial, and this is out loud, is so enormous, in my respectful submission, it vastly outweighs the potential downside of a delay caused by an appeal.

THE COURT:                    I mean, nobody is, and I understand why, none of the Applicants are undertaking to have an appeal.

MR. HAPGOOD:                    No, nor could one expect them to.

THE COURT:                    Yes.

MR. HAPGOOD:                    Those are my submissions, My Lord.

LORD FALCONER:                    And, My Lord, I gratefully and enthusiastically adopt the submissions made by my three learned friends in relation to the application.  Can I try and restrict my submissions to things that haven't already been said.

My Lord, the question in relation to a preliminary point I think has got to be looked at in

the context of all the actions before you raising the
redemption issues.

There are 15 actions already started.
There are 94 companies in all being sued in those
actions.  Sixty-one of them are represented and 33 are
unrepresented.  All those that are represented are
represented by one of seven firms within the British
Virgin Islands, and there are the four speaking firms
which is that instructing Mr. Chambers, Mr. Lord,
Mr. Hapgood and myself, and there are three others,
Appleby's, Farara's and Lennox Paton who are here
represented today.

THE COURT:               Yes, I see.

LORD FALCONER:           So, in effect,
all the active Defendants in all 15 actions are here.

There is one action, which is the first
action, where there's one Defendant called Wounds, who
aren't represented, so although there are 15 actions,
there are only 14 actions in which you've got
representation before you today.

In those actions, I would submit that
there are essentially four big issues.  One, is it too
late now to reopen the net asset values either because
of Article 11 or because of their good consideration
point, the good consideration point being that the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

shares have been redeemed.

Two, what was Fairfield's knowledge of what was going on with Madoff, and what it's effect in relation to mistake and/or implied term and/or duty of care and/or estoppel.

Three, what change of position defence do each of the Defendant's have, and as my learned friend, Mr. Hapgood, has said, each of the Defendants is, in effect, representing somebody else, probably, and in some cases very many somebody elses.

THE COURT:                    Yes.

LORD FALCONER:                So it would be different in every case.

And then the fourth issue is if you are recreating the net asset value, to what extent is there setoffs for dividends, the original subscription price and other transactions.

It is, as my learned friend, Mr. Hapgood, says, a very complicated exercise.

My Lord, there could be no realistic doubt, in my respectful submission, that point (a), namely, can you reopen the NAV, is severable from the other three points, and is immeasurably shorter.  It is, if found in favour of the Applicants, decisive of these 15 actions and these claims against 94 companies.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

My Lord, without in any way disfavouring any other of the submissions made, I particularly adopt Mr. Hapgood's submission, if this isn't a case for preliminary point, it is quite difficult to see in the context, both of the Ashmore approach and in the context of the Civil Procedure Rules, post Wolfe, that this wouldn't be a case where you would divide the issues and start with the issue that might save millions of dollars and time as well.

My Lord, I submit there are particularly four reasons why a preliminary point should be ordered. The first is, without asking Your Lordship in any way to resolve the preliminary points at this stage, it would be wrong, it would be open to Your Lordship to say that on the face of it the point is strongly arguable, by which I mean that Your Lordship approaches the Article 11 point on the basis that it has realistic prospects of success.

And, My Lord, I think it is, I submit it is important, My Lord, to look and see what the Defendants themselves or the Claimants themselves think about the prospects of success. They have been --

THE COURT:                But they use the language which is quoted in your skeleton. It's at least arguable.

LORD FALCONER:                They do.

My Lord, could I just refer you to one other piece of material in that respect, or two other pieces of material.

First of all, Core Bundle 2, Flag 2, page 21.  This is Mr. Torres' affidavit, "Prospects of Success", Paragraph 7:

"Based on a review of the Statements of Claim, I believe that the claims contemplated against the Defendants have a realistic prospect of success, subject to the defences that might be arguable in respect of claims of this type."

I've never seen that before.  He appears to think that there's a reasonable prospect of success and as long as you ignore the defences, but it's subject to the defences.  I wonder the extent to which he is aware of the problems in relation to the particular defences.

My Lord's already seen, because it's been drawn to Your Lordship's attention, what was said in the skeletons in support in May 2010.

My Lord, if one goes to Core Bundle 1 and looks at Mr. Krys' third witness statement, Flag 16 --

THE COURT:                Yes.

LORD FALCONER:                -- and I simply

ask Your Lordship to look at Paragraphs 7 and 8 and 11
and 12.  I don't read that as being a denial of the
Defence in any shape or form.

And then if I can take Your Lordship to
Mr. Gadd's skeleton --

THE COURT:                    Yes.

LORD FALCONER:                -- My Lord,
Paragraphs 9 and 10.

My Lord, again, I would respectfully
submit that Your Lordship should read these documents
as saying something might turn up that might provide us
with a defence in relation to it.  There's no, even
basic statement of what the defence in relation to it
is.  So I respectfully ask Your Lordship to approach
the matter in relation to the Article 11 defence on the
basis it looks to be strong.  The Claimants have been
pretty tepid in their response to it.  They're hoping
something may turn up in relation to give them
something to resist the defence with.

The third point is the timing point.  It
obviously saves time and a huge amount of costs if the
Claimants win.

Your Lordship has expressed the point
about appeal.  Suppose the position were that the
matter is heard this year, it then goes to the Privy

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

976

Council, and taking Your Lordship's timing, in 2013, and assume that the Applicants for the preliminary points then lost, you have to start and you wouldn't resolve the case until say 2014.

Take the position if Your Lordship does not order a preliminary point.

THE COURT:                     Yes.

LORD FALCONER:                 You then have a situation where the matter comes on for trial with these points in play, and that's resolved in say, 2013, taking two years, but then there is still the appeals that can be made in relation to these respective --

THE COURT:                     Yes.

LORD FALCONER:                 -- points.  So the issue, with respect, is not the delay that comes from the appeal, but from the fact that should you resolve this issue first before you get into what I respectfully submit are very substantial issues.

THE COURT:                     Yes.

LORD FALCONER:                 So I would respectfully submit in relation to the appeal that it is a legitimate point to take into account because the Court's got to be practical in relation to it, but upon analysis, there is no greater delay if one orders the preliminary points than if one doesn't, because it

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

977

simply means the appeals would come after the full
trial.

    THE COURT:                  Right.

    LORD FALCONER:          The next
point --

    THE COURT:                  All right.  So
you say it's the same difference?

    LORD FALCONER:          It's the same
difference, exactly.

    The next point is that, My Lord, if you
don't order the preliminary points, then even if the
Applicants win at the end of the day on the Article 11
point, they will have lost to a significant extent the
purpose of this clause.

    The purpose of this clause is exactly as
my learned friends have said, to give commercial
certainty.  If they are never, in effect, able to rely
on that until after there's been a three-month trial of
93 actions against 93 defendants which they've got to
prepare for in full and go through with the costs, and
go through with the delay, whilst winning at the end of
the day gives them some satisfaction from the existence
of the clause, to have to go through all that, would
remove, to some extent, the purpose of the clause.  So
that's a further reason for ordering a preliminary

point now.

      And then, the next point, My Lord --

THE COURT:          Haven't you put
that need for certainty as soon as possible?

LORD FALCONER:      I would say
need for certainty includes avoiding the need to fight
out every issue --

THE COURT:          Yes.

LORD FALCONER:      -- when what
the purpose commercially is --

THE COURT:          If it's what
you say it is --

LORD FALCONER:      It is what we
say it is.

THE COURT:          -- you should
get that sooner rather than later.

LORD FALCONER:      Exactly.

      What the parties wanted is certainty in
relation to all of this.  You don't get the benefit of
that certainty if you've got to fight a trial at the
same time.

THE COURT:          Yes.

LORD FALCONER:      Then fourth or
fifth point, my numbering has gone wrong, it's
important in the context of the worldwide bankruptcy of

Madoff that there be a resolution of this particular point. You will see that there are US proceedings. These proceedings are obviously going to go, going to proceed.

My learned friend, Mr. Hapgood, has drawn your attention to attempts being made by the Liquidator from time to time to bring proceedings elsewhere, but they've now accepted, and this is expressed in the correspondence, that the BVI should resolve these redemption claims, these particular redemption claims.

The effect of Article 11 is a BVI law point. If Your Lordship decides the point, it would be at best res judicata elsewhere. And even if it's not res judicata elsewhere, it's bound to be the most authoritative view as to what BVI law is, because it's the BVI Commercial judge saying what it is.

So it's got importance beyond the confines simply of this jurisdiction.

THE COURT:                    Right.

LORD FALCONER:                And, finally, in relation to my submissions that Defendants in the matter are entitled for there to be some progress being made in it.

THE COURT:                    That's (unclear).

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

LORD FALCONER:                 Indeed, My

Lord, and just on the relevant dates in relation to

this, July '09 the Liquidator was appointed; September

'09 is the date of the first action.  October '09, the

second action.

April 9th, 2010 is the date that an

application is made for leave to serve out which is, by

my calculation, seven months after writ was issued.

Since then, a year later, we've got to the stage of

Defence, and what appears to be happening is that the

Liquidator is trying to start proceedings in other

countries, rather than seeking aggressively to pursue

this litigation.

He offers no explanation as to why,

despite the fact that we are 18 months on from the time

that he's appointed the Liquidator, he hasn't yet get a

hold of all the documents.

THE COURT:                 Well, he says

he's had trouble getting those things.

LORD FALCONER:                 He does say

that, but he doesn't go into very much detail, My Lord.

THE COURT:                 No, he doesn't.

LORD FALCONER:                 My Lord, I

would respectfully submit that the right order to make

is that there be a hearing of all three of the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

preliminary points, because I respectfully adopt what
Mr. Chambers has said in relation to the good
consideration point.  It is not, with respect,
fact-sensitive.  It's a point of law.  The question is,
was good consideration given.  The significance of the
point, I respectfully submit, is if good consideration
is given, then the framework within which the Court
looks at that issue is a contractural framework, not a
restitutionary framework.  And, with respect, Your
Lordship, the example that Your Lordship has apparently
been giving to Mr. Gadd on a number of occasions
identifies that.

        THE COURT:           Once is enough,
I think.

        LORD FALCONER:         Once is enough
to Mr. Gadd, I'm quite sure.

        The holiday example indicates that can
you get your money back when you thought you could have
afford it but you couldn't.  Well, that will depend
upon the contractural terms between you and the holiday
company, because what the holiday company is giving in
exchange for your money, even though you didn't want to
pay, you didn't think, because you've made a mistake
about how much money you had, they gave good
consideration, then it's for them to give you the

holiday.

So it's a legal point rather than a
factual point, and it doesn't fall foul of any of the
golf oil type problems where you end up resolving a
point of law, but then it's the facts that determine
it.

THE COURT:                    Yes.

LORD FALCONER:                And I have the
support of Mr. Gadd in that respect, because in his
skeleton he acknowledges that it's only a point of law.

So I respectfully submit the right order
is to order a preliminary point, although is it too
late to reopen the NAV points, including any factual
issues that have to be resolved.

We should try to agree between the
Claimants and the Applicants as to what discovery is
necessary, but Your Lordship should make orders today
in relation to discovery, and it would probably be
sensible to try to identify a target date within which
the hearing of the preliminary point should take place,
and we're all happy with October, but if Your Lordship
wants it to be earlier, we will certainly cooperate in
relation to that.  But I think it's necessary for us to
have enough certainty today so that we can work on that
basis.  That will include the discovery order.  It

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

would include staying all the proceedings in the action
until the resolution of the preliminary point.

THE COURT:                    It's pointless
otherwise.

LORD FALCONER:                Exactly.  And
it would require an order that it is binding in respect
of all 14 or 15 actions, depending on which Your
Lordship thinks --

THE COURT:                    That I need a
little help with.  I was trying to leave that over.  I
suppose that's not right.

If I was to go that far, what's the
jurisdiction to do that, to lash out at people who
aren't here?

LORD FALCONER:                At the moment
Your Lordship has only eight of the 15 actions before
you.

THE COURT:                    It's not a case
of representation orders, because they're in different
proceedings.

LORD FALCONER:                No, exactly.

THE COURT:                    That's the
trouble.

LORD FALCONER:                First of all,
if the Defendants in the other actions who are

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

represented all agree, and you can ask them today

whether they would agree or perhaps to come back in 14

days and indicate whether they'll agree, that deals

with making the order in the presence, as it were, of

the Defendants.  The Liquidator is here on behalf of

the Liquidator, so he is here.  So in practice you've

got all of the represented Defendants in all of the 15

actions before you today, or nearly before you today,

so you can ask us all to make representations about it,

and once you've heard the representations make an order

binding on the people represented here today.

It might be that some of the lawyers here

don't have instructions from all their clients --

THE COURT:              That's what I

was thinking.

LORD FALCONER:          -- of all of

their clients, but Your Lordship could, in those

circumstances, indicate what Your Lordship is minded to

do, subject to representations then being made by those

who are represented here today, and I think that would

probably be sufficient.

THE COURT:              Well, the one

person who is common to all of them is the Liquidator,

and it strikes me that, depending on what I decide on

this application, it might be that the most surgical

route would simply be to give the Liquidator directions
to do or not to do certain things.

        LORD FALCONER:        Well, I would
be happy, because the end result that we all seek in
relation to this is that Your Lordship's determination
of the Article 11, the good consideration point, should
then, in effect, bind all of the parties to the 15
pieces of litigation that are before Your Lordship.
And it may well be that the easiest way to do that is
to direct the Liquidator fight the matter in however
many actions, and then don't take the point in any of
the other actions, i.e., be bound by whatever
conclusion Your Lordship reaches.

        THE COURT:        I mean, I'll
have to think about that, obviously, depending on what
I decide about this, whether it should be preliminary
at all.

        LORD FALCONER:        Certainly.

        My Lord, unless there's any other point I
can help Your Lordship on.

        THE COURT:        Thank you very
much, Lord Falconer.

        Mr. Gadd.

        MR. GADD:        My Lord, as you
see from my skeleton arguments, I oppose the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

application because you see that the binding and good
consideration is the most difficult points of law and
should be considered in their factual context.

It's common ground there has to be
disclosure here, and although some attempt has been
made by my learned friends or some of them to suggest
that our estimate of 12 weeks is excessive, and that we
probably don't have that very many documents that
factually goes to these preliminary issues or be
material for the purpose of the preliminary issues, the
fact is, we have 500,000 pages of documentation, and
it's really like my learned friend saying, all you have
to hand over to me is a needle.  And my answer to that
is that that may be right, but it's in a haystack.

THE COURT:                I mean, I
haven't got any evidence about the existence of a
haystack.

MR. GADD:                Well, you have
evidence, My Lord, of 500,000 pages of documentation.

THE COURT:                Well, so there
are in a British library.  I mean, there's an index.

MR. GADD:                My Lord, there
is no index here, and in order --

THE COURT:                How do you know
that?

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

MR. GADD:                    Well, so I'm
told.  That's my instructions.

THE COURT:                   I mean,
Mr. Krys hasn't really told me what the sifting process
entails.  I mean, obviously you didn't.

MR. GADD:                    My Lord, if you
go to Core Bundle 1 --

THE COURT:                   Yes.

MR. GADD:                    -- and we'll
find Mr. Krys' witness evidence, I think it's at Tab
16.

THE COURT:                   Yes, it is.

MR. GADD:                    What he says in
Paragraph 9 --

THE COURT:                   Yes.

MR. GADD:                    He was
referring to 500,000 documents, and he's advised by his
lawyers that each will need to be reviewed and that
process can, on average, take about ten seconds a page,
which is not exactly excessive, in my submission.

He then goes on to say in the last few
lines:

"After that task had been completed, I am
informed by Forbes Hare that the more time consuming
exercise of ordering and indexing the documents would

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

988

then need to take place," which suggests to me, well,
it hasn't taken place yet.

So, this is the estimate of ten seconds a
page where an index doesn't already exist, which has
been put forward by Mr. Krys.

THE COURT:                Sorry, Mr.
Gadd.

When did these documents reach the
Liquidators?

MR. GADD:                Well, it's been
a drip feeding process over many months.

THE COURT:                But, I mean,
reading Mr. Krys by the light of nature, not a single
one has yet been looked at.

MR. GADD:                It hasn't been
looked at by Forbes Hare, and they're the ones who then
have to decide what is disclosable and what is not,
rather than Mr. Krys.

THE COURT:                I mean, I
suppose it might be unkind to say that they should have
done before they launch proceedings of this sort.

MR. GADD:                Well, first of
all, the documentation is still not complete.

THE COURT:                Well, hang on.
But you haven't even read what you've got, Forbes Hare.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

MR. GADD:                    Yes, but, of course, we didn't have it when we launched many of the actions.  Of course the documentation has increased since.

We still haven't got a complete set of documentation, but when we launched, started launching these actions, we only had enough information to launch the various actions.  And, My Lord, in my submission, it's not appropriate to go through what will effectively be a disclosure exercise before you even issue proceedings.

Obviously if you know of something that would be fatal to the case, you don't bring the proceedings.  But you don't spend half a million dollars on effectively carrying out a disclosure exercise assuming you've got the documents, which we hadn't at the time, before you even bring that proceedings, particularly when you're facing a limitation problem.

THE COURT:                   I realise there was a limitation problem.

MR. GADD:                    But the short matter for Your Lordship's point of view, these documents had not been looked at by the lawyers for the purpose of disclosure, and that would have to be done

now.

THE COURT:                    All the
500,000?

MR. GADD:                     My Lord,
obviously, I assume we have seen some of them, but only
a small quantity.  I'm told that the vast majority were
delivered in the last three weeks or month.

The sort of documentation which we have
seen are simply records of when redemptions took place
and by whom.

Your Lordship's --

THE COURT:                    You must have
had those, otherwise you couldn't have brought
proceedings at all.

MR. GADD:                     Your Lordship's
seen the spreadsheet --

THE COURT:                    Yes.

MR. GADD:                     -- and Your
Lordship also knows that some of the information on
them was wrong, but actual documentation about party
and party communications, I haven't seen anything of
those.

THE COURT:                    No.

But, I mean, there must be -- I mean, the
board minutes, for example, if there are any, or

communication between NV and the directors, you'd think

would be separate, unless they're just scattered

randomly.

MR. GADD:                    Yes.  Well, we

do have board minutes.

THE COURT:                    I thought you

did, too.

MR. GADD:                    Yes, but

unfortunately we don't have a complete set because we

haven't had anything from Fairfield Greenwich, so we

may have to qualify that in our disclosure statement.

THE COURT:                    What is it, I

mean, Mr. Gadd, sorry, what is it you think would help,

forget helping them, you know, they can look after

themselves, what would help the Liquidator in the

course of the disclosure process?  What is it that

might --

MR. GADD:                    Does Your

Lordship mean something might turn up?

THE COURT:                    No, I'm not

saying that.  That's Mr. Hapgood's expression, I think.

But what issue would sifting through this vast amount

of document assist the Liquidator with?

MR. GADD:                    Well, first it

would assist the Liquidator if ordered to give

disclosure even if limited to preliminary issues.  He
cannot give a disclosure statement saying that he's
disclosed everything of relevance unless the disclosure
has taken place.  So that's for his own protection.

　　　　　Secondly, we don't know if there had been
any correspondence between individual redeemers and the
Fund or its agents on the question as to whether the
documents exhibited by Mr. Kite in his witness
statement or any of them amount to certificates.

　　　　　THE COURT:　　　　　　Why should
there be correspondence?

　　　　　MR. GADD:　　　　　　Well, it's got
beyond the realms of possibility, and this is pure
speculation on my part, because I haven't looked at the
documents, that there may be the case of a redeemer who
asked, can we rely on this as being a certificate for
the purposes of Article 11, and the answer may have
come back, yes, of course, you can, in which case I
will find myself in difficulty.  It also means that
until we -- the answer could have come back, of course
it's not, in which case my learned friends would find
themselves in difficulties.  And also it would give
rise to possibly a different issue between Fairfield
Sentry and some redeemers as opposed to others, because
my learned friends might say, or I might say if there

is such correspondence, and it's against me, that

that's res inter alios acta, because it's just between

that redeemer and the Fund; it doesn't have any

relevance to other redeemers.

        THE COURT:             That would be a

particular incident of a particular relationship.

        MR. GADD:             Yes.

        THE COURT:             But I, mean, if

I was decide to hear this issue I could qualify any

decision by reference to specific facts.  I mean, I

could say that you take points.  I mean, if I was just

dealing with questions of law, it would still be open

to you to say, ah, yes, but in this particular instance

we told them that they relied on this at their own risk

and so an exception for this particular redeemer, I

suppose that could be done.

        MR. GADD:             Well, that

gives rise to the difficulty of deciding a point on

hypothetical facts.  Your Lordship would be deciding

the binding now point on the assumption that there was

no documentary evidence that shed any light on it one

way or the other beyond the document that would have

been produced by Mr. Kite.

        THE COURT:             You see, Mr.

Gadd, I have to put this to you.  I can't understand

why the Liquidators are not grabbing this opportunity,
because if a decision is made on at least one of these
points, this thing is going to collapse sooner rather
than later depending upon the decision made.

    MR. GADD:      Yes.

    THE COURT:      And I would
have thought you and your Creditors Committee might
well think that if this is a potential torpedo, the
sooner we have that worked out the better.  And I'm
struggling to understand why you don't want that to be
done.  I accept there are difficulties in the
preliminary issue, and one of them is a delay caused by
an appeal.  Why don't you want this?

    MR. GADD:      My first
concern, My Lord, is that I should be permitted to make
full disclosure, because I don't, while I'm conscious
of the fact that disclosure can sometimes make one's
case worse rather than better, I'm prepared to take
that risk, and I would oppose any suggestion, I don't
think one's seriously being made, that the, that
preliminary issues shouldn't be, that there shouldn't
be disclosure before the preliminary issues are
decided.

    I'm also --

    THE COURT:      It could be

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

limited.

      MR. GADD:        Well, it could
be limited to the preliminary issues --

      THE COURT:       Yes.

      MR. GADD:        -- if Your
Lordship is going down that route.

      THE COURT:       I'm not going
down any route.

      MR. GADD:        If Your
Lordship is.

      THE COURT:       Yes.

      MR. GADD:        Secondly, I am
concerned at the suggestion that at this stage all
Defendants should be bound, because we don't know what
disclosure will throw up.

      I've just given the example of the
possibility of their being correspondence between the
Fund and various redeemers, but not others, as to
whether certain documents amounted to a certificate.

      THE COURT:       Sorry. I
didn't hear that.

      MR. GADD:        I was just
giving the example of the possible existence, it's
speculative, possible existence of documentation as to
whether something constitutes a certificate or not for

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

the purposes of Article 11.

THE COURT:                    But unless
there was consideration given, or statements, they
don't bind, do they?  I mean, it's a question of the
contract, Article 11, as I understand it, and unless
you're saying that's varied in some way, which is very
difficult, or you're saying that it was extra
consideration given for a promise or a statement that
you can't rely on, I can't see where the variation
comes from.

MR. GADD:                    Well, my
submission, if we get there --

THE COURT:                    Well, we are
getting there, because I'm trying to wonder what it is
that you want to disclose.

MR. GADD:                    Well, my
submission is going to be, in due course when the
matter comes up for decision, that the documentation
relied on by Mr. Kite does not amount to a certificate.

THE COURT:                    Well, that's
fine.

MR. GADD:                    And then if one
has the example of a shareholder/redeemer who received
certain assurances, then no doubt that shareholder, I
don't want to make their argument for them --

THE COURT:                    These people
don't give out assurances.  We know how these things
are run.

MR. GADD:                     Well, we don't
know.

THE COURT:                    They're run by
normally teenagers pressing buttons.  That's how
they're done, and the idea that teenager X rings up and
says I've just been reading Goff and Jones is fanciful,
Mr. Gadd, really.

I've got to have some -- I'm allowed to
take judicial notice of the fact, I think, that these
people are not lawyers, seeking these assurances, but
they've got a contract, there it is, and they take the
money and run.  That's what happens.

MR. GADD:                     That may be
right.  Until we look at the documents, we don't know.

THE COURT:                    I think I
probably do, actually, and I'm prepared to say it in
open proceedings, because I think it's going to be the
exception, very much the exception, where you find any
qualifying documents.

I mean, you've got a strong, you've got a
perfect position.  You say that is not a certificate;
it's not; it's a piece of correspondence you would say

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

or something of that sort, and it doesn't qualify to

give the protection which, on one reading, Article 11

applies.  It's a perfectly coherent argument.

MR. GADD:                    My Lord, yes,

but as I understand it, my learned friends all agree

that there should be disclosure.

THE COURT:                    I don't

understand why they do, but they do.  I mean, it's not

for me.

MR. GADD:                    They're seeking

an order, My Lord, for disclosure, and if one is made,

I have to comply with it.  But also I submit it is an

appropriate case for disclosure to take place.  If, by

way of example one looks at Core Bundle 1 again --

THE COURT:                    Yes.

MR. GADD:                    -- and at Tab

12, there is a Defence, Credit Suisse.

THE COURT:                    Yes.

MR. GADD:                    Paragraph 38,

the change of position:

"...the CS Defendants paid the money over

approximately seven years ago.  Given the passage of

time it will in practical and/or in legal terms be very

difficult (if not impossible) for either of the CS

Defendants to reclaim these monies from their

principals.  The CS Defendants are also hampered by the
fact that both now have in their possession relatively
little by way of relevant documentation.

        THE COURT:                    Yes.

        MR. GADD:                  Well, my
submission based on that simply is that if they have
relatively little by way of relevant documentation,
then it is appropriate if Your Lordship is making a
decision in its factual context to determine a
difficult point of law in its factual context that
there should be disclosure on the part of the
Liquidator to supplement the very little by way of
relevant documentation that the Defendants have
retained.

        THE COURT:                  So you want 12
weeks to do that?

        MR. GADD:                  My Lord, yes.

        THE COURT:                  And it's going
to cost how much?

        MR. GADD:                  Well, in my
submission, it -- may I just take instructions --

        THE COURT:                  Yes.

        MR. GADD:                  -- because I'm
not the one who is sending out the bills.

        I'm told it's six figures, My Lord.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

THE COURT:                    It's what?

MR. GADD:                     Six figures, My
Lord.

THE COURT:                    I mean, it's
1400 hours of work; isn't it?

MR. GADD:                     My Lord, yes.

THE COURT:                    It's going to
be, at least six.  It's going to be six pretty much,
yes.

MR. GADD:                     But, My Lord,
in my submission, in the context, I'm not seeking to
minimize it, it's a lot of money, but in the context of
all this litigation and the amounts turning on this
litigation, in my submission, it would be money well
spent to ensure that any issues Your Lordship felt is
proper are properly decided in their factual context.
And, of course, if I was successful, assuming again, I
know Your Lordship hasn't decided it --

THE COURT:                    Yes.

MR. GADD:                      -- but assuming
there are preliminary issues, we don't want anyone to
appeal on the basis that there was no disclosure and
that the matter was decided on hypothetical facts.

In my submission, this case should be
decided on the basis of all the relevant facts, and if

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1001

there's to be an appeal, there's an appeal, but at
least it won't go wrong, the process won't go wrong
because, My Lord, we're suggesting that there should
have been disclosure.

THE COURT:                    So what you're
saying is that you must make full disclosure, otherwise
were you to succeed, you might be appealed on that
ground.

MR. GADD:                    Yes, I might
succeed on a false perspective, if there are documents
that --

THE COURT:                    You could be
appealed any way, if you succeed, and they all -- what
difference does it make?

MR. GADD:                    That there
shouldn't be an appeal based on anything other than a
full finding as to what all the relevant facts were.

Now I have to go through the exercise
anyway in order to find whether the issues are possibly
different between the Fund and various Defendants as
opposed to others.  I have to look to see if there was
any discussion between the Fund and Citco as to
whether -- I'm not suggesting for one moment --

THE COURT:                    No, I know
you're not.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1002

MR. GADD:                    -- Citco wasn't
their agent, but there is a question as to whether
perhaps they were authorized to give certificates,
because the Articles, Article 11 doesn't say a
certificate must be given.

THE COURT:                    No.  It just
says that what happens to be given that's binding.

MR. GADD:                    That's binding,
yes, and so there might be a question as to whether as
between the Fund and Citco Citco actually had authority
to give certificates as opposed to giving out
statements.

THE COURT:                    Well, that
would be the buyer on behalf of.

MR. GADD:                    Yes.

I'm not sure if my learned friends fully
understood the point.  I'm not suggesting for one
moment that Citco wasn't the Fund's agent.  It's just a
question of what authority it had.

THE COURT:                    Did it have
authority to issue certificates within the meaning of
Article 11?

MR. GADD:                    My Lord, yes.

And, again, it might be argued by whoever
wanted to keep that out that whatever the Fund and

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1003

Citco were thinking but not bothering to tell the
shareholders is irrelevant, but if I find some such
documentation, I can't shut it out. Your Lordship may
shut it out after full argument, but I can't simply
take it upon myself to say I'm not going to disclose it
because it's not relevant.

      THE COURT:             Right.

      MR. GADD:            The other
concerns that we have, basically, if I can run through
very quickly --

      THE COURT:            Yes, please.

      MR. GADD:            -- the points
that concern us.

      THE COURT:            Take your time.

      MR. GADD:            My Lord, I'm
obliged.

      We certainly accept that there has to be
appropriate case management.  We certainly accept that
points should be decided and not re-litigated, so there
must be some proper arrangement to ensure that
everybody is bound.  At the moment that doesn't look as
though it would be very difficult.

      We have 55 Defendants who have submitted
to the jurisdiction, either by filing a Defence or by
filing an Acknowledgment of Service, and not within the

time limited applying to challenge the jurisdiction.
Of those 55 who have either defended or filed
acknowledgments, 39 have filed a defence.

For this purpose I'm ignoring duplication
where someone's being sued twice for different amounts.
I'm treating them as one Defendant.

Those Defendants, the 55, are represented
by seven law firms, who are all here today, represented
here today. So it shouldn't be at all difficult to
ensure that a regime can be put in place to ensure that
everybody is bound. Your Lordship can bind the
Liquidator simply by giving a direction or refusing to
give a direction.

The difficulties I suggest with a
preliminary issue is that, first of all, it does
require the Liquidator to make disclosure, which is a
substantial exercise, which I will prefer only to have
to do once, which is why I suggest that it would be
more appropriate to have a test case rather than
preliminary issues. It would be better to carry out
disclosure only once and to deal with it for the
purpose of the trial on all issues other than change of
position, which plainly is not going to be the same, is
not going to be a common issue as between (unclear).

The second point is that my learned

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

friends have identified only two issues, which, and the best one can say at this stage is they could go either way.  I'll try not to be controversial.  They could go either way.

THE COURT:                    Well, they could go either way.

MR. GADD:                    What I'm saying, I'm not going to try to persuade Your Lordship today that my arguments on the merits are likely to prevail.  Some effort was made to suggest that we've been rather tentative in the way we put our case.  That is simply because on the application for permission to serve out --

THE COURT:                    Well, I'm not going to decide this on the quality of stress in particular sentences.

MR. GADD:                    But there are only two issues that have been identified.  They could go either way, and if they lead to appeals, which is not at all unlikely --

THE COURT:                    Well, they may appeal if you win, but if you were to lose, if there were to be a preliminary issue, I might have a distinct problem about allowing you to resort to funds in the liquidation to prosecute an appeal.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

MR. GADD:                    My Lord, yes,
but that would be an argument for another day.

THE COURT:                   Well, it is an
argument for another day, because I have got to do a
lot of second guessing on this application, on the
nature of the application.

MR. GADD:                    Well, even
assuming, against me, that I would get Your Lordship's
permission --

THE COURT:                   It would depend
on the nature of the decision.

MR. GADD:                    It would depend
on the nature of the decision.

There is an awful lot of money at stake,
and even if I won't appeal, my learned friends would.

THE COURT:                   Oh, yes, they
would.

MR. GADD:                    They don't need
Your Lordship's leave.

THE COURT:                   No, no, no.

MR. GADD:                    And, in my
submission, there would be less -- what I want to avoid
here is what I might call penny packet appeals where
you're just appealing on, if the preliminary issues are
directed to be heard, you would be appealing just on

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

those two issues, whereas if you have a trial of a test
case, that means, assuming the worse, there is only one
appeal, because you've got a decision on everything
except change of position, so there could only be one
appeal, and also, because any resolution of all the
issues in the case, other than change of position,
would involve decisions on factual issues which would
make an appeal less likely. But even assuming an
appeal, you've only got one instead of possibly two,
because you could have appeals on the preliminary issue
and then appeals on the rest of the issues.

Going back to the disclosure point,
because I don't think I answered Your Lordship's
question, if there were communications between the Fund
and various shareholders as to whether something is a
certificate or not, "certificate", in my submission,
means -- because it is common ground here there was
nothing that said it was a certificate.

THE COURT:                  No, that is
common ground.

MR. GADD:                  And there are
cases where the Court has said this isn't a
certificate, but since the parties treated it as one,
then it is. So if it was just a matter of
interpretation or construction or taking a view as to

whether this piece of paper is a certificate or not, the answer would be no, but because the parties treated it as if it were a certificate, then it is.

So that's the first point that could be relied on.  Or if the parties didn't treat it, expressly didn't treat it as a certificate, then it's not.  So, that is something that would change the case, at least as regards the parties to that correspondence, assuming there is any.  And for all those reasons, particularly because it is easy to do if there are only seven law firms involved, we think that the test case approach is the more attractive proposition.  It avoids the risk of two appeals instead of one.  It may avoid the risk of any appeal at all if one would be faced with appealing against my (unclear) if my appeal succeeds.  In my submission it would be over costly and that the Defendants are --

THE COURT:                    How long do you say a case can take?  I mean, I have been given three months, six to seven weeks.

MR. GADD:                    My Lord, I don't know until disclosure has taken place or we've had an opportunity to make an estimate based on the documents that we've got.  I'm not suggesting Your Lordship were to order a test case today.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

                    THE COURT:                 I'm not going

to.

                    MR. GADD:                  I'm not asking

Your Lordship.

                    THE COURT:                 No.  Well,

that's good.

                    MR. GADD:                  That removes

one possible issue.  But I'm not asking Your Lordship

to order that today because we don't know if it would

be suitable.

          It may be my learned friends are right

that the negligence issue would lead to months of

debate and argument.  We simply didn't know until

disclosure has taken place.  And so our plan, if I can

put it that way, on this side, was disclosure, we would

give disclosure and at that point we would identify

whether it was appropriate to go forward with a test

case on all issues except change of circumstances or

whether it would be appropriate to go forward on

certain preliminary issues which might not be limited

to the preliminary issues that my learned friends have

proposed.

          Why, for example, could one not deal with

the question of set up (unclear).

                    THE COURT:                 Mr. Gadd, I

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

mean, is this material, this 500,000 documents, are
they organized at all?

MR. GADD:              My Lord, it's
not in evidence, but I can tell Your Lordship, on
instructions, that the documents have been received in
installments.  The largest document production was last
month which is 350,000 pages.

THE COURT:              Of what?  Of
what?

MR. GADD:              My Lord, that I
can't answer.  Those instructing me haven't looked at
them, haven't been given them, haven't been instructed
to look at them, having asked Your Lordship's
permission to incur costs in the liquidation looking at
them.

THE COURT:              I mean, if
anyone knew there was a file dealing with internal
transactions between the Company and Citco NV, you
could just go and look at that.  And if you knew there
was a file for each of the individual, I say
individual, each of the specific investors, then you
could look at those files.  That could be quite quick,
couldn't it?

MR. GADD:              Yes.

My Lord, Mr. Hare keeps trying to tell me

something.   I think it's probably better if he tells

you himself because he knows all about the documents.

MR. HARE:                My Lord, just

to assist the Court, the documents have come in various

file types from Citco.   We're instructed that there are

word documents, PDF documents and Excel documents.

Mr. Gadd's just indicated we haven't seen them.

THE COURT:              No, no.

MR. HARE:               We've never

been asked to look at them.

The difficulty is, that if you're going

to pin down each particular redeemer, if you don't have

a document which has, or files limited to that

redeemer, and none of the documents that we've seen

have been in that order, you're going to have to upload

all those documents onto a document management system

which the Liquidators are using, and then use the

search function in that document management system to

try to sort the documents relevant to each particular

redeemer.

Now it may well be the case that these

documents are largely NAV statements, statements to the

different redeemers and to different investors in the

Funds, and e-mail correspondence between Citco and the

Fund.   It may be the vast majority of these documents

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

are of that type, but as Mr. Gadd has said, until we've

seen what the sort of internal documents between the

directors and the investment manager and Citco, those

may be a smaller class, but we really haven't reviewed

any of these.  Until we've got them in a reviewable

form, put them onto the document management system, we

can't say what those documents consist of, and what is

or isn't in the documents.  And what we've got, we're

told Citco can't provide them in a more efficient

format which may have been one of the reasons why it

took so long to get documents in the drip feed fashion

in which they were provided.

We're told that the document management

system which is being used is not able to break down

the documents, or, for example, if they were on an

excel spreadsheet is not able to resort the documents

by redeemer, so you have to carry out a particular

search for whatever string you're looking for.

And the Liquidators are very concerned

that if disclosure is to take place that they have

sufficient time to do it.  They've got to get

sufficient time to seek Your Lordship's sanction to do

it, and the manner in which Your Lordship wants them to

do it is approved.  And also, in the back of their mind

there is the possibility that they're aware of, they

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

may not have, in fact, received all documents from

Citco, in which case they may need to go off and get

further documents or get Your Lordship's direction as

to whether they should or not seek further documents

from Citco.

        THE COURT:           Thank you, Mr.

Hare.

        MR. GADD:           So, My Lord,

for the reasons I've given, we are going to reach a

decision and put a proposal to Your Lordship after

disclosure as, in fact, as to whether we're going down

the preliminary issues route, which would include the

preliminary issues, at least preliminary issues that

have been identified by my learned friends.  We may be

able to load some more onto it and get more things

decided, if possible.

        The big prize, in my submission, would

be, if we were able to conclude as to whether it was

possible to have a test case on all issues except

change of position, that could be heard relatively

quickly and relatively cheap.

        I don't know how much documentation will

go to the issue of negligence or alleged negligence on

the part of the directors.

        THE COURT:           Well, one can

safely assume the more negligent you were the less
documents you would have.

MR. GADD:                    And, of course,
my client, the Liquidator, he doesn't know beyond what
people have told him, and he's not able to examine
people who are out of the jurisdiction.  So it may be
that for all the smoke that Mr. Picard has blown,
actually deciding the issue in this court will not
require a lot of documentation because there won't be
any and won't require a lot of evidence.

THE COURT:                    Right.

MR. GADD:                    But, we don't
know.  We don't know.

THE COURT:                    You keep saying
that.

MR. GADD:                    But that's
precisely why I say this decision should be taken after
disclosure instead of now.

THE COURT:                    What is wrong
with having a decision on (a) what "certificate" means
and (b) whether a particular document is a certificate,
and (c), if those two things arose that the certificate
binds?  What's wrong with that?

MR. GADD:                    Or doesn't
bind, as the case may be.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

THE COURT:                    Or doesn't
bind.  Obviously it's a mirror image.

MR. GADD:                    Yes.

The difficulty with that is that it could
be a ruling made in a vacuum.

THE COURT:                    What sort of
vacuum is that?

MR. GADD:                    Well, we don't
know.  I'm repeating myself.  We don't know whether
there is any relevant material that we disclosed on,
discover, disclosure which would put a different
complexion on it.

THE COURT:                    Oh, yes.  But
if you, if one moves toward decisions on those three
points, but said save the other defences, wouldn't it
move things forward?

MR. GADD:                    It would move
things forward, My Lord.  We're asking for 12 weeks for
disclosure.  It's subject to Counsel's availability.
It puts us into October or November, perhaps subject to
the Court's other commitments.  So we're looking really
at, if Your Lordship was to direct preliminary issues
without disclosure, we're looking at doing it shortly
before the long vacation.  If we do have disclosure,
we're looking at doing it shortly after the long

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1016

vacation.  In my submission, the certainty of doing it the right way outweighs getting it on before as opposed to after the long vacation.  And the possibility that after disclosure we may be able to identify and agree that we should expand the list of preliminary issues.

My learned friends at the moment don't want to try negligence.  They may be right.  It may be a non-starter.

THE COURT:                What do you say about the suitability of the good consideration point as a preliminary issue?

MR. GADD:                Again, I submit, there ought to be disclosure.

THE COURT:                No.  What about the suitability of that as a preliminary issue?

MR. GADD:                What I would say, it's not suitable on its own because of the prospect of an appeal.  If that were the only preliminary, if that were the only issue to be decided, then, in my submission, that's too little, and we should be more ambitious than that.

But, it is, I accept, it's a point of law and so my only concern about it is that it should have more issues than just that one.

THE COURT:                What you're

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

really saying about the Article 11 point is that it
isn't a preliminary issue.  That's what you're saying.
What you're really saying, because you're saying, ah,
it's all very well, that's no good, because in each of
these cases it may be the nuance of correspondence
which changes the complexion.  I think you have to say
it isn't really a preliminary issue.  You can't say
I've got to read 500,000 documents and then we can have
it as a preliminary issue.  You're really saying it can
never be a preliminary issue, if I understand your
submission, because there always might be something
which will turn up to show that whatever the Court
thinks a plain language mean, in any given case or in
any given redemption there's a phone call or an e-mail
which destroys that construction.  So there's no point
in having preliminary issues, if I'm understanding you
right.

      MR. GADD:          My Lord, what
I'm saying is that it's not appropriate to direct it
today.  But after disclosure has taken place, then it
should be considered.  Because I fully accept that, to
take one extreme, there may be nothing in the
disclosure that takes the issue further one way or the
other.  But my point really is that we should, first of
all we should decide it in the light, or Your Lordship

should decide it in the light of, and also at that point we can identify what other issues, if any, could usefully be dealt with at the same time.

THE COURT:                   If the Article 11 point is suitable, there's no point in having any other issue, really, because either it fails or it succeeds.  I mean, if it fails, their point fails, then I think there is nothing much other than a full trial, to be honest.

MR. GADD:                   If they fail on both points.

THE COURT:                   Mr. Gadd, how much more do you want to say?  Have you got sort of more than 10 minutes?

MR. GADD:                   My Lord, I don't have more than 10 minutes.

THE COURT:                   Just take your time.  But, I mean, finish off.

MR. GADD:                   Yes.  I'm not going to take Your Lordship to the authorities because Your Lordship's familiar with Whiteman and those cases.

THE COURT:                   I think that's right.

MR. GADD:                   They were decided under the RSC, but the only reason we put them

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

in our bundle is because they show Your Lordship there
is a danger in deciding points of law on hypothetical
facts.

THE COURT:                  Well, you don't
need authority for that.  There is obviously a danger.

MR. GADD:                  My Lord, yes.

Just dealing with the sort of directions
that would be required to make --

THE COURT:                  Yes.

MR. GADD:                  -- everything
binding on all parties, of course it's in everybody's
interest that any rulings Your Lordship makes are
binding on all parties.

We don't have any concern, however, about
Defendants who haven't submitted to the jurisdiction
because I can get a default judgment against them if I
want to.  It won't do me any good.  So Your Lordship is
not concerned with that.

So as I told Your Lordship we're
concerned with only those Defendants who have either
served Defences or have served an Acknowledgment of
Service --

THE COURT:                  Yes.

MR. GADD:                  -- and do not
challenge the jurisdiction.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

Your Lordship's not concerned -- I'm not against the idea of this, but there's no concern or should be no legitimate concern about the Liquidators as to whether they should be bound or not because they're subject to Your Lordship's direction anyway.

There are only 41, including those who acknowledged service, 55 active Defendants represented by seven firms, so it should be possible to make satisfactory arrangements, but I will submit Your Lordship can't be satisfied today that everyone should be bound.

THE COURT:                 Everyone being what?

MR. GADD:                 A reactive Defendant.  What I'm suggesting to Your Lordship is it would be unsafe to assume today that every active Defendant would be bound.

THE COURT:                 So you're saying that there's a distinction between those who are represented today by Counsel and the rest, is that what you're saying?

MR. GADD:                 My Lord, yes.

I'm not making this point in order to derail things, because it's in my interest, as well as everybody else's, that there should be a binding

decision in due course.  So all I'm saying is that,

particularly if this all comes back after disclosure,

it should be possible by then for the Liquidators and

the Defendants who are represented today to have made

some sort of agreement with all active Defendants, that

active Defendants can either take part in the

proceedings and make submissions or simply sit outside.

THE COURT:                Well, they're

asking me to make a direction to that effect today, and

what's wrong with that?  I mean, it may be wrong, but

what is wrong with that?

MR. GADD:                 No one's had

the opportunity to be heard on it.

THE COURT:                They have had

the opportunity to be heard.  They just having taken

it.  You've always got an opportunity to be heard.

MR. GADD:                 Well, there are

Defendants who haven't given instructions to their

lawyers.

THE COURT:                Yes, but that's

not the same as having an opportunity to be heard.

MR. GADD:                 There are also

Defendants who haven't yet put in a Defence.  There are

also claims that will be brought in the next few weeks.

THE COURT:                I have

difficulty about making orders in actions which haven't yet started.

MR. GADD:                    Indeed.  In my submission, it can't be done.

THE COURT:                  You're probably right.

MR. GADD:                    But what I do say, is that we can, with only seven firms involved, something could be done so far as humanly possible so everyone is bound.

As for the question of staying the proceedings, regardless of whether there's a test case or preliminary issue, I accept that a stay of existing proceedings seems sensible, except that all existing actions should proceed to close of pleadings, so at least we get notice if someone is raising a different type of defence.

THE COURT:                  I think they would say that they would quite like to see replies from you too.

MR. GADD:                    Well, we'll consider whether we ought to be.

THE COURT:                  If any.

MR. GADD:                    If any, yes.

Certainly if I, if I take the view that in any case we

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

should be replying, then we will.

THE COURT:                    Yes.

MR. GADD:                     But at the
moment I remain to be convinced about that.

And as for actions that are to be brought
in the future, and Your Lordship's made the point that
there are some proceedings that don't exist yet, of
course we would have to, subject to Your Lordship
refusing or taking away the permission we already have,
we will have to issue proceedings to maintain the
limitation position.

So, My Lord, just to sum up, it isn't
seriously suggested on the other side, the way Your
Lordship has suggested it, that there shouldn't be
disclosure, and, in my submission, and I assume my
learned friends are all agreed, there should be
disclosure.  If there is to be disclosure, it has to be
done properly, and the evidence is it will take 12
weeks.  And in order to do things properly, that simply
makes the difference between a hearing in July before
the long vacation or hearing after the long vacation.
In the great scheme of things it doesn't make a huge
amount of difference.

My learned friend made the point that the
Articles, the whole regime of the Articles was to bring

about certainty, but that rather begs the question as
to whether the documents they rely on are certificates
or not.  In any case, in spite of the urgency that's
suggested on that part, we're only talking about the
difference between before or after the long vacation.
And, as I've said, after disclosure has taken place, we
can identify whether to expand to one extreme test case
or simply just to add to the preliminary issues we've
already suggested.

THE COURT:              Yes.

MR. GADD:               My Lord,
perhaps I ought to just make the position clear that
our position is that we do not consider that this is an
appropriate case for preliminary issues.

THE COURT:              Well, I thought
your position was that you do not consider it's
appropriate at the moment.

MR. GADD:               At the moment.

THE COURT:              But you might
be.

MR. GADD:               We think that
it is possible to have a test case.

THE COURT:              Oh, I see.
Well, that's at all.

MR. GADD:               My Lord, yes.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

THE COURT:                 You seem to be running two lines.  One is you've got to have discovery first.  And the second is, if you have discovery, you've got to have the whole trial.

MR. GADD:                 Well, I've been running two cases, My Lord --

THE COURT:                 That's all right, that's fine.

MR. GADD:                 -- in case Your Lordship is against me.

THE COURT:                 I mean, there are two separate strands in what you're saying.

MR. GADD:                 My Lord, yes.

Strand one is no preliminary issues, that once we've had disclosure we can identify a way forward that gives us a test case or at least a test case on the majority of issues --

THE COURT:                 Yes.

MR. GADD:                 -- not necessarily all.

That is our preference.  That's what we wanted.  If Your Lordship's against me on that, I'll say we still need disclosure as we go down the preliminary issue route.  We would still need disclosure.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

The main reason we don't favour the preliminary issues, even assuming that disclosure doesn't make them unsuitable for preliminary issues or make them unsuitable for the purpose of binding all Defendants, is that the preliminary issues are not short points of law that are easily decided, and assuming that the possibility of an appeal, that is going to slow things down because although my learned friend, Lord Falconer, made the point that it makes no difference whether the appeal is now or later, in my submission, it does make a difference if there's two appeals rather than one.

THE COURT:                    Yes.  There's no doubt about that.

MR. GADD:                    My Lord, unless I can try to assist you further, those are my submissions.

THE COURT:                    Right.

Well, I'll sit again, unless anyone has any objection to the shortness of time, I'll sit again at 2:00 o'clock and then I'm going to ask Lord Falconer and Mr. Hapgood to sign the book before we do anything else.

(THEREUPON, luncheon adjournment taken at 1:14 p.m.)

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

```
1                    AFTERNOON PROCEEDINGS

2              (Court reconvened at 2:00 p.m.)

3                           * * *

4              LORD FALCONER:              My Lord, can I

5      deal very shortly with the submissions made by Mr. Gadd

6      and at the heart of his submission was the issue of

7      discovery.  He was saying in effect don't make any

8      decision about the preliminary point until we've had an

9      opportunity to go through the documents and then let's

10     come back when we've done that in order to see whether

11     or not there should be preliminary points.  And then

12     secondly, if you are going to make an order for

13     preliminary points now, he is saying please let us make

14     full disclosure of issues rather than preliminary

15     points by going through the documents.  So bear that in

16     mind when Your Lordship comes to face directions.

17                   We have had an opportunity to think about

18     that and we, well not all of us, but most of us are

19     attracted by the suggestion that Your Lordship, we

20     understood, to be putting to Mr. Gadd, what is wrong

21     with the Court deciding the following issues, what is a

22     certificate, are these documents certificates, what is

23     the effect in this case if they are they are

24     certificates.  In effect, three issues.

25                   We believe that if preliminary points
```

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1   were formulated to that effect, they are very, very

2   likely to resolve the issues in this case.

3           How does that affect discovery?  We don't

4   believe that any discovery would be required in

5   relation to those issues.  We believe that the right

6   way for the Court to proceed would be to decide those

7   issues, for the Court in effect to take a number of

8   particular redemptions, and the obvious redemptions to

9   take are those in the application cases.  In one of

10  those application cases which is Mr. Chambers', the

11  last one, there are five hundred redemptions and it

12  might be sensible for the parties, us four and

13  Mr. Gadd, to agree a restricted number in relation to

14  those; we produce the documents that relate to those

15  redemptions, Mr. Gadd can put forward any documents he

16  wants to but there is no obligation in relation to

17  discovery and Your Lordship then rules on the

18  preliminary points with everything else being stayed.

19          If, as we think is hugely unlikely, there

20  is something special about an individual redemption,

21  the idea, for example, there was some side deal, then

22  when we move from the preliminary point, assume that we

23  have won it, we might not, but assume that we had won

24  it, the next consequence would be for us to seek

25  judgment in the action.  If Mr. Gadd's client then

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

 1   think actually there might be something special about

 2   this particular one, then they can raise it then, but

 3   it's matter for them, perhaps in applications it makes

 4   to Your Lordship at a subsequent occasion, to determine

 5   whether it is worth the effort should we win the

 6   preliminary point, in going through all of their five

 7   hundred thousand odd documents to see whether there are

 8   these side deals, and it's a matter to be decided once

 9   the Court knows what its view is in relation to the

10   Article 11 point.

11                THE COURT:                It's not just

12   side deals.  I think Mr. Gadd also is concerned that

13   there might have been an understanding between the

14   funds and Citco NV which might have meant that in fact

15   these were not done on behalf of the funds.  He is

16   taking a point that if he can't find, it's the

17   authority point, so if the matter was to be approached

18   in the way that you have just outlined, there would

19   have to be a saving, wouldn't there, for individual

20   cases.  You've said well you'd go for judgment if you

21   had succeeded on it, and then by that time Mr. Gadd

22   might have got himself in a position where he was

23   better able to identify the papers relating to your

24   claim or the papers relating to the actual instructions

25   that Citco NV were receiving and would be able to meet

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1  it and say that just doesn't wash; you may be right on

2  the construction of Article 11 but in this particular

3  case you've got an answer to it.

4         LORD FALCONER:            Exactly.  But

5  it would be a question for him in consultation or in

6  application to this Court, to determine whether or not

7  there was a sufficient prospect of something turning up

8  to make hundreds of thousands of pounds or US dollars,

9  required to go through these documents to see whether

10  there is something either on authority or on side deal

11  or what Mr. Rumsfeld would describe them as, unknown

12  unknown, when it might well be that the Court, and we

13  will invite the Court to take this view, that it's

14  pretty likely that the transactions are as straight

15  forward as they look and that is the more likely

16  conclusion to reach.

17         THE COURT:                Any judgment

18  will have to be given on a balance of probabilities.

19         LORD FALCONER:            Exactly.  So,

20  My Lord, we would respectfully submit that the answer

21  in this case is to take Your Lordship's approach to

22  make the appropriate savings in relation to side deals

23  or authority and we can work out how we frame it, that

24  we, the defendants, should provide documents in

25  relation to, as it were, exemplar redemptions, which we

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1   will try and agree which they are with Mr. Gadd's

2   clients.   That we then try as quickly as possible

3   points in relation to Article 11, that the next stage

4   would then be, assume that we win, we would go for

5   judgment and they would have the opportunity to raise

6   the specials.   If we lose, then the question would

7   arise in relation to appeal.   But we can go to the next

8   stage in relation to this.

9           We would respectfully submit that you

10   should include good consideration in relation to it

11   because there is no dispute on the facts as Mr. Gadd

12   rightly acknowledges, that the good consideration of

13   which we rely on is the redemption of the share, the

14   giving up of the shares by the investors.   So there is

15   no real factual matrix to go into.

16           THE COURT:                 The only thing

17   I've got about that, the only thing that worries me,

18   it's not for now really.   All the cases that I have

19   been referred to, the person who gave the good

20   consideration is never party to the actual contract.

21   It baffles me that you can defeat any claim for mistake

22   by saying well we did a deal and we completed a deal.

23   You can complete a conveyance of a house and the chap

24   can still come along and say it's a mistake.   There can

25   never be an answer as between the immediate parties,

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1032

1    can it, that the contract was completed.  At least I

2    can't see that.

3              I just tried the preliminary issue.

4              LORD FALCONER:              Your Lordship

5    is right that all other cases appear to be banks paying

6    on behalf of somebody else and the bank is trying --

7              THE COURT:              They are trying

8    to sort out who should bear the loss.

9              LORD FALCONER:              And because

10   they don't have authority, they are in effect a

11   stranger to the transaction and because they are a

12   stranger to the transaction, then unjust enrichment

13   kicks in rather than the contract.  In the example that

14   you gave, I buy a house, I hand over the money

15   believing that I have a million pounds in my bank

16   account, in fact I've got minus 500,000 pounds.  Of

17   course you can't be heard to say oops, sorry, I am not

18   as rich as I thought I was, money paid under mistake of

19   fact.  Why not?  Because good consideration has been

20   given to you and it's bound by contract.

21             The reason why where good consideration

22   moves from a payee is a complete defence, is because

23   you never get into the unjust enrichment framework.

24   And I respectfully submit that is so obvious that the

25   only circumstance in which it's ever arisen is in

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1033

1   relation to banks paying without authority where they

2   can describe themselves as strangers, but there is an

3   issue of consideration.

4             THE COURT:              But you can

5   rescind a completed transaction for mistake.

6             LORD FALCONER:             But that's in

7   the context of the rules of contract, not the rules of

8   unjust enrichment.  That is a mistake applied in the

9   context of contract, where there are strictly defined

10  rules and this is about people who have indeed made a

11  contract, but they've made a contract on the basis of

12  the rules that apply to contract; whereas the unjust

13  enrichment thing is where they don't have a precedent

14  relationship except.  So in the leading case, Barclays

15  Bank and Simms, the bank in fact doesn't have authority

16  to make the payment to the company so it is making the

17  payment as a stranger and there aren't, there isn't a

18  relationship between Barclays Bank and, I don't know

19  whether you call Mr. Simms the person to whom is the

20  receiver of the building company.

21            THE COURT:              All right.

22  That's my fault.  It's not for discussion now.

23            LORD FALCONER:             But it's a

24  point of law which can be dealt with in a manageable

25  way.

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1            So, My Lord, there is no point in me

2    repeating the submissions we made before the short

3    adjournment, which is that effectively it's manageable,

4    the discovery point shouldn't distract us from the

5    essential proposition.  We should be allowed to get on

6    in relation to it.

7            I should just give one point.  Mr. Gadd

8    appear to be saying, and this may be caricatured, but

9    for Your Lordship's protection against appeal you

10   should --

11           THE COURT:            Yes.

12           LORD FALCONER:        Your Lordship's

13   got to form a view with respect as to whether or not

14   the exercise of going through the discovery --

15           THE COURT:            Well if you

16   have put it on that basis, you are not allowed to

17   appeal on the basis that you did not get full

18   discovery.

19           LORD FALCONER:        Of course not.

20           THE COURT:            That's self

21   canceling.

22           LORD FALCONER:        Exactly.  Your

23   Lordship's got to look at the question of will this

24   discovery be a worthwhile process in the context of

25   this preliminary point, and I respectfully submit it's

```
 1   unlikely to be.

 2            THE COURT:              I think

 3   Mr. Gadd, if I took that course, would still be saying

 4   you shouldn't be doing this, you shoved this

 5   preliminary issue down my throat.  I can't stop him

 6   submitting that, whatever decision one makes.  So I

 7   think that would have to be clearly understood.

 8            LORD FALCONER:            I understand

 9   that, My Lord.

10            My Lord, unless there is any other point

11   I can help Your Lordship with.

12            MR. HAPGOOD:              My Lord, I

13   respectfully adopt everything Lord Falconer has just

14   submitted in his reply.

15            Very briefly on the two points, first the

16   concern about side deals or special facts.  Now can I

17   just remind you how this problem was very successfully

18   addressed in the Interest Rate Swap Litigation in

19   London.

20            There were lead cases selected to resolve

21   two points of principle which is one in a pure

22   bi-partaid situation, how did the restitutionary

23   principle apply, how far back would you unwind

24   payments, did you set off multiple swaps, et cetera.

25   There was a separate issue about what happened in
```

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1   relation to those local authorities who had

2   intermediated between a bank and a second, which none

3   of them did.   And Mr. Justice Hirst said right, there

4   are common points of principle here, I am going to rule

5   on those, I am going to stay all other actions.   When I

6   rule, the general stay would be lifted and any bank or

7   local authority that says I've got special facts which

8   takes me outside the ruling, can come back to me.   And

9   in the event, of course, there weren't any such banks

10   or local authorities because everyone agreed either

11   summary judgment for the bank or summary judgment for

12   the authority after the ruling had been given.   So it

13   can be dealt with.

14           This of course is rather different

15   because if one is being realistic, the notion that

16   there is some special bargain between Fairfield Sentry

17   and individual defendant which somehow overrides what's

18   in the articles, is rather fanciful and it's just not

19   going to happen.   I can't even imagine what the bargain

20   would actually say.   But nevertheless, if Your Lordship

21   stayed those actions save the ones in which

22   applications have been determined, stayed them

23   generally on the basis that following your judgment

24   having been handed down the stay would be lifted, then

25   everyone is protected if they do wish to come along and

1   say well we've got special facts.

2          THE COURT:          Stay what other

3   actions?

4          MR. HAPGOOD:          There are

5   applications for preliminary issues in seven, sorry, in

6   eight actions and there are seven actions in which no

7   applications are made at all.  And so those seven

8   actions would, in my submission, be subject to a

9   general stay after the point has been reached at close

10  of pleadings.  I certainly accept that they should

11  progress that far.

12         Now the other aspect, the other minor

13  wrinkle on all this is the authority point.  Now again

14  this is really such an artificial concern for two

15  reasons.  First, Citco's authority from Fairfield

16  Sentry, its actual authority is contained in the

17  administration agreement.  It's not before you, but of

18  course it's an agreement.

19         Secondly, Citco's apparent authority

20  vis-a-vis shareholders is contained in the placement

21  memorandum and are on very similar terms and both say

22  in effect, Citco calculates and publishes the NAV on

23  behalf of Fairfield.  Now how can the discovery add to

24  those facts?  There may be a point of law as to whether

25  authority to calculate and publish the NAV does not

1   carry with it authority to certify.  We say obviously

2   it does but that could be a matter of argument, but I

3   don't myself see how disclosure can impact on this.

4   But if Fairfield remained of the view that it might do,

5   then they can get on at whatever point they think

6   appropriate and look at their documents and if

7   necessary, if they haven't completed that exercise to

8   the stage where we have the hearing of the preliminary

9   issues, they can ask you to make a reservation in your

10  judgment to protect them against the possibility and

11  maybe should come back at some later date and raise

12  want of authority.  But they can't sit on the fence on

13  this forever.  At some stage they will have to plead

14  want of authority if that's going to be their case.

15  And they need to be getting on now to investigate it

16  because we think it's factually, absolutely hopeless.

17              THE COURT:              I didn't put it

18  to Mr. Gadd, but there seems to me to be two questions

19  really.  One is whether the funds could, as between

20  themselves and Citco, complain about want of authority

21  which they may be able to.  Quite another question is

22  whether as against investors who have redeemed they can

23  say having allowed this process to carry on for years,

24  that unbeknownst to you these people had no authority

25  of doing it, they find that very hard.  And they are

1    saying the second one (Inaudible) as between you and

2    the funds.

3              MR. HAPGOOD:              Well except

4    that if in fact there was actual authority we don't

5    have to allow --

6              THE COURT:              No, I accept

7    that.  But I mean if there was actual authority but

8    they desired to cancel the management agreement because

9    they had said oh, we can't face the fees, but by

10   allowing them to carry on dealing with redeemers I

11   would have thought the funds would be stuck and simply

12   allowed Citco to hold themselves out as having

13   authority and that's the end of that.

14             MR. HAPGOOD:              Your Lordship,

15   it's a completely unrealistic proposition.  Fairfield

16   probably never concerned itself with the way Citco's

17   presenting information to the shareholders.

18             THE COURT:              I think that's

19   what Mr. Picard has said.

20             MR. HAPGOOD:              Citco is given

21   an enormously wide authority because Fairfield Sentry

22   doesn't want to do these things itself to its own

23   employees.  So it's come years after the event when

24   Citco has been for years someone saying well ah, Citco

25   didn't have authority.  And it must be as unattractive

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1    a submission as one can make, and it's just not going

2    to succeed.

3              Those are my reply submissions, thank

4    you.

5              THE COURT:              Mr. Lord.

6              MR. LORD:              My Lord, I am

7    the dissenting voice on the question of disclosure.  My

8    very clear instructions are to seek disclosure from the

9    Liquidators in relation to the preliminary issue.  The

10   reason for that, My Lord, is that there is concern

11   there may well be documents in the Liquidators'

12   possession which will help you decide whether or not

13   certificates were issued.

14             My Lord, I gave you four examples this

15   morning.  I don't want to repeat them if you've got a

16   note of them.  Shall I just trot through them?

17             THE COURT:              Yes.

18             MR. LORD:              First of all,

19   all documents including board minutes in which the

20   board approved the document that contained NAV

21   calculations or, for example, it might be minuted in

22   monthly board minutes what the NAV had been certified

23   at.  Documents pursuant to which the board --

24             THE COURT:              So all

25   documents including board minutes, sorry, in which

1    redemptions were approved?

2                    MR. LORD:                    Which the board

3    approved the document that contained NAV calculations

4    or minuted in the board minutes that the NAV had been

5    certified at a particular price.

6                    The second category was documents

7    pursuant to which the board delegated the right to

8    calculate the NAV to others, namely, Citco.

9                    The third category is audited financial

10   statements that refer to or approve the NAVs for any

11   period.

12                   And the fourth, and these are not

13   intended to be exhaustive, is all documents evidencing

14   discussions and communications about the finality of

15   the NAV determinations under Article 11.  And the

16   example I gave was the possibility of correspondence

17   with subscribers who subscribed in November 2008 and

18   then when they realised that it was all a Ponzi scheme,

19   wrote and complained and said we would like our money

20   back and one just wonders whether or not the response

21   wasn't you can't because of Article 11.

22                   Obviously those documents would not

23   amount to the certificates but they may well help Your

24   Lordship in deciding the issue.

25                   THE COURT:                   It seems to me

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1    standing on its head, when you are entitled and should

2    be relying on the internal management rule and saying

3    well I am not interested in any of this, as far as I am

4    concerned it was all being done properly.  It's for

5    Mr. Gadd, I would have thought, if he wants to say well

6    April fool, it wasn't.  Well anyway, there you are.

7              MR. LORD:              My Lord, in

8    terms of timing, the difference of course that would

9    make would be a difference between a trial of the

10   preliminary issues in June or July or October.

11             THE COURT:              Yes, but I've

12   got, I know that they are not before me except through

13   the liquidator, but I have got to worry about all the

14   creditors and how much of their money is being spent.

15   That's the thing.

16             MR. LORD:              My Lord, I

17   just wanted to make my submissions.

18             THE COURT:              Thank you very

19   much.  That's very clear.

20             Mr. Chambers.

21             MR. CHAMBERS:              My Lord, for

22   our part we are in the same camp as my learned friends

23   Lord Falconer and Mr. Hapgood and we have nothing to

24   add, My Lord.

             THE COURT:              Right.  I

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1    should give a decision, I think, at 12:00 noon on

2    Wednesday the 20th.    I don't expect leading counsel to

3    be here.    The local bar can deal with anything which

4    arises.    Is that all right?

5              Before parting with this, I would like to

6    congratulate everybody on the speed at which it has

7    been handled and as I said before we started, on the

8    impeccable way in which the applications have been

9    prepared.

10             Thank you very much.

11             (THEREUPON, adjournment taken at 2:25

12   p.m.).

13                        * * *

14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1

2                    ## REPORTERS' CERTIFICATE

3

4              WE, PETULA STOUTT, a Certified Court Reporter,

5    and MONIQUE M. GRAHAM, a Certified Court Reporter do

6    hereby certify:

7              That on the 18th of April, 2011 the foregoing

8    proceedings were taken down by us in machine shorthand,

9    consisting of 161 pages herein; that the foregoing is a

10   true and correct transcript of the proceedings had.

11             That we are not attorneys, relatives, or

12   employees of any party hereto, or otherwise interested

13   in the events of this cause;

14             IN WITNESS WHEREOF, we have hereunto affixed our

15   signatures at Road Town, Tortola, British Virgin

16   Islands, this 9th day of May, 2011.

17

18                            _____
                              PETULA STOUTT
19                            Certified Court Reporter

20

21

22                            _____
                              MONIQUE M. GRAHAM
23                            Certified Court Reporter

24

25

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

BRITISH VIRGIN ISLANDS

IN THE HIGH COURT OF JUSTICE

(COMMERCIAL DIVISION)


CLAIM NO. BVIHC(COM) 357 OF 2009
FAIRFIELD SENTRY LIMITED (in Liquidation)
And
ALFREDO MIGANI & 22 Others

CLAIM NO. BVIHC (COM) 404 of 2009
FAIRFIELD SENTRY LIMITED (in Liquidation)
And
BANCO GENERAL SA/BANCA PRIVADA & 30 Others

CLAIM NO. BVIHC (COM) 425 OF 2009
FAIRFIELD SENTRY LIMITED (in Liquidation)
And
BANK JULIUS BAER & CO LTD & 26 Others

CLAIM NO. BVIHC (COM) 5 of 2010
FAIRFIELD SENTRY LIMITED (in Liquidation)
AND
BANK JULIUS BAER & CO LIMITED 26 Others

CLAIM NO. BVIHC (COM) 15 of 2010
FAIRFIELD SENTRY LIMITED (in Liquidation)
AND
ARBITRAL FINANCE INC & 23 Others

CLAIM NO. BVIHC (COM) 30 of 2010
FAIRFIELD SENTRY LIMITED (in Liquidation)
And
BANK JULIUS BAER & CO LTD & 33 Others

CLAIM NO. BVIHC (COM) 153 of 2010
FAIRFIELD SENTRY LIMITED (in Liquidation)
And
WISE GLOBAL FUND LIMITED

CLAIM NO. BVIHC (COM) 20 of 2011
FAIRFIELD SENTRY LIMITED (in Liquidation)
And
CREDIT SUISSE LONDON NOMINEES LIMITED


COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

**Fairfield Sentry**
TRANSCRIPT OF PROCEEDINGS


**Wednesday 20th April 2011**
**12:00 noon to 12:30 p.m.**


BEFORE:   HONOURABLE JUSTICE EDWARD BANNISTER, Judge


Court Reporting Unit
Government of the British Virgin Islands
Road Town, Tortola
British Virgin Islands


COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT


APPEARANCES:

FORBES HARE
Chambers
Road Town, Tortola
British Virgin Islands
BY: MR. MICHAEL GADD, and

Fairfield Sentry
MR. WILLIAM HARE
For the Claimant

MAPLES & CALDER
Chambers
Road Town, Tortola
British Virgin Islands
BY:  MR. DOMINIC CHAMBERS QC
MS. ARABELLA di IORIO
For the Maples & Calder Defendants

OGIER
Chambers
Road Town, Tortola
British Virgin Islands
BY: MR. DAVID LORD QC
MR. MICHAEL FAY, and
MS. CLAIRE GOLDSTEIN
For the Ogier Defendants

HARNEY WESTWOOD & RIEGELS
Chambers
Road Town, Tortola
British Virgin Islands
BY: MR. MARK HAPGOOD QC
MR. PHILIP KITE, and
MR. KISSOCK LAING
For the Harneys Defendants

O'NEAL WEBSTER
Chambers
Road Town, Tortola
British Virgin Islands
BY: LORD FALCONER QC
MR. PAUL WEBSTER QC, and
MS. NADINE WHYTE
For the O'NEAL DEFENDANTS

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1        P-R-O-C-E-E-D-I-N-G-S

2                * * *

3        (Court convened at 12:00 noon)

4        THE CLERK:              BVIHC(COM) 357

5    of 2009, Fairfield Sentry Limited and Alfredo Migani et

6    al.

Fairfield Sentry

7              THE COURT:                    For the reasons

8   given in the judgment - I am afraid it has only just

9   been handed down - I am going to order preliminary

10  issues on the Article 11(1) point and the so-called

11  consideration point.  I don't think there is any

12  difficulty about the drafting of the consideration

13  point issue because that really tracks pretty much what

14  was in the application.  There is much more room for

15  leeway in the other one.

16              Now you won't have had a chance to, I

17  don't suppose anybody, Mr. Chambers, can I start with

18  you, you won't have had a chance to digest this at all.

19              MR. CHAMBERS:                 My Lord, we

20  have had a small chance.

21              THE COURT:                    I don't expect

22  you to commit yourself now, but if you want to raise a

23  point that's very helpful.

24              MR. CHAMBERS:                 First of all,

25  might I just start by thanking Your Lordship on behalf

    COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT


1   of all the parties for the considerable time, care and

2   effort which Your Lordship has put in the judgment and

3   the formulation on the preliminary issues itself.

4              My Lord, preliminary issue 3, and this is

5   the --

6              THE COURT:                    That's the

7   attempted saving in the case.

8              MR. CHAMBERS:                 Forgive me, My

9   Lord, it's 1 to 3, the first subparagraph 3.  It's

1049

10    below letter B, two lines below.  Your Lordship refers

11    to a member of the Claimant who subsequently redeemed

12    on the basis of the NAV stated in such documents.

13                   THE COURT:            Can you take

14    the word 'subsequently' out.

15                   MR. CHAMBERS:         Yes, My Lord,

16    that's what we were hoping.  There was a slightly

17    different formulation we had because the redemption

18    process was such that the relevant documents for

19    certificate purposes were produced both before and

20    after the actual moment of redemption.  And so what we

21    had thought we could do is this, in the second line

22    below (b) where it reads "document identified as

23    falling within 2(a) or (b) above, 2(a)," then insert

24    the words "redeeming or redeemed".

25                   So it reads "above to a redeeming or

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1     redeemed member of the Claimant," and then delete the

2     words, "who subsequently redeemed on the basis of the

3     NAV stated in such document."

4                    Then it goes on:  "Precludes the Claimant

5     from asserting that money paid to that," then insert

6     the words "redeeming or redeemed," before the word

7     member.

8                    So those were the changes that would now

9     read, let me just read it from the beginning of 3:

10                   "If the answer to 2(a) or (b) is yes,

11    whether the publication or delivery by the Claimant

12                   (a) as a matter of information only, or

Fairfield Sentry

13          (b) in connection with a redemption

14    request

15          Of a document containing substantially

16    the same items of information as a document identified

17    as falling within 2(a) or (b) above to a redeeming or

18    redeemed member of the Claimant, precludes the Claimant

19    from asserting that the money paid for that redeeming

20    or redeemed member on redemption exceeded the true

21    Redemption Price and as such is recoverable as to the

22    excess from the redeeming member."

23          We haven't had a chance to discuss that

24    with my learned friend, Mr. Gadd, but we wanted to flag

25    it up from our side that was the only issue we had on

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT


1    the drafting.

2          THE COURT:          I objected

3    privately to the word 'subsequently'.  I don't know how

4    it's got back in there.

5          Subject to what anyone else wanted to

6    say, I approve that formulation.

7          Shall we just go along the line.  Is

8    there anything else you wanted to say?

9          MR. CHAMBERS:          My Lord, just

10    one tiny point in the heading on page 1 at the bottom.

11    It should be Action 20.

12          THE COURT:          I am not going

13    to change paragraph 23.  I think the heading should be

14    changed before the judgment goes out.

15          MR. CHAMBERS:          So, My Lord,

Fairfield Sentry

16  that's the only thing I had to say about that.

17              THE COURT:              Miss Goldstein,

18  you want to say anything?

19              MS. GOLDSTEIN:            My Lord, yes.

20  I have no additional changes with regard to formulation

21  of the preliminary issue.  With regard to the judgment,

22  just one comment in the appearances, which I think it

23  referred for us to Mr. Robert Foote and it should be to

24  Mr. Michael Fay.

25              My Lord, the other point that we just

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT


1  wanted to raise was we note that in paragraph 25 Your

2  Lordship talks about setting down a short timetable and

3  some directions, which we are more than happy to deal

4  with that immediately.  What we would like to flag at

5  this stage, however, is if we could set down some date

6  for the trial or a window for the trial, we are

7  obviously keen to progress this as quickly as possible

8  and we don't see any reason, if there will not be a

9  great deal of evidence, if this could come on for

10  hearing even at the end of June.

11              THE COURT:              The trouble is

12  I was dealing with an out-of-date draft order.  What

13  that said was that there was disclosure by 25th of

14  March.  That's all gone.  I don't know if anybody

15  wishes, we would just go down the line, to put in any

16  further evidence.  It just occurred to me that somebody

17  may have in their attic something they think is not a

18  killer or something and might want to put that in.



Fairfield Sentry

19              MS. GOLDSTEIN:              My Lord, there

20    might be a list.

21              THE COURT:              I am going to

22    give, I propose to give liberty to all parties to, I am

23    not going to have exchange, but if any party wishes to

24    put in additional evidence, I think they should have,

25    we've got to take account of Easter, but I think they

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1    should have until, subject to anything that anybody

2    says, I think they should have until Friday the 13th of

3    May to put that in.

4              So anyone else wants to say anything at

5    this stage?

6              MR. GADD:              No.

7              THE COURT:              So further

8    evidence, if any, by Friday 13th May.

9              Now that takes us down to, well I set a

10   hearing for two days.  Since we are not having

11   disclosure and so forth and since it's not going to be

12   a trial of the preliminary issues, it's going to be a

13   determination of the preliminary issues, I thought two

14   days was sufficient.  Does anyone want to say anything?

15              MR. GADD:              My Lord, it's

16   very unlikely, but there may be cross-examination if

17   additional evidence is put in.

18              THE COURT:              Well I think

19   what I am going to say about that is that there will be

20   no cross-examination unless an application is made and

21   granted.  So that it will have to be proactive on that.

Fairfield Sentry

22  But in that case, one might have to move the trial, but

23  it's a good point you raise, Mr. Gadd, and it will just

24  have to be monitored as we go on.

25              Now if we do that by May the 13th, I

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT




1   would have thought, I know everyone wants to get on

2   with it, but I would have thought that the sensible

3   thing to do is to direct a hearing not before Monday

4   the 20th of June, that's my suggestion, which would

5   give everybody a chance to assemble bundles and do

6   whatever they need to do, make applications for

7   cross-examination if that's what people want.  So

8   that's slightly later than what was envisaged but it's

9   not too bad, I think.  So it's the first available two

10  days and I think it's obviously for, I think, it's for

11  Maples to take the lead in fixing the date because you

12  are the lead Claimant.

13              MR. CHAMBERS:          My Lord, yes.

14              THE COURT:             But obviously

15  in consultation with all the other parties.  The Court

16  appreciates that a lot of heavy diaries are going to

17  have to be co-ordinated before we fix on a date, but it

18  seems to me if we say not before the 20th of June would

19  be safe.

20              Lord Falconer, do you wish to say

21  anything?

22              LORD FALCONER:         I am very happy

23  with that timetable because we had envisaged that the

24  import of Your Lordship's judgment was that you wanted,

Fairfield Sentry
25   subject to reasonable time of preparation, to get on

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT


1   with this reasonably quickly.

2                THE COURT:                I think one or

3   other side needs to be put out of their misery as soon

4   as possible.

5                LORD FALCONER:              I am not sure

6   what the consequence of saying not before the 20th of

7   June is in terms of I don't know how busy Your Lordship

8   is in relation to other cases, but does that mean, I

9   ask this rhetorically, but does that mean that the

10  hearing will come on shortly after the 20th of June?

11  That's what we think would be the best situation to be

12  in.  Because I think everybody down the line including,

13  I would envisage, the Liquidator, is keen for the point

14  to be resolved as quickly as possible.  We are very

15  happy, and we think it's sensible, the directions that

16  you have indicated which we can then embody in an

17  order.

18                THE COURT:                The trouble is,

19  Lord Falconer, I can't give a date now because we have

20  to make sure that everything is done through the

21  Registry otherwise I am giving one set of dates.  In

22  any case, your diary has to be looked at.  You can take

23  it from me that if, for example, I've got a two-day gap

24  and there is a case management conference, we will move

25  the case management conference.  That's an indication

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1    as far as I can go.

2                    LORD FALCONER:          That's fine.

3                    Could I raise a completely separate point

4    unless there was any other points on the directions.

5                    In Your Lordship's judgment, you say in

6    paragraph 26, "I will order that each of the

7    proceedings which are before me be stayed until after

8    determination of the preliminary issues."

9                    I take that to be a reference to the

10   eight actions in respect of which --

11                   THE COURT:              It's the 8 out

12   of the 15.

13                   LORD FALCONER:          "As for

14   proceedings not presently before me, I direct that no

15   further steps be taken in them until after

16   determination of the preliminary issues."

17                   And I took that to be a reference to the

18   other actions in the BVI which aren't ones --

19                   THE COURT:              That's what I

20   meant.

21                   LORD FALCONER:          Beyond that,

22   there are the actions in the United States of America

23   and there are also actions threatened in the United

24   Kingdom which Your Lordship saw reference to in the

25   course of the matter.  It would be sensible if the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1    Liquidator didn't pursue any of those actions until the

2    preliminary point had been resolved, and I look at it

3    from the point of view of the UBS parties who, in the

4    light of Your Lordship's order, now believe that there

5    will be a determination as to whether or not the

6    Liquidator has indeed got the right to reopen the NAV.

7                    It must be sensible, and Your Lordship's

8    got the power as the judge who is responsible for

9    oversight of the liquidation, to indicate to the

10   Liquidator that he shouldn't proceed with any of those

11   actions either in the United States of America or the

12   United Kingdom, until this point is resolved.  There

13   may be reasons, for example limitation, which has got

14   to take certain steps.

15                    THE COURT:                That's what I

16   had in mind.

17                    LORD FALCONER:            But if there

18   are limitation steps, then let those be raised and

19   justification sought for it.  Because one should, I

20   would respectfully submit, look at this in the round

21   rather than simply as, I think, an application.  So I

22   would, insofar as I am able, because I recognise the

23   relationship between the Court and the Liquidator is a

24   separate relationship, take steps to ensure that we

25   wouldn't be oppressed with steps that may be completely

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1    pointless.  It may be that Mr. Gadd can give me some

2    comfort in relation to that.

3                    THE COURT:                Obviously I am

4    not going to stop the Liquidators at least commencing

5    proceedings anywhere in the globe in order to preserve

6    limitation points.  And I don't think anybody would

7    expect me to do that, it would be quite wrong.  Knowing

8    Mr. Gadd as I do, I think he will probably advise the

9    Liquidator that it would be a waste of money to take

10   any further steps in foreign proceedings unless, of

11   course, there is a good reason.  There may be, I mean

12   for all I know there may be an order made in the

13   Commercial Court in London or wherever requiring a

14   pleading to be put in by a specific date or something

15   like that.  And that's why I didn't attempt to

16   legislate foreign proceedings over which I have no

17   control.

18            But, Mr. Gadd, do you want to just

19   respond to what Lord Falconer said now?

20            MR. GADD:            My Lord, I am

21   obliged.  As Your Lordship's anticipated, we will adopt

22   the spirit of --

23            THE COURT:            Yes, I was

24   expecting that.

25            MR. GADD:            I don't know

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT


1    whether, I am not aware of anything that needs to be

2    done in London but I simply don't know the position in

3    New York and it may be necessary to progress matters

4    there.

5            THE COURT:            Yes.  Well I

6    mean, I don't think, Lord Falconer, I don't think I

7    shall go any further than that.

8            Is there anything else you wanted to say.

1058

```
 9              LORD FALCONER:           No.
10              THE COURT:               Mr. Gadd is
11  there any other point you have?
12              MR. GADD:                On what has
13  been mentioned so far as to fixing the date, as Your
14  Lordship said there are diaries to be co-ordinated.
15              THE COURT:               Including your
16  own.
17              MR. GADD:                I anticipate
18  that those instructing me will instruct leading
19  counsel, indeed possibly leading counsel who has
20  already been, as Your Lordship knows, involved in the
21  case.  We did ascertain that unfortunately he is not
22  available for a five-day hearing until November, but of
23  course we haven't asked him about a two-day hearing
24  which we will do as soon as possible.  So I simply
25  mention that.
    COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT
```

```
 1              THE COURT:               You agree with
 2  the estimate of two days?  I've got your cross-
 3  examination point.
 4              MR. GADD:                Subject to the
 5  cross-examination point, two days.
 6              THE COURT:               It might be
 7  helpful if I say that I cannot conceive if
 8  cross-examination is going to assist me in determining
 9  the issues, because the intention was (INAUDIBLE) from
10  any documents but that's not to stop you.
11              MR. GADD:                Of course.  We
```

Fairfield Sentry

12    simply don't know what further evidence --

13          THE COURT:            You may get

14    advice from leading counsel or something like that, in

15    which case you will have to bring it up.

16          MR. GADD:            My Lord, that's

17    all I had on what's been mentioned so far.  I do have

18    another application to make.  I don't know if my

19    learned friends are finished.

20          LORD FALCONER:            On the costs,

21    we propose that costs be in the preliminary issues

22    application.

23          THE COURT:            I would have

24    thought so.

25          MR. GADD:            My Lord, I have

          COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT



1    nothing to add on that.

2          THE COURT:            So the costs in

3    the preliminary issues.

4          All right.  Well that determines all

5    business except Mr. Gadd.  Do you want to do that

6    privately upstairs, Mr. Gadd?

7          MR. GADD:            My Lord, I am

8    entirely in Your Lordship's hands.

9          THE COURT:            I don't know

10    what you want to ask me.

11          MR. GADD:            It's actually

12    an application in the action so it doesn't need to be

13    done privately unless things turn out in such a way

14    that we have to adjourn and continue upstairs.

15          My Lord, the application I have is for
16   permission to appeal.  My Lord, I haven't had an
17   opportunity to read Your Lordship's judgment from
18   beginning to end, so I am going to do this a little on
19   the hoof.  But stating the case briefly and not
20   repeating all the submissions I made the other day, our
21   concern is that first of all the preliminary issues
22   against me were determined without the benefit of
23   disclosure.  As I understand it, the door will
24   nevertheless be left ajar so that I or anyone else can
25   come back after the preliminary issues have been
     COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1    decided and plead special case presumably in response
2    to an application.
3          THE COURT:              The issue would
4    be done and dusted but you might, that wouldn't give
5    anyone judgment.  There would have to be an application
6    for summary judgment or something similar and on that
7    application, you might be able to say well no, sorry,
8    there are facts here.  Or you can even say, I guess,
9    there may be facts here and I have to take account of
10   what that added up to, if anything.
11         MR. GADD:                My Lord, yes.
12   But, of course, our difficulty is that although the
13   door was taken to be left ajar, it's rather cold
14   comfort to us if we can't look at our documents when in
15   argument the other day it was suggested at one stage we
16   should have looked at them already.  It was also
17   already suggested that we shouldn't look at them

18    without Your Lordship's permission as liquidation

19    judge.  If we go there, that may be a matter for

20    upstairs.  But my submission is simply that the

21    difficulty we have on the preliminary issues and the

22    grounds for appeal, permission to appeal, the grounds

23    for seeking permission to appeal are that we are in

24    difficulty if we can't look at the documents before the

25    preliminary issues are heard and although the door is

      COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT


1     left ajar, it's effectively locked in our faces because

2     we haven't been able to look at the document.

3              If Your Lordship were minded to give

4     permission to appeal, we would move heaven and earth to

5     get it on as soon as possible as indeed we did in

6     another matter recently.  It would be a short appeal

7     and as I understand it, the Court of Appeal is sitting

8     here between the 2nd and 6th of May and we will try to

9     get it on then.  If we couldn't get it on then, we

10    would obviously have to reconsider the position because

11    it's not our aim to delay the proceedings

12    unnecessarily.  But I make an application for

13    permission to appeal on that basis.

14              THE COURT:              All right.

15    Mr. Gadd, thank you very much.

16              This is in essence a case management

17    decision and as Lord Templeman said in Ashmore and

18    Corporation of Lloyd's, Appellate Courts should not,

19    and I say that with some trepidation, interfere with

20    decisions of that sort.  And I think, I am prepared to

21    put it on record, I think the attempt which, I would be

22    disappointed if the attempt which I am making to get

23    this decided as soon as possible was delayed any

24    further.

25          So for those reasons, Mr. Gadd, I am not

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1    going to give you permission.  You will have to ask the

2    Court of Appeal.

3          MR. GADD:          My Lord, there

4    just remains the question of looking at the documents.

5    Rather than mount a separate application to be dealt

6    with, would Your Lordship, insofar as necessary and of

7    course subject to fees assessment in due course, give

8    the liquidators any permission they need to look at the

9    documents?

10         THE COURT:         I am not going

11    to give you permission to spend a quarter of a million

12    dollars because as I tried to say in the judgment, I am

13    trying to stop you having to do that at all.  You may

14    have to look them round in another matter.  If you were

15    going to ask me if you can see if there is some quick

16    way of being able to reference documents relating to

17    particular applicants in this, in these applications,

18    in other words, you want to be able to pull up

19    documents relating to Mr. Chambers' clients, for

20    example, I would be quite happy for you to explore

21    that.

22         MR. GADD:          My Lord, that

23    has been explored and unfortunately and surprisingly

Fairfield Sentry

24   the answer is it can't be done and this is simply

25   because the way the records were kept by others and the

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

1    Liquidators received them in the way they were kept and

2    it simply can't be done.

3                    THE COURT:              Well in that

4    case, I am not going to sanction the expense, the cost

5    and the expense at this stage, and it is at this stage,

6    of examining these documents.  If they are simply, as

7    someone put it two days ago, a huge hay stack, then

8    it's going to have to be left undisturbed at the

9    moment.

10                   MR. GADD:               I am simply

11   concerned that if the door is going to be left ajar

12   that I should be able to at least have the opportunity

13   of passing through the door and I can't do that without

14   looking at the documents.

15                   THE COURT:              Well no, you

16   can't.  So that's a paradox about the decision I have

17   given, but you may have somebody who knows something

18   about something who will be able to help you.  It's

19   just too much money.

20                   MR. GADD:               My Lord, yes.

21                   THE COURT:              All right.

22                   Mr. Gadd, I am going to say this

23   particularly to yourself because the Liquidators have

24   not been successful on that, but I have been very

25   greatly assisted by your submissions and I congratulate

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

Fairfield Sentry

1   you on the way you made them in the face of such heavy

2   opposition.  And that actually of course I repeat what

3   I said on Monday, that I have had the greatest

4   assistance and I am very grateful to all parties.

5                MR. GADD:                    Very grateful,

6   My Lord.

7                (THEREUPON, adjournment taken at 12:30

8   p.m.)

9                                * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT

Fairfield Sentry

1

2                    REPORTER'S CERTIFICATE

3

4                    I, MONIQUE M. GRAHAM, A Certified Court

5    Reporter, do hereby certify:

6                    That on the 20th day of April, 2011 the

7    foregoing proceedings were taken down by me in machine

8    shorthand, consisting of 23 pages herein; that the

9    foregoing is a true and correct transcript of the

10   proceedings had.

11                   That I am not an attorney, relative, or

12   employee of any party hereto, or otherwise interested

13   in the events of this cause;

14                   IN WITNESS WHEREOF, I have hereunto

15   affixed my signature at Road Town, Tortola, British

16   Virgin Islands, this 4th day of May, 2011.

17

18

19                              _____

                                Monique M. Graham
20                              Certified Court Reporter

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPT BY THE COURT REPORTING UNIT