# EXHIBIT P

**BRITISH VIRGIN ISLANDS**
**EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**COMMERCIAL DIVISION**

**CLAIM NO: BVIHC (COM) 30/2010**

**BETWEEN:**

**ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED**

Applicant

And

**FAIRFIELD SENTRY LIMITED (in Liquidation)**

Claimant

**Appearances:** Mr Mark Hapgood QC, Mr Phillip Kite and Mr Kissock Laing for the Applicant/4th Defendant
Mr Michael Brindle QC for the Respondent/Claimant

**JUDGMENT**

[2011: 27 September, 10 October]

(Defendant succeeding on preliminary issue - Defendant applying to have claim dismissed pursuant to CPR 26.1(2)(i), alternatively for summary judgment under CPR 15.2(a) – whether decision on preliminary issue dispositive of whole claim – whether Defendant entitled to judgment pursuant to CPR 26.1(2)(a – whether Claimant entitled to take alternative allegations to trial – whether arguable that redemption contracts void for mutual mistake – whether arguable that redemption contracts should be rescinded for mutual mistake – whether Defendant entitled to summary judgment - whether Claimant should have adjournment in order to collect material enabling it to allege that redemption monies not received in good faith or to bring forward new claims)

[1]   **Bannister J [ag]:**   In these proceedings Fairfield Sentry Limited ('Sentry'), which went into liquidation on 29 July 2009, claims recovery from former investors of redemption monies previously paid to them when they redeemed their shares.

1

[2]  Two causes of action are asserted by Sentry. The first, set out in paragraphs 9 and 10 of the statement of claim, is that payment of the redemption monies was made by Sentry under a mistake of fact, because, so it is alleged, 95% of the money contributed by its members had been invested by Sentry with Bernard L Madoff Investment Securities LLC ('BLMIS') and because, unbeknown to Sentry at the time, BLMIS operated a Ponzi scheme so that Sentry's investments were lost as soon as they were made. The consequence of that, it is pleaded, is that Sentry's NAV was at all material times nil or merely a nominal sum, so that the redeemers who were paid out by Sentry at sums in excess of nil or a nominal amount were unjustly enriched and must pay the money back. It is important to grasp that there is no allegation that redeeming members had contributed to Sentry's alleged mistake or that they had received their redemption payments in bad faith. The issue, under paragraphs 9 and 10 of the statement of claim was whether Sentry's alleged mistake entitled it, without more, to recover the redemption payments.

[3]  Sentry's second cause of action is pleaded in paragraph 12 of the statement of claim as an addition to or as an alternative to the first. The claim is that Sentry is 'entitled to set aside the redemptions' on the grounds that 'the payment of the [redemption monies] was effected under a mutual mistake.'

[4]  Certain of the Defendants applied to have certain matters decided as preliminary issues and on 20 April 2011 I made an order for the trial of two issues.[1] The first was whether certain documents which had been distributed by Sentry amounted to certificates of NAV given by or on behalf of its directors and thus[2] precluded Sentry from asserting that the NAV was other than as stated in those documents. The second was formulated as follows:

> 'Whether a redeeming Member of the Claimant in surrendering its shares gave good consideration for the payment by [Sentry] of the redemption Price and, if so, whether that precludes [Sentry] from asserting that the money paid to that Member on redemption exceeded the true redemption Price and as such is recoverable as to the excess from such redeeming Member.'

This second issue was directed at the cause of action set out in paragraphs 9 and 10 of the statement of claim and which I have discussed in paragraph [2] above. I formally delivered judgment on 16 September 2011, when I decided the first issue in Sentry's favour, but held that in

---

[1] in fact, there were four, but the first three were all on the same point
[2] by reason of a provision in Article 11(1) of Sentry's Articles of Association

2

surrendering their shares in consideration for payment of the redemption monies the redeeming members had given good consideration and that it was accordingly not open to Sentry to seek recovery of the price which it paid for the purchase of the shares of redeeming investors simply because it had calculated the NAV upon information which has subsequently proved unreliable for reasons unconnected with any of the redeemers.

[5]    After I had handed down judgment the defendants who were represented at the hearing asked for final judgment to be entered on the basis of my decision in their favour on the second issue. I expressed considerable hesitation whether it was even open to me to do so, but the fourth Defendant, ABN Amro Fund Services (Isle of Man) Nominees Limited ('ABN Amro'), has since drawn my attention to the Court's case management power under CPR 26.1(2)(i) which shows that it is. The existence of the power does not, however, eliminate my concern, which arises from the fact that at the preliminary issue hearing I had not decided the claim based on mutual mistake raised by paragraph 12, which remained outstanding. I therefore refused to dismiss Sentry's entire claim on handing down judgment.

[6]    On 20 September 2011 ABN Amro applied under CPR 26.1(2)(i), or alternatively under CPR 15.2(a) (summary judgment) for final judgment in these proceedings. The hearing took place at short notice on 26 September 2011. Mr Brindle QC, who appeared again for Sentry, took no point on that and I abridged time to enable the hearing to go ahead.

**Is any further argument open to Sentry?**

[7]    The first submission made by Mr Hapgood QC, for ABN Amro, is that my finding on the second preliminary issue is dispositive of the entire claim, including the claim based upon mutual mistake, so that no further argument can help Sentry. He says in his written submissions that where a payer makes a payment pursuant to a contract, he cannot recover the payment unless he establishes that the contract is void. This submission is plainly too wide as formulated. A payment may be recovered if an otherwise valid contract can be rescinded or avoided. What Mr Hapgood QC means is that in the absence of a plea of any material which would support a claim for rescission or avoidance, the payer's only hope is to establish that the contract never had binding effect. He next submits that where it has been held that consideration has passed from the payee, it necessarily follows that the contract pursuant to which it was made was not void – otherwise the

3

question of consideration could not arise. So, he says, I must have decided that point against Sentry inferentially.

[8]    There is a superficial attraction to this submission, but I think that when examined it is unsound. Obviously it is nonsense to speak of consideration being paid under a void contract. The consideration point raised by the second preliminary issue can only sensibly be considered on the hypothesis that the contracts were effective. In the present case, however, Sentry makes an alternative claim[3] based upon mutual mistake. Whether the plea as made is sufficient to support a case that the redemption contracts were void or, for that matter, could be rescinded, is something which I will have to go on to consider in a moment, but it remains part of Sentry's claim. If this case were to go to trial, the right course to take would be to consider the claim that the redemption contracts were void first. If that succeeded, there would be no need to go on to consider the consideration defence, which would arise, as Mr Hapgood QC says, only if they were not. What Mr Hapgood's point really amounts to is a demonstration that the second preliminary issue was badly chosen, because it proceeded upon the hypothesis that any claim that the redemption contracts were void, or liable to be rescinded, would be bound to fail when those questions, although raised by paragraph 12 of the statement of claim, were not before the Court. It just adds to the long list of cases where the hearing of a preliminary issue gets no one anywhere – or, at any rate, not as far as had been hoped.

[9]    Mr Hapgood QC makes other complaints about the alleged failure of Mr Brindle QC to grapple sufficiently with the **Bell v Lever Bros**[4] defence at the preliminary issue hearing, but that seems less than fair given that the issue for determination was whether Sentry could have its money back on the sole grounds that it had been under a mistaken assumption when it parted with it. In truth, **Bell v Lever Bros**[5] was irrelevant to the determination of the second preliminary issue. I do not accept, therefore, that in arguing it now Sentry is having a second bite at anything.

[10]    In my opinion, therefore, the mutual mistake point remained open to Sentry and was not determined, whether directly or by a sidewind, by my decision on the second preliminary issue. It

---

[3] in paragraph 12 of the statement of claim
[4] [1932] AC 161
[5] supra

4

follows that I must decline to give judgment pursuant to CPR 26.1(2)(i). I therefore go on to consider ABN Amro's claim for summary judgment under CPR 15.2(a).

**Mutual mistake**

[11]  It is worth setting out paragraph 12 of Sentry's statement of claim in full:

> 'Further or alternatively, [Sentry] is entitled to set aside the redemption of the Defendants' shares on the grounds that the payment of the Aggregate Redemption sum[6] was effected under a mutual mistake.'

The mutual mistake is not identified in paragraph 12, but the reference must be to paragraph 9, which contains the only allegation of mistake made in the statement of claim:

> 'The NAV was calculated under a mistake of fact as, unbeknown to the Claimant, BLMIS was in fact operating a Ponzi scheme and its investments in BLMIS were therefore lost from the date of [Sentry's] investment.'

[12]  Paragraph 12 thus makes a claim that Sentry is entitled 'to set aside the redemption of the Defendants' shares' on the ground that the *payment* of the redemption monies was effected under a mutual mistake. This is not, as it stands, an adequate pleading that the contracts pursuant to which the shares were redeemed were void and that in consequence the payments can be recovered as money had and received. On the contrary, it appears to be an allegation that the redemption contracts (rather than the payments made under them) can be set aside at the option of Sentry on the grounds of mutual mistake – in other words that the redemption contracts were not void, but liable to be rescinded. Further, as Mr Hapgood QC points out, it is difficult to see how redeeming members of Sentry are supposed to have been labouring under a mistake as to the calculation of NAV by Sentry's directors or as to the amount which Sentry was, as a result, obliged to pay on redemption. Certainly, no such allegation is spelt out. It seems to me, therefore, that paragraph 12 arguably discloses no cause of action, but that was not how the application proceeded. Mr Hapgood QC argued the matter on the footing that it was being alleged by Sentry that the redemption contracts were void. Mr Brindle QC, although referring in his oral submissions to 'setting aside' the redemption contracts, treated the authorities relied upon by Mr Hapgood QC as demonstrating that the contracts were not void as authorities which he needed to deal with. I

---

[6] defined as the total of US$135 million alleged to have been paid to the Defendants' collectively in March 2004

5

shall therefore proceed on the footing that Sentry makes a good (i.e. properly pleaded) claim that the contracts of redemption themselves were void on the grounds of common mistake, with the consequence that money paid under them by Sentry may be recovered.

[13] The most recent authority on common mistake is **Great Peace Shipping Ltd v Tsavliris Salvage (International) Ltd**[7] ('**Great Peace**'), a decision of the Court of Appeal of England and Wales. The claimants agreed to hire their vessel *Great Peace* to the defendants, who had agreed to provide salvage services to the owners of a ship called the *Cape Providence*, which had got into serious and life threatening difficulties in the South Indian Ocean. The reason for the hire was that defendant's tug would take six days to reach the *Cape Providence*, whereas the *Great Peace* was believed by both parties to be only about 35 miles from the *Cape Providence* and thus in a position to escort and stand by the *Cape Providence* within about twelve hours. In fact, the *Great Peace* was some 410 miles away. Despite that, the defendant did not cancel the hire until after it had satisfied itself that there was an alternative vessel nearer at hand. The claimants claimed for the minimum period of hire under the fixture and the defendants refused to pay on the grounds that it was void as having been entered into under a mutual mistake – that the *Great Peace* was only 12 hours away from the *Cape Providence*.

[14] Lord Phillips MR gave the judgment of the Court. He first distinguished the cases where a contract never comes into effect because the parties are not *ad idem* and went on to categorise the case before the Court as involving

> 'an allegation of a common mistaken assumption of fact which renders the service that will be provided if the contract is performed in accordance with its terms something different from the performance that the parties contemplated. This is the type of mistake which fell to be considered in **Bell v Lever Bros**.[8] We shall describe it as "common mistake', although it is often alternatively described as 'mutual mistake."

[15] The Master of the Rolls then analysed **Bell v Lever Bros**[9] at first instance, in the Court of Appeal and in the House of Lords. He cited a passage from the speech of Lord Atkin:

> '"So the agreement of A and B to purchase a specific article is void if in fact the article had perished before the date of sale. In this case, though the parties in fact

---

[7] [2002] EWCA Civ 1407; [2003] QB 679
[8] supra
[9] supra

6

> were agreed about the subject matter, yet a consent to transfer or take delivery of something not existent is deemed useless, the consent is nullified. As codified in the Sale of Goods Act [1893] the contract is expressed to be void if the seller was in ignorance of the destruction of the specific chattel ... Corresponding to mistake as to the existence of the subject matter is mistake as to the title in cases where, unknown to the parties, the buyer is already the owner of that which the seller purports to sell to him. The parties intended to effectuate a transfer of ownership: such a transfer is impossible: the stipulation is naturali ratione inutilis.'"

He also cited the observation of Lord Thankerton that a common mistake will not avoid a contract unless it related to something that both the parties must necessarily have accepted in their minds as an essential and integral element of the subject matter.

[16] Having discussed difficult issues as to the extent to which a shared mistake which concerns not the existence of the intended subject matter of the proposed contract but rather some essential quality of the subject matter which makes the thing without the quality essentially different from the thing it was believed to be and having also examined the related topic of contractual frustration, the Master of the Rolls identified[10] the question on the facts of **Great Peace** as being

> 'whether the mistake as to the distance apart of the two vessels had the effect that the services that the *Great Peace* was in a position to provide were something essentially different from that to which the parties had agreed.'

He put the matter slightly differently at paragraph 162:

> 'It was unquestionably a common assumption of both parties when the contract was concluded that the two vessels were in sufficiently close proximity to enable the *Great Peace* to carry out the service that she was engaged to perform. Was the distance between the two vessels so great as to confound that assumption and to render the contractual adventure impossible of performance? If so, the defendants would have an arguable case that the contract was void under the principle in **Bell v Lever Bros**.[11]

He answered the question by reference to the defendant's conduct in delaying cancelling the fix until they were sure that an alternative vessel was at hand and able to provide the service. That demonstrated that it was 'not impossible to perform the contractual adventure.' So the contract was not void for common mistake and could be enforced.

---

[10] at paragraph 94
[11] supra

[17] If one applies these principles to the present case, the question is whether the fact, contrary to the assumed understanding of both parties, that BLMIS was a Ponzi scheme means that Sentry was unable to perform the contract which arose when a redemption notice was served in accordance with its Articles of Association. Sentry contracted to invest its members' money and return its product when demanded on the basis of a rateable proportion of Sentry's NAV. The fact that a fund in which it invested and which, for present purposes, I have to assume was mistakenly believed by Sentry and ABN Amro to have been genuine, turned out to have been run fraudulently had no impact whatsoever upon Sentry's ability to perform these obligations. The fact, if true, that upon redemption by ABN Amro, Sentry's directors should have declared a nil NAV does not make the contract void. It means merely that the money contributed by, among others, ABN Amro had been lost. If a tradesman contracts to supply fuel which his customer knows will be sourced from a particular supply believed by both parties to be sound, the contract is not void if it turns out that the supply is adulterated and the product delivered is useless, any more than it would be void if the customer was entirely ignorant of the source of supply. The customer must rely on other remedies. Sentry's case on common mistake confuses (1) a shared mistaken assumption the truth of which is a necessary condition for the performance of a particular contract with (2) a shared mistaken assumption about the background against which it is expected that the contract will be performed. The former case will mean that no contract can, as a matter of law, be concluded. The latter will not.

[18] As I mentioned earlier, paragraph 12 of Sentry's statement of claim appears to treat the contract between Sentry and any particular redeemer as liable to be rescinded rather than void. **Great Peace** is clear authority that there is no jurisdiction in equity to rescind a contract binding in law on the grounds of common mistake. Apart from that, rescission is not available in circumstances, such as the present, where *restitutio in integrum* is impossible.

[19] Either way, therefore, the claim made in paragraph 12 of the statement of claim cannot, in my judgment, succeed. That, coupled with my earlier decision on the consideration point, means that Sentry is bound to fail at trial on its claims as presently formulated.

8

**An adjournment**

[20]  Sentry has put in evidence a fifth affidavit made by one of its Joint Liquidators. It explains that the Joint Liquidators have, since the end of June of this year, had access to information in the possession of Mr Madoff's SIPA Trustee, so that (if such information is in the Trustee's hands) they are in a position to obtain information about any of the defendants to these proceedings. They exhibit copies of two complaints made by the Trustee against (among others) two of the defendants to the present proceedings (not ABN Amro). These complaints make various allegations of actual or constructive knowledge of Madoff's fraud and (as I understand it) of profiting from it. The Joint Liquidators say that with sufficient time, they may be able to discover material which will enable them to plead that particular redeemers did not receive the redemption monies in good faith. This, I believe, is intended to be a reference to the passage in the judgment of Robert Goff J in **Barclays Bank v Simms**[12] where the learned judge says:

> 'However, even if the payee has given consideration for the payment . . . that transaction may itself be set aside (and so provide no defence to the claim) if the payer's mistake was induced by the payee, or possibly even where the payee, being aware of the payer's mistake, did not receive the money in good faith: cf **Ward v Wallis** [1900] 1 QB 675, 678-679, per Kennedy J.'

I was not taken to **Ward v Wallis** but I do not need authority before accepting that there may be circumstances where, if it is demonstrated that a party knows that his counterparty is acting under a mistake, it may be unconscionable for the party to retain the benefit of the transaction, although I find it extremely difficult to see how the principle could be applied where (as here) there is no possibility of putting the parties back in the position in which they were before the transaction was entered into.

[21]  The Joint Liquidators also suggest that, based upon this material, they may be able to mount additional claims against some or all of the redeemers – for example, in knowing receipt. They therefore ask for an adjournment in order to review the Trustee's materials and, if they strike gold, to seek permission to amend, before final judgment is given. Mr Brindle QC cited possible limitation defences accruing if the present proceedings are dismissed and the Joint Liquidators

---

[12] [1980] 1 QB 677, 695G-H

have to start afresh as well as a risk that **Henderson v Henderson**[13] points may be taken against them if they have to start fresh proceedings to bring any new claims which they may be able to support as a result of their examination of the Trustee's material.

[22]   I see the Joint Liquidators' difficulty, but I had always thought that 'something may turn up' was never an answer to an otherwise successful summary judgment application. Applicants for summary judgment are entitled to have their applications dealt with on the facts as they are, not as they might be, and I have never heard of a summary judgment application being adjourned to give the unsuccessful party an opportunity to improve his position by searching for material upon which to make fresh allegations. So the adjournment application is refused.

## Conclusion

[23]   The claim against ABN Amro is accordingly dismissed. I will hear the parties (including the parties other than ABN Amro who participated in the preliminary issue application) on the question of costs.

*[signature]*

Commercial Court Judge
10 October 2011

---

[13] (1843) 3 Hare 100

10