**BROWN RUDNICK LLP**
David J. Molton
Daniel J. Saval
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
(212) 209-4800

*Counsel for the Foreign Representatives*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| **In re:** | ) ) | Chapter 15 Case |
| **Fairfield Sentry Limited, et al.,** | ) ) ) | Case No. 10-13164 (SMB) |
| **Debtors in Foreign Proceedings.** | ) ) | Jointly Administered |

**DECLARATION OF GABRIEL MOSS QC IN
SUPPORT OF MOTION FOR LEAVE TO AMEND**

I, GABRIEL MOSS QC, do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

1.  I am a barrister practising at the independent Bar in England and Wales, admitted in 1974, and have also been admitted as a barrister of the Eastern Caribbean Supreme Court (which includes the British Virgin Islands). I hold Her Majesty's Patent as Queen's Counsel and have done so since 1989. I advise and on occasions act as an advocate for Kenneth M. Krys and Charlotte Caulfield, in their capacities as joint liquidators (the "**Liquidators**") of Fairfield Sentry Limited, in liquidation ("**Sentry**"), Fairfield Sigma Limited, in liquidation ("**Sigma**"), and Fairfield Lambda Limited, in liquidation, ("**Lambda**") (together, the "**Funds**"). The liquidations

1

of the Funds are proceeding under the supervision of the High Court of Justice for the British Virgin Islands ("**BVI Court**").

2.      The liquidation proceedings before the BVI Court for Sentry, Sigma, and Lambda commenced in 2009, and the Liquidators were appointed by the BVI Court to conduct the liquidation of the Funds' estates, under the supervision of the BVI Court. The powers granted to the Liquidators include the power to commence proceedings in the name of and on behalf of the Funds or in their own official names.

A.      **Purpose of Declaration**

3.      I submit this Declaration in support of the Liquidators' motion for leave to file their proposed amended complaints in their US litigation against certain of the Funds' redeemers.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge or learned from my review of relevant documents, including, without limitation, two Proposed Amended Complaints ("**Sample Amended Complaints**")[1] which contain the proposed amendments that this declaration addresses,[2] and select documents produced by the Citco Entities during the course of the Anwar Litigation ("**Citco Documentation**") and obtained by the Liquidators in the summer of 2014, and upon my opinion based on my experience and knowledge. To the extent matters stated in this Declaration are

---

[1] I understand that these Sample Amended Complaints are the proposed amended complaints for the actions Fairfield Sentry Limited (In Liquidation) v. Citigroup Global Markets Limited, Adv. Pro. No. 11-02770; and Fairfield Sentry Limited (In Liquidation) v. Banca Cesare Ponti SPA, Adv. Pro. No 12-01140.

[2] I understand that the proposed amendments that I address in this declaration and that are included in the Sample Amended Complaints are included in all the proposed amended complaints as to which leave is sought (the Citco lack of good faith allegations pertaining to the certificate issues and the amendments pertaining to the BVI statutory avoidance claims), in approximately half of them (the amendments adding contract-based overpayment claims), or in a discrete number of them (amendments concerning whether beneficial owners of shares for redemptions may be charged with the knowledge of record holders of such shares, in connection with the issue of a redemption recipient's lack of good faith). With respect to the contract-based claims, I understand that over half of the complaints already contain contract overpayment claims that were added when those complaints were amended as of right under applicable law.

2

statements of legal opinion, such statements represent my view of the law of the BVI as a practicing BVI attorney.

5. In the course of this declaration I adopt the definitions used in the Sample Amended Complaints.

**B.     Qualifications to Provide Testimony Regarding BVI Law**

6. I am a barrister of the Eastern Caribbean Supreme Court, entitled to practise law in the courts of the British Virgin Islands.

7. As stated above, I also (and mainly) practice at the independent Bar of England and Wales, having been admitted in 1974 and having become a Queen's Counsel (leading barrister) in 1989.

8. The modern insolvency and corporate law of the British Virgin Islands is largely based on English law, and the law of contract in the British Virgin Islands is essentially the same as English contract law for all material purposes.

9. I have over 40 years' experience in both insolvency matters and commercial and corporate litigation.

10. In particular I specialise in English and International insolvency law, including European Union and EEA insolvency law. I also sit from time to time as a Deputy High Court judge in the Chancery Division of the High Court and am a Visiting Professor in Corporate Insolvency Law at the University of Oxford.

11. I obtained a First Class Honours law degree from Oxford University ("BA Jurisprudence") in 1971. This meant that I was ranked in approximately the top 10% of students for that year. I then obtained a masters law degree from Oxford University ("BCL") in 1972. I then spent a year as a Lecturer in Law at the University of Connecticut Law School in the United

3

States in 1972-1973. I successfully passed the English Bar exams, preceded by a full time one year Bar course, and became a member of the English Bar in July 1974. I had previously been made an honorary scholar of my college at Oxford University, had joined one of the four Inns of Court, Lincoln's Inn, and obtained two scholarships from them, the Hardwicke and Cassel scholarships. I was awarded the annual Eldon scholarship by Oxford University in 1975, a scholarship restricted to Oxford graduates with First Class honours law degrees who intend to practice at the Bar.

12. From about 1978 I specialised in insolvency law and related matters. In 1989 I was appointed by the Secretary of Trade and Industry as an arbitrator in a commercial arbitration and was appointed a Department of Trade Inspector enquiring into the affairs of Bestwood plc, a failed listed public company.

13. I was a founding member of the Board of the Insolvency Research Unit formerly at King's College, London University and now at the University of Sussex. I became a Member and subsequently Chairman of the Editorial Board on Insolvency Intelligence, a leading journal dealing with insolvency matters. I am a member of the Insolvency Law Sub Committee of the Consumer and Commercial Law Committee of the Law Society and a Member of the Insolvency Committee of Justice, the British Section of the International Commission of Jurists, both of which consider and make recommendations in relation to insolvency law reform.

14. I am a Member of the Advisory Editorial Board of the Receivers, Administrators and Liquidators Quarterly, and a Member of the Editorial Board of the International Insolvency Law Review.

15. I am an Honorary Member of the Association of Fellows and Legal Scholars of the Center for International Legal Studies in Salzburg, a full Member of Insol Europe and a Member by invitation of the Core Group of the Academic Wing of Insol Europe.

16. I am a Fellow of the Society for Advanced Legal Studies at the Institute of Advanced Legal Studies at London University.

17. In 1998 I was elected as Bencher (Member of Governing Body) of Lincoln's Inn, one of the four Inns of Court which make up the English Bar. I am a Member of the University Liaison Executive Committee at Lincoln's Inn.

18. I am a Member and Director Emeritus of the International Insolvency Institute.

19. In 2001 I was authorised by the Lord Chancellor to sit as a Deputy High Court Judge and I have sat on a number of cases in the Chancery Division, including cases involving insolvency matters, and some of my judgments have been reported in the law reports which publish decisions which serve as case-law precedents in the English legal system.

20. In 2011 I was appointed a Visiting Professor in Corporate Insolvency Law at Oxford University. I teach corporate insolvency law to students studying for Masters level law degrees at Oxford. This is a part-time position and my full-time practice at the Bar continues. I have also been made a Visiting Fellow at St. Catherine's College, Oxford (one of the constituent colleges of Oxford University).

21. I am the co-editor and co-author of Rowlatt on Principal and Surety (Fourth Edition 1982, Fifth Edition 1999, Sixth edition 2011), co-editor and co-author of Lightman & Moss, Law of Administrators and Receivers of Companies (First Edition 1986, Second Edition 1994, Third Edition, 2000, Fourth Edition 2007, Fifth Edition 2011). I am the Editor-in-Chief

5

and Contributor to Moss, Kawaley, Seife and Montgomery: Cross Frontier Insolvency of Insurance Companies (2001) and of numerous chapters in books and articles in learned journals.

22. I was a member of the Review Panel set up by the Insolvency Lawyers' Association to advise the Insolvency Service on the implementation in Great Britain of the UNCITRAL Model Law on judicial assistance to cross-frontier insolvency proceedings.

23. I have been involved as Counsel in advising and/or acting as advocate in nearly all the major insolvency proceedings in or affecting the United Kingdom in the last twenty years or so. Many of these cases have had cross-frontier aspects.

24. I have been admitted in relation to specific cases to foreign bars in Bermuda, Cayman, Hong Kong and the Isle of Man. I am generally admitted in Gibraltar and the East Caribbean Supreme Court (including the British Virgin Islands). I have appeared as counsel in a number of cases in the BVI at first instance and also on appeal in the East Caribbean Court of Appeal. I have also addressed the Federal Bankruptcy Court for the Southern District of New York in one case and acted as an expert witness on English and Bermudian law in the same court in another case. I have provided expert evidence in a number of other cases in relation to English law for courts in the US and elsewhere.

25. A copy of my curriculum vitae is exhibited hereto.

C. **Matters Dealt with in this Declaration**

26. In this declaration:

  a. I explain why the decision of the Judicial Committee of the Privy Council ("Privy Council") in *Fairfield Sentry Ltd v Migani* [2014] UKPC 9 does not preclude the continuance of those causes of action asserted in the Sample Amended Complaints that are not based on BVI statutory avoidance provisions, and why the

6

Funds have an arguable case[3] that documents issued by the Funds' former administrators, and which the Privy Council held to be "certificates" within the meaning used in Article 11 of the Funds' Articles of Association, are not in fact binding on the Funds by virtue of having been issued by the said administrators without good faith;

b. I explain why certain amendments have been made in the Sample Amended Complaints to the passages asserting causes of action based on BVI statutory avoidance provisions and why such claims remain viable; and

c. I explain why the claims under BVI law for breach of contract against the defendants included in the Sample Amended Complaints are viable and arguable.

---

[3] Based on information from Brown Rudnick it seems to me that the BVI/English "arguable case" standard is similar to the US plausible pleading standard. I have been supplied with the following quote from His Honour Judge Bernstein from a decision issued on September 28, 2016 on a motion to amend in the case Picard v. Mendelow, Adv. Pro. No. 10-04283 (SMB) (Bankr. S.D.N.Y.):

> To state a legally sufficient claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted); accord Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678; accord Twombly, 550 U.S. at 570. Courts do not decide plausibility in a vacuum. Determining whether a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 556. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

7

### D. The Privy Council Decision and Whether Certificates were Issued in Good Faith

27. The Funds issued a number of claims ("**BVI Actions**") in the BVI Court against redeemers from the Funds, asserting causes of action in restitution, on the basis that every Redemption Payment paid to a redeemer was based on a NAV that was mistaken. The mistake lay in the calculation of a NAV based on assets purportedly held for the Funds by Bernard L Madoff Investment Securities LLC ("**BLMIS**"). In fact, as the world now knows, BLMIS was a Ponzi scheme, and the assets purportedly held by it for the Funds did not exist.

28. Some of the defendants to those BVI Actions brought applications for the determination of certain preliminary issues. The BVI Court ordered that there be determined as preliminary issues:

   a. Whether the defendants to the BVI Actions had given "good consideration" for the Redemption Payments received by them (the "**good consideration issue**"); and

   b. Whether certain documents published to those defendants, and which stated a NAV figure, constituted "certificates" within the meaning used in the Funds' Articles of Association ("**certificate issue**") (and certain related issues).

29. I understand that the genesis and progression of the determination of those preliminary issues will be addressed in more detail in an accompanying declaration to be given by William Hare of Forbes Hare, the BVI law firm advising the Liquidators. For reasons set out in that declaration, the issues identified by the BVI Court for preliminary determination did not include whether, as a matter of fact, any document found to be a certificate had been "given in good faith". The relevance of this point is that Article 11 of the Funds' Articles of Association

8

provides that a certificate as to the NAV "given in good faith" shall be binding: "*Any certificate as to Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties.*"[4]

30. The preliminary issues identified by the BVI Court were determined by it as follows:

   a. It was determined, in favour of the defendant applicants, that they had given good consideration for the Redemption Payments received; and

   b. It was determined, in favour of the Funds, that the various documents relied upon by the defendant applicants as being certificates were not, in fact, certificates.

31. Both sides appealed to the Eastern Caribbean Court of Appeal ("Court of Appeal"), which dismissed both appeals (in US parlance, "affirming" the decision of the of the BVI Court, albeit on reasoning that differed in some respects from Bannister J's reasoning). Both sides then appealed further, to the Privy Council in London.

<u>The Decision of the Privy Council and the Relevance of "Good Faith"</u>

32. By the time the matter reached the Privy Council, the good consideration issue had become refined, and the question for determination was whether the Funds were, at the time of payment of the Redemption Payments, under a contractual obligation to make that payment. This depended on whether documents issued by the Funds' administrator amounted to "certificates" within Article 11.

33. As stated by Lord Sumption, who gave the judgment of the Privy Council, at paragraph 18: "*The basic principle is not in dispute. The payee of money "cannot be said to have been unjustly enriched if it was entitled to receive the sum paid to him": Kleinwort Benson*

---

[4] The reference to "all parties" means the company and its members, since Articles are regarded as binding between a company and its members, and also as between the company's members: section 11(1) of the BVI Business Companies Act 2004.

9

*Ltd v Lincoln City Council* [1999] 2 AC 349 at 408B (Lord Hope). *Or, as Professor Burrows has put it in his Restatement of the English law of Unjust Enrichment (2012) at 3(6), "in general, an enrichment is not unjust if the benefit was owed to the defendant by the claimant under a valid contractual, statutory or other legal obligation." Therefore, to the extent that a payment under a mistake discharges a contractual debt of the payee, it cannot be recovered, unless (which is not suggested) the mistake is such as to avoid the contract: Barclays Bank Ltd v WJ Simms Son & Cooke (Southern) Ltd* [1980] QB 677, 695. *So far as the payment exceeds the debt properly due, then the payer is in principle entitled to recover the excess."*

34. Whether the Funds were entitled to recover the Redemption Payments therefore turned on whether the Fund had been obliged to pay (i) the true NAV per share, ascertained in the light of information which subsequently became available about the fraud, or (ii) the NAV per share determined at the time of redemption (see paragraph 19 of the judgment).

35. The Privy Council went on to hold (in paragraph 24 of the judgment) that where the Articles provided for a certification of the liability to pay redeemers, such as the certification provision in Article 11(1)(c), the certification provision "... *must be read as referring to the ordinary transaction documents recording the NAV per share or the Subscription or Redemption Price which will necessarily be generated and communicated to the Member at the time, and not to some special document issued at the discretion of the Directors."*

36. The Privy Council went on to hold that various "ordinary transaction documents" (namely emails publishing a "final NAV" to investors, contract notes recording redemptions effected, and statements of account sent to investors) were "certificates" within the meaning in Article 11. The Privy Council left open whether certain website screenshots might be capable of being "certificates" for this purpose.

10

37. Accordingly, the Privy Council held that certain documents that published the NAV to investors were "certificates" within Article 11 of the Articles. If the NAV was certified within Article 11 then the Funds were under a contractual obligation to pay the Redemption Payments that were paid. In the Privy Council's judgment, therefore, the good consideration issue and certification issue became merged.

38. What the Privy Council did not consider or decide, because the issue was not before it, is whether the certificates were "given in good faith". In a case where the Articles provided for certification, and required the certificate to be given in good faith, if the certificates were not given in good faith, then the NAV would not be binding on all parties. It then follows that the Funds were <u>not</u> under a contractual obligation to pay the Redemption Payments, such that the good consideration defence falls away[5]. At a minimum, it is properly arguable and pleadable in the BVI or England that the good consideration defence cannot prevail in any case where a "certificate" has been given in bad faith and that the common law claims pleaded by the Liquidators remain arguable and viable if the certificates had not been given in good faith.

<u>Lack of Good Faith:  Applicable Test</u>

39. The Sample Amended Complaints plead that certificates were not given in good faith by the Funds' administrators. I describe here the test for showing absence of good faith under BVI law (which is the same as English law on this point).

40. Not acting in good faith is in BVI/English law the same thing as acting in bad faith. There are no rules or authorities in BVI law that depart from the position in English law, and accordingly the BVI Court is likely to follow English case law decisions on the test for good faith.

---

[5] I am aware that certain Defendants have raised arguments in other proceedings, with which I do not agree, to the contrary. If those arguments are raised in these proceedings I will deal with them as appropriate.

11

41. In short, a person will be held to have acted in bad faith in English law if he acted:

   a. Knowing that what he was doing was wrongful;

   b. Suspecting that what he was doing was wrongful but deliberately not taking steps to check the position in order to avoid having his suspicions confirmed (known as "wilful blindness" or "Nelsonian [blind eye] knowledge"); or

   c. Recklessly, indifferent as to whether or not what he was going was wrongful or lacking any belief that what he was doing was right. Such recklessness might be inferred from a failure to take obvious steps to check the position or in cases falling short of wilful blindness, in which a person suspects that what he is doing might be wrongful, but fails to take steps to clarify the position for extraneous reasons beyond mere negligence (e.g. because he is unwilling to upset an important client or lose a valuable income stream).

(See: *Derry v Peek* (1889) 14 App Cas 337, HL, at 374 per Lord Herschell; *Royal Brunei Airlines v Tan* [1995] AC 378, PC at 389-390 per Lord Nicholls; and *Three Rivers District Council v Bank of England (No. 3)* [2003] 2 AC 1, HL, at 191-192 per Lord Steyn.)

42. I gather from New York law drawn to my attention by Brown Rudnick that there appear to be parallels between English law and New York law in relation to the inclusion of recklessness within the ambit of fraud, albeit that under New York law it may be couched in terms of "gross negligence" (e.g. *State Street Trust Co v Alwin C Ernest* 278 NY 104 (1938) and *Stephenson v Citco Group* 700 F Supp 2d 599 (2010). Although I am not qualified in New York, it seems to me that New York law and English law are essentially aiming at the same target: mere negligence is not sufficient to amount to bad faith, but recklessness tending to show a

12

disregard for the truth or for the legitimacy or consequences of one's actions may lead to an inference or judgment that the defendant was acting in bad faith.

43. Knowledge gained by an employee or other agent while acting in the course of his employment for his principal will ordinarily be attributed to his principal: *Bowstead and Reynolds on Agency* (20th Ed) paragraph 8-207.

### Arguable Case on Lack of Good Faith

44. I have seen the facts and matters pleaded in the Sample Amended Complaints and it is my opinion that those facts and matters are sufficient to constitute a properly arguable case of bad faith on the part of the Funds' administrators under BVI law: i.e. there is an arguable case that the administrators of the Funds acted, at a minimum, recklessly as to whether the net asset statements were correct when determining the NAV and publishing certificates of the same.

### Bad Faith of the Recipient of Redemption Payments

45. I understand that allegations have been added to certain proposed amended complaints that may bear upon whether beneficial owners of shares for redemptions at issue in such complaints may be charged with the knowledge of the record holders of such shares. I next discuss the relevance of such "recipient" knowledge (whether that of a record holder or, if a record holder's knowledge may be charged to a beneficial owner, of a beneficial owner) insofar as the knowledge bears upon the recipient's lack of good faith.

46. Quite separately from and independent of the question relating to the binding nature or otherwise of the "certificate", recovery of payments based on a fictitious NAV can at least arguably be made on the basis of the bad faith of the recipient, where that can be pleaded.

47. There appear to be two separate arguable legal bases for such a recovery. First of all, there is an arguable case for implying a term into the Articles to the effect that a recipient in

13

bad faith must repay a payment made on the basis of a fictitious NAV. Such an implication can be based on either the fact that an obligation to repay would have been regarded as obvious by contracting parties or that it was necessary on the grounds of business efficacy: *Holmes v Keyes* [1959] Ch 199 at 215, *Bratton Seymour Service Co Ltd v Oxborough* [1992] BCLC 693 at 699, *Towcester Racecourse Co Ltd v The Racecourse Association Ltd* [2003] 1 BCLC 260.

48.  More generally, the conceptual approach to implication of terms in contracts has produced a split between differently constituted panels of the Privy Council and the UK Supreme Court in *Attorney General of Belize v Belize Teecom Ltd* [2009] 2 BCLC 148 (PC) and *Marks and Spencer Plc v BNP Paribas* [2016] AC 742. Put simply, *Belize* regards implication as a branch of ascertaining the true meaning of the parties' intentions, like construction of the express words, whereas *Marks* sees the implication and construction processes as being completely separate with separate legal tests: see per Lord Neuberger at [26][6]. It is difficult to see what difference the two approaches would have in practice in the present case. Whether one takes the *Belize* approach to implication of working out what the parties really meant to provide, or whether one applies the traditional tests of obviousness or business efficacy, there is at least a proper argument for implication of a term requiring repayment by bad faith receivers.

49.  The alternative and separate ground of recovery against bad faith receivers is in restitution. It has long been recognized that absence of good faith on the part of the recipient of a payment may negate the good consideration defence: *Barclays Bank v WJ Simms Son & Cooke*

---

[6] Strictly speaking, only the *Belize* decision would be binding in the BVI, since the Privy Council and not the UK Supreme Court is in effect the final court of appeal for the BVI and the *Belize* case concerns the Articles of a company, whereas *Marks* dealt with a lease. However, the BVI courts would try to avoid conflicting with the later UK Supreme Court decision, as appeals would go to a Privy Council panel which is more likely to resemble the later *Marks* panel than the earlier *Belize* panel.

14

*(Southern) Ltd* [1980] 1 QB 677 at 695G-H. The case was cited with approval (on another point) by the Privy Council in *Fairfield Sentry v Migani* [2015] UKPC 9.

50. The dictum itself relies on the previous decision in *Ward & Co v Wallis* [1900] 1 QB 675 at 678-9. That case dealt with a "compulsion of legal process" defence to restitution, but the principle is relevant to the "consideration" defence in the present case. The plaintiffs sued for the price of work and in doing so mistakenly credited a payment by the defendant which it had not made. The credit was treated as a mistaken payment. The defendant was aware of the mistake but accepted the credit and received a receipt for payment in full by paying the balance ostensibly due. The receipt would normally be regarded as final and binding, having been achieved by pressure of legal proceedings. However, the case holds that there is an exception in the case where the credit was received in bad faith. The amount of the credit could be recovered. Bad faith receipt of monies certified due would in my opinion constitute an analogous exception to the consideration defence to restitution.

51. The Privy Council's decision in *Fairfield Sentry v Migani* does not detract from any of that, and indeed at [18] the decision in *Barclays Bank* was cited with approval (on another point) by the Privy Council.

Conclusion on Common law and Contract Claims

52. The question of whether there are binding certificates of NAV is relevant to both the common law mistake-based and contract claims (but not, as explained below, the statutory avoidance claims): if there were certificates within Article 11, the Funds were under contractual obligations to pay the Redemption Payments, and that would then provide a good consideration defence to the common law mistake-based restitutionary claims and also likely (at least in relation to any claim under BVI law) negate a claim based in contract. However, the pleaded

15

material discloses, in my opinion, an arguable case that the certificates were not given in good faith, so that no binding contractual obligation to pay the Redemption Payments did exist. On that basis, the common law mistake based and contractual claims pleaded in the Sample Amended Complaints would (at least so far as BVI law bears on them) remain viable. Likewise, quite separately, there is at least an arguable (and in my view correct) case for saying that recipients in bad faith had in any event an obligation to repay on the basis either of an implied term or an exception to the consideration defence to restitution.

### E.    Amendments to the Statutory Avoidance Claims

53.    Before turning to the amendments set out in the Sample Amended Complaints, I should note that the statutory avoidance claims are in a different position from that of the common law mistake-based and contract claims: whether or not there were binding certificates, and consequently a contractual obligation on the Funds to pay the Redemption Payments, is not relevant to the statutory avoidance claims. The avoidance provisions specifically contemplate situations where there may be a valid contractual obligation, and yet the transaction may be avoided (e.g. where a genuine creditor of the company is paid in preference to other creditors).

54.    As to the amendments to the Sample Amended Complaints, further detail has been pleaded as to why the Funds were insolvent on the dates when the Redemption Payments were made. Further, certain amendments have been made in order to correct the point being pleaded (for example, the "ordinary course of business" defence is not applicable to undervalue transactions, and reference has now been made to the correct defence).

55.    In my opinion the proposed amendments support and sustain the viability of the claims under the BVI statutory avoidance provisions. They expressly and sufficiently plead the relevant BVI statutory provisions and also the necessary statutory elements required for both

16

preference and undervalue claims. I also note that because the initial transferee defendants were members of the Funds at the time of the redemption transactions, they were "connected persons" within the meaning used in the BVI Insolvency Act 2003 (see section 5(1)(b)). This has the following consequences for transactions within the statutory vulnerability period (the period commencing 2 years prior to the onset of insolvency and ending on the appointment of the liquidator):

    a. Where the transaction had the effect of putting the defendant into a position which, in the event of the company going into insolvent liquidation, would be better than the position he would have been in if the transaction had not been entered into, then for the purposes of the claims pursuant to section 245 (unfair preferences) it is presumed, unless the contrary is proved, (i) that the transaction was an insolvency transaction, and (ii) that the transaction did not take place in the ordinary course of business[7].

    b. Where the redemption transaction was for either no consideration or consideration the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by the company, then for the purposes of the claims pursuant to section 246 (undervalue transactions), it is presumed, unless the contrary is proved, (i) that the transaction was an insolvency transaction, and (ii) that the defence in section 246(2) did not apply to the transaction (namely where the company enters into the transaction in good faith and for the purposes of its business, and at the time when it enters into

---

[7] See section 245(4).

the transaction, there were reasonable grounds for believing that the transaction would benefit the company)[8].

56. In each case, the presumption is rebuttable, but the burden of proof is on the defendants to show that the transaction was not an insolvency transaction and also that the defences in section 245(2) (ordinary course of business) or (as appropriate) section 246(2) (transaction in good faith and reasonable grounds for believing transaction would benefit company) do apply.

### F. Claims Under BVI Contract Law

57. In my opinion it is arguable that the Articles (which are governed by BVI law and, as stated above, constitute a contract between the Fund and its members) contain an implied term[9] requiring repayment of any overpaid Redemption Monies where (a) a certificate has not been given in good faith by or on behalf of the directors, (b) accordingly there is no binding debt and (c) a mistaken payment based on a fictitious NAV has been made. The Articles do not expressly envisage such a situation and the implication of such a term is (a) obvious, (b) necessary for business efficacy and (c) reflects the intentions of the parties viewed objectively as reasonable people. The facts and matters pleaded in contract-based causes of action in the Sample Amended Complaints in my opinion give rise to an arguable claim under BVI contract law for repayment of the Redemption Payments pursuant to such an implied term in each Fund's Articles.

Executed on October 20, 2016.                  /s/ Gabriel Moss
London, UK                                              GABRIEL MOSS

---

[8] See section 246(4).

[9] The legal basis for implying terms into Articles is discussed above at paragraphs 47 to 48.