**BROWN RUDNICK LLP**
David J. Molton
Daniel J. Saval
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
(212) 209-4800

*Counsel for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 Case |
| FAIRFIELD SENTRY LIMITED, et al., | Case No: 10-13164 (SMB) |
| Debtors in Foreign Proceedings. | Jointly Administered |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al., | |
| Plaintiffs, | Adv. Pro. No. 10-03496 |
| -against- | |
| THEODOOR GGC AMSTERDAM, et al., | Administratively Consolidated |
| Defendants. | |

<u>DECLARATION OF DAVID J. MOLTON</u>
<u>IN SUPPORT OF MOTION FOR LEAVE TO AMEND</u>

I, David J. Molton, do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

1.      I am a member of the law firm of Brown Rudnick LLP, counsel for Kenneth Krys and Charlotte Caulfield, (together, the "<u>Liquidators</u>" or "<u>Foreign Representatives</u>"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry

Limited (In Liquidation) ("Sentry"), Fairfield Sigma Limited (In Liquidation), and Fairfield Lambda Limited (In Liquidation) (collectively, the "Fairfield Funds" or "Funds"). I submit this Declaration in support of Plaintiffs' Motion for Leave to Amend (the "Motion") filed in the above-captioned actions.

2.    Attached as Exhibit A is a schedule of the proposed amended complaints that were filed in the actions prosecuted by the Liquidators in this Court following the July 27, 2016 status conference before the Court (the "Actions"). For each Action, Exhibit A includes the docket entry number of the corresponding proposed amended complaint and summarizes categories of amendments made to the complaint.

3.    Attached as Exhibit B is a true and correct copy of the proposed amended complaint filed in Fairfield Sentry Limited et al. v. Citigroup Global Markets Limited et al., Adv. Pro. No. 11-02770 (Bankr. S.D.N.Y.), which contains proposed amendments including: (i) allegations concerning Citco's lack of good faith; (ii) jurisdictional allegations concerning the use of correspondent U.S. bank accounts; (iii) changes to the wording of existing contract-based claims; (iv) changes to the wording of BVI statutory avoidance claims; and (v) allegations bearing on the issue of charging beneficial owners with the knowledge of record holders of redeemed shares, in connection with the issue of a redemption payment recipient's lack of good faith in receiving the redemption.

4.    Attached as Exhibit C is a true and correct copy of the proposed amended complaint filed in Fairfield Sentry Limited et al. v. Ching-Yang Huang et al., Adv. Pro. No. 11-01255 (Bankr. S.D.N.Y.), which contains proposed amendments including: (i) allegations concerning Citco's lack of good faith; (ii) changes to the wording of existing contract-based

claims; (iii) jurisdictional allegations concerning the use of correspondent U.S. bank accounts; and (iv) changes to the wording of BVI statutory avoidance claims.

5.      During the summer of 2014, pursuant to a subpoena served in the Chapter 15 case In re Fairfield Sentry Ltd., et al., Case No. 10-13164, the Liquidators received documents and materials concerning, *inter alia*, Citco's knowledge and conduct in connection with issuing statements concerning the Fairfield Funds' NAV, which provided the basis for the allegations in the proposed amended complaints concerning Citco's lack of good faith in giving certificates. The Liquidators did not have this information prior to their receipt of the subpoenaed materials.


Executed on October 21, 2016.          _____*/s/ David J. Molton*_____
                                        DAVID J. MOLTON

# EXHIBIT A

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 1. | Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al. | Bankr. 10-3635 | 139 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• dismissal of one or more defendants and relevant causes of action against them<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants<br>• allegations concerning charging beneficiaries with records holders' knowledge |
| 2. | Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al. | Bankr. 10-3636 | 152 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• dismissal of one or more defendants and relevant causes of action against them<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants<br>• allegations concerning charging beneficiaries with records holders' knowledge |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 3. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Abu Dhabi Investment Authority, et al. | Bankr. 11-1719 | 12 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 4. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Al Nahyan Mansour B Zayed, et al. | Bankr. 10-3790 | 20 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• added contract-based claims against the registered shareholder defendant |
| 5. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Albemar Participation Ltd., et al. | Bankr. 12-1266 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations |
| 6. | Fairfield Sentry Ltd. (In Liquidation), et al. v. All Funds Bank, et al. | Bankr. 11-1591 | 17 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

|  | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 7. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Almel Ltd., et al. | Bankr. 10-3789 | 20 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• added contract-based claims against the registered shareholder defendant |
| 8. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Alok Sama, et al. | Bankr. 12-1294 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 9. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Alton Alternative Fund Limited | Bankr. 12-1763 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 10. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Alton Select Ltd., et al. | Bankr. 10-3541 | 19 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 11. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Andorra Banc Agricol Reig SA, et al. | Bankr. 11-2611 | 16 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 12. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Annex Ltd., et al. | Bankr. 11-2593 | 14 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations |
| 13. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Apollo Nominees, Inc., et al. | Bankr. 11-1603 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 14. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Arden Endowment Advisers Ltd., et al. | Bankr. 11-1458 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• added contract-based claims against the registered shareholder defendant |
| 15. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Arden Int'l Capital Ltd., et al. | Bankr. 10-3870 | 17 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |

4

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 16. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Atl. Sec. Bank, et al. | Bankr. 12-1550 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations |
| 17. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Avalon Absolute Return Funds PLC, et al. | Bankr. 11-2530 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations |
| 18. | Fairfield Sentry Ltd. (In Liquidation), et al. v. AXA Isle of Man, et al. | Bankr. 10-3623 | 30 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 19. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banc of America Secs. LLC, et al. | Bankr. 11-1571 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 20. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banca Carige SPA, et al. | Bankr. 12-1123 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 21. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banca Cesare Ponti SPA, et al. | Bankr. 12-1140 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 22. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Banca Di San Marino SPA, et al. | Bankr. 11-1572 | 16 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 23. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Banca Popolare Dell'Alto, et al. | Bankr. 12-1148 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 24. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Banca Popolare Friuladria SPA, et al. | Bankr. 12-1156 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 25. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banca Privada D'Andorra S.A., et al. | Bankr. 11-1717 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 26. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Banca Profilo SPA, et al. | Bankr. 12-1285 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 27. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Atlantico (Bah.), et al. | Bankr. 10-3783 | 21 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 28. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Atlantico (Gib.) Ltd., et al. | Bankr. 10-3787 | 32 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 29. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Bilbao Vizcaya Argentaria, S.A., et al. | Bankr. 10-3515 | 29 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 30. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco di Desio e Della Brianza, et al. | Bankr. 10-4096 | 23 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 31. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco General SA Banca Privada, et al. | Bankr. 12-1286 | 11 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |
| 32. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Inversis SA, et al. | Bankr. 10-4089 | 18 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 33. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Itau Europa Int'l, et al. | Bankr. 12-1124 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 34. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Itau Europa Lux. SA, et al. | Bankr. 10-3755 | 29 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 35. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Nominees (IOM) Ltd., et al. | Bankr. 10-4097 | 19 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 36. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Patagonia (Uruguay) S.A.I.F.E., et al. | Bankr. 12-1287 | 15 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 37. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Popolare Di Verona E Novara Luxembourg, S.A., et al. | Bankr. 12-1187 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 38. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Privado Portugues (Cayman) Ltd., et al. | Bankr. 11-2531 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 39. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Santander (Suisse) S.A., et al. | Bankr. 10-3509 | 20 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 40. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Hapoalim BM, London, et al. | Bankr. 12-1144 | 13 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 41. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Hapoalim (Suisse) Ltd., et al. | Bankr. 10-3510 | 26 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 42. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Julius Baer & Co. Ltd., Zurich, et al. | Bankr. 11-1243 | 15 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 43. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Morgan Stanley AG, et al. | Bankr. 10-4212 | 12 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 44. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank of Am. Nat'l Trust & Sav. Ass'n, et al. | Bankr. 10-3615 | 20 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 45. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Bank of Ireland Nominees Ltd., et al. | Bankr. 12-1135 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 46. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Sal. Oppenheim Jr. & Cie (Schweiz) AG, et al. | Bankr. 11-2440 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• dismissal of one or more defendants and relevant causes of action against them<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 47. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Sarasin & Cie, et al. | Bankr. 12-1295 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 48. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Sarasin & Cie AG, et al. | Bankr. 11-1612 | 13 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 49. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Vontobel AG, et al. | Bankr. 11-1760 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 50. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BankMed (Suisse) S.A., et al. | Bankr. 11-2772 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 51. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Baring Bros. Sturdza SA, et al. | Bankr. 12-1157 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 52. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque de Luxembourg, et al. | Bankr. 10-3616 | 28 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• dismissal of one or more defendants and relevant causes of action against them<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants<br>• changes to wording of BVI Statutory Claims |
| 53. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque de Reescompte et de Placement, et al. | Bankr. 11-1585 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 54. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Degroof Luxembourg S.A., et al. | Bankr. 12-1147 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

|  | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 55. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque et Caisse D'Epargne de L'Etat Luxembourg, et al. | Bankr. 11-1598 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 56. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Piguet & Cie S.A., et al. | Bankr. 10-3514 | 21 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 57. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Privee Edmond De Rothschild (Eur.), et al. | Bankr. 10-3505 | 24 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 58. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque SCS Alliance S.A., et al. | Bankr. 11-1256 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 59. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Sudameris, et al. | Bankr. 10-3586 | 18 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 60. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Sudameris, et al. | Bankr. 10-3749 | 18 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 61. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Syz & Co. S.A., et al. | Bankr. 10-3513 | 20 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 62. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Barclays Bank (Suisse) S.A., et al. | Bankr. 11-1259 | 12 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 63. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Barclays Bank SA Madrid, et al. | Bankr. 12-1265 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |
| 64. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Barclays Private Bank & Trust (Channel Islands) Limited, et al. | Bankr. 12-1599 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |
| 65. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Barfield Nominees Ltd., et al. | Bankr. 11-1470 | 16 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 66. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bie Bank & Trust Bah. Ltd., et al. | Bankr. 11-1587 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 67. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bipielle Banke (Suisse), et al. | Bankr. 11-1568 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 68. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Blubank Ltd., et al. | Bankr. 10-3750 | 23 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 69. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Arbitrage SNC, et al. | Bankr. 10-4098 | 11 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• claims arising under BVI law<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 70. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Espana, et al. | Bankr. 12-1551 | 8 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li><li>additional jurisdictional allegations</li><li>changes to wording of BVI Statutory Claims</li></ul> |
| 71. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Lux. S.A., et al. | Bankr. 10-3626 | 28 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li><li>additional jurisdictional allegations</li><li>changes to wording of BVI Statutory Claims</li><li>added contract-based claims against all defendants</li></ul> |
| 72. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Private Bank & Trust Cayman Ltd., et al. | Bankr. 10-4099 | 13 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li><li>additional jurisdictional allegations</li><li>changes to wording of BVI Statutory Claims</li><li>added contract-based claims against all defendants</li></ul> |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 73. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Secs. Nominees Ltd., et al. | Bankr. 11-1579 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 74. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Secs. Servs. Lux., et al. | Bankr. 10-3627 | 51 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 75. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BNY AIS Nominees Ltd., Credit Andorra/Crediivest, et al. | Bankr. 11-1589 | 11 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 76. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Bordier & Cie, et al. | Bankr. 10-3873 | 18 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 77. | Fairfield Sentry Ltd. (In Liquidation), et al. v. BP Alpha S.A., et al. | Bankr. 11-1245 | 13 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 78. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Bred Banque Populaire, et al. | Bankr. 12-1136 | 11 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 79. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Brown Bros. Harriman & Co., et al. | Bankr. 10-3752 | 39 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li><li>additional jurisdictional allegations</li><li>changes to wording of BVI Statutory Claims</li><li>added contract-based claims against all defendants</li></ul> |
| 80. | Fairfield Sentry Limited (In Liquidation), et al. v. Bureau of Labor Insurance, et al. | Bankr. 11-1574 | 12 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li><li>additional jurisdictional allegations</li><li>changes to wording of BVI Statutory Claims</li></ul> |
| 81. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Caceis Bank EX-IXIS IS, et al. | Bankr. 10-3871 | 27 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional jurisdictional allegations</li><li>additional bank account allegations</li><li>added contract-based claims against all defendants</li><li>changes to wording of BVI Statutory Claims</li></ul> |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 82. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Caceis Bank Lux., et al. | Bankr. 10-3624 | 34 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 83. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Cais Bank, et al. | Bankr. 12-1288 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 84. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Capital Global Mgmt. Ltd., et al. | Bankr. 12-1552 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 85. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Capluck Enters. Ltd., et al. | Bankr. 11-1573 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 86. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Catalunya Caixa, et al. | Bankr. 12-1129 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 87. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Cathay Life Insurance Co. Ltd., et al. | Bankr. 11-1577 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 88. | Fairfield Sentry Ltd. (In Liquidation), et al. v. CDC IXIS, et al. | Bankr. 10-3754 | 36 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 89. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Celfin Int'l Ltd., et al. | Bankr. 10-3865 | 17 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 90. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Centre Coll., et al. | Bankr. 12-1143 | 11 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 91. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Chelsea Trust Co., Ltd., et al. | Bankr. 12-1138 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations |
| 92. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Chen Tyan-Wen, et al. | Bankr. 11-1611 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 93. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Ching-Jung Fang, et al. | Bankr. 11-2591 | 14 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 94. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Citibank (Switz.) AG, et al. | Bankr. 10-3640 | 29 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 95. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Citibank Korea Inc., et al. | Bankr. 12-1142 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 96. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Citibank NA London, et al. | Bankr. 10-3622 | 38 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants<br>• allegations concerning charging beneficiaries with records holders' knowledge |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 97. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Citigroup Global Markets Ltd., et al. | Bankr. 11-2770 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims<br>• allegations concerning charging beneficiaries with records holders' knowledge |
| 98. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Citivic Nominees Ltd., et al. | Bankr. 10-4100 | 24 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 99. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Clarks Fork Foundation, et al. | Bankr. 12-1150 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 100. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Clearstream Banking S.A., et al. | Bankr. 11-1263 | 11 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 101. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Commercial Bank of Kuwait, et al. | Bankr. 10-4093 | 11 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 102. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Agricole (Suisse) S.A., et al. | Bankr. 11-1244 | 15 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 103. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Agricole Titres, et al. | Bankr. 11-2787 | 12 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 104. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Industriel et Commercial Sing. Branch, et al. | Bankr. 11-1575 | 18 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 105. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse (Bah.), et al. | Bankr. 10-3782 | 33 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 106. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse AG Nassau Branch Wealth Management, et al. | Bankr. 11-1601 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 107. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Credit Suisse Int'l, et al. | Bankr. 10-3620 | 18 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 108. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse Nassau Branch, et al. | Bankr. 12-1127 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 109. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse Nominees, et al. | Bankr. 10-4236 | 24 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 110. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse Nominees (Guernsey) Ltd., et al. | Bankr. 11-2612 | 15 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 111. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse (Lux.) S.A., et al. | Bankr. 10-4088 | 19 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 112. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Criterium Capital Funds BV, et al. | Bankr. 12-1268 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations |
| 113. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Danobat S. Coop, et al. | Bankr. 12-1159 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 114. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Delta, S.P.A., et al. | Bankr. 12-1162 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 115. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Deltec Bank & Trust Ltd., et al. | Bankr. 11-2532 | 12 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 116. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Deutsche Bank (Cayman), et al. | Bankr. 10-3746 | 26 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 117. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Deutsche Bank AG Singapore, et al. | Bankr. 10-3747 | 24 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 118. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Deutsche Bank Nominees (Jersey) Ltd., et al. | Bankr. 11-1564 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 119. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Deutsche Bank (Suisse) S.A. Geneve, et al. | Bankr. 10-3745 | 26 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li><li>additional jurisdictional allegations</li><li>changes to wording of BVI Statutory Claims</li><li>added contract-based claims against all defendants</li></ul> |
| 120. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Deutsche Bank Trust Co. Am., et al. | Bankr. 10-3744 | 30 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li><li>additional jurisdictional allegations</li><li>changes to wording of BVI Statutory Claims</li><li>added contract-based claims against all defendants</li></ul> |
| 121. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Dexia BIL, et al. | Bankr. 10-4090 | 15 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li><li>additional jurisdictional allegations</li><li>changes to wording of BVI Statutory Claims</li><li>added contract-based claims against all defendants</li></ul> |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 122. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Dexia Private Bank (Switz.), et al. | Bankr. 10-4091 | 13 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 123. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Don Chimango SA, et al. | Bankr. 12-1298 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |
| 124. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Drake & Co., et al. | Bankr. 11-1246 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations |
| 125. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Dreadnought Fin. OY, et al. | Bankr. 12-1289 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 126. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Dresdner LateinAmerika AG, et al. | Bankr. 10-3753 | 24 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 127. | Fairfield Sentry Ltd. (In Liquidation), et al. v. E. Star Sicavf, et al. | Bankr. 11-1597 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 128. | Fairfield Sentry Ltd. (In Liquidation), et al. v. EC.Com, Inc., et al. | Bankr. 11-2614 | 14 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 129. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Eduardo Fernandez de Valderrama Murillo, et al. | Bankr. 11-1599 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 130. | Fairfield Sentry Ltd. (In Liquidation), et al. v. EFG Bank, et al. | Bankr. 10-3625 | 37 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• dismissal of one or more defendants and relevant causes of action against them<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 131. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Essex 21 Limited, et al. | Bankr. 12-1716 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations |
| 132. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Field Nominees Ltd., et al. | Bankr. 12-1133 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 133. | Fairfield Sentry Ltd. (In Liquidation), et al. v. First Gulf Bank, et al. | Bankr. 12-1567 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |

|  | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 134. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Bank Cayman Limited, et al. | Bankr. 12-1571 | 14 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations |
| 135. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Bank Nederland N.V., et al. | Bankr. 12-1119 | 12 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 136. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Bank SA/NV, et al. | Bankr. 11-1617 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 137. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Global Custody Servs. N.V., et al. | Bankr. 11-2422 | 12 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 138. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Global Custody Servs. N.V., et al. | Bankr. 12-1568 | 12 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |

|  | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 139. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis (Isle of Man) Nominees Ltd., et al. | Bankr. 10-3776 | 32 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 140. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis SA/NV, et al. | Bankr. 11-1614 | 13 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 141. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FPB Int'l Bank, Inc., et al. | Bankr. 12-1126 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

|  | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 142. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS ABN AMRO Global Custody, et al. | Bankr. 10-3504 | 27 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 143. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/AEB Lux., et al. | Bankr. 11-1254 | 18 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 144. | Fairfield Sigma Ltd. (In Liquidation), et al. v.FS/ANDBanc Andorra, et al. | Bankr. 10-3632 | 43 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 145. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Bank Leumi Israel, et al. | Bankr. 12-1158 | 11 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 146. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Banque Degroof Bruxelles, et al. | Bankr. 11-1569 | 14 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 147. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/BBVA Miami, et al. | Bankr. 10-3618 | 22 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 148. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/BBVA Zurich/Shares, et al. | Bankr. 11-1600 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

pg 45 of 347

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 149. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/BK Hapoalim/B M Tel Aviv, et al. | Bankr. 11-1467 | 21 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 150. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/CBESSA, et al. | Bankr. 10-3756 | 27 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 151. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Fortis Banque Lux., et al. | Bankr. 11-1242 | 14 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 152. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/GSCO London, et al. | Bankr. 12-1569 | 9 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li><li>additional jurisdictional allegations</li><li>changes to wording of BVI Statutory Claims</li></ul> |
| 153. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/HSBC Guyerzeller, et al. | Bankr. 11-1594 | 11 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li><li>additional jurisdictional allegations</li><li>changes to wording of BVI Statutory Claims</li></ul> |
| 154. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/HSBC Private Banking Nom, et al. | Bankr. 10-3629 | 28 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li><li>additional jurisdictional allegations</li><li>changes to wording of BVI Statutory Claims</li><li>added contract-based claims against all defendants</li></ul> |
| 155. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/ING Lux, et al. | Bankr. 11-1565 | 10 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li><li>additional jurisdictional allegations</li><li>changes to wording of BVI Statutory Claims</li></ul> |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 156. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Israel Disc. Bank, Ltd., Tel Aviv, et al. | Bankr. 11-1610 | 11 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 157. | Fairfield Sigma Ltd. (In Liquidation), et al. v. FS/LAB/AXA PM, et al. | Bankr. 11-1460 | 12 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 158. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Mizrahi Tefahot Bank Ltd., et al. | Bankr. 10-3512 | 22 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 159. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/MLBS Geneva, et al. | Bankr. 12-1269 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

|  | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 160. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/NBK Kuwait, et al. | Bankr. 11-1260 | 11 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 161. | Fairfield Sigma Ltd. (In Liquidation), et al. v. FS/NBP Titres, et al. | Bankr. 11-1619 | 16 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 162. | Fairfield Sigma Ltd. (In Liquidation), et al. v. FS Oddo & Cie, et al. | Bankr. 10-3621 | 23 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 163. | Fairfield Sigma Ltd. (In Liquidation), et al. v. FS/Procap/Bryan Garnier | Bankr. 11-1262 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 164. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/SG Private Banking (Lugano-Svizzera) SA, et al. | Bankr. 11-1566 | 10 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li><li>additional jurisdictional allegations</li><li>changes to wording of BVI Statutory Claims</li></ul> |
| 165. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Stichting Stroeve Global Custody, et al. | Bankr. 10-3867 | 18 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li></ul> |
| 166. | Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Swedclient/IAM, et al. | Bankr. 11-1253 | 11 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li><li>additional jurisdictional allegations</li><li>changes to wording of BVI Statutory Claims</li></ul> |
| 167. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fullerton Capital PTE, Ltd., et al. | Bankr. 11-2771 | 12 | <ul><li>edits to reflect additional factual detail</li><li>allegations concerning Citco's lack of good faith</li><li>additional bank account allegations</li><li>additional jurisdictional allegations</li></ul> |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 168. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Fund Nominees Ltd., et al. | Bankr. 10-3525 | 21 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 169. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Gates Charitable Trust, et al. | Bankr. 12-1145 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 170. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Global Fund Porvenir, et al. | Bankr. 11-1567 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 171. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Grand Cathay Secs. (H.K.) Ltd., et al. | Bankr. 11-1462 | 15 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 172. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hambros Guernsey Nominees, et al. | Bankr. 10-3799 | 32 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 173. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hansard Europe Ltd., et al. | Bankr. 10-4238 | 15 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 174. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hinduja Bank (Switzerland) SA, et al. | Bankr. 12-1185 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

|  | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 175. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hontai Life Ins. Co. Ltd., et al. | Bankr. 12-1271 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 176. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Inst. Trust Servs. (Asia) Ltd., et al. | Bankr. 10-3619 | 19 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 177. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Int'l Trustee Ltd., et al. | Bankr. 12-1290 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 178. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Private Bank (Guernsey) Ltd., et al. | Bankr. 10-3631 | 30 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 179. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Private Bank (Suisse) S.A., et al. | Bankr. 10-3633 | 33 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants<br>• allegations concerning charging beneficiaries with records holders' knowledge |
| 180. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Secs. (Panama) SA, et al. | Bankr. 12-1270 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 181. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Secs. Servs. (Lux.) S.A., et al. | Bankr. 10-3630 | 35 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• dismissal of one or more defendants and relevant causes of action against them<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants<br>• allegations concerning charging beneficiaries with records holders' knowledge |
| 182. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Seoul Branch, Ltd., et al. | Bankr. 12-1128 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 183. | Fairfield Sentry Ltd. (In Liquidation), et al. v. HSH Nordbank Secs. S.A., et al. | Bankr. 12-1555 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 184. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hsu, et al. | Bankr. 11-1247 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 185. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hua Nan Commercial Bank, et al. | Bankr. 12-1153 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 186. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Ching-Yang Huang, et al. | Bankr. 11-1255 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 187. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Huang, et al. | Bankr. 11-1465 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 188. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hui-Liang Tsai & Chien-Hui Tu, et al. | Bankr. 11-1466 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 189. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Hyposwiss Private Bank Geneve, et al. | Bankr. 12-1600 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations |
| 190. | Fairfield Sentry Ltd. (In Liquidation), et al. v. ING Bank (Suisse) S.A., et al. | Bankr. 10-3801 | 31 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 191. | Fairfield Sentry Ltd. (In Liquidation), et al. v. International Hedge Fund Ltd., et al. | Bankr. 12-1161 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 192. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Investec Bank (Switzerland) AG, et al. | Bankr. 12-1125 | 12 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 193. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Irish Life Int'l, et al. | Bankr. 12-1291 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 194. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Istituto Bancario Sammarinese S.P.A., et al. | Bankr. 12-1292 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 195. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Jared Trading Ltd./BVI, et al. | Bankr. 12-1264 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations |
| 196. | Fairfield Sentry Ltd. (In Liquidation), et al. v. John E. Niederhuber IRA, et al. | Bankr. 12-1296 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 197. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Judith Cherwinka, et al. | Bankr. 11-1592 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 198. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Judith A. Hansen, et al. | Bankr. 11-1593 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 199. | Fairfield Sigma Ltd. (In Liquidation), et al. v. KAS Depositary Trust Co., et al. | Bankr. 11-2533 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 200. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Kasbank Depositary Trust Co., et al. | Bankr. 12-1137 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 201. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Kasbank Effecten Bewaarbedrijf, N.V., et al. | Bankr. 12-1163 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 202. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Kay Torshen, et al. | Bankr. 10-3866 | 18 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 203. | Fairfield Sentry Ltd. (In Liquidation), et al. v. KB (CI) Nominees Ltd., et al. | Bankr. 10-4240 | 16 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 204. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Kefong Lee, et al. | Bankr. 11-1596 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 205. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Kiangsu Chekiang and Shanghai Residents (H.K.) Association, et al. | Bankr. 12-1155 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 206. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Koch Inv. (UK) Co., et al. | Bankr. 11-1606 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 207. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Kookmin Bank, et al. | Bankr. 10-3777 | 39 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 208. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Korea Exch. Bank, et al. | Bankr. 11-1486 | 16 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 209. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Kredietbank S.A. Luxembourgeoise, et al. | Bankr. 10-3868 | 27 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 210. | Fairfield Sentry Ltd. (In Liquidation), et al. v. KWI, et al. | Bankr. 11-1595 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 211. | Fairfield Sigma Ltd. (In Liquidation), et al. v. La Romana Inversiones SICAV, S.A., et al. | Bankr. 12-1149 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 212. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Lacroze, et al. | Bankr. 10-3528 | 26 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• added contract-based claims against the registered shareholder defendant |
| 213. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Leyden Dev., et al. | Bankr. 11-1622 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |
| 214. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Lion Global Investors, et al. | Bankr. 11-2392 | 11 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 215. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Lombard Odier Darier Hentsch & Cie, et al. | Bankr. 10-3795 | 29 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 216. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Lombardy Props. Ltd., et al. | Bankr. 10-3521 | 24 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 217. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Loquat Holdings, Inc., et al. | Bankr. 12-1152 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 218. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Lung Yen Life Serv. Co. Ltd., et al. | Bankr. 11-1608 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 219. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Madison Cultural Arts Support Trust, et al. | Bankr. 12-1121 | 13 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 220. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Mandalay Invs. SA, et al. | Bankr. 12-1141 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 221. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Maple Key Mkt. Neutral Cayman Islands LP, et al. | Bankr. 12-1122 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 222. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Mario Pacheco Cortes, et al. | Bankr. 11-2401 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations |
| 223. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Melguizo, et al. | Bankr. 11-1607 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 224. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Melrose Investments Ltd., et al. | Bankr. 11-1461 | 13 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |
| 225. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Meritz Fire & Marine Ins. Co. Ltd., et al. | Bankr. 10-3507 | 27 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 226. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Merrill Lynch Bank (Suisse) S.A., et al. | Bankr. 10-3788 | 27 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

|  | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 227. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Merrill Lynch Int'l, et al. | Bankr. 11-1463 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• allegations concerning charging beneficiaries with records holders' knowledge |
| 228. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al. | Bankr. 10-3516 | 24 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>•  additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 229. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Mirabaud & Cie, et al.[*] | Bankr. 11-1257 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

---

[*] Plaintiffs are permitted to amend the Complaint in this action without leave from the Court pursuant to Fed. R. Bankr. P. 7015.

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 230. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Monte Paschi Ireland Ltd., et al. | Bankr. 10-3791 | 18 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 231. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Multi-Strategy Fund Ltd., et al. | Bankr. 11-1576 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 232. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Naidot & Co., et al. | Bankr. 11-2336 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations |
| 233. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Natexis Banques Populaires, et al. | Bankr. 10-4094 | 21 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |

10-03635-jpm    Doc 153    Filed 11/14/16    Entered 01/12/17 14:55:58    Main Document
Pg 67 of 347

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 234. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Natixis, et al. | Bankr. 11-1464 | 13 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims<br>• Added contract-based claims against all Defendants |
| 235. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Natixis Private Banking Int'l, et al. | Bankr. 10-3864 | 21 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 236. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Neue Bank AG, et al. | Bankr. 10-3519 | 20 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 237. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Nihon Unicom Corp., et al. | Bankr. 11-1261 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 238. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Nomura Int'l PLC, et al. | Bankr. 10-3793 | 22 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 239. | Fairfield Sentry Ltd. (In Liquidation), et al. v. NYROY, Royal Bank of Canada, et al. | Bankr. 11-1578 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 240. | Fairfield Sentry Ltd. (In Liquidation), et al. v. P.S.I. Int'l Ltd., et al. | Bankr. 11-2592 | 14 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 241. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Parson Fin. Panama S.A., et al. | Bankr. 11-1580 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 242. | Fairfield Sentry Ltd. (In Liquidation), et al. v. PFPC Bank Ltd., et al. | Bankr. 11-1604 | 18 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 243. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Pictet & Cie, et al. | Bankr. 10-3764 | 28 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 244. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Pleasant T. Rowland Found., Inc. et al. | Bankr. 11-1613 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 245. | Fairfield Sentry Ltd. (In Liquidation), et al. v. POBT Bank & Trust Ltd., et al. | Bankr. 11-1248 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• added contract-based claims against the registered shareholder defendant |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 246. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Portobelo Advs., Inc., et al. | Bankr. 12-1146 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 247. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Presnow Ltd., et al. | Bankr. 11-1620 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 248. | Fairfield Sentry Ltd. (In Liquidation), et al. v. PRS Inv. Strategies Fund Class 4E, et al. | Bankr. 10-4101 | 12 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 249. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Public Bank (Hong Kong) Ltd., et al. | Bankr. 12-1164 | 11 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 250. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Rahn & Bodmer Banquiers, et al. | Bankr. 11-1581 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 251. | Fairfield Sentry Ltd. (In Liquidation), et al. v. RBC Dexia Inv. Servs. Espana S.A., et al. | Bankr. 12-1132 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 252. | Fairfield Sentry Ltd. (In Liquidation), et al. v. RBC Dominion Sec. Sub A/C, et al. | Bankr. 10-3502 | 21 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 253. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Robinson & Co., et al. | Bankr. 10-3628 | 40 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 254. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Rothschild & Cie Banque Paris, et al. | Bankr. 12-1131 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 255. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Rothschild Trust (Schweiz) AG, et al. | Bankr. 11-2594 | 14 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 256. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Royal Bank of Canada, et al. | Bankr. 11-2253 | 12 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 257. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Royal Bank of Canada (Asia) Ltd., et al. | Bankr. 11-1582 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 258. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Royal Bank of Canada (Suisse), et al. | Bankr. 10-4087 | 21 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 259. | Fairfield Sigma Ltd. (In Liquidation), et al. v. S. Coop Irizar, et al. | Bankr. 11-1570 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 260. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Samsung Absolute Return Trust M1, et al. | Bankr. 12-1762 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 261. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Schroder & Co. Bank AG, et al. | Bankr. 11-1249 | 18 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 262. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Schroder & Co. (Asia) Ltd., et al. | Bankr. 10-3508 | 23 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 263. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Schroders Italy SIM SPA, et al. | Bankr. 12-1272 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 264. | Fairfield Sigma Ltd. (In Liquidation), et al. v. SEI Invs. Trustee, et al. | Bankr. 12-1134 | 18 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 265. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Select Absolute Strategies Sicav, et al. | Bankr. 12-1601 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations |
| 266. | Fairfield Sentry Ltd. (In Liquidation), et al. v. SG Private Banking (Suisse) S.A., et al. | Bankr. 10-3595 | 21 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 267. | Fairfield Sentry Ltd. (In Liquidation), et al. v. SG Private Banking (Suisse) S.A., et al. | Bankr. 10-3786 | 23 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 268. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Sherli Elghanian Krayem, et al. | Bankr. 10-3614 | 19 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 269. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Silverado Holdings LDC, et al. | Bankr. 12-1300 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 270. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Simgest SpA, et al. | Bankr. 11-2534 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations |
| 271. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Six Sis AG, et al. | Bankr. 10-3869 | 18 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 272. | Fairfield Sentry Ltd. (In Liquidation), et al. v. SNS Global Custody B.V., et al. | Bankr. 10-3757 | 23 | • edits to reflect additional factual detail <br>• allegations concerning Citco's lack of good faith <br>• additional bank account allegations <br>• additional jurisdictional allegations <br>• changes to wording of BVI Statutory Claims <br>• added contract-based claims against all defendants |
| 273. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Societe Europeenne De Banque S.A., et al.* | Bankr. 11-1615 | 11 | • edits to reflect additional factual detail <br>• allegations concerning Citco's lack of good faith <br>• additional bank account allegations <br>• additional jurisdictional allegations <br>• changes to wording of BVI Statutory Claims <br>• added contract-based claims against all defendants |

---

* Plaintiffs are permitted to amend the Complaint in this action without leave from the Court pursuant to Fed. R. Bankr. P. 7015.

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 274. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Societe Generale Bank & Trust (Lux.), et al. | Bankr. 11-1584 | 14 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• dismissal of one or more defendants and relevant causes of action against them<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 275. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Societe Generale Bank & Trust S.A. (Lux.), et al. | Bankr. 11-2613 | 16 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• dismissal of one or more defendants and relevant causes of action against them<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |
| 276. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Sofos Capital LLC, et al. | Bankr. 12-1154 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 277. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Somers Nominees (Far East) Ltd., et al. | Bankr. 12-1556 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 278. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Spin City Corp., et al. | Bankr. 12-1160 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 279. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Stichting Stroeve Global Custody, et al. | Bankr. 11-2615 | 14 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations |
| 280. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Strina, et al. | Bankr. 10-3798 | 19 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• claims arising under BVI law<br>• added contract-based claims against all defendants |
| 281. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Sumitomo Banking & Trust Co. Ltd., et al. | Bankr. 10-3863 | 21 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 282. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Swedbank, et al. | Bankr. 11-1586 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 283. | Fairfield Sentry Ltd. (In Liquidation), et al. v. TAIB Bank E.C., et al. | Bankr. 12-1267 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |
| 284. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Tayleigh Trust Co. Ltd., et al. | Bankr. 12-1130 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 285. | Fairfield Sigma Ltd. (In Liquidation), et al. v. Tercas – Cassa di Risparmio della Provincia di Teramo S.P.A., et al. | Bankr. 10-3503 | 26 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 286. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Theodoor GGC Amsterdam, et al. | Bankr. 10-3496 | 915 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 287. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Triumph Offshore Fund, et al. | Bankr. 12-1293 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 288. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Tsao, et al. | Bankr. 11-1468 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations |
| 289. | Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS AG N.Y., et al. | Bankr. 10-3780 | 27 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants<br>• allegations concerning charging beneficiaries with records holders' knowledge |

77

|  | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 290. | Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Fund Servs. (Cayman) Ltd., et al. | Bankr. 10-4095 | 14 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• added contract-based claims against the registered shareholder defendant |
| 291. | Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Fund Servs. (Cayman) Ltd. Ref Greenlake Arbitrage Fund Ltd., et al. | Bankr. 10-3758 | 21 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• added contract-based claims against the registered shareholder defendant |
| 292. | Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Fund Servs. (Ir.) Ltd., et al. | Bankr. 11-1258 | 14 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 293. | Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Lux. SA, et al. | Bankr. 11-1250 | 14 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants<br>• allegations concerning charging beneficiaries with records holders' knowledge |
| 294. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Unicorp Bank & Trust Ltd., et al. | Bankr. 12-1301 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |
| 295. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Union Finance Int'l (HK) Ltd., et al. | Bankr. 12-1139 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 296. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Union USD Global Arbitrage A Fund, et al. | Bankr. 10-3506 | 21 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |
| 297. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Vontobel Asset Mgmt. Inc., et al. | Bankr. 10-3540 | 18 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• added contract-based claims against the registered shareholder defendant |
| 298. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Wall Street Secs. S.A., et al. | Bankr. 10-3778 | 25 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims<br>• added contract-based claims against all defendants |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 299. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Weston Sec. Ltd., et al. | Bankr. 10-3784 | 18 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• added contract-based claims against the registered shareholder defendant |
| 300. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Winchester Fiduciary Servs. Ltd., et al. | Bankr. 12-1302 | 8 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• changes to wording of BVI Statutory Claims |
| 301. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Woori Bank, et al. | Bankr. 11-1616 | 10 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |
| 302. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Yuanta Asset Mgmt. (H.K.) Ltd., et al. | Bankr. 11-1588 | 9 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• changes to wording of BVI Statutory Claims |

| | CASE NAME | DOCKET NO. | INDIVIDUAL ECF DOCKET NO. OF NOTICE OF PROPOSED AMENDED COMPLAINT | PROPOSED AMENDMENTS INCLUDED |
|---|---|---|---|---|
| 303. | Fairfield Sentry Ltd. (In Liquidation), et al. v. ZCM Asset Holding Co. (Berm.) Ltd., et al. | Bankr. 10-3792 | 23 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants |
| 304. | Fairfield Sentry Ltd. (In Liquidation), et al. v. Zurich Capital Mkts. Co., et al. | Bankr. 10-3634 | 77 | • edits to reflect additional factual detail<br>• allegations concerning Citco's lack of good faith<br>• dismissal of one or more defendants and relevant causes of action against them<br>• additional bank account allegations<br>• additional jurisdictional allegations<br>• added contract-based claims against all defendants<br>• allegations concerning charging beneficiaries with records holders' knowledge |

# EXHIBIT B

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | ) **Chapter 15 Case** |
| | ) |
| **FAIRFIELD SENTRY LIMITED, et al.,** | ) **Case No. 10-13164 (SMB)** |
| | ) |
| Debtors in Foreign Proceedings. | ) **Jointly Administered** |
| | ) |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION),** acting by and through the Foreign Representatives thereof, and **KENNETH KRYS and CHARLOTTE CAULFIELD,** solely in their capacities as Foreign Representatives and Liquidators thereof, | ) |
| | ) |
| | ) |
| | ) |
| | ) **Adv. Pro. No. 11-01255** |
| | ) **(SMB)** |
| Plaintiffs, | ) |
| | ) **NOTICE OF FILING OF** |
| -against- | ) **PROPOSED AMENDED** |
| | ) **COMPLAINT** |
| **CHING-YANG HUANG, CHIN-HUAH SHIH and BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF CHING-YANG HUANG 1-1000,** | ) |
| | ) |
| | ) |
| Defendants. | ) |

      **PLEASE TAKE NOTICE** that Fairfield Sentry Limited ("Sentry"), by and through

Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "Foreign

Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry, the

"Plaintiffs"), solely in their capacities as the Liquidators of Sentry and the Foreign

Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited, and

Fairfield Lambda Limited pending before the Commercial Division of the Eastern Caribbean

High Court of Justice, British Virgin Islands, hereby file the enclosed proposed amended complaint in the above-captioned adversary proceeding (the "Proposed Amended Complaint").

**PLEASE TAKE FURTHER NOTICE** that a clean copy of the Proposed Amended Complaint is filed herewith as Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that a document showing the Proposed Amended Complaint redlined against the operative complaint in the above-captioned adversary proceeding is filed herewith as Exhibit B.

Dated: New York, New York
        September 7, 2016

                                        **BROWN RUDNICK LLP**


                                        By:    */s/ David J. Molton*
                                               David J. Molton
                                               May Orenstein
                                               Daniel J. Saval

                                        Seven Times Square
                                        New York, New York 10036
                                        Telephone: 212.209.4800
                                        Facsimile: 212.209.4801

                                        *Attorneys for the Foreign Representatives*

# EXHIBIT A

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**FAIRFIELD SENTRY LIMITED, et al.,**<br><br>  Debtors in Foreign Proceedings. | ) **Chapter 15 Case**<br>)<br>) **Case No. 10-13164 (SMB)**<br>)<br>) **Jointly Administered**<br>)<br>) |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION),** acting by and through the Foreign Representatives thereof, and **KENNETH KRYS and CHARLOTTE CAULFIELD,** solely in their capacities as Foreign Representatives and Liquidators thereof,<br><br>                    **Plaintiffs,**<br><br>                  **-against-**<br><br>**CHING-YANG HUANG, CHIN-HUAH SHIH and BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF CHING-YANG HUANG 1-1000,**<br><br>                    **Defendants.** | )<br>)<br>)<br>)<br>)<br>) **Adv. Pro. No. 11-01255**<br>) **(SMB)**<br>)<br>) **SECOND AMENDED**<br>) **COMPLAINT**<br>)<br>)<br>)<br>)<br>) |

Fairfield Sentry Limited ("Sentry"), by and through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "Foreign Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and the Foreign Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for

their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.     This action and similar actions are brought by the Plaintiffs, with the approval of the foreign court having jurisdiction over the matter, to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008.

2.     The Funds were created as a means for private investment in managed accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that Bernard L. Madoff used to perpetrate his massive Ponzi scheme.  Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss Franc investments) through purchases of shares of Sentry.  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held by BLMIS for Sentry.  As stated in their offering materials, the Funds' investment objective was to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3.     It is now known that these types of feeder funds were essential to the perpetration of Madoff's Ponzi scheme.  In order for the Ponzi scheme to operate, Madoff required a continuous flow of new investors and investments to be able to satisfy redemption requests from early investors.  Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS), brought new investors into this scheme, allowing Madoff to make payments to early investors and

thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.      From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares was transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff.  Prior to December 2008, the voting participating shares of Sentry ($.01 par value per share), Sigma (€01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value."  Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund, net of certain expenses ("Net Asset Value").

5.      From time to time, in order to make payments to investors for the redemption of Shares ("Redemption Payments"), Sentry generally made withdrawals from its BLMIS accounts. On occasion, Sentry made Redemption Payments directly from amounts on hand invested by other subscribers in the Funds.  At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by BLMIS for Sentry.  The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which was calculated based principally on the assets that the Funds believed were being held, and investments that were being made, by BLMIS for Sentry's account.

6.      As the world now knows, Madoff was operating a massive Ponzi scheme through BLMIS.  Thus, at all relevant times, the money that Sentry transferred to BLMIS was not

3

invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses. Further, none of the securities shown on statements provided to Sentry by BLMIS were in fact purchased for Sentry. Additionally, none of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of sales of securities or other investments. Instead, such amounts represented the monies of more recent investors into the Madoff scheme.

7.      In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent, and the Funds were insolvent at the time Redemption Payments were made or they were rendered insolvent by those payments. As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

8.      At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of his fraud. Similarly, the Redemption Payments that the Funds made to redeeming shareholders were not made in the ordinary course of any business or for any legitimate purposes. Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and

4

simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme. These payments were crucial in perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9.      During the period from and after July 19, 2007 through November 19, 2008, following the receipt by Sentry of notices of redemption, Sentry made Redemption Payments to accounts held in the name of Defendant Ching-Yang Huang ("Huang") aggregating USD $276,462.00.

10.      At the time such payments were made, Sentry mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption. In fact, however, as stated, the Redemption Payments made to Huang far exceeded the Net Asset Value of Shares redeemed that would have been calculated based on the true facts existing at that time or any relevant time. Moreover, these Redemption Payments did not, as Sentry intended, represent the proceeds arising from the profitability of or to continue investment in BLMIS. Instead, any amounts obtained directly or indirectly by Sentry from BLMIS to make Redemption Payments to Huang generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

11.      Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them, and, at all relevant times, the Funds were unable to pay their debts as they fell or would fall due. Indeed, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.

5

12.    In particular, claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (SMB) (the "BLMIS Adversary Proceeding").  As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.  This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud. The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.  At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

13.    On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda.  The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and further increased the amount of those liabilities.  In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their

existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

14.    Upon information and belief, Huang has either retained the Redemption Payments made to him/her by Sentry for his/her own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities, including but not limited to Chin-Huan Shih, for whom Huang may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with Huang, the "Defendants").

15.    Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value.  As of December 2008 and presently, Sentry, Sigma, and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

16.    Unless Redemption Payments paid to shareholders are recovered for the Funds' estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may be made against them; further, recoveries of Redemption Payments will increase distributions to the Funds' investors who have been harmed .  Moreover, to the extent such liabilities and claims must be satisfied solely from the Funds' current assets, Defendants will have been unjustly enriched as they will not bear their proportionate share of such liabilities and claims, but rather will retain a windfall at the expense of other shareholders and creditors of the Funds.

## JURISDICTION AND VENUE

17.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re

<u>Fairfield Sentry Limited, et al.</u>, No. 10-13164 (SMB), pending in this Court.   Additionally,

pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("<u>SIPA</u>"), which

incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States

Code, jurisdiction is also proper in this Court because this action also relates to the consolidated

liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the

caption <u>Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC</u>,

SIPA Liquidation No. 08-1789 (SMB).   Pursuant to the Amended Standing Order of Reference

of the United States District Court for the Southern District of New York, dated January 31,

2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United

States Code (as amended, the "<u>Bankruptcy Code</u>") are referred to this Court for adjudication.

18.    This is a core proceeding under 28 U.S.C. § 157(b)(2).[1]   Should the Court

determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and

order by this Court.

19.    This Court has jurisdiction over Huang and any Beneficial Shareholders pursuant

to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil

Practice Law & Rules § 302 (McKinney 2008) because Huang and the Beneficial Shareholders

purposely availed themselves of the laws of the United States and the State of New York by,

among other things, investing money with the Funds, knowing and intending that the Funds

would invest substantially all of that money in New York-based BLMIS, and, upon information

and belief, maintaining bank accounts in the United States, and in fact receiving Redemption

---

[1]    Although the District Court, in <u>In re Fairfield Sentry Ltd.</u>, No. 1:11-mc-00224-LAP, 458 B.R. 665 (S.D.N.Y. 2011), held that causes of action alleged by the Plaintiffs in other cases before this Court—causes of action that are similar or the same as those alleged in this complaint—are not core proceedings, this determination may be subject to appeal.  In any event, plaintiffs submit that the causes of action in this complaint, which include, *inter alia*, allegations regarding transfers of property that were directed into the territorial jurisdiction of the United States, render the claims asserted in this complaint core in accordance with the District Court's decision.

Payments in those United States-based accounts. Huang and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, upon information and belief, designated United States-based bank accounts to receive their Redemption Payments from the Funds and actively directed Redemption Payments at issue in this action into those bank accounts. Huang and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein. Huang and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

20.    Moreover, this Court has jurisdiction over Huang and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more agreements for the subscription of Shares that Huang entered into with Sentry

21.    Huang, upon information and belief, entered into a Subscription Agreement with Sentry on or about July 24, 2003 (the "Initial Subscription Agreement") pursuant to which it subscribed for a total of 95.12 Shares. Subsequent to entering into the Initial Subscription Agreement, Huang, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry on or about January 6, 2004 and October 1, 2004 pursuant to which he/she subscribed for 301.23 additional shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement. The Initial Subscription Agreement and the Subsequent Subscription Agreements are collectively referred to herein as the "Subscription Agreements."

9

22.    The Subscription Agreements provide for, *inter alia*, the irrevocable submission by Huang to the jurisdiction of the New York courts with respect to any proceeding with respect to said agreement and Sentry and Huang's consent to service of process by the mailing of such process, as provided therein.  In particular, the Subscription Agreements provide as follows:

> <u>New York Courts</u>.   Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records.  Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

23.    Furthermore, by executing the Subscription Agreements, Huang agreed to all terms and conditions contained therein, including the express provision that any agreement made by Huang in the Subscription Agreements would also apply to any other person for whom Huang was subscribing as trustee, agent, representative, or nominee – <u>i.e.</u>, all Beneficial Shareholders. Moreover, by executing the Subscription Agreements, Huang represented that s/he had all requisite authority from Beneficial Shareholders to execute and perform any and all obligations on their behalf, and also agreed to indemnify Sentry for any damages resulting from an assertion by a Beneficial Shareholder that Huang lacked proper authorization to enter into the Subscription Agreements or perform the obligations thereof.   Specifically, the Subscription Agreements provide as follows:

> <u>If Subscriber is acting as a Representative</u>.  If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute

10

and perform the obligations hereunder. Subscriber also agrees to indemnify the Fund . . . for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

### Plaintiffs

25.     Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

26.     The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names. On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "Lambda Appointment Order"). On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order"). On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order"). On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds. On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the

11

"Second Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, and the Supplemental Appointment Order, the "BVI Appointment Orders").    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claims herein, including the avoidance claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

27.    Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property.    After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15.    On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

28.    Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code.    Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a).    Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section

12

1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the proceedings before the BVI Court.

**Defendants**

29.     Huang was, at all relevant times, a member of Sentry and a registered holder of Shares.  Upon information and belief, Huang is an individual who maintains an address at 13F, No. 10, Lane 163, Jhensin Road, Kaohsiung, Taiwan R.O.C.  Huang subscribed for the purchase of Shares by entering into one or more Subscription Agreements with Sentry.  All purchases of Shares by Huang were subject to the terms of the Subscription Agreements.

30.     Defendants "Beneficial Owners of the Accounts Held in the Name of Ching-Yang Huang" - i.e., the Beneficial Shareholders, are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry issued to Huang and on whose behalf Huang was acting as trustee, agent, representative, or nominee.

31.     Based on Sentry records, some or all of the Redemption Payments made to Huang may have been paid to an account holder or holders associated with Chin-Huan Shih, an individual maintaining an address at 13F, No. 10, Lane 163, Jhensin Road, Kaohsiung, Taiwan R.O.C.

**NOTICE PURSUANT TO FED. R. CIV. P. 44.1**

32.     Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

13

## FACTUAL ALLEGATIONS

### A.    Role of Feeder Funds In Madoff Fraud

33.    Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

34.    As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

### B.    Calculation of Net Asset Value and Shareholder Redemption Payments

35.    Substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy.  In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each

14

Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

36.     In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry.   Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

37.     In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements.   None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred.   Indeed, no investments of any kind were ever made by BLMIS for Sentry.   At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious.   Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

38.     From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS).

15

The Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or to continue investment in BLMIS.  In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.  At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud.  The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose.  Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.

39.     Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme.  At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

C.     **Redemption Payments Made or Transferred to Defendants**

40.     During the period from and after July 19, 2007 through November 19, 2008, Huang received Redemption Payments totaling USD $276,462.00 from Sentry in respect of Shares tendered for redemption.

41.     At Huang's directions and instructions, some or all of the Redemption Payments were received at, upon information and belief, designated United States-based bank accounts.

16

42.     The dates and amounts of each Redemption Payment received by Huang from Sentry, and the Huang bank accounts to which each Redemption Payment was made, are set forth on <u>Exhibit A</u>.

43.     At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.   In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between Huang and Sentry, Sentry received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry.

44.     Upon information and belief, Huang and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**D.     <u>Citco Did Not Issue Any Certifications of Net Asset Value in "Good Faith"</u>**

45.     Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share . . . given in good faith by or on behalf of the Directors shall be binding on all parties."   During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "<u>Administrators</u>").   On April 16, 2014, the Judicial Committee of the Privy Council (the "<u>Privy Council</u>") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "<u>Certificates</u>").   The Privy Council did not, however, address whether such Certificates were given "in good faith."   In carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "<u>Citco</u>") acted with a lack of good faith in giving the Certificates.

17

46.     Over the course of fifteen years, in its capacity as service providers to the Funds, Citco reviewed information concerning BLMIS not available to the general public, and expressed internal alarm about what that information showed with respect to the likelihood of fraud at BLMIS, but turned a blind eye to the reality reflected in the information and instead proceed with issuing the Certificates as if there were no problem.

47.     So grave were the Administrators' internal concerns that they expressed doubts— many years before the fraud was made public—that the Funds' assets with BLMIS even existed, with one employee stating "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." The Administrators also expressed repeated concern over the fact there was no segregation of duties at BLMIS—*i.e.*, BLMIS (i) had discretion over which investments to make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the broker. Based upon the proprietary information they reviewed, Citco expressed concern— internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of the 1990s "multiplied by a factor of five." Ultimately, unable to resolve their grave concerns, Citco, rather than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a corporate decision to continue on as service providers—in exchange for an 800% increase in fees.

**1.      Citco Expressed Doubt as to Whether the Funds' Assets at BLMIS Even Existed.**

48.     Beginning in 2000, the Administrators ran into trouble with the basic task of verifying the existence of the Funds' assets with Madoff. Initially, Citco expressed serious concerns regarding whether the Funds' Treasury bond transactions actually matched those transactions reported by Madoff because of an apparent "rhythm of trading" each month. The

rhythm of trading within Sentry's portfolio appeared too consistent to be true, as the assets included only a limited number of Treasury bonds by each month's end.  At the beginning of each month, Madoff would purchase shares and put options and would sell call options, but, like clockwork, would then liquidate all of Sentry's holdings by the 20th of each month.  Thus the Administrators wanted to check whether the Treasury bonds even existed at all.

49.    The Administrators could not verify the existence of the assets because the Funds' custodians, Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody (the "Custodians"), did not actually hold them.  Instead, Madoff served as his own custodian.  Therefore, the custody statements that the Custodians were supposed to generate based on assets in their possession, were instead merely copied, or "shadow booked," from BLMIS account statements.  The Custodians were "only the custodian[s] on paper, not in reality" and did not place any trades for the Funds.

50.    Management within Citco, including Ruud Bodewes ("Bodewes"), the head of internal audit for all of Citco Group, and Ger Jan Meijer ("Meijer"), the head of internal audit for the Administrators, expressed concern about the operations at BLMIS.  In May 2000, Bodewes expressed his concern to the general counsel and manager of Citco Bank Nederland, as well as Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information from BLMIS."  Indeed, Meijer had raised these concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a factor of five."

51.    In addition to warning Bodewes, Meijer also warned Citco Group's Chief Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too

late does indeed mean that investors once again faithfully deposit tens of millions of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Citco could "already be held personally responsible insofar as we have allowed the subscriptions to take place as of May without a fight." Smeets acknowledged receipt of Meijer's emails and concerns. At that time, Meijer emphasized that "with the current knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of the Funds' assets.

52. However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession. Citco Group did not address the Administrators' concerns raised in May 2000, and a few months later, Meijer stated: "[i]t seemed that this affair [was] being put on the back burner and hushed."

53. A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved." Meijer warned that "Citco has a risk exposure of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario." He stated: "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." Five months later, in January 2002, the Administrators again emphasized that the issues concerning BLMIS posed severe risks to Citco and the Funds' investors. Meijer told Bodewes: "I have been worried about this situation for 2 years (including the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen. . . . My intuition (combined with the business that I have seen) tells me that things are not right."

54. In January 2002, Meijer insisted to Bodewes that: "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years. . . . Personally I think the chance [that

something is wrong] is at least 50%." Meijer persisted that there was "still the opportunity to more or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan). Otherwise you run the risk that the scene will later be determined by others." However, in response Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

55.     In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions.   John Verhooren ("<u>Verhooren</u>"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about the existence of the Funds' assets for years, but deliberately ignored those concerns.   For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena.   Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Citco was facing "an enormous risk exposure."   Instead, Verhooren told Meijer to stop raising the issue and claimed that Citco would try to meet with Madoff to investigate.   However, neither Verhooren nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

**2.      Citco Failed To Obtain Evidence Of the Existence of the Funds' Assets.**

56.     Citco not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—it knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

21

57.    The Administrators' audit reports designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at BLMIS.  Each year from 2000 through 2006, the Administrators recommended that Citco either confirm the existence of the Funds' assets held by BLMIS or resign as service providers.  On three occasions between May 2000 and December 2002, Citco attempted to verify the existence of the Funds' assets at BLMIS. All attempts failed.

58.    In May 2000, Citco set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bills, and to determine how Madoff derived share prices from the markets.  However, this effort failed. BLMIS did not verify the existence of the assets, and Citco concluded internally that the meeting had not provided "a full disclosure of [the] assignment."

59.    In July 2001, Bodewes had attempted to assess the concerns raised by Meijer in an internal due diligence memorandum.  However, Bodewes's due diligence was limited to a review of Citco's proprietary documents because Citco was concerned that permitting "an on-site audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss of [a] USD 1.5 million dollar fee income."  Even so, based on the documents and information in Citco's possession, Bodewes shared Meijer's concerns about BLMIS's operations, and concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds' shareholders.  Bodewes also noted that the two man audit firm used by BLMIS did not "match up" with the size of BLMIS's business.  Indeed, multiple Administrator employees acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of the firm was not large enough to audit the amount of assets purportedly managed by BLMIS.

22

60.     Smeets, Citco Group's CEO, received Bodewes' memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm.   Citco Group's management responded that they would like to "work this out" with Madoff, but never met with him in 2001.   By an email dated 6 February 2002, Unternaehrer of Citco Group stated that Citco wanted evidence the T Bills existed.   In December 2002, Citco once again "attempt[ed] to get conclusive proof" from Madoff that Sentry's portfolio was in BLMIS custody and to have "Madoff . . . provide evidence of the existence/custody of the positions."   Before the meeting, Meijer directed a member of the internal audit group at Citco to "[p]roperly record what you have done and what you have not been able to determine. . . . It is a troublesome task insofar as Madoff is not known for his openness."   However, the meeting did not include any meaningful discussion with Madoff regarding the holdings purported to be in his custody.   The employee, Albert van Nijen, reported back that the Administrators' "mission" to increase "Citco's comfort level with respect to the existence of the assets in relation to [Citco's] responsibilities as Custodian[s]" had again failed.   On 27 December 2002 Bodewes reported to the executive committee of Citco Group that as long as the position of Sentry with BLMIS was not independently verified "there will be doubts".

61.     After Citco's third failed attempt, Citco never again tried to gain evidence from Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008. In addition, Meijer noted that "Madoff [was] no[t] known" to Citco's external traders, even though his investment strategy required selling major quantities of call options each month.   In an email to Bodewes, Meijer stated, "I visited the Madoff website. . . . According to the investment policy, the fund needs to sell major quantities of call options on the market each month.  I absolutely do not trust it!!!!"

23

62.     Meanwhile, through the entire period, Citco continued to issue the Certificates.

**3.     Citco Negotiated For Higher Fees As Reimbursement For the "Risks" of Doing Business with Madoff.**

63.     Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put its financial interests ahead of its duties to the Funds and the Funds' investors.

64.     By 2002, Citco knew that the Funds' holdings could not be verified, knew that BLMIS cleared its own trades, and knew that Citco's efforts to reconcile Madoff's operations had failed.  That year, Citco's executive committee put credit line requests from the Funds "on hold until . . . the 'investigation' on Fairfield" was complete, because Citco was concerned about its exposure to liabilities well beyond the loans in the case of fraud.  Smeets and Citco's management were aware that the credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

65.     Two years later, in February and March 2004, the Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether.   Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen—who was responsible for the entire division of administration services at Citco—found out that "the risk team of AIG took the decision to get out from all Madoff exposure . . . [t]hey are scared with the structure . . . ."  It appears that at least some Citco Group management wanted the Custodian to resign: by an email of 6 February 2004, Keunen informed the Administrator that Unternaehrer of Citco Group had decided the Custodian should step down as custodian.  At this time, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from Madoff.  A few months later, in or about September 2004, Citco's board of directors made the decision to place the Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships . . . to

24

decrease [Citco's] exposure." Citco knew that its credit relationship with the Funds would expose it to liability because of BLMIS's role as custodian, among other reasons.

66.    By 2006, Citco considered resigning as service providers. The Custodians told Citco Group's management, including Smeets: "We are taking a risk and we only get US$60K per year!"

67.    Instead, Citco negotiated a new fee arrangement. The new arrangement calculated the Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset Value. In other words, Citco's fees for the Custodians' services were now directly tied to the Net Asset Value as determined by the Administrators. Citco decided "[o]n that basis" to stay on as Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

68.    Simply put, Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS, as well as its continued silence regarding BLMIS's role as custodian of the Funds' assets. Ultimately, Citco's fees increased by 800%.

69.    Internally, Citco knew that: (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Custodians did not have custody of the Funds' portfolios.

70.    Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information. Accountants working for the Administrators discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades. When the Administrators' personnel discovered that

the reported share or option prices reported by Bloomberg and Madoff differed, they used the public price in calculating the Net Asset Value reflected in the Certificates. Citco thus turned a blind eye to its knowledge that BLMIS issued account statements with incorrect pricing information.

71.    Citco acted with a lack of good faith by issuing Certificates in spite of its knowledge that: (1) BLMIS's transactions were likely impossible, given its awareness that "Madoff always [knew] precisely when to buy and sell;" (2) Madoff was the only broker-dealer Citco worked with that provided settlement date transaction confirmations only, rather than trade date confirmations; and (3) Madoff insisted that Citco book all trades for the Funds manually, rather than through automated or electronic means, which directly contradicted Citco's own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible;" and, within its own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Citco.

72.    This lack of good faith permeated the entire Citco organization. Until 2008, the Administrators and the Custodians worked hand-in-hand with multiple other "Citco" entities to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Defendants under the Subscription Agreements. Under Citco Group's direction and control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

73.    From the top down, Citco saw and appreciated, but consciously disregarded, the risks to the Fund's investors posed by Madoff's operations. The Administrators and all other "Citco" subsidiaries served at the whim of Citco Group, which controlled the day-to-day operations of the Administrators and the issuance of Certificates showing an inaccurate and

26

inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds. Irrespective of which "Citco" entity the Funds' engaged, at all relevant times the Funds' were provided services from and on behalf of "Citco" as a whole from at least eight separate entities, including: Citco Group; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services (Europe) B.V.; Citco (Canada) Inc.; and Citco Global Security Services.

74.     By virtue of the foregoing conduct, Citco issued the Certificates without good faith. The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

## E.    Exposure of Madoff's Fraud

75.     On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws. On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme. See United States v. Madoff, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008). Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

76.     On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS. See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

77.     In March 2009, Madoff pleaded guilty to the criminal charges brought against

him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December

11, 2008, I operated a Ponzi scheme through the investment advisory side of my business,

Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective
> clients who wished to open investment advisory and individual trading accounts
> with me that I would invest their money in shares of common stock, options and
> other securities of large well-known corporations, and upon request, would return
> to them their profits and principal.  Those representations were false because for
> many years up and until I was arrested on December 11, 2008, I never invested
> those funds in the securities, as I had promised.  Instead, those funds were
> deposited in a bank account at Chase Manhattan Bank.  When clients wished to
> receive the profits they believed they had earned with me or to redeem their
> principal, I used the money in the Chase Manhattan bank account that belonged to
> them or other clients to pay the requested funds.

78.     Madoff further confessed to covering up his fraud by fabricating false trade

confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my
> investment advisory clients, I knowingly caused false trading confirmations and
> client account statements that reflected the bogus transactions and positions to be
> created and sent to clients purportedly involved in the split strike conversion
> strategy, as well as other individual clients I defrauded who believed they had
> invested in securities through me. The clients receiving trade confirmations and
> account statements had no way of knowing by reviewing these documents that I
> had never engaged in the transactions represented on the statements and
> confirmations.

79.     Madoff is now serving a 150-year sentence in federal prison.

F.      **The Funds' Estates in Liquidation**

80.     Following the revelation of Madoff's fraud, the Funds' boards of directors

suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values.

As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively,

approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

81.     In 2009, the Funds were put into liquidation proceedings in the BVI.

28

82.     On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding").  The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

83.     On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding").  The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

84.     On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings").  The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

85.     As alleged above, the BVI Court issued orders – the BVI Appointment Orders – appointing the Foreign Representatives as liquidators of the Funds.  Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

86.     The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry's estate that Defendants are not entitled to keep.

## FIRST CLAIM
### (Unjust Enrichment - Against Huang)

87.     Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 86 above as if set forth herein.

29

88.     As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Huang, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

89.     Huang did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by him/her, in that he/she received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

90.     By reason of his/her receipt of monies represented as amounts deposited by other BLMIS investors or monies deposited by the Funds' subscribers, for amounts far in excess of the amounts that it would have received had the Net Asset Value of Shares been calculated based upon the true facts existing at that time or any relevant time, Huang has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

91.     It would offend principles of equity and good conscience to permit Huang to retain the Redemption Payments he/she received from Sentry.

92.     The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from Huang an amount equal to the Redemption Payments received by him/her from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

30

## SECOND CLAIM
### *(Unjust Enrichment - Against Beneficial Shareholders)*

93.     Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 92 above as if set forth herein.

94.     Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

95.     Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her from Sentry to accounts of the Beneficial Shareholders.  These Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.   Instead, Redemption Payments were made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

96.     The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

97.     To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Huang in his/her capacity as trustee, agent, representative, or nominee for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

31

98.    It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by Sentry.

99.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## THIRD CLAIM
### (Money Had and Received - Against Huang)

100.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 99 above as if set forth herein.

101.    As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Huang, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.    The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

102.    Huang did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by him/her, in that he/she received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

103.    By reason of his/her receipt of monies which generally represented the proceeds arising from or to continue investment in BLMIS, which the world now knows was operated by

32

Madoff as a Ponzi scheme. Huang has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

104.    Furthermore, Huang was not entitled to receive the Redemption Payments because the amounts of each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Huang for his/her redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

105.    To the extent that Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

106.    It would offend principles of equity and good conscience to permit Huang to retain the Redemption Payments his/her received from Sentry.

107.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from Huang an amount equal to the Redemption Payments received by him/her from Sentry,  or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## **FOURTH CLAIM**
### *(Money Had and Received - Against Beneficial Shareholders)*

108.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 107 above as if set forth herein.

33

109.    Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

110.    Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

111.    The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

112.    To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Huang in his/her capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

113.    Furthermore, the Beneficial Shareholders were not entitled to receive the Redemption Payments paid to Huang upon the redemption of Shares issued to him/her in his/her capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value which caused the payment received for redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

34

114.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

115.    It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments made by Sentry.

116.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from the Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time .

## FIFTH CLAIM
### (Mistaken Payment - Against Huang)

117.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 116 above as if set forth herein.

118.    As described above, Sentry made each of the Redemption Payments to Huang under the mistaken belief that the amounts paid to Huang represented the proceeds arising from the profitability of or to continue investment in BLMIS and were based upon the Net Asset Value of Shares redeemed based upon the true facts at that time.

119.    Upon information and belief, however, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to Huang represented, in fact, money deposited with BLMIS by other

35

BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

120.    The Redemption Payments, while benefiting Huang, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

121.    Additionally, Huang was not entitled to receive the Redemption Payments because, as was unknown to Sentry, the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Huang for his/her redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.  In these circumstances, the Redemption Payments should be returned for the benefit of Sentry, their creditors and the current holders of Shares in Sentry.

122.    Huang did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by him/her, in that he/she received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

123.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

124.    It would thus offend principles of equity and good conscience to permit Huang to retain the Redemption Payments.

125.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from Huang a sum in an amount equal to the Redemption

Payments received by him/her from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SIXTH CLAIM
### *(Mistaken Payment - Against Beneficial Shareholders)*

126.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 125  above as if set forth herein.

127.    As described above, Sentry made each of the Redemption Payments to Huang under the mistaken belief that the amounts paid to Huang represented the proceeds arising from the profitability of or to continue investment in BLMIS.

128.    However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to Huang represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

129.    Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

130.    Additionally, the Beneficial Shareholders were not entitled to receive the Redemption Payments received by Huang upon the redemption of Shares issued to him/her in his/her capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders

37

because, as was unknown to Sentry, the amounts transferred with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by Huang for his/her redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

131.    The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

132.    The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

133.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and Sigma and other shareholders and creditors of Sentry.

134.    It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

135.    The Foreign Representatives in their capacities as liquidators of Sentry and on behalf of Sentry are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount

of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SEVENTH CLAIM
### *(Constructive Trust - Against all Defendants)*

136.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 135 above as if set forth herein.

137.    As described above, upon receipt of a redemption request, Sentry made each of the Redemption Payments to Huang based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

138.    As alleged above, the Redemption Payments generally represented the proceeds arising from or to continue investment in what the world now knows was Madoff's Ponzi scheme.    Accordingly, these Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of (or to continue investment in) BLMIS.

139.    Upon information and belief, Huang may have paid some or all of the Redemption Payments he/she received to the Beneficial Shareholders.

140.    By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

141.    Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Huang for

39

his/her redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

142.    It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

143.    By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry for the benefit of the Foreign Representatives and Sentry and other shareholders and creditors of Sentry.

## EIGHTH CLAIM
### (Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against Huang)

144.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 143 above as if set forth herein.

145.    Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

40

146.    A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

147.    The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) . . . causes the company to become insolvent."  BVI Insolvency Act § 244(2).

148.    For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c) … (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act §§ 8, 244(3).

149.    For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator . . . ."  BVI Insolvency Act § 244(1).

150.    The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed."  BVI Insolvency Act § 244(1).  Thus, the vulnerability period, for each of the Funds, is the period commencing two years prior to the application for the appointment of the Liquidators for each Fund and ending on the date of the appointment of the liquidators of each Fund.

151.    A "connected person" is:

(1) … one or more of the following:

(a) a promoter of the company;

41

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act § 5 (emphasis added).

152.    Redemption Payments aggregating USD $276,462.00 were made by Sentry to Huang during the two-year period prior to the application for appointment of the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

153.    During the Sentry Vulnerability Period, Sentry was insolvent or was rendered insolvent by the making of Redemption Payments.

154.    Each of the Redemptions and/or Redemption Payments made during the Sentry Vulnerability Period ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

155.    Huang was a shareholder (i.e., a member) of Sentry during the Sentry Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

156.    Each of the Vulnerability Period Payments put Huang in a better position than it would have been in had such Payment not been made.

157.    Because Huang was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were

42

"insolvency transactions." Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent. This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, i.e. using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers). Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in BLMIS. On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

158. In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of any business" of Sentry. Even were this not presumed, the same would follow in that, among other things, each Vulnerability Period Payment represented a distribution of monies (including fictitious profits) from Madoff's Ponzi scheme or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

159. Each of the Vulnerability Period Payments was made following receipt by Sentry of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles. Following the receipt by Sentry of a notice of redemption by Huang, Huang became a contingent creditor. Upon the subsequent redemption of Huang's shares and until such time as Huang received the Vulnerability Period Payment, Huang was a "creditor" of Sentry with an admissible claim against Sentry in any subsequent liquidation of Sentry had payment of the

43

Redemption Price not been made, albeit that post-liquidation Huang would have been deferred to outside creditors.

160.    By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to recover from Huang an amount equal to the Vulnerability Period Payments received by Huang from Sentry.

### NINTH CLAIM
*(Unfair Preference Pursuant to Section 245 of the BVI
Insolvency Act - Against Beneficial Shareholders)*

161.    The Foreign Representatives, in their capacities as Foreign Liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 160 above as if set forth herein.

162.    Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

163.    Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders.

164.    To the extent that any money that Huang received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to avoid and set aside such further transfer by Huang to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability

44

Period Payments received by them, and the Foreign Representatives, in their capacities as

liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

### TENTH CLAIM
*(Undervalue Transaction Pursuant to Section 246 of the*
*BVI Insolvency Act - Against Huang)*

165.    The Foreign Representatives, in their capacities as Foreign Representatives and

liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through

167 above as if set forth herein.

166.    Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction
with a person if (a) the company makes a gift to that person or otherwise enters
into a transaction with that person on terms that provide for the company to
receive no consideration; or (b) the company enters into a transaction with that
person for a consideration the value of which, in money or money's worth, is
significantly less than the value, in money or money's worth, of the consideration
provided by the company; and (c) in either case, the transaction concerned (i) is
an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a)
the company enters into the transaction in good faith and for the purposes of its
business; and (b) at the time when it enters into the transaction, there were
reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is
entered into pursuant to the order of a court or tribunal in or outside the Virgin
Islands.

(4) Where a company enters into a transaction with a connected person within the
vulnerability period and the transaction falls within subsection (1)(a) or
subsection (1)(b), unless the contrary is proved, it is presumed that (a) the
transaction was an insolvency transaction; and (b) subsection (2) did not apply to
the transaction.

167.    During the Sentry Vulnerability Period, all assets purportedly held by BLMIS for

Sentry and other investors were non-existent, and Sentry was insolvent or rendered insolvent by

the Vulnerability Period Payments as alleged in paragraph 157 above.  Thus, each of the

Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of the BVI Insolvency Act.

168.    Sentry received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sentry received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry to Huang for each of the Vulnerability Period Payments.

169.    Huang was a shareholder (i.e., a member) of Sentry during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

170.    Because Huang was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions."   Further, there is a statutory presumption that the Vulnerability Period Payments were not made in good faith and for the purposes of the Funds' business with reasonable grounds to believe that they would benefit the Funds.  Even were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious profits from a Ponzi scheme such as BLMIS.

171.    By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and to recover from Huang an amount equal to the Vulnerability Period Payments received by Huang from Sentry.

## ELEVENTH CLAIM
### *(Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act - Against Beneficial Shareholders)*

172.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 171 above as if set forth herein.

173.    Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for Beneficial Shareholders.

174.    Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders.

175.    To the extent that any money that Huang received in connection with the Vulnerability Period Payments was transferred to Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to avoid and set aside such further transfer by Huang to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act

## TWELFTH CLAIM
### *(Breach of Contract - Against Huang)*

176.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 175 above as if set forth herein.

177.    Huang, upon information and belief, entered into the Initial Subscription Agreement with Sentry, on or about July 24, 2003, pursuant to which Huang subscribed for a

47

total of 95.12 Shares.  Huang's subscription for shares was made pursuant to the terms of the Initial Subscription Agreement itself as well as the terms of the other documents referred to therein, namely; (i) Sentry's Private Placement Memorandum (as amended from time to time); and (ii) Sentry's Memorandum of Association and Articles of Association (the "Articles"). Subsequent to entering into the Initial Subscription Agreement, Huang, upon information and belief, entered into the Subsequent Subscription Agreements with Sentry on or about January 6, 2004 and October 1, 2004 pursuant to which he/she subscribed for 301.23 additional shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement.  The Initial Subscription Agreement, together with the Subsequent Subscription Agreements, including all of the terms and provisions incorporated therein by reference to the Private Placement Memorandum (as amended from time to time) and the Articles, are collectively referred to herein as the "Fund Documents."

178.    The Fund Documents provide for the calculation of the redemption price for Shares (the "Redemption Price") based on the "Net Asset Value per Share."  Net Asset Value per share is to be determined by the directors of Sentry as of the relevant valuation day "by dividing the value of the net assets of [Sentry] by the number of Shares then in issue [.]" Articles at 11(1).

179.    The Fund Documents provide that in determining the Net Asset Value per share for each class of shares issued, the value of the net assets of the Fund is to be adjusted "to take into account any dividends, distributions, assets or liabilities" attributable to such class of shares. Articles at 11(1).   Pursuant to the Fund Documents, each subscriber, including Huang acknowledges that "the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's

48

investment and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value." See Initial Subscription Agreement ¶ 10.

180.    With respect to the valuation of different types of assets, the Fund Documents prescribe methods of valuation that are, however, subject to the exercise of the judgment and discretion by the Directors of Sentry.   For example, with respect to the valuation of assets consisting of securities, the Fund Documents prescribe methods of valuation based on price and market data, provided however that "[i]f the Directors determine that [any of the prescribed methods of valuation] does not fairly represent its market value, the Directors shall value such securities as they determine and shall set forth the basis of such valuation in writing in the Company's records[.]"  Articles at 11(3)(b).

181.    With respect to the value of any shares of stock held by Sentry in an "investment company," the Fund Documents provide for valuation "in accordance with the manner in which such shares are valued by such investment company" provided however that "the Directors may make such adjustments in such valuations the Directors may from time to time consider appropriate." Articles at 11(3)(c).

182.    With respect to assets that have been "realised or contracted to be realised" the Fund Documents provide for the inclusion of the assets receivable in respect of such realization, provided however that "if the value of such assets is not then known exactly then its value shall be as estimated by the Directors."   Articles at 11(3)(e).

183.    Additionally, the Fund Documents provide that "notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion, warrant a different valuation of any securities, such securities will be valued at such prices as the Directors shall determine."  Articles at 11(3)(f).

49

184.    The Fund Documents provide that any "certificate" as to the Net Asset Value per Share or as to the Redemption Price that is given in good faith by or on behalf of the Directors "shall be binding on all parties."  Articles at 11(1).

185.    No Certificate was provided in good faith by or on behalf of the Directors to Huang in respect of any Net Asset Value determination made while Huang was a member of the Fund or in respect of any Redemption Payment made to Huang.

186.    Pursuant to the Fund Documents, at any time prior to the good faith issuance and receipt of a Certificate, the Redemption Price calculated in respect of the redemptions by Huang and paid to Huang remains subject to adjustment, recalculation and redetermination based on, *inter alia*, the foregoing identified provisions of the Fund Documents.  Upon the true interpretation of the Fund Documents, the same contained an implied term for repayment of any over-payments, and/or such a term is to be implied on the basis of obviousness and/or as being necessary for the business efficacy of the Fund Documents and/or to give effect to the reasonable expectations of the parties.

187.    Upon information and belief, Huang received the Redemption Payments listed on Exhibit A in respect of Shares submitted for redemption.

188.    Subsequent to December 8, 2008, Sentry has determined that the Net Asset Value calculations upon which Redemption Payments were made to Huang included assets not held by or on behalf of Sentry at the time of the making of such payments and, additionally, that such Net Asset Value calculations failed to account for and make appropriate deduction of liabilities of Sentry existing at the time such payments.  For these and other reasons, such Net Asset Value calculation substantially overstated the net asset value of the assets of Sentry.

50

189.     To the extent that Huang has received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, Huang is contractually obligated to return amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

190.     Following determination by the Fund that Redemption Payments made to Huang had been calculated on the basis of an overstated Net Asset Value, demand has been made on Huang to return excess and overpaid Redemption Payments to the Fund.

191.     Huang has failed and refused to repay to the Fund the amount that, under the Fund Documents, he/she is contractually required to repay to the Fund.

192.     The failure of Huang to make the repayment requested constitutes a breach of the Fund Documents for which Sentry is entitled to the award of damages.

## THIRTEENTH CLAIM
### *(Breach of Contract - Against Beneficial Shareholders)*

193.     Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 192 above as if set forth herein.

194.     Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

195.     Each Beneficial Shareholder authorized Huang to enter into the Fund Documents on his, her or its behalf and to bind the Beneficial Shareholder to the agreements and representations contained therein to the same extent as had the Beneficial Shareholder executed the Fund Documents on his, her or its, own behalf.

51

196.     Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her from Sentry to accounts of the Beneficial Shareholders.

197.     To the extent that any Beneficial Shareholder has received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, such Beneficial Shareholder is contractually obligated to return amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

198.     Following determination by the Fund that Redemption Payments made to Huang had been calculated on the basis of an overstated Net Asset Value, demand was made on the Beneficial Shareholders by demand on Huang for the return of excess and overpaid Redemption Payments.

199.     The Beneficial Shareholders have failed and refused to repay to the Fund the amounts that, under the Fund Documents, they are contractually required to repay to the Fund.

200.     The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the Fund Documents for which Sentry is entitled to the award of damages.

## FOURTEENTH CLAIM
### (Breach of Implied Covenant of Good Faith and Fair Dealing - Against Huang)

201.     Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 200 above as if set forth herein.

202.     Following determination by the Fund that Redemption Payments to Huang had been made on the basis of an overstated Net Asset Value, demand was made to Huang to return excess and overpaid Redemption Payments to Sentry.

203.     Huang has failed and refused to make the requested repayment to Sentry.

204.    By retaining the Redemption Payments to which Huang is not entitled, Huang has deprived Sentry of the benefit of its bargain and has subverted the Fund Documents.

205.    The failure of Huang to make the repayment requested constitutes a breach of the covenant of good faith and fair dealing that inheres in the Fund Documents for which Sentry is entitled to the award of damages.

## FIFTEENTH CLAIM
### *(Breach of Implied Covenant of Good Faith and Fair Dealing - Against Beneficial Shareholders)*

206.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 205 above as if set forth herein.

207.    Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

208.    Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her from Sentry to accounts of the Beneficial Shareholders.

209.    Following determination by the Fund that Redemption Payments made to Huang had been calculated on the basis of an overstated Net Asset Value, demand was made on the Beneficial Shareholders by demand on Huang for the return of excess and overpaid Redemption Payments.

210.    The Beneficial Shareholders have failed and refused to make repayment to Sentry.

53

211.    By retaining the Redemption Payments to which they are not entitled, the Beneficial Shareholders have deprived Sentry of the benefit of its bargain and have subverted the Fund Documents.

212.    The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the implied covenant of good faith and fair dealing that inheres in the Fund Documents for which Sentry is entitled to the award of damages.

## SIXTEENTH CLAIM
### (Declaratory Judgment - Against All Defendants)

213.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 212 above as if set forth herein.

214.    An actual and justiciable controversy exists between the Plaintiffs and the Defendants with respect to the obligation of the Defendants to repay to the Funds all or a portion of amounts received by them as excess or overpaid Redemption Payments under circumstances where:

(i)     the Net Asset Value per share calculation upon which the Redemption Price was paid, directly or indirectly, to any Defendant has been subsequently adjusted, recalculated or redetermined in accordance with the Fund Documents;

(ii)    the resulting adjusted, recalculated and redetermined Redemption Price is less than the Redemption Price paid to the Defendant;

(iii)   prior to such adjustment, recalculation or redetermination, no binding Certificate has been issued by the Fund; and

(iv)    Citco issued no Certificates in good faith.

215.    The harm to Sentry is real and immediate because, a result of the failure and refusal of the Defendants to make repayment, Sentry has become insolvent and is presently unable to pay its debts as they fall or will fall due.

216.    Plaintiffs have no adequate remedy at law.

217.    Pursuant to 28 U.S.C. § 2201 et. seq., Plaintiffs are entitled to a declaration by this Court declaring that, pursuant to the Fund Documents, each Defendant must repay Sentry that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First, Third and Fifth Claims, judgment in favor of Plaintiffs and against Huang allowing the Plaintiffs to recover an amount equal to the Redemption Payments received by Huang, plus interest, or, in the alternative, an amount equal to the amount of the Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

B.    On the Second, Fourth and Sixth Claims, judgment in favor of Plaintiffs and against Beneficial Shareholders allowing the Plaintiffs to recover an amount equal to any portion of any Redemption Payments received by the Beneficial Shareholders, plus interest, or, in the alternative, an amount equal to any portion of the Redemption Payments received by the Beneficial Shareholders less the amount of such portion that such Beneficial Shareholders would

have received had the Net Asset Value been calculated based upon the true facts existing at the

time, plus interest;

       C.      On the Seventh Claim, imposition of a constructive trust on Redemption

Payments;

       D.      On the Eighth and Ninth Claims:

            i.      a declaratory judgment in favor of the Foreign Representatives and against Huang and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

            ii.     judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

            iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against Huang and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest.

       E.      On the Tenth and Eleventh Claims:

            i.      a declaratory judgment in favor of the Foreign Representatives and against Huang and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments made during the vulnerability period constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

            ii.     judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments made during the vulnerability period; and

            iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against Huang and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest.

       F.      On the Twelfth and Fourteenth Claims, judgment against Huang and in favor of

the Plaintiffs in an amount to be determined at trial;

       G.      On the Thirteenth and Fifteenth Claims, judgment against the Beneficial

Shareholders and in favor of the Plaintiffs in an amount to be determined at trial;

H. On the Sixteenth Claim, a declaratory judgment against the Defendants and in favor of the Plaintiffs that, under the Fund Documents, the Defendants must repay that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry;

I. Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

J. Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
September 7, 2016

BROWN RUDNICK LLP


By: ___*/s/ David J. Molton*___
      David J. Molton
      May Orenstein
      Daniel J. Saval
Seven Times Square
New York, New York 10036
Telephone: 212.209.4800
Facsimile: 212.209.4801

*Attorneys for the Foreign Representatives*

**EXHIBIT A**

*Redemption Payments Received by Defendants from Sentry*
*From July 19, 2007 Through November 19, 2008*

| **Payment Date** | **Redemption Payment** | **Number of Shares** | **Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+]** |
|---|---|---|---|
| July 19, 2007 | $11,450.53* | 9.15 | Bank of Kaohsiung Ming Chen Branch, Taiwan |
| January 17, 2008 | $109,787.08* | 85.00 | Bank of Kaohsiung Ming Chen Branch, Taiwan |
| November 19, 2008 | $155,224.49* | 115.00 | Bank of Kaohsiung Ming Chen Branch, Taiwan |

* Denotes Redemptions in the Sentry Vulnerability Period.

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.

# EXHIBIT B

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign* ~~Representative~~*Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** ) | **Chapter 15 Case** |
| ) | |
| **FAIRFIELD SENTRY LIMITED, et al.,** ) | **Case No. 10-13164** |
| ) | **(**~~BRL~~**SMB)** |
| **Debtors in Foreign Proceedings.** ) | |
| ) | **Jointly Administered** |
| ) | |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION),** ) | |
| acting by and through the Foreign ) | |
| ~~Representative~~**Representatives** thereof, and KENNETH ) | |
| KRYS **and CHARLOTTE CAULFIELD,** solely in ~~his~~ ) | |
| ~~capacity~~**their capacities** as Foreign ) | **Adv. Pro. No. 11-01255** |
| ~~Representative~~**Representatives** and ~~Liquidator~~**Liquidators** ) | **(**~~BRL~~**SMB)** |
| thereof, ) | |
| ) | **~~FIRST~~SECOND** |
| **Plaintiffs,** ) | **AMENDED COMPLAINT** |
| ) | |
| -against- ) | |
| ) | |
| **CHING-YANG HUANG, CHIN-HUAH SHIH** and ) | |
| **BENEFICIAL OWNERS OF ACCOUNTS HELD IN** ) | |
| **THE NAME OF CHING-YANG HUANG 1-1000,** ) | |
| ) | |
| **Defendants.** | |

Fairfield Sentry Limited ("Sentry"), by and through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "Foreign Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and the Foreign Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") ~~by and through Kenneth Krys (together~~

with his predecessors, the "Foreign Representatives"), and Kenneth Krys (together with Sentry,
the "Plaintiffs"), solely in his capacity as Liquidator of the Funds and the Foreign Representative
of the liquidation proceedings involving the Funds pending before the Commercial Division of
the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their
complaint against Defendants, allege the following based on personal knowledge or information
derived from the Funds' books and records or from other sources, including, *inter alia*, court
filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This action and similar actions are brought by the Plaintiffs, with the approval of
the foreign court having jurisdiction over the matter, to recover payments made to shareholders
for the redemption of shares in the Funds prior to December 2008.

2.      The Funds were created as a means for private investment in managed accounts
with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that
Bernard L. Madoff used to perpetrate his massive Ponzi scheme.  Sentry was the largest of all so-
called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect
BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss
Franc investments) through purchase purchases of shares of Sentry.  Sentry's account statements
with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly
held by BLMIS for Sentry.  As stated in their offering materials, the Funds' investment objective
was to achieve capital appreciation of assets through investments in BLMIS (directly, in the case
of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3.      It is now known that these types of feeder funds were essential to the perpetration
of Madoff's Ponzi scheme.  In order for the Ponzi scheme to operate, Madoff required a

2

continuous flow of new investors and investments to be able to satisfy redemption requests from early investors. Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS), brought new investors into this scheme, allowing Madoff to make payments to early investors and thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.      From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares were was transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff. Prior to December 2008, the voting, participating shares of Sentry ($.01 par value per share), Sigma (€01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value." Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund, net of certain expenses ("Net Asset Value").

5.      From time to time, in order to make payments to investors for the redemption of Shares ("Redemption Payments"), Sentry generally made withdrawals from its BLMIS accounts. On occasion, Sentry made Redemption Payments directly from amounts on hand invested by other subscribers in the Funds. At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by BLMIS for Sentry. The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which was calculated based

3

principally on the assets that the Funds believed were being held, and investments that were being made, by BLMIS for Sentry's account.

6.      As the world now knows, Madoff was operating a massive Ponzi scheme through BLMIS.  Thus, at all relevant times, the money that Sentry transferred to BLMIS was not invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses.  Further, none of the securities shown on statements provided to Sentry by BLMIS were in fact purchased for Sentry.  Additionally, none of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of sales of securities or other investments.  Instead, such amounts represented the monies of more recent investors into the Madoff scheme.

7.      In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent, and the Funds were insolvent at the time Redemption Payments were made or they were rendered insolvent by those payments.  As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the actual Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

8.      At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of his fraud.  Similarly, the Redemption Payments that the Funds made to redeeming shareholders were not made in the ordinary course of any business or for any legitimate purposes.  Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as the source of these

4

~~payments was not the sales of securities, or return of investments, as contemplated by those~~ ~~documents. Rather, the payments were derived from uninvested monies of other BLMIS~~ ~~investors or other uninvested deposits made by Sentry in BLMIS, but in either event, they~~ ~~represented the fraudulent and ill-gotten gains of~~<u>they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by</u> Madoff~~'s~~ <u>as a</u> Ponzi scheme~~, distributed by BLMIS to Sentry~~. These payments ~~and other payments made to BLMIS~~ ~~investors~~ were crucial in perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9. During the period from and after July 19, 2007 through November 19, 2008, following the receipt by Sentry of notices of redemption, Sentry made Redemption Payments to <u>accounts held in the name of</u> Defendant Ching-Yang Huang ("<u>Huang</u>") aggregating USD $276,462.00.

10. At the time such payments were made, Sentry mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption. In fact, however, as stated, the Redemption Payments made to Huang far exceeded the ~~actual~~ Net Asset Value of ~~the~~ Shares redeemed <u>that would have been calculated based on the true facts existing at that time or any relevant time</u>. Moreover, ~~the source of~~ these Redemption Payments ~~was~~<u>did</u> not, as Sentry ~~believed them to be,~~<u>intended, represent the</u> proceeds ~~of the~~ ~~liquidation of securities or investments held for their accounts~~<u>arising from the profitability of or</u>

5

to continue investment in BLMIS.  Instead, any amounts obtained directly or indirectly by Sentry from BLMIS to make Redemption Payments to Huang generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

11.    Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them, and, at all relevant times, the Funds were unable to pay their debts as they fell or would fall due.  Indeed, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.

12.    In particular, claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (BRLSMB) (the "BLMIS Adversary Proceeding").  As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.  This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud. The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.  At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

6

13.     On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court ~~of~~for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda.  The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and further increased the amount of those liabilities.  In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

14.     Upon information and belief, Huang has either retained the Redemption Payments made to him/her by Sentry for his/her own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities, including but not limited to Chin-Huan Shih, for whom Huang may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (~~the~~ individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with Huang, the "Defendants").

15.     Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value.  As of December 2008 and presently, Sentry, Sigma, and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

16.    Unless Redemption Payments paid to shareholders are recovered for the Funds'
estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may
be made against them; further, recoveries of Redemption Payments will increase distributions to
the Funds' investors who have been harmed .  Moreover, to the extent such liabilities and claims
must be satisfied solely from the Funds' current assets, Defendants will have been unjustly
enriched as they will not bear their proportionate share of such liabilities and claims, but rather
will retain a windfall at the expense of other shareholders and creditors of the Funds.

## JURISDICTION AND VENUE

17.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b),
as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise
under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re
Fairfield Sentry Limited, et al., No. 10-13164 (BRLSMB), pending in this Court.  Additionally,
pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which
incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States
Code, jurisdiction is also proper in this Court because this action also relates to the consolidated
liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the
caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC,
SIPA Liquidation No. 08-1789 (BRLSMB).  Pursuant to the Amended Standing Order of
Reference of the United States District Court for the Southern District of New York, dated
January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11
of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for
adjudication.

8

18.     This is a core proceeding under 28 U.S.C. § 157(b)(2).[1]  Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

19.     This Court has jurisdiction over Huang and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney ~~2001~~2008) because Huang and the Beneficial Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and, upon information and belief, maintaining bank accounts in the United States, and in fact receiving Redemption Payments in those United States-based accounts.  Huang and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, upon information and belief, designated United States-based bank accounts to receive their Redemption Payments from the Funds and actively directed Redemption Payments at issue in this action into those bank accounts.  Huang and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.  Huang and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

---

[1]     Although the District Court, in _In re Fairfield Sentry Ltd._, No. 1:11-mc-00224-LAP, 458 B.R. ~~655~~665 (S.D.N.Y. 2011), held that causes of action alleged by the Plaintiffs in other cases before this Court—causes of action that are similar or the same as those alleged in this complaint—are not core proceedings, this determination may be subject to appeal.  In any event, plaintiffs submit that the causes of action in this complaint, which include, _inter alia_, allegations regarding transfers of property that were directed into the territorial jurisdiction of the United States, render the claims asserted in this complaint core in accordance with the District Court's decision.

20.     Moreover, this Court has jurisdiction over Huang and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more ~~Subscription~~ agreements for the subscription of Shares that Huang entered into with Sentry ~~(collectively, the "Subscription Agreements").~~

21.     Huang, upon information and belief, entered into a Subscription Agreement with Sentry on or about July 24, 2003 (the "Initial Subscription Agreement") pursuant to which it subscribed for a total of 95.12 Shares.  Subsequent to entering into the Initial Subscription Agreement, Huang, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry on or about January 6, 2004 and October 1, 2004 pursuant to which he/she subscribed for 301.23 additional shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement.  The Initial Subscription Agreement and the Subsequent Subscription Agreements are collectively referred to herein as the "Subscription Agreements."

22.  ~~21.~~ The Subscription Agreements provide for, *inter alia*, the irrevocable submission by Huang to the jurisdiction of the New York courts with respect to any proceeding with respect to said agreement and Sentry and Huang's consent to service of process by the mailing of such process, as provided therein.  In particular, the Subscription Agreements provide as follows:

> <u>New York Courts</u>.   Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.  Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then

appearing on the Fund's records. Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

23.    ~~22.~~ Furthermore, by executing the Subscription Agreements, Huang agreed to all terms and conditions contained therein, including the express provision that any agreement made by Huang in the Subscription Agreements would also apply to any other person for whom Huang was subscribing as trustee, agent, representative, or nominee – <u>i.e.</u>, all Beneficial Shareholders. Moreover, by executing the Subscription Agreements, Huang represented that s/he had all requisite authority from Beneficial Shareholders to execute and perform any and all obligations on their behalf, and also agreed to indemnify Sentry for any damages resulting from an assertion by a Beneficial Shareholder that Huang lacked proper authorization to enter into the Subscription Agreements or perform the obligations thereof.   Specifically, the Subscription Agreements provide as follows:

> <u>If Subscriber is acting as a Representative</u>. If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder.  Subscriber also agrees to indemnify the Fund . . . for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

24.    ~~23.~~ Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## **PARTIES**

**Plaintiffs**

25.    ~~24.~~ Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-

registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

26. ~~25.~~ The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names. On April 23, 2009, the BVI Court issued an order appointing Christopher Stride ~~(Ms. Lau's predecessor)~~ as liquidator of Lambda (the "Lambda Appointment Order"). On July 21, 2009, the BVI Court issued an order appointing ~~Mr.~~ Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order"). On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and ~~Ms.~~ the appointment of Joanna Lau~~'s appointment~~ as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order" ~~and, together with the Lambda Appointment Order and the Sentry & Sigma Appointment Order, the "BVI Appointment Orders"~~). On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds. On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, and the Supplemental Appointment Order, the "BVI Appointment Orders"). The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claims herein, including the avoidance claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

27.    26. Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property.    After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15.  On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

28.    27. Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code.    Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a).  Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the BVI proceedings before the BVI Court.

13

**Defendants**

29. ~~28.~~ Huang was, at all relevant times, a member of Sentry and a registered holder of Shares.  Upon information and belief, Huang is an individual who maintains an address at 13F, No. 10, Lane 163, Jhensin Road, Kaohsiung, Taiwan R.O.C.  Huang subscribed for the purchase of Shares by entering into one or more Subscription Agreements with Sentry ~~(collectively, the "Subscription Agreements")~~.  All purchases of Shares by Huang were subject to the terms of the Subscription Agreements.

30. ~~29.~~ Defendants "Beneficial Owners of the Accounts Held in the Name of Ching-Yang Huang" - i.e., the Beneficial Shareholders ~~-~~, are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry issued to Huang and on whose behalf Huang was acting as trustee, agent, representative, or nominee ~~(individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders")~~.

31. ~~30.~~ Based on Sentry records, some or all of the Redemption Payments made to Huang may have been paid to an account holder or holders associated with Chin-Huan Shih, an individual maintaining an address at 13F, No. 10, Lane 163, Jhensin Road, Kaohsiung, Taiwan R.O.C.

## NOTICE PURSUANT TO FED. R. CIV. P. 44.1

32. ~~31.~~ Certain ~~or all~~ of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

## FACTUAL ALLEGATIONS

**A.      Role of Feeder Funds In Madoff Fraud**

33. 32. Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

34. 33. As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**B.      Calculation of Net Asset Value and Shareholder Redemption Payments**

35. 34. Substantially all of the money (someup to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy. In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for

15

each Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

36.   35. In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry. Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to purported, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

37.   36. In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements. None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred. Indeed, no investments of any kind were ever made by BLMIS for Sentry. At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious. Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

38.   37. From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS).

16

The Funds believed that the amounts provided in connection with such withdrawals represented the proceeds ~~from the sale or liquidation of securities or~~arising from the profitability of or to continue investment ~~positions held by~~in BLMIS ~~for the account of Sentry~~.  In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.  At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud.  The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose.  Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.

39.    ~~38.~~Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme.  At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

**C.    Redemption Payments Made or Transferred to Defendants**

40.    ~~39.~~During the period from and after July 19, 2007 through November 19, 2008, Huang received Redemption Payments totaling USD $276,462.00 from Sentry in respect of Shares tendered for redemption.

41.    At Huang's directions and instructions, some or all of the Redemption Payments were received at, upon information and belief, designated United States-based bank accounts.

17

42.    40. The dates and amounts of each Redemption Payment received by Huang from Sentry, and the Huang bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.

43.    41. At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.  In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between Huang and Sentry, Sentry received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry.

44.    42. Upon information and belief, Huang and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**D.    Citco Did Not Issue Any Certifications of Net Asset Value in "Good Faith"**

45.    Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share . . . given in good faith by or on behalf of the Directors shall be binding on all parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").  The Privy Council did not, however, address whether such Certificates were given "in good faith."  In

18

carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "Citco") acted with a lack of good faith in giving the Certificates.

46.     Over the course of fifteen years, in its capacity as service providers to the Funds, Citco reviewed information concerning BLMIS not available to the general public, and expressed internal alarm about what that information showed with respect to the likelihood of fraud at BLMIS, but turned a blind eye to the reality reflected in the information and instead proceed with issuing the Certificates as if there were no problem.

47.     So grave were the Administrators' internal concerns that they expressed doubts—many years before the fraud was made public—that the Funds' assets with BLMIS even existed, with one employee stating "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists."  The Administrators also expressed repeated concern over the fact there was no segregation of duties at BLMIS—*i.e.*, BLMIS (i) had discretion over which investments to make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the broker.  Based upon the proprietary information they reviewed, Citco expressed concern—internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of the 1990s "multiplied by a factor of five."  Ultimately, unable to resolve their grave concerns, Citco, rather than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a corporate decision to continue on as service providers—in exchange for an 800% increase in fees.

**1.     Citco Expressed Doubt as to Whether the Funds' Assets at BLMIS Even Existed.**

48.     Beginning in 2000, the Administrators ran into trouble with the basic task of verifying the existence of the Funds' assets with Madoff.  Initially, Citco expressed serious

19

concerns regarding whether the Funds' Treasury bond transactions actually matched those transactions reported by Madoff because of an apparent "rhythm of trading" each month. The rhythm of trading within Sentry's portfolio appeared too consistent to be true, as the assets included only a limited number of Treasury bonds by each month's end. At the beginning of each month, Madoff would purchase shares and put options and would sell call options, but, like clockwork, would then liquidate all of Sentry's holdings by the 20th of each month. Thus the Administrators wanted to check whether the Treasury bonds even existed at all.

49.    The Administrators could not verify the existence of the assets because the Funds' custodians, Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody (the "Custodians"), did not actually hold them. Instead, Madoff served as his own custodian. Therefore, the custody statements that the Custodians were supposed to generate based on assets in their possession, were instead merely copied, or "shadow booked," from BLMIS account statements. The Custodians were "only the custodian[s] on paper, not in reality" and did not place any trades for the Funds.

50.    Management within Citco, including Ruud Bodewes ("Bodewes"), the head of internal audit for all of Citco Group, and Ger Jan Meijer ("Meijer"), the head of internal audit for the Administrators, expressed concern about the operations at BLMIS. In May 2000, Bodewes expressed his concern to the general counsel and manager of Citco Bank Nederland, as well as Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information from BLMIS." Indeed, Meijer had raised these concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a factor of five."

20

51.    In addition to warning Bodewes, Meijer also warned Citco Group's Chief Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Citco could "already be held personally responsible insofar as we have allowed the subscriptions to take place as of May without a fight."  Smeets acknowledged receipt of Meijer's emails and concerns.  At that time, Meijer emphasized that "with the current knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of the Funds' assets.

52.    However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession.  Citco Group did not address the Administrators' concerns raised in May 2000, and a few months later, Meijer stated:  "[i]t seemed that this affair [was] being put on the back burner and hushed."

53.    A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved."  Meijer warned that "Citco has a risk exposure of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario."  He stated: "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists."  Five months later, in January 2002, the Administrators again emphasized that the issues concerning BLMIS posed severe risks to Citco and the Funds' investors.  Meijer told Bodewes: "I have been worried about this situation for 2 years (including the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen. . . . My intuition (combined with the business that I have seen) tells me that things are not right."

21

54.     In January 2002, Meijer insisted to Bodewes that: "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years. . . . Personally I think the chance [that something is wrong] is at least 50%."  Meijer persisted that there was "still the opportunity to more or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan).  Otherwise you run the risk that the scene will later be determined by others."  However, in response Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

55.     In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions.  John Verhooren ("Verhooren"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about the existence of the Funds' assets for years, but deliberately ignored those concerns.  For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena.  Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Citco was facing "an enormous risk exposure."  Instead, Verhooren told Meijer to stop raising the issue and claimed that Citco would try to meet with Madoff to investigate.  However, neither Verhooren nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

**2.     Citco Failed To Obtain Evidence Of the Existence of the Funds' Assets.**

22

56.    Citco not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—it knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

57.    The Administrators' audit reports designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at BLMIS.  Each year from 2000 through 2006, the Administrators recommended that Citco either confirm the existence of the Funds' assets held by BLMIS or resign as service providers.  On three occasions between May 2000 and December 2002, Citco attempted to verify the existence of the Funds' assets at BLMIS. All attempts failed.

58.    In May 2000, Citco set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bills, and to determine how Madoff derived share prices from the markets.  However, this effort failed. BLMIS did not verify the existence of the assets, and Citco concluded internally that the meeting had not provided "a full disclosure of [the] assignment."

59.    In July 2001, Bodewes had attempted to assess the concerns raised by Meijer in an internal due diligence memorandum.  However, Bodewes's due diligence was limited to a review of Citco's proprietary documents because Citco was concerned that permitting "an on-site audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss of [a] USD 1.5 million dollar fee income."  Even so, based on the documents and information in Citco's possession, Bodewes shared Meijer's concerns about BLMIS's operations, and concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds' shareholders.  Bodewes also noted that the two man audit firm used by BLMIS did not "match up" with the size of BLMIS's business.   Indeed, multiple Administrator employees

acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of the firm was not large enough to audit the amount of assets purportedly managed by BLMIS.

60.     Smeets, Citco Group's CEO, received Bodewes' memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm.  Citco Group's management responded that they would like to "work this out" with Madoff, but never met with him in 2001.  By an email dated 6 February 2002, Unternaehrer of Citco Group stated that Citco wanted evidence the T Bills existed.  In December 2002, Citco once again "attempt[ed] to get conclusive proof" from Madoff that Sentry's portfolio was in BLMIS custody and to have "Madoff . . . provide evidence of the existence/custody of the positions."  Before the meeting, Meijer directed a member of the internal audit group at Citco to "[p]roperly record what you have done and what you have not been able to determine. . . . It is a troublesome task insofar as Madoff is not known for his openness."  However, the meeting did not include any meaningful discussion with Madoff regarding the holdings purported to be in his custody.  The employee, Albert van Nijen, reported back that the Administrators' "mission" to increase "Citco's comfort level with respect to the existence of the assets in relation to [Citco's] responsibilities as Custodian[s]" had again failed.  On 27 December 2002 Bodewes reported to the executive committee of Citco Group that as long as the position of Sentry with BLMIS was not independently verified "there will be doubts".

61.     After Citco's third failed attempt, Citco never again tried to gain evidence from Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008. In addition, Meijer noted that "Madoff [was] no[t] known" to Citco's external traders, even though his investment strategy required selling major quantities of call options each month.  In an email to Bodewes, Meijer stated, "I visited the Madoff website. . . . According to the

investment policy, the fund needs to sell major quantities of call options on the market each month.  I absolutely do not trust it!!!!"

62.    Meanwhile, through the entire period, Citco continued to issue the Certificates.

**3.    Citco Negotiated For Higher Fees As Reimbursement For the "Risks" of Doing Business with Madoff.**

63.    Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put its financial interests ahead of its duties to the Funds and the Funds' investors.

64.    By 2002, Citco knew that the Funds' holdings could not be verified, knew that BLMIS cleared its own trades, and knew that Citco's efforts to reconcile Madoff's operations had failed.  That year, Citco's executive committee put credit line requests from the Funds "on hold until . . . the 'investigation' on Fairfield" was complete, because Citco was concerned about its exposure to liabilities well beyond the loans in the case of fraud.  Smeets and Citco's management were aware that the credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

65.    Two years later, in February and March 2004, the Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether.  Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen—who was responsible for the entire division of administration services at Citco—found out that "the risk team of AIG took the decision to get out from all Madoff exposure . . . [t]hey are scared with the structure . . . ."  It appears that at least some Citco Group management wanted the Custodian to resign: by an email of 6 February 2004, Keunen informed the Administrator that Unternaehrer of Citco Group had decided the Custodian should step down as custodian.  At this time, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from Madoff.  A few months later, in or about September 2004,

25

Citco's board of directors made the decision to place the Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships . . . to decrease [Citco's] exposure."  Citco knew that its credit relationship with the Funds would expose it to liability because of BLMIS's role as custodian, among other reasons.

66.    By 2006, Citco considered resigning as service providers.  The Custodians told Citco Group's management, including Smeets: "We are taking a risk and we only get US$60K per year!"

67.    Instead, Citco negotiated a new fee arrangement. The new arrangement calculated the Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset Value.  In other words, Citco's fees for the Custodians' services were now directly tied to the Net Asset Value as determined by the Administrators.  Citco decided "[o]n that basis" to stay on as Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

68.    Simply put, Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS, as well as its continued silence regarding BLMIS's role as custodian of the Funds' assets.  Ultimately, Citco's fees increased by 800%.

69.    Internally, Citco knew that: (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Custodians did not have custody of the Funds' portfolios.

70.    Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information.  Accountants working for the Administrators

26

discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades.  When the Administrators' personnel discovered that the reported share or option prices reported by Bloomberg and Madoff differed, they used the public price in calculating the Net Asset Value reflected in the Certificates.  Citco thus turned a blind eye to its knowledge that BLMIS issued account statements with incorrect pricing information.

71.    Citco acted with a lack of good faith by issuing Certificates in spite of its knowledge that: (1) BLMIS's transactions were likely impossible, given its awareness that "Madoff always [knew] precisely when to buy and sell;" (2) Madoff was the only broker-dealer Citco worked with that provided settlement date transaction confirmations only, rather than trade date confirmations; and (3) Madoff insisted that Citco book all trades for the Funds manually, rather than through automated or electronic means, which directly contradicted Citco's own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible;" and, within its own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Citco.

72.    This lack of good faith permeated the entire Citco organization.  Until 2008, the Administrators and the Custodians worked hand-in-hand with multiple other "Citco" entities to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Defendants under the Subscription Agreements.  Under Citco Group's direction and control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

73.    From the top down, Citco saw and appreciated, but consciously disregarded, the risks to the Fund's investors posed by Madoff's operations.  The Administrators and all other

27

"Citco" subsidiaries served at the whim of Citco Group, which controlled the day-to-day operations of the Administrators and the issuance of Certificates showing an inaccurate and inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds.  Irrespective of which "Citco" entity the Funds' engaged, at all relevant times the Funds' were provided services from and on behalf of "Citco" as a whole from at least eight separate entities, including: Citco Group; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services (Europe) B.V.; Citco (Canada) Inc.; and Citco Global Security Services.

74.     By virtue of the foregoing conduct, Citco issued the Certificates without good faith.  The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

**E.      Exposure of Madoff's Fraud**

75.      43. On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  See United States v. Madoff, No. O808-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

76.      44. On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS. See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a

permanent injunction and continuing relief against him, including a permanent freezing of his

assets.

77.    45. In March 2009, Madoff pleaded guilty to the criminal charges brought against

him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December

11, 2008, I operated a Ponzi scheme through the investment advisory side of my business,

Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective
> clients who wished to open investment advisory and individual trading accounts
> with me that I would invest their money in shares of common stock, options and
> other securities of large well-known corporations, and upon request, would return
> to them their profits and principal.  Those representations were false because for
> many years up and until I was arrested on December 11, 2008, I never invested
> those funds in the securities, as I had promised.  Instead, those funds were
> deposited in a bank account at Chase Manhattan Bank.  When clients wished to
> receive the profits they believed they had earned with me or to redeem their
> principal, I used the money in the Chase Manhattan bank account that belonged to
> them or other clients to pay the requested funds.

78.    46. Madoff further confessed to covering up his fraud by fabricating false trade

confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my
> investment advisory clients, I knowingly caused false trading confirmations and
> client account statements that reflected the bogus transactions and positions to be
> created and sent to clients purportedly involved in the split strike conversion
> strategy, as well as other individual clients I defrauded who believed they had
> invested in securities through me. The clients receiving trade confirmations and
> account statements had no way of knowing by reviewing these documents that I
> had never engaged in the transactions represented on the statements and
> confirmations.

79.    47. Madoff is now serving a 150-year sentence in federal prison.

## F.    The Funds' Estates in Liquidation

80.    48. Following the revelation of Madoff's fraud, the Funds' boards of directors

suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values.

As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

81.    49. In 2009, the Funds were put into liquidation proceedings in the BVI.

82.    50. On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding").  The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

83.    51. On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding").  The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

84.    52. On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings").  The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

85.    53. As alleged above, the BVI Court issued orders – the BVI Appointment Orders – appointed appointing the Foreign Representatives as liquidators of the Funds.  Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

54. The BVI Appointment Orders grant the Liquidators all powers set forth in Section 186, Schedule 2 of the BVI Insolvency Act, including, but not limited to, the following:

a. to pay any class of creditors in full;

b. to make a compromise or arrangement with creditors or persons claiming to be creditors, or having or alleging that they have any claim against the Funds, whether present or future, certain or contingent, ascertained or not;

30

c. to compromise any claims, debts or liabilities capable of resulting in claims or debts whether present or future, certain or contingent, ascertained or not, between the Funds and any person or entity, and to compromise questions in any way relating to or affecting the assets or the liquidations of the Funds;

d. to commence, continue, discontinue, or defend any action or other legal proceeding in the name and on behalf of the Funds in the BVI or elsewhere;

e. to carry on the Funds' business so far as may be necessary for its beneficial liquidation;

f. to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the Funds or for which the Funds may be rendered liable;

g. to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the Funds and a contributory or alleged contributory or other Funds or person apprehending liability to the Company;

h. to deal with all questions in any way relating to or affecting the assets or the winding up of the Funds to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it;

i. to sell or otherwise dispose of property of the Funds;

j. to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents;

k. to use the Funds' seal;

l. to draw, accept, make and endorse any bill of exchange or promissory note in the name and on behalf of the Funds;

m. to borrow money, whether on the security of assets of the Funds or otherwise;

n. to take out in an official capacity letters of administration for any deceased member or past member or debtor, or to do any other act necessary for obtaining payment of any money due from a member or past member or debtor;

31

o. to call meetings of the creditors or members for (i) the purpose of informing the creditors or members concerning the progress of or other matters arising in the liquidation; (ii) the purpose ascertaining the views of creditors or members on any matter arising in the liquidation; or (iii) such other purposes connected with the liquidation as the liquidators considers fit;

p. to appoint a solicitor, accountant or other professionally qualified person to assist in the performance of the liquidators' duties;

q. to appoint an agent to do any business that the liquidators are unable to do themselves, or which can be more conveniently done by an agent;

r. to apply to the BVI Court for directions concerning any matter arising out of the exercise of any of the liquidators' powers; and

s. to do all things incidental to any of the liquidators' powers.

55. The Foreign Representatives must seek BVI Court approval before they can exercise any of the first five powers enumerated in the BVI Appointment Orders. *See* BVI Act § 186(3) ("The Court may provide that certain powers may only be exercised with the sanction of the Court."). The Foreign Representatives may exercise all of the other powers enumerated in the BVI Appointment Orders without prior BVI Court approval.

56. With the express authorization of the BVI Court, the Foreign Representatives filed petitions in this Court on June 14, 2010 seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15 of the Bankruptcy Code. On July 22, 2010, the Bankruptcy Court issued the Recognition Order, which, among other things, specifically entrusted the Foreign Representatives with the administration and realization of the Funds' assets located in the United States, including any and all claims and causes of action belonging to the Funds.

57. Acting in accordance with authority afforded to them by the Recognition Order and with the duties and powers afforded to them as liquidators under the BVI Insolvency Act, and with the requisite court approval by the foreign court having jurisdiction over the matter , the

32

Foreign Representatives have brought this and similar actions on behalf of the Funds, and/or in their capacities as liquidators of the Funds, to recover Redemption Payments made to the Funds' investors in the years prior to the exposure of the Madoff fraud.

58. On December 9, 2010, the BVI Court issued an order authorizing the Foreign Representatives to assert claims seeking: (i) a declaration that the Redemption Payments were unfair preferences under Section 245 of the BVI Insolvency Act and were undervalue transactions under Section 246 of the BVI Insolvency Act, and (ii) an order setting aside the Redemption Payments, restoring the Funds to the position that they would have been had the Redemption Payments not been paid and such further and other relief as the Foreign Representatives deem necessary.   On December 5, 2011, the Court of Appeal of the Eastern Caribbean Supreme Court, sitting as an appellate court of the BVI Court, issued an Order giving the Foreign Representatives sanction to continue to pursue claims in the United States, including both common law claims and claims under Sections 245 and 246 of the BVI Insolvency Act.

86.   59. At present, without recovery of Redemption Payments made to shareholders, the Funds' assets are not sufficient to satisfy contingent and non-contingent liabilities of the Funds' estates.   The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry's estate that Defendants are not entitled to keep.

## FIRST CLAIM
### (Unjust Enrichment - Against Huang)

87.   60. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 5986 above as if set forth herein.

33

88. ~~61.~~ As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Huang, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

89. ~~62.~~ Huang did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by him/her.~~—~~

~~63. Upon information and belief, Huang~~, in that he/she received ~~and retained~~ Redemption Payments made for amounts far in excess of ~~amounts paid by him/her for~~ the ~~purchase~~ Net Asset Value of Shares ~~of and in Sentry~~ redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

90. ~~64.~~ By reason of his/her receipt of monies represented as amounts deposited by other BLMIS investors or ~~previous deposits made by Sentry with BLMIS~~ monies deposited by the Funds' subscribers, for amounts far in excess of the amounts that it would have received had the Net Asset Value of Shares been calculated based upon the true facts existing at that time or any relevant time, Huang has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

91. ~~65.~~ It would offend principles of equity and good conscience to permit Huang to retain the Redemption Payments ~~s/~~he/she received from Sentry.

92. ~~66.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from Huang an amount equal to the Redemption Payments received by him/her from Sentry~~.~~, or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that

Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SECOND CLAIM
### *(Unjust Enrichment - Against Beneficial Shareholders)*

93. ~~67.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~66~~92 above as if set forth herein.

94. ~~68.~~ Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

95. ~~69.~~ Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her from Sentry to accounts of the Beneficial Shareholders. ~~As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Huang, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of~~ These Redemption Payments ~~was~~did not, as Sentry mistakenly believed, represent the proceeds ~~from the sale of securities or investments held by BLMIS for the account of Sentry~~arising from the profitability of or to continue investment in BLMIS. Instead, Redemption Payments were made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

96. ~~70.~~ The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for ~~any portion of any of~~ the Redemption Payments or any portion thereof received by them~~.~~

71. Upon information and belief, some or all of the Beneficial Shareholders, in that they received and retained Redemption Payments made for amounts far in excess of amounts paid by them for the purchaseNet Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

97. 72. To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Huang in his/her capacity as trustee, agent, representative, or nominee for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

98. 73. It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by Sentry.

99. 74. The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them., or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

**THIRD CLAIM**
*(Money Had and Received - Against Huang)*

100. 75. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 7499 above as if set forth herein.

101. 76. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Huang, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's

fraud. The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

102. ~~77.~~ Huang did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by him/her~~.~~

~~78. Upon information and belief, Huang~~, in that he/she received ~~and retained~~ Redemption Payments made for amounts far in excess of ~~amounts paid by him/her for~~ the ~~purchase~~Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

103. ~~79.~~ By reason of his/her receipt of monies ~~representing the deposits of other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud,~~which generally represented the proceeds arising from or to continue investment in BLMIS, which the world now knows was operated by Madoff as a Ponzi scheme. Huang has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

104. ~~80.~~ Furthermore, Huang was not entitled to receive the Redemption Payments because the amounts of each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Huang for his/her redemption of Shares to be in excess of the ~~actual~~ Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

105. ~~81.~~ To the extent that Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

37

106. 82. It would offend principles of equity and good conscience to permit Huang to retain the Redemption Payments s/hehis/her received from Sentry.

107. 83. The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from Huang an amount equal to the Redemption Payments received by him/her from Sentry., or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FOURTH CLAIM
### *(Money Had and Received - Against Beneficial Shareholders)*

108. 84. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 83107 above as if set forth herein.

109. 85. Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

110. 86. Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Huang, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of These Redemption Payments wasdid not, as Sentry mistakenly believed, represent the proceeds from the sale of securities or investments held byarising from the profitability of or to continue investment in BLMIS for the account of Sentry.

38

111. 87. The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for any portion of any of the Redemption Payments or any portion thereof received by them.

88. Upon information and belief, some or all of the Beneficial Shareholders, in that they received and retained Redemption Payments made for amounts far in excess of amounts paid by them for the purchase Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

112. 89. To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Huang in his/her capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

113. 90. Furthermore, the Beneficial Shareholders were not entitled to receive any portion of the Redemption Payments paid to Huang upon the redemption of Shares issued to him/her in his/her capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received for redemption of Shares to be in excess of the actual Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

114. 91. To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

39

115. 92. It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments made by Sentry.

116. 93. The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from the Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time .

## FIFTH CLAIM
### *(Mistaken Payment - Against Huang)*

117. 94. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 93 116 above as if set forth herein.

118. 95. As described above, Sentry made each of the Redemption Payments to Huang under the mistaken belief that the amounts paid to Huang represented the proceeds of the sale of securities and investments held for Sentry in accounts established with BLMIS. arising from the profitability of or to continue investment in BLMIS and were based upon the Net Asset Value of Shares redeemed based upon the true facts at that time.

119. 96. Upon information and belief, however, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to Huang represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

40

120. 97. The Redemption Payments, while benefiting Huang, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

121. 98. Additionally, Huang was not entitled to receive the Redemption Payments because, as was unknown to Sentry, the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Huang for his/her redemption of Shares to be in excess of the actual Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.  In these circumstances, the Redemption Payments should be returned for the benefit of Sentry, their creditors and the current holders of Shares in Sentry.

122. 99. Huang did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by him/her.

100. Upon information and belief, Huang, in that he/she received and retained Redemption Payments made for amounts far in excess of amounts paid by him/her for the purchaseNet Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

123. 101. To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

124. 102. It would thus offend principles of equity and good conscience to permit Huang to retain the Redemption Payments.

125. 103. The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from Huang a sum in an amount equal to the

41

Redemption Payments received by him/her from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SIXTH CLAIM
### (Mistaken Payment - Against Beneficial Shareholders)

126. 104. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 103125 above as if set forth herein.

127. 105. As described above, Sentry made each of the Redemption Payments to Huang under the mistaken belief that the amounts paid to Huang represented the proceeds of the sale of securities and investments held for Sentry in accounts established with arising from the profitability of or to continue investment in BLMIS.

128. 106. However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to Huang represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

129. 107. Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Huang, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of These Redemption Payments wasdid not, as Sentry mistakenly believed, represent the

proceeds ~~from the sale of securities or investments held by~~ arising from the profitability of or to continue investment in BLMIS ~~for the account of Sentry~~.

130. ~~108.~~ Additionally, the Beneficial Shareholders were not entitled to receive ~~any portion of~~ the Redemption Payments received by Huang upon the redemption of Shares issued to him/her in his/her capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because, as was unknown to Sentry, the amounts transferred with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by Huang for his/her redemption of Shares to be in excess of the ~~actual~~ Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

131. ~~109.~~ The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for ~~any portion of any of~~ the Redemption Payments or any portion thereof received by them~~.~~

~~110. Upon information and belief, some or all of the Beneficial Shareholders~~, in that they received ~~and retained~~ Redemption Payments made for amounts far in excess of ~~amounts paid by them for~~ the ~~purchase~~ Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

132. ~~111.~~ The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

133. To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will

43

be disproportionately and unjustly borne by Sentry and Sigma and other shareholders and creditors of Sentry.

134. ~~112.~~ It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

135. ~~113.~~ The Foreign Representatives in their capacities as liquidators of Sentry and on behalf of Sentry are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them~~,~~, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SEVENTH CLAIM
### *(Constructive Trust - Against all Defendants)*

136. ~~114.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~113~~135 above as if set forth herein.

137. ~~115.~~ As described above, upon receipt of a redemption request, Sentry made each of the Redemption Payments to Huang based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the ~~actual~~ Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

138. ~~116.~~ As alleged above, the Redemption Payments generally represented ~~money deposited with BLMIS by other BLMIS investors or previous deposits of Sentry with BLMIS, never invested but rather misused and misappropriated as part of~~the proceeds arising from or to continue investment in what the world now knows was Madoff's ~~fraud.  The source of~~Ponzi

44

scheme.  Accordingly, these Redemption Payments ~~was~~did not, as Sentry mistakenly believed, represent the proceeds ~~from the sale of securities and investments held by~~arising from the profitability of (or to continue investment in) BLMIS ~~for the account of Sentry~~.

139.  ~~117.~~ Upon information and belief, Huang may have paid some or all of the Redemption Payments ~~s/~~he/she received to the Beneficial Shareholders.

140.  ~~118.~~ By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

141.  ~~119.~~ Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Huang for his/her redemption of Shares to be in excess of the ~~actual~~ Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

142.  ~~120.~~ It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

143.  ~~121.~~ By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry for the benefit of the Foreign Representatives and Sentry and other shareholders and creditors of Sentry.

## EIGHTH CLAIM
### *(Unfair Preference Pursuant to Section 245 of the BVI*
### *Insolvency Act - Against Huang)*

144. ~~122.~~ The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through ~~121~~143 above as if set forth herein.

145. ~~123.~~ Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

146. ~~124.~~ A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

147. ~~125.~~ The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) ~~...~~. . . causes the company to become insolvent."  BVI Insolvency Act~~,~~ § 244(2).

46

148. 126. For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c) … (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act, §§ 8, 244(3).

149. 127. For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator . . . ." BVI Insolvency Act § 244(1).

150. 128. The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed." BVI Insolvency Act, § 244(1). Thus, the vulnerability period, for each of the Funds, is the period commencing two years prior to the application for the appointment of the Liquidators for each Fund and ending on the date of the appointment of the liquidators of each Fund.

151. 129. A "connected person" is:

(1) … one or more of the following:

(a) a promoter of the company;

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

47

(h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act, § 5 (emphasis added).

152. ~~130.~~ Redemption Payments aggregating USD $276,462.00 were made by Sentry to Huang during the two-year period prior to the application for appointment of the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

153. ~~131.~~ During the Sentry Vulnerability Period, Sentry was insolvent or was rendered insolvent by the making of Redemption Payments.

154. ~~132.~~ Each of the Redemptions and/or Redemption Payments made during the Sentry Vulnerability Period ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

155. ~~133.~~ Huang was a shareholder (i.e., a member) of Sentry during the Sentry Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

156. ~~134.~~ Each of the Vulnerability Period Payments put Huang in a better position than ~~s/he~~ it would have been in had such Payment not been made.

157. ~~135.~~ Because Huang was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions~~" and "did not take place in the ordinary course of business~~." Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent.  This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, i.e. using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for

48

investing those monies and also withdrawing monies from BLMIS to pay redeemers). Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in BLMIS. On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

158. In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of any business" of Sentry~~, nor~~. Even were ~~they made for any legitimate business purpose,~~this not presumed, the same would follow in that, among other things, each Vulnerability Period Payment ~~was determined and paid based on a~~represented a distribution of monies (including ~~Net Asset Value and was made incidental to and as a necessary part of~~profits) from Madoff's Ponzi scheme~~.~~ or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

159. ~~136.~~ Each of the Vulnerability Period Payments was made following receipt by Sentry of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles. Following the receipt by Sentry of a notice of redemption by Huang, Huang became a contingent creditor. Upon the subsequent redemption of Huang's shares and until such time as Huang received the Vulnerability Period Payment ~~that became due and payable by reason of Huang's redemption of Shares~~, Huang was a "creditor" of Sentry ~~as defined in the BVI Insolvency Act, as Huang would have had~~with an admissible claim against Sentry in ~~the BVI~~any subsequent liquidation ~~Proceeding~~of Sentry had ~~the Vulnerability Period~~ payment ~~not been made~~of the Redemption Price not been made, albeit that post-liquidation Huang would have been deferred to outside creditors.

49

137. Further, upon information and belief, Huang may assert claims against Sentry in this action or elsewhere which, if proven, allowed and/or admitted, would make him/her a "creditor" of Sentry as defined by the BVI Insolvency Act.

160. 138. By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to recover from Huang an amount equal to the Vulnerability Period Payments received by Huang from Sentry.

## NINTH CLAIM
### *(Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against Beneficial Shareholders)*

161. 139. The Foreign Representatives, in their capacities as Foreign Liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 138160 above as if set forth herein.

162. 140. Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

163. 141. Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders.

164. 142. To the extent that any money that Huang received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to avoid and set aside such further transfer by Huang to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability

Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## TENTH CLAIM
### (Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act - Against Huang)

165.    143. The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 142167 above as if set forth herein.

166.    144. Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction with a person if (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a) the company enters into the transaction in good faith and for the purposes of its business; and (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that (a) the transaction was an insolvency transaction; and (b) subsection (2) did not apply to the transaction.

167.    145. During the Sentry Vulnerability Period, all assets purportedly held by BLMIS for Sentry and other investors were non-existent, and Sentry was insolvent or rendered insolvent by the Vulnerability Period Payments as alleged in paragraph 157 above.  Thus, each

51

of the Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of the BVI Insolvency Act.

168. 146. Sentry received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sentry received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry to Huang for each of the Vulnerability Period Payments.

169. 147. Huang was a shareholder (i.e., a member) of Sentry during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

170. 148. Because Huang was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" and "did not take place in the ordinary course of business." Further, even were this not presumed, there is a statutory presumption that the Vulnerability Period Payments were not made in the ordinary course of any business of Sentry, nor were they made for any legitimate business purpose, in that, among other things, each Vulnerability Period Payment was determined and paid based on a fictitious Net Asset Value and was made incidental to and as a necessary part of Madoff's good faith and for the purposes of the Funds' business with reasonable grounds to believe that they would benefit the Funds. Even were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious profits from a Ponzi scheme such as BLMIS.

171. 149. By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to an order avoiding and setting

52

aside the Vulnerability Period Payments and to recover from Huang an amount equal to the Vulnerability Period Payments received by Huang from Sentry.

## ELEVENTH CLAIM
### *(Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act - Against Beneficial Shareholders)*

172. 150. The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 149171 above as if set forth herein.

173. 151. Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for Beneficial Shareholders.

174. 152. Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her to accounts of the Beneficial Shareholders.

175. 153. To the extent that any money that Huang received in connection with the Vulnerability Period Payments was transferred to Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to avoid and set aside such further transfer by Huang to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them., and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act

## TWELFTH CLAIM
### *(Breach of Contract - Against Huang)*

176. 154. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 153175 above as if set forth herein.

177. 155. Huang, upon information and belief, entered into a the Initial Subscription Agreement with Sentry, on or about July 24, 2003 (the "Initial Subscription Agreement"), pursuant to which the Subscriber Huang subscribed for a total of 95.12 Shares (the "Shares"). Huang's subscription for shares was made pursuant to the terms of the Initial Subscription Agreement itself as well as the terms of the other documents referred to therein, namely; (i) Sentry's Private Placement Memorandum (as amended from time to time) (the "PPM"); and (ii) Sentry's Memorandum of Association and Articles of Association (the "Articles"). Subsequent to entering into the Initial Subscription Agreement, upon information and belief, Huang, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry on or about January 6, 2004 and October 1, 2004 pursuant to which he/she subscribed for 301.23 additional shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement. The Initial Subscription Agreement, together with the Subsequent Subscription Agreements, including all of the terms and provisions incorporated therein by reference to the PPM Private Placement Memorandum (as amended from time to time) and the Articles, is are collectively referred to herein as the "Subscription Agreement". Fund Documents."

178. 156. The Subscription Agreement provides Fund Documents provide for the calculation of the redemption price for Shares (the "Redemption Price") based on the "Net Asset Value per Share." Net Asset Value ("NAV") per share is to be determined by the directors of Sentry as of the relevant valuation day "by dividing the value of the net assets of [Sentry] by the number of Shares then in issue [.]" Articles at 11(1).

179. 157. The Subscription Agreement provides Fund Documents provide that in determining NAV the Net Asset Value per share for each class of shares issues issued, the value

54

of the net assets of the Fund is to be adjusted "to take into account any dividends, distributions, assets or liabilities" attributable to such class of shares.   Articles at 11(1).   Pursuant to the ~~Subscription Agreement~~Fund Documents, each subscriber, including Huang acknowledges that "the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's investment and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value." See Initial Subscription Agreement~~,~~ ¶ 10.

181.   ~~158.~~ With respect to the valuation of different types of assets, the ~~Subscription Agreement prescribes~~Fund Documents prescribe methods of valuation that are, however, subject to the exercise of the judgment and discretion by the Directors of Sentry.   For example, with respect to the valuation of assets consisting of securities, the ~~Subscription Agreement prescribes~~Fund Documents prescribe methods of valuation based on price and market data, provided however that "[i]f the Directors determine that [any of the prescribed methods of valuation] does not fairly represent its market value, the Directors shall value such securities as they determine and shall set forth the basis of such valuation in writing in the Company's records[.]"   Articles at 11(3)(b).

181.   ~~159.~~ With respect to the value of any shares of stock held by Sentry in an "investment company," the ~~Subscription Agreement provides~~Fund Documents provide for valuation "in accordance with the manner in which such shares are valued by such investment company" provided however that "the Directors may make such adjustments in such valuations the Directors may from time to time consider appropriate."   Articles at 11(3)(c).

182.   ~~160.~~ With respect to assets that have been "realised or contracted to be realised" the ~~Subscription Agreement provides~~Fund Documents provide for the inclusion of the assets

receivable in respect of such realization, provided however that "if the value of such assets is not then known exactly then its value shall be as estimated by the Directors."   Articles at 11(3)(e).

183.    161. Additionally, the ~~Subscription Agreement provides~~Fund Documents provide that "notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion, warrant a different valuation of any securities, such securities will be valued at such prices as the Directors shall determine."  Articles at 11(3)(f).

184.    162. The ~~Subscription Agreement provides~~Fund Documents provide that any "certificate" as to the ~~NAV~~Net Asset Value per Share or as to the Redemption Price that is given in good faith by or on behalf of the Directors "shall be binding on all parties."  Articles at 11(1).

185.    163. No Certificate ~~issuable under the Subscription Agreement (a "Redemption Price Certificate")~~ was provided in good faith by or on behalf of the Directors to Huang in respect of any ~~NAV~~Net Asset Value determination made while Huang was a member of the Fund or in respect of any Redemption Payment made to Huang.

186.    164. Pursuant to the ~~Subscription Agreement~~Fund Documents, at any time prior to ~~this~~the good faith issuance ~~of a Redemption Price~~and receipt of a Certificate, the Redemption Price calculated in respect of the redemptions by Huang and paid to Huang remains subject to adjustment, recalculation and redetermination based on, *inter alia*, the foregoing identified provisions of the ~~Subscription Agreement.~~Fund Documents.  Upon the true interpretation of the Fund Documents, the same contained an implied term for repayment of any over-payments, and/or such a term is to be implied on the basis of obviousness and/or as being necessary for the business efficacy of the Fund Documents and/or to give effect to the reasonable expectations of the parties.

187. 165. Upon information and belief, Huang received the Redemption Payments listed on Exhibit A in respect of Shares submitted for redemption.

188. 166. Subsequent to December 8, 2008, Sentry has determined that the NAVNet Asset Value calculations upon which Redemption Payments were made to Huang included assets not held by or on behalf of Sentry at the time of the making of such payments and, additionally, that such NAVNet Asset Value calculations failed to account for and make appropriate deduction of liabilities of Sentry existing at the time such payments. For these and other reasons, such NAVNet Asset Value calculation substantially overstated the net asset value of the assets of Sentry.

189. 167. To the extent that Huang has received Redemption Payments in excess of the NAVNet Asset Value of the Shares redeemed, Huang is contractually obligated to return amounts in excess of the actual NAVNet Asset Value that would have been calculated based upon the true facts existing at the relevant time.

190. 168. Following determination by the Fund that Redemption Payments made to Huang had been calculated on the basis of an overstated NAVNet Asset Value, demand has been made toon Huang to return excess and overpaid Redemption Payments to the Fund.

191. 169. Huang has failed and refused to repay to the Fund the amount that, under the Subscription AgreementFund Documents, he/she is contractually required to repay to the Fund.

192. 170. The failure of Huang to make the repayment requested constitutes a breach of the Subscription AgreementFund Documents for which Sentry is entitled to the award of damages.

## THIRTEENTH CLAIM
### *(Breach of Contract - Against Beneficial Shareholders)*

193. ~~171.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~170~~192 above as if set forth herein.

194. ~~172.~~ Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the ~~Subscription Agreements~~Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

195. ~~173.~~ Each Beneficial Shareholder authorized Huang to enter into the ~~Subscription Agreement~~Fund Documents on his, her or its behalf and to bind the Beneficial Shareholder to the agreements and representations contained therein to the same extent as had the Beneficial Shareholder executed the ~~Subscription Agreement~~Fund Documents on his, her or its, own behalf.

196. ~~174.~~ Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her from Sentry to accounts of the Beneficial Shareholders.

197. ~~175.~~ To the extent that any Beneficial Shareholder has received Redemption Payments in excess of the ~~NAV~~Net Asset Value of the Shares redeemed, such Beneficial Shareholder is contractually obligated to return amounts in excess of the ~~actual NAV~~Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

198. ~~176.~~ Following determination by the Fund that Redemption Payments made to Huang had been calculated on the basis of an overstated ~~NAV~~Net Asset Value, demand was made on the Beneficial Shareholders by demand on Huang for the return of excess and overpaid Redemption Payments.

199. 177. The Beneficial Shareholders have failed and refused to repay to the Fund the amounts that, under the ~~Subscription Agreement, he, she or it is~~Fund Documents, they are contractually required to repay to the Fund.

200. 178. The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the ~~Subscription Agreement~~Fund Documents for which Sentry is entitled to the award of damages.

## FOURTEENTH CLAIM
### (Breach of Implied Covenant of Good Faith and Fair Dealing - Against Huang)

201. 179. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~178~~200 above as if set forth herein.

202. 180. Following determination by the Fund that Redemption Payments to Huang had been made on the basis of an overstated ~~NAV~~Net Asset Value, demand was made to Huang to return excess and overpaid Redemption Payments to Sentry.

203. 181. Huang has failed and refused to make the requested repayment to Sentry.

204. 182. By retaining the Redemption Payments to which Huang is not entitled, Huang has deprived Sentry of the benefit of its bargain and has subverted the ~~Subscription Agreement~~Fund Documents.

205. 183. The failure of Huang to make the repayment requested constitutes a breach of the covenant of good faith and fair dealing that inheres in the ~~Subscription Agreement~~Fund Documents for which Sentry is entitled to the award of damages.

## FIFTEENTH CLAIM
### *(Breach of Implied Covenant of Good Faith*
### *and Fair Dealing - Against Beneficial Shareholders)*

206.    ~~184.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~183~~205 above as if set forth herein.

207.    ~~185.~~ Upon information and belief, Huang may have subscribed to all or some portion of the Shares issued to him/her under the ~~Subscription Agreements~~Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

208.    ~~186.~~ Upon information and belief, Huang may have paid to or credited some or all of the Redemption Payments received by him/her from Sentry to accounts of the Beneficial Shareholders.

209.    ~~187.~~ Following determination by the Fund that Redemption Payments made to Huang had been calculated on the basis of an overstated ~~NAV~~Net Asset Value, demand was made on the Beneficial Shareholders by demand on Huang for the return of excess and overpaid Redemption Payments.

210.    ~~188.~~ The Beneficial Shareholders have failed and refused to make repayment to Sentry.

211.    ~~189.~~ By retaining the Redemption Payments to which they are not entitled, the Beneficial Shareholders have deprived Sentry of the benefit of its bargain and have subverted the ~~Subscription Agreement~~Fund Documents.

212.    ~~190.~~ The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the implied covenant of good faith and fair dealing that inheres in the ~~Subscription Agreements~~Fund Documents for which Sentry is entitled to the award of damages.

60

## SIXTEENTH CLAIM
### *(Declaratory Judgment - Against All Defendants)*

213. ~~191.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~190~~212 above as if set forth herein.

214. ~~192.~~ An actual and justiciable controversy exists between the Plaintiffs and the Defendants with respect to the obligation of the Defendants to repay to the ~~Fund~~Funds all or a portion of amounts received by them as excess or overpaid Redemption Payments under circumstances where:

(i)      ~~(i)~~ the ~~NAV~~Net Asset Value per share calculation upon which the Redemption Price was paid, directly or indirectly, to any Defendant has been subsequently adjusted, recalculated or redetermined in accordance with the ~~Subscription Agreement~~Fund Documents;

(ii)      ~~(ii)~~ the resulting adjusted, recalculated and redetermined Redemption Price is less than the Redemption Price paid to the Defendant; ~~and~~

(iii)      ~~(iii)~~ prior to such adjustment, recalculation or redetermination, no ~~Redemption Price~~binding Certificate has been issued by the Fund~~.~~; and

(iv)      Citco issued no Certificates in good faith.

215. ~~193.~~ The harm to Sentry is real and immediate because, a result of the failure and refusal of the Defendants to make repayment, Sentry has become insolvent and is presently unable to pay its debts as they fall or will fall due.

216. ~~194.~~ Plaintiffs have no adequate remedy at law.

217. ~~195.~~ Pursuant to 28 U.S.C. § 2201 et. seq., Plaintiffs are entitled to a declaration by this Court declaring that, pursuant to the ~~Subscription Agreements~~Fund Documents, each

Defendant must repay Sentry that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First, Third and Fifth Claims, judgment in favor of Plaintiffs and against Huang allowing the Plaintiffs to recover an amount equal to the Redemption Payments received by Huang, plus interest, or, in the alternative, an amount equal to the amount of the Redemption Payments received by Huang less the amount of redemption payments that Huang would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

B.    On the Second, Fourth and Sixth Claims, judgment in favor of Plaintiffs and against Beneficial Shareholders allowing the Plaintiffs to recover an amount equal to any portion of any Redemption Payments received by the Beneficial Shareholders, plus interest, or, in the alternative, an amount equal to any portion of the Redemption Payments received by the Beneficial Shareholders less the amount of such portion that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

C.    On the Seventh Claim, imposition of a constructive trust on Redemption Payments; and

D.    On the Eighth and Ninth Claims:

    i.    a declaratory judgment in favor of the Foreign Representatives and against Huang and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

    ~~b~~ii.  judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

    ~~c~~iii.  judgment pursuant to Section 249 of the BVI Insolvency Act against Huang and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest.

  E.  On the Tenth and Eleventh Claims:

    ~~a~~i.  a declaratory judgment in favor of the Foreign Representatives and against Huang and the Beneficial Holders that the ~~Redemption~~Redemptions and/or Vulnerability Period Payments made during the vulnerability period constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

    ~~b~~ii.  judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the ~~Redemption~~Redemptions and/or Vulnerability Period Payments made during the vulnerability period; and

    ~~c~~iii.  judgment pursuant to Section 249 of the BVI Insolvency Act against Huang and the Beneficial Holders in the amount of the avoided ~~Redemption~~Vulnerability Period Payments received by them or for their benefit, plus interest.

  F.  On the Twelfth and Fourteenth Claims, judgment against Huang and in favor of the Plaintiffs in an amount to be determined at trial;

  G.  On the Thirteenth and Fifteenth Claims, judgment against the Beneficial Shareholders and in favor of the Plaintiffs in an amount to be determined at trial;

  H.  On the Sixteenth Claim, a declaratory judgment against the Defendants and in favor of the Plaintiffs that, under the ~~Subscription Agreements~~Fund Documents, the Defendants must repay that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry;

I.      Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

J.      Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated:  New York, New York
September 7, 2016

                          BROWN RUDNICK LLP


                          By:  ___*/s/ David J. Molton*___
                                David J. Molton
                                May Orenstein
                                Daniel J. Saval
                          Seven Times Square
                          New York, New York 10036
                          Telephone: 212.209.4800
                          Facsimile: 212.209.4801

                          *Attorneys for the Foreign*
                          *~~Representative~~Representatives*

65

# EXHIBIT A

*Redemption Payments Received by Defendants from Sentry*
*From July 19, 2007 Through November 19, 2008*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| July 19, 2007 | $11,450.53* | 9.15 | Bank of Kaohsiung Ming Chen Branch, Taiwan |
| January 17, 2008 | $109,787.08* | 85.00 | Bank of Kaohsiung Ming Chen Branch, Taiwan |
| November 19, 2008 | $155,224.49* | 115.00 | Bank of Kaohsiung Ming Chen Branch, Taiwan |

\* Denotes Redemptions in the Sentry Vulnerability Period.

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.

| Summary report: Litéra® Change-Pro TDC 7.5.0.127 Document comparison done on 9/7/2016 2:31:40 PM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:**iw://WORKSITE/WorkSiteUS/60585324/2 | |
| **Modified DMS:** iw://WORKSITE/WorkSiteUS/60585324/4 | |
| **Changes:** | |
| Add | 530 |
| Delete | 467 |
| Move From | 17 |
| Move To | 17 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1031 |

# EXHIBIT C

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 15 Case |
| | ) |
| **FAIRFIELD SENTRY LIMITED, et al.,** | ) Case No. 10-13164 (SMB) |
| | ) |
| Debtors in Foreign Proceedings. | ) Jointly Administered |
| | ) |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION),** acting by and through the Foreign Representatives thereof, and **KENNETH KRYS and CHARLOTTE CAULFIELD,** solely in their capacities as Foreign Representatives and Liquidators thereof, | ) |
| | ) |
| | ) |
| | ) Adv. Pro. No. 11-02770 |
| | ) (SMB) |
| Plaintiffs, | ) |
| | ) **NOTICE OF FILING OF** |
| -against- | ) **PROPOSED AMENDED** |
| | ) **COMPLAINT** |
| **CITIGROUP GLOBAL MARKETS LIMITED** and **BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF CITIGROUP GLOBAL MARKETS LIMITED 1-1000,** | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

**PLEASE TAKE NOTICE** that Fairfield Sentry Limited ("Sentry"), by and through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "Foreign Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and the Foreign Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited, and

Fairfield Lambda Limited pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands, hereby file the enclosed proposed amended complaint in the above-captioned adversary proceeding (the "Proposed Amended Complaint").

**PLEASE TAKE FURTHER NOTICE** that a clean copy of the Proposed Amended Complaint is filed herewith as Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that a document showing the Proposed Amended Complaint redlined against the operative complaint in the above-captioned adversary proceeding is filed herewith as Exhibit B.

Dated: New York, New York
      September 20, 2016

                              **BROWN RUDNICK LLP**

                              By:   */s/ David J. Molton*
                                    David J. Molton
                                    May Orenstein
                                    Daniel J. Saval

                              Seven Times Square
                              New York, New York 10036
                              Telephone: 212.209.4800
                              Facsimile: 212.209.4801

                              *Attorneys for the Foreign Representatives*

# EXHIBIT A

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 15 Case |
| | ) |
| **FAIRFIELD SENTRY LIMITED, et al.,** | ) Case No. 10-13164 (SMB) |
| | ) |
| Debtors in Foreign Proceedings. | ) Jointly Administered |
| | ) |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION),** acting by and through the Foreign Representatives thereof, and **KENNETH KRYS** and **CHARLOTTE CAULFIELD,** solely in their capacities as Foreign Representatives and Liquidators thereof, | ) Adv. Pro. No. 11-02770 (SMB) |
| Plaintiffs, | ) |
| -against- | ) **SECOND AMENDED COMPLAINT** |
| **CITIGROUP GLOBAL MARKETS LIMITED** and **BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF CITIGROUP GLOBAL MARKETS LIMITED 1-1000,** | ) |
| Defendants. | ) |

Fairfield Sentry Limited ("Sentry"), by and through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "Foreign Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and the Foreign Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending before the Commercial Division

of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.        This action and similar actions are brought by the Plaintiffs, with the approval of the foreign court having jurisdiction over the matter, to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008.

2.        The Funds were created as a means for private investment in managed accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that Bernard L. Madoff used to perpetrate his massive Ponzi scheme.  Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss Franc investments) through purchases of shares of Sentry.  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held by BLMIS for Sentry.  As stated in their offering materials, the Funds' investment objective was to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3.        It is now known that these types of feeder funds were essential to the perpetration of Madoff's Ponzi scheme.  In order for the Ponzi scheme to operate, Madoff required a continuous flow of new investors and investments to be able to satisfy redemption requests from early investors.  Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS), brought

2

new investors into this scheme, allowing Madoff to make payments to early investors and thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.     From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares was transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff.  Prior to December 2008, the voting participating shares of Sentry ($.01 par value per share), Sigma (€01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value."  Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund, net of certain expenses ("Net Asset Value").

5.     From time to time, in order to make payments to investors for the redemption of Shares ("Redemption Payments"), Sentry generally made withdrawals from its BLMIS accounts. On occasion, Sentry made Redemption Payments directly from amounts on hand invested by other subscribers in the Funds.  At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by BLMIS for Sentry.  The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which was calculated based principally on the assets that the Funds believed were being held, and investments that were being made, by BLMIS for Sentry's account.

3

6.      As the world now knows, Madoff was operating a massive Ponzi scheme through BLMIS.   Thus, at all relevant times, the money that Sentry transferred to BLMIS was not invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses.   Further, none of the securities shown on statements provided to Sentry by BLMIS were in fact purchased for Sentry.   Additionally, none of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of sales of securities or other investments.   Instead, such amounts represented the monies of more recent investors into the Madoff scheme.

7.      In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent, and the Funds were insolvent at the time Redemption Payments were made or they were rendered insolvent by those payments.   As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

8.      At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of his fraud.   Similarly, the Redemption Payments that the Funds made to redeeming shareholders were not made in the ordinary course of any business or for any legitimate purposes.   Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from

4

investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme.  These payments were crucial in perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9.    During the period from and after October 14, 2005 through November 19, 2008, following the receipt by Sentry of notices of redemption, Sentry made Redemption Payments to accounts held in the name of Defendant Citigroup Global Markets Limited ("CGML") aggregating USD $130,000,000.

10.    At the time such payments were made, Sentry mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption.  In fact, however, as stated, the Redemption Payments made to CGML far exceeded the Net Asset Value of Shares redeemed that would have been calculated based on the true facts existing at that time or any relevant time.  Moreover, these Redemption Payments did not, as Sentry intended, represent the proceeds arising from the profitability of or to continue investment in BLMIS.  Instead, any amounts obtained directly or indirectly by Sentry from BLMIS to make Redemption Payments to CGML generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

11.    Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them, and, at all relevant times, the Funds were unable to pay their debts as they fell or

5

would fall due.   Indeed, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.

12.     In particular, claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (SMB) (the "BLMIS Adversary Proceeding").  As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.  This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud. The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.  At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

13.     On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda.  The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments,

6

and other creditors of the Funds, and further increased the amount of those liabilities.  In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

14.    Upon information and belief, CGML has either retained the Redemption Payments made to it by Sentry for its own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities for whom CGML may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with CGML, the "Defendants").

15.    Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value.  As of December 2008 and presently, Sentry, Sigma, and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

16.    Unless Redemption Payments paid to shareholders are recovered for the Funds' estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may be made against them; further, recoveries of Redemption Payments will increase distributions to the Funds' investors who have been harmed.  Moreover, to the extent such liabilities and claims must be satisfied solely from the Funds' current assets, Defendants will have been unjustly enriched as they will not bear their proportionate share of such liabilities and claims, but rather will retain a windfall at the expense of other shareholders and creditors of the Funds.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re Fairfield Sentry Limited, et al., No. 10-13164 (SMB), pending in this Court.   Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, SIPA Liquidation No. 08-1789 (SMB).   Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

18.     This is a core proceeding under 28 U.S.C. § 157(b)(2).[1]   Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

19.     This Court has jurisdiction over CGML and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney 2008) because CGML and the Beneficial Shareholders

---

[1]     Although the District Court, in In re Fairfield Sentry Ltd., No. 1:11-mc-00224-LAP, 458 B.R. 665 (S.D.N.Y. 2011), held that causes of action alleged by the Plaintiffs in other cases before this Court—causes of action that are similar or the same as those alleged in this complaint—are not core proceedings, this determination may be subject to appeal.  In any event, plaintiffs submit that the causes of action in this complaint, which include, inter alia, allegations regarding transfers of property that were directed into the territorial jurisdiction of the United States, render the claims asserted in this complaint core in accordance with the District Court's decision.

8

purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and maintaining bank accounts in the United States at JP Morgan Chase NA, and in fact receiving Redemption Payments in those United States-based and/or New York-based accounts.   On information and belief, CGML also has subsidiaries or affiliates doing business in the United States and/or conducts business itself in the United States.  CGML and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, designated United States-based and/or New York-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those bank accounts.  CGML and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.  CGML and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

20.    Moreover, CGML has waived any objection to personal jurisdiction in an action brought by the BLMIS Trustee in the U.S. in the United States Bankruptcy Court for the Southern District of New York, Adversary Proceeding Number 10-05345 (BRL), in connection with claims that the BLMIS Trustee has asserted for the same Redemption Payments being claimed in this action.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

9

## PARTIES

### Plaintiffs

22.    Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.  Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

23.    The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names.  On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "Lambda Appointment Order").   On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order").   On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order").   On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds.  On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, and the Supplemental Appointment Order, the "BVI Appointment Orders").  The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having

10

jurisdiction over the matter to bring this action and the claims herein, including the avoidance

claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

24.     Pursuant to the BVI Appointment Orders, the Foreign Representatives are

responsible for all aspects of the Funds' businesses, including, among other things, custody and

control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of

the Funds, any deeds, receipts or other documents, and the power to compromise claims,

commence litigation and to dispose of property.  After obtaining BVI Court approval, the

Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title

11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as

"foreign main proceedings" under Chapter 15.  On July 22, 2010, this Court issued an order (the

"Recognition Order") granting that recognition.

25.     Pursuant to the Recognition Order, the Foreign Representatives were

automatically afforded relief available under 11 U.S.C. § 1520, including application of the

Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as

well as the ability to operate the Funds' business and exercise the rights and powers of a trustee

under Sections 363 and 552 of the Bankruptcy Code.  Moreover, the Bankruptcy Court

specifically granted additional relief in the Recognition Order to the Foreign Representatives

pursuant to 11 U.S.C. § 1521(a).  Such relief includes, but is not limited to: (i) staying any

actions, proceedings or execution against the Funds' assets to the extent not stayed under Section

1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning

the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign

Representatives with the administration and realization of the Funds' assets that are located

11

within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the proceedings before the BVI Court.

**Defendants**

26.    CGML was, at all relevant times, a member of Sentry and a registered holder of Shares.  Upon information and belief, CGML is a corporate entity organized under the laws of the United Kingdom and having its registered address at Citigroup Centre, 33 Canada Sq. Canary Wharf, London  E14 5LB, United Kingdom.  CGML subscribed for the purchase of Shares by entering into one or more written agreements with Sentry.

27.    Defendants "Beneficial Owners of the Accounts Held in the Name of Citigroup Global Markets Limited" - i.e., the Beneficial Shareholders, are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry issued to CGML and on whose behalf CGML was acting as trustee, agent, representative, or nominee.

**NOTICE PURSUANT TO FED. R. CIV. P. 44.1**

28.    Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

**FACTUAL ALLEGATIONS**

A.    **Role of Feeder Funds In Madoff Fraud**

29.    Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials,

12

Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

30.      As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**B.      Calculation of Net Asset Value and Shareholder Redemption Payments**

31.      Substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy.   In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

32.      In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry.  Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in

13

addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

33.     In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements.   None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred.   Indeed, no investments of any kind were ever made by BLMIS for Sentry.   At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious.   Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

34.     From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS). The Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or to continue investment in BLMIS.   In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.   At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of

14

his fraud.  The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose.  Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.

35.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme.  At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

**C.    Redemption Payments Made or Transferred to Defendants**

36.    During the period from and after October 14, 2005 through November 19, 2008, CGML received Redemption Payments totaling USD $130,000,000 from Sentry in respect of Shares tendered for redemption.

37.    At CGML's directions and instructions, CGML received all of its Redemption Payments at its bank account with JP Morgan Chase NA in New York.

38.    The dates and amounts of each Redemption Payment received by CGML from Sentry, and the CGML bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.

39.    At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.  In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between CGML and Sentry, Sentry received no consideration or consideration of a value that, in money or

15

money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry.

40.    Upon information and belief, CGML and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**D.    Citco Did Not Issue Any Certifications of Net Asset Value in "Good Faith"**

41.    Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share . . . given in good faith by or on behalf of the Directors shall be binding on all parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").  The Privy Council did not, however, address whether such Certificates were given "in good faith."  In carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "Citco") acted with a lack of good faith in giving the Certificates.

42.    Over the course of fifteen years, in its capacity as service providers to the Funds, Citco reviewed information concerning BLMIS not available to the general public, and expressed internal alarm about what that information showed with respect to the likelihood of fraud at BLMIS, but turned a blind eye to the reality reflected in the information and instead proceed with issuing the Certificates as if there were no problem.

43.    So grave were the Administrators' internal concerns that they expressed doubts— many years before the fraud was made public—that the Funds' assets with BLMIS even existed,

16

with one employee stating "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists." The Administrators also expressed repeated concern over the fact there was no segregation of duties at BLMIS—i.e., BLMIS (i) had discretion over which investments to make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the broker. Based upon the proprietary information they reviewed, Citco expressed concern—internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of the 1990s "multiplied by a factor of five." Ultimately, unable to resolve their grave concerns, Citco, rather than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a corporate decision to continue on as service providers—in exchange for an 800% increase in fees.

1.    **Citco Expressed Doubt as to Whether the Funds' Assets at BLMIS Even Existed.**

44.    Beginning in 2000, the Administrators ran into trouble with the basic task of verifying the existence of the Funds' assets with Madoff. Initially, Citco expressed serious concerns regarding whether the Funds' Treasury bond transactions actually matched those transactions reported by Madoff because of an apparent "rhythm of trading" each month. The rhythm of trading within Sentry's portfolio appeared too consistent to be true, as the assets included only a limited number of Treasury bonds by each month's end. At the beginning of each month, Madoff would purchase shares and put options and would sell call options, but, like clockwork, would then liquidate all of Sentry's holdings by the 20th of each month. Thus the Administrators wanted to check whether the Treasury bonds even existed at all.

45.    The Administrators could not verify the existence of the assets because the Funds' custodians, Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody (the

17

"Custodians"), did not actually hold them.  Instead, Madoff served as his own custodian.

Therefore, the custody statements that the Custodians were supposed to generate based on assets

in their possession, were instead merely copied, or "shadow booked," from BLMIS account

statements.  The Custodians were "only the custodian[s] on paper, not in reality" and did not

place any trades for the Funds.

46.     Management within Citco, including Ruud Bodewes ("Bodewes"), the head of

internal audit for all of Citco Group, and Ger Jan Meijer ("Meijer"), the head of internal audit for

the Administrators, expressed concern about the operations at BLMIS.  In May 2000, Bodewes

expressed his concern to the general counsel and manager of Citco Bank Nederland, as well as

Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as

Citco, may very well be in a potential dangerous situation, since we do not seem to have an

independent source to verify the information from BLMIS."  Indeed, Meijer had raised these

concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a

factor of five."

47.     In addition to warning Bodewes, Meijer also warned Citco Group's Chief

Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too

late does indeed mean that investors once again faithfully deposit tens of millions of USD in the

Madoff well (for which we do not know if there is a bottom to it) at month's end," with the

understanding that Citco could "already be held personally responsible insofar as we have

allowed the subscriptions to take place as of May without a fight."  Smeets acknowledged receipt

of Meijer's emails and concerns.  At that time, Meijer emphasized that "with the current

knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of

the Funds' assets.

18

48.    However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession.  Citco Group did not address the Administrators' concerns raised in May 2000, and a few months later, Meijer stated:  "[i]t seemed that this affair [was] being put on the back burner and hushed."

49.    A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved."  Meijer warned that "Citco has a risk exposure of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario."  He stated: "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists."  Five months later, in January 2002, the Administrators again emphasized that the issues concerning BLMIS posed severe risks to Citco and the Funds' investors.  Meijer told Bodewes: "I have been worried about this situation for 2 years (including the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen. . . . My intuition (combined with the business that I have seen) tells me that things are not right."

50.    In January 2002, Meijer insisted to Bodewes that: "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years. . . . Personally I think the chance [that something is wrong] is at least 50%."  Meijer persisted that there was "still the opportunity to more or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan).  Otherwise you run the risk that the scene will later be determined by others."  However, in response Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

19

51.    In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions.    John Verhooren ("Verhooren"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about the existence of the Funds' assets for years, but deliberately ignored those concerns.    For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena.    Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Citco was facing "an enormous risk exposure."    Instead, Verhooren told Meijer to stop raising the issue and claimed that Citco would try to meet with Madoff to investigate.    However, neither Verhooren nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

**2.    Citco Failed To Obtain Evidence Of the Existence of the Funds' Assets.**

52.    Citco not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—it knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

53.    The Administrators' audit reports designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at BLMIS.    Each year from 2000 through 2006, the Administrators recommended that Citco either confirm the existence of the Funds' assets held by BLMIS or resign as service providers.    On three occasions between May 2000 and December 2002, Citco attempted to verify the existence of the Funds' assets at BLMIS. All attempts failed.

54.    In May 2000, Citco set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bills, and to

determine how Madoff derived share prices from the markets.    However, this effort failed.

BLMIS did not verify the existence of the assets, and Citco concluded internally that the meeting

had not provided "a full disclosure of [the] assignment."

55.    In July 2001, Bodewes had attempted to assess the concerns raised by Meijer in

an internal due diligence memorandum.    However, Bodewes's due diligence was limited to a

review of Citco's proprietary documents because Citco was concerned that permitting "an on-site

audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss

of [a] USD 1.5 million dollar fee income."    Even so, based on the documents and information in

Citco's possession, Bodewes shared Meijer's concerns about BLMIS's operations, and

concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds'

shareholders.    Bodewes also noted that the two man audit firm used by BLMIS did not "match

up" with the size of BLMIS's business.    Indeed, multiple Administrator employees

acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of

the firm was not large enough to audit the amount of assets purportedly managed by BLMIS.

56.    Smeets, Citco Group's CEO, received Bodewes' memo regarding the issues at

BLMIS, including the issues posed by the size of Madoff's audit firm.    Citco Group's

management responded that they would like to "work this out" with Madoff, but never met with

him in 2001.  By an email dated 6 February 2002, Unternaehrer of Citco Group stated that Citco

wanted evidence the T Bills existed.    In December 2002, Citco once again "attempt[ed] to get

conclusive proof" from Madoff that Sentry's portfolio was in BLMIS custody and to have

"Madoff . . . provide evidence of the existence/custody of the positions."    Before the meeting,

Meijer directed a member of the internal audit group at Citco to "[p]roperly record what you

have done and what you have not been able to determine. . . . It is a troublesome task insofar as

21

Madoff is not known for his openness."  However, the meeting did not include any meaningful

discussion with Madoff regarding the holdings purported to be in his custody.  The employee,

Albert van Nijen, reported back that the Administrators' "mission" to increase "Citco's comfort

level with respect to the existence of the assets in relation to [Citco's] responsibilities as

Custodian[s]" had again failed.  On 27 December 2002 Bodewes reported to the executive

committee of Citco Group that as long as the position of Sentry with BLMIS was not

independently verified "there will be doubts".

57.    After Citco's third failed attempt, Citco never again tried to gain evidence from

Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008.

In addition, Meijer noted that "Madoff [was] no[t] known" to Citco's external traders, even

though his investment strategy required selling major quantities of call options each month.  In

an email to Bodewes, Meijer stated, "I visited the Madoff website. . . . According to the

investment policy, the fund needs to sell major quantities of call options on the market each

month.  I absolutely do not trust it!!!!"

58.    Meanwhile, through the entire period, Citco continued to issue the Certificates.

**3.    Citco Negotiated For Higher Fees As Reimbursement For the "Risks" of Doing Business with Madoff.**

59.    Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put

its financial interests ahead of its duties to the Funds and the Funds' investors.

60.    By 2002, Citco knew that the Funds' holdings could not be verified, knew that

BLMIS cleared its own trades, and knew that Citco's efforts to reconcile Madoff's operations

had failed.  That year, Citco's executive committee put credit line requests from the Funds "on

hold until . . . the 'investigation' on Fairfield" was complete, because Citco was concerned about

its exposure to liabilities well beyond the loans in the case of fraud.  Smeets and Citco's

management were aware that the credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

61.    Two years later, in February and March 2004, the Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether.   Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen—who was responsible for the entire division of administration services at Citco—found out that "the risk team of AIG took the decision to get out from all Madoff exposure . . . [t]hey are scared with the structure . . . ."  It appears that at least some Citco Group management wanted the Custodian to resign: by an email of 6 February 2004, Keunen informed the Administrator that Unternaehrer of Citco Group had decided the Custodian should step down as custodian.  At this time, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from Madoff.   A few months later, in or about September 2004, Citco's board of directors made the decision to place the Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships . . . to decrease [Citco's] exposure."   Citco knew that its credit relationship with the Funds would expose it to liability because of BLMIS's role as custodian, among other reasons.

62.    By 2006, Citco considered resigning as service providers.  The Custodians told Citco Group's management, including Smeets: "We are taking a risk and we only get US$60K per year!"

63.    Instead, Citco negotiated a new fee arrangement. The new arrangement calculated the Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset Value.  In other words, Citco's fees for the Custodians' services were now directly tied to the Net Asset Value as determined by the Administrators.  Citco decided "[o]n that basis" to stay

on as Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

64.    Simply put, Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS, as well as its continued silence regarding BLMIS's role as custodian of the Funds' assets.  Ultimately, Citco's fees increased by 800%.

65.    Internally, Citco knew that: (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Custodians did not have custody of the Funds' portfolios.

66.    Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information.  Accountants working for the Administrators discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades.  When the Administrators' personnel discovered that the reported share or option prices reported by Bloomberg and Madoff differed, they used the public price in calculating the Net Asset Value reflected in the Certificates.  Citco thus turned a blind eye to its knowledge that BLMIS issued account statements with incorrect pricing information.

67.    Citco acted with a lack of good faith by issuing Certificates in spite of its knowledge that: (1) BLMIS's transactions were likely impossible, given its awareness that "Madoff always [knew] precisely when to buy and sell;" (2) Madoff was the only broker-dealer Citco worked with that provided settlement date transaction confirmations only, rather than trade date confirmations; and (3) Madoff insisted that Citco book all trades for the Funds manually,

24

rather than through automated or electronic means, which directly contradicted Citco's own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible;" and, within its own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Citco.

68.    This lack of good faith permeated the entire Citco organization.  Until 2008, the Administrators and the Custodians worked hand-in-hand with multiple other "Citco" entities to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Defendants under the Subscription Agreements.  Under Citco Group's direction and control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

69.    From the top down, Citco saw and appreciated, but consciously disregarded, the risks to the Fund's investors posed by Madoff's operations.  The Administrators and all other "Citco" subsidiaries served at the whim of Citco Group, which controlled the day-to-day operations of the Administrators and the issuance of Certificates showing an inaccurate and inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds.  Irrespective of which "Citco" entity the Funds' engaged, at all relevant times the Funds' were provided services from and on behalf of "Citco" as a whole from at least eight separate entities, including: Citco Group; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services (Europe) B.V.; Citco (Canada) Inc.; and Citco Global Security Services.

70.    By virtue of the foregoing conduct, Citco issued the Certificates without good faith.  The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

E.    **Citibank NA Knew or Should Have Known of the BLMIS Fraud**[2]

71.    By no later than June 2007, and likely several years earlier, Citigroup had knowledge of the possibility of Madoff's Ponzi scheme.  Citigroup's Global Head of Options Strategy and Global Head of Equity Derivatives Research, Leon Gross, was responsible for making recommendations to investors on equity derivatives and other assets. Upon information and belief, Gross had the opportunity to meet and befriend Harry Markopolos, a fellow member of the financial industry.  Markopolos is a certified financial analyst who, for many years, had been asserting that Madoff was most likely operating a Ponzi scheme and that BLMIS's investment advisory business was a complete fraud.

72.    Markopolos reached out directly to Gross via e-mail in June 2007, informing Gross of Markopolos's suspicions regarding an unspecified leveraged swap that provided exposure to Madoff.  Markopolos made his suspicions regarding Madoff clear stating, "[w]e all know how Ponzi schemes turn out." Upon information and belief, Markopolos and Gross had additional oral and written communications before December 10, 2008, in which Madoff's fraud was specifically discussed.

73.    Years before the collapse of BLMIS, and before the June 2007 email, Gross met with Markopolos at Citigroup's and its affiliates' New York offices. During that visit, Markopolos showed Gross a description of Madoff's "split-strike conversion" strategy and historical returns generated by that trading strategy as reported by a Madoff Feeder Fund, which, upon information and belief, was Sentry.

---

[2]The allegations set forth in Paragraphs 41 through 45 of this Complaint are made by the Foreign Representative upon information and belief based on allegations set forth in the complaint filed by the Madoff Trustee in Picard v. Citibank N.A., 10-05345 (Bankr. S.D.N.Y.).  Upon information and belief, the allegations of the BLMIS Trustee are based on an extensive investigation and the analysis of documentary evidence as well as other sources.

26

74.    Markopolos asked Gross whether the strategy that was described could result in the returns claimed.  Within minutes, Gross concluded that Madoff's strategy as described could not generate the returns indicated by the Madoff Feeder Fund.  Gross attempted to reconcile the discrepancy he saw between the strategy as described and the returns supposedly generated by the strategy, but could not resolve the discrepancy. Gross quickly concluded that the claimed returns were not in fact generated by the Madoff strategy as described.  Gross relayed his conclusion to Markopolos that same day.

75.    Gross and Markopolos also discussed whether others at Citigroup were familiar with Madoff trading in the equity and options markets.  That same day, before Markopolos left Citigroup's and its affiliates' offices in New York, Gross asked around various desks at Citigroup and its affiliates and quickly determined that no trader at Citigroup and its affiliates on the index trading desk was trading options with BLMIS, nor were they aware of BLMIS trading OEX options.  Gross also asked salespeople at Citigroup if they knew BLMIS as a customer or as someone who is active in the market, to which the salespeople told Gross "no."

76.    Upon information and belief, Citigroup obtained more information placing it on inquiry notice that Madoff was making fraudulent transfers when Brian Leach became the Chief Risk Officer for Citigroup and its affiliates in or around March 2008. Prior to joining Citigroup and its affiliates, Leach had been the Chief Risk Officer and Co-Chief Operating Officer of Old Lane L.P., a multi-strategy hedge fund which was acquired by Citigroup in 2007.

77.    Leach was previously the Risk Manager for Institutional Services Business at Morgan Stanley.  Upon information and belief, Leach was employed at Morgan Stanley when the firm internally blacklisted Madoff-related investments due to concerns of fraud and other

27

wrongdoing.  Shortly after Leach became Citigroup's Chief Risk Officer, Citigroup began to immediately unwind its BLMIS trades and rid itself of any and all remaining Madoff exposure.

78.     CGML served as trustee, agent, representative, nominee or custodian for the Beneficial Owners in connection with their investments in the Funds, including, by:  subscribing to Shares of Sentry on behalf of the Beneficial Owners, maintaining custody of the Shares as record shareholders, paying redemption proceeds from the Shares of Sentry to the Beneficial Owners, and otherwise exercising control over the Shares of Sentry.

79.     Further, each of the Subscription Agreements, executed by CGML, manifested the Beneficial Owners' consent for CGML to act on behalf of and subject to the Beneficial Owners' control.

80.     In executing the Subscription Agreements, CGML accepted and agreed to act on behalf of the Beneficial Owners.

81.     Accordingly, the Beneficial Owners had the same knowledge as CGML regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

## F.     Exposure of Madoff's Fraud

82.     On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  See United States v. Madoff, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

83.     On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing

fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS.  See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

84.    In March 2009, Madoff pleaded guilty to the criminal charges brought against him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal.  Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised.  Instead, those funds were deposited in a bank account at Chase Manhattan Bank.  When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

85.    Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

86.    Madoff is now serving a 150-year sentence in federal prison.

29

**G.**     <u>The Funds' Estates in Liquidation</u>

87.     Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values. As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

88.     In 2009, the Funds were put into liquidation proceedings in the BVI.

89.     On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "<u>Lambda Proceeding</u>"). The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

90.     On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "<u>Sentry Proceeding</u>"). The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

91.     On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "<u>Sigma Proceeding</u>" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "<u>BVI Liquidation Proceedings</u>"). The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

92.     As alleged above, the BVI Court issued orders – the BVI Appointment Orders – appointing the Foreign Representatives as liquidators of the Funds. Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

93.     The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry's estate that Defendants are not entitled to keep.

## FIRST CLAIM
### *(Unjust Enrichment - Against CGML)*

94.     Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 93 above as if set forth herein.

95.     As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to CGML, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

96.     CGML did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by it, in that it received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

97.     By reason of its receipt of monies represented as amounts deposited by other BLMIS investors or monies deposited by the Funds' subscribers, for amounts far in excess of the amounts that it would have received had the Net Asset Value of Shares been calculated based upon the true facts existing at that time or any relevant time, CGML has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

98.     It would offend principles of equity and good conscience to permit CGML to retain the Redemption Payments it received from Sentry.

31

99.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from CGML an amount equal to the Redemption Payments received by it from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by CGML less the amount of redemption payments that CGML would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

**SECOND CLAIM**
*(Unjust Enrichment - Against Beneficial Shareholders)*

100.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 99 above as if set forth herein.

101.    Upon information and belief, CGML may have subscribed to all or some portion of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

102.    Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it from Sentry to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.  Instead, Redemption Payments were made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

103.    The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares

redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

104.     To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to CGML in its capacity as trustee, agent, representative, or nominee for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

105.     It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by Sentry.

106.     The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

### THIRD CLAIM
#### (Money Had and Received - Against CGML)

107.     Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 106 above as if set forth herein.

108.     As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to CGML, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

33

109.    CGML did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by it, in that it received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

110.    By reason of its receipt of monies which generally represented the proceeds arising from or to continue investment in BLMIS, which the world now knows was operated by Madoff as a Ponzi scheme, CGML has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

111.    Furthermore, CGML was not entitled to receive the Redemption Payments because the amounts of each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by CGML for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

112.    To the extent that Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

113.    It would offend principles of equity and good conscience to permit CGML to retain the Redemption Payments it received from Sentry.

114.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from CGML an amount equal to the Redemption Payments received by it from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by CGML less the amount of redemption payments that CGML

34

would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FOURTH CLAIM
### *(Money Had and Received - Against Beneficial Shareholders)*

115.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 114 above as if set forth herein.

116.    Upon information and belief, CGML may have subscribed to all or some portion of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

117.    Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.  These Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

118.    The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

119.    To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to CGML in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

35

120.    Furthermore, the Beneficial Shareholders were not entitled to receive the Redemption Payments paid to CGML upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value which caused the payment received for redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

121.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

122.    It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments made by Sentry.

123.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from the Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FIFTH CLAIM
### *(Mistaken Payment - Against CGML)*

124.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 123 above as if set forth herein.

36

125.    As described above, Sentry made each of the Redemption Payments to CGML under the mistaken belief that the amounts paid to CGML represented the proceeds arising from the profitability of or to continue investment in BLMIS and were based upon the Net Asset Value of Shares redeemed based upon the true facts at that time.

126.    Upon information and belief, however, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to CGML represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

127.    The Redemption Payments, while benefiting CGML, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

128.    Additionally, CGML was not entitled to receive the Redemption Payments because, as was unknown to Sentry, the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by CGML for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.  In these circumstances, the Redemption Payments should be returned for the benefit of Sentry, their creditors and the current holders of Shares in Sentry.

129.    CGML did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by it, in that it received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

37

130.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

131.    It would thus offend principles of equity and good conscience to permit CGML to retain the Redemption Payments.

132.    The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from CGML a sum in an amount equal to the Redemption Payments received by it from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by CGML less the amount of redemption payments that CGML would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SIXTH CLAIM
### *(Mistaken Payment - Against Beneficial Shareholders)*

133.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 132 above as if set forth herein.

134.    As described above, Sentry made each of the Redemption Payments to CGML under the mistaken belief that the amounts paid to CGML represented the proceeds arising from the profitability of or to continue investment in BLMIS.

135.    However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to CGML represented, in fact, money deposited with BLMIS by other

BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

136.    Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.  These Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

137.    Additionally, the Beneficial Shareholders were not entitled to receive the Redemption Payments received by CGML upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because, as was unknown to Sentry, the amounts transferred with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by CGML for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

138.    The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

139.    The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

140.    To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

141.    It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

142.    The Foreign Representatives in their capacities as liquidators of Sentry and on behalf of Sentry are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SEVENTH CLAIM
### *(Constructive Trust - Against all Defendants)*

143.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 142 above as if set forth herein.

144.    As described above, upon receipt of a redemption request, Sentry made each of the Redemption Payments to CGML based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

145.    As alleged above, the Redemption Payments generally represented the proceeds arising from or to continue investment in what the world now knows was Madoff's Ponzi

40

scheme.   Accordingly, these Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of (or to continue investment in) BLMIS.

146.   Upon information and belief, CGML may have paid some or all of the Redemption Payments it received to the Beneficial Shareholders.

147.   By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

148.   Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by CGML for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

149.   It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

150.   By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry for the benefit of the Foreign Representatives and Sentry and other shareholders and creditors of Sentry.

### EIGHTH CLAIM
*(Unfair Preference Pursuant to Section 245 of the BVI*
*Insolvency Act - Against CGML)*

151.   The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 150 above as if set forth herein.

152.   Section 245 of the BVI Insolvency Act provides:

41

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

153.    A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

154.    The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) . . . causes the company to become insolvent."  BVI Insolvency Act § 244(2).

155.    For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c) . . . (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act §§ 8, 244(3).

156.    For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and

42

ending on the appointment of the administrator or, if the company is in liquidation, the liquidator
. . . ." BVI Insolvency Act § 244(1).

157.    The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed." BVI Insolvency Act § 244(1). Thus, the vulnerability period, for each of the Funds, is the period commencing two years prior to the application for the appointment of the Liquidators for each Fund and ending on the date of the appointment of the liquidators of each Fund.

158.    A "connected person" is:

(1) . . . one or more of the following:

(a) a promoter of the company;

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act § 5 (emphasis added).

159.    Redemption Payments aggregating USD $100,000,000 were made by Sentry to CGML during the two-year period prior to the application for appointment of the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

160.    During the Sentry Vulnerability Period, Sentry was insolvent or was rendered insolvent by the making of Redemption Payments.

43

161.    Each of the Redemptions and/or Redemption Payments made during the Sentry Vulnerability Period ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

162.    CGML was a shareholder (i.e., a member) of Sentry during the Sentry Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

163.    Each of the Vulnerability Period Payments put CGML in a better position than it would have been in had such Payment not been made.

164.    Because CGML was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions."  Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent.  This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, i.e. using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers).  Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in BLMIS.  On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

165.    In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of any business" of Sentry.  Even were this not presumed, the same would follow in that, among other things, each Vulnerability Period Payment represented a distribution of monies (including fictitious profits) from Madoff's Ponzi

44

scheme or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

166.    Each of the Vulnerability Period Payments was made following receipt by Sentry of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles.  Following the receipt by Sentry of a notice of redemption by CGML, CGML became a contingent creditor.  Upon the subsequent redemption of CGML's shares and until such time as CGML received the Vulnerability Period Payment, CGML was a "creditor" of Sentry with an admissible claim against Sentry in any subsequent liquidation of Sentry had payment of the Redemption Price not been made, albeit that post-liquidation CGML would have been deferred to outside creditors.

167.    By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to recover from CGML an amount equal to the Vulnerability Period Payments received by CGML from Sentry.

## NINTH CLAIM
### *(Unfair Preference Pursuant to Section 245 of the BVI*
*Insolvency Act - Against Beneficial Shareholders)*

168.    The Foreign Representatives, in their capacities as Foreign Liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 167 above as if set forth herein.

169.    Upon information and belief, CGML may have subscribed to all or some portion of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

170.    Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

171.    To the extent that any money that CGML received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to avoid and set aside such further transfer by CGML to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## TENTH CLAIM
### *(Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act - Against CGML)*

172.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 171 above as if set forth herein.

173.    Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction with a person if (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period.

46

(2) A company does not enter into an undervalue transaction with a person if (a) the company enters into the transaction in good faith and for the purposes of its business; and (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that (a) the transaction was an insolvency transaction; and (b) subsection (2) did not apply to the transaction.

174. During the Sentry Vulnerability Period, all assets purportedly held by BLMIS for Sentry and other investors were non-existent, and Sentry was insolvent or rendered insolvent by the Vulnerability Period Payments, as alleged in paragraph 164 above. Thus, each of the Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of the BVI Insolvency Act.

175. Sentry received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sentry received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry to CGML for each of the Vulnerability Period Payments.

176. CGML was a shareholder (i.e., a member) of Sentry during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

177. Because CGML was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions." Further, there is a statutory presumption that the Vulnerability Period

47

Payments were not made in good faith and for the purposes of the Funds' business with reasonable grounds to believe that they would benefit the Funds. Even were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious profits from a Ponzi scheme such as BLMIS.

178.    By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and to recover from CGML an amount equal to the Vulnerability Period Payments received by CGML from Sentry.

### ELEVENTH CLAIM
*(Undervalue Transaction Pursuant to Section 246 of the
BVI Insolvency Act - Against Beneficial Shareholders)*

179.    The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 178 above as if set forth herein.

180.    Upon information and belief, CGML may have subscribed to all or some portion of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

181.    Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

182.    To the extent that any money that CGML received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to avoid and set aside such further transfer by CGML to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability

48

Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## TWELFTH CLAIM
### *(Breach of Contract - Against CGML)*

183.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 182 above as if set forth herein.

184.    CGML, as a Subscriber in Sentry, is bound by Sentry's Memorandum of Association and Articles of Association, as amended from time to time (the "Articles").

185.    The Articles provide for the calculation of the redemption price for Shares (the "Redemption Price") based on the "Net Asset Value per Share."  Net Asset Value per share is to be determined by the directors of Sentry as of the relevant valuation day "by dividing the value of the net assets of [Sentry] by the number of Shares then in issue [.]" Articles at 11(1).

186.    The Articles provide that in determining the Net Asset Value per share for each class of shares issued, the value of the net assets of the Fund is to be adjusted "to take into account any dividends, distributions, assets or liabilities" attributable to such class of shares. Articles at 11(1).

187.    With respect to the valuation of different types of assets, the Articles prescribe methods of valuation that are, however, subject to the exercise of the judgment and discretion by the Directors of Sentry.  For example, with respect to the valuation of assets consisting of securities, the Articles prescribe methods of valuation based on price and market data, provided however that "[i]f the Directors determine that [any of the prescribed methods of valuation] does not fairly represent its market value, the Directors shall value such securities as they determine

and shall set forth the basis of such valuation in writing in the Company's records[.]"  Articles at 11(3)(b).

188.    With respect to the value of any shares of stock held by Sentry in an "investment company," the Articles provide for valuation "in accordance with the manner in which such shares are valued by such investment company" provided however that "the Directors may make such adjustments in such valuations the Directors may from time to time consider appropriate." Articles at 11(3)(c).

189.    With respect to assets that have been "realised or contracted to be realised" the Articles provide for the inclusion of the assets receivable in respect of such realization, provided however that "if the value of such assets is not then known exactly then its value shall be as estimated by the Directors."   Articles at 11(3)(e).

190.    Additionally, the Articles provide that "notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion, warrant a different valuation of any securities, such securities will be valued at such prices as the Directors shall determine." Articles at 11(3)(f).

191.    The Articles provide that any "certificate" as to the Net Asset Value per Share or as to the Redemption Price that is given in good faith by or on behalf of the Directors "shall be binding on all parties."  Articles at 11(1).

192.    No Certificate was provided in good faith by or on behalf of the Directors to CGML in respect of any Net Asset Value determination made while CGML was a member of the Fund or in respect of any Redemption Payment made to CGML.

193.    Pursuant to the Articles, at any time prior to the good faith issuance and receipt of a Certificate, the Redemption Price calculated in respect of the redemptions by CGML and paid

50

to CGML remains subject to adjustment, recalculation and redetermination based on, *inter alia*, the foregoing identified provisions of the Articles.  Upon the true interpretation of the Articles, the same contained an implied term for repayment of any over-payments, and/or such a term is to be implied on the basis of obviousness and/or as being necessary for the business efficacy of the Articles and/or to give effect to the reasonable expectations of the parties.

194.    Upon information and belief, CGML received the Redemption Payments listed on Exhibit A in respect of Shares submitted for redemption.

195.    Subsequent to December 8, 2008, Sentry has determined that the Net Asset Value calculations upon which Redemption Payments were made to CGML included assets not held by or on behalf of Sentry at the time of the making of such payments and, additionally, that such Net Asset Value calculations failed to account for and make appropriate deduction of liabilities of Sentry existing at the time of such payments.  For these and other reasons, such Net Asset Value calculation substantially overstated the net asset value of the assets of Sentry.

196.    To the extent that CGML has received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, CGML is contractually obligated to return amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

197.    Following determination by the Fund that Redemption Payments made to CGML had been calculated on the basis of an overstated Net Asset Value, demand has been made on CGML to return excess and overpaid Redemption Payments to the Fund.

198.    CGML has failed and refused to repay to the Fund the amount that, under the Articles, it is contractually required to repay to the Fund.

51

199.    The failure of CGML to make the repayment requested constitutes a breach of its contractual obligations under the Articles for which Sentry is entitled to the award of damages.

## THIRTEENTH CLAIM
### *(Breach of Implied Covenant of Good Faith and Fair Dealing - Against CGML)*

200.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 199 above as if set forth herein.

201.    Following determination by the Fund that Redemption Payments to CGML had been made on the basis of an overstated Net Asset Value, demand was made to CGML to return excess and overpaid Redemption Payments to Sentry.

202.    CGML has failed and refused to make the requested repayment to Sentry.

203.    By retaining the Redemption Payments to which CGML is not entitled, CGML has deprived Sentry of the benefit of its bargain and has subverted the Articles.

204.    The failure of CGML to make the repayment requested constitutes a breach of the covenant of good faith and fair dealing that inheres in the Articles for which Sentry is entitled to the award of damages.

## FOURTEENTH CLAIM
### *(Declaratory Judgment - Against All Defendants)*

205.    Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 204 above as if set forth herein.

206.    An actual and justiciable controversy exists between the Plaintiffs and the Defendants with respect to the obligation of the Defendants to repay to the Funds all or a portion

of amounts received by them as excess or overpaid Redemption Payments under circumstances where:

    (i)    the Net Asset Value per share calculation upon which the Redemption Price was paid, directly or indirectly, to any Defendant has been subsequently adjusted, recalculated or redetermined in accordance with the Articles;

    (ii)    the resulting adjusted, recalculated and redetermined Redemption Price is less than the Redemption Price paid to the Defendant;

    (iii)    prior to such adjustment, recalculation or redetermination, no binding Certificate has been issued by the Fund; and

    (iv)    Citco issued no Certificates in good faith.

207.    The harm to Sentry is real and immediate because, as a result of the failure and refusal of the Defendants to make repayment, Sentry has become insolvent and is presently unable to pay its debts as they fall or will fall due.

208.    Plaintiffs have no adequate remedy at law.

209.    Pursuant to 28 U.S.C. § 2201 et. seq., Plaintiffs are entitled to a declaration by this Court declaring that, pursuant to the Articles, each Defendant must repay Sentry that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First, Third and Fifth Claims, judgment in favor of Plaintiffs and against CGML allowing the Plaintiffs to recover an amount equal to the Redemption Payments received

by CGML, plus interest, or, in the alternative, an amount equal to the amount of the Redemption

Payments received by CGML less the amount of redemption payments that CGML would have

received had the Net Asset Value been calculated based upon the true facts existing at the time,

plus interest;

      B.      On the Second, Fourth and Sixth Claims, judgment in favor of Plaintiffs and

against the Beneficial Shareholders allowing the Plaintiffs to recover an amount equal to any

portion of any Redemption Payments received by the Beneficial Shareholders, plus interest, or,

in the alternative, an amount equal to any portion of the Redemption Payments received by the

Beneficial Shareholders less the amount of such portion that such Beneficial Shareholders would

have received had the Net Asset Value been calculated based upon the true facts existing at the

time, plus interest;

      C.      On the Seventh Claim, imposition of a constructive trust on Redemption

Payments;

      D.      On the Eighth and Ninth Claims:

           i.      a declaratory judgment in favor of the Foreign Representatives and against CGML and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

           ii.      judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

           iii.      judgment pursuant to Section 249 of the BVI Insolvency Act against CGML and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

      E.      On the Tenth and Eleventh Claims:

           i.      a declaratory judgment in favor of the Foreign Representatives and against CGML and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

54

ii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against CGML and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

F.    On the Twelfth and Thirteenth Claims, judgment against CGML and in favor of the Plaintiffs in an amount to be determined at trial;

G.    On the Fourteenth Claim, a declaratory judgment against the Defendants and in favor of the Plaintiffs that, under the Articles, the Defendants must repay that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry;

H.    Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

I.    Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
September 20, 2016

**BROWN RUDNICK LLP**

By: /s/ David J. Molton
      David J. Molton
      May Orenstein
      Daniel J. Saval

Seven Times Square
New York, New York 10036
Telephone: 212.209.4800
Facsimile: 212.209.4801

*Attorneys for the Foreign Representatives*

**EXHIBIT A**

***Redemption Payments Received by Defendants from Sentry
From October 14, 2005 Through November 19, 2008***

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| October 14, 2005 | $30,000,000 | 28,067.27 | JP Morgan Chase Bank NA,  New York |
| April 14, 2008 | $60,000,000* | 46,048.35 | JP Morgan Chase Bank NA,  New York |
| November 19, 2008 | $40,000,000* | 29,634.50 | JP Morgan Chase Bank NA,  New York |

* Denotes Redemptions in the Sentry Vulnerability Period.

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.

# EXHIBIT B

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign ~~Representative~~Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 15 Case |
| | ) |
| FAIRFIELD SENTRY LIMITED, et al., | ) Case No. 10-13164 |
| | ) (~~BRL~~SMB) |
| Debtors in Foreign Proceedings. | ) |
| | ) Jointly Administered |
| | ) |
| FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), acting by and through the Foreign ~~Representative~~Representatives thereof, and KENNETH KRYS and CHARLOTTE CAULFIELD, solely in ~~his capacity~~their capacities as Foreign ~~Representative~~Representatives and ~~Liquidator~~Liquidators thereof, | ) |
| | ) |
| | ) |
| | ) Adv. Pro. No. 11-02770 |
| | ) (~~BRL~~SMB) |
| | ) |
| | ) ~~FIRST~~SECOND |
| Plaintiffs, | ) AMENDED |
| | ) COMPLAINT |
| -against- | ) |
| | ) |
| CITIGROUP GLOBAL MARKETS LIMITED and BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF CITIGROUP GLOBAL MARKETS LIMITED 1-1000, | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

Fairfield Sentry Limited ("Sentry"), by and through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "Foreign Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and the Foreign Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," together

with Sentry and Sigma, the "Funds" or the "Debtors")~~, by and through Kenneth Krys (together with his predecessors, the "Foreign Representatives"), and Kenneth Krys (together with Sentry, the "Plaintiffs"), solely in his capacity as Liquidator of the Funds and the Foreign Representative of the liquidation proceedings involving the Funds~~ pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This action and similar actions are brought by the Plaintiffs, with the approval of the foreign court having jurisdiction over the matter, to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008.

2.      The Funds were created as a means for private investment in managed accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that Bernard L. Madoff used to perpetrate his massive Ponzi scheme. Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS. Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss Franc investments) through ~~purchase~~purchases of shares of Sentry. Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held by BLMIS for Sentry. As stated in their offering materials, the Funds' investment objective was to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

2

3.      It is now known that these types of feeder funds were essential to the perpetration of Madoff's Ponzi scheme.    In order for the Ponzi scheme to operate, Madoff required a continuous flow of new investors and investments to be able to satisfy redemption requests from early investors.    Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS), brought new investors into this scheme, allowing Madoff to make payments to early investors and thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.      From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares ~~were~~was transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff.    Prior to December 2008, the voting~~,~~ participating shares of Sentry ($.01 par value per share), Sigma (€.01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value."   Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund, net of certain expenses ("Net Asset Value").

5.      From time to time, in order to make payments to investors for the redemption of Shares ("Redemption Payments"), Sentry generally made withdrawals from its BLMIS accounts. On occasion, Sentry made Redemption Payments directly from amounts on hand invested by other subscribers in the Funds.    At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by

3

BLMIS for Sentry.  The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which was calculated based principally on the assets that the Funds believed were being held, and investments that were being made, by BLMIS for Sentry's account.

6.       As the world now knows, Madoff was operating a massive Ponzi scheme through BLMIS.  Thus, at all relevant times, the money that Sentry transferred to BLMIS was not invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses.  Further, none of the securities shown on statements provided to Sentry by BLMIS were in fact purchased for Sentry.  Additionally, none of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of sales of securities or other investments.  Instead, such amounts represented the monies of more recent investors into the Madoff scheme.

7.       In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent, and the Funds were insolvent at the time Redemption Payments were made or they were rendered insolvent by those payments.  As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the ~~actual~~ Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

8.       At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of his fraud.  Similarly, the Redemption Payments that the Funds made to redeeming shareholders were not made in the ordinary course of any business or for any legitimate purposes.  Those

4

Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as ~~the source of these payments was not the sales of securities, or return of investments, as contemplated by those documents. Rather, the payments were derived from uninvested monies of other BLMIS investors or other uninvested deposits made by Sentry in BLMIS, but in either event, they represented the fraudulent and ill gotten gains of~~ they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff ~~'s~~ as a Ponzi scheme~~, distributed by BLMIS to Sentry~~. These payments ~~and other payments made to BLMIS investors~~ were crucial in perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9.    During the period from and after October 14, 2005 through November 19, 2008, following the receipt by Sentry of notices of redemption, Sentry made Redemption Payments to accounts held in the name of Defendant Citigroup Global Markets Limited ("CGML") aggregating USD $130,000,000.

10.    At the time such payments were made, Sentry mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption. In fact, however, as stated, the Redemption Payments made to CGML far exceeded the ~~actual~~ Net Asset Value of ~~the~~ Shares redeemed that would have been calculated based on the true facts existing at that time or any relevant time. Moreover, ~~the source of~~ these Redemption

Payments ~~was~~did not, as Sentry ~~believed them to be,~~intended, represent the proceeds ~~of the liquidation of securities or investments held for their accounts~~arising from the profitability of or to continue investment in BLMIS.  Instead, any amounts obtained directly or indirectly by Sentry from BLMIS to make Redemption Payments to CGML generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

11.    Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them, and, at all relevant times, the Funds were unable to pay their debts as they fell or would fall due.  Indeed, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.

12.    In particular, claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (~~BRL~~SMB) (the "BLMIS Adversary Proceeding").  As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.  This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud.  The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.  At all relevant times, monies that the Funds

6

received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

13.    On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court ~~of~~for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda.  The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and further increased the amount of those liabilities.  In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

14.    Upon information and belief, CGML has either retained the Redemption Payments made to it by Sentry for its own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities for whom CGML may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (~~the~~ individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with CGML, the "Defendants").

15.    Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value.  As of December 2008 and presently, Sentry, Sigma, and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

16.    Unless Redemption Payments paid to shareholders are recovered for the Funds' estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may be made against them; further, recoveries of Redemption Payments will increase distributions to the Funds' investors who have been harmed.    Moreover, to the extent such liabilities and claims must be satisfied solely from the Funds' current assets, Defendants will have been unjustly enriched as they will not bear their proportionate share of such liabilities and claims, but rather will retain a windfall at the expense of other shareholders and creditors of the Funds.

## JURISDICTION AND VENUE

17.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re Fairfield Sentry Limited, et al., No. 10-13164 (BRL SMB), pending in this Court.    Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, SIPA Liquidation No. 08-1789 (BRL SMB).    Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

8

18.     This is a core proceeding under 28 U.S.C. § 157(b)(2).[1]  Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

19.     This Court has jurisdiction over CGML and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney ~~2001~~2008) because CGML and the Beneficial Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and maintaining bank accounts in the United States at JP Morgan Chase NA, and in fact receiving Redemption Payments in those United States-based and/or New York-based accounts.    On information and belief, CGML also has subsidiaries or affiliates doing business in the United States and/or conducts business itself in the United States.  CGML and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, designated United States-based and/or New York-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those bank accounts.  CGML and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in

---

[1]     Although the District Court, in In re Fairfield Sentry Ltd., No. 1:11-mc-00224-LAP, 458 B.R. ~~655~~665 (S.D.N.Y. 2011), held that causes of action alleged by the Plaintiffs in other cases before this Court—causes of action that are similar or the same as those alleged in this complaint—are not core proceedings, this determination may be subject to appeal.  In any event, plaintiffs submit that the causes of action in this complaint, which include, *inter alia*, allegations regarding transfers of property that were directed into the territorial jurisdiction of the United States, render the claims asserted in this complaint core in accordance with the District Court's decision.

connection with the claims alleged herein.    CGML and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

20.    Moreover, CGML has waived any objection to personal jurisdiction in an action brought by the BLMIS Trustee in the U.S. in the United States Bankruptcy Court for the Southern District of New York, Adversary Proceeding Number 10-05345 (BRL), in connection with claims that the BLMIS Trustee has asserted for the same Redemption Payments being claimed in this action.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

**Plaintiffs**

22.    Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.  Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

23.    The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names.  On April 23, 2009, the BVI Court issued an order appointing Christopher Stride (Ms. Lau's predecessor) as liquidator of Lambda (the "Lambda Appointment Order").  On July 21, 2009, the BVI Court issued an order appointing Mr.Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order").    On September 6, 2010, the BVI Court

issued notices acknowledging Mr. Stride's resignation and ~~Ms.~~the appointment of Joanna Lau~~'s~~
~~appointment~~ as joint liquidator with Mr. Krys of all three Funds (the "Supplemental
Appointment Order"~~and, together with the Lambda Appointment Order and the Sentry & Sigma~~
~~Appointment Order, the "BVI Appointment Orders"~~).  On November 23, 2011, Ms. Lau resigned
as joint liquidator of the Funds.  On June 24, 2014, the BVI Court issued an order appointing
Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second
Supplemental Appointment Order" and, together with the Lambda Appointment Order, the
Sentry & Sigma Appointment Order, and the Supplemental Appointment Order, the "BVI
Appointment Orders").  The Foreign Representatives, in their capacities as Foreign
Representatives and liquidators of the Funds, have been authorized by the foreign court having
jurisdiction over the matter to bring this action and the claims herein, including the avoidance
claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

24.    Pursuant to the BVI Appointment Orders, the Foreign Representatives are
responsible for all aspects of the Funds' businesses, including, among other things, custody and
control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of
the Funds, any deeds, receipts or other documents, and the power to compromise claims,
commence litigation and to dispose of property.  After obtaining BVI Court approval, the
Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title
11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as
"foreign main proceedings" under Chapter 15.  On July 22, 2010, this Court issued an order (the
"Recognition Order") granting that recognition.

25.    Pursuant to the Recognition Order, the Foreign Representatives were
automatically afforded relief available under 11 U.S.C. § 1520, including application of the

11

Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code.   Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a).   Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the ~~BVI~~ proceedings before the BVI Court.

**Defendants**

26.     CGML was, at all relevant times, a member of Sentry and a registered holder of Shares.   Upon information and belief, CGML is a corporate entity organized under the laws of the United Kingdom and having its registered address at Citigroup Centre, 33 Canada Sq. Canary Wharf, London   E14 5LB, United Kingdom.   CGML subscribed for the purchase of Shares by entering into one or more written agreements with Sentry.

27.     Defendants "Beneficial Owners of the Accounts Held in the Name of Citigroup Global Markets Limited" - i.e., the Beneficial Shareholders—, are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry issued to CGML and on whose behalf CGML was acting as trustee, agent, representative, or nominee ~~(individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders")~~.

12

**NOTICE PURSUANT TO FED. R. CIV. P. 44.1**

28.    Certain ~~or all~~ of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

**FACTUAL  ALLEGATIONS**

**A.**    **Role of Feeder Funds In Madoff Fraud**

29.    Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

30.    As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**B.**    **Calculation of Net Asset Value and Shareholder Redemption Payments**

31.    Substantially all of the money (~~some~~up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or

13

through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy. In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

32.    In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry. Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to purported, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

33.    In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements. None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred. Indeed, no investments of any kind were ever made by BLMIS for Sentry. At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious. Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of

14

securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

34.     From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS). The Funds believed that the amounts provided in connection with such withdrawals represented the proceeds from the sale or liquidation of securities or arising from the profitability of or to continue investment positions held by in BLMIS for the account of Sentry.  In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.  At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud.  The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose.  Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.

35.     Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme.  At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

15

### C.    Redemption Payments Made or Transferred to Defendants

36.    During the period from and after October 14, 2005 through November 19, 2008, CGML received Redemption Payments totaling USD $130,000,000 from Sentry in respect of Shares tendered for redemption.

37.    At CGML's directions and instructions, CGML received all of its Redemption Payments at its bank account with JP Morgan Chase NA in New York.

38.    The dates and amounts of each Redemption Payment received by CGML from Sentry, and the CGML bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.

39.    At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.    In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between CGML and Sentry, Sentry received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry.

40.    Upon information and belief, CGML and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

### D.    Citco Did Not Issue Any Certifications of Net Asset Value in "Good Faith"

41.    Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share . . . given in good faith by or on behalf of the Directors shall be binding on all parties."    During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").    On April 16, 2014, the Judicial Committee of the Privy Council (the

16

"Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").   The Privy Council did not, however, address whether such Certificates were given "in good faith."   In carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "Citco") acted with a lack of good faith in giving the Certificates.

42.    Over the course of fifteen years, in its capacity as service providers to the Funds, Citco reviewed information concerning BLMIS not available to the general public, and expressed internal alarm about what that information showed with respect to the likelihood of fraud at BLMIS, but turned a blind eye to the reality reflected in the information and instead proceed with issuing the Certificates as if there were no problem.

43.    So grave were the Administrators' internal concerns that they expressed doubts— many years before the fraud was made public—that the Funds' assets with BLMIS even existed, with one employee stating "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists."  The Administrators also expressed repeated concern over the fact there was no segregation of duties at BLMIS—i.e., BLMIS (i) had discretion over which investments to make and when to make them, such that BLMIS was de facto investment manager, (ii) had actual custody of the Funds' assets, such that BLMIS was de facto custodian, and (iii) was also the broker.   Based upon the proprietary information they reviewed, Citco expressed concern— internally—that BLMIS would be a repeat of the notorious Manhattan Investment Fund fraud of the 1990s "multiplied by a factor of five."   Ultimately, unable to resolve their grave concerns, Citco, rather than withdrawing, ceasing to issue Certificates, or sounding a public alarm, made a

17

corporate decision to continue on as service providers—in exchange for an 800% increase in fees.

**1.    Citco Expressed Doubt as to Whether the Funds' Assets at BLMIS Even Existed.**

44.    Beginning in 2000, the Administrators ran into trouble with the basic task of verifying the existence of the Funds' assets with Madoff.    Initially, Citco expressed serious concerns regarding whether the Funds' Treasury bond transactions actually matched those transactions reported by Madoff because of an apparent "rhythm of trading" each month.    The rhythm of trading within Sentry's portfolio appeared too consistent to be true, as the assets included only a limited number of Treasury bonds by each month's end.    At the beginning of each month, Madoff would purchase shares and put options and would sell call options, but, like clockwork, would then liquidate all of Sentry's holdings by the 20th of each month.    Thus the Administrators wanted to check whether the Treasury bonds even existed at all.

45.    The Administrators could not verify the existence of the assets because the Funds' custodians, Citco Bank Nederland N.V. Dublin Branch and Citco Global Custody (the "Custodians"), did not actually hold them.    Instead, Madoff served as his own custodian. Therefore, the custody statements that the Custodians were supposed to generate based on assets in their possession, were instead merely copied, or "shadow booked," from BLMIS account statements.    The Custodians were "only the custodian[s] on paper, not in reality" and did not place any trades for the Funds.

46.    Management within Citco, including Ruud Bodewes ("Bodewes"), the head of internal audit for all of Citco Group, and Ger Jan Meijer ("Meijer"), the head of internal audit for the Administrators, expressed concern about the operations at BLMIS.    In May 2000, Bodewes expressed his concern to the general counsel and manager of Citco Bank Nederland, as well as

18

Meijer, that "[w]ith [the] Manhattan [Investment Fund fraud] in the back of our minds, we, as Citco, may very well be in a potential dangerous situation, since we do not seem to have an independent source to verify the information from BLMIS."   Indeed, Meijer had raised these concerns to Bodewes weeks earlier, warning that Madoff could be "a Manhattan multiplied by a factor of five."

47.    In addition to warning Bodewes, Meijer also warned Citco Group's Chief Executive Officer, Christopher Smeets ("Smeets") in May 2000 that "[t]o not react or to react too late does indeed mean that investors once again faithfully deposit tens of millions of USD in the Madoff well (for which we do not know if there is a bottom to it) at month's end," with the understanding that Citco could "already be held personally responsible insofar as we have allowed the subscriptions to take place as of May without a fight."   Smeets acknowledged receipt of Meijer's emails and concerns.    At that time, Meijer emphasized that "with the current knowledge and Citco as asset protector, Citco has a legal obligation to obtain more assurance" of the Funds' assets.

48.    However, in what became a familiar pattern, Citco turned a blind eye to the documents and information in their possession.   Citco Group did not address the Administrators' concerns raised in May 2000, and a few months later, Meijer stated:  "[i]t seemed that this affair [was] being put on the back burner and hushed."

49.    A year later, Meijer again reiterated his concerns about BLMIS's operations, which "remain[ed] unsolved."   Meijer warned that "Citco has a risk exposure of more than USD3 billion" and that "[p]robably there are no options to restore this situation from a worst case scenario."   He stated: "I will not change my [opinion] as long as I [do] not see evidence that the portfolio exists."   Five months later, in January 2002, the Administrators again emphasized

19

that the issues concerning BLMIS posed severe risks to Citco and the Funds' investors.  Meijer told Bodewes: "I have been worried about this situation for 2 years (including the risk to the continued existence of Citco), however the same was not taken seriously by certain gentlemen. . . . My intuition (combined with the business that I have seen) tells me that things are not right."

50.    In January 2002, Meijer insisted to Bodewes that: "Citco must now seriously take the possibility that everything is really wrong with [the Funds'] account, as well as the possibility that everything will come into view within 2 years. . . . Personally I think the chance [that something is wrong] is at least 50%."  Meijer persisted that there was "still the opportunity to more or less direct the whole process, and search out the best way out with the help of good lawyers (legal contingency plan).  Otherwise you run the risk that the scene will later be determined by others."  However, in response Citco Group's management, and Bodewes in particular, failed to undertake a meaningful investigation into Meijer's doubts regarding the existence of the Funds' assets, and instead continued acting as a service provider for the Funds for over six more years.

51.    In fact, multiple members of the Administrator's management tried to prevent Meijer from asking questions.    John Verhooren ("Verhooren"), a member of Citco's administration services management team, actually knew that Meijer had raised concerns about the existence of the Funds' assets for years, but deliberately ignored those concerns.  For example, in May 2000, Verhooren acknowledged that the lack of segregation of duties and trading patterns at Madoff were not new discoveries, and many people at Citco had already recognized these phenomena.  Later, in response to concerns raised in 2001, Verhooren again rebuffed Meijer's insistence that Citco was facing "an enormous risk exposure."  Instead, Verhooren told Meijer to stop raising the issue and claimed that Citco would try to meet with

20

Madoff to investigate.   However, neither Verhooren nor any member of the Administrator's staff ever gained sufficient evidence that the Funds' assets existed from Madoff.

**2.      Citco Failed To Obtain Evidence Of the Existence of the Funds' Assets.**

52.      Citco not only expressed internal concern regarding whether the Funds' assets with BLMIS even existed—it knew that BLMIS would not confirm their existence for Citco as the Funds' service providers.

53.      The Administrators' audit reports designated Sentry as a non-compliant fund on their "watch list" as a result of the lack of segregation of duties at BLMIS.  Each year from 2000 through 2006, the Administrators recommended that Citco either confirm the existence of the Funds' assets held by BLMIS or resign as service providers.  On three occasions between May 2000 and December 2002, Citco attempted to verify the existence of the Funds' assets at BLMIS. All attempts failed.

54.      In May 2000, Citco set up a meeting with Madoff to gain "independent confirmation of the[] existence" of the Funds' assets, particularly the Treasury bills, and to determine how Madoff derived share prices from the markets.  However, this effort failed. BLMIS did not verify the existence of the assets, and Citco concluded internally that the meeting had not provided "a full disclosure of [the] assignment."

55.      In July 2001, Bodewes had attempted to assess the concerns raised by Meijer in an internal due diligence memorandum.   However, Bodewes's due diligence was limited to a review of Citco's proprietary documents because Citco was concerned that permitting "an on-site audit at [BLMIS] premises may hurt the relationship with [the Fund], resulting in a possible loss of [a] USD 1.5 million dollar fee income."  Even so, based on the documents and information in Citco's possession, Bodewes shared Meijer's concerns about BLMIS's operations, and

21

concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds' shareholders.    Bodewes also noted that the two man audit firm used by BLMIS did not "match up" with the size of BLMIS's business.    Indeed, multiple Administrator employees acknowledged that the small size of Madoff's accounting firm posed a risk, given that the size of the firm was not large enough to audit the amount of assets purportedly managed by BLMIS.

56.    Smeets, Citco Group's CEO, received Bodewes' memo regarding the issues at BLMIS, including the issues posed by the size of Madoff's audit firm.    Citco Group's management responded that they would like to "work this out" with Madoff, but never met with him in 2001.  By an email dated 6 February 2002, Unternaehrer of Citco Group stated that Citco wanted evidence the T Bills existed.    In December 2002, Citco once again "attempt[ed] to get conclusive proof" from Madoff that Sentry's portfolio was in BLMIS custody and to have "Madoff . . . provide evidence of the existence/custody of the positions."    Before the meeting, Meijer directed a member of the internal audit group at Citco to "[p]roperly record what you have done and what you have not been able to determine. . . . It is a troublesome task insofar as Madoff is not known for his openness."    However, the meeting did not include any meaningful discussion with Madoff regarding the holdings purported to be in his custody.    The employee, Albert van Nijen, reported back that the Administrators' "mission" to increase "Citco's comfort level with respect to the existence of the assets in relation to [Citco's] responsibilities as Custodian[s]" had again failed.    On 27 December 2002 Bodewes reported to the executive committee of Citco Group that as long as the position of Sentry with BLMIS was not independently verified "there will be doubts".

57.    After Citco's third failed attempt, Citco never again tried to gain evidence from Madoff that the Funds' assets existed until his fraud was ultimately exposed in December 2008.

22

In addition, Meijer noted that "Madoff [was] no[t] known" to Citco's external traders, even though his investment strategy required selling major quantities of call options each month. In an email to Bodewes, Meijer stated, "I visited the Madoff website. . . . According to the investment policy, the fund needs to sell major quantities of call options on the market each month. I absolutely do not trust it!!!!"

58.     Meanwhile, through the entire period, Citco continued to issue the Certificates.

**3.     Citco Negotiated For Higher Fees As Reimbursement For the "Risks" of Doing Business with Madoff.**

59.     Facing grave concerns regarding the Funds' assets placed with BLMIS, Citco put its financial interests ahead of its duties to the Funds and the Funds' investors.

60.     By 2002, Citco knew that the Funds' holdings could not be verified, knew that BLMIS cleared its own trades, and knew that Citco's efforts to reconcile Madoff's operations had failed. That year, Citco's executive committee put credit line requests from the Funds "on hold until . . . the 'investigation' on Fairfield" was complete, because Citco was concerned about its exposure to liabilities well beyond the loans in the case of fraud. Smeets and Citco's management were aware that the credit line requests were on hold while Citco tried to "get as much comfort as possible" that BLMIS was not a fraud.

61.     Two years later, in February and March 2004, the Custodian decided to cancel one of its credit facilities with Sentry following its discovery that AIG had pulled its investments from BLMIS altogether. Specifically, the Administrator's management, including Meijer, Verhooren, and William Keunen—who was responsible for the entire division of administration services at Citco—found out that "the risk team of AIG took the decision to get out from all Madoff exposure . . . [t]hey are scared with the structure . . . ." It appears that at least some Citco Group management wanted the Custodian to resign: by an email of 6 February 2004, Keunen

23

informed the Administrator that Unternaehrer of Citco Group had decided the Custodian should step down as custodian. At this time, Smeets was kept informed and aware of Citco's concerns regarding AIG's withdrawal from Madoff. A few months later, in or about September 2004, Citco's board of directors made the decision to place the Custodians' and Administrators' business with the Funds "under scrutiny" and "to close down all credit relationships . . . to decrease [Citco's] exposure." Citco knew that its credit relationship with the Funds would expose it to liability because of BLMIS's role as custodian, among other reasons.

62.    By 2006, Citco considered resigning as service providers. The Custodians told Citco Group's management, including Smeets: "We are taking a risk and we only get US$60K per year!"

63.    Instead, Citco negotiated a new fee arrangement. The new arrangement calculated the Custodians' rate as one basis point (one hundredth of one percent) of the Funds' total Net Asset Value. In other words, Citco's fees for the Custodians' services were now directly tied to the Net Asset Value as determined by the Administrators. Citco decided "[o]n that basis" to stay on as Custodians because Sentry's Net Asset Value at that time, based principally on the assets purportedly at BLMIS, was approximately "$5bn, i.e., fees of $500k."

64.    Simply put, Citco accepted dramatically higher fees—tied directly to the Net Asset Value certified by Citco—in exchange for the risks to Citco of doing business with BLMIS, as well as its continued silence regarding BLMIS's role as custodian of the Funds' assets. Ultimately, Citco's fees increased by 800%.

65.    Internally, Citco knew that: (i) the Administrators did not consistently price the Funds' portfolios independently and typically relied exclusively on the share pricing information supplied by Madoff; and (ii) the Custodians did not have custody of the Funds' portfolios.

66.    Citco failed to verify the pricing information for the Funds' portfolio from independent sources and instead relied on BLMIS statements, even though it knew that such account statements contained incorrect information.    Accountants working for the Administrators discovered on numerous occasions that the trades reported by BLMIS contradicted the public daily price ranges for corresponding trades.    When the Administrators' personnel discovered that the reported share or option prices reported by Bloomberg and Madoff differed, they used the public price in calculating the Net Asset Value reflected in the Certificates.    Citco thus turned a blind eye to its knowledge that BLMIS issued account statements with incorrect pricing information.

67.    Citco acted with a lack of good faith by issuing Certificates in spite of its knowledge that: (1) BLMIS's transactions were likely impossible, given its awareness that "Madoff always [knew] precisely when to buy and sell;" (2) Madoff was the only broker-dealer Citco worked with that provided settlement date transaction confirmations only, rather than trade date confirmations; and (3) Madoff insisted that Citco book all trades for the Funds manually, rather than through automated or electronic means, which directly contradicted Citco's own "policy to set up [electronic] reconciliation programs for each fund and to avoid manual entries as much as possible;" and, within its own records, "there [were] differences between the custody statements of Citco Bank and Madoff that [were] not being analyzed" by Citco.

68.    This lack of good faith permeated the entire Citco organization.    Until 2008, the Administrators and the Custodians worked hand-in-hand with multiple other "Citco" entities to generate the Certificates for the Funds and served as the intermediaries for all subscription funds invested by Defendants under the Subscription Agreements.    Under Citco Group's direction and

25

control, the Administrators issued Certificates without good faith and with willful blindness to the fact that they could not confirm whether the Funds' assets actually existed.

69.    From the top down, Citco saw and appreciated, but consciously disregarded, the risks to the Fund's investors posed by Madoff's operations.  The Administrators and all other "Citco" subsidiaries served at the whim of Citco Group, which controlled the day-to-day operations of the Administrators and the issuance of Certificates showing an inaccurate and inflated Net Asset Value under the Administration Agreements (as amended from time to time) with the Funds.  Irrespective of which "Citco" entity the Funds' engaged, at all relevant times the Funds' were provided services from and on behalf of "Citco" as a whole from at least eight separate entities, including: Citco Group; Citco Global Custody NV; Citco Global Custody (NA) NV; CGC (NA); Citco Fund Services (BVI); Citco Fund Services (Europe) B.V.; Citco (Canada) Inc.; and Citco Global Security Services.

70.    By virtue of the foregoing conduct, Citco issued the Certificates without good faith.  The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

**E.    Citibank NA Knew or Should Have Known of the BLMIS Fraud**[2]

71.    ~~41.~~ By no later than June 2007, and likely several years earlier, Citigroup had knowledge of the possibility of Madoff's Ponzi scheme.  Citigroup's Global Head of Options Strategy and Global Head of Equity Derivatives Research, Leon Gross, was responsible for making recommendations to investors on equity derivatives and other assets. Upon information and belief, Gross had the opportunity to meet and befriend Harry Markopolos, a fellow member

---

[2]The allegations set forth in Paragraphs 41 through 45 of this Complaint are made by the Foreign Representative upon information and belief based on allegations set forth in the complaint filed by the Madoff Trustee in Picard v. Citibank N.A., 10-05345 (Bankr. S.D.N.Y.).  Upon information and belief, the allegations of the BLMIS Trustee are based on an extensive investigation and the analysis of documentary evidence as well as other sources.

of the financial industry.    Markopolos is a certified financial analyst who, for many years, had been asserting that Madoff was most likely operating a Ponzi scheme and that BLMIS's investment advisory business was a complete fraud.

72.    42.  Markopolos reached out directly to Gross via e-mail in June 2007, informing Gross of Markopolos's suspicions regarding an unspecified leveraged swap that provided exposure to Madoff.    Markopolos made his suspicions regarding Madoff clear stating, "[w]e all know how Ponzi schemes turn out." Upon information and belief, Markopolos and Gross had additional oral and written communications before December 10, 2008, in which Madoff's fraud was specifically discussed.

73.    43.  Years before the collapse of BLMIS, and before the June 2007 email, Gross met with Markopolos at Citigroup's and its affiliates' New York offices. During that visit, Markopolos showed Gross a description of Madoff's "split-strike conversion" strategy and historical returns generated by that trading strategy as reported by a Madoff Feeder Fund, which, upon information and belief, was Sentry.

74.    44.  Markopolos asked Gross whether the strategy that was described could result in the returns claimed.    Within minutes, Gross concluded that Madoff's strategy as described could not generate the returns indicated by the Madoff Feeder Fund.    Gross attempted to reconcile the discrepancy he saw between the strategy as described and the returns supposedly generated by the strategy, but could not resolve the discrepancy. Gross quickly concluded that the claimed returns were not in fact generated by the Madoff strategy as described.    Gross relayed his conclusion to Markopolos that same day.

75.    45.  Gross and Markopolos also discussed whether others at Citigroup were familiar with Madoff trading in the equity and options markets.    That same day, before

27

Markopolos left Citigroup's and its affiliates' offices in New York, Gross asked around various desks at Citigroup and its affiliates and quickly determined that no trader at Citigroup and its affiliates on the index trading desk was trading options with BLMIS, nor were they aware of BLMIS trading OEX options.  Gross also asked salespeople at Citigroup if they knew BLMIS as a customer or as someone who is active in the market, to which the salespeople told Gross "no."

76.    46.  Upon information and belief, Citigroup obtained more information placing it on inquiry notice that Madoff was making fraudulent transfers when Brian Leach became the Chief Risk Officer for Citigroup and its affiliates in or around March 2008. Prior to joining Citigroup and its affiliates, Leach had been the Chief Risk Officer and Co-Chief Operating Officer of Old Lane L.P., a multi-strategy hedge fund which was acquired by Citigroup in 2007.

77.    47.  Leach was previously the Risk Manager for Institutional Services Business at Morgan Stanley.   Upon information and belief, Leach was employed at Morgan Stanley when the firm internally blacklisted Madoff-related investments due to concerns of fraud and other wrongdoing.   Shortly after Leach became Citigroup's Chief Risk Officer, Citigroup began to immediately unwind its BLMIS trades and rid itself of any and all remaining Madoff exposure.

78.    CGML served as trustee, agent, representative, nominee or custodian for the Beneficial Owners in connection with their investments in the Funds, including, by:  subscribing to Shares of Sentry on behalf of the Beneficial Owners, maintaining custody of the Shares as record shareholders, paying redemption proceeds from the Shares of Sentry to the Beneficial Owners, and otherwise exercising control over the Shares of Sentry.

79.    Further, each of the Subscription Agreements, executed by CGML, manifested the Beneficial Owners' consent for CGML to act on behalf of and subject to the Beneficial Owners' control.

28

80.     In executing the Subscription Agreements, CGML accepted and agreed to act on behalf of the Beneficial Owners.

81.     Accordingly, the Beneficial Owners had the same knowledge as CGML regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

**F.      Exposure of Madoff's Fraud**

82.     48. On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  See United States v. Madoff, No. O808-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

83.     49. On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS. See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

84.     50. In March 2009, Madoff pleaded guilty to the criminal charges brought against him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC." As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective
> clients who wished to open investment advisory and individual trading accounts

29

with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal. Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised. Instead, those funds were deposited in a bank account at Chase Manhattan Bank. When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

85.    51. Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

86.    52. Madoff is now serving a 150-year sentence in federal prison.

## G.    The Funds' Estates in Liquidation

87.    53. Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values. As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

88.    54. In 2009, the Funds were put into liquidation proceedings in the BVI.

89.    55. On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding"). The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

30

90. 56. On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding"). The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

91. 57. On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings"). The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

92. 58. As alleged above, the BVI Court issued orders – the BVI Appointment Orders appointedappointing the Foreign Representatives as liquidators of the Funds. Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

59. The BVI Appointment Orders grant the Liquidators all powers set forth in Section 186, Schedule 2 of the BVI Insolvency Act, including, but not limited to, the following:

a. to pay any class of creditors in full;

b. to make a compromise or arrangement with creditors or persons claiming to be creditors, or having or alleging that they have any claim against the Funds, whether present or future, certain or contingent, ascertained or not;

c. to compromise any claims, debts or liabilities capable of resulting in claims or debts whether present or future, certain or contingent, ascertained or not, between the Funds and any person or entity, and to compromise questions in any way relating to or affecting the assets or the liquidations of the Funds;

d. to commence, continue, discontinue, or defend any action or other legal proceeding in the name and on behalf of the Funds in the BVI or elsewhere;

e. to carry on the Funds' business so far as may be necessary for its beneficial liquidation;

31

f. to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the Funds or for which the Funds may be rendered liable;

g. to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the Funds and a contributory or alleged contributory or other Funds or person apprehending liability to the Company;

h. to deal with all questions in any way relating to or affecting the assets or the winding up of the Funds to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it;

i. to sell or otherwise dispose of property of the Funds;

j. to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents;

k. to use the Funds' seal;

l. to draw, accept, make and endorse any bill of exchange or promissory note in the name and on behalf of the Funds;

m. to borrow money, whether on the security of assets of the Funds or otherwise;

n. to take out in an official capacity letters of administration for any deceased member or past member or debtor, or to do any other act necessary for obtaining payment of any money due from a member or past member or debtor;

o. to call meetings of the creditors or members for (i) the purpose of informing the creditors or members concerning the progress of or other matters arising in the liquidation; (ii) the purpose ascertaining the views of creditors or members on any matter arising in the liquidation; or (iii) such other purposes connected with the liquidation as the liquidators considers fit;

p. to appoint a solicitor, accountant or other professionally qualified person to assist in the performance of the liquidators' duties;

q. to appoint an agent to do any business that the liquidators are unable to do themselves, or which can be more conveniently done by an agent;

32

r. to apply to the BVI Court for directions concerning any matter arising out of the exercise of any of the liquidators' powers; and

s. to do all things incidental to any of the liquidators' powers.

60. The Foreign Representatives must seek BVI Court approval before they can exercise any of the first five powers enumerated in the BVI Appointment Orders. *See* BVI Act § 186(3) ("The Court may provide that certain powers may only be exercised with the sanction of the Court."). The Foreign Representatives may exercise all of the other powers enumerated in the BVI Appointment Orders without prior BVI Court approval.

61. With the express authorization of the BVI Court, the Foreign Representatives filed petitions in this Court on June 14, 2010 seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15 of the Bankruptcy Code. On July 22, 2010, the Bankruptcy Court issued the Recognition Order, which, among other things, specifically entrusted the Foreign Representatives with the administration and realization of the Funds' assets located in the United States, including any and all claims and causes of action belonging to the Funds.

62. Acting in accordance with authority afforded to them by the Recognition Order and with the duties and powers afforded to them as liquidators under the BVI Insolvency Act, and with the requisite court approval by the foreign court having jurisdiction over the matter , the Foreign Representatives have brought this and similar actions on behalf of the Funds, and/or in their capacities as liquidators of the Funds, to recover Redemption Payments made to the Funds' investors in the years prior to the exposure of the Madoff fraud.

63. On December 9, 2010, the BVI Court issued an order authorizing the Foreign Representatives to assert claims seeking: (i) a declaration that the Redemption Payments were unfair preferences under Section 245 of the BVI Insolvency Act and were undervalue

33

transactions under Section 246 of the BVI Insolvency Act, and (ii) an order setting aside the Redemption Payments, restoring the Funds to the position that they would have been had the Redemption Payments not been paid and such further and other relief as the Foreign Representatives deem necessary. On December 5, 2011, the Court of Appeal of the Eastern Caribbean Supreme Court, sitting as an appellate court of the BVI Court, issued an Order giving the Foreign Representatives sanction to continue to pursue claims in the United States, including both common law claims and claims under Sections 245 and 246 of the BVI Insolvency Act.

93.    64. At present, without recovery of Redemption Payments made to shareholders, the Funds' assets are not sufficient to satisfy contingent and non-contingent liabilities of the Funds' estates.    The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry's estate that Defendants are not entitled to keep.

## FIRST CLAIM
### (Unjust Enrichment - Against CGML)

94.    65. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 6493 above as if set forth herein.

95.    66. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to CGML, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

96.    67. CGML did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by it.

34

68. Upon information and belief, CGML, in that it received and retained Redemption Payments made for amounts far in excess of amounts paid by it for the purchaseNet Asset Value of Shares of and in Sentryredeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

97. 69. By reason of its receipt of monies represented as amounts deposited by other BLMIS investors or previous deposits made by Sentry with BLMISmonies deposited by the Funds' subscribers, for amounts far in excess of the amounts that it would have received had the Net Asset Value of Shares been calculated based upon the true facts existing at that time or any relevant time, CGML has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

98. 70. It would offend principles of equity and good conscience to permit CGML to retain the Redemption Payments it received from Sentry.

99. 71. The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from CGML an amount equal to the Redemption Payments received by it from Sentry., or, in the alternative, an amount equal to the amount of all Redemption Payments received by CGML less the amount of redemption payments that CGML would have received had the Net Asset Value been calculated based upon the true facts existing at the time.


## SECOND CLAIM
### *(Unjust Enrichment - Against Beneficial Shareholders)*

100. 72. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 7199 above as if set forth herein.

101. ~~73.~~ Upon information and belief, CGML may have subscribed to all or some portion of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

102. ~~74.~~ Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it from Sentry to accounts of the Beneficial Shareholders. ~~As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to CGML, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of~~ These Redemption Payments ~~was~~did not, as Sentry mistakenly believed, represent the proceeds ~~from the sale of securities or investments held by BLMIS for the account of Sentry.~~arising from the profitability of or to continue investment in BLMIS. Instead, Redemption Payments were made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

103. ~~75.~~ The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for ~~any portion of any of~~ the Redemption Payments or any portion thereof received by them.~~—~~

~~76. Upon information and belief, some or all of the Beneficial Shareholders~~, in that they received ~~and retained~~ Redemption Payments made for amounts far in excess of ~~amounts paid by them for~~ the ~~purchase~~Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

104. ~~77.~~ To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to CGML in its capacity as trustee, agent, representative, or nominee

for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

105. ~~78.~~ It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by Sentry.

106. ~~79.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them~~.~~, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## THIRD CLAIM
### (Money Had and Received - Against CGML)

107. ~~80.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~79~~106 above as if set forth herein.

108. ~~81.~~ As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to CGML, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

109. ~~82.~~ CGML did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by it~~.~~

~~83. Upon information and belief, CGML~~, in that it received ~~and retained~~ Redemption Payments made for amounts far in excess of ~~amounts paid by it for~~ the ~~purchase~~Net Asset Value

37

of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

110. 84. By reason of its receipt of monies representing the deposits of other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of which generally represented the proceeds arising from or to continue investment in BLMIS, which the world now knows was operated by Madoff's fraud as a Ponzi scheme, CGML has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

111. 85. Furthermore, CGML was not entitled to receive the Redemption Payments because the amounts of each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by CGML for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

112. 86. To the extent that Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

113. 87. It would offend principles of equity and good conscience to permit CGML to retain the Redemption Payments it received from Sentry.

114. 88. The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from CGML an amount equal to the Redemption Payments received by it from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by CGML less the amount of redemption payments that CGML

38

would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## **FOURTH CLAIM**
### *(Money Had and Received - Against Beneficial Shareholders)*

115. 89. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 85114 above as if set forth herein.

116. 90. Upon information and belief, CGML may have subscribed to all or some portion of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

117. 91. Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders. As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to CGML, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of These Redemption Payments wasdid not, as Sentry mistakenly believed, represent the proceeds from the sale of securities or investments held byarising from the profitability of or to continue investment in BLMIS for the account of Sentry.

118. 92. The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for any portion of any of the Redemption Payments or any portion thereof received by them.

93. Upon information and belief, some or all of the Beneficial Shareholders, in that they received and retained Redemption Payments made for amounts far in excess of amounts paid by

39

~~them for~~ the ~~purchase~~Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

119. ~~94.~~ To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to CGML in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

120. ~~95.~~ Furthermore, the Beneficial Shareholders were not entitled to receive ~~any portion of~~ the Redemption Payments paid to CGML upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value~~,~~ which caused the payment received for redemption of Shares to be in excess of the ~~actual~~ Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

121. ~~96.~~ To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

122. ~~97.~~ It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments made by Sentry.

123. ~~98.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from the Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them~~.~~, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Beneficial Shareholders less the

40

amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FIFTH CLAIM
### *(Mistaken Payment - Against CGML)*

124. 99. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 98123 above as if set forth herein.

125. 100. As described above, Sentry made each of the Redemption Payments to CGML under the mistaken belief that the amounts paid to CGML represented the proceeds of the sale of securities and investments held for Sentry in accounts established with BLMIS.arising from the profitability of or to continue investment in BLMIS and were based upon the Net Asset Value of Shares redeemed based upon the true facts at that time.

126. 101. Upon information and belief, however, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to CGML represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

127. 102. The Redemption Payments, while benefiting CGML, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

128. 103. Additionally, CGML was not entitled to receive the Redemption Payments because, as was unknown to Sentry, the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by CGML for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares that would have been calculated based upon the true facts existing at

41

that time or any relevant time.    In these circumstances, the Redemption Payments should be returned for the benefit of Sentry, their creditors and the current holders of Shares in Sentry.

129.    ~~104.~~ CGML did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by it~~.~~

~~105. Upon information and belief, CGML,~~ in that it received ~~and retained~~ Redemption Payments made for amounts far in excess of ~~amounts paid by it for~~ the ~~purchase~~Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

130.    ~~106.~~ To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

131.    ~~107.~~ It would thus offend principles of equity and good conscience to permit CGML to retain the Redemption Payments.

132.    ~~108.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from CGML a sum in an amount equal to the Redemption Payments received by it from Sentry~~.~~, or, in the alternative, an amount equal to the amount of all Redemption Payments received by CGML less the amount of redemption payments that CGML would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

42

## SIXTH CLAIM
### *(Mistaken Payment - Against Beneficial Shareholders)*

133.   ~~109.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~108~~132 above as if set forth herein.

134.   ~~110.~~ As described above, Sentry made each of the Redemption Payments to CGML under the mistaken belief that the amounts paid to CGML represented the proceeds ~~of the sale of securities and investments held for Sentry in accounts established with~~arising from the profitability of or to continue investment in BLMIS.

135.   ~~111.~~ However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to CGML represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

136.   ~~112.~~ Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders. ~~As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to CGML, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of~~ These Redemption Payments ~~was~~did not, as Sentry mistakenly believed, represent the proceeds ~~from the sale of securities or investments held by~~arising from the profitability of or to continue investment in BLMIS~~for the account of Sentry~~.

137.   ~~113.~~ Additionally, the Beneficial Shareholders were not entitled to receive ~~any portion of~~ the Redemption Payments received by CGML upon the redemption of Shares issued

43

to it in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because, as was unknown to Sentry, the amounts transferred with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by CGML for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

138. 114. The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for any portion of any of the Redemption Payments or any portion thereof received by them.

115. Upon information and belief, some or all of the Beneficial Shareholders, in that they received and retained Redemption Payments made for amounts far in excess of amounts paid by them for the purchaseNet Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

139. 116. The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

140. To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

141. 117. It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

44

142. 118. The Foreign Representatives in their capacities as liquidators of Sentry and on behalf of Sentry are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SEVENTH CLAIM
### (Constructive Trust - Against all Defendants)

143. 119. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 118 142 above as if set forth herein.

144. 120. As described above, upon receipt of a redemption request, Sentry made each of the Redemption Payments to CGML based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the actual Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

145. 121. As alleged above, the Redemption Payments generally represented money deposited with BLMIS by other BLMIS investors or previous deposits of Sentry with BLMIS, never invested but rather misused and misappropriated as part of the proceeds arising from or to continue investment in what the world now knows was Madoff's fraud. The source of Ponzi scheme. Accordingly, these Redemption Payments was did not, as Sentry mistakenly believed, represent the proceeds from the sale of securities and investments held by arising from the profitability of (or to continue investment in) BLMIS for the account of Sentry.

45

146.    122.  Upon information and belief, CGML may have paid some or all of the Redemption Payments it received to the Beneficial Shareholders.

147.    123.  By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

148.    124.  Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by CGML for its redemption of Shares to be in excess of the actual Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

149.    125.  It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

150.    126.  By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry for the benefit of the Foreign Representatives and Sentry and other shareholders and creditors of Sentry.

## EIGHTH CLAIM
### (Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against CGML)

151.    127.  The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 126150 above as if set forth herein.

152.    128.  Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an

46

insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

153.    129. A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

154.    130. The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) . . . causes the company to become insolvent." BVI Insolvency Act, § 244(2).

155.    131. For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c) . . . (ii) the company is unable to pay its debts as they fall due." BVI Insolvency Act, §§ 8, 244(3).

156.    132. For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and

47

ending on the appointment of the administrator or, if the company is in liquidation, the liquidator . . . ." BVI Insolvency Act § 244(1).

157. ~~133.~~ The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed." BVI Insolvency Act, § 244(1). Thus, the vulnerability period, for each of the Funds, is the period commencing two years prior to the application for the appointment of the Liquidators for each Fund and ending on the date of the appointment of the liquidators of each Fund.

158. ~~134.~~ A "connected person" is:

(1) ~~...~~ . . . one or more of the following:

(a) a promoter of the company;

(b) a director or *member of the company* or of a related company;

(c) a beneficiary under a trust of which the company is or has been a trustee;

(d) a related company;

(e) another company one of whose directors is also a director of the company;

(f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

(g) a person in partnership with a person referred to in paragraphs (a) to (c); and

(h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act, § 5 (emphasis added).

159. ~~135.~~ Redemption Payments aggregating USD $100,000,000 were made by Sentry to CGML during the two-year period prior to the application for appointment of the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

160. ~~136.~~ During the Sentry Vulnerability Period, Sentry was insolvent or was rendered insolvent by the making of Redemption Payments.

48

161.    ~~137.~~ Each of the Redemptions and/or Redemption Payments made during the Sentry Vulnerability Period ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

162.    ~~138.~~ CGML was a shareholder (i.e., a member) of Sentry during the Sentry Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

163.    ~~139.~~ Each of the Vulnerability Period Payments put CGML in a better position than it would have been in had such Payment not been made.

164.    ~~140.~~ Because CGML was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions~~" and "did not take place in the ordinary course of business~~." Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent. This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, i.e. using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers). Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in BLMIS. On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

165.    In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of any business" of Sentry~~, nor~~. Even were ~~they made for any legitimate business purpose,~~ this not presumed, the same would follow in that,

49

among other things, each Vulnerability Period Payment ~~was determined and paid based on a~~represented a distribution of monies (including fictitious ~~Net Asset Value and was made incidental to and as a necessary part of~~profits) from Madoff's Ponzi scheme~~.~~, or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

166.    ~~141.~~ Each of the Vulnerability Period Payments was made following receipt by Sentry of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles.  Following the receipt by Sentry of a notice of redemption by CGML, CGML became a contingent creditor.  Upon the subsequent redemption of CGML's shares and until such time as CGML received the Vulnerability Period Payment ~~that became due and payable by reason of CGML's redemption of Shares~~, CGML was a "creditor" of Sentry ~~as defined in the BVI Insolvency Act, as CGML would have had~~with an admissible claim against Sentry in ~~the BVI~~any subsequent liquidation ~~Proceeding~~of Sentry had ~~the Vulnerability Period~~ payment ~~not been made~~of the Redemption Price not been made, albeit that post-liquidation CGML would have been deferred to outside creditors.

~~142. Further, upon information and belief, CGML may assert claims against Sentry in this action or elsewhere which, if proven, allowed and/or admitted, would make it a "creditor" of Sentry as defined by the BVI Insolvency Act.~~

167.    ~~143.~~ By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to

recover from CGML an amount equal to the Vulnerability Period Payments received by CGML from Sentry.

## NINTH CLAIM
### (Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against Beneficial Shareholders)

168. 144. The Foreign Representatives, in their capacities as Foreign Liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 143167 above as if set forth herein.

169. 145. Upon information and belief, CGML may have subscribed to all or some portion of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

170. 146. Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

171. 147. To the extent that any money that CGML received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to avoid and set aside such further transfer by CGML to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia,* section 249(2)(b) of the BVI Insolvency Act.

### TENTH CLAIM
*(Undervalue Transaction Pursuant to Section 246 of the
BVI Insolvency Act - Against CGML)*

172. ~~148.~~ The Foreign Representatives, in their capacities as Foreign Representatives

and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1

through ~~147~~171 above as if set forth herein.

173. ~~149.~~ Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction
with a person if (a) the company makes a gift to that person or otherwise enters
into a transaction with that person on terms that provide for the company to
receive no consideration; or (b) the company enters into a transaction with that
person for a consideration the value of which, in money or money's worth, is
significantly less than the value, in money or money's worth, of the consideration
provided by the company; and (c) in either case, the transaction concerned (i) is
an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a)
the company enters into the transaction in good faith and for the purposes of its
business; and (b) at the time when it enters into the transaction, there were
reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is
entered into pursuant to the order of a court or tribunal in or outside the Virgin
Islands.

(4) Where a company enters into a transaction with a connected person within the
vulnerability period and the transaction falls within subsection (1)(a) or
subsection (1)(b), unless the contrary is proved, it is presumed that (a) the
transaction was an insolvency transaction; and (b) subsection (2) did not apply to
the transaction.

174. ~~150.~~ During the Sentry Vulnerability Period, all assets purportedly held by

BLMIS for Sentry and other investors were non-existent, and Sentry was insolvent or rendered

insolvent by the Vulnerability Period Payments, as alleged in paragraph 164 above. Thus, each

of the Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency

transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of

Section 246 of the BVI Insolvency Act.

175. ~~151.~~ Sentry received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sentry received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry to CGML for each of the Vulnerability Period Payments.

176. ~~152.~~ CGML was a shareholder (i.e., a member) of Sentry during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

177. ~~153.~~ Because CGML was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions~~" and "did not take place in the ordinary course of business~~." Further, ~~even were this not presumed,~~ there is a statutory presumption that the Vulnerability Period Payments were not made in ~~the ordinary course of any business of Sentry, nor were they made for any legitimate business purpose, in that, among other things, each Vulnerability Period Payment was determined and paid based on a fictitious Net Asset Value and was made incidental to and as a necessary part of Madoff's~~ good faith and for the purposes of the Funds' business with reasonable grounds to believe that they would benefit the Funds.  Even were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious profits from a Ponzi scheme such as BLMIS.

178. ~~154.~~ By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and to recover from CGML an amount equal to the Vulnerability Period Payments received by CGML from Sentry.

## ELEVENTH CLAIM
### *(Undervalue Transaction Pursuant to Section 246 of the*
### *BVI Insolvency Act - Against Beneficial Shareholders)*

179. ~~155.~~ The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through ~~154~~178 above as if set forth herein.

180. ~~156.~~ Upon information and belief, CGML may have subscribed to all or some portion of the Shares issued to it in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

181. ~~157.~~ Upon information and belief, CGML may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

182. ~~158.~~ To the extent that any money that CGML received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to avoid and set aside such further transfer by CGML to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## TWELFTH CLAIM
### *(Breach of Contract - Against CGML)*

183. ~~159.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through ~~158~~182 above as if set forth herein.

184. ~~160.~~ CGML, as a Subscriber in Sentry, is bound by Sentry's Memorandum of Association and Articles of Association, as amended from time to time (the "Articles").

54

185. 161. The Articles provide for the calculation of the redemption price for Shares (the "Redemption Price") based on the "Net Asset Value per Share." Net Asset Value ("NAV") per share is to be determined by the directors of Sentry as of the relevant valuation day "by dividing the value of the net assets of [Sentry] by the number of Shares then in issue [.]" Articles at 11(1).

186. 162. The Articles provide that in determining NAV the Net Asset Value per share for each class of shares issues issued, the value of the net assets of the Fund is to be adjusted "to take into account any dividends, distributions, assets or liabilities" attributable to such class of shares. Articles at 11(1).

187. 163. With respect to the valuation of different types of assets, the Articles prescribe methods of valuation that are, however, subject to the exercise of the judgment and discretion by the Directors of Sentry. For example, with respect to the valuation of assets consisting of securities, the Articles prescribe methods of valuation based on price and market data, provided however that "[i]f the Directors determine that [any of the prescribed methods of valuation] does not fairly represent its market value, the Directors shall value such securities as they determine and shall set forth the basis of such valuation in writing in the Company's records[.]" Articles at 11(3)(b).

188. 164. With respect to the value of any shares of stock held by Sentry in an "investment company," the Articles provide for valuation "in accordance with the manner in which such shares are valued by such investment company" provided however that "the Directors may make such adjustments in such valuations the Directors may from time to time consider appropriate." Articles at 11(3)(c).

55

189.    ~~165.~~ With respect to assets that have been "realised or contracted to be realised" the Articles provide for the inclusion of the assets receivable in respect of such realization, provided however that "if the value of such assets is not then known exactly then its value shall be as estimated by the Directors."   Articles at 11(3)(e).

190.    ~~166.~~ Additionally, the Articles provide that "notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion, warrant a different valuation of any securities, such securities will be valued at such prices as the Directors shall determine." Articles at 11(3)(f).

191.    ~~167.~~ The Articles provide that any "certificate" as to the ~~NAV~~Net Asset Value per Share or as to the Redemption Price that is given in good faith by or on behalf of the Directors "shall be binding on all parties." Articles at 11(1).

192.    ~~168.~~ No Certificate ~~issuable under the Articles (a "Redemption Price Certificate")~~ was provided in good faith by or on behalf of the Directors to CGML in respect of any ~~NAV~~Net Asset Value determination made while CGML was a member of the Fund or in respect of any Redemption Payment made to CGML.

193.    ~~169.~~ Pursuant to the Articles, at any time prior to ~~this~~the good faith issuance ~~of a Redemption Price~~and receipt of a Certificate, the Redemption Price calculated in respect of the redemptions by CGML and paid to CGML remains subject to adjustment, recalculation and redetermination based on, *inter alia*, the foregoing identified provisions of the Articles. Upon the true interpretation of the Articles, the same contained an implied term for repayment of any over-payments, and/or such a term is to be implied on the basis of obviousness and/or as being necessary for the business efficacy of the Articles and/or to give effect to the reasonable expectations of the parties.

194. 170. Upon information and belief, CGML received the Redemption Payments listed on Exhibit A in respect of Shares submitted for redemption.

195. 171. Subsequent to December 8, 2008, Sentry has determined that the NAVNet Asset Value calculations upon which Redemption Payments were made to CGML included assets not held by or on behalf of Sentry at the time of the making of such payments and, additionally, that such NAVNet Asset Value calculations failed to account for and make appropriate deduction of liabilities of Sentry existing at the time of such payments. For these and other reasons, such NAVNet Asset Value calculation substantially overstated the net asset value of the assets of Sentry.

196. 172. To the extent that CGML has received Redemption Payments in excess of the NAVNet Asset Value of the Shares redeemed, CGML is contractually obligated to return amounts in excess of the actual NAVNet Asset Value that would have been calculated based upon the true facts existing at the relevant time.

197. 173. Following determination by the Fund that Redemption Payments made to CGML had been calculated on the basis of an overstated NAVNet Asset Value, demand has been made toon CGML to return excess and overpaid Redemption Payments to the Fund.

198. 174. CGML has failed and refused to repay to the Fund the amount that, under the Articles, it is contractually required to repay to the Fund.

199. 175. The failure of CGML to make the repayment requested constitutes a breach of its contractual obligations under the Articles for which Sentry is entitled to the award of damages.

## THIRTEENTH  CLAIM
### (Breach of Implied Covenant of Good Faith and
### Fair Dealing - Against CGML)

200. 176. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 175199 above as if set forth herein.

201. 177. Following determination by the Fund that Redemption Payments to CGML had been made on the basis of an overstated NAVNet Asset Value, demand was made to CGML to return excess and overpaid Redemption Payments to Sentry.

202. 178. CGML has failed and refused to make the requested repayment to Sentry.

203. 179. By retaining the Redemption Payments to which CGML is not entitled, CGML has deprived Sentry of the benefit of its bargain and has subverted the Articles.

204. 180. The failure of CGML to make the repayment requested constitutes a breach of the covenant of good faith and fair dealing that inheres in the Articles for which Sentry is entitled to the award of damages.

## FOURTEENTH  CLAIM
### (Declaratory Judgment - Against All Defendants)

205. 181. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 180204 above as if set forth herein.

206. 182. An actual and justiciable controversy exists between the Plaintiffs and the Defendants with respect to the obligation of the Defendants to repay to the Funds all or a portion of amounts received by them as excess or overpaid Redemption Payments under circumstances where:

(i)     the NAVNet Asset Value per share calculation upon which the Redemption Price was paid, directly or indirectly, to any Defendant has been subsequently adjusted, recalculated or redetermined in accordance with the Articles;

(ii)    the resulting adjusted, recalculated and redetermined Redemption Price is less than the Redemption Price paid to the Defendant; and

(iii)   prior to such adjustment, recalculation or redetermination, no Redemption Pricebinding Certificate      has been issued by the Fund.; and

(iv)    Citco issued no Certificates in good faith.

207.    183. The harm to Sentry is real and immediate because, as a result of the failure and refusal of the Defendants to make repayment, Sentry has become insolvent and is presently unable to pay its debts as they fall or will fall due.

208.    184. Plaintiffs have no adequate remedy at law.

209.    185. Pursuant to 28 U.S.C. § 2201 et. seq., Plaintiffs are entitled to a declaration by this Court declaring that, pursuant to the Articles, each Defendant must repay Sentry that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First, Third and Fifth Claims, judgment in favor of Plaintiffs and against CGML allowing the Plaintiffs to recover an amount equal to the Redemption Payments received by CGML, plus interest;, or, in the alternative, an amount equal to the amount of the Redemption Payments received by CGML less the amount of redemption payments that CGML would have

received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

B.      On the Second, Fourth and Sixth Claims, judgment in favor of Plaintiffs and against the Beneficial Shareholders allowing the Plaintiffs to recover an amount equal to any portion of any Redemption Payments received by the Beneficial Shareholders, plus interest; or, in the alternative, an amount equal to any portion of the Redemption Payments received by the Beneficial Shareholders less the amount of such portion that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

C.      On the Seventh Claim, imposition of a constructive trust on Redemption Payments; and

D.      On the Eighth and Ninth Claims:

        i.    a.    a declaratory judgment in favor of the Foreign Representatives and against CGML and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

        ii.    b.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

        iii.    c.    judgment pursuant to Section 249 of the BVI Insolvency Act against CGML and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest.;

E.      On the Tenth and Eleventh Claims:

        i.    a.    a declaratory judgment in favor of the Foreign Representatives and against CGML and the Beneficial Holders that the Redemption Payments made during the Redemptions and/or Vulnerability Period Payments constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

60

ii.    ~~b.~~    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the ~~Redemption Payments made during the~~Redemptions and/or Vulnerability Period Payments; and

iii.    ~~c.~~    judgment pursuant to Section 249 of the BVI Insolvency Act against CGML and the Beneficial Holders in the amount of the avoided ~~Redemption~~Vulnerability Period Payments received by them or for their benefit, plus interest~~.~~;

F.    On the Twelfth and Thirteenth Claims, judgment against CGML and in favor of the Plaintiffs in an amount to be determined at trial~~.~~;

G.    On the Fourteenth Claim, a declaratory judgment against the Defendants and in favor of the Plaintiffs that, under the Articles, the Defendants must repay that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry;

H.    Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

I.    Granting Plaintiffs such other and further relief as the Court deems just and proper.

61

Dated: New York, New York
September 20, 2016

**BROWN RUDNICK LLP**

By: /s/ ~~May Orenstein~~David J. Molton
       David J. Molton
       May Orenstein
       Daniel J. Saval

Seven Times Square
New York, New York 10036
Telephone: 212.209.4800
Facsimile: 212.209.4801

*Attorneys for the Foreign*
*~~Representative~~Representatives*

62

**EXHIBIT A**

*Redemption Payments Received by Defendants from Sentry*
*From October 14, 2005 Through November 19, 2008*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| October 14, 2005 | $30,000,000 | 28,067.27 | JP Morgan Chase Bank NA, New York |
| April 14, 2008 | $60,000,000* | 46,048.35 | JP Morgan Chase Bank NA, New York |
| November 19, 2008 | $40,000,000* | 29,634.50 | JP Morgan Chase Bank NA, New York |

\* Denotes Redemptions in the Sentry Vulnerability Period.

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.

| Summary report: Litéra® Change-Pro TDC 7.5.0.127 Document comparison done on 9/20/2016 8:55:15 AM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://WORKSITE/WorkSiteUS/60616233/2 | |
| **Modified DMS:** iw://WORKSITE/WorkSiteUS/60616233/4 | |
| **Changes:** | |
| Add | 464 |
| Delete | 387 |
| Move From | 14 |
| Move To | 14 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 879 |