# EXHIBIT D

Articles of Association of Fairfield Sigma Limited

## TERRITORY OF THE BRITISH VIRGIN ISLANDS
## THE INTERNATIONAL BUSINESS COMPANIES ACT
## AMENDED AND RESTATED MEMORANDUM OF ASSOCIATION
## of
## FAIRFIELD SIGMA LIMITED

1.    NAME

The name of the Company is Fairfield Sigma Limited.

2.    REGISTERED OFFICE

The Registered Office of the Company will be Citco Building, Wickhams Cay, P.O. Box 662, Road Town, Tortola, British Virgin Islands.

3.    REGISTERED AGENT

The Registered Agent of the Company will be Citco B.V.I. Limited, Wickhams Cay, P.O. Box 662, Road Town, Tortola, British Virgin Islands.

4.    GENERAL OBJECTS AND POWERS

(1)    The object of the company is to engage in any act or activity that is not prohibited under any law for the time being in force in the British Virgin Islands.

(2)    The Company may not:

(a)    carry on business with persons resident in the British Virgin Islands;

(b)    own an interest in real property situate in the British Virgin Islands, other than a lease referred to in paragraph (e) of subclause (3);

(c)    carry on banking or trust business, unless it is licensed under the Banks and Trust Companies Act, 1990;

(d)    carry on business as an insurance or reinsurance company, insurance agent or insurance broker, unless it is licensed under an enactment authorising it to carry on that business;

(e)    carry on the business of company management unless it is licensed under the Company Management Act, 1990; and

(f)    carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands.

(3)    For purposes of paragraph (a) of subclause (2), the Company shall not be treated as carrying on business with persons resident in the British Virgin Islands if:

(a)    it makes or maintains deposits with a person carrying on banking business within the British Virgin Islands;

(b)    it makes or maintains professional contact with solicitors, barristers, accountants, bookkeepers, trust companies, administration companies, investment advisers or other similar persons carrying on business within the British Virgin Islands;

(c)    it prepares or maintains books and records within the British Virgin Islands;

(d)    it holds, within the British Virgin Islands, meetings of its Directors or members;

(e)    it holds a lease of property for use as an office from which to communicate with members or where books and records of the Company are prepared or maintained;

(f)    it holds shares, debt obligations or other securities in a company incorporated under The International Business Companies Ordinance or under The Companies Act; or

(g)    shares, debt obligations or other securities in the Company are owned by any person resident in the British Virgin Islands or by any company incorporated under The International Business Companies Ordinance or under the Companies Act.

(4)    The Company shall have all such powers as are permitted by law for the time being in force in the British Virgin Islands which are necessary or conducive to the conduct, promotion or attainment of the object of the Company.

5.    CURRENCY

Shares in the Company shall be issued in euro, the currency of the member states of the European Union that adopted a single currency in accordance with the treaty establishing the European Communities as amended by the Treaty on European Union.

36015

Fairfield Sigma Limited                                                                      Page 3

6.    AUTHORISED CAPITAL

The authorised capital of the Company is Euro 50,000.00.

7.    CLASSES, NUMBER AND PAR VALUE OF SHARES

The authorised capital shall be divided into two classes, being 1,500,000 Class A Shares of euro 0.01 par value each, and 3,500,000 Class B Shares of euro 0.01 par value each. Shares will not be issued in series.

8.    DESIGNATIONS, POWERS, PREFERENCES, ETC. OF SHARES

The shares of the Company shall have the following rights and restrictions:

(1)    the holders of Class A Shares shall, subject to the provisions of the Articles:

      (a)    be entitled to one vote per Class A Share;

      (b)    be entitled to such dividends as the Directors may from time to time declare;

      (c)    in the event of a winding-up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, be entitled, subject to the provisions of the Articles, to share pro rata in the surplus assets of the Fund; and

      (d)    be entitled, and subject, to redemption or repurchase of such Class A Shares as provided in the Articles.

(2)    the holders of Class B Shares shall, subject to the provisions of the Articles:

      (a)    be entitled to one vote per Class B Share;

      (b)    be entitled to such dividends as the Directors may from time to time declare;

      (c)    in the event of a winding-up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, be entitled, subject to the provisions of the Articles, to share pro rata in the surplus assets of the Fund; and

      (d)    be entitled, and subject, to redemption or repurchase of such Class B Shares as provided in the Articles.

36015

Fairfield Sigma Limited                                                          Page 4

Except as provided in this Memorandum of Association and the Articles of Association, the designations, powers, preferences, rights, qualifications, limitations and restrictions of each share that the Company is authorised to issue shall be fixed by resolution of Directors, but the Directors shall not allocate different rights as to voting, dividends, distributions on liquidation or redemption unless the Memorandum of Association shall have been amended.

9.    SHARE ISSUANCE

Shares in the Company shall be issued as registered shares.

10.    TRANSFER OF REGISTERED SHARES

Registered shares in the Company may be transferred subject to the prior approval of the Directors of the Company as evidenced by a resolution of Directors.

11.    AMENDMENT OF MEMORANDUM AND ARTICLES OF ASSOCIATION

The Company may amend its Memorandum of Association and Articles of Association by a resolution of the Directors or by a resolution of the Members.

12.    DEFINITIONS

The meanings of words in this Memorandum of Association are as defined in the Articles of Association annexed hereto.


We, Caribbean Corporation Company Limited of Citco Building, P.O. Box 662, Road Town, Tortola, British Virgin Islands for the purposes of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to this Memorandum of Association the 20th day of November, 1990 in the presence of:


Witness                                              Subscriber


Sgd. B. Patrick                                      Sgd: B. d'Ancona/A. Solomon
Road Town, Tortola                                   For and on behalf of
Secretary                                            Caribbean Corporation
                                                     Company Limited

36015

## TERRITORY OF THE BRITISH VIRGIN ISLANDS

## THE INTERNATIONAL BUSINESS COMPANIES ACT

## AMENDED AND RESTATED ARTICLES OF ASSOCIATION

### of

## FAIRFIELD SIGMA LIMITED

### INTERPRETATION

1.         In these Articles unless there is something in the subject or context inconsistent therewith:-

"Accounting Date" means, subject to the provisions of these Articles, the 31st day of December;

"Act" means the International Business Companies Act as amended from time to time;

"Articles" means these Articles of Association as herein contained or as the same may from time to time be altered or amended;

"Auditor" means the person or firm for the time being appointed as Auditor of the Company;

"Base Currency" means euros in the currency of the member states of the European Union that adopted a single currency in accordance with the treaty establishing the European Communities as amended by the Treaty on European Union;

"business day" means any day which is not a Saturday or a Sunday and that is not a public holiday or a day on which banks are generally authorised or obliged by law or regulation to close in the Netherlands, the Republic of Ireland or the United States of America;

"Company" means Fairfield Sigma Limited;

"Custodian" means the person or persons for the time being appointed as custodian, joint custodians or prime broker pursuant to the Articles;

"Dealing Day" means with respect to subscriptions the first business day following a Valuation Day, and with respect to redemptions a Valuation Day, and/or, in either case, such other day or days in addition thereto or in substitution therefor as may from time to time be determined by the Directors either in any particular case or generally;

"Dealing Time" means the time by which an application for subscription or a request for redemption must be received, which in relation to subscriptions is 5:00 pm (Amsterdam time) on the third to the last business day of a month and in relation to redemptions is 5:00 pm (Amsterdam time) on the day fifteen business days before a Dealing Day, or, in either case, such other time or day as the Directors may from time to time determine either in any particular case or generally;

"Director" means a person who is a director of the Company;

"duties and charges" includes all stamp and other duties, taxes, Governmental charges, brokerage, bank charges, transfer fees and registration fees;

"Fund" means the assets and liabilities of the Company as a whole;

"Initial Charge" means an amount as agreed between the Directors and the Manager but not exceeding 5% of the Subscription Price payable to the Manager, an affiliate of the Manager or an unaffiliated placement agent;

"Investment" means any right or interest in any share, stock, bond, debenture, debenture stock, unit, sub-unit, or other security or any loan of money or any currency or interest in any currency and includes any financial stock market index, interest rate or currency futures or similar financial or other instruments and any rights in or options over any of the aforesaid, issued by or under the guarantee of anybody, whether incorporated or unincorporated, or of any governmental body and whether paying interest or dividends or not and whether fully paid, partly paid or nil paid and includes any participation as a limited partner or participant in any partnership or unincorporated association;

"in writing" and "written" includes printing, lithography, photography, and other modes of representing or reproducing words in visible form;

"Manager" means the person for the time being appointed and acting as manager of the Company;

"Member" has the same meaning as member given in the Act and means the person or body corporate registered in the Register as the holder of shares in the Company, and, when two or more persons are so registered as joint holders of shares, means the person whose name stands first in the Register as one of such joint holders;

"Memorandum" means the Memorandum of Association of the Company;

"month" means calendar month;

39832

"Net Asset Value" means the net asset value per Share determined in accordance with Article 11;

"notice" means written notice unless otherwise specifically stated;

"Office" means the registered office of the Company for the time being;

"Paid-up" means paid up and/or credited as paid up;

"Principal Market" with reference to any Investment, means such market which in the opinion of the Directors is the sole or principal securities market upon which such Investment is listed, quoted or traded or in respect of which permission to deal is effective and the expression "market" shall include any over-the-counter market or recognised exchange;

"Record Date" in respect of any dividend means the date as of which the persons entitled to participate therein fall to be determined and in respect of any general meeting of the Company means the date as of which the persons entitled to receive notice of and vote thereat fall to be determined;

"Redemption Price" means the price at which Shares may be redeemed, determined in accordance with these Articles;

"Register" means the Register of Members maintained by the Company in Amsterdam, The Netherlands, or such other place as the Directors may determine, with a copy kept at the registered office of the Company in the British Virgin Islands;

"Seal" means the Common Seal of the Company and includes any duplicate common seal which the Directors may by resolution approve or adopt;

"Secretary" means (subject to the provisions of the Act) the person for the time being appointed to perform the duties of the Secretary of the Company and includes an Assistant, Acting or Deputy Secretary;

"Share" means a share of any class in the capital of the Company of a par value of euro 0.01 having the rights and being subject to the restrictions specified in the Memorandum and these Articles with respect to such shares and shall where the context so permits include a fraction of a Share and "Shares" shall be construed accordingly;

"Subscription Price" means the price at which Shares may be subscribed, determined in accordance with the Articles; and

39832

"Valuation Day" means the last business day of a month and/or such other day or days in addition thereto or in substitution therefor as may from time to time be determined by the Directors either in any particular case or generally but so that there shall be at least one Valuation Day in each month.

The word "may" shall be construed as permissive and the word "shall" shall be construed as imperative.

Words importing the singular number only include the plural number and vice versa.
Words importing the masculine gender only include the feminine gender.
Words importing persons include companies or associations or bodies of persons, whether corporate or unincorporate.

Reference herein to any act is to an act of the British Virgin Islands legislature.

Save as aforesaid any words or expressions defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## BUSINESS

2.        The meetings of the Members and of the Directors and of any committee appointed by the Directors shall be held in the British Virgin Islands or such other place as the Directors may from time to time determine.

3.        Any branch or kind of business which the Company is either expressly or by implication authorised to undertake may be undertaken by the Directors at such time or times as they may think fit, and further may be suffered by them to be in abeyance, whether such branch or kind of business may have been actually commenced or not, so long as the Directors may deem it expedient not to commence or proceed with the same.

## SHARE CAPITAL

4.    (1)    Subject to the provisions of these Articles, the unissued Shares of the Company shall be available for issue by the Directors who may offer, allot, grant options over or otherwise dispose of them to such persons, at such times and for such consideration and upon such terms and conditions as they may determine.

    (2)    Each class of Shares shall have in common with all other classes of Shares the same investment objectives and policies and underlying assets of the Fund, but in addition thereto the Shares of each class may have different dividend and distribution policies and

Fairfield Sigma Limited                                                          Page 5

additional assets and liabilities solely for the account of such class as the Directors may determine.

(3)    Except where the context otherwise requires, the provisions of these Articles shall apply, mutatis mutandis, separately and independently to each class of Shares as if any such class of Shares were the sole class of Shares created and established pursuant to these Articles.

5.    (1)    Notwithstanding anything herein contained, fully paid shares of the Company shall be free and clear of all and any liens and charges in favour of the Company.

(2)    Subject to the provisions of these Articles, the Directors may by notice to a Member (the "Converter") convert all or a portion of the existing shares (the "Existing Shares") held by the Converter comprised in a share certificate into Shares of another class (the "New Shares") and the following provisions of this Article shall apply:

(a)    the rate at which all or any part of the holding of Existing Shares shall be converted into New Shares, shall be determined in accordance with the following formula:

$$A = \frac{(B \times RP)}{SP}$$

where:

A is the number of New Shares to be allotted

B is the number of Existing Shares to be converted

RP is the redemption price of the Existing Shares determined on the Valuation Day which precedes the day on which the conversion is to be effected

SP is the subscription price of the New Shares determined on the Valuation Day which precedes the day on which the conversion is to be effected.

PROVIDED THAT:

(b)    the conversion of Shares pursuant to this Article shall be made on the Dealing Day specified in the notice;

(c)    no conversion of part only of the holding of any Member shall be made if as a result thereof such Member would hold less than the minimum number of

Existing Shares and/or New Shares as specified from time to time by the Directors;

(d)    no Shares shall be converted during any period when the determination of Net Asset Value is suspended pursuant to paragraph (4) of Article 11 hereof.

(3)    Where a certificate has been issued in respect of any Shares to be converted:

(a)    the Converter shall lodge with the Company or its authorised agent such certificate and subject as hereinafter mentioned no certificate for the New Shares shall be issued under this Article until such certificate shall have been received;

(b)    the Directors may at their option dispense with the production of any certificate which shall have become lost or destroyed on compliance by the Converter with the like requirements for those applying in the case of an application by him for replacement of a lost or destroyed certificate under these Articles;

(c)    on a conversion of part only of the Existing Shares registered in the Converter's name, the Converter shall be entitled without payment to a balance certificate for the balance of Existing Shares held by him.

6.        Without prejudice to any special rights for the time being conferred on the holders of any shares or class of shares (which special rights shall not be varied or abrogated, except with such consent or sanction as is provided by the next following Article) any share in the Company may be issued with such preferred deferred or other special rights, or such restrictions, whether in regard to dividend, return of capital, redemption, voting or otherwise as the Company may from time to time in general meeting determine.

7.    (1)    Whenever the capital of the Company is divided into different classes of shares all or any of the special rights for the time being attached to any class of share for the time being issued may (unless otherwise provided by the terms of issue of the shares of that class) be altered or abrogated, either whilst the Company is a going concern or during or in contemplation of a winding up, with the consent in writing of the holders of not less than three-fourths of the issued shares of the class and of the holders of not less than three-fourths of the issued shares of any other class of shares which may be affected by such variation, but not otherwise.

(2)    The special rights conferred upon the holders of any shares or class of shares issued with preferred or other special rights shall not (unless otherwise expressly provided by the conditions of issue of such shares) be deemed to be varied by the creation, allotment or issue of further shares ranking pari passu therewith or subsequent thereto.

8.          The Company shall be entitled to treat the registered holder of any share as the absolute owner thereof and accordingly shall not be bound to recognise any equitable or other claim to, or interest in, such share on the part of any other person.

### ISSUE OF SHARES

9.    (1)    Subject as hereinafter provided, the Company may on receipt by it or its authorised agent of an application in such form as the Directors may from time to time determine issue and allot Shares PROVIDED THAT:

(a)    the issue of Shares pursuant to this Article shall be made on the Dealing Day on which, or immediately following the day on which, the application is received provided that the application is received on or before the Dealing Time;

(b)    the issue of Shares pursuant to this Article shall be effected at not less than the Subscription Price determined in accordance with paragraph (2) of this Article but in no event shall a Share be allotted or issued at a price less than its par value;

(c)    payment shall be made in the Base Currency at such time and place and in such manner as the Directors may from time to time determine failing which any allotment of Shares for which payment is due may be canceled by the Directors;

(d)    the Company shall not issue any of its Shares or securities (i) for services, or (ii) for property other than cash or securities (including securities of which the Company is the issuer) except that it may issue fully paid Shares as a distribution to its Members or in connection with a reorganisation;

(e)    no Share shall be allotted or issued (except those for which applications have been previously received and accepted by the Company or its agent) during any period when the determination of the Net Asset Value is suspended pursuant to paragraph (4) of Article 11;

(f)    the Directors may satisfy any such application for Shares by procuring the transfer to the applicant of fully paid Shares at the appropriate Subscription Price. If in lieu of issuing Shares the Company shall procure a transfer of Shares to the person making such application, any duties and charges

payable in connection with such transfer shall be discharged by or on account of the transferor out of the price payable for such Shares;

(g) Shares shall be issued in such minimum numbers as the Directors may specify either generally or in any particular case;

(h) fractions of a Share, of not less than one-thousandth of a Share, may be issued.

(2) The Subscription Price for each Share shall be the Net Asset Value of each Share (as determined in accordance with Article 11) as at the close of business in Amsterdam, The Netherlands on the Valuation Day immediately preceding the Dealing Day on which such issue is made in each case rounded to the nearest minimum integral unit of the Base Currency PROVIDED THAT in the case of an initial issue of Shares (that is, an issue of Shares at a time when there are no Shares of the relevant class in issue), the Directors shall, at their discretion, fix a Subscription Price which shall apply for the purposes of such initial issue of Shares. In addition to the foregoing the Directors may require any applicant for Shares to pay to the Manager or to an unaffiliated placement agent, or to the Company on behalf of the Manager or an unaffiliated placement agent, the Initial Charge and the Manager or unaffiliated placement agent may differentiate between such persons as to the amount of such Initial Charge (within the permitted limit).

(3) Share certificates in respect of Shares allotted, if requested, as aforesaid shall not be issued or delivered unless and until the subscription moneys have been paid over to the Custodian.

(4) The Company may on any issue of Shares pay such brokerage or commission as may be lawful.

## REDEMPTION OF SHARES

10. (1) Subject to the provisions of the Memorandum, these Articles and the Act and subject as hereinafter provided, the Company shall on receipt by it or its authorised agent of a request in writing (or in such other form as the Directors may determine) by a Member (the "Applicant") specifying the number and class of Shares to be redeemed redeem or purchase all or any portion of the Shares registered in the Applicant's name PROVIDED THAT:

(a) subject as hereinafter provided, the redemption or purchase of Shares pursuant to this Article shall be made on the Dealing Day on which, or immediately following the day on which, the written request is received provided that the said request is received on or before the Dealing Time;

(b)   the redemption or purchase of Shares pursuant to this Article shall be effected at the Redemption Price determined in accordance with paragraph (2) of this Article less a charge of 2% of the Redemption Price which charge shall only be applied where Shares are redeemed at the option of the Directors as a result of any actual or attempted assignment, pledge, mortgage, or other prohibited dealing by a Member which is not otherwise consented to by the Directors, or as a result of any application to record a transfer of Shares, including an application to record a transfer by operation of law, if not approved by the Directors within thirty (30) days;

(c)   subject as hereinafter provided, payment shall be made to the Applicant in the Base Currency in respect of the redemption or purchase of Shares. Any amount payable as aforesaid to the Applicant shall be payable as soon as practicable after the relevant Dealing Day, being normally thirty (30) days, plus (i) any period after the receipt of the request for redemption and before such payment during which the determination of the Net Asset Value has been suspended by declaration of the Directors pursuant to Article 11 and (ii) any period during which the relevant share certificate, if any, has not been lodged as provided in this Article 10. Payment for Shares redeemed or purchased hereunder shall be made to the Applicant by a cheque, draft, wire transfer or other means of payment posted (at the risk of the Applicant) or otherwise paid to the Applicant in the manner determined by the Directors from time to time. If an Applicant shall require payment in a currency other than the Base Currency, the Directors may, subject to receipt of any necessary exchange control or other governmental consent and at the risk of the Applicant and on his paying any costs thereby involved, arrange for the conversion of the sum to which the Applicant is entitled into such currency as the Applicant may require at such exchange rate as the Directors shall consider appropriate;

(d)   on any redemption or purchase the Directors shall have the power to divide in specie the whole or any part of the assets of the Company and appropriate such assets in satisfaction or part satisfaction of the Redemption Price and any other sums payable on redemption as is herein provided;

(e)   no Shares shall be redeemed or purchased during any period when the determination of the Net Asset Value is suspended pursuant to Article 11, the right of the Applicant to have his Shares redeemed or purchased pursuant to this Article shall be similarly suspended and during the period of suspension he may withdraw his request for redemption and his certificate. Any withdrawal of a request for redemption under the provisions of this Article shall be made in writing and shall only be effective if actually

received by the Company or its duly authorised agent before termination of the said period of suspension.   If the request is not so withdrawn the redemption or purchase of the said Shares shall be made on the Dealing Day next following the end of the said suspension;

(f)    instead of redeeming or purchasing the Applicant's Shares, the Directors may procure the purchase thereof at not less than such Redemption Price and at the same time and under the same conditions as apply to redemption under the provisions of these Articles;

(g)    subject as hereinafter in this Article provided, the Applicant shall not be entitled to withdraw a request duly made in accordance with this Article without the consent of the Directors; and

(h)    no redemption or purchase of part only of the holding of any Member may be made if as a result thereof such Member would hold less than the minimum number of Shares as specified from time to time by the Directors.

(2)    The Redemption Price for each Share shall be the Net Asset Value per Share (as determined in accordance with Article 11) as at the close of business in Amsterdam, The Netherlands on the Dealing Day on which such redemption is effected less such sum (if any) as the Directors may consider represents the appropriate provision for fiscal and sale charges which would be incurred on the sale of assets of the Company, in each case rounded to the nearest minimum integral unit of the Base Currency.

(3)    Where a certificate has been issued in respect of any Shares to be redeemed or purchased:

(a)    the Applicant shall lodge with the Company or its authorised agent such certificate and subject as hereinafter mentioned no payment shall be made under this Article until such certificate shall have been received;

(b)    the Directors may at their option dispense with the production of any certificate which shall have become lost or destroyed upon compliance by the Applicant with the like requirements to those applying in the case of an application by him for replacement of a lost or destroyed certificate under these Articles;

(c)    on redemption or purchase of part only of the Shares registered in the Applicant's name the Applicant shall be entitled by written request without payment to a balance certificate for the balance of such Shares.

39832

(4)     Upon the redemption or purchase of a Share being effected pursuant to this Article, the Member shall cease to be entitled to any rights in respect of that Share (excepting always the right to receive a dividend which has been declared in respect thereof prior to such redemption or repurchase being effected) and accordingly his name shall be removed from the Register with respect thereto.

(5)     Subject to the provisions of the Memorandum, these Articles and the Act and subject as hereinafter provided, the Directors shall have the power exercisable by resolution to redeem or purchase all or any portion of the Shares registered in the name of any Member (the "Relevant Member") and the provisions of this Article 10 shall apply to any such redemption or purchase EXCEPT THAT:

> (a)     the Company shall give notice to the Relevant Member of its intention to redeem or purchase such Relevant Member's Shares specifying the class, if applicable, and the number of such Shares;

> (b)     subject as hereinafter provided, the redemption or purchase of Shares pursuant to this Article shall be made on the Dealing Day immediately following the day on which such notice is received or deemed received by virtue of the provisions of these Articles;

> (c)     if a certificate in respect of any Shares the subject of redemption or purchase under this paragraph of this Article is outstanding then, upon receipt of the notice as aforesaid, the Relevant Member shall be bound forthwith to deliver to the Company or its duly authorised agents the certificate for such Shares. Payment of the redemption or purchase proceeds shall be deposited by the Company with or to the order of the Custodian in the name of the Company for payment to the Relevant Member against surrender of the certificate representing such Shares previously held by such Relevant Member. Upon the deposit of such redemption or purchase monies as aforesaid, the Relevant Member shall have no further interest in such Shares or any of them or any claim against the Company in respect thereof except the right to receive the money so deposited (without interest) from the Company upon surrender of the said certificate;

> (d)     no Shares shall be redeemed or purchased under this Article during any period when the determination of the Net Asset Value is suspended pursuant to Article 11.

## DETERMINATION OF NET ASSET VALUE

11.    (1)    The Net Asset Value per Share of each class shall be determined by the Directors as at the close of business on each Valuation Day (except when determination of the Net Asset Value per Share has been suspended under the provisions of paragraph (4) of this Article), on such other occasions as may be required by these Articles and on such other occasions as the Directors may from time to time determine.

The Net Asset Value per Share shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue or deemed to be in issue and by adjusting for each class of Shares such resultant number to take into account any dividends, distributions, assets or liabilities attributable to such class of Shares pursuant to paragraph (2) of Article 4, all determined and calculated as hereinafter provided.

Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties.

(2)    The net assets of the Fund shall comprise the aggregate of:-

(a)    Investments owned or contracted to be acquired by the Company for the account of the Fund;

(b)    cash on hand or on deposit including accrued interest relating to the Fund;

(c)    cash payments outstanding on any Shares of the class allotted;

(d)    bills and demand notes and amounts receivable including net amounts receivable in respect of investments of the Fund contracted to be realised;

(e)    interest accrued on interest bearing investments of the Fund except that accrued on securities which is included in the quoted price; and

(f)    other property and assets of the Fund of any kind and nature including prepaid expenses and unamortised preliminary expenses as valued and defined from time to time by the Directors;

from which shall be deducted:-

(i)    Investments of the Fund contracted to be sold;

(ii)    bills and accounts payable for the account of the Fund;

(iii)  management and administrative expenses payable and/or accrued (the latter on a day-to-day basis);

(iv)  the gross acquisition consideration of Investments or other property contracted to be purchased for the Fund;

(v)  reserves authorised or approved by the Directors for duties and charges or taxes or contingencies (accrued where appropriate on a day-to-day basis);

(vi)  the aggregate amount of all borrowings and interest, commitment fee, and other charges arising in connection therewith (accrued where appropriate on a day-to-day basis); and

(vii)  liabilities of the Company relating to the Fund of whatsoever nature (which shall, where appropriate, be deemed to accrue from day-to-day) including outstanding payments on any Shares of the relevant class previously redeemed. For the purposes of these articles, the amount of any distribution or dividend shall be a liability of the Fund from the day when the distribution or dividend is declared until it is paid.

For the purpose of calculating the number of Shares in issue or deemed to be in issue, Shares for which applications have been duly made shall be deemed to be not in issue on the relevant Valuation Day and Shares to be redeemed or purchased in accordance with Article 10 hereof shall be deemed to be in issue on the relevant Valuation Day.

(3)  For the purpose of calculating the value of the net assets of the Fund:

(a)  the value of any cash on hand or on deposit, bills and demand notes and accounts receivable, prepaid expenses, cash dividends and interest declared or accrued as aforesaid and not yet received shall be deemed to be the full amount thereof, unless in any case the same is unlikely to be paid or received in full, in which case the value thereof shall be arrived at after making such discount as the Directors may consider appropriate in such case to reflect the true value thereof;

(b)  the value of securities which are listed on a securities exchange (which term shall include any interdealer quotation system which provides for reporting of last sale price) shall be valued at their last sales prices on the last business day of the month on the largest securities exchange on which such securities shall have traded on such date, or, if trading in such securities on such exchange was reported on the consolidated tape, the last sales price on the consolidated tape (or, in the event that the last business day of the month is

not a date upon which a securities exchange on which such securities are listed was open for trading, on the last prior date on which such a securities exchange was so open). If no sales of such securities occurred on either of such dates, such securities shall be valued at the reported last "bid" price (in the case of a security held long) and the last reported "asked" prices (in case of a security sold short) on the largest securities exchange on which such securities are traded, on the last business day of the month. Securities which are not listed shall be valued at their last "bid" prices on the last business day of the month if held "long" by the Company and their last "asked" prices on the last business day of the month if held "short" by the Company, as determined from representative dealers quotations. Securities for which no "bid" and "asked" prices are available shall be valued at such value as the Directors may determine. Securities which are commodities or commodity contracts shall be valued at their last prior sales prices on the principal board of trade or other contracts market in which dealings are made or by quotations from the contra-party bank in the case of a forward contract. All other securities and other assets of the Company (other than goodwill, which shall not be taken into account) shall be assigned such value as the Directors may determine. If the Directors determines that the valuation of any security pursuant to the foregoing does not fairly represent its market value, the Directors shall value such security as they determine and shall set forth the basis of such valuation in writing in the Company's records;

(c)    the value of any shares of stock held by the Company in an investment company shall be valued in accordance with the manner in which such shares are valued by such investment company; provided, however, that the Directors may make such adjustments in such valuation as the Directors may from time to time consider appropriate;

(d)    the value of any investment or security as aforesaid or other property for which no price quotations are available as above provided shall be determined in such manner, consistent with generally accepted accounting procedures, as the Directors may from time to time consider appropriate;

(e)    notwithstanding the foregoing, where on the last business day of the month any cash or other asset of the Company has been realised or contracted to be realised there shall be included in the assets of the Company, in place of such cash or other asset, the assets receivable by the Company in respect thereof, provided that if the value of such assets is not then known exactly then its value shall be as estimated by the Directors; and

(f)    notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion, warrant a different valuation of any securities, such securities will be valued at such prices as the Directors shall determine.

(4)    The Directors may suspend the determination of the Net Asset Value per Share of any class for the whole or any part of a period:-

(a)    during which any stock exchange or over-the-counter market on which any significant portion of the investments of the Fund are listed, quoted, traded or dealt in is closed (other than customary weekend and holiday closing) or trading on any such stock exchange or over-the-counter market is restricted; or

(b)    when circumstances exist as a result of which in the opinion of the Directors it is not reasonably practicable for the Company to dispose of investments comprised in the Fund or as a result of which any such disposal would be materially prejudicial to Members; or

(c)    when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the investments or other assets of the Fund cannot reasonably or fairly be ascertained; or

(d)    during which the Company is unable to repatriate funds required for the purpose of making payments due on redemption of shares of the relevant class or during which any transfer of funds involved in the realisation or acquisition of investments or payments due on redemptions of shares of the relevant class cannot in the opinion of the Directors be effected at normal rates of exchange.

Any such suspension shall take effect at such time as the Directors shall declare but not later than the close of business on the business day next following the declaration, and thereafter there shall be no determination of the Net Asset Value per Share of the Fund until the Directors shall declare the suspension at an end, except that such suspension shall terminate in any event on the first business day on which (a) the condition giving rise to the suspension shall have ceased to exist; and (b) no other condition under which suspension is authorised under this paragraph shall exist. Each declaration by the Directors pursuant to this paragraph shall be consistent with such official rules and regulations (if any) relating to the subject matter thereof as shall have been promulgated by any authority having jurisdiction over the Company and as shall be in effect at the time. To the extent not inconsistent with such official rules and regulations, the determination of the Directors shall be conclusive. Whenever the Directors shall declare a

suspension of the determination of the Net Asset Value per Share, then as soon as may be practicable after any such declaration, the Directors shall give notice to all Members stating that such declaration has been made. At the end of any period of suspension as aforementioned the Directors shall give notice to all Members stating that the period of suspension has ended.

## INVESTMENT AND BORROWING POWERS

12.    (1)    In carrying on the business of the Company, the Directors shall be entitled to acquire, hold, deal in and dispose of any Investment in such manner at such times and in such amounts as the Directors shall think fit. The Company will adhere to the general principle of diversification in respect of all of its assets and the following investment restrictions will apply to any Investments (after taking account of any unpaid amounts in respect thereof) to be made or added to by the Company:

(a)    no more than 10 percent of the net assets of the Fund will be invested in the securities of any one issuer (exclusive of securities issued or guaranteed by a government, governmental agency or instrumentality of any member state or Organization for Economic Cooperation and Development ("OECD") member state or by any supranational authority of which one or more European Union ("EU") or OECD member states are members);

(b)    the Fund may not hold more than 10 percent of the issued securities of any one class of securities in any issuer (exclusive of securities issued or guaranteed by a government, governmental agency or instrumentality of any member state or OECD member state or by any supranational authority of which one or more EU or OECD member states are members);

(c)    no more than 10 percent of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty (exclusive of governments, governmental agencies or instrumentalities of any member state or OECD member state or any supranational authority of which one or more EU or OECD member states are members), in each case calculated at the time of investment;

(d)    no more than 10 percent of the net assets of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

(e)    the Fund will not invest in the securities of any issuer if the directors and officers of the Company and the Manager collectively own in excess of 5 percent of such securities;

39832

    (f)    the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

    (g)    the Fund will adhere to the general principle of diversification in respect of all of its assets;

    (h)    the Fund will not invest directly in real property;

    (i)    the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) except with the consent of the Custodian, however, at no time will the Fund loan more than an amount equal to 10% of the Fund's net assets ( as measured at the time of the loan) to any one issuer (exclusive of securities issued or guaranteed by a government, governmental agency or instrumentality of any member state or OECD member state or by any supranational authority of which one or more EU or OECD member states are members); and

    (j)    no more that 10 percent (in the aggregate) of the net assets of the Fund will be invested in physical commodities

The investment restriction set out in (c) above will not apply to transactions with any counterparty which advances full and appropriate collateral to the Fund in respect of such transactions.

    (2)    For the purposes of this Article:

    (a)    securities shall be deemed to be of the same class if they confer identical rights and (if applicable) are subject to identical restrictions but so that in the case of an issue of securities which are in other respects identical with securities already in issue, any temporary differences in rights as to the dividends or interest between such existing and new securities shall be disregarded;

    (b)    nothing shall prevent the beneficial ownership of any entity, including all or part of the issued share capital of any company or companies, which for fiscal or other reasons the Manager considers it necessary or desirable to incorporate or acquire for the purpose of holding certain of the Investments contained in the Fund. None of the limitations or restrictions in paragraph (1) of this Article shall apply to Investments in, loans to or deposits with any such entity, and for the purpose of the said paragraph (1) Investments held by any such entity shall be deemed to be held directly by the Company;

(c)    the value of any Investment for the purpose of any limit contained in this Article shall not include any accrued interest in respect thereof, even if such accrued interest is included in the net assets of the Company.

(3)    It shall not be necessary for the Directors to effect changes of Investments merely because, owing to appreciations or depreciations of the value of Investments held by the Fund and/or variations in exchange rates, any of the limitations prescribed by paragraph (1) of this Article shall be exceeded, or by reason of any of the said limits being exceeded as a result of: (i) the receipt of any rights, bonuses or benefits in the nature of capital, (ii) any scheme or arrangement for amalgamation, reconstruction, conversion or exchange, (iii) any realisation of any Investments; but if and so long as any of the said limits shall be exceeded no purchase shall be made of any type of Investment which would result in any of the said limits being further exceeded.

(4)    The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital, or any part thereof, and may issue debentures, debenture stock and other securities whether outright or as security for any debt, liability or obligation of the Company or any third party PROVIDED that, except with the approval by resolution in general meeting or, where there is more than one class of shares in issue, by the holders of the relevant class, the Directors shall not exercise the power to borrow if the total amount for the time being of borrowed moneys exceeds or would exceed an amount equal to the Borrowing Limit at the relevant time, and the Directors shall exercise any powers of control over any subsidiaries so as to secure (so far as may be possible) that the aggregate amount of borrowed moneys (exclusive of intra-group borrowings) shall not exceed the said amount. For the purposes of this sub-paragraph, the issue of loan capital shall be deemed to constitute a borrowing notwithstanding that the same may be issued in whole or in part for a consideration other than cash.

(5)    The Custodian shall be entitled at any time at its entire discretion and without assigning any reason to give notice to the Directors that it is not prepared to accept any property which in the opinion of the Custodian infringes the terms of this Article and the Custodian shall be entitled to require the Company to replace any such property with other property not infringing the terms of this Article.

## CUSTODIAN

13.         The Directors shall appoint a Custodian who or whose nominee shall hold the assets of the Company and in whose name or in the name of whose nominee the same shall be registered in the case of registered securities and who shall perform such other duties upon such terms as the Directors may from time to time (with the agreement of the Custodian) determine. All moneys, bills and notes belonging to the Company shall be paid to or to the order of or deposited with or to the order of the Custodian to an account to be opened in the name of the Company. The Custodian shall be a corporation having a capital (in stock or shares) for the time being issued of not less than US$1,000,000 (or equivalent in other currency). In the event of the Custodian desiring to retire the Directors shall use their best endeavours to find a corporation having the said qualifications to act as Custodian and upon doing so the Directors shall appoint such corporation to be Custodian in place of the retiring Custodian. The Directors shall not remove the Custodian unless and until a successor corporation shall have been appointed in accordance with this Article to act in the place thereof. The powers of the Directors under this Article shall include a power to appoint joint custodians and/or sub-Custodians.

## SHARE CERTIFICATES

14.    (1)    Every person whose name is entered as a Member in the Register shall, by request in writing, be entitled without payment to one certificate for all his shares, or upon payment of such reasonable out-of-pocket expenses as the Directors shall from time to time determine, to several certificates, each for one or more of his shares. Where a Member transfers part only of his holding of shares he shall be entitled without payment to a balance certificate for the shares retained by him. Every certificate shall be under the Seal or a facsimile thereof or a securities seal of the Company adopted by the Directors for that purpose and shall specify the number and class and distinguishing numbers (if any) of the shares to which it relates, and the amount paid up thereon. The Company shall not be bound to register more than four persons as the joint holders of any share or shares (except in the case of executors or trustees of a deceased Member) and in the case of a share held jointly by two or more persons, the Company shall not be bound to issue more than one certificate therefor, and delivery of a certificate for a share to one of several joint holders shall be sufficient delivery to all. If a share certificate be defaced, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity as the Directors think fit.

        (2)    Notwithstanding the foregoing, unless and until the Company receives a request in writing from the Member requesting a certificate for his shares pursuant to paragraph (1) of this Article, the Company need not issue the certificate to which the Member is otherwise entitled, in which case such Member's holding shall be recorded in the Register alone.

39832

## REGISTER OF MEMBERS

15.    (1)    The Secretary shall enter or procure the entry in the Register of the particulars required by the Act, and the Register shall be kept in such manner as to show at all times the Members of the Company for the time being and the shares respectively held by them.

(2)    Notwithstanding any other provision of these Articles, the Directors may fix any date as the Record Date for:-

(a)    determining the Members entitled to receive any dividend; and

(b)    determining the Members entitled to receive notice of and to vote at any general meeting of the Company.

## TRANSFER OF SHARES

16.    Subject to such of the restrictions of these Articles as may be applicable, any Member may transfer all or any of his shares by instrument in writing in a usual common form or in any other form which the Directors may approve. Such instrument may be on the back of the share certificate (if issued) and need not be under seal. The transferor shall be deemed to remain the holder of such shares until the name of the transferee is entered in the Register in respect thereof. An instrument of transfer need not be signed by or on behalf of the transferee.

17.    (1)    No transfer of Shares may be made if (i) as a result of such transfer either the transferor or the transferee of such Shares would hold less than the minimum number of Shares as the Directors may from time to time specify or (ii) such transfer would in the opinion of the Directors result in Shares being acquired or held by:-

(a)    any person in breach of the law or requirements of any country or governmental authority; or

(b)    any person or persons in circumstances (whether directly or indirectly affecting such person or persons and whether taken alone or in conjunction with any persons, connected or not, or any circumstances appearing to the Directors to be relevant) which in the opinion of the Directors might result in the Company incurring any liability to taxation or suffering any other pecuniary disadvantage which the Company might not otherwise have incurred or suffered.

(2)    The Directors may decline to recognise any instrument of transfer, unless the instrument of transfer is deposited at the office of the Company or such other place as the

39832

Directors may appoint, accompanied by the certificate, if any, for the shares to which it relates, and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer.

(3)    The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine provided always that such registration shall not be suspended for more than thirty days in any year.

18.    All instruments of transfer which shall be registered shall be retained by the Company, but any instrument of transfer which the Directors may decline to register shall (except in the case of fraud) be returned to the person depositing the same.

## TRANSMISSION OF SHARES

19.    (1)    In the case of the death of a Member the survivors or survivor where the deceased was a joint holder, and the legal personal representatives of the deceased where he was a sole or only surviving holder, shall be the only persons recognised by the Company as having any title to his interest in the shares, but nothing in this Article shall release the estate of a deceased joint holder from any liability in respect of any share jointly held by him.

(2)    Any person becoming entitled to shares in consequence of the death, incompetence or bankruptcy of a Member or otherwise by operation of law upon producing such evidence as the Directors may deem sufficient, may be registered as a Member in respect of such shares, or may, subject to Article 18, transfer such shares to some other person by executing an instrument of transfer in a usual common form or any other form which the Directors may approve.

(3)    If the person so becoming entitled shall elect to be registered himself, he shall deliver or send to the Company a notice in writing signed by him stating that he so elects. If he shall elect to have another person registered, he shall testify his election by executing to such person a transfer of such share. All the limitations, restrictions and provisions of these presents relating to the right to transfer and the registration of transfers of shares shall be applicable to any such transfer as aforesaid as if the death, incompetence or bankruptcy of the Member had not occurred and the transfer were a transfer executed by such Member.

(4)    A person becoming entitled to a share in consequence of the death, incompetence or bankruptcy or otherwise by operation of law of a Member shall be entitled to receive and may give a discharge for all dividends and other moneys payable on or in respect of the share, but he shall not be entitled to receive notice of or to attend or vote at meetings of the Company, or, save as aforesaid, to any of the rights or privileges of a Member until he shall have become a Member in respect of the share.

39832

(5)    For the purposes of this Article, what amounts to incompetence on the part of a person is a matter to be determined by the Supreme Court of the British Virgin Islands or a judge thereof after having regard to all the relevant evidence and the circumstances of the case.

## CONVENING OF MEETINGS OF MEMBERS

20.    (1)    The Directors of the Company may convene meetings of the Members at such times and in such manner and places within or outside the British Virgin Islands as the Directors consider necessary or desirable.

(2)    Upon the written request of Members holding more than ten percent of the votes of the outstanding voting shares in the Company the Directors shall convene a meeting of Members.

21.    A Member shall be deemed to be present at a meeting of Members if he participates by telephone or other electronic means, and all Members participating in the meeting are able to hear each other.

22.    The Directors shall give not less than seven days notice of meetings of Members to those persons whose names on the date the notice is given appear as Members in the share register of the Company and are entitled to vote at the meeting.

23.    A meeting of Members held in contravention of the requirement to give notice pursuant to this Article is valid if a 90% majority of:

(a)    the total number of shares entitled to vote on all matters to be considered at the meeting;

(b)    the votes of each class of shares where Members are entitled to vote thereon as a class together with an absolute majority of the remaining votes;

have waived notice of the meeting and, for this purpose, the presence of a Member at the meeting shall be deemed to constitute waiver on his part.

24.    The inadvertent failure of the Directors to give notice of a meeting to a Member, or the fact that a Member has not received notice, does not invalidate the meeting.

## QUORUM AT GENERAL MEETINGS

25.          No business shall be transacted at any general meeting unless a quorum is present. At a general meeting, subject as in these Articles otherwise provided, two persons present representing in person or by proxy not less than 50 per cent of shares of the Company entitled to vote at general meetings for the time being in issue shall be a quorum for all purposes provided that where there is only one Member, one person representing in person or by proxy such Member shall be a quorum for all purposes. If within thirty minutes from the time appointed for the meeting (including such a general meeting at which a resolution as aforesaid is to be proposed) a quorum is not present, the meeting, if convened on the requisition of or by Members, shall be dissolved. In any other case, it shall stand adjourned for not less than fifteen days at the same place and if at such adjourned meeting a quorum is not present within thirty minutes from the time appointed for holding the meeting, the Members entitled to vote present in person or by proxy, not being less than two, shall be a quorum.

## MAJORITY TO APPROVE RESOLUTIONS

26.    (1)    Subject to the provisions of these Articles, any act or thing which in accordance with these Articles is required to be transacted, made, done, approved, determined, decided or passed by the Company in general meeting shall not be effective except by virtue of a resolution passed by a simple majority of the persons voting thereat upon a show of hands, or, if a poll is duly demanded, by a simple majority of the votes given at such poll.

        (2)    In the case of an equality of votes at a general meeting, whether on a show of hands or on a poll, the chairman of such meeting shall be entitled to a second or casting vote.

27.          Subject to the Act, anything which may be done by resolution of the Company in general meeting or by resolution of a meeting of any class of the Members of the Company, may, without a meeting and without any previous notice being required, be done by resolution in writing signed by, or, in the case of a Member that is a corporation whether or not a company within the meaning of the Act, on behalf of, all the Members who at the date of the resolution would be entitled to attend the meeting and vote on the resolution. A resolution in writing may be signed by, or, in the case of a Member that is a corporation whether or not a company within the meaning of the Act, on behalf of, all the Members, or any class thereof, in as many counterparts as may be necessary.

## PROCEEDINGS AT GENERAL MEETINGS

28.          The Chairman or in his absence the Deputy Chairman of the Company, or in the absence of both of them some other Director nominated by the Directors, shall preside as chairman at every general meeting of the Company, but if at any meeting none of the foregoing persons is present within fifteen minutes after the time appointed for holding the meeting, or if none of them be willing to act as chairman, the Directors present shall choose some Director

present to be chairman, or if no Director is present, or if all the Directors present decline to take the chair, the Members present shall choose some person present to be chairman.

29.         The Chairman may with the consent of any meeting at which a quorum is present (and shall if so directed by the meeting) adjourn the meeting from time to time and from place to place, provided that (a) no business shall be transacted at any adjourned meeting except business which might lawfully have been transacted at the meeting from which the adjournment took place and (b) notice of the adjourned meeting shall, if necessary, be given in accordance with the provisions of these Articles.

30.         At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands unless (before or on the declaration of the result of the show of hands) a poll be demanded by the chairman or by at least three Members present in person or by proxy and entitled to vote or by any Member or Members present in person or by proxy and representing in the aggregate not less than one-tenth of the total voting rights of all Members having the right to vote at the meeting or holding shares conferring a right to vote at the meeting on which there have been paid up sums in the aggregate equal to not less than one-tenth of the total sum paid on all shares conferring that right. Unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried or carried unanimously or by a particular majority or not carried by a particular majority or lost, and an entry to that effect in the book of the proceedings of the Company shall be conclusive evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against such a resolution. If a poll is duly demanded the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

31.         A poll demanded on the election of a chairman, or on a question of adjournment, shall be taken forthwith. A poll demanded on any other question shall be taken at such time and place and in such manner as the chairman directs.

32.         If any votes shall be counted which ought not to have been counted, or might have been rejected, the error shall not vitiate the result of the voting unless it is pointed out at the same meeting, or at any adjournment thereof, and not in that case unless it shall in the opinion of the chairman of the meeting be of sufficient magnitude to vitiate the result of the voting.

33.         Each Director of the Company shall be entitled to attend and speak at any general meeting of the Company.

34.         Subject to any special terms as to voting upon which any shares may be issued or may for the time being be held, at any general meeting on a show of hands every Member who (being an individual) is present in person or (being a corporation) is present by a duly authorised representative and every person holding a valid proxy at such meeting shall have one vote, and

39832

on a poll every Member who is present as aforesaid or by proxy shall have one vote for every share of which he is the holder.

35.         On a poll a Member entitled to more than one vote need not, if he votes, use all his votes, or cast all the votes he uses in the same way.

36.         The following apply in respect of joint ownership of shares:

(a)    if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of Members and may speak as a member;

(b)    if only one of them is present in person or by proxy, he may vote on behalf of all of them; and

(c)    if two or more are present in person or by proxy, they must vote as one.

37.         A Member of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by his committee, receiver, curator bonis, or other person in the nature of a committee, receiver or curator bonis appointed by such court, and such committee, receiver, curator bonis or other person may on a poll vote by proxy, provided that such evidence as the Directors may require of the authority of the person claiming to vote shall have been deposited at the office of the Company not less than thirty-six hours before the time for holding the meeting or adjourned meeting at which such person claims to vote.

38.         No objection shall be raised to the qualification of any voter except at the meeting or adjourned meeting at which the vote objected to is given or tendered, and every vote not disallowed at such meeting shall be valid for all purposes. Any such objection made in due time shall be referred to the chairman of the meeting, whose decision shall be final and conclusive.

## PROXIES AND REPRESENTATIVES

39.         A Member may be represented at a general meeting by a proxy who may speak and vote on behalf of the Member. The instrument appointing a proxy shall be in writing, under the hand of the appointor or of his attorney, or, if such appointor is a corporation, under its common seal or the hand of a duly authorised officer. The instrument appointing a proxy shall be in such form as the Directors may approve either generally or for a particular instance. A Member may appoint more than one proxy to attend on the same occasion. A proxy need not, unless required by law, himself be a Member.

39832

40.          The instrument appointing a proxy and the power of attorney or other authority (if any) under which it is signed, or a notarially certified or office copy of such power of attorney, shall be deposited at the office of the Company or at such other place as is specified in the notice of meeting or in the instrument of proxy issued by the Company before the time appointed for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote and in default the instrument of proxy shall not be treated as valid.   No instrument appointing a proxy shall be valid after the expiration of twelve months from the date named in it as the date of its execution, except at an adjourned meeting or on a poll demanded at a meeting or an adjourned meeting in cases where the meeting was originally held within twelve months from such date.

41.          The Directors may at the expense of the Company send, by post or otherwise, to the Members instruments of proxy (with or without stamped envelopes for their return) for use at any general meeting or at any meeting of any class of Members of the Company either in blank or nominating in the alternative any one or more of the Directors or any other persons.  If, for the purpose of any meeting invitations to appoint as a proxy a person or one of a number of persons specified in the invitations are issued at the expense of the Company, such invitations shall be issued to all (and not to some only) of the Members entitled to be sent a notice of the meeting and vote thereat by proxy.

42.          A vote given in accordance with the terms of an instrument of proxy shall be valid, notwithstanding the death or insanity of the principal or the revocation of the instrument of proxy, or of the authority under which the instrument of proxy was executed, or the transfer of the share in respect of which the instrument of proxy is given, provided that no intimation in writing of such death, insanity, revocation or transfer shall have been received by the Company at the office of the Company before the commencement of the meeting or adjourned meeting at which the instrument of proxy is used.

43.          Any corporation which is a Member of the Company may authorise such person as it thinks fit to act as its representative at any meeting of the Company, or at any meeting of any class of Members of the Company, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Member of the Company.

## DIRECTORS

44.          The first Director or Directors of the Company shall be elected by the subscriber to the Memorandum and the first Director or Directors may elect any number of additional Directors as it or they may determine up to the maximum number set by Article 45.  Thereafter, the Directors shall be elected by the Members for such term as the Members determine

45.          The minimum number of Directors shall be one and the maximum number shall be seven.

46.   (1)     Each Director shall hold office for the term, if any, fixed by resolution of Members or until his earlier death, resignation or removal.

(2)     A Director may be removed from office, with or without cause, by a resolution of Members but not by resolution of Directors.

(3)     A Director may resign his office by giving written notice of his resignation to the Company and the resignation shall have effect from the date the notice is received by the Company or from such later date as may be specified in the notice.

47.          A vacancy in the board of Directors resulting from the death, resignation or removal of a Director may be filled by a resolution of the remaining Directors.

48.   (1)     With the prior or subsequent approval by a resolution of Members, the Directors may, by a resolution of Directors, fix the emoluments of Directors with respect to services to be rendered in any capacity to the Company.

(2)     A Director shall not require a share qualification, and may be an individual or a company.

(3)     Any Director which is a body corporate may appoint any person its duly authorised representative for the purpose of representing it at meetings of the board of Directors or with respect to unanimous written consents.

49.   (1)     A Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with his office of Director, or may act in a professional capacity to the Company, on such terms as to tenure of office, remuneration and otherwise as the Directors may determine.

(2)     No Director or intending Director shall be disqualified by his office from contracting with the Company either as vendor, purchaser or otherwise, nor shall any such contract or any contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office, or of the fiduciary relation thereby established, but the nature of his interest must be declared by him at the meeting of the Directors at which the question of entering into the contract or arrangement is first taken into consideration, or if the Director was not at the date of that meeting interested in the proposed contract or arrangement, then at the next meeting of the Directors held after he

becomes so interested, and in a case where the Director becomes interested in a contract or arrangement after it is made then at the first meeting of the Directors held after he becomes so interested.

(3)    Save as provided in this Article, a Director shall not vote in respect of any contract or arrangement or any other proposal whatsoever in which he has any material interest (otherwise than by virtue of his interests in shares or debentures or other securities of or otherwise in or through the Company) unless the nature of his interest is declared at the first opportunity at a meeting of the Directors or by writing to the Directors and no other Director objects to the interested Director voting on such arrangement.  A Director shall not be counted in the quorum at a meeting in relation to any resolution on which he is debarred from voting.

(4)    If any question shall arise at any meeting as to the materiality of a Director's interest or as to the entitlement of any Director to vote and such question is not resolved by his voluntarily agreeing to abstain from voting, such question shall be referred to the chairman of the meeting and his ruling in relation to such Director shall be final and conclusive except in a case where the nature or extent of the interests of the Director concerned have not been fairly disclosed.

(5)    The Company in general meeting may suspend or relax the provisions of this Article to any extent or ratify any transaction not duly authorised by reason of a contravention of this Article.

50.    Any Director may continue to be or become a president, vice president, director, managing director, manager or other officer or member of any other company in which this Company may be interested, and no such Director shall be accountable for any remuneration or other benefits received by him as a president, vice president, director, managing director, manager or other officer or member of any such other company.  The Directors may exercise the voting powers conferred by the shares in any other company held or owned by the Company, or exercisable by them as directors of such other company, in such manner in all respects as they think fit (including the exercise thereof in favour of any resolution appointing themselves or any of them presidents, vice presidents, directors, managing directors, managers or other officers of such company, or voting or providing for the payment of remuneration to the presidents, vice presidents, directors, managing directors, managers or other officers of such company), and subject to the provisions of the preceding Article any Director may vote in favour of the exercise of such voting rights in the manner aforesaid, notwithstanding that he may be, or be about to be, appointed a president, vice president, director, managing director, manager or other officer of such other company and as such is or may become interested in the exercise of such voting rights in manner aforesaid.

51.    No person other than a Director retiring at the meeting shall, unless recommended by the Directors for election, be eligible for the office of a Director at any general meeting

39832

unless, not less than six or more than forty-eight days before the day elected for the meeting, there shall have been given to the Company notice in writing by some Member duly qualified to be present and vote at the meeting for which such notice is given of his intention to propose such person for election, and also notice in writing signed by the person to be proposed of his willingness to be elected.

## POWERS OF DIRECTORS

52.         The business of the Company shall be managed by the Directors, who may exercise all such powers of the Company as are not by the Memorandum, these Articles or the Act reserved to the Members, subject nevertheless to any regulations of these Articles, to the provisions of the Memorandum and of the Act, and to such regulations, being not inconsistent with the aforesaid regulations or provisions, as may be prescribed by the Company in general meeting, but no regulation made by the Company in general meeting shall invalidate any prior act of the Directors which would have been valid if such regulation had not been made. The general powers given by this Article shall not be limited or restricted by any special authority or power given to the Directors by any other Article.

53.    (1)    The Directors may, subject to these Articles, establish any committees (not being committees consisting solely of Directors to which paragraph (2) of this Article applies), local boards or agencies for managing any of the affairs of the Company, either in the British Virgin Islands or elsewhere and may appoint any persons to be members of such committees, local boards or agencies, and may fix their remuneration and may delegate to any such committee, local board or agency any of the powers, authorities and discretions vested in the Directors, with power to sub-delegate, and may authorise the members of any local board, or any of them, to fill any vacancies therein, and to act notwithstanding vacancies, and any such appointment or delegation may be made upon such terms and subject to such conditions as the Directors may think fit, and the Directors may remove any persons so appointed, and may annul or vary any such delegation, but no person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

(2)    The Directors may, by a resolution of the Directors, designate one or more committees, each consisting of one or more Directors. Each committee of Directors has such powers and authorities of the Directors, including the power and authority to affix the Seal, as are set forth in the resolution of Directors establishing the committee, except that no committee has any power or authority either to amend the Memorandum or these Articles or with respect to the matters requiring a resolution of Directors under these Articles. The meetings and proceedings of any such committee consisting of two or more members shall be governed by the provisions of these Articles regulating the meetings and proceedings of the Directors.

(3)    The Directors may from time to time, and at any time, by power of attorney under the Seal, appoint any company, firm or person, or any fluctuating body of persons, whether

nominated directly or indirectly by the Directors, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney may contain such provisions for the protection and convenience of persons dealing with any such attorney as the Directors may think fit, and may also authorise any such attorney to sub-delegate all or any of the powers, authorities and discretions vested in him.

54.        The Directors may from time to time appoint any one or more of their body to the office of managing Director, for such period and on such terms as they think fit. A Director appointed to the office of managing Director shall receive such remuneration (whether by way of salary commission or participation in profits or otherwise) as the Directors may determine.

55.        The Directors may entrust to and confer upon any Director appointed to the office of managing Director any of the powers exercisable by them as Directors upon such terms and conditions and with such restrictions as they think fit, and either collaterally with or to the exclusion of their own powers, and may from time to time revoke, withdraw or vary all or any of such powers.

56.        All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments, and all receipts for moneys paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as the Directors shall from time to time by resolution determine.

## REGISTER OF DIRECTORS

57.    (1)    The Company may keep a register to be known as a register of Directors containing:

> (a)    the names and addresses of the persons who are Directors;
>
> (b)    the date on which each person whose name is entered on in the register was appointed as a Director; and
>
> (c)    the date on which each person named as a Director ceased to be a Director.

(2)    The register of Directors may be in such form as the Directors approve, but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents.

39832

Fairfield Sigma Limited                                                    Page 31

(3)    A copy of the register of Directors, commencing from the date of the registration of the Company, shall be kept at the registered office of the Company.

(4)    The register of Directors is prima facie evidence of any matters directed or authorised by the Act to be contained therein.

## THE MANAGER

58.    (1)    The Directors may appoint any person or persons as Manager of the Company to exercise all or any of the duties, powers and discretions exercisable by the Directors upon such terms and conditions and for such period and with such restrictions as the Directors think fit and whether collaterally with or to the exclusion of their own powers. The Directors shall procure that in any agreement appointing any person as Manager provisions shall be contained restricting the Manager and any investment adviser appointed by the Manager dealing with the Company as beneficial owner on the sale or purchase of investments to or from the Company except on a basis approved by the Directors from time to time or without the consent of the Directors otherwise dealing with the Company as principal.

(2)    The Manager shall be entitled to receive for its services such fees, including a fee on the issue of Shares, as may from time to time be agreed between the Manager and the Company.

## PROCEEDINGS OF DIRECTORS

59.    (1)    The Directors may meet at such times and in such manner and places within or outside the British Virgin Islands as the Directors may determine to be necessary or desirable. Questions arising at any meeting shall be determined by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote.

(2)    A Director shall be deemed to be present at a meeting of Directors if he participates by telephone or other electronic means and all Directors participating in the meeting are able to hear each other.

(3)    An action that may be taken by the Directors or a committee of Directors at a meeting may also be taken by a resolution of Directors or a committee of Directors consented to in writing or by telex, telegram, cable or other written electronic communication, without the need for any notice.

39832

(4)    A Director may by a written instrument appoint an alternate who need not be a Director and an alternate is entitled to attend meetings in the absence of the Director who appointed him and to vote or consent in place of the Director.

60.    (1)    A Director may, and the Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors. Notice of every meeting of Directors shall be given to all Directors.

(2)    A Director shall be given not less than three days notice of meetings of Directors. A meeting of Directors held without three days notice having been given to all Directors is valid if a majority of Directors entitled to vote at the meeting waive notice of the meeting and, for this purpose, the presence of a director at a meeting shall be deemed to constitute waiver on his part. The inadvertent failure to give notice of a meeting to a Director, or the fact that a Director has not received the notice, does not invalidate the meeting.

61.    The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed at any other number shall be two, unless there is only one Director, in which case a quorum shall be one. For the purposes of this Article an alternate shall be counted in a quorum, but for the purpose of deciding whether or not there is a quorum for a meeting, an alternate shall only count as one person.

62.    The continuing Directors or a sole continuing Director may act notwithstanding any vacancies in their body, but if and so long as the number of Directors is reduced below the minimum number fixed by or in accordance with these Articles, the continuing Directors or Director may act for the purpose of appointing Directors to fill any vacancy, summoning general meetings of the Company and for preserving the assets of the Company, but not for any other purpose. If there are no Directors or Director able or willing to act, then any Member may summon a general meeting for the purpose of appointing a Director or Directors.

63.    The Directors may appoint officers of the Company at such times as they may determine. Such officers may consist of a Chairman, a Deputy Chairman, a President and one or more Vice Presidents and such other officers as they may from time to time determine. Any number of offices may be held by the same person.

64.    Unless otherwise agreed by a majority of those attending and entitled to attend and vote thereat, the President or Chairman, as the case may be, or in his absence a Vice President or Deputy Chairman, as the case may be, shall preside at all meetings of the Directors, but if at any meeting none of the foregoing be present within five minutes after the time appointed for holding the same, the Directors present may choose one of their number to be chairman of the meeting.

65.        A resolution in writing signed by all the Directors or by all the members of a committee of the Directors for the time being shall be as effective as a resolution passed at a meeting of the Directors or of such committee, duly convened and held, and any such resolution may consist of several documents in the like form each signed by one or more of the Directors.

66.        A meeting of the Directors for the time being at which a quorum is present shall be competent to exercise all powers and discretions for the time being exercisable by the Directors.

67.        All acts done by any meeting of Directors, or of a committee of Directors, or by any person acting as Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director, or person acting as aforesaid, or that they or any of them were disqualified, or had vacated office, or were not entitled to vote, be as valid as if every such person had been duly appointed, and was qualified and had continued to be a Director and had been entitled to vote

## MINUTES

68.        The Directors shall cause minutes to be made:-

    (a)    of all appointments of officers made by the Directors;

    (b)    of the names of the Directors present at each meeting of Directors and of any committee of Directors; and

    (c)    of all resolutions and proceedings at all meetings of the Company and of the Directors and of committees of Directors.

## THE SECRETARY

69.        A Secretary may be appointed by the Directors and shall hold office during the pleasure of the Directors. Anything by the Act required or authorised to be done by or to the Secretary may, if the office is vacant or there is for any other reason no Secretary capable of acting, be done by or to any Assistant or Deputy Secretary or if there is no Assistant or Deputy Secretary capable of acting, by or to any officer of the Company authorised generally or specially in that behalf by the Directors.

70.        The Secretary shall attend all meetings of the Company and of the Directors or committee of Directors held in the British Virgin Islands to keep correct minutes of such meetings and enter the same in proper books provided for the purpose. He shall perform such other duties as are prescribed by the Act or these Articles, or as shall be prescribed by the

39832

Directors. The Secretary shall receive such salary or other remuneration as the Directors shall from time to time determine.

71.    Any provisions of the Act or of these Articles requiring or authorising a thing to be done by or to a Director and the Secretary shall not be satisfied by its being done by or to the same person acting both as a Director and as, or in the place of, the Secretary.

## THE SEAL

72.    The Directors shall provide for the safe custody of the Seal which shall only be used by the authority of the Directors or of a committee of Directors authorised by the Directors in that behalf. Every instrument to which the Seal shall be affixed shall be signed by any two Directors or by a Director and the Secretary or by the Director if there is only one Director or the Seal shall be affixed under the signature of some other person appointed by the Directors for that purpose. Notwithstanding the foregoing, the Secretary may affix the Seal of the Company over his signature only to any authenticated copies of the Memorandum or these Articles, the minutes of any meetings or any other documents required to be authenticated by him, and further when the instrument shall be a share certificate it shall be sufficient for the share certificate to bear a facsimile of the Seal or a securities seal (in such form as the Directors shall approve) and the facsimile signature of two Directors or of one Director and the Secretary or of the Director if there is only one Director and be signed by an authorised representative for the time being of the Company or its share registrar.

## DIVIDENDS AND DISTRIBUTIONS

73.    The Company may by a resolution of Directors declare and pay dividends in money, shares, or other property but dividends shall only be declared and paid out of surplus. Dividends shall be paid to the Members in accordance with their respective rights and priorities. The Directors shall have power to declare and pay dividends accordingly and other distributions at such times and at such intervals as they may think fit. Dividends may be paid in cash or in specie.

74.    (1)    Subject to the rights of persons, if any, entitled to shares with special rights as to dividends, all dividends or other distributions declared or paid to the holders of any class of share shall be declared and paid to such holders in proportion to the shares held by them.

(2)    All unclaimed dividends or distributions may be invested or otherwise made use of by the Directors for the benefit of the Company until claimed. No dividend or distribution shall bear interest as against the Company.

Fairfield Sigma Limited                                                                  Page 35

(3)    The Directors may deduct from any dividend or other moneys payable to any Member on or in respect of a share all sums of money (if any) presently payable by him to the Company in relation to the shares of the Company.

75.            Any dividends or other moneys payable on or in respect of a share may be paid by cheque or warrant sent through the post to the registered address of the Member or person entitled thereto, and in the case of joint holders to any one of such joint holders, or to such person and such address as the holder or joint holders may direct. Every such cheque or warrant shall be sent at the risk of the person entitled to the money represented thereby and where being sent to an address outside the British Virgin Islands shall as far as may be practicable be forwarded by airmail.

76.            If several persons are registered as joint holders of any share, any one of them may give effectual receipts for any moneys payable on or in respect of the share.

77.            The Directors may carry to reserve out of the profits or gains of the Company (including, if allowed by law, any surplus of the Company) such sums as they think proper as a reserve or reserves which shall at the discretion of the Directors be applicable for any purpose to which the profits or gains of the Company may be properly applied and pending such application may be employed in the business of the Company as the Directors may from time to time think fit.

78.            In the case of a dividend of authorized but unissued shares with par value, an amount equal to the aggregate par value of the shares shall be transferred from surplus to capital at the time of the distribution.

79.            In the case of a dividend of authorized but unissued shares without par value, the amount designated by the Directors shall be transferred from surplus to capital at the time of the distribution, except that the Directors must designate as capital an amount that is at least equal to the amount that the shares are entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

## CAPITALISATION OF PROFITS

80.    (1)    The Directors may resolve that it is desirable to capitalise any undivided profits or surplus of the Company (including profits carried and standing to any capital or other reserve or reserves) relating to the Fund, and accordingly appropriate the profits or sum resolved to be capitalised to the Members holding shares of relevant class in the proportion in which such profits or sum would have been divisible amongst them had the same been applied or been applicable in making the payment of dividends and to apply such profits or sum on their behalf, either in or towards paying up the amounts, if any, for the time being unpaid on any shares of the

39832

relevant class or debentures held by such Members respectively, or in paying up in full unissued shares of the relevant class or debentures of the Company of a nominal amount equal to such profits or sum, such shares or debentures to be allotted and distributed, credited as fully paid up, to and amongst such Members in the proportion aforesaid, or partly in one way and partly in the other provided that a surplus account relating to that class may, for purposes of this Article, only be applied in the paying up of unissued shares of the same class to be issued to Members of the Company holding shares of the relevant class as fully paid shares.

(2)     Whenever such a resolution as aforesaid shall have been passed the Directors shall make all appropriations and applications of the profits or sum resolved to be capitalised thereby, and all allotments and issues of fully paid shares, if any, and generally shall do all acts and things required to give effect thereto, with full power to the Directors to make such provision by the issue of fractional shares or by payment in cash or otherwise as they think fit for the case of shares becoming distributable in fractions and also to authorise any person to enter on behalf of all the Members entitled to the benefit of such appropriations and applications into an agreement with the Company providing for the allotment to them respectively, credited as fully paid up, of any further shares to which they may be entitled upon such capitalisation, and any agreement made under such authority shall be effective and binding on all such Members.

## ACCOUNTS AND FINANCIAL STATEMENTS

81.       The Directors shall cause to be kept proper accounts with respect to:-

(a)    all sums of money received and expended by the Company and the matters in respect of which such receipt and expenditure take place;

(b)    all sales and purchases of assets by the Company; and

(c)    the assets and liabilities of the Company.

82.       The books of account shall be kept at the office of the Company, or (subject to the provisions of the Act) at such other place as the Directors think fit, and shall always be open to inspection by the Directors.

83.       No Member (other than a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by the Act or authorised by the Directors or by the Company in general meeting.

84.       The financial year end of the Company may be determined by resolution of the Directors and failing such resolution shall be the Accounting Date in each year.

Fairfield Sigma Limited                                                          Page 37

85.        At least once every financial year, the Company shall send to each Member printed copies of the financial statements of the Company made up as of the date of the last financial year end.

86.        Every balance sheet contained in the financial statements sent to each Member shall be signed on behalf of the Board of Directors by two of the Directors.

87.        The Directors' report, if any, and Auditor's report, if any, shall be attached to the financial statements.

88.        Every account of the Directors when audited shall be conclusive except as regards any error discovered therein within three months next after the audit. Whenever such an error is discovered within that period, the financial statements shall forthwith be corrected and thereupon shall be conclusive.

## AUDIT

89.    (1)    The Directors or Members may appoint an independent representative of the Members as Auditor of the accounts of the Company and such Auditor shall hold office until the Directors or Members shall appoint another Auditor or remove the Auditor, provided that if the Auditor was appointed by the Members only the Members may appoint another Auditor or remove the Auditor.

       (2)    The Auditor may be a Member but no Director or officer of the Company shall, during his continuance in office, be eligible for appointment as Auditor.

       (3)    The remuneration of the Auditor shall be determined by the Members or by the Directors if so authorised by the Members.

90.        If the Auditor's office becomes vacant by the resignation or death of the Auditor or by his becoming incapable of acting by reason of illness or absence from the British Virgin Islands at a time when his services are required, the Directors shall, as early as practicable, appoint an Auditor to fill the vacancy or an acting Auditor to act during the incapacity of the Auditor, or if the Auditor was appointed by the Members the Directors shall, as early as practicable, convene a general meeting to appoint an Auditor to fill the vacancy or an acting Auditor to act during the incapacity of the Auditor.

91.    (1)    The Auditor shall examine such books, accounts and vouchers as may be necessary for the performance of his duties in accordance with generally accepted auditing standards in the British Virgin Islands or in such other country or jurisdiction as the Directors may determine.

39832

(2)    The Auditor shall be furnished with a list of all books kept by the Company and shall at all times have the right of access to the books and accounts and vouchers of the Company, and shall be entitled to require from the Directors and officers of the Company such information and explanations as may be necessary for the performance of his duties.

(3)    The Auditor shall make a report to the Members on the financial statements examined by him during his tenure of office, and the report shall state whether or not in his opinion the financial statements present fairly, in all material aspects, the financial position of the Company and the results of its operations and the changes in its net assets in accordance with generally accepted accounting principles in the British Virgin Islands or in such other country or jurisdiction as the Directors may determine.

92.        The Auditor shall be entitled to attend any general meeting of the Company at which any financial statements which have been examined or reported on by him are to be laid before the Company and to make any statement or explanations he may desire with respect to the financial statements.

## NOTICES

93.        Any notice or document may be served by the Company on any Member either personally or by sending it through the post in a prepaid letter addressed to such Member at his address as appearing in the Register.  In the case of joint holders of a share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all joint holders.

94.        Any Member present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting, and, where requisite, of the purposes for which such meeting was convened.

95.    (1)    Any notice or other document, if served by post, shall be deemed to have been served at the time when the letter containing the same is posted, and in proving such service it shall be sufficient to prove that the letter containing the notice or document was properly addressed and duly posted.

(2)    All notices or other documents being posted to addresses outside the British Virgin Islands shall so far as may be practicable be forwarded by airmail.

96.        Any notice or document delivered or sent by post to or left at the registered address of any Member in pursuance of these Articles shall, notwithstanding that such Member be then dead or bankrupt, and whether or not the Company had notice of his death or bankruptcy, be deemed to have been duly served in respect of any share registered in the name of such Member as sole or joint holder, unless his name shall, at the time of the service of the notice or

39832

document, have been removed from the Register as the holder of the share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all persons interested (whether jointly with or as claiming through or under him) in that share.

## WINDING UP

97.    (1)    No resolution to wind up the Company shall be deemed passed unless it is passed by a majority of the votes cast at a general meeting in accordance with the provisions of these Articles.

(2)    If the Company shall be wound up, the liquidator shall apply the assets of the Company in satisfaction of creditors' claims in such manner as he thinks fit.

(3)    The surplus assets available for distribution among the Members shall then be applied in the payment to the holders of each class of shares in accordance with the rights and restrictions of each such class and otherwise equally, such payment being made in proportion to the number of shares of the class held.

(4)    If the Company shall be wound up (whether the liquidation is voluntary or by or under the supervision of the Court) the liquidator may, with the authority of a resolution passed in general meeting, divide among the Members in specie the whole or any part of the assets of the Company, and whether or not the assets shall consist of property of one kind or shall consist of properties of different kinds, and may for such purposes set such value as he deems fair upon any one or more class or classes of property, and may determine how such division shall be carried out as between the Members or different classes of Members. The liquidator may, with the like authority, vest any part of the assets in trustees upon such trust for the benefit of Members as the liquidator, with the like authority, shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no Member shall be compelled to accept any shares in respect of which there is a liability.

## FORMS

98.    The forms in the Schedule may be used, subject to such variations or alterations to meet the special circumstances or particular cases as may be necessary and as the Directors may approve.

## INDEMNITY

99.    (1)    Each Director, Secretary or other officer of the Company shall be indemnified by the Company against, and it shall be the duty of the Directors out of the funds of the Company to pay all costs, losses, and expenses which any such Director or officer may incur or become liable for by reason of any contract entered into, or act or thing done by him as such Director or

officer, or in any way in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Company, and have priority as between the Members over all other claims but only if any such Director or officer acted honestly and in good faith with a view to the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

(2)    No Director, Secretary or other officer of the Company shall be liable for the acts, receipts, neglects or defaults of any other Director or officer, or for joining in any receipt or other act for conformity, or for any loss or expense happening to the Company through the insufficiency or deficiency of title to any property acquired by order of the Directors for or on behalf of the Company, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Company shall be invested, or for any loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default, or oversight on his part, or for any other loss, damage, or misfortune whatever which shall happen in relation to the execution of the duties of his office or in relation thereto, to the extent permitted by law.

(3)  The decision of the Directors as to whether the person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the person had no reasonable cause to believe that his conduct was unlawful is in the absence of fraud, sufficient for the purposes of this Article, unless a question of law is involved.

## FUNDAMENTAL CHANGES

100.    The Company may by resolution of Members continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws.

101.    Notwithstanding section 80 of the Act, the Directors may sell, transfer, lease, exchange or otherwise dispose of the assets of the Company without the sale, transfer, lease, exchange or other disposition being authorised by a resolution of Members.

39832

Fairfield Sigma Limited

We, Caribbean Corporation Company Limited of Citco Building, P.O. Box 662, Road Town, Tortola, British Virgin Islands for the purposes of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to this Articles of Association the 20th day of November, 1990 in the presence of:

Witness                                                    Subscriber

Sgd. B. Patrick                                      Sgd. B. d'Ancona/A. Solomon
Road Town, Tortola                             For and on behalf of
Secretary                                               Caribbean Corporation
                                                             Company Limited

Fairfield Sigma Limited                                            Page 42

## THE SCHEDULE

## FORM "A"

## TRANSFER OF SHARES

I/We  .................................................................................................[the transferor]

in consideration of....................................................................................................[amount]

DO HEREBY TRANSFER TO.........................................................................[the transferee]

of.............................................................................................................................[address]

.........................................................................................................[number and class of shares]
in the Company represented by the attached/within certificate.


AS WITNESS my/our hand(s) the       day of          20  .


SIGNED by the above-named transferor(s)
in the presence of:

                                            ....................................................................
                                            (Signature of Transferor(s))


....................................................
(Witness)

                                            ....................................................................
                                            (Signature of Transferee(s))


....................................................
(Witness)


39832

Fairfield Sigma Limited

## FORM "B"

### TRANSFER BY PERSONAL REPRESENTATIVES

I/We having become entitled in consequence of the death of (name of deceased Member) ........................................ to (number) ...................... share(s) comprised in certificate(s) numbered .................. standing in the Register of Members of ................................ in the name of the said deceased Member, instead of being registered myself/ourselves in consideration of the sum of (state total consideration) ...................... paid to me/us by name(s) of transferee(s)........................................................................................................................................ of (address(es) ............................................................................................................................... (hereinafter called "the transferee(s)") do hereby transfer to the transferee(s) (number and class of shares transferred) .................... share(s) in the said Company subject to the several conditions on which the same were held immediately before the execution hereof; and I/We the transferee(s) do hereby agree to take the said share(s) hereby transferred subject to the conditions aforesaid.

AS WITNESS my/our hand(s) the        day of        20  .

SIGNED by the above-named person(s)
entitled in the presence of:

.................................................................

.................................................................
(Signatures of person(s) entitled)

SIGNED by the above-named Transferee(s)
in the presence of:

.................................................................

.................................................................
(Signature(s) of Transferee(s))

39832

Fairfield Sigma Limited                                                                                Page 44

---

## FORM "C"

### PROXY LIMITED TO ONE MEETING

I/We ...............................................................................................................................[name]

the holder of ....................................................................................................[number] shares

hereby appoint .........................................................................................................[proxy]

of.............................................................................................................................[address]

 or failing whom..........................................................................................................[proxy]

of.............................................................................................................................[address]

to be my/our proxy to vote on me/our behalf at the general meeting of the

Members of the company to be held on the ........ day of ............ 20 .., and at any adjournment

thereof.

Unless otherwise instructed with respect to any particular resolution(s) the proxy will vote or
abstain as he thinks fit.

AS WITNESS my/our hand(s) this        day of          20   .

SIGNED by

.............................................
(Signature(s) of Member(s))

.............................................
(Witness)

39832

# EXHIBIT E

Articles of Association of Fairfield Lambda Limited



No 37757

## The International Business Companies Act, 1984

### MEMORANDUM OF ASSOCIATION
### ARTICLES OF ASSOCIATION

of

### FAIRFIELD LAMBDA LIMITED

### An International Business Company

Incorporated the 7th day of December, 1990
Amendment registered the 22nd day of November, 1993
Amendment registered the 17th day of July, 1997
Amendment registered the 4th day of June, 2003
Amendment registered this the 10th day of October, 2003

### CITCO B.V.I. LIMITED
CITCO Building, Wickhams Cay
Road Town, Tortola
British Virgin Islands
Tel: 1(284) 494-2217 Fax: 1(284) 494-3917



## TERRITORY OF THE BRITISH VIRGIN ISLANDS
## THE INTERNATIONAL BUSINESS COMPANIES ACT
## AMENDED AND RESTATED MEMORANDUM OF ASSOCIATION
### of
## FAIRFIELD LAMBDA LIMITED

1.  **NAME**

    The name of the Company is Fairfield Lambda Limited.

2.  **REGISTERED OFFICE**

    The Registered Office of the Company will be Citco Building, Wickhams Cay, P.O. Box 662, Road Town, Tortola, British Virgin Islands.

3.  **REGISTERED AGENT**

    The Registered Agent of the Company will be Citco B.V.I. Limited, Wickhams Cay, P.O. Box 662, Road Town, Tortola, British Virgin Islands.

4.  **GENERAL OBJECTS AND POWERS**

    (1)  The object of the company is to engage in any act or activity that is not prohibited under any law for the time being in force in the British Virgin Islands.

    (2)  The Company may not:

    (a)  carry on business with persons resident in the British Virgin Islands;

    (b)  own an interest in real property situate in the British Virgin Islands, other than a lease referred to in paragraph (e) of subclause (3);

    (c)  carry on banking or trust business, unless it is licensed under the Banks and Trust Companies Act, 1990;

    (d)  carry on business as an insurance or reinsurance company, insurance agent or insurance broker, unless it is licensed under an enactment authorizing it to carry on that business;

    (e)  carry on the business of company management unless it is licensed under the Company Management Act, 1990; and

Fairfield Lambda Limited                                                    Page 2

---

   (f) carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands.

 (3) For purposes of paragraph (a) of subclause (2), the Company shall not be treated as carrying on business with persons resident in the British Virgin Islands if:

   (a) it makes or maintains deposits with a person carrying on banking business within the British Virgin Islands;

   (b) it makes or maintains professional contact with solicitors, barristers, accountants, bookkeepers, trust companies, administration companies, investment advisers or other similar persons carrying on business within the British Virgin Islands;

   (c) it prepares or maintains books and records within the British Virgin Islands;

   (d) it holds, within the British Virgin Islands, meetings of its Directors or members;

   (e) it holds a lease of property for use as an office from which to communicate with members or where books and records of the Company are prepared or maintained;

   (f) it holds shares, debt obligations or other securities in a company incorporated under The International Business Companies Ordinance or under The Companies Act; or

   (g) shares, debt obligations or other securities in the Company are owned by any person resident in the British Virgin Islands or by any company incorporated under The International Business Companies Ordinance or under the Companies Act.

 (4) The Company shall have all such powers as are permitted by law for the time being in force in the British Virgin Islands which are necessary or conducive to the conduct, promotion or attainment of the object of the Company.

## 5. CURRENCY

Shares in the Company shall be issued in Swiss Francs.

## 6. AUTHORISED CAPITAL

The authorised capital of the Company is CHF 50,000.00.



37006

7.    CLASSES, NUMBER AND PAR VALUE OF SHARES

The authorised capital shall be divided into two classes, being 1,000,000 Class A Shares of CHF 0.01 par value each, and 4,000,000 Class B Shares of CHF 0.01 par value each. Shares will not be issued in series.

8.    DESIGNATIONS, POWERS, PREFERENCES, ETC. OF SHARES

The shares of the Company shall have the following rights and restrictions:

(1)    the holders of Class A Shares shall, subject to the provisions of the Articles:

    (a)    be entitled to one vote per Class A Share;

    (b)    be entitled to such dividends as the Directors may from time to time declare;

    (c)    in the event of a winding-up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, be entitled, subject to the provisions of the Articles, to share pro rata in the surplus assets of the Fund; and

    (d)    be entitled, and subject, to redemption or repurchase of such Class A Shares as provided in the Articles.

(2)    the holders of Class B Shares shall, subject to the provisions of the Articles:

    (a)    be entitled to one vote per Class B Share;

    (b)    be entitled to such dividends as the Directors may from time to time declare;

    (c)    in the event of a winding-up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, be entitled, subject to the provisions of the Articles, to share pro rata in the surplus assets of the Fund; and

    (d)    be entitled, and subject, to redemption or repurchase of such Class B Shares as provided in the Articles.

Except as provided in this Memorandum of Association and the Articles of Association, the designations, powers, preferences, rights, qualifications, limitations and restrictions of each share that the Company is authorised to issue shall be fixed by the Directors, but the Directors shall not allocate different rights as to voting, dividends

37006

Fairfield Lambda Limited                                                     Page 4

distributions on liquidation or redemption unless the Memorandum of Association shall have been amended.

9.    SHARE ISSUANCE

Shares in the Company shall be issued as registered shares.

10.    TRANSFER OF REGISTERED SHARES

Registered shares in the Company may be transferred subject to the prior approval of the Directors of the Company as evidenced by a resolution of Directors.

11.    AMENDMENT OF MEMORANDUM AND ARTICLES OF ASSOCIATION

The Company may amend its Memorandum of Association and Articles of Association by a resolution of the Directors or by a resolution of the Members.

12.    DEFINITIONS

The meanings of words in this Memorandum of Association are as defined in the Articles of Association annexed hereto.


We, Caribbean Corporation Company Limited of Citco Building, P.O. Box 662, Road Town, Tortola, British Virgin Islands for the purposes of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to this Memorandum of Association the 7th day of December, 1990 in the presence of:


Witness                                          Subscriber


(Sgd. L. Hanley)                                 (Sgd: B. d'Ancona/H. Skelton)
Road Town, Tortola                               For and on behalf of
Secretary                                        Caribbean Corporation
                                                 Company Limited

37006



### TERRITORY OF THE BRITISH VIRGIN ISLANDS

### THE INTERNATIONAL BUSINESS COMPANIES ACT

### AMENDED AND RESTATED ARTICLES OF ASSOCIATION

#### of

### FAIRFIELD LAMBDA LIMITED

### INTERPRETATION

1.　　　　In these Articles unless there is something in the subject or context inconsistent therewith:-

"Accounting Date" means, subject to the provisions of these Articles, the 31st day of December;

"Act" means the International Business Companies Act as amended from time to time;

"Articles" means these Articles of Association as herein contained or as the same may from time to time be altered or amended;

"Auditor" means the person or firm for the time being appointed as Auditor of the Company;

"Base Currency" means Swiss Francs;

"business day" means any day which is not a Saturday or a Sunday and that is not a public holiday or a day on which banks are generally authorised or obliged by law or regulation to close in the Netherlands, the Republic of Ireland or the United States of America;

"Company" means Fairfield Lambda Limited;

"Custodian" means the person or persons for the time being appointed as custodian, joint custodians or prime broker pursuant to the Articles;

"Dealing Day" means with respect to subscriptions the first business day following a Valuation Day, and with respect to redemptions a Valuation Day, and/or, in either case, such other day or days in addition thereto or in substitution therefor as may from time to time be determined by the Directors either in any particular case or generally;

"Dealing Time" means the time by which an application for subscription or a request for redemption must be received, which in relation to subscriptions is 5:00 pm (Amsterdam time) on the third to the last business day of a month and in relation to redemptions is

Fairfield Lambda Limited                                                    Page 2

5:00 pm (Amsterdam time) on the day fifteen business days before a Dealing Day, or, in either case, such other time or day as the Directors may from time to time determine either in any particular case or generally;

"Director" means a person who is a director of the Company;

"duties and charges" includes all stamp and other duties, taxes, Governmental charges, brokerage, bank charges, transfer fees and registration fees;

"Fund" means the assets and liabilities of the Company as a whole;

"Initial Charge" means an amount as agreed between the Directors and the Manager but not exceeding 5% of the Subscription Price payable to the Manager, an affiliate of the Manager or an unaffiliated placement agent;

"Investment" means any right or interest in any share, stock, bond, debenture, debenture stock, unit, sub-unit, or other security or any loan of money or any currency or interest in any currency and includes any financial stock market index, interest rate or currency futures or similar financial or other instruments and any rights in or options over any of the aforesaid, issued by or under the guarantee of anybody, whether incorporated or unincorporated, or of any governmental body and whether paying interest or dividends or not and whether fully paid, partly paid or nil paid and includes any participation as a limited partner or participant in any partnership or unincorporated association;

"in writing" and "written" includes printing, lithography, photography, and other modes of representing or reproducing words in visible form;

"Manager" means the person for the time being appointed and acting as manager of the Company;

"Member" has the same meaning as member given in the Act and means the person or body corporate registered in the Register as the holder of shares in the Company, and, when two or more persons are so registered as joint holders of shares, means the person whose name stands first in the Register as one of such joint holders;

"Memorandum" means the Memorandum of Association of the Company;

"month" means calendar month;

"Net Asset Value" means the net asset value per Share determined in accordance with Article 11;

"notice" means written notice unless otherwise specifically stated;

"Office" means the registered office of the Company for the time being;

"Paid up" means paid up and/or credited as paid up;

"Principal Market" with reference to any Investment, means such market which in the opinion of the Directors is the sole or principal securities market upon which such Investment is listed, quoted or traded or in respect of which permission to deal is effective and the expression "market" shall include any over-the-counter market or recognised exchange;

"Record Date" in respect of any dividend means the date as of which the persons entitled to participate therein fall to be determined and in respect of any general meeting of the Company means the date as of which the persons entitled to receive notice of and vote thereat fall to be determined;

"Redemption Price" means the price at which Shares may be redeemed, determined in accordance with these Articles;

"Register" means the Register of Members maintained by the Company in Amsterdam, The Netherlands, or such other place as the Directors may determine, with a copy kept at the registered office of the Company in the British Virgin Islands;

"Seal" means the Common Seal of the Company and includes any duplicate common seal which the Directors may by resolution approve or adopt;

"Secretary" means (subject to the provisions of the Act) the person for the time being appointed to perform the duties of the Secretary of the Company and includes an Assistant, Acting or Deputy Secretary;

"Share" means a share of any class in the capital of the Company of a par value of CHF 0.01 having the rights and being subject to the restrictions specified in the Memorandum and these Articles with respect to such shares and shall where the context so permits include a fraction of a Share and "Shares" shall be construed accordingly;

"Subscription Price" means the price at which Shares may be subscribed, determined in accordance with the Articles; and

"Valuation Day" means the last business day of a month and/or such other day or days in addition thereto or in substitution therefor as may from time to time be determined by the

Fairfield Lambda Limited                                             Page 4

Directors either in any particular case or generally but so that there shall be at least one Valuation Day in each month.

The word "may" shall be construed as permissive and the word "shall" shall be construed as imperative.

Words importing the singular number only include the plural number and vice versa.
Words importing the masculine gender only include the feminine gender.
Words importing persons include companies or associations or bodies of persons, whether corporate or unincorporate.

Reference herein to any act is to an act of the British Virgin Islands legislature.

Save as aforesaid any words or expressions defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.


## BUSINESS

2.            The meetings of the Members and of the Directors and of any committee appointed by the Directors shall be held in the British Virgin Islands or such other place as the Directors may from time to time determine.

3.            Any branch or kind of business which the Company is either expressly or by implication authorised to undertake may be undertaken by the Directors at such time or times as they may think fit, and further may be suffered by them to be in abeyance, whether such branch or kind of business may have been actually commenced or not, so long as the Directors may deem it expedient not to commence or proceed with the same.


## SHARE CAPITAL

4.    (1)    Subject to the provisions of these Articles, the unissued Shares of the Company shall be available for issue by the Directors who may offer, allot, grant options over or otherwise dispose of them to such persons, at such times and for such consideration and upon such terms and conditions as they may determine.

    (2)    Each class of Shares shall have in common with all other classes of Shares the same investment objectives and policies and underlying assets of the Fund, but in addition thereto the Shares of each class may have different dividend and distribution policies and additional assets and liabilities solely for the account of such class as the Directors may determine.

39833

Fairfield Lambda Limited                                                    Page 5

---

(3)     Except where the context otherwise requires, the provisions of these Articles shall apply, mutatis mutandis, separately and independently to each class of Shares as if any such class of Shares were the sole class of Shares created and established pursuant to these Articles.

5.     (1)     Notwithstanding anything herein contained, fully paid shares of the Company shall be free and clear of all and any liens and charges in favour of the Company.

(2)     Subject to the provisions of these Articles, the Directors may by notice to a Member (the "Converter") convert all or a portion of the existing shares (the "Existing Shares") held by the Converter comprised in a share certificate into Shares of another class (the "New Shares") and the following provisions of this Article shall apply:

(a)     the rate at which all or any part of the holding of Existing Shares shall be converted into New Shares, shall be determined in accordance with the following formula:

$$A = \frac{(B \times RP)}{SP}$$

where:

A is the number of New Shares to be allotted

B is the number of Existing Shares to be converted

RP is the redemption price of the Existing Shares determined on the Valuation Day which precedes the day on which the conversion is to be effected

SP is the subscription price of the New Shares determined on the Valuation Day which precedes the day on which the conversion is to be effected.

PROVIDED THAT:

(b)     the conversion of Shares pursuant to this Article shall be made on the Dealing Day specified in the notice;

(c)     no conversion of part only of the holding of any Member shall be made if as a result thereof such Member would hold less than the minimum number of Existing Shares and/or New Shares as specified from time to time by the Directors;

      (d)    no Shares shall be converted during any period when the determination of Net Asset Value is suspended pursuant to paragraph (4) of Article 11 hereof.

(3)    Where a certificate has been issued in respect of any Shares to be converted:

      (a)    the Converter shall lodge with the Company or its authorised agent such certificate and subject as hereinafter mentioned no certificate for the New Shares shall be issued under this Article until such certificate shall have been received;

      (b)    the Directors may at their option dispense with the production of any certificate which shall have become lost or destroyed on compliance by the Converter with the like requirements for those applying in the case of an application by him for replacement of a lost or destroyed certificate under these Articles;

      (c)    on a conversion of part only of the Existing Shares registered in the Converter's name, the Converter shall be entitled without payment to a balance certificate for the balance of Existing Shares held by him.

6.        Without prejudice to any special rights for the time being conferred on the holders of any shares or class of shares (which special rights shall not be varied or abrogated, except with such consent or sanction as is provided by the next following Article) any share in the Company may be issued with such preferred deferred or other special rights, or such restrictions, whether in regard to dividend, return of capital, redemption, voting or otherwise as the Company may from time to time in general meeting determine.

7.    (1)    Whenever the capital of the Company is divided into different classes of shares all or any of the special rights for the time being attached to any class of share for the time being issued may (unless otherwise provided by the terms of issue of the shares of that class) be altered or abrogated, either whilst the Company is a going concern or during or in contemplation of a winding up, with the consent in writing of the holders of not less than three-fourths of the issued shares of the class and of the holders of not less than three-fourths of the issued shares of any other class of shares which may be affected by such variation, but not otherwise.

    (2)    The special rights conferred upon the holders of any shares or class of shares issued with preferred or other special rights shall not (unless otherwise expressly provided by the conditions of issue of such shares) be deemed to be varied by the creation, allotment or issue of further shares ranking pari passu therewith or subsequent thereto.

39833

Fairfield Lambda Limited                                                                          Page 7

8.              The Company shall be entitled to treat the registered holder of any share as the absolute owner thereof and accordingly shall not be bound to recognise any equitable or other claim to, or interest in, such share on the part of any other person.

## ISSUE OF SHARES

9.     (1)     Subject as hereinafter provided, the Company may on receipt by it or its authorised agent of an application in such form as the Directors may from time to time determine issue and allot Shares PROVIDED THAT:

(a)   the issue of Shares pursuant to this Article shall be made on the Dealing Day on which, or immediately following the day on which, the application is received provided that the application is received on or before the Dealing Time;

(b)   the issue of Shares pursuant to this Article shall be effected at not less than the Subscription Price determined in accordance with paragraph (2) of this Article but in no event shall a Share be allotted or issued at a price less than its par value;

(c)   payment shall be made in the Base Currency at such time and place and in such manner as the Directors may from time to time determine failing which any allotment of Shares for which payment is due may be canceled by the Directors;

(d)   the Company shall not issue any of its Shares or securities (i) for services, or (ii) for property other than cash or securities (including securities of which the Company is the issuer) except that it may issue fully paid Shares as a distribution to its Members or in connection with a reorganisation;

(e)   no Share shall be allotted or issued (except those for which applications have been previously received and accepted by the Company or its agent) during any period when the determination of the Net Asset Value is suspended pursuant to paragraph (4) of Article 11;

(f)   the Directors may satisfy any such application for Shares by procuring the transfer to the applicant of fully paid Shares at the appropriate Subscription Price. If in lieu of issuing Shares the Company shall procure a transfer of Shares to the person making such application, any duties and charges payable in connection with such transfer shall be discharged by or on account of the transferor out of the price payable for such Shares;

39833

(g)   Shares shall be issued in such minimum numbers as the Directors may specify either generally or in any particular case;

(h)   fractions of a Share, of not less than one-thousandth of a Share, may be issued.

(2)   The Subscription Price for each Share shall be the Net Asset Value of each Share (as determined in accordance with Article 11) as at the close of business in Amsterdam, The Netherlands on the Valuation Day immediately preceding the Dealing Day on which such issue is made in each case rounded to the nearest minimum integral unit of the Base Currency PROVIDED THAT in the case of an initial issue of Shares (that is, an issue of Shares at a time when there are no Shares of the relevant class in issue), the Directors shall, at their discretion, fix a Subscription Price which shall apply for the purposes of such initial issue of Shares. In addition to the foregoing the Directors may require any applicant for Shares to pay to the Manager or to an unaffiliated placement agent, or to the Company on behalf of the Manager or an unaffiliated placement agent, the Initial Charge and the Manager or unaffiliated placement agent may differentiate between such persons as to the amount of such Initial Charge (within the permitted limit).

(3)   Share certificates in respect of Shares allotted, if requested, as aforesaid shall not be issued or delivered unless and until the subscription moneys have been paid over to the Custodian.

(4)   The Company may on any issue of Shares pay such brokerage or commission as may be lawful.

## REDEMPTION OF SHARES

10.   (1)   Subject to the provisions of the Memorandum, these Articles and the Act and subject as hereinafter provided, the Company shall on receipt by it or its authorised agent of a request in writing (or in such other form as the Directors may determine) by a Member (the "Applicant") specifying the number and class of Shares to be redeemed redeem or purchase all or any portion of the Shares registered in the Applicant's name PROVIDED THAT:

(a)   subject as hereinafter provided, the redemption or purchase of Shares pursuant to this Article shall be made on the Dealing Day on which, or immediately following the day on which, the written request is received provided that the said request is received on or before the Dealing Time;

(b)   the redemption or purchase of Shares pursuant to this Article shall be effected at the Redemption Price determined in accordance with paragraph

Fairfield Lambda Limited                                                                 Page 9

(2) of this Article less a charge of 2% of the Redemption Price which charge shall only be applied where Shares are redeemed at the option of the Directors as a result of any actual or attempted assignment, pledge, mortgage, or other prohibited dealing by a Member which is not otherwise consented to by the Directors, or as a result of any application to record a transfer of Shares, including an application to record a transfer by operation of law, if not approved by the Directors within thirty (30) days;

(c)    subject as hereinafter provided, payment shall be made to the Applicant in the Base Currency in respect of the redemption or purchase of Shares. Any amount payable as aforesaid to the Applicant shall be payable as soon as practicable after the relevant Dealing Day, being normally thirty (30) days, plus (i) any period after the receipt of the request for redemption and before such payment during which the determination of the Net Asset Value has been suspended by declaration of the Directors pursuant to Article 11 and (ii) any period during which the relevant share certificate, if any, has not been lodged as provided in this Article 10. Payment for Shares redeemed or purchased hereunder shall be made to the Applicant by a cheque, draft, wire transfer or other means of payment posted (at the risk of the Applicant) or otherwise paid to the Applicant in the manner determined by the Directors from time to time. If an Applicant shall require payment in a currency other than the Base Currency, the Directors may, subject to receipt of any necessary exchange control or other governmental consent and at the risk of the Applicant and on his paying any costs thereby involved, arrange for the conversion of the sum to which the Applicant is entitled into such currency as the Applicant may require at such exchange rate as the Directors shall consider appropriate;

(d)    on any redemption or purchase the Directors shall have the power to divide in specie the whole or any part of the assets of the Company and appropriate such assets in satisfaction or part satisfaction of the Redemption Price and any other sums payable on redemption as is herein provided;

(e)    no Shares shall be redeemed or purchased during any period when the determination of the Net Asset Value is suspended pursuant to Article 11, the right of the Applicant to have his Shares redeemed or purchased pursuant to this Article shall be similarly suspended and during the period of suspension he may withdraw his request for redemption and his certificate. Any withdrawal of a request for redemption under the provisions of this Article shall be made in writing and shall only be effective if actually received by the Company or its duly authorised agent before termination of the said period of suspension. If the request is not so withdrawn the

39833

redemption or purchase of the said Shares shall be made on the Dealing Day next following the end of the said suspension;

(f)    instead of redeeming or purchasing the Applicant's Shares, the Directors may procure the purchase thereof at not less than such Redemption Price and at the same time and under the same conditions as apply to redemption under the provisions of these Articles;

(g)    subject as hereinafter in this Article provided, the Applicant shall not be entitled to withdraw a request duly made in accordance with this Article without the consent of the Directors; and

(h)    no redemption or purchase of part only of the holding of any Member may be made if as a result thereof such Member would hold less than the minimum number of Shares as specified from time to time by the Directors.

(2)    The Redemption Price for each Share shall be the Net Asset Value per Share (as determined in accordance with Article 11) as at the close of business in Amsterdam, The Netherlands on the Dealing Day on which such redemption is effected less such sum (if any) as the Directors may consider represents the appropriate provision for fiscal and sale charges which would be incurred on the sale of assets of the Company, in each case rounded to the nearest minimum integral unit of the Base Currency.

(3)    Where a certificate has been issued in respect of any Shares to be redeemed or purchased:

(a)    the Applicant shall lodge with the Company or its authorised agent such certificate and subject as hereinafter mentioned no payment shall be made under this Article until such certificate shall have been received;

(b)    the Directors may at their option dispense with the production of any certificate which shall have become lost or destroyed upon compliance by the Applicant with the like requirements to those applying in the case of an application by him for replacement of a lost or destroyed certificate under these Articles;

(c)    on redemption or purchase of part only of the Shares registered in the Applicant's name the Applicant shall be entitled by written request without payment to a balance certificate for the balance of such Shares.

(4)    Upon the redemption or purchase of a Share being effected pursuant to this Article, the Member shall cease to be entitled to any rights in respect of that Share (excepting

always the right to receive a dividend which has been declared in respect thereof prior to such redemption or repurchase being effected) and accordingly his name shall be removed from the Register with respect thereto.

(5)     Subject to the provisions of the Memorandum, these Articles and the Act and subject as hereinafter provided, the Directors shall have the power exercisable by resolution to redeem or purchase all or any portion of the Shares registered in the name of any Member (the "Relevant Member") and the provisions of this Article 10 shall apply to any such redemption or purchase EXCEPT THAT:

(a)   the Company shall give notice to the Relevant Member of its intention to redeem or purchase such Relevant Member's Shares specifying the class, if applicable, and the number of such Shares;

(b)   subject as hereinafter provided, the redemption or purchase of Shares pursuant to this Article shall be made on the Dealing Day immediately following the day on which such notice is received or deemed received by virtue of the provisions of these Articles;

(c)   if a certificate in respect of any Shares the subject of redemption or purchase under this paragraph of this Article is outstanding then, upon receipt of the notice as aforesaid, the Relevant Member shall be bound forthwith to deliver to the Company or its duly authorised agents the certificate for such Shares. Payment of the redemption or purchase proceeds shall be deposited by the Company with or to the order of the Custodian in the name of the Company for payment to the Relevant Member against surrender of the certificate representing such Shares previously held by such Relevant Member. Upon the deposit of such redemption or purchase monies as aforesaid, the Relevant Member shall have no further interest in such Shares or any of them or any claim against the Company in respect thereof except the right to receive the money so deposited (without interest) from the Company upon surrender of the said certificate;

(d)   no Shares shall be redeemed or purchased under this Article during any period when the determination of the Net Asset Value is suspended pursuant to Article 11.

## DETERMINATION OF NET ASSET VALUE

11.     (1)     The Net Asset Value per Share of each class shall be determined by the Directors as at the close of business on each Valuation Day (except when determination of the Net Asset Value per Share has been suspended under the provisions of paragraph (4) of this Article), on

such other occasions as may be required by these Articles and on such other occasions as the Directors may from time to time determine.

The Net Asset Value per Share shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue or deemed to be in issue and by adjusting for each class of Shares such resultant number to take into account any dividends, distributions, assets or liabilities attributable to such class of Shares pursuant to paragraph (2) of Article 4, all determined and calculated as hereinafter provided.

Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties.

(2)    The net assets of the Fund shall comprise the aggregate of:-

(a)    Investments owned or contracted to be acquired by the Company for the account of the Fund;

(b)    cash on hand or on deposit including accrued interest relating to the Fund;

(c)    cash payments outstanding on any Shares of the class allotted;

(d)    bills and demand notes and amounts receivable including net amounts receivable in respect of investments of the Fund contracted to be realised;

(e)    interest accrued on interest bearing investments of the Fund except that accrued on securities which is included in the quoted price; and

(f)    other property and assets of the Fund of any kind and nature including prepaid expenses and unamortised preliminary expenses as valued and defined from time to time by the Directors;

from which shall be deducted:-

(i)    Investments of the Fund contracted to be sold;

(ii)   bills and accounts payable for the account of the Fund;

(iii)  management and administrative expenses payable and/or accrued (the latter on a day-to-day basis);

(iv)  the gross acquisition consideration of Investments or other property contracted to be purchased for the Fund;

(v)  reserves authorised or approved by the Directors for duties and charges or taxes or contingencies (accrued where appropriate on a day-to-day basis);

(vi)  the aggregate amount of all borrowings and interest, commitment fee, and other charges arising in connection therewith (accrued where appropriate on a day-to-day basis); and

(vii)  liabilities of the Company relating to the Fund of whatsoever nature (which shall, where appropriate, be deemed to accrue from day-to-day) including outstanding payments on any Shares of the relevant class previously redeemed. For the purposes of these articles, the amount of any distribution or dividend shall be a liability of the Fund from the day when the distribution or dividend is declared until it is paid.

For the purpose of calculating the number of Shares in issue or deemed to be in issue, Shares for which applications have been duly made shall be deemed to be not in issue on the relevant Valuation Day and Shares to be redeemed or purchased in accordance with Article 10 hereof shall be deemed to be in issue on the relevant Valuation Day.

(3)  For the purpose of calculating the value of the net assets of the Fund:

(a)  the value of any cash on hand or on deposit, bills and demand notes and accounts receivable, prepaid expenses, cash dividends and interest declared or accrued as aforesaid and not yet received shall be deemed to be the full amount thereof, unless in any case the same is unlikely to be paid or received in full, in which case the value thereof shall be arrived at after making such discount as the Directors may consider appropriate in such case to reflect the true value thereof;

(b)  the value of securities which are listed on a securities exchange (which term shall include any interdealer quotation system which provides for reporting of last sale price) shall be valued at their last sales prices on the last business day of the month on the largest securities exchange on which such securities shall have traded on such date, or, if trading in such securities on such exchange was reported on the consolidated tape, the last sales price on the consolidated tape (or, in the event that the last business day of the month is not a date upon which a securities exchange on which such securities are listed was open for trading, on the last prior date on which such a securities exchange was so open). If no sales of such securities occurred on either of

such dates, such securities shall be valued at the reported last "bid" price (in the case of a security held long) and the last reported "asked" prices (in case of a security sold short) on the largest securities exchange on which such securities are traded, on the last business day of the month. Securities which are not listed shall be valued at their last "bid" prices on the last business day of the month if held "long" by the Company and their last "asked" prices on the last business day of the month if held "short" by the Company, as determined from representative dealers quotations. Securities for which no "bid" and "asked" prices are available shall be valued at such value as the Directors may determine.    Securities which are commodities or commodity contracts shall be valued at their last prior sales prices on the principal board of trade or other contracts market in which dealings are made or by quotations from the contra-party bank in the case of a forward contract.  All other securities and other assets of the Company (other than goodwill, which shall not be taken into account) shall be assigned such value as the Directors may determine.  If the Directors determines that the valuation of any security pursuant to the foregoing does not fairly represent its market value, the Directors shall value such security as they determine and shall set forth the basis of such valuation in writing in the Company's records;

(c)    the value of any shares of stock held by the Company in an investment company shall be valued in accordance with the manner in which such shares are valued by such investment company; provided, however, that the Directors may make such adjustments in such valuation as the Directors may from time to time consider appropriate;

(d)    the value of any investment or security as aforesaid or other property for which no price quotations are available as above provided shall be determined in such manner, consistent with generally accepted accounting procedures, as the Directors may from time to time consider appropriate;

(e)    notwithstanding the foregoing, where on the last business day of the month any cash or other asset of the Company has been realised or contracted to be realised there shall be included in the assets of the Company, in place of such cash or other asset, the assets receivable by the Company in respect thereof, provided that if the value of such assets is not then known exactly then its value shall be as estimated by the Directors; and

(f)    notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion, warrant a different valuation of any

securities, such securities will be valued at such prices as the Directors shall determine.

(4)     The Directors may suspend the determination of the Net Asset Value per Share of any class for the whole or any part of a period:-

(a)     during which any stock exchange or over-the-counter market on which any significant portion of the investments of the Fund are listed, quoted, traded or dealt in is closed (other than customary weekend and holiday closing) or trading on any such stock exchange or over-the-counter market is restricted; or

(b)     when circumstances exist as a result of which in the opinion of the Directors it is not reasonably practicable for the Company to dispose of investments comprised in the Fund or as a result of which any such disposal would be materially prejudicial to Members; or

(c)     when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the investments or other assets of the Fund cannot reasonably or fairly be ascertained; or

(d)     during which the Company is unable to repatriate funds required for the purpose of making payments due on redemption of shares of the relevant class or during which any transfer of funds involved in the realisation or acquisition of investments or payments due on redemptions of shares of the relevant class cannot in the opinion of the Directors be effected at normal rates of exchange.

Any such suspension shall take effect at such time as the Directors shall declare but not later than the close of business on the business day next following the declaration, and thereafter there shall be no determination of the Net Asset Value per Share of the Fund until the Directors shall declare the suspension at an end, except that such suspension shall terminate in any event on the first business day on which (a) the condition giving rise to the suspension shall have ceased to exist; and (b) no other condition under which suspension is authorised under this paragraph shall exist. Each declaration by the Directors pursuant to this paragraph shall be consistent with such official rules and regulations (if any) relating to the subject matter thereof as shall have been promulgated by any authority having jurisdiction over the Company and as shall be in effect at the time. To the extent not inconsistent with such official rules and regulations, the determination of the Directors shall be conclusive. Whenever the Directors shall declare a suspension of the determination of the Net Asset Value per Share, then as soon as may be practicable after any such declaration, the Directors shall give notice to all Members stating that

such declaration has been made. At the end of any period of suspension as aforementioned the Directors shall give notice to all Members stating that the period of suspension has ended.

## INVESTMENT AND BORROWING POWERS

12.    (1)    In carrying on the business of the Company, the Directors shall be entitled to acquire, hold, deal in and dispose of any Investment in such manner at such times and in such amounts as the Directors shall think fit. The Company will adhere to the general principle of diversification in respect of all of its assets and the following investment restrictions will apply to any Investments (after taking account of any unpaid amounts in respect thereof) to be made or added to by the Company:

(a)    no more than 10 percent of the net assets of the Fund will be invested in the securities of any one issuer (exclusive of securities issued or guaranteed by a government, governmental agency or instrumentality of any member state or Organization for Economic Cooperation and Development ("OECD") member state or by any supranational authority of which one or more European Union ("EU") or OECD member states are members);

(b)    the Fund may not hold more than 10 percent of the issued securities of any one class of securities in any issuer (exclusive of securities issued or guaranteed by a government, governmental agency or instrumentality of any member state or OECD member state or by any supranational authority of which one or more EU or OECD member states are members);

(c)    no more than 10 percent of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty (exclusive of governments, governmental agencies or instrumentalities of any member state or OECD member state or any supranational authority of which one or more EU or OECD member states are members), in each case calculated at the time of investment;

(d)    no more than 10 percent of the net assets of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

(e)    the Fund will not invest in the securities of any issuer if the directors and officers of the Company and the Manager collectively own in excess of 5 percent of such securities;

(f)    the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

(g)    the Fund will adhere to the general principle of diversification in respect of all of its assets;

(h)    the Fund will not invest directly in real property;

(i)    the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) except with the consent of the Custodian, however, at no time will the Fund loan more than an amount equal to 10% of the Fund's net assets ( as measured at the time of the loan) to any one issuer (exclusive of securities issued or guaranteed by a government, governmental agency or instrumentality of any member state or OECD member state or by any supranational authority of which one or more EU or OECD member states are members); and

(j)    no more that 10 percent (in the aggregate) of the net assets of the Fund will be invested in physical commodities

The investment restriction set out in (c) above will not apply to transactions with any counterparty which advances full and appropriate collateral to the Fund in respect of such transactions.

(2)    For the purposes of this Article:

(a)    securities shall be deemed to be of the same class if they confer identical rights and (if applicable) are subject to identical restrictions but so that in the case of an issue of securities which are in other respects identical with securities already in issue, any temporary differences in rights as to the dividends or interest between such existing and new securities shall be disregarded;

(b)    nothing shall prevent the beneficial ownership of any entity, including all or part of the issued share capital of any company or companies, which for fiscal or other reasons the Manager considers it necessary or desirable to incorporate or acquire for the purpose of holding certain of the Investments contained in the Fund. None of the limitations or restrictions in paragraph (1) of this Article shall apply to Investments in, loans to or deposits with any such entity, and for the purpose of the said paragraph (1) Investments held by any such entity shall be deemed to be held directly by the Company;

(c)   the value of any Investment for the purpose of any limit contained in this Article shall not include any accrued interest in respect thereof, even if such accrued interest is included in the net assets of the Company.

(3)   It shall not be necessary for the Directors to effect changes of Investments merely because, owing to appreciations or depreciations of the value of Investments held by the Fund and/or variations in exchange rates, any of the limitations prescribed by paragraph (1) of this Article shall be exceeded, or by reason of any of the said limits being exceeded as a result of: (i) the receipt of any rights, bonuses or benefits in the nature of capital, (ii) any scheme or arrangement for amalgamation, reconstruction, conversion or exchange, (iii) any realisation of any Investments; but if and so long as any of the said limits shall be exceeded no purchase shall be made of any type of Investment which would result in any of the said limits being further exceeded.

(4)   The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital, or any part thereof, and may issue debentures, debenture stock and other securities whether outright or as security for any debt, liability or obligation of the Company or any third party PROVIDED that, except with the approval by resolution in general meeting or, where there is more than one class of shares in issue, by the holders of the relevant class, the Directors shall not exercise the power to borrow if the total amount for the time being of borrowed moneys exceeds or would exceed an amount equal to the Borrowing Limit at the relevant time, and the Directors shall exercise any powers of control over any subsidiaries so as to secure (so far as may be possible) that the aggregate amount of borrowed moneys (exclusive of intra-group borrowings) shall not exceed the said amount. For the purposes of this sub-paragraph, the issue of loan capital shall be deemed to constitute a borrowing notwithstanding that the same may be issued in whole or in part for a consideration other than cash.

(5)   The Custodian shall be entitled at any time at its entire discretion and without assigning any reason to give notice to the Directors that it is not prepared to accept any property which in the opinion of the Custodian infringes the terms of this Article and the Custodian shall be entitled to require the Company to replace any such property with other property not infringing the terms of this Article.

39833

## CUSTODIAN

13.          The Directors shall appoint a Custodian who or whose nominee shall hold the assets of the Company and in whose name or in the name of whose nominee the same shall be registered in the case of registered securities and who shall perform such other duties upon such terms as the Directors may from time to time (with the agreement of the Custodian) determine. All moneys, bills and notes belonging to the Company shall be paid to or to the order of or deposited with or to the order of the Custodian to an account to be opened in the name of the Company. The Custodian shall be a corporation having a capital (in stock or shares) for the time being issued of not less than US$1,000,000 (or equivalent in other currency). In the event of the Custodian desiring to retire the Directors shall use their best endeavours to find a corporation having the said qualifications to act as Custodian and upon doing so the Directors shall appoint such corporation to be Custodian in place of the retiring Custodian. The Directors shall not remove the Custodian unless and until a successor corporation shall have been appointed in accordance with this Article to act in the place thereof. The powers of the Directors under this Article shall include a power to appoint joint custodians and/or sub-Custodians.

## SHARE CERTIFICATES

14.    (1)     Every person whose name is entered as a Member in the Register shall, by request in writing, be entitled without payment to one certificate for all his shares, or upon payment of such reasonable out-of-pocket expenses as the Directors shall from time to time determine, to several certificates, each for one or more of his shares. Where a Member transfers part only of his holding of shares he shall be entitled without payment to a balance certificate for the shares retained by him. Every certificate shall be under the Seal or a facsimile thereof or a securities seal of the Company adopted by the Directors for that purpose and shall specify the number and class and distinguishing numbers (if any) of the shares to which it relates, and the amount paid up thereon. The Company shall not be bound to register more than four persons as the joint holders of any share or shares (except in the case of executors or trustees of a deceased Member) and in the case of a share held jointly by two or more persons, the Company shall not be bound to issue more than one certificate therefor, and delivery of a certificate for a share to one of several joint holders shall be sufficient delivery to all. If a share certificate be defaced, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity as the Directors think fit.

         (2)     Notwithstanding the foregoing, unless and until the Company receives a request in writing from the Member requesting a certificate for his shares pursuant to paragraph (1) of this Article, the Company need not issue the certificate to which the Member is otherwise entitled, in which case such Member's holding shall be recorded in the Register alone.

39833

## REGISTER OF MEMBERS

15.   (1)   The Secretary shall enter or procure the entry in the Register of the particulars required by the Act, and the Register shall be kept in such manner as to show at all times the Members of the Company for the time being and the shares respectively held by them.

(2)   Notwithstanding any other provision of these Articles, the Directors may fix any date as the Record Date for:-

(a)   determining the Members entitled to receive any dividend; and

(b)   determining the Members entitled to receive notice of and to vote at any general meeting of the Company.

## TRANSFER OF SHARES

16.   Subject to such of the restrictions of these Articles as may be applicable, any Member may transfer all or any of his shares by instrument in writing in a usual common form or in any other form which the Directors may approve. Such instrument may be on the back of the share certificate (if issued) and need not be under seal. The transferor shall be deemed to remain the holder of such shares until the name of the transferee is entered in the Register in respect thereof. An instrument of transfer need not be signed by or on behalf of the transferee.

17.   (1)   No transfer of Shares may be made if (i) as a result of such transfer either the transferor or the transferee of such Shares would hold less than the minimum number of Shares as the Directors may from time to time specify or (ii) such transfer would in the opinion of the Directors result in Shares being acquired or held by:-

(a)   any person in breach of the law or requirements of any country or governmental authority; or

(b)   any person or persons in circumstances (whether directly or indirectly affecting such person or persons and whether taken alone or in conjunction with any persons, connected or not, or any circumstances appearing to the Directors to be relevant) which in the opinion of the Directors might result in the Company incurring any liability to taxation or suffering any other pecuniary disadvantage which the Company might not otherwise have incurred or suffered.

(2)   The Directors may decline to recognise any instrument of transfer, unless the instrument of transfer is deposited at the office of the Company or such other place as the

39833

Directors may appoint, accompanied by the certificate, if any, for the shares to which it relates, and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer.

(3)    The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine provided always that such registration shall not be suspended for more than thirty days in any year.

18.    All instruments of transfer which shall be registered shall be retained by the Company, but any instrument of transfer which the Directors may decline to register shall (except in the case of fraud) be returned to the person depositing the same.

## TRANSMISSION OF SHARES

19.    (1)    In the case of the death of a Member the survivors or survivor where the deceased was a joint holder, and the legal personal representatives of the deceased where he was a sole or only surviving holder, shall be the only persons recognised by the Company as having any title to his interest in the shares, but nothing in this Article shall release the estate of a deceased joint holder from any liability in respect of any share jointly held by him.

(2)    Any person becoming entitled to shares in consequence of the death, incompetence or bankruptcy of a Member or otherwise by operation of law upon producing such evidence as the Directors may deem sufficient, may be registered as a Member in respect of such shares, or may, subject to Article 18, transfer such shares to some other person by executing an instrument of transfer in a usual common form or any other form which the Directors may approve.

(3)    If the person so becoming entitled shall elect to be registered himself, he shall deliver or send to the Company a notice in writing signed by him stating that he so elects. If he shall elect to have another person registered, he shall testify his election by executing to such person a transfer of such share. All the limitations, restrictions and provisions of these presents relating to the right to transfer and the registration of transfers of shares shall be applicable to any such transfer as aforesaid as if the death, incompetence or bankruptcy of the Member had not occurred and the transfer were a transfer executed by such Member.

(4)    A person becoming entitled to a share in consequence of the death, incompetence or bankruptcy or otherwise by operation of law of a Member shall be entitled to receive and may give a discharge for all dividends and other moneys payable on or in respect of the share, but he shall not be entitled to receive notice of or to attend or vote at meetings of the Company, or, save as aforesaid, to any of the rights or privileges of a Member until he shall have become a Member in respect of the share.

(5)    For the purposes of this Article, what amounts to incompetence on the part of a person is a matter to be determined by the Supreme Court of the British Virgin Islands or a judge thereof after having regard to all the relevant evidence and the circumstances of the case.

## CONVENING OF MEETINGS OF MEMBERS

20.    (1)    The Directors of the Company may convene meetings of the Members at such times and in such manner and places within or outside the British Virgin Islands as the Directors consider necessary or desirable.

(2)    Upon the written request of Members holding more than ten percent of the votes of the outstanding voting shares in the Company the Directors shall convene a meeting of Members.

21.    A Member shall be deemed to be present at a meeting of Members if he participates by telephone or other electronic means, and all Members participating in the meeting are able to hear each other.

22.    The Directors shall give not less than seven days notice of meetings of Members to those persons whose names on the date the notice is given appear as Members in the share register of the Company and are entitled to vote at the meeting.

23.    A meeting of Members held in contravention of the requirement to give notice pursuant to this Article is valid if a 90% majority of:

> (a)    the total number of shares entitled to vote on all matters to be considered at the meeting;

> (b)    the votes of each class of shares where Members are entitled to vote thereon as a class together with an absolute majority of the remaining votes;

have waived notice of the meeting and, for this purpose, the presence of a Member at the meeting shall be deemed to constitute waiver on his part.

24.    The inadvertent failure of the Directors to give notice of a meeting to a Member, or the fact that a Member has not received notice, does not invalidate the meeting.

## QUORUM AT GENERAL MEETINGS

25.         No business shall be transacted at any general meeting unless a quorum is present. At a general meeting, subject as in these Articles otherwise provided, two persons present representing in person or by proxy not less than 50 per cent of shares of the Company entitled to vote at general meetings for the time being in issue shall be a quorum for all purposes provided that where there is only one Member, one person representing in person or by proxy such Member shall be a quorum for all purposes.  If within thirty minutes from the time appointed for the meeting (including such a general meeting at which a resolution as aforesaid is to be proposed) a quorum is not present, the meeting, if convened on the requisition of or by Members, shall be dissolved. In any other case, it shall stand adjourned for not less than fifteen days at the same place and if at such adjourned meeting a quorum is not present within thirty minutes from the time appointed for holding the meeting, the Members entitled to vote present in person or by proxy, not being less than two, shall be a quorum.

## MAJORITY TO APPROVE RESOLUTIONS

26.     (1)     Subject to the provisions of these Articles, any act or thing which in accordance with these Articles is required to be transacted, made, done, approved, determined, decided or passed by the Company in general meeting shall not be effective except by virtue of a resolution passed by a simple majority of the persons voting thereat upon a show of hands, or, if a poll is duly demanded, by a simple majority of the votes given at such poll.

         (2)     In the case of an equality of votes at a general meeting, whether on a show of hands or on a poll, the chairman of such meeting shall be entitled to a second or casting vote.

27.         Subject to the Act, anything which may be done by resolution of the Company in general meeting or by resolution of a meeting of any class of the Members of the Company, may, without a meeting and without any previous notice being required, be done by resolution in writing signed by, or, in the case of a Member that is a corporation whether or not a company within the meaning of the Act, on behalf of, all the Members who at the date of the resolution would be entitled to attend the meeting and vote on the resolution.  A resolution in writing may be signed by, or, in the case of a Member that is a corporation whether or not a company within the meaning of the Act, on behalf of, all the Members, or any class thereof, in as many counterparts as may be necessary.

## PROCEEDINGS AT GENERAL MEETINGS

28.         The Chairman or in his absence the Deputy Chairman of the Company, or in the absence of both of them some other Director nominated by the Directors, shall preside as chairman at every general meeting of the Company, but if at any meeting none of the foregoing persons is present within fifteen minutes after the time appointed for holding the meeting, or if none of them be willing to act as chairman, the Directors present shall choose some Director

present to be chairman, or if no Director is present, or if all the Directors present decline to take the chair, the Members present shall choose some person present to be chairman.

29.        The Chairman may with the consent of any meeting at which a quorum is present (and shall if so directed by the meeting) adjourn the meeting from time to time and from place to place, provided that (a) no business shall be transacted at any adjourned meeting except business which might lawfully have been transacted at the meeting from which the adjournment took place and (b) notice of the adjourned meeting shall, if necessary, be given in accordance with the provisions of these Articles.

30.        At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands unless (before or on the declaration of the result of the show of hands) a poll be demanded by the chairman or by at least three Members present in person or by proxy and entitled to vote or by any Member or Members present in person or by proxy and representing in the aggregate not less than one-tenth of the total voting rights of all Members having the right to vote at the meeting or holding shares conferring a right to vote at the meeting on which there have been paid up sums in the aggregate equal to not less than one-tenth of the total sum paid on all shares conferring that right.  Unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried or carried unanimously or by a particular majority or not carried by a particular majority or lost, and an entry to that effect in the book of the proceedings of the Company shall be conclusive evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against such a resolution. If a poll is duly demanded the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

31.        A poll demanded on the election of a chairman, or on a question of adjournment, shall be taken forthwith.  A poll demanded on any other question shall be taken at such time and place and in such manner as the chairman directs.

32.        If any votes shall be counted which ought not to have been counted, or might have been rejected, the error shall not vitiate the result of the voting unless it is pointed out at the same meeting, or at any adjournment thereof, and not in that case unless it shall in the opinion of the chairman of the meeting be of sufficient magnitude to vitiate the result of the voting.

33.        Each Director of the Company shall be entitled to attend and speak at any general meeting of the Company.

34.        Subject to any special terms as to voting upon which any shares may be issued or may for the time being be held, at any general meeting on a show of hands every Member who (being an individual) is present in person or (being a corporation) is present by a duly authorised representative and every person holding a valid proxy at such meeting shall have one vote, and

39833

on a poll every Member who is present as aforesaid or by proxy shall have one vote for every share of which he is the holder.

35.          On a poll a Member entitled to more than one vote need not, if he votes, use all his votes, or cast all the votes he uses in the same way.

36.          The following apply in respect of joint ownership of shares:

     (a)   if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of Members and may speak as a member;

     (b)   if only one of them is present in person or by proxy, he may vote on behalf of all of them; and

     (c)   if two or more are present in person or by proxy, they must vote as one.

37.          A Member of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by his committee, receiver, curator bonis, or other person in the nature of a committee, receiver or curator bonis appointed by such court, and such committee, receiver, curator bonis or other person may on a poll vote by proxy, provided that such evidence as the Directors may require of the authority of the person claiming to vote shall have been deposited at the office of the Company not less than thirty-six hours before the time for holding the meeting or adjourned meeting at which such person claims to vote.

38.          No objection shall be raised to the qualification of any voter except at the meeting or adjourned meeting at which the vote objected to is given or tendered, and every vote not disallowed at such meeting shall be valid for all purposes. Any such objection made in due time shall be referred to the chairman of the meeting, whose decision shall be final and conclusive.

## PROXIES AND REPRESENTATIVES

39.          A Member may be represented at a general meeting by a proxy who may speak and vote on behalf of the Member. The instrument appointing a proxy shall be in writing, under the hand of the appointor or of his attorney, or, if such appointor is a corporation, under its common seal or the hand of a duly authorised officer. The instrument appointing a proxy shall be in such form as the Directors may approve either generally or for a particular instance. A Member may appoint more than one proxy to attend on the same occasion. A proxy need not, unless required by law, himself be a Member.

40.        The instrument appointing a proxy and the power of attorney or other authority (if any) under which it is signed, or a notarially certified or office copy of such power of attorney, shall be deposited at the office of the Company or at such other place as is specified in the notice of meeting or in the instrument of proxy issued by the Company before the time appointed for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote and in default the instrument of proxy shall not be treated as valid.   No instrument appointing a proxy shall be valid after the expiration of twelve months from the date named in it as the date of its execution, except at an adjourned meeting or on a poll demanded at a meeting or an adjourned meeting in cases where the meeting was originally held within twelve months from such date.

41.        The Directors may at the expense of the Company send, by post or otherwise, to the Members instruments of proxy (with or without stamped envelopes for their return) for use at any general meeting or at any meeting of any class of Members of the Company either in blank or nominating in the alternative any one or more of the Directors or any other persons.  If, for the purpose of any meeting invitations to appoint as a proxy a person or one of a number of persons specified in the invitations are issued at the expense of the Company, such invitations shall be issued to all (and not to some only) of the Members entitled to be sent a notice of the meeting and vote thereat by proxy.

42.        A vote given in accordance with the terms of an instrument of proxy shall be valid, notwithstanding the death or insanity of the principal or the revocation of the instrument of proxy, or of the authority under which the instrument of proxy was executed, or the transfer of the share in respect of which the instrument of proxy is given, provided that no intimation in writing of such death, insanity, revocation or transfer shall have been received by the Company at the office of the Company before the commencement of the meeting or adjourned meeting at which the instrument of proxy is used.

43.        Any corporation which is a Member of the Company may authorise such person as it thinks fit to act as its representative at any meeting of the Company, or at any meeting of any class of Members of the Company, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Member of the Company.

## DIRECTORS

44.        The first Director or Directors of the Company shall be elected by the subscriber to the Memorandum and the first Director or Directors may elect any number of additional Directors as it or they may determine up to the maximum number set by Article 45.  Thereafter, the Directors shall be elected by the Members for such term as the Members determine

45.          The minimum number of Directors shall be one and the maximum number shall
be seven.

46.    (1)    Each Director shall hold office for the term, if any, fixed by resolution of
Members or until his earlier death, resignation or removal.

        (2)    A Director may be removed from office, with or without cause, by a resolution of
Members but not by resolution of Directors.

        (3)    A Director may resign his office by giving written notice of his resignation to the
Company and the resignation shall have effect from the date the notice is received by the
Company or from such later date as may be specified in the notice.

47.          A vacancy in the board of Directors resulting from the death, resignation or
removal of a Director may be filled by a resolution of the remaining Directors.

48.    (1)    With the prior or subsequent approval by a resolution of Members, the Directors
may, by a resolution of Directors, fix the emoluments of Directors with respect to services to be
rendered in any capacity to the Company.

        (2)    A Director shall not require a share qualification, and may be an individual or a
company.

        (3)    Any Director which is a body corporate may appoint any person its duly
authorised representative for the purpose of representing it at meetings of the board of Directors
or with respect to unanimous written consents.

49.    (1)    A Director may hold any other office or place of profit under the Company (other
than the office of Auditor) in conjunction with his office of Director, or may act in a professional
capacity to the Company, on such terms as to tenure of office, remuneration and otherwise as the
Directors may determine.

        (2)    No Director or intending Director shall be disqualified by his office from
contracting with the Company either as vendor, purchaser or otherwise, nor shall any such
contract or any contract or arrangement entered into by or on behalf of the Company in which
any Director is in any way interested be liable to be avoided, nor shall any Director so
contracting or being so interested be liable to account to the Company for any profit realised by
any such contract or arrangement by reason of such Director holding that office, or of the
fiduciary relation thereby established, but the nature of his interest must be declared by him at
the meeting of the Directors at which the question of entering into the contract or arrangement is
first taken into consideration, or if the Director was not at the date of that meeting interested in
the proposed contract or arrangement, then at the next meeting of the Directors held after he

becomes so interested, and in a case where the Director becomes interested in a contract or arrangement after it is made then at the first meeting of the Directors held after he becomes so interested.

(3)    Save as provided in this Article, a Director shall not vote in respect of any contract or arrangement or any other proposal whatsoever in which he has any material interest (otherwise than by virtue of his interests in shares or debentures or other securities of or otherwise in or through the Company) unless the nature of his interest is declared at the first opportunity at a meeting of the Directors or by writing to the Directors and no other Director objects to the interested Director voting on such arrangement. A Director shall not be counted in the quorum at a meeting in relation to any resolution on which he is debarred from voting.

(4)    If any question shall arise at any meeting as to the materiality of a Director's interest or as to the entitlement of any Director to vote and such question is not resolved by his voluntarily agreeing to abstain from voting, such question shall be referred to the chairman of the meeting and his ruling in relation to such Director shall be final and conclusive except in a case where the nature or extent of the interests of the Director concerned have not been fairly disclosed.

(5)    The Company in general meeting may suspend or relax the provisions of this Article to any extent or ratify any transaction not duly authorised by reason of a contravention of this Article.

50.    Any Director may continue to be or become a president, vice president, director, managing director, manager or other officer or member of any other company in which this Company may be interested, and no such Director shall be accountable for any remuneration or other benefits received by him as a president, vice president, director, managing director, manager or other officer or member of any such other company. The Directors may exercise the voting powers conferred by the shares in any other company held or owned by the Company, or exercisable by them as directors of such other company, in such manner in all respects as they think fit (including the exercise thereof in favour of any resolution appointing themselves or any of them presidents, vice presidents, directors, managing directors, managers or other officers of such company, or voting or providing for the payment of remuneration to the presidents, vice presidents, directors, managing directors, managers or other officers of such company), and subject to the provisions of the preceding Article any Director may vote in favour of the exercise of such voting rights in the manner aforesaid, notwithstanding that he may be, or be about to be, appointed a president, vice president, director, managing director, manager or other officer of such other company and as such is or may become interested in the exercise of such voting rights in manner aforesaid.

51.    No person other than a Director retiring at the meeting shall, unless recommended by the Directors for election, be eligible for the office of a Director at any general meeting

unless, not less than six or more than forty-eight days before the day elected for the meeting, there shall have been given to the Company notice in writing by some Member duly qualified to be present and vote at the meeting for which such notice is given of his intention to propose such person for election, and also notice in writing signed by the person to be proposed of his willingness to be elected.

## POWERS OF DIRECTORS

52.         The business of the Company shall be managed by the Directors, who may exercise all such powers of the Company as are not by the Memorandum, these Articles or the Act reserved to the Members, subject nevertheless to any regulations of these Articles, to the provisions of the Memorandum and of the Act, and to such regulations, being not inconsistent with the aforesaid regulations or provisions, as may be prescribed by the Company in general meeting, but no regulation made by the Company in general meeting shall invalidate any prior act of the Directors which would have been valid if such regulation had not been made.  The general powers given by this Article shall not be limited or restricted by any special authority or power given to the Directors by any other Article.

53.     (1)     The Directors may, subject to these Articles, establish any committees (not being committees consisting solely of Directors to which paragraph (2) of this Article applies), local boards or agencies for managing any of the affairs of the Company, either in the British Virgin Islands or elsewhere and may appoint any persons to be members of such committees, local boards or agencies, and may fix their remuneration and may delegate to any such committee, local board or agency any of the powers, authorities and discretions vested in the Directors, with power to sub-delegate, and may authorise the members of any local board, or any of them, to fill any vacancies therein, and to act notwithstanding vacancies, and any such appointment or delegation may be made upon such terms and subject to such conditions as the Directors may think fit, and the Directors may remove any persons so appointed, and may annul or vary any such delegation, but no person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

        (2)     The Directors may, by a resolution of the Directors, designate one or more committees, each consisting of one or more Directors.  Each committee of Directors has such powers and authorities of the Directors, including the power and authority to affix the Seal, as are set forth in the resolution of Directors establishing the committee, except that no committee has any power or authority either to amend the Memorandum or these Articles or with respect to the matters requiring a resolution of Directors under these Articles.   The meetings and proceedings of any such committee consisting of two or more members shall be governed by the provisions of these Articles regulating the meetings and proceedings of the Directors.

        (3)     The Directors may from time to time, and at any time, by power of attorney under the Seal, appoint any company, firm or person, or any fluctuating body of persons, whether

Fairfield Lambda Limited                                                    Page 30

nominated directly or indirectly by the Directors, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney may contain such provisions for the protection and convenience of persons dealing with any such attorney as the Directors may think fit, and may also authorise any such attorney to sub-delegate all or any of the powers, authorities and discretions vested in him.

54.        The Directors may from time to time appoint any one or more of their body to the office of managing Director, for such period and on such terms as they think fit. A Director appointed to the office of managing Director shall receive such remuneration (whether by way of salary commission or participation in profits or otherwise) as the Directors may determine.

55.        The Directors may entrust to and confer upon any Director appointed to the office of managing Director any of the powers exercisable by them as Directors upon such terms and conditions and with such restrictions as they think fit, and either collaterally with or to the exclusion of their own powers, and may from time to time revoke, withdraw or vary all or any of such powers.

56.        All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments, and all receipts for moneys paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as the Directors shall from time to time by resolution determine.

## REGISTER OF DIRECTORS

57.    (1)    The Company may keep a register to be known as a register of Directors containing:

    (a)    the names and addresses of the persons who are Directors;

    (b)    the date on which each person whose name is entered on in the register was appointed as a Director; and

    (c)    the date on which each person named as a Director ceased to be a Director.

    (2)    The register of Directors may be in such form as the Directors approve, but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents.

(3)    A copy of the register of Directors, commencing from the date of the registration of the Company, shall be kept at the registered office of the Company.

(4)    The register of Directors is prima facie evidence of any matters directed or authorised by the Act to be contained therein.

## THE MANAGER

58.    (1)    The Directors may appoint any person or persons as Manager of the Company to exercise all or any of the duties, powers and discretions exercisable by the Directors upon such terms and conditions and for such period and with such restrictions as the Directors think fit and whether collaterally with or to the exclusion of their own powers. The Directors shall procure that in any agreement appointing any person as Manager provisions shall be contained restricting the Manager and any investment adviser appointed by the Manager dealing with the Company as beneficial owner on the sale or purchase of investments to or from the Company except on a basis approved by the Directors from time to time or without the consent of the Directors otherwise dealing with the Company as principal.

(2)    The Manager shall be entitled to receive for its services such fees, including a fee on the issue of Shares, as may from time to time be agreed between the Manager and the Company.

## PROCEEDINGS OF DIRECTORS

59.    (1)    The Directors may meet at such times and in such manner and places within or outside the British Virgin Islands as the Directors may determine to be necessary or desirable. Questions arising at any meeting shall be determined by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote.

(2)    A Director shall be deemed to be present at a meeting of Directors if he participates by telephone or other electronic means and all Directors participating in the meeting are able to hear each other.

(3)    An action that may be taken by the Directors or a committee of Directors at a meeting may also be taken by a resolution of Directors or a committee of Directors consented to in writing or by telex, telegram, cable or other written electronic communication, without the need for any notice.

39833

(4)    A Director may by a written instrument appoint an alternate who need not be a Director and an alternate is entitled to attend meetings in the absence of the Director who appointed him and to vote or consent in place of the Director.

60.    (1)    A Director may, and the Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors. Notice of every meeting of Directors shall be given to all Directors.

(2)    A Director shall be given not less than three days notice of meetings of Directors. A meeting of Directors held without three days notice having been given to all Directors is valid if a majority of Directors entitled to vote at the meeting waive notice of the meeting and, for this purpose, the presence of a director at a meeting shall be deemed to constitute waiver on his part. The inadvertent failure to give notice of a meeting to a Director, or the fact that a Director has not received the notice, does not invalidate the meeting.

61.    The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed at any other number shall be two, unless there is only one Director, in which case a quorum shall be one. For the purposes of this Article an alternate shall be counted in a quorum, but for the purpose of deciding whether or not there is a quorum for a meeting, an alternate shall only count as one person.

62.    The continuing Directors or a sole continuing Director may act notwithstanding any vacancies in their body, but if and so long as the number of Directors is reduced below the minimum number fixed by or in accordance with these Articles, the continuing Directors or Director may act for the purpose of appointing Directors to fill any vacancy, summoning general meetings of the Company and for preserving the assets of the Company, but not for any other purpose. If there are no Directors or Director able or willing to act, then any Member may summon a general meeting for the purpose of appointing a Director or Directors.

63.    The Directors may appoint officers of the Company at such times as they may determine. Such officers may consist of a Chairman, a Deputy Chairman, a President and one or more Vice Presidents and such other officers as they may from time to time determine. Any number of offices may be held by the same person.

64.    Unless otherwise agreed by a majority of those attending and entitled to attend and vote thereat, the President or Chairman, as the case may be, or in his absence a Vice President or Deputy Chairman, as the case may be, shall preside at all meetings of the Directors, but if at any meeting none of the foregoing be present within five minutes after the time appointed for holding the same, the Directors present may choose one of their number to be chairman of the meeting.

Fairfield Lambda Limited                                                   Page 33

65.        A resolution in writing signed by all the Directors or by all the members of a committee of the Directors for the time being shall be as effective as a resolution passed at a meeting of the Directors or of such committee, duly convened and held, and any such resolution may consist of several documents in the like form each signed by one or more of the Directors.

66.        A meeting of the Directors for the time being at which a quorum is present shall be competent to exercise all powers and discretions for the time being exercisable by the Directors.

67.        All acts done by any meeting of Directors, or of a committee of Directors, or by any person acting as Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director, or person acting as aforesaid, or that they or any of them were disqualified, or had vacated office, or were not entitled to vote, be as valid as if every such person had been duly appointed, and was qualified and had continued to be a Director and had been entitled to vote

## MINUTES

68.        The Directors shall cause minutes to be made:-

   (a)    of all appointments of officers made by the Directors;

   (b)    of the names of the Directors present at each meeting of Directors and of any committee of Directors; and

   (c)    of all resolutions and proceedings at all meetings of the Company and of the Directors and of committees of Directors.

## THE SECRETARY

69.        A Secretary may be appointed by the Directors and shall hold office during the pleasure of the Directors. Anything by the Act required or authorised to be done by or to the Secretary may, if the office is vacant or there is for any other reason no Secretary capable of acting, be done by or to any Assistant or Deputy Secretary or if there is no Assistant or Deputy Secretary capable of acting, by or to any officer of the Company authorised generally or specially in that behalf by the Directors.

70.        The Secretary shall attend all meetings of the Company and of the Directors or committee of Directors held in the British Virgin Islands to keep correct minutes of such meetings and enter the same in proper books provided for the purpose. He shall perform such other duties as are prescribed by the Act or these Articles, or as shall be prescribed by the

39833

Directors. The Secretary shall receive such salary or other remuneration as the Directors shall from time to time determine.

71.        Any provisions of the Act or of these Articles requiring or authorising a thing to be done by or to a Director and the Secretary shall not be satisfied by its being done by or to the same person acting both as a Director and as, or in the place of, the Secretary.

## THE SEAL

72.        The Directors shall provide for the safe custody of the Seal which shall only be used by the authority of the Directors or of a committee of Directors authorised by the Directors in that behalf. Every instrument to which the Seal shall be affixed shall be signed by any two Directors or by a Director and the Secretary or by the Director if there is only one Director or the Seal shall be affixed under the signature of some other person appointed by the Directors for that purpose. Notwithstanding the foregoing, the Secretary may affix the Seal of the Company over his signature only to any authenticated copies of the Memorandum or these Articles, the minutes of any meetings or any other documents required to be authenticated by him, and further when the instrument shall be a share certificate it shall be sufficient for the share certificate to bear a facsimile of the Seal or a securities seal (in such form as the Directors shall approve) and the facsimile signature of two Directors or of one Director and the Secretary or of the Director if there is only one Director and be signed by an authorised representative for the time being of the Company or its share registrar.

## DIVIDENDS AND DISTRIBUTIONS

73.        The Company may by a resolution of Directors declare and pay dividends in money, shares, or other property but dividends shall only be declared and paid out of surplus. Dividends shall be paid to the Members in accordance with their respective rights and priorities. The Directors shall have power to declare and pay dividends accordingly and other distributions at such times and at such intervals as they may think fit. Dividends may be paid in cash or in specie.

74.    (1)    Subject to the rights of persons, if any, entitled to shares with special rights as to dividends, all dividends or other distributions declared or paid to the holders of any class of share shall be declared and paid to such holders in proportion to the shares held by them.

       (2)    All unclaimed dividends or distributions may be invested or otherwise made use of by the Directors for the benefit of the Company until claimed. No dividend or distribution shall bear interest as against the Company.

(3)    The Directors may deduct from any dividend or other moneys payable to any Member on or in respect of a share all sums of money (if any) presently payable by him to the Company in relation to the shares of the Company.

75.    Any dividends or other moneys payable on or in respect of a share may be paid by cheque or warrant sent through the post to the registered address of the Member or person entitled thereto, and in the case of joint holders to any one of such joint holders, or to such person and such address as the holder or joint holders may direct. Every such cheque or warrant shall be sent at the risk of the person entitled to the money represented thereby and where being sent to an address outside the British Virgin Islands shall as far as may be practicable be forwarded by airmail.

76.    If several persons are registered as joint holders of any share, any one of them may give effectual receipts for any moneys payable on or in respect of the share.

77.    The Directors may carry to reserve out of the profits or gains of the Company (including, if allowed by law, any surplus of the Company) such sums as they think proper as a reserve or reserves which shall at the discretion of the Directors be applicable for any purpose to which the profits or gains of the Company may be properly applied and pending such application may be employed in the business of the Company as the Directors may from time to time think fit.

78.    In the case of a dividend of authorized but unissued shares with par value, an amount equal to the aggregate par value of the shares shall be transferred from surplus to capital at the time of the distribution.

79.    In the case of a dividend of authorized but unissued shares without par value, the amount designated by the Directors shall be transferred from surplus to capital at the time of the distribution, except that the Directors must designate as capital an amount that is at least equal to the amount that the shares are entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

## CAPITALISATION OF PROFITS

80.    (1)    The Directors may resolve that it is desirable to capitalise any undivided profits or surplus of the Company (including profits carried and standing to any capital or other reserve or reserves) relating to the Fund, and accordingly appropriate the profits or sum resolved to be capitalised to the Members holding shares of relevant class in the proportion in which such profits or sum would have been divisible amongst them had the same been applied or been applicable in making the payment of dividends and to apply such profits or sum on their behalf, either in or towards paying up the amounts, if any, for the time being unpaid on any shares of the

39833

relevant class or debentures held by such Members respectively, or in paying up in full unissued shares of the relevant class or debentures of the Company of a nominal amount equal to such profits or sum, such shares or debentures to be allotted and distributed, credited as fully paid up, to and amongst such Members in the proportion aforesaid, or partly in one way and partly in the other provided that a surplus account relating to that class may, for purposes of this Article, only be applied in the paying up of unissued shares of the same class to be issued to Members of the Company holding shares of the relevant class as fully paid shares.

(2)    Whenever such a resolution as aforesaid shall have been passed the Directors shall make all appropriations and applications of the profits or sum resolved to be capitalised thereby, and all allotments and issues of fully paid shares, if any, and generally shall do all acts and things required to give effect thereto, with full power to the Directors to make such provision by the issue of fractional shares or by payment in cash or otherwise as they think fit for the case of shares becoming distributable in fractions and also to authorise any person to enter on behalf of all the Members entitled to the benefit of such appropriations and applications into an agreement with the Company providing for the allotment to them respectively, credited as fully paid up, of any further shares to which they may be entitled upon such capitalisation, and any agreement made under such authority shall be effective and binding on all such Members.

## ACCOUNTS AND FINANCIAL STATEMENTS

81.        The Directors shall cause to be kept proper accounts with respect to:-

      (a)    all sums of money received and expended by the Company and the matters in respect of which such receipt and expenditure take place;

      (b)    all sales and purchases of assets by the Company; and

      (c)    the assets and liabilities of the Company.

82.        The books of account shall be kept at the office of the Company, or (subject to the provisions of the Act) at such other place as the Directors think fit, and shall always be open to inspection by the Directors.

83.        No Member (other than a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by the Act or authorised by the Directors or by the Company in general meeting.

84.        The financial year end of the Company may be determined by resolution of the Directors and failing such resolution shall be the Accounting Date in each year.

39833

85.        At least once every financial year, the Company shall send to each Member printed copies of the financial statements of the Company made up as of the date of the last financial year end.

86.        Every balance sheet contained in the financial statements sent to each Member shall be signed on behalf of the Board of Directors by two of the Directors.

87.        The Directors' report, if any, and Auditor's report, if any, shall be attached to the financial statements.

88.        Every account of the Directors when audited shall be conclusive except as regards any error discovered therein within three months next after the audit. Whenever such an error is discovered within that period, the financial statements shall forthwith be corrected and thereupon shall be conclusive.

## AUDIT

89.    (1)    The Directors or Members may appoint an independent representative of the Members as Auditor of the accounts of the Company and such Auditor shall hold office until the Directors or Members shall appoint another Auditor or remove the Auditor, provided that if the Auditor was appointed by the Members only the Members may appoint another Auditor or remove the Auditor.

       (2)    The Auditor may be a Member but no Director or officer of the Company shall, during his continuance in office, be eligible for appointment as Auditor.

       (3)    The remuneration of the Auditor shall be determined by the Members or by the Directors if so authorised by the Members.

90.        If the Auditor's office becomes vacant by the resignation or death of the Auditor or by his becoming incapable of acting by reason of illness or absence from the British Virgin Islands at a time when his services are required, the Directors shall, as early as practicable, appoint an Auditor to fill the vacancy or an acting Auditor to act during the incapacity of the Auditor, or if the Auditor was appointed by the Members the Directors shall, as early as practicable, convene a general meeting to appoint an Auditor to fill the vacancy or an acting Auditor to act during the incapacity of the Auditor.

91.    (1)    The Auditor shall examine such books, accounts and vouchers as may be necessary for the performance of his duties in accordance with generally accepted auditing standards in the British Virgin Islands or in such other country or jurisdiction as the Directors may determine.

Fairfield Lambda Limited                                                    Page 38

(2)    The Auditor shall be furnished with a list of all books kept by the Company and shall at all times have the right of access to the books and accounts and vouchers of the Company, and shall be entitled to require from the Directors and officers of the Company such information and explanations as may be necessary for the performance of his duties.

(3)    The Auditor shall make a report to the Members on the financial statements examined by him during his tenure of office, and the report shall state whether or not in his opinion the financial statements present fairly, in all material aspects, the financial position of the Company and the results of its operations and the changes in its net assets in accordance with generally accepted accounting principles in the British Virgin Islands or in such other country or jurisdiction as the Directors may determine.

92.        The Auditor shall be entitled to attend any general meeting of the Company at which any financial statements which have been examined or reported on by him are to be laid before the Company and to make any statement or explanations he may desire with respect to the financial statements.

## NOTICES

93.        Any notice or document may be served by the Company on any Member either personally or by sending it through the post in a prepaid letter addressed to such Member at his address as appearing in the Register.  In the case of joint holders of a share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all joint holders.

94.        Any Member present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting, and, where requisite, of the purposes for which such meeting was convened.

95.    (1)    Any notice or other document, if served by post, shall be deemed to have been served at the time when the letter containing the same is posted, and in proving such service it shall be sufficient to prove that the letter containing the notice or document was properly addressed and duly posted.

(2)    All notices or other documents being posted to addresses outside the British Virgin Islands shall so far as may be practicable be forwarded by airmail.

96.        Any notice or document delivered or sent by post to or left at the registered address of any Member in pursuance of these Articles shall, notwithstanding that such Member be then dead or bankrupt, and whether or not the Company had notice of his death or bankruptcy, be deemed to have been duly served in respect of any share registered in the name of such Member as sole or joint holder, unless his name shall, at the time of the service of the notice or

document, have been removed from the Register as the holder of the share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all persons interested (whether jointly with or as claiming through or under him) in that share.

## WINDING UP

97.    (1)    No resolution to wind up the Company shall be deemed passed unless it is passed by a majority of the votes cast at a general meeting in accordance with the provisions of these Articles.

(2)    If the Company shall be wound up, the liquidator shall apply the assets of the Company in satisfaction of creditors' claims in such manner as he thinks fit.

(3)    The surplus assets available for distribution among the Members shall then be applied in the payment to the holders of each class of shares in accordance with the rights and restrictions of each such class and otherwise equally, such payment being made in proportion to the number of shares of the class held.

(4)    If the Company shall be wound up (whether the liquidation is voluntary or by or under the supervision of the Court) the liquidator may, with the authority of a resolution passed in general meeting, divide among the Members in specie the whole or any part of the assets of the Company, and whether or not the assets shall consist of property of one kind or shall consist of properties of different kinds, and may for such purposes set such value as he deems fair upon any one or more class or classes of property, and may determine how such division shall be carried out as between the Members or different classes of Members. The liquidator may, with the like authority, vest any part of the assets in trustees upon such trust for the benefit of Members as the liquidator, with the like authority, shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no Member shall be compelled to accept any shares in respect of which there is a liability.

## FORMS

98.    The forms in the Schedule may be used, subject to such variations or alterations to meet the special circumstances or particular cases as may be necessary and as the Directors may approve.

## INDEMNITY

99.    (1)    Each Director, Secretary or other officer of the Company shall be indemnified by the Company against, and it shall be the duty of the Directors out of the funds of the Company to pay all costs, losses, and expenses which any such Director or officer may incur or become liable for by reason of any contract entered into, or act or thing done by him as such Director or

Fairfield Lambda Limited                                                    Page 40

---

officer, or in any way in the discharge of his duties, and the amount for which such indemnity is
provided shall immediately attach as a lien on the property of the Company, and have priority as
between the Members over all other claims but only if any such Director or officer acted
honestly and in good faith with a view to the best interests of the Company and, in the case of
criminal proceedings, the person had no reasonable cause to believe that his conduct was
unlawful.

(2)     No Director, Secretary or other officer of the Company shall be liable for the
acts, receipts, neglects or defaults of any other Director or officer, or for joining in any receipt or
other act for conformity, or for any loss or expense happening to the Company through the
insufficiency or deficiency of title to any property acquired by order of the Directors for or on
behalf of the Company, or for the insufficiency or deficiency of any security in or upon which
any of the moneys of the Company shall be invested, or for any loss or damage arising from the
bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or
effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default,
or oversight on his part, or for any other loss, damage, or misfortune whatever which shall
happen in relation to the execution of the duties of his office or in relation thereto, to the extent
permitted by law.

(3) The decision of the Directors as to whether the person acted honestly and in good
faith and with a view to the best interests of the Company and as to whether the person had no
reasonable cause to believe that his conduct was unlawful is in the absence of fraud, sufficient
for the purposes of this Article, unless a question of law is involved.

## FUNDAMENTAL CHANGES

100.    The Company may by resolution of Members continue as a company incorporated under
the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those
laws.

101.    Notwithstanding section 80 of the Act, the Directors may sell, transfer, lease, exchange
or otherwise dispose of the assets of the Company without the sale, transfer, lease, exchange or
other disposition being authorised by a resolution of Members.

Fairfield Lambda Limited                                                                                    Page 41

We, Caribbean Corporation Company Limited of Citco Building, P.O. Box 662, Road Town, Tortola, British Virgin Islands for the purposes of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to these Articles of Association the 7th day of December, 1990 in the presence of:

Witness                                          Subscriber

(Sgd. L. Hanley)                                 (Sgd. B. d'Ancona/H. Skelton)
Road Town, Tortola                               For and on behalf of
Secretary                                        Caribbean Corporation
                                                 Company Limited

39833

Fairfield Lambda Limited                                            Page 42

## THE SCHEDULE

### FORM "A"

### TRANSFER OF SHARES

I/We ............................................................................................................[the transferor]

in consideration of.........................................................................................................[amount]

DO HEREBY TRANSFER TO.........................................................................[the transferee]

of...........................................................................................................................[address]

.......................................................................................................[number and class of shares]
in the Company represented by the attached/within certificate.


AS WITNESS my/our hand(s) the        day of            20  .


SIGNED by the above-named transferor(s)
in the presence of:

                                        ....................................................................
                                        (Signature of Transferor(s))


...........................................
(Witness)

                                        ....................................................................
                                        (Signature of Transferee(s))


...........................................
(Witness)



39833

Fairfield Lambda Limited                                          Page 43

---

## FORM "B"

### TRANSFER BY PERSONAL REPRESENTATIVES

I/We having become entitled in consequence of the death of (name of deceased Member) ......................................... to (number) ...................... share(s) comprised in certificate(s) numbered ................. standing in the Register of Members of ................................. in the name of the said deceased Member, instead of being registered myself/ourselves in consideration of the sum of (state total consideration) .................... paid to me/us by name(s) of transferee(s)..........................................................................................................................
of (address(es) ..............................................................................................................
(hereinafter called "the transferee(s)") do hereby transfer to the transferee(s) (number and class of shares transferred) .................... share(s) in the said Company subject to the several conditions on which the same were held immediately before the execution hereof; and I/We the transferee(s) do hereby agree to take the said share(s) hereby transferred subject to the conditions aforesaid.

AS WITNESS my/our hand(s) the      day of       20  .

SIGNED by the above-named person(s)
entitled in the presence of:

.........................................................

                                    .........................................................
                                    (Signatures of person(s) entitled)

SIGNED by the above-named Transferee(s)
in the presence of:

.........................................................

                                    .........................................................
                                    (Signature(s) of Transferee(s))

39833

Fairfield Lambda Limited                                                    Page 44

---

## FORM "C"

### PROXY LIMITED TO ONE MEETING

I/We ...............................................................................................................[name]

the holder of .....................................................................................[number] shares

hereby appoint ........................................................................................[proxy]

of.............................................................................................................[address]

 or failing whom...........................................................................................[proxy]

of.............................................................................................................[address]

to be my/our proxy to vote on me/our behalf at the general meeting of the

Members of the company to be held on the ........ day of ............ 20 .., and at any adjournment

thereof.


Unless otherwise instructed with respect to any particular resolution(s) the proxy will vote or abstain as he thinks fit.

AS WITNESS my/our hand(s) this        day of         20   .

SIGNED by


........................................
(Signature(s) of Member(s))


........................................
(Witness)


39833

FILED

OCT 0 1 2004

REGISTER OF COMPANY AFFAIRS
BVI FINANCIAL SERVICES COMMISSION

# CERTIFIED RESOLUTIONS
## OF
# Fairfield Lambda Limited

I, Gareth Thomas, an authorized signatory of Codan Trust Company (B.V.I.) Ltd., the Registered Agent of **Fairfield Lambda Limited,** a company duly organised and existing under the laws of the British Virgin Islands that the following are true and correct extracts from the resolutions in writing of the Board of Directors of the Company dated the 17th September 2004, and the resolutions contained therein are in full force and effect

### Amendment to the Memorandum and Articles of Association

**RESOLVED THAT** section 7 of the memorandum of association of the Company be and is hereby deleted and replaced as follows:

"7.    CLASSES, NUMBER AND PAR VALUE OF SHARES

The authorised capital shall be divided into 5,000,000 Shares of CHF 0.01 par value each. Shares will not be issued in series."

**RESOLVED THAT** section 8 of the memorandum of association of the Company be and is hereby deleted and replaced as follows:

"8.    DESIGNATIONS, POWERS, PREFERENCES, ETC. OF SHARES

The shares of the Company shall have the following rights and restrictions:

(1)    the holders of Shares shall, subject to the provisions of the Articles:

(a)    be entitled to one vote per Share;

(b)    be entitled to such dividends as the Directors may from time to time declare;

(c)    in the event of a winding-up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or

FILED

OCT 07 2004

REGISTRY OF FINANCIAL AFFAIRS
INTERNATIONAL SERVICES COMMISSION

otherwise or upon any distribution of capital, be entitled, subject to the provisions of the Articles, to share pro rata in the surplus assets of the Fund; and

(d)     be entitled, and subject, to redemption or repurchase of such Shares as provided in the Articles.

Except as provided in this Memorandum of Association and the Articles of Association, the designations, powers, preferences, rights, qualifications, limitations and restrictions of each share that the Company is authorised to issue shall be fixed by resolution of Directors, but the Directors shall not allocate different rights as to voting, dividends, distributions on liquidation or redemption unless the Memorandum of Association shall have been amended."

RESOLVED THAT paragraphs (2) and (3) of article 4 of the articles of association of the Company be and are hereby deleted.

RESOLVED THAT article 5 of the articles of association of the Company be and is hereby deleted and replaced as follows:

"5.     Intentionally deleted."

RESOLVED THAT paragraph (1) of article 7 of the articles of association of the Company be and is hereby deleted and replaced as follows:

"11.     (1)     The Net Asset Value per Share shall be determined by the Directors as at the close of business on each Valuation Day (except when determination of the Net Asset Value per Share has been suspended under the provisions of paragraph (4) of this Article), on such other occasions as may be required by these Articles and on such other occasions as the Directors may from time to time determine.

The Net Asset Value per Share shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue or deemed to be in issue, all determined and calculated as hereinafter provided.

Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties."

RESOLVED THAT on or at anytime after October 1, 2004, Codan Trust Company (B.V.I.) Ltd., the registered agent of the Company, be and is hereby authorised and directed to file the above amendments to the memorandum of association and articles of association of the Company with the Registrar of Companies (British Virgin Islands) and to take any and all other action which may be necessary or desirable to effect the aforementioned changes, provided that Codan Trust Company (B.V.I.) Ltd. shall not and is not authorised to file the above amendments to the memorandum of association and articles of association prior to October 1, 2004.

FILED

OCT 0 1 2004

REGISTRY OF CORPORATE AFFAIRS
BVI FINANCIAL SERVICES COMMISSION

**IN WITNESS HEREOF** I hereby set my hand this 1st day of October, 2004.

Gareth Thomas
Authorized signatory of
CODAN TRUST COMPANY (B.V.I) LTD.
Registered Agent of
**Fairfield Lambda Limited**



FILED

JAN 0 5 2004

REGISTRY OF CORPORATE AFFAIRS
BVI FINANCIAL SERVICES COMMISSION

## CERTIFIED RESOLUTIONS
## OF
## Fairfield Lambda Limited

I, Gareth Thomas, an authorized signatory of Codan Trust Company (B.V.I.) Ltd., the new Registered Agent of **Fairfield Lambda Limited**, a company duly organised and existing under the laws of the British Virgin Islands **DO HEREBY CERTIFY** that the following are true and correct extract from the resolutions in writing of the Board of Directors of the Company dated December 29, 2003, and the resolutions contained therein are in full force and effect as at the date hereof:

"Change of Registered Office/Registered Agent

**RESOLVED THAT** the registered office of the Company be and is hereby changed to Romasco Place, Wickhams Cay 1, P O Box 3140, Road Town, Tortola, British Virgin Islands.

**RESOLVED THAT** the registered agent of the Company be and is hereby changed to Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P O Box 3140, Road Town, Tortola, British Virgin Islands.

**RESOLVED THAT** clauses 2 and 3 of the memorandum of association of the Company be and are hereby deleted and replaced with the following:

"2.    REGISTERED OFFICE

The Registered Office of the Company is Romasco Place, Wickhams Cay 1, P O Box 3140, Road Town, Tortola, British Virgin Islands.

3.    REGISTERED AGENT

The Registered Agent of the Company is Codan Trust Company (B.V.I.) Ltd., Romasco Place, Wickhams Cay 1, P O Box 3140, Road Town, Tortola, British Virgin Islands."

**RESOLVED THAT** the registered agent of the Company be and is hereby authorized and directed to transfer all the books and records of the Company to Trident Trust Company (B.V.I.) Limited.

Cont'd

FILED

JAN 0 5 2004

REGISTRY OF CORPORATE AFFAIRS
BVI FINANCIAL SERVICES COMMISSION

Page 2

## CERTIFIED RESOLUTIONS
## OF
## Fairfield Lambda Limited

**RESOLVED THAT** Codan Trust Company (B.V.I.) Ltd. be and is hereby authorized to file the requisite documents with the Registrar of Companies in the British Virgin Islands to amend the memorandum of association of the Company and to take any and all other actions which may be necessary or desirable to effect the aforementioned changes."

IN WITNESS HEREOF I hereby set my hand this 5th day of January, 2004.

_____
Gareth Thomas
Authorized signatory of
**Codan Trust Company (B.V.I.) Ltd.**
The new Registered Agent of
**Fairfield Lambda Limited**

# **EXHIBIT F**

July 27, 2016 Hearing Transcript

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 10-13164-smb

4    Adv. Case No. 10-03496-smb

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7    FAIRFIELD SENTRY LIMITED,

8            Debtor.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

10   FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) ET AL

11                Plaintiff,

12           v.

13   THEODOOR GGC AMSTERDAM ET AL

14                Defendants.

15   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

16                U.S. Bankruptcy Court

17                One Bowling Green

18                New York, NY  10004

19

20                July 27, 2016

21                10:00 AM

22

23   B E F O R E :

24   HON STUART M. BERNSTEIN

25   U.S. BANKRUPTCY JUDGE



Page 2

1    Hearing re:    Status Conference

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:    Sonya Ledanski Hyde

Page 3

```
 1   A P P E A R A N C E S :

 2

 3   O'MELVENY

 4        Attorney for Credit Suisse Defendants

 5        Times Square Tower

 6        7 Times Square

 7        New York, NY 10036

 8

 9   BY:  BILL SUSHON

10

11   HOGAN LOVELLS

12        Attorneys for Barclays Defendants

13        875 Third Avenue

14        New York, NY 10022

15

16   BY:  MARC J. GOTTRIDGE

17

18   CLEARY GOTTLIEB STEEN & HAMILTON LLP

19        One Liberty Plaza

20        New York, NY 10006

21

22   BY:  THOMAS J. MOLONEY

23

24

25
```

Page 4

1    WIGGIN AND DANA LLP

2          Attorney for Morgan Stanley

3          Two Stamford Plaza

4          281 Tresser Blvd

5          Stamford, CT 06901

6

7    BY:  JAMES H. BICKS

8

9    SIDLEY AUSTIN LLP

10         787 Seventh Avenue

11         New York, NY 10019

12

13   BY:  ANDREW P. PROPPS

14

15   DLA PIPER

16         1251 Avenue of the Americas

17         New York, NY 10020

18

19   BY:  CHRISTOPHER P. (KIP) HALL

20

21   EISEMAN LEVINE LEHRHAUPT & KAKOYIANNIS

22         805 Third Avenue

23         New York, NY 10022

24

25   BY:  LAURENCE MAY

```
 1   HUNTON & WILLIAMS LLP

 2        200 Park Avenue

 3        New York, NY 10166

 4

 5   BY:  MICHAEL P. RICHMAN

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              P R O C E E D I N G S

2         THE COURT:  Go ahead.

3         MR. MOLTON:  Good morning, Your Honor.  David

4    Molton.  I'm here with Mark Krzyzowski and Elizabeth Molino

5    at Brown Rudnick for the Fairfield Foreign Representatives.

6    With us in court today as well is Ken Kriss, the liquidator

7    -- one of the liquidators and the Foreign Representative of

8    the Fairfield Funds.

9         Does Your Honor want introductions by my friends

10   on the other side?

11        THE COURT:  Sure.  Go ahead.

12        MR. GIBLIN:  Your Honor, Thomas Giblin from Latham

13   & Watkins on behalf of certain ABN AMRO defendants.

14        MR. MOLONEY:  And Tom Moloney on behalf of the

15   HSBC defendants.  The two of us will be talking on behalf of

16   the Defense Group this morning.

17        THE COURT:  Okay.  Can you ask them to be quiet?

18   Go ahead.

19        MR. MOLTON:  Judge, we're here for a status

20   conference in light of activities -- recent activities that

21   have brought us here.  Last we reported to Your Honor was in

22   April of 2015 in connection with the status of activities.

23   And at that point we reported to you that there was a trial

24   that had just finished on what we call the 273 Application.

25   And I'll get to that.  And the decision was being awaiting.

1      Well, that decision happened and that's what

2  brought us here.  I'm here to report on the status of

3  proceedings here, Your Honor, the status of relevant

4  proceedings abroad and how we think they impact or don't

5  impact the proceedings here.  I've had discussions over --

6  intermittently in April and then over the past couple of

7  weeks with my friend Mr. Moloney regarding what next steps

8  we should take.

9      I had hoped we would have something agreed to to

10  submit to Your Honor in connection with lifting the stay

11  that was set by Judge Lifland, procedures for dealing with

12  claim amendments, and procedures for dealing with dismissal

13  motions.  Unfortunately, Your Honor, I cannot report to Your

14  Honor that we have such agreement as to any of those items.

15      But let me begin, first of all, with a very

16  concise summary -- and I hope to be very concise in this.  I

17  know that we're dealing with a lot of material and I'm going

18  to try not to get too far in the weeds unless Your Honor

19  wants me to.  And I'll of course entertain any questions and

20  all questions that Your Honor may have.

21      But we're here because the liquidators of the

22  Fairfield Funds believe that this case should get on.  These

23  cases were filed well over -- most of them well over five

24  years ago.  And as Your Honor knows, the liquidation has

25  bene progressing.  We'll be seeking to make a distribution,

1   and these cases, properly we believe filed in this court,

2   are ripe for progression in connection with active case

3   management.

4           There are presently, Your Honor, 304 pending

5   actions.  Approximately, 750 named defendants -- I think the

6   actual number is 747 -- there is allegations against various

7   unnamed beneficiaries that may or may not be the subject of

8   later proceedings in this Court and later discovery issues.

9           The claims that are made in those actions, Your

10  Honor, basically break down as follows.  And I do want to

11  say that the claims are made against Fairfield's

12  shareholders, redeemers, and when appropriate and

13  necessarily, their beneficial owners and customers.  And

14  what they seek, Your Honor, based on the fact that

15  redemptions were paid on a fictitious and inflated NAV, net

16  asset value, based on the Madoff fraud -- the claims

17  basically break down into three component parts.

18          There are restitutionary mistake claims.  Those

19  were the ones that were the subject of the BVI proceedings,

20  Your Honor, and I'll get to those momentarily; or claims

21  making those -- BVI claims asserting those claims or similar

22  claims were the subject of the -- were the subject of the

23  BVI proceedings.

24          Contractual overpayment claims, Your Honor, as

25  well as BVI avoidance actions under the BVI insolvency law

Page 9

1   that the liquidators are pursuing here based on preference

2   and undervalued transaction.  And those are, I think,

3   Section 275 and 276, and somebody will scream if I'm wrong,

4   of the BVI Insolvency Act.  The contractual overpayment

5   claims and the BVI avoidance actions, Your Honor, were never

6   subject to the proceedings in the BVI.  They're here and

7   they remain here.

8            As I mentioned, Your Honor, there were claims that

9   the liquidator made very early on in the BVI to make sure

10  that redemptions didn't fall off the statute of limitations

11  wagon, and those were based on restitutionary and estate

12  claims.  And to bring us full forward to where and how we

13  got here, Your Honor, is that the defendants -- certain

14  defendants in the BVI sought at one point back in 2011

15  preliminary issues, what they call under English law, with

16  respect to the BVI claims, the restitutionary mistake claims

17  there, and seeking to attack them on two grounds, Your

18  Honor.

19           No consideration or lack of -- or there was good

20  consideration, I'm sorry, for the redemptions and,

21  accordingly, there's no claim; as well as the fact that

22  certain emails, account statements, and other paper issued

23  by our administrator, Citco, to the redeemers or to the

24  Fairfield customers were certificates, which under Article

25  11 of the company's articles, would then be binding -- if

Page 10

```
1    they were, in fact, certificates, would then be binding

2    against all the parties.  So even though -- the argument

3    would be that even though the NAV was fictitious and

4    inflated and wrong, if Citco on behalf of the directors gave

5    a binding certificate, that that bound all the parties to

6    that number even if that number was wrong.

7              What the preliminary issues didn't deal with and

8    what Judge Banister did not allow the liquidators to do,

9    Your Honor, is to develop a factual record with respect to

10   these issues.  So they went up on the pure legal issues.

11   And the articles of association, Your Honor, make the

12   certificates binding only if given in good faith.  That

13   issue was never addressed in the privy council; that issue

14   was not allowed -- the liquidators were not allowed to delve

15   into that issue in the BVI proceedings, and the BVIs --

16             THE COURT:  Why not?  They're only binding if

17   they're given in good faith.  Why weren't you allowed to

18   show that --

19             MR. MOLTON:  Judge, I'd have to --

20             THE COURT:  Let me finish.

21             MR. MOLTON:  I'm sorry.

22             THE COURT:  Why weren't you allowed to show that

23   they were given in bad faith?

24             MR. MOLTON:  Your Honor, because we'd have to go

25   back to the proceedings in front of Judge Banister in 2011.
```

 1    He didn't allow us to even do the fact finding to make that

 2    discovery.

 3                THE COURT:  Did you raise that issue when you went

 4    to the --

 5                MR. MOLTON:  Yes, yes, that was raised and that

 6    was specifically carved out.  That issue was -- the issue of

 7    factual issues pertaining to the claims was specifically

 8    carved out of the preliminary issues back in 2011 based on

 9    my recollection, Your Honor.  But it later come to pass,

10    Your Honor, that the liquidators did discover that they did

11    have a -- just a note for the record.  The BVI avoidance

12    claims are 245 and 246; not 275 and 276.  Thank you.

13                But the liquidators did discover later on in the

14    course of other of their activities that there was very good

15    grounds to show and prove that the certificates -- what the

16    privy council called the certificates that were given on

17    behalf of the directors of the funds by Citco were not in

18    good faith.

19                THE COURT:  So, did you go back to the BVI court

20    and make this argument?

21                MR. MOLTON:  Excuse me?

22                THE COURT:  Did you go back to the BVI court and

23    basically say you discovered that the certificates are not

24    given --

25                MR. MOLTON:  Judge, I'll have to report to you

1    more on those proceedings.  I'm not able to tell you exactly

2    what happened in front of Judge Banister on that.

3            THE COURT:  It just sounds like you litigated

4    these issues or you should litigate them in the BVI.  I

5    don't understand why they're here.

6            MR. MOLTON:  Well, Judge, the issues are here

7    because there's a forum selection clause, and because the

8    cases are here.  These defendants --

9            THE COURT:  Well, the cases are here because you

10   brought them here --

11           MR. MOLTON:  Yeah, we brought them here.

12           THE COURT:  That I understand.

13           MR. MOLTON:  But the cases are -- and the issues

14   are here, Your Honor.  Like many other issues come before

15   the Bankruptcy Court because of agreements made by the

16   parties by which they agree the fora and the form in which

17   the claims should be heard.

18           THE COURT:  But I thought that the -- which court

19   is it?  -- the privy council dealt with that issue in its

20   April 2014 decision and said that the forum selection

21   clauses don't control this question that you're raising

22   about the certificates.

23           MR. MOLTON:  No, they did not deal with the forum

24   selection clause, whether we have a right to sue here, Your

25   Honor.

```
 1              THE COURT:  Yeah, I understand that.

 2              MR. MOLTON:  The commented on it.  What they

 3      commented on, Your Honor, in the privy council decision is

 4      that they didn't believe that New York law, which applies to

 5      the subscription agreement, is applicable to the privy

 6      council's analysis of the articles of association.

 7              THE COURT:  Okay.

 8              MR. MOLTON:  And that's specifically what they

 9      found.  And I have that flagged somewhere but I...

10              THE COURT:  I understand.

11              MR. MOLTON:  Yeah, yeah.  But I don't think they

12      referred to the litigation here, Your Honor, and they issued

13      no holding or finding in any way concerning that litigation

14      and what Your Honor should --

15              THE COURT:  But the good faith exception is under

16      the articles of agreement for the corporation --

17              MR. MOLTON:  It is.

18              THE COURT:  So, tell me why you don't go back to

19      the BVI court and argue that you've discovered that these

20      certificates were given in bad faith.

21              MR. MOLTON:  Judge, because these cases are here,

22      and because the cases in the BVI are not against these

23      defendants mostly.  I think that there's some overlap but

24      it's not against these defendants mostly.

25              THE COURT:  But why didn't you sue them in the BVI
```

```
 1    then?

 2            MR. MOLTON:  Judge, I mentioned that the suits

 3    were made in the BVI very early on mostly and before the

 4    liquidators had done their diligence.  As Your Honor knows,

 5    the Madoff fraud happened in 2009.  There was complete --

 6            THE COURT:  Well, 2008.

 7            MR. MOLTON:  2008.  But 2009 is when the

 8    liquidators came in.  They basically were only able to come

 9    to conclusions that they can pursue claims here following

10    their analysis of the subscription agreements.  But they

11    were dealing with the fact that every month subscriptions

12    were falling off the limitations bandwagon.  And what they

13    did in the BVI, according to my understanding, is that they

14    initiated and commenced a limited amount of suits for much,

15    much fewer -- or less redemptions, and defendants, and money

16    that's involved here in order to protect their -- to protect

17    those --

18            THE COURT:  I understand that.  But at some point

19    you commenced these cases here.

20            MR. MOLTON:  Yes, Your Honor.

21            THE COURT:  And the question is why you didn't

22    commence them in the BVI.

23            MR. MOLTON:  Well, Your Honor, because we don't

24    have necessarily jurisdiction over all these defendants in

25    the BVI.  Arguably, the only way that the preliminary issues
```

```
 1    even happened was that the Defendants consented to that

 2    jurisdiction in order to raise those issues in the BVI we

 3    believe as a tactical way of getting in front of Judge

 4    Lifland here.  And that's why that happened.  We don't have

 5    jurisdiction against these folks, number one -- they have

 6    jurisdictional arguments, number one -- whether they would

 7    consent to it is a different issue; and, number two, at this

 8    point, Judge, there's a real question as to whether we have

 9    -- we can go back there with viable claims based on statute

10    of limitations issues.

11            Number three, Your Honor, all of these defendants

12    or the predominant amount of defendants that are in front of

13    Your Honor have signed subscription agreements that said

14    we'll be sued here.  And my friends, the Defendants, say,

15    well, that doesn't include this claim or that claim, or this

16    claim or that claim.  That's a subject for a later day.

17    It's our contention...  And that is governed by New York

18    law, Your Honor.  And it's our contention that all the

19    claims are properly made here in front of Your Honor.

20            So, I hope that answers Your Honor's questions

21    regarding that but --

22            THE COURT:  It answer it; it doesn't explain it,

23    though.

24            MR. MOLTON:  Well, the bottom line is we can

25    supplement Your Honor and I can get more from --
```

```
 1              THE COURT:  They're here.

 2              MR. MOLTON:  Yeah, yeah.

 3              THE COURT:  And they're going to tell they

 4     shouldn't be.  So, I'll wait to hear from them.

 5              MR. MOLTON:  Yeah, yeah.  But in any event, Judge,

 6     in any event, Judge, we received the privy council decision

 7     in 2014 in March.  Again, that decision didn't deal with two

 8     of the three tranches of claims we have in front of Your

 9     Honor.  And with respect to the one tranche of claims that

10     we have in front of Your Honor, the restitutionary claim, it

11     only dealt with the issue that went up to the privy council.

12     It didn't go up to -- it didn't deal with the factual issue.

13              And we agree with Your Honor.  We submit that

14     there was no reason and it wouldn't been much more efficient

15     for the BVI court to have let us...  There's been a lot of

16     criticism of preliminary issues in the English system for

17     this very reason, that they think they're dealing with

18     something and they think that they're dealing with something

19     that can be dealt with in a dispositive way, and then it

20     turns out not the case because you didn't let the litigation

21     proceed in the normal course and discovery happen in the

22     normal course.

23              But in any event, Your Honor, what then happened,

24     as Your Honor knows, is that 14 defendants of the 750 filed

25     applications in the BVI under Section 273 of the BVI
```

```
 1   Insolvency Act basically to stop the liquidators from

 2   proceeding here.  That was the subject of our discussion.

 3   There's, again, only 14 -- and although I'm probably missing

 4   something, it's UBS, Julius Baer, Deutsche Bank, and SNS

 5   Global.

 6           Last March, Your Honor, Judge Leon gave us a

 7   decision denying and dismissing in entirety what I call the

 8   14 273 applicants after an antisuit, basically to antisuit

 9   the liquidator from making his decision and relying on the

10   subscription agreements and coming here to assert his

11   claims.

12           Judge, there's been no application by those 14 273

13   applicants for a stay of Judge Leon's order.  And that order

14   at this point -- you know, we provided it to Your Honor --

15   basically allows the liquidator to come here and the issues

16   that were raised in that proceeding, which are going to be

17   the very issues that are going to be raised on dismissal

18   motions here -- that judge, Judge Leon says Your Honor is

19   perfectly capable of handling.  And I'll get to a preview of

20   some of those issues as we go forward.

21           In the same month, Your Honor, there was a cost

22   judgment by Judge Leon that I don't think we sent you, but

23   we could and we will.  I just received the final copy of it

24   yesterday so I didn't even have it.  But that cost

25   adjustment awarded full cost to the liquidator
```

```
1    notwithstanding the Defendant's arguments that they achieved

2    some sort of tactical success in the judgment and,

3    accordingly, they should be -- the liquidator should not be

4    awarded full costs.  Judge Leon denied that in entirety.

5    And I will send you that judgment, Your Honor.

6              What then happened, as Your Honor knows from my

7    letter, is we were forced to go to the Eastern Caribbean

8    Court of Appeal with respect to obtaining sanction to be

9    here basically at the fund's cost.  Sanction is a term of

10   art in British or English law that means approval.  And it

11   doesn't mean that the liquidator has no right to do what the

12   liquidator is doing, but it means that if you don't have

13   sanction then you can't go and get paid from the estate.

14             On June 24th, Your Honor, the Eastern Caribbean

15   Court of Appeals heard the sanction appeal by the

16   liquidator, which was within the liquidation proceeding,

17   which is an ex parte proceeding, and unanimously reversed

18   Judge Banister and gave the liquidators full sanction to

19   proceed here through final judgment, I believe.  That was

20   finalized on June 30th, and it was after June 30th -- it was

21   finalized and sealed on June 30th, and that's when we

22   advised Your Honor of it.

23             What's happening now, Your Honor, in the BVI,

24   before I get to some of the other issues, is that -- and,

25   again, it's my understanding that there's been no
```

 1   application to stay the sanction (indiscernible) whatsoever

 2   by any of my redeemer friends.  But what's happening now,

 3   Your Honor, in the BVI is that the Defendants, these 14 273

 4   applicants have appealed the 273 judgment of Judge Leon, and

 5   what they've also done is sought to intervene in the already

 6   decided sanction appeal and seek its reopening.

 7            I do know that I wrote Your Honor about the case

 8   management order and the scheduling issue, and regarding the

 9   fact that a single judge at the BVI court after the sanction

10   order was given by the BVI Court of Appeals did a case

11   management order that referred to that appeal as if it was

12   still pending.

13            The Court of Appeals has written to all the

14   parties, however, that it is -- a Latin word that I had to

15   look up -- functus, F-U-N-C-T-U-S, with respect to the

16   orders in that appeal.  It's without jurisdiction.  And how

17   they handle this motion to intervene, I can't tell you, but

18   that's on -- it has been made.

19            And it's my understanding, Your Honor, that the

20   Eastern Caribbean Court of Appeal has scheduled these issues

21   for the week of November 21, 2016.

22            THE COURT:  That's the appeal from the Section 273

23   order?

24            MR. MOLTON:  My understanding is as follows,

25   Judge.  I think it's three things.  And my friends will tell

1    me if I'm wrong.  It's the appeal from the 273 application,

2    number one; number two, it's a motion to intervene in the

3    already decided sanction appeal; and, number three, it was

4    the liquidator's application to correct the case management

5    order that referred to the sanction appeal as still pending.

6              THE COURT:  There's a motion to intervene in the

7    sanction appeal but I thought the Appellate Court has

8    already moved it doesn't have jurisdiction?

9              MR. MOLTON:  Well, we received a...  We received a

10   letter from...  Or, rather, my BVI counsel friends received

11   a letter, and this was a letter -- an email that was sent to

12   all parties.  "Dear Counsel..." And this was by the

13   registrar of the Court of Appeals in the Eastern Caribbean

14   Court of Appeals.  "Dear Counsel, I've been directed by the

15   Court to acknowledge receipt of your various correspondence

16   on the above caption matter.  The Court is directed that I

17   inform that any application will be dealt with when filed.

18   The Court is functus as it relates to the orders made.

19   Please be guided accordingly." So, that's the word we had

20   from...

21             THE COURT:  Which orders made was that referring

22   to?

23             MR. MOLTON:  That refers to the sanction order,

24   Your Honor.  But they made an application to intervene and

25   they have a right to do so, I guess, and the Court will

```
 1   decide whether it has jurisdiction to entertain that motion

 2   and if it does decide it does have jurisdiction, what that

 3   decision will or won't be.

 4            But in any event, Judge, what we're looking at --

 5   and this is, I think, important also in terms of why we're

 6   here and what I'm going to be asking from the Court in terms

 7   of going further, is the status of timing.  It's fair to say

 8   that if...  Oh, I missed one thing, Judge.  If I can add one

 9   thing...

10            Another thing that's up before the EC Court of

11   Appeals on November -- the week of November 21st is the

12   liquidator's application as well for case management so that

13   the -- to ask the Court to hear on the 273 appeal -- there

14   were two parts of it.  Judge Leon first said that these

15   applicants had no standing under BVI English law; and, two,

16   then he said if they did have standing, they didn't meet the

17   extraordinary threshold to stop the liquidator from taking

18   acts a liquidator thinks are reasonable.

19            So, the liquidators have said that in order for

20   case management and case management efficiency, there should

21   be...the standing issue should go first.  So that's also a

22   matter that's up before the Eastern Caribbean Court of

23   Appeal in November.

24            We don't know what the Court will do then --

25   whether it will just hear the preliminary matters and not
```

1   hear the 273 appeal then.  Assuming it does hear the 273

2   appeal then, it's fair to say that we will not have a

3   decision until 2017.  And it's fair to say that the party

4   that loses that decision will then seek its or his or her

5   remedy up to the privy council.  And depending on whether

6   the -- let me clear my throat -- depending on whether the

7   273 is bifurcated into standing and merits or is heard

8   together, that appeal to the privy council will no doubt not

9   be decided until 2018 or 2019.

10          If Your Honor -- and I hope I get my dates right -

11  - but the Eastern Caribbean Court of Appeal on the

12  preliminary issues from Judge Banister rendered its decision

13  in 2012.  I think the privy council came down two years

14  later.  Thank you, Elizabeth.

15          So, it's the liquidator's view, Your Honor, that

16  these cases are properly here.  They're properly here for a

17  lot of reasons.  They're properly here because these very

18  defendants agreed that they'd be here.

19          And it's not remarkable for Your Honor to hear

20  cases dealing with foreign law where the parties have agreed

21  that they be heard here.  And it's not unremarkable for Your

22  Honor to hear cases dealing with foreign law aspects when

23  there is, even absent a consented jurisdiction, when there's

24  other personal jurisdiction for that case to be heard here.

25  The Defendants reserve and retain all their rights and

```
 1   arguments in connection with that.  And as Judge Leon said,

 2   that's for Your Honor to decide.

 3          So, we submit, Your Honor, and we're here to ask

 4   this Court to do case management and to start this

 5   litigation after a hiatus for the benefit of all of the

 6   interested parties in the Fairfield Funds.  And what we're

 7   looking for, Your Honor -- and I'll outline some of the

 8   issues that Mr. Moloney and I talked about but which we

 9   were unable to come to agreement on...is, first of all, we

10   think the stay must be lifted in all respects.

11          THE COURT:  Tell me more about Judge Lifland's

12   stay in this matter.

13          MR. MOLTON:  Yeah, Judge Lifland first imposed the

14   stay as what he called a "time out".  I believe that's what

15   he said...in connection with Judge Banister's preliminary

16   issues decision back in September-October 2011.  And Judge

17   Banister's decision on preliminary issues was very different

18   than the privy council.  Because Judge Banister said,

19   whatever these things are that Citco gave out, they're not

20   certificates under English law.

21          But there was good consideration --

22   notwithstanding that it was the liquidator's argument that

23   these folks got overpaid -- the redeemers gave up certain

24   rights and remedies.  And under English law, that was all

25   that was required to make for a good consideration defense.
```

```
 1              That went up... So he issued that -- the stay
 2     then pending that.  And another issue, Your Honor, that the
 3     state dealt with, by the way, which was a U.S. issue, was
 4     the issue of mandatory abstention.  Because what happened
 5     was that the liquidators started filing cases in New York
 6     State Court before they had recognition and then --
 7              THE COURT:  How can you do that?  What's your
 8     standing to do that?
 9              MR. MOLTON:  Well, Your Honor, there's an argument
10     to be made that under 1509 of Chapter 15, that a liquidator
11     who is not recognized need not have that recognition to
12     pursue claims of the company.  1509F, I believe.  Now,
13     that's an issue that some courts -- you know, I think a
14     District judge has read very strictly --
15              THE COURT:  In Brooklyn, wasn't it?
16              MR. MOLTON:  Excuse me?
17              THE COURT:  In Brooklyn?  Years ago?
18              MR. MOLTON:  Yeah, years ago.  It was a District
19     judge in the Southern District whose name I can't --
20              THE COURT:  It's in the Eastern District.
21              MR. MOLTON:  Eastern District.  Other folks have
22     said, well, this relates to claims of the corporation and
23     not claims of the liquidator for which you need recognition.
24     And, really, there's no distinction.  Because I know that
25     the legislative history of Congress or the (indiscernible)
```

1    legislative history refers to the fact that this would of

2    course refer to a claim for an account receivable or

3    something like that, that could be done.  And some of the

4    courts really focus on that and said that's all you have.

5              THE COURT:  Okay.

6              MR. MOLTON:  But conceptually, from my personal

7    point of view, that doesn't make sense.  It's a claim of the

8    company or it's not a claim of the company.  If it's a claim

9    of the company, maybe you're in 1509F.  But in any event, in

10   order, again, to stop the conveyer belt of redemptions

11   falling off the statute of limitations or falling into a

12   limitations defense, the liquidator, once convinced that

13   they could sue here in the United States, started doing so

14   in the State Court, then removed those actions.

15             Those, what I call, the remand defendants, which I

16   believe there are...40 cases, Your Honor -- 40 out of our

17   305 cases...

18             THE COURT:  So, of the 305, that includes the

19   removed actions?

20             MR. MOLTON:  Yeah, which are still here.  Judge

21   Lifland before Stern v.  Marshall -- my God, we're getting

22   an entire law school lecture here but I can't help it.

23   That's what this case involves.  Before Stern v.  Marshall,

24   Judge Lifland denied the mandatory abstention motion on the

25   grounds that these claims were statutorily core.

```
 1              Then three weeks later, Stern v.  Marshall

 2     happened.  It went up on appeal to Judge Preska, and Judge

 3     Preska held that these were not core claims --

 4     constitutionally core claims.  They were then subject to

 5     mandatory abstention.  And she found with respect to four of

 6     those claims, which are now only three because one's been

 7     settled, they were untimely removed and remanded with

 8     instructions to send them to 60 Centre Street.

 9              And with respect to the other 37 that Judge

10     Lifland had to engage in a timely adjudication, timely

11     adjudication finding, and then determine mandatory

12     abstention on remand.  Those cases got caught up in the

13     stay.  They've never been -- meaning, they were stayed so...

14              THE COURT:  So, Judge Lifland's stay was until

15     when or for what?

16              MR. MOLTON:  I'm getting to that.  I broke it up.

17     I'm sorry.  But I wanted to add that part of that stay was

18     to account for the liquidator's appeal from Judge Preska's

19     decision.  Judge Preska granted interlocutory appeal on this

20     issue for herself first; and then after decision, she said,

21     if I gave it to myself, I've got to give it to the Second

22     Circuit.

23              It went up to the Second Circuit, and the circuit

24     basically held sometime in 2012 that it was denied -- the

25     interlocutory appeal was denied without prejudice, subject
```

1    to the entire remand issue -- mandatory abstention issue

2    being finally determined, you know, meaning the timely

3    adjudication issue.

4           I don't know -- and one of my questions to Mr.

5    Moloney over -- we've been discussing is whether these

6    remand defendants continue to want to be remanded to State

7    Court.  I haven't gotten a clear answer on that yet.

8    Hopefully that will resolve itself at some point in time,

9    but there we are.

10          So, but that was resolved by the Second Circuit.

11   So, Judge Lifland's stay really encompassed the appeal of

12   preliminary issues.  And then we came in a number of times -

13   - we then got sanctioned notwithstanding the appeal of

14   preliminary issues in Judge Banister's decision -- we got

15   sanctioned from the Eastern Caribbean Court of Appeal to

16   pursue these claims and to seek to lift stay.

17          Judge Lifland said, no, I'm going to wait until

18   privy council.  And he also in his later writings that

19   touched upon the stay referred to the fact that some of the

20   defendants were making this anti-suit by way of 273.

21          So, the bottom line, it's our position, Judge that

22   those conditions which gave rise to Judge Lifland's stay are

23   over.  We have a privy council decision that we understand

24   what it says but it doesn't resolve the matter factually

25   with respect to the position of good faith.

```
 1          And we also have the 273 being decided quite

 2   emphatically in terms of standing and also in terms of the

 3   fact that the liquidator was not operating vexatiously or

 4   unreasonably or the other high threshold that would stop him

 5   from coming here.

 6          So, that's why we submit, Your Honor, that it's

 7   time to get on.  A lot of the points that you're going to

 8   hear are going to be -- I gather from my friends, will be

 9   points that they raised in the 273 that they're going to be

10   trying to re-raise in front of the Eastern Caribbean Court

11   of Appeal...

12          THE COURT:  Let me ask you a question.  Let's

13   suppose that you go forward with these litigations and the

14   273 issue is reversed and decided against you.  Does that

15   mean you don't have the authority to do it or you just don't

16   get paid for it?

17          MR. MOLTON:  No, that means we don't have the

18   authority to do it.  That means the presiding court has

19   stopped the liquidator from doing that.  It's my

20   understanding, Your Honor, that from a litigation

21   perspective, you know, based on the extraordinarily

22   thresholds that the 273 applicants have to show -- and I

23   think Judge Leon quite aptly described them in his judgment

24   -- that it's going to be very hard for them to do that.

25          But we submit, Your Honor, again...most of the
```

1   arguments, if not all the arguments that they're going to be

2   making...and I'll get to that as I finish up...are arguments

3   that Your Honor can be dealing with in the next 12 months.

4   These are all -- what they call over there and what we --

5   strikeout; what we call over here dismissal -- and I'll

6   articulate what they are, what I think they are.

7           Tom and I, Mr. Moloney and I have known what

8   they've been for the past four years.  But those are issues

9   that will not be finally -- even on a 273, they're indirect

10  issues that go to a very extraordinary standard that would

11  stop the liquidator from proceeding.  Here, they're soup and

12  nuts.  They're in front of Your Honor, Your Honor can deal

13  with them, and avoid having to wait until 2018 and 2019 with

14  300 cases on your docket, Your Honor, in order to get to

15  them.

16          And that's our position, Your Honor, that the

17  conditions of Judge Lifland's stay order are gone and we

18  should proceed.  And those very issues are issues that can

19  be raised, will be raised, should be raised by defendants,

20  and will be determined here well before -- we before these

21  ancillary issues that only indirectly cover these issues get

22  resolved by the privy council.

23          So, in terms of the second issue -- so that's the

24  issue of stay, Judge.  And when I refer to the issue of

25  stay, Judge, I also do want to make reference to the fact

1   that it's been -- I don't have to remind you...in the BLMS

2   proceeding you're told that all the time...it's been...we're

3   closer to ten years than we are almost to five years.  And

4   we've got stakeholders who are wanting to see resolution.

5   We believe that resolution can happen here under Your

6   Honor's act of case management much quicker than it can

7   happen anywhere else.

8           And again, repeat -- this is where -- as Your

9   Honor knows from also the arguments in front of you on

10  extraterritoriality where the issue was discussed on forum

11  selection in New York -- this is where they agreed to be

12  sued.

13          So, turning to amendments, in the past few years,

14  in light of the fact that the stay has been granted, there's

15  been a number of circumstances that cause us to want to

16  amend.  And I've raised these issues, and I've identified

17  them to Mr. Moloney, who has taken the thankless task, no

18  doubt, of being -- herding cats and being mouth...you know,

19  the spokesperson for everybody behind me, and on the phone,

20  and in the overflow room.

21          And these come down to a few things.  And by the

22  way, we did enter into some constructive case management

23  status quo orders -- what I would call status quo orders

24  with the defense group regarding amendments.  And in the

25  past, I think in 2013, whereby it's not important to go

1    through them yet but parties reserve their rights, both

2    with...we reserved our right that we weren't going to file

3    to seek amendment then, and they weren't going to raise

4    certain issues that they may -- would be able to raise, and

5    as the time went on...and that the total...and it also

6    operated to hold the statute of limitations at a specific

7    date.  But I don't think I need to go that far in the weeds

8    unless Your Honor wants to.  But the --

9            THE COURT:  What are the amendments that you're

10   proposing?

11           MR. MOLTON:  Okay, that's where I'm going to.

12   Basically, four amendments, Your Honor, that we'd like to

13   include.  And we believe -- Tom and I -- Mr. Moloney and I

14   had a conversation yesterday, and he asked me "Are these

15   really generic or are they case-specific?" and we had a

16   little...  I said, "They're generic to all cases." I mean,

17   arguably, I'd have to put in the name of a defendant on

18   different complaints.  I've got 305 complaints.

19           But I've confirmed that these are generic

20   amendments, and we're ready to provide Mr. Moloney with a

21   template of these by the end of next week for him to look at

22   and see, and get back to me whether they'd agree to consent.

23   He told me yesterday that if they were not generic, they'd

24   want me to amend all complaints --

25           THE COURT:  (Indiscernible)

```
1              MR. MOLTON:  Okay, I'm sorry, Judge.  To include
2       the Citco good faith issue -- clearly, Your Honor, the privy
3       council's decision would be dispositive of the
4       restitutionary claims.  And although it didn't deal with it,
5       it may have impact on the contract claims as well in
6       connection...with respect to the certificate issue, but for
7       the fact that we're able to in good faith and with a
8       reasonable basis allege that Citco delivered these
9       certificates not in good faith.  So --
10              THE COURT:  Is that subjective good faith or
11      objective good faith?
12              MR. MOLTON:  Judge, I don't think it matters
13      because --
14              THE COURT:  Well, it may.
15              MR. MOLTON:  But from what I know, I think we're
16      able to show both.  So...
17              THE COURT:  And what do you have to show?
18              MR. MOLTON:  Under English law, gosh, Judge, I
19      didn't...I would have to report back to you on that, whether
20      it's objective or subjective.  I have advice on that and,
21      unfortunately, it's not at my fingertips now.  But I will
22      say this, Judge.  That I think it's the liquidator's
23      position that we're able to show subjective good faith.
24              THE COURT:  Okay.
25              MR. MOLTON:  Okay?  Meaning a lack of
```

10-04098-smb  Doc 172-2  Filed 07/28/16  Entered 08/04/16 15:32:23  Main Document
Pg 138 of 179

                                                                    Page 33

1    subjective...a lack of good faith in the subjective tense.

2    The second amendment, Judge, is -- we've added, when we were

3    able to and when Judge Lifland allowed us to or as of right,

4    the contract overpayment claims. These contract overpayment

5    claims, Your Honor, have been added to 120...177 actions.

6    We have 127 that we were unable to add them to because we

7    would've had to make a motion for leave to amend.  And we

8    entered instead into this -- these status quo orders.

9            THE COURT:  What's the relationship between the

10   contract of opinion claims and your generic NAV -- inflated

11   NAV claims?

12           MR. MOLTON:  They're related in a sense, however,

13   the contract over payment claim may have aspects of implied

14   contract that the restitutionary claims don't and may also

15   touch upon provisions of the subscription agreement as well,

16   which the restitutionary claims do not.  So they're

17   different in that regard, Your Honor.  And we submit, again,

18   that they're generic and they would not require

19   particularization.

20           The third amendment, Judge, is jurisdictional.

21   And when I talk about jurisdictional, I'm not talking about

22   contract selection clause but I'm talking about the fact

23   that we've alleged in 158 of our complaints that the

24   redeemers specifically identified and used U.S. dollar U.S.

25   accounts for purposes of the redemptions.

1          THE COURT:  Is this personal jurisdiction?

2          MR. MOLTON:  Yeah.  So this is an alternative

3   personal jurisdiction issue in addition to the consensual

4   forum selection and consent to jurisdiction.  And I think we

5   have the basic facts, and there's, again, 158 complaints.  I

6   think we've alleged the basic facts and Judge Lifland

7   allowed us to allege those basic facts, and we did so in

8   those 158.

9          But Your Honor is now doubt aware that Judge

10  Daniels recently articulated, I think, in the Arcapita case

11  or in an ancillary proceeding -- an adversary proceeding of

12  Arcapita a good treatise on the law on how when a redemption

13  uses...is directed through a U.S. dollar U.S. account here

14  in the United States, that's it.  And we would like to tweak

15  those already filed amendments to comply or to be consistent

16  with the articulation of the law that Judge Daniels recently

17  gave.

18          And, lastly, Your Honor, we've alleged, I think,

19  seven of our...seven?  (Indiscernible) in file or seven?

20  Eight.  Seven or eight of our complaints alleged knowledge

21  against the redeemers.

22          Now, why is this important?  And these are, Your

23  Honor, again, some of the largest financial institutions.

24  And Your Honor is familiar no doubt -- will be familiar with

25  these knowledge allegations because they're similar

1   allegations that Mr. Card and his team has raised against

2   the very same major financial institutions in connection

3   with his litigation pending here.

4           Now, these knowledge allegations are important in

5   terms of privy council decision because it's the advice that

6   if a defendant has knowledge...we're out of the privy

7   council, notwithstanding the Citco good faith issue.

8           THE COURT:  Knowledge of what?  That the NAVs are

9   inflated?

10          MR. MOLTON:  Yeah.  Knowledge of the Madoff fraud

11  and that the NAVs were inflated.  I mean, basically, that

12  the NAVs were...yes.  Simply put.  And those are our four

13  amendments.  We think that...  No, those have already been

14  amended.  With respect to those complaints, Judge, we would

15  like to add again generic allegations of imputation of that

16  knowledge to the customers of those shareholders.

17          So, those are our four amendments, and we're ready

18  to send my friends the templates next week and move on that.

19  Hopefully, they consent.  I can't govern their actions.  If

20  not, we're ready to proceed on those.

21          I'm going to sum up, Judge, with what I consider

22  to be what we can expect in terms of dismissal motions, and

23  they're pretty well the same issues that were raised in

24  front of Judge Leon.  First of all, subject matter

25  jurisdiction with respect to Section 1334 and possibly

 1   Chapter 15, personal jurisdiction.  That implicates not only

 2   minimum context in the way I just raised, but it really

 3   comes down to the major issue here of forum selection and

 4   consent to jurisdiction, which was a key component of the

 5   subscription agreement and, again, is governed by New York

 6   law, as Judge Leon noted.

 7             THE COURT:  We might have to first determine

 8   whether the forum selection clause in the subscription

 9   agreement has any bearing on the redemptions.

10             MR. MOLTON:  Yes, it does.  Can I --

11             THE COURT:  We're going to have to determine first

12   the relevance of the forum selection clause or the

13   applicability of the forum selection clause in the

14   subscription agreement on the claims you've asserted

15   relating to the inflated NAVs.

16             MR. MOLTON:  Judge, of course.  My friend's

17   argument is that all of my clients -- all of the

18   liquidators' claims in this action aren't within the scope

19   of that forum selection clause.  Your Honor is probably very

20   well familiar with how those clauses are treated.  It's

21   written with, we think, the language that has the broadest

22   scope with respect to, not arising from or, you know,

23   focusing on it, but with respect to.

24             And we submit that the case law here in New York

25   and in the federal courts sustains our position that all of

10-04090-smb    Doc 906-2    Filed 01/13/17    Entered 01/13/17 22:31:44    Exhibit D-F
Pg 142 of 180

 1    the claims fall within that forum selection clause.  That's

 2    going to be, we believe, an issue for Your Honor.  That's a

 3    New York-Federal issue -- New York issue and possibly how

 4    the Federal Courts view it, as recognized by Judge Leon, we

 5    think.

 6            And then, Your Honor, forum non conveniens.

 7    Again, it's our position that the forum selection clause

 8    eradicates that as a matter of New York law and as a matter

 9    of contractual term it does as well -- but that, no doubt,

10    we're going to see as well.  There's going to be Chapter 15

11    issues, Judge.  There's going to be Condor issues.  There's

12    going to be the issue of the liquidator asserting BVI

13    avoidance claims against these defendants and whether that's

14    sustainable, allowable, enforceable, executable under

15    Chapter 15.

16            And then, Your Honor, we get to failure to state a

17    claim and that goes, Your Honor, to these provisions -- the

18    statutory...you know, the -- our allegations regarding the

19    BVI avoidance claims.  And it should be noted, Your Honor --

20    I mean, I don't want to get too far in the weeds on this,

21    but it should be noted that under BVI law, all of our

22    shareholders are deemed connected parties under the BVI

23    avoidance law statutes --

24            THE COURT:  What does that mean?

25            MR. MOLTON:  That means that there's a presumption

```
 1    that the...their transactions are either preferences under
 2    value and/or -- and that there's insolvency.  So, we benefit
 3    from certain...  And, again, Your Honor, I'm not here to
 4    give an articulation, and if I got something wrong, you
 5    know, I'm not here dispositively to say it.  But there are
 6    presumptions in the BVI avoidance law that we -- certainly
 7    the liquidator benefits from in claims against connected
 8    persons, which are its members.
 9            With respect to the estoppel...with respect to the
10    restitutionary and contract claims, of course, Your Honor,
11    there'll be the issue of the privy council decision,
12    there'll be the issue of the good faith of Citco and
13    assorted issues according there.  I do anticipate also that
14    we may see in some regard some form of in pari delicto, one
15    way or another -- whether it's applicable here in either a
16    New York form or another form is a question that a court
17    will have to decide.  I'm sure we're going to see it at some
18    point in some manner.
19            And the last two issues I've written down,
20    although I'm sure I've missed some, Judge -- there may be
21    estoppel issues regarding the defendants whose claims were
22    resolved in the BVI litigation.  Because, as I mentioned,
23    not all -- most of the Defendants had nothing to do with the
24    BVI litigation; and then the issue of remand and mandatory
25    abstention.  And that really is going to be an issue for the
```

Page 39

1    Defendants to decide what they want to do at that point in

2    time.

3            So, the bottom line, Judge, is for all the reason

4    I've said, these issues, we think, are right for

5    determination here.  Many of them -- many of the many of

6    them can be addressed quickly -- much more quickly, Your

7    Honor, than they'll ever get addressed overseas.  And I'd

8    note again that the overseas litigation only indirectly

9    deals with these issues and not under the same standards.

10           And what we'd like to do, Judge, is start case

11   managing and progressing these cases.  For the benefit of

12   the stakeholders, I do want to say that we have a

13   Liquidation Committee, as I think Your Honor knows, made up

14   of redeemers.  And of that Liquidation Committee we have a

15   non-conflicted subcommittee, because many of the terrific

16   people who serve on the committee are being sued by us.

17   They support what we're doing here, Judge, and it's

18   important to note for that, that the -- our unconflicted

19   Liquidation Committee members are behind the liquidators'

20   efforts, have been behind the liquidators' efforts, and

21   would like to see this litigation progress.

22           I've covered a lot of ground, Judge.  I'm sure

23   I've missed something; I'm sure probably I said one or more

24   things not entirely squarely on point and...

25           THE COURT:  Mr. Moloney will --

```
 1              MR. MOLTON:  He'll catch me on that.  It's not in
 2     bad faith, Mr. Moloney.  It's just there was a lot of
 3     material to go through.
 4              THE COURT:  Okay, thank you.
 5              MR. MOLTON:  Thank you.
 6              THE COURT:  Who's next?
 7              MR. GIBLIN:  Good morning, Your Honor.  Thomas
 8     Giblin from Latham & Watkins.  And as Mr. Moloney stated
 9     earlier, I believe, that I speak for the entire defense
10     group.
11              Your Honor, I'll be brief and I don't plan to
12     address the merits of the BVI proceedings, which I am
13     certain to add more confusion than clarity to, but I am here
14     to formally oppose counsel's desire to lift the stay.  We
15     believe that lifting the stay would be premature and
16     unnecessary.
17              THE COURT:  What has to happen before it's time
18     for me to lift the stay?
19              MR. GIBLIN:  We believe that the proceedings in
20     the BVI should be allowed to run their course and that we
21     can have final resolution whether or not the liquidators and
22     the former representatives have authority to pursue these
23     actions so that several months or several years from now,
24     having pursued these actions and litigated these actions at
25     great expense both to the Fairfield estate and to the
```

1    Defendants, that the foreign representatives are not then

2    forced to withdraw or abandon those actions permanently.

3            And, first, Your Honor, I'd like to address, if I

4    could, the basis of the stay.  The stay was originally put

5    in place in 2011 in part because of the pending proceeding

6    in the BVI.  That being, of course, the proceeding that

7    resulted in the privy council ruling in 2014.

8            However, since that original stay was put in

9    place, it was maintained or reaffirmed in spite -- in the

10   face of briefing on at least two occasions.  Once in January

11   2012, once in July of 2012, specifically on the basis of the

12   pending 273 application -- the ruling which is now on appeal

13   in the BVI.

14           So, in short, we believe that counsel has

15   overestimated the extents, or mischaracterized perhaps the

16   extents to which these proceedings in the BVI are actually

17   over, as he put it.  And I want to address...  He described

18   -- he went -- counsel went into the actual nitty-gritty of

19   the proceeding but I want to address primarily two points.

20           Number one is counsel is right that in March, the

21   liquidators received an order from Justice Leon on the 273

22   application in their favor, although somewhat equivocalist

23   to the merits.  That order, as counsel described, is now on

24   appeal and listed to be heard in November 2011.  Counsel

25   noted that we did not seek a stay pending appeal of that

     1    order.  The reason is procedural.

     2            Rather than seek a stay, pending appeal, because

     3    of the nature of Justice Leon's order, we would've had to

     4    seek an interim injunction.  That would've led to -- and

     5    this is, by the way, I'm relying largely on advice of BVI

     6    counsel.  Seeking an interim injunction would have required

     7    an additional round of full briefing.  That would've been

     8    listed in September or November -- would have significantly

     9    elongated the proceedings in the BVI.

    10            Because we want the proceedings in the BVI, as I'm

    11    sure counsel does, to proceed as expeditiously as possible,

    12    we chose not to seek that interim injunction, to proceed as

    13    quickly as we could in the BVI and to instead, seek to keep

    14    the extent stay in place in the U.S. proceedings, which is

    15    what we're doing now.

    16            Second, I'd like to address the situation on the

    17    proceeding for sanction that counsel described.  Now, he

    18    went through in Footnote 2 of his letter on July 7th

    19    described the basics of what happened but I'll restate them

    20    again so that the Court can understand fully what the

    21    situation is.

    22            At some point this spring, Justice Banister, as we

    23    understand it, revoked the liquidator's sanction to proceed

    24    in this -- the U.S. proceedings.  And I'm sure Mr. Molton

    25    will correct me if I have mischaracterized that.  The

1    liquidators appealed, and the Section 273 applicants,

2    including my clients, applied to the Eastern Caribbean Court

3    of Appeal to have the 273 appeal heard immediately before

4    the sanctions appeal.  That is because, of course, the

5    sanctions appeal is ex parte, but we believed that if we

6    were heard essentially together, that there were enough

7    overlapping issues in the Section 273 proceeding that it

8    would educate the Court in a way that would inform their

9    hearing to be held immediately hereafter on sanction.

10           That order was granted on July 28th and the

11   appeals were scheduled to be heard together.  We found out a

12   few days later that four days prior, the sanctions appeal

13   had already been heard and ruled on and Justice Banister had

14   been reversed.  And this is, of course, despite the fact

15   that our appeal to have them heard together was, in fact,

16   pending.

17           We believe -- and I suspect counsel will agree

18   with me -- that the only reasonable explanation for this is

19   a mistake.  The Court will not be surprised to hear that we

20   disagree on what the actual mistake was.  As counsel

21   described, they had filed an application to bury or clarify

22   the scheduling order.

23           We believe that the error was in hearing the

24   appeal when there was a pending application to have it heard

25   at a later date.

```
 1              THE COURT:  When did this occur?

 2              MR. GIBLIN:  This occurred, I believe, in April.

 3    It may have been early May.  Well, I should say -- I should

 4    ask which part of it, Your Honor?

 5              THE COURT:  The order reversing Judge Banister.

 6              MR. GIBLIN:  I believe it was in April or at the

 7    latest, early May.  Within weeks -- and I don't have the

 8    exact date in front of me, but within weeks we had filed

 9    that application to have those heard together.

10              So, as a result, our clients -- and all of the

11    Section 273 applicants have applied to intervene in the

12    sanctions appeal and to actually set aside that order so

13    that it can be heard at the properly scheduled time.

14              The result of all of this is that all of -- as

15    counsel stated, all of these appeals are scheduled to be

16    heard in November.  And considering that all of these

17    appeals essentially get at variations of the same theme,

18    which is the liquidator's authority to proceed in these U.S.

19    proceedings, we think that the law is clearly still

20    unsettled.  And as further support of this, the idea that

21    their authority is unsettled and that the liquidators have

22    essentially --

23              THE COURT:  But right now there's an order --

24              MR. GIBLIN:  That's right.

25              THE COURT:  -- that says -- that reversed Judge
```

1   Banister.  And in a sense, everything is unsettled until the

2   final court speaks.  So, do we always have to wait until the

3   final court speaks?  That's the issue.

4          MR. GIBLIN:  Well, Your Honor, I will note that

5   had this status conference gone forward -- this is a little

6   bit of an aside, but had the status conference gone forward

7   in April, as it was originally scheduled, we would've been

8   faced with two conflicting orders...

9          THE COURT:  But it's July.

10         MR. GIBLIN:  Right.  Because the liquidators

11  requested and were granted an adjournment of the status

12  conference so that they could pursue their appeal, a

13  courtesy which they obviously have not extended to

14  Defendants.

15         But I think the larger point is it is true that we

16  could go on for a while if, in fact, we have to go to the

17  final court.  But the truth is, the expense of proceeding in

18  parallel -- and I don't need to belabor the point, given the

19  size of the gallery behind me -- but the expense both to the

20  Defendants and the Fairfield estate could be astronomical.

21         There are, I think we said 747 Defendants in 304

22  cases, all of whom -- or most of whom at least are subject

23  to amended complaints; all of whom or most of whom will be

24  subject to motion practice.  And, further, Your Honor, the

25  reason, as I described for the stay and keeping the stay in

1    place for the Section 270...while the 273 application was

2    pending, was because Judge Lifland and Your Honor to the

3    extent you have kept the stay in place, felt that the most -

4    - that case management was best served by orderly resolving

5    the issues in order and not having parallel proceedings.

6         THE COURT:  I don't disagree with you that it

7    makes sense to resolve the authority issue before you deal

8    with the merits, but I'm being told that that's not going to

9    happen until...I think he said 2018 or 2019, assuming it'll

10   appeal to the privy council.

11        MR. MOLTON:  Yeah.  Presumably, Judge, again,

12   depending on how the case management of that appeal goes in

13   November, 2018 and 2019 is what we were told.

14        MR. GIBLIN:  That's true, Your Honor.  However, I

15   would submit that time is a lesser consideration than not

16   only to expense but also one of the risks of parallel

17   proceedings is that as we continue to pursue our rights in

18   the BVI, we will inevitably receive rulings or at least even

19   dicta on novel issues of BVI law, which raises the risk

20   of...

21        And I'm sure Your Honor is very, very well-

22   qualified to rule on issues of BVI law, but it does expose

23   the Court to conflicting issues on novel foreign law issues,

24   which, as counsel alluded to earlier, is actually what

25   happened to Judge Lifland with respect to whether or not the

```
 1    documents at issue were certificates.  He ruled one way and

 2    the BVI privy council ended up ruling the other way.

 3           So, Your Honor, there is a time consideration and

 4    we are not -- we do not dismiss that out of hand.  But

 5    certainly my clients, and I think many clients or many of

 6    the defendants in these cases believe that these cases

 7    should have been and always should be litigated in the BVI

 8    because they deal with novel issues of BVI law, because it's

 9    -- Fairfield is in the BVI, and because their statutory

10    authority is derived from the BVI Insolvency Act.

11           And so we believe that parallel -- that conducting

12    these parallel proceedings, which might end up being

13    abandoned in two or three years, is a waste of time, money,

14    and, frankly, judicial resources.

15           THE COURT:  Okay.  Does it make sense, though, to

16    decide a threshold question of whether New York law has any

17    application in this case?  Since that seems to be the

18    driving force upon the argument that the cases should stay

19    here?

20           MR. GIBLIN:  Perhaps, Your Honor, but I'm not sure

21    that actually addresses the fundamental issue, which is

22    whether or not these cases actually have a basis to be here

23    or not.  Because I don't believe that the liquidators

24    sanctioned to proceed or their authority as challenged in

25    the 273 application is completely predicated on issues --
```

Page 48

1    whether there are issues of BVI or New York law, although

2    that certainly plays a part -- but also whether the

3    liquidators have the right to pursue these proceedings

4    overseas in the first place.

5            THE COURT:  Now, some of the arguments that the

6    liquidator wants to make go to the knowledge of some of the

7    redeemers.  And as time goes by, the ability to get evidence

8    (indiscernible) knowledge dissipates or disappears.  So why

9    not permit them -- the matters to go forward on that basis?

10           MR. GIBLIN:  Your Honor, I will defer to some

11   extent on that because I don't believe that my clients are

12   among the group facing those allegations.  I will say that

13   given how much of the evidence is documentary rather than

14   testimonial, although I understand the consideration, I

15   don't think that it should be an overriding consideration in

16   this case.

17           THE COURT:  All right, thank you.

18           MR. MOLTON:  I was looking for Mr. Moloney but he

19   didn't (indiscernible).  First of all, I'd like to just deal

20   with a few things.  First of all, Judge Banister did not

21   revoke the sanction.  And I just want to clear that -- my

22   friend probably got that wrong.  What happened was we were

23   given sanction by the Eastern Caribbean Court of Appeals to

24   proceed with this litigation through privy council.  That

25   expired when the privy council decision came.  We would have

```
 1    had to, in any respect, go back to the BVI court.  They then

 2    teed up the 273 that Judge Banister put -- according to

 3    Judge Banister, in the high grass until the privy council

 4    came back.  At which case, after Judge Leon's judgment,

 5    Judge Leon's remarks that we were to go for an ex parte

 6    sanction, and he expects that -- and that's what we did.

 7            Judge Banister came back from retirement for a

 8    month and a half or two months, denied us, went back into

 9    retirement, we got him reversed, and here we are, as Your

10    Honor says, with full ascension.

11            Number two, the November stuff that my friend

12    refers to.  It's not...  He's making remarkable something

13    that's not remarkable at all.  Our appeal is the appeal of

14    the sanction issues and independent appeal in a separate

15    proceeding -- it's in the liquidation, which is, as Judge

16    Leon remarked in the judgment, full disclosure to everybody,

17    which was no surprise to my English and BVI counsel, going

18    to be ex parte.

19            That appeal goes up ex parte.  The liquidator's

20    counsel has an absolute obligation under English law, BVI

21    law, to make a fair and full disclosure.  I think that's the

22    term of art.  Any relevant facts are -- Queens counsel, Guy

23    Phillips, who appeared in front of the ECCA did that and

24    fully explained to the panel that was sitting there the fact

25    that the redeemers had moved in their appeal for case
```

```
 1    management that would affect this appeal.

 2              THE COURT:  Is there a transcript for that

 3    argument, or is that also ex parte?

 4              MR. MOLTON:  I would have to find out.  There may

 5    be...  I would have to find out, Judge.  I don't have it.

 6    There may be a tape recording but I can find out that.  And

 7    if Your Honor wants further information on that, I can get

 8    that for you.  But one of the most reputable QCs in London

 9    stood up there and abided by his known duties that every

10    barrister knows what they do in an ex parte proceeding, and

11    he advised them of that in any event.

12              My friend talks about novel foreign law issues.  I

13    think we're beyond that at this point, Judge.  I don't think

14    the issue of contractual analysis of whether the binding --

15    the certificate is binding in light of good faith is a novel

16    issue of foreign law.  It's a contract construction issue,

17    and from what I can tell, whether it's English law or U.S.

18    law, contract construction in both jurisdictions looks

19    pretty well the same to me.

20              Second of all, the BVI statutory claims are

21    written in stone.  They're written out.  There's -- I don't

22    know how novel those issues are.  There's provisions that

23    say what you have to show, what you don't have to show.

24    Issues that Your Honor is extremely familiar with.

25    Insolvency, undervalued transactions, and the like.  We
```

 1    don't think that there's any novel issues of law.

 2            And, basically, Your Honor, and lastly, he talks

 3    about -- my friend talks about parallel proceedings.  These

 4    aren't parallel...parallel proceedings in the normal course

 5    where stays are sort of one pending the other has to do with

 6    litigations on the same issue for the same thing usually.

 7    Here, you have an issue going on in BVI that deals with

 8    different standards that touch upon these issues.  Is it --

 9    does the liquidator have good grounds and is it vexatious

10    for him to pursue these claims?  Not whether these claims

11    met the standard that Your Honor's going to find on a motion

12    to dismiss that's going to give these Defendants the

13    finality they want.

14            So, they're not parallel proceedings.  And I think

15    my friend gave it away, what they're looking to do.  Because

16    these 14 defendants are the tail wagging the dog, Your

17    Honor.  They're really the tail...14 defendants are holding

18    this proceeding up.  They're looking for dicta.  They're

19    looking for dicta that when in 2019-2020, they can come and

20    say, "See, this is what a BVI judge might've-could've-

21    would've done."

22            And I think it's fair to say -- and you'll find

23    when we send you the cost judgment -- if Your Honor wants

24    it, I'm going to send it anyways and I'll put it on the

25    docket because it's an interest read -- they talk about the

1   dicta that Judge Leon said.  And Judge Leon basically said,

2   whatever I said has no -- basically, it's Judge Bernstein

3   that's going to make the decision, and you can't say you

4   were successful in any respect based on the fact that I

5   mused a little bit on the last few pages of my judgment.

6           So, and lastly, and possibly most importantly,

7   Judge, to Judge Lifland's last words...his minute order

8   proceedings, which I can hand up, filed July 19, 2012, where

9   he continues the stay, he says, "In all other respects..."

10  and I'm reading the last line on Page 4 "...the stay of

11  these proceedings shall continue throughout the foreign

12  representatives' appeal to the English privy council and

13  further order of this Court."

14          He doesn't in that ultimate directive, although he

15  had referred to the 273 as a by the way they're seeking to

16  stop the liquidator, his stay order was and remained

17  condition on privy council.  I can hand this up to Your

18  Honor.  I don't need it anymore.  I've marked it up but I

19  don't think...

20          THE COURT:  Is there a document number?  I can

21  look it up.

22          MR. MOLTON:  Judge, it's Document 799 in the

23  consolidated -- the administrative consolidated proceeding.

24  That's 10 dash (indiscernible) 496.  (Indiscernible)

25          THE COURT:  Thank you.

```
1          MR. MOLTON:  So, for that and all other reasons,

2     Judge, we think that there's work that can be done

3     immediately.  I'm ready to proceed next week with sending

4     Mr. Moloney templates.  He can tell me whether that does the

5     trick or not, in which case, we can deal with amendments.

6          And it's my utter hope for the benefit of the

7     Fairfield interest holders and stakeholders, other than of

8     course those stakeholders that are being sued may have a

9     different idea.  But for those folks who will benefit from

10    this liquidation because they were the losers, that we get

11    going with this litigation, which they support and which has

12    been sanctioned and approved, and which Judge Leon basically

13    sent back to Your Honor.  Thank you.

14          THE COURT:  Thank you.  Assuming that these

15    litigations go forward, are there any threshold legal issues

16    that can be addressed without...with less amounts of work

17    than some of these other issues, like...?

18          MR. MOLONEY: I think there are, Your Honor.  Tom

19    Moloney for the record.  (Indiscernible).  And if I could

20    take a step back, because the original stay came out as a

21    result of a letter I wrote to Judge Lifland.  And I recall

22    coming to see him in the afternoon for a status conference,

23    I think it was just me, frankly, and Mr. Molton and a few of

24    our -- a few others.  Very few people.  It wasn't a big

25    meeting like this.
```

1          And the letter said just, look, we have a three-

2     ring circus going on here.  We have an appeal from Judge

3     Preska, we have what's going on in the BVI, and we have

4     these arguments that keep going on here, and they're making

5     different legal arguments in all three forums.  And we

6     should decide and have one forum decide what law applies,

7     what agreements apply, and if it turns out it's BVI law,

8     what the BVI law is.

9          So then once we understand that, then if they want

10    to go forward in New York on New York issues, ready to do

11    that -- either here or in State Court.  If they want to go

12    forward on BVI issues, they should be doing that in the BVI.

13    Or at least the U.S. court, if it has those issues, as the

14    benefit of the BVI court's rulings on those issues so that

15    you don't have to make truly novel decisions.

16          THE COURT:  At this point, the only merit-based

17    ruling that've I've read relates to the certificate issue.

18          MR. MOLONEY:  That's not exactly correct, Your

19    Honor.  I think -- there were basically two (indiscernible)

20    questions that went up from the court below.  And they

21    reason they came up only in the context of a mistake claim

22    is that it's the only claim they had.

23          When they first came here, they only brought a

24    mistake claim.  It was only after the privy council...after

25    they had lost the good faith consideration claim that they

1   started -- which they've been doing over and over again;

2   changing the theory, changing the complaints, and started

3   asserting first avoidance claims and then these contracts.

4           THE COURT:  You were telling me about Judge

5   Lifland and this July conference.

6           MR. MOLONEY:  Well, it was actually -- I don't

7   know but I think it was in the summer.

8           MAN:  September.

9           MR. MOLONEY:  Or September.  But I don't think it

10  was July.  At this conference he said, time out and we'll

11  get clarity on these issues.  So that's why he issued the

12  initial stay.

13          So, the two preliminary questions were -- which

14  came up in the context of the mistake claims, were, one, the

15  certificate issue, where originally the first court that

16  decided the question said these documents -- there were no

17  certificates.  And the second question, which was also very

18  important, was the good consideration question, Your Honor.

19          And I think both of those issues independently

20  provided a defense -- the mistake claim, both of those

21  issues probably independently provide the defense -- the

22  contract claim and I don't know about the...whether they

23  both provided defense to the avoidance claims.  But

24  certainly the consideration issues -- ruling, probably

25  provides a defense to the avoidance claims.

1        So, the fact that they didn't come up in the

2  context of all three claims doesn't mean that those issues

3  are not going to cut across all three claims.  I think

4  there's a pretty novel issue (indiscernible) the NAV

5  determination can be binding in a bankruptcy in BVI.  I

6  don't think -- I don't know what the answer to that question

7  is.

8        THE COURT:  The NAV determination would not be

9  binding?

10        MR. MOLONEY:  Whether if there's...  For an

11  avoidance claim, whether you'd say -- because you're

12  estopped from the NAV, you can't bring in a claim that

13  you're insolvent for...for avoidance claim purposes,

14  bankruptcy purposes you can't bring in an insolvency claim.

15  I don't think the NAV determination necessarily resolves

16  that.  It may but I think that's a somewhat open question.

17        THE COURT:  Do they have a principle that's

18  splitting the cause of action, the BVI?  It sounds like

19  there's -- a lot of the claims are basically the same claim.

20        MR. MOLONEY:  Well, that's the two big questions.

21  And I think Your Honor was spot on on them -- which is that

22  we went through this whole procedural mechanism in the BVI

23  to get clarity on this law and get clarity on

24  (indiscernible).  And if they wanted to assert this good

25  faith issue as a procedural matter, at least our BVI counsel

1    says they should've done it.

2           That's a BVI question.  Totally novel.

3    Secondarily, she thinks it makes no difference.  It's again

4    a BVI question.  He could get clarity on that on the BVI --

5    he can go back there and say, what happens if I argue this?

6    Does that mean I'm bound by the decision...?

7    (indiscernible) Are you kidding?  We went for a two-year

8    period, you had everybody in the whole world wait why you

9    lived that question, and now you want to raise this other

10   argument about the fact that the intermediary, financial

11   intermediary, Citco, for every single one, somehow they knew

12   something...?

13          THE COURT:  Let me ask you a question.  Are you

14   saying that he's barred from raising questions or I should

15   abstain from deciding whether he's barred from raising

16   questions?

17          MR. MOLONEY:  The latter.

18          THE COURT:  I don't think I can abstain in a case

19   related to a Chapter --

20          MR. MOLONEY:  Yeah, I know, that's the --

21          THE COURT:  And that's one of the issues.

22          MR. MOLONEY:  That's one of the big issues, Your

23   Honor, is that --

24          THE COURT:  (Indiscernible) issue.

25          MR. MOLONEY:  And it's one we're working on.

1      We're trying to figure out how we get to the right place,

2      which I think --

3              THE COURT:  It sounds more like a forum non

4      conveniens --

5              MR. MOLONEY:  Correct.  And then you have this

6      whole subscription issue question which is -- and that may

7      be a threshold --

8              THE COURT:  That sounds to me like a threshold

9      issue.

10             MR. MOLONEY:  Yeah, I think the two threshold

11     issues, if Your Honor wants to go forward here --

12             THE COURT:  And that might be an issue that I

13     would decide anyway.

14             MR. MOLONEY:  Correct.  I think the two threshold

15     questions would be, first of all, if you granted...  You may

16     want some additional briefing on this issue of the stay

17     because I frankly can't understand what's going in the BVI,

18     which is why I had somebody else argue that.

19             THE COURT:  Well, the stay is discretionary

20     anyway, and let's --

21             MR. MOLONEY:  Right, right.

22             THE COURT:  If there are issues that can be

23     resolved one way or another that are not going to be

24     litigated anyway in the BVI, they can be resolved..

25             MR. MOLONEY:  And I would think the two most

10-04063-shl pm    Doc 172-2    Filed 01/13/17    Entered 01/13/17 22:31:44    Ex. D-F
Pg 165 of 179

Page 59

1   rational things to happen to this case to proceed rationally

2   going forward would be that Mr. Molton should -- he's not

3   prepared to go forward.  So it's somewhat academic about the

4   stay -- he's not going to go forward with any of his

5   complaints.

6           THE COURT:  He wants to amend his complaints.

7           MR. MOLONEY:  He should just go ahead and amend

8   all of his complaints --

9           THE COURT:  Well, do you speak for everybody?

10          MR. MOLONEY:  I think he should file a motion.

11  I'm not consenting.  He should file a motion to amend all

12  his complaints or give everybody amended complaints and say,

13  do you consent?  And then --

14          THE COURT:  That's the procedure we follow in a

15  extraterritoriality motion in a sense.

16          MR. MOLONEY:  Yeah.  I think here it's a little

17  more complicated because in the extraterritoriality decision

18  we knew were going to move on only one ground and,

19  therefore, if they were set up -- you could work off of it

20  at that point.  Here, when some people are going to allege

21  jurisdiction, some people are going to allege forum non

22  conveniens, some people are going to allege you named the

23  wrong party, some people are going to allege you need to go

24  through the Hague.

25          I think everybody wants to see their complaints --

1  see what exactly he's going to say as to them.  That's

2  what...  We had a call yesterday that everybody said they

3  want to see what their complaint looks like.  The rules do

4  permit that.  Kind of require it.  So, I think that's the

5  first thing.

6          THE COURT:  Well, I couldn't grant a motion to

7  amend without seeing the compliant, because someone may want

8  to argue that the claims are futile.  So we had the same

9  issue in the ET...

10          MR. MOLONEY:  Correct, example.

11          THE COURT:  ...litigation.

12          MR. MOLONEY:  So I think that would buy us a

13  little time to get a little clarity in the BVI.  Maybe not a

14  lot of clarity.  But at the moment as I understand it, the

15  Court has both granted his ex parte sanctions motion and

16  still scheduled an appeal of that, and they both were

17  showing up on the docket and both sides have moved for

18  clarity.  And you would've thought --

19          THE COURT:  I'm not familiar with the practice

20  there but what's the likelihood that a judge at the appeal

21  would say, "You know, this was a mistake--we didn't need

22  to..."?

23          MR. MOLONEY:  Our local counsel thinks it's more

24  likely than not it was a clerical error.  But, on the other

25  hand, it's been several months and they haven't fixed it.

```
 1   So I have no idea, to be honest, Your Honor.  I have no

 2   idea.  Everything's ex parte...nobody...

 3            THE COURT:  All right.  So you think he should

 4   amend or submit his proposed amendment --

 5            MR. MOLONEY:  Yeah, submit a proposed amendment

 6   for everybody.  And then I think after he does that, perhaps

 7   the first order of business would be for us to organize some

 8   sort of briefing on what the subscription agreement means

 9   and what, if any, continued relevance it has to this case in

10   light of the privy counsel's ruling that all of his claims

11   arise under the articles of the certificate and not under

12   the subscription.

13            Do the provisions in the subscription agreement

14   preclude a forum non conveniens argument?  Do they preclude

15   a personal jurisdiction argument?  Because that would

16   simplify a lot of...  Some people don't have subscription

17   agreements, Your Honor, so it's not going to simplify it for

18   everybody but it could simplify it for a lot of people.  And

19   that would be -- that's an issue that's going to be a New

20   York law issue, it's going to be up your alley, Your Honor,

21   to decide that issue.  And that might be the first order of

22   business after we get the proposed complaints -- would be

23   what I think would make sense.

24            And then when I told Mr. Molton this afternoon --

25   after we get -- well, that's done, we could sit down, the
```

1   two of us, and try to work up a proposal for how the

2   sequence the other arguments -- to the extent that they went

3   forward before Your Honor.

4           THE COURT:  All right.

5           MR. MOLTON:  Judge, can I just add two things that

6   may be helpful?  If we're talking about gating issues,

7   there's no reason why those issues, which have nothing to do

8   with the amended complaints, can't go forward immediately.

9           THE COURT:  Such as what?

10          MR. MOLTON:  Such as subject matter jurisdiction,

11  such as forum selection.  Not person --

12          THE COURT:  I don't understand this.  Maybe I'm

13  not understanding what the subject matter jurisdiction issue

14  is.  Are these related to Chapter --

15          MR. MOLTON:  Yeah, but there were arguments in

16  front of Judge Lifland that they weren't.  And Judge Preska,

17  although wrote that she was not going to decide that

18  decision but I think subsequent --

19          THE COURT:  Well, I think she implicitly decided

20  it --

21          MR. MOLTON:  Yeah.

22          THE COURT:  -- telling you to decide to

23  (indiscernible) remand.

24          MR. MOLTON:  And I would subject, Judge,

25  subsequent case law really answers that question in our

1   favor.  But really the forum selection clause, Your Honor...

2          THE COURT:  That's the New York law --

3          MR. MOLTON:  Yeah, yeah.  And forum non conveniens

4   to the extent it's barred by that, which we think it is by

5   way of the general obligations law as well as pursuant to

6   the forum non conveniens provision.  Another point is the

7   remand issue, Judge.  The bottom line is the remand

8   defendants should be making the decision.  Do they want to

9   be here or do they want to be somewhere else?

10         THE COURT:  Is it their obligation to make a

11  decision or is it your obligation under Judge Preska's order

12  to demonstrate that they can't be timely adjudicated in

13  State Court?  I don't know if I have to do anything.

14         MR. MOLTON:  I'm trying to remember the

15  (indiscernible) decision which asked Judge Kaplan to come

16  down on that burden, and I don't know if he did or didn't.

17         THE COURT:  I know what Judge Kaplan said and I

18  know what Judge Preska said.  And, you k now, I had a recent

19  case that I looked to see who really has the burden --

20         MR. MOLONEY:  Your Honor, that's part of why we

21  wanted to see the new complaints, to see -- one of the

22  things I think they're required to do is allege -- if

23  they're going to allege foreign law, they need to allege

24  that in the complaint.  And so we'll know if they have

25  foreign law complaints.     If they don't put an

1    allegation for foreign law --

2              THE COURT:  (indiscernible) they had in the old

3    complaints --

4              MR. MOLONEY:  No, the old complaints they went

5    back and forth three times as to whether it was New York law

6    or foreign law.  Depending on how we're doing it in BVI, how

7    we're doing it in New York, they went back and forth on that

8    issue at least three times.

9              THE COURT:  I thought they were contending that

10   BVI law obviously applied to the BVI statutory causes of

11   action.

12             MR. MOLONEY:  No, but for the mistake claims, they

13   originally said they were New York claims --

14             THE COURT:  Oh, I see.

15             MR. MOLONEY:  ...then they said they were BVI

16   claims, then they said they were New York claims, now

17   they're saying they're BVI claims.  But until they kind of

18   land somewhere with the new complaint, I don't think we need

19   to address that question.

20             THE COURT:  What are the other thresholds?

21             MR. MOLTON:  Okay, I understand your point on

22   remand.  The other one may be the Condor issue, Judge, the

23   Chapter 15 issue regarding the BVI avoidance claims.  And

24   that's certainly --

25             THE COURT:  And is that an extension issue, or is

10-04096-smb Doc 906-2 Filed 01/13/17 Entered 01/13/17 22:31:44 Main Document
Pg 170 of 190

Page 65

```
 1    it a jurisdiction issue?  I mean, I don't know why I

 2    couldn't decide a claim under foreign law.  The Court

 3    (indiscernible).

 4              MR. MOLTON:  Yeah, that's fine.  I know --

 5              THE COURT:  Whether it makes sense to do it is a

 6    different issue and it's forum non conveniens or...

 7              MR. MOLTON:  Yeah, they've raised it.

 8              THE COURT:  You can't say extension but, you know,

 9    it's really an extension issue.

10              MR. MOLTON:  Okay.  Understood.  But --

11              MR. MOLONEY:  I don't know that you -- we liked

12    reserve -- we're looking into that as to -- you do have some

13    power to just dismiss on the grounds that -- where there's

14    really no law to guide you in foreign law, and you have to

15    be guessing as to what foreign law is...

16              THE COURT:  I guess at New York law.

17              MR. MOLONEY:  The New York approach, having read

18    some of these BVI reports, the U.S. approach is very

19    different than the BVI and from a public policy point of

20    view.  Understand that the BVI has a policy in favor of

21    these people setting up these kind of hedge funds over

22    there.  And people who invest in these hedge funds -- plus

23    they're hedge funds and there's a risk associated with it.

24    But they understand that there's a risk -- they could lose

25    their money and they can deal with that.  Particularly funds
```

1   of funds when they diversify, and one of their things is in

2   the Madoff fund.

3          What they can't really hedge against is five or

4   six years later, somebody saying, we're going to -- even

5   though we gave you back your money and you're giving it back

6   to your investors, we're going to start this thing all over

7   again.  And that's why the BVI courts have generally said

8   this idea of we're going to go back through the end of time

9   and force everybody to give money back and recycle it back

10  to them again, we're not going to do it.  Because whatever

11  equity is cheap by that undermines our policies of certainty

12  for people who are investing in BVI.  So, the New York

13  perspective, the New York mindset is not the same as the BVI

14  mindset on that question.

15         THE COURT:  Let me just -- what are the other

16  threshold (indiscernible)?

17         MR. MOLTON:  Judge, I think those are what I've

18  identified now.  Clearly forum selection is a big one, and

19  that shouldn't stop us from carrying on with the claim

20  amendments to try and get --

21         THE COURT:  Well, I think Mr. Moloney agrees you

22  should amend your complaints and see -- and then sit down

23  and talk and see whether it makes sense to come up with some

24  sort of a briefing schedule and issues -- I still don't see

25  what the subject matter jurisdiction issue is, but maybe I

10-03490-smb Doc 906-2 Filed 01/13/17 Entered 01/13/17 22:31:44 Main Document
Pg 176 of 190

1    can be educated.

2            Personal jurisdiction is going to be a case by

3    case issue...

4            MR. MOLONEY:  (Indiscernible) and the big question

5    of the forum (indiscernible).

6            THE COURT:  The relationship -- yeah.  If that's

7    the only contact, I suppose.  I'm told forum non conveniens

8    is tied in with -- the forum selection clause, I mean,

9    there's no real factual dispute in terms of what happened.

10   So, you know, but it makes sense to just amend your

11   complaints...  Maybe between now and then at the November

12   hearing in the Appeals Court they'll say, oh, we made a

13   mistake.  You know, we didn't mean to affirm Judge Banister.

14   Or they'll say we did.

15           MR. MOLTON:  Reverse.

16           THE COURT:  Reverse or we did.

17           MR. MOLTON:  Yeah.

18           THE COURT:  We did mean to reverse them.  That

19   doesn't ultimately resolve that issue, but it's not going to

20   be resolved for a couple of years anyway but we can deal

21   with some of these issues.

22           MR. MOLTON:  And, by the way, Judge, again,

23   reminding you the issue of sanction has nothing to do with

24   the liquidator instructing me to be here and him being here

25   pursuant to his authority under Chapter 15.  All it has to

```
 1   do --
 2              THE COURT:  That's your issue.
 3              MR. MOLTON:  Yeah, that's my issue.  But if they
 4   come up with alternative funding, that's an irrelevant
 5   issue.  So...
 6              MR. MOLONEY:  Your Honor (indiscernible) BVI law.
 7              THE COURT:  I thought I answered the first time.
 8   I thought you said that in order to proceed you have to have
 9   sanction.  I asked you if it was whether -- the difference
10   between you proceeding on your own dime or on the estate's
11   dome.  And now you're saying that the sanction is irrelevant
12   to your authority --
13              MR. MOLTON:  Yeah, I think, Judge, in our letters
14   we've always been clear.  Maybe you've misapprehended me,
15   but I think in our --
16              THE COURT:  Well, that's why I asked you the
17   question.  I thought you just told me --
18              MR. MOLTON:  No, I -- I then misspoke.  And I
19   think at the very beginning of this presentation I said the
20   question of sanction only has to do with our getting paid
21   from the estate.  It has nothing to do with the liquidator's
22   authority.
23              THE COURT:  Do you agree with that?
24              MR. MOLONEY:  We heard from a BVI lawyer yesterday
25   who said he did not agree with that.  I'm not a BVI lawyer
```

```
 1    and so I have no idea.

 2              THE COURT:  All right.  Well, I mean, that does

 3    make a difference in terms of whether you go forward or not.

 4    So, in the meantime, file or submit your amended complaints.

 5    Mr. Moloney I guess will be the point person, although you

 6    have to send them to the parties, and then you can deal with

 7    them on what issues -- threshold issues it makes sense to

 8    proceed on.

 9              MR. MOLTON:  Judge, that's fine.  And so you --

10              THE COURT:  If you want to poll the remanded

11    defendants and find out if some of them are no longer

12    interested in remand but what to buy into these other

13    issues, you can do that.  But unless they all go away, I

14    don't know if it matters.

15              MR. MOLTON:  Understood.  So, Judge, in terms of

16    sequencing, you want us to deal with amendment first and not

17    in parallel with the skating issue?

18              THE COURT:  Amend your complaint.  File your

19    proposed amended complaint.  I can't authorize you to amend

20    the complaints because there may be opposition, but at least

21    let's see what's in there and whether they're futile.

22              MR. MOLTON:  Okay.

23              THE COURT:  We're not talking about delaying of

24    prejudice or anything like that.  I raised the issue

25    regarding the (indiscernible) issue and I was told it's not
```

Page 70

 1   a problem so...

 2           MR. MOLTON:  Okay.

 3           THE COURT:  I assume everybody's preserving their

 4   documents?

 5           MR. MOLONEY:  (Indiscernible) have a number of

 6   other lawsuits that require us to do that, Your Honor.

 7           THE COURT:  All right.

 8           MR. MOLTON:  Judge, I've just got to say one

 9   thing, otherwise I'll get a kick in the behind is -- my

10   friend, Mr. Moloney said that we only started amending after

11   we started getting bad decisions.  That's not true.  We

12   basically brought the BVI statutory claims in early --

13   started in early 2011 here, well before preliminary issues,

14   which we vehemently oppose for the very reasons that led us

15   to the point where we have a privy council decision that

16   doesn't answer the question.

17           THE COURT:  When are you going to submit your

18   proposed amended complaints?

19           MR. MOLTON:  Okay, I am able, Judge, to give him

20   the templates and I'll say they'll be generic to all -- and

21   I'll identify which complaints that will go on.  If the

22   defense group holds me to my word, which I hope they would,

23   they would be able to make a decision based on those generic

24   amendments.  Actually, logistically amending 305 complaints

25   creates a different challenge, shall we say?

10-03498-shup pm Doc 900 72-2 Filed 01/28/16 13/17 Entered 01/28/16 13:32:23 11:44 Main Ex D F Page 176 of 190 Document Pg 176 of 190

Page 71

```
 1              THE COURT:  You must have some allegations that

 2    are particular to certain defendants, like on the personal

 3    jurisdiction issues to include allegations of personal

 4    jurisdiction (indiscernible).

 5              MR. MOLTON:  Yeah.  I think we've alleged those

 6    already per Judge Lifland.

 7              THE COURT:  All right.

 8              MR. MOLTON:  And all we need to do is put in some

 9    generic allegations that tie in to what Judge Daniels held.

10    And as I said, I don't think those generic allegations are

11    going to be particulars.  I think the particularis.  I think

12    the particularis facts are already in the complaint.

13              So it's just a question of making allegations as

14    to connecting use with rejections.  My understanding.  So,

15    but if that --

16              MR. MOLONEY:  He should just amend his complaints

17    --

18              THE COURT:  Yeah, I'm just trying to find out when

19    he's going to do it.

20              MR. MOLTON:  Judge --

21              THE COURT:  What he's saying is rather than redo

22    it 304 times, he has certain generic proposed amendments

23    that are going to apply across the board and we'll tee up

24    some of these --

25              MR. MOLONEY:  Yeah, but why I decided that was a
```

Page 72

```
 1   nonstarter was then some of these stipulations said, and by

 2   the way, if there are things we didn't include in that that

 3   we did include in the final complaint, you can then object

 4   to that then.  He wanted to build that into his schedule.

 5           I think -- we just like to see the complaints.

 6   We're up against a moving target at all times.  I think

 7   we're entitled to have them stop.  Whatever his complaint

 8   is, let's see it.  Stop.

 9           MR. HALL:  Judge, can I have 30 seconds?

10           THE COURT:  Sure.

11           MR. HALL:  Kip Hall, DLA Piper.  I represent banks

12   in Paraguay, Andorra, Switzerland, and Spain.  My clients do

13   not speak English as a primary language.  They haven't been

14   served under the Hague Convention.  We want to see the

15   complaint against each of our clients.

16           THE COURT:  All right, you've convinced me.  A

17   major complaint.

18           MR. MOLTON:  Judge, I think we can do it --

19           THE COURT:  That'll bring us to -- when will you

20   do it?

21           MR. MOLTON:  I think we can do it within 45 days

22   and we're going to try and do it way sooner.  It's not in --

23           THE COURT:  All right, you're the one who's

24   pushing his action, so the sooner you do it, the sooner this

25   thing will move along.
```

Page 73

1          MR. MOLTON:  Yeah.

2          THE COURT:  I'm not going to impose a time limit.

3     And after you do that, meet and confer to see if you can

4     come up with a schedule.  Maybe that'll get you into that

5     November argument date.  Maybe there'll be some

6     clarification at the oral argument about what occurred.

7          MR. MOLTON:  Thank you.

8          THE COURT:  I'm curious about the sanction issue

9     and whether or not it's just a money issue or an authority

10    issue.

11         MR. MOLONEY:  Your Honor -- I don't know.

12         THE COURT:  Well, because if it's just a money

13    issue, it just doesn't matter.  He's taking (indiscernible)

14    like a contingency fee lawyer and he can proceed.

15         MR. MOLONEY:  Yes, as long as he doesn't stop, and

16    then it's a money issue for everyone here.

17         THE COURT:  What, are you going to complain if he

18    decides to dismiss his complaints?

19         MR. MOLONEY:  No.

20         THE COURT:  You can't dismiss -- he doesn't want

21    you to dismiss those complaints under any circumstances.  To

22    have heard him say that...

23         MR. MOLTON:  Judge, I've known that for five

24    years.  When I used to be a prosecutor, they said, keep the

25    indictments (indiscernible).

Page 74

1           THE COURT:  Okay, thank you.  This is adjourned

2    sine die.

3           (Whereupon these proceedings were concluded at

4    11:35 AM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T I O N

 2

 3       I, Sonya Ledanski Hyde, certified that the foregoing

 4       transcript is a true and accurate record of the proceedings.

 5       Sonya Ledanski        Digitally signed by Sonya Ledanski Hyde
                               DN: cn=Sonya Ledanski Hyde,
 6       Hyde                  o=Veritext, ou,
                               email=digital@veritext.com, c=US
 7                             Date: 2016.07.28 16:17:07 -04'00'

 8       Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20       Veritext Legal Solutions

21       330 Old Country Road

22       Suite 300

23       Mineola, NY 11501

24

25       Date:  July 28, 2016
```