**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) **Chapter 15 Case** |
| **Fairfield Sentry Limited, et al.,** | ) |
| | ) **Case No. 10-13164 (SMB)** |
|     **Debtors in Foreign Proceedings.** | ) |
| | ) **Jointly Administered** |
| **Fairfield Sentry Limited (In** | ) |
| **Liquidation), et al., acting by** | ) |
| **and through the Foreign** | ) |
| **Representatives thereof,** | ) **Adv. Pro. No. 10-03496 (SMB)** |
| | ) |
|         **Plaintiffs,** | ) |
| | ) **Administratively Consolidated** |
|     **-against-** | ) |
| | ) |
| **Theodoor GGC Amsterdam, et al.,** | ) |
|         **Defendants.** | ) |

**DECLARATION OF SIMON MORTIMORE, QC**

**IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND IN**

**SUPPORT OF THE DEFENDANTS' MOTION TO DISMISS**

Pursuant to 28 U.S.C. § 1746, I, SIMON MORTIMORE, declare as follows:

1.      I am a barrister in independent practice at the English Bar and am a member of

chambers at 3-4 South Square, Gray's Inn, London WC1 3RQ. I was called to the Bar in

1972 (Inner Temple) and appointed Queen's Counsel in 1991. In 1991, I was called to the

Bar of the British Virgin Islands ("**BVI**"). I have also been admitted to the Bars of Bermuda

and the Cayman Islands for specific cases. I have during most of my career at the Bars

undertaken complex commercial work covering both contentious and advisory aspects. In

my practice, I have specialized in insolvency law and related fields of company law, banking

and commercial law. I have provided expert evidence on English law for courts in the United

1

States, Europe, Hong Kong and elsewhere on numerous occasions.  A copy of my curriculum vitae is attached as Exhibit A.

2.      As an expert in BVI and English law, I have been retained by counsel for the financial institutions listed in Exhibit B (the "**Defendant Institutions**") to aid the Court by providing legal opinions as to BVI law in relation to the Plaintiffs' motion for leave to amend the complaints and the Defendant Institutions' opposition to such motion and their motion for an order dismissing with prejudice the pending complaints in the above-captioned adversary proceedings brought against them and other unnamed defendants by Fairfield Sentry Limited ("**Sentry**" or a "**Fund**"), Fairfield Sigma Limited ("**Sigma**" or a "**Fund**") and Fairfield Lambda Limited ("**Lambda**" or a "**Fund**" and with Sentry and Sigma, the "**Funds**") and by Kenneth Krys and Charlotte Caulfield (the "**Liquidators**" and with the Funds, the "**Plaintiffs**"), in their capacities as Foreign Representatives and Liquidators of the Funds.

3.      In this declaration, I express my opinions regarding the law of the BVI relevant to the questions raised in the above-mentioned motions and how that law would be applied by an authoritative court of the BVI.  I also identify the relevant authorities that support my opinions.

4.      My compensation for providing this opinion is independent of the outcome of any proceedings in connection with the above-captioned Chapter 15 case or any associated adversary proceedings.  A person who gives expert evidence to the Court in England and Wales or in the BVI owes a duty to assist the Court, which overrides any obligations to the person from whom the expert has received instructions or by whom he is paid.  Whether or not such a requirement exists in the United States Bankruptcy Court for the Southern District of New York (the "**US Bankruptcy Court**"), I have made this declaration on that basis.

5.      In forming my opinions, I have read copies of the following documents:

2

(a)   the proposed third amended complaint in *Fairfield Sentry Limited and Fairfield Sigma Limited, et al. v. Credit Agricole (Suisse) SA*, Adv. Pro. No. 11-01244 (SMB) (Bankr. S.D.N.Y. Sept. 22, 2016) (Dkt. No 15-1) (the "**CA Amended Complaint**") together with the Memorandum of Association and the Articles of Association ("**Articles**") of the Funds, certain Subscription Agreements, and other offering materials of the Funds referred to in the CA Amended Complaint;[1] and

(b)   the proposed third amended complaint in *Fairfield Sentry Limited and Fairfield Sigma Limited, et al. v. HSBC Private Bank (Suisse) S.A. et al.*, Adv. Pro. No. 10-03633 (SMB) (Bankr. S.D.N.Y. Sept. 20, 2016) (Dkt. No 33-1) (the "**HSBC Amended Complaint**"), which is substantially the same as the CA Amended Complaint, except that in Sections E-G it includes allegations that the Defendant Institution ("**HSBC**") knew or should have known of the fraud in Bernard L. Madoff Investment Securities LLC ("**BLMIS**"), together with the documents in Sections F and G relied on to support the allegation of knowledge against HSBC;

(c)   the proposed second amended complaint in *Fairfield Sentry Limited and Fairfield Sigma Limited, et al. v. Citigroup Global Markets Limited. et al.*, Adv. Pro. No. 11-02770 (SMB) (Bankr. S.D.N.Y. Sept. 20, 2016) (Dkt. No 10-1) (the "**Citigroup Amended Complaint**"),

---

[1] I have been instructed by counsel for the Defendant Institutions that the claims asserted and relief sought in the CA Amended Complaint are fairly representative of the relief sought in the Plaintiffs' complaints against all of the Defendant Institutions (except for the additional allegations relating to the purported lack of good faith, made in the Amended Complaints against some of the Defendant Institutions, including those mentioned in sub-paragraphs (b) and (c) below). Accordingly, in this declaration, unless the context otherwise indicates, references to the "**Amended Complaints**" are references to the Amended Complaints against all Defendant Institutions.

which is substantially the same as the CA Amended Complaint, except

that in Section E it includes allegations that the Defendant Institution

("**Citigroup**" and with HSBC and other Defendant Institutions against

whom the Amended Complaints make allegations that such Defendant

Institutions knew or should have known of the BLMIS fraud, the

"**Knowledge Defendant Institutions**") knew or should have known of

the fraud in BLMIS;

(d) the declarations of William Hare and Gabriel Moss QC in support of

the Plaintiffs' motion for leave to file the Amended Complaints and the

exhibits to those declarations; and

(e) the declarations of Phillip Kite and Thomas J. Moloney in opposition

to the Plaintiffs' motion for leave to file the Amended Complaints and

in support of the Defendant Institutions' motion for an order

dismissing with prejudice the pending complaints in the above-

captioned adversary proceedings, and the exhibits to those

declarations.

6. Exhibit C to this declaration includes copies of legislation, cases, and text-

books cited in this declaration, which I understand may not be readily available to the US

Bankruptcy Court.

## THE PLAINTIFFS' CLAIMS IN THIS COURT AND IN THE BVI

7. Between 2009 and 2011, the Funds brought numerous proceedings in the BVI

(the "**BVI Redeemer Proceedings**") against financial institutions and others (the "**BVI**

**Defendants**") asserting restitution claims to recover redemption payments made to the BVI

Defendants on the ground that the payments had been made by mistake in that the net asset

value ("**NAV**") of the Funds, 95% of whose assets were invested in BLMIS,[2] "*was calculated under a mistake of fact as, unbeknown to [the Funds], BLMIS was in fact operating a [P]onzi scheme and its investments in BLMIS were therefore lost from the date of [the Funds'] investment.*"[3]

8.    The Amended Complaints in the proceedings in this Court brought by the Plaintiffs against the Defendant Institutions (the "**US Proceedings**") are, at bottom, all founded on the same allegation of mistake of fact and overstatement of NAV.[4]  In them, the Plaintiffs make three groups of claims against the Defendant Institutions in respect of payments made to the Defendant Institutions for the redemption of their shares in the Funds under Article 10 of the Articles:

(a)    claims for unjust enrichment, money had and received, mistaken payment, and (remedial) constructive trust (the "**Restitution Claims**");[5]

(b)    unfair preference and undervalue transaction claims under Sections 245 and 246 of the BVI Insolvency Act 2003[6] (the "**BVI Insolvency Act**") (the "**BVI Insolvency Act Claims**");[7] and

(c)    claims for breach of contract, breach of an implied covenant of good faith and fair dealing, and for declaratory relief (the "**New Claims**" and with the Restitution Claims, the "**Common Law Claims**"), which

---

[2] Sentry's assets were directly invested in BLMIS.  The assets of Sigma and Lambda were indirectly invested in BLMIS through Sentry.

[3] Exhibit A to Mr Hare's Declaration at ¶ 9.  There was also a claim in ¶ 12 to set aside the redemptions on the ground of mutual mistake, but this plea was summarily dismissed by Bannister J on 10 October 2011.  *See* Exhibit P to Mr Hare's Declaration at §§ 11-19.

[4] CA Amended Complaint ¶¶ 7, 8, 39-43, 47.

[5] The first, third, fifth and seventh claims and paragraphs A and C of the prayer for relief in the CA Amended Complaint.

[6] No 5. of 2003, as amended from time to time.

[7] The eighth and tenth claims and paragraphs D and E of the prayer for relief in the CA Amended Complaint.

assert different claims grounded on the same factual allegations and

purported injury as the Restitution Claims.[8]

9.      The Common Law Claims are in respect of "*Redemption Payments*", which

are defined as "*payments to investors for the redemption of Shares*", the Shares being shares

in the applicable Fund (the "**Redemption Payments**").[9]

10.     The BVI Insolvency Act Claims are in respect of:

(a)      "*Redemptions*", which are not defined, but I shall assume are

redemptions under Article 10 of the Funds' Articles (the

"**Redemptions**");[10] and

(b)      "*Vulnerability Period Payments*", which are defined as Redemption

Payments made during the Sentry and Sigma Vulnerability Periods;

i.e., the two-year periods prior to the application for appointment of

the Liquidators of the applicable Fund (the "**Vulnerability Period**

**Payments**").[11]

**PURPOSE OF THIS DECLARATION**

11.     In this declaration I shall explain:

(a)      in <u>Section 1</u>: relevant aspects of the BVI court system, appeals and

precedent;

(b)      in <u>Section 2</u>: why the decision of the Judicial Committee of the Privy

Council (the "**Privy Council**") in *Fairfield Sentry Ltd v Migani*[12] (the

---

[8] The twelfth, fourteenth and sixteenth claims and paragraphs F and H of the prayer for relief in the CA
Amended Complaint.

[9] CA Amended Complaint at ¶¶ 4, 5.

[10] "*Redemptions*" are mentioned for the first time at ¶ 159 of the CA Amended Complaint.  The Articles of
Sigma and Lambda are identical in all material respects to Sentry's Articles.  *See* Exhibits D and E to Mr
Moloney's Declaration.

[11] CA Amended Complaint at ¶¶ 156-159.

[12] [2014] UKPC 9, a copy of which is in Exhibit Q to Mr Hare's Declaration.

"**Privy Council Judgment**") precludes the Funds from pursuing the Common Law Claims against the Defendant Institutions;

(c)     in Section 3: the rules of BVI law that prevent a party from re-litigating issues decided in earlier proceedings or which could with reasonable diligence have been raised in those proceedings;

(d)     in Section 4: why, as a matter of BVI law, the allegation in Section D of the CA Amended Complaint that Citco Fund Services (Europe) BV ("**Citco**"[13]), the agent of the Funds, issued NAV certificates in bad faith does not enable the Funds to avoid the preclusive effect of the Privy Council Judgment and to maintain the Common Law Claims against the Defendant Institutions;

(e)     in Section 5: the rules of BVI law applicable to the allegation that Citco issued NAV certificates in bad faith and how those rules would be applied by a BVI Court (as defined below);

(f)     in Section 6: why, as a matter of BVI law, the allegations of knowledge or deemed knowledge of the BLMIS fraud against the Knowledge Defendant Institutions do not enable the Funds to avoid the preclusive effect of the Privy Council Judgment and to maintain the Common Law Claims against those Defendant Institutions;

(g)     in Section 7: an introduction to the BVI Insolvency Act Claims;

(h)     in Section 8: why, assuming the factual allegations in the Amended Complaints are true, the Liquidators fail to state a claim that the Redemptions and/or the Vulnerability Period Payments constitute unfair preferences within Section 245 of the BVI Insolvency Act;

---

[13] The CA Complaint at ¶ 49 refers to all affiliates of Citco as "Citco" and in this declaration I shall do the same.

(i)     in <u>Section 9</u>: why, on the same assumptions, the Amended Complaints

fail to state a claim that the Redemptions and/or the Vulnerability

Period Payments constitute undervalue transactions within Section 246

of the BVI Insolvency Act; and

(j)     in <u>Section 10</u>: why, in any event, Section 249 of the BVI Insolvency

Act does not give the US Bankruptcy Court power to grant the

Liquidators relief under that Section against the Defendant Institutions.

## 1.    BVI COURTS AND LEGAL SYSTEM

12.     The BVI is an overseas territory of the United Kingdom, which is internally

self-governing.  Its legal system is based on English law, but it has its own legislation,

including the BVI Insolvency Act and the BVI Business Companies Act 2004 (the "**BCA**

**2004**"), both of which apply to the Funds.

13.     Commercial cases and cases relating to companies under the BVI Insolvency

Act are heard in the High Court of Justice (Commercial Division) in the Eastern Caribbean

Supreme Court (the "**BVI Court**"), from which there may be an appeal to the Eastern

Caribbean Court of Appeal (the "**EC Court of Appeal**" and together with the BVI High

Court, the "**BVI Supreme Court**")[14] and, with permission, to the Privy Council in London.

The judges of the Privy Council are invariably members of the UK Supreme Court.

14.     The courts of the BVI apply English common law rules and equitable

principles.  Thus, in the Privy Council Judgment, Lord Sumption said:

> "*In every relevant respect, the principles of the law of the [BVI]
> governing the construction of the Articles and any associated common
> law right to restitution are the same as those of English law.*"[15]

---

[14] The Supreme Courts Order 1967 (SI 1967/223); the Virgin Islands (Courts) Order 1967 (SI 1967/231); the West Indies Associated States Supreme Court (Virgin Islands) Ordinance 1969.

[15] At § 17.

BVI courts interpret BVI legislation in accordance with precedents of their own courts, including decisions of the Privy Council on appeal from those courts.

15.    Decisions of the Privy Council, on appeal from the BVI Courts, on questions of law are binding on the BVI Supreme Court.[16]  Decisions of the EC Court of Appeal on questions of law are also binding on the BVI Supreme Court, unless the decision is overruled by, or cannot stand with, a decision of the Privy Council.[17]

16.    The BVI Supreme Court would only decline to follow a decision of the UK Supreme Court (formerly the House of Lords) or of the Privy Council on appeal from other jurisdictions in a rare and exceptional case, e.g., where the decision was inappropriate to the circumstances of the BVI.  The BVI Supreme Court also takes persuasive guidance from decisions of the courts of England and Wales and other Commonwealth jurisdictions (including Bermuda and the Cayman Islands) with which they share a common legal tradition.[18]  This approach promotes predictability and consistency among common law jurisdictions in relation to commercial matters, of which insolvency law is a particularly significant part.

### 2.    BINDING EFFECT OF THE PRIVY COUNCIL JUDGMENT

17.    In this Section I will:

(a)    outline the course of the BVI Redeemer Proceedings given in the declarations of Mr Hare and Mr Kite in order to explain why, as a matter of BVI law, the Funds are precluded by the Privy Council Judgment from pursuing the Common Law Claims;

---

[16] Halsbury's Laws of England, Vol 11 (5th ed, 2015) at § 37; *Robins v National Trust Co* [1927] AC 515, Privy Council on appeal from the Supreme Court of Ontario.

[17] Halsbury's Laws of England, Vol 11 (5th ed, 2015) at § 30; *Consett Industrial and Provident Society v Consett Iron Co* [1922] 2 Ch 135, English Court of Appeal; *A-G of St Christopher, Nevis and Anguilla v Reynolds* [1980] AC 637, Privy Council on appeal from the Court of Appeal of the West Indies Associated States Supreme Court.

[18] And also Hong Kong.  The Hong Kong Court of Final Appeal often includes a judge or former judge of the UK Supreme Court.

(b)      explain what was decided by the Privy Council Judgment;

(c)      express my opinion on Mr Moss's interpretation of the Privy Council Judgment; and

(d)      explain why the Privy Council Judgment precludes the Funds from pursuing the Common Law Claims against the Defendant Institutions.

**(a)      The Preliminary Issues in the BVI Redeemer Proceedings**

18.      On the application of certain of the BVI Defendants (the "**PI Defendants**")[19] and in spite of the opposition of the Funds,[20] on 20 April 2011, Bannister J of the BVI Court made an order (the "**PI Order**") that (i) there be a trial of preliminary issues as set out in the Schedule to the PI Order (the "**Preliminary Issues**"), (ii) the BVI Redeemer Proceedings be stayed until after the determination of the Preliminary Issues, and (iii) the Funds should send copies of the PI Order to all defendants in the BVI Redeemer Proceedings, other than the PI Defendants.[21]  The Preliminary Issues all arose from the PI Defendants' defences and were:

(a)      the "**Certificate Issue**", which was in three parts: (i) whether certain documents were certificates within Article 11; if so, (ii) whether they were certificates as to the NAV per share and/or the redemption price for each share (the "**Redemption Price**"); and if so, (iii) whether publication or delivery of them to a redeeming or redeemed member precludes the Fund from asserting that money paid to that redeeming or redeemed member exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming member; and

---

[19] Exhibit C to Mr Hare's Declaration.  A copy of the PI Defendants' skeleton argument in support of the application for preliminary issues to be ordered is in Exhibit G to Mr Hare's Declaration.

[20] A copy of the Funds' skeleton argument in opposition to the application for preliminary issues is in Exhibit H to Mr Hare's Declaration and the transcripts of the hearings on 18 and 20 April 2011 are in Exhibit L.

[21] Copies of the judgment and order dated 20 April 2011 are in Exhibit N to Mr Hare's Declaration.

(b)      the "**Good Consideration Issue**", which was in two parts: (i) whether

a redeeming member of a Fund in surrendering its shares gave good

consideration for the payment by the Fund of the Redemption Price

and; if so, (ii) whether that precludes the Fund from asserting that

money paid to that redeeming or redeemed member exceeded the true

Redemption Price and as such is recoverable as to the excess from such

redeeming member.

Paragraph 2 of the PI Order contains a proviso, set out in paragraph 60 below, which

preserves the ability of the Funds to pursue a claim against a particular defendant,

notwithstanding the determination of any of the questions in the Certificate Issue, if the claim

was not raised at the trial of the Preliminary Issues because it is based on facts unknown to

the Liquidators at the time of the trial.

19.     On 4 May 2011, the Funds appealed to the EC Court of Appeal against the PI

Order, but the appeal was dismissed on 31 May 2011.[22]

20.     Following a hearing on 28 and 29 July 2011, on 16 September 2011, Bannister

J gave judgment on the trial of the Preliminary Issues.[23] On the Certificate Issue, Bannister J

held that none of the documents was a certificate within Article 11, so that the third part of

the Certificate Issue did not have to be determined.[24]  On the Good Consideration Issue,

however, Bannister J found that the Funds were precluded from bringing restitution claims,

because:

> "*it is not open to Sentry now to seek to recover the price which it paid
> for the purchase of the shares of redeeming investors simply because it*

---

[22] A copy of the Funds' notice of appeal dated 4 May 2011 is in Exhibit D to Mr Hare's Declaration, a copy of the Funds' skeleton argument in support of its appeal is in Exhibit I and copies of the judgment of the EC Court of Appeal, and the order dismissing the appeal are in Exhibit O.

[23] A copy of Bannister J's judgment on the trial of the Preliminary Issues is in Exhibit B to Mr Kite's Declaration.

[24] § 33.

> *calculated the NAV upon information which has subsequently proved*
> *unreliable for reasons unconnected with any of the redeemers.*"[25]

Further, Sentry could not "*recover the redemption price in circumstances in which restitutio*

*in integrum is no longer possible*"; [26] i.e., where it was not possible to restore the parties to

their original positions.  Accordingly, by the order dated 16 September 2011, Bannister J

answered the first two parts of the Certificate Issue in the negative, but gave affirmative

answers to both parts of the Good Consideration Issue.[27]

21.    Sentry appealed Bannister J's judgment to the EC Court of Appeal on the

Good Consideration Issue and the PI Defendants appealed his decision on the Certificate

Issue.

22.    On 20 September 2011, one of the PI Defendants applied for dismissal of the

BVI Redeemer Proceedings against them and for summary judgment against Sentry.[28]  The

Liquidators then requested that Bannister J adjourn that application in light of allegations

made in complaints filed by the trustee appointed for the liquidation of BLMIS (the "**BLMIS**

**Trustee**") that certain BVI Defendants had actual or constructive knowledge of the BLMIS

fraud before they received Redemption Payments, which the Liquidators stated "*raise[d]*

*serious issues as to good faith and/or knowledge*" and "*require[d] further investigation and*

*consideration by the Liquidators.*"[29]  The Liquidators argued that such an investigation may

"*demonstrate that defendants to the present claims did not act in good faith in redeeming*

*their shares.*"[30]  Following a hearing of this application on 27 September 2011, on 10

---

[25] §§ 36 and 37.

[26] § 34.

[27] A copy of the order dated 16 September 2011 is in Exhibit B to Mr Kite's Declaration.

[28] A copy of the application is in Exhibit E to Mr Hare's Declaration.

[29] § 9 of the Fifth Witness Statement of Kenneth Krys submitted in support of the Funds' request to adjourn the summary judgment motion, a copy of which is in Exhibit D to Mr Kite's Declaration.

[30] § 13 of the Fifth Witness Statement of Kenneth Krys submitted in support of the Funds' request to adjourn the summary judgment motion.

October 2011,[31] Bannister J refused Sentry's request for an adjournment to explore the bad faith allegations and gave summary judgment in favour of the applicant PI Defendants and ordered that the BVI Redeemer Proceedings against them be dismissed.[32]  Sentry appealed this decision to the EC Court of Appeal.

23.    On 19 October 2011, Judge Lifland stayed the US Proceedings to await the outcome of the appeals in the BVI Redeemer Proceedings.

24.    Following a hearing on 17 and 18 January 2012, on 13 June 2012, the EC Court of Appeal delivered judgments upholding Bannister J's judgment on both Preliminary Issues and dismissed the appeal against summary judgment.  In relation to the Good Consideration Issue, Pereira JA (with whom Mitchell and Baptiste JJA agreed) cited well-known English authorities on restitution and mistake and said:

> *"I agree with the [PI Defendants] that Sentry's contractual obligations gave rise to a debt obligation whatever the value of the shares and the surrender of the rights to the shares by the [PI Defendants], in my view, having fully performed their part of the contract, gave good consideration which defeats Sentry's restitutionary claim."*[33]

The EC Court of Appeal order dated 13 June 2012 therefore dismissed the PI Defendants' appeal in relation to the Certificate Issue and dismissed Sentry's appeals in relation to the Good Consideration Issue and summary judgment.[34]  Accordingly, Bannister J's affirmative answers on the Good Consideration Issue stood and, as his summary judgment ruling confirmed, were independently dispositive of the Funds' claims.

25.    The parties appealed to the Privy Council.  Following a hearing on 18 and 19 March 2014, the Privy Council, in the Privy Council Judgment delivered by Lord Sumption

---

[31] The transcript of the hearing is in Exhibit M to Mr Hare's Declaration.

[32] A copy of the judgment is in Exhibit P to Mr Hare's Declaration.  A copy of the order dated 10 October 2011, entered 22 June 2012, is in Exhibit E to Mr Kite's Declaration.

[33] § 80. § 87 replicates the reasoning of Bannister J quoted in § 20 above.  A copy of the EC Court of Appeal judgment is in Exhibit G to Mr Kite's Declaration.

[34] A copy of the EC Court of Appeal order dated 13 June 2012 is in Exhibit H to Mr Kite's Declaration.

on 16 April 2014, allowed the PI Defendants' appeal on the Certificate Issue and dismissed

Sentry's appeal on the Good Consideration Issue.[35]

26.     Subsequently all the BVI Redeemer Proceedings which had not already been

dismissed by Bannister J's order dated 10 October 2011, were discontinued by the Funds.[36]

27.     In the BVI (unlike in the United States, as I understand it), there is not the

option to discontinue claims expressly "*with*" or "*without prejudice.*"   When claims in the

BVI are discontinued, they can technically be re-issued (either in the BVI or elsewhere) but

they will not succeed in the BVI and will be dismissed if they are re-issued (i) outside any

relevant limitation period (normally 6 years), or (ii) when the relevant issue is *res judicata* (as

to which, *see* Section 3 below).   I mention this only because it should not be assumed that

there is any particular significance as a matter of BVI law, to the fact that Mr Hare states in

paragraph 68 of his Declaration that the claims were discontinued "*without prejudice to the*

*continuance of claims elsewhere.*"

**(b)     The Privy Council Judgment**

28.     Lord Sumption described the Certificate Issue and the Good Consideration

Issue and the outcomes in the courts below and made three points about them:[37]

(a)     the Fund was right to accept that if the documents said to be

certificates were binding its claim must fail;[38]

(b)     although the two Issues had been argued separately in the Courts

below and in the Privy Council, "*they are closely related and have to*

*be considered together*"; and

---

[35] Copies of the Privy Council Judgment and the Order in Council are at Exhibits Q and R to Mr Hare's Declaration.

[36] Mr Hare's Declaration, §§ 67 and 68.

[37] §§ 6, 7 and 20.

[38] This had been conceded on behalf of Sentry in its case to the Privy Council as respondent in relation to PI Defendants' appeal on the Certificate Issue; *see* Exhibit N to Mr Kite's Declaration at § 6.

(c)    neither issue could be resolved without deciding what is the effect of

the Articles, which governed redemptions and the relevant provisions

of which he had summarised.[39]

29.    As to restitution, Lord Sumption said that:[40]

(a)    since the claim for restitution arose out of a transaction governed by

the Articles, the claim for restitution was governed by the same law,

namely BVI law, which is the same as English law;

(b)    there was no issue between the parties as to the basic legal principles,

which he summarised (and which are quoted in Mr Moss's Declaration

at § 33);

(c)    the Fund could not recover the Redemption Payments if it was bound

by the redemption terms in the Articles to make the payments which it

did make;

(d)    whether the Fund could recover depended on whether the effect of

redemption terms in the Articles is that the Fund is obliged "*upon a*

*redemption to pay (i) the true NAV per share, ascertained in the light*

*of information which subsequently became available about Madoff's*

*frauds, or (ii) the NAV per share which was determined by the*

*Directors at the time of redemption*"; and

(e)    "*if (ii) is correct, then, the shares having been surrendered in*

*exchange for the amount properly due under the articles, the*

*redemption payments are irrecoverable.*"

---

[39] §§ 8-13.

[40] §§ 17-19.

30.    On that analysis, there were two issues to determine: (i) what was the Fund obliged to pay on redemption, and (ii) whether any of the documents relied on were "certificates" within Article 11.

31.    As to the amount that the Fund was obliged to pay, following a review of the scheme of Articles 9-11 and the redemption procedure,[41] Lord Sumption rejected the notions that the issue of a certificate was discretionary or that the amount to be paid could be affected by subsequently acquired information and held that:

    (a)    the subscription price and the Redemption Price had to be definitively ascertained at the time when the transaction took effect and the price fell to be paid and that the scheme was unworkable on any other basis;

    (b)    the Redemption Price could not be affected by information coming to light after the issue or redemption;

    (c)    "*the NAV per share on which those prices are based must be the one determined by the Directors at the time, whether or not the determination was correctly carried out in accordance with Articles 11(2) and (3)*"; and

    (d)    since Article 11 includes a provision for certification as part of the mechanics of subscription and redemption, "*the ordinary transaction documents recording the NAV per share or the Subscription or Redemption Price which will necessarily be generated and communicated to Members at the time*" must be regarded as certificates for the purposes of Article 11.[42]

---

[41] At §§ 10-16, 21.

[42] §§ 23, 24.

32.     As to certificates, Lord Sumption found that all the documents generated by Citco on behalf of the Funds were certificates for the purposes of Article 11, except for statements posted on Citco's website.[43]

33.     Accordingly, Lord Sumption concluded that alternative (ii) in paragraph 29(d) above was correct (i.e., the Fund was obliged upon a redemption to pay the NAV per share which was determined by the directors at the time of redemption), with the consequence stated in paragraph 29(e) above (i.e., the shares having been surrendered in exchange for the amount properly due under the Articles, the redemption payments are accordingly irrecoverable).  Having reached that conclusion and made his finding about the documents, Lord Sumption was able to provide answers to the questions posed separately by the Certificate and Good Consideration Issues.  In the final paragraph of his judgment, Lord Sumption advised that (i) the PI Defendants' appeal from the decisions of Bannister J and the EC Court of Appeal on the Certificate Issue should be allowed, save as to information posted on the Citco website (which was not a certificate), and (ii) Sentry's appeal on the Good Consideration Issue should be dismissed.  Lord Sumption also invited the parties to agree to a form of declaration, but they were unable to do so, and thus the Order in Council dated 8 October 2014 (the "**PC Order**") simply reflects Lord Sumption's conclusions.[44]

34.     The upshot of the Privy Council Judgment is that the Funds are precluded from asserting that the money paid to a redeeming or redeemed member (being the certificate price, regardless of whether it was correct), exceeded the "true" Redemption Price and as such is recoverable as to the excess from such redeeming member for two independent reasons:

---

[43] §§ 14-16, 25-32.

[44] There was an issue between the parties as to whether the PC Order should include declarations, but the order as issued does not contain any.  *See* Exhibits J, K and R to Mr Hare's Declaration.

(a)     (as a result of the Privy Council allowing the PI Defendants' appeal on the Certificate Issue) on the ground that, except for information posted on the Citco website, the documents relied on were certificates within Article 11, which were published or delivered by the Funds to the redeeming or redeemed member; and

(b)     (as a result of the dismissal of the appeals from Bannister J's decision on the Good Consideration Issue) on the ground that a redeeming member in surrendering its shares gave good consideration for the payment by the Fund of the Redemption Price.

**(c)     Mr Moss's Declaration**

35.     In paragraphs 32 and 37 of his Declaration, Mr Moss says:

"*[32] By the time the matter reached the Privy Council, the good consideration issue had become refined, and the question for determination was whether the Funds were, at the time of payment of the Redemption Payments, under a contractual obligation to make that payment.*"

"*[37] In the Privy Council's judgment, therefore, the good consideration issue and certification issue became merged.*"

36.     I respectfully disagree with these opinions. Although I recognise that it will be for the US Bankruptcy Court, not the experts on BVI law, to interpret Lord Sumption's judgment, I would respectfully refer to what I have said in Subsection (b) above. The debate before the Privy Council narrowed as a result of Sentry's concession that a determination that the documents referred to were certificates would be dispositive of its claims, as Lord Sumption recorded (paragraph 28(a) above). The conclusions arrived at by Lord Sumption on the closely connected Certificate and Good Consideration Issues enabled him to provide separate answers on both.[45] The two Issues were not merged in the parties' arguments as

---

[45] This is how the Cayman Islands Court of Appeal interpreted the Privy Council Judgment in *Skandinaviska Enskilda Banken AB (PUBL) v Conway*, CICA No 2 of 2016, 18 November 2016 (the "***Weavering Case***"). The Hon John Martin QC, JA (with whom The Hon Dennis M Morrison and the Hon Sir Richard Field JJA agreed)

Lord Sumption recorded them (paragraph 28(b) above), in the Privy Council Judgment or in the PC Order. It was not necessary for the Privy Council to consider what would have been the position if no certificates had been issued. Since certification was part of the essential mechanics of subscription and redemption, that situation could not have occurred. Moreover, the Privy Council's decision left intact, and did not criticize, the judgments of the EC Court of Appeal or Bannister J on the Good Consideration Issue.

**(d)    The Privy Council Judgment precludes the Funds from pursuing the Common Law Claims against the Defendant Institutions**

37.     The Privy Council Judgment is a definitive statement of BVI law, binding on the BVI Supreme Court.[46] Further, the decision of the EC Court of Appeal with regard to the Good Consideration Issue is a definitive statement of BVI law on that issue, which is also binding on the BVI Supreme Court.

38.     Accordingly (putting to one side the allegation of bad faith on the part of Citco, which is discussed in Sections 4 and 5 below, and the allegation of knowledge on the part of the Knowledge Defendant Institutions, which is discussed in Section 6 below), a Common Law Claim brought by the Funds against the Defendant Institutions to which BVI law applies and which is based on the same mistake of fact and overstatement of NAV as the claims pleaded in the BVI Redeemer Proceedings would be bound to fail as a matter of BVI law.

39.     Thus, the Privy Council Judgment and the decision of the EC Court of Appeal on the Good Consideration Issue each independently preclude the Restitution Claims because these claims were directly decided by these decisions. Each of the Restitution Claims against

---

said at § 26: "*In the Privy Council, however, both the Article 11 question and the good consideration question were determined in favour of the defendants.*"

[46] It has been followed and applied by Hellman J in the Supreme Court of Bermuda in *Kingate Global Fund Ltd v Kingate Management Ltd* [2015] (Bda) 65 Com at § 79 (a case concerning a restitution claim by another BLMIS feeder fund, the "***Kingate Case***") and by the Cayman Islands Court of Appeal in the *Weavering Case* at § 26.

the Defendant Institutions for unjust enrichment,[47] money had and received,[48] mistaken

payment[49] and (remedial) constructive trust[50] is based on the same factual allegations: due to

mistake as to the value of the investments in BLMIS as a result of lack of knowledge of the

fraud by BLMIS, the redeeming shareholder did not provide good consideration for the

Redemption Payment when it delivered up shares for redemption and the Redemption

Payment was too much.  Those Restitution Claims are all precluded by the Privy Council

Judgment which held that (i) each Fund was obliged under the Articles upon a redemption to

pay the NAV per share which was determined on behalf of the directors at the time of

redemption, whether or not the NAV was correctly calculated, and (ii) "*the shares having

been surrendered in exchange for the amount properly due under the articles, the redemption

payments are irrecoverable*."

      40.     The New Claims against the Defendant Institutions are for breach of

contract,[51] breach of an implied covenant of good faith and fair dealing[52] and for a

declaratory judgment.[53]  They appear to be grounded on the allegation that Citco did not give

the certificates in good faith and overstatement of NAV.  The allegation of overstatement of

NAV is precluded by the Privy Council Judgment for the reasons given in paragraph 39

above.  In Section 4 below I will explain why the allegation of bad faith on the part of Citco

does not enable the Funds to avoid the preclusive effect of the Privy Council Judgment and

the decision of the EC Court of Appeal on the Good Consideration Issue.

---

[47] CA Amended Complaint at ¶¶ 91-96.

[48] CA Amended Complaint at ¶¶ 104-111.

[49] CA Amended Complaint at ¶¶ 121-129.

[50] CA Amended Complaint at ¶¶ 140-147.

[51] CA Amended Complaint at ¶¶ 181-197.

[52] CA Amended Complaint at ¶¶ 206-210.

[53] CA Amended Complaint at ¶¶ 218-222.

### 3.    SUBSTANTIVE AND PROCEDURAL BARS TO RE-LITIGATION

41.    There are substantive and procedural rules of BVI law (which is the same as English law in this respect) that prevent a party, in appropriate circumstances, from re-litigating issues that have been decided in earlier proceedings or issues which could with reasonable diligence have been raised in those proceedings.  I have been advised by counsel for the Defendant Institutions that although in these cases the Court will apply its own United States federal law rules as to claims and issue preclusion, it may be of assistance if I outline how a BVI Court would approach such issues.

**(a)    Cause of action and issue estoppel under BVI law**

42.    Cause of action estoppel is a rule of substantive law that precludes a party from challenging the same cause of action in subsequent proceedings.  In *Virgin Atlantic Airways Ltd v Zodiac Seats UK Ltd*, Lord Sumption described the principle in these terms:

> "*once a cause of action has been held to exist or not to exist, that outcome may not be challenged by either party in subsequent proceedings.*"[54]

He went on to explain that cause of action estoppel is "*absolute in relation to all points which had to be and were decided in order to establish the existence or non-existence of a cause of action*" and that it also bars:

> "*the raising in subsequent proceedings of points essential to the existence or non-existence of a cause of action which were not decided because they were not raised in the earlier proceedings, if they could with reasonable diligence and should in all the circumstances have been raised.*"[55]

43.    Issue estoppel is also a rule of substantive law that precludes a party from challenging in subsequent proceedings some issue determined in earlier proceedings.  In the *Virgin Atlantic* case, Lord Sumption said there is a principle that:

---

[54] [2014] AC 160, UK Supreme Court, at §§ 17, 25, per Lord Sumption, with whom the other Supreme Court justices agreed (*see* § 42).

[55] At § 22.

> "*even where the cause of action is not the same in the later action as it was in the earlier one, some issue which is necessarily common to both was decided on the earlier occasion and is binding on the parties.*"[56]

He also said:

> "*Except in special circumstances where this would cause injustice, issue estoppel bars the raising in subsequent proceedings of points which (i) were not raised in the earlier proceedings or (ii) were raised but unsuccessfully. If the relevant point was not raised, the bar will usually be absolute if it could with reasonable diligence and should in all the circumstances have been raised.*"[57]

44.    Thus the Funds are estopped from bringing a further claim against the PI Defendants based on the causes of action or issues decided against them by, or as a result of, the Privy Council Judgment and from pleading a new legal or factual point that with reasonable diligence could and should have been raised before in the BVI Redeemer Proceedings.

45.    It is well-established that cause of action and issue estoppel extend beyond the original parties to their privies.  In *OJSC Oil Company Yugraneft v Abramovich*, Christopher Clarke J described the essential elements of issue estoppel:

> "*(i) a final and conclusive judgment on the merits by a court of competent jurisdiction; (ii) between the same parties or their privies; and (iii) the issue decided in the former case on which the estoppel is sought to be founded must be the same as the issue in the later case and must have been necessary for the earlier decision.*"[58]

46.    Thus, where the defendant was the successful party in the earlier proceedings, a third party may be protected by cause of action or issue estoppel from a claim brought by the same claimant against him, if he can show privity of interest with the defendant in the earlier proceedings.  In *Gleeson v J Wippell & Co Ltd*, Sir Robert Megarry V-C said that he would not be able to do so:

---

[56] At §§ 17, 22, 25.

[57] At § 22.

[58] [2008] EWHC 2613 (Comm), English High Court, at §§ 396, 397.

> *"unless there is a sufficient degree of identity between the successful defendant and the third party. I do not say that one must be the alter ego of the other: but it does seem to me that, having due regard to the subject-matter of the dispute, there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was a party should be binding in proceedings to which the other is a party."[59]*

Sir Robert went on to say that the determination of privity of interest is not conditional on the outcome of the original proceedings.[60]

47.    In *Resolution Chemicals Ltd v H Lundbeck A/S*, having quoted the passage from *Gleeson,* Floyd LJ said that:

> *"One type of case where privity is recognised is where C knows of proceedings between A and B in which his rights are being tested but stands back and does nothing."[61]*

48.    The same reasoning should also apply where the court orders that the parties' rights in a proceeding brought by A against B should be tested by a preliminary issue and that, pending the determination of the preliminary issue, proceedings brought by A against other defendants, raising the same issue, should be stayed and the defendants notified of the order.

49.    Floyd LJ went on to say:

> *"in my judgment a court which has the task of assessing whether there is privity of interest between a new party and a party to previous proceedings needs to examine (a) the extent to which the new party had an interest in the subject matter of the previous action; (b) the extent to which the new party can be said to be, in reality, the party to the original proceedings by reason of his relationship with that party, and (c) against this background to ask whether it is just that the new party should be bound by the outcome of the previous litigation."[62]*

---

[59] [1977] 1 WLR 510, 515, English High Court. Cited with approval in *Johnson v Gore Wood* [2002] 2 AC 1, 32, House of Lords, per Lord Bingham.

[60] At page 516A.

[61] [2013] EWCA Civ 924, English Court of Appeal, at § 26. Longmore and Moore-Bick LJJ agreed.

[62] [2013] EWCA Civ 924, English Court of Appeal, at § 32.

50.     It is clear that there is privity between Sigma and Lambda on the one hand and

Sentry on the other, so that the former Funds are bound by the outcome of the appeals to the

Privy Council and the EC Court of Appeal.  The three Funds had common legal

representation and Sigma and Lambda sat back and allowed Sentry to conduct the appeals for

their benefit.

51.     The BVI Court would apply these principles of BVI law in order to determine

whether there is sufficient privity of interest between the PI Defendants and the other

Defendant Institutions, who were aware of the PI Order and against whom the BVI Redeemer

Proceedings and the US Proceedings were stayed, for the Funds to be estopped from pursuing

the proceedings in this Court against them.

52.     In my opinion, the BVI Court would conclude that there is sufficient privity of

interest between the PI Defendants and the other defendants to the BVI Redeemer

Proceedings (who may include the Defendant Institutions or some of them) for the Funds to

be estopped from bringing further proceedings against them. If that were not so, the purpose

of ordering the Preliminary Issues would be negated.

53.     Given that Judge Lifland stayed the US Proceedings to await the outcome of

the appeal from Bannister J's determination of the Preliminary Issues,[63] it is but a short step

for the BVI Court to conclude that the Funds are also estopped from bringing proceedings

against the Defendant Institutions who were not defendants in the BVI Redeemer

Proceedings.  In my opinion, the BVI Court would take that short step because that would

achieve consistency between parties in substantially the same position as against the Funds

and give effect to the Privy Council Judgment.

---

[63] I have been informed by counsel for the Defendant Institutions that a copy of the letter dated 27 September
2011 from counsel for the Defendant Institutions to Judge Lifland, inviting him to consider a stay to abide the
outcome of the Preliminary Issues in the BVI is available at *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam
(In re Fairfield Sentry Ltd.)*, Adv. Pro. No. 10-03496 (SMB) (Bankr. S.D.N.Y. Sept. 27, 2011) (Dkt. No. 402).

**(b)**    *Henderson v Henderson*

54.    Even assuming for purposes of argument that there is no privity enabling the

Defendant Institutions to rely on cause of action or issue estoppel, the BVI Court should find

that they are protected from further proceedings by the *Henderson v Henderson*[64] principle.

This is a procedural rule against abusive proceedings, which precludes a party from raising in

subsequent proceedings matters which were not raised, but could and should have been, in

the earlier ones.  The *Henderson v Henderson* principle can apply even where the parties in

the two actions are different.[65]  In the leading case of *Johnson v Gore Wood & Co*, Lord

Bingham explained that the application of the principle requires:

> "*a broad, merits-based judgment which takes account of the public and
> private interests involved and also takes account of all the facts of the
> case, focusing attention on the crucial question whether, in all the
> circumstances, a party is misusing or abusing the process of the court
> by seeking to raise before it the issue which could have been raised
> before.*"[66]

55.    It is more difficult for someone who was not a defendant in the earlier

proceedings to make out a case of abuse than it would be for a defendant in the earlier

proceedings, but he may do so if he can show that the later action involves "*unjust

harassment or oppression*" of him.[67]

56.    Under BVI law, which is the same as English law in this respect, the BVI

Court, taking into account that the trial of Preliminary Issues was a case management device

to determine efficiently legal issues relevant to the claims against all of the Defendant

Institutions, should conclude that it would be an abuse within the *Henderson v Henderson*

principle for the Funds to litigate against the BVI Defendants and the defendants in the US

---

[64] (1843) 3 Hare 100, English Court of Chancery.

[65] *Virgin Atlantic Airways Ltd v Zodiac Seats UK Ltd* [2014] AC 160, SC, § 17, 24, 25, per Lord Sumption.

[66] [2002] 2 AC 1, 31, HL.

[67] *Aldi Stores Ltd v WSP Group plc* [2008] 1 WLR 748 at § 6, English Court of Appeal (citing the earlier Court of Appeal decision  in *Dexter Ltd v Vlieland-Boddy* [2003] EWCA Civ 14 at §§ 49-53).

Proceedings issues that had been decided against the Funds in the BVI Redeemer

Proceedings based on purported "new" facts or arguments that could and should have been

raised in the BVI Redeemer Proceedings.

### 4.      IMPACT ON COMMON LAW CLAIMS IF CITCO ACTED IN BAD FAITH

57.      In Section D of the CA Amended Complaint, the Funds allege that Citco

"*acted with a lack of good faith in giving the Certificates.*"[68]

58.      In this Section of my Declaration, I shall assume that the Amended

Complaints plead such recklessness of Citco as to amount to bad faith on its part when it

issued the documents which the Privy Council held to be certificates for the purposes of

Article 11.  I make this assumption in order to respond to paragraph 38 of Mr Moss's

Declaration where he says that, if the certificates were not given in good faith "*the Funds*

*were not under a contractual obligation to pay the Redemption Payments, such that the good*

*consideration defence falls away*", that the Funds' Common Law Claims are "*properly*

*arguable and pleadable in the BVI or England*" and that these Claims "*remain arguable and*

*viable.*"  I respectfully disagree.  Under BVI law, which is the same as English law in this

respect, even if Citco gave the certificates in bad faith, the Funds are precluded from

maintaining the Common Law Claims because:

(a)      they are bound, as explained in Section 2 above, by the determination
of the Certificate Issue against them;

(b)      they are similarly bound by the determination of the Good
Consideration Issue against them;

(c)      they are bound by the certificates even if they are affected by fraud;

(d)      they are bound by the certificates since Citco gave them as the Funds'
agent;

---

[68] CA Amended Complaint at ¶¶ 49, 75, 78.

(e)     Article 11 would not be interpreted so as to permit the Funds to take

advantage of the wrong of Citco as their agent;

(f)     the Funds would be prevented by the *ex turpi causa* rule from pursuing

proceedings against the Defendant Institutions based on the unlawful

conduct of Citco, their agent, which is attributed to them;

(g)     in relation to the Restitution Claims, the Funds cannot maintain a claim

that Redemption Payments were made under a mistake of fact; and

(h)     the New Claims disclose no grounds under BVI law for redeeming

members being obliged to return excessive Redemption Payments.

59.     In Section 5 below, I will address paragraphs 39-43 of Mr Moss's Declaration

where he considers the test under BVI and English law for showing lack of good faith and his

conclusion at paragraph 44 that the Amended Complaints plead an arguable case that, at a

minimum, Citco acted recklessly in relation to the determination of NAV and the issuance of

certificates.

**(a)     The Funds are bound by the determination of the Certificate Issue against them**

60.     The PI Order included in paragraph 2 a saving provision that in strictly limited

circumstances allows the Funds to pursue claims against particular defendants,

notwithstanding the determination of any of the questions in the Certificate Issue.  Such a

new claim is permitted *only* if it is based on a fact or facts not actually known to the

Liquidators until after 29 July 2011, the time of the trial of the Certificate Issue.[69]  The clear

purpose of paragraph 2, in the context of the PI Order as a whole, was that parties would be

bound by the outcome of the Preliminary Issues, save insofar as a Fund was entitled under

---

[69] The reason for including this provision is explained by Bannister J in §§ 15-18 of his judgment dated 20 April 2011, a copy of which is in Exhibit N to Mr Hare's Declaration.  The reasons were to cater for the possibilities that (i) certain investors had waived reliance on Article 11, or (ii) Citco had issued documents relied on as certificates without authority.

paragraph 2 to bring a new claim founded on facts of which the Liquidators acquired actual

knowledge after the trial of the Preliminary Issues.  Paragraph 2 provides:

> "*Determination against the [Funds] of any of the questions falling to be determined in [the Certificate Issue] shall not debar the [Funds] from subsequently asserting on the basis of a fact or facts not actually known to the Liquidators of the [Funds] at the time of the hearing of the [Certificate Issue] that notwithstanding the determination of that particular question a particular defendant is liable to repay to the [Funds] all or some part of any redemption monies paid to that defendant.*"

61.    Importantly, the language of paragraph 2 of the PI Order did not permit the

Funds to raise a new legal argument which was within the scope of the Certificate Issue,

simply because the Liquidators learned of some new fact relevant to it.

62.    As I have explained, the scope of the Certificate Issue covered three parts.

The first two parts of the Certificate Issue asked whether certain documents were certificates

of NAV per share or the Redemption Price.  If they were, the third part asked whether

publication or delivery of those documents to a redeeming or redeemed member precludes

the Funds from asserting that the Redemption Payment exceeded the true Redemption Price

and was recoverable.

63.    The scope of the Certificate Issue was not limited to certificates that had been

given in good faith.  The language used in the PI Order was capable of applying to documents

relied on as certificates whether they had been given in good faith or bad faith.  Accordingly,

it was open to the Funds to contend at the trial of the Preliminary Issues or on appeal that, as

a matter of law, they would not be precluded from maintaining a claim to recover

Redemption Payments if the certificates had not been given in good faith, but they never did

so.  This was so even though the possible legal implications of the certificates having been

issued in bad faith were expressly raised by the PI Defendants (i) in the skeleton argument in

support of their application for Preliminary Issues,[70] (ii) at the hearing of that application,[71] and (iii) in their skeleton argument for the trial of Preliminary Issues.[72]  In each case the PI Defendants argued that the "good faith" of the Funds and their agents was legally irrelevant. Plainly, therefore, the Liquidators were aware before the trial of the Preliminary Issues of the potential legal argument that the answer to the third part of the Certificate Issue would be "no", if the certificates were issued in bad faith.  The Funds, however, chose not to make any such arguments.

64.    It was equally open to the Funds to argue under the third part of the Certificate Issue that, where the redeeming member was acting in bad faith, the Funds were not precluded from asserting that the Redemption Payment exceeded the Redemption Price and was recoverable.  Again, the Funds did not make this argument.

65.    In its case as respondent to the PI Defendants' appeal to the Privy Council on the Certificate Issue, Sentry accepted that:

> *"if (contrary to its main case) any of the Documents is a "certificate" within Article 11, then [Sentry] cannot maintain a cause of action based on restitution for the purpose of recovering any overpayment so certified."*[73]

This concession further waived as a matter of law any argument that Sentry would not be bound by certificates issued in bad faith (whether the redeeming member was acting in good or bad faith).

66.    In my opinion, paragraph 2 of the PI Order should be read as preserving the Funds' ability to assert a new claim based on new facts, but not an ability to re-litigate the basis of an argument they were aware of and chose not to make.  Accordingly, the Funds

---

[70] A copy of the skeleton argument is in Exhibit G to Mr Hare's Declaration; *see* § 21.

[71] A copy of the transcript is in Exhibit L to Mr Hare's Declaration; *see* pages 937 and 938.

[72] A copy of the PI Defendants' skeleton argument for the trial of the preliminary issue is in Exhibit A to Mr Kite's Declaration.

[73] A copy of Sentry's case for the appeal to the Privy Council is in Exhibit N to Mr Kite's Declaration; *see* § 6.

remain bound by the determination of the Certificate Issue against them.  Specifically, the determination of the third part of the Certificate Issue applies even if certificates had been given in bad faith.

67.      If, as appears to be the case, the Funds do not rely on paragraph 2 of the PI Order,[74] they are nevertheless bound by the determination of the Certificate Issue in the Privy Council Judgment, since the legal effect of a certificate having been given in bad faith was within the scope of the Certificate Issue (as was the effect if any of a redeeming member acting in bad faith).

**(b)      The Funds are bound by the determination of the Good Consideration Issue against them**

68.      It is important to note that paragraph 2 of the PI Order applies to the Certificate Issue, but not to the Good Consideration Issue.  Bannister J and the EC Court of Appeal decided the Good Consideration Issue against the Funds, having decided that no valid certificates had been given by Citco, and the Privy Council dismissed Sentry's appeal on that issue.

69.      The proposed amendment of the Amended Complaints, alleging bad faith on the part of Citco in issuing certificates, has no effect on the the alternative holding in respect of the Good Consideration  Issue.  The decision of the BVI Supreme Court, affirmed by the Privy Council, holding that as a matter of law the Funds cannot bring the Restitution Claims because good consideration was given for the redemptions and because the parties could not be restored to their initial positions, remains a barrier to the Funds' Common Law Claims, regardless of whether the Funds are bound by the NAV determination in the certificates delivered to the redeemers or whether the redeemers were acting in good or bad faith.

---

[74] Paragraph 2 of the PI Order is not mentioned in the CA Amended Complaint at ¶ 49 or in Mr Moss's Declaration at § 38.

**(c)      The Funds are bound by the certificates even if they are affected by fraud**

70.      In the *Weavering Case*,[75] the official liquidators of Weavering Macro Fixed

Income Fund Ltd (the "**Company**") obtained an order of the Grand Court of the Cayman

Islands that Skandinaviska Enskilda Banken AB (PUBL) ("**SEB**") repay certain redemption

payments on the ground that they were voidable preferences within Section 145(1) of the

Cayman Islands Companies Law (2013 Revision).[76]   SEB appealed to the Cayman Islands

Court of Appeal.   One of the grounds of appeal was that, at the time of making the

redemption payments to SEB, the Company was not unable to pay its debts as required by

Section 145(1).   This was because the evidence showed that the only purported liabilities that

the Company could not pay were redemption payments, which it was argued that the

Company was not obliged to pay, since they were all based on NAVs which were affected by

fraud in that they gave false and inflated value to fictitious transactions with a connected

party, as Magnus Peterson, the controlling mind of the Company, well knew.[77]

71.      Giving the judgment of the Cayman Islands Court of Appeal, Mr Martin QC

JA said that the appropriate place to start in considering SEB's argument was the Company's

article 34, which stated:

> "*The assets of the Company shall be valued in accordance with such
> policies as the Directors may determine. Any valuations made
> pursuant to these Articles shall be binding on all persons.*"[78]

72.      In rejecting SEB's argument, Mr Martin QC, JA relied heavily on the Privy

Council Judgment and noted that the Funds' Articles were "*different in form from, but in*

---

[75] CICA No 2 of 2016, 18 November 2016.

[76] This Section is modelled on pre-English Insolvency Act preference sections and does not use the concept of "*transaction entered into*."   SEB was a creditor at the time of the impugned payments.

[77] §§ 5-18.

[78] §§ 21, 24.  The other members of the Court (The Hon Dennis Morrison and The Hon Sir Richard Field JJA) agreed with Mr Martin QC, JA.

*substance the same as*" the Company's articles.[79]  The core of Mr Martin QC JA's judgment on this point is in paragraph 29:

(a)   He began by noting that the case before the Cayman Islands Court of Appeal was different from the case of the Funds before the Privy Council, in that the Company was complicit in the fraud, whereas the Funds and their agents were not complicit in the BLMIS fraud.  This distinction made no difference, because "*the whole scheme of the Company's articles requires its business to be conducted on the basis that the NAV is binding, whether it is accurate or not.*"

(b)   The practical reasons that underlie the Privy Council Judgment apply equally to a case where the NAV is affected by fraud, since the day-to-day operations of the Company require certainty and consistency.

(c)   That certainty is the purpose of article 34, which is to be construed as referring to "*a valuation purportedly made in compliance with the articles.*" This is necessary to avoid the practical problems mentioned by Lord Sumption in paragraph 23 of the Privy Council Judgment.

(d)   Fraud is not irrelevant, because if the company is complicit, investors may have claims against it for damages for fraudulent misrepresentation and against the directors for conspiracy. If the company is not complicit, it may have a claim against the fraudster and investors may have claims against the company for damages for negligence or innocent misrepresentation.

(e)   "*Apart from any remedies specific to a winding-up, such as the avoidance of preferences, however, it is not in my view permissible to*

---

[79] § 27.

> *reopen a NAV retrospectively on the ground of fraud, whether or not*
> *the company was complicit in it.*"

    (f)    Finally, the Company could not allege that the NAV was invalid on the ground of fraud, because "*it is not on the face of it permissible for the company to rely on its own misconduct to terminate a contract.*"

73.    A BVI Court would regard this fully reasoned judgment of the Cayman Islands Court of Appeal as giving persuasive guidance.  I see no reason why the BVI Court would not follow and apply the conclusion that it is not "*permissible to reopen a NAV retrospectively on the ground of fraud, whether or not the company was complicit in it*"; particularly since that conclusion is derived from the Privy Council Judgment, by which the BVI Court is bound.

74.    For the reasons developed in Subsections (d)-(f) below, the fact that the Funds' Article 11(1) refers to the certificate being "*given in good faith*" is not a good ground for distinguishing the *Weavering Case*.  Most importantly, the commercial necessity of achieving certainty and consistency in the Funds' businesses prevents them from reopening certified NAVs where there has been fraud external to the Funds (within BLMIS) as well as where the fraud has been internal to them (through the alleged bad faith of Citco, their agent).[80]

**(d)**    **The Funds are bound by the certificates given by Citco as their agent**

75.    Article 11 provides for the determination of NAV for the purposes of (i) subscriptions under Article 9 between the Fund and subscribers for shares, and (ii) redemptions under Article 10 between the Fund and members wishing to redeem.  By the first paragraph of Article 11(1), it is for the directors to make the determination, taking into

---

[80] The CA Amended Complaint at ¶ 78 appears to treat Citco's alleged bad faith as being external to the Funds, because it alleges that the Funds were victims of Citco's conduct.

account the matters prescribed in Articles 11(2) and (3).  By the third paragraph of Article

11(1):

> *"Any certificate as to the [NAV] per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties*."

*Analysis under common law*

76.    In exercising their powers under Article 11, including the giving of

certificates, the directors of the Funds would be carrying out their function of managing the

business of the Funds under Article 52.  At common law, the Funds would be bound by the

certificates so given even if the directors gave them in bad faith, because (i) the certificates

would have been given by the directors acting within their actual or ostensible authority on

behalf of the Funds, and (ii) a third party, dealing in good faith, is not prejudiced by the fact

that the Funds may rightly complain that the directors were using their authority against the

interests of the Funds.[81]

77.    In fact, as Lord Sumption records, under an administration agreement dated 20

February 2003, Sentry appointed Citco as its administrator, under the overall direction of the

directors, with responsibility for day-to-day administrative services, including calculation of

NAV, communications with shareholders and processing payments in respect of

subscriptions and redemptions.[82]  The CA Amended Complaint describes Citco as "*the

Funds' administrators*."[83]  The directors caused Sentry to appoint Citco as its agent pursuant

to the power to delegate contained in Article 53.  At common law, the position is as described

in the preceding paragraph: in favour of a third party dealing in good faith, the Funds are

---

[81] *Chitty on Contracts* (32nd ed, 2015) at § 31-061; *Bowstead and Reynolds on Agency* (20th ed, 2016) at § 8-062, which states Article 75: "*An act of an agent within the scope of his apparent authority does not cease to bind his principal merely because the agent was acting fraudulently and in furtherance of his own interests*."  *See* comment at § 8-063.

[82] Lord Sumption's judgment at § 14.  A copy of the administration agreement, which is expressed to be governed by BVI law, is in Exhibit O to Mr Kite's Declaration.  I assume that Sigma and Lambda appointed Citco as their agents under administration agreements in similar terms.

[83] At §§ 40, 49.

bound by certificates given by Citco within the scope of its actual or apparent authority, even if Citco gave them in bad faith.

78.    The reference to "*good faith*" in Article 11(1) would not be effective to deprive redeeming members of the benefit of the conclusive effect of the certificates.  This is because (i) the Funds' Articles each constitute a contract which is binding as between the Fund and each member of the Fund,[84] (ii) it is a principle of the interpretation of contracts under BVI and English law that clear words are required before the court will hold that a contract has taken away legal rights which one of the parties would have had at common law,[85] and (iii) Article 11(1) does not, in my opinion, contain clear words indicating that the legal rights of subscribers, members and redeemers are being taken away.

79.    While the phrase "*binding on all parties*" in Article 11(1) covers all subscribers and redeemers who might be affected by a certificate given in respect of a particular Valuation Day as well as the Fund, it does not follow that the Fund may dispute the certificate or claim not to be bound by it and so recover Redemption Payments already made. There are several reasons for this.

80.    First, the phrase "*given in good faith*" is designed to protect the Fund from challenges to the determinations of NAV or Redemption Price made on its behalf and to protect it from claims by subscribers or redeemers for damages for negligence or innocent misrepresentation.  If such a provision had not been included in Article 11(1), a BVI Court would imply a term to the effect that subscribers and redeemers are not bound by a certificate given irrationally or in bad faith,[86] since it would be necessary and obvious to protect subscribers and redeemers from the arbitrary picking by the directors of the Funds or their agents of a number for the NAV that would otherwise be binding on them.  Such a term

---

[84] Section 11(1) BCA 2004.

[85] *Lewison: The Interpretation of Contracts* (6th ed, 2015) at § 12.19.

[86] *Lewison* at § 14.04.

would be consistent with the duty that the Funds, acting through their directors or agents, were under as a matter of BVI law (which is the same as English law in this respect); namely to determine NAV rationally and in good faith.[87]

81.    Second, if the directors considered that NAV may have been determined in bad faith, they could protect the Fund by suspending the determination of NAV under Article 11(4), with the result that redemptions cease during the period of suspension under Article 10(1)(e).

82.    Third, for the reasons given by Lord Sumption in the Privy Council Judgment,[88] a BVI Court would resist an interpretation of the Articles that permitted a Fund, relying on the bad faith of its directors or agent, to open up the determination of a NAV per share, perhaps long after it had been determined, in order to claim extra amounts from subscribers, if the NAV was understated, or to recover part of Redemption Payments from redeemers, if it had been overstated.  In the *Weavering Case*, Mr Martin QC JA adopted that reasoning.[89]

*Analysis under Section 31 BCA 2004*

83.    In favour of a third party acting in good faith, the position at common law is fortified by Section 31 BCA 2004.[90]  This section recognises that BVI companies frequently conduct their business through agents and gives third parties who deal with such companies much greater protection than they would have when dealing with, e.g., an English company.[91] So far as relevant, this section provides:

> "*(1)    A company ... may not assert against a person dealing with the company or with a person who has acquired assets, rights or interests from the company that*

---

[87] *See* the authorities cited in the *Weavering Case* at § 22.

[88] At § 23.

[89] At § 29.

[90] The BCA 2004 applies to the Funds: CA Amended Complaint at ¶¶ 25, 26.

[91] Compare Section 40 of the English Companies Act 2006.

> (c)    a person held out by the company as a director,
>        employee or agent of the company ...
>
>    (ii)    does not have authority to exercise a power
>            which a director, employee or agent of a
>            company carrying on business of the kind
>            carried on by the company customarily has
>            authority to exercise;
>
> (d)    a person held out by the company as a director,
>        employee or agent of the company with authority to
>        exercise a power which a director, employee or agent of
>        a company carrying on business of the kind carried on
>        by the company does not customarily have authority to
>        exercise, does not have authority to exercise that
>        power;
>
> (e)    a document issued on behalf of a company by a
>        director, employee or agent with actual or usual
>        authority to issue a document is not valid or genuine;
>
> unless the person has, or ought to have, by virtue of his
> relationship to the company, knowledge of the matters referred
> to in any of paragraphs (a) to (e).
>
> (2)    Subsection (1) applies even though a person of the kind
>        specified in paragraphs (b) to (e) of that subsection acts
>        fraudulently ...,unless the person dealing with the company or
>        with a person who has acquired assets, rights or interests from
>        the company has actual knowledge of the fraud ..."

84.    As redeeming members, the Defendant Institutions are persons who dealt with

one of the Funds or acquired the Redemption Payments from the Funds, so they are entitled

to the protections in Subsections 31(1) and (2), provided they did not have actual knowledge

of Citco's fraud.  As against Defendant Institutions who did not have that actual knowledge,

the Funds cannot assert that Citco lacked authority to give the certificates or that the

certificates are not valid and genuine.  This is so even if, in giving the certificates, Citco had

acted in bad faith or fraudulently.

85.    The Funds cannot avoid these consequences by relying on the reference to

"*good faith*" in Article 11(1), because Section 11(3) BCA 2004 provides:

*"The memorandum and articles of a company have no effect to the extent that they contravene or are inconsistent with this Act."*

*Conclusions*

86.    In my opinion, as against all the Defendant Institutions, other than the Knowledge Defendant Institutions, the Funds are bound at common law and pursuant to Section 31 by the certificates issued by Citco as their agent, even if it did so in bad faith.

87.    As against the Knowledge Defendant Institutions, the Funds are also bound pursuant to Section 31 by the certificates issued by Citco, since the HSBC and Citigroup Amended Complaints (which I am told are representative in this respect of all the Amended Complaints against Knowledge Defendant Institutions) do not allege that HSBC and Citigroup had actual knowledge of Citco's alleged bad faith.

**(e)    Article 11 does not permit the Funds to benefit from the alleged wrong of Citco, their agent**

88.    There is a well-established principle of the construction of contracts under BVI and English law that a contract will be interpreted so far as possible in such a manner as not to permit one party to it to take advantage of his own wrong.[92]

89.    Under the first paragraph of Article 11, the responsibility for determining NAV and subscription and Redemption Prices lies with the Funds, acting through their directors or Citco.  Under BVI and English law, a term may be implied where the proposed term is obvious or it is necessary to imply it in order to give business efficacy to Articles 9-11.[93]  As I have said in paragraph 80 above, applying those tests, a BVI court would imply a term that the Fund, acting through its directors or agent, would carry out its functions under those Articles rationally and in good faith.

---

[92] *Lewison* at § 7.10. The principle is referred to in the *Weavering Case* at § 29.

[93] *Marks & Spencer plc v BNP Paribas Securities Services Trust Co (Jersey) Ltd* [2016] AC 742, UK Supreme Court.

90.    If Citco gave certificates in bad faith, the Funds would not be permitted to say that Citco's bad faith should not be attributed to them.  As Mr Moss states in paragraph 43 of his Declaration:[94]

> *Knowledge gained by an employee or other agent while acting in the course of his employment for his principal will ordinarily be attributed to his principal.*"

This general rule will not apply where an agent's functions are limited and narrow, but it will apply to agents who "*so far represent the principal that in all respects their acts and intentions and their knowledge may truly be said to be the acts, intentions, and knowledge of the principal.*"[95]  This rule applies even though "*it is clear beyond doubt that the principal was personally unaware of the relevant fact, and that therefore there has not been any communication by the agent.*"[96]

91.    Under this rule, the knowledge and state of mind of the individuals employed by Citco, who are alleged to have been reckless, is under BVI and English law ordinarily attributed to Citco.  The same principle applies to attribute to the Funds the knowledge and state of mind of Citco, acquired through its officers, since Citco acted as the Funds' agent for the purpose of operating subscriptions and redemptions under Articles 9-11, including the giving of certificates and processing of Redemption Payments.

92.    Therefore, if Citco gave a certificate in bad faith, the Funds would be in breach of the implied term.  If the Funds were able to assert that they were not bound by a certificate because it had been given in bad faith, and therefore were entitled to recover Redemption Payments made in accordance with the certificate, they would benefit from their

---

[94] Citing *Bowstead and Reynolds on Agency* (20th ed), Article 95(1) at § 8-207.  The rule was cited and applied in *UBS AG v Kommunale Wasserwerke Leipzig GmbH* [2014] EWHC 3615 (Comm) at § 762.  It is the subject of further comment in *Bowstead* at §§ 8-208-8-210.

[95] *Blackburn, Low & Co v Vigors* (1887) 12 App Cas 531, 537, 538, House of Lords, per Lord Halsbury LC, quoted in *Bowstead and Reynolds on Agency* (20th ed) at § 8-210.  Lord Sumption makes the same point in *Bilta (UK) Ltd v Nazir* [2016] AC 1, at §§ 67, 68 (and Lords Neuberger, Clarke and Carnwath agreed at § 7).  Also see Lords Toulson and Hodge at §§ 204-208.

[96] *Bowstead* at § 8-209, citing *Kettlewell v Watson* (1882) 21 Ch D 685, 705, English High Court.

own wrong, which is a construction disfavoured under BVI law.  The principle can be displaced if the language of the contract shows a clear intention to do so,[97] but the Articles show no such intention.  Accordingly, the Funds are bound by the certificates, even if Citco gave them in bad faith.

**(f)**     ***Ex turpi causa non oritur actio***

93.     If, for the reasons outlined above, any bad faith on the part of Citco is attributed to the Funds as Citco's principal, the principle of BVI and English law that the court will not lend its aid to a person who founds his cause of action on an immoral or illegal act may prevent the Funds from pursuing claims against the Defendant Institutions which rely on the illegal or immoral act.

94.     This is a rule of procedure, albeit founded on public policy, which is potentially engaged where any act of, or act attributed to, the claimant is a criminal offence or is otherwise dishonest.[98]  This will be the case where the wrong-doing or knowledge of directors is attributed to the company.  (There is an exception where the company has been the victim of the wrong-doing by its directors and brings a claim against them, for in such a case the wrong-doing or knowledge of the directors is not attributed to the company as a defence to a claim brought against them.[99])

95.     Applied to the Common Law Claims, the *ex turpi causa* principle provides the Defendant Institutions with a defence to a claim grounded on the bad faith of Citco, since (i) the Funds allege that Citco's reckless conduct was dishonest (involving the tort of deceit and, depending on where the conduct occurred, almost certainly a criminal offence),[100] (ii) Citco

---

[97] *BDW Trading Ltd v JM Rowe (Investments) Ltd* [2011] EWCA Civ 548, English Court of Appeal, at § 35.

[98] *Bilta (UK) Ltd v Nazir* [2016] AC 1, at § 63; *Les Laboratoires Servier v Apotex Inc* [2015] AC 430, UK Supreme Court, at §§ 25, 28, 56.

[99] *Bilta (UK) Ltd v Nazir* at §§ 7, 55, 65-78, 82-97, 182-209.

[100] *See, e.g.,* Section 91 of the BVI Securities and Investment Business Act 2010; Section 223 of the BVI Criminal Code (which applies to directors and officers); Section 89 of the UK Financial Services Act 2012,

acted as agent of the Funds, carrying out functions for the directors, so that its bad faith and knowledge is attributed to the Funds, and (iii) without the allegation of Citco's bad faith, the claims could not be pursued for the reasons outlined in Section 2 above.  On the other hand, the principle should not bar the Funds from bringing a claim for compensation against Citco.

96.    The *ex turpi causa* defence has been recently reviewed by the UK Supreme Court in *Patel v Mirza*,[101] which concerned a claim in restitution to recover money paid by the claimant to the defendant for an illegal purpose, namely to buy shares using advance insider information (a criminal offence), which was not carried out.  All the Supreme Court justices held that the illegal purpose did not prevent recovery, but there was a sharp disagreement between the reasoning of the six justices in the majority and the three justices in the minority.[102]  The majority judgment, given by Lord Toulson, adopted a "*range of factors*" approach,[103] under which the court may take into account "*the seriousness of the conduct, its centrality to the contract, whether it was intentional and whether there was marked disparity in the parties' respective culpability*."  Applying these factors, there was no reason to debar the claimant from enforcing his unjust enrichment claim, because the illegal conduct did not happen and such enforcement would not undermine the integrity of the justice system.  The minority view focused on the continued application of a rule-based approach, which permitted restoring the parties to the situation they were in before they entered into their illegal conduct, when the actual wrongful act had not occurred and there was no need to rely on the wrongful conduct to establish the restitution claim.

---

which replaced Section 397 of the Financial Services and Markets Act 2000; as well as more general offences of conspiracy, fraud, deceit, and obtaining property or a pecuniary advantage by deception.

[101] [2016] UKSC 42, UK Supreme Court.

[102] The majority judgment was delivered by Lord Toulson, with whom Lady Hale and Lords Kerr, Wilson and Hodge agreed. Lord Neuberger delivered a separate judgment in which he agreed with Lord Toulson; *see* § 174. The minority comprised Lords Mance, Clarke and Sumption.

[103] *See* in particular §§ 105, 107, 120.

97.     A BVI Court, whether it followed the majority or minority in *Patel v Mirza*, would not permit the Funds to maintain the Common Law Claims relying on the bad faith of Citco, which is attributed to them.  The Funds would be the culpable parties.  The unlawfulness is at the centre of the claim and if the claim were allowed to proceed it would lead to the consequence that Lord Sumption deprecated in the Privy Council Judgment.[104]

98.     If the BVI Court were to adopt the majority opinion in *Patel v Mirza*, it would have to consider the allegation of bad faith against the Knowledge Defendant Institutions.  It would consider the strength of the case against them and would not take into account the allegation unless the Funds could satisfy it that there would be a real prospect of establishing bad faith at trial (as to which, see Section 6 below).

**(g)     Attribution of Citco's bad faith to the Funds precludes them from claiming that Redemption Payments were made under a mistake of fact**

99.     Under BVI and English law, a person who claims restitution for money paid under a mistake of fact must prove that he would not have made the payment had he known of his mistake at the time it was made.[105]  If the person thought that he might not be liable to pay, but nevertheless does so, the payment will not have been caused by the mistake, but by the calculated risk taken by the payer about the existence of his liability to pay.[106]

100.     It follows that if Citco's recklessness is attributed to the Funds, as it normally would be (as explained at paragraphs 90 and 91 above), the Funds will not be able to assert that they made Redemption Payments under a mistake of fact, as they do in the Amended Complaints.[107]

---

[104] At § 23.

[105] *Kleinwort Benson Ltd v Lincoln CC* [1999] 2 AC 349, 408, House of Lords, per Lord Hope.

[106] *Deutsche Morgan Grenfell Group plc v Inland Revenue Commissioners* [2007] 1 AC 558, House of Lords, at § 65, per Lord Hope.

[107] CA Amended Complaint at ¶¶ 92, 122, 141.

**(h)      The New Claims disclose no grounds under BVI law for redeeming members being obliged to return excessive Redemption Payments**

101.      The only Common Law Claim that appears to rely on the allegation of Citco's bad faith is the New Claim for breach of contract.[108]  Before considering the implied term which is alleged to have been breached, I should make two points.  First, the Funds rely on certain Subscription Agreements, as well as the Funds' Articles.  I understand that the Subscription Agreements are governed by New York law and so I do not comment on them, save to note that in the Privy Council Judgment, Lord Sumption stated that it is the Articles that govern Redemptions.[109]

102.      Second, the New Claim for breach of contract relies on an implied term in the Funds' Articles and is founded on the allegation that the Funds are not bound by the certificates which they claim were given by Citco in bad faith.  For the reasons given in Subsections 4(a)-(f) above, the Funds are bound by the certificates even if they were given in bad faith, with the consequence that the New Claim for breach of contract cannot be maintained.  Further, for the reason given in Subsection 4(g) above, the Funds cannot maintain the claims based on mistake if Citco gave the certificates in bad faith.

103.      Instead, this new claim alleges breach of "*an implied term for repayment of any over-payments*."[110]  At paragraph 57 of his Declaration, Mr Moss expresses the opinion that it is arguable that the Articles contain an implied term requiring repayment of overpaid Redemption Payments where a certificate was not given in good faith.  I agree with him as to the test for implying a term, namely obviousness or business necessity; but I respectfully disagree with him that the suggested term would be implied here.  It is not obvious or necessary.

---

[108] CA Amended Complaint at ¶ 190.

[109] At §§ 10, 20.

[110] CA Complaint at ¶ 191.

104.    First, there is no necessity for implying such a term, since the same ground is covered by Sections 56-59, 62 and 63 BCA 2004, which identify the circumstances in which, as a matter of BVI policy, a Redemption Payment may be recovered.  The alleged implied term appears to subject redeeming members to different and more onerous liabilities than BVI statutory law (which does not provide the Funds with a remedy), including depriving them of a defence of good faith receipt and change of position.

105.    Second, the ground is also already covered by the law of unjust enrichment and it is neither obvious nor necessary that parties who become bound by the Funds' Articles intended that the Funds should have a contractual right of recovery more extensive than that provided by the law of unjust enrichment (which, as explained above, does not provide the Funds with a remedy).

106.    Third, the alleged implied term is commercially unsound, since it exposes a redeeming member to "*an open-ended liability to repay part of the price received if it subsequently appeared that the assets were worth less than was thought at the time*",[111] which was a situation that Lord Sumption deprecated.

107.    Finally, the alleged implied term is one-sided, since it works in favour of the Funds but does not protect redeeming members or overpaying subscribers.  Members would have no need of the term, since they would not be bound by a certificate issued in bad faith and may have a claim for misrepresentation against the Funds for compensation for any loss they had suffered.

---

[111] Lord Sumption in the Privy Council Judgment at § 23.

## 5.    CITCO'S ALLEGED LACK OF GOOD FAITH

108.    In paragraphs 39-43 of his Declaration, Mr Moss states his opinion as to the applicable test under BVI law for an allegation of lack of good faith.  I respectfully agree with him that:

(a)    BVI law is the same as English law on this point (paragraph 39);

(b)    not acting in good faith is the same as acting in bad faith (paragraph 40); and

(c)    knowledge gained by an agent while acting in the course of his employment for his principal will ordinarily be attributed to his principal (paragraph 43).

109.    While there may be little difference between us on the test of bad faith, as described by Mr Moss in paragraph 41, it may be helpful if I attempt to summarise the law on wilful blindness and recklessness, as indications of bad faith.  I am not able to comment on the matters of New York law referred to in paragraph 42.

110.    Under BVI law the allegation that Citco issued false certificates in bad faith amounts to an allegation of deceit or fraudulent misrepresentation.  The leading authority on what is required to prove such an allegation is the statement of Lord Herschell in *Derry v Peek*:

> "*fraud is proved when it is shewn that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless[112] whether it be true or false.  Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states.  To prevent a false statement being fraudulent, there must, I think, always be an honest belief in its truth.*"[113]

---

[112] That is, not caring.

[113] (1889) 14 App Cas 337, 374, House of Lords, which is cited by Mr Moss.  He also cites two other cases, which are unlikely to assist the Court: *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, 389-390, Privy Council on appeal from the Court of Appeal of Brunei (third party liable to a beneficiary for dishonestly assisting a trustee to commit a breach of trust) and *Three Rivers District Council v Bank of England (No 3)*

111.    The converse of this is that however negligent a person may be, he cannot be liable for fraud or said to have acted in bad faith, provided his belief is honest.  In this case, the allegation of bad faith appears to be that "*Citco turned a blind eye to the documents and information in their possession*" and "*appreciated, but consciously disregarded, the risks to the Fund's investors posed by Madoff's operations*."[114]

112.    In *Manifest Shipping Co Ltd v Uni-Polaris Insurance Co Ltd*, in a passage that has been cited and applied many times, Lord Scott explained what is required to make good a case of blind-eye knowledge:

> "*In summary, blind-eye knowledge requires, in my opinion, a suspicion that the relevant facts exist and a deliberate decision to avoid confirming that they exist.  But a warning should be sounded. Suspicion is a word that can be used to describe a state-of-mind that may, at one extreme, be no more than a vague feeling of unease and, at the other extreme, reflect a firm belief in the existence of relevant facts. In my opinion, in order for there to be blind-eye knowledge, the suspicion must be firmly grounded and targeted on specific facts.  The deliberate decision must be a decision to avoid obtaining confirmation of facts in whose existence the individual has good reason to believe. To allow blind-eye knowledge to be constituted by a decision not to enquire into an untargeted or speculative suspicion would be to allow negligence, albeit gross, to be the basis of a finding of privity.*"[115]

113.    Under BVI and English law, a person who alleges dishonesty must distinctly plead and particularise his case; he will fail to do so if the allegations relied on are equally consistent with negligence or gross negligence.  This is all the more important where the plaintiff alleges dishonesty not against a defendant, but against its own agent, for in such a case the plaintiff would be expected to know of the facts necessary to make good the allegation, whereas the defendants would not.  In *Three Rivers District Council v Bank of England (No 3)*, Lord Millett said:

---

[2003] 2 AC 1, 191, 192, House of Lords (whether the claimants had pleaded the ingredients for the tort of misfeasance in public office).

[114] CA Amended Complaint at ¶¶ 56, 74, 77.

[115] [2003] 1 AC 469, House of Lords, at § 116.

> *"It is well established that fraud or dishonesty (and the same must go for the present tort) must be distinctly alleged and as distinctly proved; that it must be sufficiently particularised; and that it is not sufficiently particularised if the facts pleaded are consistent with innocence [citations omitted]. This means that a plaintiff who alleges dishonesty must plead the facts, matters and circumstances relied on to show that the defendant was dishonest and not merely negligent, and that facts, matters and circumstances which are consistent with negligence do not do so."*[116]

114.    It follows from the judgments of Lords Scott and Millett that a person who alleges recklessness based on blind-eye knowledge must plead and prove: (i) that specific relevant facts exist, (ii) a firmly grounded suspicion on the part of that person that those specific facts exist, and (iii) a deliberate decision by that person to avoid confirming that those specific facts exist, which involves identifying the steps that could have been taken, but were not taken to obtain confirmation of the specific facts.  Thus Lord Nelson at the battle of Copenhagen would have seen the signal to break off the action that he suspected was given if he had put the telescope to his good eye.

115.    In paragraph 44 of his Declaration, Mr Moss opines that the facts and matters pleaded in Section D of the Amended Complaint constitute *"a properly arguable case of bad faith on the part of the Funds' administrators under BVI law"*, because, at a minimum, they were reckless *"as to whether the net asset statements were correct when determining NAV and publishing certificates of the same."*

116.    I would respectfully disagree with Mr Moss's opinion.  Rather, when the facts and matters alleged in Section D of the CA Amended Complaint are reviewed under BVI law in light of the guidance given by Lords Scott and Millett, the opposite conclusion should be reached.

---

[116] [2003] 2 AC 1, 291 at § 184.  Lord Hobhouse said much the same at page 284 at § 161.  He and Lord Millett were in the minority, since the majority, who did not take a different view on the legal approach, were of the opinion that the pleading did plead a case of misfeasance in public office.

(a)     The relevant specific facts are the elements of the Ponzi fraud within BLMIS, summarised in paragraph 6 of the CA Amended Complaint.

(b)     The question then is whether the facts pleaded in Section D distinctly allege that Citco had a firmly grounded suspicion that BLMIS was conducting a Ponzi fraud or whether, at most Citco had "*a vague feeling of unease*" or "*untargeted or speculative suspicion*", which is not enough to support an allegation of bad faith, since the matters alleged are equally consistent with negligence or gross negligence.

(c)     Even if Section D sufficiently pleads that Citco had a firmly grounded suspicion of the existence of the Ponzi fraud, it does not identify any effective steps that Citco should have taken to obtain confirmation of the existence of the fraud and which Citco deliberately decided not to take.  To the contrary, the CA Amended Complaint pleads Mr Madoff's confession that clients (which includes their administrators, such as Citco) had no way of knowing of the fraud in BLMIS.[117]

**6.      THE KNOWLEDGE DEFENDANT INSTITUTIONS**

117.    Section E of the HSBC Amended Complaint includes an allegation that HSBC "*was well aware of the indicia of fraud surrounding BLMIS.*"  Section E of the Citigroup Amended Complaint includes an allegation that "*By no later than June 2007, and likely several years earlier, Citigroup had knowledge of the possibility of Madoff's Ponzi scheme.*"  I understand that similar allegations are made against other Knowledge Defendant Institutions.  The Common Law Claims are all pleaded against the Knowledge Defendant Institutions in the same way that they are pleaded against the other Defendant Institutions.

---

[117] CA Amended Complaint at ¶ 82.

118.    In paragraphs 47-51 of his Declaration, Mr Moss identifies two grounds under BVI law on which a redeeming member, who received a Redemption Payment in bad faith, is supposedly liable to repay it:

(a)    implication of a term in the Articles "*to the effect that a recipient in bad faith must repay a payment made on the basis of a fictitious N.A.V.*"; and

(b)    a Restitution Claim against a bad faith receiver.

119.    Even if there were merit in Mr Moss's two grounds, which as explained below I respectfully dispute, as against the Knowledge Defendant Institutions, the Funds are bound by the Privy Council Judgment (which confirmed the EC Court of Appeal judgment on the Good Consideration Issue) and are prevented by each of the substantive grounds discussed in Sections 2-4 above from asserting the Common Law Claims. The legal effect of a Defendant Institution being in bad faith could have been, but was not, raised as an argument on the third part of the Certificate Issue. As to the Good Consideration Issue, the Knowledge Defendant Institutions provided exactly the same consideration as the other Defendant Institutions; namely the shares delivered up on Redemption. As a result it is not necessary to consider whether Knowledge Defendant Institutions were bad faith receivers who could not defend the Common Law Claims.

**(a)    Implied term**

120.    I agree with what Mr Moss says in paragraphs 47 and 48, to the effect that a term may be implied in a company's articles if the proposed term is obvious or necessary on the grounds of business efficacy. That is a high hurdle, however, and I respectfully disagree with him that it is either obvious or necessary that his proposed term would or should be implied into the Articles.

121.    The first point I should make is that the implied term described by Mr Moss is not even pleaded in the HSBC Amended Complaint or the Citigroup Amended Complaint. Instead, as noted in paragraph 103 above, in relation to the New Claim for breach of contract, those Amended Complaints plead "*an implied term for repayment of any over-payments*", regardless of whether the recipient had received the Redemption Payment in good or bad faith.[118]  If bad faith on the part of the recipient is not an essential ingredient of the pleaded implied term, it is impossible to see how the term considered by Mr Moss could satisfy the standards of obviousness or necessity which are required under BVI law.

122.    Second, the alleged implied term conflicts with the express terms of the Funds' Articles under which, as the Privy Council Judgment held, the Funds' contractual obligation was to pay the Redemption Price based on the NAV per share stated in the certificates, whether or not the determination had been correctly carried out.  Article 11(1) contains no qualification relating to the good faith of the redeeming member.

123.    Third, there is no need to imply the term considered by Mr Moss, since the same ground is covered by Sections 56-59, 62 and 63 BCA 2004 and by the law of unjust enrichment, as described in paragraphs 104 and 105 above.

**(b)    Restitution Claims: bad faith receipt**

124.    In paragraph 49 of his declaration Mr Moss states that "*absence of good faith on the part of the recipient of a payment <u>may negate the good consideration defence</u>*" (emphasis added).  This appears to be put forward as a reason why the Funds may not be bound by the determination of the Good Consideration Issue against the Knowledge Defendant Institutions, so that it does not affect the availability of other defences.  The word "*may*" indicates that there is some uncertainty as to whether bad faith prevents a recipient from being able to rely on a good consideration defence to a Restitution Claim.

---

[118] CA Amended Complaint at ¶ 191; the Amended HSBC Complaint at ¶ 204; the Citigroup Amended Complaint at ¶ 193.

125.    As a matter of BVI and English law (i) the contractual obligation of a Fund to make a Redemption Payment to a redeeming member depends solely on the NAV per share stated in the applicable certificate and is unaffected by the state of mind of the redeeming member, and (ii) the redeeming member is not unjustly enriched if he receives no more than his contractual entitlement.  The good consideration defence therefore applies and there can be no claim in restitution to recover the Redemption Payment.  This is confirmed by the leading case of *Barclays Bank Ltd v WJ Simms Son & Cooke (Southern)Ltd*, in which Robert Goff J[119] said:

> "*(1) If a person pays money to another under a mistake of fact which causes him to make the payment, he is prima facie entitled to recover it as money paid under a mistake of fact. (2) His claim may however fail if … (b) the payment is made for good consideration, in particular if the money is paid to discharge, and does discharge, a debt owed to the payee … or by a third party by whom he is authorised to discharge the debt; or (c) the payee has changed his position in good faith, or is deemed in law to have done so.*"[120]

Accordingly, under proposition 2(b), the good faith of the payee is irrelevant to the availability of the good consideration defence; whereas it is one of the elements of the change of position defence under proposition 2(c).

126.    Robert Goff J added footnotes to his two propositions.  In relation to proposition 1, he said:

> "*Of course, if the money was due under a contract between the payer and payee, there can be no recovery on this ground unless the contract itself is void for mistake … or is rescinded by the plaintiff.*"[121]

---

[119] Later Lord Goff of Chieveley and one of the original editors of *Goff & Jones, The Law of Restitution*, now *The Law of Unjust Enrichment* (9th ed. 2016).

[120] [1980] 1 QB 677, 695C-D, English High Court.

[121] At page 695E-F. This confirmed by *Goff & Jones* (9th ed) at § 3-13: "*Where there is a contract between the parties relating to the benefit transferred, no claim in unjust enrichment will generally lie while the contract is subsisting.*" At § 3-16 this general principle is justified on the basis that "*the law should give effect to the parties' own allocation of risk and valuations, as expressed in the contract, and should not permit the law of unjust enrichment to be used to overturn those allocations or valuations.*" In relation to mistake *Goff & Jones* states at § 9-94: "*Where a benefit is mistakenly conferred by one party on another under a contract, a claim in unjust enrichment will commonly fail even if the mistake would otherwise support the claim. As we explained in Ch. 3, the contract will bar the claim, to the extent that it entitles the defendant to receive the relevant benefit. For the claim to succeed, the claimant will need to show that the contract is invalid, being either non-existent,*

In relation to proposition 2(b) he added the footnote upon which Mr Moss relies:

> "*However, even if the payee has given consideration for the payment, for example by accepting the payment in discharge of a debt owed to him by a third party on whose behalf the payer is authorised to discharge it, that transaction may itself be discharged (and so provide no defence to the claim) if the payer's mistake was induced by the payee, or possibly even where the payee, being aware of the payer's mistake, did not receive the money in good faith ...*"[122]

127.    In the Privy Council Judgment Lord Sumption summarised the relevant principle to be derived from Robert Goff J's judgment:

> "*Therefore, to the extent that a payment under a mistake discharges a contractual debt of the payee, it cannot be recovered, unless (which is not suggested) the mistake is such as to avoid the contract.*"[123]

128.    In my opinion, the footnote to proposition 2(b) does not enable the Funds to maintain a claim to recover Redemption Payments against the Knowledge Defendant Institutions based on alleged bad faith receipt for two reasons.  First, the qualification to proposition 2(b) is expressed tentatively and is supported only by a case on payment under legal compulsion, where the payee knew he was not entitled to the money (since he had been wrongly credited with a payment he knew he had not made).[124]  The facts of the present cases are distinguishable because (i) the Redemption Payments were made pursuant to a contractual obligation, and (ii) redeeming members were entitled to receive the Redemption Payment based on the NAV per share stated in the applicable certificate, which the Funds had determined.

129.    Second, Robert Goff J's qualification is not directed towards the case where the payer discharges a debt that he owes to the payee (where the payee's good faith is not

---

*void or voidable. This is not a matter for the law of unjust enrichment, but the law of contract.*" At §§ 9-95-9-97 this proposition is illustrated and supported by the Privy Council Judgment.

[122] At page 695G-H.

[123] At § 18.

[124] *Ward & Co v Wallis* [1900] 1 QB 675, 678, 679, English High Court.

relevant), but to the other situation described in proposition 2(b), where the payer is not the

person contractually liable to make the payment but makes it to discharge a debt owed to the

payee by a third party. Consistently with the footnote to proposition 1, the money can only be

recovered if the "*transaction may itself be set aside*."[125]  In the present cases, the Redemption

Payments were made by the Funds to the redeeming members to discharge their obligations

under the statutory contracts contained in the Funds' Articles which cannot be rendered void,

set aside or rescinded.

130.    If, contrary to the above, the Funds may have a claim based on bad faith

receipt by the Knowledge Defendant Institutions, that does not end the inquiry.  It is

necessary to address the questions of (i) what is required to be pleaded and proved under BVI

law for a person to be a bad faith recipient, and (ii) whether the matters pleaded in Sections

F-G of the HSBC Amended Complaint and Section E of the Citigroup Amended Complaint

adequately support the allegations of bad faith against HSBC and Citigroup.

131.    In the commercial context of redeeming shares in the Funds, the Knowledge

Defendant Institutions were entitled to rely on what they were told by Citco when it

published the certificates unless they themselves were dishonest or irrational (which includes

recklessness and blind-eye ignorance).[126]  The law summarised in paragraphs 110-114 above

applies to the pleading and proof of allegations of dishonesty against the Knowledge

Defendant Institutions.

132.    Sections F-G of the HSBC Amended Complaint purport to support the claim

of knowledge against HSBC.  The Funds rely upon (i) a MAR/Hedge report dated May 2001

"*Madoff tops charts; skeptics ask how*"; (ii) an HSBC Bank USA report dated 7 August 2001

---

[125] The *Kingate Case* at § 167.

[126] *Thanakharn Kasikorn Thai Chamkat v Akai Holdings Ltd* (2010) 13 HKCFAR 479 at §§ 49, 51, 52, 62, per Lord Neuberger, with whom the other judges agreed (a decision of the Hong Kong Court of Final Appeal, which has been applied by the English Court of Appeal in *Quinn v CC Automotive Group Ltd* [2010] EWCA Civ 1412, at § 23).

on Sentry; and (iii) reports dated 16 February 2006 and 8 September 2008 by KPMG to

HSBC Bank plc (each a "**KPMG Report**"), reviewing fraud and related operational risks at

BLMIS.[127]

133.    Section E of the Citigroup Amended Complaint purports to support the claim

of knowledge against Citigroup.  The Funds rely upon (i) communications in or before June

2007 between Leon Gross of Citigroup and Harry Markopolos, a financial analyst, and (ii)

Brian Leach becoming an officer of Citigroup in about March 2008, having previously

worked at Morgan Stanley, a firm that had "*internally blacklisted Madoff-related investments*

*due to concerns of fraud and other wrongdoing*."

134.    I shall assume that those allegations are pleaded in an effort to make good a

case that HSBC and Citigroup were bad faith recipients of Redemption Payments.

Accordingly, the Funds must satisfy a high pleading standard that includes the identification

of specific facts that such defendants had "*good reason to believe*" were true but nevertheless

made "*a deliberate decision . . . to avoid*" confirming such facts.  Adopting this approach to

its review of those sections in the HSBC and Citigroup Amended Complaints, a BVI Court

would find the position to be as follows.

(a)    It would consider whether those sections identify specific facts

pointing to the Ponzi fraud within BLMIS or whether the allegations

are too general to be specific or whether, in the case of the KPMG

Reports, they identify different facts.

(b)    Even if those sections do identify specific facts pointing to that Ponzi

fraud, the next question is whether those sections plead a firmly

grounded suspicion on the part of HSBC and Citigroup of the existence

of the Ponzi fraud.  If the allegations in those sections are consistent

---

[127] I also discuss the KPMG Reports in Paragraph 248 below.

with negligence, that would not be sufficient to support a plea of knowledge of fraud on the part of HSBC or Citigroup.  The KPMG Reports drew HSBC's attention to a number of risk factors concerning BLMIS, but did not provide material from which HSBC could have developed a firmly grounded suspicion that there was a Ponzi fraud within BLMIS.  The most that can be said of the allegation against Citigroup is that certain of its employees had "*a vague feeling of unease*" with respect to BLMIS, consistent with negligence and insufficient to meet the very high hurdle for alleging bad faith.

(c)    Finally, those sections do not plead that HSBC or Citigroup deliberately decided not to take steps that would have confirmed to them the existence of the Ponzi fraud in BLMIS.  The HSBC Amended Complaint refers to due diligence undertaken on two occasions by KPMG on the instructions of HSBC, which demonstrates that HSBC did not deliberately decide to "*avoid obtaining confirmation*" that BLMIS was operating a Ponzi scheme and undermines any claim that HSBC had blind-eye knowledge or acted recklessly.  In any case, as I have said, the CA Amended Complaint pleads Mr Madoff's confession that clients had no way of knowing of the fraud in BLMIS.[128]

## 7.    INTRODUCTION TO THE BVI INSOLVENCY ACT CLAIMS

135.    In this section I will explain:

(a) the origins and provisions of Sections 245 and 246 of the BVI Insolvency Act;

(b) the consequences of a transaction falling within Sections 245 or 246;

---

[128] CA Amended Complaint at ¶ 82.

    (c)  that there is no overlap between the two Sections;

    (d)  that it is always necessary to identify the transaction entered into in order to determine whether it is a transaction within the applicable Section;

    (e)  that the Redemptions (not the Redemption Payments) were the transactions that the Funds entered into and each Fund did so when it, or its agent, received a written redemption request; and

    (f)  that the Liquidators' resorting to hindsight is not legitimate.

136.    Unless otherwise indicated, references in Sections 7-10 of this Declaration to Sections and Subsections are to sections and subsections in the BVI Insolvency Act.

**(a)      Origins and provisions of Sections 245 and 246**

137.    The BVI Insolvency Act contains provisions about the liquidation of companies (Part VI) and voidable transactions (Part VIII), which replaced the provisions of Part IV of the BVI Companies Act (Chapter 285, as amended) about the winding up of companies, which was modelled on the provisions about the winding up of companies contained in Part IV of the English Companies Act 1862.

138.    The BVI Insolvency Act is to a considerable extent modelled on the English Insolvency Act 1986 (the "**English Insolvency Act**"), but there are some differences in relation to unfair preferences and undervalue transactions, as discussed below.  It is also necessary to consider provisions of Australian and New Zealand insolvency law, which have or had features in common with Section 245, the BVI unfair preference provision.

139.    Sections 245 (unfair preferences) and 246 (undervalue transactions) are in Part VIII of the BVI Insolvency Act (Sections 244 to 252), headed "*Voidable Transactions*", which, pursuant to Section 244(4)(b), applies when a company is in liquidation.  Part VIII applies to the Funds, since the BVI Court appointed the Liquidators of Lambda under the BVI Insolvency Act on 23 April 2009, pursuant to an application made on 27 February 2009,

and the Liquidators of Sentry and Sigma under the BVI Insolvency Act on 21 July 2009,

pursuant to applications made in respect of Sentry on 21 April 2009 and in respect of Sigma

on 23 April 2009.[129]

140.    The relevant provisions of Sections 245, 246, and related Sections are set out

in the following paragraphs.

141.    Section 245 provides (omitting Subsection (3), which is not relevant here):

> *"(1)    Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company[130] to a creditor if the transaction*
> *(a)    is an insolvency transaction;*
> *(b)    is entered into within the vulnerability period; and*
> *(c)    has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.*
>
> *(2)    A transaction is not an unfair preference if the transaction took place in the ordinary course of business.*
>
> *(4)    Where a transaction entered into by a company within the vulnerability period has the effect specified in subsection (1)(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business."*

142.    Section 246 provides (omitting Subsection (3) which is not relevant here):

> *"(1)    Subject to subsection (2), a company enters into an undervalue transaction with a person if*
> *(a)    the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or*
> *(b)    the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and*
> *(c)    in either case, the transaction concerned*

---

[129] CA Amended Complaint ¶¶ 25-27, 86-88.

[130] By section 3(c), inserted by Section 250 BCA 2004 and Schedule 3, paragraph 2, *"company"* includes a company incorporated or re-registered under the BCA 2004.

> *(i)      is an insolvency transaction; and*
> *(ii)     is entered into within the vulnerability period.*
>
> *(2)    A company does not enter into an undervalue transaction with a person if*
> *(a)     the company enters into the transaction in good faith and for the purposes of its business; and*
> *(b)     at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.*
>
> *(4)    Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that*
> *(a)     the transaction was an insolvency transaction; and*
> *(b)     subsection (2) did not apply to the transaction."*[131]

143.    Sections 244(2) and (3) explain the meaning of "*insolvency transaction*",

which is used in Subsection 245(1)(a) and also in Subsection 246(1)(c)(i):

> *"(2)    A transaction is an insolvency transaction if*
> *(a)     it is entered into at a time when the company is insolvent; or*
> *(b)     it causes the company to become insolvent;*
>
> *(3)    For the purposes of subsection (2), 'insolvent' has the meaning specified in section 8(1) with the deletion of paragraph (c)(i)."*

144.    Subsection 8(1)(c) provides that a company is insolvent if:[132]

> *"(ii)    the company is unable to pay its debts as they fall due."*

145.    Sections 245 and 246 have common features:

(a)     They apply to a transaction entered into by a company, which has three

features:  (i) it has the effect of giving a preference to a creditor, or it is

at an undervalue, (ii) it is an insolvency transaction, in that the

company is unable to pay its debts as they fall due at the time of or in

---

[131] The provisions of Subsections 246(1)(a) and (b) and (2) are substantially the same as subsections 238(4) and (5) of the English Insolvency Act.

[132] The other grounds on which a company may be insolvent, specified in Subsections 8(1)(a) and (b) are not relevant to this opinion.

consequence of entering into the transaction, and (iii) it is entered into during the vulnerability period;

(b)    The transaction is protected if (i) in the case of preference, it took place in the ordinary course of business, and (ii) in the case of undervalue, the company entered into it in good faith and for the purpose of its business and there were at the time reasonable grounds for believing it would benefit the company;

(c)    If the transaction was entered into during the vulnerability period and has the effect of giving a preference or was at an undervalue, the creditor or other party, if connected to the company, has the burden of displacing the presumptions that the transaction (i) was an insolvency transaction, and (ii) is not protected under paragraph (b) above.

**(b)    Consequences of a transaction falling within Sections 245 or 246**

146.    Sections 245 and 246 are among a group of sections with the heading "*Voidable Transactions*." This is somewhat misleading in that the fact that a company enters into a transaction covered by these Sections has no substantive effect with regard to the transaction or any property subject to the transaction. The only consequence is that the liquidator may apply to the BVI Court for an order under Section 249. Under Subsection 249(1), if satisfied that the transaction entered into by the company is a voidable transaction (i.e. an unfair preference within Section 245 or an undervalue transaction within Section 246) the BVI Court:

> "*(a)    may make an order setting aside the transaction in whole or in part;*
>
> *(b)    in respect of an unfair preference or an undervalue transaction, may make such order as it considers fit for restoring the position to what it would have been if the company had not entered into that transaction;*"…

Subsections 249(2) and (3) and Section 250 apply to the orders the BVI Court may make. The BVI Court is therefore given power to adjust the rights of the parties in relation to a transaction to which Sections 245 or 246 applies. The comparable Sections in the English Insolvency Act are grouped under the heading "*Adjustment of prior transactions*", which may be considered a more appropriate heading.

147.    Preference provisions in previous English legislation about the winding-up of companies had substantive effect over the property transferred. If the requirements of the provision about preferences were satisfied, the disposition of property "*shall in the event of the company being wound up be deemed a fraudulent preference and be invalid accordingly.*"[133] Similarly, Section 81 of the BVI Conveyancing and Law of Property Act 1967 (Cap 220), which is in substantially the same terms as Section 172 of the former English Law of Property Act 1925, provides for conveyances of property made with intent to defraud creditors to be "*voidable at the instance of any person prejudiced.*"[134]

148.    There are two important points to note about Sections 245, 246 and 249. The first is that a claim under those Sections does not vindicate property rights which the company had before it went into liquidation.[135] The right to make such a claim and the fruits of the claim are not property of the company; the claim cannot be assigned and is among "*the statutory privileges and liberties conferred on liquidators.*"[136] It is therefore necessary for Section 251 to provide that assets and benefits recovered under an order made under Section

---

[133] Section 320 of the English Companies Act 1948; Section 615 of the English Companies Act 1985.

[134] Section 172 of the English Law of Property Act has been replaced by Sections 423-425 of the English Insolvency Act, which deal with transactions defrauding creditors and remedies in respect of those transactions. I note that no claim under Section 81 of the BVI Conveyancing and Law of Property Act has been made by the Liquidators on behalf of creditors in the Amended Complaints.

[135] *Re New Cap Reinsurance Corporation* [2011] EWHC 677 (Ch), English High Court, at § 26; *Rubin v Eurofinance SA* [2013] 1 AC 236, UK Supreme Court, at § 98. See the quotations from these cases at paragraphs 197, 198 below.

[136] *Re Oasis Merchandising Services Ltd* [1998] Ch 170, English Court of Appeal. See in particular page 183, quoting with approval from the judgment of Knox J in *Re Ayala Holdings Ltd (No 2)* [1996] 1 BCLC 467, 480. The English Insolvency Act has been amended by the Small Business, Enterprise and Employment Act 2015 to give liquidators and other officeholders power to dispose of preference and undervalue claims and the fruits of such claims.

249 "*are deemed to be assets of the company available to pay unsecured creditors of the company.*"

149.    The second point is that Sections 245 and 246, read with Sections 249 and 250, give the BVI Court a wider power to adjust prior transactions and greater flexibility as to the exercise of the power than was the case under previous insolvency legislation in the BVI and England.  The greater width stems from the fact that the Sections apply to the whole of the transaction entered into and not just to the disposition of property.  The BVI Court is also given wide discretion as to the appropriate order to make, as is clear from use of the word "*may*" throughout Section 249.

150.    It is well established that this is a real discretion and that the BVI Court may decide to make no order, even though the provisions of Sections 245 or 246 are satisfied.[137] The BVI Court, as the court before which the liquidation is being conducted, may take into account the financial position of the estate and the identity of the creditors; in an appropriate case it could, for example, limit the order to the amount required to pay creditors.[138]  On the other hand, the BVI Court will not necessarily be deterred from making an order under Section 249 by the fact that the other party to the transaction cannot be restored to his original position.[139]

---

[137] *Re Paramount Airways Ltd* [1993] Ch 223, 239, 240, English Court of Appeal; *Singla v Brown* [2008] Ch 357, English High Court, at §§ 52-59 (a bankruptcy case under Section 339 of the English Insolvency Act, holding that the discretion to make no order applied generally and not just in the cross-border context).

[138] *West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250, English Court of Appeal (a preference and misfeasance case under Section 212 of the English Insolvency Act, which is similar to Section 254 of the BVI Insolvency Act).  Also see *Revenue and Customs Commissioners v Holland, Re Paycheck Services Ltd* [2010] 1 WLR 2793, UK Supreme Court, at § 49, 51, 53, 124, 146 (another misfeasance case under Section 212 of the English Insolvency Act).

[139] *Lord v Sinai Securities* [2005] 1 BCLC 295, English High Court, at §§ 12-15.

**(c)      No overlap between Sections 245 and 246**

151.      The Liquidators contend that the Redemptions and the Redemption Payments, which are Vulnerability Period Payments, are both preferences and undervalue transactions.[140]

152.      There is, however, a fundamental distinction between Sections 245 and 246, which means that, contrary to the way the Liquidators state their claims, there is no overlap between their respective provisions and a transaction cannot be both an unfair preference and an undervalue transaction.  The distinction is that Section 245, which addresses unfair preferences, is concerned with transactions which give a preference to a creditor and is linked to the common law *pari passu* principle, whereas Section 246, dealing with undervalue transactions, is concerned with transactions with a person, which improperly reduce the company's assets, and is linked to the common law anti-deprivation rule.[141]  The position is clearly stated in the following passage from Professor Goode's *Principles of Corporate Insolvency Law*:

> *"A key distinction is that the provisions relating to transactions at an undervalue are aimed at payments, transfers or other acts which diminish the company's assets, whereas the provisions relating to preferences are concerned with transactions that unfairly favour one creditor at the expense of the others, whether or not they diminish the company's assets.  For example, payment of a debt which does not exceed the amount due is not a transaction at an undervalue, as the net asset position is unchanged, whilst to the extent that the payment exceeds what is due to the creditor, he does not receive it qua creditor and his liability, if any, arises under s. 238 [of the English Insolvency Act (transactions at an undervalue)], not s. 239 [(preferences)]."*[142]

---

[140] CA Amended Complaint at ¶¶ 159, 172 and paragraphs D and E of the prayer for relief.

[141] See the authoritative statement of the principles under English law, in relation to sections 238 and 239 of the English Insolvency Act, made by Professor Roy Goode in *Principles of Corporate Insolvency Law* (4th ed, 2011) at §§ 13-03, 13-12 and 13-107.

[142] § 13-107.

62

153.    *Re MC Bacon Ltd*[143] illustrates this.  In that case, the impugned transaction

was the grant of a charge to the company's bank to secure its overdraft from time to time.

This could have been a preference within Section 239 of the English Insolvency Act, had the

requisite desire been present (which it was not), but it was conceptually impossible for the

charge to be a transaction at undervalue within Section 238 of the English Insolvency Act,

since the charge did not deplete the company's assets.  The grant of the charge was neutral as

regards the company's balance sheet; it simply appropriated property subject to the charge to

payment of the secured debt.

154.    It follows from this that, contrary to the claims stated by the Liquidators, the

Redemptions and/or the Vulnerability Period Payments cannot be both unfair preferences and

undervalue transactions.

**(d)    The transaction entered into**

155.    Subsection 245(1) identifies the entry by the company into a transaction as the

event which may constitute an unfair preference.  The Subsection applies to "*a transaction

entered into by a company*."  The same phrase is repeated in Subsection 245(4) and

Subsections 245(1)(b), (1)(c) and (3) use the phrase "*entered into*."

156.    Subsections 246(1), (1)(b), (2), (2)(a), (2)(b) and (4) use the phrases "*enters

into*" or "*enter into*" in relation to an undervalue transaction, while Subsection 246(3) uses

the phrase "*entered into*."

157.    Accordingly, both Sections 245 and 246 raise two connected issues of

statutory interpretation: (i) what is meant by "*transaction*", and (ii) what is meant by entry

into a transaction?  The same issues arise in relation to undervalue transactions under Section

238 of the English Insolvency Act, which is in substantially the same terms as Section 246 of

the BVI Insolvency Act.  The issues do not arise in relation to preferences under Section 239

---

[143] [1990] BCLC 324, 334-335, 340, English High Court.

of the English Insolvency Act, which does not use the word "*transaction*" or the concept of entering into a transaction.  Instead the English Section applies where "*the company has at a relevant time … given a preference to any person*", being "*one of the company's creditors or a surety or guarantor for any of the company's debts or other liabilities.*"[144]

158.    The phrase "*a transaction entered into by a company*" in Subsection 245(1) and the comparable phrases used in Sections 244(2) and 246 must be given their normal meaning in the context of the sections in which they appear. The phrases must have the same meaning in all three Sections.

*The transaction*

159.    The BVI Insolvency Act does not define "*transaction*", but it is a word that is often used in English legislation.  *Jowitt's Dictionary of English Law* (4th ed, 2015) says that "*transaction*" is "*a very broad term which as used in legislation is capable of including all kinds of legal, commercial and other agreements and other arrangements.*" The English Insolvency Act 1986 states that:

> "'*transaction' includes a gift, agreement or arrangement and references to entering into a transaction shall be construed accordingly.*"[145]

160.    The BVI Court might be expected to give a similar meaning to the word "transaction" when used in Sections 244 to 246.  Therefore, as used in Sections 245 and 246, "*transaction*" connotes some form of dealing, whether it is an agreement or an arrangement.[146]  That there must be some form of dealing is reinforced by Subsection 246(1),

---

[144] Subsections 239(2) and (4) of the English Insolvency Act.

[145] Section 436 of the English Insolvency Act.

[146] *Re Taylor Sinclair (Capital) Ltd* [2001] 2 BCLC 176, English High Court, at § 20, a case on Section 238 of the English Insolvency Act. In *Feakins v DEFRA*  [2007] BCC 54, English Court of Appeal, a case on Section 423 of the English Insolvency Act (transactions defrauding creditors), Jonathan Parker LJ said at § 78:  "*In some cases it may be appropriate … to treat a single step in a series of linked dealings as the relevant "transaction"; in others it may not*" (emphasis added).  In *Clements v Henry Hadaway Organisation Ltd* [2008] 1 BCLC 223, English High Court, the deputy judge, Peter Leaver QC said at § 31:  "*I have no doubt that the use of the word "transaction" in section 238 was intended to cover as wide a range of mutual dealings as possible*" (emphasis added).

since it uses the phrases "*with a person*" and "*on terms which provide.*"[147]  A person may be said to enter into a transaction when he binds himself to it or engages in it.

161.    A transaction may, and often does, include a payment.  In fact a transaction could be entered into simply for a payment to be made.  In *Re Ovenden Colbert Printers Ltd*,[148] Kitchin LJ was of the view that a payment could be a transaction for the purposes of Section 238 of the English Insolvency Act concerning transactions at undervalue.  On the other hand in *Re Hampton Capital Ltd*,[149] it was held that mere transmission of money, without a dealing between the parties, could not constitute entering into a transaction with a person for the purposes of Subsection 238(4) of the English Insolvency Act.

*Entry into the transaction*

162.    By referring to entry into a transaction, Sections 245 and 246 require the BVI Court to focus on the inception of the transaction.  The time to determine whether the requirements of Sections 245 and 246 are satisfied is when the transaction is entered into, not when it is performed.  This is illustrated by *Re MC Bacon Ltd*, where the alleged preference or transaction at undervalue was the grant of security for a bank overdraft.  Millett J said that the relevant time was the time when the decision to grant the charge was taken, not when it was created.[150]

163.    Where there is an interval between entry into a transaction and performance of obligations under it, it is necessary to consider whether the performance is simply implementation of the existing transaction or whether it is a distinct, albeit linked transaction.  In *Re MC Bacon Ltd* Millett J clearly regarded the creation of the charge as mere implementation of the transaction under which the company had agreed to give it.  Similarly,

---

[147] Goode, *Principles of Corporate Insolvency Law* (4th ed) at § 13-19.

[148] [2014] 1 BCLC 291, English Court of Appeal, at § 32 (but the court did not have to consider whether a company would enter into a transaction if it merely paid a debt in accordance with the contract).

[149] [2016] 1 BCLC 374, 384-85, English High Court.

[150] *Re MC Bacon Ltd* [1990] BCLC 324, 336d-e and *Re Fairway Magazines Ltd* [1993] BCLC 643, 649h.

where a company enters into a transaction to buy goods on 30 days' credit, it performs its obligation under that transaction when it makes the payment, but it does not enter into a separate transaction when it makes the payment.[151]

164.    On the other hand, where a debt under an existing transaction has become overdue, a fresh undertaking to pay it could be regarded as a distinct transaction entered into by the company, albeit linked to the original transaction.  Similarly, a company may also be regarded as entering into a distinct transaction to pay a debt where it is necessary for its board to consider whether the payment should properly be made, having regard to lapse of time since the original obligation was entered into or concerns about insolvency.[152]

165.    It is not necessary or justifiable to give Subsection 245(1)'s reference to "*a transaction entered into*" a strained construction so as to bring within its grasp all payments by a company to a person who is at the time a creditor, even if the payment is made in accordance with agreed terms and the credit period is measured in days rather than months. Of course such payments may well be made in the ordinary course of business, so that they are prevented from being unfair preferences by Subsection 245(2).  But the same protection may not be so effective in the case of an individual against whom a bankruptcy order is made. Section 401 deals with unfair preferences given by an individual in substantially the same terms as Section 245.  The individual bankrupt may not have carried on business or may have incurred credit in relation to personal expenditure.  If all payments in discharge of credit made by an individual during what later turns out to have been the vulnerability period could

---

[151] In *BTI 2014 LLC v Sequana SA* [2016] EWHC 1686 (Ch), English High Court, at § 500 Rose J made this very point, when she said: "*Provided that the initial contract was not entered into with the s 423 purpose [to defraud creditors], that delayed payment is not a transaction with the s 423 purpose because the purpose is to fulfil the contractual obligation to make the payment.*"

[152] *See Wills v Corfe Joinery Ltd* [1998] 2 BCLC 75, 77h-78b, English High Court, and *Re Stealth Construction Ltd* [2011] EWHC 1305 (Ch), English High Court at § 61, both cases on section 239 of the English Insolvency Act, which require the court to determine whether, and if so when, the company was influenced by a desire to prefer. These cases follow the reasoning of *Re MC Bacon Ltd* [1990] BCLC 324, 336d-e and *Re Fairway Magazines Ltd* [1993] BCLC 643, 649h.  Similarly in the *Weavering Case* the directors chose to pay SEB in preference of other redeeming shareholders.

be impugned by the bankruptcy trustee under Section 401, an individual who was in financial difficulties would find it impossible to obtain professional advice or to obtain the necessities of life unless he paid in advance for all goods or services.  That is not a consequence that the BVI legislature could have intended when enacting Sections 245 and 401.

166.    For these reasons it is my opinion that, on the true construction of Sections 245 and 246, the requirements of those Sections must be satisfied at the time when the company enters into the transaction and that a company does not enter into a transaction if it merely pays a debt in accordance with the terms of a transaction already entered into.  The company would only enter into a transaction within these Sections when it makes a payment if the payment may be regarded as a transaction distinct from the transaction under which the debt obligation was incurred.

*Relevance of the time of entry into the transaction*

167.    The time when the transaction is entered into is relevant for several statutory purposes, as it is the time for determining whether:

(a)      the transaction gives a preference to a creditor within Section 245(1), which is relevant to the discussion in Section 8(a) below as to whether a redeeming member is a creditor at the time when the redemption request is received, so as to be capable of being given a preference;

(b)      the transaction is at an undervalue within Section 246(1), which is relevant to the discussion in Section 9(a) and (b) below as to whether the Redemptions (or Vulnerability Period Payments) were transactions at undervalue;

(c)      the transaction is an insolvency transaction within Sections 244(2), 245(1)(a) and 246(1)(c)(i), which is relevant to the discussion in

Sections 8(b) and 9(c) below as to whether the Funds were unable to

pay their debts on a cash-flow basis at the time of the Redemptions;

(d)    the transaction was entered into during the vulnerability period within

Sections 244(1), 245(1)(b) and 246(1)(c)(ii);[153]

(e)     the transaction took place in the ordinary course of business so as not

to be an unfair preference (Section 245(2)), which is relevant to the

discussion in Section 8(c) below as to whether the Redemptions (or

Vulnerability Period Payments) were entered into in the ordinary

course of business; and

(f)    the transaction is a business transaction so as not to be a transaction at

undervalue (Section 246(2)), which is relevant to the discussion in

Section 9(d) below as to whether the Redemptions (or Vulnerability

Period Payments) were good faith business transactions.

**(e)    The Redemptions, not the Redemption Payments, were the transactions entered
into by the Funds**

168.    A Fund would enter into a transaction with a subscriber for shares in the Fund

when it or its agent received a subscription application under Article 9.  Under that

transaction the subscriber would be obliged to pay the subscription price and the Fund would

issue shares to the subscriber, whereupon the subscriber would become a member of the

Fund.  From the moment the subscriber became a member, the Articles of the Fund, including

Article 10 dealing with redemption of shares, would be binding as a contract between the

Fund and the member.[154]

---

[153] On the assumption that the Defendant Institutions are members of the Funds within Section 5(1)(b), by
Subsection 244(1) the vulnerability period for each Fund is two years prior to the date on which the application
for the appointment of the liquidators was filed.

[154] Section 11(1) BCA 2004.

169.    It is my opinion that a further distinct transaction was entered into when the Fund received the redemption request and set in train the Redemption under which the shares would be redeemed on the applicable dealing day (the "**Dealing Day**") and the Fund was obliged to redeem or purchase and pay for the shares in accordance with the scheme set out in Article 10, which has been described by Lord Sumption.[155]  This Redemption is not a fresh contract, since the Fund and the redeeming member were already bound by the contract constituted by the Articles, but it is sufficiently distinct from the original subscription to be capable of being a transaction for the purposes of Sections 245 and 246.[156]

170.    On the other hand, when the Funds then made the Redemption Payment this was not a distinct transaction; rather it was part and parcel of the Redemption transaction that was entered into between the Fund and its member when the Fund received a redemption request in accordance with the Fund's Articles.  Further, each Redemption Payment was paid in the normal, unremarkable performance of the Fund's obligations under the Redemption which had been entered into when the Fund received a written redemption request and which had taken effect on the Dealing Day.[157]  As discussed further below, the Amended Complaints do not allege that, at any time when a Fund was due to make a Redemption Payment to the Defendant Institutions, it had any unpaid debts which it was unable to pay. Thus the Fund never had to make a choice as to which debt to pay from insufficient resources.

171.    The Amended Complaints allege that both the Redemptions, entered into when a written redemption request was received, and the Redemption Payments, made some time later, were distinct insolvency transactions and so within Sections 245 and 246.[158]  As I

---

[155] The Privy Council Judgment at §§ 12, 13 and 21.

[156] In the *Weavering Case* at § 29 Mr Martin QC, JA described redemption as an incident of the existing contract, embodied in the Company's articles.

[157] CA Amended Complaint ¶¶ 4, 5.

[158] CA Amended Complaint ¶¶ 159, 162, 172, 175.

have indicated, in my opinion the Funds entered into a single transaction when they or their

agent received a redemption request, but, under BVI law, did not enter into distinct

transactions when they then made the required Redemption Payments.  The Funds simply

completed a transaction that began when they received the redemption requests, which took

effect on the Dealing Days.  The CA Amended Complaint admits as much because it

pleads:[159]

> "*Each of the Vulnerability Period Payments was made following receipt by Sentry and Sigma of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles.*"

**(f)**    **Liquidators' reliance on hindsight**

172.    The Liquidators appear to allege that the Redemptions and/or Vulnerability

Period Payments were unfair preferences or undervalue transactions, because, when viewed

with the benefit of hindsight, the Ponzi scheme perpetrated by Bernard Madoff in relation to

BLMIS, even though unknown to the Funds at the time of the Redemptions or when the

Vulnerability Period Payments were made, effectively rendered the Funds insolvent and

transformed the routine Redemption Payments that make up the Vulnerability Period

Payments into payments made outside the ordinary course of business, without any legitimate

business purpose, for no or no sufficient consideration and, moreover, at a time when the

Funds were unable to pay their debts.[160]

173.    In my opinion (as explained below), under the applicable provisions of the

BVI Insolvency Act, it is not permissible to have regard to those matters with the benefit of

hindsight.  In particular, what the Liquidators allege was the discovery of the BLMIS fraud

after the payments were made; but the BVI Court consistently directs its inquiry to the

information that was reasonably available to an objective observer at the time each

transaction was entered into, without intrusion of hindsight.

---

[159] CA Amended Complaint at ¶ 164.

[160] CA Complaint at §§ 7, 8, 11, 12, 43, 47, 162, 173, 175.

174.    This test of the information reasonably available to an objective observer enables an appropriate balance to be struck between achieving commercial certainty for a person dealing with someone who subsequently enters insolvency proceedings on the one hand and enabling the recovery of property that should be available for distribution to creditors in the insolvency proceedings on the other hand.

## 8.    THE UNFAIR PREFERENCE CLAIMS

175.    In this section, I shall explain why, assuming the factual allegations set forth in the Amended Complaint are true, the Liquidators have failed to state a claim that the Redemptions, pursuant to which the Vulnerability Period Payments were paid, constitute unfair preferences under Section 245 and why I respectfully disagree with Mr Moss's opinion, stated in paragraph 55 of his Declaration, that the Liquidators' unfair preference claims as pleaded in the Amended Complaints are viable. My reasons for this (each of which on its own is sufficient to find the Liquidators have failed to state a claim) are:

(a)    at the time each Redemption was entered into, each Defendant Institution was a member of the Fund in relation to the shares being redeemed so that no preference could be given to it as a creditor within Subsections 245(1) and 245(1)(c);

(b)    the Redemptions (and the Vulnerability Period Payments) were not insolvency transactions within Subsections 244(2) and 245(1)(a) since, at the time each Redemption was entered into (and each Vulnerability Period Payment made), the Fund was not unable to pay its debts as they fell due and the Vulnerability Period Payments did not cause it to become unable to pay its debts as they fell due; and

(c)      the Redemptions (and the Vulnerability Period Payments) were not

unfair preferences since they took place in the ordinary course of the

Funds' businesses within Section 245(2).

176.    In respect of my reasons in subparagraphs 175(b) and (c), it is correct, as Mr

Moss points out in paragraphs 55(a) and 56 of his Declaration, that, since the Defendant

Institutions were members, there are presumptions that the Funds were unable to pay their

debts as they fell due and that the Redemptions (or Vulnerability Period Payments) were not

made in the ordinary course of business.  Under BVI law, those presumptions are rebutted by

the facts pleaded in the Amended Complaints when the illegitimate resort to hindsight is

disregarded as irrelevant.

177.    At paragraph 53 of his Declaration, Mr Moss expresses the opinion that the

fact that the parties have agreed to a price (e.g., under a binding certificate) does not prevent

the court from finding that the transaction gives a preference.  That is correct, but is not

relevant to the three reasons stated above as to why the Amended Complaints fail to state a

preference claim, except to the extent that the fixing of the Redemption Price by reference to

NAV was part of the ordinary course of the Funds' businesses at the material time.

178.    In this Section I shall assume that at all relevant times the Funds carried on

their business in good faith and without knowledge of the fraud within BLMIS, since that

appears to me to be the case stated in the Amended Complaints.[161]

179.    Finally, it is worth noting that whether or not the recipient of a Redemption

Payment acted in good faith is not an issue in an unfair preference claim under Section 245.

---

[161] CA Amended Complaint at ¶¶ 5, 40, 43, 82.  Also the Amended Complaints allege that the Funds were
victim of Citco's alleged bad faith.  CA Amended Complaint at ¶ 78.

**(a)     The Defendant Institutions were members at the time the Redemptions were entered into so no preference could be given to them as creditors**

180.    A person cannot be preferred within Section 245 unless he is a creditor.  That is clear from the use of the word "*creditor*" twice in Subsection 245(1) and again in Subsection 250(2)(b), concerning the orders a BVI court may make in a case of preference.

181.    The Amended Complaints plead that each Defendant Institution was a member during the Funds' vulnerability periods.[162]  In fact it is plain that the Defendant Institution was a member of the Fund in respect of the shares to be redeemed at the time the Fund received the redemption request.  As I have explained in Section 7(d) above, that was the time when the Fund entered into the Redemption transaction.  Under Article 10(1)(a), the Defendant Institution remained a member until the applicable Dealing Day, at which time the Fund redeemed the shares in the redemption request.

182.    It is the time when the transaction is entered into that determines whether a person is a creditor, capable of being given a preference under Subsection 245(1).  The position can be tested by considering a company in financial difficulties which enters into a transaction with a new supplier (to whom it owes no debt) for the supply of goods on 7 days credit.  Immediately after the transaction is entered into, it could be said that the supplier had become a contingent creditor; the contingency being performance by him of his contractual obligations, including supply of the goods.  Between performance and receipt of payment, the supplier would be a creditor, but it would be absurd to suggest that the transaction entered into gave, or could be capable of giving, the supplier a preference.  At the time the transaction was entered into he was not a creditor at all.  The position is the same when the position of an individual debtor is considered (paragraph 165 above).

---

[162] CA Amended Complaint at ¶¶ 160, 162.

183.    The Amended Complaints distinguish between (i) the period between receipt of the redemption request and the Dealing Day, when the Redemption took effect, and (ii) the period between the Dealing Day and receipt of the Vulnerability Period Payment.  Paragraph 164 of the CA Amended Complaint alleges:

> "*Following the receipt by Sentry and Sigma of a notice of redemption by [the Defendant Institution], [the Defendant Institution] became a contingent creditor.  Upon the subsequent redemption of [the Defendant Institution]'s shares and until such time as [the Defendant Institution] received the Vulnerability Period Payment, [the Defendant Institution] was a "creditor" of Sentry and Sigma … .*"

This pleading appears to accept that at the point in time when the redemption request was received (when the transaction was entered into), the Defendant Institution was a member.  In order to try to bring the Defendant Institution within the reach of Section 245, the Liquidators allege that, under the transaction set in train by receipt of the redemption request, it subsequently became a contingent creditor and then a creditor.  As I have explained in paragraph 182 above, this purported change in the member's status after receipt by the Fund of the redemption notice is irrelevant.

184.    In fact it is not correct or meaningful to describe a redeeming member as a contingent creditor in the period starting with receipt of the redemption request and ending on the Dealing Day.  Article 11(4) makes it clear that until the Dealing Day when the shares are redeemed, the redeeming member remains a registered member and entitled to any rights (for example, to dividend or to vote) in respect of the shares being redeemed.  It is only after redemption on the Dealing Day that the member's name is removed from the register and the member ceases to be entitled to the rights in respect of the shares.  If, during this period, the Fund had gone into liquidation, the redeeming member would have ranked as a member, not a creditor, in respect of the shares subject to the redemption notice.[163]

---

[163] Section 197 of the BVI Insolvency Act.

185.   It is correct, however, that from the Dealing Day, under Section 62(1)(c) BCA 2004, the redeeming Defendant Institution became an unsecured creditor of the Fund for the Redemption Price and so remained for the short period, normally up to 30 days, until it was paid (Article 10(1)(c)).[164]  To that extent only, I agree with the final sentence of paragraph 164 of the CA Amended Complaint.  However, that sentence goes on to allege that if the Fund had gone into liquidation between the Dealing Day and payment of the Redemption Price, the Defendant Institution would have had an admissible claim in the liquidation, but deferred to outside creditors.  Under BVI law, the Liquidators' proposition is controversial and I would not agree to it.  Since at the relevant time, receipt of the redemption notice, the Defendant Institution was a member (and so remained until the Dealing Day), it is not necessary for me to explore this controversy.[165]

186.   Accordingly, it is my opinion that the Defendant Institutions were members when the Redemptions were entered into and that the Redemptions could not have given them a preference as creditors within Section 245(1).  The fact that they became creditors between the Dealing Day and payment of the Vulnerability Period Payment is irrelevant.

---

[164] In the *Weavering Case* SEB, the redeeming member, had become a creditor for the price of the redeemed shares when the preference was given to it.

[165] In *Westford Special Situations Fund Ltd v Barfield Nominees Ltd*, HCVAP 2010/014, 28 March 2011, the EC Court of Appeal held (§§ 21, 23) that, pursuant to Section 197 of the BVI Insolvency Act, an unpaid redeeming member did not have standing to apply for the appointment of liquidators or "*claim in its liquidation in the same way as an ordinary "third party" creditor*" and "*is not a creditor of the company for the purposes of winding up the company.*"  Later, in *Somers Dublin Ltd A/C KBCS v Monarch Pointe Fund Ltd* HCVAP 2011/040, 11 March 2013, the EC Court of Appeal held that under Section 197 a former member with a claim for unpaid redemption monies was entitled to participate in the surplus after ordinary creditors had been paid in full.  The EC Court of Appeal in *Somers Dublin* commented on the earlier *Westford* judgment in a way which leaves some uncertainty as to whether or not a former member with a claim for unpaid redemption monies may be a creditor in the liquidation of the company within Sections 2(1) and 9 with an admissible claim within Section 11.

**(b)      No insolvency transaction: the Funds were not at the time unable to pay their debts as they fell due**

187.    In the following paragraphs I shall address the question whether the Redemptions (or the Vulnerability Period Payments) could have been insolvency transactions within Subsection 245(1)(a).

188.    A transaction can only be an unfair preference within Section 245 (or an undervalue transaction within Section 246) if it was an insolvency transaction, in that at the time it was entered into, the Fund was unable to pay its debts as they fell due.  In this connection:

(a)      regard is had only to debts then due or which become due within a short period thereafter;

(b)      regard is had only to debts that were known of or ought to have been known of at the relevant time, without intrusion of hindsight; and

(c)      no account is taken of possible claw-back claims on behalf of a third party's estate which at the relevant time had not entered the insolvency proceedings under which the possible claw-back claims might be asserted.

*A cash-flow test*

189.    Subsection 244(2) defines "*insolvency transaction*" for the purposes of Sections 245 and 246:  a transaction is an insolvency transaction if it is entered into at a time when the company is insolvent or it causes the company to become insolvent.  By Subsection 244(3), read with Subsection 8(1)(c)(ii), a company is "*insolvent*" for the purposes of Sections 244-246 if it is "*unable to pay its debts as they fall due*."  This is commonly referred to as a cash-flow test.  Subsection 8(1)(c)(i), read with the definition of "*liabilities*" in Section 10, states a balance sheet test, which has no application to Sections 244-246.  These

76

provisions of the BVI Insolvency Act are narrower than the comparable provisions of the

English Insolvency Act, which includes both a cash-flow and a balance sheet test, and restrict

the circumstances in which there may be an insolvency transaction for the purposes of

Section 245 (or 246).

190.    When Subsection 8(1)(c)(ii) refers to the company being unable to pay its

debts as they fall due, it is referring to "debts" in the ordinary meaning of the word; i.e. a

liquidated monetary obligation.[166]  There are two reasons for this.  First, the test under

Subsection 244(2), read with Subsection 8(1)(c)(ii), is whether, at the relevant date, the

company is unable to pay a due debt.  It cannot be described as unable to pay an obligation

the amount of which is not ascertained (still less, a possible obligation of which it is wholly

unaware).  Second, the word "debts" in Subsection 8(1)(c)(ii) is to be contrasted with

"liabilities" in subsection (i).  "Liabilities" is given the extended meaning in Section 10 and

"*includes a debt.*"  Section 10 provides, so far as relevant:

> "*(1)    For the purposes of this Act, "liability" means a liability to pay
> money or money's worth including a liability under an enactment, a
> liability in contract, tort or bailment, a liability for a breach of trust
> and a liability arising out of an obligation to make restitution, and
> "liability" includes a debt.*
>
> *(2)    A liability may be present or future, certain or contingent, fixed
> or liquidated, sounding only in damages or capable of being
> ascertained by fixed rules or as a matter of opinion.*"[167]

191.    English authority on the cash-flow test in Subsection 123(1)(e) of the English

Insolvency Act, which corresponds to Subsection 8(1)(c)(ii), shows that a company will only

fail that cash-flow test, if (i) it fails, without good reason, to pay a debt that is due and

---

[166] *Re European Life Assurance Society* (1869) LR 9 Eq 122, 127, English High Court; *Ex p Kemp, re Fastnedge* (1874) LR 9 Ch App 383, 387, 388, 390, English High Court; *Box Valley Pty Ltd v Kidd* [2006] NSWCA 26, New South Wales Court of Appeal at §§ 14, 15.

[167] Emphasis added.  Subsections 10(1) and (2) are in substantially the same terms as Rule 13.12(3) and (4) of the English Insolvency Rules 1986, prior to Rule 13.12 being remodelled in 2006.

undisputed,[168] or (ii) as Briggs J put it in *Re Cheyne Finance plc*, at the time in question it

suffers from "*an endemic shortage of working capital*" which prevents it from being able to

pay debts then due or which it will be obliged to pay in the near future.[169]

192.    In *Re Casa Estates (UK) Ltd*, Lewison LJ summarised the second aspect of the

cash-flow test in these terms:

> "*The cash-flow test looks to the future as well as to the present …The future in question is the reasonably near future; and what is the reasonably near future will depend on all the circumstances, especially the nature of the company's business… The test is flexible and fact-sensitive.*
>
> *Cash-flow solvency or insolvency is not to be ascertained by a blinkered focus on debts due at the relevant date. Such an approach will in some cases fail to see that a momentary inability to pay is only the result of temporary illiquidity. In other cases it will fail to see that an endemic shortage of working capital means a company is on any commercial view insolvent, even though it may continue to pay its debts for the next few days, weeks, or even months.*"[170]

*No intrusion of hindsight*

193.    Under the cash-flow test, no account is taken of liabilities that the debtor did

not know of at the relevant time and ought not to have known of.  Thus the subsequent

discovery of unexpected liabilities is irrelevant to the application of the cash-flow test at the

time of the transaction.  This is confirmed by the Australian case *Lewis v Doran*,[171] which

concerned a preference claim under Section 95A of the Australian Corporations Act 2001,

which states:

---

[168] *Taylors Industrial Flooring Ltd v M&H Plant Hire (Manchester) Ltd* [1990] BCLC 216, English Court of Appeal.  The mere existence of presently owing debts which the company was not obliged to pay at the time would not be evidence of cash-flow insolvency; *Re Capital Annuities Ltd* [1979] 1 WLR 170, 187-188, English High Court.

[169] *Re Cheyne Finance plc* [2008] 2 All ER 987, English High Court, at § 51 (a case of a company in run-off and with known assets and liabilities, where the judge followed Australian authorities on the comparable provisions in Australian legislation), which was approved in *BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3BL plc* [2013] 1 WLR 1408, by Lord Walker (with whom the other Supreme Court Justices agreed).

[170] [2014] 2 BCLC 49, English Court of Appeal, at §§ 27, 28, citing Lord Walker's judgment in *Eurosail* at §§ 34, 37, 51.

[171] [2004] NSWSC 608, New South Wales Supreme Court; [2005] NSWCA 243, New South Wales Court of Appeal.

*"(1)    A person is solvent if, and only if, the person is able to pay all the person's debts, as and when they become due and payable.*

*(2)    A person who is not solvent is insolvent*."

At the trial, Palmer J said:

*"The Court will be able to see whether as at the alleged date of insolvency the company was, or was not, actually paying all of its debts as they fell due and whether it did, or did not, actually pay all those debts which, although not due as at the alleged date of insolvency, nevertheless became due at a time which, as a matter of commercial reality and common sense, had to be considered as at the date of insolvency.*"[172]

194.    The New South Wales Court of Appeal upheld Palmer J's decision and Giles

JA said this:

*"Section 95A speaks of objective ability to pay debts as and when they become due and payable, <u>but ability must be determined in the circumstances as they were known or ought to have been known at the relevant time, without intrusion of hindsight.</u>  There must of course be "consideration…given to the immediate future,"*[173] *and how far into the future will depend on the circumstances including the nature of the company's business and, if it is known, of the future liabilities. <u>Unexpected later discovery of a liability, or later quantification of a liability at a particular level, may be excluded from consideration if the liability was properly unknown or seen in lesser amount at the relevant time.</u>*"[174]

195.    In the course of his lengthy judgment in *The Bell Group Ltd v Westpac*

*Banking Corp*, Owen J considered the cash flow test in section 95A of the Australian

Corporations Act 2001 and discussed and followed the guidance of Giles JA in *Lewis v*

*Doran*.[175]  Owen J held that account could be taken of events occurring after the relevant date

"*that a reasonable observer at the relevant date, looking at all of the circumstances in which*

*the company found itself, would have considered likely to occur.*"[176]

---

[172] [2004] NSWSC 608 at § 108.

[173] *Bank of Australasia v Hall* (1907) 4 CLR 1514, 1528, High Court of Australia, per Griffith CJ.

[174] [2005] NSWCA 243 at § 103 (emphasis added).

[175] [2008] WASC 239, Western Australia Supreme Court, at §§ 1065-1122. The judgment extends to 9,762 paragraphs and 2,565 pages.

[176] At § 1119.

196.    The statement of Giles JA in *Lewis v Doran* is of particular relevance because it shows that (i) the test is objective, (ii) future debts may be taken into account if, but only if, they were known of or ought to have been known of at the time, and (iii) unexpected liabilities that later emerge or which are quantified at an unexpectedly large amount are not taken into account.  In *Re Cheyne Finance plc (No 2)*, Briggs J described that paragraph in Giles JA's judgment as "*a helpful explanation of the question how far into the future the inquiry as to present insolvency may go.*"[177]

*No account of subsequent statutory claw-back claims*

197.    It is plain that, when considering whether at a particular time a company is unable to pay its debts as they fall due, no account can be taken of a claim, such as a statutory claw-back claim, that arises out of insolvency proceedings in respect of a third party which have not commenced at the time the impugned transaction was entered into.  Until insolvency proceedings had been commenced in respect of the third party, the company could not be said to be under any legal obligation from which a contingent liability to the third party's estate might arise.  This is made clear by Lewison J in *Re New Cap Reinsurance Corporation*, who said:[178]

> "*A claim to set aside a transaction entered into before the onset of insolvency is a claim which arises only as a result of the insolvency legislation itself and can be brought only by the office holder.*"

198.    When the *New Cap* appeal reached the UK Supreme Court, along with *Rubin v Eurofinance SA*, Lord Collins said much the same thing when discussing the nature of avoidance proceedings:

> "*The order [in respect of unfair preference claim under Australian law] does not vindicate property rights which the company itself would have had prior to liquidation, but statutory rights which the liquidator has under the statutory scheme in consequence of winding up. The purpose of the order for the payment of money to a company in*

---

[177] [2008] 2 All ER at § 50.

[178] [2011] EWHC 677 (Ch), English High Court, at § 26.

*liquidation is not to compensate the company, but to adjust the rights of creditors among themselves in such a way as to eliminate the effects of favourable treatment afforded to one or more creditors, to the exclusion of others, in the period immediately before an insolvent administration commences.*"[179]

*The Funds were not unable to pay their debts as they fell due*

199.    The Liquidators allege that the Funds were insolvent at the time of each Vulnerability Period Payment or were rendered insolvent by the making of each Redemption Payment as a result of the later disclosed Madoff Ponzi scheme.[180]  There is no suggestion, however, in the Amended Complaints that there was a change in the financial position of the Funds between the date when a redemption request was received (which is the date when the Redemption transaction was entered into) and the date of making a Redemption Payment, or at any time during which Vulnerability Period Payments were made.

200.    Assuming, as the Liquidators allege, that the burden is on the Defendant Institutions to overturn the presumption that when each Redemption was entered into the Funds were unable to pay their debts as they fell due or became unable to do so in consequence of the Vulnerability Period Payment, the Defendant Institutions are clearly able to overturn that presumption relying solely on the facts alleged in the Amended Complaints and the absence of statements therein with regard to alleged unpaid debts (save as mentioned below).

201.    The facts set out in the Amended Complaints, as described in paragraphs 202-207 below, show, expressly or by inference, a straightforward position in relation to the Funds under which they carried on their businesses on a solvent basis until after the exposure of the Ponzi fraud.[181]

---

[179] [2013] 1 AC 236, UK Supreme Court at § 98.

[180] CA Amended Complaint at ¶ 162.

[181] CA Amended Complaint at ¶¶ 2, 4, 5, 15, 37-40, 42, 44, 82, 84.

202.    The Funds received funds from investors, such as the Defendant Institutions, as subscriptions for shares in the Funds, which they applied (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to investments in BLMIS. The Funds regularly redeemed shares of members, including the Defendant Institutions, pursuant to redemption requests made in accordance with the Articles.

203.    BLMIS provided Sentry with account statements showing the investments held for their account. The account statement for the end of October 2008 showed in excess of $6 billion of assets apparently held by BLMIS for Sentry. The Funds in good faith relied on the statements and trading confirmations produced by BLMIS and had no reason to doubt them, as the Liquidators state in the Amended Complaints:

> "*At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by BLMIS for Sentry,*"

> "*In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS ...;*"[182]

204.    Clients of BLMIS, such as Sentry, allegedly had no way of knowing that the account statements or trade confirmations were false. The Amended Complaints state that the misuse and misappropriation of funds invested in BLMIS were "*unknown to the Funds*"[183] and report Mr Madoff as confessing:

> "*The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.*"[184]

---

[182] CA Amended Complaint at ¶¶ 5, 40.

[183] CA Amended Complaint at ¶ 43.

[184] CA Amended Complaint at ¶ 82.

205.    Accordingly, the NAV of the Funds was always a positive figure, reflecting the value of Sentry's apparent investments in BLMIS and their ability to pay their debts as they fell due.

206.    When investors redeemed shares in the Funds, Sentry was able to make withdrawals from BLMIS and the Funds never had any difficulty in making Redemption Payments to investors such as the Defendant Institutions.

207.    The nature of the Funds' businesses was such that they had few creditors (e.g., for management expenses) and never had any difficulty in paying their debts. The Amended Complaints do not assert the existence of any claims of creditors, except those later made by BLMIS or the BLMIS Trustee, as mentioned below.

208.    The position changed dramatically and unexpectedly following Mr Madoff's arrest on 11 December 2008.[185] It emerged that the account statements and trade confirmations provided by BLMIS to Sentry were false, in that BLMIS never made the investments that it reported in its statements; instead BLMIS had retained the funds invested with it as cash in accounts at Chase Manhattan Bank.  On 15 December 2008, the BLMIS Trustee was appointed for the liquidation of BLMIS.  Subsequently, upon the applications to the BVI Court by shareholders, the Liquidators (or their predecessors) were appointed in the case of Lambda on 23 April 2009 and in the case of Sentry and Sigma on 21 July 2009.

209.    In order to try to address the issue of cash-flow insolvency, in the Amended Complaints the Liquidators rely, or may rely, on two matters.  First, they refer to claims made by the BLMIS Trustee and the settlement of that claim.[186]  On 18 May 2009, the BLMIS Trustee commenced proceedings against Sentry and others, seeking to recover from them about $3.2 billion, relying on causes of action under the Bankruptcy Code and applicable state law, described as being on "*preference and fraudulent transfer grounds*."  These claims

---

[185] CA Amended Complaint at ¶¶ 6, 11, 12, 27, 42, 79, 81, 84-88.

[186] CA Amended Complaint at ¶¶ 12, 13.

were settled after the commencement of the US Proceedings against the Defendant

Institutions.  Moreover, as explained in paragraphs 148, 197 and 198 above, these statutory

claw-back claims under US law did not vindicate rights of BLMIS, did not exist until after

the BLMIS Trustee was appointed and could not be relied upon to show that the Funds were

unable to pay their debts as they fell due at any time before his appointment.  I note that these

claw-back claims are not expressly relied on in the paragraphs in the Amended Complaints

that specifically deal with the insolvency transaction issue for the purposes of the preference

and undervalue claims.[187]

     210.    Secondly, the Liquidators rely on the allegation that "*each time the Funds*

*withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of*

*and investors in BLMIS*."[188]  It is far from clear to me how under BVI law or any common

law rule the Funds could have been under an immediate liability to repay monies withdrawn

from BLMIS, as alleged by the Liquidators.  BLMIS could not claim that the payments by

BLMIS to the Funds were paid by mistake, since they would have been made by or under the

direction of Mr Madoff who was responsible for the Ponzi fraud.  Further, even if BLMIS did

have a claim of the sort alleged in the Amended Complaints, BLMIS did not make it and

would not make it so long as Mr Madoff was in control of BLMIS, which was the position

until 11 December 2008.  A similar argument was made in *Madoff Securities International*

*Ltd v Raven* and was rejected by Popplewell J, who said that to any claim by BLMIS for the

return of monies paid to Madoff Securities International, that company would have had a

good defence of change of position since it did not know of the Ponzi fraud.[189]  A similar

defence would have been available to the Funds under BVI law had BLMIS, or anyone on its

---

[187] CA Amended Complaint at ¶¶ 162, 175

[188] CA Amended Complaint at ¶ 162.

[189] [2013] EWHC 3147 (Comm), English High Court, at § 283.

behalf, raised the claim, since the Funds did not know of the fraud[190] and had used monies

received from BLMIS to make Redemption Payments or, perhaps, to reinvest in BLMIS.

211.    In these circumstances the claims later made by the BLMIS Trustee would be

regarded under BVI law as being an "*unexpected later discovery of a liability*",[191] which an

objective observer would not take into account in determining whether, at any time before 11

December 2008, the Funds were unable to pay their debts as they fell due.  In fact, the CA

Amended Complaint states that:

> "*... the money paid by the Funds ... to BLMIS on account of Sentry was, at all relevant times and <u>unknown to the Funds</u>, misused and misappropriated by Madoff as part of his Ponzi scheme.*"[192]

212.    I therefore conclude that, assuming that the factual allegations set forth in the

Amended Complaints are true, at all times when the Funds entered into Redemption

transactions or made the Vulnerability Period Payments they were able to pay their debts as

they fell due under BVI law.

**(c)    The Vulnerability Period Payments Were Made in the Ordinary Course of Business**

213.    By Subsection 245(2) a transaction is not an unfair preference, even if the

conditions of Subsection 245(1) are satisfied, if the transaction took place in the ordinary

course of business.

214.    In the Amended Complaints the Liquidators allege that the Vulnerability

Period Payments were not made in the ordinary course of the Funds' businesses, or for any

legitimate business purpose, because:

> "*each Vulnerability Period Payment represented a distribution of monies (including fictitious profits) from Madoff's Ponzi scheme or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to*

---

[190] CA Amended Complaint at ¶¶ 5, 40, 43, 82.

[191] Per Giles JA in *Lewis v Doran* quoted in paragraph 194 above.

[192] CA Amended Complaint at ¶ 43 (emphasis added).

*pay redeemers) and it was no part of the ordinary course of business of*
*the Funds to invest in and distribute profits of a Ponzi scheme.*"[193]

215.    In my opinion this is incorrect, because, as a matter of BVI law, the ordinary

course of the Funds' businesses must be judged at the time of the transaction and in light of

what an objective observer would regard as the ordinary operations of the business at that

time, without the benefit of hindsight.  Applying that standard and looking at the factual

circumstances at the time each Redemption  transaction was entered into (or each

Vulnerability Period Payment was made), no account can be taken of the later discovery of

the BLMIS Ponzi scheme and its impact on the Funds' NAVs per share.

*The objective standard; no hindsight*

216.    My opinion is supported by the Australian authorities on "*inability to pay*

*debts as they fall due*" (paragraphs 193-195 above) and also by Australian and New Zealand

authority on "*ordinary course of business*" in the context of preference provisions and

English authority on the interpretation of that phrase when used in security documents.

217.    In providing an "ordinary course of business" exception for transactions that

would otherwise be unfair preferences, the BVI Insolvency Act departs from the model in the

English Insolvency Act.  Under English insolvency legislation, it has always been necessary

to show some mental element on the part of the debtor; i.e., under the pre-1986 law, that the

debtor intended to give a preference, and now, that he was influenced by a desire to prefer.[194]

In contrast, Australian insolvency legislation has favoured an objective approach, to which

"*ordinary course of business*" provided an exception until the reforms made by the Australian

Corporations Act 2001.[195]  In 1993, New Zealand adopted an "*ordinary course of business*"

exception, which applied until the reforms made in 2006.[196]

---

[193] CA Amended Complaint at ¶ 163.

[194] Section 239(5) of the English Insolvency Act.

[195] Sections 588FA, 588FC and 588FE of the Australian Corporations Act 2001.

[196] Section 27(2) of the New Zealand Companies Amendment Act 2006.

218.    The Australian and New Zealand authorities show that a transaction is protected as taking place in the ordinary course of business, if, viewed objectively at the time of the transaction, it takes place in a normal commercial context and is commercially unremarkable.

219.    In *Downs Distributing Co Pty Ltd v Associated Blue Star Stores Pty Ltd*, the High Court of Australia considered the meaning of the ordinary course of business exception in Section 95 of the Australian Bankruptcy Act 1924-1930.[197]  The judgments contain two well-known and frequently cited expositions of the phrase "*ordinary course of business*."[198] Rich J said:

> "*It means that the transaction must fall into place as part of the undistinguished common flow of business done, that it should form part of the ordinary course of business as carried on, calling for no remark and arising out of no special or particular situation.*"

Williams J said:

> "*It seems to me, therefore, that the expression refers to a transaction into which it would be usual for a creditor and debtor to enter as a matter of business in the circumstances of the particular case uninfluenced by any belief on the part of the creditor that the debtor might be insolvent.*"

220.    *Taylor v White*[199] is a further decision of the High Court of Australia, which explains the meaning of "*ordinary course of business*" in the context of the preference provision contained in Section 95 of the Australian Bankruptcy Act 1924-1960 in similar terms.  Dixon CJ said:

> "*The time-honoured phrase 'in the ordinary course of business' is meant to refer to transactions regularly taking place in a sustained course of activity or some usual process naturally passing without examination.  It must be remembered that the provisions relating to preference have a course of history which substantially begins with an attempt to invalidate transactions made in contemplation of*

---

[197] (1948) 76 CLR 463, High Court of Australia.

[198] At pages 477, 480.

[199] (1964) 110 CLR 129, High Court of Australia.

> *bankruptcy or insolvency and calculated to disturb the ratable distribution of the debtor's assets or their proceeds which the law designed.*"[200]

Kitto J said:

> "*...if the payee is to be protected by s 95(2), the payment must have presented itself to him as a fair payment to accept, and what a debtor might offer who was uninfluenced by any prospect of bankruptcy. What is required, in my opinion, is the quality of ordinariness from a business point of view in the acceptance of the payment.*"[201]

221.    *Countrywide Banking Corporation Ltd v Dean* is a decision of the Privy Council in England, on appeal from the Court of Appeal of New Zealand, concerning a claim by the liquidator of a company to recover a preference under Section 266 of the New Zealand Companies Act 1955.[202]  In giving the opinion of the Privy Council, Gault J said:

> "*Plainly the transaction must be examined <u>in the actual setting in which it took place</u>. That defines the circumstances in which it is to be determined whether it was in the ordinary course of business.  The determination then is to be made objectively by reference to the standard of what amounts to the ordinary course of business.  As was said by Fisher J in the Modern Terrazzo Ltd case, 10 October 1997, the transaction must be such that it would be viewed by an objective observer as having taken place in the ordinary course of business. While there is to be reference to business practices in the commercial world in general, the focus must still be the ordinary operational activities of businesses as going concerns, not responses to abnormal financial difficulties.*
> *...*
> <u>*The section therefore requires examination of the actual transaction in its factual setting*</u> *(excluding the intent or purpose of the company save as required by subsection (4)).  Because the examination is undertaken objectively by reference to the standard of the ordinary course of business, there may be circumstances where a transaction, exceptional to a particular trader, will nonetheless be in the ordinary course of business as for example the first transaction of a particular type.  It may be that transactions undertaken in the past will, because of changed circumstances, no longer be considered as in the ordinary course of business.  The payment of some accrued indebtedness may be within the ordinary course of business as may the payment of moneys owing under a lease to secure a lessor's consent to an assignment of*

---

[200] At page 137.

[201] At page 142.

[202] [1998] AC 338, Privy Council on appeal from the Court of Appeal of New Zealand.

*the lessee's interest. The particular circumstances will require assessment in each case."*[203]

222.    In *Waikato Freight and Storage v Meltzer*, Tipping J gave the judgment of the New Zealand Court of Appeal in a preference case under Section 292 of the New Zealand Companies Act 1993.[204]  With reference to the ordinary course of business protection, Tipping J said:

> *"The creditor can keep the payment if able to show, the onus being on it, that the payment was made by the debtor company in the ordinary course of business.  Parliament thereby intended a commercially unremarkable payment to stand, even if having preferential effect.  It must have been Parliament's view that otherwise the ordinary processes of commerce would be unduly undermined."*

> *The question is whether, <u>at the time it was made</u>, the relevant transaction was made in the ordinary course of business.  That is a question of objective fact.  General business practices are relevant to that question, as are any particular customs or practices within the field of commerce concerned.  So too is the previous commercial relationship between the parties.  The observer spoken of in the Privy Council is in reality the Court which must look at the circumstances, <u>as objectively apparent at the time of the transaction</u>.  The ultimate question is whether on the evidence before the Court the transaction or payment can be said to have been made in the ordinary course of business.  Was it in its objective commercial setting an ordinary or an out of the ordinary transaction for the parties to have entered into?"*[205]

223.    In the English case, *Ashborder BV v Green Gas Power Ltd*, Etherton J had to decide whether the disposal of certain property by a company was permitted by a debenture, containing a floating charge over all the company's property and undertaking, the terms of which restricted disposals without prior consent to those in the ordinary course of business.[206]  After reviewing the authorities, Etherton J summarized his conclusions, including the following, which are relevant to the issues considered in this Declaration:

---

[203] At pages 349D-350A (emphasis added).

[204] [2001] 2 NZLR 541, New Zealand Court of Appeal.

[205] At §§ 18, 31 (emphasis added).

[206] [2005] 1 BCLC 623, English High Court, at §§192-227.

> "*(1)  The question whether a particular transaction is within the ordinary course of a company's business in the context of a floating charge is a mixed question of fact and law;*
>
> *(2)  it is convenient to approach the matter in a two stage process;*
>
> *(3)  first, to ascertain, as a matter of fact, whether an objective observer, with knowledge of the company, its memorandum of association and is business, would view the transaction as having taken place in the ordinary course of its business, and, if so*
>
> *(4)  second, to consider whether, on the proper interpretation of the document creating the floating charge ... the parties nonetheless did not intend that the transaction should be regarded as being in the ordinary course of the company's business for the purpose of the charge;*
>
> *(5)  subject to any special considerations resulting from the proper interpretation of the charge document, there is no reason why an unprecedented or exceptional transaction cannot, in appropriate circumstances, be regarded as in the ordinary course of the company's business...*"[207]

224.    Therefore, there is a strong and consistent line of English and Commonwealth authority to the effect that (i) the question of whether a transaction took place in the ordinary course of business is to be judged objectively at the time it occurred, without the benefit of hindsight; (ii) a broad approach should be taken in order to avoid stultifying ordinary business dealings; and (iii) normal good faith commercial transactions by a person who is unable to pay all his debts as they fall due will not be invalidated.  In my opinion, the BVI Supreme Court would apply this line of authority.

*The facts pleaded in the Amended Complaints*

225.    I have described the alleged facts, as stated in the Amended Complaints, in paragraphs 202-207 above.  It is a proper inference from what is alleged and what is not alleged that all the Redemptions made by Funds pursuant to requests from the Defendant Institutions and all Vulnerability Period Payments made by the Funds were entirely normal, unremarkable business transactions and that they took place in the ordinary course of the Funds' businesses as investment companies, which placed their investments almost entirely

---

[207] At § 227.  These conclusions appear to have received the approval of the English Court of Appeal in *Sandhu v Jet Star Retail Ltd* [2011] EWCA Civ 459 at § 10.

with BLMIS.  This is so even if the NAVs on which the Redemption Prices were fixed were incorrect.  As part of the ordinary course of the Funds' businesses, all parties proceeded on the basis that they were bound by the certified NAVs.

226.    It is not permissible under BVI law to have regard to subsequent unexpected events when determining whether a transaction or payment took place in the ordinary course of business.  The discovery after 11 December 2008 of the BLMIS Ponzi scheme and subsequent claims made by the BLMIS Trustee are therefore irrelevant to a consideration of the situation at the times when the Redemptions were entered into and the Funds made Vulnerability Period Payments.

227.    Therefore, even though the burden is on the Defendant Institutions to overturn the presumption that the Redemptions were not entered into and the Vulnerability Period Payments were not made in the ordinary course, the facts alleged in the Amended Complaints establish under BVI law that all the Redemptions and Vulnerability Period Payments took place in the ordinary course of business.

## 9.    THE UNDERVALUE CLAIM

228.    In paragraph 55 of his Declaration Mr Moss opines that in the Amended Complaint the Liquidators have pleaded a viable case of undervalue transaction under Section 246.  I respectfully disagree.  In my opinion the Liquidators have failed to state a claim that the Redemptions and/or Vulnerability Period Payments constitute undervalue transactions under Section 246 for the following reasons (reasons (a) and (b) together, or alternatively reason (c) or reason (d) on its own, are sufficient to find that the Liquidators have failed to state a claim):

      (a)    the Redemptions (and the Vulnerability Period Payments) were not made for no consideration, as required by Subsection 246(1)(a);

(b)     the Redemptions (and the Vulnerability Period Payments) were not made for a consideration the value of which in money or money's worth was significantly less than the amount of the Vulnerability Period Payments as required by Subsection 246(1)(b);

(c)     the Redemptions (and the Vulnerability Period Payments) were not insolvency transactions within Subsections 244(2) and 246(1)(c)(i), since at the time of each Redemption (and each Vulnerability Period Payment) the Fund was not unable to pay its debts as they fell due and the Vulnerability Period Payment did not cause it to become unable to pay its debts as they fell due;

(d)     the Redemptions (and the Vulnerability Period Payments) were not undervalue transactions since the Funds entered into them in good faith and for the purposes of their business and there were reasonable grounds for believing that they would benefit the Funds within Subsection 246(2).

229.    In respect of my reasons in subparagraphs 228(c) and (d), it is correct, as Mr Moss points out in paragraphs 55(b) and 56 of his Declaration, that, since the Defendant Institutions were members, there are presumptions that the Funds were unable to pay their debts as they fell due and that the Redemptions (or Vulnerability Period Payments) were not good faith business dealings.  Under BVI law, those presumptions are rebutted by the facts pleaded in the Amended Complaints when the illegitimate resort to hindsight is disregarded.

230.    It is also worth noting that whether or not the other party to an alleged undervalue transaction acted in good faith is not an issue under Section 246.  On the other hand, the good faith of the Funds when entering into the transaction is relevant to Subsection

246(2), as discussed in Subsection (d) below.  In this connection I shall make the same

assumption as I did at paragraph 178 above, that the Funds acted in good faith.

231.    Before addressing the reasons why the Amended Complaints fail to state a

case of undervalue transaction, I should comment on the fact that the Amended Complaints

appear to allege that the Redemptions and/or the Vulnerability Period Payments were

insolvency transactions within Subsection 246(1)(c)(i)[208] and that the Vulnerability Period

Payments were undervalue transactions within Subsections 246(1)(a) and (b).[209]  To be clear,

for the reasons given in paragraphs 155-171 above, it is my opinion that the transactions that

the Funds entered into with the Defendant Institutions were the Redemptions, which occurred

when the Funds or their agent received the redemption request and that when the Funds made

the Vulnerability Period Payments they performed their obligations under the Redemption

transactions previously entered into.

**(a)    The Redemptions (and Vulnerability Period Payments) were not made for no consideration**

232.    The Liquidators' contention in the Amended Complaints that the Funds

received no consideration for the Vulnerability Period Payments[210] is incorrect as a matter of

law.  If, which is correct, the relevant transaction was the Redemption, the Fund received the

redeemed shares in return for payment of the applicable Redemption Price.  The redeemed

shares had value, reflected in the applicable NAV, and the redemption increased the NAV on

subsequent Dealing Days for the benefit of the Fund and its members.  If, which is not

correct, the relevant transaction was the Redemption Payment, it was not made for no

consideration, since it discharged the Fund's obligation to pay the Redemption Price and

therefore did not deplete the balance sheets of the Fund.

---

[208] CA Amended Complaint at ¶¶ 172, 175.

[209] CA Amended Complaint at ¶ 173.

[210] CA Amended Complaint at ¶ 173.

**(b)      There was no significant undervalue in the consideration for the Redemptions (and the Vulnerability Period Payments)**

233.    In my opinion, the Liquidators have failed to state a case of any, or any significant, undervalue because they impermissibly rely on hindsight, and the subsequent disclosure of the BLMIS Ponzi fraud, when to the contrary value is to be determined at the time of the transaction on the basis of the then current market price and what was known to a reasonably well-informed purchaser.

*The law*

234.    The following principles have emerged from decisions of the English courts on the question of whether a transaction is at an undervalue within Sections 238 or 339 (transactions at undervalue in cases of bankruptcy of individuals) of the English Insolvency Act.  In the absence of relevant BVI case law, those principles would be applied by a BVI court considering an issue under Section 246, which is in substantially similar terms.

235.    First, the burden of proving that a transaction is at an undervalue is on the Liquidators, although where the value of the consideration provided to the company is speculative, the evidential burden shifts to the other party.[211]

236.    Second, the value of the consideration, in money or money's worth, passing to and from the company, is to be assessed from the viewpoint of the company, not the other party.[212]

237.    Third, the consideration passing between the parties is to be valued as at the date of the transaction.[213]

---

[211]  *Stanley v TMK Finance Ltd* [2010] EWHC 3349 (Ch), English High Court, at § 7.

[212]  *Re MC Bacon Ltd (No 2)* [1990] BCLC 324, 340, English High Court, per Millett J.  In *Pena v Coyne (No 1)* [2004] 2 BCLC 703, English High Court, a case under Section 423 of the English Insolvency Act (transactions defrauding creditors), the Deputy Judge, at § 114, took into account the real economic benefits, not artificial book values, when assessing the differences in the value of the consideration passing under the transaction.

[213]  *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] 1 WLR 143, House of Lords, at §26 per Lord Scott; *Re Thoars, Reid v Ramlort Ltd* [2003] 1 BCLC 499, English High Court, at § 17; *Stanley v TMK Finance Ltd* [2010] EWHC 3349 (Ch), English High Court, at § 7.

238. Fourth, as Lord Scott said in the House of Lords case, *Phillips v Brewin Dolphin Lawrie Ltd*:

> "*The value of an asset that is being offered for sale is, prima facie, not less than the amount that a reasonably well informed purchaser is prepared, in arms' length negotiations, to pay for it.*"[214]

In the earlier case of *Re Brabon*,[215] Jonathan Parker J said that the actual price paid is the open market value of the asset if it is the subject of an exchange on the date when the asset is to be valued "*between a willing buyer and a willing seller in an arm's length transaction after proper marketing wherein the parties have each acted knowledgeably, prudently and without compulsion.*"[216] In *Stanley v TMK Finance Ltd*, David Richards J adopted the following guidance where the court has to assess the value of an asset on a particular date:

> "*The Court has to assess as best it can on the evidence what [the asset's] value in money or money's worth would be to a rational and reasonably well-informed purchaser, having knowledge of the actual characteristics of what it is he is buying.*"[217]

The "*actual characteristics*" of the property being sold are those that it was generally understood to possess at the time; otherwise there would be no need to refer to the "*reasonably well-informed purchaser.*" Section 246 does not enable a liquidator to avoid a purchase or sale of an asset just because it subsequently emerges that the asset was in fact more or less valuable than it was generally thought to be at the time.

239. Fifth, the general rule is that where an asset is to be valued at a fixed date, no account can be taken of subsequent events.[218] It must be valued in the circumstances that applied at the fixed date (though evidence as to the price obtained on a subsequent sale may enable an inference to be drawn as to the market value of the asset at the valuation date, if

---

[214] [2001] 1 WLR 143 at § 30.

[215] [2001] 1 BCLC 11, 38, English High Court; a case on Section 339 of the English Insolvency Act.

[216] By reference to the definition of market value in a practice statement in the Royal Institute of Chartered Surveyors' Appraisal and Valuation Manual.

[217] [2010] EWHC 3349 (Ch) at § 7.

[218] *Joiner v George* [2003] BCC 298, English Court of Appeal, at §§ 68 and 70.

there has been no material change in market conditions between the valuation date and the sale).[219]

240.    Sixth, there is an exception to that general rule, which applies only where at the time the transaction is entered into the value of the asset is known by the parties or would be known to a reasonably well-informed purchaser to be uncertain (or precarious), or subject to a contingency (the happening or non-happening of an event).  In such a case the court may have regard to subsequent events to determine the value of the asset at the valuation date.[220]

241.    Before turning to the facts stated by the Liquidators in the Amended Complaint, I should refer to the following passage in Goode, *Principles of Corporate Insolvency Law* at paragraph 13-26.

> "*Prima facie the value of an asset is not less than the amount that a reasonably well-informed purchaser is prepared, in arm's-length negotiations, to pay for it.  Where there is a market for assets of the type in question, in general the figure to be taken is the market value.  This is normally determined by expert evidence.  The fact that the parties took reasonable steps to obtain an accurate valuation is not in itself the determining factor, for the valuation may have ignored relevant factors or taken into account factors that should not have been considered or may simply have been based on a mistaken view as to the attributes of what was being sold.*"

242.    I have the following comments on that passage:

(a)    The first two sentences are supported by the *Brewin Dolphin* and *Brabon* cases and confirm the principle stated in paragraph 238 above.

(b)    The third and fourth sentences make the point that the transaction is not immune from challenge as an undervalue transaction just because the parties obtained a valuation from an expert as evidence to support the consideration paid.  This is because the valuer may have proceeded

---

[219] *Stanley v TMK Finance Ltd* [2010] EWHC 3349 (Ch) at §§ 15-18.

[220] *Re Thoars, Reid v Ramlort Ltd* [2003] 1 BCLC 499 at § 17, per Sir Andrew Morritt V-C; *Stanley v TMK Finance Ltd* [2010] EWHC 3349 (Ch) at § 7 (both citing *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] 1 WLR 143, HL, at § 26, per Lord Scott).

on an erroneous basis, so that his valuation does not reflect the price

that an arm's length, reasonably well-informed purchaser would have

been prepared to pay at the time.

(c)    In the passage in *Re Brabon* cited in support of the fourth sentence,

Jonathan Parker J reviewed the expert evidence tendered before him to

identify the value of the property, having regard to the state of

knowledge about the property at the valuation date.  *Re Brabon* was

not a case where there was some feature of the property that affected

its value of which a reasonably knowledgeable purchaser would have

been unaware.

(d)    The reference in the fourth sentence to "*a mistaken view as to the

attributes of what is being sold*" should be read as a reference to the

attributes that with reasonable diligence would be known to a

reasonably well-informed purchaser at the time of the transaction.  It

does not support an open-ended use of hindsight, because that would

be contrary to the authorities on undervalue transactions to which I

have referred and with the approach generally taken in insolvency

cases; e.g. to the valuation of property or liabilities at an earlier fixed

date (paragraphs 172-174 and 193-196 above) or to the question

whether a transaction was in the ordinary course of business

(paragraphs 219-223 above).

243.    Accordingly I respectfully agree with the editors of *Muir Hunter on Personal

Insolvency*[221] who express the opinion that there is nothing in the speech of Lord Scott in

*Phillips v Brewin Dolphin* (paragraphs 238 and 240 above) that:

---

[221] Edited by John Briggs and Christopher Brougham QC; at § 3-2260, commenting on Section 339(3)(c) of the English Insolvency Act, concerning transactions at undervalue by individuals who become bankrupt.

"*contradicts the proposition that the value of the consideration is to be assessed as at the date of the transaction. Nor does the judgment lay down a rule that that value is to be assessed with the benefit of hindsight; any such rule would deter many perfectly proper commercial transactions.*"

*The allegation of undervalue in the Amended Complaints*

244.    The Amended Complaints allege that the consideration received by the Funds for each Vulnerability Period Payment was worth significantly less than the money paid by the Fund.[222]  Each Vulnerability Period Payment discharged the Fund's obligation to make the Redemption Payment in return for the redeemed shares under the Redemption Transaction previously entered into.  The Amended Complaints do not explain this allegation, but I infer that the Liquidators allege that there were undervalue transactions as a result of the later discovery that BLMIS did not hold the assets for Sentry that it represented it held and that Sentry's claim against BLMIS for damages or other financial compensation cannot be satisfied, because BLMIS is unable to discharge all its debts and liabilities.[223]  In my opinion, it is not correct under BVI law to take into account the subsequent emergence of the BLMIS Ponzi fraud when considering the value of shares in the Funds redeemed prior to that discovery.

245.    In this case the value of the redeemed shares was fixed in accordance with their Articles.  The Funds were willing, reasonably well-informed purchasers of the redeemed shares.  On Redemption, the redeemed shares were cancelled in accordance with Subsection 62(1)(b) BCA 2004,[224] so enhancing NAV per share on the next Valuation Day for the purpose of calculating the price of shares issued to new investors or existing members, increasing their investments, who were also willing, good faith, reasonably well-informed purchasers.  The Redemption Price, and the corresponding subscription price, represented the

---

[222] CA Amended Complaint at ¶ 173.

[223] CA Amended Complaint at ¶¶ 6-8, 10, 11, 79-82.

[224] I understand that the directors of the Funds have never resolved to hold redeemed or purchased shares in treasury in accordance with Section 64 BCA 2004.

open market value of shares in the Funds at all times prior to 11 December 2008, when Mr

Madoff was arrested.  Not only were the Funds rational and reasonably well-informed

purchasers of their shares, but so too were subscribers and holders of their shares, who

included financial institutions and sophisticated investors.

246.    Since the value of the redeemed shares was fixed by or on behalf of the

directors of the Funds on what was in effect an open-market basis and since Section 246

requires the valuation to be made at the date of the transaction, there is no scope for using

hindsight to take into account the subsequent discovery of the BLMIS Ponzi scheme.  The

redeemed shares were valued on the basis of information then available to the Funds.  In this

connection I refer to the summary in paragraphs 202-207 above of the facts in the Amended

Complaints.

247.    In paragraph 53 of his Declaration, Mr Moss expresses the opinion that the

fact that the parties have agreed to a price (e.g., under a binding certificate) does not prevent

the court from finding that the transaction was at an undervalue.  I agree with this, but it does

not assist the Liquidators in this case.  Even if the NAV was incorrect, it was still the value

that was used by the Funds on the one hand and investors and redeeming shareholders on the

other hand in respect of all their arm's-length dealings prior to the exposure of the BLMIS

fraud.  Unless a reasonably well-informed purchaser could have discovered at the time each

Redemption was entered that the Fund's published NAV per share was affected by fraud or

was based on false information from BLMIS, that published NAV stands as evidence of the

price that a purchaser would pay for shares in the Funds, even though hindsight reveals that

the NAV was inaccurate.

248.    When considering what a reasonably well-informed person could with

reasonable diligence have found out about BLMIS and the Funds' NAVs, a BVI Court would

be greatly assisted by the KPMG Reports on which the Plaintiffs rely in the HSBC Amended

Complaint. The KPMG Reports are dated 16 February 2006 and 8 September 2008 and therefore cover the vulnerability periods applicable to the Liquidators' claims against the Defendant Institutions. The Reports describe the work undertaken, including meetings with Mr Madoff and other BLMIS personnel. Certain fraud and operational risks were identified and commented on, but what is most striking about the KPMG Reports is that KPMG found no hint of the Ponzi fraud that later emerged and no reason to doubt that BLMIS carried on the investment business that it claimed to conduct. Accordingly, a reasonably well-informed person (including a director or agent of the Funds, a subscriber or redeeming shareholder), at the times when each Redemption was entered into or Vulnerability Period Payment made, would have had no reasonable grounds to doubt the Funds' NAVs at those times or the information provided by BLMIS on which they were based.

**(c)      The Funds were able to pay their debts as they fell due**

249.      In support of the allegation of insolvency in paragraph 172 of the CA Amended Complaint, the Liquidators rely on paragraph 162, concerning the unfair preference claim. I have expressed my opinion regarding that allegation in Section 8(b) above and have explained why it is my opinion that at the dates when each Redemption was entered into and of each Vulnerability Period Payment, the Funds were not unable to pay their debts as they fell due and the Vulnerability Period Payments did not cause them to become unable to pay their debts under BVI law. The facts pleaded in the Amended Complaints (see paragraphs 202-207 above) show that the Funds remained able to pay their debts as they fell due until after the arrest of Mr Madoff and the exposure of the BLMIS Ponzi scheme.

**(d)      Good faith, business transactions benefitting the Funds**

*The law*

250.      This defence under Subsection 246(2) is similar in effect to the ordinary course of business defence that applies to Section 245. Although Subsection 246(2) is for the

protection of the other party to the transaction, it looks at the position from the company's

viewpoint.  Since the Defendant Institutions are assumed to be connected with the Funds, the

burden is on them to show that Subsection 246(2) applies.  Subsection 246(2) has three

distinct requirements, which are all satisfied on the facts alleged in the Amended Complaints.

251.    The first requirement is that the company entered into the transaction in good

faith.

252.    The second requirement is that the company entered into the transaction for

the purpose of its business.  The nature of the company's business is as an objective observer

would regard it without the benefit of hindsight.  The authorities discussed in paragraphs 219-

223 above would apply.

253.    The third requirement is that there were reasonable grounds for believing that

the transaction would benefit the company.  This again must be assessed objectively without

regard to hindsight.

*The allegation in the Amended Complaints*

254.    The Amended Complaints do not allege that the Funds acted otherwise than in

good faith; indeed they emphasise on several occasions that the Funds acted in good faith in

the mistaken belief that all was as it appeared to be at BLMIS.[225]  Section D of the CA

Amended Complaint alleges that Citco issued certificates in bad faith, but alleges that the

Funds were victims of Citco's conduct.[226]  In any event, the Amended Complaints do not

suggest that this allegation of bad faith against Citco is relevant to the undervalue claim.

255.    The Redemptions and Redemption Payments were normal business

transactions pursuant to the Articles.  The essence of the Funds' businesses, as set out in the

Amended Complaints and described in paragraphs 202-207 above, was receiving

subscriptions for shares for investment in BLMIS and redeeming the shares on request.

[225] CA Amended Complaint at ¶¶ 5, 7, 10, 40, 42, 43.

[226] CA Amended Complaint at ¶ 78.

Paragraph 175 of the CA Amended Complaint alleges that the Vulnerability Period Payments were not made for proper business purposes because "*in any event it is clear that the purpose of the Funds was not to invest and distribute fictitious profits from a Ponzi scheme such as BLMIS.*" That allegation involves inadmissible use of hindsight. The purpose of the Funds in accepting Redemptions and paying Vulnerability Period Payments was to comply with their obligations under the Articles and to carry on their business as described in paragraphs 202-207 above.

256.    There were reasonable grounds for believing that redeeming the Defendant Institutions' shares on request and making the Redemption Payments would benefit the Funds because (i) the Funds had reasonable grounds for fixing the Redemption Price for each Redemption on the basis of the information provided by BLMIS, as I have described,  (ii) it benefited the business of the Funds, as described in the preceding paragraph, for them to comply with their obligations to redeem shares in accordance with the Articles, and (iii) the Funds did not have reasonable grounds for suspending the determination of NAV per share in accordance with Article 11(4) until after the revelation of the BLMIS fraud in December 2008.

257.    Accordingly, on the basis of the facts stated in the Amended Complaints and inference from what is not stated, but which the Liquidators would be expected to state if the facts existed, it is my opinion that the Liquidators have also failed to state a claim of undervalue transaction, since the Redemptions (and Vulnerability Period Payments) are protected by Subsection 246(2).

**10.    THE COURT WHICH MAY MAKE ORDERS UNDER SECTION 249**

258.    In this Section I will consider:

(a)    to which court may a liquidator apply for an order under Section 249;

(b)    the cross-border application of Section 249; and

(c)    the discretion of the court to make an order under Section 249.

**(a)    The court to which application is made**

259.    Sections 245 and 246 state the requirements for a transaction entered into by a company which goes into liquidation under the BVI Insolvency Act to be an unfair preference or undervalue transaction.  As I have said in Section 7(b) above, no legal consequences automatically follow from those requirements being satisfied; those Sections do not state that the transaction is void or voidable.  The relevant consequence is that the Liquidator may apply to the "*Court*" for an order under Section 249.

260.    "*Court*" is a defined term in the BVI Insolvency Act.  Section 2(1) provides that in that Act, unless the context otherwise requires, "court" means the BVI Court, described in Section 1 above.

261.    The BVI Insolvency Act does not give foreign courts authority to make an order under Section 249.  In two appeals in *Carlyle Capital Corporation Ltd v Conway*, the Guernsey Court of Appeal regarded it as plain that only the Guernsey Court could make orders under the Guernsey statute in respect of wrongful trading by directors (comparable to insolvent trading under Section 256 of the BVI Insolvency Act).[227]  This has long been understood to be the position.  In *Galbraith v Grimshaw*, the trustee of a Scottish bankrupt tried to recover a debt in England owed to the bankrupt, but over which a creditor had obtained execution.[228]  The trustee claimed in England that under Scottish bankruptcy law his title to the debt related back to a date before the execution and that he was entitled to the debt free of the execution.  His claim failed.  Lord Loreburn LC summed up the position:

> "*a foreign law making the title of the trustee relate back to transactions which the debtor himself could not have disturbed has no operation in England, while the English law as to relation back applies*

---

[227] 11/2012 at §§ 48(iv), 50; [2013] 2 Lloyd's Rep 179 at § 73, 78, 79.

[228] [1910] AC 508, House of Lords.

103

*only to cases of English bankruptcy, and therefore the trustee may find himself (as in this case) falling between two stools.*"[229]

**(b)      Cross-border scope of Section 249**

262.    As regards statutory claw-back provisions, that outcome may be avoidable in two ways.  First, the liquidator in a BVI liquidation may apply to the BVI Court for permission to serve proceedings for relief under Section 249 on a defendant out of the jurisdiction.[230]

263.    Second, the BVI Court can also ask a foreign court for assistance, but whether the foreign court can assist by applying provisions of the BVI Insolvency Act, such as Section 249, depends on the power given to the foreign court under its own laws.

264.    If the BVI Court applied to the English High Court for assistance under Section 426 of the English Insolvency Act in respect of a claw-back claim,[231] the English court might well be able to assist.  This is because a request from the BVI Court gives the English High Court authority (i.e., power) "*to apply, in relation to any matters specified in the request, the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction.*"[232]  As a result of the definition of "*insolvency law*" in Subsection 426(10), the English court would have power to apply to the facts of the case either the English claw-back provisions (Sections 238-241 of the English Insolvency Act) or the BVI claw-back provisions (Sections 245, 246 and 249).[233]

---

[229] At page 510; cited approvingly by Lord Walker in *Al Sabah v Grupo Torras  SA* [2005] 2 AC 333, Privy Council on appeal from the Court of Appeal of the Cayman Islands, at § 7.

[230] *Re Paramount Airways Ltd* [1993] Ch 223, English Court of Appeal; *Bilta (UK) Ltd v Nazir* [2016] AC 1, at §§ 110, 214.

[231] The BVI is a designated country or territory for the purposes of Section 426 of the English Insolvency Act by the Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986 (SI 1986/2123).

[232] Subsection 426(5) of the English Insolvency Act.  In exercising its discretion as to which law to apply, the English court is required to have regard to the rules of private international law.

[233] Similarly, when Section 467 of the BVI Insolvency Act comes into force, it will give the BVI High Court power to make orders in aid of foreign insolvency proceedings in designated foreign countries and for this purpose it "*may apply the law of the Virgin Islands or the law applicable in respect of the foreign proceeding.*"

265.    Great Britain and the BVI have both adopted the UNCITRAL model law on cross-border insolvency (the "Model Law"), but Part XVIII of the BVI Insolvency Act, dealing with cross-border insolvency, is not yet in force.  Under the Cross-Border Insolvency Regulations 2006 (SI 2006/1030), upon recognition of a foreign proceeding, the foreign representative has standing to apply to the English court for a claw-back order under Sections 238-241 of the English Insolvency Act, but the English court is not given power under the Cross-Border Insolvency Regulations to apply the claw-back provisions based on the law of the foreign proceeding.[234]  Similarly, when Section 456(2) of the BVI Insolvency Act comes into force, the BVI Court will have power, on recognition of a foreign main proceeding, to make an order under Section 249 (but not under the claw-back provisions based on the law applicable to the foreign main proceeding).[235]

**(c)    Discretion**

266.    As I have said, the fact that a transaction falls within Sections 245 or 246 does not make it void or voidable.  The only legal consequence is that the liquidator, as office holder, may apply to the BVI Court for an order under Section 249.  The BVI Court is given discretion as to whether or not to make an order and as to what type of order to make.  I refer to paragraphs 146-150 above in which I have described the width of the discretion given to the BVI Court.

---

[234] Article 23 in the form adopted by the English Cross-Border Regulation.  Article 21(1) gives the English Court power to grant "*any appropriate relief*", but this is regarded as giving it power to make orders of a procedural nature and this does not extend to giving the English Court power to apply the law of the foreign proceeding; *Rubin v Eurofinance SA* [2013] 1 AC 236 at § 143; *Re Pan Ocean Co Ltd* [2014] EWHC 2124 (Ch) at § 108, 111.  In *Pan Ocean* at §§ 97-99, 106, 107 and 114 Morgan J discussed the US case *Condor Insurance Co Ltd*, 601 F.3d 319 (5th Cir. 2010), where under Section 1521 of the US Bankruptcy Code, a US court applied the law of Nevis to set aside a transaction, and explained why he declined to follow it.

[235] When this Section comes into force I would expect the BVI Court to follow the English precedents noted in the preceding footnote.

## CONCLUSION

267.    For the reasons I have given, my opinions are as stated in this Declaration.

268.    I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct.


Dated this 13th day of January 2017

Signed: _____
Simon Mortimore, QC

## CONCLUSION

267.   For the reasons I have given, my opinions are as stated in this Declaration.

268.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 13th day of January 2017

Signed: _____
Simon Mortimore, QC