# EXHIBIT C

## Part 1

**Sources Cited in Declaration of Simon Mortimore, QC**

| Cases | |
|---|---|
| | **Citation** |
| 1. | *A-G of St Christopher, Nevis and Anguilla v Reynolds* [1980] AC 637, Privy Council on appeal from the Court of Appeal of the West Indies Associated States Supreme Court |
| 2. | *Al Sabah v Grupo Torras  SA* [2005] 2 AC 333, Privy Council on appeal from the Court of Appeal of the Cayman Islands |
| 3. | *Aldi Stores Ltd v WSP Group plc* [2008] 1 WLR 748, English Court of Appeal |
| 4. | *Ashborder BV v Green Gas Power Ltd* [2005] 1 BCLC 623, English High Court |
| 5. | *Bank of Australasia v Hall* (1907) 4 CLR 1514, High Court of Australia |
| 6. | *Barclays Bank Ltd v WJ Simms Son & Cooke (Southern) Ltd* [1980] 1 QB 677, English High Court |
| 7. | *BDW Trading Ltd v JM Rowe (Investments) Ltd* [2011] EWCA Civ 548, English Court of Appeal |
| 8. | *Bilta (UK) Ltd v Nazir* [2016] AC 1, UK Supreme Court |
| 9. | *Blackburn, Low & Co v Vigors* (1887) 12 App Cas 531, House of Lords |
| 10. | *BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3BL plc* [2013] 1 WLR 1408, UK Supreme Court |
| 11. | *Box Valley Pty Ltd v Kidd* [2006] NSWCA 26, New South Wales Court of Appeal |
| 12. | *BTI 2014 LLC v Sequana SA* [2016] EWHC 1686 (Ch), English High Court |
| 13. | *Carlyle Capital Corporation Ltd v Conway*, 11/2012, Court of Appeal of the Island of Guernsey |
| 14. | *Carlyle Capital Corporation Ltd v Conway* [2013] 2 Lloyd's Rep 179, Court of Appeal of the Island of Guernsey |
| 15. | *Clements v Henry Hadaway Organisation Ltd* [2008] 1 BCLC 223, English High Court |
| 16. | *Consett Industrial and Provident Society v Consett Iron Co* [1922] 2 Ch 135, English Court of Appeal |

| 17. | *Countrywide Banking Corporation Ltd v Dean* [1998] AC 338, Privy Council on appeal from the Court of Appeal of New Zealand |
| 18. | *Derry v Peek* (1889) 14 App Cas 337, House of Lords |
| 19. | *Deutsche Morgan Grenfell Group plc v Inland Revenue Commissioners* [2007] 1 AC 558, House of Lords |
| 20. | *Dexter Ltd v Vlieland-Boddy* [2003] EWCA Civ 14 |
| 21. | *Downs Distributing Co Pty Ltd v Associated Blue Star Stores Pty Ltd* (1948) 76 CLR 463, High Court of Australia |
| 22. | *Ex p Kemp, re Fastnedge* (1874) LR 9 Ch App 383, English High Court |
| 23. | *Fairfield Sentry Ltd v Migani* [2014] UKPC 9, Privy Council |
| 24. | *Feakins v DEFRA* [2007] BCC 54, English Court of Appeal |
| 25. | *Galbraith v Grimshaw* [1910] AC 508, House of Lords |
| 26. | *Gleeson v J Wippell & Co Ltd* [1977] 1 WLR 510, English High Court |
| 27. | *Henderson v Henderson* (1843) 3 Hare 100, English Court of Chancery |
| 28. | *Johnson v Gore Wood* [2002] 2 AC 1, House of Lords |
| 29. | *Joiner v George* [2003] BCC 298, English Court of Appeal |
| 30. | *Kettlewell v Watson* (1882) 21 Ch D 685, English High Court |
| 31. | *Kingate Global Fund Ltd v Kingate Management Ltd* [2015] (Bda) 65 Com |
| 32. | *Kleinwort Benson Ltd v Lincoln CC* [1999] 2 AC 349, House of Lords |
| 33. | *Les Laboratoires Servier v Apotex Inc* [2015] AC 430, UK Supreme Court |
| 34. | *Lewis v Doran* [2004] NSWSC 608, New South Wales Supreme Court |
| 35. | *Lewis v Doran* [2005] NSWCA 243, New South Wales Court of Appeal |
| 36. | *Lord v Sinai Securities* [2005] 1 BCLC 295, English High Court |
| 37. | *Madoff Securities International Ltd v Raven* [2013] EWHC 3147 (Comm), English High Court |

| 38. | *Manifest Shipping Co Ltd v Uni-Polaris Insurance Co Ltd* [2003] 1 AC 469, House of Lords |
| 39. | *Marks & Spencer plc v BNP Paribas Securities Services Trust Co (Jersey) Ltd* [2016] AC 742, UK Supreme Court |
| 40. | *OJSC Oil Company Yugraneft v Abramovich* [2008] EWHC 2613 (Comm), English High Court |
| 41. | *Patel v Mirza* [2016] UKSC 42, UK Supreme Court |
| 42. | *Pena v Coyne (No 1)* [2004] 2 BCLC 703, English High Court |
| 43. | *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] 1 WLR 143, House of Lords |
| 44. | *Quinn v CC Automotive Group Ltd* [2010] EWCA Civ 1412 |
| 45. | *Re Ayala Holdings Ltd (No 2)* [1996] 1 BCLC 467 |
| 46. | *Re Brabon* [2001] 1 BCLC 11, English High Court |
| 47. | *Re Capital Annuities Ltd* [1979] 1 WLR 170, English High Court |
| 48. | *Re Casa Estates (UK) Ltd* [2014] 2 BCLC 49, English Court of Appeal |
| 49. | *Re Cheyne Finance plc* [2008] 2 All ER 987, English High Court |
| 50. | *Re European Life Assurance Society* (1869) LR 9 Eq 122, English High Court |
| 51. | *Re Fairway Magazines Ltd* [1993] BCLC 643 |
| 52. | *Re Hampton Capital Ltd* [2016] 1 BCLC 374, English High Court |
| 53. | *Re MC Bacon Ltd* [1990] BCLC 324, English High Court |
| 54. | *Re New Cap Reinsurance Corporation* [2011] EWHC 677 (Ch), English High Court |
| 55. | *Re Oasis Merchandising Services Ltd* [1998] Ch 170, English Court of Appeal |
| 56. | *Re Ovenden Colbert Printers Ltd* [2014] 1 BCLC 291, English Court of Appeal |
| 57. | *Re Pan Ocean Co Ltd* [2014] EWHC 2124 (Ch), English High Court |
| 58. | *Re Paramount Airways Ltd* [1993] Ch 223, English Court of Appeal |
| 59. | *Re Stealth Construction Ltd* [2011] EWHC 1305 (Ch), English High Court |

| 60. | *Re Taylor Sinclair (Capital) Ltd* [2001] 2 BCLC 176, English High Court |
| 61. | *Re Thoars, Reid v Ramlort Ltd* [2003] 1 BCLC 499, English High Court |
| 62. | *Resolution Chemicals Ltd v H Lundbeck A/S*  [2013] EWCA Civ 924, English Court of Appeal |
| 63. | *Revenue and Customs Commissioners v Holland, Re Paycheck Services Ltd* [2010] 1 WLR 2793, UK Supreme Court |
| 64. | *Robins v National Trust Co* [1927] AC 515, Privy Council on appeal from the Supreme Court of Ontario |
| 65. | *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, Privy Council on appeal from the Court of Appeal of Brunei |
| 66. | *Rubin v Eurofinance SA* [2013] 1 AC 236, UK Supreme Court |
| 67. | *Sandhu v Jet Star Retail Ltd* [2011] EWCA Civ 459, English Court of Appeal |
| 68. | *Singla v Brown* [2008] Ch 357, English High Court |
| 69. | *Skandinaviska Enskilda Banken AB (PUBL) v Conway*, CICA No 2 of 2016, 18 November 2016 ("*Weavering* Case") |
| 70. | *Somers Dublin Ltd A/C KBCS v Monarch Pointe Fund Ltd* HCVAP 2011/040, 11 March 2013, the EC Court of Appeal |
| 71. | *Stanley v TMK Finance Ltd* [2010] EWHC 3349 (Ch), English High Court |
| 72. | *Taylor v White* (1964) 110 CLR 129, High Court of Australia |
| 73. | *Taylors Industrial Flooring Ltd v M&H Plant Hire (Manchester) Ltd* [1990] BCLC 216, English Court of Appeal |
| 74. | *Thanakharn Kasikorn Thai Chamkat v Akai Holdings Ltd* (2010) 13 HKCFAR 479 |
| 75. | *The Bell Group Ltd v Westpac Banking Corp* [2008] WASC 239, §§1065-1122 Western Australia Supreme Court (excerpt) |
| 76. | *Three Rivers District Council v Bank of England (No 3)* [2003] 2 AC 1, House of Lords |
| 77. | *UBS AG v Kommunale Wasserwerke Leipzig GmbH* [2014] EWHC 3615, § 762 (Comm) (excerpt) |

| 78. | *Virgin Atlantic Airways Ltd v Zodiac Seats UK Ltd* [2014] AC 160, UK Supreme Court |
| 79. | *Waikato Freight and Storage v Meltzer* [2001] 2 NZLR 541, New Zealand Court of Appeal |
| 80. | *Ward & Co v Wallis* [1900] 1 QB 675, English High Court |
| 81. | *West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250, English Court of Appeal |
| 82. | *Westford Special Situations Fund Ltd v Barfield Nominees Ltd*, HCVAP 2010/014, 28 March 2011, the EC Court of Appeal |
| 83. | *Wills v Corfe Joinery Ltd* [1998] 2 BCLC 75, English High Court |

## Rules & Statutes

| | Citation |
| --- | --- |
| 84. | Australian Corporations Act 2001 §§ 95A, 588FA, 588FC, 588FE |
| 85. | BVI Business Companies Act ("BCA") 2004 §§ 11, 31, 56-59, 62-64, 250 |
| 86. | BVI Conveyancing and Law of Property Act 1967 (Cap 220) § 81 |
| 87. | BVI Criminal Code § 223 |
| 88. | BVI Insolvency Act 2003 §§ 2, 3, 5, 8-12, 197, 244-252, 254, 256, 401, 456, 467 |
| 89. | BVI Securities and Investment Business Act 2010 § 91 |
| 90. | BVI and other Islands: The Supreme Courts Order 1967 (SI 1967/223) |
| 91. | Cayman Islands Companies Law (2013 Revision) § 145(1) |
| 92. | English Companies Act 1948 § 320 |
| 93. | English Companies Act 1985 § 615 |
| 94. | English Companies Act 2006 § 40 |
| 95. | English Insolvency Act 1986 §§ 123, 238-241, 339, 423-426, 436 |
| 96. | English Insolvency Rules 1986, as Amended, Rule 13.12 (in its current form, and in its form before 2006) |
| 97. | English Law of Property Act 1925 § 172 |

| 98. | New Zealand Companies Amendment Act 2006 § 27(2) |
| 99. | UK Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986 (SI 1986/2123) |
| 100. | UK Cross-Border Insolvency Regulations 2006 (SI 2006/1030), Schedule 1, Articles 20-23 |
| 101. | UK Financial Services and Markets Act 2000 § 397 |
| 102. | UK Financial Services Act 2012 § 89 |
| 103. | Virgin Islands (Courts) Order 1967 (SI 1967/231) |
| 104. | West Indies Associated States Supreme Court (Virgin Islands) Ordinance 1969 |

| **Other Authorities** | |
| | **Citation** |
| 105. | *Bowstead and Reynolds on Agency* (20th ed, 2016) at §§ 8-062, 8-063, 8-207, 8-208, 8-210 |
| 106. | *Chitty on Contracts* (32nd ed, 2015) at § 31-061 |
| 107. | Goff & Jones, *The Law of Unjust Enrichment* (9th ed, 2016) at §§ 3-13, 3-16, 9-94-9-97 |
| 108. | Goode, *Principles of Corporate Insolvency Law* (4th ed, 2011) at §§ 13-03, 13-12, 13-19, 13-26, 13-107 |
| 109. | Halsbury's Laws of England, Vol 11 (5th ed, 2015) at §§ 30, 37 |
| 110. | *Jowitt's Dictionary of English Law* (4th ed, 2015): "transaction" |
| 111. | Lewison, *The Interpretation of Contracts* (6th ed, 2015) at §§ 7.10, 12.19, 14.04 |
| 112. | *Muir Hunter on Personal Insolvency*, (loose-leaf) edited by John Briggs and Christopher Brougham QC at § 3-2260 |

TAB 1

*A-G of St Christopher, Nevis and Anguilla v Reynolds* [1980] AC 637,
Privy Council on appeal from the
Court of Appeal of the West Indies Associated States Supreme Court

A.C.

A

[PRIVY COUNCIL]

ATTORNEY-GENERAL OF ST. CHRISTOPHER,
    NEVIS AND ANGUILLA    .    .    .    .    .    . APPELLANT

AND

B JOHN JOSEPH REYNOLDS  .    .    .    .    .    . RESPONDENT

[ON APPEAL FROM THE COURT OF APPEAL OF THE WEST INDIES
ASSOCIATED STATES SUPREME COURT]

1979  March 12, 13, 14, 15;              Lord Salmon, Lord Simon of Glaisdale,
C      June 25                           Lord Fraser of Tullybelton, Lord Russell
                                         of Killowen and Lord Scarman

*St. Christopher, Nevis and Anguilla — Constitution — Right to
    personal liberty — Emergency — Detention of plaintiff under
    emergency powers—No evidence against plaintiff—Claim for
    damages for false imprisonment and compensation for un-*
D *lawful detention — Whether emergency powers regulations in
    conformity with Constitution — Proper construction of regu-
    lation giving Governor power to detain—Whether reasonable
    grounds — St. Christopher, Nevis and Anguilla Constitution
    Order 1967 (S.I. 1967 No. 228), Sch. 2, ss. 3, 14, 103 (1), 108
    —Leeward Islands (Emergency Powers) Order in Council 1959
    (S.I. 1959 No. 2206), s. 3 (1)—Emergency Powers Regulations
    1967 (S.R. & O. 1967 No. 16) (St. Christopher, Nevis and*
E *Anguilla) reg. 3 (1)*
*St. Christopher, Nevis and Anguilla — Constitution — Access to
    courts—Statute purporting to take away fundamental right—
    Validity — St. Christopher, Nevis and Anguilla Constitution
    Order, Sch. 2, s. 16—Indemnity Act 1968 (No. 1 of 1968),
    ss. 3, 5*
*Damages—Exemplary—False imprisonment and wrongful deten-*
F *tion—Award of damages including small sum as exemplary
    damages—Whether quantification of sum awarded as exemp-
    lary damages necessary*

Section 3 of the Leeward Islands (Emergency Powers)
Order in Council 1959 provides:

"(1) The administrator of a colony to which this Order
applies may, during a period of emergency in that colony,
G make such laws for the colony as appear to him to be
necessary or expedient for securing the public safety, the
defence of the colony or the maintenance of public order
or for maintaining supplies and services essential to the
life of the community."

Regulation 3 of the Emergency Powers Regulations 1967
provides:

"Detention of Persons. (1) If the Governor is satisfied
H that any person has recently been concerned in acts pre-
judicial to the public safety, or to public order or in the
preparation or instigation of such acts, or in impeding the
maintenance of supplies and services essential to the life

A.C. 1980—24

of the community and that by reason thereof it is neces-
sary to exercise control over him, he may make an order    A
against that person directing that he be detained."

The Constitution of St. Christopher, Nevis and Anguilla [1]
(" the state ") came into effect on February 27, 1967. It
provided, inter alia, that no person should be deprived of
personal liberty save as authorised by law (section 3 (1) ) and
gave a right of compensation for unlawful detention (section
3 (6) ); but section 14 stated that nothing done under the    B
authority of a law should be held to be inconsistent with or
in contravention of section 3 to the extent that the law
authorised the taking, during a period of public emergency,
of measures that were reasonably justifiable for dealing with
the situation. A right of application to the High Court was
provided under section 16 for the redress of certain violations
of the Constitution. Some provisions, including section 16,
were entrenched by section 35 which required a referendum    C
to be held before any Bill effecting alterations to those
provisions was submitted to the Governor for his assent.
Existing laws were required by section 103 (1) to be construed
with such modifications, adaptations, qualifications and excep-
tions as were necessary to bring them into conformity with
the Constitution. Section 108 expressly provided that the
Leeward Islands (Emergency Powers) Order in Council 1959
would cease to have effect on September 1, 1967.    D

On May 30, 1967, the Governor proclaimed a state of
emergency and made the Emergency Powers Regulations
1967 under section 3 (1) of the Order in Council of 1959. On
June 10 the Governor made an order under regulation 3 (1)
of the regulations that the plaintiff (a retired inspector of
police) be detained. On June 11 the plaintiff was arrested.
He was imprisoned in humiliating and insanitary conditions.
On June 16 a written statement was served on him under    E
section 15 of the Constitution which required that he be
furnished with a statement " specifying in detail " the grounds
on which he was detained. It stated that he had during 1967,
both within and outside the state, encouraged civil dis-
obedience throughout the state, thereby endangering the
peace, public safety and public order of the state. In July
at an inquiry into the plaintiff's detention the state conceded
that it had no evidence against him. On August 10 he was    F
released. In January 1968 the legislature passed the
Indemnity Act 1968, section 3 of which precluded the institu-
tion of legal proceedings in respect of acts done in the public
interest during the state of emergency. The Act was
expressed to be retroactive to May 30, 1967. In February
1968 the plaintiff brought an action against the Attorney-
General claiming (1) damages for false imprisonment, and
(2) compensation for unlawful detention under section 3    G
of the Constitution.

The High Court gave judgment for the plaintiff for
$5,000. On appeal by the Attorney-General and cross-appeal
by the plaintiff as to the amount of the damages, the Court
of Appeal held first, that section 3 (1) of the Leeward Islands

[1] St. Christopher, Nevis and Anguilla Constitution Order 1967, Sch. 2,    H
s. 3 (1), (6): see post, p. 652D–E.
S. 14: see post, p. 652F.
S. 16: see post, p. 653B.
S. 103 (1), (2), (5): see post, p. 653D–H.

A.C.                    **Attorney-General v. Reynolds (P.C.)**

A    (Emergency Powers) Order in Council 1959 was not in con-
formity with the Constitution and could not be so construed
under the provisions of section 103 of the Constitution and
that therefore the Emergency Powers Regulations 1967 were
void and the plaintiff's detention unlawful; and, secondly, that
sections 3 and 5 of the Indemnity Act 1968[2] were contrary
to section 16 of the Constitution and void and accordingly
afforded no protection against the plaintiff's action. The court
dismissed the Attorney General's appeal and increased the
B    amount of the damages to $18,000 to include "a small sum
as exemplary damages."

On the Attorney-General's appeal to the Judicial Com-
mittee: —

*Held,* dismissing the appeal, (1) that after the Constitution
came into effect the Leeward Islands (Emergency Powers)
Order in Council 1959 did not continue in force as originally
C    promulgated but was confirmed as an existing law which,
by virtue of section 103 (1) of the Constitution, had to
be construed in accordance with any modification, adapta-
tion, qualification or exception necessary to bring it into
conformity with the Constitution; that the express provision
in section 108 for the expiry of the Order in Council did not
protect the Order in Council from such modifications and
adaptations; and that, accordingly, section 3 (1) of the Order in
D    Council properly construed in accordance with section 103 (1)
and in the light of section 14 of the Constitution provided
that the Governor of a state might during a period of public
emergency in that state make such laws for securing the
public safety or defence of the state or the maintenance of
public order or for maintaining supplies and services
essential to the life of the community, to the extent that
those laws authorised the taking of measures that were
E    reasonably justifiable for dealing with the situation which
existed during the emergency; and that, therefore, on May 30,
1967, the Governor had had power under the Order in
Council to make the Emergency Powers Regulations 1967
(post, pp. 654B–E, 655D–H).

*Charles* v. *Phillips and Sealey* (1967) 10 W.I.R. 423 and
*Herbert* v. *Phillips and Sealey* (1967) 10 W.I.R. 435 over-
ruled in part.

F    *Per curiam.* The basis upon which Isaacs J. in *Australian
Agricultural Co.* v. *Federated Engine-Drivers and Firemen's
Association* rests his opinion is unsound. So long as there is
an appeal from a Court of Appeal to their Lordships' Board
or to the House of Lords, the Court of Appeal should
follow its own decisions on a point of law and leave it to the
final appellate tribunal to correct any error in law which may
have crept into any previous decision of the Court of Appeal.
G    (post, p. 660B–E).

Dictum of Isaacs J. in *Australian Agricultural Co.* v.
*Federated Engine-Drivers and Firemen's Association of
Australasia* (1913) 17 C.L.R. 261, 278–279 doubted.

(2) That the validity of the Emergency Powers Regulations
1967 depended on the construction to be given to the opening
words of regulation 3 (1) "If the Governor is satisfied" and
those words should be construed consistently with the modified
H    meaning of section 3 (1) of the Order in Council of 1959 and
with sections 3 and 14 of the Constitution; that on its true

[2] Indemnity Act 1968, ss. 3, 5: see post pp. 641G—642D.

Attorney-General v. Reynolds (P.C.)                    **[1980]**

construction regulation 3 (1) meant that if the Governor was
satisfied that any person had recently been concerned in acts    A
prejudicial to the public safety or to public order and that
by reason thereof it was reasonably justifiable and necessary
to exercise control over him, he could make an order against
that person directing that he be detained, and that so con-
strued regulation 3 (1) conformed with the Constitution; but
that since the statement given to the plaintiff on June 16
gave no details of any reasonable ground on which the    B
Governor had detained him and there was no other evidence
of any such ground, on the facts there was an irresistible
presumption that no reasonable grounds existed, so that the
detention order was invalid and the plaintiff's detention was
unlawful (see post, pp. 656E–F, 661D–H).

Liversidge v. Anderson [1942] A.C. 206, H.L.(E.);
Nakkuda Ali v. Jayaratne [1951] A.C. 66, P.C. and Secretary
of State for Education and Science v. Tameside Metropolitan    C
Borough Council [1977] A.C. 1014, H.L.(E.) considered.

(3) That the Court of Appeal had been right in deciding
that since by sections 3 and 5 of the Indemnity Act 1968 the
legislature had purported to amend the entrenched section 16
of the Constitution without going through the procedure
prescribed by the Constitution for such amendment the
Indemnity Act was unconstitutional and void and afforded
no protection against the plaintiff's claim (post, p. 662A).    D

(4) That notwithstanding that the High Court had no
power to award exemplary damages on a claim for compen-
sation under section 3 (6) of the Constitution, the court could
award exemplary damages on a claim for false imprisonment;
that there was no rule requiring the court to quantify a sum
awarded as exemplary damages separately from that awarded
as general damages; and that, accordingly, there were no    E
grounds to justify interfering with the Court of Appeal's
award of damages even though it included a small sum as
exemplary damages (post, pp. 662E—663A).

Rookes v. Barnard [1964] A.C. 1129, H.L.(E.) considered.
Decision of the Court of Appeal of the West Indies
Associated States Supreme Court affirmed in part.

The following cases are referred to in the judgment of their Lordships:    F

Australian Agricultural Co. v. Federated Engine-Drivers and Firemen's
    Association of Australasia (1913) 17 C.L.R. 261.
Charles v. Phillips and Sealey (1967) 10 W.I.R. 423.
Farrell v. Alexander [1977] A.C. 59; [1976] 3 W.L.R. 145; [1976] 2 All
    E.R. 721, H.L.(E.).
Herbert v. Phillips and Sealey (1967) 10 W.I.R. 435.
Liversidge v. Anderson [1942] A.C. 206; [1941] 3 All E.R. 338, H.L.(E.).    G
Minister of Home Affairs v. Fisher [1980] A.C. 319; [1979] 2 W.L.R.
    889; [1979] 3 All E.R. 21, P.C.
Nakkuda Ali v. Jayaratne [1951] A.C. 66, P.C.
Ridge v. Baldwin [1964] A.C. 40; [1963] 2 W.L.R. 935; [1963] 2 All E.R.
    66, H.L.(E.).
Rookes v. Barnard [1964] A.C. 1129; [1964] 2 W.L.R. 269; [1964] 1 All
    E.R. 367, H.L.(E.).    H
Secretary of State for Education and Science v. Tameside Metropolitan
    Borough Council [1977] A.C. 1014; [1976] 3 W.L.R. 641; [1976]
    3 All E.R. 665, C.A. and H.L.(E.).

**A.C.**    **Attorney-General v. Reynolds (P.C.)**

A

*Young* v. *Bristol Aeroplane Co. Ltd.* [1944] K.B. 718; [1944] 2 All E.R. 293, C.A.; [1946] A.C. 163; [1946] 1 All E.R. 98, H.L.(E.).

The following additional cases were cited in argument:

*Assa Singh* v. *Mentri Besar, Johore* [1969] 2 M.L.J. 30.

*Attorney-General for Alberta* v. *Attorney-General for Canada* [1947] A.C. 503, P.C.

B

*Beckles* v. *Dellamore* (1965) 9 W.I.R. 299.

*Broome* v. *Cassell & Co. Ltd.* [1972] A.C. 1027; [1972] 2 W.L.R. 645; [1972] 1 All E.R. 801, H.L.(E.).

*Christie* v. *Leachinsky* [1947] A.C. 573; [1947] 1 All E.R. 567, H.L.(E.).

*Dumbell* v. *Roberts* [1944] 1 All E.R. 326, C.A.

*Francis* v. *Chief of Police* [1973] A.C. 761; [1973] 2 W.L.R. 505; [1973] 2 All E.R. 251, P.C.

C

*Hamilton* v. *Halesworth* (1937) 58 C.L.R. 369.

*Hussien* v. *Chong Fook Kam* [1970] A.C. 942; [1970] 2 W.L.R. 441; [1969] 3 All E.R. 1626, P.C.

*Kanda* v. *Government of Malaya* [1962] A.C. 322; [1962] 2 W.L.R. 1153, P.C.

*McArdle* v. *Egan* (1933) 30 Cox C.C. 67, C.C.A.

D

*Maharaj* v. *Attorney-General of Trinidad and Tobago (No. 2)* [1979] A.C. 385; [1978] 2 W.L.R. 902; [1978] 2 All E.R. 670, P.C.

*Phillips* v. *Eyre* (1870) L.R. 6 Q.B. 1

*Tiverton Estates Ltd.* v. *Wearwell Ltd.* [1975] Ch. 146; [1974] 2 W.L.R. 176; [1974] 1 All E.R. 209, C.A.

E    APPEAL (No. 8 of 1978) by the Attorney-General of St. Christopher, Nevis and Anguilla, from a judgment (November 28, 1977) of the Court of Appeal of the West Indies Associated States Supreme Court (St. Bernard Ag. C.J., Peterkin J.A. and Nedd Ag. J.A.) dismissing the Attorney-General's appeal from a judgment (February 28, 1973) of the High Court (Glasgow J.) in favour of John Joseph Reynolds (the plaintiff) in his action against the state in the name of the Attorney-General for damages for false imprisonment and for compensation under F section 6 (1) of the Constitution for unlawful detention. The Court of Appeal allowed the plaintiff's cross-appeal against Glasgow J.'s award of damages of $5,000 and increased the amount to $18,000. On the Attorney-General's contention that the Indemnity Act 1968 discharged and made void the plaintiff's proceedings against the state, Peterkin J.A., delivering the judgment of the Court of Appeal, said:

G    "The Indemnity Act was passed in January 1968 and has been referred to as a healing statute. The teeth of the Act are to be found in sections 3 and 5. Section 6 deems the Act to have come into force on May 30, 1967. Sections 3 and 5 are as follows: '3. (1) No action or other legal proceeding whatsoever whether civil or criminal, shall be instituted in any court of law for or on account of or in respect of any act, matter or thing done, whether within or without H    the state, during the state of emergency before the passing of this Act, if done in good faith, and done or purported to be done in the execution of his duty or for the defence of the state or the public

safety, or for the enforcement of discipline or otherwise in the
public interest, by a person holding office under or employed in the    A
service of the Crown in any capacity, whether naval, military, air-
force, or civil or by any other person acting under the authority of
a person so holding office or so employed; and if any such pro-
ceeding has been instituted whether before or after the passing of
this Act, it shall be discharged and made void; . . . (2) For the
purposes of this section, a certificate by a government department    B
that any act, matter, or thing was done under the authority of a
person so holding office or so employed as aforesaid, or was done
in execution of a duty, shall be sufficient evidence of such authority
or duty and of such act, matter or thing having been done thereunder,
or in execution thereof, and any such act, matter or thing done by
or under the authority of a person so holding office or so employed
as aforesaid shall be deemed to have been done in good faith unless    C
the contrary is proved. . . . 5. All laws, Acts, Ordinances, proclama-
tions, regulations, orders, resolutions and other legislative acts made,
issued, passed or done by the House of Assembly, the Cabinet, the
Governor, a Minister or any other lawful authority during the state
of emergency before the passing of this Act, for the peace, order
or good government of the state shall be deemed to be and always    D
to have been valid and of full effect until repealed or superseded by
such lawfully constituted legislative authority of the state, notwith-
standing that any such legislative act may have been repealed,
suspended or been inconsistent with the law previously in force in
the state.'

" The Act therefore purports not only to deem legal and constitu-
tional the detention of the plaintiff during the state of emergency as    E
therein defined but also prohibits his taking any action whatsoever
before any court to determine the legality of his detention. It
would mean in effect that the legality or otherwise of any act of arrest
or detention, even if done in total disregard of the Constitution, and
however capricious, would not be justiciable. . . . It is clear that
what the Indemnity Act seeks to do is to amend section 16 of the    F
Constitution. It seeks to take away the fundamental right of
access to the High Court by the plaintiff which the Constitution
ensures to him and which cannot be so easily amended, being an
entrenched clause of the Constitution. In my opinion, therefore,
the Indemnity Act is unconstitutional, null and void."

The facts are stated in the judgment of their lordships.    G

*Lee Moore,* Attorney-General of St. Christopher, Nevis and Anguilla,
*Henry Browne* (Crown Counsel of St. Christopher, Nevis and Anguilla),
*Richard Fernyhough* and *Delano Bart* for the Attorney-General. On a
proper construction of the Leeward Islands (Emergency Powers) Order in
Council 1959 (" the Order in Council of 1959 "), the Emergency Powers    H
Regulations 1967 and the Constitution the detention of the plaintiff was
lawful. But in any event if there was any illegality it was cured by the
Indemnity Act 1968.

**A.C.**                    **Attorney-General v. Reynolds (P.C.)**

A    Section 108 of the Constitution deals specifically with the Order in
Council of 1959. That section is without reservation and it is a necessary
implication from its terms that the Order in Council remained in full force
and effect as originally drafted until the date specified. The strategy behind
the section was to put pressure on the legislature to enact suitable substitute
legislation without delay. The Order in Council constituted a sufficient
basis for the proclamation of emergency and for the Emergency Powers
B    Regulations 1967. On a proper view the Constitution is to be regarded as
having come into force subject to (i.e. in so far as it is consistent with) the
Order in Council of 1959. It is important to note that the Order in Council
deals only with emergencies and contains no general postponement of
fundamental rights. Without the Order in Council it is doubtful whether
the Governor would have had power to make the Emergency Powers
Regulations 1967.
C    An alternative view of the interaction of the Order in Council of 1959
and the Constitution is that the Order in Council is part of the body of
·" existing law " which is contemplated by section 103 of the Constitution
and therefore to be modified or adapted to bring it into conformity with the
Constitution. Section 103 (1) of the Constitution contemplates that existing
laws may have to be modified. The court is not entitled to strike out or
D    declare an existing law void but where such a law conflicts with the Con-
stitution the court must use the Constitution to " launder " the existing law
into conformity, i.e., the law must be read, refurbished or adapted
·in the light of the Constitution: *Kanda* v. *Government of Malaya* [1962]
A.C. 322, 334 and *Assa Singh* v. *Mentri Besar, Johore* [1969] 2 M.L.J. 30.
By contrast a post-Constitution law which is in conflict with the Constitu-
·tion would be void. It is conceded that if a provision is irreconcilable it
E    may be necessary to strike it out but only where a substitute provision is
to be inserted. The court has a duty under the Constitution to keep any
·pre-existing law in force so that it complies with the Constitution. It is
clear from section 103 (5) that " existing law " means existing written law
·and it would not be within the power of the court to modify unwritten law
into conformity with the Constitution in the same way.
F    If section 3 (1) of the Order in Council of 1959 is construed according
to section 103 (1) of the Constitution and in the light of section 14 of the
Constitution it provides that the Governor may make laws in an emergency
" to the extent that those laws are reasonably justifiable " for dealing with
the situation which exists in the state during the emergency. Section 103
(1) and (2) allow section 14 to be read into the Order in Council of 1959.
Both sections 14 and 17 are specified in the declaration of emergency. On
G    the facts section 17 (2) did not apply: the legislature met and extended the
emergency. Section 14 contemplates a situation which is to be provided
for by the legislature but it is conceded that for the Attorney-General to
rely on section 14 the detention of the plaintiff must have been reasonably
justifiable. If a course of action is necessary or expedient it is justifiable.
*Charles* v. *Phillips and Sealey* (1967) 10 W.I.R. 423 and *Herbert* v. *Phillips
and Sealey* (1967) 10 W.I.R. 435 were wrongly decided. The court is able
H    to recognise a situation which exists and therefore can gauge what is
reasonably justifiable in the light of it. " Measures " in section 14 must
be seen as a whole and must be reasonably justifiable. An individual

action may be not justifiable but that will not vitiate the measures. There
is a prima facie presumption that everything done by a public official is $\quad$ A
proper. The Attorney-General is not seeking to rely on *Liversidge* v.
*Anderson* [1942] A.C. 206 in this context. Where the legislature has
passed a law authorising the taking of measures to deal with an emergency
section 14 applies unless it can be shown that the measures were not
reasonably justifiable for dealing with the situation. As to " reasonably
justifiable," see *Beckles* v. *Dellamore* (1965) 9 W.I.R. 299. The burden of $\quad$ B
proof lies on the party alleging that a provision or action is unreasonable:
*Francis* v. *Chief of Police* [1973] A.C. 761. Accordingly here the onus
lay on the plaintiff to show that the regulations were unreasonable or not
reasonably required.

Although regulation 3 of the Emergency Powers Regulations 1967
provides that the Governor must be satisfied there is no need for him to be
reasonably satisfied except to the extent that his discretion must not be $\quad$ C
exercised capriciously. It is enough if the Governor makes an honest
decision that he is satisfied. The tests of whether the Governor was satis-
fied and whether the regulations were reasonably required are the same.
The seemingly absolute discretion given by section 14 of the Constitution
has to be exercised according to established principles. What is " necessary
or expedient " is limited by the facts and those words lead to the same test $\quad$ D
as that for whether an action is reasonably justifiable. The terms of the
Emergency Powers Regulations themselves show that they were reasonably
justifiable. To treat regulation 3 as constitutional it is not necessary to
modify it into conformity under section 103 of the Constitution because it
was enacted by the Governor after the Constitution came into force. That
the Order in Council of 1959 was an existing law makes no difference to
that situation. $\quad$ E

If, contrary to these submissions, it is necessary to reconcile regulation
3 of the Emergency Powers Regulations 1967 with section 3 of the Con-
stitution, that may be done by the operation of section 103 (2) of the
Constitution. Notwithstanding that regulation 3 was not made by the legis-
lature it is valid having been made under a power conferred by the Order
in Council of 1959 which was itself an existing law at the coming into force $\quad$ F
of the Constitution. Both together are to be brought into conformity with
the Constitution, i.e., not only with section 3 but also with section 14.
Section 15 of the Constitution is a substantive provision and contemplates
regulations made under the Order in Council of 1959 and it is clear that
there was no need for re-enactment of the regulation-making power given
by the Order in Council. Section 3 (2) of the Constitution contemplates
the possibility of the detention of persons during an emergency. $\quad$ G

The detention order itself was lawful. The Governor's decision to issue
a detention order can be reviewed by the court. But the court is not
entitled to substitute its discretion for his. The doctrines of the presumption
of regularity and presumed constitutionality are really the same and justify
the view that the Governor's discretion was exercised lawfully and in good
faith unless the contrary is proved. The Governor can detain without $\quad$ H
giving reasons, merely asserting that he has good ones: see *Liversidge* v.
*Anderson* [1942] A.C. 206, 237, *per* Lord Atkin. The order of the
Governor is prima facie evidence that he is satisfied. The Governor may

**A.C.**                **Attorney-General v. Reynolds (P.C.)**

A    be satisfied by evidence which would not be sufficient in a court of law or which cannot be made public: *McArdle* v. *Egan* (1933) 30 Cox C.C. 67, 70.  It is conceded that under regulation 3 there must be reasonable ground for suspicion but the fact of the emergency will bear on the reasonableness. Under section 15 (2) of the Constitution the Governor may disregard any recommendation of the tribunal and continue a detention, the inference being that he does so on grounds that seem good.  The remedy of habeas

B    corpus is available in St. Christopher, Nevis and Anguilla as part of the common law.  The reception of common law was before the Habeas Corpus Act 1816.

Any illegality committed during the emergency was cured by the Indemnity Act 1968.  That was a legitimate exercise by the legislature of its powers under the Constitution: see sections 14 and 34 of the Constitu-

C    tion and *Phillips* v. *Eyre* (1870) L.R. 6 Q.B. 1.  Parliament is sovereign, it can legislate both prospectively and retrospectively and thereby abrogate fundamental rights: see section 41 (4) of the Constitution.  That is subject only to the overruling power of the Imperial Parliament.  After an emergency has developed a Governor may have a better grasp of how to deal with it.  He may have made mistakes and the best way to deal with them is by an indemnity Act.  The fundamental right of access to the court

D    is entrenched in section 16 of the Constitution and cannot be taken away except by amendment of the Constitution.  Therefore anyone alleging infringement of his fundamental right has a substantive right of action under the Constitution.  But section 3 of the Indemnity Act does not take that away.  It provides a defence which nullifies the right by striking at the right to bring the action.  It is in the nature of a limitation statute. It only protects against acts done in good faith.  There is no vice in section

E    5 of the Indemnity Act which validates acts rather than takes away rights. The abrogation of fundamental rights during an emergency is not an alteration of the Constitution.  If section 3 of the Indemnity Act is objectionable then section 5 is severable.  For the principles of severability, see *Attorney-General for Alberta* v. *Attorney-General for Canada* [1947] A.C. 503.

*Fernyhough* following.  The plaintiff made no claim for aggravated or

F    exemplary damages. Exemplary damages must now be specifically pleaded: see *Broome* v. *Cassell & Co. Ltd.* [1972] A.C. 1027.  Here damages are recoverable only in so far as they are compensatory but not if they contain a punitive or aggravated element.  It is conceded that the conditions of an illegal detenion are relevant to loss.  *Dumbell* v. *Roberts* [1944] 1 All E.R. 326, which was relied on by the plaintiff before Glasgow J., has been overtaken by *Rookes* v. *Barnard* [1964] A.C. 1129.  The power under the

G    Constitution to order compensation is comparable to the common law power to award damages simpliciter.  That excludes any element not related to loss: *Broome* v. *Cassell & Co. Ltd.* [1972] A.C. 1027 and *Rookes* v. *Barnard* [1964] A.C. 1129.  The use of the term " exemplary damages " by the Court of Appeal indicates that the court erred in principle.  Where there has been unlawful arrest or detention the court is restricted to com-

H    pensating the plaintiff and if he has not been injured by the detention there is no subject-matter for compensation.  That is so notwithstanding any outrage the court may feel at the imprisonment.  It was the difficulty in a jury's keeping a sense of outrage separate from a duty to compensate for

loss suffered which led to the restriction of exemplary damages in *Rookes*
v. *Barnard* [1964] A.C. 1129, 1228. If the measure of damages is the **A**
same under section 3 (6) of the Constitution as at common law it is not
necessary to consider whether the constitutional remedy supplants the
common law remedy of damages for false imprisonment. Here since the dam-
ages can only be compensatory the Board does not have to decide the
question whether if section 3 of the Indemnity Act 1968 excludes an action
for damages it is nevertheless unconstitutional in relation to section 16 of **B**
the Constitution and therefore does not exclude a claim for compensation.
The damages awarded were too high. An analogy can be drawn with the
ex gratia payments for wrongful imprisonment in this country which are
not generous. It is not part of the court's function to express disapproval
of the executive by the size of awards.

Generally it seems that the Court of Appeal is bound by its own **C**
decisions (see *Tiverton Estates Ltd.* v. *Wearwell Ltd.* [1975] Ch. 146)
subject to *Young* v. *Bristol Aeroplane Co. Ltd.* [1944] K.B. 718. But
there is a distinction between ordinary cases and those turning on the
construction of the Constitution. The Court of Appeal being the ultimate
tribunal in the state charged with the resolution of all constitutional
questions is not bound by its previous decisions and should consider each
case de novo: see *Australian Agricultural Co.* v. *Federated Engine-Drivers* **D**
*and Firemen's Association of Australasia* (1913) 17 C.L.R. 261, 274–279.
The Court of Appeal decided *Charles* v. *Phillips and Sealey*, 10 W.I.R.
423, and *Herbert* v. *Phillips and Sealey*, 10 W.I.R. 435, without reference
to *Kanda* v. *Government of Malaya* [1962] A.C. 322. The Constitution
itself imposes a duty on the High Court to resolve difficulties of construc-
tion of the Constitution: see sections 16, 98 (2), 99, 100, 101. That duty
is in a different category from the duty to try other cases at first instance. **E**
But regardless of the position of the High Court it is enough for the
purposes of the present case to establish that the Court of Appeal is not
bound by its previous decisions.

*Jonathan Harvie* for the plaintiff. It is not necessary in this case for
exemplary or aggravated damages to have been expressly pleaded. The
nature of the pleadings invites an award of aggravated damages and any **F**
failure to pray for them has not prejudiced the Attorney-General. The
court has to look at compensation in the context of section 3 (6) of the
Constitution. That subsection contemplates the very situation contem-
plated by Lord Devlin in *Rookes* v. *Barnard* [1964] A.C. 1129. It is
conceded that " exemplary " does mean punitive or aggravated and
therefore heavier against a defendant for something he has done. If
contrary to the plaintiff's submission exemplary damages should be **G**
expressly asked for there is nothing to suggest that the amount awarded
was not proper compensation for the wrong suffered. It is open to the
Board itself to vary the award or to remit the case to the Court of
Appeal: *Hussien* v. *Chong Fook Kam* [1970] A.C. 942.

Notwithstanding the constitutional questions which have been canvassed,
on the facts the detention order cannot be supported in law and the plaintiff **H**
is entitled to succeed. The effect of section 14 of the Constitution is that
the Governor must be really satisfied. *Liversidge* v. *Anderson* [1942] A.C.
206 does not assist on the burden of proof. Apart from any question of

**A.C.**                    **Attorney-General v. Reynolds (P.C.)**

A  bad faith the issue is whether it is for the executive or the plaintiff to prove
   or disprove (as the case may be) " reasonably satisfied." It is important
   to distinguish between the evidential burden and the legal or ultimate
   burden. The plaintiff only has to call enough evidence to shift the evidential
   burden to the Attorney-General. The court has to look at what is practi-
   cable: a plaintiff cannot establish bad faith if the Governor is not available
   for cross-examination. A detainee's surmise as to why he has been de-
B  tained is not enough to establish " reasonably satisfied."

        " Necessary or expedient " used in section 3 (1) of the Order in Council
   of 1959 must include " reasonably justifiable " used in section 14 of the
   Constitution. Here the Governor can only do what is reasonably justifiable.
   That requirement is entrenched in the Constitution and the burden of
   proving that an act is reasonably justifiable is on the executive. It is clear
   from sections 14 and 16 of the Constitution that judicial review of executive
C  acts is intended. If the Order in Council of 1959 must be construed into
   conformity with the Constitution the Governor's power under the Order in
   Council must be translated into power to make laws provided they are
   reasonably justifiable for dealing with the situation as it exists. That means
   that regulation 3 of the Emergency Powers Regulations 1967 must have
   " reasonably satisfied " read into it. As to whether the Governor can apply
D  regulation 3 and whether " satisfied " in that regulation limits the judicial
   review of his action the plaintiff adopts the view of the Board in *Nakkuda
   Ali* v. *Jayaratne* [1951] A.C. 66, 76–77. Practically that means that if the
   Governor refuses to give reasons for a detention and a plaintiff detainee
   testifies " I have done nothing wrong " the burden shifts to the Governor
   to show that he did have reason and he must be able to point to some
   grounds for satisfaction. It is conceded that the Governor has a discretion
E  but there must have been some evidence on which he could have been
   satisfied: *Secretary of State for Education and Science* v. *Tameside
   Metropolitan Borough Council* [1977] A.C. 1014. It is conceded that in
   an emergency any burden of proof on the Governor will not be heavy. For
   the position where relevant facts are peculiarly within the knowledge of
   one party, see *Cross, Evidence,* 4th ed. (1974), pp. 85–86. Where the
F  burden of proof is to be discharged according to the balance of prob-
   abilities calling no evidence must affect that balance.

        If *Liversidge* v. *Anderson* [1942] A.C. 206 is good law it decides that
   in time of war and in the circumstances in which the Defence Regulations
   were made it is plain that Parliament intended to exclude the principles
   of natural justice and therefore to exclude judicial review: see *Nakkuda
   Ali* v. *Jayaratne* [1951] A.C. 66; *Ridge* v. *Baldwin* [1964] A.C. 40 and
G  *Secretary of State for Education and Science* v. *Tameside Metropolitan
   Borough Council* [1977] A.C. 1014. In the present case it is clear that
   there was no intention to exclude the principles of natural justice because
   sections 14 and 16 of the Constitution limit the extent (even in times of
   emergency) to which the legislature can derogate from the fundamental
   rights and freedoms set out in the Constitution: *Ridge* v. *Baldwin* [1964]
H  A.C. 40, 73 and *Wade, Administrative Law,* 4th ed. (1977), pp. 386–387.
   The court may inquire into whether there are reasonable grounds for the
   Governor's satisfaction. If there are such grounds then the court may not
   substitute its discretion for that of the Governor. But the executive cannot

be in a better position during a transitional period than it would be under    A
legislation passed by a legislature fettered by section 3 of the Constitution.
If *Liversidge* v. *Anderson* [1962] A.C. 206 is right and is applied here it
excludes judicial review contrary to sections 14 and 16 of the Constitution.
Section 14 limits the permissible derogation from the fundamental rights
and does not go as far as *Liversidge* v. *Anderson*. Unless " satisfied " in
regulation 3 means " really satisfied " it is ultra vires any law which
complies with section 14 of the Constitution.    B

The Order in Council of 1959 as originally drafted offends section 3 of
the Constitution. It cannot be brought into conformity with the Constitu-
tion and therefore it must fail. Section 108 of the Constitution is a negative
section and should not be read positively. It would have been easy to draft
the section in a positive form. At the coming into force of the Constitution
the Order in Council was an existing law. Whether it was in full force and    C
effect or subject to construction under section 103 of the Constitution or of
no effect must make a difference to the validity of actions done in reliance
on section 14 of the Constitution. The Governor's power to amend existing
law under subsection (3) of section 103 of the Constitution is distinguish-
able from the power to construe by modification under subsections (1) and
(2). The Order in Council could only be kept in being by amendment
under section (3). Subsections (1) and (2) have no application because the    D
changes necessary to bring the Order in Council into conformity with the
Constitution are too drastic for a process of construction. If those sub-
sections did apply then any existing law could be " laundered " as suggested
by the Attorney-General and there would be no need for subsection (3).
The plaintiff relies on the submissions advanced by the appellants in
*Charles* v. *Phillips and Sealey*, 10 W.I.R. 423, 426, and *Herbert* v. *Phillips
and Sealey*, 10 W.I.R. 435, 438, and adopts the fourth holding in the    E
headnote of *Charles's* case at p. 427.

What was done under the detention order was unconstitutional on its
face and cannot be cured by the Indemnity Act 1968. Alternatively,
sections 3 and 5 of the Indemnity Act are inconsistent with section 16 of
the Constitution in denying effective access to the courts and are void for
that reason.    F

*Moore* in reply. The powers to construe and amend given by section
103 of the Constitution are co-ordinate and the effect of that section is that
even if a legislative provision had not been amended by September 1, 1967,
nevertheless the process of construction could be applied.

Despite the attacks on it *Liversidge* v. *Anderson* [1942] A.C. 206 is a
very strong authority in the circumstances of this case. It is conceded that
it lays down no general principle but the limitation imposed on it in    G
*Nakkuda Ali* v. *Jayaratne* [1951] A.C. 66 leaves its authority untouched
in the present circumstances. The circumstances of an emergency are
similar to those of war. It is enough that the Governor was satisfied; he
need not have been reasonably satisfied. In any event " reasonably satis-
fied " is still a subjective formula. The court can inquire if the Governor
was satisfied but cannot probe further. Having regard to *Liversidge* v.    H
*Anderson* " honestly satisfied " would be a more apt formula. On the facts
of this case when the Governor signed the detention order he was justified
by the principle in *Liversidge* v. *Anderson* [1942] A.C. 206, but it is

A.C.                    Attorney-General v. Reynolds (P.C.)

A  conceded that where a court is able to look behind the order (as at the
hearing) and if it is stated that the Governor has no evidence against the
detainee it could be said that the Governor was not satisfied. But in such
a case the detention would not have been a trespass ab initio. It is unlawful
only from the date of the hearing and that would go to damages.

As to the plaintiff's submission that regulation 3 of the Emergency
Powers Regulation 1967 is ultra vires section 14 of the Constitution unless
B  " satisfied " means " reasonably satisfied ": " reasonably " could be read
into the regulation imported from section 14 or because it forms a necessary
limiting factor in the exercise of a discretion of this kind. It is conceded
that " reasonably satisfied " means " satisfied with reason " but on the
authority of Lord Atkin in *Liversidge* v. *Anderson* [1942] A.C. 206, 237,
the Governor does not have to show the grounds he had for being
satisfied.
C
The constitutional right to compensation overrides the common law right
to damages and compensation cannot include any element of punishment.

*Cur. adv. vult.*

June 25. The judgment of their Lordships was delivered by LORD
D  SALMON.
Before dealing with the important points of law raised by this appeal,
it is necessary to set out the relevant facts which were established by
uncontradicted and unchallenged evidence called on behalf of Mr. John
Joseph Reynolds, the plaintiff, at the trial of an action which he brought
against the Attorney-General of the State of St. Christopher, Nevis and
Anguilla and to which reference will be made later in this judgment.
E  The plaintiff was a member of the Leeward Islands Police Force from
October 20, 1933, to December 31, 1959, and of the St. Christopher, Nevis
and Anguilla Police Force from January 1, 1960, until October 26, 1964;
having then reached the age limit, he retired from the force holding the
rank of Inspector of Police. Prior to his retirement he had on at least
one occasion acted as Assistant Superintendent of Police and he had
F  received the Police Efficiency Medal and the Police Long Service Medal.
He was described by the Chief of Police in his discharge certificate as a
" dependable and knowledgeable officer." The plaintiff was a happily
married man with four children whose conduct and behaviour reflected
" a good home upbringing." He had the reputation of being " a very
decent and upright person " and a good churchman. He was also a
member of the People's Action Movement, which was a political party
G  in opposition to the party in power in 1967.
On May 30, 1967, the Governor of the State of St. Christopher, Nevis
and Anguilla (which will be referred to in this judgment as " the state ")
made a proclamation declaring that a state of emergency was in existence.
On the same day he made and published the Emergency Powers Regula-
tions 1967. The only relevant regulation is regulation 3 (1), which reads
H  as follows:

" 3. Detention of Persons. (1) If the Governor is satisfied that any
person has recently been concerned in acts prejudicial to the public
safety, or to public order or in the preparation or instigation of

Attorney-General v. Reynolds (P.C.)                    **[1980]**

such acts, or in impeding the maintenance of supplies and services
essential to the life of the community and that by reason thereof it is    A
necessary to exercise control over him, he may make an order against
that person directing that he be detained."

On June 10, 1967, the plaintiff was warned by an anonymous telephone
call and by certain acquaintances that he was about to be arrested and
imprisoned, and he was advised by his acquaintances to return to    B
Antigua, where he was born. The plaintiff replied that he had done
nothing wrongful, so he had nothing to fear and would stay where he
was. On June 11, 1967, the plaintiff was arrested by the police and
taken to the prison where he was detained until August 10, 1967, in
most insanitary and humiliating conditions. His arrest and detention were
carried out under a detention order signed by the Deputy Governor. It
reads as follows:                                                     C

"Order made under the Emergency Powers Regulations 1967.
Whereas I am satisfied that with respect to John Reynolds that he has
recently been concerned in acts prejudicial to the public safety
and to public order, and that by reason thereof it is necessary
to exercise control over him: now therefore, in pursuance of the
power conferred on me by regulation 3 of the Emergency Powers    D
Regulations 1967, and all other powers thereunto enabling me, I
do hereby order and direct that the said John Reynolds be detained.
Ordered by me this 10th day of June 1967 (sgd.) B. F. Dias,
Governor's Deputy."

On June 16, 1967, the following written statement (supposedly under
section 15 (1) (a) of the Constitution which is set out later in this judg-    E
ment) was delivered to the plaintiff whilst he was in prison:

"That you John Reynolds during the year 1967, both within and
outside of the state, encouraged civil disobedience throughout the
state, thereby endangering the peace, public safety and public order
of the state."

Early in July 1967 a tribunal presided over by a chairman, who later    F
became a Supreme Court judge, inquired into the cases of a number of
persons, including the plaintiff, then detained in prison. This inquiry
was held under section 15 (1) (c), (d) and (e) of the Constitution. The
hearings lasted about two weeks. The Government was represented by
senior Crown counsel. The plaintiff and the other detainees were also
legally represented. During the course of the hearings, the chairman
said to Crown counsel, "You have not led any evidence against the    G
plaintiff and two other detainees." To which Crown counsel replied,
"I have no evidence against them." The chairman said, "So I can
make my recommendation." Crown counsel replied, "I will speak to
the authorities." The clear inference from those remarks was that the
chairman considered that there were no grounds for detaining the plaintiff
and that Crown counsel agreed and would report accordingly to the    H
authorities.

It was not, however, until August 10, 1967, that the plaintiff was
released from detention. This happened to be on the same day as that

A  upon which the Court of Appeal gave judgment ordering that Mr. Charles
and Dr. Herbert, who had been arrested and detained at about the same
time as the plaintiff, should be released on the grounds that the Emergency
Powers Regulations 1967 contravened the Constitution and were there-
fore unlawful; and that, accordingly, the detention orders made under
those regulations were invalid.

B  Early in February 1968 the plaintiff brought an action against the
state in the name of the Attorney-General claiming, amongst other
things, damages for false imprisonment and compensation under
section 3 (6) of the Constitution on the ground that his detention had
been unlawful. The defence delivered early in March 1968 alleged that
the plaintiff had been lawfully arrested and detained and that, in any
event, his claim should be " discharged and made void " under the state's
C  Indemnity Act No. 1 of 1968.

On May 28, 1968, the solicitor acting for the Attorney-General issued
a summons praying that the plaintiff's action should be stayed under the
Indemnity Act 1968. After that, nothing happened for about five years
until April, 1973, when the Attorney-General's summons for a stay of the
action was heard and dismissed by Glasgow J. After about another
three years' delay, the action finally came on for hearing before Glasgow J.
D  towards the end of July 1976.

The trial judge gave judgment for the plaintiff, holding that he was
bound to find that the plaintiff's arrest and detention were unlawful
because of the decisions of the Court of Appeal in *Charles* v. *Phillips
and Sealey* (1967) 10 W.I.R. 423 and *Herbert* v. *Phillips and Sealey* (1967)
10 W.I.R. 435. Glasgow J. also found that the Indemnity Act 1968
E  contravened the Constitution and accordingly was of no effect; and he
gave judgment for the plaintiff for the sum of $5,000. The Attorney-
General appealed from that judgment, and the plaintiff cross-appealed
praying that the judgment should be varied by increasing the sum of the
damages awarded. The Court of Appeal dismissed the appeal and
allowed the cross-appeal increasing the damages to $18,000. The
Attorney-General now appeals to Her Majesty the Queen in Council from
F  both those decisions of the Court of Appeal.

This appeal raises the three following points of law and a fourth point
of mixed fact and law: 1. Were the Emergency Powers Regulations
1967 lawful? 2. If they were, was the detention order made against the
plaintiff under those regulations lawful? 3. If the first two points or
either of them is decided in favour of the plaintiff, does his claim fail
G  because of the Indemnity Act 1968? 4. If the plaintiff's claim succeeds,
ought the award of $18,000 to be reduced?

1. The first is probably the most important point to be decided, namely,
whether or not the Emergency Powers Regulations 1967 were lawful.
They purport to be made by the Governor under the Leeward Islands
(Emergency Powers) Order in Council 1959 and section 17 (1) of the
H  Constitution. Section 17 (1) of the Constitution empowers the Governor
to proclaim a state of emergency but it gives him no power to make
any regulations. Accordingly, the only source from which the Governor
could derive the power to make regulations in a state of emergency was

Attorney-General v. Reynolds (P.C.)                    **[1980]**

the Order in Council of 1959. This Order in Council had originally been
made under section 3 of the Leeward Islands Act 1956, which was    A
repealed by the West Indies Act 1962. This latter Act, however, enabled
the Order in Council of 1959 to be kept alive because the West Indies
(Dissolution and Interim Commissioner) Order in Council 1962 was made
under it. That Order in Council provided that all laws in force in each
territory immediately before the dissolution of the federation (which
included the Order in Council of 1959) should remain in force. The    B
Order in Council of 1962 also amended the Order in Council of 1959
by adding three new subsections to it. The only relevant section of the
Order in Council of 1959 is section 3 (1) which reads as follows:

> " The administrator of a colony to which this Order applies may,
> during a period of emergency in that colony, make such laws for
> the colony as appear to him to be necessary or expedient for securing    C
> the public safety, the defence of the colony or the maintenance of
> public order or for maintaining supplies and services essential to the
> life of the community."

In order to decide whether the Emergency Powers Regulations 1967
and the detention order against the plaintiff were lawful, it is necessary
to examine the following relevant parts of the Constitution.    D
Section 3:

> " (1) No person shall be deprived of his personal liberty save as
> may be authorised by law in any of the following cases, that is
> to say:— . . . [None of the cases then recited in this subsection
> includes regulations made by the Governor.] (6) Any person who is
> unlawfully arrested or detained by any other person shall be entitled    E
> to compensation therefor from that other person or from any other
> person or authority on whose behalf that other person was acting."

Section 14:

> " Nothing contained in or done under the authority of a law
> enacted by the legislature shall be held to be inconsistent with or
> in contravention of section 3 or section 13 of this Constitution to    F.
> the extent that the law authorises the taking during any period of
> public emergency of measures that are reasonably justifiable for
> dealing with the situation that exists in [the state] during that period."

Section 15:

> " (1) When a person is detained by virtue of any such law as    G
> is referred to in section 14 of this Constitution the following pro-
> visions shall apply, that is to say:—(a) he shall, as soon as reason-
> ably practicable and in any case not more than seven days after the
> commencement of his detention, be furnished with a statement in writing
> in a language that he understands specifying in detail the grounds
> upon which he is detained; . . ."    H

The rest of this subsection provides, amongst other things, that not more
than one month after the commencement of the detention, the detainee's

A   case shall be reviewed by an independent and impartial tribunal: and
that the detainee shall be allowed to have a lawyer to represent him
before the tribunal: and the tribunal may make recommendations to
the authority by which the detention was ordered but that authority shall
not be obliged to act on such representations.

Section 16:

B   "(1) If any person alleges that any of the provisions of sections
2 to 15 (inclusive) of this Constitution has been . . . contravened
in relation to him . . . then, without prejudice to any other action
with respect to the same matter which is lawfully available, that
person . . . may apply to the High Court for redress . . ."

Section 35 is the entrenchment section and provides, amongst other things,
C   that the legislature may not alter any of the provisions of the Constitution
except by the votes of not less than two-thirds of all the elected members
of the House of Assembly, and also provides that a Bill to alter section 35
of or Schedule 1 to the Constitution, or any of the provisions of the
Constitution specified in Part I of that schedule, shall not be submitted
to the Governor for assent unless, after the Bill has passed the House
of Assembly, it is approved on a referendum by not less than two-thirds
D   of all the votes validly cast on that referendum. Part I of Schedule 1
to the Constitution specifies, inter alia, sections 1 to 18 inclusive of the
Constitution.

Section 103:

"(1) The existing laws shall, as from the commencement of this
Constitution, be construed with such modifications, adaptations,
E   qualifications and exceptions as may be necessary to bring them
into conformity with . . . this Constitution. . . . (2) Where any
matter that falls to be prescribed or otherwise provided for under
this Constitution by the legislature or by any other authority or
person is prescribed or provided for by or under an existing law . . .
that prescription or provision shall, as from the commencement of
F   this Constitution, have effect (with such modifications, adaptations,
qualifications and exceptions as may be necessary to bring it into
conformity with . . . this Constitution . . .) as if it had been made
under this Constitution by the legislature or, as the case may require,
by the other authority or person. (3) The Governor may by Order
made at any time before September 1, 1967, make such amendments
G   to any existing law as may appear to him to be necessary or
expedient for bringing that law into conformity with the provisions
of . . . this Constitution . . . or otherwise for giving effect or enabling
effect to be given to those provisions. . . . (5) For the purposes of
this section, the expression 'existing law' means any Act, Ordinance,
law, rule, regulation, order or other instrument made in pursuance of
(or continuing in operation under) . . . the West Indies (Dissolution and
H   Interim Commissioner) Order in Council 1962 and having effect
as part of the law of [the state] . . . immediately before the
commencement of this Constitution."

Section 108:

A

"The Leeward Islands (Emergency Powers) Order in Council 1959 shall cease to have effect as part of the law of [the state] on September 1, 1967, or such earlier date as the legislature may prescribe."

Their Lordships consider that section 103 (5) of the Constitution makes it plain, beyond doubt, that the Leeward Islands (Emergency Powers) Order in Council 1959 was an "existing law" immediately before the commencement of the Constitution. The Constitution came into operation on February 27, 1967 (see the St. Christopher, Nevis and Anguilla Constitution Order 1967, section 1 (2)). Nor are their Lordships in any doubt that the Order in Council of 1959 continued to have effect, with the modifications and adaptations which will presently be described, until September 1, 1967, or such earlier date as the legislature may have prescribed. The legislature certainly made no such prescription before August 10, 1967—the date upon which the plaintiff was released.

B

C

The Attorney-General, whose arguments were all most ably presented, contended, however, that the effect of section 108 of the Constitution was to preserve (for the period specified) the Leeward Islands (Emergency Powers) Order in Council 1959 in full force and vigour as drafted. He submitted that, by reason of the section, the Constitution left untouched and unimpaired the provisions of the Order in Council and the powers it conferred upon the Governor. Their Lordships cannot accept this submission. The purpose of section 108 was a limited one—to ensure that powers existed to deal with an emergency, should one arise (as, indeed, happened) before the legislature had enacted appropriate (and constitutional) legislation for dealing with such an event. Their Lordships cannot read the section as limiting the generality of section 103 or protecting the Order in Council from any modifications or adaptations necessary to bring it into line with the Constitution.

D

E

It seems plain that section 108 intended to give the legislature six months within which to pass an Act replacing the Leeward Islands (Emergency Powers) Order in Council 1959. This gave the legislature ample time; and they would surely have passed such an Act within the specified period. Otherwise, in a state of emergency, there would have been no law giving the Governor or any other authority the right to arrest and detain anyone, however reasonably justifiable and urgently necessary it may have been to do so. During a period of emergency it may well be urgently necessary, in order to preserve the safety of the state, to detain certain persons immediately. If the House of Assembly were not sitting, or even if it were, it might be impossible to get the necessary Act through in time to deal effectively with the danger to the state. Until September 1, 1967, however, but only until such date, the Leeward Islands (Emergency Powers) Order in Council 1959, construed with such modifications, adaptations, qualifications and exceptions as were necessary to bring it into conformity with the Constitution, would be available to preserve the safety of the state if and when a period of emergency came into existence.

F

G

H

**A.C.**          **Attorney-General v. Reynolds (P.C.)**

A    In *Charles* v. *Phillips and Sealey,* 10 W.I.R. 423 and in *Herbert* v.
*Phillips and Sealey,* 10 W.I.R. 435 the Court of Appeal held (1) that the
provisions of section 3 of the Leeward Islands (Emergency Powers) Order
in Council 1959 were not in conformity with the Constitution, and
(2) that they were so much out of conformity, that it was impossible
to construe them so as to bring them into conformity with the Constitu-
tion: and that, therefore, the Emergency Powers Regulations 1967, which
B    purported to be made under that Order in Council, were invalid.  Their
Lordships agree with the first part of that finding but not with the second.

The law laid down by section 3 of the Order in Council of 1959 (as it
originally stood) and by section 14 of the Constitution had the same
purpose—namely, to ensure that measures could immediately be taken
during a state of public emergency, to arrest and detain persons whom
it was necessary to arrest and detain in order to secure public safety or
C    public order.  The difference between the two laws was that the first law
gave an authority absolute discretion, and indeed the power of a dictator,
to arrest and detain anyone, whilst section 14 of the Constitution allows
a law to be enacted conferring power to arrest and detain only if it was
reasonably justifiable to exercise such a power.  It is this very real
difference which makes the Order in Council of 1959 out of tune with
D    the Constitution.  If the Court of Appeal were right in concluding that
no modification or adaptation or qualification or exception could bring
the Order in Council into line with the Constitution, then they would
have been plainly right in holding that the Order in Council was nugatory
and the Emergency Powers Regulations 1967 invalid  Their Lordships
cannot, however, accept that the Constitution would have preserved the
life of the Order in Council of 1959 for any period if the Order in Council
E    could not be construed under section 103 of the Constitution so as to
bring it into conformity with the Constitution.  It is inconceivable that
a law which gave absolute power to arrest and detain without reasonable
justification would be tolerated by a Constitution such as the present,
one of the principal purposes of which is to protect fundamental rights
and freedoms.  Their Lordships do not consider that there is any difficulty
F    in construing the Order in Council by modification, adaptation, qualifica-
tion, or exception so as to bring it into conformity with the Constitution.
As stated in the judgment of their Lordships' Board in *Minister of Home
Affairs* v. *Fisher* [1980] A.C. 319, a Constitution should be construed
with less rigidity and more generosity than other Acts.  Their Lordships
are of opinion that the Order in Council should be construed, in accord-
G    ance with section 103 (1) and in the light of section 14 of the Constitution,
as follows:

"The Governor of a state may, during a period of public emergency
in that state, make such laws for securing the public safety or
defence of the state or the maintenance of public order or for main-
taining supplies and services essential to the life of the community
H          to the extent that those laws authorise the taking of measures that are
reasonably justifiable for dealing with the situation that exists in the
state during any such period of public emergency."

Having regard to the view which their Lordships take about section
103 (1), it is perhaps unnecessary to express any opinion about the rather   A
abstruse section 103 (2) of the Constitution.   Out of respect however
for the arguments addressed to their Lordships' Board on this subsection,
their Lordships would observe that as the Constitution preserved the
life of the Leeward Islands (Emergency Powers) Order in Council 1959
for a limited period, it seems to follow that if, during that period,
a state of emergency arose, it would fall to be provided for, not by the   B
legislature, but by an "existing law," namely the Order in Council of
1959, and that that Order in Council, during its life after "the commence-
ment of [the] Constitution," would have effect "with such modifications,
adaptations, qualifications and exceptions as may be necessary to bring
[it] into conformity with [the] Constitution." If this view is correct,
the Order in Council would have exactly the same effect under
section 103 (2) as it has under the construction which their Lordships   C
have given it under section 103 (1) of the Constitution.   In these circum-
stances, the fact that the Governor did not exercise his power under
section 103 (3) of the Constitution to amend the Order in Council of 1959
so as to bring it into conformity with the Constitution is irrelevant.

Since this judgment decides that the Leeward Islands (Emergency
Powers) Order in Council 1959 can and should be construed so as to bring   D
it into conformity with the Constitution, it destroys the basis upon
which the Court of Appeal found that the Emergency Powers Regulations
1967, made under that Order in Council, were invalid.   It does not,
however, necessarily follow that the Emergency Powers Regulations 1967
are therefore valid.   Their validity depends upon the proper construction
of the following crucial words in regulation 3 (1): "If the Governor is
satisfied . . ." These words can and should be given a meaning which   E
is consistent with sections 3 and 14 of the Constitution and with the
construction which their Lordships have put upon the Order in Council
under which the regulation was made.   Accordingly "is satisfied," which
might otherwise mean "thinks" or "believes," does mean:

> "if the Governor is satisfied upon reasonable grounds that any
> person has recently been concerned in acts prejudicial to the public   F
> safety or to public order . . . and that by reason thereof it is reason-
> ably justifiable and necessary to exercise control over him, he may
> make an order against that person directing that he be detained."

Their Lordships consider that it is impossible that a regulation made
on May 30, 1967, under an Order in Council which, on its true construc-
tion, conformed with the Constitution on that date, could be properly   G
construed as conferring dictatorial powers on the Governor: and that
is what the regulation would purport to do if the words "if the Governor
is satisfied" mean "if the Governor thinks that etc." No doubt Hitler
thought that the measures—even the most atrocious measures—which he
took were necessary and justifiable, but no reasonable man could think
any such thing.                                                        H

For these reasons their Lordships consider that regulation 3 (1) of
the Emergency Powers Regulations 1967, on its true construction, does
conform with the Constitution.

A    Several authorities have been cited in argument which are helpful
but none of which is directly in point. The first is *Liversidge* v. *Anderson*
[1942] A.C. 206. It concerns the construction of the Defence (General)
Regulations 1939, regulation 18B (1), which, so far as relevant, reads as
follows:

"If the Secretary of State has reasonable cause to believe any person
to be of hostile . . . associations . . . and that by reason thereof it
B    is necessary to exercise control over him, he may make an order
against that person directing that he be detained."

The plaintiff was detained by an order made under regulation 18B (1),
and he then brought an action for damages for false imprisonment against
the Home Secretary who had made the order for his detention. The
majority of the House of Lords decided that the words "if the Secretary
C    of State has reasonable cause to believe" meant "if the Secretary of
State thinks that he has reasonable cause to believe" providing he acts
in good faith. Lord Atkin, in his celebrated dissenting speech, held
that the words "If the Secretary of State has reasonable cause to believe"
meant what they said, namely that they give only a conditional authority
to the Minister to detain any person without trial, the condition being
D    that he has reasonable cause for the belief which leads to the detention
order.

The Attorney-General, whilst not relying on the decision in *Liversidge*
v. *Anderson* [1942] A.C. 206 because it was not directly in point, did
however rely on the following passage in Lord Atkin's speech at p. 237:

". . . if there were a certain ambiguity in the words 'has
reasonable cause to believe' the question would be conclusively
E    settled by the fact that the original form of the regulation issued
in September, 1939, gave the Secretary of State the complete dis-
cretion now contended for: "The Secretary of State is satisfied,
etc.' But it was withdrawn and published in November, 1939, in its
present form . . . What is certain is that the legislators intentionally
introduced the well known safeguard by the changed form of words."

F    Whilst their Lordships consider it unnecessary, for the reasons given by
the Attorney-General, to express any view about what Lord Reid in *Ridge*
v. *Baldwin* [1964] A.C. 40, 73 described as: "the very peculiar decision
of this House in *Liversidge* v. *Anderson*" they do consider it necessary
to deal with the passage in Lord Atkin's speech upon which the Attorney-
General did rely. No doubt that passage supports the argument that the
G    words "The Secretary of State is satisfied, etc." *may* confer an absolute
discretion upon the executive. Sometimes they do, but sometimes they
do not. In *Secretary of State for Education and Science* v. *Tameside
Metropolitan Borough Council* [1977] A.C. 1014 the question arose as
to whether section 68 of the Education Act 1944 gave an absolute dis-
cretion to the Secretary of State. That section reads as follows:

H    "If the [Secretary of State] is satisfied . . . that any local education
authority . . . have acted or are proposing to act unreasonably
with respect to the exercise of any power conferred or the per-
formance of any duty imposed by . . . this Act [upon the authority],

Attorney-General v. Reynolds (P.C.)                    [1980]

he may, notwithstanding any enactment rendering the exercise of
the power or the performance of the duty contingent upon the    A
opinion of the authority . . . give such directions as to the exercise
of the power or the performance of the duty as appear to him to
be expedient."

The House of Lords decided that that section's opening words " If the
[Secretary of State] is satisfied " did not confer an absolute discretion upon    B
him, and that accordingly the court should exercise its judgment (a) as
to whether grounds existed which were capable of supporting the Sec-
retary of State's decision, and (b) as to whether he had misdirected
himself on the law in arriving at his decision. The House also held that
if no such grounds existed or the Secretary of State had misdirected
himself, his decision, however bona fide it was, should be overruled
(see pp. 1047, 1064–1065, 1070 and 1074).    C

The *Tameside* case was exceptional in that the Secretary of State had
to be satisfied not that the local authority had made a wrong decision
in the exercise of the power conferred upon them, but that they had
made a decision which no reasonable local authority could have made.
The decision which the local authority made, that certain grammar
schools should continue in existence and should not be turned into com-    D
prehensive schools, was a policy decision.  It may have been right or
wrong but it certainly was not a decision at which no reasonable local
authority could have arrived.  Similarly, the local authority's decision
that there was plenty of time before the beginning of the next term in
which to make the necessary arrangements for the grammar schools to
continue in existence may have been right or wrong.  It was, however, im-
possible for the Secretary of State to have been satisfied that no reasonable    E
authority could have come to that decision on the evidence which was
before them.  Accordingly, it followed that either the Secretary of State
had misdirected himself as to the true meaning of section 68 of the
Education Act 1944 or that no reasonable Secretary of State could have
been satisfied that the local authority's decision was a decision at which
no reasonable local authority could have arrived.    F

In *Nakkuda Ali* v. *Jayaratne* [1951] A.C. 66 their Lordships' Board,
on an appeal from the Supreme Court of Ceylon, had to consider the
meaning of regulation 62 of the Defence (Control of Textiles) Regula-
tions 1945, which read as follows:

" Where the Controller has reasonable grounds to believe that any
dealer is unfit to be allowed to continue as a dealer, the Controller    G
may cancel the textile licence . . . issued to that dealer."

Lord Radcliffe in delivering the judgment of this Board referred to
*Liversidge* v. *Anderson* and said, at pp. 76–77:

" Their Lordships do not adopt a similar construction of the words
in regulation 62 . . .  Indeed, it would be a very unfortunate    H
thing if the decision of *Liversidge's* case came to be regarded as
laying down any general rule as to the construction of such phrases
when they appear in statutory enactments. . . .  After all, words

A    such as these are commonly found when a . . . law-making autho-
rity confers powers on a minister or official. However read, they
must be intended to serve in some sense as a condition limiting
the exercise of an otherwise arbitrary power. But if the question
whether the condition has been satisfied is to be conclusively decided
by the man who wields the power the value of the intended restraint
is in effect nothing. . . . Their Lordships therefore treat the words
B    in regulation 62 . . . as imposing a condition that there must in fact
exist such reasonable grounds, known to the Controller, before
he can validly exercise the power of cancellation."

The facts and background of the *Tameside* case, *Liversidge* v.
*Anderson*, the *Nakkuda Ali* case and the present case are, of course,
all very different from each other. This is why their Lordships have
C    reached their conclusion as to the true construction of regulation 3 (1)
of the Emergency Powers Regulations 1967 in reliance chiefly on the
light shed by the Constitution, rather than on such light as may be thrown
on that regulation by the authorities to which reference has been made.

Their Lordships have been asked by the Attorney-General to express
their opinion as to whether the Court of Appeal was right in considering
D    itself to be bound by the two previous decisions of that Court in
*Charles* v. *Phillips and Sealey*, 10 W.I.R. 423 and *Herbert* v. *Phillips and
Sealey*, 10 W.I.R. 435 to hold that regulation 3 (1) of the Emergency
Powers Regulations 1967 was invalid. Their Lordships consider that
the Court of Appeal was right in holding itself to be so bound, although
their Lordships have decided that regulation 3 (1) was valid for the
reasons stated in this judgment. Their Lordships agree with the decision
E    in *Young* v. *Bristol Aeroplane Co. Ltd.* [1944] K.B. 718 that, save for
three exceptions there stated but which are irrelevant to the present case,
the Court of Appeal is bound by its own decisions on points of law.
The Court of Appeal in England has never since 1944 departed from that
decision and the House of Lords has frequently endorsed it, firstly in *Young*
v. *Bristol Aeroplane Co. Ltd.* [1946] A.C. 163, 169 itself and most recently
F    in *Farrell* v. *Alexander* [1977] A.C. 59, 92, 105. The opinion of their
Lordships' Board and of the House of Lords on this question can, how-
ever, be only of persuasive authority. No doubt it would be treated
with great respect but it can not be of binding authority because the
point can never come before this Board or the House of Lords for
decision. Indeed if a case came before either in which the Court of
G    Appeal had refused to follow one of its own previous decisions on a
point of law the appeal would have to be dismissed if the final appellate
tribunal concluded that the previous decision was wrong.

The Attorney-General has drawn the attention of this Board to
*Australian Agricultural Co.* v. *Federated Engine-Drivers and Firemen's
Association of Australasia* (1913) 17 C.L.R. 261 and in particular to a
passage in the judgment of Isaacs J. in that case. That passage reads
H    as follows, at pp. 278–279 :

"The oath of a justice of this court is 'to do right to all manner
of people *according to law.*' Our sworn loyalty is to the law itself,

Attorney-General v. Reynolds (P.C.)                    **[1980]**

and to the organic law of the Constitution first of all. If, then, we
find the law to be plainly in conflict with what we or any of our    A
predecessors erroneously thought it to be, we have, as I conceive
no right to choose between giving effect to the law, and maintaining
an incorrect interpretation. It is not, in my opinion, better that the
court should be persistently wrong than that it should be ultimately
right . . . In my opinion, where the prior decision is manifestly
wrong . . . it is the paramount and sworn duty of this court to declare    B
the law truly."

Attractive as this pronouncement may sound and great as is the reputa-
tion of Isaacs J., their Lordships cannot agree that the basis upon which
he rests his opinion is sound. After all, the judicial oath to which he
refers is taken not only by justices of the High Court but by all judges.
Accordingly, if any puisne judge sitting at first instance concluded that    C
a judgment of the High Court, or, for that matter, of this Board, was
wrong in law, he also would be bound by his oath to disregard that
judgment. Their Lordships consider that if this became the accepted
practice of the courts the law would become so uncertain that no-one
could ever know what the law was or where he stood. This would
certainly be very much contrary to the public good. So long as there    D
is an appeal from a Court of Appeal to their Lordships' Board or to the
House of Lords, the Court of Appeal should follow its own decisions on
a point of law and leave it to the final appellate tribunal to correct
any error in law which may have crept into any previous decision of the
Court of Appeal. Neither their Lordships' Board nor the House of
Lords is now bound by its own decisions, and it is for them, in the very
exceptional cases in which this Board or the House of Lords has plainly    E
erred in the past, to correct those errors—just as it is for them alone to
correct the errors of the Court of Appeal.

In the circumstances such as the present where there is an appeal
from the Court of Appeal to their Lordships' Board it is, in their
Lordships' view, for the reasons stated, most important in the public
interest, that the Court of Appeal should be bound by its own previous    F
decision on questions of law save for the three exceptions specified in
*Young* v. *Bristol Aeroplane Co. Ltd.* [1944] K.B. 718.

2. It is now necessary to consider the second question, whether the
detention order made against the plaintiff was lawful. On the con-
struction which their Lordships put upon regulation 3 (1) of the Emer-
gency Powers Regulations 1967, this question must depend upon whether    G
there existed reasonable grounds upon which the Governor could be
satisfied that the plaintiff had been concerned in acts prejudicial to
public safety or to public order and that, by reason thereof, it was
reasonably justifiable and necessary to detain him.

Neither at the inquiry made early in July 1967 (to which reference
has already been made in this judgment) nor at the trial of the present    H
action presided over by Glasgow J. nor in the Court of Appeal was there
any glimmer of a suggestion put forward by the Governor or by the
Attorney-General of any reason, justification or ground upon which any

**A.C.**                    **Attorney-General v. Reynolds (P.C.)**

A  reasonable Governor could have been satisfied that the plaintiff had been concerned in acts prejudicial to the public safety or good order. The plaintiff gave evidence at the trial repeating what in effect he had said in evidence at the inquiry, namely that he had been warned that he was about to be arrested and advised to leave the state, that he had done nothing wrong and so he was not afraid and had decided to stay where he was. No evidence was called by Crown counsel at the inquiry and

B  none by the Attorney-General during the trial of the action. Had there been any evidence which could have shown that the plaintiff's detention was reasonably justifiable, surely it would have been called on both occasions.

Section 15 (1) of the Constitution has been set out in full earlier in this judgment. It provides that anyone in the plaintiff's position has to be furnished, not more than seven days after the commencement of his

C  detention, with a statement in writing specifying "*in detail*" the grounds upon which he was detained. As already mentioned, on the sixth day after the commencement of his detention he was served with a notice supposed to be in accordance with section 15 (1) of the Constitution. It is very short and its barren words bear repetition.

D      "That you John Reynolds during the year 1967, both within and outside of the state, encouraged civil disobedience throughout the state, thereby endangering the peace, public safety and public order of the state."

It is difficult to imagine anything more vague and ambiguous or less informative than the words of this notice. It was indeed a mockery to put it forward as specifying in detail the grounds on which the plaintiff

E  was being detained.

It seems plain to their Lordships that the irresistible inference to be drawn from this notice is that there were no grounds, far less any justifiable grounds, for detaining the plaintiff. Had there been any such grounds they would surely have been set out in the notice. If they were omitted from the notice by accident, which is hardly likely, evidence

F  on behalf of the Governor could have been called by Crown counsel at the hearing of the inquiry early in July 1967, or at the trial that took place about nine years later, showing that his detention was reasonably justifiable. Naturally the Governor would not have been obliged to furnish anyone with the sources of his information if he considered that it was contrary to public policy to do so. He could, however, have had

G  evidence called on his behalf or given evidence himself to state, with full particularity, exactly what the plaintiff had done to justify his detention, and when and where and how the plaintiff had done it. The fact that no grounds of any kind have been put forward on behalf of the Governor to justify him for making a detention order against the plaintiff, and all the circumstances of the case, raise an irresistible pre-

H  sumption that no such grounds have ever existed. Accordingly their Lordships have no doubt that the detention order was invalid and that the plaintiff was unlawfully detained.

A.C. 1980—26

3. The next question concerns the Attorney-General's contention that
the Indemnity Act 1968 affords him complete protection against any
such claim as the present. Sections 3 and 5 of that Act have been set
out in Peterkin J.A.'s judgment in the Court of Appeal with which the
other judges sitting with him concurred. It is unnecessary to repeat
these sections in this judgment. Their Lordships entirely agree with the
Court of Appeal, for the reasons which they so clearly give, that " the
Indemnity Act is unconstitutional, null and void.* "

4. The last question that falls to be decided concerns the damages
being raised to $18,000 by the Court of Appeal. Clearly Glasgow J.,
who gave an excellent judgment on all the issues of law that arose, was
in some doubt as to the amount of damages he should award. He said:

> " I am unable to find any similar cases decided in the region or
> elsewhere. They might have assisted me on the question of
> quantum."

The Court of Appeal came to the unanimous conclusion that, taking·
everything into account, the sum of $5,000 awarded at first instance was·
wholly inadequate, and they raised that sum to $18,000. It is not the usual·
practice of their Lordships' Board to interfere with the quantum of damages
assessed by the Court of Appeal in cases of this kind, save in exceptional
circumstances. Their Lordships cannot find anything on the facts of
the present case which could justify them in interfering with the damages
of $18,000 as assessed by the Court of Appeal.

The Attorney-General relied on the last few words of the judgment·
which revealed that the sum awarded included " a small sum as exemplary·
damages." His argument was that no exemplary damages should have
been awarded because compensation alone could be claimed under
section 3 (6) of the Constitution. This, no doubt, would be true but
for section 16 (1) of the Constitution, which makes it plain that anyone·
seeking redress under the Constitution may do so " without prejudice to
any other action with respect to the same matter which is lawfully avail-
able."; and in the present case, the plaintiff claimed (1) damages for
false imprisonment, and (2) compensation pursuant to the provisions of
section 3 (6) of the Constitution.

The Attorney-General did not dispute that if the Governor had acted
unconstitutionally, the present case would fall into the first category of
the cases which the House of Lords laid down as justifying an award of
exemplary damages, namely, " oppressive, arbitrary or unconstitutional
action by the servants of the government ": see *Rookes* v. *Barnard*
[1964] A.C. 1129, 1226. The Attorney-General did, however, argue
that the Court of Appeal had erred in not quantifying that part of the
$18,000 which represented exemplary damages. The observations on,
this topic in *Rookes* v. *Barnard* at p. 1228 were confined to trials by
jury. Even so, they do not suggest that if the jury gives exemplary
damages it must necessarily specify the amount of those damages
separately from the amount of compensatory damages which it awards.
Their Lordships are satisfied that obviously that judgment does not cast

---

* See, ante, p. 642E–G.

**A.C.**                    **Attorney-General v. Reynolds (P.C.)**

A   any such obligation upon a trial judge sitting alone or upon the Court
of Appeal.  Accordingly their Lordships can find no grounds which
could justify them in reducing the award of $18,000 damages or remitting
it for re-assessment.

   For these reasons, their Lordships will humbly advise Her Majesty
that the appeal be dismissed with costs.

B     Solicitors: *Kingsford, Dorman; Philip Conway, Thomas & Co.*

                                                            **T. J. M.**

C                              ————

                         [PRIVY COUNCIL]

   ATTORNEY-GENERAL OF HONG KONG   .   .   . APPELLANT
D                              AND

   IP CHIU AND ANOTHER   .   .   .   .   .   . RESPONDENTS

          [ON APPEAL FROM THE COURT OF APPEAL OF HONG KONG]

   1979 Oct. 23;              Lord Wilberforce, Lord Edmund-Davies,
       Dec. 3          Lord Russell of Killowen, Lord Keith of Kinkel
E                                              and Lord Lane

   *Hong Kong—Crime—Bribery—Accepting advantage in capacity as
     public servant—" Capacity "—Prevention of Bribery Ordinance
     (Laws of Hong Kong, 1974 rev. c. 201), s. 4 (2) (a)*

         The respondents, a police sergeant and a constable,
F     approached CK and accused him of selling heroin.  He
      admitted that he had done so two months previously.  After
      unsuccessfully searching CK, the respondents indicated that
      they wished to take him to a police station.  In order to avoid
      being beaten up, the planting of evidence on him or possible
      future harassment by the respondents, CK then gave them
      $2,000.  The respondents were charged under section 4 (2) (a)
      of the Prevention of Bribery Ordinance [1] that being public
G     servants they had accepted an advantage, namely $2,000 on
      account of their abstaining from performing an act in their
      capacity as public servants, namely taking police action in
      respect of an alleged dangerous drugs offence.  The magistrate
      ruled that the payment was made on account of the respon-
      dents' abstaining from taking any further action against CK
      and they were convicted.  The Court of Appeal of Hong Kong
      allowed their appeal holding that since the payment did not
H     relate to the offence previously committed, but was made in
      respect of a possible future allegation of an offence which
      would be proved by planted evidence and as the fabrication

      [1] Prevention of Bribery Ordinance, s. 4 (2): see post, p. 666G.

TAB 2

*Al Sabah v Grupo Torras  SA* [2005] 2 AC 333,
Privy Council on appeal from the
Court of Appeal of the Cayman Islands

333

**[2005] 2 AC**                                    Al Sabah v Grupo Torras SA (PC)

A                                    Privy Council

## Al Sabah and another *v* Grupo Torras SA

### [2005] UKPC 1

2004  Oct 25, 26, 27;                    Lord Hoffmann, Lord Scott of Foscote,
B  2005  Jan 11                                    Lord Rodger of Earlsferry,
                                                Lord Walker of Gestingthorpe and
                                                Lord Brown of Eaton-under-Heywood

*Cayman Islands — Bankruptcy — Jurisdiction — Courts of one British territory
assisting those of another in bankruptcy matters — Whether provision in
Westminster statute continuing to apply in overseas territory after repeal in
United Kingdom — Whether similar provision in Cayman legislation having
C  equivalent effect — Whether Cayman court having jurisdiction to act in aid of
Bahamian bankruptcy — Bankruptcy Act 1914 (4 & 5 Geo 5, c 59), s 122[1] —
Insolvency Act 1985 (c 65), ss 235, 236, Sch 10[2] — Insolvency Act 1986 (c 45),
s 426[3] — Bankruptcy Law (Laws of the Cayman Islands, 1997 rev, c 7), ss 107,
156[4]*
*Statute — Repeal — Extraterritorial effect — Imperial statute repealed by post-
imperial statute of Westminster Parliament — Whether repeal taking effect
D  outside United Kingdom*

The trustee in bankruptcy of a debtor in the Bahamas obtained from the
Bahamian court a letter of request directed to the Grand Court of the Cayman Islands
seeking its aid in setting aside two Cayman trusts established by the debtor. The
Grand Court held that it had jurisdiction to provide such assistance under either
section 156 of the Bankruptcy Law of the Cayman Islands or section 122 of the
E  Bankruptcy Act 1914 or under the court's inherent jurisdiction, and that it should as
a matter of discretion grant the Bahamian trustee powers under section 107 of the
Cayman Bankruptcy Law to enable him to set aside the trusts. An appeal by the
debtor's wife and son, who were beneficiaries under the trusts, was dismissed by
the Court of Appeal of the Cayman Islands.

On the appellants' appeal to the Privy Council—

*Held*, (1) that section 156 of the Cayman Bankruptcy Law was a re-enactment in
F  identical terms of section 161 of the Jamaican Bankruptcy Law 1880 under which,
prior to Jamaica becoming independent and while the Cayman Islands were still
being governed as a dependency of Jamaica, the bankruptcy courts of Jamaica and
the Grand Court of the Cayman Islands were required to act in each other's aid in
bankruptcy matters; that section 161 did not in terms have any extraterritorial effect
outside Jamaica and the Cayman Islands and it was hard to see what effect,
extraterritorial or otherwise, could sensibly have been intended by its re-enactment,
G  following Jamaica's independence, in a legal system under which there was only one
bankruptcy court; and that, accordingly, section 156 of the Cayman Bankruptcy Law
had no practical present effect in the Cayman Islands and could not be relied upon in
aid of a Bahamian bankruptcy ( post, paras 17, 21–22, 26–27).

(2) Dismissing the appeal, that section 122 of the Bankruptcy Act 1914, which
provided for mutual assistance between bankruptcy courts throughout the United
Kingdom and the British Empire, had been repealed under sections 235(3) and
H  236(2) of and Schedule 10 to the Insolvency Act 1985 in so far as it applied within the

---

[1] Bankruptcy Act 1914, s 122: see post, para 15.
[2] Insolvency Act 1985, ss 235, 236, Sch 10: see post, para 29.
[3] Insolvency Act 1986, s 426: see post, para 38.
[4] Bankruptcy Law, s 107: see post, para 6.
S 156: see post, para 21.

334
**Al Sabah v Grupo Torras SA (PC)**                                    **[2005] 2 AC**

United Kingdom, but continued to apply to former colonial territories overseas    A
unless and until an Order in Council made under section 236(5) of the 1985 Act
extended the effect of the 1985 Act to any such territory; and that, since no such
Order had yet been made in respect of the Cayman Islands, the Grand Court had
jurisdiction under section 122 of the 1914 Act to act in aid of a Bahamian bankruptcy
( post, paras 32, 34).

*Ukley v Ukley* [1977] VR 121 considered.

*Per curiam.* If the Grand Court had no statutory jurisdiction to act in aid of a    B
foreign bankruptcy it might have had some limited inherent power to do so. But it
cannot have had inherent jurisdiction to exercise the extraordinary powers conferred
by section 107 of its Bankruptcy Law in circumstances not falling within the terms of
that section. The non-statutory principles on which British courts have recognised
foreign bankruptcy jurisdiction are more limited in their scope and the inherent
jurisdiction of the Grand Court cannot be wider ( post, para 35).

(3) That the jurisdiction conferred by section 122 of the 1914 Act in the Cayman    C
Islands and the other territories in which it remained in force was essentially as wide
as that conferred by section 426 of the Insolvency Act 1986 in that the powers it
conferred were not merely auxiliary but operated as though there were a hypothetical
bankruptcy in the receiving territory; and that, accordingly, it authorised the Cayman
Grand Court to exercise in favour of the Bahamian trustee a statutory power, under
section 107 of the Bankruptcy Law, which might not have been available to him if the
trusts were governed by Bahamian law ( post, paras 36, 41, 45–46, 48).    D

*In re Osborn*; *Ex p Tree* [1931–32] B & CR 189 and *In re a Debtor (Order in Aid
No 1 of 1979), Ex p Viscount of the Royal Court of Jersey* [1981] Ch 384 considered.

*Hall v Woolf* (1908) 7 CLR 207 and *Galbraith v Grimshaw* [1910] AC 508,
HL(E) distinguished.

Decision of the Court of Appeal of the Cayman Islands affirmed.

The following cases are referred to in the judgment of their Lordships:    E

*Ayres; Ex p Evans, In re* (1981) 34 ALR 582; sub nom *Ayres v Evans* (1981) 39 ALR
    129
*Bank of Credit and Commerce International SA, In re (No 9)* [1994] 2 BCLC 636
*Callender, Sykes & Co v Colonial Secretary of Lagos* [1891] AC 460, PC
*Dallhold Estates (UK) Pty Ltd, In re* [1992] BCLC 621
*Debtor (Order in Aid No 1 of 1979), In re A, Ex p Viscount of the Royal Court of
    Jersey* [1981] Ch 384; [1980] 3 WLR 758; [1980] 3 All ER 665    F
*Galbraith v Grimshaw* [1910] AC 508, HL(E)
*Grupo Torras SA v Al Sabah* [1999] CLC 1469
*Hall v Woolf* (1908) 7 CLR 207
*Hart, In re; Ex p Green* [1912] 3 KB 6, CA
*Hughes v Hannover Rückversicherungs-AG* [1997] 1 BCLC 497, CA
*Osborn, In re; Ex p Tree* [1931–32] B & CR 189
*R v Jameson* [1896] 2 QB 425, DC    G
*Radich v Bank of New Zealand* (1993) 116 ALR 676
*Tucker (A Bankrupt), In re* (unreported) 27 September 1988, CA, Guernsey
*Ukley v Ukley* [1977] VR 121

The following additional cases were cited in argument:

*Attorney General for Alberta v Huggard Assets Ltd* [1953] AC 420; [1953] 2 WLR
    768; [1953] 2 All ER 951, PC    H
*Dent (A Bankrupt), In re* [1994] 1 WLR 956; [1994] 2 All ER 904, DC
*Dick v McIntosh* [2001] FCA 1008; [2002] FCA 1135
*First International Bank of Grenada Ltd, In re* (unreported) 23 January 2002, Royal
    Court of Jersey
*Fogarty, In re* [1904] QWN 67

A  *Globe-X Canadiana Ltd, In re* (unreported) 28 May 2003, Eastern Caribbean
       Supreme Court (Anguilla)
   *Greenaway, In re* (1910) 27 WN (NSW) 112
   *Hoe, In re* (1957) 34 HKCU 1; 49 HKCU 1
   *Jackson, In re* [1973] NI 67
   *James (An Insolvent), In re (Attorney General intervening)* [1977] Ch 41; [1977]
       2 WLR 1; [1977] 1 All ER 364, CA
B  *Kelly v Jones* (1852) 7 NBR 473
   *Leisurenet Ltd, In re* (unreported) 26 February 2002, Royal Court of Jersey
   *Oasis Merchandising Services Ltd, In re* [1995] 2 BCLC 493
   *Paramount Airways Ltd, In re* [1993] Ch 223; [1992] 3 WLR 690; [1992] 3 All ER 1,
       CA
   *R v Marais, In re; Ex p Marais* [1902] AC 51, PC
C  *Television Trade Rentals Ltd, In re* [2002] EWHC 211 (Ch); [2002] BPIR 859
   *Tucker, In re* 1987–89 MLR 106

   **APPEAL** from the Court of Appeal of the Cayman Islands
       The appellants, Barbara Alice Al Sabah and Mishal Roger Al Sabah, who
   were the wife and son of the debtor, Sheikh Fahab Mohammed Al Sabah,
   and were beneficiaries of two trusts set up by him in the Cayman Islands,
   appealed against the decision of the Court of Appeal of the Cayman Islands
D  (Zacca P, Rowe and Taylor JJA) on 1 October 2003 that the Grand Court of
   the Cayman Islands had jurisdiction to comply with a letter of request
   obtained from the Grand Court of the Bahamas by the second respondent,
   Clifford Culmer, as the debtor's trustee in bankruptcy in the Bahamas, who
   sought to set aside the two trusts under powers conferred by Cayman
   legislation. The first respondent, Grupo Torras SA, was a Spanish company
   which sought to recover in the Cayman Islands sums owed by the debtor in
E  satisfaction of a judgment obtained in earlier English proceedings.
       The facts are stated in the judgment of their Lordships.

       *Robin Dicker QC* and *Adrian Beltrami* for the appellants. The wording
   of section 156 of the Cayman Bankruptcy Law was enacted first as section 64
   of the Jamaican Bankruptcy Law 1871 and then as section 161 of the
   Jamaican Bankruptcy Law 1880 as a provision facilitating and mandating
F  auxiliary assistance between local bankruptcy courts. The term "all the
   courts in bankruptcy" meant all the courts subject to the Jamaican
   Bankruptcy Law. There was nothing in section 64 of the 1871 Law or
   section 161 of the 1880 Law to suggest that they were intended to have a
   wider non-domestic application. [Reference was also made to sections
   60 and 102 of the 1871 Law and section 167 of the 1880 Law.] The
G  Jamaican provision therefore applied only in Jamaica and, after 1894, in the
   Cayman Islands, which was then governed as a dependency of Jamaica and
   whose Grand Court was given jurisdiction in bankruptcy matters under the
   Cayman Islands Administration of Justice Law 1894.
       The effect of the Cayman Statute Law Revision (Amendments) Act 1963
   was to amend the 1880 Law in so far as it applied separately to Jamaica and
   the Cayman Islands. However, the fact that there was only a single court in
H  the Cayman Islands capable of administering the bankruptcy jurisdiction did
   not alter the meaning of the words used in section 161 of the Jamaican
   Bankruptcy Law 1880 and re-enacted as section 156 of the Cayman
   Bankruptcy Law. Either section 156 envisaged the creation of further
   bankruptcy courts within the Cayman Islands or its wording is simply one of

336
**Al Sabah v Grupo Torras SA (PC)**                                      [2005] 2 AC

a number of copying errors or anomalies. [Reference was also made to    *A*
sections 3 and 66.] A review of bankruptcy statutes passed by other colonial
legislatures does not provide conclusive assistance: compare the Bahamian
Bankrupty Law 1870; Hong Kong Bankruptcy Ordinance 1891; Gibraltar
Bankruptcy Ordinance 1934 and New Zealand Bankruptcy Law 1883.
Section 156 therefore cannot enable the Cayman Grand Court to act in aid
of the courts of any other jurisdiction.
                                                                        *B*
    Section 122 of the Bankruptcy Act 1914 ceased to have effect in the
Cayman Islands when that Act was repealed and replaced in the United
Kingdom by the Insolvency Act 1985. [Reference was made to *Halsbury's
Laws of England*, 4th ed (1974), vol 6, paras 1200–1202 and *In re James
(An Insolvent) (Attorney General intervening)* [1977] Ch 41.] The combined
effect of section 235 of and Part IV of Schedule 10 to the 1985 Act, the
Insolvency Act 1985 (Commencement No 2) Order 1986 (SI 1986/185) and    *C*
the Insolvency Act 1985 (Commencement No 5) Order 1986 (SI 1986/1924)
was to repeal section 122 of the 1914 Act. The repeal operated as a repeal of
the reciprocal regime of auxiliary assistance both in the United Kingdom and
in any dependent territories in which the law had hitherto had direct effect.
[Reference was made to sections 15 and 16 of the Interpretation Act 1978;
the Jesuits etc Act 1584 (27 Eliz 1, c 2); the Roman Catholics Act 1844 (7 &
8 Vict c 102); the Statute Law Revision Acts of 1867, 1871, 1873, 1874 and  *D*
1875 and the Statute Law (Repeals) Acts of 1973, 1976, 1981 and 1995.]
The effect of the 1985 Act was to introduce a new and more extensive regime
for judicial assistance in different terms (which eventually became
section 426 of the Insolvency Act 1986), with express provision for
dependent territories to adopt the new scheme (by Order in Council) if they
so wished. In relation to those jurisdictions which have adopted the new     *E*
section 426 scheme or its equivalent, there has been no question of any
additional or separate repeal of section 122 of the 1914 Act because it has
already been repealed: see the Insolvency Act 1986 (Guernsey) Order 1989
(SI 1989/2409); article 48 of the Bankruptcy (Desastre) (Jersey) Law 1990
and section 1 of the Bankruptcy Act 1988 of the Isle of Man. [Reference was
also made to *Muir Hunter on Personal Insolvency* (looseleaf ed), issues prior
to September 2002; *Halsbury's Laws of England* 4th ed (1974), vol 6, para    *F*
1186 and 4th ed (1974) (2003 reissue), vol 6, paras 865–877; *Smart, Cross-
Border Insolvency*, 2nd ed (1998), p 406; *McDonald, Henry and Meek,
Australian Bankruptcy Law and Practice*, 5th ed (1996), para 29.0.10 and
the Irish Bankruptcy Act 1988, section 142.] There is no indication that the
Cayman Islands considered that section 122 still formed part of their law.
    The Court of Appeal correctly concluded that the purpose of    *G*
Commencement Order No 2 was to repeal section 122 of the 1914 Act in so
far as it conferred authority and imposed duties on bankruptcy courts of the
dependencies. *Ukley v Ukley* [1977] VR 121 is distinguishable on its facts.
[Reference was also made to Evidence (Proceedings in Other Jurisdictions)
Act 1975 and Evidence (Proceedings in Other Jurisdictions) (Cayman
Islands) Order 1978 (SI 1978/1890), section 3.] If, on the other hand, the
1914 Act were still valid in the Cayman Islands, it would not be open to the    *H*
Cayman legislature to repeal it; nor could it pass extra-territorial legislation:
see Cayman Islands (Constitution) Order in Council 1972 (SI 1972/1101),
Schedule 2, sections 29 and 58; West Indies Act 1962, section 5; Colonial
Laws Validity Act 1865 (28 & 29 Vict c 63), section 2; *Halsbury's Laws of*

A  *England*, 4th ed (2003 reissue), vol 6, paras 840–841 and *In re R v Marais; Ex p Marais* [1902] AC 51.

There was no basis for reliance on the court's inherent jurisdiction. There is no jurisdiction to grant a party a power to obtain relief under a statute whose terms do not entitle the party to relief. It follows that Smellie CJ had no jurisdiction to grant the second respondent the statutory powers accorded to a trustee in bankruptcy in the Cayman Islands, in particular the powers under section 107 of the Cayman Bankruptcy Law, and Henderson J and the Court of Appeal were wrong to uphold his order.

B

As to the nature of the assistance which may be given by the Cayman court to the conduct of a Bahamian bankruptcy, section 107 only applies to a Cayman bankruptcy. Section 122 of the 1914 Act creates an auxiliary or remedial jurisdiction in the court to facilitate the process of a foreign bankruptcy; it does not create any new rights, nor does it enable the foreign bankruptcy to be treated for substantive purposes as a local bankruptcy: see *Hall v Woolf* (1908) 7 CLR 207, 210–212; *Radich v Bank of New Zealand* (1993) 116 ALR 676, 692–695; *In re Ayres, Ex p Evans* (1981) 34 ALR 582, 589, 591; *Ayres v Evans* (1981) 39 ALR 129, 132; *Galbraith v Grimshaw* [1910] AC 508, 510–513; *Dick v McIntosh* [2001] FCA 1008, para 19; [2002] FCA 1135, para 18; *In re Osborn; Ex p Tree* [1931–2] B & CR 189, 190, 194; *In re Fogarty* [1904] QWN 67 and *In re Greenaway* (1910) 27 WN (NSW) 112. The order of Smellie CJ was therefore too wide and the Court of Appeal wrong to consider it a legitimate exercise of jurisdiction under section 156 of the Bankruptcy Law, on the basis of a "hypothesis of jurisdiction" under which the Bahamian bankruptcy was to be treated as a Cayman bankruptcy and the second respondent trustee as a Cayman trustee in bankruptcy: see *In re Osborn* [1931–32] B & CR 189 and *Radich v Bank of New Zealand* 116 ALR 676, 695. Section 107 of the Cayman Bankruptcy Law only applies in relation to transactions effected within a set period of a Cayman bankruptcy order, and the only beneficiary of the section is the Cayman official identified in the Bankruptcy Law as the trustee in bankruptcy.

C

D

E

F  Section 426 of the 1986 Act, though directed towards the same general aim as section 122 of the 1914 Act, is drafted in very different terms. Its focus is not jurisdiction but law: see *Smart, Cross-Border Insolvency*, p 417. The development of the concept of the hypothesis of jurisdiction in relation to section 426 in cases such as *Hughes v Hannover Rückversicherungs-AG* [1997] 1 BCLC 497; *In re Dallhold Estates (UK) Pty Ltd* [1992] BCLC 621 and *In re Bank of Credit and Commerce International SA (No 9)* [1994] 2 BCLC 636 therefore does not provide the support which the Court of Appeal sought to find in them.

G

As to the issue of appropriateness or discretion, although the Bahamas have an almost identical voidable disposition provision, it is subject to the restriction that the transfer is made by a "trader": no such restriction applies under the Cayman legislation, which is more favourable to the respondents. However, even if section 156 of the Cayman Bankruptcy Law is to be interpreted in the same way as section 426 of the 1986 Act, considerations of private international law should still apply. The proper law to be applied to the transactions to be avoided is that of the country with the closest and most real connection with the transaction: see *Bridge and Stevens, Cross-Border Security and Insolvency* (2001), pp 279–281; *Smart, Cross-Border*

H

*Insolvency*, p 419; *In re Television Trade Rentals Ltd* [2002] BPIR 859, 864    A
and *In re Paramount Airways* [1993] Ch 223, 240. [Reference was also
made to *In re Oasis Merchandising Services Ltd* [1995] 2 BCLC 493.]

*Andrew Popplewell QC* and *Paul Wright* for the respondents. "Courts"
in section 156 refers to foreign courts. The use of the plural in the section in
making provision for one court to respond to another only makes sense if
Grand Court (the sole court exercising bankruptcy jurisdiction in the    B
Cayman Islands) can assist courts outside the Cayman Islands. By contrast,
sections 157 and 158 use "court" in the singular to refer only to the Cayman
Grand Court. [Reference was also made to section 135 of the New Zealand
Insolvency Act 1967 and section 29 of the Australian Bankruptcy Act 1966.]

As to section 122 of the 1914 Act, there was nothing in the Insolvency Act
1985 or the statutory instruments made thereunder which repealed its
application and effect as an Imperial provision in the Cayman Islands.    C
[Reference was made to sections 213, 235(3), 236(2) and (5) of and Part IV of
Schedule 10 to the 1985 Act; Commencement Orders No 2 and No 5;
section 426 of the Insolvency Act 1986 and the Co-operation of Insolvency
Courts (Designation of Relevant Countries and Territories) Order 1986 (SI
1986/2123).] Statutes of the Westminster Parliament are not to be regarded
as having effect in overseas territories unless they clearly so provide: see    D
*Attorney General for Alberta v Huggard Associates Ltd* [1953] AC 420,
436, 441 and *Bennion, Statutory Interpretation*, 4th ed, (2002), paras 282,
283. The same principle applies to repealing enactments: see *Halsbury's
Laws*, 4th ed (1974), vol 6, paras 1104–1106; 4th ed (1974) (2003 reissue),
vol 6, para 821; *Ukley v Ukley* [1977] VR 121, 124 and *Kelly v Jones* (1852)
7 NBR 473. The logical result of the relevant provisions of the 1985 Act was    E
to repeal section 122 so far as it applied to the UK because it was part of a
code that was being replaced, but to leave it intact so far as it applied to
other territories unless and until its replacement was extended to, or some
equivalent provision was made in, those territories. [Reference was made to
*In re Hoe* (1957) 34 HKCU 1; 49 HKCU 1; *In re Tucker* 1987–89 MLR 106
and *In re Tucker (A Bankrupt)* (unreported) 27 September 1988.]

If neither section 156 of the Cayman Bankruptcy Law nor section 122 of    F
the 1914 Act applies, a large hole in the insolvency regime of the Cayman
Islands is opened up, thereby destroying the reciprocity which underlies the
designation of the Cayman Islands as a relevant territory under section 426
of the Insolvency Act 1986. Both Smellie CJ and Henderson J rightly agreed
that the Cayman Court must have inherent jurisdiction to fill that hole and
grant the relief sought: see *In re Globe-X Canadiana Ltd* (unreported)    G
28 May 2003. [Reference was also made to *In re First International Bank
of Grenada Ltd* (unreported) 23 January 2002 and *In re Leisurenet Ltd*
(unreported) 26 February 2002.]

As to section 107 of the Cayman Bankruptcy Law, the courts below
rightly rejected the contention that it only affords remedies to the Cayman
trustee in bankruptcy, not the second respondent trustee. Section 156 of the
Cayman Bankruptcy Law and section 122 of the 1914 Act confer    H
jurisdiction to provide assistance on a hypothetical assumption of
jurisdiction, ie, by putting the overseas trustee in a position equivalent to
that of the Cayman trustee under a Cayman bankruptcy, "in regard to
similar matters within their respective jurisdictions". The distinction

A   between creating rights and conferring remedies, derived from *Hall v Woolf*
7 CLR 207, 212 is a false one and has no basis in the wording of section 122.
There is nothing in *Galbraith v Grimshaw* [1910] AC 508; *In re Fogarty*
[1904] QWN 67; *In re Greenaway* 27 WN (NSW) 112; *In re Osborn,
Ex p Tree* [1931–2] B & CR 189, 189; *Radich v Bank of New Zealand* 116
ALR 676, 695, 700; *Dick v McIntosh* [2001] FCA 1008 or *In re Jackson*
[1973] NI 67, 69, 71, 73 to prevent the hypothesis of local jurisdiction

B   applying, just as it does under section 426(5) of the 1986 Act: see *In re
Dallhold Estates (UK) Pty Ltd* [1992] BCLC 621, 626; *Hughes v Hannover
Rückversicherungs-AG* [1997] 1 BCLC 497, 505, 511, 513, 516, 517; *In re
Bank of Credit and Commerce International SA (No 9)* [1994] 2 BCLC 636,
643 and *In re Television Trade Rentals Ltd* [2002] BPIR 859.

C   Section 107 has its origin in English statutes: see section 91 of the 1869
Act; section 47 of the Bankruptcy Act 1883; section 42 of the 1914 Act and
section 339 of the 1986 Act. It does not operate automatically; void means
voidable: see *In re Hart; Ex p Green* [1912] 3 KB 6, 9–10. The trustee must
apply to the court, and the grant of relief is discretionary: see *In re Dent
(A Bankrupt)* [1994] 1 WLR 956, 959–961. The right vested in the trustee is
a contingent one. The property involved in the avoidable transaction must
be within the jurisdiction of the receiving court in order for it to render

D   assistance in the first place.   Jurisdiction should not depend on the
happenstance of where the foreign bankruptcy takes place. The purpose of
section 122 is to take that out of the equation. The receiving court should
apply the proper law of the transaction, not of the requesting bankruptcy.
Section 107 does not therefore create rights so much as recognise and give
effect to existing (if contingent) rights created elsewhere.   Any other

E   conclusion would deprive sections 156 and 122 of any effect and render
them arbitrary and capricious. They are enabling provisions which permit
an exercise of discretion, and would be otiose if all they permitted was for
the receiving court to exercise a discretion it already possessed. Reliance on
them cannot be categorised as either forum shopping or otherwise
inappropriate in the circumstances.

F   *Dicker QC* replied.

*Cur adv vult*

11 January 2005. The judgment of their Lordships was delivered by
**LORD WALKER OF GESTINGTHORPE**

G   1   The appellants Barbara Alice Al Sabah and Mishal Roger Al Sabah are
the wife and adult son respectively of Sheikh Fahad Mohammed Al Sabah
("the debtor"). The debtor was formerly head of the Kuwait Investment
Authority in London. It embarked on a huge programme of investment in
Spain through a Spanish company named Grupo Torras SA ("GT"). With
the help of co-conspirators the debtor defrauded GT on a very large scale.
The misappropriations were effected by four separate fraudulent schemes
between 1988 and 1990. After a long civil trial in London the debtor was

H   found liable for very large damages (see *Grupo Torras SA v Al Sabah* [1999]
CLC 1469). There have subsequently been various proceedings in different
parts of the world by which GT, and more recently the debtor's Bahamian
trustee in bankruptcy, have sought to recover funds in order to satisfy the
judgment. GT has so far recovered about US$178m from the debtor or

trusts established by him, but that is only a small part of the total   A
indebtedness.

2    The debtor is now resident in the Bahamas. On 29 June 2001 he was
adjudicated bankrupt under the Bahamian Bankruptcy Act 1870. The
bankruptcy was deemed to have commenced on 6 February 2001. GT's
proof of debt was for a sum of the order of US$800m. On 30 July 2001 the
first meeting of creditors was held and Mr Clifford Culmer, a partner in
BDO Mann Judge of Nassau, was appointed as trustee in bankruptcy.   B

3    The debtor is the settlor in respect of two trusts governed by the law of
the Cayman Islands. One is the Comfort Trust, which he established (under
the name of the Chester Trust) under Bahamian law on 29 September 1992.
On 30 December 1992 a corporate trustee resident in the Cayman Islands,
Bank of Butterfield International (Cayman) Ltd, was appointed as trustee of
the trust and on 12 February 1993 the trust's proper law was changed to that   C
of the Cayman Islands, and its name was changed to its present name. The
debtor is the principal beneficiary under this trust and the appellants are also
beneficiaries. The other is the Eaglet Trust, established on 14 February 1992
and governed from its inception by Cayman law. The trustees are Pictet
Trustee SA (a Swiss company) and Pictet Bank and Trust (Cayman) Ltd
(a Cayman company). The appellant Mishal Al Sabah is the principal
beneficiary under this trust.   D

4    The trustee in bankruptcy's case is that the two trusts own and
control, through a network of companies, very valuable assets (the Comfort
Trust alone is said to be worth over US$27m) which enable the debtor,
despite his bankruptcy, to enjoy a life of luxury. On 31 August 1995
GT commenced proceedings in the Cayman Islands (cause No 271 of 1995)
against the trustee of the Comfort Trust and various companies owned by the   E
trustee, pleading proprietary claims. The pleadings have been extensively
amended and the proceedings are still on foot. GT has also obtained
summary judgment from the Grand Court of the Cayman Islands in effect
converting its English money judgment into a Cayman money judgment.
These Cayman proceedings are of no more than background relevance to the
claim by the Bahamian trustee in bankruptcy, which is of central importance
in this appeal.   F

*The letter of request and subsequent proceedings*

5    On 14 February 2002 the trustee in bankruptcy made an ex parte
application to the Bahamian Grand Court for an order under section 122 of
the Bankruptcy Act 1914 of the United Kingdom (or alternatively under the
inherent jurisdiction) requesting aid from the Grand Court of the Cayman   G
Islands. On 12 March 2002 Lyons J gave a short reasoned judgment (mainly
concerned with section 122 of the Bankruptcy Act 1914) and made an
ex parte order for a letter of request to be issued seeking assistance under
three heads: (i) that Mr Culmer's appointment as trustee in bankruptcy of
the property of the debtor should be recognised in the jurisdiction of the
Cayman Islands; (ii) that the trustee should be granted "all general law
powers and the statutory powers accorded to a trustee in bankruptcy in [the   H
jurisdiction of the Cayman Islands] and in particular . . . the powers under
section 107 of the [Cayman] Bankruptcy Law (1997 Revision)"; and (iii) that
he should be granted such other powers as the Grand Court of the Cayman
Islands thought fit.

A      6   Section 107 of the Bankruptcy Law (1997 Revision) of the Cayman
Islands provides that any voluntary settlement (an expression which is
widely defined) of property is to be void against the trustee in bankruptcy if
the settlor is made bankrupt (i) within two years after the date of the
settlement or (ii) within ten years after the date of the settlement unless (in
the latter case) the beneficiaries can prove that the settlor was, when he made
the settlement, able to pay all his debts without the aid of the property
B   comprised in the settlement (and that the settled property passed to the
trustee on execution of the settlement).   Although this enactment speaks of
the settlement being "void" it is common ground that this should be
interpreted as "voidable" in accordance with the decision of the English
Court of Appeal in *In re Hart; Ex parte Green* [1912] 3 KB 6.   If the Cayman
trusts are to be set aside under section 107, that can be achieved only by an
C   order of a court of competent jurisdiction, prima facie the Grand Court of
the Cayman Islands.
      7   The Bankruptcy Act 1987 of the Bahamas contains (in section 71)
provisions similar to those of section 107 of the Cayman statute but they are
not identical.   In particular, the power conferred by section 71 of the
Bahamian statute is exercisable only if the bankrupt settlor was (apparently
at the time of the settlement) a trader (within the meaning of a rather old-
D   fashioned statutory definition).   Their Lordships heard no argument as to
whether the debtor was at any time a trader within the meaning of the
Bahamian statute and they express no view on the point.   But it appears to
have been one of the considerations which led the trustee in bankruptcy to
seek a letter of request to the Cayman court.   The other consideration may
have been doubt as to whether the Cayman court would give effect to an
E   order of the Bahamian court setting aside a trust governed by Cayman law.
Their Lordships express no view on that point either; it was mentioned in the
course of the hearing but was not fully argued, and is of no direct relevance
to the outcome of this appeal (its only relevance is that if the doubt is well-
founded, it shows that the Bahamian trustee in bankruptcy, like the Scottish
trustee in bankruptcy in *Galbraith v Grimshaw* [1910] AC 508, 510 may
F   still "find himself . . . falling between two stools").
      8   The Bahamian court's letter of request came before the Grand Court
of the Cayman Islands on 15 March 2002, when Smellie CJ considered it
ex parte.   He made an immediate order (followed by a written judgment
delivered on 27 March 2002) acceding to the letter of request and (in
particular) granting the Bahamian trustee in bankruptcy the powers
conferred by section 107.   The main points in his judgment can be
G   summarised as follows: (i) that section 156 of the Bankruptcy Law (1997
Revision) of the Cayman Islands, and further or alternatively section 122 of
the Bankruptcy Act 1914 of the United Kingdom, authorised the Grand
Court to act on the letter of request; (ii) that the Grand Court should as a
matter of discretion confer the section 107 powers, since any Cayman assets
relevant to the bankruptcy were likely to be held in trust; and (iii) that the
order could in any case be made under the court's inherent jurisdiction.
H      9   The matter then came before Henderson J inter partes on three days in
September 2002.   Henderson J also had before him an application to join the
trustee in bankruptcy as a co-plaintiff in cause No 271 of 1995.   He reserved
judgment and handed down a written judgment on 8 November 2002.   In
relation to the letter of request Henderson J decided: (i) that the Chief Justice

had rightly exercised jurisdiction (although Henderson J took a rather **A** different view as to the reasons); (ii) that the order should not be set aside on grounds of material non-disclosure (this is not an issue in the appeal to the Board); and (iii) that any further exercise of the Court's discretion should be postponed until after a full consideration of the evidence.

10   The appellants appealed to the Court of Appeal of the Cayman Islands and the appeal came before that court (Zacca P, Rowe and Taylor JJA) in July 2003. On 1 October 2003, the Court of Appeal (in a **B** reserved judgment of the court delivered by Taylor JA) dismissed the appeal. The appellants now appeal to Her Majesty in Council with final leave granted on 5 December 2003. The principal issues in the appeal are as follows. (i) Was the Court of Appeal correct in its view that the Grand Court had jurisdiction under section 156 of the Bankruptcy Law (1997 Revision)? (ii) If not, did the Grand Court have jurisdiction under section 122 of the **C** Bankruptcy Act 1914 of the United Kingdom (on the basis that it was not repealed by the Insolvency Act 1985) or under its inherent jurisdiction? (iii) If the Grand Court had jurisdiction under any of these routes, did it have power to confer the section 107 powers on a Bahamian trustee in bankruptcy?

*The legislation* **D**

11   In considering these issues it is necessary to look closely at the terms and antecedents of a number of statutory provisions, including in particular section 156 of the Bankruptcy Law (1997 Revision) of the Cayman Islands and section 122 of the Bankruptcy Act 1914 of the United Kingdom. As the Court of Appeal recorded, it had had submissions covering enactments passed in the United Kingdom, Jamaica and the Cayman Islands over a **E** period of more than 130 years, and the judgments at first instance and in the Court of Appeal reflect the care with which all the courts below have approached this difficult task. Their Lordships have also had the benefit of thorough research and admirable arguments from both sides; the depth of the research is particularly impressive in view of the severe damage and disruption which has unfortunately been suffered in the Cayman Islands as a **F** result of the recent hurricane.

12   Before embarking on the detail of the legislation their Lordships think it desirable to set out some basic points about legislation in the imperial context. The earliest statute to which it is necessary to refer is the Bankruptcy Act 1869 (32 & 33 Vict c 71) of the United Kingdom. In the middle of the reign of Queen Victoria the British Empire was nearing its fullest geographical extent (although there was some later expansion, **G** especially in Africa) and the establishment of local legislatures (dating back to the 1850s in the case of most states of Australia, to the 18th century in the case of most of the provinces of Canada, and to the early 17th century in the case of Bermuda) marked the beginnings of the long progress towards independent status within the Commonwealth. The enactment of the Colonial Laws Validity Act 1865 (28 & 29 Vict c 63) ("an Act to remove doubts as to the validity of colonial laws") reaffirmed the superior power of **H** the Westminster Parliament but made clear that colonial laws could depart from any non-statutory rules of common law or equity. The 1865 Act did not in terms refer to the enactment of laws with extraterritorial effect. But most colonial legislatures had powers (granted either under the Royal

**[2005] 2 AC**                                    Al Sabah v Grupo Torras SA (PC)

A    Prerogative, or by the Westminster Parliament) to make laws "for the peace, order and good government" of the territory in question and this implied (but did not clearly define) some territorial restrictions. This gave rise to many difficulties both before and after the 1865 Act: see generally D P O'Connell, "The Doctrine of Colonial Extra-Territorial Legislative Incompetence" (1959) 75 LQR 318. The 1865 Act has of course ceased to

B    apply to independent members of the Commonwealth, the first repeals having been effected by the Statute of Westminster 1931. The balance of law-making authority, as between the Crown and the Westminster Parliament, was regulated (in relation to settled colonies) by the British Settlements Act 1887 (50 & 51 Vict c 54): see generally *Halsbury's Laws of England* 4th ed, (2003 Reissue) Vol 6, paras 821–823.

     13   During the 19th century the English court was fairly ready to hold

C    that an Act of the Westminster Parliament, especially if concerned with general rules of law, was intended to apply throughout the empire. So in *Callender, Sykes & Co v Colonial Secretary of Lagos* [1891] AC 460, the Board held (at a time when Nigeria had no bankruptcy law of its own) that the general vesting provisions of the Bankruptcy Act 1869 of the United Kingdom (and not merely provisions about reciprocal enforcement) applied in Nigeria. But the Westminster Parliament's supreme legislative

D    competence has in practice been more and more constrained by two factors. One has been an increasingly strong constitutional convention (eventually given statutory force, in relation to the Commonwealth countries to which it applied, by the Statute of Westminster 1931) not to interfere, unasked, in the laws of Commonwealth countries which enjoyed representative government. The other has been the courts' long-standing practice, in

E    construing statutes of the Westminster Parliament, of presuming that their intended territorial extent is limited to the United Kingdom, unless it is clear that a wider extent is intended: see for instance the observations of Lord Russell of Killowen CJ in *R v Jameson* [1896] 2 QB 425, 430. This presumption is of long standing but (with increasingly precise drafting techniques) it appears to have become stronger over the years, and it has become common for an Act of the Westminster Parliament to contain power

F    for all or part of its provisions to be extended to British territories by Order in Council. A detailed commentary on the current position as to the territorial extent of an Act of Parliament can be found in *Bennion, Statutory Interpretation*, 4th ed (2002), at pp 275–305.

     14   At the time of the enactment of the United Kingdom Bankruptcy Act 1869 the Bahamas were a British colony acquired by settlement; Jamaica

G    was a British colony acquired by conquest; and the Cayman Islands were a British colony acquired by settlement but governed (under the Cayman Islands Act 1863 (26 & 27 Vict c 31) of the Westminster Parliament) as a dependency of Jamaica. The Bahamas became fully independent in 1973; Jamaica became fully independent in 1962; and the Cayman Islands are still a British colony, now officially termed a British overseas territory. Before the 1863 Act the Cayman Islanders had magistrates and a parish meeting which

H    exercised limited law-making powers. The effect of the 1863 Act was to confirm the existing arrangements so far as they went, but the islanders' institutions became subject to the jurisdiction of the Governor, legislature and Supreme Court of Jamaica. The law of Jamaica was in general to apply to the Cayman Islands. That state of dependency continued until 1959. It is

of central importance to the first issue, that is the construction of section 156    A
of the Cayman Bankruptcy Law.

15   The Bankruptcy Act 1869 of the United Kingdom provided
principally for bankruptcies in England. The Scottish law of bankruptcy
developed on very different lines and had its own statutes enacted by the
Westminster Parliament (see generally Professor McBryde's work on
[Scottish] *Bankruptcy*, 2nd ed (1995), at pp 2–4). Ireland also had its own    B
statutes enacted at Westminster. Nevertheless the 1869 Act had some
extraterritorial effect, as already noted. In particular, sections 73 to 77
contained provisions which provided in different ways for mutual
recognition and assistance in respect of bankruptcy proceedings in other
parts of the United Kingdom and throughout the British Empire. Section 74
is the most important for present purposes. It was re-enacted (with a small
change of language to which neither side attached importance) as section 118    C
of the Bankruptcy Act 1883 (46 & 47 Vict c 52) and again re-enacted
(without any change) in section 122 of the Bankruptcy Act 1914.
Section 122 is in the following terms:

"The High Court, the county courts, the courts having jurisdiction in
bankruptcy in Scotland and Ireland, and every British court elsewhere
having jurisdiction in bankruptcy or insolvency, and the officers of those    D
courts respectively, shall severally act in aid of and be auxiliary to each
other in all matters of bankruptcy, and an order of the court seeking aid,
with a request to another of the said courts, shall be deemed sufficient to
enable the latter court to exercise, in regard to the matters directed by the
order, such jurisdiction as either the court which made the request or the
court to which the request is made, could exercise in regard to similar    E
matters within their respective jurisdictions."

16   The principal bankruptcy statute in force in the Bahamas is the
Bankruptcy Act 1870 (33 Vict c 13). It did not contain any power
comparable to section 74 of the United Kingdom Bankruptcy Act 1869 (the
antecedent of section 122). But when he ordered the despatch of a letter of
request, Lyons J was satisfied that section 122 applied in the Bahamas,    F
having been specially mentioned in a Bahamian enactment (after the
Bahamas became fully independent in 1973) entitled "Acts of the United
Kingdom Parliament applying in or affecting the Bahamas otherwise than by
virtue of an enactment of the Legislature of the Bahamas". The correctness
of that conclusion is not an issue in this appeal.

17   The legislative history in Jamaica and the Cayman Islands is more    G
complicated. The Jamaican Bankruptcy Law 1871 (Law 25 of 1871) did
contain, in section 64, provisions similar but by no means identical to those
of section 74 of the Bankruptcy Act 1869. Section 64 was in the following
terms:

"All the courts in bankruptcy, and the officers of such courts, shall act
in aid of and shall be auxiliary to each other in all matters of bankruptcy,
and any order of any one court in a proceeding in bankruptcy may, on    H
application to another court, be made an order of such other court, and
may be carried into effect accordingly: And an order of any court in
bankruptcy seeking aid, together with a request to another of the said
courts, shall be deemed sufficient to enable the latter court to exercise, in

**[2005] 2 AC**                                   Al Sabah v Grupo Torras SA (PC)

A    regard to the matters directed by such order, the like jurisdiction which
the court which made the request, as well as the court to which the
request is made, could exercise in regard to similar matters within their
respective jurisdictions."

These provisions do not in terms have any extraterritorial effect.
Bankruptcy law was administered in Jamaica by several district courts
B    whose jurisdiction was based on the residence or place of business of the
debtor, with an appeal to the Supreme Court (see sections 60 and 62 of the
1871 Act). The Grand Court of the Cayman Islands did not have any
jurisdiction in bankruptcy until the enactment (as a Jamaican statute) of
the Cayman Islands Administration of Justice Law 1894 (c 18). Section 40
of that law provided:

C        "The Grand Court shall have and exercise all the jurisdiction and
powers in bankruptcy now vested in the Chief Court of Bankruptcy of
Jamaica, save and except the jurisdiction now vested in the Supreme
Court of Judicature of Jamaica as the Chief Court of Bankruptcy sitting as
a Court of Appeal, but any such appeal shall lie to the full Court of the
Supreme Court of Judicature of Jamaica, and all the bankruptcy laws and
D        rules now in force in Jamaica shall extend and apply to the Cayman
Islands and to the said Grand Court."

The reference to the Chief Court of Bankruptcy of Jamaica is explained by
changes made by sections 3 to 11 of the Jamaican Bankruptcy Law 1880
(c 32), which established the High Court of Justice as the Chief Court of
Bankruptcy, and gave limited jurisdiction (where the estate of the debtor was
E    worth less than £200) to the resident magistrates' courts, with an appeal (in
either case) to the Court of Appeal.

    18   So after 1894 section 64 of the Jamaican Bankruptcy Law 1871 (by
then re-enacted as section 161 of the Jamaican Bankruptcy Law 1880) still
made sense, with a very limited degree of extraterritorial effect as between
the Grand Court of the Cayman Islands and the various Jamaican courts
with original jurisdiction in bankruptcy (the Court of Appeal of Jamaica
F    having jurisdiction to hear appeals from all of them). These statutory
provisions remained in force unchanged throughout the first half of the 20th
century. The Cayman Islands were still a dependency of Jamaica at the
inception of the short-lived British Caribbean Federation. But the Cayman
Islands and Turks and Caicos Islands Act 1958 repealed the Cayman Islands
Act 1863 and provided for the Cayman Islands to have a new constitution,
G    granted by the Cayman Islands (Constitution) Order in Council 1959
(SI 1959/863). This provided for the Governor of Jamaica to be ex-officio
the Governor of the Cayman Islands, with limited legislative powers
conferred concurrently on the Governor with the advice and consent of the
Cayman Legislative Assembly (on the one hand) and the legislature of
Jamaica (on the other hand), with power being reserved to Her Majesty in
Council to amend or vary the Order in Council.
H        19   The 1959 Order in Council was revoked by the Cayman Islands
(Constitution) Order in Council 1962 (SI 1962/1646), which was intended
to take effect on 6 August 1962, simultaneously with Jamaica's attainment
of full independence under the Jamaica Independence Act 1962. The 1962
Order in Council was inadvertently not laid before Parliament and was

brought into force retrospectively by the Cayman Islands (Constitution)  *A*
Order 1965 (SI 1965/1860). The present constitution was brought into
force by the Cayman Islands (Constitution) Order 1972 (SI 1972/1101).
Both the 1962 and the 1972 Constitutions conferred law-making power "for
the peace, order and good government of the Islands" on the Administrator
(later the Governor) with the advice and consent of the Legislative Assembly,
with power reserved to Her Majesty in Council.

*B*

20 That completes the relevant constitutional history. But it is
necessary to go back a little in time to the enactment of the Cayman
Bankruptcy Law 1964. The general effect of the various constitutional
instruments was to maintain existing laws in force in the Cayman Islands,
subject to any necessary modifications. But with Jamaica's independence it
was appropriate for the Cayman Islands to have their own body of statute
law. That was the purpose of the Revised Edition (Laws of the Cayman  *C*
Islands) Law 1960 (a Cayman enactment). It provided (in section 3) for the
Governor to appoint commissioners to prepare a revised edition of the laws
of the Cayman Islands and (in section 8) a Table of the Acts and Laws in
force on 31 December 1963. The commissioners had power (in section 4) to
make a variety of formal or verbal changes (no doubt in the interests of
clarity, simplicity, uniformity and accuracy) but section 6 provided:

*D*

"(1) The powers conferred upon the commissioners by section 4 of this
Law shall not be taken to imply any power in them to make any alteration
or amendment in the matter or substance of any Act or Law or part
thereof.

"(2) In every case where any such alteration or amendment is, in the
opinion of the commissioners, desirable, the commissioners shall draft a  *E*
Bill setting forth such alterations and amendments and authorising them
to be made in the revised edition, and every such Bill shall, subject to the
sanction of the Governor, be submitted to the Legislative Assembly and
dealt with in the ordinary way."

Several amendments to the Jamaican Bankruptcy Law 1880 were made by
the enactment of the Statute Law Revision (Amendments) Law 1963 which  *F*
was passed by the Cayman Legislative Assembly (apparently under section 6
(2) of the 1960 Law) but no amendment of section 161 was made by those
means. Such textual alterations as were made must have been made under
the limited powers conferred by section 4 of the 1960 Law.

21 The commissioners' labours did in due course produce three volumes
of statutes entitled "The Laws of the Cayman Islands 1963", with the
Bankruptcy Law as chapter 7. It is still in force, with some amendments not  *G*
material to this appeal, as the Bankruptcy Law (1997 Revision). There has
never been any change to section 156 which (with the side note
"Enforcement of warrants and orders of courts") is in the following terms:

"All the courts in bankruptcy and the officers of such courts, shall act
in aid of and be auxiliary to each other in all matters of bankruptcy and
any order of any one court in a proceeding in bankruptcy may, on  *H*
application to another court, be made an order of such other court, and
be carried into effect accordingly. An order of any court in bankruptcy
seeking aid, together with a request to another of the said courts, shall be
deemed sufficient to enable the latter court to exercise in regard to the

A   matters directed by such order, the like jurisdiction which the court which
made the request, as well as the court to which the request is made, could
exercise in regard to similar matters within their respective jurisdictions."

22   It will be apparent that most of the language of the section, like that
of section 161 of the Jamaican Bankruptcy Law 1880, is close to that of
section 122 of the Bankruptcy Act 1914 of the United Kingdom. But
B   whereas the United Kingdom statute applied to all British courts, the only
extraterritorial operation of the Jamaican statute was very limited (and
constitutionally unexceptionable), that is to the Cayman Islands as
Jamaica's dependency. Under section 156 of the Cayman statute it is very
hard to see what effect (extraterritorial or otherwise) could sensibly have
been intended, since the Cayman Islands had only one court with
C   bankruptcy jurisdiction, and its Governor and Legislative Assembly had (at
best) very limited power to legislate with extraterritorial effect.

*The first issue: section 156*

23   So their Lordships come to the first issue, the meaning of "all the
courts in bankruptcy" at the beginning of section 156. It is, once the
D   background has been explained, a short point of statutory construction.
The Court of Appeal noted four possible interpretations: (i) all United
Kingdom and British courts (the view of the Chief Justice); (ii) all
bankruptcy courts worldwide (the view of Henderson J); (iii) all bankruptcy
courts in the Cayman Islands (of which there was only one, so that the
provision would have no present application at all); and (iv) Cayman and
Jamaican bankruptcy courts (a view which neither side put forward in the
E   Court of Appeal, and which the Court of Appeal regarded as untenable).

24   The Court of Appeal preferred the view of the Chief Justice. The
court was reluctant to find that section 156 had no coherent present
meaning, and was directed simply to the possibility of there being more than
one Cayman court with bankruptcy jurisdiction at some time in the future (a
possibility which would in any event have called for primary legislation).
F   The court attached little weight to the argument that the Governor and the
Legislative Assembly had no general power of extraterritorial legislation by
treating section 156 as a sort of declaratory repetition or re-enactment of
section 122 of the Bankruptcy Act 1914 so as to provide a complete
bankruptcy code for the Islands:

"We believe the proper view to be that a correct statement of prevailing
G   law contained in an enactment will fall within the competence of the
enacting body notwithstanding that such body does not itself have
authority to make or change the law so stated—that such a practice is
constitutionally unobjectionable, whether in state or provincial
legislation, municipal by-laws, rules and regulations of administrative
tribunals or other branches of government or by-laws or articles of a body
H   corporate created under statutory authority."

The court also relied (as did the respondents before the Board) on the
contrast in language between "courts" in section 156 (and its Jamaican
antecedents) and the singular "court" (defined as the Chief Court in
Bankruptcy) in sections 157 and 158 (and their Jamaican antecedents).

25   Their Lordships readily understand why the Court of Appeal was *A*
anxious to interpret section 156, if possible, in a way that gives it a sensible
present effect. But for the legislative history as summarised above the Court
of Appeal's interpretation might have been possible, although to treat
section 156 simply as a declaratory repetition of the United Kingdom
provision would involve some remoulding of the statutory language. The
section would have to be read as conferring on the Grand Court authority to *B*
send letters of request to United Kingdom courts and other British courts,
and as placing it under a duty to respond to letters of request from such
courts, while leaving the powers and duties of the other courts to be
conferred or imposed by other legislation enacted in the United Kingdom or
elsewhere in the Commonwealth.

26   But in their Lordships' view the history of the Jamaican legislation,
and the way in which it has been transposed into Cayman legislation, make *C*
such an interpretation impossible. When the transposition took place the
state of Jamaican law was that for nearly a century section 64 of the
Bankruptcy Law 1871, and then section 161 of the Bankruptcy Law 1880,
had provided a system of co-operation in bankruptcy matters which made
sense in the domestic context of Jamaica. Section 122 of the Bankruptcy Act
1914 and its antecedents provided for mutual assistance between the
Jamaican courts and the British courts. It is inconceivable that the *D*
commissioners appointed under the Revised Edition (Laws of the Cayman
Islands) Law 1960 (who seem, from the contents of the Statute Law Revision
(Amendments) Law 1963, to have been scrupulous about what might be
regarded as amendments of substance) should have intended to make a
significant change of substance without invoking the procedure in section 6
(2) of the 1960 Law. This aspect of the matter does not seem to have been *E*
raised in the Court of Appeal, which seems to have thought that the
amendment to section 161 was included in the 1963 amending statute.

27   Their Lordships must therefore conclude that the commissioners
cannot have understood the effect of this part of the Jamaican legislation.
Had they done so they would have realised that there was no way in which it
needed to be, or could sensibly be, transposed into a legal system under
which there was only one bankruptcy court. Section 156 has no practical *F*
present effect in the Cayman Islands. Therefore the appellants succeed on
the first issue.

*The second issue: repeal of section 122*

28   This issue is also an issue of statutory construction, the relevant
statute being the Insolvency Act 1985 of the United Kingdom. The question *G*
is whether that Act repealed section 122 in its entirety, and across the whole
range of its extent, or repealed it in relation to the United Kingdom but left it
in force in relation to the Channel Islands, the Isle of Man, and all other
parts of Her Majesty's Dominions (including fully independent
Commonwealth countries) in which it was still in force. Although this too is
in the end a short point of construction it is by no means an easy one.
Counsel on both sides put forward some elaborate arguments representing *H*
the fruits of painstaking research. But the only sure conclusions that their
Lordships can draw are that the drafting techniques of successive
generations of parliamentary counsel have not been wholly uniform, and the
reasons for variations in their techniques are often obscure.

A    29  The relevant provisions of the 1985 Act are as follows.

(i) Section 213 provided for mutual assistance between courts within different parts of the United Kingdom, and between its courts and those of a "relevant country or territory". It was the predecessor of section 426 of the Insolvency Act 1986, which is discussed below as part of the third issue.

(ii) Section 235(3): "The enactments mentioned in Schedule 10 to this Act are hereby repealed to the extent specified in the third column of that

B   Schedule."

(iii) Section 236(2):

"This Act shall come into force on such day as the Secretary of State may, by order made by statutory instrument, appoint; and different days may be so appointed for different purposes and for different provisions."

C    (iv) Section 236(3) provided that certain provisions of the Act do not extend to Scotland. Subsection (4) provided that with certain exceptions (including section 235 and the relevant parts of Schedule 10, Part IV) the Act does not extend to Northern Ireland.

(v) Section 236(5):

"Her Majesty may, by Order in Council, direct that such of the

D   provisions of this Act as are specified in the Order shall extend to any of the Channel Islands or any colony with such modifications as may be so specified."

(vi) Schedule 10, Part III (Bankruptcy repeals) included the following:

| | | |
|---|---|---|
| 4 & 5 Geo 5, c 59 | The Bankruptcy Act 1914 | The whole Act, except sections 121 to 123. |

(vii) Schedule 10, Part IV (Other repeals) included the following:

| | | |
|---|---|---|
| 4 & 5 Geo 5, c 59 | The Bankruptcy Act 1914 | Sections 121 to 123. |

F
30  The Secretary of State made two relevant commencement orders on 6 February 1986 and 10 November 1986 respectively. The Insolvency Act 1985 (Commencement No 2) Order 1986 (SI 1986/185) provided for the coming into force on 1 April 1986 of most of the provisions of section 213 and of Schedule 10 "except insofar as it relates to courts in the United Kingdom acting in aid of and being auxiliary to British courts elsewhere".

G   The Insolvency Act 1985 (Commencement No 5) Order (SI 1986/1924) provided for the coming into force on 29 December 1986 (with a very few immaterial exceptions) of all the remaining provisions of the 1985 Act.

31  No Order in Council was made under section 236(5) extending any provision of the Insolvency Act 1985 to the Cayman Islands, nor has any such Order ever been made under section 442 of the Insolvency Act 1986 (which replaced section 236(5)). In particular, there has been no such

H   extension of the repeal of section 122. The respondents rely on this simple point as their key argument. The appellants say that no extension of the repeal was necessary, since section 122 was repealed outright by the Insolvency Act 1985 itself. They contend that the presumption against extraterritorial operation of a United Kingdom statute does not apply (at

any rate with the same force) to a repeal. They point to other statutes   A
(especially Statute Law Revision Acts and Statute Law (Repeals) Acts
ranging from 1867 to 1995) in which clear words of exception were used—
for instance, in section 2(3) of the Statute Law (Repeals) Act 1995:

"this Act does not repeal any enactment so far as the enactment forms
part of the law of a country outside the United Kingdom; but Her Majesty
may by Order in Council provide that the repeal by this Act of any   B
enactment specified in the Order shall on a date so specified extend to any
of the Channel Islands or any colony."

They point to the Insolvency Act 1986 (Guernsey) Order 1989 (SI
1989/2409), by which section 426 of the Insolvency Act 1986 was extended
to Guernsey. This Order in Council did not include any express repeal of
section 122. Similarly, Jersey and the Isle of Man have enacted their own   C
provisions for mutual assistance (in article 48 of the Bankruptcy (Desastre)
(Jersey) Law 1990 and section 1 of the Manx Bankruptcy Act 1988
respectively) without any express repeal of section 122.

   32   The Court of Appeal did not find it necessary to reach a definite
conclusion on this point, although it appears to have been inclined towards
the view that section 122 had not been repealed in relation to the Cayman
Islands. This inclination seems to have been based partly on the decision of   D
the Full Court of the Supreme Court of Victoria in *Ukley v Ukley* [1977]
VR 121, 124–125, which attached great weight to the power to extend the
relevant statute (the Evidence (Proceedings in other Jurisdictions) Act 1975)
by Order in Council (although not to Victoria) and concluded, at p 131, after
a full discussion of the authorities, that there is "no sufficient reason for
distinguishing between a statute which repeals an earlier statute and one   E
which amends it". Mr Dicker, for the appellants, sought to distinguish this
case because Victoria, unlike the Cayman Islands, had full self-government
at the time when the 1975 Act was passed. Mr Popplewell, for the
respondents, was right in commenting that the position of the Cayman
Islands is really an a fortiori case.

   33   It is surprising that there should be any room for doubt as to whether   F
an important provision of primary legislation has or has not been fully
repealed by a modern statute which appears to have been drafted skilfully
and with close attention to detail. It is particularly noteworthy that in
section 236(4) the draftsman has painstakingly excepted certain repeals (all
affecting Ireland) from the general provision that the Act does not extend to
Northern Ireland.

   34   After carefully considering all the competing arguments their   G
Lordships have come to the conclusion that the Insolvency Act 1985 did not
repeal section 122 in its application outside the United Kingdom.
Section 236(4) (the provision about Irish repeals) and section 236(5) (the
power for Her Majesty by Order in Council to extend any of the provisions
of the Act to certain territories outside the United Kingdom) strongly
support the natural reading of section 235(3) and Schedule 10. The only
possible drafting defect was that parliamentary counsel omitted   H
(presumably as unnecessary) precautionary formulae (such as that used in
the 1995 Act mentioned in para 31 above) which have been used from time
to time, both before and since the 1985 Act, by other parliamentary counsel.
That carries little weight as against the matters just mentioned. Nor can

A   much weight be attached to the fact that there may have been an oversight
(or a deliberate reliance on implied repeal) in subsequent instruments
affecting the Channel Islands and the Isle of Man. Therefore the respondents
succeed on the second issue.

35   The respondents relied in the alternative, on the second issue, on the
inherent jurisdiction of the Grand Court. This point was not much
developed in argument and their Lordships can deal with it quite shortly. If
B   the Grand Court had no statutory jurisdiction to act in aid of a foreign
bankruptcy it might have had some limited inherent power to do so. But it
cannot have had inherent jurisdiction to exercise the extraordinary powers
conferred by section 107 of its Bankruptcy Law in circumstances not falling
within the terms of that section. The non-statutory principles on which
British courts have recognised foreign bankruptcy jurisdiction are more
C   limited in their scope (see *Dicey & Morris, Conflict of Laws*, 13th ed (2000),
vol 2, pp 1181–2, 1186–3) and the inherent jurisdiction of the Grand Court
cannot be wider.

*The third issue: section 107*

36   The conclusion that section 122 of the Bankruptcy Act 1914 remains
D   in force in the Cayman Islands leads to the third issue, that is the nature and
width of the jurisdiction that it confers on the Grand Court. In particular,
does it authorise the Grand Court to exercise in favour of the Bahamian
trustee in bankruptcy a special statutory power which might not be available
to him (because of the "trader" requirement) if the trusts in question were
governed by Bahamian law and the trustees were resident in the Bahamas
and facing proceedings in the Bahamian court?

E   37   Mr Popplewell has urged the Board to give an affirmative answer to
that question. He has pointed to the alternatives spelled out in the latter part
of section 122: "such jurisdiction as either the court which made the request,
or the court to which the request is made, could exercise in regard to similar
matters within their respective jurisdictions." He has submitted that this
equates the receipt and acceptance of a letter of request in the receiving territory, with consequences described as
F   follows by Chadwick J in *In re Dallhold Estates (UK) Pty Ltd* [1992]
BCLC 621, 626, a case on section 426 of the Insolvency Act 1986:

"The scheme of subsection (5) appears to me to be this. The first step is
to identify the matters specified in the request. Secondly, the domestic
court should ask itself what would be the relevant insolvency law
applicable by the domestic court to comparable matters falling within its
G   jurisdiction. Thirdly, it should then apply that insolvency law to the
matters specified in the request, notwithstanding that on this hypothesis,
those are matters which would not, or might not, otherwise fall within its
jurisdiction by reason of some foreign element."

Rattee J agreed with that passage in *In re Bank of Credit and Commerce
International SA (No 9)* [1994] 2 BCLC 636, 655, and both decisions were
H   referred to with approval by the Court of Appeal in *Hughes v Hannover
Rückversicherungs-AG* [1997] 1 BCLC 497, 511–515.

38   To this Mr Dicker replied that these are all recent authorities on
section 426 of the Insolvency Act 1986, which is in different and wider terms
than section 122, and that the Court of Appeal was in error in treating them

as having any relevance to section 122. It is therefore appropriate to set out    *A*
the relevant provisions of section 426:

> "(4) The courts having jurisdiction in relation to insolvency law in any
> part of the United Kingdom shall assist the courts having the
> corresponding jurisdiction in any other part of the United Kingdom or
> any relevant country or territory.
>
> "(5) For the purposes of subsection (4) a request made to a court in    *B*
> any part of the United Kingdom by a court in any other part of the
> United Kingdom or in a relevant country or territory is authority for the
> court to which the request is made to apply, in relation to any matters
> specified in the request, the insolvency law which is applicable by either
> court in relation to comparable matters falling within its jurisdiction. In
> exercising its discretion under this subsection, a court shall have regard    *C*
> in particular to the rules of private international law."

Subsection (10) contains a wide definition of "insolvency law".
Subsection (11) defines "relevant country or territory" as any of the Channel
Islands, the Isle of Man, and any country or territory which the Secretary of
State designates by statutory instrument.

39 Mr Dicker submitted that section 122 (like its statutory    *D*
predecessors, but unlike section 426) conferred an essentially auxiliary
jurisdiction, which granted new remedies but did not create new rights. The
High Court of Australia said as much (in relation to section 118 of the
Bankruptcy Act 1883 of the United Kingdom) in *Hall v Woolf* (1908) 7 CLR
207, 212. Moreover in *Galbraith v Grimshaw* [1910] AC 508, 511–512
Lord Macnaghten said:

> "It may have been intended by the legislature that bankruptcy in one    *E*
> part of the United Kingdom should produce the same consequences
> throughout the whole kingdom. But the legislature has not said so. The
> Act does not say that a Scotch sequestration shall have effect in England
> as if it were an English bankruptcy of the same date. It only says that the
> courts of the different parts of the United Kingdom shall severally act in    *F*
> aid of and be auxiliary to each other in all matters of bankruptcy. The
> English court, no doubt, is bound to carry out the orders of the Scottish
> court, but in the absence of special enactment the Scottish court can only
> claim the free assets of the bankrupt. It has no right to interfere with any
> process of an English court pending at the time of the Scotch
> sequestration."

40 *Galbraith v Grimshaw* was primarily concerned with section 117 of    *G*
the Bankruptcy Act 1883. What the House of Lords actually decided was
that where a Scottish sequestration (that is, bankruptcy) occurred about a
fortnight after an English garnishee order nisi, the judgment creditor
prevailed over the trustee in bankruptcy, although the result would have
been different if both the attachment and the bankruptcy had occurred in the
same jurisdiction (whether England or Scotland). The attachment in    *H*
England had not been completed, but the fact that it had started meant that
the garnished debt was no longer "free assets" of the bankrupt. But in
referring to the court's auxiliary function Lord Macnaghten must have had
in mind section 118.

A    41    The general tenor of his opinion is adverse to the notion of a hypothetical bankruptcy in the receiving territory, as the operation of section 426 has been described in the recent authorities already mentioned. In *The Law of Insolvency*, 3rd ed (2002), at p 773, Professor Ian Fletcher has criticised *Galbraith v Grimshaw* as a

B    "somewhat unsophisticated, if not disingenuous, decision, which purports to disallow any possibility that the rules of law in force in one jurisdiction may enjoy effect elsewhere by virtue of rules of private international law in force in the other countries concerned",

and he suggests that it is overdue for reconsideration. The decision has also been described as "unfortunate" in *Anton, Private International Law*, 2nd ed (1990), at p 734.

C    42    Section 122 was given a cautious interpretation by Farwell J in *In re Osborn; Ex p Tree* [1931–32] B & CR 189, a case in which an Isle of Man trustee in bankruptcy was seeking the assistance of the English court in relation to the bankrupt's immovable property in England. *In re Osborn* is one of very few reported English cases on the operation of section 122. It has since been cited in many overseas cases in relation to the degree of discretion which the receiving court has in applying the apparently mandatory terms of section 122 (or comparable overseas enactments). Another of the rare English cases on section 122 is *In re A Debtor (Order in Aid No 1 of 1979), Ex p Viscount of the Royal Court of Jersey* [1981] Ch 384, 399, 400 in which Goulding J (after noting the striking differences between insolvency laws in England and Jersey) said:

E    "The word 'bankruptcy' in section 122, if indeed it refers at all to *process* of bankruptcy, must, in my judgment, be construed in a wide sense, for the section is designed to produce co-operation between courts acting under different systems of law, and it would be much restricted if extended only to jurisdictions which reproduce all the main features of English procedure. Dodd J took much the same view of a similar provision in the Bankruptcy (Ireland) Amendment Act 1872: see *In re Bolton* [1920] 2 IR 324, 327."

F

    43    In addition to *Hall v Woolf* 7 CLR 207 and *Ukley v Ukley* [1977] VR 121 their Lordships were referred to a number of other Australian authorities, the most important of which are *In re Ayres; Ex p Evans* (1981) 34 ALR 582 and on appeal *Ayres v Evans* (1981) 39 ALR 129; and *Radich v Bank of New Zealand* (1993) 116 ALR 676. These cases are of limited assistance since they are concerned with section 29 of the Bankruptcy Act 1966 of the Commonwealth of Australia, which although similar in its general scope to both section 122 and section 426, is not in identical terms to either. The key provisions of section 29 are in subsections (2) and (3):

H    "(2) In all matters of bankruptcy, the court: (a) shall act in aid of and be auxiliary to the courts of the external territories, and of prescribed countries, that have jurisdiction in bankruptcy; and (b) may act in aid of and be auxiliary to the courts of other countries that have jurisdiction in bankruptcy.

    "(3) Where a letter of request from a court of an external territory, or of a country other than Australia, requesting aid in a matter of

bankruptcy is filed in the court, the court may exercise such powers with     A
respect to the matter as it could exercise if the matter had arisen within its
own jurisdiction."

In *In re Ayres* the Federal Court of Australia was largely concerned with the
aspect of indirect enforcement of the revenue laws of a foreign country (the
New Zealand Inland Revenue Department was a major creditor of the
bankrupt). There are passing references to the judgments in *Hall v Woolf*     B
and *Galbraith v Grimshaw* but the main issue was as to the mandatory
nature of the court's response to a letter of request.

   44   *Radich's* case 116 ALR 676 was concerned with whether a debtor,
already bankrupt in New Zealand, should be made subject to a further
sequestration order in Australia. It was held on appeal that the Australian
court had erred in exercising its discretion to bring about a second           C
bankruptcy. The Federal Court was critical of *Hall v Woolf*, Einfeld J,
at p 683, saying that it had produced a "virtual nonsense" and Drummond J,
at p 692, referring to "unsatisfactory aspects of the reasoning" in it. But all
three Justices regarded it as a decision on unusual facts (involving a change
of domicile in the course of the bankruptcy). Drummond J said of
section 29(3), at p 695:
                                                                               D
   "The jurisdiction the Australian court has under section 29(3) is a wide
   one . . . The Australian court is not limited in providing assistance to a
   foreign court to cases in which the Australian and the foreign court have
   powers that mirror each other. If there is a 'matter of bankruptcy' within
   section 29(3) before the foreign court, the Australian court, in response
   to a request for aid, can exercise any of the powers it has under the
   Bankruptcy Act 1966 if that same matter had arisen in Australia, being    E
   powers the exercise of which will provide assistance to the foreign court
   in the circumstances of the particular case."

So here the Federal Court saw section 29(3) as importing a hypothetical
bankruptcy in the receiving state.

   45   Their Lordships see some force in the criticisms which have been
made of *Hall v Woolf* 7 CLR 207 and *Galbraith v Grimshaw* [1910]           F
AC 508. The distinction between "rights" and "remedies" is not, in the
context of auxiliary jurisdiction in bankruptcy, marked by a bright line
(though their Lordships cannot accept Mr Popplewell's submission that
even the debtor himself, before his bankruptcy, had some inchoate right to
have his own trusts set aside). Section 122 is expressed in terms of
exercising jurisdiction; section 29(3) is expressed in terms of exercising    G
powers; section 426(5) is expressed in terms of applying insolvency law.
That is not in their Lordships' view a sound basis for concluding that
section 426 has conferred different and wider powers on the court which
receives a letter of request. The Court of Appeal in *Hughes v Hannover
Rückversicherungs-AG* [1997] 1 BCLC 497, 515 did not take that view.
Moreover there is nothing in the report of the Cork Committee on
Insolvency Law and Practice (1982) (Cmnd 8558) to suggest that           H
section 426 was intended to make a large extension in the court's auxiliary
jurisdiction in bankruptcy otherwise than in a geographical sense (that is, by
extending its scope to any "relevant country or territory"): see Chapter 49,
especially paras 1909–1913.

**[2005] 2 AC**                              Al Sabah v Grupo Torras SA (PC)

A    46   For these reasons their Lordships conclude, despite Mr Dicker's skilful submissions in support of the appeal, that the jurisdiction conferred by section 122 is, in the Cayman Islands and the other territories in which it remains in force, essentially as wide as that conferred by section 426. Therefore the respondents succeed on the third issue.

47   In reaching this conclusion their Lordships have not overlooked the express provision in section 426(5) requiring the court to have regard to the rules of private international law.  If asked to exercise its powers under section 426 the English court may find it necessary to consider whether the requesting court has properly exercised jurisdiction over a debtor with no obvious connection with its territory, and it might also, in some circumstances, have to take account of the general principle against enforcement of the public laws of another country.  But that was true of section 122 also: see the judgment of the Court of Appeal of Guernsey in *In re Tucker (A Bankrupt)* (unreported) 27 September 1988. Considerations of private international law may be material in subsequent proceedings which the Bahamian trustee in bankruptcy takes in the Grand Court.  But their Lordships have no reason to suspect that there will be any real doubt about the debtor's sufficient connection with the Bahamas, where he is permanently resident.  Moreover the larger of the trusts in question, the Comfort Trust, was originally governed by Bahamian law, and the switch to the Cayman Islands seems to have taken place when the English proceedings against the debtor were already imminent.  Their Lordships have no criticism of the observations made by the Court of Appeal as to the Grand Court's eventual exercise of discretion in this matter.

48   Their Lordships will therefore humbly advise Her Majesty that this appeal should be dismissed with costs.

*Solicitors: Alan Taylor & Co; Baker & McKenzie.*

P M M

_____

TAB 3

*Aldi Stores Ltd v WSP Group plc* [2008] 1 WLR 748,
English Court of Appeal

substantially lower than the level of income required to support the overall life-style of that non-applicant.    *A*

(2) Paragraph (1) shall not apply where the Secretary of State is satisfied that the life-style of the non-applicant is paid for—(a) out of capital belonging to him; or (b) by his partner, unless the non-applicant is able to influence or control the amount of income received by that partner.

*Appeal allowed.*    *B*

*Solicitors: Dutton Gregory, Southampton; Solicitor, Department of Work and Pensions; Leigh Day & Co.*

J R S

*C*

————

Court of Appeal

*D*

## *Aldi Stores Ltd v WSP Group plc and others*

### [2007] EWCA Civ 1260

2007  Oct 3;                                     Longmore, Thomas and Wall LJJ
Nov 28

*E*

*Practice — Pleadings — Striking out — Abuse of process — Judge striking out claim for failure to pursue it in earlier action against different defendants — Whether decision exercise of discretion or judgment — Whether appellate court to interfere with decision — Whether rule of law that abuse of process not capable of arising absent sufficient identity of defendants in both actions — Whether claim abusive — Appropriate procedure where party wishing to bring other proceedings while reserving right in existing proceedings*    *F*

The decision of the judge on an application to strike out a claim for abuse of process on the ground that the claims could and should have been brought in previous litigation is not the exercise of a discretion. It is a decision involving the assessment of a large number of factors to which there can only be one correct answer as to whether there is an abuse of process. An appellate court will be reluctant to interfere with the judge's decision in the judgment he reaches on abuse of process by the balance of the factors; it will generally only interfere where the judge has taken into account immaterial factors, omitted to take account of material factors, erred in principle or come to a conclusion that was impermissible or not open to him (post, paras 16, 32, 37, 38).    *G*

There is no rule of law that there cannot be abuse of process unless the defendants who are sued in the further action have a sufficient identity with the defendants in the original action. It is none the less a powerful factor in the broad merits-based judgment that the original action was brought by the claimant against one party and the second is brought against completely different parties (post, paras 10, 26, 32, 37).    *H*

*Johnson v Gore Wood & Co* [2002] 2 AC 1, HL(E) applied.
*Gleeson v J Wippell & Co Ltd* [1977] 1 WLR 510 considered.

A    Where, therefore, the claimants appealed against the judge's decision to strike out their claim because it should have been brought in previous litigation and was therefore abusive—

    *Held*, allowing the appeal, that since the judge had taken into account factors which he should not have done and omitted to consider relevant factors his decision could not stand; and that, in the circumstances, having regard in particular to the facts that the claimants had not behaved in a way that was culpable, the original

B action had been brought against different parties, and the claimants' decision not to pursue the defendants in the original action had been reasonable, the claim was not abusive ( post, paras 16, 18–19, 27–28, 32, 34–35, 37, 40).

    *Per curiam.* Where in complex commercial multi-party litigation a party wishes to pursue other proceedings whilst reserving a right in existing proceedings, the proper course is for the issue to be raised with the court seised of the existing proceedings. The court will be able to express its view as to the proper use of its

C resources and on the efficient and economical conduct of the litigation. It is in the interests of the parties, of the public and of the efficient use of court resources that that is done. There can be no excuse for failure to do so in the future ( post, paras 29–31, 32, 34, 36, 37, 42).

    Decision of Jackson J [2007] EWHC 55 (TCC); [2007] BLR 113 reversed.

    The following cases are referred to in the judgments:

D *Assicurazioni Generali SpA v Arab Insurance Group (Practice Note)* [2002] EWCA Civ 1642; [2003] 1 WLR 577; [2003] 1 All ER (Comm) 140, CA
    *Browne of Madingley (Lord) v Associated Newspapers Ltd* [2007] EWCA Civ 295; [2008] QB 103; [2007] 3 WLR 289, CA
    *Dexter Ltd v Vlieland-Boddy* [2003] EWCA Civ 14; 147 SJLB 117, CA
    *Gleeson v J Wippell & Co Ltd* [1977] 1 WLR 510; [1977] 3 All ER 54
    *Henderson v Henderson* (1843) 3 Hare 100
E *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529; [1981] 3 WLR 906; [1981] 3 All ER 727, HL(E)
    *Johnson v Gore Wood & Co* [2002] 2 AC 1; [2001] 2 WLR 72; [2001] 1 All ER 481, HL(E)
    *Mersey Care NHS Trust v Ackroyd (No 2)* [2007] EWCA Civ 101; [2007] HRLR 580, CA
    *Toth v Ledger* [2002] PIQR P1, CA

F    The following additional cases were cited in argument:

    *Talbot v Berkshire County Council* [1994] QB 290; [1993] 3 WLR 708; [1993] 4 All ER 9, CA
    *Wall v Radford* [1991] 2 All ER 741

    The following additional cases, although not cited, were referred to in the skeleton
G arguments:

    *Bradford & Bingley Building Society v Seddon* [1999] 1 WLR 1482; [1999] 4 All ER 217, CA
    *Department of Transport v Chris Smaller (Transport) Ltd* [1989] AC 1197; [1989] 2 WLR 578; [1989] 1 All ER 897, HL(E)
    *Yat Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581; [1975] 2 WLR 690, PC

H    **APPEAL** from Jackson J

    By a claim form dated 22 June 2001, the claimant, Aldi Stores Ltd ("Aldi"), brought an action against Holmes Building Ltd ("Holmes"), the main contractor in the building of retail premises at Dallow Road, Luton, for

the claimant. Holmes brought Part 20 claims against WSP Group plc, *A*
WSP London Ltd and Aspinwall & Co Ltd. On 15 March 2002 judgment
on liability was given for the claimant against Holmes, which had gone into
administration on 5 February 2002. Interim payments were made to the
claimant. At a final hearing of the quantum claim judgment was given
for the claimant on 22 May 2003 for £331m. After credit was given for
payments made, the claimant sought to recover the outstanding sum of
£179m from the excess layer underwriters. A separate action was brought *B*
by B&Q plc in May 2002 against Holmes for damages of £26m for breaches
of warranty and negligence in relation to similar damage sustained to their
store adjacent to that of Aldi. Holmes issued Part 20 claims against, inter
alia, WSP Group plc, WSP London Ltd and Aspinwall & Co Ltd making
substantially similar allegations to those in the Aldi action. The B&Q action
was eventually compromised in January 2004. *C*

By a claim form dated 18 October 2005 Aldi brought an action for
damages for breaches of warranty and negligence against the defendants,
WSP Group plc, WSP London Ltd and Aspinwall & Co Ltd. The pleaded
claim was in similar terms to allegations made against those same parties by
Holmes in the Part 20 claims in the earlier actions

The defendants applied to have the claim brought by the claimant on *D*
18 October 2005 struck out. On 15 January 2007 Jackson J struck out the
claim as an abuse of process, dismissed the action and refused permission to
appeal.

By an appellant's notice dated 5 February 2007 the claimant appealed on
the grounds, inter alia, that (1) the judge had been wrong in law and in fact
in his identification of the features of the case that he regarded as significant
in reaching his conclusion on abuse of process: he had been wrong in law in *E*
not treating the fact that the claimant had never previously sued the
defendants as decisive or highly material against the proceedings being
abusive, but treating that fact as just one among the features to be weighed
up to reach his decision; (2) the judge had been wrong in law not to apply the
test of whether the defendant to a second action had a sufficient identity of
interest with the defendant to the first action to make the first action binding
(see *Johnson v Gore Wood & Co* [2002] 2 AC 1, 32); (3) the judge had been *F*
wrong in law not to treat the most important question as whether a new
defendant in a later action could persuade the court that the action against
him was oppressive; (4) the judge had been wrong in law to treat as
significant the fact that both the claimant and the defendants had been
parties to the first action, as the defendants had not been parties to the
claimant's action but Part 20 defendants to Holmes's action; (5) the judge *G*
had been wrong in law not to take account of the claimant's signal success in
its strategy in 2001 and 2002; (6) the judge had been wrong in law to rely on
a general rule that all persons who were to be sued should be sued at the
same time when there was no such general rule (see *Johnson v Gore Wood &
Co* [2002] 2 AC 1, 31); (7) the judge had been wrong in law to treat the
claimant's lack of impecuniosity as a feature indicating abuse: he should
have considered the claimant's private reasons for not suing the present *H*
defendants and considered that they were legitimate; (8) the judge should
have considered whether the defendants had shown unjust oppression or
harassment and found as a fact that there had been none or insufficient to
make the action abusive; (9) the judge had been wrong in law to consider

751

A  additional costs a significant feature of itself; (10) the judge had given
insufficient weight to the fact that the claimant had recovered only half of the
judgment sum in refusing permission to seek recovery from professionals
who had given warranties; (11) the judge had failed to take into account
further features which were significant, including the fact that the previous
proceedings in which the defendants were Part 20 defendants had ended in
B  settlement; (12) the judge had been wrong in law not to ask himself whether
the claimant had had a legitimate private reason not to join the defendants in
the first action and not to seek to join the main action; (13) the judge had
been wrong in law not to take account of the true public interest in
encouraging parties to litigation to attempt to save costs; and (14) the judge
had been wrong in law not to take account of the fact that there was no
impropriety or culpability on the claimant's part: he should have held that
C  the claimant appeared to have had reasonable prospects of success in the
insurance action until after it was too late to join the main action.

   By a respondent's notice dated 19 March 2007 the defendants sought to
uphold the judge's order on the different or additional ground that in
deciding that the action constituted an abuse of process the judge should
have taken into account the additional factors that: (1) success for the
D  claimants in the insurance action against Holmes Ltd's excess layer insurers
would not necessarily have enured to the benefit of the defendants, having
regard to the potential liability of those insurers to pursue (by abrogation)
Holmes's Part 20 claims against the defendants; and/or (2) the claimant had
unreasonably further delayed pursuit of that action between April 2004 and
February 2006.

E    The facts are stated in the judgment of Thomas LJ.

   *David Thomas QC* for the claimant.
   *Michael Soole QC* for the first and second defendants.
   *Michael Douglas QC* for the third defendant.

   28 November. The following judgments were handed down.

F  **THOMAS LJ**
   1  This appeal concerns the application of the principles set out in
*Johnson v Gore Wood & Co* [2002] AC 1 to an attempt to strike out a claim
for abuse of process on the basis that the claim could and should have
been brought in previous litigation. It arises in the context of complex
commercial litigation relating to the damage sustained to a retail store site
G  near Luton.
   2  The undisputed facts are very fully set out at paras 2–45 of the
judgment of Jackson J [2007] BLR 113. It is therefore only necessary to
summarise them.
   (i) In 1993 and 1994, Laporte Industries Ltd ("Laporte") entered into
agreements for a lease with the claimants ("Aldi") and B&Q plc ("B&Q")
under which it agreed to construct stores at a site at Dallow Road, Luton; the
H  site had previously been used by Laporte to deposit chemical waste from its
nearby plant.
   (ii) In 1994, Laporte entered into a building contract with Holmes plc
("Holmes") for the design and construction of the buildings and into
agreements with the first and second defendants (to whom I shall refer

together as "WSP") and the third defendants ("Aspinwall") for specialist    *A*
consultancy services for engineering and environmental services
respectively.    Holmes employed Norwest Holst Soil Engineering Ltd
("Norwest Holst") as the ground improvement contractor. Under the terms
of complex contractual arrangements, Aldi and B&Q became entitled to
warranties from Holmes, WSP and Aspinwall to the effect that they had
properly performed their obligations; in the case of WSP and Aspinwall this
related to their respective professional duties of skill and care; the warranties    *B*
were supported by professional indemnity insurance for £5m.    These
warranties were executed under seal by these companies in 1994 and 1995.

(iii) The buildings were completed in 1995. Laporte entered into a 25-year
lease with Aldi and a lease for a similar term with B&Q. The freehold
reversions were subsequently transferred to Grantchester Properties (Luton)
Ltd and to Grantchester Retail Parks plc (Grantchester).    *C*

(iv) Aldi and B&Q commenced trading from their stores in 1995. In 1997
and 1998, differential settlement to the buildings leased by Aldi and B&Q
began to occur and caused damage to the buildings. Aldi were advised that
the settlement had been caused by the vibro-compaction of the site; they
were also advised that vibro-compaction was an unsuitable method of
ground improvement and had not achieved its objective. There appears now
to be little dispute that the differential settlement was caused by the    *D*
unsuitability of the site and the method of compaction.

(v) On 22 June 2001 Aldi commenced an action in the Technology and
Construction Court ("TCC") against Holmes claiming damages for breach
of warranty and negligence; its claim was for £3·01m. Holmes joined the
second defendants (one of the WSP companies) and Norwest Holst as Part
20 defendants in August 2001. In the Part 20 claim Holmes alleged that    *E*
there had been breaches of the various warranties given to Aldi and B&Q.

(vi) B&Q commenced an action against Holmes in May 2002 in the TCC;
its store was considerably bigger and its claim was for £26m. Holmes issued
Part 20 claims in that action against one of the WSP companies and Norwest
Holst in July 2002. Grantchester commenced actions against WSP and
Norwest Holst in September 2002.

(vii) It was only in November 2002 that Aspinwall were joined by    *F*
WSP into the action commenced by Aldi and B&Q. Between then and early
2003, Aspinwall and WSP were made parties by B&Q and Grantchester to
their actions and to some of the Part 20 proceedings in the B&Q and
Grantchester actions. Aspinwall were made, along with the first defendants
(the other WSP company), Part 20 defendants to the Aldi action by Holmes
in January 2003. Subsequently another company, Keller Ltd, who had acted    *G*
as ground improvement specialists, became party to the actions.

(viii) Holmes had gone into administration on 5 February 2002. None the
less it had the required professional indemnity insurance under a cost
inclusive primary layer for £2m and for a second layer of £3m excess of £2m.
The primary layer agreed to indemnify Holmes and instructed solicitors to
act on behalf of Holmes; the Aldi claim attached to one year and the B&Q
claim to a different year.    However, the position of the excess layer    *H*
underwriters was different; by July 2002, they had reserved their position
and Aldi were informed of this.

(ix) Aldi pursued its claim vigorously against Holmes who continued to
be represented by solicitors instructed by the primary layer underwriters

753
[2008] 1 WLR                           Aldi Stores Ltd v WSP Group plc (CA)
                                                              Thomas LJ

A   until 11 April 2003; it claimed only against Holmes and never made WSP or
    Aspinwall defendants to its claim.  It is clear that Aldi's quantum claim
    against Holmes was, from an early stage, treated separately from the
    remainder of the Aldi action and the other actions.  Thus: (a) on 16 March
    2002, Aldi obtained judgment against Holmes on certain liability issues.
    (b) On 26 July 2002, Aldi obtained judgment on further liability issues.
B   Directions were given at a pre-trial review before Judge Bowsher QC for a
    preliminary issue on quantum to be tried on 1 October 2002 with the
    remaining issues for trial in March 2003; the Part 20 defendants to that
    action were to be bound by the result and were given permission to attend
    the trial.  A case management conference ("CMC") was heard on the same
    date in the B&Q action and a trial of the quantum issues between B&Q and
    Holmes was fixed for March 2003.  (c) On 1 October 2002, Aldi obtained
C   judgment by consent on the preliminary issue on quantum; in essence
    Holmes accepted Aldi's contention that it was bound under the terms of the
    lease to keep the store in substantial repair.  (d) On 29 November 2002,
    there was a further CMC before Judge Bowsher QC in all the actions; the
    trial of the quantum of Aldi's claim was adjourned to 3 June 2003.  It was
    ordered that Holmes' Part 20 claim in the Aldi action, the B&Q action and
    the Grantchester actions were to be tried together on a date to be fixed; the
D   CMC was adjourned to 17 January 2003.  (e) At the adjourned CMC in all
    the actions on 17 January 2003 Judge Bowsher QC made directions for the
    trial of the remaining issues of quantum in Aldi's claim against Holmes.  The
    order provided that the other parties were not to be bound by or required
    to attend the quantum hearing.  This was because WSP and Aspinwall
    contended that the measure of damages was different and therefore different
E   issues would arise.  The date for the trial of the Part 20 proceedings in the
    Aldi action and the other actions was fixed for 12 January 2004, with an
    estimated length of just over six weeks; mediation was recommended for
    early June 2003.  (f) On 24 January 2003, Holmes were ordered by consent
    to make a further interim payment to Aldi in the sum of £1·3m; this was
    agreed on the basis that it was likely to be the sum that would exhaust the
F   primary layer of Holmes' cover; in fact the sum was too low and a further
    payment of £0·131m was made to Aldi in August 2004.  (g) Aldi served its
    case on quantum on 3 February 2003 putting forward a claim that totalled
    £3·5m.  (h) On 11 April 2003, the solicitors instructed by the primary layer
    underwriters on behalf of Holmes who no longer had an effective interest in
    the action after the agreement made on 24 January 2003, came off the record
    for Holmes; solicitors instructed by the administrator then came on the
G   record for Holmes.  (i) On 1 May 2003, there was a summary assessment of
    Aldi's quantum claim by Judge Bowsher QC; Aldi obtained a further
    judgment for £2·054m and that was made enforceable as to £0·526m after
    giving credit for the sums already paid.  Certain issues were left over.  (j) On
    22 May 2003, there was a final hearing of the quantum claim before Judge
    Bowsher QC when the remaining issues were resolved by consent.  Judgment
    was entered for Aldi for £3·331m; after giving credit for the payments made,
H   the judgment was made enforceable for a further £1·266m, making a total of
    about £1·792m.
       (x) As Aldi had obtained judgment against Holmes for the whole of its
    claim, it set about trying to recover the sum of £1·792m from the excess
    layer underwriters.  On 12 May 2003, Aldi's solicitors wrote to the solicitors

for the excess layer underwriters making it clear that the Third Parties     *A*
(Rights against Insurers) Act 1930 would be used if necessary.

"In particular, our client has an understandable reason to wish to
pursue to a conclusion the issue of enforcement under the 1930 Act which
is that our client currently retains the benefit of various other potential
causes of action against other parties. Claims against those other parties
are subject to concerns in relation to limitation law. Further, those other    *B*
parties are defendants to various other claims (Part 20 claims) before the
[TCC] which are due to come to trial in January of next year. It is our
client's view that the court would expect our client to seek to bring any
claims against such parties at the same time so as to avoid duplication
and wastage of court time. We are therefore instructed to advance, if
necessary, proceedings under the 1930 Act as a matter of urgency in order    *C*
to conclude whether our client needs to pursue others."

The response of the underwriters' solicitors was that investigations were
continuing.

(xi) Aldi's solicitors wrote again to the solicitors for the excess layer
underwriters on 27 May 2003 after obtaining the final judgment against
Holmes. They asked for a decision as to whether underwriters would pay;     *D*
they stated that, in the absence of a favourable decision, they would issue
proceedings.

"You will be aware that there is extensive ongoing litigation in the
[TCC] between various different parties, all due to go to trial early in the
new year. Our client has other causes of action which it may wish to take
up in the event that indemnity is not provided by your client pursuant to    *E*
our client's rights under the 1930 Act. Given the extent of the litigation
and the number of parties, our client's Queen's Counsel has advised that
the court would expect to hear Aldi in relation to allegations against any
other party (such as the engineer and environmental consultant) at the
same time as all of the other parties early in the new year. It is therefore
a matter of urgency that the issue in relation to your client is resolved
and we intend to make these observations to the court when seeking, if      *F*
necessary, an early hearing in this matter."

The solicitors for the excess layer underwriters responded to say that they
were still investigating.

(xii) On 11 June 2003 Aldi's solicitors wrote to the solicitors for all the
parties in the B&Q and Grantchester actions and the Part 20 proceedings in
the Aldi action pointing out that Aldi's present intention was to enforce the   *G*
judgment obtained against Holmes against the excess layer underwriters.
They added: "If satisfaction of the two judgment sums is not obtained, then
it may be that our client will wish to call upon other causes of action
available to it and we will keep other parties apprised in that regard."

(xiii) On the same day the solicitors wrote to the clerk to Judge
Bowsher QC, the judge managing the litigation, about a hearing due to take    *H*
place on 13 June 2003 in the B&Q and Grantchester actions and the Part 20
proceedings; they made a suggestion as to how orders in the actions should
be drafted so that it was clear whether any order impacted on Aldi. They
made clear Aldi's interest in the following terms:

A         "We continue to receive correspondence from all of the parties
    involved in [the Part 20 proceedings and the other actions]. We have no
    objection to being copied in on that correspondence especially as our
    client currently maintains an interest in relation to this matter dependent
    on the outcome of its attempts to enforce the judgment."

    (xiv) Aldi commenced proceedings against the excess layer underwriters
B   in the Commercial Court; on 6 August 2003, the solicitors for the excess
    layer underwriters wrote to the solicitors for Aldi setting out detailed
    reasons why underwriters were avoiding the policy for non disclosure in
    relation to the Dallow Road site and other matters; the letter set out detailed
    allegations about Holmes's knowledge of those matters. A defence reflecting
    that position was served on 1 September 2003.

    (xv) On 4 September 2003, Aldi's solicitors sent an e-mail to the solicitors
C   for the parties in the B&Q and Grantchester actions and the Part 20
    proceedings stating:

        "We are evidently not exchanging statements because of the state of the
    proceedings between Aldi and Holmes. But given that our client may
    wish to commence proceedings in the future depending on success or
    otherwise in prosecuting its claim against insurers under the 1930 Act, we
D   would be grateful for sight of a copy of the witness statements exchanged
    in due course."

    (xvi) Despite Aldi's request for early disclosure from the excess layer
    underwriters, the excess layer underwriters did not provide disclosure
    until 2 December 2003. Aldi carried out inspection of the documents on
    12 December 2003.

E   (xvii) In the meantime, the parties in the B&Q and Grantchester actions
    and the Part 20 proceedings in the Aldi action were preparing for the trial in
    January 2004, the estimate for which had been increased to 12 weeks. On
    8 December 2003, Norwest Holst amended its pleadings to allege that
    three named employees of WSP were aware in 1994 of, and deliberately
    concealed, (or ought to have been aware of) the significant risk that vibro-
F   compaction might not be sufficient to prevent the buildings being damaged
    as a result of differential settlement. Aldi have made it clear that it will not
    take this point against WSP and Aspinwall.

    (xviii) The trial of the B&Q and Grantchester actions and the Part 20
    proceedings in the Aldi action commenced on 12 January 2004 at the largest
    available court in London with eight separately represented parties, each
    with leading counsel. There were to be 38 witnesses of fact, 14 experts on
G   liability and 16 on quantum; the trial bundle comprised 81 volumes.
    A settlement was, however, agreed in the second week of the trial; the
    actions were in consequence stayed by an order of 22 January 2004. Aldi
    were not invited to participate in the settlement discussions and were not a
    party to the settlement agreement.

    (xix) In April 2004, leading counsel advised Aldi that its claim against the
    excess layer underwriters was likely to fail; Aldi accepted that advice. In
H   December 2004 Aldi formally settled the proceedings with the excess layer
    underwriters on the basis that underwriters would refund the premium—
    a sum of just over £8,000.

    (xx) In June 2004, Aldi's solicitors wrote to WSP and Aspinwall stating
    that Aldi intended to proceed against them, setting out the basis for the claim

and attached a draft pleading. The response of WSP's solicitors was to make   *A*
it clear that they would apply to strike out the claim on the basis it was an
abuse of process. Aspinwall's solicitors subsequently adopted the same
position.

(xxi) On 18 October 2005 Aldi issued these proceedings against WSP and
Aspinwall in the TCC in Birmingham; the proceedings were served on
17 February 2006. The action was subsequently transferred to the TCC in
London.                                                                        *B*

3   The basis of Aldi's claim in these proceedings is that WSP and
Aspinwall were in breach of the warranties given under seal as they had
failed to exercise all reasonable skill and care in relation to the foundations
and the vibro-compaction; those breaches had caused the differential
settlement. Aspinwall and WSP have not filed defences, but their contention
was that the damage was not caused by their breach of warranty; that, if they   *C*
were liable, the measure of damages was not the same as the measure of
damages applicable to the claim against Holmes.

4   An application was made by WSP and Aspinwall to strike out the
present claim on 16 March 2006. Jackson J [2007] BLR 113 acceded to that
application. I refer to his reasons for doing so at paras 13 and 14 below, but
it is convenient at this stage to set out further findings he made. (i) The costs   *D*
incurred by the parties in the Aldi, B&Q and Grantchester actions were in
excess of £7·5m; the costs up to and including a full trial of the present
action would be about £2·5m: para 51. (ii) It was obvious by April 2003
that Aldi would face a serious contest with the excess layer underwriters:
para 80. Whether it could succeed depended on witnesses and knowledge
not within its control. When Aldi received underwriters' letter of 6 August   *E*
2003 (referred to at para 2(xiv) above), it was still possible that Aldi might
win that action, but its prospects of success were not better than even:
para 81. (iii) It would have been perfectly feasible for Aldi to rejoin its action
and the B&Q and Grantchester actions at a late stage—September 2003; the
judge managing that litigation would have allowed Aldi to do so: paras 75
(v) and 77. The involvement of Aldi in the action would not materially have   *F*
increased its length: para 77. (iv) No response by WSP and Aspinwall to the
letters of 11 June and e-mail of 4 September 2003 from Aldi's solicitors was
appropriate:

"On both of those dates it was still perfectly feasible that Aldi might
rejoin the main action. In the event, this did not happen. As January
2004 approached, and still Aldi made no move, the applicants (who were
all advised by experienced counsel and solicitors) no doubt took comfort   *G*
from the rule in *Henderson v Henderson*": para 82.

(v) There was no impropriety or culpable conduct on the part of Aldi:
para 76.

*The applicable law*

*(1) The general principles*                                                   *H*

5   The principles applicable to an application to strike out a claim on the
basis that it is an abuse of process to bring a claim that could and should
have been brought in previous proceedings are set out in the speech of Lord
Bingham of Cornhill in *Johnson v Gore Wood & Co* [2002] 2 AC 1. It is, in

A  my view, generally neither necessary nor helpful to refer to the accretion of
authority before that decision, as the decision clearly sets out the principles
the courts are to apply. Lord Bingham summarised the main principles in
these terms, at p 31:

"But *Henderson v Henderson* abuse of process, as now understood,
although separate and distinct from cause of action estoppel and issue
B  estoppel, has much in common with them. The underlying public interest
is the same: that there should be finality in litigation and that a party
should not be twice vexed in the same matter. This public interest is
reinforced by the current emphasis on efficiency and economy in the
conduct of litigation, in the interests of the parties and the public as a
whole. The bringing of a claim or the raising of a defence in later
C  proceedings may, without more, amount to abuse if the court is satisfied
(the onus being on the party alleging abuse) that the claim or defence
should have been raised in the earlier proceedings if it was to be raised at
all. I would not accept that it is necessary, before abuse may be found, to
identify any additional element such as a collateral attack on a previous
decision or some dishonesty, but where those elements are present the
D  later proceedings will be much more obviously abusive, and there will
rarely be a finding of abuse unless the later proceeding involves what the
court regards as unjust harassment of a party. It is, however, wrong to
hold that because a matter could have been raised in earlier proceedings it
should have been, so as to render the raising of it in later proceedings
necessarily abusive. That is to adopt too dogmatic an approach to what
should in my opinion be a broad, merits-based judgment which takes
E  account of the public and private interests involved and also takes
account of all the facts of the case, focusing attention on the crucial
question whether, in all the circumstances, a party is misusing or abusing
the process of the court by seeking to raise before it the issue which could
have been raised before. As one cannot comprehensively list all possible
forms of abuse, so one cannot formulate any hard and fast rule to
F  determine whether, on given facts, abuse is to be found or not. Thus
while I would accept that lack of funds would not ordinarily excuse a
failure to raise in earlier proceedings an issue which could and should
have been raised then, I would not regard it as necessarily irrelevant,
particularly if it appears that the lack of funds has been caused by the
party against whom it is sought to claim. While the result may often
be the same, it is in my view preferable to ask whether in all the
G  circumstances a party's conduct is an abuse than to ask whether the
conduct is an abuse and then, if it is, to ask whether the abuse is excused
or justified by special circumstances. Properly applied, and whatever the
legitimacy of its descent, the rule has in my view a valuable part to play in
protecting the interests of justice."

6  It is, however, helpful to refer to the judgment of Clarke LJ in *Dexter*
H  *Ltd v Vlieland-Boddy* [2003] EWCA Civ 14 at [49]–[53], where he
summarised the principles to be derived from *Johnson v Gore Wood & Co*:

"49. . . . (i) Where A has brought an action against B, a later action
against B or C may be struck out where the second action is an abuse of
process. (ii) A later action against B is much more likely to be held to be

an abuse of process than a later action against C. (iii) The burden of establishing abuse of process is on B or C or as the case may be. (iv) It is wrong to hold that because a matter could have been raised in earlier proceedings it should have been, so as to render the raising of it in later proceedings necessarily abusive. (v) The question in every case is whether, applying a broad merits based approach, A's conduct is in all the circumstances an abuse of process. (vi) The court will rarely find that the later action is an abuse of process unless the later action involves unjust harassment or oppression of B or C.

"50. Proposition (ii) above seems to me to be of importance because it is one thing to say that A should bring all his claims against B in one action, whereas it is quite another thing to say that he should bring all his claims against B and C (let alone against B, C, D, E, F and G) in one action. There may be many entirely legitimate reasons for a claimant deciding to bring an action against B first and, only later (and if necessary) against others.

"51. Those reasons include, for example, the cost of proceeding against more than one defendant, especially where B is apparently solvent and the case against B seems stronger than against others. More defendants mean more lawyers, more time and more expense. This is especially so in large commercial disputes. It by no means follows that either the public interest in efficiency and economy in litigation or the interests of the parties, including in particular the interests of C, D and E, is or are best served by one action against them all.

"52. It seems to me that the courts should be astute to ensure that it is only in a case where C can establish oppression or an abuse of process that a later action against C should be struck out. I could not help wondering whether the defendants in this case would have given their lawyers the same instructions on the question whether they should have been sued in the first action if they had been asked before that action began as they have given now that a later action has been begun.

"53. It is clear from the speeches of both Lord Bingham and Lord Millett that all depends upon the circumstances of the particular case and that the court should adopt a broad merits based approach, but it is likely that the most important question in any case will be whether C, D, E or any other new defendant in a later action can persuade the court that the action against him is oppressive. It seems to me to be likely to be a rare case in which he will succeed in doing so."

*(2) A requirement for identity between the defendants?*

7 Although Mr Thomas on behalf of Aldi accepted that the approach was to be a broad merits-based judgment, he contended that there was an essential or threshold requirement before that broad merits-based judgment could be applied. The threshold requirement was that there had to be a sufficient degree of identity between the defendants to the original action and the defendants to the new action which the defendants were seeking to strike out; without such a degree of identity, the abuse application was bound to fail and the court would never reach the stage of making the broads merits-based judgment. It followed that as Aldi had only brought its action in 2001 against Holmes and had not made any claim against WSP and

759
[2008] 1 WLR                                   Aldi Stores Ltd v WSP Group plc (CA)
                                                                      Thomas LJ

A   Aspinwall, the present proceedings brought in 2005 were against different
    parties; there was no identity at all between either of them and Holmes.

        8   The submission was founded on a passage in the speech of Lord
    Bingham in *Johnson v Gore Wood & Co* [2002] 2 AC 1. Counsel for
    Mr Johnson had argued that his client could bring the claim as he had not
    been the plaintiff in the first action against the defendants; this argument was
B   rejected on the basis that a formulaic application of the rule would be
    mistaken.   The plaintiff in the first action had been the corporate
    embodiment of Mr Johnson who had made the decisions and given the
    instructions on its behalf; he could have brought his claim at the same time.
    Lord Bingham observed that the correct approach was that formulated by
    Sir Robert Megarry V-C in *Gleeson v J Wippell & Co Ltd* [1977] 1 WLR
    510, 515:

C       "Second, it seems to me that the substratum of the doctrine is that a
        man ought not to be allowed to litigate a second time what has already
        been decided between himself and the other party to the litigation. This is
        in the interest both of the successful party and of the public. But I cannot
        see that this provides any basis for a successful defendant to say that the
        successful defence is a bar to the plaintiff suing some third party, or for
D       that third party to say that the successful defence prevents the plaintiff
        from suing him, unless there is a sufficient degree of identity between the
        successful defendant and the third party. I do not say that one must be the
        alter ego of the other: but it does seem to me that, having due regard to
        the subject matter of the dispute, there must be a sufficient degree of
        identification between the two to make it just to hold that the decision to
        which one was party should be binding in proceedings to which the other
E       is party. It is in that sense that I would regard the phrase 'privity of
        interest'."

        9   Mr Thomas contended that, as the passage in the judgment of
    Megarry V-C had been expressly approved by the House of Lords, then, as it
    had been made clear by Megarry V-C that there had to be a sufficient
    identity between the defendants if an abuse of process application was to
F   succeed, it could not succeed in this case as there was no identity between the
    defendants to the original claim and the present claim. Aldi had brought
    proceedings only against Holmes; WSP and Aspinwall were entirely different
    companies.

        10   I cannot accept this argument. Lord Bingham made clear in his
    speech that the approach should be a "broad merits-based judgment" and
G   not formulaic. It is clear he was approving the passage in the judgment of
    Megarry V-C as the "correct approach" and not as a statement of rigid
    application. The fact that the defendants to the original action and to this
    action are different is a powerful factor in the application of the broad-
    merits based judgment; it does not operate as a bar to the application of the
    principle. This was plainly the view of Clarke LJ in *Dexter's* case [2003]
    EWCA Civ 14 at [49]–[53] in the passage I have set out with which I agree.

H
        *(3) A distinction between cases resolved by judgment and those resolved
        by settlement?*

        11   Mr Thomas also contended that as a matter of law, a distinction had
    to be drawn between previous litigation where the case was settled and

previous litigation where the case proceeded to judgment. The submission    *A*
was based on a passage in the speech of Lord Millett in *Johnson v Gore
Wood & Co* [2002] 2 AC 1, 59. However, Lord Bingham made clear, at
pp 32–33:

"An important purpose of the rule is to protect a defendant against the
harassment necessarily involved in repeated actions concerning the same
subject matter. A second action is not the less harassing because the    *B*
defendant has been driven or thought it prudent to settle the first; often,
indeed, that outcome would make a second action the more harassing."

It seems to me clear that no distinction should be drawn as a matter of law
between cases where the original action concludes by settlement and where
it concludes by judgment. The course of the original action and whether it
resulted in a settlement or a trial are but part of the facts to be considered    *C*
alongside all the other facts.

*The argument of WSP and Aspinwall*

12    Although separately represented before Jackson J and in this court,
there was no material difference in the argument presented as to why these
proceedings were an abuse of process. It can be summarised. (i) The    *D*
allegations made by Aldi in these proceedings were essentially the same as
those made by Holmes against them in the original actions. (ii) By bringing
the actions against Holmes, it was almost inevitable that Holmes would
bring Part 20 claims against WSP and Aspinwall. (iii) There had been
nothing to prevent Aldi pursuing those claims in its original action; it had
brought that action and it was in that action that the claims should have
been pursued. (iv) Aldi was well aware of the principle that the claims    *E*
should all have been brought in one action, as was apparent from the letters
from its solicitors to the solicitors for the excess layer underwriters set out at
paras 2(x) and 2(xi). (v) There was no factor, such as impecuniosity, that
excused or justified Aldi from failing to bring the claim in the original action.
Aldi had not done so, because it had deliberately decided to take no further
part in the action; instead it had pursued its own interests and proceeded
against the excess layer insurers. That provided no excuse or justification.    *F*
Although it was claimed that the decision made by Aldi to bring a claim
against excess layer underwriters might have produced a potential benefit to
WSP and Aspinwall in that it would relieve them of having to meet the claim,
the benefit was illusory as the underwriters would be subrogated to the
claims. In any event WSP and Aspinwall should not have to bear the risk of
Aldi's decision to act in this way by not bringing the claim in the original    *G*
action. (vi) Aldi should have realised that the proceedings against excess
layer underwriters faced clear difficulties by the summer of 2003; Aldi
should not have assumed that, if it was unsuccessful in that action, it would
be entitled to exercise its rights against WSP and Aspinwall. (vii) Aldi could
and should therefore have rejoined the action in the autumn of 2003. (viii) If
the present claim was allowed to proceed, Norwest Holst would be joined
and thus the three named employees of WSP who faced the serious    *H*
allegations (to which I have referred at para 2(xvii)) would face them again.
(ix) The trial of these proceedings would relitigate at a cost in excess of
£2·5m the issues which had been the subject of the original actions which
had cost in excess of £7·5m. (x) Aldi had delayed for almost two years

A   between April 2004 when it accepted advice that the claim against excess
    underwriters was unlikely to succeed and February 2006 when it served the
    claim form in the new action. In consequence the trial of the new action
    would not take place until 2008 or 2009—some 15–16 years after the
    alleged professional negligence had occurred.

    13   Jackson J in essence accepted the contentions of WSP and Aspinwall
B   as correctly addressing the material considerations. He identified [2007]
    BLR 113, para 75 seven factors, including the fact that the resources of the
    TCC would be devoted, for a second time, to trying the same allegations. He
    concluded that, applying the approach set out in *Johnson v Gore Wood &
    Co* [2002] 2 AC 1, the balance came down firmly in favour of WSP and
    Aspinwall. It would be unjust and oppressive for them to be subjected for a
    second time to a very expensive and time consuming action. It would also be
C   an abuse and misuse of the process of the TCC to bring a second and
    substantial action which alleged the same breaches of professional duty by
    the same firms. He observed, at para 76:

        "It is the policy, and indeed the duty, of this court to achieve, so far as
    possible, the efficient, just and cost effective disposal of all litigation
    which is brought. This policy serves the interests of the business
D   community, in particular the construction industry and building owners,
    who are the principal users of this court. Relitigation on the scale which
    Aldi now proposes flies in the face of that policy."

    14   He accepted that Aldi's strategy of proceeding against the excess
    layer underwriters might have succeeded and that this might have enured to
    the benefit of WSP and Aspinwall as well as Aldi. But it was for Aldi to take
E   the risk on this; it was not right for them to reap the potential benefits of a
    chosen strategy, but inflict upon WSP and Aspinwall the risk of a second
    action.

    15   In their argument before us WSP and Aspinwall made substantially
    the same submissions on the facts as they had made before Jackson J. In
    addition WSP submitted that the decision made by the judge was a decision
    based on the exercise of judgment akin to the exercise of a discretion; an
F   appellate court should only therefore reverse on the limited grounds
    applicable in such a case. Aspinwall, although accepting that the decision to
    be made by the judge was not strictly the exercise of a discretion, submitted
    that the test in *Johnson v Gore Wood & Co* was not amenable to a simple
    right or wrong approach. The judge had approached the matter by the
    application of the correct principles, gave weight to the relevant factors and
G   reached a decision well within the ambit of the balancing exercise. This
    court should not therefore interfere with the exercise of that balance.
    WSP and Aspinwall relied on *Lord Browne of Madingley v Associated
    Newspapers Ltd* [2008] QB 103 where this court had observed in relation to
    the grant of an interlocutory injunction that the balancing exercise which a
    judge had to carry out was similar to the exercise of a discretion upon which
    judges could properly reach different conclusions; that therefore an appellate
H   court should not interfere unless the judge had erred in principle, taken into
    account immaterial facts or reached a conclusion which was plainly wrong:
    see para 45 of the judgment of the court. They also relied upon a passage in
    the speech of Lord Bingham in *Johnson v Gore Wood & Co* [2002] 2 AC 1,
    22 where he referred to the speech of Lord Diplock in *Hunter v Chief*

*Constable of the West Midlands Police* [1982] AC 529 and upon the   *A*
judgment of Peter Gibson LJ in *Dexter*'s case [2003] EWCA Civ 14 at [37]
where he had said:

> "In these circumstances, where the judge, in whom the discretion to
> strike out a claim is vested, has correctly directed himself as to the law,
> this court cannot properly interfere with that exercise of discretion unless
> the applicant shows that the judge, in making his assessment, omitted to   *B*
> take account of material facts or took account of immaterial facts or was
> otherwise plainly wrong."

*Conclusion*

16   In considering the approach to be taken by this court to the decision
of the judge, it was rightly accepted by Aspinwall that the decision to be   *C*
made is not the exercise of a discretion; WSP were wrong in contending
otherwise. It was a decision involving the assessment of a large number of
factors to which there can, in such a case, only be one correct answer to
whether there is or is not an abuse of process. None the less an appellate
court will be reluctant to interfere with the decision of the judge where the
decision rests upon balancing such a number of factors; see the discussion in   *D*
*Assicurazioni Generali SpA v Arab Insurance Group (Practice Note)* [2003]
1 WLR 577 and the cases cited in that decision and *Mersey Care NHS Trust
v Ackroyd (No 2)* [2007] HRLR 580, para 35. The types of case where a
judge has to balance factors are very varied and the judgments of the courts
as to the tests to be applied are expressed in different terms. However, it is
sufficient for the purposes of this appeal to state that an appellate court will
be reluctant to interfere with the decision of the judge in the judgment he   *E*
reaches on abuse of process by the balance of the factors; it will generally
only interfere where the judge has taken into account immaterial factors,
omitted to take account of material factors, erred in principle or come to a
conclusion that was impermissible or not open to him. In this case, I
consider that the judge, despite the weight that must be accorded his view
given his great experience in this type of litigation and the conspicuous
success with which he has managed the TCC, reached a decision which was   *F*
impermissible by taking into account factors which he should not have done
and omitting factors which he should have taken into account.

17   I approach the issue on the basis that the claims Aldi wish now to
pursue against WSP and Aspinwall could have been brought by Aldi in the
original action it brought against Holmes. However, as was made clear in
*Johnson v Gore Wood & Co* [2002] 2 AC 1, the fact that a claim could have   *G*
been raised in the original action does not mean it is necessarily abusive to
raise it in a second action. It is necessary to consider whether in all the
circumstances Aldi is abusing the process of the court by seeking to raise the
issues it could have raised before.

18   First, it is important that Aldi had not behaved in anyway that
was culpable, let alone improper, even though neither impropriety nor   *H*
culpability is a necessary finding before a claim can be struck out. Aldi had
made a judgment that it would be in its interests to try and make a recovery
against excess layer underwriters on the judgment that it had obtained rather
than to continue to participate in the action by bringing claims against
WSP and Aspinwall. In my view that was a decision which was open to Aldi

A  as a sensible and cost effective way of proceeding in the light of the fact that
(a) the trial of the Aldi Part 20 claims and the B&Q and Grantchester actions
would last several weeks; (b) the costs would be considerable, given the fact
there were eight separately represented parties; (c) the issues which WSP and
Aspinwall were raising on their liability and on quantum were issues that
Aldi had not been concerned with in its claim against Holmes; (d) the
interest of Aldi in monetary terms was a fraction of that of B&Q. Aldi had
B  been singularly successful in the strategy it had pursued against Holmes and
its success was a factor which the judge failed to take into account in judging
Aldi's decision on its strategy.

19  A criticism of Aldi can be made that it should have reassessed the
strategy when the underwriters made their defence clear in August 2003. If it
had done so and decided that it should have abandoned its claim against
C  underwriters in September 2003, it would have been in a position on the
judge's finding (which was not challenged) that at that stage it could have
rejoined the original action. However at that stage Aldi had not had
discovery in the action against the excess layer underwriters and, in my
judgment, it would be very difficult for prudent advisers to say in the
circumstances of the defence raised by underwriters that the claim should be
abandoned until after discovery. I do not consider that it can sensibly be
D  suggested that Aldi should have rejoined the original action and continued to
pursue the action against underwriters at the same time. In the circumstances
it was, in my view, a judgment sensibly open to Aldi in the autumn of 2003
not to bring claims against WSP and Aspinwall at that stage by seeking to
rejoin the original action. The judge did not take this into account.

20  In contrast to these private interests of Aldi, there are the private
E  interests of WSP and Aspinwall—the desire to have finality in the dispute
relating to the Dallow Road site, the costs incurred in the original actions,
the likely costs of the present action, the delay that has occurred (and which
has been exacerbated by Aldi's action in not commencing these proceedings
promptly) the anxiety under which the three named employees are going to
be placed (as it is likely that Norwest Holst will be joined) and the general
effect on WSP and Aspinwall of facing allegations of professional negligence.
F  21  However WSP and Aspinwall were made aware by Aldi that Aldi
had a claim over against them and that it might be pursued. The judge was,
in my view, wrong in considering that the letters of 11 June 2003 and the
e-mail of September 2003 did not require a response. If WSP and Aspinwall
were concerned that the prospect of a second action might cause them
oppression or vexation, they could have responded to that correspondence
G  in terms putting Aldi on notice of their position and applying to the court if
necessary: see paras 29–31 below.

22  Nor, in my judgment, were WSP and Aspinwall entitled, as the judge
found, to take comfort from the rule in *Henderson v Henderson* (1843)
3 Hare 100 when they entered into the settlement agreement. The principles
set out in *Johnson v Gore Wood & Co* [2002] 2 AC 1 are clear—the question
of whether there is an abuse of process is a broad merits-based judgment.
H  They could and should have made their position to Aldi clear. They decided
not to do so, no doubt, on the basis that it was better not to provoke Aldi
into action. They settled in full knowledge of the fact that there might be a
second claim, as was the case in *Toth v Ledger* [2002] PIQR P1 a decision
of this court given on 21 December 2000, a few days after the decision in

*Johnson v Gore Wood & Co* [2002] 2 AC 1. The judge was in my view    *A*
wrong in reaching the contrary conclusion. The way in which this case
settled was therefore a highly material consideration.

23   The judge accepted the contention of WSP and Aspinwall that it was
important to take into account the fact that it was almost inevitable that as a
result of Holmes's action, WSP and Aspinwall would be brought into the
litigation. He was wrong to do so. As I have set out at para 2(vii) the first    *B*
defendants (one of the WSP companies) and Aspinwall were not brought
into the action until some 18 months after Aldi had commenced
proceedings.   The claims by Holmes against the first defendants and
Aspinwall were made in circumstances where Holmes had accepted liability
to Aldi; furthermore, in the CMC on 17 January 2003, the directions given
in respect of the quantum claim in the action between Aldi and Holmes were
expressed in terms that any decision would not bind WSP or Aspinwall in the    *C*
Part 20 proceedings.

24   The factors which I have set out are largely the private interest
factors. As was made clear in *Johnson v Gore Wood & Co*, the public
interest extends not only to finality and preventing a party being vexed
twice, but also to economy and efficiency in litigation. The judge considered
that the decision of Aldi not to bring its claims against WSP and Aspinwall in
the original action was an abuse or misuse of the process of the TCC. I do    *D*
not see how the mere fact that this action may require a trial and hence take
up judicial time (which could have been saved if Aldi had exercised its right
to bring an action in a different way) can make the action impermissible. If
an action can be properly brought, it is the duty of the state to provide the
necessary resources; the litigant cannot be denied the right to bring a claim
(for which he in any event pays under the system which operates in England    *E*
and Wales) on the basis that he could have acted differently and so made
more efficient use of the court's resources. Although the judge was self
evidently right in saying that it was the duty of the TCC to achieve the just
and cost effective disposal of litigation and that this served the interests of
the business community, he was wrong to find that the action brought by
Aldi flew in the face of that policy. As I seek to explain at paras 29–31    *F*
below, the problems that have arisen in this case should have been dealt with
through case management.

25   Furthermore, there is a real public interest in allowing parties a
measure of freedom to chose whom they sue in a complex commercial
matter and not to give encouragement to bringing a single set of proceedings
against a wide range of defendants or to complicate proceedings by cross-
claims against parties to the proceedings. That freedom can and should be    *G*
restricted by appropriate case management.

26   Although, as I have set out at para 10 above, I consider that there is
no rule of law that there cannot be abuse of process unless the defendants
who are sued in the further action have a sufficient identity with the
defendants in the original action, it is none the less a factor that the original
action was brought by the claimant against one party and the second is being
brought against completely different parties. I do not think that it helps the    *H*
analysis to examine the summary of the principles put forward by Clarke LJ
in *Dexter's* case [2003] EWCA Civ 14 at [49]–[53] that in the circumstances
of this case the position is closer to that of B rather than C. The fact was that
Aldi was not vexing or harassing these defendants a second time.

A   27   In circumstances such as these where Aldi had not brought a claim
against WSP and Aspinwall and there are good reasons why Aldi acted as it
did, I have come to the conclusion, weighing all the factors I have set out,
that bringing this action was not a misuse or abuse of the process of the
court. The burden was on WSP and Aspinwall to prove that it was and they
failed to do so.

B   28   As I have set out above, the judge failed to take into account a
number of factors which he should have taken into account and was wrong
as to some he took into account. Each of these led him to the impermissible
conclusion that Aldi were abusing the process of the court. For these
reasons, I would therefore allow this appeal and dismiss the application
made by WSP and Aspinwall. I would hope that when the first CMC takes
place, the court will carefully examine why it is estimated that this litigation

C   will cost in excess of £2·75m when the sum in issue is considerably less.
The requirements of the Civil Procedure Rules and the principles of
proportionality would suggest that a much more economic way should be
found to litigate the issues in this action.

    29   I also wish to add a word as to the approach that should be adopted
if a similar problem arises in the future. In circumstances such as those that

D   arose in this case, the proper course is to raise the issue with the court. Aldi
did write to the court, as I have set out at para 2(xiii), but not in terms that
made it clear what the court was being invited to do. WSP and Aspinwall
knew of Aldi's position and were before the court on numerous occasions;
they did nothing to raise it.

    30   Parties are sometimes faced with the issue of wishing to pursue other
proceedings whilst reserving a right in existing proceedings. Often, no

E   problem arises; in this case, Aldi, WSP and Aspinwall each in truth knew at
one time or another between August 2003 and the settlement of the original
action in January 2004 that there was a potential problem, but it was never
raised with the court. I have already expressed the view that it should have
been. The court would, at the very least, have been able to express its view
as to the proper use of its resources and on the efficient and economical

F   conduct of the litigation. It may have seen if a way could have been found to
determine the issues applicable to Aldi in a manner proportionate to the size
of Aldi's claim and without the very large expenditure that would have been
necessary if Aldi had to participate in the trial of the actions. It may be that
the court would have said that it was for Aldi to elect whether it wished to
pursue its claim in the proceedings, but if it did not, that would be the end
of the matter. It might have inquired whether the action against excess

G   underwriters could have been expedited. Whatever might have happened in
this case is a matter of speculation.

    31   However, for the future, if a similar issue arises in complex
commercial multi-party litigation, it must be referred to the court seised of
the proceedings. It is plainly not only in the interest of the parties, but also in
the public interest and in the interest of the efficient use of court resources

H   that this is done. There can be no excuse for failure to do so in the future.

    WALL LJ
    32   I have had the advantage of reading in draft the judgments prepared
by Longmore and Thomas LJJ. I agree with both, and like them, I would
allow this appeal.

33   The only two comments which I wish to add are that, first and self-
evidently, my experience of this category of litigation is limited to cases
which have reached this court. Accordingly, I readily acknowledge both the
judge's "unrivalled experience" identified by Longmore LJ in para 37 below,
and his conspicuous success in managing the TCC to which Thomas LJ
refers in para 16 of his judgment. I am none the less wholly satisfied that in
this instance the judge was wrong, as a matter of law, to strike out Aldi's
claim on the ground that it was an abuse of process.

*A*

*B*

34   When I first read the papers in preparation for the argument on this
appeal, I was struck by two points in particular. The first was the fact that
the judge had found in terms in para 76 of his judgment that there had been
"no impropriety or culpable conduct on the part of Aldi", a phrase which
he prefaced by the words "of course". The second was the fact that,
as it seemed to me, the course steered by Aldi throughout this complex
litigation was: (a) commercially reasonable; (b) forensically legitimate; and
(c) reasonably transparent. In these circumstances, I found it difficult, at first
blush, to understand how, within the principles identified by Lord Bingham
of Cornhill in *Johnson v Gore Wood & Co* [2002] 2 AC 1, Aldi's conduct in
launching the current proceedings could properly be described as an abuse of
process.

*C*

*D*

35   I thus listened to the argument with interest, and at its conclusion
found myself in complete agreement with Longmore and Thomas LJJ that
the appeal should be allowed.

36   My second comment is that, whilst acknowledging my lack of
experience in this category of litigation, I would none the less wish
particularly to associate myself with everything which Thomas LJ says in
relation to case management in paras 29–31 of his judgment.

*E*

**LONGMORE LJ**

37   I agree with Thomas LJ's reasoning and conclusions. Since we are
differing from a very experienced judge who has unrivalled experience in
handling heavy litigation, I will shortly say what has compelled me to this
conclusion.

38   First, the question of abuse or no is not a matter of the court's
discretion in the normal sense of that word. If Peter Gibson LJ meant to say
that it was in *Dexter v Vlieland-Boddy* [2003] EWCA Civ 14 at [37], it was
not part of the ratio in that case which could equally well have been decided
by reference to the principles set out at para 16 in Thomas LJ's judgment.
It would be troubling if two different judges could come to different
conclusions on whether the same facts constituted an abuse of process and
yet both be right.

*F*

*G*

39   Secondly, however desirable it may be, from the point of view of the
court, that all possible actions arising from the same state of facts should be
brought at the same time, it can be a recipe for complex and unwieldy
litigation. The interests of the court are, of course, relevant but the judge
[2007] BLR 113, para 76 appears to have regarded those interests as almost
the most important factor in the equation. This does not seem to me to be
right in a case where the parties could have brought the matter before the
court at a time between June 2003 and the settlement of the B&Q and
Grantchester actions in January 2004 but chose not to do so, no doubt for
their own good commercial reasons. This failure is, in my judgment, more

*H*

767
**[2008] 1 WLR**                    **Aldi Stores Ltd v WSP Group plc (CA)**
                                              **Longmore LJ**

A  attributable to WSP and Aspinwall than to Aldi who had made their
intentions clear in their letters of 13 June and 4 September 2003. The judge
said, at para 82, that no response was appropriate. In one sense that may be
right since no one is ever bound to reply to another person's intimation of
intention. But it seems to me to be inappropriate to make no response at that
stage but then at a later stage, when intentions turn into action, to assert that
that action is an abuse of process.

B     40   I also agree that the judge did not adequately take into account the
facts (i) that it could not be said that Aldi had behaved in any way culpably
or improperly; (ii) that Aldi's own position was a difficult one, faced as they
were with a assertion of non-disclosure by underwriters which could not be
satisfactorily assessed before discovery in the underwriting action; (iii) that
although WSP and Aspinwall had been impleaded in the B&Q and
C  Grantchester actions, they had not been sued by Aldi at all, before June
2004.

      41   As Lord Bingham of Cornhill observed in *Johnson v Gore Wood &
Co* [2002] 2 AC 1, 31: "there will rarely be a finding of abuse unless the later
proceeding involves what the court regards as unjust harassment of a party."
It might be fair to say it is harassing for WSP and Aspinwall to have to face a
second action; I cannot see that it is unjust when they are facing a claim from
D  Aldi for the first time.

      42   I also agree with paras 29–31 of Thomas LJ's judgment. The parties
should have raised the possible difficulties of a further set of proceedings
with the court at a stage when the matter could have been sorted out in a
proper way at a case management conference and not left it to fester in a way
that has now made the difficulties problematic, time-wasting and expensive
E  at a later stage.

*Appeal allowed with costs.*

*Solicitors: Cobbetts, Birmingham; Reynolds Porter Chamberlain;
Simmons & Simmons.*

F                                                                        S L D

G

H

TAB 4

*Ashborder BV v Green Gas Power Ltd* [2005] 1 BCLC 623,
English High Court

*a*

# Ashborder BV and others v Green Gas Power Ltd and others

## [2004] EWHC 1517 (Ch)

*b*

CHANCERY DIVISION

ETHERTON J

17–28 MAY, 9–15, 29 JUNE 2004

*c*

*Debenture – Charge – Ordinary course of business – Whether debentures created fixed or floating charge over oil and gas licences and shares – Express provision permitting company to dispose of assets in the ordinary course of its business – Whether transactions disposing of interests in licences were in ordinary course of business – Assignments of licences not pursuant to earn-in and joint operating agreements – Transactions not genuine independent arm's length transactions – Whether claimants estopped from denying validity of assignments.*

*d*

*e*

Companies in the Octagon group held seven licences for the extraction of oil and gas in the UK. In order to finance their operations the Octagon companies borrowed money from lenders in the Enron group. The financing arrangements included debentures containing charges over the Octagon companies' assets and earn-in agreements under which the second defendant (EP), which had expertise in extraction, was to obtain a 10% interest in the licences. Octagon claimed that the Enron lenders had failed to provide the funds which were to be made available under the facility agreement and Enron lenders served notice of default on Octagon. Meanwhile Octagon had acquired four further licences. Octagon then entered into a drilling agreement which gave the drilling company an earn-in interest in the relevant licences. Because the Octagon companies did not have the money to pay outstanding licence rental fees they were paid by EP in return for assignments of further interests in certain licences. The second claimant appointed administrative receivers of the Octagon group companies under the security documents and the claimants and defendants sought rival declarations as to their ownership of the licences and as to the ownership of 50% of the shares of the first defendant Octagon company. The primary issue in respect of the licences and shares was whether under the provisions of the security documents the relevant Octagon company had been entitled to make the relevant transfer free of any charge imposed by the debentures. The claimants contended that the debentures created a fixed charge over the licences, including the after-acquired licences, and also the shares. The defendants claimed that the debentures created a floating charge over those assets and not a fixed charge.

*f*

*g*

*h*

*i*

**Held** – (1) The debentures did not create a fixed charge over the licences or the shares. The relevant clauses of the debentures and of the facility agreement, given their natural and ordinary meaning, provided that each of

the Octagon group companies could dispose of any of its assets if such *a*
disposal was in the ordinary course of its business and was not prohibited
by any other finance document (as defined in the facility agreement).
Indications in the language of the debentures that the parties intended a
fixed charge on the licences was not determinative since whether or not a
fixed charge had been created depended on the nature of the rights and
obligations which the parties intended to grant each other in respect of the *b*
charged assets, rather than on the description that they had used in
describing the nature of the charge. The fact that the licences were not part
of the companies' circulating capital or stock in trade did not have an
important influence in the categorisation of the charge since the parties had
agreed an express provision permitting each of the companies to dispose of
assets in the ordinary course of its business. *Agnew v Commissioner of* *c*
*Inland Revenue* [2001] 2 BCLC 188 applied.

(2) The expression 'ordinary course of its ... business' were ordinary
words of the English language which had to be given the meaning which
ordinary business people in the position of the parties to the facility
agreement and the debentures would be expected to give them against the *d*
factual and commercial background in which those documents were made.
A transaction could be in the ordinary course of business even if it was
exceptional or unprecedented. A transaction was not to be regarded as in
the ordinary course of a company's business, for the purpose of the implied
or an express exception from the prohibition against disposals under a
floating charge, merely because it was not fraudulent, was within the *e*
company's memorandum, and was not with a view to the termination of the
business of the company. That interpretation would give little, if any,
meaning to the word 'ordinary'. *Countrywide Banking Corp Ltd v Dean*
[1998] 1 BCLC 306 applied.

(3) The fact that a payment by the company might be a fraudulent or
wrongful preference, in the context of a winding up, did not necessarily *f*
render the same payment, in the absence of a winding up, a transaction
outside the ordinary course of the company's business. *Willmott v London*
*Celluloid Co* (1886) 34 Ch D 147 applied.

(4) The assignment of 41% of the two most valuable licences pursuant to
the drilling agreement would not be sufficient of itself to take the
transaction outside the ordinary course of the business of the Octagon *g*
group companies. If such disposal had been the only reasonable commercial
means open to the Octagon group companies to preserve the balance of the
interest in those licences, and there were no other unusual features, then the
transactions could properly be described as being in the ordinary course of
their business. However in the circumstances the transfers of the 41% were *h*
taken outside the scope of the ordinary course of business by reason of
non-disclosure to the directors of the material terms of the agreements, the
involvement in the transaction of Octagon's drilling consultant and the
payment terms, and the giving of deliberately misleading information to the
DTI in connection with the transfer.

(5) The assignments to EP of a 10% interest in three of the original *i*
licences were properly made pursuant to the provisions of the earn-in
agreement, and were therefore expressly permitted by the facility
agreement, but the assignments of the 10% interest in respect of the other
original licences were not pursuant to the terms of the earn-in agreement,

*a* since the drilling condition was not satisfied in those cases, and were not permitted or authorised under the facility agreement. Such a transaction could not be in the ordinary course of business under the facility agreement.

(6) The transfers of the shares and of the after-acquired licences were not in the ordinary course of the business of the Octagon group companies. The Octagon group companies were then insolvent, at least on a balance sheet

*b* basis, but that did not mean that the transactions for that reason fell outside the ordinary course of business. However the transactions were not genuine, independent arm's length transactions. It was not in the ordinary course of the business of the Octagon companies to execute assignments to an assignee, without the prior consent of the DTI, in circumstances in which the after-acquired licences were exposed to the right of the DTI to revoke

*c* the licences for breach of the requirement for consent in the 1995 Model Clauses. Far from being a transaction in the ordinary course of the business of the Octagon group companies, the transaction involving the transfers of the after-acquired licences was, in all the circumstances, remarkable and extraordinary. There was no proper basis for a claim that the claimants

*d* were estopped from claiming that the assignments were unlawful and in breach of the terms of the facility agreement and debentures.

(7) The assignments to EP of further interests in respect of certain licences were not executed pursuant to the relevant joint operating agreements and were not effected in the ordinary course of the business of any of the Octagon group companies. There were a number of unusual features

*e* surrounding the transfers which, apart from the breach of the facility agreement, took the transactions outside the ordinary course of business. The claimants were not estopped from denying the validity of the assignments.

(8) None of the defendants were entitled to repayment of any sums expended by them in relation to the licences and the shares, as a condition

*f* of the enforcement by the third claimant of its property interests.

(9) The third claimant had wrongly interfered with the rights of the first defendant Octagon company in respect of a drilling rig and equipment, and had to deliver up the same to the latter company.

*g* **Cases referred to in judgment**
*Agnew v Commissioner of Inland Revenue* [2001] 2 BCLC 188, [2001] 2 AC 710, [2001] 3 WLR 454, PC.
*Arthur D Little Ltd v Ableco Finance LLC* [2002] 2 BCLC 799, [2003] Ch 217, [2002] 3 WLR 1387.
*Borax Co, Re* [1901] 1 Ch 326.
*h* *Cooper, ex p* (1875) LR 10 Ch App 510.
*Coslett (Contractors) Ltd, Re* [1999] 1 BCLC 205, [1998] Ch 495, [1997] 4 All ER 115, [1998] 2 WLR 131, CA.
*Countrywide Banking Corp Ltd v Dean* [1998] 1 BCLC 306, [1998] AC 338, [1998] 2 WLR 441, PC.
*Downs Distributing Co Pty Ltd v Associated Blue Star Stores Pty Ltd*
*i* (1948) 76 CLR 463, Aust HC.
*Driver v Broad* [1893] 1 QB 744, CA.
*Fire Nymph Products Ltd v Heating Centre Pty Ltd* (1992) 7 ACSR 365.
*Florence Land and Public Works Co, Re, ex p Moor* (1878) 10 Ch 530, CA.

*Hamilton's Windsor Ironworks Co, Re* (1879) 12 Ch 707.                    *a*
*Harper (Julius) Ltd v FW Hagedorn & Sons Ltd* [1991] 1 NZLR 530, NZ
    CA.
*HH Vivian & Co Ltd, Re* [1900] 2 Ch 654.
*Kinsela v Russell Kinsela Pty Ltd (in liq)* (1986) 4 NSWLR 722.
*MC Bacon Ltd, Re (No 2)* [1990] BCLC 607, [1991] Ch 127.
*Modern Terrazzo Ltd, Re* [1998] 1 NZLR 160, NZ CA.                       *b*
*Quality Camera Co Pty Ltd, Re* [1965] NSWR 1330.
*Reynolds Bros (Motors) Pty Ltd v Esanda Ltd* (1983) 8 ACLR 422, NSW
    CA.
*Sarflax Ltd, Re* [1979] 1 All ER 529, [1979] Ch 592, [1979] 2 WLR 202.
*Street v Mountford* [1985] 2 All ER 289, [1985] AC 809, [1985] 2 WLR    *c*
    877, HL.
*Tomkins v Saffery* (1877) LR 3 App Cas 213.
*Torzillu Pty Ltd v Brynac Pty Ltd* (1983) 8 ACLR 52, NSW SC.
*United Builders Pty Ltd v Mutual Acceptance Ltd* (1980) 144 CLR 673.
*West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250.
*Willmott v London Celluloid Co* (1886) 34 Ch D 147, CA.                 *d*
*Yagerphone Ltd, Re* [1935] Ch 392, [1935] All ER Rep 803.
*Yorkshire Woolcombers Association Ltd, Re* [1903] 2 Ch 284, 72 LJ
    Ch 635, CA; sub nom *Illingworth v Houldsworth* [1904] AC 355, 73 LJ
    Ch 739, HL.

**Claim**                                                                *e*

The claimants and the defendants sought rival declarations as to their
ownership of certain licences for the extraction of oil and gas in the UK and
of one half of the shares in the first defendant, Octagon Gas Ltd, and as to
the person entitled to act as operator of each of the licences. The defendants
counterclaimed that, if they were not the owners of, and had no entitlement   *f*
to assignment of, any of the licences or the disputed shares, there should be
made an order for repayment of all sums expended by them in relation to
the licences and the shares. Octagon Gas Ltd also counterclaimed for a
declaration that the third claimant, Greenpark, had wrongfully interfered
with a drilling rig and ancillary equipment, and an order for delivery up of
the same, and damages.                                                   *g*

*Gabriel Moss* QC and *Edward Cohen* (instructed by *Salans*) for the
    claimants.
*Richard Adkins* QC and *David Alexander* (instructed by *Norton Rose*) for
    the defendants.
                                                                         *h*

                                                            *Cur adv vult*

29 June 2004. The following judgment was delivered.

**ETHERTON J.**                                                          *i*

INDEX

Introduction                                              [1]–[5]
Summary of background facts                               [6]–[77]

*a*  The issues                                                    [78]–[83]
     The trial                                                     [84]–[87]
     The witnesses                                                 [88]–[103]
     The licences                                                  [104]–[111]
     The security documents
*b*  The facility agreement                                        [112]–[126]
     The debentures                                                [127]–[135]
     The earn-in agreement                                         [136]–[141]
     The JOAs                                                      [142]–[146]
     The direct agreement                                          [147]–[154]
     The moral high ground                                         [155]–[160]
*c*  Fixed or floating charge                                      [161]–[191]
     Ordinary course of business                                  [192]–[227]
     Transfer to Cabot of 41% of PEDLs 11 and 12                  [228]–[285]
     Transfer of 10% interest in original licences                [286]–[307]
     Sale of the OGL shares and the after-acquired licences       [308]–[367]
*d*  Transfer of 90% interests to E & P in EXL 273, EXL            [368]–[440]
     284, PEDL 10, PEDL 13 and PEDL 43
     Wrongful interference with the drilling rig and the           [441]–[447]
     equipment
     Summary of conclusions                                       [448]

*e*  INTRODUCTION

[**1**] This action concerns a dispute as to the ownership of, and right to operate, various petroleum licences (the licences) granted by the Secretary of State for Trade and Industry (the Secretary of State), which permit the extraction of oil and gas from various regions within the UK.

*f*  [**2**] There is also an issue as to the ownership of one half of the share capital of the first defendant, which was formerly called Octagon Gas Ltd (OGL).

[**3**] The claimants and the defendants seek rival declarations as to their ownership of the licences and the disputed shares in OGL, and as to the person entitled to act as operator of each of the licences.

*g*  [**4**] The defendants further counterclaim that, if they are not the owners of, and have no entitlement to assignment of, any of the licences or the disputed shares, there should be made an order for repayment of all sums expended by them in relation to the licences and the shares.

[**5**] OGL also counterclaims for a declaration that the third claimant (Greenpark) has wrongfully interfered with a drilling rig (the drilling rig)
*h*  and ancillary equipment (the equipment), and an order for delivery up of the same, and damages.

SUMMARY OF THE BACKGROUND FACTS

[**6**] The factual background to the dispute is complex. The following is a brief summary.
*i*  [**7**] Octagon Energy Ltd (OEL) had two wholly-owned subsidiaries, namely Octagon (CBM) Ltd (OCL) and Octagon (CBM) Resources Ltd (OCRL).

[**8**] In 1999 those three companies (the Octagon group companies) were controlled by Mr John Garratt . He was the managing director and the

controlling shareholder of OEL by virtue of his 14.8% stake in OEL's issued ordinary share capital and a 98.2% stake in the issued ordinary share capital of Exeter Oil & Gas Ltd (Exeter), which owned in turn a further 50.7% stake in OEL.

[9] Mr Garratt was also a director of OCL and OCRL.

[10] At that time OEL owned 50 shares in OGL (the OGL shares), which was half OGL's issued share capital. The remaining 50 shares were held by the third defendant (Cabot).

[11] Mr Garratt was also the managing director of OGL.

[12] At that time OCL and OCRL held seven licences (the original licences) in respect of the following locations: EXL 273 (Warrington), EXL 284 (South Wales), PEDL 10 (Canonbie), PEDL 11 (Hickleton), PEDL 12 (Nottinghamshire), PEDL 13 (Whitehaven) and PEDL 43 (Maltby).

[13] The Octagon group companies were engaged in the business of exploring and extracting coal mine methane (CMM) and coal bed methane (CBM) for use as clean burning fuel in industry.

[14] For the purpose of their business, the Octagon group companies required funding. Between December 1999 and February 2000 they entered into financing arrangements for £11.5m with ECT Europe Finance Inc and Joint Energy Development Investments LLP as lenders (the Enron lenders), and Enron Power Operations Ltd (EPOL), which acted at that time as agent for the Enron lenders.

[15] The principal documents giving effect to, or otherwise relevant to, the financing arrangements (the security documents) comprised the following: a facility agreement dated 22 December 1999, which was subsequently amended on 11 February 2000, 12 October 2001 and 25 July 2002 (the facility agreement, meaning the facility agreement as so amended); debentures by each of the Octagon group companies (the debentures), by which each of the Octagon group companies charged their assets; an earn-in agreement (the earn-in agreement) between OCL, OCRL and the second defendant (E & P), which in broad terms provided for circumstances in which E & P was to obtain a 10% interest in the existing licences; and an agreement (the direct agreement) between EPOL, the Octagon group companies and various counterparties, including E & P, under which, in particular, E & P accepted various direct obligations to EPOL with regard to the possible exercise of rights under a proposed detailed joint operating agreement (JOA) intended to regulate the future development and operation of each of the licences, including the identity of the operator and procedures for the removal and replacement of the operator.

[16] E & P's participation was the result of insistence by the Enron lenders that the Octagon group companies bring in an operator experienced in CMM/CBM, who would take at least a 10% interest. E & P was a company which, at that time, was owned by people with experience in the CMM/CBM business.

[17] A JOA was entered into between OCRL and OCL in respect of each of the existing licences.

[18] Following the signing of the security documents, requests for funding were made during 2000. Some were met. Others were not. The defendants maintain that there were serious delays in the provision of funding.

[19] On 29 August 2000 OCL acquired four new licences from the DTI,

*a*  namely PEDL 64 (Carlisle), PEDL 65 (Selby), PEDL 66 (Thurcroft) and PEDL 67 (Abercarn) (the after-acquired licences).

[**20**] Relations between the Octagon group companies and the Enron group of companies (Enron) deteriorated.

[**21**] On 11 April 2001 Enron Europe Finance & Trading Ltd (EEFTL) wrote to OEL notifying OEL that an event of default had occurred under
*b*  cl 20.1.23 of the facility agreement, and reserved all rights in respect of it.

[**22**] In August and September 2001 OEL wrote to Enron Europe Ltd (EEL) explaining that funding was required to make rental payments under the licences and to enable wells to be drilled by the dates required by the licences, and of the risk of termination of the licences by the Department of Trade and Industry (the DTI) in the event of non-compliance.
*c*  [**23**] On 12 October 2001 an amendment agreement was made in relation to the facility agreement, providing for a further £700,000 of loan finance, and part of the transaction being a waiver of any prior default.

[**24**] On 13 November 2001 Octagon requested EEL to permit a drawdown of £500,000 in respect of drilling finance. On 28 November
*d*  2001 Octagon made a further request for a drawdown of £200,000 for general corporate purposes.

[**25**] None of the £500,000 drilling finance requested was advanced.

[**26**] At the end of November or beginning of December 2001, various Enron companies filed for Ch 11 bankruptcy.

[**27**] On 18 December 2001 one or more of the Octagon group companies
*e*  received £65,294 from Enron in respect of the drawdown request of £200,000.

[**28**] On 16 January 2002 OEL wrote to EPOL's general counsel saying, among other things, that the balance of £135,131.70 in respect of its £200,000 drawdown request was urgently required, and that the Enron lenders were in default of the facility agreement as a result of not providing
*f*  those funds. A similar observation was made in relation to the failure of the Enron lenders to advance the £500,000 drilling finance. The letter stated that Octagon was at risk of losing some of its most beneficial licences and core assets. It further said that, if the Enron lenders did not provide the £500,000 by 1 February 2002, then Octagon would take action to mitigate its losses, and would, if necessary, try and enter into a joint venture
*g*  agreement whereby a third party carried out the required drilling for a percentage of the licences concerned.

[**29**] On 8 February 2002 the Enron lenders indicated they were not in a position to fund the requested drawdown of £135,000 for corporate purposes, and were not willing to advance the £500,000 drilling finance
*h*  requested.

[**30**] On 26 March 2002 EPOL served a notice of default on the Octagon group companies.

[**31**] On 12 April 2002 OCL and Quality Drilling (UK) Ltd (Quality Drilling UK) entered into an agreement for the drilling of a well by Quality Drilling UK on PEDL 12 for the sum of £250,000 payable by 31 December
*i*  2002 (the drilling agreement). The drilling agreement provided that, if such sum had not been paid by then, Quality Drilling UK would instead be entitled to a 41% earn-in interest in PEDL 11 and PEDL 12.

[**32**] On 19 April 2002 Cabot agreed to purchase all of Quality Drilling

UK's legal and beneficial interest under the drilling agreement (the 41% *a*
transfer agreement).

[**33**] In March 2002 Parkfield Management Ltd (Parkfield) acquired 49% of E & P. Mr Michael Grove and Mr John Atencio became directors of E & P in March 2002, on the initiative of Parkfield.

[**34**] On 27 May 2002 ECT Europe Finance Inc (ECT) replaced EPOL as agent and trustee in relation to the facility agreement. *b*

[**35**] On 5 June 2002 Mr Garratt, on behalf of OEL, wrote to Mr Grove, on behalf of E & P, stating, among other things, that it was agreed that under the earn-in agreement E & P had the right to a 10% interest in each of the original licences, and, following E & P's request, the 10% interest in each of the original licences together with a 10% interest in the JOA for each original licence would be assigned by OCL to E & P as soon as *c* possible and submitted to the DTI for approval.

[**36**] On 12 July 2002, OCL and E & P entered into deeds of assignment to E & P of 10% of the original licences. They also entered into an operating agreement novation and a JOA in respect of each original licence.

[**37**] At this time the Octagon group companies were in discussions with *d* Scottish & Southern Energy plc (SSE) for refinancing. On 7 June 2002 SSE had sent a letter setting out an indicative non-binding funding proposal for Octagon of up to £14m on behalf of itself and Orix Europe Ltd (Orix).

[**38**] On 22 July 2002 OCL sent the DTI copies of the deeds of assignment in respect of the original licences. In due course the DTI gave consent to those assignments. *e*

[**39**] On 9 October 2002 the DTI wrote to OCRL stating that licence rental fees were outstanding in respect of PEDL 10 and EXL 284, and requested payment within seven days. On 18 October 2002, following a request by OCL for a further three months in which to pay those licence rentals, the DTI wrote to OCL stating that OCL would be given the additional three months in which to settle those debts, but that was a last *f* and final extension of the period in which the debts had to be paid, and if any were still outstanding as of 18 January 2003, the DTI would consider taking action to recover them. In that letter the DTI attached a schedule showing the payments due and outstanding in respect of EXL 273, EXL 284, PEDL 10 and PEDLs 64–67, amounting in total to £102,500.

[**40**] By the end of 2002 the directors of the Octagon group companies *g* were in negotiations with Enron to purchase the outstanding loan. No agreement, however, was ever reached.

[**41**] On 20 January 2003 Cabot wrote to OCL stating that, as the £250,000 had not been paid under the provisions of the drilling agreement, there should be an assignment to Cabot of 41% of the interest in the *h* licences for PEDL 11 and PEDL 12.

[**42**] On 21 January 2003 the DTI wrote to OCL stating that £102,500 was due in respect of the licences, and that, in the event that the payments were not received by 1 March 2003, the Secretary of State would be minded to exercise the powers conferred upon him to revoke each licence.

[**43**] By 24 January 2003 SSE had withdrawn from re-financing *i* negotiations.

[**44**] On 24 January 2003 E & P wrote to OCL stating that it was evident that Octagon was not able to pay the licence rentals on EXL 273, EXL 274 and PEDL 10, amounting to £85,000, and had no intention of paying the

*a*  licence rentals. In the letter E & P gave notice that it would pay the licence rentals by 28 February 2003, and under cl 16.3 of the JOA in respect of each licence, OCL and OCRL should transfer and assign those licences to E & P.

[**45**] Minutes of a meeting of the board of directors of OEL on 7 February 2003 recorded that it was agreed to assign EXL 273 and PEDL 10 to E & *b*  P at the earliest opportunity, and, unless a settlement could be completed with Enron concerning the Enron loan in the interim, it was agreed to assign EXL 284 to E & P before the DTI's deadline for payment of licence rentals of 28 February 2003.

[**46**] The minutes also recorded that OEL had borrowed £125,000 from OGL, and the directors agreed, following discussions with Cabot, that OEL *c*  sell the OGL shares to Cabot for £60,000, on the basis that the £60,000 received from Cabot was paid to OGL in partial extinguishment of the £125,000 borrowings.

[**47**] The minutes further recorded that it was agreed to sell the after-acquired licences to OGL for a total of £65,000, which would be *d*  set-off against the balance of the £125,000 borrowing from OCL.

[**48**] Minutes of meetings of the boards of directors of OCL and OCRL on 7 February 2003 recorded the approval of those proposed transactions.

[**49**] On 10 February 2003 deeds of assignment were executed transferring to E & P the outstanding 90% interest of OCL or OCRL, as appropriate, in EXL 273, EXL 284 and PEDL 10.

*e*  [**50**] Minutes of the meeting of the board of directors of OEL on 7 February 2003 recorded the agreement of the directors that test rigs and associated equipment would be sold to OGL for £25,000, the office equipment would be sold to Exeter for £7,500, and the office lease would be sold to Exeter for £1,000. The minutes recorded that Mr Garratt had told the board that OEL could continue to use the office equipment on a *f*  temporary basis without payment, provided it was not required by Exeter and provided that OEL did not become insolvent or a proposal was made to the company and its creditors for a composition in satisfaction of its debts or a scheme of arrangement of its affairs or an application to the Court for 'an Order of bankruptcy' or placed into any form of administration, and that OEL could use the office on a temporary basis *g*  subject to the same conditions.

[**51**] On 14 February 2003 sale and purchase agreements were entered into between OCL or OCRL, as appropriate, and OGL in relation to the after-acquired licences.

[**52**] On 14 February 2003 a sale and purchase agreement was entered *h*  into between Cabot and OEL in relation to the OGL shares.

[**53**] On 20 February 2003 Cabot paid £60,300 to OEL (being £60,000 and £300 stamp duty) in respect of the sale of the OGL shares.

[**54**] On 25 February 2003 E & P paid £85,000 to the DTI in respect of rental arrears.

[**55**] On 11 March 2003 a share certificate for 50 shares in OGL was *i*  issued to Cabot.

[**56**] On 27 March 2003 deeds of assignment of a 41% interest, operating agreement novations and JOAs were entered into between OCL, Cabot and E & P in respect of PEDL 11 and PEDL 12.

[**57**] On 1 April 2003 deeds of assignment between OCRL or OCL, as

appropriate, and OGL were executed transferring to OGL the *a* after-acquired licences.

[58] Minutes of a meeting of the board of directors of OEL on 21 March 2003 recorded that rentals on PEDL 43 were overdue and the DTI had written letters requesting payment.

[59] On 15 April 2003 the DTI wrote to OCRL seeking payment of the licence rents in respect of PEDL 43. *b*

[60] On 23 April 2003 minutes of a meeting of the board of directors of OCL recorded the agreement of the directors to assign PEDL 43 to E & P.

[61] On 28 April 2003 a deed of assignment between OCL and E & P was executed transferring PEDL 43 to E & P.

[62] On 8 May 2003 heads of terms for the funding and development of power plants were signed by Octagon with Maxim Power Corp (Maxim). *c*

[63] Minutes of a meeting of the board of directors of OEL on 6 June 2003 recorded that licence rents on PEDLs 11, 12 and 13 were overdue and the DTI was threatening legal action to recover them. The minutes also recorded that the CBM potential on PEDL 13 was small, and that the company was not in a position to test the potential or spend further money *d* on the licence rental payments. The board resolved to relinquish licence PEDL 13 to E & P under the JOA, with E & P to be responsible for the licence rentals.

[64] A deed of assignment dated 13 June 2003 was executed by OCL and E & P in respect of PEDL 13.

[65] In the minutes of a meeting of the board of directors of OGL on *e* 16 June 2003, it was recorded that Cabot was prepared to subscribe for £750,000 worth of shares in OGL, on condition that OGL bought the drilling rig from Cabot and which was for sale for £750,000. The board agreed to issue 750,000 ordinary shares of £1 par value to Cabot and to complete the purchase of the drilling rig.

[66] On 15 July 2003 an agreement was entered into between Cabot and *f* OCL for the purchase of the drilling rig by OGL for £750,000.

[67] On the same day, at a meeting of the board of directors of OGL, 750,000 ordinary shares in OGL were allotted to Cabot.

[68] On 26 August 2003 ECT was removed as agent and trustee for the purposes of the security documents, and Beechchoice Ltd (Beechchoice) was appointed as agent. *g*

[69] The second claimant (Cedarbase) was appointed as trustee.

[70] Beechchoice demanded immediate repayment of all sums due under the facility agreement.

[71] Cedarbase gave notice to the Octagon group companies of the conversion of the floating charge created by the debentures into a fixed *h* charge.

[72] Cedarbase appointed administrative receivers of the Octagon group companies (the receivers).

[73] A deed of release was executed by Cedarbase in favour of the Octagon group companies and Greenpark, whereby Cedarbase irrevocably released and discharged from the security created by the debentures certain *i* assets, including the licences and the OGL shares.

[74] A sale agreement was entered into between the Octagon group companies and Greenpark whereby, in consideration of the sum of £1.1m, Greenpark purchased 'whatever right, title and interest', if any, each of the

*a* Octagon group companies had in, among other things, the licences, the OGL shares, and any drilling rigs (other than those held under lease contract, as defined).

[75] On 3 September 2003 OGL changed its name to Green Gas Power Ltd.

[76] On about 6 or 7 January 2004 Greenpark caused the drilling rig and
*b* equipment to be removed from their places of storage, and has thereafter refused to return them to OGL.

[77] The present proceedings were commenced on 14 October 2003.

THE ISSUES

*c* [78] So far as concerns the licences and the OGL shares, the primary issue is whether, under the provisions of the security documents, the relevant Octagon Group Company was entitled to make the following transfers free of any charge imposed by the debentures: (1) 41% of PEDL 11 and PEDL 12 to Cabot pursuant to the drilling agreement and the 41% transfer agreement, as being in the ordinary course of the business of OCL; (2) 10%
*d* of the original licences to E & P pursuant to the earn-in agreement, or as being in the ordinary course of the business of OCL and OCRL; (3) the after-acquired licences to OGL pursuant to cl 16.4 of the relevant JOA, or as being in the ordinary course of the business of OCL and OCRL; (4) the OGL shares to Cabot, as being in the ordinary course of the business of OEL; (5) 90% of EXL 273, EXL 284, PEDL 10, PEDL 13 and PEDL 43 to
*e* E & P pursuant to cl 16.4 of the relevant JOA, or as being in the ordinary course of the business of OCL and OCRL.

[79] The defendants also claim that the drilling agreement, and the transfers of the 10% interest in the original licences to E & P, were made with the express consent of persons acting on behalf of the Enron lenders.

*f* [80] The defendants also allege, in relation to certain of the transfers of interests in the licences, that the claimants are estopped from claiming that the assignments were unlawful or in breach of the terms of the facility agreement or the debentures.

[81] If the transfer of any of the licences or any interest in any of the licences by OCL and OCRL, or the sale of the OGL shares by OEL, was contrary to cl 4.2 of the debentures and is not binding on the claimants, the
*g* defendants counterclaim that they are entitled to repayment of all sums expended by them in relation to the licences and the OGL shares.

[82] OGL claims that Greenpark has wrongly interfered with the drilling rig and the equipment, and OGL is entitled to a declaration to that effect, together with an order for delivery up of the same.

*h* [83] There are two issues in respect of which it was agreed between the parties during the course of the trial that consideration of them should be adjourned to one or more subsequent hearings. The first of those matters is as to the identity of the person entitled to act as the operator in respect of each of the licences. The second matter is as to the amount of any damages recoverable by OGL in respect of any wrongful interference by Greenpark
*i* with the drilling rig and the equipment.

THE TRIAL

[84] In view of the pressing commercial urgency to establish the correct legal position as to the ownership of the licences, and the person responsible

for paying licence payments and complying with other conditions of the licences, Evans-Lombe J made an order on 22 January 2004 for an early trial of the claim.

[85] The trial commenced on 17 May 2004 and concluded on 15 June 2004, spanning the Spring vacation.

[86] In view of the commercial urgency, to which I have referred, and, in particular, the date for making payments under the licences, I was asked to deliver my judgment prior to 30 June 2004. This has imposed a tight deadline for a judgment on complex issues and many areas of conflicting evidence.

[87] At the trial, the claimants were represented by Mr Gabriel Moss QC and Mr Edward Cohen; and the defendants were represented by Mr Richard Adkins QC and Mr David Alexander.

THE WITNESSES

[88] Witness statements were made, on behalf of the claimants, by Mr George Giard Jr, the chief executive officer of Greenpark; Mr Andrew Marsden, who was employed by EEL between July 1997 and June 2002, and who, as head of Enron Principal Investments in Europe communicated with the Octagon group companies in relation to the loan by the Enron lenders; and Mr Timothy Larrison, who, as an employee of EEFTL and a representative of ECT, became involved in matters relating to the loan to the Octagon group companies by the Enron lenders after Mr Marsden's departure.

[89] Mr Giard, Mr Marsden and Mr Larrison all gave oral evidence.

[90] Mr Giard, who has been involved in the oil and gas exploration and production business for over thirty-five years, was a patently honest witness, who gave his evidence in a measured and careful manner. His evidence was, however, of limited assistance, since Mr Giard was not a party to, and had no personal knowledge of, the transactions with which I am principally concerned, other than the removal of the drilling rig and the equipment in January 2004.

[91] Mr Marsden and Mr Larrison were cautious and careful in their evidence relating to the material facts. I am satisfied that they were trying to give their evidence honestly and carefully, to the best of their recollection.

[92] Witness statements were made, on behalf of the defendants, by Mr Garratt; Mr Alan Gravelius, a chartered accountant, the company secretary of the Octagon group companies, a director of OEL and the company secretary of OGL at the relevant times; Mr Julian Whately, a solicitor and senior partner of Lee & Pembertons, who was a director and the company secretary of Exeter at the relevant times; Mr Andrew Shrager, who has had extensive experience in banking and corporate finance, particularly in relation to the oil and gas and energy sectors and who was a director of OEL at the relevant times; Mr Michael Grove, who became a director of E & P in March 2002; Mr Peter Roscoe, who claims to be the principal beneficial owner of Cabot and has a minority shareholding in Parkfield; Mr Malcolm Aw, who claims to be a minority shareholder in Cabot; Mr Jay Vallabh, who is a Swiss fiduciary, and was a director of Cabot and appears to have acted on behalf of Parkfield since about March

*a* 2002; and Mr Edward Davenport, who claims to represent the majority shareholders of Parkfield.

[93] Oral evidence was given by Mr Garratt, Mr Gravelius, Mr Whately, Mr Shrager, and Mr Roscoe. Mr Grove gave his oral evidence by video link from Denver, Colorado, USA..

*b* [94] I formed the view that the evidence of Mr Garratt should be treated with caution. He is plainly an intelligent and quick-witted person. It is clear, however, that on occasions he has acted with a distinct lack of candour. In his dealings, for example, with the DTI in connection with applications for consent to the various transfers of licences or interest in licences to the defendants, which I describe in more detail subsequently in this judgment, some of his representations were, at the least, highly misleading. By way of *c* another example, in responses to a request for further information in relation to the amended defence and counterclaim, in respect of which responses Mr Garratt signed a statement of truth, it was stated that Mr Garratt did not know who owned the shares in Cabot. It was clear, however, from his oral evidence that he had had many dealings with *d* Mr Roscoe, as the beneficial owner of Cabot; and, in cross-examination, he stated that he had discovered that Mr Roscoe had a beneficial interest in Cabot in about 1997. It was typical of his manner of giving evidence, in cross-examination, that he sought to justify his answer to the request for further information, which I have mentioned, by saying that Mr Roscoe had told him that he had an interest, but he (Mr Garratt) did not know the *e* details. At the very least, an honest and straightforward answer to the request for further information would have been that Mr Garratt was made to understand by Mr Roscoe, and believed, that Mr Roscoe was the beneficial owner of, or had a beneficial interest in, the shares in Cabot. Generally, in many areas I found that his answers to questions in cross-examination were not straightforward, and often involved what appeared *f* to be after-the-event rationalisation and a degree of obfuscation.

[95] I am satisfied that Mr Gravelius, Mr Whately and Mr Shrager were doing their best to give honest evidence to the best of their recollection.

[96] Mr Roscoe presented himself as a person of considerable wealth, operating through a network of foreign companies and foreign accounts, with accommodation addresses in numerous places throughout the world. *g* Mr Moss sought to undermine his credibility by emphasising, among other things, that Mr Roscoe had formerly been adjudicated bankrupt in this country, and had left the country without discharging all his debts. In relation to the specific evidence he gave at the trial, however, there is nothing in the quality or consistency of his evidence to raise any cogent *h* ground for disbelieving his evidence in any material respect.

[97] Mr Grove, as I have said, gave his evidence on two occasions by video link. There were aspects of his evidence which were troubling; in particular, it was astonishing that, although he was, in effect, the managing director of E & P, he was unaware of the beneficial owner or owners of Parkfield, which, according to his evidence, was the ultimate owner of E & *i* P. It was equally astonishing that, although he appears to have received his instructions from Mr Vallabh, representing the controlling shareholders of E & P, and although he keeps a file on E & P matters, his evidence was that there is not a single document which represents, or deals with, communications between Mr Vallabh and himself. Nevertheless, I formed

the view that, although parts of his evidence had to be viewed with caution, his evidence concerning the absence of any control of Cabot and its affairs by Mr Garratt was honest and credible.

[98] No directions were given, prior to the trial, for either side to adduce expert evidence. This was of particular relevance in relation to one area of evidence emphasised by Mr Garratt and his co-directors of the Octagon group companies, namely the 'high-grading' or 'farming-in' or 'farming-out' of assets. This practice was described, in the following way, in Mr Shrager's witness statement:

'I supported the implementation of generally accepted oil industry practices to safeguard Octagon's principal assets. This was done by farm-outs or the acceptance of a dilution of our interests in licences where value could be achieved. It was also done by the relinquishment of licences which had limited potential or upon which payments had to be made for which the company did not have the funds. Putting it another way, the position was continually assessed by reference to the risk/reward of licences and other assets as well as the financial position of the company and the best steps taken to protect what at any given moment in time were thought to be the more valuable licences.'

[99] His evidence, in this respect, was elaborated upon by him in his evidence in re- examination as follows:

'I have seen many examples where a company will have an interest in a licence whether it is in the UK, or anywhere in the world, it has either a licence or a lease or some arrangement with the government, or just is a service agreement or a contract with the government where they may start with a 100% interest in a licence.

They will then as a result of work they do, they may well decide, on the balance of risk and reward, that if they were to themselves go on to drill commitment wells, which they have an obligation to drill for a government and spend money, that perhaps it is better to share the risk with somebody else. This is usually called a farm-in where the other partner comes and is prepared to drill a well or pay money to government whether it is promotes or bonuses paid to government. So it is a very well known principle throughout the oil industry on a worldwide business where the partners then decide we can now become two partners, they may have 50/50 each, in the licence and they are in partnership on an individual basis for that particular licence. They do not create necessarily a company where they are shareholders, they have undivided business interest in that licence and they then have a joint operating agreement exactly as we have had in this case, and under that agreement that is the principal binding agreement which allows them then to finance their interest separately.

One of them might be chosen to be a partner, the operator, the operator usually does this because he is in the best position, he has the most knowledge, he then operates on behalf of the new partnership. It is not intended that the operator should take any incremental benefit out of it, he is merely an operator there on behalf of the other partners

*a*  and he merely takes a fee for providing that service. So that is a farm-in, it is a worldwide exercise to share risk.' (Transcript 28 May 2004 pp.89–90).

[100] Mr Moss objected to evidence by the defendants of farming-in/farming-out/high-grading on the basis that it was expert *b*  evidence, for which no permission had been given.

[101] I take the view that the evidence of Mr Garratt and, in particular, Mr Shrager, on this subject should be admitted in evidence. I am satisfied that, in the case of Mr Garratt and Mr Shrager, the evidence represents, not simple expert opinion evidence, but a factual account of their own knowledge (possibly direct, possibly hearsay) of such a practice from their *c*  long experience in the oil and gas exploration industry. The claimants were aware, from Mr Shrager's witness statement, that the defendants intended to rely on such evidence.

[102] Further, and in any event, the practice, as described by Mr Shrager, appears perfectly rational and commercially sensible; and its existence is, in some measure, borne out by the communications between Mr Garratt and *d*  the DTI in connection with the attempts to register the transfers to the defendants of interests in the licences, in which the DTI, far from being surprised at the transfer of partial interests in the licences, appears to have a general procedure for the approval of re-organisation of different interests subsisting in a licence.

*e*  [103] The witness statements of Mr Aw, Mr Vallabh and Mr Davenport were admitted as hearsay evidence.

THE LICENCES

[104] Licences EXL 273 and EXL 284 incorporated certain clauses of the model clauses for petroleum exploration and development licences in landward areas set out in schedule 3 to the Petroleum (Production) *f*  (Landward Areas) Regulations 1991 (SI 1991 No.981) (the 1991 Model Clauses). The other licences incorporated certain clauses of the Model Clauses set out in schedule 3 to the Petroleum (Production) (Landward Areas) Regulations 1995 (SI 1995 No.981) (the 1995 Model Clauses).

[105] By each licence, the Secretary of State, in consideration of the *g*  payments specified in the licence and the performance and observance by the licensee of all its terms and conditions, granted exclusive licence and liberty during the continuance of the licence, and subject to its provisions, to search and bore for, and get, petroleum in a specified area.

[106] Each licence was for an initial term of six years. In all cases, other than EXL 273 and EXL 284, there was provision for continuation for a *h*  further term of five years and beyond, if certain terms and conditions were satisfied including, in particular, the execution of a work programme. The initial term working obligations included an obligation to drill a well.

[107] Each licence contained terms for the licensee, at any time, to determine the licence or surrender any part of the licensed area, by giving to the Secretary of State not less than six months' notice in writing to that *i*  effect.

[108] Each licence, other than EXL 273 and EXL 284, contained provision for the periodic payment of licence sums specified in schedule 2 to the licence.

[109] Clause 27 of the 1991 Model Clauses (applicable to EXL 273 and

EXL 284) provided that the licensee should not, without the consent of the
Secretary of State in writing, assign or part with any of the rights granted by
the licence in relation to the whole or any part of the licensed area or grant
any sub-licence in respect of any such rights.

[**110**] Clause 37 of the 1995 Model Clauses (applicable to all the other
licences) provided as follows:

> '37.-(1) The Licensee shall not, except with the consent in writing of
> the Minister and in accordance with the conditions (if any) of the
> consent do anything whatsoever whereby, under the law (including the
> rules of equity) of any part of the UK or of any other place, any right
> granted by this licence or derived from a right so granted becomes
> exercisable by or for the benefit of or in accordance with the directions
> of another person.'

[**111**] Clause 28 of the 1991 Model Clauses and cl 38 of the 1995 Model
Clauses provided that the Secretary of State may revoke the licence in
certain specified circumstances, including any breach or non-observance by
the licensee of any of the terms and conditions of the licence.

THE SECURITY DOCUMENTS

*The facility agreement*

[**112**] Under the heading 'Background', at the commencement of the
facility agreement, it was recited that, at the request of OEL, the Enron
lenders were willing to provide a term loan facility of £11.5m, comprising
four tranches of £2.5m each and one tranche of £1.5m to the Octagon
group companies, such facility to be guaranteed by those companies and
secured by the debentures.

[**113**] By cl 2.1, the lenders agreed to make available to the Octagon
group companies the facility, subject to the terms of the facility agreement.

[**114**] By cl 2.2, each of the Octagon group companies agreed to use the
proceeds of the first four tranches to finance general corporate purposes
related to ' the Specified Developments'. That expression was defined by
cl 1.1 of the facility agreement to mean:

> '… the exploration, evaluation, preparation, development and
> operation of any vent, vent well, gob gas, conventional coal bed
> methane, evacuation, extraction, transportation, conversion, generation
> and transmission assets or projects related to the Specified assets and
> any electricity which may be generated utilising them.'

[**115**] Clause 2.5 of the facility agreement provided that all amounts due
under the facility agreement would be secured by the debentures.

[**116**] By cl 19.1.6 of the facility agreement each of the Octagon group
companies agreed as follows:

> '19.1.6 Disposal of assets: It will not dispose of any of its Assets or
> any interest in any of its Assets (including, without limitation the
> Specified Assets) without the consent of the Agent or as permitted
> pursuant to the Power Purchase and Emissions Credit Agreement or the
> Earn In Agreement. It will also procure that none of its Subsidiaries will
> dispose of that subsidiary's Assets. This does not apply to disposals in
> the ordinary course of its or a Subsidiary's business, or to disposals of

*a*  obsolete or unused Assets on an arm's length basis or as waste, or where such Assets are replaced with Assets of substantially the same nature and value, or to disposals up to a maximum net sale proceeds of £50,000 in any one year. For these purposes, a lease is treated as a disposal. Receipts from sales or disposals to which the Agent consents

*b*  shall, unless the Agent otherwise agrees or they have been used in the purchase of replacement Assets, be applied in repayment of the Loan.'

[**117**] The expression 'Assets' was defined in cl 1 of the Agreement as having the following meaning:

*c*  '... "Assets" of any person means all or any part of its present and future business, undertaking, property, assets, revenues, Rights (including any right to receive revenues), and uncalled capital, wherever situated.'

[**118**] The expression 'Specified Assets' was defined in cl 1 of the Agreement as follows:

*d*  '... "Specified Assets" means the petroleum, coal bed, methane gas and other hydrocarbon assets to which the licences relate.'

[**119**] Clause 19.1.7 of the facility agreement contained an obligation by each of the Octagon group companies as follows:

*e*  'Carry on business: It will carry on its business in the exploration, evaluation, preparation, development, operation, evacuation, extraction and transportation of the Specified Assets for use in the generation of electricity (alternative uses for the methane gas will be permitted subject to the prior written consent of the Agent, such consent not to be unreasonably withheld) and will procure that no substantial change is

*f*  made to the general nature of the business of the Company, the Borrowers or the Group.'

[**120**] Clause 19.1.11 of the facility agreement, so far as relevant, contained covenants by each of the Octagon group companies as follows:

*g*  '19.1.11 Operating Agreements: It will:
  (a) ...
  (b) ...
  (c) not amend, waive or modify or concur in the amendment or waiver or modification of or cancel, terminate, suspend or surrender any Operating Agreement or the Earn In Agreement in any material

*h*  respect without the prior written consent of the Agent, such consent not to be unreasonably withheld;
  (d) not agree to the transfer by a person of that person's obligations under an Operating Agreement or the Earn In Agreement without the prior written consent of the Agent, such consent not to be unreasonably withheld;

*i*  (e) maintain in full force and exercise all of its rights under the Operating Agreements and the Earn In Agreement;
  (f) ...
  (g) without limiting (d) above, not agree to the appointment or replacement of the operator, the Contractor or any Sub-Contractor or

any new operator, contractor or sub-contractor without the prior
written consent of the Agent such consent not to be unreasonably
delayed: and
  (h) …'

[**121**] The expression 'Operating Agreement' was defined in cl 1 of the
facility agreement to include the JOAs.

[**122**] By cl 19.1.17 of the facility agreement each of the Octagon group
companies covenanted, so far as relevant, as follows:

'19.1.17 Consents and licences: It will:

i) obtain, maintain in full force and effect and comply with applicable
Consents in relation to the Specified Developments and the Specified
Assets except to the extent that failure to do so would not have a
Material Adverse Effect;

ii) …

iii) …

iv) not abandon or relinquish any licence or take any action which
would permit an Agency to revoke, suspend or withdraw a licence
except to the extent that such abandonment, relinquishment or action
would not have a Material Adverse Effect.'

[**123**] The expression 'Consent' was defined in cl 1 of the Agreement to
include the licences.

[**124**] The expression 'Material Adverse Effect' was defined as follows in
cl 1 of the facility agreement:

'… "Material Adverse Effect" means a material adverse effect:

(a) on the financial condition of a Borrower or a Guarantor, as the
case may be, or

(b) on the ability of a Borrower or a Guarantor, as the case may be, to
perform and comply with their respective obligations under the Finance
Documents.'

[**125**] Part 1 of Sch 1 to the facility agreement sets out the commitments
of the Enron lenders. Each of them was to contribute equally to each of the
tranches.

[**126**] Schedule 10 to the facility agreement specified the licences. The
licences were the original licences.

*The debentures*

[**127**] Clause 1 of each debenture provided that, except to the extent that
the context required otherwise or as otherwise defined in the debenture,
terms and references defined in the facility agreement should have the same
meanings and constructions when used in the debenture.

[**128**] By cl 1.1 of each debenture, the expression 'Investments' was
defined to include securities and investments of any kind, including shares.

[**129**] By cl 3.1 of each of the debentures, the respective Octagon Group
Company 'with full title guarantee and as security for the payment and
discharge of all capital Liabilities … [charged] in favour of the Trustee (as
trustee for the secured creditors)':

'3.1.3 by way of first fixed charge:
i) …

*a*        ii) all its present and future Investments

iii) …

iv) …

v) …

vi) the benefits of all Consents vested in the Company: and

*b*        3.1.4 by way of first floating charge, its undertaking and all its Assets, both present and future (including Assets expressed to be charged by Clauses 3.1.1, 3.1.2, and 3.1.3 or assigned by Clause 3.2).'

[130] By cl 3.2 of each debenture, the respective Octagon Group Company 'with full title guarantee … [assigned] by way of security to the Trustee':

*c*
        '3.2.5 the benefits of all Consents vested in the Company.'

[131] Clause 3.3 of each debenture provided as follows:

        '3.3 Ranking

*d*        The floating Charge created by Clause 3.1.4 shall rank behind all the fixed Charges created by or pursuant to this debenture but shall rank in priority to any other Security hereafter created by the Company, except for Security permitted by Clause 4.1 to rank in priority and except for Security ranking in priority in accordance with Clause 9.3.5.'

*e*        [132] Clause 3.4 of each of the debentures provided as follows;

        '3.4 Creation of Fixed Charge

        If the creation or purported creation of the fixed charges pursuant to Clause 3.1.2 (vi) over any of the Company's rights in respect of any Consent breaches any term of the relevant Consent and as a result of such breach any person seeks or is likely to seek to repudiate or cancel

*f*        the relevant Consent or commences or is likely to commence proceedings for breach, repudiation or cancellation, the Trustee will release the relevant Consent from the fixed charges to the extent necessary to avoid a breach of that Consent.'

[133] The reference in cl 3.4 to cl 3.1.2(vi) would appear to be a mistaken
*g*  reference to cl 3.1.3(vi).

[134] Clause 4.2 of each debenture provided as follows:

        '4.2 Disposal

        The Company shall not (and shall not agree to) assign to any Person all or part of the benefit of any Project Agreement or any interest

*h*        therein or any of the revenues or proceeds thereof or make or concur in (whether by a single transaction or in a number of related or unrelated transactions and whether at one time or over a period of time) any sale, transfer, lease out, lend or other disposal of (whether outright, by a sale-and-repurchase or sale-and-leaseback arrangement, or otherwise)

*i*        any of its Assets except for any such disposal permitted by Clause 19.1.6 of the facility agreement and not prohibited by any other Finance Document.'

[135] By cl 6.2 of each debenture the relevant Octagon Group Company was precluded from exercising any rights attached to or connected with any

charged investment, which included charged shares, if that would prejudice *a* the interests of the secured creditors.

*The earn-in agreement*

[**136**] The earn-in agreement was made between OCL, OCRL and E & P.

[**137**] The earn-in agreement recited that OCL and OCRL between them *b* held all the legal and beneficial interest in each of the existing licences, and that E & P wished to obtain, and OCL was willing to transfer to E & P, 10% of the legal and beneficial interest in the licences and the joint operations resulting from them, and the Secretary of State had no objection in principle to the terms of the Agreement.

[**138**] By cl 2.7 E & P undertook that it would abide by the terms of the *c* relevant JOA in all matters associated with the licences as if it were a signatory thereto.

[**139**] Clause 2.7 also provided as follows:

'AND OCL AND OCRL HEREBY CONFIRM THAT effective as of the date hereof and until such time as the assignments and transfers referred to in Clause 3 below are effected or until E & P have forfeited *d* their rights by going Non-Consent, OCL (providing E & P continues to abide by the terms of this Clause 2), will hold a ten percent (10%) interest in each of the licences on trust for E & P and carry out E & P's instructions in connection with that interest with regard to all decisions taken under the relevant JOA and OCL and OCRL shall abide by all *e* the terms thereof.'

[**140**] The expression 'Non-Consent' meant, by virtue of cl 2.6 of the earn-in agreement, an election by E & P under the provisions of a JOA not to participate in a well in accordance with the term of the JOA.

[**141**] Clauses 3.1 and 3.2 of the earn-in agreement provided as follows: *f*

'3.1 Immediately following the Commencement of Drilling of one (1) Well on each licence in which E & P has participated, OCL shall assign to E & P a ten percent (10%) legal and beneficial interest in and under that licence and a corresponding interest in and under the JOA for that licence.

3.2 OCL shall apply for approval from the DTI for such assignments, *g* and until such approval is obtained shall continue to hold the assigned interests in trust for E & P in accordance with clause 2.7 above.'

*The JOAs*

[**142**] A JOA was entered into in respect of each licence. In some cases the *h* parties to the JOA were OCRL and OCL. In other cases, E & P was also a party. In others, Cabot was also a party.

[**143**] So far as relevant to the present proceedings, the provisions of each JOA were the same.

[**144**] Article 4 provided that OCL should be the operator, removable by the affirmative vote of parties owning a combined participating interest of *i* 65% or more, after excluding the operator's percentage interest in specified circumstances. Article 4 also contained provisions as to the selection of a successor.

[**145**] Article 5 specified the rights and duties of the operator. It provided,

*a*  in particular, that, unless otherwise provided in the JOA, the operator should have the exclusive right to conduct operations under the JOA.

[146] Article 16.4 set out a procedure whereby a party, which desired not to pay its share of a payment in respect of a licence, could be required to assign its interest to the other participating parties. It was in the following terms:

*b*

> '16.4 Non-participation in Payments. A Party that desires not to pay its share of a rental, minimum royalty, or similar payment shall notify the other Parties in writing at least sixty (60) days before the payment is due. The operator shall then make the payment for the benefit of the Parties that do desire to maintain the licence. In such event, or in the
> *c*  event that a Party does not pay its share of a rental within 30 days of the due date for the rental and having received due notice to pay by the operator or in the case of the operator by the other Participating Parties, the Non-participating Party shall assign to the Participating Parties, upon their request, the portions of its interest in the licence maintained by the payment. The assigned interest shall be owned by
> *d*  each Participating Party in proportion to its Participating Interest. The assignment shall be made in accordance with Article 26 (Successors and Assigns).'

*The direct agreement*
*e*  [147] This Agreement was made between EPOL, E & P, Enron Capital & Trade Resources Ltd, Protocom Operating LLC, E & P Operating LLC, and the Octagon group companies. The direct agreement recited that E & P, in its capacity as a JOA counterparty, was a party to the direct agreement in anticipation of becoming a party to the JOAs.

*f*  [148] It also recited that EPOL, as security trustee for 'the secured creditors', held the benefit of the direct agreement on trust for the secured creditors.

[149] Clause 1 of the direct agreement provided that terms defined and references construed in the facility agreement should have the same meaning and construction in the direct agreement, except to the extent that the
*g*  context required otherwise.

[150] By cl 2.1 of the direct agreement, E & P, among others of the parties, acknowledged receipt of a copy of the debentures made between the relevant borrowers and the trustee, and by cl 2.2 consented to the security interests created by the applicable debenture.

[151] By cl 7 of the direct agreement each of the Octagon group
*h*  companies acknowledged and notified to each counterparty that it was bound by the restrictions imposed under the Finance Documents on the exercise by the Octagon group companies of certain of their rights, powers and discretions under the Operating Agreements (including their rights to amend, waive, vary or assign the same).

*i*  [152] Clause 8.1 of the direct agreement provided that E & P, among others of the parties, would give to EPOL written notice of any material breach of an Operating Agreement to which it was a party by any of the Octagon group companies as soon as reasonably practicable after it became aware of the same.

[153] Clause 9.1 provided that E & P, among others of the parties, was to

give EPOL at least 90 days' written notice prior to exercising any rights *a* granted to it in respect of any default of any of the Octagon group companies under a JOA; and cl 9.2 provided that E & P would not exercise any such right if, within 90 days of due notice, the default in question was cured or remedied or EPOL acted otherwise than in accordance with the options contained in cl 9.2. Those clauses, so far as relevant, were in the following terms: *b*

> '9.1 Each Counterparty will give the Trustee at least 90 days notice prior to:
>
> 9.1.1 exercising any right to rescind, cancel or terminate an Operating Agreement to which it is a party;
>
> 9.1.2 suspending performance of its obligations thereunder; or *c*
>
> 9.1.3 exercising any other rights granted to it (whether pursuant to such Operating Agreement or otherwise at law) in respect of any default, insolvency or winding-up of or by a Borrower under an Operating Agreement;
>
> (together "Enforcement Action").
>
> 9.2 Each Counterparty confirms that it will not take any Enforcement *d* Action and will continue to perform its obligations under the Operating Agreements to which it is a party if, within 90 days of notice given pursuant to Clause 9.1:
>
> 9.2.1 such default or situation is either (i) cured or remedied, or (ii) if not capable of cure or remedy, the event or circumstances giving rise to the right to terminate is not continuing; or *e*
>
> 9.2.2 the Trustee has delivered a notice to the Counterparty pursuant to Clause 10.1 below of its intention to join an Additional Party or substitute a Substitute Party for the Borrower; or
>
> 9.2.3 the Trustee is conducting bona fide negotiations to acquire or dispose of the Borrower's interest in the Operating Agreement in *f* question and in the Specified Assets and Specified Developments and within a further 30 days has delivered a notice to the Counterparty pursuant to Clause 10.1 below of its intention to join an Additional Party or substitute a Substitute Party for the Borrower; or
>
> 9.2.4 alternative arrangements are being made by the Trustee which are reasonably satisfactory to the Counterparty.' *g*

[**154**] Under cl 10.4 of the direct agreement EPOL confirmed that it had notice of the trust created in favour of E & P under the earn-in agreement, and acknowledged that the security created in favour of the secured creditors was subject to that trust. Clause 10.4.4 expressly acknowledged that no valid and binding assignment made in accordance with the terms of *h* the earn-in agreement should breach the terms of the facility agreement or the Finance Documents.

THE MORAL HIGH GROUND?

[**155**] Each side, for obvious reasons, clothed its legal case with the outer garments of a moral claim. *i*

[**156**] The claimants sought to portray the defendants as participants in an unlawful collusion, master minded by Mr Garratt who owned or controlled or directed all of them, and by which assets, known by all of them to fall within the debentures, were shuffled out of the Octagon group companies

a   for no or inadequate consideration in transactions that were masqueraded
    as ordinary business transactions but were actually initiated and executed
    solely to undermine the rights of the Enron lenders.

    [157] The defendants, on the other hand, and, in particular Mr Garratt
    and his co-directors of the Octagon group companies, portray their dealings
    with the licences as reasonable and, indeed, necessary commercial
b   transactions in order to stay in business–brought about by the unlawful
    conduct of the Enron lenders in failing to provide the funding for the
    Octagon group companies pursuant to the contracts between them.

    [158] The resolution of the disputes, which are the subject of these
    proceedings, is not assisted by any pre-conceived or intuitive sense of the
    justice of either side.
c   [159] The Enron lenders agreed to a facility for the Octagon group
    companies on the terms of the security documents. Whether or not the
    Enron lenders were in breach of any of the security documents, or the
    supplementary financing agreement made in October 2001, is not an issue
    before me, and is not a matter on which I can form any view. What is not
d   apparently in dispute is that, at the time of the transactions which are the
    subject of these proceedings, the Octagon group companies owed
    substantial sums to the Enron lenders in the region of £6m. What is also
    clear is that it is no part of the defendants' case that the Enron lenders were,
    and the claimants are, precluded from enforcing the security conferred by
    the debentures because the Enron lenders failed to advance to the Octagon
e   group companies money which the defendants claim ought to have been
    advanced.

    [160] Accordingly, if the dealings by the Octagon group companies and
    the defendants with the licences were dealings permitted by the security
    documents, then they are free from the claims of the Enron lenders and the
    claimants, even though the effect of the dealings was to reduce the assets
f   available by way of security for the loans to the Octagon group companies.
    On the other hand, if the transactions were not permitted by the security
    documents, then, even though they may have been prudent or even
    necessary for the financial survival of the Octagon group companies and
    even though the desperate financial condition of those Companies was
    brought about, in whole or in part, by the failure of the Enron lenders to
g   comply with their funding obligations, the assets are recoverable by the
    claimants since that was the basis of the commercial deal reflected in the
    actual terms of the security documents.


    FIXED OR FLOATING CHARGE?
h   [161] The claimants contend that the debentures created a fixed charge
    over the licences, that is to say both the existing licences and the
    after-acquired licences, and also the OGL shares. The defendants claim that
    the debentures created a floating charge over those assets and not a fixed
    charge.
    [162] A chargor's unfettered freedom to deal with the charged assets in
i   the ordinary course of business free from the charge is inconsistent with the
    nature of a fixed charge: *Re Coslett* (*Contractors*) *Ltd* [1999] 1 BCLC 205,
    217, [1998] Ch 495, 510 (Millett LJ).
    [163] In *Agnew v Comr of Inland Revenue* [2001] 2 BCLC 188, [2001]
    2 AC 710 Lord Millett, giving the judgment of the Privy Council, described

in the following way, at [32], the two stage process to be undertaken by the
Court in determining whether a charge is a fixed charge or a floating
charge:

> 'In deciding whether a charge is a fixed charge or a floating charge,
> the court is engaged in a two-stage process. At the first stage it must
> construe the instrument of charge and seek to gather the intentions of
> the parties from the language they have used. But the object at this stage
> of the process is not to discover whether the parties intended to create a
> fixed or a floating charge. It is to ascertain the nature of the rights and
> obligations which the parties intended to grant each other in respect of
> the charged assets. Once these have been ascertained, the court can then
> embark on the second stage of the process, which is one of
> categorisation. This is a matter of law. It does not depend on the
> intention of the parties. If their intention, properly gathered from the
> language of the instrument, is to grant the company rights in respect of
> the charged assets which are inconsistent with the nature of a fixed
> charge, then the charge cannot be a fixed charge however they may
> have chosen to describe it. A similar process is involved in construing a
> document to see whether it creates a licence or tenancy. The court must
> construe the grant to ascertain the intention of the parties: but the only
> intention which is relevant is the intention to grant exclusive possession:
> see *Street v Mountford* [1985] 2 All ER 289 at 300, [1985] AC 809 at
> 826 per Lord Templeman. So here: in construing a debenture to see
> whether it creates a fixed or a floating charge, the only intention which
> is relevant is the intention that the company should be free to deal with
> the charged assets and withdraw them from the security without the
> consent of the holder of the charge; or, to put the question another way,
> whether the charged assets were intended to be under the control of the
> company or of the charge holder.'

[**164**] It is common ground that, for the purposes of the first stage of the
two stage process described by Lord Millett, the critical issue is the
inter-relationship between cll 3.1.3, 3.2 and 4.2 of the debenture and
cl 19.1.6 of the facility agreement.

[**165**] Clauses 3.1.3 and 3.2 of the debentures are not merely consistent
with, but, taken on their own, a positive indication of the intention of the
parties to create a first fixed charge in relation to the OGL shares and, at
the least, the original licences.

[**166**] Clause 4.2 of the debentures contains a broad prohibition, in
relation to all the Assets of the relevant company, against any disposal
'except for any such disposal permitted by Clause 19.1.6 of the facility
agreement'.

[**167**] The defendants contend that, giving cl 19.1.6 of the facility
agreement its natural and ordinary meaning, it permits all disposals in the
ordinary course of the business of each of the Octagon group companies.
Accordingly, the defendants submit, cl 4.2 of the debenture also permits
disposals of all the assets of the relevant company in the ordinary course of
its business, including the assets specified in cl 3.1.3 of the debentures.

[**168**] The claimants, on the other hand, maintain that cl 4.2 of the
debentures and cl 19.1.6 of the facility agreement must be interpreted in a
sensible commercial manner so as to give effect to the obvious intention of

*a*    the parties that the assets specified in cl 3.1.3 of the debentures should be subject to a first fixed charge, as distinct from a floating charge such as was expressly imposed in cl 3.1.4 of the debentures.

[**169**] Mr Moss, on behalf of the claimants, submitted that such a commercial and sensible interpretation could be achieved by limiting cl 19.1.6 of the facility agreement to all those assets of the relevant

*b*    company not expressed to be subject to the fixed charge in cl 3.1.3 of the debentures and not caught by cl 3.2 of the debentures.

[**170**] He submitted that, in the alternative, the same result could be achieved, in a more technical way, by concentrating on the word 'permitted' in the phrase 'except for any such disposal permitted by cl 19.1.6 of the facility agreement ...', and relating that word back to its appearance in

*c*    cl 19.1.6 of the facility agreement in the phrase 'without the consent of the Agent or as permitted pursuant to the Power Purchase and Emissions Credit Agreement or the Earn In Agreement.' In other words, the exception to the prohibition in cl 4.2 of the debentures is limited to disposals permitted pursuant to the Power Purchase and Emissions Credit Agreement and the Earn In Agreement.

*d*    [**171**] Mr Moss supported this approach by emphasising that neither the OCL Shares nor the licences formed part of the circulating capital or stock-in-trade, or part of a fluctuating body of assets, of any of the Octagon group companies. Mr Gravelius accepted that the licences were properly treated in the accounts of the Octagon group companies as fixed assets.

*e*    [**172**] Mr Moss, in this regard, referred to the reasoning and decision in *Arthur D Little Ltd v Ableco Finance LLC* [2002] 2 BCLC 799, [2003] Ch 217 which concerned a dispute over whether a charge in a debenture by the claimant over its entire shareholding in a subsidiary was a fixed or floating charge. The claimant carried on a management consultancy business. Roger Kaye QC, sitting as a Deputy High Court Judge, held that

*f*    the debenture created a fixed charge over the shares. He said ([2002] 2 BCLC 799 at [40], [2003] Ch 217 at [40]):

> '(2) I again remind myself that the company was not trading in shares and no one has suggested it did. The essential nature of its business cannot, in my judgment, be ignored. The shares in CCL were not part
*g*    > of the company's circulating capital and it did not need to sell them, to deal with them, or to substitute them as part of its ordinary business as a management consultant, nor to improve or assist its cash flow as part of that business. The shares were not part of a fluctuating body of assets which changed from time to time in the ordinary course of the company's business.'

*h*    [**173**] In *Re Yorkshire Woolcombers Association Ltd* [1903] 2 Ch 284 at 295 Romer LJ said:

> 'I certainly do not intend to attempt to give an exact definition of the term 'floating charge,' nor am I prepared to say that there will not be a floating charge within the meaning of the Act, which does not contain
*i*    > all the three characteristics that I am about to mention, but I certainly think that if a charge has the three characteristics that I am about to mention it is a floating charge. (1) If it is a charge on a class of assets of a company present and future; (2) if that class is one which, in the ordinary course of the business of the company, would be changing

from time to time; and (3) if you find that by the charge it is
contemplated that, until some future step is taken by or on behalf of
those interested in the charge, the company may carry on its business in
the ordinary way as far as concerns the particular class of assets I am
dealing with.'

[**174**] Mr Moss submitted that neither the OGL shares nor the licences fell
within Romer LJ's category (2).

[**175**] Mr Moss emphasised that, although not decisive, the description
applied by the parties to the charge in cl 3.1.3 of the debentures, and the
plain intention of the parties that the assets within cl 3.1.3 of the debentures
should be subject to a first fixed charge, rather than a floating charge, ought
properly to be taken into account, and the cases are consistent with that
approach.

[**176**] He emphasised, further, that the express assignment provisions of
cl 3.2 were strongly indicative of an intention to create a fixed charge in
relation to, for example, the consents specified in cll 3.2.5 and 3.1.3(vi). He
submitted that the assignment was a legal assignment and not merely an
equitable assignment. Indeed, in the course of Mr Adkins' closing
submissions, Mr Adkins accepted that, if there was no fixed charge of the
licences, but only a floating charge, cl 3.2.5 of the debentures was
unnecessary and redundant.

[**177**] Mr Moss also submitted that the provisions of cll 3.3 and 3.4 of the
debentures reinforce both the intention of the parties to create a fixed
charge over the assets in cl 3.1.3 of the debentures and the importance the
parties attached to the fixed charge.

[**178**] Finally, Mr Moss submitted that, if the effect of cl 4.2 of the
debentures and cl 19.1.6 of the facility agreement was that all and any of
the assets of the Octagon group companies could be disposed of in the
ordinary course of their business, the entirety of cl 3.1.3 of the debentures,
which purported expressly to impose a first fixed charge over six specific
categories of assets, was of no effect whatsoever.

[**179**] In my judgment, the approach of the defendants is to be preferred
on this issue.

[**180**] Giving cl 4.2 of the debentures and cl 19.1.6 of the facility
agreement their natural and ordinary meaning, they provide that each of the
Octagon group companies can dispose of any of its assets if such disposal is
in the ordinary course of its business and is not prohibited by any other
Finance Document (as defined in the facility agreement). Neither cl 4.2 of
the debentures nor cl 19.1.6 of the facility agreement makes any distinction
between different categories of assets. Clause 4.2 prohibits disposals by the
relevant company of 'any of its assets,' but then excepts from such
prohibition 'any such disposal permitted by cl 19.1.6 of the facility
agreement'. Clause 19.1.6 similarly contains a covenant by each of the
Octagon group companies that it will not dispose 'of any of its Assets or
any interest in any of its Assets', and then provides five exceptions. The first
exception is that disposals may take place with the consent of EPOL. The
second, is that disposals may take place if permitted pursuant to the Power
Purchase and Emissions Credit Agreement or the earn-in agreement. The
third exception is that disposals may take place in the ordinary course of its
business. The fourth exception is that disposals may take place 'of obsolete
or unused Assets on an arm's length basis or as waste, or where such Assets

*a*  are replaced with Assets of substantially the same nature and value'. Finally, cl 4.2 provides that disposals may take place up to maximum net sale proceeds of £50,000 in any one year. In none of those exceptions is a distinction made between different categories of assets, in particular assets within cl 3.1.3 of the debentures and other assets.

[181] As I have said, Mr Moss laid emphasis on the clear indications in *b*  cll 3.1.3 and 3.2 of the debentures that the parties intended there should be a first fixed charge on, among other things, the licences. While it would be wrong to discount this factor entirely, too much emphasis upon it would undermine, and run directly contrary to, the two stage process specified by Lord Millett in *Agnew* and the principle that whether or not a fixed charge has been created depends upon the nature of the rights and obligations *c*  which the parties intended to grant each other in respect of the charged assets, rather than on the description that they have used in describing the nature of the charge. As Lord Millett said ([2001] 2 BCLC 188 at [32], [2001] 2 AC 710 at [32]):

*d*  'If their intention, properly gathered from the language of the instrument, is to grant the company rights in respect to the charged assets which are inconsistent with the nature of a fixed charge, then the charge cannot be a fixed charge however they may have chosen to describe it.'

In short, it turns the process of analysis on its head to say that cl 19.1.6 of *e*  the facility agreement must be construed so as to apply only to assets within the floating charge created by cl 3.1.4 of the debentures since it is apparent from cl 3.1.3 that the parties intended to create a fixed charge in relation to the assets there specified.

[182] Nor is it possible, in my judgment, fairly to interpret cl 4.2 of the *f*  debentures as permitting only those disposals 'permitted' pursuant to the Power Purchase and Emissions Credit Agreement or the earn-in agreement. This analysis rests entirely on establishing an intended link between the word 'permitted' in the phrase 'such disposal permitted by cl 19.1.6 of the facility agreement' in cl 4.2 of the debentures and the word 'permitted' in the phrase 'as permitted pursuant to the Power Purchase and Emissions *g*  Credit Agreement or the earn-in agreement' in cl 19.1.6 of the facility agreement. As a purely grammatical matter, the word 'permitted' is not used in cl 19.1.6 in the sense specified in cl 4.2 of the debentures, namely a disposal 'permitted by' cl 19.1.6. For that reason, and also as a natural and reasonable reading of cl 4.2 of the debentures and cl 19.1.6 of the facility agreement, the disposals 'permitted by' cl 19.1.6 can only be a reference to *h*  all the five categories of exemption which I have summarised earlier.

[183] Further, there is a danger in the present case in laying too great an emphasis on the nature of the assets in question, namely the licences and the OGL shares. The fact that assets are not part of a company's circulating capital or stock in trade, which it needs to sell as part of its ordinary business, can understandably have an important influence in the *i*  categorisation of a charge as a fixed charge, rather than a floating charge, in an appropriate case. In the present case, however, unlike, for example, *Arthur D Little* and *Re Yorkshire Woolcombers Association*, the parties have agreed an express provision permitting each of the Octagon group companies to dispose of assets in the ordinary course of its business. In

accordance with Lord Millett's two stage process, what must be ascertained *a*
at the first stage, as a matter of standard interpretation of written
documents, is whether, on the language used, the express power to dispose
of assets in the ordinary course of business was limited to particular assets
or applied to all assets of the company. Whilst, of course, the nature of the
assets in question forms part of the factual background against which the
standard process of documentary interpretation takes place, the ordinary *b*
and natural meaning of the words used is the primary touchstone. By
contrast, in the absence of an express provision permitting disposals in the
ordinary course of business, the nature of the charged assets assumes a
much greater significance in the process of establishing whether the
intention was to create a fixed charge or a floating charge over the assets in
question. *c*

[**184**] So far as concerns cl 3.2 of the debentures, I consider that this
effected an equitable assignment rather than a legal assignment. An
equitable assignment is not inconsistent with a floating charge over the
assets specified in cl 3.2.

[**185**] It is a matter of interpretation whether an assignment by way of *d*
security is intended to be an absolute and legal assignment, subject to an
implied right to reassignment on redemption, or an equitable assignment.
The claimants have not alleged expressly in their particulars of claim that
cl 3.2 effected an absolute and legal assignment. Indeed, it appeared that,
until certain observations were made by me in the course of final
submissions, the claimants' position was that cl 3.2 only created an *e*
equitable assignment.

[**186**] It appears inherently unlikely that the parties intended cl 3.2 to
operate as a legal assignment. In relation to the benefit of the licences, for
example, it seems that it would have required the Enron lenders, or possibly
EPOL, to be registered with the DTI as the owners and operators of the
licences. That was not, in fact, ever done, and plainly was never the *f*
intention of the parties. Neither the Enron lenders nor EPOL would have
satisfied the requirements for registration (to which I shall refer in more
detail later in this judgment), including, in particular, the need to show
possession of the relevant mining expertise. Further, an absolute assignment
of the benefit of the licences would have involved the right of the Enron
lenders to receive the financial rewards of any successful mining operations. *g*
Again, there is no evidence, and it is inherently unlikely, that that was the
intention of the parties.

[**187**] Clause 3.2 of the debentures must be interpreted against the
background, and in the light of, the other provisions of the security
documents. In the light of the ordinary meaning of cl 4.2 of the debentures
and cl 19.1.6 of the facility agreement, the more natural interpretation of *h*
cl 3.2 is that it created an equitable charge rather than an absolute legal
charge.

[**188**] Finally, it is to be observed that cl 3.1.4 of the debentures, which
expressly creates a floating charge, is expressed to extend to the 'Assets
expressed to be charged by Clauses 3.1.1, 3.1.2 and 3.1.3 or assigned by *i*
Clause 32'. Mr Moss expressed the view that the reason the draftsman
included within cl 3.1.4 the assets already purportedly charged by way of
first fixed charge under cl 3.1.3 must have been to have a failsafe in case,
for any reason, the first fixed charge did not take effect. He expressed the

*a*  opinion that this was not an uncommon feature of debentures. Mr Adkins, for his part, considered that the provision was unusual, and exemplified the poor standard of drafting.

[189] I agree with Mr Adkins that the inclusion, in cl 3.1.4, of the assets already purportedly subject to a first fixed charge under cl 3.1.3, and subject to the assignment provisions of cl 3.2, is poor drafting. If Mr Moss

*b*  is correct about the intention of the draftsman, that intention was not expressed, and certainly not clearly expressed, in the wording of cl 3.1.4. Such confusing and unsatisfactory drafting lends weight to the doubt that the draftsman really appreciated the legal consequences of the inter-relationship between cll 3.1.3, 3.2 and 4.2 of the debentures in the context of the distinction between fixed charges and floating charges.

*c*  [190] Accordingly, for all those reasons, I conclude that the debentures did not create a fixed charge over the licences or the OGL shares.

[191] In the circumstances, it is not necessary for me to decide an issue between the parties as to whether, if cl 3.1.3(vi) created a first fixed charge, the after-acquired licences were subject to that charge.

*d*
ORDINARY COURSE OF BUSINESS

[192] The parties do not agree on the proper legal interpretation of the expression 'in the ordinary course of its … business' in cl 19.1.6 of the facility agreement.

[193] The extent of the disagreement between the parties, at least in the

*e*  opening positions of Mr Moss and Mr Adkins respectively, was striking.

[194] Reduced to its essence, the primary submission of Mr Moss was that a transaction of one of the Octagon group companies was only in the ordinary course of its business if it was part of the common flow of business done by the company, forming part of the ordinary course of business

*f*  which it carried on, calling for no remark and arising out of no special or particular situation.

[195] The primary submission of Mr Adkins, on the other hand, was that a transaction was carried out in the ordinary course of business of one of the Octagon group companies if the transaction was not fraudulent, was within the ambit of the memorandum of association of the company, and

*g*  was not calculated to bring the business of the company to an end.

[196] I was referred to numerous English, Australian and New Zealand authorities on this aspect. Some of the English authorities cited were from the very early period of the development of the jurisprudence concerning floating charges in the latter part of the 19th century. In those, and in other cases, the facts under consideration were so different from those with which

*h*  I am concerned, and the statements of principle about, for example, the jurisprudential nature of a floating charge, were expressed in such loose and general terms, that they are of little, if any, assistance in relation to the proper meaning and effect of cl 19.1.6 of the facility agreement. It must always be borne in mind that the court is engaged in the present case on the proper interpretation of a particular phrase in a written document, forming

*i*  part of a group of associated documents for the purpose of a particular business.

[197] Mr Moss' primary submission was derived from the language of the New Zealand Court of Appeal in *Julius Harper Ltd v F W Hagedorn & Sons Ltd* [1991] 1 NZLR 530. The issue in that case was whether two

assignments of goods by Harper to the defendant, a related company, were
in contravention of a debenture given by Harper to the National Bank of
New Zealand Ltd – which created a floating charge over certain of Harper's
assets, with a provision that Harper was not to be at liberty to sell or
dispose of such property or assets covered by the floating charge 'except in
the ordinary course of carrying on its business' – or were fraudulent
conveyances under s 60 of the Property Law Act 1952 as an alienation with
intent to defraud creditors.

[**198**] Mr Moss relied particularly upon the following passage in the
judgment of Somers J, giving the judgment of the Court of Appeal ([1991]
1 NZLR 530 at 543):

'In referring to a provision in a bankruptcy act having reference to a
purchase 'in good faith and for valuable consideration and in the
ordinary course of business' Rich J in *Downs Distributing Co Pty Ltd v
Associated Blue Star Stores Pty Ltd* (1948) 76 CLR 463, at p 477 said
of the last requirement:

"… it does suppose that according to the ordinary and common flow
of transactions in affairs of business there is a course, an ordinary
course. It means that the transaction must fall into place as part of the
undistinguished common flow of business done, that it should form
part of the ordinary course of business as carried on, calling for no
remark and arising out of no special or particular situation."

That in our view is the usual meaning of the words "ordinary course
of business"; in this case it is to be applied to the particular business of
Harper by reason of the use of the words "carrying on its business".'

[**199**] Mr Adkins relied upon some of the early English authorities
including, in particular, *Re Borax Co* [1901] 1 Ch 326. The material facts
in that case were that Borax Co Ltd (Borax) issued debentures which
created a floating charge on the undertaking of the company. Borax sold the
whole of its property and assets, including the goodwill, with the exception
of certain securities, to a new company formed for the purpose of acquiring
and working the old company's business and similar undertakings, and
Borax agreed not to carry on any similar business otherwise than in
conjunction with and for the benefit of the new company. One of the
debenture holders brought proceedings against Borax claiming that the
charge created by the debentures had, by virtue of the sale, immediately
attached to the relevant assets. The Court of Appeal held that the plaintiffs
claim failed. Mr Adkins relied upon the following passage in the judgment
of Lord Alverstone CJ ([1901] 1 Ch 326 at 337–338):

'In my opinion, in order to enable the debenture-holder to insist on
payment of his debentures in such a case as this he must shew, either
that the act complained of is ultra vires, or that, to use the language of
Lord Macnaghten, 'the undertaking has ceased to be a going concern,'
or that the terms of the debenture which he holds give him the express
right to veto or negative the operations which the company are
proposing to carry out within their powers.

In my opinion, the facts in this case do not support any of the above
positions. There is nothing in the debenture to prevent the company
from carrying out this particular operation, if it is, as I hold it to be,
within the memorandum of association; and in my opinion Farwell J.

*a*      ought to have declined to give the plaintiff and the dissenting debenture-holders he represents any special rights in respect of the 16,800l. brought into court, and ought to have treated them as having the same rights as the debenture-holders who had assented.'

*b*    [200] Mr Adkins also relied upon the following passage in the judgment of Rigby LJ ([1901] 1 Ch 326 at 338):

      'In this case North J., on an interlocutory motion, granted, on March 21, 1899, an injunction until the hearing, restraining the defendants from carrying out a sale of all their assets to the defendants De Friese and Borax Consolidated, Ltd, without first making due provision for *c*      the payment of the debenture-holders whose assent to such transfer had not been obtained.
      No previous authority is cited for such a finding when, as in the present case, the company is only doing what is plainly authorized by the memorandum of association, and a substantial and independent business has throughout remained to be carried on.'

*d*    [201] In my judgment, the opening position of each side, as I have described them, is too extreme.
    [202] The proper starting point is that the words in the expression 'ordinary course of its … business' are ordinary words of the English language which must be given the meaning which ordinary business people *e*  in the position of the parties to the facility agreement and the debentures would be expected to give them against the factual and commercial background in which those documents were made. Mr Adkins' approach would accord little, if any, weight to the word 'ordinary.'
    [203] On the other hand, such businessmen would not be likely to take so narrow a view of 'ordinary course of business' that it would not embrace a *f*  transaction for the preservation and continuance of a company's business, merely because it was not a transaction that had ever been carried out before.
    [204] The weight of authority supports that intuitive interpretation of the expression 'ordinary course of its … business' in cl 19.1.6.
    [205] In *Reynolds Bros (Motors) Pty Ltd v Esanda Ltd* (1983) 8 ACLR *g*  422, the Court of Appeal of New South Wales considered whether an unusual trading transaction by the company was contrary to an equitable mortgage and floating charge which it had given to a bank. In the course of his judgment Mahoney JA said (at 428):

      'The principle by reference to which it is to be determined whether a *h*      subsequently created interest is held free of a floating charge is clear. The reason why the charge is not fixed but floating is that, if it were fixed, the company could not, in a practical sense, continue to carry on business: subsequent interests created by it in the course of its business might be held to be subject to the prior equitable charge. Therefore, for example, where it is provided that the charge is a floating charge, or *i*      where the intention that it be such appears from the terms of the charge: *United Builders Pty Ltd v Mutual Acceptance Ltd* (1980) 144 CLR 673 at 681–2, 686; or where it is the intention of the parties that the company continue to deal with the charged asset as part of a continuing business: *Illingworth v Houldsworth* [1904] AC 355; the

company will be entitled, while the charge continues to float, to deal       *a*
with such assets free of it. The test conventionally adopted for
determining whether what the company has done is within this
principle is: was it done by the company in the ordinary course of
business? Mr Grieve, for the bank, submitted that the transaction of
8 September 1982, was not such.

The transaction was, as Mr Grieve submitted, an extraordinary one.       *b*
But, within this principle, "ordinary" is not to be confined to what is in
fact ordinarily done in the course of the particular business of the
company. Transactions will be within this principle, even though they
be, in relation to the company, exceptional or unprecedented. Thus, in
*Willmott v London Celluloid Co* (1886) 34 Ch D 147, a fire had       *c*
destroyed most of the company's business and the insurance moneys
were taken by the directors on a garnishee in respect of debts due to
them personally: it was held that they took them free of the equitable
charge. In the *Borax Company* litigation [1901] 1 Ch 326, the company
joined with other companies in selling the whole of its assets (excluding
certain of its securities) for shares in a new holding company. The Court       *d*
of Appeal accepted the finding that, in holding shares in the holding
company, the company did not "cease to be a going concern": at 337,
339; cf at 342. And in *Re HH Vivian & Co Ltd* [1900] 2 Ch 654, a
company having three businesses, or branches of a business, sold one: it
was held to pass free of the charge.'

                                                                          *e*

[**206**] As Mahoney JA observed in that passage, *Borax* is, indeed, English
Court of Appeal authority that a transaction may be in the ordinary course
of business even if it is exceptional or unprecedented.

[**207**] In *Julius Harper* the New Zealand Court of Appeal distinguished
those observations of Mahoney JA in *Reynolds Bros* on the basis that the       *f*
relevant clause in *Julius Harper* referred to the 'ordinary course of *its*
business', that is to say Harper's business (see [1991] 1 NZLR 530 at 543
cited above). I cannot agree with the proposition that the principle stated by
Mahoney JA in *Reynolds Bros* can be distinguished on such a technical and
narrow basis. It would introduce a fundamental distinction between the
case of a floating charge which, by virtue of the nature of the charge, does       *g*
not preclude disposals in the ordinary course of a company's business, and
a floating charge in which there is an express written exception for
disposals 'in the ordinary course of its business.'

[**208**] Many of the cases, describing the effect of a floating charge, where
the documentation does not contain any such express exception, refer to
disposals of the property of the company while carrying on 'its' business in       *h*
the ordinary course: see, for example, *Re Florence Land and Public
Works Co, ex p Moor* (1878) 10 Ch 530 at 541 (Jessel MR); *Re Hamilton's
Windsor Ironworks Co* (1879) 12 Ch 707 at 712 (Malins V-C). In *Driver v
Broad* [1893] 1 QB 744, the Court of Appeal considered the nature and
effect of a debenture which created a floating charge and contained an       *i*
express provision that the company should be at liberty to dispose of the
charged property 'in the ordinary course of its business'. Kay LJ thought
there was no distinction between a debenture containing such an express
provision and one which did not. He said ([1893] 1 QB 744 at 748–749):

*a*      'It was urged that this was a "floating" security. That term only
expresses what is more fully expressed in the conditions indorsed on the
debentures, viz., that the company shall, notwithstanding the
debentures, be at liberty to carry on its business, and in the ordinary
course of such business to dispose of the property, as if the debentures
did not exist. That is the ordinary meaning of the term "floating
*b*      security." It does not mean that there is not to be a charge, and an
immediate charge, on the property, but merely that, notwithstanding the
existence of the charge on all the property, including the real property,
of the company, power is reserved to dispose of the property if in the
ordinary course of carrying on the company's business it becomes
necessary to do so. The charge is none the less a charge because such a
*c*      power is reserved. In the case of *In re Florence Land, &c., Co., ex parte
Moor*, already referred to by the Master of the Rolls, I observe that
Jessel, M.R., said, with regard to this kind of security, that it was
intended to be "a security on the property of the company as a going
concern, subject to the powers of the directors to dispose of the
property of the company while carrying on its business in the ordinary
*d*      course".'

[209] In *Torzillu Pty Ltd v Brynac Pty Ltd* (1983) 8 ACLR 52
Helsham CJ in Eq, sitting in the Equity Division of the Supreme Court of
New South Wales, considered whether a particular disposal of property by
a company subject to a floating charge under a debenture fell within an
*e*      express exception for dealings with assets 'in the ordinary course of
business'. Helsham CJ said (at 53):

'I can imagine circumstances in which the severance of the part of a
business might be considered necessary for the orderly conduct of a
business for its reconstruction, for its survival. Such may, in particular
*f*      facts, amount to a dispersal of assets which could be said to be in the
ordinary course of business. It may be that even a transmogrification of
the owner of the business into a new entity may involve dealing with
the assets of a business in a way that could be regarded as not affecting
the operations carried on otherwise than in the ordinary course of
business. But I cannot see that a plan made between the proprietor and
*g*      one other interested party to dissemble the various aspects that go to
make up the entity of a business in order to bring it to an end in a way
best calculated to serve those who have an interest in its assets can be
labelled in its execution as dealing with those aspects in the ordinary
course of business. It was put that the dealing with assets in the
*h*      ordinary course of bringing a business to an end can be characterised as
being in the ordinary course of business. I am not persuaded that this
could be so but it is not necessary to decide that here.'

[210] The distinction made by Helsham CJ between an exceptional
transaction necessary for the survival of a business, and a transaction
intended to bring the business to an end is one generally recognised in
*i*      relation to the operation of a floating charge: see, for example, *Fire Nymph
Products Ltd v Heating Centre Pty Ltd* (1992) 7 ACSR 365; Lightman and
Moss on the *Law of Receivers and Administrators of Companies* (2000 ed.)
para 3–011.

[211] On the other hand, I do not accept Mr Adkins' submission that *Re*

*Borax Co* [1901] 1 Ch 326 is binding English authority that any transaction   *a*
is to be regarded as in the ordinary course of a company's business, for the
purpose of the implied or an express exception from the prohibition against
disposals under a floating charge, merely because it is not fraudulent, is
within the company's memorandum, and is not with a view to the
termination of the business of the company. In that case, Vaughan
Williams LJ expressed himself as follows, on this aspect ([1901] 1 Ch 326 at   *b*
342):

> 'The difficulty of the plaintiff is that it cannot be denied that generally
> it is true to say that a debenture-holder who takes a floating charge on
> the undertaking and property of a company cannot complain of
> anything which is done by the company intra vires *and* in the ordinary   *c*
> course of business; and Farwell J, following North J, has, in effect, held
> that the sale or amalgamation agreement of the company with De Friese
> was intra vires *and* in ordinary course of business, because he has held
> that, notwithstanding the sale, the company has not ceased to carry on
> business. This decision may be right or may be wrong, but it cannot be
> discussed because there is no appeal by the plaintiff against it.' (My   *d*
> emphasis.)

[**212**] Many of the cases were reviewed by the Privy Council in
*Countrywide Banking Corp Ltd v Dean* [1998] 1 BCLC 306, [1998] AC
338. That case concerned the issue whether a transaction by Countrywide   *e*
Banking Corp Ltd (Countrywide) should be set aside, following its
liquidation, on the basis that it was a preference within the Companies
Act 1955 (of New Zealand), ss 266–270. The applicant applied to the High
Court of New Zealand under s 268(2) for an order that the transaction
should not be set aside on the ground that it had taken place in the ordinary
course of business. Gault J, giving the judgment of the Privy Council,   *f*
emphasised the diversity of contexts in which the courts had given
consideration to 'the ordinary course of business'. Some, for example, were
in relation to statutory provisions concerning fraudulent preference and
personal and corporate insolvency; others concerned the disposal of assets
subject to a floating charge.
[**213**] In the latter context Gault J referred to *Reynolds Bros*, *Julius*   *g*
*Harper*, *Downs* (cited in both *Reynolds* and *Julius Harper*), and *Re Modern*
*Terrazzo Ltd* [1998] 1 NZLR 160.
[**214**] Following his review of the authorities, Gault J said [1998] 1 BCLC
306 at 315, [1998] AC 338 at 349:

> 'There are difficulties in drawing upon formulations in different   *h*
> words of statutory tests and treating them as applicable in all
> circumstances. Such difficulties are increased where those formulations
> originate in different legal or factual contexts. This is particularly so
> where the test is essentially one of fact in any event. For these reasons,
> as presently informed by the argument in this case, their Lordships do   *i*
> not adopt any particular formulation. Nor is it necessary for this case to
> make any comprehensive statement, suitable for all cases, of the criteria
> for determining when a transaction is to be held to have taken place in

*a*   the ordinary course of business for the purpose of s 266 and the
corresponding section in the [Companies Act 1993].'

[**215**] Those observations of Gault J provide further support for the
conclusion that the restrictive approach of the New Zealand Court of
Appeal in *Julius Harper* that an unprecedented or exceptional transaction
*b*   could never properly fall within an express exclusion, from a floating
charge, of transactions in the ordinary course of the company's business –
based as it was upon a statement by Rich J in *Downs*, a case concerning
statutory provisions relating to wrongful preference in the context of
liquidation, was erroneous.

*c*   [**216**] Although the Privy Council in *Countrywide Banking* declined to
adopt any particular formulation, or comprehensive statement, suitable for
all cases, of the criteria for determining when a transaction is to be held to
have taken place in the ordinary course of business, some general
observations of the Privy Council, albeit made in the specific context of
s 266 of the New Zealand Companies Act 1955, may appropriately be
*d*   viewed as having a wider application, extending to transactions in the
ordinary course of a company's business in the context of a floating charge.
In particular, Gault J commented that the transaction must be examined in
the actual setting in which it took place, which defines the circumstances in
which it is to be determined whether it was in the ordinary course of
business. He further observed that the determination is to be made
*e*   objectively by reference to the standard of what amounts to the ordinary
course of business. It must be such that it would be viewed by an objective
observer as having taken place in the ordinary course of business: see
[1998] 1 BCLC 306 at 316, [1998] AC 338 at 349.

[**217**] Reference was made by both sides to *Willmott v London
Celluloid Co* (1886) 34 Ch D 147. The facts of the case were that two
*f*   directors of the company loaned it money from time to time. The company's
premises were burnt down, and an insurance company admitted liability to
pay in respect of the damage. The directors brought proceedings against the
company for the money they had loaned, and, pursuant to board
resolutions which they had passed that the company should instruct
solicitors to consent on behalf of the company to immediate judgment, they
*g*   obtained immediate judgment by consent. The directors then obtained a
sum of money from the insurance company under garnishee orders, and
applied it in part payment of the debts due to themselves from the company.
The company was at that time practically insolvent. Following the making
of a winding-up order against the company, the proceedings were brought
*h*   by the holder of a debenture issued by the company, on behalf of himself
and the holders of other debentures issued by the company, each of which
created a floating security, for repayment of the sum recovered by the
directors from the insurance company and other relief. The debentures
expressly provided that the company might 'in the course of its business'
deal with the property charged in such manner as the company might think
*i*   fit. A claim based on fraudulent preference under Companies Act 1962,
s 164 was dismissed at first instance by Bacon V-C. The Court of Appeal
held that the decision of the Vice-Chancellor on the question of fraudulent
preference was correct; and, secondly, that the payment to the directors was
a dealing by the company in the course of business within the debentures;

*a*

and, accordingly, the appeal was dismissed.

[**218**] Mr Moss submitted that the decision in *Willmott* was no longer good authority, and should not be followed by me. He relied upon the decision of the Court of Appeal in *West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250. The facts in that case were that West Mercia Safetywear Ltd (West Mercia) was a wholly owned subsidiary of A J Dodd & Co Ltd (Dodd). The respondent was a director of both companies. Both companies banked with the same bank. Dodd's overdraft at the bank was personally guaranteed by the respondent. In May 1984 West Mercia owed Dodd about £30,000. At that time both companies were in financial difficulties. The respondent transferred £4,000 from the West Mercia account to the Dodd account. Shortly afterwards both companies went into liquidation. The liquidator of West Mercia applied for a declaration that the respondent was guilty of misfeasance and breach of trust and that he be ordered to repay the £4,000 transferred from West Mercia to Dodd. The Court of Appeal granted the relief sought by the liquidator. Dillon LJ, with whom the other members of the Court of Appeal agreed, said ([1988] BCLC 250 at 252–253):

*b*

*c*

*d*

> 'We have been referred to quite a number of authorities on this topic. For my part I find helpful, and would approve, the statement of Street CJ in *Kinsela v Russell Kinsela Pty Ltd* (*in liq*) (1986) 4 NSWLR 722 at 730, where he said:
>    "In a solvent company the proprietary interests of the shareholders entitle them as a general body to be regarded as the company when questions of the duty of directors arise. If, as a general body, they authorise or ratify a particular action of the directors, there can be no challenge to the validity of what the directors have done. But where a company is insolvent the interests of the creditors intrude. They become prospectively entitled, through the mechanism of liquidation, to displace the power of the shareholders and directors to deal with the company's assets. It is in a practical sense their assets and not the shareholders' assets that, through the medium of the company, are under the management of the directors pending either liquidation, return to solvency, or the imposition of some alternative administration."
>    In the present case, therefore, in my judgment Mr Dodd was guilty of breach of duty when, for his own purposes, he caused the £4,000 to be transferred in disregard of the interests of the general creditors of this insolvent company. Therefore the declaration sought in the notice of motion ought to be made as against Mr Dodd.'

*e*

*f*

*g*

*h*

[**219**] *West Mercia* was not a case concerned with the operation and effect of a floating charge either generally, or in the specific context of a transaction in the ordinary course of the company's business.

[**220**] What is clearly established by *Willmott* and other cases, none of which were referred to in *West Mercia*, is that the mere fact that a payment by the company may be a fraudulent or wrongful preference, in the context of a winding up, does not necessarily render the same payment, in the absence of a winding up, a transaction outside the ordinary course of the company's business. This was explained by Cotton LJ in *Willmott* as follows ((1886) 34 Ch D 147 at 149):

*i*

a      'This is an appeal from a decision of Vice-Chancellor *Bacon*. The
       ground on which the case was argued on behalf of the Plaintiff before
       the Vice-Chancellor was that the payment of the insurance moneys to
       the defendants in respect of their claims against the company must be
       treated as a fraudulent preference within the 164th section of the
       *Companies Act*, 1862, which provides that any act relating to property
b      which would in bankruptcy be a fraudulent preference of the creditors
       shall be considered as such in the winding-up of a company, so that
       money recovered under a claim on account of fraudulent preference
       would be recovered for the general creditors as if it had been recovered
       by the trustee in bankruptcy, and that therefore the moneys so paid to
       the defendants must remain subject to the security of the Plaintiff. The
c      Vice-Chancellor held that the section did not apply, and dismissed the
       action so far as it related to this claim. I think he did so rightly, because
       the section is only intended to apply in the case of a winding-up and for
       the benefit of the general creditors. Here the Plaintiff is seeking to
       enforce his claim independently of the winding-up. And in the case of
d      *Ex parte Cooper* ((1875) LR 10 Ch App 510) it was decided that the
       doctrine of fraudulent preference is not to be taken advantage of by a
       mortgagee, but only for the benefit of the whole body of creditors. That
       was a bankruptcy case. The 164th section relates only to a case similar
       in all respects to that which arises in bankruptcy. I think, therefore, that
       the decision of the Vice-Chancellor was right on that point.'

e    [**221**] The same point was made in *Reynolds Bros*. In that case Glass JA
     said ((1983) 8 ACLR 422 at 424):

       'There was also some suggestion in argument that because the
       transaction may have given Esanda a preference over other unsecured
       creditors in the event of a subsequent liquidation, it could not be within
f      the course of the dealer's business. This would appear to be an
       irrelevant consideration. In *Re Quality Camera Co Pty Ltd* [1965]
       NSWR 1330 McLelland J held that although payments made by a
       company which had given a floating charge over its assets and later
       became insolvent were void as preferences against the liquidator they
g      nevertheless fell within the licence of the mortgagor and were valid
       against the receiver.'

     [**222**] Priestley JA said ((1983) 8 ACLR 422 at 430–431):

       'The appellant's argument that the objective observer could see that at
       the time the challenged transaction took place the business was bound
h      soon to come to an end does not require the conclusion that the
       transaction was not in the ordinary course of business but rather the
       opposite. This point was made by Lord Blackburn in a bankruptcy case:
       *Tomkins v Saffery* (1877) LR 3 App Cas 213 at 235.
         "Now I think you must say that it is not with a view to give an undue
       preference, if a man makes a payment to a creditor in the ordinary
i      course of business. Supposing a bankrupt, although knowing that he is
       very likely to stop payment next week, struggles on and makes a
       payment without being particularly asked; supposing he pays his debts
       and sends his money to meet his bills on those days on which they
       become due, and does other things so as to keep himself alive and in

good credit for the time; that would not have been undue preference I think, because those payments were not made 'in favour of' certain creditors as against others, but were made in the hope – a desperate hope perhaps – that if he were able to keep himself alive something might turn up in his favour. Nor do I think it would be an undue or fraudulent preference if there was a demand upon him, and a yielding to that demand, by making a payment which might not otherwise have been made so soon."

Everything mentioned by Lord Blackburn in that paragraph was regarded by him as being "in the ordinary course" of the trader's business.'

[**223**] The principle was reiterated by Millett J in *Re MC Bacon Ltd* (*No 2*) [1990] BCLC 607, [1991] Ch 127. In that case he said ([1990] BCLC 607 at 611–612, [1991] Ch 127 at 137):

'An application to set aside a voidable preference can be made only by a liquidator or administrator and in the absence of a liquidation or administration order cannot be made at all: see s 239(1) of the 1986 Act. It cannot be made by an administrative receiver. This is so provided by the relevant legislation because a payment or other transaction in the course of business binds the debenture holder even if its effect is to prefer another creditor: see *Willmott v London Celluloid Co* (1886) 34 Ch D 147. Cotton LJ pointed out that the preference section, then s 164 of the Companies Act 1862, was "only intended to apply in the case of a winding-up and for the benefit of the general creditors" (at 150). It was thus established long before 1986 that any sum recovered from a creditor who has been wrongly preferred enures for the benefit of the general body of creditors, not for the benefit of the company or the holder of a floating charge. It does not become part of the company's assets but is received by the liquidator impressed with a trust in favour of those creditors amongst whom he has to distribute the assets of the company: see *Re Yagerphone Ltd* [1935] Ch 392, [1935] All ER Rep 803. The actual ratio in that case was that the payment of a debt due to an unsecured creditor prior to the crystallisation of the floating charge bound the debenture holder. The liquidator submits that the last paragraph of Bennett J's judgment in which he stated that the money received by the liquidators was impressed in their hands with a trust for the general body of creditors was obiter and wrong. The passage in question may strictly have been obiter but in my judgment it follows logically from the ratio and I agree with it.

...

It follows, in my judgment, that a claim to set aside a voidable preference is not a claim to realise or get in any asset of the company. That must be so whether the preference took the form of the payment of a debt or the grant of a security. The only difference is that in the latter case the claim wears a greater semblance of being a claim to get in the assets of the company because the assets comprised in the security belong to the company. But in truth the claim is not to get in the assets comprised in the security but to set aside the security.'

[**224**] It is to be remembered, in this context, that it is well settled law

*a* that, apart from the principles applicable on insolvency, a person may pay his debts in any order: *Re Sarflax Ltd* [1979] 1 All ER 529 at 538 and 545, [1979] Ch 592 at 603 and 612.

[**225**] This is not to say that the principle in *West Mercia* is of no relevance in the context of deciding whether a transaction by a company is in the ordinary course of its business for the purposes of a floating charge.

*b* If a transaction is carried out at a time when it is insolvent, in breach of the directors' fiduciary duties, that may be a factor, possibly an important one, in concluding that, in all the circumstances, the transaction was precluded by the charge.

[**226**] So far as concerns the decision in *Willmott* on the facts of that case, it is not necessary to consider whether it would be decided in the same way

*c* to-day. As was pointed out in *Julius Harper*, a possibly significant feature of *Willmott* was that the express terms of the debentures in that case provided that the company might deal with the property charged 'in the course of its business'. The omission of the word 'ordinary', which is usually to be found in express provisions in a floating charge, and is present in cl 19.1.6 of the

*d* facility agreement, and is the qualification that applies by implication in the absence of an express provision for dealing by the company notwithstanding the floating charge, is a material distinction.

[**227**] With the same caution, and for the same reasons, as were mentioned by the Privy Council in *Countrywide Banking*, I do not propose to attempt any particular formulation of the test for determining whether a

*e* transaction falls within the ordinary course of a company's business for the purpose of a floating charge, or to make any comprehensive statement of the criteria for determining when a transaction is to be held to have taken place in the ordinary course of business for that purpose. On the other hand, it may be helpful to summarise briefly the following conclusions that I have reached from the decided cases that I have reviewed: (1) The question

*f* whether a particular transaction is within the ordinary course of a company's business in the context of a floating charge is a mixed question of fact and law; (2) it is convenient to approach the matter in a two stage process; (3) first, to ascertain, as a matter of fact, whether an objective observer, with knowledge of the company, its memorandum of association and its business, would view the transaction as having taken place in the

*g* ordinary course of its business, and, if so (4) second, to consider whether, on the proper interpretation of the document creating the floating charge, applying standard techniques of interpretation, the parties none the less did not intend that the transaction should be regarded as being in the ordinary course of the company's business for the purpose of the charge; (5) subject

*h* to any such special considerations resulting from the proper interpretation of the charge document, there is no reason why an unprecedented or exceptional transaction cannot, in appropriate circumstances, be regarded as in the ordinary course of the company's business; (6) subject to any such special considerations, the mere fact that a transaction would, in a liquidation, be liable to be avoided as a fraudulent or otherwise wrongful

*i* preference of one creditor over others, does not, of itself, necessarily preclude the transaction from being in the ordinary course of the company's business; (7) nor does the mere fact that a transaction was made in breach of fiduciary duty by one or more directors of the company; (8) such matters in (6) and (7) may, however, where appropriate and in all the circumstances,

be among the factors leading to the conclusion that the transaction was not *a*
in the ordinary course of the company's business; (9) transactions which are
intended to bring to an end, or have the effect of bringing to an end, the
company's business are not transactions in the ordinary course of its
business.

*b*

TRANSFER TO CABOT OF 41% OF PEDLS 11 AND 12

[**228**] The commercial rationale for the transaction with Quality Drilling
UK and Cabot, pursuant to the drilling agreement and the 41% transfer
agreement, is conveniently summarised in the following evidence of
Mr Garratt in cross-examination:                                          *c*

  '… if you consider what happened with 11 and 12: at the 31st March,
  at that point in time we were going to lose both licences. We were
  actually going to lose our very best licences and where all the major
  value of the company was situated. We could not find anybody to fund
  it, if you like, except for Quality Drilling and Cabot Energy.
    Now, that frankly was very beneficial for us, and by doing that, we  *d*
  preserved our assets. Enron were very pleased that we did that. If we
  did not do that, then we would have lost basically our major asset and
  we really would have had a problem. Now the fact is we entered into a
  joint venture, that joint venture at the time was the fact that for
  £250,000, if we paid £250,000 by 31st December 2002 we would have
  kept 100% of the licences. The fact is that we were not able to pay    *e*
  because we were not funded by 31st December 2002.
    However, we had every expectation that we would be funded and that
  we would not have to, if you like, release the 41% to Cabot which is
  also why we had a significant time period. It was during this time
  period that we had an offer from Scottish and Southern which finally   *f*
  unfortunately collapsed.'

(Transcript 24 May 2004 pp 177–178).

[**229**] In short, the defendants' case is that PEDL 11 and PEDL 12 were at
risk of being lost unless certain work, required by the licences, was carried
out; that work involved drilling operations on the land to which PEDLs 11  *g*
and 12 related; the Octagon group companies did not have the money to
procure the drilling operations to be carried out pursuant to conventional
arrangements with conventional drilling operators, since they had not been
put in funds by Enron; and the arrangements with Quality Drilling UK and
Cabot enabled the work to be carried out, with a deferral of a fixed or
'turnkey' price of £250,000 for a period of time within which, it was    *h*
anticipated, re-financing of the Octagon group companies would be
negotiated and agreed.

[**230**] The work specified in the drilling agreement was in due course
executed. OCL did not, however, pay the £250,000 due under the drilling
agreement. Accordingly, deeds of assignment dated 27 March 2003,
transferring to Cabot a 41% interest in PEDL 11 and PEDL 12 respectively, *i*
were in due course executed. Applications were sent by Mr Garratt to the
DTI for consent to those assignments under cover of a letter dated 1 August
2003. That letter was, apparently, not received by the DTI until 28 August
2003, which was after the date of the appointment of the receivers and the

a  sale to Greenpark. By reason of those intervening events, the DTI refused to
process the applications for consent.

[231] In my judgment, aspects of the drilling agreement, the 41% transfer
agreement and the subsequent consent applications to the DTI for
registration, taken separately or together, are so unusual that the transfer of
the 41% interest in PEDLs 11 and 12 cannot be described as disposals in
b  the ordinary course of OCL's business within cl 19.1.6 of the facility
agreement.

[232] Both the passage in Mr Garratt's cross-examination, which I have
cited above, and para 61 of his witness statement refer to the need for a
well to be drilled on PEDL 11 and PEDL 12 in order to keep those licences.
It appears from Mr Garratt's evidence that the critical date was 31 March
c  2002. The drilling agreement, however, was not executed until 12 April
2002. It was recorded in minutes of a meeting of the directors of OEL on
25 April 2002 that, in relation to PEDL 11, the fact that gas was already
being produced 'has been accepted for ongoing extension and we now have
no need to separately drill'. The same minutes recorded, in respect of PEDL
d  12, that 'we did have a drill rig on site by 31 March, and have been granted
a second term'. To my mind, the evidence, both written and oral, never
clearly explained the inter-relationship between the need to carry out work
on or before 31 March 2002, the agreement of the DTI to extensions of
PEDL 11 and PEDL 12 recorded in the minutes of the meeting of OEL on
25 April 2002, and the urgent need to enter into the drilling agreement on
e  12 April 2002.

[233] It was that urgency and that commercial necessity which are relied
upon by the defendants as justification for entering into a transaction
which, on the face of it, is very surprising.

[234] The drilling agreement was with Quality Drilling UK. Quality
Drilling UK had an issued share capital of £100. It had no assets of any
f  significance. Quality Drilling UK had hired the drilling rig and the
equipment from Cabot pursuant to an agreement dated 14 December 2000.
Cabot was a Liberian company with a Swiss PO Box address, the assets of
which were unknown. Mr Garratt confirmed in his oral evidence that the
41% transfer agreement and the drilling agreement were known to him to
be all part of the same transaction.
g  [235] On the basis of the OCL directors' statement of affairs, sworn by
them following the appointment of the receivers, 41% of PEDLs 11 and 12
had an estimated realisation value on 26 August 2003 in excess of £6m. A
default position, under which Cabot would receive an interest of that value,
in the event of non-payment of £250,000, is certainly surprising.

h  [236] Those features of the transaction, surprising and extraordinary as
they appear, could be commercially justified if, as is the defendants' case, it
was imperative to enter into the drilling agreement in order to save PEDLs
11 and 12, and there was no practical alternative.

[237] It is true to say, in favour of the defendants, that the evidence is that
the Octagon group companies were in financial difficulties at that time.
i  There is a factual dispute between the parties as to whether the Octagon
group companies were offered by Enron an advance of £135,000 in
February 2002, and, if so, on terms which the Octagon group companies
might reasonably be expected to have accepted rather than enter into the
drilling agreement. Mr Garratt's evidence was that there was never any firm

offer for an advance of £135,000 at that time, and, in any event, that *a* amount would not have been sufficient to pay for the necessary drilling works. For the purpose of the present analysis, I am prepared to assume in favour of the Octagon group companies and Mr Garratt on that issue.

[**238**] Further, Mr Roscoe explained the commercial basis for the drilling agreement and the 41% transfer agreement, from Cabot's perspective. He explained that Cabot had, for a limited period of time (prior to 30 January *b* 2001), held an interest in Quality Drilling's parent company, Quality Drilling Ltd (Quality Drilling) and had provided funds for that company. The £250,000 'turnkey' price was commercially attractive since it would enable Cabot to recoup some of the costs of funding Quality Drilling. His evidence was that the 41% interest in PEDLs 11 and 12, in default of *c* payment of the £250,000, was in the nature of a 'poison pill'. He understood that Mr Garratt was seeking finance, and he was looking forward to getting the £250,000. He explained that the reason for taking a default interest in PEDL 11, which, according to the minutes of the meeting of the directors of OEL on 25 April 2002, there was no longer any need separately to drill, was because PEDL 11 was producing an income, *d* whereas it would have been necessary to spend even more money on PEDL 12 in order to obtain an income from it. Mr Roscoe further explained that he asked for a 51% interest, but, following negotiations, agreement was struck at 41%. He explained the rationale behind his negotiations over the percentage as being that he was taking a risk of a mining problem within the area or some other reason why it was not possible to take out gas. It *e* was not, however, foremost in his mind that he would ever obtain 41% of PEDLs 11 and 12. What he sought was a guarantee in case the £250,000 was not paid.

[**239**] Mr Roscoe also explained, in his oral evidence, the basis for the provisions of cl 3.4 of the 41% transfer agreement, under which Cabot was to pay £120,000 to Quality Drilling UK for the purchase and assignment of *f* the drilling agreement, but only £75,000 of which was to be paid in cash. Clause 3.4 provided that, of the balance, £45,000 was to be treated as having been paid: £20,000 on 22 January 2001 or thereabouts and £25,000 on 18 February 2002 or thereabouts. Mr Roscoe explained, in his oral evidence, that those payments, which were treated as having been made even before the date of the 41% transfer agreement, were intended to be by *g* way of repayment of the funding or part of the funding by Cabot of Quality Drilling.

[**240**] It was also pointed out, on behalf of the defendants, that, in addition to the payment of £120,000 by Cabot, cl 3.5 of the 41% transfer agreement provided for the waiver by Cabot of all hire and associated *h* charges for the hire of the drilling rig since 13 December 2002. I was not told, however, the total value of the amount so waived.

[**241**] Further, it can be said, in favour of the defendants' case, that, although Cabot was a Liberian company the assets of which were unknown to the directors of the Octagon group companies, Cabot had been involved with the Octagon group companies since 1997 when, in consideration of *i* loans made by Cabot to OGL, OEL agreed that half the shares in OGL should be allotted to Cabot.

[**242**] Notwithstanding the evidence given by Mr Garratt, Mr Roscoe and the other witnesses for the defendants as to the commercial rationale of the

*a*  drilling agreement, the following features, in my judgment, preclude any reasonable depiction of the transaction, and the associated 41% transfer agreement, as being transactions in the ordinary course of OCL's business within cl 19.1.6 of the facility agreement.

[**243**] The persons controlling Quality Drilling UK at the time of the drilling agreement were Mr Martyn Bacon and Mr Gary Wells. They were *b*  the directors of Quality Drilling. They were also the directors of Quality Drilling UK, and Mr Bacon was the company secretary. The evidence is that Mr Bacon negotiated the price of the drilling agreement, on behalf of Quality Drilling UK. Mr Bacon was also, however, a consultant to the Octagon group companies. There is no evidence that OCL ever consulted any other person or expert in connection with the terms of the drilling *c*  agreement. At least one of the directors, Mr Gravelius, who was present at the meeting on 25 April 2002 of the directors of OEL, was unaware that Mr Bacon was a director of Quality Drilling UK.

[**244**] Mr Garratt said, in cross-examination, that he helped to draft the drilling agreement, and provided most, or at any event a great deal, of the *d*  material for the 41% transfer agreement. The essence of that agreement was that Cabot would be entitled to receive the £250,000 payable by OCL under the drilling agreement or, in default, the 41% interest in PEDLs 11 and 12. The consideration payable by Cabot to Quality Drilling UK was £120,000, of which only £75,000 was to be paid in cash. The involvement of Cabot as the ultimate recipient of the benefit of the drilling agreement *e*  was not, however, recorded in the minutes of the meeting of the board of directors of OCL on 12 April 2002 and of OEL on 25 April 2002. Mr Gravelius was present at both meetings. It is clear, from his evidence in cross-examination, that he was unaware that Cabot was involved in the transaction at that stage. Indeed, it would appear that he was unaware of the involvement of Cabot, as the recipient of the benefit of the drilling *f*  agreement, even as late as 21 March 2003, when, according to the minutes of the meeting of the board of directors of OEL on that day, the directors discussed a request for assignment of the 41% interest in PEDLs 11 and 12 by 'the drilling company', pursuant to the drilling agreement. It appears, from Mr Whately's evidence in cross-examination, that he was similarly ignorant of Cabot's rights pursuant to the drilling agreement and the 41% *g*  transfer agreement.

[**245**] Mr Garratt's concealment from the directors of OCL and OEL of the 41% transfer agreement, and the role of Cabot in the transaction, was matched by a similar obfuscation by Mr Garratt in his dealings with Enron at the time.

*h*  [**246**] On 15 February 2002 Mr Marsden spoke to Mr Garratt on the telephone. In a contemporaneous written note of that telephone conversation Mr Marsden recorded as follows, in connection with this part of the conversation:

'He told me that he had had to resort to selling an interest in the *i*  Hickleton and Nottinghamshire licences in order to get them drilled to keep the licences. When asked who he had done this deal with he said 'a combination of companies' and it was 'rather complicated' and that

he 'didn't have the details with him'. He was extremely evasive (I told him so). This would be in contravention with our agreement as we have security over all assets.'

[**247**] Mr Garratt confirmed, in cross-examination, that he had indeed been evasive.

[**248**] Mr Garratt's evidence, in cross-examination, was that Mr Marsden's contemporaneous attendance note was incorrect in recording that Mr Marsden told Mr Garratt that the sale would be in contravention of the security documents. I have no hesitation in rejecting that evidence of Mr Garratt. Not only is it inherently improbable that Mr Marsden would have mis-recorded such an important matter, but the point was made again in an email sent by Mr Marsden to Mr Garratt on the same day as the telephone conversation. In that email Mr Marsden said:

'I should be grateful if you would provide me with details of the sale of half of your licence interest that you described to me on the telephone this morning as we would need to agree any such sale given our security over the assets.'

[**249**] In an email from Mr Garratt to Mr Marsden on 23 February 2002, Mr Garratt explained the arrangement as follows:

'… As has been notified a joint venture agreement has been entered into to drill a well on the Nottinghamshire licence in order that it does not terminate on 31 March 2002 in accordance with the licence commitments. This only involves the third party drilling the well. We have made no arrangements with any third party concerning provision of cash …'

[**250**] Insofar as that was a reflection of the transaction ultimately recorded in the drilling agreement and 41% transfer agreement, it was highly misleading. It made no disclosure of any kind about the involvement of Cabot, or its entitlement, should the £250,000 turnkey price not be paid, to claim an assignment of 41% of PEDLs 11 and 12.

[**251**] Mr Garratt wrote Mr Marsden a letter dated 21 April 2002 enclosing a copy of the drilling agreement 'as discussed'. He explained in the letter that, if the £250,000 was not paid by 31 December 2002, then 'Quality Drilling Ltd (or its assignee) will be assigned a 41% interest in licences PEDL 11 & PEDL 12.' Not only did Mr Garratt fail to send Mr Marsden a copy of the 41% transfer agreement, which was plainly of importance to Enron, but the letter gave the wholly misleading impression that there had been no transfer of the benefit of the rights of Quality Drilling UK to Cabot, even though the 41% transfer agreement was dated 19 April 2002.

[**252**] I take the view that Mr Garratt deliberately withheld from Mr Marsden details of Cabot's rights under the 41% transfer agreement, even though, on Mr Garratt's own oral evidence, it formed part of a single transaction with the drilling agreement. The most likely explanation for Mr Garratt's deliberate non-disclosure is that he was concerned that Mr Marsden, in the light of his earlier observations in February 2002 to which I have referred, would take the view that the drilling agreement and the 41% transfer agreement or one or other of them would be an

*a* infringement of the rights of the Enron lenders under the security documents.

[**253**] As I have indicated already, the non-disclosure by Mr Garratt to his co-directors of Cabot's involvement in, and rights under, the drilling agreement and the 41% transfer agreement continued beyond the execution of the assignments of 27 March 2003 in favour of Cabot. The minutes of

*b* the meeting of the directors of OEL on 23 April 2003 refer to a request for assignment of the 41% interest in PEDL 11 and PEDL 12 under the drilling agreement. The minutes note that the 41% interest had been assigned 'to a third party', but no express reference was made to Cabot, let alone its involvement from the inception of the transaction. The minutes of a subsequent meeting of the directors of OEL on 6 June 2003 recorded:

*c* 'Further, the drilling company also has a 41% interest in PEDLs 11 and 12.' That, again, was inaccurate and misleading, since the 41% interest had at all relevant times been vested in Cabot and not Quality Drilling UK.

[**254**] The transaction had the following further oddity. As I have already said, the applications for consent to the transfers of the 41% interest were

*d* sent to the DTI under cover of a letter from Mr Garratt dated 1 August 2003. The delay between 27 March 2003 and 1 August 2003 is remarkable. Mr Garratt's explanation, in cross-examination, was that he was very busy at the time. It is to be noted that the minutes of the meeting of the directors of OEL on 23 April 2003, in which it was recorded that there had been a request for assignment of the 41% interest in PEDL 11 and PEDL 12, were

*e* written in language clearly indicating that it was only at that meeting that the directors agreed to the assignment of the 41% interest: 'In accordance with the drilling agreement the board agreed to carry out the assignment of the 41% interest in PEDL 11 and PEDL 12…' The minutes are, accordingly, inconsistent with the due execution of the transfers on the date they bear, namely 27 March 2003. There has been no satisfactory explanation of these

*f* discrepancies, which raise the possibility that the transfers were back-dated, or, alternatively, the transfers were executed without the knowledge of, and prior to the approval of, the directors of OEL and OCL.

[**255**] Mr Moss submitted that a letter from Mr Garratt to Mr Grove of E & P dated 17 June 2003 is further evidence that the transfers dated 27 March 2003 were back dated, or alternatively they were being

*g* concealed. In particular, he relied upon the following passage:

> 'However, as mentioned before, PEDLs 11 and 12 are by far the most important licences and we cannot relinquish any interest in these …'

Bearing in mind the context of the letter of 17 June 2003, and all the

*h* other circumstances, I do not consider that the letter is a secure evidential base for the inference which Mr Moss seeks to draw.

[**256**] The claimants seek to draw the same inference from the evidence that Mr Grove had no knowledge of any interest of Cabot in PEDLs 11 and 12, even though Mr Vallabh acted as Cabot's representative and also authorised Mr Grove's letters and actions on behalf of E & P. Again,

*i* however, unlike the minutes of the meeting of OEL of 23 April 2003, I do not consider those matters to be a secure evidential basis for the inference which the claimants seek to draw.

[**257**] The letter from Mr Garratt, to the DTI dated 1 August 2003, enclosing the application forms for consent to the assignment of a 41%

interest in PEDLs 11 and 12 to Cabot, said the following of Cabot: 'Cabot *a*
Energy Ltd funded and drilled wells including the Dinnington No 1 well on
Octagon's PEDL 12 licence. Under the drilling agreement Cabot Energy Ltd
is entitled to a 41% interest in the licences PEDLs 11 and 12. Cabot
Energy Ltd … has bought a drilling rig for drilling onshore UK.'

[**258**] The two consent applications relating to PEDL 11 and PEDL 12
respectively contained the following statement: 'Cabot Energy Ltd funded *b*
and were responsible for drilling wells on the licences including the
Dinnington No 1 well.'

[**259**] In an earlier letter from the DTI to Mr Garratt dated 24 February
2003 Mr Mike Hawkins, the head of licence administration at the DTI, had
explained the conditions that would need to be met in the case of the licence
assignments in respect of EXL 273, PEDL 10 and the after-acquired *c*
licences, which would have the effect of creating a new single-company
licensee, namely E & P in the case of EXL 273 and PEDL 10, and OGL in
respect of the after-acquired licences. Mr Hawkins stated that the DTI
would need to be satisfied with the assignee's competence, both technical
and financial, to perform the role of operator; and that competence would *d*
have to be in many respects UK-based. Mr Hawkins drew attention to the
information usually required about an assignee described on the DTI's
website, and, in particular, the part describing the assignee's financial
capacity. The DTI would require to be satisfied that the assignee was
solvent and likely to remain so, and it would usually be necessary to require
production of two copies of the latest annual report and accounts, and, if *e*
appropriate, those of the company's ultimate parent.

[**260**] It is possible that the information given by Mr Garratt in the letter
of 1 August 2003 to the DTI concerning Cabot was directed to meeting the
matters highlighted by Mr Hawkins in his letter of 24 February 2003.
Whether that be the case or not, the information which Mr Garratt gave
was misleading and untrue. It gave the clear impression that Cabot was a *f*
drilling company, with drilling experience, and had carried out the drilling
of wells, including the Dinnington No 1 well. The truth was, as Mr Garratt
well knew, Cabot itself had never carried out any drilling of wells and was
not entitled, under the drilling agreement, to which it was not a party, to the
41% interest in PEDLs 11 and 12. Cabot is and was a Liberian corporate
investment vehicle. Mr Garratt was cross-examined on those statements by *g*
him in the letter of 1 August 2003 to the DTI. That part of his oral evidence
proceeded as follows:

'Q. It says Cabot Energy Ltd funded and drilled wells. What other
wells did it fund, Mr Garratt?
A. I cannot remember, it certainly funded and drilled the Dinnington *h*
number one well.
Q. This is just a blatant lie, Mr Garratt, is it not?
A. No, I do not remember the details.
Q. What other wells did it fund?
A. I do not recall.
Q. It is just untrue, is it not? Mr Garratt, this is untrue, is it not? *i*
A. I do not recall, I am sorry, I do not recall precisely what the
situation was.'

[**261**] I regard those answers of Mr Garratt as dissembling and untrue. I

*a*  consider that he knew full well that the statements in his letter to the DTI of 1 August 2003 were misleading and inaccurate.

[262] The defendants claim that, in any event, the Enron lenders, through Andrew Marsden, expressly consented to the drilling agreement.

[263] In para 61 of his witness statement Mr Garratt said that, in a conversation with Mr Marsden in early 2002, he told Mr Marsden that a
*b*  well had to be drilled on PEDL 12 and probably another on PEDL 11 to keep those licences, and that, if Enron did not provide the funding, the licences would have to be farmed out, that is to say a third party would take a substantial interest in them in return for drilling a well. In his witness statement, Mr Garratt's evidence was that:

*c*          'Andrew Marsden said that that was best solution and that Octagon should try to do that because Enron would not provide the funds.'

[264] Mr Marsden gave oral evidence that he did recall telling Mr Garratt that Enron would not be funding the drilling of the well on PEDL 12 and another on PEDL 11 to keep those licences, and that he recalled discussions
*d*  or emails raising concerns about losing the licences if the wells were not drilled. He said he did not recall making any remarks that 'the best solution' was for the licences to be farmed out.

[265] In my judgment, the overwhelming probability is against Mr Marsden having given any consent to, or indication of approval of, a transaction such as the drilling agreement or the 41% transfer agreement.
*e*  The contemporaneous written material to which I have referred is inconsistent with any such consent: in particular, the attendance note made by Mr Marsden of his telephone conversation with Mr Garratt on 15 February 2002 and Mr Marsden's email to Mr Garratt of the same date. Those documents plainly show that, from what Mr Marsden understood of
*f*  the proposed transaction and the terms of the security documents, he considered that it could only proceed with the consent of Enron.

[266] Furthermore, and in any event, it is equally clear from those documents and other evidence to which I have already referred, that Mr Garratt did not disclose full or accurate details of the proposed transaction to Mr Marsden. For that reason, even if, contrary to my
*g*  conclusion, consent of some kind was indicated by Mr Marsden, it would not have operated as an effective consent or waiver of rights in relation to the actual transaction which took place in the form of the drilling agreement and the 41% transfer agreement.

[267] The defendants also rely upon the letter from Mr Garratt to Mr Marsden dated 21 April 2002, which stated that a copy of the drilling
*h*  agreement 'as discussed' was enclosed, and the fact that neither Mr Marsden nor anyone else on behalf of the Enron lenders ever responded with objections to the transaction or challenging what was said in the letter.

[268] Mr Garratt gave oral evidence that 'the fact is that Enron were actually delighted, because if we had not that agreement we would have lost the licences and there could not be anything here today …' (Transcript
*i*  24 May 2004 pp. 15 – 16).

[269] I reject, without hesitation, Mr Garratt's evidence that anyone, on behalf of Enron, expressed delight at the drilling agreement. No such evidence was given in Mr Garratt's witness statement. He did not give any particulars in his oral evidence as to the identity of the person who

expressed any such delight, and when and where. His evidence runs *a*
contrary to the contemporaneous written documentation of Mr Marsden.

[270] Bearing in mind the warnings which Mr Marsden gave Mr Garratt
about the proposed transaction, as he understood it in the light of
Mr Garratt's evasive explanations, and bearing in mind that Mr Garratt had
never fully explained the entire transaction, including the role of Cabot and
Cabot's rights under the 41% transfer agreement, the absence of any formal *b*
response to the letter of 21 April 2002 did not amount to any clear promise
or representation by Enron on which any of the Octagon group companies
or Cabot was entitled to rely, and is of no legal significance. There is no
inequity, in all the circumstances, in the claimants enforcing their legal
rights.

[271] In summary, I conclude that (1) the non-disclosure by Mr Garratt to *c*
his co-directors of the Octagon group companies about the involvement of
Cabot in, and its rights under, the drilling agreement and the 41% transfer
agreement, and all the material terms of those Agreements of which he was
aware, (2) the involvement of Mr Bacon in the transaction, on behalf of
Quality Drilling UK, even though he was the drilling consultant for the *d*
Octagon group companies, set against the background that Cabot was only
paying £75,000 cash to Quality Drilling UK, but receiving the right to
receive £250,000, and, in default, a 41% interest in PEDLs 11 and 12
which had a value of many times that amount, and (3) the deliberately
misleading information given by Mr Garratt to the DTI in connection with
the transfer of the 41% interest to Cabot, take the transfers of the 41% *e*
outside the scope of the ordinary course of business of OCL for the
purposes of cl 19.1.6 of the facility agreement.

[272] I would have reached that conclusion even in the absence of the
lack of clarity, to which I have referred, as to the inter-relationship between
the need for carrying out works in respect of PEDL 11 and PEDL 12 by
31 March 2002, the execution of the drilling agreement on 12 April 2002 *f*
and the execution of the 41% transfer agreement on 19 April 2002, and the
fact that the minutes of the meeting of 25 April 2002 of OEL record that
there was no need to drill separately PEDL 11, and a second term had been
granted for PEDL 12, as well as obscurity as to whether the actual
assignments of the 41% to Cabot were executed on the date which they
bear or were executed without the knowledge of, and prior to the approval *g*
of, the board of OCL. All those matters, however, give further weight to the
extraordinary nature of the assignments.

[273] For the sake of completeness, I should briefly comment on a
number of other submissions made on behalf of the parties relating to this
aspect of the case. *h*

[274] I do not accept the submission of the claimants that the mere fact
that the assignments to Cabot, pursuant to the drilling agreement and the
41% transfer agreement, constituted 41% of the two most valuable licences
would be sufficient, of itself, to take the transaction outside the ordinary
course of the business of the Octagon group companies. If such disposal
was the only reasonable commercial means open to the Octagon group *i*
companies to preserve the balance of the interest in those licences, and there
were no other such unusual features as I have described, then it seems to me

*a*  that the transactions could properly be described as being in the ordinary course of their business.

[275] Mr Moss submitted that the minutes of the meeting of the board of directors of OCL on 12 April 2002 and of OEL on 25 April 2002 make clear that the arrangements discussed at those meetings were to provide only for a possible 41% of PEDL 12 to be transferred, and there was no

*b*  discussion or agreement for a transfer of 41% of PEDL 11, which was the most valuable licence and the only one producing income. In the light of the evidence of Mr Garratt, Mr Shrager, Mr Gravelius and Mr Whately, I conclude, on a balance of probabilities, that the minutes of both meetings were drawn up in error in failing to record the proposal that, in default of payment of the £250,000 under the drilling agreement, a 41% interest

*c*  would be transferred in both PEDL 11 and PEDL 12.

[276] In the closing written submissions of the claimants, it was suggested that there is no plausible evidence that, even if the terms of PEDL 12 were not complied with, PEDL 12 would have been lost. The claimants appear to rely upon the patience of the DTI over the lack of progress generally in

*d*  relation to drilling, the fact that Mr Garratt was blaming the difficulties on Enron, and what was said to be Mr Garratt's remarkable ability to placate the DTI. I do not consider that, in the light of all the evidence, including the oral evidence of the directors of the Octagon group companies, those directors were unreasonable or unrealistic in taking a commercial course of action in fear that, if work was not carried out as required by PEDL 12,

*e*  that licence was in danger of being lost.

[277] The claimants claim that the directors of OCL and OEL did not make any proper assessment of the value of a 41% interest in PEDL 11 and PEDL 12. They did not have that stake independently valued or exposed to the market, on an arm's length basis. Further the claimants claim that the directors did not make a proper assessment of the risk that the 41% interest

*f*  would be lost and, with it, assuming E & P had already validly been assigned a 10% interest, the majority interest and control in the two most valuable assets of the Octagon group companies.

[278] In the light of all the evidence, I consider that the directors of OCL and OEL formed the view, and were entitled to do so, that there was, at the least, a reasonable prospect of obtaining re-financing before 31 December

*g*  2002. This is borne out by the indicative funding proposal put forward by SSE and ORIX Europe Ltd to OEL in a letter dated 7 June 2002 to Ernst & Young.

[279] So far as concerns the absence of an independent valuation of a 41% stake, it is clear that Mr Garratt and his co-directors were fully aware

*h*  that a 41% interest in PEDLs 11 and 12 was of very considerable value, well in excess of the £250,000 turnkey price for the drilling. The consolidated accounts of the Octagon group companies for the year ended 31 March 2001 showed the licences as having a net book value (at cost) of just under £4.5m; and the directors' report indicated that the licences were of considerable value. I see no reason, however, to disbelieve Mr Roscoe's

*i*  account, which I have set out earlier in this judgment, as to his thought processes, and the course of the negotiations, concerning the transfer of that substantial interest in PEDL 11 and PEDL 12, in default of payment of the £250,000.

[280] As to the criticism that the 41% stake was not exposed to the

market on an arm's length basis, this is unrealistic. The evidence from the *a* directors of the Octagon group companies was that, prior to the drilling agreement, they had already sought to raise funds or obtain a new co-venturer, but without success. Further, the issue of transfers to Quality Drilling UK and Cabot of a 41% interest in PEDL 11 and PEDL 12 only arose in the course of, and for the purpose of, the negotiations leading to the drilling agreement and the 41% transfer agreement. On the defendants' *b* case, there was simply no time to allow for the independent marketing of that share.

[**281**] Mr Moss submitted that the economic effect of the drilling agreement and the 41% transfer agreement was that Cabot was lending OCL £75,000 on the security of a 41% interest in PEDL 11 and PEDL 12. *c* I do not accept that as a fair analysis of the commercial transaction, certainly from the perspective of Quality Drilling UK and Cabot, or even from the perspective of the Octagon group companies. There is no evidence that anyone involved in the transaction at the time approached the transaction along those lines. As I have said, I have no reason to disbelieve Mr Roscoe's oral account, in cross-examination, of his approach to the *d* negotiations and his commercial objectives.

[**282**] In para 5 of the particulars of claim the claimants allege that 'Cabot and/or the shares in and/or the officers of [that company] are owned and/or controlled and/or directed (whether directly, indirectly, wholly or partly) by Mr Garratt'. Mr Garratt gave evidence that Mr Garratt had no such ownership or control or powers of direction. *e*

[**283**] Mr Roscoe explained, in cross-examination, how he acquired 95 of the 100 shares in Cabot, and how Mr Malcolm Aw acquired the other 5 shares.

[**284**] The claimants have not discharged the burden of proving that, on a balance of probabilities, Mr Garratt owned or controlled or directed Cabot or the shares in Cabot or the officers of Cabot. *f*

[**285**] In para 47 of the claimants' written closing submissions it is alleged that, without the court needing to make any finding as to the precise nature and extent of Mr Garratt's interest in or association with Cabot, the court can properly draw the inference that Cabot was not simply an independent third party dealing at arm's length with the Octagon group companies but, on the contrary, Mr Garratt 'had a close connection with' Cabot. There are *g* set out in 12 sub-paragraphs of para 47 of the claimants' written closing submissions the matters on which the claimants rely. I do not accept the accuracy of all the facts alleged in those sub-paragraphs. In particular, Mr Garratt did not say that he was chiefly responsible for drafting the 41% transfer agreement, as alleged in sub-paragraph 47(4), although he did *h* accept that he provided much of its substance. Further, many of the matters alleged are no more than suspicions and speculations. The allegations in those sub-paragraphs do not, either singly or together, constitute cogent evidence of the matters alleged in para 5 of the particulars of claim. Short of proof of those allegations, the speculations and suspicions and other matters set out in the sub-paragraphs of para 47 of the claimants' written *i* closing submissions do not advance the claimants' case.

*a*  TRANSFER OF 10% INTEREST IN THE ORIGINAL LICENCES

[286] Deeds of assignment of a 10% interest in EXL 273, EXL 274, PEDL 10, PEDL 11, PEDL 12, PEDL 13 and PEDL 43 were executed by OCL in favour of E & P dated 12 July 2002.

[287] Each of those deeds of assignment recited that the assignment was pursuant to the earn-in agreement.

*b*  [288] Paragraph 7.3 of the re-amended defence alleges that those deeds of assignment were executed pursuant to the earn-in agreement 'and/or with the express consent (through Andrew Marsden and/or Tim Larrison) of the Enron lenders …'

[289] The claimants contend that the assignments of the 10% interest were not permitted disposals within cl 19.1.6 of the facility agreement since,
*c*  at the time they were executed, E & P was not entitled under the earn-in agreement to the transfer of such an interest, and the assignments were made in breach of the promises of each of the Octagon group companies in cl 19.1.11(c) and (e) of the facility agreement not to amend, waive or modify the earn-in agreement in any material respect, and to maintain in full force and exercise all its rights under the earn-in agreement.

*d*  [290] In my judgment, the assignments of a 10% interest in EXL 273, EXL 284 and PEDL 12 were properly made pursuant to the provisions of the earn-in agreement, and were therefore expressly permitted by cl 19.1.6 of the facility agreement. Assignments of the 10% interest in respect of the other original licences were not, however, pursuant to the terms of the
*e*  earn-in agreement, and were not permitted or authorised under cl 19.1.6 of the facility agreement.

[291] Clause 3.1 of the earn-in agreement provided that, immediately following the commencement of the drilling of a well in respect of each licence in which E & P participated, OCL should assign to E & P a 10% legal and beneficial interest in and under that licence and a corresponding
*f*  interest in and under the JOA for that licence. The evidence is that, prior to the assignment of a 10% interest in EXL 273, EXL 274 and PEDL 12, that express drilling condition was satisfied in respect of each of those licences.

[292] The claimants contend that, none the less, E & P had no entitlement to an assignment of a 10% interest in respect of those licences since E & P was in breach of the provisions of cl 2 of the earn-in agreement under
*g*  which E & P was obliged to make the payments specified there. In this connection, the claimants rely particularly upon the express confirmation by OCL and OCRL in cl 2.7 of the earn-in agreement that, until such time as the assignments and transfers referred to in cl 3 were effected, or until E & P had forfeited its right by going Non-Consent, OCL, '(providing E & P
*h*  continues to abide by the terms of this cl 2)', would hold a 10% interest in each of the licences on trust for E & P and would carry out E & P's instructions in connection with that interest with regard to all decisions taken under the relevant JOA.

[293] In my judgment, on the proper interpretation of the earn-in agreement, the entitlement of E & P to a transfer of a 10% interest under
*i*  cl 3.1 was not subject to a precondition that it had complied with all the provisions of cl 2. Clause 3.1 contains no such express condition, and there is no need to import such a condition in order to make the earn-in agreement workable. Indeed, it is to be noted that cl 3.1 of the earn-in agreement does not mirror the express qualification in cl 2.7 to which I

have referred – '(providing E & P continues to abide by the terms of … *a*
cl 2)'. That part of cl 2.7 which contains that proviso is plainly dealing, and
dealing only, with the period *prior* to the satisfaction of the conditions
specified in cl 3.1 of the earn-in agreement and the ensuing assignment of
the 10% interest in the relevant licence.

[**294**] The claimants further maintain that, by a letter of 5 June 2001 from
OCL to E & P's attorneys, OCL had already forfeited E & P's rights under *b*
the earn-in agreement for failure to comply with the provisions of that
Agreement. The claimants cannot, in my judgment, properly raise any such
argument. Termination of the earn-in agreement, without the prior written
consent of EPOL, would have been a breach of cl 19.1.11 of the facility
agreement. It is not suggested that EPOL or any other Enron entity ever
gave consent, whether written or otherwise, to any such termination. *c*
Further, there is no evidence that the Enron lenders or any other Enron
entity ever relied upon any such termination effected by the letter of 5 June
2001. Further, it is apparent that, following the letter of 5 June 2001, OCL
and E & P conducted their relations between themselves, and acted
generally, on the basis that the earn-in agreement continued to be in force. *d*

[**295**] The assignment of a 10% interest in PEDL 10, PEDL 11, PEDL 13
and PEDL 43 was outside the terms of the earn-in agreement, since the
drilling condition in cl 3.1 was not satisfied in those cases. The agreement
to assign a 10% interest, and the subsequent deeds of assignment, in those
cases constituted a waiver or modification of the earn-in agreement in a
material respect, without the written consent of EPOL, and was in breach *e*
of cl 19.1.11 (c) and (e) of the facility agreement. They were, accordingly,
not within the express permission contained in cl 19.1.6 of the facility
agreement for dispositions 'permitted pursuant to … the earn-in agreement.'

[**296**] Mr Garratt, in his evidence in cross-examination, sought to explain
and support the assignments of a 10% interest in PEDL 10, PEDL 11,
PEDL 13 and PEDL 43 on the ground that it was in the commercial *f*
interests of the Octagon group companies that E & P should be made to
participate in expenses associated with those licences sooner rather than
later. I consider, however, that it is clear that a transaction in breach of
cl 19.1.11 (c) or (e) of the facility agreement was not intended by the parties
to the facility agreement to constitute, and does not constitute, a transaction
in the ordinary course of business within cl 19.1.6 of the facility agreement. *g*

[**297**] The defendants claim that Mr Marsden and Mr Larrison approved
all the assignments of a 10% interest in the licences, to which I have
referred. The allegation of consent or approval was introduced, at the
beginning of the trial, by re-amendment of the defence. Mr Garratt's oral
evidence, in cross-examination, was that Mr Marsden consented before the *h*
assignments were executed, and Mr Larrison confirmed the position
afterwards.

[**298**] Both Mr Marsden and Mr Larrison gave evidence in their witness
statements that they did not give any such consent or approval, and had no
authority to do so. In cross-examination Mr Marsden confirmed that he
was not aware of having given any such consent or approval, and he had no *i*
recollection of giving consent or approval. Mr Larrison, in
cross-examination, said he had no specific recollection. I am satisfied,

*a*  having regard to all the evidence, that neither Mr Marsden nor Mr Larrison gave consent or approval.

[**299**] Mr Marsden had left his employment with Enron well before the date of the deeds of assignment, namely 12 July 2002. The minutes of the meeting of the directors of OCRL on 5 June 2002 recorded that Mr Marsden had been informed about the agreement to assign a 10% *b*  interest in the original licences to E & P and that he approved the arrangement and the assignments. Mr Marsden gave oral evidence, however, which I accept, that he was abroad for a three to four week holiday at that time, and was uncontactable for much of the time. Moreover, in his oral evidence in cross-examination, Mr Garratt said that Mr Marsden had given his consent in April or May. Mr Garratt's witness *c*  statement, however, made no reference whatsoever to any consent given by Mr Marsden to the assignments. On the contrary, in para 63 of his witness statement he expressly refers to agreement by Mr Larrison, without any mention of Mr Marsden.

[**300**] Further, I accept Mr Marsden's evidence that he had no authority to *d*  give any such consent.

[**301**] In view of the discrepancies in the evidence as to the timing of any consent by Mr Marsden, the absence of any written consent by him, the absence of any reference to any consent by Mr Marsden in Mr Garratt's witness statement, and the lateness of the relevant re-amendment of the defence, and taking into account the relative credibility generally of *e*  Mr Garratt and Mr Marsden, I hold that the overwhelming probability is that Mr Marsden gave no such consent as the defendants allege.

[**302**] So far as Mr Larrison is concerned, Mr Garratt's evidence, as I have said, was that Mr Larrison 'confirmed the position afterwards' (Transcript 24 May 2002 p 8). No evidence was given, on behalf of the defendants, as to precisely when, where, or in what circumstances Mr Larrison expressed *f*  such approval.

[**303**] I accept Mr Larrison's evidence that he had no authority to express any such approval. There is no contemporaneous written evidence of any approval having been given by him. On the contrary, copies of the assignments were sent, not to Mr Larrison, who took over from Mr Marsden towards the end of May 2002, but to Enron's general counsel *g*  in Houston, Texas, under cover of a letter of 22 July 2002. That letter states that the documents had been discussed previously with Andrew Marsden, but made no reference to any approval by Mr Larrison.

[**304**] In the light of all that evidence, and taking into account my assessment of the reliability of Mr Garratt's evidence, I have no hesitation in *h*  concluding that the overwhelming probability is that no such approval was given by Mr Larrison, as is alleged by the defendants.

[**305**] I can see no sound basis for Mr Adkins' further submission that, even if Mr Marsden or Mr Larrison did not have actual authority to give approval, they had ostensible authority to do so. There is no evidence before me that persons in their position were able to give such approval or *i*  consent within their usual authority, and I am aware of no cogent evidence that there was any holding out by the Enron lenders, EPOL or any other Enron entity that they had authority to give any such consent or approval. On the contrary, all the contemporaneous documentary material, including, in particular, communications by Enron and its agents or representatives

with Mr Garratt, emphasised the limited authority of Mr Marsden and
Mr Larrison to make decisions in relation to the security documents and the
loans to the Octagon group companies and the need for decisions to be
obtained and clearance to be given by Enron in the United States.

[306] Unlike the other transfers which are the subject of dispute in these
proceedings, the defendants do not raise a separate defence of estoppel in
relation to the transfers to E & P of a 10% interest in the original licences:
cf. para. 22 of the re-amended defence, the wording of which appears to be
inapposite to include the 10% assignments in 2002.

[307] For the sake of completeness, however, I should say that no case of
estoppel could be made out on the facts. As I have said, copies of the
assignments of a 10% interest in the original licences were sent by
Mr Garrett to ECT under cover of a letter dated 22 July 2002. The
defendants have not adduced any evidence, however, that Enron was aware,
then or thereafter, that the transfers of a 10% interest in the original
licences, other than EXL 273, EXL 274 and PEDL 12, were not properly
made in accordance with the terms of the earn-in agreement. In all the
circumstances, the absence of any objection by Enron after receipt of the
letter of 22 July 2002 did not amount to any clear promise or
representation on which the Octagon group companies or the defendants
are entitled to rely, and there is no inequity in the claimants relying on their
strict legal rights.

SALE OF THE OGL SHARES AND THE AFTER-ACQUIRED LICENCES

[308] The minutes of a meeting of the board of directors of OEL on
7 February 2003 record that it was agreed, among many other things, that
OEL would sell its total shareholding in OGL for £60,000 to Cabot, and
that the £60,000 was to be paid to OCL partially to extinguish outstanding
borrowings of £125,000 by OEL from OGL.

[309] The same minutes also record a decision to sell the after-acquired
licences to OCL for a total of £65,000, and that OGL would take on the
liabilities which went with those licences. It was recorded that the £65,000
to be received from OGL for the sale of the after-acquired licences would be
set-off against the £65,000 balance of the outstanding borrowings from
OGL.

[310] Minutes of meetings of the directors of OCL and OCRL on
7 February 2003 also record the decision of those directors to sell the
companies' interests in the after-acquired licences. The purchase price was
to be £50,000 in the case of the sale by OCL for the sale of PEDLs 65–67,
and £15,000 in the case of OCRL for PEDL 64.

[311] On 14 February 2003 a sale and purchase agreement relating to the
OGL shares was concluded between Cabot and OEL.

[312] Minutes of a meeting of the board of directors of OEL on
14 February 2003 record that, in accordance with the discussions at the
board meeting on 7 February 2003, it was agreed that the assignments of
the after-acquired licences to OGL be carried out at the earliest opportunity.

[313] Minutes of meetings of the directors of OCL and OCRL on
14 February 2003 also record decisions that the assignments of the
after-acquired licences to OGL be carried out at the earliest opportunity, in
accordance with the discussions at the board meetings on 7 February 2003.

[314] On 14 February 2003 a sale and purchase agreement was entered

*a*  into between OCL and OCL in relation to PEDLs 65–67; and a sale and purchase agreement was entered into between OGL and OCRL in relation to PEDL 64.

[**315**] On 11 March 2003 a share certificate for a further 50 shares in OGL was issued to Cabot.

*b*  [**316**] Deeds of assignment dated 1 April 2003 between OGL and OCL, and between OGL and OCRL, were executed for the transfer of the entire interest of OCL and OCRL respectively in the after-acquired licences.

[**317**] Mr Garratt sent the DTI application forms for consent to the assignments of the after-acquired licences to OGL.

[**318**] As I have previously mentioned, Mr Hawkins of the DTI wrote a letter to Mr Garratt dated 24 February 2003, in which he pointed out the requirements of the DTI in the case of proposed assignments which would have the effect of creating a single company licensee. In particular, he stated that the DTI would require to be satisfied with the assignee's competence, both technical and financial, to perform the role of an operator, and would therefore require certain information from the *d*  assignee. He also observed, as I have mentioned previously, that in many respects such competence would have to be UK based. The DTI would not accept all such operations could be directed entirely from North America. He drew the attention of Mr Garratt to the DTI's website, which set out the usual requirements of the DTI for an assignee, and mentioned in his letter the particular requirement concerning the need for the DTI to be satisfied *e*  that the licensee is solvent and likely to remain so, and the common requirement of the DTI that two copies of the latest annual reports and accounts be provided, and, if appropriate, those of the company's ultimate parent. If the company is a subsidiary that would rely on support from its parent, the DTI would need a letter of support from the parent stating that it would ensure that adequate financial and technical resources would be *f*  made available to the prospective licensee to meet its share of licence obligations and liabilities. Mr Hawkins summarised his position, at the conclusion of his letter, by saying that he would consider the application for approval of the proposed assignments of the after-acquired licences upon receipt of, among other things, the information required from OGL concerning its financial and technical capacity, as outlined in the letter.

*g*  [**319**] Mr Garratt responded by letter dated 25 February 2003, in which he proposed, 'in order to make the whole assignment process easier', that there be an assignment of a 90% interest in the after-acquired licences 'so that Octagon has a 10% interest after assignment and Octagon Gas Ltd has a 90% interest after assignment and Octagon (CBM) Ltd and Octagon *h*  (CBM) Resources Ltd remain operators of the respective licences.'

[**320**] Under cover of a letter dated 7 March 2003 Mr Garratt sent to the DTI fresh application forms for consent to the assignment of the after-acquired licences. The application forms briefly described the transaction as 'Assignment of 90% of licence interest … to affiliate Octagon Gas Ltd.'

*i*  [**321**] The defendants' case, and the evidence on their behalf, was that the disposals of the OGL shares and of the after-acquired licences were an attempt to ease the critical financial position of the Octagon group companies.

[**322**] The last funds from Enron had been received in March 2002. By

February 2003 rental payments were outstanding on the licences. The DTI *a* had written Mr Garratt a letter dated 21 January 2003 referring to outstanding rental payments in respect of the licences, and referring to the power of the Secretary of State under cl 38 of the 1995 Model Clauses to revoke any licence in the event that the payments mentioned in cl 9 of the licence were in arrears or unpaid for two months after the date on which they fell due. The letter stated that, subject to any representations to be *b* made by Mr Garratt, the Secretary of State was minded to exercise his powers to revoke each of the licences, in the event that the payments set out in the letter had not been received by 1 March 2003.

[**323**] The re-financing discussions with SSE lapsed on 23 January 2003. In his witness statement Mr Garratt said that, accordingly, in January and early February 2003 he spoke to people he knew in the industry to see if he *c* could interest anyone in buying licences EXL 273, EXL 274, PEDL 10, PEDL 13, PEDL 43, and PEDLs 64–67. He said he asked Mr Shrager, Mr Whately and Mr Gravelius, but they did not know of anybody, especially at short notice. He said he tried to find someone interested in buying the OGL shares to provide some cash, 'but it was almost impossible *d* to interest anybody because of the complications and difficulties in explaining the whole situation.'

[**324**] Mr Garratt's evidence in his witness statement is that there was not enough income from PEDL 11, at the time, to keep the Octagon group companies 'on a firm cash-flow footing'. Mr Garratt was not being paid and had not been paid for his services since July 2002. Similarly, *e* Mr Gravelius and the other directors were not being paid. He says, in para 78 of his witness statement, that there was no prospect of acquiring funds in the very near future.

[**325**] Mr Roscoe, in his oral evidence in cross-examination, described Mr Garratt at this time as 'running around … like a headless chicken' looking for money to keep the Octagon group companies going. *f*

[**326**] In my judgment, neither the sale of the OGL shares, nor the sale of the after-acquired licences were in the ordinary course of the business of the Octagon group companies, within 19.1.6 of the facility agreement.

[**327**] As I have said, the defendants' case is that the sales of the OGL shares and of the after-acquired licences were desperate measures taken, in conditions of great financial difficulty, by the directors of the Octagon *g* group companies in order to keep their business afloat. In the light of the outstanding rental payments due under the licences, the threat of the DTI to invoke the right to revoke the licences, the outstanding debt due from OEL to OGL, as well as all the other trade and other debts of the Octagon group companies, and the absence of any prospect of further loan finance on the *h* horizon, they claim that the steps were reasonable and necessary in all the circumstances.

[**328**] As evidence in support of the genuinely independent nature of the negotiations regarding the sale of the OGL shares, they rely upon the evidence, given by Mr Garratt and by Mr Roscoe, that Mr Garratt initially wanted £100,000 for the OGL shares; but, in the light of Cabot's existing *i* right to purchase them for £50,000 in certain circumstances, pursuant to a 1997 pre-emption agreement between them, Cabot's initial position was

*a* that it was prepared to offer only £50,000. After negotiations, the price was agreed at £60,000.

[329] The minutes of the meetings of the directors of the Octagon group companies on 7 February 2003 and 14 February 2003 set out in detail the various commercial considerations which, the defendants say, the directors took into account in deciding on the sale of the OGL shares and the *b* after-acquired licences.

[330] Mr Moss submitted that the Octagon group companies were insolvent at that time, and, consequently, neither the sale of the OGL shares nor the sale of the after-acquired licences could have been within the ordinary course of the business of the Octagon group companies since they were intended to result, and did result, in the total discharge of the *c* £125,000 borrowing by the Octagon group companies from OGL in preference to the other creditors of the Octagon group companies.

[331] The witnesses for the defendants were not prepared to accept, in cross-examination, that the Octagon group companies were insolvent at that time. They relied on various matters in support of that contention, *d* including agreements by creditors to extend the time for payment of amounts due and the prospect of re-financing in the future. Taking the evidence as a whole, I am satisfied that the Octagon group companies were indeed insolvent at the time, certainly on a balance sheet basis, and probably on the basis of an inability to pay debts as they fell due.

[332] On the other hand, for the reasons I have set out earlier in this *e* judgment, I do not consider that, merely because the sale of the OGL shares and of the after-acquired licences resulted in a preferential payment of the outstanding indebtedness of the Octagon group companies to OGL, the transactions for that reason alone fell outside the ordinary course of business of the Octagon group companies.

[333] Neither the sale of the OGL shares nor the sale of the after-acquired *f* licences increased the cash available to the Octagon group companies for furthering their business. All the proceeds were applied in discharging borrowings, said to amount to £125,000, from OGL. The evidence seems clear, however, that the motivation for those sales was not pressure by OGL for repayment. There is no suggestion to that effect in any of the witness statements. Moreover, and importantly, Mr Roscoe's oral evidence was that *g* the issue of the repayment of the indebtedness of the Octagon group companies to OGL only arose after the initiation by Mr Garratt of discussion of the sales, and in the course of their negotiation.

[334] Mr Garratt gave evidence, in his cross-examination, that it was not the intention, at the time, that the £60,000 paid by Cabot for the sale of the *h* OGL shares would be paid to OGL in reduction of the indebtedness due from the Octagon group companies. Mr Moss drew Mr Garratt's attention to the following clear statement to that effect in the minutes of the meeting of the directors of OEL on 7 February 2003:

> 'In view of the above and the company's limited funds it was agreed,
*i* following discussions with the other shareholder in Octagon Gas, that the company sell its total shareholding in Octagon Gas for the sum of £60,000 to the other shareholder in Octagon Gas on the basis that the

£60,000 received from the other shareholder is paid to Octagon Gas to *a*
partially extinguish the temporary borrowings.'

[**335**] Mr Garratt's evidence was that this statement in the minutes was
incorrect and a mistake. I do not accept his evidence on this point.
Mr Garratt, in his capacity as chairman of the meeting, signed the minutes
as being accurate. The minutes were prepared by Mr Gravelius as secretary *b*
to the board of directors. He also signed the minutes, in his capacity as
company secretary, as being accurate. Furthermore, Mr Gravelius in his
cross-examination, when he was taken to the above passage in the minutes
of the meeting of the directors of OEL on 7 February 2003, did not
question the accuracy of the minutes, but indeed confirmed that the
£60,000 received was to go partially to extinguish the temporary *c*
borrowings from OGL, and so no moneys would actually come into the
Octagon group companies for the general benefit of its creditors.

[**336**] There was no independent valuation of either the OGL shares or
the after-acquired licences. As I have said, the evidence on behalf of the
defendants, and in particular the oral evidence of Mr Garratt, was that
attempts had been made earlier in 2003 to find people interested in buying *d*
the after-acquired licences and other licences and the OGL shares. I was
shown no contemporaneous note of, or relating to, any communications
with any such people, nor any other contemporaneous written material
showing any analysis of the value of those assets.

[**337**] Further, in relation to the sale of the after-acquired licences,
Mr Garratt was on both sides of the transaction, with conflicting interests *e*
and duties. He was the managing director of OGL as well as the managing
director of the Octagon group companies. The assignments of the
after-acquired licences were, in fact, signed by the same persons, including
Mr Garratt, on behalf of all parties.

[**338**] Mr Garratt gave oral evidence, in cross-examination, that he *f*
'specifically stated at the board meeting that [he] was not prepared to vote
and .. was not prepared to either suggest that it should or should not go
through.' (Transcript 25 May 2004 p 125).

[**339**] There is, however, nothing whatever in the minutes of any of the
relevant meetings of the boards of directors of the Octagon group
companies or OGL which supports that evidence. Nor is his evidence, in *g*
this regard, reflected in his witness statement or in any evidence given by
any of his co-directors. On the contrary, my clear impression from the
evidence is that the overwhelming probability is that the other directors
relied heavily on Mr Garratt's views.

[**340**] Further, the transactions took place at the same time as, and must
be viewed in the context of, other unusual transactions. So, the minutes of *h*
the meeting of the board of directors of OEL on 14 February 2003 not only
dealt with the transfer of the after-acquired licences, and noted that the sale
and purchase of the OGL shares had been completed and 'the temporary
borrowings from Octagon Gas returned', but they also record decisions of
the directors to sell test rigs and associated equipment to OGL for £25,000,
to sell the office equipment to Exeter for £7,500, including computers, and *i*
to sell the office lease to Exeter for £1,000. The minutes record that
Mr Garratt informed the board that OEL could continue to use the office
equipment on a temporary basis without payment, provided it was not
required by Exeter and provided OEL did not become 'insolvent bankrupt

*a*  or a proposal was made to the company and its creditors for a composition in satisfaction of its debts or a scheme or arrangement of its affairs or the application to the Court for an Order of bankruptcy or placed into any form of administration.' The minutes also record that Mr Garratt told the board that OEL could continue to use the office on a temporary basis on similar conditions to those for the office equipment.

*b*  [341] A series of transactions by which the Octagon group companies parted with, in favour of associated companies, the lease of their office premises, the office equipment, the test rigs and associated equipment, all the after-acquired licences, and the entire shareholding in OGL, without raising any substantial new cash for their business purposes, has all the hallmarks of an attempt to find a safe-haven for the assets of the business so that it could continue to be carried on by, or under the control of, Mr Garratt notwithstanding the insolvency of the Octagon group companies and the terms of the security documents, including, in particular, the debentures.

*c*

[342] That inference is strongly reinforced by the highly unusual terms, carefully recorded in the minutes, to which I have referred, enabling OEL to continue to use its business equipment and its business premises on licence from OEL, but terminable in the event of liquidation or 'any form of administration' or merely, apparently, becoming 'insolvent bankrupt.'

*d*

[343] The inference is also further strongly supported by the failure of the Octagon group companies to make any contact with Mr Giard, who had held meetings with Mr Garratt in the second half of 2002 with a view to the possibility of providing development funding in respect of the licences or acquiring the assets of the Octagon group companies, including the licences. The minutes of the meeting of the directors of OEL on 14 February 2003 show that the directors were aware that Mr Giard was trying to buy the licences from Enron at that time. Mr Garratt and the other witnesses for the defendants gave various reasons for the absence of any communication with Mr Giard in 2003, prior to the decisions to sell the OGL shares and the after-acquired licences to Cabot and OCL respectively, including, in particular, the difficulty of locating and contacting Mr Giard and the unattractiveness of the proposals previously made by Mr Giard. Bearing in mind, however, the particularly acute financial difficulties which the Octagon group companies were experiencing in early 2003, on which the defendants rely to justify the transactions to which I have referred, it seems remarkable that, if Mr Garratt really wished to obtain further finance for the Octagon group companies by sale of its assets in arm's length transactions, he did not have discussions with Mr Giard.

*e*

*f*

*g*

*h*  [344] The inference of an unusual attempt to find a safe-haven, or series of safe-havens, from which Mr Garratt could continue to run the business of the Octagon group companies, rather than genuine commercial sale arrangements at arm's length, is further reinforced by the deliberate decision, carefully recorded in the minutes of the relevant boards of directors on 14 February 2003, not to give advance notice to Enron.

*i*  [345] In my judgment, it is reasonable to conclude that the reason why a deliberate decision was taken not to notify Enron in advance of the transactions in February 2003, including, in particular, the sale of the OGL shares and of the after-acquired licences, was because Mr Garratt was particularly concerned that the Enron lenders would object to the

transactions on the basis that they were not authorised by the security *a*
documents, and, in particular, were not in the ordinary course of the
business of the Octagon group companies within cl 19.1.6 of the facility
agreement.

[**346**] In any genuine, independent arm's length transaction, both Cabot
and OGL, whose agents or representatives were aware of the security held
by the Enron lenders over the assets of the Octagon group companies, *b*
would have made enquiries of, or sought reassurances from, the Enron
lenders as to the likelihood of challenge by the Enron lenders. There is no
evidence of any kind that any such enquiries were made or assurances
sought.

[**347**] The collusive nature of the transactions involving the sale of the
after-acquired licences and the OGL shares, and the absence of the usual *c*
characteristics of arm's length commercial transactions, is further illustrated
by the following features of the sale of the after-acquired licences.

[**348**] Mr Garratt was well aware, since it appears on the face of each of
the deeds of assignment, that the Secretary of State's consent was required
to the assignments. It is also clear from his oral evidence that he was aware
that the DTI would require to be satisfied about the suitability of the *d*
assignee of a licence before being willing to register the assignment. The
requirements as to suitability were set out in the letter from Mr Hawkins of
the DTI to Mr Garratt dated 24 February 2003.

[**349**] At the time of the assignments of the after-acquired licences, it was
the intention of OEL to sell the OGL shares to Cabot, upon which OGL *e*
would become the wholly owned subsidiary of Cabot, a Liberian registered
private investment company, which had no published accounts.

[**350**] By the date of the applications to the DTI for consent to the
assignments, a formal sale and purchase agreement had been entered into
between Cabot and OEL in relation to the OGL shares.

[**351**] In those and all the other circumstances I have mentioned, I *f*
consider that Mr Garratt could not have had any real or reasonable
expectation that the requirements specified in Mr Hawkins' letter could or
would be satisfied in relation to OGL, as the assignee of the after-acquired
licences. It was not, in my judgment, in the ordinary course of the business
of OCL and OCRL to execute assignments to an assignee, without the prior
consent of the DTI, in circumstances in which the after-acquired licences *g*
were exposed to the right of the DTI to revoke the licences for breach of
requirement for consent in the 1995 Model Clauses. In particular, there is
no evidence before me to indicate that either OGL or Cabot, its parent
company, could provide, or would be willing to provide, the financial
evidence required by the DTI. It is significant, in my judgment, that when *h*
Mr Garratt wrote his letter of 25 February 2003, in response to
Mr Hawkins' letter of 24 February 2003, and he described OGL, he said
nothing whatever about the agreement to transfer the remaining OGL
shares to Cabot and said nothing whatever about Cabot itself. The clear
impression created by Mr Garratt's letter ('Octagon Gas has been a
subsidiary for some 6 years and the same technical team and competence *i*
applies as to Octagon overall') was that nothing had changed, and no
change was currently underway, as to OGL's status as a subsidiary of OEL.
I consider that, in that respect, the letter was deliberately misleading.

[**352**] Doubtless to overcome that difficulty, Mr Garratt, apparently

*a*  entirely on his own initiative, suggested in his letter of 25 February 2003 that the agreement to assign dated 14 February 2003 could in some way be unscrambled so as to provide that only 90% of the interest in the after-acquired licences be transferred to OGL. Indeed, as I said earlier in this judgment, revised applications were submitted on that basis under cover of a letter from Mr Garratt dated 7 March 2003.

*b*  [353] This was, on any footing, a remarkable state of affairs. There appears to be no contemporaneous documentary evidence, including minutes of board meetings, that Mr Garratt's proposal in his letter of 25 February 2003 to Mr Hawkins or the revised applications were the subject of any discussion or decision at meetings of the directors of the Octagon group companies or OGL or, indeed, the subject of discussions and agreement between Mr Garratt or anyone else representing the Octagon group companies and Cabot and its representatives. Minutes of meetings of the directors of the Octagon group companies on 21 March 2003, for example, simply note 'that the assignments of licences PEDL 64, PEDL 65, PEDL 66 and PEDL 67 to Octagon Gas were being progressed.'

*c*

*d*  [354] The actual assignments dated 1 April 2003 were of the entire interest of OCL and OCRL in the after-acquired licences, and so were inconsistent with the revised applications to the DTI. I have not seen any agreement to reassign or any actual reassignment of any part of the interest in the after-acquired licences previously assigned to OGL by those assignments dated 1 April 2003, so as to give effect to the proposal to Mr Hawkins and the revised applications to the DTI.

*e*

[355] Far from being a transaction in the ordinary course of the business of the Octagon group companies, the transaction involving the transfers of the after-acquired licences was, in all these circumstances, remarkable and extraordinary.

*f*  [356] The defendants, in para 22 of the re-amended defence, allege that the claimants are estopped from claiming that the assignments are unlawful or in breach of the terms of the facility agreement or the debentures. No similar claim of estoppel is alleged in relation to the sale of the OGL shares.

[357] I can see no proper basis for a claim of estoppel as alleged.

[358] In support of the alleged estoppel, the defendants rely upon the notification given by letter to the general counsel of ECT by letter dated 17 February 2003 from Mr Garratt, which stated that the board of OEL had resolved to sell the after-acquired licences to OGL for £65,000, with OGL to be responsible for licence rentals from 8 September 2002 and any work commitments that pertained to the licences, and which enclosed copies of the agreement dated 14 February 2003 for the sale to OGL of the after-acquired licences, as well as a copy of the agreement for the sale of the OGL shares by OEL to Cabot.

*g*

*h*

[359] The defendants claim that the failure of the Enron lenders or their agent to object to those agreements, within a reasonable time of their disclosure, constituted an unequivocal indication of the intention of the Enron lenders not to insist on their strict legal rights to challenge them. I reject that contention.

*i*

[360] My conclusion from the evidence of Mr Marsden and Mr Larrison, to which I referred earlier in this judgment, and the other evidence I have seen, leads me to conclude that Mr Garratt and his co-directors of the Octagon group companies were at all relevant times fully aware that the

Enron lenders wished to insist on their strict legal rights. Mr Garratt and his *a*
co-directors had no reason to believe, and did not believe, in my judgment,
that the Enron lenders or their agent were willing to take a less strict view
of the transactions concerning the OGL shares and the after-acquired
licences. As I have said, Mr Garratt and the other directors of the Octagon
group companies took the deliberate decision, recorded in the minutes of
the meetings of the boards of directors on 14 February 2003, not to give *b*
prior notice to Enron of the assignments of the after-acquired licences. As I
have said, I conclude, from the evidence as a whole, that the motivation for
that decision was that they were concerned that the Enron lenders would
object to the transactions.

[361] Further, and in any event, even if that is incorrect, there is no
evidential basis for concluding that the Enron lenders or their agent were *c*
aware of all of the facts and matters, to which I referred earlier in this
judgment, which colour the true nature of the sale of the OGL shares and of
the after-acquired licences, including, for example, the fact that it was
always intended that the entire proceeds of the sales should be applied in
discharging the outstanding borrowing of the Octagon group companies *d*
from OGL, the fact that there were no independent valuations of any of the
assets transferred, the contemporaneous state of the office premises and the
office equipment of the Octagon group companies as well as other assets,
the absence of any consent to the assignments by the DTI and the absence
of any real basis for supposing that the DTI would consent to a transfer of
the after-acquired licences to OGL, in view of the qualities and financial *e*
circumstances of that company and Cabot, its parent company, in the
context of the requirements of the DTI for approval of transfers of licences.

[362] In short, the Enron lenders made no clear or unequivocal promise
or representation, whether of fact or otherwise, to OGL or, for that matter,
Cabot, that the Enron lenders would not rely upon their strict legal rights,
and rendering it inequitable for them to do so. *f*

[363] In the re-amended defence, the defendants claim that, if OGL is not
the owner of the after-acquired licences, OGL should be repaid the purchase
price paid for those licences and all sums expended by OGL in relation to
such licences.

[364] The defendants also claim that, if Cabot is not the sole legal and
beneficial owner of the OGL shares, Cabot should be repaid all sums *g*
expended by it in relation to those shares.

[365] In the defendants' written closing submissions, the defendants put
the matter in the following way. They claim that, since the claimants are
seeking restitution of the after-acquired licences in equity, it would be
inequitable to allow such restitution without, at the same time, allowing for *h*
recoupment of sums of money expended to develop or preserve the licences,
including licence rental payments to avoid forfeiture, such expenditure
being in the nature of salvage.

[366] The claim that an order in favour of the claimants in respect of the
after-acquired licences and the OCL Shares should be conditional on
recoupment of the expenses of OCL and Cabot is, in my judgment, *i*
misconceived. No authority was cited to me by Mr Adkins in support of
this part of his case. The legal position seems to me to be that the claimants
are asserting a property right, based upon the prior equitable interest of the
Enron lenders arising from the debentures. The defendants do not claim to

*a* be purchasers, in good faith, without notice of the debentures and the rights which such debentures conferred on the Enron lenders and their successors in title. Indeed, it is clear from the evidence that the defendants were at all relevant times aware of the debentures and the rights under them. In those circumstances, and in the absence of any estoppel, there is no basis for the court imposing on the claimants the suggested qualification of their
*b* assertion to a property interest in the after-acquired licences and the OGL shares.

[367] The question whether OGL or Cabot has any claim against the Octagon group companies in relation to the sale of the after-acquired licences and for the OGL shares does not arise for my decision in this case, and was not the subject of any submissions to me.
*c*

TRANSFERS OF 90% INTERESTS TO E & P IN EXL 273, EXL 284. PEDL 10. PEDL 13 AND PEDL 43

[368] As I have explained earlier in this judgment, a 10% interest in EXL 273, EXL 284, PEDL 10, PEDL 13 and PEDL 43 was transferred to E & P
*d* by deeds of assignment dated 12 July 2002.

[369] E & P claims to have acquired, and to be entitled to retain as against the claimants, the 90% balance of the interest in those licences by deeds of assignment dated 10 February 2003 (in respect of EXL 273, EXL 284 and PEDL 11), a deed of assignment dated 28 April 2003 (PEDL 43) and a deed of assignment dated 13 June 2003 (PEDL 13).
*e* [370] Briefly summarised, the defendants' case in relation to the transfer of the 90% interest in those licences is as follows. On a number of occasions between 13 July 2002 and the end of 2002, E & P wrote to the Octagon group companies expressing concern that licence payments were not being made and that wells were not being drilled, with the consequence that the licences might be lost. E & P also expressed the same concern to
*f* Enron. E & P made it clear that E & P would make those licence payments, but that the consequence would be that, under the relevant JOAs in respect of those licences, the interests of the Octagon group companies in them would have to be relinquished to E & P.

[371] The defendants' case is that, by the beginning of 2003, given the
*g* financial position of the Octagon group companies, those companies had to farm-out their assets in order to ensure that the most valuable licences, namely the remaining interest of the Octagon group companies in PEDL 11 and PEDL 12, would be retained.

[372] On 21 January 2003 the DTI wrote to Mr Garratt stating that, if the outstanding licence payments were not made by 1 March 2003 in
*h* respect of EXL 273, EXL 284 and PEDL 11, among other licences, the Secretary of State was minded to exercise the power conferred on him by cl 38 of the 1995 Model Clauses to revoke each licence.

[373] E & P was told of the threat of the Secretary of State, and that Octagon could not pay. E & P's response was to say that it would make the rental payments and take over the licences.
*i* [374] The defendants say that, in view of the inability of the Octagon group companies to pay what was due on those licences, the choices were, first, to allow the licences to lapse with the consequence that the Octagon group companies would still be responsible for the outstanding rental payments; alternatively, provided that E & P was prepared to take over

those payments, to accede to the relinquishment requests from E & P. The defendants' case is that the Octagon group companies had no choice but to agree to E & P's requests, in order to prevent the licences being lost to the DTI and the Octagon group companies being pursued for the licence fees.

[375] As I have said, deeds of assignment of the 90% interest held by the Octagon group companies in EXL 273, EXL 284 and PEDL 10 were executed in favour of E & P on 10 February 2003.

[376] E & P subsequently paid the sum of £85,000 due to the DTI in respect of those licences.

[377] Under cover of a letter dated 16 February 2003 Mr Garratt sent ECT copies of the signed documentation.

[378] By letter dated 7 March 2003 from E & P to Mr Garratt, E & P stated that, if the licence rentals due on PEDLs 13 and 43 were not paid on time, E & P would have to pay them to preserve the licences, and the Octagon group companies would be liable to forfeit all their rights and title to their interest in those licences.

[379] On 15 April 2003 the DTI requested payments in respect of PEDL 43 within 14 days.

[380] As I have said, OCL's 90% interest in PEDL 43 was transferred to E & P by an assignment dated 28 April 2003.

[381] Copies of the documentation in relation to that assignment were given to ECT under cover of a letter from Mr Garratt dated 2 May 2003.

[382] On 2 June 2003 the DTI wrote to OCRL seeking payment in respect of, among other licences, PEDL 13 and threatening them with legal proceedings in the absence of payment.

[383] As I have said, an assignment of OCL's 90% interest in PEDL 13 was transferred to E & P by an assignment dated 13 June 2003.

[384] Copies of the documentation in relation to that assignment were sent to ECT under cover of a letter from Mr Garratt dated 18 June 2003.

[385] PEDL 10 has now lapsed.

[386] In the re-amended defence it is alleged that those transfers to E & P of the 90% interest of OCL and OCRL in EXL 273, EXL 284, PEDL 10, PEDL 13 and PEDL 43 were:

> '16.1 In accordance with the provisions of the JOAs executed pursuant to the Earn In Agreement; and/or
>
> 16.2 In the ordinary course of the business of Octagon CBM and/or Octagon Resources.'

[387] In my judgment, the 90% interest assignments in respect of EXL 273, EXL 284, PEDL 10, PEDL 13 and PEDL 43 were not executed pursuant to the relevant JOAs and were not effected in the ordinary course of the business of any of the Octagon group companies.

[388] The contemporaneous documentation clearly shows that the intention of OCL and OCRL and E & P was that each of those assignments was to be effected pursuant to cl 16.4 of the relevant JOAs. The following are important examples.

[389] In a letter from Mr Grove, on behalf of E & P, to Mr Garratt dated 24 January 2003, Mr Grove stated that E & P gave notice that it would pay the licence rentals for EXL 273, EXL 284 and PEDL 11 by 28 February 2003 and, under 'clause 16.3' of the JOA in respect of each of those licences, OCL and OCRL should transfer and assign the licences to E & P.

*a* It is clear from Mr Grove's oral evidence that the reference to cl 16.3 of the JOA was a mistake, and he intended to refer to cl 16.4.

[390] The minutes of meetings of the directors of the Octagon group companies on 7 February 2003 record that, since licence rentals had not been paid, E & P had the right to take over the relevant licences according to the JOAs; and since the licence rentals had not been paid, certain licences

*b* had to be assigned to E & P to satisfy their demands. The minutes record that, in view of those matters, and the limited funds available to the Octagon group companies, it was agreed to assign EXL 273 and PEDL 10 to E & P at the earliest opportunity, and to assign EXL 284 to E & P before the DTI's deadline for payment of licence rentals of 28 February 2003 unless a settlement could be completed with Enron concerning the Enron

*c* loan in the interim.

[391] At the same time as the deeds of assignment were executed on 10 February 2003 in respect of EXL 273, EXL 284 and PEDL 10, deeds of licence assignment were also executed in respect of the same licences, each of which recited that the assignments were pursuant to the relevant JOA.

*d* [392] Mr Garratt sent the DTI application forms in respect of the assignments of EXL 273, EXL 284 and PEDL 10 under cover of a letter dated 10 February 2003. In those application forms it was stated, by way of a brief description of the transaction, that 90% of the licence interest was transferred from OCL and OCRL to E & P 'pursuant to existing Joint Operating Agreement.'

*e* [393] In the letter of 16 February 2003 from Mr Garratt to ECT, under cover of which Mr Garratt sent copies of the assignment documents relating to the transfer of the 90% interest in EXL 273, EXL 284 and PEDL 10, Mr Garratt stated that 'Octagon has now forfeited its 90% interest' in those licences. That could only have been a reference to cl 16.4 of the relevant JOAs.

*f* [394] In the letter of 7 March 2003 from Mr Grove, on behalf of E & P, to Mr Garratt with regard to rental payments due on PEDL 13 and PEDL 43, among other licences, Mr Grove stated that, if the rental payments were not made on time and E & P had to pay them to keep the licences on foot, the Octagon group companies 'would be liable to forfeit' all their rights and title to their interests in the licences. Again, this could only have been a

*g* reference to cl 16.4 of the relevant JOAs.

[395] Minutes of meetings of the directors of the Octagon group companies on 21 March 2003 recorded that rental payments on PEDL 43 were overdue, and E & P had been pressing for the payments to be paid, failing which they would 'take over the licence in accordance with the JOA.'

*h* [396] Although, on the evidence before me, the next meeting of the directors of each of the Octagon group companies was not until 23 April 2003, Mr Garratt wrote to E & P on 1 April 2003 stating that, because of the current situation 'and your rights', the Octagon group companies had agreed to transfer and assign to E & P its 90% interest in PEDL 43.

[397] Minutes of meetings of the directors of the Octagon group

*i* companies on 23 April 2003 recorded that rental payments on PEDL 43 were overdue, and E & P had been pressing for them to be paid, failing which 'they will take over the licence in accordance with the JOA'. The minutes recorded that, in consideration of those and other matters, the

board resolved 'to relinquish the licence to E & P … under the JOA.'          *a*

[**398**] In the letter from Mr Garratt to ECT dated 2 May 2003, under cover of which Mr Garratt sent copies of documents relating to the assignment of the 90% interest in PEDL 43, Mr Garratt stated that OCL 'has now forfeited' its 90% interest in PEDL 43 to E & P.

[**399**] In minutes of meetings of the directors of the Octagon group companies on 6 June 2003 it was recorded that rental payments on PEDL          *b* 13, among others, were overdue, and E & P had been pressing for them to be paid, failing which they would take over the licences 'in accordance with the JOA.' It was further recorded that, in consideration of those and other points, it was 'resolved to relinquish licence PEDL 13 to E & P … under the JOA.'          *c*

[**400**] In the letter of 18 June 2003 from Mr Garratt to ECT, under cover of which Mr Garratt sent copies of the assignment documentation relating to the transfer of the 90% interest in PEDL 13 to E & P, Mr Garratt stated that OCL 'has now forfeited' its 90% interest in PEDL 13.

[**401**] All those references to the rights of E & P to acquire the 90% interest in the relevant licences pursuant to the JOAs could only be a          *d* reference to cl 16.4 of the JOAs, as is also the case as regards all references to forfeiture of the 90% interest to E & P.

[**402**] It is clear, however, that none of the transfers of the 90% interest of the Octagon group companies in EXL 273, EXL 285, PEDL 10, PEDL 13 and PEDL 43 was in accordance with the procedure set out in cl 16.4 of the JOAs. The 60 day written notice of desire not to make a payment was not          *e* given.

[**403**] The assignments of the 90% interests in those licences, purportedly pursuant to cl 16.4 of the relevant JOAs, was, in the circumstances, a breach by the relevant Octagon group companies of cll 19.1.11 (c), (d) and (e) of the facility agreement.

[**404**] Further, by failing to give 90 days' prior notice to ECT of E & P's          *f* exercise of its rights under cl 16.4 of the relevant JOA, E & P was in breach of its obligations under cl 9.1 of the direct agreement.

[**405**] So far as concerns the defendants' alternative claim that the assignments of the 90% interests of OCL and OCRL in EXL 273, EXL 284, PEDL 10, PEDL 13 and PEDL 43 were in the ordinary course of the business of OCL and OCRL, a disposition, purportedly pursuant to cl 16.4          *g* of the relevant JOA, which was not in fact in accordance with the terms of the JOA and was in breach of the obligations of OCL and OCRL under cl 19 of the facility agreement, and in breach of the obligations of E & P under cl 9 of the direct agreement, cannot have been intended by the parties to fall within, and in my judgment did not fall within, the expression 'in the          *h* ordinary course of its … business' within cl 19.1.6 of the facility agreement.

[**406**] The claimants allege, in addition, that the transactions fell outside the ordinary course of business of the Octagon group companies since Mr Garratt was, in reality, involved on both sides of the transactions.

[**407**] It appears that, during the course of 2002, Parkfield, a British Virgin Island company, acquired a 49% interest in Protocom Operating          *i* LLC and E & P Operating LLC, which owned 100% of E & P. There is also evidence that, by virtue of its 49% interest, Parkfield effectively controls the affairs of E & P.

[**408**] In para 5 of the particulars of claim, the claimants allege that

*a*  Parkfield and/or the shares in and/or the officers of Parkfield are owned and/or controlled and/or directed (whether directly, or indirectly, wholly or partly) by Mr Garratt.

[**409**] In paras 37– 39 of the written closing submissions of the claimants a large number of matters are set out in support of the claimants' case that E & P cannot accurately be described as a third party acting independently *b*  of Mr Garratt or the Octagon group companies and generally at arm's length in relation to the impugned assignments.

[**410**] I do not propose to address each of the matters there set out. It is certainly true, as the claimants allege, that there is a remarkable dearth of evidence as to precisely who owns the majority beneficial interest in Parkfield. Absolutely no documentary evidence has been disclosed by E & P *c*  on this aspect, even though it is an issue directly raised in the particulars of claim. Mr Grove said, in his oral evidence, that he does not know who are the beneficial owners of Parkfield. His evidence was that he received his instructions from Mr Vallabh, but that there is not a single document on his files recording any of his communications with Mr Vallabh.

*d*  [**411**] I also agree with the claimants that it is clear from Mr Grove's evidence, and from the contents of correspondence written to the Octagon group companies and others by Mr Grove, on behalf of E & P, that Mr Garratt must have played a significant role in relation to the contents and wording of that correspondence.

[**412**] Nevertheless, having regard to the evidence as a whole, and *e*  particularly what I was told by Mr Grove, and notwithstanding the suspicions raised by the various matters mentioned in the paragraphs of the claimants' written closing submissions to which I have referred, I find that there is insufficient evidence to establish, on a balance of probabilities, that Mr Garratt owned or controlled or directed Parkfield, or its shares or its officers as alleged in para 5 of the particulars of claim.

*f*  [**413**] Mr Moss further submitted that the transfers of the 90% interest in EXL 273, EXL 284, PEDL 10, PEDL 13 and PEDL 43 were not in the ordinary course of the business of OCL or OCRL since the Octagon group companies were then left with inadequate assets to continue to trade and, in particular, to enable any re-financing to take place. There is insufficient evidence before me to justify that conclusion. The Octagon group *g*  companies were left with a significant holding in the two most valuable licences, as well as other assets.

[**414**] On the other hand, there are a number of unusual features surrounding the transfers of the 90% interests of OCL and OCRL in EXL 273, EXL 284, PEDL 10, PEDL 13 and PEDL 43 which, quite apart from *h*  the breaches of cl 19.1.11 of the facility agreement and cl 9.1 of the direct agreement, take the transactions outside the ordinary course of the business of those companies within cl 19.1.6 of the facility agreement.

[**415**] Like the sale of the after-acquired licences to OGL and the sale of the OGL shares to Cabot, the transfers of the 90% interest took place at a time when negotiations with the Enron lenders had come to an end, the *i*  Octagon group companies were in severe financial difficulties, and, in my judgment, insolvent, and they were effected in favour of an entity apparently controlled or directed by persons known to Mr Garratt personally, namely Mr Grove and Mr Vallabh. The transactions took place notwithstanding the absence of any independent valuation of the interest

being transferred, and without any new money being injected into the
Octagon group companies.

[**416**] A deliberate decision was taken not to inform the Enron lenders in
advance of the transactions. The obvious and proper inference to be drawn,
in all the circumstances, is that Mr Garratt and his co-directors of the
Octagon group companies were concerned that the proposed assignments of
the 90% interest might be prohibited under the terms of the security
documents and the Enron lenders or their representatives might object to
them.

[**417**] The most unusual and remarkable aspect of the transactions,
however, is the attempt by Mr Garratt, apparently of his own initiative, to
re-jig the assignments, in his dealings with the DTI, in order to avoid the
complications arising from the DTI's requirements in the case of
assignments of a 100% interest in existing licences to a new operator.

[**418**] The transfer of the 90% interest in EXL 273, EXL 284, PEDL 10,
PEDL 13 and PEDL 43, in conjunction with the prior assignments of a 10%
interest, resulted in assignments of 100% of the interest of OCL and OCRL
in those licences to E & P. The assignments were made, however, without
the consent in writing of the Secretary of State, contrary to the provisions of
the 1991 Model Clauses and the 1995 Model Clauses. Each of the relevant
licences was, therefore, subject to revocation by the Secretary of State.

[**419**] On the evidence before me, it was highly improbable, at the least,
that the Secretary of State would have approved E & P as assignee, in the
light of the personal qualifications required to be met by the DTI, as
mentioned by Mr Hawkins in his letter to Mr Garratt of 24 February 2003.
Mr Grove accepted in his oral evidence, for example, that E & P was
insolvent. It is highly unlikely, on the evidence before me, that E & P's
ultimate parent company would have been willing to supply the evidence of
its financial position, as specified in Mr Hawkins' letter.

[**420**] So far as concerns the DTI's requirements for technical competence,
and a UK basis for operations, it is also doubtful if the DTI would have
been satisfied with E & P's qualifications.

[**421**] In his letter of 25 February 2003, in reply to Mr Hawkins' letter of
24 February 2003, Mr Garratt stated:

> 'Information was provided on E & P … at the time of signing the
> Enron Agreements. It is a UK company which will use some of the
> existing consultants that Octagon has used on the licences in addition to
> expertise from the USA. Some of the US personnel have worked in the
> UK on UK onshore licences.'

[**422**] That statement was, at best, highly misleading. It did not accurately
reflect the facts, as known to Mr Garratt, that the original personnel of E &
P who had considerable relevant technical expertise, withdrew from the
operations of E & P when Parkfield acquired its interest in 2002. The two
new directors of E & P, who were not based in the UK, were Mr Grove and
Mr John Atencio. Mr Grove, who was principally responsible for managing
the affairs of E & P, had never been involved in any CMM or CBM
operations, and had never been involved in drilling any wells. Mr Grove's
evidence was that Mr Atencio was active in the oil and gas business,
especially in CBM leasing. Mr Grove agreed with Mr Moss, however, that
Mr Atencio did not play any significant role in any of the key decisions or

*a* the writing of any letters. There is no evidence before me that Mr Atencio had ever worked in the UK on UK on-shore licences, as stated in the letter of 25 February 2003. There is no evidence that any of the companies directly or indirectly owning or controlling E & P had any technical experience of any kind in relation to the work required to be, and anticipated to be, carried out pursuant to the licences.

*b* [**423**] Doubtless it was in order to deal with these difficulties that Mr Garratt, when he sent to the DTI the original application forms in respect of the assignments of a 90% interest in EXL 273, EXL 284 and PEDL 10, stated in each of the application forms that E & P had 'been involved in the exploration of the licence since February 2000', without any regard to the changes that had taken place in the personnel and ownership

*c* of E & P when Parkfield acquired its interest in 2002.

[**424**] The assignment of a 90% interest in EXL 273, EXL 284 and PEDL 10, without the prior written consent of the Secretary of State, in circumstances in which it was highly unlikely that the Secretary of State would ever accept E & P as a proper owner of a 100% interest in those

*d* licences, and thereby exposing the licences to the real possibility of revocation by the Secretary of State, could not properly be described as being a transaction in the ordinary course of the business of any of the Octagon group companies.

[**425**] Furthermore, and remarkably, in order to circumvent the difficulties of satisfying the requirements in Mr Hawkins' letter of 24 February 2003,

*e* Mr Garratt proposed, in his letter to Mr Hawkins of 25 February 2003, that the assignments be re-jigged so that only an 80% interest was to be treated as transferred, and so that E & P had a 90% interest after assignment and the Octagon group companies had a 10% interest after assignment, and there was no change in the operator, notwithstanding that the deeds of assignment in respect of EXL 273, EXL 284 and PEDL 10 had

*f* already been executed.

[**426**] Pursuant to that proposal, revised application forms were submitted to the DTI under cover of a letter from Mr Garratt to the DTI dated 7 March 2003, each of which briefly described the transaction as 'Assignment of 80% of licence interest from [OCL] to the other Licensee, [E & P], pursuant to the existing Joint Operating Agreement.' Each of those

*g* revised applications forms contained the same statement as the original forms that E & P had been involved in the exploration of the relevant licences since February 2000.

[**427**] As in the case of the revised proposals and revised applications for the transfer of the after-acquired licences to OGL, there appears to be no

*h* contemporaneous documentary evidence, including minutes of board meetings, that the re-jigging of the transfers to E & P was the subject of any discussion or decision at meetings of the directors of the Octagon group companies or of E & P or the subject of discussion and agreement between Mr Garratt or anyone else representing the Octagon group companies and E & P and its representatives.

*i* [**428**] So far as concerns the assignments of the 90% interest in respect of PEDL 13 and PEDL 43, which were executed on 13 June 2003 and 28 April 2003 respectively, they were executed without the prior written consent of the Secretary of State, and with Mr Garratt's knowledge of the requirements specified in Mr Hawkins' letter of 24 February 2003. They were,

accordingly, executed by OCL in the knowledge that it was highly *a*
improbable that the Secretary of State would consent to the assignments.

[**429**] Remarkably, on 1 August 2003, Mr Garratt wrote to the DTI
stating that an 80% interest in PEDL 13 and PEDL 43 had been transferred
from OCL to E & P which, when combined with the 10% interest
previously transferred to E & P in respect of those licences, resulted in E &
P holding a 90% interest and OCL holding a 10% interest after the *b*
assignments. Those assignments of an 80% interest in PEDL 13 and PEDL
43 were said by Mr Garratt, in the letter of 1 August 2003, to have been
transferred 'following your comments in your letter of 15 July 2003
regarding Open Permission'. That was a reference to a letter sent by email
by Mr Robert Bailey of the DTI to Mr Garratt on 15 July 2003 in which
Mr Bailey explained that, if a transaction is not a licence assignment 'which *c*
would involve one or more parties entering and/or leaving a licence', but
merely an internal reorganisation of the allocation of rights agreed amongst
existing licensees, Mr Garratt should consider whether, by virtue of the
provisions of 'the Open Permission (Operating Agreements)', permission
had already been granted in respect of the assignments for EXL 273, EXL *d*
284 and PEDL 10.

[**430**] The statements in Mr Garratt's letter to the DTI of 1 August 2003
in respect of the assignments for PEDL 13 and PEDL 43 were bald
untruths. The assignments were not of an 80% interest, but were of a 90%
interest which, together with the previously transferred 10% interest,
assigned to E & P 100% of the interest in those licences. Further, the *e*
assignments had not taken place following the DTI's letter of 15 July 2003,
since they had already been executed on 28 April 2003 and 13 June 2003.

[**431**] Once again, there is no contemporaneous documentary evidence
that Mr Garratt's purported revision of the interest transferred to E & P in
respect of PEDL 13 and PEDL 43 was discussed with, let alone agreed by,
either Mr Garratt's co-directors of the Octagon group companies or E & P, *f*
and there is no evidence that there was ever any re-assignment of any
interest transferred by the assignments executed on 28 April 2003 and
13 June 2003.

[**432**] Whether or not there was any oral discussion and agreement
between the directors of OCL or OCRL and also between E & P and
OCL/OCRL (as to which there was no cross-examination), in all the *g*
circumstances the purported assignments to E & P of a 90% interest in
EXL 273, EXL 284, PEDL 10, PEDL 13 and PEDL 43 could hardly be
described as being in the ordinary course of the business of any of the
Octagon group companies.

[**433**] As in the case of the assignment to Cabot of the after-acquired *h*
licences, the defendants claim that the claimants are estopped from denying
the validity of the assignments in respect of the 90% interest in EXL 273,
EXL 284, PEDL 10, PEDL 13 and PEDL 43, or from claiming that those
assignments were in breach of the terms of the facility agreement or the
debentures.

[**434**] Among other things, the defendants rely upon the fact that the *i*
relevant assignments were provided to ECT under cover of letters from
Mr Garratt dated 16 February 2003, 2 May 2003 and 18 June 2003. The
defendants rely upon the absence of any response by ECT or the Enron
lenders or any other representative of them, within a reasonable period of

*a*  time after being notified of the assignments, objecting to the assignments.

[435] In my judgment, there is no proper basis for any such estoppel as is alleged. There is no evidence before me that the Enron lenders or anyone acting on their behalf knew of all the various facts and matters which I have set out above and which preclude the transactions from being fairly described as having been carried out in the ordinary course of the business

*b*  of OCL or OCRL. There is no evidence, for example, that they were aware that the procedure specified in cl 16.4 of the relevant JOAs had not been satisfied, or that the facts and circumstances were such that it was highly probable that the Secretary of State would not consent to the assignments, or that Mr Garratt, in order to attempt to procure the consent of the Secretary of State, would resort to the untruths and the purported revisions

*c*  of the interests assigned which I have described above in connection with the applications to the DTI for consent.

[436] In summary, the Enron lenders made no clear or unequivocal promise or representation to the Octagon group companies or E & P that the Enron lenders would not rely on their strict legal rights, or rendering it

*d*  inequitable for them or the claimants to do so.

[437] As in the case of the sale of the after-acquired licences to OGL, and of the OGL shares to Cabot, E & P claims that, if it is not entitled to a declaration that it is the owner of 100% of the legal and beneficial interest in EXL 273, EXL 284, PEDL 10, PEDL 13 and PEDL 43, E & P is entitled to repayment of all sums expended by it in relation to those licences.

*e*  [438] For the same reasons as I have mentioned in connection with a similar claim by OGL and Cabot in relation to the after-acquired licences and the OGL shares, I hold that E & P is not entitled to an order for such repayment. In short, in the absence of any estoppel, Greenpark asserts its rights by virtue of the superiority of its property interest over that of E & P, since the equitable interest of the Enron lenders, through which Greenpark

*f*  derives title, is earlier in time than the creation of the equitable interest purportedly transferred to E & P, and E & P does not claim to be purchaser of the legal interest in the relevant licences without notice.

[439] As I have said, no authority was cited to me by Mr Adkins in support of the defendants' case on this aspect.

*g*  [440] Once again, the question whether E & P has any claim against OCL or OCRL in relation to the transfers of a 90% interest in EXL 273, EXL 284, PEDL 10, PEDL 13 and PEDL 43 does not arise for my decision in this case, and was not the subject of any submissions to me.

WRONGFUL INTERFERENCE WITH THE DRILLING RIG AND THE EQUIPMENT

*h*  [441] The defendants counterclaim that OGL was at all material times the legal and beneficial owner of the drilling rig and the equipment; and that on 6 or 7 January 2003 Greenpark, or those acting on its behalf, removed the drilling rig and the equipment, or caused them to be removed, from where they were stored by OGL; and Greenpark thereby wrongfully interfered with OGL's property.

*i*  [442] OGL seeks a declaration that the drilling rig and the equipment are its property, an order that Greenpark forthwith deliver up the drilling rig and the equipment to OGL, and damages for wrongful interference.

[443] It appears, both from the re-amended defence to counterclaim, and the evidence that was given on the claimants' behalf, that the claimants do

not deny that the drilling rig and the equipment were removed from their
existing places of storage by Greenpark, but they put OGL to proof that the
drilling rig and the equipment were previously owned by Cabot, from
which company OGL claims to have purchased them.

[**444**] I am satisfied, from the evidence of Mr Roscoe and the
documentary evidence, including invoices, that, on a balance of
probabilities, the drilling rig and the equipment were purchased by Cabot
and Cabot subsequently sold them to OGL. Mr Roscoe's oral and written
evidence described in detail the circumstances and the manner in which
Cabot purchased the drilling rig and the equipment and then sold them to
OGL. The available documentary evidence, including invoices, supports his
account.

[**445**] Greenpark has refused or failed to return the drilling rig and the
equipment to OGL, notwithstanding a demand for their return in a letter
dated 9 January 2004 from OGL to Greenpark.

[**446**] In the light of those findings, no arguable defence was advanced by
the claimants to the allegation of wrongful interference with OGL's
property.

[**447**] Accordingly, OGL is entitled to its counterclaim for a declaration
that Greenpark has wrongfully interfered with the drilling rig and the
equipment, and an order for delivery up of the same. So far as concerns the
claim to damages, as I have said earlier in this judgment, the parties are
agreed that, in all the circumstances, I should order an enquiry.

SUMMARY OF CONCLUSIONS

[**448**] In summary, my conclusions on the issues which arose for
determination at the trial are as follows:

i) the transfers to Cabot of 41% of PEDL 11 and PEDL 12 were not
within the ordinary course of OCL's business;

ii) the transfers to E & P of a 10% interest in EXL 273, EXL 284 and
PEDL 12 were expressly permitted by cl 19.1.6 of the facility agreement
and, accordingly, cl 4.2 of the debentures; but the transfers to E & P of a
10% interest in PEDL 10, PEDL 11, PEDL 13 and PEDL 43 were outside
the terms of the earn-in agreement and were not in the ordinary course of
the business of OCL or OCRL within cl 19.1.6 of the facility agreement;

iii) the transfers to OGL of the after-acquired licences were not in the
ordinary course of the business of OCL or OCRL and were not otherwise
permitted by cl 19.1.6 of the facility agreement;

iv) the sale to Cabot of the OGL shares was not in the ordinary course of
the business of OEL;

v) the transfers to E & P of 90% of EXL 273, EXL 284, PEDL 10, PEDL
11, PEDL 13 and PEDL 43 were not in the ordinary course of the business
of OCL or OCRL and were not otherwise permitted by cl 19.1.6 of the
facility agreement;

vi) Greenpark is not precluded, by any consent given on behalf of the
Enron lenders, or by any estoppel, from asserting its rights in respect of
those assets the disposals of which were not permitted by cl 19.1.6 of the
facility agreement;

vii) none of the defendants are entitled to repayment of any sums
expended by them in relation to the licences and the OGL shares, as a

*a*  condition of the enforcement by Greenpark of its property interests
pursuant to my findings;

   viii) Greenpark has wrongly interfered with OGL's rights in respect of the
drilling rig and the equipment, and must deliver up the same to OGL.

*b*  *Order accordingly.*

Victoria Ellis   Barrister.

TAB 5

*Bank of Australasia v Hall* (1907) 4 CLR 1514,
High Court of Australia



1514

HIGH COURT

1907.

[HIGH COURT OF AUSTRALIA.]

BANK OF AUSTRALASIA . . . APPELLANTS;

AND

THOMAS MURRAY HALL, TRUSTEE OF
THE ESTATE OF JAMES ROBERT-    RESPONDENT.
SON IN LIQUIDATION . . .

ON APPEAL FROM THE SUPREME COURT OF
QUEENSLAND.

H. C. OF A.
1907.

BRISBANE,
May 1, 2, 3.

Griffith C.J.,
Isaacs and
Higgins JJ.

SYDNEY,
July 29, 30,
31 ;
Aug. 1, 19.

Griffith C.J.,
Barton,
O'Connor,
Isaacs and
Higgins JJ.

*Insolvency—Security given over property of debtor for advances—Insolvency Act
1874 (Qd.) (38 Vict. No. 5), secs. 107, 108, 109, 112, 113, 140—Ability to pay
"debts as they become due" from his own moneys—"Reasonable and sufficient
consideration given at the time"—"Good faith"—Debts, liquidated and con-
tingent liabilities—Assets, realizable property, credit—Bills of Sale Act 1891
(Qd.), sec. 4—True statement of consideration—Secret defeasance.*

Where the validity of a conveyance by a debtor to a creditor is questioned
under the *Insolvency Act* 1874 (Qd.), the words in secs. 107 and 108, "unable
to pay his debts as they become due from his own moneys," mean that the
debtor must at the time in question have had sufficient cash in hand or been
able to obtain, by sale or pledge of his available assets, command of sufficient
money to satisfy all debts that were anticipated to fall due and become
ascertained in the reasonably immediate future.

*Held, per Curiam (Higgins J. dissenting).—"Debts" in the above sections
include any liabilities that would have been provable in insolvency if the
debtor had been adjudicated insolvent at the time in question.*

Under sec. 108 the words "reasonable and sufficient consideration" require
that the debtor shall, in return for the property conveyed or pledged, receive
from the creditor such consideration in money or realizable value as will
make up to his estate substantially what the conveyance or pledge has taken
from it.

Under sec. 109, the words "in good faith" mean that the creditor taking
a conveyance or security from the debtor must prove that he took without
knowing, or being put upon inquiry which would disclose, that the convey-
ance or security taken would or might defeat the claims of other creditors.

R. on 7th July 1905, being in need of money to pay wages to the miners in
his colliery, applied for an advance from the A. Bank, which had financed

OF AUSTRALIA.

him for some years, and the manager whereof was familiar with all his affairs. The bank made him an advance of £937, and took a security for an amount comprising that sum and an old overdraft of £954. This, with a further advance of about £200 which was contemplated, but not stipulated for, would, it was stated, have been a full advance upon the assets assigned, stated as worth £4,800. At that time R. had other assets, including book debts worth £1,250, and furniture, an office, and small allotments of land, worth £350 in all; and there were debts then due of £450 and other debts soon accruing due of £600. In August a further sum of about £200 would fall due for current wages. Besides these assets R. was conducting a colliery business at a slight profit, and had a claim against P. for £1,800 as balance of purchase money of a ship, which, however, had since March 1905 been the subject of an action by P. against R. The action resulted in August 1905 in a judgment against R. for the rescission of the sale, the repayment of £700 deposit of purchase money, and the payment of damages and costs amounting to over £1,500. R. then presented a petition for liquidation.

*Held, per Curiam* (*Higgins* J. dissenting), that the security given to the bank was invalid under secs. 108 and 109 of the *Insolvency Act* 1874 (Qd.); that the debtor at the time of giving the security was unable to pay his debts as they became due out of his own moneys, and did not obtain a reasonable and sufficient consideration; and that the bank did not take the security in good faith.

*Per Higgins* J. :—The word "debts" in secs. 107 and 108, in the expression "unable to pay his debts as they become due from his own moneys," does not include contingent or other mere liabilities, but means debts in the ordinary commercial and legal sense, whether payable presently or in the future.

The words in sec. 108, requiring for the validity of a dealing before insolvency "a reasonable and sufficient consideration given at the time," do not, as applied to a security given by the insolvent, mean that the present advance must be equal, or nearly equal, or equivalent, or nearly equivalent, in amount to the amount secured. The object of the section was to prevent the favouring of certain creditors at the expense of the others. The test is, was the dealing a true bargain, each of the parties straining for his own benefit. On the facts, the trustee has not satisfied the burden of proof by showing that on the 7th and 8th July R. was unable to pay his debts.

Judgment of *Real* J.: *In re Robertson* ; *Ex parte Hall*, 1907 St. R. Qd., 76, affirmed.

APPEAL from a judgment of the Supreme Court of Queensland.

The trustee in insolvency of the estate of James Robertson moved the Insolvency Court to set aside certain securities given by the insolvent to the appellant bank as invalidated by secs. 107, 108, and 109 of the *Insolvency Act* 1874 and the *Bills of Sale Act* 1891, sec. 4.

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
v.
HALL.

The sections of the *Insolvency Act*, and the circumstances under which the debtor gave the securities to the appellant bank, are fully set out in the judgments.

In the Insolvency Court *Real* J. declared the securities invalid, holding that the requirement of sec. 108 that the debtor shall be able to pay his debts as they become due "out of his own moneys" meant that he shall have not merely credit, but money available in ready cash or at call sufficient to pay the debts when they become payable; and that the requirement of sec. 108 that "reasonable and sufficient consideration" must be given for the security meant that an amount equal to the value of the security must be advanced: *In re Robertson; Ex parte Hall* (1). From this decision the bank appealed to the High Court.

The case was twice argued, first at Brisbane before *Griffith* C.J., *Isaacs* and *Higgins* JJ., and afterwards at Sydney before the Full Bench.

*Feez* and *Shand*, for the appellants. The giving of the securities was not a fraudulent preference under sec. 108 of the *Insolvency Act* 1874. On that date, 7th July 1905, the debtor had ample assets to pay his debts "as they became due."

The total property was worth over £7,000; and of this he pledged £4,800 worth to secure the bank in a charge of £1,890 and some small further advances; while the debts then owing were £430 and a debt accruing for railage of his coal. Apart from the *Kingswear* transaction it is clear that the debtor was well able to pay his debts at the time of giving the securities, which is the only date to which the inquiry as to his ability to pay debts is to be directed. The *Kingswear* transaction is excluded from any reasonable definition of the word "debts"; it created at most a mere contingent liability to be mulcted in damages and costs. No reasonable man, knowing that Robertson had a *bonâ fide* defence to Phillipson's claim, could on 7th July consider the £2,260 ultimately lost upon the *Kingswear* action a "debt" that would be coming due. "Debt" must mean a present liquidated claim.

[ISAACS J.—You cannot claim to exclude bills of exchange and

(1) 1907 St. R. Qd., 76.

BarNet publication information  -  Date: Saturday, 07.01.2017  -  Publication number: 2479940  -  User: anonymous

4 C.L.R.]                 OF  AUSTRALIA.                        1517

promissory notes, shortly becoming payable, from the category of "debts." Phillipson had already, on 22nd March 1905, rescinded the contract and claimed his £700 back again.]

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
v.
HALL.

The contract was not rescinded till 10th August, when Phillipson elected to take a judgment for rescission instead of damages; he never at any time claimed the £700 as money had and received. He claimed in the alternative for unliquidated damages for fraud; it could not be said that on 7th July he would not elect for damages. Such an inchoate and indeterminate liability could not be termed a "debt" on 7th July. Under the English *Companies Act* 1860 debts "as they become due" mean debts that are actually due at the time: *In re European Life Assurance Society* (1).

The debtor is able to pay his debts "out of his own moneys" if he has such resources that in the ordinary course of business he is able to make enough profits or raise enough money on credit to pay the debts when they become payable; he is not bound to have money "at call" ready to pay, which was the basis of *Real J.'s* decision.

Phillipson's action against the debtor did not disclose any lawful right to rescind; furthermore the findings of the jury against the debtor, and the judgment for rescission, which was bad at law, were not in any way binding on the bank in the present question: *Ex parte Pearse* (2); *Urquhart v. Macpherson* (3); *Kerr on Fraud*, 2nd ed., pp. 367-8; *Taylor on Evidence*, 9th ed., § 1682.

Under sec. 108, "debt" does not include "liabilities," as under the Act of 13 Eliz. c. 5.

In any case the *Kingswear* transaction set up only a contingent liability: *Insolvency Act* 1874, sec. 140. A "liability" may be a "debt provable in insolvency" under sec. 140 in common with other debts; but that does not make it a "debt" within the meaning of sec. 108.

[ISAACS J. referred to *In re Charles* (4); *Jones v. Thompson* (5); *Hardy v. Fothergill* (6); *Ex parte Broadhurst*; *In re Broadhurst* (7).]

(1) L.R. 9 Ex., 122.
(2) 2 Deac. & Ch., 451.
(3) 3 App. Cas., 831.
(4) 14 East., 197.

(5) 27 L.J.Q.B., 234.
(6) 13 App. Cas., 351.
(7) 22 L.J. Bk., 21.

1518                    HIGH COURT                    [1907.

H. C. of A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

"Due" in sec. 108 means "presently payable." A man is only bound by this section to provide for debts that he *knows* will accrue due; if it is *solvendum in futuro*, it must still be *debitum in praesenti* ; *Ex parte Sturt & Co.* ; *In re Pearcy* (1).

"Reasonable and sufficient consideration" under sec. 108 is satisfied if, at the time and under the circumstances of the transaction, the debtor obtained fair value for what he gave. An advance of £950 to meet a pressing liability, and an arrangement for further advances, enabling the debtor to safely carry on a lucrative business, is ample value for a charge of £1,850: *Bittlestone* v. *Cook* (2); *Dixon* v. *Todd* (3); *In re Donaldson* (4).

[ISAACS J. referred to *In re Colemere* (5).]

HIGGINS J. referred to *Ex parte Fisher* (6).]

It is clearly wrong to hold that sec. 108 requires that the property hypothecated must be only the exact value of the advance; the property and the advance need, at most, be reasonably proportionate.

[GRIFFITH C.J.—The objection taken is that the £1,850 charge was given, not only for the present advance of £950, but also for the past overdraft of £900.]

But if the debtor had gone to another bank and raised £1,850 upon the securities, thus paying off the overdraft and wages, this transaction would be clearly valid; it can make no difference that the debtor borrowed from the same bank to which he owed the overdraft; the result is the same. This disposition of property does not fall within sec. 108, but is, of course, liable to be caught by sec. 107 and the Statute of 13 Eliz. c. 5, if it was made in order to avoid the consequences of a verdict certain to go against the debtor; at that time the verdict in the *Kingswear* action was hardly even a probability, and could have been set aside if Robertson had not given up the fight and filed his schedule. An honest transaction, in which a fair equivalent was obtained for the debtor, to enable him to benefit the creditors by carrying on a good business, should not be brought within the mischief aimed at by sec. 108, if the debtor is made insolvent within six months

(1) L.R. 13 Eq., 309.
(2) 6 El. & Bl., 296, at pp. 309-311.
(3) 1 C.L.R., 320, at p. 324.
(4) 1 Q.L.J., 105.
(5) L.R. 1 Ch., 128.
(6) L.R. 7 Ch., 636.

{ C.L.R.]        OF  AUSTRALIA.                    1519

by the consequences of an action for tort to which he had a good

[GRIFFITH C.J.—The debtor's honest belief that he is bargaining
for a fair equivalent can hardly be made the measure of " sufficient
consideration" under sec. 108, which did away with all these
questions of intention and *bona fides,* and substituted a test of
the state of facts at the time of the transaction.]

The onus is on the trustee to prove that the consideration was
not a fair equivalent : *Mercer* v. *Peterson* (1); *Wace on Bank-
ruptcy,* 1904 ed., pp. 22, 252; *Ex parte King*; *In re King* (2);
*Ex parte Johnson*; *In re Chapman* (3); *Jamaica* (*Administrator-
General*) v. *Lascelles, De Mercado & Co.*; *In re Rees' Bank-
ruptcy* (4); *Ex parte Wilkinson*; *In re Berry* (5); *Ex parte
Lancaster*; *In re Marsden* (6).

Sec. 109 does not touch this transaction, as *Real* J. found that
it was perfectly *bond fide* on both sides : *Butcher* v. *Stead*; *In re
Meldrum* (7); *Tomkins* v. *Saffery*; *Ex parte Saffery, In re
Cooke* (8).

*Macgregor* and *Graham* for the respondent (*Macgregor* at
Brisbane only.) This legislation in insolvency was framed to
deal more stringently with fraudulent preferences. The Queens-
land *Insolvency Act* 1874, sec. 107, went so far as to cut out the
exception in sec. 92 of the English Act of 1869 where there had
been pressure by the creditor. Sec. 108 was enacted to do away
with the whole question of intention or *bona fides,* and to sub-
stitute for that the test of two facts, ability to pay debts, and
sufficiency of consideration. " Preference " in this Act does not
connote any state of mind in the debtor, but merely denotes the
effect of giving the creditor an advantage. The phrase " debts as
they become due " in sec. 108 indicates the continuous falling
due of various debts in succession ; and the period contemplated
must be the six months named in the Act within which these
transactions are liable to impeachment. It is not necessary to
claim that a transaction can be impeached if the debtor is ruined

H. C. of A.
1907.
~~~~~
BANK OF
AUSTRALASIA
*v.*
HALL.
———

(1) L.R. 3 Ex., 104.
(2) 2 Ch. D., 256.
(3) 26 Ch. D., 338.
(4) (1894) A.C., 135.
(5) 22 Ch. D., 788.
(6) 25 Ch. D., 311.
(7) L.R. 7 H.L., 839.
(8) 3 App. Cas., 213.

1520                            HIGH COURT                            [1907.

H. C. OF A.
1907.
~~
BANK OF
AUSTRALASIA
*v.*
HALL.
———

by some catastrophe within the six months; the position of the debtor on 7th July discloses sufficient to invalidate the securities then given to the bank, if the facts then developing are looked at in the proper light. The *Kingswear* liability was always a provable debt, which ripened into a judgment before insolvency. The claim for return of £700 was a debt actually due on 7th July, as Phillipson had then elected to rescind the contract of sale, and was willing and able to return the ship in the same condition as before.

[HIGGINS J. referred to *Street* v. *Blay* (1).]

There was total failure of consideration here. The fact that the debtor thinks he can successfully defend a claim properly brought against him, does not make that claim not a "debt." The £700 was immediately recoverable as money had and received, or, at any rate, as an immediate equitable debt as money obtained by fraud.

[*Feez.*—This money was rightly treated throughout the case as not so recoverable : *Jack* v. *Kipping* (2).

ISAACS J.—Phillipson had an election to sue in tort for damages, or to waive the tort and prove in the insolvency on the contract : *Ex parte Read* ; *In re Paine* (3) ; *In re Blackpool Motor Car Co. Ltd.* ; *Hamilton* v. *Blackpool Motor Car Co. Ltd.* (4).]

The remedies were interchangeable, but both rights of action were equally provable in insolvency as arising out of contract.

The verdict obtained for damages, although for a tort, was a "debt provable in insolvency" under sec. 140, which means the same as debt in sec. 108 : *Ex parte Adamson* ; *In re Collie* (5) ; *Insolvency Act* 1874 (Qd.), sec. 140. There is no distinction made in sec. 108 between the various kinds of debts, so long as they were on 7th July liabilities which were provable as debts in the supervening insolvency : *Peat* v. *Jones* (6) ; *In re British Gold Fields of West Africa* (7). The fact that the amount was not ascertained by judgment before 7th July did not make the *Kingswear* liability unliquidated, any more than in a case where a judgment has been obtained for such an amount as may be found to be due

(1) 2 B. & Ad., 456.
(2) 9 Q.B.D., 113.
(3) (1897) 1 Q.B., 122.
(4) (1901) 1 Ch., 77.

(5) 8 Ch. D., 807, at p. 819.
(6) 8 Q.B.D., 147.
(7) (1899) 2 Ch., 7.

Following paragraph cited by:

**BarNet publication information** - Date: Saturday, 07.01.2017 - Publication number: 2479940 - User: anonymous

4 C.L.R.]    OF AUSTRALIA.    1521

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
v.
HALL.

on accounts being taken ; the amount was always definite, though not yet formally ascertained. The continuous succession indicated by "as they become due" shows that the debts are not to be calculated on any particular day. The place of sec. 108 would not be adequately filled by the Statute 13 Eliz. c. 5 ; the two enactments treat the matter quite differently ; knowledge, intention, *bona fides*, and all other states of mind are, under sec. 108, quite immaterial ; the only transactions that are exempted are payments *bonâ fide* made in the ordinary course of business.

On the facts, there were so many debts accruing due from day to day, apart from the *Kingswear* liability, that the debtor was on 7th July virtually insolvent.

"Out of his moneys" in sec. 108 means such resources as the debtor can enforce immediate liquidation of ; it cannot include book debts or the probability of being able to raise more credit upon his assets: *In re Washington Diamond Mining Co.* (1). The debtor's position depends on whether he *can* pay his debts, not on whether a balance-sheet will show a surplus of assets over liabilities.

The *Kingswear* was on 7th July the subject of a lawsuit, and had been condemned as unseaworthy, and was an eminently unrealizable asset ; while the coal business was not a paying concern, but always in arrears.

"Reasonable and sufficient consideration" in sec. 108 is an absolute bar to giving security to cover an old debt as well as a present advance.

[HIGGINS J.—Any consideration that is legal and not illusory has long been treated as "sufficient" ; adequacy of consideration is immaterial.]

That applies only in the law of contract ; whereas the *Insolvency Act* treats the word "consideration" in an entirely different aspect. It aimed to secure the equal distribution of assets among the creditors without diminution ; hence the consideration obtained must under sec. 104 be "a contemporaneous equivalent," and "the creditors must lose nothing by the assignment": *Dixon* v. *Todd* (2).

The transaction is also assailable under secs. 107 and 109,

(1) (1893) 3 Ch., 95.    (2) 1 C.L.R., 320.

1522                                        HIGH COURT                                       [1907.

H. C. of A.   because it was not made in "good faith." This does not require
1907.         proof of actual fraud, but merely fraud in law, *i.e.*, the preferred
BANK OF       creditor does not take in good faith if he takes knowing that, or
AUSTRALASIA   recklessly without inquiring whether, the preference given to
*v.*          him will prejudice other creditors; "mere passive good faith is
HALL.         not enough:" *Butcher v. Stead*; *In re Meldrum* (1); *Tomkins v.
              Saffery*, *Ex parte Saffery, In re Cooke* (2); the bank manager
              should have made better inquiries, but preferred to take his
              chance, although he knew well that there was some danger.

              The trustee is entitled to the costs of this appeal, as he would
              be liable to pay costs personally, even if he is the respondent:
              *Ex parte Angerstein* (3); *Ex parte Stapleton*; *In re Nathan* (4);
              *In re Mackenzie*; *Ex parte Hertfordshire (Sheriff of)* (5);
              *Williams on Bankruptcy*, 1904 ed., p. 312.

              *Feez* in reply. The trustee should protect himself as to costs
              by taking indemnity from the creditors: *Ex parte Brown*; *In re
              Smith* (6).

              [ISAACS J. referred to *Pitts v. La Fontaine* (7).]

              The onus is not on the appellants to prove the presence of good
              faith in order to satisfy sec. 109 of the *Insolvency Act*. The bank
              were satisfied on 7th July after careful inquiry that the debtor's
              position, apart from a possible liability, which could neither be
              estimated nor guessed, was thoroughly solvent; and *Real* J. found
              that the debtor and the bank's manager acted with absolute
              honesty. "Debts" do not include all kinds of provable liabilities
              under sec. 108, which has no connection with sec. 140: *Ex parte
              Kelly & Co.*; *In re Smith, Fleming & Co.* (8).

              [GRIFFITH C.J.—You would make "creditors" and "debts"
              refer to different subject matters in the various places where they
              occur in secs. 107 and 108.]

              Sec. 108 is not concerned merely with a state of facts; it also
              has regard to intention: *In re Mills* (9); *In re Warren*; *Ex parte
              Trustee* (10); *In re Blackpool Motor Car Co.*; *Hamilton v. Black-*

              (1) L.R. 7 H.L., 839.                (6) 17 Q.B.D., 488.
              (2) 3 App. Cas., 213, at p. 227.     (7) 6 App. Cas., 482.
              (3) L.R. 9 Ch., 479.                 (8) 11 Ch. D., 306.
              (4) 10 Ch. D., 586.                  (9) 5 Morr., 55.
              (5) (1899) 2 Q.B., 566.              (10) (1900) 2 Q.B., 138.

4 C.L.R.]  OF AUSTRALIA.  1523

pool Motor Car Co. (1); *Ex parte Lancaster*; *In re Marsden* (2);
*Wolmershausen* v. *Gullick* (3).

<div style="text-align:right">*Cur. adv. vult.*</div>

<div style="text-align:right">H. C. of A.<br>1907.<br><br>Bank of<br>Australasia<br>*v.*<br>Hall.<br><br>Aug. 19.</div>

GRIFFITH C.J.  This is an appeal from a decision of *Real J.*,
upon a motion of the respondent, the trustee in liquidation of
James Robertson, for a declaration that certain securities dated
8th July 1905, given by the debtor to the appellants by way of
mortgage, were invalid under the provisions of the *Insolvency
Act* of 1874, and also, as to one of them, under the *Bills of Sale
Act* of 1891.  Secs. 107, 108, and 109 of the *Insolvency Act* are
as follow :—

"107.  Every conveyance assignment gift delivery or transfer
of property or charge thereon made every payment made every
obligation incurred and every judicial proceeding taken or
suffered by any debtor unable to pay his debts as they become
due from his own moneys in favour of any creditor or any person
in trust for any creditor with a view of giving such creditor a
preference over the other creditors shall if a petition for adjudi-
cation in insolvency be presented against such debtor within six
months after the date of making taking paying or suffering the
same and adjudication of insolvency be made on such petition be
deemed fraudulent and void as against the trustee of the insolvent
appointed under this Act but this section shall not affect the
rights of a purchaser payee or incumbrancer in good faith and for
valuable consideration  Provided that pressure by a creditor shall
not be sufficient to exempt any transaction from the operation of
this section.

"108.  Every conveyance assignment gift delivery or transfer
of property or charge thereon made executed or given by any
debtor unable to pay his debts as they become due from his own
moneys in favour of any creditor or any person in trust for any
creditor not being for a reasonable and sufficient consideration
given at the time of making or giving the same shall if a petition
for adjudication of insolvency be presented against such debtor
within six months after the date of making executing or giving

(1) (1901) 1 Ch., 77, at p. 81.  (2) 25 Ch. D., 311, at p. 318.
(3) (1893) 2 Ch., 514.

1524                                    HIGH COURT                                    [1907.

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Griffith C.J.

the same and adjudication of insolvency be made thereon be deemed a fraudulent preference and shall be void as against the trustee of the insolvent under this Act and shall not be available to the creditor as against the trustee.  .  .  .

" 109.  Every conveyance assignment gift delivery or transfer of property or charge thereon made executed or given by any debtor unable to pay his debts as they become due from his own moneys and the effect whereof is to defeat or delay the creditors of such debtor or to diminish the property to be divided amongst his creditors shall if a petition for adjudication of insolvency be presented against the debtor within six months thereafter be deemed fraudulent and void as against the petitioning creditor and if adjudication of insolvency be made on such petition shall also be deemed fraudulent and void as against the trustee in the insolvency unless in either case it shall be proved that such conveyance assignment gift delivery transfer or charge was in fact made in good faith proof whereof shall be upon the party alleging the validity of the transaction

" Provided that pressure by a creditor shall not be sufficient to protect any such transaction nor shall any such transaction acquire any validity by reason only that it was made or done in pursuance of an antecedent agreement."

Sec. 107 corresponds to sec. 92 of the English *Bankruptcy Act* of 1869.  Secs. 108 and 109, under which the questions for decision arise, are peculiar to Queensland.  The duty of the Court is to give effect to these enactments according to the expressed intention of the legislature.

The first subject for inquiry is whether on 7th July 1905 the debtor was able to pay his debts as they became due from his own moneys within the meaning of secs. 108 and 109.  Robertson was a colliery proprietor at Torbanlea, near Maryborough, and the appellants had for some years been his bankers.  His account was overdrawn and unsecured.  In April 1905 he had been informed that the account could not be further carried on unless he gave satisfactory security, which he promised to do.  On 7th July 1905 the account was overdrawn to the extent of £954 18s.  On that day he had to pay a sum of £937 for wages due for the month of June to the employés in the colliery.  At that time

BarNet publication information  ·  Date: Saturday, 07.01.2017  ·  Publication number: 2479940  ·  User: anonymous

4 C.L.R.]                    OF AUSTRALIA.                    1525

book debts were owing to him to the amount of about £1,250, which were regarded as good. The debtor in his evidence said that he was unable to pay the wages without getting an advance from his customers who were indebted to him, which, I suppose, means without getting them to pay sooner than they would do in the ordinary course of business. On 3rd July the appellants' manager had informed him that before paying, *i.e.*, honouring a cheque for, the wages he must ask that the necessary securities be duly executed.

Robertson thereupon agreed to give the securities now in question, and on 8th July they were executed. They comprised the colliery and colliery plant, a half share in some land adjacent to the colliery, and a piece of land in a distant part of Queensland. In a balance sheet which the debtor had prepared as of 30th April these properties were respectively valued at £4,000, £640, and £160. The appellants' manager deposed on an examination held in the liquidation that he thought that £1,850 was a very full advance on these securities. He said, when examined upon the hearing of the motion, that he had not considered whether he would make any further advance upon them, but added, " I should say about £200 limit."

Besides the property comprised in this security the debtor had the following assets :—Book debts, as already stated, to the amount of £1,250, some household furniture which he valued at about £100, an office with furniture which he valued at the same amount, and sundry shares and small pieces of land which he valued in the whole at £159. He had also a claim against one Phillipson for £1,800, the balance of the purchase money upon the sale of a steamship named the *Kingswear*, which the debtor had sold to Phillipson in the preceding December for £2,500, receiving £700 in part payment and a bill of mortgage over the vessel to secure the balance. An action had, however, been commenced by Phillipson against Robertson in the Supreme Court on 22nd March, in which the plaintiff alleged that the contract had been obtained by fraud, and claimed a return of the £700, cancellation of the mortgage, and £1,000 damages for deceit, or in the alternative £3,500 for breach of warranty. On 7th July the action had been set down for trial and was to come on for trial

H. C. of A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Griffith C.J.

1526  HIGH COURT  [1907.

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Griffith C.J.

on the 24th.   The debtor's other obligations on 7th July amounted to about £435 due to sundry creditors, £399 15s. 3d. due to the Commissioner of Railways for the carriage of coal, but not payable until the 21st, and a further sum of £251 due to the Commissioner of Railways which was to be paid by a set-off of the price of coal to be delivered.   He was also under a liability for the current wages accruing to the men employed in the colliery, and amounting to about £200 a week, although by usage they were not payable until the Friday after the 4th of each month, which in August would fall on the 11th.   In addition to these debts Robertson had to provide during the month of July £200 or £300 for his solicitor's costs in Phillipson's action.

The respondent contends that under these circumstances the debtor was unable to pay his debts as they became due from his own moneys, even without regard to any question arising upon Phillipson's claim, and he further contends that in any event that claim must be taken into consideration in determining whether Robertson was or was not unable to do so.   The appellants contend that this claim ought to be altogether disregarded in estimating the debtor's financial position on 7th July, and they say that if it is disregarded he was then solvent.

Apart from the *Kingswear* element of the case, it appears that the debtor was unable to pay out of any money then at his immediate disposal the wages payable on 7th July, and it is improbable that he could have collected a sufficient sum in respect of the book debts (£1,250) to enable him to make the payment, nor had he any available money to pay the overdraft due to the appellants, which was payable on demand.   On the other hand, he was able, by mortgaging his unencumbered property, to satisfy the bank and to raise enough money to pay the wages and possibly £200 more.   In order to meet his other liabilities presently payable he had nothing available but the chance of getting in a sufficient amount of the book debts.   It was probably anticipated that a sufficient amount would be collected to pay the Railway Commissioner's claim on the 21st July (as actually happened), and the claim for £259 was to be satisfied by a set-off.

Phillipson's action came on for trial in July, and resulted in a verdict, given on 10th August, for the plaintiff for £700, the

Following paragraph cited by:

4 C.L.R.]    OF AUSTRALIA.    1527

amount of the instalment of purchase money paid, and £968 damages for fraud, with costs of action. The judgment was admitted in evidence without objection, and was treated as evidence against the appellants of the actual facts as existing on 7th July. It may be doubtful whether it was, strictly speaking, admissible evidence for this purpose, but no objection was taken either in the Supreme Court or this Court. It appears, then, that on 7th July the debtor was under liability to Phillipson for over £1,660. This was a debt provable in insolvency; that is to say, if the debtor had on that day become insolvent Phillipson could have proved in his estate for the amount of his claim which would have been ascertained in due course : *Jack* v. *Kipping* (1). Moreover, Phillipson, his creditor in respect of that debt, was a creditor in whose favour a fraudulent preference might have been made by payment of his claim with an intention to prefer him : *In re Paine* ; *Ex parte Read* (2) ; *In re Blackpool Motor Car Co. Ltd.* ; *Hamilton* v. *Blackpool Motor Car Co. Ltd.* (3). It was suggested that these cases are not good law, but I have no doubt as to the accuracy of the law as laid down in them. It follows that, since Phillipson was a creditor of Robertson within the meaning of sec. 107, the debt in respect of which he was such a creditor was also a debt within the meaning of secs. 108 and 109, and was one of the debts to be taken into consideration in determining whether the debtor was then able to pay his debts as they became due from his own moneys. It is impossible to contend that a creditor who can be preferred is not a creditor to whom others can be preferred. It was argued that only debts then actually payable and the amounts of which were then actually ascertained should be taken into consideration. One answer to this argument is that the matter for determination is the ability of the debtor, which is a state or condition that cannot be determined without having regard to all the facts. Another answer is that the debts referred to are not his debts " then " payable, but his debts " as they become due "—a phrase which looks to the future. No doubt, only the reasonably immediate future is to be looked to, but the anticipated verdict was not beyond this

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Griffith C.J.

(1) 9 Q.B.D., 113.    (2) (1897) 1 Q.B., 122.
(3) (1901) 1 Ch., 77.

Following paragraph cited by:

BarNet publication information  -  Date: Saturday, 07.01.2017  -  Publication number: 2479940  -  User: anonymous

1528                              HIGH COURT                              [1907.

H. C. OF A.    limit.  It is not seriously contended that the debtor was, or had
1907.          any prospect of being, able to pay this debt when it became due,
BANK OF        *i.e.* when the amount was definitely ascertained, from his own
AUSTRALASIA    moneys.
*v.*
HALL.               But, even if Phillipson had not been a creditor in the strict
               sense of the term, and if the obligation to him had not been a
Griffith C.J.  debt strictly so called, it would still, in my opinion, be impossible
               to apply the tests prescribed by secs. 107, 108, and 109 without
               taking it into consideration.  The words " as they become due"
               require, as already pointed out, that some consideration shall be
               given to the immediate future ; and, if it appears that the debtor
               will not be able to pay a debt which will certainly become due in,
               say, a month (such as the wages payable by Robertson for the
               month of July) by reason of an obligation already existing, and
               which may before that day exhaust all his available resources, how
               can it be said that he is able to pay his debts " as they become
               due," out of his own moneys ?

                    It was suggested, but the argument was not pressed, that the
               debtor's affairs should be regarded from the point of view of a
               balance sheet of assets and liabilities.  This is not what the Statute
               says.  It has always been interpreted in Queensland to mean what
               it says, and the only English reported case on the point, *In re
               Washington Diamond Mining Co.* (1), is to the same effect.  The
               question is not whether the debtor would be able, if time were
               given him, to pay his debts out of his assets, but whether he is
               presently able to do so with moneys actually available.  The most
               favourable construction that can be put on the words " his own
               moneys " is that they include any moneys of which the debtor
               can obtain immediate command by sale or pledge of his assets.

                    Applying these principles to the present case, it is clear that on
               7th July Robertson was not able to pay his debts as they became
               due from his own moneys.  Apart from his obligation to Phillip-
               son, the payments which he had to make during July were of such
               an amount that he probably would have been unable to pay the
               July wages in August without borrowing on the security of his
               assets, as indeed proved to be the case.  When the time came for
               that payment he had no money in hand, and applied to the appel-

                              (1) (1893) 3 Ch., 95.

**BarNet publication information**  -  Date: Saturday, 07.01.2017  -  Publication number: 2479940  -  User: anonymous

lants for assistance.  Their manager was apparently disposed to
give it on the security of an assignment of Robertson's book
debts, but his principals refused to sanction the advance.  If made,
it would have left him without any available moneys to pay his
other current debts.  It was suggested that he might have raised
money upon the other property already mentioned, but it is idle to
pretend that the mortgage of the *Kingswear* was, pending an
action to set it aside on the ground of fraud, an asset on which
money could be raised.  The other small pieces of property were
equally unlikely sources for providing the necessary funds.  All
these facts throw a reflected light as to the actual state of the
debtor's affairs on 7th July.  And when they are taken into con-
sideration, even without Phillipson's claim, they afford strong
ground for contending that Robertson was then unable to pay
his debts as they became due from his own moneys.  When
Phillipson's debt is taken into consideration the respondent's case
becomes overwhelming.

The next subject of inquiry is whether the charges now im-
peached were made for a reasonable and sufficient consideration
given at the time within the meaning of sec. 108.  On that
question sec. 109 affords very material assistance.  The charge
given was for a sum substantially double the amount of the
present advance.  It would, if valid, obviously have had the effect
of diminishing the property divisible among Robertson's creditors
to the extent of the charge for the past debts, *i.e.*, £954.  The trans-
action was therefore *primâ facie* fraudulent under sec. 109.  In
my opinion a very heavy onus is undertaken by anyone who
attempts to maintain that a consideration, the smallness of which
renders a transaction *primâ facie* fraudulent, is nevertheless rea-
sonable and sufficient.  The appellants, however, contend that the
*bona fides* of the transaction was found by the learned Judge of
first instance, and was established by the evidence.  In my opinion
the *bona fides* affirmed by the learned Judge was not that which
is meant in sec. 109.  I think that a creditor, who takes a security
for a past debt from a debtor whom he knows to be in such
pecuniary circumstances that the security will defeat the debtor's
other creditors, does not act in good faith within the meaning of
that section.  If he has no knowledge of any other creditors,

H. C. of A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Griffith C.J.

BarNet publication information  -  Date: Saturday, 07.01.2017  -  Publication number: 2479940  -  User: anonymous

1530                              HIGH COURT                              [1907.

H. C. of A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Griffith C.J.

and no reason to suspect their existence, a different conclusion would be drawn: *Butcher* v. *Stead* (1). But if he does know of them, the case of *Tomkins* v. *Saffery* (2) shows that the transaction cannot have the benefit of any protection afforded by the existence of good faith. The transaction in that case was void as an act of bankruptcy unless made in good faith. So, here, the transaction is void under sec. 109 unless proved to have been made in good faith. If the creditor knows of a transaction between the debtor and another person which may have resulted in a debt, although the debtor denies the existence of any such debt, and if the creditor knows that the security which he is taking will defeat that other person's claim if it exists, the case just cited shows that the same rule is to be applied as if the existence of the debt were known, and that the security is not taken in good faith. The creditor takes his chance, and must take the consequences—*à fortiori*, if he knows of a claim which is being actively asserted. In the present case it is admitted that the appellants were fully aware of Robertson's financial position and of Phillipson's claim. I am therefore of opinion that the appellants have failed to prove that the transaction impeached was made in good faith within the meaning of sec. 109. The learned Judge of first instance thought that both the bank manager and the debtor honestly believed that Phillipson's action would fail, and it was in this sense that he found that the parties acted in good faith. For the reasons already given, I think that this belief was irrelevant—just as irrelevant as if the action had been on a promissory note, and a defence had been pleaded as to which the debtor was sanguine of success.

Independently of sec. 109, I think that the securities impeached were not made for a reasonable and sufficient consideration given at the time. The object of this group of sections is to protect creditors, and ensure an equal distribution of a debtor's assets among them. The term " reasonable and sufficient " cannot, therefore, bear the same meaning as if it were used with reference to a transaction between two free and independent contracting parties, neither of whom owes any duty to other persons with

(1) L.R. 7 H.L., 839.                    (2) 3 App. Cas., 213.

Following paragraph cited by:

4 C.L.R.]                OF AUSTRALIA.                    1531

respect to that transaction.  In the case of *Dixon* v. *Todd* (1)
this Court, expounding sec. 108, said :—" The effect is that a person
in insolvent circumstances cannot make away with his property
except for a contemporaneous equivalent.  If he receives such an
equivalent, his creditors, of course, lose nothing by the assignment."

I see no reason to depart from that exposition.  In my opinion,
in order that a consideration may be reasonable and sufficient
within the meaning of sec. 108, it must be such that the property
of the debtor presently available for the payment of other
creditors is not substantially diminished by the transaction.
Whether it is or is not so diminished must always be a question of
fact.  In the present case the effect of the transaction impeached
was to leave the debtor with substantially less property available
to satisfy his other creditors than he had before.  It is true that
there was a promise to make further advances of an undefined
amount, but the promise was not capable of enforcement, and it
was certainly not worth more than the £200 mentioned by the
bank manager in his evidence.  In my judgment it had no
appreciable value.  I think, therefore, that the transaction is
brought within both sec. 108 and sec. 109.  I do not express any
opinion as to the points taken by the respondent with regard to
the validity of the bill of sale under the *Bills of Sale Act* 1891.

The appeal should be dismissed with costs.

BARTON J.  I have very little to add to the judgment just
delivered, with which I entirely agree.  But I would refer to the
case of *Ex parte Griffith* ; *In re Wilcoxon* (2), the headnote of
which is as follows :—" In determining whether a transaction
amounts to a fraudulent preference the Court ought now to have
regard simply to the statutory definition contained in sec. 92 of
the *Bankruptcy Act* 1869.  The decisions on the subject before
the Act may be useful as guides, but the standards laid down in
them must not be substituted for that which is laid down in the
Act."  *Bowen* L.J., expressing more fully an opinion in which
the two other members of the Court of Appeal were agreed
said (3) :—" Everybody knows that originally there was no

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Griffith C.J.

(1) 1 C.L.R., 320, at p. 324.        (2) 23 Ch. D., 69.
(3) 23 Ch. D., 69, at p. 74.

1532         HIGH COURT         [1907.

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Barton J.

express statutory enactment in regard to fraudulent preference. But from the time of Lord *Mansfield* down to 1869 the Courts considered that certain transfers of property were frauds upon the bankruptcy law, though there was no statutory enactment upon the subject. Then came the *Bankruptcy Act* of 1869, and in that Act it was for the first time explained what was meant by fraudulent preference, and the Act uses very definite language. Now what is the method which has been pursued by judicial decisions since ? I think it is very unfortunate. I do not say that it has led to any wrong decision, but I think that it has had a tendency to draw one's mind away from the true question. The first thing which the Courts did was to discuss the question whether the Act had altered the old law and introduced an entirely new law, and they came to the conclusion that it had not altered the old law. Then began what I may call the old metaphysical exploration of the motives of people. The Courts first adopted a supposed verbal equivalent for the words of the Statute, and then pursued the old inquiries as to what were the deductions which followed from the adoption of this verbal equivalent. And so we have been drawn into questions of pressure and volition, and at length in the present case we have got into a discussion as to what is the motive of a motive, whatever that may mean. I think it is a wiser policy to go back, as I do, in a humble spirit to the words of the Statute, and, without discussing motives of motives, inquire whether the transaction was entered into with a view to give the one creditor a preference over the others." This opinion amounts to a clear statement of the principles on which sec. 92 of the English Act of 1869—the equivalent of which is sec. 107 of the Queensland Act of 1874—is to be construed ; and those principles are to be applied equally to secs. 108 and 109. I think the Chief Justice has, if I may say so, justly applied them. I have only to add that, with reference to the judgment in the action relating to the sale of the *Kingswear*, I should have thought it more than doubtful whether the findings of the jury contained in that document could have been rightly admitted as evidence against the appellants if objection had been taken before *Real* J. But the whole document was admitted by consent and was treated as evidence of all that it contained, and

4 C.L.R.]          OF  AUSTRALIA.          1533

in such circumstances it is before us for the purposes for which
it was then allowed to be used.   I agree that the appeal must be
dismissed.

O'CONNOR J.   I do not propose to deal with all the different
aspects of the facts which were presented for our consideration.
The case is of general importance, not by reason of its facts, but
because of the questions of law raised on the interpretation of
secs. 108 and 109 of the Queensland *Insolvency Act* of 1874.   It
is to these questions that I propose to address myself.   An assign-
ment of a debtor's property comes under the sections mentioned
only, if at the time the debtor "is unable to pay his debts as
they become due out of his own moneys."   For the purpose of
confining my judgment to the most important matters of law I
shall assume that, but for the *Kingswear* transaction, the debtor
would, at the time in question, have been able to pay his debts as
they became due from his own money, though that is probably
an assumption more in the appellants' favour than the facts
would justify.   In finding for the trustee under sec. 108 Mr.
Justice *Real* took into consideration the debtor's liability under
that transaction as it stood at the date of the assigment to the
bank.   The appellants contend that that could not legally be
done inasmuch as the liability did not come within the meaning
of the word "debts" as used in the sections mentioned.   We have
to determine whether that contention is right.   The position of
the *Kingswear* transaction at the date of the assignment was
this.   The ship had been sold some short time before by the
debtor to Phillipson for £2,500 with a warranty of seaworthiness.
The latter had taken possession of her and had sent her to another
port for overhaul and repairs.   In course of the repairs the unsea-
worthiness was discovered.   Phillipson, who then had been some
months in possession of the ship, on making the discovery notified
the debtor of his intention to rescind the contract, and to claim a
return of the £700 paid under it and damages for breach of war-
ranty and fraudulent representation.   The debtor disputed the
claim, and Phillipson began his action in April 1905.   Towards the
end of the following June witnesses examined in Sydney on
commission gave evidence on Phillipson's behalf in support of his

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

O'Connor J.

Following paragraph cited by:

BarNet publication information  -  Date: Saturday, 07.01.2017  -  Publication number: 2479940  -  User: anonymous

1534                    HIGH COURT                    [1907.

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
v.
HALL.

O'Connor J.

complaint of unseaworthiness, and the debtor attended the commission. The case was set down for trial on the 24th July following. These facts were all known to the debtor and to the bank on the date of the assignments. It is no doubt true that if the facts were such that Phillipson was in a position at that time to rescind the contract and demand return of the £700 as on a total failure of consideration, the debtor's liability to pay that amount would be complete without the aid of a Court, and there would then have existed a liquidated debt, due by the debtor to Phillipson for that amount. But I am satisfied that the facts were not such as to put Phillipson in that position. His possession of the ship for many months and his dealings with her while in his possession made it impossible for him to take up the position that, on rescission of the contract the parties could be placed in statu quo, and that there had been a total failure of consideration. His right against the debtor was therefore a right to recover, not a liquidated amount, but an unliquidated amount by way of damages for breach of warranty and fraudulent misrepresentation arising out of the contract. Until determined by judgment of a Court no amount would be actually payable, and no "debt" —using that word in its narrow sense—would be in existence. But there can be no doubt that Phillipson's claim would be a liability provable in the administration of the debtor's estate under sec. 140 of the Act, and the question is, can such a liability be taken into account in considering the debtor's position under sec. 108 ? During the argument the controversy turned upon what is the proper interpretation of the word "debts." Like all general expressions it is capable of a narrow and a wide interpretation. The former would, strictly speaking, cover only money demands, fixed, liquidated, and payable at the material date. The latter would include such a liability as that of the debtor to Phillipson before the damages had been awarded. The case of *Ex parte Kemp; In re Fastnedge* (1) illustrates how the word "debts" will be held to have been used in a wider or a narrower sense according to the object of the enactment. In that case the meaning of "debts due to him," in the order and disposition clause of the *Bankruptcy Act* of 1869 was under consideration.

(1) L.R. 9 Ch., 383.

Following paragraph cited by:

4 C.L.R.]        OF AUSTRALIA.        1535

*Mellish* L.J. says (1):—" Now, the words 'debts due to him' are certainly words which are capable of a wide or a narrow construction. I think that *primâ facie*, and if there be nothing in the context to give them a different construction, they would include all sums certain which any person is legally liable to pay, whether such sums had become actually payable or not. On the other hand, there can be no doubt that the word 'due' is constantly used in the sense of 'payable,' and if it is used in that sense, then no debts which had not actually become payable when the act of bankruptcy was committed would be included. Lastly, the expression 'debts due' is sometimes used in bankruptcy proceedings to include all demands which can be proved against a bankrupt's estate, although some of them may not be strictly debts at all."

This is also an example of the well known rule of interpretation that, where an ambiguity arises as to whether the legislature has used a general expression in its narrow or in its wider sense, the Court will place that meaning upon the expression which will most effectually carry out the object of the section. In such cases it becomes necessary to examine the context, the subject matter, and the object and purpose of the enactment as disclosed by its provisions. But before entering upon that examination I shall refer to two cases which not only illustrate the general rule but afford a guide to the sense in which the word has been used in the sections under consideration. In *In re Paine*; *Ex parte Read* (2) it became necessary to interpret the word "creditor" as used in sec. 48 of the *Bankruptcy Act* of 1883, a similar provision to sec. 107 of the Queensland *Insolvency Act* of 1874. It was contended that that word "creditor" meant an actual creditor, a person to whom money was actually payable at the time of the alleged preference, and did not include the person to whom money would be due on the happening of a contingency, a surety, for instance, who might be, but had not yet been called upon to pay. But *Vaughan Williams* J. decided against that contention. After referring to the object of the section he said (3):—" I think the legislature in enacting the section intended to prevent a pay-

H. C. of A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

O'Connor J.

(1) L.R. 9 Ch., 383, at p. 387.        (2) (1897) 1 Q.B., 122.
(3) (1897) 1 Q.B., 122, at p. 124.

BarNet publication information  -  Date: Saturday, 07.01.2017  -  Publication number: 2479940  -  User: anonymous

1536                              HIGH COURT                              [1907.

H. C. of A.     ment to anybody who, but for such payment, would share in the
1907.           administration of the bankrupt's estate.   I think, therefore, that
BANK OF         the word 'creditor' means any person who, at the date of the
AUSTRALASIA     payment to him, would have had to come in and prove and rank
*v.*            with the other creditors in the bankruptcy.   A surety would be
HALL.           such a person.   I hold, therefore, that you may make a fraudu-
O'Connor J.     lent preference by a payment to or for the benefit of a surety
                who has not yet been called upon to pay as surety.   It is not dis-
                puted that at the date of the payment into the bank Barnard was
                a person who had a right of proof under sec. 37 in respect of his
                contingent liability as acceptor of the bill.   He had a right, there-
                fore, to share in the distribution of the bankrupt's assets; and
                under the circumstances I hold that the payment into the bank
                was a fraudulent preference of Barnard by the bankrupt."

Turning now to a general consideration of the enactment, its
purpose is to secure the equal distribution of the debtor's assets
amongst his creditors, and as a safeguard to their interests it

That case was followed in *In re Blackpool Motor Car Co.
Ltd.*; *Hamilton* v. *Blackpool Motor Car Co. Ltd.* (1).   The
same question was raised on the same section, and *Buckley* J.,
after considering all the other cases on the point, quotes the
judgment of *Vaughan Williams* L.J. in *Read's Case* in full and
follows it.   These cases apply not only to sec. 107, but are a
direct authority that the word "creditor" in sec. 108 means not
only a person to whom money is then actually due by the
debtor, but also a person to whom money is not then actually
due, but who, by reason of the facts then existing, will be
entitled to prove in the debtor's estate if bankruptcy supervenes.
It does not, of course, follow that, because it is necessary for the
effective operation of the section to interpret the word "creditor"
in the wider sense, it must therefore be held that the word
"debtor" was also intended to have the wider interpretation put
upon it.   But bearing in mind the general object of the section it
is difficult to see why, if any liability of the debtor afterwards
provable on his bankruptcy constitutes the person to whom he is
liable a creditor within the meaning of the section, the liability
itself should not constitute a debt for the purposes of the section.

Turning now to a general consideration of the enactment, its
purpose is to secure the equal distribution of the debtor's assets
amongst his creditors, and as a safeguard to their interests it

(1) (1901) 1 Ch., 77.

4 C.L.R.]          OF AUSTRALIA.                    1537

H. C. of A.
1907.

BANK OF
AUSTRALASIA
v.
HALL.

O'Connor J.

is in effect provided that any alienation of his property by the debtor during six months preceding the adjudication is open to the scrutiny of the Court if it takes place under the circumstances mentioned in secs. 107, 108 and 109. The governing circumstance in all three sections is the same, namely, that the debtor at the time of the transaction was unable to pay his debts as they became due out of his own moneys. Such a condition of affairs might well be described as impending insolvency, and the policy of the sections would appear to be that at such a crisis the debtor should not be allowed to so deal with his property as to prejudice the interests of those who, in the event of his subsequent insolvency, would be entitled to a share of it in distribution. In charging the Court with the duty of determining whether the debtor's affairs had reached that crisis at the time of the transaction impeached, it surely must have been intended that it should make as real an inquiry into the existence of the debts and of the moneys available to pay them as they became due as a man of business would make if he had to determine the same issue for himself, having due regard to the interests of all those who would be entitled to claim against his estate in the event of adjudication. It becomes apparent on reading the section that the word " debts " cannot be construed so literally as to include only amounts then actually due. It is conceded that the survey of the debtor's affairs must take into account debts for liquidated amounts, such as on promissory notes then maturing but not yet due. It must also be conceded that, even if "debts" is to be taken in its narrower sense, its meaning could not be restricted so as to include only the debts which the debtor admitted to be due or believed to be due. The elements of intent or belief do not arise under the section. The debtor's affairs are to be taken as they are, not as he believes them to be. It is obvious that these admissions must be made if the section is to be construed so as to involve any effective consideration of the debtor's financial position. For the same reason it is difficult to see how his position could in any business sense be ascertained without having regard to liabilities pending and provable as debts in the event of bankruptcy, but not yet fixed as liquidated amounts, as well as the debts then actually due. The *Kingswear* trans-

1538                    HIGH COURT                    [1907

H. C. of A.
1907.

BANK OF
AUSTRALASIA
v.
HALL.

O'Connor J.

action itself is a good illustration of the necessity for so extending the inquiry if effect is to be given to the object of the legislature. At the date of the transfers impeached in these proceedings Phillipson's claim, although one which would be provable in insolvency, was unliquidated and disputed by the debtor. But it was then evident that in three weeks' time it would be either a liquidated amount or at an end. If determined in Phillipson's favour there would be a judgment debt against the debtor of £700 at least, which would, beyond all question, put it out of his power to pay his liquidated and ascertained debts as they became due out of his own money. The Court no doubt must look at the facts of the transaction as they stood before the verdict, and judge them reasonably. But any fair examination of the debtor's position might well be expected to extend to the takings and obligations of his business for the ensuing month, and to take account of liabilities, which, although not yet liquidated and payable, must in all probability become so within a few weeks, in cases where their discharge would be likely to seriously diminish the funds available for payment of the debtor's actual debts as they become due. That was exactly the case with the *Kingswear* transaction in relation to the debtor's affairs, and I find it difficult to understand how any examination intended to ascertain the real state of his business could leave that transaction entirely out of consideration. I have, therefore, come to the conclusion that, in order to give any real effect to the object of the enactment, it is necessary to interpret the word "debts" in the wider sense which would include the *Kingswear* transaction.

Questions both of law and of fact have been raised as to the second issue under the section (108), namely, whether the debtor received "reasonable and sufficient consideration given at the time" for "making" the mortgage and transfers. I do not know of a clearer way of expounding the meaning of "reasonable and sufficient" in that section than in the words of my learned brother the Chief Justice with reference to them in *Dixon* v. *Todd* (1):—"The effect is that a person in insolvent circumstances cannot make away with his property except for a contemporaneous equivalent."

(1) 1 C.L.R., 320, at p. 324.

4 C.L.R.]                    OF AUSTRALIA.                    1539

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
v.
HALL.

O'Connor J.

The object of the section is to ensure that, if a debtor unable to pay his debts as they become due from his own moneys wishes to transfer or mortgage to any creditor any portion of his property which would otherwise, in the event of adjudication, be distributable amongst all his creditors, he can do so validly only by then getting from that creditor some consideration, either in money or other tangible value, which will make up to his estate or business substantially what the mortgage or transfer has taken from it. The section would certainly fail to achieve that object if "reasonable and sufficient" were held to mean no more than what is conveyed in the well known legal phrases "good consideration" or "valuable consideration."

In this case then, the learned Judge, as he properly might, took account of the bank's undertaking to make further advances for carrying on the debtor's business as part of the consideration. It was for him to estimate its value, as well as to compare the amount of the advance then made with the fair mortgage value of the properties assigned, and I can see no reason to differ from the conclusion that, under all the circumstances, the mortgages and transfers were not made for reasonable and sufficient consideration given at the time. It follows that, in my opinion, the judgment on the whole section in favour of the trustee in insolvency must stand.

Now as to sec. 109. If the circumstances of a transfer to a creditor are such as to render it liable to be declared void under sec. 108, it is clear that the good faith of the parties cannot make it valid. But even if it should be found that the consideration for the mortgage and transfer given at the time was reasonable and sufficient, and that the respondent therefore fails under sec. 108, he urges that the facts in evidence clearly bring the transactions within sec. 109 in all other respects and the appellants have failed to establish the existence of that good faith which alone would make the section inapplicable. Whether or not the appellants have established that "good faith" on the part of both parties, proof of which the section has expressly imposed on those who allege the validity of the transaction, is a question of fact. But the cases have laid down rules for the guidance of Judges in dealing with that issue which it appears to me have made the conclusion

1540                    HIGH  COURT                    [1907.

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
v.
HALL.

O'Connor J.

proper to be arrived at in this case abundantly clear.  In *Butcher* v. *Stead* (1) the House of Lords considered the meaning of the expression "good faith" as used in sec. 92 of the *Bankruptcy Act* of 1869 which protects "a payee in good faith and for valuable consideration."  That was succeeded by *Tomkins* v. *Saffery* (2), involving the construction of the same section, which upheld and adopted the law as laid down in *Butcher* v. *Stead*.  *Cairns* L.C., in the course of his judgment in *Tomkins* v. *Saffery* (3) said:—
"But are they to be taken as payees 'in good faith,' within the meaning of this section ?  Of course I do not speak of good faith in a moral point of view.  They may have believed the statement, and I am willing to take it that they did believe the statement of the bankrupt as to his having no other creditors.  But are they payees in good faith according to the test which is laid down in this section, a test derived from the operation of the bankruptcy law ?  I take it that in order to give any meaning to the words 'in good faith' at the end of the section, your Lordships must hold those words to apply to the matters which are mentioned in the earlier part of the section.  If you find a person receiving a payment in complete ignorance of, or without any means of getting information with regard to, the matters mentioned in the earlier part of the section, he may be a payee in good faith."

Again, Lord *Blackburn* says (4):—" It comes round to this, that I think (I am stating it in my own words, but it is very nearly what the Lord Chancellor has already said) that when they knew that the man was insolvent and unable to pay his debts, when they knew that this money was given them to prefer a particular body of creditors to all the other creditors, if there were others, they were then fixed with the knowledge of an infringement of the Statute, and although they were told by the man who after-wards became a bankrupt that he had no other creditors, they cannot get out of it ; they took their chance.  If he had told them the truth, and there had been in fact no other creditors, this trans-action would have stood and been perfectly good ; if he had any other creditors it would not stand.  They knew all that it was

(1) L.R. 7 H.L., 839.            (3) 3 App. Cas., 213, at p. 226.
(2) 3 App. Cas., 213.            (4) 3 App. Cas., 213, at p. 237.

BarNet publication information  -  Date: Saturday, 07.01.2017  -  Publication number: 2479940  -  User: anonymous

4 C.L.R.]          OF  AUSTRALIA.          1541

necessary for them to know, and I think they took their chance, and they must take the consequences."

In my opinion these passages apply directly to the expression " good faith " as used in sec. 109.  It is immaterial that there was no want of " good faith " in a moral sense in either party. In order to succeed the transferee must go far beyond that and prove that there was that good faith which the bankruptcy law requires in such transactions as explained in the judgment I have quoted.

The transfers and mortgages impeached are clearly within the section unless the bank can establish the defence of good faith. Applying the principle laid down by Lord *Cairns* and Lord *Blackburn* to the facts proved in this case it is difficult to see how that defence can be established.  The bank had a full knowledge of all the debtor's business.  Indeed it would be carried on only by their aid, and they necessarily kept themselves informed of the condition of his affairs, and had at all times either the knowledge or the means of obtaining knowledge of his exact position in all his transactions.  Having regard to his financial position at the time of the impeached securities, the effect upon his estate and his other creditors of giving the bank the securities, and the position of advantage as compared with other creditors in which the holding of the securities placed the bank, I find it impossible to say that the transfers were made in good faith within the meaning of sec. 109.

Holding these views it becomes unnecessary for me to refer to the questions raised by the bill of sale.  On the whole case, therefore, I agree that the judgment of *Real* J., must be upheld and the appeal dismissed.

ISAACS J.  The securities have been challenged by the trustee on various grounds.  He contended that they are invalidated by secs. 107, 108, and 109 of the Queensland *Insolvency Act* 1874, and also by the *Bills of Sale Act* 1891.

Sec. 107 of the *Insolvency Act* prescribes as one of the conditions of avoidance that the act of the debtor shall be with a view of giving a creditor a preference over the other creditors ; and this was negatived by an express finding of the learned Judge

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

O'Connor J.

---

Following paragraph cited by:

**BarNet publication information** · Date: Saturday, 07.01.2017 · Publication number: 2479940 · User: anonymous

1542                          HIGH COURT                         [1907.

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Isaacs J.

whose judgment is appealed from. That issue depends to a great extent on the credibility of the witnesses, and as there was abundant evidence to sustain it, I do not see my way to reverse the finding on this point.

Sec. 108 lays down among the essentials for avoiding an assignment that the debtor was unable to pay his debts as they became due from his own moneys, and that it was not made for a reasonable and sufficient consideration given at the time of making the assignment.

The onus of establishing both essentials is upon the trustee who seeks to invalidate the assignment : *Ex parte Lancaster; In re Marsden* (1); and *Ex parte Green: In re Laurie* (2). The question is whether he has satisfied this burden.

*Real* J. has held that the insolvent was on 8th July 1905, the date of giving the securities, in fact unable to pay his debts as they became due from his own moneys, but he has done so upon a view of the law, which, with deference to the learned Judge, appears to me to be erroneous.

His Honor says :—" The total amount of his liabilities, including these sums but excluding the action, was £1,085, and the total amount of the debts due to him was £1,200 odd—as good or equal to nearly £1,200 cash, for in substance all these debts were paid. But still it appears to me the Act requires, and I am bound to hold, that he must have moneys of his own or at call to pay his debts as they become due. They were in fact due and he had not the money in hand or at call, and therefore on that ground I hold that he was unable to pay his admitted debts from his own moneys. His debtors were so good for their liabilities that I think he could have got the money from them if he had asked for it. Yet technically it appears to me he was insolvent."

The action referred to in the passage quoted ended in the establishment of a liability of £700, the amount of part of the purchase money of a vessel called the *Kingswear* paid and ordered to be returned, and also £968 11s. 11d. damages for fraudulent misrepresentations as to the condition of the vessel by which the purchaser was induced to make the contract.

His Honor considered that, although money to the credit of a

(1) 25 Ch. D., 311.                    (2) 67 L.J.Q.B., 431.

Following paragraph cited by:

4 C.L.R.]        OF  AUSTRALIA.                    1543

man's banking account at call is practically his own money, yet

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
v.
HALL.

Isaacs J.

money owing to him by private individuals and payable immed-
iately, and which if asked for would be immediately paid, is not
money of the debtor. In my opinion both classes of assets are on
the same footing, and no legal distinction can be drawn between
them. If a man by asking his debtor can get paid what is owing
to him, there is no difference in law between a debtor who is a
bank, and another debtor who is a merchant, or whatever his
occupation may be. If the moneys so available are sufficient
to pay the man's liabilities, then he is able to pay his debts out
of his own moneys.

The Act requires the debtor to be able to pay his debts as they
become due. This does not mean that he is always bound to
keep by him in cash a sum sufficient to meet all his outstanding
indebtedness however distant the date of payment may be. If at
the time he makes the assignment, the debtor's position is such
that he has property either in the form of assets in possession or
of debts, which if realised would produce sufficient money to pay
all his indebtedness, and if that property is in such a position as
to title and otherwise that it could be realized in time to meet
the indebtedness as the claims mature, with money thus belonging
to the debtor, he cannot be said to be unable to pay his debts as
they become due from his own moneys. In other words, if the
debtor can, by sale or mortgage of property which he owns at the
time of the assignment, change the form of the property into cash
wholly or partly but sufficient for the purpose of paying his debts
as they become due, that requirement of the section is satisfied.

Robertson's financial position on 7th July, that is just before
giving the assignment, was as follows. His liabilities consisted of
a bank overdraft £954 18s. and a further bank advance of
£937 7s. 6d. for wages ; sundry creditors £1,085, from which had to
be deducted £243 payable according to agreement in coal, leaving a
net sundry indebtedness of £842. So far, the total is £2,734 5s. 6d.
To this Mr. *Graham* claimed to add the *Kingswear* liabilities of
£700 and £968 11s. 11d., and a further amount for solicitors' costs,
which he estimated at about £250 up to 7th July. If these be
added the total liabilities to be provided for on 7th July, and all
rightfully payable at once except perhaps the costs—and these

HIGH COURT

H. C. of A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Isaacs J.

would be payable very shortly afterwards — amounted to £4,652 17s. 5d.

As against this, the greatest possible amounts procurable by the debtor to pay his liabilities by means of his own assets, whatever the ultimate value of the assets may have been, were £2,200, the amount which could have been drawn from the bank as against security, and £1,280 book debts, and also by a very fair concession on the part of Mr. *Graham*, say £172, being two-thirds of £259, the stated value of some additional assets mentioned in the statement of affairs. This would bring the total amount of cash available for the due satisfaction of the above mentioned liabilities to £3,652, and would leave a deficiency of £1,000. The only other possible asset was the *Kingswear*, which it was contended for the respondent ought not to be taken into consideration as a means of meeting Robertson's liabilities. For some time, while recognizing the probability of Robertson's insolvent position on 8th July, I was greatly pressed by the want of some direct evidence on the part of the trustee to countervail the sworn statement of the debtor in his statement of affairs that the vessel was on 30th August 1905 worth £1,500 as she then lay in Sydney Harbour. But further reference to the evidence does, I think, lead to the conclusion that at all events the vessel was not available as a present means of paying Robertson's debts as they became due. The debtor's petition presented on 12th August— only two days after the adverse judgment—states that he admits his inability to pay his debts on that date. There was since 8th July no new debt of extraordinary amount, and besides the bank debt of £1,400 17s. 7d., and the ordinary trade debts which continued and amounted to £1,182 6s. 8d., the only outside debts were apparently his own solicitors' costs, £250, and the *Kingswear* judgment and costs, £2,260, in all £5,093 4s. 3d., or only £440 6s. 10d. more than on 8th July.

Schedule H of his statement of affairs, dated 30th August 1905, sets out as one of the causes of insolvency that the adverse judgment rendered it impossible to obtain the necessary financial accommodation to pay his wages, which on the day after the verdict were something over £800. It appears from the evidence of Mr. Ridley, the bank manager, that he offered to pay the wages

4 C.L.R.]                OF  AUSTRALIA.                    1545

and railage, in all about £1,100, on the security of the book debts, but apparently no one then thought of the *Kingswear* as a present available means of raising money, even to pay the wages.

As appears by schedule C the vessel was in fact held by Phillipson as security until Robertson's liability of £700 to him was paid.   The only fair conclusion from these facts is, that whatever its actual value might ultimately be, it was as an immediate money-raising asset worth nothing to Robertson, and ought to be excluded from commercial considerations on 8th July for the purpose of paying his debts.

The main question on this branch of the case is whether the two sums of £700 and £968 11s. 11d. in respect of the *Kingswear* liability should be included amongst Robertson's debts on 8th July within the meaning of sec. 108.   If not, his debts on that date would be reduced to £2,984 5s. 6d., and would be amply met by the book debts and the amount procurable from the bank on his free assets, which together would exceed £3,000.

If either of them is to be taken into account as a debt, the liabilities would exceed the power of the debtor to meet them.

It is necessary therefore to consider whether these two sums, or either of them, ought to be included as debts on 8th July.

It is contended for the appellant that the sums, and particularly the sum of £968 11s. 11d., became debts only when Phillipson obtained judgment, namely, 10th August 1905.   The trial of the action began 24th July, and ended on 10th August, and the judgment rested upon a finding of fraud inducing the contract, and upon that finding the plaintiff obtained judgment rescinding the contract and ordering the defendant to pay £700 which had been paid to him in terms of the contract " now rescinded," and also the further sum of £968 11s. 11d. already mentioned, with costs.

Undoubtedly the Act in some sections recognizes a clear distinction between " debts " and " liabilities."

It is quite clear, too, on authority, that Phillipson's claims were not, until after the judgment, debts that would have supported a petition for insolvency : *Ex parte Charles* (1) ; *Ex parte Broadhurst* (2) ; *Jones* v. *Thompson* (3).   And the appellants' case is

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Isaacs J.

(1) 14 East., 197.                    (2) 22 L.J. Bkcy., 21.
                (3) 27 L.J.Q.B., 234.

BarNet publication information  -  Date: Saturday, 07.01.2017  -  Publication number: 2479940  -  User: anonymous

1546          HIGH COURT          [1907.

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Isaacs J.

that, where the Act in secs. 107, 108, and 109 speaks of a debtor's inability to pay his debts as they become due, it refers to liquidated sums which have or will certainly become payable.

At first sight this contention has much force. But in *In re Poland* (1) the words " any creditor " were restricted to creditors under the bankruptcy, being construed as was said by *Turner* L.J., " in accordance with the circumstances to which the Act was intended to apply." Upon the same principle have been decided the cases of *In re Paine*; *Ex parte Read* (2), and in *In re Blackpool Motor Car Co. Ltd.*; *Hamilton* v. *Blackpool Motor Car Co. Ltd.* (3), which determined quite clearly that the word " creditor " in sec. 48 of the English *Bankruptcy Act* 1883 means any person who at the date when the charge or payment is made is entitled, if bankruptcy supervenes, to prove in the bankruptcy under sec. 37, and share in the distribution of the bankrupt's estate.

It was argued in regard to these two cases that the interpretation they give to the word " creditor " is not sound law, and also that, even if it be well founded in law, it does not affect the meaning of the word " debts " in the earlier part of the sections. As to the correctness of the decisions, I agree with the learned Judges who determined them that the history of the fraudulent preference section shows that the word " creditor " in that connection must receive the signification they attach to it.

The doctrine of fraudulent preference was rested by Lord *Mansfield* in 1768 in the case of *Alderson* v. *Temple* (4), upon fraud upon the law, and he said *inter alia* (5):—"It is defeating the *equality* that is introduced by the Statutes of bankruptcy." The judgment of *Cockburn* C.J., in *Bills* v. *Smith* (6), in 1865 traces the decisions down to that time and takes the same view. He says (7):—"For, it must be borne in mind that the true question in all these cases is whether the intention with which the payment was made was *to defeat the operation of the bankrupt law.* It is this intention to act in fraud of the law which stamps the preference of the particular creditor, however morally honest, with the character of fraud."

(1) L.R. 1 Ch., 356, at p. 358.
(2) (1897) 1 Q.B., 122.
(3) (1901) 1 Ch., 77.
(4) 4 Burr., 2235.

(5) 4 Burr., 2235, at p. 2240.
(6) 6 B. & S., 314.
(7) 6 B. & S., 314, at p. 319.

4 C.L.R.]  OF AUSTRALIA.  1547

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
v.
HALL.

Isaacs J.

These authorities apply directly to sec. 107, and in secs. 108 and 109 the same words must have the same meaning, because all those sections are framed for the same object and levelled at the same thing, though with possibly different effect according to the varying circumstances.

But assuming the correctness of this construction of the word "creditor," it was maintained by Mr. *Feez* that debts in these sections were only such as were debts in the strict sense and would in their nature support a petition for insolvency.

I do not think this contention can be upheld. It would lead to confusion of terms in the sections themselves. The enactments are to regulate the duties between the person who is called uniformly the debtor, and the persons who are with equal uniformity called his creditors. The moneys which are payable by him to them are called debts. Whatever meaning is properly attributable to "creditor" must, as it seems to me, correlatively apply to "debtor," and therefore of necessity to debts. Reverting again to the history of the fraudulent preference sections, I think it can be distinctly discerned in the cases that the equality introduced by the Statute of Bankruptcy referred to by Lord *Mansfield*, and the cardinal question in cases of this kind as to whether the debtor intended to defeat the operation of the bankruptcy laws, determined not merely the quality of the act impeached but the nature of the obligation affected. The same reasoning applies to interpret both "debtor" and "creditor," and the indebtedness of the one to the other. The section operates, it is true, only in the case of an adjudication of insolvency within six months, but it assumes that the debtor is already insolvent in fact. There can be no valid reason for differentiating the relations of debtor and creditor, or the meanings of debtor and debt.

The extensive meanings to be given to such words in order to effectuate the objects of the legislature in relation to bankruptcy may be well gathered from the cases of *Hardy* v. *Fothergill* (1), and *Flint* v. *Barnard* (2).

Turning to the Act itself we find indications that distribution and discharge are the main objects aimed at by Parliament. The title of the Act is:—"To provide for the distribution of the Estates

(1) 13 App. Cas., 351.  (2) 22 Q.B.D., 90.

Following paragraph cited by:

1548                    HIGH COURT                    [1907.

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Isaacs J.

of Insolvent Debtors amongst their creditors, and their release from their debts, and for the punishment of fraudulent debtors and for other purposes."

Here, then, we have the three words debtors, debts, and creditors all used in correlation at the threshold of the Statute.

In sec. 47 it is expressly provided that the debt of a petitioning creditor must be a liquidated sum due at law or in equity. The appellants' argument would render this qualification unnecessary. In sec. 140 there is no doubt of the extensive nature of debts as provable in insolvency: *Jack* v. *Kipping* (1), following *Peat* v. *Jones & Co.* (2), as well as *Ex parte Adamson*; *In re Collie* (3), show that damages, even though unliquidated, arising from the debtor's fraudulent misrepresentation inducing the creditors to enter into a contract with the debtor, are provable. The actual cause of the damage is entering into the contract, though the right to be relieved from the loss would not exist but for the fraud, which in such case is a violation of the debtor's obligation of good faith in relation to the contract, and therefore provable. In sec. 152 and some following sections under the head "Dividends" the word "creditors" is obviously employed to denote all persons who have proved in the insolvency in respect of provable debts. It is they who are to be entitled to dividends in the distribution of the estate. Secs. 173 and 174 provide for the insolvent's release from all debts provable in insolvency with certain specified exceptions.

In view of these provisions it appears to me that secs. 107, 108 and 109 are merely for the purpose of effectuating the main objects of the Act as already mentioned. They must be read and construed with reference to those objects and as instruments to aid the ultimate intention of the legislature. So reading them, it appears to me impossible to separate the terms creditor, debtor, and debt, as Mr. *Feez* has invited us to do.

It may not be out of place to observe that the signification of the word "debt" in relation to fraudulent preference appears to have gradually extended. In Lord *Mansfield's* time only debts strictly so called were provable, and so were the only ones subject to the doctrine he is said to have originated. By the year 1808

(1) 9 Q.B.D., 113.          (2) 8 Q.B.D., 147.          (3) 8 Ch. D., 807.

4 C.L.R.]                    OF  AUSTRALIA.                    1549

H. C. of A.
1907.

BANK OF
AUSTRALASIA
v.
HALL.

Isaacs J.

the principle had been well established as Lord *Ellenborough* recognized.   He said in *Crosby* v. *Crouch* (1), " Strictly, only the acts of a trader subsequent to his bankruptcy are void.   Precedent acts supposed to be in contemplation of bankruptcy have likewise been invalidated ; but this is an excrescence upon the bankrupt laws."

The subsequent history of the bankruptcy law shows a gradual extension by the legislature of the nature of the obligations which could be proved in bankruptcy, participate in the distribution of the bankrupt's property, and be released by his discharge.   The " contemplation of bankruptcy " was the dominant idea ; and this, whether in the later form of " view of preferring " or the actual effect as in sec. 108, always appears to bring together the debts which the debtor is unable to pay, and the persons to whom they are owing, in relation to the ultimate result of the bankruptcy law upon the indebtedness.   These considerations all, in my opinion, conclude the law in favor of the respondent's contention on this point.

In the result, the two sums of £700 and £968 11s. 11d. ought for this purpose to be included in the debts of Robertson on 8th July, and they, independent of Phillipson's costs, establish his insolvency on that date.

It then becomes necessary to consider whether the trustee has proved that the securities were not executed " for a reasonable and sufficient consideration given at the time of making or giving the same."   The consideration was £937 7s. 6d., actually given at the time—because the agreement " and advance of the 7th July " and the consequent signing of the documents on the 8th were all one transaction and may justly be regarded as contemporaneous—and £954 18s. previous overdraft, and an indefinite arrangement to make current advances which without any breach of contract could be and has terminated shortly afterwards.   What is meant by " reasonable and sufficient consideration ? "   Can it be said as was argued by Mr. *Feez* that it merely means " reasonable and sufficient " as between a creditor and a debtor, who hopes and expects thereby to re-establish his solvency, and that " sufficient " means of sufficient value to the debtor, or, so to speak, worth the

(1) 2 Camp., 166, at p. 168.

1550                    HIGH  COURT                    [1907.

H. C. of A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Isaacs J.

sacrifice, in the circumstances in which he is placed? I do not feel able to accept that definition. The object of the section must be borne in mind. As already indicated, it was not enacted for the debtor's protection, for he, like every other man of sound mind and full age, may be left to make his own bargains, nor to enable him to run risks with property already insufficient to meet his liabilities. It was designed for the protection of the general body of his creditors once he is in fact insolvent. It was recognized by the legislature that such a man ought not to alter the condition of his assets so far as either to appreciably lessen them in value or to render them more difficult to satisfy his creditors' claims. Reading the words " reasonable and sufficient " with this object in view, I think they mean what an honest and prudent man in the position of an insolvent debtor, anxious to retrieve his position if possible, and yet careful not to lessen his present means of discharging his obligations in any way, would think a reasonable and sufficient consideration. In other words " sufficient " means of substantially equal value, and "reasonable" means substantially as available for realization. The form of his property may be changed, but he may not materially diminish its capacity to satisfy his creditors' just demands.

The section was intended to absolutely prevent one creditor obtaining more than his just and proportionate share of an insolvent debtor's property, whether by design or accident; the result of the transaction, instead of the contemplation, intention or purpose of the debtor being the test. If, then, the result of the transaction be substituted for the debtor's contemplation of bankrutcy, the case of *Linton* v. *Bartlett* (1) is much in point. There a bankrupt had given a preference to a creditor, and the question was whether it was an act of bankruptcy. The Court said :—" The deed and the transaction *may have been very fair as between the parties* ; but in all these cases the object to be attended to is, *quo animo* the transaction is done. Now the single question is, whether a man shall be allowed to commit *a fraud upon the whole system of the laws concerning bankrupts,* by giving a preference to one creditor in prejudice to the rest? Clearly he shall not."

(1) 1 Cowp., 120.

4 C.L.R.]                    OF AUSTRALIA.                    1551

Having regard therefore to the result of the transaction, it is not enough to say that the bargain was very fair as between the parties. The Act, in such circumstances as here exist, stamps it as a fraud.

That is sufficient without more to avoid the securities, and it is not actually necessary to deal with the further questions of law raised by the respondent.

As to one of them, however, that of good faith under sec. 109, it is desirable to state my views.

The burden of proving good faith by the section itself is expressly placed upon the person supporting the validity of the transaction. I have come to the conclusion that the evidence does not support the finding of the learned Judge that the securities were take in good faith. I do not refer to good faith as a matter of morality but as within the meaning of sec. 109. *James* L.J. in *In re Tate* (1), after quoting from *Butcher* v. *Stead* (2), said of a person who had received money from a bankrupt:— "The person receiving the money must show that he took it in good faith, and that he did not know that the person paying the money was doing anything injurious to his other creditors."

In this case the bank knew as much of Robertson's affairs as he did, and therefore knew that he was sued by Phillipson upon a claim which, if substantiated, would leave Robertson unable to meet his liabilities. The bank, in effect, threw all the risk upon the other creditors, securing to itself a preference in case of Robertson's insolvency. In these circumstances the words of Lord *Hobhouse* in delivering the judgment of the Privy Council in *National Bank of Australasia* v. *Morris* (3) apply with great force :—"Their Lordships conceive that if the creditor who receives payment has knowledge of circumstances from which ordinary men of business would conclude that the debtor is unable to meet his liabilities, he knows, within the meaning of the Act, that the debtor is insolvent." The Act there referred to was 25 Vict. No. 8 of New South Wales, and sec. 2 of that Act provided that certain payments before sequestration to a creditor should be protected, if *inter alia* the creditor did not know at

H. C. OF A.
1907.

BANK OF AUSTRALASIA
*v.*
HALL.

Isaacs J.

(1) 35 L.T., 531, at p. 532.            (2) L. R., 7 H.L., 839.
          (3) (1892) A.C., 287, at p. 290.

BarNet publication information  -  Date: Saturday, 07.01.2017  -  Publication number: 2479940  -  User: anonymous

1552 HIGH COURT [1907.

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Isaacs J.

the time of payment that the debtor was insolvent or would by the payment be rendered insolvent. Taking this view of the facts and the law, I have no doubt the securities are invalidated by force of sec. 109 as well as sec. 108.

The ground upon which the bills of sale were attacked under the *Bills of Sales Act* is one which relates to the construction of the particular documents rather than of the Act itself, and therefore I do not find it necessary in this case to enter upon its consideration.

In my opinion the appeal must be dismissed.

HIGGINS J. This is a case in which the learned Judge below has reluctantly found himself compelled, according to a certain view of the Queensland *Insolvency Act* of 1874, to treat an honest transaction as fraudulent. He does not doubt " in the smallest degree, the *bona fides* of the bank manager in requiring immediate security." It is true that Phillipson's action for either damages or rescission of a contract was pending against the debtor ; but His Honor is satisfied that the bank manager " had not the slightest notion that the defendant in that action would not be successful, . . . The defendant told him (and truly) that he was advised by his counsel, after the evidence on commission had been taken, that he had a good case. The action was one in which fraud was alleged against the defendant. Well, he had known the defendant in the action for a considerable time, and apparently had every respect and esteem for him as a man of high character, and not likely to be a man who would be guilty of fraud." The learned Judge expressly finds also:—" I do not think that Robertson had the slightest idea, in giving the security, of preferring the bank "; and so promising was the defendant's bank account that the bank was willing and anxious to keep him as a customer, and not let his account go elsewhere. It was a healthy account of a going business. The question is, does the law of Queensland compel the Court to say, notwithstanding such findings, that Robertson fraudulently preferred the bank.

The trustee in the insolvency mainly relies on sec. 108 of the *Insolvency Act* of 1874. To succeed under that section, he has to show (a) that Robertson was, at the time of giving the

4 C.L.R.]                    OF  AUSTRALIA.                    1553

securities, " unable to pay his debts as they became due out of his
own moneys "; and (b) that the securities were not given " for a
reasonable and sufficient consideration given at the time." The
Judge has found, as to (a), that Robertson had on 8th July, the date
of the securities, credit which would have enabled him to pay his
debts if and when they should be demanded ; and that he had,
apart from other assets, good book debts—book debts such that
he could have got the money from his debtors if he had asked
for it—exceeding the amount of his then existing engagements.
"But still," His Honour says,"it appears to me that the Act requires,
and I am bound to hold, that he must have moneys of his own, in
his actual possession or at call, to pay his debts as they become
due "; and adds, " technically, it appears to me that he was insol-
vent,   .   .   .   and I have reluctantly come to the conclusion that
I must answer the first question in the affirmative—that Mr.
Robertson, when he gave the securities, was not able to pay his
debts as they became due from his own moneys and was insol-
vent." If this view, that only moneys in his actual possession or
at call are to be considered in applying the words of sec. 108,
"unable to pay his debts as they become due out of his own
moneys," is correct, it will follow that a Rothschild or a Rocke-
feller will often be liable to be treated as coming within the words,
even if his debts are a few thousands, and his assets and resources
many millions.   On question (b) also the learned Judge finds
against the bank, following in this, not his own view as to the
reasonableness and sufficiency of the consideration as a matter of
business, but what he conceives to have been treated as the effect
of sec. 108.

The debtor, a colliery proprietor, had £954 18s. overdraft at
his bank on 7th July.   This was the day for paying the June
wages to the employés at the colliery, £937 ; and the bank
manager consented to advance the wages on getting security,
covering both debts, over assets valued, on a mercantile basis
(not a banker's basis), at £4,800.   It is said that the £937 was
not a " reasonable and sufficient consideration given at the time."
These words are treated, in the argument for the trustee, as if
they meant that the amount of the consideration given at the
time must be equal, or nearly equal, to the amount secured.   The

<div style="text-align: right">

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
v.
HALL.

Higgins J.

</div>

1554                         HIGH COURT                         [1907.

H. C. of A.   learned Judge cannot see—nor can I—why, if these words mean
1907.         equality in amount, it should not be complete equality. The
              security, on this theory, ought to be given for the amount of
BANK OF       the present advance only. But, in *In re Donaldson* (1), the Court
AUSTRALASIA   held that a present advance of three-fifths of the amount secured
v.            was "sufficient"; and here, it did not exceed one half. His
HALL.         Honor, in deference to this decision, would have gone so far
Higgins J.    as to treat the consideration as sufficient if five-eighths of
              the amount secured consisted of a present advance; but as it
              was only four-eighths, it is to be treated as insufficient. I concur
              with the learned Judge in his view that it is impossible to under-
              stand on what principle we are to determine the inquiry, what
              proportion the advance should bear to the charge so as to be
              valid, and to give business men confidence that their transactions
              will not be regarded as fraudulent. But I do not think that sec.
              108 of the Act involves any such inquiry.

                  As for the meaning of the phrase " unable to pay his debts as
              they become due from his own moneys," it has to be remembered
              that it is taken from the British *Bankruptcy Act* of 1869;
              that the Bankruptcy Acts used to apply to traders only, and that
              this very Act applied in great part to traders only; and that the
              phrase was meant to be used by commercial men in regulating
              their dealings. The critical words are "as they become due";
              so that, on the one hand, a debtor in making a payment or giving
              a security to a creditor, has to take into account, not only his
              debts immediately payable, but his debts which will become
              payable; and on the other hand, he is not obliged to keep money
              always in hand to meet debts not immediately due. It is suffi-
              cient if he see to it that he will be in a position to get enough
              moneys of his own to pay each debt as and when it becomes due.
              For instance, if he get money by sale or by mortgage of his
              assets, they are "his own moneys." But he does not satisfy this
              phrase by showing merely that his father, or his aunt, would pay
              for him. Again, no mercantile man would be treated as unable
              to pay his "debts," for the mere reason that he had not resources
              wherewith to pay the full uncalled liability on shares that he
              holds in prosperous companies, or the contingent liability under

                                (1) 1 Q.L.J., 105.

4 C.L.R.]   OF AUSTRALIA.   1555

a guarantee given by him for the due administration of an estate by a wealthy and reputable administrator against whom there is no shadow of a charge. These are not "debts"; they are contingent liabilities. A call is not a "debt" until it is made. The test used to be, was a man in a condition to pay his debts, in ordinary course, as persons carrying on a trade usually do: *De Tastet* v. *Le Tavernier* (1). The expression used in a long line of cases, and incorporated in the *Bankruptcy Act* 1849 was "unable to meet his engagements"; but this expression was changed, in the *Bankruptcy Act* of 1869 to "unable to pay his debts as they become due out of his own moneys"—I presume in the belief that the word "engagements" was too vague. This very Queensland Act, copying the British Act, makes, in section 140, a marked distinction between "debts" and "liabilities." "Liabilities" are provable as well as "debts," if capable of estimation. The section is headed "proof of *debts*"; but this is only a brief expression to cover all that is more accurately defined in the section itself. It is a rude sign-post for the guidance of travellers through the Act. It is urged upon us that whatever is provable in the insolvency is a "debt" within the meaning of the expression "unable to pay his debts"; but that is impossible. A liability as surety under an administration bond, and an uncalled liability on shares, may, if capable of estimation, be proved in insolvency; but this is by virtue of the express provisions allowing the proof of mere liabilities. They are not "debts" in fact; and there is no provision in the Act that they are to be deemed to be debts. These provisions of the Bankruptcy Acts are meant for the guidance of commercial men in their conduct. A man can regulate his conduct so far as regards things known and certain, such as debts; but not even the cautious merchant of Venice could regulate his conduct so as to avoid disaster when all possible contingences turn out adversely. I see no reason for refusing to the word "debts" the ordinary mercantile meaning, and the ordinary legal meaning, if it be understood that debts payable in the future as well as debts now payable, such as promissory notes not yet payable, are included. It is not neces-

H. C. of A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Higgins J.

(1) 1 Keen, 161.

1556                           HIGH  COURT                           [1907.

H. C. of A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Higgins J.

sary that they should be actually payable so as to be capable of supporting a petition for insolvency. This is the meaning given to "debts due" in the converse case, of debts due to the insolvent at insolvency, for the purposes of the order and disposition clause (*Queensland Act*, sec. 87). As *Mellish* L.J. said in *Ex parte Kemp*; *In re Fastnedge* (1):—" Until a sum certain has become due, and *is to be paid in all events*, there is, in my opinion, no debt due. The clause does not relate to demands which may be proved against the estate of a bankrupt, but to debts due to him." My opinion, therefore, is that a debtor is not "unable to pay his debts as they become due out of his own moneys," merely because he has contingent or other liabilities that *may possibly* become debts, and would then be too much for him; or because he does not always keep money in his box, or at call in a bank, sufficient to meet all his present and future debts, much less his contingent liabilities. That this is the true meaning of the words "from his own moneys" is apparent from the language of the Court of Appeal in *In re Washington Diamond Mining Co.* (2); where the moneys that a company could get in by making calls were treated as its own moneys for the purpose of these words. There is, therefore, no foundation for the view that the debtor "must have moneys of his own in his actual possession or at call, to pay his debts as they become due"; or for the view that contingent liabilities are to be regarded as debts.

Now, to apply this view of the phrase to the facts of the case. On 8th July, the day that he executed the securities, Robertson owed the bank £954 in addition to the present advance of £937. Taking the view of the facts which is most favourable to the trustee, Robertson owed £1,085 to other creditors; but of this sum £243 was only payable out of coal to be supplied, and £399 was payable on 21st July. He owed even less than £1,085, according to the Judge's finding; for his Honor treats these two debts as being only £239 and £311 respectively, and the other debts as amounting to £403 12s. (see Ex. 2); but the difference is not very material. Taking the figures which are the most favourable to the trustee, Robertson's actual debts, present and future, were £2,733, including the £1,891 owing to the bank;

(1) L.R. 9 Ch., 383, at p. 390.          (2) (1893) 3 Ch., 95, at pp. 101, 109.

and there was no one asking for payment. He was also defend-
ant in an action brought by Phillipson, the purchaser of the ship
*Kingswear*, for fraudulent representation, and for consequent
rescission of the contract of purchase, or damages; but this was
not a "debt," according to the view expressed above; and neither
the bank manager nor Robertson had any idea that the action
would be successful. So the learned Judge has found; and his
finding is not, and cannot be, impugned. An order for rescission
(with the incidental order to repay the £700 purchase money
already paid) is by no means an order as of course on proof of
fraud, and it may be fenced in with unforeseen conditions and
terms; and who could foretell the damages which would be
awarded by the jury for deceit? There were costs payable to
Robertson's own solicitors at the time that he filed his schedule,
12th August; but the trial extended over several days at the end
of July and the beginning of August, and there is no evidence to
show how much, if any, of these costs, were due on 8th July. On
the other side Robertson's assets, as estimated at the time, were
£7,410. This amount would have been even greater, but for the
fact of the pending action as to the *Kingswear*. The full pur-
chase money was £2,500; £700 were already paid, and the value
of the balance was treated as £1,000 net instead of £1,800,
because the purchaser disputed his liability to pay it. The
assets included £1,251 absolutely good book debts—as the banker
says "his debtors were so good for their liabilities that I think
he could have got the money from them if he had asked them for
it." These book debts alone would have been ample to satisfy
all debts due or becoming due to Robertson's other creditors; and
in addition, there were about £550 other book debts as to which,
and their then present value, there is no evidence, one way or the
other (transcript, p. 13). This is conclusive that Robertson was
able to pay his creditors in full, if my view of the meaning of the
phrase is right, and if the contingent liability in respect of the
*Kingswear* is not to be treated as a debt. By the judgment in
the action, dated 10th August, it was ordered that the contract of
sale "be rescinded," that Robertson repay the £700 already
paid, that Phillipson on such payment put the *Kingswear*
in the same condition as at the date of the contract and de-

H. C. of A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Higgins J.

1558 HIGH COURT |1907.

H. C. OF A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Higgins J.

liver her to Robertson; and that Robertson pay £968 11s. 11d. "by way of damages." I do not understand this judgment awarding both rescission and damages; but there has been no appeal, and Robertson filed his schedule within two days. Looking now at the figures as they stood on 8th July, the assets and the liabilities are as follows:—

As estimated by the parties { Assets £7,410. / Debts (present and future) £2,833.

Adding the *Kingswear* liability as ultimately ascertained—treating it as a debt; and omitting costs. { Assets £7,410. / Liabilities £4,501.

Still adding the *Kingswear* liability, but treating the ship as worth nothing to Robertson. { Assets £6,410. / Liabilities £4,501.

Even on the last basis there was a surplus of £1,909. I say nothing about the July wages; from the 8th July only about one week's wages had accrued due; and if we are to take into account wages to be earned in the future, we ought to take into account the handsome earnings of the business and the fruit of those wages. There is no evidence that £842, the other debts, could not have been paid by means of this surplus; and, therefore, I am of opinion that the appellants have not discharged their burden of proof, as they have not shown that Robertson was on 8th July unable to pay his debts, even assuming that the *Kingswear* liability is to be treated as a debt on that date, and that the *Kingswear* itself was of no value. It is alleged that Robertson was unable to raise money to pay his wages and debts after the judgment on 10th August. But his financial position after the adverse verdict is no fair test of his financial position on 8th July; yet even after the judgment the bank manager was ready to advance the month's wages and more—about £1,600—on the security of the book debts, if Robertson would give it. But, of course, the *Kingswear* was worth something. She had been sold, as seaworthy, for £2,500. She stood at that value in the books of the bank. I shall assume (though I doubt it very much) that the finding of the jury, (recited in the judgment), of unseaworthiness is to be treated as evidence of the fact of unseaworthiness against the bank; yet even after the action she is

4 C.L.R.]　　　　OF AUSTRALIA.　　　　1559

valued in the sworn schedule as worth £1,500, and that is the only evidence on the subject.  On 8th July, the initial date, the Court had not given Phillipson any security on the *Kingswear*; and the jury had not found that she was unseaworthy.  It is, therefore, obviously unfair to treat the *Kingswear*, or the purchase money payable therefor, on that date, as being worthless for financing purposes.  In this part of the case I am assuming, against my own view, that the possible liability in respect of the *Kingswear* is to be treated as a debt as on 8th July; but, of course, if my view is right, the appellants' failure to satisfy the burden of proof is still more obvious.

I ought, perhaps, to allude to the argument that, because the class of creditors who may be treated as preferred includes those who are to become, or may become, creditors in the future, by virtue of contracts already existing: *In re Paine*; *Ex parte Read* (1); *In re Blackpool Motor Car Co. Ltd.*; *Hamilton* v. *Blackpool Motor Car Co. Ltd.* (2), so the class of debts in the phrase " unable to pay his debts " must include all liabilities of all kinds that may become debts in the future.  No one, I think, has urged that these cases are not good law.  It seems, for instance, that a man may "prefer" his surety by giving him a security by way of indemnity against any possible loss.  But why should these cases bind us in the interpretation of the other phrase ?  There is really no analogy between the cases.  To " prefer " a creditor means to put him in a position that he will be better off than other creditors in the administration in insolvency.  It involves a mental state as to the future; and in preferring a creditor the mind is necessarily fixed on the state of things at the time of insolvency, and on the debts or liabilities that may be proved at that time.  But in the phrase " unable to pay his debts as they become due out of his own moneys " there is no mental state involved; and the question is one of external facts as they exist at the time of the security being given.  The phrase " unable to pay his debts as they become due " is not to be explained by the rule of thumb method of finding what liabilities are provable on an insolvency.  The true correlative of *debts due by the insolvent* is *debts due to the insol-*

H C. OF A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Higgins J.

(1) (1897) 1 Q.B., 122.　　　　(2) (1901) 1 Ch., 77.

1560                           HIGH  COURT                         [1907.

H. C. of A.
1907.

BANK OF
AUSTRALASIA
v.
HALL.

Higgins J.

*vent,* and the meaning of this is given by *Mellish* L.J., in the passage which I have quoted above.

The next question is, what is the meaning of " a reasonable and sufficient consideration given at the time ? "  What is " a reasonable and sufficient consideration " for giving a security over an existing debt and a present advance ?  The phrase is read by the respondent trustee as if it were " a consideration in money equal in amount to the amount secured."  But there is nothing whatever about equality, or even equivalence, in the section.  At the time when this sec. 108 was first enacted—in the *Insolvency Act* of 1864, sec. 74—there were frequent cases in England and elsewhere in which the want of a reasonable and sufficient consideration, given at the time of the security by the creditor secured, was held to be evidence, but not conclusive evidence, of an intention to defraud the other creditors.  For it was a common occurrence to give satisfaction or security to a favoured creditor, and to conceal the real motive by taking from him at the time some colourable fresh payment, and then to say that the consideration for the transaction was this fresh payment.  There were endless struggles as to what was the real motive.  It seems to me that the Queensland legislature merely meant that what had hitherto been mere evidence should hereafter be conclusive demonstration of a fraudulent intent to prefer, in the case of a man unable to pay his debts.  But there is no reason why the same tests should not be applied in finding whether there was or was not such a consideration.  In *Allen* v. *Bonnett* (1) the old debt was £450 ; the fresh advance was only £300 ; and yet a security for the whole sum of £750 was upheld.  In *Ex parte Fisher; In re Ash,* the cases are reviewed, and *Mellish* L.J. said (2) :—" We do not, however, think that we can lay down as a matter of law that the smallness of the amount of the advance necessarily makes the bill of sale an act of bankruptcy ; but we think that it affords strong evidence that the principal object of the parties in the whole transaction was, not to enable the bankrupt to continue his trade, but to secure to Mr. *Wells* the repayment of his past advances."  This was said in an extreme case in which the security covered the whole of the debtor's property.  The idea

(1) L.R. 5 Ch., 577.                      (2) L.R. 7 Ch., 636, at p. 644.

4 C.L.R.]   OF AUSTRALIA.   1561

that the present advance must be equal, or even nearly equal, to the amount secured, was never suggested in these cases. The words used in the Act are not "equal in amount," but "reasonable and sufficient." A secured creditor cannot get more than his debt, whatever the value of the property mortgaged may be. He merely gets a priority of payment so far as regards certain assets; and if he be paid from these assets, the other assets are available for the other creditors. The amount available for other creditors is not diminished if by means of the advance obtained the debtor could maintain or retrieve his position, even if he is actually unable to pay his debts at the time. This case was argued as if the bank got, for its £937, assets of the value of £4,800, or, at the best, got assets of the value of £1,891 (the amount secured); but this is a mistake. This is not the case of an absolute assignment. In the case of an absolute assignment a comparison of the property assigned with the amount of the debt discharged is often very material. If a man on 7th July has to pay £937 for wages, or else shut up his business in ruin, is it not worth his while to give priority as to part—even the greater part—of his property to the extent of covering an existing debt of £954 and the present advance of £937? Is there not here a "reasonable and sufficient consideration?" Another part of the consideration is to be found in the contract of the bank (recited in the bill of sale) to make advances to Robertson by way of loan; but the amount was undefined. The word "sufficient" has for many years been familiar in cases and text writers in connection with "consideration." It does not refer to the amount, but to the nature of "consideration." Any damage to the person to whom the promise is made, as well as any advantage to the person by whom the promise is made, is "sufficient" consideration to support a contract. A widow promises to pay her late husband's creditor if he will prove the debt to be owing. He proves it; and the trouble that he takes in doing so is "sufficient" consideration to support the contract: See *Williamson* v. *Clements* (1). There is no necessity to show anything like equality. In this section there is added the word "reasonable." Probably this means such consideration as a man could reasonably

H. C. of A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Higgins J.

(1) 1 Taunt., 523.

VOL. IV.   100

BarNet publication information  -  Date: Saturday, 07.01.2017  -  Publication number: 2479940  -  User: anonymous

1562                              HIGH COURT                              [1907.

H. C. of A.
1907.

BANK OF
AUSTRALASIA
*v.*
HALL.

Higgins J.

expect, under the circumstances, to obtain by way of bargain, where each party is straining for his own benefit. At the time the words were first put into the Queensland Act of 1864, the test was, is it a transaction by way of genuine bargain, not a favour to the creditor : *Shelford Bankruptcy Acts* 1862, p. 323 ; *Alderson* v. *Temple* (1). In this case the bank had long been promised security, but the giving of it had been postponed from various causes, and nothing was more natural than for the bank to say : "Either the whole debt secured, or no advance of £937." But whatever is the precise force of this word "reasonably," it certainly does not mean "equal in amount to the debt secured." There is no evidence whatever tending to show that the consideration was unreasonable ; and the learned Judge evidently thought the transaction was the most natural, honest, business-like one in the world. But he felt compelled by decisions to find that no reasonable or sufficient consideration was given at the time. I am of opinion that sec. 108, in prescribing that these two conditions—inability to pay debts &c., and the want of a reasonable and sufficient consideration given at the time—shall be *conclusive* evidence of fraud —while other sections of the Act gave an opportunity to impeach the transaction on the ground that there was an actual fraud (sec. 107) or that the transaction was fraudulent in *effect* (sec. 109)—meant to prescribe substantially that if a man, in financial difficulties, choose to (practically) make a gift to, instead of a bargain at arm's length with, the creditor, the Court need make no further inquiry as to motive or effect, but treat the transaction as a fraud.

An attempt has been made by Mr. *Graham*, who has certainly been unsparing of pains in working at the case, to show that even if sec. 108 does not invalidate the transaction, the securities are invalid under sec. 109 ; and for this purpose he seeks now to show that the bank has not proved that the security was taken in good faith. There is no express finding on this subject in the judgment ; and I do not find in the Judge's notes of the argument, which are full, any reference to sec. 109, although there is reference to secs. 107 and 108. It is not fair, therefore, to comment on the absence of an express finding of good faith under sec. 109.

(1) 4 Burr., 2235.

4 C.L.R.]                OF AUSTRALIA.                          1563

Indeed, if this section 109 was not pressed before the Judge, this    H. C. of A
Court ought not to be asked to give a finding of fact under that          1907.
section now.    Reliance is principally placed on the remarks of     BANK OF
*Cairns* L.J. in *Tomkins* v. *Saffery* (1), but in that case the    AUSTRALASIA
creditors alleged to have been preferred were obviously put               *v.*
upon inquiry by facts which were fully within their knowledge.        HALL.
They knew, as Lord *Cairns* said, "that there was a person with       Higgins J.
whom the bankrupt had had pecuniary dealings to a considerable
amount, which dealings might take the form either of debt or of
bounty not amounting to debt." The bankrupt was "the person
who of all others upon a matter of this kind would be their
most untrustworthy informant." But Robertson is found to be
a man of tested probity and honour, and his opinion as to the
result of the action was backed up by all his legal advisers.    I
do not quite see of whom the bank manager could effectively
have made further inquiries.    But perhaps the simplest answer
to the contention is that, if my interpretation of the phrase
"unable to pay debts &c." is right, neither Robertson nor the
bank manager had any need to concern themselves, for the
purposes of the section, with possible liabilities which were not
debts.  This is one of several answers which seem to me to be
sufficient as regards the new charge under sec. 109.    As for the
technical point taken before the Court—not in the notice of
motion—that the bill of sale does not truly state all its con-
ditions, I do not agree with it at all.  But, in view of the turn
which the case has taken, I do not feel called upon to take up
further time and space in elaborating my reasons on a point of
no general importance.  I have felt it incumbent on me to state
at some length the reasons why I venture to dissent on the main
point—the meaning and application of sec. 108—from my learned
colleagues.

                    *Appeal dismissed, with costs.*

Solicitors, for appellants, *Flower & Hart.*
Solicitors, for respondent, *Althow & McGregor.*
                                          N. G. P.

            (1) 3 App. Cas., 213, at p. 227.

**Cited by:**

BarNet publication information  -  Date: Saturday, 07.01.2017  -  Publication number: 2479940  -  User: anonymous

TAB 6

*Barclays Bank Ltd v WJ Simms Son & Cooke (Southern) Ltd*
[1980] 1 QB 677, English High Court

**1 Q.B.**

A

## BARCLAYS BANK LTD.
*v.*

## W. J. SIMMS SON & COOKE (SOUTHERN) LTD. AND ANOTHER

### [1977 B. No. 679]

1979   March 21, 22, 23, 26, 27, 28, 29, 30;                    Robert Goff J.

B         April 24

*Bill of Exchange—Cheque—Payment under mistake of fact—Cheque drawn on bank—Instructions to bank not to pay on presentation—Money erroneously paid on presentation—Whether bank entitled to recover sum from payee*

C        A housing association drew a cheque for £24,000 on its account with the plaintiff bank, in favour of a building company, there being sufficient funds in the association's account to meet the cheque. The following day a receiver was appointed to call in the building company's assets, and as a result the association phoned the bank to give instructions to stop the cheque, subsequently confirming its telephone instructions in writing to the bank. The bank's computer was programmed accordingly, and the following morning the amendment to the computer was checked by the bank's staff. That same day the receiver

D        presented the cheque, and the bank's paying official, overlooking the stop instruction, made payment on that date. The bank did not give notice to the company or the receiver of its claim for repayment on the day the cheque was paid but subsequently demanded repayment of the sum of £24,000 from the receiver, who refused to make repayment.

On a claim by the plaintiff bank against the company and

E        the receiver for repayment of £24,000 as money paid under a mistake of fact: —

*Held,* giving judgment for the plaintiff bank, that money paid under a mistake of fact was prima facie recoverable provided that the payer did not intend the payee to have the money in any event, the money was not paid for good consideration, and the payee had not in good faith changed his position (post, pp. 695B–D, 699A–B); that those principles applied to a

F        bank that erroneously acted without a mandate from its customer in circumstances where the payee was not deemed to have changed his position by a failure to give notice of dishonour; and that, since by section 50 (2) (c) of the Bills of Exchange Act 1882 there was no requirement for notice of dishonour to be given on a simple unendorsed cheque, the plaintiff bank's erroneous payment without a mandate had been made in circumstances where the defendants had not

G        changed their position either in fact or in law and, accordingly, the bank was entitled to repayment of the sum of £24,000 (post, pp. 700F–G, 702G—703A, C–E).

*Kelly* v. *Solari* (1841) 9 M. & W. 54; *Kleinwort, Sons & Co.* v. *Dunlop Rubber Co.* (1907) 97 L.T. 263, H.L.(E.) and *R. E. Jones Ltd.* v. *Waring and Gillow Ltd.* [1926] A.C. 670, H.L.(E.) applied.

*Cocks* v. *Masterman* (1829) 9 B. & C. 902 distinguished.

H        *Barclay & Co. Ltd.* v. *Malcolm & Co.* (1925) 133 L.T. 512 doubted.

*Chambers* v. *Miller* (1862) 13 C.B.N.S. 125 and *National Westminster Bank Ltd.* v. *Barclays Bank International Ltd.* [1975] Q.B. 654 considered.

Barclays Bank v. W. J. Simms Ltd.                    [1980]

The following cases are referred to in the judgment:

A

*Aiken* v. *Short* (1856) 1 H. & N. 210; 25 L.J. Ex. 321
*Barclay & Co. Ltd.* v. *Malcolm & Co.* (1925) 133 L.T. 512.
*Chambers* v. *Miller* (1862) 13 C.B.N.S. 125; 32 L.J.C.P. 30.
*Cocks* v. *Masterman* (1829) 9 B. & C. 902.
*Colonial Bank* v. *Exchange Bank of Yarmouth, Nova Scotia* (1885)
    11 App.Cas. 84, P.C.
*Diplock, In re* [1948] Ch. 465; [1948] 2 All E.R. 318, C.A.
*Fibrosa Spolka Akcyjna* v. *Fairbairn Lawson Combe Barbour Ltd.* [1943]

B

    A.C. 32; [1942] 2 All E.R. 122, H.L.(E.).
*Imperial Bank of Canada* v. *Bank of Hamilton* [1903] A.C. 49, P.C.
*Jones (R. E.) Ltd.* v. *Waring and Gillow Ltd.* [1925] 2 K.B. 612, C.A.;
    [1926] A.C. 670, H.L.(E.).
*Kelly* v. *Solari* (1841) 9 M. & W. 54.
*Kerrison* v. *Glyn, Mills, Currie & Co.* (1911) 81 L.J.K.B. 465, H.L.(E.).
*Kleinwort, Sons & Co.* v. *Dunlop Rubber Co.* (1907) 97 L.T. 263, H.L.(E.).

C

*Larner* v. *London County Council* [1949] 2 K.B. 683; [1949] 1 All E.R.
    964, C.A.
*London and River Plate Bank Ltd.* v. *Bank of Liverpool Ltd.* [1896]
    1 Q.B. 7.
*Morgan* v. *Ashcroft* [1938] 1 K.B. 49; [1937] 3 All E.R. 92, C.A.
*National Westminster Bank Ltd.* v. *Barclays Bank International Ltd.* [1975]
    Q.B. 654; [1975] 2 W.L.R. 12; [1974] 3 All E.R. 834.

D

*Norwich Union Fire Insurance Society Ltd.* v. *Wm. H. Price Ltd.* [1934]
    A.C. 455, P.C.
*Pollard* v. *Bank of England* (1871) L.R. 6 Q.B. 623.
*Porter* v. *Latec Finance (Qld.) Pty. Ltd.* (1964) 111 C.L.R. 177.
*Price* v. *Neal* (1762) 3 Burr. 1354.
*Sinclair* v. *Brougham* [1914] A.C. 398, H.L.(E.).
*Thomas* v. *Houston Corbett & Co.* [1969] N.Z.L.R. 151.

E

*United Australia Ltd.* v. *Barclays Bank Ltd.* [1941] A.C. 1; [1940]
    4 All E.R. 20, H.L.(E.).
*Ward & Co.* v. *Wallis* [1900] 1 Q.B. 675.
*Weld-Blundell* v. *Synott* [1940] 2 K.B. 107; [1940] 2 All E.R. 580.

The following additional cases were cited in argument:

*Deutsche Bank (London Agency)* v. *Beriro & Co.* (1895) 73 L.T. 669, C.A.

F

*Gowers* v. *Lloyds and National Provincial Foreign Bank Ltd.* [1938] 1
    All E.R. 766, C.A.
*Krebs* v. *World Finance Co. Ltd.* (1958) 14 D.L.R. (2d) 405.
*Liggett (B.) (Liverpool) Ltd.* v. *Barclays Bank Ltd.* [1928] 1 K.B. 48.
*Morison* v. *London County and Westminster Bank Ltd.* [1914] 3 K.B. 356,
    C.A.
*Simpson* v. *Eggington* (1855) 10 Exch. 845.

G

*South Australian Cold Stores Ltd.* v. *Electricity Trust of South Australia*
    (1957) 98 C.L.R. 65.
*Steam Saw Mills Co. Ltd.* v. *Baring Bros. & Co. Ltd.* [1922] 1 Ch. 244,
    C.A.
*Westminster Bank Ltd.* v. *Hilton* (1926) 136 L.T. 315, H.L.(E.).
*Yagerphone Ltd., In re* [1935] Ch. 392.

H

ACTION

By a writ dated December 5, 1977, the plaintiff, Barclays Bank Ltd.,
claimed £24,000 with interest from the first defendants, W. J. Simms Son &

1 Q.B.                    Barclays Bank v. W. J. Simms Ltd.

A    Cooke (Southern) Ltd., and the second defendant, William Sowman, a chartered accountant and receiver of the first defendants. The basis of the claim was that the plaintiff bank had paid the money under a mistake of fact when the second defendant presented a cheque drawn on the bank for the sum of £24,000 by the Royal British Legion Housing Association Ltd. in favour of the first defendants.

The facts, as agreed between the parties, are stated in the judgment.

B

*David Hunter Q.C.* and *Peter Cresswell* for the plaintiff bank. The general rule as to payment or satisfaction by a third person is that it is not sufficient to discharge a debtor, unless it is made by the third person as agent, for and on behalf of the debtor and with his prior authority or subsequent ratification: see *Simpson* v. *Eggington* (1855) 10 Exch. 845. The relationship of banker and customer is basically one of debtor and creditor

C    but with regard to the drawing and payment of the customer's cheques as against his money in the banker's hands, the relation is that of principal and agent: see *Westminster Bank Ltd.* v. *Hilton* (1926) 136 L.T. 315. One of the banker's basic obligations is to honour his customer's cheques, provided there are sufficient funds in the account. When a customer, as principal, draws, and a banker as agent honours such a cheque, then the banker is

D    paying on behalf of his customer. Alternatively, if the banker ought to be regarded as acting as principal, then he is likewise so acting on behalf of his customer. Another equally basic obligation of the banker is to obey his customer's instructions to countermand payment. This obligation is peculiar to cheques: see section 75 of the Bills of Exchange Act 1882 and *Byles on Bills of Exchange,* 23rd ed. (1972), p. 431. A banker who pays a cheque in defiance of notice of countermand, pays without authority and

E    without mandate. Whether he is to be regarded as acting as agent or principal, he acts on his own behalf. Other examples of a banker who has no authority to pay are: a banker who ignores or overlooks notice of death; a banker who pays on a cheque bearing the forged signature of the drawer; a banker who pays pursuant to an agreement with his customer which is void for mistake. When a banker pays within his mandate, the position

F    is that he is acting pursuant to an obligation to his customer and discharging a duty to his customer. He is paying on behalf of his customer, to a recipient, who on those instructions is entitled to receive the money. The bank can then debit the customer's account, and no enforceable obligation arises directly between the banker and the payee. The banker is only the drawee of the cheque. He is not an acceptor.

G    When a banker pays without a mandate, in all cases (with the possible exception of where he pays pursuant to an agreement with his customer which is void for mistake), the position is that he pays solely as principal and on his own behalf. He is not entitled to debit his customer's account unless and until the customer ratifies. Ratification or estoppel apart, if he debits his customer's account the only defence he would have to an action for a declaration that he was not entitled to debit would be a defence based

H    on *B. Liggett (Liverpool) Ltd.* v. *Barclays Bank Ltd.* [1928] 1 K.B. 48. That defence only arises if the banker can show that the money which he has paid has been expended wholly or in part in satisfaction of debts due

**Barclays Bank v. W. J. Simms Ltd.**                              **[1980]**

and owing by the customer to the recipient, and extends only so far as that
can be established.                                                        A

If the customer draws a cheque when there are insufficient funds in his
account and without making prior arrangements with the bank, the position
is that the drawing of the cheque is a request for overdraft facilities. The
bank has no obligation to grant such facilities or to honour the cheque.
It is free to choose. If the bank chooses to pay, this creates an enforce-
able obligation against the customer. By these means the banker pays    B
with a mandate.

Where money is paid under a mistake of fact, and would not have been
paid if the payer had known that the alleged fact was untrue, it is against
conscience for the payee to retain it: see *Kelly* v. *Solari* (1841) 9 M. & W.
54. The rule as stated in *Aiken* v. *Short* (1856) 1 H. & N. 210 appears to
restrict the right of recovery more narrowly than does *Kelly* v. *Solari*, but
cannot be regarded as exhaustive in the sense that no mistake, which does    C
not induce the payer to believe that payment will discharge or reduce his
liability, will found an action for money had and received: see *Morgan* v.
*Ashcroft* [1938] 1 K.B. 49; *Colonial Bank* v. *Exchange Bank of Yarmouth,
Nova Scotia* (1885) 11 App.Cas. 84; *Thomas* v. *Houston Corbett & Co.*
[1969] N.Z.L.R. 151; *United Australia Ltd.* v. *Barclays Bank Ltd.* [1941]
A.C. 1, *Larner* v. *London County Council* [1949] 2 K.B. 683 and *Fibrosa*    D
*Spolka Akcyna* v. *Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32.

Where money is paid under a mistake of fact, and is demanded back
from the payee who received it before his position was altered to his dis-
advantage, the money must be repaid: see *Kleinwort, Sons & Co.* v. *Dunlop
Rubber Co.* (1907) 97 L.T. 263. Accordingly, the proposition that the only
mistake which will ground recovery is a mistake which leads the payer to
believe that he is liable to the payee to pay it to him, is invalid. See also,    E
*Kerrison* v. *Glyn, Mills, Currie & Co.* (1911) 81 L.J.K.B. 465. Even though
the mistake was not a mistake as between a plaintiff and defendant, the
plaintiff can recover the money as having been paid under mistake of fact:
see *R. E. Jones Ltd.* v. *Waring and Gillow Ltd.* [1925] 2 K.B. 612. The
principle that in order that there should be grounds for recovery, the mis-
take must have been between payer and payee, has been rejected and re-    F
formulated in terms which provide that the mistake must have caused the
payment: see *Weld-Blundell* v. *Synott* [1940] 2 K.B. 107 and *Porter* v.
*Latec Finance (Qld.) Pty. Ltd.* (1964) 111 C.L.R. 177. If, however, a
person pays money under a mistake of fact, being liable to pay it, if the
fact of which he was ignorant does not discharge him from that liability,
he cannot recover it: see *Steam Saw Mills Co. Ltd.* v. *Baring Bros. &*    G
*Co. Ltd.* [1922] 1 Ch. 244.

Where a bank has no mandate to pay, and acts with the mistaken belief
that it has a mandate, then the bank is paying as principal on its own
behalf, and not on behalf of the customer. The payee receives money paid
on the bank's behalf alone. The effect of the mistake is to bring banker
and payee directly into contact with each other in a two party situation
from which the drawer is wholly excluded. This is quite contrary to their    H
intentions. In such circumstances both banker and payee are affected by
the same mistake and the mistake operates between banker and payee: see

**1 Q.B.**                    **Barclays Bank v. W. J. Simms Ltd.**

A  *Porter* v. *Latec Finance (Qld.) Pty. Ltd.* and *National Westminster Bank Ltd.* v. *Barclays Bank International Ltd.* [1975] Q.B. 654.

A bank may honour a cheque without realising that there are insufficient funds in the account, and by mistake grant overdraft facilities to the drawer: see *Chambers* v. *Miller* (1862) 13 C.B.N.S. 125 and *Pollard* v. *Bank of England* (1871) L.R. 6 Q.B. 623. In such a situation the bank would pay on behalf of its customer, albeit with money mistakenly pro-
B  vided by the bank for this purpose. The payee would receive precisely what he expected, namely moneys paid to him on behalf of the drawer of the cheque. The transaction would be the tri-partite transaction envisaged, affecting customer, banker and payee. In such circumstances it can, if necessary, be said that a mistake of this nature does not operate between banker and payee. However, if the mistake between the banker
C  and the customer is so fundamental as to render the relevant agreement void, then the situation may be the same as where there is no mandate.

If in an action for the recovery of money paid under a mistake of fact, special principles apply to bankers, so that the nature and quality of the banker's mistake becomes material, the proper distinction to be made is between the situation where there is a mandate, and that where there is no mandate.

D  The money when received by the receiver did not become part of the general assets of the company, but was impressed with a trust: see *In re Yagerphone Ltd.* [1935] Ch. 392. [Reference was also made to: *Deutsche Bank (London Agency)* v. *Beriro & Co.* (1895) 73 L.T. 669; *Gowers* v. *Lloyds and National Provincial Foreign Bank Ltd.* [1938] 1 All E.R. 766; and *Krebs* v. *World Finance Co. Ltd.* (1958) 14 D.L.R. (2d) 405.]

E  *E. C. Evans Lombe Q.C.* and *Michael Crystal* for the defendants. On the facts set out in the agreed statement and shown by its supporting documents, the amount claimed is irrecoverable from the company and from the receiver, because it was paid by the bank and received by the company in discharge of the obligation of the housing association under the building contract pleaded, and/or the cheque pleaded. Alternatively, on the same facts and on the assumption that, contrary to the above
F  submission, it is held that the amount claimed is recoverable from the company as a money debt, it is irrecoverable from the receiver because an action for money had and received does not lie against the receiver in respect of it, and it cannot be traced into the receiver's hands.

The bank are not entitled to recover because there was no mistake of fact between the plaintiff and the defendants, or either of them, or alter-
G  natively, any mistake was confined to the plaintiffs. A person who intends to make a voluntary payment and thinks that he is making a certain kind of voluntary payment, is not making such payment under a mistake of fact which is fundamental or basic: see *Morgan* v. *Ashcroft* [1938] 1 K.B. 49.

Since the plaintiff bank failed to give notice of its claim on the day
H  the cheque was paid, it could not recover the money: see *Cocks* v. *Masterman* (1829) 9 B. & C. 902; *Price* v. *Neal* (1762) 3 Burr. 1354 and *Paget's Law of Banking,* 8th ed. (1972), p. 377. The plaintiff bank could only succeed if it established that the money was impressed with a trust

Barclays Bank v. W. J. Simms Ltd.    **[1980]**

in its favour, and this it could not do: see *In re Diplock* [1948] Ch. 465. A
Where money is paid by mistake of fact due to a mistake by a third party,
and not due to any mistake on the part of the payee, it is not recoverable:
see *Barclay & Co. Ltd.* v. *Malcolm & Co.* (1925) 133 L.T. 512. Where
the money is due under a contract between the payer and the payee, there
can be no recovery on that ground, unless the contract itself is void for
mistake or is rescinded by the plaintiff: see *Norwich Union Fire Insurance
Society Ltd.* v. *Wm. H. Price Ltd.* [1934] A.C. 455. It is a defence to B
the claim that the payee has given consideration for the payment: see
*Ward & Co.* v. *Wallis* [1900] 1 Q.B. 675.

A voluntary payment, as in *Morgan* v. *Ashcroft* [1938] 1 K.B. 49,
is a payment made without legal obligation. Where such payment is
made, the payer cannot generally recover the money from the payee,
even where it has been paid under a mistake of fact, unless the mistake
is fundamental: see *Morgan* v. *Ashcroft*; *Sinclair* v. *Brougham* [1914] C
A.C. 398 and *Aiken* v. *Short*, 1 H. & N. 210.

Once a cheque is discharged by payment and the money has been
received by the payee in good faith, the presenter of the cheque is under
no liability to repay: see *Morison* v. *London County and Westminster
Bank Ltd.* [1914] 3 K.B. 356.

*Hunter Q.C.* in reply. The need for a claimant to give notice of D
dishonour (see *Cocks* v. *Masterman,* 9 B. & C. 902) only applies
where notice of dishonour is required: see *Imperial Bank of Canada* v.
*Bank of Hamilton* [1903] A.C. 49; *London and River Plate Bank Ltd.* v.
*Bank of Liverpool Ltd.* [1896] 1 Q.B. 7 and *National Westminster Bank
Ltd.* v. *Barclays Bank International Ltd.* [1975] Q.B. 654. Notice of
dishonour is not required to be given on a simple unendorsed cheque: see
section 50 (2) (*c*) of the Bills of Exchange Act 1882. E

*Cur. adv. vult.*

April 24. ROBERT GOFF J. read the following judgment. This case
raises for decision the question whether a bank, which overlooks its
customer's instructions to stop payment of a cheque and in consequence
pays the cheque on presentation, can recover the money from the payee as F
having been paid under a mistake of fact. The point is one on which there
is no decision in this country; and it is a point, I was told, of considerable
importance to bankers, not only because it is an everyday hazard that
customers' instructions may be overlooked, but because modern technology,
rather than eliminating the risk, has if anything increased it.

The matter comes before the court on agreed facts, which I now propose G
to set out in this judgment. On June 10, 1971, W. J. Simms Son & Cooke
(Southern) Ltd. (which I shall call " the company ") granted to National
Westminster Bank Ltd. a mortgage debenture which provided, inter alia:

" 2.  The company as beneficial owner . . . (v) charges by way of
floating security its undertaking and all its other property, assets and
rights whatsoever and wheresoever present or future.

" 7.  At any time after this security shall have become enforceable H
[National Westminster] may by writing . . . appoint any person . . .
to be a receiver of the property hereby charged . . . Any receiver so

1 Q.B.                Barclays Bank v. W. J. Simms Ltd.                Goff J.

A    appointed shall be the agent of the company and the company shall be solely responsible for his acts or defaults and for his remuneration and any receiver so appointed shall have power: (i) to take possession of, collect and get in the property hereby charged and for that purpose to take any proceedings in the name of the company or otherwise . . . (v) to do all such other acts and things he may consider necessary or desirable for the realisation of any property hereby charged.

B    " 8.    All moneys received by any receiver shall be applied by him in the following order: (i) in payment of the costs charges and expenses of and incidental to the appointment of the receiver and the exercise of all or any of his powers and of all outgoings paid by him; (ii) in payment of remuneration to the receiver at such rates as may be agreed between him and the bank at or at any time after his appointment; (iii) in or towards satisfaction of the amount owing on this security;

C    (iv) the surplus (if any) shall be paid to the company or other person entitled to it."

The mortgage debenture was registered pursuant to section 95 of the Companies Act 1948, on June 24, 1971.

On June 21, 1976, the company entered into a contract in the R.I.B.A.

D    Standard Form of Building Contract, 1963 edition with the Royal British Legion Housing Association Ltd. (which I shall call " the association ") to perform certain works for the association at Borstal Road, Rochester, Kent, for the total sum of £699,024. Clause 25 of the building contract provided:

" (2)    In the event of a receiver or manager of his business or under-taking duly appointed, or possession taken, by or on behalf of the holders of any debentures secured by a floating charge, of any property

E    comprised in or subject to the floating charge, the employment of the contractor under this contract shall be forthwith automatically deter-mined but the said employment may be reinstated and continued if the employer and the contractor his . . . receiver or manager shall so agree.    (3) In the event of the employment of the contractor being determined as aforesaid and so long as it has not been reinstated and

F    continued, the following shall be the respective rights and duties of the employer and contractor: (a) The employer may employ and pay other persons to carry out and complete the works . . . (b) The employer may pay any supplier or sub-contractor for any materials or goods delivered or works executed for the purposes of this contract (whether before or after the date of determination) in so far as the price thereof has not already been paid by the contractor.    The employer's rights

G    under this paragraph are in addition to his rights to pay nominated sub-contractors as provided in clause 27 (c) of these conditions and payments made under this paragraph may be deducted from any such due or to become due to the contractor . . . (d) The contractor shall allow or pay to the employer in the manner hereinafter appearing the amount of any direct loss and/or damage caused to the employer

H    by the determination.    Until after completion of the works under paragraph (a) of this sub-clause the employer shall not be bound by any provision of this contract to make any further payment to the contractor, but upon such completion and the verification within a

**Goff J.**                **Barclays Bank v. W. J. Simms Ltd.**                **[1980]**

reasonable time of the accounts therefor the architects shall certify
the amount of expenses properly incurred by the employer and the    A
amount of any direct loss and/or damage caused to the employer by
the determination and, if such amounts when added to the moneys paid
to the contractor before the date of determination exceed the total
amount which would have been payable on due completion in accord-
ance with this contract, the difference shall be a debt payable to the
employer by the contractor; and if the said amounts when added to    B
the said moneys be less than the said total amount, the difference shall
be a debt payable by the employer to the contractor."

On September 2, 1977, Messrs. Michael Aukett Associates, the
architect under the building contract, issued an interim certificate based on
a valuation of works performed at August 25, 1977, certifying that £24,000
was payable under the building contract by the association to the company.    C

At all material times the association has been a customer of the plaintiffs,
Barclays Bank Ltd. at their branch at 78, Victoria Street, London S.W.1
(which I shall call " the branch ").

On Monday, September 12, 1977, the association drew a cheque for
£24,000 on its account with Barclays at the branch in favour of the company
in payment of the interim certificate. At all material times there were
sufficient funds in the account to meet the cheque.    D

On Tuesday, September 13, 1977, pursuant to the terms of the mortgage
debenture, National Westminster appointed Mr. William Sowman, a
chartered accountant, to be receiver of the undertaking, property and assets
of the company.

On Thursday, September 15, 1977, at 9.20 a.m. the association tele-
phoned the branch and instructed Barclays to stop payment on the cheque.    E
The branch immediately prepared that instruction for the computer which
was then programmed accordingly. On the morning of Friday,
September 16, 1977, a member of the branch staff checked the computer
amendment applied report to ensure that the stop details had been recorded
correctly. The association subsequently confirmed its telephone instructions
in writing to Barclays.

The cheque was received by Mr. Sowman in the ordinary course of post    F
and his assistant paid in the cheque at the Waddon branch of National
Westminster with a direction that the cheque be specially cleared. It is
not suggested that in giving such instruction for special clearance or at any
time prior to the cheque being specially cleared, Mr. Sowman, or his
assistant or the company, was aware of the instructions given by the
association to Barclays on Thursday, September 15, 1977.    G

Late on Thursday, September 15, or early on Friday, September 16,
1977, a special presentation from the Waddon branch of National West-
minster was received by the branch enclosing the cheque. Details of its
presentation were recorded in the Branch Fate Register on Friday,
September 16, 1977, and the cheque was paid by the branch that day due
to a mistake by the paying official at the branch who overlooked the stop    H
instruction. A credit for National Westminster's special presentation
account was sent to National Westminster in the branch credit transfers
that evening.

A    The cheque was rejected by Barclays' computer on Monday, September 19, 1977, the next business day, and was placed to the debit of the computer's suspense account for the work of September 16, 1977. The cheque was subsequently filed with the association's vouchers and its omission from the association's statement was discovered at Barclays' central accounting unit, on Monday, September 19, 1977. On September 27, 1977, Barclays' head office telephoned the branch to state that there was

B    an outstanding item for £24,000. The branch then telephoned the association to establish the reason for payment being countermanded. The association have since confirmed to Barclays, (1) that they heard of the receiver's appointment on about September 14, 1977, and (2) that they decided to stop the cheque in the belief that they were entitled so to act under the building contract.

C    Barclays subsequently demanded repayment of the cheque from Mr. Sowman who declined to make such repayment. Correspondence ensued between Barclays and its solicitors and Mr. Sowman and his solicitors. The bank subsequently commenced proceedings claiming repayment of the £24,000 from the company and/or Mr. Sowman as moneys paid under a mistake of fact. Mr. Sowman has at all times since December 1977 held £24,000 in a separate account pending a decision in these proceedings.

D    In the receivership there is likely to be a deficiency as regards the preferential creditors. There will certainly be a substantial deficiency in the receivership for National Westminster, the mortgage debenture-holder.

    In the action as constituted, the plaintiff bank claimed to be entitled to recover the money from the first defendants (the defendant company) and the second defendant (the receiver) as money paid under a mistake of fact.

E    Pleadings were served: in the defence, apart from certain non-admissions of fact (which were subsequently resolved in the agreed facts), the substantial point taken by the defendants was that the plaintiff bank were not entitled to recover because there was no mistake of fact between the plaintiffs and the defendants or either of them, alternatively that any mistake or misapprehension of fact was confined to the plaintiffs. This point went to the nature of the mistake necessary to ground recovery, the matter to

F    which the greater part of the argument in the case was devoted; and the defendants' argument on this point was (as will be seen) the subject of some development.

    However, in the course of argument other points were raised by the defendants. These were as follows. (1) The money was irrecoverable from either defendant, because it was paid by the plaintiff bank and received by the defendant company in discharge of the association's obligation to the

G    company under the building contract or alternatively under the cheque. (2) Since the plaintiff bank failed to give notice of its claim on the day when the cheque was paid, it was unable (on the principle in *Cocks* v. *Masterman* (1829) 9 B. & C. 902 and other cases) to recover the money. (3) In any event, no action lay against the receiver. (4) It was at one time submitted that the effect of the crystallisation of the floating charge was that the

H    plaintiff bank could only succeed in its claim if it could establish that the money was impressed with a trust in its favour, and this, it was submitted, on the authority of *In re Diplock* [1948] Ch. 465 and other cases, the plaintiff bank could not establish. This submission provoked the response

by the plaintiff bank that the money was indeed impressed with such a trust, and would not therefore go as a windfall to the defendant company's creditors; alternatively that the plaintiff bank would if necessary seek leave to join as defendants the National Westminster Bank, as the immediate recipients of the payment. In the outcome the point was not pursued by the defendants; and it was recognised by them that, since the action was intended to be in the nature of a test case to ascertain whether money paid in the circumstances of the present case was recoverable, the plaintiff bank's action should not fail for want of parties and that, upon the plaintiff bank not proceeding further against the receiver, the receiver would procure payment of any sum found due by the judgment.

I propose to deal with the matter as follows. I shall first consider the principles upon which money is recoverable on the ground that it has been paid under a mistake of fact. Next, I shall consider the application of those principles to a case where a bank has paid, under a mistake of fact, a cheque drawn upon it by a customer. Third, I shall consider how far the defence in *Cocks* v. *Masterman*, 9 B. & C. 902 is available to defeat a claim brought by a bank which has paid a cheque under a mistake of fact. Lastly, I shall consider the application of these principles to the present case.

1. *The principles upon which money is recoverable on the ground that it has been paid under a mistake of fact.*

Nearly 40 years ago, Asquith J. stated that " it is notoriously difficult to harmonise all the cases dealing with payment of money under a mistake of fact,": see *Weld-Blundell* v. *Synott* [1940] 2 K.B. 107, 112. This is indeed true, and it does not make easy the task of the trial judge, whose duty it is both to search for guiding principles among the authorities, and to pay due regard to those authorities by which he is bound. I have however come to the conclusion that it is possible for me, even in this field, to achieve both these apparently irreconcilable objectives. The key to the problem lies, in my judgment, in a careful reading of the earliest and most fundamental authorities, and in giving full effect to certain decisions of the House of Lords. It is necessary therefore for me to review the leading authorities.

I shall go straight to three early cases, the first of which provided the basis of the modern law on this topic. That is *Kelly* v. *Solari* (1841) 9 M. & W. 54. The action was brought by the plaintiff, as one of the directors of Argus Life Assurance Co., to recover from the defendant a sum of money alleged to have been paid to her under a mistake of fact. The evidence was that the money had been paid to her, as executrix of her deceased husband, upon a policy on the life of her husband, in entire forgetfulness that the assured had by mistake allowed the policy to lapse by reason of non-payment of the premium. At the trial, Lord Abinger directed a nonsuit, expressing the opinion that if the directors had had knowledge, or the means of knowledge, of the policy having lapsed, the plaintiff could not recover; but he reserved leave to the plaintiff to move to enter a verdict for him for the amount claimed. The plaintiff obtained a rule nisi accordingly, or for a new trial. The principal issue in the case was therefore whether negligence on the part of the plaintiff precluded

**1 Q.B.**    **Barclays Bank v. W. J. Simms Ltd.**    **Goff J.**

A   recovery; it was held that it did not, a conclusion that has stood ever
since. For present purposes, however, the case is important for a state-
ment of principle by Parke B., in the following terms, at pp. 58–59:

"I think that where money is paid to another under the influence of
a mistake, that is, upon the supposition that a specific fact is true,
which would entitle the other to the money, but which fact is untrue,
and the money would not have been paid if it had been known to
B   the payer that the fact was untrue, an action will lie to recover it back,
and it is against conscience to retain it; . . . If, indeed, the money
is intentionally paid, without reference to the truth or falsehood of
the fact, the plaintiff meaning to waive all inquiry into it, and that
the person receiving shall have the money at all events, whether the
fact be true or false, the latter is certainly entitled to retain it; but if
it is paid under the impression of the truth of a fact which is untrue,
C   it may, generally speaking, be recovered back, however careless the
party paying may have been, in omitting to use due diligence to inquire
into the fact."

Rolfe B. also said, at p. 59:

"... wherever [money] is paid under a mistake of fact, and the
party would not have paid it if the fact had been known to him, it
D   cannot be otherwise than unconscientious to retain it."

The case was concerned with a payment made with the intention of
discharging a supposed liability of the plaintiff to the defendant. It is no
doubt for that reason that the first part of Parke B.'s statement of principle
was directed to such a case; though it is to be observed that, in the context
of such a case, Parke B. did not place any restriction on the nature of the
E   mistake which would ground recovery. But it would not, in my judgment,
be right to infer that Parke B. was stating that money paid under a
mistake of fact was only recoverable in cases where the plaintiff's mistake
led him to believe that he was under a liability to the defendant to pay the
money to him. There is nothing to indicate that the first part of his
statement of principle was intended so to restrict the right of recovery;
F   indeed later in his judgment he stated the principle of recovery in broader
terms, as did Rolfe B., which appears to indicate that it is sufficient to
ground recovery that the plaintiff's mistake has caused him to make the
payment.

The second of these three cases is *Aiken* v. *Short* (1856) 1 H. & N. 210.
The plaintiffs were bankers. The bank was the transferee from one Carter
of an inheritance to which Carter was supposedly entitled. The plaintiffs
G   paid £266 16s. 6d. (£200 plus interest) to the defendant in discharge of a
debt owed by Carter to the defendant, which was secured by an equitable
mortgage on Carter's supposed inheritance. It transpired that Carter had
no inheritance; and the plaintiffs claimed to recover the money from the
defendant as having been paid under a mistake of fact. It was held by
the Court of Exchequer that the money was in those circumstances irre-
H   coverable. It is a crucial fact in the case that, the payment having been
authorised by Carter, it was effective to discharge the debt which was in
fact owed by Carter to the defendant; the defendant therefore gave con-
sideration for the payment which was, for that reason, irrecoverable. This

was the basis of the decision of both Pollock C.B. and Platt B.; it seems
likely, from interventions in the argument, that Martin B. (who was absent
when judgment was given) would have decided the case on the same basis.
Pollock C.B. said, at p. 214:

> " The bank had paid the money in one sense without any consideration,
> but the defendant had a perfect right to receive the money from
> Carter, and the bankers paid for him . . . The money was, in fact,
> paid by the bank as the agents of Carter."

Platt B. said, at p. 215:

> " Carter referred [the defendant] to the bank, who paid the debt,
> and the bond was satisfied. The money which the defendant got from
> her debtor was actually due to her, and there can be no obligation
> to refund it."

The case is however remembered principally for an obiter dictum of
Bramwell B. He said, at p. 215:

> " In order to entitle a person to recover back money paid under a
> mistake of fact, the mistake must be as to a fact which, if true, would
> make the person paying liable to pay the money; not where, if true,
> it would merely make it desirable that he should pay the money."

He recognised that the bankers were under no antecedent obligation to
pay the money: they " were at liberty to pay or not, as they pleased ":
and, " having voluntarily parted with their money to purchase that which
the defendant had to sell," they were unable to recover. It appears from
the rather fuller report in 25 L.J. Ex. 321, 324 that Bramwell B. did not
necessarily regard his statement of principle as comprehensive. But,
strictly construed, it appears to restrict the right of recovery more
narrowly than did Parke B. in *Kelly* v. *Solari,* 9 M. & W. 54. It purports
to exclude recovery in cases where the plaintiff's mistake did not lead
him to believe that he was liable to pay the money to the defendant; and
it appears in particular to exclude recovery in a case where the plaintiff
had paid the money to the defendant in the mistaken belief, not that he
was liable to the defendant to pay it, but that he was under an obligation
to a third party to pay it to the defendant, even when the payment did not
discharge a debt owing to the defendant who therefore gave no consideration
for it. Subsequent decisions of the House of Lords show that so restricted
a statement of the principle of recovery does not represent the law.

The third of the early cases to which I must refer is *Chambers* v. *Miller*
(1862) 13 C.B.N.S. 125, not because it sheds any particular light on this
branch of the law, but because its effect has been misrepresented in certain
textbooks, and in particular a dictum of Erle C.J. has frequently been
cited out of context and so misunderstood. The case was not concerned
with recovery of money paid under a mistake of fact, but with an action
for assault and false imprisonment. The plaintiff was a clerk, who
presented for payment at the defendant's bank a cheque held by his
employers, drawn on the bank by one of their customers. The cashier,
overlooking the fact that the customer's account was insufficient to meet
the cheque, received it and placed the amount in cash on the counter.

689

**1 Q.B.**                  **Barclays Bank v. W. J. Simms Ltd.**                  **Goff J.**

A    The plaintiff counted the money, and was counting it a second time when the cashier, realising his mistake, returned and said that the cheque could not be paid. The plaintiff put the money in his pocket, whereupon the cashier detained him, under threat of being given into custody on a charge of theft; he was so detained until he handed over the money, when he was given back the cheque uncancelled. The cheque was subsequently presented to the drawer and paid by him. The crucial question in the case was whether, in these circumstances, the property in the money had

B    passed to the bearer of the cheque. All the members of the court held that it had, and a rule nisi to enter a verdict for the defendant was accordingly discharged.

It was part of the defendant's argument that the money was recoverable, as having been paid under a mistake of fact. However that was, as at least two members of the court recognised (see p. 135, *per* Williams J.,

C    and pp. 136–137, *per* Byles J.), irrelevant to the question whether the property had passed; indeed, where an action is brought to recover money paid under a mistake of fact, property will almost invariably have passed to the defendant, the effect of the action, if successful, being simply to impose on the defendant a personal obligation to repay the money. Furthermore, the kind of mistake that will ground recovery is, as Parke B.'s

D    statement of the law in *Kelly* v. *Solari*, 9 M. & W. 54 shows, far wider than the kind of mistake which will vitiate an intention to transfer property. The court was satisfied in *Chambers* v. *Miller*, 13 C.B.N.S. 125 that the cashier's mistake did not prevent the property in the money from passing. It was in the context of considering that question that Erle C.J. referred to the mistake as being "not as between [the cashier] and the bearer of the cheque, but as between him and the customer": see p. 133.

E    This dictum has, however, been taken out of its context and it has subsequently been suggested on its authority that no action will lie to recover money paid under a mistake of fact, unless the mistake was "as between" the payer and the payee, in the sense that both parties were suffering under the same mistake. *Chambers* v. *Miller* provides, in my judgment, no basis for any such proposition, which was later to be authoritatively rejected by

F    the House of Lords.

Such are the early cases most frequently cited on this topic. I propose to go next to three cases in the House of Lords, in which the law on this subject was authoritatively established, but before I do so, I will first refer to a decision of the Privy Council, which was later to be relied upon in one of the cases in the House of Lords. This is *Colonial Bank* v. *Exchange Bank of Yarmouth, Nova Scotia* (1885) 11 App.Cas. 84. A firm called

G    B. Rogers & Son was in business in Yarmouth, Nova Scotia. They instructed agents in Antigua to remit certain funds to the Halifax branch of the Bank of British North America. The agents paid the funds into the plaintiff bank, and gave them "rather ambiguous instructions" for their remittance in favour of the Bank of British North America, which omitted any reference to that bank's branch in Halifax. The plaintiff bank then

H    gave instructions to New York agents to carry out the instructions so received by them from B. Rogers' agents. The New York agents proceeded to put the New York Branch of the Bank of British North America in funds, but gave them instructions in terms which erroneously required

Goff J.                    Barclays Bank v. W. J. Simms Ltd.                    [1980]

payment "for account Yarmouth Bank, credit of Rogers." The Bank of
British North America had no branch in Yarmouth, but considered that    A
the proper way of remitting funds to Yarmouth was to pay them to the
defendant bank, with whom they had arrangements. This they did, paying
the money to the defendant bank, "credit of Rogers." It so happened
that Rogers was a customer of the defendant bank, and was considerably
in their debt at the time, and so they put the money to the credit of Rogers,
and to the debit of the Bank of British North America. On the following    B
day the Bank of British North America in New York, having been advised
by Rogers of the mistake, called for the repayment of the money from the
defendant bank; this was refused on the ground that the credit had been
"used," which meant that it had been placed in the defendant bank's
books in reduction of Rogers' indebtedness to them. It was held that the
plaintiff bank were entitled to recover the money from the defendant bank.
The principal question in the case was whether the plaintiff bank had a    C
sufficient interest to proceed directly against the defendant bank for the
money. But for present purposes, the decision is of interest because the
plaintiff bank did not suffer under a mistake which led them to believe
that they were under any liability to the defendants to pay the money to
them; indeed nobody, in the whole chain of parties, believed that they
were under any such liability. The decision is therefore clearly contrary    D
to the view, founded on Bramwell B.'s dictum in *Aiken* v. *Short*, 1 H. & N.
210, that to ground recovery, a mistake of fact must fall within any such
restrictive category; indeed there is nothing in the advice of the Board in
this case, which was delivered by Lord Hobhouse, to suggest that there
is any limitation to be placed upon the category of mistake necessary to
ground recovery, other than that it must have caused the payment.

I come then to the three cases in the House of Lords. The first is    E
*Kleinwort, Sons & Co.* v. *Dunlop Rubber Co.* (1907) 97 L.T. 263. A
firm called Messrs. Kramrisch were rubber merchants, who were financed
both by the appellants Messrs. Kleinworts, and by another merchant
bank, Messrs. Brandts. Kramrisch supplied the respondents, the Dunlop
Rubber Co., with a quantity of rubber, directing them to pay the price to
Brandts, who had an equitable mortgage upon it. The respondents    F
mistakenly paid it to the appellants, who received it in good faith. Messrs.
Kramrisch failed and the respondents were subsequently held liable to pay
the money to Messrs. Brandts. They claimed to recover from the
appellants the money they had mistakenly paid to them. It was held that
they were entitled to recover it as having been paid under a mistake of
fact. The main question in the case was whether the appellants could
rely upon the defence of change of position; but that plea was conclusively    G
negatived by the answers of the jury at the trial. For present purposes,
the interest of the case lies in two matters. First, there was no question
of the respondents mistakenly believing that they were under any liability
to the appellants to pay the money to them. Second, Lord Loreburn L.C.
stated the principle of recovery in very broad terms. He said, at p. 264:

> ". . . it is indisputable that, if money is paid under a mistake of fact    H
> and is redemanded from the person who received it before his position
> has been altered to his disadvantage, the money must be repaid in
> whatever character it was received."

**1 Q.B.**            **Barclays Bank v. W. J. Simms Ltd.**            **Goff J.**

A    The second of these cases is *Kerrison* v. *Glyn, Mills, Currie & Co.* (1911) 81 L.J.K.B. 465. The appellant paid a sum of money to the respondents, for the account of a New York bank called Kessler & Co., in anticipation of a liability to recoup Kessler & Co. for advances made by them to a mining company in Mexico in which the appellant was interested. Unknown to the appellant or the respondents, Kessler & Co. were insolvent at the time of the payment. The money was not paid over by the

B    respondents to Kessler & Co.; but since Kessler & Co. were indebted to them, the respondents claimed to be entitled to retain the money and declined to refund it to the appellant. It was held that the appellant was entitled to recover the money from the respondents. Two questions arose in the case. First, whether the arrangements between the appellant and Kessler & Co. were such that he was indebted to Kessler & Co. in the sum of money; it was held by the House of Lords (differing from the Court

C    of Appeal on this point) that he was not, and that the money was paid only in anticipation of a future liability. Had the appellant been so indebted, it was recognised by the House of Lords that the money would have been paid in discharge of an existing debt and would have been irrecoverable, despite the fact that the appellant had paid it under the misapprehension that Kessler & Co. were solvent. Lord Atkinson, who

D    delivered the leading speech, said, at p. 470:

> " [The appellant] lodged the money in the belief that Kessler & Co. were a living commercial entity able to carry on their business as theretofore, that they were in a position to honour and would honour the drafts of the Bote Mining Co. up to the sum which he, in anticipation, sent to recoup them for their repeated advances. Kessler & Co. had, in fact, ceased to be in that position."

E
The second question was whether the fact that the respondents were bankers enabled them to resist the appellant's claim, on the ground that money once paid in to a bank ceases altogether to be the money of the payer. That was held to be irrelevant.

This decision, too, is therefore inconsistent with the proposition that

F    the only mistake which will ground recovery is a mistake which leads the payer to believe that he is liable to the payee to pay it to him. But the case is also of interest for present purposes because of statements in the speeches of their Lordships relating to the type of mistake which will ground recovery. These are in very broad terms. Lord Atkinson said, at p. 470:

> " I cannot doubt but that on general principles . . . [the appellant]

G    would be entitled to recover back money paid in ignorance of these vital matters as money paid in mistake of fact."

Lord Shaw of Dunfermline said, at p. 471:

> " The money was paid . . . under the mistake of fact—which was material, and was indeed the only reason for payment—that Kessler & Co. could perform their obligations."

H
Lord Mersey said, at p. 472, that the facts brought the case directly within the terms of the judgment of Lord Loreburn L.C. in *Kleinwort, Sons & Co.* v. *Dunlop Rubber Co.*, 97 L.T. 263, and then quoted the

passage from that judgment which I have set out above. He went on
to dismiss an attempt by the respondents "to take the case out of this
plain and simple rule of law." It is to be observed that Lord Loreburn
L.C. was a member of the Judicial Committee in *Kerrison* v. *Glyn, Mills,
Currie & Co.*, 81 L.J.K.B. 465, and concurred, as did the Earl of Halsbury.

It thus appears that, provided the plaintiff's mistake is "vital" or
"material," which I understand to mean that the mistake caused the
plaintiff to pay the money, the money is prima facie recoverable; but that
if the payment discharged an existing debt owing to the payee (or to a
principal on whose behalf the payee is authorised to receive the payment),
it is irrecoverable. Such a conclusion is, if I may say so with respect,
entirely consistent with the decision in *Aiken* v. *Short*, 1 H. & N. 210,
though not with the dictum of Bramwell B. in that case.

The third decision of the House of Lords to which I must refer is
*R. E. Jones Ltd.* v. *Waring and Gillow Ltd.* [1926] A.C. 670. The facts
of the case are complicated and somewhat unclear, due in part to the
curious way in which they were found, since they appear to have been
taken by the trial judge from the opening speech of the plaintiff's counsel.
In summary, a rogue named Bodenham obtained from the respondents
furniture and other effects to a value of over £13,000 on hire purchase
terms, under which the down payment was to be £5,000. It appears that
Bodenham defaulted in making the down payment, and that the respon-
dents then repossessed the goods. Bodenham then approached the
appellants, informing them that he represented a firm of motor manu-
facturers called International Motors who had control of a car called the
"Roma" car, and he persuaded the appellants to accept an appointment
as agents for the sale of the car in certain parts of this country, one term
of the agency being the payment of a deposit of £5,000 (£10 for each of
500 cars). Bodenham told the appellants that the people who were financing
the thing and who were the principals behind him in the matter were the
respondents, and that the deposit might be paid to them. The appellants then
made out two cheques payable to the order of the respondents, one for
£2,000 and one for £3,000, and handed them to Bodenham; he handed them
to the respondents, who received them from him in respect of his deposit
under the hire purchase agreement. The respondents' accountant observed
that the cheques bore the signature of only one director; he then arranged
with the appellants to exchange them for one cheque for £5,000, duly signed.
This exchange was effected in good faith, nothing being said about the nature
of the transaction. The cheque for £5,000 was cashed by the respondents,
who then restored to Bodenham the furniture they had seized, and let him
have some more. Subsequently, the fraud came to light, and it transpired
that there was no International Motors and no "Roma" car. The respon-
dents resumed possession of the furniture. The appellants claimed
repayment of the sum of £5,000 from the respondents.

The trial judge gave judgment for the appellants; but his judgment
was reversed by the Court of Appeal [1925] 2 K.B. 612. The reasons
given by the members of the court vary; but for present purposes the
significant judgment is that of Pollock M.R. He held that the appellants'
claim to recover the money as paid under a mistake of fact must fail,

**1 Q.B.**                **Barclays Bank v. W. J. Simms Ltd.**                **Goff J.**

A because the mistake was not a mistake *as between* the appellants and the respondents. He referred to the dicta of Parke B. in *Kelly* v. *Solari*, 9 M. & W. 54, and of Bramwell B. in *Aiken* v. *Short*, 1 H. & N. 210; he also referred to the decision in *Chambers* v. *Miller*, 13 C.B.N.S. 125, and to the dictum of Erle C.J. in that case (in the version reported in 32 L.J. C.P. 30, 32). He concluded, at p. 632:

B "The plaintiffs and the defendants were each of them under mis-apprehensions—. . .—and different mistakes of fact. It appears to me, therefore, that it is not possible for the plaintiffs to recover the money as having been paid under a mistake of fact."

The House of Lords were however unanimous in concluding that the appellants' mistake of fact was sufficient to ground recovery, though a minority considered that the respondents had a good defence to the claim C because they had changed their position in good faith. The House accordingly allowed the appeal. For present purposes, I am only concerned with the nature of the mistake which will ground recovery. Viscount Cave L.C. (with whose speech Lord Atkinson agreed) stated the principle in very broad terms, which show that he considered it sufficient for the plaintiff to show that he suffered under a mistake of fact which caused D the payment. He said, at pp. 679–680:

"The plaintiffs were told by Bodenham that he represented a firm called International Motors which was about to be formed into a company, that the firm had control of a car called the 'Roma' car which he described as an existing car, and that the defendants were financing the firm and were the principals behind him and behind E International Motors in the matter. Believing these statements to be true, the plaintiffs entered into an agreement which bound them to pay a deposit of £5,000 on 500 Roma cars; and still believing them to be true, and that the respondents as the nominees of International Motors could give a good receipt for the £5,000, they paid that sum to the respondents. In fact the statements were untrue from beginning to end; and the money was, therefore, paid under a mistake of fact F induced by the false statements of a third party and, apart from special circumstances, could be recovered. As to the general principle, it is sufficient to refer to the well known case of *Kelly* v. *Solari*, and to the more recent decisions in *Colonial Bank* v. *Exchange Bank of Yarmouth, Nova Scotia* and *Kerrison* v. *Glyn, Mills, Currie & Co.*"

It is significant that Viscount Cave L.C. did not consider it necessary to G identify the precise capacity in which the appellants supposed that the respondents received the money; it was enough for him that the appellants supposed that the respondents were "nominees" of International Motors who could give a good receipt for the money—a purely neutral term. It follows that he did not regard it as necessary that the appellants should have supposed that they were liable to the respondents to pay the money H to them, as is borne out by his citation of *Colonial Bank* v. *Exchange Bank of Yarmouth, Nova Scotia*, 11 App.Cas. 84 and of *Kerrison* v. *Glyn, Mills, Currie & Co.*, 81 L.J.K.B. 465. It is scarcely surprising that Lord Atkinson, who delivered the leading speech in *Kerrison's* case, agreed with

Goff J.                    Barclays Bank v. W. J. Simms Ltd.                    [1980]

Viscount Cave L.C. on this aspect of the case.   Lord Shaw of Dunfermline
also agreed with Viscount Cave L.C. that the money was paid under a mis-
take of fact.   He concluded, at p. 686, that it seemed quite clear that the
appellants would never have parted with the money if they had had any
knowledge of the real truth, and that the money was recoverable.   It
appears from his statement of the facts that he did not consider that the
appellants mistakenly believed that they were liable to the respondents to
pay the money to them.   Lord Sumner, at pp. 691–692, stated the facts
in terms which show that he considered that the appellants supposed that,
in paying the money, they were discharging an obligation to International
Motors, not an obligation to the respondents.   Lord Carson, in agreeing
with Viscount Cave L.C. that the money was paid under a mistake of
fact, cited and relied upon both the dictum of Parke B. and the very
broad dictum of Rolfe B. in *Kelly* v. *Solari,* 9 M. & W. 54, of which at
least the latter requires only that the plaintiff's mistake should have caused
him to pay the money.

I wish to make three comments on the decision of the House of Lords
in *R. E. Jones Ltd.* v. *Waring and Gillow Ltd.* [1926] A.C. 670.   First, the
House of Lords must have rejected the view, expressed by Pollock M.R.,
that to ground recovery the mistake must have been " as between " payer
and payee, in the sense of having been a mistake shared by both parties.
Second, it is implicit in the speeches of all their Lordships that it is not a
prerequisite of recovery that the plaintiff must have mistakenly believed that
he was liable to the defendant to pay the money to him.   Third, as I under-
stand their Lordships' speeches, in particular the speech of Viscount Cave
L.C. (with which Lord Atkinson agreed) and the speeches of Lord Shaw and
Lord Carson, it is sufficient to ground recovery that the plaintiff's mistake
should have caused him to pay the money to the payee.

I should add, with great respect, that the reasoning, if not the decision, of
Roche J. in *Barclay & Co. Ltd.* v. *Malcolm & Co.* (1925) 133 L.T. 512
cannot in my judgment be reconciled with the decision of the House of
Lords in *R. E. Jones Ltd.* v. *Waring and Gillow Ltd.* [1926] A.C. 670.
It is striking that *Barclay & Co. Ltd.* v. *Malcolm & Co.* was argued and
decided between the decisions of the Court of Appeal and the House of
Lords in *R. E. Jones Ltd.* v. *Waring and Gillow Ltd.*   Moreover, leading
counsel for the plaintiffs in *Barclay & Co. Ltd.* v. *Malcolm & Co.* had
appeared for the respondents in *R. E. Jones Ltd.* v. *Waring and Gillow
Ltd.* before the Court of Appeal only three months earlier.   The decision
of the Court of Appeal in the latter case is not mentioned in the report
of *Barclay & Co. Ltd.* v. *Malcolm & Co.*; but that case is very briefly
reported in the Law Times reports, and it is inconceivable that so recent
an authority, in which counsel had appeared, was not cited to Roche J.
In *Barclay & Co. Ltd.* v. *Malcolm & Co.,* the plaintiff bank had mistakenly
paid the same sum twice to the defendants, in the belief that a confirming
letter from another bank constituted a second set of instructions.   Roche
J. held that the money was not recoverable.   The first and principal
ground upon which he so held was expressed by him in the following
words, at p. 513:

**1 Q.B.**                    Barclays Bank v. W. J. Simms Ltd.                    Goff J.

A

"It is not contrary to good conscience that the defendants should be allowed to keep the money in question. The mistake was in no way due to them. The mistake which was made concerned only the plaintiffs and the Warsaw Bank by whom the plaintiffs were instructed, and it was not a mistake with regard to the legality of one person to pay or the right of another person to receive. The nearest authority appears to be *Chambers* v. *Miller* . . . In my view, the first point gives a good

B

defence to the action."

Such reasoning is, in my judgment, inconsistent with the ratio decidendi of the decision of the House of Lords in *R. E. Jones Ltd.* v. *Waring and Gillow Ltd.* [1926] A.C. 670.

From this formidable line of authority certain simple principles can, in my judgment, be deduced: (1) If a person pays money to another under a

C

mistake of fact which causes him to make the payment, he is prima facie entitled to recover it as money paid under a mistake of fact. (2) His claim may however fail if (a) the payer intends that the payee shall have the money at all events, whether the fact be true or false, or is deemed in law so to intend; or (b) the payment is made for good consideration, in particular if the money is paid to discharge, and does discharge, a debt owed to the payee (or a principal on whose behalf he is authorised to receive the pay-

D

ment) by the payer or by a third party by whom he is authorised to discharge the debt; or (c) the payee has changed his position in good faith, or is deemed in law to have done so.

To these simple propositions, I append the following footnotes: (a) *Proposition* 1. This is founded upon the speeches in the three cases in the House of Lords, to which I have referred. It is also consistent with the

E

opinion expressed by Turner J. in *Thomas* v. *Houston Corbett & Co.* [1969] N.Z.L.R. 151, 167. Of course, if the money was due under a contract between the payer and the payee, there can be no recovery on this ground unless the contract itself is held void for mistake (as in *Norwich Union Fire Insurance Society Ltd.* v. *Wm. H. Price Ltd.* [1934] A.C. 455) or is rescinded by the plaintiff. (b) *Proposition* 2 (a). This is founded upon the

F

dictum of Parke B. in *Kelly* v. *Solari*, 9 M. & W. 54. I have felt it necessary to add the words " or is deemed in law so to intend " to accommodate the decision of the Court of Appeal in *Morgan* v. *Ashcroft* [1938] 1 K.B. 49, a case strongly relied upon by the defendants in the present case, the effect of which I shall have to consider later in this judgment. (c) *Proposition* 2 (b). This is founded upon the decision in *Aiken* v. *Short*, 1 H. & N. 210, and upon dicta in *Kerrison* v. *Glyn, Mills, Currie & Co.*, 81 L.J.K.B. 465.

G

However, even if the payee has given consideration for the payment, for example by accepting the payment in discharge of a debt owed to him by a third party on whose behalf the payer is authorised to discharge it, that transaction may itself be set aside (and so provide no defence to the claim) if the payer's mistake was induced by the payee, or possibly even where the payee, being aware of the payer's mistake, did not receive the money in

H

good faith: cf. *Ward & Co.* v. *Wallis* [1900] 1 Q.B. 675, 678–679, *per* Kennedy J. (d) *Proposition* 2 (c). This is founded upon the statement of principle of Lord Loreburn L.C. in *Kleinwort, Sons & Co.* v. *Dunlop Rubber Co.*, 97 L.T. 263. I have deliberately stated this defence in broad

terms, making no reference to the question whether it is dependent upon
a breach of duty by the plaintiff or a representation by him independent
of the payment, because these matters do not arise for decision in the
present case.   I have however referred to the possibility that the defendant
may be deemed in law to have changed his position, because of a line of
authorities concerned with negotiable instruments which I shall have to
consider later in this judgment, of which the leading case is *Cocks* v.
*Masterman*, 9 B. & C. 902.   (e) I have ignored, in stating the principle of
recovery, defences of general application in the law of restitution, for
example where public policy precludes restitution.   (f) The following pro-
positions are inconsistent with the simple principle of recovery established
in the authorities: (i) That to ground recovery, the mistake must have
induced the payer to believe that he was liable to pay the money to the
payee or his principal. (ii) That to ground recovery, the mistake must
have been " as between " the payer and the payee.   Rejection of this test
has led to its reformulation (notably by Asquith J. in *Weld-Blundell* v.
*Synott* [1940] 2 K.B. 107 and by Windeyer J. in *Porter* v. *Latec Finance
(Qld.) Pty. Ltd.* (1964) 111 C.L.R. 177, 204) in terms which in my judgment
mean no more than that the mistake must have caused the payment.

In the case before me, Mr. Evans Lombe submitted on behalf of the
defendants that I could not proceed on the basis of the simple principles
I have stated, because I was precluded from so doing by binding
authority, viz. the decision of the Court of Appeal in *Morgan* v. *Ashcroft*
[1938] 1 K.B. 49.   That case came on appeal from the county court.   The
respondent was a bookmaker, with whom the appellant was in the habit
of making bets.   The respondent claimed that his clerk mistakenly credited
the appellant twice over with a sum of £24 2s. 1d., and claimed to recover
that sum from the appellant as having been paid under a mistake of fact.
The county court judge held that the respondent was entitled to recover the
money.   The Court of Appeal allowed the appeal, holding that the money
was not recoverable.   The first ground of the court's decision was that, in
order to ascertain whether there had been an overpayment, it would be
necessary for the court to examine the state of account between the parties,
and that the court could not do, by reason of the Gaming Act 1845.   How-
ever the court also held that the money was in any event not recoverable as
having been paid under a mistake of fact.   Mr. Evans Lombe relied in
particular on a passage in the judgment of Sir Wilfrid Greene M.R., in
which he stated, at p. 66:

" . . . a person who intends to make a voluntary payment and thinks
that he is making one kind of voluntary payment whereas upon the
true facts he is making another kind of voluntary payment, does not
make the payment under a mistake of fact which can be described as
fundamental or basic."

That passage Mr. Evans Lombe identified as being the crucial passage in Sir
Wilfrid Greene M.R.'s judgment on this point; and he submitted further
that the expression " voluntary payment " must here be understood as a
payment made without legal obligation, so that, generally speaking, a person
who makes a payment without the intention of discharging a legal obligation
cannot recover the money from the payee although it has been paid under

A  a mistake of fact except possibly in circumstances where the mistake can be described as fundamental, for example where the mistake is as to the identity of the payee.

It is legitimate to observe the consequences of Mr. Evans Lombe's submission. If he is right, money would be irrecoverable in the following, by no means far-fetched, situations. (1) A man, forgetting that he has already paid his subscription to the National Trust, pays it a second time.

B  (2) A substantial charity uses a computer for the purpose of distributing small benefactions. The computer runs mad, and pays one beneficiary the same gift one hundred times over. (3) A shipowner and a charterer enter into a sterling charterparty for a period of years. Sterling depreciates against other currencies; and the charterer decides, to maintain the goodwill of the shipowner but without obligation, to increase the monthly hire payments. Owing to a mistake in his office, the increase in one monthly hire

C  payment is paid twice over. (4) A Lloyd's syndicate gets into financial difficulties. To maintain the reputation of Lloyd's, other underwriting syndicates decide to make gifts of money to assist the syndicate in difficulties. Due to a mistake, one syndicate makes its gift twice over. It would not be difficult to construct other examples. The consequences of Mr. Evans Lombe's submission are therefore so far-reaching that it is necessary to

D  examine the ratio decidendi of this part of the decision in *Morgan* v. *Ashcroft* to ascertain whether it produces the result for which Mr. Evans Lombe contends.

Only two judges sat to hear the appeal in *Morgan* v. *Ashcroft* [1938] 1 K.B. 49—Sir Wilfrid Greene M.R. and Scott L.J. Furthermore, there are considerable differences between their two judgments on this part of the case. First, there was a difference in the basic philosophy expounded

E  by the two judges. Sir Wilfrid Greene M.R. favoured the so-called "implied contract" theory as the basis of recovery of money paid under a mistake of fact. Citing a well-known dictum of Lord Sumner from *Sinclair* v. *Brougham* [1914] A.C. 398, 452, he rejected the principle of unjust enrichment and stated that the claim was based upon an imputed promise to repay: [1938] 1 K.B. 49, 62. Scott L.J. adopted a less

F  restricted view. While accepting that the moral principle of unjust enrichment had been rejected as a universal or complete legal touchstone whereby to test the cause of action, he referred to passages from the works of eminent jurists and concluded, at p. 76, that his citations emphasised:

> "the importance of trying to find some common positive principles upon which these causes of action called 'implied contracts' can be
G  said to rest, and which will not altogether exclude that of unjust enrichment embodied in those citations."

Scott L.J.'s approach has been amply vindicated by subsequent developments in the law, as is shown in particular by authoritative statements of principle in the House of Lords by Lord Atkin in *United Australia Ltd.* v. *Barclays Bank Ltd.* [1941] A.C. 1, 28–29 and by Lord Wright in *Fibrosa*

H  *Spolka Akcyjna* v. *Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32, 61.

How far Sir Wilfrid Greene M.R.'s narrower philosophic approach affected his analysis in *Morgan* v. *Ashcroft* [1938] 1 K.B. 49 is difficult to

Goff J.                    Barclays Bank v. W. J. Simms Ltd.                    **[1980]**

tell; but there was a further difference between him and Scott L.J., in
their view of the nature of the mistake which will ground recovery of   A
money paid under a mistake of fact. Again, Sir Wilfrid Greene M.R.
adopted a more restricted view. He founded himself upon the dictum of
Bramwell B. in *Aiken* v. *Short,* 1 H. & N. 210, which he accepted as an
authoritative statement of law " so far as regards the class of mistake with
which he was dealing," i.e. in " cases where the only mistake is as to the
nature of the transaction." From that dictum he deduced the conclusion   B
on which Mr. Evans Lombe relied before me, viz. that if a person thinks
that he is making one kind of voluntary payment, whereas on the true facts
he is making another kind of voluntary payment, his mistake is not funda-
mental or basic and therefore cannot ground recovery: see pp. 65–67 of
the report. Scott L.J., on the other hand, was not prepared to accept
Bramwell B.'s dictum as authoritative; in particular, he referred to *Kerrison*
v. *Glyn, Mills, Currie & Co.,* 81 L.J.K.B. 465 and said that the decision of   C
the House of Lords in that case seemed to him " conclusive that the rule as
stated in *Aiken* v. *Short,* 1 H. & N. 210 cannot be regarded as final and
exhaustive in the sense that no mistake, which does not induce in the mind
of the payer a belief that payment will discharge or reduce his liability,
can ground an action for money had and received ": see pp. 73–74 of the
report. In these circumstances it is by no means easy to determine the   D
ratio decidendi of this part of the case. It may well be found in the opinion
of both judges that an overpayment of betting debts by a bookmaker is
not made under a mistake of fact sufficiently fundamental to ground re-
covery, apparently on the basis that the payment is in any event intended
to be a purely voluntary gift, because " the law prevents the plaintiff from
saying that he intended anything but a present " (see p. 77, *per* Scott L.J.),
and the plaintiff is therefore deemed in law to intend that the payee shall   E
be entitled to retain the money in any event.

That the ratio decidendi is not to be found in the passage from Sir
Wilfrid Greene M.R.'s judgment on which Mr. Evans Lombe relied is shown
by the fact that the subsequent decision of the Court of Appeal in *Larner* v.
*London County Council* [1949] 2 K.B. 683 is, in my judgment, inconsistent
with that passage. In that case, the London County Council had resolved   F
to pay all their employees who went to the war the difference between their
war service pay and their civil pay until further order. Mr. Larner was an
ambulance driver employed by the council, who was called up in 1942. As
a result of his failure to keep the council accurately informed about changes
in his war service pay, the council overpaid the difference. In contending
that the overpayment was irrecoverable, Mr. Larner's counsel relied upon
the dictum of Bramwell B. in *Aiken* v. *Short,* 1 H. & N. 210. The Court   G
of Appeal however held that the money was recoverable. Denning L.J.,
who delivered the judgment of the court, declined to follow that dictum,
because he said, at p. 688, ". . . that dictum, as Scott L.J. pointed out in
*Morgan* v. *Ashcroft,* cannot be regarded as an exhaustive statement of
the law." He pointed out that the council

    H

    " made a promise to the men which they were in honour bound to
    fulfil. The payments made under that promise were not mere
    gratuities. They were made as a matter of duty: . . ."

A  but he went on to state that it was irrelevant that the council's promise
was unsupported by consideration or unenforceable by action. It was
enough that the council would never have paid the money to Mr. Larner
had they known the true facts: see p. 688 of the report. It is doubt-
ful if the decision in *Larner* v. *London County Council* [1949] 2 K.B.
683 is one of which Sir Wilfrid Greene M.R. would have approved; but,
if I may say so with respect, it is entirely consistent with the principles
B  of recovery established in the earlier decisions of the House of Lords
to which I have referred. Accordingly it is those principles which I
intend to apply in the present case.

II. *Where a bank pays a cheque drawn upon it by a customer of the
bank, in what circumstances may the bank recover the payment from
the payee on the ground that it was paid under a mistake of fact?*

C  It is a basic obligation owed by a bank to its customer that it will
honour on presentation cheques drawn by the customer on the bank,
provided that there are sufficient funds in the customer's account to
meet the cheque, or the bank has agreed to provide the customer with
overdraft facilities sufficient to meet the cheque. Where the bank
honours such a cheque, it acts within its mandate, with the result that
D  the bank is entitled to debit the customer's account with the amount of
the cheque, and further that the bank's payment is effective to discharge
the obligation of the customer to the payee on the cheque, because the
bank has paid the cheque with the authority of the customer.

In other circumstances, the bank is under no obligation to honour its
customer's cheques. If however a customer draws a cheque on the bank
without funds in his account or agreed overdraft facilities sufficient to
E  meet it, the cheque on presentation constitutes a request to the bank to
provide overdraft facilities sufficient to meet the cheque. The bank
has an option whether or not to comply with that request. If it declines
to do so, it acts entirely within its rights and no legal consequences
follow as between the bank and its customer. If however the bank pays
the cheque, it accepts the request and the payment has the same legal
F  consequences as if the payment had been made pursuant to previously
agreed overdraft facilities; the payment is made within the bank's man-
date, and in particular the bank is entitled to debit the customer's
account, and the bank's payment discharges the customer's obligation to
the payee on the cheque.

In other cases, however, a bank which pays a cheque drawn or
purported to be drawn by its customer pays without mandate. A bank
G  does so if, for example, it overlooks or ignores notice of its customer's
death, or if it pays a cheque bearing the forged signature of its customer
as drawer, but, more important for present purposes, a bank will pay
without mandate if it overlooks or ignores notice of countermand of the
customer who has drawn the cheque. In such cases the bank, if it pays
the cheque, pays without mandate from its customer; and unless the
H  customer is able to and does ratify the payment, the bank cannot debit
the customer's account, nor will its payment be effective to discharge
the obligation (if any) of the customer on the cheque, because the bank
had no authority to discharge such obligation.

It is against the background of these principles, which were not in dispute before me, that I have to consider the position of a bank which <span style="float:right">A</span> pays a cheque under a mistake of fact. In such a case, the crucial question is, in my judgment, whether the payment was with or without mandate. The two typical situations, which exemplify payment with or without mandate, arise first where the bank pays in the mistaken belief that there are sufficient funds or overdraft facilities to meet the cheque, and second where the bank overlooks notice of countermand given by <span style="float:right">B</span> the customer. In each case, there is a mistake by the bank which causes the bank to make the payment. But in the first case, the effect of the bank's payment is to accept the customer's request for overdraft facilities; the payment is therefore within the bank's mandate, with the result that not only is the bank entitled to have recourse to its customer, but the customer's obligation to the payee is discharged. It follows that the payee has given consideration for the payment; with the consequence <span style="float:right">C</span> that, although the payment has been caused by the bank's mistake, the money is irrecoverable from the payee unless the transaction of payment is itself set aside. Although the bank is unable to recover the money, it has a right of recourse to its customer. In the second case, however, the bank's payment is without mandate. The bank has no recourse to its customer; and the debt of the customer to the payee on the cheque <span style="float:right">D</span> is not discharged. Prima facie, the bank is entitled to recover the money from the payee, unless the payee has changed his position in good faith, or is deemed in law to have done so.

It is relevant to observe that if, in *Chambers* v. *Miller*, 13 C.B.N.S. 125, the action had, instead of being a claim by the bearer for damages for false imprisonment, taken the form of a claim by the paying bank for recovery of the money as having been paid under a mistake of fact, that <span style="float:right">E</span> claim would, on the foregoing analysis, have failed, because the mistake of the bank in that case was a mistaken belief that there were sufficient funds in the customer's account to meet the cheque. Similarly in *Pollard* v. *Bank of England* (1871) L.R. 6 Q.B. 623, where a bank paid a bill of exchange accepted by one of their customers payable at the bank, in ignorance of the fact that the balance of the credit of the <span style="float:right">F</span> acceptors at the bank was insufficient to meet the bill and indeed that the acceptance had, in the general sense, stopped payment (and so were unable to pay their debts when they fell due), the bank was held to be unable to recover from the payee the money so paid: see p. 631 of the report, *per* Blackburn J., who delivered the judgment of the court. In both these cases, the bank acted within its mandate; but where the bank's mistake relates not to sufficiency of funds in its customer's account, <span style="float:right">G</span> but arises from ignorance or oversight of a notice of countermand, the bank acts without mandate, and the money is in my judgment prima facie recoverable.

III. *If a bank pays a cheque under a mistake of fact, in what circumstances has the payee a good defence to the bank's claim to recover the* <span style="float:right">H</span> *money, on the principle in Cocks v. Masterman, 9 B. & C. 902?*

The authorities on this topic have recently been analysed by Kerr J. in *National Westminster Bank Ltd.* v. *Barclays Bank International Ltd.*

A   [1975] Q.B. 654, an analysis which I gratefully adopt and which makes it
unnecessary for me to burden this judgment with a full analysis of the
authorities.   The case before Kerr J. was concerned with a claim by the
plaintiff bank to recover from the defendant bank a sum paid by it on a
forged cheque presented by the defendant bank on behalf of a customer
for special collection, which the plaintiff bank had paid to the defendant
bank in ignorance of the forgery, and the defendant bank had then
B   credited to its customer's account.   A principal question in the case was
whether the plaintiff bank was estopped from claiming repayment by a
representation, in honouring the cheque, that the cheque was genuine.
Kerr J., in holding that the bank made no such representation and was
not so estopped, considered the line of cases, commencing with the
decision of Lord Mansfield in *Price* v. *Neal* (1762) 3 Burr. 1354, in which
payments of bills of exchange which contained forged signatures had been
C   held irrecoverable on a number of grounds.   The early cases on the topic
culminated in the leading case of *Cocks* v. *Masterman,* 9 B. & C. 902.
In that case the plaintiff bankers paid a bill which purported to have been
accepted by their customer, in ignorance of the fact that the acceptance
was forged—a fact they did not discover until the day after payment.
It was held by the Court of King's Bench that they could not recover
D   the money from the defendants, the holders' bankers.   Bayley J., who
delivered the judgment of the court, said, at pp. 908–909:

". . . we are all of opinion that the holder of a bill is entitled to know,
on the day when it becomes due, whether it is an honoured or dis-
honoured bill, and that, if he receive the money and is suffered
to retain it during the whole of that day, the parties who paid it
E       cannot recover it back.   The holder, indeed, is not bound by law (if
the bill be dishonoured by the acceptor) to take any steps against the
other parties to the bill till the day after it is dishonoured.   But he is
entitled so to do, if he thinks fit, and the parties who pay the bill
ought not by their negligence to deprive the holder of any right or
privilege.   If we were to hold that the plaintiffs were entitled to
recover, it would be in effect saying that the plaintiffs might deprive
F       the holder of a bill of his right to take steps against the parties to the
bill on the day when it becomes due."

The principle to be derived from this case is probably that, if the plaintiff
fails to give notice on the day of payment that the bill contained a forged
signature and that the money, having been paid in ignorance of that fact,
is being claimed back, the defendant is deprived of the opportunity of
G   giving notice of dishonour on the day when the bill falls due, and so is
deemed to have changed his position and has a good defence to the claim
on that ground.   But, whatever the precise basis of the defence, it is
clearly founded on the need for the defendant to give notice of dishonour;
and it can therefore have no application where notice of dishonour is
not required.   Thus in *Imperial Bank of Canada* v. *Bank of Hamilton*
H   [1903] A.C. 49, it was held by the Privy Council that the defence had no
application to an unendorsed cheque in which the amount of the cheque
had been fraudulently increased by the drawer after it had been certified.
The cheque was regarded as a total forgery, and not as a negotiable

Goff J.            **Barclays Bank v. W. J. Simms Ltd.**              **[1980]**

instrument at all. Lord Lindley, who delivered the advice of the Board, said, at p. 58:

> " The cheque for the larger amount was a simple forgery; and Bauer, the drawer and forger, was not entitled to any notice of its dishonour by non-payment. There were no indorsers to whom notice of dishonour had to be given. The law as to the necessity of giving notice of dishonour has therefore no application. The rule laid down in *Cocks* v. *Masterman*, 9 B. & C. 902, and recently reasserted in even wider language by Mathew J. in *London and River Plate Bank Ltd.* v. *Bank of Liverpool Ltd.* [1896] 1 Q.B. 7, has reference to negotiable instruments, on the dishonour of which notice has to be given to some one, namely, to some drawer or indorser, who would be discharged from liability unless such notice were given in proper time. Their Lordships are not aware of any authority for applying so stringent a rule to any other cases. Assuming it to be as stringent as is alleged in such cases as those above described, their Lordships are not prepared to extend it to other cases where notice of the mistake is given in reasonable time, and no loss has been occasioned by the delay in giving it."

Likewise, in *National Westminster Bank Ltd.* v. *Barclays Bank International Ltd.* [1975] Q.B. 654, Kerr J. held that the defence had no application in the case which he had to consider of a wholly forged cheque, which was also not a negotiable instrument at all.

In a passage in *Paget's Law of Banking,* 8th ed. (1972) p. 377, which was relied upon by Mr. Evans Lombe for the defendants in the present case, it is suggested that the law as expounded by Lord Lindley in *Imperial Bank of Canada* v. *Bank of Hamilton* [1903] A.C. 49 is open to criticism, on the ground that if a bill is paid and the money is thereafter reclaimed, no dishonour takes place until the money is reclaimed and therefore no notice of dishonour can be given until then, from which it follows that it is hard to conceive of any case of payment by mistake where the opportunity of giving notice of dishonour is lost. I am unable to accept this criticism. If the money is recovered, then the bill will not have been paid on the due date or at all, for the payment will not have discharged the debt due upon the bill. It follows that, in such a case, the bill is in fact dishonoured on the day it falls due, and as Bayley J. in *Cocks* v. *Masterman*, 9 B. & C. 902 and Lord Lindley in *Imperial Bank of Canada* v. *Bank of Hamilton* [1903] A.C. 49 both contemplated, unless notice of the plaintiff's claim is given on that date, the opportunity of the defendant to give notice of dishonour on that day is lost. Like Lord Lindley in the *Imperial Bank of Canada* case I can find nothing inconsistent with this conclusion in the decision of Mathew J. in *London and River Plate Bank Ltd.* v. *Bank of Liverpool Ltd.* [1896] 1 Q.B. 7.

It is therefore a prerequisite of the application of the defence that the defendant should be under a duty to give notice of dishonour. The provisions regarding notice of dishonour in the Bills of Exchange Act 1882 are contained in sections 48 to 50 of the Act. In section 50 (2) are set out the circumstances in which notice of dishonour is dispensed with. For present purposes, the relevant provision is contained in section 50 (2) (c),

**1 Q.B.**                    **Barclays Bank v. W. J. Simms Ltd.**                    **Goff J.**

A  which provides (inter alia) that notice of dishonour is dispensed with, as regards the drawer, where the drawer has countermanded payment. It follows that in the case of a simple unendorsed cheque, payment of which is countermanded by the drawer, notice of dishonour is not required; and in such a case the payee cannot invoke the defence established in *Cocks* v. *Masterman, 9* B. & C. 902.

B  It is to be observed that, in *Imperial Bank of Canada* v. *Bank of Hamilton* [1903] A.C. 49, Lord Lindley described the rule laid down in *Cocks* v. *Masterman* as a stringent rule. It is not merely stringent, but very technical. It is possible that if, in due course, full recognition is accorded to the defence of change of position, there will be no further need for any such stringent rule and the law can be reformulated on a more rational and less technical basis. Whether the law will hereafter develop in this way remains to be seen.

C

IV. *Application of the foregoing principles to the present case.*

In the light of the above principles, it is plain that in the present case the plaintiff bank is entitled to succeed in its claim. First, it is clear that the mistake of the bank, in overlooking the drawer's instruction to stop payment of the cheque, caused the bank to pay the cheque. Second, since

D  the drawer had in fact countermanded payment, the bank was acting without mandate and so the payment was not effective to discharge the drawer's obligation on the cheque; from this it follows that the payee gave no consideration for the payment, and the claim cannot be defeated on that ground. Third, there is no evidence of any actual change of position on the part of either of the defendants or on the part of the

E  National Westminster Bank; and, since notice of dishonour is not required in a case such as this, the payee is not deemed to have changed his position by reason of lapse of time in notifying them of the plaintiff's error and claiming repayment.

I must confess that I am happy to be able to reach the conclusion that the money is recoverable by the plaintiff bank. If the bank had not failed to overlook its customer's instructions, the cheque would have

F  been returned by it marked " Orders not to pay," and there would have followed a perfectly bona fide dispute between the association and the receiver on the question, arising on the terms of the building contract, whether the association was entitled to stop the cheque—which ought to be the real dispute in the case. If the plaintiff bank had been unable to recover the money, not only would that dispute not have been ventilated

G  and resolved on its merits but, in the absence of ratification by the association, the plaintiff bank would have had no recourse to the association. Indeed, if under the terms of the building contract the money had not been due to the defendant company, non-recovery by the plaintiff bank would have meant quite simply a windfall for the preferred creditors of the defendant company at the plaintiff bank's expense. As however I

H  have held that the money is recoverable, the situation is as it should have been; nobody is harmed, and the true dispute between the association and the receiver can be resolved on its merits.

I have however to consider the identity of the party against whom the

704

Goff J.                    Barclays Bank v. W. J. Simms Ltd.                    [1980]

plaintiff bank is entitled to judgment. As at present advised I am reluc-
tant to enter judgment against the defendant company without further      A
argument. I say that because the argument before me was concentrated
on the right of recovery generally, and there was not fully canvassed
before me the question whether, assuming that the National Westminster
Bank received the payment as agent for the defendant company, an
action will lie against its principal to whom the bank had neither paid
the money nor done anything equivalent to payment. I will be glad,      B
therefore, to hear submissions from counsel as to how the parties wish
the matter to be taken from here.

[There followed a discussion with counsel, in the course of which
the defendants by their counsel conceded that, for the purposes of the
case before the court, the receipt of the money by the National West-
minster Bank, as collecting banker or agent of the first defendants (the
defendant company), was a sufficient receipt of the money by the first     C
defendants to enable the defendants to entitle the plaintiff bank to
judgment for the sum so paid as against the first defendants. His
Lordship then entered judgment for the plaintiff bank against the first
defendants for £26,451·38p (£24,000 together with £2,451·38p by way of
interest) and by consent ordered that the first defendants pay the plaintiff
bank's costs of the action up to and including March 23, 1979, with      D
no order as to costs thereafter. The action against the second defendant
(the receiver) was dismissed, with no order as to costs.]

> *Judgment for the plaintiff against first
> defendants with costs up to March 23,
> 1979.*
> *Action against second defendant dis-*     E
> *missed with no order as to costs.*

Solicitors: *Durrant Piesse; Harvey, Ingram, Leicester.*

R. D.

F

––––––––––

G

END OF VOLUME AND OF QUEEN'S BENCH SERIES FOR 1980.      H

TAB 7

*BDW Trading Ltd v JM Rowe (Investments) Ltd*
[2011] EWCA Civ 548, English Court of Appeal

Neutral Citation Number: [2011] EWCA Civ 548

Case No: A3/2010/2030

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**Peter Smith J**
**HC09C00287**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 12<sup>th</sup> May 2011

Before :

**LADY JUSTICE ARDEN**
**LORD JUSTICE AIKENS**
and
**LORD JUSTICE PATTEN**

- - - - - - - - - - - - - - - - - - - - -

Between :

| | |
|---|---|
| **BDW TRADING LIMITED (T/A BARRATT NORTH LONDON)** | **Claimant/ Respondent** |
| **- and -** | |
| **JM ROWE (INVESTMENTS) LIMITED** | **Defendant/ Appellant** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Michael Barnes QC and Mr Jonathan Davey** (instructed by **Pitmans Solicitors**) for the
**Appellant**
**Mr Nigel Jones QC and Ms Michelle Stevens-Hoare** (instructed by **Owen White**) for the
**Respondent**

Hearing dates : 12<sup>th</sup> and 13<sup>th</sup> April 2011

- - - - - - - - - - - - - - - - - - - - -

# Judgment

**Lord Justice Patten :**

**Introduction**

1.     The appellant, JM Rowe (Investments) Limited ("Rowe") was in 2007 the freehold owner of some premises at 52 and 52A-56 Watford High Street.  On 18th May 2007 it obtained planning permission for the re-development of 52A-56 and the rear part of 52 into a block of 56 flats with an underground car park and with shops on the ground floor fronting on to Watford High Street.

2.     The property at 52A-56 consisted of shops with an open area to the rear.  The adjoining property at number 52 was let to and occupied by Alliance & Leicester plc ("A&L") under two separate leases both dated 15th February 2007.  One lease related to the front part of the property; the other to the rear part.  The premises were connected internally.

3.     The leases of 52 were each granted for a term of 10 years from 24th March 2006 but the lease of the rear part included (in clause 52) a break clause which entitled Rowe to determine that lease at any time after 25th March 2007 on the giving of not less than 6 months' notice to the tenant.  The clause was included in the lease because it was anticipated by February 2007 that the rear premises at 52 would be required as part of any comprehensive re-development of the site.   And on 14th September 2007, following the grant of planning permission and in anticipation of a sale of the development to the respondent BDW Trading Limited ("Barratt"), Rowe gave notice to A&L under clause 52.1 thereby terminating the lease on 18th March 2008.

4.     On 7th February 2008 Rowe and Barratt entered into an agreement ("the Contract") under which 52A-56 and the rear part of 52 were sold to Barratt with vacant possession for £1.8 million.  Under the Contract Barratt was to redevelop the site and

BDW Trading Ltd v JM Rowe (Investments) Ltd

then lease back the ground floor shops to Rowe for a term of 999 years at a peppercorn rent.  The flats it would dispose of itself on long residential leases.

5.      The lease of the rear part of 52 contained detailed provisions relating to the separation of the premises from the front part of 52 which was unaffected by the sale and the development.  Clause 52 of the lease provided as follows:

> "52.1    If the Landlord wishes to terminate this Lease at any time after 25 March 2007 and shall have given to the Tenant not less than six months notice in writing of its intention to do so then on the expiration of such notice this Lease shall absolutely cease and determine but without prejudice to any rights of action or claims of either party in respect of any antecedent breach or breaches of covenant save that the Landlord shall not make any claim against the Tenant in respect of dilapidations.
>
> 52.2    In the event that Landlord terminates this Lease in accordance with clause 52.1 it will pay to the tenant the sum of £95,500 to be apportioned as follows:
>
> 52.2.1  A capital payment of £68,000
>
> 52.2.2  An allowance made by the Landlord against the rent payable by the Tenant in respect of the Adjoining Property in the sum of £27,500
>
> 52.3    In the event that the Landlord terminates this Lease in accordance with clause 52.1 the Landlord will at its own expense carry out the Separation Works as defined in and in accordance with the provisions set out in the Fifth Schedule hereto
>
> 52.4    For the avoidance of doubt the Landlords obligations set out in the Fifth Schedule hereto shall not merge upon termination of the Lease and shall continue in full force and effect until discharged."

6.      The Fifth Schedule referred to in clause 52.3 defined the separation works by reference to a description of the works necessary to separate the services and to create separate means of access to the premises.  The detail does not matter for the purposes of this appeal.  But it is necessary to set out a number of the other provisions:

1.2    "Specification" means the specification detailing the Separation Works to be agreed between the Landlord and the Tenant before the Lease terminates under clause 52.1 (both parties acting reasonably)

…

1.4    "Landlord's Notice": The notice in writing to be served by the Landlord on the Tenant confirming the date of commencement of the Separation Works for the purposes of paragraph 2 hereof

…

1.6    "Method Statement" means a method statement and programme for carrying out and completing the Separation Works in accordance with this Schedule

1.7    "Warranties" means BPF form of design and construction warranties form the Contractors and Professional Consultants employed and appointed by the Landlord in respect of the Separation Works

2      The Separation Works

       If the Landlord terminates the Lease in accordance with clause 52.1 the Landlord hereby covenants with the Tenant as follows:

2.1    To carry out and complete the Separation Works within twelve weeks of the date specified as the date of commencement of the Separation Works in the Landlord's Notice to the reasonable satisfaction of the Tenant subject to any strikes lock-outs shortage of materials or labour or other services weather conditions inevitable accident emergency Act of God or any cause or circumstances whatsoever beyond the control of the Landlord in which event a reasonable extension shall be agreed between the parties and failing agreement determined by independent expert pursuant to paragraph 6 of this Schedule

2.2    Provide Method Statement and copy of the Warranties for approval by the Tenant before the Separation Works commence such approval not to be unreasonably withheld or delayed

2.3    At least 12 weeks prior to the Landlord commencing the Separation Works the Tenant shall upon the written request of the Landlord attend a pre-contract meeting to discuss and agree (both parties acting reasonably) the scope and method of the Separation Works provided that if the Tenant fails to attend such a meeting after two reasonable attempts to schedule the same the Tenant shall be deemed to have accepted the scope and method of the Separation Works

2.4    To carry out the Separation Works in accordance with all necessary consents and permissions (if any) from the Local or any other Authority and under or by virtue of the Town and County Planning Act 1990 or any statutory modification or re-enactment thereof for the time being in force and any other relevant statutes bye-laws or regulations:

2.4.1    in accordance with the Specification and the Method Statement

…..

4.    Deed of Variation

Within 5 working days of the Landlord's Notice or the Tenant's Notice the Landlord shall enter into a Deed of Variation ("Deed of Variation") of the lease of the Adjoining Property to grant the Tenant the following rights:

4.1    A right of way on foot only (in Common with the Landlord) to the rear of the Adjoining Property over such reasonable access route as shall be agreed between the Landlord and the Tenant

4.2    A right of fire escape from the upper floors of the Adjoining Property

4.3    A right to place on the external rear wall of the Premises air conditioning condenser units and associated equipment at least equivalent to those as presently serving the Premises and the Adjoining Property Provided that the location of the air conditioning equipment must first be agreed with the Landlord such agreement not to be unreasonably withheld or delayed

4.4    A right to place and use waste bins placed in an area reasonably designated by the Landlord from time to time

4.5    Any other rights as are reasonably required for the use and enjoyment of the Adjoining Property that might arise as a consequence of the Separation Works

4.6    In both cases the parties shall act reasonably in agreeing the Deed of Variation incorporating the terms of this clause."

7.    The provisions of clause 52 of the lease and the Fifth Schedule therefore provided a comprehensive scheme for the separation of the rear from the front premises of 52 under which Rowe became liable on termination of the lease to carry out the necessary works in accordance with an agreed specification and method statement and to procure warranties from the contractors and other professionals for the benefit of

BDW Trading Ltd v JM Rowe (Investments) Ltd

A&L.  The approval of the warranties and the method statement were to precede the commencement of the separation works.

8.      Against this background Rowe entered into the Contract with Barratt.  The sale of the freehold and the agreement that Barratt would carry out the development obviously had to accommodate the obligations of Rowe under the lease of the rear of 52 which had survived the termination of the lease but had not therefore passed to Barratt on its purchase of the property.  To this end clause 15 of the Contract provided that:

> "      The Vendor and the Purchaser agree the following in respect of the Separation Works:
>
> 15.1   The Vendor will seek confirmation from Alliance and Leicester Plc ("A & L") that a meeting dated 14 November 2007 between A & L, the Vendor's Surveyor and the Purchaser is agreed as the pre-contract meeting required by clause 2.3 of the Fifth Schedule of the Lease and, if not, the Vendor will as soon as practicable agree a date for a meeting with A & L (and the Purchaser) in accordance with the provisions of the Fifth Schedule of the Lease and the Purchaser will attend such meeting upon being given at least 3 working days notice;
>
> 15.2   The Purchaser will provide the Specification (as defined in the Fifth Schedule of the Lease) and the method statement and warranties referred to in clause 2.2 of the Fifth Schedule to the Lease within 8 weeks of the date of this Agreement and the Vendor will request approval of them in writing by A & L in accordance with the provisions of the said clause 2.2;
>
> 15.3   As soon as the Vendor receives from A & L the executed Deed of Variation (as defined in paragraph 4 of the Fifth Schedule of the Lease ("Deed of Variation") in readiness for completion of it the Vendor will notify the Purchaser in writing.
>
>        .....
>
> 15.5   The Vendor and the Purchaser agree to use all reasonable endeavours to agree the Deed of Variation and carry out the provisions of this clause 15 as quickly and expeditiously as reasonably practicable after the date of this Agreement
>
> 15.6   The Purchaser agrees and covenants it shall carry out the Separation Works in accordance with the provisions contained in the Fifth Schedule of the Lease and the agreed method statement

> as referred to in clause 6.2 to the reasonable satisfaction of the Vendor's Surveyor (acting reasonably) and the Purchaser shall indemnify the Vendor against all costs claims actions and losses directly suffered by the Vendor arising out of any breach of this obligation save where the Purchaser is unable to comply with such obligations due to any act or omission by the Vendor or the Tenant."

9.    Contractually therefore A&L continued to look to Rowe for the purposes of the specification, the method statement and the warranties and for the execution of the separation works.  A&L never came into a contractual relationship with Barratt.  But, as between Rowe and Barratt, the latter undertook in effect to fulfil Rowe's obligations under clause 52.3 of the lease and the Fifth Schedule.

10.    The completion date specified in the Contract was 1$^{st}$ July 2008 but clause 6.2 contained a series of conditions which had to be met before Barratt could be compelled to complete.  If those conditions were not satisfied within 5 months of the Contract (i.e. by 7$^{th}$ July 2008) then either party became entitled to rescind.  The construction and effect of these provisions lies at the heart of this appeal and I set them out in full:

> "6.2  The Purchaser shall be entitled to refuse to complete until such time as:-
>
> (i)    the Vendor's Solicitors provide written confirmation to the Purchaser's solicitors that a form SDLT1 has been duly completed and submitted to the Inland Revenue in respect of the determination of the Lease with a copy of such form and the electronic receipt once received and
>
> (ii)    an application has been submitted to the Land Registry for the closure of the leasehold title number HD467416 and removal of the Lease from Title Number HD4668718 and a copy of the application has been provided to the Purchaser's solicitors together with a written undertaking from the Vendor's solicitors to the Purchaser's solicitors to use reasonable endeavours to deal with any requisitions raised by the Land Registry as soon as practicable, and

(iii)  the Deed of Variation has been completed or is ready to be completed simultaneously with completion of the sale and purchase of the Property and the Deed of Variation executed by A & L (as defined in clause 15) is being held by the Vendor's solicitors and has been released to the Vendor's solicitors by A & L's solicitors and the method statement and all matters to be agreed with or approved by A & L pursuant to the Fifth Schedule of the lease have been agreed or approved by A & L the Vendor and the Purchaser in writing (and the Vendor and the Purchaser shall act reasonably and use all reasonable endeavours to agree such matters), and

(iv)  The Vendor's solicitors have confirmed in writing that they are holding an original signed letter from the Vendor addressed to the Purchaser (in a form previously approved by the Purchaser's solicitor as shown attached at Appendix 1) confirming the vesting of the copyright of all plans in respect of the Planning Permission in the Purchaser together with the original letter date 9th January 2008 from W Griffiths & Glass (copy attached at Appendix 2) and have undertaken to send both letters to the Purchaser's solicitors on the Completion Date

(v)  the Vendor has provided a written consent for the Purchaser to temporarily oversail the Retained Land (as defined in the Transfer) and to erect temporary scaffolding abutting the Retained Land and bridging across part of the roof of the building on the Retained Land during redevelopment of the Property pursuant to the Planning Permission provided that neither such oversail rights nor such scaffolding materially interferes with the access of light or air to the Retained and the Adjoining Land (as defined in the Transfer) together "the Land" or with any other right or easement and so that pedestrian access and vehicle deliveries to the High Street entrances of the buildings on the Land and supplies of water gas electricity telecoms and drainage are maintained to the Land and otherwise in a form agreed by the parties (acting reasonably), and provided further that all or any damage caused to the Land shall forthwith be made good by the Purchaser at its own cost to the reasonable satisfaction of the Vendor and

(vi)  the Vendor's solicitor has confirmed in writing that all sums due to A & L as a result of the Vendor terminating the Lease (being a capital payment of £68,000 and an allowance of £27,500 under their lease of the adjoining property) have been paid in full to A & L and receipt has been acknowledged in writing (a copy of which has been provided to the Purchaser's solicitors)

> Provided That *the Vendor or* the Purchaser shall be entitled to rescind this contract by serving written notice on the Vendor at any time if the matters referred to in paragraphs (i)-(vi) above have not occurred within *5* months of the date hereof *(save where the party purporting to serve such notice is in default of its obligations under this clause 6.2)* whereupon this Agreement shall automatically determine (and the Deposit shall be returned to the Purchaser)."

11.     The wording of the proviso to clause 6.2 was the subject of some late manuscript amendments which extended the right to rescind to the vendor and introduced the words in parenthesis. The changes are shown in italics. The consequences of the amendments were not fully thought through so that the reference in the second line of the provision to the vendor must, I think, also be read as including the purchaser following the amendment to line one. However, the issues between the parties do not turn on these minor omissions in the drafting but on their different construction of the words used.

12.     On 25th November 2008 Barratt served written notice on Rowe purporting to rescind the contract by reason of Rowe's failure to satisfy the condition in clause 6.2(vi) by 7th July 2008. The decision to terminate the Contract was taken for purely commercial reasons unconnected with any breach by Rowe of its obligations under the Contract. Following the downturn in the housing market, Barratt had calculated that the development was likely to be unprofitable and wanted to find a way out of it. But its reasons do not matter. The right to rescind conferred by clause 6.2 does not depend upon Barratt having any particular intention or justification beyond the non-fulfilment of one or more of the clause 6.2 conditions. If that is established then *prima facie* the right to rescind is exercisable without more.

13.     It is common ground that as of 7th July 2008 Rowe had not made the specified payments to A&L which fell due on the termination of the lease nor (therefore) had it

given to Barratt written confirmation of that fact.  The reason for this was that Rowe

had in February 2008 agreed with A&L that it could remain in occupation of the rear

part of no. 52 as a tenant at will following the termination of the lease on 18th March

and a formal agreement for a tenancy at will was executed on 20th March.  Barratt was

agreeable to A&L continuing in possession until 23rd June after which it was

anticipated that completion would take place.  At the same time there was an

exchange of side letters between Rowe and A&L under which they agreed to

postpone the payment of the £95,500 compensation due under clause 52.2 of the lease

but Rowe accept that Barratt was not informed about this or asked to agree to it.

14.     Rowe does not accept that the notice served on 25th November 2008 was effective to

terminate the Contract.  It contends that, on a proper construction of clause 6.2(vi),

there were no sums due to A&L as of 7th July either because the sums did not become

payable under the lease until A&L gave vacant possession of the premises or because

it had been agreed by Rowe that payment of the monies should be postponed until

after then.  Clause 6.2(vi) is said only to require confirmation to be given when

payment is due and that it is otherwise inapplicable.

15.     Next it is said that the right to rescind cannot be exercised if the non-fulfilment of the

condition in clause 6.2(vi) was due in some material part to a breach by Barratt of its

own obligations under the Contract.  Under clause 15.2 Barratt was to provide the

Specification, method statement and warranties by 3rd April 2008.  It is common

ground that it did not do this.  The first version of the specification and the method

statement was not sent out until 21st April.  The warranties were sent to A&L on 24th

June.  It is said that these delays made it sensible that A&L should be allowed to

remain in occupation of the rear of 52 after 18th March.  In these circumstances, the

payment did not fall due because vacant possession was not given by 7th July.  The breaches were therefore causative of Rowe's non-compliance with the condition in clause 6.2(vi) of the Contract.

16.     Barratt contends that it is not prevented by the breaches of clause 15.2 of the Contract from serving a valid notice under clause 6.2.  It submits that the implication of the term contended for by Rowe is excluded by the words in parenthesis which were added to the proviso by amendment.  It also denies that the breaches relied on were responsible in any material way for Rowe's failure to pay the £95,500 to A&L.  It became payable on the termination of the lease, not on the giving of vacant possession and could in any event have been paid by Rowe before 7th July.

17.     Barratt does, however, accept that the service of a valid notice under clause 6.2 depended on its not being in breach of any of its obligations under clause 6.2 at the date of service of the notice.  Rowe rely on there being at least one subsisting breach of clause 6.2 as of 25th November 2008.  It is said that Ms Stephanie Bishop, the solicitor at Messrs Owen White who was acting for Barratt, adopted a mistaken and wrong view as to whether her client was obliged under the Contract to procure warranties that were directly enforceable by A&L as opposed to Rowe and that she persisted in this stance up to and including the service of the notice.  This is alleged to have amounted to a breach by Barratt of its obligation under clause 6.2(iii) of the Contract to act reasonably and to use all reasonable endeavours to agree all matters which require to be agreed with A&L under the Fifth Schedule to the lease.

18.     If it is wrong about this, Rowe contends as a further alternative that the right to rescind which Barratt purported to exercise on 25th November had by then been lost as a result of it having elected by its conduct after 7th July not to rescind the Contract

based on Rowe's failure to give the confirmation of the payments referred to in clause 6.2(vi).  The conduct relied on is the continuing attempts to agree the specification, method statement and warranties which subsisted up to 25th November.

19.    On 4th February 2009 Barratt issued the claim form which seeks the return of the deposit of £180,000 paid on exchange of contracts.  Rowe counterclaimed seeking specific performance of the Contract or, in the alternative, damages.

20.    On 19th March 2010, shortly after the trial was due to start, Barratt served a second notice of rescission based on clause 6.2(iii) of the Contract.  The notice was served without prejudice to the validity of the notice of 25th November 2008 and relied on the warranties supplied by Barratt not having been agreed by 7th July.  It is, I think, common ground that nothing materially changed between the service of the first notice and the service of the second so that the second notice will only assist Barratt if the first notice is held to be ineffective on the sole ground that there were no sums due to A&L as of 7th July or if any finding of election can be confined to the grounds upon which the 25th November notice was served.

21.    The action was tried by Peter Smith J who delivered judgment on 30th July 2010 in favour of Barratt and dismissed the counterclaim for specific performance and damages: see [2010] EWHC 1987 (Ch).  Rowe now appeal against that order with the permission of Mummery LJ.  In addition to the points I have already mentioned, there was a challenge at the hearing to the judge's refusal to order an inquiry as to damages in respect of the admitted breaches of clause 15.2 of the Contract in relation to the late delivery of the specification, method statement and warranties.  Mr Barnes QC for Rowe submits that even if his client is wrong about the application of what I shall call the own wrong principle to the Contract and is also wrong about the breach of clause

6.2(iii) and election, it is nonetheless entitled to damages for the loss which it has sustained by these breaches of the Contract.  This claim depends (at the very least) on establishing that the April breaches caused Rowe's failure to make the payments to A&L by 7th July.  As explained earlier, this same point arises in relation to the own wrong principle and I will return to it after considering the issues of liability.  Mr Jones QC for Barratt also contends that this point is not open to Rowe on its notice of appeal.  Again I will postpone further consideration of this obligation until later.

### Clause 6.2(vi)

22.    The first issue to consider is the construction of clause 6.2(vi) and Rowe's argument that the right to rescind could not be exercised on the basis of a failure by them to give the confirmation referred to by 7th July 2008.

23.    The reference to "all sums due to A&L as a result of the Vendor terminating the Lease" concentrates on the sums which became due and payable under clause 52.2 of the lease.  The obligation to pay arises "in the event that (Rowe) terminates the lease in accordance with clause 52.1".  Termination under that clause was effective on the expiration of the landlord's notice on 18th March 2008.

24.    The Contract was entered into before the termination of the lease and the grant of the tenancy at will and makes no reference to those arrangements or to the agreement between Rowe and A&L under which the  payment of the £95,500 was postponed.  It is contingent only on the performance of clause 52 of the lease and therefore assumes that the monies became payable in accordance with those provisions.  I can see no basis for reading the words "as a result of the Vendor terminating the lease" as including any subsequent arrangements between Rowe and A&L entered into for their mutual convenience.  That would give to Rowe the power to avoid any possible

rescission by Barratt for non-compliance with clause 6.2(vi) simply by agreeing with its former tenant to extend the time for payment. Clause 6.2 is concerned with setting a long-stop date for the finalisation of the matters on which Barratt's liability to complete depends and to give it (and Rowe) a right to rescind if that deadline is not met. The ability of Rowe to limit this right unilaterally by agreement with A&L seems to me quite inconsistent with the terms and the obvious commercial purpose of clause 6.2.

25.    I also reject Mr Barnes' submission that the payment of the £95,500 was, under the lease, conditional on the giving of vacant possession by A&L. There is no provision to this effect in clause 52.2 and I can see no reason for implying one. But the argument (even if correct) does not assist Rowe. There is no reason to suppose that A&L would not have quit the rear premises at 52 had Rowe not offered to extend its period of occupation by the grant of the tenancy at will. Its continued possession of the premises was attributable to the arrangements made with Rowe following the expiry of the notice on 18th March. Rowe's reliance on A&L's failure to give vacant possession as preventing the £95,500 from becoming due under the lease is therefore open to the same objection. The postponement was the result of the later arrangements made between Rowe and A&L and is not within the ambit of clause 6.2(vi) of the Contract.

26.    There is also, I think, a more fundamental objection to the construction which Rowe seeks to put on clause 6.2(vi). Its argument concentrates on the words "sums due" but the satisfaction (or not) of the condition depends on whether Rowe's solicitor has given confirmation in writing that the £95,500 has been paid. The structure of clause 6.2 is that all of the conditions have to be satisfied before Barratt is obliged to

BDW Trading Ltd v JM Rowe (Investments) Ltd

complete and that the non-satisfaction of any of them by 7th July entitles either party to rescind. The question therefore in each case is simply whether what is referred to in each condition has been done, not whether it was legally or practically possible to do it within the agreed timescale. Those obligations are only relevant (if at all) to the proviso to clause 6.2 which prevents the service of a notice of rescission if the party in question remains in breach of its obligations under that clause. They are not relevant to whether or not the condition was, as a matter of fact, satisfied by 7th July.

27.    It is accepted by Rowe that the £95,500 was not paid by that date and that notice could not have been and was not therefore given to Barratt. It must follow that (subject to Rowe's other points) the right to rescind became exercisable under clause 6.2(vi) after 7th July 2008.

**Reliance on own wrong**

28.    The second issue is whether Barratt was deprived of its right to rescind based on the non-satisfaction of clause 6.2(vi) (or, under the second notice, clause 6.2(iii)) because of its own breaches of the Contract which occurred in the period up to 7th July. It is accepted by Mr Barnes that, in order to rely upon this principle, Rowe must show a causal link between the breaches relied on and the non-satisfaction of the condition which Barratt relies on as the basis of its right to rescind.

29.    Before coming to this issue of causation it is important to identify the legal principle which Rowe relies upon to bring into account breaches of the other provisions in the Contract apart from clause 6.2 itself. It is stated in Chitty on Contracts (30th edition, 2008) at para 12.082 that:

        "**Party Cannot Rely on His Own Breach**

> It has been said that, as a matter of construction, unless the contract clearly provides to the contrary it will be presumed that it was not the intention of the parties that either should be entitled to rely on his own breach of duty to avoid the contract or bring it to an end or to obtain a benefit under it. This presumption applies only to acts or omissions which constitute a breach by that party of an express or implied contractual obligation, or (possibly) of a non-contractual duty, owed by him to the other party….".

30.    This statement of the principle is largely derived from the speech of Lord Diplock in

*Cheall v A.P.E.X.* [1983] 2 AC 180 at p. 188 who said that:

> "In the course of the speeches, which are not entirely consistent with one another, [in the *New Zealand Shipping* case [1919] AC 1] reference was made by all their Lordships to the well known rule of construction that, except in the unlikely case that the contract contains clear express provisions to the contrary, it is to be presumed that it was not the intention of the parties that either party should be entitled to rely upon his own breaches of his primary obligations as bringing the contract to an end, i.e. as terminating any further primary obligations on his part then remaining unperformed….".

31.    Although there has been a certain amount of academic discussion as to whether the principle has the status of a rule of law which is imposed upon the parties to a contract almost regardless of what they have agreed, it is now clear as a matter of authority that the application of the principle can be excluded or modified by the terms of the contract and that its scope in any particular case will depend upon the construction of the relevant agreement.

32.    In the present case the proviso to clause 6.2 which creates the right to rescind is expressly subject to the restriction that notice of rescission may not be served when the party in question is in default of its obligations under clause 6.2. This is the only express limitation on the right to rescind ("save where") and it raises the issue of whether, as a matter of construction, this operates to exclude any wider disability based on a breach of the Contract which brought about the non-satisfaction of the condition relied upon in the notice to rescind.

33.     The principle that one cannot rely upon one's own breach of contract as a ground of rescission means in this case that the focus is on events leading up to 7th July rather than the time when the right to rescind was exercised in November.  This is simply the product of the mismatch between the date which was inserted in the proviso for satisfaction of the clause 6.2 conditions and the express right of the parties to rescind the Contract on those grounds "at any time".  But the structure of the clause is that any qualification to the right to rescind would have to be added by way of parenthesis in addition to the words already included which refer to breaches of clause 6.2.  This therefore requires one to attribute to the parties an intention to have made a further significant reservation on their shared right to rescind even though they chose in express terms to limit their rights in one particular way.

34.     Some reliance is placed by Mr Barnes on Lord Diplock's reference to the need for there to be clear words before the implication of a term embodying the own wrong principle is excluded.  But I think that this formulation needs now to be read and considered in the light of the later authorities on the correct approach to the construction of contracts and the implication of terms.

35.     In *Richco International v. Alfred C. Toepfer International* [1991] 1 Lloyd's Rep. 136, Potter J (as he then was) said this at p.144:

> "I am prepared to accept the principle as stated in Chitty subject to the reservation that as an exercise in construction the requirement of 'clear express provisions to the contrary' should not be read as meaning more than a clear contractual intention to be gathered from the express provisions of the contract."

36.     This approach is, I think, consistent with the recent guidance on the implication of terms contained in the decision of the Privy Council in *A-G of Belize v Belize Telecom Ltd* [2009] UKPC 10 where Lord Hoffmann, building on what he said in *Investors*

*Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896,

said:

> "[21] It follows that in every case in which it is said that some provision ought to be implied in an instrument, the question for the court is whether such a provision would spell out in express words what the instrument, read against the relevant background, would reasonably be understood to mean. It will be noticed from Lord Pearson's speech that this question can be reformulated in various ways which a court may find helpful in providing an answer – the implied term must "go without saying", it must be "necessary to give business efficacy to the contract" and so on – but these are not in the Board's opinion to be treated as different or additional tests. There is only one question: is that what the instrument, read as a whole against the relevant background, would reasonably be understood to mean?

> ....

> [26] In *BP Refinery (Westernport) Pty Ltd v Shire of Hastings* (1977) 180 CLR 266, 282-283 Lord Simon of Glaisdale, giving the advice of the majority of the Board, said that it was "not . . . necessary to review exhaustively the authorities on the implication of a term in a contract" but that the following conditions ("which may overlap") must be satisfied:

>> "(1) it must be reasonable and equitable;

>> (2) it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it;

>> (3) it must be so obvious that 'it goes without saying'

>> (4) it must be capable of clear expression;

>> (5) it must not contradict any express term of the contract."

> [27] The Board considers that this list is best regarded, not as series of independent tests which must each be surmounted, but rather as a collection of different ways in which judges have tried to express the central idea that the proposed implied term must spell out what the contract actually means, or in which they have explained why they did not think that it did so. The Board has already discussed the significance of "necessary to give business efficacy" and "goes without saying". As for the other formulations, the fact that the proposed implied term would be inequitable or unreasonable, or contradict what the parties have expressly said, or is incapable of clear expression, are all good reasons for saying that a reasonable man would not have understood that to be what the instrument meant."

37.     It seems to me that when the parties in clause 6.2 have positively selected the breaches of contract which will debar them from being able to rescind the contract and have indicated in the language used that the qualification is an exhaustive one, it is difficult to attribute to them an intention to include some wider provision.  We were referred by Mr Barnes to the decision of the Privy Council in *New Zealand Shipping Co Ltd v Société des Ateliers et Chantiers de France* [1919] AC 1 as providing an example of a contract in which the right of the shipbuilders to terminate the contract due to their inability to complete the vessel by the agreed delivery date was construed as not including a case where their failure to complete the construction in time was due to their own default.

38.     I do not find this of much assistance in the present case.  It concerns very different contractual provisions and the different question of whether the automatic termination of the contract in the event of delayed completion should be read as including delay due to some unjustifiable failure on the part of the shipbuilders.  Here the question is whether an express exclusion of the right to rescind in the event of a particular type of breach of contract should be treated as exhaustive.  That question has to be answered in the context of the contract under consideration.

39.     The Contract is a commercial agreement negotiated and drafted with the benefit of legal advice over a period of time.  It seems to me that the reasonable man reading the document with a knowledge and understanding of the transaction to which it relates would regard the words contained in parenthesis in the proviso to clause 6.2 as comprising the only circumstances in which either party could be precluded from exercising its right to rescind based on a breach by them of the Contract.  The irresistible inference is that had any wider qualification been intended, it would have

been spelt out expressly.  The opening words "save where" are inconsistent with the implied term for which Rowe contends and it cannot, in my view, be accommodated within clause 6.2.

40.     This makes it strictly unnecessary to consider the issue of causation in relation to the own wrong principle but, because it is also relevant to the issue of damages, I set out my conclusions on this as well.

41.     Rowe relies on four alleged breaches of clause 15.2 of the Contract by Barratt in the period prior to $7^{th}$ July.  They are:

(i)      its failure to provide the warranties by $3^{rd}$ April 2008.  They were not sent out until $24^{th}$ June;

(ii)     the form of the warranties sent out.  They are said not to have been in the required BPF form and to have contained provisions for assignment which were meaningless;

(iii)    Barratt's failure to deliver the specification and method statement by $3^{rd}$ April. These were not sent out until $21^{st}$ April; and

(iv)     Barratt's failure to provide a complete version of the specification and method statement until $4^{th}$ July.

42.     The late delivery of these documents was undoubtedly a breach of clause 15.2 of the Contract but the allegation about the form of the warranties delivered is less straightforward.  Clause 15.2 required Barratt to provide the warranties referred to in clause 2.2 of the Fifth Schedule to the lease.  These are the warranties described in paragraph 1.7 of the Fifth Schedule which refers to their being in the BPF form.  An

examination of the standard BPF form of warranty indicates that it would not have been suitable for use in relation to the separation works without considerable amendment.  It is formulated in terms of a purchase or an agreement for a lease and not a project of this kind.  There was therefore an exchange of correspondence and e-mails between Owen White (the solicitors for Barratt) and Pitmans (Rowe's solicitors) from October 2007 onwards about the form of warranty to be used and by January 2008 (one month before the Contract was signed) the current draft had already changed considerably from the standard BPF form.  The version sent out to A&L on 24th June 2008 was in fact the fourth version of the warranties and they continued to be negotiated right through until 24th November 2008; the day before the notice of rescission was served.   Barratt therefore contends that any breach occasioned by the form of the warranties initially provided to A&L was waived by Rowe in the negotiations which followed.

43.    Barratt's obligations under the Contract in respect of the provisions of the specification, method statement and warranties do not, of course, stop with  their delivery under clause 15.2.  It was also subject to the obligation contained in the concluding words of clause 6.2(iii).  The requirement that it should act reasonably and use all reasonable endeavours to agree "such matters" is a reference back to the method statement and the other matters which are required to be agreed with or approved by A&L pursuant to the Fifth Schedule of the lease.  This must be a reference to paragraphs 2.2 and 2.3 of the Fifth Schedule which require the method statement and warranties to be provided to A&L for its approval and for the separation works to be agreed in advance of their being carried out.  Under paragraph 1.2 of the Fifth Schedule the specification should have been agreed between Rowe and A&L prior to the termination of the lease on 18th March but it is not suggested

that Barratt contracted to meet that deadline. The highest it can be put is that the three classes of documents should have been supplied by 3rd April in accordance with clause 15.2 of the Contract and that Barratt was then under an obligation to use reasonable endeavours to agree them with Rowe and A&L prior to the execution of the separation works.

44.    Although Barratt's use of reasonable endeavours is challenged as of 25th November 2008 in relation to the service of the first notice of rescission, it is not part of Rowe's case that Barratt was in breach of clause 6.2(iii) in the period up to 7th July. The judge therefore refers (in paragraph 135 of his judgment) to the clause 15.2 breaches which occurred on 3rd April 2008 as having been rectified before the right of rescission arose presumably (although he does not say so) on 7th July. By this I take him to mean that the documents had by then been delivered to Rowe and A&L. But that was not performance in accordance with the Contract and could not alter the fact that the breaches had occurred with whatever consequences that might produce.

45.    Mr Barnes submits that the judge's reasoning overlooks the impact of their late production on the payment by Rowe of the £95,500 due on the termination of the lease. He does not dispute that it was open to Rowe to make the necessary payments and to give written notice to Barratt by 7th July. But the issue he says is whether the breaches were a major contributory factor to these things not being done.

46.    As indicated earlier, the reason why the money was not paid by 7th July was that A&L (with Barratt's consent) were allowed to remain in occupation and Rowe agreed with A&L (without Barratt's consent or knowledge) that the payment of the money should be postponed. Mr Barnes submits that the first of these arrangements (the grant of the tenancy at will) was a sensible measure in the light of the delay in producing the

specification and other documents and the knock-on effect this would have on the timetable for the works. In these circumstances, it was reasonable for Rowe and A&L to agree to the postponement of the payment of the £95,500 until possession was actually given up.

47.    I am not able to accept these submissions. The £95,500 fell due upon the termination of the lease on 18th March 2008. This was before the deadline of 3rd April set for the delivery of the specification and other documents under clause 15.2 of the Contract. Nor was the payment of the £95,500 linked under the lease to the delivery of the specification and other documents and the carrying out of the separation works. The provisions of the Fifth Schedule came into effect on the termination of the lease and are unrelated to Rowe's obligations under clause 52.3.

48.    Rowe's obligation to pay the money to A&L was a liability which arose under a contract to which Barratt was not a party and which had no contractual impact on the obligations which Barratt had to perform under its own contract with Rowe. Rowe was therefore obliged to pay the money on or after 18th March and accepts that it could have done so. It did not seek the agreement of Barratt to the postponement of the payment and the postponement was not the necessary consequence of the grant of the tenancy at will as between Rowe and A&L. Even on the test of causation postulated by Mr Barnes (as to which I express no concluded view) it cannot be said that Barratt's breaches of clause 15.2 of the Contract were responsible for Rowe's failure to pay the £95,500 by 7th July.

## The validity of the first notice

49.    The next issue is whether Barratt was prevented from exercising its right to rescind based on clause 6.2(vi) because, as of 25th November 2008 when the notice was

served, it remained in breach of its obligations under clause 6.2. The only obligation under clause 6.2 placed upon Barratt was the obligation to act reasonably and to use all reasonable endeavours to agree the matters referred to in clause 6.2(iii). I have already explained (in paragraph 43 above) what this refers to.

50. The judge made a series of findings which exonerated Barratt and its solicitors from any alleged failure to comply with this obligation. With the exception of one issue which I will come to shortly, his analysis of the evidence is expressed in general terms but he found that both parties acted in good faith and did their best to satisfy the clause 6.2 conditions with a view to the Contract becoming unconditional; that they continued to negotiate in that way both up to and after 7$^{th}$ July; and that although the form of the warranties was not finally agreed by 24$^{th}$ November, this was the fault of neither party. He therefore held (in paragraph 116) that Barratt was not in breach of any duty under clause 6.2 at the time when it served the first notice.

51. Although Rowe submitted to the judge that there were at least ten aspects in which Barratt was in breach of clause 6.2 as of 25$^{th}$ November, only one of those issues is pursued on this appeal. This concerns the stance taken by Owen White in relation to the form of the warranties. Mr Barnes has, however, raised as a separate matter the judge's criticisms of the honesty of Mr Alan Horn who was the solicitor to A&L in 2008 and gave evidence at the trial. It is common ground that the judge's conclusions about Mr Horn's conduct are not decisive of any issues on this appeal but we have been asked to consider whether the judge was right to have made the findings which he did in relation to the conduct of a solicitor whose integrity was not criticised by either party at the trial.

52.    The alleged breach in respect of the warranties centres on a sequence of e-mails passing between Ms Stephanie Bishop of Owen White and Mr Paul Murray of Pitmans between 20th and 24th November 2008. As I mentioned earlier, the standard form BPF warranty could not be used in relation to the separation works without amendment. By late October the travelling draft had reached a stage at which both Rowe and A&L were parties to the warranty agreement and the warranties were given by the contractors to both of them.

53.    One issue which arose during the negotiations about the form of the warranties was their assignability. The original drafting on Barratt's side was carried out by Mr Joel Day, one of its technical managers who had no legal training. He provided for A&L as the tenant to have the benefit of the warranties but made no provision for A&L's assignees. Mr Horn, A&L's solicitor, amended the reference to the Tenant so as to include "its successors in title and permitted assignees under this Agreement". In the drafts of the warranty agreement up to the end of October there was no provision which restricted the number of persons to whom the benefit of the warranty could be assigned but Rowe was given (under clause 7) an unlimited right to assign the benefit of the warranty to the tenant and any financiers of the development. However, the inclusion in the definition of the tenant of a reference to its successors in title meant that the benefit of the warranties could pass indefinitely to any assignees of A&L's lease.

54.    The judge found that this was not something which Barratt intended and that Mr Horn and Mr Paul Murray of Pitmans (who became involved in the drafting after 11th August 2008) took advantage of Mr Day's inexperience in this respect. In paragraph 60 of his judgment he said this:

"In my view Mr Murray and Mr Horn exploited Mr Day's lack of legal expertise. The drafts dealing with the assignment of the warranties as drafted by Mr Day were inadequate because there was lack of clarity as to who was to have the benefit of the warranties. Initially Mr Day drafted it with the word *"tenant"* in it. Mr Horn changed that by extending the definition of tenant to extend to assignees. This had the effect of potentially allowing an unlimited number of assignments. Mr Day plainly did not appreciate that. Mr Horn (see his email of 20th August 2008 to Mr Day) sought that the warranties be given for the benefit of A & L and reinstate the word *"Tenant"* and an extended definition of the word tenant to include *"successors in title and permitted assignees under this Agreement"* that had the effect of meaning that anybody who stood in the shoes of a tenant also had the benefit of the warranty. Plainly that was never something Barratt contemplated and both Mr Horn (and later Mr Murray) knew that. In his email of 15th August 2008 for example to Mr Day Mr Horn expressly referred to a maximum of two assignees being permitted. The changes introduced by Mr Horn removed by stealth that limitation."

55.     This brings us to the events of November relied on as constituting a breach of contract by Barratt. On 20th November Mr Murray produced a new document in the form of a deed between Rowe, A&L and Barratt under which Barratt agreed to provide the completed warranties from the contractors to Rowe and A&L in the form annexed to the deed. The purpose of this document was not obvious because Barratt was already obliged to procure and agree the warranties under clause 15 of the Contract. But the real significance of the document for present purposes is that it utilised the draft warranty agreements which did not limit the number of potential assignees. Barratt and its contractors had always been willing to allow a maximum of two assignments which was what the standard form of BPF warranty agreement provided for. But the execution of the deed in this form would have committed it to providing contractors' warranties which had no such restriction.

56.     Ms Bishop replied to Mr Murray about 30 minutes after receiving his e-mail with the draft deed saying that she did not think that the deed was necessary. She went on:

"As I pointed out in September, the contract for the execution of the separation works is the contract Barratt and JM Rowe.  At clause 15.6 Barratt covenants to carry out the works in accordance with the Deed of Variation.  This contract was negotiated at length.

You may recall that I advised that, whilst Barratt has agreed that the A&L may be added as a party to the warranties (in an attempt to get these settled), this is not contractually correct.  Barratt is being employed by JM Rowe to do the separation works.  JM Rowe is to procure the warranties under the obligations as Landlord.  Technically Barratt should only be providing warranties to their employer (JM Rowe) which JM Rowe could then assign to their Tenant.

As part of its obligation to carry out the separation works Barratt will supply the agreed form of warranties to JM Rowe so that they can comply with their obligations as Landlord under the terms of the lease."

57.    Some ten minutes later Mr Murray replied in these terms:

"I note your comments and am slightly surprised at your interpretation of the warranties (whose form you have after all agreed) where you seem to suggest that A&L could only take the benefit of the warranties in circumstances where the warranties were assigned to them by JM Rowe.  In this respect can I draw your attention to clause 1 of each of the warranties where it reads "the Warrantor warrants and undertakes to the Employer and the Tenant" i.e. a direct warranty to both JM Rowe and A&L.

Whilst I feel that strictly speaking JM Rowe do not require the warranties from the consultants since they can revert to BDW under the terms of the agreement of the 7th February, if there is any problem with the Separation Works, without recourse to the consultants. However you will appreciate that both the agreement between our clients and the 5th Schedule of the surrendered lease assume that warranties will be provided to A&L and all the attached document does is give effect to that agreement.

In the light of the above can I ask you to reconsider your stance on the deed of agreement which after all is a completely uncontroversial document and one reasonably necessary to give effect to the intentions of the parties."

58.    Finally, in the sequence, is the following response from Ms Bishop:

"Please could you explain to me why this is not therefore already dealt with in clause 15.6 of the contract dated 7th February 2008?"

59.     There is a dispute between the parties as to precisely what Ms Bishop was objecting
        to in her first e-mail of 20th November.  In terms, she seems to be querying whether
        her client was required to provide warranties in favour of both Rowe and A&L.  But,
        in response to the reply from Mr Murray which made the point that it had already
        been agreed that the warranties should include A&L as a beneficiary, she seems to
        revert to a different point which is whether the deed is necessary given the terms of
        clause 15.6 of the Contract.

60.     Mr Barnes submits that, on a fair reading of these exchanges, Ms Bishop on behalf of
        Barratt was refusing to agree to warranties made directly in favour of A&L.  This, he
        says, was unreasonable and in breach of both clause 15 and clause 6.2(iii) of the
        Contract.  Mr Jones says that there was never any objection by Barratt to making
        A&L a party to the warranties as the drafts show.  Everything had been agreed except
        in relation to the issue of assignability.  Ms Bishop's principal response was that the
        supplemental deed was unnecessary.  But, in her reply to Mr Murray, she confused
        the form of warranty to be given to Rowe and A&L in respect of the separation works
        with the warranties which were to be given to Rowe on the lease back by Barratt of
        the re-developed commercial premises.

61.     This was confirmed by Ms Bishop who, when cross-examined about the e-mails of
        20th November, accepted that her response to Mr Murray was wrong.  But it was not
        put to her that Barratt was refusing to provide contractors' warranties directly in
        favour of A&L in respect of the separation works and it is clear from her evidence
        that once she had concentrated on the correct point she would have accepted this.
        Based on this material, the judge was right in my view to hold that there was no
        subsisting breach by Barratt of its obligations under clause 6.2(iii) when it gave the

first notice of rescission on 25$^{th}$ November.  The e-mails relied on amount to a brief

exchange prompted by the introduction of a document, the principal purpose of which

seems to have been to tie Barratt down to a form of warranty agreement which was

freely assignable.  However ineptly Ms Bishop may have handled this issue, it is

impossible to regard her confusion over the relevant parts of the Contract as anything

but a temporary slip which did not alter the willingness of Barratt to provide

contractors' warranties in favour of both Rowe and A&L.  Mr Murray clearly did not

regard Ms Bishop's e-mail as an accurate or final response on the issue of two

beneficiaries and he was right to do so.

62.     It is convenient at this stage to say something more about the position of Mr Horn.

Barratt's decision to serve notice of rescission on 25$^{th}$ November meant that the issue

about the assignability of the warranties was never resolved.  But, in his judgment,

Peter Smith J expressed serious criticisms of what he regarded as the attempt by

Mr Horn and Mr Murray to take advantage of Barratt's failure to spot that under the

draft warranty agreements being circulated, A&L were not limited to two

assignments.  In paragraphs 63-5 the judge said this:

> "63.   Paul Murray challenged that in an email of 20th November 2008
> (timed 12:25).  On 24th November 2008 timed 11:05 Mr Horn
> had sent an email to Mr Murray and had copied in Ms Beidas (of
> Owen White).  He was referring to the draft that he had created
> back in July/August.  He said **"however for the purpose of the
> warranties I believe it would be preferable that a specific right
> for A & L to assign is expressly set out"**.  Ten minutes later Mr
> Murray replied to Mr Horn and copied in David Gough.  He said
> this **"do you think it is sensible to draw their drafting errors
> (which after all benefit your client) to Owen White's
> attention?"**
>
> 64.   This to my mind was an attempt (in which Mr Horn participated)
> to have Barratt sign a document where the definition of tenant
> meant that the assignments potentially could exceed two.  They
> both knew that this was not what Barratt had ever agreed or

        intended.  Mr Murray justified this as getting the best for his client.

65.    It is clear from the evidence of Mr Murray and Mr Horn that they were setting a trap whereby they hoped that Barratt would inadvertently agree to unlimited assignments.  I refer to the cross examination of Mr Murray (T4) and Mr Horn (T5).  To my mind this is unacceptable.  All that it would do would be to create an ambiguity in the understanding of the parties which ultimately, if it became important, would have led to more litigation and claims for rectification.  Lawyers who are instructed to draft documents do it for the purpose of avoiding litigation, not creating it.  Mr Horn acknowledged this.  He was quite willing to concede to the assignment point knowing that is what Barratt wanted if Barratt came back but they never did.  He acknowledged that this is the kind of attitude that would create litigation in the future (T5/69/20;T5/82-84).  In particular he clearly took on board Mr Murray's suggestion about silence."

63.    Mr Barnes has asked us to re-consider the judge's findings in respect of Mr Horn.  It is clear that Mr Horn sent an e-mail to Mr Murray on 24th November asking for the draft warranty agreements to be amended so as to include an express right for A&L to assign the benefit of the warranties to its successors in title.  This would have made it clear to Barratt precisely what A&L was seeking to achieve.  Mr Horn also said in evidence that the omission of a limitation on assignments in the earlier versions of the warranty agreement was an error.  Both counsel agree that it was never suggested to Mr Horn that he had acted in a shifty way or tried to trick anybody.  There was therefore no proper basis for the findings which the judge made.

64.    I have some sympathy with these submissions and my own view is that the judge may well have been over harsh and unjustified in his assessment of Mr Horn.  But I think that it is difficult to take the matter further than that.  We have not been taken in detail to the relevant evidence because, as Mr Barnes recognises, this issue is not relevant to Rowe's appeal.  In these circumstances, it must be left there.

**Election**

65.  For the reasons explained above, Barratt's right to rescind under clause 6.2 arose when Rowe failed to give notice of the payment of the £95,500 by 7th July.  It also arose because the deed of variation had not been completed by then nor had the warranties been agreed  but I propose to concentrate for the moment on the first notice based on clause 6.2(vi).

66.  The consequence was that Barratt (and Rowe) became contractually entitled to rescind the contact "at any time" by the service of a notice.  This is not a right exercisable in the event of a breach of the Contract by Rowe.  It is an option given to the parties to terminate their contractual relationship on the non-fulfilment of certain conditions by a specified date.  If not exercised the Contract will continue to be enforceable according to its terms.

67.  Rowe contend that the effect of its failure to serve written notice of the payment in satisfaction of the condition in clause 6.2(vi) was to put Barratt to an election between rescinding the Contract or affirming it.  Mr Barnes says that it must be taken to have elected to affirm it by continuing to negotiate about the form of the warranties and other matters right up to 25th November when it served the first notice.  In these circumstances, it could no longer exercise the right to rescind based on the non-payment of the £95,500 or (it would follow) on any of the other grounds available to it under clause 6.2.

68.  In *Kammins Ballrooms Co Ltd v Zenith Investments (Torquay) Ltd* [1971] AC 850 Lord Diplock (at page 882) referred to the doctrine of election in these terms:

> ""Waiver" is a word which is sometimes used loosely to describe a number of different legal grounds on which a person may be debarred

from asserting a substantive right which he once possessed or from raising a particular defence to a claim against him which would otherwise be available to him. We are not concerned in the instant appeal with the first type of waiver. This arises in a situation where a person is entitled to alternative rights inconsistent with one another. If he has knowledge of the facts which give rise in law to these alternative rights and acts in a manner which is consistent only with his having chosen to rely on one of them, the law holds him to his choice even though he was unaware that this would be the legal consequence of what he did. He is sometimes said to have "waived" the alternative right, as for instance a right to forfeit a lease or to rescind a contract of sale for wrongful repudiation or breach of condition; but this is better categorised as "election" rather than as "waiver." It was this type of "waiver" that Parker J. was discussing in *Matthews v. Smallwood* [1910] 1 Ch. 777."

69.     The dispute in *Kammins* concerned the alleged waiver by a landlord of the time limits imposed on a tenant under Part II of the Landlord and Tenant Act 1954 for making an application to the court for the grant of a new tenancy.  As recognised in the passage quoted, this is not a context which engages the kind of election Lord Diplock was describing.  But, subject to one qualification, that statement of principle is not in dispute.

70.     The qualification concerns the extent to which the person with the inconsistent rights must be aware not only of the facts giving rise to the election but also of the right of election itself.  In *Peyman v Lanjani* [1985] 1 Ch 457 Stephenson LJ (at page 487), after referring to what Lord Diplock said in *Kammins*, said this:

> "Election leads, I think, to waiver, whether in choosing to object or not to object to breaches of contract or in acting in accordance with rules of procedure or statutory provisions. But common sense prevents landlords from saying that when they demanded rent from a tenant in breach of covenant they did not know they had a right to retake possession, which they were waiving (*David Blackstone Ltd. v. Burnetts (West End) Ltd*. [1973] 1 W.L.R. 1487), and the Sale of Goods Act 1979 prevents buyers from saying that when they accepted goods from a seller in breach of a condition they did not know that they had a right to reject the goods, which they were waiving. When a party has legal advice, he will be more easily presumed to know the law and evidence or special circumstances may be required to rebut the

presumption, as in this case. The principles on which one party to a contract is held to affirm it so that he cannot repudiate or rescind it are not peculiar to forfeiture of leases, as was pointed out in *Aquis Estates Ltd. v. Minton* [1975] 1 W.L.R. 1452, 1458E. Nor are they confined to the sphere of contract, as *Evans v. Bartlam* [1937] A.C. 473 and *Leathley v. John Fowler & Co. Ltd.* [1946] K.B. 579 demonstrate.

Lord Diplock's words were on any view obiter dicta and Lord Pearson's unnecessary to his (and Lord Reid's) dissenting opinion that there had in fact been waiver; and if they have to be interpreted as we are asked to interpret them, they seem to me, if I may respectfully say so, to conflict with the earlier opinions in their Lordships' House which I have already cited, particularly in *Evans v. Bartlam* [1937] A.C. 473. I therefore feel free to follow the decision of this court in *Leathley v. John Fowler & Co. Ltd.* [1946] K.B. 579 and to hold that knowledge of the facts which give rise to the right to rescind is not enough to prevent the plaintiff from exercising that light, but he must also know that the law gives him that right yet choose with that knowledge not to exercise it."

71.    The judge dealt with these issues in the following paragraphs of his judgment:

"122. Rowe based its contention on the (admitted) fact that from 7th July 2008 to 24th November 2008 Barratt continued discussions with Rowe to achieve the specification for the Separation Works under clause 15.2, they continued to discuss and provide the method statement, they continued to discuss the warranties and continued to attend meetings and attempt to agree a Deed of Variation. Rowe submits that these were only consistent with Barratt deciding to choose to carry on with the Agreement and not exercise the right to rescind which accrued on 7th July 2008.

123. Barratt did in my view (and I so find) no such thing. I have analysed what Barratt and Rowe did up until 25th November 2008. It is clear that Barratt never considered the accrual of and existence of the right to rescind between 7th July 2008 and 24th November 2008. It was never put to Barratt's witnesses that they had. There is (whatever the legal principle) no factual platform to sustain it.

124. Whether this is called election waiver or estoppel by conduct in this context in my view does not matter because the factual basis for it is simply not made out. All of those in my view require some active conduct by the person alleged to be debarred. By that I mean there must be some kind of considered decision to choose between the rights or to give up (or waive the rights) or to conduct themselves in such a way that the other party in reliance upon that conduct was entitled to assume that the rights had been given up. It all relates back in my view to the important decision of the Court of Appeal in *Peyman v Lanjani* above. I do not see

that a party can give up a right if it is not aware of it arising. It is quite clear as I have said Barratt's employees until 24th November 2008 never considered that rights had accrued on 7th July 2008 which they could exercise. As Rowe point out in their closing the classic formulation in *Kammins Ballrooms v Zenith Investments Ltd* [1991] AC 850 at page 883 does not in my view arise on the facts. For the doctrine of election or waiver or estoppel by conduct to arise it must arise *"in a situation where a person is entitled to alternative rights inconsistent with one another. If he has knowledge of the facts which give rise in law to these alternative rights and acts in a manner which is consistent only with his having chosen to rely on one of them, the law holds him to his choice even though he was unaware that this would be the legal consequence of what he did".*

125.   There is nothing in the evidence in my view which showed that Barratt acted in such a way. Nor was it ever put to them that they had consciously or unconsciously exercised their rights in a way in which was consistent only with giving up of the rights which accrued to rescind the Agreement on 7th July 2008.

126.   Equally Rowe's evidence failed completely to establish that it had acted any way in reliance on an understanding that Barratt had given up its alternative rights. This is reinforced by the observations in *Peyman v Lanjani* where not only was it necessary for the doctrine to be established to show that the person knew the facts which gave rise to inconsistent rights but also of the existence of the inconsistent rights. Obviously Barratt as an organisation knew the contractual terms but it seems to me that the conduct being analysed is that of the people who were negotiating the Agreement of the conditional matters. It does not seem to me that there is evidence to show that when they carried on the negotiations after the right to rescind had arisen on 8th July 2008 that they were doing anything other than merely carrying on the negotiations. Nothing significant happened. As I have said the contractual date for completion passed and the date for fulfilment of the conditions passed without having any impact on the way in which Barratt and Rowe carried on addressing the finalisation of the conditional matters. It is insufficient in my mind to add the clear corporate knowledge that Barratt had of the rights accruing and merge that with the officers in question who were conducting the negotiations when they never appeared to have considered the rights let alone the possible exercise of the rights. Equally they cannot be said to have communicated to Rowe the fact that they intended on behalf of Barratt to elect between these two supposed alternative rights."

72.   Mr Barnes submits that this analysis discloses a number of errors of law. It is not necessary, he says, for there to be some kind of considered decision to elect between

inconsistent rights.  What has to be shown is knowledge of the right to elect based on the facts which have occurred and conduct which is consistent only with an election having been made for or against the continuation of the contract.  Barratt was in receipt of legal advice throughout the relevant time and must be taken to have known the terms of clause 6.2 and its right to rescind based on the non-satisfaction of the conditions.  It must also be taken to have known that notification of the payment of the £95,500 was not given by 7th July thereby giving rise to a right to rescind.

73.    The second criticism of the judge is that he was wrong to separate the solicitors and other individuals from the directors or other senior employees of the company for the purpose of attributing to Barratt knowledge of its right to elect.  The knowledge and actions of those directly involved in the negotiations must be attributed to the company for these purposes.

74.    Thirdly the judge was wrong, Mr Barnes submits, to suggest that it was necessary to show that Rowe had acted in reliance on an understanding that Barratt had given up its right to rescind.  The doctrine of election, including estoppel, is not concerned with the effect of the conduct on the other party.

75.    This last point is clearly correct and I think that the judge was also wrong to suggest that there has to be some kind of conscious decision to elect before a contract can be affirmed.  Unequivocal conduct coupled with knowledge of the right to elect is enough.  But I am also satisfied that the judge was right to hold that the right to rescind had not been lost in this case.

76.    It seems to me difficult to argue that Barratt, acting as it did with the benefit of legal advice, did not have knowledge of the terms of the Contract and that a right to rescind had arisen as of 7th July.  Knowledge of such matters is not the same as actually

applying one's mind to the question at some particular point in time. But the question whether a party with a contractual right to rescind has waived that right by electing to affirm the contract must depend on an analysis of the terms of the particular contract and the circumstances in which the right has arisen.

77.    The classic and common situation in which a party to a contract is put to an election of the kind described by Lord Diplock is where the other party has committed the breach of a significant term of the contract amounting to a repudiation. The innocent party is then faced with a choice between accepting that repudiation and thereby terminating the contract or affirming the contract and thereby waiving the breach. Because the continued performance of the contract is ipso facto likely to amount to an affirmation of the contract, the innocent party is necessarily put to his election and most choose. Similarly in the case of a lease where the tenant commits a breach of covenant entitling the landlord to forfeit, he must decide whether to issue and serve proceedings for possession thereby exercising his right of forfeiture or to accept rent and thereby waive the right to forfeit for that breach. Because an acceptance of rent will necessarily have that consequence under the lease, there is again an immediate election to be made.

78.    But not all rights to terminate a contract arise in these circumstances or have the effect of putting the party with the right to rescind to an immediate election. The lease with a break clause entitling the landlord or tenant to terminate the lease after the end of part of the term does not have to be exercised immediately unless the lease so provides. In most cases it will remain exercisable at any time after the right has arisen. The continued acceptance of rent by the landlord will not, without more, operate as a waiver of his rights under the break clause because there is nothing

inconsistent between the continuation of the landlord and tenant relationship and the reservation of the right to break. If it is exercisable at any time during the remainder of the term the landlord is not put to an election and does not make an election by continuing to perform the contract until he chooses to exercise his right to break.

79. The same principle applies in my view to the right to rescind under clause 6.2. It conferred upon Barratt the right to rescind the Contract by the service of a notice at any time following the non-satisfaction of any of the specified conditions. In addition, it also precluded the service of a notice if at the time the party in question was in default of its obligations under clause 6.2. In the case of Barratt this was a reference to its obligations under clause 6.2(iii) to act reasonably and to use all reasonable endeavours to agree the specification, warranties and method statement with Rowe and A&L.

80. Barratt was therefore entitled to wait after 7th July before serving its notice and, in the meantime, it was obliged to continue to attempt to agree the form of the warranties and other documents. I cannot see how, in those circumstances, its performance of that obligation was in any way inconsistent with its right to rescind when it was under the contract a necessary pre-condition to the exercise of that right.

81. The correct analysis is, I think, that Barratt did not make an election before 25th November 2008 when it served its notice to rescind and that nothing it did between 7th July and then can amount to a waiver of its rights. It could, of course, have chosen to waive its right to rescind but for that to occur Barratt would need to have indicated its intention to abandon its right in clear and unequivocal terms: see *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corporation of India* [1990] 1 Lloyd's Rep 391 at page 398.

82.    The judge, I think, took essentially the same view when he said in paragraph 136 that:

> "In my judgment this is not a case involving election at all as I have said.  Both parties negotiated for an additional right to terminate the agreement without breach if the conditions were not satisfied by a particular date.  When such clauses are drafted they regularly set an express time limit within which that right can be exercised.  In so far as the Agreement purported to do so it gave a right to exercise at any time.  Effect must be given to that provision and I have given meaning to it earlier in this judgment.  When both parties are given the identical right by reason of the non fulfilment to a condition the concepts of doctrine of election and the position of the innocent and guilty party simply do not arise."

83.    I therefore reject the defence based on election and would dismiss this appeal. Because the breaches of clause 15.2 of the Contract were not causative of the failure by Rowe to pay the £95,500 by 7th July, the judge was right to dismiss the counterclaim for damages and it is therefore unnecessary for us to decide the procedural issue which has arisen as to whether Rowe should be allowed to include a challenge to the judge on this point as part of its appeal.

**Lord Justice Aikens** :

84.    I agree.

**Lady Justice Arden** :

85.    I also agree.

TAB 8

*Bilta (UK) Ltd v Nazir* [2016] AC 1, UK Supreme Court

*A*

# The Law Reports

## Appeal Cases

*B*

———

*C*

Supreme Court

### Bilta (UK) Ltd (in liquidation) and others *v* Nazir and others (No 2)

#### [2015] UKSC 23

*D*

2014  Oct 14, 15;              Lord Neuberger of Abbotsbury PSC, Lord Mance,
2015  April 22               Lord Clarke of Stone-cum-Ebony, Lord Sumption,
                             Lord Carnwath, Lord Toulson, Lord Hodge JJSC

*Company — Fraud — Knowledge of company — Company's claim for conspiracy to defraud — Whether defence of ex turpi causa non oritur actio available to company's directors or those alleged to have conspired with them — Companies Act 2006 (c 46), ss 172, 239*

*E*

*Insolvency — Winding up — Fraudulent trading — Statutory provision making persons party to fraudulent trading liable to contribute to company's assets — Whether having extraterritorial effect — Insolvency Act 1986 (c 45), s 213*

The first and second defendants were the sole directors of the first claimant, a company incorporated in England and registered for the purposes of VAT. The company purchased carbon credits on the Danish Emissions Trading Agency from traders carrying on business outside the United Kingdom, including the sixth defendant, a company incorporated in Switzerland the sole director of which was the

*F*

seventh defendant. Accordingly the purchases were zero-rated for VAT. The first and second defendants as directors owed fiduciary duties to the company under sections 172 and 239 of the Companies Act 2006[1]. The second and third claimants, the company's liquidators, claimed that a conspiracy existed to injure and defraud the company by trading in carbon credits and dealing with the resulting proceeds in such a way as to deprive the company of its ability to meet its VAT obligations on such trades. It was claimed that the defendants were knowingly parties to the business of

*G*

the company with intent to defraud creditors and for other fraudulent purposes, and should therefore be ordered under section 213 of the Insolvency Act 1986[2] to contribute to the company's assets. The sixth and seventh defendants, who were

[1] Companies Act 2006, s 172: see post, para 124.

S 239: "(1) This section applies to the ratification by a company of conduct by a director amounting to negligence, default, breach of duty or breach of trust in relation to the company. (2) The decision of the company to ratify such conduct must be made by resolution of the

*H*

members of the company.  (3) Where the resolution is proposed as a written resolution neither the director (if a member of the company) nor any member connected with him is an eligible member . . . (5) For the purposes of this section— (a) 'conduct' includes acts and omissions . . . (7) This section does not affect any other enactment or rule of law imposing additional requirements for valid ratification or any rule of law as to acts that are incapable of being ratified by the company."

[2] Insolvency Act 1986, s 213: see post, para 107.

© 2016 The Incorporated Council of Law Reporting for England and Wales

2
**Bilta (UK) Ltd v Nazir (No 2) (SC(E))**                                    [2016] AC

claimed to have dishonestly assisted the conspiracy, applied for orders that the claim    A
be summarily dismissed as against each of them on the grounds, among others, that
(1) the claim by the company was precluded by an application of the maxim ex turpi
causa non oritur actio on the basis that the pleaded conspiracy disclosed the use of the
company by its directors and their associates to carry out a carousel fraud, the only
victim of which was the Revenue and Customs Commissioners, and since the
company was a party to the fraud it could not claim against the other conspirators for
losses which it had suffered as a result of the fraud which it had carried out, and     B
(2) the liquidators' claim for fraudulent trading under section 213 of the 1986 Act
was bound to fail because the section had no extraterritorial effect. The application
was refused on the grounds, among others, that the defence of ex turpi causa non
oritur actio was not available to the defendants, and section 213 of the 1986 Act was
of extraterritorial effect. The Court of Appeal upheld that decision.

On appeal by the sixth and seventh defendants—

*Held*, dismissing the appeal, (1) that in most circumstances the acts and state of    C
mind of its directors and agents could be attributed to a company by applying the
rules of the law of agency, but ultimately the key to any question of attribution was
always to be found in considerations of context and the purpose for which the
attribution was relevant; that where the purpose of the attribution was to apportion
responsibility between a company and its agents so as to determine their rights and
liabilities to each other, the result would not necessarily be the same as it would be in
a case where the purpose was to apportion responsibility between the company and a
third party; that where a company had been the victim of wrongdoing by its    D
directors, or of which its directors had notice, that wrongdoing or knowledge of the
directors could not be attributed to the company as a defence to a claim brought
against the directors by the company's liquidators, in the name of the company
and/or on behalf of its creditors, for the loss suffered by the company as a result of
the wrongdoing even where the directors were the only directors and shareholders of
the company, and even though the wrongdoing or knowledge of the directors might be
attributed to the company in other types of proceedings; and that, accordingly, the    E
defence of ex turpi causa non oritur actio was not available to the defendant directors
against the company's claim because the defendants' wrongful activities could not be
attributed to the company in the proceedings brought by the liquidators (post,
paras 7–9, 39–48, 84, 86–97, 181, 202, 208).

*Tinsley v Milligan* [1994] 1 AC 340, HL(E), *Meridian Global Funds Management
Asia Ltd v Securities Commission* [1995] 2 AC 500, PC, *Stone & Rolls Ltd v Moore
Stephens* [2009] AC 1391, HL(E), *Safeway Stores Ltd v Twigger* [2011] Bus LR    F
1629, CA and *Moulin Global Eyecare Trading Ltd v Inland Revenue Comr* (2014) 17
HKCFAR 218 considered.

(2) That an English court winding up an English company had worldwide
jurisdiction over the company's assets and their proper distribution; that section 213
of the Insolvency Act 1986 had extraterritorial effect so that an order winding up a
company registered in Great Britain had worldwide effect and provided a remedy
against any person who had knowingly been a party to the carrying on of business    G
with a fraudulent purpose of a now insolvent company; and that, accordingly,
section 213 could be invoked against the defendants (post, paras 10, 53, 106–111,
213–214).

*In re Paramount Airways Ltd* [1993] Ch 223, CA approved.

*Per* Lord Toulson and Lord Hodge JJSC. The fiduciary duties of a director of a
company which is insolvent or bordering on insolvency differ from the duties of a
company which is able to meet its liabilities, because in the case of the former the    H
director's duty towards the company requires him to have proper regard for the
creditors and prospective creditors. The purpose of the inclusion of the creditors'
interests within the scope of the fiduciary duty of the directors of an insolvent
company towards the company is so that the directors should not be off the hook if
they acted in disregard of the creditors' interests. It would be contradictory and

© 2016 The Incorporated Council of Law Reporting for England and Wales

3

**[2016] AC**                                        Bilta (UK) Ltd v Nazir (No 2) (SC(E))

A    contrary to the public interests if in such circumstances their control of the company
should provide a means for them to be let off the hook on the ground that their
illegality tainted the liquidators' claim (post, paras 123, 130).

Decision of the Court of Appeal [2013] EWCA Civ 968; [2014] Ch 52; [2013]
3 WLR 1167; [2014] 1 All ER 168; [2014] 1 BCLC 302 affirmed.

The following cases are referred to in the judgments:

B    *Aberdeen Railway Co v Blaikie Bros* (1854) 1 Macq 461, HL(Sc)
*Abrath v North Eastern Railway Co* (1886) 11 App Cas 247, HL(E)
*Arab Bank plc v Zurich Insurance Co* [1999] 1 Lloyd's Rep 262
*Ashmore Benson Pease & Co Ltd v AV Dawson Ltd* [1973] 1 WLR 828; [1973] 2 All
ER 856, CA
*Attorney General's Reference (No 2 of 1982)* [1984] QB 624; [1984] 2 WLR 447;
[1984] 2 All ER 216, CA
C    *Attorney General's Reference (No 2 of 1999)* [2000] QB 796; [2000] 3 WLR 195;
[2000] 3 All ER 182; [2000] 2 BCLC 257, CA
*Bank of Credit and Commerce International SA, In re (No 15); Morris v Bank of
India* [2005] EWCA Civ 693; [2005] 2 BCLC 328; [2005] BCC 739, CA
*Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd* [1997] AC 191; [1996]
3 WLR 87; [1996] 3 All ER 365, HL(E)
*Belmont Finance Corpn Ltd v Williams Furniture Ltd* [1979] Ch 250; [1978] 3 WLR
D    712; [1979] 1 All ER 118, CA
*Belmont Finance Corpn Ltd v Williams Furniture Ltd (No 2)* [1980] 1 All ER 393,
CA
*Berg Sons & Co Ltd v Mervyn Hampton Adams* [1993] BCLC 1045; [2002] Lloyd's
Rep PN 41
*Blain, Ex p; In re Sawers* (1879) 12 Ch D 522, CA
*Bowman v Secular Society Ltd* [1917] AC 406, HL(E)
E    *Brink's-Mat Ltd v Noye* [1991] 1 Bank LR 68, CA
*Caparo Industries plc v Dickman* [1990] 2 AC 605; [1990] 2 WLR 358; [1990] 1 All
ER 568; [1990] BCLC 273, HL(E)
*Citizens' Life Assurance Co Ltd v Brown* [1904] AC 423, PC
*Clark v Oceanic Contractors Inc* [1983] 2 AC 130; [1983] 2 WLR 94; [1983] 1 All
ER 133, HL(E)
*Courage Ltd v Crehan* (Case C-453/99) EU:C:2001:465; [2002] QB 507; [2001]
F    3 WLR 1646; [2002] ICR 457; [2001] All ER (EC) 886; [2001] ECR I-6297, ECJ
*Cox v Ergo Versicherung AG* [2014] UKSC 22; [2014] AC 1379; [2014] 2 WLR 948;
[2014] 2 All ER 926, SC(E)
*Crehan v Inntrepreneur Pub Co CPC* [2004] EWCA Civ 637; [2004] 2 CLC 803, CA
*Cross v Kirkby* The Times, 5 April 2000; [2000] CA Transcript No 321, CA
*Director of Public Prosecutions v Kent and Sussex Contractors Ltd* [1944] KB 146;
[1944] 1 All ER 119, DC
G    *Duomatic Ltd, In re* [1969] 2 Ch 365; [1969] 2 WLR 114; [1969] 1 All ER 161
*El Ajou v Dollar Land Holdings plc* [1994] 2 All ER 685; [1994] 1 BCLC 464, CA
*Euro-Diam Ltd v Bathurst* [1990] 1 QB 1; [1988] 2 WLR 517; [1988] 2 All ER 23,
CA
*Everet v Williams* (1725) (unreported); but noted (1893) 9 LQR 197
*Ferguson v Wilson* (1866) LR 2 Ch App 77
*Gray v Thames Trains Ltd* [2009] UKHL 33; [2009] AC 1339; [2009] 3 WLR 167;
H    [2009] 4 All ER 81, HL(E)
*Gluckstein v Barnes* [1900] AC 240, HL(E)
*Hall v Hebert* [1993] 2 SCR 159
*Hampshire Land Co, In re* [1896] 2 Ch 743
*Holman v Johnson* (1775) 1 Cowp 341
*Houghton (JC) & Co v Nothard Lowe & Wills Ltd* [1928] AC 1, HL(E)

© 2016 The Incorporated Council of Law Reporting for England and Wales

4
**Bilta (UK) Ltd v Nazir (No 2) (SC(E))**                                              [2016] AC

*Hounga v Allen (Anti-Slavery International intervening)* [2014] UKSC 47; [2014]    A
   1 WLR 2889; [2014] ICR 847; [2014] 4 All ER 595, SC(E)

*King, decd, In re* [1963] Ch 459; [1963] 2 WLR 629; [1963] 1 All ER 781, CA

*Kinsela v Russell Kinsela Pty Ltd* (1986) 4 NSWLR 722

*Lancashire County Council v Municipal Mutual Insurance Ltd* [1997] QB 897;
   [1996] 3 WLR 493; [1996] 3 All ER 545, CA

*Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd* [1915] AC 705, HL(E)

*Les Laboratoires Servier v Apotex Inc* [2014] UKSC 55; [2015] AC 430; [2014]    B
   3 WLR 1257; [2014] Bus LR 1217; [2015] 1 All ER 671, SC(E)

*Lister v Hesley Hall Ltd* [2001] UKHL 22; [2002] 1 AC 215; [2001] 2 WLR 1311;
   [2001] ICR 665; [2001] 2 All ER 769, HL(E)

*Lloyd v Grace Smith & Co* [1912] AC 716, HL(E)

*Mackinnon v Donaldson Lufkin & Jenrette Securities Corpn* [1986] Ch 482; [1986]
   2 WLR 453; [1986] 1 All ER 653

*McNicholas Construction Co Ltd v Customs and Excise Comrs* [2000] STC 553    C

*Masri v Consolidated Contractors International (UK) Ltd (No 2)* [2008] EWCA Civ
   303; [2009] QB 450; [2009] 2 WLR 621; [2009] Bus LR 168; [2008] 2 All
   ER (Comm) 1099; [2008] 2 Lloyd's Rep 128, CA

*Masri v Consolidated Contractors International (UK) Ltd (No 4)* [2009] UKHL 43;
   [2010] 1 AC 90; [2009] 3 WLR 385; [2009] Bus LR 1269; [2009] 4 All ER 847;
   [2009] 2 BCLC 382, HL(E)

*Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC    D
   500; [1995] 3 WLR 413; [1995] 3 All ER 918; [1995] 2 BCLC 116, PC

*Moore v I Bresler Ltd* [1944] 2 All ER 515, DC

*Moulin Global Eyecare Trading Ltd v Inland Revenue Comr* [2014] HKFCA 22;
   17 HKCFAR 218; [2014] HKC 323

*Nelson v Nelson* (1995) 184 CLR 538

*PCW Syndicates v PCW Reinsurers* [1996] 1 WLR 1136; [1996] 1 All ER 774;
   [1996] 1 Lloyd's Rep 241, CA

*Paramount Airways Ltd, In re* [1993] Ch 223; [1992] 3 WLR 690; [1992] 3 All ER 1;    E
   [1992] BCLC 710, CA

*ParkingEye Ltd v Somerfield Stores Ltd* [2012] EWCA Civ 1338; [2013] QB 840;
   [2013] 2 WLR 939; [2012] 2 Lloyd's Rep 679, CA

*Photo Production Ltd v Securicor Transport Ltd* [1980] AC 827; [1980] 2 WLR 283;
   [1980] 1 All ER 556; [1980] 1 Lloyd's Rep 545, HL(E)

*Prest v Prest* [2013] UKSC 34; [2013] 2 AC 415; [2013] 3 WLR 1; [2013] 4 All ER
   673; [2014] 1 BCLC 30, SC(E)                                                      F

*R v Gomez* [1993] AC 442; [1992] 3 WLR 1067; [1993] 1 All ER 1, HL(E)

*R v ICR Haulage Ltd* [1944] KB 551; [1944] 1 All ER 691, CCA

*R (Best) v Chief Land Registrar* [2015] EWCA Civ 17; [2016] QB 23; [2015] 3 WLR
   1505; [2015] 4 All ER 495, CA

*Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378; [1995] 3 WLR 64; [1995]
   3 All ER 97, PC

*Safeway Stores Ltd v Twigger* [2010] EWCA Civ 1472; [2011] Bus LR 1629; [2011]    G
   2 All ER 841; [2011] 1 Lloyd's Rep 462, CA

*Salomon v A Salomon & Co Ltd* [1897] AC 22, HL(E)

*Schmid v Hertel* (Case C-328/12) EU:C:2014:6; [2014] 1 WLR 633, ECJ

*Seagull Manufacturing Co Ltd, In re* [1993] Ch 345; [1993] 2 WLR 872; [1993] 2 All
   ER 980; [1993] BCLC 1139, CA

*Stichting Shell Pensioenfonds v Krys* [2014] UKPC 41; [2015] AC 616; [2015] 2 WLR
   289; [2015] 2 All ER (Comm) 97; [2015] 1 BCLC 597, PC

*Stone & Rolls Ltd v Moore Stephens* [2009] UKHL 39; [2009] AC 1391; [2009]    H
   3 WLR 455; [2009] Bus LR 1356; [2009] 4 All ER 431; [2010] 1 All ER (Comm)
   125; [2009] 2 Lloyd's Rep 537; [2009] 2 BCLC 563, HL(E)

*Tesco Stores Ltd v Brent London Borough Council* [1993] 1 WLR 1037; [1993] 2 All
   ER 718, DC

© 2016 The Incorporated Council of Law Reporting for England and Wales

5

[2016] AC                                          Bilta (UK) Ltd v Nazir (No 2) (SC(E))
                                                                            Argument

A   *Tesco Supermarkets Ltd v Nattrass* [1972] AC 153; [1971] 2 WLR 1166; [1971] 2 All
        ER 127, HL(E)
    *Tinsley v Milligan* [1994] 1 AC 340; [1993] 3 WLR 126; [1993] 3 All ER 65, HL(E)
    *West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250, CA
    *Yukong Line Ltd of Korea v Rendsburg Investments Corpn of Liberia (No 2)* [1998]
        1 WLR 294; [1998] 4 All ER 82; [1998] 1 Lloyd's Rep 322; [1998] 2 BCLC 485

B   The following additional case was cited in argument

    *Gourdain v Nadler* (Case C-133/78) EU:C:1979:49; [1979] ECR 733, ECJ

    **APPEAL** from the Court of Appeal
        In September 2009 the second and third claimants, Kevin John Hellard
    and David Anthony Ingram, as the provisional liquidators of the first
    claimant, Bilta (UK) Ltd ("Bilta"), commenced proceedings in Bilta's name
C   against the defendants, Muhammad Nazir, Chetan Chopra, Pan I Ltd, Aman
    Ullah Khan, Sheikh Zulfiqar Mahmood, Jetivia SA, Urs Brunschweiler,
    Trading House Group Ltd (a company incorporated in the British Virgin
    Islands) and Muhammad Fayyaz Shafiq (also known as Fayyaz Shafiq Rana),
    alleging conspiracy to injure and default Bilta. On 25 November 2009 Bilta
    was compulsorily wound up and the second and third claimants were
D   appointed liquidators. The proceedings were amended on 13 October 2011
    to include claims under section 213 of the Insolvency Act 1986 for
    fraudulent trading. The first and second defendants were the sole directors
    of Bilta, the fourth and fifth defendants were the directors of the third
    defendant, and the seventh defendant was the sole director of the sixth
    defendant.
E       By an application notice issued on 22 December 2011 the sixth and
    seventh defendants sought orders that the claim be summarily dismissed on
    the grounds that (1) the claim made by Bilta was precluded by the
    application of the maxim ex turpi causa non oritur actio, (2) the claim under
    section 213 of the 1986 Act had to fail because that section had no
    extraterritorial effect, and (3) both claims were outside the jurisdiction of the
    court because they constituted the enforcement of a revenue debt of a foreign
F   state. By the time of the hearing of the application none of the defendants
    save the sixth, seventh and ninth was participating in the proceedings. On
    30 July 2012 Sir Andrew Morritt C refused the application and granted
    permission to appeal.
        The sixth and seventh defendants appealed. On 31 July 2013 the Court of
    Appeal (Lord Dyson MR, Rimer and Patten LJJ) dismissed the appeals
G   [2014] Ch 52.
        On 11 February 2014 the Supreme Court (Lord Neuberger of
    Abbotsbury PSC, Lord Carnwath and Lord Toulson JJSC) granted the sixth
    and seventh defendants permission to appeal, pursuant to which they
    appealed, and granted the Revenue and Customs Commissioners permission
    to intervene in the appeal by written submissions only.
H       The facts are stated in the judgments.

        *Alan Maclean QC* and *Colin West* (instructed by *Macfarlanes LLP*) for
    the sixth and seventh defendants.
        As a matter of law Bilta's claims against the defendants are barred for
    illegality under the doctrine ex turpi causa non oritur actio. If the pleaded

© 2016 The Incorporated Council of Law Reporting for England and Wales

6
**Bilta (UK) Ltd v Nazir (No 2) (SC(E))**                                   **[2016] AC**
**Argument**

allegations can be proved several parties, including Bilta, participated in a   A
large-scale and very probably criminal fraud against the revenue in respect
of VAT receipts. It is not open to Bilta as a party to that fraud to sue the other
alleged participants in fraud for losses which Bilta has suffered or liabilities
which it has incurred by reason of its participation in the fraud.

Bilta presents its claim on the basis that the fraud was carried out against
it rather than by it. The victim of the fraud was the revenue. Bilta's role was   B
as villain and not victim. Bilta was a company of no substance the only
purpose of which was to perpetrate the fraud and its trading transactions
had no legitimate purpose whatsoever. They were artificial transactions the
sole purpose of which was to generate payments by way of VAT which those
in control of Bilta intended should be the object of massive fraud on the
revenue.

That Bilta would incur large VAT liabilities which it would not pay was   C
not simply a consequence of the fraud in this case. It was the critical
mechanism on which the fraud depended. Bilta was a central participant in
a major VAT fraud, yet it seeks to bring a claim seeking compensation where
the subject matter of its claim is the very proceeds of the fraud which it
perpetrated. Its commission of the fraud is inextricably linked with the
insolvency of the company which it inevitably entailed.

The defence of illegality rests upon the foundation of public policy. It   D
would be quite unrealistic to regard Bilta as innocent or as a victim of the
wrongdoing which was its sole purpose and single activity. English law will
not permit a fraudulent company such as Bilta to advance a claim based on
the assertion that the fraud was carried out against it rather than by it. The
test is satisfied for the doctrine of ex turpi causa non oritur actio to apply and
it does not matter if the relevant acts were not authorised by Bilta.   E

[Reference was made to *Moulin Global Eyecare Trading Ltd v Inland
Revenue Comr* (2014) 17 HKCFAR 18; *Meridian Global Funds
Management Asia Ltd v Securities Commission* [1995] 2 AC 500; *Hounga v
Allen (Anti-Slavery International intervening)* [2014] 1 WLR 2889; *Stone &
Rolls Ltd v Moore Stephens* [2009] AC 1391; *Tinsley v Milligan* [1994] 1 AC
340; *Gray v Thames Trains Ltd* [2009] AC 1339; *In re Hampshire Land Co*
[1896] 2 Ch 743; *Safeway Stores Ltd v Twigger* [2011] Bus LR 1629; *Berg*   F
*Sons & Co Ltd v Mervyn Hampton Adams* [1993] BCLC 1045 and *Schmid v
Hertel* (Case C-328/12) [2014] 1 WLR 633.]

The application of the ex turpi causa doctrine to companies depends upon
the principles of attribution, namely, the principles whereby the knowledge
and states of mind of individuals are attributed to companies in the
management of which they are involved or on whose behalf they act. The   G
ordinary rule of attribution is that the acts and states of mind of those who
are the company's directing mind will be attributed to the company.

The Court of Appeal relied for its reasoning on the "context" in which the
process of attribution fell to be made, holding that a claim against Bilta was
a separate "context" from a claim by Bilta against its former directors and
that as such the attribution rules operated differently in each sphere.
However there was only one fraud and only one conspiracy. As a result   H
there is only one relevant context.

It is illogical to regard there being two separate "contexts" calling for the
application of two separate attribution rules, depending on whether Bilta is
the claimant or the defendant. Once the court has determined that, vis-à-vis

A   the revenue, Bilta was engaged in a VAT fraud, any attempt by Bilta to bring
proceedings against other participants in that fraud based on that
participation or inextricably linked with it runs squarely into the ex turpi
causa principle.

    The Court of Appeal's approach permits a party to a fraudulent
conspiracy to sue other parties to that conspiracy for the losses resulting to it
B   from breaches of duty allegedly committed against it as part and parcel of
the carrying into effect of the fraudulent conspiracy. That approach is
contrary to principle. Once Bilta has been identified as itself a participant in
the fraud it cannot then seek to sue the other participants in the fraud by
relying upon the fiduciary duties owed to it by its directors.

    If Bilta can sue the sixth defendant for the losses resulting to Bilta from its
involvement in the fraud, the sixth defendant must equally be able to sue
C   Bilta for losses resulting to it, on the same basis, namely that Bilta
dishonestly assisted the sixth defendant's director, the seventh defendant, to
breach his fiduciary duties to the sixth defendant by involving it in the fraud.
The result would be that Bilta's action against the sixth defendant would fail
for circuity of action.

    [Reference was made to *Citizens' Life Assurance Co Ltd v Brown* [1904]
AC 423; *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd* [1915] AC
D   705; *Belmont Finance Corpn Ltd v Williams Furniture Ltd* [1979] Ch 250;
*In re Hampshire Land Co* [1896] 2 Ch 743; *Stone & Rolls Ltd v Moore
Stephens* [2009] AC 1391; *Safeway Stores Ltd v Twigger* [2011] Bus LR
1629 and *Attorney General's Reference (No 2 of 1982)* [1984] QB 624.]

    The application of the ex turpi causa doctrine does not mean that Bilta's
creditors will be left without any remedy or recourse. Bilta's liquidators
E   have statutory powers pursuant to the Insolvency Act 1986 to bring
proceedings against those who were knowing parties to fraudulent or
wrongful trading by Bilta. Such proceedings are brought by the liquidators
themselves and not Bilta and they are not open to the objection of arising ex
turpi causa.

    Section 213 of the 1986 Act does not apply to the sixth and seventh
defendants because it does not have extraterritorial effect. The sixth
F   defendant is a Swiss company with no presence in the United Kingdom and
the seventh defendant has no connection to England, having lived in France
and worked in Switzerland at the material times.

    [Reference was made to *Ex p Blain; In re Sawers* (1879) 12 Ch D 522;
*Clark v Oceanic Contractors Inc* [1983] 2 AC 130; *Masri v Consolidated
Contractors International (UK) Ltd (No 4)* [2010] 1 AC 90 and *In re
G   Paramount Airways Ltd* [1993] Ch 223.]

    The approach of the Court of Appeal in *In re Paramount Airways Ltd* is
contrary to principle. That case was wrongly decided and should be
overruled. The ordinary approach in English law and the universal approach
under various European instruments which now govern jurisdiction in many
contexts is that jurisdiction be determined once and for all at the outset of the
proceedings. If any factual questions arise as to jurisdictional connections
H   which have to be established, it is for the claimant to establish them to the
standard of a good arguable case.

    Thus if the jurisdictional test for the making of an order under section 213
is whether a defendant has a sufficient connection with England, that ought to
be determined at the start of the claim and not at the end of the trial. If there is

© 2016 The Incorporated Council of Law Reporting for England and Wales

not demonstrated the necessary sufficient connection with England the    A
defendant ought not to be subject to trial here at all. In the present case the
sixth and seventh defendants have no connection at all with England and the
liquidators' claims under section 213 of the 1986 Act do not apply to them.

   *Christopher Parker QC* and *Rebecca Page* (instructed by *Gateley LLP*)
for the claimants.

   Bilta was the primary victim of the conspiracy. The pleaded case was that    B
the conspiracy was one to defraud and deprive it of its assets leaving it
insolvent. The Court of Appeal rightly applied a conventional analysis as set
out in *Belmont Finance Corpn Ltd v Williams Furniture Ltd* [1979] Ch 250
and held that the directors' knowledge of an illegal transaction could not be
imputed to Bilta. The same conclusion would apply even if the true object of
the conspiracy were the revenue. *Stone & Rolls Ltd v Moore Stephens*    C
[2009] AC 1391 is distinguishable from the present case and does not
support the defendants' case.

   [Reference was made to *Gourdain v Nadler* (Case C-133/78) [1979] ECR
733 and *Moulin Global Eyecare Trading Ltd v Inland Revenue Comr* (2014)
17 HKCFAR 218.]

   The defendants and their accomplices inflicted an intentional injury on
Bilta in breach of the directors' fiduciary duties. The reliance on ex turpi    D
causa in those circumstances is misconceived. Such a defence arises where a
company has committed a wrong against a third party. It can have no
application to a claim by a company against its own directors and their
accomplices for a fraud committed on itself or through itself on its
constituent elements such as its shareholders and creditors.

   The argument that the victim was not the company, Bilta, but its creditor,    E
the revenue, overlooks the fact that the wrong complained of is breach of
fiduciary duty which is necessarily a wrong against the company because the
duty was owed to the company and not to its creditors. The fraud is one
which gives rise to a right of action by the company for breach of fiduciary
duty: there is no right of action by the creditor and, had the revenue brought
a claim for breach of fiduciary duty by the directors, it would have been
struck out. The same would apply to claims for dishonest assistance or    F
knowing receipt. The loss to creditors is a reflective loss in respect of which
it would not be allowed to sue.

   The only wrongdoing identified on the pleadings is the wrong done to the
company. It has never been suggested that as a matter of public policy a
company cannot sue when it is the intended victim of an agent's dishonesty.
Public policy is best served by the ex turpi causa defence failing in this case so    G
that the economic consequences can be visited on those who perpetrated the
fraud on Bilta to the detriment of its creditor, the revenue. Public policy
would not be best served by allowing those who perpetrated the fraud to rely
on their own knowledge of the fraud to defend such a claim. The courts
have long recognised that such a situation would be absurd and the law of
agency and principles of attribution have evolved to prevent a fraudster
seeking to defend claims in that way.    H

   The defendants must establish that the law attributes to Bilta the unlawful
conduct, not just knowledge, of its directors and sole shareholder. A
director is not authorised to misappropriate company assets. As between
the director and the company his acts cannot be said to be the acts of the

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   company at all. Equally the fraud of a director on a company will be ultra
vires the company since it is outside the scope of the company's powers. It
will be a breach of fiduciary duty for a director to appropriate or simply to
pay away company assets.

B
The conduct of the directors cannot be attributed to Bilta simply because
it is a one-man company. The separate legal personality of the company
cannot be ignored where the company suffers loss and is therefore, for the
purposes of its claim against the directors and their accomplices, the victim.

Section 213 of the Insolvency Act 1986 is of the widest formulation and
on its face is of unlimited territorial scope. It concerns fraud in relation to
the businesses of English companies or companies being wound up in
England. Where a defendant voluntarily submits to the jurisdiction there is a
presumption that English legislation will apply unless it can be shown that

C   the statute is one which does not apply to foreign residents or there is
insufficient connection with the jurisdiction. There would be no good
reason for Parliament to wish to limit its reach to those who happened to
be resident in England. Properly construed section 213 applies to the
defendants and the court has jurisdiction to hear the section 213 claim.

D
*In re Paramount Airways Ltd* [1993] Ch 223 was correctly decided and
its reasoning applies to section 213.

*Maclean QC* replied.

*Michael Gibbon QC* (instructed by *Howes Percival*) for the intervener
made written submissions.

The court took time for consideration.

E
22 April 2015. The following judgments were handed down.

**LORD NEUBERGER OF ABBOTSBURY PSC** (with whom **LORD CLARKE
OF STONE-CUM-EBONY** and **LORD CARNWATH JJSC** agreed)

*Introductory*

F
1  The facts giving rise to this appeal can be shortly summarised,
although they are more fully set out in the judgments of Lord Sumption JSC at
paras 56–59, and of Lord Toulson and Lord Hodge JJSC at paras 113–116
below.

2  Bilta (UK) Ltd is an English company which was compulsorily wound
up in November 2009 pursuant to a petition presented by HMRC. Bilta's

G   liquidators then brought proceedings against, inter alia, its two former
directors, Mr Chopra, who was also its sole shareholder, and Mr Nazir; and
Jetivia SA, a Swiss company and its chief executive, Mr Brunschweiler, who
is resident in France ("the four defendants").

3  The pleaded claim alleges that the four defendants were parties to an
unlawful means conspiracy to injure Bilta by a fraudulent scheme, which
involved Messrs Chopra and Nazir breaching their fiduciary duties as

H   directors, and Jetivia and Mr Brunschweiler ("the appellants") dishonestly
assisting them in doing so. The liquidators claim (i) through Bilta,
(a) damages in tort from each of the four defendants, (b) compensation based
on constructive trust from the appellants, and (ii) directly from each of the
four defendants, a contribution under section 213 of the Insolvency Act 1986.

© 2016 The Incorporated Council of Law Reporting for England and Wales

10

Bilta (UK) Ltd v Nazir (No 2) (SC(E))                                    [2016] AC
Lord Neuberger of Abbotsbury PSC

4   The case against the four defendants is based on the contention that   A
between April and July 2009, Messrs Chopra and Nazir caused Bilta to enter
into a series of transactions relating to European Emissions Trading Scheme
Allowances with various parties, including Jetivia, and that those
transactions constituted what are known as carousel frauds. The effect of
the transactions was that they generated (i) an obligation on Bilta to account
to HMRC for output VAT and (ii) an obligation on HMRC to pay a slightly   B
lower sum by way of input VAT to another company. While the input VAT
was paid by HMRC, it was inherent in the fraud that Bilta would always be
insolvent and unable to pay the output VAT to HMRC. The amount of
output VAT for which Bilta consequently remains liable is said to be in
excess of £38m.

*The application to strike out*                                           C

5   The appellants applied to strike out Bilta's claim against them on
the ground that (i) Bilta could not maintain the proceedings in view of the
principle ex turpi causa non oritur actio, or, to put it another way, the
appellants were bound to defeat the claims against them on the basis of an
illegality defence, and (ii) in so far as the claims were based on section 213, it
could not be invoked against the appellants as it does not have   D
extraterritorial effect. The application was dismissed by Sir Andrew
Morritt C, whose decision was upheld by the Court of Appeal [2014] Ch 52.
The appellants now appeal to the Supreme Court.

6   In common with all members of the court, I consider that this appeal
should be dismissed because the Court of Appeal were right to hold that
(i) illegality cannot be raised by Jetivia or Mr Brunschweiler as a defence   E
against Bilta's claim because the wrongful activity of Bilta's directors and
shareholder cannot be attributed to Bilta in these proceedings, and
(ii) section 213 of the Insolvency Act 1986 has extraterritorial effect.

*Attribution*

7   So far as attribution is concerned, it appears to me that what Lord   F
Sumption JSC says in his paras 65–78 and 82–97 is effectively the same in its
effect to what Lords Toulson and Hodge JJSC say in their paras 182–209.
Both judgments reach the conclusion which may, I think, be stated in
the following proposition. Where a company has been the victim of
wrongdoing by its directors, or of which its directors had notice, then the
wrongdoing, or knowledge, of the directors cannot be attributed to
the company as a defence to a claim brought against the directors by the   G
company's liquidator, in the name of the company and/or on behalf of its
creditors, for the loss suffered by the company as a result of the wrongdoing,
even where the directors were the only directors and shareholders of the
company, and even though the wrongdoing or knowledge of the directors
may be attributed to the company in many other types of proceedings.

8   It appears to me that this is the conclusion reached by Lord   H
Sumption JSC and Lords Toulson and Hodge JJSC as a result of the
illuminating discussions in their respective judgments—in paras 65–78 and
82–95 and paras 182–209.

9   Particularly given the full discussion in those passages, I do not think
that it would be sensible for me to say much more on the topic. However,

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   I would suggest that the expression "the fraud exception" be abandoned, as it is certainly not limited to cases of fraud—see per Lord Sumption JSC at para 71 and Lords Toulson and Hodge JJSC at para 181. Indeed, it seems to me that it is not so much an exception to a general rule as part of a general rule. There are judicial observations which tend to support the notion that it is, as Lord Sumption JSC says in his para 86, an exception to the agency-based rules of attribution, which is based on public policy—or common

B   sense, rationality and justice, according to the judicial observations quoted in paras 72, 73, 74, 78 and 85 of Lord Sumption JSC's judgment. However, I agree with Lord Mance JSC's analysis at paras 37–44 of his judgment, that the question is simply an open one: whether or not it is appropriate to attribute an action by, or a state of mind of, a company director or agent to the company or the agent's principal in relation to a particular claim against

C   the company or the principal must depend on the nature and factual context of the claim in question.

*Section 213 of the 1986 Act*

10   I agree with Lord Sumption JSC and Lords Toulson and Hodge JJSC for the reasons they give in paras 107–110 and 210–218 that section 213 of

D   the 1986 Act has extraterritorial effect, at least to the extent of applying to individuals and corporations resident outside the United Kingdom.

*The matters in dispute*

11   There are some issues on which Lord Sumption JSC and Lords Toulson and Hodge JJSC differ. In that connection, I think that there are three areas of disagreement to which it is right to refer, and, taking them in

E   the order in which it is most convenient to discuss them, they are as follows.

12   First, there is disagreement as to the basis on which a defence based on illegality, or ex turpi causa, is to be approached—compare Lord Sumption JSC at paras 60–63 and 98–100 with Lords Toulson and Hodge JJSC at paras 170–174. Secondly, Lords Toulson and Hodge JJSC would also dismiss this appeal on the attribution issue on the ground of

F   statutory policy (see their paras 122–130), whereas Lord Sumption JSC would not (see his paras 98–102). Thirdly, there are differences between Lord Sumption JSC and Lords Toulson and Hodge JJSC as to the proper interpretation of two cases, namely *Stone & Rolls Ltd v Moore Stephens* [2009] AC 1391 (see Lord Sumption JSC at paras 79–81 and Lords Toulson and Hodge JJSC at paras 134–155), and *Safeway Stores Ltd v Twigger*

G   [2011] Bus LR 1629 (see Lord Sumption JSC at para 83 and Lords Toulson and Hodge JJSC at paras 156–162).

*The proper approach to the illegality defence*

13   First, then, there is the proper approach which should be adopted to a defence of illegality. This is a difficult and important topic on which, as the two main judgments in this case show, there can be strongly held differing

H   views, and it is probably accurate to describe the debate on the topic as involving something of a spectrum of views. The debate can be seen as epitomising the familiar tension between the need for principle, clarity and certainty in the law with the equally important desire to achieve a fair and appropriate result in each case.

© 2016 The Incorporated Council of Law Reporting for England and Wales

14   In these proceedings, Lord Sumption JSC considers that the law is    A
stated in the judgments in the House of Lords in *Tinsley v Milligan* [1994]
1 AC 340, which he followed and developed (with the agreement of three of
the four other members of the court, including myself and Lord Clarke JSC)
in *Les Laboratoires Servier v Apotex Inc* [2015] AC 430. He distinguishes
the judgment of Lord Wilson JSC in *Hounga v Allen (Anti-Slavery
International intervening)* [2014] 1 WLR 2889 as involving no departure
from *Tinsley v Milligan,* but as turning on its own context in which           B
"a competing public policy required that damages should be available even
to a person who was privy to her own trafficking" (para 102). By contrast
Lord Toulson JSC (who dissented from that approach in the *Les
Laboratoires* case) and Lord Hodge JSC favour the approach adopted by the
majority of the Court of Appeal in *Tinsley v Milligan* and treat that of Lord
Wilson JSC in para 42ff of *Hounga v Allen* as supporting that approach.       C

15   In my view, while the proper approach to the defence of illegality
needs to be addressed by this court (certainly with a panel of seven and
conceivably with a panel of nine Justices) as soon as appropriately possible,
this is not the case in which it should be decided. We have had no real
argument on the topic: this case is concerned with attribution, and that is the
issue on which the arguments have correctly focussed. Further, in this case,   D
as in the two recent Supreme Court decisions in the *Les Laboratoires* and
*Hounga* cases, the outcome is the same irrespective of the correct approach
to the illegality defence.

16   It would, in my view, be unwise to seek to decide such a difficult and
controversial question in a case where it is not determinative of the outcome
and where there has been little if any argument on the topic. In *Les
Laboratoires*, the majority did opine on the proper approach not because it    E
was necessary to decide the appeal, but because they considered that the
Court of Appeal (who had reached the same actual decision) had adopted an
approach which was inconsistent with *Tinsley*. Similarly in *Hounga*, as
Lord Sumption JSC has shown in para 99, it may well not have been
necessary to consider the proper approach to the illegality defence, but it
none the less remains the fact that it was the subject of argument, and that
Lord Wilson JSC did express a view on the point, and two of the four other    F
members of the court agreed with his judgment.

17   *Les Laboratoires* provides a basis for saying that the approach in
*Tinsley* has recently been reaffirmed by this court and that it would be
inappropriate for this court to visit the point again. However, it was not
argued in *Les Laboratoires* that *Tinsley* was wrongly decided, and, as Lord
Toulson JSC pointed out in his judgment, the majority decision was reached    G
without addressing the reasoning in *Hounga*. Lord Sumption JSC is right to
say that, unless and until this court refuses to follow *Tinsley*, it is at the very
least difficult to say that the law is as flexible as Lords Toulson and
Hodge JJSC suggest in their judgment, but (i) in the light of what the
majority said in *Hounga* at paras 42–43, there is room for argument that this
court has refused to follow *Tinsley*, and (ii) in the light of the Law
Commission report *The Illegality Defence* (2010) (Law Com No 320), the      H
subsequent decisions of the Court of Appeal, and decisions of other common
law courts, it appears to me to be appropriate for this court to address this
difficult and controversial issue—but only after having heard and read full
argument on the topic.

© 2016 The Incorporated Council of Law Reporting for England and Wales

13

A  *The role of statutory policy in this case*

18   As well as dismissing this appeal on the attribution issue on the same grounds as Lord Sumption JSC, Lords Toulson and Hodge JJSC would also dismiss the appeal on the grounds of statutory policy. They suggest that it would make a nonsense of the statutory duty contained in section 172(3) of the Companies Act 2006 (and explained by them in their paras 125–127), if
B  directors against whom a claim was brought under that provision could rely on the ex turpi causa or illegality defence. That defence would be based on the proposition, relied on by the appellants in this case, that, as the directors in question (here the first and second defendants, Mr Nazir and Mr Chopra) were, between them, the sole directors and shareholders of Bilta, their illegal actions must be attributed to the company, and so the defence can run.

C  19   I agree with Lords Toulson and Hodge JJSC that this argument cannot be correct. Apart from any other reason, it seems to me that Lord Mance JSC must be right in saying in his para 47 that, at least in this connection, the 2006 Act restates duties which were part of the common law. It also appears to me to follow that, if Lords Toulson and Hodge JJSC are right about the proper approach to the illegality principle, then their reasoning in paras 128–130 would be correct. However, I would not go
D  further than that, because, as I have already indicated, this is not an appropriate case in which this court should decide conclusively (in so far as the issue can ever be decided conclusively) on the right approach to the illegality principle. It is unnecessary to decide the right approach even in order to determine whether the illegality defence can be run in relation to the section 172(3) claim in the present case.

E  20   That is, of course, because it is clear, for the very reasons given by Lord Toulson and Lord Hodge JJSC in paras 126–130 that a claim against directors under section 172(3) cannot be defeated by the directors invoking the defence of ex turpi causa. It is clear from "the language of the rule ([as] it is in a statute) and its content and policy" that the "act (or knowledge or state of mind) was *for this purpose* [not] intended to count as the act etc of
F  the company", to quote and apply the test laid down by Lord Hoffmann in *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500, 507, set out by Lord Sumption JSC at the end of his para 67.

*The proper analysis of Stone & Rolls v Moore Stephens and of Safeway Foodstores Ltd v Twigger*
G
21   In para 3.32 of the report referred to above, the Law Commission observed that "it is difficult to anticipate what precedent, if any, *Stone & Rolls* will set regarding the illegality defence", explaining that, in their view at any rate, "there was no majority reasoning" with the members of the committee "reaching different conclusions on how the defence should be applied". The confusing nature of the decision has been commented on in a
H  number of articles (see e g David Halpern, "Stone & Rolls Ltd v Moore Stephens: An Unnecessary Tangle" (2010) 73 MLR 487, Peter Watts, "Audit Contracts and Turpitude" (2010) 126 LQR 14 and "Illegality and Agency Law: Authorising Illegal Action" [2011] JBL 213, Eilis Ferran, "Corporate Attribution and Directing Mind and Will" (2011) 127 LQR 239 and Mary

© 2016 The Incorporated Council of Law Reporting for England and Wales

14
**Bilta (UK) Ltd v Nazir (No 2) (SC(E))** [2016] AC
**Lord Neuberger of Abbotsbury PSC**

Watson, "Conceptual Confusion: Organs, Agents and Identity in the English    A
Courts" (2011) 23 Sing Ac Law Jo 762).

22 These critics have been joined by Lord Walker of Gestingthorpe
himself, who was of course a member of the majority in *Stone & Rolls*. In
the course of his illuminating judgment in *Moulin Global Eyecare Trading
Ltd v Inland Revenue Comr* (2014) 17 HKCFAR 218, he described the    B
decision in *Stone & Rolls* as a "controversial exception" to a general rule and
referred to its facts as "extreme and exceptional"—see para 133. In
para 106, he rightly added that the judgment of Patten LJ in the Court of
Appeal in the present case had "achieved a welcome clarification of the law
in this area". Casting further doubt on the decision in *Stone & Rolls*, in
para 101 of *Moulin Global* Lord Walker NPJ recanted part of his reasoning
in the House of Lords.

23 It seems to me that the view that it is very hard to seek to derive much    C
in the way of reliable principle from the decision of the House of Lords in
*Stone & Rolls* is vindicated by the fact that, in their judgments in this case,
Lord Sumption JSC and Lords Toulson and Hodge JJSC have reached rather
different conclusions as to the effect of the majority judgments.

24 Particularly given the difference between them as to the ratio
decidendi of Lord Phillips of Worth Matravers's opinion, and subject to    D
what I say in the next four paragraphs, I am of the view that, so far as it is to
be regarded as strictly binding authority, *Stone & Rolls* is best treated as a
case which solely decided that the Court of Appeal was right to conclude
that, on the facts of the particular case, the illegality defence succeeded and
that the claim should be struck out. I believe that this largely reflects the
views of both Lord Sumption JSC (see his para 81) and Lords Toulson and
Hodge JJSC (see their para 152–154).    E

25 But it would be unsatisfactory for us to leave the case without
attempting to provide some further guidance as to its effect, in so far as we
fairly can. For that purpose I welcome Lord Sumption JSC's enumeration of
the three propositions which he suggests in his para 80 can be derived from
*Stone & Rolls*. With the exception of the first, I agree with what he says
about them, although even the second and third propositions are supported
by only three of the judgments at least one of which is by no means in    F
harmony with the other two.

26 Subject to that, I agree that the second and third of the propositions
which Lord Sumption JSC identifies in his para 80 can be extracted from
three of the judgments in *Stone & Rolls*. Those propositions concern the
circumstances in which an illegality defence can be run against a company
when its directing mind and will have fraudulently caused loss to a third    G
party and it is relying on the fraud in a claim against a third party. The
second proposition, with which I agree, is that the defence is not available
where there are innocent shareholders (or, it appears, directors). The third
proposition, with which I also agree, is that the defence is available, albeit
only on some occasions (not in this case, but in *Stone & Rolls* itself) where
there are no innocent shareholders or directors.

27 I need say no more about the second proposition, which appears to    H
me to be clearly well founded. As to the third proposition, I agree with
Lords Toulson and Hodge JJSC that it appears to be supported (at least in
relation to a company in sound financial health at the relevant time) by the
reasoning in the clear judgment of Hobhouse J in *Berg, Sons & Co Ltd v*

© 2016 The Incorporated Council of Law Reporting for England and Wales

15

[2016] AC                  Bilta (UK) Ltd v Nazir (No 2) (SC(E))
                                                 Lord Neuberger of Abbotsbury PSC

A   *Mervyn Hampton Adams* [2002] Lloyd's Rep PN 41, which was referred to with approval and quoted from in *Stone & Rolls* by Lord Phillips of Worth Matravers (at paras 77–79) and Lord Walker (at paras 150, 158–161), and indeed by Lord Mance, dissenting (at paras 258–260).

     28  However, I note that Lord Mance suggests that it should be an open question whether the third proposition would apply to preclude a claim against auditors where, at the relevant audit date, the company concerned

B  was in or near insolvency. While it appears that the third proposition, as extracted from three judgments in *Stone & Rolls*, would so apply, I have come to the conclusion that, on this appeal at least, we should not purport definitively to confirm that it has that effect. I am of the view that we ought not shut the point out, in the light of (a) our conclusion that attribution is highly context-specific (see para 9 above), (b) Lord Walker's change of mind

C  (see para 22 above), (c) the fact that the three judgments in *Stone & Rolls* which support the third proposition are not in harmony (in the passages cited at the end of para 27 above), and (d) the fact that the third proposition is in any event not an absolute rule (see the end of para 26 above).

     29  I cannot agree that the first proposition identified by Lord Sumption JSC, namely that the illegality defence is only available where the company is directly, as opposed to vicariously, responsible for the illegality,

D  can be derived from *Stone & Rolls* (whether or not the proposition is correct in law, which I would leave entirely open, although I see its attraction). I agree that, in paras 27–28, Lord Phillips accepted that the illegality defence is available against a company only where it was directly, as opposed to vicariously, responsible for it, albeit that that was ultimately an obiter conclusion. More importantly, I do not think that Lord Walker accepted

E  that proposition at paras 132–133: he merely identified an issue as to whether the company was "primarily . . . liable for the fraud practised on KB, or was merely vicariously liable for the fraud of Mr Stojevic", but as he then went on to accept that the Court of Appeal "was clearly right in holding that" the company "was primarily . . . liable", he did not have to address the point in question.

F     30  Subject to these points, the time has come in my view for us to hold that the decision in *Stone & Rolls* should, as Lord Denning MR graphically put it in relation to another case in *In re King, decd* [1963] Ch 459, 483, be put "on one side in a pile and marked 'not to be looked at again'". Without disrespect to the thinking and research that went into the reasoning of the five Law Lords in that case, and although persuasive points and observations may be found from each of the individual opinions, it is not in the interests of

G  the future clarity of the law for it to be treated as authoritative or of assistance save as already indicated.

     31  I turn, finally, to *Safeway Stores Ltd v Twigger*. Lord Sumption JSC has accurately summarised the effect of the decision in his para 83. Lords Toulson and Hodge JJSC deal with it a little more fully and much more critically in their paras 157–162. I would take a great deal of persuading that the Court of Appeal did not arrive at the correct conclusion in that case.

H  However, I do not believe that it would be right on this appeal to express a concluded opinion as to whether the case was rightly decided, and, if so, whether the reasoning of the majority or of Pill LJ was correct. It is unnecessary to reach any such conclusion and the points were not argued in detail before us: indeed, they were hardly addressed at all.

© 2016 The Incorporated Council of Law Reporting for England and Wales

16
**Bilta (UK) Ltd v Nazir (No 2) (SC(E))**                                    [2016] AC
**Lord Mance JSC**

**LORD MANCE JSC**                                                          A

32   The respondent, Bilta (UK) Ltd ("Bilta"), claims damages from the appellants for losses suffered through its involvement in a carousel fraud on the Revenue.   The defendants in the proceedings include Bilta's two directors, Mr Chopra who was also its sole shareholder and Mr Nazir, as well as a Swiss company, Jetivia SA ("Jetivia"), and Jetivia's chief executive, Mr Brunschweiler.  Jetivia and Mr Brunschweiler are the appellants in this appeal.  The scheme involved the purchase of carbon credits by Bilta from sources outside the United Kingdom (so not subject to VAT), followed by their resale (mostly at a loss, if one takes the basic resale price excluding VAT) to UK companies registered for VAT, and the remission of the proceeds to Jetivia and other offshore companies.  Inevitably, the scheme rendered Bilta at all material times insolvent, it cannot meet its liabilities to the Revenue and the present claim is brought by liquidators, for the ultimate benefit no doubt of the Revenue as Bilta's creditors.                        B

C

33   The appellants' defence is that Bilta was through its directors and shareholder party to illegality which precludes it pursuing its claim.  I have read with great benefit the judgments prepared by Lords Toulson and Hodge JJSC, by Lord Sumption JSC and by Lord Neuberger of Abbotsbury PSC.  Neither they, nor I understand any other member of the court, consider that the defence can succeed, and I agree that it cannot.  But there are some differences in reasoning, particularly regarding the general approach to be adopted to illegality.  Save perhaps for a slight difference of view (in para 52 below) regarding *Safeway Stores Ltd v Twigger* [2011] Bus LR 1629, I agree on all points in substance with Lord Neuberger PSC.  D

34   This is not, in my view, the occasion on which to embark on any re-examination either of the House of Lords' decision in *Tinsley v Milligan* [1994] 1 AC 340 or of the Supreme Court's recent decisions in *Hounga v Allen* [2014] 1 WLR 2889 and *Les Laboratoires Servier v Apotex Inc* [2015] AC 430.  There was no challenge to or detailed examination of any of these decisions.  I agree however that these cases and their inter-relationship merit further examination by this court whenever the opportunity arises.  E

35   The present appeal raises the question whether a company can pursue its directors and sole shareholder for breaches of duty towards the company depriving it of its assets.  Lord Toulson and Lord Hodge JJSC consider that the straightforward answer to the question is that it would deprive the duties which the shareholder-directors owed Bilta of all content, if the defence of illegality were open to the appellants.  But they consider that, if analysed in terms of attribution, the case is not one where the shareholder-directors' acts and state of mind can or should be attributed to Bilta.  More generally, they favour a policy-based approach to illegality, but I will not examine that possibility, in view of what I have said in para 34.  F

G

36   Lord Sumption JSC in contrast sees the case as turning on rules of attribution, which he views as applying "regardless of the nature of the claim or the parties involved" (para 86) and amongst which he identifies a rule that the acts and state of mind of a directing mind and will be attributed to a company.  But he qualifies the effect of his analysis by reference to a policy-based "breach of duty exception" which covers the present case in order "to avoid, injustice and absurdity", as Lord Walker of Gestingthorpe NPJ put it in a passage in *Moulin Global Eyecare Trading Ltd v Inland Revenue Comr*, 17 HKCFAR 218, which Lord Sumption JSC quotes in para 85.  Later in his  H

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   judgment however in para 92, he modifies this approach by describing it as
no more than a "valuable tool of analysis".

37   In common, as I see it, with Lords Neuberger PSC, Toulson and
Hodge JJSC, and for reasons which I set out in paras 39–44 below, I do not
think it appropriate to analyse the present case as one of prima facie
attribution, which is then negatived under a breach of duty exception. As
B   Lord Sumption JSC's judgment demonstrates, it would, however, make no
difference to the outcome in this case, if the matter were to be so analysed,
though the plethora of difficult authority to which such an analysis has given
rise, far from proving its value, argues for what is to my mind a simpler and
more principled analysis.

38   One way or another, it is certainly unjust and absurd to suggest that
the answer to a claim for breach of a director's (or any employee's) duty
C   could lie in attributing to the company the very misconduct by which the
director or employee has damaged it. A company has its own separate legal
personality and interests. Duties are owed to it by those officers who
constitute its directing mind and will, similarly to the way in which they are
owed by other more ordinary employees or agents. All the shareholders of a
solvent company acting unanimously may in certain circumstances (which
D   need not here be considered, since it is not suggested that they may apply) be
able to authorise what might otherwise be misconduct towards the
company. But even the shareholders of a company which is insolvent or
facing insolvency cannot do this to the prejudice of its creditors, and the
company's officers owe a particular duty to safeguard the interest of such
creditors. There is no basis for regarding the various statutory remedies
available to a liquidator against defaulting officers as making this duty or its
E   enforcement redundant.

39   Rules of attribution are as relevant to individuals as to companies.
An individual may him- or herself do the relevant act or possess the relevant
state of mind. Equally there are many contexts in which an individual will
be attributed with the actions or state of mind of another, whether an agent
or, in some circumstances, an independent contractor. But in relation to
F   companies there is the particular problem that a company is an artificial
construct, and can only act through natural persons. It has no actual mind,
despite the law's persistent anthropomorphism—as to which see the
references by Lord Hoffmann in *Meridian Global Funds Management Asia
Ltd v Securities Commission* [1995] 2 AC 500, 507A, 509G–H to the absence
of any "ding an sich", and by Professor Eilis Ferran in "Corporate
Attribution and the Directing Mind and Will" (2011) 127 LQR 239,
G   239–240 to the distracting effect of references to a company's "brain and
nerve centre" or "hands".

40   As Lord Hoffmann pointed out in *Meridian Global*, pp 506–507, the
courts' task in all such situations is to identify the appropriate rules of
attribution, using for example general rules like those governing estoppel
and ostensible authority in contract and vicarious liability in tort. It is well-
recognised that a company may as a result of such rules have imputed to it
H   the conduct of an ordinary employee, and this is so also in the context of
illegality. By acquiescing in the overloading of the hauliers' lorries in
*Ashmore Benson Pease & Co Ltd v AV Dawson Ltd* [1973] 1 WLR 828 the
consignors' assistant transport manager and his assistant made the haulage
contract unenforceable at the instance of the consignors, who were unable to

© 2016 The Incorporated Council of Law Reporting for England and Wales

18
### Bilta (UK) Ltd v Nazir (No 2) (SC(E))                                    [2016] AC
Lord Mance JSC

recover when a lorry toppled over damaging the goods being carried. But it
is not always appropriate to apply general rules of agency to answer
questions of attribution, and this is particularly true in a statutory context.
Particular statutory provisions may indicate that a particular act or state of
mind should only be attributed when undertaken or held by a company's
"directing mind and will": see e g *Lennard's Carrying Co Ltd v Asiatic
Petroleum Co Ltd* [1915] AC 705 and *Tesco Supermarkets Ltd v Nattrass*
[1972] AC 153, cited in *Meridian Global*, pp 507–509. In contrast in
*Meridian Global* itself the company was for criminal purposes attributed
with the conduct and knowledge of the senior portfolio manager who,
without knowledge of the board or managing director, had entered into the
relevant transaction of which the company had failed to give notice as
required by the legislation.

41   As Lord Hoffmann made clear in *Meridian Global*, the key to any
question of attribution is ultimately always to be found in considerations of
context and purpose. The question is: whose act or knowledge or state of
mind is *for the purpose* of the relevant rule to count as the act, knowledge or
state of mind of the company? Lord Walker NPJ said recently in *Moulin
Global*, para 41 that: "One of the fundamental points to be taken from
*Meridian* is the importance of context . . . in any problem of attribution."
Even when no statute is involved, some courts have suggested that a
distinction between the acts and state of mind of, on the one hand, a
company's directing mind and will or "alter ego" and, on the other, an
ordinary employee or agent may be relevant in the context of third party
relationships. This is academically controversial: see Professor Peter Watts,
"The Company's Alter Ego—An Impostor in Private Law" (2000) 116 LQR
525; Neil Campbell and John Armour, "Demystifying the Civil Liability of
Corporate Agents" [2003] CLJ 290. Any such distinction cannot in any
event override the need for attention to the context and purpose in and for
which attribution is invoked or disclaimed.

42   Where the relevant rule consists in the duties owed by an officer to
the company which he or she serves, then, whether such duties are statutory
or common law, the acts, knowledge and states of mind of the company
must necessarily be separated from those of its officer. The purpose of the
rule itself means that the company cannot be identified with its officers. It is
self-evidently impossible that the officer should be able to argue that the
company either committed or knew about the breach of duty, simply
because the officer committed or knew about it. This is so even though the
officer is the directing mind and will of the company. The same clearly also
applies even if the officer is also the sole shareholder of a company in or
facing insolvency. Any other conclusion would ignore the separate legal
identity of the company, empty the concept of duty of content and enable the
company's affairs to be conducted in fraud of creditors.

43   At the same time, however, if the officer's breach of duty has led to
the company incurring loss in the form of payments to or liability towards
third parties, the company must be able as part of its cause of action against
its officer to rely on the fact that, in that respect, its officer's acts and state of
mind were and are attributable to the company, causing it to make such
payments or incur such liability. In other words, it can rely on attribution
for one purpose, but disclaim attribution for another. The rules of
attribution for the purpose of establishing or negating vicarious liability to

© 2016 The Incorporated Council of Law Reporting for England and Wales

19

[2016] AC                                      Bilta (UK) Ltd v Nazir (No 2) (SC(E))
Lord Mance JSC

A  third parties differ, necessarily, from the rules governing the direct relationship inter se of the principal and agent.

44  It follows that I would, like Lords Toulson and Hodge JJSC (para 191), endorse the observations of Professors Peter Watts and Francis Reynolds QC as editors of *Bowstead & Reynolds on Agency*, 19th ed (2010), para 8-213, in relation to the argument that a principal should be attributed with the state of mind of his agent who has defrauded him, so as to relieve either the agent or a third party who had knowingly assisted in the fraud:

B

"Such arguments by defendants, though hazarded from time to time, are plainly without merit. However, in such situations imputation has no reason to operate. The rules of imputation do not exist in a state of nature, such that some reason has to be found to disapply them. Whether knowledge is imputed in law turns on the question to be addressed."

C

The same point is made in rephrased terms in their 20th ed (2014), para 8-213:

"The simple point is that, were the principal deemed to possess the agent's knowledge of his own breaches of duty, and thereby to have condoned them, the principal could never successfully vindicate his rights . . . there is no need for an exception as such. The putative defence that the exception is used to rebut is premised on the fallacy that a principal is prima facie deemed to know at all times and for all purposes that which his agents know. As observed already, imputation has never operated in such a way. Before imputation occurs, there needs to be some purpose for deeming the principal to know what the agent knows. There is none in this type of case."

D

E

45  The breach of duty exception has been more plausibly deployed in situations where the issue is the legal effect of relations between the company and a third party. For example, in *JC Houghton & Co v Nothard Lowe & Wills* [1928] AC 1, the issue was whether the knowledge of the directors of the latter company should be attributed to it, with the effect that the latter company could and should be treated as estopped from denying that it had consented to a particular arrangement with a third party company. However, the arrangement was one that was against the company's interests and for the benefit of the third party company which the directors also controlled and which was in financial difficulties. In the words of Viscount Dunedin, both common sense and authority in the form of *In re Hampshire Land Co* [1896] 2 Ch 743 led to the conclusion that, although "It may be assumed that the knowledge of directors is in ordinary circumstances the knowledge of the company", that cannot be so if the knowledge of an infringement of the company's rights is "only brought home to the man who himself was the artificer of such infringement" (pp 14–15). Even in this context it may be questioned whether an analysis involving prima facie imputation subject to exception is necessary or fruitful: see Professor Peter Watts's critique in "Imputed Knowledge in Agency Law—Excising the Fraud Exception" (2001) 117 LQR 300, 316 et seq Since it leads to a right result and involves a different context to the present, I need however say no more about that here.

F

G

H

© 2016 The Incorporated Council of Law Reporting for England and Wales

20
Bilta (UK) Ltd v Nazir (No 2) (SC(E))                                    [2016] AC
Lord Mance JSC

46  With regard to *Stone & Rolls Ltd v Moore Stephens* [2009] AC 1391   A
I do not propose to say very much. The potential qualification on the
application of the maxim ex turpi causa, which the majority accepted in the
case of a company with innocent shareholders indicates that they too must
ultimately have regarded context as having at least some relevance to
attribution, and Lord Walker NPJ has in *Moulin* now explicitly withdrawn
from the position that attribution operates independently of context: see
paras 41 and 101. More fundamentally, the context in which issues of   B
attribution arose in *Stone & Rolls* was different from the present. The
company's claim was against its auditors rather than against an officer.
Lord Phillips at least in the majority clearly saw that as important, in particular in
the light of what he viewed as the scope of an auditor's duty. I remain of the
view, which I expressed in para 265 in *Stone & Rolls*, that this ought to have
been the central issue in that case, not a preliminary issue about ex turpi   C
causa into which the majority view, that the claim even though pursued for
the benefit of the company's creditors should fail, was in the event fitted.
I note that Professor Eilis Ferran takes a similar view in her article, cited at
para 39 above, at p 251; see also the statement by Professor Peter Watts,
"Audit Contracts and Turpitude" (2010) 126 LQR 14, that "Ultimately,
what divided the judges in *Stone & Rolls* was determining the classes of
innocent parties whose interests the contract of audit is designed to protect"   D
(p 14).

47  I say nothing of course about the correct answer to a question
addressed in terms of what an auditor's duty would or should have been.
However, so far as concerns the nature and enforceability of a company's
claim for misconduct by its directing mind and sole shareholder, I remain of
the views expressed in paras 224–225 in *Stone & Rolls*:   E

"224. . . . before the House Mr Sumption's submission was that S &
R could only claim against Mr Stojevic on a narrow basis for abstraction
of its moneys (a proprietary claim like that mentioned by O'Connor LJ in
*Caparo* . . .: see para 214 above); and that any claim against him for
damages for breach of duty as an officer would be barred by the maxim ex
turpi causa because it would involve pleading S & R's fraud on the banks.   F
I do not accept this submission. It would mean that, if one element of
Mr Stojevic's fraud on the banks had involved persuading the banks to
pay the funds direct into an account represented as being S & R's but in
fact Mr Stojevic's, S & R could not sue Mr Stojevic. Mr Stojevic's
common law duty as a director to S & R was to conduct its affairs
honestly and properly. Section 172(1) of the Companies Act 2006 now   G
states the duty, in terms expressly based on common law rules and
equitable principles (see section 170(3)), as being to 'act in the way he
considers, in good faith, would be most likely to promote the success of
the company for the benefit of its members as a whole'—a duty made
expressly 'subject to any enactment or rule of law requiring directors, in
certain circumstances, to consider or act in the interests of creditors of the
company': see section 172(3). Section 212 of the Insolvency Act 1986   H
provides a summary remedy available in the course of winding up against
anyone who is or has been an officer of the company in respect of, inter
alia, 'any misfeasance or breach of any fiduciary or other duty in relation
to the company'. (This is in addition to the specific remedies that apply in

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   circumstances of fraudulent or wrongful trading under sections 213 and
214.)

"225. As between S & R and Mr Stojevic, Mr Stojevic's fraud on the
banks was and is just as objectionable as the later abstraction of moneys
to which it was designed to lead. In holding a director responsible in such
a case, a company is as a separate legal entity enforcing duties owed to it
B   by the director. It is not acting inconsistently, or asking the court to act
inconsistently, with the law. It is a remarkable proposition, that the
directing mind of a company can commit the company to a scheme of
fraud and then avoid liability in damages if the company would have to
plead and rely on this scheme to establish such liability."

48   Like Lord Neuberger PSC, I would not endorse Lord Sumption JSC's
C   suggestion (paras 79 and 80) that *Stone & Rolls* establishes an apparently
general and context-unspecific distinction between personal and vicarious
liability as central to the application of the illegality defence. Outside the
statutory sphere, where such a distinction originated and has been found
useful, there is very little authority for any such distinction, and there is
certainly none for its application as a key to a resolution of issues of
D   attribution in the context of illegality. Its origin in that context lies in a
concession by counsel (Mr Jonathan Sumption QC), no doubt tactically
well-judged, in *Stone & Rolls* (p 1443B–C). The only member of the House
who referred to this concession as a requirement, along with turpitude, of an
ex turpi causa defence was Lord Phillips, but he did so expressly on the basis
that (para 24): "Those . . . are valid qualifications to the defence of ex turpi
E   causa in the context in which it is raised on this appeal. They are not,
however, of general application to the defence of ex turpi causa."

49   As I have already noted in para 40 above, with reference to the
*Ashmore, Benson* case, it is not the law that the ordinary principles of
attribution are replaced in the case of a company, any more than they are in
the case of an individual, by some general principle that the only relevant
conduct or state of mind is that of someone who is or can be treated as an
F   alter ego or directing mind and will of the relevant company or individual.
In his article "Audit Contracts and Turpitude", to which I have referred in
para 46 above, at p 17, Professor Watts says this about the way in which the
concept of directing mind and will entered the debate in *Stone & Rolls*:

"Their Lordships were drawn into recognising the mind-and-will
concept by Mr Sumption QC's concession on the auditor's behalf . . . that
G   a claimant cannot be caught by the ex turpi causa rule except as a result of
his own conduct, 'not conduct for which he is vicariously liable or which
is otherwise attributed to him under principles of the law of agency'. This
is simply wrong. Generally speaking, the ex turpi causa rule will preclude
a principal from taking advantage of an agent's illegal acts (see
e g *Apthorp v Nevill* (1907) 23 TLR 575 for a human principal, and
H   *Ashmore Benson Pease & Co Ltd v AV Dawson Ltd* [1973] 1 WLR 828,
CA for a company). None the less, as we have noted, context is important
with the ex turpi rule, and in the case of contracts designed to deal with
the risks of agents' dishonesty (such as audit and insurance contracts) the
law looks to where guilt really lies."

© 2016 The Incorporated Council of Law Reporting for England and Wales

22
**Bilta (UK) Ltd v Nazir (No 2) (SC(E))**                                    **[2016] AC**
Lord Mance JSC

50    With regard to the three points for which Lord Sumption JSC    *A*
suggests in para 80 that *Stone & Rolls* is authority, it follows from what
I have said in paras 48–49 that I do not agree that the case is authority for the
first point, viz that the illegality defence is only available to a company where
it is "directly" as opposed to vicariously responsible for the illegality. As
Professor Watts says, there are no doubt some limited contexts in which this
may be the appropriate analysis, but there is no such general rule. I agree    *B*
with Lord Sumption JSC's second point, viz that the House rejected the
auditor's argument that merely because Mr Stojevic was the company's
mind and will and sole owner, his conduct and state of mind should be
attributed to *Stone & Rolls* in relation to its claim against its auditors. I have
already pointed out in para 46 above that the majority was thereby at least
accepting that context must have some relevance. The third point appears a    *C*
factually correct representation of the outcome of *Stone & Rolls*, though the
present appeal does not raise the correctness in law of that outcome, which
may one day fall for reconsideration.

51    I turn to a defence of circuity of action which the appellants suggest
arises on this appeal. The claim against Jetivia and Mr Brunschweiler is that
they dishonestly assisted Mr Chopra's and Mr Nazir's breaches of duty
towards Bilta, or were co-conspirators with Mr Chopra and Mr Nazir. On    *D*
the face of it, Jetivia and Mr Brunschweiler cannot raise a defence of
illegality if Mr Chopra and Mr Nazir cannot. The suggestion is that Jetivia
could have a defence of circuity of action. This is, I understand, on the basis
that any liability on its part arose from a conspiracy between Bilta, through
Mr Chopra and Mr Nazir, and Mr Brunschweiler. Apart from this being
unpleaded, I cannot, at present at least, see how a company (here Jetivia)    *E*
which is through its director or other agent held liable to another company
(here Bilta) for dishonestly assisting or conspiring with the latter company's
directors or agents to cause loss to the latter company can then turn round
and say that it has been damaged by the former company by the very liability
which it has incurred to the former company. That would turn the law
governing dishonest assistance and conspiracy on its head.

52    I sympathise with the views expressed by Lords Toulson and    *F*
Hodge JJSC in paras 156–162 regarding the Court of Appeal decision in
*Safeway Stores Ltd v Twigger* [2011] Bus LR 1629, but any decision about
its correctness must be for another day, after full argument.

53    For the reasons given by Lords Sumption, Toulson and Hodge JJSC
and again in agreement with Lord Neuberger PSC, I consider that
section 213 of the Insolvency Act 1986 has extraterritorial effect, and do not    *G*
regard any reference to the Court of Justice as necessary.

54    It follows that I also would dismiss the appeal.

#### LORD SUMPTION JSC

55    The main issue on this appeal is the scope of the rule of public policy
*ex turpi causa non oritur actio*. "No court will lend its aid to a man who
founds his cause of action on an immoral or an illegal act": *Holman v*    *H*
*Johnson* (1775) 1 Cowp 341, 343 (Lord Mansfield CJ). It is convenient to
call this the illegality defence, although the label is not entirely accurate for it
also applies to a very limited category of acts which are immoral without
being illegal.

© 2016 The Incorporated Council of Law Reporting for England and Wales

23

A   *The proceedings*

56   Bilta (UK) Ltd is an English company which was ordered to be
wound up by the High Court on 29 November 2009 on the application of
Her Majesty's Revenue and Customs. Before that order was made, its sole
directors were Mr Chopra and Mr Nazir. Mr Chopra was also Bilta's sole
shareholder.

B   57   The present proceedings were brought by Bilta (through its
liquidators) against the two former directors and a Swiss company, Jetivia
SA, together with Jetivia's chief executive Mr Brunschweiler. There are
other defendants also, but for present purposes they can be ignored. The
appeal arises out of a preliminary issue on the pleadings as between Bilta on
the one hand and Jetivia and Mr Brunschweiler on the other. In summary,
Bilta's pleaded allegation is that between April and July 2009 the two
C   directors caused Bilta to engage in fraudulent trading in carbon credits
(European Emissions Trading Scheme Allowances) recorded on the Danish
Emission Trading Registry. The fraud was very simple. At the relevant time
carbon credits traded between parties both of whom were in the United
Kingdom were treated as taxable supplies subject to VAT at the standard rate
of 15%, but if either the buyer or the seller of the credit was outside the
D   United Kingdom, the sale was not subject to VAT. Bilta bought carbon
credits free of VAT from Jetivia. It resold them back-to-back to UK
companies registered for VAT. In most cases, the onsale price of the credits
net of VAT was artificially fixed at a level marginally below Bilta's purchase
price, thus enabling Bilta's UK buyer to sell them on at a small profit. The
proceeds of Bilta's sales, together with the VAT thereon, were paid either to
Bilta and then on to Jetivia, or directly by the UK buyers to Jetivia or an
E   offshore company called THG. Since Bilta had no other business and no
assets other than the cash generated by its sales, the result was to make the
company insolvent and to generate a liability on Bilta's part to account to
HMRC which it was unable to satisfy.

58   As against the directors, Bilta's claim is that in breach of their
fiduciary duties they organised and participated in a conspiracy to

F       "defraud and injure [Bilta] . . . by trading in carbon credits and dealing
        with the proceeds therefrom in such a way as to deprive [Bilta] of its
        ability to meet its VAT obligations on such trades, namely to pass the
        money (which would otherwise have been available to [Bilta] to meet
        such liability) to accounts offshore, including accounts of Jetivia . . ."
        (Amended particulars of claim, para 14(a).)

G   As against Jetivia and Mr Brunschweiler, the allegation is that they were
(i) liable as parties to the same conspiracy (ii) accountable as constructive
trustees on the footing of knowing assistance in the dishonest diversion of
book-debts due to Bilta. Jetivia, but not Mr Brunschweiler, is also said to be
liable to account on the footing of knowing receipt of the proceeds of those
book-debts. As against all parties, there is in addition a claim for fraudulent
trading under section 213 of the Insolvency Act 1986.
H   59   The victim identified in the pleading is Bilta. It is not in terms
pleaded that it was any part of the object of the scheme to defraud HMRC.
Patten LJ in the Court of Appeal considered that the case had to be decided
without regard to the possibility that HMRC were a victim. But that, with
respect, seems unrealistic. In *Everet v Williams* (1725), the famous case in

© 2016 The Incorporated Council of Law Reporting for England and Wales

which two highwaymen sought an account of their partnership profits, they   *A*
did not plead the nature of their business. But that did not prevent the court
from looking through the gaps and circumlocutions to the substance of the
transaction: see (1893) 9 LQR 197. The substance of the transactions in
issue on this appeal, if the pleaded facts are true, is a fraud on HMRC, who
will be the real losers. The pleadings describe a classic "missing trader"
fraud. Whether it was technically a carousel fraud (in which the trader sells   *B*
to a connected entity, arranges for the latter to obtain a VAT refund, then
pays away the VAT collected and disappears) or the simpler so-called
"acquisition fraud" where he simply disappears without accounting for VAT,
does not matter. The common feature of both is the intention of the
fraudster to collect VAT and disappear before it can be accounted for, and
this is the aspect of the scheme which founds the pleaded case of conspiracy.
The dishonesty alleged against the directors consists wholly in their having   *C*
removed assets of Bilta which would otherwise have been available to pay
creditors, in particular HMRC.

*The illegality defence*

60   Although it begs many questions, the most succinct and
authoritative statement of the law remains that of Lord Mansfield CJ in   *D*
*Holman v Johnson* 1 Cowp 341, 343:

"No court will lend its aid to a man who founds his cause of action on
an immoral or an illegal act. If, from the plaintiff's own stating or
otherwise, the cause of action appears to arise ex turpi causa, or the
transgression of a positive law of this country, there the court says that he
has no right to be assisted. It is on that ground the court goes; not for   *E*
the sake of the defendant, but because they will not lend their aid to such
a plaintiff. So if the plaintiff and defendant were to change sides, and the
defendant was to bring his action against the plaintiff, the latter would
then have the advantage of it; for where both are equally in fault, potior
est conditio defendentis."

Thus stated, the law of illegality is a vindication of the public interest   *F*
as against the legal rights of the parties. The policy is one of judicial
abstention, by which the judicial power of the state is withheld where its
exercise in accordance with ordinary rules of private law would give effect to
advantages derived from an illegal act.

61   In the two centuries which followed Lord Mansfield CJ's apparently
simple proposition, it was among the most heavily litigated rules of common
law, and by the end of the 20th century it had become encrusted with an   *G*
incoherent mass of inconsistent authority. The main reason for this was the
unfortunate tendency of the common law to fragmentation, as judges
examined each case in its own factual and legal context without regard to
broader legal principle. By the time that the illegality defence came before
the Court of Appeal in *Euro-Diam Ltd v Bathurst* [1990] 1 QB 1, the law of
illegality had generated a mass of sub-rules, each appropriate to its own
context, a state of affairs which necessarily gave rise to difficulty when the   *H*
law had to be applied to situations which were either new or not classifiable
according to existing categories. The Court of Appeal resolved this problem
by treating the whole body of authority as illustrative of a process which was
essentially discretionary in nature. Kerr LJ, delivering the only reasoned

© 2016 The Incorporated Council of Law Reporting for England and Wales

25

[2016] AC
Bilta (UK) Ltd v Nazir (No 2) (SC(E))
Lord Sumption JSC

A judgment, expressed that principle at p 35 by saying that the test was whether

> "in all the circumstances it would be an affront to the public conscience to grant the plaintiff the relief which he seeks because the court would thereby appear to assist or encourage the plaintiff in his illegal conduct or to encourage others in similar acts."

B That question, he suggested, needed to be approached "pragmatically and with caution, depending on the circumstances". This view of the law was unanimously rejected by the House of Lords four years later in *Tinsley v Milligan* [1994] 1 AC 340. Lord Goff of Chievely, delivering the leading judgment on this point, said, at p 363, that it

C > "would constitute a revolution in this branch of the law, under which what is in effect a discretion would become vested in the court to deal with the matter by the process of a balancing operation, in place of a system of rules, ultimately derived from the principle of public policy enunciated by Lord Mansfield CJ in *Holman v Johnson*."

62  The Law Commission struggled valiantly with the issue in the early years of this century, and at one point proposed a structured statutory
D discretion of the kind which has been adopted in New Zealand. It abandoned this proposal in the expectation that the courts would reintroduce a measure of the flexibility which *Tinsley v Milligan* had rejected. But *Tinsley v Milligan* is binding authority, subject to review in this court, and in the 20 years since it was decided, the highest court has never been invited to overrule it. In those circumstances, the law has moved in a
E different direction, accepting that the illegality defence depends on a rule of law which applies regardless of the equities of any particular case but seeking to rationalise an area that has generated a perplexing mass of inconsistent case law. In its recent decision in *Les Laboratoires Servier v Apotex Inc* [2015] AC 430, paras 19–20, this court reaffirmed the principle that the illegality defence is based on a rule of law on which the court is required to act, if necessary of its own motion, in every case to which it
F applies. It is not a discretionary power on which the court is merely entitled to act, nor is it dependent on a judicial value judgment about the balance of the equities in each case: In the light of the rejection of the public conscience test, it is incumbent on the courts to devise principled answers which are no wider than is necessary to give effect to the policy stated by Lord Mansfield CJ and are certain enough to be predictable in their application.

G 63  In *Les Labratoires Servier*, it was pointed out that the illegality defence commonly raised three questions: (i) what are the "illegal or immoral acts" which give rise to the defence? (ii) what relationship must those acts have to the claim? (iii) on what principles should the illegal or immoral acts of an agent be attributed to his principal, especially when the principal is a company? *Les Laboratoires Servier* was about the first of the three questions. It is authority for the proposition that the illegality defence
H is potentially engaged by any act of the claimant which is criminal or dishonest or falls into a limited number of closely analogous categories. It is not disputed that the acts alleged in this case were of that kind. Various tests have been proposed for the connection which the law requires between the illegal act and the claim, but it has not been disputed that any of them would

© 2016 The Incorporated Council of Law Reporting for England and Wales

be satisfied on the facts alleged in this case. It is obvious, and apparent from    A
the pleadings, that the claim against both the directors and Jetivia is directly
founded on the VAT frauds.

64   The sole question on this part of the appeal is therefore the third. As
applied to the present case, it is whether the dishonesty which engages the
illegality defence is to be attributed to Bilta for the specific purpose of
defeating its claim against the directors and their alleged co-conspirators.    B
The question is whether the defence is available to defeat an action by a
company against the human agent who caused it to act dishonestly for
damages representing the losses flowing from that dishonesty.   The
Chancellor of the High Court and Court of Appeal both held that it was not.
While there are dicta in the judgments below, especially in the Court of
Appeal, which range wider than is really necessary, their essential reason
was the same, namely that the agent was not entitled to attribute his own    C
dishonesty to the company for the purpose of giving himself immunity from
the ordinary legal consequences of his breach of duty. For reasons which
I shall explain below, I think that the courts below were right about that, and
I understand that view to be shared by every other member of the court.

### Attribution

D
65   English law might have taken the position that a company, being an
artificial legal construct, was mindless. If it had done that, then legal wrongs
which depended on proof of some mental element such as dishonesty or
intention could never be attributed to a company and the present question
could not arise. In the early years of English company law, there were
powerful voices which denied that a tort dependent on proof of a mental
element could be committed by a company. For many years this view was    E
principally associated with Lord Bramwell, who in a well known dictum in
*Abrath v North Eastern Railway Co* (1886) 11 App Cas 247, 250–251,
declared that a fictitious person was "incapable of malice or of motive" even
if the whole body of its directors or shareholders in general meeting
approved its acts for improper reasons. This question was, however, settled
as far as English civil law was concerned by the end of the 19th century. As
Lord Lindley put it in *Citizens' Life Assurance Co Ltd v Brown* [1904] AC    F
423, 426, once companies were recognised by the law as legal persons, they
were liable to have the mental states of agents and employees such as
dishonesty or malice attributed to them for the purpose of establishing civil
liability. In the criminal law, the notion that a corporation was incapable of
committing an offence requiring mens rea persisted rather longer. It was
asserted in both the first edition (1909) and the second edition (1933) of    G
*Halsbury's Laws of England*. But it was rejected in a series of decisions in
1944: see *Director of Public Prosecutions v Kent and Sussex Contractors
Ltd* [1944] KB 146; *R v ICR Haulage Ltd* [1944] KB 551; *Moore v I Bresler
Ltd* [1944] 2 All ER 515. It is now well established that a company can be
indicted for conspiracy to defraud (*R v ICR Haulage Ltd*) or manslaughter
before statute intervened in 2007 (*Attorney General's Reference (No 2 of
1999)* [2000] QB 796), provided that an agent with the relevant state of    H
mind can be sufficiently identified with it. It cannot be emphasised too
strongly that neither in the civil nor in the criminal context does this involve
piercing the corporate veil. It is simply a recognition of the fact that the law
treats a company as thinking through agents, just as it acts through them.

© 2016 The Incorporated Council of Law Reporting for England and Wales

*A*    66  It follows that in principle, the illegality defence applies to companies as it applies to natural persons.  This is the combined effect of the company's legal personality and of the attribution to companies of the state of mind of those agents who for the relevant purpose can be said to think for it.  But the principles can only apply to companies in modified form, for they are complex associations of natural persons with different interests, different legal relationships with the company and different degrees of involvement in

*B*  its affairs.  A natural person and his agent are autonomous in fact as well as in law.  A company is autonomous in law but not in fact.  Its decisions are determined by its human agents, who may use that power for unlawful purposes.  This gives rise to problems which do not arise in the case of principals who are natural persons.

    67  The question what persons are to be so far identified with a company

*C*  that their state of mind will be attributed to it does not admit of a single answer.  The leading modern case is *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500.  The primary rule of attribution is that a company must necessarily have attributed to it the state of mind of its directing organ under its constitution, i e the board of directors acting as such or for some purposes the general body of shareholders.  Lord

*D*  Hoffmann, delivering the advice of the Privy Council, observed that the primary rule of attribution together with the principles of agency and vicarious liability would ordinarily suffice to determine the company's rights and obligations.  However, they would not suffice where the relevant rule of law required that some state of mind should be that of the company itself. He explained, at p 507:

*E*    "This will be the case when a rule of law, either expressly or by implication, excludes attribution on the basis of the general principles of agency or vicarious liability.  For example, a rule may be stated in language primarily applicable to a natural person and require some act or state of mind on the part of that person 'himself', as opposed to his servants or agents.  This is generally true of rules of the criminal law, which ordinarily impose liability only for the actus reus and mens rea of

*F*    the defendant himself."

The directing organ of the company may expressly or implicitly have delegated the entire conduct of its business to the relevant agent, who is actually although not constitutionally its "directing mind and will" for all purposes.  This was the situation in the case where the expression "directing mind and will" was first coined, *Lennard's Carrying Co Ltd v Asiatic*

*G*  *Petroleum Co Ltd* [1915] AC 705.  Such a person in practice stands in the same position as the board.  The special insight of Lord Hoffmann, echoing the language of Lord Reid in *Tesco Supermarkets Ltd v Nattrass* [1972] AC 153, 170, was to perceive that the attribution of the state of mind of an agent to a corporate principal may also be appropriate where the agent is the directing mind and will of the company for the purpose of performing the

*H*  particular function in question, without necessarily being its directing mind and will for other purposes [1995] 2 AC 500, 507:

    "This is always a matter of interpretation: given that it was intended to apply to a company, how was it intended to apply?  Whose act (or knowledge, or state of mind) was *for this purpose* intended to count as

© 2016 The Incorporated Council of Law Reporting for England and Wales

the act etc of the company? One finds the answer to this question by  *A*
applying the usual canons of interpretation, taking into account the
language of the rule (if it is a statute) and its content and policy." (And
see pp 509–511.)

68 A modern illustration of the attribution of knowledge to a company
on the basis that its agent was its directing mind and will for all purposes is
*Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, where the Privy  *B*
Council was concerned with the knowledge required to make a company
liable as a constructive trustee on the footing of knowing assistance in a
dishonest breach of trust. The defendants were a one-man company, BLT,
and the one man, Mr Tan. At pp 392–393, Lord Nicholls of Birkenhead,
delivering the advice of the Board, observed that Mr Tan had known the
relevant facts and was therefore liable. "By the same token, and for good  *C*
measure, BLT also acted dishonestly. [Mr Tan] was the company, and his
state of mind is to be imputed to the company." On the other hand, *El Ajou
v Dollar Land Holdings plc* [1994] 2 All ER 685 did not concern a one-man
company. The issue was whether knowledge of the origin of funds received
for investment by Dollar Land Holdings, a public company, could be
imputed to it so as to found a liability to account as a constructive trustee on
the footing of knowing receipt. Lord Hoffmann, delivering the leading  *D*
judgment of the Court of Appeal and applying the principles which he would
later explain in *Meridian Global*, held that the company was fixed with the
knowledge of one Mr Ferdman, its part-time chairman and a non-executive
director, because he had acted as its directing mind and will for the
particular purpose of arranging its receipt of the tainted funds.

69 These refinements can give rise to nice questions of fact. But their  *E*
application in a case like the present one is perfectly straightforward. On the
pleaded facts, Mr Chopra and Mr Nazir were the directing organ of Bilta
under its constitution. They constituted the board. Mr Chopra was also the
sole shareholder. As between Bilta and Jetivia it is common ground on the
pleadings that they were the "directing mind and will" of Bilta for all
purposes, and certainly in relation to those of its functions which are
relevant in these proceedings.  *F*

70 The search for a test of a company's direct or "personal" liability has
sometimes been criticised as a distraction or an artificial anthropomorphism,
and it is certainly true that English law might have developed along other
lines. As it is, the distinction between a liability which is direct or "personal"
and one which is merely vicarious is firmly embedded in our law and has had
a considerable influence on the way it has developed in relation to both kinds
of liability. Vicarious liability does not involve any attribution of  *G*
wrongdoing to the principal. It is merely a rule of law under which a
principal may be held strictly liable for the wrongdoing of someone else.
This is one reason why the law has been able to impose it as broadly as it has.
It extends far more widely than responsibility under the law of agency: to all
acts done within the course of the agent's employment, however humble and
remote he may be from the decision-making process, and even if his acts are  *H*
unknown to the principal, unauthorised by him and adverse to his interest or
contrary to his express instructions (*Lloyd v Grace Smith & Co* [1912] AC
716), indeed even if they are criminal (*Lister v Hesley Hall Ltd* [2002] 1 AC
215). Personal or direct liability, on the other hand, has always been

© 2016 The Incorporated Council of Law Reporting for England and Wales

29

[2016] AC                                 Bilta (UK) Ltd v Nazir (No 2) (SC(E))
                                          Lord Sumption JSC

A  fundamental to the application of rules of law which are founded on
   culpability as opposed to mere liability. One example, as Lord Hoffmann
   pointed out in *Meridian Global*, is provided by the rules governing criminal
   responsibility, which do not usually recognise vicarious responsibility.
   Another is the class of statutory provisions dependent on a company's
   personal misconduct, such as a shipowner's right to limit his liability for a
B  loss which is not attributable to his "personal act or omission": see article 4
   of the Convention on Limitation of Liability for Maritime Claims (1976)
   (Merchant Shipping Act 1995, Schedule 7, Part I), a principle derived from
   the 19th century Merchant Shipping Acts of the United Kingdom. A third
   example is provided by the illegality defence, which the House of Lords held
   in *Stone & Rolls v Moore Stephens* [2009] AC 1391 to apply only to direct
   and not to vicarious responsibility. It is, for example, the reason why public
C  policy precludes recovery under a liability policy in respect of a criminal act
   where the insured's liability is personal or direct, but not where it is purely
   vicarious: *Lancashire County Council v Municipal Mutual Insurance Ltd*
   [1997] QB 897, 907. As cases like this illustrate, if the illegality defence
   were to be engaged merely by proof of a purely vicarious liability, it would
   apply irrespective of any question of attribution, to any case in which the
   human wrongdoer was acting within the scope of his employment. This
D  would extend the scope of the defence far more widely than anything
   warranted by the demands of justice or the principle stated by Lord
   Mansfield CJ. On the footing that the attribution of culpability is essential
   to the defence, the concept of a "directing mind and will" remains valuable.
   It describes a person who can be identified with the company either generally
   or for the relevant purpose, as distinct from one for whose acts the company
E  is merely vicariously liable.

   *The exception: breach of the agent's duty to the company*

   71   Bilta's answer to this, which was accepted by both the judge and the
   Court of Appeal, is that the dishonesty of Mr Chopra and Mr Nazir is not to
   be attributed to Bilta, because in an action for breach of duty against the
F  directors there cannot be attributed to the company a fraud which is being
   practised against it by its agent, even if it is being practised by a person
   whose acts and state of mind would be attributable to it in other contexts. It
   is common ground that there is such a principle. It is commonly referred to
   as the fraud exception, but it is not limited to fraud. It applies in certain
   circumstances to prevent the attribution to a principal of his agent's
   knowledge of his own breach of duty even when the breach falls short of
G  dishonesty. In the context of the illegality defence, which is mainly
   concerned with dishonest or criminal acts, this exception from normal rules
   of attribution will normally arise when it is sought to attribute to a principal
   knowledge of his agent's fraud or crime but that is not inherent in the
   underlying principle. I shall call it the "breach of duty exception".

   72   The breach of duty exception is commonly referred to as the
   *Hampshire Land* principle, after the judgment of Vaughan Williams J in
H  *In re Hampshire Land Co* [1896] 2 Ch 743. This case did not involve any
   allegation of fraud. The facts were that the Hampshire Land Company had
   borrowed money from a building society. The borrowing required the
   authority of the shareholders in general meeting, but their authority,
   although it was given, was vitiated by defects in the notice by which it was

© 2016 The Incorporated Council of Law Reporting for England and Wales

30
Bilta (UK) Ltd v Nazir (No 2) (SC(E))                                      [2016] AC
Lord Sumption JSC

summoned. The issue was whether a building society was affected by notice    A
of the irregularity so as to be prevented from relying on the internal
management rule. The contention was that the building society was on
notice because its secretary happened also to be the secretary of the
borrower, and in the latter capacity he knew the facts. In the course of
discussing that question, the judge observed, at p 749:

"if Wills had been guilty of a fraud, the personal knowledge of Wills of    B
the fraud that he had committed on the company would not have been
knowledge of the society of the facts constituting that fraud; because
common sense at once leads one to the conclusion that it would be
impossible to infer that the duty, either of giving or receiving notice, will
be fulfilled where the common agent is himself guilty of fraud."

73   Vaughan Williams J's dictum was subsequently adopted by two    C
members of the House of Lords in *JC Houghton & Co v Nothard Lowe &
Wills* [1928] AC 1, where the issue was whether a company was bound by an
arrangement adverse to the company's interest which had been made by two
of its directors for their own benefit and was never approved by the board. It
was contended that the knowledge of the two directors could be attributed
to the company so as to found a case of acquiescence. Viscount Dunedin (at    D
p 14) summarily rejected the suggestion that the company could be treated
as knowing about a director's breach of duty by virtue only of the knowledge
of the defaulting director himself:

"My Lords, there can obviously be no acquiescence without
knowledge of the fact as to which acquiescence is said to have taken
place. The person who is sought to be estopped is here a company, an    E
abstract conception, not a being who has eyes and ears. The knowledge
of the company can only be the knowledge of persons who are entitled to
represent the company. It may be assumed that the knowledge of
directors is in ordinary circumstances the knowledge of the company.
The knowledge of a mere official like the secretary would only be the
knowledge of the company if the thing of which knowledge is predicated
was a thing within the ordinary domain of the secretary's duties. But    F
what if the knowledge of the director is the knowledge of a director who
is himself particeps criminis, that is, if the knowledge of an infringement
of the right of the company is only brought home to the man who himself
was the artificer of such infringement? Common sense suggests the
answer, but authority is not wanting."

He then cited the dictum of Vaughan Williams J. Viscount Sumner agreed,    G
observing (p 19) that it would be "contrary to justice and common sense to
treat the knowledge of such persons as that of their company, as if one were
to assume that they would make a clean breast of their delinquency".

74   These dicta are concerned only with the attribution of knowledge.
The argument which they reject is that there is no breach of duty because the
company must be deemed to know the facts and therefore cannot be misled
or must be supposed to have consented. They are not concerned with the    H
ambit of the illegality defence or the breach of duty exception to it. For the
first full consideration of the exception, one must move forward seven
decades to the decision of the Court of Appeal in *Belmont Finance Corpn
Ltd v Williams Furniture Ltd* [1979] Ch 250, which is the starting point for

© 2016 The Incorporated Council of Law Reporting for England and Wales

A  the modern law. That case arose out of an elaborate scheme, to which
Belmont's directors were party, to extract value from Belmont by causing it
to buy the shares of a company called Maximum at a considerable
overvalue. This was a breach of the fiduciary duties of the directors. Their
object was to recycle the profit on the sale of Maximum so that it could be
used to fund the purchase by three companies associated with the directors
B  of Belmont's own shares. This was not only a breach of the directors'
fiduciary duty but a criminal contravention of what was then section 54 of
the Companies Act 1948. Belmont subsequently went into liquidation, and
an action was brought in its name by receivers for damages for breach of
duty against the directors who had authorised the transaction, and for an
account on the footing of knowing receipt against the three companies. The
plaintiff was met by the illegality defence. The judge dismissed the action at
C  the close of the plaintiff's case on that ground, holding that the company was
a party to the conspiracy. This was because it must be taken to have known,
through its directors, that the asset was over-valued and that the purpose of
the transaction was to fund the purchase of Belmont's shares. Reversing the
judge, Buckley LJ said, at pp 261–262:

D      "But in my view such knowledge should not be imputed to the
company, for the essence of the arrangement was to deprive the company
improperly of a large part of its assets. As I have said, the company was a
victim of the conspiracy. I think it would be irrational to treat the
directors, who were allegedly parties to the conspiracy, notionally as
having transmitted this knowledge to the company; and indeed it is a
well-recognised exception from the general rule that a principal is affected
E      by notice received by his agent that, if the agent is acting in fraud of his
principal and the matter of which he has notice is relevant to the fraud,
that knowledge is not to be imputed to the principal. So in my opinion the
plaintiff company should not be regarded as a party to the conspiracy, on
the ground of lack of the necessary guilty knowledge."

75  In *Attorney General's Reference (No 2 of 1982)* [1984] QB 624 two
F  men were charged with theft from a company which they wholly owned and
controlled. The issue was whether, for the purpose of section 2(1)(b) of the
Theft Act 1968, they had appropriated the property of another "in the belief
that [they] would have the other's consent if the other knew of the
appropriation and the circumstances of it". The argument was that they
must have had that belief because the company had no other will than theirs,
so that it must be taken to consent to whatever they consented to. This
G  argument had been accepted by the trial judge but it failed in the Court of
Appeal for two reasons. One turned on the construction of the Theft Act
and is of no present relevance. The other was that the decision in *Belmont
Finance* "directly contradicts the basis of the defendants' argument in the
present case. There can be no reason, in our view, why the position in the
criminal law should be any different".

H  76  In *Brink's-Mat Ltd v Noye* [1991] 1 Bank LR 68, gold had been
stolen from Brink's Mat's warehouse and delivered to a company called
Scadlynn to be melted down, recast and sold. The directors and sole
shareholders of Scadlynn, who were well aware that the gold was stolen,
caused the proceeds to be paid into the company's bank account and then
paid away, thus leaving it without assets to meet its liabilities to Brink's Mat.

© 2016 The Incorporated Council of Law Reporting for England and Wales

The appeal arose out of an application by Brink's Mat to amend the    A
pleadings so as to add a number of claims against the bank. The proposed
amendments proceeded on the basis that since the payments into Scadlynn's
bank account represented property to which Brink's Mat was beneficially
entitled, it was entitled to enforce Scadlynn's rights against the bank. It was
alleged that the bank was liable to Scadlynn as a constructive trustee on the
footing of knowing receipt and that Brink's Mat was entitled to enforce that    B
liability for its own benefit. One of the issues which arose was whether
Scadlynn would have been precluded from advancing a claim against the
bank because it had known (through its directors) about the origin of the
gold. Mustill LJ, rejecting this argument, considered that

"the corporate entity named Scadlynn was, however odd the notion
may seem at first sight, the victim of wrongful arrangements to deprive it    C
improperly of a large part of its assets": p 72.

Nicholls LJ, agreeing, observed (p 73):

"On the facts alleged in the proposed amendments, Scadlynn was at all
material times being used by Chappell and Palmer and others for a
fraudulent purpose, viz, to realize the proceeds of sale of the robbery. But
the plaintiff was not implicated in any such fraudulent purpose. On the    D
contrary, along with the owners of the gold, the plaintiff was the intended
victim of the scheme. Likewise, Scadlynn itself was an intended victim, in
that Scadlynn was being used as a vehicle for committing a fraud on its
creditors and a fraud on those beneficially interested in property held by
Scadlynn. In those circumstances the fraudulent purposes of those
controlling Scadlynn are not to be imputed to the company itself: see    E
*Belmont Finance Corpn Ltd v Williams Furniture Ltd* [1979] Ch 250, per
Buckley LJ, at pp 261–262."

77  *Arab Bank plc v Zurich Insurance Co* [1999] 1 Lloyd's Rep 262 was
a decision of Rix J arising out of a claim under the Third Parties (Rights
against Insurers) Act 1930 against the liability insurer of a valuer. The
valuer was alleged to have issued fraudulent valuations to induce banks    F
to lend money to third parties. The valuations had been issued by a
Mr Browne, who was the managing director and also a personal assured.
The insurer defended the claim on the ground that the company was not
entitled to indemnity under the policy because Browne's dishonesty was
attributable to it by virtue of his knowledge. Rix J thought that Browne
would on ordinary principles of attribution have been treated as the
directing mind and will of the valuer for the relevant purpose (pp 278–279).    G
But he rejected the illegality defence because it was inconsistent with the
terms of the contract of insurance under which Mr Browne and the company
were separately insured each for his own interest (pp 272–273). It followed
that only Mr Browne would be precluded from recovering. The attribution
of his knowledge to the company would be contrary to the agreement to
insure their interests separately. The company's liability was therefore
purely vicarious. Having made these points, Rix J dealt briefly (and obiter)    H
at pp 282–283 with the question of attribution. He said that although
Browne's valuations were frauds on the lending banks, the valuer itself
should be treated as a "secondary victim", first because Browne's frauds
exposed it to liability to the banks, and secondly because Browne's conduct

© 2016 The Incorporated Council of Law Reporting for England and Wales

A  involved "such a breach of duty to [the valuer] as in justice and common
sense must entail that it is impossible to infer that the knowledge of his own
dishonesty was transferred to [the valuer]". He thought that the position
might well be different in the case of a one-man company.

78   *McNicholas Construction Co Ltd v Customs and Excise Comrs*
[2000] STC 553 arose out of a classic VAT fraud against the Customs and
Excise. The fraudsters submitted invoices to McNicholas for VAT in respect
B  of non-existent goods and services. The company's site managers, who were
in league with them, procured the VAT to be paid to them. The VAT was
then reclaimed as input tax from the Customs and Excise. The scheme
inflicted a loss on the Customs & Excise but the net financial effect on the
company was neutral. The Customs & Excise claimed statutory penalties
on the basis that the company's conduct was dishonest. This case was
C  simply about attribution.     The illegality defence did not arise, for
McNicholas was claiming nothing. Dyson J held that as a matter of
construction the statute implicitly fixed the company with the knowledge of
those of its employees who handled its VAT payments, including the site
managers. The company argued that knowledge of the fraud should
nevertheless not be imputed to it because it was a victim of the fraud, which
D  exposed it to statutory penalties. Rejecting this argument (at paras 55–56),
the judge said:

     "55. In my judgment, the tribunal correctly concluded that there
should be attribution in the present case, since the company could not
sensibly be regarded as a victim of the fraud. They were right to hold that
the fraud was 'neutral' from the company's point of view.       The
E  circumstances in which the exception to the general rule of attribution
will apply are where the person whose acts it is sought to impute to the
company knows or believes that his acts are detrimental to the interests of
the company in a material respect . . . It follows that, in judging whether
a company is to be regarded as the victim of the acts of a person, one
should consider the effect of the acts themselves, and not what the
position would be if those acts eventually prove to be ineffective. As the
F  tribunal pointed out, in *In re Supply of Ready Mixed Concrete (No 2)*
[1995] 1 AC 456 the company suffered a large fine for contempt of court
on account of the wrongful acts of its managers. The fact that their
wrongful acts caused the company to suffer a financial penalty in this way
did not prevent the acts and knowledge of the managers from being
attributed to it.

G      "56. The [breach of duty exception] is founded in common sense and
justice. It is obvious good sense and justice that the act of an employee
should not be attributed to the employer company if in truth, the act is
directed at, and harmful to, the interests of the company. In the present
case, the fraud was not aimed at the company. It was not intended by the
participants in the fraud that the interests of the company should be
harmed by their conduct."

H  The Court of Appeal approved this reasoning in rejecting a somewhat
similar argument in *In re Bank of Credit and Commerce International SA
(No 15); Morris v Bank of India* [2005] BCC 739. The facts of this case,
baldly summarised, were that BCCI had placed deposits with Bank of India
on unusual terms as part of a scheme to window-dress its accounts at the

© 2016 The Incorporated Council of Law Reporting for England and Wales

34
**Bilta (UK) Ltd v Nazir (No 2) (SC(E))**                                    [2016] AC
**Lord Sumption JSC**

A
year-end. The liquidators of BCCI brought proceedings against Bank of
India under section 213 of the Insolvency Act 1986 on the ground that it had
been knowingly party to the carrying on of business by BCCI with intent to
defraud. The judge found that the general manager of the Bank of India had
deliberately turned a blind eye to what was going on, and that his knowledge
was attributable to the bank. The bank advanced an argument somewhat
similar to that which had been advanced by McNicholas before Dyson J.
The Court of Appeal rejected it for the same reason, namely that the general
manager's acts were not targeted at Bank of India: see paras 114–118.

B

79   This was the state of the authorities when *Stone & Rolls v Moore
Stephens* [2009] AC 1391 came before the courts. Stone & Rolls was a
company created solely for the purpose of defrauding banks. It never did
anything else. The author of the frauds was a Mr Stojevic, its sole director,
manager and shareholder. The action was brought by the company at the
instance of its liquidators against the auditors on the basis that if they had
exercised due skill and care, they would have discovered that the company
had no legitimate business. The course of frauds against the bank would
then have ceased earlier than it actually did. They claimed the losses said to
have been incurred as the direct result of the company's course of fraudulent
behaviour continuing for longer than it would otherwise have done. The
House of Lords held that the illegality defence applied and upheld the order
of the Court of Appeal striking out the proceedings. It is a difficult case to
analyse, because it was decided by a majority comprising Lord Phillips, Lord
Walker and Lord Brown and there are significant differences between the
reasoning of Lord Walker (with whom Lord Brown agreed) and Lord
Phillips. But the fact that they differed on critical points does not undermine
the authority of their speeches on those points on which they were agreed.

C

D

E

80   Lord Phillips and Lord Walker were agreed on three points for which
the case is accordingly authority. The first was that the illegality defence is
available against a company only where it was directly, as opposed to
vicariously, responsible for it: see Lord Phillips, at paras 27–28. Lord
Walker refers to this at paras 132–133 and must have taken the same view,
for if vicarious liability was enough to engage the illegality defence the
attribution of Mr Stojevic's knowledge to the company (with which the
whole of the rest of his speech is concerned) would have been irrelevant.
This is because the company was vicariously liable for Mr Stojevic's defaults
whether or not it was treated as privy to them. Secondly, the majority was
agreed in rejecting the primary argument of the auditors that once it was
shown that the directing mind and will of a company (whether generally or
for the relevant purpose) had caused it to defraud a third party and that the
company was relying on that fraud to found its cause of action, the illegality
defence necessarily barred the claim. Both Lord Phillips (para 63) and Lord
Walker (para 173) rejected this submission as too broad, because it would
involve the attribution of the agent's dishonesty to the company even if there
were innocent directors or shareholders.   Accordingly, both of them
regarded it as critical that Stone & Rolls was a "one-man company", i e a
company in which, whether there was one or more than one controller, there
were no innocent directors or shareholders. Third, Lord Phillips and Lord
Walker were agreed that, as between a "one-man" company and a third
party, the latter could raise the illegality defence on account of the agent's
dishonesty, at any rate where it was not itself involved in the dishonesty.

F

G

H

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   81   There are difficulties about treating *Stone & Rolls* as authority for
any wider principles than these.  There are two main reasons for this.  The
first is that Lord Phillips and Lord Walker differed in their reasons for
holding that the illegality defence could be taken against a one-man
company.  Lord Walker adopted the "sole actor" principle, a label which he
derived from the case law of the United States, but which he supported by
B   reference to ordinary principles of English company law.  Lord Phillips on
the other hand was guided by the principle that a loss is recoverable only if
the relevant duty was to protect against loss of that kind: *Banque Bruxelles
Lambert SA v Eagle Star Insurance Co Ltd* [1997] AC 191.  He regarded this
as expressing a rule of policy, which led him to conclude that Mr Stojevic
constituted the entire constituency whose interests the auditors were bound
to protect.  It followed in his opinion that there was no reason not to
C   attribute his state of mind to the company for the purposes of the illegality
defence.  The second reason is that Lord Phillips's view that it was no part of
the purpose of an audit report to protect the interests of current or
prospective creditors was peculiarly his own.  Although Lord Walker agreed
with it (see para 168), the proposition was not part of his reasoning on
the impact of illegality.  This has proved more controversial than any other
feature of the reasoning in the case: see, for example, Eilis Ferran,
D   "Corporate Attribution and the Directing Mind and Will" (2011) 127 LQR
239, paras 251–257.  The scope of an auditor's duty and its relationship to
the illegality defence may one day need to be revisited by this court, but it is
not an issue in this appeal.

*Application to claims by the company against the defaulting agent*

E   82   The real issue in the present case is a different one.  Does the illegality
defence bar a claim by the company against the dishonest agent who
procured the fraud, in the same way as it bars a claim by the company
against an honest outsider who is said to be liable to indemnify them?  In
*Stone & Rolls* the question whether the illegality defence would have been
available to Mr Stojevic to defeat an action by the company did not arise
directly, but it was considered by every member of the committee.  Lord
F   Phillips did not express a concluded view.  Lord Walker presumably thought
that the company could not have sued Mr Stojevic, since he regarded them as
co-conspirators and likened their case to an action for an action between
highwaymen (paras 187–188).  Lord Scott of Foscote and Lord Mance
thought that Mr Stojevic could not have raised the defence against the
company.  Since then the position as between the company and its dishonest
G   agent has reached the Court of Appeal twice, in *Safeway Stores Ltd v
Twigger* [2011] Bus LR 1629, where the illegality defence succeeded, and in
the present case where it failed.  The same question was considered,
although it did not arise directly, by the Court of Final Appeal of Hong Kong
in *Moulin Global Eyecare Trading Ltd v Inland Revenue Comr* (2014) 17
HKCFAR 218 (decided on 13 March 2014), in which Lord Walker NPJ gave
the leading judgment.
H   83   *Safeway Stores* was an action against a number of directors and
senior employees of a supermarket group who by exchanging pricing
information with competitors had caused the company to contravene
section 2 of the Competition Act 1998.  Under section 36 of the Act, the
company became liable to a penalty, provided that the OFT was satisfied

Bilta (UK) Ltd v Nazir (No 2) (SC(E))                                    [2016] AC
Lord Sumption JSC

that it had committed the infringement "intentionally or negligently".    A
Safeway was not a one-man company, but the statutory scheme had the
peculiarity, which was critical to the reasoning of the Court of Appeal, that
the offence was not capable of being committed by the individuals directly
responsible. The Act imposed the prohibition and the resulting penalty only
on the company. It was held that this required the attribution of the
infringement to the company and its non-attribution to the defendants. On    B
that ground, it was held that to apply the breach of duty exception so as to
allow recovery of the penalty from the defendants would be inconsistent
with the statutory scheme. The decision is not authority for any proposition
applying more generally.

84    In the present case, the Court of Appeal dealt with the question as a
matter of general principle and reached a different conclusion. Patten LJ,
delivering the leading judgment, considered that the answer depended on the    C
duty which was sought to be enforced and the parties between whom the
issue was raised. In an action against the company by a third party who had
been defrauded, the company was responsible. But it did not follow that the
company was to be treated as responsible for a fraud for the purposes of an
action against the dishonest director. In such an action, the illegality defence
cannot be available, whether the damages claimed arose from the liability    D
which the company was caused to incur to a third party or from the direct
abstraction of the company's assets. Patten LJ's reasoning on these points is
encapsulated in paras 34–35 of his judgment:

"34. . . . attribution of the conduct of an agent so as to create a
personal liability on the part of the company depends very much on the
context in which the issue arises. In what I propose to refer to as the    E
liability cases like *El Ajou, Tan, McNicholas* and *Morris,* reliance on
the consequences to the company of attributing to it the conduct of its
managers or directors is not enough to prevent attribution because, as
Mummery LJ pointed out, it would prevent liability ever being imposed.
As between the company and the defrauded third party, the former is not
to be treated as a victim of the wrongdoing on which the third party sues
but one of the perpetrators. The consequences of liability are therefore    F
insufficient to prevent the actions of the agent being treated as those of the
company. The interests of the third party who is the intended victim of
the unlawful conduct take priority over the loss which the company will
suffer through the actions of its own directors.

"35. But, in a different context, the position of the company as victim
ought to be paramount. Although the loss caused to the company by its    G
director's conduct will be no answer to the claim against the company by
the injured third party, it will and ought to have very different
consequences when the company seeks to recover from the director the
loss which it has suffered through his actions. In such cases the company
will itself be seeking compensation by an award of damages or equitable
compensation for a breach of the fiduciary duty which the director or
agent owes to the company. As between it and the director, it is the victim    H
of a legal wrong. To allow the defendant to defeat that claim by seeking
to attribute to the company the unlawful conduct for which he is
responsible so as to make it the company's own conduct as well would be
to allow the defaulting director to rely on his own breach of duty to defeat

© 2016 The Incorporated Council of Law Reporting for England and Wales

A     the operation of the provisions of sections 172 and 239 of the Companies Act whose very purpose is to protect the company against unlawful breaches of duty of this kind. For this purpose and (it should be stressed) in this context, it ought therefore not to matter whether the loss which the company seeks to recover arises out of the fraudulent conduct of its directors towards a third party (as in *McNicholas* and *Morris*) or out of

B     fraudulent conduct directed at the company itself which Sir Andrew Morritt C accepted was what is alleged in the present case. There is a breach of fiduciary duty towards the company in both cases."

    Patten LJ declined to apply the sole actor principle for two reasons. First, he considered that it had no place in the context of a claim by the company against the fraudulent director, because it would be inconsistent with the

C     duty of the directors to have regard to the interests of creditors and to the statutory restrictions on the ratification of breaches of the duty of directors. Secondly, he regarded it as having the support of only Lord Walker and Lord Brown in *Stone & Rolls* and did not accept that it was "now an established feature of English law for all purposes".

    **85** *Moulin Global Eyecare Trading Ltd* was an application for judicial review of the decision of the Hong Kong Commissioner of Inland Revenue to

D     reject a claim by Moulin for the repayment of tax overpaid in a previous years of assessment. Repayment had been claimed on the ground that the company's profits for the reference year had been fraudulently inflated by certain of its then directors. The commissioner contended that no repayment could be claimed because the dishonesty of the directors was attributable to the company. In the Court of Final Appeal the claim failed

E     because neither of the two provisions of the Inland Revenue Ordinance relied on applied as a matter of construction. For present purposes, the relevant provision was section 70A which provided for the reopening of an assessment on the ground of "error". Lord Walker NPJ, with whom the majority of the court agreed, held that there was no error because for the purpose of preparing the company's tax returns, its directing mind and will

F     consisted of the two directors who knew the facts and had deliberately falsified them. Their dishonesty was therefore to be attributed to the company. "A deliberate lie is not an 'error' for the purposes of that section." Lord Walker NPJ considered that the ordinary rules of attribution should apply unless the breach of duty exception was engaged. He resiled from the view that he had expressed in *Stone & Rolls* (at para 145) that the fraud exception applied generally to any issue as to a company's notice,

G     knowledge or complicity. Reviewing the authorities in the light of the Court of Appeal's decision in the present case, he concluded that the breach of duty exception was in fact of limited application. Its rationale was to prevent the illegality defence from barring a claim by a company against its own agents. He summarised the proper scope of the exception as follows, in para 80:

H     "The situation to which it most squarely applies (and some would say, the only situation to which it should properly be applied) is where a director or senior employee of a company seeks to rely on his own knowledge of his own fraud against the company as a defence to a claim by the company against him (or accomplices of his) for compensation for the loss inflicted by his fraud. The injustice and absurdity of such a

© 2016 The Incorporated Council of Law Reporting for England and Wales

38
**Bilta (UK) Ltd v Nazir (No 2) (SC(E))**                                    [2016] AC
**Lord Sumption JSC**

defence is obvious, and for more than a century judges have had no    A
hesitation in rejecting it."

It is clear that Lord Walker NPJ numbered himself among the "some" who
would say that this was the only situation in which the fraud exception
should properly be applied. At para 106(4) of his summary, he said:

    "The underlying rationale of the fraud exception is to avoid the
injustice and absurdity of directors or employees relying on their own    B
awareness of their own wrongdoing as a defence to a claim against them
by their own corporate employer."

And at para 106(6):

    "But the exception does not apply to protect a company where the
issue is whether the company is liable to a third party for the dishonest    C
conduct of a director or employee."

86    The problem posed by the authorities is that until the Court of
Appeal's decision in this case, they have generally treated the imputation of
dishonesty to a company as being governed by tests dependent primarily on
the nature of the company's relationship with the dishonest agent, the result
of which is then applied universally. This was the point made by Lord    D
Walker in *Stone & Rolls* at para 145, from which he resiled in *Moulin*. The
fundamental point made by the Court of Appeal in this case and the Court of
Final Appeal in *Moulin* is that, while the basic rules of attribution may apply
regardless of the nature of the claim or the parties involved, the breach of
duty exception does not. I agree with this. It reflects the fact that the rules of
attribution are derived from the law of agency, whereas the fraud exception,    E
like the illegality defence which it qualifies, is a rule of public policy. Viewed
as a question of public policy, there is a fundamental difference between the
case of an agent relying on his own dishonest performance of his agency to
defeat a claim by his principal for his breach of duty; and that of a third party
who is not privy to the fraud but is sued for negligently failing to prevent the
principal from committing it.

87    There are three situations in which the question of attribution may    F
arise. First, a third party may sue the company for a wrong such as fraud
which involves a mental element. Secondly, the company may sue either its
directors for the breach of duty involved in causing it to commit that fraud,
or third parties acting in concert with them, or (as in the present case) both.
Third, the company may sue a third party who was not involved in the
directors' breach of duty for an indemnity against its consequences.    G

88    In the first situation, the illegality defence does not arise. The
company has no claim which could be barred, but is responding to a claim
by the third party. It will be vicariously liable for any act within the course
of the relevant agent's employment, and in the great majority of cases no
question will arise of attributing the wrong, as opposed to the liability, to the
company. Where the law requires as a condition of liability that that the    H
company should be personally culpable, as Lord Nicholls appears to have
assumed it did in *Royal Brunei Airlines*, the sole function of attribution is to
fix the company with the state of mind of certain classes of its agents for the
purpose of making it liable. The same is true in cases like *McNicholas*,
involving statutory civil penalties for quasi-criminal acts. It is also true of

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   cases like *El Ajou* where the relevant act (receipt of the money) was unquestionably done by the company but the law required as a condition of liability that it should have been done with knowledge of some matter. This will commonly be the case with proprietary claims, where vicarious liability is irrelevant.

89   A claim by a company against its directors, on the other hand, is the paradigm case for the application of the breach of duty exception. An agent
B   owes fiduciary duties to his principal, which in the case of a director are statutory. It would be a remarkable paradox if the mere breach of those duties by doing an illegal act adverse to the company's interest was enough to make the duty unenforceable at the suit of the company to whom it is owed. The reason why it is wrong is that the theory which identifies the state of mind of the company with that of its controlling directors cannot apply
C   when the issue is whether those directors are liable to the company. The duty of which they are in breach exists for the protection of the company against the directors. The nature of the issue is therefore itself such as to prevent identification. In that situation it is in reality the dishonest directors who are relying on their own dishonesty to found a defence. The company's culpability is wholly derived from them, which is the very matter of which complaint is made.
D   90   This would be obvious if the company were suing the agent for a criminal or dishonest act committed against it where there was no third party involved: for example where the agent had embezzled the company's funds and made off with them. This was the situation before the Court of Appeal in *Attorney General's Reference (No 2 of 1982)* [1984] QB 624, when the notion of attribution and the inference of consent were alike
E   rejected. The position would have been no different if consent had been more than an inference, for example because the fraudsters had procured the company's express consent in their capacity as its sole directors or shareholders: see *Prest v Prest* [2013] 2 AC 415, 491. As Lord Browne-Wilkinson put it in *R v Gomez* [1993] AC 442, 497,

F   "it would offend both common sense and justice to hold that the very control which enables such people to extract the company's assets constitutes a defence to a charge of theft from the company. The question in each case must be whether the extraction of the property from the company was dishonest, not whether the alleged thief has consented to his own wrongdoing."

Where the directors simply embezzle the company's funds the question of
G   attribution arises but the illegality defence does not. There is no wrongdoing by the company. But the analysis would be precisely the same if there were. This was the position in *Belmont Finance Ltd v Williams Furniture Ltd* [1979] Ch 250, where the directors' scheme for abstracting the company's assets necessarily involved a criminal contravention by the company of the Companies Act 1948. The Court of Appeal declined to attribute knowledge of the conspiracy to the company so as to make it party to the scheme. This
H   was because the company's claim was against the directors who had authorised the transaction. They could not raise the illegality defence by fixing the company with knowledge of their own plans, for the same reason that the defendants in *Attorney General's Reference (No 2 of 1982)* could not raise the defence of consent on that basis. This is so whether the

© 2016 The Incorporated Council of Law Reporting for England and Wales

company is a one-man company or not, because the objection to the     *A*
attribution of the culpable directors' state of mind to the company is that
they are being sued for abusing their powers. It is the same objection
whether they were one, some or all of the directors and whether or not they
were also shareholders. In *Belmont Finance Corpn Ltd v Williams Furniture
Ltd (No 2)* [1980] 1 All ER 393, 398, it was held on appeal from the
judgment after trial that the directors' knowledge was not to be attributed to     *B*
Belmont although the transaction was formally approved by the board and
completed under the company's seal. If the fraudulent agent cannot raise the
defence of illegality in these circumstances, the same must be true of third
parties who are under an ancillary liability for participating in the fraudulent
agent's wrong: co-conspirators, aiders and abetters, knowing assisters and
receivers, and so on. That was the basis on which in *Belmont Finance* it was     *C*
held that the companies who sold the Maximum shares at an overvalue and
acquired Belmont's shares were potentially liable along with the culpable
directors of Belmont.

91 The position is different where the company is suing a third party
who was not involved in the directors' breach of duty for an indemnity
against its consequences. In the first place, the defendant in that case,
although presumably in breach of his own distinct duty, is not seeking to     *D*
attribute his own wrong or state of mind to the company or to rely on his
breach of duty to avoid liability. Secondly, as between the company and the
outside world, there is no principled reason not to identify it with its
directing mind in the ordinary way. For a person, whether natural or
corporate, who is culpable of fraud to say to an innocent but negligent
outsider that he should have stopped him in his dishonest enterprise is as
clear a case for the application of the illegality defence as one could have.     *E*
*Stone & Rolls* was a case of just this kind. Leaving aside the admittedly
important question of the scope of an auditor's duty, if the illegality defence
had not applied in that case, it could only have been because (i) the company
was treated in point of law as a mindless automaton, or (ii) the defence could
never apply to companies even in circumstances where it would have applied
to natural persons. Neither proposition is consistent with established     *F*
principle.

92 The technique of applying the general rules of agency and then an
exception for cases directly founded on a breach of duty to the company is a
valuable tool of analysis, but it is no more than that. Another way of putting
the same point is to treat it as illustrating the broader point made by Lord
Hoffmann in *Meridian Global* that the attribution of legal responsibility for     *G*
the act of an agent depends on the purpose for which attribution is relevant.
Where the purpose of attribution is to apportion responsibility between a
company and its agents so as to determine their rights and liabilities to each
other, the result will not necessarily be the same as it is in a case where the
purpose is to apportion responsibility between the company and a third
party.

93 This makes it unnecessary to address the elusive distinction between     *H*
primary and secondary victimhood. That distinction could arise only if the
application of the breach of duty exception depended on where the loss
ultimately fell, or possibly on where the culpable directors intended it to fall.
If, however, the application of the exception depends on the nature of the

© 2016 The Incorporated Council of Law Reporting for England and Wales

41

A   duty and the parties as between whom the question arises, the only question
is whether the company has suffered any loss at all.

*Application to Bilta*

**94** As between Bilta and its former directors, the present action is
brought to recover compensation for breach of the duties they owed
B   to the company. They are alleged to have broken those duties by causing it
to conduct its business in a manner calculated to prevent it from meeting its
obligation to account to HMRC for VAT. In particular, they are alleged to
have caused the proceeds of the sales to UK purchasers, together with the
VAT charged on them, to be paid out to Jetivia. Those proceeds were either
the property of Bilta (in those cases where they reached Bilta's accounts), or
C   were owed to Bilta (in those cases where they were paid by the UK
purchasers directly to Jetivia). In either case, they represented assets of Bilta.
Since the issue thus stated arises directly between the company and its
directors, the fraud exception applies and the illegality defence cannot lie.
Whether the payment out to Jetivia of funds which may represent the fruits
of the fraud is truly a loss may well be a difficult question, but it is a different
question which will have to be examined in the light of all the facts at a trial.
D   It does not affect the application of the fraud exception.

**95** Jetivia and Mr Brunschweiler are in no different position from the
directors, since the claim against them is that they were party to the
directors' misfeasance. They are said to have participated in the conspiracy
to defraud Bilta, and to have knowingly assisted the directors' breach of
their fiduciary duties. The claim against Jetivia for an account on the footing
E   of knowing receipt is likewise based on an allegation of participation in the
directors' misfeasance, since it is based on that company's knowledge
(through Mr Brunschweiler) that the receipts represented assets of Bilta
which the directors had caused to be paid to Jetivia in breach of their
fiduciary duties.

**96** Before leaving these questions I should briefly refer to two further
arguments of the appellants. The first is that if Jetivia is liable to Bilta for
F   conspiring with Bilta's directors, then Bilta is liable on the same basis to
Jetivia for conspiring with Mr Brunschweiler against Jetivia. The claim
therefore fails for circuity. The Court of Appeal ignored this ingenious and
problematical argument, and I would do so too. The facts which would be
necessary to found it are not agreed or even pleaded. The second argument
is that Bilta has suffered no loss because they had not been deprived of any
G   assets that they had legitimately acquired. In the words of Lord Phillips in
*Stone & Rolls*, at para 5, "if a person starts with nothing and never
legitimately acquires anything, he cannot realistically be said to have
suffered any loss". Lord Walker (para 171) agreed. These observations
were, however, made with reference to the facts of that case, which had been
found in great detail by Toulson J in parallel proceedings between the
defrauded banks and Stone & Rolls. It is not in my opinion appropriate to
H   examine how far they are analogous to the facts of the present case at a stage
of the proceedings when those facts are far from clear.

**97** For these reasons, which substantially correspond to those of the
Court of Appeal and those expressed by Lord Toulson and Lord Hodge JJSC
in the second part of their judgment (on attribution), I would dismiss the

© 2016 The Incorporated Council of Law Reporting for England and Wales

appeal on the illegality defence. So far as that point is concerned, this is
enough to decide the present appeal.                                           *A*

*Policy*

98   I add to my judgment on this point only because Lord Toulson and
Lord Hodge JJSC would also decide the appeal on the ground that the
application of the illegality defence is inconsistent with a statutory policy     *B*
requiring directors to have regard to the interests of the creditors of an
insolvent or prospectively insolvent company. Since I am unwilling to
follow them down that route, I should briefly explain why.

99   Given that the illegality defence is based on public policy, it is
understandable that policy should have been invoked in a number of
academic and judicial analyses of these problems. It is, however, important
to bear in mind the proper role of policy in the law of illegality, for         *C*
arguments based on it can easily degenerate into the kind of discretionary
weighing of the equities which was rejected in *Tinsley v Milligan* and *Les
Laboratoires Servier v Apotex Inc*. The fact that the illegality defence is
based on policy does not entitle a court to reassess the value or relevance of
that policy on a case-by-case basis. In a broad sense, any rule of law which
imposes civil liability in respect of a wrong may be described as a reflection     *D*
of legal policy. It does not follow that the courts may apply the illegality
defence or not according to the relative importance which they attach to the
policy underlying it by comparison with desirability of allowing an
otherwise sound claim to succeed. This was the essential problem about the
reasoning of the Court of Appeal in *Les Laboratoires Servier*, which explains
why this court felt unable to adopt that reasoning while arriving at the same
result.                                                                          *E*

100   The illegality defence is based on the subordination of private rights
and liabilities to certain interests belonging to the public sphere. The
underlying rationale, as I sought to explain in *Les Laboratoires Servier*, at
paras 23 and 25, is that the rights of private parties to remedies in private
law may be overridden if the claims based on them are founded on "acts
which are contrary to the public law of the state and engage the public         *F*
interest". These are acts which engage what in French and other civil law
systems would be categorised as interests belonging to the *ordre public* or, as
a writer has put it, "that part of law that is not at the free disposition of
private individuals": Roel de Lange, "The European Public Order,
Constitutional Principles and Fundamental Rights" [2007] Erasmus Law
Review 3, 11. This is why a judge, as a public officer, may be required to
take a point on illegality of his own motion, contrary to the ordinary          *G*
adversarial practice of the English courts. And it is why ordinary private
wrongs, sounding in tort or contract, do not give rise to the illegality
defence.

101   Courts normally examine the policy rationale of a rule of law in
order to discover what the rule is, not in order to decide whether they
approve of its application in a particular case. The scope for conflict
between competing public policies is therefore limited. It is, however,          *H*
implicit in the reasoning in *Les Laboratoires Servier* that there is one
situation in which an examination of competing policies may be required,
and that is where a competing public policy (as opposed to a competing legal
interest) requires the imposition of civil liability notwithstanding that the

© 2016 The Incorporated Council of Law Reporting for England and Wales

A claim is founded on illegal acts. A good example is a claim for damages for breach of EU or national competition law, which may in certain circumstances succeed notwithstanding that it is founded on a contract or other act which is unlawful: *Courage Ltd v Crehan* (Case C-453/99) [2002] QB 507, paras 34, 36; *Crehan v Inntrepreneur Pub Co CPC* [2004] 2 CLC 803, paras 149–153. This is because the correction by an award of damages of the economic effects of the breach of public competition law is required in order to give effect to its purpose.

B

102    More recently, a somewhat similar question came before this court in a very different context in *Hounga v Allen* [2014] 1 WLR 2889. This was a claim for unlawful discrimination in relation to the claimant's dismissal. Eighteen months before her dismissal, Ms Hounga's employer had conspired with her to bring her into the United Kingdom under a false identity and had arranged for her to receive a visitor's visa for six months. The factual basis on which the appeal was argued was that

C

"by dismissing her Mrs Allen discriminated against Miss Hounga in that on racial grounds, namely on ground of nationality, she treated Miss Hounga less favourably than she would have treated others": see para 3.

D

It was contended that in these circumstances the claim was barred because it was founded on the illegal conspiracy. There was no doubt that the relevant illegality constituted turpitude and no issue about attribution. The question was whether the employee's unlawful entry into the United Kingdom was sufficiently connected to her dismissal. Because Ms Hounga had no right to work in the United Kingdom, her contract of employment was illegal and unenforceable. But she had a distinct cause of action for the statutory tort of discrimination: see paras 24–25. To make good that cause of action Ms Hounga did not rely, and did not need to rely on the circumstances in which she had entered into the United Kingdom, either by way of pleading or by way of evidence. They were in reality no more than background facts. The reliance test, which had been adopted in *Tinsley v Milligan*, is the narrowest test of connection which is consistent with the existence of an illegality test at all, and by that test, Ms Hounga would certainly have been entitled to succeed. But in *Cross v Kirkby* The Times, 5 April 2000; [2000] CA Transcript No 321 the Court of Appeal had suggested a wider test of connection, dependent on whether the illegal act was "inextricably bound up with" the facts on which the cause of action depended even if it was unnecessary to rely on it. This would have substantially extended the range of cases in which the illegality defence could apply. Lord Wilson JSC (with whom Baroness Hale of Richmond DPSC and Lord Kerr of Tonaghmore JSC agreed), regarded the question whether the "inextricable connection" test applied to the facts of that case as the "bigger question": see para 41. He answered it by holding that international conventions against human trafficking required that compensation should be available, so that the "inextricably bound up" test could not be applied in those circumstances. The court was not purporting to depart from *Tinsley v Milligan* without saying so. It simply recognised the case before it as one in which a competing public policy required that damages should be available even to a person who was privy to her own trafficking. Lord Hughes JSC (with whom Lord Carnwath JSC agreed) did not agree with the majority's construction of the

E

F

G

H

© 2016 The Incorporated Council of Law Reporting for England and Wales

relevant conventions, but agreed in the result on the ground that the illegal *A* entry was not sufficiently closely connected with the dismissal. The result was that although the panel disagreed on the effect of the conventions, so far as the law of illegality was concerned, there was no inconsistency between their approaches. On the footing that the conventions required a right of damages to be available, the illegality defence failed on both grounds. The result of *Hounga v Allen* would have been exactly the same even if *B* Ms Hounga had entered the United Kingdom legally or had done so illegally by her own unaided efforts (so that no question of trafficking arose) and the Allens had merely known of and taken advantage of that fact. In its recent decision in *R (Best) v Chief Land Registrar* [2016] QB 23, the Court of Appeal was divided on the significance of *Hounga* although it was able to decide the case without reference to it. Arden LJ expressed some scepticism *C* about its significance as a statement of principle of general application. It will be apparent from what I have said that I have considerable sympathy for her approach.

103    In the present case, Lord Toulson and Lord Hodge JJSC have suggested that such a relevant countervailing public policy may be found in the rule requiring the directors of an actually or potentially insolvent company to have regard to the interests of creditors. I would prefer to leave this question open for two reasons. *D*

104    The first is that it is not by any means clear that the duty of directors to have regard to the interests of creditors does require the imposition of civil liability notwithstanding the illegality defence. It is true that many of the central principles and detailed rules of company law are matters of public policy. They do not simply sound in private law. This is in particular true of those rules which impose duties for the benefit of third parties, such as *E* creditors, who are not party to the contract of incorporation. These rules include rules for the conservation of capital, and for ensuring that companies do not trade while insolvent. More generally, section 172 of the Companies Act 2006, which includes among the general duties of directors a duty to "promote the success of the company for the benefit of its members as a whole", treats the interests of members as corresponding to those of employees, suppliers, customers and, in certain respects the public at large. *F* The common law goes further than this, treating the interests of an actually or prospectively insolvent company as synonymous with those of its creditors: *West Mercia Safetyware v Dodd* [1988] BCLC 250. The duty to have regard to the interests of creditors is not one of the general duties of directors identified in the statute, but the common law duty is preserved by section 172(3) of the Act, notwithstanding the directors' obligation to serve *G* the interests of members. However, it does not follow that the public policy reflected in these principles requires the imposition of civil liability on directors notwithstanding the illegality defence. One reason is that although the general duties of directors have effect notwithstanding any enactment or rule of law, by way of exception to this the company may in principle validly authorise something which would otherwise be a breach of those duties: Companies Act 2006, section 180(4)(5). Another is that the Companies Acts *H* confer on the liquidator of a company in the course of winding up a wide range of statutory powers which enable effect to be given to these principles whether or not an ordinary civil action is available. These include not only provisions for misfeasance proceedings against directors and other officers,

© 2016 The Incorporated Council of Law Reporting for England and Wales

A but provisions for recovering the dissipated assets of insolvent companies from third parties. These points were not fully developed in argument, and I do not think that it is desirable to resolve them on the present appeal. As presently advised, I cannot accept that sections 172 and 180 are a sufficient answer to Jetivia's reliance on the illegality defence.

105 There is, however, a more fundamental reason why I would prefer not to go down this path in the present case, which is that it is unnecessary
B and undesirable. This is a case about attribution. It was approached in that way in both courts below, and that seems to me to be realistic. The problem about the policy argument is that it focuses too narrowly on the status of Mr Chopra and Mr Nazir as directors and on the insolvency of this particular company given the way in which they caused it to carry on business. In my opinion, it is perfectly clear that the illegality defence would
C fail even if these particular features of the facts were not present, just as in Hounga v Allen, the illegality defence would have failed even if Ms Hounga had not been trafficked. The company would be entitled to claim against Mr Chopra and Mr Nazir (and any collaborator of theirs) for their breach of duty to the company even if those gentlemen had not been directors but mere agents who happened to be the company's directing mind and will for the relevant particular purpose. It is equally clear that the company would be
D entitled to claim against them if it were solvent. I am unwilling to decide this case on a basis which invites distinctions between different situations which are irrelevant to the principle that we are applying. I would be extremely reluctant to see the law of illegality revert to the multiplicity of micro-topics and sub-rules which once characterised it. I agree with Lord Toulson and Lord Hodge JJSC that Occam's Razor is a valuable analytical tool, but only
E if it is correctly understood.    Entia non sunt multiplicanda praeter necessitatem. Do not gratuitously multiply your postulates.

*Insolvency Act 1986, section 213*

106 This is a short point and a straightforward one.
107 Section 213 of the Insolvency Act provides:

F    "(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.

"(2) The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such
G contributions (if any) to the company's assets as the court thinks proper."

The appellants' case is that the provision has no extraterritorial effect and therefore no application to Jetivia which is domiciled in Switzerland or Mr Brunschweiler, who is domiciled in France. In effect the submission is that in subsection (2) "any persons" means only persons in the United Kingdom. In my opinion this argument is misconceived.
H    108 Most codes of insolvency law contain provisions empowering the court to make orders setting aside certain classes of transactions which preceded the commencement of the liquidation and may have contributed to the company's insolvency or depleted the insolvent estate. They will usually be accompanied by powers to require those responsible to make good the

© 2016 The Incorporated Council of Law Reporting for England and Wales

loss to the estate for the benefit of creditors.  Such powers have been part of    *A*
the corporate insolvency law of the United Kingdom for many years.  In the
case of a company trading internationally, it is difficult to see how such
provisions can achieve their object if their effect is confined to the United
Kingdom.

109   The English court, when winding up an English company, claims
worldwide jurisdiction over its assets and their proper distribution.  That
jurisdiction is not universally recognised, but it is recognised within the    *B*
European Union by articles 3 and 16 of Council Regulation (EC)
No 1346/2000.  In *Schmid v Hertel* (Case C-328/12) [2014] 1 WLR 633 the
Court of Justice of the European Union considered these articles in the
context of the jurisdiction of the German courts to make orders setting aside
transactions with a bankrupt.  It held not only that articles 3 and 16 applied
to such orders, but that member states must be treated as having power to    *C*
make them notwithstanding any limitations under its domestic law on the
territorial application of its courts' orders.

110   Section 213 is one of a number of discretionary powers conferred
by statute on the English court to require persons to contribute to the
deficiency who have dealt with a company now in liquidation in a manner
which has depleted its assets.  None of them have any express limits on their    *D*
territorial application.  Another such provision, section 238, which deals in
similar terms with preferences and transactions at an undervalue, was held
by the Court of Appeal to apply without territorial limitations in *In re
Paramount Airways Ltd* [1993] Ch 223.  Delivering the leading judgment in
that case, Sir Donald Nicholls V-C observed (i) that current patterns of
cross-border business weaken the presumption against extraterritorial effect
as applied to the exercise of the courts' powers in conducting the liquidation    *E*
of a United Kingdom company; (ii) that the absence in the statute of any test
for what would constitute presence in the United Kingdom makes it unlikely
that presence there was intended to be a condition of the exercise of the
power; and (iii) that the absence of a connection with the United Kingdom
would be a factor in the exercise of the discretion to permit service out of the
proceedings as well in the discretion whether to grant the relief, which was
enough to prevent injustice.  These considerations appear to me, as they did    *F*
to the Chancellor and the Court of Appeal, to be unanswerable and equally
applicable to section 213.

111   I would accordingly dismiss the appeal on this point also.

**LORD TOULSON** and **LORD HODGE JJSC**

112   When the directors of a company involve it in a fraudulent    *G*
transaction, is the company barred by the doctrine of illegality from suing
them and their accessories for losses caused by their breach of fiduciary
duty?  Secondly, does section 213 of the Insolvency Act 1986 ("IA 1986"),
which empowers a liquidator of a company registered in the United
Kingdom to seek financial contributions from persons involved in the
company's fraudulent trading, have extraterritorial effect?  These questions
arise on an appeal by Jetivia SA ("Jetivia") and Mr Brunschweiler against the    *H*
dismissal of their applications for the summary dismissal or striking out of
the claims against them.

113   Bilta (UK) Ltd ("Bilta"), a company incorporated in England, seeks
through its joint liquidators, Mr Hellard and Mr Ingram, to recover

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   damages or equitable compensation in respect of its alleged loss. As against
    the directors, Bilta claims damages for conspiracy or equitable
    compensation for breach of fiduciary duty. The conspiracy is alleged to have
    been an unlawful means conspiracy, and the unlawful means are the
    directors' alleged breach of their fiduciary duties. As against Jetivia and
    Mr Brunschweiler, Bilta claims damages for conspiracy or compensation for
    dishonest assistance in the directors' breach of their fiduciary duties. Since
B   the matter comes before the court on Jetivia's and Mr Brunschweiler's
    application for the claims against them to be summarily struck out or
    dismissed, it is to be assumed for present purposes that the factual
    allegations made in Bilta's amended particulars of claim are capable of
    proof, and there is no need to repeat the word "alleged" whenever referring
    to the defendants' conduct. The liquidators also pursue a separate claim for
C   fraudulent trading under section 213 of IA 1986. Jetivia is a Swiss company
    and Mr Brunschweiler, who is resident in France, is its sole director.

        114   Bilta had two directors, Mr Nazir and Mr Chopra ("the directors"),
    who are the first and second defendants. Mr Chopra owned all the issued
    shares. Bilta was registered for the purposes of VAT. Its only trading
    activity, which took place between 22 April and 21 July 2009, was trading in
    European Emissions Trading Scheme Allowances ("EUAs"), which are
D   commonly known as carbon credits. EUAs were treated as taxable supplies
    under the Value Added Tax Act 1994 until 31 July 2009. Since then they
    have been zero-rated. The VAT status of supplies of the EUAs at the relevant
    time explains Bilta's activities.

        115   In short, Bilta bought large numbers of EUAs from overseas
    suppliers, including Jetivia, free of VAT, and sold them in the UK with VAT
E   to companies described as "first line buffers", which immediately sold them
    on. The price for which Bilta sold the EUAs was lower before VAT than the
    price at which it bought, and Bilta was therefore never going to be in a
    position to meet its liabilities to HM Revenue and Customs ("HMRC").
    Bilta had minimal capital and was insolvent virtually from the outset. The
    money payable to Bilta, including the VAT due to HMRC, was either paid to
    Bilta and paid on by it to its overseas supplier, or was paid by the first line
F   buffer (or a later company in the chain) directly to Bilta's supplier, or was
    otherwise paid to offshore accounts. At the end of the chain the EUAs would
    be resold to a company outside the UK, generating a right to a VAT refund. It
    is a familiar kind of carousel or missing trader fraud.

        116   Bilta was insolvent throughout the period of its trading in EUAs. In
    that three-month period, Bilta sold more than 5·7m EUAs for about £294m.
G   Its liability for VAT on those transactions amounts to £38,733,444. It did
    not submit any VAT returns to HMRC. On the application of HMRC
    Mr Hellard and Mr Ingram were appointed provisional liquidators of Bilta
    on 29 September 2009. They commenced the company's claim against
    the defendants who were its directors and other parties, including the
    appellants. The company was compulsorily wound up on 25 November
    2009. The proceedings were amended on 13 October 2011 to include the
H   liquidators' claims under section 213 of IA 1986.

        117   Patten LJ has set out the principal allegations in Bilta's particulars
    of claim in his impressive judgment [2014] Ch 52, paras 9–14. We can
    therefore summarise them very briefly. Bilta's pleaded case focuses on the
    injury done to it rather than to HMRC. It alleges that the appellants among

© 2016 The Incorporated Council of Law Reporting for England and Wales

others were parties to a conspiracy to defraud and injure it by depriving it of the money needed to pay its VAT liabilities and thereby rendering it insolvent. The conspirators knew that their fraudulent scheme involved the breach by Mr Nazir and Mr Chopra of their fiduciary duties as directors of Bilta. Against its directors Bilta claims compensation for breach of fiduciary duty, damages for unlawful means conspiracy and a contribution under section 213 of IA 1986. Against the appellants Bilta alleges that they were parties to the conspiracy to defraud it, that they are liable for dishonestly assisting Mr Nazir and Mr Chopra in the breaches of their fiduciary duties to it and (under section 213) for carrying on its business with intent to defraud creditors.

118   On 30 July 2012 Sir Andrew Morritt, the Chancellor of the High Court, dismissed the appellants' application for summary dismissal of the claims [2014] Ch 52. He held that the maxim ex turpi causa non oritur actio (no action may be founded on illegal or immoral conduct) was not available as a defence to Bilta's directors or the appellants and that section 213 of IA 1986 had extraterritorial effect. The Court of Appeal (Lord Dyson MR, Rimer and Patten LJJ) in a judgment dated 31 July 2013 dismissed the appellants' appeal.

119   The principal issues raised by this appeal in relation to the defence based on the maxim ex turpi causa are (i) the purpose of that maxim and its application in relation to Bilta's claims and (ii) the circumstances in which and mechanisms by which the knowledge of directors and other persons is attributed to a legal person such as a registered company. The other issue is whether section 213 of IA 1986 has extraterritorial effect. We deal with each in turn.

### Illlegality: ex turpi causa non oritur actio

120   At the heart of Bilta's claims is the allegation that the directors acted in breach of their fiduciary duties to the company, in concert with others including Jetivia and its director, Mr Brunschweiler. Although the directors have played no part in the current proceedings, it is rightly accepted by the parties to the appeal that in relation to the defence of illegality there is no distinction to be drawn between the position of Jetivia and Mr Brunschweiler and that of the directors. The primary question for the court is whether Bilta's claim against the directors for breach of fiduciary duty is barred by the doctrine of illegality. If so, the claim for damages for conspiracy must equally fail, since the breach of fiduciary duty constitutes the unlawful means on which Bilta relies. And the converse also applies.

121   The appellants argue that Bilta's claims against its directors are barred by reason of the criminal nature of its conduct under their control. Its function was to serve as a vehicle for defrauding HMRC, and it is submitted that the doctrine of illegality bars it from suing the directors who caused its participation in the scheme, and their co-conspirators, as a means of recovering the company's loss for the benefit of the company's creditors.

122   In any case where the defence of illegality is raised, it is necessary to begin by considering the nature of the particular claim brought by the particular claimant and the relationship between the parties. So we start with the nature of the directors' duty to Bilta.

123   It is well established that the fiduciary duties of a director of a company which is insolvent or bordering on insolvency differ from the duties

A  of a company which is able to meet its liabilities, because in the case of the former the director's duty towards the company requires him to have proper regard for the interest of its creditors and prospective creditors.    The principle and the reasons for it were set out with great clarity by Street CJ in *Kinsela v Russell Kinsela Pty Ltd* (1986) 4 NSWLR 722, 730:

B  "In a solvent company the proprietary interests of the shareholders entitle them as the general body to be regarded as the company when questions of the duty of directors arise.  If, as a general body, they authorise or ratify a particular action of the directors, there can be no challenge to the validity of what the directors have done.  But where a company is insolvent the interests of the creditors intrude.  They become prospectively entitled, through the mechanism of liquidation, to displace the power of the shareholders and directors to deal with the company's assets.  It is in a practical sense their assets and not the shareholders' assets that, through the medium of the company, are under the management of the directors pending either liquidation, return to solvency, or the imposition of some alternative administration."

C

124    This passage was cited with approval by Dillon LJ in *West Mercia Safetywear v Dodd* [1988] BCLC 250, 252–253.  The principle now has statutory recognition in the Companies Act 2006.  In Part 10, Chapter 2 of the Act, concerning the general duties of directors, section 172 provides:

D

"(1) A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole . . .
"(3) The duty imposed by this section has effect subject to any enactment or rule of law requiring directors, in certain circumstances, to consider or act in the interests of creditors of the company."

E

125    Section 180(5) provides that the general duties under the Act have effect (except as otherwise provided or the context otherwise requires) notwithstanding any enactment or rule of law.  A director of an insolvent company is not directly a fiduciary agent of the creditors and cannot be sued by an individual creditor for breach of the fiduciary duty owed by the director to the company: *Yukong Line Ltd v Rendsburg Investments Corpn (No 2)* [1998] 1 WLR 294.

F

126    Instead, the protection which the law gives to the creditors of an insolvent company while it remains under the directors' management is through the medium of the directors' fiduciary duty to the company, whose interests are not to be treated as synonymous with those of the shareholders but rather as embracing those of the creditors.

G

127    Such protection would be empty if it could not be enforced.  To give effect to it, this action is brought by the liquidators in the name of the company to recover, for the benefit of the creditors, the loss caused to the company by the directors' breach of their fiduciary duty.

128    It is argued on behalf of the appellants that it would offend against the doctrine of illegality for the claim to succeed.  It is said that the fact that the errant directors were in sole control of the company makes it unlawful for the company to enforce their fiduciary duty towards it.  If this were the law, it would truly deserve Mr Bumble's epithet—"a ass, a idiot".  For it would make a nonsense of the principle which the law has developed for the

H

© 2016 The Incorporated Council of Law Reporting for England and Wales

50
**Bilta (UK) Ltd v Nazir (No 2) (SC(E))**                                        **[2016] AC**
Lord Toulson and Lord Hodge JJSC

protection of the creditors of an insolvent company by requiring the   A
directors to act in good faith with proper regard for their interests.

129   It has been stated many times that the doctrine of illegality has been
developed by the courts on the ground of public policy.  The context is
always important.  In the present case the public interest which underlies the
duty that the directors of an insolvent company owe for the protection of
the interests of the company's creditors, through the instrumentality of the   B
directors' fiduciary duty to the company, requires axiomatically that the law
should not place obstacles in the way of its enforcement.  To allow the
directors to escape liability for breach of their fiduciary duty on the ground
that they were in control of the company would undermine the duty in
the very circumstances in which it is required.  It would not promote the
integrity and effectiveness of the law, but would have the reverse effect.  The   C
fact that they were in sole control of the company and in a position to act
solely for their own benefit at the expense of the creditors, makes it more,
not less, important that their legal duty for the protection of the interests of
the creditors should be capable of enforcement by the liquidators on behalf
of the company.

130   For that reason in our judgment this appeal falls to be dismissed.
The courts would defeat the very object of the rule of law which we have   D
identified, and would be acting contrary to the purpose and terms of sections
172(3) and 180(5) of the Companies Act 2006, if they permitted the
directors of an insolvent company to escape responsibility for breach of their
fiduciary duty in relation to the interests of the creditors, by raising a defence
of illegality to an action brought by the liquidators to recover, for the benefit
of those creditors, the loss caused to the company by their breach of
fiduciary duty.  In everyday language, the purpose of the inclusion of the   E
creditors' interests within the scope of the fiduciary duty of the directors of
an insolvent company towards the company is so that the directors should
not be off the hook if they act in disregard of the creditors' interests.  It
would be contradictory, and contrary to the public interest, if in such
circumstances their control of the company should provide a means for them
to be let off the hook on the ground that their illegality tainted the   F
liquidators' claim.

131   There would be much to say for ending this judgment at this point,
except that it would be wrong not to identify the principal counter
arguments and show that we have considered them.  There is an attendant
risk, in going on at further length, of losing sight of the simple and central
point that the defence of illegality would undermine the rule of law,   G
reinforced by Act of Parliament, which exists for the protection of those for
whose benefit the action is brought, namely the creditors who have a right to
such assets as the liquidators may recover in the name of the company.  We
see no need, for example, to get into the subject of attribution and the
*Hampshire Land* principle in order to decide the appeal, but in discussing it
(as we do below) we hope by the end to achieve some simplicity and clarity.

132   We turn to the question whether any authorities present an   H
impediment to this approach and whether they require reconsideration.

133   Mr Alan Maclean QC's primary submission was that it follows
from the decision of the House of Lords in *Stone & Rolls Ltd v Moore
Stephens* [2009] AC 1391 that Bilta's claims are barred by the doctrine of

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   illegality by reason of its being a "one-man company" which engaged in deliberate fraud.

134   *Stone & Rolls* has been a much debated and much criticised case. A lot of the criticism stems from the fact that there were five judgments running to nearly 100 pages, the judges were divided three to two, and differing reasons were given by the majority. The claim was by a company in

B   liquidation against the firm of chartered accountants, who had acted as its auditors, for negligence and breach of contract in failing to detect and report that the company's business consisted mainly of defrauding banks (by obtaining credit through presenting false documents purportedly relating to commodity trading which was fictitious). The company was under the complete control of a Mr Stojevic. When the bank which was the principal victim discovered the fraud it sued the company and Mr Stojevic and

C   obtained judgment for over \$90m. The judgment was unpaid, the company was put into liquidation and it brought proceedings through the liquidators against the accountants for the benefit of the creditors. Negligence was admitted, but the accountants applied successfully to strike out the action on the ground of illegality. The shares in the company were held by an Isle of Man company, whose shareholders were nominee companies acting under a trust. In the proceedings brought by the bank Mr Stojevic was evasive about

D   the beneficial interest behind the trust, although he acknowledged that he had a beneficial interest in the company, and there was no evidence to suggest that any innocent person had a share in it. All but one of the House of Lords (Lord Scott) proceeded on the basis that the company was Mr Stojevic's company in the fullest sense.

135   The opinions of the majority (Lords Phillips, Walker and Brown),

E   although differently expressed in various ways, have in common that they identified two features which were critical to their analysis. One concerned the scope of the accountants' duty. The other was the fact that no one who had any part in the ownership or management of the company was unaware of the fraud which the accountants failed to detect and report. Put shortly, the majority (in disagreement with Lord Mance) held that the accountants

F   owed no contractual or tortious duty of care in respect of the interests of the creditors, notwithstanding that the company's solvency depended on the fraud being undetected. Their sole duty was to report to the company the matters which the directors and shareholders ought to know for the purpose of making informed decisions. If those people were already aware of and complicit in the fraud, that fact provided a complete barrier to the claim. Lord Phillips was explicit that the case turned critically on whether the

G   auditor's duty extended to protecting those for whose benefit the claim was brought. He also observed that one fundamental proposition appeared to him to underlie the reasoning of Lord Walker and Lord Brown—that the duty owed by an auditor to the company was for the benefit of the interests of the shareholders, but not those of the creditors—and that here lay the critical point of difference of opinion between them and Lord Mance: para 68.

H   136   While it would shorten this judgment considerably if we were to say simply that the present case is plainly distinguishable from *Stone & Rolls* on its facts, since this case concerns directors who unquestionably owed duties for the protection of the interests of the creditors (unlike the auditor, according to the opinions of the majority in *Stone & Rolls*), the case has

© 2016 The Incorporated Council of Law Reporting for England and Wales

caused so much difficulty that it would be wrong for us to leave it there. It is    *A*
therefore necessary to analyse the judgments in closer detail before
expressing our final view about its status.

137   Lord Phillips summarised his conclusions (para 18) before
developing his analysis. He said that those for whose benefit the claim was
brought (the creditors) fell outside the scope of any duty owed by the
accountants; and that the sole person for whose benefit the accountants'
duty was owed (Mr Stojevic, who owned and ran the company) was himself    *B*
the person responsible for the fraud. In those circumstances he said that ex
turpi causa afforded a defence.

138   Lord Phillips made some comments about the law of illegality and
the decision of the House of Lords in *Tinsley v Milligan* [1994] 1 AC 340.
He rejected the idea that *Tinsley v Milligan* laid down a universal test of ex
turpi causa. It was concerned with the effect of illegality on title to property.    *C*
It established that once title had passed, it could not be attacked on the basis
that it passed pursuant to an illegal transaction. If title could be asserted
without reliance on the illegality, the defendant could not rely on illegality to
defeat the title: para 21. But he did not believe that it was right to proceed
generally on the basis that the reliance test could automatically be applied as
a rule of thumb, because it was necessary to consider the policy underlying    *D*
the ex turpi causa maxim in order to decide whether the defence was bound
to defeat the claim: para 25.

139   Lord Phillips said that the underlying policy in relation to
contractual obligations could be divided into two principles: the court will
not enforce a contract which is expressly or impliedly forbidden by statute or
is entered into with the intention of committing an illegal act; and the court
will not assist a claimant to recover a benefit from his own wrongdoing.    *E*
In the instant case the claim is not brought for the benefit of the
shareholder/directors, but for the benefit of the defrauded creditors for
whose benefit the relevant duty was owed. Whereas in *Stone & Rolls* no
such duty was owed for the benefit of the creditors, in this case it was owed.
On Lord Phillips's analysis of *Tinsley v Milligan* there is no inconsistency
between that decision and the reasons which we have given for dismissing    *F*
this appeal.

140   Lord Phillips considered the consequences of the primary argument
advanced by the accountants in a case where the company carried on a
legitimate business and had honest shareholders, but the person who was in
charge of running it ("its directing mind and will") involved it in fraudulent
trading, which its auditors negligently failed to discover and report. In such    *G*
circumstances any claim by the company for the benefit of the shareholders,
whose interests the auditors should have protected, would according to
the accountants' argument be barred by the very wrongdoing which the
auditors' negligence had allowed to occur: paras 29–30. Lord Phillips did
not accept that if Stone & Rolls had been a company with independent
shareholders, which had been "high-jacked" by Mr Stojevic, its claim would
necessarily have been defeated by reason of the reliance test or the    *H*
underlying principle of public policy: para 63.

141   Lord Phillips considered that where a company's complaint was
that its directing mind and will had infected it with turpitude, if ex turpi
causa was not to apply, "the reason should simply be that the public policy
underlying it does not require its application": para 60. That would be a

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   very easy conclusion where all the shareholders were innocent: para 61. He considered that the situation would be more problematic if some shareholders were innocent and some were not, but it was not necessary for the court to solve that problem in the case of *Stone & Rolls*, because it had no innocent shareholders. In short, whether ex turpi causa applied was dependent on identifying the underlying public policy and on identifying for whose benefit the action was being brought.

B
142   In *Stone & Rolls* (as in the present case) there was a good deal of argument about "attribution" and the application of the so-called *Hampshire Land* principle (*In re Hampshire Land Co* [1896] 2 Ch 743), but in a passage which is important to Lord Phillips's analysis he said that the real issue was not whether the fraud should be attributed to the company but whether ex turpi causa should defeat the company's claim for breach of the auditor's duty, and that this depended critically on whether the scope of the auditor's duty extended to protecting those for whose benefit the claim was brought: para 67.

C
143   Lord Phillips proceeded to examine that issue and he concluded that the accountants owed no duty for the protection of the company's creditors. (That, of course, places them in stark contrast with the directors of an insolvent company.) In examining that question Lord Phillips cited

D   with approval the decision of Hobhouse J in *Berg Sons & Co Ltd v Mervyn Hampton Adams* [2002] Lloyd's Rep PN 41. That was also a claim by a company in liquidation, brought for the benefit of its creditors (banks and discount houses), against a firm of chartered accountants which had acted as the company's auditors. The company operated under the sole control of a Mr Golechha, who was the beneficial owner of its entire share capital. The

E   accountants were found to have acted with lack of proper skill in accepting too readily assurances given to them by Mr Golechha about the recoverability of certain debts owed to the company. The judge found that the auditors ought to have qualified the company's accounts. At the relevant time the company was not insolvent, but it was accepted (as indeed the accountants had said in a letter to Mr Golechha) that it was foreseeable that

F   the company's bankers and discount houses with whom it did business might place some reliance on its audited accounts. The company asserted, but did not prove, that Mr Golechha's conduct had been fraudulent. The claim failed on various grounds, including reasons directly comparable to the position in *Stone & Rolls*.

144   Lord Phillips quoted (paras 78 and 79) the following passages from Hobhouse J's judgment:

G
"It follows [from the decision of the House of Lords in *Caparo Industries plc v Dickman* [1990] 2 AC 605] that the purpose of the statutory audit is to provide a mechanism to enable those having a proprietary interest in the company or being concerned with its management or control to have access to accurate financial information about the company. Provided that those persons have that information,

H   the statutory purpose is exhausted. What those persons do with the information is a matter for them and falls outside the scope of the statutory purpose. In the present case the first plaintiffs have based their case not on any lack of information on the part of Mr Golechha but rather on the opportunity that the possession of the auditor's certificate is said to

© 2016 The Incorporated Council of Law Reporting for England and Wales

have given for the company to continue to carry on business and to
borrow money from third parties.  Such matters do not fall within the
scope of the duty of the statutory auditor."

"However one identifies the company, whether it is the head
management, or the company in general meeting, it was not misled and
no fraud was practised on it.   This is a simple and unsurprising
consequence of the fact that every physical manifestation of the company
Berg was Mr Golechha himself.  Any company must in the last resort, if it
is to allege that it was fraudulently misled, be able to point to some
natural person who was misled by the fraud.  This the plaintiffs cannot
do."

145   Lord Phillips observed that this comment demonstrated that
*Hampshire Land* had no application to the facts of that case, but that it also
had wider implications: para 80.  It supported the proposition that the law
could not rationally hold the auditor liable when the entire shareholder body
and the entire management was embodied in a single individual who knew
everything because he had done everything.  The passages set out above
correspond with and support the twin factors to which we have referred
(para 26) as central to the reasoning of the majority—the limited nature of
the auditors' duty, and the knowledge of everyone involved in the ownership
and management of the company about the matters which the auditors
failed to discover and report to them.  Lord Phillips returned to those points
at the end of his judgment: para 86.

146   Lord Walker concluded that he would apply what he referred to as
the "sole actor" principle to a claim made against its former auditors by a
company in liquidation, where the company was a one-man company
engaged in fraud, and the auditors were accused of negligence in failing to
call a halt to the fraud: para 168.  He defined what he meant by a one-man
company, by reference to what Hobhouse J had said in *Berg Sons & Co Ltd
v Mervyn Hampton Adams*, as

"a company which has no individual concerned in its management and
ownership other than those who are, or must (because of their reckless
indifference) be taken to be, aware of the fraud or breach of duty with
which the court is concerned": para 161.

He cited *Berg Sons & Co Ltd v Mervyn Hampton Adams* as a clear case of a
one-man company, which did not involve fraud, but in which every physical
manifestation of the company was Mr Golechha himself who knew all about
the irrecoverable loans; and there is a clear echo of Hobhouse J's judgment
in Lord Walker's explanation for rejecting Stone & Rolls' claim: para 168.
He said that any duty of care owed by the auditors was to the company as a
whole, not to current or prospective creditors, and that there was no
protection which the auditors could give to the company if the only human
embodiment of the company knew all about its fraudulent activities.

147   Lord Walker's judgment was a great deal more detailed than that
summary, because he considered the various arguments advanced by the
company, but his critical reasoning was that the auditors were in a very
different position from the company's directors (para 190), their duty of care
was limited in the way that he identified, and the company's sole actor knew
all that was to be known.

© 2016 The Incorporated Council of Law Reporting for England and Wales

A    148  Lord Brown agreed with Lord Walker. He said that the claim against the accountants ran diametrically counter to the principles established in *Caparo Industries plc v Dickman* [1990] 2 AC 605 and was difficult to reconcile with Hobhouse J's decision in *Berg Sons & Co Ltd v Mervyn Hampton Adams*: para 202. In that case (see para 144 above) Hobhouse J had said that the claim against the accountants was based on the opportunity which possession of the auditor's certificate was said to have

B given for the company to continue to carry on business and borrow money, but such matters did not fall within the scope of the auditor's duty. Similarly, said Lord Brown, the assumed negligence of the accountants had enabled the company to continue to carry on business, in this case stealing rather than borrowing from third parties.

C    149  What divided the minority (Lords Scott and Mance) from the majority is that they took a different view about the classes of parties in respect of whose interests the auditors owed a duty of care. They both regarded the insolvency of the company as critical, but Lord Mance set out his reasoning more fully. He held that just as a director's fiduciary duty to a company which is insolvent or bordering on insolvency embraces a duty to the company's creditors, a parallel principle applied to the auditor, so that the duty of care owed by an auditor to such a company embraced a duty to

D have regard to the interests of the creditors. He distinguished *Berg Sons & Co Ltd v Mervyn Hampton Adams* because in that case the company was solvent at each audit date: paras 260 and 265. He said that the fact that Stone & Rolls was insolvent at each audit date was critical. He defined the issue as being whether the auditors' duty to the company extended, like the directors', beyond the protection of the interests of shareholders in a

E situation where the auditors ought to have detected the company's insolvency. He observed that the centrality of this issue may have been obscured by the spread of argument over other issues: para 265. He considered that it was not inconsistent with *Caparo* to hold that the company was entitled to pursue a claim against the auditors for loss resulting from its breach of its duty in failing to detect that the company was subject to a continuing fraudulent scheme in circumstances in which it was

F insolvent: paras 269–271.

    150  Lord Scott emphasised the public policy foundation of the doctrine of illegality. For this reason he differentiated between an action for damages for breach of the auditors' duty of care brought by a solvent company and a similar action brought by an insolvent company. If the company had remained solvent, an action against the auditors which would have enabled

G Mr Stojevic to benefit from any damages would have offended the ex turpi causa rule. But the company was insolvent and there was no possibility of Mr Stojevic benefitting from any damages recoverable from the accountants. There was therefore no public policy reason to bar an action against the auditors based on their breach of duty. "The wielding of a rule of public policy" he said, "in circumstances where public policy is not engaged constitutes, in my respectful opinion, bad jurisprudence": paras 119–122.

H    151  Critics of *Stone & Rolls* for being over long and diffuse have a fair point, and commentators and practitioners have found the case difficult. Lord Walker NPJ himself commented in *Moulin Global Eyecare Trading Ltd v Inland Revenue Comr* 17 HKCFAR 218 that it is difficult to extract a clear ratio from the speeches of the majority, and he praised the Court of

© 2016 The Incorporated Council of Law Reporting for England and Wales

Appeal in the present case for achieving a welcome clarification of the law: paras 100, 106. We have endeavoured to apply Occam's razor in concentrating on the critical features of the case: the scope of the auditors' duty and the inability of the company to show that anyone who had any part in the ownership or management of the company was misled by the auditors' negligence, which was a prerequisite for the company's claim to succeed.

152    Much of the difficulty of *Stone & Rolls* is that the treatment of the issues was more roundabout, for example with much discussion of principles of attribution. We have already referred to the fact that Lord Phillips considered that the real issue was not about attribution, but about the scope of the auditors' duty, and to Lord Mance's comment that the centrality of this issue had been obscured by the spread of argument over other issues. The centrality of the point is further emphasised by the parallel with *Berg Sons & Co Ltd v Mervyn Hampton Adams* which each of the majority drew in their judgments. That parallel had nothing to do with the fraudulent nature of Stone & Rolls' business. The restricted nature of the auditors' duty and the knowledge of those in charge of the company had the same significance whether the nature of the business was fraudulent (*Stone & Rolls*) or not (*Berg Sons & Co Ltd v Mervyn Hampton Adams*). Likewise, Lord Mance's ground for distinguishing *Berg Sons & Co Ltd v Mervyn Hampton Adams* had nothing to do with whether the business was lawful or fraudulent. Lord Mance distinguished Hobhouse J's decision because the insolvency of Stone & Rolls at the time of the statutory audits made all the difference in his view to the scope of the auditors' duty. We are not of course concerned in this case to revisit the point of disagreement between Lord Mance and the majority on that question. The finding that all whose interests were the subject of the auditors' duty of care knew the facts which the auditors failed to detect was dispositive. The conclusion of the majority that the claim was therefore barred by illegality may be seen as a reflection on the illegal nature of the conduct as a matter of fact and perhaps a perceived need to bring their conclusion within the scope of the issues as argued, but it was not the illegality which on a proper analysis of their reasoning drove the conclusion. As Lord Phillips observed, the fundamental proposition which underlay the reasoning of Lord Walker, Lord Brown and himself was that the auditors owed no duty for the benefit of those for whose benefit the claim was brought. It necessarily followed that the claim should be struck out.

153    Lord Sumption JSC analyses the case differently. There is no disguising the fact that serious difficulties arise from the different ways in which the majority expressed themselves. The Law Commission in its report on *The Illegality Defence* (2010) (Law Com No 320), commented at para 3.32:

"It is difficult to anticipate what precedent, if any, *Stone & Rolls* will set regarding the illegality defence. Though there was a majority verdict, there was no majority reasoning, with all their Lordships reaching different conclusions on how the defence should be applied."

154    We conclude that *Stone & Rolls* should be regarded as a case which has no majority ratio decidendi. It stands as authority for the point which it decided, namely that on the facts of that case no claim lay against the auditors, but nothing more.

© 2016 The Incorporated Council of Law Reporting for England and Wales

A    155   *Stone & Rolls* in any event does not support Mr Maclean's primary
submission that in the present case Bilta's claims are barred because it was a
one-man company. The duty of the directors was significantly different from
the duty of the statutory auditors, and Stone & Rolls' attempt to compare
the two was rejected by the majority (see, for example, Lord Walker at
para 190), although it found favour with Lord Mance. The fact that Stone
& Rolls was a one-man company was relevant because it meant that the
B    company was unable to point to anyone involved in the ownership or
management of the company who was adversely affected by the
accountants' failure to discover what that one man had concealed from it.
But it does not follow that the person in charge of a one-man company can
never be liable for any form of wrongdoing towards the company. As Lord
Mance pointed out in *Stone & Rolls* (para 230), the controller of a one-man
C    company who dishonestly strips its assets is guilty of theft from the
company: *Attorney General's Reference (No 2 of 1982)* [1984] QB 624. If
the majority had agreed with Lord Mance's view as to the scope of the
auditors' duty, it is plain from their reasoning that they would not have
struck out the action, albeit that it was a one-man company and its activities
were fraudulent. They saw the claim as an attempt to get around *Caparo*,
whereas Lord Mance saw no conflict with *Caparo*.
D    156   Mr Maclean also relied on the decision of the Court of Appeal in
*Safeway Stores Ltd v Twigger* [2011] Bus LR 1629. The issue was whether a
company could recover the amount of financial penalties imposed on it by
the Office of Fair Trading, for anti-competitive activity in contravention of
the Competition Act 1998, from the directors or employees who were
responsible for the illegal activity in breach of their contractual and fiduciary
E    duties to the company. The court held that the claim was barred by the
illegality principle.
157   The leading judgment was given by Longmore LJ. His reasoning
was as follows: (i) The company's liability to the OFT was not a vicarious
liability for the wrongful conduct of its directors or employees, because the
Competition Act 1998 did not impose any liability on the directors or
employees for which the company could be held vicariously responsible.
F    The liability under the Act was imposed on the company itself, which acted
(as any company must) through agents. (ii) The liability was therefore the
"personal" liability of the company, so that its claim against the directors
and employees was based on its own wrongdoing. (iii) Its claim was
therefore barred by illegality. (iv) It was not open to the company to argue
that it was a victim of the directors' and employees' misconduct, and to rely
G    on the *Hampshire Land* principle, because the statutory scheme imposed
responsibility on the company. (v) It was unnecessary to consider the
position if the company's liability had been strict, because the OFT could
only impose a penalty under the Competition Act 1998 if the infringement
had been committed intentionally or negligently by the company.
158   If that reasoning is sound, it would support Mr Maclean's
argument that the doctrine of illegality should apply in the present case,
H    although this would have nothing to do with Bilta being a one-man
company.
159   We disagree with the reasoning. We have been greatly helped by
the analysis provided by Professor Watts in a characteristically lucid article,
"Illegality and Agency Law: Authorising Illegal Action" [2011] JBL 213.

© 2016 The Incorporated Council of Law Reporting for England and Wales

58
Bilta (UK) Ltd v Nazir (No 2) (SC(E))                                    [2016] AC
Lord Toulson and Lord Hodge JJSC

A   160   Safeway's direct liability (or "personal" liability in the words of the
Court of Appeal) under the Competition Act 1998 arose through the acts of
its directors and employees as its agents, but should the company therefore
be denied the right to hold its errant directors and employees to account?
We agree with Professor Watts's proposition, at p 220, that

B   "it simply does not follow that because under the law of agency a
principal becomes directly a party to an illegal agreement as a result of its
agents' acts, it is thereby to be deprived of its rights under separate
contracts, not otherwise illegal, with its employees and other agents to act
in its interests and to exercise due care and skill. Indeed, it would not
follow even if the 1998 Act *were* found to have invoked some sui juris
concept of direct liability other than the law of agency.

C   "In the absence of some countervailing policy reason, it is not just for
someone who falls foul of a statute by reason of the acts of its employees
or other agents to add to its burdens and disabilities by depriving it of any
recourse against those employees or other agents."

161   Unless there are special circumstances, the innocent shareholders
should not be made to suffer twice. The reasoning in *Safeway*, if taken to its
logical conclusion, would also mean that the company could not lawfully
D   dismiss the errant employees or directors; for to rely on their misconduct
would be to rely on its own misconduct, as Professor Watts has observed. It
might be argued that unfair dismissal is different, but that could only be on
public policy grounds.

162   Reference to public policy takes us to the only basis on which we
consider that the decision of the Court of Appeal in *Safeway* may have been
E   justified. Pill LJ considered that the policy of the Competition Act 1998
would be undermined if undertakings were able to pass on their liability to
their employees. That may have been a sound reason for striking out
Safeway's claims, and we express no view as to the merits of the decision.
We accept that there may be circumstances where the nature of a statutory
code, and the need to ensure its effectiveness, may provide a policy reason
for not permitting a company to pursue a claim of the kind brought in
F   *Safeway*.

163   In *Bowman v Secular Society Ltd* [1917] AC 406 the House of
Lords established the principle that the illegality of a company's objects does
not make its existence invalid in law. Put broadly, a company has the same
power to act illegally as an individual. Lord Parker of Waddington also
stated, at p 439:

G   "if the directors of the society applied its funds for an illegal object,
they would be guilty of misfeasance and liable to replace the money, even
if the object for which the money had been applied were expressly
authorised by the memorandum."

164   That is a generalisation. It would be harsh on directors if the law
were to impose strict liability, and to do so would exceed the general duties
H   of directors set out in the Companies Act 1998. But the reasoning of
Longmore LJ would negate the company's right of recourse against the
director who acted in breach of his fiduciary duty if his conduct as its agent
was such as to give rise to a direct liability of the company to a third party.
That would be inconsistent with the dictum of Lord Parker and contrary to

© 2016 The Incorporated Council of Law Reporting for England and Wales

A  ordinary principles of agency. As we have said, where the liability arises
under a statute, there may in some circumstances be cause to conclude that
the statutory scheme would be undermined by allowing the principal to
enforce its ordinary right of recourse against its agent, but that would be a
departure from ordinary rules of agency based on the specific nature of the
statutory scheme and the requirements of public policy arising from it.

B  165  *Brink's-Mat Ltd v Noye* [1991] 1 Bank LR 68 provides an
illustration of the application of Lord Parker's dictum. The proceeds of the
theft of gold bullion from a warehouse owned by the plaintiffs were
laundered through the bank account of a company called Scadlynn Ltd with
Barclays Bank. The directors and sole shareholders of Scadlynn were
signatories of the account and drew cheques on it for cash totalling nearly
£8m over four months. The plaintiffs sought to enforce rights which

C  Scadlynn was said to possess against the bank in consequence of the
payments out of its account. The issue before the Court of Appeal (Mustill
and Nicholls LJJ and Sir Roualeyn Cumming-Bruce) was whether the
pleading should be permitted. This raised the question, among others,
whether it was open to Scadlynn to sue the bank in respect of withdrawals
made or authorised by the company's sole directors and shareholders. The
court held that there was no reason why Scadlynn, which was being put into

D  compulsory liquidation, should be prevented from enforcing such a claim
for the benefit of the creditors who would look to the assets for the
satisfaction of their debts. Nicholls LJ described the existence of the
directors' fiduciary duties to the company as a means by which the law
sought to protect the company's creditors. In that context, Mustill LJ rightly
described Scadlyn as being an intended victim of arrangements intended

E  dishonestly to deprive it of a large part of its assets and Nicholls LJ agreed
with him.

166  Mr Maclean submitted that there was no scope for applying the
*Hampshire Land* principle (so as not to attribute the directors' conduct to
Bilta because they were acting in fraud of the company) in the circumstances
that Bilta is a one-man company and in any event that Bilta's role in the
fraud was that of villain and not victim. The argument proceeds on the false

F  premise that Bilta's role must be characterised in the same way both as
between Bilta and HMRC and as between the company and its directors;
and that the attribution of the fraud to the company for the first purpose
applies equally when considering the second. We do not consider the
question of attribution to be the real issue in this case. The real issue is
simpler: whether it is contrary to public policy that the company, through

G  the liquidators, should enforce for the benefit of its creditors the duty which
the directors owed for the protection of the creditors' interests as part of
their fiduciary duty to the company. In this respect we echo Lord Phillips's
observation in *Stone & Rolls* (para 67) that the real issue was not whether
the fraud should be attributed to the company, but whether ex turpi causa
should defeat the company's claim for breach of the auditors' duty. This, as
he said, depends critically on whether the scope of that duty extends to

H  protecting those for whose benefit the claim was brought. The answer to
that question in the present case is clear. The directors' fiduciary duty to the
company did extend to protecting the interests of those for whose benefit the
claim is brought. However, because the issue of attribution loomed large in
the course of argument (as it did in *Stone & Rolls*), and because the topic has

© 2016 The Incorporated Council of Law Reporting for England and Wales

caused a fair amount of confusion, we address it below in the hope of    A
providing some clarification.

167   Mr Maclean further submitted that Bilta's claims fall within the
illegality principle because the claims are inextricably linked with, and it is
relying on, its own dishonest actions. The flaw in this argument is that when
a company is insolvent or on the border of insolvency its interests are not
equated solely with the proprietary interests of its owners. Company law    B
requires that the interests of creditors receive proper consideration by the
shareholders and directors. Although the creditors are not shareholders, as
creditors they are recognised at that point as having a form of stakeholding
in, or being a constituency of, the company which is under the management
of the directors, and their interests are to be protected at law through the
directors' fiduciary duty to the company, which encompasses proper regard
for the creditors' interests. It is therefore misleading to say that when the    C
company, through the liquidators, brings an action against the directors for
breach of that duty, the company (whose interests ex hypothesi include the
interests of those for whose benefit the duty is owed and the action is
brought) is claiming in respect of "its" dishonest actions.

168   The argument about reliance harks back to *Tinsley v Milligan*. We
have referred (at para 138) to Lord Phillips's treatment of that case in *Stone*    D
*& Rolls* and to his statement that whether ex turpi causa should apply
should depend on whether the public policy underlying it required its
application. *Tinsley v Milligan* sparked a debate which has continued ever
since then. This is not surprising because the judges in that case themselves
considered the law to be very unsatisfactory, but they were of the opinion
that it was beyond judicial reform, although it was based on public interest    E
and was a common law doctrine. Lord Goff referred to the New Zealand
Illegal Contracts Act 1970, which provides that the court may deal with an
illegal contract "howsoever as the court in its discretion thinks just". He
suggested that there should be a full inquiry, and said that he would be more
than happy if a new system could be evolved which was satisfactory in its
effect and capable of avoiding indiscriminate results.    F

169   The Law Commission studied the subject over many years with
wide consultation. It did not recommend that the court should have an open
ended discretion. However, it agreed with the great majority of consultees
and commentators that the law was in an unsatisfactory state if, in the words
of Lord Browne-Wilkinson in *Tinsley v Milligan*, "The effect of illegality is
not substantive but procedural". The objections were well expressed by
McHugh J in the High Court of Australia in *Nelson v Nelson* (1995) 184    G
CLR 538, para 27 (and many others have written or spoken in similar vein):

"The [reliance] rule has no regard to the legal and equitable rights of
the parties, the merits of the case, the effect of the transaction in
undermining the policy of the relevant legislation or the question whether
the sanctions imposed by the legislation sufficiently protect the purpose of
the legislation. Regard is had only to the procedural issue; and it is that    H
issue and not the policy of the legislation or the merits of the parties which
determines the outcome. Basing the grant of legal remedies on an
essentially procedural criterion which has nothing to do with the
equitable positions of the parties or the policy of the legislation is

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   unsatisfactory, particularly when implementing a doctrine which is
    founded on public policy."

    The Law Commission did not recommend that the solution should be
    statutory. Its reason or primary reason was not the difficulty of obtaining
    Parliamentary time for law reform, although that has been a serious
    problem. Its study of various possible legislative models did not result in it
B   finding an altogether satisfactory version, but there also appeared to the
    Commission to be signs of fresh judicial thinking since *Tinsley v Milligan*. It
    considered that judicial reform was the best way forward and it made
    recommendations to that end. The Commission suggested that it was within
    the power of the courts to develop the law in a way which was neither simply
    discretionary nor arbitrary and indiscriminate, but which had regard to the
C   underlying public policies, and its recommendations were intended to assist
    the courts in that direction.

    170   In *Gray v Thames Trains Ltd* [2009] AC 1339, para 30, Lord
    Hoffmann said that the doctrine is founded not on a single rationale but
    number of policy objectives. His observation was echoed by Lord Phillips in
    *Stone & Rolls* (at para 25). We have given our reasons for saying that
    application of the doctrine in the present context would undermine the
D   purpose and relevant provisions of the Companies Act for the protection of
    the creditors of insolvent companies through the duty imposed on the
    directors towards the company.

    171   There may be cases which are less clear cut where there are public
    policy arguments which pull in opposite directions. *Houngla v Allen* [2014]
    1 WLR 2889 was such a case. The claimant was a victim of unlawful
E   discrimination occurring within the context of a contract of employment,
    which was contrary to the terms on which the claimant had been permitted
    to enter the United Kingdom. Lord Wilson JSC, giving the judgment of the
    majority, adopted Lord Phillips's statement in *Stone & Rolls* that the
    reliance test was not to be applied automatically but that it was necessary to
    consider the policy underlying ex turpi causa in order to decide whether it
    should defeat the claim. He referred next to the test of inextricable link and
F   said that he would conclude that the link was missing. But he did not
    consider that to be the determining question for reasons which he set out in
    the critical part of his judgment under the heading "Public policy". He said
    (para 42):

        "The defence of illegality rests on the foundation of public policy . . .
    'Rules which rest on the foundation of public policy, not being rules
G   which belong to the fixed or customary law, are capable, on proper
    occasion, of expansion or modification': *Maxim Nordenfelt Guns and
    Ammunition Co v Nordenfelt* [1893] 1 Ch 630, 661 (Bowen LJ). So it is
    necessary, first, to ask 'What is the aspect of public policy which founds
    the defence?' and, second, to ask 'But is there another aspect of public
    policy to which application of the defence would run counter?' "

H   172   Lord Wilson JSC examined what, if any, considerations of public
    policy underlying the doctrine of illegality, in particular the importance of
    preserving the integrity of the legal system (highlighted by McLachlin J in
    *Hall v Hebert* [1993] 2 SCR 159), militated in favour of applying the defence
    to defeat Miss Hounga's claim, and he judged them scarcely to exist. He

© 2016 The Incorporated Council of Law Reporting for England and Wales

considered next the second question which he had posed in para 42. He *A* concluded that there was an important aspect of public policy to which application of the defence would run counter, namely the protection of victims of trafficking, about which the United Kingdom was party to a European Convention. Lord Wilson JSC described as fanciful the idea that an award of compensation to the claimant would give the appearance of encouraging others to enter into illegal contracts of employment, whereas its refusal might engender a belief among employers that they could *B* discriminate against such employees with impunity (para 44), and he said that to uphold the defence of illegality would run strikingly counter to the prominent strain of current public policy against trafficking and in favour of protection of its victims: para 52. He concluded his judgment by saying: "The public policy in support of the application of that defence, to the extent that it exists at all, should give way to the public policy to which its *C* application is an affront."

173   Lord Sumption JSC says that the illegality defence is not dependent on a judicial value judgment about the balance of the equities in each case, and he cites *Tinsley v Milligan* and *Les Laboratoires Servier v Apotex Inc* [2015] AC 430. In *Tinsley v Milligan* the House of Lords disapproved the "public conscience" test which had been developed by the Court of Appeal. *D* But that decision did not preclude this court from adopting the approach in *Hounga v Allen* set out above at para 171 above. Lord Wilson JSC's statement was one of principle. It was made after a review of the authorities in which Lord Wilson JSC referred to the rejection of the public conscience test in *Tinsley v Milligan*: para 28. Lord Wilson JSC's statement was part of the ratio decidendi in *Hounga v Allen* because it formed the foundation for the conclusion in the final paragraph of the judgment, to which we have *E* referred at para 172. It is not the court's practice consciously to depart from an earlier decision of the House of Lords or Supreme Court without saying so. No member of the court in *Les Laboratoires Servier* suggested that the court's approach in *Hounga v Allen* had been wrong. The issue in *Les Laboratoires Servier* was whether the doctrine of illegality should be expanded beyond the reach of previous authorities to include a tort of strict liability. The decision is not inconsistent with ratio of *Hounga v Allen*. *F* Some of the dicta are in a different direction from *Hounga v Allen* but that is not a sufficient reason to conclude that the majority consciously meant to disapprove the approach in *Hounga v Allen*. Since the hearing of the appeal, the Court of Appeal has considered *Hounga v Allen* and *Les Laboratoires Servier* in *R (Best) v Chief Land Registrar* [2016] QB 23. Sales LJ, with whom McCombe LJ agreed, analysed them at paras 51–61 and adopted the *G* analytical framework of Lord Wilson JSC in weighing the considerations of public policy in favour of and against applying the ex turpi causa defence in the particular circumstances. He did not consider *Les Laboratoires Servier* to be incompatible with that approach and he applied Lord Wilson JSC's guidance at para 70 and following. Arden LJ dissociated herself from the reliance on *Hounga v Allen* by the majority: paras 111–112. The analysis of Sales LJ accords with our views. *H*

174   The Law Commission's report has been considered in some detail by the Court of Appeal on two occasions, *Les Laboratoires Servier* and *Parkingeye Ltd v Somerfield Stores Ltd* [2013] QB 840. In a chapter in *English and European Perspectives on Contract and Commercial Law:*

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   *Essays in Honour of Hugh Beale*, Professor Andrew Burrows, writing before
the decision of this court in *Les Laboratoires Servier* commended these
decisions as an example of the work of the Commission helping to influence
judicial law reform. The report has not so far been considered in any detail
by this court, nor has this court been invited to review the decision in *Tinsley
v Milligan*. The differences between Lord Sumption JSC and us suggest to us

B   that there is a pressing need for both. In any future review the court would
undoubtedly wish to examine the law in other countries and particularly the
judgments of the High Court of Australia in *Nelson v Nelson*, all of which
merit reading.

*Conspiracy*

C   175   For the reasons explained we have concentrated on the claim
against the directors for breach of fiduciary duty, which the appellants are
said dishonestly to have assisted. It is difficult to see that the claim for
conspiracy adds anything. Mr Maclean argued that the real conspiracy was
to injure HMRC and that it is artificial to regard there as having been a
conspiracy against Bilta, when it was in truth nothing more than a vehicle
for defrauding HMRC. It may be that Bilta will fail to establish the

D   conspiracy alleged, but the merits of that argument are not fit for
determination on a summary application. Bilta has a triable case, and the
only issue before the court is whether it must fail for illegality. In that respect
the appellants are on no stronger ground in relation to conspiracy than in
relation to the breach of fiduciary duty relied on as the unlawful means. It is
perhaps worth observing that in *Berg Sons & Co Ltd v Mervyn Hampton

E   Adams* [1993] BCLC 1045 Hobhouse J noted that there was no allegation of
conspiracy by the accountants and Mr Golechha to defraud the company
(p 1066), implying that this would have made a potential difference. In this
case there is an allegation of conspiracy between the directors and others to
defraud the company. It does not alter the analysis to say that the aim of the
dishonest director shareholders was to make a dishonest profit for
themselves and their accomplices at the expense of HMRC, for this itself

F   involved a breach of fiduciary duty towards Bilta (representing the interests
of its creditors) and the intentional causation of loss to Bilta.

*Loss*

176   Mr Maclean submitted that Bilta suffered no loss since it began life
with negligible assets and never acquired any lawful assets, so it had none to

G   lose. He relied on an obiter dictum of Lord Phillips to similar effect in *Stone
& Rolls* (para 5), but Lord Mance observed (para 231) that to cause a deficit
to a company making it insolvent is to cause it loss. Lord Phillips described
his own remark as an initial impression and it was no part of his reasoning.

177   In *Brink's-Mat Ltd v Noye* [1991] 1 Bank LR 68 one of the
arguments advanced by the bank was that Scalynn suffered no loss because it

H   never had any property of its own and held the proceeds of the bullion on
trust. The argument was dismissed. Nicholls LJ observed that a director
was as much in breach of fiduciary duties which he owed to the company if
he misappropriated property of which the company was a trustee as if he
misappropriated property belonging beneficially to the company.

© 2016 The Incorporated Council of Law Reporting for England and Wales

178   A company's profit and loss account and its balance sheet may be positive or negative. When the directors caused Bilta to incur VAT liabilities, and simultaneously caused it to misapply money which should have been paid to HMRC, leaving the company with large liabilities and no means of paying them, the directors caused it to suffer a recognisable form of loss.

*Circuity*

179   The appellants also submit that if Bilta is entitled to a remedy against Jetivia because it conspired with Bilta's directors, so also is Jetivia entitled to claim against Bilta for conspiring with Mr Brunschweiler against it. There is, it is submitted, circuity of action. In our view Jetivia will be liable only if it is established that it knowingly assisted in the fraud against Bilta, which would result from Mr Brunschweiler's knowledge and actions being attributed to it. We discuss attribution below. If the fraud against HMRC was designed to benefit Jetivia and the other overseas suppliers, we see no reason why there should not be such attribution and doubt if Jetivia would have a claim against Bilta. But, as Lord Sumption JSC states, the facts relevant to this issue have not been pleaded.

*Attribution*

180   The issue of attribution arises in the context that Mr Nazir and Mr Chopra were the only directors of the company and Mr Chopra was its sole shareholder. Bilta in its amended particulars of claim (at para 42) referred to them as its "directing mind and will". While there is a role in our law for the concept of the directing mind and will of a company, it is important to analyse that role and in particular to avoid the dangers of ascribing human attributes to a non-natural person such as a company.

181   In most circumstances the acts and state of mind of its directors and agents can be attributed to a company by applying the rules of the law of agency. It has become common to speak of "the *Hampshire Land* principle" or the "fraud exception" as the exception to an otherwise general rule that attribution occurs. It is our view that "the fraud exception" is not confined to fraud but is simply an instance of a wider principle that whether an act or a state of mind is to be attributed to a company depends on the context in which the question arises. "The fraud exception", applied to prevent an agent from pleading his own breach of duty in order to bar his principal's claim against him, is the classic example of non-attribution. But it is not the only one.

182   We set out our conclusions on the importance of context to the process of attribution in paras 202–209 below. Before then, we examine the case law which has led us to those conclusions.

183   The starting point in an analysis of attribution is the recognition of the separate personality of the company, which the House of Lords recognised long ago in *Salomon v A Salomon & Co Ltd* [1897] AC 22 and which this court recently confirmed in *Prest v Prest* [2013] 2 AC 415. A company, the creation of law, is, in Lord Halsbury LC's words (*Salomon*, p 33), "a real thing" and has a legal existence even if it is controlled by one person. Because the company is not a natural person it can operate only by the acts of its officers, employees and agents. In *Aberdeen Railway Co v Blaikie Bros* (1854) 1 Macq 461, 471, Lord Cranworth LC stated: "The

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   directors are a body to whom is delegated the duty of managing the general affairs of the company. A corporate body can act only by agents." Similar statements about the necessity of agency can be found in *Ferguson v Wilson* (1866) LR 2 Ch App 77 (Cairns LJ, at p 89) and *Citizens' Life Assurance Co Ltd v Brown* [1904] AC 423 (Lord Lindley, at p 426).

184   While a company cannot act but through the agency of others, it

B   can incur obligations and have rights; and directors, including a sole director who is also the sole shareholder of a company, owe it the general duties set out in sections 171 to 177 of the Companies Act 2006. The company can also incur liability to a third party because the law holds it responsible for the tortious acts and omissions of an employee.

185   Lord Diplock stated the principles in a contractual context in *Photo Production Ltd v Securicor Transport Ltd* [1980] AC 827, 848:

C
   "My Lords, it is characteristic of commercial contracts, nearly all of which today are entered into not by natural legal persons, but by fictitious ones, i e companies, that the parties promise to one another that something will be done . . . Such a contract is the source of primary legal obligations on each party to it to procure that whatever he has promised will be done is done."

D   "Where what is promised will be done involves the doing of a physical act, performance of the promise necessitates procuring a natural person to do it; but the legal relationship between the promisor and the natural person by whom the act is done, whether it is that of master and servant, or principal and agent, or of parties to an independent sub-contract, is generally irrelevant. If that person fails to do it in the manner in which the promisor has promised to procure it to be done, as, for instance, with

E   reasonable skill and care, the promisor has failed to fulfil his own primary obligation. This is to be distinguished from 'vicarious liability'—a legal concept which does depend on the existence of a particular legal relationship between the natural person by whom a tortious act was done and the person sought to be made vicariously liable for it. In the interests of clarity the expression should, in my view, be confined to liability for

F   tort."

186   Such vicarious liability is indirect liability; it does not involve the attribution of the employee's act to the company. It entails holding that the employee has committed a breach of a tortious duty owed by himself, and that the company as his employer is additionally answerable for the employee's tortious act or omission.

G   187   A company can incur direct liability in at least three circumstances. First, the provisions of company legislation, a company's constitution (its articles of association, including provisions of a company's memorandum of association now deemed to be provisions of its articles by section 28 of the Companies Act 2006 ("the 2006 Act")) and the non-statutory rules of company law provide that certain acts of its board of directors are treated as the acts of the company. For example, in the Companies (Model Articles)

H   Regulations 2008 (SI 2008/3229), Schedule 3, article 3 provides that "subject to the articles, the directors are responsible for the management of the company's business, for which purpose they may exercise all the powers of the company". Similarly, certain resolutions of the shareholders in general meeting are treated as the acts of the company. Further, the

© 2016 The Incorporated Council of Law Reporting for England and Wales

non-statutory "consent principle", that shareholders who have a right to
vote may by unanimous agreement bind the company in a matter in which
they had power to do so by passing a resolution at a general meeting (*In re
Duomatic Ltd* [1969] 2 Ch 365), is preserved by section 281(6) of the 2006
Act.

188  Secondly, a company can also incur direct liability through the
transactions of agents within the scope of their agency (actual or apparent).
Thus, when an agent commits his or her company to a contract, the
company incurs direct liabilities (and acquires rights) as a party to the
contract under ordinary principles of the law of agency.

189  Thirdly, a statute or subordinate legislation or a regulatory body's
code or rules of the common law or equity may impose liabilities or confer
rights on a company. For example, a company as a legal entity is owed by its
directors the general duties set out in sections 171 to 176 of the Companies
Act 2006 even when the controlling director is also the sole shareholder.

190  In *Meridian Global Funds Management Asia Ltd v Securities
Commission* [1995] 2 AC 500, Lord Hoffmann (at p 506) pointed out that it
is a necessary part of corporate personality that there should be rules by
which acts are attributed to the company. First, he identified the "primary
rules of attribution" from company law, which is the first of the direct forms
of liability which we describe above. He then referred to the general
principles of agency and vicarious liability which in most circumstances
determine a company's rights and obligations: p 507B. He recognised that
there was a third category where, exceptionally, a rule of law expressly or
impliedly excludes attribution on the basis of those general principles. For
this third category, which is relevant to the third form of direct liability
(above), he stated: "the court must fashion a special rule of attribution for
the particular substantive rule". He described the fashioning of that special
rule of attribution in these terms (p 507E–F):

"This is always a matter of interpretation: given that it is intended to
apply to a company, how is it intended to apply? Whose act (or
knowledge or state of mind) was *for this purpose* intended to count as the
act etc of the company? One finds the answer to this question by applying
the usual canons of interpretation, taking into account the language of the
rule (if it is a statute) and its content and policy."

191  The relevance of the context in which the question is asked—"Is
X's conduct or state of mind to be treated as the conduct or state of mind of
the company for the purpose in hand?"—is not limited to Lord Hoffmann's
third category. The nature and subject matter of the relevant rule and duty, is always relevant to that question. In *Bowstead &
Reynolds on Agency*, 20th ed (2014) Professor Peter Watts and Professor
Francis Reynolds stated (at para 8-213): "Before imputation occurs, there
needs to be some purpose for deeming the principal to know what the agent
knows." In the 19th edition the learned editors made the same point in the
same paragraph thus: "The rules of imputation do not exist in a state of
nature, such that some reason has to be found to disapply them. Whether
knowledge is imputed in law turns on the question to be addressed." We
agree; an analysis of the relevant case law supports that view in relation to
each category of rules of attribution. We turn first to the special rules of
attribution which Lord Hoffmann saw as providing the answer in

© 2016 The Incorporated Council of Law Reporting for England and Wales

A  exceptional cases when the other rules did not determine the company's
rights and obligations.

192  Thus, in *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd*
[1915] AC 705, the Merchant Shipping Act 1894 (57 & 58 Vict c 60)
excluded the liability of a shipowner for loss or damage if it occurred
"without his actual fault or privity". That phrase prevented the shipowner
B  incurring such liability vicariously. The House of Lords treated the fault of
Mr J M Lennard, who was a director of another company which managed
the ship, was registered in the ship's register as the manager, and was also a
director of the ship-owning company, as the fault of the latter company.
Both Viscount Haldane LC and Lord Dunedin, who gave the only
substantive speeches in the case saw the question as one of statutory
construction which depended on the particular facts of the case. In *Tesco*
C  *Supermarkets Ltd v Nattrass* [1972] AC 153, the supermarket company was
charged with an offence under the Trade Descriptions Act 1968. It pleaded a
defence under section 24 of the Act namely (a) that the commission of the
offence was due to the act or default of another person, in this case the
manager of the store at which the misleading representations as to price had
occurred, and (b) that it had taken all reasonable precautions to avoid the
commission of such an offence. The House of Lords upheld that defence.
D  Like the Divisional Court, the House of Lords treated the store manager as
"another person" for the purpose of section 24 of the Act and focused on the
question whether the task of taking reasonable precautions was that of the
board of the company or was delegated to its store managers. It construed
the statutory defence as allowing an employer who was personally blameless
to escape liability and held that in this case the board of directors had not
E  delegated their management functions to the shop managers. As a result
Tesco established the statutory defence.

193  As in each case the court is engaged in the interpretation of a
particular statute and in its application to particular facts, other statutory
provisions have given rise to different approaches. Thus in *Tesco Stores Ltd
v Brent London Borough Council* [1993] 1 WLR 1037 the Divisional Court
F  was concerned with the offence in section 11 of the Video Recordings Act
1984 of supplying a video recording to a person under the age specified in
the classification certificate. The court rejected Tesco's statutory defence
that it had neither known nor had reasonable grounds to believe that the
purchaser was under 18. It distinguished *Tesco Supermarkets Ltd v
Nattrass*, holding that the knowledge or information that the section 11(2)
defence addressed was that of the employee who supplied the video film to
G  the purchaser and not that of the company's senior management.

194  In *Attorney General's Reference (No 2 of 1982)* [1984] QB 624, to
which we referred in para 155 above, the Court of Appeal had to consider
whether a person or persons who through shareholding and directorship had
total control of a company were capable of stealing the property of the
company. This involved, among other things, considering section 2(1)(b) of
the Theft Act 1968 which provides that a person's appropriation of property
H  is not regarded as dishonest "if he appropriates the property in the belief that
he would have the other's consent if the other knew of the appropriation and
the circumstances of it". The Court of Appeal held that the company could
not be regarded as "the other" for the purpose of this provision because the
mind and will of the defendants fell to be treated as the mind and will of the

company. The defendants could be charged with theft of the company's property and their appropriate defence (if made out) would be that they appropriated the property in the honest belief that they had the right to deprive the company of it: section 2(1)(a). Again, the court approached the question of attribution as one of statutory construction.

195  In *McNicholas Construction Co Ltd v Customs and Excise Comrs* [2000] STC 553 Dyson J attributed to a main contractor the knowledge of its site managers that fraudulent invoices for sub-contract labour were being created, in circumstances in which the main contractor suffered no loss because it could claim input VAT but evaded income tax. Section 60 of the Value Added Tax Act 1994 imposes civil penalties on a person who dishonestly acts or omits to act for the purpose of evading VAT. Dyson J recorded that it was common ground in that case that the knowledge and dishonest acts of the site managers could be attributed to the main contractors only if a special rule of attribution, of which Lord Hoffmann had written in *Meridian*, could be applied. He stated (para 44):

"The question in each case is whether attribution is required to promote the policy of the substantive rule, or (to put it negatively) whether, if attribution is denied, that policy will be frustrated."

He held (paras 48–49) that the statutory policy of discouraging the dishonest evasion of VAT would be frustrated if the knowledge of the employees of a company who had to play a part in the making and receiving of supplies, as well as those involved in its VAT arrangements, were not attributed to the employing company. Further, as the participants in the fraud had not intended to harm the interests of their employing company, there was no basis for excluding such attribution.

196  The Court of Appeal took a similar approach in *In re Bank of Credit and Commerce International SA (No 15); Morris v Bank of India* [2005] 2 BCLC 328 which concerned a claim for fraudulent trading under section 213 of the Insolvency Act 1986. The court upheld Patten J's finding that the knowledge, which the general manager of Bank of India's London branch had of BCCI's fraud, was to be attributed to his employers for the purpose of section 213. In paras 156–162 above we discussed *Safeway Stores Ltd v Twigger*. What is relevant for present purposes is that the court in that case looked to the wording and policy of the relevant statute in order to determine whether the acts and the intention or negligence underlying those acts were to be attributed to the company.

197  It is not only in the field of statute that the court, when deciding whether to attribute another's act or state of mind to a company, has regard to the purpose of the rule of law which is in play. In the different context of a claim based on knowing receipt of the proceeds of a fraud, the Court of Appeal in *El Ajou v Dollar Land Holdings plc* [1994] 2 All ER 685 had to consider whether the knowledge of an agent who was also the director of a company should be attributed to that company. Mr Ferdman, who was a non-executive director of Dollar Land, had made the arrangements by which Dollar Land acquired an interest in assets in which others had invested funds that they had earlier obtained by fraud. He had acted without the authority of a resolution by Dollar Land's board. Because Mr Ferdman managed and controlled the transactions, the court attributed his knowledge to the company, treating him as the directing mind and will of the company in

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   relation to those transactions. The court recognised that different persons
    could be treated as the directing mind and will of a company for different
    purposes (Rose LJ at p 699H and Hoffmann LJ at p 706E). While a Mr Stern
    generally managed Dollar Land, Mr Ferdman was for the purpose of the
    receipt of the funds the company's mind and will, and on that basis his
    knowledge of the fraud was attributed to the company. The plaintiff's
    alternative basis of attribution on the ground of agency failed. We see force
B   in the suggestion by the editors of *Bowstead & Reynolds on Agency*
    (para 8.214) that the rules of agency could have resulted in imputation of
    knowledge in that case. But in the event the court decided otherwise. Thus
    the only basis on which Mr El Ajou succeeded was the attribution of
    Mr Ferdman's knowledge to the company based on the concept of a person
    being a company's directing mind and will in relation to a particular
C   transaction. Similarly, although in that case it was not necessary to do so in
    order to establish Mr Tan's accessory liability for dishonest assistance of a
    breach of trust, the Judicial Committee of the Privy Council in *Royal Brunei
    Airlines Sdn Bhd v Tan* [1995] 2 AC 378, 393B–C attributed Mr Tan's
    objective dishonesty to the travel agency company which he controlled.

        198   The courts have also had to consider questions of attribution of
    knowledge or actions in a contractual context such as that of an insurance
D   policy. In that context the terms of the insurance policies are relevant and
    can be decisive as the court seeks to give effect to the intentions of the parties
    as expressed in their contract. In *Arab Bank plc v Zurich Insurance Co*
    [1999] 1 Lloyd's Rep 262 Rix J addressed a professional indemnity policy
    which covered the legal liability of both a company which provided estate
    agency and valuation services and its directors. The assumed facts included
E   the assertion that one of the directors, who was the managing director, had
    made a number of fraudulent valuations in the company's name. The
    plaintiffs obtained judgments against the company, which went into
    liquidation, and sought to enforce them against the insurance company
    under the Third Parties (Rights against Insurers) Act 1930. Zurich
    purported to avoid the policy on the basis of the director's fraud. But the
F   insurance policy included fidelity insurance which indemnified the company
    against liabilities resulting from the fraudulent acts of a director. Because he
    construed the policy as insuring the company and its directors as separate
    insureds, the logic of the policy was that the guilty knowledge and conduct
    of a director could not be attributed to the company for the purpose of
    giving effect to the insurance contract even if he were the directing mind and
    will of the company in relation to the particular transactions. He referred to
G   Lord Hoffmann's analysis of a special rule of attribution which we have
    quoted in para 190 above, and held that in the context of the particular
    contract he was not prepared to find that the fraudulent director was the
    directing mind and will of the company: pp 278–279. In *Morris v Bank of
    India* [2005] 2 BCLC 328 the Court of Appeal (at paras 122–124) explained
    the *Arab Bank* case as a case which rested on the construction of the terms of
    the insurance contract.
H       199   In *Belmont Finance Corpn Ltd v Williams Furniture Ltd* [1979] Ch
    250 ("*Belmont No 1*"), the Court of Appeal considered a claim by the
    receiver of an insolvent company ("A") that its shareholders and directors
    had dishonestly conspired to use A's funds to purchase shares in another
    company ("B") at an excessive price and thereby give unlawful financial

© 2016 The Incorporated Council of Law Reporting for England and Wales

assistance to the shareholders of B to purchase A's shares. The Court of
Appeal held that the directors' knowledge that they were effecting an illegal
transaction should not be imputed to A because the object of the conspiracy
was improperly to deprive A of a large part of its assets. Buckley LJ
(pp 261–262) explained the non-attribution on the basis that when an agent,
who is acting in fraud of his principal, has knowledge which is relevant to
the fraud, that knowledge is not imputed to the principal to defeat the
company's claim against the conspirators (as to which rule see *Bowstead &
Reynolds on Agency*, 20th ed (2014), paras 8-207 (article 95, rule 4) and 8-
213). When the case returned to the Court of Appeal after a retrial,
(*Belmont Finance Corpn Ltd v Williams Furniture Ltd (No 2)* [1980] 1 All
ER 393 ("*Belmont No 2*")) the court's findings made clear that the
transaction had been approved by resolution at a formal board meeting of A
and completed at two further board meetings, including by the sealing by
A of the share transfers of B's issued share capital (Buckley LJ at p 398G–H).
Although the transaction was clearly subject to what Lord Hoffmann in the
*Meridian Global Funds* case [1995] 2 AC 500 described as the primary rules
of attribution, the knowledge which some of A's directors (Mr James and
Mr Foley) had of the illegal transaction and their misfeasance was not
attributed to A so as to bar its claim but was attributed to the defendant
parent companies of which they were officers.

200    We think that the court would have reached the same conclusion in
the *Belmont* case if it had approached the question of attribution on the basis
that the board of directors of A was its "directing mind and will" because the
company was pursuing a claim against, among others, its directors for
conspiracy. Were it otherwise a company could not vindicate its rights
against its directors and those who assisted them or benefited from the
conspiracy. This approach is consistent with the older case of *Gluckstein v
Barnes* [1900] AC 240, in which the promoters of a company, who also
comprised its entire board of directors, were aware of a secret profit which
they made on the asset which they had sold to the company. The House of
Lords looked at the question of disclosure in the context of the particular
claim. The Earl of Halsbury LC thought that it was absurd to suggest that
the knowledge of those who were hoodwinking the shareholders should be
treated as disclosed to the company (p 247) and Lord Robertson (p 258)
agreed, stating colourfully that "the boardroom was occupied by the
enemy".

201    Finally, in *Moulin Global Eyecare Trading Ltd v Inland Revenue
Comr*, to which we have referred, the Court of Final Appeal of Hong Kong
was concerned with a claim by way of judicial review by an insolvent
company's liquidator to be entitled to object out of time to tax assessments
and obtain repayment of the tax paid on the basis that its former
management had fraudulently inflated its profits over several years. The
company's entitlement to object out of time and also to claim repayment
based on error in its tax returns depended on whether the company was
attributed with its managers' knowledge of the fraud. The majority of the
court held that the company was to be attributed with the knowledge of its
management. In the leading judgment, which contained an admirable
analysis of the law, Lord Walker of Gestingthorpe NPJ supported an
approach to the attribution to a company of a director's knowledge in civil
cases which had regard to the factual situation in which they arose and the

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   purpose of the legal rules that were in play. See his summary (at para 129).
He distinguished between: (i) claims by the company against its directors or
employees and their accomplices for loss which the company suffered as a
result of their wrongdoing, where it was absurd to allow the directors or
employees to rely on their own awareness of their wrongdoing and attribute
it to the company as a defence against its claim, and (ii) third party claims
B   against a company for loss caused to the third party by the misconduct of a
director or employee, where the dishonesty of the director or employee
would not prevent his act and knowledge being attributed to the company.

202   It is clear from those cases that a finding that a person is for a
specific purpose the "directing mind and will" of a company, when it is not
merely descriptive, is the product of a process of attribution in which the
court seeks to identify the purpose of the statutory or common law rule or
C   contractual provision which might require such attribution in order to give
effect to that purpose. Similarly, when the question of attribution arises in
the context of an agency relationship, the nature of the principal's or other
party's claim is highly material as the learned editors of *Bowstead &
Reynolds* discuss at para 8-213. Even when the primary rules of attribution
apply, where the transaction is approved by the board of directors and
completed under company seal as in *Belmont (No 2)*, the court will not
D   attribute to a company its directors' or employees' knowledge of their own
wrongdoing to defeat the company's claim against them and their associates.
We agree with Lord Walker NPJ in *Moulin's* case when (at para 113) having
discussed the Court of Appeal's judgment in this case he stated:

"the crucial matter of context includes not only the factual and
statutory background, but also the nature of the proceedings in which the
E   question [of attribution] arises."

203   In our view, that applies to the knowledge of directors whether one
applies the primary rules of attribution of the company's constitution (the
cases of *Gluckstein v Barnes* and *Belmont (No 2)*), the rules of attribution of
agency (*Belmont (No 1)*), or the special rules of attribution which Lord
Hoffmann discussed in the *Meridian Global Funds* case. Where a company's
F   liability is only vicarious, it is attributed with responsibility for the act of the
other, usually the employee; but neither the other's act nor his or her state of
mind is attributed to the company.

204   It is helpful in the civil sphere, to consider the attribution of
knowledge to a company in three different contexts, namely (i) when a third
party is pursuing a claim against the company arising from the misconduct
G   of a director, employee or agent, (ii) when the company is pursuing a claim
against a director or an employee for breach of duty or breach of contract,
and (iii) when the company is pursuing a claim against a third party.

205   In the first case, where a third party makes a claim against the
company, the rules of agency will normally suffice to attribute to the
company not only the act of the director or employee but also his or her state
of mind, where relevant. In this context, the company is like the absent
H   human owner of a business who leaves it to his managers to run the business,
while he spends his days on the grouse moors (to borrow Staughton LJ's
colourful metaphor in *PCW Syndicates v PCW Reinsurers* [1996] 1 WLR
1136, 1142). Where the rules of agency do not achieve that result, but the
terms of a statute or contract are construed as imposing a direct liability

© 2016 The Incorporated Council of Law Reporting for England and Wales

which requires such attribution, the court can invoke the concept of the *A* directing mind and will as a special rule of attribution. Thus where the company incurs direct liability as a result of a wrongful act or omission of another (as in *Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd* and *McNicholas Construction Co Ltd v Customs and Excise Comrs*) it is deemed a wrongdoer because of those acts or omissions. If it is only vicariously liable for its employee's tort, it is responsible for the act of the other without *B* itself being deemed a wrongdoer and without the employee's state of mind being attributed to it.

206 In the second case, where the company pursues a claim against a director or employee for breach of duty, it would defeat the company's claim and negate the director's or employee's duty to the company if the act or the state of mind of the latter were to be attributed to the company and the company were thereby to be estopped from founding on the wrong. It *C* would also run counter to sections 171 to 177 of the 2006 Act, which sets out the director's duties, for the act and state of mind of the defendant to be attributed to the company. This is so whether or not the company is insolvent. A company can be attributed with knowledge of a breach of duty when, acting within its powers and in accordance with section 239 of the 2006 Act, its members pass a resolution to ratify the conduct of the director. But, as this court discussed in *Prest v Prest* [2013] 2 AC 415, para 41, *D* shareholders of a solvent company do not have a free hand to treat a company's assets as their own. Further, as we have discussed, actual or impending insolvency will require the directors to consider the interests of the company's creditors when exercising their powers. This might prevent them from seeking such ratification. Similarly, where a company ratifies a breach of duty by an agent or employee, it must be attributed with the *E* relevant knowledge. But otherwise, as the courts have recognised since at least *Gluckstein v Barnes* [1900] AC 240, it is absurd to attribute knowledge to the company and so defeat its claim.

207 In the third case, where the company claims against a third party, whether or not there is attribution of the director's or employee's act or state of mind depends on the nature of the claim. For example, if the company were claiming under an insurance policy, the knowledge of the board or a *F* director or employee or agent could readily be attributed to the company in accordance with the normal rules of agency if there had been a failure to disclose a material fact. But if the claim by the company, for example for conspiracy, dishonest assistance or knowing receipt, arose from the involvement of a third party as an accessory to a breach of fiduciary duty by a director, there is no good policy reason to attribute to the company the act *G* or the state of mind of the director who was in breach of his fiduciary duty. If the company chose not to sue the director who was in breach of his duty, the third party defendant could seek a contribution from him or her under the Civil Liability (Contribution) Act 1978. We have set out above why we consider that the defence of illegality is not available to a company's directors or their associates who are involved in a conspiracy against the company or otherwise act as accessories to the directors' breach of duty. *H* Equally, there is no basis for attributing knowledge of such behaviour to the company to found an estoppel.

208 In the present case Patten LJ rightly stated that attribution of the conduct of an agent so as to create liability on the part of the company

A  depends very much on the context in which the issue arises. He said that as between the company and the defrauded third party, the company should be treated as a perpetrator of the fraud; but that in the different context of a claim between the company and the directors, the defaulting directors should not be able to rely on their own breach of duty to defeat the operation of the provisions of the Companies Act 2006 in cases where those provisions were intended to protect the company: paras 34, 35.

B  209   We agree. Accordingly, if, contrary to our view, the doctrine of illegality were insensitive to context and to competing aspects of public policy, the rules of attribution would achieve the same result and preserve Bilta's claim.

*Insolvency Act 1986 section 213*

C  210   The appellants' second challenge is that the court's powers under section 213 of IA 1986 do not extend to people and corporations resident outside any of the jurisdictions of the United Kingdom.

211   Section 213 of IA 1986 provides:

"(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud
D  creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.

"(2) The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such contributions (if any) to the company's assets as the court thinks proper."

E  212   The appellants accept that the English courts have jurisdiction in personam. Their challenge is to the court's subject matter jurisdiction as discussed by Hoffmann J in *Mackinnon v Donaldson Lufkin & Jenrette Securities Corpn* [1986] Ch 482, 493 and Lawrence Collins LJ in *Masri v Consolidated Contractors International (UK) Ltd (No 2)* [2009] QB 450, paras 30–31. It relates to whether the court can regulate the appellants'
F  conduct abroad. Whether a court has such subject matter jurisdiction is a question of the construction of the relevant statute. In the past it was held as a universal principle that a United Kingdom statute applied only to United Kingdom subjects or foreigners present in and thus subjecting themselves to a United Kingdom jurisdiction unless the Act expressly or by necessary implication provided to the contrary: *Ex p Blain; In re Sawers* (1879) 12 Ch D 522, 526, James LJ. That principle has evolved into a question of
G  interpreting the particular statute: *Clark v Oceanic Containers Inc* [1983] 2 AC 130, Lord Scarman, at p 145, Lord Wilberforce, at p 152; *Masri v Consolidated Contractors International (UK) Ltd (No 4)* [2010] 1 AC 90, Lord Mance, at para 10; and *Cox v Ergo Versicherung AG* [2014] AC 1379, Lord Sumption JSC, at paras 27–29. In *Cox* Lord Sumption JSC suggested that an intention to give a statute extraterritorial effect could be implied if the purpose of the legislation could not effectually be achieved without such
H  effect: para 29.

213   In our view section 213 has extraterritorial effect. Its context is the winding up of a company registered in Great Britain. In theory at least the effect of such a winding up order is worldwide: *Stichting Shell Pensioenfonds v Krys* [2015] AC 616, paras 34, 38. The section provides a remedy against

© 2016 The Incorporated Council of Law Reporting for England and Wales

any person who has knowingly become a party to the carrying on of that *A* company's business with a fraudulent purpose. The persons against whom the provision is directed are thus (a) parties to a fraud and (b) involved in the carrying on of the now-insolvent company's business.   Many British companies, including Bilta, trade internationally.   Modern communications enable people outside the United Kingdom to exercise control over or involve themselves in the business of companies operating in this country. *B* Money and intangible assets can be transferred into and out of a country with ease, as the occurrence of VAT carousel frauds demonstrates.   We accept what HMRC stated in their written intervention: there is frequently an international dimension to contemporary fraud.   The ease of modern travel means that people who have committed fraud in this country through the medium of a company (or otherwise) can readily abscond abroad.   It would seriously handicap the efficient winding up of a British company in an *C* increasingly globalised economy if the jurisdiction of the court responsible for the winding up of an insolvent company did not extend to people and corporate bodies resident overseas who had been involved in the carrying on of the company's business.

214  In our view the Court of Appeal reached the correct decision in *In re Paramount Airways Ltd* [1993] Ch 223, in which it held that the court *D* had jurisdiction under section 238 of IA 1986 (which empowers the court to make orders against any person to reverse transactions at an undervalue) to make an order against a foreigner resident abroad.   Sir Donald Nicholls V-C expressed the view (p 239D-E) that Parliament did not intend to impose any limitation on the expression "any person" in sections 238 and 239 of IA 1986 and that it must be left to bear its literal, natural meaning.   We reach the same conclusion in relation to the use of that expression in section 213 *E* for essentially the same reasons.   The section, like sections 238 and 239 and also section 133 (which concerns the public examination of persons responsible for the formation and running of a British company) share the statutory context of the winding up of a British company.   The Court of Appeal considered section 133 in *In re Seagull Manufacturing Co Ltd* [1993] Ch 345.   Peter Gibson J, who produced the leading judgment, expressed the *F* views (a) that Parliament could not have intended that a person who had been responsible for the state of affairs of an insolvent British company should escape liability to be investigated simply because he was not within the jurisdiction (p 354G–H) and (b) that reasons of international comity would not prevent the summoning for public examination of a person who had participated in the running of a British company: p 356E.   Hirst LJ said (p 360G–H) that the process of investigating why a company had failed *G* would be frustrated if a non-resident director were immune from public examination.   Again, that reasoning is in our view both correct and equally applicable to section 213.

215  The appellants argued that it was wrong that they should be required to defend themselves against a claim when it would only be after the substantive hearing that the court could decide whether to exercise its jurisdiction on the basis that the defendants were sufficiently connected with *H* England.   We do not agree.   While the court which hears the claim will have to decide whether in all the circumstances the appellants are sufficiently connected with England, we think that the respondents have a good arguable case that they are.   The substance of the section 213 allegation is

© 2016 The Incorporated Council of Law Reporting for England and Wales

75

[2016] AC
Bilta (UK) Ltd v Nazir (No 2) (SC(E))
Lord Toulson and Lord Hodge JJSC

A   that the appellants were party to a conspiracy to defraud Bilta in the context of a wider VAT fraud, that they were parties to the conduct of Bilta's business to that end, and that Jetivia obtained the proceeds of that fraud. If Bilta's liquidators establish those allegations after trial, we think it is likely that the court would decide to exercise its jurisdiction under section 213 of IA 1986 against the appellants, their foreign residence notwithstanding.

B   216   Bilta's liquidators also asserted that the English courts had jurisdiction by virtue of article 3(1) Council Regulation (EC) No 1346/2000 on insolvency proceedings ("the European Insolvency Regulation"). It provides:

"The courts of the member state within the territory of which the centre of a debtor's main interests is situated shall have jurisdiction to open insolvency proceedings. In the case of a company or legal person, the place of the registered office shall be presumed to be the centre of its main interests in the absence of proof to the contrary."

C

217   In *Schmid v Hertel* (Case C-328/12) [2014] 1 WLR 633 the Court of Justice of the European Union ("CJEU") held (a) that article 3(1) conferred international jurisdiction to hear and determine actions which derive directly from those proceedings and which are closely connected with them (para 30) and (b) that the court of the relevant member state had jurisdiction to hear and determine an action to set aside a transaction by virtue of insolvency that is brought against a person who is not resident in the territory of a member state: para 39. Thus, Bilta's liquidators submitted, the European Insolvency Regulation, so interpreted, conferred jurisdiction against both appellants. On the other hand, the appellants submitted that the question whether the territorial reach of section 213 of IA 1986 was worldwide was now governed by the European Insolvency Regulation, whose natural meaning was that it related to relationships between member states and not with third party states. Mr Maclean said that the decision in *Schmid* was controversial and suggested that there should be a reference to the CJEU to determine whether the section 213 proceedings were covered by the European Insolvency Regulation.

D

E

F   218   We do not think that it is necessary to rely on the European Insolvency Regulation as the Court of Justice has interpreted it in *Schmid* in order to determine whether there is subject matter jurisdiction against Jetivia. If the proceedings against Jetivia were not covered by the Regulation, there is a basis for the exercise of subject matter jurisdiction in our domestic law, as we have discussed above. There is therefore no need for a reference to the CJEU.

G

*Conclusion*

219   We therefore would dismiss the appeal.

*Appeal dismissed.*

H   SHIRANIKHA HERBERT, Barrister

© 2016 The Incorporated Council of Law Reporting for England and Wales

TAB 9

*Blackburn, Low & Co v Vigors* (1887) 12 App Cas 531,
House of Lords

1/6/2017    10-03635-jpm    Doc 173-2    Filed 01/13/17    Blackburn, Low & Co. v. Vigors    Entered 01/13/17 22:34:28    Ex. C part 1
Pg 351 of 856

531

**12 App.Cas.**

Original Printed Version (PDF)

[HOUSE OF LORDS.]

BLACKBURN, LOW & CO.                                          APPELLANTS;

AND

THOMAS VIGORS                                                RESPONDENT.

1887 Aug. 9.                          LORD HALSBURY L.C., LORD WATSON,
                                            LORD FITZGERALD, and LORD
                                                         MACNAGHTEN.

*Insurance (Marine) - Concealment of Material Facts - Principal and Agent - Concealment by Agent through whom Policy not effected.*

The plaintiffs instructed a broker to re-insure an overdue ship. Whilst acting for the plaintiffs the broker received information material to the risk, but did not communicate it to them, and the plaintiffs effected a re-insurance for £800 through the broker's London agents. Afterwards the plaintiffs effected a re-insurance for £700, lost or not lost, through another broker. The ship had in fact been lost some days before the plaintiffs tried to re-insure, but neither the plaintiffs nor the last-named broker knew it, and both he and the plaintiffs acted throughout in good faith:-

*Held,* reversing the judgment of the Court of Appeal and restoring the judgment of Day J. (17 Q. B. D. 553), that the knowledge of the first broker was not the knowledge of the plaintiffs, and that the plaintiffs were entitled to recover upon the policy for £700.

*Fitzherbert v. Mather* (1 T. R. 12); *Gladstone v. King* (1 M. & S. 35); *Stribley v.* Imperial Marine Insurance Company (1 Q. B. D. 507); *Ruggles v. General Interest Insurance Company* (4 Mason, 74; 12 Wheaton, 408); and Proudfoot v. Montefiore (Law Rep. 2 Q. B. 511) commented on.

APPEAL from the Court of Appeal.

The facts are stated in the judgments of Lord Esher M.R. and Lindley L.J. (1) The following outline will suffice for this report.

(1) 17 Q. B. D. 553.

---

532

**12 App.Cas.**                    **BLACKBURN, LOW & CO. v. VIGORS. (H.L.(E.))**

The appellants having brought an action against the respondent upon a policy of re-insurance subscribed by him for £50, claiming for a total loss by perils of the sea, the substantial defence was that the defendant was induced to subscribe the policy by the wrongful concealment by the plaintiffs and their agents of certain material facts known to the plaintiffs or their agents and unknown to the defendant.

At the trial before Day J. and a special jury in July 1885 the following facts were proved or admitted.

The plaintiffs, underwriters and insurance brokers at Glasgow, had underwritten the steamship *State of*

*Florida* for £1500, the policy having been effected by the usual brokers for the ship, Rose, Murison & Thomson, who were underwriters and insurance brokers in Glasgow. The ship had left New York on the 11th of April 1884 bound for Glasgow where she was due about the 24th or 25th. On the 30th the plaintiffs tried to re-insure through their London brokers Roxburgh, Currie & Co., but the terms asked were higher than the plaintiffs would give. On the next day, May 1st, the plaintiffs asked Rose, Murison & Thomson to effect a re-insurance for £1500 at fifteen guineas through Rose, Thomson, Young & Co., the London agents of Rose, Murison & Thomson. The latter telegraphed accordingly to Rose, Thomson, Young & Co. After the telegram and before any answer came Murison a member of the firm of Rose, Murison & Thomson became aware of certain facts concerning the ship which were material to the risk, but these facts were never communicated to the plaintiffs or to Roxburgh, Currie & Co. After learning these facts Rose, Murison & Thomson received the following answer to their telegram; "Twenty guineas paying freely and market very stiff; likely to advance before day is out." This answer they shewed to the plaintiffs, and then sent in the plaintiffs' names the following telegram to Rose, Thomson, Young & Co., "Pay 20 guineas." The answer to this was sent direct to the plaintiffs, who ultimately re-insured for £800 at 25 guineas through Rose, Thomson, Young & Co. This was not the policy sued on.

On the 2nd of May the plaintiffs through Roxburgh, Currie & Co. effected a policy of re-insurance for £700 at 30 guineas lost or not lost. This was the policy sued on. The ship had in fact

---

**533**

12 App.Cas.          **BLACKBURN, LOW & CO. v. VIGORS. (H.L.(E.))**

been lost some days before the plaintiffs tried to reinsure. It was admitted that the plaintiffs and Roxburgh, Currie & Co. acted in good faith throughout.

The jury having been discharged by consent Day J. gave judgment for the plaintiffs for the amount claimed.

The Court of Appeal (Lindley and Lopes L.JJ., Lord Esher M.R. dissenting) reversed this decision and gave judgment for the defendant.

Against this judgment the plaintiffs appealed.

April 28, 29. Sir *C. Russell* Q.C. and *Hollams* for the appellants:-

The decision of the Court of Appeal was wrong because the material information was not known either to the plaintiffs or to anyone who was their agent to effect the insurance in question, or whose knowledge was the knowledge of the principal. The knowledge of Rose, Murison & Thomson was not the knowledge of the plaintiffs so far as the insurance in question was concerned. Concealment of a material fact by the agent through whom the policy is effected avoids the policy. and so will concealment by some other agents: but no case decides that concealment by every agent avoids. The agent must be the master of the ship, or the agent at the port where she is, or in a similar position. He must be in control of and in direct relation to the subject-matter: the alter ego of the principal; an "habitual," a "general" agent; - expressions used in the various authorities. Here the agent was not the "habitual" or "general" agent, and he did not effect the policy. To sustain the judgment the respondent must contend that the broker is bound to send his principal every rumour he hears, for which proposition there is no authority. The cases of *Fitzherbert v. Mather* (1), *Gladstone v. King* (2), and *Proudfoot v. Montefiore* (3), are discussed and exposed in the judgment of Lord Esher (4). If their effect is what was supposed by the Court of Appeal they are contrary to principle and may be overruled in this House. *Stribley v. Imperial Marine Insurance Company* (5) only followed *Gladstone v.*

(1) 1 T. R. 12.
(2) 1 M. & S. 35.
(3) Law Rep. 2 Q. B. 511.
(4) 17 Q. B. D. 553.
(5) 1 Q. B. D. 507.

12 App.Cas.                 **BLACKBURN, LOW & CO. v. VIGORS. (H.L.(E.))**

*King* [(1)](#). Whether the decision of Story J. or of the Court in Error was the right one in *Ruggles v. General Interest Insurance Company* [(2)](#) the case does not throw much light on the present point. The question is also discussed in 1 Phillips Ins. ss. 531, 543 and in 2 Duer Mar. Ins. Lect. 13, Part 1, ss. 23-32, pp. 413, 427.

Sir *R. Webster* A.G. and *J. Gorell Barnes* for the respondent:-
It is a condition of the contract of insurance that there is no misrepresentation or concealment either by the assured or anyone who ought, as a matter of business or fair dealing, to have disclosed the material facts. The plaintiffs having been left in ignorance of the material facts by their agents whose duty it was to inform them cannot take advantage of a concealment without which the insurance could not have been effected. The material facts became known to Rose, Murison & Thomson while acting as the plaintiffs' agents to reinsure their whole line. Murison went on acting as the plaintiff's agent after he knew those facts; and so long as an agent acts he is bound to communicate material facts to his principal. On what ground is the policy for £800 different from that for £700? A distinction is attempted to be drawn between a risk sought to be covered and one not sought to be covered, but the risk was indivisible, though split up into different policies. No part of the risk was insured when Murison knew the facts. He by his London agents did effect an insurance on part on May 1, which was vitiated by his knowledge. How can the principal validly insure the remainder the next day? To vitiate the contract fraud is not necessary: whether the misrepresentation or concealment be the result of ignorance, mistake or misadvertence, whether it be intentional or accidental, the result is the same: 2 Duer Mar. Ins. Lect. 1 3 Part 1, ss. 3, 23, pp. 381, 415; 1 Phillips Ins. ss. 543, 549, 562, 564; 1 Arnould Mar. Ins. (4th ed.) pp. 481, 490. The duty to communicate is equally binding whether the agent be the habitual or general agent or not. Where two innocent persons contract the loss must fall on him who trusted the person who knew the truth. [They also discussed at length the above cases, and Lord Macnaghten

(1) 1 M. & S. 35.
(2) 4 Mason, 74; in error, 12 Wheaton, 408.

12 App.Cas.                 **BLACKBURN, LOW & CO. v. VIGORS. (H.L.(E.))**

referred to *Wyllie v. Pollen* [(1)](#), per Lord Westbury on the subject of constructive notice to a principal.]

*Hollams* for the appellants in reply cited 2 Duer Mar. Ins. p. 788.

The House took time for consideration.

Aug. 9. LORD HALSBURY L.C.:-
My Lords, in this case the plaintiffs sue upon a policy of marine insurance, and the only question arises upon the statement of defence that the defendant was induced to enter into the contract by concealment of material facts by the plaintiffs and their agents.
The facts are not in dispute. Neither the plaintiffs nor the agent through whom the policy was effected had any knowledge of the material fact the concealment or non-disclosure of which is relied on as vitiating the

policy; but an agent, who did not effect the policy, at an earlier period received information, admitted to be material, while he was acting as agent to effect an insurance for the plaintiffs, which he did not communicate.

Day J., before whom the case was decided without a jury, held that this did not affect the validity of the policy. A majority of the Court of Appeal reversed Day J.'s judgment, and held that the non-disclosure was fatal to the plaintiffs' claim.

So far as I can understand the judgment of the Court of Appeal, it is intended to lay down a principle that would not, I think, be contested, but it applies that principle to a state of facts to which I think it is inapplicable. Lindley L.J. says, I think correctly: "It is a condition of the contract that there is no misrepresentation or concealment either by the assured or by any one who ought as a matter of business and fair dealing to have stated or disclosed the facts to him or to *the* underwriter for him (2)." And Lopes L.J. after stating the principle upon which the knowledge of the agent is the knowledge of the principal, explains it to mean that the principal is to be as responsible for any knowledge of a material fact acquired by his

(1) 32 L. J. (Ch.) 782.
(2) 17 Q. B. D. 578.

---

536

| 12 App.Cas. | BLACKBURN, LOW & CO. v. VIGORS. (H.L.(E.)) | Lord Halsbury, L.C. |

agent employed to obtain the insurance as if he had acquired it himself (1). To the propositions thus stated I think no objection could be made; but it is obvious that the words in the one judgment "agent employed to obtain the insurance," or in the other judgment the words "*the* underwriter," import that the particular contract obtained was, in the language of the statement of defence, a policy which the defendant was induced to subscribe by the wrongful concealment by the plaintiffs and their agents of certain facts then known to the plaintiffs or their agents, and unknown to the defendant, and which were material to the risk.

I doubt very much whether the solution of the controversy as to what is the true principle upon which the contract of insurance is avoided by concealment or misrepresentation, whether by considering it fraudulent or as an implied term of the contract, helps one very much in deciding the present case. If one were to adopt in terms the language of Lord Ellenborough in *Gladstone v. King* (2), I do not think it could justify the judgment of the majority of the Court of Appeal. In that case a policy lost or not lost was effected on the 25th of October. On the previous 25th of July the ship had run upon a rock. On the 5th of August the captain wrote to his owners, the plaintiffs; they received his letter on the 5th of October. Whatever may be said of the logic of that case, which acquitted the captain of all ill intention, but decided upon the ground that otherwise owners might direct their captains to remain silent, and which upon a policy lost or not lost assumes any antecedent damage to have been an implied exception out of the policy, it does not proceed upon any such ground as the Court of Appeal appear to rely on here. Lord Ellenborough says: "No mischief will ensue" (a somewhat strange mode of enunciating a proposition of law) "from holding in this case that the antecedent damage was an implied exception out of the policy. If the principle be new, it is consistent with justice and convenience." Unfortunately his Lordship does not state what is the principle which he apparently admits to be new. I can quite understand that when a man comes for an insurance upon his ship he may be expected to know

(1) 17 Q. B. D. 579.
(2) 1 M. & S. 35.

---

537

both the then condition and the history of the ship he seeks to insure. If he takes means not to know, so as to be able to make contracts of insurance without the responsibility of knowledge, this is fraud. But even without fraud, such as I think this would be, the owner of the ship cannot escape the necessity of being acquainted with his ship and its history because he has committed to others, - his captain, or his general agent for the management of his shipping business, - the knowledge which the underwriter has a right to assume the owner possesses when he comes to insure his ship.

With respect to agency so limited, I am not disposed to differ with the proposition laid down by Cockburn, C.J. in *Proudfoot v. Montefiore* (1). A part of the proposition is "that the insurer is entitled to assume as the basis of the contract between him and the assured that the latter will communicate to him every material fact of which the assured has, or in the ordinary course of business ought to have knowledge." I think these last are the cardinal words and contemplate such an agency as I have described above. I am unable however to see that the present case is governed by any such principle.

A broker is employed to effect a particular insurance. While so employed he receives material information - he does not effect the insurance and he does not communicate the information. How is it possible to suggest that the assured could rely upon the communication to the principal of every piece of information acquired by any agent through whom the assured has unsuccessfully endeavoured to procure an insurance? I am unable to accept the criticism by the Master of the Rolls upon the proposition that the knowledge of the agent is the knowledge of the principal. When a person is the agent to know, his knowledge does bind the principal. But in this case I think the agency of the broker had ceased before the policy sued upon was effected. The principal himself and the broker through whom the policy sued on was effected were both admitted to be unacquainted with any material fact which was not disclosed. I cannot but think that the somewhat vague use of the word "agent" leads to confusion. Some agents so far represent the principal that in all

(1) Law Rep. 2 Q. B. 511, 521.

---

538

| 12 App.Cas. | BLACKBURN, LOW & CO. v. VIGORS. (H.L.(E.)) | Lord Halsbury, L.C. |

respects their acts and intentions and their knowledge may truly be said to be the acts, intentions, and knowledge of the principal. Other agents may have so limited and narrow an authority both in fact and in the common understanding of their form of employment that it would be quite inaccurate to say that such an agent's knowledge or intentions are the knowledge or intentions of his principal; and whether his acts are the acts of his principal depends upon the specific authority he has received.

In *Fitzherbert v. Mather* (1) the consignor and shipper of the goods insured was the agent whose knowledge was in question. In *Gladstone v. King* (2) the master of the ship was the agent; and in *Proudfoot v. Montefiore* (3) the agent was the accepted representative of the principal, in effect trading and acting for him in Smyrna, the owner himself carrying on business in Manchester. And though the decision in *Ruggles v. General Insurance Co.* (4) before the Supreme Court of the United States may not be very satisfactory in what they held under the circumstances of that case to be the relation between the captain of the ship and his owners, the principle upon which that case was decided was the supposed termination of the agency between them.

Where the employment of the agent is such that in respect of the particular matter in question he really does represent the principal, the formula that the knowledge of the agent is his knowledge is I think correct, but it is obvious that that formula can only be applied when the words "agent" and "principal" are limited in their application.

To lay down as an abstract proposition of law that every agent, no matter how limited the scope of his agency, would bind every principal even by his acts, is obviously and upon the face of it absurd; and yet it is

by the fallacious use of the word "agent" that plausibility is given to reasoning which requires the assumption of some such proposition.

What then is the position of the broker in this case, whose knowledge, though not communicated, is held to be that of the principal?

(1) 1 T. R. 12.
(2) 1 M. & S. 35.
(3) Law Rep. 2 Q. B. 511.
(4) 12 Wheaton, 408.

---

**539**

12 App.Cas.                **BLACKBURN, LOW & CO. v. VIGORS. (H.L.(E.))**                Lord Halsbury, L.C.

He certainly is not employed to acquire such knowledge, nor can any insurer suppose that he has knowledge in the ordinary course of employment like the captain of a ship, or the owner himself, as to the condition or history of the ship. In this particular case the knowledge was acquired, not because he was the agent of the assured, but, from the accident that he was general agent for another person. The reason why, if he had effected the insurance, his knowledge, unless he communicated it, would have been fatal to the policy, is because his agency was to effect an insurance, and the authority to make the contract drew with it all the necessary powers and responsibilities which are involved in such an employment; but he had no general agency - he had no other authority than the authority to make the particular contract, and his authority ended before the contract sued on was made. When it was made no relation between him and the shipowner existed which made or continued him an agent for whose knowledge his former principal was responsible. There was no material fact known to any agent which was not disclosed at the point of time at which the contract was made; there was no one possessed of knowledge whose duty it was to communicate such knowledge.

For these reasons, I am of opinion that the judgment of the Court of Appeal should be reversed, and the judgment of Day J. restored; and I move your Lordships accordingly.

LORD WATSON:-

My Lords, this is a case of considerable nicety; but I have ultimately come to the conclusion, for the reasons already stated by the Lord Chancellor, that the appeal ought to be allowed.

It is, in my opinion, a condition precedent of every contract of marine insurance that the insured shall make a full disclosure of all facts materially affecting the risk which are within his personal knowledge at the time when the contract is made. Where an insurance is effected through the medium of an agent, the ordinary rule of law applies, and non-disclosure of material facts, known to the agent only, will affect his principal, and give the insurer good ground for avoiding the contract.

In the case of insurance by a shipowner, it has been decided

---

**540**

12 App.Cas.                **BLACKBURN, LOW & CO. v. VIGORS. (H.L.(E.))**                Lord Watson.

that he is affected by the knowledge of a class of agents other than those whom he employs to insure. In the ordinary course of business, the owner of a trading vessel employs a master and ship-agents, whose special function it is to keep their employer duly informed of all casualties encountered by his ship, which would materially influence the judgment of an insurer. On that ground it has been ruled that the insurer must be held to have transacted in reliance upon the well-known usage of the shipping trade, and that he is consequently

entitled to assume that every circumstance material to the risk insured has been communicated to him, which ought in due course to have been made known to the shipowner before the insurance was effected. Accordingly if a master or ship-agent, whether wilfully or unintentionally, fail in their duty to their employer, their suppression of a material fact will, notwithstanding his ignorance of the fact, vitiate his contract.

I do not think it necessary to notice in detail the authorities which bear on this point. I desire to say, however, that I have difficulty in comprehending the principle upon which the Court in *Gladstone v. King* (1) and *Stribley v. Imperial Marine Insurance Company* (2) held that the innocent non-communication of a material fact by an agent who was the alter ego of the shipowner merely created an exception from the policy. In both these cases the Court appears to me to have undertaken the somewhat perilous task of settling the terms of the contract which the insurer would have made for himself if the fact had been communicated to him.

In the present case it is sought to extend the imputed knowledge of the insured to all facts which during the period of his employment became known to any agent, other than the agent effecting the policy in question, who was employed at any time, successfully or unsuccessfully, to insure the whole or part of the same risk with that covered by the policy. This is a case of re-insurance; but it is obvious that the principle, if admitted, would be equally applicable to the original contract.

I am of opinion, with your Lordships, that the responsibility of an innocent insured for the non-communication of facts which

(1) 1 M. & S. 35.
(2) 1 Q. B. D. 507.

---

541

12 App.Cas.                    BLACKBURN, LOW & CO. v. VIGORS. (H.L.(E.))                    Lord Watson.

happen to be within the private knowledge of persons whom he merely employs to obtain an insurance upon a particular risk, ought not to be carried beyond the person who actually makes the contract on his behalf. There is no authority whatever for enlarging his responsibility beyond that limit, unless it is to be found in the decisions which relate to captains and ship-agents; and these do not appear to me to have any analogy to the case of agents employed to effect a policy. There is a material difference in the relations of these two classes of agents to their employer. The one class is specially employed for the purpose of communicating to him the very facts which the law requires him to divulge to his insurer; the other is employed, not to procure or furnish information concerning the ship, but to effect an insurance. There is also, as the Master of the Rolls pointed out, an important difference in the positions of those two classes with respect to the insurer. He is entitled to contract, and does contract, on the basis that all material facts connected with the vessel insured, known to the agent employed for that purpose, have been by him communicated, in due course, to his principal. So, also, when an agent to insure is brought into contract with an insurer, the latter transacts on the footing that the agent has disclosed every material circumstance within his personal knowledge, whether it be known to his principal or not; but it cannot be reasonably suggested that the insurer relies, to any extent, upon the private information possessed by persons of whose existence he presumably knows nothing.

In the circumstances of this case I have come to the conclusion that whilst it might be the moral duty of Mr. Murison to communicate to the appellants the information which he received on the forenoon of the 1st of May 1884, he was under no legal obligation to do so. There may be circumstances which impose upon agents in the position of Mr. Murison an express or implied duty to communicate their own information to their principal: but nothing of that sort occurs here. I must in fairness to Mr. Murison say that I can find no warrant for the inference of fact drawn by Lindley L.J. that he purposely omitted to impart his knowledge to the appellants, in order that they might re-insure on more favourable terms. No such imputation was made at the

12 App.Cas.        BLACKBURN, LOW & CO. v. VIGORS. (H.L.(E.))

trial; and, if it had been made, it ought to have been submitted to the jury, and their verdict taken upon it.

I concur therefore in the judgment which has been moved.

LORD FITZGERALD:-

My Lords, in this very interesting case I concur in the order which will presently be proposed by my noble and learned friend the Lord Chancellor. I adopt entirely the reasons which have been given by the Lord Chancellor and by my noble and learned friend opposite (Lord Watson). The judgment delivered by the Master of the Rolls was one of more than usual ability - it was a considered judgment, prepared with care and upon a critical examination of the authorities; and I am prepared to adopt that judgment and substantially the reasons given by the noble and learned Lord for the conclusion at which he arrived, though not every portion of those reasons.

LORD MACNAGHTEN:-

My Lords, I agree.

It has frequently been said by eminent judges that the doctrine of constructive notice ought not to be extended. It seems to me that the decision under appeal involves a great and a dangerous extension of that doctrine.

There is nothing unreasonable in imputing to a shipowner who effects an insurance on his vessel all the information with regard to his own property which the agent to whom the management of that property is committed possessed at the time and might in the ordinary course of things have communicated to his employer. In such a case it may be said without impropriety that the knowledge of the agent is the knowledge of the principal. But the case is different when the agent whose knowledge it is sought to impute to the principal is not the agent to whom the principal looks for information but an agent employed for the special purpose of effecting the insurance. It is quite true that the insurance would be vitiated by concealment on the part of such an agent just as it would be by concealment on the part of the principal. But that is not because the knowledge of the agent

543

12 App.Cas.        BLACKBURN, LOW & CO. v. VIGORS. (H.L.(E.))        Lord
Macnaghten.

is to be imputed to the principal but because the agent of the assured is bound as the principal is bound to communicate to the underwriters all material facts within his knowledge. Concealment of those facts is a breach of duty on his part to those with whom his principal has placed him in communication: *Lynch v. Dunsford* (1).

It was argued that in the present case Murison was under a legal obligation to communicate to the appellants the knowledge which he acquired while employed as their agent. But the learned counsel for the respondent produced no authority for that proposition, nor did they, I think, satisfy your Lordships that such an obligation flowed from Murison's employment. The majority of the Court of Appeal say that whether there was a legal obligation on the part of Murison or not there was a moral obligation on his part to communicate this information to his employers. But I apprehend that it is not the function of a Court of Justice to enforce or give effect to moral obligations which do not carry with them legal or equitable rights. Whatever may be thought of Murison's conduct from a moral point of view, it would, in my opinion, be a dangerous extension of the doctrine of constructive notice to hold that persons who are themselves absolutely innocent of any concealment or misrepresentation, and who have not wilfully shut their eyes or closed their ears to any

means of information, are to be affected with the knowledge of matters which other persons may be morally though not legally bound to communicate to them.

> *Order appealed from reversed; judgment of Day J. restored; respondent to pay to the appellants the costs both here and below; cause remitted to the Queen's Bench Division.*
>
> *Lords' Journals 9th August 1887.*

Solicitors for appellants: *Hollams, Son & Coward.*
Solicitors for respondent: *Waltons, Bubb & Johnson.*

(1) 14 East, 494.

01741317

TAB 10

*BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3BL plc*
[2013] 1 WLR 1408, UK Supreme Court

Supreme Court                                            *A*

## *BNY Corporate Trustee Services Ltd *v* Eurosail-UK 2007-3BL plc and others*

### [2013] UKSC 28

2013  Feb 25, 26;              Lord Hope of Craighead DPSC, Lord Mance,   *B*
      May 9                         Lord Sumption, Lord Carnwath JJSC,
                                        Lord Walker of Gestingthorpe

*Insolvency — Winding up — Company's debts — Company deemed "unable to pay its debts" where its assets exceeded by liabilities "taking into account its contingent and prospective liabilities" — Whether prospective liabilities to be taken into account at face value irrespective of maturity date or rate of interest payable in meantime — Whether company unable to pay debts — Insolvency Act 1986 (c 45), s 123(1)(e)(2)*                                                  *C*

The issuer, a special purpose entity set up by the Lehman Brothers group not long before its collapse, issued loan notes in the course of a securitisation transaction comprising a portfolio of mortgage loans. The conditions of issue of the notes incorporated (with minor modifications) the provisions of section 123(1) and (2) of   *D* the Insolvency Act 1986[1]. Condition 9(a) provided that the trustee of the notes might, on the occurrence of certain specified events of default, serve on the issuer a written enforcement notice, declaring the notes to be due and repayable. In the absence of any event of default, the notes were finally repayable at dates ranging from 2027 to 2045. The specified events of default included, by condition 9(a)(iii), the issuer being "deemed unable to pay its debts" as contemplated by section 123(1)(e) and (2) of the 1986 Act. The service of an enforcement notice had   *E* the effect of changing the priority according to which different classes of noteholders were entitled to receive repayments of principal upon redemption of the underlying mortgages. Following the filing by two other companies in the Lehman Brothers group for protection under chapter 11 of the US Bankruptcy Code, and their failure to fulfil certain obligations to the issuer under interest and currency rate swap transactions designed to hedge the issuer's risks in relation to the securitisation transaction, the trustee of the notes sought the court's determination of two   *F* questions. First, whether the issuer was "unable to pay its debts" for the purposes of condition 9(a)(iii), which depended on how the requirement to "[take] into account its contingent and prospective liabilities" should be applied when determining whether the value of its assets was less than the amount of its liabilities within the meaning of section 123(2) of the 1986 Act. Second, if the issuer were deemed unable to pay its debts, whether a post-enforcement call option under which, in the event that the security for the notes was enforced and found to be insufficient, an   *G* associated company of the issuer was to have a call option in respect of the benefit of all the notes at a nominal price, had the effect that the issuer was not, after all, unable to pay its debts within the meaning of section 123(2).

The judge held that the assets to be valued were the present assets of the company without taking into account any contingent or prospective assets; that the requirement to take into account contingent and prospective liabilities could not require such liabilities to be aggregated at their face value with debts presently due or the conversion of prospective liabilities denominated in foreign currency into sterling   *H* at the present spot rate; and that the content of "taking account of" had to be recognised in the context of the overall question posed by section 123(2) which involved consideration of the relevant facts of the case, including when the

[1] Insolvency Act 1986, s 123(1)(e)(2): see post, para 1.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   prospective liability fell due, whether it was payable in sterling or some other
currency, what assets would be available to meet it and what if any provision was
made for the allocation of losses in relation to those assets. He granted a declaration
that the issuer was not unable to pay its debts within section 123(2) of the 1986 Act
for the purposes of the condition in question. On appeal by the holders of one class of
notes, the Court of Appeal upheld the judge's decision.

B   On appeal by the appellant noteholders on the first question and cross-appeal by
the issuer on the second—

*Held*, dismissing the appeal and the cross-appeal, that the test in section 123(1)(e)
of the Insolvency Act 1986 was concerned not simply with the petitioner's own
presently-due debt, nor only with other presently-due debt owed by the company, but
also with debts falling due from time to time in what was, depending on all the
circumstances, but especially on the nature of the company's business, the reasonably
near future; that, once the court had to move beyond the reasonably near future, any

C   attempt to apply the section 123(1)(e) test would become completely speculative and
a comparison under section 123(2) of present assets with present and future
liabilities, discounted for contingencies and deferment, became the only sensible test,
with the burden of proof on the party asserting balance-sheet insolvency; that
whether or not the section 123(2) test of balance-sheet insolvency was satisfied would
depend on the available evidence as to the circumstances of the particular case, with
the court, having looked at the company's assets and made proper allowance for its
prospective and contingent liabilities, asking whether it could not reasonably be

D   expected to be able to meet those liabilities; but that the more distant the liabilities,
the harder it would be to deem insolvent a company that was currently able to pay its
debts as they fell due; and that, accordingly, the answer to the first question was that
since the issuer's ability or inability to pay all its debts, present or future, might only
be finally determined after 30 years, the court could not be satisfied that there would
eventually be a deficiency; and it followed that the second question did not arise,
although the court agreed with the judge and the Court of Appeal that the post-

E   enforcement call option agreement had no effect on the way the liability of the issuer
to the noteholders for the purposes of the default provision in condition 9(a)(iii) was
to be calculated (post, paras 37, 38, 42, 49–51).

*Byblos Bank SAL v Al-Khudhairy* [1987] BCLC 232, CA and *In re Cheyne
Finance plc (No 2)* [2008] Bus LR 1562 considered.

*Per Lord Hope of Craighead DPSC.* As to why the court agrees with the judge
and the Court of Appeal on the second question, the exercise that condition 9(a)(iii)

F   predicates is the quantification of the amount of the issuer's assets and liabilities in
order to determine whether there has been an event of default. The legal effect and
the commercial effect of the post-enforcement call option agreement, on its true
analysis, both point in the same direction. It has no effect, for the purpose of that
quantification, on the amount of the issuer's liabilities (post, para 63).

Decision of the Court of Appeal [2011] EWCA Civ 227; [2011] 1 WLR 2524;
[2011] Bus LR 1359; [2011] 3 All ER 470 affirmed.

G   The following cases are referred to in the judgments:

*Bank of Australasia v Hall* (1907) 4 CLR 1514
*Byblos Bank SAL v Al-Khudhairy* [1987] BCLC 232, CA
*Capital Annuities Ltd, In re* [1979] 1 WLR 170; [1978] 3 All ER 704
*Cheyne Finance plc, In re (No 2)* [2007] EWHC 2402 (Ch); [2008] Bus LR 1562;
[2008] 2 All ER 987

H   *Company (No 006794 of 1983), In re A* [1986] BCLC 261
*Company (No 0012209 of 1991), In re A* [1992] 1 WLR 351; [1992] 2 All ER 797;
[1992] BCLC 865
*Enviroco Ltd v Farstad Supply A/S* [2011] UKSC 16; [2011] 1 WLR 921; [2011]
Bus LR 1108; [2011] 3 All ER 451; [2011] 2 All ER (Comm) 269; [2011]
2 Lloyd's Rep 72, SC(E)

© 2013 The Incorporated Council of Law Reporting for England and Wales

*European Life Assurance Society, In re* (1869) LR 9 Eq 122   A

*Rainy Sky SA v Kookmin Bank* [2011] UKSC 50; [2011] 1 WLR 2900; [2012]
     Bus LR 313; [2012] 1 All ER 1137; [2012] 1 All ER (Comm) 1; [2012] 1 Lloyd's
     Rep 34, SC(E)

The following additional cases were cited in argument:

*Colt Telecom Group plc, In re (No 2)* [2002] EWHC 2815 (Ch); [2003] BPIR 324

*Culross Global SPC Ltd v Strategic Turnaround Master Partnership Ltd* [2010]   B
     UKPC 33, PC

*Deiulemar Shipping SpA v Transfield ER Futures Ltd* [2012] EWHC 928 (Comm)

*Dollar Land Holdings plc, In re* [1993] BCC 823

*Heis v FM Front Door Ltd* [2011] CSOH 175

*MDA Investment Management Ltd, In re* [2003] EWHC 2277 (Ch); [2004] 1 BCLC
     217

*R (SRM Global Master Fund LP) v Treasury Comrs* [2009] EWHC 227 (Admin);   C
     [2009] BCC 251, DC

**APPEAL** and **CROSS-APPEAL** from the Court of Appeal

By a CPR Pt 8 claim issued on 7 May 2010 BNY Corporate Trustee
Services Ltd, the trustee of notes issued by the first defendant, Eurosail-UK
2007-3BL plc ("the issuer"), sought the directions of the court as to whether
an event of default was capable of having arisen under condition 9(a)(iii) of   D
the terms and conditions which governed the issue of the notes. The specific
questions raised were: (1) whether, without regard to the post-enforcement
call option agreement ("PECO"), the issuer was unable to pay its debts
within the meaning of section 123(2) of the Insolvency Act 1986 for the
purposes of condition 9(a)(iii) ("the first question"); and if so, (2) whether
the post-enforcement call option agreement had the effect that the issuer was   E
not unable to pay its debts within the meaning of section 123(2) for the
purposes of condition 9(a)(iii) ("the second question"). The second to sixth
defendants, Natixis, Neuberger Berman Europe Ltd (on behalf of Sealink
Funding Ltd), Orpington Structured Finance I Ltd, Municipality Finance plc
and Carrera Capital Finance Ltd, represented holders of A3 notes issued by
the issuer ("the A3 noteholders"). The seventh and eighth defendants,   F
Patron EMF SARL and Pamplona Credit Opportunities Master Fund,
represented holders of A2 notes issued by the issuer ("the A2 noteholders").

On 30 July 2010 Sir Andrew Morritt C [2011] 1 WLR 1200 answered the
first question in the negative and granted a declaration that the issuer was not
unable to pay its debts within the meaning of section 123(2) of the 1986 Act.

On 7 March 2011, the Court of Appeal (Lord Neuberger of
Abbotsbury MR, Wilson and Toulson LJJ) [2011] 1 WLR 2524 dismissed an   G
appeal by the A3 noteholders against that decision.

On 12 July 2011 the Supreme Court (Lord Walker of Gestingthorpe,
Lord Collins of Mapesbury and Lord Clarke of Stone-cum-Ebony JJSC)
granted an application by the A3 noteholders for permission to appeal (the
A3 noteholders appealing in the event being Neuberger Berman Europe
Ltd, Municipality Finance plc and Carrera Capital Finance Ltd). On
30 November 2011 the Supreme Court (Lord Walker of Gestingthorpe,   H
Lord Clarke of Stone-cum-Ebony and Lord Dyson JJSC) gave the issuer
leave to cross-appeal on the second question. The issues on the appeal and
the cross-appeal, as stated in the parties' agreed statement of facts and issues,
were: (1) whether the issuer was, without regard to the PECO, deemed

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   unable to pay its debts within the meaning of section 123(2) of the Act for
the purposes of condition 9(a)(iii); (2) whether the PECO had any effect on
the amount of the issuer's liabilities when determining whether the issuer
was deemed unable to pay its debts within the meaning of section 123(2).

The facts are stated in the judgment of Lord Walker of Gestingthorpe.

B   *Gabriel Moss QC* and *Richard Fisher* (instructed by *Sidley Austin LLP*)
for the A3 noteholders.

*Robin Dicker QC* and *Jeremy Goldring* (instructed by *Berwin Leighton
Paisner LLP*) for the issuer.

*David Allison* (instructed by *Allen & Overy LLP*) for the trustee, by
written submissions.

C   The court took time for consideration.

9 May 2013. The following judgments were handed down.

**LORD WALKER OF GESTINGTHORPE** (with whom **LORD MANCE,
LORD SUMPTION** and **LORD CARNWATH JJSC** agreed)

D   *Introduction*

1   Subsections (1) and (2) of section 123 of the Insolvency Act 1986
("the 1986 Act") provide as follows:

"(1) A company is deemed unable to pay its debts—

"(a) [non-compliance with a statutory demand for a debt exceeding
£750 presently due]

E   "(b) to (d) [unsatisfied execution on judgment debt in terms appropriate
to England and Wales, Scotland and Northern Ireland respectively]

"(e) if it is proved to the satisfaction of the court that the company is
unable to pay its debts as they fall due.

"(2) A company is also deemed unable to pay its debts if it is proved to
the satisfaction of the court that the value of the company's assets is less
than the amount of its liabilities, taking into account its contingent and

F   prospective liabilities."

A company in the situation described in subsection (1)(e) is often said to be
"cash-flow" insolvent. A company in the situation described in subsection (2)
is often said to be "balance-sheet" insolvent, but that expression is not to be
taken literally. It is a convenient shorthand expression, but a company's

G   statutory balance sheet, properly prepared in accordance with the
requirements of company law, may omit some contingent assets or some
contingent liabilities. There is no statutory provision which links
section 123(2) of the 1986 Act to the detailed provisions of the Companies
Act 2006 as to the form and contents of a company's financial statements.
This appeal is concerned with the construction and effect of section 123(1)(e)
and (2) as incorporated into the documentation of an issue of loan notes.

H   2   The statutory provisions were incorporated, with some small
modifications, into the conditions applicable to loan notes issued in
the course of a securitisation transaction comprising a portfolio of
non-conforming mortgage loans secured on residential property in the
United Kingdom. The issuer is Eurosail-UK 2007-3BL plc ("Eurosail"), one

© 2013 The Incorporated Council of Law Reporting for England and Wales

1412
**BNY Ltd v Eurosail plc (SC(E))**                                                [2013] 1 WLR
**Lord Walker of Gestingthorpe**

of many similar single purpose entities ("SPEs") set up by the Lehman    A
Brothers group (but off the balance sheet of any of that group's companies)
not long before its collapse. Eurosail is the principal respondent to this
appeal, and it has a cross-appeal on a subsidiary issue. The other respondent
appearing before this court, BNY Corporate Trustee Services Ltd ("the
trustee") is part of the BNY Mellon Group. It is the trustee for the holders
("noteholders") of loan notes of various classes issued by Eurosail. It has    B
adopted a neutral attitude in the proceedings (as explained in its written
case), and has not appeared by counsel before this court. But it will, in the
event that the appeal succeeds and the cross-appeal fails, have an important
judgment to make as to material prejudice to the noteholders' interests.

3 In 2007 Eurosail (described in the documentation as "the issuer")
acquired a portfolio of mortgage loans, secured on residential property in
England and Scotland and denominated in sterling, to the principal amount    C
of approximately £650m. Most of the mortgages were regarded as "non-
conforming" in that they did not meet the lending requirements of building
societies and banks. This purchase was funded by the issue on 16 July 2007
of loan notes in five principal classes (A, B, C, D and E) comprising
14 different subclasses, some denominated in sterling, some in US dollars
and some in euros. In the designation of the classes "a" indicated that the    D
loan was denominated in euros, "b" US dollars and "c" pounds sterling.
The senior (class A) notes were divided into three sub-classes, denominated
in one of the three currencies, designated and issued as follows:

| A1b | US$200m |
| A1c | £102·5m |
| A2a | € 64·5m |
| A2b | US$100m |
| A2c | £ 63m |
| A3a | €215m |
| A3c | £ 64·5m |

The B, C, D and E notes were issued in smaller amounts, with variations in
currency but no subclasses having different priorities as between themselves.    G
There were also some notes designated as ETc "revenue-backed" notes. The
total sum raised was just under £660m. After payment of costs and expenses
of the issue the initial surplus of assets over prospective liabilities (if taken at
face value) was quite small.

4 The provisions of section 123(1) and (2) of the 1986 Act are
incorporated into an important provision in the conditions of issue of the
notes ("the conditions"). Condition 9(a) (events of default) provides that    H
the trustee may on the occurrence of any of five specified events (an "event
of default") serve on Eurosail a written notice (an "enforcement notice")
declaring the notes to be due and repayable. In some circumstances the
trustee is obliged to serve such a notice. In the absence of an event of default

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   the A1 notes were repayable in 2027 at latest (in fact they have already been
repaid, as have the revenue-backed notes).  All the other notes are repayable
in 2045 at latest.

   5   The events of default include (condition 9(a)(iii)):

"The issuer, otherwise than for the purposes of such amalgamation or
reconstruction as is referred to in sub-paragraph (iv) below, ceasing or,
B   through or consequent upon an official action of the board of directors of
the issuer, threatens to cease to carry on business or a substantial part of
its business or being unable to pay its debts as and when they fall due or,
within the meaning of section 123(1) or (2) (as if the words 'it is proved
to the satisfaction of the court' did not appear in section 123(2) of the
Insolvency Act 1986 (as that section may be amended from time to time),
C   being deemed unable to pay its debts . . ."

Under a proviso to condition 9(a), an occurrence falling within
sub-paragraph (iii) counts as an event of default only if the trustee certifies to
Eurosail that it is, in the trustee's sole opinion, materially prejudicial to the
interests of the noteholders.

   6   The service of an enforcement notice would have immediate and
far-reaching consequences for all the noteholders (other than the A1 and
D   ETc noteholders, whose notes have already been fully redeemed).  As
described in more detail below, an enforcement notice shifts their rights
from the regime prescribed in condition 2(g) (priority of payments prior to
enforcement) to the regime prescribed in condition 2(h) (priority of
payments post-enforcement).  Under the latter regime noteholders of class
A3 ("A3 noteholders") rank pari passu with noteholders of class A2
E   ("A2 noteholders") for repayment of principal.  That is in contrast with the
present regime, under which A2 and A3 noteholders rank pari passu
for interest payments (clause 2(g)(vi)) but A2 noteholders have priority
over A3 noteholders in receiving repayments of principal out of funds
representing principal sums received on the redemption of mortgages in
the portfolio (those funds being included in the definition of "Actual
F   Redemption Funds" in the preamble to the conditions): condition 5(b)(i)(2)
and (3).

   7   It is in these circumstances that the construction of section 123(2) of
the 1986 Act, as incorporated into condition 9(a)(iii), has assumed such
importance.  Eurosail, together with those of the A2 noteholders who
appeared below, succeeded before Sir Andrew Morritt C [2011] 1 WLR
1200, and the Court of Appeal [2011] 1 WLR 2524.  The Court of Appeal, at
G   para 54, considered that section 123(2) should be interpreted broadly and in
line with standards of commercial probity:

"A balance has to be drawn between the right of an honest and prudent
businessman, who is prepared to work hard, to continue to trade out of
his difficulties if he can genuinely see a light at the end of the tunnel,
and the corresponding obligation to 'put up the shutters', when, by
H   continuing to trade, he would be doing so at the expense of his creditors
and in disregard of those business considerations which a reasonable
businessman is expected to observe."

(That is a quotation from para 216 of the *Report of the Review Committee
on Insolvency Law and Practice* (1982) (Cmnd 8558), better known as the

© 2013 The Incorporated Council of Law Reporting for England and Wales

Cork Report, reflecting the view of Professor Goode; this passage is quoted    A
in para 54 of the judgment of Lord Neuberger MR in the Court of Appeal.)
The appellant A3 noteholders say that this passage is not in point. They
have argued for a much stricter construction. They have emphasised that a
company's inability to pay its debts is no more than a precondition to the
exercise of the court's jurisdiction, which is discretionary, to make a winding
up order or an administration order. The precondition to be satisfied should    B
be, they have argued, transparent and certain, leaving scope for the exercise
of discretion on the hearing of the petition. There has also been argument as
to whether the statutory text (as incorporated in an amended form, and also
allowing for possible future legislative amendment) must bear the same
meaning as it would in actual winding-up proceedings, or whether it can and
should, as incorporated, take account of the commercial context of the
conditions.                                                                     C

8   Those, in outline summary, are the positions of the opposing parties
on the appeal. The cross-appeal, which is relevant only if the appeal is
successful, is concerned with the so-called post-enforcement call option
("PECO") which is a subsidiary (but technically important) part of the
securitisation transaction.

9   Before going further into the complexities of the appeal I would         D
comment that the image invoked by Professor Goode of an honest and
prudent trader working hard to turn his business round relates, as was
pointed out by Mr Moss QC for the appellants, to the law of insolvency as it
applies to individuals. Even if translated into corporate terms, it has very
little bearing on the situation in which Eurosail now finds itself. Its present
financial position and future prospects are not matters for which Eurosail
and its managers merit either praise or criticism, since those matters are      E
almost entirely out of their control. They depend on three imponderables:
first, (since the currency and interest-rate hedging arrangements with the
Lehman Brothers group have failed, leaving Eurosail with a claim in its
insolvency) the movements of the US dollar and the euro relative to the
pound sterling; secondly, movements in LIBOR [the London Interbank
Offered Rate] or equivalent interest rates on loans denominated in those
three currencies; and thirdly, the performance of the United Kingdom         F
economy in general, and the United Kingdom residential property market in
particular, as influencing the performance of the mortgage portfolio.

*The transaction documents*

10   The legal documents relating to the securitisation issue are, as Lord
Neuberger MR put it, regrettably and forbiddingly voluminous. Apart from    G
the conditions themselves there was a formal trust deed made between the
trustee and Eurosail, a liquidity facility agreement, currency swaps
agreements, a fixed/floating swap agreement, a BBR swap agreement and
other agreements relating to administrative matters (there is a full list of
"transaction documents" in the definition of that expression in the preamble
to the conditions). Several expressions used in the conditions involve a
paperchase to other documents in order to find their definitions. Mr Moss    H
opened the documents very lightly, moving rapidly from condition 9(a)(iii)
to concentrate his submissions on the construction of section 123(1)
and (2) of the 1986 Act. Mr Dicker QC (for Eurosail) went into the
conditions more fully to pave the way for his contextual arguments.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   Without pre-judging those arguments I think it is necessary, if only in order to appreciate the consequences of the opposing arguments, to have an outline understanding of how the SPE (which counsel concurred in describing as a "closed system" or "wrapper") operated before the collapse of Lehman Brothers, of how it operates now (after the collapse of Lehman Brothers but before any enforcement notice), and of how it would operate after the service of an enforcement notice.

B        11   Interest is payable on all unredeemed notes quarterly in arrears, the first payment having been made on 13 September 2007. The annual rate of interest is linked to LIBOR or its dollar or euro equivalents (condition 4(c)(i)), exceeding that rate by a margin (the "relevant margin" as defined in the preamble) which varies from 0·07% for A1b notes to 4% for E notes.

C        12   Mortgage interest received by Eurosail (the principal component in the "available revenue fund") cascades down the metaphorical waterfall set out in the 24 sub-paragraphs of condition 2(g) (priority of payments prior to enforcement). The first claims on the income stream are for remuneration, charges and expenses; then (sub-paragraph (iv)) sums due to the liquidity facility provider, and (sub-paragraph (v)) sums payable under or in connection with the fixed/floating swap agreement and the BBR swap agreement (but not any currency swaps). Payments to currency swaps counterparties were linked to interest payments to particular classes of noteholders, so that payments to counterparties in respect of A noteholders come into the provision for payment of interest to those noteholders, which is made pari passu as between all the A sub-classes (condition 2(g)(vi)). The next priority (condition 2(g)(vii) was for payment-off of any A principal deficiency (another expression defined in the preamble), but in practice such a deficiency could arise only if all the junior classes of notes had become valueless. Next in the waterfall come similar groups of provisions for payment of interest, sums due to the currency swaps counterparties (and any B principal deficiency) in respect of B notes (condition 2(g)(viii) and (ix)) and so on for all the other classes (condition 2(g)(x) to (xv)).

F        13   On 15 September 2008 Lehman Brothers Holdings Inc ("LBHI"), the guarantor of the swaps counterparty, Lehman Brothers Special Financing Ltd ("LBSF"), filed for Chapter 11 bankruptcy, as did LBSF on 3 October 2008. The swaps were terminated on 13 November 2009. Eurosail has made a claim against LBHI's and LBSF's bankrupt estates for about $221m. At the time of the hearings below, the claim had not been admitted and no distribution has been made in respect of it. During the last three years sterling has depreciated significantly against both the euro and the dollar, but the prevailing low level of interest rates has resulted in a surplus ("excess spread") of mortgage interest received by Eurosail, which has enabled it to continue to pay in full the interest on all the outstanding notes of every class.

H        14   In the meantime, both before and after the collapse of Lehman Brothers, Eurosail received principal sums from time to time as principal secured by the mortgages was repaid, either by way of partial or total redemption by mortgagors, or by enforcement of the security against mortgagors who were in default. These sums have been and are at present applied under condition 5(b)(i) as "actual redemption funds", on each date for payment of interest, in repaying the principal of the notes in the order of

© 2013 The Incorporated Council of Law Reporting for England and Wales

priority A1 (now fully repaid), A2, A3, B, and so on. There is a proviso to *A* condition 5(b) under which the order of priority may be altered. The first possible variation (proviso (A)) applies if all the A1 and A2 notes have been redeemed and other (favourable) specified conditions are satisfied: the A3 to E1c notes then rank pari passu. Conversely, under the other variation (proviso (B)), which applies if there is an A principal deficiency, priority is granted to the A notes as a single class ranking pari passu.

*B*

15   Events of default are regulated by condition 9. The events specified in condition 9(a) are, apart from those already set out (para 5 above): default in payment for three business days of any principal or interest due on any of the notes; breach by Eurosail of any of its obligations and failure to remedy the breach (if remediable) for 14 days after notice of the breach given by the trustee; the making of an order or resolution for the winding up of Eurosail, otherwise than for an approved amalgamation or reconstruction; and *C* the initiation of insolvency or administration proceedings, or the levying of execution (subject to various qualifications which it is unnecessary to set out in detail).

16   If the event of default is an event under condition 9(a)(iii) or a breach of Eurosail's obligations, there is a further requirement that the trustee shall have certified to Eurosail "that such event is, in its sole opinion, materially *D* prejudicial to the interests of the noteholders." For this purpose the trustee may under the trust deed (as recorded in condition 2(c)) "have regard only to (i) the interests of the A noteholders if, in the trustee's sole opinion, there is a conflict between the interests of the A noteholders (or any class thereof) and the interests of the B noteholders, the C noteholders, the D noteholders and/or the E noteholders." This provision does not indicate how the trustee is to exercise its discretion in the event of a conflict (such as there now *E* potentially is) between the interests of the A2 noteholders and the A3 noteholders. If there is an event of default (and, in the cases just mentioned, it is materially prejudicial) the trustee may at its discretion serve an enforcement notice on Eurosail. Moreover it is obliged to do so if requested or directed (i) by holders of at least 25% of the outstanding "most senior class of notes" (defined as meaning the A noteholders, rather than a subclass of them) or (ii) by an extraordinary resolution of the holders of that class. *F* This court was not shown any evidence, and did not hear any submissions, as to whether either of those requirements would be likely to be satisfied in practice.

17   On service of the enforcement notice the notes become immediately due and payable and the noteholders' security becomes enforceable (condition 9(b)). Thereupon the order of priority shifts from that in *G* condition 2(g) to that in condition 2(h). It is unnecessary to go through all the detail of condition 2(h). The all-important change is that under condition 2(h)(v) the available funds are applicable to pay

> "pari passu and pro rata (1) all amounts of interest and principal then due and payable on the A1c notes, the A2c notes and the A3c notes and (2) [subject to provisions about currency swaps that have now lapsed] any *H* interest and principal then due and payable on the A1b notes, the A2a notes, the A2b notes and the A3a notes, respectively."

In practical terms, the A2 notes would no longer have priority, in terms of principal, to the A3 notes.

© 2013 The Incorporated Council of Law Reporting for England and Wales

1417

A   18  The opening words of condition 2(h) express the trustee's obligation
as being to make payments "to the extent of the funds available to
[Eurosail] and from the proceeds of enforcement of the security" (with
exceptions that need not be detailed).   The penultimate provision of
condition 2(h) provides:

B      "The noteholders have full recourse to [Eurosail] in respect of the
    payments prescribed above and accordingly are entitled to bring a claim
    under English law, subject to the trust deed, for the full amount of such
    payments in accordance with condition 10 (enforcement of notes)."

Mr Dicker did not challenge Mr Moss's submission that the opening words
do not contradict the penultimate provision, and that seems to be correct.
The opening words are directed to the trustee's obligations, not to those of
C   Eurosail.

    19  Condition 5(j) contains the PECO (post-enforcement call option)
which is the subject of the cross-appeal.  This option (which has been given
effect to as a separate written agreement between the trustee and a company
named or referred to as OptionCo) is regarded in the industry as a means of
achieving the effect of limited recourse without the adverse tax consequences
D   that would then have followed from a simple express non-recourse
provision.  The operative part of clause 5(j) is as follows:

       "All of the noteholders will, at the request of the holder of the
    post-enforcement call option, sell all (but not some only) of their holdings
    of the notes to the holder of the post-enforcement call option, pursuant to
    the option granted to it by the trustee (as agent for the noteholders)
E   to acquire all (but not some only) of the notes (plus accrued
    interest thereon), for the consideration of one euro cent per euro note
    outstanding, one dollar cent per dollar note outstanding and one penny
    per sterling note outstanding (and for these purposes, each global note
    shall be one note) in the event that the security for the notes is enforced, at
    any time after the date on which the trustee determines that the proceeds
    of such enforcement are insufficient, after payment of all other claims
F   ranking higher in priority to the notes and pro rata payment of all claims
    ranking in equal priority to the notes and after the application of any such
    proceeds to the notes under the deed of charge, to pay any further
    principal and interest and any other amounts whatsoever due in respect of
    the notes."

G   *Bankruptcy remoteness*

    20  "Bankruptcy remoteness" was the expression used by Standard &
Poor's credit-rating agency, and generally in the industry, to describe one
criterion for a SPE to obtain a satisfactory credit rating for its loan
notes (see "European Legal Criteria for Structured Finance Transactions"
published by Standard & Poor's (28 August 2008), and the comments
of the Chancellor [2011] 1 WLR 1200, para 8 and Lord Neuberger of
H   Abbotsbury MR [2011] 1 WLR 2524, para 28).  This is not the place to
consider either the reliability of the credit-rating agencies' judgments on
notes secured by sub-prime mortgages, or the influence that their judgments
seem to have had in the market (caused, some have suggested, by the
industry's general inability to comprehend the risks inherent in its own

© 2013 The Incorporated Council of Law Reporting for England and Wales

1418
BNY Ltd v Eurosail plc (SC(E))                                    [2013] 1 WLR
Lord Walker of Gestingthorpe

creations). But the notion of "bankruptcy remoteness", even if imperfectly    A
understood, underlay many features of the conditions and the arrangements
of which they formed part.

21  In developing his contextual argument that this court should
(if necessary) mould the meaning of section 123(1) and (2), as incorporated
into condition 9(a)(3) so as to take account of commercial realities,
Mr Dicker drew particular attention to five features of the arrangements.    B
They are set out and discussed in section B2 of Eurosail's case. Most of them
have been mentioned already, at least in passing, but it may be helpful to
bring them together in summary form. They are relevant not only (arguably)
to the issue of construction but also (without room for argument) to
determining the likely length of deferment of Eurosail's long-term liabilities
under the conditions, in the absence of an event of default which triggers an
enforcement notice. These points are covered at some length in the witness    C
statements of Mr Mark Filer, a director of Wilmington Trust SP Services
(London) Ltd, Eurosail's corporate services provider.

22  The five salient features of the conditions and the supporting
documentation bearing on the likely deferment of Eurosail's obligations
in respect of principal and interest are as follows: (1) Condition 2(g)
defines Eurosail's obligations for payment of interest on the notes (after
remuneration, charges and expenses) in terms of the available revenue fund    D
(see para 12 above). If that source is insufficient for payment of interest
on any of the junior notes (that is, those which are not A notes) the
obligation is deferred (while accruing interest) under condition 6(i) and (j),
if necessary until the final redemption date in 2045. (2) Temporary
shortages of income can be provided for by the liquidity facility
(reimbursements to which have a high order of priority under condition    E
2(g)(iv)). (3) As to principal, redemption of notes (other than the redeemed
A1 notes and the revenue-backed notes) is not due until 2045. Until then
redemption is limited to the actual redemption funds (as defined in the
preamble) which are applied in the appropriate order of priority under
condition 5(b) (see para 14 above). (4) Any loss of principal resulting from
default on mortgages is termed a "principal deficiency" and is recorded in
the principal deficiency ledger (the detailed provisions as to this are found    F
not in the conditions but in clauses 8 and 9 of the cash/bond administration
agreement). If there is surplus income from the mortgage payments,
the "excess spread" can be used to reduce or eliminate any principal
deficiency on whatever is the highest-ranking class of notes with
a deficiency. Recoupment of a principal deficiency takes priority to the
payment of interest on lower-ranking notes (see para 12 above). (5) Finally    G
there is the PECO, which is intended to produce the same, or a similar
result as an express limited-recourse provision (see paras 18 and 19 above).

*The legislation*

23  This court was taken to the legislative history of sections 122 and
123 of the 1986 Act, and it will be necessary to refer to it in some detail. But
it may be better to start with the sections themselves. The 1986 Act was a    H
consolidating statute which gave effect to the amendments made by the
Insolvency Act 1985. Section 122(1), as amended, provides seven cases in
which a company may be wound up by the court, of which the most
important are the last two: "(f) the company is unable to pay its debts,

© 2013 The Incorporated Council of Law Reporting for England and Wales

*A*  (g) the court is of the opinion that it is just and equitable that the company should be wound up." Section 123(1) then sets out five cases (stated or summarised in para 1 above) in which a company "is deemed unable to pay its debts".

24   The four cases in paragraphs (a) to (d) of section 123(1) are true deeming provisions.   A company's non-compliance with a statutory demand, or non-satisfaction of execution of a judgment debt, is a
*B*  matter that can be proved quite simply, usually by a single short witness statement.   If proved, it establishes the court's jurisdiction to make a winding up order, even if the company is in fact well able to pay its debts. If however a debt which has been made the subject of a statutory demand is disputed on reasonable grounds, the petitioner is adopting what has been called a high-risk strategy, and the petition may be dismissed with
*C*  indemnity costs: *In re A Company (No 0012209 of 1991)* [1992] 1 WLR 351, 354 (Hoffmann J).

25   Section 123(1)(e) is significantly different in form: "if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due."   This is not what would usually be described as a deeming provision.   It does not treat proof of a single specific default by a company as
*D*  conclusive of the general issue of its inability to pay its debts.   Instead it goes to that very issue.   It may open up for inquiry a much wider range of factual matters, on which there may be conflicting evidence.   The range is wider because section 123(1)(e) focuses not on a single debt (which under paragraphs (a) to (d) has necessarily accrued due) but on all the company's debts "as they fall due" (words which look to the future as well as to the present).

*E*  26   The words "as they fall due" did not appear in the legislation until the Insolvency Act 1985.   Similarly the express reference in section 123(2) to the test of "the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities" did not appear before the Insolvency Act 1985.   In the present case both the Chancellor and the Court of Appeal treated the present legislative provisions
*F*  as materially different from those previously in force: [2011] 1 WLR 1200, para 24; [2011] 1 WLR 2524, para 53.   Yet when this point was raised during the passage of the Insolvency Bill in 1985, the government spokesman in House of Lords, Lord Lucas of Chilworth, stated (Hansard (HL Debates), 23 October 1985, col 1247):

"Commons Amendment No 458 gives effect to the way in which the courts have interpreted section 518 of the Companies Act [1985]; that
*G*  was previously section [223] of the 1948 Act.   We are not seeking to amend the law by this amendment; merely to give effect to that interpretation by the courts, namely, that section 518 contains both a cash flow and a balance sheet test."

In these circumstances it is necessary to look quite closely at the legislative history.   In considering it I have derived great assistance from a variety of
*H*  academic commentary, including an article by Dr Peter Walton, " 'Inability to pay debts': Beyond the Point of No Return?" [2013] JBL 212.

27   The starting point is sections 79 and 80 of the Companies Act 1862 (25 & 26 Vict, c 89), the general structure of which is similar to that of sections 122 and 123 of the 1986 Act.   Section 80(4) of the 1862 Act stated

© 2013 The Incorporated Council of Law Reporting for England and Wales

the test simply as: "Whenever it is proved to the satisfaction of the court that    *A*
the company is unable to pay its debts." However, it is to be noted
that under section 158, once a winding up order had been made,

> "all debts payable on a contingency, and all claims against the
> company, present or future, certain or contingent, ascertained or
> sounding only in damages, shall be admissible to proof against the
> company, a just estimate being made, so far as is possible, of the value of    *B*
> all such debts or claims as may be subject to any contingency or sound
> only in damages, or for some other reason do not bear a certain value."

So a contingent or prospective creditor could not present a petition, but if
another creditor presented a petition and secured a winding up order, contingent and prospective liabilities were admitted to proof.

28  In *In Re European Life Assurance Society* (1869) LR 9 Eq 122    *C*
Sir William James V-C dismissed a petition for the winding up of a company
which had issued large numbers of life policies and annuity contracts, and
appeared to be in financial difficulties. In an extempore judgment he
decided, with very little reasoning, that "inability to pay debts must refer to
debts absolutely due": p 127. He then proceeded to consider at greater
length, but to dismiss, the alternative "just and equitable" ground in    *D*
section 79(5) of the Companies Act 1862. As to this ground he said,
at p 128:

> "And in my view of the law of the case it would be just and equitable to
> wind up a company like this assurance company if it were made out to my
> satisfaction that it is, not in any technical sense but, plainly and
> commercially insolvent—that is to say, that its assets are such, and its    *E*
> existing liabilities are such, as to make it reasonably certain—as to make
> the court feel satisfied—that the existing and probable assets would be
> insufficient to meet the existing liabilities. I take it that the court has
> nothing whatever to do with any question of future liabilities, that it
> has nothing whatever to do with the question of the probability whether
> any business which the company may carry on tomorrow or hereafter will
> be profitable or unprofitable. That is a matter for those who may choose    *F*
> to be the customers of the company and for the shareholders to consider."

So here, it seems, the Vice-Chancellor was applying a balance-sheet test, but
only to existing liabilities, in the context of the "just and equitable" ground.
He did not refer to any of the authorities that had been cited. It may be
unfortunate that his judgment has come to be regarded as a leading case.

29  Shortly afterwards the law was changed in relation to life offices by    *G*
the Life Assurance Companies Act 1870 (33 & 34 Vict, c 61), which was
effectively the beginning of the modern statutory regulation of life assurance.
There was no general change until section 28 of the Companies Act 1907
(7 Edw 7, c 50), which made an amendment which was then consolidated by
the Companies (Consolidation) Act 1908 (8 Edw 7, c 69). The latter
provided in section 130(iv) that a company should be deemed to be unable to
pay its debts "if it is proved to the satisfaction of the court that the company    *H*
is unable to pay its debts, and, in determining whether a company is
unable to pay its debts, the court shall take into account the contingent
and prospective liabilities of the company." The amendment made by
the Companies Act 1907 was introduced on the recommendation of the

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  Loreburn Committee (Report of the Company Law Amendment Committee)
(1906) (Cd 3052), para 43, which was influenced by section 21 of the Life
Assurance Companies Act 1870. The amendment is described by Dr Walton
[2013] JBL 212, 228 as an abbreviated version of section 21. But there is not
a very close parallel, since section 21 referred to a life office being insolvent
(meaning, apparently, balance-sheet insolvent) rather than its being unable
to pay its debts. But the admission of contingent and prospective liabilities,
B  and especially long-term liabilities, must tend to focus attention on balance-
sheet considerations. Thus in *In re Capital Annuities Ltd* [1979] 1 WLR
170, 185, Slade J observed:

  "From 1907 onwards, therefore, one species of 'inability to pay its
  debts' specifically recognised by the legislature as a ground for the making
  of a winding up order in respect of any company incorporated under the
C  Companies Acts was the possession of assets insufficient to meet its
  existing, contingent and prospective liabilities."

Essentially the same wording appeared in section 223(d) of the Companies
Act 1948 (11 & 12 Geo 6, c 38) and in section 518(e) of the Companies Act
1985. Two cases decided under section 223(d) call for mention.

  30 The first is *In re A Company (No 006794 of 1983)* [1986]
D  BCLC 261, decided by Nourse J on 21 December 1983 (also referred to as
*Bond Jewellers*). Like *In re European Life Assurance Society*, it was an
extempore judgment given without citation of authority, in order to avoid
delay, but it has been much cited. It was referred to in both Houses of
Parliament during the committee stages of the Insolvency Bill. It concerned a
tenant company with a propensity for postponing payment of its debts until
E  threatened with litigation. Nourse J felt unable to make an order under
section 223(d), and considered, but ultimately did not make an order, on the
"just and equitable" ground in section 222(f). The case is of interest as
illustrating (at p 263) that the phrase "as they fall due", although not part of
the statutory text, was understood to be implicit in section 223(d). It is also
of interest for the judge's observation on the second point in section 223(d)
(now embodied, in different words, in section 123(2) of the 1986 Act):

F
  "Counsel says that if I take into account the contingent and prospective
  liabilities of the company, it is clearly insolvent in balance sheet terms. So
  indeed it is if I treat the loans made by the associated companies as loans
  which are currently repayable. However, what I am required to do is to
  'take into account' the contingent and prospective liabilities. That cannot
  mean that I must simply add them up and strike a balance against assets.
G  In regard to prospective liabilities I must principally consider whether,
  and if so when, they are likely to become present liabilities."

  31 The second case, *Byblos Bank SAL v Al-Khudhairy* [1987] BCLC
232, was a considered judgment of Nicholls LJ (with whom Slade and
Neill LJJ agreed) delivered after 11 days of argument. It concerned the
disputed validity of the appointment of a receiver in June 1985, before either
H  the Companies Act 1985 or the Insolvency Act 1985 was in force. The
ostensible ground for appointment of the receiver was not made out, but the
bank relied on a new ground, section 223(d). Nicholls LJ observed, at p 247:

  "Construing this section first without reference to authority, it seems
  to me plain that, in a case where none of the deeming paragraphs (a),

© 2013 The Incorporated Council of Law Reporting for England and Wales

(b) or (c) is applicable, what is contemplated is evidence of (and, if *A*
necessary, an investigation into) the present capacity of a company to
pay all its debts. If a debt presently payable is not paid because of lack of
means, that will normally suffice to prove that the company is unable to
pay its debts. That will be so even if, on an assessment of all the assets
and liabilities of the company, there is a surplus of assets over liabilities.
That is trite law. It is equally trite to observe that the fact that a *B*
company can meet all its presently payable debts is not necessarily the
end of the matter, because paragraph (d) requires account to be taken of
contingent and prospective liabilities. Take the simple, if extreme, case
of a company whose liabilities consist of an obligation to repay a loan of
£100,000 one year hence, and whose only assets are worth £10,000. It is
obvious that, taking into account its future liabilities, such a company
does not have the present capacity to pay its debts and as such it 'is' *C*
unable to pay its debts."

Nicholls LJ then referred to the judgment of Sir William James V-C in
*In re European Life Assurance Society* LR 9 Eq 122, including the passage
quoted at para 28 above, and commented, at p 248: "In my view the exercise
described by James V-C is the exercise required to be done under section 223 *D*
(now section 518 of the 1985 Act)." He also referred to the decisions of
Slade J in *In re Capital Annuities Ltd* [1979] 1 WLR 170 and Nourse J in
*In re A Company (No 006794 of 1983)* [1986] BCLC 261 as consistent with
the views he had expressed.

32 In my view these authorities go quite a long way to establishing that
neither the notion of paying debts "as they fall due", nor the notion of
balance-sheet insolvency, was unfamiliar before the enactment of the *E*
Insolvency Act 1985. But petitions by contingent or prospective creditors
have been rare even after the repeal in 1986 of the standard requirement for
such a creditor to provide security for costs. One reason for that is no doubt
the difficulty of quantifying contingent and prospective liabilities to the
satisfaction of the court. Another may be the fact that well-advised
commercial lenders will insist on contractual conditions under which *F*
deferred liabilities are accelerated in the event of the borrower getting into
financial difficulties.

33 The far-reaching reforms effected by the Insolvency Acts of 1985 and
1986, together with related subordinate legislation, were influenced by the
report of the Cork Committee, published in 1982 (Cmnd 8558). One of its
recommendations, at para 535, was that "the sole ground upon which the
court may make an insolvency order in respect of a debtor, whether *G*
individual or corporate, will be that the debtor is unable to pay his or its
debts." The Committee proposed three cases in which the debtor would
be deemed to be insolvent and unable to pay his or its debts. The first
two corresponded to the cases in section 123(1)(a) to (d) of the 1986 Act.
The third case was:

"(c) where the applicant is a contingent or prospective creditor to *H*
whom the debtor is or may become indebted in a sum of not less than the
prescribed amount, being a debt not yet presently due and payable, and it
is proved to the satisfaction of the court that the ultimate repayment
of the debt is in jeopardy because the debtor's liabilities, including
contingent and prospective liabilities, exceed the debtor's assets."

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   This proposal limited the balance-sheet insolvency test to applications by
    contingent or prospective creditors whereas the *Byblos Bank* case suggested
    that it was also relevant to the payment of debts "as they fall due". That
    point was noted by Briggs J in his perceptive judgment *In re Cheyne Finance
    plc (No 2)* [2008] Bus LR 1562. He referred at paras 42–43 to similar
    language ("as they become due") used in Australian companies' legislation,
B   which until 1992 had a single test based on an inability to pay debts "as they
    become due"—a phrase which looks to the future, as Griffith CJ said in *Bank
    of Australasia v Hall* (1907) 4 CLR 1514, 1527. There is a good deal of later
    Australian authority, mentioned in the judgment of Briggs J, to the same
    effect.

        34   *In re Cheyne Finance Plc (No 2)* was concerned with a security trust
C   deed which (in contrast to condition 9(a)(iii) in the present appeal)
    incorporated into its definition of "insolvency event" the terms of
    section 123(1), but not section 123(2). It was therefore necessary to
    consider how far section 123(1)(e) was concerned, not only with debts that
    were immediately payable, but also with those that would be payable in
    the future. Briggs J decided, rightly in my view, that that is what
    section 123(1)(e) requires, at para 56:

D       "In my judgment, the effect of the alterations to the insolvency test
        made in 1985 and now found in section 123 of the 1986 Act was to
        replace in the commercial solvency test now in section 123(1)(e), one
        futurity requirement, namely to include contingent and prospective
        liabilities, with another more flexible and fact sensitive requirement
        encapsulated in the new phrase 'as they fall due.' "

E   Briggs J considered, at para 35, again rightly in my view, that the *Byblos
    Bank SAL* case was a case about ability to pay debts as they became due, but
    that the Court of Appeal recognised that balance-sheet insolvency is not
    irrelevant to that issue.

    *The practical effect of section 123*

F       35   There is no doubt that, as a matter of form, the statutory test for a
    company being unable to pay its debts is materially different (as the
    Chancellor and the Court of Appeal observed) from the position under the
    Companies Act 1985. Section 123(1)(e) introduced the words "as they fall
    due" and section 123(2) has introduced a direct reference to a company's
    assets and liabilities. These two provisions, both labelled as "deeming"
G   provisions (though neither is obviously of that character) stand side by side
    in section 123(1)(e) and section 123(2) with no indication of how they are to
    interact.

        36   It seems likely that part of the explanation lies in the history of the
    passage through Parliament of the Insolvency Bill in 1985, and the lengthy
    and interrupted process of review and consultation which had preceded it.
    This process began as long ago as October 1976 when the Secretary of State
H   announced his intention of setting up what became the Review Committee
    chaired by Mr (later Sir) Kenneth Cork. It produced an interim report in
    October 1979 (after a change of government) and its final report in 1982.
    The whole protracted process is described by Professor Ian Fletcher in his
    *Law of Insolvency* 4th ed (2009), pp 16–22. He explains, at para 1-034,

© 2013 The Incorporated Council of Law Reporting for England and Wales

1424
BNY Ltd v Eurosail plc (SC(E))                                    [2013] 1 WLR
Lord Walker of Gestingthorpe

how there was no official reaction to the final report until a spate of financial     A
scandals early in 1984:

"At relatively short notice the government White Paper, referred to
above [*A Revised Framework of Insolvency Law* (1984) (Cmnd 9175)],
was published in February 1984 together with an indication that
legislation was imminent. In consequence, very little time was allowed
for interested parties to submit comments before the drafting of the     B
Insolvency Bill was embarked upon, and the Bill itself was introduced in
the House of Lords on 10 December 1984. This regrettable mishandling
of the period of preparation for the first major overhaul of insolvency
law for over 100 years cannot but be lamented. The inadequate manner
in which consultation was conducted, coupled with the near-total lack
of any form of public debate about the issues of policy and principle at     C
the heart of any radical recasting of insolvency law, were an inauspicious
prelude to what was to become a most contentious and confused episode
of legislative history. Thereby, what ought to have been a largely
non-controversial, non-Party Bill became the subject of highly dramatic
proceedings before both Houses, and also in Committee, and damage
was unquestionably inflicted upon the ultimate quality of a highly
technical piece of legislation whose detailed provisions were but vaguely     D
understood by all but a minority of those participating in its enactment,
but whose social and economic importance was none the less immense.
The Bill's deficiencies, due to haste in preparation, together with the
vicissitudes of the parliamentary process, resulted in a quite exceptional
number of amendments being tabled to the Insolvency Bill, estimated
to have approached 1,200 by the time of Royal Assent. A high     E
proportion of these amendments were tabled by the Government itself,
and many were adopted virtually without debate during the closing
stages of proceedings."

37   Despite the difference of form, the provisions of section 123(1) and
(2) should in my view be seen, as the Government spokesman in the House of
Lords indicated, as making little significant change in the law. The changes in     F
form served, in my view, to underline that the "cash-flow" test is concerned,
not simply with the petitioner's own presently-due debt, nor only with other
presently-due debt owed by the company, but also with debts falling due
from time to time in the reasonably near future. What is the reasonably near
future, for this purpose, will depend on all the circumstances, but especially
on the nature of the company's business. That is consistent with the *Bond
Jewellers* case *(In re A Company (No 006794 of 1983))* [1986] BCLC 261,     G
*Byblos Bank SAL v Al-Khudhairy* [1987] BCLC 232 and *In re Cheyne
Finance plc (No 2)* [2008] Bus LR 1562. The express reference to assets and
liabilities is in my view a practical recognition that once the court has to move
beyond the reasonably near future (the length of which depends, again, on all
the circumstances) any attempt to apply a cash-flow test will become
completely speculative, and a comparison of present assets with present and
future liabilities (discounted for contingencies and deferment) becomes the     H
only sensible test. But it is still very far from an exact test, and the burden of
proof must be on the party which asserts balance-sheet insolvency. The
omission from condition 9(a)(iii) of the reference to proof "to the satisfaction
of the court" cannot alter that.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  38  Whether or not the test of balance-sheet insolvency is satisfied must depend on the available evidence as to the circumstances of the particular case. The circumstances of Eurosail's business, so far as it can be said to have a business at all, are quite unlike those of a company engaged in normal trading activities. There are no decisions to be made about choice of suppliers, stock levels, pricing policy, the raising of new capital, or other matters such as would constantly engage the attention of a trading

B  company's board of directors. Instead Eurosail is (in Mr Moss's phrase) in a "closed system" with some resemblance to a life office which is no longer accepting new business. The only important management decision that could possibly be made would be to attempt to arrange new hedging cover in place of that which was lost when Lehman Brothers collapsed. To that extent Eurosail's present assets should be a better guide to its ability to meet

C  its long-term liabilities than would be the case with a company actively engaged in trading. But against that, the three imponderable factors identified in para 9 above—currency movements, interest rates and the United Kingdom economy and housing market—are and always have been outside its control. Over the period of more than 30 years until the final redemption date in 2045, they are a matter of speculation rather than calculation and prediction on any scientific basis.

D  39  At first instance Sir Andrew Morritt C [2011] 1 WLR 1200, paras 29–32, started with three propositions derived from the case law: that the assets to be valued are the present assets of the company; that "contingent and prospective liabilities" are not to be taken at their full face value; and that, at para 32:

E  "'Taking account of' must be recognised in the context of the overall question posed by the subsection, namely whether the company is to be deemed to be insolvent because the amount of its liabilities exceeds the value of its assets. This will involve consideration of the relevant facts of the case, including when the prospective liability falls due, whether it is payable in sterling or some other currency, what assets will be available to meet it and what if any provision is made for the allocation of losses in

F  relation to those assets."

He then set out four reasons, at paras 34–37, for concluding, at para 38, that the value of Eurosail's assets exceeded its liabilities, "having taken account of its contingent and prospective liabilities to such extent as appears to be necessary at this stage."

40  In the Court of Appeal [2011] 1 WLR 2524 Lord Neuberger MR did

G  not disagree with anything in the Chancellor's judgment so far as it related to statutory construction. He did however go further in his detailed discussion of section 123(2). He observed, at para 44:

"In practical terms, it would be rather extraordinary if section 123(2) was satisfied every time a company's liabilities exceeded the value of its assets. Many companies which are solvent and successful, and many companies early on in their lives, would be deemed unable to pay their

H  debts if this was the meaning of section 123(2). Indeed, the issuer is a good example of this: its assets only just exceeded its liabilities when it was formed, and it was more than possible that, even if things went well, it would fall from time to time within the ambit of section 123(2) if the appellants are right as to the meaning of that provision."

© 2013 The Incorporated Council of Law Reporting for England and Wales

41 Lord Neuberger MR developed this at paras 47–49 of his judgment:

*A*

"47. More generally, I find it hard to discern any conceivable policy reason why a company should be at risk of being wound up simply because the aggregate value (however calculated) of its liabilities exceeds that of its assets. Many companies in that position are successful and creditworthy, and cannot in any way be characterised as 'unable to pay [their] debts'. Such a mechanistic, even artificial, reason for permitting a creditor to present a petition to wind up a company could, in my view, only be justified if the words of section 123(2) compelled that conclusion, and in my opinion they do not.

*B*

"48. In my view, the purpose of section 123(2) has been accurately characterised by Professor Sir Roy Goode in *Principles of Corporate Insolvency Law*, 3rd ed (2005). Having referred to section 123(1)(e) as being the 'cash flow test' and to section 123(2) as being the 'balance sheet test', he said this, at para 4-06: 'If the cash flow test were the only relevant test [for insolvency] then current and short-term creditors would in effect be paid at the expense of creditors to whom liabilities were incurred after the company had reached the point of no return because of an incurable deficiency in its assets.'

*C*

"49. In my judgment, both the purpose and the applicable test of section 123(2) are accurately encapsulated in that brief passage . . ."

*D*

42 Toulson LJ agreed with Lord Neuberger MR but expressed himself in a more guarded way. He agreed, at para 115, that Professor Sir Roy Goode had "rightly discerned the underlying policy", but added that Professor Goode's reference "to a company having reached the point of no return because of an incurable deficiency in its assets illuminates the purpose of the subsection but does not purport to be a paraphrase of it": para 119. He continued:

*E*

"Essentially, section 123(2) requires the court to make a judgment whether it has been established that, looking at the company's assets and making proper allowance for its prospective and contingent liabilities, it cannot reasonably be expected to be able to meet those liabilities. If so, it will be deemed insolvent although it is currently able to pay its debts as they fall due. The more distant the liabilities, the harder this will be to establish."

*F*

I agree with what Toulson LJ said here, and with great respect to Lord Neuberger MR I consider that "the point of no return" should not pass into common usage as a paraphrase of the effect of section 123(2). But in the case of a company's liabilities that can as matters now stand be deferred for over 30 years, and where the company is (without any permanent increase in its borrowings) paying its debts as they fall due, the court should proceed with the greatest caution in deciding that the company is in a state of balance-sheet insolvency under section 123(2).

*G*

*Reasoning in the courts below*

*H*

43 Sir Andrew Morritt C, having set out some general propositions as to the effect of section 123(1)(e) and (2) (in paras 29–32 of his judgment, summarised above), rejected the A3 noteholders' submission that Eurosail was plainly insolvent for the purposes of section 123(2) as applied by

© 2013 The Incorporated Council of Law Reporting for England and Wales

1427

A  condition 9(a)(iii). He relied on four points, set out in paras 34–37 of his
judgment: [2011] 1 WLR 1200. First, Eurosail's claims in the insolvencies of
LBHI and LBSF, though not admitted, could not be ignored. The secondary
market indicated that the claim was worth 35% to 37% of US$221m (that is,
a value of the order of £60m). Second, a large part of the total deficiency
that was claimed to exist was due to conversion into sterling at the prevailing
B  spot rate of liabilities not due for payment until 2045. Third, the future
liabilities were fully funded in the limited sense that deficiencies resulting
from mortgage defaults reduced Eurosail's liability to the noteholders
through the operation of the principal deficiency ledger.    Fourth, the
Chancellor was able to infer that a calculation of the then present values of
assets and liabilities would not show a deficiency, since Eurosail was well
able to pay its debts as they fell due, there was no deficiency on the principal
C  deficiency ledger, and projected redemptions of each class of A notes were in
advance of the maturity dates.

    44   In the Court of Appeal counsel appearing for the A2 noteholders did
not feel able to give complete support to the Chancellor's second point, and
Lord Neuberger MR accepted, at para 67, the submission of counsel for the
appellants: "As Mr Sheldon [then appearing for the A3 noteholders] said,
D  one has to value a future or contingent liability in a foreign currency at the
present exchange rate. By definition, that is the present sterling market value
of the liability." I would also respectfully question the Chancellor's third
point.  The Chancellor had earlier in his judgment, at para 13, referred to
clause 8 of the cash/bond administration agreement, which provides for the
maintenance of principal deficiency ledgers.  That seems to be the basis
of his point about liabilities being self-cancelling.  But clause 8 seems to
E  be concerned with no more than an accountancy exercise, not with a
permanent extinction of liabilities.    It operates to defer liabilities
for principal until the final redemption date, if circumstances require, and
provided that an enforcement notice is not given in the meantime.  But
condition 2(h) provides for Eurosail to be liable on a full recourse basis
post-enforcement, as already noted (para 18 above).

F     45   Lord Neuberger MR did not accept that a forecast deficiency based
on then current exchange rates could be dismissed as entirely speculative.
He started, at para 63, from Eurosail's audited accounts for the year ending
30 November 2009, which showed a net liability of £74·557m. He noted, at
paras 63 to 74, that this figure required two substantial amendments (one for
the Lehman Brothers claim, and the other for the full recourse factor)
"which, ironically and coincidentally, virtually cancel each other out":
G  para 69. So his final discussion and conclusion, at paras 75–83, starts with
an assumed deficiency of the order of £75m.

    46   Against that Lord Neuberger MR set three factors. The first was that
a deficiency of £75m, with an aggregate principal sum of just over £420m
outstanding on the mortgages, was less than 17% of the assets. Secondly, the
deficity was largely based on the assumption that exchange rates would
H  remain constant:

      "Of course, they are as likely to move in an adverse direction as they
    are to move in a favourable direction, but the volatility of those rates tells
    against the appellants, given that they have to establish that the issuer has
    reached the point of no return": para 76.

© 2013 The Incorporated Council of Law Reporting for England and Wales

Thirdly the court was looking a long way ahead, at para 78:                    A

> "Not only do all the unredeemed notes have a final redemption date in
> 2045, but it appears from the evidence that the weighted average term of
> the remaining mortgages is in the region of 18 years, and the rate of early
> redemption has slowed significantly, and is likely, according to expert
> assessment, to remain low for the time being."

47   Lord Neuberger MR accepted, at para 79, that there was a real         B
possibility that, if no enforcement notice was served, events might turn out
to the disadvantage of the A3 noteholders:

> "However, as mentioned, a future or contingent creditor of a company
> can very often show that he would be better off if the company was
> wound up rather than being permitted to carry on business.   In a
> commercially sensible legal system that cannot of itself justify the creditor   C
> seeking to wind up the company."

Toulson and Wilson LJJ agreed with this reasoning. Toulson LJ emphasised
the importance of the liabilities being distant in time: para 119, quoted in
para 42 above. The appeal was therefore dismissed, as was the cross-appeal.

### Conclusions                                                          D

48   The crucial issue, to my mind, is how far the Court of Appeal's
conclusion depended on the "point of no return" test. For reasons already
mentioned, I consider that that is not the correct test, if and in so far as it
goes beyond the need for a petitioner to satisfy the court, on the balance of
probabilities, that a company has insufficient assets to be able to meet all its
liabilities, including prospective and contingent liabilities. If it means no       E
more than that, it is unhelpful, except as illuminating (as Toulson LJ put it)
the purpose of section 123(2).

49   In my view the Court of Appeal would have reached the same
conclusion without reference to any "point of no return" test; and I would
myself reach the same conclusion. Eurosail's ability or inability to pay all its
debts, present or future, may not be finally determined until much closer to
2045, that is more than 30 years from now. The complex documentation          F
under which the loan notes were issued contains several mechanisms
(identified in para 22(1) to (4) above, the PECO being disregarded for
present purposes) for ensuring that liabilities in respect of principal are,
if necessary, deferred until the final redemption date, unless the post-
enforcement regime comes into operation. The movements of currencies
and interest rates in the meantime, if not entirely speculative, are incapable   G
of prediction with any confidence. The court cannot be satisfied that there
will eventually be a deficiency.

50   I would therefore dismiss the appeal. I would also dismiss the cross-
appeal, for the same reasons as were given by the Chancellor and the Court
of Appeal. It is not necessary to consider Mr Dicker's arguments based on
supposed inconsistencies and commercial realities, except to say that they
would have encountered serious difficulties in the light of this court's         H
decision in *Enviroco Ltd v Farstad Supply A/S* [2011] 1 WLR 921: see the
judgment of Lord Collins of Mapesbury JSC, with which the other members
of the court agreed, at paras 51 and 52. The loan notes documentation did
indeed contain some provisions (identified in paras 128–134 of Eurosail's

A case) which are inconsistent with the post-enforcement regime being triggered by a temporary deficiency of assets. But the court might well have taken the view, on documents of such complexity, that the draftsman had simply failed to grasp all its many and various implications, and that it was not for the court to rewrite the documents for the parties.

**LORD HOPE OF CRAIGHEAD DPSC**

B   51   I would dismiss the appeal for the reasons given by Lord Walker of Gestingthorpe. I would also dismiss the cross-appeal, which concerns the effect of the PECO on the application of section 123(2) of the 1986 Act as incorporated into condition 9(a)(iii). The question which it raises no longer needs to be answered as the noteholders' appeal on the question whether Eurosail ("the issuer") was unable to pay its debts was not successful. But

C Sir Andrew Morritt C [2011] 1 WLR 1200 gave his view on it in paras 39–44 of his judgment, and so too did Lord Neuberger MR in the Court of Appeal [2011] 1 WLR 2524 in paras 84–100. A PECO is widely used in securitisation transactions of the kind that was entered into in this case, and we have been told that the question is of some importance to the securitisation market more generally. So it is appropriate that we should give our reasons for agreeing with the Chancellor and the Court of Appeal

D that it has no effect on the way the liability of the issuer to the noteholders for the purposes of the default provision in condition 9(a)(iii) is to be calculated.

52   The trustee entered into a PECO Agreement on behalf of the noteholders on 16 July 2007, which is the same date as that on which the notes were issued. By clause 3.1 it granted an option to a company called

E Eurosail Options Ltd (referred to in the agreement as "OptionCo"):

"to acquire all (but not some only) of the notes (plus accrued interest thereon) in the event that the security for the notes is enforced and the trustee, after the payment of the proceeds of such enforcement, determines that the proceeds of such enforcement are insufficient, after payment of all claims ranking in priority to or pari passu with the notes

F pursuant to the deed of charge, to pay in full all principal and/or interest and any other amounts whatsoever due in respect of the notes. The trustee shall promptly after the security is enforced and the proceeds of such enforcement are paid, make a determination of whether or not there is such an insufficiency. If the trustee determines that there is such an insufficiency the trustee shall forthwith give notice (the 'insufficiency notice') of such determination to OptionCo and the issuer."

G

53   Clause 3.1 has to be read together with condition 5(j) (see para 19, above), which provides that each noteholder will, on the exercise of the option conferred on OptionCo, sell to the company the whole of his holding of notes for the nominal consideration for which the PECO provides. It also has to be read together with the event of default described in condition

H 9(a)(iii): see para 5, above. Under that provision a default occurs, among other things, in the event of the issuer "being unable to pay its debts as and when they fall due or, within the meaning of section 123(1) or (2) (as if the words 'it is proved to the satisfaction of the court' did not appear in section 123(2)) of the Insolvency Act 1986 (as that section may be amended from time to time), being deemed unable to pay its debts".

© 2013 The Incorporated Council of Law Reporting for England and Wales

A
54 The prospectus, at p 26, contains this explanation of the effect of these provisions, under the heading "Considerations related to the instruments", for prospective purchasers:

"Although the instruments will be full recourse obligations of the issuer, upon enforcement of the security for the instruments, the trustee . . . will, in practice, have recourse only to the loans and collateral security, and to any other assets of the issuer then in existence as described in this document . . ."

B

55 The purpose of a PECO is to achieve bankruptcy remoteness for the issuer. Its aim is to prevent the issuer from being susceptible to insolvent winding up proceedings by ensuring so far as possible that, if its assets prove to be insufficient to meet its liabilities, a director of the issuer will not instigate bankruptcy proceedings in respect of it. Bankruptcy remoteness is one of the criteria used by the rating agencies which issuers of notes seek to satisfy so that their instruments will achieve the highest possible credit rating. That criterion is satisfied in other jurisdictions by provisions which limit the rights of noteholders against the issuer to the value of the issuer's assets. Until recent tax legislation altered the position, limited recourse provisions of that kind gave rise to UK stamp duty reserve tax at the rate of 1·5% of the amount subscribed for them. As the Chancellor explained [2011] 1 WLR 1200, para 40, the PECO is designed to achieve the same result as limited recourse provisions, but without the adverse tax consequences.

C

D

56 The issuer accepts that, as a matter of contract, the liabilities were unlimited in recourse. But it maintains that the commercial reality was that the liabilities alleged to be the debts that the issuer was unable to pay to the noteholder were liabilities which it would never have to meet. In the event that the assets of the issuer were exhausted, any claim that the noteholder had against the issuer would be assigned to the option holder. That, it is said, would bring an end to the claim. So it would be wrong to treat the issuer as falling within section 123(2) as incorporated into condition 9(a)(iii) on the ground that it was unable to pay its debts, as in practice it was never intended or expected that the liabilities would be paid except out of the underlying assets available to the issuer.

E

F

57 The soundness of this approach depends however on whether, in law, the PECO affects the liability of the issuer to the noteholder. In answering this question it is important to appreciate that the question is not whether the issuer should actually be wound up on the grounds described in section 123(2), but whether its financial position is such that it falls within that subsection for the purposes of the default provision in condition 9(a)(iii). The answer to that question is to be found by examining the wording of the condition in the context of the provisions of the transaction documents as a whole. Does the PECO in any way alter the conclusion that would otherwise be drawn that the issuer's assets were less than its liabilities and that it was unable to pay its debts?

G

58 The Chancellor based his judgment that it did not on the wording of section 123(2), as amended for the purposes of condition 9(a)(iii). He held that if, in the application of that subsection the court concluded that the value of the company's assets was less than the amount of its liabilities, taking into account its contingent and prospective liabilities, the PECO had

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

A no effect on those liabilities at all: para 43. As he put it, the liabilities of the issuer remain the same, whether or not there is a PECO or, if there is, whether or not the call option has been exercised. Unless and until the option holder releases the issuer from all further liability, which it is under no obligation to do, the liability of the issuer is unaffected.

59 Lord Neuberger reached the same conclusion, but for fuller reasons: see paras 92–97. He said that, reading the relevant provisions of the documents together, they established that the issuer's liability to the noteholders was to be treated as a liability of full recourse at least until the security was enforced and, arguably, until the option was exercised and the transfer to the option holder was completed. There was the statement in the prospectus mentioned in para 54, above. It suggested a two-stage process, under which the issuer's liability was treated initially as full recourse and liability would become limited recourse only on enforcement of the security. There was the closing part of clause 6.7 of the deed of charge which, having restricted the ability of the trustee to enforce the noteholders' rights on enforcement of the security beyond the issuer's assets, provided that this "shall not apply to and shall not limit the obligations of the issuer to the [noteholders] under the instruments and this deed." And there was the provision in condition 2(h), which stated in terms that the noteholders had full recourse to the issuer in respect of payments due and that they were entitled to bring a claim under English law for the full amount of such payments.

60 Finally Lord Neuberger referred to the wording of condition 9(a)(iii) itself. It was hard to see why any reference should be made in that condition to section 123(2) if the noteholders' rights against the issuer were not to be treated as full recourse until the enforcement of the security. He also said that there was nothing commercially insensible in the conclusion that, for the purpose of condition 9(a)(iii), the noteholders' rights against the issuer were treated as being of full recourse, notwithstanding the PECO: para 100.

61 The A3 noteholders submit that the key operative provision is clause 3.1 of the PECO itself. It makes it plain that it does not have the effect of limiting the liability of the issuer in respect of the notes to the value of the issuer's assets. Its reference to there being an "insufficiency" of assets after enforcement to meet whatever is "due in respect of the notes" is a clear indication that it contemplates that the amount of the liabilities that the notes have created must be capable of exceeding the value of the assets of the issuer. Then there is the time at which the option is exercisable. It is not said to have any operative effect at all prior to enforcement of the security. So at all times prior to its exercise the noteholders remain entitled to payment in accordance with the conditions. And even when exercised all it does is provide a mechanism by which the right to be paid under the notes is assigned to OptionCo.

62 As the issuer relies on commercial reality rather than legal form, the legal effect of the documents is not really in dispute. The common intention of the parties is said by the issuer to be quite different. Its argument is that, as inclusion of a PECO rather than a contractual limited recourse provision was done solely for tax reasons, it was not intended or understood to alter the commercial nature, effect and operation of the asset-backed securitisation. As a matter of contract the liabilities were unlimited in recourse. As a matter of commercial substance and in practice, they were the

© 2013 The Incorporated Council of Law Reporting for England and Wales

equivalent of a provision by which the rights of noteholders were expressly    *A*
limited. The issuer's case is that its future obligations to pay principal under
the notes should be taken into account only to the extent that its assets were
sufficient to pay for them. As Mr Dicker QC for the issuer put it at the end of
his argument, legal form should not triumph over commercial substance.

63  I do not think that it is possible to distinguish the intended
commercial effect of these provisions from their legal effect in this way.    *B*
The exercise that condition 9(a)(iii) predicates is the quantification of the
amount of the issuer's assets and liabilities in order to determine whether
there has been an event of default. The legal effect and the commercial effect
of the PECO, on its true analysis, both point in the same direction. It has
no effect, for the purpose of that quantification, on the amount of the
issuer's liabilities. To limit those liabilities as the issuer contends would    *C*
contradict the parties' clearly expressed commercial intention as found in
the contractual documents. The fact that the economic result of the PECO
may be the same as if the noteholders' right of recourse had been limited
to the issuer's assets is beside the point. It can be expected to achieve
bankruptcy remoteness as effectively. But it would not be in accordance
with the true meaning of the documents to treat the two methods as if they
had the same effect in law.

64  The ultimate aim in construing provisions of the kind that are    *D*
in issue in this case, as it is when construing any contract, is to determine
what the parties meant by the language that they have used. Commercial
good sense has a role to play when the provisions are open to different
interpretations. The court should adopt the more, rather than the less,
commercial construction: *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR
2900. But, for the reasons given by Sir Andrew Morritt C and Lord    *E*
Neuberger MR, the meaning to be given to the language that the parties used
in this case is not open to doubt. The suggestion that to give effect to that
meaning is to surrender to legal form over commercial substance amounts,
in effect, to an invitation to depart from the settled role of commercial good
sense. Its role is to find out what the parties meant when they entered into
the arrangement, not to replace it with something which is not to be found in
the language of the documents at all.    *F*

*Appeal dismissed.*
*Cross-appeal dismissed.*

COLIN BERESFORD, Barrister

*G*

*H*

© 2013 The Incorporated Council of Law Reporting for England and Wales

TAB 11

*Box Valley Pty Ltd v Kidd* [2006] NSWCA 26,
New South Wales Court of Appeal

24 ACLC 471, 2006 WL 458013, [2006] ALMD 7288

Keywords
Opinions
Bryson JA
Basten JA
Gzell J

*Box Valley Pty Limited - Appellant*

*Elizabeth Kidd - First Respondent*

*David John Kidd - Second Respondent*

Docket Number(s):40039 of 2005

New South Wales Court of Appeal

12/8/05, 24/02/2006

BrysonBasten JJA Gzell J

Corporations — Director's duty to prevent insolvent trading — solvency and insolvency s 95A — grain trading company faced looming losses when futures sale contracts greatly exceeded purchase contracts in steeply rising market for white cottonseed, and directors took company into Voluntary Administration on 21 June 2001 followed by Creditors' resolution for liquidation on 27 June 2001 — large liabilities for damages accrued with defaults on sale contracts as they fell due after liquidation — company incurred debts to plaintiff appellant for purchases of sorghum delivered 1 to 15 June for payment no later than 30 July 2001 — whether insolvent when debts on sorghum purchases incurred — whether liabilities for damages to be incurred in future are debts within test for solvency in s 95A — held they were not
Appeal and new trial — Trial Judge did not rule on an alternative case of insolvency referred to in report of plaintiff's accounting expert — on review of evidence and conduct of trial, discretionary decision against New Trial under SCR Pt 51 r 3(1) (substantial wrong or miscarriage)
J.T. Johnson - Appellant
R.J. Brender - First and Second Respondents
Sally Nash & Co. - Appellant

Bamford Marcellos O'Connor - First and Second Respondents

*Corporations Act 2001* s 588G, 588H(2) & (3), 588M(1) and (3), 588R, 1317S, 1318

*Companies (NSW) Code* s 556(1)

*District Court Act 1973* (NSW) s 83A

*Supreme Court Rules 1970* (NSW) Pt 51 r 23(1)

Bryson JA

1    The Claimant Box Valley Pty Ltd, plaintiff in the District Court, appeals against judgment for the defendants given by his Honour Judge Hughes for reasons published on 6 December 2004. In the District Court the Claimant sued for $95,570.63 and alleged that the Opponents were liable as directors for insolvent trading of David Kidd Grain Trading Pty Ltd (the Company). The Claimant also claimed interest pursuant to s 83A of the *District Court Act*; the claim for interest was not contractually based. If interest were allowed judgment would exceed $100,000. If leave to appeal is necessary (which was not examined at the hearing) I am of opinion that it should be granted, in view of the amount in dispute and the nature of the issues.

2    The Company was incorporated on 1 February 1993 and traded in grains, principally sorghum and white cottonseed, and other rural commodities. Its principal figure and Managing Director was Mr David Blair Kidd. The defendants and now the Opponents are his wife and one of their sons. Mr David Blair Kidd and Mrs Elizabeth Kidd were directors of the Company from its formation and throughout the relevant events, and each owned one of its two issued shares. The second opponent Mr David John Kidd became a director on 28 June 2000 and resigned on 18 June 2001. Mr David Blair Kidd was the first defendant when the District Court proceedings were commenced, but he became bankrupt on 2 March 2004 and the proceedings against him were discontinued before the District Court hearing.

3  The Company entered into administration on 21 June 2001 when Mr A.R. Nicholls was appointed Voluntary Administrator by a resolution of the directors under section 436A of the *Corporations Act 2001*. The Company went into liquidation on 27 June 2001 upon a resolution of its creditors and Mr Nicholls became its liquidator. The Claimant is a creditor of the Company under an agreement in writing for the sale to the Company of a quantity of sorghum; the Purchase Contract Confirmation (Tab 8, p41) incorporating NACMA Standard Terms & Conditions was signed on behalf of the Company on 29 May 2001 and on behalf of the Claimant on 1 June 2001. (NACMA refers to National Commodity Marketing Association Inc., which issues Standard Terms and Conditions and maintains Trade Rules for trade in agricultural commodities.) The Purchase Contract Confirmation provided among other things for the Company to buy a quantity of 600 to 650 tonnes of sorghum, stated specifications and provided for delivery ex farm in June 2001 at $145 per tonne or $159.50 including GST. Under "Payment Terms" the Confirmation said, partly in handwriting and partly in typewriting "30 days end week delivery BUT NO LATER THAN 30 JULY 2001." The Standard Terms included the following (White book 2 - Tab 13, p231

> "DEFAULT: In the event of Default in fulfilment of Contract by either party, the other at their discretion shall have the right, after giving written notice by letter, or facsimile, or telex, to sell or purchase, as the case may be, against the Defaulter and the Defaulter shall make good the loss, if any, on such purchase or sale as set forth below:
> If the Buyer or Seller suspend payments of debts, or convenes or holds a meeting of creditors, or commits an act of bankruptcy, or being a company shall have a receiver appointed, or hold a meeting for the purpose of considering a resolution that the company be wound up or go into liquidation, such Buyer or Seller shall be deemed to be in Default."

4  The Company took a series of 22 deliveries of sorghum from early June 2001 to 15 June 2001 and tax invoices show prices totalling $100,600.68. Deduction of

a dividend of $5,030.05 in the liquidation produced the amount claimed.

5  The liquidator decided not to bring proceedings against the directors but under s 588R of the *Corporations Act* he consented to the Claimant's bringing proceedings for its own debt. A creditor may recover the amount of loss or damage caused by contravention of s 588G(2) or (3); see s 588M(1) and (3). The Statement of Claim does not allege facts which would invoke subs 588G(3). Section 588G so far as relevant provides in subss (1) and (2) as follows:

> **"588G  Director's duty to prevent insolvent trading by company**
>
> (1)  This section applies if:
>> (a)  a person is a director of a company at the time when the company incurs a debt; and
>> (b)  the company is insolvent at that time, or becomes insolvent by incurring that debt, or by incurring at that time debts including that debt; and
>> (c)  at that time, there are reasonable grounds for suspecting that the company is insolvent, or would so become insolvent, as the case may be; and
>> (d)  that time is at or after the commencement of this Act.
>
> (1A)  …
> (2)  By failing to prevent the company from incurring the debt, the person contravenes this section if:
>> (a)  the person is aware at that time that there are such grounds for so suspecting; or
>> (b)  a reasonable person in a like position in a company in the company's circumstances would be so aware.
>> Note: This subsection is a civil penalty provision (see subsection 1317E(1))."

Box Valley Pty Ltd v Kidd, [2006] NSWCA 26 (2006)

6  Solvency and insolvency are established according to s 95A:

> **"95A Solvency and insolvency**
> (1) A person is solvent if, and only if, the person is able to pay all the person's debts, as and when they become due and payable.
> (2) A person who is not solvent is insolvent."

7  The principal facts on which liability under section 588G turns can be summarised as:
- the company was insolvent
- there were reasonable grounds for suspecting that the company was insolvent
- awareness of insolvency; which can alternatively be
- actual awareness of reasonable grounds for suspecting insolvency, or
- a reasonable person would be so aware.

8  Section 588H creates defences including two summarised as reasonable grounds to expect company solvent (s 588H(2)) and reliance on a competent and reliable person (s 588H(3)). The Opponents pleaded these defences, and thereby undertook the onus of proof of their own relevant states of mind. The Trial Judge was also of the view that claims for relief from liability under s 1317S and s 1318 of the *Corporations Act* were before him; these were raised in the Further Amended Notice of Grounds of Defence which appears to have been filed in Court on behalf of the second defendant Mrs Elizabeth Kidd during the hearing. The Trial Judge did not make findings of fact upon which these defences could be disposed of, because his Honour found against the Claimant at an earlier stage relating to proof of insolvency. These are not issues which the Court of Appeal could undertake to decide; there was no consideration of issues relating to the Opponents' states of mind at first instance, and the second opponent Mr David John Kidd was subject to cross-examination and it would not be just to make findings about his state of mind without having seen and heard his evidence being given.

9  At the hearing, which took four days, oral evidence was given on three different days and a large mass of written material was put in evidence. The Trial Judge said that the evidence was not essentially controversial. The issue to which his Honour gave attention was the issue whether the Company was insolvent when the Company incurred its debt to the Claimant. It can be taken that its debt was incurred by the series of events beginning on 1 June 2001 when a representative of the Claimant signed the Purchase Contract Confirmation and ending on 15 June 2001 with the last delivery of sorghum. Insolvency is a state of affairs, not an event at a single point of time, and the question of solvency cannot be addressed in a narrow timeframe.

10  From the terms in which the Trial Judge addressed the facts in his judgment it should be understood that his Honour regarded the Claimant's case that the Company was insolvent as consisting of and turning on evidence including opinion evidence given by Mr Paul Alexander Russell, a chartered accountant and a principal of Sims Partners, who practise in Business Recovery, Reconstruction and Insolvency Services. Mr Russell made an Expert Report (White Book 2 Tab 13) as to solvency dated 22 October 2003 for the purpose of these proceedings, and that Report was put in evidence by the Claimant; Mr Russell also gave oral evidence on the first hearing day. The Trial Judge dealt with Mr Russell's evidence in these words: Judgment (35).

> "Mr Russell a Chartered Accountant gave a report and was effectively cross-examined by the defendant. Mr Russell took into account unrealised losses from the trading in white cottonseed in determining the insolvency of the Company at the earlier dates. For the reasons I have already given I am not satisfied that this is a relevant factor in determining solvency. I therefore reject the evidence of Mr Russell."

11  What underlies this is a considerable body of evidence and views expressed by Mr Russell about the significance for solvency of large obligations which the Company incurred by futures trading in primary products, principally white cottonseed and sorghum. It seemed to the Managing Director Mr David Blair Kidd on 21 June 2001, when the Company went into Voluntary Administration, that the Company was about to be completely overwhelmed; yet those obligations had not at that time reached the point where any recognisable debt or ascertainable amount was payable, and the most that could be known was that, under the then state of the market for sorghum and white cottonseed, it was highly likely that when the time arrived for performance

of forward contracts the Company would be unable to meet its obligations to sell and deliver, either by matching sale contracts with purchase contracts, or by buying-in product on the market and delivering it. Market prices had risen to a level where, in Mr David Blair's Kidd's judgment of what the future held, the Company would default on many purchase contracts when their times for performance arrived, with severely adverse results including inability to continue to trade in grains.

12   In illustration of the development of difficulty in futures trading, the Company's position report dated 30 April 2001 dealing with trading in commodities showed that it then had purchase contracts for white cottonseed totalling 6000 tonnes at an average price of $170.33, for delivery on 31 July 2001 as to 2250 tonnes and on 25 May 2001 as to 3000 tonnes. On the other hand the Company had outstanding sale contracts for 35,000 tonnes, deliverable on 31 July 2001 and another 1000 tonnes deliverable on 17 August 2001, at an average price of $182.24 a tonne. If the company were to comply with the sale contracts it would be necessary to obtain from somewhere and deliver 31,000 tonnes of white cottonseed; if it did this it would receive $182.24 per tonne; yet, according to the evidence of Mr D. B. Kidd, the market price on 29 May 2001 was $228 a tonne and on 20 June $250 a tonne. For a company whose internal management balance sheet for 30 April 2001 showed net assets of (-$32,984.19) a completely unmanageable crisis was looming on 31 July 2001 unless the price of white cottonseed fell below $182.24 a tonne in the meantime. Mr D. B. Kidd's view on 21 June 2001 that a fall like that was unlikely to happen precipitated the decision to go into voluntary administration. (As it happens, although it does not affect what I have in hand, his foresight of what was to happen in the white cottonseed market was correct, and there were huge claims for damages from the holders of defaulted forward sale contracts in the liquidation).

13   It is necessary to look at the operation of NACMA standard terms and conditions relating to default to understand what would be the consequence of a default. It would of course be an event of default if the time for completion of a forward sale contract arrived and the Company did not deliver the goods. (There would also be and I take it there actually were deemed defaults in the circumstances set out in the Default clause when the Company went into Administration and suspended payments of debts, and also when in association with

the Administration it held a meeting of creditors, and again when it went into liquidation.) When a default happens, purchasers have the right to sue for damages on default. A purchaser would also have the right to follow the machinery in the Default clause, give written notice which would require compliance within a reasonable time, in the circumstances a very short time and more or less forthwith, and then purchase on the market "against the defaulter" (in the words of the Contract), meaning that the purchaser could claim against the Company the amount of money which would make good the loss, the difference between the two prices.

14   The debts referred to in the test of solvency in s 95A are only part of the debts or claims provable in winding-up referred to in s 553(1); and for the purposes of s 588G the debts which come under consideration are not be identified in the case of an insolvent company with the debts provable referred to in s 553E. The word "debt" is used in s 95A of the *Corporations Act* without any supporting definition. An entitlement to claim damages for breach of a contractual obligation to sell and deliver goods is not a debt within the ordinary meaning of that word. Entitlement to purchase against the defaulter after notice and to have the defaulter make good the loss on such purchase in accordance with the Default clause could well create a debt within the meaning of the Default clause, because the amount would be clearly ascertainable and not a matter for assessment (see *Alexander v Ajax Insurance*) [1956] VLR 436; [1956] ALR 1077), but there would only be a debt on completion of the events referred to, which include giving notice and purchasing against the defaulter; and those events had not happened when the debt to the Claimant was incurred, or indeed when the Company went into voluntary administration.

15   This view of the reference to "debt" and the phrase "incurs a debt" in s 556(1) of the *Companies (NSW) Code* was adopted by the Court of Appeal in *Shephard & Ors v ANZ Banking Corporation Ltd & Anor* (1997) 15 ACLC 1802; see Giles AJA at 1805 and Abadee AJA (with whom Meagher JA agreed) at 1813 to 1814. Abadee AJA referred to passages in *Hawkins v Bank of China* (1992) 26 NSWLR 562 at 572 (Gleeson CJ, 578 Kirby P) which show that a contingent debt may be a debt for the purposes of s 556(1). Abadee AJA's holding and the passages cited from *Hawkins v Bank of China* tend to confirm that a contingent debt may have the character of a debt, the central concept of which is that the amount

of the obligation is liquidated. Abadee AJA's holding also shows that an obligation which will come into existence only upon the exercise of an election, or which when it comes into existence will be an obligation for unliquidated damages, is not a debt; see the passages from my judgment at first instance 14 ACLC 987 at 996 cited at 26 NSWLR 1809.

16   It was the evidence of Mr D.B. Kidd and was not disputed that Management Accounts were prepared and were made available to the other directors at monthly meetings in the third or fourth week of each month. This led to attention being concentrated, by Mr Russell in his report and also elsewhere, on what was made known by internal Management Accounts showing the financial position of the Company on 30 April 2001; these are important for issues under s 588G which relate to the Opponents' actual knowledge or reasonable grounds for suspecting or being aware of insolvency. Mr D.B. Kidd himself had other and better sources of knowledge as the Managing Director in control of affairs day by day; but as the claim against him had been discontinued his state of mind was no longer relevant. Mr D.J. Kidd's knowledge about the Company's solvency when the debt to the Claimant was incurred is a matter which could reasonably be inferred from the Management Accounts for 30 April 2001; Mrs Elizabeth Kidd's evidence was that she was not taking any significant part in the Company's business in April, but the Management Accounts would tend to show the knowledge of a reasonable person in her position as a non-executive director. The Management Accounts as at 30 April are of less use in showing the matter directly the subject of s 588G(1)(b), whether the Company was insolvent during the period from 1 to 15 June. Attention appears to have been concentrated, both at first instance and on appeal, on the position shown by the Management Accounts.

17   There are no instances in evidence of defaults in meeting obligations to pay debts, whether trading debts or other debts, in accordance with the appropriate payment terms. There is no record of any dishonoured cheque or of any other indication of a cash flow difficulty. Quite unlike what is usually encountered in insolvency, there are no instances of failure or of late payment of taxation or group tax obligations, and there are no notices of demand, statutory demands, late payment of wages, judgments or summonses for debt, attempted levies of execution or other usual indications of insolvency. Nor are there any

indications of difficulties in the Company's maintaining its relationship and dealings on overdraft with its bank. The Company was also indebted to National Australia Bank for a term loan which at 30 April 2001 amounted to $217,086. It must be said that the Bank was in a very strong position, with a fixed and floating charge over all assets, and was, as events fell out, fully protected by its securities, for the overdraft and for the other lendings. The Bank was not the source of any of the troubles which led to the Company's going into voluntary administration.

18   There were very wide ranges in the bank balance. There is no reason to think that the overdraft might not have continued to be available for as long as the Bank's existing approval continued, that is until October 2002; or later, other than the development of difficulty over futures trading. It is true that the Bank could reverse its position at any time and call in the overdraft, and this possibility seems to have influenced Mr Russell's thinking; see t.34-36; but it had no basis in terms of assessing the Company's position on the assumption that reasonable dealings with the Bank would continue throughout April, May and June 2001.

19   Mr Russell's report made a review of the resources available to the Company when considering ability to pay all the Company's debts as and when they became due and payable. These included a number of assets of kinds which could not be readily converted into cash and would not be converted into cash if the business were to continue, such as office equipment, furniture and fittings and plant and equipment; and other assets as to which it is plain that there was no plan or project in hand in May or June 2001 to convert them into money for the purpose of paying debts, nor was there any basis on which that could readily be done within the scale of time indicated by the need to pay trading debts from time to time as incurred. It was Mr D. B. Kidd's evidence on affidavit (Tab 19 p.3, para 16) that all the Company's creditors were on 30-day accounts, and by reference to documents in evidence this can be understood as meaning that with small variations trading debts were payable (as in the Claimant's case) within 30 days from the end of the week of delivery; some purchase contract documents in evidence referred to 30 days from the end of the month of delivery.

20   In Mr Russell's review of assets and sources of funds he discounted a house at Boomerang Beach owned by the Company as a possible contribution to funds for working

capital, as any proceeds of its sale could be expected to be appropriated by National Australia Bank under its charge. I add that there was no project in hand for selling it. Mr Russell also discounted an investment holding of shares in Australian Grains Fund Ltd with a cost value of $76,000 and several loan accounts to persons associated with the Kidd family totalling $109,176.42. There were no prospects of early realisation of these.

21 Mr Russell then addressed current assets as at 30 April 2001, substantially comprised of:

> "Trade debtors - $2,710,059
> Stock on hand - at cost $90,583.71
> CPOT Trading Account - $9,044.77"

He observed that the majority of outstanding debtors were relatively current. In dealing with the Company's overdraft account with National Australia Bank Mr Russell said that according to Management Accounts the bank overdraft was effectively in excess of its limit by approximately $69,000. What the balance sheet in fact showed was that the bank overdraft account on 30 April 2001 was $468,948.75. Mr Russell's statement was based on correspondence from the National Australia Bank which shows that on 15 November 2000 the bank set a limit of $400,000 on the overdraft approval until 31 October 2001.

22 As Mr Russell said, the bank statements showed that the account was overdrawn on 30 April 2001 at (-$380,623.91). It seems markedly anomalous that the bank statement shows the overdraft considerably lower than the Company's internal Management Accounts. This appears to arise from a strange practice which the Company followed of drawing cheques for creditors in advance of the time when the creditors were entitled to be paid; the cheques were retained until the appropriate time to send them out arrived, usually the end of the month, but entries reflecting the fact that the cheques had been drawn appeared in a Grain Trader program which the Company operated. This program dealt not only with receipts and payments of money, but also with trading transactions, forward purchase and sale contracts which were yet to mature; essential records for understanding the Company's trading position and what its position was likely to be in the future, but not, in the practices of the Company, records of movements of money in and out. The Company maintained another accounting program called Cash Manager, in which cheques paid were entered up when they were sent out, a process more likely to

reveal the true cash position, but not the process which appears to have been relied on in preparing the internal Management Accounts.

23 The bank statements in evidence (or those which I have located in the large volume of material) do not show the position on 30 April 2001 but do show the position for 26 May to 20 June 2001. During that period there was one occasion when the overdraft limit of (-$400,000) was exceeded: it was (-$450,563.99) at the close of 30 May but returned to +$67,104.81 the following day. Otherwise the account was always under the approved limit during that period, frequently far under it and sometimes in credit. The account was in credit from 5 June 2001 until 18 June 2001, sometimes for very large amounts the maximum being +$557,045.14 at the close of business on 12 June 2001. This is remarkable for a company which is alleged to have then been unable to pay all its debts as and when they became due and payable.

24 Mr Russell says in his report: "It is clear from an analysis of the National Australia Bank overdraft that even without accounting for payments not yet presented, [the Company] was struggling to operate within its overdraft limit, particularly during March and April 2001." This conclusion could not, in my view, be reached on the bank's statements for the period in May and June when the debt to the Claimant was incurred. Mr Russell includes a table as Annexure B to his report with a summary of balances of the bank overdraft. This table shows that the approved limit was usually exceeded in the second half of March 2001 and was often but not usually exceeded in April 2001; but only exceeded on two days in May 2001. In my opinion the reasonable conclusion from this table is that the company experienced no difficulty in obtaining credit from its bank in excess of its approved overdraft for short periods, but typically operated well within the approved limit.

25 Mr Russell dealt with the amount due to outstanding trade creditors. He referred to the anomaly between the Management Accounts (by which I understand him to refer to the Grain Trader account) and the creditor's ledger, which he sometimes refers to as the subsidiary ledger, and which I understand to be maintained in the Cash Manager program. Mr Russell said "the balance reflected in the general ledger for trade creditors does appear to be the more accurate figure for the creditors outstanding at month end." However Mr

WESTLAW   © 2017 Thomson Reuters.

Russell was of the view that anomalies in the treatment of outstanding trade creditors meant that there was significant uncertainty regarding the ageing of trade creditors balances.

26    Section 5 of Mr. Russell's Report is headed FINANCIAL POSITION OF KIDD (meaning the Company) and includes these passages:

"5.14  The management accounts for KIDD as at 30 April 2001 indicate that the amount due to outstanding trade creditors, as at that date is $2,823,073. I note that the creditors aged trial balance as at that date indicates that the total amount due to trade creditors at 30 April 2001 is $2,027,491.50 and that the aging of this debt is as follows:

| Total $ | Current $ | 30 Days $ | 60 Days $ | 90 Days $ |
| --- | --- | --- | --- | --- |
| 2,027,491 | 1,768,440 87% | 107,511 5% | 130,153 6% | 21,387 1% |

5.15    The difference between the amount recorded in the management accounts and the subsidiary ledger is $795,582.

5.16    A further review of the subsidiary ledger and management accounts of KIDD for the period September 2000 to May 2001 indicates the following significant variations:

| Month End | Management Accounts $ | Creditors Ledger $ | Difference $ |
| --- | --- | --- | --- |
| September 2000 | 1,180,774 | 859,851 | 320,923 |
| October 2000 | 1,381,215 | 891,634 | 489,581 |
| November 2000 | 662,663 | 479,768 | 182,895 |
| December 2000 | 1,558,268 | 1,120,239 | 438,029 |
| January 2001 | 3,047,602 | 2,413,373 | 634,729 |
| February 2001 | 1,493,040 | 748,564 | 744,476 |
| March 2001 | 1,083,689 | 560,259 | 523,430 |
| April 2001 | 2,823,073 | 2,027,492 | 795,581 |
| May 2001 | 3,784,704 | 3,235,032 | 549,672 |

It appears from the information provided that the differences relate to cheques drawn as payments to creditors that were posted to the subsidiary ledger during the relevant month and not to the General Ledger. I am unsure as to the reasons why this practice would have been adopted.

5.17  An unfortunate effect of this practice is that it results in significant uncertainty regarding the aging of the trade creditors balances reported in the creditors subsidiary ledger.

5.18    From the accounting records of KIDD provided to my instructing solicitor I am unable to determine the precise aging of the additional creditors balances that were effectively eliminated from the creditors ledger each month whilst the creditor remained unpaid.

5.19  Given the level of KIDD's overdraft it would not have had the ability to forward the cheques on to creditors at month end and the cheques would have to have been held back. The balance reflected in the General Ledger for Trade Creditors would thus appear to be the more accurate figure for creditors outstanding at month end. The aging of the creditors balances is unable to be determined with certainty from the subsidiary ledgers and other information provided.

5.20    The Collins Report addresses the balances due to creditors according to the subsidiary ledger and fails to note that the amounts are different from the amounts reported in the management accounts and the findings and conclusions based upon the incorrect figures are thus flawed.

5.21  The effect of the 'rolling' of the unremitted payments to creditors out of the creditors ledger upon the aging of creditors

balances is potentially substantial. It is significant that from the information provided by the directors of KIDD that it is not possible to accurately determine the aging of outstanding creditors balances."

27  Mr Russell's report discussed working capital in section 6. After referring to s 95A and describing the test for insolvency, correctly, as a cash flow test, Mr Russell said:

"6.3    Working capital is the difference between the company's current assets and current liabilities. Current assets are those assets, which will be realised in the day to day activities of the company such as cash, debtors and inventory. Current liabilities are short-term liabilities, which become due in the day to day activities of the company such as trade creditors, bank overdrafts, employee entitlements etc.
…
6.5  Positive working capital is an indicator that a company will be able to realise sufficient assets to pay its current liabilities. Negative working capital indicates that a company will have difficulty paying its debts as they fall due from trading activities.
6.6    I have reviewed the Management Accounts for KIDD for the months ended 28 February 2001 to 31 May 2001 inclusive.
6.7  As noted at Section 4 of this report the information contained within the Management Accounts does not include the contingent liabilities and contingent assets existing in respect of grain contracts."

28  Mr Russell proceeded to comment on the deficiency in working capital which in his opinion existed in the Company, and gave a summary in Annexure C to his

Report of the working capital position on the last days of February, March, April and May 2001. For 30 April 2001 Annexure C showed a deficiency of working capital of $504,010.03. In Annexure C Mr Russell went on to bring under consideration what in his calculations were unrealised profits on sorghum contracts and unrealised losses on white cottonseed contracts, and when these were brought under consideration the deficiency of working capital including unrecognised gains and losses was $1,079,520.33. For reasons I have given earlier, it was in my opinion incorrect to have regard to what Mr Russell spoke of as unrealised profits and unrealised losses when calculating working capital and deficiency of working capital as a means of assessing solvency within the meaning of s 95A.

29  The conclusions expressed in Annexure C to the effect that there were deficiencies of working capital on the last day of each month from February 2001 to May 2005 depend upon the adoption by Mr Russell of the figures for outstanding trade creditors appearing in the Management Accounts, and on not adopting the figures for outstanding trade creditors appearing in the Creditors Ledger, which were lower. If the figures in the Creditors Ledger are adopted, there is no deficiency of working capital in any of those four months. I find Mr Russell's view difficult to understand as Mr Russell said (Page 14 para 5.19) "The balance reflected in the general ledger for trade creditors would thus appear to be the more accurate figure for creditors outstanding at month end."

30  If there was, at 30 April 2001, a deficiency of working capital of $504,010.03 without having regard to unrecognised gains and losses in trading, there was, in my opinion, a prima facie case of insolvency which required to be addressed by the Trial Judge and to be the subject of findings. It was far from being an overwhelmingly convincing case; it needed to be addressed, analysed and assessed. Continuing deficiency of working capital in the order calculated by Mr Russell is likely to have meant continuing acute difficulty in paying creditors within the usual credit terms of 30 days after the month of delivery; yet there is no evidence of the signs which can be expected as a matter of probability to accompany persistent late payment of suppliers.

31  After dealing extensively with working capital Mr Russell went on to deal with net assets. In this exercise he adjusted the values of a number of non current assets

from the values in the Company's balance sheet prepared for Management Accounts as at 30 April 2001; the adjustments had regard to realisations later effected in the liquidation and this exercise produced an adjustment of the net assets shown in the balance sheet from (-$32,984) to (-$107,984). The solvency of the Company was not assisted by prospects of realisation of non-current assets, and I do not think that this part of Mr Russell's report has any importance. Mr Russell brought under consideration, as further balance sheet items, unrealised losses for white cottonseed contracts and unrealised profits for sorghum contracts, to produce a potential deficiency of (- $683,495).

32  In s 9, p.25 of his Report Mr Russell expressed his conclusions in these terms:

> "9.1   As detailed in Section 7 of this report KIDD was trading with a substantial deficiency of assets as at 30 April 2001. Taking account of the net position in respect of white cottonseed and sorghum contracts this deficiency was at least $683,495.
>
> 9.2   As determined at Section 6 of this report as at 30 April 2001 KIDD had a deficiency of working capital of at least $504,010.03. It had traded with a deficiency of working capital from at least February 2001. When account is taken of the unrecognised net liability in respect of exposure to grain trading contracts this deficiency of working capital increased by an amount of $575,510 as at 30 April 2001 to $1,079,520.33.
>
> 9.3   KIDD utilised accounting packages that provided its directors with detailed information in relation to its financial position and its obligations in respect of grain trading contracts. Utilising this information it was clear as at 30 April 2001 and probably significantly earlier that the company was insolvent."

33  For reasons I have given, I regard the opinion in Para 9.1 as irrelevant. The opinion in the first two sentences of Para 9.2 is relevant to the issue of solvency, but that opinion should not be brought under consideration on the issue of solvency unless and until the underlying factual basis is established; essentially, if the trade creditors were the higher figure adopted by Mr Russell from the Management Accounts, there was a basis for the view that there was a deficiency of working capital of $504,010.33, and that view could and should have been brought to bear when proceeding to the subject which it was for the Trial Judge to determine, that is whether on the facts before him the Company was insolvent. The existence (if it did exist) of a deficiency of working capital of at least $504,010.33 is not conclusive on that subject. The material in the third sentence in paragraph 9.2 is not relevant to the issue of insolvency.

34  Mr Russell refers from time to time to a report by Ms Kim Collins, accountant, on behalf of the Opponents; the Opponents did not tender or rely on that report and observations by counsel on both sides when it was tendered (t.20-21) showed that it was admitted in evidence on a limited basis so as to be available to understand what Mr Russell said. At the point of admitting the Collins Report the Trial Judge said to the effect that he should not rely on the truth of anything that Ms Collins had to say.

35  The Trial Judge rejected Mr Russell's report with few words and without analysis on the ground that Mr Russell took into account unrealised losses from trading in white cottonseed in determining the insolvency of the Company. This was a correct ground for rejecting the parts of Mr Russell's opinion which were affected by these unrealised losses, but did not deal with the whole of the material put forward by Mr Russell. It was not correct of the Trial Judge to reject Mr Russell's opinion out of hand for reasons shortly stated. It may well have been correct to reject Mr Russell's opinion, but a decision whether or not to do so was dependent on findings of facts which the Trial Judge did not address. For this reason the Trial Judge did not in my opinion consider all that he should have considered before concluding against the Claimant.

36  In particular, it was not correct to conclude against the Claimant solely on the basis of the large looming losses which would follow the maturation of the white cottonseed sale contracts which were not covered by

purchase contracts, and could not be covered unless the market price fell (which as is retrospectively known, it did not). But leaving that basis out of consideration, the Claimant still had a case of fact in support of its allegations of insolvency, which was worthy of adjudication if the Claimant obtained findings that the total amount due to trade creditors was the higher figure shown in the Management Accounts and not the lower figure shown in the Creditors Ledger, and specifically that the total amount due to trade creditors on 30 April 2001 was $2,823,073 from the Management Accounts and not $2,027,492 from the Creditors Ledger. Those findings in turn would not be conclusive of insolvency; but unless the Claimant were to obtain those findings it does not appear to me that, in the world of practicalities, there was any real prospect of obtaining a conclusion favourable to the Claimant on the complex factual resolution required for a finding of insolvency.

37   This issue, and the other issues which would have to be determined if the Claimants were to succeed, cannot be decided by the Court of Appeal. They could only be decided upon a new trial, and under Pt 51 r 23(1) of the *Supreme Court Rules* the Court of Appeal is not to order a new trial unless it appears that some substantial wrong or miscarriage has been occasioned by the ground upon which the new trial is to be ordered. A new trial would be a very undesirable outcome in this case. There has already been a trial, of four days, upon a claim for $95,570.63. Although Mr Russell's Report, if read quite closely, contains material supporting a conclusion that the Company was insolvent even if the effect of forward trading is left out of account, that is not primarily or prominently the basis of his conclusion. The terms in which the Trial Judge disposed of the proceedings suggest that it was not made known to the Trial Judge, or not made known with emphasis or clarity that there was in Mr Russell's Report an alternative basis for a conclusion of insolvency. I am reluctant to order a new trial in these circumstances. I will review the strength of the Claimant's case upon the factual issue I have identified with a view to determining whether it can be regarded as sufficiently compelling.

38   In his opening address counsel for the Claimant referred, in the context of insolvency, to evidence from Mr Russell about continual exposure in respect of grain trading; counsel said (not accurately) that that left an exposure of about $1 million and would be falling

due during June in respect of white cottonseed trading. Counsel referred in more detail to futures trading and dealt with the price movements in white cottonseed, the figures given for trade creditors on 21 June and the date of liquidation related to closing out futures contracts. Counsel referred to the accounting systems and said that there were two, but did so in the course of explaining that the financial records only recorded net profit or net loss in respect of each grain transaction and did not reflect the contingent exposure. In the opening address counsel did not refer to the contention that there was a continuing and large deficiency of working capital, or to there being different figures given in different accounts for outstanding trade creditors, or to any implications of there being so, and did not point out that Mr Russell's evidence or any other evidence supported a finding of insolvency in any other context than the futures trading obligation.

39   On tendering Mr Russell's Report the Claimant's counsel made an extended exposition of its contents including (t.25) reference to the passages dealing with outstanding trade creditors and aging analysis. Counsel pointed out, briefly, the existence of the passages at 5.15, 5.16, 5.18, 5.19, 5.20, 5.21 dealing with unremitted payments to creditors. Counsel did not in doing so point out that Mr Russell's Report supported a finding of insolvency on an additional basis to that related to futures trading.

40   A reading of the transcript shows that both during the adduction of evidence and in addresses of counsel (and the final addresses of counsel at the conclusion of the evidence are not recorded) attention was principally directed to the more prominent basis of Mr Russell's opinion on insolvency relating to the adverse Futures trading position. The alternative basis received relatively little attention in evidence.

41   The terminology used by Mr Russell it is not clear. In my understanding, with the advantage of reading the transcript of evidence, Mr Russell's references to "the management account" should be taken to refer to the Management Accounts for the information of directors relating to the state of trading at the end of each month, and although I do not regard this as completely clear, "subsidiary accounts" refers to the ledger page for trade creditors in the general ledger. The general ledger represents dealings in money and does not reflect trading positions, favourable or adverse, unless and until they

have matured into transactions in which money becomes due or passes hands. No doubt the Company's accounts, if they were to show the true and fair position, would have to include statements about developing adverse trading positions; but the matter in hand relates to solvency and ability to pay debts, not to the position of the company generally and not to what should appear in its accounts as a whole.

42    In his opening address to the Trial Judge counsel for the Claimant did not refer to this aspect of Mr Russell's evidence. In the course of cross-examining Mr Russell counsel for the Opponent referred to the subject when putting some assumptions to Mr Russell for questions which, in the context of Mr Russell's evidence generally, were hypothetical (t.46-48). The subject received little attention in the course of Mr Russell's evidence, and in particular Mr Russell said nothing in evidence which would explain more fully or clearly the passage from his Report which I have set out above. In the cross-examination of Mr D. B. Kidd there were references (t.138-140) to bank reconciliation reports prepared at the end of trading months and (t.140) to there being unpresented cheques as at 30 April 2001. There was no cross-examination of Mr D. B. Kidd such as upholding the contention apparently underlying Mr Russell's observation would seem to require; that is, a suggestion that as a matter of system and in particular on 30 April 2001 the total trade creditors figure made known to the directors, or to the other directors, was distorted by preparing a number of cheques in favour of trade creditors, but not sending them out until a later date. I suppose the underlying suggestion would be to the effect that the amount appearing to be due to trade creditors was distorted and reduced by treating debts for which cheques have been drawn as having been paid although in fact cheques had been retained, and were not sent out until later. If that was the underlying suggestion, or if there was any suggestion to the same effect, it was never clearly articulated in evidence at any point. It was a forensic necessity to articulate it in the cross-examination of Mr D. B. Kidd if it were seriously contended that information about the total trade creditors was distorted in this way.

43    Mr Stephen Matthews, Chartered Accountant, the Company's external accountant, referred in his evidence (t.150 and following) to the function of the Grain Trader account and of the Cash Manager account in preparing reports, but the suggestion that there was, systematically,

deliberately or otherwise, any distortion of the trade creditors position associated with holding back cheques was not explored in his evidence. Ms Ruth Tourle, who was at the relevant time the accounts manager working within the Company's organisation, was shown in evidence in chief the creditor trial balance as at 30 April 2001 and its summary and age analysis and was then asked (t.155-156):

> "Q.  Just want to ask, could you explain what happens at the end of the month in the accounting package which is prepared to prepare the management accounts at the end of the month in relation to creditors?
>
> A.    Okay. This document in front of me has actually arisen from the Grain Trading Program which is called Grain Trader. Grain Trader is not an accounting program, it's actually a trading program so it has not a lot of the facilities that an accounting program would have. So this document has come from that program. At the end of the month, just prior to the end of the month, in the Grain Trader Trading Program, I would run the cheques payable from the company, created in the Grain Trader. The Grain Trader program, as I said, was not an accountancy program so we had to clear all cheques prior to the end of the month out of the Grain Trader. In effect we had to draw all of our credited cheques. The Grain Trader program will not carry those balances over to allow us to draw the cheques later. That information was not available in the form that we could print a cheque from it. That was the way the program was written. Not ideal, but that's the way it was because it wasn't an accountancy program. So I would draw all those cheques prior to

the end of the month. Now that was not necessary that month. It probably wouldn't have been until about the 12th, 13th of the following month because we had to wait for final weights, we had to wait for things like dockages that did occur. They had to be taken into account before we drew the cheque to the grower and all these — there were adjustments that had to be made. So I'd run the cheque run, about the 12th, 13th, depending when the information came in to finalise the loads to be able to print the cheques and that would clear out the trial balance, in effect, according to the Grain Trader, everyone had been paid. In effect of course, that didn't happen in that in the accounting program I would then transpose or key into the accounting program the cheques as they actually were sent to the growers from a handwritten cashbook that was kept. So in effect the Grain Trader showed that all the growers had been paid at that point on the 12th of the month, when they really weren't even — they were drawn on the 12th of the month or they were drawn showing that they were paid, when in effect they weren't even due at that point.

Q.  So what was done with the cheques that had been created off the system?

A.  Okay all the cheques had been drawn, matched to the relevant recipient, created tax invoices and they were put in a folder and given to David John Kidd.

Q.  And when were the cheques due?

A.  In varying times. The cheques were due in relation to the contract terms of the contract.

Sometimes they were 30 days end of the week, sometimes they were 30 days end of month, depending on the contract.

Q.  That's 30 days from the end of the week or the month of delivery?

A.  Of delivery, of receipted delivery, yeah.

Q.  And so the cheques would be held by David John Kidd?

A.  Yes.

Q.  Until they were due?

A.  Yes.

Q.  And then what, what happened?

A.  And then when they were due he would write them up in a cashbook, in a handwritten cashbook and he would mail them and at the end of the month I would post that cashbook into my accounting package, called Cash Manager. He actually kept a handwritten list of the cheques that I had given him for his own record and he would mark when they were due for his own purpose and we would reconcile and made sure that our totals were correct, that we were in balance, that he hadn't misplaced one or something like that."

44  In evidence in chief Ms Tourle also said (t.157-158)

"Q.  Now just going back to the creditor trial balance, it looks as if the majority, vast majority of the creditors are current. Were any creditors not paid on 30, 60, or 90 days because of any liquidity problem of which you know?

A.  No.

Q.  Well if you just look at, you see the 90 day column, can you explain why the accounting system is showing $21,000 as having been owed for 90 days?

A.  It's showing $21,386 made up of primarily two largish entries.

There's one for $4,959.82 and that was a dispute with that particular company that at a later stage that was reversed as a credit, bringing that account down to zero. There's another large amount $15,950 outstanding and that also was reversed the following month, being a dispute that was resolved.

Q. And if you look at the 60 day amount, it's apparently showing $126,000?

A. Yes.

Q. Owing on one item. On 30 days there seems to be a reversal to the effect of 119,000?

A. Correct.

Q. So does that mean that that 60 day amount was not in fact owing?

A. Correct. This being as I said for a trading program, not an accounting program, if I had to do a credit for a dispute or for any reason, I couldn't actually do what's called ageing back to the correct month. That credit would automatically go into the current month. So if I was reversing something that was two months old, it would show as a credit in the current and that debit that was two months old would still be there even though the net effect would be zero. So in effect the ageing wasn't a hundred per cent correct that that was the computer system I was using that I had no control over."

45 The creditor trial balance became Exhibit 1. In cross-examination of Ms Tourle some of these subjects were referred to in terms which confirmed some aspects Ms Tourle's explanation (t.163, 165), including a passage (t.166) which epitomises the explanation why the aging accounts were unreliable (t.166, line 17):

"Q. So the, what I might call the net entries from the reports generated by the Grain Trader program were then used to create a single entry in the accounting program each month?

A. Indeed they were."

46 There was no challenge to Ms Tourle's explanation of the functions of the Grain Trader program or of the need which it imposed to print out cheques in advance of the time when they were required to be remitted to the creditors. Ms Tourle said in evidence to the effect that the trade creditors were not significantly in arrears, and this was not challenged.

47 In my opinion the hearing was not conducted on the basis that the Claimant set out to prove that there was a serious shortcoming in the Company's business methods and in the information available about the amount of trade creditors of the kind which Mr Russell's evidence would suggest. Reading the transcript gives me the impression that Ms Tourle's evidence, and later passages in the evidence of Mr D. J. Kidd which showed that he dealt with the cheques in the manner which she stated, dispelled the issue and any supposed significance it had.

48 Far from it being the case that the circumstances call for a new trial so that the issue can be dealt with, I would regard it as procedurally unjust to order a new trial and allow the Claimant to open up and give attention to this issue when it has been definitively established that the Claimant should not succeed on the issue upon which the Claimant chose to fight the trial. If it were the case that a facade of solvency was being maintained by manipulating the times when cheques were remitted, or by following business methods which intentionally or not had the effect of obscuring the total trade creditors, that would have left a very large impression on the evidence adduced and on the conduct of the case generally. It is not appropriate to grant a new trial to enable this to be explored further when it was not explored during an earlier four-day trial. I regard it as unfortunate that the Trial Judge dealt so shortly with Mr Russell's evidence and did not mention this aspect at all, but I am of the view that there has been no miscarriage of justice and there are no circumstances calling for a new trial.

49 In my opinion the Court of Appeal should order:—

"Dismiss the appeal with costs."

Basten JA

50   On 29 May 2001 David Kidd Grain Trading Pty Ltd ("the Company") signed an agreement to purchase a quantity of sorghum from Box Valley Pty Ltd ("the Claimant"). The Claimant executed the agreement on 1 June 2001 and, between approximately 5 and 15 June 2001 delivered the sorghum to the Company. The net price payable by the Company was $95,570.63.

51   On 21 June 2001 the Company went into voluntary administration, as a result of its contingent liabilities under a number of unrelated sale contracts involving white cottonseed. Prior to entering into the contract with the Claimant, the Company had entered into sale contracts for 35,000 tonnes of white cottonseed, deliverable on 31 July 2001, at an average price of $182 a tonne. At the same time, it had contracted to purchase 6,000 tonnes of white cottonseed on or before that date. To honour the commitments under the sale contracts it would need to have purchased approximately 30,000 tonnes but, as at 29 May, the price was $228 per tonne and by 20 June had risen to $250 per tonne. Thus, as at 29 May, if it had purchased on that date, it would have made a loss of approximately $40 per tonne on some 30,000 tonnes, being an amount of approximately $1.2 million.

52   The evidence reviewed by Bryson JA demonstrates that the Company did not have the resources, as at 29 May, to meet debts of $1.2 million, if they had been incurred at that time. However, all that had been incurred at that time was a contingent liability to provide goods at a price which, if the liability had crystallized at that time, would have led to a loss of approximately $1.2 million. Whether that loss would in fact eventuate depended on whether the market price of white cottonseed changed between 29 May and the date at which the contractual liability under the sale contracts were to be met, namely 31 July 2001.

53   The statutory provisions pursuant to which the Claimant brought its proceedings against Mr Kidd are now to be found in s 588M of the *Corporations Act 2001* (Cth). That provision permits a creditor, who has suffered loss or damage "in relation to the debt because of the company's insolvency" to recover from a director an amount equal to the amount of loss or damage: s 588M(1) and (2). A condition of seeking such recovery is that the director has contravened sub-s 588G(2) or (3) in relation

to the incurring of the debt by the company. Relevant parts of s 588G are set out by Bryson JA at [5] above.

54   The debt to the Claimant was incurred either on 29 May, when the Company signed an offer to purchase a specified quantity of sorghum at a specified price, or on 1 June, when the Claimant accepted the offer, or was incurred progressively as the Claimant delivered sorghum to the Company between 5 and 15 June. In this case, nothing turns on the resolution of this question, because the contingent liabilities with respect to white cottonseed had been incurred prior to 29 May and, apart from a possible increase in the market price of white cottonseed, nothing significant in the financial or commercial affairs of the Company changed between 29 May and 15 June. However, I will assume for present purposes that the Company incurred the debt when the Claimant executed the agreement on 1 June. That, accordingly, is the time at which it is necessary to determine whether the Company was insolvent, for the purposes of s 588G(1)(b). (It was not suggested that the Company became insolvent by incurring that debt, nor by incurring other debts at that time.)

55   The *Corporations Act* contains a definition of when a person "is solvent", in s 95A, set out at [6] above. That statutory test requires that the Company was, at 29 May 2001, "able to pay all [its] debts, as and when they [became] due and payable".

56   Although s 95A uses the present tense, namely that the person "is" able to pay its debts, it refers to an ability or capacity, not a fixed state of affairs at a point in time. That is reflected in the use of the words "able to pay", rather than has paid or is paying, and the reference to being able to pay debts "as and when" they become due and payable. Accordingly, the statutory definition in s 95A does not affect the well-established principle that a temporary lack of liquidity does not constitute insolvency: *Sandell v Porter* (1966) 115 CLR 666 at 670 (Barwick CJ).

57   In other respects, the *Corporations Act* does not mirror provisions in earlier statutes, such as s 556 of the *Companies (New South Wales) Code*, considered in *Hawkins v Bank of China* (1992) 26 NSWLR 562 (set out by Gleeson CJ at 565D). The liability for a director under that provision is continued by s 592 of the *Corporations Act*, but only in relation to liability for debts incurred before 23 June 1993. Significantly, that provision (and

hence *Hawkins*) did not depend on whether the company was insolvent at the time the debt was incurred, but whether there were "reasonable grounds to expect that the company will not be able to pay all its debts as and when they become due". At least as at 21 June 2001, when the Company went into voluntary administration, that terminology may have been satisfied. If it had been, a further question of fact would have been whether the same grounds and expectation existed three weeks earlier on 1 June 2001. But that is not the test which is presently relevant.

58  Although it has been said on many occasions that whether or not a company is insolvent is a question of fact, it is necessary, nevertheless, to identify the legal principles relevant to determining that fact: see generally, *Sycotex Pty Ltd v Baseler & Ors [No. 2]* (1994) 51 FCR 425 at 434 (Gummow J) and *Iso Lildo' Aliphumeleli Pty Ltd (In liq) v Commissioner of Taxation* (2003) 42 ACSR 561 (Davies AJA) and other authorities referred to by Chesterman J in *Emanuel Management Pty Ltd v Fosters Brewing Group Ltd* [2003] QSC 205 at [72]-[95]; and see *White ACT (in liq) v G B White & Ors* (2004) 49 ACSR 220 (McDougall J). The statutory test requires consideration of when a debt becomes "due and payable". In particular, questions have arisen as to the relevance and effect of indulgence granted, either as a matter of commercial practice, or in specific circumstances, with respect to payment. The authorities in relation to this issue were discussed by Palmer J in *Southern Cross Interiors Pty Ltd v Deputy Commissioner of Taxation* (2001) 53 NSWLR 213, a discussion which has been referred to in the cases cited, decided subsequent to his Honour's judgment.

59  There have been fewer cases dealing with the proper approach to contingent liabilities, which have not yet fallen due. One case in this Court where such a matter has been considered was *Hawkins v Bank of China* (supra). In that case, the Court held that a company "incurs a debt" for the purposes of s 556 of the Code, when it entered into a guarantee by which it subjected itself to a conditional, but unavoidable obligation, to pay money at a future time. However, that statement of principle, to be found in the headnote to the report, does less than full justice to the principles with respect to guarantees established by the case. For example, Gleeson CJ noted at 568D-E:

"Guarantees are sometimes executed in advance of any principal debt coming into existence. A person may

execute a guarantee in favour of a bank in a case in which the bank has not yet made an advance to its customer. In such circumstances it is not normally said that the guarantor, upon the execution of the guarantee, incurs a debt. Nor would it normally, and apart from some special context, be said that a person who gives a guarantee in respect of a debt incurred by another thereupon himself incurs a debt, at least if the principal debtor is apparently solvent and not in default."

60  Gleeson CJ then noted that it was conceded in that case that the liability to pay unliquidated damages could not constitute a debt and referred to a passage in the judgment of Mason CJ in *Sunbird Plaza Pty Ltd v Maloney* (1988) 166 CLR 245 at 255, where his Honour discussed two separate kinds of liability arising under a guarantee - see *Hawkins* at 569G:

"If the subject of the guarantee is payment of a debt or a sum of money which has accrued due, the creditor may, on default by the principal debtor, sue the guarantor instead of the principal debtor for the debt or sum of money, his claim being for a liquidated amount. If, on the other hand, the subject of the guarantee is the performance of some other obligation, then the person having the benefit if the guarantee may, upon default, sue the guarantor for damages for breach of contract."

61  It was not argued in this case that the Company incurred a debt by entering into an agreement to sell white cottonseed to a third party. However, in order to complete such a sale, the Company needed to acquire white cottonseed. Accordingly, it may be said to be an inevitable consequence of entering into a sale contract that the Company would also need to enter into a purchase contract, which would involve a debt. Purchase contracts with respect to 30,000 tonnes of white cottonseed were not entered into prior to the voluntary administration. Trading in futures inevitably involves a level of speculation and risk. As the white cottonseed market rose, the likelihood of default under

the sale contracts increased until it became at least highly probable, around 21 June 2001. The likelihood that the Company would therefore become liable to damages for breach of the sale contracts rose to a similar level. However, whilst a breach would have given rise to damages which were unliquidated, it could not be said that the Company had thereby incurred a debt. The position of the Company may, on that approach, have become commercially untenable, but it was not insolvent in the sense defined by s 95A, at any time prior to 15 June 2001.

62  In seeking to avoid this result, the Claimant argued that default under the sale contracts triggered a right of the purchaser to purchase "against the defaulter" with a consequential entitlement of the defaulter to make good the loss resulting from the alternative purchase. The Claimant argued that prospective liabilities under the white cottonseed contracts, which would probably become liquidated debts at a point no more than two months from 1 June, (the bulk of the contracts fell for completion on 31 July) were liabilities of the Company which could be taken into account in determining whether on 1 June it was able to pay its debts as and when they became due and payable.

63  The Claimant sought to rely on a passage in the judgment of Gleeson CJ in *Hawkins*, at 572F:

> "Similarly, the word 'incurs' takes its meaning from its context and is apt to describe, in an appropriate case, the undertaking of an engagement to pay a sum of money at a future time, even if the engagement is conditional and the amount involved uncertain. Once it is accepted that 'debt' may include a contingent debt then there is no obstacle to the conclusion that, in the present context, a debt may be taken to have been incurred when a company entered a contract by which it subjected itself to a conditional but unavoidable obligation to pay a sum of money at a future time."

64  The issue before the Court in *Hawkins* was whether a company incurred a debt when it entered into a guarantee. On one view, that obligation was not dissimilar to the obligation incurred under the default clause of the white cottonseed contracts in the present case. However, the

question in *Hawkins* was when the "debt" was incurred: in the present case the Court is concerned with the different question, namely whether at a point in time, the Company was able to pay debts when they became due and payable. In the present case, as demonstrated by Bryson JA, the Claimant did not prove that, absent its potential liabilities under the white cottonseed contracts, the Company was not able to pay its debts as and when they fell due and hence either should not have entered into the contract for purchase of the sorghum from the Claimant, or should not have accepted delivery.

65  The trial judge identified the question as requiring application of the principles stated by Palmer J in *Lewis v Doran* (2004) 50 ACSR 175 at [107]-[108]. In the latter paragraph his Honour stated:

> "[108]  Where the question is retrospective insolvency, the court has the inestimable benefit of the wisdom of hindsight. One can see the whole picture, both before, as at and after the alleged date of insolvency. The court will be able to see whether as at the alleged date of insolvency the company was, or was not, actually paying all of its debts as they fell due and whether it did, or did not, actually pay all those debts which, although not due as at the alleged date of insolvency, nevertheless became due at a time which, as a matter of commercial reality and commonsense, had to be considered as at the date of insolvency. By reference to what actually happened, rather than to conflicting experts' opinions as to the implications of balance sheets, the court's task in assessing insolvency as at the alleged date should not be very difficult."

66  The Court is entitled to look at debts which were not due and payable as at the date in question, if they were debts which arose under an existing agreement. If the white cottonseed contracts required the Company to purchase white cottonseed at a fixed price, the Court would be entitled to consider whether the Company

could pay for those purchases when they fell due. On that hypothesis, payment would have been contingent upon delivery, but the amount was a liquidated sum and the date for payment was fixed. By contrast, where the existing agreements required the sale of white cottonseed, the Company had then incurred no debt. It had an obligation (which it may not have been likely to meet) to deliver goods at a particular price on a particular date. However, if it failed to purchase the necessary supplies and defaulted, no liquidated debt would arise until the purchasers took further steps, namely to obtain white cottonseed from alternative sources, at a price which was not then known.

67    Although, in commercial terms, the distinction between these two situations may not be critical (if the company will not be able to meet its obligations) nevertheless, in legal terms the distinction is important in determining insolvency. The trial judge held that he was not entitled to take into account prospective liabilities arising from default on the white cottonseed sale contracts: in my view his Honour was correct in that respect. Because the Claimant did not establish that the Company was not otherwise unable to pay its debts as and when they fell due, the Claimant failed to establish its insolvency as at the date on which the Company incurred debts payable to the Claimant. I agree with the orders proposed by Bryson JA.

Gzell J

68    I agree with Bryson JA. I have had the great advantage of his analysis of the facts and the law. I add some brief observations of my own.

69    In *Hawkins v Bank of China* (1992) 26 NSWLR 562 it was common ground that an obligation to pay unliquidated damages rather than a liquidated sum was not a debt for the purposes of the *Companies (New South Wales) Code*, s 556, the forerunner of the *Corporations Act 2001* (Cth), s 588G(1) which is in issue in this case. Furthermore, the guarantee executed by the company in *Hawkins* subjected it to a conditional but unavoidable obligation to pay a sum of money at a future time. The contingent liability incurred by the company in executing the guarantee was thus for a liquidated amount rather than for damages for breach of contract, in terms of the distinction drawn by Mason CJ in *Sunbird Plaza Pty Ltd v Maloney* (1987-1988) 166 CLR 245 at 255.

70    These points of distinction were referred to by Abadee AJA, with whom Meagher JA agreed, in *Shepherd & Ors v ANZ Banking Corporation Ltd & Anor* (1996) 41 NSWLR 431 at 443-444.

71    In the present case the exposure of David Kidd Grain Trading Pty Ltd under its futures trading in white cottonseed did not give rise to a contingent liability to pay a liquidated sum. The exposure consisted of insufficient forward purchase contracts to meet forward sales obligations.

72    At the time the question of insolvency of the company was to be determined, the likelihood was that it would default on its forward sales contracts because of the increase in market price of cottonseed. The consequences were that it would become liable to a claim for damages for breach of contract or the default clause in the sales contracts would be activated by the purchasers giving notice hereunder and purchasing on the market against the company.

73    On the authorities, a claim for damages for breach of contract is not a debt for the purposes of the definition solvency and insolvency in the *Corporations Act 2001* (Cth), s 95A. Nor, in my view, would a claim under the default clause in a forward sales contract constitute a debt until notice was given under it.

74    Thus the prospect that the company would sustain a loss in the future on its dealings in white cottonseed did not, in my view, constitute a debt for the purposes of the *Corporations Act 2001* (Cth), s 95A when the company's solvency or insolvency had to be considered.

75    In considering the working capital of the company, Mr Russell included $595,713.00 of unrealised losses on white cottonseed contracts (offset by $20,202.70 of unrealised profits on sorghum contracts) in arriving at his estimate of the deficiency in the working capital of the company of $1,079,520.33 as at 30 April 2001.

76    Hughes DCJ rejected these inclusions as irrelevant to the determination of solvency. In my view, his Honour was correct to do so.

77    But that is not the end of the matter. As Bryson JA has pointed out, Mr Russell's analysis showed a deficiency of working capital, excluding the unrealised profits and

losses on futures trading, of $504,010.03 as at 30 April 2001. The trial judge did not consider this matter.

78   Mr Russell arrived at this figure by including trade creditors at $2,823,073.39. That figure was taken from what Mr Russell described as the management accounts, by which he presumably meant the grain trader account. There was a lower figure in the creditors' ledger of $2,027,492.00.

79   Had that figure been included in the analysis (and Mr Russell said the balance in the creditors' ledger appeared to be more accurate a figure for creditors outstanding at the end of the month), far from a deficiency of working capital being shown up, $291,570.97 of working capital would have been identified.

80   I agree with Bryson JA that this issue should have been analysed by his Honour and a determination made as to which figure for trade creditors should have been included in Mr Russell's analysis. If a deficiency in working capital was demonstrated, his Honour ought to have gone on to determine whether the company was insolvent at the material time.

81   That is not a task that this Court can undertake. There are insufficient findings of primary fact. I agree with the analysis by Bryson JA of the conduct of the parties in the Court below and agree that the appeal should be dismissed with costs.

82   I add a note on a problem of construction that has arisen as a result of a transposition from the *Companies (New South Wales) Code*, s 556(1)(b)(ii) to the *Corporations Act 2001* (Cth), s 588G(1)(b).

83   The former provision created a liability in a director of a company that incurred a debt, when there were reasonable grounds to expect that if the company incurred the debt, it would not be able to pay all its debts as and when they became due.

84   The latter provision replaces reasonable grounds of expectation with the fact of insolvency. The sub-section provides as follows:

"This section applies if:

(a)   a person is a director of a company at the time when the company incurs a debt; and
(b)   the company is insolvent at that time, or becomes insolvent by incurring that debt, or by incurring at that time debts including that debt; and
(c)   at that time, there are reasonable grounds for suspecting that the company is insolvent, or would so become insolvent, as the case may be; and
(d)   that time is at or after the commencement of this Act."

85   Since insolvency is constituted by an inability to pay debts when they become due and payable, the only contemporaneous debts to which reference is made in the *Corporations Act 2001* (Cth), s 588G(1)(b) on a literal construction must be debts which are immediately due and payable.

86   The *Companies (New South Wales) Code*, s 556(1)(b)(ii) maintained a distinction between the time at which a debt is incurred and the time of its discharge and preserved that well known distinction encapsulated in the Latin phrase *debitum in praesenti solvedum in futuro*.

87   There is nothing in the *Public Exposure Draft and Explanatory Paper to the Corporate Law Reform Bill* 1992 to suggest there was to be any change in the concept of the contemporaneous debt referred to in the *Corporations Act 2001* (Cth), s 588G(1)(b) from that contained in the *Companies (New South Wales) Code*, s 556(1)(b)(ii). It may be, therefore, that the Court will need to construe s 588G(1)(b) accordingly.

88   This is not a matter, however, that requires resolution in these proceedings.

© Thomson Legal and Regulatory
Limited ABN 64 058 914 668

[2006] NSWCA 26

---

End of Document

© 2017 Thomson Reuters.

TAB 12

*BTI 2014 LLC v Sequana SA* [2016] EWHC 1686 (Ch),
English High Court

Case No: HC-2014-001215
HC-2013-00376

Neutral Citation Number: [2016] EWHC 1686 (Ch)

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 11/07/2016

Before :

**MRS JUSTICE ROSE**

- - - - - - - - - - - - - - - - - - - - -

Between :

|  |  |
|---|---|
| **BTI 2014 LLC** | **Claimant** |
| **- and -** |  |
| **(1) SEQUANA S.A.** | **Defendants** |
| **(2) ANTOINE COURTEAULT** |  |
| **(3) PIERRE MARTINET** |  |
| **(4) CLIVE MOUNTFORD** |  |
| **(5) MARTIN NEWELL** |  |

And between:

|  |  |
|---|---|
| **B.A.T. INDUSTRIES PLC** | **Claimant** |
| **- and -** |  |
| **(1) SEQUANA S.A.** | **Defendants** |
| **(2) WINDWARD PROSPECTS LIMITED** |  |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**JOE SMOUHA QC, ANDREW THOMPSON QC, EDWARD DAVIES, CIARAN KELLER** (instructed by **Debevoise & Plimpton LLP**) for the **Claimant**

**DAVID FOXTON QC, BEN VALENTIN QC, DAVID MUMFORD** QC (instructed by **Freshfields Bruckhaus Deringer LLP**) for the **Defendants**

Hearing dates: 23rd February – 26th February, 29th February – 4th March, 7th March – 11th March, 14th March – 16th March, 18th March, 21st March – 23rd March, 5th April – 8th April, 11th April, 14th April, 22nd April, 25th April – 29th April

- - - - - - - - - - - - - - - - - - - - -

# Judgment

**CONTENTS**                                                                         PARA

**I. INTRODUCTION**                                                                    1

**II AWA**                                                                            8

**III THE EVIDENCE**                                                                 19

**(a) The factual witnesses**                                                        19

**(b) The CERCLA experts**                                                           32

**(c) The accounting experts**                                                       36

**(d) The documentary evidence**                                                     39

**(e) Other participants in the events giving rise to the claim**                    40

**IV CERCLA**                                                                        47

**V  LIABILITY FOR THE REMEDIATION OF THE LOWER FOX RIVER**                          61

**(a) The pollution of the Lower Fox River**                                         61

**(b) The application of CERCLA to the Lower Fox River**                             64

*(i) The early stages*                                                               64

*(ii) The WDNR Technical Memorandum 2d (February 1999): the Tech Memo*               67

*(iii) The Fox River Group's Agreement on interim allocation: 27 July 1999*          73

*(iv) The Amendola Report*                                                           74

*(v) US Government enforcement action*                                               77

**(c) The Green Mediation**                                                          79

**(d) Parallel work on the NRDs**                                                    86

**(e) The *Whiting* litigation**                                                     96

**(f) The insurance position and the Green Bay Litigation**                          99

**VI THE EVOLUTION OF THE PROVISION IN AWA'S ACCOUNTS UP TO
DECEMBER 2008**                                                                     105

**(a) The elements that go into the provision**                                     105

**(b) The provision in the years to 2007**                                          118

**(c) Events in early 2008**                                                        139

**(d) The September Internal Memorandum**                                           149

**(e) The New York meeting on 22 October 2008 and following**                       165

**(f) The 20 November 2008 estimates**                                              187

**(g) The involvement of Mr Mountford and Mr Newell**                               193

**(h) The 15 December 2008 meeting: the reduction of capital**                      207

*(i) the November 2008 Interim Accounts*                                            210

*(ii) the December AON Report*                                                              213

*(iii) The PwC Agreed Upon Procedures report*                                              218

**(i) The 17 December 2008 meeting: the December Dividend**                                 226

**VII  DEVELOPMENTS BETWEEN DECEMBER 2008 AND MAY 2009**                                    230

**(a) The decision of the US Supreme Court in *Burlington Northern***                       231

**(b) Other developments on the Lower Fox River**                                          239

**(c) Developments within Sequana and AWA**                                                250

**VIII  THE EVOLUTION OF THE PROVISION BETWEEN DECEMBER 2008 AND MAY 2009**                 257

**(a) AWA's intentions after the December Dividend**                                        257

**(b) Reaction in the AWA team to *Burlington Northern***                                   265

**(c) The run up to the 18 May 2009 board meetings**                                       275

**(d) Finalising the AWA audited accounts for the year 2008: the emphasis of matter**      290

**(e) The 18 May 2009 meetings and the sale of AWA to TMW**                                293

**IX THE 'COULD NOT' CLAIMS: THE ALLEGED CONTRAVENTION OF PART 23 OF THE CA 2006**          301

**(a) The reduction of capital: legal issues**                                             311

*(i) The correct approach to construing these provisions*                                  317

*(ii) Is it necessary to show that the directors applied the right test and in fact formed the opinion stipulated?*   321

*(iii) What is the correct test under section 643(1)(a)?*                                   323

*(iv) Taking into account contingent and prospective liabilities*                          328

*(v) Must directors have reasonable grounds for the opinion that they form?*               331

*(vi) When forming their view, should the directors assume that all the distributable reserves created by a reduction in capital will be distributed by way of dividend?*   334

*(vii) The relevance of the Historic Insurance Policies*                                   336

*(viii) The error in the memorandum of capital*                                            341

**(b) The reduction of capital: the factual issues**                                       346

*(i) Mr Martinet's and Mr Courteault's solvency statements*                                347

*(ii) Mr Mountford's and Mr Newell's solvency statements*                                  356

**(c) The adequacy of the Lower Fox River provision in AWA's accounts**                     365

*(i) The relevant statutory provisions and accounting standards*                           367

*(ii) A duty to obtain professional advice*                                                378

**(d) The challenge to the provision in the December 2008 Interim Accounts**                382

**(e) The challenge to the provision in the 2008 Final Accounts (used for the May Dividend)**     401

*(i) The reduction of NCR/API's share  from 60% to 38%*     402

*(ii) Mr Martinet's evidence about the May Dividend*     422

*(iii) The NRD value of $18.8 million for NCR/API*     430

**(f) The disclosures made in AWA's accounts regarding contingent liabilities**     432

*(i) Disclosure actually made in the accounts*     436

*(ii) The relevance of defective disclosure in the accounts*     440

*(iii) Disclosure: the Kalamazoo River*     443

**(g) Conclusion on the "could not" claims**     454

**X  THE 'SHOULD NOT' CLAIMS: BREACH OF FIDUCIARY DUTY**     456

**(a) Some preliminary points**     460

**(b) When does the creditors' interests duty arise?**     464

**XI CLAIM UNDER SECTION 423 OF THE INSOLVENCY ACT 1986**     485

**(a) Section 423: the law**     486

**(b) Section 423: some preliminary points**     494

**(c) Is a dividend a transaction falling within section 423(1)(a) or (c)?**     497

**(d) Did the directors of AWA have the s 423 purpose in relation to the December Dividend?**     503

**(e) Did the directors of AWA have the s 423 purpose in relation to the May Dividend?**     506

**XII CONCLUSION**     526

**MRS JUSTICE ROSE:**

## I. INTRODUCTION

1. On 17 December 2008 the Second to Fifth Defendants, Antoine Courteault, Pierre Martinet, Clive Mountford and Martin Newell, attended a meeting of the board of a company called Arjo Wiggins Appleton Limited ('AWA').  At that time, they were the four directors of AWA, now called Windward Prospects Limited, and AWA was a wholly-owned subsidiary of Sequana SA, the First Defendant ('Sequana').

2. The directors resolved at the meeting on 17 December 2008 to pay an interim dividend to the parent company Sequana of €443 million and resolved further that the payment of the dividend should be effected by way of set off against an equivalent amount of the intra-group receivable due to AWA from Sequana.  The outstanding balance of the intra-group receivable after the payment of the dividend was €142.5 million.

3. On 18 May 2009 the directors of AWA held another board meeting. By this time there were only two directors, Mr Martinet and Mr Courteault. They held the meeting by telephone as Mr Courteault was in London and Mr Martinet was travelling to Turin. The directors resolved to pay a further interim dividend to Sequana to be satisfied by the release by AWA of €135 million of Sequana's intra-group debt owed to AWA.

4. The payment by AWA of these two dividends is challenged in these proceedings by the Claimants on a number of grounds. The Claimants allege that the dividends contravened Part 23 of the Companies Act 2006 ('CA 2006'). This is on the basis that the accounts on which the directors relied as showing there were sufficient distributable reserves to justify the payment of the dividends were incorrect and did not give a true and fair picture of the state of the company's finances. It is also alleged that the decision to pay both dividends was a breach by the directors of their fiduciary duties towards the company. Finally it is alleged that the dividends constituted transactions which contravened section 423 of the Insolvency Act 1986.

5. The source of the Claimants' complaint about the dividends lies almost 4000 miles away, in the sediment of the Lower Fox River in Wisconsin, USA. That sediment was heavily polluted during the 1950s and 1960s and the River has been subject to a complex and very expensive clean up operation pursuant to the US statute, the Comprehensive Environmental Response, Compensation and Liability Act 1980 ('CERCLA'). Through a series of corporate acquisitions and asset transfers since then, the Claimant BAT Industries PLC ('BAT') is liable to pay for part of that clean up and AWA is liable to indemnify BAT for part of the monies BAT has to pay out.

6. That liability to indemnify BAT resulted in a provision being included for a number of years in AWA's accounts to reflect the directors' best estimate of the value of that liability. The Claimants assert that that provision was inadequate and further that the directors, when taking the various decisions under attack, should have taken more account of the possibility that, even if the provision in the accounts was a best estimate, that estimate could turn out to be wrong by a long way. They also assert that a large reduction in AWA's capital which was approved two days before the payment of the December dividend was unlawful.

7. The trial which took place before me over 32 days was the trial of two sets of proceedings heard jointly:

   (a) The first, Claim No HC-2013-00376, was issued on 9 December 2013 and is brought by BAT against Sequana and AWA. This is, broadly, the claim based on section 423 of the Insolvency Act 1986.

   (b) The second, Claim No HC-2014-001215, was issued on 9 May 2014 and is now brought by BTI 2014 LLC ('BTI') against Sequana and against the four directors personally. It was initially brought by AWA itself. But under an assignment effective as of 30 September 2014 AWA assigned its claims against the Defendants to BTI which is a corporate vehicle set up by BAT for this purpose.

## II AWA

8. In 1969 the National Cash Register Company ('NCR') purchased a company called Combined Paper Mills which owned a paper coating company operating in the Lower

Fox River area.  In 1970 NCR bought Appleton Coated Paper Company which also owned a paper coating facility there.  These two businesses were later merged to become the Appleton Paper Division of NCR.

9.  In 1978 the Appleton Paper Division of NCR was sold to BAT when it was acquired by a wholly-owned indirect subsidiary of BAT called Appleton Papers Inc ('API').  Under the terms of that sale:

(a)  API took over NCR's obligations and liabilities, including NCR's environmental liabilities; and

(b)  BAT agreed to indemnify NCR against any failure by API to meet those obligations and liabilities.

10.  Thus, the first indemnity that is relevant for our purposes is this obligation entered into in 1978 by API and BAT to NCR.

11.  When it acquired the Appleton Paper Division, BAT already had a paper business in the form of its subsidiary called Wiggins Teape Group Ltd.  In 1990 the two businesses, API and Wiggins Teape Group Ltd were combined in a new company which had been incorporated in 1989 and was then named Wiggins Teape Appleton plc.  It was demerged from BAT in 1990.  Under the demerger agreement, Wiggins Teape Appleton plc and API agreed to indemnify BAT for liabilities arising from the demerged assets, that is for certain losses arising out of the neglect or default in the business or operations carried out by the de-merged group prior to the demerger, including any potential liability under the indemnity given by BAT in connection with the 1978 purchase.

12.  Later in 1990, Wiggins Teape Appleton plc was merged with a French paper manufacturer called Arjomari Prioux SA and the company changed its name to Arjo Wiggins Appleton plc.  In 1998 there was an agreement between NCR, API and BAT under which it was agreed that certain environmental liabilities of the three parties would be shared up to a total of $75 million as to 45% to be paid by NCR and as to 55% to be paid by API and BAT.  The environmental liabilities covered by this allocation included not only the Lower Fox River but also 'Future Sites' as defined in the agreement.  For our purposes the only Future Site relevant is the Kalamazoo River in the state of Michigan, USA.

13.  Who would pay what share for costs above $75 million was still in dispute after the 1998 Agreement.  In November 2005 there was an arbitration under the 1998 agreement by which it was determined that for costs above $75 million the split would be 60% to API and BAT and 40% to NCR.

14.  In 2000 Arjo Wiggins Appleton plc was acquired by Sequana for €1.3 billion.  Various restructurings within the Sequana group and sales of subsidiaries took place after 2000.  One such transaction is significant in this narrative. In November 2001 API was sold by AWA to an employee buy-out vehicle Paperweight Development Corp.  As part of this sale, AWA entered into an indemnity agreement whereby it indirectly indemnified API against all of its liabilities (save for a $25 million tranche which API had to cover), net of insurance recoveries, relating to the Lower Fox River (that is the liabilities that API had taken on under the 1998 settlement agreement).  API in return assigned to AWA its rights to recover from any third parties.  These rights against third parties included rights under

certain historical insurance policies which had been taken out by BAT with a number of insurance companies between 1978 and 1986.

15. It was in the context of this 2001 sale and indemnity arrangement that AWA set up a Bermudan subsidiary called Arjo Wiggins Appleton (Bermuda) Limited which purchased a guaranteed investment contract referred to as the Maris Policy, discussed later. This was a policy issued with the insurer AIG on the deposit of $185 million in 2001. It provided AWA with a source of funds to pay for all aspects of the Fox River liability. The limits on the policy increased over the years but reached a maximum of $250 million by November 2008. The policy funds did not keep pace with inflation. The terms of the sale in 2001 also provided for AWA to have the right to control the defence of all claims within the indemnity given.

16. Following its disposal of its interest in API, AWA ceased to be a trading company. The movement of various businesses out of AWA and the loaning up to the parent Sequana of other receipts over the years resulted in AWA having on its balance sheet a very large, interest accruing receivable owed to it by Sequana.

17. The outcome of all this is that these proceedings were conducted on the basis that:

(a) as regards negotiations with the Government or with other parties who might contribute to clean up costs, NCR and API were grouped together as a single entity responsible together for one share ('NCR/API');

(b) AWA was liable to reimburse NCR and BAT for API's share, which was 60% of whatever costs NCR/API had to pay; and

(c) to meet these liabilities AWA had the benefit of the Maris Policy and of the assigned rights under the historic BAT insurance policies ('the Historic Insurance Policies').

18. AWA had two other outstanding problematic liabilities in 2005. It had been found guilty of an infringement of the European Union competition rules and a substantial fine had been imposed, the precise amount of which was being contested on appeal to the court in Luxembourg. It also had responsibilities under the Wiggins Teape pension scheme for which it remained the principal employer despite no longer owning any businesses with employees. These were not resolved until early 2008.

## III THE EVIDENCE

### (a) The factual witnesses

19. All the witnesses giving factual evidence in the case gave evidence on behalf of the Defendants.

*Pierre Martinet*

20. Mr Martinet started working for investment companies for the Agnelli family in 1992. Through that role he became a member of the supervising board of Sequana in 2004 and in May 2005 he took on the executive role of joint Deputy Managing Director of Sequana. Upon taking up that post, he became a director of various of Sequana's subsidiaries including AWA. In July 2007 Mr Martinet ceased to perform an executive role at Sequana although he continued as a non-executive director of Sequana and as an

executive director of AWA. He resigned from the board of AWA in May 2009 when AWA was sold by Sequana and from the board of Sequana in July 2014.

21. Mr Martinet was the principal witness for the Defendants and was cross-examined over eight and a half days during which he answered questions about very many meetings and documents from 2005 to 2009.  He gave his evidence in excellent English although French is his native language.  Mr Martinet struck me as an impressive, highly experienced business man and a careful and honest witness doing his best to answer questions to the best of his recollection, given that these events occurred a long time ago. Despite the very serious allegations being levelled against him in these proceedings, he did not become defensive and he resisted any temptation to embroider or improve the evidence he was able to give, distinguishing carefully between his actual recollection and speculation about what had happened.  Indeed, it was striking that during the course of Mr Martinet's long and tenacious cross-examination there were only one or two answers that Mr Smouha QC, acting for the Claimants, challenged as untruthful.  In their closing submissions the Claimants did not invite me to reject anything that Mr Martinet said as being untruthful.  I am confident that I can rely on Mr Martinet's evidence as truthful both as to his recollection of events and as to his recollection of his thoughts and motivations at the time of these events.

*Antoine Courteault*

22. Mr Courteault is Company Secretary of Sequana and General Counsel of the Sequana group. He has held those roles since May 2005. Between June 2005 and May 2009 he was a director of AWA. At the time of his appointment in 2005 he was primarily focused on various human resources and legal matters within the group, mainly arising out of a restructuring that took place in 2005.  As the group at that time had about 300 subsidiaries all over the world, generating a large number of legal issues, his role was to provide strategic oversight and to liaise with external local legal advisers as necessary.

23. Following his initial briefings on the Fox River issue in mid 2005, Mr Courteault did not regularly engage with the issue and left the detailed numbers analysis to Mr Martinet and the other advisers involved.  His understanding at the time of the figures used in the computations that I will describe later was much less thorough than Mr Martinet's and his recollection of the detail correspondingly less certain. Mr Courteault also gave his evidence in very good English.

24. I found Mr Courteault also to be an honest witness.  Again, I was not invited to disbelieve anything that he said in evidence and I find that both his written and oral evidence are truthfully given.

*Clive Mountford and Martin Newell*

25. Mr Mountford is a qualified accountant who joined the tax department of the Wiggins Teape Group in January 1988 when it was a subsidiary of BAT.  He became a director of AWA on 1 May 2002 and held that position until his resignation on 14 May 2009. Mr Newell is also a qualified accountant who joined the Wiggins Teape Group in 1982. He became a director of AWA at the end of April 2004 and held that post until he resigned on 14 May 2009. It is clear that before December 2008, the AWA board meetings had dealt only with formal matters – that is not surprising given that it was a non-trading, wholly-owned subsidiary.

26. Both men gave their evidence in an open and straightforward manner. I consider them entirely honest both in their evidence and more generally in their conduct as directors of AWA. They had a good understanding of what their duties were; when they were in doubt they made arrangements to get advice. They both emphasised in the course of their evidence that they were well aware of the significance of the transaction being proposed for December 2008 and the gravity of the criminal and civil consequences for them personally if they did not comply with the statutory requirements. I have no doubt that they are both cautious men and there was certainly no reason for them to put that caution aside in relation to these events.

*Pascal Lebard*

27. Mr Lebard is currently the Chairman and CEO of Sequana which is the parent company of the Sequana group. He joined the Sequana group in 2002 and took on an executive role in 2004. Following a company reorganisation in 2005 he and Mr Martinet became joint Deputy Managing Directors of Sequana. In July 2007 Mr Lebard bought a 21.9% stake in Sequana with about €230 million from his family investment fund and took on the role of CEO. He therefore had a large personal stake in the success of the group.

28. Mr Lebard and Mr Martinet have known each other for many years and Mr Lebard describes Mr Martinet as his equal and trusted business confidante – he trusted his business judgement completely. Mr Lebard focused on the group's day to day business needs and strategy whereas Mr Martinet focused on the group's financial issues and also on particular issues facing the group such as the AWA liabilities. So far as he was concerned there was a large team of highly experienced and capable experts, including external advisers, tasked with managing the issue and he never had any reason to doubt that a prudent approach was being taken to drawing up the company's accounts.

29. Mr Lebard came across in the witness box as a forceful personality who gave his evidence clearly and emphatically. It was clear to me that he prides himself on his business acumen and that he would be a tough negotiator. I accept his evidence as truthful.

*Stephen Thomas*

30. Mr Thomas has been a certified chartered accountant since 1994 and began working for the Sequana group in late 2001. Between 2001 and May 2009, he was responsible for preparing the statutory accounts of AWA as well as being responsible for day to day accounting issues. He prepared the accounts that were used by AWA for the purpose of the capital reduction and the payment of the two dividends. His evidence described the spreadsheets which were used by the company to estimate the costs of the Fox River clean up for the purpose of arriving at the provision to be included in the accounts. He was clearly an honest witness and I accept his evidence as entirely truthful.

31. At the end of trial the Claimants did not submit to me that I should treat any of the evidence of any of the Defendants' witnesses as unreliable or untruthful. The question is therefore whether the Claimants can prove their case on the basis of the evidence that was given.

**(b) The CERCLA experts**

32. The Claimants' CERCLA expert was Laurence S. Kirsch.  Mr Kirsch is a partner and Chair of the Energy and Environmental Practice Group at Goodwin Procter LLP, a US based law firm.  He has been practising in environmental law for over 30 years and a large part of his practice has involved representing large corporate clients in the area of 'Superfund' matters, that is the investigation and remediation of contaminated sites pursuant to CERCLA. From his experience in negotiating with governmental agencies and private parties and having litigated major cases under CERCLA, Mr Kirsch states that he has a good sense not only of his own practice but also of the practice of environmental law generally and the ways in which other environmental lawyers handle matters.  Mr Kirsch prepared a main report and two supplementary reports.

33. The Defendants' expert on CERCLA matters was Ronald J. Tenpas who is a partner in the Washington DC office of Morgan, Lewis & Bockius LLP. For the past eight or so years Mr Tenpas' practice has focused nearly exclusively on matters relating to environmental law. From 2007 to 2009 he was Assistant Attorney-General for the Environment and Natural Resources Division of the Justice Department.  In that role he supervised about 400 attorneys, including those who represent the Environmental Protection Agency.  He states that between his duties in the Justice Department and his work for Morgan Lewis, he has been involved in dozens of CERCLA remediation matters.  He has also regularly appeared in court or prepared filings for court proceedings. He also served a main report and two supplemental reports.

34. Mr Kirsch and Mr Tenpas met on 27 October 2015 to discuss their main reports.  They produced a joint memorandum dated 13 November 2015 setting out the points on which they agreed and those on which they disagreed.

35. Both Mr Kirsch and Mr Tenpas undoubtedly have a wide ranging and profound knowledge of this complex area of US law and I found their evidence invaluable in getting to grips with many unfamiliar concepts.

**(c) The accounting experts**

36. The Claimants' expert accountant was David Lindsell.  He has spent almost thirty years as a partner in Ernst & Young where he served as the lead audit partner for various FTSE 100 companies and as a member of the firm's governing council for 15 years.  He was appointed Ernst & Young's first Global Director of International Financial Reporting Standards in 2003 and held that position until his retirement in 2007. He has held various positions in supervisory bodies and bodies responsible for devising and advising on the adoption and implementation of financial reporting standards. He was a member of the Auditing Practices Board for the UK and Ireland from 1994 to 2002. Mr Lindsell's first report was served on 17 November 2015 and he served a supplementary report on 28 January 2016.

37. The Defendants' expert accountant was Nigel Grummitt, currently a partner in Mazars LLP, the UK firm of the Mazars Group which is an international advisory and accountancy organisation. He is a fellow of the ICAEW and is a specialist in forensic and investigation services.  Until recently he was also responsible for auditing a number of clients.  He has worked on major group audits and has routinely been faced with the need to consider a company's liabilities where the timing or quantum of those liabilities has been uncertain.  He also states that he is responsible for the conduct of professional indemnity claims against the UK firm and recommends the appropriate provision for their

own financial statements, liaising with Mazars' auditors in their audit of each provision. Mr Grummitt's first report was served on 17 November 2015 and his supplementary report was also served on 28 January 2016.

38. The accounting experts met on 30 November 2015 to discuss issues arising from their first reports and prepared a Joint Statement dated 15 January 2016 setting out their points of agreement and disagreement. Again, I found both experts to be very knowledgeable and candid witnesses. Their reports were thorough and helpful.

### (d) The documentary evidence

39. As is often the position in major litigation, much of the evidence took the form of email traffic, internal company memos, meeting minutes and informal notes. A large number of the emails in the bundles were between people neither of whom gave evidence in the proceedings, containing records of discussions with yet other people who were not witnesses in the case. When these emails were put to the witnesses during the trial they often could not remember what was recorded in the email or said that the email was not accurate. Counsel agreed that even though many of these documents contain multiple hearsay, I could treat the emails as evidence not only of what the author was thinking at the time but also of the truth of the matters recorded in the email, and could give as much or as little weight to it as I thought appropriate.

### (e) Other participants in the events giving rise to the claim

*Christopher Gower*

40. Although it would be going too far to say that holding the trial without evidence from Mr Christopher Gower was like performing *Hamlet* without the Prince of Denmark, Mr Gower was conspicuous by his absence from the proceedings and the trial. Mr Gower is a solicitor qualified in England and Australia. By the time that Sequana became interested in AWA and the Fox River liability issue, Mr Gower had been working as General Counsel for AWA for several years - since May 2001. In August 2005 he left AWA as an employee but continued in the same role as before in his capacity as an independent consultant to AWA.

41. Mr Gower was recognised by everyone involved at the time as the person with an in-depth understanding of every aspect of the complex Fox River liability issue and much of the advice of other people involved was mediated through him to the AWA and Sequana directors. It was Mr Gower who initially briefed Mr Martinet and Mr Courteault when they first became interested in this matter. Throughout the events that I shall relate, he was the source of advice and information of both the strategic and the most detailed kind for all the AWA directors.

42. On 18 May 2009 Mr Gower, with his colleague Mr Brian Tauscher, bought AWA from Sequana through their vehicle TMW Investments (Luxembourg) SARL ('TMW'). In the sale agreement Mr Gower acknowledged that he had managed all aspects of the Fox River matter on behalf of AWA through the period 2001 to May 2009 and that he had 'complete knowledge' of the history of the Fox River matter, the litigation in which AWA was engaged in relation to that liability and the contingent liabilities it generated.

43. Both sides in this case criticised the other for having chosen not to call Mr Gower as a witness. The Claimants assert that the Defendants rely on Mr Gower's expertise as a justification for the decisions that the directors took but that they have not called Mr Gower to confirm the advice he gave. The Defendants in turn point out that it now appears that Mr Gower is firmly within the Claimants' camp because, as a result of agreements entered into between AWA and the Claimants in the light of this litigation, Mr Gower stands to benefit substantially from any monetary award that I make in the Claimants' favour.

44. In all the circumstances I do not accept that it is appropriate to draw an adverse inference against either party for failing to call Mr Gower.

*Brian Tauscher*

45. Brian Tauscher is in a similar position to Mr Gower although he is not so omnipresent in the contemporaneous documents as his colleague. From July 2001 he was counsel to AWA in relation to all insurance issues arising from the Fox River liability. Until 2006 he was a solicitor with McDermott Will & Emery LLP, in the US ('MWE US') and specialised in insurance law. In 2006 he set up his own law firm Brian M Tauscher PLLC and continued to provide advice to AWA. There is no criticism made of his competence or independence in giving the advice he gave.

*Jeff Bates*

46. Mr Bates is a senior lawyer in the US law firm MWE US. Like Mr Gower, he had been involved in advising on the Fox River dispute for some time before Sequana became interested in the matter. Mr Martinet referred frequently in his evidence to discussions he had had over the years with Mr Bates and clearly Mr Martinet and the other directors relied on Mr Bates as being a person with a detailed understanding of the Fox River liabilities issues. No criticism was made by either party of the other's decision not to call Mr Bates as a witness.

**IV CERCLA**

47. The US legislation underlying this case is the Comprehensive Environmental Response, Compensation and Liability Act ('CERCLA') which was adopted in 1980. It confers on the US government wide ranging powers to deal with releases of hazardous substances. CERCLA is administered by the Environmental Protection Agency ('EPA'). Clean ups are usually achieved by private parties undertaking the remediation work according to a design and plan of work which those private parties agree with the EPA. If the private parties are unwilling to organise and arrange for the remediation themselves, the EPA can commission the work and then seek reimbursement from the responsible persons.

48. Once the EPA has decided to clean up a particular site, it identifies potentially responsible persons or 'PRPs'. Section 107 of CERCLA imposes liability on four categories of PRPs: (i) current owners of a facility even if the current owner made no contribution to the contamination; (ii) the past owner or operator of the facility at the time of the release of the hazardous substance; (iii) a party who arranged for the disposal or treatment of hazardous substances; and (iv) a party which transported hazardous substances to a disposal or treatment facility chosen by it.

*Arranger liability*

49. The third category of person is important in this case and is generally referred to as a PRP having 'arranger' liability.  The wording of the relevant provision of CERCLA is:

> "(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances."

50. 'Disposal' is defined elsewhere in CERCLA as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water."

51. Liability under CERCLA is strict in the sense that there is no need for the EPA to show a lack of due care on the part of the polluter.  While the process of identifying PRPs can be quite complex at ordinary disposal sites, it is unusually complicated for waterbody sites because of their size, the large number of parties – often including municipalities – discharging substances into the waterbody, and the long periods of time over which discharges to the waterbodies have typically occurred.  The liability of PRPs is joint and several but even where the EPA identifies numerous PRPs, it may choose to pursue only some of them. The regime allows the EPA to compel any one or more PRPs to pay for the entire clean up, leaving the PRPs to seek contribution from other responsible parties in accordance with their equitable share of the costs.  Therefore, in many cases it is necessary for the identified PRPs to sue other parties to contribute to their costs.  However, as discussed further below, in some circumstances a PRP can attempt to limit its liability by showing that it should only be responsible for its own harm to the site because the overall damage is divisible or capable of apportionment.

52. The two main kinds of costs for which a PRP may be responsible are the costs of remedial action (initially the investigative costs and then the costs of the work itself) and damages for injury to, destruction of, or loss of natural resources.  The second kind, natural resources damages ('NRDs'), are an important element in this case. NRDs are intended to compensate the owner of the natural resources for a deprivation of that owner's rights, for example for damage to fisheries or other amenities provided by a waterbody. The owner of those "common good" resources are the sovereign entities, which hold the resources on trust for the public. In the U.S., the sovereign entities claiming NRDs may include different agencies of the federal government, the state governments, and Indian tribes.

*The EPA's powers*

53. The EPA has information gathering powers, in particular under section 104(e) of CERCLA.  A section 104(e) request may be directed at any party who has or may have relevant information about materials used or disposed of at a facility and the nature or extent of the release of hazardous material.

54. If the EPA arrives at an agreement with a PRP for the clean up of the site, the agreement is usually included in an Administrative Order on Consent or a Consent Decree. The settlement is usually included in a court order and before approving the order the court must come to a view as to whether the settlement is "reasonable, fair, and consistent with the purposes that CERCLA is intended to serve".

55. In the absence of any such agreement, one of the statute's most powerful tools is the federal government's authority under section 106 of CERCLA to issue unilateral administrative orders. These can be issued without the participation of any neutral third party such as a court and can require parties to undertake investigative or clean up activity. Such orders are commonly referred to as "UAOs" or "Section 106 orders". The courts have construed the relevant provisions of CERCLA as giving the EPA a broad discretion in issuing section 106 orders in a wide variety of circumstances. If a PRP refuses to comply with a UAO and is later found not to have had sufficient cause for that refusal, it may be liable to pay not only the EPA's response costs but also damages up to three times the amount of those response costs together with daily penalties.

56. Often polluted sites are divided into "operable units" or "OUs," sometimes designated by number, such as OU-1, OU-2, and so forth. Different operable units may have the same, different, or overlapping PRPs, and may be addressed collectively or separately for purposes of investigation and remediation. Dividing complex sites into OUs allows the EPA and the PRPs to address different situations (such as varying contaminants and upland versus waterbody sites) differently, and to handle these complex sites in more manageable chunks. In a river site like the Fox River, the location of a PRP's facility along the river will determine for which OUs it is likely to be liable (otherwise than as an arranger) as any direct discharges can only have flowed downstream of the facility.

57. Once a contaminated site has been identified for action, the EPA will carry out a remedial investigation and feasibility study of the environmental issues at the site. This allows the lead agency to identify site conditions, determine the contaminants at the site, assess the risk to human health and the environment and conduct testing to determine how to treat the site. It also provides the mechanism for developing, screening, and evaluating alternative remedial actions. The EPA then selects the final remedy for the site. This occurs in two stages. First the EPA identifies a preferred remedy and carries out a public consultation and then the EPA selects the final remedy. At that point there is a Record of Decision ('ROD'). The ROD may include cost estimates but the PRPs normally require their own contractors to prepare their own estimates of the costs of implementing the ROD selected remedy. If a PRP or group of PRPs agrees to implement the remedy or is ordered by the EPA to do so, the PRPs would retain their own contractor either to perform the work or to oversee subcontractors or some combination of both. The contractors to the PRPs would prepare estimates prior to and as part of the contracting process. RODs can also be amended over time.

*Contribution proceedings amongst PRPs*

58. Once a PRP has incurred costs it may pursue court action against another PRP in an attempt to recover these costs. There are two different avenues through which a party might seek to recover these costs, depending on the circumstances. First, a PRP that has voluntarily cleaned up a site may use section 107(a)(4)(B) of CERCLA – known as "cost

recovery" – to bring claims against other parties. Cost recovery claims are only available if the PRP "has not been subjected to an enforcement or liability action, and ... is not party to a settlement". Secondly, a PRP that has already been subject to civil liability or has settled its liability with the Government can seek contribution against other PRPs under section 113(f) of CERCLA. Section 113(f) contribution claims are subject to several important limitations. As part of CERCLA's system of encouraging parties to reach settlements with the Government, CERCLA provides in section 113(f)(2) that a person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable to other PRPs for claims for contribution regarding matters addressed in the settlement. The consequence of contribution protection is that, as parties reach settlements with the U.S., there are fewer remaining PRPs upon whom the remaining burdens can be imposed. Section 113(f) also provides that "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate". Thus, defendants in section 113(f) contribution actions are only severally liable for their equitable share. There are certain, commonly-used factors for allocation determinations known as the "Gore factors" (named after former U.S. Vice President Al Gore). The Gore factors are:

(a) the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished;

(b) the amount of hazardous waste involved;

(c) the degree of toxicity of the hazardous waste;

(d) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

(e) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(f)  the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

59. While the Gore factors provide a helpful framework, they are not an exclusive or exhaustive list of the factors a court can consider in exercising its discretion to allocate liability in contribution proceedings among PRPs. Courts may employ only some of the Gore factors, a single Gore factor, or non-Gore factors like knowledge or the financial resources of the parties. The district court dealing with the claim enjoys broad latitude to decide which equitable factors will inform its decision in any given case, and that decision follows a fact-intensive inquiry.

60. Another important aspect of CERCLA liability is the divisibility of harm or the apportionment of harm. Section 107 of CERCLA generally imposes joint and several liability for the Government's response costs on each PRP. However, under traditional tort principles, a tortfeasor can avoid being held jointly and severally liable for the entirety of damages if it can show that the harm is divisible, i.e. that there is a reasonable basis for apportionment. Because divisibility provides a defence to joint and several liability, the defence is typically asserted in response to a lawsuit brought under sections 106 or 107 by the government. But it can be important in contribution negotiations and proceedings too because if a PRP is only responsible for a divisible part of the loss, then it

cannot be liable to other PRPs to pay a contribution in respect of other parts for which it is not jointly and severally liable.

## V LIABILITY FOR THE REMEDIATION OF THE LOWER FOX RIVER

### (a) The pollution of the Lower Fox River

61. The Lower Fox River is a river in eastern and central Wisconsin in the United States. It starts from an outlet at the north end of Lake Winnebago and flows north and then northeast until it reaches Green Bay in Lake Michigan.  Unfortunately the high concentration of paper mills and other industry along the Lower Fox River over many years has been the source of much pollution of the river. The contamination which provides the background to this dispute arose from the manufacture of carbonless copy paper developed by NCR in the 1950s.  The paper was coated with an emulsion incorporating microcapsules of ink.  Instead of the traditional method of creating copies by placing a sheet of carbon paper between two sheets of plain paper, the NCR paper produced an identical copy because the pressure applied to one side of the top sheet by handwriting or typing caused the ink capsules on the underside of that sheet to rupture creating an identical copy on the lower sheet.

62. Polychlorinated biphenyls ('PCBs') were used in the creation of the emulsion and are highly toxic.  Commercial production of carbonless copy paper using PCB emulsions began in the Fox River Valley in 1954 and continued until the early 1970s. NCR produced the emulsion and then sold it to other companies who applied it to paper (the "coating process"). Two paper coating companies operating in the Lower Fox River area were the Appleton Coated Paper Company and the Combined Locks Company.  These two facilities were bought by NCR in 1969 and 1970, starting the chain of liability that has resulted in the indemnity owed by AWA to BAT.  These companies then sold the coated paper to NCR, which in turn sold it to businesses that converted (by printing and sizing) the NCR paper into products for their customers (the "converting process"). The coating of the paper with the emulsion and the converting process both generated a by-product known as 'broke', that is damaged or off-specification excess paper which was sold to paper recycling mills.  The converting process also generated trimmings.  Broke and trimmings were then processed by the recycling mills so that the paper fibres could be re-pulped to make paper.

63. PCBs were discharged into the Lower Fox River in two ways.  Some of the emulsion that was used to coat NCR paper in the coating process would be accidentally spilled or wasted and would mix with the paper mill's wastewater during paper production and be discharged along with the wastewater, reaching the River. Secondly, when broke and trimmings were re-pulped by the recycling mills, they would wash the emulsion out of the usable paper fibres and discharge the contaminated waste water into the River.

### (b) The application of CERCLA to the Lower Fox River

*(i) The early stages*

64. In September 1994 the State of Wisconsin notified NCR that it was designated as a PRP with respect to the Lower Fox River. In February 1996 the U.S. Fish and Wildlife Service notified API that it was potentially liable for NRDs in relation to the Lower Fox River. Then in July 1997, the EPA formally designated the following companies as PRPs:

(a) NCR

(b) API

(c) P. H. Glatfelter Company ('Glatfelter' or 'PHG')

(d) Georgia Pacific

(e) WTM I Company ('WTM I')

(f) Riverside Paper Co ('Riverside')

(g) U.S. Paper Mills Corporation ('US Paper').

65. Those companies formed themselves into the Fox River Group. Other PRPs were designated at a later stage.

66. For the purposes of the remediation, the EPA divided the Lower Fox River into five OUs. OU1 is Little Lake Butte des Morts; OU2 is Appleton to Little Rapids; OU3 is Little Rapids to De Pere; OU4 is De Pere to Green Bay; and OU5 is Green Bay. It is estimated that there are 11 million cubic yards of PCB-contaminated sediment spread over the 39 miles of the Lower Fox River and Green Bay. It is important to bear in mind that the direct discharges into the Lower Fox River for which AWA might ultimately be responsible were all down stream of OU1. So no contaminated water discharged by API's mills could have affected the part of the Lower Fox River designated as OU1.

*(ii) The WDNR Technical Memorandum 2d (February 1999): the Tech Memo*

67. The Fox River Group and the Wisconsin Department of Natural Resources ('WDNR') carried out research jointly into the estimates of PCB concentrations in the Lower Fox River and the likely responsibility of each of the PRPs for the contamination. An early study was produced in June 1998 and a revised version published on 23 February 1999 ('the Tech Memo'). The Tech Memo contains a careful explanation of the work that supports it and the purpose for which it was produced. It was undertaken in order to test how well models of the fate and transport of PCBs predict future conditions. The Tech Memo notes that while direct data do not exist for PCB concentrations and mass loads, a significant amount of information that can be used to create a reliable estimate of loading was found.

68. The specific objectives of the Tech Memo were to identify all major dischargers that operated at any time during the period of PCB discharge; to estimate the total suspended solids loads from all major dischargers to the Lower Fox River; to develop discharge volume estimates for all major dischargers; to develop estimates of production for all industrial dischargers during the entire period and to calculate, directly or by extrapolation, PCB loads from each discharger for the period 1954 to 1997.

69. The Tech Memo opened with a disclaimer:

> "Many comments were received suggesting that this document can be used to "allocate liability". As stated above, this document was prepared at the request of the [Fox River Group] for the sole purpose of conducting model hindcasts. Therefore,

> the Department believes this version of the document should
> not be used for an allocation of liability. If anyone reading this
> document wishes to pursue liability issues, they may contact
> the Wisconsin Department of Justice."

70. However, it went on in the Note to Readers to say that:

> "The information in this document reflects the most complete
> understanding of solids and PCB discharges to the Lower Fox
> River for the period 1954 to 1997. To the greatest extent
> possible, data from monitoring or discharger records were used
> to estimate discharges. However, complete records for this
> period no longer exist and not all existing records were
> necessarily available to the Department at the time this report
> was prepared. Should more accurate, verifiable information
> become available, these discharge estimates may be revised.
>
> During the course of this effort, the Department received access
> to Confidential Business Information (CBI) provided by
> dischargers. This CBI contributed to the strength of this report.
> Although no CBI is presented in this report, CBI is present in
> many key spreadsheet files used to compute solids and PCB
> discharges to the Lower Fox River. The confidential status of
> this information prevents distribution of these files as open
> records."

71. The Executive Summary of the Tech Memo sets out the following conclusions:

(a) Nearly all PCB discharges to the Lower Fox River are believed to have resulted from the production and recycling of NCR paper made with coating emulsions that contained PCBs. Three pathways of release to the River were identified relevant to PCBs used in the production of NCR paper.

(b) The first pathway is the releases of PCBs during the manufacturing process. The Tech Memo concluded that 39% of the total PCB release came through this route. The second route was the de-inking of NCR paper broke by recycling mills. The Tech Memo estimated that 56% of the total PCBs released came from this source. The third route was recycling which includes post-consumer paper sources that contain some NCR paper or use of secondary fibre sources that contain detectable PCB levels. The Tech Memo concluded that 5% of the total PCBs came from this source.

(c) Two primary factors control the size of PCB discharges. The first is the rate of PCB loss during the coating process and the second is the partition of PCBs to product during de-inking. The production loss rate affects the mills that produced NCR paper. Production loss rates vary from 1% to 5%. The Tech Memo adopted a rate of 3% based on particular reasoning rather than simply taking it as a midway point of the range. As regards the second factor, a higher partitioning factor results in lower overall discharges. The partitioning factor was said to be in a range of 25% to 75%.

(d) Over 98% of the cumulative PCB load was discharged by the end of 1971. Five facilities account for more than 99% of the PCBs discharged to the river.

72. The Tech Memo set out a pie chart showing the shares of discharges that it attributed to each of the companies it considered as follows:

   (i) Appleton Papers-Coating Mill    38%

   (ii) Appleton Papers-Locks Mill    2%

   (iii) Glatfelter    27%

   (iv) Georgia Pacific (which was referred to in some of the documentation by its relevant subsidiary's name, Fort James) Green Bay West Mill    23%,

   (v) WTM I    10%

   (vi) Discharges from all other facilities were less than 1% of the total PCB release.

*(iii) The Fox River Group's agreement on interim allocation: 27 July 1999*

73. On 27 July 1999 an agreement was reached between API, NCR, Georgia Pacific, Glatfelter, Riverside and WTM I on the outcome of an interim allocation mediation. The agreement covered all FRG assessments approved by those PRPs from 28 July 1999 until the end of Phase II of the Allocation Procedures, as defined in the agreement. They agreed that the costs would be attributed in the following proportions:

   (a) NCR/API    38%

   (b) Georgia Pacific    30%

   (c) Glatfelter    18.5%

   (d) WTM I    12%

   (e) Riverside    1% (up to a maximum of $51,500)

*(iv) The Amendola Report*

74. The United States Fish and Wildlife Service contracted with its own expert called Gary Amendola to estimate the weight of discharges of PCBs into the River. He produced his first report on 12 May 2000 ('the Amendola Report') setting out various scenarios. The author described the Amendola Report as a summary of preliminary estimates of PCB discharges for the period 1954 to 1985. Principal sources of information were said to be information provided by the paper companies and Fox River municipal authorities, the WDNR and published technical literature. The purpose of the report was to set out for review and comment by each of the PRPs the data used for their mills and the key factors and assumptions used to develop the estimates.

75. The preliminary estimates of PCB releases were shown in relation to four different scenarios ranging from a scenario assuming relatively low aggregate PCB discharges to a scenario assuming a high aggregate discharge. Mr Amendola also took 3% as the rate of loss of emulsion in the coating process. He also assumed that nearly all the PCBs in the River came from the production of carbonless copy paper. Amendola's preliminary estimates were set out in a table which showed:

(a) The discharges attributed to the two NCR mills ranged from 38.94% to 54.16%;

(b) Other significant percentages were attributed to Glatfelter, WTM I, Riverside and Georgia Pacific (Fort James); and

(c) The mid scenario allocated 40.37% of total discharges to NCR/API.

76. On 13 April 2001 the Amendola Report was revised and the estimate of NCR/API's share by weight of the PCBs discharged into the river was reduced to 30% of the total. This seems to be because Mr Amendola reduced his assumption as to the amount of PCBs lost in the course of production of the coated paper. However, it seems to be accepted that this document was not in the hands of the parties to this litigation before 2008 and 2009 though they may have known of its existence.

*(v) US Government enforcement action*

77. After identifying the principal PRPs, the Government moved forward with enforcement action. Over the years between 1994 and 2005 there were a number of funding agreements entered into between the Government and various PRPs, several consent decrees and other court orders made at the suit of the Government against various PRPs and funding agreements among the Fox River Group PRPs in addition to the one in 1999 that I have already described. These orders and agreements included the following:

(a) On 31 January 1997 there was a funding and interim implementation agreement entered into between NCR, API, Glatfelter and other PRPs for the first $18 million of remediation costs. NCR/API agreed to pay half of the first $6 million costs and 27% of the additional costs up to $12 million.

(b) In August 2001, API and NCR entered into a consent decree with the U.S. Department of Justice ("DoJ"), the EPA and other governmental entities. NCR/API agreed to contribute $41.5 million over four years to fund a response action and NRD restoration project at the site. This did not, however, constitute a final settlement of NCR/API's liabilities such as to protect NCR/API against further contribution.

(c) In December 2001, API and NCR entered into an Interim Consent Decree with the Government agencies pursuant to which they paid about $10 million per year for four years. The Government could spend the money how they chose on remediation or NRDs, in return for which the Government agreed not to take any enforcement action against either company for the duration of the Decree. The Decree expired in December 2005. Once the Government drew down the money, API paid 55% of the funds called for, pursuant to an agreement with NCR. $10 million of that amount was allocated to the OU1 clean up. This figure became significant later when the issue arose whether NCR/API could have any liability for pollution in OU1 upstream of their facilities. The remainder of the money was allocated to various NRD or remediation projects.

(d) On 9 May 2003 there was a consent decree entered into in the proceedings between the Government and Glatfelter and WTM I under which those two companies agreed to finance and perform response work in accordance with the ROD and other work plans devised by them and approved by the relevant agencies in respect of remediation work on OU1 of the Lower Fox River. Again this decree was not such as

to preclude any further contribution from Glatfelter or WTM I either at the suit of the Government or in contribution proceedings brought by other PRPs.

78. A number of RODs were issued and amended by the WDNR.  Each of these was a substantial document setting out the Government's views as to what work needed to be carried out in the different OUs and setting out the very substantial costs likely to be incurred in performing that work.  In addition to issuing the RODs, the Government began negotiations with the PRPs to get work started on remediation.

**(c) The Green Mediation**

79. On 14 February 2007 the Government wrote to NCR and seven other PRPs to ask them to enter into settlement negotiations concerning a consent decree to implement the remediation programme.  The PRPs together with two other entities Menasha Corporation ('Menasha') and the U.S. Army Corps of Engineers ('COE') started a non-binding mediation with an experienced and highly regarded mediator Eric Green ('the Green Mediation').  Negotiations in the Green Mediation continued throughout the second half of 2007 and, with some stops and starts, through 2008.  But the mediation was ultimately unsuccessful and no allocation agreement was achieved.  However, the proposals which Mr Green put forward as a result of his detailed work play a part in the story as the directors regarded them as a useful reference point when considering what NCR/API's share of the remediation costs and NRDs was likely to be.

80. Mr Green and his colleague Douglas Allen wrote a memo to the participating PRPs on 9 August 2007 giving an update of the status of the mediation.  This was based on the 30 July 2007 mediation session and his follow up discussions with the parties' representatives.  Mr Green started with dire (and prescient) warnings as to what would happen if the parties failed to reach an agreement:

> "In light of the time pressures we face, if we are to turn our substantial progress into an actual settlement, we have to work hard and fast. Thus, we are forgoing diplomacy in favor of frankness, candor and clarity so that all the parties to the mediation know exactly where things stand and precisely what is necessary for there to be a consensus based allocation in lieu of the unilateral administrative orders that will issue shortly and the litigation world war that will follow."

81. He explained that they had been working on the assumption that they would need to provide $450 million new money for the OU2-5 remediation and $65-70 million new money for the NRD settlement.  He described this and other assumptions as 'subject to challenge and change'.  He then said:

> "There are an infinite number of permutations that get to $450 million and $65-70 million. Needless to say, each mediation participant has its own view as to how these numbers should be raised, and each of these views incorporates a large dose of subjective self-interest. For the avoidance of doubt, all parties should understand that we have faithfully listened, recorded, assimilated, and understood each of your arguments about how the targeted amounts should be allocated. There is a large

measure of truth and rationality in all of your arguments, but they cannot all be right. As we have explained to you many times, including at the mediation sessions, we have formed our own impressions and reached our own conclusions based on the best understanding we have been able to reach of the technical, factual, operational, historical, geographical, hydrological, remedial, and equitable factors brought to our attention as part of the mediation. We recognize that there are other allocations that reasonable people could derive and defend and we respect the mediation parties' strongly held views on this subject."

82. Mr Green then set out the shares which the mediators thought the PRPs should pay towards the $450 million total. The allocation he proposed was as follows – I have added in the percentages in italics:

| Green Mediation proposed shares | | | | |
|---|---|---|---|---|
| **Party** | **OUs2-5 Remediation** | *% of $450 m* | **NRDs (OUs1-5)** | *% of $66 m* |
| OU-1 parties: Glatfelter; WTM1; Menasha | $40 m | *8.9%* | $20 m | *30%* |
| NCR/API | $250 m | *55.6%* | $25 m | *38%* |
| Riverside | ------ | ------ | $1 m | *2%* |
| US Paper | $60 m | *13.3%* | $10 m | *15%* |
| Georgia-Pacific | $100 m | *22.2%* | N/A | *N/A* |
| COE | ------ | ------ | $10 m | *15%* |
| **TOTAL** | **$450 m** | | **$66 m** | |

83. On 24 September 2007 Mr Green and Mr Allen wrote again summarising their understanding of the progress made and the agreements reached at the end of the mediation session on 18 September 2007. The understanding related to the PRPs' contribution to the remediation of OU2-5. They set out the following table:

"**Summary of Fox River Parties' Contributions to the
Remediation of OUs 2-5**

Settling Party Contribution

NCR-API        $240,000,000

| GP | $90,000,000 |
| USP | $40,000,000 |
| WTM I | $13,333,000 |
| Menasha | $10,000,000 |
| Riverside* | $1,000,000 |
| TOTAL: | $394,333,000 |

**\*Subject to agreement on payment terms**"

84. This therefore allocated NCR/API a share of 60.8%. This proposal did not include any contribution from Glatfelter and did not include NRDs since the issue of NRDs had been put on temporary hold pending resolution of the remediation issues. However Mr Green noted that NCR/API, United States Paper and WTM I still had amounts on the table for NRDs of $25 million, $11.5 million and $5 million respectively. He also recorded that:

> "The Settling Parties instructed the Mediator to inform US DOJ of the progress and the proposed way forward and next steps. Pursuant to these instructions, the Mediator talked with Randy Stone to inform him of these developments. Stone indicated he was disappointed with the lack of closure but that he appreciated the progress made so far. Discussions between DOJ and the Mediator are ongoing."

85. On 13 November 2007, the EPA issued a UAO against NCR, API and the six other PRPs (CBC Coating Inc., Georgia Pacific, Menasha, Glatfelter, U.S. Paper, and WTM I) directing the parties to implement the Government's remedy for OUs 2-5. The UAO required full-scale remediation to begin in 2009. Paragraph 2 of the UAO provided that each PRP is jointly and severally responsible for carrying out all activities required by the Order. In other words, the Government did not divide or apportion any particular part of the contamination to any particular PRP but treated them all as responsible for all the contamination.

**(d) Parallel work on the NRDs**

86. In parallel with this work on remediation costs the Fish and Wildlife Service and other trustees began to evaluate the potential natural resources damages associated with PCB discharges. On 20 June 2002 Georgia Pacific entered into a settlement agreement with the DoJ and the Fox River Trustees to pay $10.1 million to cover all NRD claims against Georgia Pacific for the Fox River. This was approved by the court in March 2004 thereby releasing Georgia Pacific from any further obligation to contribute either to the Government or to the other PRPs for NRDs.

87. On 3 June 2003, the Fox River Trustees issued the final Joint Restoration Plan for NRDs at the Fox River. The Joint Restoration Plan selected a proposed course of action which was estimated to cost $223-333 million.

88. On 9 July 2007, the Senior Attorney of the US Department of Justice, Randulph (Randy) Stone wrote a confidential settlement memorandum to the Fox River PRPs ('the Stone Total NRD Offer'). This offer and a later offer to settle the NRD claim against NCR/API are relevant to the Claimants' challenge to the provision in AWA's accounts. The title of Mr Stone's memorandum was "Recommended "Bottom Line" Settlement Position on Natural Resource Damages". The memo explained:

> "The settlement position outlined in this memorandum reflects the views of key legal and technical staff from several of the government agencies involved in natural resource damage assessment and restoration activities for the Lower Fox River and Green Bay Site. It incorporates their analysis of the most current information, including: (1) data on all past and ongoing restoration projects performed with interim NRD recoveries in this case, …; (2) all available information on the potential costs and benefits of prospective future projects, including project concepts advanced by PRP representatives in recent NRD Settlement Work Group Meetings; and (3) recent analyses that the Trustees and their consultant have performed for preparation of a formal Restoration Progress Report."

89. Mr Stone said that he was prepared to recommend that the Trustees settle their remaining NRD claim on the terms summarised. He included the caveat that although the offer had been discussed with most of the staff-level Trustee representatives involved with the site, and with some senior-level officials, the offer had not been formally approved by the people who had ultimate authority to approve a settlement. He pointed out further that any proposed settlement was subject to Court approval.

90. Mr Stone outlined the work that had been carried out in the past to estimate the value of NRDs. The range used in 2001 as the starting point for any settlement negotiations was $176-333 million. That was based on two different possible remediation plans – an intensive remediation which would cost $176-256 million and an intermediate remediation plan which would cost $223-333 million. He referred to the Trustees' Restoration Plan issued in 2003 which was based on the more expensive intermediate remediation plan but reflected the bottom end of the damages range for that plan, namely $223 million. However, he went on to say that since issuing the Restoration Plan, the Trustees had gained valuable experience in implementing actual restoration projects with interim NRD recoveries from partial settlements, and had worked toward accomplishing the overall goals in the most cost-effective manner. In many instances, the Trustees had been able to achieve high quality restoration at lower than expected costs; specific areas of wetland habitat had been restored or preserved at less than the per-acre cost originally estimated. That past experience led Mr Stone to believe that the Trustees could justify settling the total NRD claim now for less than the prior dollar estimates.

91. Mr Stone said that he also took into account the various payments that had already been made by the PRPs over the years under Georgia Pacific's settlement and the other interim funding arrangements that had been concluded, including $25 million already paid over by NCR/API for NRD projects.

92. Taking everything into account, Mr Stone proposed a settlement figure of $93,575,000 to be paid over ten years and explained in detail how he had arrived at that figure. He then

said that although that figure already included significant discounts, he was prepared to recommend 'one more major concession to enhance the prospect of a near-term "global" settlement'. That concession was that he would accept immediate payment of the net present value of that payment stream into an interest-bearing account. That NPV was $75,647,794. The memorandum closed with the following comment:

> "The settlement structure proposed here also would allow the PRPs to satisfy the remaining NRD claim for less than $76 million, and the PRPs' total past and future payments to settle the NRD claim would be less than $120 million. That total commitment by the PRPs would only be a fraction of the $223-333 million total claim amount estimated by the RCDP."

93. The offer was rejected by the PRPs.

94. Later, in July 2008, there was a meeting between Mr Stone, Mr Gower, Mr Bates and Mr Tauscher with representatives of the DoJ, EPA and WDNR to discuss a form of consent decree. In an email to Mr Martinet, Mr Gower said that as regards NRDs:

> "The Government made an outright demand on NCR/API for an additional $50 million for NRD if we wanted to settle the claim. Stone stated that in any event, a consent decree would need to address NRD, if only on the terms it proposed, to be sure that API/NCR were not able to use the proposed consent decree as a vehicle to insulate their resources from the NRD claim. Stone and John Carlucci (Department of the Interior) agreed that the Government's interest in this NRD claim was not driven purely by economic or financial considerations and that the Government would sue. Should such a suit be filed, it would be based on the full $333M assessment, and not their summer 2007 "bottom line" NPV offer of $76M. There did not appear to be much room for negotiation, but Stone also made clear that neither his proposal ($10M now and $10M next year) nor his $50M demand had been run by the NRD Trustees."

Mr Gower described the tone of the meeting as having been 'cooperative'.

95. As regards what share of the total NRD one could expect NCR/API to have to bear, the experts were agreed that this would reflect their allocated share of the remediation costs, subject to an important exception. That was that Georgia Pacific which was expected still to contribute to the remediation costs had settled its NRD claim in 2002 and so could not be pursued for any further contribution. Georgia Pacific's share would have to be met by the other PRPs.

**(e) The *Whiting* litigation**

96. On 7 January 2008, NCR/API commenced the *Whiting* litigation in the United States District Court, Eastern District of Wisconsin, Case 08-C-16, *Appleton Papers Inc & NCR Corporation v George A. Whiting Paper Co*. The initial claim was only against the George A. Whiting Paper Company, but NCR/API soon brought every significant potential contributor into the *Whiting* litigation as a defendant. In the Complaints,

NCR/API asserted claims under CERCLA section 107 for cost recovery for remediation costs and NRDs, under section 113 for contribution for remediation costs, and sought a judicial declaration allocating costs and liabilities among NCR/API and the defendants.

97. The *Whiting* defendants filed motions to dismiss. On 20 August 2008, the court held that NCR/API could seek to recover clean up costs from other PRPs only under CERCLA section 113(f), not section 107(a). This meant that NCR/API would have the burden of showing that it had paid more than its equitable share before it could recover anything, and it could only recover from each defendant that defendant's equitable share of the excess. NCR/API's claims for contribution against other PRPs would be subject to equitable factor defences and the Gore factors weighed according to the discretion of the judge. Further, NCR/API would not be able to recover a contribution from any party that settled with the Government and obtained contribution protection. In September 2008, the *Whiting* defendants filed answers and counterclaims against NCR/API. The answers asserted numerous different defences to NCR/API's claims. However, there were several defences asserted by virtually all of the PRPs. These asserted that all or substantially all of the PCBs that had been discharged into the Lower Fox River were a direct result of NCR's manufacturing of carbonless copy paper either through direct discharges or the sale of NCR broke.

98. The judge docketed with the *Whiting* litigation was Judge Griesbach. On 28 September 2008 he made a case management decision and scheduling order ('the *Whiting* CMO') which had significant repercussions for the future shape of the litigation. By that stage there were twenty-three defendants who NCR/API claimed bore some degree of liability for some of the costs they had already incurred, or would incur, in cleaning up the River. In the *Whiting* CMO the Judge noted that all parties agreed that full preparation of the case for trial would require extensive document discovery, deposition of several hundred witnesses, and retention of expert witnesses at substantial expense to each party. Trial of all issues at once could take months. Judge Griesbach therefore divided the *Whiting* defendants into those who were party to the November 2007 UAO entered by EPA who had already incurred more than $100 million in clean up costs and those who were not. For those who were not a party to the UAO, Judge Griesbach stayed their disclosure obligation for four months to give them time to negotiate a settlement of their liability with the Government. If they succeeded then API/NCR's claim against them for contribution under section 113 would be barred so they would drop out of the proceedings. As to the remaining parties, and the non-UAO defendants who did not reach early settlement, the Judge ordered a split trial on the issues (1) when each party knew, or should have known, that recycling NCR paper would result in the discharge of PCBs to a waterbody, thereby risking environmental damage; and (2) what, if any, action each party took upon acquiring such knowledge to avoid the risk of further PCB contamination. Judge Griesbach set 1 December 2009 as the date for the start of the trial on the knowledge issues.

**(f) The insurance position and the Green Bay Litigation**

99. I have mentioned that AWA was by 2005 the beneficiary of the Historic Insurance Policies. There was extensive litigation in the US between insurers and insured over the timing and extent of the insurers' liability to pay out under such policies for environmental damage costs. In July 2003 the Wisconsin Supreme Court overturned the

existing law and held that comprehensive general liability policies of this kind did cover environmental claims. The costs recoverable under the policies include not only the costs that the insured had to pay towards remediation and NRDs but also defence costs, that is costs incurred by the PRP in litigation against the Government or the other PRPs.

100.  Some of the insurers were keen to settle future claims by negotiating with AWA a cash sum that the insurer would pay up front in return for AWA releasing it from any further liability under the policy.  By the time Sequana became involved in these events, some substantial settlements had already been achieved.  AWA had loaned these receipts to Sequana and they formed part of the sum represented by the inter-company receivable in AWA's accounts.

101.  In January 2005 one of API's insurers, a group of insurers referred to as CNA commenced proceedings in the Brown County Circuit Court of Wisconsin seeking a declaration that API did not have coverage under the polices. This was referred to by the parties as the 'Green Bay Litigation'. On 16 March 2008, following a jury trial, it was held that API was entitled to insurance coverage in respect of the Lower Fox River clean up liabilities.

102.  There were further legal proceedings to work out in more detail the nature of the insurers' liability under the Historic Insurance Policies. The presiding judge in the Green Bay Litigation was Judge Zuidmulder. One of the main issues between the insurers and API was whether recovery was on what was called the 'pro rata basis' or the 'all sums basis'. Under a pro rata basis, the insurer is responsible for only a pro rata share of the damages based upon the years that it provided coverage relative to years when no coverage was purchased. Thus, an insurer is liable for only the damages that accrue during a policy period. Under an "all sums" basis, the insurer is required to pay all sums that result from the occurrence that has triggered liability under the policy. The 'all sums' approach is therefore hugely more beneficial for the insured party than the pro rata approach. This was a significant point for the PRPs in the Fox River claim.  The insurance policies which AWA had been assigned were from different insurers for different periods and covered different tranches of possible coverage.

103.  On 12 November 2008, Judge Zuidmulder made three important rulings:

(a) API would benefit from the historic insurance policies on an 'all sums' basis, and no defences would apply under the policies to exclude or limit the insurance coverage for API's liabilities;

(b) the insurers would not have to pay out on claims until actual incurred costs exceeded monies that API had received from other insurers in cashing out a policy (i.e. providing a lump sum in settlement of any future liability under the policy); and

(c) API could not submit claims for reimbursement to its insurers until there had been either an agreement or a judicial determination of the share of the total remediation costs that API was liable to bear.

104.  The first finding was very welcome news.  Judge Zuidmulder's decision meant that AWA could choose the order in which it claimed against its insurers and could claim against each of them up to the limit of each policy for loss arising, even if the damage to the River occurred before the policy started.  The second ruling was immaterial since API expected to use up settlement monies fairly soon.  The third point was very unwelcome since it might be many years before the final determination of API's share and API was

having to pay out costs on an ongoing basis.  On 11 December 2008 the Company filed motions for reconsideration of the rulings regarding the timing of insurance payments.

## VI THE EVOLUTION OF THE PROVISION IN AWA'S ACCOUNTS UP TO DECEMBER 2008

### (a) The elements that go into the provision

105.  AWA's accounts were drawn up to the calendar year and were consolidated up into Sequana's group accounts which were also drawn up to the calendar year.  AWA's accounts were initially drawn up showing amounts in sterling.  However, in January 2007 AWA changed to show amounts in euros, making it easier to consolidate them with the Sequana group.  It then changed its functional currency to US dollars in January 2009.  In the years that are particularly relevant to these proceedings there was considerable delay in drawing up the end of year AWA accounts.  The AWA accounts for the year ended 31 December 2007 were not finalised until 28 October 2008 and the accounts for the year ended 31 December 2008 were not finalised until 18 May 2009.  It was not suggested that there was anything sinister in this – AWA was one of a very large number of companies being audited within the group.

106.  The Sequana group accounts had however to be drawn up rather more quickly after the year end.  PriceWaterhouse Coopers ('PwC') were the auditors for the group, the Paris office auditing the group accounts and the London office auditing AWA's and many other subsidiaries' accounts.

107.  In order to arrive at the provision in respect of the Lower Fox River in AWA's accounts, there are a large number of 'moving parts' to be calculated. I have mentioned below only those that are relevant to these proceedings.  The calculation that had to be performed was in reality much more complicated than the explanation below.

108.  **Remediation costs**   The largest figure to be included in the calculation was the estimated total remediation costs of implementing the ROD ultimately agreed with the EPA. It was expected that the costs would be incurred over a 40 year period into the future.  The source of the estimates for remediation costs was a company called Project Control Companies Inc ('PCC').  They were acting for API and AWA in liaising with the contractors engaged by the PRPs in the Fox River Group to undertake the work.  At the start of our involvement in events, the main contractor was called Shaw Environmental & Infrastructure Inc ('Shaw') but they were replaced by a company called Tetra Tech in 2007.

109.  The Claimants accepted that the total remediation cost figures provided to PCC and used in the modelling of the provision were best estimates of those figures.  But it is important to recognise, as was common ground, that the estimate figures varied widely over the course of the years; that the low and high estimates were very far apart and that there were factors at play that could cause the costs figures to change greatly over future years.  Generally speaking, costs for this kind of work will tend to rise as work gets underway and problems that were not anticipated in the initial work plan emerge and have to be overcome.  Conversely, sometimes contractors learn better ways of working as they go along and this enables them to save costs.  Such savings were sometimes referred to by the parties as value engineering.  A key factor in the amount of costs was the way the remediation work would be carried out.  There were two ways of remediating the Lower

Fox River, by dredging out the polluted sediment, transporting it away from the site and disposing of it elsewhere or by capping the sediment by pouring clean sand onto the river bed. Clearly the former was a much more expensive form of remediation than the latter so much of the negotiation over the RODs and plans of work focused on which parts of the River were so polluted that dredging was really needed and which parts were less polluted so that capping would suffice. These decisions were based on the sampling of sediment in the River. Programmes of sampling and analysis took place at various stages.

110. **NCR/API's share of remediation costs**  One of the most contentious issues was the best estimate of the share of the remediation costs that would ultimately be borne by NCR/API and hence by AWA. The estimate included in the accounts that were used to justify the May Dividend was challenged by the Claimants as being too low.

111. **API/AWA's share of NCR/API's share**  As a result of the arbitration decision in November 2005 under the agreement between API, NCR and BAT, it was known that API and hence AWA would bear 60% of whatever costs NCR/API was liable to pay.

112. **NRDs** I have described the potential liability for NRDs and the Stone Total NRD Offer. A figure representing the best estimate of NCR/API's likely liability for paying NRDs had to be factored into the computation of the provision. The Claimants challenged the figures used as the best estimate of NRD liability in both the December Dividend and the May Dividend.

113. **Defence and other costs** The costs incurred by AWA would include the costs of litigation on various fronts.  There was no challenge by the Claimants to the best estimates of these costs.

114. **Inflation and discounting rates**. Since the provision was stated at present value but related to a liability likely to be spread over many years, the costs had to be inflated and then discounted to arrive at a present value. Although there was some criticism of the rates used, this was not an issue raised on the pleadings or dealt with by the experts.

115. **Maris Policy** The fund available under the Maris Policy did not increase by inflation once it had reached its maximum level of $250 million. Payments were being made out of the Maris Policy as AWA paid out sums under interim funding agreements or UAOs.

116. **Currency conversion rates**  All the costs incurred in the Fox River liability were incurred in dollars and the Maris Policy was also expressed in dollars. Before January 2009 all these amounts had to be converted into euros to arrive at the provision for AWA's accounts.  This is important because some apparent changes in the amounts included in the accounts are due simply to currency fluctuations rather than to any change in the underlying dollar figure.

117. **Calculating the provision** The way that the provision was arrived at for AWA's accounts was by constructing a series of spreadsheets in which all the figures were entered and formulae applied to arrive at an end result. The models were prepared by PCC.  They obtained information about remediation costs from the contractors Shaw or Tetra Tech, they provided the appropriate inflation rates and discount rates though these would be checked with the auditors PwC. Mr Gower would provide them with other inputs, in particular the NCR/API share and the NRD figure, following all the discussions that I describe later. It is important to bear in mind that the provision in AWA's accounts

only had to reflect the best estimate of the amount which AWA was expected to have to contribute over and above the pot of money in the Maris Policy. When a dollar figure was arrived at as the estimate of AWA's share of the clean up and NRD costs, the amount remaining in the Maris Policy would be deduced from that dollar figure and the result then be converted into euros before being included as the provision figure in the accounts.

### (b) The provision in the years to 2007

118. For several years after AWA took on the indemnity liability for the Lower Fox River it was thought that the funds in the Maris Policy would be sufficient to meet the whole liability into the future. No provision was therefore made in AWA's accounts in the years 2001, 2002, 2003 and 2004. However, it seems that this assumption was based on the expectation that AWA/API's share of the costs allocated to NCR/API would be less than the 60% that was ultimately determined in the November 2005 arbitration award.

119. In May 2005 Mr Martinet and Mr Lebard took on their executive roles as joint Deputy Managing Directors of Sequana and Mr Martinet became a director of AWA. At that time, as I have described, the striking feature of AWA's accounts was that the balance sheet in the 2004 annual accounts showed a debt of over £450 million owed by its parent company and a called up share capital of over £200 million. All the Defendants' witnesses and the accounting experts recognised that generally speaking it is not satisfactory to maintain in place such a substantial inter-company receivable between a parent and a wholly-owned, non-trading subsidiary. Other things being equal, it would be entirely proper and desirable for that inter-company receivable to be removed. It was also recognised by all the witnesses and the accounting experts that a way of removing the receivable and more generally 'tidying up' the corporate position would be to carry out the exercise that was carried out in this case, that is make a sizeable reduction in the company's capital, declare a dividend in favour of the parent company and set that dividend off against the inter-company receivable. Ultimately, in general, the goal would be to reduce the share capital to a much smaller amount and remove the inter-company receivable altogether. The unusual feature which made any such tidying up exercise difficult in the case of AWA were the three liabilities to which it was, in 2005, still subject; the Lower Fox River indemnity, the EU competition infringement fine and the pension fund liability. The last two were familiar problems for the Sequana management and capable of computation. It was also fairly clear that their quantification would be resolved reasonably soon. But the Fox River liability was much more intractable. Sequana and the new AWA directors needed to understand much more about this problem before they could begin considering how the position of AWA within the group could be brought into line. In other words they needed to know how much money should be left in AWA to meet the Fox River liability and therefore how much money could properly be taken out by way of dividend to the parent Sequana.

120. Soon after his appointment, therefore, Mr Martinet started to ask for information about the Lower Fox River liability. On 11 July 2005 Mr Gower sent Mr Martinet a lengthy memo setting out the history of AWA's indemnity, of the Fox River pollution and the enforcement activity so far by the US Government agencies, and of the potential liability for NRDs.

121. In reply Mr Martinet wrote back to Mr Gower acknowledging the complexity of the issue and asking him to provide a matrix of possible outcomes:

> "Given this apparent complexity and as we discussed some time ago when we met (briefly) in Pascal's [Mr Lebard's] office, may I ask you again on the basis of your intimate knowledge of these issues to please try and map it out under the form of some sort of a matrix/occurrence tree/prioritization of issues, if feasible, so that we could have your synthetic opinion at a glance as to what could be the worst case and best case scenarios looking forward. Am I right in assuming that the base case scenario (…) is some sort of a best guess between the worse and best case scenarios, and that it should be amended/refined as a continuous process on the basis of the latest developments (i.e. the $10.4 M insurance payments so far, etc .. )?"

122.  In response to Mr Martinet's request, Mr Gower emailed him again on 15 July 2005 with two documents.  The first was an analysis which Mr Gower said attempted to quantify AWA's exposure based on the information available at that time.  The second was the half yearly financial statement prepared by PCC that would be discussed at a meeting to be held in Chicago.  The analysis described the various inputs and the uncertainties surrounding them.  Mr Gower's conclusion was (emphasis in the original):

> "$104 million (API/NCR share of 40% of $500 million - API being allocated 50% of that share after the first $75 million) to $368 million (API/NCR share of 60% of $850 million - API being allocated 75% of that share after first $75 million. To this you then need to add the NRD liability resulting in a total range of possible liability of:
>
> **$124 million to $408 million in present value terms**."

123.  It is helpful to unpack that a little to explain how the estimate was arrived at:

(a) The $500 million and $850 million figures were the range of estimates of the total remediation costs for the Lower Fox River.

(b) The 40% and 60% figures were the range of estimates of NCR/API's share of the total remediation costs.

(c) The 50% and 75% were the range of estimates of API's allocation of the 40% - 60% API/NCR share – this memo was written before the outcome of the 2005 NCR arbitration which fixed this figure at the 60% used in all post-2005 computations.

(d) The NRD liability was estimated in the memo at between $90 and $120 million.

*The meeting in Chicago in July 2005*

124.  On 26 to 28 July 2005 Mr Martinet attended a three day meeting in Chicago.  He went with Mr Courteault and they met there Mr Gower, Jeff Bates and Brian Tauscher from MWE US, Vincent Favier (the Sequana executive dealing with the provision in Sequana's accounts for the Fox River liability) and Jeffrey Lawson and Susan O'Connell from PCC.  The purpose of the meeting was to discuss in depth the background to AWA's liabilities

for the clean up of the River.  Mr Martinet said it was very much a fact finding exercise and the first opportunity for him really to get to grips with the complexities of the issue. This was the first time that Mr Martinet met Mr Bates.

125.  From this meeting Mr Martinet emerged with a clear perception of 60% as the most likely figure for the share that NCR/API would have to bear of the total remediation costs. This proved very important for all future calculations of the provision in the AWA accounts for the Lower Fox River liability. Mr Martinet's evidence was that this 60% figure was discussed with Mr Bates at the Chicago meeting and Mr Bates advised that this was a prudent figure to use.

126.  Mr Martinet's understanding was that the 60% figure was derived as follows:

(a) The direct discharges of API into the River were calculated on the basis of the Tech Memo and the Amendola Report at about 40% of the total discharges for OUs2-5.

(b) To this had to be added an amount to reflect API's potential arranger liability under CERCLA for the whole of the River including OU1.  In OUs2 – 5 the other PRPs were treated in the Tech Memo and the Amendola Report as having discharged the other 60% of the PCBs.  The percentage of those other PRPs' discharges which the Government was likely to treat as having been 'arranged' by NCR/API could be worked out by analogy with what had happened in the OU1 clean up because in OU1 NCR/API had no direct discharges but only arranger liability.

(c) The budget for the clean up of OU1 was $60 million of which the Government had accepted a contribution from NCR/API of $10 million, that is one sixth of the total.

(d) One sixth of the other PRPs' 60% discharges was 10%.

(e) That 10% for arranger liability for the River was added to NCR/API's direct discharge figure of 40% to make 50%.

(f) The 50% was multiplied by 1.2 as a precaution so that a further 10% was added to make 60%.  This 10% was added, according to Mr Martinet, out of prudence to take account of possible factors such as one of the other PRPs being unable to pay its share, in which event that share would be allocated amongst the remaining PRPs.

127.  Mr Martinet recalled that Mr Gower's advice had been that there was no need to take into account the possibility of arranger liability when estimating NCR/API's share but Mr Bates was more cautious and advised that it should be added.  Mr Bates' view prevailed. Mr Martinet described the calculation above as 'obviously not scientific' but he believed that it involved two significant reference points, the two reports apportioning direct discharges into the Lower Fox River and the experience in paying for the OU1 clean up.

128.  NRDs were also discussed at the Chicago meeting.  Although the figures quoted by Mr Gower in his 11 July memo had been very large, Mr Martinet's recollection was that at the meeting Mr Bates explained that there were ways of bringing down these damages significantly by taking steps, for example, to repair the river habitat for bird life.

129.  On his return from Chicago Mr Martinet provided a memo to the Sequana board reporting on his discussions.  The position he presented to the Sequana board was as

follows (bearing in mind that the API share of the NCR/API share was still not settled by the 2005 arbitration at this time).

(a) Having regard to the different remediation methods of dredging and capping, the estimate of remediation costs was $300 – 750 million with a mid-point of $525 million. The range of liability for NRDs was $90 - $120 million with a mid-point of $105 million. The range of total costs was therefore $390 - $870 million with a mid-point of $630 million.

(b) Looking at a range for NCR/API's share of the total and at a range for API's allocation of the NCR/API share, the probable cost share for AWA alone was between 15% and 53% with a mid-point of 33%.

(c) Plotting these ranges on a table, the mid-point of the mid-points (33% of $630 million) gave a figure of $182 million (not including defence costs).

(d) The Maris Policy and the $25 million that API was contractually bound to pay provided a pot of money calculated at $215 million.

130. Mr Martinet noted that although this pot of money was higher than the median figure, it was less than half of the amount of $434 million estimated in the worst case scenario (that figure being 53% of $870 million). Mr Martinet also referred to the Historic Insurance Policies as providing about $940 million of potential coverage – something which he described as an absolutely fundamental point. He referred to the Green Bay litigation and noted that since there had already been several payments out by the insurers, there was reason for optimism.

131. In the memo to the Sequana Board Mr Martinet stressed the uncertainty of the outcome and described the strategy going forward. He praised 'the professionalism and seriousness' of the AWA teams working on the matter. He concluded that the Maris Policy might be adequate to cover the costs but that:

> "… AWA is not impervious to a certain number of unpleasant surprises in the matter (the "worst case" falls within the range of $182 and $434 million) that would make this provision manifestly insufficient though it is not possible to evaluate the probability of this at this stage."

132. The result of this was that it was agreed that the AWA accounts for the year ended 31 December 2005 would include provision over and above the Maris Policy. The provision included in respect of the Fox River liability was £50.8 million (sterling). The note to the 2005 annual accounts stated:

> "During 2005 a clearer picture began to emerge on the future costs relating to the Fox River project. A subsequent review resulted in the creation of a provision which represents the anticipated excess discounted future expenditure on the project over the discounted available project insurance. The amounts are expected to be paid out over the next forty years."

*The appointment of Mr Bartolotta*

133. In December 2005 Mr Martinet brought a former colleague of his, Michael Bartolotta, onto the team. Mr Bartolotta was based in New York and had an accounting background. Mr Martinet valued his contribution because he was precise, thorough and good with numbers and able to scrutinise and challenge the figures being put forward by, amongst others, Mr Gower. Mr Bartolotta started analysing the PCC models, asking pertinent questions and finding some of the answers unsatisfactory. He emailed Mr Martinet copying him into the answers that he had received from MWE US and PCC to his comments on the model. He noted that some of the answers he had received 'indicate errors or sloppy modelling which is being corrected'. He continued: 'It is interesting to note that these items were not picked up by either PCC's senior principal review or by Chris [Gower]'. Mr Martinet clearly regarded this stance of Mr Bartolotta as fully justifying his decision to bring him into the team. He emailed back:

> "I believe this shows us that having somebody from within in the loop was both legitimate and presumably overdue. Good work!"

134. Mr Martinet was asked whether Mr Bartolotta's fault finding knocked the confidence he had in Mr Gower. His evidence was that he recognised that Mr Gower was clearly 'not an accounting expert and probably not a model expert either'. That did not mean that Mr Martinet did not trust him. Mr Martinet said:

> "I needed extra comfort -- after Chicago, I thought it was a very complex issue and I thought it would not be useless to have an extra layer of checks and also on the issue, that is the -- not that I didn't trust Mr Gower. Frankly, I was rather impressed by what Mr Gower was doing. I thought his notes were very well done. He knew very well – you know when somebody knows an issue. You ask him questions, he responds immediately, gives you some – so I had no reason to distrust Mr Gower. But the numbers were significant. It was a significant issue. And I was more comfortable to have somebody that I would absolutely trust also to look at the numbers."

135. In the AWA accounts to the year ended 31 December 2006, the same provision of £50.8 million was included for the Lower Fox River liability.

136. During the course of 2007, the uncertainty over the level of the fine for the EU competition infringement was resolved when the Luxembourg court reduced the fine payable and the fine was paid in full. Similarly the pension liability was resolved by an agreement at the end of March 2008 reached with the UK pension funds' trustees whereby AWA ceased to be the pension funds' principal employer.

137. Between the decision on the 2005 provision and the start of 2008 there were various other developments in the background that I have referred to earlier, in particular the Green Mediation and the replacement of Shaw with Tetra Tech as the main contractor for carrying out the Lower Fox River remediation work.

138. In October 2007 Mr Martinet prepared a file note for himself of the likely position at the end of 2007. He noted that budgetary slippage had occurred in the remediation of OU1 and might be repeated in OUs2-5. He set out a 'Worst-case scenario' of remediation

costs of $750 million and NRDs of $70 million of which AWA would have to pay 36% (60% of 60%) less the $25 million that API was committed to pay, arriving at $286.2 million. His conclusion was that:

> "While a successful mediation would have allowed us to entertain the possibility of recovering the provision of almost $50 million from 2007, the examination of the current situation allows us to think that such an outcome is now a good deal less likely and that, quite the contrary, we could be confronted with the need to increase the FOX provision from 2007 onwards by considerable proportions ($60 million in the worst-case scenario)."

### (c) Events in early 2008

139. On 16 January 2008, there was a meeting in New York between Mr Gower, Mr Martinet, Mr Bartolotta, Mr Bates and others including a construction expert and two people from PCC. The purpose of the meeting was, in part at least, to be able to fix the provision to be included in the Sequana and AWA accounts for the 2007 year just ended. At this point the total for remediation costs being discussed was $750 million.

140. The provision included in the Sequana group accounts drawn up shortly after the 2007 year end was the same as had been included in the AWA 2006 accounts.

141. In early 2008, attention was focused on the Green Bay trial concerning the ability of AWA to recover under the Historic Insurance Policies. There was also the resumption of the Green Mediation talks, prompted by the issue in November 2007 of the EPA's section 106 order against the PRPs requiring them to execute the EPA's proposed remediation work for OUs2-5.

142. There were also negotiations being conducted between NCR/API and Georgia Pacific aimed at the two of them arriving at an agreement. In early June 2008, Georgia Pacific put forward a proposal based on a total clean up cost for OU2-5 of $698 million with NCR/API paying $333 million, Georgia Pacific $156 million and the other PRPs $209 million. NCR's chief legal officer wrote to Mr Gower in enthusiastic terms about the proposal. He stated that their experts' current view was that NCR/API were responsible for 34% of the clean up costs in OUs 2-5 but that the experts for the other parties put NCR/API's share at 60%. Mr Martinet said that what he took from this was not so much Georgia Pacific's views of the precise numbers or their approach to calculating NCR/API's share but their view that the other PRPs could be expected to contribute a significant amount of money to the clean up costs.

143. In the event NCR/API did not accept the proposal; the negotiations with Georgia Pacific continued throughout 2008 until they finally collapsed on 10 December 2008.

144. Also during the middle of 2008, following the successful outcome of the Green Bay litigation against the insurers, there were discussions about the possible sale of AWA. With this in mind, Mr Martinet approached various merchant banks to see if they would place a value on the company. He accepted that these discussions foundered because of the unquantified nature and complexity of the Fox River liability.

145.  On 31 July 2008 Mr Martinet sent a memo to Mr Lebard copying Mr Courteault and Mr Bartolotta. He started by saying that:

> "As customary, the news on the Fox River issue are contrasted: some good, some bad and still a lot of unknowns. Under the circumstances that I'll summarize below, urgent actions are now needed on AWA ltd so as to prepare for the future and control potential damages."

146.  Mr Martinet outlined the good news, that is the success in the Green Bay litigation jury trial in March 2008, but said that there was still uncertainty about the scale of remediation costs.  There had been no settlement with the DoJ on NRDs.  He described the *Whiting* litigation as having 'triggered a multiple dog fights situation'.  He also described the offers and counter offers as between NCR, API and Georgia Pacific, concluding that it was far from certain that this would lead to an acceptable compromise. He said:

> "We therefore made clear, Mike [Bartolotta] and I, to our counsel (Jeff Bates) that AWA was very stretched, that he could not count on more money than what we had currently reserved for, and that either we could work a compromise with what we had on the table, or we would have to have a plan B, whatever such plan could be. None looks right at the time being."

147. Mr Martinet noted in the memo that AWA's two other issues (the competition infringement fine and the pension fund issue) were now resolved and "we need to recalibrate the company so as to transform it into a pure containment structure for Fox".  His recommendation was that work be undertaken with the assistance of Ms Georgia Quenby, a solicitor who worked in MWE's London office, under the supervision of Mr Bates.  He also stated his belief that they needed to include Mr Gower in the work.  He continued:

> "To calibrate the capital reduction, we obviously need to have a clear vision of the 2008 possible reserve adjustment, which is a function of what was explained above. And we will need to have a fairness opinion from a reputable third party that what is being done, when it will be done, is the best that could be done under the current circumstances.
>
> By the way, the way to effect a capital reduction will change on October 1st, 2008.  A judge decision will not be needed anymore, simply a letter by each member of AWA's board asserting that the company is in good financial condition for the upcoming 12 months following the capital reduction. Chris can help there, not with Antoine and myself, but with his former colleagues.
>
> I would suggest that the maximum deadline for all this work be fixed at December 31, 2008, at the latest."

148. When the memo was put to Mr Martinet in cross-examination he accepted that in the event, there was no "fairness opinion from a reputable third party" obtained. He was also asked why he had fixed a deadline and why he regarded the matter as urgent. His response was that Mr Bates had told him that AWA was seen around the Fox River as being a 'deep pocket' or 'easy prey' because of the very large net asset position on its balance sheet. In the AWA accounts for the year 2006, the inter-company receivable on AWA's balance sheet was £464.6 million, up from £437.5 million in the year 2005. The advice Mr Martinet had received was that companies that appear to have deep pockets not surprisingly become the focus of the EPA's attention when it comes to choosing which PRPs to make subject to further section 106 orders. Mr Martinet thought it would be better to resolve the question of how much money should be left in AWA by the end of the financial year so that the 2007 accounts that AWA would have to make available to the US authorities in the context of the negotiations would not show that it had several hundreds of millions of dollars available to spend on the clean up.

**(d) The September Internal Memorandum**

149. After the summer 2008 break, the AWA executives turned their minds again to how to deal with the Lower Fox River provision.

150. Several emails in this period were put to Mr Martinet in cross-examination to suggest that the wording he used in them indicated two things. The first was that he was pushing Mr Gower to reduce the provision needed for the AWA accounts by all means possible, fair or foul. The second was that from at least July 2008 he had the fixed intention of eliminating the inter-company receivable in AWA's accounts as quickly as possible because he knew that the 'moving parts' in the Fox River liability were all moving in the wrong direction and he feared it would soon become apparent that a much larger provision was needed in the AWA accounts to reflect the best estimate of the Fox River liability. For example, it was suggested to him that the *Whiting* CMO made by Judge Griesbach raised the possibility that NCR/API would be liable for 100% not just 60% of the remediation costs. Mr Martinet denied that this was his motivation. He insisted that throughout he was trying to take a professional and cautious approach to the issues with the intention, certainly, of reducing the €585 million receivable on AWA's balance sheet but only so far as could prudently be done, having regard to a proper estimation of the likely liability. As to the *Whiting* CMO, Mr Martinet recalled that he had been told about the main elements of it and he remembered being told that there would be a first trial limited to the issue of knowledge. He also realised that since this first trial would not take place until 1 December 2009, the end of the *Whiting* litigation had been delayed. He said that the impression he got from his advisers was that they were not particularly worried because the issue of knowledge had already been explored during the Green Bay litigation against the insurers. He did not recall being told that one possible outcome of the knowledge issue trial would be that NCR/API would be adjudged responsible to pay 100% of the costs and unable to recover any contribution from the other PRPs. He said that the 100% assumption was never put to him as a realistic possibility. He accepted that some other moving parts might be moving in an adverse direction, for example with the possibility of remediation costs increasing if new sampling of the sediment indicated that more dredging than capping would be needed. But he was clear that any urgency from his point of view was to ensure that the 2007 audited annual accounts did not show the US Government any more money available for the clean up than was prudently necessary.

151. Mr Martinet prepared a confidential memorandum ('the September Memo') for his colleagues at Sequana and for Mr Bates and Ms Quenby, the lawyer in the London offices of MWE UK.  He reiterated the point that he had made in July that that the other two issues had been resolved:

> "As of now, therefore, AWA is in a position to be transformed into a single purpose entity responsible for the Fox River exposure, and be re-organized in such a way that it would have adequate resources on its own to meet its remaining long term obligations in the US.
>
> To accomplish that, however, given the very significant, and largely excessive, amount of remaining inter-co accounts between AWA and Sequana, an additional, and presumably final, distribution of reserves coupled with an AWA capital reduction becomes mandatory before year end 2008.
>
> This cannot be done without an in-depth re-assessment of the current Fox River exposure, coupled with a third party fairness opinion as to the adequacy of the thus actualized Fox River reserve and related available resources, as well as of the envisaged AWA capital reduction."

152. He concluded: (emphasis in the original)

> "**The objective of rapidly transforming AWA into a viable Fox River containment structure is essential. Alternative scenarios therefore need to be rapidly envisaged so as to optimize such restructuration and best calibrate AWA's forthcoming capital reduction**."

153. Attached to the September Memo were various exhibits.  Exhibit 3 set out the figures from AWA's balance sheets in 2006, 2007 and F3Q 2008 and also showed a pro forma balance sheet showing the position if there were a capital reduction sufficient, when taken together with other reserves, to pay a dividend of €517 million.  That would leave shareholders' funds of €5 million. He commented:

> "Under such a preliminary scenario, however, AWA would still remain with a 66 MEUR receivable from Sequana, corresponding roughly to the sums recouped by AWA from the Fox insurance carriers in 2006 and 2007, but still an unnecessarily large number, particularly in light of Sequana's currently available cash resources."

154. He suggested some alternative courses, concluding:

> "**These different alternatives need to be urgently vetted, in light of the recent Fox River developments (which could impact AWA's reserve)**."

155.  Again Mr Martinet's response as to why it was urgent was because of the 'deep pocket' point of which, he said, Mr Bates was well aware. It was put to him that the last sentence of Exhibit 3 was intended to convey the idea that the urgency arose because developments in the Fox River would inevitably result in a higher provision being required if the dividend was not dealt with by the end of the year.  It was suggested that he wanted to ensure that the dividend was paid before new higher remediation costs estimates came in.  Mr Martinet consistently denied that there was any such motivation.  He described the intention behind the September Memo as follows:

> "…our intention was not to strip AWA of all its resources. It was to make a proper work and to do a good work where we would be comfortable that what we had done was right.  There were a number of constraints. One of the constraints was timing, because we needed to have a set of statements that could be presented to the authorities, showing that we were not a deep pocket. …."

156.  Mr Martinet said he had no settled commitment at this point as to what would ultimately happen to AWA.  He accepted that Sequana's objective was to reduce the capital of AWA and release part of the intercompany debt.  The September Memo shows that it was Sequana's wish to reach some finality in terms of its liability for Fox River by the end of the year if this was possible:

> "And of course -- now, of course nobody wants to increase a provision, if you can avoid it. But it was not my intention. My intention was: let's have a hard look at this situation. Let's do the best we can. We now are at a stage where a number of things have happened over the past years, so on and so forth. It is time to look at it very seriously, try to do everything we can to come up with a solid opinion. And frankly, this is what -- and I spent the remaining weeks of 2008 to try and do that."

157.  It was also put to Mr Martinet that by this time the financial crisis that had started across the world was putting Sequana under financial pressure. Mr Martinet's response was:

> "But at that point in time I was not under the understanding that the situation of Sequana was such that we needed, at any cost, to do something improper. At that point in time I was not particularly worried by Sequana's position. I was worried in general by the economic situation, but I was not worried by Sequana's position, because it was not something that was of such an urgency that it would have worried me. That is what I'm trying to say.

158.  I accept Mr Martinet's evidence that the purpose of the September Memo was to start a process by which there would be a thorough reassessment of the Fox River liability so that a decision could then be made, in the light of that, as to what should be done. There was no decision taken by him or Sequana at this stage to eliminate the reserve in AWA's accounts, regardless of what the reassessment revealed.

159. After the September Memo, there was a meeting in Paris on 30 September 2008
attended by Mr Martinet, Mr Lebard, Mr Courteault and Ms Quenby. This was to discuss
the legal procedures for approving the capital reduction. Following the meeting Ms
Quenby sent round an email to which she attached a table showing the different steps that
would have to be taken.

160. Following that meeting Mr Martinet asked Mr Gower to produce, in conjunction with
PCC, some figures for a possible new provision. At this stage it was thought that the
capital reduction and the dividend payment would be done in a single stage rather than, as
ultimately happened, having a single capital reduction but two dividends. It was agreed
that the matter would be discussed at a proposed meeting in New York towards the end of
October 2008. Mr Martinet asked Mr Gower to prepare three scenarios, best case, mid
case and high case. Mr Gower emailed PCC, copying Mr Bates and Mr Tauscher, asking
them to produce the necessary models. He suggested that NCR/API share should range
from 44% to 70%. As to the assumptions that should be made about liability for NRDs,
Mr Gower said:

> "For NRDs, we have two issues, amount and timing of
> payment. The high point should assume we pay 60% of 70% of
> the government's latest demand. JB — what was that number?
> The low point should assume 60% of 44% of the government's
> demand. The high point should assume payment in 2009. The
> low point should assume payment in tranches, say $5 million
> per year."

161. He concluded 'JB and Brian, please feel free to weigh in on any of these'; JB being Mr
Bates.

162. On 6 October 2008 Mr Bates emailed Ms Quenby. He pointed out various factors that
would need to be borne in mind. First, the cost estimates provided by PCC would be
based on old sediment sampling data because there would not be any further sampling of
the River bed until 2009. That new sampling might cause costs to go up in which event
the 2009 provision would need to increase perhaps substantially. Mr Bates said:

> "Based on this information, I think we have to contemplate
> that, regardless of the basis for the 2008 provision, we could
> see a significant increase a year later which, if the 2008 recap
> [*sc. recapitalisation*] is based on the 2008 provision, could be
> inadequate within 12 months."

163. He also commented that the NCR/API share may change from the 60% assumed in the
past and that if the Government's offer to settle NRDs was rejected then 'the
Government's litigation claim will be in the hundreds of millions of USD'. Mr Martinet
recalled seeing this email when it was forwarded to him by Ms Quenby. He took it as a
warning from Mr Bates that the company needed to be very prudent in its decisions
because of the number of uncertainties. This was in part why Mr Martinet insisted that
Mr Bates attend the meeting in New York. On 8 October 2008 there was a meeting
between Ms Quenby and Mr Courteault to discuss the nuts and bolts of the reduction of
capital mechanism. The point about the delays to the sediment sampling were discussed.
Mr Courteault said that he regarded this as a good reason to be careful about the provision
but not a good reason to postpone the whole transaction.

164.  It was suggested by the Claimants that the extent of the uncertainty about the outcome of the *Whiting* litigation and the other moving parts was such that the AWA directors ought to have concluded at this stage that the process of making a decision to reduce capital and to pay a dividend was just too difficult and that they should have left the AWA accounts as they were.  This was particularly true, the Claimants said, given that at the beginning of September 2008, in addition to the delays to the sampling, it was announced that the period for the design work on the remediation plan had been extended by the Government from the end of 2008 until May 2009.  This meant a further delay on resolving the uncertainty about remediation costs.  In my judgment it would be wrong to criticise the Defendants for undertaking the exercise that was outlined in the September Memo rather than leaving €580 million on the balance sheet indefinitely.  Companies have to wrestle with uncertainties about the future and although the Fox River liability may be at the extreme end of the spectrum of uncertainty, it is not unique in that regard. They were fully entitled to investigate the position to see if some of the receivable could properly be released.

**(e) The New York meeting on 22 October 2008 and following**

165.  A meeting in New York was fixed for 22 October 2008.  Before that meeting there were various emails back and forth in preparation.  One was an email between Ms Quenby and Mr Bates dated 13 October in which she discussed what advice MWE could and could not give to the company regarding the capital reduction.  She said that MWE could continue to advise the company on the law and the requirements without advising them actually to proceed.  That must be a decision each director takes. Mr Bates suggested engaging PwC 'to opine on the provision/reduction'.  Ms Quenby replied that she would be happy with using PwC and would suggest this to Mr Courteault.

166.  On 20 October, there was a further exchange of emails between Ms Quenby and Mr Bates outlining what they would say at the meeting. This included a description of the solvency statement procedure for reducing capital and the risk that any intra-group transfer of assets by AWA could be challenged in court by an allegation of fraudulent transfer if AWA failed to pay the indemnity at some point in the future.  Mr Bates said at the end of the email:

> "Basis for Supporting Solvency and Deferring or Defending Litigation
>
> • Independent auditors have to conclude that AWA is solvent under UK law and that the intergroup transfer is not constructively fraudulent under UK and US law based on valuation of liabilities and assets, contingent and actual
>
> • Confer with PWC regarding modality (e.g., possibly proposed IASB methodology regarding contingent liabilities and assets)
>
> • No guarantee that this process will ultimately survive a court challenge in the UK or the US
>
> • Should consider providing third-party or self-insurance or a guarantee for the litigation on the legacy insurance

> • Should consider moving a trading company back into AWA
>
> • Should consider moving the intergroup obligation in stages (130 Million euros now; another next year following river sampling; another following the insurance appeal)
>
> • Should consider whether/when to notify or start arbitration with API over right to terminate indemnity"

167. The point made there about a possible claim for fraudulent transfer was spurred by the judgment in *New Jersey Department of Environmental Protection et al v Occidental Chemical Corp. et al.*, case number L-009868-05, in the Superior Court of the State of New Jersey, Essex County ('*Repsol*') handed down on 5 September 2008. The issue determined by that ruling was whether the New Jersey court could assert personal jurisdiction over the Spanish company Repsol which had acquired two companies, Maxus and Tierra. Those companies were liable to the New Jersey Department for Environmental Protection for the clean up costs of the Passaic River. In addition to pointing to various links between Repsol's business and New Jersey, the Government claimed that Repsol and YPF had depleted Maxus and Tierra of their assets, leaving them unable to satisfy their remediation obligations. The judge held that the New Jersey court did have jurisdiction. Amongst other reasons he held that to the extent that some wrongful conduct was required, the 'extraordinary stripping of Maxus' assets, if proven, [was] arguably sufficient, at least for jurisdictional purposes'.

168. The meeting on 22 October 2008 was attended by Mr Martinet, Mr Lebard, Mr Gower, Mr Tauscher, Mr Bates, Mr Bartolotta and Mr Lawson and Ms O'Connell from PCC. Several possible restructuring solutions for AWA were discussed, including moving a substantial trading company into AWA from elsewhere in the Sequana group. At the meeting PCC produced PowerPoint slides giving an update of the total cost estimate as at 22 October. As requested by Mr Gower, they set out cost estimate comparisons on the basis of various possible NCR/API shares ranging from 44% to 70% applied to remediation costs and NRDs. The numbers were discussed and PCC undertook to revise the figures taking the points raised into account.

169. In the meantime on 28 October 2008 the AWA board met to approve the 2007 Final Accounts. The balance sheet that was approved at the meeting showed a provision of €59.3 million (equivalent to $87,371,724) for the Fox River liability. It valued the inter-company receivable at €569.7 million.

170. The provision in the 2007 Final Accounts was based on:

(a) The NCR/API share of remediation costs being 60% of the total and AWA's share of that being 60%.

(b) Total NRD costs of $196.6 million, that is both expected future costs and the amounts already paid by the PRPs. Taking into account the amounts that NCR/API had already paid towards NRDs, and assuming that it would have to pay 36% of remaining costs, the amount for NRDs included in the provision computation was $70.8 million. It is not entirely clear why the figure of $196.6 million had been chosen (presumably by Mr Gower) other than that it was at the lower end of the range

of \$176 - \$333 million that Mr Stone had warned might be the US Government's claim if the Stone Total NRD Offer was not accepted.

171.  On 2 November 2008 Mr Gower sent Mr Martinet some new modelling following the New York meeting.  These were figures that PCC had sent to Mr Gower on 29 October 2008 for his comment. As regards the estimate of the costs to be borne by AWA (and hence the amount which would need to be provided, once Maris Policy funds had been deducted), this set out the following figures:

(a) a low estimate of \$249,501,542;

(b) a mid estimate of \$272,923,115; and

(c) a high estimate of \$316,267,769.

172.  The NCR/API share on which these figures were based was shown as 55.5% in the low estimate, 60% in the mid estimate and 'variable' in the high estimate because in the high estimate, different percentages of share were used for different OUs of the River. The background data sheets in the model show 64% was used for OU4 and 100% used for OU2 and 3.  When asked about this, Mr Martinet could not remember why 100% had been used as the high estimate of NCR/API's share but accepted that this must have resulted from something discussed at the 22 October meeting in New York.  It may have reflected discussions going on with Georgia Pacific at the time, whereby Georgia Pacific was expected to contribute to the OU4 clean up but not to the OU2 and OU3 clean up.

173.   As to the NRD costs included in the 2 November figures, the figure of \$50 million was used as the cost for NCR/API for NRDs in all three scenarios, low, mid and high, giving API and hence AWA a figure of \$30.9 million being 60% of \$50 million. Mr Martinet's evidence was that he considered that it was reasonable to use that figure even in the high, or worst case scenario, estimate, since it was derived from the Stone Total NRD Offer and so was, he said 'something of certain solidity'.

174.  There were some further email exchanges between Mr Martinet and Mr Gower in which Mr Martinet raised queries about the numbers. One question was whether there should be some variation in the figure used for the NRDs in the different estimates. Mr Martinet denied when asked about this that he was concerned that the numbers were higher than they had been previously.  His concern was, he said, only that the assumptions had to be robust.

175.  Also in early November 2008 Mr Martinet produced what he called his own 'quick and dirty' model to look at the sensitivity of the figures. He compared the figures that had been discussed at the New York meeting with the figures in the revised estimate sent to him on 2 November. But he made certain adjustments to the 2 November figures, for example by reducing the AWA share in the high estimate to 38.7% rather than 40%, including substantial sums for 'value engineering'[1] in each of the estimates and reducing the NRD figure to \$25 million in the low estimate, \$35 million in the mid and \$50 million in the high. The figures he arrived at for AWA's liability on 4 November (before deducting Maris Policy funds) were:

---

[1] Value engineering gives credit for the possibility that experience of carrying out the remediation work over a long period leads to improved ways of working which reduce costs from what was estimated.

(a) A low estimate of $191,815,000;

(b) A mid estimate of $240,752,000; and

(c) A high estimate of $299,523,000.

176. Mr Martinet then took a further step and assigned a probability to each of the low, mid and high estimates, namely a 35% probability to the low estimate, 45% to the mid estimate and 20% to the high estimate. When these probabilities were applied to the 2 November figures as sent to him by Mr Gower, the overall average came out at $273,395,000. When the same percentages were applied to the figures as adjusted by him in the 'quick and dirty' model the overall average was $235.378 million, slightly lower than the figures that had been discussed at the 22 October meeting.

177. Mr Martinet was asked where he had got those probabilities from. His evidence was that these did not come from any source but were just dummy figures used in a working document to prompt further discussion with Mr Gower.

178. Mr Gower forwarded Mr Martinet's 'quick and dirty' model to PCC. In the meantime, PCC had been working on their own revised figures which they sent to Mr Gower also on 4 November 2008. Those figures also included value engineering savings in all three scenarios and put in variable amounts for NRDs, albeit not the same figures that Mr Martinet had included in his model. The figures that PCC arrived on 4 November 2008 for AWA's overall liability from their calculation before seeing Mr Martinet's model were:

(a) A low estimate of $228,552,209;

(b) A mid estimate $270,423,563; and

(c) A high estimate of $317,310,401.

179. The low estimate figure was below the 2 November 2008 estimates and the mid and high not much changed. But they were all much higher than the figures in Mr Martinet's 'quick and dirty' model. These figures were sent to Mr Martinet by Mr Gower on 5 November 2008. Mr Martinet's response was to raise four issues about the net share, the scale of the value engineering benefits, why there was a variation in 'past costs' which seemed counterintuitive and why there was such a variation in defence costs. He concluded the email 'In a nutshell, the mid case looks pretty bad to me as it requires a rather massive provision increase'.

180. The next run of figures was circulated on 10 November 2008. Changes had been made to many of the moving parts including value engineering, NRDs and the NCR/API share which was adjusted to 45% in the low estimate, 50% in the mid and 55% in the high. The figures resulting from these 10 November calculations were much lower:

(a) A low estimate of $163,156,773;

(b) A mid estimate of $204,770,415; and

(c) A high estimate of $263,963,583.

181. Mr Martinet forwarded the revised 10 November calculations to Mr Lebard and Mr Bartolotta saying:

> "Looks much better for us.  Now, is it realistic?"

182. He also wrote back to Mr Gower saying:

> "Chris, this obviously looks much better. Can you stand behind these numbers?"

183. Mr Martinet was cross-examined at some length about the chain of revisions to the numbers that I have described and his reactions to them.  It was put to him that he was showing Mr Gower his determination to get the numbers down to a low figure so that the provision needed in the accounts was kept to a minimum.  Mr Martinet denied that this was what was happening:

> "Q. Now, Mr Martinet, as you have just accepted, these changes haven't happened with any input from the experts in relation to each of the assumptions. All you wanted at this stage was just to see whether you could get Mr Gower to say, "Yes, we can use these numbers."
>
> A. But I'm asking, "Is it realistic?".
>
> Q. Well, you knew it wasn't realistic.
>
> A. I did not know whether it was realistic or not. I challenged the numbers. He changed the numbers and I am asking myself, and I am asking Pascal [Lebard] and Michael Bartolotta, "Is it realistic?" So I think basically I challenged some of the assumptions, I challenged the logic of the assumptions, came up with a number, numbers that are better. But I'm asking myself and my colleagues, I don't know if it is realistic so ...
>
> Q. I see. Maybe I misread this, I'm sorry. You are asking Mr Lebard and Mr Bartollotta, "Is it realistic?".
>
> A. Yes, I'm pointing my question mark to my colleagues, I don't know if it is realistic, "Is it realistic?" It is a question mark.
>
> Q. Because you knew perfectly well that, for example, the share has been changed, but there was no basis for changing the share, was there?
>
> A. I think what I did was I challenged some of the assumptions which were not totally understandable from my standpoint. He changed them, the numbers came back low, and I was asking myself: is that correct? And I am asking my colleagues, you know, I don't know if it is correct.

Q. All you wanted was to -- having now got what you wanted in terms of lower numbers, was to just see whether you could protect your own back and see whether Mr Gower might say, "Yes, this is okay."

A. Protect my own back?

Q. Yes.

A. I don't think so.

Q. You have made the changes to assumptions in your quick and dirty model. You show it to Gower. Mr Gower passes that on to PCC. You discuss it with him on the phone. The changes are made. The numbers come back. They are good for you. You like them. Now the question is how to make it seem this is all okay.

A. It is not to protect my own back. I'm asking myself, you know: is it correct, is it -- are the assumptions okay? This is what I think this may suggest."

184. Mr Martinet agreed that he would be happier with lower numbers but he did not ask Mr Gower 'at any cost to change the numbers to fit my desires' and he denied that the question to Mr Gower as to whether he could stand behind the numbers was 'window dressing'.

185. Mr Martinet also pointed out that he sent the figures to Mr Bartolotta who had been brought in specifically to check the numbers. Mr Bartolotta wrote to Mr Martinet and Mr Gower on 10 November 2008 setting out various queries which arose because he had, he said, tried to put himself in the role of the auditor who was going to review the analysis, bearing in mind that auditors like consistency. In particular Mr Bartolotta challenged the move of the figure for NCR/API's share away from the 60% that had been used up till then. He did not accept as valid the reason given for the move to lower shares, namely the ongoing discussions on a deal with Georgia Pacific.

186. The upshot of the points that Mr Bartolotta raised was that a fourth scenario was introduced into the modelling, referred to as 'mid2' in which 60% was used as the NCR/API share.

**(f) The 20 November 2008 estimates**

187. On 20 November 2008, PCC sent Mr Gower some updated cost estimate scenarios and on 24 November Mr Gower forwarded them to Mr Martinet and Mr Bartolotta. The mid2 scenario figures in this estimate from PCC were ultimately the figures used to set the provision in the accounts used to support the capital reduction and the payment of the December Dividend. The four estimates given on this date are also significant in this case because this is the first set of figures provided to Mr Mountford and Mr Newell and are the figures on which they formed their opinion for the purpose of signing the solvency statement on 15 December 2008. The figures shown as AWA's liability in the 20 November estimates were:

(a) A low estimate of $167,295,632 using an NCR/API share of 45% and NRD costs of $25 million spread over four years;

(b) A mid1 estimate of $202,792,591 using an NCR/API share of 50% and NRD costs of $35 million spread over four years;

(c) A mid2 estimate of $230,864,497 using an NCR/API share of 60% and NRD costs of $35 million spread over four years; and

(d) A high estimate of $264,289,286 using an NCR/API share of 60% and NRD costs of $50 million payable in 2010.

188. Mr Bartolotta responded to Mr Gower on 24 November 2008 with comments which merit being set out in full:

> "Gentlemen - I have not worked my way through all the detail, - and I will look at it further tomorrow— however I have the same basic point I previously made regarding the approach and the auditors. In the past we did not use a range of outcomes we used a point. None of the email attachments has an analysis that shows the 12/31/07 reserve in comparison to your four outcomes — I think you need that for the auditors. Second the auditors will want you to explain all the year over year substantive changes by line item. This becomes much more complicated when you vary the various line elements in the different scenarios — which is why I have previously suggested that you only vary those elements where there truly is a reason for variability or multiple possible outcomes. For instance, in the past we picked a discount rate — based on a given methodology — now you have three different rates with a .20bps spread up and down — why? In the past we have used 60% of the full river costs as the NCR/API share — now we have a 45% and 50% case as well as 60% — what changed in 2008 to make the 60% less "correct" this year? - You see the point - where there is true variability — such as in the subsequent allocation to PRP's, or the contractor savings - new elements - I think "scenarios" may make sense — otherwise I think they are overly complicating.
>
> On the other hand I know you have had more discussions on this issue, particularly with the new insurance valuation consultants and, in fact, preliminary discussions with the auditors and thus my comments may in fact be irrelevant, but I will be surprised if the auditor's first reaction does not bring similar comments.
>
> Anyway — I think we need a comparative analysis to prior reserve calculations and I think we need a summary sheet that briefly explains why or supports the variance in each element that changes from case to case."

189.  Mr Martinet thought that this showed Mr Bartolotta asking all the right questions as he expected he would.

190.  There were further iterations of the numbers in the four scenarios and questions being asked and answered about the factual underpinning of the numbers being used, including further discussion of what the other PRPs could be expected to contribute.

191.  On 10 December 2008 Mr Gower sent through more provision calculations.  These were sent not just to Mr Martinet and Mr Bartolotta but to Mr Mountford and Mr Newell as well.  The covering email said that the mid2 range reflected Mr Gower's view of 'the reasonable and most-likely outcome'.  The four estimates were:

(a)  A low estimate of $171,068,612 using an NCR/API share of 45% and NRD costs of $25 million spread over four years;

(b)  A mid1 estimate of $210,282,750 using an NCR/API share of 50% and NRD costs of $35 million spread over four years;

(c)  A mid2 estimate of $225,554,023 using an NCR/API share of 55% and NRD costs of $35 million spread over four years; and

(d)  A high estimate of $282,649,881 using an NCR/API share of 60% and NRD costs of $50 million payable in 2010.

192.  Attached to the estimates were the spreadsheets showing a detailed breakdown of the figures and a reconciliation with the figures used in the 2007 Final Accounts that had been finalised on 28 October 2008.

**(g) The involvement of Mr Mountford and Mr Newell**

193.  I need now to backtrack a little to explain how Mr Mountford and Mr Newell became involved in the discussions about the Lower Fox River provision in the AWA accounts and about the proposed capital reduction and December Dividend.

194.  Both Mr Mountford and Mr Newell knew Mr Gower and regarded him as the person who knew the most about the Lower Fox River liabilities.  In his witness statement, Mr Newell says that he did not have a detailed understanding of the source of AWA's Fox River liability or how it was estimated.  He knew the matter was very complicated and that 'it would take an incredible amount of time and effort … to understand the detail'.  He did not consider that it was necessary for him to understand the detail because he relied on Mr Gower, whose job it was to manage the liability on behalf of AWA and to liaise with AWA's professional advisers.

195.  Both Mr Mountford and Mr Newell regarded it as uncontroversial that a subsidiary would remit excess assets to its parent by way of dividend.  Mr Newell said he regarded it as bad financial management to leave significant assets in a non-operating subsidiary like AWA if they are not required. Having reached the point in mid-2008 when the competition infringement fine and the pension scheme issues had been resolved, it made sense to move any assets in excess of AWA's liabilities to somewhere else in the group where better use could be made of them.  Mr Mountford said that he had experience of this kind of capital reduction and dividend where a cash rich but inactive subsidiary

passed cash up to the parent reducing or eliminating inter-company loans. Both men entirely understood that the key question for them to consider was the value of the assets that should be left in AWA to be sure that there would be sufficient funds to meet the future Fox River liabilities. The dividend paid to Sequana would have to be calibrated so as not to deplete AWA's assets below that amount.

196. The first significant meeting so far as Mr Mountford and Mr Newell were concerned was on 15 October 2008 at MWE UK's offices in London. The meeting was led by Ms Quenby, the MWE London partner responsible for the December capital reduction and dividend. Mr Mountford attended the meeting but not Mr Newell. At the meeting the steps that would need to be taken for the proposed capital reduction and dividend were explained.

197. From Mr Mountford and Mr Newell's perspective the matter then went quiet until mid November 2008. On 19 November Mr Thomas told Mr Mountford that there was a meeting with PwC scheduled to take place at MWE's offices on 21 November to discuss the Fox River issue. Mr Mountford was not invited to that meeting but he did attend a meeting a few days later on 26 November 2008. Mr Newell did not attend as he relied on Mr Mountford in effect to represent them both and to report back to him what happened. Mr Newell said he knew Mr Mountford to be 'a very cautious and diligent person'.

198. The meeting on 26 November 2008 was attended by Mr Mountford, Mr Gower, Mr Thomas and two people from PwC, Mr Derbyshire and Mr O'Brien. The purpose of the meeting was for Mr Gower to brief PwC on the four scenarios that had by this time been devised by Mr Gower and PCC to estimate the potential costs that AWA might be liable to pay over and above what remained in the Maris Policy. The four scenarios presented were those that had been produced by PCC on 20 November 2008 as set out in paragraph 187, above: to recap, a low of $167,295,632; a mid1 of $202,792,591; a mid2 of $230,864,497 and a high of $264,289,286.

199. Mr Gower said at the meeting that the mid2 scenario was in his view the most realistic estimate. Mr Gower explained to the meeting some of the 'big-picture developments' in relation to the Lower Fox River issue, including the progress of the *Whiting* litigation, the recoveries by AWA of insurance indemnities under the Historic Insurance Policies and the identification of new PRPs who were added as defendants in the *Whiting* litigation. Mr Mountford's evidence was that his overwhelming impression from Mr Gower's presentation was that there were far more potential upsides for AWA in relation to issues such as insurance recoveries and API's share of the clean up costs than there were downsides. His evidence was:

> "Mr Gower was bullish. He was certainly – the impression I got from him at the meeting was that things were moving in our favour and that the likely liability would be moving downwards. Nevertheless I think in my role as a director it is necessary to be cautious, bearing in mind, of course, the risks I would be taking if we got this wrong, risks of a claim against me, risk of a criminal act. So yes, I certainly wanted always to be cautious."

200. After the meeting, on 27 November 2008, Mr Gower emailed to Mr Mountford and Mr Newell the spreadsheets that had been presented to PwC at the meeting. Both Mr

Mountford's and Mr Newell's evidence was that they focused on the high estimate in these spreadsheets because they wanted to be prudent by basing their assessment of how much money should be left in AWA (and hence how much could be safely paid by way of dividend to Sequana) on the high estimate rather than on the best estimate. They understood that the figures put into the model to generate the four scenarios came from Mr Gower and PCC. Mr Mountford carried out a computation that was, from that time forward, very significant for his and Mr Newell's decision making. For all four scenarios he looked at the figure on the supporting spreadsheet for the Discounted Total Costs for AWA as per the table that Mr Gower had presented. That figure, it appeared from the supporting spreadsheet, is a discounted figure, that is to say, in order to reflect the fact that the costs are likely to be incurred over the next 40 years, the expected costs are increased for inflation over that period but then discounted back to obtain the net present value. However, Mr Mountford was not at this stage happy with the way the discounting had been done. He therefore removed the impact of discounting to net present value by adding back onto the costs the amount shown in the spreadsheet as 'Discount impact'. For the high estimate this figure was $33,623,939. This gave him a total for undiscounted liability of AWA on the high estimate of $297,913,225 (instead of $264,289,286). From this he deducted the then value of the remaining Maris Policy funds which was $168 million to arrive at what he called AWA's undiscounted cost of $129,913,225 or $130 million.

201. Mr Mountford wrote to Mr Courteault copying in Mr Newell and Mr Martinet on 28 November 2008. He set out what he considered were the pertinent facts that had emerged from the meeting with PwC and Mr Gower. He set out the table he had prepared of the range of AWA's costs on both a discounted and undiscounted basis in the four scenarios, the highest of which was the $130 million as I have described. He noted 'Clearly the figures are provisional at the moment and subject to further review by PwC - so they are just being used as illustrative numbers at the moment'. He went on:

> "We also understand that it is the intention to reduce the share capital to a nominal amount on the 15th December. The amount of the reduction would be transferred to reserves. There would be a dividend payment out of reserves but a significant amount of reserves (€100m?) would be retained in the company. There may then be further distributions next year.
>
> We believe that it would be prudent to retain some share capital in AWA on the 15th December. The amount of this capital would be the difference between the amount of the Fox River provision in AWA's books and the high undiscounted scenario - in the above illustration it would be the equivalent of $67m ($130m less $63m).
>
> We consider this is prudent in view of the uncertainties in calculating the provision referred to above. We believe it should be the undiscounted provision as this will be AWA's actual liability.
>
> If we reduce the share capital to a nominal sum, even if we retain a "cushion" in reserves, it would be easy for future directors' (who may not necessarily be ourselves and who we

> have no control over) to declare this as a dividend. This could
> leave AWA with insufficient capital to meet its liabilities if
> they actually exceed the estimated provision."

202. Mr Newell's evidence was that he agreed with all Mr Mountford's comments except
the suggestion that it was important to leave the 'cushion' in the company in the form of
share capital rather than in the form of distributable reserves. That was Mr Martinet's
view too. Mr Martinet wrote back to Mr Mountford on 1 December 2008 saying that
what mattered really was the amount of assets left in the company to meet its liability,
regardless of whether those assets were in the form of capital or distributable reserves.
He told them that he shared their concerns. He referred to the recent instruction of Aon
Accuracy to provide 'an additional layer of professional expertise' and 'fresh eyes'. He
also noted the victory in the Green Bay litigation against the insurers. He went on:
(emphasis in original)

> "I therefore urge you not to jump to any conclusion before all
> the parameters are on the table, and we have had the time to
> analyse them thoroughly. Clearly, however, and despite all our
> efforts and diligences, we will still presumably be confronted at
> our next BOD with a not unsignificant level of uncertainties.
> On top of that, some new elements might emerge between Dec.
> 15th and the effective 2008 year end closing, which may
> somewhat change the picture and potentially reduce further the
> uncertainties.
>
> Having said that, now that AWA has become a structure
> principally dedicated to the Fox River issue, its shareholders'
> worth is undoubtedly, and quite grossly, disproportionate.
> Hence the idea of first effecting AWA's capital reduction prior
> to year end, assorted with a dividend distribution in kind which
> would leave AWA with ample reserves to very comfortably
> cover even the worse case scenario, as will be apprehended on
> December 15th. We would then reconvene in early 2009 when
> the PWC diligences will have been fully conducted on the basis
> of the latest Fox River developments, if any, and the AWA's
> 2008 accounts will have been closed.
>
> Only then shall we be in a position to determine the right level
> of shareholders' worth, at large, that AWA should be left with,
> and the definitive amount of reserves that should be distributed
> in kind to AWA's shareholder. In terms of methodology,
> therefore, this means that AWA's new capital should in our
> opinion be "nominal", and this is where we seem to differ.
>
> In fact, we strongly believe that our responsibility as Directors
> is not so much with the form of AWA's capital reduction, as
> with the amount of resources that the company should be left
> with to best meet its API obligations regarding the Fox River
> matter. And we will not be in a position to express an educated
> judgement on this before Q1 2009."

203. Mr Mountford and Mr Newell had an informal meeting with Mr Gower at a public house on 3 December 2008 to go through the material that Mr Gower had discussed with PwC and Mr Mountford on 26 November. This was the first meeting at which Mr Newell had had a proper opportunity to be briefed on the figures by Mr Gower.  After that meeting Mr Mountford and Mr Newell decided to instruct the solicitors Eversheds to provide them with advice about their duties in respect of the capital reduction.

204. On 8 December Mr Martinet emailed Mr Mountford and Mr Newell explaining that the transactions planned for mid-December would (emphasis in original):

> "calibrate AWA's capital reduction so that the company would be left with €150 million of interco loan assets with Sequana …
>
> [this] would mean that the company would without a doubt have more than ample resources to cover its future obligations to API even in the very worst case scenario."

205. On 9 December 2008 Mr Mountford emailed Mr Gower saying that they were 'getting more comfortable' with the matters to be resolved on 15 December.  He commented to Mr Gower that their meeting with him gave them a lot of reassurance since Mr Gower had commented that if he were a director, he would be 'entirely comfortable with the proposed capital reduction'. Mr Mountford asked Mr Gower to produce a memo giving them, as much as he felt able to, his assurance that the proposed capital reduction and dividend was reasonable. Mr Gower provided the memo on 11 December 2008 and sent it to Mr Martinet and Mr Courteault as well.  Mr Gower said:

> "I have shared with you my financial analysis of the Liability and attach to this memo my most recent analysis. As we have discussed, there remain a number of uncertainties which may have a material impact on the amount AWA is called to ultimately pay pursuant to the indemnity it gave Appleton Papers Inc. in 2001. I believe the issue you need to consider is to what extent should the company retain assets in excess of the Maris policy to meet those indemnity obligations. In my opinion, the funds required in excess of the Maris policy, in 2009 dollars, range between $55 million and $90 million with my best estimate based on currently available information being approximately $66 million.
>
> Consequently, I have no difficulty advising the board that, following the reduction of capital, a dividend which leaves approximately €150 million in distributable reserves will, in my opinion, have no impact on the company's ability to pay any sums due pursuant to the indemnity as they fall due. For that reason, I believe it is reasonable to proceed with the proposed capital reduction and payment of a dividend."

206. Again, Mr Mountford and Mr Newell said that they did not pay much regard to the figures used by Mr Gower as they were working on the basis that the worst case scenario was $130 million.  However, Mr Newell felt that the memo was 'a big comfort' to him.

**(h) The 15 December 2008 meeting: the reduction of capital**

207.  Mr Martinet chaired the board meeting on 15 December 2008 to approve the capital reduction.  All four directors were present together with Ms Quenby and various other advisers at MWE UK's offices at Bishopsgate in London.

208.  The Board had in front of them:

   (a)  The draft solvency statements drawn up pursuant to section 641 of the CA 2006;

   (b)  Draft minutes of the meeting drawn up by MWE UK which acted as an agenda of the items that they had to work through;

   (c)  A set of unaudited interim accounts for AWA for the 11 months 1 January 2008 to 30 November 2008 ('the November 2008 Interim Accounts');

   (d)  A draft report from AON Accuracy dated 10 December 2008;

   (e)  A report from PwC dated 15 December 2008 ('the PwC AUP Report');

   (f)  Estimates for the costs of remediation from PCC;

   (g)  A memorandum of advice for the board about directors' duties prepared by MWE UK; and

   (h)  Other formal documents including a new memorandum of capital.

209.  I need to explain what some of these documents were.

*(i) the November 2008 Interim Accounts*

210.  The November 2008 Interim Accounts were prepared by Mr Thomas for the purpose of the capital reduction.  They showed a provision for the Fox River liability of €62.8 million.  This was derived from the estimates that PCC had sent on 20 November 2008 which showed that the mid2 estimate of AWA's liability would be $230,864,497 – that figure had then had the remaining funds in the Maris Policy deducted and been converted from dollars to euros to arrive at €62.8 million.  That figure was based on a 60% NCR/API share.

211.  The treatment for NRDs had changed in the November 2008 Interim Accounts from the treatment in the 2007 Final Accounts.  In the 2007 Final Accounts the NRD figure had derived from an estimate of total costs for NRDs of $196.6 million, multiplied by 60% to arrive at NCR/API's share and then by a further 60% to arrive at AWA's share of $70.8 million.  In the 20 November model used for the November 2008 Interim Accounts the NRD figure was based on an assumption that NCR/API would settle with the US Government for $35 million payable over 5 years so that AWA's share of that would be 60% of $35 million, that is $21 million.

212.  There were other smaller liabilities shown so that the total provision for liabilities in the November 2008 Interim Accounts was €68.5 million.  The balance sheet showed, under current assets, debts of €593.3 million of which €592 was the intra-group debt owed to AWA by Sequana.  They showed called up share capital of €318.6 million; a share premium account of €69.8 million and profit of €128.6 million.

*(ii) the December Aon Report*

213. Aon Accuracy is a financial consultancy which performs valuations, financial modelling and forecasting and market analysis. It is part of the Aon group which is a global insurance specialist. They were instructed by Mr Martinet on 19 November 2008 to look at two aspects of the Fox River liability, the remediation costs and the likely receipts under the Historic Insurance Policies. So far as the costs were concerned, Aon looked at the raw material produced by Tetra Tech rather than only at the PCC figures.

214. Aon Accuracy produced a draft report on 10 December 2008 ('the December Aon Report'). In the covering letter accompanying the report, Aon described the task they had undertaken as follows:

> **"Key matters for your attention**
>
> Our job consisted in providing you with an estimated value of the net liability related to the Litigation. This valuation was performed on the basis of information provided by Management and its counsel, which we considered as being reliable and that we did not seek to verify independently. In particular, a significant part of our job is based on Management views which are its sole responsibility.
>
> In this context, our job as independent advisors has consisted in exercising our own judgment on the said valuation, challenging Management views, providing the valuation methodology, ensuring the overall coherence of the valuation model and performing the actual computation."

215. The Claimants pointed to the reference there to Aon not verifying the information provided to them by management and counsel (by whom they meant primarily Mr Gower) as greatly diminishing any supposed usefulness of the Report as an independent assessment of the material set out in it. I do not accept that. There was no point engaging Aon just to tell AWA what Mr Gower had to say on any particular topic. They were already paying Mr Gower to tell them that. What Aon were engaged to provide was what is described in the second paragraph quoted above, namely their very extensive experience of how insurance and insurers work. It is clear from their reports that on various matters they did not simply accept management's or counsel's view but brought to bear their own analysis, usually to arrive at a more conservative figure. I also reject any suggestion, as put to Mr Martinet in cross examination, that he tried to influence the outcome of the Aon Accuracy report to improve the position on insurance recoveries.

216. The December Aon Report concluded as follows:

(a) Remediation costs were, using conservative assumptions, likely to amount to $506.5 million, that being the net present value of expected costs of $567.2 million incurred over a long period.

(b) Their estimate of total expected NRD cash flows for AWA alone amounted to $30.4 million compared with 'Management's base case' of $19.2 million.

(c) Expected total cash flows allocated to API amounted to $218 million compared to a Management's base case of $210 million (this included remediation costs of $168.7 million, defence costs of $18.9 million and NRDs of $30.4 million). The scenarios used to model possible allocations were complicated by the timing issues as to when the *Whiting* litigation might come to an end. The Report recorded that Management believed that it was 90% certain that an agreement on allocation would be reached with Georgia Pacific before the end of 2009. The proposal then being discussed with Georgia Pacific was that NCR/API would pay 62% and Georgia Pacific 38% of OU4 costs (OU4 being the most expensive segment of the River to repair). The three companies would fund the clean up up to a cap of $685 million provided that at least $150 million was contributed by other parties – a sum that management believed was a reasonable estimate. Aon Accuracy estimated that there was a 53% probability that a decision on allocation would be made by the end of 2010 either through settlements or through a ruling at the end of the *Whiting* litigation.

(d) Their estimate of the total amount of expected insurance indemnities under the Historic Insurance Policies was $100 million including settlements with insurances, with a range of $0 to $150 million. They noted that AWA had by this stage already recovered about $117 million from the insurers including $33.1 million for defence costs. Again, the modelling of these scenarios was complicated by uncertainty over whether Judge Zuidmulder would agree to reconsider the adverse aspects of his November ruling and what impact other, non-Fox River litigation would have on the insurance position.

217. At the 15 December meeting, Mr Martinet told the directors that the AON work was not yet complete. He told them:

> "in consequence, in assessing the assets and liabilities of the Company in order to reach their conclusions for the purpose of making the Solvency Statement, the directors of the Company were to assume that the value of the Relevant Policies was zero."

*(iii) The PwC Agreed Upon Procedures report*

218. In addition to the auditing work carried out by PwC in Paris and London, a different team in PwC's London office was engaged by Mr Martinet to carry out a specific task for the capital reduction and dividend meetings in December 2008. The letter of engagement dated 15 December 2008 stated that the directors were responsible, for, amongst other things "identifying the appropriate assumptions underlying the calculation of the Fox River provision". It went on to provide:

> **"Our Services**
>
> You have engaged us to perform the specified limited scope procedures (the "Services") set out in Appendix A on the Fox River provision calculation (the "Schedule"). You are responsible for determining whether the scope of the Services is sufficient for your purposes. The Schedule has been prepared by, and remains the sole responsibility of the Company's directors.

> Our work will be performed in accordance with the International Standard on Related Services (ISRS) 4400 "Engagements to perform agreed-upon procedures regarding financial information".
>
> As noted in Clause 1.4 of the Terms of Business, the Services do not constitute assurance; you and we agree that we have not been engaged to, and will not, perform an audit or a review, the objective of which would be the expression of an opinion on the Schedule. Accordingly, we will not express such an opinion. If we were to perform additional procedures or if we were to perform an audit or review of the Schedule, other matters might come to our attention that would be reported to you.
>
> You should understand that there is no guarantee that these procedures will result in the identification of all matters which may be of interest to you."

219. It spelled out again on the following page what PwC were and were not doing and how this task was not the same as their audit work:

> "Our work will be based on information provided to us by the Company and will be carried out on the assumption that information provided to us by the Company is reliable and, in all material respects, accurate and complete. As set out in Clause 1.4 of the Terms of Business, we will not subject the information provided by you or contained in our reports and letters to checking or verification procedures except to the extent expressly stated. This is normal practice when carrying out such limited scope procedures, but contrasts significantly with, for example, an audit."

220. The work that they undertook to do was to obtain a copy of the Fox River provision calculation, that is the spreadsheet provided by PCC, to check its mathematical accuracy and, broadly, to look at sources from which the figures in the spreadsheet are said to have been drawn to check that the right figures have been correctly transposed from that source into the spreadsheet and that inflation and discount rates have been properly applied. They also undertook to compare the value of the "mid2" model provision, less the Maris Policy funds, to the value of the provision recorded in the interim unaudited accounts for AWA at 30 November 2008 and report any differences in value.

221. Clause 1.4 of the Terms of Business referred to in the engagement letter provided:

> "No Assurance - Save as expressly stated in the Engagement Letter, we will rely on and will not verify the accuracy or completeness of any information provided to us. The Services do not constitute an audit or review carried out in accordance with generally accepted auditing standards and no assurance will be given by us."

222.  The reference to ISRS 4400 is to the International Standard on Related Services 4400 on Engagements to Perform Agreed-Upon Procedures Regarding Financial Information. The Standard sets out the ethical principles to which an auditor must adhere when carrying out AUPs, including integrity, confidentiality and technical competence. Beyond that, it emphasises the importance of ensuring that there is a clear understanding regarding the agreed procedures and the conditions of the engagement.

223.  As well as the engagement letter there was also a representation letter sent by Mr Martinet to PwC on 15 December 2008 in which he confirmed that AWA was responsible for ensuring that the Schedule had been properly prepared and was complete and accurate in all respects, reflecting all matters of significance in relation to the provision.

224.  The AUP Report was also dated 15 December 2008 and stated that PwC had checked the mathematical accuracy of the Schedule that had been provided and then ran through the different inputs into the computation indicating the document to which they had reconciled the figures in the spreadsheets. They concluded that the value of the total API (that is AWA) provision on the basis of the mid2 model was $225.6 million; deducting the remaining Maris Policy funds of $154.8 million from that resulted in a provision of $70.8 million equivalent to about €55.7 million at 30 November 2008 exchange rates.

225.  At the 15 December meeting each of the directors signed a solvency statement under section 643 of the CA 2006 stating that they had formed the opinion that (i) there was no ground as at 15 December 2008 on which AWA could be found to be unable to pay or otherwise discharge its debts and that (ii) AWA would be able to pay or otherwise discharge its debts as they fall due during the year immediately following 15 December 2008. The capital of AWA was reduced, by special resolution of Sequana, as sole shareholder:

(a)  the capital as at 14 December 2008 was 417,869,520 ordinary shares of €1 each;

(b)  this was reduced by the cancellation of 317,620,692 shares;

(c)  the capital left was therefore 100,248,828 shares of €1 each; and

(d)  the share premium account of €69.8 million was cancelled.

**(i) The 17 December 2008 meeting: the December Dividend**

226.  After the meeting on 15 December 2008 and the capital reduction resolution, Mr Thomas drew up another set of interim accounts for AWA, as at 16 December 2008 ('the December 2008 Interim Accounts'). The 17 December meeting was held with Mr Mountford and Mr Newell in AWA's offices in Basingstoke and Mr Martinet and Mr Courteault joined by telephone. It was common ground that this was a more formal meeting because the decision to declare the dividend had in effect been taken as part and parcel of the earlier meeting.

227.  The December 2008 Interim Accounts showed the effect of the capital reduction but not, of course, the effect of the payment of the December Dividend. On the balance sheet:

(a)  under current assets, there were debts of €593.9 million of which €592.6 was intra-group debt;

(b) provision for liabilities was shown as €64.1 million of which the Fox River provision was €58.4 million;

(c) called up share capital was shown as €1 million; the share premium account was zero and the profit and loss account showed €520.8 million.

228. The apparent change in the provision for the Lower Fox River from €62.8 million in the November 2008 Interim Accounts to €58.4 million in the December 2008 Interim Accounts was due only to currency fluctuations and not to any change in the underlying dollar figures used to compute AWA's share of remediation costs or NRDs.

229. At the 17 December meeting the board resolved to pay the December Dividend of €443 million by way of set off against the inter-company receivable owed by Sequana. That left an outstanding balance of the inter-company debt of €142.5 million.

## VII DEVELOPMENTS BETWEEN DECEMBER 2008 AND MAY 2009

230. Following the capital reduction and the payment of the December Dividend there were various developments on the different fronts, some of them pointing to a lowering of the likely liability of AWA and some of them pointing to an increase in that liability. I describe in the following paragraphs the developments that seem to me the most pertinent to these proceedings.

### (a) The decision of the US Supreme Court in *Burlington Northern*

231. By far the most significant of these was that on 4 May 2009 the United States Supreme Court handed down its judgment in *Burlington Northern and Santa Fe Railway Company et al v United States et al* 129 S.Ct. 1870 ('*Burlington Northern*'). Since this judgment played an important role in the decision of the AWA board to reduce the provision in the 2008 Final Accounts and pay the May Dividend, it is important to understand what the case decided.

232. *Burlington Northern* concerned land owned by the petitioning railway company ('the Railway') on which an agricultural chemical distributor, Brown & Bryant ('B&B'), stored hazardous chemicals. B&B bought some of these chemicals from Shell Oil Company. Over time, some of these chemicals spilled during their transfer and delivery at the site and as a result of equipment failures. This resulted in significant soil and groundwater contamination. In 1989 the Government exercised its powers under CERCLA to clean up the site and by 1998 the clean up had cost $8 million. The Government sought to recover these costs from, amongst others, the Railway and Shell. B&B had become insolvent in 1989. The Railway was said to be liable as the owner of the land and Shell was liable because it had 'arranged for disposal ... of hazardous substances'. The trial court found the parties liable but only for a small portion of the costs. The court found that the site contamination created a single harm but concluded that the harm was divisible and therefore capable of apportionment. The trial court found the Railway liable for 9% of the remediation costs, and Shell liable for 6%. On appeal the Ninth Circuit Court of Appeals upheld Shell's liability but rejected the lower court's apportionment and held that both Shell and the Railway were jointly and severally liable for the whole of the cost.

233. In the Supreme Court, Justice Stevens, giving the judgment of the Court, described the case as raising 'the questions whether and to what extent a party associated with a

contaminated site may be held responsible for the full costs of remediation'. It was not disputed that the Railway was a PRP because it owned the site at the time of the contamination and continued to own it.  The more difficult questions were (i) whether Shell was an arranger because of its sales of the toxic chemicals to B&B: had Shell *arranged* for the disposal of the chemicals when it sold them and (ii) whether the harm was divisible so that the Railway was only liable for a portion of it.

234.   As regards Shell's liability as an arranger, Justice Stevens held that it was plain from the language of CERCLA that arranger liability would attach if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance. It is similarly clear that an entity could not be held liable as an arranger merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination. Less clear is the liability attaching to the many permutations of "arrangements" that fall between these two extremes—cases in which the seller has some knowledge of the buyers' planned disposal or whose motives for the "sale" of a hazardous substance are less than clear. In such cases, Judges Stevens said, courts have concluded that the determination of whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties' characterisation of the transaction as a "disposal" or a "sale" and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions.  The Court held that the term 'arrang[e] for' disposal of a hazardous substance should be given its ordinary meaning. Consequently, under the plain language of the statute, an entity may qualify as an arranger when it takes intentional steps to dispose of a hazardous substance.

235.   The US Government submitted to the Supreme Court that by including unintentional acts such as 'spilling' and 'leaking' in the definition of 'disposal', Congress intended to impose liability on entities not only when they directly dispose of waste products but also when they engage in legitimate sales of hazardous substances knowing that some disposal may occur as a collateral consequence of the sale itself.  Shell knew when it sold the chemicals to B&B that this would result in the spilling of a portion of the hazardous substance by the purchaser or by the transporter. Since Shell expected this result, it was, the Government said, properly found to have arranged for the disposal of the chemicals. The Supreme Court disagreed:

> "[8] While it is true that in some instances an entity's knowledge that its product will be leaked, spilled, dumped, or otherwise discarded may provide evidence of the entity's intent to dispose of its hazardous wastes, knowledge alone is insufficient to prove that an entity "planned for" the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product. In order to qualify as an arranger, Shell must have entered into the sale of [the chemicals] with the intention that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in [the definition of 'disposal']. Here, the facts found by the District Court do not support such a conclusion."

236.   Thus although the facts found showed that Shell was aware that accidental spills took place, that did not support an inference that Shell intended such spills to occur. To the

contrary there was evidence that Shell took steps to encourage its customers to reduce spills. Therefore 'Shell's mere knowledge that spills and leaks continued to occur is insufficient grounds for concluding that Shell "arranged for the disposal" of the chemicals. Shell was not therefore liable for any of the clean up costs.

237.  The Supreme Court then turned to the question whether the Railway was properly held jointly and severally liable for the whole of the remediation costs. The Court referred to the Restatement (Second) of Torts which provides that when two or more persons acting independently cause a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, then each is liable only for the portion of the total harm that he himself has caused. But where two persons cause a single and indivisible harm, each is subject to liability for the entire harm. The Court confirmed that CERCLA defendants seeking to avoid joint and several liability bear the burden of proving that a reasonable basis for apportionment exists – the courts will not 'make an arbitrary apportionment for its own sake'. In a footnote, the Court drew a distinction between the principles applied in apportionment and the principles applied when determining contribution claims between defendants. Equitable considerations play no role in the apportionment analysis but apportionment is only possible where the evidence supports the divisibility of the damage. Contribution, however, allows jointly and severally liable PRPs to recover from each other on the basis of equitable considerations.

238.  The question therefore was whether there was a reasonable basis for concluding that the Railway should be liable for only 9% of costs. The District Court's calculation was based on the proportion that the Railway's property bore to the surface area of the whole B&B site, the proportion that the period of the Railway's lease bore to the whole period when the site was operated and the locations within the site that had been largely responsible for the leakages, which locations were not in fact on the Railway's land. The Supreme Court rejected the Appeal Court's criticisms of this exercise and found that it was reasonable for the court to use the size of the leased parcel and the duration of the lease as the starting point for its analysis, in particular given that the District Court had included a 50% margin of error in its calculation, that is to say the arithmetical product of the exercise resulted in a 6% share which the court had increased to 9%. The Supreme Court therefore reversed the judgment of the Appeals Court and upheld the District Court's decision that the Railway was only liable for 9% of the clean up costs.

**(b) Other developments on the Lower Fox River**

239.  **Settlement by Government with de minimis parties** I referred earlier to the *Whiting* CMO made by Judge Griesbach in September 2008 in the PRP contribution proceedings. He had given the defendants who were not subject to the Government's UAO a four month stay of their disclosure obligations in order for them to negotiate a settlement with the Government. Towards the end of December 2008 the Government indicated a shift in its negotiating stance whereby it would treat the non-UAO defendants as de minimis contributors with the exception of the two municipalities which had operated the waste water utilities at the Fox River. Those two municipality defendants would be expected to make more substantial payments towards the costs. At the end of January 2009, Mr Hermes (the lawyer with conduct of the *Whiting* litigation on behalf of API and AWA) reported to Mr Tauscher that the Government had settled with 11 de minimis parties for a total of $1,875,000. Those parties effectively dropped out of the contribution litigation as they were now immune from any further liability at the suit of the other PRPs. Mr

Hermes noted that the DoJ used a $1.5 billion site cost number during negotiations, though that included NRDs of $250 million.

240. **Funding for municipalities' potential liability** The upside of the Government's de minimis settlement with 11 of the *Whiting* defendants was that it became clear that the two municipality defendants (the City of Appleton and Menasha) were not only expected to make a substantial contribution but were being put in funds by Federal Government to do so. Mr Gower reported that the State of Wisconsin expected to receive $50 million in federal funding to contribute to the clean up on behalf of the municipal PRPs.

241. **Identification of non-NCR paper Aroclors** Another point that emerged after the December Dividend was one that cast doubt on the assumption hitherto made by everyone that all the PCBs in the Lower Fox River came from NCR paper. Almost all PCBs were manufactured by Monsanto Chemical Company. Until 1971 Monsanto produced and sold eight PCB mixtures including Aroclors 1221, 1232, 1242, 1248, 1254, 1260 and 1268. The first two digits in the naming scheme indicate the number of carbon atoms in the ring structure, and the last two indicate the average chlorine content. The Aroclor used in NCR paper was Aroclor 1242.

242. Sediment from the Lower Fox River was analysed by the PRPs' environmental consultant, Ann Arbor Technical Services Inc ('ATS'). They had been commissioned by Hermes, the lawyers acting for API in the *Whiting* litigation. Their final report was produced on 4 May 2009. They analysed a total of 1,150 samples collected along the length of the Lower Fox River during the period from 2004 to 2008. The samples were consistent in indicating that Aroclors other than Aroclor 1242 were responsible for PCB contamination in Fox River sediments, namely Aroclors 1254, 1260 and 1268. The potential sources for these Aroclors included manufacturers and end users of a range of products including hydraulic fluids, adhesives, pesticide extenders, rubber plasticizers and cutting oils. It appears that AWA intended to deploy this information in the *Whiting* litigation to dissuade the Government from settling with a number of PRPs who had been regarded as de minimis contributors to the contamination in the river.

243. **Financial difficulties of other PRPs** One of the PRPs which NCR/API regarded as likely to contribute to the clean up costs was WTM I. The company filed for bankruptcy on 29 December 2008. There were also concerns that Georgia Pacific might be a candidate for Chapter 11 protection at some point. It had been assumed in the Green Mediation that WTM I would be a contributor of about $16 million. As I described earlier, WTM I had been allocated a 10% share in the Tech Memo and a 12% share in the Amendola Report.

244. **Collapse of the negotiations with Georgia Pacific** Before the December Dividend, AWA's advisers had been very optimistic about the chances of NCR reaching a settlement with Georgia Pacific. However, on 10 December 2008 the discussions broke off without agreement. It appears that although such a settlement would have had the advantage of reducing the scope and hence the expense of the *Whiting* litigation, Georgia Pacific were not offering a substantial amount of money up front but rather were expecting their payments to be deferred until after NCR/API had paid its share under the agreement.

245. **More information about NCR's knowledge of the harmful effects of PCBs** The Claimants assert that it also emerged at this time that there may be documents showing

that NCR had more detailed knowledge about the toxicity of PCBs in the 1960s than previously thought. The other PRPs rejected settlement proposals from NCR/API on the grounds that they thought that NCR/API would end up paying for the bulk of the costs because of its greater knowledge. The question of knowledge had already been raised prior to the December meetings. Thus, on 15 October 2008, Mr Bates had emailed Mr Gower in the aftermath of the *Whiting* CMO. He reported that the Judge Griesbach had placed primary emphasis on fault as an equitable factor. He said:

> "This "fault" factor has been a major concern during the insurance litigation and in the mediation. In addition, there was some focus on fault in the NCR-API arbitration, in light of NCR's cleaning up of PCB-contaminated sediment in Japan and documents from Wiggins Teape to NCR indicating concerns about the environmental effects of PCBs. We countered it in the mediation by producing evidence that the recycling mills should have known that PCBs were in carbonless paper around the time in the late 1960's when the environmental harms of PCBs became widely known, and that they did nothing to abate their wastewater discharges, despite numerous state orders to do so. The mediator gave NCR/API a 55.5% share, based, we think, largely on the arguments regarding this factor. As an aside, the mediator stated that Glatfelter had a harmful document with respect to NCR on this factor, but he was not able to tell us what it was."

246. In December 2008 Georgia Pacific asserted that they had found a new document which was damaging to NCR/API on the knowledge point, but said that they were not prepared to disclose it to the NCR/API team. One document does seem to have emerged in January 2009, a memorandum dated 5 November 1964 from a research and development establishment in England. This memo raised the question of how much of the PCB in the NCR paper was removed during the repulping of waste paper and conversely how much might still be present in the new paper made from the recycled pulp. The concern arose from the fact that the new paper might still contain PCBs and might ultimately wind up being used for food wrapping. The concern expressed recognised that the PCB is toxic and that is why it was important to know how much, if any, remained in re-pulped paper and potentially came into contact with food for human consumption.

247. **Formation of the LLC** Another factor which the Claimants point to as indicating that the NCR/API share might increase rather than decrease between December 2008 and May 2009 was the formation of an LLC in the US by NCR and API. This LLC was set up to perform the remediation work at the site. Mr Kirsch (the Claimants' CERCLA expert) argued that the fact that NCR and API took on this responsibility by themselves might be seen as an acceptance by them that out of the PRPs they were primarily responsible for the clean up. However it seems to me that this factor can work both ways. Given that an equitable factor in the attribution of share is the extent of the PRPs' cooperation in the clean up, this might work in their favour. Further, it also appears that the costs paid out by the LLC were reimbursed to it in part by Georgia Pacific and not solely by NCR/API.

248. **The decision in *Plastics Engineering*** I referred earlier to the Green Bay litigation and Judge Zuidmulder's ruling in the District Court in November 2008 upholding the 'all sums' approach as opposed to the 'pro-rata' approach to the insurers' liability under the

Historic Insurance Policies. On 29 January 2009, the Supreme Court of Wisconsin handed down its decision in *Plastics Engineering Company v Liberty Mutual Insurance Company* (2009) WI 13. This was a decision on a certified question from the Seventh Circuit. Nine amicus briefs were lodged with the Court. The issue was whether Wisconsin courts should adopt an 'all sums' or a 'pro-rata' approach to determining the liability of insurance companies when an injury spans multiple successive insurance policies. The Court noted that the issue turned on the specific wording of the insurance policies concerned but that this was standard language found in other insurance contracts governed by Wisconsin law. The question arose in the context of the claimant's liability to people suffering from asbestos related diseases following exposure to the claimant's product and the scope of the claimant's insurance coverage against those claims under a policy with the defendant. The Court dealt with whether Liberty Mutual was liable to pay 'all sums' arising out of an occurrence, up to the maximum limit of the policy, or whether it was obliged to pay only a pro rata amount. The Court noted that different courts across the country had adopted different approaches to this question. The Court upheld the all sums approach so that Liberty Mutual was responsible for "all sums," up to policy limits, even where the compensation was for damage that occurred partly before and partly within the policy period.

249. **Success in the Green Bay Litigation reconsideration** Meanwhile, the Green Bay Litigation (between API/AWA and its insurers) was continuing. At the time of the December 2008 meetings, API's application to Judge Zuidmulder for him to reconsider the negative aspects of his November 2008 rulings was pending. The hearing of the reconsideration took place on 21 January 2009 and the ruling appears to have been given immediately. The application to reconsider was successful. Judge Zuidmulder vacated the part of his order which had stipulated that AWA would have to wait until its share was ascertained before being able to claim and left this point open. He confirmed that settlement receipts would have to be used up before further claims could be made on the policies but, importantly, he confirmed that AWA was entitled to submit claims for costs, both defence costs and indemnification of remediation costs, to the insurers. Further, if the insurers refused to pay because they wanted to appeal to re-establish the principle that AWA could only claim once its share was allocated, they were on risk of having to pay interest at 12% on the claims if they ultimately lost that argument and it was found that they had been bound to pay the claims when submitted. The *Plastics Engineering* ruling of course made any appeal in the Green Bay litigation about 'all sums' a pointless exercise.

### (c) Developments within Sequana and AWA

250. **Mr Mountford's and Mr Newell's resignations** Mr Mountford and Mr Newell resigned as directors of AWA on 14 May 2009. The Claimants tried to portray this as indicating that the two men disapproved of the payment of the May Dividend and suggested that this showed they regretted their approval of the capital reduction and the December Dividend. However, Mr Mountford and Mr Newell both denied that that was their motivation. By the time that they were brought into the discussions about the size of the May Dividend there was very little time before the planned meeting for them to delve deep enough into the numbers to understand them fully and assess what additional dividend could properly be paid. I accept their evidence on this point. It would not be fair to infer from their resignation that there was in fact anything wrong with the May

Dividend or that they were having second thoughts about the wisdom of what they had done in December 2008.

251. **The downturn in Sequana's turnover and the group's alleged financial difficulties.** In the course of 2008 the Sequana group overall suffered very substantial losses. Some of the evidence of a pending financial crisis within Sequana came from emails sent by the former Sequana Executive Vincent Favier to Mr Gower – the two men seem to have been close friends and the emails were sent in part in the context of making arrangements for family exchange visits between their young children. These comments suggested dire problems within Sequana and painted a very gloomy picture of the company's position.

252. However, a different picture emerged in the evidence of Mr Lebard and Mr Courteault. Mr Courteault's evidence was that there was no problem with cash flow for Sequana in Autumn 2008 and he was not aware of any negotiations with Sequana's bankers regarding the credit facilities available to the group. Mr Lebard was also very firm in rejecting the idea that any financial problems within the group motivated any of the transactions challenged in these proceedings. He showed a very clear and comprehensive grasp, as one would expect, of the group's financial figures. He said that there was no threat to the ratios in the covenants that Sequana had in its loans from its bank lenders. He accepted that the paper industry had descended into a shambles at this time and that there was a substantial drop in turnover. But his evidence was that the question of market turbulence and reduced volumes of sales had nothing to do with Sequana's financial performance. Indeed, because of the robust steps that Sequana took to restructure the business, such as shutting down or selling off mills, laying off employees, entering into a factoring agreement to provide financing for the redundancy payments, they managed to protect their profit position, halving the number of mills they owned. There was no issue with the liquidity of Sequana despite the difficult market conditions and there was no issue with the banks about current or future lending.

253. Mr Lebard was cross-examined about the drastic drop in the Sequana share price from a monthly average of about €18.50 in January 2008 to €5 in December 2008. This, of course, had a very bad impact on his own substantial personal investment in the company – a blow about which he showed commendable stoicism. He denied that this drop reflected an accurate assessment by the market of Sequana's future prospects. Rather, he explained that there was a hedge fund shorting Sequana stock and putting false rumours in the market about the difficulties facing Sequana to push the stock price down for the fund's own advantage. As I understood his evidence it was, at base, that he had had to dismiss Mr Favier some time earlier for being disloyal, as Mr Lebard put it. Mr Favier had set up his own hedge fund and Mr Lebard suspected that Mr Favier was shorting their stock and spreading rumours of impending doom for Sequana out of spite. I have not, of course, heard Mr Favier's response to Mr Lebard's suspicions but in my judgment Mr Lebard's clear evidence carries more weight than what is at best tittle tattle from a former executive, whatever his motives.

254. **The Final Aon report.** On 20 February 2009, Aon Accuracy produced their final report in the form of an addendum to the December Aon Report discussed earlier. Their conclusions were as follows:

(a) Their estimate of total expected remediation cash flows for all parties was $525 million compared to a Management's base case of $505.8 million (using a similar discount rate and inflation rate).

(b) Their estimate of total expected NRDs for API slightly increased from $30.4 million to $30.5 million compared to a Management's base case of $19.2 million (using a similar discount rate and inflation rate). This remained, they noted, "conservative on purpose", given the outstanding uncertainties on this issue and the fact that NCR and API had, together, already paid approximately $23 million to date.    The Aon Accuracy estimate derived from an average of the result of five scenarios putting the NRDs at values of between $11.8 million and $44.7 million.

(c) As regards the share of costs to be borne by AWA, they noted that the negotiations with Georgia Pacific about which Management had been optimistic at the time of the December Aon Report had broken down.  The probability of settling the case before 2010 had decreased from 53% to 30%. The share of costs was therefore based on (i) the current allocation of costs between NCR/API and Georgia Pacific under the interim funding agreement; (ii) negotiations relating to a new interim agreement with Georgia Pacific; and (iii) management and counsel's estimate of recoveries from the other parties.  They also noted WTM I's bankruptcy filing on 29 December 2008 but stated that it was counsel's view that this would not affect the overall amount of recoveries expected from the parties to the *Whiting* case.  This led to an increase in remediation cash flows expected for API of $188.9 million compared with $168.7 million in the December Aon Report. Overall the total cash flow expected to be required from API was $242.5 million (being $188.9 million remediation costs, $30.5 million NRDs and $23.1 million defence costs).

(d) As regards insurance recoveries, they noted the reconsideration of the Green Bay litigation ruling by Judge Zuidmulder and the *Plastics Engineering* decision.  Aon also noted that the limit of all non-settled and solvent carriers was $390 million. Aon concluded:

> "Our estimate of the total amount of expected insurance indemnities is 142 m$ (including settlements with carriers) vs. 100 m$ in our previous report, and varies between 12 m$ and 183 m$.
>
> Based on recent favourable Court decisions, Counsel believe that the likelihood of winning on Appeal has increased. We have therefore increased the probability of winning on Appeal from 75% to 80%. This probability remains prudent compared to the Circuit Court Judge average reversal rate on Appeal of 12%. Overall, the cumulative probability of winning the case is 93%. The probability of losing it is 7%."

255.  It was, Aon Accuracy concluded, 'virtually certain that AWA will receive indemnities from the carriers'.

256.  On the basis of their calculations they concluded that the estimate of net liability (that is the amount of AWA's liability for costs in excess of likely receipts under the Historic Insurance Policies) was $78 million compared with $88 million in the December Aon Report.  On the basis that there was $162.4 million left in the Maris Policy, they concluded:

> "The overview of outcomes presented in this graph shows that:

- there is an estimated 84% chance that net liability is lower than 64 m$,

- there is an estimated 93% chance that Maris policy is sufficient to cover AWA's net liability,

- there is a 7% chance that net liability amounts at an estimated 231 m$ (cases when API does not receive any indemnities from insurers after losing all appeals)."

## VIII  THE EVOLUTION OF THE PROVISION BETWEEN DECEMBER 2008 AND MAY 2009

### (a) AWA's intentions after the December Dividend

257.  Following the capital reduction and dividend in December 2008, AWA's share capital was reduced to €1 million from €318.6 million, its distributable reserves stood at €77.8 million and the latest Fox River provision was €58.4 million.

258.  Mr Martinet's view at the time was, he said, that they would 'have another hard look' when the 2008 accounts came to be closed and see if it was possible to release the provision and distribute it together with the distributable reserves. He denied that at this stage there was a plan to do so come what may.  In cross examination Mr Martinet was shown an email from Mr Gower to Mr Tauscher in which Mr Gower reported to Mr Tauscher that he had spoken to Mr Martinet that morning and that 'His aim is to show that assets net off liabilities so that there is no need for any reserve to be held in AWA'. Mr Martinet did not remember saying this to Mr Gower and could not say why Mr Gower would have reported that to Mr Tauscher.  Mr Martinet reiterated his understanding of what was happening at the time:

> "A. My Lady, what I remember from that date was that we had done some work, we were okay, we wanted to see whether it could be done in a different way once the reports were finalised and so on and so forth. And we will see. Again, that is all I can say.
>
> Q. You --
>
> A. And frankly, I go one step further. Frankly, in January and February, I was not obsessed by Lower Fox River at all. We had other things to do and I must honestly say that this was -- we had done something. We had done something I think to the satisfaction of everyone. I thought that what we were leaving in terms of assets was perfectly palatable by Sequana, and that is it.
>
> You know -- so -- and frankly, I remember that in January and February I had much other things on my plate rather than go again on this issue. I thought I treated it, with my fellow directors, in a reasonable way. So whatever Mr Gower was -- had in mind, you know, I don't know."

259.   At the start of 2009, the Sequana group accounts for the year ended 31 December 2008 had to be finalised and audited by PwC in Paris.  This required a figure for the AWA provision in respect of its Lower Fox River liability. The figures provided to PwC Paris by Mr Gower as part of this process assumed an NCR/API share of 55% rather than 60%.  This reduction was picked up and challenged both by Mr Bartolotta and PwC in Paris who pressed Mr Gower to justify the change.  The justification was expressed in a note to the model spreadsheet:

> "NCR/API's share of full river costs was changed from 60% last year to 55% this year based on the expanded list of defendants involved in the *Whiting* litigation case that was submitted to the Wisconsin court in 2008.  In addition, the Cities of Appleton and Menasha were determined to NOT be de minimis.  API expects the parties to the litigation will settle the complaint by 2012 and that when the other parties' contributions are considered, API's share will likely be 55% of total costs."

260.   Ultimately there was further modelling done and the provision for AWA's liability for the Fox River clean up included in the audited Sequana group accounts for the year 2008 was based on an assumed NCR/API share of 47.5% not 55%.

261.   Back with AWA, various options were explored in early 2009 to reduce the provision in the AWA accounts.  Mr Martinet tried to persuade PwC to approve the treatment of the prospective insurance settlement proceeds as an asset on the strength of the Aon Final Report.  PwC were firm that despite the optimism that had been expressed about likely future receipts under the Historic Insurance Policies, they would have to qualify the accounts if the directors insisted on this.  That ruled out that idea so far as Mr Martinet and Sequana were concerned.  Other ideas were floated but were not realistic for one reason or another.

262.   There were also more serious discussions with Mr Gower and Mr Tauscher about the sale of AWA to TMW. On 24 February 2009 Mr Martinet and Mr Gower met for dinner and Mr Gower made an offer for the company which Mr Martinet then discussed with Mr Lebard.  However, as discussions progressed it became clear that it was not possible to find an acceptable deal with Mr Gower without leaving a substantial hole of €35 million (about $50 million) in the balance sheet.  This was because Sequana were not prepared to sell AWA to TMW with a substantial amount of the inter-company receivable still payable to AWA.  TMW did not have the resources to take over that liability from Sequana to AWA and the inter-company receivable could not be eliminated by a payment of dividend by AWA unless the provision could be removed.

263.   In February 2009 there was a further spreadsheet produced by PCC and Mr Gower which showed the NCR/API share at 47.5% and various other changes to different inputs. On 3 March 2009 Mr Gower sent Mr Martinet some more spreadsheets including, in the footnote, his justification for lowering the NCR/API share.  The spreadsheet showed the share at 47.5% and the footnote set out the justification as based on (i) the fact that more defendants had been brought into the *Whiting* litigation; (ii) the indication from the US Department of Justice that it did not regard the Cities of Appleton and Menasha as being de minimis parties; (iii) the provision of $50 million federal funding to settle the

municipalities' liability; and (iv) the discovery by ATS of non-1242 Aroclors in the River.

264.  The NRD figures in these spreadsheets remained the same as in the December 2008 Interim Accounts, namely $35 million spread over 2012-2016.

**(b) Reaction in the AWA team to _Burlington Northern_**

265.  On 4 May 2009, when the Supreme Court's ruling in _Burlington Northern_ was released, NCR's counsel Mr Lieb sent a copy of the judgment to Mr Gower the same day.  Mr Gower immediately forwarded this to Mr Martinet saying:

> "The US Supreme Court handed down its decision in the Shell case today. The decision appears to be favourable to NCR and API but I will provide a more detailed analysis after I have discussed the decision with Jeff [Bates] and the NCR lawyers on Wednesday."

266.  Mr Martinet then spoke to Mr Bates late in the evening when Mr Bates was travelling. Mr Martinet said in cross examination:

> "So I called Bates, I think. And I said, "Jeff, is it important?" I think I got him late and he said -- a very quick conversation, as I remember, but he said, "You will have -- I'm working on it. You will have my answer to that. But it is significant. It is significant on apportionment, it is significant on joint and several, it is significant." I think he also said for arranger and so on.
>
> And so that struck me as something important indeed"
>
> …
>
> "A. I think I was probably in Paris. And I think he was travelling. So I got him late, very quickly. He said, "Look, it is an important decision. I am working on it, but it could be very significant and I am working on it." That is what I remember. And I think he said, "No apportionment is confirmed, no joint and several", I think he mentioned arrangers and so on. And I think I said, "Okay, maybe that is very good news indeed."

267.  When pressed, Mr Martinet accepted that he was not certain that he could recall Mr Bates mentioning arranger liability in that call but he certainly got the impression that Mr Bates thought the decision was significant. Mr Martinet immediately appreciated the significance of this development in solving the problem of removing the provision, eliminating the inter-company receivable and selling AWA to Mr Gower and Mr Tauscher. Mr Martinet wrote to Mr Gower:

> "it looks as if we do not have a solvency issue at all any more: the Shell decision of today (no joint and several liability, apportionment, etc...) should significantly reduce AWA's

> liability, presumably more than by the 35 M euros we have in mind. Too bad we can't book it retroactively for 2008.
>
> Our call with PWC tomorrow therefore seems redundant. But I will participate out of courtesy while eating my morning croissant."

268.  Both Mr Gower and Mr Tauscher forwarded copies of the Supreme Court's ruling to Mr Bates. Mr Tauscher described it as 'the decision we've been awaiting…'. Mr Bates emailed back saying 'Hooray!!!!' and that the result was 'bad' for Randy Stone and some of the other PRPs. Mr Tauscher sent a copy to Mr Hermes describing it as 'the latest word on arranger liability' which, he said, did not look good for the defendants in *Whiting*. A few hours later, still on 4 May, Mr Bates emailed Mr Gower with his summary of the effect of the case. He opened the email saying:

> "I have not done any back and forth on the counter-arguments in this 'brief'."

269.  The email consisted of headings and then passages from the judgment cut and pasted into the email with certain important sentences in bold. The headings set out by Mr Bates were: (I have omitted the passages from the judgment)

> "No arranger liability for API or NCR:
>
> No joint and several liability for API and NCR, except for the Appleton POTW (although, API would still have successor liability exposure with respect to NCR):
>
> • API liability:
>
> o None for OU1 (including to WTM1), and a 107 Recovery for the $10 million put in the OU1 escrow
>
> o None for non-1242 PCBs
>
> o Successor liability with NCR
>
> o Joint and several liability with Appleton POTW (API/NCR an arranger there)
>
> o Apportioned liability for the OU2-5 and NRD
>
> o No joint and several liability for bankrupt parties shares including WTM I, or "inability to pay" including USP and PHG."

270.  To decipher that a little – 'Appleton POTW' is the City of Appleton's liability for its water treatment works through which much of the contaminated water was released into the River; the 'non-1242 PCBs' refers to the Aroclors which are not Aroclor 1242 according to the ATS report; and the '107 Recovery' refers to API's ability to claw back, pursuant to section 107 of CERCLA, the $10 million it had already paid towards the clean up of OU1 on the basis of arranger liability because it was now thought that there would be no arranger liability for that upstream section of the River.

271. On 5 May 2009, Mr Gower sent an email with a more considered response to Mr Courteault, PwC and the solicitors Freshfields who had been retained to draw up the documents for the sale of AWA to TMW. He said:

> "The effect of the case, as it impacts API, appear to be:
>
> 1. Arranger liability (effectively liability for some part of the other PRP's share of the cleanup costs) has been abolished in cases like this where the Appleton coating plant sold a useful product; and
>
> 2. Where liability can be apportioned (as it surely can in this case where each company had its own distinct outlet to the river) then it should be which means that there is no "joint and several" liability and liability for the orphan shares (arising from bankruptcy or inability to pay) falls to the government.
>
> This decision will have a significant impact on how we assess API's future liability. The government already has a number of reports it commissioned which apportioned liability based on assumed discharges which, in turn, were based on assumed production. Those reports allotted a 38% share to NCR and API. Setting aside what those companies have paid in the past and rounding up to 40% would result in API's future liability being:
>
> | Cost of cleanup and LTM: | 604.5 million |
> |---|---|
> | Less 2008 and Jan/Feb 09 spend: | 95.1 million |
> | Remaining costs | 509.4 million |
> | 40% for NCR/API | 203.8 million |
> | API share @ 60% | 122.3 million |
>
> You will note that this amount is less than the current balance remaining in the Maris policy.
>
> If we apply the same analysis to Natural Resource Damages and start with the government's "demand" of a further $76 million, the API share of that number would be $18.2 million resulting in a total future liability of $140.5 million. As at the end of March the limits remaining in the Maris policy were approximately $145 million.
>
> This may moot any discussion regarding the transfer of the receivable as a reserve in excess of the Maris policy may no longer be necessary.
>
> We can discuss during today's call."

272.  The NCR and API lawyers in the *Whiting* litigation (that is Mr Hermes for API) met on 6 May 2009.  Mr Hermes reported back to Mr Gower and Mr Tauscher what had been discussed.  It was clear from the meeting that Mr Hermes took a very different and more positive view of the *Burlington Northern* decision from the view expressed at the meeting by the NCR lawyers, Sidley Austin.  He reported that the NCR lawyers did not seem to think that it would have much of an impact at all; they did not believe that it ended arranger liability. There had also been a discussion about how the issue of arranger liability could be brought into the *Whiting* litigation which was about the contributions of the PRPs amongst themselves.  Mr Hermes had argued at the meeting that they should try to get the arranger claims against NCR/API dismissed because the equitable factors, including knowledge of the toxicity of PCBs, were only relevant to the sharing out of clean up costs for pollution for which NCR/API were responsible.  If they could show that they were not responsible for some of the pollution, either because they had not 'arranged' it or because it was divisible from the pollution for which they were directly responsible, then the equitable factors were irrelevant as regards that pollution. But he reported that NCR did not seem to see it that way and warned Mr Gower, ahead of a meeting the next day that 'it does not appear that we will start the conversation on the same page'.

273.  Mr Martinet recalled that Mr Gower had reported this discussion with NCR to him but had reassured him that NCR's analysis was wrong and that the API lawyers were confident that their analysis was correct.

274.  Mr Bates, Mr Tauscher and Mr Hermes met on 8 May 2009 to discuss tactics in the *Whiting* litigation and in particular how to try to introduce the apportionment argument into the litigation and put it forward to the Government in the context of the continuing work being carried out pursuant to the UAO.  At the end of his email to Mr Gower reporting this, Mr Bates noted that all the models so far - the Tech Memo, the Amendola Report and the Green Mediation - had put NCR/API responsibility for direct discharges into the River at around or below 40%.  But he noted also that the Supreme Court took the trial court's conservative 'margin of error' figure significantly into account so that AWA 'will have to blend in a reasonably conservative apportionment margin of error'.

### (c) The run up to the 18 May 2009 board meetings

275. In the run up to the May board meetings there were various iterations of the spreadsheets passing between Mr Gower, PCC, Mr Martinet and Mr Thomas.  Mr Thomas was tasked with both finalising AWA's 2008 Final Accounts and drawing up interim accounts for the period 1 January 2009 to 15 May 2009.

276.  On 7 May 2009 Mr Gower sent to Mr Martinet and Mr Courteault a revised provision calculation.  The changes made were:

(a) Reducing NCR/API shares for remediation costs and NRDs to 40% based on the arithmetic averages of the early reports (Tech Memo, Amendola and the Fox River Group interim cost sharing arrangement);

(b) Updating the discount rate;

(c) Removing liability for past costs incurred by the Government on the basis that these should be paid by companies who were not at that time contributing to the clean up; and

(d) A $10 million credit to reflect the costs paid by NCR/API to the OU1 clean up which should now be reimbursed because NCR/API's only possible liability for OU1 was as an arranger (its direct discharges all being downstream of OU1), and that was no longer expected post-*Burlington Northern*.

277. The file attached to that email set out the figures that had been attributed to the different PRPs:

|  | Tech Memo | FRG | Amendola Report (Case 2) | Average |
|---|---|---|---|---|
| API/NCR | 40 | 38 | 40 | 118/3 = 39 |
| GP | 22 | 30 | 38 | 90/3 = 30 |
| Glatfelter | 27 | 19 | 17 | 63/3 = 21 |
| WTM I | 10 | 12 | 4 | 26/3 = 9 |

278. The 'FRG' figure there came from the FRG companies' Agreement on Interim Allocation on 27 July 1999, which included a de minimis allocation to Riverside Paper Corporation. Under that agreement, the companies selected these interim allocation percentages but the percentages were not binding. The figures in the spreadsheet that Mr Gower attached to that email showed an AWA liability of $155,711,131 at a time when the Maris Policy funds left were $150,980,919. This was based on an NCR/API share of 40% and NCR/API liability for NRDs of $21.1 million payable over five years.

279. Mr Martinet responded to these new figures by emailing Mr Gower saying:

> "I want to discuss this before you send it out. We are not there as far as we are concerned and I want to understand why. Could PCC also do the standard comparison analysis (by columns, comparing 31/12/08 to today's on a line by line basis), please."

280. Mr Martinet was cross-examined on what he meant by 'We are not there'. It was put to him that he meant that Mr Gower had not yet achieved the goal of reducing the estimate of AWA's liability to the level of the Maris Policy so that the provision could be eliminated. Mr Martinet firmly denied that this is what he meant. What he meant by the email was, he said, that he did not yet understand the reasons why various numbers had been used and he wanted to be sure he understood it before the calculation was circulated more widely. The new figures also used inflation rates that were not consistent with the former numbers. I accept Mr Martinet's evidence on this point – there is no justification for imputing some sinister slant to his request for clarification of the numbers and a line by line comparison with the previous figures.

281. Mr Gower replied setting out the comparison Mr Martinet had requested in an email on 8 May 2009. He commented that they could argue for a lower than 40% share because the Government reports on which it was based assumed that the Appleton facility

discharged to the River on the same basis as the recycling mills, which it did not (in other words the discharges from the Appleton facility arose from accidental losses of emulsion during the paper production process rather than by deliberately washing the emulsion off recycled paper when recovering the fibres).

282. Mr Martinet replied with some suggestions as to how the figures could be reduced further. As regards the 40% figure he said that if this 'is deemed to be too high' then PCC and Mr Gower would 'have to determine what could be a realistic and defendable share'. He also made points on the inflation and discount rates, the defence costs and the overall remediation costs perhaps all being too high. He concluded "All this suggests that we should in all likelihood be south, not north, of $150M". He asked Mr Gower to consider and tell him what he thought.

283. On 8 May 2009, PCC sent Mr Gower some revised figures and a reconciliation of the current cost estimate to the 2008 year end model. They had reduced the NCR/API share to 40%, updated the allocation credit to reflect that change, removed agency past costs, reduced NRD costs to $21.1 million over 5 years and added a $10 million credit in 2013. The resulting estimate of liability was $153.9 million. Mr Gower forwarded this to Mr Martinet with the comment "If we lower the percentage to 38% (as per the government's own reports) the total falls to $146.7 million". That 38% figure came, it appears, from the interim cost sharing agreement among the FRG in July 1999. On 11 May 2009, PwC emailed Mr Gower to say that they had no further questions and that the figures should also be supplied to Mr Thomas to draw up the 2008 Final Accounts. Mr Gower emailed a revised provision to Mr Derbyshire and Mr O'Brien at PwC, copying Mr Thomas, Mr Martinet and Mr Courteault. In that email Mr Gower said: (emphasis added)

> "Following our discussion last week. I attach a revised provision which you will see (as described in Footnote 3) takes into account the impact of the Burlington Northern decision. I have also attached an analysis of the allocations suggested by the government's own apportionment reports and Fox River Group interim allocation which enabled me to arrive at the 38% figure (the page is taken from the analysis we did for API's insurers). You should note that those reports and the allocation made certain assumptions about the process at the Appleton facility which are likely to have led to a higher allocation to NCR and API than is actually justified. When arguing apportionment, the practice at the facility is crucial in determining the output to the river; all of the depositions of former Appleton employees who worked at the facility during the relevant period have confirmed that the emulsion containing the PCBs was handled carefully due to its cost and was not discarded but great lengths were taken to recover and re-use the emulsion. **It is reasonable, therefore, to argue that the NCR/API share of liability on an apportionment basis could be as low as single figures**. Furthermore, these reports and analysis, when prepared, only contemplated 7 responsible parties, which is no longer the case."

284. Later on 11 May 2009 Mr Thomas wrote to Mr Gower that he had applied the appropriate calculations to the model and the provision required was now zero. Mr Martinet responded to Mr Thomas: (emphasis in the original)

> "What we can infer from the recent developments is that the Maris should indeed be sufficient to cover the Fox liability as currently determined, and more. Out of prudence, though, I believe we should disregard the slight positive difference resulting from your calculus and satisfy ourselves strictly with "Maris = Fox liability"."

285. That email was copied to Mr Mountford and Mr Newell.  Mr Newell in response emailed Mr Martinet and Mr Courteault saying:

> "Putting on my director's hat I have to ask the question: in the light of these changes is it still in the best interests of the company to sell AWA Ltd at the price currently envisaged? There just seems to be a lot of potential upside & not much downside."

286. Mr Martinet replied as follows:

> "Martin, this is the KEY question, isn't it?
>
> What we first have to understand here is that i) the good news we just received will also have the effect of decreasing whatever AWA/API might get from the carriers in the future, especially in light of what we have already gotten from them in the recent past, and ii) we wish we were perfectly sure that there was no downside at all. There is definitely going to be a lot of legal work needed to bend the Supreme Court decision to fit our case. We presumably have a very good chance of success there, but I cannot recount the number of times in the recent past where good news has been systematically mitigated with bad news (remember the NCR/API allocation mediation, etc...?).
>
> We are currently working on the concept of getting something out of this transaction, while pondering whether we should try and maximize our share of the potential upside (and thus remain associated with the Fox problem for another number of years) or whether we should satisfy ourselves with mostly getting rid of a very hairy situation once and for all, without being held responsible for future downside, however remote this might be. It should be a basic risk/reward analysis, except there are many moving parts, numerous parties involved and much at stake, in either direction.
>
> Hence the dilemma, which nevertheless has to be sorted out sooner rather than later."

287.  Mr Martinet said that at this point he was not totally convinced that selling the company to TMW was the right thing to do.  But there was pressure from Mr Gower to agree the sale and Sequana wanted to move on to other issues that they thought were more pressing.

288.  On 12 May 2009, PwC made a few comments on the model that Mr Gower had emailed to them the previous day.  PwC raised various queries on the figures asking how they were supported and pointing out that the discounting previously used was no longer valid and should be set at zero.  Mr Gower agreed with this, a change that increased the AWA liability from $146 million to $150 million.  PwC did not query the change to the NCR/API share.  They did query the NRD costs asking why they had changed, although acknowledging that there would be some reduction to reflect the change in NCR/API share.  In a reply also on 12 May, Mr Gower explained the new NRD figure on the basis that he took the Stone Total NRD Offer of $76 million and added back what had been paid to date by the PRPs to arrive at a total NRD spend of $115.16 million.  He took 38% of that (being the NCR/API share) to arrive at $43.8 million as the NCR/API share of NRDs and deducted the $25 million that they had already paid to get to $18.8 million.  AWA's share of that NCR/API liability would be 60% of $18.8 million being $11.3 million which he then spread over five years resulting in payments of $2.26 million per year.

289.  In fact there were some mathematical errors in the spreadsheet sent round on 12 May 2009 because the NRD figure was double discounted, in the sense that the figure for AWA-only share of $11.3 million was wrongly treated as the NCR/API share so that the 60% allocation of that share to AWA was applied twice.

**(d) Finalising the AWA audited accounts for the year 2008: the emphasis of matter**

290.  The work on the provision was being undertaken not only for the purpose of considering whether a further dividend could be paid but also because a figure was needed for the AWA audited accounts for the year 2008. Early in the morning of Monday 18 May 2009, PwC, who were producing the 2008 Final Accounts to be approved, raised the point about the emphasis of matter. Mr O'Brien of PwC said in an email to Mr Courteault, Mr Martinet and others:

> "By way of managing expectations, the good news is that the disclosure around LFR seems comprehensive but there remain some internal inconsistencies and outstanding disclosure (such as the detail of the capital reduction in December) which need to be processed.
>
> The one matter that I want to flag at this stage is that our opinion will include an "emphasis of matter" paragraph which will refer to the LFR disclosure in the accounts. This very clearly states it is not a qualification but given the level of judgement and major change from the previous year appears appropriate. Very happy to discuss further when you have a chance to see the words."

291.  The PwC audit report on the 2008 Final Accounts included the following statements:

> "Opinion

In our opinion:

• the financial statements give a true and fair view, in accordance with United Kingdom Generally Accepted Accounting Practice, of the state of the Company's affairs as at 31 December 2008 and of its profit for the year then ended;

• the financial statements have been properly prepared in accordance with the Companies Act 1985; and

• the information given in the Directors' Report is consistent with the financial statements.

**Emphasis of matter**

Without qualifying our opinion we draw attention to note 15 to the financial statements, which describes how the Company has indemnified a former subsidiary company, Appleton Papers Inc, for costs in connection with the costs of investigation, remediation of and other costs related to the alleged contamination of the Lower Fox River in Wisconsin, USA. The valuation of this liability and its settlement date, together with the realisation of potential contingent insurance policy assets, involve significant judgements by the Company. While the Directors have carried out an assessment of the position at 31 December 2008, this matter will still depend on the rulings of court cases and other agreements with relevant other parties in the future, the outcome of which are not certain at the date of these financial statements, nor necessarily under the control of the company."

292. The source of this idea of an emphasis of matter is the International Standard on Auditing (UK and Ireland) 700. That contains the following guidance to auditors:

"30. In certain circumstances, an auditor's report may be modified by adding an emphasis of matter paragraph to highlight a matter affecting the financial statements which is included in a note to the financial statements that more extensively discusses the matter. The addition of such an emphasis of matter paragraph does not affect the auditor's opinion. The paragraph would preferably be included after the opinion paragraph and would ordinarily refer to the fact that the auditor's opinion is not qualified in this respect.

…

32-1. The emphasis of matter paragraph describes the matter giving rise to the significant uncertainty and its possible effects on the financial statements, including (where practicable) quantification. Where it is not possible to quantify the potential effects of the resolution of the uncertainty, the auditor includes

a statement to that effect. Reference may be made to notes in the financial statements but such a reference is not a substitute for sufficient description of the significant uncertainty so that a reader can appreciate the principal points at issue and their implications.

…

32-3. In determining whether an uncertainty is significant, the auditor considers:

(a) the risk that the estimate included in financial statements may be subject to change;

(b) the range of possible outcomes; and

(c) the consequences of those outcomes on the view shown in the financial statements.

32-4. Uncertainties are regarded as significant when they involve a significant level of concern about the validity of the going concern basis or other matters whose potential effect on the financial statements is unusually great. A common example of a significant uncertainty is the outcome of major litigation."

**(e) The 18 May 2009 meetings and the sale of AWA to TMW**

293.  The 18 May 2009 meetings were held by telephone call between Mr Martinet and Mr Courteault who were by then the only two directors.  In fact there were three meetings held that evening.  By the time of the first meeting, held at 9:10 pm the directors had seen:

(a) The audited Final 2008 Accounts signed off by PwC and approved by the board on 18 May 2009.  These showed the position after the capital reduction and the payment of the December Dividend.  They therefore showed:

   (i)  Under current assets, debts of €149.4 million of which €148.1 million was the intra-group debt;

   (ii) Provision for liabilities of negative €3 million – this reflected the fact that the directors had concluded that there was more than enough money in the Maris Policy to meet the expected liability;

   (iii) Called up share capital of €1 million; a share premium account of zero and a profit and loss account of €137 million.

(b) A set of draft truncated interim accounts to 15 May 2009 showing a one page profit and loss account and a one page balance sheet, reflecting the position after the capital reduction and payment of the December Dividend but before the payment of the May Dividend.  These showed broadly the same picture as the 2008 Final Accounts.

294.  At the first 18 May 2009 meeting Mr Martinet and Mr Courteault resolved:

(a) to reduce the Fox River liability provision to zero, creating additional distributable reserves; and

(b) to pay an interim dividend to Sequana of €135,181,358 by way of releasing the inter-company debt by that amount. This would leave inter-company debt of about €3.1 million.

295. There were two other board meetings held by telephone by Mr Martinet and Mr Courteault on the evening of 18 May 2009. The second meeting (following the meeting at which the May Dividend was approved) was timed as starting at 9:30pm and approved the sale and purchase agreement between Sequana and TMW. This involved a series of legal steps including the creation of a 'golden share' retained by Sequana, discussed below. The third meeting of the evening started at 10:30 pm and approved the sale of the company to TMW.

296. An important feature of the sale agreement between Sequana and TMW was the retention by Sequana of a 'golden share' which would enable Sequana to benefit from any future 'upside'. The 'upside' could arise from successful negotiation of settlements with the Historic Insurance Policies insurers. If Mr Gower and Mr Tauscher could negotiate large lump sum settlements for AWA with the insurers and then minimise AWA's actual future liabilities for clean-up costs they would enjoy the balance of the insurance pay outs as pure profit.

297. Mr Lebard's evidence was that it was important for him that the deal with Mr Gower allowed Sequana to share in any 'upside' of AWA's likely future position:

> "A. … But again, my feeling, my understanding as a businessman, was that between the Maris Policy and the potential insurance recoup, actually there were more assets than liabilities in this case.
>
> Q. That is the upside?
>
> A. That is my feeling.
>
> Q. That was the potential upside?
>
> A. Yes, that was my feeling. It was more assets than liability. And so that in the end also I also mention that to you, my Lady, yesterday, is the fact that Mr Gower wanted to make the transaction. He was himself absolutely convinced that it was the case. So I didn't want to look stupid or foolish vis à vis my shareholders in my board in having Mr Gower make so much money that Sequana, in the end, had made a wrong decision.
>
> Q. Of course Mr Gower wasn't going to be exposed to the downside, was he, the downside risk, personally?
>
> A. Personally, I don't think so, yes. But again, you know, he was thinking himself, and I was sure of that, that he will make a fortune in taking over the Fox liability. And because he knew so well the case, I was pretty much convinced that there was pretty good news to come, especially vis à vis some court

decisions and in the end he was really thinking he will make millions of euros."

298.  On 18 May 2009, Mr Martinet sent a confidential memo to the senior executives of the Exor company which owned Sequana, explaining the rationale behind the sale of AWA. In the memo Mr Martinet described the outcome of the Green Bay litigation, the large number of defendants in the *Whiting* litigation and the *Burlington Northern* Supreme Court decision. He said in the memo that the consequence of this was that 'it can be reasonably demonstrated' that the Maris Policy monies will be enough to cover AWA's liabilities and indeed that there may be excess monies available both in the Maris Policy and from the recoveries under the Historic Insurance Policies. AWA was now in a position to be sold to Mr Gower and Mr Tauscher whom he described as 'the natural purchasers'. He then described the main features of the proposed transaction:

(a) The purchase price was €5.9 million paid by TMW taking over the remaining Sequana debt of €3.1 million and the remaining €2.8 million payable through a 31 month promissory note.

(b) There would be the golden share giving Sequana the right to 80% of AWA's future distributable reserves after the distribution to TMW of the first €5.9 million. This reduced to a 50:50 split once Sequana has received more than $70 million in cash as a result of dividend payments. The golden share is indefinite in time but can be cancelled by Sequana at any time.

299.  The memo concludes with Mr Martinet's comments:

"Altogether, we believe it's a good deal which, for all intents and purposes, allows Sequana to get rid of a very hairy issue under favourable terms, while greatly limiting its future exposure to the Fox matter, if any at all.

Time will tell, bearing in mind that the remaining Maris monies, anyway, are expected to cover API's Fox River obligations for a minimum of 2.5 to 3 years at the pre Burlington Northern (Latest Supreme Court decision) run rate.

A minimum monitoring will nevertheless remain necessary in the future, if only to secure Sequana's earn-out rights which could be significant. In the short run, Sequana will generate a windfall profit of — €5 million by getting rid of its Fox River reserve."

300.  The board meeting of Sequana took place on 27 May 2009. That described the effect of the sale as follows:

"The immediate effect of this operation was to externalise a significant underlying risk that was difficult to control from the scope of the group, with Sequana having expressly excluded any guarantee under the sale contracts of API and the Fox River risk. The CEO drew the Board's attention to the strictly

confidential nature of the conditions of this operation, which
needed to be maintained in the group's own interests."

## IX THE 'COULD NOT' CLAIMS: THE ALLEGED CONTRAVENTION OF PART 23 OF THE CA 2006

301.  AWA was incorporated under the Companies Acts and was subject at all material times
to the English statutory and common law provisions and principles restricting
distributions and requiring capital to be maintained.  Part 23 of the CA 2006 ('Part 23')
sets out the detailed rules restricting the circumstances in which a distribution to members
can be made lawfully.  These provisions came into force on 6 April 2008.

302.  There are two bases of claim alleging that the Dividends are unlawful.  The first and
primary claim is that the dividends were paid in contravention of Part 23 and the second
that the dividends were unlawful at common law as a distribution of capital.  However,
the common law claim was not pursued in closing submissions and it was not suggested
that the result would be any different from the result reached by applying the statutory
scheme.  I have set out the statutory provisions in an Annex to this judgment and
summarise them here.

303.  Section 829 of the CA 2006 defines a 'distribution' as every description of distribution
of a company's assets to its members whether in cash or otherwise, subject to some
exceptions which are not relevant here.

304.  Section 830 provides that a company may only make a distribution out of profits
available for the purpose and that a company's profits available for distribution are its
accumulated, realised profits less its accumulated, realised losses.

305.  Section 836 then deals with how one determines what those profits and losses are and
that is by reference to specified items in the company's accounts, namely profits, losses,
assets and liabilities, and provisions of various kinds; for our purposes, provisions of the
kinds mentioned in paragraphs 88 and 89 of Schedule 4 to the Companies Act 1985.

306.  Where the accounts relied on are the company's last annual accounts, section 837 sets
out the requirements that must be met by those annual accounts.  In the sections as they
were modified by transitional provisions applicable during the relevant period, the
company's accounts had to have been 'properly prepared' in accordance with the
Companies Act 1985 or to have been so prepared subject only to matters that are not
material for determining whether the distribution would contravene Part 23. Section 837
also provides that if the auditors of the accounts have qualified their report, they must
have stated in writing that the qualification is not in respect of matters that are relevant to
the application of Part 23.

307.  Section 838(1) provides that where interim accounts are used to justify a dividend, they
must be accounts that enable a reasonable judgment to be made as to the amounts of the
items on which the justification of the dividend depends.

308.  Section 847 provides that where a distribution is made in contravention of Part 23 then
in certain circumstances the company can claim back the dividend from its member.  This
is a key provision in this case as it forms one of the main causes of action relied on by
BTI in its action against Sequana.

309.  BTI's claim that the December and May Dividends contravened Part 23 are at base that the accounts by reference to which the directors justified the distributions for the purposes of section 836 either were not 'properly prepared in accordance with the Companies Act 1985' as required by section 837(2) in so far as they were AWA's last annual accounts or that they did not enable a reasonable judgment to be made as to the amounts of the specified items as required by section 838(1) in so far as they were interim accounts. There are three aspects of the accounts that are challenged:

(a)  All the accounts relied on were drawn up on the basis that the capital reduction that had taken place on 15 December 2008 was effective to free up distributable reserves. The Claimants say that this capital reduction was ineffective as a matter of law because it did not comply with the relevant legislation.

(b)  All the accounts relied on made, it is alleged, inadequate provision for the Lower Fox Liability. In relation to all the accounts it is alleged that the amount included in the computation of the provision for AWA's potential liability for NRDs was too low. In relation to the May Dividend it is also alleged that the share that it was assumed NCR/API would bear of the overall remediation costs was too low.

(c)  All the accounts failed to give adequate disclosure about AWA's contingent liabilities, using that term in the technical accounting sense I will describe later.

310.  The Defendants say that the capital reduction was effective but they accept that if they are wrong about this, then both dividends did contravene Part 23.  They also contend that the provision for the Lower Fox River liability was appropriate, but again they accept that if they are wrong on this, then the dividends did contravene Part 23.  As regards the alleged failure to disclose details of contingent liabilities, the Defendants argue that they did comply with the relevant obligations but they also argue that even if they did not, these are not defects that result in the dividends contravening Part 23.

**(a) The reduction of capital: legal issues**

311.  Until 1 October 2008 a decision by a company to reduce the company's capital required the approval of the court.  On that date, section 641 in Chapter 10 of the CA 2006 came into force and provided two alternative procedures for a company to reduce its share capital.  A private company limited by shares can reduce its share capital by special resolution supported by a solvency statement.  Any company can reduce its capital by special resolution confirmed by the court.  The relevant statutory provisions are set out in the Annex to this judgment.

312.  Section 642 describes the circumstances in which a reduction of capital is supported by a solvency statement.  The directors must make the statement not more than 15 days before the date of the special resolution. The requirements for a solvency statement are set out in section 643.  A solvency statement is a statement that each of the directors has formed two different opinions about the company.  The first is the opinion, as regards the company's situation at the date of the statement, that "there is no ground on which the company could then be found to be unable to pay (or otherwise discharge) its debts".  The second opinion is that the company will be able to pay (or otherwise discharge) its debts as they fall due during the year immediately following the date of the statement. According to section 643(2), in forming those opinions the directors must take into account all of the company's liabilities, including any contingent or prospective liabilities.

Section 643(3) prescribes the form that the solvency statement must take. It also provides that if a director makes a solvency statement without having reasonable grounds for the opinions expressed in it, he commits a criminal offence punishable by 12 months imprisonment or a fine or both.

313. Section 644 (as modified by transitional provisions in this case) deals with the registration of the special resolution and supporting documents. Within 15 days of the special resolution being passed, the company must deliver to the registrar the special resolution together with a copy of the solvency statement and a memorandum of capital. The memorandum of capital must show the amount of capital, the number and value of shares and the amount deemed to be paid up on each share. The registrar must register the documents delivered to him and subsection (4) provides that the resolution does not take effect until those documents are registered.

314. There are a number of issues raised by the parties on the construction of these provisions that are questions of law. The first seven issues relate to whether the solvency statement signed by the four directors on 15 December 2008 complied with section 643. The eighth issue concerns the memorandum of capital sent by AWA to the company registrar after the meeting on 15 December 2008. The legal issues can be summarised as follows:

(i) What is the proper approach to the construction of the provisions setting out the solvency statement route to approving a capital reduction?

(ii) To what extent does the court have to enquire about the state of mind of the directors when they make the solvency statement – is it necessary to show that they applied the right test and in fact formed the opinions stipulated?

(iii) If it is necessary to show that the directors applied the right test, what is the correct test under section 643(1)(a)?

(iv) What is the content of the obligation in section 643(2) that the directors must 'take into account' the contingent and prospective liabilities of the company when forming their opinions?

(v) Does the company have to show that the directors had reasonable grounds for the opinions that they formed?

(vi) When forming their opinions, should the directors assume that all the distributable reserves created by a reduction of capital will be distributed by way of dividend?

(vii) When forming their opinions, can the directors take into account that the company is likely, but not certain, to receive additional assets in future from which to meet any contingent and prospective liabilities?

(viii) Did the memorandum sent to the company registrar comply with section 644(2) even though it contained an error in the description of the remaining share capital?

315. There is also the factual issue as to what test the directors did in fact apply.

316. Before embarking on a discussion of these legal points there are some preliminary points to make.  First, it is accepted that the directors all had a genuine belief that they were entitled to make the solvency statement in the sense that they were not acting dishonestly in making the statement despite knowing that they could not properly do so. Secondly, it is only section 643(1)(a) that is relevant in these proceedings.  BTI does not assert that the directors were wrong to form the opinion required in section 643(1)(b)(ii); namely that AWA would be able to pay or otherwise discharge its debts as they fell due during the year following the reduction of capital.  Thirdly, the allegation that the solvency statements were invalid does not depend on the Claimants showing that there was anything wrong with the provision made in the accounts.  This is an allegation they make even if, which of course they deny, the accounts were drawn up properly. Fourthly, it is accepted by Sequana that all four directors had to have the right state of mind in signing the solvency statement in order for the capital reduction to be valid.  Finally, it is worth bearing in mind that there is no cause of action relied on by BAT or BTI arising from the capital reduction *per se* – the relevance of the question whether the capital reduction was valid or not is that if it was not valid then it is common ground that the distributions of the December Dividend and May Dividend were unlawful because they were based on improperly drawn up accounts.

*(i) The correct approach to construing these provisions*

317. The Claimants submit that I must construe the solvency statement route in the context that it operates in parallel with the court approval mechanism.  The court approval mechanism contains strong protection for creditors both in its statutory terms and in the way it has been applied in practice by the courts over many years. The Claimants emphasise that it is a fundamental proposition of company law that a company's creditors should be able to rely on the fact that the company has received, or is entitled to receive, a fund of assets represented by its issued share capital.  Rules designed to ensure that the creditors can rely on that fund of assets include the rules preventing the company from reducing its share capital, repurchasing or redeeming its own shares or returning its capital to shareholders.  Although these rules have been modified by statute, there are still important restrictions on the company's freedom of action in respect of its capital. Parliament cannot have intended to leave creditors' interests without adequate protection. The Claimants say there is no reason why creditors should be in any different position when the company uses the solvency statement route from the position they would be in if court approval were sought.   The solvency statement route provisions should be interpreted in a way which enables them to be used only in clear, cast-iron cases where there is no threat to creditors' interests.

318. The Defendants argue that the solvency statement route provisions must be construed in the context that it is vital to have certainty about what the value of the company's capital is.  To allow an unravelling of a capital reduction many years later on the basis of the kind of analysis that we have undertaken in this trial is the wrong approach.  They rely on the comments of Megarry J in *De Courcy v Clement and another* [1970] 1 Ch 693 ('*De Courcy*').  In *De Courcy* the claimant sought a declaration from the court that the directors' declarations of solvency in a winding up made over four years earlier were of no effect because of the omission from the statement of assets and liabilities of an alleged loan.  Megarry J held that it would be wrong to imply into the statute a requirement that the declarations of solvency be substantially or entirely correct.  He considered that a declaration of solvency was a watershed, determining that the liquidator would be dealing

with a members' rather than a creditors' voluntary winding up.  A liquidator must, the judge held, be able to feel a degree of assurance that he was acting in accordance with the law when he relied on a declaration of solvency. Megarry J described a requirement of perfection for the declaration of solvency as creating:

> "… something of a concealed trap, taking effect if it proves to be substantially complete and perfect, and retrospectively destroying the operation and effect of the declaration of solvency if, at whatever distance of time, error in the statement can be detected. The implication of a retrospective effect is, in my judgment, a significant pointer against a strict construction."

319.  Mr Foxton QC acting for the Defendants also relies on the criminal sanction imposed on directors under section 643(4) if they make a statement for which they have no reasonable grounds.  The existence of the criminal sanction indicates, he submits, that a clear and coherent test which is easy for directors to understand is what is needed.

320.  My conclusion on this point is that there are competing policy considerations here that Parliament must have taken into account when introducing this new mechanism for allowing a reduction of capital without the need for judicial scrutiny and without the protection for creditors that the court process has always provided.  The key feature of this procedure is that there is no mechanism whereby the creditors of the company are notified of the proposed reduction or have an opportunity to object.  This feature and the absence of any third party oversight struck Mr Courteault as remarkable since it contrasted with the French provisions with which he was familiar.  However, that is what Parliament decided to enact.  The concerns expressed by Megarry J in *De Courcy* about the dangers of retrospectively unravelling declarations of solvency years after the event apply equally here.  I do not regard policy considerations as requiring me to approach the task of construing the provisions in any way that is out of the ordinary.  The words must be given their natural meaning.

*(ii) Is it necessary to show that the directors applied the right test and in fact formed the opinion stipulated?*

321.  Mr Foxton submits that once it is accepted, as it is here, that the directors acted honestly and that the solvency statement meets the requirements in section 643(3)  as to its form, that is the end of the inquiry.  The statement must be taken at face value and there is no justification for examining what opinion the directors in fact formed.

322.  I do not accept that submission.  Subsection (2) of section 643 states that in forming the opinions required by subsection (1) the directors must take certain things into account.  That demonstrates in my judgment that the directors must actually have formed the opinions set out in the solvency statement.  It is not enough that they make a solvency statement that says that they have formed those opinions if in fact they have not – for example because they misunderstood what the correct test was.  I agree with the Claimants that it is necessary for the court to be satisfied that the directors have in fact formed the opinions required and hence that they have applied the correct test in coming to those opinions.

*(iii) What is the correct test under section 643(1)(a)?*

323.  This was the most important area of dispute between the parties. It turns on what is meant by the requirement that there is 'no ground' on which the company could be found at the date of the statement to be unable to pay its debts. The Claimants submit that the directors have to form the opinion that there is no possible basis, even assuming that the worst case scenario arises, for concluding that AWA is unable to pay its debts. In their written opening submissions they expressed the test as a requirement that the directors come to the conclusion that there is no basis on which it could possibly be thought that the company is unable to pay its debts. In their closing written submissions the Claimants submitted that the provision requires the directors to consider not just their best estimate of the likely quantum of the contingent/prospective liability but the range of possible estimates at the time. If the directors recognised that a higher estimate than their best estimate could be arrived at, then they must consider whether the company's presently available assets would be sufficient to cover that higher estimate. If the assets would not be sufficient, then there is a 'ground' on which the company could be found to be unable to pay its debts, and the directors cannot make the solvency statement. During oral closing argument, Mr Thompson QC, acting for the Claimants, expressed the test slightly differently saying that the provision requires a high degree of confidence on the part of the directors because in order to give sufficient protection for creditors corresponding to the court sanction route, the directors must be satisfied to a high degree of confidence that the company is able to pay its debts. 'No ground', Mr Thompson argued, should be given its natural meaning of 'no basis'. On the facts of this case, it was easy for the directors to work out, adapting the PCC spreadsheets, that even if only one or two of the moving parts in the calculation of the provision moved against NCR/API, the Lower Fox River liability could quickly overtop the assets available as at 15 December 2008. In those circumstances the directors could not form the necessary opinion under section 643(1)(a).

324.  Mr Foxton proposed a very different construction. He pointed out that the provision refers to the company being '<u>found</u> to be unable to pay' its debts. This must, he argued, refer to the company being found *by a court* to be unable to pay its debts. This is in effect a cross reference to the grounds in section 123 of the Insolvency Act 1986. Section 123 sets out the grounds on which a company is deemed to be 'unable to pay its debts' for the purpose of conferring jurisdiction on the court to wind up the company under section 122(1)(f).

325.  I do not accept Mr Foxton's submission as a possible construction of section 643(1)(a). There is nothing in the wording of that subsection to suggest that a cross-reference to section 123 was intended. The circumstances in which the deeming provision in section 123(1)(a) arises do not fit easily into the mechanism for the solvency statement route. For example, a healthy and profitable company at no risk of either balance sheet or cash flow insolvency may for whatever reason neglect to pay a statutory demand for three weeks and hence be deemed unable to pay its debts. That does not greatly affect the company unless and until someone petitions to wind it up on that ground, at which point it can, of course, avoid being wound up by paying the debt. I do not see why the mere existence of an unsatisfied statutory demand should prevent the directors from making a solvency statement for the entirely separate purpose of effecting a capital reduction. Indeed, Parliament cannot have intended to import into section 643 an obligation on the directors to address their minds to the issues that frequently arise under section 123(1)(a), such as whether there is a bona fide dispute as to the amount claimed in the statutory demand.

Further, section 123(1)(e) refers to the court being satisfied that the company is unable to pay its debts as they fall due. If Mr Foxton's arguments were right, there would be a curious overlap between the directors having to form an opinion on that ground under section 643(1)(a) and also form the opinion required under section 643(1)(b).

326. However, I also do not regard the test that the Claimants propose as a workable one either. That would, it appears, require the directors of a company to go through every contingent or prospective liability facing the company, work out what is the worst that can happen, attempt to put a value on the liability in that scenario and then measure the company's assets against that figure. Further it requires, on the Claimants' argument, the directors to assume that any insurance that it has arranged will not pay out, since there is always a possibility in a worst case scenario that the insurer may find some way of disclaiming liability under the policy. Such a test would render the solvency statement mechanism unusable in most cases. It is not right to adopt a principle that only comfortably applies in the relatively unusual case of a non-trading company faced with a single major liability, the test has to be one that directors can apply in the whole range of circumstances facing a company. In a different context in this case, Mr Foxton made a point as regards BAT's own contingent liabilities disclosed in its accounts. For example, in the Notes to its 2009 annual accounts BAT disclosed contingent liabilities in relation to tax audits, product liability litigation in which significant compensatory and punitive damages were being sought, civil actions by government healthcare agencies to recover the costs of treating people with smoking related illnesses, eight separate class actions by groups of smokers, claims relating to asbestos, a claim by the US DoJ for disgorgement of profits pursuant to the RICO statute and tobacco related claims in many other countries in the world. The notes conclude that "At least in the aggregate, and despite the quality of defences available to the Group, it is not impossible that the Group's results of operations or cash flows in particular quarterly or annual periods could be materially affected by the final outcome of any particular litigation". Even if a company's position was somewhere between the two extremes of AWA with one liability and BAT with multiple liabilities, I do not see how the directors could work out what the worst case scenario is for each liability and put a value on it in order then to be able to form an opinion as to whether there are any grounds on which the company could be found to be unable to pay its debts.

327. I hold that the opinion that the directors must form is not whether, if calamity were to strike on some or all fronts, the company might be unable to pay its debts nor is it whether the court would have jurisdiction to wind up the company under section 123 of the Insolvency Act on a petition issued on the day the solvency statement was signed. The test is not a technical one but a straightforward one applying the words of the section. The directors must look at the situation of the company at the date of the statement and, taking into account contingent or prospective liabilities, form an opinion as to whether the company is able to pay its debts.

*(iv) Taking into account contingent and prospective liabilities*

328. This issue is linked with the previous question. The Claimants submit that the directors must take account of the contingent and prospective liabilities by assuming that they will have to be paid in full. They must consider the possible quantum of the liability when it is ultimately payable. The Defendants submit that this taking into account refers only to the need to ensure that proper provision is made in accordance with the accounting rules

for potential liabilities.  If a prospective liability is not sufficiently certain to merit a provision in the accounts, then there is no need for the directors to consider it.

329.  Again, I do not accept that either of these constructions is right.  I consider that the test to be applied is the same as was adopted by Sir Andrew Morritt C when he was considering the construction of the same wording in section 123(2) of the Insolvency Act 1986 in *BNY Corporate Trustee Services Ltd and others v Neuberger Berman Europe Ltd (on behalf of Sealink Funding Ltd) and others* [2010] EWHC 2005 (Ch).  Andrew Morritt C said:

> "31. … the requirement 'to take account of contingent and prospective liabilities' cannot require such liabilities to be aggregated at their face value with debts presently due. Such inclusion would be commercially illogical; an obligation to pay £100 today has a higher present value than an obligation to pay £100 in five years. Had the simple aggregation of present and prospective liabilities been intended the subsection would have provided that the amount of its liabilities 'include its contingent and prospective liabilities'.
>
> 32. Third, subject to the foregoing, the subsection is silent as to what 'taking into account' a prospective liability involves. On the one hand a prospective liability cannot simply be added at its face value to the present liabilities of the company; on the other it cannot be ignored. In my view, the content of 'taking account of" must be recognised in the context of the overall question posed by the subsection, namely whether the company is to be deemed to be insolvent because the amount of its liabilities exceeds the value of its assets. This will involve consideration of the relevant facts of the case, including when the prospective liability falls due, whether it is payable in sterling or some other currency, what assets will be available to meet it and what if any provision is made for the allocation of losses in relation to those assets."

330.  The test is not a technical, all or nothing one, but a question to be posed by the directors to themselves considering the nature of the contingent and prospective liabilities, what assets will be available to meet them and what provision (in a non-technical sense) has been made for that purpose.

*(v) Must directors have reasonable grounds for the opinion that they form?*

331.  The fourth issue arising on the construction of the section 643 is whether the directors have to have reasonable grounds for the opinion that they form.

332.  I find that this is not an element in subsection (1) but only in the definition of the criminal offence in subsection (4).  The absence of reasonable grounds is a necessary ingredient of the criminal offence but it does not render the solvency statement invalid.  I recognise that this creates a legal position which at first sight seems counterintuitive. If a director makes a solvency statement having no reasonable grounds for forming the opinion he in fact forms then he commits a criminal offence but the reduction of capital is

still valid. But Mr Foxton has persuaded me that this must be right. The *actus reus* of the criminal offence involves not just the making of the solvency statement but the bringing about of the capital reduction. That is why the criminal offence is only committed when the statement is delivered to the registry because that step is needed to bring about the capital reduction. If the lack of reasonable grounds prevented the capital reduction from taking effect, there would be no *actus reus* but only ever an attempt to effect a capital reduction.

333. Mr Thompson pointed to section 642(1)(a) which provides that the resolution reducing the capital must be supported by a solvency statement 'in accordance with section 643'. He points out that section 643 includes subsection (5). However, if reasonable grounds were part of the requirement for the solvency statement, one would expect it to be referred to in subsection (1) or (3) and not incorporated rather obliquely by inclusion in the criminal offence. I do not consider, therefore, that there is a requirement that the directors show that they had reasonable grounds for forming their opinion. Of course, the issue may arise on the facts of any given case since if it were entirely unreasonable to form the necessary opinion, a court may not be persuaded that the directors did in fact form the opinion. But it is not a separate element in the validity of the solvency statement.

*(vi) When forming their view, should the directors assume that all the distributable reserves created by a reduction in capital will be distributed by way of dividend?*

334. I can deal with this point fairly shortly as on the facts the issue does not arise for decision. The Claimants submit that where the purpose of the capital reduction is the creation of distributable profits, the directors must assume, when forming their opinion about the company's situation as at the date of the statement, that the funds released to be distributable reserves will all be paid out as dividends by the company. The Defendants argue that such an approach wrongly elides the test in section 643 with the test for the distribution of dividends under Part 23. However Mr Foxton rightly accepted that the evidence given by all four directors showed that they regarded the capital reduction approved on 15 December 2008 and the distribution of the December Dividend two days later as being effectively one transaction. The directors had therefore assessed the company's solvency on the basis that that dividend would be paid.

335. The issue might have arisen in relation to the May Dividend since the directors did not accept that the decision to declare that dividend had been taken by 15 December 2008. But in fact all of the capital reduction monies were paid out in the December Dividend. The capital reduction was €317.6 million plus the €69.8 million in the share premium account and the December Dividend was €443 million. The December Dividend distributed not only all the capital released pursuant to the solvency statement but some of the distributable reserves that had been on the balance sheet before the capital reduction. The May Dividend did not therefore involve the distribution of any of the capital released pursuant to the solvency statement.

*(vii) The relevance of the Historic Insurance Policies*

336. The Claimants submit that when taking account of the contingent and prospective liabilities of the company pursuant to section 643(2), the directors were not entitled to take into account the possibility that AWA would receive monies from its insurers under

the Historic Insurance Policies either in settlement on cashing out the policies or by way of reimbursement for payments made by AWA under its indemnity.

337.  This is part and parcel of their submission, which I have rejected, that the directors are required by section 643 to consider the worst case scenario when forming their opinion.  I consider that it flies in the face of commercial sense to require directors to disregard the existence of insurance that they have put in place precisely to cover these contingent and prospective liabilities when they are considering the ability of the company to meet them in the future.  An analogous point was considered by the Supreme Court in *BNY Corporate Trustee Services Ltd and others v Neuberger Berman Europe Ltd (on behalf of Sealink Funding Ltd) and others* [2013] UKSC 28 ('*Eurosail*').  In that case, the conditions of issue of certain loan notes provided, as one of the specified events of default, a test mirroring the test in section 123 of the Insolvency Act 1986.  It was alleged that the default provision had been triggered because the company was unable to pay its debts.  This depended on how the requirement to take into account the company's contingent and prospective liabilities should be applied when determining whether the value of its assets was less than the amount of its liabilities within the meaning of section 123(2).  Lord Walker of Gestingthorpe (with whom Lord Mance, Lord Sumption and Lord Carnwath JJSC agreed) stated that: "Whether or not the test of balance-sheet insolvency is satisfied must depend on the available evidence as to the circumstances of the particular case": paragraph 38.  He noted that the future prospects of the company were dependent almost entirely on matters outside the control of its management, namely currency fluctuations, movements in LIBOR and the performance of the UK economy generally.  Over the period of more than thirty years until the final redemption date of the loan notes, these factors were "a matter of speculation rather than calculation and prediction on any scientific basis.".

338.  At paragraph 42 of his judgment Lord Walker approved the statement of Toulson LJ (as he then was) in the court below in describing the court's task as follows:

> "Essentially, section 123(2) requires the court to make a judgment whether it has been established that, looking at the company's assets and making proper allowance for its prospective and contingent liabilities, it cannot reasonably be expected to be able to meet those liabilities. If so, it will be deemed insolvent although it is currently able to pay its debts as they fall due. The more distant the liabilities, the harder this will be to establish."

339.  Of particular relevance to this issue is the fact that at first instance in *Eurosail* ([2010] EWHC 2005 (Ch)) Sir Andrew Morritt C considered whether it was possible to take into account the claims of the issuer in the liquidation of Lehman Brothers as present assets, even though the claims had not been admitted by the liquidators, and if so what was their value. The Chancellor recognised that the claims were not included in the financial statements because it is normal accounting practice not to recognise sums that may be recovered from ongoing litigation but have not yet been recovered:

> "34. … But the exercise required by section 123(2) is not the production of an annual balance sheet but a comparison of the value of assets with the amount of liabilities in order to ascertain solvency. There is no doubt that the claim in the

> liquidations of the Lehmans companies is a present asset of the
> issuer. Similarly there is no doubt that it is of considerable
> value, whether admitted or not. If the secondary market is
> indicative of value it is worth some 35% to 37% of US$221m.
> This asset and its value should not be ignored."

340. Mr Thompson submitted that the *Eurosail* case can be distinguished from the instant
case because the reason why the unadmitted claims in the Lehman insolvency could be
taken into account was because they were tradeable on an established secondary market
unlike AWA's claims under the Historic Insurance Policies.   I do not agree.   The
relevance of the fact that the claims against the Lehman liquidators were tradeable was
only that this established that the claims had some value – not always the case with a
claim against a liquidator.   I consider that in line with *Eurosail* the directors were fully
entitled to take into account the likely receipts by AWA under the Historic Insurance
Policies when considering solvency.

*(viii) The error in the memorandum of capital*

341. Section 644 of the CA 2006 provides that within 15 days of the resolution to reduce the
company's capital being passed, the company must deliver to the registrar a
memorandum which shows the amount of the share capital, the number of shares into
which it is to be divided, the amount of each share and the amount at the date of the
registration deemed to be paid up on each share.   A memorandum purporting to comply
with this requirement for AWA was sent to the company registrar within 15 days but it
contained an error.   The memorandum said that the share capital as reduced by a special
resolution passed on 15 December 2008 was as follows:

| | |
|---|---|
| **The amount of the share capital** | €100,248,828 |
| **The number of shares into which it is divided and the amount of each share** | 100,248,828 ordinary shares of €1 each |
| **The amount (if any) at the date of registration deemed to be paid up on each share** | €1 |

342. This was wrong.   It was true that the nominal share capital had been reduced by the
capital reduction from 417,869,520 shares to 100,248,828 (a reduction of 317,620,692)
but the paid up share capital had only been €18,620,413 so the capital reduction resulted
in that paid up share capital being reduced to €99,721.   Mr Thompson submitted that this
was a gross error – it was wrong by a factor of 100 and so not a technical defect.
According to section 644(4), the resolution does not take effect until documents under
subsection (1) are registered and since the document registered could not be described as
a memorandum complying with subsection (2), that had never happened.   The resolution
did not, therefore, take effect.

343. On this point I accept the submissions of the Defendants that to interpret the statutory
provision as the Claimants contend would impose a stringency that cannot have been

Parliament's intention. The *De Courcy* decision discussed earlier (paragraph 318, above) shows that inadvertent error of this kind does not prevent a document from complying with statutory requirements and does not prevent the consequences of the adoption or registration of the document from taking effect. In *De Courcy* Megarry J rejected a similarly strict construction of the requirement for a statement of the company's assets and liabilities saying: (pages 698H – 699)

> "There must be something which can be reasonably and fairly described as "a statement of the company's assets and liabilities": but if there is, then even if it subsequently appears that there are errors and omissions, these will not prevent the statement from being a statement within the subsection. I do not think that I ought to impute to Parliament an intention to require perfection in a provision which contains no words to indicate this super-human standard."

344. The same reasoning applies here. Despite the mistake mixing up the authorised share capital with the paid up share capital, the memorandum registered was still in my judgment sufficiently compliant with section 644 to avoid the extreme consequence that the resolution was invalid and hence all the audited company accounts filed since that date have been seriously misstating the company's capital position. Mr Thompson argued that the less stringent meaning given to the statutory wording at issue in *De Courcy* was justified because it is very difficult for company directors to be able to state with complete certainty what the assets and liabilities are whereas it is very easy to state correctly what the company's paid up capital is. However, that was not one of the several reasons relied on by Megarry J for his conclusion. Many of the reasons he did rely on apply equally here, in particular the fact that a criminal offence is committed by an officer of a company for a default in compliance and the serious impact of a retrospective destruction of the operation and effect of the special resolution.

345. I therefore reject this challenge to the efficacy of the capital reduction.

**(b) The reduction of capital: the factual issues**

346. I have set out the history of the events leading up to the capital reduction on 15 December 2008. I now consider what opinion the directors in fact formed and whether this was an opinion that entitled them to sign the solvency statement.

*(i) Mr Martinet's and Mr Courteault's solvency statements*

347. Even a best estimate can be wrong and, as I have explained earlier, I accept that the obligation under section 643(2) to take account of all the company's contingent and prospective liabilities requires a director to consider, not the worst case scenario on all fronts, but whether there is going to be enough money in the company to meet those liabilities beyond the extent to which they are provided for in the accounts. Mr Martinet was cross-examined extensively over whether he took into account not only the provision that was included in the November 2008 Interim Accounts but also the possibility that that provision might be wrong. He was taken to the many documents, for example, in which NCR/API shares of more than the 60% used in the November 2008 Interim Accounts provision calculation had been posited and in which low, mid and high estimates had been used for the different moveable parts.

348. Mr Martinet pointed out that so far as he was aware that 60% share already had a margin built into it for error: see the explanation in paragraph 126, above. His evidence was that he had taken into account what he thought was a worst case scenario; he knew that there were a number of uncertainties that were extremely difficult to deal with so the way they dealt with those uncertainties was to leave enough assets in the company. His approach was therefore not to try to compute with any precision what the value of the worst case scenario was but rather to work out the best estimate of the liability and then leave a substantial margin in the company's asset base. In my judgment that approach was entirely fair and, indeed, inevitable in the circumstances.

349. In an important passage in his evidence Mr Martinet described his thought process when he was considering the effect of the capital reduction on AWA's liability. He said that as at September 2008, the inter-company debt owed by Sequana to AWA, converted from euros to dollars would amount to about $766 million. There was also about $160 million left in the Maris Policy. So AWA had assets of almost $1 billion to meet its potential liability. Given that AWA's likely liability was only about 36% of the total remediation costs (60% of NCR/API's share of 60%), $1 billion would only be needed to cover AWA's share if the overall liability for all the PRPs together was over $2.5 billion. No one had ever mentioned that kind of figure as the likely overall costs. The company needed much less than that since the figures generally quoted for total remediation and NRD costs were about $650 million.

350. The capital reduction proposed would leave about $350 - $360 million in the company, even ignoring possible receipts from the Historic Insurance Policies. This comprised what would be left of the inter-company receivable; €149 million, equating to about $190 -200 million and the left over funds in the Maris Policy of about $160 million. Grossing that amount up, total costs would need to be close to $1 billion in order for AWA's 36% share to be $350 million. So even after the capital reduction (and the distribution of the December Dividend) there would be enough money in the company to meet its liability even if there was a substantial cost overrun (i.e. total costs for all PRPs were close to $1 billion) or if AWA's share in fact rose from 36% to 50%. His evidence was therefore that at the 15 December 2008 meeting he and his fellow directors understood that the company had 'a comfortable buffer to take care, even of the worst-case scenario, and much further than that'. This was because according to the calculations he made, the cushion left in the company was more than the amount included in the provision itself and was enough to enable AWA to meet its liabilities if total costs increased by 50% or if AWA's share of costs of $650 million increased from 36% to 50%.

351. I find that Mr Martinet's approach to the difficult question he was faced with was entirely reasonable. I do not accept that he was obliged to carry out some more detailed 'flexing' of the models that he had been provided with to see where the numbers ended up. The models provided costs estimates of a net present value of sums to be expended over 40 years. It is of the nature of the use of spreadsheets and models that they generate figures exact to the last dollar – a spurious precision in these circumstances. That was needed in order to arrive at the figure for the provision because that needs to be a precise figure capable of audit. As to the solvency statement, Mr Martinet was well aware of the wide ranges quoted by the experts for possible remediation and other costs and the uncertainty about the NCR/API share. He took these uncertainties into account by leaving in AWA not only the margin of error built into the 60% NCR/API share but a very substantial amount of money to cope with the provision turning out to be wrong.

Again, that was even ignoring the possible recoveries under the Historic Insurance Policies.

352.  Mr Courteault's evidence was less precise than this since he was largely relying on Mr Martinet to have worked out the numbers. Mr Courteault's evidence as to what he thought going into the 15 December 2008 meeting was as follows.  He understood the difference between the balance sheet insolvency and the cash flow insolvency tests in section 643(a) and (b)(ii) of the CA 2006.  He also realised that he had to consider AWA's ability to meet its share of the Fox River liability over the whole 40 year period, not just any demands under the indemnity that happened to come in over the following few years.  He did not himself dig into the numbers but relied on what Mr Martinet and the experts they had engaged told him. When he signed the solvency statement he thought that there were enough assets in the company for it to meet its liabilities and had no reason to doubt this. He also had regard to the Historic Insurance Policies because the December Aon Report said that there was a very high probability of substantial recoveries to help AWA in future.

353.  It was put to Mr Courteault that the meeting on 15 December 2008 should have been postponed because the documents were not ready until very shortly beforehand; they had been prepared in a rush and the directors had not had time to consider them.  Mr Courteault denied this, saying that there was plenty of time at the meeting itself for them to consider the documents and the issues had been fully discussed beforehand. He said that there had been a full discussion at the meeting and that the directors were free to decide what they wanted to decide.

354.  Mr Courteault accepted that by October 2008 it was Mr Lebard's and hence Sequana's wish to eliminate the receivable and move the money standing on AWA's balance sheet up into the group.  But Mr Courteault denied that this aim would have led any of them to achieve this goal 'at any cost or at any price':

> "Q …Mr Lebard's view was that he wanted to take everything out, he wanted to keep any value in Sequana, not in AWA?
>
> A. That was not my view. I mean, my view was that we had to achieve a transaction where we could reorganise AWA with only the Fox River liabilities in it. And then I was here to achieve this in a right way, I mean.  I am the lawyer of the company. So I'm trying to -- what I am trying to do here is probably to make sure that we comply with the rules and that we are taking care of everything. That is the only thing.
>
> Now, I was -- my target here, which has been assigned to me, was to achieve a transaction where we could reduce the receivable, so through capital reduction and the distribution of dividend, and maybe at some stage we would try to sell the company to somebody else. But that is all that what we had in mind here."

355.  In so far as Mr Courteault's opinion was in effect the same opinion that Mr Martinet formed when signing the solvency statement, I find that it was the necessary opinion for the purposes of section 643.

*(ii) Mr Mountford's and Mr Newell's solvency statements*

356. Mr Mountford's evidence was very clear as to how he and Mr Newell satisfied themselves that they were justified in signing the solvency statement.  As I have described, by late 2008 both men were aware that Sequana wanted to move excess assets out of AWA by declaring a dividend that would pay off a large portion of the existing inter-company receivable.  AWA would then be left as a vehicle solely responsible for the Fox River liability.

357. Mr Mountford and Mr Newell thought that there needed to be a 'buffer' not only over and above the provision in the accounts but also over and above the worst case scenario figure they had in mind.  Mr Mountford's calculation going into the 15 December 2008 meeting was that the worst case scenario was $130 million over the Maris policy of $160 million.  I have described how he arrived at this figure in paragraph 200, above.  The capital reduction and December Dividend would still leave €150 million of assets (about $200 million) (in the form of the provision and the remaining intercompany loan) plus the Maris Policy funds in the company.

358. Both Mr Mountford and Mr Newell also bore in mind the December Aon Report that indicated that there was a very high probability of recovering substantial sums under Historic Insurance Policies to meet the future liability, particularly given that AWA had already received over $100 million in payments under the policies.  There were, they concluded, sufficient assets in the company without the insurance recoveries to cover the worst case scenario and there were more assets plus the insurance recoveries (which they thought of as amounting to a further $100 million) to provide a buffer even above that.  All these calculations, of course, were made by Mr Mountford on the basis that the December Dividend of €443 million would be paid in two days' time.

359. At the meeting on 15 December 2008 Mr Mountford recognised that when deciding whether to sign the solvency statement he had to consider both cash flow insolvency and balance sheet insolvency.  He also recalled that Mr Martinet told the meeting that because the December Aon Report was not in final form, they should assume that there would be no monies coming in from the Historic Insurance Policies.  Although the figures for the worst case scenario referred to in the minutes of the meeting were rather lower than those Mr Mountford had in his own mind, his recollection was very firm as to his own thought process in coming to the decision to sign the solvency statement:

> "Q. The reality is, isn't it, Mr Mountford, that you knew very well in that meeting on 15 December that there was a serious risk that if this dividend was paid, the company might ultimately be unable to meet its indemnity liability if it turned out to be larger than estimated?
>
> A. I was very cautious. I did not want to expose – as I said yesterday, my motivation here was to make sure I did everything legally, did not expose myself to a criminal act or indeed a claim, a personal claim against me. So I reviewed -- I

> believed that the amount of assets that we were leaving in the
> company were more than sufficient to meet the worst case
> scenario that we foresaw. So in my mind there was no question
> of insolvency. If there had been any issue in my mind on that, I
> simply would not have taken the risk of doing it."

360. Mr Mountford was asked whether he felt under pressure from Sequana at the 15
December 2008 meeting to approve the transaction. His reply was that the main pressure
for him was always the thought that they needed to be prudent, that he was putting
himself at risk, and he was potentially committing a criminal act if he did not behave
prudently. That, he said, was the main pressure he always felt in the process.

361. Mr Newell's evidence as to his decision to sign the solvency statement was:

> "I knew that the solvency statement was something that each
> individual director has to sign. So it is up to each individual
> director to make their own judgment as to whether they should
> sign it or not.

> For me, I had my worst case scenario in mind, I had my assets
> in mind, and that is why I signed the solvency statement."

362. At the meeting on 15 December 2008, Mr Newell described how Ms Quenby from
MWE UK stood up in front of them and explained about the solvency statement and then
came round to each of the directors in turn to get them to sign. He described his state of
mind:

> "A. Well, all I can say is that at that meeting that is what I
> genuinely believed. I did -- I thought there was no basis on
> which the company could not meet its liabilities in the future.
> And that is why I signed the solvency statement. I mean, I
> knew this was a significant transaction. I'm not going to do
> anything that I thought was incorrect. We had had McDermott
> there, giving us advice. We had PwC, they were at the meeting.
> They had vetted the accounts. They had looked again at the
> provision. As I say, from my point of view, when I signed that
> solvency statement, I believed there was no risk of the
> company becoming insolvent. That is all I can say.

> Q. But you didn't, at that stage, have enough material to allow
> you to reach that conclusion, did you?

> A. Well, I believe that I had. We had a range of estimates from
> PCC and Mr Gower. We had had PwC to look at the provision,
> review the provision. We had had McDermotts providing legal
> advice to us. I can sit here and say to you, my Lady, when I was
> at that meeting I had no doubt in my mind that there was no --
> that the company -- there was no risk of insolvency."

363. Although Mr Mountford and Mr Newell went about their calculation in a different way
from Mr Martinet and Mr Courteault they were in effect doing the same exercise. They

bore in mind the uncertainties surrounding the different moving parts within the AWA liability for the Fox River clean up; they were fully aware that the provision was only a best estimate and might be wrong by a substantial margin and they formed the honest opinion that even so, taking into account all the circumstances surrounding that liability, there was plenty of money left in the company after the capital reduction and the payment of the December Dividend to be sure that AWA would be able to meet its indemnity obligations.

364.  In my judgment all four directors formed the necessary opinion for the purpose of section 643 and the challenge to the solvency statement and to the capital reduction fails. I therefore find that the December 2008 Interim Accounts (used to justify the December Dividend) and the 2008 Final Accounts (used to justify the May Dividend) were not defective by showing that the capital reduction had taken place.

**(c)  The adequacy of the Lower Fox River provision in AWA's accounts**

365.  It is alleged by the Claimants that the provision made in AWA's accounts for the Lower Fox River liability was inadequate.  This is another reason why it is said that the accounts did not justify the distribution of the dividends and hence why the dividends contravened Part 23. The Claimants' case changed significantly during the course of the trial.  It was initially alleged that the provision should have been based, at least as at December 2008, on the possibility that NCR/API would be liable for 100% of the clean up costs. This was supported by Mr Kirsch's opinion relying particularly on the *Whiting* CMO.   The Claimants submit that the decision embodied in the *Whiting* CMO shows that Judge Griesbach thought that knowledge was going to be a very important equitable factor which might override all other factors.  However, after the close of evidence from the factual witnesses, the Claimants accepted that the figure of 60% used for NCR/API's share in the provision for the purposes of the capital reduction and the December Dividend was a reasonable best estimate.   However, the Claimants maintained their challenge to the NCR/API share used in the 2008 Final Accounts relied on to justify the May Dividend. As I have described, the best estimate of the NCR/API share in those accounts was assumed to be 38% (60% of which was then taken to be AWA's share).

366.  In relation to both the December Dividend and the May Dividend, the Claimants challenged the accuracy of the NRD estimate.  This was a figure of $35 million used in the December 2008 Interim Accounts as the estimate of NCR/API's share and a figure of $18.8 million in the 2008 Final Accounts (both of which were then multiplied by 60% to find AWA's share).

*(i) The relevant statutory provisions and accounting standards*

367.  This raises a large number of factual issues but here I summarise the relevant provisions (set out in full in the Annex) and the legal issues that arise.

368.  Part 23 allows a dividend to be justified by reference either to audited accounts or interim accounts.  Where audited accounts are relied on they must have been properly prepared in accordance with the Companies Act 1985, or have been so prepared subject only to matters that are not material: section 837(2) of the CA 2006.  Where interim accounts are relied on they must enable a reasonable judgment to be made as to the amounts of the relevant items in section 836(1): see section 838(1).

369. For the December Dividend the accounts relied on were the December 2008 Interim Accounts: see paragraphs 226 and 227, above. For the May Dividend the accounts relied on were the 2008 Final Accounts: see paragraph 293 above.

370. Section 226A of the CA 1985 sets out how a company's annual accounts must be drawn up. They must include a balance sheet and that balance sheet must give 'a true and fair view' of the state of affairs of the company as at the end of the financial year. Subsection (3) provides that the accounts must comply with the provisions of Schedule 4 to the Companies Act 1985 as to the form and content of the balance sheet and the additional information to be provided by way of notes to the accounts. The relevant paragraphs of Schedule 4 for our purposes include paragraph 89 which provides that references to provisions for liabilities are to any amount retained as reasonably necessary for the purposes of providing for any liability the nature of which is clearly defined and which is either likely to be incurred, or certain to be incurred but uncertain as to amount or as to the date on which it will arise.

371. The question here is therefore how to determine whether accounts give 'a true and fair view of the state of affairs of the company'. It was common ground between the parties that this was determined by reference to the relevant accounting standards applicable to the preparation of accounts. For this purpose the Defendants accepted that the same standard of probity in relation to the computation of provisions applied in interim accounts as applied for the company's annual accounts. In other words, there is no difference between the requirement that an audited balance sheet show a true and fair view of the state of affairs of the company within the meaning of section 226A(2) of the Companies Act 1985, brought in by section 837(2) of the CA 2006, and the requirement that interim accounts enable a reasonable judgment to be made for the purposes of section 838(1).

372. As to the content of that requirement, the parties referred to the Opinion dated 21 April 2008 by Martin Moore QC who was instructed to advise on, amongst other things, whether the earlier Opinions from former eminent Chancery silks on the relationship between accounting standards and the requirement in the Companies Act 1985 that accounts give a true and fair view still held good. He concluded that they did. The requirement to prepare accounts which show a true and fair view is a legal requirement, the satisfaction of which is a question of law for the courts to determine. In determining that question, the Courts will rely very heavily upon the ordinary practices of professional accountants in determining whether accounts show a true and fair view. That is because those practices reflect the accumulation of experience and good professional practice and mould the expectations of the users of accounts as to the sufficiency and utility of the information in terms of quantity and quality.

373. The main accounting standard relevant to the computation of the Lower Fox River provision is *Financial Reporting Standard 12: provisions, contingent liabilities and contingent assets* issued by the Accounting Standards Board in 1998 ('FRS 12'). The important distinction so far as making provision in financial accounts is the difference between recognising provisions and disclosing contingent liabilities. In FRS 12 a *provision* is a liability that is of uncertain timing or amount, to be settled by the transfer of economic benefits. A *contingent liability* is defined in paragraph 2 as either:

(a) a possible obligation arising from past events whose existence will be confirmed only by the occurrence of one or more uncertain future events not wholly within the entity's control; or

(b) a present obligation that arises from past events but is not recognised because:

(i) it is not probable that a transfer of economic benefits will be required to settle the obligation; or

(ii) because the amount of the obligation cannot be measured with sufficient reliability.

374. According to FRS 12, a provision should be recognised when an entity has a present obligation (legal or constructive) as a result of a past event, it is probable that a transfer of economic benefits will be required to settle the obligation, and a reliable estimate can be made of the amount of the obligation. Unless these conditions are met, no provision should be recognised.

375. There is no doubt here that the obligations of AWA under its indemnity to API counts as a present obligation arising as a result of a past event. Indeed, FRS 12 gives clean up costs for unlawful environmental damage as an example of an 'obligating event' which gives rise to a provision. FRS 12 acknowledges that the use of estimates is an essential part of the preparation of financial statements and does not undermine their reliability. This is especially true in the case of provisions, which by their nature are more uncertain than most other balance sheet items. FRS 12 provides that an entity will normally be able to determine a range of possible outcomes and can therefore make an estimate of the obligation that is sufficiently reliable to use in recognising a provision. If it is not possible to do so, then the liability is contingent only and should not be recognised in the accounts.

376. FRS 12 gives guidance as to how the company should measure the provision and what should be disclosed in the accounts:

(a) The best estimate of the expenditure required to settle the present obligation is the amount that an entity would rationally pay to settle the obligation at the balance sheet date or to transfer it to a third party at that time. It will often be impossible or prohibitively expensive to settle or transfer an obligation at the balance sheet date. However, the estimate of the amount that an entity would rationally pay to settle or transfer the obligation gives the best estimate of the expenditure required to settle the present obligation at the balance sheet date (paragraph 37);

(b) The risks and uncertainties that inevitably surround many events and circumstances should be taken into account in reaching the best estimate of the amount of the provision. Care is needed to avoid duplicating adjustments for risk and uncertainty with consequent overstatement of a provision;

(c) The estimates of outcome and financial effect are determined by the judgement of the entity's management, supplemented by experience of similar transactions and, in some cases, reports from independent experts. The evidence considered will include any additional evidence provided by events after the balance sheet date;

(d) Where the effect of the time value of money is material, the amount of a provision should be the present value of the expenditures expected to be required to settle the obligation;

(e) Provisions should be reviewed at each balance sheet date and adjusted to reflect the current best estimate. If it is no longer probable that a transfer of economic benefits will be required to settle the obligation, the provision should be reversed;

(f) The entity should give: (i) a brief description of the nature of the obligation, and the expected timing of any resulting outflows of economic benefits; (ii) an indication of the uncertainties about the amount or timing of those outflows; and (iii) the amount of any reimbursement, and of any asset that has been recognised for that expected reimbursement.

377. FRS 12 draws a distinction between the case where the obligation which the provision recognises is one for which the company is jointly and severally liable with other companies and one where it may be entitled to reimbursement from other companies for the funds it has to pay to settle the obligation.  According to paragraph 29, where an entity is jointly and severally liable for an obligation, the part of the obligation that is expected to be met by other parties is treated as a contingent liability and so not included in the provision sum. The entity recognises a provision for the part of the obligation for which a transfer of economic benefits is probable. Paragraph 56 deals with the position where some or all of the expenditure required to settle a provision is expected to be reimbursed by another party, for example under an insurance contract. In most cases, the company will remain liable for the whole of the amount in question so that the company would have to settle the full amount if the third party failed to pay for any reason. In this situation, a provision is recognised for the full amount of the liability and a separate asset for the expected reimbursement is recognised when it is 'virtually certain' that reimbursement will be received if the company settles the liability. The reimbursement should be treated as a separate asset.

*(ii) A duty to obtain professional advice*

378.  There is one legal issue that arises about the application of these standards. This relates to the obligation to obtain proper professional advice.  Both accounting experts Mr Lindsell and Mr Grummitt agreed that, faced with the need to make a provision for the Fox River liability, the directors should have recognised that expert help was needed in understanding the legal implications of CERCLA, working out AWA's likely exposure and assessing what insurance cover was available.  This applied to the drawing up of the interim accounts as well as to the final audited accounts.

379. Both experts also relied on ISA 620, an international standard on auditing which contains guidance to auditors on using the work of an expert as audit evidence.  Mr Grummitt accepted that it was reasonable to treat the relevant parts of ISA 620 as the appropriate criteria for selecting and appointing expert advisers to advise a company in relation to a liability that is or may be a material item in its accounts.  The main appointment factors are competence, objectivity (ensuring that the expert does not have a conflict of interest), the scope of the work the expert is required to perform (ensuring that the expert's task reflects the need for assurance) and an assessment of the actual work of the expert, in light of the auditor's overall knowledge of the business.  Both experts

applied these criteria to Mr Gower and the other experts but arrived at different results in respect of some of them.

380.  The legal issue which arose is whether this requirement to seek expert advice is a free-standing requirement that must be satisfied before the accounts are considered to provide a true and fair view (as the Claimants contended) or whether the issue of the experts' suitability is only relevant if the accounts themselves are determined by the court not to provide a true and fair view (as the Defendants contended).

381.  I do not regard this as a separate requirement.  If the figures themselves provide a true and fair view then it does not matter how they were arrived at by the directors.  In my judgment, any imperfections in the process of producing the figures cannot taint the accounts if the figures themselves are justified.

**(d)  The challenge to the provision in the December 2008 Interim Accounts**

382.  To recap, the provision for the Fox River liability included in the December 2008 Interim Accounts used to support the December Dividend was €58.4 million.  This was based on the figures in a PCC spreadsheet that computed the AWA liability in excess of the Maris Policy at $79,911,234.  It assumed (amongst many other things) that:

(a)  total remediation costs would be $645.4 million of which AWA would be liable to pay 36% because it assumed that the NCR/API share would be 60% and AWA would have to pay 60% of that; and

(b)  NCR/API would settle the NRD claim against them for $35 million payable over five years from 2012 to 2016 and AWA would have to pay 60% of that.

383.  The only element I need to consider here is the challenge to the reasonableness in this computation of the NRD figure of $35 million.  The Claimant's challenge to this was primarily two fold.  First they say that it was wrong to base the NRD input on an assumption that there would be a settlement between NCR/API and the Government.  It should have been based on the share of the total amount of NRDs that the Government was likely to claim from all the PRPs, as appears to have been done in the 2007 Final Accounts.  They relied on the evidence of Mr Kirsch that absent an actual settlement, any offer from Randy Stone did not fix the upper limit of the PRPs' liability and when the offer was rejected, the Government was free to pursue the PRPs for a much larger sum.  The second challenge is that there was no real justification for the figure of $35 million given that the lowest figure so far offered by Mr Stone to settle with NCR/API was $50 million.

384.  As to the first point, it is true that Mr Stone indicated in the memorandum setting out the Stone Total NRD Offer that the claim that the Government would pursue if the PRPs did not accept this offer would be for $223 – 333 million: see paragraphs 88 onwards, above.  However, that does not mean that the provision should be based on those much larger figures for a number of reasons.  First, as Mr Martinet pointed out in cross-examination, the Stone Total NRD Offer itself recognised that since the plans to which those costings related had been formulated the Trustees responsible for repairing NRD had gained valuable experience in implementing actual restoration projects:

> "In many instances, the Trustees have been able to achieve high quality restoration at lower than expected costs (specific areas of wetland habitat have been restored or preserved at less than the per-acre cost originally estimated by the RCDP). That past experience with interim recoveries — coupled with a reasonable expectation that a near-term final settlement could fund other cost-effective restoration projects — leads me to believe that the Trustees could justify settling the total NRD claim now for less than the prior dollar estimates, as discussed below."

385.  Those cost figures also did not take into account the credit for the money the PRPs had already spent on NRDs.

386.  Secondly, in fact we know that all the PRPs rejected this offer indicating that the considered view of all the parties was that they could do better than that in further negotiations. It seems to me unlikely that the PRPs thought there was a serious risk that they would ultimately have to pay a very much higher sum at the end of costly litigation. Thirdly, the CERCLA experts' evidence was that NRD claims generally tend to settle rather than to fight.  It is true that, as Mr Stone made clear in his offer, the Trustees who would ultimately make the decision whether to settle at this level had not yet committed to the sum he put forward.  However, Mr Kirsch and Mr Tenpas both also agreed that Mr Stone would not have put forward the offer unless he had been confident that it would be acceptable to those within the Government who had to approve any proposed consent decree. Further, Mr Lindsell very fairly accepted in his evidence that a reserve could be based on expected settlement if this was the best estimate.

387.  In my judgment there was plenty of evidence on which the directors could conclude that the best estimate of likely liability for NRDs should be based on the likelihood of settlement with the Government rather than on the pessimistic view that the case would fight, the Government would revert to claiming a much higher figure and a court would ultimately award a much higher figure than had been discussed in the settlement negotiations.  I do not see, therefore, that the provision in the accounts is wrong simply because it was based on a possible settlement figure rather than on the figure that the Government might claim if the issue were litigated.

388.  Where did the $35 million come from?  The Stone Total NRD Offer to settle for an upfront lump sum of $76 million was made in July 2007. That offer was itself a substantial reduction from an earlier offer, on which the 2005 and 2007 provision was based, of $125 million in 2004.   There is evidence that by September 2007, the Government had reduced this to $67.3 million.  Mr Gower emailed Mr Martinet and Mr Bartolotta on 19 September 2007 reporting on a meeting apparently with those parties taking part in the mediation and this is one of the items he mentions.  Then on 30 May 2008 Ms Zurlo, a lawyer at MWE US, wrote to Mr Bates, Mr Gower and Mr Tauscher reporting on a conversation with Mr Stone. She said:

> "First, (after noting we appreciated his comments and efforts) API would be looking for closure on the NRD issue. Without missing a beat, Randy said that closure would be $50M (for both API/NCR). He knew I wasn't calling to negotiate, and that I was only passing the info along to you all."

389.  It appears therefore that although Mr Stone had described his offer as the bottom line, there was still room for negotiation both as regards a global settlement for all the PRPs and for an individual settlement for NCR/API.

390.  There is also evidence that Mr Bates had suggested a figure of $35 – 40 million as the best estimate of NCR/API's likely liability and this was in fact an increase of $10 million over the amount estimated in 2006.  In October 2007, Ms Dupuis from PCC emailed Mr Gower about her work on the 2007 reserve calculation, seeking his advice on some of the numbers.  She said:

> "1) Shared NCR/API NRD payment- Last year we listed a $25 million payment for 2007. Should we use this same figure for 2008? Jeff Bates suggested $35-$40 million. We also would like to ask Laura Moore [of MWE US] to provide us with a short justification for the amount you give. We would insert her justification in the backup documentation for the reserve. She provided us with justification for last year's figure and, based on her time and knowledge on the subject, we do not believe it would be a difficult task."

391.  In February 2008, PwC in Paris were working on the provision to be included for the purposes of the Sequana group accounts. Mr Basset of PwC wrote to Mr Gower asking various questions and Mr Gower interpolated his answer into the email in bold italic font:

> "**3/ Estimation of NRD costs**
>
> As of December 2007, we understand that your best estimate is that API/NCR liability for NRD costs will be $35 million (+ $10 million compared to 2006, no support for that amount in the PCC report)
>
> We understand that in a 2000, potential natural resource damages ("NRDs") were estimated by the U.S. Fish and Wildlife Service ("FWS") to fall in the range of $176 million to $333 million for all PRPs in the aggregate. In its 10-Q report, dated 5/10/2007, NCR Corp. mentions "for total natural resource damages (NRD), NCR uses a best estimate of $131 million. The range of reasonably possible outcomes is between $10 million and $176 million."
>
> — > Could you please explain what are the 35MUSD derived from and why that amount has increased compared to 2006? How will you share these expenses with NCR (same agreement 60/40?)?
>
> — > What is the status of the negotiations between IGP (Inter Governmental partnership) and API/NCR on that matter?
>
> ***The companies are not negotiating the government's NRD claim at this time. It may be deferred until after the cleanup is complete. The $35million figure reflects our reasonable***

> *estimate of the NCR/API share of the government's demand*
> *for a further $75million which it made last year. Any NRD*
> *settlement will be shared with NCR according to the terms of*
> *the arbitration agreement. The 2007 reserve forecasts a $35M*
> *NRD settlement in 2009. By then, the $75M threshold with*
> *NCR will have been met and API's share will be 60%. I do not*
> *believe, however, that we will reach a settlement of NRDs in*
> *2009.*"

392. On the likely settlement figure for the NRDs, I also bear in mind the experience of Georgia Pacific in settling its own NRD liability. This shows that the courts are prepared to approve settlements that represent a small portion of the PRP's potential liability. In 2001 Georgia Pacific had settled its liability for NRDs for $11 million. There was a legal challenge to the fairness of that settlement. In a ruling on 19 March 2004 (*US and State of Wisconsin v Fort James Operating Company* 313 F.Supp.2d 902 (2004)), the US District Court in the Eastern Division of Wisconsin held that the deal was substantively fair and reasonable and that it was consistent with the statutory goals of CERCLA. The court noted that the most recent estimate suggested that Fort James (that is, Georgia Pacific) discharged in the range of 15-20% of the total PCB mass into the River. The Government's estimate for the total NRDs was said in that case to be $176 - $333 million so the court recognised that the settlement figure was far below 15% of even the bottom of this range.

393. However, the court acknowledged that there were good reasons to discount their claim against Georgia Pacific: the relative costs and benefits of litigation versus settlement including the risk that the Government's estimate "greatly overestimates the total potential damages, particularly in view of the state's previous damages assessment". There was also a value in discounting the share of an 'early settler' to encourage others to settle the claims against them. The court therefore held that while the consent decree did not mandate that Fort James pay its full equitable share of the natural resource damages, when viewed in light of the benefits of early settlement and CERCLA's joint and several liability scheme, it appeared to compensate the public satisfactorily for Fort James's share of the estimated natural resource damages.

394. I accept that the 'early settler' point would no longer be relevant to any settlement entered into between NCR/API and the Government. But it seems clear from this case that individual settlements at a sum far below what might be considered the PRP's share of the Government's total claim are agreed by the Government and approved by the court.

395. On the other hand, the Claimants point to what the December Aon Report said about NRDs. After recounting the various contributions so far made to NRDs by different PRPs and the offers from Mr Stone ($76 million from all PRPs and $50 million from NCR/API) Aon analysed five scenarios. These ranged from Scenario 1 which was that there was 'a small chance' that API would settle with the Government for a $12 million one off payment in 2009 (npv $11.8 million) to Scenario 5 which was that litigation which would take place after remediation was complete would result in a claim for $125 million from all PRPs (npv $44.3 million). They attached different probabilities to the five different scenarios and arrived at a compound average of these values and probabilities. This produced an average value of NRDs amounting to $30.4 million for API/AWA alone (not for NCR/API). This was about $11 million more than the figure included in the model that was used for the November 2008 Interim Accounts.

396. It is unfortunate that there does not seem to be a document in the very voluminous disclosure available at trial in which there is set out a calculation of how the $35 million was arrived at from the various settlement figures being discussed. We do not, of course, have Mr Gower's evidence as to how he arrived at that figure. However, there is plenty of evidence, as I have described, showing the $35 million figure being discussed. Although there are other figures also referred to, it was open to the management of the company in arriving at a best estimate of NRDs to conclude that $35 million was the best estimate for the NCR/API share and hence that 60% of that, $21 million, was a reasonable figure to include for AWA's share of NRDs.

397. I note that Mr Bartolotta, MWE US and the PwC Paris people were challenging this number to find out why it was proposed for inclusion in the provision. It appears that Mr Bates did support the $35 million figure and Mr Bartolotta and PwC must have been satisfied with the answers they were given. The Claimants made much of the point that the advice that Mr Martinet claims he was given by Mr Bates was not recorded in formal memos, even if it went to very important matters. Mr Martinet acknowledged that on occasion MWE had provided a formal written opinion, for example on the US law relating to fraudulent transfers in the context of the proposed sale of AWA or on the merits of a settlement proposal from Georgia Pacific. But Mr Martinet's evidence was that he dealt with Mr Bates mostly on the telephone or at meetings and that is how legal advice was sought and provided most of the time. He felt comfortable ringing up Mr Bates whenever he wanted to discuss anything.

398. The Claimants also submitted that Mr Martinet and the other directors were wrong to place such reliance on Mr Gower's opinion. This was for three reasons. First, it was said that he was not a US qualified lawyer and so could not properly advise on the many elements of the provision that called for expertise on US litigation. Secondly, he was not independent because he was engaged as a consultant by the company and thirdly, the Claimants point to incidents recorded in the contemporaneous documents that show Mr Gower to be prone to put an optimistic slant on things, making him unreliable. I consider these criticisms were misplaced. By the time Mr Martinet and Sequana became interested in the Lower Fox River liability Mr Gower had already been working full time on all aspects of the issue on behalf of API and AWA for several years. It is apparent from the number of memos and emails Mr Gower sent over the relevant period that he had a comprehensive and detailed knowledge of the litigation and the legal issues despite his lack of any formal qualification as a US litigator. There was no reason for Mr Martinet to jettison the 'sunk cost' of Mr Gower's knowledge and expertise and bring on board a US lawyer who would have to start familiarising him or herself with the complex history of the matter. It is true that Mr Gower was engaged by AWA and so was not independent of the company in a formal sense. But he was a professional person and I am not prepared to assume that he would give false advice or put his own interests over those of AWA for some personal advancement.

399. Finally, Mr Martinet accepted that Mr Gower was not perfect. There are various points in the email chains where Mr Martinet is rather critical of Mr Gower. I find that Mr Martinet did what any astute and careful businessman would do when presented with an adviser who is not of his own choosing but who is already deeply involved with the issue to which Mr Martinet was coming afresh. He made an assessment of Mr Gower's strengths and weaknesses and where he identified weaknesses he supplemented Mr Gower, as it were, with people he trusted. That was why he engaged Mr Bartolotta to

oversee and challenge Mr Gower's work and that was why he spoke directly to Mr Bates to get his input first hand rather than always relying on Mr Gower's reports of Mr Bates' advice. His conclusion about Mr Gower was as follows:

> "I always said that I believed that Mr Gower was extremely knowledgeable of all the issues in Fox River. He had spent seven years or eight years, whatever, working only on that. And although I understand that he was not a CERCLA expert, but he was -- he had a legal mind. He was an intelligent person. He was hard-working. And I -- and it was my view was that he knew much more than me and that his advice was reliable. I also knew that Mr Bates was very much in the background and so -- and Mr Bates being a CERCLA expert. And yes, I mean, I thought that Mr Gower was as good as any, and more probably better than any to provide us with solid advice. That is what I thought."

400. I therefore reject the criticism of the $35 million figure in so far as the complaint is that it was based on the advice of Mr Gower. I conclude that there is no reason to doubt that the NRD figure of $35 million was the best estimate of all those involved in calculating the provision on the basis that this was the likely settlement figure that would ultimately be negotiated with the Government to settle NCR/API's liability.

**(e) The challenge to the provision in the 2008 Final Accounts (used for the May Dividend)**

401. There are two challenges to the 2008 Final Accounts by reference to which the May Dividend was justified. In these accounts the provision was eliminated because it had been concluded that the best estimate of AWA's liability would not exceed the funds left in the Maris Policy. The spreadsheet from which this estimate of liability was drawn showed that:

(a) total remediation costs would be $640.3 million;

(b) NCR/API's share of those costs would be 38%;

(c) NCR/API would settle the NRD claim with the Government for $21 million payable over five years and AWA would be liable for 60% of that; and

(d) AWA's total liability would be $146,688,383.

*(i) The reduction of NCR/API's share from 60% to 38%*

402. The reduction of the NCR/API share from 60% to 38% was one of the most contentious issues in these proceedings. I have described earlier the events which occurred between December 2008 and May 2009 in the Lower Fox River and how the provision calculation evolved over that time. I now turn to consider whether those events justified a reduction in the NCR/API share from the 60% used in the November and December 2008 Interim Accounts to the 38% share used in the 2008 Final Accounts.

403.  Although the Claimants did not, in the end, challenge the 60% NCR/API share used for the provision on which the December Dividend relied, Mr Martinet was cross-examined as to whether it was appropriate by May 2009 to rely on the three very old reports that Mr Gower referred to as the basis for the 40% direct discharges which were the starting point for the 60% NCR/API share computation. It was put to him that they were unsuitable bases for PCC's computations because of the purpose for which they had been drawn up and because they were caveated by the authors in various ways. Mr Martinet's response in relation to the FRG cost sharing report could equally apply to the Tech Memo and the Amendola report, namely that 'it had the virtue of existing'.  He thought that it represented work that had been done seriously by the various parties involved.  I agree with Mr Martinet's approach here. There are of course many uncertainties, but his obligation as a director to come up with a figure for the provision did not permit him to throw up his hands in despair. He and those advising him had to rely on the work done by their advisers and on reports that had 'the virtue of existing' and that is what he did.

404. As to the move from 60% to 38%, the spreadsheet from PCC which set out the calculation on which the elimination of the provision in the 2008 Final Accounts was based contained various Notes on the different moving parts.  The note explaining the NCR/API share said as follows:

> "NCR/API's share of full river costs was lowered from 60% last year to 38% this year in light of the following developments which have occurred since 1 Jan 2008: (i) the list of defendants named in the *Whiting* litigation (filed by NCR and API in January 2008) now stands at 23, which number includes the 6 other PRPs together with a number of other companies which are not expected to be de minimis parties; (ii) in seeking to reach a settlement with 11 of the defendants in the *Whiting* case, the US Department of Justice has indicated that it does not consider the Cities of Appleton and Neenah-Menasha to be de minimis parties suggesting that NCR and API may expect the City of Appleton to pay a material proportion of those companies' liability; (iii) NCR has informed API that, as a result of its lobbying, it expects the state of Wisconsin to receive at least $50 million in funding from the federal government to settle the cities and municipalities liability; and (iv) as a result of testing conducted by API late in 2008, it appears that a material amount of the PCBs in the river have resulted from the discharge of Aroclors other than 1242, suggesting that the universe of parties liable to pay for the remediation will further increase; and (v) the Supreme Court's ruling in Burlington Northern which the company's legal adviser has stated (i) removed the likelihood that NCR and API would bear any arranger liability and (ii) suggests that liability for the cleanup will be apportioned resulting in no joint or several liability falling on any of the PRPs.  For these reasons, API believes that a more realistic estimate of the combined NCR/API share of the remediation costs is now 38% of the total costs, which number is supported by the government's

> own apportionment analyses although that number is the upper
> end of the range and, therefore, remains prudent."

405. Mr Martinet confirmed in evidence that these were the factors that he took into account when concluding that the new spreadsheet gave the best estimate. I will consider each in turn and the reasons why the Claimants say it was wrong for the directors to rely on these points to reduce the NCR/API share.

406. **The increase in defendants in the *Whiting* litigation**   The Claimants did not accept that the mere increase in the number of defendants to the *Whiting* litigation was any reason to conclude that NCR/API's share of the clean up costs would ultimately be lower than 60%. They also make the point that the number of defendants increased before the December 2008 meetings and yet the 60% figure was still used in the November and December 2008 Interim Accounts. This second point is not a valid one because it was clear from the evidence that the 60% figure was retained from earlier years as a prudent step because the work on the figures was still on-going. It was not based on a conclusion that nothing material had happened to change the share but rather that it was too soon to work out what any such changes might mean.

407. I consider that it was reasonable to assume that if there were 23 defendants in the *Whiting* litigation this was likely to lead to a larger pool of people being held liable to pay something towards the costs of clean up. This would in turn reduce the amount that NCR/API would have to pay. Mr Martinet's evidence was that his recollection of this development was that although some *Whiting* defendants were being considered de minimis, there were still something like 18 or 19 defendants that were still very seriously being considered as potential PRPs. It was not simply a matter of the number of defendants increasing. More significant to my mind is the fact that the 60% share previously used was based on the direct discharge share of 40% in the Tech Memo and the Amendola Report: see the explanation of the 60% in paragraph 126, above. Those reports had shared the direct discharges out as between only a handful of PRPs. If many more companies were being brought into the dispute than had been considered in those two early reports then it is certainly likely that when the pie is shared out among this larger group, a smaller piece will land on NCR/API's plate.

408. **The likely contribution from the Appleton and Menasha municipalities**   Mr Martinet's evidence was that more significant in his mind than the settlement with the de minimis parties was that the City of Appleton and the Menasha Sewerage Commission had been put in funds to pay $50 million towards the clean up. This was, in my judgment, an important factor. It is not surprising that once it becomes known that $50 million has been allocated to the municipalities to enable them to pay their share of the costs, people thereafter assume that $50 million will indeed be required from those parties. That is consistent with the CERCLA experts' evidence that parties with funds available are often targeted by the Government. I accept that this development overrode the apparently negative development of the settlement by the Government with 11 de minimis defendants. The 60% share that had been used up to and including the spreadsheets relied on for the December Dividend had not allocated any share to these 11 defendants because they had not been included in the Tech Memo and the Amendola Report. So their exclusion as de minimis participants now could not have signalled the need for an increase in share.

409. **The identification of the non-NCR paper Aroclors in the Lower Fox River**   I referred earlier to the ATS Report which identified the presence of other Aroclors in the Lower Fox River sediment, indicating that sources other than NCR paper were responsible for the pollution: see paragraph 242, above.  The Claimants, supported by Mr Kirsch, dismissed the ATS Report as irrelevant because it was commissioned by AWA for the purpose of persuading the Government not to settle with the smaller PRPs for de minimis amounts.  I reject that approach.  The presence or absence of Aroclors in the sediment is an empirical fact and there would be little point in faking or exaggerating test results, even supposing that a consultant would be willing to do so.  The work was commissioned to see if anything useful could be found to support NCR/API's case.  Presumably if it had confirmed the assumptions underlying the Tech Memo and the Amendola Report that all the PCBs came from NCR paper, the Report would have been shelved.

410. As it turned out, ATS's research did find something useful.  Its significance was increased when viewed together with the *Burlington Northern* ruling since the ATS finding pointed to the possibility of the harm to the River being divisible as between one industrial sector and another.  Mr Bates was certainly alive to the significance of these two developments taken together. In the email that I quote from in paragraph 269, above, Mr Bates said that the consequence of *Burlington Northern* was no liability for non-1242 PCBs.  The conclusion that the ATS Report would, when explored further, lead to additional PRPs outside the carbonless paper industry being required to make a contribution either by the EPA or by the *Whiting* claimants seems to me entirely logical and to justify a reduction in the assumed NCR/API contribution.

411. *Burlington Northern*  I have described the ruling of the Supreme Court on 4 May 2009 and the very positive reaction of AWA's advisers, including Mr Bates and Mr Gower.  It was primarily this which in Mr Martinet's mind justified the reduction from the 47.5% share that had been used in the Sequana group accounts in early 2009 to the 38% share in the AWA 2008 Final Accounts.  He accepted that his thoughts about the best estimate were all based on the assumption that *Burlington Northern* applied – he had been very strongly advised that *Burlington Northern* would be applied and that it represented 'a major change in the CERCLA world' as regards arranger liability and apportionment.  He did not take into account the percentage share if *Burlington Northern* did not apply.

412. The Claimants suggested that it was inappropriate to make such a significant deduction from the NCR/API so soon after the Supreme Court ruling was delivered.  I do not accept that criticism.  All those involved in these matters were well aware of the *Burlington Northern* case and of the decisions in the lower courts.  They had followed the progress of the case once the Supreme Court accepted the appeal in July 2008 and Mr Bates attended the oral hearing before the Court on 24 February 2009 and so knew the issues that were being argued.  He had had plenty of time to think about the implications for the Fox River case pending the handing down of the judgment and had discussed its implications with Mr Gower in February.  It appears that during the hearing the Supreme Court Justices gave some indication of the way their thoughts were tending as Mr Bates correctly predicted the outcome in an email at that time.

413. I have described the email that Mr Bates wrote which Mr Gower forwarded to Mr Martinet and Mr Courteault amongst others on 5 May 2009.  It was put to Mr Martinet that all that Mr Bates was doing here was putting forward the arguments that could be made about the effect of the *Burlington Northern*, not that he was saying that this was his

conclusion of its effect. Mr Martinet said that was not how he read it – he took it 'as something absolutely as a sea change'. I do not accept that this document was as limited as the Claimants suggest. It was described by Mr Gower as Mr Bates' analysis of the decision. Clearly what Mr Martinet and his colleagues wanted was exactly that; Mr Bates' thoughts on what the impact of the decision was on their position, not simply what arguments could be put forward. I do not read the comment about 'back and forth on the counter-arguments' as indicating anything more than that the passages quoted in the email from the judgment were limited to the Supreme Court's conclusions and did not set out what counsel in the case had argued.

414. The Claimants also criticise Mr Martinet for not obtaining formal advice from the lawyer acting for API in the *Whiting* litigation, Mr Hermes, as to the real impact. But Mr Martinet knew that all the advisers were in touch with each other and there was no reason to think that Mr Bates' and Mr Gower's view was strikingly different from Mr Hermes' view.

415. I also recognise, as was discussed in some of the email traffic, that there were difficulties in ensuring that the benefit of the ruling in *Burlington Northern* translated into a lowering of liability for NCR/API. Apportionment or divisibility of harm was not an issue in the *Whiting* litigation because that claim was concerned only with the allocation of shares of the loss for which PRPs were jointly and severally liable. As Mr Kirsch explained, the only way to push the issue of divisibility was for NCR/API to stop complying with the Government's UAO order to force the Government to bring enforcement proceedings. In defending those proceedings, NCR/API could rely on the *Burlington Northern* ruling to argue that they should not be required to pay so much towards the clean up costs. The experts differed as to how risky a strategy that might be. Mr Kirsch said that if the court ultimately rejected NCR/API's reliance on *Burlington Northern* on the basis that it was not for some reason applicable to the Lower Fox River site, then NCR/API might be held liable to pay triple damages and daily penalties for failing to comply with the UAO. NCR/API might also be branded as uncooperative for the purposes of assessing the Gore factors in the *Whiting* litigation. Mr Tenpas acknowledged that risk but thought that it was unlikely that a court would treat NCR/API has having had no sufficient cause to disobey the UAO order even if the court decided that *Burlington Northern* did not justify a removal of arranger liability or a division of the harm.

416. Despite these difficulties, in my judgment the prize for NCR/API of persuading a court that NCR/API should not carry arranger liability for the recycling mills' discharges and/or that it should not be jointly and severally liable for a substantial part of the River's contamination was a very valuable one. I consider it was reasonable of Mr Martinet and Mr Courteault to assume, given the very positive response to the ruling that they received from their advisers, that the ingenuity of US litigation attorneys acting for the PRPs would find a way of bringing the matter to court. Similarly, although the factual scenario of the pollution from spilled and leaking chemicals in an asphalt covered goods yard in the *Burlington Northern* case was very different from the Lower Fox River, the significance of the ruling was to signal to courts that they were entitled to take a broad brush approach to divisibility. On arranger liability, I can see strong similarities in Shell's position selling useful chemicals to B&B knowing that some of them will be spilled with NCR/API's position selling useful brokes and trimmings to recycling mills knowing that they would wash the emulsion out of the pulp before reusing it. I do not see that it was

overly optimistic to assume that arranger liability was no longer on the table. Mr Kirsch also challenged reliance on *Burlington Northern* to remove arranger liability on the basis that although the Supreme Court ruling signalled a substantial change in approach in relation to arranger liability for some states in the US, the courts in Wisconsin had been applying the 'useful product' concept already. But the important point is that the 60% NCR/API used earlier did, despite that, include a proportion for arranger liability in relation to the whole of the River and it was this proportion that was now being removed.

417. Taking all these factors into account, I find that it was reasonable for Mr Martinet and Mr Courteault to base their best estimate of the NCR/API share on the assumption that NCR/API would no longer be liable as an arranger of other PRPs' discharges and that a way would be found to cut down the scale of the pollution for which it was jointly and severally liable.

418. The Claimants pointed to various factors which they say should have caused the directors to regard an increase in the NCR/API share rather than a decrease as being likely. I consider here the factors that appear to me to be the most significant ones.

419. **Financial difficulties of the PRPs** WTM I filed for bankruptcy on 29 December 2008. There was a difference of opinion between Mr Kirsch and Mr Tenpas about whether this meant that any claim against it by the Government or by PRPs was discharged (that is, whether or not it could be maintained against WTM I if and when the company emerged from the insolvency proceedings). Other evidence of different PRPs, including Georgia Pacific, either being in financial difficulty or stating in their financial accounts that they would not be prepared to contribute more than a given figure to the Lower Fox River costs were put to the Defendants' witnesses. The Claimants contended that these indicated great uncertainty about the assumption that there would be other PRPs still available at the end of the day to pay the balance of the costs beyond the NCR/API share. Mr Martinet denied that he thought it possible that Georgia Pacific would have foundered by the end of the process. He could not remember whether any of the other financial difficulties were factored into the final number given for NCR/API's share. He also made the point first that some of the PRPs might well, like API, have insurance policies or indemnities from other substantial companies which could still be required to pay out in these circumstances and secondly, that the 60% NCR/API share used in the earlier provision had included a margin of error designed to take account of other PRPs dropping out of the picture.

420. I agree that it was important to bear in mind that a best estimate that NCR/API will pay only 38% of the costs assumes to a certain extent that other PRPs will be able to meet the remaining 62%. If some of them have become insolvent then other PRPs may have to pick up their share. But it is also important to bear in mind that much of the drop from 60% to 38% was based on the *Burlington Northern* decision. That, it was thought, removed arranger liability and allowed AWA to limit its liability to those divisible parts of the River's contamination for which it was jointly and severally responsible. If this is right then the demise of other PRPs does not necessarily mean that part of its share will then fall to NCR/API. If the failed PRP is responsible for direct discharges for which NCR/API is neither an arranger nor jointly and severally liable directly, then my understanding is that NCR/API's liability would not necessarily increase. Although I accept therefore that the actual or possible bankruptcy of some of the PRPs was a factor that needed to be borne in mind, it is far from clear to me that at this stage it pointed clearly to a likely increase in NCR/API share.

421. **NCR/API's knowledge of PCB toxicity**  I referred earlier to statements from other PRPs in January 2009 that they had uncovered evidence to show that NCR's state of knowledge in the 1960s of the toxicity of PCBs was greater than had previously been thought: see paragraphs 245 onwards, above.  I do not accept the Claimants' submission that this was a significant factor pointing towards a higher share for NCR/API than had previously been thought appropriate.  There is evidence that Mr Bates reviewed these documents but no one appears to have regarded them as sounding any alarm bells, given the extent to which the knowledge issue had already been investigated in earlier litigation and negotiations.

*(ii) Mr Martinet's evidence about the May Dividend*

422. I have discussed the reasons that were put forward in the Notes to the PCC spreadsheet for reducing the NCR/API share to 38%.  Mr Martinet also gave evidence about how he approached the question of whether to pay the May Dividend. Mr Martinet accepted that by the time the 18 May 2009 meeting took place, the decision to pay the dividend had in effect been taken because they had come to the conclusion a few days earlier that the inter-company receivable could be eliminated, releasing the money previously used in the provision into distributable reserves.  It was put to Mr Martinet that the only question he and Mr Courteault had considered at the first 18 May 2009 meeting was whether the company had sufficient distributable reserves on its balance sheet to cover the proposed May Dividend.  He did not accept that that was the only point:

> " That was to me the most important point, of course.  But there was also the matter of the solvency which we had -- which we had to consider and which we had considered carefully.  Again, prior to that day.  So we knew it was an important decision.
>
> …
>
> Q.  And the solvency point that you mention, was what?  What was the question that you say had already been considered?
>
> A.  Well, the solvency point dates back to the long work we had had on this issue in the preceding month, and of course we needed to be comfortable that this would not put the company in jeopardy, looking forward.  We were leaving some resources in the company.  We thought those resources were enough to cover its liabilities in the long run, and that is what we were considering.
>
> Q.  Can you just identify what resources you are referring to?
>
> A.  Two resources, one which was the Maris, which was at that point in time, $151 million, if my recollection is correct.  And the second was of a more contingent nature, but on which we were very confident, which was the possibilities of very, very significant settlements or indemnities from the insurance carriers."

423. Mr Martinet thought the estimate of $146,688,383 for AWA's liability for the Lower Fox River 'was the result of a lot of hard work, a lot of process, looking at those numbers, looking at the cost, the remediation costs that were provided by a number of experts'. He also realised that the figures used would be reviewed by the company's auditors and that there were a number of people working on the numbers, checking their consistency with previous figures used. I accept that he honestly thought it was indeed the best estimate.

424. The 38% figure was criticised by the Claimants on the basis that it removed not only arranger liability from the previous 60% estimate but also any margin for error that had been built into the 60% figure. Mr Martinet's evidence was that he believed that the 38% NCR/API share did contain 'an element of prudence'. Mr Martinet knew that Mr Gower had said in an email to PwC that the right number was in the range from as low as a single digit share to 38% or 40% (see paragraph 283, above). He explained the calculation that he made in his own mind at the time. He understood that the 60% figure that had been used for a long time, including in the November and December 2008 Interim Accounts, had been based on an assumption of direct discharges of 40%, that is to say, two thirds of the 60% were for direct discharges, one sixth for arranger liability and one sixth for margin of error. But even before *Burlington Northern*, the NCR/API share had been brought down to 47.5% in the models used for, amongst other things, the provision in the Sequana consolidated accounts for the year ending 31 December 2008. That pre-*Burlington Northern* figure of 47.5% therefore included arranger liability so the reduction from 60% must be the result of factors that decreased the direct liability to below the 40% that had been posited in the Tech Memo and Amendola reports. He thought that applying the same $^{2}/_{3}$ $^{1}/_{6}$ $^{1}/_{6}$ approach, the figure of 47.5% must have been based on direct discharges of about 31.5%, plus arranger liability of 8% and a margin of error of 8%. Therefore the figure of 38% ultimately used, having stripped out arranger liability, had a built in margin of about 6.5% if liability for direct discharges was in fact only 31.5%. His view was therefore that the 38% they used resulted in a conservative or prudent figure because it effectively only stripped out arranger liability.

425. By this time Mr Martinet was aware of course that there had been the favourable reconsideration by Judge Zuidmulder of his ruling in the Green Bay Litigation, the confirmation of the 'all sums' approach in the *Plastics Engineering* decision and the Final Aon Report. Mr Martinet was justified in feeling more confident in assuming that there would be recovery of insurance proceeds under the Historic Insurance Policies. He considered that the likely recovery figure was about $100 million. There was therefore still a substantial buffer taking into account the Maris Policy funds and the Historic Insurance Policies in case the best estimate turned out to be wrong.

426. The Claimants cross-examined Mr Martinet on the basis that the changes made to the figures after the December Dividend were all part of a plan between him and Mr Gower to push the figures down by whatever means possible to remove the provision. On the seventh day of his cross-examination, when it was suggested to him that he had no basis for accepting one particular figure amongst many Mr Martinet said this:

> "At the end of the day we were proposed a number of numbers which we thought were solid or robust and that is what was used. And that is what I remember. I never --You see, my Lady, for the past few days I have been -- the alternative is either an I am an idiot and unprofessional, or I am a manipulator, with tortuous  ideas. Well, you know, maybe I'm an idiot, but I'm

> not a manipulator, I'm not trying to doctor anything there. On the contrary, it is ironic, because all of my life I have been considered as a straight arrow, so I understand what you are saying, Mr Smouha, but again, I was trying to do a professional job, trying to determine whether we should change the numbers or not, and the conclusion was that the numbers we had used, there was no compelling reason to change them. Rightly or wrongly, I don't know."

427.   I accept that evidence and having seen Mr Martinet in the witness box I reject the suggestion that he approached the issue in a biased or improper manner.  Of course it was clear to everyone that Sequana would prefer not to have to include a provision in AWA's accounts on the grounds that its liability would not exceed the funds in the Maris Policy. But there is a big jump from that position to a position in which two directors and their adviser set about to manipulate the figures to arrive at that goal, knowing that there is no real basis for changing the numbers.  I am sure that Mr Martinet did not make that jump and that nothing he said to Mr Gower suggested to Mr Gower that he was being asked or was expected to make that jump either.  I have not had the advantage of seeing Mr Gower in the witness box.  But whatever his inclinations may have been, he knew very well that Mr Bartolotta and other professional people such as PwC and the US lawyers would be scrutinising the figures, asking difficult questions and making sure that there was an adequate explanation for any change made.

428.   As Mr Gower has not given evidence we do not know how he and those he consulted arrived at the conclusion that all the factors listed in the Note to the spreadsheet should lead to a reduction of 22% rather than, say, of 15% or 30%.  But the need to make a provision requires a hard number to be given to soft factors. I have not seen anything in all the evidence before me which suggests either that that reduction was unreasonable or that any of the many other people involved in this exercise expressed a view that the figure should be something different.  Mr Martinet did accept that he knew that there had been substantial extra work done on sediment sampling since the reports referred to by Mr Gower in that email. But it was not suggested to him by any of the people working on the issue and advising him that this work justified a movement away from the 40% direct discharge figure that had been the basis for the provision as from 2005.

429.   I find therefore that there was plenty of evidence which justified Mr Martinet's and Mr Courteault's conclusion that 38% was the best estimate as at 18 May 2009 of NCR/API's likely ultimate share of the costs of the Fox River remediation. There was therefore nothing wrong with the 2008 Final Accounts on that score.

*(iii) The NRD value of $18.8 million for NCR/API*

430.   I have already explained why I consider that it was reasonable for the NRD figure included in the calculation of the provision to be based on a likely settlement figure rather than to assume that the Government would pursue and ultimately win a claim for a much higher figure. I have also set out how Mr Gower explained to PwC on 12 May 2009 the calculation of the $18.8 million used for the purposes of the 2008 Final Accounts: see paragraph 288, above.  He seems to have gone back to the Stone Total NRD Offer of $76 million, taken into account the amounts already paid and applied the 38% NCR/API share to the total.  I accept that there is no automatic read across from the appropriate share of remediation costs to the share of NRDs because it was expected that Georgia Pacific

would contribute to remediation costs but it was immune from any further contribution for NRDs because of its settlement with the Government. However Mr Tenpas' evidence (and it appears Mr Bates' advice at the time) was that NRDs would be apportioned on the basis of direct discharges. This is the 15% to 20% figure that the court referred to in the ruling approving the settlement of the Georgia Pacific NRD liability. On that basis $18.8 million as the best estimate for NCR/API's share of NRDs has plenty of support in the evidence.

431. I therefore find also that the $18.8 million figure used for the NCR/API share of NRDs (leading to an $11.3 million share for AWA alone) was reasonable as a best estimate for NRD liability.

**(f) The disclosures made in AWA's accounts regarding contingent liabilities**

432. The third challenge to the accounts (the first being to the capital reduction and the second being to the value of the provision) is to the lack of disclosure in the accounts about contingent liabilities.

433. The obligations about disclosure are also found in Accounting Standard FRS 12. Paragraph 90 provides that:

> "90. An entity should disclose the following for each class of provision:
>
> (a) a brief description of the nature of the obligation, and the expected timing of any resulting transfers of economic benefits;
>
> (b) an indication of the uncertainties about the amount or timing of those transfers of economic benefits. Where necessary to provide adequate information, an entity should disclose the major assumptions made concerning future events, as addressed in paragraph 51; and
>
> (c) the amount of any expected reimbursement, stating the amount of any asset that has been recognised for that expected reimbursement."

434. Where the liability is a contingent liability either because it is only a possible and not a present obligation or because, although it is a present obligation, it is not probable that it will give rise to a transfer of economic benefit or it is not possible to arrive at a reliable estimate of the amount needed to settle it, then no provision should be made. There must however be disclosure of the contingent liability:  (emphasis added)

> "91. **Unless the possibility of any transfer in settlement is remote**, an entity should disclose for each class of contingent liability at the balance sheet date a brief description of the nature of the contingent liability and, where practicable:
>
> (a) an estimate of its financial effect, …;
>
> (b) an indication of the uncertainties relating to the amount or timing of any outflow; and

(c) the possibility of any reimbursement."

435. There is an exception to the need to make disclosure of a contingent liability that may be relevant here:

> "97. In extremely rare cases, disclosure of some or all of the information required by paragraphs 89-94 can be expected to prejudice seriously the position of the entity in a dispute with other parties on the subject matter of the provision, contingent liability or contingent asset. In such cases an entity need not disclose the information, unless its disclosure is required by law; but should disclose the general nature of the dispute, together with the fact that, and reason why, the information has not been disclosed."

*(i) Disclosure actually made in the accounts*

436. In the December 2008 Interim Accounts there was no disclosure of the nature of the Lower Fox River liability or any reference to the element of the liability that was contingent and not included in the provision because it was expected that the other jointly and severally liable PRPs would meet it.

437. In the 2008 Final Accounts there was of course no provision made for the Fox River liability.  In note 15 in the accounts, headed 'Contingent liabilities' there was a brief description of the source of AWA's indemnity liability, the two RODs issued by the EPA, the UAO issued in November 2007, the Maris Policy and the Historic Insurance Policies, and the Green Bay litigation. It recorded the conclusion of the Final AON Report that the probability of obtaining significant recoveries from the insurers was very high. Note 15 then continued:

> "15.3: the LFR reserve:
>
> For the purposes of creating its reserve, the Company using third party experts (notably PCC) has taken a reasonable, prudent view as to API's likely share of the cost of remediating the remainder of the river as proposed in the ROD2 amendment and as further modified by information received from the contractors during the bid process and subsequent review.
>
> A significant unknown remains the precise percentage of the total costs of the remediation and natural resource damages which will be borne by NCR Corporation and API, which two companies the Agencies treat as a single share. The final cost to the Company is unlikely to be determined until all allocation issues are finally determined by a court or through some form of dispute resolution.
>
> Nevertheless, as between NCR and API, costs are shared pursuant to a 1998 settlement between these two companies and a November 2005 arbitration which found API liable for 60% of all costs in excess of $75 million. For the purposes of

creating its reserve, the Company has taken a prudent view as to API's likely overall percentage allocation, without taking into account the existence of highly likely contingent asset (see 15.2 above [*sc. the Historic Insurance Policies*]).

On 4 May 2009, the US Supreme Court delivered its decision in the Burlington Northern case. In that case the court considered three issues relevant to the Fox River matter (i) arranger liability (ii) joint and several liability, and (iii) apportionment. The impact of the decision in that case on the Company's liability for the Fox River may mean that API and NCR have no arranger liability; that their liability may be apportioned and, if so, no joint and several liability exists. For these reasons management has re-assessed the Company's exposure and determined that a reduction in the share for which API may be found liable is more likely than not.

15.4: other contingent liabilities:

There are no other contingent liabilities arising in the ordinary course of business in respect of litigation and guarantees, which the directors believe will have a significant effect on the financial position of the Company and its subsidiary undertakings."

438.   The May 2009 Interim Accounts were drawn up for the period 1 January 2009 to 15 May 2009 and also did not include any provision for the Fox River liability. They contained a shortened version of the background paragraphs of the 2008 Final Accounts including the reference to *Burlington Northern* and continued:

"In light of the Burlington Northern decision and based on the Company's own scientific and technical investigation regarding the processes utilised at the facility now owned by API, the directors have determined that the Company has sufficient financial assets to meet its indemnity obligations to API on the basis that those obligations are limited. It is the view of the directors that it is reasonably likely that the Company, on behalf of API, has already paid more than the amount that API will ultimately be held legally obligated to pay. Accordingly, whilst the Company intends to continue to fund the ongoing cleanup work for the time being, resolution of API's share will be sought through appropriate avenues including the courts."

439.   There were no disclosures about Future Sites in general or the Kalamazoo River in particular in any of the accounts.

*(ii) The relevance of defective disclosure in the accounts*

440.   The accounting experts agreed that the notes complied with some aspects of FRS 12 but they disagreed on a number of issues, including about whether it is possible that AWA relied on the exception in paragraph 97 of FRS 12 despite the absence of any reference to

this in the contemporaneous documents. In my judgment, however, any defects in the disclosure made in the accounts are not relevant to the question whether the accounts gave a true and fair view or enabled a reasonable judgment to be made for the purposes of Part 23 of the CA 2006. The wording of section 836 focuses on the numbers used in the accounts as opposed to the other narrative parts. Thus, section 836(1) provides that the lawfulness of a distribution is determined 'by reference to the <u>following items</u> as stated in the relevant accounts'. For our purposes, these items are those in section 836(1)(a), that is profits, losses, assets, liabilities, those in paragraph 88 of Schedule 4 to the Companies Act 1985 (namely provisions relating to depreciation or diminution in the value of assets) and those in paragraph 89 of Schedule 4 (namely references to any amount retained as reasonably necessary for the purposes of providing for any liability the nature of which requires provision for accounting purposes). This focus on amounts rather than narrative is apparent too from section 837(2) which qualifies the requirement that the accounts must be properly prepared by stipulating that this is 'subject only to matters that are not material for determining (by reference to the items mentioned in section 836(1)) whether the distribution would contravene this Part'. This requirement that any defects in the accounts must relate to material items is further reinforced by section 837(4) which envisages that even a report qualified by an auditor can support a lawful distribution if the auditor states in writing that the matters in respect of which his report is qualified are not material for determining whether a distribution would contravene Part 23.

441. I also agree with the Defendants' submission that the fact that directors can rely on interim accounts to determine whether a distribution is lawful or not is an indication that disclosure notes are not relevant to this exercise. In my judgment there are no accounting standards, practices or guidelines that impose disclosure obligations on those drawing up interim accounts. The absence of disclosure in the December 2008 Interim Accounts which supported the December Dividend did not result in those accounts being defective in any way and so cannot have prevented those accounts from enabling a reasonable judgment to be made of the company's affairs for the purpose of Part 23.

442. Further, I conclude that even if there were defects in the 2008 Final Accounts which supported the May Dividend they are not defects which result in the distribution contravening Part 23. However in case I am wrong on the legal point I have decided, I have already set out above the disclosure that was made. I now set out my conclusions on the main factual dispute arising from this issue, by way of a short diversion to the banks of the Kalamazoo River.

*(iii) Disclosure: the Kalamazoo River*

443. The Kalamazoo River is a CERCLA site that stretches for approximately 80 miles in the state of Michigan. From the 1950s to 1970s, it was contaminated with PCBs due to the activities of paper mills and other industrial operations. Although there were no mills actually making carbonless paper on the Kalamazoo, the paper mills there bought broke and trimmings and washed the emulsion into the Kalamazoo when they were recycling and de-inking it to recover the pulp fibres. After investigations by federal and state agencies, the Kalamazoo River was designated as a Superfund site in 1990 (that is before the Lower Fox River). The PRPs designated included Georgia Pacific but not NCR or API. By 1995 there were already contribution proceedings on foot among the PRPs and the first ROD was issued in 1998, four years before the first ROD for the Lower Fox River.

444. In 2000 a Michigan District Court linked PCB contamination in the Kalamazoo River to PCBs from NCR carbonless copy paper in its decision in *Kalamazoo River Study Group v Rockwell International*. But it was not clear how the PCBs would have got there. Mr Kirsch points out that the Revised Amendola Report in April 2001 stated Mr Amendola's belief that roughly 30% of the broke sold from the NCR mills was probably recycled in the Kalamazoo River watershed. This is in part what caused him to lower his estimate of the direct discharges from those mills into the Fox River.

445. In 2003 NCR/API received a section 104(e) request for information from the EPA concerning the Kalamazoo River. The request did not indicate that NCR or API were being considered as PRPs but asked for information about historic sales of broke and production of NCR paper. NCR and API's response stated that they had not identified any documents showing sales of NCR paper broke from their predecessor facilities to mills in the Kalamazoo River area. NCR and API also stated that there were no such sales, since its records indicated that all broke was sold to and used by mills on the Lower Fox River.

446. Nothing further was heard about the Kalamazoo River by NCR or API until after the events with which these claims are concerned. Thus, by the time of the dividends in December 2008 and May 2009, the US government had not issued letters to NCR/API asserting that they were liable for contamination at the Kalamazoo River. The Kalamazoo River parties had not sued NCR/API for contribution, nor otherwise threatened or given informal notice of such litigation. Moreover, Georgia Pacific had pursued contribution litigation against other parties without naming NCR or API in its suits.

447. Mr. Kirsch's view is that AWA should have been on notice that NCR/API's potential liability was not remote because (i) NCR Paper appeared to be the primary source of PCBs in the Kalamazoo River; (ii) NCR/API had received section 104(e) requests from the EPA concerning the Kalamazoo River; and (iii) after receiving its section 104(e) request, API notified AWA of its indemnity obligation with respect to any claim at the Kalamazoo River. However, he accepted that there was no good reason why if the PRPs arranging the clean up of the Kalamazoo River had thought that they had a credible arranger liability claim against NCR, they did not bring proceedings before May 2009.

448. Mr. Tenpas' view is that NCR/API should not have anticipated any liability for the Kalamazoo River. In the absence of NCR/API paper-coating operations near the site, there was no reason to expect that NCR/API would have had liability as direct dischargers. Further, there was no reason to believe NCR/API would be held liable as arrangers of hazardous substances because there was no evidence that NCR or API sold broke to the recyclers on the Kalamazoo River. Even if they had, broke was likely to be regarded as a "useful product" whose subsequent disposal would not give rise to arranger liability. He did not regard the receipt of the section 104(e) letter as significant given that subsequently other parties were named and pursued by the Government as PRPs but not NCR or API.

449. Mr Martinet's evidence was emphatic that he had never been told that there was a possibility of AWA having a liability for the Kalamazoo River. He remembered the name being mentioned but he said 'it was never, never presented to me as even a remote prospect'. He did recall looking at the question of liability for Future Sites more generally but Mr Gower told him that 'it was a non-issue' and that in all the seven years he (Mr Gower) had been working on Fox River issues, he had never been confronted with a Future Sites issue. Mr Martinet also said that he did not realise that API did not have

records of the plants to which they had sold broke or of the fact that broke from the Fox River paper coating plants might have been sent to the Kalamazoo River. Nor was he aware of the fact that API and NCR had been sent information requests by the Government in respect of the Kalamazoo River in 2003. He did recall that there had been attempts to obtain insurance for AWA's liability for Future Sites in general (rather than the Kalamazoo River in particular). A possible carrier was identified but this had not been pursued because Mr Martinet was advised that nothing had happened in relation to Future Sites over the past seven years and it was therefore 'a very remote point'. The cost of the proposed insurance was high and he concluded that it was not worth paying.

450. Mr Courteault, Mr Mountford and Mr Newell all gave evidence that they had never been aware of any potential liability for the Kalamazoo River and this was not challenged when they were cross-examined.

451. The key question is therefore whether the possibility of AWA having to pay out money for the Kalamazoo River clean up was 'remote'. If it was remote then there was no need under paragraph 91 of FRS 12 to disclose it as a contingent liability. If it was not 'remote' then disclosure should have been made in the 2008 Final Accounts.

452. In my judgment there was no reason for the directors to conclude that the possibility of AWA being liable for any part of the costs of cleaning up the Kalamazoo River was more than remote. There is no evidence that it was raised with Mr Martinet at any of the initial briefing meetings to discuss the problems underlying the AWA provision. If the US lawyers thought there was a risk of this liability arising they would have drawn it to Mr Martinet's attention. I accept Mr Martinet's evidence that Mr Gower told him that there was nothing to worry about regarding potential liability for Future Sites. The directors and their advisers were entitled, in my judgment, to infer from the fact that no action was taken for several years against NCR or API after they responded to the section 104(e) letters, even though there was considerable clean up activity and accompanying litigation, that they would not be pursued for these costs.

453. I would therefore find, if it were relevant, that there was no breach of FRS 12 paragraph 91 arising from the absence of any disclosure relating to the Kalamazoo River.

**(g) Conclusion on the "could not" claims**

454. I have therefore concluded that the December and May Dividends did not contravene Part 23 of the CA 2006:

(a) the December 2008 Interim Accounts enabled the directors to make a reasonable judgment about the amounts of the items mentioned in section 836(1) for the purpose of determining the value of the December Dividend; and

(b) the 2008 Final Accounts were properly prepared in accordance with the Companies Act 1985 in so far as material for determining whether the May Dividend would contravene Part 23 because they gave a true and fair view of the state of affairs of AWA.

455. Having reached that conclusion I do not need to resolve the many interesting legal questions which would arise if either or both of the dividends did contravene Part 23. The Claimants sought relief for such contravention via four routes; the statutory remedy

under section 847, a remedy in equity against Sequana for unconscionable receipt, a claim in restitution for unjust enrichment and the avoidance of the release of the inter-company receivable on the grounds of mutual mistake as to the lawfulness of the distribution. In relation to each of these routes, the parties made rival submissions as to the state of knowledge on the part of Sequana that the Claimants had to show, whether the amount recoverable would be the whole dividend or only that part that could not have been lawfully paid and the application of any change of position defence. Although I heard argument on all these points, I have decided not to lengthen this judgment by considering them, particularly since in respect of some of the points, the Defendants reserved the right to argue the point differently if the case went further, so that there may be little to be gained from my analysis of case law which binds me but does not bind a higher court.

## X  THE 'SHOULD NOT' CLAIMS: BREACH OF FIDUCIARY DUTY

456. BTI argue that even if the provision was based on a best estimate of the liability, the AWA directors were still in breach of their fiduciary duties in declaring a dividend of the distributable reserves shown in the accounts. The directors were aware that the estimate was surrounded by great uncertainty and there was a risk that the liability would ultimately be much greater than that estimate. In those circumstances, the Claimants submit, it was a breach of the directors' duty to AWA to pay away the December and May Dividends to Sequana. Even though they *could* declare the dividend in the light of the available distributable reserves they *should not* have done so.

457. The Claimants allege that the directors have acted in breach of a number of the duties that are imposed on them by sections 171 – 174 of the CA 2006. The main provision relied on is section 172 and in particular the proviso in section 172(3). BTI also referred to the duty in section 174 (to exercise reasonable care, skill and diligence), that in section 171 (to exercise powers for the purpose for which they were conferred) and that in section 173 (duty to exercise independent judgment). But it was not suggested that the result of the case could be any different depending on which duty was breached. I will therefore focus on section 172.

458. Section 172 provides:

> "**172 Duty to promote the success of the company**
>
> (1) A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole, and in doing so have regard (amongst other matters) to--
>
>> (a) the likely consequences of any decision in the long term,
>>
>> (b) the interests of the company's employees,
>>
>> (c) the need to foster the company's business relationships with suppliers, customers and others,
>>
>> (d) the impact of the company's operations on the community and the environment,

(e) the desirability of the company maintaining a reputation for high standards of business conduct, and

(f) the need to act fairly as between members of the company.

(2) …

(3) The duty imposed by this section has effect subject to any enactment or rule of law requiring directors, in certain circumstances, to consider or act in the interests of creditors of the company."

459. BTI accept that, given that Sequana is the sole shareholder, a breach of fiduciary duty can only arise – or at least is only incapable of ratification by Sequana – if at the time of declaring the dividends, the directors were bound to consider the interests of the creditors of the company and not, or not only, the interests of Sequana. The principal legal issue for the 'should not' case is therefore whether the duty to act in what the directors believe to be in the best interest of creditors had arisen here at the time of the December Dividend or the May Dividend.  I shall refer to this duty as 'the creditors' interests duty'.

### (a) Some preliminary points

460. There was some common ground between the parties as to the following principles. First, the effect of subsection (3) of section 172 is to retain the common law principles as to when the creditors' interests duty arises; it does not attempt to codify those principles. Secondly, once the creditors' interests duty has arisen, the duty is still the duty owed to the company.  There is no cause of action conferred on the creditors by a breach of the duty.  The claim against the directors under this head is brought by BTI as the assignee of AWA's rights against the directors, not by BAT as creditor.

461. Thirdly, it is accepted by the Claimants that there is a single threshold for when the creditors' interests duty arises for all decisions taken by the directors.  BTI were not submitting that the duty could arise in respect of a decision whether or not to pay a dividend but not in relation to the directors' other decisions about the running of the company.  However, BTI do say that the fact that the decision in dispute here is a decision to pay a dividend, rather than any other kind of decision about the future of the business, is significant because it is a decision that benefits only the interests of the shareholder and not at all the interests of the creditors.

462. Fourthly, it is agreed that the content of the duty - whether it is to give paramount consideration to the interests of creditors or only to take their interests into account in some lesser way - does not vary according to the degree of risk of insolvency that has arisen.

463. Fifthly, if the court decides that the creditors' interests duty did arise but the directors did not in fact take the interests of the creditors into account in their decision making, that is not of itself a breach of fiduciary duty, invalidating everything done automatically: see the judgment of Pennycuick J in *Charterbridge Corporation Ltd v Lloyds Bank Ltd and another* [1970] 1 Ch 62 as applied in *Colin Gwyer & Associates Ltd & Anor v London Wharf (Limehouse) Ltd & Ors* [2002] EWHC 2748 (Ch).

**(b) When does the creditors' interests duty arise?**

464.  The Defendants accepted that the creditors' interests duty can arise in circumstances where the company is not actually insolvent.  Something short of actual insolvency is sufficient.  The question is, how close to insolvency does the company have to be?  The Defendants argue that it has to be very close to insolvency, the Claimants contend that it is enough if there is a real, as opposed to a remote, risk of insolvency.

465.  The list of authorities in which this test has been expressed and applied is a long one, yet the final position seems not to be at all clear.  What does seem to me important is to look at the facts of the cases as well as the formulation of the test in the judgments. Statements of principle may be expressed more broadly than is warranted by the facts of the particular case.  But where a formula extending the creditors' interests duty to a situation short of insolvency is cited by the court in a case where the company was in fact found to be insolvent or to be very close indeed to insolvency, or conversely where the court was satisfied that there was no problem with the company's solvency, it is unlikely that the court had turned its mind to the precise point at which a solvent company crosses some threshold which causes the creditors' interests duty to arise.

466.  The earliest case to which I was referred was *In Re Horsley & Weight Ltd*  [1982] 1 Ch 442. There a liquidator sought to set aside a pension policy acquired by the company for the benefit of a retiring director. The question was whether the decision to acquire the pension had been ratified by the shareholders.  The Court of Appeal upheld the finding that there had been no misfeasance by the directors.  Templeman LJ said that if the company 'had been doubtfully solvent at the date of the grant to the knowledge of the directors' then the directors would have been liable, but, he said the good faith of the directors was not impugned.  Cumming-Bruce LJ referred to a suspicion that at the time of the decision the company was not in a position to pay the money to the respondent. But that evidence 'fell far short of proof that the directors should at the time have appreciated that the payment was likely to cause loss to the creditors'. Buckley LJ also stressed that the good faith of the directors was not questioned and there was no suggestion that they had failed to apply their minds honestly to the question whether the decision was a fair and proper thing for the company to do in the light of the company's financial state as known to them at the time.

467.  *Horsley & Weight* was considered by the Court of Appeal in New Zealand in *Nicholson and others v Permakraft (N.Z.) Ltd. (in liq)* [1985] 1 NZLR 242; (1985) 3 ACLC 453 ('*Permakraft*').   There the court considered a claim by the liquidators of Permakraft against the former directors to recover a dividend paid to themselves as shareholders from distributable profits as part of a plan to restructure the company.  The honesty of the directors was not in issue.  White J found at first instance that the directors were in breach of duty and should refund the whole amount.  The argument was advanced that Permakraft was in a state of near insolvency at the relevant time and that the capital profit should have been retained in the interest of creditors. The appeal was allowed.  Each judge on appeal expressed his conclusions differently.  Cooke LJ said:

> "(iii) The duties of directors are owed to the company. On the facts of particular cases this may require the directors to consider inter alia the interests of creditors. For instance, creditors are entitled to consideration, in my opinion, if the company is insolvent, or near insolvent, or of doubtful

> solvency, or if a contemplated payment or other course of action would jeopardise its solvency.
>
> The criterion should not be simply whether the step will leave a state of ultimate solvency according to the balance sheet, in that total assets will exceed total liabilities. Nor should it be decisive that on the balance sheet the subscribed capital will remain intact, so that a capital dividend can be paid without returning capital to shareholders. Balance sheet solvency and the ability to pay a capital dividend are certainly important factors tending to justify proposed action. But as a matter of business ethics it is appropriate for directors to consider also whether what they do will prejudice their company's practical ability to discharge promptly debts owed to current and likely continuing trade creditors.
>
> …
>
> … If the company's financial position is precarious the fortunes of such suppliers may be so linked with those of the company as to bring them within the reasonable scope of the directors' duties. They may continue to give credit in ignorance of a change damaging to their prospects of payment."

468.  Richardson LJ stated (page 463) that:

> "If a company is solvent in the sense of its assets exceeding its liabilities there can, I think, be no question of a separate duty to creditors: they have their ordinary remedies if their accounts are not paid. If it is insolvent the creditors have an interest in the company and the directors might be said to have a duty to them for creditors' money is then at stake. It is in the intermediate situation of near insolvency or doubtful insolvency that greater difficulties of legal principle arise."

469.  Richardson LJ held that the first instance judge had made no findings as to solvency and on his assessment of the evidence, 'that starting premise of near insolvency is not justified'. Somers J also stated that 'it has been suggested that when the solvency of a company is doubtful or marginal it will be a misfeasance (probably not capable of being ratified or exonerated by shareholders) to enter into a transaction which directors ought to know is likely to cause a loss to creditors'.  However, he concluded that he did not have to decide the issue since he was satisfied the company was solvent at the material times (page 464).

470.  *Permakraft* was applied by the Court of Appeal in Australia in *Kinsela & another v Russell Kinsela Pty Ltd (in liq)* (1986) 10 ACLR 395 ('*Kinsela*').  There the first instance court had set aside a lease granted by the company to its directors as lessees. The Court described the company's financial position at the time the lease was granted as 'to say the least, precarious' and it was wound up as insolvent three months later.  The judge had found that the company had sustained regular and perhaps increasing trading losses and its accounts showed a substantial excess of liabilities over assets.  Street CJ, giving the

judgment of the court, described the company as an 'insolvent company in a state of imminent and foreseen collapse' (page 399). He held that where a company is insolvent, 'the interests of the creditors intrude':

> "They become prospectively entitled, through the mechanism of liquidation, to displace the power of the shareholders and directors to deal with the company's assets. It is in a practical sense their assets and not the shareholders' assets that, through the medium of the company, are under the management of the directors pending either liquidation, return to solvency, or the imposition of some alternative administration."

471. Street CJ said it was not necessary in *Kinsela* to consider the degree of financial instability which would impose the creditors' interests duty on directors since in that case the company was plainly insolvent and about to collapse. The judgment of Street CJ in *Kinsela* was cited with approval by the English Court of Appeal in *Liquidator of West Mercia Safetywear Ltd v Dodd & anor* (1988) 4 BCC 30 ('*West Mercia*'). In *West Mercia* there was no doubt that both the company which made the challenged payment and the parent company which received the money were insolvent at the time the payment was made. Similarly in *Facia Footwear Ltd (in administration) and another v Hinchliffe and another* [1998] 1 BCLC 218 where these cases were cited, there was uncontested evidence that the company was 'hopelessly insolvent' at the time that the payments were made (page 225f-g).

472. The Claimants also referred me to the Australian case of *Grove v Flavel* (1986) 11 ACLR 161. This is the first case in which the formulation referring to a real as opposed to remote risk was used. The issue arose in a different context, an appeal from a criminal conviction of a former director for the offence of making improper use of information acquired from his position as an officer of the company for the purpose of gaining an indirect advantage. He had written out cheques on the company's bank account to himself and other creditors within the group whose debts were thereby discharged. The information he was alleged to have obtained was that the company was experiencing liquidity problems and had been refused a bank loan. The court noted that there was no doubt that at the time of the cheques, the company was in serious financial difficulty and that liquidation 'became a real possibility' if the creditors sought to enforce payment. The Court quoted from *Permakraft* and *Kinsela*. In construing the word 'improper' in the statutory offence in issue, Jacobs J (with whom the other judges agreed) held: (page 170)

> "1. A director of a company X Ltd who, upon acquiring information which leads him to believe that the company faces a risk of liquidation, whether voluntary and because it cannot pay its debts as they fall due or at the suit of creditors, which is a real and not a remote risk, thereupon acts to protect himself and other companies of which he is a director from the consequences of such liquidation, to the possible detriment of the creditors of X Ltd, is acting "improperly" as a director of X Ltd because:
>
> (a) There can be no doubt of such possible detriment when the action taken involves a disposition of the assets of X Ltd, in this case debts owing to X Ltd, which would be part of the fund

available to creditors generally in the event of liquidation. It is in the words of Richardson J in *Nicholson & Ors v Permakraft (NZ) Ltd (in liq)*, supra, "the creditors' money that is at stake".

(b) If that is the principle which dictates the "duty" of a director to have regard to the interest of creditors when the company is known to be insolvent there can be no reason in principle why knowledge of a real risk of insolvency should not attract the same duty.

2. Whether there is such a real and perceived risk of insolvency must depend upon the facts of the particular case."

473.  Mr Thompson also referred me to *Hilton International Ltd v Hilton* [1989] 1 NZLR 442, a case in the New Zealand High Court where Tipping J stated that even if the company is solvent in both balance sheet and cash flow terms, a dividend cannot be paid if the payment 'is likely to jeopardise either form of solvency'.  He also held that the directors are at fault if they pay when they ought to appreciate that risk; and if the company's solvency is doubtful the directors must be able to show that they acted in good faith and on reasonable grounds.  On the facts of the case, the company had been cash flow insolvent at the date of the dividend.  The judge found that the company was either in a state of balance sheet insolvency 'or very close to it' as a result of and following the declaration and crediting of the capital dividend: page 462.  He found that if the directors had commissioned accounts prior to the declaration of the dividend it would have emerged that the passing of the dividend would have taken the company into a state of balance sheet insolvency.  Even if he was wrong in taking that view, the dividend 'would have seriously jeopardised the company's balance sheet solvency' – the company was put 'on a knife edge' by the payment of the dividend.

474.  Other cases in which the court has referred to a test of 'doubtful solvency' or of the company being 'on the verge of insolvency' have also, on their facts, concerned companies that were in fact insolvent or very close to collapse:

(a) In *Colin Gwyer & Associates Ltd v London Wharf (Limehouse) Ltd* [2002] EWHC 2748 (Ch) Leslie Kosmin QC (sitting as a deputy High Court Judge) referred (para 74) to the creditors' interests duty arising where a company is insolvent or of doubtful solvency or on the verge of insolvency and it is the creditors' money which is at risk. In those circumstances the directors, when carrying out their duty to the company, must consider the interests of the creditors as paramount and take those into account when exercising their discretion.  At paragraph 80 of his judgment he stated that both the directors knew that the company was insolvent because it was unable to pay a statutory demand.

(b) In *MDA Investment Management Ltd* [2003] EWHC 227 (Ch) Park J found that at the time of the transaction being challenged by the liquidator, there were substantial arrears of consultant's fees and the company was being pressed for payment, HMRC were asserting tax debts, Customs & Excise had presented a winding up petition and the company's financial service regulator was asserting that a substantial amount of money needed to be repaid into the company's client account. Park J's conclusion was that the company was in a serious financial situation and its prospects of survival as a trading company were very poor: paragraph 53.  He held that in the circumstances "it

was relevant to have regard to the interests of creditors as well as the interests of shareholders". He said "In this case, whether IM Ltd was technically insolvent before the transaction or not (and in my view it was anyway), it was on any view in a dangerous financial position, and [the director] knew it": para 75.

(c) In *Re Loquitur Ltd* [2003] 2 BCLC 442 Etherton J (as he then was) held that a dividend was unlawful because the accounts that had been drawn up failed to include any provision for a liability that should have been provided for. He also held that the effect of the dividend was, as the directors knew or ought to have known, to render the company 'insolvent or potentially insolvent'. It appears that the payment of the dividend left the company with assets of £253,682, a far lower amount than the amount that should have been included as a provision in the accounts if the accounts had been properly drawn up.

(d) In *GHLM Trading Ltd v Maroo and others* [2012] EWHC 61 (Ch) Newey J cited the statement of Street CJ in *Kinsela* that had been approved in *West Mercia*. He referred to evidence that at the time of the challenged transaction the company was known to have financial difficulties because of a shortage of cash flow to pay salaries and expenses. The company was therefore insolvent 'or at any rate of doubtful solvency or on the verge of insolvency'.

(e) In *Vivendi SA v Richards* [2013] EWHC 3006 (Ch) ('*Vivendi*') Newey J again cited the passage from *Kinsela* and, at para 150, he quoted from the judgment of Giles J.A. in *Kalls Enterprises Pty Ltd v Baloglow* [2007] NSWCA 191; (2007) 25 ACLC 1094 ('*Kalls*') where Giles J.A. said:

> "It is sufficient for present purposes that, in accord with the reason for regard to the interests of creditors, the company need not be insolvent at the time and the directors must consider their interests if there is a real and not remote risk that they will be prejudiced by the dealing in question."

Newey J in *Vivendi* held that the creditors' interests duty had arisen because the company was in fact insolvent at the time of the challenged transaction. Even if some of the directors had not been aware of that, they knew that the company had large obligations to meet and no income. The money it had was bound to be exhausted within a relatively short period unless the company's liabilities could be reduced and/or new sources of income achieved – the company's fragility had been obvious.

(f) In *Roberts (Liquidator of Onslow Ditchling Ltd) v Frohlich* [2011] EWHC (Ch) 257 ('*Frohlich*') the liquidator sued the former directors for breaches of their duties on the basis that they had caused the company to become involved in a speculative, inadequately funded project which was bound to fail and had caused the company to carry out work without ensuring that arrangements for payment were in place. Norris J held that the creditors' interests duty had arisen because of the parlous state of the company's finances. No reasonably competent director would have continued with the project because "he would have appreciated that the time horizon for the company was extremely short". The pressing creditors stood at some £300,000, significant further liabilities were about to be incurred and there was no cash and no realistic prospect of getting cash to pay the bills.

475.  These authorities were reviewed by John Randall QC (sitting as a deputy High Court Judge) in *Re HLC Environmental Projects Ltd (in liq.)* [2013] EWHC 2876 (Ch) ('*HLC Environmental*').  The company in that case was a building development company.  The judge set out the figures included in the company's accounts, showing that throughout the relevant period the company had substantial net current liabilities, overall liabilities and trade creditors and had made substantial trading losses annually.  There was a large shareholder deficit throughout the period: paragraph 77.  This provided strong prima facie evidence of insolvency, even though the company had failed to include any provision in the accounts for liabilities that should have been provided for.  He found as a fact that the company was both balance sheet and cash flow insolvent: para 86.  The judge then set out the various references in the case law to a company being 'doubtfully solvent' or to the 'parlous financial state' of the company or the company being 'on the verge of insolvency'.  He also cited the passage from Giles JA's judgment in *Kalls* included in Newey J's judgment in *Vivendi* and continued:

> "For my part, I do not detect any difference in principle behind these varying verbal formulations. It is clear that established, definite insolvency before the transaction or dealing in question is not a pre-requisite for a duty to consider the interests of creditors to arise. The underlying principle is that directors are not free to take action which puts at real (as opposed to remote) risk the creditors' prospects of being paid, without first having considered their interests rather than those of the company and its shareholders. If, on the other hand, a company is going to be able to pay its creditors in any event, ex hypothesi there need be no such constraint on the directors. Exactly when the risk to creditors' interests becomes real for these purposes will ultimately have to be judged on a case-by-case basis. Different verbal formulations may fit more comfortably with different factual circumstances."

476.  The Claimants relied on this passage to submit that it is sufficient for them to show that AWA was at a real risk – as opposed to a remote risk – of insolvency for the creditors' interests duty to have arisen.  They say that the risk here was 'real' as opposed to remote. They emphasise the unusual and extreme circumstances of (i) AWA's position as a non-trading company; (ii) the very great uncertainties, outside AWA's control, surrounding the scale of the indemnity liability; (iii) the wide range of possible outcomes for each of the moving parts making up the best estimate, such that the final liability might be several multiples of the best estimate and (iv) the fact that the decision to pay the interim dividends benefited only the shareholder and brought no possible benefit to the creditors of the company.  The Claimants produced models which showed how flexing even one of the moving parts involved in the computation of the likely liability resulted in a very large deficit in AWA's balance sheet.

*Discussion*

477.  To say that my house is on the verge of burning down seems to me to describe a much more worrying situation compared to one in which there is a risk which is something more than a remote risk of my house burning down.  Similarly, giving the words their natural meaning, a test set at the level of 'a real (as opposed) to remote risk of insolvency' would appear to set a much lower threshold than a test set at the level of being 'on the

verge of insolvency' or of 'doubtful' or 'marginal' solvency.  But I agree with the conclusion of Mr Randall QC in *HLC Environmental* that the authorities appear to treat these and all the other formulations as different expressions of the same test.  Having reviewed the authorities I do not accept that they establish that whenever a company is 'at risk' of becoming insolvent at some indefinite point in the future, then the creditors' interests duty arises unless that risk can be described as 'remote'.  That is not what the cases say and there is no case where, on the facts, the company could not also be accurately described in much more pessimistic terms, as actually insolvent or 'on the verge of insolvency', 'precarious', 'in a parlous financial state' etc.

478.  The essence of the test is that the directors ought in their conduct of the company's business to be anticipating the insolvency of the company because when that occurs, the creditors have a greater claim to the assets of the company than the shareholders.  This case is very different from the other cases in which the triggering of the creditors' interests duty has been considered.  AWA's balance sheet showed no deficit of liabilities over assets and there were no unpaid creditors knocking at AWA's door.  It was not in the downward spiral of accumulating trading losses, with no income and no prospect of any income that is typical of the companies where the duty has been held to have arisen.  I agree with the statement of Norris J in *Frohlich* that the underlying principle is that:

> "The acts which a competent director might justifiably undertake in relation to a solvent company may be wholly inappropriate in relation to a company of doubtful solvency **where a long term view is unrealistic**". (emphasis added)

479.  In the instant case, there was a real possibility that AWA would never become insolvent or even close to insolvent.  The best estimate of the Fox River liability might turn out to be accurate in which case the company's assets would be sufficient to meet the liability even without the need to rely on proceeds from the Historic Insurance Policies.  It cannot be right that whenever a company has on its balance sheet a provision in respect of a long term liability which might turn out to be larger than the provision made, the creditors' interests duty applies for the whole period during which there is a risk that there will be insufficient assets to meet that liability.  That would result in directors having to take account of creditors' rather than shareholders' interests when running a business over an extended period.  This would be a significant inroad into the normal application of directors' duties.  To hold that the creditors' interests duty arises in a situation where the directors make proper provision for a liability in the company's accounts but where there is a real risk that that provision will turn out to be inadequate would be a significant lowering of the threshold as currently described and applied in the cases to which I have referred.  I can see no justification in principle for such a change.

480.  The Claimants submitted that there were a number of 'red flags' waved at Mr Martinet and Mr Courteault before the 18 May 2009 meetings which should have alerted them to the risks of AWA tipping over into insolvency. One of these was the emphasis of matter that PwC included in the 2008 Final Accounts.  Mr Smouha submitted that the inclusion of this showed that PwC were uncomfortable with the removal of the provision for the Fox River liability in those accounts.  I do not accept that anything can be inferred from the emphasis of matter about PwC's views, other than they had concluded that the conditions set out in the accounting standard for when an emphasis of matter is appropriate had been satisfied. Mr Martinet's understanding of why this had been included was slightly different from the accounting standard's guidance. He thought it

was more to do with drawing the readers' attention to a significant change in assumptions from those underlying the previous year's accounts whereas the standard suggests that an emphasis is important where there is a significant degree of uncertainty about a provision. Whichever is the case, it would not be fair to read into this some subtle signal from PwC that they disapproved of what the company had done.  If they had been unhappy they could have qualified their audit report, as they threatened to do if the directors insisted on treating expected insurance receipts as an asset on the balance sheet.

481.  Another factor that the Claimants referred to as a red flag as to the risk of insolvency was a letter dated 22 April 2009 from Mr Mark Richards, the Chief Executive Officer of API to Mr Martinet raising concerns about the sale.  That letter showed that Mr Richards had slightly misunderstood the nature of the transaction proposed, because it appears that he thought that AWA was going to assign its rights and obligations under the indemnity agreement to another entity. In his response on 11 May, Mr Martinet explained the nature of the proposed deal and pointed out that the indemnity agreement did not include any provision forbidding the sale of AWA to a third party.

482.  Although I can understand Mr Richards' concern, I do not see that this should have alerted AWA's directors to any problem with the company's finances that they did not already appreciate.

483.  Taking all these factors into account, I do not think that AWA could be described as on the verge of insolvency or of doubtful insolvency, or as being in a precarious or parlous financial state.  The risk it faced that the best estimate would turn out to be wrong and that the company might not have enough money, when called upon in the future, is a risk that faces many companies that have provisions and contingent liabilities reflected in their accounts.  It is not enough in my judgment to create a situation where the directors are required to run the company in the interests of the creditors rather than the shareholders of the company.

484.  I therefore hold that the creditors' interests duty had not arisen at the time of the directors' decision to pay the December Dividend or the May Dividend.  There can therefore have been no actionable breach of fiduciary duty by them in making the payments. As with my findings in relation to Part 23 of the CA 2006, and for the same reasons I will not seek to resolve the many additional legal issues that would arise as to the appropriate remedy against Sequana or the directors if I had come to the opposite conclusion.

## XI CLAIM UNDER SECTION 423 OF THE INSOLVENCY ACT 1986

485.  So far the claims discussed have been claims brought by BTI as assignee of AWA's rights as against the directors for breach of fiduciary duty and as against Sequana under section 847 CA 2006 or the other non-statutory routes described.  There is in addition a claim brought by BAT in its own capacity under section 423 of the Insolvency Act 1986.

**(a) Section 423: the law**

486.  Section 423 provides:

> **"423 Transactions defrauding creditors**

(1) This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another person if—

    (a) he makes a gift to the other person or he otherwise enters into a transaction with the other on terms that provide for him to receive no consideration;

    (b) …

    (c) he enters into a transaction with the other for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.

(2) Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for—

    (a) restoring the position to what it would have been if the transaction had not been entered into, and

    (b) protecting the interests of persons who are victims of the transaction.

(3) In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purpose—

    (a) of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or

    (b) of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.

(4) …

(5) In relation to a transaction at an undervalue, references here and below to a victim of the transaction are to a person who is, or is capable of being, prejudiced by it; …".

487. I shall refer to the purposes set out in section 423(3) as 'the s 423 purpose'.

488. Section 424 limits the kinds of claimant who can apply for an order under section 423 to someone who is a victim of the transaction (except in circumstances which do not apply here). An application made for an order is treated as made on behalf of every victim of the transaction. Section 425 sets out the kinds of orders that the court can make if there has been a transfer, including an order requiring the property transferred by the transaction to be vested in any person or to require any person to pay to any other person in respect of benefits received from the debtor such sums as the court may direct.

489.  The question of whether the s 423 purpose must be the predominant purpose of the transaction was considered in *Inland Revenue Commissioners v Hashmi* [2002] EWCA Civ 981 ('*Hashmi*'). There the court was asked to set aside a written declaration of trust by Mr Ghauri of the beneficial interest in a business property for the benefit of his son. The claim under section 423 was brought by the Revenue asserting that the trust was aimed at avoiding a very large assessment for tax on undeclared profits in the business. The judge at first instance held that Mr Ghauri had deliberately and dishonestly under-declared his taxes and he knew that his other assets would be insufficient to meet the tax payments were his dishonesty ever discovered. The judge further held that Mr Ghauri had had two purposes, the first was that of a caring parent who wanted to secure the property for his son and the second was to put the property beyond the reach of creditors should they emerge. The judge made the declaration sought by the Revenue. On appeal, Arden LJ having described the history of section 423 held:

> "23. … Accordingly, in my judgment, the section does not require the inquiry to be made whether the purpose was a dominant purpose. It is sufficient if the statutory purpose can properly be described as a purpose and not merely as a consequence, rather than something which was indeed positively intended. Moreover, I agree with the observation of the judge that it will often be the case that the motive to defeat creditors and the motive to secure family protection will co-exist in such a way that even the transferor himself may be unable to say what was uppermost in his mind.
>
> …
>
> 25. … [F]or something to be a purpose it must be a real substantial purpose; it is not sufficient to quote something which is a by-product of the transaction under consideration, or to show that it was simply a result of it, …, or an element which made no contribution of importance to the debtor's purpose of carrying out the transaction under consideration. I agree with the point made by Lord Justice Laws in argument, that trivial purposes must be excluded."

490.  Arden LJ went on to uphold the judge's finding that "the intent to defraud the Revenue was the dominant purpose".

491.  Laws LJ agreed with that judgment and expressed the test in the following terms:

> "32 ... It is clear that the statutory purpose referred to in section 423(3) of the Insolvency Act 1986 need not be the only purpose for which the impugned transaction was entered into. Moreover, there is in my judgment no warrant for a construction of the statute which would qualify the term "purpose" by the adjective "dominant". No such qualification is required to make sense of the Act or to give it pragmatic efficacy. On the contrary, it is easy to envisage cases where more than one purpose is at hand between whose weight or

influence it is on the evidence impossible to distinguish in practical terms.

33.  In such a case, in my judgment, the application of section 423(3) is by no means necessarily excluded. What in my judgment is required is that the claimant show that the donor, vendor or settler was substantially motivated by one or other of the aims set out in section 423(3)(a) and (b) in entering into the transaction in question. There may be cases in which, even absent the statutory purpose, the transaction would or might have been entered into anyway. That would not necessarily negate the section's application; but the fact-finding judge on an application made to him under section 423 must be alert to see that he is satisfied that the statutory purpose has in truth substantially motivated the donor if he is to find that the section bites."

492.  Simon Brown LJ considered but rejected a test which turned on the question whether the transaction would have been entered into "but for the debtor's wish to put his assets beyond his creditors' (or prospective creditors') reach".  Instead he said that in each case the question to be asked is: can the court be satisfied that a substantial purpose of the debtor's transaction was (putting it in shorthand) to escape his liabilities?  However, he added the caveat that if the judge were to find in any given case that the transaction is one which the debtor might well have entered into in any event, he should not then too readily infer that the debtor also had the substantial purpose of escaping his liabilities.

493.  *Hill v Spread Trustee* [2006] EWCA Civ 542 was a claim brought by the trustee in bankruptcy of Mr Nurkowski to set aside a settlement trust made by Mr Nurkowski in favour of his daughter.  The judge at first instance had found Mr Nurkowski to be 'a dreadful witness' and completely dishonest.  He was not able to rely on anything Mr Nurkowski said.  He found that one of the purposes of making the settlement was to prejudice the interests of the Revenue.  This was not the sole or dominant purpose but it was positively intended and a factor that substantially motivated Mr Nurkowski. Arden LJ noted that an unusual feature of the case was that the settlement alone could not prejudice the Revenue.  It was Mr Nurkowski's failure to reveal an offer to acquire the land at a high value with the effect that the land valued in the settlement was too low that prejudiced the Revenue, because it led to the Revenue accepted a lower value for the purpose of computing tax. On the issues of law, Arden LJ (with whom, on this issue, the other two members of the court agreed) stated that the test whether Mr Nurkowski had the necessary intention is a subjective test: the judge had to be satisfied that he actually had the purpose, not that a reasonable person in his position would have it: paragraph 86.

**(b) Section 423: some preliminary points**

494.  First, it is not disputed here that BAT is a 'victim' within the meaning of section 423(5) and so is entitled to bring this claim. Secondly, this claim can only be brought by BAT and only as against Sequana as the recipient of the dividends. Thirdly, although this section is found in the Insolvency Act, there is no requirement that the company be insolvent or on the verge of insolvency.  However, questions about the risk to creditors created by the payment of the dividend may arise when considering whether the victim's interests were prejudiced by the transaction for the purposes of section 423(3)(b).

Fourthly, it is accepted that when considering whether AWA acted with the s 423 purpose, it is enough if the majority of the directors acted with that purpose in declaring the dividend. This of course is only really relevant in relation to the December Dividend since it was not suggested that Mr Martinet and Mr Courteault could have had different purposes by the time of the May Dividend. Fifthly, although the section is headed 'Transactions defrauding creditors' there is no requirement of fraud in the sense of a finding of dishonesty on the part of the transferor.

495.  The legal issues arising can be summarised as follows:

(a) Can the payment of a dividend ever be a transaction between the member and the company on terms that provide for the company to receive no consideration so that it falls within section 423(1)?

(b) Did the directors have the s 423 purpose in paying the December Dividend or the May Dividend?

(c) Does Sequana have a defence that it has changed its position in reliance on the transaction?

496.  As to the application of the test to this case, BAT say that the claim is made out on the basis of the clear evidence of the witnesses, frankly given, as to what they intended to achieve by the 17 December 2008 and 18 May 2009 meetings.

**(c) Is a dividend a transaction falling within section 423(1)(a) or (c)?**

497.  Sequana submit that a dividend paid by a company to its member is not a gift, nor is it properly characterised as a transaction for no consideration or at an undervalue. The transaction pursuant to which the dividend is paid is not the decision of the directors to pay it but rather the antecedent contract deemed to exist by virtue of section 33 of the CA 2006. That section provides that the provisions of the company's constitution bind the company and its members to the same extent as if there were covenants on the part of the company and of each member to observe those provisions.

498. Mr Foxton relies on *Inland Revenue Commissioners v Laird Group plc* [2003] UKHL 54 ('*Laird*') in which the issue before the House was whether the payment of a dividend was a 'transaction in securities' for the purposes of the Incomes and Taxes Act 1988. Lord Millett, with whom all their Lordships agreed, cited the definition of the term 'transaction in securities' and identified the question in issue as whether the payment of a dividend is a transaction in or relating to the shares in respect of which it is paid. He referred to a deeming provision in the legislation which made clear that without that provision, a distribution to shareholders upon a liquidation of the company would not be a transaction in securities. Accordingly the critical questions were why the payment of undistributed profits of the company to the shareholders in the course of a liquidation was not a transaction relating to their shares, and what, if any, was the difference between such a payment and a distribution to shareholders by way of dividend while the company is a going concern. Lord Millett examined the juridical nature of a share quoting at paragraph 35 of his speech the description by Lord Russell of Killowen in *Inland Revenue Commrs v Crossman* [1937] AC 26:

> "It is the interest of a person in the company, that interest being composed of rights and obligations which are defined by the Companies Act and by the memorandum and articles of association of the company."

499.  The rights of the shareholders in a company are set out in its articles of association and are the rights to receive dividends if declared, rights to vote and rights in a liquidation to receive a share of surplus assets after discharge of liabilities. Lord Millett went on to say:

> "37.  … The distribution of the undistributed profits of a company in liquidation to its shareholders is not a transaction relating to securities because neither the shares themselves nor the rights attached to them are affected by a payment which merely gives effect to the shareholders' rights; they receive only what is already theirs. Distributions are made to shareholders in respect of the shares, but the shares of the individual shareholder are nothing more than the measure of the proportion of the total which is due to him.

> 38.  In my opinion the position is not materially different if part of the undistributed profits is paid to the shareholders by way of dividend while the company is a going concern. The Court of Appeal seized on the fact that until a dividend, if final, is declared or, if interim, is paid, the shareholders have no right to it: [2002] STC 722. Accordingly, the Court of Appeal concluded, the declaration and payment do not merely give effect to pre-existing rights.

> …

> 40.  The right to receive a dividend does not arise until the conditions laid down in the company's articles of association are satisfied. Any requirement that a dividend must be declared by the directors before the shareholders are entitled to receive it must be found in the company's articles of association: there is nothing in the Companies Acts save an obligation not to pay dividends out of capital. Constraints on the shareholders' rights to receive dividends contained in the articles are self-imposed.

> 41.  In the early days articles of association commonly left the declaration of dividends to the company in general meeting, that is to say to the shareholders themselves. Gradually, however, it became the general practice to require the dividend to be declared by the directors. The change was a response to the increasing separation of ownership and management. The shareholders own the company, but they entrust the management of its undertaking to the directors. To enable the directors to carry out their functions, shareholders give them a discretion to decide how much of the company's funds should be retained to pay creditors and carry on the business and how much can safely be returned to shareholders by way of

dividend. By declaring a dividend, the directors effectively release funds due to the shareholders from their power to retain them in the business.

42. Whether the company is in liquidation or continuing to carry on business as a going concern, therefore, the distribution of the undistributed profits of a company to the shareholders entitled thereto merely gives effect to the rights attached to the shares. The funds are released, in the one case from the liquidator's discretion to retain them for the purpose of the winding up, and in the other from the directors' discretion to retain them for the purposes of the undertaking. Given that the former is not "a transaction relating to securities'', neither in my opinion is the latter. The relationship between the payment and the shares in respect of which it is paid is the same in both cases."

500.  Although I see the force in Mr Foxton's submission I do not consider that the analysis of the nature of the dividend in *Laird* for the purposes of statutory provisions at issue there can be read across to the construction of section 423.  A key step in Lord Millett's reasoning that the payment of the dividend was not a transaction relating to shares was the statutory provision which made it clear that Parliament did not regard the liquidation of company in itself as a transaction relating to its shares.  That is not the position here.  In construing section 423 I accept Mr Thompson's submission that the wording of section 423 is deliberately wide in order to protect creditors from assets being moved from the potential debtor out of their reach.  Subsection (1) is drafted to exclude transactions only where the consideration received by the potential debtor is not significantly less in value than the consideration that the debtor receives.  Where the consideration provided by the debtor and the other party to the transaction are roughly the same, there can be no detriment to the creditor because the debtor's assets are not depleted.  But where they are not, then the creditor is less likely to be able to recover what is owed to him.  There may be a situation where the consideration paid by the debtor to the third party is fixed in a contract but payment is delayed.  Provided that the initial contract was not entered into with the s 423 purpose, that delayed payment is not a transaction with the s 423 purpose because the purpose is to fulfil the contractual obligation to make payment.  The payment may have the consequence of depriving other creditors of money later, but as Arden LJ emphasised in *Hashmi*, consequences are different from purposes.  The payment of the dividend is not, in my judgment, the satisfaction of an earlier obligation in the same way.  It is true that the reason why the member of the company, rather than any other person, receives the dividend is because of the pre-existing relationship of company and shareholder.  But the decision to pay the dividend and choice of its value is not the consequence of that relationship because it is discretionary not only in its amount but in whether it is paid at all.

501.  Mr Foxton argued that there is no lacuna left in the protection of creditors if dividends are not transactions within section 423 because creditors are already adequately protected by Part 23 of the CA 2006 and by the fiduciary duties owed by directors when the creditors' interests duty arises, as discussed earlier.  I do not accept that.  First, the only possible claimant in respect of those other causes of action is the company itself whereas the class of claimants here is much wider under section 424.  Secondly, the powers of the

court to put matters right under sections 423(2) and 425 are much broader and more flexible than the remedies available under Part 23. It is not difficult to see that a blanket exclusion of dividend payments from the scope of section 423 will quickly reduce the efficacy of the provision given the many instances where the directors and shareholders of a company are the same or linked individuals.

502.  There is no reason in the wording of the section to exclude the payment of a dividend from the scope of section 423 if the payment is made with the s 423 purpose.

**(d) Did the directors of AWA have the s 423 purpose in relation to the December Dividend?**

503.  I have described earlier the evidence of the four directors as to their intentions in declaring the December Dividend. I am fully satisfied that the directors cannot have had the s 423 purpose in declaring that dividend. At that stage there was no settled intention of selling AWA to someone outside the Sequana group. Certainly it was Mr Martinet's and Mr Courteault's wish to declare a further dividend so as to remove the inter-company receivable if that became possible later on. But this was long before the developments I have described in section VII of this judgment and there was no reason to think that it would become possible. There was, as I have found, no intention to declare a further dividend come what may and no intention to sell the company to someone outside the group unless the receivable could be reduced to very much less than it stood as at that date.

504.  It is also relevant that Mr Lebard's evidence was that Sequana's policy was to stand behind its subsidiaries. Whatever the position on AWA's accounts, if AWA was owned by the Sequana group, they would have injected whatever cash was needed into the company to enable it to meet its obligations, even if they had no legal obligation to do so. If you own a business, Mr Lebard said, "you have obligations and if you need cash to do it, you just do it". He said:

> "If I can elaborate, I will give you some reason for that. Never, ever Sequana didn't fulfil its obligations vis à vis any subsidiaries. And also we had some subsidiaries in the paper industry that you can imagine which had a tough, tough time, and very big difficulties. We had injected the money which had to be needed to find ways to help our business to survive and to work. That is the first point.
>
> The second is we also had a board of directors and maybe I will come back to that, which are prestigious and very well-known people, including senior people from the Agnelli family. And in the end, remember that the Agnelli family still owned close to 30% of Sequana. Sequana was consolidated into the IFIL group; the Agnelli family. For the Agnelli family, can you imagine that they would accept that one of their subsidiaries would let fall bankrupt a business in the US, with obligations vis à vis the US Government? It is just impossible.

> So in my mind, in the mind of the board, it was not question at
> all not to fulfil our obligations vis à vis AWA. As simple as
> that."

505.  Mr Martinet and Mr Courteault were presumably aware of this as senior executives of
Sequana.  Since they are part of the guiding mind of AWA for this purpose then I do not
see that AWA can have had the s 423 purpose at that point.  It was not suggested that Mr
Mountford and Mr Newell had that purpose if Mr Martinet and Mr Courteault did not.

**(e) Did the directors of AWA have the s 423 purpose in relation to the May Dividend?**

506.  There is, in contrast, plenty of evidence to show that the intention of AWA, through the
governing minds of Mr Martinet and Mr Courteault, in declaring the May Dividend was
to remove from the Sequana group the risk that the indemnity liability to BAT for the
Lower Fox River clean up might turn out to be much more than the amount available
from the Maris Policy plus the Historic Insurance Policies receipts.

507.  So far as Mr Martinet is concerned, I have already referred to the email on 11 May
2009 when he was responding to Mr Newell's question about whether they were
foregoing a good opportunity to enjoy a 'potential upside' by selling AWA to TMW: see
paragraph 286, above.  Mr Martinet's view was that AWA should be satisfied with
"mostly getting rid of a very hairy situation once and for all, without being held
responsible for future downside, however remote this might be".  In a more formal
setting, Mr Martinet's report to the Sequana board meeting on 27 May 2009 referred to
the immediate effect of the operation being "to externalise a significant underlying risk
that was difficult to control from the scope of the group, with Sequana having expressly
excluded any guarantee under the sale contracts of API and the Fox River risk".

508.  Mr Courteault's evidence was to similar effect when he was cross-examined about the
terms of the sale of AWA to TMW and the absence in that sale of any indemnity or
guarantee from Sequana to TMW in relation to AWA's existing liabilities:

> "Q.  … in this case you very carefully, in a number of places in
> the documentation … inserted clauses to make it absolutely
> clear that the seller, Sequana, would have absolutely no post-
> sale liabilities in relation to the indemnity liabilities, Fox River,
> Future Sites and so on; correct?
>
> A.  It was absolutely the purpose of -- it was a part of this
> transaction.  I also took care –
>
> Q.  It was the reason for the transaction?
>
> A.  Well, the reason for the transaction was a sale.  But we did
> not intend to guarantee any of the liabilities regarding the Fox
> River or any of the Future Sites.
>
> Q.  Because if you had that would have cut across … the
> objective of removing Sequana from …
>
> A.  From the risk, yes, of course.

Q. Thank you.

A. And that is the reason why I also took care of including in the agreement some wording about the fact that Mr Gower and Mr Tauscher were fully aware of what they were purchasing. … It was important for me that these two persons, who were the purchasers of the company, recognised that they knew exactly what they were purchasing. … I wanted Mr Gower and Mr Tauscher to give a personal guarantee that they were fully aware of what they were purchasing and so on. It was important for us."

509. Although Mr Courteault there spoke about removing the risk of any liability being owed to Mr Gower and Mr Tauscher, he must have realised that in fact the absence of any guarantee from Sequana to TMW was likely to be of much greater concern to BAT that it would be to TMW.

510. Mr Lebard explained the importance for Sequana of removing the risk from AWA's and Sequana's balance sheet. Sequana was trying to present itself to investors as a 'pure player in the paper business'. Investors were discouraged from investing in the Sequana group if they could see environmental issues in the U.S. on the balance sheet:

"… it is immediately scary, and they don't want to spend the time in trying to understand the case and they invest in another company. It is a marketing and communications thing."

511. There may well have been legitimate business reasons for Sequana wishing to rid itself of the risk that the Maris Policy and the Historic Insurance Policies would ultimately not be enough to enable AWA to fulfil its indemnity obligations. But there is no requirement in section 423 for the transferor to be motivated by some ill will towards a particular creditor or to be acting dishonestly (although many of the cases in which section 423 is relied on are cases of dishonesty). The removal of the 'scary' item on Sequana's balance sheet could only be achieved if the May Dividend could be paid by off-setting it against the remaining inter-company receivable so that the company could be sold. That was the purpose of the transaction.

512. Mr Foxton argued that the purpose of the sale of AWA might have been to remove the liability from Sequana's account but the transaction being challenged here under section 423 is not the sale as such but the payment of the dividend. Further, he submitted, there is no evidence that the dividend payment was motivated by the desire to remove any risk of further liability from Sequana. I do not accept that one can distinguish between the purpose of paying the dividend and the purpose of selling the company in that way by the time the May Dividend came to be paid. Both Mr Martinet and Mr Courteault knew what the sequence of events would be on the evening of 18 May 2009 during the series of board meetings that they held over the telephone. It is clear from *Hill v Spread Trustee* referred to earlier that it is enough if the impugned transaction is entered into with the s 423 purpose; it does not have to achieve that purpose by itself:

"102. … If the transaction is entered into with the requisite purpose, the fact that some other event needs to occur does not mean that the transaction cannot itself be within section 423(3).

> I consider that this is what the judge meant by his test of whether the transaction was an essential part of the purpose. … The right approach in my judgment is to apply the statutory wording. It is enough if the transaction sought to be impugned was entered into with the requisite purpose. It is entry into the transaction, not the transaction itself, which has to have the necessary purpose."

513.  I have no doubt here that the payment of the May Dividend was entered into with the purpose of eliminating the receivable which then cleared the way to AWA being sold and to Sequana removing any risk of having to fund the indemnity itself if the funds left in AWA proved to be inadequate.

514.  The Defendants say that provided that AWA had made proper provision for the Fox River liability in its accounts then there is no room for a finding that the payment of a dividend which was not contrary to Part 23 and was not in breach of the directors' fiduciary duty was nonetheless made with the s 423 purpose. The Defendants say in effect that if a provision has been properly made in relation to the claim, the company only needs to keep back that money.  It is free to spend any additional monies or dispose of any additional assets and it cannot be said to have the s 423 purpose.  There is no justification, Sequana submits, for overlaying on those protections the application of section 423.

515.  Sequana also points to the difficulties that would arise in practice if companies have to take into account the possible application of section 423 when considering whether to declare a dividend.  I referred earlier to BAT's own complex and high value list of contingent liabilities.  Do those actual and potential claims mean that a company in BAT's position risks entering into a transaction at an undervalue with the s 423 purpose if it declares a dividend without checking not only that it has made adequate provision in its accounts in accordance with the relevant accounting standards but that it has enough assets left to meet the totality of the amount claimed if that turns out to be higher than the best estimate on which the provision is based?

516.  The Claimants rely on the very particular circumstances of this case.  AWA was a non-trading company and a wholly owned subsidiary.  Its only function was as a containment vehicle for the Fox River liability.  There is clear evidence that the purpose of the declaration of the May Dividend and the sale of AWA to TMW clearly was to remove from Sequana the risk that the Maris Policy plus the insurance proceeds might not be enough to meet the indemnity.  Such evidence of the subjective intention of those in control of the company when making the decision to pay the dividend will distinguish this case from other cases where directors declare dividends for their shareholders for the usual reasons for which dividends are paid, without turning their minds to whether this leaves enough money for potential creditors. Here there is no doubt that the subjective intention of the directors at the time of the May Dividend and the sale was to prevent AWA having any legal or moral call upon its parent company to meet its creditors' claims.  After the declaration of the dividend and the sale to TMW, the creditors were prejudiced because the assets of AWA had been depleted and it no longer had any call on Sequana to that extent.

517.  After some hesitation I have concluded that the Claimants are right on this point. Section 423 does not distinguish between companies and individuals.  The first limb of

the s 423 purpose -  putting assets beyond the reach of a person who is making or may at some time make a claim against him - has inherent in it the assumption that following the transaction, the person does not have sufficient funds remaining with him to satisfy the actual or potential claim made against him.  If a person or a company has plenty of assets left with which to meet the claim, then however many additional assets are gifted to people, he or it cannot have the s 423 purpose.  This must be inherent in the wording of section 423(3)(a), and is confirmed by the second limb which refers to action "otherwise prejudicing the interests of" the claimant, implying that the transaction in the first limb must prejudice those interests too.

518. If an individual ('A') comes under a liability to another person ('B'), for example by negligently injuring B in a car accident, there may be a great deal of uncertainty about how serious B's injuries will turn out to be in the long term.  A may receive advice from the experts he engages that it is likely that B will make a full recovery in which case the best estimate of the value of B's claim is £50,000.  But the advisers may also warn that, if it turns out that B's injuries are much worse and likely to be permanent, the value of the claim could be very much higher, perhaps up to £500,000.  Suppose that A has savings of £50,000 in the bank and a house worth £1 million.  A decides to leave the money in the savings account to meet B's claim but to gift the house to his daughter C just in case it turns out that B's injuries are much more serious than expected.  Does A transfer the house to C with the s 423 purpose?  I think he does. If that is right then the same reasoning applies to AWA.  AWA received advice and, as I have held, properly took the view that the best estimate of its liability under the indemnity was $143 million, covered by the Maris Policy.  But Mr Martinet and Mr Courteault were well aware of the great uncertainties that existed over the ultimate level of remediation and NRD costs.  The size of NCR/API's share would be determined perhaps only after many years of the further litigation.   It may have been an unlikely scenario and I have held that it was not sufficiently likely to generate a duty to take account of BAT's interests when declaring the May Dividend.  But the evidence shows that it was precisely the scenario they had in mind when they paid the May Dividend in order then to be able to sell the company and move the risk out of the group.  The transaction was undertaken with the intention of putting assets beyond the reach of BAT in the event that the Maris Policy and the Historic Insurance Policies receipts were not enough to meet the indemnity claim.  This prejudiced BAT because, as Mr Martinet and Mr Courteault knew, the new owners of AWA would not have any other funds to make good any shortfall.

519. I therefore find that AWA, through its directors, did have the s 423 purpose when paying the May Dividend.

520. The Defendants' final point on section 423 is that Sequana has changed its position as a result of the payment of the dividend and that this constitutes a defence to the claim under section 423.  For the existence of this defence Mr Foxton relies on the judgment of Sales J (as he then was) in *4Eng Ltd v Harper* [2009] EWHC 2633 (Ch) the leading case on the scope of the powers of the court under section 425. In that case a director had transferred his house into his wife's name with the s 423 purpose of avoiding having to satisfy a judgment against him.  Sales J found that the wife did not know of the illegitimate purpose for the transfer.  He noted that the statute does not specify any particular mental state or action on the part of the transferee as an ingredient of the conditions for liability.  That does not mean however that such matters are irrelevant for defining the extent of the

liability to be imposed, or the order to be made, at the next stage in the analysis, when the court considers the question of remedy under s.423(2) and s.425.  Sales J held:

> "13. In my judgment, the nature of any order and the extent of the relief granted by the court under s.423(2) and s.425 should take into account the mental state of the transferee of property under a relevant transaction (or of any other person against whom an order is sought) and the degree of their involvement in the fraudulent scheme of the debtor/transferor to put assets out of the reach of his creditors. The principles in the application of this statutory regime should reflect in this respect general principles inherent in other areas of the law, which treat the mental state and degree of involvement of a defendant in wrongdoing as relevant to the extent of recovery available against him (compare, as one example among many, *Seager v Copydex Ltd* [1967] 1 W.L.R. 923, 932 — no order of an account of profits ordered against an innocent wrongdoer in respect of a breach of confidence). Although the trigger conditions for liability to make restoration under s.423 set out the basic balance to be struck between the interests of the creditors and of a transferee as established by Parliament, the making of an order under s.423(2) and s.425 necessarily requires some further balancing of the interests of the transferor's creditors and of the transferee to be determined by the court, since by the time the court has to take action events will have moved on from the transfer and the balance of the equities between creditors and transferee may well have been affected by changes in circumstances over time."

521.  After giving examples of different situations, Sales J went on:

> "16. In choosing what relief is appropriate in a given case, a great deal will depend upon the particular facts. One of the reasons the court is given such a wide jurisdiction as to remedy under this regime is to allow it flexibility in fashioning relief which is carefully tailored to the justice of the particular case. Helpful analogies may be drawn with other areas of the law to guide the court in reaching its conclusion, but given the wide range of situations which the statutory regime is intended to deal with it would be wrong to be unduly prescriptive in trying to lay down hard and fast rules for the application of these provisions."

522.  The Defendants submit that Sequana as transferee of the May Dividend did change its position after the transactions on 18 May 2009 by selling AWA to TMW and thereby losing control over the management of the company's exposure to the Lower Fox River and the various pieces of litigation that AWA was involved in against the other PRPs or against the insurers under the Historic Insurance Policies. If the May Dividend had not been paid, the inter-company receivable would not have been released, the company would not have been sold and Sequana would have retained control of AWA.  They point also to the complex funding agreement that was concluded between BAT/BTI, NCR, API

and AWA in 2014 under which, they say, AWA's exposure to the various risks involved had been fundamentally re-written.

523.  In my judgment the *4Eng* decision establishes that these points are relevant to the question of what is the appropriate relief to be granted and do not provide a complete defence to the claim under section 423.  I do not accept the submission that Sequana must be shown to have acted in bad faith in the sense of having engaged in sharp practice or recklessness before it is appropriate to fashion a remedy under section 425.

524.  In any event Sequana's position is very different from the position of the transferee in *4Eng*.  First, Sequana fully shared the s 423 purpose of AWA declaring the May Dividend and in fact was the intended beneficiary of that purpose since it was Sequana which no longer bore the risk of the liability exceeding the Maris Policy.  AWA and Sequana had always relied on the abilities of Mr Gower and Mr Tauscher to conduct those matters for their benefit; their interests were fully aligned and remained so, as a result of the golden share, after the sale of AWA to TMW.  I do not therefore accept that there was a significant detriment on which Sequana can rely in giving up control of the conduct of the *Whiting* litigation or the control of the Historic Insurance Policies settlement negotiations.

525.  The parties were agreed that, in the event that I found that the claim under section 423 succeeded, I should not attempt to fashion a remedy at this stage.  This was in part because in order to do so it is important to understand what has in fact happened in respect of the Lower Fox River and Future Sites liabilities since May 2009. During the course of these proceedings, we have all carefully shielded our eyes from what has happened since then in order to ensure that the assessment of what the directors knew and thought at the relevant times was not coloured by hindsight.  However it may be helpful for me to give the following indication.  I do not currently have in mind a remedy whereby the May Dividend is simply repaid by Sequana to AWA.  In *4Eng* Sales J contemplated such a payment in a situation where the transferor has become insolvent so that the transferred money is repaid to the transferor's liquidator or trustee in order to be distributed to the class of creditors.  That is not the position here.

## XII CONCLUSION

526.  For the reasons set out above, I therefore dismiss BTI's claims. Neither the December Dividend nor the May Dividend contravened Part 23 of the CA 2006 because:

(a) the directors were entitled to sign the solvency statements on 15 December 2008 pursuant to section 643 of the CA 2006;

(b) the error in relation to the authorised share capital of the company in the memorandum of capital registered under section 644(1) of the CA 2006 did not invalidate the reduction of capital;

(c) the provision made in respect of the Lower Fox River liability in the December 2008 Interim Accounts and the 2008 Final Accounts was not defective because:

(i) the directors were justified in concluding that the sums used as the likely NRD liability in the calculation of the provision in the accounts on which the December Dividend and the May Dividend were based were the best estimates of that liability at the time;

     (ii) the directors were also justified in concluding that the best estimate of AWA's liability of remediation costs was 60% of an NCR/API share of 38% in respect of the May Dividend; and

     (iii) any defects in the disclosure made in the accounts are not relevant to the issue of whether Part 23 of the CA 2006 is contravened.

527.  As regards BAT's claim under section 423 of the Insolvency Act 1986:

     (a) I hold that a dividend is a transaction entered into at an undervalue within the meaning of section 423(1);

     (b) I dismiss the claim as regards the payment of the December Dividend on the basis that AWA did not have the s 423 purpose at that time;

     (c) I find that the claim is well founded as regards the payment of the May Dividend in that AWA had the intention, in paying that dividend, of putting the dividend monies beyond the reach of BAT or of otherwise prejudicing BAT's interests, BAT being a victim of the transaction within the meaning of section 423(5).

528. I thank all those involved in this case which was very complex both factually and legally.

529.

## BAT INDUSTRIES v SEQUANA

## ANNEX of LEGISLATIVE PROVISIONS

## PART 1

### Distributions of profits

### Part 23 of the Companies Act 2006

*Note: According to the Companies Act 2006 (Commencement No 5, Transitional Provisions and Savings) Order 2007 (SI 2007/3495) Part 23 applies to distributions made on or after 6 April 2008: see paragraph 33 of Schedule 4. However, there are transitional provisions set out in that Order where the period covered by a company's accounts includes some period before 6 April 2008. That is the case here in respect of both the December Dividend and the May Dividend because they are both based on accounts which cover a period starting 1 January 2008. The modifications in the transitional provisions are shown in italics*

### 829 Meaning of "distribution"

(1) In this Part "distribution" means every description of distribution of a company's assets to its members, whether in cash or otherwise, subject to the following exceptions.

(2) …

**830 Distributions to be made only out of profits available for the purpose**

(1) A company may only make a distribution out of profits available for the purpose.

(2) A company's profits available for distribution are its accumulated, realised profits, so far as not previously utilised by distribution or capitalisation, less its accumulated, realised losses, so far as not previously written off in a reduction or reorganisation of capital duly made.

(3) Subsection (2) has effect subject to sections 832 and 835 (investment companies etc: distributions out of accumulated revenue profits).

**836 Justification of distribution by reference to relevant accounts**

(1) Whether a distribution may be made by a company without contravening this Part is determined by reference to the following items as stated in the relevant accounts—

    (a) profits, losses, assets and liabilities;

    (b) provisions of the following kinds—

        (i) where the relevant accounts are Companies Act accounts, *provisions of any of the kinds mentioned in paragraphs 88 and 89 of Schedule 4 to the Companies Act 1985*;

        (ii) …;

    (c) share capital and reserves (including undistributable reserves).

(2) The relevant accounts are the company's last annual accounts, except that—

    (a) where the distribution would be found to contravene this Part by reference to the company's last annual accounts, it may be justified by reference to interim accounts, and

    (b) ….

(3) The requirements of—

        section 837 (as regards the company's last annual accounts),

        section 838 (as regards interim accounts), and

        section 839 (as regards initial accounts),

must be complied with, as and where applicable.

(4) If any applicable requirement of those sections is not complied with, the accounts may not be relied on for the purposes of this Part and the distribution is accordingly treated as contravening this Part.

## 837 Requirements where last annual accounts used

(1) The company's last annual accounts means the company's individual accounts—

> (a) that were last circulated to members in accordance with *section 238 of the Companies Act 1985* (duty to circulate copies of annual accounts and reports), or

> (b) if in accordance with *section 251 of the Companies Act 1985* the company provided a summary financial statement instead, that formed the basis of that statement.

(2) The accounts must have been properly prepared in accordance with *the Companies Act 1985*, or have been so prepared subject only to matters that are not material for determining (by reference to the items mentioned in section 836(1)) whether the distribution would contravene this Part.

(3) Unless the company is exempt from audit and the directors take advantage of that exemption, the auditor must have made his report on the accounts.

(4) If that report was qualified—

> (a) the auditor must have stated in writing (either at the time of his report or subsequently) whether in his opinion the matters in respect of which his report is qualified are material for determining whether a distribution would contravene this Part, and

> (b) a copy of that statement must—

>> (i) in the case of a private company, have been circulated to members in accordance with *section 238 of the Companies Act 1985*, or

>> (ii) in the case of a public company, have been laid before the company in general meeting.

(5) An auditor's statement is sufficient for the purposes of a distribution if it relates to distributions of a description that includes the distribution in question, even if at the time of the statement it had not been proposed.

## 838 Requirements where interim accounts used

(1) Interim accounts must be accounts that enable a reasonable judgment to be made as to the amounts of the items mentioned in section 836(1).

**847 Consequences of unlawful distribution**

(1) This section applies where a distribution, or part of one, made by a company to one of its members is made in contravention of this Part.

(2) If at the time of the distribution the member knows or has reasonable grounds for believing that it is so made, he is liable--

(a) to repay it (or that part of it, as the case may be) to the company, or

(b) in the case of a distribution made otherwise than in cash, to pay the company a sum equal to the value of the distribution (or part) at that time.

(3) This is without prejudice to any obligation imposed apart from this section on a member of a company to repay a distribution unlawfully made to him.

(4) This section does not apply in relation to--

(a) financial assistance given by a company in contravention of section 678 or 679, or

(b) any payment made by a company in respect of the redemption or purchase by the company of shares in itself.

## Companies Act 1985

**226A. Companies Act individual accounts**

(1) Companies Act individual accounts must comprise–

(a) a balance sheet as at the last day of the financial year, and

(b) a profit and loss account.

(2) The balance sheet must give a true and fair view of the state of affairs of the company as at the end of the financial year; and the profit and loss account must give a true and fair view of the profit or loss of the company for the financial year.

(3) Companies Act individual accounts must comply with the provisions of Schedule 4 as to the form and content of the balance sheet and profit and loss account and additional information to be provided by way of notes to the accounts.

(4) Where compliance with the provisions of that Schedule, and the other provisions of this Act as to the matters to be included in a company's individual accounts or in notes to those accounts, would not be sufficient to give a true and fair view, the necessary additional information must be given in the accounts or in a note to them.

(5) If in special circumstances compliance with any of those provisions is inconsistent with the requirement to give a true and fair view, the directors must depart from that provision to the extent necessary to give a true and fair view.

(6) Particulars of any such departure, the reasons for it and its effect must be given in a note to the accounts.

**Schedule 4 to CA 1985:**

5A. The directors of a company must, in determining how amounts are presented within items in the profit and loss account and balance sheet, have regard to the substance of the reported transaction or arrangement, in accordance with generally accepted accounting principles or practice.

…

88 (1)--  References to provisions for depreciation or diminution in value of assets are to any amount written off  by way of providing for depreciation or diminution in value of assets.

(2)--  Any reference in the profit and loss account formats set out in Part I of this Schedule to the depreciation of, or amounts written off, assets of any description is to any provision for depreciation or diminution in value of assets of that description.

89. References to [provisions for liabilities] are to any amount retained as reasonably necessary for the purposes of providing for any liability [the nature of which is clearly defined and] which is either likely to be incurred, or certain to be incurred but uncertain as to amount or as to the date on which it will arise.


## PART 2
## Capital reduction

## Chapter 10 of Part 17 of the Companies Act 2006

**641 Circumstances in which a company may reduce its share capital**

(1) A limited company having a share capital may reduce its share capital—

> (a) in the case of a private company limited by shares, by special resolution supported by a solvency statement (see sections 642 to 644);

> (b) in any case, by special resolution confirmed by the court (see sections 645 to 651).


**642 Reduction of capital supported by solvency statement**

(1) A resolution for reducing share capital of a private company limited by shares is supported by a solvency statement if—

> (a) the directors of the company make a statement of the solvency of the company in accordance with section 643 (a "solvency statement") not more than 15 days before the date on which the resolution is passed, and

> (b) the resolution and solvency statement are registered in accordance with section 644.

(2) Where the resolution is proposed as a written resolution, a copy of the solvency statement must be sent or submitted to every eligible member at or before the time at which the proposed resolution is sent or submitted to him.

(3) Where the resolution is proposed at a general meeting, a copy of the solvency statement must be made available for inspection by members of the company throughout that meeting.

(4) The validity of a resolution is not affected by a failure to comply with subsection (2) or (3).


**643 Solvency statement**

(1) A solvency statement is a statement that each of the directors—

> (a) has formed the opinion, as regards the company's situation at the date of the statement, that there is no ground on which the company could then be found to be unable to pay (or otherwise discharge) its debts; and

> (b) has also formed the opinion—

>> (i) if it is intended to commence the winding up of the company within twelve months of that date, that the company will be able to pay (or otherwise discharge) its debts in full within twelve months of the commencement of the winding up; or

>> (ii) in any other case, that the company will be able to pay (or otherwise discharge) its debts as they fall due during the year immediately following that date.

(2) In forming those opinions, the directors must take into account all of the company's liabilities (including any contingent or prospective liabilities).

(3) The solvency statement must be in the prescribed form and must state—

> (a) the date on which it is made, and

> (b) the name of each director of the company.

(4) If the directors make a solvency statement without having reasonable grounds for the opinions expressed in it, and the statement is delivered to the registrar, an offence is committed by every director who is in default.

(5) A person guilty of an offence under subsection (4) is liable—

    (a) on conviction on indictment, to imprisonment for a term not exceeding two years or a fine (or both);

    (b) on summary conviction—

        (i) in England and Wales, to imprisonment for a term not exceeding twelve months or to a fine not exceeding the statutory maximum (or both);

        (ii) …

### 644 Registration of resolution and supporting documents

(1) Within 15 days after the resolution for reducing share capital is passed the company must deliver to the registrar—

    (a) a copy of the solvency statement, and

    (b) a *memorandum complying with subsection (2).*

This is in addition to the copy of the resolution itself that is required to be delivered to the registrar under Chapter 3 of Part 3.

(2) *The memorandum must show with respect to the company's share capital as reduced by the resolution—*

    *(a) the amount of the share capital,*

    *(b) the number of shares into which it is to be divided, and the amount of each share, and*

    *(c) the amount (if any) at the date of the registration deemed to be paid up on each share.*

(3) The registrar must register the documents delivered to him under subsection (1) on receipt.

(4) The resolution does not take effect until those documents are registered.

(5) The company must also deliver to the registrar, within 15 days after the resolution is passed, a statement by the directors confirming that the solvency statement was—

    (a) made not more than 15 days before the date on which the resolution was passed, and

(b) provided to members in accordance with section 642(2) or (3).

(6) The validity of a resolution is not affected by—

(a) a failure to deliver the documents required to be delivered to the registrar under subsection (1) within the time specified in that subsection, or

(b) a failure to comply with subsection (5).

(7) If the company delivers to the registrar a solvency statement that was not provided to members in accordance with section 642(2) or (3), an offence is committed by every officer of the company who is in default.

(8) If default is made in complying with this section, an offence is committed by—

(a) the company, and

(b) every officer of the company who is in default.

(9) a person guilty of an offence under subsection (7) or (8) is liable—

(a) on conviction on indictment, to a fine;

(b) on summary conviction, to a fine not exceeding the statutory maximum.

## PART 3
## Directors' duties

## Chapter 2 of Part 10 of the Companies Act 2006

**172 Duty to promote the success of the company**

(1) A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole, and in doing so have regard (amongst other matters) to--

(a) the likely consequences of any decision in the long term,

(b) the interests of the company's employees,

(c) the need to foster the company's business relationships with suppliers, customers and others,

(d) the impact of the company's operations on the community and the environment,

(e) the desirability of the company maintaining a reputation for high standards of business conduct, and

(f) the need to act fairly as between members of the company.

(2) …

(3) The duty imposed by this section has effect subject to any enactment or rule of law requiring directors, in certain circumstances, to consider or act in the interests of creditors of the company.

## 1157 Power of court to grant relief in certain cases

(1) If in proceedings for negligence, default, breach of duty or breach of trust against--

(a) an officer of a company, or

(b) …

it appears to the court hearing the case that the officer or person is or may be liable but that he acted honestly and reasonably, and that having regard to all the circumstances of the case (including those connected with his appointment) he ought fairly to be excused, the court may relieve him, either wholly or in part, from his liability on such terms as it thinks fit.

## PART 4
## Transactions defrauding creditors

## Insolvency Act 1986

## 423 Transactions defrauding creditors

(1) This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another person if—

(a) he makes a gift to the other person or he otherwise enters into a transaction with the other on terms that provide for him to receive no consideration;

(b) …

(c) he enters into a transaction with the other for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.

(2) Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for—

(a) restoring the position to what it would have been if the transaction had not been entered into, and

(b) protecting the interests of persons who are victims of the transaction.

(3) In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purpose—

(a) of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or

(b) of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.

(4) …

(5) In relation to a transaction at an undervalue, references here and below to a victim of the transaction are to a person who is, or is capable of being, prejudiced by it; …

## 425 Provision which may be made by order under s 423

(1) Without prejudice to the generality of section 423, an order made under that section with respect to a transaction may (subject as follows)—

(a) require any property transferred as part of the transaction to be vested in any person, either absolutely or for the benefit of all the persons on whose behalf the application for the order is treated as made;

(b) require any property to be so vested if it represents, in any person's hands, the application either of the proceeds of sale of property so transferred or of money so transferred;

(c) release or discharge (in whole or in part) any security given by the debtor;

(d) require any person to pay to any other person in respect of benefits received from the debtor such sums as the court may direct;

(e) provide for any surety or guarantor whose obligations to any person were released or discharged (in whole or in part) under the transaction to be under such new or revived obligations as the court thinks appropriate;

(f) provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any property and for such security or charge to have

the same priority as a security or charge released or discharged (in whole or in part) under the transaction.

(2) An order under section 423 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the debtor entered into the transaction; but such an order—

(a) shall not prejudice any interest in property which was acquired from a person other than the debtor and was acquired in good faith, for value and without notice of the relevant circumstances, or prejudice any interest deriving from such an interest, and

(b) shall not require a person who received a benefit from the transaction in good faith, for value and without notice of the relevant circumstances to pay any sum unless he was a party to the transaction.

(3) For the purposes of this section the relevant circumstances in relation to a transaction are the circumstances by virtue of which an order under section 423 may be made in respect of the transaction.

(4) In this section "security" means any mortgage, charge, lien or other security.

TAB 13

*Carlyle Capital Corporation Ltd v Conway*, 11/2012,
Court of Appeal of the Island of Guernsey

10-03635-jpm    Doc 173-2    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C part 1
Pg 561 of 856
Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

**Judgment 11/2012**                    **Carlyle Capital Corporation Limited et al v Conway et al – Court of Appeal – Civil File No 435 – 23rd March 2012**

---

**Appeal of Royal Court judgment of 22 July 2011.  Companies (Guernsey) Law 1994 – company liquidation – jurisdiction – appeal allowed.  Leave to appeal to the Privy Council dismissed – application for stays pending leave to appeal dismissed.  (see 29/2011)**

## IN THE COURT OF APPEAL OF GUERNSEY

The 23rd day of March, 2012 before The Hon Michael Jacob Beloff QC, presiding, James Walker McNeill QC and Sir Hugh Bennett

Between

    (1)   CARLYLE CAPITAL CORPORATION LIMITED (IN LIQUIDATION)
    (2)   ALAN JOHN ROBERTS, NEIL MATHER, CHRISTOPHER MORRIS, ADRIAN JOHN DENIS RABET, solely in their capacity as Joint Liquidators of Carlyle Capital Corporation Limited (In Liquidation)

                                       Plaintiffs/Appellants

                and

    (1)   WILLIAM ELIAS CONWAY JR
    (2)   JAMES H. HANCE JR
    (3)   JOHN CRUMPTON STOMBER
    (4)   MICHAEL J. ZUPON
    (5)   ROBERT BARCLAY ALLARDICE III
    (6)   HARVEY JAY SARLES
    (7)   JOHN LEONARD LOVERIDGE
    (8)   CARLYLE INVESTMENT MANAGEMENT LLC
    (9)   TC GROUP LLC
    (10)  TCG HOLDINGS LLC

                                    Defendants/Respondents

On the Plaintiffs'' application for leave to appeal the judgment given by the Royal Court (Ordinary Division) on 22 July 2011;

THE COURT, having on 30 to 31 January 2012 and 1 to 3 February 2012 heard from Advocates J M Wessels for the Plaintiffs, Advocate S H Davies for the First to Fourth and Eighth to Tenth Defendants and Advocate G K Bell for the Fifth to Seventh Defendants;

And whereas, on 23 February 2012 the Court handed down a draft reasoned judgment for the parties to correct any literal errors;

And whereas, on 5 March 2012 the Court formally handed down its Judgment ("the Forum Judgment"), THE COURT:-

    (i)     GRANTED the Plaintiffs leave to appeal the judgment of 22 July 2011;

    (ii)    ALLOWED the appeal;

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

(iii)     DISMISSED the First to Fourth and Eighth to Tenth  Defendants' cross- appeal  by Respondents‟ Notice dated 21 September 2011;

(iv)     DISMISSED the Fifth to Seventh Defendants' cross- appeal by Respondents‟ Notice dated 23 September 2011;

(v)     DISMISSED the Exceptions Déclinatoire of the First to Fourth and Eighth to Tenth Defendants dated 28 February 2011;

(vi)     DISMISSED the Exceptions Déclinatoire of the Fifth to Seventh Defendants dated 28 February 2011;

(vii)     SET ASIDE the stay granted by the Deputy Bailiff on 22 July 2011;

(viii)     GRANTED the Plaintiffs leave to file an Amended Cause in the terms set out in the Proposed Amended Cause dated 13 May 2011, exhibited at Tab 165 to the Affidavit of Alan John Roberts sworn 13 May 2011;

(ix)     ORDERED that the Defendants pay the Plaintiffs‟ costs of and incidental to the Defendants‟ Exceptions Déclinatoire dated 28 February 2011 including all of the costs of the hearing before Deputy Bailiff Collas from 27 June to 1 July 2011 and all of the costs of and incidental to the appeal on the standard recoverable basis, to be taxed if not agreed; and

(x)     ORDERED that the Defendants provide an address for service and that the Amended Cause be placed on the Rôle des Causes à Plaider.

THE COURT this day ISSUED JUDGMENT in the terms attached hereto.

And whereas, UPON THE UNDERTAKING of the Plaintiffs not to contend or otherwise rely on in any way, in the courts of Guernsey or elsewhere, that the filing and service of a Defence by the Defendants (or any other subsequent steps, directions, or applications made before the courts of Guernsey or the provision of an address for service) prior to the determination of any application for special leave to appeal to the Privy Council or (if leave is granted) any appeal to the Privy Council against the Forum Judgment of the Court of Appeal constitutes a submission by the First to Sixth and Eighth to Tenth Defendants to the jurisdiction of the courts of Guernsey.

On 6 March 2012, THE COURT:

(xi)     DISMISSED the First to Fourth and Eighth to Tenth  Defendants' application for leave to appeal to the Judicial Committee of the Privy Council;

(xii)     DISMISSED the Fifth to Seventh Defendants' application for leave to appeal to the Judicial Committee of the Privy Council;

(xiii)     DISMISSED the First to Fourth and Eighth to Tenth  Defendants' application for a stay pending an application for leave to appeal to the Judicial Committee of the Privy Council; and

(xiv)     DISMISSED the Fifth to Seventh Defendants' application for a stay pending an application for leave to appeal to the Judicial Committee of the Privy Council.

J TORODE
Registrar of the Court of Appeal

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

# IN THE COURT OF APPEAL OF GUERNSEY

**Before:**

The Hon Michael Jacob Beloff QC
James Walker McNeill QC
Sir Hugh Peter Derwyn Bennett

**Judges of Appeal**

**Between:**

**(1) CARLYLE CAPITAL
CORPORATION LIMITED
(IN LIQUIDATION)**

**(2) ALAN JOHN ROBERTS, NEIL MATHER, CHRISTOPHER MORRIS,
ADRIAN JOHN DENIS RABET,
SOLELY IN THEIR CAPACITY AS JOINT LIQUIDATORS OF
CARLYLE CAPITAL CORPORATION LIMITED (IN LIQUIDATION)**

**(Applicants Plaintiffs)**

**–v–**

**(1) WILLIAM ELIAS CONWAY Jr
(2) JAMES H HANCE Jr
(3) JOHN CRUMPTON STOMBER
(4) MICHAEL J ZUPON
(5) ROBERT BARCLAY ALLARDICE III
(6) HARVEY JAY SARLES
(7) JOHN LEONARD LOVERIDGE
(8) CARLYLE INVESTMENT MANAGEMENT L.L.C.
(9) TC GROUP L.L.C.
(10) TCG HOLDINGS L.L.C.**

**(Respondents Defendants)**

**Decision handed down 13 February 2012
Written Judgment handed down 5 March 2012**

**Advocate  J M Wessels appeared for the Appellants
Advocate   S H Davies (First to Fourth & Eighth to Tenth)  &
Advocate G K Bell (Fifth to Seventh) appeared for the Respondents**

The President,

1.      This is a judgment of the Court.

2.      Carlyle Capital Corporation Limited (in liquidation) ("CCC") and its joint Liquidators, Messrs
Roberts, Mather, Morris and Rabet (the Plaintiffs in the Cause) apply for leave to appeal and, if
leave is granted, appeal that part of the order of the Deputy Bailiff dated 22 July 2011 whereby
he, having refused to set aside leave to the Plaintiffs to serve the Cause out of the jurisdiction
upon the Defendants 1-6 and 8-10 granted by Lieutenant Bailiff Patrick Talbot Q.C. on 7 July
2010, nevertheless ordered that the claims in the Cause be stayed pending a trial of any action
against all the Defendants by the Plaintiffs in the State of Delaware in the United States of

10-03635-jpm    Doc 173-2    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C part 1
Pg 564 of 856
Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

America.  The Defendants 1-7 and 8-10, if leave is granted, appeal by cross notice the Deputy Bailiff"s order refusing to set aside leave to serve out of the jurisdiction granted by LB Talbot. The Plaintiffs also seek leave to amend the Cause by adding certain causes of action against the existing Defendants and to join another party to the Cause.  For convenience, without prejudice to the distinct identities indicated, we shall call the disputant parties, save where otherwise necessary, the Liquidators and the Directors respectively.

3.    On 13 February 2012 we gave leave to appeal and allowed the appeal.  We dismissed the Directors cross-notice.  We allowed the Liquidators application for leave to amend the Petition. We indicated, as we foreshadowed at the conclusion of the hearing that we would give our reasons for these several decisions later.  The following are our reasons.

4.    At this stage of this potentially complex and costly litigation the  dispute is not about the merits of the Liquidators" claim but where adjudication of those merits should take place - the choice being between Guernsey and Delaware, the former supported by the Liquidators, the latter by the Directors.  The Deputy Bailiff, as appears from his order, acceded to neither side"s proposal in full. The essential question before this Court is whether his via media (or compromise) was flawed.

5.    We must start by setting out the background taking advantage, with gratitude, of the lucid summary made by the Deputy Bailiff.

6.    On 29 August 2006 CCC was incorporated in Guernsey.   It was promoted by the Carlyle Group, one of the world"s largest private equity firms, to invest in residential mortgage backed securities ("RMBS"). By July 2007 CCC had raised capital totalling US$ 945 million through a series of private placements and an initial public offering.  It was listed on the Euronext Exchange in Amsterdam.  The substantive proceedings in this matter concern the events of the following eight months during which the global credit markets became increasingly volatile and during which period the entire capital of CCC was lost.

7.    On 17 March 2008 CCC was placed into compulsory liquidation in Guernsey pursuant to section 94(a) of The Companies (Guernsey) Law 1994, as amended ("the 1994 Law") on the application of the Directors of CCC.

8.    CCC financed its investments through short-term repurchase agreements giving extensive leverage.  Consequently when CCC collapsed not only was the capital lost but, it is alleged, there was a substantial deficit.

9.    There are ten Defendants in these proceedings.  The first seven Defendants were all Directors of CCC.  The first four Defendants held offices and/or were employees of other companies within the Carlyle Group.  The fifth to seventh Defendants were appointed as independent members of the board of CCC. The eighth Defendant, Carlyle Investment Management LLC ("CIM") is a Delaware registered company and was appointed as the investment manager and advisor to CCC pursuant to an investment management agreement ("IMA") dated 20 September 2006.

10.    The ninth Defendant, TC Group LLC, ("TCG"), which owned 75% of CIM, and the tenth Defendant, TCG Holdings LLC, the sole managing member of TCG , are collectively referred to as "Carlyle", except where otherwise stated. Carlyle and CIM have been described collectively by the Liquidators as "the Corporate Defendants".  It is alleged that, by virtue of their control over CCC and by their conduct, the Corporate Defendants became de facto or shadow Directors of CCC and thereby owed the same duties to CCC as its de jure Directors.

11.    The procedural history in outline is as follows.  On 7 July 2010 the Liquidators issued proceedings in four separate jurisdictions, Guernsey, Delaware, District of Columbia, and in the State of New York, all claiming in similar form damages "*in a sum to be determined at trial exceeding $1 billion*" together with other relief.  The Liquidators alleged in the Cause and

10-03635-jpm    Doc 173-2    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C part 1
Pg 565 of 856
Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

submitted before the Deputy Bailiff and before us, that the nature of the action is one essentially concerned with the internal management, control and corporate governance of CCC.  The Directors submitted before the Deputy Bailiff and before us that the nature of the Liquidators'' action essentially relates to the failures of the duties arising under and connected with the IMA.

12.    On 7 July 2010 the Liquidators applied for leave to serve the proceedings out of the jurisdiction on all the Directors (save for the seventh Director ("Mr Loveridge") who is resident in Guernsey), pursuant to Rule 8 of The Royal Court Civil Rules, 2007.  The application was heard and granted by LB Talbot on an *ex parte* basis.

13.    By applications dated 28 February 2011, the non-resident Directors applied to set aside the leave granted to serve out of the jurisdiction or, alternatively, for an order that the proceedings be stayed pending the outcome of the proceedings in Delaware.  The Deputy Bailiff understood that the proceedings in New York and in the District of Columbia were not being seriously pursued, and that, as he said in para 10 of his judgment "*the argument before me centred upon the choice of jurisdiction between Delaware and Guernsey*".

14.    On 8 August 2011 the Liquidators sought the Deputy Bailiff's leave to appeal which on 18 August 2011 was refused.  On 19 August 2011, the Liquidators sought leave to appeal from the Court of Appeal pursuant to an interlocutory direction from the Bailiff, sitting as a single member.  On 15 September 2011 the application came before The Hon. Michael J. Beloff QC (President), Michael Jones QC and Clare Montgomery QC, JJA, when it was ordered that the Liquidators'' application for leave to appeal, with appeal to be followed if granted, was to be heard on 30 January 2012 with a 5 day estimate.  On 21 September the First to Fourth and Eighth to Tenth Defendants served a Cross Notice seeking to overturn the Deputy Bailiff's refusal to set aside the leave to serve out or alternatively to uphold the order as to the stay.  On 23 September the Fifth to Seventh Defendants served a similar Cross-Notice.

15.    The hearing before us accordingly took place between 30 January and 3 February 2012 frustrating the hopes of Lord Templeman in *Spiliada* that in this area "*submissions will be measured in hours not days*" (1987 1 AC 460 at p.465G).  Advocate Wessels represented the Appellants and Advocate Davies all the Respondents except for the independent Directors who were represented by Advocate Bell.  We are grateful to the advocates for submissions of high quality and to the substantial teams who provided legal and logistical support.

16.    By way of prologue we deal with the application to amend.  Although in correspondence prior to the hearing before him the Deputy Bailiff was invited to consider the proposed amendments on the basis that they were certain to be granted, for whatever reason, the Liquidators in fact made no formal application to amend (DB paragraphs 118 and 133).  The Deputy Bailiff's approach to the proposed amendments was in consequence explicably ambivalent.  He said that he would in principle ignore them by reference to considerations of the balance of prejudice (DB paragraphs 133-4) - but nonetheless did avert to them, it appears on a *de bene esse* basis, and concluded that they would not have affected his decision on forum in any event (DB paragraph 140).  It seems to us preferable, now the application to amend has been made, to determine whether the claim is to proceed on the original or on an amended basis before adjudicating on the substantive matters in issue before us.  There is no doubt that we have power to do so**.**

17.    It would moreover be productive of delay and expense were we not to consider the application ourselves and to direct that it be heard by a judge of first instance.  Furthermore, neither Advocates Davies nor Bell indeed submitted that it was not appropriate for us to consider the application for leave to amend. Their submissions were rather that leave to amend should be refused.

18.    The Cause, as it presently stands, is against all the Directors for damages, jointly and severally, in a sum to be determined at trial exceeding $1 billion together with interest.  We summarise the bases of the various claims as follows.  It is alleged at section C of the Cause that the Directors

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

owed CCC fiduciary duties to act in the best interests of CCC without regard to the interests of Carlyle and duties to act with skill and care in managing CCC″s business affairs. So far as Carlyle and CIM are concerned, it is alleged that each owed duties, including fiduciary duties, to CCC to act in CCC″s best interests; in addition each owed the same duties as shadow Directors. It is alleged between E.6 to E.14 of the Cause that breaches of the various duties began in about July 2007 and continued through to about February 2008. Each breach is said to be either reckless or grossly negligent or negligent and to have constituted wilful misconduct and been in breach of fiduciary duties and other obligations owed by all the Defendants to CCC. Para 34 of the Cause, part of Section A "Introduction", stated:-

> ―At every juncture, the Defendants breached their fiduciary duties and acted recklessly and/or grossly negligently, by giving priority to The Carlyle Group's interests over those of CCC. What is more, the Defendants well understood and publicly declared their intention to undertake the steps that needed to be taken to maintain CCC as a viable entity, while simultaneously and secretly deciding to do precisely the opposite of what they knew and believed was necessary to save CCC. But The Carlyle Group's relationship with CCC did not reward prudent management and reduction of risk; rather it encouraged the Defendants to continue to increase risk in volatile markets, rather than preserve CCC's capital. In a desire to reap the rewards of outsize returns, the Defendants maintained excessive leverage and low liquidity, and recklessly sent CCC into its inevitable demise. CCC was so unprotected from the known and sustained volatility of the financial markets that by mid 2007 the loss of CCC's entire capital and its collapse became the inevitable consequence. "

Further, there is a claim against CIM for breach of the IMA.

19.    The claims for relief are set out under 18 "Claims for Relief" in the Cause. The First to the Eighth Claims and the Eleventh to the Thirteenth Claims are for damages for misfeasance, breach of fiduciary duty, gross negligence and/or negligence as against the Defendants in their capacities as Directors and/or in the case of CIM and Carlyle as shadow Directors. The Ninth Claim, which has now been abandoned, was against CIM for a declaration to set aside the IMA. The Tenth Claim is against CIM for damages for breach of contract. The Fourteenth Claim is by the Liquidators against the Directors, pursuant to s.106 of the 1994 Law or s.422 of the Companies (Guernsey) Law 2008 ("the 2008 law"), for compensation in amounts to be determined at trial. The Fifteenth and Sixteenth Claims are again claims by the Liquidators under s. 106 etc., but against CIM and Carlyle, respectively, alleging that each were "officers" of CCC. The Seventeenth Claim is a claim against CIM and Carlyle for the return of CCC″s books and records and other property, in that despite requests for the return of all CCC″s books etc, some but not all books have been returned, and the failure to return all books etc amounts to obstruction of the proper investigation of CCC by the Liquidators. The Eighteenth Claim is a claim against CIM and Carlyle for unjust enrichment.

20.    We summarise the proposed amendments to the Cause as follows. The Sixth to Eighth Claims are substituted for the original claims thereunder by a claim by the Liquidators against CCC″s Directors for wrongful trading pursuant to s.67C of the Companies (Guernsey) Law 1994 or s.434 of the Companies (Guernsey) Law 2008, against CIM for wrongful trading under the same Laws, and against Carlyle for wrongful trading under the same Laws. Declarations are sought that both CIM and Carlyle were Directors of CCC, as defined by s.67C (7) of the 1994 Law or s.434 (7) of the 2008 Law, and that all Defendants are liable to make such contributions to CCC″s assets as the Royal Court thinks proper. Further, an additional head of relief is for a disqualification order in respect of each of CCC″s Directors, CIM and Carlyle pursuant to s.67A (1) of the 1994 Law and s.428 of the 2008 Law. The last proposed amendment is to add State Street (Guernsey) Ltd, a Guernsey registered company, which provided administration services to CCC under an agreement dated 6 October 2006. The proposed Nineteenth Claim is against State Street and CIM for return of books and records of CCC.

10-03635-jpm    Doc 173-2    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C part 1
Pg 567 of 856
Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

21.    The test to be applied in considering the application for leave to amend is to be found in para 75 of the judgment of Lord Phillips in *NML Ltd v Republic of Argentina* [2011] UKSC 31, which the Deputy Bailiff set out at para 129 of his judgment:-

> ―*Where an application is made to amend a pleading the normal approach is to grant permission where to do so will cause no prejudice to the other party that cannot be dealt with by an appropriate order for costs.  This accords with the overriding objective.  Where all that a refusal of permission will achieve is additional cost and delay, the case for permitting the amendment is even stronger.*"

He added:
> ―*I can see no reason in principle why similar considerations should not apply where an application is made for permission to serve process out of the jurisdiction.*"

22.    As the Deputy Bailiff said at para 130 of his judgment, Lord Phillips" reasoning is entirely consistent with the overriding objective which Guernsey has adopted in Rule 1 of the Royal Court Civil Rules, 2007, and there is no reason why that reasoning should not be persuasive and followed in Guernsey.

23.    In respect of all proposed amendments the Directors submitted that leave should be denied because they were all sought for purely tactical reasons i.e. to support the Liquidators" case on forum conveniens.  It seems to us that as long as the proposed amendments were not demurrable and had an independent purpose, the mere fact that they also, if allowed, added weight to the Liquidators" forum arguments could not be a valid basis for objection.  Indeed if they had both substance and purpose, it would be very difficult, if not impossible, to find that they were advanced only for inappropriate tactical reasons.  In any event we are unpersuaded that the Directors" assault under this head had any force.  The issue of proceedings in four jurisdictions, all claiming essentially the same relief, seemed to us to be no more than a conventional exercise of keeping all options open.  Even if at one time the Liquidators might have been open to the notion of a Delaware forum, their later rejection of that possibility was, in our view, nothing other than the product of consideration of its full implications.  There are in the copious files before us instances of both sides emphasising one matter in Delaware and another in Guernsey.  We must concentrate on the objective facts.

24.    In respect of the proposed amendment to plead Wrongful Trading the Directors claimed that it was demurrable.  If this could be made good, it would of course be an irresistible ground for refusal of leave.    We remind ourselves, however, of the dangers of refusing leave in circumstances where the area of law is developing, and it would be preferable to have facts found rather than facts hypothetical before assessing the soundness of a plea.  See *X v Bedfordshire CC* 1995 2 AC 633 at p. 740-741 in a passage on striking out, in the speech of Lord Browne-Wilkinson but equally applicable, *mutatis mutandis*, to refusal of leave to amend:-

> ―*In all these cases the defendants are seeking to strike out the claims at an early stage, before discovery has taken place and before the facts are known.  It is therefore necessary to proceed on the basis that the facts alleged in the various statements of claim are true.  It must be stressed that these allegations are not admitted by the defendants.*

> *Actions can only be struck out under R.S.C., Ord. 18, r. 19 where it is clear and obvious that in law the claim cannot succeed.  Where the law is not settled but is in a state of development (as in the present cases) it is normally inappropriate to decide novel questions on hypothetical facts. ......*

> *Much more difficult is the question whether it is appropriate to decide the question whether there is a common law duty of care in these cases. There may be cases… where it is evident that, whatever the facts, no common law duty of care can exist.  But in other*

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

> *cases the relevant facts are not known at this stage. For example, in considering the question whether or not a discretionary decision is justiciable, the answer will often depend on the exact nature of the decision taken and the factors relevant to it. Evidence as to those matters can only come from the defendants and is not presently before the court...... if, on the facts alleged in the statement of claim, it is not possible to give a certain answer whether in law the claim is maintainable then it is not appropriate to strike out the claim at a preliminary stage but the matter must go to trial when the relevant facts will be discovered".*

25. The concept of wrongful trading was introduced in the constituent parts of the United Kingdom pursuant to Cork Report of 1982. The concept of fraudulent trading had required proof of dishonesty and to the criminal standard. The Committee wished to allow compensation for those who had suffered foreseeable loss as a result of unreasonable behaviour, namely the objectively unreasonable continuation of the incurring of liabilities with no reasonable prospect of meeting them: see paragraphs 1776 – 1790 of the Report. In Guernsey, section 67C of the 1994 Law (once amended) permits a declaration of liability where a director, of a company which has gone into insolvent liquidation, at some time before the commencement of winding up knew or ought to have concluded that there was no reasonable prospect of avoiding going into insolvent liquidation. The proposed amended pleading embraces this concept in the amended Sixth, Seventh and Eighth Claims and tracks exactly the statutory language. The Directors″ submission therefore has to be that the particulars said to give support to the general plea, even if established, did not support it.

26. The debate between the parties can be epitomized in this way. The Directors said that as long as insolvency could be avoided by the taking of some measures, the criterion of „no reasonable prospect of avoiding insolvent liquidation″ could not be satisfied. The Liquidators say that for so long as the Directors had set their face against such measures, they could not deploy that hypothetical possibility in order to deny the existence of a mandatory element of the offence. We need not pronounce on where the balance of arguments lies; it is sufficient to say that, at its lowest, the Liquidators″ argument is not untenable.

27. Two cases were relied on by the Directors for the contrary conclusion. On a proper reading, neither do. *In re Continental Assurance* [2001] BPIR 733, at paragraph 106, Park J merely referred to typical cases where directors have:

> *"closed their eyes to the reality of the company's position, and carried on trading long after it should have been obvious to them that the company was insolvent and that there was no way out for it."*

In *In Re Marini Ltd* [2004] BCC 173 HH Judge Seymour QC, at paragraph 69 was considering a relatively ordinary trading company and the timing of the taking of radical measures. The key sentence in that paragraph

> *"I should have been fairly readily persuaded on the totality of the evidence that each of the respondents ought to have appreciated by the time sales up to Christmas in 1998 had not produced any improvement in the situation of the company that there was no reasonable prospect of insolvent liquidation being avoided in the absence of radical measures, but even at that stage the evidence did not indicate that insolvent liquidation was anything like inevitable."*

is both *obiter* and, on the issue under scrutiny, ambiguous.

28. Neither passage enunciates a principle and both cases were determined after a trial. It is worthy of note that the Cork Committee had in mind the inclusion of liability for those who shut their eyes to the obvious or refrained from asking obvious questions (paragraph 1788) and the test of what an honest reasonable businessman, with knowledge of all the facts, would have done

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

(paragraphs 1789 and 1790).  There seems to us no reason in principle why the conclusion that there was no reasonable prospect of avoiding insolvent liquidation should not be available where it could be based upon the decisions which the Board itself had taken as to the way in which the company was to operate in its hour of difficulty.  Assuming that a situation has developed which might be retrievable through radical measures but a Board decides on measures of a diametrically opposed nature, we are not persuaded that there is anything remarkable about a result that such conduct is wrongful.  In other words, the relevant director knew or ought to have concluded that, assuming the Board did not depart from its policies, there was no reasonable prospect of avoiding going into insolvent liquidation.

29.     Another proposed amendment was designed to enable the Appellants to seek disqualification of the respondent Directors. The relevant statutory provisions are to be found in Section 67A(1)(7) and Schedule 3 of the 1994 Law.  Unfitness of a character sufficient to entitle a court to make such an order is to be determined by reference to, among other matters, the individual″s probity, competence, solvency, soundness of judgement, diligence and previous conduct.  The Directors″ bold argument that the Liquidators should not be permitted to bring such a claim flies, in our view, in the face of the statutory endowment of their power to do so.  The supplementary and somewhat elusive argument that there is a perceptible conflict between the Liquidators″ application for Directors″ disqualification and their concurrent application for compensation from  the self-same Directors under s.106 of the same law is again irreconcilable with the statutory recognition that  they could do either (and, if saw fit, therefore both).     The final argument that other bodies with power under the self-same statute to act had not done so leads nowhere.  If a basis for a director″s disqualification is arguably established, a liquidator is best placed to make an application in the context of proceedings where the director″s conduct is already to be adjudicated upon.

30.     The Directors alleged a lack of particularity of the grounds in support of the application.  Whilst there is no specified correlation of Conclusion 6 to particular parts of the preceding narrative, this is no basis for rejecting amendment as long as the general pleading contains material which could – and that is our view – support it.  Any such imperfection can be cured later. So far as our experience goes, it is far from unusual for the early stages of such applications to be attended with calls for further and better particulars.

31.     The proposed addition of the eleventh defendant was not seriously contested.

32.     We will accordingly allow all the amendments and so clear the decks for the main (ie forum) issue before us.

33.     On the main issue we have borne in mind the established tests in this jurisdiction for (i) leave to appeal **and** (ii) where a discretionary decision is involved, the limits of powers of the appellate court to interfere.

34.     The general test for determining whether to grant leave to appeal is set out in *McNamara v Gauson* [2009-10] GLR 387, citing and adopting the English Practice Direction (Court of Appeal (Civil Division)) (8) of 1999.  Thus (1) leave to appeal will be granted unless an appeal would have no real prospect of success; and (2) leave to appeal may also be granted in exceptional circumstances if there is an issue which, in the public interest, should be examined by the Court of Appeal, such as where a case raises questions of great public interest or questions of general policy.

35.     Where the discretionary decision of a lower court is involved, the limits of the appellate court are the correction of error of principle, of the taking into account of an irrelevant matter, the failure to take into account a relevant matter or the interference with a decision plainly wrong: e.g. *The Abidin Daver* [1984] AC 398, at 420.

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

36.    The established tests for service out of the jurisdiction are summarised in *Altimo Holdings Investments Ltd v Kyrgyz Mobile Telecom Limited* (2011) UKPC 7 para 71 (quoted by the Deputy Bailiff at paragraph 16).

"*71.    On an application for permission to serve a foreign defendant (including an additional defendant to counterclaim) out of the jurisdiction, the claimant (or counterclaimant) has to satisfy three requirements: Seaconsar Far East Ltd v Bank Barkazi Jomhouri Islami Iran [1994] 1 AC 438, 453-457. First, the claimant must satisfy the court that in relation to the foreign defendant there is a serious issue to be tried on the merits, i.e. a substantial question of fact or law, or both. The current practice in England is that this is the same test as for summary judgment, namely whether there is a real (as opposed to a fanciful) prospect of success: e.g. Carvill America Inc v Camperdown UK Ltd [2005] EWCA Civ 645, [2005] 2 Lloyd's Rep 457, at [24]. Second, the claimant must satisfy the court that there is a good arguable case that the claim falls within one or more classes of case in which permission to serve out may be given. In this context —god arguable case" connotes that one side has a much better argument than the other: see Canada Trust Co v Stolzenberg (No2) [1998] 1 WLR 547, 555-7 per Waller LJ, affd [2002] 1 AC 1; Bols Distilleries BV v Superior Yacht Services [2006] UKPC 45, [2007] 1 WLR 12, [26]-[28]. Third, the claimant must satisfy the court that in all the circumstances the Isle of Man is clearly or distinctly the appropriate forum for the trial of the dispute, and that in all the circumstances the court ought to exercise its discretion to permit service of the proceedings out of the jurisdiction.*"

37.    Of the three key elements the satisfaction of the first two is not now in dispute. There are serious issues to be tried (DB paragraph 17). There is a good arguable case as to the gateways. (DB paragraph 66)

38.    As to the third test (ie that Guernsey is the "*clearly appropriate forum*") we start by observing that, although invited to do so, the Deputy Bailiff did not set aside the Lieutenant Bailiff's order serving the other Respondents out of the jurisdiction.

39.    The test for stay of proceedings instituted within the jurisdiction on grounds of forum non conveniens ("a forum stay") is set out in the classic case of *Spiliada Maritime Corporation v Cansulex Limited* [1987] 1 AC 460 which has been applied in Guernsey on a number of cases including *Masood v Zahoor (*Royal Court, LB Southwell QC, 9th July 2007) and was referred to below by the Deputy Bailiff (DB paragraphs 20 and 67). Lord Goff there stated (at p 476B – G):

—*Inmy opinion, having regard to the authorities (including in particular the Scottish authorities), the law can at present be summarised as follows.*

(a)    *The basic principle is that a stay will only be granted on the ground of forum non conveniens where the court is satisfied that there is some other available forum, having competent jurisdiction, which is the appropriate forum for the trial of the action, i.e. in which the case may be tried more suitably for the interests of all the parties and the ends of justice.*

(b)    *As Lord Kinnear's formulation of the principle indicates, in general the burden of proof rests on the defendant to persuade the court to exercise its discretion to grant a stay (see, e.g., the Société du Gaz case, 1926 S.C.(H.L.) 13 , 21, per Lord Sumner; and Anton, Private International Law (1967) p. 150). It is however of importance to remember that each party will seek to establish the existence of certain matters which will assist him in persuading the court to exercise its discretion in his favour, and that in respect of any such matter the evidential burden will rest on the party who asserts its existence. Furthermore, if the court is satisfied that there is another available forum which is prima facie the appropriate forum for the trial of the action, the burden will then shift to the*

> *plaintiff to show that there are special circumstances by reason of which justice requires that the trial should nevertheless take place in this country (see (f), below).*

> (c)    *The question being whether there is some other forum which is the appropriate forum for the trial of the action, it is pertinent to ask whether the fact that the plaintiff has, ex hypothesi, founded jurisdiction as of right in accordance with the law of this country, of itself gives the plaintiff an advantage in the sense that the English court will not lightly disturb jurisdiction so established."*

40.    The criteria that govern stay on such grounds are the converse of those set out in the forum element of leave to serve out of the jurisdiction, as noted by the editors of the Supreme Court Practice 2012 at 6.37, 16 p.252.

41.    Since the power to stay proceedings is part of the general case management powers of the court, in exceptional circumstances it may be exercised where the interests of justice so require even where the case does not come within *Spiliada* principles; ie on grounds other than that another jurisdiction is forum conveniens.  *Reichhold Norway v Goldman Sachs* 2000 1 WLR 173.

42.    There was some debate before us as to whether the stay ordered by the Deputy Bailiff was a forum stay or a case management stay; paradoxically the Directors argued that it was a forum stay though the reluctance of an appellate court to interfere with exercise of discretion would be particularly strong in respect of a case management decision.  In *Reichhold* Lord Bingham of Cornhill C.J., (at p. 186) cited with approbation the submissions of Counsel.

> *_'He did, however, suggest that the court was well able to control its own business, and he accepted that the grant of stays such as this would be a rarity, account always being taken of the legitimate interests of plaintiffs and the requirement that there should be no prejudice to plaintiffs beyond that which the interests of justice were thought to justify."*

and added:

> *"stays are only granted in cases of this kind in rare and compelling circumstances."*

43.    The question of classification is in this instance difficult; the stay ordered by the Deputy Bailiff may most accurately be termed a quasi-forum stay since its basis was the apparent perception of the Deputy Bailiff that for most issues Delaware but, for a residual category Guernsey, was the appropriate forum.

44.    The case law in our view shows that the Court seized whether of an application for service out or an application for stay on forum grounds must identify what is the *forum conveniens* for resolution of —the*trial of the dispute"* rather than of individual issues within the dispute (see passages from *Altimo Holdings* and *Spiliada* cited above).  Close scrutiny of the Deputy Bailiff's decision persuades us that in the end, for all his careful analysis, he never confronted that key question.  Two sentences which we highlight in the concluding parts of his judgment are significant.

> "Conclusion
> 151.    *Returning to the three limbed test laid down by the Privy Council in Altimo Holdings, the merits are not in issue.  I am satisfied that two of the jurisdiction gateways relied upon by the Plaintiffs are available.  I now have to decide whether Guernsey is clearly or distinctly the appropriate forum for the trial of the dispute.  As I have indicated, there are arguments for and against both Guernsey and Delaware.  **If the Plaintiffs had not pleaded any claims for statutory relief, I would be persuaded that Delaware is clearly or distinctly the appropriate forum**.  Having carefully considered the allegations in the*

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

> *cause, I believe the importance to be attached to the exclusive jurisdiction clause in the IMA outweighs any of the factors that would point in favour of Guernsey and I am not persuaded there is a strong cause to disregard the exclusive jurisdiction clause.*

> 152. *All counsel approach the proceedings on the basis that it is preferable that all claims for relief are determined in the same set of proceedings. I have accepted that the Delaware court will not have jurisdiction over the Section 106 claim, although the Defendants will submit to the jurisdiction of that court in respect of all heads of claim. It would be unwise for me to assume that the Delaware court will ignore the limits on its jurisdiction and agree to deal with the Section 106 claim. **Therefore, if the claims for relief all have to be determined in the same set of proceedings, Guernsey is not just clearly or distinctly the appropriate forum, it is the only available forum.** The same applies to the proposed Section 67 claims in the proposed amended cause if I have to have regard to those claims which as I have explained, I do not believe is necessary. Even though all the parties accepted the desirability of proceeding in a single jurisdiction, none of them have persuaded me that it is imperative to do so. As I have endeavoured to explain, I am not persuaded that there is a real risk of conflicting legal or factual conclusions if the statutory claims are severed from the other claims for relief. Similarly, I am not persuaded that any significant additional costs would be incurred if the statutory claims have to be determined in Guernsey after the other claims have been decided by the Delaware court. Sending the case to Delaware will not therefore deprive the Plaintiffs of a juridical advantage because the statutory claims will still be available in Guernsey.*

45.  In each instance the Deputy Bailiff's choice is contingent. Indeed had he concluded that Delaware was clearly the appropriate forum he should logically have set aside the order for service out, which had as its necessary premise that Guernsey was clearly the appropriate forum; but he did not. This departure from principle by itself entitles us to revisit the exercise of discretion.

46.  There is a further point. The Deputy Bailiff never at any juncture considered the consequences of his order. True it is that the Directors" application for setting aside service out had as its alternative an application for a stay. But neither in their written nor in their oral submissions did any party address this as a viable option; all were content to argue for (on the appellants" side) Guernsey, or (on the respondents") Delaware as the forum for resolution of the whole dispute, and for nothing in between, as indeed is reflected in the opening sentence of paragraph 152 of his Judgment quoted above. We were taken carefully through the transcript of the hearing before him and, apart from a couple of allusive and speculative comments by the Deputy Bailiff, there was nothing at all to indicate that he had in mind the order he in fact made; and as he had invited the parties at the outset to not to deal with peripheral matters, both proceeded on the basis that it was an "*either/or*" case. Whether or not the Deputy Bailiff's approach constituted (unwittingly) a breach of the *audi alteram partem* rule it is unnecessary to decide. It is sufficient to note that he did not take into account a material consideration in the exercise of his discretion i.e. how his order would or could work and whether it would better deliver justice than the orders actually contended for by each side.

47.  This feeds into a third point on which the Deputy Bailiff, in our respectful view, erred. Stating (correctly) that all the parties accepted the desirability of proceedings in a single jurisdiction, he continued —*none of them persuaded me that it is imperative to do so*" (DB paragraph 152). This inverts the proper approach. Presumptively all proceedings should be heard in a single jurisdiction; modern cases from *Spiliada* to *Altimo Holdings* require the court to choose which jurisdiction is *forum conveniens*. It is for a party who contends for fragmentation to contend that (exceptionally) fragmentation is imperative, rather than vice versa. So, in so far as the Directors sought to defend the Deputy Bailiffs order, the burden lay upon them to justify the split. It was not for the Liquidators who assaulted it to show why a split could not be entertained. The Deputy Bailiff relied on no authority for his statement; and we were not shown any which supports it.

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

48.     On the premise, which we consider we have established, that it is for the above reasons at least proper for us to revisit the DBs exercise of discretion, it is useful to remind ourselves of certain matters which are indisputable.

   i.     The Cause, amended as it will be pursuant to our order raises *ex concessis* triable issues.
   ii.    The Directors have not put in their defence; in consequence it is impossible as of now to know what particular issues a court, where ever it sits, will have to decide.
   iii.   The Royal Court in Guernsey has jurisdiction to consider all the claims.
   iv.    The Chancery Court of Delaware does not have jurisdiction to consider all the claims. As far as wrongful trading is concerned, the Royal Court under the 1994 Law is the only Court which has jurisdiction: see the references to the Court in the 1994 Law, sections 67C and 117(1).  As far as directors disqualification is concerned a Delaware court could not exercise a regulatory function conferred only on organs or officers in another jurisdiction.  In our view the same must be true by parity of reasoning of the Section 106 claim brought under a Guernsey statute.  No evidence submitted by experts in Delaware law by the Directors sought to suggest otherwise or sought to contradict similar evidence submitted by the Appellants experts consistent with this proposition.
   v.     Delaware law will govern the IMA breach of contract claims only.  All claims of breach of duty by the Defendants whether as Directors *de jure, de facto* or shadow will be governed by Guernsey law.
   vi.    The Directors were responsible for the choice of Guernsey as the place of incorporation of CCC with the perceived advantages that such choice would bring.  The Carlyle Group chose to incorporate CCC in Guernsey and the Director Defendants chose to be Directors of a Guernsey company.  They opted, in short, to take advantage of the legal, fiscal and regulatory regimes applicable in Guernsey; furthermore prior to applying to place CCC in liquidation, the Directors considered which forum to adopt for that procedure and again chose Guernsey.  All the Directors must have contemplated at the very least that they could be the subject of litigation in Guernsey. In emphasising the alleged primacy of the choice of forum clause (which we shall consider below) they could fairly be charged with blowing hot and cold, or, to mix the metaphor, having their cake and eating it.

49.     In our view factors (iii-vi) tell strongly in favour of Guernsey as the *forum conveniens*. Factors (iii) and (iv) engage the presumption against fragmentation. As to factor (v), where the principal issues are those of internal management of a corporation and correlative breach of duty, the place of incorporation will presumptively be the appropriate forum because of its ability to judge matters by its own standards of business conduct: see, for example, *Ceskoslovenska Obchodni Banka AS v Nomura International plc* 2003 I. L. Pr. 20 at paragraph 12(2) and (5).

50.     It is accepted that the Delaware Court, which, we are told, treats foreign law as law, not fact, could with the assistance of experts rule on matters of Guernsey law; but it is obvious beyond a peradventure that a  Guernsey  Court will be able to deal more directly, and shortly and cost effectively with such issues which are freighted by considerations of legal domestic policy, potentially particular to offshore jurisdictions.  As to (vi) the place of incorporation is, under conflicts rules, the presumptive place for the resolution of disputes internal to a company, whose laws govern those issues: see *Konamaneni v Rolls Royce Industrial Power (India) Ltd* [2002] 1 WLR 1269 at paragraph 128 and *Base Metal Trading Ltd v Shamurin* [2005] 1 WLR 1157 at paragraph 67.

51.     The Directors submit that the Guernsey-specific claims outwith the reach of Delaware jurisdiction should be discounted.  We need not repeat what we have said about wrongful trading and directors'' disqualification above.  We should however emphasise that the provisions underlying those claims, and those under section 106, have a public interest dimension which gives them a particular importance.  In *In re Pantmaenog Timber Co Ltd* [2004] 1 AC 158, the following views were expressed by Lords Millett and Walker of Gestingthorpe respectively:

10-03635-jpm    Doc 173-2    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C part 1
Pg 574 of 856
Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

> —52. *From the earliest days of the joint stock company the liquidator has exercised functions which serve the public interest and not merely the financial interests of the creditors and contributories.....In consequence...'the community itself has always been recognized as having an important interest in [insolvency proceedings].'"*
>
> —77. *...winding up has...a dual purpose....The other is the investigation and the imposition of criminal or civil sanctions in respect of misconduct.....[This function] serves a wider public interest."*

52.    In respect of s106 claims the Directors say that, in fact if not in form, they add nothing to the common law claims. Of section 106 it is said by them (correctly) that it is procedural only; but it is incorrect to assert in consequence that it has no special role.

53.    We understand that this case involves the only application to the courts of this jurisdiction relying upon section 106 of the 1994 Law. It made provisions which apply during the course of a winding up of a company. The section gives procedural rights to the liquidator, members and creditors. But, whilst there are references to winding up and a liquidator, these do not, of course, identify that the provisions are a special part of an insolvency code but, as the title of the Part of the Law states, „Provisions of General Application in Winding Up". The Liquidators plead that this company is being wound up because of a special resolution, on the application of the Directors, after the entire capital had been lost. On taking office they stated that the company was unable to pay its debts and that there would be no distribution to shareholders. The Liquidators being officers of the Court this court is entitled to proceed upon their statements on these fundamental matters. The s. 106 claims in this litigation are being pled in the aftermath of and as part of the winding up of an insolvent company.

54.    The section, as the Deputy Bailiff stated (at paragraph 41 of his judgment), is in terms similar to, but not identical with, those of s. 212 of the Insolvency Act 1986 (as amended from time to time) in force in England and Wales. This court is able to proceed, therefore, upon the basis of relevant judicial pronouncements from that other jurisdiction as to certain aspects of s.212 which are germane to the issues in this case.

55.    Put shortly, those indicate that, over many decades, the provision has been interpreted as providing a summary form of remedy to the specified persons who may rely upon it, but not innovating upon the nature of the obligations, breach of which will incur the potential intervention of the courts into the running of a company prior to its winding up: see, for example, *Revenue & Customs Commissioners v Holland* [2010] 1 WLR 2793, where. at paragraph 51 Lord Hope of Craighead DPSC said:

> —*Mr Knox submitted that the discretion under section 212 was wide enough to allow the court to reduce the award to nil even if it declined relief under section 727 of the 1985 Act. I agree with Rimer LJ that the discretion under section 212(3), which is essentially procedural in nature, is a discretion as to amount only once liability has been established. It is not so wide as to allow the judge, having determined that the section applies, to decline to make any order at all: see paras 108—110. The discretion which he is given by section 212(3) is as to the order that would be appropriate once liability has been established, not to grant relief against liability. It is a discretion as to how much the director should be ordered to pay, so as to do what is just in all the circumstances: see In re Loquitur Ltd [2003] 2 BCLC 442, para 245, per Etherton J."*

See also Lord Collins of Mapesbury JSC at paragraph 55:

> —*.....setion 212 is a procedural provision which does not create any substantive obligations, and consequently for a person to be made liable under section 212, that person must be guilty of breach of an independent duty: In re Canadian Land*

10-03635-jpm    Doc 173-2    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C part 1
Pg 575 of 856
Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

> *Reclaiming and Colonising Co (Coventry and Dixon's case) (1880) 14 ChD 660; In re
> City Equitable Fire Insurance Co Ltd [1925] Ch 407."*

56.     The provisions of s106 should, therefore be viewed as both summary and discretionary.  As such,
and particularly remembering that the provisions apply during a winding up, the procedure which
should accompany the provisions should be expeditious, and the case management very much
under the direction of the court: for example as to timeframes and to the need for and modes of
proof. Section 106, therefore, whilst being procedural in the sense of not establishing a new or
independent liability, does establish a new discretionary remedy, available upon liquidation, to
the liquidator and others.

57.     It is also to be borne in mind that in *In re B Johnson* [1955] 1 Ch 634, at 647, Evershed MR
stated of the then equivalent English provisions:

> ―*Section 333, it has been many times said, is a purely procedural section. **I do not in the
> least seek, by so stating, to lessen its significance**: I mean (to restate it) that it does not
> create any new cause of action; it only provides a method of litigating particular claims;
> and, in providing a method, it is not exclusive. Prima facie (though, as will be later seen,
> there are difficulties in the plaintiff's way in this case), if the procedure of section 333 is
> not open against any person who is within the section, the claimant may proceed by
> ordinary action. But there is this procedural difference, which may, I think, indicate the
> kind of case to which it is intended to refer: whereas, in an ordinary action, it would be
> open to the person charged to bring in (if it were proper procedurally to do so) some
> third party whom that person might seek to make responsible; in a case under section
> 333, no such third-party procedure appears to be available."*
> (*our underlining)

58.     The present case therefore is one in which the Liquidators" reliance on s. 106 is unlikely to
provide a different remedy to that which they plead at common law.  But, hypothetically, had the
Liquidators thought that a court might be reluctant to grant the remedy sought at common law, or
had they been concerned as to delays in common law procedures, the very fact of liquidation
would have permitted them access to the s. 106 remedy.

59.     As a result of the implementation of s. 6 of the Companies Amendment Guernsey Law 1996, (a
section given the heading „Provisions relating to directors, fraudulent trading, etc.") section 67F
of the Companies (Guernsey) Law, 1994 (as amended) provided, among others, that Company
Articles exempting persons from liability pursuant to sections 67A-D or any other provision of
the Law are void.  Upon an ordinary interpretation of this provision, as the Deputy Bailiff uses at
paragraphs 54 to 62, it will embrace s. 106, which imposes a liability.  The fact that the same
liability is imposed at common law and that the section does not create a new liability does not
detract from the fact that the section imposes a liability if sought by certain persons, in certain
circumstances and if deemed appropriate by the court in the exercise of its discretion.  Such a
result is not inappropriate having regard to other considerations.  First it is to be noted that
neither s. 67A (Disqualification Orders) nor s. 67B (Fraudulent trading orders) require that there
be an insolvency.  Further, the new provisions were inserted in the general sector, Part XI:
Directors, of the principal Law and not, for example in Part XVI: Compulsory Winding Up.

60.     For decades legislators have been astute continuously to monitor the operation of limited liability
companies and to protect the public from abuse of the protection from some liabilities which
incorporation brings.  One of the protective mechanisms is that, upon winding up, the process of
winding up is in the hands of an officer of the court, the liquidator.  That process brings with it,
therefore, an independent appraisal of the manner in which the company has been operated, by a
person not bound to the commitments of the company and those with whom it has contracted.  In
a different context, that of a contractual agreement to arbitrate, the Court of Appeal in Singapore

10-03635-jpm   Doc 173-2   Filed 01/13/17   Entered 01/13/17 22:34:28   Ex. C part 1
Pg 576 of 856
Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

expressed the following views in *Larsen Oil and Gas v Petropod* [2011] 3 SLR 414, at paragraph 48:

> "When a company becomes insolvent, its assets are impressed with a statutory trust that is administered by the liquidator for the benefit of the company's creditors (see Ng Wei Teck Michael v Oversea-Chinese Banking Corp Ltd [1998] 1 SLR(R) 778). That being so, the creditors of the insolvent company are the parties with the real interest in any dispute that involves the insolvent company, since they are the ones who stand to lose or gain from any diminution or augmentation of the company's assets. Since these creditors are not parties to the arbitration agreement between the insolvent company and its arbitral counterparties, it is very hard to justify why the liquidator (who represents the creditors) should be compelled to give up its rights to judicial remedies in favour of arbitration."

61.     Those views were expressed in the context of insolvency, which is not a qualifying factor chosen by the legislature in this jurisdiction for the operation of s. 67F, but the views appear equally applicable for a s. 106 scenario. A company would have had a claim against its Directors but does not pursue it (a) because it is controlled by its Directors and (b) because the (other) members, who might have sought a derivative action, did not do so because they were unaware of the salient circumstances giving rise to a claim.  Had there been a derivative action it would have been met by the contractual defence of exemption from liability.  Why, when the Directors have either chosen, or been forced by circumstances, to place the company in winding up and a liquidator has grounds for bringing a s.106 application should a court, otherwise entitled to make a discretionary order, be precluded from doing so by a pre-insolvency contract between the company and its Directors or third parties? The following points were discussed in argument.

62.     The parties both referred to a passage in a policy letter from the State Advisory and Finance Committee, dated 26 January 1996, on the proposed amendments to the 1994 Law.  Whilst this may have lacked the interpretative significance of more formal *travaux preparatoires,* it nonetheless indicated that some of those considering possible legislative amendments had in mind precluding the restriction on s. 106 remedies, but through the medium of what was permissible in company articles.  S. 67F makes no reference to s.106, hence the present issue; but it may be worthy of some note that the terms of that section include restriction both through company articles as well as contract with the company.  There appears to be no intervening statement on behalf of the promoters of the amendment.  On any view therefore the letter gives no indication that the result of the ordinary interpretation is not to be relied upon.

63.     It was submitted for the Directors that, by cross-reference to ss 29 and 30 (which imposed liabilities) s. 106 could not properly be interpreted as resulting in the imposing or incurring of a liability.  Such a contention cannot withstand the scrutiny of s. 106. Whilst the section does not create a new cause of action, it provides a procedure which, once properly instigated and duly accepted by the court, imposes a liability in such measure as the court determines.  The ultimate liability might (or might not) be the same as might have been imposed through common law procedures based upon the same facts, but whilst the basis for the accrual of the cause of action would have been the same, the liability is determined upon through and imposed by means of the statute.

64.     The Directors also suggested, by reference to older English authority and to the new 2008 Guernsey Law, that the result of the ordinary interpretation would be surprising in that there would be no saving provisions in respect of a s. 106 matter. Again that submission does not withstand a proper scrutiny of s. 106.  The structure of the section is that there be (under subsection 1) the basis for an application, and (under subsection 3) the possibility of an examination of conduct following which there may be a discretionary order *„as the Court thinks fit'.* Such a provision, in its simple and clear terms, allows for a discretionary approach which is

10-03635-jpm   Doc 173-2   Filed 01/13/17   Entered 01/13/17 22:34:28   Ex. C part 1
Pg 577 of 856
Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

well capable to consider all issues as to consideration of conduct preparatory to determining upon an order.

65.   Speaking of ss 212 – 214 of the Insolvency Act 1986 in *Re Pantmaenog Timber Co Ltd* [2004] 1 AC 158, at paragraph 79, Lord Walker of Gestingthorpe said:

—*Ever since the 1862 Act the court has made clear that these procedures exist for the protection of the general public, not in the interests of the creditors or shareholders of the particular company which is in liquidation. Indeed it may be contrary to the financial interests of the creditors and shareholders for these procedures to be invoked."*

The foregoing conclusion as to the proper interpretation of s. 67F is consistent with that general aim.

66.   The s. 106 claims were pled at the outset of this action. Whilst, as indicated above, reliance on s. 106 is unlikely to provide a different remedy for the Liquidators to that which is pled on behalf of the company at common law, there may be procedural advantages to the Liquidators in seeking to rely on it and they are entitled to do so. The entitlement of a litigant to rely on maintaining broadly similar rights of action was recognised by Lord Goff of Chieveley in *Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145, 193H-194D. As his lordship said there, *" I do not find it objectionable that the claimant may be entitled to take advantage of the remedy which is most advantageous to him".* Unless a claim is manifestly without possible foundation, this court cannot exclude from contemplation the right of the Liquidators to rely upon s. 106. The Cause, as it stands unamended, sets out claims based upon allegations of misfeasance and breach of fiduciary duty which cannot be said to be without any possible prospect of success.  They must be recognised, at this stage of proceedings, as proper parts of the whole case which is brought against the various defendants.

67.   The Directors further submit in the alternative that the findings made by a Delaware court on matters over which they have jurisdiction will dictate (or at least may fruitfully inform) the outcome of the Guernsey specific claims.  Putting it broadly, they contend that once the Delaware court has pronounced on what the Directors did or did not do, and whether by such acts or omissions they breached their duties as Directors, those findings can be relied on by the Guernsey court to determine whether they were guilty of Wrongful Trading, should pay compensation under section.106, or be disqualified.

68.   This ambitious submission ignores several key factors.  First unless and until the defences are served we cannot predict upon what issues the Delaware Court may be invited to pronounce. Secondly we cannot predict upon what issues the Delaware Court will in fact pronounce.  It is, for example, possible that the Directors will jointly or severally seek to rely upon the standard indemnity in article 157 of the Articles of CCC**,** or clause 6 of IMA as a preliminary issue. Thirdly it is by no means clear that the findings of the Delaware court will satisfy the criteria of issue estoppel, which are conveniently summarised in Spencer Bower and Handley (4th Edn) ("Spencer Bower" paragraph 1.02), and endorsed by the Supreme Court in *R (Coke-Wallis) v ICAEW* [2011] UKSC 1 at para 34.   Fourthly it is not inconceivable that at any rate the Liquidators might in any event be able to take advantage of an exception to issue estoppel where new evidence is discovered [Spencer Bower: para.8.31]. We have in mind the salutary warning of Dillon LJ in E I *du Pont de Nemours v Agnew* 1998 2 LLR 240 at p.245 where claims under product liability insurance were commenced in both England and in Illinois.

"*Other issues were also canvassed.  But in my judgment it is not proper for this Court to attempt to decide any of these issues at this stage.  As yet there has been no final judgment of the Illinois Court, and inevitably there has been no application by the insurers to amend their pleading in the English proceedings to rely on a final Illinois judgment as an estoppel.  The present application for a declaration that the insurers will not be entitled to rely on any such judgment as an estoppel is therefore necessarily premature: Re Clay, [1919] 1 Ch.66 and Re Barnato, [1949] Ch. 258.  In addition the*

*course of the argument on this appeal, and the cases cited where the Courts have had to consider issues of cause of action estoppel or issue estoppel, all show that to decide any such issue an analysis, and possibly a very close analysis, is necessary of what the decision, which is said to have given rise to the estoppel, decided and on what grounds. But that is not possible until after the decision has been made and its grounds are known. Again, until the decision of the Illinois Court is available, and the insurers have formulated their plea of estoppel in the English proceedings, it cannot really be known what estoppels are being set up and it may be possible that there are estoppels on some issues which ought to be recognised by the English Court: e.g. an issue estoppel precluding Du Pont from disputing that on the facts of their participation in the wrongful act they are under Illinois law – whatever its relevance to the English proceedings – precluded from claiming indemnity from the insurers against the punitive damages. To make either of the declarations claimed now would, in my judgment, be premature."*

[See also to like effect Neill LJ at p.249, Stocker LJ at p.250.]

We do not accept that *Texan Management v Pacific Electric* [2009] UKPC 46, upon which the Directors relied, provides a compelling precedent to contrary effect. In that case the issue was as to ownership of shares. Once the Hong Kong Court had pronounced on ownership, the BVI register would necessarily be amended, if necessary, to reflect its findings as a purely ministerial act.

69.    The Deputy Bailiff was clearly attracted by the idea that the Delaware Court would in fact, if not in form, solve any issues for the Guernsey Court. He said:

"*If the case, as presently pleaded, goes ahead in Delaware the facts and the causes of action will be proved or otherwise in that jurisdiction. Advocate Davies has acknowledged that will create an issue estoppel. The Plaintiffs could then pursue a separate action for the relief under statutory claims in Guernsey, relying upon the Delaware decision. I do not believe it would involve a lengthy hearing or be expensive.*" DB Paragraph para 136.

70.    It was, in this Court″s view, odd to suggest that the Directors „acknowledged″ (sic) that there would be issue estoppels. Rather it was for them to aver the same. The Liquidators″ certainly did <u>not</u> accept such estoppels would be created. This articulation of this throwaway line appears to this Court to be another consequence of the Deputy Bailiff going in a direction not signposted by any party and without the full benefit of their forensic analysis.

71.    The Deputy Bailiff also grappled with a question of what the dispute was in essence all about. At the hearing before the Deputy Bailiff the Advocates for each of the parties sought to persuade the Deputy Bailiff that their "*characterisation*" of the nature of the case being advanced by the Liquidators in the Cause was the correct one. The Deputy Bailiff considered the parties″ submissions on this matter between paras 80 and 101 of his judgment. It is to be noted that he changed his mind, having initially been persuaded by Advocate Wessels″ submission but in the end agreed with Advocate Davies″ contentions – see paras 81 to 83 and 101 of DB judgment.

72.    The issue before us is whether the Deputy Bailiff fell into error by considering this issue at all, or if he was entitled to do so, whether he himself mischaracterised the nature of the Cause in that he accepted the submissions of Advocate Davies in preference to those of Advocate Wessels.

73.    We start by reminding ourselves of how the Deputy Bailiff considered the matter. At para 82 he said that when he first read the Cause his impression was that the main thrust was directed at all the Directors, whether *de jure* or *de facto* or shadow Directors, their duties and their alleged failures to act in CCC″s best interests. The main allegations were directed to the failure of the business model and failure to take strategic action to deal with the risk arising from market volatility and global economic crisis. It would be a matter for the trial court to decide precisely

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

where to draw the line between areas of responsibility delegated to CIM under the IMA and those areas where, either as a matter of contractual interpretation, or by Guernsey law, or by regulation, or otherwise, the board of Directors could not delegate but instead retained responsibility themselves.

74.    At para 83 the Deputy Bailiff said that, in order to understand whether one party has mischaracterised the nature of the claim, he must look at the substance of the case and decide whether the allegations were "the product of artful pleading", a phrase taken from para 59 of the affidavit of Allen Terrell, the Directors" expert on Delaware law.  Mr Terrell stated that Delaware courts have found that a forum selection clause was not to be defeated by artful pleading of claims **not** based on the contract containing the clause if those claims "grow out of" the contractual relationship or if the gist of the claims is a breach of that relationship.

75.    Between paras 86 and 95 the Deputy Bailiff concentrated his analysis on the terms of the appointment of CIM, which he describes as "*wide*", and the extent of the delegation thereunder to CIM.  He alluded to the fact that investors in CCC "were fully aware" that CIM was the investment manager, that one of the independent Directors (the Seventh Defendant) swore an affidavit to the effect that CIM implemented the investment guidelines of the board of Directors of CCC and that CIM carried out the every-day management and operations of CCC pursuant to the IMA. At para 94 the Deputy Bailiff said that looking at paras 57 to 59 of the Cause (which he set out) the Plaintiffs themselves understood the position to be that CIM was the investment manager and advisor to CCC with full discretionary investment management authority to implement the investment guidelines of CCC and to perform its day to day management and operations of its business subject to the oversight of CCC's directors, that CIM and TCG developed CCC's business model, and that in addition CIM provided investment management services to other affiliates within the Carlyle Group with similar or overlapping investment strategies.At para 95 he extracted various parts of the Cause as part of his analysis leading up to his conclusions in subsequent paragraphs.

76.    At para 98 the Deputy Bailiff stated that the alleged failures of the directors of CCC were "*essentially*" failures to act otherwise than in accordance with the advice of CIM or to adopt policies different from those recommended by CIM and Carlyle. At para 100 he said that it seemed to him that the "*starting point*" and "*a key factor*" in the trial court"s analysis of the events that led to the collapse of CCC "*is going to be the steps taken, or not taken as the case may be, by CIM and Carlyle under the IMA.*"

77.    Thus it was that the Deputy Bailiff concluded at para 101, as we have already noted, that he had changed his view as to the character and nature of the allegations pleaded and of the case the Directors had to face. He agreed with the submission on behalf of all Directors that "*in substance the case is more concerned with failures of the investment advice, the investment policy, the investment guidelines and generally the duties of CIM under the IMA*". He went on to say that "*those issues need to be understood before considering the failures of the Directors whether they be de jure, de facto or shadow Directors.  In that sense, the breaches of the IMA are the primary issues and the allegations against the Directors are secondary*".

78.    Advocate Wessels submitted to us that this exercise ought not to have been undertaken at all. No authority had been produced by Advocate Davies that an evaluation of the "nature of the case" of a plaintiff was a necessary part of the court"s reasoning in a *forum non conveniens* dispute. The Directors had conceded before the Deputy Bailiff that all the issues in the Cause were "serious issues to be tried on the merits i.e. a substantial question of fact or law, or both" – see para 71 of the judgment of Lord Collins in *AK Investment CJSC v Kyrgyz Mobil Tel Ltd [2011]* UKPC 7. It was not accordingly appropriate to conduct a mini-trial as to what was really the nature of the case was.

79.    Advocate Wessels submitted that he had specifically drawn to the attention of the Deputy Bailiff that it was not necessary for him to evaluate the nature of the case, in his written submissions in

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

reply below – see paras 44 and 48. Alternatively, Advocate Wessels submitted that, if *per contra* the Deputy Bailiff was entitled to consider the nature of the Liquidators" case, he had come to the wrong conclusion at para 101. He took us painstakingly through the Cause, a very long document consisting of no less than 547 paragraphs plus sub-paragraphs. He submitted that on any analysis the various causes of action against the Directors were independent of each other, and each was conceded to be "seriously arguable" by the Directors, and thus the court must work on the assumption that they will be made good. He submitted that what was at the heart of the Liquidators" case as pleaded in the Cause was the setting of the strategy for CCC"s investments and the guidelines in relation thereto by its Directors and/or the failure of the Directors to adjust the strategy and guidelines in the light of changing economic conditions. In the late summer or autumn of 2007 the guidelines set out by CCC as to investment policy were abandoned. He described that abandonment as the critical focus of the Liquidators" case.

The Directors recognised what they needed to do but did the exact opposite, namely in September 2007 they announced that fundamental revisions to CCC"s business model were required and would be implemented but did the reverse. Leverage needed to be reduced and the minimum liquidity cushion raised to at least 40%. However what in fact happened, so it is alleged, is that the guidelines were suspended which included a minimum liquidity cushion of 20%, repo lines of a minimum equal to 125% of all outstanding borrowings, and a maximum of 85% of CCC"s capital be allocated to RMBS. All this, and continuing breaches of duty thereafter, were driven, so it is alleged, by a desire to give priority to the interests of Carlyle over those of CCC.

80.    Advocate Davies, supported by Advocate Bell who adopted the submissions of Advocate Davies, submitted to us that the exercise undertaken by the Deputy Bailiff was a necessary part of the evaluation of a court in a *forum non conveniens* dispute, particularly so in the instant case where the IMA contained an exclusive jurisdiction clause in favour of the courts of Delaware. If the nature of the case was indeed primarily about the alleged failures of CIM under the IMA, then the IMA and hence the exclusive jurisdiction clause was central to the dispute before the Deputy Bailiff. He referred us to the case of *Berliner Verkehrsbetriebe (BVG) Anstalt Des Offentlichen Rechts v JP Morgan Chase Bank NA & anor* [2010] EWCA Civ 390, [2010] 1 CLC 628 which involved whether the English court should have jurisdiction pursuant to the parties" contract or whether a German court should have jurisdiction pursuant to Article 22 (2) and Article 25 of Council Regulation (EC) No 44/2001, viz the Jurisdiction and Judgments Regulation.

81.    Advocate Davies referred to paras 22 and 23 of the judgment of Aikens LJ to the effect that the judge (Teare J) typified the questions that had to be asked under the Articles which we summarise broadly as what was the nature of the case or what were the principle issues. Thus, Advocate Davies submitted that as the IMA brought in the exclusive jurisdiction clause, it was necessary for the court to undertake an evaluation of the nature of the Appellants" case. The analogy between the authority of Berliner and the instant case was that, as in Berliner there was a competition between an exclusive jurisdiction clause in favour of the English courts and a regulation which favoured a German court, so in the instant case there was a competition between an exclusive jurisdiction clause favouring Delaware and claims in the Cause (and in the proposed amendments thereto) which only a Guernsey court could decide e.g. s.106 and s.67A and C. He submitted that the Deputy Bailiff was correct to conclude that the role of CIM was at the centre of the Appellants" case and that the breach of duties of the Directors of CCC was secondary. CCC had delegated to CIM very wide discretionary management authority, in particular as to its investments. The claim against the Directors is essentially that they failed to supervise CIM or to realise that what CIM had done was in breach of duty. Thus, if CIM was not liable in the terms of the pleaded claims, it would be almost inconceivable that the de jure Directors of CCC would be held liable.

82.    Advocate Davies submitted to us that, whether the Liquidators" claim was characterised as one for breach of duty involving corporate governance and internal management or breach of duty arising under the IMA, the claim against CIM under the IMA was central to all the claims.

10-03635-jpm   Doc 173-2   Filed 01/13/17   Entered 01/13/17 22:34:28   Ex. C part 1
Pg 581 of 856
Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

Alternatively he submitted that if the Deputy Bailiff had mischaracterised the Liquidators″ case, then their case cannot override the exclusive jurisdiction clause. It outweighs everything else.

83.     We are of the opinion that it was not part of a court″s function to undertake the sort of exercise undertaken by the Deputy Bailiff in the instant case. No authority has been produced in support of Advocate Davies″ proposition that such an exercise should be undertaken in a forum non conveniens dispute. In our view the case of Berliner is plainly distinguishable in that the relevant Articles required the court to undertake such an exercise in the circumstances of that case. Furthermore, Advocate Davies conceded, rightly in our view, that if the Liquidators had chosen to claim against only the de jure Directors of CCC no evaluation of the nature of the case could have been undertaken.   Those claims, it has always been conceded by the Directors raise seriously arguable issues.

84.     Had only the de jure Directors been sued, it would not have been open to the Directors to submit that the true dispute was about CIM and the IMA, and hence bring in the exclusive jurisdiction clause. It would have been left to the Directors to plead, by way of defence, that the role of CIM was paramount in the light of the allegations (i.e by the Directors″ delegation of the director″s duties to CIM under the IMA). Why then, we ask rhetorically, should the mere joinder of CIM alleging, *inter alia* against that entity, breaches of contract under the IMA, fundamentally alter the nature of the Liquidators pleaded case against the Directors  in such a way that the IMA takes centre stage? Surely it is for the trial court, having heard the evidence and submissions, to conclude what is the true position. Accordingly we conclude that the Deputy Bailiff erred in conducting such an exercise.

85.     If, however, we are wrong in concluding that the Deputy Bailiff ought not to have undertaken the exercise that he did, we nevertheless are of the opinion that he manifestly came to the wrong conclusion. We have carefully reread the Cause in the light of the submissions made to us by both Advocates, who took us through the Cause highlighting those of its parts which supported their contentions as to the nature of the Liquidators″ case against the Directors. We do not consider that the Liquidators have indulged in "*artful pleading*".

86.     To us the nature of the case, as pleaded in the Cause, is as follows. The first four Directors were intimately connected to Carlyle, of which CIM, TC Group and TCG Holdings were associates controlled by Carlyle. Mr Conway, it is pleaded, was joint managing director of TCG Holdings, which was the sole managing member of TC Group.  He was also joint managing director of CIM, which was owned as to 75% by TC Group with power to direct and control CIM.  Mr Hance was an officer of CIM.  Mr Stomber was an officer of TC Group, joint managing director of TC Group, and managing director of CIM. Mr Zupon was a founding member of Carlyle and managing director of Carlyle.  Each of the above were Directors of CCC.  Mr Conway was a member of CCC″s investment committee.  Mr Hance was the non-executive chairman of CCC and a member of its investment committee. Mr Stomber was the President and Chief Executive Officer of CCC, and a member of its investment committee.  Mr Zupon was a member of CCC″s investment committee.  There were then of course the independent Directors of CCC, namely the Fifth, Sixth and Seventh Respondents.

87.     We consider that what is set out in the Introduction to the Cause, which might well have served as its conclusion, is an accurate summary of what is pleaded in detail thereafter. The Carlyle Group held all the voting shares of CCC. The Directors of CCC were as above, the first four intimately bound up with Carlyle. The Directors set the investment guidelines, details of which are set out in para 7 of the Cause.  It was the Directors″ responsibility to set the investment managing guidelines and to alter them in the light of changing economic conditions. That critical function was not delegated by CCC to CIM under the IMA. The maintenance of an unencumbered minimum liquidity cushion was fundamental to the management of CCC″s leveraged investment portfolio.  By about the second quarter of 2007 the global credit markets were deteriorating and subprime mortgages defaults were increasing. This eroded the value of RMBS and other financial assets.  The Directors were aware of the escalating risks.  However, so

10-03635-jpm    Doc 173-2    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C part 1
Pg 582 of 856
Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

it is pleaded, far from selling RMBS and reducing CCC"s leverage, both of which, it is alleged, were in CCC"s interests, more RMBS were purchased and the leverage was not reduced.  The minimum liquidity cushion became inadequate.  Margin calls were at risk.  In September 2007 fundamental revisions were decided upon i.e leverage was to be reduced and the minimum liquidity cushion raised from 20% to 40%.  It is pleaded that no steps were actually taken to implement those revisions; indeed it is pleaded that the investment guidelines were suspended.  Thereafter it is pleaded that the Directors took no steps to preserve the assets of CCC but continued along the same path of a downward spiral.  It seems to us that the nub of the Liquidators" case is to be found in paras 30 and 34 of the Cause, i.e. the Directors did not manage CCC"s investments prudently but put the interests of Carlyle above those of CCC. All these allegations are then expanded in very considerable detail in the Cause.

88.    Whilst we, of course, take into account those parts of the Cause highlighted by the Deputy Bailiff between paras 93 and 95 of his judgment, we cannot agree that looking at the Cause as a whole the core of the Liquidators case can be characterised as "*the alleged failures of the Directors of CCC are, essentially, failures to act otherwise than in accordance with the advice from CIM or adopt policies different from, and independent of, the recommendations being received from CIM and Carlyle*" (para 98).  Nor, with respect, can we agree with his conclusions at paras 100 and 101.  In arriving at his conclusions the Deputy Bailiff does not appear to have appreciated the part of the Cause which in essence pleads that the Directors of CCC were being advised <u>by themselves</u> in their capacity of being so intimately involved in Carlyle or that they allegedly breached their duties by putting the interests of Carlyle before that of CCC.

89.    What the Directors were doing before the Deputy Bailiff was in essence to extract from the Cause parts which might be said to foreshadow, even support they would say,  a defence in the future from the Directors (or at least of the de jure Directors of CCC), namely that they had delegated their responsibilities to CIM under the IMA. If such may be their defence, or one of them, then that is a matter for them to plead and for the trial court to decide having heard the evidence.

90.    Advocate Davies, in paras 222 to 228 of his submissions before us, contended that the allegations against the Directors are at bottom primarily allegations that arise out of the services performed under the IMA by CIM, the external manager of CCC"s business. Thus he contended that the authorities demonstrate that where the day to day operation of a company"s business is vested in an external manager, the Directors" duties are inevitably different from a situation where the director himself is managing the business. Advocate Davies drew our attention to *John v Price Waterhouse & anor* [2001] All E.R. 123, a decision of Ferris J, which he contended was similar to the instant case. This then led to the submission that in the instant case there was a confined residual role for the Directors of supervision more than a management role.

91.    The case of *John v Price Waterhouse & anor* involved a claim by Sir Elton John and various companies connected with him for damages for negligence against Price Waterhouse. A similar claim was made by the corporate claimants against Andrew Haydon.  Sir Elton placed his career in the hands of an individual called John Reid and a company formed by him, John Reid Enterprises Ltd ("JREL"), of which Mr Haydon, a chartered accountant, became a director and ultimately managing director.  Several management agreements were entered into between the claimants and Mr Reid and JREL. Mr Haydon was a director of two of the corporate claimants. Advocate Davies particularly relied on a passage at para 298 in the judgment of Ferris J where he said that the engagement of JREL left the Directors of the two corporate claimants with nothing to do except such formal acts as only the Directors personally could carry out. The judge found that Mr Haydon was running the companies but in his capacity as an executive of JREL. Advocate Davies submitted that that authority was analogous to the instant case.

92.    It is to be noted that the decision of Ferris J was one handed down <u>after</u> he had heard the evidence and submissions thereon.  All the claims against Mr Haydon were dismissed on the facts – see paras 270 to 300, and in particular para 300 (2). Para 298 was very much a finding of

10-03635-jpm    Doc 173-2    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C part 1
Pg 583 of 856
Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

fact.  In the instant case it will be for the trial judge to decide, having heard the evidence, what was the true position.

93.    Furthermore, in the instant case the capacity in which Carlyle purported to act is a very live issue, particularly, so say the Liquidators, in circumstances in which they allege that there was a conflict of interest and where it is alleged the Directors subordinated the interests of CCC to their own.  As we have said, it has always been conceded by the Directors that all the allegations of breach of duty pleaded in the Cause are seriously triable issues.  Accordingly, we do not consider the case of *John v Price Waterhouse & anor* to be of assistance at this stage of this litigation.

94.    The result of this effort at characterisation of the claims was to uplift the importance of the forum selection clause (the "FSC") – the jewel in the crown of the Directors" submissions.  Section 9 of the IMA provides [as quoted by the DB para 71].

> "*This Agreement shall be governed by, and construed in accordance with, the laws of Delaware, without giving effect to the choice of law principles thereof.  The federal or state courts sitting in Delaware shall have exclusive jurisdiction over any action, suit or proceeding with respect to this Agreement and each party hereto hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may have, whether now or in the future, to the laying of venue in, or to the jurisdiction of, any and each of such courts for the purposes of any such suit, action, proceeding or judgment and further waives any claim that any such suit, action, proceeding or judgment has been brought in an inconvenient forum, and each party hereto hereby submits to such jurisdiction.  The parties hereby agree that no punitive or consequential damages shall be awarded in any such action, suit or proceeding.*"

*A*rguments will, we recognise, arise under Delaware Law as to the extent to which this binds persons other than the parties to the IMA itself i.e. CCC and CIM.

95.    The Directors directed the Deputy Bailiffs attention to *Donohue v Armco Inc* [2002] 1 Lloyd"s Rep. 425 [DB paras 73-74] where Lord Bingham of Cornhill said:

> ―*24.    If contracting parties agree to give a particular Court exclusive jurisdiction to rule on claims between those parties, and a claim falling within the scope of the agreement is made in proceedings in a forum other than that which the parties have agreed, the English Court will ordinarily exercise its discretion (whether by granting a stay of proceedings in England, or by restraining the prosecution of proceedings in the non-contractual forum abroad, or by such other procedural order as is appropriate in the circumstances) to secure compliance with the contractual bargain, unless the party suing in the non-contractual forum (the burden being on him) can show strong reasons for suing in that forum.  I use the word ―ordinarily" to recognise that where an exercise of discretion is called for there can be no absolute or inflexible rule governing that exercise, and also that a party may lose his claim to equitable relief by dilatoriness or other unconscionable conduct.  But the general rule is clear: where parties have bound themselves by an exclusive jurisdiction clause effect should ordinarily be given to that obligation in the absence of strong reasons for departing from it.  Whether a party can show strong reasons, sufficient to displace the other party's prima facie entitlement to enforce the contractual bargain, will depend on all the facts and circumstances of the particular case.  In the course of his judgment in The Eleftheria, [1969] 1 Lloyds Rep. 237 at p.242; [1970] P.94 at pp.99-100, Mr Justice Brandon helpfully listed some of the matters which might properly be regarded by the Court when exercising its discretion and his judgment has been repeatedly cited and applied.  Mr Justice Brandon did not intend his list to be comprehensive, but mentioned a number of matters, including the law governing the contract, which may in some cases be material.  (I am mindful that the principles governing the grant of injunctions and stays are not the same: see*

10-03635-jpm    Doc 173-2    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C part 1
Pg 584 of 856
Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

*Aérospatiale at p.896. Considerations of comity arise in the one case but not in the other. These differences need not, however, be explored in this case*

25.    *Where the dispute is between two contracting parties, A and B, and A sues B in a non-contractual forum, and A's claims fall within the scope of the exclusive jurisdiction clause in their contract, and the interests of other parties are not involved, effect will in all probability be given to the clause. That was the result in Mackender v Feldia AG [1967] 2 QB 590; Unterweser Reederei GmbH v Zapata Off-Shore Co ('The Chaparral') [1968] 2 Lloyd's Rep 158; The Eleftheria, [1969] 1 Lloyd's Rep. 237; [1970] P 94; DSV Silo- und Verwaltungsgesellschaft mbH v Owners of the Sennar and 13 Other Ships ('The Sennar' (No. 2)) [1985] 1 WLR 490; British Aerospace Plc v Dee Howard Co [1993] 1 Lloyd's Rep 368; Continental Bank NA v Aeakos Compania Naviera SA and Others [1994] 1 WLR 588; Aggeliki Charis Compania Maritima SA v Pagnan SpA ('The Angelic Grace') [1995] 1 Lloyd's Rep 87; and Akai Pty Ltd v People's Insurance Co Ltd [1998] 1 Lloyd's Rep. 90. A similar approach has been followed by courts in the United States, Canada, Australia and New Zealand: see, for example, M/S Bremen v Zapata Off-Shore Co (1972) 407 US 1; Volkswagen Canada Inc v Auto Haus Frohlich Ltd [1986] 1 WWR 380; FAI General Insurance Co Ltd v Ocean Marine Mutual Protection and Indemnity Association (1997) 41 NSWLR 559; and Kidd v van Heeren [1998] 1 NZLR 324."*

96.    Unfortunately the Deputy Bailiff's attention referred only to the passages about when an FSC should ordinarily be enforced and not to the paragraph where it would ordinarily not be. ie paragraph 27:

—27    *The authorities show that the English court may well decline to grant an injunction or a stay, as the case may be, where the interests of parties other than the parties bound by the exclusive jurisdiction clause are involved or grounds of claim not the subject of the clause are part of the relevant dispute so that there is a risk of parallel proceedings and inconsistent decisions. These decisions are instructive. In* Evans Marshall and Co Ltd v Bertola SA and Another [1973] 1 WLR 349 *there was a tripartite dispute but only two of the parties were bound by a clause conferring exclusive jurisdiction on the court in Barcelona. Kerr J at first instance was impressed by the undesirability of there being two actions, one in London and the other in Barcelona (pp 363–364). The Court of Appeal took a similar view (pp 377, 385). Sachs LJ thought separate trials particularly inappropriate where a conspiracy claim was in issue (p 377). In* Aratra Potato Co Ltd v Egyptian Navigation Co (The El Amria) [1981] 2 Lloyd's Rep 119 *the primary dispute was between cargo interests and the owner of the vessel, both parties being bound by a clause in the bill of lading conferring exclusive jurisdiction on the courts of Egypt. But the cargo interests had also issued proceedings against the Mersey Docks and Harbour Co, which was not bound by the clause. The Court of Appeal upheld the judge's decision refusing a stay. In the course of his leading judgment in the Court of Appeal Brandon LJ said, at p 128:* —I agree entirely with the learned Judge's view on that matter, but would go rather further than he did in the passage from his judgment quoted above. By that I mean that I do not regard it merely as convenient that the two actions, in which many of the same issues fall to be determined, should be tried together; rather that I regard it as a potential disaster from a legal point of view if they were not, because of the risk inherent in separate trials, one in Egypt and the other in England, that the same issues might be determined differently in the two countries. See as to this* Halifax Overseas Freighters Ltd v Rasno Export (The Pine Hill) [1958] 2 Lloyd's Rep 146 *and* Taunton-Collins v Cromie [1964] 1 WLR 633." Citi-March Ltd v Neptune Orient Lines Ltd [1996] 1 WLR 1367 *also involved third party interests and raised the possibility of inconsistent decisions. Colman J regarded separate trials in England and Singapore as not only inconvenient but also a potential source of injustice and made an order intended to achieve a composite trial in London despite a Singaporean exclusive jurisdiction clause: see at pp 1375–1376.* Mahavir Minerals Ltd v Cho Yang Shipping Co Ltd (The M C Pearl) [1997] 1 Lloyd's Rep 566 *again involved third parties and raised the possibility*

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

*of inconsistent findings. Despite a clause conferring exclusive jurisdiction on the courts of Seoul, Rix J refused to stay proceedings in England. He regarded the case as on all fours with Citi-March (see p 575) and at p 569 observed: —it seems to me that so far the plaintiffs have shown strong cause why the jurisdiction clause should not be enforced. This is indeed a paradigm case for the concentration of all the relevant parties' disputes in a single jurisdiction. If in such a case a host of different jurisdiction clauses were to be observed, the casualty at the root of the action would become virtually untriable. The action would fragment and reduplicate, at vast cost …" A similar approach is discernible in* <u>*Bouygues Offshore SA v Caspian Shipping Co [1998] 2 Lloyd's Rep 461,*</u> *in which the disputes involved four parties only two of whom were bound by an English exclusive jurisdiction clause. Although the effect of the clause was described by Evans LJ as —near-conclusive" (p 467), an injunction to restrain proceedings in South Africa was refused. In paragraph 27 of his judgment (at p 466) Evans LJ said: —In my judgment, two questions arise, one a matter of principle. First, should the Court, when deciding whether or not to enforce the exclusive jurisdiction clause by means of an injunction which prevents Bouygues from continuing with its proceedings against Ultisol in South Africa, take into account the effects of such an injunction on persons who are not parties or entitled to enforce the contract containing the jurisdiction clause, Portnet and Caspian here, but who are both necessary and proper parties to the litigation wherever it is held? In my judgment, the clear answer to this question is ̳yes'. Mr Justice Clarke did so in his judgment and the contrary has not been argued before us. The relevance of the potential effects on third parties has been recognised in other authorities …" Sir John Knox also held that proceedings should be allowed to continue in South Africa because, among other reasons (see p 470), —this is the only way in which to minimize, if not avoid altogether, the risk of inconsistent decisions in different jurisdictions."*

The present is an example, in our view, of the type of cases where a FSC will not be enforced because the grounds of claim are outside it.  It is notable that the Directors" expert quoted by the Deputy Bailiff at para 84 said that Courts in Delaware will not allow forum selection clauses to be defeated by artful pleading of:

> *"claims not based on the contract containing the clause if those claims grow out of the contractual relationship .... or if the gist of those claims is a breach of that relationship"*

For reasons we have already discussed, in this case the Liquidators" claims are not based on contract: nor do they grow out of the contractual relationship, nor is the gist of those claims a breach of that relationship.

97    The Directors advanced sundry logistical considerations which the DB helpfully summarised paras 141-149.  (See generally Dicey, Morris, Collins: The Conflict of Laws: 16 ed p.476)

98    For the most part the DB was unimpressed by them.   He recognized that modern communications and modes of travel meant that international businessmen were or should be both available and able to litigate without difficult in a variety of fora and could not sensibly complain if the forum chosen was the place where they had incorporated a company, whose fate lay at the heart of the litigation (paras 142 and 147).  He discounted any notion that a Delaware trial would take significantly less time than one in Guernsey (para 143).  He accepted that Guernsey"s case management tools were as effective as those in Delaware (para 144).  He rejected the notion that the Royal Court in Guernsey lacked the resources to cater for protracted trials (para 145); or that the Guernsey bar was too small to cope with substantial multi party commercial litigation (para 146). These are precisely the kind of matters involving fact sensitive evaluation in which an Appellate body would, *ceteris paribus*, not embark upon reconsideration of the rational assessment of the first instance tribunal even if it might itself have weighted them differently.

10-03635-jpm   Doc 173-2   Filed 01/13/17   Entered 01/13/17 22:34:28   Ex. C part 1
Pg 586 of 856
Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

99       The same arguments under this heading were redeployed before us, although we are in the present case free, indeed obliged, to reconsider all matters relevant to the disposal of the appeal for reasons deployed above.    We both can and do endorse the DB″s conclusions as summarised above.   In particular we can vouch from our collective experience as Appellate judges in this jurisdiction for all he has said about the capacity of the domestic Courts and local profession to cope with substantial commercial litigation with an international dimension, a growing phenomenon, reflective of Guernsey″s importance as a financial centre.

100      Why then did the DB finally conclude that the logistical factors to which he rightly attributed, consistently with the jurisprudence, little weight favoured Delaware (para 149)?    It was the consequence of his view that third parties might have to give evidence, and that the process of obtaining the same, if the witnesses were unwilling to come to Guernsey might be "*time consuming and more expensive*″″ than if the trial took place in Delaware (para 148) (indeed before us this proposition was amplified into a submission that third parties might be joined in the proceedings).

101      We have three observations.   The first is that the number and identity of such involuntary witnesses is at present unknown; (and Advocate Wessels assured us that the Liquidators themselves had no present intention to join further parties).   The second is that, as the DB himself recognized, the procedures for taking evidence in foreign jurisdiction are indeed "*normal*″″; the point has little more force than those referring to the incidents of  litigation with an international dimension that he had already rejected  (DB paras 142 and 147). Thirdly a submission deployed before us, if not before the DB, that each potential witness would need his own local lawyer as guardian of his interests, reflected a practice, which may exist elsewhere but which we would not wish to encourage as a transplant  in this jurisdiction.

102      There was an in *terrorem* and a speculative element about some of the Directors″ submissions under this rubric, elegantly presented though they were, and we are not persuaded to allow them to tilt the balance away from Guernsey.

103      The main points, as we see it, which favour this jurisdiction for disposal of these proceedings are those set out in paras 48 and 49 above, coupled with the need where possible to avoid fragmentation between jurisdictions; see, among a host of citations, *Donohue* cit sup para 36 where Lord Bingham said:

> *36        In my opinion, and subject to an important qualification, the ends of justice would be best served by a single composite trial in the only forum in which a single composite trial can be procured, which is New York, and accordingly I find strong reasons for not giving effect to the exclusive jurisdiction clause in favour of Mr Donohue.*

The qualification in that case is not present in this [protection against liability under the RICO claims] and so the presumptive position is that fragmentation should be avoided (see Lord Scott at para 75).

104      While it is possible that the anti suit injunction, the subject of a forthcoming appeal, might be lifted and that the Delaware Court might then enjoin prosecution of some part of Guernsey proceedings, so as to create at any rate the possibility of fragmentation, we cannot allow this series of contingencies to divert our attention from the status quo.

105      The Deputy Bailiff himself rightly acknowledged the high desirability of having all heads of relief determined in the same set of proceedings in a single jurisdiction (DB para 137).   We would put it even higher.   Unless split hearings are required, they should be rejected as a *modus operandi*.

Guernsey Judgment 11/2012 – Carlyle Capital Corporation Limited et al v Conway et al

106     Advocate Wessels indulged in a final forensic flourish:

> "*Our basic position is: why should the entire trial of this action be split when it can take place in Guernsey? What good reason has been put forward for that? Why should these liquidators not be entitled to pursue their statutory insolvency claims in Guernsey? Why should they be delayed in doing that? What good reason is there for that? Why should they not be entitled to proceed with their claims first in Guernsey because those are the claims which contain the valuable exclusions of the indemnities? Why should anybody think it's a good idea to delay the prima facie stronger claims in favour of the prima facie weak claims?*
>
> *What arguments have the defendants been able to marshal to persuade you that this is not a case that triggers the internal management corporate governance principles that I've discussed? Why is it not a case about what the governance of this case has done? Why should this court not determine as a matter of its own law what the duties of directors are, what the duties of shadow and de facto directors are and in accordance with this jurisdiction's public policy work out whether those directors and these defendants are liable?*
>
> *On what basis have the defendants been able to counter the notion that lack of fragmentation is a good argument for breaking through and allowing this case to take place in one jurisdiction? What have they demonstrated, sir, to suggest that all the other cases that have gone that way – those principles shouldn't be applied in this case? And the deputy bailiff , having concluded that this jurisdiction was the only place in which all the actions against all the defendants could take place, why shouldn't the action proceed in this court? Why should the liquidators, as officers of this court, be put to the risk of substantial additional cost, delay and uncertainty of further satellite litigation for a split trial rather than being permitted to pursue all the claims in this jurisdiction in the manner that they have determined to be most efficient rather than allow the defendants to micromanage their case for them?*"

We cannot discern any compelling answer to this congerie of points.

107     Accordingly, we grant leave to amend the Cause as sought. We give leave to the Appellants to appeal and allow the appeal. We dismiss the Cross-Notices. We set aside the stay granted by the Deputy Bailiff.

108     We add only a coda. If there are circumstances in which a judge considers that a point on which he may wish to decide the case has not been fully argued, he should invite the parties to address the point in writing or orally as he sees fit. If in circumstances where a draft judgment is handed down it appears to advocates to rest on an unargued point, they should before the Judge becomes functus seek an opportunity to address it.

TAB 14

*Carlyle Capital Corporation Ltd v Conway* [2013] 2 Lloyd's Rep 179,
Court of Appeal of the Island of Guernsey

### COURT OF APPEAL OF THE ISLAND OF GUERNSEY

30 March; 27 April 2012

————

### CARLYLE CAPITAL CORPORATION LTD (IN LIQUIDATION) AND OTHERS

v

### CONWAY AND OTHERS

Before The Hon Michael Jacob BELOFF QC,
James Walker MCNEILL QC and
Sir Hugh Peter Derwyn BENNETT, Judges of Appeal

**Practice — Anti-anti-suit injunction — Liquidators of Guernsey company bringing common law and statutory claims against former directors and managers — One defendant having benefit of exclusive Delaware jurisdiction clause — Whether non-statutory claims should be litigated in Delaware — Whether liquidators entitled to anti-anti-suit injunction restraining Delaware proceedings.**

The first plaintiff (CCC) was incorporated in Guernsey on 29 August 2006 to invest in residential mortgage-backed securities. After eight months of increasing volatility in the global credit markets, on 17 March 2008 CCC was placed into compulsory liquidation in Guernsey on the application of its directors. When CCC collapsed not only was the capital lost but there was a substantial deficit.

On 7 July 2010 CCC's liquidators issued proceedings in four separate jurisdictions, Guernsey, Delaware, Washington DC, and the State of New York, all claiming in similar form damages "in a sum to be determined at trial exceeding US$1 billion" together with other relief.

There were 10 defendants. The first seven were directors of CCC. The eighth defendant, Carlyle Investment Management LLC (CIM), was a Delaware-registered company and was appointed as the investment manager and advisor to CCC pursuant to an investment management agreement (IMA) dated 20 September 2006. The ninth defendant, TC Group LLC (TCG), owned 75 per cent of CIM, and the 10th defendant, TCG Holdings LLC, was the sole managing member of TCG. The eighth, ninth and 10th defendants were referred as "the Carlyle defendants". It was alleged that, by virtue of their control over CCC and by their conduct, the Carlyle defendants became de facto or shadow directors of CCC and thereby owed the same duties to CCC as its de jure directors.

The claim alleged that the defendants owed CCC fiduciary duties and duties to act with skill and care in managing CCC's business affairs, and were in breach of the various duties. There was also a claim against CIM for breach of the IMA. The liquidators claimed damages for misfeasance, breach of fiduciary duty, gross negligence and/or negligence as against the defendants in their capacities as directors and/or in the case of the Carlyle defendants as shadow directors. There was also a claim against CIM for damages for breach of contract. In addition, there was a claim against the directors, pursuant to section 106 of the Companies (Guernsey) Law 1994 or section 422 of the Companies (Guernsey) Law 2008 for compensation, claims under section 106 against the Carlyle defendants alleging that they were "officers" of CCC, a claim against the Carlyle defendants for the return of CCC's books and records and other property, and a claim against the Carlyle defendants for unjust enrichment.

On 7 July 2010 the liquidators applied for leave to serve proceedings out of the jurisdiction on all the defendants (save for the seventh defendant, who was resident in Guernsey). The application was heard and granted by Lieutenant Bailiff Talbot on an ex parte basis.

On 16 December 2010 the liquidators withdrew their proceedings in the Delaware court.

On 29 December 2010 the Carlyle defendants instituted proceedings in the Delaware court for an injunction ordering the liquidators not to pursue any litigation with respect to the IMA in any jurisdiction other than Delaware, for damages, and for a declaration that the exclusive jurisdiction clause in the IMA was a valid, binding and enforceable contractual agreement.

On 28 February 2011 all the defendants filed in Guernsey exceptions déclinatoire to set aside the leave to serve out of the jurisdiction granted by LB Talbot or, alternatively, for an order that the proceedings be stayed pending the outcome of proceedings in Delaware.

On 22 July 2011 Deputy Bailiff Collas declined to set aside service out of the jurisdiction but, relying on the exclusive Delaware jurisdiction clause in the IMA, he imposed a temporary stay on all the liquidators' claims, requiring them first to litigate their non-statutory claims in Delaware, followed by their statutory, insolvency type, claims in Guernsey once the Delaware proceedings had been concluded (the forum issue).

On 8 August 2011 the liquidators sought the Deputy Bailiff's leave to appeal on the forum issue which, on 18 August 2011, he refused.

On 17 August 2011 the Carlyle defendants filed a motion in the Delaware court for preliminary injunctive relief.

**Carlyle Capital Corporation Ltd v Conway**          [Guernsey CA

On 18 August 2011 in the Delaware court the liquidators filed a motion to dismiss or stay the anti-suit proceedings.

On 19 August 2011 the liquidators in Guernsey submitted an application for leave to appeal to the Court of Appeal on the forum issue. On 15 September 2011 the Guernsey Court of Appeal ordered that the application, with the appeal to follow, if granted, should be heard as soon as possible.

On 21 September 2011 the first to fourth and eighth to 10th defendants served a cross-notice seeking to overturn the Deputy Bailiff's refusal to set aside the leave to serve out or alternatively to uphold the order as to the stay. On 23 September 2011 the fifth to seventh defendants served a similar cross-notice.

On 4 October 2011 the liquidators made an ex parte application in Guernsey for an anti-anti-suit injunction against the Carlyle defendants. The application was granted by Judge Finch on 7 October 2011.

On 17 November 2011 Judge Finch dismissed an application by the Carlyle defendants to set aside the ex parte order.

On 2 December 2011 Judge Finch in the course of a supplementary judgment recorded the Carlyle defendants' apparent intention to "advance the Delaware proceedings" and "to set up a trial in Delaware" and that would "cause serious issues before the Guernsey Court of Appeal to be pronounced upon in Delaware and is contrary to the sense of the judgment I handed down". He granted leave to appeal to the Carlyle defendants.

On 23 December 2011 the proceedings issued in the State of New York and in Washington DC by the liquidators were discontinued by consent.

Between 30 January and 3 February 2012 the Guernsey Court of Appeal heard the liquidators' appeal on the forum issue. In a judgment handed down on 5 March 2012 the Court of Appeal allowed the liquidators to amend the Cause so as to bring in additional statutory claims for wrongful trading and for disqualification orders. It allowed the liquidators' appeal on the forum issue and dismissed the defendants' cross-notice, on the basis that the Guernsey court had jurisdiction to consider all the claims whereas the Delaware court did not. The consequence of the Court of Appeal's decision was that all the liquidators' claims would proceed in a single jurisdiction, ie Guernsey.

On the hearing of the Carlyle defendants' appeal against Judge Finch's refusal to set aside the anti-anti-suit injunction, the Carlyle defendants submitted that the exclusive jurisdiction clause in

the IMA gave them a contractual right to have all the issues decided by the Delaware court; it was therefore for the Delaware court and not for the Guernsey court to determine what effect should be given to the exclusive jurisdiction clause.

The liquidators contended that the Carlyle defendants were seeking to subvert the effect of the Court of Appeal's earlier judgment on the forum issue by seeking in Delaware that which they had already failed to obtain in Guernsey, ie an order compelling the liquidators' proceedings to be heard in Delaware.

———*Held* by Guernsey CA (BELOFF, MCNEILL and BENNETT JJA) that the appeal would be dismissed.

(1) The principles governing the grant of an anti-anti-suit injunction were essentially the same as those which governed an anti-suit injunction. In considering whether to grant an anti-suit injunction the paramount objective was the ends of justice. Insofar as discrete categories of cases in the granting of such an injunction had been identified, they were not exhaustive. As long as the ends of justice were served by the grant of such injunction the absence of previous precedent should not inhibit the court to which an application was made (*see* paras 68, 71 and 72).

(2) Guernsey was the only jurisdiction in which all causes of action, common law and statutory, could be pursued and the statutory insolvency remedies were freighted with public interest considerations. To permit the Carlyle defendants to pursue their quest for anti-suit relief from the Delaware court might lead to multiplicity of proceedings and the possibility of inconsistent results. In the circumstances, the overall interests of justice favoured the grant of the anti-anti-suit injunction (*see* paras 78 to 85).

(3) Case law did not compel a contrary conclusion. An exclusive jurisdiction clause could be overridden in appropriate cases, not limited to the existence of vexation and oppression; for example, where it was necessary to avoid multiplicity of proceedings and the possibility of inconsistent judgments; where it was necessary to give effect to a statutory right in one forum even if the dispute was otherwise subject to a forum selection clause in favour of the foreign forum; where it was necessary for the protection of a court's legitimately conferred jurisdiction and the prevention of litigants' evasion of important public policies of the forum; and where it was necessary for the court to protect the integrity of its own judgments (*see* paras 86 to 108);

———*OT Africa Line Ltd v Magic Sportswear Corporation* [2005] 2 Lloyd's Rep 170, *Donohue v Armco Inc* [2002] 1 Lloyd's Rep 425; [2002] 1

Guernsey CA]      **Carlyle Capital Corporation Ltd v Conway**      [BELOFF JA

All ER 749, *Evans Marshall and Co Ltd v Bertola SA* [1973] 1 Lloyd's Rep 453; [1973] 1 WLR 349, *The El Amria* [1981] 2 Lloyd's Rep 119, *Samengo-Turner v J & H Marsh & McLennan (Services) Ltd* [2007] 2 CLC 104, *Qantas Airways Ltd v Rolls-Royce plc* [2010] FCA 1481, *Laker Airways Ltd v Sabena, Belgian World Airlines* 731 F.2d 909 (DC Cir 1984), *Masri v Consolidated Contractors International Co SAL* [2008] 2 Lloyd's Rep 301; [2009] QB 503 and *The Alkimos* [2004] FCA 698, considered.

(4) In any event, the Carlyle defendants' pursuit of the Delaware anti-suit proceedings, and of the present appeal, could be characterised as vexatious. It was calculated to prevent the liquidators from continuing to pursue the litigation in a single forum to a single trial; and to prevent the liquidators from ever pursuing their statutory insolvency remedies against the Carlyle defendants, which were available to the liquidators only in Guernsey (*see* para 112).

(5) There was a strong public policy in Guernsey against multiplicity of litigation and the fragmentation of proceedings that could and should be determined in a single action. The objectives and rationales underlying the policy included: (i) the saving of costs and waste of party and judicial resources; (ii) the avoidance of delay; (iii) the avoidance of the risk of inconsistent decisions and consequent injustice to parties; (iv) the prevention of loss to a complainant of the benefit of a single composite trial; (v) the avoidance of uncertainty and satellite disputes such as on questions of issue estoppel or res judicata; and (vi) the avoidance of potential injustice to third parties. In the present case the interests of justice were best served by the submission of the whole of the dispute to a single tribunal which was best fitted to give comprehensive judgment on all matters in issue in accordance with its own law which governed the vast majority of the claims (*see* para 116).

––––––––

The following cases were referred to in the judgment:

*Aggeliki Charis Compania Maritima SA v Pagnan SpA (The Angelic Grace)* (CA) [1995] 1 Lloyd's Rep 87;

*Aratra Potato Co Ltd v Egyptian Navigation Co (The El Amria)* (CA) [1981] 2 Lloyd's Rep 119;

*Bouygues v Offshore SA v Caspian Shipping Co* (CA) [1998] 2 Lloyd's Rep 461;

*Citi-March Ltd v Neptune Orient Lines Ltd* [1997] 1 Lloyd's Rep 72; [1996] 1 WLR 1367;

*Donohue v Armco Inc* (HL) [2001] UKHL 64; [2002] 1 Lloyd's Rep 425; [2002] 1 All ER 749;

*Evans Marshall and Co Ltd v Bertola SA* (CA) [1973] 1 Lloyd's Rep 453; [1973] 1 WLR 349;

*Glencore International AG v Exter Shipping Ltd* (CA) [2002] EWCA Civ 524;

*Hadmor Productions Ltd v Hamilton* (HL) [1983] 1 AC 191;

*Incitec Ltd v Alkimos Shipping Corporation (The Alkimos)* [2004] FCA 698;

*Laker Airways Ltd v Sabena, Belgian World Airlines* 731 F.2d 909 (DC Cir 1984);

*Laugee v Laugee* [1990] JLR 236;

*Mahavir Minerals Ltd v Cho Yang Shipping Co Ltd (The MC Pearl)* [1997] 1 Lloyd's Rep 566;

*Masri v Consolidated Contractors International Co SAL* (CA) [2008] EWCA Civ 625; [2008] 2 Lloyd's Rep 301; [2009] QB 503;

*OT Africa Line Ltd v Magic Sportswear Corporation* (CA) [2005] EWCA Civ 710; [2005] 2 Lloyd's Rep 170;

*Qantas Airways Ltd v Rolls-Royce plc* [2010] FCA 1481;

*Samengo-Turner v J & H Marsh & McLennan (Services) Ltd* (CA) [2007] EWCA Civ 723; [2007] 2 CLC 104;

*Seismic Shipping Inc v Total E&P UK plc (The Western Regent)* (CA) [2005] EWCA Civ 985; [2005] 2 Lloyd's Rep 359;

*Société Nationale Industrielle Aérospatiale v Lee Kui Jak* (PC) [1987] AC 871;

*Star Reefers Pool Inc v JFC Group Co Ltd* (CA) [2012] EWCA Civ 14; [2012] 1 Lloyd's Rep 376;

*Turner v Grovit* (HL) [2001] UKHL 65; [2002] 1 WLR 107.

––––––––

This was an appeal by the eighth to 10th defendants from the decision of Judge Finch dated 2 December 2011 refusing to set aside an anti-anti-suit injunction granted to the plaintiffs restraining the eighth to 10th defendants from pursuing proceedings in the Delaware courts.

Advocate S H Davies, instructed by Williams & Connolly, for the eighth to 10th defendants; Advocate J M Wessels, instructed by Lipman Karas, for the plaintiff liquidators.

The further facts are stated in the judgment of Beloff JA.

Judgment was reserved.

Friday, 27 April 2012

[Editor's note: on 10 July 2012 the Judicial Committee of the Privy Council refused the defendants' applications for permission to appeal.]

––––––––

### JUDGMENT

**BELOFF JA:**

1.  This is the judgment of the court in an appeal by the eighth, ninth and 10th defendants against an order of Judge Finch dated 2 December 2011 ("the Finch Decision").

2.  The circumstances which generated the litigation, the backcloth to the Finch Decision, we take from our judgment in Civil Appeal No 435 handed down on 5 March 2012 to which we add the chronology of and relating to the litigation in the State of Delaware.

3.  On 29 August 2006 the first plaintiff, Carlyle Capital Corporation Ltd ("CCC"), was incorporated in Guernsey. It was promoted by the Carlyle Group, one of the world's largest private equity firms, to invest in residential mortgage-backed securities.

4.  By July 2007 CCC had raised capital totalling US$945 million through a series of private placements and an initial public offering. It was listed on the Euronext Exchange in Amsterdam.

5.  The substantive proceedings in this matter arise out of the events of the following eight months during which the global credit markets became increasingly volatile and during which period the entire capital of CCC was lost.

6.  On 17 March 2008 CCC was placed into compulsory liquidation in Guernsey pursuant to section 94(a) of the Companies (Guernsey) Law 1994 as amended ("the 1994 Law") on the application of the directors of CCC.

7.  CCC financed its investments through short-term repurchase agreements giving extensive leverage. Consequently when CCC collapsed not only was the capital lost but, it is alleged, there was a substantial deficit.

8.  On 7 July 2010 the liquidators (who for present purposes should be treated as CCC) issued proceedings in four separate jurisdictions, Guernsey, Delaware, Washington DC, and the State of New York, all claiming in similar form damages "in a sum to be determined at trial exceeding $1 billion" together with other relief. The liquidators allege in the Cause in this jurisdiction that the nature of the action is one essentially concerned with the internal management, control and corporate governance of CCC. The defendants, it appears, are likely to argue that the nature of the liquidators' action essentially relates to the failures of the duties arising under and connected with an investment management agreement ("IMA") dated 20 September 2006 between CCC and the eighth defendant.

9.  There are 10 defendants in these proceedings. The first seven were all directors of CCC. The first four held offices and/or were employees of other companies within the Carlyle Group. The fifth to

seventh defendants were appointed as independent directors. The eighth defendant, Carlyle Investment Management LLC ("CIM"), is a Delaware-registered company and was appointed as the investment manager and advisor to CCC pursuant to the IMA.

10.  The ninth defendant, TC Group LLC ("TCG"), owned 75 per cent of CIM, and the 10th defendant, TCG Holdings LLC, was the sole managing member of TCG. The eighth, ninth and 10th defendants refer to themselves as "the Carlyle defendants" and we shall do likewise. It is alleged that, by virtue of their control over CCC and by their conduct, the Carlyle defendants became de facto or shadow directors of CCC and thereby owed the same duties to CCC as its de jure directors.

11.  The procedural history in outline is as follows.

12.  On 7 July 2010 the liquidators applied for leave to serve proceedings out of the jurisdiction on all the defendants (save for the seventh defendant, Mr Loveridge, who is resident in Guernsey), pursuant to Rule 8 of the Royal Court Civil Rules 2007. The application was heard and granted by Lieutenant Bailiff Talbot on an ex parte basis.

13.  On 16 December 2010 the liquidators withdrew their proceedings in the Delaware Chancery Court.

14.  On 29 December 2010 the Carlyle defendants instituted proceedings by way of Verified Complaint in the Delaware Chancery Court ("the Complaint") against the liquidators for an injunction ordering the liquidators not to pursue any litigation with respect to the IMA in any jurisdiction other than Delaware, for damages, and for a declaration that the exclusive jurisdiction clause (the "EJC") in the IMA is a valid, binding and enforceable contractual agreement.

15.  The EJC itself is set out in clause 9 of the IMA and reads:

"This Agreement shall be governed by, and construed in accordance with, the laws of Delaware, without giving effect to the choice of law principles thereof. The federal or state courts sitting in Delaware shall have exclusive jurisdiction over any action, suit or proceeding with respect to this Agreement and each party hereto hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may have, whether now or in the future, to the laying of venue in, or to the jurisdiction of, any and each of such courts for the purposes of any such suit, action, proceeding or judgment and further waives any claim that any such suit, action, proceeding or judgment has been brought in an inconvenient forum, and each party hereto hereby submits to such jurisdiction."

Guernsey CA]          **Carlyle Capital Corporation Ltd v Conway**          [BELOFF JA

16. The Complaint alleged, in broad terms, that the liquidators were in breach of the IMA, in particular the EJC, in bringing proceedings in Guernsey, the State of New York, and the District of Columbia. The Complaint made no distinction between the common law and equitable claims on the one hand and the statutory claims on the other in the liquidators' proceedings in Guernsey. Indeed, para 52 of the Complaint alleged that "any future litigation" by the liquidators in Guernsey (and elsewhere, other than Delaware) would cause the Carlyle defendants irreparable harm. On its face the injunction sought in the Complaint was wide enough to cover all existing and any future causes of action, whether pursuant to statute or otherwise, in Guernsey.

17. On 7 January 2011 the liquidators transferred the Carlyle defendants' Complaint proceedings (which we call "the anti-suit proceedings") to the Delaware Federal Court seeking to rely on US statutory provisions.

18. On 21 January 2011 the Carlyle defendants applied to transfer the anti-suit proceedings back to the Delaware Chancery Court.

19. On 10 February 2011, at a hearing in front of LB Talbot in Guernsey, Advocate Wessels for the liquidators told the court that the anti-suit proceedings in Delaware and the Guernsey proceedings would take their course, move at their own pace, and thus that neither case would affect the other. Advocate Davies for the Carlyle defendants, while careful to say before us that he was not alleging that the Carlyle defendants were deliberately lured into abstaining from accelerating their interim applications in Delaware by such statements made on behalf of the liquidators in Guernsey (and also in Delaware), nonetheless asserted that in point of fact such statements caused the Carlyle defendants to accept a more relaxed briefing schedule and to be content with a later hearing date in Delaware for their claim for interim relief than might otherwise have been the case.

20. On 16 February 2011 the Carlyle defendants requested the Delaware Federal Court to grant emergency relief, ie to resolve their expedited motion to remit the anti-suit proceedings to the Delaware Chancery Court so as to permit them to seek preliminary injunctive relief against the liquidators forbidding them to pursue proceedings in Guernsey.

21. On 25 February 2011 the liquidators filed their Reply Brief in Delaware and, at page 2 note 6 under "Introduction", drew attention to remarks made by the Royal Court on 10 February 2011 (when it set a five-day hearing of the Carlyle defendants' application to set aside leave to serve out of the jurisdiction for 6 June 2011) that applying

the principles of international comity it did not wish to put any pressure, in terms of timing, on the Delaware court and expressed the hope that the US courts would approach the matter in an equally deliberative manner to make sure that the issues between the parties were fairly and properly heard.

22. On 28 February 2011 all the defendants filed in Guernsey exceptions déclinatoire to set aside the leave to serve out of the jurisdiction granted by LB Talbot or, alternatively, for an order that the proceedings be stayed pending the outcome of proceedings in Delaware.

23. On the same date the Carlyle defendants filed for preliminary injunctive relief in the Delaware Federal Court, to which, on 24 March 2011, the liquidators responded to the motion for preliminary injunctive relief, with the Carlyle defendants then filing their Reply Brief on 4 April 2011.

24. On 13 May 2011 Mr Roberts, one of the liquidators, swore his second affidavit in relation to the exceptions déclinatoire, and exhibited the proposed Amended Cause, details of which can be found in para 20 of our judgment in Civil Appeal No 435, and in respect of which we gave leave to amend – see para 32 thereof.

25. On 23 May 2011 the defendants applied for an adjournment of the hearing fixed for 6 June 2011, which the liquidators opposed.

26. On 2 June the Deputy Bailiff adjourned the hearing and ordered it to commence on 27 June 2011. The hearing duly took place between 27 June 2011 and 1 July 2011. The Deputy Bailiff understood that the proceedings in New York and in the District of Columbia were not being seriously pursued, and that, as he said in para 10 of his judgment "the argument before me centred upon the choice of jurisdiction between Delaware and Guernsey".

27. On 22 July 2011 the Deputy Bailiff declined to set aside service out of the jurisdiction but granted a stay of the proceedings in Guernsey on the basis that the liquidators should litigate their non-statutory claims in Delaware and only thereafter their statutory claims in Guernsey.

28. On 4 August 2011 the Delaware Federal Court transferred the anti-suit proceedings back to the Delaware Chancery Court and denied both the Carlyle defendants' motion for Preliminary Injunctive Relief and the liquidators' motion to dismiss or stay the proceedings as "moot".

29. On 8 August 2011 the liquidators sought the Deputy Bailiff's leave to appeal which, on 18 August 2011, he refused.

30. On 17 August 2011 the Carlyle defendants filed a motion in the Delaware Chancery Court for Preliminary Injunctive Relief. At para 13 thereof it is stated inter alia:

"On 8 August 2011, the Liquidators sought leave to appeal the decision of the Royal Court of Guernsey to the Guernsey Court of Appeal. The Liquidators accordingly continue their efforts to avoid this Court and continue to violate the IMA's forum selection clause. In papers filed in this action prior to remand, the Liquidators indicated that they anticipate their appeal will be heard later this year."

31. On 18 August 2011 in the Delaware Chancery Court the liquidators filed a motion to dismiss or stay the anti-suit proceedings.

32. On 19 August 2011 the liquidators in Guernsey submitted an application for leave to appeal to a single judge of the Court of Appeal.

33. On 26 August 2011 the Carlyle defendants filed a motion for Summary Judgment in the Delaware Chancery Court. In the introduction it is stated that:

"this case seeks to end the flagrant forum shopping of [the Liquidators] in violation of their contractual obligations."

It recites that:

"On July 22, 2011, the Guernsey court enforced the IMA's forum selection clause, staying the Guernsey proceedings and directing the Liquidators to pursue their claims in Delaware . . . Nevertheless, the Liquidators persist in their efforts to avoid the jurisdiction of this Court by seeking leave to appeal the Guernsey court's judgment . . ."

34. The submission that by seeking leave to appeal the Deputy Bailiff's order the liquidators were persisting in their efforts to violate the IMA's exclusive Delaware EJC is repeated at page 17 of the motion. It is further submitted at page 29 that: "All of the claims that the Liquidators seek to bring against the Carlyle entities . . . are 'with respect to' the IMA and accordingly must be brought in Delaware". The conclusion of the motion makes it clear that the Carlyle defendants sought "summary judgment, permanently enjoin[ing] the Liquidators from further violating the IMA's exclusive Delaware forum selection clause, and . . . damages, subject to later quantification". In the alternative a preliminary injunction was sought prohibiting the liquidators from pursuing their claims outside of Delaware during the pendency of "this" action.

35. On 28 August 2011 the US counsel for the Carlyle defendants wrote to the liquidators' US counsel seeking to agree a combined briefing schedule, to which the latter replied on 6 September 2011 proposing a different schedule.

36. On 7 September 2011 the Bailiff directed the liquidators to present their application for leave to appeal to the full Court of Appeal during the following week for determination of the discrete question whether the liquidators' application for leave should be heard before or concurrently with the substantive appeal.

37. On 12 September 2011 [by which date no agreement for a briefing schedule had been reached], the Carlyle defendants filed a motion in Delaware seeking such a schedule. Under the proposed order all briefing was to be completed by 17 October 2011.

38. On 14 September 2011 the liquidators filed a response submitting that such motion sought to interfere with the Guernsey appellate process and that the various motions pending in Delaware should be stayed pending determination of the appeal in Guernsey.

39. On the same day the Court of Appeal heard the liquidators' application for leave to appeal. Mourant Ozannes for the liquidators wrote to Ogier for the Carlyle defendants seeking undertakings from the Carlyle defendants not to seek scheduling of the Delaware pending motions for anti-suit relief until after the determination of the liquidators' appeal in Guernsey.

40. On 15 September 2011, before the Court of Appeal sat to deliver its judgment, Advocate Davies informed Advocate Wessels for the liquidators that the Carlyle defendants would not give the undertakings sought. The Court of Appeal (Michael J Beloff QC (President), Michael Jones QC and Clare Montgomery QC JJA) ordered that the application for leave to appeal, with appeal to follow if granted, would be heard "as soon as possible preferably before a Court of Appeal in November . . ." with ". . . liberty to apply should it prove impossible to arrange for a Court of Appeal to sit in November 2011".

41. On the same day Strine C in the Delaware Chancery Court ordered the parties to reach agreement on a briefing schedule for the liquidators' motion to dismiss and the Carlyle defendants' motions for preliminary injunction and summary, ie final judgment.

42. Thereafter correspondence passed between the US lawyers for the parties, in which it is apparent that the Carlyle defendants were pressing for the motions to be heard and the liquidators were suggesting that the Delaware motions should await the hearing of the application which had been fixed for 30 January 2012, as the Carlyle defendants' motions were seeking to interfere with that process.

43. On 21 September 2011 the first to fourth and eighth to 10th defendants served a cross-notice seeking to overturn the Deputy Bailiff's refusal to set aside the leave to serve out or alternatively to uphold the order as to the stay.

44. On 23 September 2011 the fifth to seventh defendants served a similar cross-notice.

LLOYD'S LAW REPORTS

**Carlyle Capital Corporation Ltd v Conway**

45. On 28 September 2011 the US counsel for the Carlyle defendants informed the liquidators' US counsel that they had spoken to Strine C who had scheduled a hearing for all the motions for 9 November 2011 but had said that 28 October 2011 might become available.

46. On 30 September 2011 the US counsel for the Carlyle defendants informed the liquidators' US counsel that they had spoken to Strine C who had set the hearing of all the motions for 28 October 2011 with all briefing to be completed by 21 October 2011.

47. On 4 October 2011 the liquidators filed in Guernsey their ex parte application for an anti-anti-suit injunction against the Carlyle defendants.

48. On 5 October 2011 the US counsel for the liquidators wrote to Strine C with a copy to the US counsel for the Carlyle defendants, at the bottom of page 2 and the top of page 3 it was stated:

"There is no urgency or prejudice to Carlyle here. All that is basically happening is an appeal; all of Carlyle's rights are preserved and Carlyle is protected on the question of costs and any damages . . ."

49. It was submitted by Advocate Davies that as an application for an ex parte order had been filed in Guernsey on 4 October 2011 those statements were untrue and may have been an attempt by the liquidators to mislead the Delaware court into granting a more generous timetable, whilst seeking draconian ex parte orders from the Royal Court preventing the Carlyle defendants from enforcing the EJC in the IMA. We consider that such a construction is not necessarily, reading the passage in context, the only one appropriate; but even were that so, we would not see this issue as decisive of the present appeal.

50. On 6 October 2011 Strine C made a scheduling order that all briefing be concluded by 21 October 2011.

51. On 7 October 2011 the ex parte application was granted by Judge Finch.

52. On the same day the Carlyle defendants, having been notified of Judge Finch's order, immediately filed in Delaware a Notice of Withdrawal of their motions for preliminary injunctive relief and for summary judgment without prejudice to their right to reinstate as soon as the ex parte order was lifted.

53. On 12 October 2011 Strine C issued an order vacating the scheduling order of 6 October 2011.

54. On 28 October 2011 Judge Finch conducted an inter partes hearing on the Carlyle defendants' application to set aside the ex parte order.

55. On 17 November 2011 Judge Finch dismissed the application.

56. On 2 December 2011 Judge Finch in the course of his supplementary judgment recorded the Carlyle defendants' apparent intention to "advance the Delaware proceedings" and "to set up a trial in Delaware" and that would "cause serious issues before the Guernsey Court of Appeal to be pronounced upon in Delaware and is contrary to the sense of the judgment I handed down". He granted leave to appeal to the Carlyle defendants.

57. On 9 December 2011 Ogier applied for an expedited hearing of the appeal against Judge Finch's order (and before the hearing fixed for 30 January 2012), and alternatively that both appeals be heard together. It was submitted by Advocate Davies that this request was driven by the fact that the effect of Judge Finch's order was to give the liquidators an unwarranted advantage in that it deprived the Carlyle defendants of an opportunity to obtain an order in Delaware restraining the continued breach of the EJC.

58. On 20 December 2011 the Court of Appeal delivered its ruling, gave reasons for declining to expedite the appeal against the Finch Decision, suspended further steps in that appeal until after the resolution of the appeal fixed for 30 January 2012 and provisionally fixed the hearing for the Finch Decision appeal for 5 and 6 March 2012.

59. On 23 December 2011 the proceedings issued in the State of New York and in Washington DC by the liquidators were discontinued by consent.

60. Between 30 January and 3 February 2012 the hearing of the appeal from the Deputy Bailiff duly took place before us. We allowed the liquidators to amend to bring in additional statutory claims. We gave the liquidators leave to appeal and allowed the appeal against the Deputy Bailiff's decision. We dismissed the Directors' cross-notices. In consequence of our order, if not otherwise displaced, all the liquidators' claims were to proceed in a single jurisdiction, ie Guernsey.

61. A threshold issue is whether we should consider whether to uphold or dismiss the appeal against the Finch Decision by reference to the position as it was before him, or as it is before us. Advocate Davies contended for the former position; Advocate Wessels for the latter.

62. It seemed to us in principle that it would be a sterile exercise to focus on the past, not the present. If Judge Finch was right to make the order when he did, non sequitur that it should be continued if circumstances had changed in a material way: if per contra he was wrong, then non sequitur that the order should be discontinued again if circumstances had indeed so changed. We remind ourselves of the locus classicus *Hadmor Productions Ltd v Hamilton* [1983] 1 AC 191 in which Lord Diplock at pages 220A to 221A set out the circumstances in

BELOFF JA]    **Carlyle Capital Corporation Ltd v Conway**    [Guernsey CA

which an appellate body could review the exercise of a discretionary power to grant an injunction.

"Before adverting to the evidence that was before the learned judge and the additional evidence that was before the Court of Appeal, it is I think appropriate to remind your Lordships of the limited function of an appellate court in an appeal of this kind. An interlocutory injunction is a discretionary relief and the discretion whether or not to grant it is vested in the High Court judge by whom the application for it is heard. Upon an appeal from the judge's grant or refusal of an interlocutory injunction the function of an appellate court, whether it be the Court of Appeal or your Lordships' House, is not to exercise an independent discretion of its own. It must defer to the judge's exercise of his discretion and must not interfere with it merely upon the ground that the members of the appellate court would have exercised the discretion differently. *The function of the appellate court is initially one of review only. It may set aside the judge's exercise of his discretion* on the ground that it was based upon a misunderstanding of the law or of the evidence before him or upon an inference that particular facts existed or did not exist, which, although it was one that might legitimately have been drawn upon the evidence that was before the judge, can be demonstrated to be wrong by further evidence that has become available by the time of the appeal; *or upon the ground that there has been a change of circumstances after the judge made his order that would have justified his acceding to an application to vary it.* Since reasons given by judges for granting or refusing interlocutory injunctions may sometimes be sketchy, there may also be occasional cases where even though no erroneous assumption of law or fact can be identified the judge's decision to grant or refuse the injunction is so aberrant that it must be set aside upon the ground that no reasonable judge regardful of his duty to act judicially could have reached it. It is only if and after the appellate court has reached the conclusion that the judge's exercise of his discretion must be set aside for one or other of these reasons, that it becomes entitled to exercise an original discretion of its own.

. . . The right approach by an appellate court is to examine the fresh evidence in order to see to what extent, if any, the facts disclosed by it invalidate the reasons given by the judge for his decision." (Our emphasis.)

63. This was followed by the Court of Appeal in Jersey in *Laugee v Laugee* [1990] JLR 236 in a manner germane to the present appeal, where it was stated at page 248:

"Although this passage relates to interference with discretion, it must follow equally that the exercise of the discretion can be upheld on the ground that subsequent evidence has appeared which would further justify the original order."

64. By virtue of section 14 of the Court of Appeal (Guernsey) Law 1961, this court has all the power which vested in the Royal Court as a "Cour des Jugements et Records". We consider that we should exercise these powers rather than remitting the matter to Judge Finch to take a fresh view, which course would be a recipe for delay and would engage other procedural problems. That said, for reasons we shall explain later, we do not accept that the judge made any real error in principle on a fair reading of his several judgments such as would have entitled us to review his discretion even had we adopted a more conservative position.

65. The anti-anti-suit injunction is a phenomenon infrequently encountered in casebook and commentary. Our researches found only 10 instances in which the concept is referred to by that name in electronically available authorities. Counsel between them referred to one case from the United States of America, one from Australia, and one from England; and it was only in the latter two that the injunction granted was given that specific title. Initially Andrew S Bell, *Forum Shopping and Venue in Transnational Litigation*, 2003, OUP ("Bell") was the only academic work referred to which dealt with such phenomenon discretely; though under stimulus from the court, counsel's researches produced a further more recent work by Thomas Raphael: *The Anti-Suit Injunction*, 2008, OUP ("Raphael") which contained subject-specific observations.

66. There was a brief discussion of the utility of such a form of order. Since it was axiomatic that it bound only the party to whom it was directed, and not the court in which that party might seek the conventional anti-suit injunction, what then, the question was posed, was there to prevent that party nonetheless making (successfully) an application to that uninhibited court?

67. It seems to us that there is a threefold answer to the question so posed. First, a breach of an anti-anti-suit injunction would constitute a contempt of court. True it is – to take the present case – that the Carlyle defendants could, notwithstanding such an order, seek anti-suit relief in Delaware; but they would be, for example, in consequence unable to come within the Guernsey jurisdiction, without risk of committal. Secondly, it is to be assumed that in societies governed by the rule of law a court order (unless successfully appealed or avoided) will be respected by those to whom it is directed, even when outwith the jurisdiction of the court which made it. Thirdly, the very premise for the seeking of an anti-anti-suit injunction is that another court (in this case the Delaware Chancery Court) might

itself grant an anti-suit injunction against a party proceeding in the court from which such injunction is sought (in this case the Royal Court) (see *Bell*, para 4.139). However, if reasons why the Guernsey Court grants the anti-anti-suit injunction are sufficient and seen to be sufficient, the Delaware court would (or could) be in comity persuaded not to grant an anti-suit injunction even if one were subsequently sought from it.

68. Both parties proceeded on the basis that the principles governing the grant of an anti-anti-suit injunction were essentially the same as those which governed an anti-suit injunction. We are prepared to proceed on that premise given that the source of the jurisdiction (inherent or statutory) and the objects served by it are common. However it is well established that a court should exercise caution in the grant of an anti-suit injunction and we agree that, as Raphael puts it, "the particular sensitivity of this type of claim and the inherent risks of escalating conflicts between legal schemes should probably mean that anti-anti-suit injunctions should be granted with *particular* caution" (para 5.49).

69. The principles which govern classic anti-suit injunctions in the modern era were set out in the speech of Lord Goff in *Société Nationale Industrielle Aérospatiale v Lee Kui Jak* [1987] AC 871 at pages 892A to 897A, from which we derive the following principles (to some of which we have already alluded):

(1) First, the jurisdiction is to be exercised when the "ends of justice" require it.

(2) Where the court decides to grant an injunction restraining proceedings in a foreign court, its order is directed not against the foreign court but against the parties so proceeding or threatening to proceed.

(3) An injunction will only be issued restraining a party who is amenable to the jurisdiction of the court, against whom an injunction will be an effective remedy.

(4) As such an order indirectly affects the foreign court, the jurisdiction is one which must be exercised with caution.

(5) The decided cases show judges seeking to apply the fundamental principles in certain categories of case, while at the same time never asserting that the jurisdiction is to be confined to those categories.

(6) An injunction may be granted to restrain the pursuit of foreign proceedings on the grounds of vexation or oppression; but consistent with the basic principle of justice underlying the whole of this jurisdiction, the notions of vexation and oppression should not be restricted by definition; they vary with the circumstances of each case.

(7) While there is no presumption that a multiplicity of proceedings is vexatious, such multiplicity may, inter alia, make them vexatious.

(8) Since the court is concerned with the ends of justice, account must be taken not only of injustice to the defendant if the plaintiff is allowed to pursue the foreign proceedings, but also of injustice to the plaintiff if he is not allowed to do so. The court will not grant an injunction if, by doing so, it will deprive the plaintiff of advantages in the foreign forum of which it would be unjust to deprive him.

70. It was not suggested that those basic principles had themselves been altered in any of the subsequent cases, although naturally, given that later courts were confronted with a variety of different factual situations, they had to be adapted in their particular application.

71. Three matters in our view stand out from the jurisprudence viewed as a whole. First, the paramount objective is the ends of justice. [See too *Donohue v Armco Inc* [2002] 1 Lloyd's Rep 425 at page 431.] Secondly, insofar as discrete categories of cases in the granting of such an injunction have been identified, they are not exhaustive. Thirdly, even within the category to which the greatest attention was paid in the present case, that is to say the restraint of vexatious or oppressive conduct, that too was a flexible concept.

72. The case law does, of course, nonetheless provide guidelines. Examples are provided by it of when anti-suit injunctions may, and when they may not, be granted. As far as the latter is concerned, it is clear that the mere fact that a court has determined that a particular jurisdiction is forum conveniens, while it may be a necessary step, is not a sufficient basis for a grant of anti-suit relief: *Aérospatiale*, cit sup. But as long as the ends of justice are served by the grant of such injunction, the absence of previous precedent should not inhibit the court to which an application is made.

73. It is convenient before summarising the rival contentions to return to our earlier judgment so as to set the scene. At paras 48 and 49 we said:

"48. On the premise, which we consider we have established, that it is for the above reasons at least proper for us to revisit the DBs exercise of discretion, it is useful to remind ourselves of certain matters which are indisputable.

(i) The Cause, amended as it will be pursuant to our order raises ex concessis triable issues.

(ii) The Directors have not put in their defence; in consequence it is impossible as of now to know what particular issues a court, where ever it sits, will have to decide.

(iii) The Royal Court in Guernsey has jurisdiction to consider all the claims.

(iv) The Chancery Court of Delaware does not have jurisdiction to consider all the claims. As far as wrongful trading is concerned, the Royal Court under the 1994 Law is the only Court which has jurisdiction: see the references to the Court in the 1994 Law, sections 67C and 117(1). As far as directors disqualification is concerned a Delaware court could not exercise a regulatory function conferred only on organs or officers in another jurisdiction. In our view the same must be true by parity of reasoning of the Section 106 claim brought under a Guernsey statute. No evidence submitted by experts in Delaware law by the Directors sought to suggest otherwise or sought to contradict similar evidence submitted by the Appellants' experts consistent with this proposition.

(v) Delaware law will govern the IMA breach of contract claims only. All claims of breach of duty by the Defendants whether as Directors de jure, de facto or shadow will be governed by Guernsey law.

(vi) The Directors were responsible for the choice of Guernsey as the place of incorporation of CCC with the perceived advantages that such choice would bring. The Carlyle Group chose to incorporate CCC in Guernsey and the Director Defendants chose to be Directors of a Guernsey company. They opted, in short, to take advantage of the legal, fiscal and regulatory regimes applicable in Guernsey; furthermore prior to applying to place CCC in liquidation, the Directors considered which forum to adopt for that procedure and again chose Guernsey. All the Directors must have contemplated at the very least that they could be the subject of litigation in Guernsey. In emphasising the alleged primacy of the choice of forum clause (which we shall consider below) they could fairly be charged with blowing hot and cold, or, to mix the metaphor, having their cake and eating it.

49. In our view factors (iii)–(vi) tell strongly in favour of Guernsey as the forum conveniens. Factors (iii) and (iv) engage the presumption against fragmentation. As to factor (v), where the principal issues are those of internal management of a corporation and correlative breach of duty, the place of incorporation will presumptively be the appropriate forum because of its ability to judge matters by its own standards of business conduct: see, for example, *Ceskoslovenska Obchodni Banka AS v Nomura International plc* 2003 IL Pr 20 at paragraph 12(2) and (5)."

74. In the course of that judgment we particularly considered the impact of the EJC, which we described as the jewel in the crown of the Carlyle defendants' submission, and declined to enforce it relying on para 27 of *Donohue v Armco Inc*. Advocate Wessels therefore contended that the Carlyle defendants were seeking to subvert the effect of our judgment by seeking in Delaware that which they had already failed to obtain in Guernsey, ie an order which compelled the liquidators' proceedings quoad at any rate the Carlyle defendants to be heard in Delaware.

75. Advocate Davies contended to the contrary that the EJC was indeed compulsive to that end. He said that none of the cases relied upon by Advocate Wessels for general statements of principle addressed, still less permitted the overriding of an EJC. The lynchpin of his submissions was that the Carlyle defendants and CCC had agreed that any matters arising "with respect to the IMA" would be determined in the Court of Delaware. The meaning of that phrase and indeed of other aspects of the IMA, were for the Delaware courts only. If on its true construction the phrase embraced the statutory claims but the Delaware court concluded that it could not adjudicate upon them, that was the consequence of the EJC itself. CCC (and in its shoes the liquidators) could not therefore complain about its inability to pursue such claims since it was the product of the very bargain it had voluntarily struck.

76. Advocate Davies added that the Delaware court might decide that because of that limitation on their powers, ie an inability to adjudicate on the statutory claims, it would not grant the anti-suit relief sought. There were indeed a variety of possible outcomes if the Delaware court were left free to entertain the Carlyle defendants' application. Moreover the liquidators would have the full opportunity to make their case as to the proper outcome before that court. His main point was that the Carlyle defendants had a contractual right to have all such issues decided by the Delaware court, and CCC by signing the IMA was bound to respect that right. It was therefore for the Delaware court and not for us to determine what effect should be given to the EJC.

77. It was, of course, a necessary consequence of this submission that unless for whatever reason the Delaware court declined to grant the relief sought by the Carlyle defendants by way of anti-suit injunction, there would be fragmentation since it was not Advocate Davies' case that other persons not party to the IMA could make applications parasitic upon it. Advocate Davies suggested, however, that the Delaware court might be more tolerant of fragmentation than the courts of

Guernsey (or, indeed, of England and Wales); but in any event whether it could, should or would extend such tolerance was a matter for it.

78. We repeat that we accept that the mere fact that we have found Guernsey to be the forum conveniens is not of itself a sufficient basis to grant the anti-anti-suit injunction. However, we have gone significantly further than finding Guernsey to be forum conveniens. We have found that the Guernsey court is the only court in which all the causes of action, common law and statutory, can be pursued.

79. Looking at the matter in broad terms, there are three possible outcomes were we to allow the appeal and so permit the Carlyle defendants to pursue their quest for anti-suit relief from the Delaware court. First that the Delaware court would refuse it, in which case the Carlyle defendants would have lost nothing from the grant of anti-anti-suit relief. Secondly, that the Delaware court would grant relief without qualification. In which case, as we have already held, the liquidators' statutory claims, freighted with public interest considerations which we have already emphasised, might disappear into a jurisdictional black hole. Third that the Delaware court, recognising its own lack of power to adjudicate upon those statutory claims, would permit them to proceed in Guernsey, while itself adjudicating upon the so-called common law claims. In our view that would be the recipe for anarchy; multiplicity of proceedings and the possibility of inconsistent results, a fortiori if the benefits of the IMA and EJC only apply to the Carlyle defendants so that proceedings against the other directors, irrespective of the outcome in any putative anti-suit injunction in Delaware, would proceed in Guernsey. It seems counter-intuitive for us to countenance the risk of a situation in which the very same allegations against directors can be adjudicated upon in separate jurisdictions depending upon whether particular directors can (or cannot) enjoy the benefit of the IMA and the EJC, when precisely the same claims (other than the ones relating exclusively to breach of the IMA) are advanced against *all* of them.

80. Turning to the perceived advantages of litigation in Delaware, as we understood their submissions to us, the Carlyle defendants maintained that there were three. The first was logistical: nine of the 10 defendants (including for this purpose the individuals in charge of the Carlyle defendants) are American, with only the seventh defendant being resident in Guernsey. The second was that the courts of the jurisdiction specified in the EJC were best placed to apply the law by which the EJC is governed, and, particularly whether it should be enforced, against whom, as to which claims, and

as to what relief should be available. The third was that without enforcement of the EJC it is rendered valueless since damages generally are regarded as an insufficient remedy for such breach (see Millett LJ in *Aggeliki Charis Compania Maritima SA v Pagnan SpA (The Angelic Grace)* [1995] 1 Lloyd's Rep 87 at page 96, col 2: "The justification for the grant of the injunction in either case is that without it the plaintiff will be deprived of its contractual rights in a situation in which damages are manifestly an inadequate remedy".

81. It seems to us that none carries compulsive weight. Clearly there are issues, upon which we touched in our earlier judgment at paras 87 to 90, as to whether or not the nub of the case against the defendants is properly to be characterised as one relating broadly to insolvency and the general duties of directors of Guernsey companies or one relating narrowly to the operation of the IMA. The key question is, however, where the interests of justice ought to be best served [and those, as we see it, are the interests of justice in the substantive proceedings as a whole] when the claims are pleaded as both but with the main emphasis on the former.

82. The claim here is by liquidators as part of the winding up of a Guernsey company. None of the American defendants claims to be so impoverished as to make litigation in Guernsey for him an unfair burden. We are therefore not persuaded that there would be a material benefit to the interests of justice for the litigation to be in Delaware merely because the majority of defendants are American.

83. As to the benefit of control of proceedings being in the hands of the (Delaware) courts of the EJC jurisdiction, we take the view that issues as to the ambit of the clause, albeit they may exist, are merely preliminary to the disposal of the full substantive issues as between the parties; and we are not persuaded that there is a particular and overriding need here to have that preliminary issue determined by one court rather than another. The meaning and scope of the IMA, in particular how it might avail the Carlyle defendants in respect of the claims advanced against them (on which to date they have kept their forensic powder dry) will be matters for Delaware law on which the Royal Court can form a view after receipt of expert evidence.

84. Nor can we unreservedly endorse the dictum of Millett LJ in *The Angelic Grace*, which we have cited in para 80 as being of universal application. In the present case the additional costs and expenses of being required to litigate in Guernsey as distinct from Delaware are surely capable of quantification.

85. So our preferred conclusion is that the overall interests of justice favour the grant of the anti-anti-suit injunction.

86. Does then the case law compel us to a contrary conclusion? Is an EJC always a trump card which overrides all other considerations?

87. We consider first the main authorities relied on by the Carlyle defendants. We accept as a starting point that not only would the Delaware court not be regarded as acting in breach of comity in granting anti-suit relief to enforce the EJC, but that such an injunction is not to be regarded as an interference with the jurisdiction of the Courts of Guernsey. As Lord Hobhouse said in *Turner v Grovit* [2002] 1 WLR 107 at para 23:

"The present type of restraining order is commonly referred to as an 'anti-suit' injunction. This terminology is misleading since it fosters the impression that the order is addressed to and intended to bind another court. It suggests that the jurisdiction of the foreign court is in question and that the injunction is an order that the foreign court desist from exercising the jurisdiction given to it by its own domestic law. None of this is correct. When an English court makes a restraining order, it is making an order which is addressed only to a party which is before it. The order is not directed against the foreign court: Lord Goff of Chieveley, *Société Nationale Industrielle Aérospatiale v Lee Kui Jak* [1987] AC 871, 892. The order binds only that party, in personam, and is effective only in so far as that party is amenable to the jurisdiction of the English courts so that the order can be enforced against him: 'an injunction will only be issued restraining a party who is amenable to the jurisdiction of the court, against whom an injunction will be an effective remedy'."

and continued at para 26: "the making of a restraining order does not depend upon denying, or pre-empting, the jurisdiction of the foreign court". It does not, however, follow inexorably from that uncontroversial premise that an EJC must be enforced.

88. The Carlyle defendants cited a number of cases in which the courts had used the touchstone of vexation and oppression as determination of whether proceedings in a foreign court should be restrained and argued that the existence of either was a sine qua non of engagement of anti- or anti-anti-suit relief.

89. In *OT Africa Line Ltd v Magic Sportswear Corporation* [2005] 2 Lloyd's Rep 170 Longmore LJ in the English Court of Appeal said at para 31:

"As a broad proposition of law, an anti-suit injunction may be granted where it is oppressive or vexatious for a defendant to bring proceedings in a foreign jurisdiction."

See too *Star Reefers Pool Inc v JFC Group Co Ltd* [2012] 1 Lloyd's Rep 376 per Rix LJ at para 25, *Seismic Shipping Inc v Total E&P UK plc (The Western Regent)* [2005] 2 Lloyd's Rep 359 per Clarke LJ at para 38 and *Glencore International AG v Exter Shipping Ltd* [2002] EWCA Civ 524 per Rix LJ at para 42. We remind ourselves, however, that such dicta cannot have been intended to, and indeed cannot, substitute more restrictive criteria for the wider test of interests of justice laid down in *Aérospatiale*.

90. *OT Africa* contained the strongest dictum in favour of the Carlyle defendants' position. There the Canadian legislature had introduced into Canadian law jurisdiction, through provisions in section 46 of the Canadian Marine Liability Act 2001, which, in appropriate circumstances, allowed plaintiffs to ignore EJCs in favour of foreign courts and bring proceedings in Canada. Despite that, the English Court of Appeal upheld an anti-suit injunction and enforced an EJC in favour of England because of the importance attached in English law to "the autonomy of the parties": per Longmore LJ paras 19 and 42.

91. Mutatis mutandis it would appear that the Delaware court would be entitled to apply its own policies to the question and not those of the non-EJC forum where proceedings in breach of the EJC had been brought. That analysis, however, does not of itself provide any direct guidance to this court in determining whether to issue the anti-anti-suit injunction sought.

92. We must nonetheless recognise that the Court of Appeal in *OT Africa*, having identified that the Canadian approach to anti-suit injunctions was similar to the English approach, was satisfied that the English proceedings, which were filed in compliance with the EJC, and in the forum selected by the EJC, would not be restrained by the Canadian Court notwithstanding the statutory regime permitting proceedings in Canada:

"[A] Canadian court would *not grant an anti-suit injunction against proceedings in England founded on an exclusive jurisdiction clause in an English proper law contract, even in support of Canadian jurisdiction properly founded in Canadian law* under Section 46(1)." (Per Rix LJ at para 80.) [Our emphasis.]

93. It was therefore submitted by Advocate Davies that the *OT Africa* case is distinct English Court of Appeal authority for the proposition that a court ought not to grant an injunction to restrain the pursuit by a person in a foreign jurisdiction of relief seeking to enforce an EJC in favour of that jurisdiction contained in a contract governed by the law of that jurisdiction, even if the failure to grant such an injunction might prevent a party from pursuing a statutory remedy in the domestic jurisdiction.

Guernsey CA]          **Carlyle Capital Corporation Ltd v Conway**          [BELOFF JA

94. While we accept that the part of the reasoning of Rix LJ in *OT Africa* which we have quoted in para 92 is persuasive in favour of the Carlyle defendants we make these observations. First it was dictum only. Secondly, the starting point of the analysis (ie, the search for oppressive and unconscionable conduct) seems, with respect, to be too restrictive. Thirdly, there is in any event no exact read-across from the situation in *OT Africa* to the situation which confronts us.

95. In *OT Africa*, the Canadian statute concerned merely provided that the Canadian court was entitled to assume jurisdiction in certain cases notwithstanding the existence of a foreign forum clause (see at para 5). Essentially, there were parallel substantive proceedings. By virtue of the Canadian legislation, the Canadian court was therefore free, pursuant to the relevant legislation, to disregard the English forum clause in adjudging itself the forum conveniens and to refuse to grant a stay. The English court was, of course, not bound by the Canadian legislation and was free to adjudge itself what was the forum conveniens on the basis of a forum clause, which ostensibly captured the entirety of the dispute between the parties: the mere fact that the Canadian court had jurisdiction to hear the proceedings instituted before it by virtue of the Canadian legislation did not provide sufficiently strong reasons for not enforcing in England the English jurisdiction clause.

96. The analogy between the circumstances leading to the views which we have quoted from the decision in *OT Africa* and those of the present case is weak. In the present case the relevant part of the domestic law is not merely a power to assume jurisdiction and thus provide an alternative forum; it is rather a unique code which, in contradistinction to the laws enforceable by the Delaware courts, will govern all claims for substantive relief arising out of allegations of breach of duty by the defendants whether as directors de jure, de facto or shadow. It therefore follows that it could not be added here, as Longmore LJ indicated at para 40 in *OT Africa* that there was a further consideration for the court of the EJC, namely, that "[i]t is only by granting an injunction that it will be possible to avoid duplicity of proceedings". This reference to the undesirability of duplicity resonates in this case in favour of the liquidators' stance.

97. It is, moreover, indisputable that EJCs can be overridden in appropriate cases. In *Donohue v Armco Inc* Lord Bingham (with whom the other members of the House of Lords agreed) said:

"29. . . . the first point to be made is that Mr Donohue has as against the first three Armco appellants a *strong prima facie right not to be the subject elsewhere than in England of claims by those companies falling within the scope of the clause*. Some of the claims made against him by those companies in New York do fall within the clause.

. . .

33. Thus Mr Donohue's strong prima facie right to be sued here on claims made by the other parties to the exclusive jurisdiction clause so far as the claims made fall within that clause is matched by the clear prima facie right of the Armco companies to pursue in New York the claims mentioned in the last three paragraphs. The crucial question is whether, on the facts of this case, the Armco companies can show strong reasons why the Court should displace Mr Donohue's clear prima facie entitlement. If strong reasons are to be found (and the need for strong reasons is underlined in this case by the potential injustice to Mr Donohue, already noted, if effect is not given to the exclusive jurisdiction clauses) they must lie in the prospect, if an injunction is granted, of litigation between the Armco companies on one side and Mr Donohue and the PCCs on the other continuing partly in England and partly in New York. What weight should be given to that consideration in the circumstances of this case?

34. I am driven to conclude that great weight should be given to it. The Armco companies contend that they were the victims of a fraudulent conspiracy perpetrated by Messrs Donohue, Atkins, Rossi and Stinson. Determination of the truth or falsity of that allegation lies at the heart of the dispute concerning the transfer agreements and the sale and purchase agreement. It will of course be necessary for any Court making that determination to consider any contemporary documentation and any undisputed evidence of what was said, done or known. But also, and crucially, it will be necessary for any such Court to form a judgment on the honesty and motives of the four alleged conspirators. It would not seem conceivable, on the Armco case, that some of the four were guilty of the nefarious conduct alleged against them and others not. It seems to me plain that in a situation of this kind the interests of justice are best served by the submission of the whole dispute to a single tribunal which is best fitted to make a reliable, comprehensive judgment on all the matters in issue. A procedure which permitted the possibility of different conclusions by different tribunals, perhaps made on different evidence, would in my view run directly counter to the interests of justice.

. . .

36. In my opinion, and subject to an important qualification, the ends of justice would be best

served by a single composite trial in the only forum in which a single composite trial can be procured, which is New York, and accordingly I find strong reasons for not giving effect to the exclusive jurisdiction clause in favour of Mr Donohue." (Emphasis added.)

(The important qualification, germane to that, is not replicated in this case.)

98. The same theme, the need to avoid multiplicity of proceedings and possibility of inconsistent judgments, as also alluded to by Longmore LJ in *OT Africa*, is reinforced by observations of such compelling authority.

99. Not only EJCs in favour of the jurisdiction which is invited to ignore them, but also EJCs in favour of another jurisdiction, may be overridden. In *Evans Marshall and Co Ltd v Bertola SA* [1973] 1 WLR 349 there was a tripartite dispute but only two of the parties were bound by a clause conferring exclusive jurisdiction on the court in Barcelona. Kerr J at first instance was impressed by the undesirability of there being two actions, one in London and the other in Barcelona (pages 363 and 364). The Court of Appeal took a similar view (pages 377 and 385). These views were included as part of the reasoning of the House of Lords in *Donohue v Armco* itself (para 27).

100. To like effect is the decision in *Aratra Potato Co Ltd v Egyptian Navigation Co (The El Amria)* [1981] 2 Lloyd's Rep 119 where the primary dispute was between cargo interests and the owner of the vessel, both parties being bound by a clause in the bill of lading conferring exclusive jurisdiction on the courts of Egypt. The cargo interests had also issued proceedings against the Mersey Docks and Harbour Co, which was not bound by the clause. The Court of Appeal upheld the judge's decision refusing a stay. In the course of his leading judgment in the Court of Appeal Brandon LJ said, at page 128 col 2:

"I agree entirely with the learned Judge's view on that matter, but would go rather further than he did in the passage from his judgment quoted above. By that I mean that I do not regard it merely as convenient that the two actions, in which many of the same issues fall to be determined, should be tried together; rather that I regard it as a potential disaster from a legal point of view if they were not, because of the risk inherent in separate trials, one in Egypt and the other in England, that the same issues might be determined differently in the two countries."

[See too in echo of the same theme *Citi-March Ltd v Neptune Orient Lines Ltd* [1996] 1 WLR 1367 per Colman J at pages 1375 and 1376, *Mahavir Minerals Ltd v Cho Yang Shipping Co Ltd (The MC Pearl)* [1997] 1 Lloyd's Rep 566, per Rix J at pages 569 and 575, *Bouygues v Offshore SA v Caspian Shipping Co* [1998] 2 Lloyd's Rep 461, per Knox J at page 470.]

101. There are these additional considerations, beyond the need to avoid fragmentation and inconsistency, which can subvert the apparent paramountcy of an EJC.

102. First the existence of a statutory right in one forum is itself a reason for ignoring an EJC where a right could otherwise not be given effect. The (English) Court of Appeal held in *Samengo-Turner v J & H Marsh & McLennan (Services) Ltd* [2007] 2 CLC 104 that a statutory right to litigate in England will justify an anti-suit injunction against foreign proceedings, even if the dispute was otherwise subject to a forum selection clause in favour of the foreign forum. Tuckey LJ (with whom Longmore and Lloyd LJJ agreed) explained that in such circumstances the court was faced with a choice between granting an injunction to protect the plaintiff's statutory rights and doing nothing; and that it would not be just to do nothing: see at paras 38 to 39 and 41 to 43:

"So does it follow that we should grant an anti-suit injunction? Mr Dunning submits that we should because it is the only way to make the claimants' statutory right to be sued here effective. Damages would not be an effective remedy. Mr Rosen accepted that we could grant an anti-suit injunction if we found that section 5 was engaged but urges us not to do so as a matter of discretion and judicial restraint and in the interests of comity.

The position we are in is as follows. The New York court has rejected the challenge to its jurisdiction because of the clear and unambiguous terms of the exclusive New York jurisdiction clause in the bonus agreements. Had we not been concerned with the contracts of employment we should have upheld such a clause as well. *But, as it is, our law says that we cannot give effect to it. The claimants can only be sued here. What shall we do? The only choice it seems to me is between an anti-suit injunction or nothing*.

. . .

We were referred to various English cases which have dealt with these problems in the context of commercial disputes where injunctions have been claimed on the basis of an exclusive jurisdiction clause or forum conveniens. But no case was cited to us where the exclusive jurisdiction of the English court was mandated by statute. Mr Dunning submitted that where that was so, the case for an injunction was at least as strong as a case based on an exclusive jurisdiction clause. I do not necessarily accept this. In general, if parties agree an exclusive jurisdiction clause

they should be kept to their bargain; if, as here, the exclusive jurisdiction of the English courts is imposed by statute it can be said that the case for an injunction is not so strong, particularly where the statute has provided that an agreed exclusive jurisdiction clause is of no effect.

The converse of this problem arose in *OT Africa Line v Magic Sportswear Corporation* [2005] 1 CLC 923 where a cargo claim under a bill of lading containing an English law and exclusive jurisdiction clause was made in Canada relying on Canadian legalisation which allowed such a claim to be made there in spite of the clause. This court granted an anti-suit injunction to restrain the Canadian proceedings on the ground that the parties should be kept to their English law bargain. This is an illustration of the court giving full effect to party autonomy which under Article 23 of the Regulation it is required to do, but under Articles 20 and 21 it cannot. We are in the latter position: we cannot give effect to the exclusive New York jurisdiction clause.

*Doing nothing is not an option in my judgment. The New York court cannot give effect to the Regulation and has already decided in accordance with New York law on conventional grounds that it has exclusive jurisdiction. The only way to give effect to the English claimants' statutory rights is to restrain those proceedings. A multinational business must expect to be subject to the employment laws applicable to those they employ in different jurisdictions.*" (Emphasis added.)

103. Likewise in *Qantas Airways Ltd v Rolls-Royce plc* [2010] FCA 1481 the Federal Court of Australia granted an anti-suit injunction to protect the plaintiff's rights under the Australian Trade Practices Act, notwithstanding that the plaintiff's claim was otherwise subject to an exclusive jurisdiction clause in favour of England. Whilst the decision granting the defensive anti-suit injunction is not available, the reasons of Rares J on a later application (at para 5) make plain the circumstances in which the defensive anti-suit injunction was granted. Importantly, there was evidence from Professor Adrian Briggs that an English court would likely grant an anti-suit injunction to enforce a forum selection clause to the exclusion of claims under the Trade Practices Act only available to the plaintiff in Australia.

104. This approach is not limited to English or Antipodean jurisprudence. In *Laker Airways Ltd v Sabena, Belgian World Airlines* (1984) 731 F.2d 909 (DC Cir 1984), Judge Wilkey of the United States Court of Appeals (District of Columbia Circuit) identified: (i) the protection of a court's legitimately conferred jurisdiction; and (ii) prevention of litigants' evasion of important public policies of the forum as the two circumstances in which anti-suit injunctive relief is most often necessary. Judge Wilkey commenced his analysis of this justification for the grant of injunctive relief by observing (at page 927) that:

"Courts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants. Thus, when the action of a litigant in another forum threatens to paralyze the jurisdiction of the court, the court may consider the effectiveness and propriety of issuing an injunction against the litigant's participation in the foreign proceedings."

and continued at page 929 to say that:

"there must be circumstances in which an antisuit injunction is necessary to conserve the court's ability to reach a judgment. Just as the parallel proceeding rule counsels against interference with a foreign court's exercise of concurrent jurisdiction, it authorizes the domestic court to resist the attempts of a foreign court to interfere with an in personam action before the domestic court."

and at page 931 to say that:

"[a]nti-suit injunctions are also justified when necessary to prevent litigants' evasion of the forum's important public policies."

[In that case, the attempt to escape the application of United States anti-trust laws to their conduct of business in the United States.]

and concluded that there was nothing improper in the first instance decision in that case to "enjoin appellants from seeking to participate in the English proceedings solely designed to rob the court of its jurisdiction". The injunction granted by the United States court was purely defensive, rather than offensive (at page 938):

"The district court's antisuit injunction was purely *defensive* – it seeks only to preserve the district court's ability to arrive at a final judgment adjudicating Laker's claims under United States law. This judgment would neither make any statement nor imply any views about the wisdom of British antitrust policy. In contrast, the English injunction is purely *offensive* – it is not designed to protect English jurisdiction, or to allow English courts to proceed to a judgment on the defendant's potential liability under English anticompetitive law free of foreign interference. Rather, the English injunction seeks only to quash the practical power of the United States courts to adjudicate claims under United States law against defendants

admittedly subject to the courts' adjudicatory jurisdiction." (Original emphasis in italics.)

105. As is not infrequently the case, one can identify inconsistent lines of authority in the US casebooks. But we find Judge Wilkey's reasoning impressive and highly germane to a case (such as is before us) where the 1994 Law assigns unique jurisdiction to the Royal Court.

106. The central allegation in this case after all is that each of the defendants recklessly breached their fiduciary and other duties to CCC, which are governed by Guernsey law and raise important questions of Guernsey company law and public policy. The joint liquidators claim (amongst other matters) insolvency remedies under the 1994 Law against each of the defendants, namely relief for wrongful trading (under section 67C) and misfeasance (under section 106) as well as orders for disqualification (under section 67A). Those statutory claims are justiciable only by this court and are inextricably linked with the liquidators' non-statutory claims governed by Guernsey law for breach of fiduciary duty and gross negligence against each of the defendants.

107. Secondly, a court has a right to protect the integrity of its own judgments. In *Masri v Consolidated Contractors International Co SAL* [2008] 2 Lloyd's Rep 301; [2009] QB 503, Lawrence Collins LJ (as he then was) observed that a court has power to make "ancillary orders in protection of its jurisdiction and its processes, including the integrity of its judgments" (at para 26).

108. All the cases, we acknowledge, involve an assessment of the weight to be attached to competing considerations as was acutely noted in *Incitec Ltd v Alkimos Shipping Corporation (The Alkimos)* [2004] FCA 698 by Allsop J who said:

"At this point, one has the intersection of two powerful considerations in international litigation: first, the desire of courts to hold commercial parties to their bargain in terms of exclusive jurisdiction clauses; secondly, the desire of courts to avoid disruption and multiplicity of litigation, in particular a desire to avoid parallel proceedings and the risk of inconsistent findings, and to avoid the causing of inconvenience to third parties . . .

At the outset, it should be recognised that the second competing consideration should not be expressed too broadly. To the extent that the operation of the exclusive jurisdiction clause causes financial or forensic inconvenience to the party which bound itself to the clause, that, of itself, is to be seen as only the direct consequence of the bargain entered and, generally, can be set to one side. What really are of importance in weighing against the operation of the exclusive

jurisdiction clause are: (a) the inconvenience, if any, whether financial or other, caused to third parties; (b) the effect, if any, upon the due administration of justice; and (c) any other appropriate public policy consideration that can be discerned in all the circumstances."

and concluded at page 509:

"The balance is a fine one, but overall in my view this Court should not promote competing and potentially conflicting litigation in circumstances where one venue can conveniently and promptly deal with the whole controversy."

We agree though the balance here is, in our judgment, less fine for reasons we now develop.

109. The Carlyle defendants made an informed tactical choice to litigate the question of forum and jurisdiction in Guernsey, with the alternative of a stay, knowing that it was only in this jurisdiction that they could obtain a stay of the entirety of the plaintiffs' claims. They sought a stay of all claims against all defendants on the basis of the forum clause in the IMA (notwithstanding that, even on the defendants' case, none of the seven director defendants is entitled to the benefit of the forum clause or to enforce the clause). At no time were the Carlyle defendants or any of the other defendants compelled to litigate the jurisdictional dispute in Guernsey. On the contrary, the defendants were content for the hearing to proceed before DB Collas in Guernsey on the basis that it was "agreed that all claims in this multi-jurisdictional matter should be tried in a single forum", and thus they could argue that all the liquidation claims should be determined in Delaware by reason of the fact that some fell within the scope of the forum clause. They pursued their exceptions déclinatoire to judgment. They did so without ever requesting the Royal Court to await the outcome of any application in the Delaware Court of Chancery before determining their exceptions, or submitting that it would be appropriate for the Royal Court to do so. Further, the revival in this chapter of proceedings of the reliance on the EJC, which we held ineffective in our first judgment, does savour strongly of an attempt to re-litigate a matter already decided against them. Interest reipublicae ut sit finis litium is a precept as applicable to interlocutory motions as to substantive trials.

110. In *Masri*, Lawrence Collins LJ (as he then was) observed that cases in which a party seeks to re-litigate abroad the subject matter of an English judgment are (at para 95) "classic case[s] of vexation and oppression, and of conduct which is designed to interfere with the process of the English court" and later reiterated this view, stating (at para 100):

"It is consistent with principle for an English court to restrain relitigation abroad of a claim

which has already been subject of an English judgment. There is long-established authority that protection of the jurisdiction of the English court, its process and its judgments by injunction is a legitimate ground for the grant of an anti-suit injunction."

111. Indeed the Carlyle defendants asked this court in the earlier appeal to determine its own jurisdiction and in so doing set in motion a process (including the exercise of rights of appeal) which has resulted in an appellate decision on the issues of forum and jurisdiction. They now seek to re-litigate the same issues in Delaware, with a necessary concomitant of depriving the Royal Court of its jurisdiction in the matter notwithstanding the fact that an appellate court has determined that Guernsey is clearly and distinctly the appropriate forum for the trial of the liquidators' claims (and the only available forum for the trial of all the liquidators' claims).

112. We would therefore, if necessary, characterise the purpose of the Carlyle defendants' pursuit of the Delaware anti-suit proceedings, and of this appeal, as vexatious. It is calculated: (1) to prevent the liquidators from continuing to pursue this litigation in a single forum to a single trial; and (2) to prevent the liquidators from ever pursuing their statutory insolvency remedies against the Carlyle defendants, which are available to the liquidators only in Guernsey.

113. Bell, at page 198 aptly observes that:

"The expedient of seeking an anti-anti-suit injunction will be especially important where there is a difference in the substantive law to be applied in the competing forums, whether by reason of the operation of a mandatory law of one forum that overrides any expressly chosen law, as was the case in Akai, or simply by dint of different choice of law rules . . ."

114. Turning, penultimately, to the decision of Judge Finch, his rationale on considering the arguments put before him appears from paras 56 to 58 of his judgment of 17 November 2011. He acknowledged that his starting point was the simple one of asking why – as he understood the likely result of acceding to the Carlyle defendants' arguments – the liquidators should be stopped from exercising their right of appeal. In addressing this conundrum he proceeded to emphasise the importance of the statutory insolvency claims over which the Delaware courts must be assumed to have no jurisdiction. As he then observed, he was not to be mesmerised by the EJC. Read fairly in context, and bearing in mind his earlier discussion of the EJC at paras 39 to 46, his reasoning appears to recognise that the EJC had to play a part in his process of deliberating on the arguments before him; but did not outweigh the importance to be accorded to the statutory claims and the interests of justice in trying to avoid the problems of fragmentation.

115. The arguments before this court had, as often, moved on from those before the court below into broader and deeper considerations; but we do not consider the judge's reasoning, as we have indicated our understanding of it, to be flawed.

116. In conclusion there is a strong public policy in Guernsey against multiplicity of litigation and the fragmentation of proceedings that can and should be determined in a single action. The objectives and rationales underlying the policy are clear, including: (i) the saving of costs and waste of party and judicial resources; (ii) the avoidance of delay; (iii) the avoidance of the risk of inconsistent decisions and consequent injustice to parties; (iv) the prevention of loss to a complainant of the benefit of a single composite trial; (v) the avoidance of uncertainty and satellite disputes such as on questions of issue estoppel or res judicata; and (vi) the avoidance of potential injustice to third parties. Plainly in this case the interests of justice are best served by the submission of the whole of the dispute to a single tribunal which is best fitted to give comprehensive judgment on all matters in issue in accordance with its own law which governs the vast majority of the claims. It is in reliance on the fundamental principle of the interests of justice, so explained, that we dismiss this appeal.

———————————————————

TAB 15

*Clements v Henry Hadaway Organisation Ltd* [2008] 1 BCLC 223,
English High Court

*a*

# Clements (liquidator of HHO Licensing Ltd) v Henry Hadaway Organisation Ltd

*b*

### [2007] EWHC 2953 (Ch)

*c*
CHANCERY DIVISION (COMPANIES COURT)

PETER LEAVER QC SITTING AS A DEPUTY JUDGE OF THE HIGH COURT

18–20, 23–26 JULY, 17 SEPTEMBER, 10 OCTOBER 2007

*d*
*Winding up – Transactions at undervalue – Preference – Connected companies – Two companies with same individual as majority shareholder and sole director – Companies sharing same premises and same staff – Respondent company levying 'management charges' on company – Whether transactions at undervalue – Whether preferences – Insolvency Act 1986, ss 238, 239, 240, 249.*

*e*
At all material times H carried on business licensing sound recordings through various limited liability companies. The respondent was incorporated in 1971. H held half the issued shares, and his wife held the other half. H was the sole director of the respondent and his daughter was the company secretary. The company was incorporated in 1999. H held 100 shares in the company, and his wife owned one share. H was the sole director in the company. Both the company and the respondent were 'connected' companies for the purposes of s 249 of the Insolvency Act 1986. They both had their registered offices at the same premises, which were owned by the respondent, and from which H carried on other business in related fields through a number of other companies. It was not clear how the various people engaged in running H's group of companies were organised. It appeared that all staff members performed duties for all of the trading companies. In 2000, the respondent and the company entered into a licensing agreement with a third party. The company failed to account for royalties paid to it and due to the third party, which subsequently terminated the licensing agreement and successfully applied to wind up the company. The company's liquidator discovered dealings between the company and the respondent which purported to be management charges, in respect of the apparent provision by the respondent of office facilities, staff and management expertise to the company. The liquidator sought relief under ss 238, 239 and 240 of the 1986 Act, claiming that the dealings constituted transfers at an undervalue and preferences. It fell to be determined whether the company had received proper value for the services; whether the transactions had been made in good faith; and whether the respondent had rebutted the presumption that preferences had been given with a desire to put the respondent in a better position in the event of the company going into liquidation.

*f*

*g*

*h*

*i*

**Held** – In a small group of companies a degree of informality might be expected, and the courts would often take a tolerant view of such informality. It was when companies encountered difficulties, and their internal workings were exposed to scrutiny, that the informality could give rise to problems. In that regard, the failure to obtain independent advice or to arrange independent representation for the company in setting management charges payable to another company in the group would not, of itself, mean that any decision about the making or amount of the management charges was impeachable. But if a decision was then taken on the basis of calculations that were demonstrably suspect and which would undoubtedly have been queried if such advice had been taken or there had been independent representation, it was almost inevitable that the court would view sceptically the value of such services as were provided and would be disposed to the view that the value was significantly less than the amount of the payment made. In the absence of cogent evidence supporting the amount of the charge made, such a disposition was likely to become a firm conclusion. In all such calculations, there was bound to be some element of imprecision, and the court would not expect a wholly accurate calculation to have been made. But the court would expect the calculation to be explained on a rational and logical basis, and would be astute to scrutinise what had been explained to the paying company, and whether that explanation was justifiable. In the instant case, it had not even occurred to H that it would be sensible for the company to be independently advised about whether any charges could properly be made, and, if it could, the amount of those charges, or that it should be independently represented in the negotiations about the charges. Although it was not disputed that it would have been proper for the respondent to make some charge for the services which it had provided to the company, H had utterly failed to justify the charges at the level decided by him. No proper calculation had been made of what those charges might properly have been. On the evidence, the company's business could have been run with a small full-time staff, supplemented, where necessary, by the services of others who were employed on the business of H's other companies. It followed that the value of the services to the company was significantly less than the amount that it was required to pay for those services. The transactions had not been made in good faith. H and the respondent had not had reasonable grounds for believing that the transactions would benefit the company. Moreover, they had not rebutted the presumption that preferences had been given with a desire to put the respondent in a better position in the event of the company going into liquidation. Accordingly, the transactions were at an undervalue and constituted preferences, with the result that the liquidator was entitled to succeed in his claims.

### Case referred to in judgment

*Taylor Sinclair* (*Capital*) *Ltd* (*in liq*), *Re, Knights v Seymour Pierce Ellis Ltd* [2001] 2 BCLC 176.

### Application

David Michael Clements, the liquidator of HHO Licensing Ltd, applied for relief under ss 238 and 239 of the Insolvency Act 1986, in respect of transactions between HHO Licensing Ltd and Henry Hadaway

*a*  Organisation Ltd, which he claimed to be transactions at an undervalue and preferences. The facts are set out in the judgment.

*Jamie Riley* (instructed by *K & L Gates*) for the liquidator.
*Matthew Hardwick* (instructed by *Grindeys LLP*) for the respondent.

*b*
*Cur adv vult*

10 October 2007. The following judgment was delivered.

**PETER LEAVER QC.**

*c*
INTRODUCTION

[1] This is an application by the liquidator of a company, HHO Licensing Ltd (the Company), for relief in respect of a number of transactions pursuant to which the Company purportedly paid moneys to a connected company, Henry Hadaway Organisation Ltd (Organisation). In
*d*  order to make the claim comprehensible it is necessary at the outset to give an outline of the companies and individuals involved in the transactions.

[2] Mr Henry Hadaway (Mr Hadaway) has been involved in the music business for many years. Although he was not born in this country, he has lived and carried on business here for most of his life, and, as I understand it, is a British citizen.

*e*
[3] Mr Hadaway has carried on his business through limited liability companies. Organisation was incorporated on 29 November 1971. It has 100 issued shares of which Mr Hadaway owns 50 shares and his wife, Toril Hadaway, owns the other 50 shares. Mr Hadaway is the sole director of Organisation, and his daughter, Sarah Hadaway, is the company secretary.
*f*  Mr Hadaway controls Organisation, which owns, exploits and licenses the copyright in a number of audio and video recordings. Mr and Mrs Hadaway are 'associates' of each other pursuant to the provisions of s 435(2) of the Insolvency Act 1986.

[4] The Company was incorporated on 25 February 1999. On 23 July 1999 the Company's name was changed to 'HHO Music Limited'. The
*g*  Company's name was changed back to 'HHO Licensing Limited' on 28 July 2000. The Company's business was the licensing of sound recordings. Mr Hadaway owned 100 shares in the Company, and his wife owned one share. Mr Hadaway was the Company's sole director, and he controlled the Company. The Company and Organisation are 'connected' companies pursuant to the provisions of s 249 of the 1986 Act.

*h*
[5] A company with the company registration number 3623764 and with the name of Withice Ltd was incorporated on 28 August 1998. This company subsequently changed its name on two occasions. On 26 July 1999 its name was changed to 'HHO Licensing Limited' and on 2 June 2000 its name was changed again: this time it was changed to 'The Music Rights Licensing Company Limited'. It will be referred to in this judgment
*i*  as 'Old Licensing'. Old Licensing went into administrative receivership on 1 June 2000. It was after Old Licensing went into administrative receivership that the Company's name was changed back to 'HHO Licensing Limited'.

[6] The shareholders in Old Licensing were a limited liability company,

Point Group Ltd (Point Group), which owned 73% of the issued shares, and Mr Hadaway who owned 25% of the shares. (I was not informed who owned the remaining 2% of the issued shares in Old Licensing.) As Point Group owned a majority of the voting rights in Old Licensing, Old Licensing was a subsidiary of Point Group pursuant to the provisions of s 736 of the Companies Act 1985. Old Licensing was struck off the companies register on 8 June 2004 and dissolved on 15 June 2004.

[7] Mr Wilhelm Mittrich (Mr Mittrich) was the chairman of Point Group, which had a German subsidiary, ODS Optical Disc GmbH (ODS). ODS specialised in the business of manufacturing compact discs and exploiting sound recordings. Mr Mittrich was a director and shareholder of ODS. On 24 March 2000 Grant Thornton were appointed administrative receivers of Point Group by Barclays Bank plc. Point Group subsequently went into liquidation.

[8] Organisation and the Company both had their registered office at Satril House, 3 Blackburn Road, London NW6 1RZ (Blackburn Road). Blackburn Road was owned by Organisation.

[9] Prior to 30 July 1999 Organisation owned or controlled a number of recording masters embodying musical performances (the HHO masters), which it was entitled to exploit commercially. Those musical performances were known collectively as 'the HHO Catalogue'. ODS also owned a number of recording masters embodying musical performances, which it was entitled to exploit commercially: those musical performances were known collectively as 'the ODS Catalogue'.

[10] On 30 July 1999 ODS, Organisation and Mr Hadaway entered into an agreement (the asset purchase agreement) pursuant to which it was agreed that Organisation would sell the HHO masters and the rights associated with them to ODS and Organisation jointly. The consideration for the sale was the sum of £1,200,000. Payment was to be by instalments. ODS was granted an exclusive, royalty-free, licence to exploit the HHO Catalogue, and the right to grant a sub-licence of all of the rights licensed to it, to Old Licensing. The income from the exploitation was to be shared between ODS and Organisation in the proportions 75%/25% respectively. Point Group guaranteed the performance by ODS of its obligations under the asset purchase agreement.

[11] At the same time as entering into the asset purchase agreement, Organisation and ODS granted a sub-licence to Old Licensing. Old Licensing was then able to exploit both the HHO Catalogue and the ODS Catalogue.

[12] Shortly after Point Group went into administrative receivership, ODS threatened to petition for the winding up of its subsidiary, Old Licensing, as Old Licensing had not accounted to it for its share of the royalties earned from the exploitation of the HHO Catalogue and the ODS Catalogue.

[13] Point Group's administrative receivers had attempted to find a purchaser for Old Licensing, either by a sale of its shares or by a sale of its business. In order to protect the assets of Old Licensing and to enable a sale to proceed, Barclays Bank plc, who were also Old Licensing's bankers, appointed Grant Thornton as its administrative receivers.

[14] Both ODS and Organisation made offers to purchase Old Licensing's

*a*  business, but in the event Old Licensing's administrative receivers decided to sell the business to ODS.

[15] On 18 August 2000 ODS, Organisation and the Company entered into a licensing agreement, the effective date of which was 1 July 2000, by which the Company was appointed by Organisation and ODS as agent to exploit the HHO Catalogue and by ODS to exploit the ODS Catalogue.

*b*  The Company was liable to account to ODS monthly for 80% of all moneys received by way of royalties in respect of the exploitation of both the HHO Catalogue and the ODS Catalogue. ODS had the right to terminate the agreement if the Company failed to comply with its obligation to account, and the breach was not remedied within 20 days of receipt of a notice from ODS to that effect.

*c*  [16] The Company duly granted rights to exploit the HHO Catalogue and the ODS Catalogue to third parties, and received royalty payments from those third parties. However, the Company did not make any payments to ODS from the moneys that it received. The reason for the Company's failure to pay was that there was a dispute between Mr Hadaway and

*d*  Mr Mittrich as a result of complaints that ODS did not have the rights to certain music that was included in the ODS Catalogue.

[17] On 19 January 2001 ODS notified the Company that it had not provided its accounts for December 2000, which had been due on 13 January 2001, and indicated that the Company had 20 days to comply with its accounting obligations.

*e*  [18] The Company failed to account to ODS within the 20-day period, and on 18 February 2001 ODS gave notice of the termination of the licensing agreement.

[19] On 29 May 2002 ODS presented a winding-up petition in respect of the Company to the Companies Court, and on 4 September 2002 the winding-up order was made. At a creditors' meeting held on 17 December

*f*  2002 Mr David Coyne was appointed liquidator. On 21 July 2004 the applicant, Mr David Michael Clements, was appointed liquidator in place of Mr Coyne.

[20] During the course of his investigation into the affairs of the Company, the liquidator discovered three documents which set him on the trail which subsequently led to the present applications. They were, first, a

*g*  document entitled 'Abbreviated Financial Statements for the year ended 28th February 2001', which was filed at Companies House on 21 June 2001. That document, which was signed by Mr Hadaway 'on behalf of the board', stated that the Company 'was dormant (within the meaning of section 250 of the Companies Act 1985) throughout the financial year

*h*  ended 28th February 2001'. Secondly, there was a document entitled 'Statement of Accounts HHO Licensing Ltd with Henry Hadaway Organisation Ltd', which showed that in the year to 31 December 2000 the Company had a revenue of £235,000, all of which had been paid into Organisation's bank account and declared in Organisation's sales; that the Company was being charged for 50% of Organisation's 'total overhead

*i*  operating costs' in the sum of £126,932; and that Organisation owed the Company the balance, which was in excess of £100,000. The document also stated that in the year to March 2002 the Company owed Organisation £396,000 for 'Administration as per attached agreement' against which was set off the balance owed to the Company by Organisation in respect of the

year 2000 and a sum of £285,704.44 owed by Organisation to the Company over that period. A sum of £1,295.56 was shown to be owing by the Company to Organisation.

[21] The third document was the 'attached agreement', which set out 'the terms under which [Organisation] shall provide office facilities, staff and management expertise' to the Company. The document appeared to have been signed by Mr Hadaway as managing director of Organisation on 4 January 2001, but was not signed on behalf of the Company.

[22] The authenticity of the 'attached agreement' was one of the most hotly debated issues during the hearing. However, as will become apparent, I feel that I am able to decide this application without expressing a concluded view on that issue, to which I shall refer as 'the document issue'.

[23] Those are the background facts which give rise to this application. After discovering the three documents the liquidator made further investigations to which I shall come after stating the legal principles which are relevant to the application.

THE LAW

[24] The relevant provisions of the 1986 Act are:

'**238.** *Transactions at an undervalue* (*England and Wales*).—(1) This section applies in the case of a company where—(a) the company enters administration, or (b) the company goes into liquidation; and "the office-holder" means the administrator or the liquidator, as the case may be.

(2) Where the company has at a relevant time (defined in section 240) entered into a transaction with any person at an undervalue, the office-holder may apply to the court for an order under this section.

(3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction.

(4) For the purposes of this section and section 241, a company enters into a transaction with a person at an undervalue if—(a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration, or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company.

(5) The court shall not make an order under this section in respect of a transaction at an undervalue if it is satisfied—(a) that the company which entered into the transaction did so in good faith and for the purpose of carrying on its business, and (b) that at the time it did so there were reasonable grounds for believing that the transaction would benefit the company.

**239.** *Preferences* (*England and Wales*).—(1) This section applies as does section 238.

(2) Where the company has at a relevant time (defined in the next section) given a preference to any person, the office-holder may apply to the court for an order under this section.

*a*    (3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not given that preference.

(4) For the purposes of this section and section 241, a company gives a preference to a person if—(a) that person is one of the company's creditors or a surety or guarantor for any of the company's debts or other liabilities, and (b) the company does anything or suffers anything to be done which (in either case) has the effect of putting that person into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if that thing had not been done.

*c*    (5) The court shall not make an order under this section in respect of a preference given to any person unless the company which gave the preference was influenced in deciding to give it by a desire to produce in relation to that person the effect mentioned in subsection (4)(b).

*d*    (6) A company which has given a preference to a person connected with the company (otherwise than by reason only of being its employee) at the time the preference was given is presumed, unless the contrary is shown, to have been influenced in deciding to give it by such a desire as is mentioned in subsection (5).

(7) The fact that something has been done in pursuance of the order of a court does not, without more, prevent the doing or suffering of that thing from constituting the giving of a preference.

*e*    **240.** *"Relevant time" under ss 238, 239.*—(1) Subject to the next subsection, the time at which a company enters into a transaction at an undervalue or gives a preference is a relevant time if the transaction is entered into, or the preference given—(a) in the case of a transaction at an undervalue or of a preference which is given to a person who is connected with the company (otherwise than by reason only of being its employee), at a time in the period of 2 years ending with the onset of insolvency (which expression is defined below), (b) in the case of a preference which is not such a transaction and is not so given, at a time in the period of 6 months ending with the onset of insolvency … [(c) in either case, at a time between the making of an administration application in respect of the company and the making of an administration order on that application, and (d) in either case, at a time between the filing with the court of a copy of notice of intention to appoint an administrator under paragraph 14 or 22 of Schedule B1 and the making of an appointment under that paragraph].

*h*    (2) Where a company enters into a transaction at an undervalue or gives a preference at a time mentioned in subsection (1)(a) or (b), that time is not a relevant time for the purposes of section 238 or 239 unless the company—(a) is at that time unable to pay its debts within the meaning of section 123 in Chapter VI of Part IV, or (b) becomes unable to pay its debts within the meaning of that section in consequence of the transaction or preference; but the requirements of this subsection are presumed to be satisfied, unless the contrary is shown, in relation to any transaction at an undervalue which is entered into by a company with a person who is connected with the company.

(3) For the purposes of subsection (1), the onset of insolvency is—(a) in a case where section 238 or 239 applies by reason of an

administrator of a company being appointed by administration order, *a* the date on which the administration application is made, (b) in a case where section 238 or 239 applies by reason of an administrator of a company being appointed under paragraph 14 or 22 of Schedule B1 following filing with the court of a copy of a notice of intention to appoint under that paragraph, the date on which the copy of the notice is filed, (c) in a case where section 238 or 239 applies by reason of an *b* administrator of a company being appointed otherwise than as mentioned in paragraph (a) or (b), the date on which the appointment takes effect, (d) in a case where section 238 or 239 applies by reason of a company going into liquidation either following conversion of administration into winding up by virtue of Article 37 of the EC Regulation or at the time when the appointment of an administrator *c* ceases to have effect, the date on which the company entered administration (or, if relevant, the date on which the application for the administration order was made or a copy of the notice of intention to appoint was filed), and (e) in a case where section 238 or 239 applies by reason of a company going into liquidation at any other time, the date *d* of the commencement of the winding up.'

[**25**] There is no dispute between the parties as to the legal principles involved in deciding whether there has been a transaction at an undervalue or a preference: nor is there any dispute as to the issues which arise in relation to those principles in the present case. Those principles and the *e* issues can be shortly summarised.

*(a) Transactions at an undervalue*

[**26**] So far as is relevant to the present applications, ss 238 and 240 of the 1986 Act provide that where a company has gone into liquidation, and *f* during the two years prior to the commencement of the winding up it has entered into a transaction at an undervalue with a connected person, the liquidator can apply to the court for an order restoring the position to what it would have been if the company had not entered into the transaction. However, the court will not make an order if it is satisfied that the company which entered into the transaction did so in good faith and that at the time *g* there were reasonable grounds for believing that the transaction would benefit the company.

[**27**] As it is common ground that Organisation was a connected person at the relevant time, the issues to be decided in respect of the application under s 238 are (i) was the transaction at an undervalue and (ii) did the Company enter into the transaction in good faith and with reasonable grounds for *h* believing that it would benefit the Company. The transaction will be at an undervalue if the Company was paying more for the services which Organisation was providing to it than those services were worth (inequality of value).

[**28**] In respect of each of the liquidator's claims there are two periods to be considered: the first period is from 1 July 2000 to 31 December 2000, *i* and the second period is from 1 January 2001 to 31 March 2002. The difference in the length of the two periods is explained by reference to the documents discovered by the liquidator to which I have referred above.

[**29**] It will be noted that in order to trigger the provisions of s 238 the

*a*  Company has to have entered into 'a transaction'. The liquidator's case in relation to the first period is put in alternative ways: either there was no contractual basis for the Company to make any payment to Organisation in respect of the charges for that period or any agreement to make payment was made in December 2000 after the services had been provided so that the consideration for any agreement was past consideration. In relation to

*b*  the second period, the liquidator's case is that the document relied upon by the Company does not evidence a genuine agreement and is a sham document so that there was no consideration for the payment by the Company of £336,000; alternatively, if there was an agreement for the provision of services by Organisation to the Company, that the value of the services received by the Company was worth far less than that sum.

*c*  [30] It was submitted on behalf of Organisation that for the purposes of s 238 there does not have to be a contract between the parties, and that the arrangement that was made in December 2000, in circumstances which I shall describe later in this judgment, to deduct an agreed amount from the moneys which Organisation was holding on behalf of the Company was a

*d*  'transaction' for the purposes of s 238. Organisation's case is that the Company received proper value for the moneys which, as a result of the agreed deduction, it must be deemed to have paid to Organisation. Organisation also contends that the agreement purportedly recorded in the document which the liquidator alleges is a sham document in respect of the second period was a genuine agreement, and that the Company received

*e*  proper value for the payments that, again, it must be deemed to have made. Organisation's case is that in respect of neither period was there an 'imbalance' or 'inequality' of value between what the Company paid and what the Company is deemed to have received for that payment.

[31] I have no doubt that the use of the word 'transaction' in s 238 was intended to cover as wide a range of mutual dealing as possible. Although

*f*  one would normally expect to find a contract when one commercial entity agrees to provide goods or services to another such entity, the existence of a contract is not required by the 1986 Act. In *Re Taylor Sinclair (Capital) Ltd (in liq), Knights v Seymour Pierce Ellis Ltd* [2001] 2 BCLC 176 Mr Robert Englehart QC (sitting as a deputy judge of the High Court) said:

*g*  '[20] It is right to say that the word "transaction" as a matter of ordinary language embraces a potentially wide range of possibilities. Furthermore, the inclusive definition of s 436 of the 1986 Act is of broad ambit. It reads:
    " 'transaction' includes a gift, agreement or arrangement, and references to entering into a transaction shall be construed accordingly."

*h*  Doubtless, one should be wary of circumscribing the width of the statutory language of s 238 lest the evident policy of the section be undermined. Nevertheless, as I read the section it does envisage that, apart perhaps from the case of a mere gift which is expressly included within ss 238 and 436, a transaction will be something which involves

*i*  at least some element of dealing between the parties to the transaction. Not only is this implicit in the word "transaction" itself, but it is reinforced by the references in s 238 to (a) the "entry into" a transaction (b) "with a person" and (c) "on terms that provide". Whilst

plainly an actual contract is not required in order for there to be a *a* transaction, the language of the section is redolent of contract and mutual dealing.'

[**32**] The 1986 Act provides a similar regime for relief from transactions at an undervalue in the case of individual bankruptcy: see s 339.

[**33**] The task of the court is to assess whether, from the debtor's point of *b* view, the value in money or money's worth of the consideration provided to him under the transaction (the incoming value) is 'significantly less' than the value in money or money's worth, again from the debtor's point of view, of the 'consideration provided' by the debtor, that is to say, the value in money or money's worth of the totality of whatever it is that the debtor is parting with under the transaction (the outgoing value). The transaction will be at *c* an undervalue whenever the court is satisfied that the incoming value, is, on any view, 'significantly less' than the outgoing value.

[**34**] In deciding whether the incoming value is significantly less than the outgoing value, it is not necessary for a precise figure to be attributed to either value. For the transaction to be at an undervalue, the court must be satisfied that the incoming value is on any view 'significantly less' than the *d* outgoing value.

(*b*) *Preference*

[**35**] So far as is relevant to the present application, ss 239 and 240 of the 1986 Act provide that where a company has gone into liquidation, and *e* during the two years prior to the commencement of the winding up it has done anything which has the effect of putting one of its creditors into a position which, in the event of the company going into insolvent liquidation, would be better than the position it would have been in if that thing had not been done, the court can make such order as it thinks fit for restoring the position to what it would have been if the preference had not *f* been given. No order will be made unless the company which gave the preference was influenced in deciding to give it by a desire to put the creditor into a better position than it would otherwise have been in. However, in the case of connected companies, such as Organisation and the Company, such influence is presumed, unless the contrary is shown.

[**36**] It is common ground that (i) Organisation was one of the Company's *g* creditors; (ii) the relevant transaction took place within two years of the commencement of the Company's winding up; and (iii) the effect of the transaction between Organisation and the Company was to put Organisation into a better position on the Company's insolvency than it would otherwise have been in. The sole issue which has to be decided in *h* respect of this application is whether the Company can rebut the presumption of a desire to prefer Organisation.

THE EVIDENCE

(*i*) *The document issue*

[**37**] Before setting out further facts which are relevant to the decision that *i* the court has to make in relation to the liquidator's claims, however, I should refer again briefly to the document issue. That issue involved the court being taken on an intensive course on the internal workings of computers. The course was conducted with the assistance of statements

*a*  from computer experts, who had produced an agreed report so that it was not necessary to call any of them to give evidence.

[38] The liquidator's case is that the document which is relied upon by Organisation in respect of the second period is a sham document. Mr Riley submitted that the document had been created long after the date recorded on it (4 January 2001), and that it had been created in an attempt by *b*  Organisation to prove that there was an agreement between the Company and Organisation that Organisation would provide, and the Company would pay for, management services. Mr Hardwick submitted that to call a document a sham is tantamount to an allegation of fraud, and that the liquidator comes nowhere near proving fraud. He submitted that, to the contrary, the agreement which is recorded in the document is genuine.

*c*  [39] As I pointed out to Mr Riley and Mr Hardwick during the course of the hearing, it will not be necessary for me to decide whether or not the document is a sham if I conclude that there was an imbalance in value between what the Company paid for the services and the value of those services. The remaining issues of whether the payment was made in good *d*  faith and with reasonable grounds for believing that it would benefit the Company and whether the presumption of a desire to prefer had been rebutted, could also be decided without the court having to reach a conclusion on the document issue. In my judgment, therefore, despite the heat generated by, and the time taken on, the document issue, it is of peripheral importance in this case. I shall, therefore, state my views on the *e*  document issue briefly after I have set out the other facts as I find them, and expressed my conclusions on those facts.

*(ii) The witnesses*

[40] It is convenient at this stage to express my views on the most important witnesses who gave evidence during the hearing. They were *f*  Ms Beverley King, Mr Hadaway, Mr George Vassiliou and Ms Sarah Hadaway.

[41] Ms King, who used to be employed by Old Licensing and was called by the liquidator, impressed me as a careful, precise and thoughtful witness. The manner in which she gave her evidence was in sharp contrast to the manner in which Mr Hadaway gave his evidence. Even making allowance *g*  for his health problems and the difficulty that he sometimes had in expressing himself, I was unimpressed by Mr Hadaway's evidence, although I do not believe that he was giving consciously dishonest evidence.

[42] However, it became apparent that although he had been a company director for many years, Mr Hadaway had little understanding or concept *h*  of what was involved in being a director of a limited liability company. It also appeared that he had no understanding of the potential conflicts of interest that might arise when companies controlled by the same person had commercial relations with each other. That was a particularly acute problem in the companies of which Mr Hadaway was the controlling shareholder, in which the minority shareholder was his wife, and in which *i*  his daughter was the company secretary. Mr Hadaway seemed to be completely unaware of the need to keep company books or records. No minute book was apparently kept either for Organisation or for the Company: certainly, no minute book was ever produced, and, as I understand it, no minute book was to be found amongst the Company's

documents which were delivered to the liquidator.

[43] Furthermore, Mr Hadaway disavowed any knowledge of the financial aspects of the various companies which he controlled, or of the requirements to file documents at Companies House. All financial aspects were left to a part-time bookkeeper, Mr Ghandi, who was apparently about 80 years old, or to other members of the staff, who were responsible for ensuring that Mr Hadaway signed documents relating to the companies which they presented to him for signature. Mr Hadaway was apparently happy simply to sign the documents without attempting to understand them. His evidence was a textbook example of how a company director should not behave.

[44] A particularly stark example of the manner in which Mr Hadaway allowed his companies to be run arose during the evidence of Mr Pravin Haria, a bookkeeper employed by Organisation. He was asked why the Company had filed dormant company accounts. His evidence was that another employee told him that the company was dormant. Although he was a bookkeeper for Organisation, he did not apparently know that the Company was trading and that its receipts were being paid into Organisation's bank account. Mr Haria told the other employee that dormant company accounts had to be filed. So such accounts were prepared and put in front of Mr Hadaway, who duly signed them without demur.

[45] The other witnesses to whom I should specifically refer are Mr George Vassiliou and Ms Sarah Hadaway. Neither of them was a satisfactory witness, albeit for different reasons. In my judgment, Mr Vassiliou was not attempting to be honest and truthful. At times he wished to appear extremely knowledgeable and careful, in particular about the workings of computers. At other times, when faced with comparatively simple questions, for example, how to change a clock on a computer, he attempted to persuade me that he did not really understand the workings of computers to be able to make that change.

[46] Ms Hadaway was in a difficult position. She had a natural wish to support her father, but, like him, she appeared to have little knowledge or understanding of what was involved in being an officer of a limited liability company, in her case as company secretary. She explained that she was an actress, and had no knowledge of or training in the workings of limited liability companies, although she insisted that she was careful about signing documents. She was not responsible for maintaining the files, and had no clear idea of how the files were maintained or by whom. She also had difficulty in understanding conflicts of interest; indeed, she asked for an explanation of the meaning of that phrase.

(iii) *The facts*

[47] I have already set out the history of the incorporation of the Company. The Company began trading on 1 July 2000. In effect, the Company's business was almost identical with the business that had been carried on by Old Licensing before its demise, and of Organisation before it entered into the asset purchase agreement with ODS. The difference between the business originally carried on by Organisation and that carried on by both Old Licensing and the Company was that both Old Licensing and the Company had the ODS Catalogue to exploit in addition to the HHO Catalogue. The Company granted licences for the exploitation of

*a*   both the HHO Catalogue and the ODS Catalogue and received royalties from licensees.

[48] For some reason which the evidence did not satisfactorily resolve, the Company did not have a bank account for many months. Mr Hadaway told me that the reason was that the bank manager had left the particular branch at which his companies had their bank accounts, and the bank was
*b*   unable to open a new account for the Company until March 2001. Mr Hadaway told me that he became extremely angry with the bank, but to no avail. I do not think that it is necessary for me to come to any conclusion about the reason for the delay in the opening of the Company's bank account. The documents show that there was no account until March 2001. Suffice it to say, that I find it difficult to accept that a major bank was
*c*   unable to open a new account for a company which was associated with other of its company customers for about nine months.

[49] In the circumstances, all of the royalties that the Company should have received were paid into Organisation's account. As the Company was operating from Blackburn Road, and was, as has been described, effectively
*d*   carrying on the business formerly carried on, first, by Organisation and subsequently by Old Licensing, Mr Hadaway decided that the employees who worked at Blackburn Road should be responsible for the running of the Company's business.

[50] It was never made clear to me how the various people who were engaged in running Mr Hadaway's group of companies were organised. It
*e*   appeared from the evidence that everyone performed duties for all of the trading companies. Those companies included Javelin Promotions Ltd, Javelin Distribution Ltd, Half Full Music Ltd, Jackson Multimedia Ltd and HHO plc. Mr Hadaway said that all of the employees were Organisation's employees, notwithstanding the fact that Organisation had little business of its own apart from a residual music publishing business. He also told me
*f*   that, as he did not want to alter the employment status of his existing staff, before the Company began trading he had decided to use Organisation's existing administration and staff to run it.

[51] There was considerable disagreement during the hearing about the number of people needed to run the Company's business. On this issue there was a difference of opinion between Ms King, who used to be employed by
*g*   Old Licensing and who has been in the music licensing business for some 20 years, and Mr Hadaway, who has been involved in the business for more than 37 years. Ms King said that the business could be carried out by a small staff. She said, by way of example, that as licensing contracts are in a relatively standard form the basic number of staff required to run a
*h*   company which carried on the licensing business which the Company carried on was one person to answer the telephone and conclude the deals and one person to prepare the tapes and arrange delivery to the licensees, although more staff would sometimes be used. She said that she and a Ms Muna Khan carried out those tasks at Old Licensing.

[52] Mr Hadaway said that far more staff were required. In support of his
*i*   contention Mr Hadaway exhibited the telephone list for Point Group at its three locations, Ivor Place and Linhope Street in London (effectively one location), Elstree and Aldermaston. The telephone list included 85 people of whom three were identified as working for Old Licensing. Those three were Mr Hadaway, who was described as the chairman, Ms King and Ms Beky

Charles, who was described as the personal assistant to Mr Hadaway and *a* Ms King. It was Mr Hadaway's evidence that many of the other people listed 'were engaged in the business of Old Licensing'.

[53] Ms King's response to Mr Hadaway was contained in her second witness statement, upon which she was cross-examined at length. By reference to the telephone list Ms King identified ten people who were, from time to time, involved in the business of Old Licensing. The majority of *b* those people were not involved on a day-to-day basis, but worked for all of the companies in the group.

[54] Ms King was subjected to a sustained attack from Mr Hadaway both in his fifth witness statement, in which he accused her of a lack of candour, naivety and of a wish to cause harm to him, and in her cross-examination. I found Ms King's response to the attack to be impressive. She gave her *c* evidence in a dignified, thoughtful and measured manner, and resisted responding to the attack in kind. On this issue, I came to the conclusion that Mr Hadaway's evidence was not credible, and I preferred that of Ms King. I had no doubt that Mr Hadaway was attempting to make the business sound more labour intensive and complex than it was in order to *d* persuade me that the staff cost element of the management charge was justified.

[55] It must be remembered that the business of both Old Licensing and the Company was that of licensing established music catalogues. I accept Ms King's evidence that the licensing agreements would be largely in standard form. The licensor, whether Old Licensing or the Company, would *e* have to produce the standard form agreements and agree any variations to them, and then to compile, produce and deliver to the licensee a disc containing the licensed music. The compilation would be taken from a master disc. That description of the business of Old Licensing and the Company, which was common ground between Mr Hadaway and Ms King, did not appear to me to be labour intensive. I, therefore, accept Ms King's *f* evidence that two people could be employed as the basic staff. No doubt other people would be engaged from time to time in assisting in various activities involved in running the business, albeit not many on a full-time basis, but I am quite satisfied that when Ms King described ten people as being engaged in the business of Old Licensing she was accurately stating the figure. Of those ten people only two were full-time employees. As will *g* be seen, my conclusion on this issue is of great significance when I come to consider the level of the charges purportedly agreed between the Company and Organisation.

[56] During the last six months of 2000 all of the royalties that should have been received by the Company were received by Organisation. It must *h* be remembered that the Company was only entitled to retain 20% of those royalties. Organisation should have accounted to ODS for 80%: it did not do so because of the developing dispute between Mr Hadaway and Mr Mittrich about the ODS Catalogue.

[57] It was apparently not until December 2000 that it occurred to Mr Hadaway that the Company should pay to Organisation what has been *i* variously described as a 'service charge' or a 'management charge'. During those six months other companies in the group of companies controlled by Mr Hadaway carried on business from Blackburn Road. Those companies also made use of Organisation's employees. Throughout that period

*a*   Organisation only had the small music publishing business to which I have referred.

[**58**] Having decided that a management charge should be made, Mr Hadaway, the only director of both Organisation and the Company, then decided that, as the 'vast majority of the operating costs of Organisation had been incurred in dealing with the business of the

*b*   Company', the Company should pay Organisation for the services provided. Mr Hadaway 'decided that a fair allocation of the operating costs would be 50% of the total for the year as the Company had started trading and licensing at the beginning of July 2000'.

[**59**] In making this decision Mr Hadaway met on two occasions with a Mr Holloway, who described himself as 'a consultant in business affairs in

*c*   the music industry' and who had for many years been a consultant to Organisation, and Mr Ghandi, the part-time bookkeeper. The meetings took place on 20 and 22 December 2000. Mr Hadaway was the only witness who gave evidence about what was discussed at both of those meetings. Mr Ghandi was not called to give evidence, and Mr Holloway had died before the hearing. However, before his death Mr Holloway had

*d*   made a brief written statement, which was in the bundle used at trial. Mr Vassiliou attended the first meeting briefly, and was at the second meeting.

[**60**] At the first meeting, on 20 December 2000, Mr Hadaway asked Mr Ghandi to calculate the expenses incurred by Organisation for the

*e*   calendar year 2000. He also asked Mr Ghandi to prepare a calculation of the costs incurred by Organisation in the years between 1995 and 1999, and an estimate of the expenses likely to be incurred by the Company in 2001.

[**61**] Mr Ghandi prepared the requested calculations and estimate in manuscript. He gave them to Mr Vassiliou. Mr Vassiliou typed up the list of

*f*   expenses for the calendar year 2000, and the estimate of expenses likely to be incurred in 2001. Strangely, Mr Vassiliou did not type out the lists of the costs incurred by Organisation during the five years from 1995 to 1999. Instead he wrote out the figures, which were taken from Organisation's accounts, and, with Mr Ghandi's assistance, calculated, first, the average cost for one year, which was a simple averaging of the total costs incurred

*g*   over the five-year period, and, secondly, the monthly average cost, which was obtained simply by dividing the annual average by 12. Mr Vassiliou then made deductions for 'expenses less likely to occur' and additions for 'expenses likely to increase', and so produced a monthly average cost of running Organisation's business of £33,133. In making his lists,

*h*   Mr Vassiliou did not check the figures produced by Mr Ghandi. He assumed that they were correct. His task was the mechanical one of typing out Mr Ghandi's manuscript lists and then making a calculation from the figures prepared by Mr Ghandi.

[**62**] The figures were discussed at the second meeting, which was held on 22 December 2000. That meeting was attended by Mr Hadaway,

*i*   Mr Holloway, Mr Ghandi and Mr Vassiliou. It was then decided that a management charge of £33,000 was an appropriate charge to make on licensing for 2001. Mr Vassiliou's evidence was that that decision was reached by Mr Hadaway in discussion with Mr Holloway. Mr Vassiliou also gave evidence that, at Mr Ghandi's suggestion, Mr Hadaway decided to

split the expenses for 2000 equally between Organisation and the Company.  *a*

[63] Organisation was a small company as defined by the 1985 Act. It, did not have to have its accounts audited, and did not do so. Nor did the liquidator or the court have the advantage of having Organisation's books of account available for examination. The accuracy of the figures for the expenses of Organisation for the calendar year 2000 could not, therefore, be tested. However, some crucial evidence emerged during the hearing in the  *b* form of Organisation's VAT returns for the last six months of 2000 (the first period), the whole of 2001 (the second period) and the first six months of 2002.

[64] Organisation's VAT registration included the five other companies controlled by Mr Hadaway and identified above, and the Company. Each of those companies was registered in trade class '22140' apart from Javelin  *c* Promotions Ltd (Javelin), which was registered in trade class '22310'. Trade class '22140' covers 'sound recordings; publishing of', while trade class '22310' covers 'sound recording[s]', which are defined to include reproduction from master copies of gramophone records, CDs, DVDs and tapes with music or other sound recordings.  *d*

[65] The list of Organisation's expenses for 2000 prepared by Mr Ghandi showed total expenses during the year of £253,846. The VAT returns for the last six months of 2000 showed that the two companies in the group which were trading were Organisation and Javelin. Organisation's net inputs (that is, business expenses) for those six months were £79,177.46, nearly £50,000 less than the figure of £126,923 with which the Company  *e* was charged as being 50% of the total expenditure of Organisation in 2000. A simple calculation shows that, if the expenses list prepared by Mr Ghandi is correct, the expenses incurred by Organisation in the first six months of 2000 must have been nearly £175,000, that is, almost £100,000 more than in the second half of the year.

[66] The business carried on by the Company in the last six months of  *f* 2000 was effectively the same business as Organisation had been carrying on in the first six months of that year. One would, therefore, have expected some explanation as to why the expenses in the first half of the year had been so much greater than in the second half of the year, or why so many claimed expenses had not been subject to VAT. Although it might have been possible for Organisation to demonstrate why the figures for the last six  *g* months of 2000 did not seem to support the figure calculated and relied upon for the full year, no such explanation was forthcoming.

[67] In addition, there were a number of questionable items on the expenses list. For example, there was an item, 'Rent' in respect of which the expenditure was said to be £24,000. But Organisation owned Blackburn  *h* Road, from which premises its business and that of the Company and the other companies in the group was run. It was explained to me that 'Rent' was a misnomer and that the entry referred to the interest that Organisation paid in respect of a loan of £140,000 made by its bankers to enable it to purchase 3 Blackburn Road. That loan had been taken in December 1995 and was for a term of ten years. The loan repayments were £1,870.57 per  *i* month, that is, £22,446.84 per annum.

[68] That explanation is difficult to reconcile with the figures which appear in Organisation's unaudited accounts in respect of expenditure on 'Rent and rates' in the years from 1995 to 1999: those figures are expenses

*a*  of £20,228 (1995), a credit amount of £19,702 (1996) and expenses of £9,253 (1997), £8,406 (1998) and £7,921 (1999). The manuscript list of expenses for those years prepared by Mr Vassiliou, and said to be taken from Organisation's accounts show figures for rent and rates of £20,228 (1995), £23,702 (1996), £26,523 (1997), £29,406 (1998) and £32,528 (1999). It can readily be seen that apart from 1995 the figures in

*b*  Mr Vassiliou's list are much higher than those in the unaudited accounts. Mr Vassiliou's list separates rent and rates in each year, but it is not clear what is the source of his figures for rent, which increases annually by precisely £3,000 from £12,000 in 1995 to £24,000 in 1999. It apparently remained at £24,000 in 2000.

*c*  [69] There are a number of other issues which arise in relation to the figures produced by Mr Ghandi, and typed or written out by Mr Vassiliou. It is not necessary to identify each and every item that was discussed during the hearing: for example, freight charges appear on the list, but it is not clear why a licensing company, such as the Company, should incur such charges. It is sufficient to say that Mr Hadaway was unable to explain with

*d*  any clarity why the Company should be expected to contribute 50% of the amount supposedly spent on a number of those items.

[70] Mr Hadaway was the only director of both Organisation and the Company. He was the person who made the decision that the Company should pay a management charge to Organisation, and who decided what that charge should be. He was the person who requested Mr Ghandi to

*e*  calculate the figures. Mr Hadaway was also an officer of the other companies in the group that carried on business from Blackburn Road. It is apparent from that brief statement of Mr Hadaway's involvement in the affairs of the companies in the group that he wore a number of hats during the meetings on 20 and 22 December 2000. Although he told me that he had been a company director for many years and was aware of the fiduciary

*f*  duties owed by a director to the company, I formed the clear view that Mr Hadaway's appreciation of those duties was, at best, superficial.

[71] In a small group of companies a degree of informality may be expected, and the courts will often take a tolerant view of such informality. It is when companies encounter difficulties, and their internal workings are exposed to scrutiny, that the informality can give rise to problems. In my

*g*  judgment, the present case is a paradigm of the problems that can arise. At no stage did Mr Hadaway give any real thought to the fact that Blackburn Road was the place from which all of the companies in the group carried on their business. It was the centre of operations. The staff who worked there worked for all of the companies. The cost of running Blackburn Road was

*h*  a cost of all of the companies. No doubt Mr Hadaway had high hopes that the Company would become the greatest generator of cash amongst all of the companies, but when he sat down in December 2000, that was not the position. Indeed, the VAT returns would seem to show that the Company was not really generating significant sums. It also appears that Mr Hadaway forgot that of the sums that the Company received, it was

*i*  only entitled to retain 20%, and was bound to account to ODS for the balance.

[72] It did not seem to occur to Mr Hadaway that it would be sensible for the Company to be independently advised about whether any charges could properly be made, and, if it could, the amount of those charges, or that it

should be independently represented in the negotiations about the charges. *a*
Doubtless the reason for that is that Mr Hadaway was not used to operating in that way. The failure to obtain independent advice or to arrange independent representation for the Company would not, of itself, mean that any decision about the making or amount of the management charge was impeachable. But if a decision is then taken on the basis of calculations that are demonstrably suspect and which would undoubtedly *b* have been queried if such advice had been taken or there had been independent representation, it is almost inevitable that a court will view sceptically the value of such services as were provided and will be disposed to the view that the value was significantly less than the amount of the payment made. In the absence of cogent evidence supporting the amount of *c* the charge made, such a disposition is likely to become a firm conclusion.

[73] Of course, in the present case, no actual payment was made because Organisation held the moneys in its account for the Company. Organisation, therefore, simply appropriated from the moneys which it held in its account, those amounts which Mr Hadaway had decided to charge the Company in respect of management charges. That appropriation was *d* made without any attention being paid to the fact that the Company was only entitled to 20% of the moneys in the account. Arguably, all of the moneys held by Organisation from licensees of the HHO Catalogue and the ODS Catalogue was held on trust for the Company and ODS.

[74] An examination of Organisation's bank statements shows that when the Company started trading Organisation's overdraft was in excess of *e* £200,000. By 22 December 2000 Organisation's overdraft had been reduced to about £120,000. As the majority of the receipts into Organisation's account were royalties due to the Company and ODS (to neither of whom were any payments made) it would seem that Mr Hadaway was allowing Organisation's bank account to be used as the central bank for the companies in the group. And after the Company had its *f* own bank account (from March 2001) it would appear that Mr Hadaway used that account to replenish Organisation's account so as to reduce its overdraft.

[75] At the meeting on 22 December 2000 the decision was also made that the Company should pay a monthly management charge of £33,000 for 2001. That decision suffered from the same defects as the decision in *g* respect of 2000. Again, the figures were suspect, and again the Company was not independently advised or represented. In addition, at that date Mr Hadaway knew or must be taken to have known that (i) the Company's first six months trading had not generated the sort of cash flow that would have enabled it to pay £33,000 in the foreseeable future; (ii) his dispute *h* with Mr Mittrich was escalating; and (iii) there were growing problems with the licensing of the ODS Catalogue.

[76] In order to make monthly payments of £33,000 (£396,000 annually) it would have been necessary for the Company to have been in receipt of royalties of at least £1,980,000. Receipt of that sum and payment of management charges at that level would have meant that the Company *i* would have made no profit as £1,584,000 would have had to be paid to ODS and the balance would have been paid over to Organisation. If it were to be assumed that the whole of Organisation's trading for the last six months of 2000, as shown on the VAT returns, had been attributable to the

a Company's licensing business and had produced a turnover, net of VAT of £507,092.36, of which £405,673.88 was owed to ODS, it is clear that it would not have been possible for the Company to make monthly payments at the level of £33,000, unless its business had taken a remarkable turn for the better. And it was, of course, known that those same VAT returns had shown that Organisation's business expenses for the last six months of 2000

b had been far less than Mr Ghandi's figures showed.

[77] Mr Hadaway explained that he was optimistic that the Company would generate over £2m turnover per annum. In my judgment, there was no reasonable basis for that optimism. Although Organisation had generated sales of over £2m in the past, the sales for the preceding few years had been nowhere near as successful. Mr Hadaway's optimism was

c apparently based upon the belief that the exploitation of both the HHO Catalogue and the ODS Catalogue would generate substantial business. How he could have held that belief when he knew of the difficulties that were arising with the licensing of the ODS Catalogue, which was his recurring explanation for the failure of the Company, is unclear.

d [78] The Company's bank statements show that during 2001 its income was modest. Whenever it had a reasonable credit balance, a transfer was made to Organisation. But no transfer was ever made for £33,000 or anything like that amount: nor could it have been, as there was never as much as £33,000 in the Company's account. Inevitably, 80% of such payments as were made from Organisation's account, and which

e Organisation was holding for the Company, were made with moneys that the Company owed to ODS. Clearly, the Company was unable to make those payments and if ODS had instituted proceedings the Company would have had no defence. The point can be illustrated simply. On 18 May 2001 the Company's account was in credit in the sum of £17,868.75. On that date the Company paid £15,000 to Organisation. Of the sum in the account

f the Company was liable to pay ODS £14,295, that is, 80% of £17,868.75. Thus, the Company was making payment to Organisation with moneys to which it was not entitled.

[79] I conclude that Mr Hadaway knew full well that the Company would not be able to make monthly payments to Organisation of £33,000 when he made the decision that such payments should be made in

g December 2000. He naturally hoped that the Company's business would flourish, but the first six months of trading gave him no encouragement and no reasonable basis for believing that it would be able to meet such a commitment. I further conclude that at the various dates in 2001 when the Company made payments to Organisation Mr Hadaway knew full well that

h it could not afford to make those payments. Regardless of that knowledge, he decided to use the Company as a source of funds to reduce, albeit temporarily, Organisation's overdraft.

[80] In my judgment, although it is not disputed that it would have been proper for Organisation to make some charge for the services which it provided to the Company, Mr Hadaway utterly failed to justify charges at

i the level decided by him in December 2000. No proper calculation was made of what those charges might properly be.

[81] Earlier in this judgment, I concluded that the Company's business could have been run with a small full-time staff, supplemented, where necessary, by the services of others who were employed on the business of

Mr Hadaway's other companies. It follows that I have concluded that the *a*
value of the services to the Company was 'significantly less' than the
amount which it was required to pay for those services. I do not believe that
the transaction was made in good faith, nor do I believe that Organisation
or Mr Hadaway had reasonable grounds for believing that the transaction
would benefit the Company.

[82] In order to make a proper calculation of the charge to be made for *b*
the services provided by Organisation to the Company, it would have been
necessary to make a proper assessment of the cost of the full-time staff who
were engaged on the Company's business, and of the cost of the services of
others who supplemented the work of the full-time staff. An assessment
would also have to be made for the proper charge to be made for the *c*
provision of the central services that were used by all of the companies in
Mr Hadaway's group of companies.

[83] In all such calculations, there is bound to be some element of
imprecision, and a court will not expect a wholly accurate calculation to
have been made. But the court will expect the calculation to be explained
on a rational and logical basis, and will be astute to scrutinise what has *d*
been explained to the paying company, and whether that explanation was
justifiable.

[84] I am satisfied that Mr Hadaway's thought process was simply to
enable Organisation, which was running a substantial overdraft, and which
had little business of its own, to be able to fund its operations using the
money that flowed into the Company. He paid no thought to the fact that *e*
most of that money was owed to ODS. Indeed, so consumed was he by his
developing feud with Mr Mittrich, that he viewed the money as his own, or
at least as money to which Organisation was entitled.

[85] I have also concluded that neither Organisation nor Mr Hadaway
has rebutted the presumption that the preference was given with a desire to
put Organisation in a better position in the event, as happened, of the *f*
Company going into liquidation.

[86] Organisation was not providing services to the Company that were
of a value of 50% of Organisation's expenses in 2000 or worth £33,000 per
month or anything like that sum in 2001. It cannot seriously have been
believed by Mr Hadaway that the Company could make such payments.
Nothing in the record of the Company's receipts during the last six months *g*
of 2000 could possibly justify charges at the level decided upon by
Mr Hadaway. Indeed, Mr Hadaway seemed to acknowledge that fact when
he told me that he hoped that the Company's business and, crucially,
receipts, would increase to the sort of levels that Organisation had enjoyed
some years previously. I do not accept that there was any reasonable basis *h*
for such hope.

[87] I have, therefore, concluded that the decisions taken in December
2000, both in relation to 2000 and to 2001, and the subsequent
appropriations, were both transfers at an undervalue and were preferences
so that the liquidator is entitled to succeed in his claims.

*i*

THE DOCUMENT ISSUE

[88] In the light of my findings, it is not necessary for me to express any
conclusion on the document issue. Whether the allegation that the
document is a sham is strictly one of fraud or not is, therefore, not a matter

*a*  that I have to decide. However, as the matter was fiercely argued on both sides, I will express my views shortly.

[89] I start by saying that I am quite satisfied that it was proper for the liquidator, as an officer of the court, to make and persist in the allegation. There are a number of extremely curious aspects of the document that the evidence of Mr Hadaway, Ms Hadaway and Mr Vassiliou did little to
*b*  clarify. But I incline to the view that the manner in which the document containing the 'agreement' was produced was typical of the shambolic and disorganised manner in which Mr Hadaway permitted his companies to be operated.

[90] The liquidator was quite properly interested to know whether the document that he found in the papers and which was signed by
*c*  Mr Hadaway on behalf of Organisation, but was not signed on behalf of the Company, had, in fact, ever been accepted by the Company. The answers that he subsequently received from, first, Mr Hadaway and, subsequently, Organisation's solicitors were confused and confusing. I wish to make it clear that in making that comment, I do not intend any criticism
*d*  of Organisation's solicitors. They were, no doubt, acting on instructions from Mr Hadaway.

[91] Ultimately, but not until after the hearing had started, Organisation's case became clear: the document had come into existence on 4 January 2001, and was then signed by Mr Hadaway on behalf of Organisation. On the following day, 5 January 2001 a photocopy of the document which
*e*  Mr Hadaway had signed was given to Ms Hadaway to sign in her capacity as company secretary of the Company. Ms Hadaway signed it, not as Sarah Hadaway, but in her married name of Sarah Black. Why Ms Hadaway was asked to sign a photocopy and what happened to the document after Ms Hadaway had signed it is a mystery. It was Mr Hadaway's case that the document had been amongst the papers sent to the liquidator or to
*f*  Organisation's solicitors, but, in the light of answers that Organisation's solicitors subsequently gave to queries by the liquidator's solicitors as to the whereabouts and provenance of the document, it would seem that either it was not sent to them, or, if it was sent, they misplaced it.

[92] A document was eventually produced by Organisation's solicitors which purported to be the document signed by Ms Hadaway. However, a
*g*  textual analysis of that document justifiably caused the liquidator to have more doubts about the provenance of the document and whether it was a genuine document. Those doubts were not resolved before the hearing began, and led to the engagement by both sides of witnesses who were expert in the inner workings of computers. The experts produced an agreed
*h*  report. Unfortunately, that report did not resolve all of the issues. In particular, an issue remained about the identity of the computer that produced the document signed by Ms Hadaway.

[93] During her evidence Ms Hadaway explained that the document that had been produced bearing her signature was a document that she had printed and signed in March or April 2005 and which she then sent to
*i*  Organisation's solicitors. She did that because she could not find the document that she had previously signed. She did not tell Organisation's solicitors what she had done. Ms Hadaway remembered that she had not been in the office on 4 January 2001, as a very good friend had given birth that day, but that she signed the document on 5 January 2001. She was then

married and her married name was 'Sarah Black'. When she came to sign *a*
the document in March or April 2005 she had been divorced, and had
reverted to her maiden name. However, she remembered that she had signed
as 'Sarah Black', and so signed the replacement document in that name.

[94] Unfortunately, there were two versions of that document. The one
signed by Ms Hadaway did not tally with the one signed by Mr Hadaway.
But Ms Hadaway explained that she remembered signing the document on *b*
5 January 2001, although she had no recollection of what happened to the
document after she signed it. That was a remarkable admission from the
company secretary, whose duties were not onerous, but, presumably,
involved making sure that there was a system in place for the safekeeping of
important documents.

[95] There was some evidence about the number '4' that appeared on the *c*
document. In fact, there were obviously two documents on which that
number had been written as the format in which it appeared was different
in the two documents. Mr Hadaway was unable to explain the significance
of that number. He thought that it might have been the number of the file
into which the document had been placed, but no other documents were *d*
numbered in that way, and Mr Hadaway's explanation was unlikely.
Ms Hadaway was also unable to explain the significance of the number.

[96] I have concluded that in December 2000 Mr Hadaway decided that
a management charge should be made for both periods, and also decided on
the level of the charge. Equally, I think that a document was produced to
record the decision and dated 1 January 2001. The document was not *e*
produced on that day.

[97] I incline to the view that at some stage between 4 January 2001 and
March or April 2005 Ms Hadaway did sign a copy of the document. That
copy was then lost, and so Ms Hadaway had to have printed a copy of the
document, which she then signed. Unfortunately, she signed a document
that did not tally with that signed by her father. Hence the liquidator's *f*
justified doubts about the provenance of the document.

[98] I do not propose to say any more about the document. It is
unnecessary for me to do so. In particular, it is unnecessary for me to
express any conclusion on the expert evidence. I would, in any event, be
unwilling to do so in the light of the evidence that there was another
computer, which had been thrown away and which the experts had not *g*
seen, onto which the agreement may have been copied.

CONCLUSION

[99] For the reasons set out in this judgment, I will make the declarations
and other orders sought by the liquidator. I would be grateful if counsel *h*
could agree a minute of order.

[100] Finally, I would like to record my thanks to Mr Riley, Mr Hardwick
and their respective instructing solicitors for their assistance throughout this
difficult hearing.

*Application granted.* *i*

Gareth Williams   Barrister.

TAB 16

*Consett Industrial and Provident Society v Consett Iron Co*
[1922] 2 Ch 135, English Court of Appeal

**2 Ch.**                 CHANCERY DIVISION.                           **135**

## CONSETT INDUSTRIAL AND PROVIDENT SOCIETY, LIMITED *v.* CONSETT IRON COMPANY, LIMITED.

[1916. C. 2661.]

*Inclosure Act—Construction—Reservation of Manorial Rights—Provision for Compensation—Right to Support of Surface—Subsidence—System of Working—Commercial Practicability—Injunction—Lanchester Inclosure Act, 1773 (13 Geo. 3, c. lxvii.)—Appeal—Previous Decision of Court of Appeal on same Act—Grounds of Decision disapproved of by House of Lords in subsequent Case but Decision not overruled—Decision binding on Court of Appeal.*

C. A.
1921

PETERSON
J.

Feb. 15-17,
22-25 ;
March 1-3,
8-11, 14-16 ;
April 22.

C. A.
——
1921

Dec. 2, 5-9,
12, 13.

1922
April 10.
——

By the Lanchester Inclosure Act, 1773, the moors and commons of the manor of Lanchester, Durham, were divided and allotted. The Act provided that the lord of the manor and his assigns should have, hold and enjoy all mines and minerals within and under the allotments, with full and free liberty of searching for, draining, winning and working the mines and minerals by any ways or means then in use or thereafter to be invented as fully and freely as he might or could have had, held, used and enjoyed the same in case that Act had not been made without paying any damages or making any satisfaction for so doing ; and also that the annual rental of a certain allotment to the Justices should be applied in or towards the compensation of those allottees whose allotments were damnified by the exercise of the lord's mining rights, and that any deficiency should be made up by means of a rate levied upon all the allottees :—

*Held* by Peterson J. in granting an injunction against the defendants who were lessees of the mines and had caused subsidence of the plaintiffs' land,

(1.) That the reasoning of the members of the Court of Appeal who, in *Consett Waterworks Co. v. Ritson* (1889) 22 Q. B. D. 318, 702, post, p. 187n., decided, upon the construction of the same Inclosure Act, that the lord and his assigns were entitled to work the mines in such a way as to cause subsidence, could not be reconciled with the views expressed by the House of Lords in *Butterknowle Colliery Co. v. Bishop Auckland Industrial Co-operative Co.* [1906] A. C. 305, and that having regard to the rules of construction which had been laid down by the House of Lords in that case and in *Love v. Bell* (1884) 9 App. Cas. 286, the lord was not, under this Act, entitled to let down the surface of the allotments.

(2.) That in 1773, and also at the present time, it was commercially practicable to work the mines without letting down the surface, and

(3.) That at the date of the Act the established practice of mining in this particular district was not such that the inevitable consequence of employing it was subsidence.

*Held* by the Court of Appeal (reversing the decision of Peterson J.) that the case was governed by the decision of the Court of Appeal in *Consett Waterworks Co. v. Ritson* (supra), which was a decision on the

136                      CHANCERY DIVISION.                [1922]

C. A.
1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON CO.

identical question arising on the construction of the same Act and in the same circumstances, and that although the reasoning upon which that decision was founded had been disapproved of by the House of Lords in *Butterknowle Colliery Co.* v. *Bishop Auckland Industrial Co-operative Co.* (supra), the decision itself had not been overruled and was therefore binding upon the Court.

*Held*, therefore, that the defendants had a right to work the mines so as to let down the surface of the land without paying damages or making any compensation to the plaintiffs.

*Held* also by Younger L.J. that the decision at which the Court of Appeal had felt itself compelled to arrive in deference to authority binding upon it might quite well have been reached on the construction of the Act itself apart altogether from the decision by which it was bound.

Per Warrington L.J. : In order that a case may be treated as over-ruled one must find either a decision of a superior Court inconsistent with that arrived at in the case in question, or an expression of opinion on the part of that Court as a whole that the case was wrongly decided on its own facts, and not merely that it ought not to be treated as an authority in a case arising out of different facts.

THE plaintiffs were the owners in fee simple of an estate known as the Bunker Hill Estate in the parish and manor of Lanchester in the county of Durham, which formed part of the moors and commons allotted and divided by the Lanchester Inclosure Act, 1773 (13 Geo. 3, c. lxvii.), by which Act it was provided that the Lord Bishop of Durham, as Lord of the manor of Lanchester, his successors, lessees and assigns should have and hold work and enjoy all mines, minerals and quarries under the moors and commons intended to be thereby divided and allotted with full and free liberty to search for win and work the same by any means then in use or thereafter to be invented as fully and freely as theretofore without paying any damages or making any satisfaction for so doing.

The defendants were lessees of certain mines of coal, iron-stone and fireclay, under (amongst other lands) the plaintiffs' lands, under an indenture of lease dated July 24, 1884, granted to them by the Ecclesiastical Commissioners for England, the successors in title of the Lord Bishop of Durham, and had, as the plaintiffs alleged, so worked the mines as to cause serious subsidence to the Bunker Hill Estate, thereby depreciating its agricultural value and also,

which was of much greater importance, its value as a building estate.

C. A.

1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

The plaintiffs claimed in this action a declaration that the defendants were not entitled to work in such a manner as to let down the surface of the Bunker Hill Estate ; an injunction and damages.

The defendants denied subsidence and damage and claimed that their lessors and they had power to work the mines so as to let down the surface, and that the methods of working coal mines in use in the district at the time of the passing of the Inclosure Act and those invented and used thereafter were and were then known to be such as of necessity to cause subsidences of the surface.

The following further statement of the facts and of the material sections of the Inclosure Act is taken from Peterson J.'s considered judgment:—

" The question in this action is whether the defendants are, as they claim to be, entitled to work their mines under the plaintiffs' lands in such a way as to let down the surface. For the purposes of the trial, the defendants' counsel admitted that their mining operations had caused some subsidence, so that if the plaintiffs' contention that the defendants were not entitled to let down the surface were held to be correct the claim for an enquiry as to damages would succeed.

" The plaintiffs are the owners of part of Lanchester Moor in the County of Durham, which was allotted to their predecessors in title under the provisions of the Lanchester Inclosure Act, 1773. This land is known as the Bunker Hill Estate, which is at present cultivated as a farm and is alleged to have considerable value as a building estate. The manor of Lanchester in 1773, as appears from the recitals in the Act of 1773, comprised various moors, commons or tracts of waste land, which were estimated to contain about 20,000 acres. The lord of the manor was the Bishop of Durham. The lord was entitled to work the mines under the wastes, subject only to the obligation to leave sufficient pasturage for the commoners. He was also entitled by the custom of

**138**                         CHANCERY DIVISION.                    **[1922]**

C. A.

1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

———

the manor to work the mines under the copyhold tenements without the consent of the copyholders, provided that he did not let down the surface. His right then before the Act was to let down the surface of the waste so long as a sufficiency of pasturage was provided for the commoners, but he was not entitled to let down the surface of the copyhold without the consent of the copyholders.

" The Act of 1773, after reciting that considerable parts of the commons or wastes were capable of ' cultivation and improvements,' by s. 1 directed that they should be divided, set out and allotted by Commissioners ' unto and amongst or for the benefit of the several persons having rights of common thereon.' By s. 19 the Commissioners were directed to set off, ascertain and appoint such parts of the commons as appeared to be ' little capable of cultivation and improvement ' but so that the residue to be divided allotted and enclosed should not be less than 12,000 acres, and then to set out and appoint in, over, upon, and through the residue or more improvable parts, a public highway and roads, common quarries, common watering places for cattle, and common wells, and shall also assign and set out such common, public and private horse and other roads, ways, passages and bridges, and such gates, stiles, hedges, sewers, drains and watercourses in over upon and through the lands to be enclosed as they should think proper. The section then provided for the allotment of the residue of the more improvable parts of the common. Thirty acres were to be allotted to the Curate of Satley. From 300 to 500 acres were to be allotted to the Justices of the Peace for the County, and the residue, after providing for expenses and some other purpose mentioned in the section, was to be allotted amongst the Bishop and the commoners in the proportion to the values of their respective tenements to which the right of common belonged. Then under s. 23 the allottees, other than the Justices of the Peace and the Curate of Satley, were to pay to the Bishop 4*d.* per acre each year. Under s. 24, each allotment was to be held in the same manner and to be of the same nature and tenure as the tenement in right of or for

which it was allotted.  Sect. 30 provided that an allotment
in respect of a copyhold or customary tenement should be
added to that tenement and be subject to the customs to
which the tenement was subject.  Sect. 36 extinguished
all rights of common upon the more improvable parts of the
common which were divided, allotted and inclosed, and
upon any portion of the less improvable parts of the commons
which should be allotted, accepted, and inclosed under s. 50.
Sect. 44 extinguished all the lord's rights to trees and
underwood in the lands allotted in respect of copyhold or
customary tenements.

" Sects. 45, 48 and 49 are the sections on which the
defendants rely as shewing that the lord was to be at liberty
to work the mines under the lands allotted in any way he
thought fit notwithstanding that the result of his operations
might be to let down the surface.  By s. 45 it was enacted,
after providing for the royalties and the manorial rights of
the Bishop as lord of the manor, that the Lord Bishop of
Durham and his successors and his or their lessees and assigns
' shall and may from time to time and at all times for ever
hereafter hold and enjoy all courts, perquisites and profits
of courts, rents, services, waifs, estrays, and all royalties,
jurisdictions, matters, and things whatsoever to the said
manor or to the lord thereof for the time being incident,
belonging, or appertaining, other than and except such
common right as could or might be claimed by him or them
as owner or owners of the soil and inheritance of the said
moors or commons, in as full, ample, and beneficial a manner,
to all intents or purposes, as he or they could or might have
held or enjoyed the same if this Act had not been made ;
and also that the said Lord Bishop of Durham and his
successors, and his and their lessee and lessees and assigns
shall and may from time to time and at all times hereafter
have, hold, work, and enjoy all mines, minerals, and quarries,
of what nature or kind soever, lying and being within or under
the said moors or commons intended to be divided and
allotted as aforesaid, together with all convenient and neces-
sary ways and wayleaves, in, through, over and along the

C. A.

1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON CO.
—

140                   CHANCERY DIVISION.                [1922]

C. A.

1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON CO.
——

said moors or commons, or any part thereof, not only before but also at all times after the same shall be divided, in pursuance and by virtue of this Act, and full and free liberty at all times hereafter of making, laying, repairing, and using any new road or roads, waggonway or waggonways, or any other way or ways whatsoever, in, through, over and along the same or any part thereof, and for that purpose to take away and remove any hedges, fences, trees, partitions, or other obstructions which shall be made for dividing the said moors or commons, or otherwise, or which shall be standing or growing thereon, and to do every other act which shall be necessary to be done for the purposes aforesaid, and of searching for, draining, winning and working the said mines and quarries, and also of all other mines and quarries belonging to the See and Bishopric of Durham, wheresoever the same are or be, by any ways or means now in use, or hereafter to be invented, and also of lading and carrying away all and every the coals, lead, minerals, stones, the manure bred at the said mines, and other things to be gotten thereout, or out of any other lands or grounds whatsoever; and also of leading and carrying all iron, wood, materials, and things unto the said mines and quarries, needful, necessary, or proper for the draining, winning, working, and use of the same respectively, and of making pits, shafts, pit-rooms, heap-rooms, drifts, levels, watercourses, and drains, and of using as heretofore all those buildings, workshops for smiths and wrights, hay-yards and raff-yards, already erected for the purpose of working the coal mines under the said moors or commons, and of erecting and using fire engines and other engines, and other buildings, workshops, hay-yards and raff-yards, pit-rooms, heap-rooms, and all and every other necessary and convenient works, buildings, erections, liberties, powers, and authorities, either now in use or hereafter to be invented, together also with full and free liberty, power, and authority, from time to time, and at all times, at his and their will and pleasure, to remove and take away from off the said moors or commons, and to convert to their own use and uses, all and every the rails, sleepers, iron, timber and other

03635-jpm    Doc 173-2    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
Pg 636 of 856

materials of the said waggonways, and other ways, pits, shafts, fire engines, and other engines, shops, and other works, buildings and erections whatsoever, already laid, placed, built, or erected, or hereafter to be laid, placed, built, or erected as aforesaid, as fully and freely as he or they might or could have had, held, used and enjoyed the same in case this Act had not been made; and that without paying any damages or making any satisfaction for so doing.'

C. A.
1921
CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

" Sect. 48 is in these terms : ' And whereas great inconvenience may happen, and damage be done to particular persons, by reason of searching for, winning and working the said mines and quarries within and under their respective allotments, not only of the more improvable parts of the said moors or commons, but also of the less improvable parts thereof, after the same may be accepted and inclosed by virtue of this Act as hereinafter is directed and provided, by the said Lord Bishop of Durham and his successors, and his and their lessee and lessees, and assigns, without paying any damages, or making any satisfaction for so doing: For remedy whereof be it enacted, That when and so often as any person or persons shall suffer or sustain any loss or damage in his, her, or their respective allotment or allotments, by the searching for, winning or working of the said mines and quarries therein, or the leading or carrying away the coals, lead, minerals, stones, or other things to be gotten thereout, or out of any other mines or quarries belonging to the said Lord Bishop of Durham and his successors; or by the making, laying, repairing, or using of waggonways and other ways; or by making drifts, levels, or watercourses; or erecting or using fire engines or other engines; or making or using pit-rooms or heap-rooms, or using any other of the powers or liberties hereby reserved to and for the said Lord Bishop and his successors, and his and their lessee and lessees, and assigns as aforesaid; such person or persons so damnified upon making such complaint, shall receive such satisfaction for such damage as hereinafter is directed in that behalf.' Then it provides that the Justices shall hold the lands allotted to them upon trust to demise the lands for any term not

C. A.

1921

Consett
Industrial
and
Provident
Society
v.
Consett
Iron Co.

exceeding 21 years for the best and most approved yearly rent ; they to nominate a steward and clerk, and after deducting the salary of those officials and all other necessary charges and expenses attending the execution of the trusts ' from and out of the net or clear rents and profits of the premises, the residue or clear balance thereof shall from time to time, be paid, applied, and disposed of in manner following : '—that is, putting it shortly, to apply the clear rents in making satisfaction to persons injured by working the mines or by any of the other operations authorised, and for damages to be ascertained at the Sessions—' and the residue or overplus (if there be any) of the said rents and profits, after paying and satisfying all such damages and charges so to be ascertained as aforesaid, shall from time to time be paid, applied, disposed of, and laid out in the repairing, amending, and supporting the public and common highways, causeways, and other ways which shall be set out and made upon or through the said moors or commons by virtue of this Act, in such manner and form, and by or under the direction of such person or persons as to the said Justices or the major part of them at any of their said sessions or adjournments, shall from time to time order, direct, and appoint.'

" The remaining s. 49 deals with the possible effect of the rents being insufficient for the purpose of making good the damage which has been sustained. It is in these terms : ' And whereas it may happen in some years, that the clear rents and profits of the said last mentioned allotment or parcel of ground, may not be sufficient to satisfy and pay all the damages and charges which may be so sustained, and so settled, ascertained, and determined by the said Justices as aforesaid : Be it therefore enacted, That in every such case so happening the deficiency, after such application of the said rents and profits as aforesaid, shall be paid and borne by the owners or occupiers of all the several allotments of the said moors or commons (save and except the said allot- ment so to be vested in the said Justices, but including that or those of the persons so damnified and making complaint),

according to the respective yearly rents or values of the
same, as they shall be respectively rated or charged for or
towards the relieving of the poor of the several parishes,
townships, or places wherein they shall respectively lie, in
such shares and manner as the said Justices, or the major
part of them, at any of their sessions or adjournments, shall
direct or appoint.' Then in case any person or persons so to
be charged shall refuse or neglect to pay his, her or their
proper proportion, then and in every such case the same shall
be levied by distress and sale of the goods and chattels of
every person so assessed and refusing or neglecting to pay
the same. 'Provided always that every occupier or tenant,
who shall have paid such damages as aforesaid, shall and may
deduct and retain out of his, or her rent or rents so much
money as he, or she shall so pay.' Sect. 50 enabled the
Commissioners to allot the parts of the commons which were
little capable of cultivation or improvement amongst the
Bishop of Durham and the several other persons having right
of common upon the moors and commons; and any such
allotment which should be accepted and inclosed was made
subject to the provisions relating to allotments of the
more improvable parts of the commons. Under the pro-
visions of a subsequent Act passed in 1779 the lands allotted
to the Justices were sold for a perpetual quit rent of 30*l.*
per annum."

The action came on for trial on February 15–17, 22–25,
March 1–3, 8–11, 14–16, 1921, and the result of the evidence
given at the trial appears from the following judgment of
Peterson J.

*Tomlin K.C.* and *MacSwinney* for the plaintiffs.
*Hughes K.C., Maugham K.C.* and *F. K. Archer* for the
defendants.

                                    *Cur. adv. vult.*

1921. April 22. PETERSON J. [after stating the facts
and material sections of the Lanchester Inclosure Act, 1773,
as above set out, continued :] The question whether the

C. A.
1921
CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

**144**            CHANCERY DIVISION.            **[1922]**

C. A.

1921

Consett
Industrial
and
Provident
Society
*v.*
Consett
Iron Co.

Peterson J.

lord and his assigns were entitled in the course of working the mines lying under the lands allotted in accordance with the provisions of that Act to let down the surface was considered by the Court of Appeal in the case of *Consett Waterworks Co.* v. *Ritson* (1) in 1889. The Court of Appeal (consisting of Lord Esher M.R. and Lindley and Lopes L.JJ.) held (2) that the lord and his assigns were, on the true construction of the Act, entitled to work the mines lying under the allotments in such a way as to cause subsidence. Prima facie, this decision would govern me in considering a similar question which arises under the same Inclosure Act. But the judgment of the Court of Appeal in that case has been exposed to very adverse criticism. In *Bishop Auckland Industrial Co-operative Society* v. *Butterknowle Colliery Co.* (the *Butterknowle Case*) (3) Farwell J. expressed great doubt whether *Ritson's Case* (1) and *Bell* v. *Earl of Dudley* (4) could stand with the subsequent decision of the House of Lords in *New Sharlston Collieries Co.* v. *Earl of Westmorland* (5); and in the same case in the Court of Appeal (6), Vaughan Williams L.J. expressed a similar doubt, and Romer L.J. obviously felt the difficulty of reconciling the observations of the Court of Appeal in *Ritson's Case* (7) with the decision of the House of Lords in the *New Sharlston Case*. (5)

In the House of Lords (8) Lord Macnaghten expressly stated that *Ritson's Case* (7) could no longer be regarded as an authority. Lord Atkinson, however, distinguished *Ritson's Case* (7) from the *Butterknowle Case*, considering that s. 45 of the 1773 Act was stronger in favour of the lord's right than the corresponding section in the *Butterknowle Case*, and that ss. 48 and 49 were material provisions which distinguished *Ritson's Case* (7) from the *Butterknowle Case*, as s. 48 set apart a fund for damages, while by s. 49 any deficit was to be made up by the owners or occupiers, the occupiers

(1) 22 Q. B. D. 318, 702.
(2) Post, p. 187n.
(3) [1904] 2 Ch. 419, 429.
(4) [1895] 1 Ch. 182.

(5) [1904] 2 Ch. 443n.
(6) [1904] 2 Ch. 419, 440.
(7) 22 Q. B. D. 702, post, p. 187n.
(8) [1906] A. C. 305, 314, 322, 323.

being entitled to deduct any payment which they were
compelled to make from their rent, so that, in the result, the
deficit was paid by the owners, and not by the tenants. But
for reasons which appear later in the judgment, I venture to
doubt whether the compensation provided is complete, and
whether any deficit is necessarily thrown upon the owners
of the allotments.

C. A.

1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Peterson J.

In these circumstances, it becomes necessary for me to
consider the reasoning of the Court of Appeal in *Ritson's
Case* (1), and inquire whether it is so inconsistent with pro-
positions laid down by the House of Lords for guidance in
considering Inclosure Acts that it is impossible any longer to
regard it as sound. Lord Esher's judgment (2) begins with
the observation that, having regard to the powers of the
Prince Bishop of Durham, it might be anticipated that he
would reserve to himself the greatest possible power. I do
not myself appreciate how the construction of a document
can be affected by the power or influence of one of the parties
to it, but in any case the preamble shows that, among the
commoners, were powerful and influential men, such as the
Earl of Strathmore and Kinghorn, and Lord Widdrington.
Moreover, s. 44 shows that in the case of timber the lord's
rights were, in fact, diminished. The Master of the Rolls
then accepts the proposition that an Inclosure Act is not
to be construed so as to allow the lord to let down the surface
of allotments by working mines under them, unless the
language of the Act is clearly and unmistakably to that
effect. This is substantially the same as the proposition
laid down by the House of Lords in the *Butterknowle Case* (3)
—namely, that the surface owner is entitled of common right
to support for his property in its natural position, and in its
natural condition without interference or disturbance by or
in consequence of mining operations, unless such interference
or disturbance is authorized by the instrument of severance
either in express terms or by necessary implication : per
Lord Macnaghten, and also Lords Loreburn and Atkinson.

(1) 22 Q. B. D. 702, post, p. 187n.          (2) Post, p. 187n.
(3) [1906] A. C. 305, 314, 322, 323.

**146**                          CHANCERY DIVISION.                          **[1922]**

C. A.
1921
CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Peterson J.

If the introduction of a clause to the effect that the mines must be worked so as not to let down the surface would not create an inconsistency with the actual clauses of the instrument, then the surface cannot be let down : per Lord Loreburn.

The Master of the Rolls then proceeded to consider s. 45, and expressed the view that the words of that section, omitting the final words, " without paying any damages or making any satisfaction for so doing," did not deprive the owners of the surface of their right to support. This view is clearly in accordance with the opinion in the House of Lords in the *Butterknowle's Case* (1) : see, for instance, Lord Macnaghten's observations on p. 313, Lord Loreburn's on p. 309, and Lord Atkinson's on p. 320. Nor do the words " without paying any damages or making any satisfaction for so doing " displace the rights of the surface owners : see the *Butterknowle Case* (1), pp. 311 and 321. These words merely mean that the lord is not bound to make compensation for the consequences of acts which the section authorizes him to do, and cannot extend the scope of the powers conferred by the section. But the Master of the Rolls then dealt with the introductory words of s. 48. These words he read as meaning, whereas great inconveniences were being done and damage being done to particular allottees by working the mines without paying any damages or making any satisfaction for so doing. Without determining the question, he expressed the opinion which, for the purposes of his judgment, was an obiter dictum, that the words might indicate that the lord, by s. 45, was entitled to let down the surface. But if Lord Loreburn's test be applied, it appears to me to be impossible to say that the introduction of a clause prohibiting the lord from letting down the surface would create an inconsistency with the provisions of s. 45 and the introductory words of s. 48. Inconvenience or damage might be caused by searching for, winning, or working the mines without letting down the surface. It is, however, to be observed that there were precisely similar words

(1) [1906] A. C. 305.

introducing the compensation section in the *Butterknowle Case.* (1)  It was, however, the compensation section which led the Master of the Rolls to the conclusion that the lord was entitled to let down the surface.   Now the way in which he used the compensation clauses appears to me to be quite inconsistent with the opinion of the learned Lords in the *Butterknowle Case.* (2)  He assumed that the " natural interpretation " of s. 45 was to authorize the lord to cause a subsidence, and treated the absence of compensation as a " fetter " on the " natural interpretation," and held that the presence of a compensation clause removed the " fetter " with the result that you must go back and construe the words of s. 45 according to their ordinary, and, therefore, their legal signification.  This, he thought, was the result of the judgment of the House of Lords in *Love* v. *Bell* (3) ; but it is, to my mind, impossible in view of the opinions in the *Butterknowle Case* (2) to say that the natural interpretation of s. 45 is that the lord is entitled to cause subsidence.  On the contrary, they are to be construed as not conferring any such right upon him, nor does it appear to be correct to say that it is the absence of a compensation clause which prevents the section from being construed in such a way as to confer the right of letting down the surface upon the lord.  That result is due to the fact that in construing an Inclosure Act a provision authorizing the lord to work and enjoy the minerals as fully and freely as if the Act had not been passed is not sufficient to displace the common right of the owner of the surface to support, and to the fact that the introduction of a clause to the effect that the mines must be worked so as not to let down the surface could not create an inconsistency with the reservation to the lord.  Where there is a doubt as to the meaning of a reservation to the lord, the construction of a compensation section may show that it could not have been intended to confer upon the lord the right to let down the surface.  But the Master of the Rolls, in substance, held that the provision for compensation in the

C. A.

1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Peterson J.

(1) [1904] 2 Ch. 419, 420.          (2) [1906] A. C. 305.
(3) 9 App. Cas. 286.

**148**                    CHANCERY DIVISION.                    **[1922]**

C. A.
1921
CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON CO.

Peterson J.
1773 Act compelled the Court to interpret s. 45 in a manner in which, apart from such a provision, it could not have been construed. But while the absence or insufficiency of compensation may determine the construction of an ambiguous section in favour of the owner of the surface, it does not follow that the presence of a compensation clause, however sufficient it may be, is enough to show that the lord is entitled to do that which, if it were absent, he would not be entitled to do. Prima facie, compensation is payable in respect of authorized acts. The compensation section relates to the exercise of the powers conferred. The section may comprise words which show that it was contemplated that the lord should be able to let down the surface ; for instance, an express reference to subsidence ; but, normally, it covers only damages occasioned by acts which the statute authorized. Thus in the present case, s. 48 relates to damage caused by using any of the powers or liberties hereby reserved, that is to say, by s. 45. In such circumstances, it is difficult to see how a section providing for compensation in respect of powers conferred by another section can extend the scope of those powers. Thus Lord Macnaghten in the *Butterknowle Case* (1) expressly stated : "The provision of compensation in measure adequate to cover any damage likely to be caused by the exercise of the powers or privileges conferred is not sufficient to exclude the presumption in favour of the owners of the surface." So, too, Lord Loreburn, looking at the question from a slightly different angle, held that : "If the compensation clause is capable of being satisfied by reference to acts done on the surface, then, though it may be wide enough to cover also damage done to the surface by taking away the support, still it must be confined to damage done on the surface, and the inference that support might be taken away on payment of compensation would not be drawn." This appears to be the necessary consequence of applying Lord Loreburn's test, as the introduction of a clause to the effect that the surface must be let down would not create any inconsistency with the section which provides for compensation. Lord

(1) [1906] A. C. 305, 309, 313.

Robertson agreed with the judgment of Lord Loreburn L.C. See, too, the observations of Lord Davey on the subject, and the judgment of Lord Watson in *Love* v. *Bell* (1), and the observations of Lord Campbell in *Smart* v. *Morton.* (2)

In my opinion the reasoning of Lord Esher is inconsistent with the principles enunciated in the *Butterknowle Case.* (3) Lindley L.J.'s judgment (4) also, in my opinion, is inconsistent with the reasoning of the House of Lords in the *Butterknowle Case.* (3) Thus he laid great stress on the words at the end of s. 45, which freed the lord from liability for damages occasioned by the exercise of the powers conferred upon him, and on the preamble to the compensation section, s. 48. But the Act which was the subject of discussion in the *Butterknowle Case* (3) contained similar words, and a similar preamble to the compensation clause. He then proceeded to state the effect of s. 45, and quoted verbatim the words, " as fully and freely as he or they might or could have held used and enjoyed the same in case the Act had not been made and that without paying any damages or making any compensation for so doing." His view on these words was that it was impossible to say that there was not an implied power to let down the surface. But this conclusion is not consistent with the reasoning in the *Butterknowle Case.* (3) Nor do I think that the effect which he gives to the preamble to the compensation clause is consistent with the views of the learned Lords in the *Butterknowle Case.* (3) His view was that those words removed all doubt. But in the *Butterknowle Case* (3) there was a similar preamble to the compensation clause. I find it impossible to say that if any express provision against subsidence was inserted in the present Act it would, having regard to the *Butterknowle Case* (3), be inconsistent with the provisions of s. 45 or with the preamble to s. 48. Lindley L.J. did not rely upon the operative portions of the compensation clause, nor did he suggest that they afforded an adequate protection. Lopes L.J. took the view that without the compensation clause the language

C. A.

1921

CONSETT INDUSTRIAL AND PROVIDENT SOCIETY
v.
CONSETT IRON CO.

Peterson J.

(1) 9 App. Cas. 286.   (3) [1906] A. C. 305, 309, 313.
(2) (1855) 5 E. & B. 30, 47.  (4) Post, p. 193n.

150                    CHANCERY DIVISION.                    [1922]

C. A.
1921
CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON Co.

Peterson J.

of the Act was sufficient to authorize the lord to let down
the surface; but his reasoning cannot, in my opinion, be
reconciled with that which commended itself to the House of
Lords in the *Butterknowle Case*. (1)  He, too, relied upon the
preamble to s. 48.  He also expressed the view, as did
Lindley L.J., that it was difficult to understand how the mines
could be effectively worked without letting down the surface.
But this was not a difficulty which pressed upon the House of
Lords in the *Butterknowle Case*. (1)  If it were a sound argu-
ment, it would seem that the latter case must be determined
in favour of the lord, for I infer from the language of the Lords
Justices that their view was not based on any special
evidence in the case.  On analysis the proposition apparently
means that if the minerals were to be worked out or worked
to the fullest advantage the surface would, or might, be let
down.  But, as was shown in the present case, the mines could
be worked commercially without letting down the surface.  In
my opinion, then, the reasoning of the members of the Court
of Appeal cannot be reconciled with the views which were
expressed by the House of Lords in the *Butterknowle Case*. (1)

But it was contended that even if the reasoning of the
Court of Appeal in *Ritson's Case* (2) cannot stand, the true
construction of the Act is such that the lord was impliedly
given power to let down the surface.  In construing this
Inclosure Act I must loyally adhere to the rules for inter-
preting such Acts laid down by the House of Lords in *Love* v.
*Bell* (3) and the *Butterknowle Case*. (1)  It may be true as
stated by Swinfen Eady L.J. in *Beard* v. *Moira Colliery
Co*. (4) that it is " Difficult to appreciate exactly the grounds
upon which the apparent departure from the language of the
Inclosure Acts has been justified."  Lord Macnaghten in the
*Butterknowle Case* (1) observed that the construction which
had been put on such a section as s. 45 reduced it to a dead
letter for any practical purpose; and Lord Halsbury in
*Butterley Co*. v. *New Hucknall Colliery Co*. (5), was apparently

(1) [1906] A. C. 305.              (3) 9 App. Cas. 286.
(2) 22 Q. B. D. 702, post, p. 187n.      (4) [1915] 1 Ch. 257, 267.
(5) [1910] A. C. 381, 383.

not perfectly satisfied with the result. But whatever may
be said in cases which do not involve the construction of
Inclosure Acts, for instance *Beard* v. *Moira Colliery Co.* (1) ;
*Chamber Colliery Co.* v. *Twyerould* (2) ; and *Davies* v. *Powell
Duffryn Steam Coal Co.* (3), the rules which have been laid
down in *Love* v. *Bell* (4) and the *Butterknowle Case* (5) govern
the construction of Inclosure Acts.

It is said that the words in s. 45, which enable the lord
" to search for, drain, win and work the said mines where-
soever the same are or may be by any ways or means now in
use or hereafter to be invented," show that the lord was
entitled to remove all the coal and so let down the surface,
for it is suggested one of the ways or means might be the
longwall system of working. These are general words. If
Lord Loreburn's test were applied and a clause prohibiting
subsidence were inserted in the Act it would not, in my
opinion, be inconsistent with that part of s. 45 which I have
quoted. These words in such a case would, or might, refer
to new or improved machinery for working the mines.

However, I find some difficulty in seeing how these words
can operate as an addition to the other powers conferred by
s. 45. The section professes to enable the lord to search for,
win, and work the mines " as fully and freely as he could
have held used and enjoyed the same in case this Act had
not been passed." If the Act had not been passed the lord
could have worked the mines in any way or by any means
which he thought fit, although in doing so he let down the
surface, so long as he left sufficient pasturage for the
commoners. The words " as fully and freely " in themselves
include " by any way or means." Yet it is well established
that the words at the end of s. 45 are not sufficient to enable
the lord to work the mines in such a way as to cause sub-
sidence. It is not easy to see why the words " by any ways
or means now in use or hereafter to be invented," which
are implied in the words at the end of the section, should

C. A.
1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Peterson J.

(1) [1915] 1 Ch. 257.          (3) [1917] 1 Ch. 488.
(2) (1893) [1915] 1 Ch. 268n.     (4) 9 App. Cas. 286.
                (5) [1906] A. C. 305.

152                    CHANCERY DIVISION.              **[1922]**

C. A.
1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON Co.

Peterson J.

convert a section which otherwise would not justify subsidence into one which enables the lord to let down the surface, especially as they may be attributed to new forms of machinery, or to things done on the surface.

Reliance was also placed upon the compensation clauses, ss. 48 and 49, which it was said give complete compensation for any damage occasioned by subsidence and throw any deficit on the owners of the allotments, and, therefore, differentiate this case from the *Butterknowle Case.* (1)  But I do not think that the provision which they make is so complete or so reasonable as was contended.  Any deficit owing to the insufficiency of the fund constituted under s. 48, is by s. 49 to be raised by a rate, to be paid and borne by the owners and occupiers of all the allotments excluding that which was vested in the justices, but including that which belonged to the persons damnified ; and it is provided that any occupier or tenant may deduct any damage which he pays out of the rent payable by him.  The result of this provision might be that a tenant would be called upon to pay a considerable sum shortly before the expiration of his tenancy and have no opportunity of recouping himself by deducting it from his rent.  Moreover, for the reasons which I have already given, I am of opinion that a compensation clause which would be adequate to cover damages by subsidence if power had been granted to the lord to let down the surface, cannot indicate that the section which confers powers on the lord includes a power to let down the surface, which, taken by itself, the section does not comprise.  Nor should ss. 24 and 30 be disregarded in this connection.  An allotment made in respect of copyhold or customary tenements is to be added to the tenement and is to be subject to the same customs as the tenement.  Now under the custom of this manor the lord was entitled to work mines under a copyhold tenement, but was not entitled to let down the surface without the copyholder's consent.

The defendants' contention is that, though by s. 30 the allotment is added to, and becomes part of, the copyhold.

(1) [1906] A. C. 305.

**2 Ch.**          CHANCERY DIVISION.          153

tenement, the lord is entitled to let down the surface of the
addition to the tenement, although he is not entitled to do
so in the case of the original tenement. The grant or
reservation of the mines to the lord might, no doubt, be
couched in such language as to confer this right ; but where
there is no clear grant or reservation to the lord of a right
to let down the surface, such a provision as that which is
contained in s. 30 confirms the view that the lord was not
intended to have such a right. Sect. 30, in effect, places an
allotment in respect of a copyhold tenement on the same
basis as the tenement, except for the rent of 4*d.* per acre
imposed by s. 25, which I assume was not paid in respect of
copyhold tenements, and this involves the right according
to the custom to have the surface supported. It would
require very clear words to deprive the allottees of the right
which prima facie is conferred upon them by s. 30.

I ought, before I leave this part of the case, to refer to
*Benfieldside Local Board* v. *Consett Iron Co.* (1), in which the
Act of 1773 was considered. By s. 19 the Commissioners
are required to set out and appoint such public highways
and roads over the more improvable parts of the common
intended to be divided and enclosed as they think proper,
and set out and appoint other parts for common quarries,
common watering places for cattle, and common wells, and
to assign and set out such common, public, and private horse
and other roads, ways, passages, and bridges and such gates,
stiles, hedges, sewers, drains and watercourses in, over or
through the lands to be enclosed as they think convenient.
By s. 33 the Commissioners are required to cause all such
public highways, roads, passages, ways, bridges, and drains
to be well and sufficiently made, and to give directions for
the making by the allottees of such common or public and
private roads, ways, passages, bridges, gates, stiles, hedges,
sewers and watercourses, and for the maintenance and repair
by the allottees of all the works contemplated by the section
"for ever." One of the highways constructed under this
section was injured by subsidence caused by the working of

(1) (1877) 3 Ex. D. 54.

C. A.

1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Peterson J.

C. A.
1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Peterson J.

the Consett Iron Company and the Local Board sued the company for damages. The defendants contended that they were not liable, as s. 45 enabled them to work the mines without leaving any support. The Court, however, held that if the Act provided a highway by one clause it could not be read as intending by another clause to sanction the destruction of the highway.

In the present case it was urged with some force that as the Act provided for the working and perpetual maintenance and repair of roads, bridges, gates, hedges, sewers, drains and watercourses, and provided for the appropriation of parts of the commons for common quarries, common watering places and common wells, it was impossible to suppose that the Act intended to confer upon the lord the right of destroying the works which were to be made and maintained under the provisions of the Act; that the lord could not have any right of letting down or injuring them; and that it would be a fantastic result if the lord were bound not to let down the roads, highways, hedges, gates, sewers and drains, but was entitled to let down the surface of the allotments which were served by them. It is possible that it was intended that the lord should be obliged to support the hedges and gates which formed the boundaries of the allotment and the roads and drains which ran through the allotments, and entitled to let down the allotments themselves; but it appears to me to be a very improbable intention to attribute to the Legislature or to the persons who procured the Act.

Apart, then, from the question which I will now consider, I am of opinion that, having regard to the rules of construction which have been laid down by the House of Lords, and for the reasons which I have given, the lord under this Act was not entitled to let down the surface of the allotments, and I respectfully venture to agree with Lord Macnaghten that the decision in *Ritson's Case* (1) was erroneous.

But then it was contended that in 1773 the method of working coal mines in the county of Durham and under Lanchester Moor, in particular, was such that it inevitably

(1) 22 Q. B. D. 702, post, p. 187n.

caused the surface to subside, and that, in construing the
Act, effect should be given to the method of working, which
must have been in the contemplation of the various persons
who were interested in procuring the Act. Counsel for the
defendants did not put forward a custom, but said that it
was the practice of mining in 1773 to take out 75 per cent.
of the coal, and that this inevitably led to subsidence. It
was also suggested that, commercially, it was impracticable
to work in such a way as not to let down the surface.
Assuming that the question of commercial practicability is
one which would otherwise be relevant in such a case as this :
see Lord Sumner's observations in *Thomson* v. *St. Catharine's
College* (1), it is a question which does not arise in the
present case ; for the evidence of the witnesses both for the
plaintiffs and for the defendants agreed that in 1773 it was
commercially practicable to work the mines without letting
down the surface, and that it is commercially practicable
at the present time.

In construing documents which confer mining rights, the
method of working at the date of the instrument has been
admitted as one of the surrounding circumstances in many
cases. In *Bell* v. *Earl of Dudley* (2), which was a case under
an Inclosure Act, the learned judge received and acted upon
evidence that at the time when the Act was passed it was
known that the working of the coal would cause subsidence,
and that it was impracticable to work the thick seam of coal
(thirty feet thick) without subsidence. In the *Butterknowle
Case* (3) Lord Atkinson observed that the Act which was
in question in *Bell* v. *Earl of Dudley* (2) was naturally
construed with regard to the practice which had so long pre-
vailed, and to the results necessarily arising in the working
from the very nature of the subject matter.

In the *Butterley Case* (4) the question was one between
lessees of an upper seam and lessees of a lower seam, and the
Court of Appeal acted on the view that it was common
knowledge to all persons conversant with mining that it would

C. A.
1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Peterson J.

(1) [1919] A. C. 468, 502.          (3) [1906] A. C. 305.
(2) [1895] 1 Ch. 182.               (4) [1909] 1 Ch. 37; [1910] A. C. 381.

**156**                    CHANCERY DIVISION.                    **[1922]**

O. A.

1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON CO.

Peterson J.

be impossible to work the lower seam at all without causing subsidence to the upper seam : see observations of the Master of the Rolls. (1)   But this statement must be read in connection with the circumstances of the particular case, and ought not to be treated as a finding that any working of an underlying seam would let down a seam above it, even though pillars for its support be left ; for the evidence showed that the longwall system by which all the coal is removed was the recognized system in the district ; and that the necessary result of the application of this system was subsidence (2) ; and it is, I think, clear that the observations of the Court of Appeal, and of Lord Halsbury (3), had reference to the necessary consequences of the longwall system : see observations of Lord Macnaghten. (4)

In *Jones* v. *Consolidated Anthracite Collieries* (5) the dispute was one between lessees of coal and lessees of the surface of the Amman Valley.   It was proved that coal in the Amman Valley had been worked for fifty years on the longwall system, which invariably caused subsidence.   *Welldon* v. *Butterley Colliery Co.* (6) was an action by the owner of an allotment under an Inclosure Act of 1791 against the defendants, who were the successors in title of the lord to whom the mines were reserved by the Act in phraseology somewhat similar to that which is found in s. 45 of the Act in the present case.   It was proved to the satisfaction of the Court, that, for a long time before the Act of 1791, the coal in the district was worked on the longwall system, which necessarily produced subsidence. The learned judge also found that " there is no method by which coal can be so worked as not to cause subsidence in this or any other part of the country."   I think the learned judge when he said that there was no method by which coal could be worked as not to cause subsidence meant that coal could not be worked out, or to full advantage, without causing subsidence.   This would be in accordance with the evidence in the present case.

(1) [1909] 1 Ch. 37, 47.                    (4) [1910] A. C. 385.
(2) [1908] 2 Ch. 475, 479.                 (5) [1916] 1 K. B. 123.
(3) [1910] A. C. 381, 383.                  (6) [1920] 1 Ch. 130.

If the statement is to be read as meaning that coal cannot be worked at all without causing a subsidence the learned judge no doubt acted upon the evidence which was before him, but the evidence of the eminent mining engineers whom I have heard would not support so general a proposition, even if it be confined to mining operations at the present time. Mines under townships, railways, rivers, canals and the sea at Whitehaven and on the north-east coast of England are worked in such a way as to leave adequate pillars for the support of the roof and the prevention of subsidence. When I come to deal with the evidence on this branch of the case it will be seen that in past times in the first stage of the bord and pillar system, sufficient pillars were generally left for the support of the roof, and consequently for the support of the surface. The mere fact that before the Inclosure Act the lord had power to let down the surface so long as sufficient pasturage for the commoners was left does not assist on this part of the case, for this was true in the *Butterknowle Case* (1) and in *Love* v. *Bell.* (2)

The question is whether at the date of the Act the established practice of mining in the particular district was such that the inevitable consequence of employing it was subsidence. If, for instance, the longwall system had been the only system used in the district, the persons who procured the Act must have contemplated mining operations in accordance with it, but if there were two methods of mining in the district, one of which resulted in subsidence while the other did not, it would be impossible to say that the parties must have contemplated the system which caused subsidence ; and if the mines in question were at the date of the Act worked in a way which did not let down the surface, while some other mines, it may be the majority in the district, were operated on a system which resulted in subsidence, it seems impossible to hold that, for the purpose of construing the document by reference to surrounding circumstances, regard ought to be had to the system which was not in use at these mines in question. The burden of establishing

C. A.
1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Peterson J.

(1) [1906] A. C. 305.          (2) 9 App. Cas. 286.

158                    CHANCERY DIVISION.              [1922]

C. A.
1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON CO.

Peterson J.

that the practice of working the mines under Lanchester Common in 1773 was such as to cause subsidence rests upon the defendants.

I will now state the conclusions which I have drawn from the evidence. Mining operations on Lanchester Common are of considerable antiquity. I have seen a lease of the mines granted by the Bishop of Durham in the reign of Queen Elizabeth, and according to Dunn on the Coal Trade, published in 1844, p. 12, mines in the parish of Lanchester were worked in the year 1333. In the early days up to the end of the eighteenth century, at least, the mines worked in the Durham district and elsewhere were necessarily mines at a comparatively small depth from the surface. In very early times miners apparently sunk bell pits, that is to say, sunk a short shaft to the coal, and then worked the coal within a small circumference, the shaft being the handle and the workings forming the bell. This method of working generally, if not always, resulted in some subsidence of the comparatively small pieces of surface which were affected. As engineering knowledge increased, this method was superseded by the first form of pillar and stall or bord and pillar working. Under this system the miners, starting from the bottom, hewed out the coal up to the end of the royalty but left sufficient coal in pillars for the support of the roof and the surface : see Compleat Collier, published in 1710, pp. 36 and 37. The amount left in the pillars varied according to the circumstances of each mine ; but, speaking roughly, 40 per cent. to 50 per cent. of the coal was taken and 50 per cent. to 60 per cent. was left in pillars.

About 1738 the bord and pillar system began to undergo a further development. It was found that if larger pillars were left in the first working, that is in the working from the pits outward to the boundary, it was possible to reduce or remove parts of the pillars commencing with those which were further away from the pit and ending with those nearest to the pit. By adopting this method of bord and pillar working it became possible to extract about 75 per cent. of the coal. The removal of so large a percentage of the coal

**2 Ch.**          CHANCERY DIVISION.                    **159**

C. A.

1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Peterson J.

speedily produced subsidence, and sometimes caused a creep of the whole mine before the second working was completed, with the result that, apart from danger to the men, the unworked pillars were lost. In 1809 what is known as the panel system was discovered. Under this system in the course of the first working barriers of solid coal were left so as to divide the mine into compartments and prevent any creep caused by the second working—that is to say, the reduction of the pillars—from affecting the compartments in which the pillars were still unworked. In this way greater security was obtained, and more of the coal could be removed on the second working.

The real question is to what extent had the development of the bord and pillar system, which began about 1738, become the established practice of mining on Lanchester Common and in its neighbourhood in 1773. The plaintiffs' witnesses agree that by this time the practice was well known and not infrequently adopted in the Durham coalfields; but they did not agree with the defendants' witnesses that it was the established practice, or that it had become substantially the only way in which the mines were worked in the district. At this distance of time it is naturally difficult to obtain evidence of a conclusive character on such a question. The defendants produced a number of viewers' reports made before 1773, which recommended the employment of the system of double working by bord and pillar in various collieries in the neighbourhood of Lanchester, or indicated that the pillars had been reduced on a second working, and showed that a small proportion of the coal in the original pillars had been, or was to be, left standing. Three of those reports made in 1755, 1756 and 1757 relate to three pits of the Pontop Colliery, Lanchester Common. Some of them refer to the second working or reduction of the pillars as regular. They show, as was admitted by the plaintiffs, that the system of double working and the reduction of the pillars was well known to mining engineers in the county of Durham, and was in many cases at least utilised by them. Various ancient plans were also produced which indicated

160                    CHANCERY DIVISION.                    [1922]

C. A.
1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON CO.

Peterson J.

that the mines to which they referred had been, or were being, worked on this system ; but they were few in number. I had also the evidence of witnesses who had examined ancient workings in or near Lanchester Common, and found that the workings had in many cases been closed by subsidence caused by leaving too little coal for the support of the roof. But it is extremely difficult, if not impossible, to say in these cases when the workings in question were made. They may have been made after 1809 when the panel system was introduced. On the other hand, there is a report of November 20, 1828, on Fallowfield Colliery by Mr. Nicholas Wood, a well-known viewer at that time. In this report Mr. Wood stated that on inspecting the workings he found that the miners were pursuing the mode almost universally practised in the district of working the mining nine yards, taking out as a lode five yards, and leaving unwrought or standing four yards as a pillar, " and as it does not seem to be the practice to work the pillars out afterwards, four-ninths of the coal are therefore lost." The report as set out in the Bulman and Redmayne Colliery Working Management, pp. 12 and 13, concludes thus :  " The principle on which the colliery has hitherto been worked not only during the present take, but in all previous ones, has been with a view of not obtaining the coal left as pillars, and this has been sanctioned by the custom of the district."

Again, if the practice of second working or reduction of the pillars to such an extent as to cause subsidence was by 1773 so established and general in the county of Durham as the defendants contend, it is curious that in *Smart* v. *Morton* (1) the evidence at the trial at the Durham Assizes in 1854 or 1855 should have proved that according to the course and practice of mining in the county till 1810 ribs of coal were left to support the surface.

Finally, the leases of the mines under Lanchester Common during the eighteenth century constitute a great difficulty in the way of the defendants' contention that in 1773 it was the established practice to work the mines under the commons

(1) 5 E. & B. 30.

**2 Ch.**                    CHANCERY DIVISION.                    **161**

in such a way as to cause subsidence. I have seen copies
of seven sample leases of these mines, L.5 and L.1 to 7,
beginning with one which was granted in 1582–83 and end-
ing with one dated November 17, 1835. One of them was
granted in 1773. From 1842 the leases were always sub-
stantially in the same form. In each case the Bishop of
Durham demised the coal under the commons and the copy-
hold lands in the parish of Lanchester and any quarries
within the commons or copyholds, together with free way
and passage through the waste grounds or copyhold lands,
the lessee making satisfaction to the owners of the copyholds
for damage done to their grounds, with all means of carriage
to and from the pits and quarries. The leases contained
covenants by the lessee that he would " well and orderly
work the pits in such good manner and sort as every pits
in the said County are usually or ought to be wrought,"
and that he would " leave sufficient walls and pillars of coal
for support of the roof of the said colliery and coal mines."

The point of these leases for the purpose of the present case
is that the lessee covenanted to leave sufficient walls and
pillars of coal for support of the roof of the mines. If he was
bound to leave sufficient support for the roof he was pre-
cluded from letting down the surface and was therefore
not entitled to employ any system of mining which would
cause subsidence.

It was contended by the defendants that this covenant
meant that the lessee was bound to leave sufficient support
of the roof of the colliery so long as it was a colliery ; and
that as soon as the mine or colliery was worked out and
there was no more coal to be got the operation of the covenants
'came to an end. I am unable to accept this construction.
The word " leave " prima facie means leave at the end of the
term granted by the lease. It is very probable that the lessor
would desire to have the access by means of the underground
workings maintained, although the coal in the winning made
by the lessee had been worked up to the maximum extent
permissible.

But on the question of construction there is another

C. A.

1921

Consett
Industrial
and
Provident
Society
v.
Consett
Iron Co.

Peterson J.

C. A.

1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Peterson J.

formidable difficulty, which prevents me from accepting the
defendants' contention. The leases cover not only the coal
under the waste or common but also the coal under the copy-
hold tenements. Under the custom of the manor the lord
was entitled to work the minerals under the copyholds, and
apparently, if I may draw an inference from the leases, he
was entitled to enter upon the copyhold tenements for these
purposes ; but he was not entitled under the custom to mine
in such a way as to let down the surface of the copyholds.

In these circumstances the covenant must, so far as copy-
holds are concerned, be a general and unlimited covenant
for the support of the roof and, therefore, of the surface.
If this is so it is impossible to construe the covenant in a
different way in relation to mines under the wastes or
commons. It appears, therefore, that in and before 1773,
which is the critical date for this purpose: see *Smart* v.
*Morton* (1), that the lessees of the mines under the commons
were bound by covenant to support the surface. Whatever
then may be the frequency with which mines in the county
of Durham were worked in such a way as to cause subsidence,
the mines under Lanchester Common could not have been
worked in this way without breach of covenant. If it be
necessary to search for reasons for not applying to these mines
a method of working which was known and applied in the
cases of at least a considerable number of these mines in
the county it may be suggested first that, as mines under the
commons and mines under the copyhold tenements were
included in one demise, it was thought desirable that they
should all be worked on a system which gave that support
to the surface which was, owing to the custom of the manor,
necessary in the case of the mines under the copyholds ;
and, secondly, that the lord was not content to leave to the
lessee the determination of the question how much of the
surface of the commons he could let down without unduly
diminishing the pasturage available for the commoners. It may
be that in some cases the lessees reserved express permission,
notwithstanding the covenants, to work out all or nearly all

(1) 5 E. & B. 30, 48.

the coal, under some part of the surface which was not of any value to the commoners, or that the Bishop was not always as strict as he might have been in enforcing the lessees' obligation. Whatever the reason may be, I cannot, in face of the lessee's covenants in these leases, come to the conclusion, on the evidence before me, that in 1773 it was the recognized and established practice to work the mines under Lanchester Common in such a way as to cause subsidence.

I am, therefore, of opinion that the plaintiffs have established their right to prevent the defendants from letting down the surface of their land.

<div align="right">R. M.</div>

C. A.
1921

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON CO.

Peterson J.

The defendants appealed. The appeal was heard on December 2, 5, 6, 7, 8, 9, 12, 13, 1921.

C. A.

*Hughes K.C., Maugham K.C.* and *F. K. Archer* for the appellants.

*Tomlin K.C., MacSwinney* and *Gavin T. Simonds* for the respondents.

<div align="right">*Cur. adv. vult.*</div>

The arguments on the appeal on the construction of the Act were substantially the same as those used in the Court below, which sufficiently appear from the judgment of Peterson J., and having regard to the view taken by the Court of Appeal of the binding effect of *Consett Waterworks Co.* v. *Ritson* (1) it has been thought unnecessary to report them.

The following authorities were referred to : *Consett Waterworks Co.* v. *Ritson* (1) ; *Benfieldside Local Board* v. *Consett Iron Co.* (2) ; *Duke of Buccleuch* v. *Wakefield* (3) ; *Davis* v. *Treharne* (4) ; *Love* v. *Bell* (5) ; *Carnell* v. *Harrison* (6) ; *Osborne to Rowlett* (7) ; *The Vera Cruz (No. 2)* (8) ; *In re Moore* (9) ; *Butterknowle Colliery Co.* v. *Bishop Auckland*

| | |
|---|---|
| (1) 22 Q. B. D. 318, 702, post, p. 187n. | (5) 9 App. Cas. 286. |
| (2) 3 Ex. D. 54. | (6) [1916] 1 Ch. 328. |
| (3) (1870) L. R. 4 H. L. 377. | (7) (1880) 13 Ch. D. 774. |
| (4) (1881) 6 App. Cas. 460. | (8) (1884) 9 P. D. 96. |
| | (9) [1901] 1 Ch. 691. |

164                              CHANCERY DIVISION.                    [1922]

C. A.        *Industrial Co-operative Co.* (1); *Liford's Case* (2); *Jefferson* v.
1921         *Bishop of Durham* (3) ; *Knight* v. *Mosely* (4) ; *Ecclesiastical*
CONSETT      *Commissioners* v. *Wodehouse* (5) ; *Smart* v. *Morton* (6) ;
INDUSTRIAL   *Mostyn* v. *Lancaster* (7); *Bonomi* v. *Backhouse* (8); *Harris* v.
AND
PROVIDENT    *Ryding* (9); *Humphries* v. *Brogden* (10); *Dalton* v. *Angus* (11);
SOCIETY
v.           *Butterley Co.* v. *New Hucknall Colliery Co.* (12) ; *Hayles* v.
CONSETT      *Pease & Partners, Ld.* (13) ; *New Sharlston Collieries Co.* v.
IRON CO.     *Earl of Westmorland* (14) ; *Attorney-General* v. *Dean and*
—            *Canons of Windsor* (15) ; *Caledonian Ry. Co.* v. *Walker's*
             *Trustees* (16); *Quinn* v. *Leathem* (17); *Blackett* v. *Bradley* (18);
             *Chamber Colliery Co.* v. *Twyerould* (19) ;  *Thomson* v. *St.*
             *Catharine's College, Cambridge* (20); *Beard* v. *Moira Colliery*
             *Co.* (21); *Davies* v. *Powell Duffryn Steam Coal Co.* (22) ;
             *Welldon* v. *Butterley Co.* (23) ;  *Rowbotham* v. *Wilson* (24) ;
             *Gill* v. *Dickinson* (25) ;  *Smith* v. *Darby* (26) ;  Sheppard's
             Touchstone, vol. i., p. 87a.

             1922.  April 10.  The following judgments were delivered :

             LORD STERNDALE M.R.  This appeal from Peterson J. is
             concerned with a question as to the respective rights of the
             surface owners and the mineral owners under the Lanchester
             Inclosure Act, 1773.  The plaintiffs, the respondents, claiming
             through the allottees of the surface, asked that the defendants,
             the appellants, who claim through the mineral owners, should
             be restrained from working the minerals so as to let down or
             imperil the surface.  The defendants on the other hand claimed
             a right to work the minerals as they chose irrespective of

             (1) [1906] A. C. 305.              (14) [1904] 2 Ch. 443n.
             (2) (1614) 11 Rep. 46b.            (15) (1860) 8 H. L. C. 369.
             (3) (1797) 1 Bos. & P. 105.        (16) (1882) 7 App. Cas. 259.
             (4) (1753) 1 Amb. 176.             (17) [1901] A. C. 495.
             (5) [1895] 1 Ch. 552.              (18) (1862) 1 B. & S. 940.
             (6) 5 E. & B. 30.                  (19) [1915] 1 Ch. 268n.
             (7) (1883) 23 Ch. D. 583.          (20) [1919] A. C. 468.
             (8) (1858) E. B. & E. 622.         (21) [1915] 1 Ch. 257.
             (9) (1839) 5 M. & W. 60.           (22) [1917] 1 Ch. 488.
             (10) (1850) 12 Q. B. 739.          (23) [1920] 1 Ch. 130.
             (11) (1881) 6 App. Cas. 740.       (24) (1860) 8 H. L. C. 348.
             (12) [1910] A. C. 381.             (25) (1880) 5 Q. B. D. 159.
             (13) [1899] 1 Ch. 567.             (26) (1872) L. R. 7 Q. B. 716.

whether damage was done to the surface or not. Peterson J. decided in favour of the respondents and this appeal is brought by the defendants.

A lengthy, able and interesting argument was addressed to us as to Peterson J.'s decision upon the construction of the Act and the consequent rights of the parties, and the learned judge considered himself at liberty to examine and form his own opinion upon the Act. I hope I do not take too narrow a view of the case, but I think that we are not at liberty to form our own opinion on the matter, and that the case is governed by authority whether we accept the argument of the appellants or that of the respondents. Of course the result will be different, but in each case it will, in my opinion, be a result at which we are bound by authority to arrive. My reasons for this conclusion are as follows.

In the year 1889 the Court of Appeal (then consisting of Lord Esher M.R., Lindley and Lopes L.JJ.) in *Consett Water-works Co.* v. *Ritson* (1) decided the same question that is now before us upon the construction of the same Act of 1773. They held upon the true construction of the Act that the lord and his assigns—that is to say, the mineral owners—were entitled to work the minerals in such a way as to let down and injure the surface. This was a decision between different parties, and therefore no question of res judicata arises, but it was a decision of the identical question arising upon the construction of the identical Act. It is therefore binding upon us unless it has been overruled, or unless it was given in circumstances different from those of the case before us. I will deal with the question of the circumstances first. There are no additional circumstances suggested by the respondents which could alter the construction of the Act in their favour, but the appellants did give evidence which they alleged proved a practice of mining so as to let down the surface to have been in existence over this district at the time of the passing of this Act. This was a circumstance, as they contended, existing at the time of the passing of the Act which had to be considered in construing it. This

<div align="right">

C. A.

1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Lord Sterndale
M.R.
</div>

(1) 22 Q. B. D. 702, post, p. 187n.

C. A.

1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Lord Sterndale
M.R.

circumstance they alleged pointed in the direction of a construction which would continue the right of that method of working to the lord and his assigns. I think the appellants fail on this point. Assuming the effect of such a custom to be what they allege I agree with the learned judge that the evidence did not establish such a recognized and established practice as to affect the construction of the Act. I think therefore that the decision of this Court in 1889 was given on the same point in respect of the construction of the same Act and in circumstances that did not for this purpose differ from those of the present case. If not overruled therefore I think it governs our decision here, and I wish to say what I think must be taken to be the meaning of overruled for this purpose. I think it must have been overruled in the sense that decisions of a superior Court have shown it to be a wrong decision on the point, and in respect of the Act on which it was decided. If it be shown to have been so overruled then we are bound to treat it as a wrong decision, and to construe the Act as the other decisions cited show it should be construed —that is to say, so as not to give the lord and his assigns the right to let down the surface. I think therefore as I have said, with respect to Peterson J., that if we are to accept the appellants' contention that the case is not overruled, we are bound to allow the appeal, and, if we accept that of the respondents that it is overruled, we are bound to dismiss it, and that it is not open to us in either case to construe the Act for ourselves.

I think it is essential to bear in mind the true meaning of the case being overruled, because if the decision on the identical point before us arising out of the construction of the identical Act is not displaced it binds us although the reasoning upon which the decision is founded may have been so disapproved and displaced as to make the case no authority upon the construction of a distinguishable though somewhat similar Act. I do not in the least mean to say that the express term overruled need be used, but the effect of the decision of the superior Court must be such as to show that the former decision cannot stand even on its own facts

and in respect of the Act on which it was decided. It is by no means uncommon for a superior Court to say that a case which it is considering is wrong in its reasoning, and cannot be used as an authority in other cases, but that on its own facts it can be supported, and this may be expressed by implication as well as expressly. In such a case the decision remains an authority on its own facts and circumstances, but they must be the same, and a very slight difference will take a subsequent case out of the authority of the former one. Here I can see no difference between the circumstances of the case before us and those of the case decided in 1889.

The true way to consider the authority of a case decided upon the identical circumstances of one under consideration is I think stated by Cockburn C.J. in delivering the judgment of himself, Wightman J. and Blackburn J. in *Blackett* v. *Bradley*. (1) He says : " In this case, which was argued before my brothers Wightman and Blackburn and myself, on the argument on the demurrer to the plea it was admitted that, if *Hilton* v. *Lord Granville* (2) was to be considered as law, the present case was within the decision in that case, and, so far as this Court was concerned, must be governed by it. But it was insisted, on the part of the defendants, that the case of *Hilton* v. *Lord Granville* (2) had been so much impugned and shaken by subsequent cases that it must be considered as virtually overruled ; at all events sufficiently so to call upon the Court to review the decision in that case, and, upon the arguments urged against its validity, now to overrule it. There can be no doubt that to some extent the authority of *Hilton* v. *Lord Granville* (2) has been shaken, inasmuch as a position assumed in the reasoning of the Court as one of the grounds of its decision has since been distinctly overruled in the House of Lords in the case of *Rowbotham* v. *Wilson* (3), in which the question presented itself for adjudication. And it cannot be denied that the decision itself has not met with the universal approval of the profession ; and that it may be desirable that the validity of that

C. A.

1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Lord Sterndale
M.R.

(1) 1 B. & S. 940, 954.            (2) (1845) 5 Q. B. 701.
(3) 8 H. L. C. 348.

*N* 2                                               1

**168**                          CHANCERY DIVISION.                    **[1922]**

C. A.
1922
CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON Co.

Lord Sterndale
M.R.

decision should be brought under the consideration of a Court of error. At the same time it is equally clear that, though the reasoning of this Court in *Hilton* v. *Lord Granville* (1) has been impugned, the decision in that case has not been overruled. And, the judgment having been a considered judgment of the Court, and standing unreversed we do not feel ourselves at liberty to consider ourselves as otherwise than bound by it."

There have been at least three decisions upon this Act besides the one in 1889, but for reasons I shall give I do not think they afford any help. Two of them, *Blackett* v. *Bradley* (2) which I have already mentioned and *Gill* v. *Dickinson* (3), are directly opposed to one another, but they were both decided upon demurrer which involved the assumption of the correctness of the facts stated which were different from those of this case, and the former was decided also under a misconception as to the effect of an authority said to govern the case. The third case is that of *Benfieldside Local Board* v. *Consett Iron Co.* (4) This case was concerned with the question of letting down the surface of public roads set out under the Inclosure Act, and I think the decision turned a good deal upon a consideration of the bearing of public and private rights. In any case it was a decision of a Court of first instance, and could not prevail against those which I am now about to mention.

It was very forcibly argued before us that the authority of *Consett Waterworks Co.* v. *Ritson* (5) was entirely destroyed and the decision shown to be wrong by decisions in the House of Lords, notably *Butterknowle Colliery Co.* v. *Bishop Auckland Industrial Co-operative Co.* (6) and *Love* v. *Bell* (7) decided in 1884 before the case of *Consett Waterworks Co.* v. *Ritson* (5), but approved in later cases. I think there is no doubt that the judgments in those cases are contrary to the reasoning upon which the decision in *Consett*

(1) 5 Q. B. 701.                    (4) 3 Ex. D. 54.
(2) 1 B. & S. 940.                  (5) 22 Q. B. D. 702, post, p. 187n.
(3) 5 Q. B. D. 159.                 (6) [1906] A. C. 305.
                    (7) 9 App. Cas. 286.

*Waterworks Co.* v. *Ritson* (1) was founded and that they destroy
the authority of that decision in any case depending upon
a similar but distinguishable Act or upon similar but
distinguishable circumstances. The question however remains
whether they override it upon its own Act and its own
circumstances. I do not say how I should decide this
point if the case had not been considered upon it in
this Court and in the House of Lords, and I think it is
necessary to see the manner in which it was then treated.
I do not think I need do more than examine the way in which
*Butterknowle Colliery Co.* v. *Bishop Auckland, &c., Co.* (2) dealt
with it. In the Court of first instance Farwell J. expressed
a doubt whether that case could stand with the subsequent
decision of *New Sharlston Collieries Co.* v. *Earl of West-
morland* (3), but he distinguished it from the case then before
him. When that case came before the Court of Appeal the
Court's attention was expressly directed to the point, and it
was asked to express the opinion that *Consett Waterworks
Co.* v. *Ritson* (1) was not consistent with the cases mentioned,
and therefore not an authority. (4) If the Court had held
that view there would have been no necessity to distinguish
*Consett Waterworks Co.* v. *Ritson* (1); it would have been
enough to say that it was overruled, but Vaughan
Williams L.J. though expressing the same doubt as Farwell J.
distinguished it from the case then before the Court (5),
and so did Romer L.J. (6), intimating that he would have
been bound to follow or would have followed it if not dis-
tinguishable. Cozens-Hardy L.J. agreed. So far then I
think the Court did not hold the case to be overruled, but
of course this may have been the courtesy of one Court of
co-ordinate jurisdiction to another.

That case of *Butterknowle Colliery Co.* v. *Bishop Auckland,
&c., Co.* (2) however then came before the House of Lords, and
there even if the case were not up to that time overruled it
was open to the House of Lords to do so. The report of the

C. A.

1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Lord Sterndale
M.R.

---

(1) 22 Q. B. D. 702, post, p. 187n.     (4) [1904] 2 Ch. 435.
(2) [1906] A. C. 305.                   (5) [1904] 2 Ch. 419, 438, 439, 440.
(3) [1904] 2 Ch. 443n.                  (6) [1904] 2 Ch. 419, 441, 442.

C. A.
1922
CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON CO.

Lord Sterndale
M.R.
—

argument in the Law Reports is so scanty that the nature of
the allusion to *Consett Waterworks Co.* v. *Ritson* (1) does not
appear, and that in the Law Journal (2) is worse, for there
is no report of the argument at all, but from the report in
the Law Times (3) it does appear that the House was directly
asked to say that the case could not stand with the later
decisions and so to overrule it. In my opinion the House
did not do so. It is true that Lord Macnaghten stated that
the case could no longer be considered an authority, and I
think he meant to say it was wrong, and not only that it was
not an authority in a similar but not the same case, but the
noble and learned Lord was only one of five members of the
House then sitting. In spite of the direct appeal to the
House to overrule the case two of the noble and learned
Lords, Lord Loreburn and Lord Davey, did not mention it
at all, Lord Atkinson considered it with great care and dis-
tinguished it from the case then before the House on
grounds similar to but more detailed than those mentioned
in the Court of Appeal by Vaughan Williams L.J., and Lord
Robertson expressed his agreement with the opinion of Lord
Loreburn and Lord Atkinson. Lord Loreburn, as I have
pointed out, did not mention the case, but Lord Robertson
expressed his agreement with the opinion of Lord Atkinson
who distinguished and not with that of Lord Macnaghten
who considered it no longer as of authority. It seems to
me that both the Court of Appeal and the House of Lords
though expressly asked to treat the case as overruled
declined to do so or at any rate treated it as distin-
guishable, and in the position I have before mentioned
of a decision founded on wrong reasoning but not overruled
on its particular facts. If this be the right conclusion then
as we have here to deal with the same facts and the same
Act I think we must follow the decision however discredited
in its reasoning, and that on this ground the appeal should
be allowed.

I have already expressed a hope that this may not be too

(1) 22 Q. B. D. 702, post, p. 187n.    (2) 75 L. J. (Ch.) 541.
(3) 94 L. T. 795.

narrow a view ; if it be I am glad to know it can easily be corrected, and I hope that the true position of *Consett Water-works Co.* v. *Ritson* (1) may be settled, for its present position is certainly a difficult one for Courts of a jurisdiction inferior to the House of Lords.

The appeal must be allowed with costs here and below, and judgment given for the defendants.

C. A.

1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

WARRINGTON L.J. In the year 1773 an Act was passed for the enclosure of a large area of common land in the coal district of the county of Durham known as Lanchester Common. Lanchester Common was part of a common whereof the Bishop of Durham was the lord and in him, prior to the passing of the Act and the award thereunder, were vested the soil of the common and the mines and minerals therein and thereunder and he had full power to work the same even so as to cause damage to the surface by subsidence provided only he left sufficient common of pasture for the use of the commoners. The Act reserved to the Bishop and his executors and his or their lessees and assigns the mines and minerals and quarries in and under the common and conferred upon them in general words of the fullest possible nature powers of searching for winning and working such mines and minerals and quarries and doing in or under the surface things necessary for or incidental thereto, " as fully and freely as he or they might or could have had held used and enjoyed the same in case this Act had not been made and that without paying any damages or making any satisfaction for so doing". The Act also provided compensation (the particular nature of which I need not mention for the purpose of this preliminary statement) for the " great inconveniences and damage " which the Act states may happen and be done, " to particular persons by reason of searching for winning and working the said mines and quarries within and under their respective allotments."

The plaintiffs are the present owners of a portion of the common allotted to their predecessors by the award made

(1) 22 Q. B. D. 702, post, p. 187n.

172                    CHANCERY DIVISION.                [1922]

C. A.
1922
CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON CO.

Warrington L.J.

under the authority of the Act. The defendants are lessees under the Ecclesiastical Commissioners, the successors of the Bishop of Durham of the mines of coal under the plaintiffs' land and lands adjacent thereto.

The plaintiffs complain that they have suffered damage through the subsidence of the surface of their land occasioned by the underground workings of the defendants, and they claim damages and an injunction restraining the defendants from further working so as to cause subsidence.

The defendants contend that according to the true construction of the Act of 1773 the holders of allotments never acquired the right of support as against the lord of the manor as the owner of the minerals under the common, and accordingly that they and their predecessors always have been, and are now, entitled so to exercise their powers of working the mines as to cause subsidence of the surface.

The identical question for determination in the present case was raised and determined by the Court of Appeal in favour of the successors of the lords of the manor in *Consett Waterworks Co.* v. *Ritson* (1), in the year 1889. Except that the surface and mineral owners respectively were not the same, all the material facts were identical with those in the present case, and the Act of Parliament, the construction of which was in issue, was the Act of 1773—the Act the construction of which is in issue here. In saying that all the material facts in the two cases are identical I am not forgetting that the defendants set up the case that there was a special custom or practice in the neighbourhood at the date of the Act justifying working in such a manner as to injure the surface by subsidence, but I agree with the learned judge that this case was not established. Even if it had been, the additional fact would have been favourable to the defendants and would not affect the question of the effect of the decision in *Consett Waterworks Co.* v. *Ritson.* (1) Prima facie it would be the duty of the judge of first instance and of this Court to follow the decision of the Court of Appeal in the previous case leaving to the higher tribunal to say,

(1) 22 Q. B. D. 702, post, p. 187n.

**2 Ch.**          CHANCERY DIVISION.                    **173**

if they should be so advised, that that decision was incorrect.
But it is contended by the plaintiffs, and Peterson J. has
accepted their contention, that the House of Lords has
already overruled, not expressly but as the necessary result
of their action, the decision in *Consett Waterworks Co.* v.
*Ritson* (1) by their own decision in the *Butterknowle Colliery
Co.* v. *Bishop Auckland, &c., Co.* (2)

The first question, therefore, is, in my opinion, whether
this Court ought to treat the decision in *Consett Waterworks
Co.* v. *Ritson* (1) as having been overruled, and therefore not
binding upon them, and it would only be after answering
that question in the affirmative that they would be entitled
to determine for themselves the question raised in the
present action.  It must, I think, be conceded that a decision
of an inferior Court may be treated as having been overruled
by a decision of a superior Court with which it is shown to be
inconsistent although it is not expressly so stated by those
who concur in such decision.  But it is the decision of the
Court, not the dicta of individual members unless they be
essential to the ratio decidendi, which has to be considered in
determining such a question.  Lord Campbell in advising
the House in *Attorney-General* v. *Dean and Canons of
Windsor* (3) makes the following observations on the cognate
question as to the binding nature on the House itself of its
decisions : " Its decisions are authoritative and conclusive
declarations of the existing state of the law, and are binding
upon itself when sitting judicially, as much as upon all
inferior tribunals.  The observations made by members of
the House .... beyond the ratio decidendi which is propounded
and acted upon in giving judgment, although they may be
entitled to respect, are only to be followed in as far as they
may be considered agreeable to sound reason and to prior
authorities."  In *Blackett* v. *Bradley* (4) Cockburn C.J. in
answer to the contention that a previous decision of the Court
of Queen's Bench in *Hilton* v. *Lord Granville* (5) must be

C. A.

1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Warrington L.J.

(1) 22 Q. B. D. 702, post, p. 187n.      (3) 8 H. L. C. 369, 391.
(2) [1906] A. C. 305.                    (4) 1 B. & S. 940, 954.
                    (5) 5 Q. B. 701.

**174**                           CHANCERY DIVISION.                    **[1922]**

C. A.

1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Warrington L.J.

considered as virtually overruled said : "There can be no doubt that to some extent the authority of *Hilton* v. *Lord Granville* (1) has been shaken, inasmuch as a position assumed in the reasoning of the Court as one of the grounds of its decision has since been distinctly overruled in the House of Lords in the case of *Rowbotham* v. *Wilson* (2) in which the question presented itself for adjudication. And it cannot be denied that the decision itself has not met with the universal approval of the profession ; and that it may be desirable that the validity of that decision should be brought under the consideration of a court of error. At the same time it is equally clear that, though the reasoning of this Court in *Hilton* v. *Lord Granville* (1) has been impugned, the decision in that case has not been overruled." The Court then gave judgment following *Hilton* v. *Lord Granville* (1) and expressing no opinion of their own one way or the other. The conclusion I draw is that in order that a case may be treated as overruled one must find either a decision of a superior Court inconsistent with that arrived at in the case in question, or an expression of opinion on the part of that Court as a whole that such case was wrongly decided on its own facts and not merely that it ought not to be treated as an authority in a case arising out of different facts.

The decision said to be overruled in the present case is a decision on the true construction of a particular Act of Parliament—the Lanchester Inclosure Act of 1773. The decision by which it is said to have been overruled is one on the true construction of another Act of Parliament—the Hamsterley Inclosure Act of the 31 Geo. 2. The provisions of the two Acts are not identical in their terms, and there is I think no question that those of the Act of Geo. 2, especially those relating to compensation for damage, were more favourable to the existence of the right to support than those of the Act of 1773. At first sight it is difficult to see how a decision on the true construction of one Act can be said to have overruled a decision on the true construction of another Act materially different in its

(1) 5 Q. B. 701.                    (2) 8 H. L. C. 348

**2 Ch.**                    CHANCERY DIVISION.                    175

C. A.

1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON Co.

Warrington L.J.

terms. The two decisions as decisions might well stand together for the reason indicated in the previous sentence. But it is necessary to consider the question a little more closely inasmuch as it is contended that there are certain principles of construction laid down by the House of Lords as applicable to all Acts of Parliament of the particular class and that these principles have been misunderstood or misapplied by the learned judges who decided the case in question. The decision was that of the Court of Appeal consisting of Lord Esher, and Lindley and Lopes L.JJ. It was given in the year 1889. The authority most strongly relied upon by the then plaintiffs as laying down principles applicable to the case before the Court was *Love* v. *Bell* (1) and particularly the speech of Lord Selborne in that case. I think it is clear that the learned judges in the Court of Appeal realized the general nature of the views as to the construction of such Acts of Parliament expressed by Lord Selborne and adopted by the House and intended to act upon them. Their decision was plainly not inconsistent with the decision in *Love* v. *Bell* (1), for the Act there in question but that it was also an Inclosure Act, was in its terms infinitely more favourable to the contention of the allottees than the Act of 1773. Lindley L.J. was a party to the decision, *Bell* v. *Love* (2), which was affirmed in the House of Lords, and his reasons consistent with the principles laid down in the House of Lords are clearly stated in his judgment. (3) I think the principle of construction may be summed up in this, that in an Inclosure Act the reservation of mines with wide general powers of working will not confer on the owner of the mines the right to let down the surface unless the intention to confer such right appears by express terms or by necessary implication. In *Love* v. *Bell* (1) the Court came to the conclusion that the lord had not made out his right under the Act then in question ; in *Consett Waterworks Co.* v. *Ritson* (4) the Court of Appeal on another Act of Parliament came to the opposite conclusion. I am clearly of opinion so

(1) 9 App. Cas. 286.                    (3) 10 Q. B. D. 568, 569.
(2) (1883) 10 Q. B. D. 547.            (4) 22 Q. B. D. 702, post, p. 187n.

C. A.

1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Warrington L.J.

far if nothing else had happened this Court would be bound to follow *Ritson's Case* (1), leaving it to the House of Lords to say whether the decision was correct or not.

But it is contended that the House of Lords have already in effect said that it is incorrect by their decisions in two cases, first the *New Sharlston Collieries Co.* v. *Earl of Westmorland* (2), and secondly, *Butterknowle Colliery Co.* v. *Bishop Auckland, &c., Co.* (3)  I think it is really only necessary to consider the second of these two cases, for if that did not override *Consett Waterworks Co.* v. *Ritson* (1) the other certainly did not.  In the first place the two decisions as such are not inconsistent with each other owing to the differences in the provisions of the two Acts of Parliament. Did then the noble Lords who took part in the decision of the later case or a majority of them expressly or by implication express the view that the decision in the earlier case was incorrect on its own facts ?  I think not.  The decision had been criticised adversely in the Court of first instance and in the Court of Appeal and was relied upon in the House of Lords, the Act of 1773 and the judgments of the Court of Appeal being included in the appendix.  The noble Lords who took part in the decision were Lords Loreburn, Macnaghten, Davey, Atkinson and Robertson.  Lord Loreburn makes no reference to the case in question nor does Lord Davey, who however does say that the cases run very fine, and that the question for decision must ultimately depend on the proper construction of the words of the statute.  Lord Macnaghten does observe in passing that in his opinion the case in question can no longer be regarded as an authority. He does not say that it was wrongly decided on its own facts but I will assume that this is what he meant.  Lord Robertson said he had read the judgments of Lord Loreburn and Lord Atkinson and agreed with them.  He had apparently not read Lord Macnaghten's.  Lord Atkinson took the trouble to distinguish *Consett Waterworks Co.* v. *Ritson* (1) from the case before the House first in respect of the words of the clause

(1) 22 Q. B. D. 702, post, p. 187n.        (2) [1904] 2 Ch. 443n.
(3) [1906] A. C. 305.

**2 Ch.**              CHANCERY DIVISION.                    **177**

reserving the rights of the Lords as to working coal, and
secondly in respect of the provisions as to compensation.
It cannot in my opinion be said that this learned Lord said
that the case in question must be treated as overruled. The
result is that one member of the House may be said to have
treated the case as overruled, two treated it as dis-
tinguishable, and two did not refer to it. Under these
circumstances Peterson J. was not, in my opinion, justified,
nor would this Court be justified, in refusing to follow the
decision in *Consett Waterworks Co.* v. *Ritson* (1), but should
leave it to the superior Court to overrule if they think fit.
Following then this case and expressing no opinion as to its
correctness or the reverse I think the present appeal ought
to be allowed and judgment entered for the defendants with
costs here and below.

C. A.
1922
CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.
Warrington L.J.

YOUNGER L.J. The Master of the Rolls and the Lord
Justice have stated in detail the considerations which have
led them to the conclusion that the decision of this Court in
*Ritson's Case* (1) should have been in the present litigation
treated by the learned judge, and must be regarded by us,
as an authority to be accepted and applied without further
question. I am entirely of the same opinion and for the
same reasons. In my judgment *Ritson's Case* (1) has, in no
sense relevant for present purposes, been overruled by any
Court competent to overrule it. In this connection the
words of Lord Westbury in *Hills* v. *Evans* (2) may be recalled.
"I cannot too often repeat," he there says, "that what is
said by a noble and learned Lord in moving the judgment
of the House of Lords, does not by any necessity enter into
the judgment of that House." The judgment of my Lord
just delivered indicates the relevance of that observation of
Lord Westbury's as applied to the judicial history of
*Ritson's Case.* (1) It may indeed even be true that no
individual judge who has subsequently canvassed or dis-
tinguished that case, has so far committed himself as to
declare that the decision as a decision on the terms of its own

(1) 22 Q. B. D. 702, post, p. 187n.      (2) (1862) 31 L. J. (Ch.) 457, 461.

178                    CHANCERY DIVISION.                [1922]

C. A.
1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON CO.

Younger L.J.

statute, was wrong, and the very searching and detailed examination of the provisions of that statute which has been made before us—an advantage which I feel sure no other Court since *Ritson's Case* (1) has yet enjoyed—has at least served to show how perilous such a declaration would have been, had it, in a case under another statute been hazarded. It is, however, enough now to say, that no authoritative deliverance upon *Ritson's Case* (1) propounded since that decision was given justifies us in denying to it in this Court full effect, and especially so in an appeal which raises, as this appeal does, the same issue under the same statute and raises it in circumstances and supported by evidence certainly not less favourable to the conclusion reached in *Ritson's Case* (1) than were the circumstances under the consideration of the Court there. I need put it no higher than that. We are, in my judgment, in duty bound to treat that decision as an authority conclusive of the present appeal in this Court, whatever we ourselves might think of it. And there I would be content to stop but for one thing. As a result of the very careful examination of the Act of 1773 undertaken before us there have been brought into prominence certain provisions of that statute, which in the light of the *Butterknowle Case* (2) itself may, as it seems to me, go far of themselves to justify the conclusion reached in *Ritson's Case* (1), although they in no way entered into the reasoning on which that conclusion was based. I refer to the set of provisions—not paralleled or reproduced in any other Inclosure Act to which our attention was directed—relating to what in the statute are referred to as the less improvable parts of the moors or commons thereby intended to be divided, set out and allotted. The provisions of the Act with reference to these are in striking contrast to its provisions with reference to the so-called residue or more improvable parts of the same moors or commons, but while this is so it will be found that the section of the Act reserving the mines to the Bishop and the right to work them in the extremely wide terms which are referred to in the judgment of the learned judge apply equally

(1) 22 Q. B. D. 702, post, p. 187n.          (2) [1906] A. C. 305.

to the mines lying under the less improvable parts of the said moors or commons and to those lying under the more improvable parts, and the question which I desire still to consider is whether in view of the application of that section to the mines under the less improvable parts of the moors or commons an inconsistency would not at once be created if there were introduced into it a clause to the effect that these mines must nevertheless be worked so as not to let down the surface. In so phrasing the question I am of course referring to that which the learned judge describes in his judgment as Lord Loreburn's test in the *Butterknowle Case.* (1) It is convenient to quote the Lord Chancellor's exact words. They are these (2) : " If the introduction of a clause to the effect that the mines must be worked so as not to let down the surface would not create an inconsistency with the actual clauses of the instrument, then it means that the surface cannot be let down." Lord Loreburn, of course, intends to lay it down that the converse also is true. If such an introduction would create such an inconsistency then it means that the surface may be let down. Would the introduction of such a clause create that inconsistency in the present case, having regard to the special position of the surface of the less improvable parts as left by the Act. That is the question I now desire to consider.

The statute in the first paragraph of its preamble states that the large moors, commons or tracts of waste land within and parcel of the parish and manor of Lanchester contain together by estimation 20,000 acres or thereabouts, and then goes on to recite that the Bishop of Durham in right of his Church and See of Durham is lord of the manor of Lanchester and as such is seised of or entitled to the soil of and royalties within and under the moors, commons or tracts of waste lands. The statute then gives the names of the owners of hereditaments within the manor who with others not named in respect of or as appendant appurtenant or belonging to their said hereditaments are entitled " to have and enjoy right of

C. A.

1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Younger L.J.

(1) [1906] A. C. 305.                (2) Ibid. 309.

**180**                    **CHANCERY DIVISION.**                    **[1922]**

C. A.
1922
CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON Co.

Younger L.J.

common in upon and throughout *all* the said moors, commons or tracts of waste land." There is then a recital that the said moors, commons or tracts of waste land in their present state are of little use or service but that considerable parts thereof are capable of cultivation and improvement and that it would be of advantage to the Bishop and to the several persons entitled to the right of common aforesaid to have " the said moors commons or tracts of waste land divided and inclosed, and specific shares thereof allotted to them according to their several rights and interests therein." The preamble to the statute it will be observed while stating that considerable parts only of the moors commons or tracts of waste land are capable of cultivation and improvement foreshadows the division and inclosure and allotment of the whole of them, and the first operative section accordingly in terms provides that " All the moors or commons lying within and being part and parcel of the said parish and manor of Lanchester shall be divided set out and allotted by the Commissioners " thereby appointed " unto and amongst or for the benefit of the several persons having right of common thereon."

The distinction between the less and the more improvable parts of the moors and commons is first indicated in s. 19. By that section the Commissioners are required on or before May 12, 1775, or so soon after as conveniently may be in the first place to " set off ascertain and appoint such part or parts of the said moors or commons as shall " in their judgment " appear to be little capable of cultivation and improvement (so as the residue thereof to be divided allotted and inclosed by virtue of this Act shall not be less than 12,000 acres) which shall be divided and allotted and shall or may be accepted and enclosed upon such conditions as are hereinafter mentioned."

The details of that division and allotment of that residue—that is to say, of the more improvable parts of the moors or commons—are then prescribed, a rent of 4*d.* per acre being immediately made payable annually to the Bishop in respect thereof.

The directions as to the allotment of the less improvable
parts of the moors or commons are contained in a later
section of the Act, s. 50.  By that section the Commissioners
after they have set off ascertained and appointed such part
or parts of the said moors or commons as shall in their judg-
ment be little capable of cultivation and before they have
prepared and made their general award are directed and
empowered to set out mark ascertain divide and allot the
same by proper stakes metes and land marks unto and
amongst the Bishop and the several other persons having right
of common upon the said moors or commons according to the
rents or values of their respective estates having rights of
common thereon in the same manner as had been prescribed
with reference to the more improvable parts of the moors or
commons and all such allotments are in like manner to be
specified in the Commissioners' general award and in the
plan to be made and annexed thereto.  But with reference
to these allotments the allottees are at liberty to accept and
inclose their allotments at any time within twenty years next
after the date and execution of the Commissioners' general
award, they are under no obligation to accept them at all ;
from the date of acceptance only is any rent in respect of an
allotment payable to the Bishop ; and all such allotments
are until acceptance and inclosure, and after the expiration
of the said term of twenty years all such parts thereof as shall
then remain unaccepted and uninclosed are for ever there-
after to " be deemed and adjudged to be part and parcel
of the said moors and commons in their original state and as
such shall or may be used and enjoyed by the several persons
who are now entitled to right of common thereon . . . .
anything hereinbefore contained to the contrary notwith-
standing."  The compensation clause, s. 48, is also illuminating
in the present connection.  That section recites the incon-
venience and damage that may be done to particular persons
" by reason of . . . . working the said mines and quarries
within and under their respective allotments not only of the
more improvable parts of the said moors or commons,
but also of the less improvable parts thereof, after the same

C. A.

1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON CO.

Younger L.J.

182                        CHANCERY DIVISION.              [1922]

C. A.
1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON CO.

Younger L.J.

may be accepted and inclosed by virtue of this Act as hereinafter is directed and provided," but not before, and then proceeds to provide compensation for these persons. The directions for the preparation and as to the content of the general award and plan are given in s. 34 of the statute and those for its execution and deposit are contained in s. 35, and by s. 36 it is provided that from and immediately after its execution and deposit the award and plan and all matters and things therein contained shall be final and conclusive and " that all rights of common upon the more improvable parts of the said moors or commons which are so to be divided allotted and inclosed shall from thenceforth cease and be for ever extinguished, and that from and immediately after the accepting and inclosing of any allotment or allotments of the less improvable parts of the said moors or commons or of any part thereof according to the conditions and directions hereinafter prescribed and mentioned all right of common upon the grounds so accepted and inclosed shall cease and for ever be extinguished."

It is with reference to lands in the position just set forth that the powers reserved to the Bishop by s. 45 must be read inasmuch as that section relates to his mines and the working of his mines " lying and being within or under the said moors or commons intended to be allotted as aforesaid " —that is to say, to all his mines lying and being there ; including it may be even the Roughside, Charlaw and Findon Hill Commons, notwithstanding the provision of s. 22 that the surface of these is not to be allotted by the Commissioners. I assume however in what follows that this section does not deal directly with these commons. It is safer so to do. Now there are some things about this section which are not, I think, open to serious doubt. First : Its provisions are amply extensive enough so far as the reasonable construction of language is concerned to include a power in the lord in the course of working his mines to let down the surface. In any instrument other than an Inclosure Act the language used would be sufficient for that purpose. The contrary was not, I think, seriously contested by Mr. Tomlin,

and *Beard* v. *Moira Colliery Co.* (1) is an authority in favour
of that view. Secondly : The rights reserved to or conferred
upon the lord by that section are reserved or conferred in
respect of all his manorial minerals ; these rights are equally
extensive with regard to all of them and with reference to
interference with all the surface above them ; they are
reserved as from the passing of the Act ; their compre-
hensiveness at the beginning continues thereafter unabridged
and unchanged. That which at the passing of the Act the
lord may do anywhere with reference to the working of his
minerals and the effect thereof on the surface he may do
for all time and he may do it everywhere. The section, so
far as language can make it so, is on this quite clear. But
the section extends to and includes mines and the working
of mines lying it may be under, according to the statement
in the Act, of as many as 8000 acres out of the 20,000 acres
included in it, with respect to the surface of which 8000 acres
no allotment need have had any effect for twenty years ;
indeed no allotment need ever have been effective at all.
With respect to all that surface the then existing right of
common might not have been extinguished for twenty years ;
indeed it might never have been extinguished at any time.
Further with reference to that same 8000 acres the Bishop
might not for twenty years, or he might never receive any
rent at all ; and with reference to them before they are
accepted there is no provision made for surface damage.
They are so far excluded from the provision which is made.

Now why is it that as shown by the authorities the words
of this section authorizing the Bishop and his successor to
work the minerals and enjoy the property " as fully and freely
as he or they might or could have had held used and enjoyed
the same in case this Act had not been made " have attributed
to them a restricted meaning when they are found in an
Inclosure Act. An examination of the authorities will, I
think, show—the matter is very succinctly dealt with in the
judgment of this Court in *Beard* v. *Moira Colliery Co.* (1)—
that that rule of construction so far as it exists rests upon the

C. A.

1922

Consett
Industrial
and
Provident
Society
*v.*
Consett
Iron Co.

Younger L.J.

(1) [1915] 1 Ch. 257, 267, 268.

*O* 2                                1

184                    CHANCERY DIVISION.                    [1922]

C. A.

1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON CO.

Younger L.J.

necessity of recognizing, if possible, the change in the commoners' interest effected by the inclosure, a view propounded possibly for the first time with distinctness by Lord Selborne in *Love* v. *Bell* (1), but applied since in many cases. There is, so far as I am aware, however, no authority—none certainly was quoted to us—for adopting that restricted construction in the case of powers as wide as are the powers here either where no such change has taken place, or in respect of a period where the surface rights enjoyed before the Act remain unaltered by the Act, and this observation brings me to the point which I desire to stress. Here we have a case in which 8000 acres out of 20,000 acres of surface under which the minerals lie might never have been enclosed at all : the rights of common over them might never have been extinguished. The existing right of the lord, if the Act had not passed, to let down the surface in the course of working the minerals under these 8000 acres, a sufficiency of pasture being left to the commoners, is conceded. Words amply sufficient to permit the continuance of such working are found in the Act. No change of interest in respect of that surface is necessarily effected by the Act. Any change if effected at all might be effected after an interval of as long as twenty years. Yet the rights in respect of the working .of the minerals and the interference with the surface reserved by s. 45 are the same, neither more nor less, both with reference to these 8000 acres and with reference to the 12,000 acres ; no distinction whatever is drawn between the two ; and what these rights were at the beginning they were to remain to the end. From that point of view does it not follow, paraphrasing the words with which I commenced this inquiry, that the introduction into s. 45 of a clause to the effect that the mines must not be worked so as to let down the surface would create, first of all, an immediate inconsistency with the words of the Act so far as the rights of the lord in respect of the working of the minerals under the 8000 acres are concerned ; and this done, does it not follow, on the frame of the clause itself, which in no way

1) 9 App. Cas. 286, 291, 292.

distinguishes between the lord's rights of enjoyment and working at one time as contrasted with another or at one place as contrasted with another, that the whole reservation must be given its full effect in accordance with the actual sense of the words employed, and that the introduction of such a clause would produce an inconsistency with reference not only to a part but, in the result, with reference to the whole of the surface?

Even in cases under Inclosure Acts, as Lord Davey observed in the *Butterknowle Case* (1): " the question for our decision must ultimately depend on the proper construction of the words of the statute." Lord Macnaghten in the same case observed (2) that the rule of construction adopted in *Love* v. *Bell* (3) had led the House to treat the words I have quoted as a dead letter for any practical purpose although these words would seem at first sight to be the keynote of the section. May it not be for the reason I have suggested that on the construction of this particular Act it is permissible and, if permissible, incumbent upon us to attribute to these words their natural signification? It will not be forgotten that to such cases as *Duke of Buccleuch* v. *Wakefield* (4) there attaches, in Lord Westbury's words, " that irreversible and unchangeable quality that belongs to a decision of the House of Lords " (*Hills* v. *Evans* (5)) just as much as the same quality attaches to such cases as *Love* v. *Bell.* (3) To quote Lord Davey again (1): " No doubt there is some difficulty in reconciling *Duke of Buccleuch* v. *Wakefield* (4) and *Love* v. *Bell* (3); but the words of the Acts in question are not the same, and Lord Selborne in the latter case was able to distinguish them." *Duke of Buccleuch* v. *Wakefield* (4) may once again become, for the purposes of this case, the governing authority if once it is established, as I suggest it may be, that what Lord Macnaghten (6) described as the refined and subtle distinctions which the noble and learned Lords who decided

C. A.

1922

Consett
Industrial
and
Provident
Society
*v.*
Consett
Iron Co.

Younger L.J.

(1) [1906] A. C. 305, 316.
(2) Ibid. 313, 314.
(3) 9 App. Cas. 286.

(4) L. R. 4 H. L. 377.
(5) 31 L. J. (Ch.) 457, 462.
(6) [1906] A. C. 305, 314.

186                    CHANCERY DIVISION.              [1922]

C. A.

1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
v.
CONSETT
IRON CO.

Younger L.J.

*Love* v. *Bell* (1) found between the *Duke of Buccleuch's Case* (2) and the case before them, cannot be applied to the present statute. The learned judge, treating *Ritson's Case* (3) as overruled, decided here in favour of the plaintiffs on the ground that this case was governed by the *Butterknowle Case* (4) notwithstanding the marked differences between the statutes in question in the two cases, differences to which attention was directed by Lord Atkinson in the *Butterknowle Case* (5) and in more detail by the learned judge himself. In other words he further extended the principle of the *Butterknowle Case* (5), accepting, I opine, the argument addressed to us by Mr. Tomlin in support of his judgment that in arriving at the meaning of an Inclosure Act with reference to any question of support for the surface ordinary principles of construction applicable to any other case go by the board. I have the gravest doubts whether, on any view of this case, it was permissible so to extend that principle. *Butterley Co.* v. *New Hucknall Colliery Co.* (6) seems to me to show that in the opinion of the House of Lords the *Butterknowle Case* (5) registered the limit in favour of the surface owner. That limit is not lightly to be extended. I rather suspect that if anything the inevitable reaction has set in. Be that as it may however, if that limit can only be extended to cover the present case by the application of such principles of construction as Mr. Tomlin contended for, then that step should only, I think, be taken by the House of Lords itself, and I cannot myself think of any Inclosure Act with reference to which the House of Lords could have a better opportunity of finally attempting once for all to settle this great controversy, so serious to the many interests concerned while it continues to rage, than the present statute now canvassed in a litigation in which all the surrounding circumstances at the date of its passing have been so carefully collected in evidence.

To sum up the whole matter. The learned judge decided

(1) 9 App. Cas. 286.                    (4) [1906] A. C. 305, 316.
(2) L. R. 4 H. L. 377.                  (5) [1906] A. C. 305.
(3) 22 Q. B. D. 702, post, p. 187n.     (6) [1910] A. C. 381.

this case in favour of the plaintiffs; because in his view the defendants here were defeated by the application of the principles laid down in the *Butterknowle Case*. (1) These observations of mine have been directed to show that the appellants here might well succeed by the application to the present statute of the very test set by Lord Loreburn in that case.

In my view the conclusion upon this case at which this Court has felt impelled to arrive deferring to authority binding upon it, might quite well have been reached on the construction of the Act itself apart altogether from the decision by which we are bound.

In my judgment this appeal should be allowed.

*Appeal allowed.*

Solicitor for plaintiffs: *Rider, Heaton, Meredith & Mills, for G. W. Jennings & Son, Bishop Auckland.*

Solicitors for defendants: *Rawle Johnstone & Co., for Cooper & Goodger, Newcastle-upon-Tyne.*

W. I. C.

*Margin notes:*
C. A.
1922

CONSETT
INDUSTRIAL
AND
PROVIDENT
SOCIETY
*v.*
CONSETT
IRON CO.

Younger L.J.

---

### NOTE.

#### [IN THE COURT OF APPEAL.]

#### CONSETT WATERWORKS COMPANY *v.* RITSON.

The material facts in this case are stated in the reports of the case in 22 Q. B. D., pp. 318 and 702. The following are the judgments which were delivered by the Court of Appeal (Lord Esher M.R., Lindley and Lopes L.JJ.), and are taken from the transcript of a shorthand note of those judgments printed in the Appendix to the Appeal to the House of Lords in the *Butterknowle Case*. (1)

LORD ESHER M.R.  In this case the real question is whether the waterworks company is entitled to recover damages in respect of the surface of the land on which they built their reservoir having been let down by reason of the working of the mines underneath that surface or underneath the reservoir? Now, the land in question at one time belonged absolutely and in every respect to the Bishop of Durham, both as lord of the manor and as owner of the manor, subject only to a right of common on the part of certain commoners. At that time therefore the Bishop's rights, it is not denied,

(1) [1906] A. C. 305.

TAB 17

*Countrywide Banking Corporation Ltd v Dean* [1998] AC 338,
Privy Council on appeal from the Court of Appeal of New Zealand

it is impossible to say that Cussons was bound to succeed in removing No.   A
251537 and this point therefore fails. Their Lordships will therefore humbly
advise Her Majesty that the appeal should be dismissed. Cussons must pay
Unilever's costs before their Lordships' Board.

   *Solicitors: Bird & Bird; Eversheds.*

                                                              S. S.        B

                                    ————

                                                                          C

                           [PRIVY COUNCIL]

COUNTRYWIDE BANKING CORPORATION LTD.       .      Appellant
                           AND
BRIAN NORMAN DEAN      .      .      .      .      .      Respondent    D

        [APPEAL FROM THE COURT OF APPEAL OF NEW ZEALAND]

1997   Oct. 20;              Lord Browne-Wilkinson, Lord Slynn of Hadley,
       Nov. 24                    Lord Hoffmann, Lord Hutton and Gault J.

                                                                          E
        *New Zealand—Insolvency—Transaction having preferential effect—*
        *Company paying arrears due under lease to lessor—Whether*
        *transaction "in the ordinary course of business"—Whether voidable—*
        *Companies Act 1955 (No. 63 of 1955, as amended), ss. 266(2)(3),*
        *268(1)(2)*

              The lease by the applicant of retail space to a company
        provided for assignment by the company with the applicant's   F
        consent, and as a condition precedent to the giving of consent the
        applicant was entitled to require payment by the company of all
        rent and other moneys due and payable under the lease. The
        company fell into arrears. It agreed to sell its business including
        the lease and, on the basis that the sums due under the lease
        would be paid out of the proceeds of sale, at the company's
        request the applicant agreed not to issue proceedings against the   G
        company to recover the outstanding amount. The company made
        that payment to the applicant, although the company was unable
        to pay its due debts at that time, thereby enabling the applicant to
        receive more towards the satisfaction of its debt than it would
        have been likely to receive in the company's liquidation. Soon
        afterwards the company was put into liquidation. The liquidator,
        considering the payment to be voidable under section 266(2) of
        the Companies Act 1955,[1] filed a notice under section 268(1) that   H
        he wished to have the transaction set aside and the amount

____
[1] Companies Act 1955, as amended, s. 266: see post, pp. 342D–343B.
S. 268(1)(2): see post, p. 343C–D.

A    repaid. The applicant applied to the High Court of New Zealand under section 268(2) for an order that the transaction should not be set aside on the ground that it had taken place in the ordinary course of business. Unchallenged evidence in support of the application showed that the virtually invariable practice of landlords was to require all outstanding amounts under a lease to be paid as a condition of consent to assignment of the lease, and that where a tenant of commercial premises was unable to meet

B    payments under a lease as they fell due and the tenant's business was about to be sold it was usual for the landlord to receive all such payments from the proceeds of sale. The judge dismissed the application, holding that the payment had not been made in the ordinary course of business since it had been, to the applicant's knowledge, dependent on the cessation of the company's business. The Court of Appeal of New Zealand dismissed the applicant's

C    appeal, holding that the payment was of long accrued arrears and was the largest sum paid by the company to the applicant at any one time, and so it had not been made in the ordinary course of business.

On the applicant's appeal to the Judicial Committee:—

*Held*, dismissing the appeal, that it was not necessary to adopt a particular formulation or comprehensive statement of the criteria for determining whether a transaction had taken place in the

D    ordinary course of business for the purposes of section 266 of the Act of 1955; that the transaction had to be examined in its factual setting, excluding the company's intent or purpose save as required by section 266(4), and the determination made objectively by reference to the standard of what constituted the ordinary course of business having regard to business practices in the commercial world in general in relation to the ordinary operational activities of businesses as going concerns; that the past practices of the

E    particular company and its dealings with the particular creditor were also relevant considerations; that the actual circumstances had to be assessed and, although the payment of sums owed under a lease in order to secure a lessor's consent to an assignment of the lessee's interest might be within the ordinary course of business in certain circumstances, since on the evidence the payment included long-standing arrears and had been made when

F    to the knowledge of the applicant it was part of the transaction whereby the company was disposing of its business the courts below had been entitled to conclude that it had not been made in the ordinary course of business; and that, accordingly, the applicant had failed to rebut the presumption in section 266(3)(*b*) and the transaction was therefore voidable under section 266(2) and would be set aside (post, pp. 349A–B, D–H, 350A–C).

*Rust v. Cooper* (1777) 2 Cowp. 629 and *Tomkins v. Saffery*

G    (1877) 3 App.Cas. 213, H.L.(E.) distinguished.

Decision of the Court of Appeal of New Zealand affirmed.

The following cases are referred to in the judgment of their Lordships:

*Burns v. McFarlane* (1940) 64 C.L.R. 108
*Downs Distributing Co. Pty. Ltd. v. Associated Blue Star Stores Pty. Ltd.*

H    (1948) 76 C.L.R. 463
*Julius Harper Ltd. v. F. W. Hagedorn & Sons Ltd.* [1991] 1 N.Z.L.R. 530
*Modern Terrazzo Ltd., In re* (unreported), 10 October 1997; High Court of New Zealand (Auckland Registry), No. M654 of 1995
*Reynold Bros. (Motors) Pty. Ltd. v. Esanda Ltd.* (1983) 8 A.C.L.R. 422

*Rust v. Cooper* (1777) 2 Cowp. 629                                                    A
*Taylor v. White* (1964) 110 C.L.R. 129
*Tomkins v. Saffery* (1877) 3 App.Cas. 213, H.L.(E.)

The following additional cases were cited in argument:

*Alderson v. Temple* (1768) 4 Burr. 2235
*Builders Hardware Co. Ltd. v. Steel* (unreported), 15 March 1995; High Court
    of New Zealand (Christchurch Registry), No. M386 of 1994                          B
*Ceres Orchard Partnership v. Fiatagri Australia Pty. Ltd.* [1995] 1 N.Z.L.R. 112
*Chilton Saint James School v. Gray* (unreported), 19 March 1996; High Court
    of New Zealand (Wellington Registry), C.P. No. 304 of 1995
*Katoa Pty. Ltd. v. Dartnall* (1983) 2 A.C.L.C. 42
*Robertson v. Grigg* (1932) 47 C.L.R. 257
*Taylor v. Australia and New Zealand Banking Group Ltd.* (1988) 6 A.C.L.C.
    808                                                                               C

APPEAL (No. 41 of 1997) with leave of the Court of Appeal of New
Zealand by the applicant, Countrywide Banking Corporation Ltd.,
from the judgment of the Court of Appeal of New Zealand (Thomas,
Keith and Neazor JJ.) given on 12 December 1996 dismissing the
applicant's appeal from the judgment of Cartwright J. delivered on
5 December 1995 in the High Court of New Zealand whereby she had      D
dismissed its application for an order that the transaction by which the
applicant had received $30,914·90 on 5 May 1995 from C. B. Sizzlers Ltd.
not be set aside in accordance with the notice filed by the company's
liquidator, Brian Norman Dean, the High Court having put the company
into liquidation on 1 June 1995.

The facts are stated in the judgment of their Lordships.                               E

*David Smith* (of the New Zealand Bar) for the applicant. The payment
was made by the company in the ordinary course of business within
section 266(2) of the Companies Act 1955, as amended, notwithstanding
that the company was unable to pay its debts at that time. The test to
apply to the transaction is objective. Intention or purpose is irrelevant.
The court should adopt an approach which is in accord with commercial     F
reality. The question was whether the transaction was one which a person
might undertake without having bankruptcy in view. The answer clearly
was in the affirmative. [Reference was made to *Alderson v. Temple* (1768) 4
Burr. 2235; *Rust v. Cooper* (1777) 2 Cowp. 629; *Tomkins v. Saffery* (1877)
3 App.Cas. 213; *Robertson v. Grigg* (1932) 47 C.L.R. 257; *Downs
Distributing Co. Pty. Ltd. v. Associated Blue Star Stores Pty. Ltd.* (1948) 76     G
C.L.R. 463; *Reynolds Bros. (Motors) Pty. Ltd. v. Esanda Ltd.* (1983)
8 A.C.L.R. 422; *Taylor v. White* (1964) 110 C.L.R. 129; *Taylor v. Australia
and New Zealand Banking Group Ltd.* (1988) 6 A.C.L.C. 808; *Katoa Pty.
Ltd. v. Dartnall* (1983) 2 A.C.L.C. 42; *Julius Harper Ltd. v. F. W. Hagedorn
& Sons Ltd.* [1991] 1 N.Z.L.R. 530; *Ceres Orchard Partnership v. Fiatagri
Australia Pty. Ltd.* [1995] 1 N.Z.L.R. 112; *Builders Hardware Co. Ltd. v.
Steel* (unreported), 15 March 1995; High Court of New Zealand     H
(Christchurch Registry), No. M386 of 1994; *Chilton Saint James School v.
Gray* (unreported), 19 March 1996; High Court of New Zealand
(Wellington Registry), C.P. No. 304 of 1995 and *In re Modern Terrazzo*

A.C.                    Countrywide Banking Corpn. Ltd. v. Dean (P.C.)

A   *Ltd.* (unreported), 10 October 1997; High Court of New Zealand
(Auckland Registry), No. M654 of 1995.]

*Jonathan Williams* (of the New Zealand Bar) for the liquidator.
Section 266 of the Companies Act 1955, as amended, is directed to the
effect of the transaction and not the debtor's intention. If a company
makes a preference payment when it is unable to pay its debts the
liquidator may avoid the transaction and recover the money, unless (section
B   266(2)) the recipient is able to prove that the payment was made in the
ordinary course of business: see *In re Modern Terrazzo Ltd.,* 10 October
1997.

The payment to the applicant did not accord with general commercial
practice. "Ordinary course of business" means the ordinary business
practice of the commercial world in general, and not a response to
C   abnormal financial difficulties. Whether a payment is made in the ordinary
course of business is a question of fact. As there have been concurrent
findings of fact, unless it is established that an incorrect test was applied
then the finding of fact should not be disturbed in accordance with
established practice.

D                                              *Cur. adv. vult.*

24 November. The judgment of their Lordships was delivered by
GAULT J.

This appeal raises the issue of the correct construction of the voidable
preference provisions of the New Zealand Companies Acts 1955 and 1993.

At the time of the enactment of the new Act of 1993, the earlier Act
E   of 1955, which continued to apply, was amended so that the same new
provisions governing company liquidations were introduced in both Acts.
In this case their Lordships are concerned with section 266 of the Act of
1955 as amended which is in identical terms to those in section 292 of the
Act of 1993.

The material facts can be stated briefly. The applicant, Countrywide
Banking Corporation Ltd., was the lessor under a lease dated 4 May 1993
F   by which C. B. Sizzlers Ltd. ("the company") occupied retail space in the
foodcourt complex in the Queen Street Countrywide Bank Centre at
Auckland. In addition to the base rent, the lessee was required to pay as
additional rent a percentage of the gross receipts of its business, a
percentage of the foodcourt operating expenses and a promotion levy also
based upon gross receipts.

G   The lease provided for payment of interest by the lessee on amounts in
arrear and unpaid and for the lessor's costs of recovery. There was also
provision for assignment of the lease by the lessee subject to the consent
of the lessor. Before giving consent the lessor was entitled to require
payment of all moneys due and payable under the lease.

The lessee company fell into arrears and in October 1994, by variation,
the rent was reduced with retrospective effect from 1 September 1993. The
H   rate of additional rent also was reduced. Still arrears increased and in
March 1995 the amount outstanding was N.Z.$18,766·86. The applicant
then instructed solicitors to recover that amount. Shortly after that
instruction was issued the applicant was made aware that the business of

Countrywide Banking Corpn. Ltd. v. Dean (P.C.)                    [1998]

the company was subject to a sale and purchase agreement. The sale    A
included the lease the assignment of which required the consent of the
applicant. At the request of the company's solicitors the applicant agreed
not to issue proceedings on the basis that all moneys due to it under the
lease would be paid out of the proceeds of sale. On 5 May 1995 the
applicant received from the solicitors acting for the company a payment of
$30,914·90 which is the subject of this appeal. That sum represented the
total of the amounts payable under the lease and unpaid to that date.    B

In the meantime, unknown to the applicant, another creditor had
served on the company on 28 March 1995 a statutory demand for payment
of other indebtedness and had applied on 4 May for an order that the
company be wound up. Such an order was made in the High Court at
Auckland on 1 June 1995. Under the 1993 law the liquidation commenced
on the appointment of the liquidator.    C

There were filed with the liquidator proof of debts totalling $63,715·43
in addition to which the National Bank was owed $15,375 under a
debenture. The balance of the proceeds of the sale of the business (there
were no other assets) were such that other creditors were likely to receive
nothing whereas the applicant had been paid in full.

The relevant sections of the Companies Act 1955, as amended, are:    D

"266. *Transactions having preferential effect.* (1) In this section
'transaction,' in relation to a company, means—(a) A conveyance or
transfer of property by the company: (b) The giving of a security or
charge over the property of the company: (c) The incurring of an
obligation by the company: (d) The acceptance by the company of
execution under a judicial proceeding: (e) The payment of money by
the company, including the payment of money under a judgment or    E
order of a court. (2) A transaction by a company is voidable on the
application of the liquidator if the transaction—(a) Was made (i) At
a time when the company was unable to pay its due debts; and
(ii) Within the specified period; and (b) Enabled another person to
receive more towards satisfaction of a debt than the person would
otherwise have received or be likely to have received in the
liquidation—unless the transaction took place in the ordinary course    F
of business. (3) Unless the contrary is proved, for the purposes of
subsection (2) of this section, a transaction that took place within the
restricted period is presumed to have been made—(a) At a time when
the company was unable to pay its debts; and (b) Otherwise than in
the ordinary course of business. (4) For the purposes of this section,
in determining whether a transaction took place in the ordinary    G
course of business, no account is to be taken of any intent or purpose
on the part of a company—(a) To enable another person to receive
more towards satisfaction of a debt than the person would otherwise
receive or be likely to receive in the liquidation; or (b) To reduce or
cancel the liability, whether in whole or in part, of another person in
respect of a debt incurred by the company; or (c) To contribute
towards the satisfaction of the liability, whether in whole or in part,    H
of another person in respect of a debt incurred by the company—unless
that person knew that that was the intent or purpose of the company.
(5) For the purposes of subsection (2)(a)(ii) of this section, 'specified

343

A.C.                    Countrywide Banking Corpn. Ltd. v. Dean (P.C.)

A    period' means—(a) The period of two years before the commencement
of the liquidation; and (b) In the case of a company that was put into
liquidation by the court, the period of two years before the making of
the application to the court together with the period commencing on
the date of the making of that application and ending on the date on
which the order was made. (6) For the purposes of subsection (3) of
this section, 'restricted period' means—(a) The period of six months
B    before the commencement of the liquidation; and (b) In the case of a
company that was put into liquidation by the court, the period of six
months before the making of the application to the court together
with the period commencing on the date of the making of that
application and ending on the date on which the order of the court
was made. . . .

C    "268. *Procedure for setting aside voidable transactions and charges.*
(1) A liquidator who wishes to have a transaction that is voidable
under section 266 of this Act or a charge that is voidable under
section 267 of this Act set aside must—(a) File in the court a notice
to that effect specifying the transaction or charge to be set aside and,
in the case of a transaction, the property or value which the liquidator
wishes to recover, and also the effect of subsections (2), (3), and (4)
D    of this section; and (b) Serve a copy of the notice on the other party
to the transaction or the grantee of the charge and on every other
person from whom the liquidator wishes to recover. (2) A person—
(a) Who would be affected by the setting aside of the transaction or
charge specified in the notice; and (b) Who considers that the
transaction or charge is not voidable—may apply to the court for an
order that the transaction or charge not to be set aside. (3) Unless a
E    person on whom the notice was served has applied to the court under
subsection (2) of this section, the transaction or charge is set aside
28 days after the date of service of the notice. (4) If one or more
persons have applied to the court under subsection (2) of this section,
the transaction or charge is set aside on the day on which the last
application is finally determined, unless the court orders otherwise.

F    "269. *Other orders.* If a transaction or charge is set aside under
section 268 of this Act, the court may make one or more of the
following orders—(a) An order requiring a person to pay to the
liquidator, in respect of benefits received by that person as a result of
the transaction or charge, such sums as fairly represent those
benefits: . . .

G    "270 . . . (3) Recovery by the liquidator of property or its equivalent
value, whether under section 269 of this Act or any other section of
this Act, or under any other enactment, or in equity or otherwise,
may be denied wholly or in part if—(a) The person from whom
recovery is sought received the property in good faith and has altered
his or her position in the reasonably held belief that the transfer to
that person was validly made and would not be set aside; and (b) In
H    the opinion of the court, it is inequitable to order recovery or recovery
in full."

    The liquidator gave notice under section 268 of his wish to set aside
the payment by the company to the applicant and called for repayment of

the amount of $30,914·90. The applicant applied on 8 September 1995 to    A
the High Court under section 268(2) for an order that the transaction not
be set aside on the ground that it took place in the ordinary course of
business.

It is common ground that at the time the payment was made the
company was unable to pay its due debts, that the payment was made
within the specified and restricted periods and that it enabled the applicant
to receive more towards the satisfaction of its debt than it would be likely    B
to receive in the liquidation. The sole question therefore was whether the
applicant had overcome the presumption in section 266(3) and established
that the transaction took place in the ordinary course of business so as to
fall within the exception provided in section 266(2).

In support of its application the applicant filed an affidavit from an
experienced conveyancing solicitor. His unchallenged evidence was that it    C
is virtually invariable practice for a landlord to require all outstanding rent
and other payments under a lease to be paid as a condition of the
landlord's consent to the assignment of a lease. He said also that if a
tenant of commercial premises has been unable to meet payments under a
lease as they fall due and the sale of that tenant's business is about to
occur it is entirely usual for a landlord to receive all lease payments due
under the lease from the sale of that business.    D

The case for the applicant was that a payment for which the company
was liable under the terms of its lease made in circumstances which were
entirely usual represented a transaction that took place in the ordinary
course of business within the meaning of that expression in section 266(2).

In the High Court, in her judgment delivered on 5 December 1995,
Cartwright J. referred to authorities to which further reference will be    E
made. She rightly noted the focus of section 266 as on the company which
is about to be, or has been, placed in liquidation and its transactions. She
accepted that the transactions are to be viewed against the circumstances
of the company at the time. She found that the payment to the applicant
was made when there was no possibility of the company's business
continuing, that the applicant was aware of that and of the company's
serious financial difficulties when it consented to the assignment of the    F
lease. In that context she held that the payment which was dependent
upon the cessation of business could not be in the ordinary course of
business.

The applicant appealed to the Court of Appeal. The judgment of that
court delivered by Keith J. on 12 December 1996, after brief reference to
the principal authorities relied upon at first instance, noted that the parties
were not understood as disagreeing on the law. The court said that the    G
wording of the phrase "in the ordinary course of business" and its
standard interpretation make it plain that the test is an objective and
general one such that emphasis is not to be placed on the business of the
particular parties to the transaction, whether jointly or singly. The court
went on to consider the particular transaction in question. It was held that
while payments of debts as they become due, including payments under a
lease, would be part of the ordinary course of business, as might adherence    H
to invariable practice of meeting outstanding indebtedness as a condition
of securing a lessor's consent to assignment of a lease, the payment in this

A   case was of a quite different order. This was a payment of long accrued arrears and, being the largest sum paid by the company to the applicant at any one time, it could not be accepted as having been made in the ordinary course of business. The appeal was dismissed.

Before their Lordships' Board Mr. Smith for the applicant emphasised the importance of the case to lessors and the need, if the appeal should be dismissed, for lessors to change what on the evidence is an invariable
B   practice of recovering arrears upon assignment by the lessee. He said lessors will have to move on defaulting tenants before any substantial arrears accrue with consequent disruption to the lease market.

Mr. Smith submitted that certain factual findings of Cartwright J. were unsupported by evidence. Their Lordships consider however that of those material to her decision the findings that the applicant knew of the
C   cessation of the business of the company and of its financial difficulties were reasonable inferences from the evidence of the request to withhold proceedings pending completion of the sale of the business.

Mr. Smith did not take issue with the Court of Appeal's description of the test of what is in the ordinary course of business as an objective and general one. He submitted however that in its reasoning the court did not apply that test but focused on the particular dealings between the lessor
D   and the lessee in concluding that the transaction was not in the ordinary course of business between them.

He contended for a test of whether the transaction was one which a man might undertake without having any bankruptcy in view. On that test, he argued, the payment of moneys due under a lease, in accordance with invariable practice where the lease is assigned, must be accepted as in the
E   ordinary course of business. This, he said, would reflect commercial reality.

Mr. Williams for the liquidator supported the judgment. He submitted that whether the payment was made in the ordinary course of business is basically a question of fact and that there were concurrent findings in favour of the liquidator in the lower courts.

On the law Mr. Williams was able to rely upon a judgment of Fisher J. delivered only a few days before the hearing before their Lordships in
F   *In re Modern Terrazzo Ltd.* (unreported), 10 October 1997; High Court of New Zealand (Auckland Registry) No. M654 of 1995. In that judgment Fisher J. considered in some detail the interpretation of the phrase "in the ordinary course of business" in section 266 (and section 292 of the Act of 1993). In a careful analysis, drawing upon a perceptive article by M. D. J. Conaglen, "Voidable Preferences under the Companies Act 1993,
G   A Change in Focus" [1996] N.Z. Law Review 197, Fisher J. reviewed the authorities and brought them into clearer perspective. Their Lordships have been considerably assisted by his judgment, as indeed was Mr. Williams.

The repeal of section 309 and the substitution of section 266 in 1993 effected a substantial change in the approach to voidable preferences in New Zealand. Section 309, which was based upon the English law,
H   provided that payments made within two years before winding up commenced, if made by a company unable to pay its debts as they fell due, was voidable as against the liquidator if made "with a view to" giving one creditor a preference over other creditors. The inquiry was as to

Countrywide Banking Corpn. Ltd. v. Dean (P.C.)                    [1998]

whether it was the dominant intention to prefer on the part of the debtor A
when the payment was made. A creditor so preferred was able to retain
the payment by showing that it was received in good faith, that in reliance
on the validity of the payment the creditor had altered his or her position
and that retention would not be inequitable: section 311A(7).

The change effected in 1993 by the new section 266 was to abandon as
the sole ground for avoidability the intention of the debtor to prefer. The
inquiry under section 266(2) is as to whether in the prescribed B
circumstances the effect of the transaction was to prefer—to enable a
creditor to receive more than would be likely in the liquidation. That
intention did not cease to be relevant in all circumstances is apparent from
subsection (4) which reintroduces it as a factor for consideration of the
ordinary course of business exception where the person preferred knew of
any intent or purpose of the debtor to prefer. The alteration of position C
relief for creditors has been maintained in section 270.

What then is a transaction in the ordinary course of business which
has the effect of preferring a creditor, the identification of which may be
influenced by knowledge of the other person that there was an intention
or purpose on the part of the company to prefer? Good faith on the part
of the creditor of itself cannot bring a transaction within the exception
because that is an element of the change of position relief the creditor D
might seek where the exception does not apply.

In the course of argument references were made to a number of other
contexts in which consideration has been given to the ordinary course of
business. Under the former fraudulent preference provisions of bankruptcy
(or insolvency) and company winding up laws the courts evolved a test for
negating an intention to prefer where the preference was made in the E
ordinary course of business. It could be satisfied where the payment was
one a person might make without having any bankruptcy in view. That
was the approach contended for by the applicant relying on English
authorities tracing back to *Rust v. Cooper* (1777) 2 Cowp. 629 and *Tomkins
v. Saffery* (1877) 3 App.Cas. 213. Those are the authorities that also
recognised that the necessary intention to prefer could be negated by
showing that the debtor paid under pressure from the creditor or in a F
desperate attempt to remain in business. They represent the approach
jettisoned in New Zealand by the repeal of section 309. This is clear from
the report of the Law Commission which recommended the comprehensive
revision of the company law enacted in 1993 (New Zealand Law
Commission, Company Law Reform and Restatement (1989) N.Z.L.C.
Report 9, p. 153, para. 649): G

"The focus at present, when a creditor receives payment in preference
to others, is on the intention of the debtor company. This means that
in circumstances were a creditor is preferred through no voluntary
action by the debtor, for example, where a creditor is able to coerce
the debtor, the transaction cannot be attacked. This leads to the
unsatisfactory situation where creditors may be treated differently
according to the quirks of their circumstances. The purpose of a H
voidable transaction regime is to avoid this, yet the present law permits
it. Our proposals, which are drawn from both the Australian Law
Reform Commission's Report and the submission of the New Zealand

A.C.                    Countrywide Banking Corpn. Ltd. v. Dean (P.C.)

A    Society of Accountants, set out a test which is more straightforward
     to apply."

The view expressed at the end of this paragraph has not attracted
unanimous agreement as appears from the poignant addendum to
Fisher J.'s judgment in *In re Modern Terrazzo Ltd.*, 10 October 1997:

B    "It was in 1993 that the Australians abandoned the phrase 'in the
     ordinary course of business' as the key exception to their company
     voidable preference regime (formerly section 565 of the Corporations
     Law (Commonwealth) and its predecessors; see now sections 588FA
     to 588FG of The Corporations Law). As one commentator put it
     (Keay, (1994) 19 M.U.L.R. 545, 572): 'This abolition has occurred,
     principally, because of the judicial uncertainty in interpreting what
     was meant by the phrase. It is undeniable that there has not only been
C    uncertainty, but also confusion.' New Zealand chose that moment to
     introduce into its own companies legislation the very phrase which
     Australia had just discarded. One of us must have got it wrong.
     Although in these situations right-thinking New Zealanders would
     normally assume it to be Australia, Barker J. conceded in *In re NZ
     Spraybooth Ltd.* [1996] 7 N.Z.C.L.C. 261,075, 261,079, that in this
D    instance 'It is perhaps unfortunate that this phrase was included in
     the new companies legislation.' He may be right."

The Australian experience revolved around a statutory provision having
some similarity to section 266 but which cannot be said to have been
adopted by the New Zealand legislature. The leading decision of the High
Court of Australia in *Taylor v. White* (1964) 110 C.L.R. 129 dealt with the
E    statutory exception in favour of a "payee in good faith and for valuable
consideration and in the ordinary course of business." The relevant section
expressly negated the good faith component of the exception under
circumstances leading to an inference of actual or constructive knowledge
by the creditor of the debtor's inability to pay its debts and the preferential
effect of the payment. In their Lordships' view that represents a
considerably different approach to that required by the New Zealand
F    section. The Australian cases therefore do not have direct application to
the New Zealand provision though they may provide some guidance as to
the meaning to be given to the phrase "in the ordinary course of business."

Another context in which the expression is to be found is in identifying
the circumstances in which a company may dispose of assets the subject of
a floating charge. *Reynolds Bros. (Motors) Pty. Ltd. v. Esanda Ltd.* (1983)
G    8 A.C.L.R. 422 and *Julius Harper Ltd. v. F. W. Hagedorn & Sons Ltd.*
[1991] 1 N.Z.L.R. 530 are cases in that field. As was recognised by the
Court of Appeal in the second of those cases, at p. 543, the focus of
consideration in these situations is the course of business of the particular
company. Dicta in this context are to be considered in that light.

In each of the judgments of the High Court and Court of Appeal in
the present case reliance was placed on passages from two judgments
H    in Australian cases. The first is to be found in the judgment of Rich J. in
*Downs Distributing Co. Pty. Ltd. v. Associated Blue Star Stores Pty. Ltd.*
(1948) 76 C.L.R. 463, 476–477. That was a decision of the High Court of
Australia on the question of whether a transaction which had the effect of

Countrywide Banking Corpn. Ltd. v. Dean (P.C.)                    [1998]

converting an unpaid supplier into a secured creditor within the statutory    A
period prior to liquidation was void or whether the creditor was protected
by the exception in favour of a payee in good faith and for valuable
consideration and in the ordinary course of business. Citing the earlier
decision of *Burns v. McFarlane* (1940) 64 C.L.R. 108, 125, Rich J. said:

> "This last expression it was said 'does not require an investigation
> of the course pursued in any particular trade or vocation and it does    B
> not refer to what is normal or usual in the business of the debtor or
> that of the creditor.' It is an additional requirement and is cumulative
> upon good faith and valuable consideration. It is, therefore, not so
> much a question of fairness and absence of symptoms of bankruptcy
> as of the everyday usual or normal character of the transaction. The
> provision does not require that the transaction shall be in the course
> of any particular, vocation or business. It speaks of the course    C
> of business in general. But it does suppose that according to the
> ordinary and common flow of transactions in affairs of business there
> is a course, an ordinary course. It means that the transaction must
> fall into place as part of the undistinguished common flow of business
> done, that it should form part of the ordinary course of business as
> carried on, calling for no remark and arising out of no special or    D
> particular situation."

Williams J. in the same case said, at p. 480:

> "It seems to me, therefore, that the expression refers to a transaction
> into which it would be usual for a creditor and debtor to enter as a
> matter of business in the circumstances of the particular case
> uninfluenced by any belief on the part of the creditor that the debtor    E
> might be insolvent."

The New Zealand Court of Appeal in *Julius Harper Ltd. v. F. W.
Hagedorn & Sons Ltd.* [1991] 1 N.Z.L.R. 530, 543, said that the last part
of the passage from the judgment of Rich J. expresses the usual meaning
of the words "ordinary course of business" though it was there applied in
a different context.    F

In his judgment in *Reynolds Bros. (Motors) Pty. Ltd. v. Esanda Ltd.*, 8
A.C.L.R. 422, Mahoney J.A., in considering whether a floating charge
continued to attach to certain tractors disposed of by a company, addressed
the question of whether it was done by the company in the ordinary
course of business. He said, at p. 428:

> "That transaction was, as Mr. Grieve submitted, an extraordinary
> one. But, within this principle, 'ordinary' is not to be confined to what    G
> is in fact ordinarily done in the course of the particular business of
> the company. Transactions will be within this principle even though
> they be, in relation to the company, exceptional or unprecedented."

Fisher J. in *In re Modern Terrazzo Ltd.*, 10 October 1997, expressed the
view that this dictum is inconsistent with that of Rich J. in the *Downs
Distributing Co.* case, 76 C.L.R. 463, 476–477 and, because of its quite    H
different context, is unhelpful. He preferred the view of Rich J. expressed
in the analogous context as more appropriate to reflect the purpose of the
voidable preference provisions.

A.C.                    **Countrywide Banking Corpn. Ltd. v. Dean (P.C.)**

A       There are difficulties in drawing upon formulations in different words of statutory tests and treating them as applicable in all circumstances. Such difficulties are increased where those formulations originate in different legal or factual contexts. This is particularly so where the test is essentially one of fact in any event. For these reasons, as presently informed by the argument in this case, their Lordships do not adopt any particular formulation. Nor is it necessary for this case to make any comprehensive

B    statement, suitable for all cases, of the criteria for determining when a transaction is to be held to have taken place in the ordinary course of business for the purpose of section 266 and the corresponding section in the Act of 1993.

       Their Lordships do not accept, as submitted for the applicant, that the test is general in the sense that it would be satisfied so long as it can be

C    said that the transaction is one which might reasonably take place in some business setting. To abstract the particular business setting and inquire (in effect) merely whether it is possible to envisage a setting in which the transaction would be an ordinary one is not what the statute requires. In that situation the intent and purpose of the company would never have relevance yet section 266(4) specifies circumstances in which they are to be taken into account.

D       Plainly the transaction must be examined in the actual setting in which it took place. That defines the circumstances in which it is to be determined whether it was in the ordinary course of business. The determination then is to be made objectively by reference to the standard of what amounts to the ordinary course of business. As was said by Fisher J. in the *Modern Terrazzo Ltd.* case, 10 October 1997, the transaction must be such that it

E    would be viewed by an objective observer as having taken place in the ordinary course of business. While there is to be reference to business practices in the commercial world in general, the focus must still be the ordinary operational activities of businesses as going concerns, not responses to abnormal financial difficulties. Their Lordships respectfully agree with the judge's conclusion by reference to the policy of the section:

F            "Whether a payment should be regarded as commercially routine at a day to day trading and operating level will turn at least in part upon a comparison with the practices of the commercial community in general. But equally, the way in which the particular company has acted in the past, and its dealings with the particular creditor, would seem pertinent. That the payment was simply a repetition of past patterns of behaviour would make it more difficult to argue that it

G            represented special assistance to an insider or the result of special enforcement measures or a situation in which the subject creditor ought to have investigated before extending credit. So at a policy level there is something to be said for the view that relevant considerations should extend to the prior practices of the particular company."

H       The section therefore requires examination of the actual transaction in its factual setting (excluding the intent or purpose of the company save as required by subsection (4)). Because the examination is undertaken objectively by reference to the standard of the ordinary course of business, there may be circumstances where a transaction, exceptional to a particular

Countrywide Banking Corpn. Ltd. v. Dean (P.C.)                    [1998]

A

trader, will nonetheless be in the ordinary course of business as for example its first transaction of a particular type. It may be that transactions undertaken in the past will, because of changed circumstances, no longer be considered as in the ordinary course of business. The payment of some accrued indebtedness may be within the ordinary course of business as may the payment of moneys owing under a lease to secure a lessor's consent to an assignment of the lessee's interest. The particular circumstances will require assessment in each case.

B

In the present case, on the finding of Cartwright J. at first instance, the payment was made when, to the knowledge of the lessor, it was part of the transaction by which the company was disposing of its business. Their Lordships consider it was entirely open to the judge to find that in the circumstances the payment was not in the ordinary course of business. Equally, the view was open to the Court of Appeal that the payment, made up as it was including long-standing arrears, when made was not in the ordinary course of business.

C

Mr. Smith's argument that to apply the section so narrowly as to exclude from the ordinary course of business payments of the kind here in issue will disrupt the ordinary conduct of the affairs of lessors is not accepted. Lessors, although contractually entitled to payments provided for in the lease, are not secured creditors. There is no warrant for more favourable treatment for them than other creditors. On the contrary, the policy of the voidable preference law is to secure the equal participation of creditors in such of the company's property as is available in the liquidation.

D

For the reasons given their Lordships will humbly advise Her Majesty that the appeal should be dismissed. The applicant must pay the liquidator's costs before their Lordships' Board.

E

*Solicitors: Alan Taylor & Co.; Cruickshanks.*

S. S.

F

G

H

TAB 18

*Derry v Peek* (1889) 14 App Cas 337, House of Lords

VOL. XIV.]    AND PRIVY COUNCIL.    337

[HOUSE OF LORDS.]

| | | |
|---|---|---|
| WILLIAM DERRY, J. C. WAKEFIELD, M. M. MOORE, J. PETHICK, AND S. J. WILDE . . . . . . . . . | APPELLANTS; | H. L. (E.) 1889 *July* 1. |

AND

SIR HENRY WILLIAM PEEK, BARONET.    RESPONDENT.

*Action of Deceit—False Representation—Fraud—" Legal Fraud "—Company
—Misrepresentation in Prospectus.*

In an action of deceit the plaintiff must prove actual fraud. Fraud is
proved when it is shewn that a false representation has been made know-
ingly, or without belief in its truth, or recklessly, without caring whether
it be true or false.

A false statement, made through carelessness and without reasonable
ground for believing it to be true, may be evidence of fraud but does not
necessarily amount to fraud. Such a statement, if made in the honest
belief that it is true, is not fraudulent and does not render the person
making it liable to an action of deceit.

A special Act incorporating a tramway company provided that the
carriages might be moved by animal power, and, with the consent of the
Board of Trade, by steam power. The directors issued a prospectus con-
taining a statement that by their special Act the company had the right to
use steam power instead of horses. The plaintiff took shares on the faith
of this statement. The Board of Trade afterwards refused their consent
to the use of steam power and the company was wound up. The plaintiff
having brought an action of deceit against the directors founded upon the
false statement :—

*Held*, reversing the decision of the Court of Appeal and restoring the
decision of Stirling J. (37 Ch. D. 541), that the defendants were not liable,
the statement as to steam power having been made by them in the honest
belief that it was true.

APPEAL from a decision of the Court of Appeal. The facts
are set out at length in the report of the decisions below (1).
For the present report the following summary will suffice :—

By a special Act (45 & 46 Vict. c. clix.) the Plymouth, Devon-
port and District Tramways Company was authorized to make
certain tramways.

(1) 37 Ch. D. 541.

H. L. (E.)
1889
DERRY
v.
PEEK.

———

By sect. 35 the carriages used on the tramways might be moved by animal power and, with the consent of the Board of Trade, by steam or any mechanical power for fixed periods and subject to the regulations of the Board.

By sect. 34 of the Tramways Act 1870 (33 & 34 Vict. c. 78), which section was incorporated in the special Act, "all carriages used on any tramway shall be moved by the power prescribed by the special Act, and where no such power is prescribed, by animal power only."

In February 1883 the appellants as directors of the company issued a prospectus containing the following paragraph :—

"One great feature of this undertaking, to which considerable importance should be attached, is, that by the special Act of Parliament obtained, the company has the right to use steam or mechanical motive power, instead of horses, and it is fully expected that by means of this a considerable saving will result in the working expenses of the line as compared with other tramways worked by horses."

Soon after the issue of the prospectus the respondent, relying, as he alleged, upon the representations in this paragraph and believing that the company had an absolute right to use steam and other mechanical power, applied for and obtained shares in the company.

The company proceeded to make tramways, but the Board of Trade refused to consent to the use of steam or mechanical power except on certain portions of the tramways.

In the result the company was wound up, and the respondent in 1885 brought an action of deceit against the appellants claiming damages for the fraudulent misrepresentations of the defendants whereby the plaintiff was induced to take shares in the company.

At the trial before Stirling J. the plaintiff and defendants were called as witnesses. The effect given to their evidence in this House will appear from the judgments of noble and learned Lords.

Stirling J. dismissed the action; but that decision was reversed by the Court of Appeal (Cotton L.J., Sir J. Hannen, and Lopes L.J.) who held that the defendants were liable to make good to the plaintiff the loss sustained by his taking the shares,

and ordered an inquiry (1). Against this decision the defen-
dants appealed.

March 28, 29; April 5, 9, 11. Sir *Horace Davey* Q.C. and
*Moulton* Q.C. (*M. Muir Mackenzie* with them) for the appellants :—

The law as laid down by the Court of Appeal goes much
further than any previous decision and is unsound. To support
an action of deceit it always was necessary at common law and
still is both there and in Chancery to prove fraud, i.e., that the
thing was done fraudulently. Fraud never has been and never
will be exhaustively defined, the forms which deceit may take
being so many and various. There is a negative characteristic :
it must be something which an honest man would not do ; not
merely what a logical or clear-headed man would not do. How-
ever unbusinesslike a man may be he is not fraudulent if he acts
honestly. The natural consequences of words or acts must be
taken to have been intended, but not so as to impute fraud to
honesty. No honest mistake, no mistake not prompted by a dis-
honest intention, is fraud. The shape of the mistake does not
make it more or less a fraud if it is a mistake. Once establish
that a man honestly intended to do his duty, the consequences
cannot turn his words or acts into a fraud. There may be an
obligation to see that no untrue statement is made, but the failure
to meet that obligation is not fraud, if there is no dishonest
intention. The statement may be inaccurate, yet if the defendants
honestly—though mistakenly—believed that it substantially
represented the truth, there is no fraud, and an action of deceit
will not lie. The decision of the Court of Appeal is that to such
a statement the law attaches a meaning which makes it fraudulent.
A material misstatement may be a ground for rescinding the
contract, but the consequences of fraud and of breach of contract
are widely different. In an action for breach of contract the
defendant must make good his words. In an action founded on
fraud he must bear the whole of the consequences which have
been induced by the fraudulent statement, which may be very
extensive. The essence of fraud is the tricking a person into
the bargain. If the fact that the consent of the Board of Trade

(1) 37 Ch. D. 541, 591.

3        2 A 2

H. L. (E.)

1889

DERRY
*v.*
PEEK.

HOUSE OF LORDS    [VOL. XIV.

H. L. (E.)
1889
DERRY
*v.*
PEEK.

was necessary was suppressed by these defendants in order to· make the bait more alluring there was fraud. The issue then is one of fact, was there an intention to make the bait more alluring? It is not the carelessness leading to an untrue statement which makes fraud; it is the carelessness whether the statement is untrue or not. It is in this sense that the authorities have held defendants liable for fraud when they have made untrue statements "recklessly." The above propositions are the result of the authorities. The law laid down in the earlier cases is well exemplified by *Taylor* v. *Ashton* (1), where, however, the headnote does not truly represent the effect of the decision, and *Joliffe* v. *Baker* (2). In *Polhill* v. *Walter* (3)—which may be relied on by the respondent—the Court considered that the misrepresentation was made by the defendant *knowing it to be untrue.* The idea that something less than fraud was necessary to found an action of deceit crept in first in Lord Chelmsford's observations in *Western Bank of Scotland* v. *Addie* (4), and was extended by Cotton L.J. in *Weir* v. *Bell* (5), where he treats "recklessly" as· if it meant "negligently," whereas it means "indifferent whether the statement be true or false." This confusion has arisen mainly since the Judicature Act, actions of deceit being tried in Chancery by judges who, sitting without juries, have confounded issues of fact with issues of law. Here the Court of Appeal held that an action of deceit lies if the defendant makes an untrue statement, without reasonable ground for believing it to be true, though he did in fact honestly believe it to be true. If that be the law a negligent, improvident, or wrong-headed man is a fraudulent man. A want of reasonable ground may be evidence of fraud, but it is not the same thing as fraud.

As to the facts, Stirling J. found that the defendants believed the misstatement to be true, and that finding ought to be conclusive. The Court of Appeal do not contradict that finding.

The misstatement complained of really meant that the company had obtained the necessary statutory authority to use steam power, without which authority no consents could have given

(1) 11 M. & W. 401.            (3) 3 B. & Ad. 114.
(2) 11 Q. B. D. 255.            (4)· Law Rep. 1 H. L. (Sc.) 145, 162.
(5) 3 Ex. D. at p. 242.

H. L. (E.)

1889

DERRY
*v.*
PEEK.

authority, because by the Tramways Act 1870 (33 & 34 Vict. c. 78 s. 34) steam power is prohibited except where the special Act authorizes steam power. It may be that the defendants knew the statement was not strictly accurate, but if so they honestly thought that the statement conveyed a substantially accurate representation of the fact, either because they thought it not worth while to encumber the prospectus with the qualifications, or because those qualifications were not present to their minds when they made the statement. In the prospectus reference is made to the special Act, so that any one who consulted the Act could see for himself what the authority was.

Lastly, the plaintiff was no doubt in some degree influenced by the misstatement, but there was no evidence that he would not have taken the shares if the statement had contained the full truth as to the necessary consents being obtained.

*Bompas* Q.C., and *Byrne* Q.C. (*Patullo* with them) for the respondent :—

The decision of the Court of Appeal is right and for the reasons there given. Directors are liable not only for a false statement which they know to be false, but for a false statement which they ought to have known to be false. This proposition is supported by the obiter dictum of Lord Westbury in *New Brunswick &c. Co.* v. *Conybeare* (1), and by the obiter dicta of the Lords in *Peek* v. *Gurney* (2) as to what the liability of the defendants would have been to original shareholders, and by the judgment of Jessel M.R. in *Smith* v. *Chadwick* (3).

It is not necessary that there should be carelessness whether the statement is true or not : it is enough if there be carelessness or negligence in making the statement. Making an untrue statement without reasonable ground is negligence which will support an action of deceit. In support of the respondent's contention the following authorities are relied on : *Slim* v. *Croucher* (4) ; *Evans* v. *Bicknell* (5) ; *Brownlie* v. *Campbell* (6) ; *Polhill* v. *Walter* (7) ; *Milne* v. *Marwood* (8) ; *Denton* v. *Great*

(1) 9 H. L. C. 725, 726.            (5) 6 Ves. at p. 183.
(2) Law Rep. 6 H. L. 377.          (6) 5 App. Cas. 925, 935, 950.
(3) 20 Ch. D. 44.                  (7) 3 B. & Ad. 114.
(4) 1 D. F. & J. 518, 523.         (8) 15 C. B. 778, 781.

H. L. (E.)  *Northern Railway Company* (1); *Thorn* v. *Bigland* (2); *Smout* v.
1889      *Ilbery* (3); *Rawlins* v. *Wickham* (4); *Hallows* v. *Fernie* (5);
DERRY     *Mathias* v. *Yetts* (6); *Smith* v. *Chadwick* (7); *Pasley* v. *Free-*
*v.*      *man* (8); *Chandelor* v. *Lopus* (9). [LORD HALSBURY L.C. re-
PEEK.     ferred to *Haycraft* v. *Cressy* (10).]

But it is not necessary to go the full length of the propositions
contended for. Even if the fourth proposition of Lopes L.J. is
not law, the appellants are nevertheless liable; for the evidence
shews that the statements were made either with the knowledge
that they were untrue or with no belief on the subject.

It was stated that it was fully expected that a considerable
saving would be effected by the use of steam. In fact the direc-
tors had not considered the matter, and when they did so after-
wards there was a majority of one only in favour of steam. The
effect of the evidence is not the same as to all the directors. As
to Derry, the inference is that he never took the trouble to con-
sider whether the statement was true or false. Wakefield and
Wilde had complete knowledge but made statements which they
knew not to be true at the time, thinking the requisite con-
sents would be given. Pethick's evidence is inconsistent with
itself. At one moment he says that he thought the Board of
Trade had no right to refuse consent if its reasonable require-
ments were met, at another that he thought they had an abso-
lute right to refuse. Moore, it must be admitted, stands in a
different position, and can only be held liable under the fourth
proposition of Lopes L.J.

The respondents are entitled to judgment on the grounds
accepted by Lord Cranworth in *Western Bank of Scotland* v.
*Addie* (11) and by the Earl of Selborne in *Smith* v. *Chadwick* (12):
The belief which would justify the appellants must be one founded
on an exercise of judgment. Grounds which would be sufficient
in some cases would not be so in others, where uberrima fides
is required, e.g. in statements made to an intending partner. As

(1) 25 L. J. (Q.B.) 129.                    (7) 20 Ch. D. 27, 44.
(2) 8 Ex. 725.                              (8) 2 Sm. L. C., 9th ed. p. 74.
(3) 10 M. & W. 1, 10.                       (9) 1 Ibid. p. 186.
(4) 3 D. & J. 304, 312.                     (10) 2 East, 92.
(5) Law Rep. 3 Ch. 467.                     (11) Law Rep. 1 H. L. (Sc.) 145, 164.
(6) 46 L. T. (N.S.) 497, 502.               (12) 9 App. Cas. 187, 190.

to the duty of a director to persons about to take shares in a
company, see *New Brunswick and Canada Railway Company* v.
*Muggeridge* (1) and *Henderson* v. *Lacon* (2).

<div style="text-align: right">

H. L. (E.)

1889

DERRY
*v.*
PEEK.

</div>

The House took time for consideration, LORD HALSBURY L.C.
saying that notice would be given to the appellants if their
Lordships desired to hear a reply.

July 1.   LORD HALSBURY L.C. :—

My Lords, I have so recently expressed an opinion in the
Court of Appeal on the subject of actions of this character that
I do not think it necessary to do more than say that I adhere to
what I there said (3).   To quote the language now some centuries
.old in dealing with actions of this character, "fraud without
damage or damage without fraud" does not give rise to such
actions.   I have had also the opportunity of reading the judg-
ment of my noble and learned friend Lord Herschell, and I could
desire to add nothing to his exhaustive and lucid treatment of
the authorities.

My Lords, when I turn to the question of fact I confess I am
not altogether satisfied.   In the first place I think the state-
ment in the prospectus was untrue,—untrue in fact, and to the
minds of such persons as were likely to take shares I think well
calculated to mislead.   I think such persons would have no idea
of the technical division between tramways that had rights to use
mechanical means and tramways that had not.   What I think
they would understand would be that this particular tramway
was in an exceptionably advantageous position,—that the state-
ment was of a present existing fact, that it had at the time of
the invited subscription for shares the right to use steam.   And
I think such a statement if wilfully made with the consciousness
of its inaccuracy would give rise to an action for deceit, provided
that damage had been sustained if a person had acted upon a
belief induced by such a prospectus.

But upon the question whether these statements were made
with a consciousness of their misleading character, I cannot but

(1) 1 Dr. & S. 363, 381.          (2) Law Rep. 5 Eq. 249.
        (3) See *Arnison* v. *Smith*, 41 Ch. D. 348, 367.

H. L. (E.)
1889
DERBY
*v.*
PEEK.

Lord Halsbury,
L.C.

be influenced by the opinions entertained by so many of your Lordships that they are consistent with the directors' innocence of any intention to deceive.

The learned judge who saw and heard the witnesses acquitted the defendants of intentional deceit, and although the Court of Appeal held them liable, overruling the decision of the learned judge below, they appear to me to have justified their decision upon grounds which I do not think tenable, namely, that they, the directors, were liable because they had no reasonable ground for the belief which nevertheless it is assumed they sincerely entertained.

My Lords, I think it would have been satisfactory to have had a more minute and exact account of how this prospectus was framed, the actual evidence of the draftsman of it, and the discussions which took place upon the alteration in form; which alteration gave such marked and peculiar prominence to the special feature of this particular tramway, in respect of the possession of power to use steam. Nevertheless, if, as I have said, the facts are reconcilable with the innocence of the directors, and with the absence of the mens rea which I consider an essential condition of an action for deceit, the mere fact of the inaccuracy of the statement ought not to be pressed into constituting a liability which appears to me not to exist according to the law of England.

As to the question whether Sir Henry Peek was induced to take his shares by reliance on the misleading statement, I admit that I have very considerable doubt. On the one hand I do not believe that any one can so far analyse his mental impressions as to be able to say what particular fact in a prospectus induced him to subscribe. On the other hand the description of Sir Henry Peek, even now that the question has been pointedly raised and brought to his mind, of what did or did not induce him to take his shares is hardly reconcilable with his having been substantially induced by the statement in question to take them.

On the whole I acquiesce in the judgment which one of your Lordships is about to move, namely, that the judgment appealed from be reversed.

LORD WATSON :—

My Lords, I agree with Stirling J. that, as matter of fact, the appellants did honestly believe in the truth of the representation upon which this action of deceit is based. It is by no means clear that the learned judges of the Court of Appeal meant to differ from that conclusion ; but they seem to have held that a man who makes a representation with the view of its being acted upon, in the honest belief that it is true, commits a fraud in the eye of the law, if the court or a jury shall be of opinion that he had not reasonable grounds for his belief. I have no hesitation in rejecting that doctrine, for which I can find no warrant in the law of England. But I shall not trouble your Lordships with any observations of mine, because I accept without reserve the opinion about to be delivered by my noble and learned friend upon my left (Lord Herschell).

LORD BRAMWELL :—

My Lords, I am of opinion that this judgment should be reversed. I am glad to come to this conclusion ; for, as far as my judgment goes, it exonerates five men of good character and conduct from a charge of fraud, which, with all submission, I think wholly unfounded, a charge supported on such materials as to make all character precarious. I hope this will not be mis-understood ; that promoters of companies will not suppose that they can safely make inaccurate statements with no responsi-bility. I should much regret any such notion ; for the general public is so at the mercy of company promoters, sometimes dis-honest, sometimes over sanguine, that it requires all the protec-tion that the law can give it. Particularly should I regret if it was supposed that I did not entirely disapprove of the conduct of those directors who accepted their qualification from the con-tractor or intended contractor. It is wonderful to me that honest men of ordinary intelligence cannot see the impropriety of this. It is obvious that the contractor can only give this qualification because he means to get it back in the price given for the work he is to do. That price is to be fixed by the direc-tors who have taken his money. They are paid by him to give

H. L. (E.)

1889

DERRY

*v.*

PEEK.

Lord Bramwell.

him a good price, as high a price as they can, while their duty to their shareholders is to give him one as low as they can.

But there is another thing. The public, seeing these names, may well say, " These are respectable and intelligent men who think well enough of this scheme to adventure their money in it ; we will do the same," little knowing that those thus trusted had made themselves safe against loss if the thing turned out ill, while they might gain if it was successful. I am glad to think that Mr. Wilde, a member of my old profession, was not one of those so bribed. The only shade of doubt I have in the case is, that this safety from loss in the directors may have made them less careful in judging of the truth of any statements they have made.

There is another matter I wish to dispose of before going into the particular facts of the case. I think we need not trouble ourselves about "legal fraud," nor whether it is a good or bad expression ; because I hold that actual fraud must be proved in this case to make the defendants liable, and, as I understand, there is never any occasion to use the phrase " legal fraud " except when actual fraud cannot be established. " Legal fraud " is only used when some vague ground of action is to be resorted to, or, generally speaking, when the person using it will not take the trouble to find, or cannot find, what duty has been violated or right infringed, but thinks a claim is somehow made out. With the most sincere respect for Sir J. Hannen I cannot think the expression " convenient." I do not think it is " an explanation which very clearly conveys an idea ;" at least, I am certain it does not to my mind. I think it a mischievous phrase, and one which has contributed to what I must consider the erroneous decision in this case. But, with these remarks, I have done with it, and will proceed to consider whether the law is not that actual fraud must be proved, and whether that has been done.

Now, I really am reluctant to cite authorities to shew that actual fraud must be established in such a case as this. It is one of the first things one learned, and one has never heard it doubted until recently. I am very glad to think that my noble and learned friend (Lord Herschell) has taken the trouble to go into the authorities fully ; but to some extent I deprecate it,

03635-jpm    Doc 173-2    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
Pg 708 of 856

because it seems to me somewhat to come within the principle
Qui s'excuse s'accuse.    When a man makes a contract with
another he is bound by it; and, in making it, he is bound not to
bring it about by fraud.    Warrantizando vendidit gives a cause
of action if the warranty is broken.    Knowingly and fraudulently
stating a material untruth which brings about, wholly or partly,
the contract, also gives a cause of action.    To this may now be
added the equitable rule (which is not in question here), that a
material misrepresentation, though not fraudulent, may give a
right to avoid or rescind a contract where capable of such rescis-
sion.    To found an action for damages there must be a contract
and breach, or fraud.    The statement of claim in this case states
fraud.    Of course that need not be proved merely because it is
stated.    But no one ever heard of or saw a statement of claim or
declaration for deceit without it.    There is not an authority at
common law, or by a common law lawyer, to the contrary; none
has been cited, though there may be some incautious, hesitating,
expressions which point that way.    Every case from the earliest
in Comyns' Digest to the present day alleges it.    Further, the
learned judges of the Court of Appeal hardly deny it.    There is
indeed an opinion to the contrary of the late Master of the
Rolls, but it must be remembered that his knowledge of actions
of deceit was small, if any.    I did not think, then, that it was
necessary to cite cases to shew that to maintain this action
fraud in the defendant must be shewn, though I am glad it has
been done.

Now, as to the evidence.    The plaintiff's case is that the
defendants made an untrue statement, which they knew to be
untrue, and likely to influence persons reading it; therefore they
were fraudulent.    It is not necessary to consider whether a
primâ facie case was made out by the plaintiff.    We have all
the evidence before us, and must judge on the whole.    The
alleged untrue statement is that, "The company has the right to
use steam or mechanical power instead of horses," and that a
saving would be thereby effected.    Now, this is certainly untrue,
because it is stated as an absolute right, when in truth it was
conditional on the approval of the Board of Trade, and the sanc-
tion or consent of two local boards; and a conditional right is

H. L. (E.)

1889

DERRY
v.
PEEK.

Lord Bramwell.

H. L. (E.)  not the same as an absolute right.  It is also certain that the
1889     defendants knew what the truth was, and therefore knew that
DERRY    what they said was untrue.  But it does not follow that the
v.       statement was fraudulently made.  There are various kinds of
PEEK.
         untruth.  There is an absolute untruth, an untruth in itself,
Lord Bramwell.
         that no addition or qualification can make true ; as, if a man says
         a thing he saw was black, when it was white, as he remembers
         and knows.  So, as to *knowing* the truth.  A man may know it,
         and yet it may not be present to his mind at the moment of
         speaking ; or, if the fact is present to his mind, it may not occur
         to him to be of any use to mention it.  For example, suppose a
         man was asked whether a writing was necessary in a contract for
         the making and purchase of goods, he might well say " Yes,"
         without adding that payment on receipt of the goods, or part,
         would suffice.  He might well think that the question he was
         asked was whether a contract for goods to be made required a
         writing like a contract for goods in existence.  If he was writing
         on the subject he would, of course, state the exception or quali-
         fication.

         Now, consider the case here.  These directors naturally trust
         to their solicitors to prepare their prospectus.  It is prepared and
         laid before them.  They find the statement of their power to use
         steam without qualification.  It does not occur to them to alter
         it.  They swear they had no fraudulent intention.  At the very
         last they cannot see the fraud.  There is their oath, their previous
         character unimpeached, and there is to my mind this further
         consideration : the truth would have served their purpose as well.
         " We have power to use steam, etc., of course with the usual con-
         ditions of the approval of the Board of Trade and the consent
         of the local authorities, but we may make sure of these being
         granted, as the Board of Trade has already allowed the power to
         be inserted in the Act, and the local authorities have expressed
         their approbation of the scheme."  (See plaintiff's answer, 313 (1),
         which shews that he would have been content with that state-
         ment.)

         During the argument I said I am not sure that I should
         not have passed the prospectus.  I will not say so now, because

         (1) The references are to the Appendix printed for the House.

certainly I would not pass it now after knowing the unfortunate
use made of the statement, and no one can tell what would have
been the state of his mind if one of the factors influencing it was
wanting.    But I firmly believe it might have been, and was,
honestly done by these defendants.    Stirling J. saw and heard
them, and was of that opinion.    It is difficult to say that the
plaintiff was not.    The report of the 6th of November 1884
shewed that the consent of the Board of Trade was necessary,
shewed also that the corporation of Devonport would not consent,
shewed therefore the "untruth" and the defendants' knowledge
of it, and yet the plaintiff "had every confidence in the direc-
tors;" and see his answers to questions 53 and 365.

I now proceed to consider the judgments that have been
delivered.    It is not necessary to declare my great respect for
those who have delivered them.    Stirling J. refuses to say
whether actual fraud must be shewn, and deals with the case on
the footing that the question is whether the defendants had
reasonable grounds for making the statement they did.    He holds,
as I do, that they thought the company had the right, as put in
the prospectus, to use steam.    Then he says he must "come to
the conclusion that they had reasonable grounds for their belief;
at all events, that their grounds were not so unreasonable as to
justify me in charging them with being guilty of fraud."    It is
singular that the learned judge seems to consider that unreason-
ableness must be proved to such an extent as to shew fraud.    He
then proceeds, for what seem to me unanswerable reasons, to shew
that they did every one believe that they had the right stated
in the prospectus.    He refers to what he saw of them in the box.
He says he cannot come to the conclusion that their belief was
so unreasonable and so unfounded, and their proceedings so
reckless or careless that they ought to be fixed with the con-
sequences of deceit.    He makes an excellent remark, that "mer-
cantile men dealing with matters of business would be the first
to cry out if I extended the notion of deceit into what is honestly
done in the belief that these things would come about, and when
they did not come about, make them liable in an action of fraud."
My only variation of this would be that it may be that the
objection did not, and naturally did not, occur to them.    It has

H. L. (E.)

1889

DERBY
v.
PEEK.

Lord Bramwell.

H. L. (E.)
1889
DERRY
*v.*
PEEK.

Lord Bramwell.

not been argued, and I will say no more on the question, whether had the plaintiff known the contents of the Act he would or would not have applied for the shares, than that I agree with Stirling J.

Cotton L.J. says the law is " that where a man makes a statement to be acted on by others which is false, and which is known by him to be false, or is made by him recklessly, or without care whether it is true or false, that is without any reasonable ground for believing it to be true," he is liable to an action for deceit. Well, I agree to all before the " that is " and I agree to what comes after if it is taken as equivalent to what goes before, viz., " recklessly or without care whether it is true or false," understanding " recklessly " as explained by " without care whether it is true or false." For a man who makes a statement without care and regard for its truth or falsity commits a fraud. He is a rogue. For every man who makes a statement says " the truth is so and so, and I know it or believe it." I say I agree to this as I understand it.

It seems to me, with great respect, that the learned Lord Justice lost sight of his own definition, and glided into a different opinion. He says (p. 451, F.), " There is a duty cast upon a director who makes that statement to take care that there are no statements in it which in fact are false; to take care that he has reasonable ground for the material statements which are contained in that document (prospectus), which he intends to be acted on by others. And although in my opinion it is not necessary there should be what I should call fraud, there must be a departure from duty, . . . and he has violated the right which those who receive the statement have to have true statements only made to them." This seems to be a most formidable matter. I agree there is some such duty. I agree that not only directors in prospectuses, but all persons in all dealings should tell the truth. If they do not they furnish evidence of fraud; they subject themselves to have the contract rescinded. But to say that there is " a right to have true statements only made," I cannot agree, and I think it would be much to be regretted if there was any such right. Mercantile men, as Stirling J. says, would indeed cry out. No qualification is stated.

If this is law the statement may be reasonably believed to be true by him who makes it, but if untrue there is to be a cause of action; and that although he may have refused a warranty. I hope not. There is a duty to tell the truth, or, rather, what is believed to be the truth. At page 452, B., his Lordship says: "Where a man makes a false statement without reasonable ground to suppose it to be true, and without taking care to ascertain if it is true, he is liable civilly as much as a person who commits what is usually called fraud." I say I agree if that means making a statement of which he knows or believes not the truth. His Lordship proceeds to examine whether the defendants had reasonable ground for believing what they said, and comes to the conclusion that they had not, and so holds them liable, not because they were dishonest, but because they were unreasonable. I say they never undertook to be otherwise. He says (461 G.): "It is not that I attribute to them any intention to commit fraud, but they have made a statement without any sufficient reason for believing it to be true."

Sir James Hannen says that he agrees with Cotton L.J.'s statement of the law, and adds: "If a man takes upon himself to assert a thing to be true, which he does not know to be true, and has no reasonable ground to believe to be true," it is sufficient in an action of deceit. I agree, if he knows he has no such reasonable ground and the knowledge is present to his mind; otherwise, with great respect, I differ. He cites Lord Cairns (465 F.), that, "if persons take upon themselves to make assertions as to which they are ignorant whether they are true or untrue, they must in a civil point of view be held as responsible as if they had asserted that which they knew to be untrue." So say I, but this does not support Sir James's proposition. Nor does he deal with what he quotes from Lord Cranworth. But further (466), he speaks of legal fraud as meaning "that degree of moral culpability in the statement of an untruth to induce another to alter his position, to which the law attaches responsibility." But if there is moral culpability, I agree there is responsibility. But to believe without reasonable grounds is not moral culpability, but, (if there is such a thing) mental culpability. He says, "the word 'fraud' is in common parlance reserved for actions of great turpitude, but

H. L. (E.)

1889

DERBY
v.
PEEK.

Lord Bramwell.

H. L. (E.)
1889.
DERBY
v.
PEEK.

Lord Bramwell.
———

the law applies it to lesser breaches of moral duty." I agree the law applies it to all breaches of the moral duty to tell the truth in dealing with others; but that duty cannot be honestly broken. To be actionable, a breach of that duty must be dishonest. Nay, it is a man's duty sometimes to tell an untruth. For instance, when asked as to a servant's character, he must say what he believes is the truth, however he may have formed his opinion, and however wrong it may be. His Lordship says he cannot think the directors had any reasonable ground for believing the prospectus to be true. But had they the matter present to their minds? Even if this were the question I should decide in their favour.

As to the judgment of Lopes L.J., I quite agree with what he says: "I know of no fraud which will support an action of deceit to which some moral delinquency does not belong." I think that shews the meaning of what he says "fourthly," though that is made doubtful by what he says at 472 D.

I think, with all respect, that in all the judgments there is, I must say it, a confusion of unreasonableness of belief as evidence of dishonesty, and unreasonableness of belief as of itself a ground of action.

I have examined these judgments at this length owing to my sense of their importance and the importance of the question they deal with. I think it is most undesirable that actions should be maintainable in respect of statements, made unreasonably perhaps, but honestly. I think it would be disastrous if there was "a right to have true statements only made." This case is an example. I think that in this kind of case, as in some others, Courts of Equity have made the mistake of disregarding a valuable general principle in their desire to effect what is, or is thought to be, justice in a particular instance. It might, perhaps, be well to enact that in prospectuses of public companies there should be a warranty of the truth of all statements except where it was expressly said there was no warranty. The objection is to exceptional legislation, and to the danger of driving respectable and responsible men from being promoters, and of substituting for them those who are neither.

In this particular case I hold that unless fraud in the defendants could be shewn, the action is not maintainable. I am

satisfied there was no fraud.   Further, if an unreasonable mis-   H. L. (E.)
statement were enough, I hold there was none.   Still further, I        1889
do not believe that the plaintiff was influenced by the mis-       Derry
statement, though I am entirely satisfied that he was an honest        *v.*
witness.                                                              Peek.

Lord FitzGerald :—

My Lords, the pleadings and the facts have been already
referred to by the noble Lords who have addressed the House.
The action is for deceit.   The writ was sued out in February
1885, and originally claimed rescission of the contract with the
company.   It was subsequently amended by striking out the
company as defendants, and also the prayer for rescission, and it
assumed the character of an action for deceit against the present
appellants (five of the directors), and claimed "damages for the
fraudulent misrepresentations of the defendants."

The statement of claim, which is sufficient in form to raise the
real question, alleged the misrepresentation to exist in the pro-
spectus issued in February 1883, and to consist of the paragraph
so often read, that the company had a right to use steam or other
mechanical motive power; and it was further alleged "that the
defendants intended thereby to represent that the company had
an absolute right to use steam and other mechanical power," and
that such representation was made fraudulently, and with the
view to induce the plaintiff to take shares in the company.

So far, my Lords, the real issue seems to have been raised
fairly and clearly, and to depend on matters of fact.   There were
circumstances connected with the promotion of the company,
and the procuring of four of the defendants to act as directors,
which tended to create suspicion as to their statements and their
bona fides, and attracted directly the attention of the learned
judge before whom the case was tried.   The defendants, who
were severally produced as witnesses at the trial, were exposed
to a very lengthened and searching cross-examination by counsel
for the plaintiff, and were also carefully examined by the judge
as to these transactions, with the result apparently of freeing
them from any imputation therein of moral misconduct.

The question which I am about to examine in the first in-

H. L. (E.)
1889
DERRY
*v.*
PEEK.

Lord FitzGerald.

stance, and excluding for the present the element of fraud, is, whether the impugned statement in the prospectus was a false statement in the sense of being untrue. That it was inaccurate so far as it purported to give the legal effect of the special Act I do not doubt, but was it untrue as representing the position of the company in a popular and business sense? The General Tramways Act (33 & 34 Vict. c. 78), which regulates tramways generally, but subject to the provisions of the special Act, if any, of each company, places them under the supervision of the Board of Trade with a view to public safety, and for public protection generally, and by its 34th section it provides "that all carriages used on tramways shall be moved by the power prescribed by the special Act."

The special Act of this company became law on the 24th of July 1882, and by ss. 4 and 5 the company incorporated by the Act is empowered to make the seven tramways in question in all respects in accordance with the plans and sections. Sect. 15 provides minutely for their formation, subject to the orders of the Board of Trade, and by sect. 16 the tramway is not to be opened for public traffic until it shall have been inspected and certified by the Board of Trade to be fit for such traffic.

Before referring to the 35th section of the special Act we may glance at sect. 37 of that Act, which empowers the Board of Trade to make bye-laws as to any of the tramways on which steam may be used under the authority of the Act, and sect. 44, which provides that where the company intends to use steam they shall give two months' notice.

There are several other sections providing for the use of steam power if the company should elect to use it as the motor.

In the light of those sections of the special Act, and of sect. 34 of the general Act, let us now look at the particular paragraph of the prospectus, and sect. 35 of the special Act. By that section Parliament has done that which Parliament could *do*, and which the Board of Trade could not do. It has conferred on the company authority to use steam as its motive power. It has not imposed on the company the use of steam power, but it says that they may use it if they elect to do so. Before dealing with the consent of the Board of Trade I desire to call attention

to the proviso in the 35th section, "that the exercise of the H. L. (E.)
powers hereby conferred with respect to the use of steam shall 1889
be subject to the regulations in Schedule 'A,' and to any regula- DERBY
tions which may be added thereto or substituted therefor by the v.<br>PEEK.
Board of Trade for securing to the public all reasonable pro- Lord FitzGerald.
tection against danger in the exercise of the powers by this Act
conferred with respect to the use of steam."

Schedule A., referred to in sect. 35, contains no less than ten
regulations for the direction of the company in the exercise of
the right so conferred to use steam power.

Now, turning back to the words "with the consent of the
Board of Trade," in sect. 35 of the special Act, that consent could
not confer, nor would its absence take away, the right conferred
by the legislature to use steam as a motor. Its true character is
that of a precaution imposed by the legislature to defer the
actual exercise of the right conferred until the supervision of the
Board of Trade secures to the public all reasonable protections
against danger. To attain these objects the legislature provides
that the powers it has conferred should not be actually exercised
without the consent of the Board of Trade.

My Lords, I have, though with difficulty, arrived at the con-
clusion that the statement in the prospectus, that by the special
Act the company had the right to use steam power, was not
untrue in a popular or business sense.

Let us see for a moment in what way and with what meaning
General Hutchinson used similar expressions. In his report of
the 12th of July 1884 he says: "The Act of 1882 gives, however,
the company authority to use mechanical power over all their
system, and I think it would be most objectionable that this
power should be exercised on parts of Tramway No. 1 on account
of the narrowness of three of the roads."

The remainder of the incriminated paragraph of the prospectus
is, "and it is fully expected that by means of this (i.e., the use
of steam) a considerable saving will result in the working
expenses of the line as compared with other tramways worked by
horses." This was not untrue: there had been a division of
opinion in the directory on the subject, which was finally and
before the issue of the prospectus resolved in favour of steam.

03635-jpm    Doc 173-2    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
Pg 717 of 856

H. L. E.)

1889

DERBY

*v.*

PEEK.

Lord FitzGerald.

The conclusion I have arrived at, my Lords, is that this paragraph of the prospectus, though inaccurate in point of law in one particular, seems on the whole to have been morally true.

If this view is correct it is an answer to the action, but assuming that it is not correct, or that your Lordships are not prepared to adopt it, I proceed to express my opinion on the remaining substance of the action. Cotton L.J. describes the action as "an action of deceit, a mere common law action." The description is accurate, and I proceed to deal with it as a mere common law action. It has not been in the least altered in its characteristics by having been instituted in the Chancery Division, or tried by a judge without the aid of a jury, nor are your Lordships necessarily driven to consider on the present appeal some of the subtle and refined distinctions which have been engrafted on the clear and simple principles of the common law. The action for deceit at common law is founded on fraud. It is essential to the action that moral fraud should be established, and since the case of *Collins* v. *Evans* (1), in the Exchequer Chamber, it has never been doubted that fraud must concur with the false statement to maintain the action. It would not be sufficient to shew that a false representation had been made. It must further be established that the defendant knew at the time of making it that the representation was untrue, or, to adopt the language of the learned editors of the Leading Cases, that "the defendant must be shewn to have been actually and fraudulently cognisant of the falsehood of his representation or to have made it fraudulently without belief that it was true." The leading counsel for the respondent met the argument fairly on the allegations of fact. He alleged "that the defendants were not honest; that they stated in the prospectus a definite lie, and knew that it was a lie." That is the very issue, in fact, in the case.

The whole law and all the cases on the subject will be found in the notes to *Chandelor* v. *Lopus* (2) and *Pasley* v. *Freeman* (3). There is also a clear and able summary of the decisions, both in law and in equity, brought down to the present time in the recent edition of Benjamin on Sales, by Pearson-Gee and Boyd.

(1) 5 Q. B. 804, 820.          (2) 1 Smith's L. C. 9th Ed. p. 186.
(3) 2 Smith's L. C. 9th Ed. p. 74.

I desire to make an observation on *Chandelor* v. *Lopus* (1). The report in Cro. Jac. 4 would seem to have but little direct bearing on the present case were it not for the opinion attributed to Anderson J.; but there is a valuable note in 1 Dyer by Vaillant (75a) which is as follows: Lopus brought an action upon the case against Chandelor, and shewed that, whereas the defendant was a goldsmith, and skilled in the nature of precious stones, and being possessed of a stone which the defendant asserted and assured the said plaintiff to be a true and perfect stone called a bezoar stone &c., upon which the plaintiff bought it &c. There the opinion of Popham C.J. was " that if I have any commodities which are damaged (whether victuals or otherwise), and I, *knowing them to be so,* sell them for good, and affirm them to be so, an action upon the case lies for the deceit: but although they be damaged, if I, *knowing not that,* affirm them to be good, still no action lies, without I warrant them to be good." The action seems originally to have been on a warranty which failed in fact, as there had been no warranty, and it was then sought to support it as an action for deceit; but it was not alleged in the count that the defendant knew the representation to be untrue. It was in reference to that that the observation of Popham C.J. was made. He had the reputation of being a consummate lawyer.

The note in 1 Dyer (75a) was probably by Mr. Treby, afterwards Chief Justice Treby. He edited an edition of Dyer published in 1688. I have not had an opportunity of referring to it, but it is said that he gave the public some highly authoritative notes in that edition. I have quoted from Mr. Vaillant's edition, published in 1794.

The whole evidence given on this appeal has been laid before your Lordships, and we have to deal with it as a whole. That evidence has been already so fully stated and criticised that it is not necessary for me to do more than to state the conclusions of fact which in my opinion are reasonably to be deduced from it, viz. that the several defendants did not know that the incriminated statement in the prospectus was untrue, and that, on the contrary, they severally and in good faith believed it to be

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord FitzGerald.

(1) 1 Smith's L. C. 9th Ed. p. 186.

358                          HOUSE OF LORDS                    [VOL. XIV.

H. L. (E.)  true.  The conclusions, in fact, at which I have arrived, render
1889        it unnecessary for me to consider the long and rather bewildering
DERRY       list of authorities to which your Lordships were referred, or to
*v.*        criticise the reasons given in the Court of Appeal for their deci-
PEEK.       sion in the present case.  I desire, however, to make a single
Lord FitzGerald.  observation.

There is one characteristic which, as it seems to me, pervades
each of the several judgments in the Court of Appeal, viz. that
the bonâ fide belief of the defendants in the truth of the repre-
sentation was unavailing unless it was a reasonable belief resting
on reasonable grounds.  If this is correct, it seems to me that in
an action for "deceit" it would be necessary to submit to the
jury (if tried before that tribunal) not only the existence of that
belief bonâ fide, but also the grounds on which it was arrived at,
and their reasonableness.

I am by no means satisfied that such is the law, and if now
driven to express an opinion on it, I would prefer following the
opinion of Lord Cranworth in *Western Bank of Scotland* v.
*Addie* (1), in which he said: "I confess that my opinion was
that in what his Lordship (the Lord President) thus stated, he
went beyond what principle warrants.  If persons in the situa-
tion of directors of a bank make statements as to the condition
of its affairs, which they bonâ fide believe to be true, I cannot
think they can be guilty of fraud, because other persons think,
or the Court thinks, or your Lordships think, that there was no
sufficient ground to warrant the opinion which they had formed.
If a little more care and caution must have led the directors to a
conclusion different from that which they put forth, this may
afford strong evidence to shew that they did not really believe
in the truth of what they stated, and so that they were guilty of
fraud.  But this would be the consequence, not of their having
stated as true what they had not reasonable ground to believe to
be true, but of their having stated as true what they did not
believe to be true."

A director is bound in all particulars to be careful and cir-
cumspect, and not, either in his statements to the public or in
the performance of the duties he has undertaken, to be careless

(1) Law Rep. 1 H. L., Sc. 145, 168.

or negligent, or rash. Want of care or circumspection, as well as recklessness, may in such a case as the present be taken into consideration in determining at every stage the question of bona fides.

My Lords, I am of opinion that the decision of the Court of Appeal should be reversed.

H. L. (E.)

1889

DERRY
*v.*
PEEK.

LORD HERSCHELL :—

My Lords, in the statement of claim in this action the respondent, who is the plaintiff, alleges that the appellants made in a prospectus issued by them certain statements which were untrue, that they well knew that the facts were not as stated in the prospectus, and made the representations fraudulently, and with the view to induce the plaintiff to take shares in the company.

"This action is one which is commonly called an action of deceit, a mere common law action." This is the description of it given by Cotton L.J. in delivering judgment. I think it important that it should be borne in mind that such an action differs essentially from one brought to obtain rescission of a contract on the ground of misrepresentation of a material fact. The principles which govern the two actions differ widely. Where rescission is claimed it is only necessary to prove that there was misrepresentation; then, however honestly it may have been made, however free from blame the person who made it, the contract, having been obtained by misrepresentation, cannot stand. In an action of deceit, on the contrary, it is not enough to establish misrepresentation alone; it is conceded on all hands that something more must be proved to cast liability upon the defendant, though it has been a matter of controversy what additional elements are requisite. I lay stress upon this because observations made by learned judges in actions for rescission have been cited and much relied upon at the bar by counsel for the respondent. Care must obviously be observed in applying the language used in relation to such actions to an action of deceit. Even if the scope of the language used extend beyond the particular action which was being dealt with, it must be remembered that the learned judges were not engaged in deter-

H. L. (E.)

1889

DERRY
v.
PEEK.

Lord Herschell.

mining what is necessary to support an action of deceit, or in discriminating with nicety the elements which enter into it.

There is another class of actions which I must refer to also for the purpose of putting it aside. I mean those cases where a person within whose special province it lay to know a particular fact, has given an erroneous answer to an inquiry made with regard to it by a person desirous of ascertaining the fact for the purpose of determining his course accordingly, and has been held bound to make good the assurance he has given. *Burrowes* v. *Lock* (1) may be cited as an example, where a trustee had been asked by an intended lender, upon the security of a trust fund, whether notice of any prior incumbrance upon the fund had been given to him. In cases like this it has been said that the circumstance that the answer was honestly made in the belief that it was true affords no defence to the action. Lord Selborne pointed out in *Brownlie* v. *Campbell* (2) that these cases were in an altogether different category from actions to recover damages for false representation, such as we are now dealing with.

One other observation I have to make before proceeding to consider the law which has been laid down by the learned judges in the Court of Appeal in the case before your Lordships. " An action of deceit is a common law action, and must be decided on the same principles, whether it be brought in the Chancery Division or any of the Common Law Divisions, there being, in my opinion, no such thing as an equitable action for deceit." This was the language of Cotton L.J. in *Arkwright* v. *Newbould* (3). It was adopted by Lord Blackburn in *Smith* v. *Chadwick* (4), and is not, I think, open to dispute.

In the Court below Cotton L.J. said : " What in my opinion is a correct statement of the law is this, that where a man makes a statement to be acted upon by others which is false, and which is known by him to be false, or is made by him recklessly, or without care whether it is true or false, that is, without any reasonable ground for believing it to be true, he is liable in an action of deceit at the suit of anyone to whom it was addressed or anyone of the class to whom it was addressed and who was

(1) 10 Ves. 470.                    (3) 17 Ch. D. 320.
(2) 5 App. Cas. at p. 935.          (4) 9 App. Cas. 193.

materially induced by the misstatement to do an act to his pre- **H. L. (E.)**
judice." About much that is here stated there cannot, I think, 1889
be two opinions. But when the learned Lord Justice speaks of Derry
a statement made recklessly or without care whether it is true or *v.*
false, *that is* without any reasonable ground for believing it to be Peek.
true, I find myself, with all respect, unable to agree that these are Lord Herschell.
convertible expressions. To make a statement careless whether
it be true or false, and therefore without any real belief in its
truth, appears to me to be an essentially different thing from
making, through want of care, a false statement, which is never-
theless honestly believed to be true. And it is surely conceiv-
able that a man may believe that what he states is the fact,
though he has been so wanting in care that the Court may
think that there were no sufficient grounds to warrant his belief.
I shall have to consider hereafter whether the want of reasonable
ground for believing the statement made is sufficient to support
an action of deceit. I am only concerned for the moment to
point out that it does not follow that it is so, because there is
authority for saying that a statement made recklessly, without
caring whether it be true or false, affords sufficient foundation
for such an action.

That the learned Lord Justice thought that if a false statement
were made without reasonable ground for believing it to be true
an action of deceit would lie, is clear from a subsequent passage
in his judgment. He says that when statements are made in a
prospectus like the present, to be circulated amongst persons in
order to induce them to take shares, "there is a duty cast upon
the director or other person who makes those statements to take
care that there are no expressions in them which in fact are false;
to take care that he has reasonable ground for the material state-
ments which are contained in that document which he prepares
and circulates for the very purpose of its being acted upon by
others."

The learned judge proceeds to say: "Although in my opinion
it is not necessary that there should be what I should call fraud,
yet in these actions, according to my view of the law, there must
be a departure from duty, that is to say, an untrue statement
made without any reasonable ground for believing that statement

H. L. (E.)
1889
DERRY
*v.*
PEEK.

Lord Herschell.

to be true; and in my opinion when a man makes an untrue state-
ment with an intention that it shall be acted upon without any
reasonable ground for believing that statement to be true he
makes a default in a duty which was thrown upon him from the
position he has taken upon himself, and he violates the right
which those to whom he makes the statement have to have true
statements only made to them."

Now I have first to remark on these observations that the
alleged " right " must surely be here stated too widely, if it is
intended to refer to a legal right, the violation of which may
give rise to an action for damages. For if there be a right to
have true statements only made, this will render liable to an
action those who make untrue statements, however innocently.
This cannot have been meant. I think it must have been
intended to make the statement of the right correspond with
that of the alleged duty, the departure from which is said to be
making an untrue statement without any reasonable ground for
believing it to be true. I have further to observe that the Lord
Justice distinctly says that if there be such a departure from
duty an action of deceit can be maintained, though there be not
what he should call fraud. I shall have by-and-by to consider
the discussions which have arisen as to the difference between
the popular understanding of the word " fraud " and the inter-
pretation given to it by lawyers, which have led to the use of
such expressions as " legal fraud," or " fraud in law;" but I may
state at once that, in my opinion, without proof of fraud no action
of deceit is maintainable. When I examine the cases which have
been decided upon this branch of the law, I shall endeavour
to shew that there is abundant authority to warrant this pro-
position.

I return now to the judgments delivered in the Court of
Appeal. Sir James Hannen says: " I take the law to be that if
a man takes upon himself to assert a thing to be true which he
does not know to be true, and has no reasonable ground to believe
to be true, in order to induce another to act upon the asser-
tion, who does so act and is thereby damnified, the person so
damnified is entitled to maintain an action for deceit." Again,
Lopes L.J. states what, in his opinion, is the result of the

cases. I will not trouble your Lordships with quoting the first three propositions which he lays down, although I do not feel sure that the third is distinct from, and not rather an instance of, the case dealt with by the second proposition. But he says that a person making a false statement, intended to be and in fact relied on by the person to whom it is made, may be sued by the person damaged thereby: "Fourthly, if it is untrue in fact, but believed to be true, but without any reasonable grounds for such belief."

It will thus be seen that all the learned judges concurred in thinking that it was sufficient to prove that the representations made were not in accordance with fact, and that the person making them had no reasonable ground for believing them. They did not treat the absence of such reasonable ground as evidence merely that the statements were made recklessly, careless whether they were true or false, and without belief that they were true, but they adopted as the test of liability, not the existence of belief in the truth of the assertions made, but whether the belief in them was founded upon any reasonable grounds. It will be seen, further, that the Court did not purport to be establishing any new doctrine. They deemed that they were only following the cases already decided, and that the proposition which they concurred in laying down was established by prior authorities. Indeed, Lopes L.J. expressly states the law in this respect to be well settled. This renders a close and critical examination of the earlier authorities necessary.

I need go no further back than the leading case of *Pasley* v. *Freeman* (1). If it was not there for the first time held that an action of deceit would lie in respect of fraudulent representations against a person not a party to a contract induced by them, the law was at all events not so well settled but that a distinguished Judge, Grose J., differing from his brethren on the Bench, held that such an action was not maintainable. Buller J., who held that the action lay, adopted in relation to it the language of Croke J., in 3 Bulstrode 95, who said: "Fraud without damage, or damage without fraud, gives no cause of action, but where these two concur an action lies." In reviewing the case

(1) 2 Smith's L. C. 74.

H. L. (E.)

1889

DERBY
*v.*
PEEK.

Lord Herschell.

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord Herschell,

of *Crosse* v. *Gardner* (1) he says : " Knowledge of the falsehood of the thing asserted is fraud and deceit ;" and further, after pointing out that in *Risney* v. *Selby* (2) the judgment proceeded wholly on the ground that the defendant knew what he asserted to be false, he adds : " The assertion alone will not maintain the action, but the plaintiff must go on to prove that it was false, *and that the defendant knew it to be so*," the latter words being specially emphasised. Kenyon C.J. said : " The plaintiffs applied to the defendant, telling him that they were going to deal with Falch, and desired to be informed of his credit, when the defendant fraudulently, and knowing it to be otherwise, and with a design to deceive the plaintiffs, made the false affirmation stated on the record, by which they sustained damage. Can a doubt be entertained for a' moment but that this is injurious to the plaintiffs ?"  In this case it was evidently considered that fraud was the basis of the action, and that such fraud might consist in making a statement known to be false.

*Haycraft* v. *Creasy* (3) was again an action in respect of a false affirmation made by the defendant to the plaintiff about the credit of a third party whom the plaintiff was about to trust. The words complained of were, " I can assure you of my own knowledge that you may credit Miss R. to any amount with perfect safety." All the judges were agreed that fraud was of the essence of the action, but they differed in their view of the conclusion to be drawn from the facts.  Lord Kenyon thought that fraud had been proved, because the defendant stated that to be true within his own knowledge which he did not know to be true.  The other judges thinking that the defendant's words vouching his own knowledge were no more than a strong expression of opinion, inasmuch as a statement concerning the credit of another can be no more than a matter of opinion, and that he did believe the lady's credit to be what he represented, held that the action would not lie.  It is beside the present purpose to inquire which view of the facts was the more sound.  Upon the law there was no difference of opinion.  It is a distinct decision that knowledge of the falsity of the affirmation made is essential to the

(1) Carth. 90.                        (2) 1 Salk. 211.
(3) 2 East, 92.

maintenance of the action, and that belief in its truth affords a
defence.

I may pass now to *Foster* v. *Charles* (1). It was there con-
tended that the defendant was not liable, even though the repre-
sentation he had made was false to his knowledge, because he
had no intention of defrauding or injuring the plaintiff. This
contention was not upheld by the Court, Tindal C.J. saying:
" It is fraud in law if a party makes representations which he
knows to be false, and injury ensues, although the motives from
which the representations proceeded may not have been bad."
This is the first of the cases in which I have met with the expres-
sion " fraud in law." It was manifestly used in relation to the
argument that the defendant was not actuated by a desire to
defraud or injure the person to whom the representation was
made. The popular use of the word " fraud " perhaps involves
generally the conception of such a motive as one of its elements.
But I do not think the Chief Justice intended to indicate any
doubt that the act which he characterised as a fraud in law was
in truth fraudulent as a matter of fact also. Wilfully to tell a
falsehood, intending that another shall be led to act upon it as if
it were the truth, may well be termed fraudulent, whatever the
motive which induces it, though it be neither gain to the person
making the assertion nor injury to the person to whom it is
made.

*Foster* v. *Charles* (1) was followed in *Corbett* v. *Brown* (2), and
shortly afterwards in *Polhill* v. *Walter* (3). The learned counsel
for the respondent placed great reliance on this case, because
although the jury had negatived the existence of fraud in fact the
defendant was nevertheless held liable. It is plain, however, that
all that was meant by this finding of the jury was, that the defen-
dant was not actuated by any corrupt or improper motive, for Lord
Tenterden says, " It was contended that . . . in order to maintain
this species of action it is not necessary to prove that the false
representation was made from a corrupt motive of gain to the
defendant or a wicked motive of injury to the plaintiff; it was
said to be enough if a representation is made which the party

H. L. (E.)

1889

DERBY
*v.*
PEEK.

Lord Herschell.

(1) 7 Bing. 105.                    (2) 8 Bing. 33.
(3) 3 B. & Ad. 114.

H. L. (E.)
1889
DERRY
*v.*
PEEK.

Lord Herschell.

making it knows to be untrue, and which is intended by him, or which from the mode in which it is made is calculated, to induce another to act on the faith of it in such a way as that he may incur damage, and that damage is actually incurred. A wilful falsehood of such a nature was contended to be in the legal sense of the word *a fraud*, and for this position was cited *Foster* v. *Charles* (1), to which may be added the recent case of *Corbett* v. *Brown* (2). The principle of these cases appears to us to be well founded, and to apply to the present."

In a later case of *Crawshay* v. *Thompson* (3) Maule J. explains *Polhill* v. *Walter* (4) thus : " If a wrong be done by a false representation of a party who knows such representation to be false, the law will infer an intention to injure. That is the effect of *Polhill* v. *Walter*" (4). In the same case, Cresswell J. defines " fraud in law," in terms which have been often quoted. " The cases," he says, " may be considered to establish the principle that fraud in law consists in knowingly asserting that which is false in fact to the injury of another."

In *Moens* v. *Heyworth* (5), which was decided in the same year as *Crawshay* v. *Thompson* (3), Lord Abinger having suggested that an action of fraud might be maintained where no moral blame was to be imputed, Parke B. said : " To support that count (viz., a count for fraudulent representation) it was essential to prove that the defendants *knowingly* " (and I observe that this word is emphasised), " by words or acts, made such a representation as is stated in the third count, relative to the invoice of these goods, as they knew to be untrue."

The next case in the series, *Taylor* v. *Ashton* (6), is one which strikes me as being of great importance. It was an action brought against directors of a bank for fraudulent representations as to its affairs, whereby the plaintiff was induced to take shares. The jury found the defendants not guilty of fraud, but expressed the opinion that they had been guilty of gross negligence. Exception was taken to the mode in which the case was left to the jury, and it was contended that their verdict was sufficient

(1) 7 Bing. 105.          (4) 3 B. & Ad. 114.
(2) 8 Bing. 33.           (5) 10 M. & W. at p. 157.
(3) 4 M. & Gr. 357.       (6) 11 M. & W. 401.

H. L. (E.)
1889
DERRY
v.
PEEK.
Lord Herschell.

to render the defendants liable ; Parke B., however, in delivering the opinion of the Court said : " It is insisted that even that (viz., the gross negligence which the jury had found), accompanied with a damage to the plaintiff in consequence of that gross negligence, would be sufficient to give him a right of action. From this proposition we entirely dissent, because we are of opinion that, independently of any contract between the parties, no one can be made responsible for a representation of this kind unless it be *fraudulently made*. . . . But then it was said that in order to constitute that fraud, it was not necessary to shew that the defendants *knew* the fact they stated to be untrue, that it was enough that the fact *was* untrue if they communicated that fact for a deceitful purpose, and to that proposition the Court is prepared to assent. It is not necessary to shew that the defendants knew the facts to be untrue ; if they stated a fact which was untrue for a fraudulent purpose, they at the same time *not believing* that fact to be true, in that case it would be both a legal and moral fraud."

Now it is impossible to conceive a more emphatic declaration than this, that to support an action of deceit fraud must be proved, and that nothing less than fraud will do. I can find no trace of the idea that it would suffice if it were shewn that the defendants had not reasonable grounds for believing the statements they made. It is difficult to understand how the defendants could, in the case on which I am commenting, have been guilty of gross negligence in making the statements they did, if they had reasonable grounds for believing them to be true, or if they had taken care that they had reasonable grounds for making them.

All the cases I have hitherto referred to were in courts of first instance. But in *Collins* v. *Evans* (1) they were reviewed by the Exchequer Chamber. The judgment of the Court was delivered by Tindal C.J. After stating the question at issue to be " whether a statement or representation which is false in fact, but not known to be so by the party making it, but, on the contrary, made honestly and in the full belief that it is true, affords a ground of action," he proceeds to say : " The current of

(1) 5 Q. B. 804, 820.

368                         HOUSE OF LORDS                [VOL. XIV.

H. L. (E.)  the authorities, from *Pasley* v. *Freeman* (1) downwards, has laid
1889       down the general rule of law to be, that fraud must concur with
DERRY      the false statement in order to give a ground of action." Is it not
v.         clear that the Court considered that fraud was absent if the state-
PEEK.      ment was "made honestly, and in the full belief that it was true"?
Lord Herschell.
           In *Evans* v. *Edmonds* (2) Maule J. expressed an important
opinion, often quoted, which has been thought to carry the law
further than the previous authorities, though I do not think it
really does so. He said: "If a man having no knowledge what-
ever on the subject takes upon himself to represent a certain
state of facts to exist he does so at his peril, and if it be done
either with a view to secure some benefit to himself or to deceive
a third person he is in law guilty of a fraud, for he takes upon
himself to warrant his own belief of the truth of that which he
so asserts. Although the person making the representation may
have no knowledge of its falsehood the representation may still
have been fraudulently made." The foundation of this proposi-
tion manifestly is, that a person making any statement which he
intends another to act upon must be taken to warrant his belief
in its truth. Any person making such a statement must always
be aware that the person to whom it is made will understand, if
not that he who makes it *knows*, yet at least that he *believes* it to
be true. And if he has no such belief he is as much guilty of
fraud as if he had made any other representation which he knew
to be false, or did not believe to be true.

I now arrive at the earliest case in which I find the suggestion
that an untrue statement made without reasonable ground for
believing it will support an action for deceit. In *Western
Bank of Scotland* v. *Addie* (3) the Lord President told the jury
"that if a case should occur of directors taking upon themselves
to put forth in their report statements of importance in regard to
the affairs of the bank false in themselves and which they did not
believe, or had no reasonable ground to believe to be true, that
would be a misrepresentation and deceit." Exception having been
taken to this direction without avail in the Court of Session, Lord
Chelmsford in this House said: "I agree in the propriety of this

(1) 2 Smith's L. C. 74.              (2) 13 C. B. 777.
(3) Law Rep. 1 H. L., Sc. 145, 162.

interlocutor.  In the argument upon this exception the case was put of an honest belief being entertained by the directors, of the reasonableness of which it was said the jury, upon this direction, would have to judge.  But supposing a person makes an untrue statement which he asserts to be the result of a bonâ fide belief in its truth, how can the bona fides be tested except by considering the grounds of such belief?  And if an untrue statement is made founded upon a belief which is destitute of all reasonable grounds, or which the least inquiry would immediately correct, I do not see that it is not fairly and correctly characterised as misrepresentation and deceit."

I think there is here some confusion between that which is evidence of fraud, and that which constitutes it.  A consideration of the grounds of belief is no doubt an important aid in ascertaining whether the belief was really entertained.  A man's mere assertion that he believed the statement he made to be true is not accepted as conclusive proof that he did so.  There may be such an absence of reasonable ground for his belief as, in spite of his assertion, to carry conviction to the mind that he had not really the belief which he alleges.  If the learned Lord intended to go further, as apparently he did, and to say that though the belief was really entertained, yet if there were no reasonable grounds for it, the person making the statement was guilty of fraud in the same way as if he had known what he stated to be false, I say, with all respect, that the previous authorities afford no warrant for the view that an action of deceit would lie under such circumstances.  A man who forms his belief carelessly, or is unreasonably credulous, may be blameworthy when he makes a representation on which another is to act, but he is not, in my opinion, fraudulent in the sense in which that word was used in all the cases from *Pasley* v. *Freeman* (1) down to that with which I am now dealing.  Even when the expression "fraud in law" has been employed, there has always been present, and regarded as an essential element, that the deception was wilful either because the untrue statement was known to be untrue, or because belief in it was asserted without such belief existing.

H. L. (E.)

1889

DERRY

*v.*

PEEK.

Lord Herschell.

(1) 2 Smith's L. C. 74.

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Herschell.

I have made these remarks with the more confidence because they appear to me to have the high sanction of Lord Cranworth. In delivering his opinion in the same case he said: "I confess that my opinion was that in what his Lordship (the Lord President) thus stated, he went beyond what principle warrants. If persons in the situation of directors of a bank make statements as to the condition of its affairs which they bonâ fide believe to be true, I cannot think they can be guilty of fraud because other persons think, or the Court thinks, or your Lordships think, that there was no sufficient ground to warrant the opinion which they had formed. If a little more care and caution must have led the directors to a conclusion different from that which they put forth, this may afford strong evidence to shew that they did not really believe in the truth of what they stated, and so that they were guilty of fraud. But this would be the consequence not of their having stated as true what they had not reasonable ground to believe to be true, but of their having stated as true what they did not believe to be true."

Sir James Hannen, in his judgment below, seeks to limit the application of what Lord Cranworth says to cases where the statement made is a matter of opinion only. With all deference I do not think it was intended to be or can be so limited. The direction which he was considering, and which he thought went beyond what true principle warranted, had relation to making false statements of importance in regard to the affairs of the bank. When this is borne in mind, and the words which follow those quoted by Sir James Hannen are looked at, it becomes to my mind obvious that Lord Cranworth did not use the words " the opinion which they had formed " as meaning anything different from " the belief which they entertained."

The opinions expressed by Lord Cairns in two well-known cases have been cited as though they supported the view that an action of deceit might be maintained without any fraud on the part of the person sued. I do not think they bear any such construction. In the case of *Reese Silver Mining Co.* v. *Smith* (1) he said: "If persons take upon themselves to make assertions as to which they are ignorant whether they are true or untrue

(1) Law Rep. 4 H. L. 64, 79.

they must, in a civil point of view, be held as responsible as if
they had asserted that which they knew to be untrue." This
must mean that the persons referred to were conscious when
making the assertion that they were ignorant whether it was
true or untrue. For if not it might be said of any one who
innocently makes a false statement. He must be ignorant that
it is untrue, for otherwise he would not make it innocently; he
must be ignorant that it is true, for by the hypothesis it is false.
Construing the language of Lord Cairns in the sense I have
indicated, it is no more than an adoption of the opinion expressed
by Maule J. in *Evans* v. *Edmonds* (1). It is a case of the
representation of a person's belief in a fact when he is conscious
that he knows not whether it be true or false, and when he has
therefore no such belief. When Lord Cairns speaks of it as not
being fraud in the more invidious sense, he refers, I think, only
to the fact that there was no intention to cheat or injure.

In *Peek* v. *Gurney* (2) the same learned Lord, after alluding to
the circumstance that the defendants had been acquitted of fraud
upon a criminal charge, and that there was a great deal to shew
that they were labouring under the impression that the concern
had in it the elements of a profitable commercial undertaking,
proceeds to say: " They may be absolved from any charge of a
wilful design or motive to mislead or defraud the public. But
in a civil proceeding of this kind all that your Lordships have
to examine is the question, was there, or was there not, misrepre-
sentation in point of fact ? If there was, however innocent the
motive may have been, your Lordships will be obliged to arrive
at the consequences which properly would result from what was
done." In the case then under consideration it was clear that
if there had been a false statement of fact it had been knowingly
made. Lord Cairns certainly could not have meant that in an
action of deceit the only question to be considered was whether
or not there was misrepresentation in point of fact. All that he
there pointed out was that in such a case motive was immaterial :
that it mattered not that there was no design to mislead or
defraud the public if a false representation were knowingly made.
It was therefore but an affirmation of the law laid down in *Foster*

H. L. (E.)

1889

DERBY
*v.*
PEEK.

Lord Herschell.

(1) 13 C. B. 777.    (2) Law Rep. 6 H. L. 377, 409.

3    2 C 2

372                           HOUSE OF LORDS              [VOL. XIV.

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord Herschell.

v. *Charles* (1), *Polhill* v. *Walter* (2), and other cases I have already referred to.

I come now to very recent cases. In *Weir* v. *Bell* (3) Lord Bramwell vigorously criticised the expression "legal fraud," and indicated a very decided opinion that an action founded on fraud could not be sustained except by the proof of fraud in fact. I have already given my reasons for thinking that, until recent times at all events, the judges who spoke of fraud in law did not mean to exclude the existence of fraud in fact, but only of an intention to defraud or injure.

In the same case Cotton L.J. stated the law in much the same way as he did in the present case, treating "recklessly" as equivalent to "without any reasonable ground for believing" the statements made.   But the same learned judge in *Arkwright* v. *Newbold* (4) laid down the law somewhat differently, for he said : "In an action of deceit the representation to found the action must not be innocent, that is to say, it must be made either with knowledge of its being false, or with a reckless disregard as to whether it is or is not true."   And his exposition of the law was substantially the same in *Edgington* v. *Fitzmaurice* (5).   In this latter case Bowen L.J. defined what the plaintiff must prove in addition to the falsity of the statement, as "secondly, that it was false to the knowledge of the defendants, or that they made it not caring whether it was true or false."

It only remains to notice the case of *Smith* v. *Chadwick* (6). The late Master of the Rolls there said, " A man may issue a prospectus or make any other statement to induce another to enter into a contract, believing that his statement is true, and not intending to deceive ; but he may through carelessness have made statements which are not true, and which he ought to have known were not true, and if he does so he is liable in an action for deceit ; he cannot be allowed to escape merely because he had good intentions, and did not intend to defraud."   This, like everything else that fell·from that learned judge, is worthy of respectful consideration.   With the last sentence I quite agree,

(1) 7 Bing. 105.                    (4) 17 Ch. D. 301.
(2) 3 B. & Ad. 114.                 (5) 29 Ch. D. 459.
(3) 3 Ex. D. 238.                   (6) 20 Ch. D. 27, 44, 67.

but I cannot assent to the doctrine that a false statement made through carelessness, and which ought to have been known to be untrue, of itself renders the person who makes it liable to an action for deceit. This does not seem to me by any means necessarily to amount to fraud, without which the action will not, in my opinion, lie.

It must be remembered that it was not requisite for Sir George Jessel in *Smith* v. *Chadwick* (1) to form an opinion whether a statement carelessly made, but honestly believed, could be the foundation of an action of deceit. The decision did not turn on any such point. The conclusion at which he arrived is expressed in these terms: " On the whole I have come to the conclusion that this, although in some respects inaccurate, and in some respects not altogether free from imputation of carelessness, was a fair, honest, and bonâ fide statement on the part of the defendants, and by no means exposes them to an action for deceit."

I may further note that in the same case, Lindley L.J. said: " The plaintiff has to prove, first, that the misrepresentation was made to him ; secondly, he must prove that it was false ; thirdly, that it was false to the knowledge of the defendants, or at all events that they did not believe the truth of it." This appears to be a different statement of the law to that which I have just criticised, and one much more in accord with the prior decisions.

The case of *Smith* v. *Chadwick* was carried to your Lordships' House (2). Lord Selborne thus laid down the law : " I conceive that in an action of deceit it is the duty of the plaintiff to establish two things: first, actual fraud, which is to be judged of by the nature and character of the representations made, considered with reference to the object for which they were made, the knowledge or means of knowledge of the person making them, and the intention which the law justly imputes to every man to produce those consequences which are the natural result of his acts ; and secondly, he must establish that this fraud was an inducing cause to the contract." It will be noticed that the noble and learned Lord regards the proof of actual fraud as essential, all the other matters to which he refers are elements to be considered in determining whether such fraud has been

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Herschell.

(1) 20 Ch. D. 27, 44, 67.                (2) 9 App. Cas. 187, 190.

**374**                              HOUSE OF LORDS                    [VOL. XIV.

established. Lord Blackburn indicated that although he nearly agreed with the Master of the Rolls, that learned judge had not quite stated what he conceived to be the law. He did not point out precisely how far he differed, but it is impossible to read his judgment in this case, or in that of *Brownlie* v. *Campbell* (1) without seeing that in his opinion proof of actual fraud or of a wilful deception was requisite.

Having now drawn attention, I believe, to all the cases having a material bearing upon the question under consideration, I proceed to state briefly the conclusions to which I have been led. I think the authorities establish the following propositions: First, in order to sustain an action of deceit, there must be proof of fraud, and nothing short of that will suffice. Secondly, fraud is proved when it is shewn that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states. To prevent a false statement being fraudulent, there must, I think, always be an honest belief in its truth. And this probably covers the whole ground, for one who knowingly alleges that which is false, has obviously no such honest belief. Thirdly, if fraud be proved, the motive of the person guilty of it is immaterial. It matters not that there was no intention to cheat or injure the person to whom the statement was made.

I think these propositions embrace all that can be supported by decided cases from the time of *Pasley* v. *Freeman* (2) down to *Western Bank of Scotland* v. *Addie* (3) in 1867, when the first suggestion is to be found that belief in the truth of what he has stated will not suffice to absolve the defendant if his belief be based on no reasonable grounds. I have shewn that this view was at once dissented from by Lord Cranworth, so that there was at the outset as much authority against it as for it. And I have met with no further assertion of Lord Chelmsford's view until

(1) 5 App. Cas. 925.                    (2) 2 Smith's L. C. 74.
(3) Law Rep. 1 H. L., Sc. 145.

the case of *Weir* v. *Bell* (1), where it seems to be involved in
Lord Justice Cotton's enunciation of the law of deceit. But no
reason is there given in support of the view, it is treated as
established law. The dictum of the late Master of the Rolls,
that a false statement made through carelessness, which the
person making it ought to have known to be untrue, would sustain
an action of deceit, carried the matter still further. But that
such an action could be maintained notwithstanding an honest
belief that the statement made was true, if there were no reason-
able grounds for the belief, was, I think, for the first time decided
in the case now under appeal.

 In my opinion making a false statement through want of care
falls far short of, and is a very different thing from, fraud, and
the same may be said of a false representation honestly believed
though on insufficient grounds. Indeed Cotton L.J. himself
indicated, in the words I have already quoted, that he should
not call it fraud. But the whole current of authorities, with
which I have so long detained your Lordships, shews to my mind
conclusively that fraud is essential to found an action of deceit,
and that it cannot be maintained where the acts proved cannot
properly be so termed. And the case of *Taylor* v. *Ashton* (2)
appears to me to be in direct conflict with the dictum of Sir
George Jessel, and inconsistent with the view taken by the
learned judges in the Court below. I observe that Sir Frederick
Pollock, in his able work on Torts (p. 243, note), referring, I pre-
sume, to the dicta of Cotton L.J. and Sir George Jessel M.R.,
says that the actual decision in *Taylor* v. *Ashton* (2) is not con-
sistent with the modern cases on the duty of directors of com-
panies. I think he is right. But for the reasons I have given
I am unable to hold that anything less than fraud will render
directors or any other persons liable to an action of deceit.

 At the same time I desire to say distinctly that when a false
statement has been made the questions whether there were reason-
able grounds for believing it, and what were the means of know-
ledge in the possession of the person making it, are most weighty
matters for consideration. The ground upon which an alleged
belief was founded is a most important test of its reality. I can
conceive many cases where the fact that an alleged belief was

  (1) 3 Ex. D. 238.     (2) 11 M. & W. 401.

*Right margin:*

H. L. (E.)

1889

DERBY
*v.*
PEEK.

Lord Herschell.

376                          HOUSE OF LORDS                 [VOL. XIV.

H. L. (E.)     destitute of all reasonable foundation would suffice of itself to
1889           convince the Court that it was not really entertained, and that
DERRY          the representation was a fraudulent one.  So, too, although
*v.*           means of knowledge are, as was pointed out by Lord Blackburn
PEEK.          in *Brownlie* v. *Campbell* (1), a very different thing from knowledge,
Lord Herschell.   if I thought that a person making a false statement had shut his
               eyes to the facts, or purposely abstained from inquiring into them,
               I should hold that honest belief was absent, and that he was just
               as fraudulent as if he had knowingly stated that which was false.

I have arrived with some reluctance at the conclusion to which
I have felt myself compelled, for I think those who put before
the public a prospectus to induce them to embark their money
in a commercial enterprise ought to be vigilant to see that it
contains such representations only as are in strict accordance
with fact, and I should be very unwilling to give any countenance
to the contrary idea.  I think there is much to be said for the
view that this moral duty ought to some extent to be converted
into a legal obligation, and that the want of reasonable care to
see that statements, made under such circumstances, are true,
should be made an actionable wrong.  But this is not a matter
fit for discussion on the present occasion.  If it is to be done the
legislature must intervene and expressly give a right of action
in respect of such a departure from duty.  It ought not, I think,
to be done by straining the law, and holding that to be fraudu-
lent which the tribunal feels cannot properly be so described.  I
think mischief is likely to result from blurring the distinction
between carelessness and fraud, and equally holding a man fraudu-
lent whether his acts can or cannot be justly so designated.

It now remains for me to apply what I believe to be the law
to the facts of the present case.  The charge against the defen-
dants is that they fraudulently represented that by the special
Act of Parliament which the company had obtained they had a
right to use steam or other mechanical power instead of horses.
The test which I purpose employing is to inquire whether the
defendants knowingly made a false statement in this respect, or
whether, on the contrary, they honestly believed what they stated
to be a true and fair representation of the facts.  Before con-
sidering whether the charge of fraud is proved, I may say that I

(1) 5 App. Cas. at p. 952.

approach the case of all the defendants, except Wilde, with the
inclination to scrutinise their conduct with severity. They most
improperly received sums of money from the promoters, and this
unquestionably lays them open to the suspicion of being ready
to put before the public whatever was desired by those who were
promoting the undertaking. But I think this must not be
unduly pressed, and when I find that the statement impeached
was concurred in by one whose conduct in the respect I have
mentioned was free from blame, and who was under no similar
pressure, the case assumes, I think, a different complexion.

I must further remark that the learned judge who tried the
cause, and who tells us that he carefully watched the demeanour
of the witnesses and scanned their evidence, came without hesi-
tation to the conclusion that they were witnesses of truth, and
that their evidence, whatever may be its effect, might safely be
relied on. An opinion so formed ought not to be differed from
except on very clear grounds, and after carefully considering the
evidence, I see no reason to dissent from Stirling J.'s conclusion.
I shall therefore assume the truth of their testimony.

I agree with the Court below that the statement made did not
accurately convey to the mind of a person reading it what the
rights of the company were, but to judge whether it may never-
theless have been put forward without subjecting the defendants
to the imputation of fraud, your Lordships must consider what
were the circumstances. By the General Tramways Act of 1870
it is provided that all carriages used on any tramway shall be
moved by the power prescribed by the special Act, and where
no such power is prescribed, by animal power only (1). In order,
therefore, to enable the company to use steam-power, an Act of
Parliament had to be obtained empowering its use. This had
been done, but the power was clogged with the condition that it
was only to be used with the consent of the Board of Trade. It
was therefore incorrect to say that the company had the right to
use steam ; they would only have that right if they obtained the
consent of the Board of Trade. But it is impossible not to see
that the fact which would impress itself upon the minds of those
connected with the company was that they had, after submitting

H. L. (E.)

1889

DERBY
v.
PEEK.

Lord Herschell.

(1) 33 & 34 Vict. c. 78, s. 34.

H L. (E.)
1889
DERRY
*v.*
PEEK.

Lord Herschell.

the plans to the Board of Trade, obtained a special Act empower-
ing the use of steam. It might well be that the fact that the
consent of the Board of Trade was necessary would not dwell in
the same way upon their minds, if they thought that the consent
of the Board would be obtained as a matter of course if its
requirements were complied with, and that it was therefore a
mere question of expenditure and care. The provision might
seem to them analogous to that contained in the General Tram-
ways Act, and I believe in the Railways Act also, prohibiting the
line being opened until it had been inspected by the Board of
Trade and certified fit for traffic, which no one would regard as a
condition practically limiting the right to use the line for the
purpose of a tramway or railway. I do not say that the two
cases are strictly analogous in point of law, but they may well
have been thought so by business men.

I turn now to the evidence of the defendants. I will take first
that of Mr. Wilde, whose conduct in relation to the promotion of
the company is free from suspicion. He is a member of the Bar
and a director of one of the London tramway companies. He
states that he was aware that the consent of the Board of Trade
was necessary, but that he thought that such consent had been
practically given, inasmuch as, pursuant to the Standing Orders,
the plans had been laid before the Board of Trade with the state-
ment that it was intended to use mechanical as well as horse-
power, and no objection having been raised by the Board of
Trade, and the Bill obtained, he took it for granted that no
objection would be raised afterwards, provided the works were
properly carried out. He considered, therefore, that, practically
and substantially they had the right to use steam, and that the
statement was perfectly true.

Mr. Pethick's evidence is to much the same effect. He thought
the Board of Trade had no more right to refuse their consent
than they would in the case of a railway; that they might have
required additions or alterations, but that on any reasonable re-
quirements being complied with they could not refuse their
consent. It never entered his thoughts that after the Board had
passed their plans, with the knowledge that it was proposed to
use steam, they would refuse their consent.

Mr. Moore states that he was under the impression that the passage in the prospectus represented the effect of sect. 35 of the Act, inasmuch as he understood that the consent was obtained. He so understood from the statements made at the board by the solicitors to the company, to the general effect that everything was in order for the use of steam, that the Act had been obtained subject to the usual restrictions, and that they were starting as a tramway company, with full power to use steam as other companies were doing.

Mr. Wakefield, according to his evidence, believed that the statement in the prospectus was fair; he never had a doubt about it. It never occurred to him to say anything about the consent of the Board of Trade, because as they had got the Act of Parliament for steam he presumed at once that they would get it.

Mr. Derry's evidence is somewhat confused, but I think the fair effect of it is that though he was aware that under the Act the consent of the Board of Trade was necessary, he thought that the company having obtained their Act the Board's consent would follow as a matter of course, and that the question of such consent being necessary never crossed his mind at the time the prospectus was issued. He believed at that time that it was correct to say they had the right to use steam.

As I have said, Stirling J. gave credit to these witnesses, and I see no reason to differ from him. What conclusion ought to be drawn from their evidence? I think they were mistaken in supposing that the consent of the Board of Trade would follow as a matter of course because they had obtained their Act. It was absolutely in the discretion of the Board whether such consent should be given. The prospectus was therefore inaccurate. But that is not the question. If they believed that the consent of the Board of Trade was practically concluded by the passing of the Act, has the plaintiff made out, which it was for him to do, that they have been guilty of a fraudulent misrepresentation? I think not. I cannot hold it proved as to any one of them that he knowingly made a false statement, or one which he did not believe to be true, or was careless whether what he stated was true or false. In short, I think they honestly believed that what they asserted was true, and I am of opinion that the charge of fraud made against them has not been established.

H. L. (E.)

1889

DERBY
*v.*
PEEK.

Lord Herschell.

H. L. (E.)
1889
⌣
DERRY
v.
PEEK.

Lord Herschell.

It is not unworthy of note that in his report to the Board of Trade, General Hutchinson, who was obviously aware of the provisions of the special Act, falls into the very same inaccuracy of language as is complained of in the defendants, for he says : " The Act of 1882 gives the company authority to use mechanical power over all their system."

I quite admit that the statements of witnesses as to their belief are by no means to be accepted blindfold. The probabilities must be considered. Whenever it is necessary to arrive at a conclusion as to the state of mind of another person, and to determine whether his belief under given circumstances was such as he alleges, we can only do so by applying the standard of conduct which our own experience of the ways of men has enabled us to form ; by asking ourselves whether a reasonable man would be likely under the circumstances so to believe. I have applied this test, with the result that I have a strong conviction that a reasonable man situated as the defendants were, with their knowledge and means of knowledge, might well believe what they state they did believe, and consider that the representation made was substantially true.

Adopting the language of Jessel M.R. in *Smith* v. *Chadwick* (1), I conclude by saying that on the whole I have come to the conclusion that the statement, " though in some respects inaccurate and not altogether free from imputation of carelessness, was a fair, honest and bonâ fide statement on the part of the defendants, and by no means exposes them to an action for deceit."

I think the judgment of the Court of Appeal should be reversed.

> *Order of the Court of Appeal reversed ; order of Stirling J. restored ; the respondent to pay to the appellants their costs below and in this House : cause remitted to the Chancery Division.*
>
> *Lords Journals* 1st July 1889.

Solicitors for appellants : *Linklater, Hackwood, Addison & Brown.*

Solicitors for respondent : *Tamplin, Tayler & Joseph.*

(1) 20 Ch. D. at p. 67.

TAB 19

*Deutsche Morgan Grenfell Group plc v Inland Revenue Commissioners*
[2007] 1 AC 558, House of Lords

558

**Deutsche Morgan Grenfell Group plc v IRC (HL(E))**          [2007] 1 AC

House of Lords                                              *A*

## Deutsche Morgan Grenfell Group plc *v* Inland Revenue Commissioners and another

### [2006] UKHL 49

2006 July 26, 27;                     Lord Hoffmann, Lord Hope of Craighead,   *B*
    Oct 25                       Lord Scott of Foscote, Lord Walker of Gestingthorpe
                                  and Lord Brown of Eaton-under-Heywood

*Restitution — Quasi-contract — Moneys had and received — Dividends paid by*
    *United Kingdom resident subsidiaries to non-resident parent companies*
    *subjected to advance corporation tax — Decision of European Court of Justice*
    *that tax unlawful for creating cashflow disadvantage and restricting freedom of*   *C*
    *establishment — Claimant commencing action against revenue for restitution of*
    *tax paid — Claimant contending payments made under mistake of law —*
    *Whether English law recognising claim in restitution to recover taxes paid under*
    *mistake of law — Whether claim statute-barred — Limitation Act 1980 (c 58),*
    *s 32(1)(c)*

Under provisions of the Income and Corporation Taxes Act 1988, as in force   *D*
until April 1999, certain distributions made by companies resident in the United
Kingdom were subject to advance corporation tax which was payable quarterly. Tax
so paid could later be set off against any liability to mainstream corporation tax. The
legislation also provided that two companies resident in the United Kingdom, one of
which owned at least 51% of the other, could make a group income election, a
consequence of which was that the subsidiary company was not obliged to account
for advance corporation tax on dividends paid to the parent company. In March   *E*
2001, the Court of Justice of the European Communities held that a tax regime
permitting resident parent companies but not non-resident ones to receive dividends
from their resident subsidiaries without payment of advance corporation tax created
a cashflow disadvantage and was an unwarranted restriction on freedom of
establishment. The court also held that in respect of payments of advance
corporation tax already made, Community law conferred a right of compensation or
restitution. The claimant, a UK subsidiary of a German parent company, had been   *F*
able to set off the advance corporation tax it had paid against its liability to
mainstream corporation tax, but had suffered a disadvantage of timing. In October
2000 the claimant commenced an action against the revenue seeking compensation
or restitution in respect of that disadvantage. The claim for restitution was made in
respect of dividends defined as amounts, which included, but were not limited to, the
payments specified in the schedules to the particulars of claim. The schedules were
amended in August 2001, giving details of a payment made in October 1993. In   *G*
August 2002 a further amendment was made giving particulars of payments made in
February 1995 and January 1996. The claimant contended that it had made the
payments under a mistake of law so that under section 32(1)(c) of the Limitation Act
1980[1], the limitation period began to run from the date it had discovered its mistake,
or could with reasonable diligence, have discovered it. The judge found for the
claimant. On the revenue's appeal the Court of Appeal found in favour of the
revenue in relation to the 1993 payment but dismissed the appeal in relation to   *H*
the 1995 and 1996 payments.

On appeal by the taxpayer and cross-appeal by the revenue and the Attorney
General—

[1] Limitation Act 1980, s 32(1): see post, para 108.

559
[2007] 1 AC                    Deutsche Morgan Grenfell Group plc v IRC (HL(E))

A        *Held*, allowing the appeal (Lord Scott of Foscote dissenting) and dismissing the
cross-appeal, that under the common law a taxpayer who wrongly paid tax under a
mistake of law was entitled to a restitutionary remedy against the revenue; that the
fact that a taxpayer might have a concurrent cause of action under another common
law principle, which had a shorter limitation period, did not prevent him from
pursuing his claim under mistake of law if the longer limitation period best suited his
interests; that (Lord Scott of Foscote dissenting) the claimant had paid advance

B     corporation tax under a mistake of law entitling it to a restitutionary remedy; that
(Lord Brown of Eaton-under-Heywood dissenting) the mistake of law was not
discovered by the claimant until the Court of Justice of the European Communities
gave its ruling in March 2001; and that, accordingly, the claimant's claims were not
statute-barred ( post, paras 17–19, 23, 30–31, 34, 44, 51, 56, 62, 67, 71–72, 83, 93,
135–144, 149, 161–162, 177).
         *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70,

C     HL(E) and *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349, HL(E)
considered.
         Decision of the Court of Appeal [2005] EWCA Civ 78; [2006] Ch 243; [2006]
2 WLR 103; [2005] 3 All ER 1025 reversed in part.

        The following cases are referred to in the opinions of their Lordships:

        *Aegis Group plc v Inland Revenue Comrs* [2005] EWHC 1468 (Ch); [2006] STC 23

D     *Air Canada v British Columbia* (1989) 59 DLR (4th) 161
        *Amministrazione delle Finanze dello Stato v SpA San Giorgio* (Case 199/82) [1983]
ECR 3595, ECJ
        *Associated Japanese Bank (International) Ltd v Crédit du Nord SA* [1989] 1 WLR
255; [1988] 3 All ER 902
        *Autologic Holdings plc v Inland Revenue Comrs* [2005] UKHL 54; [2006] 1 AC 118;
[2005] 3 WLR 339; [2005] 4 All ER 1141; [2005] STC 1357, HL(E)

E     *Barclays Bank Ltd v W J Simms Son & Cooke (Southern) Ltd* [1980] QB 677; [1980]
2 WLR 218; [1979] 3 All ER 522
        *Brennan v Bolt Burdon* [2004] EWCA Civ 1017; [2005] QB 303; [2004] 3 WLR
1321, CA
        *Customs and Excise Comrs v Barclays Bank plc* [2006] UKHL 28; [2007] 1 AC 181;
[2006] 3 WLR 1; [2006] 4 All ER 256, HL(E)
        *David Securities Pty Ltd v Commonwealth Bank of Australia* (1992) 175 CLR 353
        *First Roodhill Leasing Ltd v Gillingham Operating Co Ltd* (unreported) 5 July 2001,

F     Lightman J
        *Guinness Mahon & Co Ltd v Kensington and Chelsea Royal London Borough
Council* [1999] QB 215; [1998] 3 WLR 829; [1998] 2 All ER 272, CA
        *Haward v Fawcetts* [ 2006] UKHL 9; [2006] 1 WLR 682; [2006] 3 All ER 497, HL(E)
        *Hazell v Hammersmith and Fulham London Borough Council* [1992] 2 AC 1; [1991]
2 WLR 372; [1991] 1 All ER 545, HL(E)
        *Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465; [1963] 3 WLR 101;

G      [1963] 2 All ER 575, HL(E)
        *Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145; [1994] 3 WLR 761; [1994]
3 All ER 506, HL(E)
        *Kelly v Solari* (1841) 9 M & W 54
        *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349; [1998] 3 WLR 1095;
[1998] 4 All ER 513, HL(E)
        *Lipkin Gorman v Karpnale Ltd* [1991] 2 AC 548; [1991] 3 WLR 10; [1992] 4 All

H      ER 512, HL(E)
        *Marcic v Thames Water Utilities Ltd* [2003] UKHL 66; [2004] 2 AC 42; [2003]
3 WLR 1603; [2004] 1 All ER 135, HL(E)
        *Marks & Spencer plc v Halsey* (Case C-446/03) [2006] Ch 184; [2006] 2 WLR 250;
[2006] All ER (EC) 255; [2006] STC 237, ECJ
        *Meadows v Grand Junction Waterworks Co* (1905) 21 TLR 538, DC

*Metallgesellschaft Ltd v Inland Revenue Comrs* (Joined Cases C-397 and 410/98)  A
    [2001] Ch 620; [2001] 2 WLR 1497; [2001] All ER (EC) 496; [2001] ECR
    I-1727; [2001] STC 452, ECJ

*Nurdin & Peacock plc v DB Ramsden & Co Ltd* [1999] 1 WLR 1249; [1999] 1 All
    ER 941

*Paragon Finance plc v DB Thakerar & Co* [1999] 1 All ER 400, CA

*Phillips-Higgins v Harper* [1954] 1 QB 411; [1954] 2 WLR 117, 782; [1954] 1 All
    ER 116; [1954] 2 All ER 51n, CA                                        B

*Pirelli Cable Holding NV v Inland Revenue Comrs* [2006] UKHL 4; [2006] 1 WLR
    400; [2006] 2 All ER 81; [2006] STC 548, HL(E)

*President of India v La Pintada Cia Navigacion SA* [1985] AC 104; [1984] 3 WLR
    10; [1984] 2 All ER 773, HL(E)

*Sebel Products Ltd v Customs and Excise Comrs* [1949] Ch 409; [1949] 1 All ER 729

*Shilliday v Smith* 1998 SC 725

*South of Scotland Electricity Board v British Oxygen Co Ltd* [1959] 1 WLR 587;   C
    [1959] 2 All ER 225, HL(Sc)

*Spectrum Plus Ltd, In re* [2005] UKHL 41; [2005] 2 AC 680; [2005] 3 WLR 58;
    [2005] 4 All ER 209, HL(E)

*Thoburn v Sunderland City Council* [2002] EWHC 195 (Admin); [2003] QB 151;
    [2002] 3 WLR 247; [2002] 4 All ER 156, DC

*Waikato Regional Airport Ltd v Attorney General of New Zealand* [2003] UKPC 50,
    PC                                                                     D

*Westdeutsche Landesbank Girozentrale v Islington London Borough Council* [1996]
    AC 669; [1996] 2 WLR 802; [1996] 2 All ER 961, HL(E)

*Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70; [1992]
    3 WLR 366; [1992] 3 All ER 737, HL(E)

The following additional cases were cited in argument:

*Apple and Pear Development Council v KJ Lewis Ltd* (Case 222/82) [1983]          E
    ECR 4083, ECJ

*Dextra Bank and Trust Co Ltd v Bank of Jamaica* [2001] UKPC 50; [2002] 1 All
    ER (Comm) 193, PC

*Mallusk Cold Storage Ltd v Department of Finance and Personnel* [2003] NIQB 58;
    [2003] RA 370

*Pigs and Bacon Commission v McCarren & Co Ltd* (Case 177/78) [1979] ECR 2161,
    ECJ                                                                    F

**APPEAL** from the Court of Appeal

This was an appeal by the claimant, Deutsche Morgan Grenfell Group
plc, with leave of the Court of Appeal, and cross-appeal by the
Commissioners of Inland Revenue and the Attorney General, with leave of
the House of Lords (Lord Hoffmann, Lord Rodger of Earlsferry and Lord
Walker of Gestingthorpe) granted on 12 July 2005, from a decision of the   G
Court of Appeal (Rix and Jonathan Parker LJJ; Buxton LJ dissenting in part)
given on 4 February 2005 allowing in part an appeal by the revenue and the
Attorney General from a decision of Park J dated 18 July 2003 in favour of
the claimant.

The facts are stated in the opinion of Lord Walker of Gestingthorpe.

*Laurence Rabinowitz QC, Francis Fitzpatrick* and *Steven Elliott* for the   H
claimant. In *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349
the House held that English law should recognise a general right to recover
money paid under a mistake, whether of fact or law, subject to the defences
available in the law of restitution. Given the abolition of the restriction on

561
**[2007] 1 AC**          Deutsche Morgan Grenfell Group plc v IRC (HL(E))

A   claims for restitution of payments made under a mistake of law, there is no
    reason why, in light of that, such claims should not be pursued against the
    revenue in the same way as they might be pursued against any other person
    who has been unjustly enriched by a mistaken payment. Indeed, it would be
    an extraordinary departure from the general approach of the English
    common law to provide an exemption from such claims for the revenue in
B   circumstances where no other person would be so exempt.

    However, the revenue goes further. It contends that the revenue, unlike
    any other unjustly enriched person, should also be exempt from a claim
    based on a payment made under a mistake of fact as well, if the payment is
    one of taxes. If right, it would falsify the assumption made by English courts
    at all times prior to the *Kleinwort Benson* case and beyond, that a claim for
    mistaken payment made to the revenue, if based on a mistake of fact, could
C   be recovered by an action in restitution, subject to any applicable statutes
    governing the position. It would deny every citizen in the country the ability
    to bring a claim in restitution for any kind of mistake in paying tax to the
    revenue in circumstances where it was perfectly possible that no other
    remedy might be available. It would also mean that, despite the explicit
    intention of the House in the *Kleinwort Benson* case to bring English
D   common law into line with the other common law and civil law jurisdictions
    such as Australia, Canada, South Africa and Scotland, all of which
    recognised the existence of such claims, English law will now be even further
    out of line than it had been before the decision in the *Kleinwort Benson* case.

    The revenue contends that Parliament intended that there should be no
    such claims against it, even though there is no statute at all, including
E   section 33 of the Taxes Management Act 1970, which does or could apply to
    the claimant's case. The only policy ground to support the revenue's
    contention is that to allow such claims would lead to substantial loss to the
    revenue.

    The Court of Appeal's decision to accept the revenue's arguments based
    on a close analysis of Lord Goff of Chieveley's speeches in *Woolwich
    Equitable Building Society v Inland Revenue Comrs* [1993] AC 70 and
F   *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349 has led to
    much academic criticism see: Burrows "Restitution in respect of Mistakenly
    Paid Tax" (2005) 121 LQR 540, 542 and Beatson "Unlawful Statutes and
    Mistake of Law: Is There a Smile on the Face of Schrödinger's Cat" in
    *Mapping the Law: Essays in Memory of Peter Birks* (2006) (ed Burrows &
    Rodger). That criticism is justified and there is nothing in either the
G   *Woolwich* case or the *Kleinwort Benson* case to suggest that a claim for
    recovery of a mistaken payment of tax is not available in an appropriate case
    against the revenue.

    Lord Goff did not say anything in the *Woolwich* case precluding the
    availability of claims to recover taxes paid by mistake of law. Rather, both
    he and Lord Slynn of Hadley pointedly avoided deciding anything about the
    mistake of law rule but indicated that they envisaged a day when such claims
H   might be possible: see *Woolwich Equitable Building Society v Inland
    Revenue Comrs* [1993] AC 70, 97–98, 100–101, 163–178, 199–201. If that
    is correct a fundamental plank of the Court of Appeal's reasoning is removed.

    There is nothing at all in any of the speeches in *Kleinwort Benson Ltd v
    Lincoln City Council* [1999] 2 AC 349 to suggest that there was a

fundamental exception in relation to the revenue. Lord Goff surveyed *A* common and civil law jurisdictions. The cases he referred to were cases of mistake of law claims being brought against the revenue. It is improbable that the House was introducing a rule of law which was completely incompatible with those decisions without saying so. The passage at p 381G of Lord Goff's speech should be construed within its context and not as if it were a statute. It is, in any event, unclear. Thus, the second plank of the Court of Appeal's reasoning is removed. *B*

The claimant paid advanced corporation tax ("ACT") in the mistaken belief that the ACT regime was lawful and that it had to pay. If it had known what the Court of Justice of the European Communities was going to say in *Metallgesellschaft Ltd v Inland Revenue Comrs* (Joined Cases C-397 and 410/98) [2001] Ch 620 it would not have made the payments. It follows from the primacy of European Union law that the claimant would have been *C* entitled to refuse to pay taxes levied in breach of European Union law: see *Pigs and Bacon Commission v McCarren & Co Ltd* (Case 177/78) [1979] ECR 2161 and *Apple and Pear Development Council v KJ Lewis Ltd* (Case 222/82) [1983] ECR 4083. The only requirement for restitution is that a mistake caused the payment: see *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349, *Barclays Bank Ltd v W J Simms Son & Cooke (Southern) Ltd* [1980] QB 677, *Nurdin & Peacock plc v DB Ramsden & Co* *D* *Ltd* [1999] 1 WLR 1249 and *Dextra Bank and Trust Co Ltd v Bank of Jamaica* [2002] 1 All ER (Comm) 193.

The claimant continued to be mistaken about the ACT legislation even after it became aware of the challenge to that legislation being made in the *Metallgesellschaft* proceedings. It continued to be mistaken until judgment was given in those proceedings: see *Metallgesellschaft Ltd v Inland Revenue* *E* *Comrs* (Joined Cases C-397 and 410/98) [2001] Ch 620. [Submissions were made on the facts.] The claimant's reasoning is supported by Burrows "Restitution in Respect of Mistakenly Paid Tax" 121 LQR 540 and Beatson "Unlawful Statutes and Mistake of Law: Is There a Smile on the Face of Schrödinger's Cat" in *Mapping the Law* (2006). Time for the purpose of section 32(1)(c) of the Limitation Act 1980 cannot be triggered by mere *F* knowledge of a challenge to the law. It is clear that in the *Kleinwort Benson* case [1999] 2 AC 349 time was not regarded as running until a decision was made: see also *Phillips-Higgins v Harper* [1954] 1 QB 411.

*Ian Glick QC, David Ewart* and *Kelyn Bacon* for the revenue and the Attorney General. The revenue concedes there is a restitutionary remedy, strictly speaking by analogy with the domestic rule for taxes levied ultra *G* vires. It is analogous because Parliament has passed legislation which is inconsistent with the UK's European treaty obligations in certain respects and that makes it similar to the situation in *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70. The claimant, however, wants a concurrent domestic remedy based on the cause of action for mistake of law and it seeks it in circumstances where if the case was purely domestic it would get nothing. *H*

The position after the *Woolwich* case was that the House had created a remedy at common law for an ultra vires or unlawful demand for tax in relation to which mistake of law was irrelevant. It constitutes, together with the relevant statutory provisions, a comprehensive code for the recovery of

563
**[2007] 1 AC**        **Deutsche Morgan Grenfell Group plc v IRC (HL(E))**
**Lord Hoffmann**

A  overpaid tax. Following the *Woolwich* case there was no need to create a
remedy to recover overpaid tax on the basis of mistake of law. A better
and more appropriate remedy already existed. It was therefore entirely
unsurprising that, when the House came to address the mistake of law
question squarely, Lord Goff made clear that the mistake of law remedy did
not apply to tax: see *Kleinwort Benson Ltd v Lincoln City Council* [1999]
B  2 AC 349, 381–382.
   Section 33 of the Taxes Management Act 1970 is the successor to
statutory provisions going back to section 24 of the Finance Act 1923. It sets
out a remedy to the overpayment of tax on the basis of a valid but erroneous
tax assessment.    The remedy is subject to specific requirements and
safeguards and differs quite markedly from any remedy at common law for a
payment made under mistake.   A common law remedy will be excluded
C  where Parliament has enacted a statutory regime inconsistent with that
remedy: see, for example, *Marcic v Thames Water Utilities Ltd* [2004] 2 AC
42. The result of the claimant's submission would be that a common law
right of recovery for mistake of law exists in parallel with the statutory
regime and applies to "fill the gaps" in the statute. But that would lead to the
anomalous consequence of a limitation period of six years in the case of the
D  remedy which is expressly provided for by statute and a far longer limitation
period for the common law remedy which supposedly fills the gaps. The
whole field of recovery for mistake has been dealt with by Parliament, both
in respect of mistakes for which it has chosen to provide a statutory remedy
and, by necessary implication, in respect of those cases for which it has
deliberately chosen not to legislate. There is an analogy with section 80(7)
E  of the Value Added Tax Act 1994 which expressly excludes common law
claims.
   [Submissions were made on the facts.] The claimant made no mistake in
any normal sense of the word.
   The claimant cannot rely on section 32(1)(c) of the Limitation Act 1980.
Its situation was similar to a suspicion of fraud. There is usually a realisation
that one might be a victim of fraud before one has the conviction that fraud
F  has actually occurred: see *Mallusk Cold Storage Ltd v Department of
Finance and Personnel* [2003] RA 370 and *Phillips-Higgins v Harper* [1954]
1 QB 411. The same must apply to mistakes of fact and law.

   *Rabinowitz QC* in reply. The revenue's submission requires a more
complex approach which is not attractive: see the Law Commission report
on Restitution: Mistakes of Law and Ultra Vires Public Authority Receipts
G  and Payments (1994) (Law Com No 227) (Cm 2731).
   Section 80 of the Value Added Tax Act 1994 expressly excludes any
common law claim, so it is not analogous to the situation here.

   Their Lordships took time for consideration.

   25 October. **LORD HOFFMANN**
H     1  My Lords. On 8 March 2001, the Court of Justice of the European
Communities decided that United Kingdom revenue law, which had since
1973 allowed companies whose parents were resident in the United
Kingdom to elect to pay dividends free of advanced corporation tax
("ACT"), discriminated unlawfully against companies with parents resident

in other member states: *Metallgesellschaft Ltd v Inland Revenue Comrs* and     *A*
*Hoechst AG v Inland Revenue Comrs* (Joined Cases C-397 and 410/98)
[2001] Ch 620. The exaction of the tax from such companies had been
contrary to the EC Treaty and they were entitled to compensation.

2   The forensic fall-out from this decision has been very considerable.
Large numbers of subsidiaries of companies resident in other member states
have lodged claims for compensation or restitution, some raising difficult     *B*
ancillary points of law. The High Court has made a group litigation order to
enable these points to be resolved in an orderly fashion. The main point in
this appeal concerns the period of limitation applicable to such claims. But
that in turn raises some fundamental questions about the cause of action
upon which the claimants rely.

3   Before coming to these questions, I must briefly enlarge upon the         *C*
provisions relating to advance corporation tax which the European Court of
Justice held to be contrary to Community law. The tax, which was abolished
in 1999, was in theory corporation tax payable in advance of the date on
which it would otherwise have been payable. A company resident in the
United Kingdom pays corporation tax on profits arising in a given
accounting period and, generally speaking, the tax is payable nine months
after the period ends. But the trigger for the payment of corporation tax was   *D*
the payment of a dividend. A company which paid a dividend became liable
to account to the Inland Revenue for ACT calculated as a proportion of the
dividend. This could afterwards be set off against the corporation tax
("mainstream corporation tax" or "MCT") which became chargeable on its
profits. The revenue thereby obtained early payment of the tax and, in cases
in which the company's liability for MCT turned out to be less than it had
paid as ACT, payment of tax which would not otherwise have fallen due.         *E*

4   The rule that ACT was payable on dividends was however subject to
an exception if the dividend was paid to a parent company in the same
group. Under section 247 of the Income and Corporation Taxes Act 1988
the company and its parent could jointly make a group income election
which gave them the right to be treated for the purposes of ACT as if they
were the same company. No ACT would be payable on the distribution by     *F*
the subsidiary. It would however be payable on any distribution by the
parent. The Act confined the right of election to cases in which the parent
was resident in the United Kingdom. Otherwise a subsidiary which had
elected would not be liable to ACT and the parent, being non-resident,
would not be liable either.

5   In the *Metallgesellschaft/Hoechst* case the Court of Justice decided    *G*
that these arrangements infringed the right of establishment guaranteed by
article 52 (now 43) of the EC Treaty in that they discriminated against
companies resident in other member states. It held that the companies which
had been unlawfully required to pay ACT were entitled to restitution or
compensation. The nature of the remedies, the procedures by which they
could be enforced and matters like the appropriate limitation periods were
said to be matters for domestic law. The only specific qualification imposed   *H*
by the Court of Justice was that English courts could not apply the rule in
*The Pintada* (*President of India v La Pintada Cia Navigacion SA* [1985]
AC 104) to deny any recovery of interest to a claimant whose ACT had been
set off against MCT before the commencement of proceedings. The

565

A  claimant was entitled to be compensated for loss of the use of the money between the date on which it was paid and the date when MCT became due.

6  In these proceedings, commenced on 18 October 2000, Deutsche Morgan Grenfell Group plc ("DMG") claims compensation for having had to pay ACT on three dividends paid to its German parent company between 1993 and 1996: in October 1993, February 1995 and January 1996. (No

B  mention of the 1995 and 1996 ACT payments appeared in the pleadings until an amendment made on 19 August 2002 and there is an issue, to which I shall return later, over whether that latter date should be taken for the purposes of limitation as the commencement date of the proceedings in respect of those dividends.) All the payments were subsequently set off against MCT. The facts are set out more fully in the speech to be delivered by my noble and learned friend, Lord Walker of Gestingthorpe, which I have

C  had the privilege of reading in draft.

7  There is no dispute that if DMG had been entitled to make a group election, it would have done so. There is likewise no dispute that DMG is entitled to compensation for breach of statutory duty (the infringement of article 43) or by way of restitution of tax unlawfully demanded under the principle established in *Woolwich Equitable Building Society v Inland*

D  *Revenue Comrs* [1993] AC 70. But the period of limitation for both of these causes of action runs from the date of payment and DMG wishes to claim in respect of the 1993 payment, which on any view was made more than six years before proceedings were commenced. In addition, if the proceedings in respect of the 1995 and 1996 ACT payments are treated as having been commenced on 19 August 2002, they would also have been more than six

E  years earlier. DMG therefore argues that it has an additional cause of action for restitution on the ground that the money was paid by mistake. Section 32(1)(c) of the Limitation Act 1980 provides that where the action is for "relief from the consequences of a mistake", the period of limitation does not begin to run until the claimant has discovered the mistake "or could with reasonable diligence have discovered it". (With effect from 8 September 2003, this provision no longer applies to mistakes of law in tax cases: see

F  section 320 of the Finance Act 2004.) DMG says that it did not discover its mistake until the European Court of Justice gave judgment (after the commencement of proceedings) and no amount of diligence could have enabled it to know in advance what the European Court of Justice was going to say.

8  The first question, therefore, is whether DMG has a cause of action

G  which can be described as being "for relief from the consequences of a mistake" within the meaning of section 32(1) of the 1980 Act. It claims that it seeks relief against having paid money to the Inland Revenue in the mistaken belief that, since section 247 of the 1988 Act made no provision for a group election by a company with a German parent, it was obliged to pay ACT. In fact, article 43 of the Treaty made this denial of a right of election unlawful and, in consequence, since DMG would have exercised its election,

H  it was not obliged to pay ACT.

9  Before the decision of the House of Lords in *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349, this mistake would not have given rise to any cause of action because it was a mistake of law. That rule has now been abandoned. Nevertheless, Mr Glick for the Inland Revenue

submits that while it is now in general true that money paid by mistake can    *A*
be recovered, whether the mistake is of fact or law, tax is different. There is
still no cause of action at common law for the recovery of tax paid under a
mistake of law. He says that there are only two remedies for the recovery of
tax which was not due. One is the common law remedy to recover tax
unlawfully demanded which was established in the *Woolwich* case. The
other is the statutory remedy provided by section 33 of the Taxes
Management Act 1970:                                                           *B*

"(1) If any person who has paid tax charged under an assessment
alleges that the assessment was excessive by reason of some error or
mistake in a return, he may by notice in writing at any time not later than
six years after the end of the year of assessment (or, if the assessment is to
corporation tax, the end of the accounting period) in which the            *C*
assessment was made, make a claim to the Board for relief.

"(2) On receiving the claim the Board shall inquire into the matter and
shall, subject to the provisions of this section, give by way of repayment
such relief . . . in respect of the error or mistake as is reasonable and just:
Provided that no relief shall be given under this section in respect of an
error or mistake as to the basis on which the liability of the claimant
ought to have been computed where the return was in fact made on the       *D*
basis or in accordance with the practice generally prevailing at the time
when the return was made.

"(3) In determining the claim the Board shall have regard to all the
relevant circumstances of the case, and in particular shall consider
whether the granting of relief would result in the exclusion from charge to
tax of any part of the profits of the claimant, and for this purpose the    *E*
Board may take into consideration the liability of the claimant and
assessments made on him in respect of chargeable periods other than that
to which the claim relates."

10   Whether the claim is under the *Woolwich* principle or section 33,
time runs from when the payment was made. So Mr Glick says that in either
case, the claim for interest on the 1993 payment is statute-barred. The judge  *F*
(Park J) rejected the submission. He saw no reason in principle why the right
to restitution of payments made by mistake, which had been extended in the
*Kleinwort Benson* case to include mistakes of law, should not apply to
payments of tax. No argument based on section 33 appears to have been
advanced to him.

11   The Court of Appeal (Jonathan Parker, Rix and Buxton LJJ)          *G*
disagreed. The main reason was their view that Lord Goff of Chieveley, in
his speech in the *Kleinwort Benson* case, had said that payments of tax under
a mistake of law were subject to a separate and distinct regime which
provided remedies *only* under the *Woolwich* principle and section 33.
Buxton LJ also offered some reasons why it would cause difficulties if
payment by mistake was accepted as a ground for the recovery of taxes.
I will come back to this point later, when I deal with the question of whether  *H*
DMG did in fact pay the tax by mistake.

12   First, however, I must deal with the opinion attributed by the Court
of Appeal to Lord Goff. Both Jonathan Parker LJ and Buxton LJ subjected
his speeches in the *Woolwich* and *Kleinwort Benson* cases to a detailed

*A*   analysis which I have read more than once with attention and respect. The chief support for Mr Glick's argument is to be found in the following passage in the *Kleinwort Benson* case [1999] 2 AC 349, 382:

"in our law of restitution, we now find two separate and distinct regimes in respect of the repayment of money paid under a mistake of law. These are (1) cases concerned with repayment of taxes and other similar
*B*   charges which, when exacted ultra vires, are recoverable as of right at common law on the principle in the *Woolwich* case, and otherwise are the subject of statutory regimes regulating recovery; and (2) other cases, which may broadly be described as concerned with repayment of money paid under private transactions, and which are governed by the common law."

*C*   13   There is no doubt that the regimes are different. Both the *Woolwich* principle and section 33 apply only to the recovery of money paid as taxes or the like. They do not apply to "private transactions". The *Woolwich* principle is indifferent as to whether the taxpayer paid the tax because he was mistaken or, as in the *Woolwich* case, for some other reason. And section 33 has its own rules. So the regime for taxes is certainly different. But the question is whether Lord Goff meant to say that the remedies provided by the
*D*   two regimes are mutually exclusive. *Woolwich* and section 33 are available only for "taxes and other similar charges". Does it follow that the common law rule for recovery of payments made by mistake, as applied to private transactions in the *Kleinwort Benson* case, does not apply to taxes? That would be going a good deal further. It is one thing to say that the regimes are different and another to say that their remedies are mutually exclusive.
*E*   14   This question is discussed at considerable length in the judgments in the Court of Appeal. It is, I think, neither here nor there for me to say that, as one who (in the end) gave wholehearted concurrence to Lord Goff's speech, I never thought that it had the meaning attributed to it by the Court of Appeal. Once a judgment has been published, its interpretation belongs to posterity and its author and those who agreed with him at the time have no better claim to be able to declare its meaning than anyone else. But to my
*F*   mind the context in which Lord Goff made the remarks which I have quoted demonstrates conclusively that he could not have meant what the Court of Appeal thought.

15   Early in his speech [1999] 2 AC 349, 367 Lord Goff announced that he proposed to address first the question of whether the rule precluding recovery of money paid under a mistake of law should remain part of
*G*   English law. This had not been much discussed in argument. Counsel for the respondents had not attempted to defend the old rule but had concentrated his fire on the questions of whether someone who acts in accordance with a settled understanding of the law can be said to have made a mistake, or whether, if he has, the rule should be subject to an exception in such a case. Nevertheless, Lord Goff devoted some space to an examination of the history and possible policies of the mistake of law rule and finally concluded,
*H*   at p 375, that it should be abrogated. That part of his speech contains no hint of an exception for taxes paid under a mistake of law.

16   Lord Goff then went on to the question of whether it made a difference that the payments were made in accordance with a settled understanding of the law. It is here that the passage which I have quoted

568
**Deutsche Morgan Grenfell Group plc v IRC (HL(E))**          [2007] 1 AC
**Lord Hoffmann**

appears. He uses the distinction between tax payments and private    *A*
transactions to argue that the case for a settled law exception is stronger in
the case of tax payments ("large numbers of taxpayers may be affected" and
"there is an element of public interest") than in the case of private
transactions. At the end of this discussion, he leaves the door slightly open
for an argument that there is such a defence for tax payments. But he rejects
it for private payments.                                              *B*

17  My Lords, this reasoning is quite inconsistent with the absence of a
cause of action for recovery of tax on the grounds of mistake of law. What
kind of claim did Lord Goff contemplate that a settled law defence might
protect the revenue against? Surely, a claim to recover tax on the ground
that it had been paid under a mistake of law. Lord Goff was not suddenly
turning to the *Woolwich* cause of action and asking whether it should be    *C*
subject to a defence that the demand for tax, although ultra vires, was in
accordance with a settled understanding of the law. The question which he
had announced, at p 367, that he intended to answer was

   "whether . . . there should be an exception to recovery on the ground
   of mistake of law . . . in cases where the money has been paid under a
   settled understanding of the law which has subsequently been changed by
   judicial decision."                                                *D*

There would be little point in discussing whether a settled understanding of
the law should be a defence to a claim for recovery of a tax payment on the
grounds of mistake of law if there was no such cause of action.

18  In my opinion, Lord Goff's speech in the *Kleinwort Benson* case does
not deny the right to recover tax on the ground that it was paid by mistake.
On the contrary, his discussion of a possible settled law defence necessarily    *E*
entails that he thought that there was such a cause of action. And for the
reasons I gave in the *Kleinwort Benson* case, I do not think that there is an
exception for cases in which there is a settled view of the law.

19  Mr Glick's alternative submission was that section 33 excluded any
common law claim on the grounds of mistake. He said that Parliament,
having provided a qualified remedy for one category of mistaken payments    *F*
of tax (when "the assessment was excessive by reason of some error or
mistake in a return"), must be taken to have dealt exhaustively with any kind
of mistaken payment of tax and, so far as section 33 did not provide a
remedy, must be taken to have intended that no remedy should exist.
Mr Glick accepts that section 33 has no application to the present case
because ACT was payable without any assessment, but nevertheless submits    *G*
that section 33 excludes a remedy. In my opinion this goes much too far.
Mr Glick advanced a similar argument in the *Woolwich* case [1993] AC 70,
where section 33 did not apply because there had been no lawful assessment.
The House of Lords rejected it. It is true that in the *Woolwich* case
Mr Glick's argument was more ambitious, in that he was trying to use
section 33 to exclude a remedy even when there had been no mistake of any    *H*
kind. But the question is in the end one of construction. When a special or
qualified statutory remedy is provided, it may well be inferred that
Parliament intended to exclude any common law remedy which would or
might have arisen on the same facts. That was the case in *Marcic v Thames
Water Utilities Ltd* [2004] 2 AC 42, upon which Mr Glick relied. But I see

569
**[2007] 1 AC**                    **Deutsche Morgan Grenfell Group plc v IRC (HL(E))**
                                                                    **Lord Hoffmann**

A   no reason to infer that Parliament intended to exclude a common law
remedy in all cases of mistake (whether of fact or law) in which the revenue
was unjustly enriched but did not fall within section 33.

20   The next question is whether the money was paid by mistake. This
might seem at first sight to be a simple question but the division of opinion in
the *Kleinwort Benson* case [1999] 2 AC 349 and the academic literature
B   show that it can lead one into deep waters. One might start by asking why it
matters. The effect of the decision in the *Metallgesellschaft/Hoechst* case
[2001] Ch 620 was that the Inland Revenue had not been entitled to the
money. Nor could the revenue have thought that DMG was intending to
make an interest-free loan to the British government or that there was any
other proper ground on which they had been entitled to retain it. Why, then,
is it necessary to investigate the precise state of mind (of which the revenue
C   would have known nothing) with which DMG made the payment?

21   The answer, at any rate for the moment, is that unlike civilian
systems, English law has no general principle that to retain money paid
without any legal basis (such as debt, gift, compromise, etc) is unjust
enrichment. In the *Woolwich* case [1993] AC 70, 172 Lord Goff said that
English law might have developed so as to recognise such a general
D   principle—the condictio indebiti of civilian law—but had not done so. In
England, the claimant has to prove that the circumstances in which the
payment was made come within one of the categories which the law
recognizes as sufficient to make retention by the recipient unjust. Lord Goff
provided a list in the *Woolwich* case, at pp 164–165, and the decision itself
added another. One such category, long recognised, is payment by mistake:
E   see *Kelly v Solari* (1841) 9 M & W 54. The late Professor Birks argued, in
the second edition of his book on *Unjust Enrichment* (2005), that the trend
of recent English decisions meant that, for the purpose of entitling a claimant
to recover, the categories were now superfluous. The fact that the money
had not been due was, in the absence of some other causa for payment, a
sufficient ground for recovery. We have now developed a condictio indebiti.
The absence of a basis for the payment is a ground which generalises and
F   subsumes all the separate categories of situation in which a payment of
money not due was recoverable.

22   I do not think it is necessary for us to decide this question about the
fundamental basis of enrichment liability because the question before the
House is not the fundamental juridical basis of DMG's cause of action but
whether the action can be described as being "for relief from the
G   consequences of a mistake" within the meaning of section 32(1)(c) of the
1980 Act. The *Kleinwort Benson* case [1999] 2 AC 349 is recent authority
for the proposition that an action for restitution of money paid under a void
contract can fall within this description. That does not seem to me
inconsistent with the existence of the mistake not being essential to the cause
of action but merely one example of a case which falls within a more general
principle, just as one could have (say, for the purposes of limitation) a
H   category called "clinical negligence" without implying that it is a cause of
action different in nature from other kinds of negligence.

23   I come back, therefore, to the question of whether DMG made a
mistake, against the consequences of which the action seeks relief. The first
point to make is that the alleged mistake was one of a very special kind. If

1 AC 2007—24

DMG had known for certain what the Court of Justice was going to say in     *A*
the *Metallgesellschaft/Hoechst* case [2001] Ch 620 on 8 March 2001, it is
very unlikely that it would have paid ACT. But it had no means of knowing
that. It was only in retrospect that it became clear that the ACT could not
lawfully have been exacted. Professor Birks said that this was not a mistake
at all. It was merely an inability to predict what the Court of Justice was
going to say, just as one cannot predict with certainty what the weather is    *B*
going to be like. And Sir Jack Beatson, writing extrajudicially in the volume
to be published in memory of Professor Birks ("Unlawful Statutes and
Mistake of Law: Is there a Smile on the Face of Schrödinger's Cat?" in
*Mapping the Law* (ed Burrows and Rodger) (2006), pp 163–180) describes
the majority decision in the *Kleinwort Benson* case to treat a similar failure
of prediction as a mistake as an "emphatic endorsement . . . of the
declaratory theory of judicial decision-making" and "abstract juridical        *C*
correctitude". This seems to me, with respect, to muddle two different
questions. One is whether judges change the law or merely declare what it
has always been. The answer to this question is clear enough. To say that
they never change the law is a fiction and to base any practical decision upon
such a fiction would indeed be abstract juridical correctitude. But the other
question is whether a judicial decision changes the law retrospectively and    *D*
here the answer is equally clear. It does. It has the immediate practical
consequence that the unsuccessful party loses, notwithstanding that, in the
nature of things, the relevant events occurred before the court had changed
the law: see *In re Spectrum Plus Ltd* [2005] 2 AC 680. There is nothing
abstract about this rule. So the main question in the *Kleinwort Benson*
case [1999] 2 AC 349 was whether a person whose understanding of the         *E*
law (however reasonable and widely shared at the time) is falsified by a
subsequent decision of the courts should, for the purposes of the law of
unjust enrichment, be treated as having made a mistake. The majority view
in the *Kleinwort Benson* case was that he should. The effect of the later
judgment is that, contrary to his opinion at the time, the money was not
owing. It is therefore fair that he should recover it. It may be that this
involves extending the concept of a mistake to compensate for the absence of  *F*
a more general condictio indebiti and perhaps it would make objectors feel
better if one said that because the law was now deemed to have been
different at the relevant date, he was *deemed* to have made a mistake. But
the reasoning is based upon practical considerations of fairness and not
abstract juridical correctitude.

    24  Mr Glick, taking the *Kleinwort Benson* case at face value, accepted   *G*
that DMG made the 1993 and February 1995 payments by mistake. But he
said that the commencement of the Hoechst litigation in July 1995 must, at
the very lowest, have raised a doubt in the relevant minds of DMG. There
was evidence that in July 1995 DMG had discussed the implications of the
Hoechst challenge and considered making a "protective" group election in
case Hoechst won their case. (Whether such an election would have done
them any good is another matter: see Park J [2003] 4 All ER 645, 657.) So   *H*
the revenue say that the 1996 payment was made when a state of doubt
existed and that this was not a mistake.

    25  There is some authority for the view that a state of doubt does not
amount to a mistake: see *Burrows, The Law of Restitution*, 2nd ed (2002),

*A*   pp 139–140. In the *Kleinwort Benson* case [1999] 2 AC 349, 410 my noble
and learned friend, Lord Hope of Craighead, said:

   "A state of doubt is different from that of mistake. A person who pays
   when in doubt takes the risk that he may be wrong—and that is so
   whether the issue is one of fact or one of law."

*B*   **26**   This was a very compressed remark in the course of a discussion of
other matters and I do not think that Lord Hope could have meant that a
state of doubt was actually inconsistent with making a mistake. Contestants
in quiz shows may have doubts about the answer ("it sounds like Haydn, but
then it may be Mozart") but if they then give the wrong answer, they have
made a mistake. The real point is whether the person who made the
payment took the risk that he might be wrong. If he did, then he cannot
*C*   recover the money. Speaking for myself, I think that there is a parallel here
with the question of whether a common mistake vitiates a contract. As
Steyn J said in *Associated Japanese Bank (International) Ltd v Crédit du
Nord SA* [1989] 1 WLR 255, 268:

   "Logically, before one can turn to the rules as to mistake . . . one must
*D*   first determine whether the contract itself, by express or implied
   condition precedent or otherwise, provides who bears the risk of the
   relevant mistake. It is at this hurdle that many pleas of mistake will either
   fail or prove to have been unnecessary."

   **27**   Likewise, the circumstances in which a payment is made may show
that the person who made the payment took the risk that, if the question was
*E*   fully litigated, it might turn out that he did not owe the money. Payment
under a compromise is an obvious example: see *Brennan v Bolt Burdon*
[2005] QB 303. I would not regard the fact that the person making the
payment had doubts about his liability as conclusive of the question of
whether he took the risk, particularly if the existence of these doubts was
unknown to the receiving party. It would be strange if a party whose lawyer
*F*   had raised a doubt on the question but who decided nevertheless that he had
better pay should be in a worse position than a party who had no doubts
because he had never taken any advice, particularly if the receiving party had
no idea that there was any difference in the circumstances in which the two
payments had been made. It would be more rational if the question of
whether a party should be treated as having taken the risk depended upon
*G*   the objective circumstances surrounding the payment as they could
reasonably have been known to both parties, including of course the extent
to which the law was known to be in doubt.

   **28**   These thoughts may be said to support the view of Professor Birks
that English law should be less concerned with whether the person who paid
the money made a mistake (involving an inquiry into his subjective state of
mind) than with whether there was a valid causa for the payment, such as a
*H*   debt, compromise or gift, these being matters of objective inquiry into the
circumstances of the payment as they would have been known to both
parties. But they do not arise in this case because both the judge and
Jonathan Parker LJ in the Court of Appeal decided on the facts that, even if a
state of doubt was inconsistent with a mistake, DMG had been mistaken.

572
**Deutsche Morgan Grenfell Group plc v IRC (HL(E))**                    [2007] 1 AC
**Lord Hoffmann**

Mr Thomason, the head of taxation at DMG, gave evidence about his state    A
of mind when it paid the ACT. He said:

"At all times prior to the determination of the European court in the
*Hoechst* case, I believed that the United Kingdom statute denying the
ability to make a group income election was the law and that I was bound
to act in accordance with this law . . . It did not occur to me that I could
ignore the law as it stood for the simple reason that the law is the law.    B
Just because another taxpayer challenged the law that did not mean that
I could or should ignore it."

29   Park J accepted this evidence as showing that, whether or not a state
of doubt was consistent with making a mistake, DMG, in the person of
Mr Thomason, was not in a state of doubt. Jonathan Parker LJ agreed. He
said [2006] Ch 243, para 235:                                                C

"I accept Mr Rabinowitz's submission . . . that mere knowledge that
the statutory provisions in question are under challenge is not to be
equated with a state of doubt as to the validity of those provisions. In any
event, as I have already pointed out, Mr Thomason's evidence was that he
was in no doubt that the ACT was payable, whatever the decision in the
*Metallgesellschaft* case."                                                   D

30   Buxton and Rix LJJ, on the other hand, doubted whether this could
be reconciled with the observations of Lord Hope which I have cited above.
But I do not understand why this should be so. The judge attributed
Mr Thomason's state of mind to DMG and found as a fact that he was not in
doubt. He thought that DMG had to pay. Someone with a more
sophisticated approach to the law might have had doubts—might even have    E
thought that Hoechst had a good case and that the European Court of Justice
ruling would apply retrospectively—but not Mr Thomason. I would
therefore agree with the judge and Jonathan Parker LJ that on any view of
the law on this point, he made a mistake.

31   If DMG made a mistake about the law, when could they "with
reasonable diligence" have discovered it? On this question it is important to    F
bear in mind the special nature of the mistake, namely that it was deemed to
have been made because of the retrospective operation of a later decision of
the Court of Justice. The "reasonable diligence" proviso depends upon the
true state of affairs being there to be discovered. In this case, however, the
true state of affairs was not discoverable until the Court of Justice
pronounced its judgment. One might make guesses or predictions,
especially after the opinion of the Advocate General. This gave    G
DMG sufficient confidence to issue proceedings. But they could not have
discovered the truth because the truth did not yet exist. In my opinion,
therefore, the mistake was not reasonably discoverable until after the
judgment had been delivered.

32   Two footnotes on the question of mistake. First, Park J took a rather
sophisticated view of the nature of the mistake. He said that the mistake was    H
not about whether ACT was payable. DMG had not made an election and
therefore it was payable. The mistake was about whether DMG should have
been allowed to elect. But I agree with the Court of Appeal that the mistake
was about whether DMG was liable for ACT. The election provisions were

A    purely machinery, which DMG would undoubtedly have used, by which it
could enforce its right to exemption from liability.

33    Secondly, Buxton LJ said that the problems about what counted as a
mistake, some of which I have discussed above, showed the "ineptitude" of
extending the law of payment under a mistake of law to payment of taxes. It
is true that there may be anomalies in the different limitation treatment of

B    claimants who paid under a mistake and those who paid without a mistake
but pursuant to an ultra vires demand (the *Woolwich* case) or a void contract
(the *Kleinwort Benson* case): see [2006] Ch 243, 332, 334. But these
anomalies flow from *any* recognition of payment by mistake as a cause of
action and not from a distinction between payments of tax and private
payments. In either case, there is the possibility of alternative causes of
action, with one producing more favourable treatment under the Limitation

C    Act 1980 than the other.

34    It follows that in my opinion section 32(1)(c) postponed the
commencement of the limitation period in respect of all three ACT payments
until 8 March 2001. That makes it unnecessary to decide whether the
proceedings in respect of the last two payments were begun when the
proceedings were issued or when they were amended. I will say only that on

D    this point I agree with the majority of the Court of Appeal. I would allow the
appeal and restore the judgment of Park J.

**LORD HOPE OF CRAIGHEAD**

35    My Lords, I have had the great advantage of reading in draft the
speeches of my noble and learned friends, Lord Hoffmann and Lord Walker
of Gestingthorpe, in which the background to this appeal is so

E    comprehensively and helpfully set out. With that advantage, which
I gratefully acknowledge, I can proceed directly to the three of the various
issues in dispute which Lord Walker has summarised, in para 117, on which
I wish to comment. These are (1) the "cause of action" issue; (2) the
"mistake" issue; and (3) the "discovery" issue.

36    As Lord Walker points out, at para 96, the focus of the present

F    appeal is on limitation of actions. DMG seeks to avoid the six-year time
limit by taking advantage of the extended limitation period that is available
in England and Wales (but not in Scotland: see the Prescription and
Limitation (Scotland) Act 1973, section 6 and Schedule 1, paragraph 1(b))
under section 32(1)(c) of the Limitation Act 1980 which provides that,
where the action is for relief from the consequences of a mistake, the period

G    of limitation shall not begin to run until the claimant has discovered the
mistake or could with reasonable diligence have discovered it. This
provision no longer applies in relation to a mistake of law relating to a
taxation matter under the care and management of the Commissioners for
Revenue and Customs: Finance Act 2004, section 320 (read together with
section 5 of the Commissioners for Revenue and Customs Act 2005). That
section, which applies only to actions brought on or after 8 September 2003,

H    was enacted in response to the judgment of Park J [2003] 4 All ER 645 in this
case which was given on 18 July 2003. The application of this provision to
claims existing but not yet made by 8 September 2003 is being challenged
under Community law: *Aegis Group plc v Inland Revenue Comrs* [2006]
STC 23. It is enough, however, for the purposes of this case to say that it is

not in dispute that the extended limitation period is available to DMG if the *A* issues which are raised in this appeal are decided in its favour.

37    The fact that the benefit of the extended period is being removed from future cases does not deprive the question whether English law recognises a restitutionary claim for tax paid under a mistake of law of all its interest. But the fact that the limitation period is now the same, at least for all new claims, whichever of the various available avenues for the recovery *B* of money from the revenue is chosen makes it unlikely that this issue will require to be revisited in cases to which it is a party. Tax paid in response to an unlawful demand will be recoverable under the *Woolwich* principle, subject to the ordinary time limit of six years: *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70. Where the revenue's assessment to tax was excessive by reason of some error or mistake made by the taxpayer in a return, a statutory remedy for repayment is available. The *C* leading examples are to be found in section 33 of the Taxes Management Act 1970 as to income tax and capital gains tax and the Finance Act 1998, Schedule 18, paragraph 51 as to corporation tax. The remedy available under these provisions must be sought not later than six years after the end of the relevant accounting period: see the Taxes Management Act 1970, section 33(1). Cases not covered by one or other of these remedies in which *D* it will be necessary to resort to a remedy under the principle of unjust enrichment are likely to be rare.

*The cause of action issue*

38    Lord Goff of Chieveley made it clear in *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349, 371–372 (his speech in that case, so *E* rich in scholarship, was the last which he prepared before his retirement as Senior Law Lord) that he was under no illusions about the difficulties which the House faced in formulating satisfactory limits to the right to recover money paid under a mistake of law. He observed that there was more sense in the old mistake of law rule than its more strident critics had been prepared to admit. But its rejection by the common law world was not, as he said, at *F* pp 372–373, due to a wish to depart from the policy underlying the rule but rather to an acknowledgement, due essentially to the work of scholars, that it could best be achieved by recognising a general right of recovery subject to specific defences to cater for the fears which formerly appeared to require a blanket exclusion of recovery. It was his acceptance of this general right of recovery of money paid under a mistake, whether of fact or law, that lay at the centre of the discussion that then followed. As he put it, at p 373C, a *G* blanket rule of non-recovery, irrespective of the justice of the case, could not survive in a rubric of the law based on the principle of unjust enrichment. Instead it was for the law to evolve appropriate defences which could, together with the acknowledged defence of change of position, provide protection where appropriate for recipients of money paid under a mistake of law in those cases in which justice or policy does not require them to *H* refund the money.

39    This then is the background against which the argument for the revenue on this issue must be examined. On the one hand there is the proposition which lay at the heart of Lord Goff's analysis. (An indication of the immense care he took over his speech, which was so evident to those of

575
**[2007] 1 AC**                    Deutsche Morgan Grenfell Group plc v IRC (HL(E))
Lord Hope of Craighead

A    your Lordships who had the privilege of sitting with him on that case, can be gathered from the fact that the original version of it lacked some of the section headings that appear in the revised version that was later published in the Appeal Cases: see [1998] 3 WLR 1095, 1119G, 1121A–B; [1999] 2 AC 349, 379F, 381B). As he put it, at p 385A–B, money paid under a mistake of law is recoverable on the ground that its receipt by the defendant will,

B    prima facie, lead to his unjust enrichment, just as receipt of money paid under a mistake of fact will do so. Then there is the principle recognised by Professor Peter Birks, to whom Lord Walker has so fittingly paid tribute. With characteristic simplicity he declared that, unless displaced by statute, causes of action good against private citizens are no less good against public bodies: see his essay (in the volume *Essays on Restitution* (1990), edited by Professor P D Finn) entitled "Restitution from the Executive", at p 174.

C    That was why he acknowledged that, if in *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70 the building society had made a mistake of fact, it would undoubtedly have entitled the society to restitution of the money paid to the revenue in consequence of its mistake, just as it plainly would have been had the transaction been with a private citizen.

D    40    The question is whether an exception to the general rule which Lord Goff identified should now be recognised in the case of payments made under a mistake of law to the revenue. How would Lord Goff himself have reacted to it? I think that there is no doubt what his initial reaction would have been. We can see what he made of the argument that the revenue was in a special position in the *Woolwich* case, at pp 171–172. The revenue had made an unlawful demand for tax but it was asserting that it was under no

E    obligation to pay back the money. That position seemed to him, as matter of common justice, to be untenable—a position made worse by the fact that it involved the revenue having the benefit of a massive interest-free loan as the fruit of its unlawful action:

F    "Common justice seems to require that tax to be repaid, unless special circumstances or some principle of policy require otherwise; prima facie, the taxpayer should be entitled to repayment as of right."

We can also see, from the way in which he dealt with the suggested defence of honest receipt in the *Kleinwort Benson* case [1999] 2 AC 349, 385, how determined he was to preserve the purity and simplicity of the principle which he had described earlier:

G    "In my opinion, it would be most unwise for the common law, having recognised the right to recover money paid under a mistake of law on the ground of unjust enrichment, immediately to proceed to the recognition of so wide a defence as this which would exclude the right of recovery in a very large proportion of cases. The proper course is surely to identify particular sets of circumstances which, as a matter of principle or policy,

H    may lead to the conclusion that recovery should not be allowed . . ."

I think that Mr Rabinowitz for DMG was right therefore to take as the starting point for his argument the general right to recover, and then to ask on what grounds either of policy or principle the revenue can claim that an exception should be made in its case.

576
Deutsche Morgan Grenfell Group plc v IRC (HL(E))                    [2007] 1 AC
Lord Hope of Craighead

41   I should add, before I complete this introduction, that I believe that   A
we are in a very different field from that which Lord Rodger of Earlsferry
was contemplating when in *Customs and Excise Comrs v Barclays Bank plc*
[2007] 1 AC 181, para 51 he reminded us of the philosopher's advice to
"Seek simplicity and distrust it". The proposition that money paid under a
mistake is recoverable is based on the principle that, prima facie, its receipt
by the defendant will lead to his unjust enrichment. There is no reason to   B
distrust a proposition based on such an elementary principle just because it is
simple. Now that the common law world has recognised that there is a
general right of recovery whether the mistake is of fact or law, it should be
careful not to disturb its purity and its simplicity unless there is a clear basis
on grounds of principle or policy for doing so.

42   The revenue submit that a common law claim for restitution based   C
on mistake of law is not available to a party in relation to an overpayment of
tax to the revenue. They maintain that common law claims for restitution
arising from a tax measure which is ultra vires or otherwise unlawful can
only be made on the principle in the *Woolwich* case [1993] AC 70 or by
analogy with that principle, and that they are subject to a limitation period
of six years. They also point to the existence of statutory remedies. To bring
the case within the *Woolwich* principle by analogy they submit that, while   D
ACT cannot be said to have been an unlawful tax, the payments that were
made in this case were the result of the unlawful exclusion of certain
subsidiaries in section 247(1) of the Income and Corporation Taxes Act
1988. It follows that a right to a remedy arises in respect of that
unlawfulness. As for the statutory remedies, they submit that there is a
general principle that a common law remedy will be excluded where   E
Parliament has enacted a statutory scheme inconsistent with the remedy.
That scheme is revealed by the various provisions that have been enacted
which, subject to certain conditions, permit the recovery of tax paid by
reason of an error or a mistake in an assessment. The authority which they
cite in support of this proposition is *Marcic v Thames Water Utilities Ltd*
[2004] 2 AC 42.

43   Two issues of principle lie at heart of this argument. The first is   F
whether the remedy in restitution that is available for payments made under
a mistake recognised in *Kleinwort Benson Ltd v Lincoln City Council* [1999]
2 AC 349 is subject to an exception in the case of taxes paid under a mistake
of law to the revenue. The second is whether, if they are not subject to any
such exception, it is open to a litigant to choose whichever of two or more
concurrent remedies best suits his interests. The argument that, where there   G
is a statutory scheme which occupies the same ground as the common law
remedy, the common law remedy must be held to be excluded by it, cannot
be said to raise an issue of principle as the effect of the scheme must depend
on the words of the statute. Nevertheless it raises an issue of policy that
needs to be dealt with.

44   The submission that the restitutionary remedy for payments made   H
under a mistake is subject to an exception in favour of the revenue where the
mistake was one of law runs into difficulty as soon as it is articulated. It
seeks to build in two exceptions, not just one, into the generality of the
remedy that was recognised in the *Kleinwort Benson* case. The first
exception would involve treating payments made under a mistake of fact

A   differently from payments made under a mistake of law. The second would
involve treating the revenue differently from all other public authorities
which receive payments made under a mistake of law. If this argument were
to succeed it would have a significant impact on the law's taxonomy.
English law has been moving step by step towards a principled statement of
the law of restitution. The carving out of exceptions which are not clearly
based on principle would risk reversing this process.

B

*(a) The debatable passage*

45   The revenue's argument on grounds of principle is based on a
passage in Lord Goff's speech in the *Kleinwort Benson* case [1999] 2 AC
349, 381–383 which Lord Walker has referred to, at para 122(5), as the
debatable passage. In this passage Lord Goff drew a distinction between, on

C   the one hand, "payments of taxes and other similar charges and, on the other
hand, payments made under ordinary private transactions": p 381G–H.
Elaborating on this distinction, at p 382B–D, he said that under our law of
restitution there were now to be found "two separate and distinct regimes"
in respect of the repayment of money paid under a mistake of law. These
were (1) cases concerned with repayment of "taxes and other similar

D   charges" exacted ultra vires, recoverable as of right at common law under
the *Woolwich* principle, and (2) other cases, which might broadly be
described as concerned with the repayment of money paid under private
transactions, governed by the common law. He went on to say, at p 382D–E,
that a case might be made in favour of a principle that, in cases concerned
with taxes, payments made in accordance with a prevailing practice or a

E   settled understanding of the law should be irrecoverable.

46   There are a number of points about this passage that have to be
taken into account in assessing its significance. The first is that it appears in
a section of Lord Goff's speech where, having concluded, at p 375, that
English law should recognise that there was a general right to recover money
paid under a mistake whether of fact or law, he was considering whether it
would be appropriate to develop a defence of settled understanding of the

F   law on the lines proposed by the Law Commission as a corollary to the
newly developed right of recovery: p 381B–C. He was, in effect clearing
the ground for a further examination of this point. Cases where taxes and
other similar charges exacted ultra vires were recoverable as of right under
the *Woolwich* principle could be left on one side because there was no need
in those cases to invoke a mistake of law by the payer: p 381H. The phrase

G   "taxes and other similar charges" lacks the precision that would be needed if
it was intended to define the extent of an exception to the general right of
recovery. But Lord Goff's point was simply that there was no room in the
case of an ultra vires demand for a defence that it was made on a settled
understanding of the law. The only context in which a limit to recovery on
that ground needed to be considered was where repayment of money was
sought as having been paid under a mistake of law under the newly

H   recognised common law principle.

47   In the Court of Appeal [2006] Ch 243, 316, para 205 Jonathan
Parker LJ said that the first of the two regimes which Lord Goff identified in
this passage was a comprehensive and complete regime in relation to
overpayments of tax made under a mistake of law, and that it was not

limited to cases where the payment of tax was made pursuant to an unlawful    *A*
demand—in other words that it was not limited to *Woolwich* cases. I do not
think that this can be right. Not only does it read far more into the passage
than the words used justify. It also fails to take account of the fact that in the
*Woolwich* case there was no error of law by the taxpayer. So the House was
not called upon to consider the effect of a mistake of law in that case at all.
Lord Goff's use of the phrase "or other similar charges" is perfectly    *B*
intelligible if is understood as referring to the case of an ultra vires demand.
All statutory charges which are the subject of an ultra vires demand fall
easily within this category. It begs many questions if it was intended to
identify a category that was to be excluded from the general common law
right of recovery for payments made under a mistake: see, for example, Sir
Jack Beatson's comments in chapter 9, "Unlawful Statutes and Mistake of    *C*
Law", pp 174–175, *Mapping the Law* (ed Burrows & Rodger) (soon to be
published).

48 It has to be acknowledged, of course, that, at p 382c–d, Lord Goff
indicated that these cases were limited to private transactions, and that he
repeated this point, at p 382e–f, when he said that the case he was dealing
with was concerned with payments made under private transactions. But it    *D*
can, I think, be inferred that the reason for this is to be found in his reference,
at pp 381h–382a, to the various statutory provisions which regulate the
repayment of overpaid tax. This is why, when he came, at p 382c–d, to
identify the first regime more precisely, he included in it not only those cases
where the payment was recoverable under the *Woolwich* principle but also
those cases which were the subject of statutory regimes regulating recovery.
Here too it was unnecessary to consider a defence of common understanding,    *E*
as it was open to the statutory regime which regulated recovery to deny relief
where, for example, the return was made on the basis of or in accordance
with prevailing practice: see, for example, the proviso to section 33(2) of the
Taxes Management Act 1970. When he was describing these two separate
and distinct regimes Lord Goff did not contemplate the possibility that there
was a third category: cases concerned with the repayment of money paid
under a mistake of law to a public authority which was not covered by any    *F*
statutory regime regulating recovery and which, although recoverable as of
right on the principle in *Woolwich* because it had been exacted by a demand
ultra vires, was also within the scope of the newly articulated common law
principle. It is into this third category that this case falls.

49 I think that it is safe to assume that if he had appreciated that there
was this third category Lord Goff would have treated it in the same way as    *G*
the second. In other words he would have recognised that, as the common
law remedy was available, the question whether a settled understanding
defence should be available was relevant here too. The element of public
interest which is lacking in the case of private transactions would have to be
taken into account in considering whether there was room for such a
defence. But it would have been wholly inconsistent with the general
principle which he had identified for Lord Goff to conclude that there was no    *H*
cause of action on the ground of unjust enrichment at common law for
payments made under a mistake of law in the case of the third category just
because it was also within the scope of the *Woolwich* principle.
I respectfully agree with Sir Jack Beatson's comment in his chapter on

A  "Unlawful Statutes and Mistake of Law", at p 173, that, if Lord Goff had thought that the general right of recovery did not apply to payments of taxes and general charges, he would surely have said so in his discussion of that general right.

   *(b) Concurrent remedies*

B     50  The question then is whether DMG must be denied a remedy on the ground that the payments were made under a mistake because a remedy under the *Woolwich* principle is available. Lord Goff treated the two categories which he identified in the debatable passage as providing separate and distinct remedies. This might be taken to suggest that, if a remedy was available to DMG by analogy with the *Woolwich* principle, it should not be allowed to pursue a remedy on the common law ground of unjust
C  enrichment. But in his discussion [1999] 2 AC 349, 387, of the question whether in the context of void transactions failure of consideration should be allowed to trump mistake of law as a ground for recovery of benefits conferred in consequence of that mistake, he pointed out that an equally strong argument might perhaps be made in favour of mistake of law trumping failure of consideration. The same point could be made in this
D  case. The revenue argue that primacy should be given to a ground of recovery based on the *Woolwich* analogy because, if this is given, the six-year limitation period will apply. DMG, on the other hand, wishes to take the benefit of section 32(1)(c) of the 1980 Act, which is why it suits it to base its claim on the general right to recover money paid under a mistake.

     51  There is no obvious way of deciding which of these two approaches
E  must be adopted if only one can be allowed. The question however is whether a claimant is under an obligation to select the remedy that will best suit his opponent. In his note on this case, "Restitution in Respect of Mistakenly Paid Tax" (2005) 121 LQR 540, 542, Professor Andrew Burrows said:

       "The starting point for a principled analysis is that, in general terms
F     now that this concurrent liability has been accepted, a claimant ought to be free to choose between causes of action and that it would be odd for one cause of action, offering an advantage to a claimant, to be knocked out by a wider cause of action which does not offer that advantage."

   It would indeed be odd, and I can think of no principle that could justify such a strange result. The answer to this point is to be found in an
G  observation by Lord Goff in a case where the question was whether a contract legislated exclusively for the parties, with the result that a parallel duty of care was excluded by it. He said that there is no sound basis for a rule which automatically restricts the claimant to either a tortious or a contractual remedy and that there could be no objection to his taking advantage of the remedy which was most advantageous to him: *Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145, 193. We are in a different field, but
H  I think that his reasoning is just as compelling in this context: see his reference in the *Kleinwort Benson* case [1999] 2 AC 349, 387 to the usual preference of English law to allow either of two alternative remedies to be available, leaving any possible conflict to be resolved by election at a late stage.

580
**Deutsche Morgan Grenfell Group plc v IRC (HL(E))**          [2007] 1 AC
**Lord Hope of Craighead**

*(c) The statutory regime*                                                            A

52   The issue here is whether DMG's claim under the *Kleinwort Benson* principle is excluded on grounds of policy. The policy which the revenue invoke is that, where there is a statutory regime for the recovery of payments made under a mistake, a common law claim cannot exist in parallel with it. The argument is that the statutory regime, of which section 33 of the Taxes Management Act 1970 provides the leading example, excludes recovery on   B the ground of mistake at common law whether the mistake is of fact or law, and whether or not the statutory regime applies to the payment that is in question. DMG, for its part, accepts that there can be no recovery at common law where the claim falls within the ambit of the statutory regime. But it submits, first, that section 33 has no application to this case and, secondly, that Parliament cannot be taken to have intended that restitution   C should be barred by the statutory regime where it does not provide a remedy because the payment was not made under an excessive assessment.

53   Mr Glick for the revenue said that section 33 was an exhaustive provision which covered the whole field of recovery for payments made under a mistake by the taxpayer. It did so both in respect of the mistakes for which it provided expressly and also, by necessary implication, in respect of those situations for which Parliament had deliberately chosen not to   D legislate. I understood him to submit that ACT fell within section 33 because it was a form of corporation tax which is charged on profits of companies and is recoverable under an assessment. Although he accepted that it was possible to envisage a case where the mistake did not fall within the terms of section 33, he said that the gap if it did exist was at best a very narrow one.

54   The problem with fitting the payment of ACT into the regime   E provided for by section 33 lies in the way this tax was collected. The system that was laid down for its collection in para 1 of Schedule 13 to the Income and Corporation Taxes Act 1980 was for a return to be made for each of the company's accounting periods of the franked payments made during that period which was to be accompanied by the amount of the ACT, if any, payable by it in respect of those payments. It was not tax charged under an   F assessment, which is what section 33(1) of The Taxes Management Act 1970 contemplates.

55   In support of his argument that, even if section 33 of the Taxes Management Act 1970 did not apply, Parliament had enacted a statutory scheme which was inconsistent with the common law remedy, Mr Glick relied on the judgment of your Lordships' House in *Marcic v Thames Water Utilities Ltd* [2004] 2 AC 42. I do not think that that case is in point here.   G Mr Marcic's claim in nuisance was held to be inconsistent with the statutory scheme. His argument was that Thames Water ought to have built new sewers to prevent flooding of his property. But, as Lord Nicholls of Birkenhead pointed out, this ignored the statutory limitations on the enforcement of sewerage undertakers' drainage obligations: para 35. An important purpose of the statutory scheme was that individual householders   H should not be able to launch proceedings in respect of a failure to build sufficient sewers. That would supplant the regulatory role of the industry's regulator, whose role was to decide whether to make an enforcement order when questions of flooding arose. Section 33 has none of the features of a statutory scheme of that kind.

581
[2007] 1 AC                           Deutsche Morgan Grenfell Group plc v IRC (HL(E))
                                                                    Lord Hope of Craighead

A    56   For all these reasons I would hold that the general right to recover
payments made under a mistake of law on the *Kleinwort Benson* principle
extends to the payment of taxes made to the revenue on the mistaken belief
that they were due and payable, and that DMG is entitled to take advantage
of section 32(1)(c) of the Limitation Act 1980 by basing its claim for
restitution on that principle.

B    *The mistake issue*

57   The availability of a cause of action under the *Kleinwort Benson*
principle is of no help to DMG unless it can show that it made the payments
of ACT under a mistake. The revenue maintain that it did not make the
payments under any mistake. They say that the tax was due and payable
when DMG paid it because it had not made a group income election in
C    respect of the relevant dividends.

58   There is no doubt that the only way that a company resident in the
United Kingdom could avoid liability under section 14(1) of the Income and
Corporation Taxes Act 1988 to ACT on qualifying distributions made to its
shareholders was by making an election jointly with the receiving company
under section 247(1) of the Act, a group income election, that section 247(1)
D    was to apply to the dividends received from the paying company. So long as
a group income election was in force the election dividends, as
section 247(1) described them, were excluded from section 14(1). But if no
group income election was in force ACT was due and payable. So, if the
correct approach is to look only at the system laid down by the statute, it is
plain that because there was no election there was no mistake.

E    59   But this approach overlooks the principle on which the claim for
restitution that was recognised in the *Kleinwort Benson* case is founded,
which is unjust enrichment. As Lord Goff put it [1999] 2 AC 349, 385, it is
unjust for the defendant to retain the money paid under a mistake. The
essence of the principle is that it is unjust for a person to retain a benefit
which he has received at the expense of another which that person did not
intend him to receive because it was made under a mistake that it was due.
F    The claimant must prove that he acted under a mistake. But the stage when
he made his mistake does not matter, so long as it can be said that if he had
known of the true state of the facts or of the law at the time of the payment
he would not have made it. A wrong turning half way along the journey is
just as capable of being treated as a relevant mistake as one that is made on
the doorstep at the point of arrival.

G    60   Robert Goff J said in *Barclays Bank Ltd v W J Simms Son & Cooke
(Southern) Ltd* [1980] QB 677, 694, after a careful review of the leading
authorities about payments made under a mistake of fact, that it is sufficient
to ground recovery that the claimant's mistake should have caused him
to pay the money to the payee. As Professor Burrows in *The Law of
Restitution*, 2nd ed (2002), p 136 puts it, the type of mistake does not
matter. It is purely its effect on the payer that counts. In the *Kleinwort
H    Benson* case [1999] 2 AC 349, 379, Lord Goff said that it was plain that the
money in that case was paid over under a mistake:

    "The payer believed, when he paid the money, that he was bound in
law to pay it. He is now told that, on the law as held to be applicable at
the date of the payment, he was not bound to pay it. Plainly, therefore, he

582
### Deutsche Morgan Grenfell Group plc v IRC (HL(E))                    [2007] 1 AC
Lord Hope of Craighead

paid the money under a mistake of law, and accordingly, subject to any applicable defences, he is entitled to recover it."     A

61    Mr Peter Thomason, DMG's head of taxation in London, gave evidence about his state of mind at the time when the payments of ACT were made. He made it clear in his witness statement that the ACT was paid because the relevant provisions of the Income and Corporation Taxes Act 1988 required it to be paid and because he believed that the UK statute denying the ability to make a group income election was the law and that he was bound to act in accordance with it. As Park J records in his judgment, at para 27, he was cross-examined on his witness statement. But the judge did not believe that this passage in his evidence was challenged or affected by his answers on other points. In his opinion the mistake that DMG made when the Act was paid was that it did not realise that it could have made a valid group election with the non-resident companies. In para 29 he repeated a point that he made in para 11 when he was summarising the evidence. He said that he had no doubt that if DMG had submitted elections the revenue would have pointed to the clear terms of the statute and rejected them, and that DMG would have been liable to pay the ACT and would have paid it.     B

    C

62    Park J acknowledged, in para 25, of his judgment that DMG's mistake was not directly a mistake about whether there was a liability to pay ACT. As he put it, it was directly a mistake about whether group income elections could be made. The liabilities to pay ACT arose as secondary consequences of that primary mistake. In the Court of Appeal Jonathan Parker LJ said that he could not agree with this analysis and that DMG's mistake lay not in its belief that a group election was not available but rather in its belief that the ACT was payable when, on the true state of the law, it was not: paras 231–232. I think, with respect, that Park J's analysis was the correct way of looking at what happened in this case. It was the mistaken belief that group relief could not be claimed that led inevitably to the liability to pay ACT which, absent a valid claim to group relief, DMG was not in a position to dispute. That was where the mistake was made, of which the payment of ACT was a secondary consequence. But, as Park J was right to recognise, if the mistake about the availability of group income relief had not existed, the ACT would not have been paid. There was an unbroken causative link between the mistake and the payment. It follows that the payments were made under a mistake. The mistake was, of course, a mistake of law. But under the *Kleinwort Benson* principle a cause of action at common law for their recovery is available.     D

    E

    F

    G

### The discovery issue

63    The next question is when, for the purposes of section 32(1)(c) of the 1980 Act, DMG discovered its mistake or could with reasonable diligence have done so. The revenue submit that the relevant mistake was discovered in relation to the 1993 and 1995 ACT payments in or about July 1995 when DMG learned that the provisions of section 247 of the Income and Corporation Taxes Act 1988 were the subject of serious legal challenge on the basis of EC law in the *Metallgesellschaft/Hoechst* case [2001] Ch 620 and might not be lawful. They submit that the 1996 payment was not made under a mistake as, when this payment was made, DMG was aware that the     H

A   provisions of section 247 were the subject of serious challenge and might not
be lawful.

   64   In support of these arguments reference is made to what I said in
*Kleinwort Benson* [1999] 2 AC 349 about the state of mind of the payer who
claims to have made a payment under a mistake. I said, at pp 409–410, that
cases of mistake could vary from complete ignorance to a state of ample
B   knowledge but a misapplication of what was known to the facts—from
sheer ignorance to positive but incorrect belief, as Mason CJ said in *David
Securities Pty Ltd v Commonwealth Bank of Australia* (1992) 175 CLR 353,
374. But I also said that a state of doubt was different from a mistake, and
that a person who pays when in doubt takes the risk that he may be wrong. I
ended this passage, at p 411C–D, by saying that the critical question was
whether the payer would have made the payment if he had known what he is
C   now being told was the law.

   65   These propositions are capable of further refinement: see Professor
McKendrick, "Mistake of Law—Time for a Change?" in *The Limits of
Restitutionary Claims: A Comparative Analysis* (ed Swadling) (1997),
pp 232–233; *Graham Virgo, The Principles of the Law of Restitution*
(1999), p 161; *Burrows, The Law of Restitution*, 2nd ed, p 140. The difficult
D   question is what degree of doubt is compatible with a mistake claim, as
Professor Burrows points out. I see the issue as being essentially one of
causation. What was the effect of the mistake on the payer? But the basic
principle is, of course, that of unjust enrichment. At what point can it be said
that the payee has been unjustly enriched? The answer to these questions
will depend on the facts of the case. One can leave on one side cases where
there is another ground on which the payee was entitled to be paid: frustra
E   petis quod mox restiturus es. As for the rest, the payer's reason for making
the payment despite his doubt will have a part to play in resolving the issue as
to whether the payer, who would not have made the payment had he known
the true state of the facts or the law at the time of the payment, should bear
the risk or can recover on the ground that he was mistaken.

   66   The argument that DMG simply took the risk that it might have
F   been wrong when it made the payments was considered and rejected by
Park J. He held, in para 30, that DMG did not discover its mistake in 1995
when it learned about the argument that Hoechst was advancing. It did not
do so until the decision in the *Metallgesellschaft/Hoechst* case [2001]
Ch 620 was released by the European court on 8 March 2001. In the Court
of Appeal Jonathan Parker LJ said, in para 234, that he agreed with the
G   judge's conclusion on this point. But Rix LJ and Buxton LJ found it difficult
to reconcile the judge's conclusion that DMG was still labouring under a
mistake of law with what I said in the *Kleinwort Benson* case [1999] 2 AC
349. Buxton LJ, recalling that that case was about the rights of the opposite
party in a private law transaction, said, in para 282, that the considerations
which applied in such a case could only be applied very imperfectly to a
citizen faced with an ultra vires demand. He said that persons who pay in
H   response to a demand by the revenue are in a quite different position from
persons who pay under a private transaction, as the demand for tax is
implicitly backed by the coercive powers of the state. He compared the
*Woolwich* case [1993] AC 70, where the society was certain that the
revenue's demand was ultra vires but paid none the less and was restricted to

584
**Deutsche Morgan Grenfell Group plc v IRC (HL(E))**                    [2007] 1 AC
**Lord Hope of Craighead**

a claim within the six year period, with the present case where DMG claims    *A*
relief because of payment under a mistake. Although it was aware of doubts
raised by other persons and of pending litigation, it paid because it thought,
as it turned out incorrectly, that the law was the law. This result, he said,
was reached through machinery developed to deal with the quite different
issue that arises where a citizen makes a private law payment under a
mistake that is his own mistake.                                              *B*

67  I recognise the force of Buxton LJ's concern. But I see it as a criticism
primarily of the uneven way the limitation rules operate, rather than of the
conclusion which the judge drew in the light of the evidence. In so far as it
amounts to a suggestion that the law ought to distinguish between payments
made under a mistake of law in private transactions and those made in
response to a demand by a public authority made in the mistaken belief that
the law under which it was made was the law, I think that the answer to it    *C*
must be found in a return to first principles. The fundamental point, as Lord
Goff recognised in *Kleinwort Benson* [1999] 2 AC 349, 373, is that a blanket
rule of non-recovery cannot sensibly survive in a rubric of the law based on
the principle of unjust enrichment. The enrichment of a public authority
because a payment was made to it in response to a demand in the mistaken
belief that the law under which the demand was made was the law is no less   *D*
unjust than an enrichment arising from a mistake of law in a private
transaction. Unevenness in the operation of the limitation rules is a matter
for Parliament.

68  The matter has, of course, been addressed so far as the revenue is
concerned by section 320 of the Finance Act 2004. But there are still some
loose ends. As Lord Goff mentioned in his concluding remarks in the
*Kleinwort Benson* case, this is a matter for consideration by the Law         *E*
Commission with a view to finding a solution that can be made the subject of
legislation by Parliament. As Professor Burrows has indicated, if there is
perceived to be a problem, the right way forward is not to distort the
common law of restitution by artificially limiting the scope of the *Kleinwort
Benson* case but for the legislature to stop time running indefinitely in
mistake cases: 121 LQR 540, 543. I would respectfully endorse his reference   *F*
in this passage to mistake cases generally. There seems to be no good reason
why cases of mistake of fact, the nature of which and the occasion for the
discovery of which can vary greatly, should not be treated in the same way
for limitation purposes as mistakes of law. Relief from the general six-year
time limit could be given in either case where the mistake was induced by the
payee's words or conduct.                                                     *G*

69  What then of the evidence? Mr Thomason said in his witness
statement that he learned of Hoechst's challenge to the ACT rules in around
July 1995. Whilst he monitored developments, it was not clear what
the outcome would be. His position was that at all times prior to the
determination of the European court in the *Metallgesellschaft/Hoechst* case
[2001] Ch 620 the law was to be found in the UK statute. He said, at
para 45, that, so far as he was concerned, there were no good grounds prior   *H*
to the date when the European court delivered its judgment for doubting the
validity of the statutory payments requiring payment of ACT. In cross-
examination he said that he did not feel anything near certainty that
Hoechst's challenge would succeed.

585
**[2007] 1 AC**                    **Deutsche Morgan Grenfell Group plc v IRC (HL(E))**
                                   **Lord Hope of Craighead**

*A*    70  It may be said that there was enough in Hoechst's challenge to raise a
doubt in Mr Thomason's mind as to whether or not the law with which he
was faced would survive it. But the situation with which he was faced is
quite different from that where a payer who is in a state of doubt about the
state of the law in a private transaction decides to pay nevertheless and take
the risk that he may be wrong. In such a case the causative link between the
*B*   mistake and the payment may be broken because the evidence shows that the
payer was content to pay irrespective of whether the sum is due or not. In
this case DMG was in no position to do anything else but pay the ACT. It
had not claimed group income relief because, wrongly as it turned out, it
believed that group income relief was not available.

71  It is plain, as the judge recognised, that if DMG had submitted a
claim for group income relief under section 247(1) the revenue would have
*C*   pointed to the clear terms of the statute and rejected it. It has never been
suggested that they would have conceded in a question with DMG the point
which they were resisting so strongly in their litigation with Hoechst.
DMG's mistaken belief that a group income election was not available was
not shown to be wrong until the issue which Hoechst had raised was
determined by the European Court on 8 March 2001. The issue, which
*D*   was one of law, was not capable of being resolved except by litigation. Until
the determination was made the mistake could not have been "discovered"
in the sense referred to in section 32(1) of the 1980 Act. In this situation
I would hold, in agreement with Park J and Jonathan Parker LJ, that
DMG was not in a state of doubt, when it paid the ACT. It was not then
obvious that the payments might not be due. They were made in accordance
with the law as it was then understood to be. There was nothing yet to be
*E*   discovered to the contrary which could have been revealed by the exercise of
reasonable diligence.

*Conclusion*

72  For these reasons and those given by Lord Hoffmann and Lord
Walker, with which I agree, I would allow the appeal and make the order
*F*   that Lord Walker proposes.

**LORD SCOTT OF FOSCOTE**

73  My Lords, this appeal is another, but assuredly not the last, of the
appeals to your Lordships' House in the litigation that has arisen as a result
of the judgment of the European Court of Justice, given on 8 March 2001,
*G*   in the *Metallgesellschaft Ltd* and *Hoechst AG* conjoined cases [2001] Ch 620,
but which I will, for convenience refer to as "the *Metallgesellschaft/Hoechst*
case". The European Court of Justice held, first, that it was contrary to
article 52 of the Treaty (now article 43 EC) for the tax legislation of the
United Kingdom to establish a tax regime under which group income
elections (enabling dividends to be paid by UK subsidiaries to their parent
companies without incurring an obligation to pay advance corporation tax)
*H*   could be made only where the parent company was resident in the UK, and,
accordingly, which denied the possibility of benefiting from a group income
election where the parent company had its seat in another member state.
Secondly, the European Court of Justice held that where a UK subsidiary had
been obliged to pay ACT in respect of dividends paid to its parent company

with a seat in another member state, even though UK subsidiaries with    A
parent companies resident in the UK were entitled in similar circumstances
to make group income elections and thereby avoid that obligation,
European law (i e article 43 EC) required that the subsidiary and its non-
resident parent:

    "should have an effective legal remedy in order to obtain
reimbursement or reparation of the financial loss which they have    B
sustained and from which the authorities of the [UK] have benefited as a
result of the advance payment of tax by the [UK subsidiary]" (ruling 2).

74   The issue in this particular appeal is whether and, if so, how
section 32(1)(c) of the Limitation Act 1980 applies to the cause (or causes) of
action on which the appellant company ("DMG") is suing the revenue. The    C
factual background to DMG's action and the manner in which the action
was dealt with in the courts below is comprehensively set out in the opinion
of my noble and learned friend Lord Walker of Gestingthorpe.  I have had
the great advantage of reading his opinion in draft and gratefully adopt and
need not repeat all that he has said.  But as I have the misfortune to differ
from him, and a majority of your Lordships, as to the right conclusion to be    D
reached in this appeal I must refer to some of the background in order to
explain the reasons for my dissent.

75   In para 117 of his opinion Lord Walker has helpfully summarised six
issues in dispute between the parties.  The issues which have led to my
dissent are those Lord Walker has numbered (2) and (5).  Issue (2) asks
the question whether DMG made its payments of ACT under a mistake of
law.  Issue (5) asks whether DMG can bring its cause of action within    E
section 32(1)(c) of the 1980 Act.  As to issue (5) I would respectfully venture
an amendment to Lord Walker's description of the issue.  Lord Walker has
suggested that issue (5) arises if DMG fails on issue (1), that is to say, fails to
satisfy your Lordships that English law recognises a restitutionary claim for
tax paid under a mistake of law.  I agree that issue (5) arises in that event, but
it would arise also if DMG were to succeed on issue (1) but fail on issue (2).    F
If that were to be the case DMG's cause of action could not be a
restitutionary claim for tax paid under a mistake of law (the recognition of
which by English law could not therefore assist DMG) but would have to be
either a compensation claim or, perhaps, a claim based upon unjust
enrichment, the revenue having obtained payment of an amount of
corporation tax earlier than would have happened if the group of which
DMG formed part had been able to make a group income election.    G
Whichever way the claim were put the question would arise whether DMG's
action could be described, for section 32(1)(c) purposes, as an "action for
relief from the consequences of a mistake".

76   My Lords, these issues, and the identification of the nature of
DMG's action against the revenue, require, in my opinion, as an essential
preliminary, a careful analysis of the European Court of Justice judgment in    H
order to be clear as to what it was about the UK tax regime that was ruled to
be a breach of European law.  Park J said, in para 22, that:

    "the mistake of law which DMG made was not that it paid ACT which
was not payable: the ACT was as a matter of law payable when

A   DMG paid it, and the decision of the [European Court of Justice] in *Metallgesellschaft/Hoechst* does not mean that it was not payable."

But, in the Court of Appeal, Jonathan Parker LJ disagreed. He said, at para 231:

B   "the Court of Justice, at para 76, held that the relevant statutory regime was contrary to article 52, and consequently unlawful under Community law. It follows that although *under the terms of that regime* ACT was due and payable, 'the true state of the law' (to use the judge's expression) was that the regime gave rise to no obligation to pay. Thus the payments were made pursuant to an unlawful demand."

C   If Jonathan Parker LJ's analysis of the *Metallgesellschaft/Hoechst* judgment is correct, it must follow that his conclusion that DMG was under no legal obligation to pay ACT too is correct. The critical question is whether that conclusion is correct.

*The Metallgesellschaft/Hoechst judgment*

D   77   The unlawfulness found by the European Court of Justice in the UK's ACT tax regime was the unjustified discrimination against corporate groups the parent companies of which were resident in member states other than the UK. The discrimination consisted of withholding from those corporate groups the option of making group income elections and thereby avoiding the obligation of a UK resident subsidiary of paying ACT to the revenue when paying dividends to its non-resident parent company. This

E   discrimination was held to be incompatible with article 52 because it would tend to discourage companies resident in other member states from establishing subsidiaries in the UK. It thus constituted an unlawful restriction on the freedom of establishment guaranteed by article 52: see para 36 of the European Court of Justice judgment.

78   The European Court of Justice was answering two questions which had been referred to it by the Chancery Division of the High Court. The

F   first was whether it was consistent with Community law "for the legislation of [the UK] to permit a group income election . . . only where both the subsidiary and parent are resident in [the UK]": para 33(1). The European Court of Justice gave to this question the answer "no". It did so because:

G   "The abolition [by article 52] of restrictions on freedom of establishment also applies to restrictions on the setting up of . . . subsidiaries by nationals of any member state established in the territory of another member state" (para 41).

The European Court of Justice explained, at para 54, that:

H   "to afford resident subsidiaries of non-resident companies the possibility of making a group income election would do no more than allow them to retain the sums which would otherwise be payable by way of [ACT] until such time as mainstream corporation tax falls due. They would thus enjoy the same cashflow advantage as resident subsidiaries of resident parent companies . . ."

588
**Deutsche Morgan Grenfell Group plc v IRC (HL(E))**                    **[2007] 1 AC**
**Lord Scott of Foscote**

And, at para 55, that:                                                          *A*

"the fact that a non-resident parent company will, unlike a resident
parent company, not be subject to [ACT] when it in turn pays out
dividends, cannot justify denying the resident subsidiary of the non-
resident parent the possibility of exemption from payment of [ACT] when
paying dividends to the parent."

*B*

And, in para 76, the European Court of Justice answered the first question by
declaring that it was:

"contrary to article 52 of the Treaty for the tax legislation of [the
UK] . . . to afford companies resident in [the UK] the possibility of
benefiting from a taxation regime allowing them to pay dividends to their
parent company without having to pay [ACT] where their parent      *C*
company is also resident in [the UK], but to deny them that possibility
where their parent company has its seat in another member state."

The reference by the European Court of Justice in each cited passage to "the
possibility" of making a group income election, a "possibility" that the tax
regime denied to corporate groups with a non-resident parent company,
identifies the element in the tax regime that the European Court of Justice   *D*
found to be inconsistent with European law. The European Court of Justice
did not hold that subjecting resident subsidiaries of non-resident companies
to the obligation of paying ACT was contrary to European law. What was
unlawful was the discriminatory nature of the group income election
provisions which failed to give corporate groups with a non-resident parent
company the same possibility of enabling resident subsidiaries to avoid the   *E*
payment of ACT as was open to corporate groups with a resident parent
company. The question is what effect this unlawful feature of the ACT tax
regime should be held to have had on the obligation of subsidiaries, such as
DMG, to pay ACT in respect of dividends paid to their non-resident parent
companies. This is a question to which I must return.

79 The second question for the European Court of Justice to answer     *F*
concerned remedies. The Chancery Division had asked, if the answer to the
first question was "no", about the remedies which national courts should
grant. In para 77 of its judgment the European Court of Justice explained
the question. Was the subsidiary and/or its parent company:

"entitled to obtain a sum equal to the interest accrued on the advance
payments made by the subsidiary from the date of those payments until
the date on which the tax became chargeable"—i e until MCT became     *G*
payable—"even when national law prohibits the payment of interest on a
principal sum which is not due."

The European Court of Justice recorded that the Chancery Division had
framed that question in two hypotheses:

"in the first alternative, where the claim by the subsidiary and/or     *H*
parent company is made in an action for restitution of taxes levied in
breach of Community law and, in the second, where the claim is made in
an action for compensation for damage resulting from the breach of
Community law."

A  However, the European Court of Justice, in para 81, stressed that it was not for the European Court of Justice but for the parties and the national law of the forum to specify the nature and basis of the remedy or remedies being sought. Community law required no more than that:

"resident subsidiaries and their non-resident parent companies should have an effective legal remedy in order to obtain reimbursement or
B  reparation of the financial loss which they have sustained and from which the authorities of the member state concerned have benefited as a result of the advance payment of tax by the subsidiaries" (para 96).

80  The *Metallgesellschaft/Hoechst* judgment [2001] Ch 620 contains passages which cast light upon the nature of the breach of Community law for which the appropriate remedy must be provided. Thus, at para 83:

C
"It is important to bear in mind in this regard that what is contrary to Community law . . . is not the levying of a tax in the United Kingdom on the payment of dividends by a subsidiary to its parent company but the fact that subsidiaries, resident in the United Kingdom, of parent companies having their seat in another member state were required to pay that tax in advance whereas resident subsidiaries of resident parent
D  companies were able to avoid that requirement"

and, to the same effect, at para 87: "the breach of Community law arises, not from the payment of the tax itself but from its being levied prematurely" and, at para 88: "the principal sum due is none other than the amount of interest which would have been generated by the sum, use of which was lost as a result of the premature levy of the tax."

E
81  These passages show that the breach of Community law was the failure of the UK's ACT tax regime to provide for corporate groups with a parent company resident in a member state other than the UK the same opportunity of postponing the payment of corporation tax by making a group income election as was available to domestic corporate groups. Does it follow that section 14(1) of the Income and Corporation Taxes Act 1988
F  (originally section 84(1) of the Finance Act 1972), which imposed the obligation on UK companies to pay ACT in respect of dividends paid to their shareholders, was unlawful, or, to put the question another way, imposed an unlawful tax? In my opinion, it does not. The effect of the European Court of Justice judgment in the *Metallgesellschaft/Hoechst* case on the validity of the section 14(1) charge to tax is a matter for the domestic courts of the UK.
G  (See *Thoburn v Sunderland City Council* [2003] QB 151, paras 68, 69.) If, under domestic law, the right conclusion is that section 14(1) imposed an unlawful tax, then it would follow that every demand for ACT had been an ultra vires demand, that every payment of ACT had been paid under a mistake of law and that every payer of ACT should be entitled, subject to limitation defences, to a restitutionary remedy. There must be many domestic corporate groups which, for one reason or another, did not make a
H  group income election and whose subsidiaries accordingly paid ACT in respect of dividends paid to their corporate shareholders. If ACT was an unlawful tax, the tax would have been paid under a mistake of law and, in any event, would be recoverable under the principle established in the *Woolwich* case [1993] AC 70. This would be a remarkable state of

affairs. There is nothing, however, in the European Court of Justice's   *A*
*Metallgesellschaft/Hoechst* judgment [2001] Ch 620 that requires this
conclusion and no reason at all why the domestic courts should reach it.

82 In my opinion, the proposition that the *Metallgesellschaft/Hoechst*
judgment requires the conclusion that section 14(1) imposed an unlawful
tax cannot be sustained. The unlawfulness of the tax regime identified by
the European Court of Justice lies not with the imposition of ACT but in the   *B*
discriminatory nature of the group income election provisions. So how
should the domestic law deal with that unlawfulness? It would clearly be an
inappropriate response for the domestic courts to hold that the benefits
afforded by the group income election provisions to domestic corporate
groups were unlawful and ultra vires. Nor was that suggested by the
European Court of Justice. The simple answer is that the UK courts must   *C*
provide a remedy to the non-domestic corporate groups for the failure of the
statutory provisions to extend the same benefits to them. The European
Court of Justice made it clear that it was no concern of Community law how,
as a matter of domestic law, that remedy was to be categorised provided the
remedy was an adequate and sufficient one: para 96. However the remedy
cannot, in my opinion, be based on the premise that the payments of
ACT were a response to unlawful demands or were payments of an unlawful   *D*
tax or were payments that were not due. None of these premises is required
to be made by the European Court of Justice's judgment in the
*Metallgesellschaft/Hoechst* case and none should be constructed by
UK domestic law.

83 The first issue referred to by Lord Walker, the issue to which more
time was devoted by counsel than to all the other issues combined, was   *E*
whether English law recognised a restitutionary claim for tax paid under a
mistake of law. On this issue I am in full agreement with, and there is
nothing I wish to add to, the opinions given by my noble and learned friends.
I agree that the effect of the speeches in this House in the *Woolwich* case
[1993] AC 70 is that tax paid in response to an unlawful demand can be
recovered by the taxpayer regardless of compulsion and regardless of
whether the taxpayer made the payment in consequence of a mistake; and   *F*
I agree that the effect of the speeches in the *Kleinwort Benson* case [1999]
2 AC 349 was that the rule barring a restitutionary remedy for money paid,
or property transferred, under a mistake of law was overturned.
Accordingly, I agree that the answer to issue (1) is that English law does now
recognise a restitutionary remedy for tax paid under a mistake of law.

84 But the answer to issue (1) does not mean that money paid, or   *G*
property transferred, under a mistake of law is *necessarily* recoverable, just
as money paid, or property transferred, under a mistake of fact is not
*necessarily* recoverable. It surely all depends on the part played by the
mistake, whether of fact or law, in the sequence of events that has led to the
payment or transfer. If A and B enter into a contract with one another for
the sale by A to B of a horse and B pays the price and takes delivery of the
horse, B cannot, absent some causative misrepresentation on A's part, claim   *H*
his money back, proffering the horse in return, on the ground that he was
mistaken as to the horse's breeding. The money once paid would be
irrecoverable unless there were some ground for invalidating the contract. It
cannot be enough for the buyer to assert and prove that but for his mistake

591
[2007] 1 AC          Deutsche Morgan Grenfell Group plc v IRC (HL(E))
                                                      Lord Scott of Foscote

A  about the horse's breeding he would not have entered into the contract and
   so would not have paid the money. In *Barclays Bank Ltd v W J Simms Son
   & Cooke (Southern) Ltd* [1980] QB 677, 695 Robert Goff J said that:

       "if a person pays money to another under a mistake of fact *which
       causes him to make the payment*, he is prima facie entitled to recover it as
       money paid under a mistake of fact" (emphasis added).

B
   He then described three types of circumstance which might lead to the claim
   failing. The first of these was that the payor intended the payee to have the
   money in any event, whether the believed fact was true or false. The second
   was that:

       "the payment is made for good consideration, in particular if the
C      money is paid to discharge, and does discharge, a debt owed to the
       payee . . . by the payer or by a third party by whom he is authorised to
       discharge the debt . . ."

   The third was that the payee had changed his position in good faith. There
   is, I would respectfully suggest, a fundamental difference between the first
   and the third of these types of circumstances on the one hand and the second
D  of them on the other. The first and third involve circumstances which have
   had no causative effect on the payment of the money. In the first, the money
   would have been paid in any event and the third involves circumstances
   which have nothing at all to do with the reasons why the payer paid the
   money or with any misapprehensions under which the payer may have been
   labouring. Neither of these types of case invalidates Robert Goff J's general
E  proposition that if a mistake of fact causes a payment to be made that would
   not have been paid but for the mistake, the payer will have a cause of action
   for its recovery. They are not true exceptions. The second, however, does
   invalidate that proposition. If a contract has been entered into that would
   not have been entered into but for a mistake, but the contract is then
   completed by a payment of the price for the goods or services that the payee
   has supplied, the payment cannot be recovered unless the contract can be set
F  aside. The proposition seems such an obviously correct one that it may seem
   pointless to ask why it is that it is correct. But I think the question does need
   to be asked for the answer casts, in my opinion, valuable light on the nature
   of the restitutionary remedy for the recovery of money paid under a mistake.
       85  The reason, it seems to me, why the proposition is correct is that the
   mistake does not necessarily undermine the legal obligation which required
G  the payment of the money or for the discharge of which the money was paid.
   If the mistake does enable the contract to be set aside then, subject to a
   change of position defence, the money should be recoverable. If the contract
   was void from the outset (as in the "swaps" cases) or had been avoided
   before the payment was made, the money should be recoverable. But if the
   legal obligation under which the money was paid cannot be, or has not been,
   invalidated, then, in my opinion, whether or not it can be shown that "but
H  for" the mistake in question the money would not have been paid, a
   restitutionary remedy for the recovery of the money would not be available.
       86  This approach to the recovery of money paid under a mistake
   should, in my opinion, apply whether the mistake be of fact or of law. In the
   *Woolwich* case [1993] AC 70 the tax paid by the Woolwich was recoverable

because it had been paid on account of a non-existent legal obligation. In the   *A*
*Kleinwort Benson* case [1999] 2 AC 349 the payments of which recovery
was sought by the bank had been paid under contracts that were void ab
initio. In neither case could it have been suggested that the payments had
been made with any animus donandi.

87   There are, I think, some problems about voluntary payments made as
gifts but that would not have been made but for some causative mistake,       *B*
whether of fact or law, e g a gift of £1,000 by A to B where B is believed by
A to be impecunious but is in fact a person of substantial wealth and where
A would not have made the gift if he had known that to be so. My present
opinion is that unless there were some other reason, such as a
misrepresentation by B, to enable the gift to be set aside, the mistake made by
A would not suffice, notwithstanding that the payment had not been made       *C*
pursuant to any legal obligation and that but for the mistake it would not
have been made. But the availability of a restitutionary remedy to recover
gifts which would not have been made but for some mistake of fact or of law
does not need to be pursued on this appeal and can be left for another day.

88   In my opinion the important question for the purposes of this appeal
is whether the payments by DMG of the ACT were made in discharge of
a legal obligation to pay. Park J thought they were. Jonathan Parker LJ      *D*
thought not. For the reasons I have already expressed I agree with Park J.
The mistake made by DMG and its parent company in Germany was in not
realising that the failure of the ACT tax regime to allow the group to make a
group income election was unlawful and could successfully have been
challenged. If the group had purported to make a group income election the
revenue would certainly have rejected it. That rejection we now know, post
the *Metallgesellschaft/Hoechst* case [2001] Ch 620, would have been        *E*
unlawful under Community law but even so, in my opinion, the lawfulness
of section 14(1) would not have been undermined. What might, perhaps,
have been undermined would have been the revenue's ability to recover the
ACT in an action against DMG since any claim for payment might have been
met by an equitable set-off or cross claim based upon the revenue's breach of
Community law in rejecting the group income election.                        *F*

89   In the events that actually happened DMG paid the ACT that was
due under section 14(1). DMG and its German parent company did make a
mistake of law in that they did not realise that they could successfully
challenge the failure of the ACT tax regime to allow them, too, to make a
group income election. It is possible to argue that this mistake of law was, in
a "but for" sense, a cause of their payment of the ACT. The argument has     *G*
difficulties but even if it were right it would not, in my opinion, justify the
conclusion that the ACT was paid under a mistake of law in the sense
necessary for a restitutionary remedy. The ACT was paid because there was
a legal obligation under a valid statutory provision for the money to be paid.
DMG's remedy was, in my opinion, not a restitutionary one for the re-
payment of money paid that was not due, or for the repayment of money
paid under a mistake, but was, and is, a claim for compensation to recover   *H*
the loss caused by the breach of Community law.

90   Before leaving the important issue of whether, in the light of the
*Metallgesellschaft/Hoechst* case, DMG was under a legal obligation to pay
the ACT, I should record the assistance I have had from the article "Justified

A   Enrichment" by Robert Stevens (2005) 5 OUCLJ 141 and in particular from
the section entitled "Was the Money Due?" I am in respectful agreement
with the conclusions there expressed.

*DMG's cause of action and section 32(1)(c) of the 1980 Act*

B   91   It is common ground that DMG has a cause of action in tort for
compensation for the loss caused by the breach of Community law found by
the European Court of Justice in the *Metallgesellschaft/Hoechst* case to be
inherent in the ACT tax regime. It is also common ground that for
Limitation Act 1980 purposes time began to run when each payment of
ACT was made. The details of the payments are set out in para 111 of Lord
Walker's opinion. Section 32(1)(c) applies where an action is brought "for
C   relief from the consequences of a mistake". In *Phillips-Higgins v Harper*
[1954] 1 QB 411 Pearson J expressed the view, at p 419, that section 26(c) of
the Limitation Act 1939 (the statutory predecessor of section 32(1)(c) of the
1980 Act) "applies only where the mistake is an essential ingredient of the
cause of action . . .." If it is right, as I think it is, that when the ACT was paid
by DMG the ACT was due, DMG's cause of action is an action for
D   compensation for tort. It is not, in my opinion, an action for restitution
based on the payment of money under a mistake. An allegation of a mistake
but for which the ACT would not have been paid is not an essential
ingredient in DMG's cause of action.

92   I would accordingly dismiss this appeal albeit for reasons different to
those of the Court of Appeal.

E   *The other issues*

93   In each of the other issues I am in respectful agreement with the
opinions of my noble and learned friends, and accordingly, if it were relevant
to do so, would dismiss the revenue's cross-appeal.

**LORD WALKER OF GESTINGTHORPE**
F   My Lords,

*Introduction*

94   Article 43 (formerly 52) of the EU Treaty, headed "Right of
Establishment" provides as follows:

G   "Within the framework of the provisions set out below, restrictions on
the freedom of establishment of nationals of a member state in the
territory of another member state shall be prohibited. Such prohibition
shall also apply to restrictions on the setting-up of agencies, branches or
subsidiaries by nationals of any member state established in the territory
of any member state. Freedom of establishment shall include the right to
take up and pursue activities as self-employed persons and to set up and
H   manage undertakings, in particular companies or firms within the
meaning of the second paragraph of article 48, under the conditions laid
down for its own nationals by the law of the country where such
establishment is effected, subject to the provisions of the chapter relating
to capital."

95   Several different statutory provisions relating to United Kingdom    A
corporation tax (in particular, as it applies to multi-national groups or
consortia of companies) have been successfully challenged, or are at present
under challenge, as infringing article 43. The challenges have been so
numerous that litigation is proceeding under several different group
litigation orders ("GLOs") made in the Chancery Division, and some appeals
have already reached this House: *Pirelli Cable Holding NV v Inland    B
Revenue Comrs* [2006] 1 WLR 400 and (as to procedural matters) *Autologic
Holdings plc v Inland Revenue Comrs* [2006] 1 AC 118. At the end of
2005, the Court of Justice of the European Communities gave judgment on a
reference made by the Chancery Division in litigation of this type (though
not proceeding under a GLO): *Marks & Spencer plc v Halsey* (Case
C-446/03) [2006] Ch 184.

96   The particular focus of the present appeal is on limitation of    C
actions—in practical terms, the length of time during which the premature
payment of advance corporation tax ("ACT") by the appellant company
Deutsche Morgan Grenfell Group plc ("DMG") gives rise to a remedy
enforceable in the national court. DMG's claim has been selected (under a
GLO made on 26 November 2001) as a suitable test case for the
determination of what are defined (in a further order made on 12 March    D
2002) as "EU issues (I) Limitation (A) and (B)." DMG was successful before
Park J (whose judgment given on 18 July 2003 is reported [2003] 4 All
ER 645) but on 4 February 2005, the Court of Appeal allowed the appeal of
the Commissioners of Inland Revenue [2006] Ch 243. Her Majesty's
Attorney General is also a party to the proceedings but I shall refer to the
respondents simply as "the revenue".    E

97   The issues summarised above may appear fairly narrow and very
technical, and on one possible view this appeal could be disposed of as a
relatively short point of construction on section 32(1)(c) of the Limitation
Act 1980. But it has produced some complex and sophisticated arguments
from counsel. The decisions of Park J and the Court of Appeal have also led
to some stimulating and far-reaching comments from legal scholars,
including Professor Andrew Burrows, "Restitution in Respect of Mistakenly    F
Paid Tax" 121 LQR 540, Professor Steve Hedley, "Tax Wrongly Paid—Basis
of Recovery—Limitation" [2005] CLJ 296, Robert Stevens, "Justified
Enrichment" (2005) 5 OUCLJ 141, Graham Virgo, "Deutsche Morgan
Grenfell: the right to restitution of tax paid by mistake rejected" [2005]
BTR 281, Sir Jack Beatson, chapter 9 ("Unlawful Statutes and Mistake of
Law") in *Mapping the Law* (ed Burrows & Rodger) (to be published shortly)    G
and two articles by Dr James Edelman, "Limitation Periods and the Theory
of Unjust Enrichment" (2005) 68 MLR 848 and "The Meaning of 'Unjust' in
the English Law of Unjust Enrichment" (2006) 3 ERPL 309. I shall return to
some of these at a later stage in this opinion, but I wish to acknowledge at
once my debt to these commentators and to other academic writers,
including of course the most recent work of the late Professor Peter Birks.

98   I shall begin with a brief summary of the relevant statutory    H
provisions relating to ACT, followed by a rather fuller summary of the
decision of the European Court of Justice in the important joined cases of
*Metallgesellschaft Ltd v Inland Revenue Comrs* and *Hoechst AG v Inland
Revenue Comrs* (Joined Cases C-397 and 410/98) [2001] Ch 620 ("the

595

A   *Metallgesellschaft/Hoechst* case"). Then I will come to the facts of the test case, the pleadings and the course of the litigation on its way to your Lordships' House. Then it will be necessary to look in some detail at the very important decisions of this House in *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70 and *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349, both majority decisions in which the leading speech was given by Lord Goff of Chieveley.

B

*ACT*

99   The relevant statutory provisions are very clearly described in the judgment of Park J, at paras 6 and 7, and a brief summary will therefore suffice. Corporation tax was first introduced by the Finance Act 1965. The structure of the tax was radically altered by the Finance Act 1972 with the

C   introduction of ACT, which was in force from 1973 until its abolition (probably hastened by the oncoming wave of litigation based on article 43) in 1999. From 1988 until 1999 the relevant provisions were to be found in a consolidating statute, the Income and Corporation Taxes Act 1988. The political and economic background to these changes has been described by Professor John Tiley in *Revenue Law*, 4th ed (2000), pp 758–762.

D   100   When a company paid a dividend to its shareholders it was required to pay to the revenue (within 14 days from the end of the quarter in which the dividend was paid) an amount of ACT equal (for most of the relevant period) to 25% of the dividend (Income and Corporation Taxes Act 1988, section 14). The ACT paid in this way was later set off against the company's liability for mainstream corporation tax ("MCT") if (as happened in this case) the company made sufficient taxable profits to be

E   liable to pay at least as much MCT as it had paid ACT. The payment of MCT would thus be accelerated by a period of between $8\frac{1}{2}$ and $17\frac{1}{2}$ months (depending on the timing of the dividend payment). A subsidiary company paying a dividend to its parent company could however avoid liability to pay ACT if both companies made a group income election ("GIE") under the Income and Corporation Taxes Act 1988, section 247. The GIE had to be

F   made at least three months in advance of payment of the dividend. This relief was however available only if both companies were for tax purposes resident in the United Kingdom. So a dividend paid by a British subsidiary to a German parent company was not (on the face of the United Kingdom corporation tax legislation) able to make a GIE and so obtain relief under section 247. In the *Metallgesellschaft/Hoechst* case [2001] Ch 620 the

G   European Court of Justice declared that part of the corporation tax legislation to be unlawful under EU law. The judgment of the European Court of Justice also deals with the consequences of the infringement in terms of remedies in the national courts.

*The Metallgesellschaft/Hoechst case*

H   101   The claimants in these two joined cases were two or more companies in groups which had a German parent company and one or more United Kingdom subsidiaries. In actions against the revenue (in which the Attorney General was also made a defendant) the claimants sought damages or compensation for loss (during the period until they would have been set off against MCT) of sums paid in ACT by the English subsidiaries in respect

596
**Deutsche Morgan Grenfell Group plc v IRC (HL(E))**                    [2007] 1 AC
**Lord Walker of Gestingthorpe**

of dividends paid to the German parent companies. The complaint was that    *A*
these losses were caused by the discriminatory and unlawful character
(under EU law) of the ACT regime under which GIEs were not available to
these multinational groups, but would have been available if all the relevant
members of the group had been United Kingdom companies.

102    Claims were brought in 1995 in respect of ACT paid (in one case)
between 1974 and 1995 and (in the other case) between 1989 and 1994. In    *B*
1998 the Chancery Division made references to the European Court of
Justice for preliminary rulings. Advocate General Fennelly delivered his
opinion on 12 September 2000 and the European Court of Justice gave its
judgment on 8 March 2001. The latter date has come to be seen as being of
considerable importance in these proceedings, so far as they turn on mistake
of law.

103    On the first referred question (paras 35–76 of its judgment) the    *C*
European Court of Justice concluded, at para 76:

"that it is contrary to article 52 [now 43] of the Treaty for the tax
legislation of a member state, such as that in issue in the main
proceedings, to afford companies resident in that member state the
possibility of benefiting from a taxation regime allowing them to pay
dividends to their parent company without having to pay advance    *D*
corporation tax where their parent company is also resident in that
member state, but to deny them that possibility where their parent
company has its seat in another member state"

In reaching that conclusion the European Court of Justice rejected the
argument (put forward by the United Kingdom and some other member
states) that the difference in tax treatment was objectively justified by the    *E*
differing circumstances of national and multinational groups, and in order
to preserve the coherence of the United Kingdom's tax system.

104    The second question, set out in para 33(2) of the European Court of
Justice's judgment, was whether EU law gave rise to a restitutionary right to
claim a sum of money by way of interest, or whether the claimant was
limited to an action for damages, and    *F*

"in either case is the national court obliged to grant a remedy even if
under national law interest cannot be awarded (whether directly or by
way of restitution or damages) on principal sums which are no longer
owing to the claimants?"

The rule of national law alluded to was that upheld by this House in
*President of India v La Pintada Cia Navigacion SA* [1985] AC 104,    *G*
mentioned in para 12 of the opinion of the Advocate General.

105    The whole of the European Court of Justice's answer to the second
question, at paras 77–96, is set out in full in the judgment of Jonathan
Parker LJ, at para 45, and it is unnecessary to repeat it in full. The crucial
passages (in the text as slightly edited in the Law Reports [2001] Ch 620,
663–664), are as follows:    *H*

"81. It must be stressed that it is not for the Court of Justice to assign a
legal classification to the actions brought by the claimants before the
national court. In the circumstances, it is for the claimants to specify the
nature and basis of their actions (whether they are actions for restitution

597
[2007] 1 AC                    Deutsche Morgan Grenfell Group plc v IRC (HL(E))
                                                 Lord Walker of Gestingthorpe

*A*   or actions for compensation for damage), subject to the supervision of the
      national court."

          "83. It is important to bear in mind in this regard that what is contrary
      to Community law, in the disputes in the main proceedings, is not the
      levying of a tax in the United Kingdom on the payment of dividends by a
      subsidiary to its parent company but the fact that subsidiaries, resident in
      the United Kingdom, of parent companies having their seat in another
*B*   member state were required to pay that tax in advance whereas resident
      subsidiaries of resident parent companies were able to avoid that
      requirement.

          "84. According to well-established case law, the right to a refund of
      charges levied in a member state in breach of rules of Community law is
      the consequence and complement of the rights conferred on individuals
*C*   by Community provisions as interpreted by the court: *Amministrazione
      delle Finanze dello Stato v SpA San Giorgio* (Case 199/82) [1983]
      ECR 3595, 3612, para 12 [etc] . . . The member state is therefore
      required in principle to repay charges levied in breach of Community
      law. . .

          "85. In the absence of Community rules on the restitution of national
*D*   charges that have been improperly levied, it is for the domestic legal
      system of each member state to designate the courts and tribunals having
      jurisdiction to lay down the detailed procedural rules governing actions
      for safeguarding rights which individuals derive from Community law,
      provided, first, that such rules are not less favourable than those
      governing similar domestic actions (principle of equivalence) and,
      secondly, that they do not render practically impossible or excessively
*E*   difficult the exercise of rights conferred by Community law (principle of
      effectiveness) . . .

          "86. It is likewise for national law to settle all ancillary questions
      relating to the reimbursement of charges improperly levied, such as the
      payment of interest, including the rate of interest and the date from which
      it must be calculated . . .

*F*       "87. In the main proceedings, however, the claim for payment of
      interest covering the cost of loss of the use of sums paid by way of [ACT]
      is not ancillary, but is the very objective sought by the claimants' actions
      in the main proceedings. In such circumstances, where the breach of
      Community law arises, not from the payment of the tax itself but from its
      being levied prematurely, the award of interest represents the
*G*   'reimbursement' of that which was improperly paid and would appear to
      be essential in restoring the equal treatment guaranteed by article 52
      [now 43] of the Treaty.

          "88. The national court has said that it is in dispute whether English
      law provides for restitution in respect of damage arising from loss of the
      use of sums of money where no principal sum is due. It must be stressed
      that in an action for restitution the principal sum due is none other than
*H*   the amount of interest which would have been generated by the sum, use
      of which was lost as a result of the premature levy of the tax."

      106  The fifth question, though phrased in abstract terms, asked in effect
      whether the United Kingdom could rely on the defence that the two groups
      of companies did not seek to make GIE's and, at para 98:

"did not therefore make use of the legal remedies available to them to    *A*
challenge the refusals of the tax authorities, by invoking the primacy and
direct effect of the provisions of Community law, where on any view
national law denied resident subsidiaries and their non-resident parent
companies the benefit of that taxation regime."

In rejecting this argument the European Court of Justice invoked the
principle of effectiveness, at para 106:    *B*

"The exercise of rights conferred on private persons by directly
applicable provisions of Community law would, however, be rendered
impossible or excessively difficult if their claims for restitution or
compensation based on Community law were rejected or reduced solely
because the persons concerned had not applied for a tax advantage which
national law denied them, with a view to challenging the refusal of the tax    *C*
authorities by means of the legal remedies provided for that purpose,
invoking the primacy and direct effect of Community law."

107    The revenue's position before your Lordships is to concede that
the European Court of Justice expects DMG to be entitled to a
restitutionary remedy, but only (as Mr Glick put it) by analogy with the
remedy in the *Woolwich* case [1993] AC 70 (and, crucially, subject to the    *D*
usual six-year limitation period). The revenue contend that DMG is trying
to obtain a concurrent domestic remedy in circumstances where, if the case
were purely domestic, it would get nothing. This is of course only a brief
summary of its argument on an important point to which it will be
necessary to return.

*The facts*    *E*

108    As just noted, DMG is seeking a concurrent domestic remedy based
on mistake of law, because it wishes to rely on section 32(1)(c) of the
Limitation Act 1980. Section 32(1) provides that (subject to immaterial
exceptions)

"where in the case of any action for which a period of limitation is    *F*
prescribed by this Act, either—(a) the action is based upon the fraud of
the defendant; or (b) any fact relevant to the plaintiff's right of action has
been deliberately concealed from him by the defendant; or (c) the action is
for relief from the consequences of a mistake; the period of limitation
shall not begin to run until the plaintiff has discovered the fraud,
concealment or mistake (as the case may be) or could with reasonable
diligence have discovered it."    *G*

It was therefore necessary for Park J to make findings of fact relevant to this
issue, and he heard oral evidence from Mr Peter Thomason, DMG's Head of
Taxation, who was cross-examined by Mr Glick. Mr Glick took your
Lordships through quite a lot of his oral evidence but before coming to the
judge's findings on the issue of mistake I should record the undisputed facts
about DMG, the group of which it came to form part, and the relevant    *H*
payments of ATC.

109    DMG (formerly Morgan Grenfell Group plc) was established in
1971 as a holding company for Morgan Grenfell & Co Ltd, a long-
established merchant bank. DMG was listed on the London Stock Exchange

*A*   in 1986. Deutsche Bank AG ("DBAG"), a well-known German bank, had acquired a 5% stake in DMG in 1984 and in 1989 it made a successful takeover bid. DBAG became the direct holder of about 14% of the shares in DMG and the remainder (about 86%) were held through another United Kingdom subsidiary of DBAG, DB Investments (GB) Ltd ("DBI"). At first DMG continued to operate in a fairly independent way, despite the

*B*   takeover, but in October 1994 DBAG decided to adopt a more integrated approach and to consolidate all its investment banking opportunities in London.   But the integration was not fully achieved, as far as the tax departments were concerned, until May 1996. Until then Mr Thomason had responsibility for the tax affairs of DMG but not for those of DBI (or, of course, DBAG).

*C*   110   I gratefully adopt Park J's summary of the history of the dividend payments:

"10. According to the terms of the Income and Corporation Taxes Act 1988, section 247, group income elections could not have been made between DMG and DBAG or between DBI and DBAG because DBAG was not a company resident in the United Kingdom. A group income election could have been made between DMG and DBI (because
*D*   both companies were resident in the United Kingdom), but no such election was made. The reason was that, although an election would have enabled dividends to flow from DMG to DBI without ACT, onward dividends from DBI to DBAG would have had to be paid subject to a liability on the part of DBI to pay ACT: or at least that was how the matter appeared on the terms of the domestic United Kingdom
*E*   legislation. In the circumstances DMG paid ACT by reference to all its dividends—the 86% of them paid to DBI as well as the 14% of them paid to DBAG—and DBI did not pay ACT when it paid onward dividends to DBAG. DBI did not have to pay ACT on those onward dividends because of the rules about franked investment income in the Income and Corporation Taxes Act 1988, sections 238 and 241.

*F*   "11. DMG has pleaded in this case, and the revenue admit, that, if section 247 had permitted group income elections to be made between a United Kingdom subsidiary and a parent company in another member state, elections would have been made between DMG and DBI, between DMG and DBAG and between DBI and DBAG. The corollary is that, because section 247 appeared clearly not to permit group income
*G*   elections to which a parent company in another member state was a party, the companies did not attempt to make group income elections. There is no doubt that, if they had attempted to make them, the revenue would have rejected the elections and pointed to the clear terms of the United Kingdom statute in justification of the rejection."

111   The amounts of ACT paid by DMG are now agreed to have been as follows (rounding pence):
*H*

| Date of Payment | On dividends to DBAG | On dividends to DBI |
| --- | --- | --- |
| 14 October 1993 | £887,076 | £5,472,956 |
| 15 February 1995 | £41,843 | £258,157 |
| 14 January 1996 | £487,471 | £3,007,529 |

These figures have however emerged by a surprisingly laboured process.   A
There has been more than one amendment of the particulars of claim.
Further discussion of this point is best deferred until I come to the last issue
in the appeal, the pleading point.

112   The judge accepted that at the time of the ACT payments in
October 1993 and February 1995 DMG (primarily in the person of
Mr Thomason) knew nothing about the argument which was ultimately       B
successful in the *Metallgesellschaft/Hoechst* case [2001] Ch 620. But by July
1995 DMG knew about the *Hoechst* litigation, which received a good deal
of publicity in the financial press. There was some discussion at DMG about
the possibility of a "protective GIE" (Mr Thomason was cross-examined
about this) but in fact nothing was done before a dividend was paid on
17 July 1995 (giving rise to the ACT payment in January 1996).

113   The judge's main findings of fact on this point are set out in para    C
27 of his judgment:

"Before I move on I wish to record the evidence which Mr Thomason
(the head of taxation at DMG) gave about his state of mind when he
learned of the *Hoechst* argument. In his witness statement he said this:
'At all times prior to the determination of the European Court in the
*Hoechst* case, I believed that the United Kingdom statute denying the     D
ability to make a group income election was the law and I was bound to
act in accordance with this law . . . It did not occur to me that I could
ignore the law as it stood for the simple reason that the law is the law.
Just because another taxpayer challenged the law that did not mean that
I could or should ignore it.' Mr Thomason was cross-examined, but I do
not believe that the foregoing passage was challenged or affected by his   E
answers on other points. He added the general point (obvious but plainly
relevant) that it was not clear in 1995 what would be the outcome of the
*Hoechst* case (or, as it turned out, of the *Metallgesellschaft/Hoechst*
conjoined cases). He also said that there were more arguments being
advanced by *Hoechst* in 1995 than the one which eventually succeeded in
the [European Court of Justice]."                                          F

114   The judge concluded, at paras 30–31, that all three relevant
payments of ACT were made under a mistake of law and that DMG did not
discover its mistake until the decision of the European Court of Justice on
8 March 2001, after DMG had commenced proceedings against the revenue
(it did so shortly after delivery of the opinion of Advocate General Fennelly).

*The pleadings*                                                            G

115   DMG issued its claim form on 18 October 2000, describing the
claim as "for damages for breach of European Community law". In its
original particulars of claim (served on 9 February 2001) it pleaded that
the Income and Corporation Taxes Act 1988, sections 14 and 247 and
Schedule 13 ("the statutory provisions") were contrary to EU law. It pleaded
(paras 9 and 11) that from time to time DMG paid dividends to DBAG and   H
DBI (which passed them on to DBAG). Para 9 (but not para 11 in its original
form) pleaded that ACT was paid in respect of these dividends "pursuant to
the unlawful statutory provisions and to unlawful demands made by the first
and/or second defendant and further and/or alternatively under a mistake of

A  law as to the validity of the statutory provisions". Para 11 was later amended
to bring it into line with para 9. By para 13 DMG claimed to be entitled to

"restitution of, and further and/or alternatively compensation for, and
further and/or alternatively compensation for the loss of use of, monies
paid on account of ACT pursuant to unlawful demands by the First
and/or second defendant and/or under a mistake of law and pursuant to
B   the statutory provisions in respect of the DBAG dividends"

(later amended to both sets of dividends), compensation for loss of use of the
moneys to be calculated "from the dates of payment until set-off against
mainstream corporation tax or other repayment or utilisation".

116  Paras 9 and 11 each ended with an averment that the amounts of
ACT "include, but are not limited to, payments of ACT made by the
C  claimant as specified in the [first or second] schedule hereto". Both schedules
(giving dates and amounts of ACT payments) were substantially amended on
various later dates. The pleading issue is whether these amendments added
or substituted a new cause of action outside the category permitted by
section 35(5)(a) of the Limitation Act 1980 ("if the new cause of action
arises out of the same facts or substantially the same facts as are already in
D  issue on any claim previously made in the original action.")

*The issues*

117  Before your Lordships, as in the courts below, there have been six
issues in dispute. Drawing on both the agreed statement of facts and issues
and the competing version in para 5 of DMG's printed case (but finding the
E  latter rather more helpful) I would summarise them as follows.  (1) The
"cause of action" issue: does English law recognise a restitutionary claim for
tax paid under a mistake of law? (2) The "mistake" issue (arising if
DMG succeeds on issue (1)): did DMG make the payments of ACT under a
mistake of law? (3) The "discovery" issue (arising if DMG succeeds on issues
(1) and (2)): when did DMG discover (or could with reasonable diligence
have discovered) its mistake? (4) The "settled law" issue (arising if
F  DMG succeeds on issues (1) to (3)): does English law recognise a defence of
"settled law" to a claim for restitution of tax paid under a mistake of law?
(5) The "scope of section 32(1)(c)" issue (arising if DMG fails on issue (1),
and raised for the first time in this House): can DMG bring itself within
section 32(1)(c) even if mistake of law is not an essential element of its cause
of action? (6) The "pleading" issue (raised by the revenue's cross-appeal and
G  linked to the limitation issues): this is the point on section 35 of the
Limitation Act 1980 already identified.

118  It will be apparent that it may not be strictly necessary for your
Lordships to resolve each of these issues in order to dispose of the appeal.
But as this is a test case under the GLO, and the facts of other cases will
differ, it seems desirable to consider all the issues. On DMG's printed case
there is a seventh issue, the "expiration" issue, arising only if DMG cannot
H  rely on section 32(1)(c), and if the revenue succeeds on its cross-appeal. This
is a truly arcane point raised (but then left undecided) by Park J in paras 39
and 40 of his judgment, and not discussed at all in the Court of Appeal. Like
Park J I would leave it for another day unless there is some practical need to
answer it.

**Deutsche Morgan Grenfell Group plc v IRC (HL(E))**          [2007] 1 AC
**Lord Walker of Gestingthorpe**

*The Woolwich and Kleinwort Benson cases*                                     A

119   The speeches delivered in this House in the *Woolwich* case [1993]
AC 70 and the *Kleinwort Benson* case [1999] 2 AC 349 have attracted a
great deal of academic interest and commentary. The speeches (especially
those of Lord Goff) were also subjected to very close scrutiny in the courts
below. Buxton LJ warned himself, at para 265, against treating Lord Goff's
speeches as if they were statutes, but the fact is that they were in the courts      B
below subjected to the same sort of minute examination as would be
appropriate for a statutory (or even, if I may say so without disrespect, a
scriptural) text. Your Lordships have been invited to undertake the same
sort of exercise.

120   That invitation cannot be wholly disregarded. But before getting
too caught up in the exegesis of Lord Goff's speeches, and at the danger of       C
stating the obvious, I would by way of preliminary make some simple
observations about the issues in the two cases, and about all the speeches
which were delivered (in each case there were quite full speeches from every
member of the Appellate Committee, with two dissenting speeches).

121   To my mind the salient points about the *Woolwich* case [1993]
AC 70 were as follows. (1) It was decided in 1992 when the general rule       D
barring recovery of money paid under a mistake of law still held the field.
(2) In any case there was no mistake on the part of the building society,
which had from the first challenged the validity of the transitional provisions
in the relevant regulations. It seems to have received confident professional
advice and to have acted confidently on the advice. It paid the tax under
protest, which was a reasonable thing to do since thousands of small
investors might have been alarmed by the news that it was said to be in         E
default. (3) The claim (as originally formulated) was for the repayment of a
principal sum of almost £57m with interest. After the issue of the writ the
principal sum was repaid (with interest from the date of the writ). So only
pre-writ interest was eventually at stake, but there had been a principal sum
claimed to be due when the writ was issued. (4) The majority (Lord Goff,
Lord Browne-Wilkinson and Lord Slynn of Hadley) upheld the simple           F
principle that tax paid in response to an unlawful demand could be
recovered, regardless of compulsion, and that this result was not ousted (or
"trumped") by any concurrent mistake of law: Lord Goff, at p 177F–H, Lord
Browne-Wilkinson, at p 198C–H, agreeing with Lord Goff but not expressly
mentioning mistake of law; Lord Slynn, at pp 204H–205A. (5) The minority
(Lord Keith of Kinkel and Lord Jauncey of Tullichettle) considered that
there could be no recovery in the absence of compulsion or duress, and that    G
there was no relevant distinction between payment of tax in response to a
demand under an ultra vires regulation and payment in response to a
demand under a misconstrued statute. If the statutory provisions for
repayment of overpaid taxes were inadequate that was a matter for
Parliament. (6) The case had no European element at all, though Lord Goff
did refer, at p 177C–E, to *Amministrazione delle Finanze dello Stato v SpA
San Giorgio* (Case 199/82) [1983] ECR 3595, remarking that it would be       H
strange if the right of the citizen to recover overpaid charges were to be more
restricted under domestic law than it is under European law.

122   The salient points about the *Kleinwort Benson* case [1999] 2 AC
349 were as follows. (1) It was not about tax but about interest rate swaps.

A  (2) There were arguably concurrent restitutionary claims, that is a claim based on money paid under a void contract and (if and only if the House abrogated the long-standing bar on recovery of money paid under a mistake of law) a claim on that ground. (3) The significance of section 32(1)(c) of the Limitation Act 1980 was clearly recognised; that was the whole point of the appellant bank seeking to overturn the rule barring recovery for mistake of

B  law.   The majority decided to overturn the rule despite explicitly acknowledging that an indefinitely extended limitation period might produce unsatisfactory results: Lord Goff, at p 389A–C; Lord Hoffmann, at p 401D–F; Lord Hope of Craighead, at p 417G–H. The minority also noted this point: Lord Browne-Wilkinson, at p 359H; Lord Lloyd of Berwick, at p 390A. (4) The House divided as to whether a mistake of law included a misprediction of the result of litigation (in that case, of the

C  outcome of *Hazell v Hammersmith and Fulham London Borough Council* [1992] 2 AC 1, decided by this House in 1991 after a challenge made in 1989 by a local authority auditor). This issue brought the House into the difficult area of the declaratory nature of judgments. The majority held that mistake of law should be broadly interpreted. I will not try to note all the relevant passages in their complex reasoning, but I note in particular Lord Goff,

D  at p 379G; Lord Hoffmann, at p 400D–E, and Lord Hope, at p 411C–D. The minority held that this was unrealistic and amounted to falsification of history: Lord Browne-Wilkinson, at p 358A–B, and Lord Lloyd, at p 394A. (5) "Settled law" was therefore for the minority not a defence to a prima facie restitutionary claim, but a reason why there was no claim at all: Lord Browne-Wilkinson, at pp 360A–362G, and Lord Lloyd, at p 394B–H. The

E  majority discussed "settled law" as a defence, as had recently been proposed by the Law Commission in its Report (1994) (Law Com No 227) on Restitution: Mistakes of Law and Ultra Vires Public Authority Receipts and Payments ("the 1994 report"), para 5. The majority rejected the proposed defence: Lord Goff, at pp 381B–383C; Lord Hoffmann, at p 401B–D; Lord Hope, at pp 414A–415B. The passage in Lord Goff's speech which I have

F  just mentioned has led to much discussion and I shall refer to it as the debatable passage. (6) There was a further issue as to "closed swaps" which is not relevant to this appeal. (7) The case had no European element at all.

123   The decision in the *Kleinwort Benson* case has attracted some academic criticism (notably from Professor Jack Beatson, who was the chief architect of the Law Commission report). It has also attracted some approbation (notably from Professor Burrows). It has not been argued that

G  your Lordships should depart from the decision.

*The judgments below*

124   Park J addressed the first issue in a section of his judgment, in paras 14–19, headed "Does English law recognise a claim in restitution to recover taxes paid under a mistake of law?" He quoted at length what I have called

H  the debatable passage in Lord Goff's speech in the *Kleinwort Benson* case. He concluded that it did not bear the meaning for which the revenue contended, for a number of reasons (set out in para 18 of his judgment). In particular he noted that none of the other speeches in the *Kleinwort Benson* case supported the view that the payment of unlawfully exacted tax was to

604
**Deutsche Morgan Grenfell Group plc v IRC (HL(E))**                    **[2007] 1 AC**
**Lord Walker of Gestingthorpe**

be an exception to the new principle permitting recovery of money paid   A
under a mistake of law.

125  As to the second and third issues, Park J held, after a careful
analysis, at paras 20–32, that DMG did make all three payments of ACT
under a mistake of law, and that the mistake was not discovered until the
decision of the European Court of Justice in the *Metallgesellschaft/Hoechst*
case [2001] Ch 620 on 8 March 2001. He had already, at the revenue's   B
request, para 18 (iv), left open the fourth issue (as to a possible settled law
defence). The fifth issue was not raised before him. On the sixth issue (as to
the pleadings) he decided, para 38, that the amendments did not plead a new
cause of action. Instead they merely gave further particulars of a cause of
action which had already been pleaded.

126  In the Court of Appeal (Buxton, Rix and Jonathan Parker LJJ) the   C
cause of action issue was most fully covered in the long and careful judgment
of Jonathan Parker LJ: paras 146–160, summarising the arguments, and
paras 192–227, Jonathan Parker LJ's reasoning and conclusions. Buxton LJ
set out his reasons separately: paras 265–291. On this issue Rix LJ agreed
with both: paras 250 and 261.

127  The reasoning on the cause of action issue in the judgments of
Jonathan Parker and Buxton LJJ is complex and it is not easy to summarise it   D
briefly. But the crucial passage in Jonathan Parker LJ's judgment seems to
me to be para 195. He had just quoted from Lord Goff's speech in the
*Woolwich* case [1993] AC 70, 176 approving the dissenting judgment of
Wilson J in *Air Canada v British Columbia* (1989) 59 DLR (4th) 161, 169.
Jonathan Parker LJ continued, at para 195:

"It seems to me that the above passage, notwithstanding that it is   E
strictly obiter, is of direct significance in the context of the cause of action
issue. Lord Goff is plainly referring to cases (of which the *Air Canada*
case was one) in which there is an unlawful demand *and* a mistake of law
by the taxpayer; indeed, if it were otherwise his reference to the mistake
of law rule would not be explicable. His conclusion (as I read it) is that in
such cases the mistake of law rule has no application since the taxpayer's   F
cause of action is founded not on his mistake but on the unlawful nature
of the demand (in effect, on the revenue's mistake): in other words, that
the *Woolwich* cause of action effectively subsumes any cause of action
which might otherwise exist for mistake of law."

Jonathan Parker LJ went on to a very detailed discussion of the debatable   G
passage in Lord Goff's speech in the *Kleinwort Benson* case [1999] 2 AC
349, 381–383, and to a consideration of Park J's reasons for not giving that
passage the significance which the revenue sought to attach to it.

128  Buxton LJ took a rather different approach to the cause of action
issue: paras 265–278. But he too concentrated on analysing the speeches of
Lord Goff in the *Woolwich* and *Kleinwort Benson* cases. He saw the
development of the law in the *Woolwich* case (para 270) as "not any   H
deduction from or development of the existing rules of restitution" and
(para 271) as "a new remedy, perhaps drawing upon, but certainly not
directly applying, ordinary principles of restitution". He pointed out that in
the *Woolwich* case [1993] AC 70, 174–177 Lord Goff contemplated that

A  strict rules of limitation might be needed for cases of unlawfully exacted tax but that on DMG's interpretation of his speech Lord Goff must have

> "none the less looked with equanimity in the *Kleinwort Benson* case upon the prospect of claims in respect of such demands that, in the present case, were not raised until nine or ten years after demand made."

B  On the same theme Buxton LJ referred, at para 283, to the fact that "*Woolwich* is restricted to a claim with a six-year limitation period because, as Lord Goff pointed out in the *Kleinwort Benson* case, it had made no mistake".

129  On the second and third issues Jonathan Parker LJ agreed with the judge: paras 229–236. Buxton LJ took a different line, at paras 279–284, developing his earlier reasoning and expressing the view, at para 279:

C
> "that the considerations that lead to recovery in a case of an ultra vires demand can only with the greatest difficulty be fitted into the rules governing recovery on grounds of mistake."

Rix LJ, at para 262, agreed with Buxton LJ's observations.

130  Only Jonathan Parker LJ dealt with the fourth issue (settled law)
D  and he did so briefly, at para 237, agreeing with the view of Lord Hoffmann in the *Kleinwort Benson* case that it was a matter for Parliament. The Court of Appeal did not consider the fifth issue. On the sixth issue (pleadings) the majority agreed with the judge, but Buxton LJ dissented: see Jonathan Parker LJ, at paras 238–248, Rix LJ, at paras 252–260, and Buxton LJ, at paras 292–297.

E  *The cause of action issue*

131  My Lords, it is impossible to read through the judgments (totalling almost 300 paragraphs) in the Court of Appeal without some surprise at the amount of time which the court devoted to what a single Law Lord (however eminent, and without doubt Lord Goff is pre-eminent in this field) said about mistake of law in a case (the *Woolwich* case [1993] AC 70) in which the
F  claimant was never under a mistake (and so the mistake of law rule was not an issue) and about unlawfully exacted taxes in a case (the *Kleinwort Benson* case [1999] 2 AC 349) which had nothing to do with tax. I fear that this may have led to some basic matters of principle being overlooked, or at least being insufficiently considered.

132  These matters of principle (which have very properly been relied on
G  and developed before your Lordships) include the following: (1) the constitutional principle of equality; (2) the need for coherence in the development of the English law of unjust enrichment; (3) English law's general readiness to permit a claimant to chose between concurrent claims; (4) the consequences of treating the *Woolwich* principle as exhaustive and exclusive, especially as regards (i) mistake of fact (ii) limitation of actions
H  and (iii) legal certainty of any proposed exception; and (5) the European element (which was not present in either the *Woolwich* case or the *Kleinwort Benson* case). I must develop these points briefly.

133  Under the rule of law, the Crown (that is the executive government in its various emanations) is in general subject to the same common law obligations as ordinary citizens. This is recognised by section 21(1) of the

Crown Proceedings Act 1947: see the observations of Vaisey J in *Sebel*   A
*Products Ltd v Customs and Excise Comrs* [1949] Ch 409, 413 (though the
notion of implied contract applied in that case must now be obsolete). There
are exceptions to this principle but they are generally the subject of express
enactment. The revenue's case requires a non-statutory exception whose
extent is both far-reaching and uncertain.

134   Buxton LJ saw the *Woolwich* case as a major departure in the   B
common law, rather than as an incremental development of the English law
of unjust enrichment. I would respectfully disagree. The *Woolwich* case was
certainly a very important development but the majority saw it as a
development which was within the proper province of the court, and not an
exercise in exorbitant judicial legislation. The Law Commission's thorough
examination of the *Woolwich* case in its 1994 Report (Part VI, paras 6.1–
6.46) seems to have accepted this, while noting some uncertainties as to how   C
far the principle would extend.

135   When Parliament enacts a special regime providing special rights
and remedies, that regime may (but does not always) supersede and displace
common law rights and remedies (or more general statutory rights and
remedies). Whether it has that effect is a question of statutory construction:
*Marcic v Thames Water Utilities Ltd* [2004] 2 AC 42, 56–58, paras 29–36   D
and *Autologic Holdings plc v Inland Revenue Comrs* [2006] 1 AC 118
(which Mr Rabinowitz for DMG put forward as a procedural analogue to
the present case). Where section 33 of the Taxes Management Act 1970
applies it does no doubt displace any common law remedy for tax paid under
a mistake. But in the *Woolwich* case tax was demanded under a regulation
which was void. There was therefore no valid assessment and the statutory
regime was simply not engaged: see Lord Goff in the *Woolwich* case [1993]   E
AC 70, 169. Similarly, the European Court of Justice has decided in the
*Metallgesellschaft/Hoechst* case [2001] Ch 620 that the ACT regime is
unlawful under EU law so far as it discriminates between national and multi-
national groups of companies. The revenue accepts that neither section 33
of the Taxes Management Act 1970 (as it stood at the relevant time) nor any
other statutory provision applies to the situation in which DMG finds itself.   F
The gap in the statutory provisions cannot provide the revenue with a
defence, both because of the *Woolwich* case and, in the context of EU law,
because of the principle of effectiveness. The appropriate remedy for
DMG is, as the revenue concedes, restitutionary in nature. It is not for the
repayment of a principal sum unlawfully exacted from the taxpayer, but for
its unlawful exaction before it became due. The European Court of Justice
has made it clear that the domestic court must provide an appropriate   G
remedy, despite the principle reaffirmed by this House in *President of India v
La Pintada Cia Navigacion SA* [1985] AC 104. Your Lordships heard no
argument as to whether and how the *Pintada* principle applies to the law of
unjust enrichment; I note that in his leading speech in the case, Lord
Brandon covered, at pp 115–116, the position in terms of damages under
common law, Admiralty law, equity and statute law, but did not refer to   H
restitution or unjust enrichment.

136   I would leave open the question whether DMG has to rely on any
special principle of EU law in order to obtain a remedy in respect of an
exaction which is unlawful only in being premature. In other respects,

A  DMG's claim relies on ordinary domestic principles. English law generally permits a claimant to chose between concurrent causes of action and concurrent remedies as best suits his interests. Lord Goff has been one of the most important influences in developing that approach: see especially *Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145, 193–194:

B       "My own belief is that, in the present context, the common law is not antipathetic to concurrent liability, and that there is no sound basis for a rule which automatically restricts the claimant to either a tortious or a contractual remedy. The result may be untidy; but, given that the tortious duty is imposed by the general law, and the contractual duty is attributable to the will of the parties, I do not find it objectionable that the claimant may be entitled to take advantage of the remedy which is most
C       advantageous to him, subject only to ascertaining whether the tortious duty is so inconsistent with the applicable contract that, in accordance with ordinary principle, the parties must be taken to have agreed that the tortious remedy is to be limited or excluded."

    137  Lord Goff reaffirmed the same approach, in the context of unjust enrichment, in the *Kleinwort Benson* case [1999] 2 AC 349, 387:

D       "However an equally strong argument may perhaps be made in favour of mistake of law trumping failure of consideration, though either approach is antagonistic to the usual preference of English law to allow either of two alternative remedies to be available, leaving any possible conflict to be resolved by election at a later stage."

E   The Law Commission took the same view in the 1994 Report: para 10, footnote 1. The claimant bank was allowed to put its case on mistake of law, rather than on payment under a void contract, precisely in order to rely on an extended limitation period under section 32(1)(c) of the Limitation Act 1980. None of the members of the Court of Appeal cited this passage from Lord Goff's speech or even, so far as I can see, paid any regard to it.

    138  I have so far been considering what appear to me to be the main
F   positive arguments in favour of allowing the appeal, and their cumulative effect appears to me to be formidable. That effect is buttressed by considering some of the difficulties involved in the revenue's case. In the first place, if the *Woolwich* principle is the only ground for recovery of wrongly paid tax, it would exclude not only an alternative cause of action based on mistake of law, but also one based on mistake of fact. That would involve a
G   departure from a well-established principle from which public authorities are not excepted (see for instance *Meadows v Grand Junction Waterworks Co* (1905) 21 TLR 538) and I can see no good reason for doing so.

    139  I do not think that the departure can be justified simply by pointing to the possibility that the claimant may, by relying on mistake, obtain a longer limitation period. Parliament has enacted that where there is an action for relief from the consequences of a mistake, time should not run so
H   long as the mistake remains undiscovered. If that is thought to be too generous in some cases, Parliament can change it (and has done so by section 320 of the Finance Act 2004). But the notion that it is right to show some indulgence to a claimant labouring under an undiscovered mistake is an entirely natural one, and it is not to my mind made unnatural simply

608
**Deutsche Morgan Grenfell Group plc v IRC (HL(E))**                    [2007] 1 AC
**Lord Walker of Gestingthorpe**

because the claim is for unlawfully exacted tax. Taxpayers naturally assume    *A*
that Parliament has got it right. I am puzzled by Buxton LJ's reference, at
para 283, to the building society being "restricted to a claim with a six-year
limitation period because, as Lord Goff pointed out in the *Kleinwort Benson*
case it had made no mistake" with the suggestion that this was somehow
unfair. In the *Woolwich* case the building society was fortunate in having
expert legal advice that the relevant regulation was invalid, and the          *B*
resources and determination to take on the revenue promptly. It did not
need any extended limitation period. Many other taxpayers would not be in
the same position.

140 If the *Woolwich* principle is to be an exhaustive and exclusive
regime for unlawfully exacted taxes, set apart from the general law of unjust
enrichment, legal certainty would require the limits of the exception to be
ascertainable with a fair degree of precision. In the debatable passage in his   *C*
speech in the *Kleinwort Benson* case [1999] 2 AC 349, 381–383 Lord Goff
referred twice to "taxes and other similar charges", which is imprecise.
Mr Glick suggested that the similarity was to be found in the existence of a
special statutory regime regulating recovery. This suggested test was not
fully explored in argument but it seems unlikely to be a satisfactory means of
setting a clear dividing line within a spectrum which stretches from central   *D*
government taxes and duties through rates, community charge, drainage
rates and charges, special levies and licence fees imposed by statute on
different industrial and commercial activities, and charges made by statutory
undertakers: as to the last category see *South of Scotland Electricity Board v
British Oxygen Co Ltd* [1959] 1 WLR 587. This point was touched on,
inconclusively, by the Privy Council in *Waikato Regional Airport Ltd v
Attorney-General of New Zealand* [2003] UKPC 50, at para 80            *E*
(discriminatory charges levied on New Zealand airports in respect of official
biosecurity services).

141 My Lords, all these considerations lead me to the conclusion that
the judge was right, and the Court of Appeal was wrong, in relation to the
cause of action issue. That is not to say that I see no difficulty in reconciling
this conclusion with the debatable passage in Lord Goff's speech in the       *F*
*Kleinwort Benson* case. Undoubtedly that passage represented part of Lord
Goff's mature reflections on the development of the English law of unjust
enrichment. It is not easy to reconcile the passage with the rest of Lord
Goff's reasoning, but I think that the explanation is provided in the opinions
of my noble and learned friends, Lord Hoffmann and Lord Hope of
Craighead, both of whom sat with Lord Goff in the *Kleinwort Benson* case
(and whose opinions I have had the great advantage of reading in draft). But  *G*
whatever the difficulties of the passage, there are to my mind two clear
beacons in Lord Goff's speech, one before and one after the debatable
passage, which are clearer and more reliable guides. The first is his
affirmation of a general right to recover money paid under a mistake of law
[1999] 2 AC 349, 375:

"... I would therefore conclude on issue (1) that the mistake of law     *H*
rule should no longer be maintained as part of English law, and that
English law should now recognise that there is a general right to recover
money paid under a mistake, whether of fact or law, subject to the
defences available in the law of restitution."

A  The other passage, at p 387, is that referring to "the usual preference of English law to allow either of two alternative remedies" which I have already cited.

142  I reach this conclusion without any heavy reliance on principles of EU law, except perhaps in relation to the *Pintada* principle (which I regard as uncertain in relation to the law of unjust enrichment). But the

B  European context confirms my conclusion. The domestic court must give DMG an equivalent and effective remedy, and that would not be achieved, in my opinion, if recovery were limited so as to exclude an alternative concurrent remedy which would be available in a dispute between private citizens.

*The mistake issue*

C  143  I can set out my views on this issue more briefly. I agree with the judge's conclusions, and I largely agree with his reasoning, though I respectfully think that he was rather over-analytical in his approach. I agree with the observation of Neuberger J in *Nurdin & Peacock plc v D B Ramsden & Co Ltd* [1999] 1 WLR 1249, 1272:

D      "For the issue of recoverability to turn upon a nice analysis as to the precise nature of the mistake of law appears to me to be almost as undesirable as it is for recoverability to turn upon whether the mistake made by the payer was one of fact or law."

The straightforward test of causation put forward by Robert Goff J, after a full survey of authority, in *Barclays Bank Ltd v W J Simms Son & Cooke

E  (Southern) Ltd* [1980] QB 677, has stood the test of time. DMG paid the ACT because it mistakenly thought that it had to. The fact that there was a procedural requirement for a GIE does not alter the substance of its mistake, since (as Park J expressly found, at para 11) any attempt at making a GIE would undoubtedly have been rejected in this case.

144  I think the judge and Jonathan Parker LJ were correct in their views that the mistake was not discovered until the European Court of Justice gave

F  judgment in the *Metallgesellschaft/Hoechst* case [2001] Ch 620. Perusal of the report in that case suggests that the United Kingdom Government tenaciously defended the ACT regime on every available ground. At no time before the judgment did the Government concede that the ACT regime was (in discriminating between national and multi-national groups) contrary to EU law and unlawful. It was the judgment that first turned recognition of

G  the possibility of a mistake into knowledge that there had indeed been a mistake. I agree with the view of Lightman J in *First Roodhill Leasing Ltd v Gillingham Operating Co Ltd* (unreported) 5 July 2001, para 22 that there may be cases "where a party may be held to have discovered a mistake without there being an authoritative pronouncement directly on point on the facts of that case by a court, let alone an appellate court". It all depends on the facts. But in this case it is, in my opinion, clear that the judgment of the

H  European Court of Justice on 8 March 2001 was the decisive moment.

*Settled law*

145  Like the judge, I agree with the view expressed in the *Kleinwort Benson* case [1999] 2 AC 349 by my noble and learned friend, Lord

Hoffmann, that the fashioning of a settled law defence would be a legislative    *A*
act and is therefore a matter for Parliament.  Parliament has indeed
incorporated its own version of the defence, in terms of "the practice
generally prevailing", in section 33(2A)(a) of the Taxes Management Act
1970, as inserted by section 19 of and paragraph 8(2) of Schedule 19 to the
Finance Act 1994, re-enacting the proviso to section 33(2).  As Lord Goff
recognised in the *Woolwich* and *Kleinwort Benson* cases, there are strong    *B*
policy arguments in favour of a general common law right of recovery of
wrongly exacted tax, and also strong countervailing arguments in favour of
some restrictions on that right of recovery, especially as the defence of
change of position could seldom, if ever, apply to wrongly exacted tax.
But the balancing of these high policy arguments is essentially a matter for
the legislature.

*C*

### The "scope of section 32(1)(c)" issue

146    This issue arises only if DMG fails on the first (cause of action)
issue.  In my opinion it does not arise on this appeal.  The rule that in order to
come within section 32(1) a mistake must be an essential ingredient of the
claimant's cause of action rests on a surprisingly uncertain basis, that is a
view expressed by Pearson J in *Phillips-Higgins v Harper* [1954] 1 QB 411,    *D*
419.  Nevertheless it has been generally accepted (with some dissentient
academic voices raised against it) for over 50 years.

147    The Law Commission has now completed and published its
review of the Law of Limitation of Actions (2001) (Law Com No 270)
and the Government has accepted its general recommendations with a
view to legislation as soon as time permits.  In those circumstances your    *E*
Lordships need not, in my opinion, reconsider the now nearly traditional
view of the scope of section 32(1)(c), although there are persuasive
arguments for its reinterpretation: see Dr James Edelman, "Limitation
Periods and the Theory of Unjust Enrichment" 68 MLR 848 and Professor
Andrew Burrows, "Restitution in Respect of Mistakenly Paid Tax" 121
LQR 540.

*F*

### The pleading issue

148    This point was fully considered in the courts below.  I agree with
the reasoning and conclusions of Park J and the majority of the Court of
Appeal.  I would only echo the observations of Millett LJ in *Paragon Finance
plc v DB Thakerar & Co* [1999] 1 All ER 400, 405:

*G*

"The pleading of unnecessary allegations or the addition of further
instances or better particulars do not amount to a distinct cause of action.
The selection of the material facts to define the cause of action must be
made at the lightest level of abstraction."

The formula used in DMG's particulars of claim ("Such amounts include,
but are not limited to, payments of ACT . . . specified in the [first or second]    *H*
schedule") was imprecise and unsatisfactory, but the defect could have been
cured by a request for particulars.

149    For these reasons I would allow the appeal and restore the order of
Park J.

611

A *The foundations of unjust enrichment*

150 I do however wish to add some brief observations on the views of
the late Professor Peter Birks, who died on 6 July 2004, after the first
instance decision of Park J but before the decision of the Court of Appeal.

151 Professor Birks was (in the words of Professor Burrows in his
introduction to the second edition of *Birks, Unjust Enrichment*, published
B posthumously in 2005) one of the most influential academic lawyers of our
time. After Lord Goff and Professor Gareth Jones (the first edition of whose
joint work on *The Law of Restitution* was published in 1966) Professor
Birks was one of the foremost, and many would say the very foremost, of the
scholars working on developing the law of restitution. In the revised
paperback edition of his *Introduction to The Law of Restitution* (1989) he
C explained his views as to the essential function in the law of unjust
enrichment of "unjust factors" (such as mistake, undue influence, and
compulsion). Most if not all other leading textbooks adopt the same or
similar terminology, for instance *Burrows, The Law of Restitution*, 2nd ed
(2002), pp 41 ff; *Goff & Jones, The Law of Restitution*, 6th ed (2002),
para 1-053; *The Law of Restitution* (general editors Hedley & Halliwell)
D (2002), para 1.20; *Tettenborn, Law of Restitution in England and Ireland*,
3rd ed (2002), pp 13 ff; *Virgo, The Principles of the Law of Restitution*
(1999), pp 119 ff.

152 But in the preface to the first (2003) edition of *Unjust Enrichment*
Birks, with characteristic intellectual courage, explained that he had
changed his views in some fundamental respects (he wrote to Sir Jack
Beatson that he was "back to square one"). In particular, he switched from
E the concept of "unjust factors" to the civilian concept of "lack of basis" (or
"lack of cause"). As he said in his preface to the first edition, summarising
the points on which his views had changed:

"Thirdly, and perhaps most importantly, the onward march of case
law and academic analysis, especially comparative analysis, has both
F compelled and convinced me that it was a misjudgement to insist that the
common law, late coming, had by good luck hit upon a better way of
answering the question whether an enrichment was unjust than, with
their much longer experience, the civilian jurisdictions had achieved."

153 Birks ascribed his change of view partly to the swaps litigation, and
especially to the *Kleinwort Benson* case [1999] 2 AC 349. In his own
G contribution, the first chapter, to *Lessons of the Swaps Litigation* (ed Birks
& Rose) (2000) he wrote of the decision of this House in the *Kleinwort
Benson* case, at p 14:

"The disagreement between the majority and the minority turns on
whether one can be retrospectively mistaken in any sense relevant to
restitutionary relief. The majority holds that one can, and in so holding it
H appears to have approved a notion of operative mistake of law which is
not only broader than operative mistake of fact but broader than the
rationale underlying relief for mistake. Without saying so expressly, it has
moved English law towards a civilian condictio indebiti. 'Condictio
indebiti' means 'Claim in respect of something not due'."

This can be contrasted with the well-known statement by Lord Goff in the     *A*
*Woolwich* case [1993] AC 70, 172:

"The first [objection] is to be found in the structure of our law of
restitution, as it developed during the 19th and early 20th centuries. That
law might have developed so as to recognise a condictio indebiti—an
action for the recovery of money on the ground that it was not due. But it
did not do so. Instead, as we have seen, there developed common law      *B*
actions for the recovery of money paid under a mistake of fact, and under
certain forms of compulsion."

The law of Scotland has, by contrast, closely followed the civilian model: see
the Lord President (Rodger) in *Shilliday v Smith* 1998 SC 725, 727–728 and
generally Professor Robin Evans-Jones, *Unjustified Enrichment: Vol 1,
Enrichment by Deliberate Conferral: Condictio* (2003).                    *C*

154   In explaining his changes of view Professor Birks also
acknowledged the influence of Dr Sonja Meier, a lecturer in law at the
University of Regensberg.  Her views are accessible in English in her
contributions to *Lessons of the Swaps Litigation* (chapter 6, "Restitution
After Executed Void Contracts") and to *Johnston & Zimmermann,
Unjustified Enrichment: Key Issues in Comparative Perspective* (2002)
(chapter 2, "Unjust factors and legal grounds").  On this point English law    *D*
may be at something of a crossroads (a metaphor first used, I think, by
Waller LJ in *Guinness Mahon & Co Ltd v Kensington and Chelsea Royal
London Borough Council* [1999] QB 215, 233, and since picked up by
others including *Dr Thomas Krebs, Restitution at the Crossroads:
A Comparative Study* (2001)).  The choice as to the way forward which     *E*
restitution scholars identify is between continuing to view unjust enrichment
as depending on the presence of one or more of a variety of "unjust factors"
and adopting the single test of "absence of basis".

155   My Lords, the House is being invited (much more pressingly, it
must be said, by scholars than by counsel for the parties) to make a choice at
a very high level of abstraction. Most scholars would take the view (though
Professor Birks himself would not, I suspect, have agreed, since he regarded    *F*
taxonomy as very important) that the choice is one which will rarely make
much if any practical difference to the outcome of any particular case before
the court. For several reasons I doubt whether this is the right time for your
Lordships to decide whether to rebase the whole law of unjust enrichment
on a highly abstract principle which (although familiar to civilians and to
Scottish lawyers, and discussed in the speech of my noble and learned friend
Lord Hope of Craighead in the *Kleinwort Benson* case [1999] 2 AC 349,     *G*
408–409) would represent a distinct departure from established doctrine.

156   It is of the nature of the common law to develop slowly, and
attempts at dramatic simplification may turn out to have been premature
and indeed mistaken. As Lord Rodger of Earlsferry put it in *Customs and
Excise Comrs v Barclays Bank plc* [2007] 1 AC 181, para 51:

"Part of the function of appeal courts is to try to assist judges and     *H*
practitioners by boiling down a mass of case law and distilling some
shorter statement of the applicable law. The temptation to try to identify
some compact underlying rule which can then be applied to solve all
future cases is obvious. [Counsel for the appellants] submitted that in this

613

A   area the House had identified such a rule in the need to find that the
defendant had voluntarily assumed responsibility. But the unhappy
experience with the rule so elegantly formulated by Lord Wilberforce in
*Anns v Merton London Borough Council* [1978] AC 728, 751–752,
suggests that appellate judges should follow the philosopher's advice to
'Seek simplicity, and distrust it'."

B   Other members of the House showed a similar disinclination to wide
generalisation: see Lord Bingham of Cornhill, at para 8, Lord Hoffmann, at
para 36 and Lord Mance, at para 83. *Customs and Excise Comrs v Barclays
Bank plc* shows that more than 40 years on from *Hedley Byrne & Co Ltd v
Heller & Partners Ltd* [1964] AC 465, the true foundations of the law of
tortious liability for negligent misstatement are still open to debate.

C       **157** By contrast the English law of unjust enrichment has in the space of
a decade seen four very important developments, all informed by the
learning of Lord Goff: *Lipkin Gorman v Karpnale Ltd* [1991] 2 AC 548 in
1991, the *Woolwich* case [1993] AC 70 in 1992, *Westdeutsche Landesbank
Girozentrale v Islington London Borough Council* [1996] AC 669 in 1996,
and the *Kleinwort Benson* case [1999] 2 AC 349 in 1998. The change in the
views of Professor Birks is a recent development (which sadly he could not
D   pursue further) and it has not yet been fully considered by other legal
scholars. There is, it seems to me, much to be said for a period of
reappraisal.

        **158** Nevertheless I would add that my tentative inclination is to
welcome any tendency of the English law of unjust enrichment to align itself
more closely with Scottish law, and so to civilian roots. I see attractions in
E   the suggestion made by Professor Birks in *Unjust Enrichment*, 2nd ed, p 116,
under the heading "The Pyramid: A Limited Reconciliation":

        "A pyramid can be constructed in which, at the base, the particular
    unjust factors such as mistake, pressure, and undue influence become
    reasons why, higher up, there is no basis for the defendant's acquisition,
    which is then the master reason why, higher up still, the enrichment is
F   unjust and must be surrendered."

I would be glad to see the law developing on those lines. The recognition of
"no basis" as a single unifying principle would preserve what Lord Hope
refers to as the purity of the principle on which unjust enrichment is
founded, without in any way removing (as this case illustrates) the need
for careful analysis of the content of particular "unjust factors" such as
G   mistake.

    **LORD BROWN OF EATON-UNDER-HEYWOOD**
        **159** My Lords, DMG's claim in these proceedings (issued on
18 October 2000) is for compensation in respect of three payments of
ACT made respectively on 14 October 1993, 15 February 1995 and
14 January 1996. These payments could and would have been avoided had
H   the UK tax regime not breached article 43 (formerly 52) of the EU Treaty by
denying DMG (as a multinational rather than exclusively UK group) the
right to make a group income election. So much, the majority of your
Lordships would hold, was established by the European Court of Justice's
decision in the *Metallgesellschaft/Hoechst* case [2001] Ch 620 on 8 March

614
Deutsche Morgan Grenfell Group plc v IRC (HL(E))                    [2007] 1 AC
Lord Brown of Eaton-under-Heywood

2001. The claim is not for the capital sums paid: those were subsequently set    *A*
off against the company's liability for MCT. Rather it is for compensation
for the loss of use of the moneys prior to such setoffs, i e for having made
accelerated payments.

160   The revenue do not dispute DMG's entitlement to such
compensation in principle. On the contrary, they readily accept that the
company has a perfectly good remedy, either in tort for breach of statutory    *B*
duty or in restitution by analogy with the principle established in *Woolwich
Equitable Buildings Society v Inland Revenue Comrs* [1993] AC 70. But
under these causes of action DMG would be confined to a six year limitation
period (i e six years from the date of the respective payments) and on this
basis would fail in respect of the October 1993 payment (and fail too in
respect of the later payments were the revenue to succeed in their cross
appeal on the pleading issue, contending as they do that such claims were    *C*
only brought by later amendment rather than when the writ was first issued).
That is why DMG assert their claim as one for restitution based on a mistake
of law—precisely so as to benefit from section 32(1)(c) of the Limitation Act
1980, just as the claimants succeeded in doing in the landmark case of
*Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349.

161   All this is fully and lucidly explained in the speech of my noble and    *D*
learned friend, Lord Walker of Gestingthorpe, as too are the various issues
which arise for decision on the appeal. With almost all of Lord Walker's
speech (and the speeches of my noble and learned friends, Lord Hoffmann
and Lord Hope of Craighead) I find myself in full agreement and, in
common with them, I too would allow DMG's appeal and restore Park J's order. On
one issue, however, the "discovery" issue (linked in one respect, as it is, with
the "mistake" issue), I have the misfortune to take a different view, indeed a    *E*
view which puts me in a minority of one. As it happens, because of the inter-
relationship of this issue with other issues arising on the appeal, my
disagreement has in fact no effect whatsoever on the overall outcome of the
proceedings. But it would not, I think, be right to ignore it entirely: the point
could well be of decisive importance in other actions, perhaps indeed actions
awaiting the outcome of this very appeal. Let me explain.                       *F*

162   As I understand it, your Lordships have concluded, first, that
DMG was acting under a mistake of law when making the three relevant
payments of ACT (it is on this issue that my noble and learned friend, Lord
Scott of Foscote dissents on the basis that DMG was in any event under a
legal obligation to make the payments and so should not be regarded within
the *Kleinwort Benson* principle as having made them under a mistake of    *G*
law); and, secondly, that that mistake was not discovered until the decision
of the European Court of Justice in the *Metallgesellschaft/Hoechst* case
[2001] Ch 626 was handed down on 8 March 2001. The contrary view
which I take is that DMG ceased to be acting under any relevant
mistake of law in July 1995 when they first became aware of the
*Metallgesellschaft/Hoechst* proceedings and recognised that there was a
serious legal challenge to the legality of the UK's ACT regime under EC law.    *H*
If I am correct in this view it would follow that DMG, although paying the
October 1993 and February 1995 payments under a mistake of law,
discovered that mistake in July 1995 so as to set time running in respect of
those particular payments as from that date; and that the January 1996

03635-jpm    Doc 173-2    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C par
Pg 800 of 856

615
[2007] 1 AC                    Deutsche Morgan Grenfell Group plc v IRC (HL(E))
                                         Lord Brown of Eaton-under-Heywood

A   payment was not made under a mistake of law at all. (It is because, however, as already stated, the claim was issued on 18 October 2000, within six years of July 1995, and because DMG have the benefit of undisputed alternative grounds of claim in respect of the January 1996 payment, that none of this matters given your Lordships' rejection, with which I agree, of the revenue's cross-appeal.)

B     163   Let me turn then to this narrow though potentially important issue upon which I diffidently disagree with your Lordships. First I should for convenience set out again section 32(1) of the 1980 Act:

"where in the case of any action for which a period of limitation is prescribed by this Act, either—(a) the action is based upon the fraud of the defendant; or (b) any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or (c) the action is
C    for relief from the consequences of a mistake; the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it."

    164   It is, I acknowledge, difficult to articulate the precise touchstone by
D which to determine whether a payment ought properly to be held to have been made under a mistake of law (or, indeed, answering essentially the same question from a different standpoint, whether such a mistake should be held to have been discovered—or able with reasonable diligence to have been discovered). Section 32 itself affords little help on the question—unsurprisingly, perhaps, given that the provision (based as it was on section 26 of the Limitation Act 1939) was framed at a time when no
E plaintiff could have hoped to pray in aid a mistake of law.

    165   For my part, however, I would hold that as soon as a paying party recognises that a worthwhile claim arises that he should not after all have made the payment and accordingly is entitled to recover it (or, as here, to compensation for the loss of its use), he has "discovered" the mistake within the meaning of section 32; and, by the same token, I would hold that if he
F makes any further payments thereafter, they are not to be regarded as payments made under a mistake of law.

    166   Where, I would respectfully ask, is there any injustice in this? No one is suggesting, let me repeat, that the moneys are not recoverable or that the payee should remain unjustly enriched. All that is required is that the payer does not sit upon that which ex hypothesi he recognises to be a worthwhile
G legal argument for more than six years. Provided he acts within that (surely ample) time, he can pursue his claim (whether in respect of past payments or, indeed, payments he may choose to continue making) under whatever may be the appropriate cause of action: restitution for mistake of law in respect of past payments made when he had no reason to question his liability to make them, total failure of consideration, or a claim based on the *Woolwich* principle.

H     167   Once a plaintiff recognises that he has a worthwhile case on the facts to pursue a claim in fraud or to extend the limitation period for a particular claim because of the defendant's deliberate concealment of a fact relevant to his cause of action, time surely then starts to run against him under section 32: he could not successfully argue that time starts running

616
Deutsche Morgan Grenfell Group plc v IRC (HL(E))                     [2007] 1 AC
Lord Brown of Eaton-under-Heywood

only when the court eventually comes to reject the defendant's denial of     A
wrongdoing and to find fraud (or, as the case may be, deliberate
concealment) established.

168   Nor do I find it easy to reconcile the approach taken by your
Lordships with other provisions of the 1980 Act, most notably
section 14A(9), as inserted by section 1 of the Latent Damage Act 1986:     B
"Knowledge that any acts or omissions did or did not, as a matter of law,
involve negligence is irrelevant for the purposes of subsection (5) above."
(Section 14A(5) determines the starting date for reckoning the period of
limitation based on the claimant's date of knowledge.) As Lord Nicholls
of Birkenhead recently observed in *Haward v Fawcetts* [2006] 1 WLR 682,
686F, para 12: "A claimant need not know he has a worthwhile cause of
action."   On your Lordships' view, however, such a claimant could well     C
argue that he was labouring under a mistake of law so as to extend time
under section 32(1).

169   The *Woolwich* case [1993] AC 70 was decided on the explicit basis
that the building society was in no way mistaken when making its payments
under the disputed regulations—see particularly the speech of Lord Goff,
at p 173D, and that of Lord Slynn, at p 201A–B. Rather the payments were
made because, as Lord Goff put it, at p 171:                                 D

"[The taxpayer] is faced with the revenue, armed with the coercive
power of the state, including what is in practice a power to charge interest
which is penal in its effect. In addition, being a reputable society which
alone among building societies is challenging the lawfulness of the
demand, it understandably fears damage to its reputation if it does
not pay. So it decides to pay first, asserting that it will challenge the     E
lawfulness of the demand in litigation."

I can see no real distinction between that case and this (this case, that is, after
July 1995). True, as Lord Goff observed, at p 171G, Woolwich was
"convinced that the demand [was] unlawful" whereas here Mr Thomason,
DMG's head of taxation, believed that the company was in law bound to
make the payments (precisely, indeed, as Lord Scott would hold to be so).     F
But I fail to see why the question whether moneys are paid under a mistake
of law should turn on the degree of conviction or optimism which the parties
hold upon the legal issue dividing them. Were the claimants in the *Hoechst*
case (who issued their proceedings against the revenue in 1995) none the less
to be regarded as having made all subsequent payments under a mistake of
law? Surely not. Even DMG itself, it will have been noted, brought its claim
in October 2000. Is it nevertheless to be said that their original mistake     G
remained undiscovered until the European Court of Justice's actual decision
in *Hoechst* some five months later?

170   In the *Kleinwort Benson* case [1999] 2 AC 349, as I understand that
case, nothing turned upon the particular state of mind of the payer as to
whether the payments for which restitution was sought were made under a
mistake. As Lord Hope noted, at p 403G, the only issue on that part of the     H
case was whether the bank's mistake was one of law. It was certainly not
critical to the decision there that the mistake of law was assumed, at least by
Lord Lloyd, to have been discovered only when the House of Lords finally
held in *Hazell v Hammersmith and Fulham London Borough Council*

617

A   [1992] 2 AC 1 that the swap agreements were void. As Lord Hoffmann observed, at p 401, the decision (in the *Kleinwort Benson* case)

"leaves open what may be difficult evidential questions over whether a person making a payment has made a mistake or not . . . There is room for a spectrum of states of mind between genuine belief in validity, founding a claim based on mistake, and a clear acceptance of the risk
B   that they are not. But these questions are not presently before your Lordships."

171   Lord Hope too left open for another day cases where payments are made in a state of doubt about the law. The revenue on the present appeal understandably place some reliance on what Lord Hope said, at p 410:

C   "Cases where the payer was aware that there was an issue of law which was relevant but, being in doubt as to what the law was, paid without waiting to resolve that doubt may be left on one side. A state of doubt is different from that of mistake. A person who pays when in doubt takes the risk that he may be wrong—and that is so whether the issue is one of fact or one of law."

D   172   On the present appeal, however, Lord Hope concludes his judgment on "the discovery issue", at paras 63–71 of his speech, with the view that, when DMG paid the ACT, "it was not then obvious that the payments might not be due." I confess to some difficulty with that conclusion. Surely, when DMG learned in July 1995 that there was a serious legal challenge to the legality of the ACT regime, it must then have been
E   obvious to them that these payments might not after all be due. Of course they could not be sure and of course nothing short of a final judgment from the European Court of Justice would have persuaded the revenue to accept any claim by DMG here for group income relief. But it does not seem to me to follow that DMG paid under a mistake of law—any more than Woolwich would be regarded as having paid under such a mistake simply because the
F   revenue in that case were insisting on the validity of the contested regulations.

173   I have the same difficulty with para 144 of Lord Walker's opinion. Again, I see no good reason why the revenue's tenacious defence of their position and their refusal to concede its unlawfulness means that DMG's mistake must be treated as undiscovered prior to the *Metallgesellschaft/Hoechst* judgment. The passage quoted by Lord Walker
G   from Lightman J's judgment in *First Roodhill Leasing Ltd v Gillingham Operating Co Ltd* 5 July 2001, para 22, continues:

"For this purpose it cannot be necessary that the party knows of the mistake as a certainty. There are gradations of knowledge. It may well be sufficient to constitute the necessary discovery when the claimant has good reason to believe that a mistake has been made (consider *Earl Beatty*
H   *v Inland Revenue Comrs* [1953] 1 WLR 1090) or has been given 'a line' on this question: see *G L Baker v Medway* [1958] 1 WLR 1216, 1224."

174   To much the same effect is Maurice Kay LJ's judgment in *Brennan v Bolt Burdon* [2005] QB 303, 315:

Deutsche Morgan Grenfell Group plc v IRC (HL(E))                    [2007] 1 AC
Lord Brown of Eaton-under-Heywood

"This [the plaintiff's extreme difficulty in obtaining permission to    *A*
appeal and 'small chance' of persuading the Court of Appeal], it seems to
me, falls short of the unequivocal but mistaken view of the law which
underlay the *Kleinwort Benson* case [1999] 2 AC 349. As Lord Hope
observed, at p 410B, the House of Lords was not dealing with the case
where there is doubt as to the law—'a state of doubt is different from that
of mistake'. An appeal might have been correctly perceived as an uphill    *B*
struggle but not as an inherently insuperable one—as subsequent events
were to prove."

175   Lord Hoffmann suggests, at para 26, that: "The real point is
whether the person who made the payment took the risk that he might be
wrong. If he did, then he cannot recover the money." But my thesis is not
that, if someone pays money knowing that he may not be under any liability    *C*
to do so, he cannot recover it. Rather it is that he cannot recover it as money
paid under a mistake of law so as to benefit from the longer limitation period
available under section 32. Certainly he can recover the money provided
only that he sues in time and has some other cause of action, such as total
failure of consideration. Clearly the quiz contestant who, in doubt whether
Haydn or Mozart wrote Eine Kleine Nachtmusik answers Haydn, made a
mistake. Suppose, however, that, making that mistake, he had paid out    *D*
money legally due only if Haydn had been the correct answer. To my mind
he, no less than the quiz contestant, took the risk that he might be wrong: he
could not recover his payment as money paid under a mistake of law (or
fact) although, provided he sued within six years, he could well recover it on
another basis.

176   The precise point at which a party may be said to be, or to cease    *E*
being, under a mistake of law is, I acknowledge, by no means easy to
formulate. Just when a party comes to recognise he has "a worthwhile
claim" (the touchstone I have suggested in para 165 above) will not always
be obvious.     Essentially, however, I am in broad agreement with
Lightman J's and Maurice Kay LJ's approach in the cases mentioned above,
as indeed I am with the views of the majority of the Court of Appeal on this
issue in the present case: see Rix LJ's judgment, at para 262, and Buxton LJ's    *F*
judgment, at paras 281–283.

177   For the reason already given, however, even if that view were
shared by a majority of this Committee, it would avail the revenue nothing.
The appeal must in any event be allowed.

> *Appeal allowed.*
> *Cross-appeal dismissed.*     *G*
> *Order of Park J restored.*

*Solicitors: Slaughter & May; Solicitor to HM Revenue and Customs.*

B L S

*H*

TAB 20

*Dexter Ltd v Vlieland-Boddy* [2003] EWCA Civ 14

Case No: <u>CHANF/A3/2002/1702, CHANF/A3/2002/1711</u>

<u>Neutral citation no. [2003] EWCA Civ  14</u>
<u>IN THE SUPREME COURT OF JUDICATURE</u>
<u>COURT OF APPEAL (CIVIL DIVISION)</u>
<u>ON APPEAL FROM THE HIGH COURT</u>
<u>OF JUSTICE CHANCERY DIVISION</u>
<u>Lloyd J.</u>

<u>Royal Courts of Justice</u>
<u>Strand,</u>
<u>London, WC2A 2LL</u>

<u>Date: Friday 24 January 2003</u>

Before :

<u>LORD JUSTICE PETER GIBSON</u>
<u>LORD JUSTICE CLARKE</u>
and
<u>LORD JUSTICE SCOTT BAKER</u>

- - - - - - - - - - - - - - - - - - - - -

Between :

DEXTER LIMITED (IN ADMINISTRATIVE RECEIVERSHIP)     <u>Respondent</u>
- and -
VLIELAND-BODDY                                        <u>Appellant</u>

- - - - - - - - - - - - - - - - - - - - -

(Transcript of the Handed Down Judgment of
Smith Bernal Wordwave Limited, 190 Fleet Street
London EC4A 2AG
Tel No: 020 7421 4040,  Fax No:  020 7831 8838
Official Shorthand Writers to the Court)

- - - - - - - - - - - - - - - - - - - - -

Mr. Andrew Sutcliffe Q.C. (instructed by Messrs DLA of Manchester) for the Respondent
Miss Linden Ife and Mr. John Taylor (instructed by Messrs Lester Aldridge of Bournemouth) for the
Appellant

- - - - - - - - - - - - - - - - - - - - -

# <u>Judgment</u>

Peter Gibson L.J.:

1.    The Appellant, the First Defendant, Clive Vlieland-Boddy, and the Fourth Defendant, Edwina Harley, appeal,  with the permission of Carnwath L.J., from the order made by Lloyd J. on 25 July 2002.  The Appellants had applied to strike out the claims of the Claimant, Dexter Ltd. ("Dexter"), against them respectively as an abuse of process.  The judge by his order dismissed those applications.

The alleged facts and claims

2.    The facts alleged by Dexter in its pleadings in the present action commenced on 7 February 2002 are in large part disputed but must be taken to be correct for the purposes of this appeal, as they were at the hearing before the judge.  I summarise them and Dexter's claims as follows.

3.    Dexter was incorporated on 20 May 1997 with the Fifth Defendant, Wensley Haydon-Baillie, as its sole director, and Martin Vlieland-Boddy ("MVB") as its company secretary. On 30 September 1997 MVB was appointed a director of Dexter, having acted as a de facto director before then.  MVB is the twin brother of the First Defendant, and they are the sons of the Fourth Defendant.

4.    On 22 September 1997 the Co-operative Bank ("the Bank") agreed to make available to Dexter a £5 million facility and on 2 October 1997 it agreed to allow Dexter to draw down £2 million for the purchase of an aircraft engine against the submission of copy invoices evidencing the purchase.  That day it was provided with a faxed copy of what purported to be an invoice from Guest Aviation Corporation ("Guest") to Dexter relating to the supply of one Rolls-Royce Olympus Concorde prototype engine and components for £2 million plus VAT.  The sale was pursuant to an agreement dated 1 October 1997 between Guest, acting by Cliven Airways and Cliven Airparts (both being entities owned by the First Defendant), as seller and Dexter as buyer.  The signature on behalf of Guest was purportedly that of Brad Lavoski but was forged by the First Defendant or by an employee of the Third Defendant, a firm of licensed insolvency practitioners then known as Marshalls but now known as Fortune Peat.  At that time MVB was a consultant of, and the First and Second Defendants were the partners in, the Third Defendant.  The invoice provided for the payment of £2 million to account no. 77161815 at National Westminster Bank plc ("NatWest").

5.    Another document which Dexter has seen purportedly relates to a sale of the same assets. This is an unsigned agreement dated 2 October 1997 between the Fifth Defendant as seller and Guest, acting through Cliven Airways, as buyer whereby the Fifth Defendant agreed to sell the engine to Guest for £1,950,000.

6.    The purported acquisition of the engine and components from Guest was an entirely fictitious and fraudulent scheme on the part of MVB, the First and Fifth Defendants, effected to procure the advance of £2 million from the Bank for their use and not for the benefit of Dexter.  The engine is not an aero engine at all but a test rig or prototype.  It is of no substantial value, nor are the components.  The engine and components were acquired by the Fifth Defendant in 1986 for £600.

7.    The £2 million was advanced by the Bank to Dexter on 3 October 1997 and paid into an account (no. 77161696) in the name of the Third Defendant at the Blandford Forum branch of NatWest pursuant to written and oral instructions from the Second Defendant to credit the same to the Third Defendant's account.  The monies so credited were then paid and applied as follows:

> (1)  £864,104 was paid on 6 October 1997 to a bank account in Jersey of a company called Channel Hotels and Properties Ltd., apparently in repayment of a personal loan of the Fifth Defendant;

> (2)  £464,250 was paid on 3 October 1997 to the client account with NatWest of M Vlieland-Boddy & Co., of which MVB and his wife were partners;

> (3)  £60,000 was paid in cash on 9 October 1997 to the First Defendant or MVB;

> (4)  £261,226.14 was paid on 6 October to a client account of the Third Defendant the designation of which referred to the Fifth Defendant;

> (5)  £350,000 was paid on 6 October 1997 to an account of the First Defendant with Barclays Bank.

Each payment was effected by or at the direction of one or more of MVB, the First, Second and Fifth Defendants and was paid or applied otherwise than for Dexter's benefit.

8.    Of the £464,250 paid on 3 October 1997 -

> (1)  £150,000 was paid to MVB;

> (2)  £314,250 was transferred on 6 October 1997 to an account with Lloyds Bank in the Channel Islands in the name of Portman Channel Islands Ltd. ("Portman") to be held for the account of MVB's father-in-law, Michael Hughes;

> (3)  on 8 October 1997 that sum was placed in a fixed bond account for 12 months in the name of Mr. Hughes;

> (4)  also on 8 October 1997 £315,422.88, the balance on the bond account, was transferred to another Portman account in the name of the Fourth Defendant;

> (5)  between 8 October 1998 and 12 July 1999 various withdrawals were made from that account, leaving a balance of £291,870.55;

> (6)  on 12 July 1999 that balance was transferred into another Portman account in the name of MVB.

Each payment was effected by or at the direction of one or both of MVB and the Fourth Defendant and was paid or applied otherwise than for Dexter's benefit.

9.    It is Dexter's claim against the First Defendant that he dishonestly assisted one or both of MVB and the Fifth Defendant in the fraudulent scheme and that he is liable to account to Dexter for the £2 million as a constructive trustee on the ground of his dishonest assistance in the breaches of fiduciary duty owed to Dexter and breaches of trust committed by MVB and the Fifth Defendant.  It further claims that the First Defendant received and/or benefited from part of the money fraudulently obtained by Dexter in the knowledge that such money was being paid in breach of fiduciary duty and in breach of trust, and the payments of £60,000 and £350,000 referred to in para. 7 (3) and (5) above are relied on.

10.   It is Dexter's claim against the Fourth Defendant that she knew that the sum of £315,422.88 referred to in para. 8 (4) above was transferred to her in breach of fiduciary duty and breach of trust, alternatively that she was reckless as to whether that was the case and failed to make such enquiries as a reasonable prudent person would have made in the circumstances.  It is further alleged that she assisted MVB in his breach of fiduciary duty and breach of trust and that in so doing she acted dishonestly.  Dexter claims that she is liable to account to Dexter for the sum of £315,422.88 as a constructive trustee on the ground of knowing receipt and dishonest assistance.

11.   A further or alternative claim of conspiracy is made by Dexter against the First, Fourth and Fifth Defendants and MVB.

12.   It is Dexter's claim against the Second and Third Defendants that the First Defendant acted with the actual or apparent authority of one or both of the Second and Third Defendants and in the course of the Third Defendant's business.

Other facts

13.   Dexter entered into administrative receivership on 23 April 1998.

14.   On 24 August 1999 Dexter commenced proceedings ("the First Action") against MVB alone, in which many of the alleged facts set out above were pleaded.  But Dexter did not allege the forgery of the signature on behalf of Guest nor the full details of what happened to the £464,250 to which I have referred in paras. 7 and 8 above.  However, it did allege that the purported acquisition of the engine from Guest was pursuant to a fictitious and fraudulent scheme on the part of MVB, the Fifth Defendant and/or the First Defendant to procure the advance of £2 million from the Bank for their own use and benefit and otherwise than for the benefit of Dexter, and that that sum was fraudulently misapplied by MVB, the Fifth Defendant and/or the First Defendant.  It further alleged that MVB and/or the Fifth Defendant acted fraudulently in breach of their fiduciary duties and/or in fraudulent breach of trust, and that there was a conspiracy between MVB, the Fifth Defendant and/or the First Defendant.  Dexter sought to make MVB liable as constructive trustee.

15.     The First Action came on for trial on 20 November 2000 before Evans-Lombe J.  The First Defendant provided MVB with a witness statement, but did not give oral evidence because, midway through being cross-examined, MVB went to Spain and abandoned his defence. Judgment was entered against him for £2 million plus interest and indemnity costs on 11 December 2000.

16.     On 12 December 2000 Dexter  successfully applied to Evans-Lombe J. for a freezing order against the Fourth Defendant without notice.  It told that judge that from information only recently obtained some of its money had been paid to the Fourth Defendant in circumstances in which she was  accountable for that money.  Dexter on 13 December 2000 commenced proceedings ("the Second Action") against the Fourth Defendant alone.  In the Particulars of Claim Dexter repeated factual allegations similar to those in the First Action, but it also made allegations similar to those which I have set out in para. 8 above and made the claims similar to those to which I have referred in para. 10 above.

17.     The Fourth Defendant is domiciled in Spain and has for some time been in poor health.  She applied to set aside the Claim Form in the Second Action and service of it on the ground that there was no jurisdiction to bring the claim in this jurisdiction against her alone under the Brussels Convention.  That application was acceded to by Lloyd J. on 8 March 2001.  The judge granted Dexter permission to appeal and Dexter appealed.  The freezing order was continued in the meantime.  This court delivered judgment on 11 April 2001 in Casio v Sayo [2001] EWCA Civ 661 on somewhat similar issues.  The Fourth Defendant's solicitor invited Dexter in July 2001 to withdraw the appeal in the light of that case.  But Dexter's solicitors, who had in May 2001 said to the Fourth Defendant's solicitor that they were instructed to issue new proceedings against her, refused to withdraw the appeal and repeated that they were instructed to issue new proceedings.  The present action was commenced only on 7 February 2002.  On 13 March 2002 Dexter sought to have the appeal in the Second Action, which was fixed for hearing on 20 March, taken out of the list.  This court refused, and Dexter then agreed to the appeal being dismissed with costs.  The Fourth Defendant agreed in turn to the continuation of the freezing order until the hearing of the application, which she was about to make, to strike out the claim against her.

The applications to Lloyd J.

18.     On 15 March 2002 the First and Fourth Defendants respectively applied to strike out the claims against them as an abuse of process.  They both relied on the rule in Henderson v Henderson (1843) 3 Hare 100 (as expounded by Sir James Wigram V.-C. at pp. 114,5) for the proposition that it was an abuse of process to bring proceedings against them when they could and should have been joined as defendants to the First Action.  The Fourth Defendant also claimed that it was an abuse of process for Dexter to commence and pursue the later proceedings without having paid her costs of the Second Action.

19.     On the applications the judge had written evidence from Mr. Shierson, one of the joint administrative receivers of Dexter.  In his first Witness Statement dated 31 May 2002 he said that at the time Dexter brought the First Action it did not have a complete knowledge of the true extent of the involvement of the Defendants to the current action.  He said that the relevant facts which form the basis of Dexter's claim against the Fourth Defendant were not

disclosed at any stage by MVB in the course of the First Action despite MVB's obligation to do so under the terms of the freezing order and his disclosure obligations in that action. Those facts, he said, were only obtained shortly before and in the course of the trial of the First Action as a result of court orders requiring Portman to disclose information; that enabled Dexter to trace what had happened to the monies which had been fraudulently dissipated.  That information showed the Fourth Defendant's involvement as a recipient of monies of Dexter.  Mr. Shierson said it would not have been possible to join the Fourth Defendant as a defendant to the First Action.  Mr. Shierson said that the Fourth Defendant had never applied to set the freezing order aside although indicating on various occasions that she would do so.  In Mr. Shierson's second Witness Statement also dated 31 May 2002 he said that it was not possible to include the First Defendant as a defendant in the First Action because at that time Dexter did not consider that it had sufficient knowledge of the extent of the First Defendant's involvement in the transaction, the true extent only becoming clear after Dexter obtained copies of his documents from Customs and Excise who had obtained the documents pursuant to their search and seizure powers.  Those documents, he said, had been provided to Dexter too late to enable the First Defendant to be added as a defendant and maintain the trial date.

20.   The First Defendant put in evidence in reply, by his second witness statement dated 6 June 2002 challenging Mr. Shierson's explanation of why the First Defendant had not been joined in the First Action.  The First Defendant pointed to the serious allegations made against him in the Particulars of Claim in the First Action.  He drew attention to the fact that Mr. Shierson gave no indication as to when he received documents from Customs and Excise nor as to what documents he received and suggested that Mr. Shierson could have obtained the documents much earlier.  The First Defendant said that he had been prejudiced by the very considerable delay in Dexter bringing proceedings against him and that prejudice included legal costs which he had incurred.  He further stated that there would have been major costs savings if he had been sued in the First Action, and that further prejudice was caused to him by the delay because Mr. Brian Trubshaw, who gave a witness statement and oral evidence at the trial of the First Action, had since died and Mr. Lavoski may be difficult to trace.

21.   The Fourth Defendant's solicitor, Mr. Kevin Heath, put in two witness statements.  In his second witness statement dated 7 June 2002 he said that correspondence between Dexter's solicitors and Portman in September 1999 confirmed that Dexter was aware then of the existence of an account held by MVB with Portman.

22.   The judge, in para. 17 of his judgment, said that Dexter's reasons for not suing the First and Fourth Defendants could not be brushed aside as those defendants sought to do.  He accepted that counsel for Dexter in the First Action could not have pleaded fraud and the other serious allegations without there being enough evidence to justify those allegations, but the judge said that it did not follow that there may not have been adequate reasons for wanting to wait before proceeding against parties such as the First Defendant.  He continued:

> "18   Martin Vlieland-Boddy was fairly obviously first in line as regards the potential Defendants, having been a director of the Claimant. The Fifth Defendant might well have been sued at the same time, but the fact that he was already subject to an i.v.a. is a fairly obvious reason why it may not have been thought worth suing him then. Whether it is really worth suing him now is another matter, but

he has not sought to have the proceedings struck out himself. It is perfectly fair for the Defendants to say that the First Defendant could have been sued at the same time as his brother, even though part of his liability could be regarded as secondary, and that it would have been natural to have done so. On the other hand, the Second Defendant, who is sought to be made liable for the First Defendant's defaults on the basis of vicarious liability, is someone whom it would have been less obvious to have sued at once. Since issue has not been taken by the Second Defendant with the Claimant's failure to sue him in the first claim, Mr Shierson has not had to explain why he did not do so. But it could have been rational to have held back from suing someone such as him, who is liable only on a secondary basis, until after proceedings had been taken against those more obviously liable, and attempts made to recover on any judgment against them. On the other hand, if the Second Defendant was to be sued, it would be natural to join the First Defendant as a party to the same proceedings."

23.   The judge referred to the decision of the House of Lords in <u>Johnson v Gore Wood & Co.</u> [2002] 2 AC 1 as containing the relevant legal principles.  After referring to certain other authorities on which the Appellants had relied, the judge said this:

"27   Approaching the matter on the basis of a broad, merits-based assessment, the onus being on the Defendants to show that the bringing of the present action is an abuse, and to show this clearly if the Claimant is to be denied the ability to bring the case before the court, it seems to me that it is at least highly relevant against it being an abuse that the Defendants are different, and not privies, and it is also relevant that the first action was successful, albeit not brought to a judgment on full evidence with findings of fact. The mere fact of the later action being brought does not show that it is an abuse, and I see nothing in the facts relied on by the two Defendants, as mentioned above, to show that it is abusive. The First Defendant is not being vexed a second time, even though he was involved as a witness in the first action. The Fourth Defendant is of course the subject of a second action, but the first having failed for want of jurisdiction she cannot complain of a second attempt in itself. Of course it is disagreeable for the First Defendant to have these allegations hanging over him, but that could be the case regardless of the prior proceedings. As for issues of costs, I do not see that it would necessarily have led to a lower costs bill if he had been sued in the first action together with his brother, as compared with the liabilities that may arise in the present proceedings. It may be that he will suffer from a disadvantage in his defence of the claim as a result of the death of Mr Trubshaw and of any difficulty that may be experienced in tracing Mr Lavoski, but these problems have nothing to do with there having been a previous claim. Indeed the consequences of Mr Trubshaw's death may be alleviated by his having given evidence at the first trial."

24.   The judge considered specific points taken on behalf of the Fourth Defendant.  He rejected the proposition that the non-payment by Dexter of the costs of the Second Action justified

the striking out against her of the current proceedings when those costs have yet to be quantified. Her other points included that it was wrong to allow the appeal by Dexter in the Second Action to remain outstanding until March 2002, wrong to wait as long as Dexter did before starting the fresh proceedings, and wrong to have the new proceedings and the appeal pending at the same time. The judge rejected each of those points.

25.    Accordingly, the applications to strike out failed.

The rival arguments on the appeal

26.    On this appeal Mr. John Taylor for the First Defendant took, in effect, three points:

(1)  the proceedings against the First Defendant were an abuse of process as he could and should have been joined in the First Action and there were no evidential reasons for failing to join him;

(2)  the judge should have found that the claims against the Second, Third and Fifth Defendants in the current proceedings were also an abuse of process because they too should have been joined in the First Action;

(3)  the judge failed to take account of the policy consideration recognised in the Johnson case that there should be finality in litigation and was wrong to find that the First Defendant was not being vexed twice by the same allegations now being made against him as were made in the First Action.

27.    Miss Linden Ife for the Fourth Defendant took the following points:

(1)  the conduct of Dexter in relying on the freezing order against the Fourth Defendant and in delaying the commencement of the current proceedings despite being informed of the Fourth Defendant's frailty of health constituted an abuse of process;

(2)  the current proceedings were a device to give jurisdiction under Article 6(1) of the Brussels Convention to enable Dexter to proceed against the Fourth Defendant, and the claims against the other defendants in the current proceedings were an abuse as they could and should have been sued in the First Action;

(3)  the Fourth Defendant could and should have been sued in the First Action.

28.    Mr. Andrew Sutcliffe Q.C. for Dexter submitted that none of the points taken by Mr. Taylor and Miss Ife established any basis for allowing the appeals. He argued that the exercise of discretion by the judge cannot be interfered with by this court.

29.    I shall consider the points taken on each appeal in turn.

<u>The First Defendant's Appeal</u>

30.     It is not in dispute that the most recent authoritative statement of the rule in <u>Henderson v Henderson</u> is to be found in the speech of Lord Bingham (with whom Lord Goff, Lord Cooke and Lord Hutton agreed) in the <u>Johnson</u> case [2002] 2 AC at p. 30H:

> "It may very well be, as has been convincingly argued (Watt, "The Danger and Deceit of the Rule in *Henderson v Henderson*: A new approach to successive civil actions arising from the same factual matter" (2000) 19 CLJ 287), that what is now taken to be the rule in *Henderson v Henderson* has diverged from the ruling which Wigram V-C made, which was addressed to res judicata. But *Henderson v Henderson* abuse of process, as now understood, although separate and distinct from cause of action estoppel and issue estoppel, has much in common with them. The underlying public interest is the same: that there should be finality in litigation and that a party should not be twice vexed in the same matter. This public interest is reinforced by the current emphasis on efficiency and economy in the conduct of litigation, in the interests of the parties and the public as a whole. The bringing of a claim or the raising of a defence in later proceedings may, without more, amount to abuse if the court is satisfied (the onus being on the party alleging abuse) that the claim or defence should have been raised in the earlier proceedings if it was to be raised at all. I would not accept that it is necessary, before abuse may be found, to identify any additional element such as a collateral attack on a previous decision or some dishonesty, but where those elements are present the later proceedings will be much more obviously abusive, and there will rarely be a finding of abuse unless the later proceeding involves what the court regards as unjust harassment of a party. It is, however, wrong to hold that because a matter could have been raised in earlier proceedings it should have been, so as to render the raising of it in later proceedings necessarily abusive. That is to adopt too dogmatic an approach to what should in my opinion be a broad, merits-based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before. As one cannot comprehensively list all possible forms of abuse, so one cannot formulate any hard and fast rule to determine whether, on given facts, abuse is to be found or not. Thus while I would accept that lack of funds would not ordinarily excuse a failure to raise in earlier proceedings an issue which could and should have been raised then, I would not regard it as necessarily irrelevant, particularly if it appears that the lack of funds has been caused by the party against whom it is sought to claim. While the result may often be the same, it is in my view preferable to ask whether in all the circumstances a party's conduct is an abuse than to ask whether the conduct is an abuse and then, if it is, to ask whether the abuse is excused or justified by special circumstances. Properly

applied, and whatever the legitimacy of its descent, the rule has in my view a valuable part to play in protecting the interests of justice."

31.    Lord Millett also made observations of relevance to the present case.  At p. 59A he echoed Lord Bingham's view of the policy reasons behind the rule in <u>Henderson v Henderson</u>, viz "to bring finality to litigation and avoid the oppression of subjecting a defendant unnecessarily to successive actions".  He continued at p. 59C:

> "It is one thing to refuse to allow a party to relitigate a question which has already been decided; it is quite another to deny him the opportunity of litigating for the first time a question which has not previously been adjudicated upon. This latter (though not the former) is prima facie a denial of the citizen's right of access to the court conferred by the common law and guaranteed by article 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms (1953). While, therefore, the doctrine of res judicata in all its branches may properly be regarded as a rule of substantive law, applicable in all save exceptional circumstances, the doctrine now under consideration can be no more than a procedural rule based on the need to protect the process of the court from abuse and the defendant from oppression. In *Brisbane City Council v Attorney General for Queensland* [1979] AC 411, 425 Lord Wilberforce, giving the advice of the Judicial Committee of the Privy Council, explained that the true basis of the rule in *Henderson v Henderson* 3 Hare 100 is abuse of process and observed that it "ought only to be applied when the facts are such as to amount to an abuse: otherwise there is a danger of a party being shut out from bringing forward a genuine subject of litigation". There is, therefore, only one question to be considered in the present case: whether it was oppressive or otherwise an abuse of the process of the court for Mr Johnson to bring his own proceedings against the firm when he could have brought them as part of or at the same time as the company's action. This question must be determined as at the time when Mr Johnson brought the present proceedings and in the light of everything that had then happened. There is, of course, no doubt that Mr Johnson could have brought his action as part of or at the same time as the company's action. But it does not at all follow that he should have done so or that his failure to do so renders the present action oppressive to the firm or an abuse of the process of the court. As May LJ observed in *Manson v Vooght* [1999] BPIR 376, 387, it may in a particular case be sensible to advance claims separately. In so far as the so-called rule in *Henderson v Henderson* suggests that there is a presumption against the bringing of successive actions, I consider that it is a distortion of the true position. The burden should always rest upon the defendant to establish that it is oppressive or an abuse of process for him to be subjected to the second action."

32.    Lord Millett then went on to express the view that the rule in <u>Henderson v Henderson</u> could not sensibly be extended to the case where the defendants are different.  As his view on this point goes beyond what the majority held, I say no more about it.

33.    Mr. Taylor argued that the judge was wrong in his treatment of the decision of this court in
Bradford and Bingley Building Society v Seddon [1999] 1 WLR 1482 on which Mr. Taylor
had placed particular reliance.   In that case an earlier action had been brought by the
defendant against an accountant for negligent advice including the funding of an investment
by a loan from the claimant building society.  Judgment was entered against the accountant
but could not be enforced because of his lack of funds.  When the building society instituted
proceedings against the defendant for recovery of the loan, the defendant issued third party
proceedings against the accountant and his partners.  The third party claim was struck out by
the county court judge as an abuse of process.  This court allowed the defendant's appeal.  It
distinguished between that form of res judicata, cause of action estoppel, which amounted to
an absolute bar to relitigation, and mere relitigation in circumstances which did not give rise
to cause of action or issue estoppel.  Part of that reasoning is inconsistent with the Johnson
case, but Mr. Taylor relied on  what  Auld  L.J.  (with  whom  Nourse  and  Ward  L.JJ.
agreed)  said  at  p. 1491 G:

> "In my view, it is now well established that the *Henderson* rule, as a
> species of the modern doctrine of abuse of process, is capable of
> application where the parties in which the issue is raised are different
> from those in earlier proceedings. Indeed, it is inherent in Sir James
> Wigram V.-C.'s reasoning that, as a general rule, all persons who are
> to be sued should be sued at the same time and in the same
> proceedings where such a course is reasonably practicable, and
> whenever it is so and is not taken then, in an appropriate case the rule
> may be invoked so as to render the second action an abuse;  see  e.g.,
> *Yat Tung Investment Co. Ltd. v Dao Heng Bank Ltd.* [1975] A.C. 581
> ..."

Lloyd J., in para. 22 of his judgment, commented that Auld L.J. did not address the instance
of successive actions against different defendants who are not privies and that the cases cited
by Auld L.J. for his proposition did not include any such example.

34.    Mr. Taylor submitted that the Yat Tung did in fact provide such an example.  In that case a
second claim was struck out as an abuse of process even though one of the defendants to the
second claim, Choi Kee Ltd., had not been a party to the first claim.  It was pleaded by the
unsuccessful appellant that Choi Kee Ltd. was in effect a privy of the sole defendant to the
first claim which was a defendant to the second claim.  But Lord Kilbrandon, giving the
judgment of the Privy Council, made no mention of Choi Kee Ltd. being a privy when
giving his reasons.  Lloyd J. may not have been justified in treating Yat Tung as a case of
successive actions against different defendants who were privies.   However, Lloyd J.
recognised that the rule in Henderson v Henderson could apply to successive claims
involving different defendants who were not privies, referring as he did to the decision of
His Honour Judge Bowsher Q.C. in Time Group Ltd. v Computer 2000 Distribution Ltd.
[2002] EWHCT 126 (TCC) on 4 April 2002 for that.  I can see no error in Lloyd J. saying in
para. 24 of his judgment that it may be unusual for the rule to be properly applicable to such
a case or in considering that it was at least highly relevant against it being an abuse that the
defendants in successive claims are different and not privies.  In my judgment it would be
unrealistic not to recognise that as a material, albeit not a conclusive, consideration.

35.    In my judgment, it is plain from para. 27 of his judgment (cited in para. 23 above) that Lloyd J. directed himself in accordance with the guidance given by Lord Bingham in the <u>Johnson</u> case which I have cited in para. 30 above.  That guidance has superseded  almost all the previous statements as to the applicable principle.  Thus it is clear that Lord Kilbrandon expressed himself too widely in the <u>Yat Tung</u> case when he said ([1975] AC 581 at p. 590A) of the doctrine of res judicata:

> "But there is a wider sense in which the doctrine may be appealed to, so that it becomes an abuse of process to raise in subsequent proceedings matters which could and therefore should have been litigated in earlier proceedings."

The fact that matters could have been litigated in earlier proceedings does not entail that they should have been litigated then so as to make the subsequent proceedings an abuse of process, as the <u>Johnson</u> case makes clear.

36.    The judge rightly approached the applications before him on the basis of the broad merits-based assessment which Lord Bingham had advocated.  The judge considered whether Dexter in all the circumstances was abusing the process of the court by the current proceedings.  He had recognised in para. 18 of his judgment (cited in para. 22 above) that the First Defendant could have been sued in the First Action, but the judge concluded that there was nothing in the facts relied on by the First Defendant to show that the bringing of the current proceedings was abusive.  Those facts include that the First Defendant had been told before the trial of the First Action that Dexter would proceed against him but chose not to do so until the present action.  The judge held that the First Defendant was not being vexed a second time even though involved in the First Action as the provider of a witness statement.  The judge clearly thought that there was no unjust harassment of the First Defendant by the present action.  I respectfully agree.  It is only in this action that for the first time the First Defendant is sought to be made liable.

37.    In these circumstances, where the judge, in whom the discretion to strike out a claim is vested, has correctly directed himself as to the law, this court cannot properly interfere with that exercise of discretion unless the applicant shows that the judge, in making his assessment, omitted to take account of material facts or took account of immaterial facts or was otherwise plainly wrong.  When asked to identify what was the relevant error of the judge, Mr. Taylor submitted that it was the failure of the judge to make findings that the reason given by Mr. Shierson for Dexter not joining the First Defendant as a defendant to the First Action (viz. that Dexter did not have a complete knowledge of the true extent of the involvement of the Defendants) was unsustainable, alternatively that the judge failed to find that there were no evidential grounds for not joining the First Defendant in the First Action.

38.    For my part I am prepared to accept that, so far as the First Defendant was concerned, the general and largely unparticularised statement of Mr. Shierson, which appears to me to have been chiefly directed to the Fourth Defendant, provides little justification for Dexter not joining the First Defendant as a defendant to the First Action.  But the judge does not treat it as justification.  As I read the judgment, the judge was saying two things.  First, he said it was for the First Defendant to establish that it was an abuse of process for a claimant to bring an action against a defendant who could have been joined in earlier proceedings, and

the facts relied on by the First Defendant, such as the mere fact of the bringing of the later action, were not sufficient to show abuse. Second, the judge pointed to the fact that MVB was the obvious prime target for Dexter. That in itself was an important consideration for a claimant like Dexter in administrative receivership and therefore likely to have limited funds at its disposal for litigation. Although there were times when Mr. Taylor in the course of his argument appeared to be suggesting that it was an abuse for any person, who could have been joined in earlier proceedings for conspiracy but was not then joined, to be sued for conspiracy in subsequent proceedings, he rightly resiled from so broad a proposition, and confined his submission to saying that on the facts of the present case it was an abuse for the First Defendant to be sued in the present proceedings. But the judge had well in mind all the facts and I am unable to say that his assessment was not one properly open to him. The judge considered the prejudice said to have been suffered by the First Defendant in consequence of being sued in the present action rather than in the First Action, but was unimpressed by that point. Before us Mr. Taylor sought to establish detriment to the First Defendant resulting from the death of Mr. Trubshaw after the First Action; but I was not persuaded that the unavailability of Mr. Trubshaw, who had been called by Dexter as a witness in the First Action, constituted real prejudice to the First Defendant in his defence in the present proceedings.

39.   As for Mr. Tayor's point relating to the failure to join the Second, Third and Fifth Defendants in the First Action, it is to be noted that none of them has made any application to strike out. Under the Civil Procedure Rules the court can act of its own motion if it is of the view that the claims against those defendants constitute an abuse, but the fact that those defendants are not applying to strike out and that the claims against them will be tried (in the absence of the court acting of its own motion) is a matter of which the court can take note. The judge said that the Second Defendant, whom Dexter seeks to make vicariously liable for the First Defendant's actions, was someone whom it would have been less obvious to have sued in the First Action than the First Defendant. The same point can be made in respect of the Third Defendant whose claimed liability is again only vicarious. The judge pointed out the rationality of holding back from suing someone liable only on a secondary basis until after proceedings had been taken against those primarily liable and judgment had been sought to be enforced. Further the judge said that he was entitled to infer that Dexter's intention in bringing the current proceedings was to seek to recover from the defendants all or part of the money alleged to have been misappropriated. The Fifth Defendant, as the judge recognised, might well have been sued in the First Action, but the fact that he was already subject to an Individual Voluntary Arrangement was, to the judge, a fairly obvious reason why he was not sued then. The judge said that it was unclear to him that it would be appropriate to disregard the Fifth Defendant as possibly not worth suing, but that, even if it were appropriate, that would not lead to the conclusion that there was any element of abuse of process on Dexter's part in proceeding against the other defendants by the current action. The conclusions of the judge seem to me to have been open to him and cannot be impugned.

40.   Mr. Taylor's third point on the policy consideration to which the judge is said to have paid insufficient regard seems to me no less difficult to make good. The judge quoted what Lord Bingham and Lord Millett said on that policy consideration, and it cannot be said that it was overlooked. Inevitably, the refusal to strike out an action which could have been the subject of earlier proceedings means that the court is accepting that those proceedings have brought no finality to the litigation. But it is clear from the <u>Johnson</u> case that the court, in applying the broad merits-based approach, may in an appropriate case properly reach that conclusion.

And there is good sense as well as justice in that: the serious claims against the defendants to the present action have yet to be the subject of judicial determination.

41.    For these reasons therefore I conclude that the First Defendant's appeal fails.

<u>The Fourth Defendant's Appeal</u>

42.    By Miss Ife's first point she complains that although Dexter had the benefit of a freezing order over the Fourth Defendant's assets since 12 December 2000 in the Second Action which was struck out for want of jurisdiction on 8 March 2001 and although Dexter had told the judge and the Fourth Defendant's solicitors that fresh proceedings against her would be commenced, it was not until February 2002 that the present proceedings, to which the Fourth Defendant is a party, were commenced. Thus, she says, for some 14 months the Fourth Defendant had been subject to a freezing order without any valid proceedings to support it. We were taken to <u>Lloyds Bowmaker Ltd. v Britannia Arrow Holdings plc</u> [1988] 1 WLR 1337 in which this court emphasised the obligation on a claimant who obtains a freezing order to press on with his action as rapidly as he can. Miss Ife drew attention to the fact that Dexter was made aware of the Fourth Defendant's poor health. She says that Dexter should have got on with the fresh proceedings and abandoned the appeal. She therefore submits that the conduct of Dexter, in bringing the present proceedings when it could and should have brought them as soon as the Second Action was struck out, was an abuse.

43.    The difficulty with those submissions is that the judge gave full consideration to this point and provided cogent reasons why it was not accepted. The judge, as the judge who struck out the Second Action, was in a good position to assess the merits of this point. He gave permission to appeal from his own decision and he considered that the appeal was being seriously pursued. In those circumstances there was jurisdiction to continue the injunction. At no time was that not the position. As I have noted, when the appeal was abandoned, the Fourth Defendant agreed to the freezing order being extended until after the application to strike out. Whilst I have sympathy with the Fourth Defendant in having this litigation hanging over her head while unwell, I cannot say that the judge made any error in his reasoning on the point.

44.    Miss Ife's second point is primarily based on what Mr. Shierson said at para 5 of his first witness statement dated 31 May 2002:

"…. Dexter's sole concern has been to establish that the court has jurisdiction to determine the claim against Mrs. Harley."

That, she argues, shows that the reason why the other defendants were not sued in the First or Second Action was that Dexter did not need to do so until it needed to establish jurisdiction against the Fourth Defendant under Article 6 (1) of the Brussels Convention (enabling a person domiciled outside the U.K. but in a state which has acceded to the Convention to be sued in the courts for the place where any co-defendant is domiciled). I do not accept that construction of what Mr. Shierson said. He was only addressing the question why Dexter had abandoned its appeal against the striking out by the judge of the Second Action and he was doing so in the context that the Fourth Defendant had applied for an order

that the claim form in the current proceedings be set aside on the ground of want of jurisdiction as well as the ground of abuse of process. As Mr. Shierson explained in para. 5 of his first witness statement, Dexter thought that on the jurisdiction point the most sensible and cost effective route was to adjourn its appeal pending the determination of the Fourth Defendant's application, but, when the Fourth Defendant opposed, and this court refused, the adjournment, Dexter thought that the proper course was to abandon the appeal and rely on Article 6 (1). Mr. Shierson does not appear to me to have been addressing the question whether Dexter genuinely intended to sue the other defendants.

45.    As for the point that the claims against the other defendants were an abuse, I have already rejected that when dealing with the Fourth Defendant's appeal.

46.    Miss Ife's third point was that the Fourth Defendant should have been joined as a defendant in the First Action. On the material before the judge, he was fully entitled to accept Dexter's explanation as to why it did not join her. Dexter's pleaded case in the First Action as to what happened to the £464,520, to which I have referred in para. 7 (2) above, was shown to be incorrect. No mention was made of any sum going into the Fourth Defendant's account as that was not known. The true position only became apparent in consequence of the Guernsey Court's disclosure order against Portman on 6 October 2000. An affidavit from Portman making disclosure was only sworn on 27 November 2000. In any event the Fourth Defendant, like the First Defendant, owed no fiduciary duty to Dexter and her alleged liability is as a constructive trustee. I repeat my comments on the judge's view that MVB was the obvious prime target for Dexter. Dexter's conduct in not making her a defendant in the First Action cannot fairly be criticised, and I agree with the judge that the Fourth Defendant has not shown the present action against her to be an abuse.

47.    Accordingly in my judgment the Fourth Defendant's appeal also fails.

Lord Justice Clarke:

48.    I agree that these appeals should be dismissed for the reasons given by Peter Gibson LJ and wish to add a few words of my own with reference to the general approach to be adopted in cases of this kind.

49.    The principles to be derived from the authorities, of which by far the most important is *Johnson v Gore Wood & Co* [2002] 2 AC 1, can be summarised as follows:

   i)    Where A has brought an action against B, a later action against B or C may be struck out where the second action is an abuse of process.

   ii)    A later action against B is much more likely to be held to be an abuse of process than a later action against C.

   iii)    The burden of establishing abuse of process is on B or C or as the case may be.

iv)    It is wrong to hold that because a matter could have been raised in earlier proceedings it should have been, so as to render the raising of it in later proceedings necessarily abusive.

v)    The question in every case is whether, applying a broad merits based approach, A's conduct is in all the circumstances an abuse of process.

vi)    The court will rarely find that the later action is an abuse of process unless the later action involves unjust harassment or oppression of B or C.

50.    Proposition ii) above seems to me to be of importance because it is one thing to say that A should bring all his claims against B in one action, whereas it is quite another thing to say that he should bring all his claims against B and C (let alone against B, C, D, E, F and G) in one action.  There may be many entirely legitimate reasons for a claimant deciding to bring an action against B first and, only later (and if necessary) against others.

51.    Those reasons include, for example, the cost of proceeding against more than one defendant, especially where B is apparently solvent and the case against B seems stronger than against others.   More defendants mean more lawyers, more time and more expense.   This is especially so in large commercial disputes.  It by no means follows that either the public interest in efficiency and economy in litigation or the interests of the parties, including in particular the interests of C, D and E, is or are best served by one action against them all.

52.    It seems to me that the courts should be astute to ensure that it is only in a case where C can establish oppression or an abuse of process that a later action against C should be struck out. I could not help wondering whether the defendants in this case would have given their lawyers the same instructions on the question whether they should have been sued in the first action if they had been asked before that action began as they have given now that a later action has been begun.

53.    It is clear from the speeches of both Lord Bingham and Lord Millett that all depends upon the circumstances of the particular case and that the court should adopt a broad merits based approach, but it is likely that the most important question in any case will be whether C, D, E or any other new defendant in a later action can persuade the court that the action against him is oppressive.  It seems to me to be likely to be a rare case in which he will succeed in doing so.

54.    However that may be in general, this is not in my opinion such a case, as explained by Peter Gibson LJ.


Scott Baker L.J.:


55.    I agree with both judgments.

Order: The first and second appellants' appeals will be dismissed. The first appellant will pay the costs of and occasioned by the appeal on the standard basis, those costs to be assessed if not agreed. The first appellant shall pay the respondent £8,500 on account of those costs by 21$^{st}$ February 2003. The first appellant will file and serve a defence in the action by 14$^{th}$ February 2003. The second appellant will pay the costs of and occasioned by the appellant on the standard basis, such costs will be assessed if not agreed. The freezing order against the second appellant dated 20$^{th}$ March 2002 will be varied so it continues until after judgment in the action or further order in the meantime. The second appellant will file and serve a defence in the action 14$^{th}$ February 2003. The action will be listed before a Master for a case management conference on the first available date after 28$^{th}$ February 2003 with an estimated length of hearing of two hours. The clerk to counsel for both parties will be represented by counsel at the case management conference to liase with the other party and the listing clerk by 10$^{th}$ February 2003 to fix suitable date.

(Order does not form part of the approved judgment)

TAB 21

*Downs Distributing Co Pty Ltd v Associated Blue Star Stores Pty Ltd*
(1948) 76 CLR 463, High Court of Australia

# Downs Distributing Co. Pty Ltd v Associated Blue Star Stores Pty Ltd (In Liquidation) [1948] HCA 14; (1948) 76 CLR 463 (27 August 1948)

## HIGH COURT OF AUSTRALIA

DOWNS DISTRIBUTING CO. PTY LTD v. ASSOCIATED BLUE STAR STORES PTY. LTD. (IN
LIQUIDATION) [1948] HCA 14; (1948) 76 CLR 463

Companies

High Court of Australia
Latham C.J.(1), Rich(2) and Williams(3) JJ.

**CATCHWORDS**

Companies - Liquidation - Preference, priority or advantage - "Ordinary course of business" -
Goods sold - Purchase price unpaid at due date - Subsequent arrangement for payment by post-
dated cheques - Cheques dishonoured - Purchasing company's ability to pay debts as they became
due - Knowledge of vendor company - "Reason to suspect" - Good faith - Fraud - Companies Act
1936- 1940 (N.S.W.) (No. 33 of 1936 - No. 56 of 1940), s. 298 (1) - Bankruptcy Act 1924-1946
(No. 37 of 1924 - No. 43 of 1946), s. 95 (1), (2) (b), (4).

**HEARING**

Sydney, 1948, August 10, 11, 27. 27:8:1948
APPEAL from the Supreme Court of New South Wales.

**DECISION**

August 27.
The following written judgments were delivered: -
LATHAM C.J. This is an appeal from a decree of the Supreme Court of New plaintiff company, the
Associated Blue Star Stores Pty. Ltd. (In liquidation), to the defendant company, Downs
Distributing Co. Pty. Ltd., was a payment made by the plaintiff which was then unable to pay its
debts as they became due from its own money in favour of the defendant, a creditor of the plaintiff,
having the effect of giving to the defendant a preference or priority or an advantage over the other
creditors of the plaintiff and (2) that, the plaintiff having been wound up within six months after
such payment, the payment was void. An order was made that the defendant pay the said sum to the
plaintiff. The order was made by virtue of s. 95 of the Commonwealth Bankruptcy Act 1924-1946,
which avoids preferences given to creditors by bankrupts within six months of bankruptcy. That
section has been made applicable in the winding up of a company by the Companies Act 1936-1940
(N.S.W.), s. 298 (1). (at p472)

2. The declaration made brings the challenged transaction within the provisions of s. 95 (1) of the
Bankruptcy Act. It is not disputed that the company was unable to pay its debts as they became due
from its own money at the time (August 1946) when the transaction which has been declared void
took place. Section 95 (2) provides that nothing in the section shall affect "(b) the rights of a

purchaser, payee or encumbrancer in good faith and for valuable consideration and in the ordinary course of business." The defendant company contends that it is entitled to protection under this provision. Section 95 (4) provides: - "For the purposes of this section a creditor shall not be deemed to be a purchaser, payee or encumbrancer in good faith if the conveyance, transfer, charge, payment or obligation were made or incurred under such circumstances as to lead to the inference that the creditor knew or had reason to suspect that the debtor was unable to pay his debts as they became due, and that the effect of the conveyance, transfer, charge, payment or obligation would be to give him a preference, a priority or an advantage over the other creditors." It was contended for the plaintiff that the transaction in question took place under circumstances such as to lead to the inference that, if the creditor did not have the knowledge to which the sub-section refers, at least it had reason to suspect that the debtor company was insolvent and that the challenged transaction had the effect of giving a preference to the defendant company over other creditors. The learned judge held that though the manager (James Mansfield) of the defendant company was an honest man and the manager of the plaintiff company (J. D. Anderson) was not an honest man, the transaction was not in the ordinary course of business and, further, that the defendant company had reason to suspect the insolvency of the plaintiff company, so that the effect of the payment would be to give a preference. The result was that it was held that the defendant company was excluded by s. 95 (4) from the category of purchaser or payee or encumbrancer in good faith. The defendant appellant challenges these findings and further contends that the principle of Ex parte James (1874) LR 9 Ch 609 is applicable and that to allow the plaintiff company to recover in the present proceedings would be to permit the liquidator, who is an officer of the court, to take advantage of what is alleged to be a dishonest transaction, and that on this ground the Supreme Court should have exercised its discretion by refusing to make a decree in favour of the plaintiff. (at p473)

3. The plaintiff company was incorporated in March 1946. It went into liquidation on 21st August 1946. The defendant company was an agent for various suppliers of groceries, and the plaintiff company was engaged in the wholesale grocery trade. In June 1946 an employee of the Blue Star company ordered goods from the defendant company on terms that payment was to be made within seven days after delivery. A representative of the Blue Star company said that there would be no difficulty about payment in seven days. The total purchase price was 3,007 pounds 2s. 6d. It was arranged, however, that ten days' credit should be given instead of seven days' credit. The goods were delivered on 3rd July. Payment was not made on the due date and on 12th July a discussion took place between Mansfield and Anderson in the course of which Anderson said that the Blue Star company had overbought and, accordingly, he asked for the time for payment to be extended. He also said that he expected further capital to be obtained for the company. It was then arranged that payment should be made by instalments. Three cheques were given. The first cheque for 1,000 pounds was paid on 15th July. The next cheque, it had been arranged, would be payable on 22nd July, and the final cheque on 29th July. The second cheque, which was due on 22nd July, was dishonoured upon presentation. Anderson said that it would be paid on Thursday, July 25th. Neither the second nor third cheques were paid. Mansfield saw the manager of the bank at which the Blue Star company kept its account, and the manager informed him that this was the first occasion on which a Blue Star company's cheque had been dishonoured. When the cheques were dishonoured Mansfield became concerned and discussed the position with Anderson. Mansfield said in evidence that he was not satisfied with Anderson's statement that further capital would be obtained, and he accepted in cross-examination the suggestion that he was sick of having promises made that were not kept and he wanted his money. Anderson said that he had been negotiating with an insurance company to obtain an advance on goods in the possession of the Blue Star company on paying 2 1/2 per cent for the advance. Mansfield then told Anderson that his company, the Downs Distributing Co., would be prepared to take the stock and make an advance of the moneys owing, hold the goods to the order of the Blue Star company, and that the company could take them as and when required, paying cash for them. Anderson agreed to this proposal with a discount of 2 1/2 per cent less than

that ordinarily allowed by the defendant company in its list prices. On 3rd August a statement was rendered by the Downs Distributing Co. to the Blue Star company setting out quantities and prices of goods delivered under the arrangement by the Blue Star company, the total value being stated at 2,042 pounds 5s. 4d. Of these goods less than 700 pounds worth had been supplied by the Downs Distributing Co. The statement of account was headed "Goods as security from Blue Star Stores Pty. Limited." In the books of the defendant company, however, the Blue Star company was represented in the ledger account as owing the amount already stated, namely, 3,007 pounds 2s. 6d., for goods sold to it, was credited with the cheque of 1,000 pounds which had been duly met, and was further credited "By goods 2,007 pounds 2s. 6d." Thus the debt of 3,007 pounds 2s. 6d. was treated as paid, that is, the goods were taken in satisfaction of the debt. The ledger account further shows that on 12th August the Blue Star company purchased goods to the value of 218 pounds 2s. 7d. from the Downs Distributing Co. and paid for them on the same date. (at p474)

4. Upon these facts Roper C.J. in Eq. held that the substance of the transaction between the defendant and the plaintiff on 3rd August was that "the plaintiff should deliver to the defendant goods of a value slightly in excess of the amount due to the defendant, that the defendant should accept those goods in payment of the debt, who should hold them for a reasonable time and resell them to the plaintiff for cash as and when the plaintiff ordered them." It has been argued for the appellant that the transaction constituted a loan by the Downs Distributing Co. to the Blue Star company of the amount of the latter company's debt, application of the loan money in discharging the debt, and a pledge of the goods as security for repayment of the loan. It is true that the statement to which I have referred represents the goods as being "security," but in my opinion all the facts show that the account of the transaction adopted by Roper C.J. in Eq. more accurately describes the substance of the matter. (at p474)

5. In my opinion it is unnecessary in this case to determine the precise meaning of the words "in the ordinary course of business" where they appear in s. 95 (2) (b) of the Bankruptcy Act. Whether that expression is understood in a very general sense or in a sense limited by reference to the particular businesses of the parties concerned, it cannot in my opinion fairly be said that the settlement of a debt between traders by a transaction involving the redelivery of goods sold together with other goods, subject to an arrangement that the debtor may purchase the goods again for cash, is a transaction in the ordinary course of business. Whether it is regarded as satisfaction of the debt by delivery of the goods (as recorded in the defendant company's books) or as a loan of money followed by payment of the debt and a pledge of the goods, the transaction is of an unusual kind and cannot be said to be in any ordinary course of business. (at p475)

6. Further, the circumstances show that Mansfield was anxious about the position and was afraid that his company might not be paid for the goods. He therefore entered into the unusual transaction involving the return of some of the goods sold, together with other goods. In my opinion Roper C.J. in Eq. was right in holding that the circumstances were such as to lead to the inference that the Downs Distributing Co. had reason to suspect that the Blue Star company was unable to pay its debts as they became due and that the effect of the transaction would be to give a preference to that company over other creditors. It was argued that the words "the creditor had reason to suspect" meant that the creditor had in his mind some knowledge or belief which to him amounted to reason to suspect; in other words, that the test was a subjective test. In my opinion there is no reason for interpreting the words of the section in this way, and there is every reason for interpreting them as referring to an objective test. The sub-section refers to "such circumstances as to lead to" one or other of two inferences; either first, that the creditor knew certain facts; or secondly, that the creditor had reason to suspect the existence of certain facts. The provision as to the creditor "knowing" adopts a subjective criterion - applied by inference made by the court. The other provision as to the circumstances leading to an inference that the creditor had "reason to suspect"

relates in my opinion to what may, by way of comparison, be described as an objective test. It is intended to deal with circumstances such that an inference can fairly be drawn by a court that there was reason to suspect, whether or not in fact the mind of the creditor consciously adverted to the significance with respect to the financial position of the debtor of the matters mentioned in the sub-section. In my opinion a transaction falls within sub-s. (4), so that a creditor is excluded from the category of a creditor dealing in good faith under sub-s. (2) (b), if, whatever the creditor may think or believe with respect to the circumstances of a transaction, those circumstances are such as to lead to an inference by the court that there was reason to suspect according to the standards of an ordinary reasonable man that the debtor was unable to pay his debts as they became due, and that the effect of the transaction would be to give the creditor a preference over other creditors. (at p476)

7. The doctrine of Ex parte James (1874) LR 9 Ch 609 was fully examined in Scranton's Trustee v. Pearse (1922) 2 Ch 87 a case which illustrates the difficulties involved in applying a criterion of honest and high-minded conduct. In the present case, however, it appears to me that there are no such difficulties. The argument for the appellant is that the original purchase of the goods by the Blue Star company (not, be it observed, the transaction attacked as a preference) was a fraudulent transaction, and that if the liquidator is allowed to succeed in the present action the result will be that the liquidator will be taking advantage of that fraudulent transaction by obtaining an order for the appellant company to pay the sum of 2,007 pounds 2s. 6d. Without going into other matters I am of opinion that the foundation of the appellant's argument fails. No issue of fraud was raised before Roper C.J. in Eq. and the evidence was not directed to such an issue. There is no finding of fraud by the learned trial judge. Before fraud is found the issue must be clearly raised and the evidence must be convincing. The evidence is as consistent with hopeful optimism on the part of the Blue Star company as with fraud. It would, in my opinion, be quite wrong for a court of appeal, which has not seen the witnesses, to base a decision upon a new finding by it that a transaction was fraudulent. There may possibly be very exceptional circumstances in which such a course might properly be adopted, but this case cannot be held to present any circumstances which would exclude what, in my opinion, should be the general rule. There are other suggested replies to the attempt to apply Ex parte James (1874) LR 9 Ch 609 with which it is not necessary to deal. Accordingly, in my opinion the decision of the Supreme Court was right and the appeal should be dismissed. (at p476)

RICH J. I agree that the appeal should be dismissed. As was pointed out in Burns v. McFarlane [1940] HCA 25; (1940) 64 CLR 108, at p 125 the issues in sub-s. 2 (b) of s. 95 of the Bankruptcy Act 1924-1933 are "(1) good faith; (2) valuable consideration; and (3) ordinary course of business." This last expression it was said "does not require an investigation of the course pursued in any particular trade or vocation and it does not refer to what is normal or usual in the business of the debtor or that of the creditor." It is an additional requirement and is cumulative upon good faith and valuable consideration. It is, therefore, not so much a question of fairness and absence of symptoms of bankruptcy as of the everyday usual or normal character of the transaction. The provision does not require that the transaction shall be in the course of any particular trade, vocation or business. It speaks of the course of business in general. But it does suppose that according to the ordinary and common flow of transactions in affairs of business there is a course, an ordinary course. It means that the transaction must fall into place as part of the undistinguished common flow of business done, that it should form part of the ordinary course of business as carried on, calling for no remark and arising out of no special or particular situation. (at p477)

2. The evidence in the case supports the findings that the transaction was not made in good faith or in the ordinary course of business. (at p477)

WILLIAMS J. This is an appeal by the defendant from a decree made by Roper C.J. in Eq. sitting as the Supreme Court of New South Wales in Equity, whereby it was declared that the payment by the plaintiff to the defendant of the sum of 2,007 pounds 2s. 6d. on 1st August 1946 was a payment made by the plaintiff which was then unable to pay its debts as they became due from its own money in favour of the defendant, a creditor of the plaintiff, having the effect of giving to the defendant a preference, a priority or an advantage over the other creditors of the plaintiff, and that, the plaintiff having been wound up within six months thereafter, such payment was void. (at p477)

2. The plaintiff had a short and for the most part an insolvent life. It was incorporated on 27th March 1946 but found it necessary as soon after as 21st August 1946 to hold a general meeting and pass an extraordinary resolution that it could not by reason of its liabilities continue its business, and that it should be wound up voluntarily. The genesis of the payment was the sale and delivery of goods by the defendant to the plaintiff on 3rd July 1946 for prices which after deducting 10 per cent totalled 3,007 pounds 2s. 6d. This was the first transaction between the companies. Prior to the sale the managing director of the defendant told the agent of the plaintiff that all the defendant's goods were sold strictly on seven days payment and the agent said there would be no difficulty whatever about such payment. But there was a difficulty at the very beginning because the agent said that the plaintiff would not be able to pay for the whole of the goods in seven days, and at his request the goods were divided into two parcels, the first parcel comprising goods priced at 2,176 pounds 17s. 6d., payment to be made on 10th July 1946 and the second parcel priced at 830 pounds 5s., payment to be made on 15th July 1946. The 2,176 pounds 17s. 6d. was not paid on 10th July 1946, whereupon the managing director of the defendant telephoned the plaintiff, and on 12th July had a discussion with its managing director. The latter told the former that his company had over bought stocks of goods on a cash basis which they were finding a little difficult to sell, and that it would be necessary to delay payment for the defendant's goods for a few days. He also said that the financial position of the plaintiff would be greatly improved because the Treasury had approved of the sale of shares in the company, and he was confident the plaintiff would be able to dispose of considerable numbers of its shares to retail shopkeepers and this would mean a considerable increase in the capital of the company. The latter replied that the defendant was not interested in the details of the plaintiff's financial position and wanted to be paid. Finally he agreed that payment of both amounts of purchase money should be made by three post-dated cheques, the first for 1,000 pounds payable on 15th July, the second for 1,000 pounds payable on 22nd July and the third for 1,007 pounds 2s. 6d. payable on 29th July. (at p478)

3. The first cheque was presented and paid on 15th July. The second cheque was presented on 22nd July and dishonoured; it was re-presented on 24th July and again dishonoured. The managing director of the plaintiff then requested the managing director of the defendant to allow this cheque to stand over until after the presentation and payment of the third cheque. The third cheque was presented on 29th July and dishonoured. The managing director of the plaintiff repeated his previous statement that the plaintiff was finding it difficult to sell goods paid for in cash as an excuse for the failure to honour these cheques. He again mentioned that the company hoped to raise fresh capital by the sale of its shares, and referred to 7,000 pounds to be provided by a mysterious person in Siam which had been delayed in transit. The managing director of the defendant also made enquiries from the manager of his bank, which was also the bank of the plaintiff, and got satisfactory answers, and inspected the plaintiff's warehouse where he saw large quantities of goods which he knew from his knowledge of the trade could only have been purchased for cash. It was in these circumstances that the transaction took place which Roper C.J. in Eq. has held to be a preference. (at p478)

4. It is described in the declaration in the decree as the payment of 2,007 pounds 2s. 6d. but I doubt whether this is an adequate description of the transaction. Its true nature appears to have been that

the defendant advanced the plaintiff the sum of 2,007 pounds 2s. 6d. to enable the plaintiff to pay the defendant for the goods. The advance was secured by the plaintiff depositing with the defendant goods consisting partly of some of the goods sold by the defendant to the plaintiff and partly of other goods, prices being placed against such goods which after deducting 7 1/2 per cent totalled 2,042 pounds 5s. 4d. The plaintiff was to be entitled to redeem these goods at these prices. The result was that for the accommodation provided the defendant was to receive the difference between 2,007 pounds 2s. 6d. and 2,042 pounds 5s. 4d., that is to say, 35 pounds 2s. 10d. Instead of being an unsecured creditor of the plaintiff for 2,007 pounds 2s. 6d., representing the purchase money of goods sold and delivered by the defendant to the plaintiff, the defendant became a secured creditor of the plaintiff for 2,042 pounds 5s. 4d. representing money lent by the defendant to the plaintiff, the balance of 35 pounds 2s. 10d. representing the consideration for the loan. There is evidence that the managing director of the plaintiff had first suggested that he would raise the money to pay the defendant by pledging goods with an insurance company and that this led the managing director of the defendant to offer on behalf of his company to lend the money instead. There is also evidence that the defendant had lent money on the security of goods before, but this was the first occasion it had lent money to an existing debtor. (at p479)

5. His Honour accepted the managing director of the defendant as an astute business man and an honest witness. He was satisfied that the witness was misled despite his astuteness by the greater astuteness and persuasiveness of the managing director of the plaintiff into accepting the latter's assurance that the financial embarrassment of the plaintiff was temporary and would shortly be overcome. But the onus was on the defendant to prove that the transaction was in good faith and for valuable consideration and in the ordinary course of business, and his Honour was not satisfied that the transaction was in good faith or in the ordinary course of business. He held that the defendant had reason to suspect that the plaintiff was unable to pay its debts as they became due and that the effect of the payment would be to give it a preference, priority or an advantage over the other creditors. (at p479)

6. I entirely agree with these findings. The meaning of the expression in the ordinary course of business in s. 95 (2) of the Bankruptcy Act was discussed by this Court in Robertson v. Grigg [1932] HCA 29; (1932) 47 CLR 257 , and Burns v. McFarlane [1940] HCA 25; (1940) 64 CLR 108 . In the later case (1940) 64 CLR, at p 125 it was said in the joint judgment of Rich J., Dixon J. and McTiernan J. that the expression does not require an investigation of the course pursued in any particular trade or vocation, and that it does not refer to what is normal or usual in the business of the debtor or that of the creditor. It seems to me, therefore, that the expression refers to a transaction into which it would be usual for a creditor and debtor to enter as a matter of business in the circumstances of the particular case uninfluenced by any belief on the part of the creditor that the debtor might be insolvent. In my opinion the transaction impeached was not of this nature. The defendant was pressing for payment in cash for the goods it had sold and delivered to the plaintiff. The transaction did not result in any immediate cash payment. Cash could only be obtained by the plaintiff selling its stock on hand or raising fresh capital. It could not assist the plaintiff to sell its goods or to raise fresh capital to have its goods deposited not in its own warehouse but in that of the defendant. The transaction was not in any sense an ordinary loan. There was no proper rate of interest and no time fixed for repayment. The purpose of the transaction was to convert the defendant from an unsecured creditor into a secured creditor, and thereby give the defendant a preference over the other unsecured creditors of the plaintiff. I agree with his Honour that a short extension of credit would have been all that was necessary to meet the situation in the ordinary course of business if the defendant had not had a possible insolvency of the plaintiff in view. (at p480)

7. His Honour was also not satisfied that the defendant was a purchaser, payee or encumbrancer in good faith. Section 95 (4) defines two instances in which a creditor shall not be deemed to be a purchaser, payee or encumbrancer in good faith. The first case is where the circumstances are such as to lead to the inference that the creditor knew that the debtor was unable to pay his debts as they became due and that the effect of the transaction would be to give him a preference, priority or advantage over the other creditors. The second case is where the circumstances are such as to lead to the inference that the creditor had reason to suspect these matters. His Honour found that the circumstances were such as to lead to the inference that the managing director of the defendant had reason to suspect these matters. It was contended for the appellant that in drawing such an inference the Court should have regard to the mentality of the particular creditor. But, in my opinion, the circumstances to which the sub-section refers are such circumstances as would lead a reasonable business man to suspect these matters. (at p480)

8. In the present case there was ample evidence to lead to the inference in question. A part of the original debt should have been paid on 10th July but it was not paid. The plaintiff had to ask for time to pay. It was unable to pay the second cheque on 22nd July or the third cheque on 29th July. Section 95 (1) of the Bankruptcy Act refers to a person being unable to pay his debts as they become due from his own money. Section 95 (4) refers to a person being unable to pay his debts as they become due, so that it does not contain the words from his own money, but the expression must have the same meaning in both sub-sections. In the leading case of Bank of Australasia v. Hall [1907] HCA 78; (1907) 4 CLR 1514 , Isaacs J. said that a debtor is able to pay his debts as they become due from his own money "if the debtor can by sale or mortgage of property which he owns at the time . . . change the form of the property into cash wholly or partly but sufficient for the purpose of paying his debts as they become due" (1907) 4 CLR, at p 1543 . (at p481)

9. Any reasonable business man in the position of the managing director of the defendant must have suspected that the plaintiff was unable to pay its debts as they became due out of its existing resources and would only be able to do so if it could obtain additional capital. The managing director knew that there were other creditors, so that any reasonable business man in his position must have suspected that to convert an unsecured into a secured debt would give the defendant a preference over the other unsecured creditors. (at p481)

10. There remains for consideration a ground not taken before his Honour, namely, the contention that the transaction impeached is protected by the rule in Ex parte James; Re Condon (1874) LR 9 Ch 609 . In that case the proceeds of an execution had been paid by the execution creditor to the trustee in bankruptcy under the mistaken belief that the trustee was legally entitled to the moneys. It was held that the Court had jurisdiction to relieve against the mistake of law and to order the trustee to repay the moneys to the execution creditor. James L.J. said: "I am of opinion that a trustee in bankruptcy is an officer of the Court. He has inquisitorial powers given him by the Court, and the Court regards him as its officer, and he is to hold money in his hands upon trust for its equitable distribution among the creditors. The Court, then, finding that he has in his hands money which in equity belongs to some one else, ought to set an example to the world by paying it to the person really entitled to it. In my opinion the Court of Bankruptcy ought to be as honest as other people" (1874) LR 9 Ch, at p 614 . The rule in Ex parte James (1874) LR 9 Ch 609 has been invoked in many subsequent cases, on some occasions with, but more often without, success. In In re Tyler (1907) 1 KB, at p 871 , Farwell L.J. said that the rule applied to the administration of all estates, whether in Chancery, Bankruptcy, or the winding up of companies where the Court itself by its officer often found itself in the position of a quasi litigant. In the same case Buckley L.J. said that in Ex parte James (1874) LR 9 Ch, at p 614 , James L.J., when he spoke of money which in equity belonged to some one else, meant money "which in point of moral justice and honest dealing belongs to some one else. He was using the words in a popular sense, and not in the sense of money

which in a Court of Equity would belong to some one else . . . assuming that he (the officer) has a right enforceable in a Court of Justice, the Court of Bankruptcy or the Court for the administration of estates in Chancery will not take advantage of that right if to do so would be inconsistent with natural justice and that which an honest man would do" (1907) 1 KB, at p 873 . These words of Buckley L.J. were approved by Atkin L.J. in In re Thellusson (1919) 2 KB, at p 762 . In Re Gozzett (1936) 1 All ER 79, at p 88 , Romer L.J. said that the principle is applicable only when an officer of the Court, if he acted in strict accordance with his legal rights, would be doing something dishonourable. There is a useful collection of the cases up to 1922 in the report of Scranton's Trustee v. Pearse (1922) 2 Ch, at p 116 . The scope of the rule is discussed in the judgments of the Court of Appeal in that case and Williams on Bankruptcy 15th ed. (1937), pp. 239 et seq. Since Scranton's Case (1922) 2 Ch 87 the rule has again been before the Court of Appeal in Re Gozzett (1936) 1 All ER 79 . In In re Thellusson, Atkin L.J. said that "it can make no difference whether the trustee himself has acquired the property by unworthy means, or whether there is vested in him by operation of law property which has been acquired by the debtor by unworthy means. If it would be dishonourable of the debtor to use the money to pay his creditors, it is equally dishonourable for the officer of the Court, knowing the full facts, to use the money to pay his creditors" (1919) 2 KB, at p 764 . But the cases as a whole appear to show that it is only in exceptional cases that the rule would be applied where the officer or his predecessor in office has not been personally concerned in the transaction. In re Thellusson (1919) 2 KB 735 is an exceptional case. There a creditor who had agreed to lend the debtor money to pay a pressing debt paid the money into the bank account of the debtor in ignorance of the fact that a receiving order had been made against him. Out of the money paid in, the bank recouped itself for the amount of an overdraft leaving a balance in the account. The balance vested in the Official Receiver by operation of law. The money was paid into a bank account over which the Official Receiver had control, so that the payment was very much akin to a payment to him personally. In Re Gozzett (1936) 1 All ER, at p 88 , Lord Wright M.R. said that the payment was very analogous to a payment under mistake of fact and it was not therefore a matter of astonishment that the Court held that the rule should apply. In his judgment in In re Wigzell (1921) 2 KB, at pp 868, 869 , Younger L.J. set out the exceptional circumstances that existed in In re Thellusson (1919) 2 KB 735 . He referred to the essential difference between applying the rule to "a transaction initiated by the bankrupt himself, not presumably in every case a person of the highest commercial morality, and a transaction initiated either by the trustee or the Court" (1921) 2 KB, at p 869 . He pointed out that in the case of transactions initiated by the bankrupt himself "it is not obvious that a creditor with whom that transaction has been carried out and is complete, even one who in relation to it may have been tricked by the bankrupt, has any equity at all as against the other creditors of the same bankrupt, who may all have been equally tricked, merely because in his case the proceeds of the transaction can be traced amongst the bankrupt's assets, and in the other cases they cannot" (1921) 2 KB, at pp 869, 870 . (at p483)

11. The trickery alleged in the present case is that the defendant was induced to give credit by the fraudulent representation of the agent of the plaintiff that there would be no difficulty whatsoever in paying for the goods, whereas the agent well knew that the plaintiff was insolvent and would be unable to pay for the goods. This is an allegation of fraud, and fraud should be strictly pleaded and proved. Fraud was not raised before Roper C.J. in Eq., and it is apparent that on such an issue further evidence might have been tendered. But it is unnecessary to pursue the matter because the trickery, if any, was the trickery of the plaintiff whilst it was a going concern, and it was not trickery in which the liquidator was in any sense involved. It may be that some of the goods sold and delivered by the defendant to the plaintiff or their proceeds of sale could be traced into the possession of the liquidator, but the mere fact that the assets available for the unsecured creditors are thereby increased would not give the defendant any equity to be paid in full. A person who sells his goods on credit without security has only himself to thank if he finds himself an unsecured creditor on the bankruptcy of his debtor: Re Gozzett (1936) 1 All ER 79 . If as in the present case he

takes a security too late he cannot complain of any hardship caused by the operation of the bankruptcy law: In re Hall (1907) 1 KB 875 ; In re Wigzell (1921) 2 KB 835 . (at p484)

12. In my opinion the appeal should be dismissed. (at p484)

**ORDER**

Appeal dismissed with costs.

---

**AustLII:** | | |
URL: *http://www.austlii.edu.au/au/cases/cth/HCA/1948/14.html*

TAB 22

*Ex p Kemp, re Fastnedge* (1874) LR 9 Ch App 383,
English High Court

Sir W. M. James, L.J.:—I cannot see what jurisdiction the County Court Judge had to make an order that the Plaintiffs in the action "should consent to the payment out of Court" of any sum.

Mr. *North*, for the creditors, was not called on.

*L. J. J.*

*1874*

*Ex parte*
BANNER.

*In re*
KEYWORTH.

Sir W. M. James, L.J.:—

The sum in question was paid into Court to abide the event of the action. It is similar to what is constantly done in this Court when a bill is filed to restrain an action at law and the Plaintiff is ordered to pay into Court the amount claimed in the action. It belongs to the party who is found eventually to be entitled to the sum in dispute. I am of opinion that the Chief Judge was right. The appeal must be dismissed with costs.

Solicitor for the Appellant: Mr. *J. H. Lydall*, agent for Messrs. *T. & T. Martin, Liverpool*.

Solicitor for the Creditors: Mr. *W. W. Wynne*, agent for Messrs. *Simpson & North, Liverpool*.

---

### *Ex parte* KEMP.   *In re* FASTNEDGE.

*Bankruptcy—Order and Disposition—Bankers' "Marginal Notes"—Debts due in the Course of Trade—Bankruptcy Act, 1869, s. 15, sub-s. 5.*

*L. J. M.*

*1874*

*March 6, 20.*

Sums retained by bankers against acceptances, and for which they have given marginal notes, are not debts due to the bankrupt in the course of his business within the order and disposition clause, *Bankruptcy Act*, 1869, s. 15, sub-s. 5.

The expression "debts due" in that clause is not to be confined to debts presently payable, but, on the other hand, will not include debts which were only contingent at the commencement of the bankruptcy.

THIS was an appeal by the trustees in the liquidation of Messrs. *Fastnedge & Co.* from an order of Mr. Registrar *Spring Rice* sitting as Chief Judge. Messrs. *Fastnedge & Co.* were exporters of goods to *India*, and were in the habit of selling the bills drawn by them

L. J. M.

1874

*Ex parte*
KEMP.
*In re*
FASTNEDGE.

against the consignments upon the consignees in *India* to bankers in *London*, with the bills of lading attached as security. The bankers were not accustomed to advance the whole of the price of the bills in cash. They paid 70 per cent. or upwards in cash, and for the rest of the price gave Messrs. *Fastnedge* what are called in the trade " marginal notes." The effect of these notes was that the bankers giving them contracted to hold the residue of the price of the bills of exchange on deposit, bearing interest, by way of security for the payment of the bills, and that the amount so deposited was not to be paid to Messrs. *Fastnedge* until advice was received of the due payment of the bills, and was then to be subject to any other claims which the bankers might have against Messrs. *Fastnedge.*

The marginal notes given by the different bankers were not exactly identical in form, but were substantially to the same effect. Those given by the *Chartered Bank of India, Australia, and China,* were in the following form :—

> " *Chartered Bank of India, Australia, and China,*
>
> " *London,* 21 Feb., 1873.
>
> "Bills, Nos. 426, 427 for Rs.839 13. 0. pur-
>     chased at 1/11⅝    .    .    .    . £79    3    5
> " Paid this day .    .    .    .    .    .    59    3    5
>
> " Leaving a margin of twenty pounds  . £20    0    0

to be accounted for to Messrs. *Fastnedge & Co.* on receipt of advice of the due payment of the above bills, and after providing for any deficiency on other liabilities of the said parties to the bank. Interest to be allowed at *Bank of England* minimum rates, but not to exceed 5 per cent. per annum.

> " *J. H. Smythe,* Manager."

These notes were not meant to be transferable, and in some cases the words " not transferable " were written across the face of the document.

Messrs. *Barbour & Brother* were commission agents in *Manchester*, and had dealings with Messrs. *Fastnedge.* Since the year 1870 they had been in the habit of selling goods to Messrs. *Fastnedge*, drawing bills upon them for the price of the goods, and receiving from them marginal notes which had been given

them by *London* bankers, as a security for the payment of such
bills. The marginal notes in question in the present case were all
given by different bankers to Messrs. *Fastnedge & Co.* previous to
the month of March, 1873, and were indorsed by Messrs. *Fastnedge*
to *Robert Barbour & Brother*, and deposited with them as a
security for the price of goods sold by *Robert Barbour & Brother*
to Messrs. *Fastnedge.*

On the 26th of March, 1873, Messrs. *Fastnedge* presented a peti-
tion for liquidation by arrangement. At that time no notice had
been given to the various bankers that the marginal notes had been
assigned to *Robert Barbour & Brother*. Messrs. *Fastnedge* inserted
the name of *Robert Barbour & Brother* in the list of their creditors
for £3500. At the time the petition for liquidation was presented
none of the bills of exchange in respect of the price of which the
marginal notes were issued had been accepted, but since that
time they had all been accepted and paid, and the bankers
were willing to pay the sums of money represented by the
marginal notes to whoever was legally entitled to receive such
sums.

Under these circumstances the trustee claimed the sums repre-
sented by the marginal notes as having been within the order and
disposition of Messrs. *Fastnedge* at the commencement of the
liquidation, but the Registrar rejected the claim, being of opinion
that they were not debts within the meaning of the 5th sub-section
of the 15th section of the *Bankruptcy Act,* 1869 (1). From this
decision the trustee appealed.

Mr. *Benjamin*, Q.C., and Mr. *Linklater*, for the Appellant:—

The question turns upon the construction of the words "debts
due to him" in the 5th sub-section of the 15th section of the
*Bankruptcy Act*, 1869. We contend that these marginal notes

L. J. M.
1874
*Ex parte*
KEMP.
*In re*
FASTNEDGE.

(1) 32 & 33 Vict. c. 71, s. 15 (sub-
sect. 5), enumerates among descriptions
of property divisible among the creditors
of a bankrupt: "All goods and chat-
tels being at the commencement of the
bankruptcy in the possession, order, or
disposition of the bankrupt, being a
trader, by the consent and permission
of the true owner, of which goods and

chattels the bankrupt is reputed owner,
or of which he has taken upon himself
the sale or disposition as owner: pro-
vided that things in action, other than
debts due to him in the course of his
trade or business, shall not be deemed
goods and chattels within the meaning
of this clause."

**CHANCERY APPEALS.**                    [L. R.

L. J. M.

1874

*Ex parte*
KEMP.

*In re*
FASTNEDGE.

were debts, as the word is used in that Act and in similar Acts. The sum represented by the marginal note was part of the price of the bill of exchange, which was kept back for his own security by the banker, but was due to the person selling the bill. It was *debitum in præsenti solvendum in futuro.* It was not merely payable on a contingency, for it was certainly to be paid in one way or another; if the bill of exchange was duly met, it would be paid in cash; if the bill was dishonoured the marginal note would be allowed in account in discharge of the liability on the bill. If we look at the use of the word "due" in the Act, we shall find that it has a wide meaning, like "payable." In sect. 19 the words "debts due to and from him," of which the bankrupt is to give an inventory, certainly include debts which are not then payable. So in sect. 49 "debts due to the Crown" must include those not yet payable.

[They also referred to *Ryall* v. *Rolle* (1); *Ex parte Greenway* (2).]

Mr. *Little*, Q.C., and Mr. *Marten*, Q.C., for Messrs. *Barbour & Brother* :—

We claim the money represented by the marginal notes under the equitable assignment to us by the liquidating debtor at the date of the presentation of the petition for liquidation, at which date the rights of the parties must be determined. At that time the bills of exchange had not been accepted, and the goods were on the sea. It was therefore entirely contingent whether the marginal notes would ever constitute a debt or not: *Jeffryes* v. *Agra and Masterman's Bank* (3). The word "due" means "payable." That was expressly decided as to sect. 6 by *Ex parte Sturt* (4), and the word is used in the same sense in other sections, particularly in sect. 25, sub-sect. 6 (where debts "due" are contrasted with debts "growing due"), and sects. 32, 34, and 35. Only such debts were intended to be included as were actually payable, like the ordinary book debts of a trader. The provisions respecting order and disposition are in the nature of a penal enactment, and must be construed literally. Such *choses in action* as marginal

(1) 1 Atk. 165.
(2) Law Rep. 16 Eq. 619.
(3) Law Rep. 2 Eq. 674.
(4) Ibid. 13 Eq. 309.

03635-jpm    Doc 173-2    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
Pg 837 of 856

notes are not within the mischief intended to be remedied:
*Ridout* v. *Lloyd* (1); *Lacon* v. *Liffen* (2); *Morris* v. *Cannan* (3);
*Ex parte Masterman* (4); *Ex parte Littledale* (5); *Ex parte
Watkins* (6).

Mr. *Benjamin*, in reply.

L. J. M.

1874

*Ex parte*
KEMP.

*In re*
FASTNEDGE.

March 20.  Sir G. MELLISH, L.J., after stating the facts of the
case, continued :—

The question now to be determined is whether the sums repre-
sented by these marginal notes ought to be paid by the banks to
Messrs. *Barbour & Brother*, or ought to be paid to the trustee,
upon the ground that at the time when the petition for liquidation
was presented they were in the order and disposition of Messrs.
*Fastnedge*, with the consent of Messrs. *Barbour & Brother*, the
true owners.   The Registrar was of opinion that these sums were,
at the time the petition for liquidation was presented, things in
action, but were not debts due to Messrs. *Fastnedge* in the course
of their trade, and were therefore not to be deemed goods and
chattels within the 5th sub-section of the 15th section of the
*Bankruptcy Act*, 1869.   I have therefore to determine, and, I
believe, for the first time, what is the construction to be put on
the words " debts due to him in the course of his trade or business "
as used in that section.

Now, the words " debts due to him " are certainly words which are
capable of a wide or a narrow construction.   I think that *primâ
facie*, and if there be nothing in the context to give them a
different construction, they would include all sums certain which
any person is legally liable to pay, whether such sums had become
actually payable or not.   On the other hand, there can be no
doubt that the word " due " is constantly used in the sense of
" payable," and if it is used in that sense, then no debts which had
not actually become payable when the act of bankruptcy was com-
mitted would be included.   Lastly, the expression " debts due " is
sometimes used in bankruptcy proceedings to include all demands

(1) Mont. 103.                    (4) 2 Mont. & A. 209.
(2) 4 Giff. 75.                   (5) 6 D. M. & G. 714.
(3) 4 D. F. & J. 581.             (6) Law Rep. 8 Ch. 520.

L. J. M.

1874

*Ex parte*
KEMP.
*In re*
FASTNEDGE.

which can be proved against a bankrupt's estate, although some of them may not be strictly debts at all.

Illustrations of these various meanings may be found in the Act itself. In the 6th sub-section of the 6th section it is enacted that it shall be an act of bankruptcy if a debtor who has been served with a debtor's summons requiring him to pay a sum due of not less than £50 has neglected to pay that sum. It is obvious that in this place " due" must mean " payable," because it would be absurd to suppose that a man could be made a bankrupt for not paying a debt which was not yet payable. In *Ex parte Sturt* (1) the Chief Judge held that the word " due" must also mean " payable" in the other parts of that section, because it was not to be supposed that the same word could be used in different senses in the same section. So also in the 6th sub-section of the 25th section it is enacted that the trustee may sell the book debts " due or growing due." In that place also due seems to mean payable, because debts due are distinguished from debts growing due. On the other hand, in the 19th section it is enacted that the bankrupt shall give such list of his creditors and debtors, and of the debts due to or from them respectively, as the trustee may reasonably require. In that case it is clear that the word " due " does not mean payable, and that all debts which have been contracted, whether the time for payment has arrived or not, were intended to be included. It is impossible that acceptances payable *in futuro,* or bills of exchange receivable *in futuro,* were intended to be excluded from the list of debts due to or by a bankrupt. Then, again, in the 49th section it is enacted that an order of discharge shall release the bankrupt from all other debts proveable under the bankruptcy except debts due to the Crown. In that place I think that " debts due to the Crown " means all proveable demands which the Crown has against the bankrupt, whether they have become payable or not, and whether they are in point of law strictly debts or not.

It is unnecessary to pursue this investigation further, and I return to the consideration of what is the true construction to be placed on the words " debts due to him in the course of his trade or business," in the 5th sub-section of the 15th section. It was

(1) Law Rep. 13 Eq. 309.

argued for the Respondents that the order and disposition clause
was a penal enactment that takes a man's property away from
him, and ought, therefore, to be construed strictly.    I cannot give
any great weight to this argument.    In former times this clause
was construed most favourably for creditors, of which there cannot
be a greater instance than that the words "goods and chattels"
were construed to include *choses in action.*    In later times the
Judges have given a stricter construction to the clause, and have
endeavoured as far as possible to confine it to cases properly within
its principle.    The Legislature has now, in the Act of 1869, re-
enacted the clause with certain modifications, and in determining
what those modifications are, I must endeavour to discover on
what principle the Legislature has acted, and carry that principle
out.    Things in action other than trade debts, are taken out of the
clause, probably because it was thought that things in action other
than trade debts were not likely to procure a trader credit from his
apparent possession of them when he had really parted with them.
His general creditors, in all probability, might never know that he
possessed them.    Debts due to a trader in the course of his trade
or business are excepted, and are still kept within the clause,
because what are ordinarily termed a trader's book debts are very
likely to procure a trader credit from his apparent possession of
them.    They often form a most important part of a trader's assets,
and they are a part of his property which a trader in good credit
does not usually pledge or part with.    There can be no clearer
mark of a trader being in difficulties than that he is obliged to
assign his book debts as a security to a creditor.    The Legislature
has therefore thought it right not to alter the law which made an
assignment of his book debts by a trader void as against his trustee
if notice of the assignment had not been given to the debtors prior
to an act of bankruptcy being committed.    Now this being, in my
opinion, the principle on which the Legislature has proceeded, is
there any sound reason for making a distinction between those
debts which at the time when an act of bankruptcy is committed
have become actually payable and those which have not?    I
cannot see that there is.    Many traders are obliged to give long
·terms of credit to their debtors, and this being known to their
creditors, procures them credit also ; and if I were to hold that

L. J. M.

1874

*Ex parte*
KEMP.

*In re*
FASTNEDGE.

L. J. M.

1874

*Ex parte*
KEMP.

*In re*
FASTNEDGE.

———

debts which have been earned, and which are, in what I consider the proper sense of the word, due to the bankrupt, although they have not yet become payable, were taken out of the order and disposition clause, I cannot help thinking that I should defeat the object which the Legislature had in view in enacting that debts due to a bankrupt in the course of his trade or business should still be kept within the clause.

On the other hand, I think that I have no right to extend the meaning of the words " debts due " so as to include demands which are not properly debts. Until a sum certain has become due, and is to be paid in all events, there is, in my opinion, no debt due. The clause does not relate to demands which may be proved against the estate of a bankrupt, but to debts due to him; and the change in expression from " things in action " to " debts " seems to prove that all things in action which might accrue to a trader in the course of his trade or business were not intended to be included in the clause, but only those which had become debts before an act of bankruptcy was committed.

This, then, being the construction which I put on the clause, I have next to consider whether the sums represented by the marginal notes had become debts due from the respective banks to Messrs. *Fastnedge & Co.* before their petition for liquidation was presented. Now it is obvious that at that time not only had these sums not become payable—which, in my opinion, would not prevent their being debts—but it was wholly uncertain whether any sum would ever become payable to Messrs. *Fastnedge* at all in respect of them. It was argued by Mr. *Benjamin* that, nevertheless, they were debts due to Messrs. *Fastnedge*, because the sums represented by the marginal notes were, as he said, to be paid to Messrs. *Fastnedge* in all events, either by being paid to them in cash, or by being applied to discharge liabilities owing to them. I do not think this argument is sound. In *Jeffryes* v. *Agra and Masterman's Bank* (1), Vice-Chancellor *Wood* thus describes the legal effect of marginal notes:—" These documents, in truth, represent a debt due from the bank, with an engagement to pay that debt to the person to whom they give the receipt note upon a certain condition, and at a certain time, as far as that time is defined by the

condition, namely, whenever they receive intelligence that the
bills, in respect of the discount of which they reserved this right of
retainer, have been duly paid and satisfied. It is, in other words,
a debt which will accrue from the bank on that event happening."
Lord *Hatherley* had not the point I am considering before him at
all, and although the words he first uses, that the documents repre-
sent a debt due to the bank, are favourable to the argument of the
Appellant, I think his last description is more accurate, that the
debt will accrue from the bank on the event happening. If, not-
withstanding the bills were dishonoured, an action was brought
against the bank to recover the sums represented by the marginal
notes, the proper plea to raise the defence of the bank would be a
plea of never indebted, and not a plea of payment or of set-off.
What I have to consider is, what was it which Messrs. *Fastnedge*
assigned to *Robert Barbour & Brother*, and of which *Robert Bar-
bour & Brother* were the true owners at the time the petition for
liquidation was presented? Now, it is obvious that Messrs. *Fast-
nedge* did not assign to *Robert Barbour & Brother*, and *Robert
Barbour & Brother* did not become the true owners of sums cer-
tain to be paid by the banks to Messrs. *Fastnedge* in all events, but
Messrs. *Fastnedge* only assigned to *Robert Barbour & Brother*, and
*Robert Barbour & Brother* only became the owners of, contingent
claims which might or might not end in becoming debts. In my
opinion contingent claims of this kind are not debts due within
the 5th sub-section of the 15th section. On the whole, I am of
opinion that the order of the Registrar must be affirmed, and the
appeal dismissed with costs.

Solicitor for the Appellant: Mr. *H. Wickens.*

Solicitors for the Respondents: Messrs. *Milne, Riddle, & Mellor,*
agents for Messrs. *Hinde, Milne, & Sudlow, Manchester.*

*[margin note]* L. J. M.
1874
*Ex parte*
KEMP.
*In re*
FASTNEDGE.

TAB 23

*Fairfield Sentry Ltd v Migani* [2014] UKPC 9, Privy Council



[2014] UKPC 9
**Privy Council Appeal No 0061 of 2012
and Nos 0058, 0059, 0060 and 0061 of 2013**

# JUDGMENT

## Fairfield Sentry Limited (in Liquidation) (Appellant) v Migani and others (Respondents)

## Lombard, Odier & Cie and others (Appellants) *v* Fairfield Sentry Limited (in Liquidation) (Respondent)

## Credit Suisse London Nominees Limited and another (Appellants) v Fairfield Sentry Limited (in Liquidation) (Respondent)

## Quilvest Finance Limited and others (Appellants) v Fairfield Sentry Limited (in Liquidation) (Respondent)

## UBS AG New York and others (Appellants) v Fairfield Sentry Limited (in Liquidation) (Respondent)

### From the Court of Appeal of the British Virgin Islands

**before**

**Lord Neuberger**
**Lord Mance**
**Lord Clarke**
**Lord Sumption**
**Lord Toulson**

## JUDGMENT DELIVERED BY

## Lord Sumption

## ON

## 16 April 2014

**Heard on 18 and 19 March 2014**

*Lombard, Odier & Cie
and others*
David Lord QC
Robert Christie

(Instructed by Blake
Lapthorn)


*Credit Suisse London
Nominees Ltd and another*
Laurence Rabinowitz QC
Arabella di Iorio
Maximilian Schlote
(Instructed by Herbert
Smith Freehills LLP)


*UBS AG New York and
others*
Lord Falconer QC
Paul Webster QC
(Instructed by Gibson
Dunn & Crutcher LLP)


*Quilvest Finance Ltd and
others*
Mark Hapgood QC
Phillip Kite
Alan Roxburgh
(Instructed by Latham &
Watkins)

*Fairfield Sentry Ltd (in
Liquidation)*
Jonathan Crow QC
Andrew Westwood
Stephen Midwinter
(Instructed by Macfarlanes
LLP)

**LORD SUMPTION:**

*Introduction*

1.      Bernard L. Madoff and his company Bernard L. Madoff Investment Securities LLC ('BLMIS') ostensibly operated as fund managers, principally from New York. Over a period of at least seventeen years he operated what seems likely to be the largest Ponzi scheme in history, accepting sums variously estimated between US$17 billion and US$50 billion for investment. It appears that from at least the early 1990s there had been no trades and no investments. Returns to investors were fictitious and the corresponding documentation fabricated. As with any Ponzi scheme, net withdrawals from funds under management were paid from new money placed with BLMIS for investment. In December 2008 Madoff was arrested, and in March 2009 he pleaded guilty in a New York court to a number of counts of fraud. He was later sentenced to 150 years imprisonment.

2.      Fairfield Sentry Ltd is a company incorporated in the British Virgin Islands as a mutual fund. I shall, like most of the formal documentation, call it "the Fund". From 1997 to 2008, it was the largest of a number of feeder funds which placed money with BLMIS for investment. Over that period, about 95% of its assets, amounting to some US$7.2 billion was placed with BLMIS. Investors participated indirectly in these placements by subscribing for shares in the Fund at a price dependent on the Fund's net asset value per share ('NAV'), and were entitled to withdraw funds by redeeming their shares under the provisions of the Fund's Articles of Association. The net addition to or reduction of its funds arising from subscriptions or withdrawals over any month was reflected in corresponding additions or reductions of funds placed with BLMIS. The shares were also transferrable, subject to certain restrictions in the Articles, but we were told that there was no secondary market in them. On 18 December 2008, shortly after Madoff's frauds came to light, the Directors of the Fund suspended the determination of the Fund's NAV per share, thus effectively terminating the redemption of shares. On 21 July 2009, the High Court of the British Virgin Islands ordered the Fund to be wound up.

3.      It is inherent in a Ponzi scheme that those who withdraw their funds before the scheme collapses escape without loss, and quite possibly with substantial fictitious profits. The loss falls entirely on those investors whose funds are still invested when the money runs out and the scheme fails. Members of the Fund who redeemed their shares before 18 December 2008 recovered the NAV which the Directors determined to be attributable to their shares on the basis of fictitious reports from BLMIS. The loss will in principle be borne entirely by those who were still Members of the Fund at that date.

4.    These proceedings are brought by the Fund at the instance of its liquidators against a number of financial institutions who were Members of the Fund but redeemed some or all of their shares before December 2008. Their purpose is to recover from the Defendants the amounts paid out to them on redemption, on the footing that they were paid out in the mistaken belief that the assets were as stated by BLMIS, when there were in fact no such assets. Any recoveries made on this basis can then be distributed rateably between all Members, irrespective of when or whether they redeemed.

5.    Similar proceedings have been brought by the Fund in other jurisdictions against other Members and former Members to recover redemption payments. They include more than 300 actions in the United States, in which the Fund is claiming more than US$6 billion. The United States actions have been stayed pending the outcome of these proceedings.

6.    On 20 April 2011, Bannister J in the Commercial Division of the High Court of the British Virgin Islands ordered four preliminary issues to be tried. The first three issues have together been called the "Article 11" question.  These issues were all concerned with the question whether certain transaction documents issued to Members of the Fund recording the NAV per share or the redemption price upon redemption were binding on the Fund under Article 11 of its Articles, which deals with the effect of certain "certificates". It is now accepted, and rightly accepted, by the Fund that if they were binding the present claims must fail. The fourth issue was whether the Defendants have a defence on the ground that by their surrendering their shares they gave good consideration for the money that they received on redemption. This has been called the "Good Consideration" question. The two questions were argued separately below and before us. But for reasons which will be explained, they are closely related and have to be considered together.

7.    Bannister J decided the Article 11 question in favour of the Fund. He held that the documents relied upon by the Defendants as binding were not "certificates" for the purpose of Article 11. But he held in favour of the Defendants on the Good Consideration question, and on that basis summarily dismissed the action. He was affirmed on both points by the Eastern Caribbean Court of Appeal.

*The contractual documentation*

8.    Subscribers for shares in the Fund complete a Subscription Agreement, by which they subscribe for shares to be offered by the Fund at the NAV per share as the opening of business on the effective date of purchase "pursuant to the terms herein, the Memorandum, and the Fund's Memorandum of Association and Articles of Association (collectively 'the Fund Documents')": see clause 1.

9.     Of these three documents, the "Memorandum" means the Private Placement Memorandum by which the Fund offers a stated number of shares. Its main function is to convey information about how the Fund is managed and how its assets are invested, and to define certain expressions used in the Subscription Agreement. It describes the investment strategy of the Fund, and explains that it is implemented by BLMIS. A section headed "Transfers, Redemptions and Termination" describes the procedure for redemption.

10.     The Subscription Agreement binds the subscriber to his subscription and to the terms of the Fund Documents, but is otherwise concerned entirely with acknowledgements, representations and warranties as to his understanding of the investment and of associated procedures and risks, mostly for regulatory purposes. For present purposes, what matters is not the subscriber's acknowledgements, representations and warranties, nor the factual statements of the Fund, but the terms of the subscriber's membership of the Fund, which govern the redemption of its shares. These terms are to be found in the Articles of Association of the Fund. The relevant provisions are Articles 9, 10 and 11 and the associated definitions in Article 1. These operate by reference to the "Valuation Day" and the "Dealing Day". A Valuation Day is the last business day of any month (or such other date as the Directors may determine); and with respect to redemptions a Dealing Day is a Valuation Day.

11.     Article 9 deals with the issue and allotment of shares. Article 9(1) provides for shares to be issued to those applying for them on the Dealing Day following the application. Article 9(1)(b) provides:

> "The issue of Shares pursuant to this Article shall be effected at not less than the Subscription Price determined in accordance with paragraph (2) of this Article but in no event shall a Share be allotted or issued at a price less than its par value."

Article 9(2) provides that the Subscription Price per share is to be the

> "Net Asset Value of each Share (as determined in accordance with Article 11) as at the close of business in Amsterdam, The Netherlands, on the Valuation Day immediately preceding the Dealing Day on which such issue is made."

12.     Article 10 deals with redemptions. It is in some respects the mirror image of Article 9. Article 10(1) provides that

> "Subject to the provisions of the Memorandum, these Articles and
> the Act and subject as hereinafter provided, the Company shall on
> receipt by it or its authorised agent of a request in writing (or in
> such other form as the Directors may determine) by a Member
> ('the Applicant') specifying the number and class of Shares to be
> redeemed redeem or purchase all or any portion of the Shares
> registered in the Applicant's name, PROVIDED THAT:

> (a) subject as hereinafter provided, the redemption or purchase of
> Shares pursuant to this Article shall be made on the Dealing Day
> on which, or immediately following the day on which, the written
> request is received provided that the said request is received on or
> before the Dealing Time."

Article 10(1)(b) provides (so far as relevant) that

> "the redemption or purchase of Shares pursuant to this article shall
> be effected at the Redemption Price determined in accordance with
> paragraph (2) of this article."

Article 10(1)(c) provides for the Redemption Price to be paid "as soon as practicable
after the Dealing Day", being normally 30 days after the Dealing Day, subject to
extension in certain special cases. Article 10(2) deals with the Redemption Price. It
provides:

> "(2)    The Redemption Price for each Share shall be the Net Asset
> Value per Share (as determined in accordance with Article 11) as
> at the close of business in Amsterdam, The Netherlands on the
> Dealing Day on which such redemption is effected less such sum
> (if any) as the Directors may consider represents the appropriate
> provision for fiscal and sale charges which would be incurred on
> the sale of assets of the Company, in each case rounded to the
> nearest minimum integral unit of the Base Currency."

13.    Article 11 deals with the determination of the NAV per share for the purpose of
both subscriptions and redemptions. Article 11(1) provides:

> "[a] The Net Asset Value per Share of each class shall be
> determined by the Directors as at the close of business on each
> Valuation Day (except when determination of the Net Asset Value
> per Share has been suspended under the provisions of paragraph

(4) of this Article), on such other occasions as may be required by these Articles and on such other occasions as the Directors may from time to time determine.

[b] The Net Asset Value per Share shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue or deemed to be in issue and by adjusting for each class of Shares such resultant number to take into account any dividends, distributions, assets or liabilities attributable to such class of Shares pursuant to paragraph (2) of Article 4, all determined and calculated as hereinafter provided.

[c] Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties."

The sub-paragraph numbers [a], [b] and [c] have been added for ease of reference. Article 11(2) identifies the assets and liabilities to be included in the calculation of the NAV. In effect they are all the assets and liabilities of the Fund. Article 11(3) contains detailed supplementary provisions governing certain aspects of the valuation.

*Redemption procedure*

14.    Since 1999, the Fund's administrator has been Citco Fund Services (Europe) BV, a leading professional administrator of mutual funds based in the Netherlands. The Private Placement Memorandum records that under an administration agreement dated 20 February 2003, the Fund has appointed Citco as the administrator of the Fund under the overall direction of the Directors. Citco is described as having responsibility for day-to-day administrative services including "calculation of Net Asset Value" and "communications with shareholders".

15.    This summary description is borne out by the terms of the agreement of 20 February 2003. Clause 2.1 of the agreement provides for the Administrator (Citco) to provide "the Services", which are defined in Schedule 2 as including the "calculation of the Net Asset Value and the Net Asset Value per Share on a monthly basis in accordance with the Fund Documents", and "publishing the Net Asset Value per Share (of each class if appropriate) as requested by the Fund." Clause 3.4 provides that "the Administrator shall on behalf of the Fund redeem Shares in accordance with the provisions and procedures set out in the applicable Fund Documents", on receipt of the

Member's written request to redeem and the provision of sufficient moneys to satisfy the Redemption Price.

16.    The management of a mutual fund is bound to involve the communication to Members of a substantial volume of routine documentation, including transactional documentation generated upon redemption. It is common ground that in the Fund's case, this included the following documents:

i)    Citco calculated an estimated NAV weekly and a final NAV on each Valuation Day, i.e. on the last business day of each month. All of these figures were posted by Citco on a password-protected website which it maintained and which was accessible to Members.

ii)    The final NAV per share for the last business day of each month was communicated in about the middle of the following month by the Fairfield Group client desk at Citco by e-mail to all Members. The operative part of the representative e-mail before us reads:

"Please be advised that the final net asset value per share of Fairfield Sentry Limited, Class A, is USD 957.8430 as at December 2003.

Should you have any questions or require further information, please do not hesitate to contact us."

iii)    Upon each redemption, the redeeming Member received from Citco in about the middle of the month following the relevant Valuation Day a contract note recording the transaction. The operative part began:

"In accordance with your instructions, we confirm having REDEEMED the following voting shares from FAIRFIELD SENTRY LIMITED."

There followed the relevant Valuation Day, the number of shares redeemed, the Redemption price per share and the total net redemption proceeds.

iv)    Each Member received from Citco in about the middle of each month a monthly statement of his account. This recorded, among other things, the

opening and closing NAV per share for the previous calendar month, and a summary of activity (if any) over the previous calendar month recording subscriptions and redemptions in the month and the NAV per share corresponding to each one.

Each of these documents is said by the Defendants to be a "certificate" for the purpose of Article 11(1) [c] of the Fund's Articles.

*Restitution*

17.    The availability of a claim for restitution arising out of a transaction governed by the Articles of the Fund is governed by the same law which governs the Articles themselves, namely the law of the British Virgin Islands. In every relevant respect, the principles of the law of the British Virgin Islands governing the construction of the Articles and any associated common law right to restitution are the same as those of English law.

18.    The basic principle is not in dispute. The payee of money "cannot be said to have been unjustly enriched if he was entitled to receive the sum paid to him": *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349 at 408B (Lord Hope). Or, as Professor Burrows has put it in his *Restatement of the English Law of Unjust Enrichment* (2012) at §3(6), "in general, an enrichment is not unjust if the benefit was owed to the defendant by the claimant under a valid contractual, statutory or other legal obligation." Therefore, to the extent that a payment made under a mistake discharges a contractual debt of the payee, it cannot be recovered, unless (which is not suggested) the mistake is such as to avoid the contract: *Barclays Bank Ltd v W.J. Simms Son & Cooke (Southern) Ltd* [1980] QB 677, 695. So far as the payment exceeds the debt properly due, then the payer is in principle entitled to recover the excess.

19.    It follows that the Fund's claim to recover the redemption payments depends on whether it was bound by the redemption terms to make the payments which it did make. That in turn depends on whether the effect of those terms is that the Fund was obliged upon a redemption to pay (i) the true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or (ii) the NAV per share which was determined by the Directors at the time of redemption. If (ii) is correct then, the shares having been surrendered in exchange for the amount properly due under the Articles, the redemption payments are irrecoverable.

*What was the Fund obliged to pay upon redemption*

20.    Mr Crow QC, who appeared for the Fund, invited us to stop at the general principle, and not to answer this question. He submitted that the effect of the contractual

provisions governing redemption was not covered by the preliminary issues and ought to be referred back to the High Court. He also suggested that at a further hearing in the High Court, New York law, which is the proper law of the Subscription Agreement, might be relevant. The Board unhesitatingly rejects these submissions. Neither the Article 11 question nor the Good Consideration question, as formulated in the preliminary issues, can be resolved without deciding what is the effect of the Articles. Both courts below proceeded on that basis. The effect of the Articles is therefore properly before the Board. The Board notes that neither the Fund nor the Defendants have pleaded New York law. Nor can the Board discern any basis on which New York law could be relevant, since none of the questions raised by the preliminary issues depends on the terms of the Subscription Agreement. They depend wholly on the construction of the Articles, which is governed by the law of the British Virgin Islands.

21.    The starting point is the scheme of the Articles. Articles 9 and 10 determine the status of investors as Members of the Fund, a question which ought in principle to be capable of definitive resolution at any moment in the Fund's history. Both the Subscription Price under Article 9 and the Redemption Price under Article 10 depend on the NAV per share determined under Article 11. Article 9(1)(a) provides that the issue of shares "shall be made on the Dealing Day". Article 9(1)(b) provides for the Subscription Price to be determined in accordance with Article 9(2), which means that it is to be the NAV per share "determined in accordance with Article 11". Article 9(1)(c) provides for the Subscription Price to be payable at a time fixed by the Directors, failing which any allotment for which payment is due may be cancelled. There are corresponding provisions of Article 10 concerning redemptions. Article 10(1)(a) provides that the redemption of shares "shall be made on the Dealing Day". Article 10(1)(b) provides that the redemption is to be effected at the Redemption Price determined in accordance with Article 10(2), which means the "Redemption Price for each Share shall be the Net Asset Value per Share (as determined in accordance with Article 11)" on the Dealing Day. Under Article 10(1)(c), that price must be paid as soon as practicable after the Dealing Day, being normally thirty days thereafter subject to specified and limited extensions. These provisions determine the amount due and the time of payment. Moreover, once the NAV per share for a given monthly Valuation Day is ascertained, subscriptions and redemptions effected at the corresponding Subscription and Redemption Price will affect the determination of NAV per share on the following monthly Valuation Day. This is because the receipt of subscription moneys and the payment out of redemption moneys will affect the amount of the Fund's assets for the purpose of Article 11(2). It will be apparent from this summary that the whole of this scheme depends upon the price being definitively ascertained by the Dealing Day and known to the parties shortly thereafter. It is unworkable on any other basis.

22.    The Fund's case is that when Article 10(2) defines the Redemption Price as the NAV per share "determined in accordance with Article 11", it means the NAV correctly determined by dividing the NAV of the Fund by the number of shares in issue in accordance with Articles 11(1)[b], 11(2) and 11(3). If this is right, the same must be

true of Article 9(1)(c), which fixes the Subscription Price by reference to the same provisions of Article 11. The Directors' determination of the NAV per share as at the Valuation Day, under Article 11, was not definitive according to this analysis unless a certificate was issued pursuant to Article 11(1)[c], and that would happen only if the Directors chose to issue one.

23.    In the Board's opinion, this is an impossible construction. If it were correct, an essential term of both the subscription for shares and their redemption, namely the price, would not be definitively ascertained at the time when the transaction took effect, nor at the time when the price fell to be paid. Indeed, it would not be definitively ascertained for an indefinite period after the transaction had ostensibly been completed, because unless a certificate was issued it would always be possible to vary the determination of the NAV per share made by the Directors at the time and substitute a different one based on information acquired long afterwards about the existence or value of the assets. This would not only expose Members who had redeemed their shares to an open-ended liability to repay part of the price received if it subsequently appeared that the assets were worth less than was thought at the time. It would confer on them an open-ended right to recover more (at the expense of other Members) if it later appeared that they were worth more. Corresponding problems would arise out of the retrospective variation of the Subscription Price long after the shares had been allotted.  Indeed, it is difficult to see how the Directors could perform their duty under Article 9(1)(b) not to allot or issue a share at less than the Subscription Price if the latter might depend on information coming to light after the allotment had been made.

24.    If, as the Articles clearly envisage, the Subscription Price and the Redemption Price are to be definitively ascertained at the time of the subscription or redemption, then the NAV per share on which those prices are based must be the one determined by the Directors at the time, whether or not the determination was correctly carried out in accordance with Articles 11(2) and (3). That means either (i) that the Directors' determination at the time must be treated as conclusive whether or not there is a certificate under Article 11(1)[c]; or else (ii) that   Article 11(1)[c] must be read as referring to the ordinary transaction documents recording the NAV per share or the Subscription or Redemption Price which will necessarily be generated and communicated to the Member at the time, and not to some special document issued at the discretion of the Directors. The Board considers, for the reasons given below, that in a case where a provision for certification such as Article 11(1)[c] has been included as part of the mechanics of subscription and redemption, the correct approach is the second one.

*Certification*

25.    The Board has been referred to a number of authorities dealing with certification clauses, none of them analogous to Article 11(1)[c]. Their effect, broadly summarised, is that the word "certificate" has no standard meaning and that the question what

constitutes a certificate is dependent on the commercial or legal context in which the certification clause appears.

26.    The Board was invited by the Fund to read the opening words ("Any certificate") as if they said "A certificate, if any". This, it was argued, showed that there would not necessarily be one in every case. For that reason, and because there is nothing in the language of the Articles which obliged the Fund to issue a certificate, it was submitted that the issue of a certificate was wholly in the discretion of the Directors or their delegates and that it could be withheld for any rational and honest reason. A variant of this argument appears to have been accepted by the Court of Appeal. The Board, however, is unable to accept it. In the first place, it places more weight on the word "Any" than it will bear. It seems more likely that the word was used because the rest of the clause refers to a number of different things that may be certified, namely the NAV per share, the Subscription Price and the Redemption Price. Secondly, the problem about the suggestion that certification is a discretionary matter for the Directors, is that it is impossible to discern what purpose such a discretion could rationally be thought to serve. The sole object of certification is to produce finality, and the scheme of the Articles, as the Board has summarised it above, shows that finality is equally important for all determinations of the NAV per share and all Subscription and Redemption Prices. There is no rational ground for regarding finality as desirable in some cases but not in others, according to the discretionary decision of the Directors or their delegates. Such a discretion, if it existed, could only operate capriciously, and is therefore most unlikely to have been intended by the draftsman.

27.    As a matter of language, a "certificate" ordinarily means (i) a statement in writing, (ii) issued by an authoritative source, which (iii) is communicated by whatever method to a recipient or class of recipients intended to rely on it, and (iv) conveys information, (v) in a form or context which shows that it is intended to be definitive. There is no reason to think that a document must satisfy any further formal requirements, unless its purpose or legal context plainly requires them. There is nothing in the context of these Articles which does.

28.    The relevant categories of document generated in the ordinary course of the Fund's relations with Members are listed at paragraph 16. In the Board's opinion the monthly e-mail, the contract notes and the monthly statement of account are all "certificates". They communicate information in documentary form to Members. It follows that the critical questions in the present case are whether transaction documents in the three categories are (i) issued by an authoritative source and (ii) in a form or context which shows that they are intended to be definitive.

29.    The authoritative character of their source can be shortly dealt with. Documents in all three categories were issued by Citco under the authority of the Directors, conferred by the Administration Agreement. The calculation of the monthly NAV per

share was among the functions of Citco included in Schedule 2, Part 1 of the Agreement. Its publication was a function of Citco under Schedule 2, Part 2(e). The communication to Members seeking to redeem their shares of the monthly NAV per share and the Redemption Price is necessarily implicit in clause 3.4 of the Agreement, which delegates to Citco the duty of redeeming shares in accordance with the "provisions and procedures" set out in the Fund Documents. These authorities are general, and not specific to any particular transaction or category of transactions. If the issue of a "certificate" were an exceptional or discretionary step, something more specific by way of authority might have been required. But for the reasons which the Board has already given, the certification procedure under Article 11(1)[c] is neither exceptional nor discretionary.

30.    Turning to the question whether they were intended to be definitive, the context in which they are issued plainly demonstrates that they were. As the Board has already observed, the nature of a redemption transaction and the procedures set out in Article 10 make it essential that the Redemption Price should be definitively ascertained at the time of the transaction and as at the Valuation Day. In that context, any unqualified documentary statement of the Redemption Price or the NAV per share on which it is based must be intended to be definitive. The Articles could not otherwise operate as they are intended to.

31.    This conclusion is borne out by the language of the documents. The emails formally "advising" the monthly NAV per share to Members describe it in terms as the "final" figure. The contract notes formally "confirm" the redemption and record its terms. The monthly Members' statement constitutes a formal record of each transaction during the month and the NAV per share at which it went through. All of this information was plainly intended to be relied upon by Members as a definitive record of the transaction and the values on which it was based.

32.    The Board prefers to express no opinion on the question whether the statements posted on the Citco website are also "certificates". A statement on a website may well have all the characteristics of a "certificate", but that may depend on a variety of considerations on which the Board has little or no evidence, including the permanence of any statement posted on it and what Members are told about the kind of information which they will find there.

*Conclusion*

The Board will humbly advise Her Majesty that the appeals against the decision of Bannister J and the Court of Appeal on Preliminary Issues 1, 2 and 3 should be allowed, save as to information posted on the Citco website, and that the appeal against their decision on Issue 4 should be dismissed. The parties are invited to agree an appropriate form of declaration on all four issues.