# EXHIBIT C

## Part 2

TAB 24

*Feakins v DEFRA* [2007] BCC 54, English Court of Appeal

**54**

## Feakins v Department for Environment Food and Rural Affairs                                    A

[2005] EWCA Civ 1513
Court of Appeal (Civil Division).
Waller, Jonathan Parker and Moses L.JJ.
Judgment delivered December 9, 2005.                                                               B

> *Transactions defrauding creditors—Transaction at an undervalue—Sale by*
> *mortgagee of farm subject to agricultural tenancy with a view to subsequent*
> *surrender of tenancy and sale with vacant possession—Whether appellant entered*
> *into relevant "transaction"—Whether requirements relating to consideration*
> *satisfied—Whether purpose of transaction to prejudice creditor's interest—Whether*
> *creditor victim of transaction—Whether tenancy should be reinstated—Insolvency*           C
> *Act 1986, ss.423, 424(1)(c).*

This was an appeal against the decision that an arrangement relating to the sale of a
farm constituted a transaction at an undervalue for the purposes of s.423 of the
Insolvency Act 1986.

The first appellant, "F", had bought the farm in 1986 and farmed it along with his then
wife, "S". The business was conducted first through a partnership and later through        D
successive limited companies. From 1992 F and S had been involved in litigation, along
with others, against the Intervention Board for Agricultural Produce ("IBAP") relating
to the validity of payments received pursuant to the sheep premium clawback scheme. In
2000 judgment was given for IBAP against F in the sum of £650,654. In the meantime the
relationship between F and S had broken down and S had commenced divorce
proceedings. The financial negotiations between F and S resulted in a consent order        E
pursuant to which F agreed to pay S £50,000 and to indemnify her against any adverse
judgment in the IBAP litigation and in return S gave up her interest in the farm and in the
farming companies. The mortgage liabilities in respect of the farm in favour of the bank
(NatWest) were transferred into the sole name of F. The farm was then worth some
£1.03 million, subject to NatWest's charge in excess of £400,000. In 1995 F and S had
granted one of the farming companies an agricultural tenancy of the land with the          F
consent of NatWest. IBAP obtained a charging order nisi against the farm in respect of its
judgment debt and interest and NatWest made a formal demand for the repayment of the
moneys owed to it by F.

A case of foot and mouth disease was then diagnosed at the farm and it was declared to
be an infected place by DEFRA which thereafter carried out a lengthy and invasive series
of measures with a view to the eradication of foot and mouth disease from the farm,
including the slaughter and disposal of all the cattle and sheep at the farm and a
consequent cleansing and disinfecting ("C & D") operation at the farm. By that time F     G
had become engaged to his lodger, "H". NatWest agreed to sell the farm subject to the
tenancy to H for £450,000. That sale would overreach IBAP's charge and NatWest would
take the proceeds to satisfy F's indebtedness. The farming company would then
surrender the agricultural tenancy leaving H to sell the farm for £1.03 million with vacant
possession. DEFRA's principal case was that the deliberate engineering by F of a
situation whereby the farm was transferred to H at a subject to tenancy valuation but in
effect with vacant possession and with a view to realising its vacant possession value      H
ostensibly for H's benefit constituted a transaction at an undervalue entered into by F.
The judge found that the tenancy had been maintained by F purely as a device to depress
the value of the farm and to induce NatWest to sell the farm to H at an undervalue. The
judge rejected F's argument that he did not enter into any relevant transaction for the
purposes of s.423 of the Insolvency Act 1986 since the only relevant transactions were the

d

A

A

sale by NatWest as mortgagee and the surrender of the tenancy by the farming company. The judge did not reinstate the tenancy but made an order which had the effect of charging H's freehold interest with the amount previously secured by IBAP's charging order.

B

F and H appealed arguing that F's agreement to introduce H to NatWest as a potential purchaser of the farm subject to the company's tenancy, but with F's commitment in advance to procure a surrender of the tenancy, was not a relevant transaction for the purposes of s.423. In the alternative, they contended that the transaction was not one where any consideration in money or money's worth was provided by F since the surrender of the tenancy was effected not by F but by the company; that F did not enter into the transaction for the purpose of putting assets beyond the reach of DEFRA, or of otherwise prejudicing the interests of DEFRA; and that DEFRA was not a "victim" of the transaction for the purposes of s.424(1)(c). They further contended that, if the judge was otherwise right to grant relief under s.423, his refusal to reinstate the tenancy placed DEFRA in a better position than it was in prior to the sale.

C

*Held*, dismissing the appeal:

1. The judge was clearly right to find that the plan or arrangement which he identified as having been made between F and H was a transaction for the purposes of s.423. The arrangement between F and H, entered into in advance of any sale of the farm, consisted essentially of two elements: the need to persuade NatWest to sell the farm to H at a price reflecting the existence of a continuing agricultural tenancy; and F's commitment to surrender the tenancy following completion of such a sale. In order to achieve the first of those objectives F and H resorted to what was by any standard deceitful conduct. By virtue of s.436 "transaction" included an "arrangement" for the purposes of s.423; and arrangement was, on its natural meaning and in the context of s.423, apt to include an agreement or understanding between parties, whether formal or informal, oral or in writing. The wide definition of transaction in the context of s.423 was entirely consistent with the statutory objective of remedying the avoidance of debts. In the instant case, the transaction under attack was not the sale by NatWest to H but the arrangement between F and H. (Re Brabon [2000] B.C.C. 1,171 distinguished.)

D

E

2. Given F's control of the farming company, his commitment to procure the company to surrender the tenancy was for all practical purposes the equivalent of a commitment by the company itself to do so. The implementation of the agreed transaction led and was intended to lead, through the medium of the sale by NatWest, to the ownership of the farm being transferred from F to H in circumstances where she took it free from encumbrances. In short, the transaction was designed to, and did, have the effect of transferring to her an asset worth approximately £1 million. That was a benefit which only F had the power to provide. That was the consideration provided by F. The consideration obtained by F was the discharge of his indebtedness to NatWest in the sum of £450,000 or thereabouts: a consideration the value of which in money or money's worth was significantly less than the value in money or money's worth of the benefit which H received under the transaction. Accordingly the requirements of s.423(1)(c) were met.

F

G

3. The judge had been entitled to find that the purpose of the transaction was to prejudice DEFRA's interests in relation to the recovery of its judgment debt, and that it accordingly fell within s.423(3) and that DEFRA was a victim of the transaction within s.423(5).

H

4. Unless the tenancy was reinstated and the surrender cancelled DEFRA's position as a secured creditor was, on paper at least, better than it was previously. The judge's order would be varied by reinstating the tenancy.

B

ue—Sale by
> subsequent
illant entered
consideration
est—Whether
—Insolvency

C

ig to the sale of a
of s.423 of the

ong with his then
nd later through
litigation, along
'IBAP") relating
vback scheme. In
the meantime the
amenced divorce
a consent order
inst any adverse
e farm and in the
vour of the bank
hen worth some
995 F and S had
te land with the
n in respect of its
repayment of the

D

t was declared to
id invasive series
from the farm,
the farm and a
. By that time F
m subject to the
l NatWest would
any would then
llion with vacant
rring by F of a
valuation but in
possession value
itered into by F.
ievice to depress
undervalue. The
nsaction for the
actions were the

E

F

G

H

**56**  **Feakins v Department for Environment Food and**  **[2007] B.C.C.**
**Rural Affairs**
(Jonathan Parker L.J.)

The following cases were referred to in the judgment of Jonathan Parker L.J.:    A

*Agricultural Mortgage Corp Plc v Woodward* [1994] B.C.C. 688.
*Brabon, Re* [2000] B.C.C. 1,171.
*Chohan v Saggar* [1994] B.C.C. 134.
*Lloyds Bank Ltd v Marcan* [1973] 1 W.L.R. 1387.
*MC Bacon Ltd, Re* [1990] B.C.C. 78.
*National Westminster Bank Plc v Jones* [2001] EWCA Civ 1541; [2002] 1 B.C.L.C. 55.    B
*Phillips (Liquidator of A J Bekhor & Co) v Brewin Dolphin Bell Lawrie Ltd* [2001] B.C.C.
864; [2001] 1 W.L.R. 143 (HL); [1999] B.C.C. 557; [1999] 1 W.L.R. 2052 (CA).

Nicholas Dowding Q.C. and Stephen Jourdan (instructed by Burges Salmon, Bristol) for the
appellants on the claim and Stephen Jourdan (instructed by Burges Salmon) on the
counterclaim.

Nicholas Caddick and Sarah Lee (instructed by DEFRA Legal Department) for the    C
respondents on the claim.

Neil Garnham Q.C., Sarah Lee, Paul Harris and Sarah Stevens (instructed by DEFRA Legal
Department) for the respondents on the counterclaim.

JUDGMENT

**Jonathan Parker L.J.: Introduction**    D

1. This judgment deals with the claim. The counterclaim is dealt with in the judgments of
my Lords. I agree with those judgments.

2. By its claim, the Department for Environment Food and Rural Affairs ("DEFRA") seeks
relief against the defendants ("KF" and "Miss Hawkins") on the footing that an arrangement
into which they entered in early October 2001 relating to the sale of Hill Farm, Llancloudy,
Herefordshire constituted a transaction at an undervalue for the purposes of s.423 of the    E
Insolvency Act 1986 ("the 1986 Act"). KF and Miss Hawkins deny that the arrangement in
question constituted such a transaction. At trial Hart J. upheld DEFRA's claim, and by his
order dated November 26, 2004 he granted relief accordingly.

**The factual background**

3. The general factual background, which is not in issue, is set out by the judge in paras 2–12    F
of his judgment, as follows:

"2. [DEFRA] is the government department which sues (and is sued) as successor to the
rights (and liabilities) of the Ministry of Food Agriculture and Fisheries ('MAFF') and
the Intervention Board for Agricultural Produce ('IBAP'). It is unnecessary to set out
the steps by which this succession took place. For much of the period with which I am
concerned the relevant body was MAFF rather than Defra. For convenience I refer to    G
Defra as the relevant body throughout.

3. . . . [KF] is a farmer. In 1986 he and his first wife ('Sarah') moved from Wiltshire and
together bought Hill Farm, comprising a sizeable Georgian farmhouse with various
agricultural buildings and farm land of approximately 250 acres in Herefordshire. Their
business, conducted at first in partnership, and later through the medium of a limited
company KA and SBM Feakins Ltd ('the company') in which their eldest child
Matthew was a 10% shareholder, prospered. By 1997 its turnover approached £6m per    H
annum. In 1997, however, the first in what were to be a series of hammer blows of
misfortune struck. One of the company's major customers, the UK Halal Meat
Company ('Halal') failed leaving huge debts owing to the company. Thereafter, the
company ceased to trade, remaining in existence solely for the purpose of seeking to
realise the security which it enjoyed in respect of Halal's indebtedness. The business
was thereafter carried on either by KF and Sarah in partnership, by a new limited

© 2007 Sweet and Maxwell Ltd
bcp2007 bcp  290 Mp  56—bcp23075

290-1-07

[2007] B.C.C.    CA    Feakins v Department for Environment Food and    57
Rural Affairs
(Jonathan Parker L.J.)

L.J.-

1 B.C.L.C. 55.
:ld [2001] B.C.C.
52 (CA).

n, Bristol) for the
Salmon) on the

artment) for the

by DEFRA Legal

the judgments of

"DEFRA") seeks
t an arrangement
arm, Llancloudy,
; of s.423 of the
e arrangement in
:laim, and by his

dge in paras 2-12

s successor to the
es ('MAFF') and
:essary to set out
with which I am
:nience I refer to

om Wiltshire and
use with various
efordshire. Their
lium of a limited
leir eldest child

roached £6m per
ammer blows of
UK Halal Meat
. Thereafter, the
ise of seeking to
ss. The business
y a new limited

company KA & S Feakins & Sons Limited and, as from February 1998, by a further limited company, Garron Livestock Limited ('Garron') which had an outside shareholder Mr S. W. Watkins.

4. From 1992 onwards KF and Sarah had been engaged in litigation in the High Court, along with others, against IBAP relating to the validity of payments received pursuant to what was known as the sheep premium clawback scheme. A reference to the European Court of Justice was one amongst other causes of that litigation becoming protracted. Eventually, however, on 23 June 2000 Mr Justice Kennedy gave judgment for IBAP against KF in the sum of £650,654.

5. In the meantime the relationship between KF and Sarah had broken down. Sarah commenced divorce proceedings against KF in the autumn of 1999. The financial negotiations between them eventually resulted in a Consent Order dated 25th May 2000 pursuant to which KF agreed to pay Sarah £50,000 and to indemnify her against any adverse judgment in the IBAP litigation. In return, Sarah gave up her interest in Hill Farm, in the company and in KA & S Feakins & Sons Ltd. The mortgage liabilities in respect of Hill Farm in favour of National Westminster Bank plc ('NatWest') were transferred into the sole name of KF.

6. By September 2000 Hill Farm with vacant possession seems to have been worth some £1.03m, subject to NatWest's charge of in excess of £400,000. KF was hoping that an appeal against the judgment of Kennedy J would either extinguish or substantially reduce his liability thereunder. His plan, however, at this stage seems to have been to sell Hill Farm. He found potential purchasers at a price of £1.03m in the persons of a married couple, Mr Nechvatal and Ms Cloud ('the Nechvatals'), who were looking to retire from their respective careers in the financial sector and take up organic farming. They were able to agree terms subject to contract. KF was not, however, in a position to enter into a contract with the Nechvatals. On 22nd September 2000 IBAP obtained a charging order nisi against Hill Farm in respect of its judgment debt and interest. Thereafter KF's hopes of realising anything for himself from a sale rested either on his appeal being successful, or on his reaching some compromise with IBAP, or on finding a way of selling the farm free from the IBAP charge while leaving the net proceeds in friendly hands.

7. We do not know what advice KF had received as to his prospects on appeal. If the position had in fact appeared to him as bad as it turned out to be (the appeal was dismissed in October of the following year) his position was indeed bleak. On 14th November 2000 NatWest made formal demand for the £202,832.51 owed to it by KF and for the £230,000 owed by the company and guaranteed by KF. The only potential string to his bow lay in the fact that KF and Sarah had, on 6th March 1995, granted the company an agricultural tenancy of the land at Hill Farm, and had done so with the consent of NatWest. Through a recently instructed firm of solicitors The Robert Davies Partnership ('RDP') he invited IBAP, by a letter dated 15th November 2000, to consider the consequences if the bank were to sell subject to the tenancy (which would leave IBAP with nothing), and to interest them in the proposition that, if he were to procure a sale with vacant possession, the net proceeds might be split between IBAP and KF. Nothing came of this.

8. On 26th February 2001 a case of foot and mouth disease ('FMD') was diagnosed at Hill Farm. This was one of the earliest cases diagnosed in what was to prove to be the catastrophic epidemic which engulfed much of the country in the following months. One amongst many consequences which flowed from this was to throw KF into a closer association with the second defendant, Georgina Hawkins ('Miss Hawkins'). Miss Hawkins had rented stabling and grazing at the farm for her horses (it is not clear from whom, whether Garron, KF or the company) from late 1999, and rooms in the

ind Maxwell Ltd
290 Mp  56—bop23075

farmhouse for herself from January 2000. By May 2001 they had become engaged, and    A
they married on July 25th that year.

9. Another consequence was that Hill Farm was declared to be an 'Infected Place' ('IP')
by Defra, and was thereafter subjected to a lengthy, and invasive, series of measures
undertaken by Defra with a view to the eradication of FMD at the farm. This involved,
inter alia, the slaughter and disposal of all the cattle and sheep at the farm and a
consequent cleansing and disinfecting (C&D) operation at the farm.    B

10. By the end of July 2001 a plan was in place for the realisation of Hill Farm. NatWest
was to sell as mortgagee to Miss Hawkins subject to the tenancy for a price of
£450,000.00. That sale would overreach IBAP's charge, and NatWest would swallow
the proceeds under its charge. The company would then surrender the tenancy, leaving
Miss Hawkins free to sell with vacant possession to the Nechvatals for £1.03m. This
plan was then implemented. On 2nd October 2001 NatWest exchanged contracts to sell    C
the property subject to the tenancy to Miss Hawkins for £450,000.00. That contract was
completed the following day with money borrowed by Miss Hawkins from KF's brother
Robin Feakins. Miss Hawkins then entered into a contract to sell to the Nechvatals for
£1.03m, a deposit of £103,000 being paid, with completion fixed for 30th November
2001. KF and Miss Hawkins then left the country for a four week holiday in Australia.

11. While the couple were still in Australia, Defra learned of the cancellation of its
charge. On their return the couple had to face three unpleasant developments. The first    D
was the receipt of a report ('the Fieldfare report') into the environmental consequences
of the operations undertaken by Defra on Hill Farm consequent on the FMD outbreak.
The second was that the appeal against IBAP's judgment had been dismissed. The third
was a freezing injunction granted on Defra's application by Gross J on 21st November
2001 (and continued by Penry Davey J on 4th December 2001).

12. Disclosure of the Fieldfare report to the Nechvatals led to the latter refusing to    E
complete and claiming a return of their deposit. Proceedings have subsequently been
started by the Nechvatals which are due to be heard later this year."

4. In para.28 of his judgment the judge described the tenancy as "an extremely fragile
interest". He continued:

"The financial state of the company . . . meant that it was in no position to insist that it be
kept alive for any appreciable period should the freeholder for the time being desire its    F
termination. The only circumstance in which the tenancy potentially had an exploitable
value as an asset of the company was one where the freeholder was contemplating a sale
with vacant possession, and needed to be able to secure a surrender for the purpose of
being able to give vacant possession. . . . Maintaining the existence of the tenancy in the
context of the subsequent sale by NatWest was not done with a view to preserving an
asset of the company but solely with a view to enticing NatWest to dispose of the
property to Miss Hawkins at an undervalue."    G

5. In paras 29–38 of his judgment the judge recorded the events leading to the sale by
NatWest, as follows:

"29. . . . On 21st February 2001 KF had retained the services of a Mr Lovell, of Charles
Lovell & Co, chartered accountants. In March 2001 he had a meeting with Mr Lovell at
RDP's offices at which Mr Lovell suggested that he seek the advice of insolvency
specialists Poppleton & Appleby. It appears to have been Mr Terry Gumbley of the    H
latter firm who suggested that the way forward was to propose to the bank that it should
appoint him or his partner as LPA receivers to sell the property. The idea at this stage
seems to have been that a 'friendly' LPA receiver might sell the farm to Miss Hawkins
subject to the tenancy, and that the family would either continue to farm it under the
tenancy, or Miss Hawkins would sell it with vacant possession. There is an issue (to

290-1-07

[2007] B.C.C.

CA

Feakins v Department for Environment Food and
Rural Effairs
(Jonathan Parker L.J.)

**59**

which I return below) as to whether a sale to the Nechvatals continued at this time to be a realistic possibility.

30. The proposal that the bank should appoint LPA receivers was put to Mr Dicks of NatWest (by that time in new ownership so that Mr Dicks was in fact an employee of Royal Bank of Scotland) at a meeting in late April or early May 2001, but he rejected it. He indicated that the bank would sell on the basis of two independent valuations from local valuers. He also indicated that, provided the valuations supported the sale price, it would not matter if the purchaser was a relative ('say, an aunty') of K.F.

31. On 15th May 2001 KF wrote to Mr Dicks reiterating the proposal that NatWest should appoint an LPA receiver in the following terms:

'Further to our meeting, I am writing to you to set out our reasons for disposing of the farm via the use of an LPA receiver, and in particular, Poppleton & Appleby. These are as follows:

1. Due to outbreak of foot and mouth, several farms in the area will be coming up for sale. I consider that it is important to achieve a sale quickly, as prices will probably be affected by the glut of sales.

2. At present, the indications are that the value of the farm will settle the bank, pay the receivers and leave a small excess for the Intervention Board, about which you are aware.

3. Currently, there is a buyer available, who will leave the tenancy in place, which will leave me earning a living, which is important to me.

4. Such is our relationship with Poppleton and Appleby, we have confidence that they will deal with the transaction to the satisfaction of all parties, while avoiding any potential adverse publicity to the bank.

I look forward to hearing from you as soon as possible.'

32. On 8th June 2001 KF, by now appreciating that NatWest was not going to appoint LPA receivers, wrote again to Mr Dicks a letter which included the following passages:

'When we visited your office four weeks ago it was to suggest a way of paying off the bank debt and also to leave my family and myself here as a tenant still with a viable business. As I explained to you there is a potential customer who has taken a liking to the farm, actually at present running a few horses here. They are interested in buying Hill Farm subject to the tenancy remaining in the company name and are happy to let us carry on living at Hill Farm renting the bulk of the land leaving them access to a small area of land and stables. I think I did write and inform Ian Cook of this very early on in the year.

Undue nationwide publicity at this stage, when our business is owed considerable money for our stock slaughtered here and in France because of the FMD, could spell the demise of our business as well as bringing unwanted publicity to the bank.

My legal advice from my family solicitor in Salisbury has been that the bank are able to sell under its mortgage by using at least two valuers who would put a correct valuation on the property for the bank taking into account the company tenancy and the remaining problems surrounding the FMD outbreak around here. The bank could then use these values to give instruction to a solicitor to sell to the interested party at what would then be the correct market price.

Two valuers of excellent reputation who did the valuation of Hill Farm for my divorce were Mr Gwyn Williams of Williams Parry Richards, Ross on Wye and Mr Robert Parry of G Herbert Banks, Worcester. Both know the farm intimately and could value the property again on behalf of the bank without falling foul of these (schedule A) FMD restriction, stopping people coming on to the farm. Robert Davies

of Robert Davies Partnership whom as you know I used for the past year to try to sell     A
Hill Farm without success, is a very competent solicitor. At present I understand he
has the deeds and has done all necessary searches on the property and again with his
knowledge of the farm could work for the bank probably a lot cheaper and a lot faster
than another firm of solicitors who would have to start from scratch

... I am mindful that when we advertised the farm nationally one year ago at
considerable expense before the problems with the FMD we only found one     B
customer whom as you know we have lost. I think we have been lucky to find a
person who has stayed interested and would be prepared to purchase Hill Farm and
effectively relieve RBS of the debt and I do not want to lose this client. All I want to
do is get the bank cleared secure a home and a future for my family by keeping our
business going and would only ask that we move towards this end as soon as is
practically possible. Several valuable weeks have already passed by since I first
came to Birmingham and we are aware that other properties are coming onto the     C
market most of which do not have any restrictive problems with FMD.'

33. On 14th June 2001, Mr Dicks wrote to KF. He said that he had instructed Hammond
Suddards Edge ('HSE') to act for the bank (thus rejecting KF's suggestion that RDP
should act) and would arrange valuations on a tenanted basis and then proceed with the
sale. On 15th June 2001, HSE wrote to D1 setting out the procedure that the bank
proposed to take, saying that the bank would sell pursuant to the power for sale to a     D
purchaser to be introduced by KF. It was envisaged that the farm would be sold subject
to an existing tenancy, but the letter reserved the bank's position as to whether any
existing tenancy bound it.

34. By a letter dated 25th June 2001 Miss Hawkins then introduced herself to HSE 'as
the client who is prepared to purchase Hill Farm', informing them that she proposed to
use RDP as her solicitors, and saying:

'I am prepared to purchase Hill Farm with the tenancy staying in place so that     E
Mr Feakins can continue running his business from there. I have had the benefit of
knowing the farm and its problems for some time now and have taken advice on the
price that I shall offer. I am prepared to pay £450,000 for Hill Farm as it stands today.
That price reflects on the company tenancy that exists on the farm and the problems
with the Foot & Mouth disease. That money is available without the necessity of
having to sell any properties'     F

35. It is far from clear that at that date Miss Hawkins did have the necessary money
available. What is clear is that at least from a date very shortly afterwards what was in
contemplation by KF and Miss Hawkins was that the purchase from NatWest would be
followed by a sale by her to the Nechvatals: a manuscript note addressed by KF to RDP,
made on a letter dated 3rd July from HSE to KF, instructed RDP that

'you will need to draw up a legal document for [the company] to give up the tenancy     G
when you sell from [Miss Hawkins] to [the Nechvatals].'

Moreover, in the course of July, in connection with Miss Hawkins' (in the event
unsuccessful) attempts to obtain bridging finance from Barclays, RDP was able to
confirm to Barclays that the purchase and sale would be simultaneous. It is further clear
(from correspondence between RDP and the Nechvatals' solicitors Shawcross & Co in
August and September) that the contemplation throughout was that the tenancy would
be surrendered immediately following Miss Hawkins' purchase in anticipation of the     H
completion of the sale with vacant possession to the Nechvatals.

36. Two valuations of Hill Farm were then obtained by NatWest on the basis that an
agricultural tenancy was in place. G Herbert Banks submitted a valuation on 10th July
2001 valuing the property (but not the house) subject to an agricultural tenancy at
£516,000. The valuation made favourable comments about the repair and condition of

[2007] B.C.C.

the property. The valuer concluded that the property would 'attract a reasonable level of interest if placed on the open market', that inquiries for such properties were forthcoming on a regular basis, and that it would take no more than four months of marketing to achieve the best prices. G Herbert Banks sent a revised valuation to Mr Dicks at the bank on 13th July 2001 on the basis that the farmhouse was included within the agricultural tenancy, lowering the value to £455,000.

37. Williams Parry Richards submitted a valuation on 11 July 2001. The value placed on the property by Mr (Gwyn) Williams subject to the tenancy was £450,000.

38. The bank appears to have relied on these valuations in entering into the contract of sale to Miss Hawkins on 2nd October 2001 for £450,000 subject to the tenancy, which sale was completed on the following day. In the event she was able to do so, as a result of a loan made to her by Robin Feakins on commercial terms. Miss Hawkins exchanged contracts on the same day (3rd October) for the sale of the farm with vacant possession to the Nechvatals for £1.03m. For a stated consideration of £1 the company (acting by KF's daughters who had by this time been appointed directors) then (on 5th October) surrendered the tenancy, thus putting Miss Hawkins in a position to complete her sale to the Nechvatals."

### The 1986 Act

6. Section 423 provides as follows (so far as material):

"(1) This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another person if- …

(c)    he enters into a transaction with the other for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.

(2) Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for-

(a)    restoring the position, … and

(b)    protecting the interests of persons who are victims of the transaction.

(3) In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purpose-

(a)    of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or

(b)    of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.

(4) …

(5) In relation to a transaction at an undervalue, references here and below to a victim of the transaction are to a person who is, or is capable of being, prejudiced by it…"

7. Section 436 provides that, save where the context otherwise requires (and subject to an immaterial qualification), the word "transaction" where used in the 1986 Act "includes a gift, agreement or arrangement".

8. Section 424(1)(c) provides that an application for an order under s.423 may be made in three cases, one of which is "by a victim of the transaction". Section 423(5) provides that references to "a victim of the transaction" are references to "a person who is, or is capable of being, prejudiced by it".

9. Section 425(1) sets out, without prejudice to the generality of s.423, various orders which the court may make under the latter section. Section 425(2) provides that an order under s.423 may affect the property of any person, whether or not he is the person with whom the debtor

and Maxwell Ltd
  290 Mp  60—bcp23075

**British Company Cases**

**62**  |  **Feakins v Department for Environment Food and Rural Affairs**  |  **[2007] B.C.C.**

(Jonathan Parker L.J.)

entered into the transaction, but subject to a proviso protecting interests in property acquired    A
otherwise than from the debtor in good faith, for value and without notice of the circumstances
by virtue of which an order under s.423 may be made.

**DEFRA's case**

    10. DEFRA's principal case (as formulated by the judge in para.16 of his judgment) is that:

> "... the deliberate engineering by KF of a situation whereby Hill Farm was transferred    B
> to Miss Hawkins at a 'subject to tenancy' valuation but in fact with vacant possession
> and with a view to realising its vacant possession value ostensibly for Miss Hawkins'
> benefit, constituted a transaction at an undervalue entered into by KF."

    11. By its amended particulars of claim DEFRA alleged that the tenancy was a sham from
its inception. However, it did not pursue that contention before the judge, contending instead
that, although not a sham from its inception, by October 2001 it had become a sham. In    C
paragraph 28 of his judgment the judge rejected that contention.

    12. By a respondent's notice DEFRA repeated its contention that by October 2001 the
tenancy agreement had become a sham, but before us Mr Nicholas Caddick (appearing for
DEFRA on the claim, leading Miss Sarah Lee) elected not to pursue that contention.
Accordingly no issue of sham is raised on this appeal.

**The judge's judgment**    D

*(i) The judge's findings*

    13. In para.26 of his judgment the judge found that the tenancy was maintained by KF
purely as a device to depress the value of Hill Farm and to induce NatWest to sell the farm to
Miss Hawkins at an undervalue. He in effect repeated this finding in the last sentence of
para.28 of his judgment (quoted in para.4 above).    E

    14. In para.39 of his judgment the judge observed that it was clear "that KF was prepared to
lie if necessary to in order to persuade the bank to sell to Miss Hawkins, failing to reveal in his
letter dated 25th June that the 'potential customer' was soon to be his wife, and claiming
falsely that the property had been expensively marketed in the previous autumn". The judge
went on to say that there were also substantial reasons to doubt whether by that time there was
any real intention that he and his family should continue to farm the land. He concluded para.39    F
by saying:

> "I think it more probable than not that both KF and Miss Hawkins were of a mind by
> 25th June 2001 that a sale to the Nechvatals was very much on the cards."

    15. The judge continued (in para.40 of his judgment):

> "That said the fact remains that it was the bank which made its own decision to sell to
> Miss Hawkins subject to the tenancy. That sale suited KF and Miss Hawkins very well:
> there can be no doubt that their purpose was to get Hill Farm into Miss Hawkins' name,    G
> out of the reach of DEFRA as a secured creditor of KF, and to enable the vacant
> possession value to be realised in Miss Hawkins' hands."

    16. In paras 47 and 48 of his judgment the judge made findings of fact in relation to the
ownership and control of the company, as follows:

> "47. Following the conclusion of his divorce proceedings against Sarah in June 2000 the    H
> shareholdings in the company were held as to 90% by KF and as to the remaining 10%
> by his son Matthew. By that date it was (as it had been since 1997) hopelessly insolvent.
> Its balance sheet as at 31st March 2000 (not in fact signed off until 10th January 2001)
> showed current assets of £228,508 and creditors of £648,199. Of those creditors some
> £225,000 consisted of indebtedness to NatWest secured by KF's guarantee. The assets
> represented the amount owed by KF to the company following the transfer to him of its

© 2007 Sweet and Maxwell Ltd
bcp2007 bcp    290 Mp    62--bcp23075

[2007] B.C.C.

**CA**    Feakins v Department for Environment Food and
Rural Affairs
(Jonathan Parker L.J.)    **63**

property acquired    A        A    assets and stock in the year ended 31st March 1998. The shares in the company were
the circumstances                accordingly plainly worthless.

48. At some point prior to 1st August 2001, KF appears to have transferred his
shareholding in the company to his daughters Kathleen and Charlotte, both of whom
were then students. It is not clear when the shares were transferred, or why. As to the
judgment) is that:                timing, no share transfers have been disclosed. The only evidence consists of an Annual
n was transferred    B        B    Return form apparently signed on 1st August 2001 recording 40 shares as having been
vacant possession                transferred to Charlotte and 50 to Kathleen on 1st September 2000. It seems doubtful
r Miss Hawkins'                  however whether that return was ever made in the form in which it has been produced to
                                  me, since the form supplied by Companies House for completion the following year
                                  continued to show KF as holding 90 shares. However that may be the case before me has
was a sham from                   proceeded on the footing that the shares had been transferred by 1st August 2001. The
ontending instead                 exact date is not important save insofar as establishing it may assist in tracing the
come a sham. In      C        C    evolution of KF's thinking, and the advice which he received, in relation to a possible
                                  transfer of Hill Farm subject to the tenancy enjoyed by company. KF himself admits to
October 2001 the                  have been considering various options in relation to this in the autumn of 2000, as indeed
ck (appearing for                 must be the case having regard to the letter sent to IBAP on 15th November 2000. It
that contention.                  seems probable that it was at this stage that it seemed expedient for KF to transfer the
                                  shares in the company to the daughters, and possible that he had already done so by the
                     D        D    time the letter dated 15th November 2000 came to be written: that would explain why in
                                  that letter RDP describe the tenant company as 'effectively controlled' by KF.
                                  Mr Lovell gave some evidence, not altogether satisfactory, as to having been instructed
                                  in the following year to provide share transfers, but the explanation for that may have
                                  been (as he himself suggested) that there was uncertainty as to whether the previous
naintained by KF                  accountants (Martin & Co.) had completed the documentation."
to sell the farm to
: last sentence of
                     E        E    *(ii) The judge's conclusions on the issues of law*

                                  17. Three issues of law were raised before the judge. The first was the allegation that the
F was prepared to                 tenancy was (alternatively had become) a sham. For reasons given earlier (see paras 11 and 12
ng to reveal in his               above), I need not consider that issue further. The second was what the judge described as "the
ife, and claiming                 mortgagee point": viz. that KF did not enter into any "transaction" for the purposes of s.423
turn". The judge                  since the only relevant transaction for those purposes was the sale by NatWest as mortgagee.
nat time there was                The third was what the judge described as "the company point": viz. that the surrender of the
concluded para.39    F        F    tenancy was effected not by KF but by the company.

vere of a mind by                 (a) The mortgagee point
ards."
                                  18. After setting out the relevant facts, as found or admitted, the judge turned to the
decision to sell to               submission of Mr Stephen Jourdan (for KF and Miss Hawkins), relying on my decision in
awkins very well:    G        G    *Re Brabon* [2000] B.C.C. 1,171, to the effect that the relevant transaction in the instant case
s Hawkins' name,                  was the sale by NatWest as mortgagee, to which KF was not a party and into which he could not
enable the vacant                 be said to have entered.

in relation to the                19. In *Brabon* the debtor contracted to sell land to a third party developer, Silver. Between
                                  contract and completion, the debtor was made bankrupt. His wife, who already held legal
                                  charges over part of the land, took a transfer of a charge over the remainder of the land from
h in June 2000 the                Nationwide Building Society and completed the contract by transferring the entirety of the land
ie remaining 10%     H        H    to Silver in exercise of her power of sale as mortgagee. It was contended that, for the purposes
ielessly insolvent.               of s.423, the sale by the debtor's wife as mortgagee to Silver was a sale at an undervalue which
Oth January 2001)                 had been entered into by the debtor. I rejected that contention, holding (at p. 1,190A) that the
se creditors some                 sale by the debtor's wife as mortgagee could not be dismissed as "conveyancing mechanics",
rantee. The assets                and that the transfers by the debtor's wife effectively superseded the contract.
nsfer to him of its
                                  20. In para.42 of his judgment the judge accepted the submission of Miss Lee (for DEFRA)
**and Maxwell Ltd**               that *Brabon* is distinguishable from the instant case in that the only "transaction" under attack
p  290 Mp  62--bcp23075

                                  **British Company Cases**

**64**       **Feakins v Department for Environment Food and**       **[2007] B.C.C.**
                          **Rural Affairs**
                       (Jonathan Parker L.J.)

in *Brabon* was the sale by the mortgagee, and that that transaction was not calculated to confer   A
a benefit on the debtor.

21. Accepting that the court should not look to narrow the wide statutory definition of
"transaction", the judge went on to pose the question whether, in the instant case, KF could be
said to have "enter[ed] into" a "transaction" for the purposes of s.423. In para.44 of his
judgment he said:

> "The answer, in my judgment, is that it is permissible as a matter of statutory   B
> construction, and entirely consonant with the purpose of the section, to read 'enter into a
> transaction' as 'participate in an arrangement', and to ask whether KF participated in the
> arrangement. That was not a question which had to be addressed in *Re Brabon*. The
> 'arrangement' here whereby the asset was transferred at an undervalue consisted, in my
> judgment, of an agreement between KF and Miss Hawkins whereby they agreed that KF
> would introduce Miss Hawkins to NatWest as a potential purchaser subject to the
> tenancy but with KF's commitment in advance to procure a surrender of the tenancy if   C
> and when NatWest took the bait. Miss Hawkins' ability to purchase from NatWest was
> dependent on the existence of that prior commitment (since the only finance available to
> her was finance premised on a subsequent sale with vacant possession to the
> Nechvatals), and fulfilment of that prior commitment was the means by which value in
> excess of the £450,000 paid by her was effectively gifted to her. If that is the correct
> identification of the 'arrangement', then, subject to what there may be in the 'company   D
> point', I do not think that there is any difficulty in saying that KF participated in it: his
> ability to commit in advance to, and subsequently to procure, a surrender of the tenancy
> was central to it."

22. In reaching that conclusion, the judge rejected two submissions made by Mr Jourdan.
He explained his reasons for doing so in para.45 of his judgment, as follows:

> "Mr Jourdan submitted that no such analysis of the transactions was possible. He   E
> submitted, first, that only two transactions could be identified, namely the sale by
> NatWest to Miss Hawkins and the surrender by the company of the tenancy to
> Miss Hawkins, secondly that KF was not a party to either of them, and, thirdly, that in
> any event it was not permissible to treat them together as one transaction for the
> purposes of applying section 423. As to the first two submissions I have already
> indicated why I regard the relevant arrangement as having encompassed more than the   F
> two individual transactions, and the way in which KF participated in that arrangement.
> In support of the third proposition Mr Jourdan sought support from the decision of the
> Court of Appeal in *National Westminster Bank v Jones* [2001] EWCA Civ 1541, [2002]
> 1 BCLC 55 ['*Jones*']. In that case, farmers were advised to incorporate a company, and
> then grant a tenancy and transfer the farming assets to the company, in order to try and
> prevent the bank from obtaining possession of the farm. They followed that advice. The
> company was incorporated with the shares beneficially owned by the farmers. Two   G
> weeks later a tenancy was granted to the company and the farming assets sold to it. The
> bank applied to set aside the tenancy and sale under section 423. The farmers argued that
> the incorporation of the company and the tenancy and sale were a single transaction. As
> they owned the shares in the company, if the tenancy or sale were at an undervalue, the
> effect would be to increase the value of the shares, so that overall, the value of the
> consideration received by them was not significantly less than the value of the tenancy   H
> and assets to the company. Thus (so the argument ran) there was, looking at the matter in
> the round, no 'transaction at an undervalue'. At first instance Neuberger J rejected that
> argument, holding that the acquisition of the company could not be said to be 'part of the
> "transaction" under consideration in the present case...not least because it was entered
> into between the defendants and third parties and related to the company as the subject
> matter of that transaction' (see [2001] 1 BCLC 98 at para 72). His decision was upheld

| | |
|---|---|
| ılculated to confer | A |
| ıtory definition of case, KF could be In para.44 of his | |
| atter of statutory ɔ read 'enter into a participated in the ı *Re Brabon*. The e consisted, in my ley agreed that KF ser subject to the r of the tenancy if rom NatWest was nance available to ɔossession to the by which value in that is the correct e in the 'company ticipated in it: his der of the tenancy | B |
| le by Mr Jourdan. ʹs: | C |
| was possible. He mely the sale by f the tenancy to nd, thirdly, that in ansaction for the is I have already sed more than the that arrangement. be decision of the Civ 1541, [2002] e a company, and in order to try and d that advice. The the farmers. Two sets sold to it. The ınners argued that ;le transaction. As ın undervalue, the , the value of the lue of the tenancy ng at the matter in ger J rejected that d to be 'part of the use it was entered any as the subject ∶ision was upheld | D, E, F, G, H |
| and Maxwell Ltd p 290 Mp 84—bcp2307S | |

290-1-07

in the Court of Appeal, but on the simpler basis that it was the sale and the tenancy which had been entered into by the defendants for the purposes of putting assets beyond the reach of the bank, and they were therefore the relevant transactions to be considered (see paragraph 26 of the Court of Appeal judgment). Nothing in the case can be read as authority for the proposition that it is impossible under section 423 to regard two or more linked transactions as one. On the contrary, if the reason behind the linkage of two or more individual transactions is to achieve by that means the object which the section is designed to frustrate, that may itself in my judgment be a justification for treating them as one composite arrangement for the purposes of the section."

**(b) The company point**

23. The judge addressed the company point in paras 49–52 of his judgment, as follows:

"49. Given the insolvency of the company, I cannot see that there was any purpose in transferring the shares to the daughters except as part of a scheme to insulate the company from any association with KF (who faced bankruptcy) and to enable the company to assert the apparent tenancy at an appropriate moment as against both himself (as owner of Hill Farm) and NatWest (as a mortgagee bound by the tenancy) and thereafter, having achieved the purpose of a sale to Miss Hawkins, to surrender it.

50. As already indicated (see paragraph 28 above) the only way in which the company could, if at all, benefit from the existence of the tenancy was by cooperating with the vendor of the freehold of Hill Farm in realising the vacant possession price in exchange for a share of the marriage value, but this was never perceived as in fact being an asset of any significant value to the company. The reality is that the tenancy was throughout treated by KF as an asset disposable of by him for his own (and in the final play for Miss Hawkins') benefit.

51. I heard evidence from both Kathleen (by video link from Australia where she now works as a portfolio manager) and from Charlotte who is a beauty therapist. Neither could remember much about why the shares had been transferred to them or when. Nor did either of them have a satisfactory explanation as to why they were appointed directors of the company on 1st August 2001, how they came to be described as farmers in the annual returns, or what their thinking had been, as directors, in relation to the surrender of the tenancy in favour of their recently acquired stepmother for a consideration of £1 on 5th October 2001. It is as plain as can be that their role in all these matters was simply to do their father's bidding, a role which they dutifully performed. They cannot be criticised for any lack of filial loyalty.

52. Accordingly, I have no difficulty in holding that it was KF who procured the company to execute the surrender."

*(iii) The judge's summary of his conclusions*

24. The judge summarised his conclusions on the claim in para.57 of his judgment, as follows:

"In my judgment DEFRA's claim under section 423 succeeds and it is entitled to an order which restores its position to what it would have been had the transaction not been entered into. As at present advised, an order which has the effect of charging Miss Hawkins' freehold interest with the amount previously secured by IBAP's charging order would appear to be the correct solution: I understand that it is common ground between the parties that Robin Feakins' charge would have priority in that event. It may, however, be argued that some other order would be more appropriate and I will hear further argument on this. In that connection I am open to persuasion that an order should also seek to reverse that part of the arrangement which consisted of the surrender by the company: amongst the consequences of so ordering would be to enable the

creditors of the company to derive what advantage they might be able to negotiate from    A
the technical existence of the tenancy and to claim any user damages in respect of
trespasses by DEFRA during the intervening period."

### The judge's supplemental judgment

25. After handing down his judgment, the judge heard further argument pursuant to the
invitation which he had extended in para.57 of that judgment (quoted in para.24 above).    B

26. Counsel for the company submitted that in granting relief under s.423 the court ought to
reinstate the tenancy, since unless that were done DEFRA would be unjustly enriched at the
company's expense. The judge ruled on this submission in a short supplemental judgment, in
paras 5–7 of which he said:

"5. In my judgment it is not necessary under section 423, when the Court is considering
the form of the order to make for 'restoring the position to what it would have been if the
transaction had not been entered into and protecting the interests of persons who are    C
victims of the transaction' that the order should seek to replicate the precise position
which would have existed but for the impugned arrangements. The principal purpose of
the section is to adjust the position as between the parties to the transaction, and the
parties to the transaction, for the purposes of this action, were the defendants, and the
victim was DEFRA.

6. To the extent that the company played a role in those arrangements, it was the entirely    D
voluntary role by which it surrendered its tenancy for £1. If the directors of the company
perceived that at that time to be in the best interests of the company, then there is no
reason to suppose that it does not remain a transaction which was a good idea from the
point of view of the company. If, on the other hand the directors of the company were not
considering the interests of the company at all in executing the surrender, but were
simply to confer a benefit out of company assets on Miss Hawkins, then it does not seem    E
to me to lie in the mouth of the company under the control, still, of the same directors,
now to come to Court and seek to take advantage of their own abuse of powers to restore
the company's position.

7. If, as a result of all that, the unsecured creditors of this insolvent company have
suffered damage as a result of the voluntary actions of the board of the company, those
creditors may, in due course, in another forum, have their remedy in respect of that. But,
having reflected on the matter, and having had the benefit of further submissions, it does    F
not seem to me to be the right, as part of my order, to resurrect the tenancy."

### The relief granted

27. The judge's order contains the following recital:

"AND UPON the court having held that the arrangement, in which [KF] participated, by
which Hill Farm was transferred to [Miss Hawkins] for a consideration of £450,000 was    G
a transaction at an undervalue for the purpose of putting assets beyond the reach of
[DEFRA], being a person who was making a claim against [KF] within the meaning of
section 423 of [the 1986 Act]."

28. Paragraph 1 in the body of the order contains a number of definitions. Those which
relate to the claim are self-explanatory save for the expression "the Robin Feakins Charge",
which is defined as "the charge by way of legal mortgage of Hill Farm dated 13 August 2003    H
and made by [Miss Hawkins] to Robin Feakins pursuant to the Order herein dated 31 July
2003".

29. Paragraphs 2, 3 and 4 in the body of the order are in the following terms:

"2. It is ordered that [Miss Hawkins] beneficial interest in Hill Farm shall stand charged
with the payment of the sums which [KF] was liable to pay to the Intervention Board for

290-1-07

CA                    Feakins v Department for Environment Food and                67
Rural Affairs
(Jonathan Parker L.J.)

A

Agricultural Produce, and is now liable to pay to the Claimant, under the judgment of the
High Court entered in Claim No. 1992 F No. 0165 against [KF] by Mr Justice Kennedy
on 23 June 2000 consisting of the principal sum of £650,645.68 and the costs of
£10,000.00, less the sum of £16,500 received by the Intervention Board for Agricultural
Produce or the Claimant from Sarah Feakins in February 2002, together with interest
thereon pursuant to the Judgments Act 1838 at 8% per annum.

B

3. The charge created in paragraph 2 above is to rank behind the Robin Feakins Charge,
but not behind any other interest in Hill Farm whatsoever.

4. The surrender of the Tenancy by the Company to [Miss Hawkins] on 5 October 2001
is not to be set aside."

30. By para.15 of his order the judge ordered KF and Miss Hawkins to pay DEFRA's costs
of the claim (subject to a set-off in respect of the costs of an earlier order). By para.20 of his
C    order he granted KF and Miss Hawkins permission to appeal in respect of the claim.

**The grounds of appeal**

31. By their grounds of appeal against the judge's order on the claim, KF and Miss Hawkins
contend primarily that KF's agreement to introduce Miss Hawkins to NatWest as a potential
purchaser of Hill Farm subject to the company's tenancy (but with KF's commitment in
D    advance to procure a surrender of the tenancy)—an agreement which they call "the
introduction agreement"—was not a relevant "transaction" for the purposes of s.423.

32. In the alternative, that is to say if "the introduction agreement" was a relevant
"transaction" for the purposes of s.423, they contend that it was not one where any
consideration of value in money or money's worth was provided by KF since the surrender of
the tenancy was effected not by KF but by the company; that KF did not enter into the
E    "introduction agreement" for the purpose of putting assets beyond the reach of DEFRA, or of
otherwise prejudicing the interests of DEFRA; and that DEFRA was not a "*victim*" of the
transaction for the purposes of s.424(1)(c).

33. They further contend that, if the judge was otherwise right to grant relief under s.423, his
refusal to reinstate the tenancy placed DEFRA in a better position than it was in prior to the
sale.

F

**The arguments on the appeal**

*(i) The arguments for the defendants*

34. Mr Nicholas Dowding Q.C. (appearing for KF and Miss Hawkins on the claim, leading
Mr Jourdan) submits that there were only two transactions in the instant case: the sale by
G    NatWest as mortgagee to Miss Hawkins, and the surrender of the tenancy, neither of which
was entered into by KF. In support of that submission he relies (as did Mr Jourdan below) on
*Brabon*. He submits that *Brabon* cannot be distinguished from the instant case on the basis that
the purchaser in *Brabon* was a bona fide purchaser (in the sense of an independent third party
purchaser), or that the transaction in *Brabon* was not calculated to confer a benefit on the
debtor. He submits that *Brabon* is authority for the proposition that in relation to a sale of land
the relevant "transaction" is the conveyance, and not the preparatory steps leading to the
H    conveyance. He submits that although the debtor may initiate a sale, unless he actually sells he
does not enter into a "transaction" for the purposes of the section. He submits that in any event
Miss Hawkins was a bona fide purchaser who paid the agreed price to NatWest under a genuine
transaction of sale between herself and NatWest.

35. Mr Dowding relies on *National Westminster Bank Plc v Jones* [2001] EWCA Civ 1541;
[2002] 1 B.C.L.C. 55 for the proposition that in a case involving a series of events it is

**68**          Feakins v Department for Environment Food and          **[2007] B.C.C.**
                                    Rural Affairs
                            (Jonathan Parker L.J.)

necessary to identify the particular event which constitutes the "transaction". (The judge          A
referred at some length to *Jones* in para.45 of his judgment, quoted in para.21 above.) In
para.72 of his judgment in *Jones*, Neuberger J. said:

> "As a matter of ordinary language, it appears to me that the 'transaction' or
> 'transactions' in the present case was or were the tenancy and the sale agreement entered
> into between the defendants and the company. I do not think that the acquisition of the
> company could be said to be part of the 'transaction' under consideration in the present          B
> case. The acquisition of the company could no doubt be a transaction for the purposes of
> section 423(1), but it seems to me that it was a separate transaction from the tenancy and
> the agreement, not least because it was entered into between the defendants and third
> parties and related to the company as the subject matter of that transaction, whereas the
> transaction or transactions under attack in the present case consist of the tenancy and the
> sale agreements entered into between the defendants and the company itself."

36. This court agreed with Neuberger J.'s approach to the identification of the relevant          C
"transactions". Mummery L.J., delivering the judgment of the court, identified three relevant
questions, the first of which was: What are the relevant transactions? In para.26 of the judgment
he answered that question thus:

> "The answer is the tenancy agreement and the sale agreement. They were the
> transactions entered into by Mr and Mrs Jones with [the company] for the admitted
> purpose of putting assets (i.e. the farm land and the farming stock) beyond the reach of
> the bank, which was making a claim, and of prejudicing the interests of the bank in          D
> relation to the claims it was making against Mr and Mrs Jones under its securities. The
> acquisition of [the company] and the issue of the shares in it was not a relevant
> transaction within section 423."

37. By analogy, submits Mr Dowding, the only relevant "transaction" in the series of
dealings concerning Hill Farm was the sale by NatWest as mortgagee.          E

38. Mr Dowding also relies on the decision of the House of Lords in *Phillips (Liquidator of
A J Bekhor & Co) v Brewin Dolphin Bell Lawrie Ltd* [2001] B.C.C. 864; [2001] 1 W.L.R. 143
("*Brewin Dolphin*") as providing further support for that submission.

39. In *Brewin Dolphin* a company (AJB) agreed to sell its stockbroking business to the first
defendant (Brewin Dolphin) for £1.25 million. AJB was also the lessee of certain computer
equipment, which Brewin Dolphin was not interested in using. The sale was effected in the
following way: (1) AJB transferred the stockbroking business to a subsidiary (BSL) and sold          F
the shares in BSL to Brewin Dolphin for £1; (2) Brewin Dolphin also undertook to discharge
certain redundancy obligations owed by AJB to its employees; (3) in breach of its leases, AJB
sublet the computer equipment to Brewin Dolphin's holding company (PCG) for four years at
an annual rent of £312,500 payable in arrears (making a total rent payable by PCG over the four
years of £1.25 million); (4) Brewin Dolphin lent AJB £312,500, to be set off against the first
rental payment under PCG's sublease. Shortly thereafter (and before the first rental payment
had become due under the sublease) the owners of the computer equipment terminated A's          G
leases of the computer equipment on grounds of non-payment of rent and recovered the
equipment. P thereupon claimed that it was discharged from its liability to pay rent under the
sublease. A went into insolvent liquidation and the liquidator applied under s.286 of the 1986
Act for a declaration that the agreement for the sale of the shares in the subsidiary was a
transaction at an undervalue for the purposes of that section. Section 238(4)(b) contains a
provision identical in all material respects to s.423(1)(c). Brewin Dolphin contended that the          H
relevant "transaction" was not limited to the share sale agreement but also included the
sublease and P's obligations thereunder, and hence that the "transaction" was not at an
undervalue.

40. At first instance Evans-Lombe J. held that the share sale agreement and the sublease
were linked, in that it was never contemplated that one would be entered into without the other.

© 2007 Sweet and Maxwell Ltd
bcp2007 bcp   290 Mp   68—bcp23076

[2007] B.C.C.

ion". (The judge A
ara.21 above.) In

'transaction' or
greement entered
acquisition of the
ion in the present
or the purposes of B
n the tenancy and
endants and third
:tion, whereas the
e tenancy and the
y itself."

n of the relevant C
ied three relevant
6 of the judgment

They were the
for the admitted
yond the reach of D
ts of the bank in
its securities. The
is not a relevant

in the series of

ips (Liquidator of E
01] 1 W.L.R. 143

isiness to the first
certain computer
as effected in the
y (BSL) and sold F
took to discharge
of its leases, AJB
) for four years at
²CG over the four
f against the first
st rental payment G
it terminated A's
nd recovered the
ay rent under the
s.286 of the 1986
subsidiary was a
(4)(b) contains a
ontended that the H
iso included the
" was not at an

and the sublease
without the other.

**and Maxwell Ltd**
o 290 Mp 68—bcp23075

A    However, he held that Brewin Dolphin and PCG could not at the same time contend on the one
hand that the sublease was a separate transaction which had come to an end on the recovery of
the equipment by the owners and on the other hand that the obligation to pay rent under the
sublease was part of the consideration for the sale of the shares. He accordingly ordered BSL to
pay the amount of the undervalue, viz. the difference between the value of the shares (assessed
at £1,050,000) and the value of BSL's obligation to discharge AJB's redundancy obligations
(assessed at £325,000).

B    41. The Court of Appeal upheld the judge's decision, but adopted a different approach,
holding that (absent a sham, or an artificial division of a single transaction into supposedly
separate parts) the form of the agreement into which the parties had entered would be
determinative in identifying the relevant "transaction" for the purposes of s.238. The Court of
Appeal decision is reported at [1999] B.C.C. 557; [1999] 1 W.L.R. 2052.

C    42. The leading judgment in the Court of Appeal was delivered by Morritt L.J., with whom
Lord Woolf M.R. and Laws L.J. agreed. Morritt L.J. identified the two issues before the court
as being (1) the value of the shares in BSL to be taken into account for the purposes of s.238;
and (2) the value of the consideration in money or money's worth for those shares provided to
AJB. Mr Dowding referred us to a passage in the judgment of Morritt L.J. at pp.564H–565D;
2060 where he said:

D        "The first two issues to which I referred earlier, particularly the second, depend on
ascertaining, for the purposes of s. 238 of the Insolvency Act 1986, what was the
transaction alleged to have been entered into by the company at an undervalue. The
allegation of the liquidator is that the share sale agreement was the transaction so that
only the consideration passing to and from the company thereunder is to be taken into
account. This was disputed by Brewin Dolphin on the basis that the court must have
regard to the whole transaction not just that part of it the liquidator seeks to challenge.
E        This is a point of some importance on the true construction and application of s. 238. It is
true that the word 'transaction' is very widely defined. It is also true, as submitted by
counsel for Brewin Dolphin, that, given the purposes of s. 238, 339 and 423 to which it
applies, the court should not strain to narrow the definition by judicial decision.
However, the word 'transaction' is to be construed and applied as part of s. 238 as a
whole... First, the transaction must be identified by reference to the person or persons,
F        for the singular must include the plural) with whom the company entered into it. Only
the elements of the transaction between the company and that person need be taken into
account. Thus, without more, a contract between the company, A, and B cannot be part
of a transaction entered into by the company, A, with C. I introduce the caveat 'without
more' to guard against cases where the transaction is artificially divided. The second
limit appears to me to flow from the comparison the statute requires the court to make. In
G        each case it is necessary to ascertain the consideration to be received by the company. In
the case of s. 238(4)(a) the transaction is either a gift or 'on terms that provide for the
company to receive no consideration'. In other cases, as provided for in subs. (4)(b), the
task is to ascertain the value of the consideration provided by the other person 'for' the
consideration provided by the company. Whether or not the word 'consideration' in
those contexts is confined to its legal meaning it clearly connotes the quid pro quo for
that which it is alleged the company disposed of at an undervalue."

H    43. Turning to the facts, Morritt L.J. concluded that the relevant "transaction" for the
purposes of s.238 was the share sale agreement alone. He expressed his reasons in the
following passage (at p.565E–G; 2061):

        "First, the parties acting at arm's length and for readily understandable commercial
reasons chose so to structure the deal between them so that on the face of the documents
the share sale agreement and the lease agreement effected two separate, though linked,
transactions. There is no indication that this different treatment was a sham or otherwise

**70**                    Feakins v Department for Environment Food and          **[2007] B.C.C.**
                                      **Rural Affairs**
                                 (Jonathan Parker L.J.)

colourable. If parties in such circumstances choose so to structure their commercial     A
dealings in my view the court should give full weight to their intentions. Secondly, for
the reasons I have already given, the share sale agreement and the lease agreement
cannot be the same transaction for the purposes of the section because, though the
company was party to both of them, only Brewin Dolphin was party to the first and only
PCG party to the second. Third, the parties to the lease agreement... unambiguously
attributed the four annual payments of £312,500 to rent due thereunder for possession     B
and use of the computer equipment to which it related. The promise to make those
payments cannot be recharacterised as consideration from PCG or Brewin Dolphin 'for'
the shares being sold by the company."

44. In the House of Lords the leading speech was delivered by Lord Scott, with whom the
rest of their Lordships agreed. In para.20 of his speech Lord Scott addressed the issue whether
Evans-Lombe J. and the Court of Appeal were right to exclude the rental covenant in the
sublease from the value of the consideration for which AJB entered into the share sale     C
agreement. After referring to the differing approaches adopted by Evans-Lombe J. and the
Court of Appeal he concluded that neither approach was right. He went on:

"One must, obviously, start with the share sale agreement. That was the agreement
under which AJB agreed to divest itself of its allegedly valuable asset, namely, the
shares in BSL. ... [Section 238(4)(b)] does not stipulate by what person or persons the
consideration is to be provided. It simply directs attention to the consideration for which     D
the company has entered into the transaction. The identification of this 'consideration' is
in my opinion, a question of fact. It may also involve an issue of law, for example, as to
the construction of some document. But if a company agrees to sell an asset to A on
terms that B agrees to enter into some collateral agreement with the company, the
consideration for the asset will, in my opinion, be the combination of the consideration,
if any, expressed in the agreement with A and the value of the agreement with B. In
short, the issue in the present case is not, in my opinion, to identify the s. 238(4)     E
'transaction'; the issue is to identify the s. 238(4) 'consideration'."

45. Lord Scott went on to conclude that on the facts of the case no other conclusion was
possible but that the consideration for the BSL shares included the benefit of PCG's rental
covenant in the sublease.

46. Thus, Lord Scott (like Evans-Lombe J. and the Court of Appeal) treated the relevant
"transaction" as being the share sale agreement, but (unlike Evans-Lombe J. and the Court of
Appeal) he held that the consideration for which AJB sold the BSL shares under that agreement     F
included the value of PCG's rental covenant. However, he then went on to hold that, on the
facts, that value was nil. In para.27 of his speech he said:

"Where the value of the consideration for which a company enters into a s. 238
transaction is as speculative as is the case here, it is, in my judgment, for the party who
relies on that consideration to establish its value. PCG and Brewin Dolphin are, in the
present case, unable to do so."     G

47. The House of Lords accordingly affirmed the Court of Appeal's decision and dismissed
Brewin Dolphin's appeal.

48. Mr Dowding submits that *Brewin Dolphin* is another example of a case in which the
relevant "transaction" did not include another, albeit "linked", transaction.

49. He further submits that in the instant case it cannot be said that the "arrangement" which     H
the judge identified was causative of the bank's decision to sell Hill Farm. He reminds us of the
judge's observation in para.40 of his judgment (quoted in para.14 above) that "the fact remains
that it was the bank which made its own decision to sell to Miss Hawkins subject to the
tenancy". He points out that if NatWest had decided not to sell to Miss Hawkins the
"arrangement" could not have gone ahead. He submits that no legal rights were created by the
"arrangement" and no property passed under it; whereas (as he submits) it is clear from the

© **2007 Sweet and Maxwell Ltd**
bcp2007 bcp   290 Mp   70—bcp23075

[2007] B.C.C.

their commercial
ons. Secondly, for
e lease agreement
cause, though the
o the first and only
.. unambiguously
der for possession
ise to make those
:win Dolphin 'for'

ott, with whom the
l the issue whether
al covenant in the
ito the share sale
Lombe J. and the

vas the agreement
asset, namely, the
son or persons the
deration for which
.'consideration' is
for example, as to
l an asset to A on
the company, the
the consideration,
:ement with B. In
ttify the s. 238(4)

er conclusion was
t of PCG's rental

eated the relevant
. and the Court of
ler that agreement
 hold that, on the

ers into a s. 238
for the party who
Dolphin are, in the

ion and dismissed

case in which the

'angement" which
reminds us of the
"the fact remains
ns subject to the
iiss Hawkins the
ere created by the
is clear from the

**and Maxwell Ltd**
o 290 Mp 70—bcs23075

A

B

C

D

E

F

G

H

---

A  whole tenor of s.425 that the statute is contemplating a transaction which has legal consequences. He submits that the "arrangement" identified by the judge was no more than an informal understanding, and as such is not capable of constituting a "transaction" for the purposes of s.423(1).

50. Turning to the question of consideration, Mr Dowding submits that the requirements of s.423(1)(c) are not met in the instant case. He submits that no consideration in money or money's worth was provided by KF, since the surrender of the tenancy was effected by the company. Nor, he submits, did KF provide the farm: NatWest did that. Accordingly he submits that under the "arrangement" KF parted with nothing of value and that its assets were not in any way depleted. To the extent that there was a depletion of assets in the instant case, he submits, that depletion was suffered not by KF but by the company when it surrendered the tenancy. He relies on the fact that NatWest sold the farm subject to the tenancy for full value, in accordance with the valuation advice which it had obtained.

51. In support of these submissions, Mr Dowding referred us to the decision of Millett J. in *Re MC Bacon Ltd* [1990] B.C.C. 78 (another case concerned with s.238 of the 1986 Act).

52. In *MC Bacon* the liquidator of the company contended (among other things) that the grant of a debenture by the company was a transaction at an undervalue. Millett J. held that that contention was misconceived, since the grant of the debenture did not operate to deplete the company's assets. At p.92 he said:

> "The mere creation of a security over a company's assets does not deplete them and does not come within the paragraph [a reference to s.238(4)]. By charging its assets the company appropriates them to meet the liabilities due to the secured creditor and adversely affects the rights of other creditors in the event of insolvency. But it does not deplete its assets or diminish their value. It retains the right to redeem and the right to sell or remortgage the charged assets. All it loses is the ability to apply the proceeds otherwise than in satisfaction of the secured debt. That is not something capable of valuation in monetary terms and is not customarily disposed of for value."

53. Millett J. accordingly concluded that the grant of the debenture was not a transaction at an undervalue for the purposes of s.238.

54. Turning to the purpose of the "arrangement" which the judge identified, Mr Dowding submits that its true purpose was not to prejudice DEFRA but to benefit Miss Hawkins at the expense of the company. He points out that neither KF nor DEFRA could prevent NatWest selling the farm in exercise of its power of sale as first mortgagee, and that their only protection was NatWest's duty to obtain the best price reasonably obtainable. In the event, it discharged that duty.

55. Next, Mr Dowding submits that DEFRA was not a "victim" of the "arrangement" within the meaning of s.424(1)(c) since it was the sale by NatWest which left DEFRA unsecured. He contends that had NatWest sold the farm to an independent third party the price would not, on the evidence, have been any greater. Hence, he submits, the "arrangement" caused DEFRA no loss.

56. Lastly, Mr Dowding submits that even if the judge was otherwise right to grant relief under s.423, he ought, in granting such relief, to have reinstated the tenancy; and that his refusal to do so has improved DEFRA's position in that by reason of the surrender of the tenancy its debt is now better secured than it was previously.

57. He submits that, given that it is no longer contended that the tenancy was or became a sham, the benefit of the tenancy should be restored to the company.

58. In support of these submissions he cites the following passage from the judgment of Nourse L.J. in *Chohan v Saggar* [1994] B.C.C. 134 at p.141:

> "The object of s. 423–425 being to remedy the avoidance of debts, the 'and' between para. (a) and (b) of s. 423(2) must be read conjunctively and not disjunctively. Any

order made under that subsection must seek, so far as practicable, both to restore the    A
position to what it would have been if the transaction had not been entered into and to
protect the interests of the victims of it. It is not a power to restore the position generally,
but in such a way as to protect the victims' interests; in other words, by restoring assets
to the debtor to make them available for execution by the victims. So the first question
the judge must ask himself is what assets have been lost to the debtor. His order should,
so far as practicable, restore that loss."
                                                                                            B

### (ii) The arguments for DEFRA

59. Mr Caddick submits that the judge was right, for the reasons he gave, to identify the
"arrangement" which he described in paras 10, 40 and 44 of his judgment (quoted earlier) as
the relevant "transaction" for the purposes of s.423; and that its informality is of no
consequence in that respect.

60. As to the requirements of s.423(1)(c) in relation to consideration, Mr Caddick submits    C
that the court should view the surrender of the tenancy not in isolation but in the context of the
wider transaction involving the sale by NatWest. In support of this submission he cites the
decision of this court in *Agricultural Mortgage Corp Plc v Woodward* [1994] B.C.C. 688
("*Woodward*").

61. In *Woodward* the first defendant, Mr Woodward, mortgaged his farm to Agricultural
Mortgage Corporation plc ("the AMC") as security for a loan. He fell into arrears with    D
payments under the mortgage, and the AMC gave him a deadline of April 18, 1992, to clear the
arrears. On April 16, 1992, he granted an agricultural tenancy of the farm to his wife, the
second defendant, at an annual rent of £37,250. The AMC sought to have the tenancy set aside
and applied for summary judgment on the ground that the tenancy was not binding on it,
alternatively that the grant of the tenancy was a transaction at an undervalue for the purposes of
s.423(1).
                                                                                            E

62. At the hearing of the application for summary judgment the AMC accepted that there
was a triable issue as to whether the grant of the tenancy was binding on it by virtue of s.99 of
the Law of Property Act 1925 (subs.(6) of which provides that a lease granted pursuant to the
powers conferred by the section shall reserve the best rent that can reasonably be obtained).
The argument before the judge accordingly proceeded on the basis that the annual rent of
£37,250 represented a full market rent. However, it was contended by the AMC that the value
in money or money's worth of the consideration received by Mr Woodward for the grant of the    F
tenancy was significantly less than the value in money or money's worth of the consideration
provided by him, since by virtue of the grant of the tenancy Mr Woodward suffered a
substantial diminution in the value of his freehold interest in the farm. At first instance His
Honour Judge Weeks rejected that contention, holding ("with some regret") that for the
purposes of s.423(1) the detriment suffered by Mr Woodward by reason of the diminution in
the value his freehold interest was not to be regarded as part of the consideration provided by    G
him. The AMC appealed.

63. The leading judgment in the Court of Appeal was delivered by Sir Christopher Slade.
After referring to the decision of this court in relation to a similar arrangement in *Lloyds Bank
Ltd v Marcan* [1973] 1 W.L.R. 1387 (in which Russell L.J. described the arrangement as "less
than honest" and as "sharp practice": see p.1391), Sir Christopher Slade observed that the
relevant transaction in *Woodward* would plainly have fallen within s.172 of the Law of
Property Act 1925 (which was replaced by s.423 of the 1986 Act). He continued:
                                                                                            H

"Prima facie it seems most unlikely that the legislature would have intended a
transaction of the Lloyds Bank v Marcan type to escape the net of the section.
Nevertheless, the wording of s. 423 is very different from that of the old s. 172 and,
while having due regard to the purpose of the section, we must apply that wording as we
find it."

© 2007 Sweet and Maxwell Ltd
bcp2007 bcp  290 Mp  72—bcp23075

290-1-07

A

64. Sir Christopher Slade then turned to the AMC's contention that the detriment suffered by Mr Woodward by reason of the diminution in the value of his freehold interest in the farm should be brought into account in assessing the value in money or money's worth of the consideration provided by him on the grant of the tenancy. After referring to *MC Bacon*, on which the AMC had relied in support of that contention, Sir Christopher Slade said (at pp.696–697):

B

"I see some force in the argument that mere detriment to the person entering into the relevant transaction, unaccompanied by a corresponding benefit to the other party, cannot properly be treated as part of the consideration provided by such person for the purpose of applying s. 423(1)(c) unless the incurring of the detriment is actually part of the bargain, as opposed to being merely an incidental result of the transaction. However, I have some doubts as to whether this is what Parliament would have intended and would prefer to leave this question open for decision in another case. For I am of the clear opinion that Mr Moss [for the AMC] is correct in his second main submission on this appeal.

This submission focused attention not so much on the detriment to the first defendant as on the benefit to the second defendant conferred by the transaction. 'Transaction', it was pointed out, is a wide word, defined by s. 436 as including 'a gift, agreement or arrangement'. The tenancy, if effective, gave her the threefold benefits of safeguarding the family home, enabling her to acquire and carry on the family farming business, and a surrender value. Furthermore, and most significantly, the transaction, if effective, placed her vis-à-vis the plaintiff in what Mr Moss described as a 'ransom' position. If the tenancy was effective, the plaintiff would have had to negotiate with and no doubt pay a high price to her before it could obtain vacant possession of the farm and sell it for the purpose of enforcing its security and repaying the debt owed to it by the first defendant. Thus, it was submitted, the transaction plainly conferred, and was intended to confer, on her significant enhanced benefits beyond the rights granted by the tenancy agreement itself, for which enhanced benefits she did not pay.

Mr Dowding, in answering these submissions, naturally relied strongly on the concession that the annual rent of £37,250 reserved under the tenancy represented a full market rent, being the best rent that could reasonably be obtained. A proper assessment of the market rent of property will, in his submission, always take account of the existence of a potential purchaser, such as the second defendant in the present case; the only relevance of the presence of a potential special purchaser is that it may inflate the market value. It is not enough for the plaintiff to assert that because of the second defendant's special position, she might or would have been willing to pay a higher rent than any other tenant. In Mr Dowding's submission, to bring the case within s. 423(1)(c), the plaintiff would have to show that the annual rent of £37,250 was *significantly* less than the market rent and this has not been shown. The alleged threefold benefits relied on by the plaintiff are, he contended, irrelevant. They would all have been available to any person who took a tenancy of the farm. Any such tenant could have acquired the farming business and lived in the farmhouse. Any such tenant would have acquired the benefit of the surrender value. All these potential advantages were part and parcel of the factors which would be reflected in the assessment of the market rent, which, together with the other obligations entered into by the second defendant under the tenancy agreement, constituted full consideration for the benefits conferred on her.

Persuasively though these submissions were advanced, I am not persuaded by them. In applying s. 423(1)(c) to the facts of the present case, one must look at the transaction as a whole; the tenancy agreement cannot be considered in blinkers. Due weight must be given (inter alia) to the facts not only that the agreement was entered into by the first defendant with his wife for the purposes outlined above, but that the land in question was

---

*[left margin column text:]*

both to restore the entered into and to position generally, by restoring assets the first question His order should,

ve, to identify the (quoted earlier) as rmality is of no

Caddick submits the context of the ssion he cites the 1994] B.C.C. 688

m to Agricultural into arrears with 1992, to clear the a to his wife, the tenancy set aside not binding on it, or the purposes of

ccepted that there y virtue of s.99 of ed pursuant to the bly be obtained). he annual rent of MC that the value or the grant of the the consideration ward suffered a first instance His et") that for the the diminution in ition provided by

hristopher Slade. t in *Lloyds Bank* ngement as "less observed that the 2 of the Law of nued:

have intended a of the section. e old s. 172 and, at wording as we

mortgaged and that the wife, through the grant of the tenancy, would be placed in the     A
'ransom' position described above. Accepting that she agreed to pay for her yearly
tenancy a rent which was the best rent reasonably obtainable for that tenancy viewed in
isolation, and that she undertook the other tenant's obligations imposed by the tenancy
agreement, it seems to me nevertheless clear that, when the transactions are viewed as a
whole, the benefits which the first defendant thereby conferred on her were significantly
greater in value, *far* greater in value, in money or money's worth than the value of the     B
consideration provided by her. To hold otherwise would seem to me to fly in the face of
reality and common sense. No further evidence was, in my judgment, required to
establish that the transaction was one falling within s. 423(1)(c); the agreed facts speak
for themselves. On the facts of this case, the substantial detriment incurred by the first
defendant under the transaction was largely matched by a substantial benefit conferred
on the second defendant beyond the rights specifically conferred on her by the tenancy
agreement."                                                                                   C

65. In a short concurring judgment, Neill L.J. expressed himself as having been
unconvinced by Mr Dowding's arguments. He continued (at p.698):

"The purpose of the grant of the tenancy agreement was to ensure that the plaintiff did
not get vacant possession of the property and was for the purpose of prejudicing the
interests of the plaintiff. By the grant of the tenancy Mrs Woodward acquired the benefit     D
of the surrender value which placed her, as counsel for the plaintiff put it, in 'a ransom
position' in any future dealings with the mortgagee. On the facts of this case it is
unnecessary to attempt to calculate the value of the surrender value. In view of the
existence of the mortgage it must be a large sum and may approach the value of the
'detriment' suffered by Mr Woodward. In the circumstances I see no answer to the
argument that, quite apart from any value which may be attributed to the securing of the
family home and the acquisition of a debt-free business, the surrender value constituted     E
'consideration provided by' Mr Woodward which was significantly greater than the
payment made by Mrs Woodward for the grant of the lease."

66. Saville L.J. agreed with the judgments of Sir Christopher Slade and Neill L.J.

67. Mr Caddick submits that the same "non-blinkered" approach as this court adopted in
*Woodward* should be adopted in the instant case, and that account should be taken of the     F
substantial benefit conferred on Miss Hawkins under the "arrangement" between her and KF
above and beyond the value of the surrender of the tenancy, viz. the benefit represented by her
ability, following her purchase from NatWest, to market Hill Farm with vacant possession—a
benefit worth approximately £1 million. The conferring of that benefit, he submits, was the
central purpose of the "arrangement". By comparison, the consideration received by KF under
the "arrangement" was the satisfaction of his indebtedness to NatWest in the sum of £450,000
or thereabouts.                                                                               G

68. So far as the company is concerned, Mr Caddick submits that the reality of the situation
was that the company was no more than KF's creature, and as such would inevitably do his
bidding. He submits that, adopting the *Woodward* approach, it was effectively KF who
surrendered the tenancy. He accordingly submits that the judge's conclusion on the "company
point" was right for the reasons which the judge gave.                                        H

69. Finally, so far as s.423 is concerned, Mr Caddick submits that, on the judge's findings,
the "victim" of the "arrangement" was plainly DEFRA.

70. As to the judge's order, Mr Caddick submits that the judge was right to refuse the
company's application to reinstate the tenancy, for the reasons which he gave in paras 5 and 6
of his supplemental judgment (quoted earlier).

© 2007 Sweet and Maxwell Ltd
bcp2007 bcp   290 Mp   74—bcp23075

290-1-07

d be placed in the
ay for her yearly
enancy viewed in
ed by the tenancy
as are viewed as a
were significantly
n the value of the
o fly in the face of
nent, required to
greed facts speak
curred by the first
benefit conferred
her by the tenancy

as having been

at the plaintiff did
of prejudicing the
quired the benefit
ut it, in 'a ransom
of this case it is
e. In view of the
a the value of the
no answer to the
he securing of the
value constituted
· greater than the

Neill L.J.

: court adopted in
d be taken of the
ween her and KF
epresented by her
ant possession—a
submits, was the
ived by KF under
sum of £450,000

ty of the situation
inevitably do his
ectively KF who
on the "company

judge's findings,

ght to refuse the
e in paras 5 and 6

**and Maxwell Ltd**
p  290 Mp  74—bcp23075

### Conclusions

*The relevant "transaction" for the purposes of s.423*

71. In my judgment the judge was clearly right to find that the "plan" or "arrangement" which he identified in paras 10, 40 and 44 of his judgment as having been made between KF and Miss Hawkins was a "transaction" for the purposes of s.423.

72. Let me return briefly to the facts. I start by considering the factual position before any plan or arrangement was made between KF and Miss Hawkins in relation to the sale of Hill Farm. At that stage, KF was the owner of Hill Farm subject to a legal charge in favour of NatWest securing some £450,000 and an equitable charge in favour of DEFRA securing its judgment debt, and subject also to an agricultural tenancy in favour of his farming company which was binding on NatWest. However, the open market value of the farm was not affected by the existence of the charges over it: the granting of those charges did not deplete KF's assets (for the reasons given by Millett J. in *MC Bacon*). Thus the farm remained KF's to dispose of for its full open market value (albeit that the net proceeds of any sale would be largely if not wholly swallowed up in payment of the secured debts). KF was in severe financial difficulties, and had no income with which to service the secured indebtedness. Hence a sale of the farm, either by receivers appointed by NatWest or by NatWest itself as mortgagee, was virtually inevitable. KF's earlier suggestion to NatWest that it should appoint receivers to sell the farm had been turned down by NatWest, so that left only the possibility of a sale by NatWest as mortgagee. Any sale of the farm by NatWest as mortgagee would be subject to the agricultural tenancy (if still subsisting). The value of the farm subject to a subsisting agricultural tenancy was some £450,000 (that is to say, enough to satisfy NatWest's secured indebtedness, but not enough to leave any balance to be applied in reduction of DEFRA's secured debt), whereas the value of the farm on the open market with full vacant possession was approximately £1 million. As to the tenancy itself, in para.28 of his judgment (quoted in para.4 above) the judge found that its only substantial value lay in its availability as a bargaining factor in negotiations with a freeholder wishing to sell the farm with vacant possession (e.g. a purchaser from NatWest).

73. So much for the factual position immediately prior to the "arrangement". I now turn to the factual position immediately after the "arrangement" had been fully implemented and all relevant dealings with the farm had taken place. The position then was that NatWest's secured debt (amounting to some £450,000) had been paid in full; DEFRA's judgment remained wholly unsatisfied and its security had disappeared (its equitable charge having been overreached); and Hill Farm was vested in Miss Hawkins free from any charge and free from the tenancy, at a cost to her of £450,000. Thus, at a cost of £450,000 Miss Hawkins had become the owner of an asset worth approximately £1 million on the open market: an extremely beneficial result from the point of view of herself and KF but not so from the point of view of DEFRA, whose security had mysteriously evaporated.

74. How, then, was this result achieved? The means by which it was achieved was a sale of the farm subject to the tenancy by NatWest as mortgagee to Miss Hawkins at a price which reflected the existence of a subsisting and continuing agricultural tenancy, coupled (crucially) with KF's "commitment in advance"—the existence of which was concealed from NatWest and its valuers and from DEFRA—"to procure a surrender of the tenancy if and when NatWest took the bait" (see para.44 of the judge's judgment, quoted in para.21 above). Thus the "arrangement" between KF and Miss Hawkins, entered into in advance of any sale of the farm, consisted essentially of two elements: (1) the need to persuade NatWest to sell the farm (a) to Miss Hawkins, and (b) at a price reflecting the existence of a continuing agricultural tenancy; and (2) KF's commitment to surrender the tenancy following completion of such a sale.

75. In order to achieve the first of those objectives KF and Miss Hawkins resorted to what was by any standard deceitful conduct. I have in mind in particular the correspondence to

**76**  Feakins v Department for Environment Food and    **[2007] B.C.C.**
Rural Affairs
(Jonathan Parker L.J.)

which the judge referred. I would for my part have no hesitation in regarding the "arrangement"    A
in the same way as Russell L.J. regarded the "transaction" in issue in *Lloyds Bank Ltd v Marcan*
(see para.63 above): viz. as "less than honest" and as "sharp practice".

76. However that may be, the question remains whether the "arrangement" which the judge
found is a "transaction" for the purposes of s.423. I agree with the judge that it clearly is. As the
judge pointed out, "transaction" includes an "arrangement" (see s.436); and "arrangement" is,
on its natural meaning and in the context of s.423, apt to include an agreement or understanding    B
between parties, whether formal or informal, oral or in writing. In my judgment the wide
definition of "transaction" in the context of s.423 is entirely consistent with the statutory
objective of remedying the avoidance of debts (see *per* Nourse L.J. in *Chohan v Saggar* at
p.141, quoted in para.58 above).

77. The "transaction" which the judge found to exist in the instant case is, in my judgment,
materially different from "transaction" in issue in *Brabon*. As the judge rightly pointed out in
para.42 of his judgment, the transaction which was under attack in *Brabon* was the sale by the    C
debtor's wife as mortgagee to the third party developer. In the instant case, by contrast, there is
no attack (nor could there be) on the sale by NatWest to Miss Hawkins. It was, of course, vital
to the success of the "transaction" in the instant case that that sale should take place, and that
the price should reflect the value of the farm subject to a subsisting and continuing agricultural
tenancy; but the "transaction" under attack in the instant case is the arrangement between KF
and Miss Hawkins, which involved using the sale by the NatWest as the means by which to    D
achieve the beneficial result referred to earlier.

78. Nor have I found *Woodward* or *Brewin Dolphin* to be of assistance in identifying the
relevant "transaction" in the instant case, since every case must turn on its own facts. In some
cases it may be appropriate (as it was in *Woodward* and *Brewin Dolphin*) to treat a single step in
a series of linked dealings as the relevant "transaction"; in others it may not. In the instant case,
in my judgment, the judge adopted the right approach and correctly identified the relevant    E
"transaction" as the "arrangement" between KF and Miss Hawkins which he described in his
judgment.

*The requirements of s.423(1)(c)*

79. In order to bring the "transaction" within s.423 it is necessary that the person who enters
into it should do so for a consideration the value of which in money or money's worth is
significantly less than the value in money or money's worth of the consideration provided by    F
him (see subs.(1)(c)); but, as Lord Scott made clear in *Brewin Dolphin*, the consideration
received by that person may in appropriate circumstances consist of, or include, the benefit of a
collateral agreement between him and a third party.

80. I turn first to the consideration (if any) provided by KF under the "transaction" in
question. In the first place, I reject Mr Dowding's submission that KF provided no
consideration since the tenancy was surrendered by the company. Given KF's control of the    G
company, his commitment to procure the company to surrender the tenancy was for all
practical purposes the equivalent of a commitment by the company itself to do so. But the
substantive point, to my mind, is that the implementation of the "transaction" led and was
intended to lead—through the medium of the sale by NatWest—to the ownership of the farm
being transferred from KF to Miss Hawkins in circumstances where she took it free from
encumbrances, that is to say free from the charges and free from the tenancy. To put it shortly,    H
the "transaction" was designed to, and did, have the effect of transferring to her an asset worth
approximately £1 million. That was a benefit which only KF had the power to provide.

81. I turn next to the other element in the calculation required by s.423(1)(c): viz. the
consideration "for" which KF entered into the "transaction": that is to say, the consideration
obtained by him. As Mr Caddick rightly submitted, the consideration obtained by KF under the

© 2007 Sweet and Maxwell Ltd
bcp2007 bcp  290 Mp  76—bcp23075

the "arrangement"   A
*Bank Ltd v Marcan*

it" which the judge
it clearly is. As the
l "arrangement" is,
at or understanding

B

udgment the wide
with the statutory
*hohan v Saggar* at

s, in my judgment,
htly pointed out in
C
was the sale by the
by contrast, there is
as, of course, vital
ake place, and that
inuing agricultural
ement between KF
neans by which to   D

: in identifying the
own facts. In some
reat a single step in
In the instant case,
ttified the relevant
he described in his   E

person who enters
money's worth is a
ration provided by
the consideration
ide, the benefit of a   F

e "transaction" in
KF provided no
F's control of the
nancy was for all
' to do so. But the
tion" led and was
ership of the farm
took it free from   G
. To put it shortly,
her an asset worth
r to provide.

423(1)(c): viz. the
, the consideration
ed by KF under the   H

---

290-1-07

CA                   **Feakins v Department for Environment Food and**          **77**
                     **Rural Affairs**
                     (Jonathan Parker L.J.)

A   "transaction" was the discharge of his indebtedness to NatWest in the sum of £450,000 or thereabouts: a consideration the value of which in money or money's worth was significantly less than the value in money or money's worth of the benefit which Miss Hawkins received under the "transaction".

82.   I accordingly conclude that the requirements of s.423(1)(c) are met in this case.

*The purpose of the "transaction"*

B   83.   As the judge said in para.40 of his judgment (quoted in para.15 above):

> "[T]here can be no doubt that their purpose was to get Hill Farm into Miss Hawkins' name, out of the reach of DEFRA as a secured creditor of KF, and to enable the vacant possession value to be realised in Miss Hawkins' hands."

84.   Not only was that a finding which the judge was fully entitled to make, but it was (to my mind) an inevitable finding on the uncontested facts. It follows that the "transaction" was C   entered into by KF for the purpose of prejudicing DEFRA's interests in relation to the recovery of its judgment debt, and that it accordingly falls within s.423(3).

*Was DEFRA a "victim" of the "transaction"?*

85.   As noted in para.8 above, s.423(5) defines "victim" as meaning, in relation to a "transaction at an undervalue", "a person who is, or is capable of being, prejudiced by it".

D   86.   With respect to Mr Dowding's submissions, it seems to me to be beyond argument that DEFRA was a "victim" of the "transaction" in the instant case. The fact that the sale by NatWest, looked at in isolation, caused no loss is not to the point. The point is that the "transaction" was not the sale by NatWest, but the arrangement between KF and Miss Hawkins to use that sale as a necessary step in the process of transferring the intended benefit to Miss Hawkins.

E   *Should the judge have reinstated the tenancy?*

87.   This is the only aspect of the case on which I have difficulty with the judge's conclusion. The judge's reasoning in paras 5 and 6 of his supplemental judgment undoubtedly has a superficial attraction. However, the fact remains that unless the tenancy is reinstated (that is to say, the surrender cancelled) DEFRA's position as a secured creditor is, on paper at least, better than it was previously. The practical consequences of reinstating the tenancy may be a matter F   for conjecture, but given (a) that the tenancy is no longer said to be a sham, and (b) that the company is "hopelessly insolvent" (see para.47 of the judge's judgment, quoted in para.16 above), I can see no justification for not reinstating it. I would accordingly vary the judge's order by reinstating the tenancy.

**Result**

G   Subject to varying the judge's order to the extent indicated, I would dismiss the appeal.

**Moses L.J.:**

[Judgment on measures undertaken by DEFRA to combat foot-and-mouth disease on Hill Farm not reproduced.]

**Waller L.J.:**

H   [Judgment on damages in relation to foot-and-mouth issue not reproduced.]

*(Appeal dismissed)*

---

TAB 25

*Galbraith v Grimshaw* [1910] AC 508, House of Lords

[HOUSE OF LORDS.]

H. L. (E.)  GALBRAITH . . . . . . . . . . . . APPELLANT ;
1910                                    AND

*June 23.*  GRIMSHAW AND ANOTHER . . . . . . . RESPONDENTS.

*Attachment of Debts—Scottish Judgment—Extension to England—Garnishee*
*Order Nisi—Service on Garnishee—Subsequent Bankruptcy of Judgment*
*Debtor in Scotland—Rights of Trustee in Bankruptcy—Bankruptcy Act,*
*1883 (46 & 47 Vict. c. 52), s. 117.*

A judgment for a sum of money which was obtained in an action
in Scotland was extended to England under the Judgments Extension
Act, 1868, and the judgment creditor served a garnishee order nisi on
a firm who owed a debt in England to the judgment debtor.

After the service of the garnishee order nisi the whole estate of the
judgment debtor was sequestrated under the Scottish bankruptcy law and
transferred wherever situated to the appellant as trustee for the creditors
with power to recover all estates, debts, or money due to the judgment
debtor. In an interpleader issue in England between the trustee and
the judgment creditor as to their respective claims to the garnished
debt :—

*Held,* that the judgment creditor had by the service of the garnishee
order nisi obtained an attachment in England before the date of the
sequestration, and that the Scottish Court had no power to interfere
with his claim.

Decision of the Court of Appeal, [1910] 1 K. B. 339, affirmed.

THE facts material to this appeal are stated in the head-note.
The dates are as follows: October 23, 1908, judgment for 311*l.*
and costs in an action in Scotland by Grimshaw and another
against Merrens & Sons; October 26, judgment extended to
England; October 27, garnishee order nisi in respect of 400*l.*
owed to Merrens & Sons in England served upon the firm in
England who owed the 400*l.*; November 12, sequestration in
Scotland of the estate of Merrens & Sons; December 7,
confirmation of the appellant as trustee of the sequestrated
estate.

In the interpleader issue between the appellant and the
respondents (Grimshaw and another) as to their respective
claims to the garnished debt Ridley J. gave judgment for the
appellant. This decision was reversed by the Court of Appeal

A. C.                    AND PRIVY COUNCIL.                    509

(Farwell, Buckley, and Kennedy L.JJ.), who entered judgment
for the respondents.  Hence this appeal.

<div style="float:right">

H. L. (E.)

1910

GALBRAITH
v.
GRIMSHAW.

</div>

June 22, 23.  *Radcliffe, K.C.,* and *Pringle,* for the appellant.
The garnishee order nisi did not transfer the property in the
sum garnished from the judgment debtor, nor did it create a
charge.  There is in our law no term which exactly defines the
right of a garnishor, which has been described as a lien or
security; it is something like a distringas on stock.  A receiver
in a debenture-holders' action is entitled to precedence over the
garnishor, although appointed after the garnishee order: *Norton*
v. *Yates* (1); *Geisse* v. *Taylor* (2); *Cairney* v. *Back.* (3)  A gar-
nishee is but a stakeholder.  In *Rogers* v. *Whiteley* (4) Lord
Watson said: "The effect of an order attaching all debts . . . .
is to make the garnishee custodier for the Court, of the whole
funds attached."  In *In re Combined Weighing and Advertising
Machine Co.* (5) it was held that a garnishee order does not create
between garnishor and garnishee any debt either at law or in
equity.  *Holmes* v. *Tutton* (6) was like the present case, and the
title of the assignees in bankruptcy prevailed.

The Court will recognize and give effect to a foreign bank-
ruptcy : *Sill* v. *Worswick.* (7)  In *Solomons* v. *Ross* (8) the title
of the administrator of "desolate" estates in Holland was
preferred to that of a person who had, like a garnishor, attached
moneys of the bankrupt.  A similar order with respect to Irish
property was made in *Neale* v. *Cottingham* (9), referred to in the
same note, and in *Jollet* v. *Deponthieu.* (10)  The question must
be decided according to Scottish and not English law.

*Rawlinson, K.C.,* and *H. Dobb,* for the respondents.  By the
order of the King's Bench Division the respondents acquired a
lien or charge for the money lodged in Court by the garnishees,
and that charge had priority to the rights of the appellant.  The
money was bound in the hands of the garnishees.  The garnishees
could not pay the money due to the bankrupt to any one else

| | |
|---|---|
| (1) [1906] 1 K. B. 112. | (6) (1855) 5 E. & B. 65. |
| (2) [1905] 2 K. B. 658. | (7) (1791) 1 H. Bl. 665. |
| (3) [1906] 2 K. B. 746. | (8) (1764) 1 H. Bl. 131, n. |
| (4) [1892] A. C. 118, at p. 122. | (9) (1764) 1 H. Bl. 133, n. |
| (5) (1889) 43 Ch. D. 99. | (10) (1769) 1 H. Bl. 132, n. |

510                        HOUSE OF LORDS                    [1910]

H. L. (E.)   than the respondents. On the order's becoming absolute the
1910         money attached becomes the property of the creditors. Sect. 117
GALBRAITH    of the Bankruptcy Act, 1883, is only machinery, and is no
    v.       authority for introducing English law into a Scottish bankruptcy.
GRIMSHAW.    When the garnishee order was obtained the rights of the Scottish
———          creditors and of the appellant had not come into existence; they
             only arose on November 12, when the petition was presented.
             There is no authority for applying the provisions of s. 45 of the
             Bankruptcy Act, 1883, which require that an execution or attach-
             ment must be completed in order to prevail over the trustee's title,
             to Scotland. The question must be decided by English and not
             Scottish law. In the cases cited from Henry Blackstone time
             was the governing consideration and the title of the assignees in
             bankruptcy was prior to the garnishee order. On the effect of
             an arrestment, which is the equivalent of a garnishee order,
             Lord Deas' judgment in *Goetze* v. *Aders* (1) supports the
             respondents.

             *Radcliffe, K.C.*, in reply.

             LORD LOREBURN L.C. My Lords, in this case I think that
             the conclusion arrived at by the Court of Appeal ought to be
             supported.

             To my mind your Lordships would be wise to apply the rule
             explained by Lord President Inglis in the case of *Goetze* v.
             *Aders*. (2) I think that rule is applicable in England also. The
             attachment in England will not prevail against a claim of a
             foreign trustee in bankruptcy which is prior in date, provided
             that the effect of the bankruptcy is to vest in the trustee the
             assets in question. If the attachment is prior in date, then I do
             not think it will be affected by the title of the trustee in a foreign
             bankruptcy; and the reason is that a foreign law making
             the title of the trustee relate back to transactions which the
             debtor himself could not have disturbed has no operation in
             England, while the English law as to relation back applies only
             to cases of English bankruptcy, and therefore the trustee may
             find himself (as in this case) falling between two stools.

             I think, my Lords, in each case the question will be whether

                  (1) (1874) 2 R. 150, 155.              (2) 2 R. 150.

the bankrupt could have assigned to the trustee, at the date when the trustee's title accrued, the debt or assets in question situated in England. If any part of that which the bankrupt could have then assigned is situated in England, then the trustee may have it; but he could not have it unless the bankrupt could himself have assigned it. It follows that the trustee cannot have this debt free from the garnishee order, because the bankrupt could only have assigned it on November 12, subject to the garnishee order.

My Lords, with regard to s. 117 of the Bankruptcy Act, 1883, I think that affects procedure and does not enlarge the rule to which I have alluded. And I am not prepared to accept and act upon the case which is scantily reported in the volume of Blackstone's Reports to which we have been referred. (1) I am not prepared to accept that case as an authority against the rule which I have referred to.

I will not say, my Lords, that there may not be exceptions to that rule; as, for example, if the effect of the foreign bankruptcy were to transfer to the trustee only part of the assets of the bankrupt. Such points, to my mind, ought not to be settled or treated as settled except after consideration of the cases in which they actually arose. But I think it is enough to say in the present case I see nothing that should disturb the rule or the principle to which I have adverted.

Lord Macnaghten. My Lords, this is rather a singular case. If the bankruptcy had been an English bankruptcy, the attachment, being uncompleted, would not have prevailed against the claim of the judicial factor or the trustee in bankruptcy. If the attachment, or the process in Scotland that corresponds more or less with attachment, had been pending there, the claim of the judicial factor or the trustee in bankruptcy must have succeeded. But, as it is, a creditor of the bankrupt having duly obtained an attachment in England before the date of the sequestration cannot, I think, be deprived of the fruits of his diligence.

It may have been intended by the Legislature that bankruptcy

(1) *Solomons* v. *Ross*, (1764) 1 H.Bl. 131, n.

H. L. (E.)
1910
GALBRAITH
*v.*
GRIMSHAW.
Lord Loreburn
L.C.

512                        HOUSE OF LORDS                    [1910]

H. L. (E.)    in one part of the United Kingdom should produce the same con-
1910          sequences throughout the whole kingdom.    But the Legislature
GALBRAITH     has not said so.    The Act does not say that a Scotch sequestra-
  v.          tion shall have effect in England as if it were an English
GRIMSHAW.     bankruptcy of the same date.    It only says that the Courts of
  Lord        the different parts of the United Kingdom shall severally act in
Macnaghten.   aid of and be auxiliary to each other in all matters of bankruptcy.
              The English Court, no doubt, is bound to carry out the orders of
              the Scottish Court, but in the absence of special enactment the
              Scottish Court can only claim the free assets of the bankrupt.
              It has no right to interfere with any process of an English Court
              pending at the time of the Scotch sequestration. `It must take
              the assets of the bankrupt such as they were at that date and
              with all the liabilities to which they were then subject.    The
              debt attached by the order nisi was at the date of the sequestra-
              tion earmarked for the purpose of answering a particular claim
              —a claim which in due course would have ripened into a right.
              With this inchoate right the Scottish Court had no power to
              interfere, nor has it even purported to do so.    Therefore I think
              the appeal fails.

                  LORD JAMES OF HEREFORD.    My Lords, I concur.


                  LORD DUNEDIN.    My Lords, I concur with the opinions which
              have been delivered.    I think that the general principle which
              underlies every bankruptcy system is that after bankruptcy the
              bankrupt is no longer really the owner of his own property,
              but holds his own property as trustee for the whole of his
              creditors for equal division.    That carries with it necessarily
              the idea that some of his creditors may already have got security
              or may have taken part of the property in execution.    And if
              the matter went no further than that it is quite clear that both
              of those positions would be good as against the bankrupt himself
              and consequently as against the rest of his creditors.    It is a
              very natural development of that in working out a bankruptcy
              system that you should introduce a law of relation back, and that
              within a certain period, which will always be an arbitrary period
              determined by positive enactment, you should hold that the

security given or the execution effected should have no effect and
that that property should be like the rest of the property of the
bankrupt.

Now so far as the general principle is concerned it is quite
consistent with the comity of nations that it should be a rule of
international law that if the Court finds that there is already
pending a process of universal distribution of a bankrupt's
effects it should not allow steps to be taken in its territory
which would interfere with that process of universal distribution ;
and that I take to be the doctrine at the bottom of the cases of
which *Goetze* v. *Aders* (1) is only one example.  But if you wish
to extend that not only to the question of recognizing a process
of universal distribution but also of introducing the law of
relation back, then it seems to me you at once get into rather
great difficulties, because the question at once arises, according
to which law will you apply the doctrine of relation back ?  If
you take the law of the country of the bankruptcy, then the
execution or security in question may be and often is of a kind
which is quite foreign to the system of law which you are
administering in the Bankruptcy Court.  If on the other hand
you take the law of the country of the attachment, then you have
to administer a law which is quite ignorant of the precise
execution or security with which it has to deal.  Accordingly, to
say the least of it, there has been quoted to us no instance where
as a question of international law a Court has applied the rule of
relation back, and certainly there are dicta of Lord President Inglis
which seem to point completely the other way.  Of course that
would not prevent the matter being dealt with in the United
Kingdom by means of positive enactment.  I entirely concur
with what fell from the noble and learned Lord on the woolsack
as to the true meaning of s. 117.

H. L. (E.)

1910

GALBRAITH

*v.*

GRIMSHAW.

Lord Dunedin.

> *Order of the Court of Appeal affirmed and appeal
> dismissed with costs.*

*Lords' Journals,* June 23, 1910.

Solicitors: *Heath & Hamilton ; Julius A. White.*

(1) 2 R. 150.

TAB 26

*Gleeson v J Wippell & Co Ltd* [1977] 1 WLR 510, English High Court

[1977]

[CHANCERY DIVISION]                                      A

\* GLEESON *v.* J. WIPPELL & CO. LTD.

[1975 G. No. 5065]

1977   Jan. 13, 14, 17                                  Megarry V.-C.

> *Estoppel—Per rem judicatam—Issue estoppel—Previous action by*   B
> *plaintiff against different defendants—Present defendants not*
> *made parties—Issue whether plaintiff's copyright infringed*
> *determined in previous action—Whether issue estoppel—*
> *Whether privity of interest between present defendants and*
> *defendants in previous action*
> *Practice — Affidavits — Form — Method of preparation — Need for*
> *endorsement—Content—Inclusion of opinions of counsel and*
> *legal aid committee undesirable—R.S.C., Ord. 41, rr. 1 (5), 9 (5)*   C

In 1959 the plaintiff designed a special type of collar-
attached shirt for use by the clergy. In 1970 she commenced
proceedings against D Ltd. for breach of copyright in her
drawings, the essence of her claim being that D Ltd. had
copied a shirt supplied to them by W Ltd., the defendants in
the present proceedings, who had indirectly infringed the
plaintiff's copyright by copying a shirt manufactured for the   D
plaintiff, which was itself a copy of the plaintiff's drawings.
W Ltd. was not a party to the action. The plaintiff failed in
that action, the court holding that there was no infringement
of the plaintiff's copyright, and that decision was upheld by
the Court of Appeal. In 1975, the plaintiff issued a writ
against W Ltd., the present defendants, alleging infringement
of copyright in relation to the same shirt and claiming relief
by way of declaration, injunction, damages and delivery up of   E
infringing copies.

On the defendants' application, under R.S.C., Ord. 18, r.
19 (1) (*b*) and (*d*) and the court's inherent jurisdiction, for an
order striking out the indorsement on the plaintiff's writ, the
statement of claim, and the reply, on the grounds that since it
had already been held in the D Ltd. action that W Ltd.'s shirt
did not infringe the plaintiff's copyright, it was frivolous,
vexatious and an abuse of the process of the court, for the   F
plaintiff to seek to litigate all over again what had already
been decided against her: —

*Held*, that while there was a trade relationship existing
between the present defendants, W Ltd., and the defendants,
D Ltd., in the first action, that was not a ground for holding
that there was any privity of interest existing between them,
and accordingly since the present defendants had not been
parties to the D Ltd. action there was nothing to make the   G
doctrine of issue estoppel applicable; that further, since the
remedy of striking out should only be used in plain and
obvious cases and was a discretionary remedy, the court should
leave the matter to be resolved at the trial and should not
exercise its discretion to strike out (post, pp. 516D–F, H—517B,
518E—519A).

*Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd.* (*No. 2*) [1967]
1 A.C. 853, H.L.(E.) and *Carl Zeiss Stiftung* v. *Rayner &*   H
*Keeler Ltd.* (*No. 3*) [1970] Ch. 506 considered.

*Yat Tung Investment Co. Ltd.* v. *Dao Heng Bank Ltd.*
[1975] A.C. 581, P.C. distinguished.

Observations on the form and contents of affidavits.

The following cases are referred to in the judgment:

*Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd.* (*No. 2*) [1967] 1 A.C. 853;
[1966] 3 W.L.R. 125; [1966] 2 All E.R. 536, H.L.(E.).

A    *Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd. (No. 3)* [1970] Ch. 506; [1969] 3 W.L.R. 991; [1969] 3 All E.R. 897.

    *Gleeson (J. C.)* v. *H. R. Denne Ltd.* [1975] R.P.C. 471; [1975] F.S.R. 250, C.A.

    *Higgins* v *Woodhall* (1889) 6 T.L.R. 1, C.A.

    *Marginson* v. *Blackburn Borough Council* [1939] 2 K.B. 426; [1939] 1 All E.R. 273, C.A.

B    *Mercantile Investment and General Trust Co.* v. *River Plate Trust, Loan, and Agency Co.* [1894] 1 Ch. 578.

    *Yat Tung Investment Co. Ltd.* v. *Dao Heng Bank Ltd.* [1975] A.C. 581; [1975] 2 W.L.R. 690, P.C.

    The following additional case was cited in argument:

C    *Stephenson* v. *Garnett* [1898] 1 Q.B. 677, C.A.

PROCEDURE SUMMONSES

    By a writ dated December 17, 1975, the plaintiff, Joanna Christine Gleeson, claimed against the defendants, J. Wippell & Co. Ltd., an injunction to restrain them from infringing the plaintiff's copyright in drawings of clerical shirts or from converting to their own use infringing copies of

D such drawings; a declaration that the defendants had infringed such copyright, and had converted such infringing copies to their own use; and damages and an order for the delivery up of all infringing copies in the defendants' possession. By a summons dated June 22, 1976, the defendants sought an order under R.S.C., Ord. 18, r. 19 first, that the endorsement on the writ, the statement of claim and the reply be struck

E out on the ground that the major and central issue raised in the statement of claim, namely, whether the defendants' " combination clerical shirt/stocks " were indirectly reproductions of two pages of drawings referred to in the statement of claim, had been adjudicated upon and determined in an action between the plaintiff and Gleeson Shirt Co. Ltd., as plaintiffs, and H. R. Denne Ltd., as defendants, in the Chancery

F Division [entitled 1970 G. No. 3873], and on the ground that they were frivolous, vexatious and otherwise an abuse of the process of the court and that the action be stayed or dismissed accordingly; and secondly, that the costs of the action including the costs of the application be paid by the plaintiff. By a summons dated July 13, 1976, the plaintiff applied for an order that lists of documents be exchanged within 14 days and be

G verified by affidavit.

    At the hearing the defendants contended that the plaintiff was estopped from alleging that the defendants' shirts were reproductions of any of the plaintiff's drawings, through a copying of one of the plaintiff's shirts, and that privity of interest existed between them and H. R. Denne Ltd., the

H defendants in the previous action. The defendants further contended that the plaintiff's solicitors had made a complaint against the defendants' actions before issue of the writ in the Denne action; that the plaintiff could have joined them as defendants in the Denne action and should have done so, having regard to the Privy Council decision in *Yat Tung Investment Co. Ltd.* v. *Dao Heng Bank Ltd.* [1975] A.C. 581 and R.S.C., Ord. 15, r. 6 (2) (*b*) (ii), and that the plaintiff was well aware of the defendants' involvement by reason of the pleadings in the Denne action

Gleeson v. J. Wippell & Co. (Ch.D.)                    [1977]

A  and, as was apparent from her evidence, had decided as a matter of policy not to sue them.

The facts are stated in the judgment.

*E. P. Skone James* for the defendants.
*Robin Jacob* for the plaintiff.

B  MEGARRY V.-C. This is litigation about a special type of collar-attached shirt, designed for use by the clergy. This shirt makes it unnecessary to wear a white clerical collar or a vestock. A vestock, I may say, is a form of black bib with a stand-up collar that is worn over an ordinary shirt. The special shirt also has the advantage of a tidy appearance when the jacket is removed. Put briefly, the shirt is black, C  and buttons up centrally down the front, with a fly strip covering the buttons. The shirt has attached to it a special kind of collar consisting of a double thickness of material with a space called a " tunnel " running all round between the two thicknesses. At the centre of the front a rectangle is excised from the outer thickness, and a strip of white plastic is inserted in this rectangle, with the ends projecting each side into the tunnel to hold it in position. This gives the appearance of a white clerical D  collar which is visible only in the rectangle and is concealed elsewhere by a black vestock. I need not describe the shirt in any greater detail as this has already been done by Whitford J. and by the Court of Appeal in *J. C. Gleeson* v. *H. R. Denne Ltd.* [1975] R.P.C. 471. I shall call that action " the Denne action ": it lies at the heart of the present proceedings. I may add that the hearing before Whitford J. took place not on the dates in October 1972 stated by the report, nor on the dates in October 1973 E  stated by [1975] F.S.R. 250 (dates which, if right, would mean that the notice of appeal was given over six months before the hearing at first instance had begun: see p. 254), but on December 11, 12, 13 and 14, 1972.

The claim in the Denne action was for breach of copyright. In 1959, the plaintiff, Miss Gleeson, had the idea of making the type of shirt in question, and made a number of drawings of it. In due course she had F  shirts manufactured to her design, and sold them. She had left it too late to obtain any protection from a patent or a registered design, but the effect of the Design Copyright Act 1968 was to enable her to sue for any infringement of copyright in her sketches, notwithstanding that they related to industrial designs.

I do not propose to set out the detailed facts; they will be found in G  the judgment of Whitford J., whose decision was affirmed by the Court of Appeal. I am concerned with two manufacturers who made shirts which the plaintiff claims were made in breach of her copyright. One manufacturer is the defendant in the present proceedings, J. Wippell and Co. Ltd., which I shall call " Wippell." The other is the defendant in the Denne action, H. R. Denne Ltd., which I shall call " Denne." They H  are linked to each other by the fact that Denne, who I think manufacture on a larger scale than Wippell, began to manufacture shirts of this type at the request of Wippell, who supplied Denne with a shirt of theirs to copy. In the Denne action, the plaintiff sued not Wippell, but Denne. The essence of the claim was not that Wippell or Denne had directly copied the drawings, but that Denne had copied the Wippell

A   shirt (which was not disputed), and that Wippell had indirectly copied the plaintiff's drawings by copying Gleeson shirts which were copies of the drawings. A central issue was thus whether the Wippell shirt infringed the plaintiff's copyright: and this fell to be decided in proceedings to which Wippell was not a party.

B   In those proceedings the plaintiff failed. The shirt-maker for Wippell was Mr. E. J. Davies, and it was he who designed the Wippell shirt in question. In the Denne action it was held that when he designed the Wippell shirt he knew nothing of the plaintiff's shirt, and so had not copied her drawings, either directly or indirectly. That was accordingly an end of the Denne action: for what Denne had copied was no infringement of the plaintiff's copyright. The Denne action, begun by writ on November 16, 1970, thus came to an end in the Court of Appeal on

C   December 20, 1974.

Almost a year later, on December 17, 1975, the plaintiff issued the writ against Wippell, claiming an injunction, a declaration, damages and delivery up of offending copies. The claim is in large degree based on the same allegations as in the Denne case. The pleadings have reached the stage of the reply, accompanied by bevies of further and better particulars.

D   What is before me is a summons by Wippell to strike out the endorsement on the writ, the statement of claim, and the reply. The application is made under R.S.C., Ord. 18, r. 19 (1) (b) (" frivolous or vexatious ") and (d) (" otherwise an abuse of the process of the court "), and under the inherent jurisdiction. The central core of the application is, of course, that since in the Denne action it had already been decided that the

E   Wippell shirt did not infringe the plaintiff's copyright, it is frivolous, vexatious and an abuse of the process of the court for the plaintiff to seek to litigate all over again what has already been decided against her. This contention naturally led into territory entitled res judicata, estoppel per rem judicatam, issue estoppel, and what, for want of a better name, was called quasi res judicata. This last expression, I should say,

F   was treated during the argument as being a label, inelegant but of convenient brevity, for the wider sense in which the doctrine of res judicata can be appealed to, where although there is no mandatory bar to the proceedings on the footing of res judicata or issue estoppel, there is a discretionary bar under the jurisdiction to strike out the proceedings as being an abuse of a process of the court: see *Yat Tung Investment Co.*

G   *Ltd.* v. *Dao Heng Bank Ltd.* [1975] A.C. 581, 590.

The basic difficulty in the way of Mr. Skone James, who appeared for Wippell, is that Wippell was not a party to the Denne action. The decision in that case was thus a decision in which Wippell played no part. At one stage Mr. Skone James seemed disposed to contend that Wippell had played some part in that action, since evidence had been given by

H   employees of Wippell: but I do not think that the discharge of the function of a witness by a servant or officer of a company can possibly be taken to mean that the company is taking a part in that action.

I propose first to consider the general head of res judicata. It was common ground that the only relevant form of this was issue estoppel. Mr. Skone James referred to the three requirements set out by Lord Reid in *Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd.* (*No. 2*) [1967] 1

A.C. 853, 909, 910; and see at p. 935, *per* Lord Guest. The first require-  **A**
ment, that of a final judgment in the earlier proceedings, is plainly
satisfied. So is the second requirement, that of identity of subject matter,
here the question whether or not the Wippell shirt is an indirect copy
of the plaintiff's drawings. It is the third requirement, that there should
be identity of parties in the two sets of proceedings, that creates the
difficulty. There was identity of plaintiffs in the two proceedings; the
presence of the plaintiff company as a co-plaintiff in the Denne action  **B**
plainly makes no difference for this purpose. But for the doctrine of
issue estoppel to apply there must also be identity of defendants (which
there plainly is not) or else the existence of privity between Denne,
the defendant in the earlier action, and Wippell, the defendant in the
present action. Such privity, said Mr. Skone James, does exist in the
present case, whereas Mr. Jacob on behalf of the plaintiff said it did not.  **C**
The question, then, is the meaning of " privity " in this context.

    The requisite privity is said to be a privity either of blood, of title, or
of interest: see *Zeiss No. 2*, at p. 910, *per* Lord Reid. Plainly there is
no question of blood or title in this case, and so only privity of interest
can be in question. One difficulty about this is the protean nature of the
word " interest," a term which at times seems almost capable of meaning  **D**
all things to all men. Another difficulty is that, as Lord Guest pointed
out in *Zeiss No. 2*, at p. 936, " There is a dearth of authority in England
upon the question of privies." From such authorities as there are, it is
by no means easy to distil any principle. In *Mercantile Investment
and General Trust Co.* v. *River Plate Trust, Loan, and Agency Co.*
[1894] 1 Ch. 578, a plaintiff had sued an American company. Under an
indemnity given to that company by an English company the English  **E**
company assisted the American company in the litigation and paid its
costs. The plaintiff won, and then sued the English company, contending
that the English company was really the defendant in the first action,
and so was estopped from disputing the plaintiff's claim. Romer J.
however, rejected this contention; and in *Zeiss No. 2* [1967] 1 A.C. 853,
Lord Reid's reference to this decision, at p. 911, was certainly not in  **F**
terms of disapproval. The fact that there would be an estoppel as
between the indemnifier and the indemnified does not produce an
estoppel quoad third parties. In that respect, an agreement to indemnify
creates no privity.

    It has also been held that a judgment against A in one capacity
does not bind in another capacity. Thus a finding of negligence against
him in proceedings in which he is concerned in his personal capacity  **G**
does not bind him in proceedings in which he engages in his capacity as
his wife's personal representative: *Marginson* v. *Blackburn Borough
Council* [1939] 2 K.B. 426. Again, if A purports to act as agent for B,
and the plaintiff then sucessfully sues A for breach of warranty of
authority, B cannot be regarded as privy to A in those proceedings:
*Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd. (No. 3)* [1970] Ch. 506.  **H**
In that case, at p. 541, Buckley J. said that he had been referred to

> " . . . no authority which indicates at all clearly what kind of interest
> in earlier litigation relied upon as constituting a res judicata is
> sufficient to render someone, who was not a party and is not a succes-
> sor in title to a party to that litigation, privy to a party for the
> purposes of the doctrine."

A   Privity for this purpose is not established merely by having " some interest in the outcome of litigation." So far as they go, I think these authorities go some way towards supporting the contention of Mr. Jacob that the doctrine of privity for these purposes is somewhat narrow, and has to be considered in relation to the fundamental principle nemo debet bis vexari pro eadem causa.

B   I turn from the negative to the positive. In *Zeiss No. 2* [1967] 1 A.C. 853, 911, 912, Lord Reid suggested that if a plaintiff sued X and established some right in that action, a servant or third party employed by X to infringe the right and so raise the whole question again should be regarded as being a privy of X's in subsequent proceedings, for it would be X who would be " the real defendant." Lord Reid agreed with a statement which applied the rules of res judicata to subsequent C   proceedings brought or defended " by another on his account," that is, on X's account.

This is difficult territory: but I have to do the best I can in the absence of any clear statement of principle. First, I do not think that in the phrase " privity of interest " the word " interest " can be used in the sense of mere curiosity or concern. Many matters that are litigated are D   of concern to many other persons than the parties to the litigation, in that the result of a case will at least suggest that the position of others in like case is as good or as bad as, or better or worse than, they believed it to be. Furthermore, it is a commonplace for litigation to require decisions to be made about the propriety or otherwise of acts done by those who are not litigants. Many a witness feels aggrieved by a decision in a case to which he is no party without it being suggested that the E   decision is binding upon him.

Second, it seems to me that the substratum of the doctrine is that a man ought not to be allowed to litigate a second time what has already been decided between himself and the other party to the litigation. This is in the interest both of the successful party and of the public. But I cannot see that this provides any basis for a successful defendant to F   say that the successful defence is a bar to the plaintiff suing some third party, or for that third party to say that the successful defence prevents the plaintiff from suing him, unless there is a sufficient degree of identity between the successful defendant and the third party. I do not say that one must be the alter ego of the other: but it does seem to me that, having due regard to the subject matter of the dispute, there must be a sufficient G   degree of identification between the two to make it just to hold that the decision to which one was party should be binding in proceedings to which the other is party. It is in that sense that I would regard the phrase " privity of interest." Thus in relation to trust property I think there will normally be a sufficient privity between the trustees and their beneficiaries to make a decision that is binding on the trustees also H   binding on the beneficiaries, and vice versa.

Third, in the present case, I think that the matter may be tested by a question that I put to Mr. Skone James in opening. Suppose that in the Denne action the plaintiff, Miss Gleeson, had succeeded, instead of failing. Would the decision in that action that Wippell had indirectly copied the Gleeson drawings be binding on Wippell, so that if sued by Miss Gleeson, Wippell would be estopped by the Denne decision from

denying liability?  Mr. Skone James felt constrained to answer Yes to    A
that question.  I say "constrained" because it appears that for privity
with a party to the proceedings to take effect, it must take effect whether
that party wins or loses.  As was said by Buckley J. in *Zeiss No. 3* [1970]
Ch. 506, 541 (where the question was rather different) "The relation-
ship cannot be conditional upon the character of the decision."  In such
a case, Wippell would be unable to deny liability to Miss Gleeson by       B
reason of a decision reached in a case to which Wippell was not a party,
and in which Wippell had no voice.  Such a result would clearly be
most unjust.  Any contention which leads to the conclusion that a person
is liable to be condemned unheard is plainly open to the gravest of
suspicions.  A defendant ought to be able to put his own defence in his
own way, and to call his own evidence.  He ought not to be concluded
by the failure of the defence and evidence adduced by another defendant   C
in other proceedings unless his standing in those other proceedings
justifies the conclusion that a decision against the defendant in them
ought fairly and truly to be said to be in substance a decision against him.
Even if one leaves on one side collusive proceedings and friendly
defendants, it would be wrong to enable a plaintiff to select the frailest
of a number of possible defendants, and then to use the victory against
him not merely in terrorem of other and more stalwart possible            D
defendants, but as a decisive weapon against them.

Let me, however, leave that on one side, and consider matters on the
footing that, as in fact occurred, the plaintiff failed against Denne.  No
question can thus arise whether Wippell, conducting its own case, could
do better than Denne did; for Denne won.  What is uncertain is whether
the plaintiff can do better against Wippell than she did against Denne;
and the real question is not so much what will in fact happen, but        G
whether, by reason of the Denne decision, the plaintiff ought to be
deprived of the right to attempt to do better against Wippell than she did
against Denne.  The result of the Denne action certainly suggests that the
plaintiff has an uphill task in suing Wippell; but not every uphill task
results in failure.  It must also be considered whether the plaintiff ought
to be precluded from having discovery against Wippell and the right        H
to cross-examine the Wippell witnesses merely because, after having
discovery against Denne and cross-examining the Denne witnesses, she
failed to establish against Denne that Wippell had indirectly copied her
drawings.  I cannot see why she should.

In the result, it does not seem to me that Wippell is in any such
privity with Denne as to make it possible to invoke the doctrine of

denying liability?  Mr. Skone James felt constrained to answer Yes to    A
that question.  I say "constrained" because it appears that for privity
with a party to the proceedings to take effect, it must take effect whether
that party wins or loses.  As was said by Buckley J. in *Zeiss No. 3* [1970]
Ch. 506, 541 (where the question was rather different) "The relation-
ship cannot be conditional upon the character of the decision."  In such
a case, Wippell would be unable to deny liability to Miss Gleeson by       B
reason of a decision reached in a case to which Wippell was not a party,
and in which Wippell had no voice.  Such a result would clearly be
most unjust.  Any contention which leads to the conclusion that a person
is liable to be condemned unheard is plainly open to the gravest of
suspicions.  A defendant ought to be able to put his own defence in his
own way, and to call his own evidence.  He ought not to be concluded
by the failure of the defence and evidence adduced by another defendant   C
in other proceedings unless his standing in those other proceedings
justifies the conclusion that a decision against the defendant in them
ought fairly and truly to be said to be in substance a decision against him.
Even if one leaves on one side collusive proceedings and friendly
defendants, it would be wrong to enable a plaintiff to select the frailest
of a number of possible defendants, and then to use the victory against
him not merely in terrorem of other and more stalwart possible            D
defendants, but as a decisive weapon against them.

With those considerations in mind, I turn to the case before me.  I
cannot see any ground for holding that Wippell is in privity of interest
with Denne, or that they are linked in such a way as to make any
doctrine of res judicata applicable.  There was a trade relationship
between the two, in the course of which Denne, at Wippell's request,       E
copied a Wippell shirt: but that is all.  If the plaintiff had succeeded
against Denne, there would, in my judgment, have been no ground
whatever for saying that Wippell should be bound by the decision against
Denne.  On the footing that the relationship of privity operates whether
the decision is for or against the party in question, that seems to me to
be conclusive.                                                            F

Let me, however, leave that on one side, and consider matters on the
footing that, as in fact occurred, the plaintiff failed against Denne.  No
question can thus arise whether Wippell, conducting its own case, could
do better than Denne did; for Denne won.  What is uncertain is whether
the plaintiff can do better against Wippell than she did against Denne;
and the real question is not so much what will in fact happen, but        G
whether, by reason of the Denne decision, the plaintiff ought to be
deprived of the right to attempt to do better against Wippell than she did
against Denne.  The result of the Denne action certainly suggests that the
plaintiff has an uphill task in suing Wippell; but not every uphill task
results in failure.  It must also be considered whether the plaintiff ought
to be precluded from having discovery against Wippell and the right        H
to cross-examine the Wippell witnesses merely because, after having
discovery against Denne and cross-examining the Denne witnesses, she
failed to establish against Denne that Wippell had indirectly copied her
drawings.  I cannot see why she should.

In the result, it does not seem to me that Wippell is in any such
privity with Denne as to make it possible to invoke the doctrine of

**1 W.L.R.**          **Gleeson v. J. Wippell & Co. (Ch.D.)**          **Megarry V.-C.**

A  issue estoppel against the plaintiff. I am conscious that I have been unable to state any clear principle as to what does and does not constitute privity of interest for this purpose; but this is merely a procedure summons, and the subject is indeed difficult. Whatever the test, and wherever the line will finally be drawn, the plaintiff seems to me to be on the right side of any reasonable line that could be drawn—right, that is, from the plaintiff's point of view. That contention of Mr. Skone James accordingly
B  fails.

I turn to the other way in which Mr. Skone James put the matter. As this finally emerged, the contention centred on a combination of the *Yat Tung* case [1975] A.C. 581 and R.S.C., Ord. 15, r. 6 (2) (*b*) (ii). The rule in question confers a power on the court, either on application or of its own motion, to order any person to be added as a party to litigation
C  if between him and any party to the proceedings there is some question or issue which arises out of any relief or remedy claimed in the proceedings, or relates to or is connected with it, and in the opinion of the court it is just and convenient to determine it as between that person and that party as well as the parties to the proceedings. Mr. Skone James contended that in the Denne proceedings it was so plain that Wippell
D  was at the heart and core of the case that the plaintiff ought to have joined Wippell, and that as she failed to do so, she ought not now to be permitted to sue Wippell. In the *Yat Tung* case, the question was one not of failure to add a party, but of failure to advance a contention. There was a sufficient identity of parties in the two sets of proceedings, but the Judicial Committee of the Privy Council held that the statement of claim in the second action should be struck out as being an abuse of a
E  process of the court because it was founded on a contention which ought to have been advanced in the first action, but which had not been. Mr. Skone James very properly accepted that he was seeking to extend the *Yat Tung* case, but urged that there was no great difference between adding contentions and adding parties.

It seems to me that the difference is very considerable. Where there
F  is a chain of possible defendants, running perhaps from a designer to a manufacturer, and thence to a wholesaler, and then to a retailer, with some degree of dependence of one upon another, a plaintiff may be put in a position of some difficulty. Some defendants may be more worth powder and shot than others; but if Mr. Skone James is right, the failure to join a possible defendant in the chain may mean that, whatever
G  additional evidence or acquisition of riches subsequently emerges, that possible defendant cannot be sued in subsequent proceedings. At least for those in the chain, those not sued initially will be released. Furthermore, if the plaintiff succeeds against those whom he sues, then those in the chain who have not been sued may be told that they are bound by the decision. Mr. Skone James's riposte was that they could avoid being
H  condemned unheard by applying to be joined as defendants; but this seems to me to be unrealistic. If this were the law, there would no doubt be what some would regard as bigger and better litigation, with a multiplication of parties.

I fully accept, of course, that it will often be desirable not to have a series of successive actions in place of one action with many parties; but circumstances vary greatly, and it is impossible to lay down rules for

every case. Sometimes a multiplicity of parties would make litigation    A
too cumbersome, protracted and expensive. The doctrine for which
Mr. Skone James contends seems to me to be one that will put litigants
into a position of some peril, requiring them to judge correctly whether
or not the case is one in which under Ord. 15, r. 6 (2) (*b*) (ii) a court
would or would not add parties. Mr. Jacob realistically accepted that with
hindsight it would have been better to have joined Wippell in the Denne
action, and Mr. Skone James very properly stressed that he was con-    B
cerned not with long chains of possible defendants, but merely with a case
in which it was plain that one additional party ought to have been joined
in the Denne action. Nevertheless, one cannot decide cases in a vacuum,
and without regard to other cases which differ in their facts but fall within
the same principle. I can well see the justice of refusing to permit a
plaintiff who has failed to take an obvious point against the defendant    C
to have a second bite at the cherry by suing the defendant a second
time in order to take that point. What I cannot see is the justice of
refusing to permit a plaintiff to sue a person at all because the plaintiff
failed to join him as a defendant in other proceedings against another
person. Such a failure may provide material for cross-examination in the
second proceedings, and it may also sound in costs, especially if the    D
second proceedings have the same result as the first; but the drastic
step of striking out the proceedings is quite another matter.

It will be seen that I regard with considerable suspicion the marriage
between R.S.C., Ord. 15, r. 6 (2), and R.S.C. Ord. 18, r. 19, for which
Mr. Skone James contends, and that I am apprehensive of the permissive
provisions of the former rule being forged into a weapon which requires
some parties to resort to it and correctly judge its effect at their peril.    E
However, it seems to me that there are two other considerations that
are decisive under this head. First, there is the well-settled requirement
that the jurisdiction to strike out an endorsement or pleading, whether
under the rules or under the inherent jurisdiction, should be exercised
with great caution, and only in plain and obvious cases that are clear
beyond doubt. Second, *Zeiss No. 3* [1970] Ch. 506 established that,    F
as had previously been assumed, the jurisdiction under the rules is
discretionary; even if the matter is or may be res judicata, it may be
better not to strike out the pleadings but to leave the matter to be
resolved at the trial. In the present case, I may say, the defence duly
pleads res judicata. The inherent jurisdiction, too, is discretionary: see
*Higgins* v. *Woodhall* (1889) 6 T.L.R. 1 *per* Lord Halsbury L.C.    G

In those circumstances, I feel no doubt. I certainly cannot say that
it is in the least plain, obvious or clear beyond doubt that the action
cannot succeed, or is an abuse of the process of the court. Nor, as a
matter of discretion, do I consider that it would be right to strike out
the writ or pleadings; indeed, I think it would be wrong to do so. That
conclusion makes it unnecessary for me to explore a question of alleged    H
inconsistency in the explanations put forward by Wippell as to the origin
of the design of the Wippell shirt, and how far it could and should have
been explored in the Denne action, and whether there was now a con-
vincing explanation of the inconsistency. These are matters that can
be explored at the trial. I also leave it as open as I can how far anything
that I have decided or said in this judgment can or should affect anything

A   that arises for decision by the trial judge. Accordingly, in my judgment, this application fails.

I must add a word about the affidavits. It is obviously desirable that it should be possible to file affidavits economically and with convenience. The rules accordingly provide that both sides of the paper must be used, and that exhibits, which of course are not filed, should not be annexed to the affidavits: see R.S.C., Ord. 41, rr. 1 (5) and 11 (1). All six of the

B   defendant's affidavits before me are typed on one side of the paper only, and three of them have exhibits which are clamped to the affidavit by a pair of plastic strips about an eighth of an inch thick which run the full length of the spine. These strips are also used on two more of the defendant's affidavits. I have no doubt that this was well-meant; but the use of such strips or of anything else which adds materially to the thick-

C   ness of affidavits is undesirable as increasing the problems of filing. Further, I observe that none of the defendant's affidavits comply with the requirement of endorsement under R.S.C., Ord. 41, r. 9 (5). I shall accordingly hear what proposals the defendant has to put matters in order.

The plaintiff's affidavits avoid these defects of form, though only partially as to R.S.C., Ord. 41, r. 9 (5); but one of them displays undesir-

D   able features that I think ought not to be allowed to pass unchecked. In Mr. Brown's affidavit he quotes a passage from an opinion of a silk, and he exhibits an article in a journal concerned with patents. The object appears to be to demonstrate that the plaintiff has prospects of success against Wippell if her action is not halted. The main objection to the extracts from the article is that they do not appear to me to

E   constitute any evidence; and the purpose of affidavits is, or should be, to provide evidence. As I told Mr. Jacob, I would listen with pleasure to any submission upon the subject that he chose to put before me, what-ever his source of inspiration, but I would not listen to the words of a Queen's Counsel, however eminent, or the author of an article, when proffered as evidence of the legal rights and prospects of a litigant. A

F   court does not hear expert evidence on what the law of England is, or what the rights of parties are under that law. In any case, extracts from counsel's opinion are usually valueless, or worse, without the rest of the opinion and the instructions on which it was based, to show what the opinion was founded on and what reservations and qualifications there are. The function of counsel's opinion in cases where litigation con-cerning an infant is being compromised, and so on, is, of course, quite

G   different.

There is one other feature in Mr. Brown's affidavit that also seems to me undesirable. He states that where an action on similar facts has been lost, the legal aid committee "would need to be well convinced that there was a genuine issue to be tried," and that the committee in this case "based their decision to grant the plaintiff legal aid in these

H   proceedings at least in part" on the opinion of the Queen's Counsel that I have mentioned. Again, I cannot see how that constitutes any sort of evidence. Further, it seems to me to be most undesirable to attempt to sway the court by referring to the view that the committee is said to have taken. If such views were admitted, then, where both parties were legally aided, the court would have to weigh the imperfectly known views of one committee, based on materials unknown to the

520

Megarry V.-C.    **Gleeson v. J. Wippell & Co. (Ch.D.)**    **[1977]**

court, against the corresponding views of the other committee; and a
litigant who had no legal aid would lack one of the weapons of his legally
aided opponent. I propose to hear what the plaintiff has to say about the
costs of this affidavit. Subject to these matters, this application fails, and
the summons will be dismissed.

> *Defendants' summons dismissed.*
> *Plaintiff's costs in any event, subject to
> disallowing costs in respect of Mr.
> Brown's affidavit and striking out
> parts thereof.*
> *Leave to appeal refused, but leave to
> file further affidavits if the matter
> should go further.*
> *Bindings to be removed from defendants'
> affidavits, and such affidavits to be
> endorsed in accordance with R.S.C.,
> Ord. 41, r. 9 (5).*
> *Order, as sought, on plaintiff's summons
> for exchange of lists of documents.*

Solicitors: *Bristows, Cooke & Carpmael; Theodore Goddard & Co. for
Crosse & Crosse, Exeter.*

T. C. C. B.

---

[QUEEN'S BENCH DIVISION]

\* ARMADORA OCCIDENTAL S.A. AND OTHERS *v.*
HORACE MANN INSURANCE CO.

[1976 A. No. 1900]

1976    Nov. 8; 18                                        Kerr J.

*Conflict of Laws—Contract—Proper law—Insurance contract for
foreign shipping companies—Cover with American and other
insurers—Policies issued and premiums and claims payable in
California—Policies including "follow London" clause and
New York suable clause — Action brought in England —
Whether jurisdiction to grant leave to serve notice of writ out
of jurisdiction—R.S.C., Ord. 11, r. 1 (1) (f) (iii)*

World-wide marine insurance cover was arranged on behalf
of the 29 plaintiffs, who were "one ship" companies regis-
tered in either Panama or Liberia. The brokers arranged
cover with insurers in England, Japan, Belgium, Greece and
the United States. A proportion of the American cover was
placed with the defendants and the American policies were
issued in California and all premiums and claims were pay-
able there mainly in dollars. The main terms of the cover
were the English Institute Time Clauses (Hulls) and all the
policies executed in the United States and outside England

---

[Reported by MRS. AVIVA GOLDEN, Barrister-at-Law]

TAB 27

*Henderson v Henderson* (1843) 3 Hare 100,
English Court of Chancery

     HENDERSON *v.* HENDERSON     

estate of Terence, the father; and that there is rent due from him, to one-seventh of which the estate of Ann, the testatrix, is entitled: the Plaintiff has, therefore, in his hands, monies which belong to the estate of the testatrix; and I think the Court ought not to disregard that fact, and decree the full payment of his legacy by the executors of Ann. It is not suggested that there was any joint lease of the premises to the four tenants in common, who at different times occupied the house: they appear to be, at law, severally liable in respect of their occupation. I cannot, however, direct an account of what is due from the Plaintiff unless the whole of the residuary legatees are parties, and are bound by the account and inquiries. If the residuary legatees of Terence, who are not before the Court, will appear and **[99]** consent to be bound by the account, I may direct it to be taken in this suit. If anything be found due from the Plaintiff, William Mac Mahon, as the tenant of the premises in question, that will be set off as against his legacy; but it will not form any set-off against the legacy to the Plaintiff Henrietta, his wife.

The Plaintiffs consented to waive the undertaking on behalf of Charles, who was abroad, and an account was directed of the two legacies and interest. And all the residuary legatees of Terence appearing by their counsel, and consenting to be bound by the inquiries and accounts thereby directed, and the Plaintiffs and Defendants not opposing their appearance, but, so far as they were able, consenting thereto, it was referred to the Master to ascertain whether the Plaintiff, William Mac Mahon, was during any and (if any) what time in the occupation of "The Lower House" in, &c., since the death of the said Terence Mac Mahon, and, if so, whether the Plaintiff, William Mac Mahon, ought to be charged with any and (if any) what sum of money, in respect of such occupation; and the Master was to state whether anything and what was paid, and when, since the death of the said Terence Mac Mahon, by the Plaintiff, William Mac Mahon, for or in respect of repairs and outgoings of the said house, or otherwise on account thereof; and whether, at the death of the testatrix, Ann Mac Mahon, the Plaintiff, William Mac Mahon, had any and what assets of the said Ann Mac Mahon in his hands applicable to pay the said legacies, with liberty to state special circumstances.

**[100]** HENDERSON *v.* HENDERSON. *July* 4, 7, 11, 20, 1843.

[S. C. at law, 6 Q. B. 288; 11 Q. B. 1015. See *Mutrie* v. *Binney*, 1887, 35 Ch. D. 620; *In re Henderson*, 1887-89, 35 Ch. D. 716; 37 Ch. D. 244; and (sub nom. *Nouvion* v. *Freeman*), 15 A. C. 1. Discussed, *Worman* v. *Worman*, 1889, 43 Ch. D. 296.]

The next of kin of an intestate filed their bill in equity in the Supreme Court of Newfoundland against A., the brother and deceased partner of the intestate, for an account of the estate of the father of A. and of the intestate possessed by A., and an account of the partnership transactions, and the dealings of A. with the estate since the death of the intestate. The bill was taken, *pro confesso*, against A. in the Colonial Court, and, on a reference, the Master reported that certain sums were due to the several next of kin on the account of the estate of the intestate's father possessed by A.; but that no account between A. and the intestate had been laid before him: the Supreme Court decreed that the sums found by the Master to be due to the next of kin and the costs should be paid to them by A. The next of kin brought their actions in this country against A. upon the decree. A. then filed his bill in this Court against the next of kin and personal representative of the intestate, stating that the intestate's estate was indebted to him on the partnership accounts and on private transactions; alleging various errors and irregularities in the proceedings in the Supreme Court, and that A. intended to appeal therefrom to the Privy Council; and praying that the estate of the intestate might be administered, the partnership accounts taken, the amount of the debt due to A. ascertained and paid, and the next of kin restrained by injunction from proceeding in their actions.
Demurrer, for want of equity, allowed on the ground that the whole of the matters

HENDERSON *v.* HENDERSON

were in question between the parties, and might properly have been the subject of
adjudication in the suit before the Supreme Court of Newfoundland.

That, inasmuch as the Privy Council is the Court of Appeal from the Colonial Court,
and has jurisdiction to stay the execution of the decree pending the appeal, the
Court will not interfere by injunction, on the ground of error or irregularity in the
decree of the Colonial Court.

Whether, in a case of error shewn in the judgment of the Court of a foreign country,
from which there was no appeal to any of Her Majesty's Courts, the decision would
be the same, *quære?*

The bill was filed in May 1843 by Bethel Henderson against Elizabeth Henderson,
the widow of Jordan Henderson, his deceased brother, and Charles Simms and
Joanna, his wife, who was the daughter of Jordan; and also against J. Gadsden, the
administrator of the estate of Jordan, in England; and it stated that William
Henderson, a merchant in Bristol and Newfoundland, the father of the Plaintiff and
Jordan Henderson, in 1808, admitted them into partnership with him, and in 1817
resigned all his interest in the trade to them: that the Plaintiff and Jordan carried
on the business in partnership from 1817: that the share or interest in the partner-
ship, which their father gave up to them, was worth £15,000 or thereabouts, and
was continued in, and formed part of, the partnership of the Plaintiff and Jordan:
that Jordan Henderson died in March 1830 intes-[101]-tate, leaving the Defendants,
Elizabeth, his widow, Joanna (the wife of the Defendant, C. Simms), his daughter,
and also leaving William, a son: that Elizabeth, the widow, obtained letters of
administration of the estate of Jordan in Newfoundland, and, together with the
Plaintiff, carried on the partnership business for the purpose of winding it up; but
before that was done, a fire in the island in August 1832 destroyed the buildings
and plant of the partnership, and all the books, except the ledgers; and that disputes
then arose between the Plaintiff and Elizabeth, the widow.

The bill then set forth a petition presented in November 1832 by the Defendants,
the widow and children of Jordan, to the Judges of the Supreme Court in Newfound-
land, which alleged that William, the father, before his death, gave or bequeathed
£1000 to or for the Petitioner, Joanna, and gave or bequeathed the rest of his estate
between Bethel, the Plaintiff, and Jordan, his sons, equally: that Bethel was living
with William, the father, at Bristol, and possessed himself of his estate: that Jordan
died possessed of considerable real and personal estate in the partnership, both in
England and Newfoundland: that Bethel had possessed himself of all such estate, as
well as of the partnership books, and carried on trade therewith, and had drawn
monies thereout: that he also refused to satisfy the Petitioners whether Jordan had
left any will; and prayed that Bethel might be decreed by the Supreme Court to come
to an account in respect of all and singular the premises; and that as well the estate
of William, the father, as the estate of Jordan, might be applied in a course of
administration.

The bill stated that no personal representative of William, the father, or of Jordan,
was a party to the said proceeding in the Supreme Court: that Elizabeth, **[102]** the
widow, presented another petition, dated the 8th of December 1832, not intituled in
any cause to the said Judges, which alleged that, since administration of the estate of
her husband had been granted to her, Bethel, the Plaintiff, had rendered her certain
accounts of debts and assets in Newfoundland, but refused to account to her for the
property of the deceased in England: that he was then about to leave the country,
whereby the Petitioner would, in all probability, be prevented from bringing him to
any account respecting the said estate, unless the Supreme Court should grant
immediate process against him: that a brig, called "The Elizabeth," belonging to the
intestate and Bethel equally, had, without the Petitioner's authority, been laden at
Harbor Grace, by Bethel, principally on freight, under an engagement to sail on the
10th of December for Bristol: that the Petitioner had good reason to know that the
monies of Jordan, in the possession of Bethel in England, amounted from £5000 to
£8000: the Petitioner therefore prayed the writ of *ne exeat regno*, to restrain Bethel
from departing out of the jurisdiction, and that he might be ordered to exhibit to the
Court a full account of all the estate of Jordan come to his hands: that C. Simms, by

affidavit, intituled " *Elizabeth Henderson* v. *Bethel Henderson*," deposed that Bethel was then justly indebted to Elizabeth, the widow, administratrix of the estate of Jordan, in the sum of £3100 sterling, exclusive of such further sum as he might be indebted to her on account of monies and property in England ; and that he threatened to leave the island and go beyond sea, out of the jurisdiction of the Court, whereby the said debt would be lost or endangered, or the recovery thereof would be difficult.

The bill stated that an instrument purporting to be a writ of *ne exeat regno,* dated the 10th of December [103] 1832, was issued out of the Supreme Court, with a summons or *subpœna,* in the first-mentioned suit : that the Plaintiff, on the 22d of December, executed his bond, with two sureties, to the high sheriff of the island, in the sum of £6200, conditioned to be void if the Plaintiff should personally appear before the Court by the 10th of June then next, and render a full account of the estate of Jordan come to his hands, whether arising from the estate of William, the father, or otherwise ; and also an account of the said partnership business, and answer and fulfil the orders and decrees of the Supreme Court touching the said estate, and also touching a certain bill, then filed, of Elizabeth Henderson and others, against the Plaintiff : that the Plaintiff then quitted the island and returned in 1834 : that, on the 14th of June 1834, the Supreme Court ordered the bond to be put in suit, unless the Plaintiff should put in his answer to the first petition ; and, in July 1834, the Plaintiff appeared in that suit by H. A. Emerson, Esq., Her Majesty's Solicitor-General in the island, who also prepared the Plaintiff's answer, which was sworn and filed on the 11th of July 1834, intituled in the first suit only.

The bill then stated the purport of the Plaintiff's answer : that exceptions were taken by the Petitioners, for that he had not set out an account of the partnership transactions, or of the estate of Jordan possessed by him ; or whether William, the father, left any and what estate, for the use of Jordan or his family : that the Supreme Court ordered that the accounts prayed for in the first suit should be filed before the 25th of July, or that the bond should be assigned to the Petitioners to be put in suit : that the Plaintiff had, for several years, employed J. Fitzgerald, an accountant in the island, in keeping the accounts of the said business ; and in order that Fitzgerald might make out the accounts of the [104] partnership, the Plaintiff, on the 20th of July, delivered over to him the books and accounts of the business in England, and on the same day the Plaintiff quitted the island.

The bill then stated that Fitzgerald made out in distinct parts the accounts of the partnership from 1817 to the death of Jordan, and the subsequent accounts of the Plaintiff, and filed the same on the 4th of August 1834, and verified them by affidavit, as true extracts from the Plaintiff's books : the bill stated the balances appearing by the several accounts ; the result of which was that £4500 and £883, 7s. 5d. were owing to the Plaintiff from the Newfoundland concern, and that a further sum of £2366, 15s. 4d. was owing to him from the estate of Jordan, in respect of transactions since his death ; and a large sum was also owing to the Plaintiff as a private debt, in respect of advances he had made for the use of Jordan and his family.

The bill then set forth a letter received by the Plaintiff from his solicitor and counsel, H. A. Emerson, Esq., stating that delay had occurred in the report on the exceptions, owing to the answer having been mislaid by the Clerk of the Court, and adverting to what had been since done : that the Plaintiff received no further information respecting the suit, except that he had recently learnt that the Master, on the 26th of December 1835, reported the Plaintiff's answer to be sufficient, but that the accounts had been subsequently filed ; and, upon the motion of the Plaintiff's counsel, the accounts were referred to the Master for his report : that the Petitioners excepted to the Master's report, and in January 1835 obtained an order discharging the order by which the accounts were referred to the Master : that no further proceedings were ever taken on the said peti-[105]-tion : that in 1836 the Plaintiff discharged H. A. Emerson, Esq., as his solicitor, and did not employ any other solicitor, and thenceforwards had no counsel or solicitor in the island, as all the Defendants and their solicitor well knew.

The bill then stated that in January 1837 the Defendants obtained a rule for leave to amend the first-mentioned petition or bill, no person being authorized by the Plaintiff, who was out of the jurisdiction, to oppose the same ; that in May 1837

the Defendants exhibited a bill in their own names (and in that of William, the son, without his authority), addressed to the Judges of the Supreme Court. [The bill was then set forth: it charged the Plaintiff with having possessed the sum of £30,000 in respect of the estate of William, the father, impeached the partnership and other accounts put in by the Plaintiff in various specific points, and charged him with misappropriation and loss of the partnership property and estate since the death of Jordan, and calling for discovery on various subjects: and it prayed that the Plaintiff might account and pay to the Defendants their share of the alleged assets of William, the father, the partnership property which belonged to Jordan, the amount of the losses thereto by the carrying on of the trade since his death, and that they might be at liberty to inspect the original books of account of the Bristol trade.]

The bill stated that the summons or *subpœna*, requiring the Plaintiff to appear to the bill, was served on H. A. Emerson, Esq., on the pretence that as he had been the Plaintiff's solicitor and agent in the petitions, he was so in the said third suit: that a commission was issued by the Supreme Court to take the Plaintiff's answer, and that in October 1837 one of the persons named in the **[106]** commission communicated with the Plaintiff, then residing at Bristol, and required him to put in his answer, and lent the Plaintiff a copy of the bill, being the first intimation of the suit which he had received. The bill then stated that the pretended service and other proceedings were wholly irregular, contrary to the rules of the Supreme Court, which were set out, and also to the statute for the better administration of justice in Newfoundland (5 Geo. 4, c. 67): that the commission was returned with a declaration by the commissioners that the Plaintiff had not put in, and did not intend to put in, any answer.

The bill then stated that the Defendants (the Plaintiffs in the third suit) in December 1839 obtained a rule *nisi* to take their bill *pro confesso* against the Plaintiff, and served the same on H. A. Emerson, Esq., who, without authority, took upon himself to appear on the motion as the Plaintiff's counsel and solicitor, and on the 11th of February 1840 the Supreme Court ordered the last-mentioned bill to be taken *pro confesso*, and referred it to the Master to compute principal and interest due to the Defendants: that on the 18th of April 1840 the Master of the Supreme Court made a rule or order, addressed to H. A. Emerson, Esq., appointing the 23d of April to take the account: that the meeting was adjourned to the 30th of April, when the Defendants' solicitor put in an account, charging the Plaintiff with sums amounting to £17,054, 12s. 9d. in respect of the partnership transactions, and £15,000 in respect of the estate of William, the father, but allowing no credits whatever to the Plaintiff: that the Master made his report, dated the 6th of June 1840, and thereby, after stating that *he had not had any account between* Bethel and Jordan laid before him, he found that the **[107]** Defendant, Bethel, received from William, the father, some time previous to his death, which occurred in the year 1821, the sum of £30,000 sterling, in trust to pay one moiety thereof to Jordan; and that Jordan died intestate, in 1830, leaving the Plaintiff Elizabeth, his widow, and two children only, namely, Joanna (married to C. Simms) and William; and he found that of the said sum of £30,000 sterling, one moiety, or £15,000, together with interest thereupon, was then due to the widow and children of Jordan by the Defendant, Bethel, to be paid in the proportions thereinafter directed; and, upon the said sum of £15,000, he computed simple interest, from the 1st of January 1822, to the 1st of June 1840, at £4 per cent. per annum, which amounted to £11,650 sterling, making, with the principal, the sum of £26,650, which he thereby reported to be due and payable to the Plaintiffs by the Defendant, Bethel, in the following proportions, namely, the sum of £8883, 6s. 8d. to the Plaintiff, Elizabeth Henderson; a like sum to the Plaintiff, C. Simms and Joanna, his wife; and a like sum to the Plaintiff, William Henderson.

The bill stated that this report was filed on the 6th of June 1840: that an order *nisi* to confirm was served on H. A. Emerson, Esq., and that the same was confirmed absolutely on the 10th of June 1840: that the Defendants obtained an order for a final decree *nisi*, but the Judges of the Supreme Court directed that as H. A. Emerson, Esq., had withdrawn from the defence of the suit, the notice of motion for the final decree should be served on the Plaintiff personally: and that, if cause should not be shewn by the then next term, the final decree should be made: that no notice of such

motion was ever served upon the Plaintiff; but that in March 1841 the Plaintiff was
served with a document purporting to be a *subpœna* to hear judgment; to which was
[108] attached a notice, signed by the solicitor of the Defendants, "that the Master's
report, filed on the 6th of June 1840," stood confirmed; that, on the affidavit of the
service of the said document, the Supreme Court, on the 6th of June 1841, made a
decree.   [The bill set forth the decree, which recited the various proceedings, as
having been duly prosecuted; and ordered and decreed that Bethel, the Defendant
therein named, should pay to Elizabeth, the widow, £8883, 6s. 8d. sterling; to C.
Simms and Joanna, his wife, £8883, 6s. 8d., and to William, the son, £8883, 6s. 8d.;
and that he should also pay to the Plaintiffs their costs of the suit.]

The bill then specified many of the statements recited in the decree, which it
alleged were untrue; that the third bill was in fact an original, and not an amended,
bill; and that there were various other irregularities in the proceedings; the bill
alleged that in December 1841, before the Plaintiff had notice of the decree, the same
was inrolled; that in August 1842 the Plaintiff was applied to, by the attorney of
the Defendants, for payment of the said sum of £8883, 6s. 8d. to the Defendant
Elizabeth, the widow, and the like sum to the Defendant, Simms, and Joanna, his
wife, with £55 costs, which was the first notice he received of the final decree; and
that the Defendants had lately brought two actions against the Plaintiff in the Queen's
Bench to recover the said sums.

The bill charged that the decree was wholly irregular, and ought not to be
enforced, and that the same ought to be reversed by Her Majesty in Council, on the
Plaintiff's appealing against the said decree, which, notwithstanding the inrolment
thereof, he intended to do; that there was no personal representative of Jordan
Henderson, appointed in this country, party to any of the [109] proceedings; and
that there was no personal representative whatever of William, the father, a party
thereto; that none but a personal representative of Jordan Henderson was entitled to,
or could give a discharge for, any part of his personal estate.

The bill alleged that the whole of the estate of William, the father, had consisted
of the partnership property, given up by him to Jordan Henderson and the Plaintiff,
his sons, and continued by them in the business, and that the Plaintiff was only
accountable for the same with, and as part of, the other partnership assets; and, if
the partnership accounts were properly taken, it would appear, and was the fact, that
a very large sum of money was due and owing to the Plaintiff from the estate of
Jordan, in respect of advances by the Plaintiff to the concern, payments beyond his
receipts, and money drawn out by Jordan, his widow and family; and that the
estate of Jordan was also indebted to the Plaintiff in two sums of £547 and £538,
in respect of monies which the Plaintiff had expended, at Jordan's request, in the
education of his said children.

The bill prayed that an account might be taken of what was due to the Plaintiff
from the estate of Jordan, and of the other debts of Jordan, and of his personal estate,
and that the same might be applied in a due course of administration: that an account
of the partnership transactions between the Plaintiff and Jordan might be also taken:
that all necessary inquiries might be directed to ascertain the personal estate of
William, the father; that so much, if any, of the said two sums of £8883, 6s. 8d. as
might be found payable by the Plaintiff (he not admitting that any part thereof was
so payable) might be applied and administered as part of the assets of Jordan: that
the Defendants, Elizabeth, the widow, and Simms and [110] his wife, might be
restrained by injunction from proceeding with the said or any other action to recover
the said two sums of £8883, 6s. 8d.: and that a commission might be issued to
examine witnesses in Newfoundland.

To this bill the Defendants, Elizabeth, the widow, and Simms and his wife,
demurred for want of equity, want of parties and multifariousness.

Mr. Tinney, Mr. Burge and Mr. Rolt, for the demurrer.

Mr. Purvis and Mr. Bagshawe, for the bill.

The points submitted to the Court in argument will sufficiently appear from the
judgment.   The authorities cited were *Phillips* v. *Hunter* (2 H. Bl. 402), *Cottington's
case* (2 Swans. 326, n.; Lord Nottingham's MS.), *White* v. *Hall* (12 Ves. 321), *Henley*
v. *Soper* (8 B. & C. 16), *Fuller* v. *Willis* (1 Myl. & K. 292, n.), *Alivon* v. *Furnival* (1

Cr. Mees. & Ros. 277), *Cowan* v. *Braidwood* (1 Man. & Grang. 882), *Becquet* v. *M'Carthy*
(2 B. & Adol. 951), *Houlditch* v. *Marquis of Donegal* (8 Bligh (N. S.), 301), *Russell* v.
*Smyth* (9 Mees. & W. 810), *Ferguson* v. *Mahon* (11 Ad. & Ell. 179), *Thompson* v.
*Derham* (1 Hare, 358).    Burge Com. Col. Law, vol. 3, p. 1058.

THE VICE-CHANCELLOR [Sir James Wigram].    The Plaintiff by his bill alleges
that he and Jordan, his late brother, were partners in business, one branch of which
was carried on at Bristol and the other at Newfoundland : and that, in respect of
that partnership, he is **[111]** a creditor to a large amount on the estate of Jordan ;
that part of the partnership property was derived from their father ; and that all the
property which they derived from their father formed part of the assets of the
partnership.    The Plaintiff also alleges that he is a creditor on the estate of Jordan,
in respect of a private debt ; and the bill prays such an account as would comprise all
these matters which are in question between the Plaintiff and the estate of Jordan.
Upon these facts a decree for an account against Gadsden, the personal representative
of Jordan in England, would be of course, and perhaps also, if that had been the object
of the suit, the decree for an account might have been extended to Elizabeth, the
widow, as the personal representative of Jordan in Newfoundland.    The widow
of Jordan and Simms and his wife are, however, before the Court in the character of
next of kin, and there is no pretence for making them parties in that character in a
suit for the mere administration of the estate of Jordan.    The relief sought against
those parties is founded upon the proceedings which have taken place in the Court in
Newfoundland, and the use which they are about to make of these proceedings in
this country.

The Defendants, who have demurred, insist, in support of their demurrer, first,
that all and every part of the matter in question on this bill was concluded by a final
decree of the Supreme Court of Newfoundland, dated in June 1841, made in a suit
wherein the Defendants and William, the son of Jordan, were Plaintiffs, and the
present Plaintiff was Defendant, except in so far as that decree is subject to be
reviewed in the Privy Council ; secondly, that by that decree the amount recovered
was decreed to be paid to the Plaintiffs in that suit as beneficial owners, and that the
same thereby ceased to be part of the estate of Jordan, subject to his debts.    They
**[112]** insist, moreover, that the proceedings appear upon the bill with sufficient
certainty to sustain the decree upon the grounds advanced ; and that the only party
against whom the Plaintiff can proceed to recover his claim, or any part of it, is the
Defendant, Gadsden.

I have read the bill carefully, and, without going minutely through the facts of
the case, it is sufficient to say, for the purpose of explaining the order I am about to
make, that the original bill in the Supreme Court of Newfoundland claimed an
account of the same partnership dealings, of which accounts are prayed by the
present bill ; and also sought accounts in respect of the estate of William Henderson,
the father, possessed by Bethel on account of Jordan ; that the Defendant in that suit,
who is the Plaintiff here, made claims by his answer to the original bill corresponding
in substance with those which he makes by his bill in the present suit : that an
amended bill, or a bill which the Court at least thought it right to term an amended
bill, was afterwards filed by the same Plaintiffs against Bethel : that the amended bill
stated and charged that Bethel was largely indebted to the estate of Jordan on the
partnership accounts ; but that such accounts could not be taken in consequence of
Bethel absenting himself from the island and not producing the documents ; and it
further appears that, Bethel having absented himself from the jurisdiction, an order
of the Supreme Court was made in February 1840 for taking the amended bill *pro
confesso ;* and that the amended bill was by the same order referred to the Master to
compute principal and interest due to the Plaintiffs ; and that the Master made his
report in June 1840.    [His Honor stated the report (*supra*, pp. 106, 107).]    It appears
further that the Supreme Court pronounced its final **[113]** decree in June 1841, and
thereby, after referring to all the antecedent proceedings in the cause, decreed that
Bethel Henderson should pay to the widow and two children of Jordan, who were
Plaintiffs, the sum of £8883, 6s. 8d. each, and costs of the suit.

This decree, explained by the report, has in effect severed William the father's
estate from the bulk of the property in question, and the partnership accounts and

the private debt are not specifically the subject of adjudication. Upon this decree Elizabeth, the widow, and Joanna, the daughter of Jordan, and the husband of Joanna have brought their actions in this country.

The bill charges that the proceedings leading to this decree were irregular, that the decree itself was irregular, that a large balance was due to the Plaintiff, and that the decree ought not to be enforced, but ought to be reversed by Her Majesty in Council, on appeal, which the Plaintiff intends to bring. The bill specially alleges, as one ground of irregularity, that the report of the Master, of the 6th of June 1840, wholly omitted any notice of the account connected with the partnership, and is confined to the monies alleged to be due from the Plaintiff, in respect of the estate of William Henderson, the father ; and that a large sum of money is due to the Plaintiff on the partnership accounts, as would appear if they were properly taken. On behalf of the Defendants, it has been argued that the proceedings on the face of the bill shewed that the decree concluded the whole matter, that I could not rehear that decree, and that it was final and conclusive, unless reversed by the Privy Council, the proper appellate tribunal.

Without giving any opinion upon the question whether charges, shewing that the proceedings in a foreign **[114]** Court were altogether null and void, as being against natural justice, would or not, upon general demurrer, have been treated as null, and have sustained the bill as to the whole of the relief prayed, I have no doubt that mere irregularity in the proceedings is insufficient for that purpose, in a case in which an appeal lies from the Colonial Court to the mother country, and there is a tribunal competent to reform the errors of the Court below, and even to suspend the execution of the decree pending the appeal, if justice requires that it should be suspended.(1)

But as the Plaintiff in this case argued only that the whole question between the parties was not concluded by the decree, and did not contend that, upon the charges in the bill, I ought to disregard the decree, I assume, for the present purpose, that I must, upon this demurrer, consider the amount due from Bethel, in respect of William the father's estate, as concluded by the decree of the Supreme Court, subject only to the appeal to the Privy Council ; and that the only question I have now to decide is whether I am to consider the partnership account and the claim of Bethel in respect of the private account as having been likewise the subject of adjudication by the Supreme Court in the island, or whether those items in the general account, which certainly might have been taken in that suit, are to be considered as excepted out of the operation of the decree, under the special circumstances appearing on the Master's report, and the other proceedings stated in the bill..

In trying this question I believe I state the rule of the **[115]** Court correctly when I say that, where a given matter becomes the subject of litigation in, and of adjudication by, a Court of competent jurisdiction, the Court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. The plea of *res judicata* applies, except in special cases, not only to points upon which the Court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time. Those who have had occasion to investigate the subject of bills of review in this Court will not discover anything new in the proposition I have stated, so far as it may apply to proceedings in this country : and in an application to a Court of Equity in this country, for its aid against the effect of a proceeding by a Court of Equity in one of the colonies, I conceive it to be the duty of this Court to apply the same reasoning, at least in the absence of charges in the bill, shewing that a different principle ought to be applied. (See *Bentinck* v. *Willink*, 2 Hare, 1.) The observations of Lord Cottenham in the case of *The Marquis of Breadalbane* v. *The Marquis of Chandos* (2 Myl. & Cr. 732, 733) have

---

(1) See stat. 3 & 4 Will. 4, c. 41, s. 21 ; and see also the Charter of Justice of Newfoundland, Clark's Summary of Colonial Law, pp. 433, 434.

an important bearing upon this point. I may mention also the cases of *Farquharson* v. *Seton* (5 Russ. 45), *Partridge* v. *Usborne* (*Id.* 195), and the judgment of Lord Eldon in *Chamley* v. *Lord Dunsany* (2 Sch. & Lef. 718), as shewing the general principle to which I have adverted. It is plain that litigation would be intermin-[116]-able if such a rule did not prevail. Now, undoubtedly the whole of the case made by this bill might have been adjudicated upon in the suit in Newfoundland, for it was of the very substance of the case there, and *primâ facie*, therefore, the whole is settled. The question then is whether the special circumstances appearing upon the face of this bill are sufficient to take the case out of the operation of the general rule.

Now, what are those circumstances? One circumstance relied upon was that, by the decree of the Colonial Court of the 11th of February 1840, the amended bill only was taken *pro confesso*. The amended bill, it appears, is not, as in this Court, the original bill amended and written upon, so that the amended bill wholly supersedes and comes in the place of the original bill; but the amendments are upon a distinct record.

The bill in this cause charges that the last bill was in fact and substance an original bill, and addressed to different Judges, and that it was not an amended bill; this charge I might have been bound to take as a fact if the Plaintiff had not, by settling out the amended bill and the final decree, given me an opportunity of judging in what sense only the charge is true. I find that the amended bill proceeds upon and refers to the original bill, and to the answer of the Defendant thereto, and the final decree of the Court recites the whole of the proceedings anterior to the final decree, beginning with the original bill. It is impossible, therefore, to contend with effect that the amended bill, though in a sense distinct from the original bill, as being written upon other paper, leaving the first bill still on the record, was not a continuance of the pleadings in one and the same cause, and this, critically considered, is not inconsistent with the charge in the bill which I have just read.

[117] Another objection was the absence or the irregularity of service upon the Plaintiff. Although it is not necessary that I should go into the question respecting the notice, I ought not to disregard the fact that the Plaintiff represents that he had on different occasions actual notice of the suit, and of the relief which was sought against him by it, however irregularly that notice might have been communicated; and if the Plaintiff thought that he might safely disregard the proceedings, and abstain from interposing any defence, on the ground of their irregularity, I think I ought to consider him as having relied on the strength of his case for establishing that irregularity by a complaint in the same jurisdiction, or in the Court of Appeal, and not to have relied on being therefore able to set the decree of the Supreme Court at defiance, even while it remained unreversed.

I may here recur to the observation that the omission of the Master to take the partnership accounts is stated in the bill to be an error in the decree, forming one ground for appeal to the Privy Council.

The point upon which I have had most difficulty in satisfying myself is this : if the decree of the Supreme Court is conclusive upon one party it must, I conceive, be conclusive upon both; and, if not conclusive upon both, it ought to be conclusive upon neither. Now the amended bill alleged that the Plaintiffs there were creditors upon the partnership account, but that the accounts of the partnership cannot be taken, owing to the manner in which the Defendant in that suit had acted. These allegations were established as facts, by the effect of the order for taking the bill *pro confesso*; and it appeared to me during the argument that the present Defendants (the Plaintiffs in Newfoundland) might have a [118] right to say that the accounts not taken by the Master were open for their benefit, by reason that it was the conduct of the Defendant alone which had prevented those accounts from being taken. But that, I think, is not a correct view of the case. The decree was to compute what was due to the Plaintiffs for principal and interest; that is, upon all the accounts in question in the pleadings, including the partnership and private account. The Plaintiffs were not compelled to take such a decree, but, having taken it, they are bound by the consequences, and must be taken to have waived any disadvantage to themselves which would result from it.

The conclusion to which I must come, in a case where relief is sought in this Court

in consequence of errors and irregularities in the decree of a Colonial Court, and an appeal lies from that decree to the appellate jurisdiction in this kingdom, is to allow the demurrer. I do not say that my conclusion would have been the same if the proceedings which were impeached had taken place in a foreign Court, from which there was no appeal to any superior jurisdiction which a Court of Equity in this country could regard as certain to administer justice in the case. I express no opinion on that point.

Demurrer allowed, with liberty to amend.

*Dec.* 18. The bill was not amended; and this day, on the motion of the Defendants, was ordered to be dismissed.

## [119] HUMBLE *v.* SHORE. *Dec.* 23, 1842.

[See the judgment more fully reported, 1 H. & M. 550 (n.). Overruled, *In re Palmer,* [1893], 3 Ch. 369; *In re Allan* [1903], 1 Ch. 276, and cases there cited.]

A suit was instituted to administer and ascertain the residue of an estate, and one of the residuary legatees, after the bill was filed, and before he was served with the *subpœna* to appear and answer, assigned his share: the assignee was held to be a necessary party to the suit.

In an administration suit, a party interested in the residue, by his answer, averred that, according to his information and belief, the suit was collusive as between the Plaintiffs and the executors and other parties: there being no replication, the allegation was taken as proof of the fact; and it was held that the fact was no objection to the making of the decree.

The Plaintiffs were entitled, under the will of Lydia Shore, to certain residuary shares in her real and personal estate, and the bill was filed against the executors and trustees, and the other parties interested in the residuary estate of the testatrix, to carry into execution the trusts of the will. The cause coming on for hearing,

Mr. Temple and Mr. Freeling, for one of the residuary legatees, objected that he had executed an assignment of his share in the residuary estate after the filing of the bill, but before he had been served with the *subpœna,* and that the assignee was a necessary party to the suit: *Pigott* v. *Nower* (3 Swans. 529, n.).

Mr. Rolt, for the Plaintiffs, submitted that an assignee *pendente lite* would be bound by the proceedings in the cause, and that the absence of the assignee was not therefore any ground for refusing the usual decree: *Landon* v. *Morris* (5 Sim. 262).

THE VICE-CHANCELLOR allowed the objection and the cause stood over.

*May* 13, 1843. The Plaintiffs filed their supplemental bill against the assignee of the residuary share, seeking the like relief against the Defendant as was prayed by the original bill. The Defendant admitted the will, but said he was informed and believed that the suit was collusive as be-[120]-tween the Plaintiffs and the executors and other parties; and that he had instituted another suit against the executors, impeaching their conduct with respect to particular matters which did not form the subject of any special charge in this suit. The Plaintiffs did not reply to this answer. At the hearing,

Mr. Romilly and Mr. Rolt said that the allegation that the Defendant was " informed and believed" the Plaintiffs and Defendants colluded was no averment of the fact; and if it were true, the fact was wholly unimportant. The Plaintiffs and the other residuary legatees (except the Defendant to the supplemental bill and his assignor) desired that the accounts should be taken, and the trusts executed in this suit: in that sense a great part of the suits in this Court were collusive: any special inquiries which the objecting Defendants could suggest might be made in the decree.

Mr. Daniel, for the executors, offered to submit to any inquiries with respect to

TAB 28

*Johnson v Gore Wood* [2002] 2 AC 1, House of Lords

A                                    House of Lords

## Johnson *v* Gore Wood & Co (a firm)

2000  July 17, 19, 20;        Lord Bingham of Cornhill, Lord Goff of Chieveley,
      Dec 14                          Lord Cooke of Thorndon, Lord Hutton
                                                            and Lord Millett

B
Company — Shareholder — Rights — Action by company for damages for breach of
    duty — Subsequent action by majority shareholder in respect of personal losses
    sustained — Whether losses recoverable where not merely reflective of
    company's losses
Damages — Contract — Breach — Measure of damages — Whether damages for
    mental distress and anxiety recoverable
Estoppel — Convention, by — Underlying assumption — Validity of test
C
Practice — Pleadings — Striking out — Abuse of process — Company bringing
    action against solicitors for damages for professional negligence — Action
    compromised — Majority shareholder subsequently bringing action in respect of
    personal losses sustained — Whether question of abuse of process to be judged
    broadly on merits

        The plaintiff, a businessman, conducted his affairs through a number of
D   companies, including W Ltd, in which he held all but two of the issued shares. On
    behalf of W Ltd he instructed the defendants, a firm of solicitors, who from time to
    time also acted on behalf of himself personally and of others of his companies, to act
    for W Ltd in connection with a proposed purchase of land, which it planned to
    develop. It had an option to purchase the land, and the defendants were instructed to
    serve a notice exercising the option. Service of the notice was followed by a dispute
    as to its validity and consequent proceedings in the Chancery Division, where an
E   order for specific performance was made against the vendor. By the time the
    conveyance was completed W Ltd had suffered substantial loss because of the cost of
    the Chancery proceedings, in which the vendor had been legally aided, its inability to
    recover damages and costs from the vendor, the collapse of the property market and
    interest charges that it had incurred. In January 1991 it started proceedings against
    the defendants for professional negligence in connection with the exercise of the
F   option. Before the action came to trial, solicitors representing W Ltd notified
    solicitors acting for the defendants that the plaintiff also had a personal claim against
    the defendants, arising out of the same matters, which he would pursue in due course.
    Subsequently, a solicitor acting for the plaintiff and a solicitor representing the
    defendants discussed the plaintiff's personal claim on the telephone and the plaintiff's
    solicitor explained that it had been thought better to wait until the company's claim
    had been concluded before dealing with the personal claim. An overall settlement of
G   W Ltd's claim and the plaintiff's claim was discussed, as was a settlement of the
    plaintiff's claim. W Ltd's proceedings were eventually compromised during the trial
    on payment to W Ltd of a substantial proportion of the sum claimed by it. In April
    1993 the plaintiff issued a writ against the defendants. In December 1997 the
    defendants applied for the action to be struck out as an abuse of the process of the
    court. They also sought determination of preliminary issues as to whether they had
    owed the plaintiff a duty of care and whether the damages claimed by him were in
H   principle recoverable on the facts pleaded. The judge declined to strike out the
    plaintiff's claim, holding that the defendants were estopped by convention from
    contending that the plaintiff's action was an abuse of process. He further held that
    the heads of damage pleaded were not irrecoverable as a matter of law in respect of
    the breaches alleged by the plaintiff. The Court of Appeal, on appeal by the
    defendants, ordered that the judge's order be set aside in so far as he had dismissed

the defendants' application to strike out the proceedings as an abuse of the process of    A
the court but not otherwise.

On appeal by the plaintiff and cross-appeal by the defendants—

*Held*, (1) allowing the appeal, that there was a public interest in the finality of
litigation and in a defendant not being vexed twice in the same matter; but that
whether an action was an abuse of process as offending against that public interest
should be judged broadly on the merits taking account of all the public and private
interests involved and all the facts of the case, the crucial question being whether the    B
plaintiff was in all the circumstances misusing or abusing the process of the court; and
that, in all the circumstances, the plaintiff's action was not abusive ( post, pp 30H–31F,
32C–33A, 34C–G, 38F–G, 42D–F, 50H, 58G–60C, F–61A).

*Henderson v Henderson* (1843) 3 Hare 100 considered.

Observations as to estoppel by convention ( post, pp 33C–G, 38H–41C, 60H–61A).

(2) Dismissing the cross-appeal but varying the order of the Court of Appeal, that
the plaintiff was in principle entitled to recover in respect of any loss that he had    C
himself suffered that was not merely a reflection of the loss suffered by W Ltd; that,
save for his claims in respect of the dimunition in value of his pension and of his
majority shareholding in W Ltd in so far as they were merely a reflection of W Ltd's
loss, the plaintiff's heads of claim in respect of quantifiable damage should not be
struck out; that damages for breach of contract could not generally include damages
for mental distress and anxiety; that (Lord Cooke of Thorndon dissenting) the
plaintiff's claim for damages under that head should be struck out; and that his claim    D
for aggravated damages should also be struck out ( post, pp 35E–37A, D, 38C–D,
41E–42C, 48B–D, 50G, 55D–56B, 67C, G–68C).

*Addis v Gramophone Co Ltd* [1909] AC 488, HL(E) applied.

Decision of the Court of Appeal [1999] Lloyd's Rep PN 91; [1999] PNLR 426
reversed in part.

The following cases are referred to in their Lordships' opinions:    E

*Addis v Gramophone Co Ltd* [1909] AC 488, HL(E)
*Amalgamated Investment and Property Co Ltd v Texas Commerce International
    Bank Ltd* [1982] QB 84; [1981] 3 WLR 565; [1981] 3 All ER 577, CA
*Arnold v National Westminster Bank plc* [1991] 2 AC 93; [1991] 2 WLR 1177;
    [1991] 3 All ER 41, H L(E )
*Ashmore v British Coal Corpn* [1990] 2 QB 338; [1990] 2 WLR 1437; [1990] 2 All
    ER 981, CA
*Bailey v Bullock* [1950] 2 All ER 1167    F
*Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427, CA
*Barrow v Bankside Members Agency Ltd* [1996] 1 WLR 257; [1996] 1 All ER 981, CA
*Bradford and Bingley Building Society v Seddon* [1999] 1 WLR 1482; [1999] 4 All
    ER 217, CA
*Bragg v Oceanus Mutual Underwriting Association (Bermuda) Ltd* [1982] 2 Lloyd's
    Rep 132, CA
*Brisbane City Council v Attorney General for Queensland* [1979] AC 411; [1978]    G
    3 WLR 299; [1978] 3 All ER 30, PC
*Brown v Waterloo Regional Board of Comrs of Police* (1982) 136 DLR (3d) 49;
    (1983) 150 DLR (3d) 729
*C (A Minor) v Hackney London Borough Council* [1996] 1 WLR 789; [1996] 1 All
    ER 973, CA
*Christensen v Scott* [1996] 1 NZLR 273
*Clark Boyce v Mouat* [1994] 1 AC 428; [1993] 3 WLR 1021; [1993] 4 All ER 268,    H
    PC
*Fischer (George) (Great Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260,
    CA
*Foss v Harbottle* (1843) 2 Hare 461
*Gerber Garment Technology Inc v Lectra Systems Ltd* [1997] RPC 443, CA

A    *Gleeson v J Wippell & Co Ltd* [1977] 1 WLR 510; [1977] 3 All ER 54
     *Greenhalgh v Mallard* [1947] 2 All ER 255, CA
     *Halliday v Shoesmith* [1993] 1 WLR 1, CA
     *Hayes v James & Charles Dodd* [1990] 2 All ER 815, CA
     *Henderson v Henderson* (1843) 3 Hare 100
     *Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145; [1994] 3 WLR 761; [1994]
       3 All ER 506, HL(E)

B    *Heron International Ltd v Lord Grade* [1983] BCLC 244, CA
     *Hobbs v London and South Western Railway Co* (1875) LR 10 QB 111
     *Home and Colonial Insurance Co Ltd, In re* [1930] 1 Ch 102
     *House of Spring Gardens Ltd v Waite* [1991] 1 QB 241; [1990] 3 WLR 347; [1990]
       2 All ER 990, CA
     *Howard (R P) Ltd v Woodman Matthews & Co* [1983] BCLC 117
     *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529; [1981] 3 WLR
       906; [1981] 3 All ER 727, HL(E)

C    *Lee v Sheard* [1956] 1 QB 192; [1955] 3 WLR 951; [1955] 3 All ER 777, CA
     *Mahmud v Bank of Credit and Commerce International SA* [1998] AC 20; [1997]
       3 WLR 95; [1997] 3 All ER 1, HL(E)
     *Manson v Vooght* [1999] BPIR 376, CA
     *Mouat v Clark Boyce* [1992] 2 NZLR 559
     *President of India v Lips Maritime Corpn* [1988] AC 395; [1987] 3 WLR 572; [1987]
       3 All ER 110, HL(E)

D    *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204;
       [1982] 2 WLR 31; [1982] 1 All ER 354, CA
     *Ruxley Electronics and Construction Ltd v Forsyth* [1996] AC 344; [1995] 3 WLR
       118; [1995] 3 All ER 268, CA
     *Stein v Blake* [1998] 1 All ER 724, CA
     *Talbot v Berkshire County Council* [1994] QB 290; [1993] 3 WLR 708; [1993] 4 All
       ER 9, CA

E    *Taylors Fashions Ltd v Liverpool Victoria Trustees Co Ltd (Note)* [1982] QB 133;
       [1981] 2 WLR 576; [1981] 1 All ER 897
     *Vervaeke (formerly Messina) v Smith* [1983] 1 AC 145; [1982] 2 WLR 855; [1982]
       2 All ER 144, HL(E)
     *Walker v Stones* [2001] QB 902; [2001] 2 WLR 623; [2000] 4 All ER 412, CA
     *Watson v Dutton Forshaw Motor Group Ltd* (unreported) 22 July 1998; Court of
       Appeal (Civil Division) Transcript No 1284 of 1998, CA

F    *Watts v Morrow* [1991] 1 WLR 1421; [1991] 4 All ER 937, CA
     *Whelan v Waitaki Meats Ltd* [1991] 2 NZLR 74
     *Windsor Steam Coal Co (1901) Ltd, In re* [1929] 1 Ch 151, CA
     *Yat Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581; [1975] 2 WLR
       690, PC

The following additional cases were cited in argument:

G    *Allison (Kenneth) Ltd v A E Limehouse & Co* [1992] 2 AC 105; [1991] 3 WLR 671;
       [1991] 4 All ER 500, HL(E)
     *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2)* [1967] 1 AC 853; [1966] 3 WLR
       125; [1966] 2 All ER 536, HL(E)
     *Compania Portorafti Commerciale SA v Ultramar Panama Inc (The Captain Gregos)*
       *(No 2)* [1990] 2 Lloyd's Rep 395, CA
     *Farley v Skinner* (unreported) 6 April 2000; Court of Appeal (Civil Division)
H    Transcript No 577 of 2000, CA
     *Fox v Star Newspaper Co Ltd* [1898] 1 QB 636, CA; [1900] AC 19, HL(E)
     *Goodwill v British Pregnancy Advisory Service* [1996] 1 WLR 1397; [1996] 2 All
       ER 161, CA
     *Hall v Governor and Co of the Bank of England* (unreported) 19 April 2000; Court
       of Appeal (Civil Division) Transcript No 725 of 2000, CA

*Hiscox v Outhwaite* [1992] 1 AC 562; [1991] 2 WLR 1321; [1991] 3 All ER 124,  A
    CA; [1992] 1 AC 562; [1991] 3 WLR 297; [1991] 3 All ER 641, HL(E)
*Ketteman v Hansel Properties Ltd* [1987] AC 189; [1987] 2 WLR 312; [1987] 1 All
    ER 38, HL(E)
*L R v Witherspoon* [1999] Lloyd's Rep PN 401, CA
*MCC Proceeds Inc v Lehman Bros International (Europe)* [1998] 2 BCLC 659, CA
*Norwegian American Cruises A/S v Paul Mundy Ltd (The Vistafjord)* [1988]
    2 Lloyd's Rep 343, CA                                                    B
*Verderame v Commercial Union Assurance Co plc* [1992] BCLC 793, CA
*Wapshott v Davis Donovan & Co* [1996] PNLR 361, CA

**APPEAL** and **CROSS-APPEAL** from the Court of Appeal
    This was an appeal by the plaintiff, William Henry John Johnson, by leave
of the House of Lords (Lord Hope of Craighead, Lord Clyde and Lord
Millett) given on 25 May 1999 and a cross-appeal by the defendants, Gore   C
Wood & Co (a firm), by leave of the House of Lords (Lord Hope of
Craighead, Lord Clyde and Lord Millett) given on 3 November 1999 from a
judgment of the Court of Appeal (Nourse, Ward and Mantell LJJ) given on
12 November 1998.
    By its judgment, the Court of Appeal had allowed an appeal by the
defendants from an order of Pumfrey J dated 21 May 1998. The judge, on    D
application by the defendants, had declined to strike out the plaintiff's claim
against them. On preliminary issues ordered by Sir Richard Scott V-C sitting
as an additional judge of the Queen's Bench Division, the judge had
determined that (a) the facts and matters relied on by the plaintiff as
constituting breaches of duty by the defendants were capable of constituting
the breach of a contractual, tortious or fiduciary duty owed as a matter of
law by the defendants to the plaintiff and (b) the heads of damage alleged in  E
paragraphs 23 and 24 of the re-amended statement of claim were not
irrecoverable as a matter of law as damages for the pleaded breaches alleged
by the plaintiff. The Court of Appeal ordered that his judgment be set aside
in so far as he had dismissed the defendants' application to strike out the
proceedings as an abuse of the process of the court but not further or
otherwise. It held that one head of damage, namely diminution in the value   F
of the plaintiff's shareholding in Westway Homes Ltd, should be struck out
of the re-amended statement of claim.
    The facts are stated in the opinion of Lord Bingham of Cornhill.

    *Roger ter Haar QC* and *Simon Howarth* for the plaintiff. The Court of
Appeal correctly identified the underlying principle in all cases of abuse of
process as that articulated by Lord Diplock in *Hunter v Chief Constable of*  G
*the West Midlands Police* [1982] AC 529, 536C–D. The Court of Appeal's
decision is inconsistent with *Bradford and Bingley Building Society v*
*Seddon* [1999] 1 WLR 1482. No "additional element" of the type suggested
in that case is present here, nor was any such additional element identified by
the Court of Appeal. The Court of Appeal appears to have regarded it as
being for the plaintiff to establish that special circumstances existed; the
approach in *Bradford and Bingley* is to be preferred as being more           H
consonant with justice and consistent with Lord Diplock's dicta in *Hunter*
and dicta in *Yat Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975]
AC 581, 590 and *Brisbane City Council v Attorney General for Queensland*
[1979] AC 411, 425. May LJ in *Manson v Vooght* [1999] BPIR 376, 387–

A    388, in a dictum correctly stating the effect of the authorities, said that "it
may in particular cases be sensible to advance cases separately". This was
such a case. The Court of Appeal appears to have regarded the mere fact of
"re"-litigation as sufficient to amount to abuse of process: compare *Bradford
and Bingley Building Society v Seddon* [1999] 1 WLR 1482, 1492G. In
effect, this equated the case to one of issue estoppel, which it is not. With
abuse of process, one is looking at much broader issues of justice; many cases
B    involve a collateral attack on a previous decision. If necessary, *Talbot v
Berkshire County Council* [1994] QB 290 should be overruled. [Reference
was also made to *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2)* [1967]
1 AC 853.]

Further, the Court of Appeal gave no or inadequate consideration to the
reasons put forward in the plaintiff's affidavit explaining the reasons for the
C    course adopted. Its reference to full legal aid having been available "long
before the trial" was incorrect. The plaintiff was obliged to have regard, and
did have regard, to the interests of the other shareholders and creditors of the
company in reaching his decision. The Court of Appeal was wrong to hold
that the plaintiff was "in control throughout". His options were severely
limited.

D    It appears, although it is not entirely clear, that the Court of Appeal
accepted that "most practitioners [in 1992] would not have thought the rule
[in *Henderson v Henderson* (1843) 3 Hare 100] applied at all". If that is so,
then the pursuit of the personal claim separately from the company claim
was not an abuse of process: see per Lord Kilbrandon in *Yat Tung
Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581, 590. Whilst the
diligence or lack of diligence of a legal adviser may not be relevant in a true
E    case of issue estoppel, it is relevant where the court is considering questions
of abuse of process (as here) or exercise of its discretion. On the other hand,
if the Court of Appeal took the view that most practitioners in 1992 would
have thought that the rule in *Henderson v Henderson* applied, then the
defendants could and should have taken the point then and it was
unconscionable for them to take it for the first time in December 1997.
F    Moreover, the consequence will be that court time will not be saved by
striking out this action as suggested by the Court of Appeal [1999] Lloyd's
Rep PN 91, 114; on the contrary, it will now be occupied by further and
more complicated litigation against the solicitors and counsel advising the
plaintiff in respect of his personal claim in 1992. Further, in deciding
whether the commencement of the present proceedings was an abuse of
process the applicable principles are those applying in 1992, not those
G    current in 1998; accordingly, the Court of Appeal was wrong to take into
account, "the current reform of civil justice". In deciding whether the
present proceedings constitute an abuse of process it is relevant to consider
not only the plaintiff's conduct but also that of the defendants. The Court of
Appeal's approach is contrary to recent comments made in *L R v
Witherspoon* [1999] Lloyd's Rep PN 401, where the guidance in *Halliday v
Shoesmith* [1993] 1 WLR 1 was approved and followed. The Court of
H    Appeal in the present case appears to have considered that there were
conflicting decisions of the court as to the proper approach to be adopted in
the circumstances, comparing, at pp 113–114, *Halliday v Shoesmith* with
*Goodwill v British Pregnancy Advisory Service* [1996] 1 WLR 1397. The
true rule, which both *Halliday* and *Goodwill* support, is that where a case is

hopeless the court should accede to an application to strike out however late   A
it is made because it is bound to save time and costs. If, however, the claim is
arguable in law then a belated application to strike it out without a trial on
the merits should only be entertained on receiving a valid explanation for the
delay in making it. The Court of Appeal accepted, that the reason for the
point not being taken earlier was that it had not been considered until
Mr Steinfeld was instructed. The plaintiff also accepts that that is the
explanation for the delay. It is a bad reason for failure to take such a point:   B
see *L R v Witherspoon* [1999] Lloyd's Rep PN 401 and *Ketteman v Hansel
Properties Ltd* [1987] AC 189, 219–220. There was accordingly no proper
reason for the delay.

   In the circumstances, the present proceedings do not constitute an abuse
of process. Applying the dictum of Lord Diplock in *Hunter v Chief
Constable of the West Midlands Police* [1982] AC 529, 536C, bringing them   C
is not "manifestly unfair" to the defendants, because they settled the original
company proceedings on the basis that the plaintiff's personal claim would
be litigated or settled later. To allow this claim to be pursued would not
"bring the administration of justice into disrepute among right-thinking
people" given that the defendants settled the company proceedings on the
basis that they knew that the personal claim would be brought, that they
obtained valuable concessions on the basis that it would be litigated or   D
settled later and that both they and the plaintiff acted for a considerable time
on a common assumption that it would be made and would be entertained
by the court. If it is necessary for the plaintiff to show "special
circumstances", these matters constitute them. The plaintiff is not the same
party as the company, nor are his claims the same.

   To apply the rule in *Henderson v Henderson* 3 Hare 100 to a party in the   E
plaintiff's position is a substantial and unnecessary extension of the law in so
far as it applies to issue estoppel. So far as that doctrine is concerned, it is
desirable that it should be clearly and unambiguously applied so that parties
know where they stand and should not depend on questions as to whether
an action "should" have been joined with another. In so far as wider
considerations apply in respect of abuse of process, the mere fact that the
plaintiff could more conveniently have joined in the earlier action against   F
the defendant does not render the later claim an abuse of process: see
*C (A Minor) v Hackney London Borough Council* [1996] 1 WLR 789 and
*Bradford and Bingley Building Society v Seddon* [1999] 1 WLR 1482. In
these circumstances the court is concerned with wider questions of justice
and fairness than the strict ratio of *Henderson v Henderson*. In so far as the
Court of Appeal extended the rule in *Henderson v Henderson* by treating   G
this case as an instance of issue estoppel they were wrong to do so. In so far
as they considered it to be a case of abuse of process going beyond
*Henderson v Henderson* they failed to consider the matter in the round. Had
they done so, they should have concluded that the significant differences
between the company and the personal claims and the reason for proceeding
first with the company claim justified (or excused) the course taken.

   One of the main reasons for the rule in *Henderson v Henderson* is the   H
prevention of the risk that different courts seized of different actions dealing
with the same subject matter and raising the same issues will come to
different conclusions. This would be unfair to the parties, particularly to an
initially successful party who fails in a subsequent proceeding, and likely to

A    bring the administration of justice into disrepute. It is self-evident that
where there is a settlement of the first action these dangers fall away. It is
open to a party fearful of a second action following settlement of the first to
negotiate terms of settlement that preclude his adversary from issuing
further proceedings. To hold that the rule applies where there has been a
compromise of the first action gives rise to practical problems. Is the rule to
apply (and if so how) in a situation where two actions are started and one is
B    settled by a prompt payment into court? There is no reason why the second
action should be regarded as an abuse of process. The defendant is aware of
both actions, has chosen to settle one and has thereby removed the risk of
inconsistent results. No one could have contemplated in the instant case that
as soon as the company action was settled the plaintiff's personal action
should immediately have been struck out.

C        As to estoppel by convention, the judgment of the Court of Appeal
confuses it with estoppel by representation, is contrary to previous binding
authority and is illogical and contrary to principle. The defendants knew
that another action was likely to be commenced and also knew that it would
involve repetition of allegations made in the company action. An objection
to a second action per se (i e, to its very existence rather than to the time
when it was launched or the detail of the case made in it) would necessarily
D    always be open to the defendant. Accordingly, such an objection could and
should have been perceived at the time of the settlement agreement and the
defendants could and should expressly have reserved their right to take it if
they had wished to preserve such a right. There was unchallenged evidence
that the plaintiff would not have agreed to the undertakings he gave in the
settlement agreement if there had been any intimation that this point would
E    be taken. Silence on the matter amounted to an undertaking not to take it.
That the defendants not only kept silent but also obtained concessions in
relation to the second action shows that the parties were proceeding on the
assumption that a second action could be brought if commenced in time
and properly constituted. Otherwise, the concessions extracted from the
plaintiff make no sense.

F        The Court of Appeal appear to have misunderstood or misconstrued the
meaning of "common assumption" in this context. They identified, at p 113,
as the assumption on which the estoppel was based as being that if the rule in
*Henderson v Henderson* did apply it would not be raised. That formulation
was not suggested by the plaintiff and he disputes its accuracy. "Assume"
means "take as being true, for purpose of argument or action": see *Concise
Oxford English Dictionary*, 7th ed (1982). In the present case, for the
G    purpose of entering into the settlement agreement the parties took it as being
true that the plaintiff could bring a second action against the defendants
provided that it was brought within time and disclosed a reasonable cause
of action. There could not have been any relevant assumption in relation
to *Henderson v Henderson* because no one had spotted the point. The
assumption must, therefore, be formulated in more general terms. The court
should not inquire into the reasons why the assumption was made once it is
H    satisfied that it existed and was relied on. If the Court of Appeal were
correct, a distinction would be drawn between a case where the parties form
their assumption because a point is overlooked and one where they notice
the point but mistakenly believe that it is a bad one. In consequence of this
distinction, an estoppel would arise in the latter case but not in the former.

Such a distinction is not logical or justifiable in principle. Further, it is not    A
clear how any rule involving such a distinction would apply where party
A misses the point entirely and party B spots the point but, thinking it a bad
one, does not mention it to party A. The parties then proceed on the
assumption that the point is not available but party B then changes his mind
as to its merits. There ought to be an estoppel, because the important factor
that suggests (as a matter of broad justice) the application of an estoppel    B
would be present. The parties would both have acted in good faith on
the basis that the point was not available. [Reference was made to
*Amalgamated Investment and Property Co Ltd v Texas Commerce
International Bank Ltd* [1982] QB 84, 122; *Ashmore v British Coal Corpn*
[1990] 2 QB 338; *Barrow v Bankside Members Agency Ltd* [1996] 1 WLR
257; *Hiscox v Outhwaite* [1992] 1 AC 562 and *Kenneth Allison Ltd v
A E Limehouse & Co* [1992] 2 AC 105.]    C

*Alan Steinfeld QC* and *Elizabeth Overy* for the defendants. The Court of
Appeal was correct to hold that the rule in *Henderson v Henderson* 3 Hare
100 prima facie applies to these proceedings. In so far as the principle covers
matters that might have been, but were not, brought forward, it is now well
established that it depends not on a strict application of the doctrine of res
judicata but on the public policy that requires that there should be an end to    D
litigation and so treats actions falling within it as an abuse of process: see
*Talbot v Berkshire County Council* [1994] QB 290, 296D. This case is
concerned with that wider, public policy, aspect of the *Henderson v
Henderson* principle. The policy itself has assumed greater importance with
the much greater stress now laid on case management under the Civil
Procedure Rules. It is not possible for the court properly to direct the parties    E
how to manage the case unless both it and the parties know the full range of
the issues that lie between the parties.

There are three vices in litigating or relitigating issues that have already
been litigated or should have been, any one of which is sufficient to
constitute an abuse of process. (i) It is a substantial waste of court time and
is unfair to other litigants; to that extent the rule in *Henderson v Henderson*
is founded in public policy. The courts should be wary of finding that the    F
parties agreed that the rule should not apply. (ii) It subjects, or potentially
subjects, the defendant to more than one set of proceedings, which is prima
facie unfair. It substantially increases costs, as in the present case. (iii) In
many cases, relitigation may constitute a collateral attack on the outcome of
the previous proceedings. There are two objections to this: it offends against
the principle that there should be an end of litigation, and it could result in    G
conflicting decisions. Here, where the plaintiff takes the view that the
amount recovered by the company in its proceedings was not enough to put
it back on its feet, all three vices are present.

The fact that the roots of the principle lie in public policy offers guidance
both on the question whether it should be applied in circumstances where it
is contended that a party could and should have brought his case forward at
an earlier stage but the factual situation differs from the precise situation    H
outlined in *Henderson v Henderson* 3 Hare 100 and on the question of the
exercise of discretion. The question of prima facie application is ultimately
whether to permit the claim to proceed would amount to a misuse of
procedure in the way indicated by Lord Diplock in *Hunter v Chief Constable*

A    *of the West Midlands Police* [1982] AC 529, 536c. The existence of the
wider *Henderson v Henderson* principle and its foundation in public policy
were clearly recognised in *Vervaeke (formerly Messina) v Smith* [1983] 1 AC
145, 157f, 163b–e. [Reference was also made to *Yat Tung Investment Co
Ltd v Dao Heng Bank Ltd* [1975] AC 581 and *Brisbane City Council v
Attorney General for Queensland* [1979] AC 411.]

B    *Bradford and Bingley Building Society v Seddon* [19991 1 WLR 1482
suggests that in the application of *Henderson v Henderson* 3 Hare 100 a
distinction is to be drawn between cases in which the narrower principle is
relevant, where the principle applies unless there are special circumstances,
and those in which the wider principle is invoked, where it is for the person
alleging abuse of process to establish that when all the circumstances are
weighed there will be found to be an abuse. No sufficient warrant for such a
C    distinction is to be found in any of the former authorities or was made in the
present case. Public policy points clearly against relitigation and thus a
prima facie abuse exists equally in any relitigation case. The need for a
careful examination of all the circumstances was recognised in both *Yat
Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581 and *Brisbane
City Council v Attorney General for Queensland* [1979] AC 411, but with
no indication that something over and above the abuse normally resulting
D    from relitigation had to be shown. *Barrow v Bankside Members Agency Ltd*
[1996] 1 WLR 257 involved consideration of the wider *Henderson v
Henderson* principle and is not properly to be relied on in the way in which it
was relied on in *Bradford and Bingley Building Society v Seddon* [1999]
1 WLR 1482. Auld LJ seems to suggest that the House of Lords in *Arnold v
National Westminster Bank plc* [1991] 2 AC 93 was dealing with issue
E    estoppel in its strict form and not deciding anything in relation to the wider
principle based on abuse of process. It is clear, however (see at pp 106b and
108g–h), that their Lordships were not drawing any distinction between
cases in which the issue had actually been decided and those in which the
relevant point might have been brought forward but was not. As *Talbot v
Berkshire County Council* [1994] QB 290 shows, that is the very distinction
between the narrower and the wider aspects of the principle. *Bradford and
F    Bingley Building Society v Seddon* [1999] 1 WLR 1482 should, therefore, be
overruled in so far as it requires a different approach to the two types of case.
Any balancing process comes only at the stage of the exercise of discretion.

The Court of Appeal was correct to hold that the rule in *Henderson v
Henderson* 3 Hare 100 applies to a privy of the claimant in the first action as
it would to the claimant himself and that the plaintiff was a privy of
G    Westway Homes Ltd ("WWH") for the purposes of the rule. As to privity
generally, an abuse of process objection based on relitigation may be taken
against a person who is a privy of the original claimant in the sense of having
a common interest in the determination of the original action: see *Ashmore
v British Coal Corpn* [1990] 2 QB 338; *House of Spring Gardens Ltd v Waite*
[1991] 1 QB 241 and *MCC Proceeds Inc v Lehman Bros International
(Europe)* [1998] BCLC 793. There is no logical justification for
H    distinguishing between the position of a privy in a case of estoppel under the
narrower *Henderson v Henderson* principle and his position in a case of
abuse of process under the wider principle. It follows that the general rule
should be that in the latter case as in the former there is no need to show any
special or exceptional circumstances before a privy may be bound. The real

question is who is a privy of the original party for these purposes. [Reference  *A*
was made to *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2)* [1967] 1 AC
853.]

The plaintiff contended in the Court of Appeal that the application of the
wider *Henderson v Henderson* 3 Hare 100 principle to privies was an
extension that could have dramatic and unfair consequences and so should
not be made. If it is an extension at all, rather than a case not previously
considered but plainly within the original rule, then it is an extension that  *B*
ensures a consistent approach to all aspects of *Henderson v Henderson*. The
difficulties identified by the plaintiff in the Court of Appeal all stem from a
choice by two closely related parties bringing claims covering substantially
the same issues to proceed independently. In such circumstances, the answer
lies in proper case management. Both claims have in fact been put forward
and it is for the parties and the court to manage the litigation in such a way  *C*
that the court's process is not abused by exposing the defendants to
relitigation. The argument does not show a basis for the House of Lords to
determine that the *Henderson v Henderson* principle does not apply to a
privy. The misuse of procedure test is satisfied.

As to privity specifically in this case, the test in *Gleeson v J Whippell & Co
Ltd* [1977] 1 WLR 510, 515F is correct. The essence of the plaintiff's case is
that WWH was his alter ego. There is the closest possible identification  *D*
between him and WWH, the original party. In substance they are one and
the same for present purposes, and it is just that the plaintiff should be bound
under the principle binding privies. Further, he relies on allegations that the
defendants owed him duties in exactly the same terms as they did to
WWH and were in breach of those duties in exactly the same way. The
Court of Appeal [1999] PLR 426, 462F rightly said that those allegations  *E*
encompass "practically the whole of the ground traversed for six weeks" in
the company proceedings. The plaintiff is fairly and squarely covered by the
approach of Stuart-Smith LJ in *House of Spring Gardens Ltd v Waite* [1991]
1 QB 241, 254A–B. If the company action had gone on to judgment and
been dismissed on a finding that the defendants had not been negligent, it is
inconceivable that he would not have been estopped by that judgment in the
same way as the plaintiff in the *Spring Gardens* case was so as to preclude his  *F*
bringing his personal claim. He is therefore to be regarded as a privy of
WWH not only as a matter of practical identity but also through his conduct
in relation to the company proceedings.

The Court of Appeal was correct to hold that the rule in *Henderson v
Henderson* 3 Hare 100 was capable of applying in the situation where the
first action was compromised rather than continued through to judgment  *G*
and that the rule applied in the present case having regard (if necessary) to
the stage the company proceedings had reached when they were
compromised. The significance of the reference in *Henderson v Henderson*
to adjudication is that adjudication is a final form of resolution after
consideration of the merits.  There is no reason in principle why a
compromise should not have the same effect, given that it is equally a final
form of resolution of the parties' disputes relating to the particular subject  *H*
matter after consideration of the merits. There is no basis in public policy
for distinguishing the two classes of case.

It is immaterial at what stage of the proceedings the compromise is
reached. There is no basis on which the plaintiff can say that the trial of the

A  company proceedings had not got far enough. In any event, the principle in *Henderson v Henderson* 3 Hare 100 should apply where the action has gone beyond the stage at which the court would permit the claimant to discontinue and start again. That will be so where the claimant has opened his case (and a fortiori once, as here, he has closed his case on liability): see *Fox v Star Newspaper Co Ltd* [1898] 1 QB 636; [1900] AC 19. The

B situation is then comparable with the primary *Henderson v Henderson* case, in which the court and the parties will have full awareness of the material issues on which the court is adjudicating. On any view, the company proceedings had gone far enough for *Henderson v Henderson* to apply.

  The Court of Appeal was correct to determine that there were no special circumstances that required that the present action should not be struck out despite the prima facie application of the rule in *Henderson v Henderson*

C 3 Hare 100. As to the first special circumstance relied on by the plaintiff, namely, his reasons for not bringing his personal claim at the same time as the company claim, all his arguments stem ultimately from his and the company's lack of financial resources. Difficulties in funding litigation do not in themselves amount to special circumstances for the purposes of the *Henderson v Henderson* principle: see *Manson v Vooght* [1999] BPIR 376.

D Any other approach would involve the risk that a claimant would pursue one head of claim after another as funding for each became available, whether from borrowing, legal aid, a contingency fee arrangement or even the fruits of success on previous heads. Such a process would clearly be oppressive to the defendant.

  As to the second special circumstance relied on, namely, the defendants' conduct relating to the plaintiff's personal claim, essentially the matters of

E conduct amount to no more than that the defendants did not ask the plaintiff to join his claim with that of WWH in the company proceedings, contemplated but did not achieve settlement of the personal claim and did not raise the abuse point until late in the day. Complaint is also made that the defendants are not prepared to make concessions (i e, to admit liability) that would reduce the length of the trial. Save in so far as his conduct may

F found an estoppel argument, a potential defendant is under no obligation to advise a claimant how to make his claim so that a successful application to strike out on the ground of abuse of process may be avoided. Similarly, a defendant is not obliged to concede points not determined against him so that the claimant cannot be said to be relitigating those issues. The Court of Appeal rightly found that the delay was not a special circumstance.

  As to the third special circumstance relied on, namely, the fact that the

G plaintiff was not warned by his legal advisers of the potential challenge to the personal claim, this should not be visited on the defendants as a special circumstance taking this case out of the *Henderson v Henderson* 3 Hare 100 principle. The mischief of relitigation between the original parties or their privies is the same in either case.

  The Court of Appeal was correct to determine that the defendants were not estopped by convention from alleging that the present action was an

H abuse of the process of the court. The difference on this point between the Court of Appeal and Pumfrey J arose not from any difference as to the applicable law but because on the facts the Court of Appeal held that the common assumption on the basis of which the parties had acted was more limited than Pumfrey J had found. The classic statement of the principle

underlying estoppel by convention on the basis of which both Pumfrey J and    A
the Court of Appeal proceeded is that of Lord Denning MR in *Amalgamated
Investment and Property Co Ltd v Texas Commerce International Bank Ltd*
[1982] QB 84, 122. [Reference was also made to *Kenneth Allison Ltd v
A E Limehouse & Co* [1992] 2 AC 105, 127D–G.] It is an essential feature of
the application of the principle that each party should be aware of the
assumption made by the other and that they should conduct their dealings
on the basis of those assumptions: see *Norwegian American Cruises A/S v*    B
*Paul Mundy Ltd (The Vistafjord)* [1988] 2 Lloyd's Rep 343, 351 and
*Compania Portorafti Commerciale SA v Ultramar Panama Inc (The Captain
Gregos) (No 2)* [1990] 2 Lloyd's Rep 395, 405. It is not sufficient that the
assumption is common to both if they are not also both aware that it is
common to both; in that sense, the assumption must be not only common
but agreed. It is also an essential feature that the estoppel should arise on the    C
basis of an assumption as to facts or law. It does not arise on the basis of a
representation by one party to the other either as to fact or as to that party's
future conduct: see *The Vistafjord*, p 351 and *Spencer Bower and Turner,
Estoppel by Representation*, 3rd ed (1977), p 157, para 157. The inquiry
concerns not what a party will do but what a state of affairs is. In *Hiscox v
Outhwaite* [1992] 1 AC 562, which led Pumfrey J to his conclusion, there
was no departure from those principles. The argument addressed to the    D
Court of Appeal related solely to the facts of the case: see p 565H. The case is
no more than an illustration of the application of the principles to particular
factual circumstances. To succeed in the present case on the footing of
estoppel by convention on the basis of the circumstances of and surrounding
the settlement of the company proceedings and the terms of that settlement,
the plaintiff needs to show an agreed assumption that as and when he made    E
his personal claim it would not be open to attack as an abuse of process on
the basis of *Henderson v Henderson* 3 Hare 100. An agreed assumption that
the defendants would not adopt a particular line of attack would not be
sufficient. The agreed assumption found by Pumfrey J that "the personal
claim would be made, and would be entertained by the court" appears to be
an assumption as to the future conduct of the plaintiff and, if it is intended to
extend to an assumption that the claim would be considered on its merits, as    F
to the future conduct either of the court or of the defendants. It could not
support the estoppel by convention that the judge found.

The Court of Appeal was correct to hold that the facts did not evidence a
common assumption of the necessary nature. The fact that the defendants
did nothing to indicate that they accepted that the threatened claim was or
might be a good one or one capable of being maintained (i e, in this context,    G
a claim that would not be vulnerable to a striking-out application on the
ground of abuse of process) and that they would limit the nature of any
defences or objections that they might have is fatal to the plaintiff's case. It is
in fact inconceivable that there should have been an agreed assumption
about possible lines of attack on the plaintiff's present claim at a time when
there was no pleading in existence and in view of the fact that the claim as
now formulated is very different from the claim then notified. If the    H
plaintiff's personal claim had been statute-barred, there was nothing in the
compromise or in the defendants' conduct to give rise to an estoppel that
would have prevented them from taking a limitation point in the personal
action when it was brought. There is no logical distinction between that and

A  any other defence or objection. The position is not affected by bringing into the equation the defendants' delay in making the striking-out application. It is true that when the claim was actually brought and pleaded they became able to assess to some degree whether or not it was an abuse of process. (The position became clearer after completion of service of the plaintiff's factual and expert evidence.) It cannot be said, however, that conduct consisting of

B  nothing more than, on the one part, failure to make an application and, on the other, continuing with the action involves a communication between the parties of the fact that each is proceeding on the assumption that the action is not an abuse of process. Delay is to be considered, as it was by the Court of Appeal and Pumfrey J, in relation to the issues of special circumstances and the exercise of the striking-out power.

As to the possibility of an estoppel by representation, if the point is sought

C  to be raised, there is nothing in the evidence to show any representation by the defendants to the plaintiff that they would conduct their defence of the action in any particular way or without taking any particular point.

There are no grounds for attacking the Court of Appeal's exercise of its discretion to strike out the plaintiff's claim as an abuse of process. Once the abuse of process has been shown, the court has a duty to put an end to it by

D  striking the action out unless in the exercise of its discretion it concludes that its duty to do so is outweighed by other considerations. It "defies common sense" (see *Goodwill v British Pregnancy Advisory Service* [1996] 1 WLR 1397, 1402), and would defeat the general public policy underlying *Henderson v Henderson* 3 Hare 100, to refuse to prevent an abuse of the court's process simply to punish the defendants for their delay. *Goodwill* should be preferred to *Halliday v Shoesmith* [1993] 1 WLR 1. It shows that

E  the decision in *Halliday* should be confined to similarly exceptional cases.

"Special circumstances" cannot be resurrected at the discretion stage as contended for by the plaintiff. The points raised are explicit or implicit in the issues already considered and do not support an independent attack on the exercise of discretion. The present action is manifestly unfair to the defendants, who only some years after the settlement of the company

F  proceedings became aware of the extent to which the plaintiff proposed to go over again issues extensively canvassed in the previous action. That could not have been foreseen from the sketchy details available at the end of November 1992. It would bring the administration of justice into disrepute to allow the plaintiff to do this simply because through his alter ego (and by his own choice) he did not recover as much in the company proceedings as he

G  would have liked to. Alternatively, on any view the Court of Appeal was entitled to exercise its discretion as it did, having regard to the overall principle of *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529 and cannot be said to have been plainly wrong.

As to delay, the prospect of a trial of at least eight weeks (the parties' current estimate), which ex hypothesi constitutes an abuse of process, has to be balanced against the time, effort and expense incurred in the progress of

H  the litigation to date and the stress of the litigation on the plaintiff. His advisers are sufficiently compensated for their time and effort through their entitlement to costs. While the plaintiff has himself spent time on the action and has experienced stress, that is the consequence of his having persisted in an action that will be found to have been an abuse. When the balancing

exercise has been performed, it is a decision not to strike out the action that   A
would be plainly wrong.

On the cross-appeal, the first five principles put forward by the Court of
Appeal [1999] PNLR 456B–F are correct. The fundamental principle is that,
as a general rule, the company is the proper claimant in an action to recover
loss that it has itself suffered: see *Foss v Harbottle* (1843) 2 Hare 461.
A shareholder cannot in substance avoid that rule by bringing a personal
claim to recover damages for loss in the value of his shares merely because   B
the company in which he is interested has suffered damage, even if the
conduct of which he complains gave him personally, and not the company
alone, a cause of action: see *Prudential Assurance Co Ltd v Newman
Industries Ltd (No 2)* [1982] Ch 204, 222H–223A. He is suing for loss that
simply reflects loss to the company. The *Prudential* principle is, as the Court
of Appeal [1999] PNLR 457F said, salutary. It ensures that loss to the   C
company is recovered only by the company and that the proceeds of
recovery are not diverted to the shareholders to the potential prejudice of
creditors. It similarly ensures that the process of recovery is conducted only
by the company and that the company's right to recover is not adversely
affected by outside compromises with the shareholders to the potential
prejudice of creditors. It applies to loss of benefits as a director as well as   D
to loss of dividends. There is no exception to it by which a shareholder
can recover in respect of reflective loss that the company itself has for any
reason failed to recover: see *Prudential*, at p 223E, and *Gerber Garment
Technology Inc v Lectra Systems Ltd* [1997] RPC 443, 471.

The loss claimed by the plaintiff as shareholder is entirely a reflection of
WWH's loss, being referable to lack of available funds in WWH at a
particular time and/or the compromise of the company proceedings for (it is   E
alleged) a sum substantially less than the full amount of WWH's loss. The
duties breach of which is alleged to have caused the plaintiff's loss are the
same in content as those relied on in the company proceedings and are
alleged to have been broken in the same way.

In any event, in accordance with general principles as to recoverability of
damage a shareholder cannot recover for loss stemming from delayed
payment of damages to him, a fortiori from delayed payment of damages to   F
the company: see *Verderame v Commercial Union Assurance Co plc* [1992]
BCLC 793. The essence of the claim to additional loss in such circumstances
is that the claimant, having been deprived of financial resources to be
expected from the company, has suffered a further loss resulting from his
reflective loss. A claim by the company to consequential loss arising from
deprivation of financial resources would be met by the general policy   G
objection to recovery of damages for loss resulting from delayed payment
and impecuniosity. A fortiori that policy constitutes a ground of objection
to recovery of such damages by a shareholder whose right of recovery is only
through the company, in accordance with *Prudential Assurance Co Ltd v
Newman Industries Ltd (No 2)* [1982] Ch 204. It is essentially a policy
limitation based on the ground that one party is not to be taken to
contemplate that a breach of duty will cause the other to suffer additional   H
loss of which the immediate cause is his impecuniosity. [Reference was made
to *Lee v Sheard* [1956] 1 QB 192; *R P Howard Ltd v Woodman Matthews
& Co* [1983] BCLC 117; *Heron International Ltd v Lord Grade* [1983]
BCLC 244; *George Fischer (Great Britain) Ltd v Multi Construction Ltd*

A [1995] 1 BCLC 260; *Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427 and *Hall v Governor and Co of the Bank of England* (unreported) 19 April 2000.]

*Christensen v Scott* [1996] 1 NZLR 273 is inconsistent with the above principles, and the Court of Appeal [1999] PNLR 457G was correct to hold that it should not be followed in this country. Although Hobhouse LJ in
B *Gerber Garment Technology Inc v Lectra Syatems Ltd* [1997] RPC 443 expressed approval of *Christensen*, he reached his conclusion for reasons that in no way depended on the correctness of anything in *Christensen*. The Court of Appeal, at p 457C–F, also rightly approved the approach of Millett LJ in *Stein v Blake* [1998] 1 All ER 724. [Reference was also made to *Hayes v James & Charles Dodd* [1990] 2 All ER 815; *Wapshott v Davis Donovan & Co* [1996] PNLR 361, 377–378; *Watson v Dutton Forshaw*
C *Motor Group Ltd* (unreported) 22 July 1998 and *Farley v Skinner* (unreported) 6 April 2000.]

Damages for mental distress and anxiety in respect of a breach of duty causing purely economic loss in circumstances in which no physical injury was reasonably foreseeable as a consequence of the breach are not recoverable, and the plaintiff's claim to such damages accordingly fails. His
D mental distress and anxiety were the consequence of the financial position of WWH and are irrecoverable under the *Prudential* principle: see *Hayes v James & Charles Dodd* [1990] 2 All ER 815 and *Verderame v Commercial Union Assurance Co plc* [1992] BCLC 793. [Reference was also made to *Wapshott v Davis Donovan & Co* [1996] PNLR 361, 377F–378D.].

As to aggravated damages, the facts pleaded in the re-amended statement of claim make it clear that the plaintiff's complaint is not as to the manner in
E which the wrong was committed but as to the manner in which the claims have been defended. That does not constitute aggravation of the damage in circumstances such as the present. When aggravated damages are claimed on the basis of the manner of defence in defamation actions, it is because the defendant has pleaded justification and so by his defence has continued to repeat the wrong of which the claimant complains. No such case can be
F made out here.

*ter Haar QC* in reply. It is important to look at the actual mischief that is said to have been caused by the alleged abuse of process.

On the cross-appeal, the primary relationship was that between the defendants and the plaintiff rather than between them and the company. In so far as they acted on behalf of the company they did so in support of
G the plaintiff's business plans. As to the cost of the plaintiff's personal borrowings (loan capital and interest), bank interest and charges and mortgage charges and interest, these losses can be grouped together. In one sense they can be said to relate to the impecuniosity of the company, but that is an incomplete analysis. All the losses are the plaintiff's personal losses. To characterise them as losses arising out of a shortage of funds in the company gives inadequate weight to the facts that the plaintiff's personal wealth was
H substantially concentrated in the company; that if the company were to lose its only substantial asset he would be liable on the guarantees given by him to support it and that support of it in its litigation could only come from him personally in circumstances where his principal asset had been rendered worthless unless the litigation succeeded; and that, accordingly, his ability to

03635-jpm    Doc 173-3    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
Johnson v Gore Wood & Co (HL(E))    Pg 72 of 903    [2002] 2 AC
Lord Bingham of Cornhill

A

borrow to finance his personal expenditure and other investments was increasingly constrained: the longer the litigation continued, the more the need for it to succeed increased while his creditworthiness decreased.

As to diminution in value of the plaintiff's pension/majority shareholding in Westway Homes Ltd, this claim is primarily related to loss of pension rights. The plaintiff has suffered a loss that is separate from the company's and that would not have been recompensed even if the company had achieved a 100% recovery in its action.

B

As to loss of the 12.5% shareholding in Westway Homes Ltd, this loss is the plaintiff's and from its nature could not be the company's. Additional tax liability is again in its very nature a loss suffered by the plaintiff.

The true ratio of *Stein v Blake* [1998] 1 All ER 724 and *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204 is in each case that no separate duty was owed to the shareholder. The decision in *Heron International Ltd v Lord Grade* [1983] BCLC 244 is explicable on the basis that no actionable duty was owed to the shareholders in respect of the loss in question: see p 263. *Christensen v Scott* [1996] 1 NZLR 273 is a good statement of the law. There is no difference between English law and the law in New Zealand. No English authority supports the defendants' propositions. [Reference was made to *R P Howard Ltd v Woodman Matthews & Co* [1983] BCLC 117; *Walker v Stones* [2001] QB 902 and *Wapshott v Davis Donovan & Co* [1996] PNLR 361.]

C

D

In so far as the plaintiff has received indemnification for his losses as a result of the settlement of the company claim, credit will have to be given. The proper way to deal with this, as the judge observed, is to recognise the risks of double recovery and to ensure that appropriate directions are given so as to ensure that the true measure of loss is established.

E

As to damages for mental distress and anxiety and aggravated damages, the judge and the Court of Appeal were right to allow these heads of damage to proceed.

As to remoteness, this is essentially fact-driven and the facts should be found first.

*Steinfeld QC* replied on the cross-appeal.

F

Their Lordships took time for consideration.

14 December. **LORD BINGHAM OF CORNHILL** My Lords, there are two parties before the House. The first is Mr Johnson, the plaintiff in the action, who appeals against a decision of the Court of Appeal dismissing the action as an abuse of the process of the court. The other is Gore Wood & Co, a firm of solicitors, who cross-appeal against a decision of the Court of Appeal, on a preliminary issue of law, that certain heads of damage pleaded by Mr Johnson should not be struck out as irrecoverable. Both appeal and cross-appeal raise questions of legal principle which your Lordships' House has not, in recent years, had occasion to consider.

G

H

*The facts*

Mr Johnson is a businessman who conducted his business affairs through a number of companies. One of his businesses was property development, which he carried on through a company, Westway Homes Ltd ("WWH"), of

A   which he was managing director and holder of all but two of the issued shares. For all practical purposes WWH was the corporate embodiment of Mr Johnson.

Acting on behalf of WWH, Mr Johnson instructed Gore Wood & Co ("GW"), through a partner in the firm named Robert Wood, to act as solicitors for WWH in connection with a proposed purchase of land at Burlesdon in Hampshire from a Mr Moores. WWH planned to develop the

B   land, but the project was one of some complexity, since the title of Mr Moores was to some extent doubtful and access to the land was dependent on acquisition of a strip of land owned by a third party. WWH had an option to purchase Mr Moores's land, and WWH instructed GW to serve a notice exercising this option.

Mr Johnson contends that from early April 1987, even before GW was

C   formally instructed to act as solicitor for WWH, Mr Johnson engaged the firm, usually acting through Mr Wood, to advise him personally and act on behalf of certain of his companies in addition to WWH, as a result of which GW and in particular Mr Wood gained a detailed knowledge of his financial affairs and those of the companies concerned. He further contends that GW through Mr Wood knew and intended that advice given to him in connection with any business matter would or might be acted upon by him

D   in relation to the conduct of his business affairs generally, including his personal financial affairs. Since the present proceedings have not progressed beyond determination of the preliminary issues giving rise to this appeal and cross-appeal there has been no detailed investigation of the facts, some of which are in dispute between the parties. But GW accepts that from time to time the firm acted on behalf of Mr Johnson personally and some of his

E   companies other than WWH.

In February 1988 GW served notice exercising WWH's option on Mr Moores's solicitors. Mr Moores and the solicitors acting for him asserted that the notice had not been validly served since it had not been served upon Mr Moores personally. Having obtained the advice of counsel WWH instructed GW to issue proceedings against Mr Moores for specific performance of the contract created by the exercise of the option. This was

F   done in March 1988. An alternative claim was made against Mr Moores's solicitors alleging breach of warranty of authority. GW continued to act for WWH in those proceedings until the end of November 1989. The proceedings came on for trial in the Chancery Division in January 1990, when an order for specific performance was made against Mr Moores and an inquiry into damages ordered. The alternative claim against Mr Moores's

G   solicitors was dismissed. Mr Moores had been legally aided from an early stage of the litigation and now, because of his mental condition, was acting through a guardian ad litem. He appealed against the judge's decision, but his appeal was dismissed by the Court of Appeal on 20 February 1991, although on different grounds.

For reasons outside the control of Mr Johnson or WWH there was further delay before the land was conveyed to WWH. It was April 1992, more than

H   four years after the exercise of the option, before the conveyance was completed. By this time WWH had suffered substantial loss because of the cost of the Chancery proceedings, the inability of WWH to recover damages and costs from Mr Moores, who had no assets save for the balance of the purchase price of the Burlesdon land, the collapse of the property market

and the high interest charges borne by WWH. On 8 January 1991    A
WWH started proceedings for professional negligence against GW. In those
proceedings GW admitted that it had owed WWH a duty to exercise
reasonable care in connection with the exercise of the option, but denied that
that duty had been broken or that the damages claimed were recoverable.
WWH applied for summary judgment. This application succeeded at first
instance but failed on appeal. WWH was now in serious financial difficulty.
    WWH's action against GW came to trial before a deputy judge on    B
26 October 1992. The hearing was estimated to last 10 to 12 days. This
estimate was greatly exceeded. In the sixth week of trial, the company's
evidence on liability had been completed and Mr Wood was in the course of
giving evidence for GW when the action was compromised upon payment
by GW to WWH of £1,480,000, which represented a very substantial
proportion of the sum claimed by WWH, and costs in the agreed sum of    C
£320,000.
    Mr Johnson claims that because he had retained GW to advise and act for
him personally as well as for WWH, the firm owed him as well as WWH a
duty of care in contract and tort in relation to the exercise of the option,
the advice which Mr Johnson contends was given to him personally as well as to
WWH concerning the prospects of success in and the likely duration of the
Chancery proceedings and the conduct of the Chancery proceedings. He    D
claims that GW breached that duty and so caused him substantial loss.
Whether GW owed Mr Johnson personally such a duty and whether (if so) it
breached that duty will be live issues in this action if it proceeds. But for
purposes of the issues now before the House, GW accepts that the facts
pleaded by Mr Johnson are capable of supporting his case on these issues if
established at trial.    E
    Mr Johnson did not initiate proceedings to enforce any personal claims
against GW at the time when WWH began its action against the firm. In an
affidavit sworn on 6 March 1998 he deposed to his reasons for not doing so
at that stage. His reasons were: (1) that he was in no position to bring a
personal claim against GW until he was granted full legal aid in October
1992, his previous certificate having been limited; (2) that advancing his    F
personal claims would have substantially delayed the progress and ultimate
resolution of WWH's action against GW, which would have led to
WWH going into liquidation before the trial of its action; (3) that the
financial resources of both Mr Johnson and WWH had been exhausted by
this litigation, said to have been caused by GW's negligence; (4) that joining
the personal claim to WWH's claims would have led to an adjournment of
the October 1992 trial date fixed for WWH's action; (5) that the more    G
complicated nature of Mr Johnson's personal claims would have had an
adverse effect on the costly and time-consuming work required to prepare
WWH's case for trial; and (6) that the time which Mr Johnson could devote
to the conduct of litigation was restricted by his need, from June 1991, to
find new employment. GW does not deny that these were the reasons which
led Mr Johnson not to proceed personally at that time, but does not accept
that they provided valid or reasonable grounds for doing so.    H
    On 17 January 1991, well before WWH's action came to trial, solicitors
representing that company notified the solicitors for GW that Mr Johnson
had a personal claim against the firm which he would pursue in due course.
No details of the claim were given. On 6 December 1991 solicitors

A    representing Mr Johnson informed GW that he had received a legal aid
certificate to take proceedings against the firm for damages for negligence.
The letter, couched in general terms, contended that GW had owed a duty to
Mr Johnson personally as well as to WWH. While making no admission,
GW's insurers in January 1992 invited Mr Johnson's solicitors to give full
details of the quantum of his personal claim. Mr Johnson's solicitors replied
B    in February 1992, outlining certain heads of claim and giving estimates in
round figures of claims approaching £2m. In October 1992, on the eve of
trial of WWH's action against GW, Mr Johnson's solicitors wrote to GW's
solicitors, referring to his legal aid certificate and giving notice that his
personal claim would be pursued whether the company's claim culminated
in judgment or settlement. Since a substantial payment into court had been
made on behalf of GW, Mr Johnson and WWH expected a favourable
C    outcome of the company's action. On 19 November 1992, when trial of the
company's action against GW was well advanced, Mr Pugh (a solicitor
representing Mr Johnson) spoke to Mrs MacLennan (the solicitor
representing GW) on the telephone and discussed Mr Johnson's personal
claim: Mr Pugh said that it had been thought better to wait until the
company's claim had been concluded before dealing with the personal claim;
D    Mrs MacLennan asked whether Mr Pugh would object to an overall
settlement of the company's claim and Mr Johnson's personal claim; he said
that he would have to take instructions but could not himself see any
objections "provided the figures were all right". He gave her a rough idea of
the heads of claim and the figures. Mr Johnson instructed Mr Pugh that he
would not be adverse to an overall settlement provided it was reasonably
satisfactory. Mrs MacLennan indicated that GW (or its insurers) also were
E    not adverse to an overall settlement if the figures could be agreed. On
1 December 1992 Mr Pugh met Mrs MacLennan at court to try to negotiate
a settlement of his personal claim. His attendance note of this meeting read:

    "She mentioned an overall cap and said that she could not settle for
    more. I said that John Johnson's claim was a separate one and she said
F    that so far as it was not related to the actual company's claim it might well
    be different. After some discussion it was agreed that so far as his claim
    as shareholder and only relating to a loss of dividends income and
    capital distribution there would be a cap at a figure to be agreed. This
    would not affect all the other claims on the list as previously discussed.
    Mrs McClenan [sic] reiterated her previous view but said it would be a
    separate claim and it would really be a matter for separate negotiation in
G    due course. A cap was agreed at £250,000 excluding interest and costs."

The settlement agreement made between WWH and GW on 2 December
1992 was signed by solicitors for both sides; the solicitors representing
WWH also, for this purpose, represented Mr Johnson.

By the settlement agreement GW agreed to pay the sums already
mentioned with no admission of liability, in full and final satisfaction of all
H    claims of WWH against GW and vice versa. The sum of £1m which GW had
paid into court was to be paid out to WWH's solicitors. WWH undertook
that any of its liabilities personally guaranteed by Mr Johnson would be
discharged out of the sums received under the settlement agreement, the
object plainly being to limit the quantum of any claim which Mr Johnson

03635-jpm Doc 173-3 Filed 01/13/17 Entered 01/13/17 22:34:28 Ex. C pa
Johnson v Gore Wood & Co (HL(E)) Pg 76 of 903 [2002] 2 AC
Lord Bingham of Cornhill

might thereafter make personally. Clause 3 of the settlement agreement   A
provided:

> "Mr Johnson undertakes that the amount of any claim made by him
> personally in any action against [GW] in respect of any losses suffered by
> him by reason of loss of income, dividends or capital distribution in
> respect of his position as a shareholder of [WWH] will not exceed
> £250,000 not including interest accruing in respect of any period after the   B
> date of this agreement nor costs. This undertaking does not limit any
> other of Mr Johnson's rights against [GW]."

A confidentiality clause in the agreement contained an exception "In
connection with any action which Mr Johnson may bring against [GW]."

Mr Johnson issued his writ in the present proceedings against GW on
7 April 1993. Over the next 4½ years the parties pleaded and repleaded   C
their respective cases. A payment into court was made by GW. Witness
statements were exchanged. Mr Johnson served his accountancy evidence.
On 20 November 1997 the action was fixed for trial in January 1999. On
3 December 1997 GW's solicitors intimated, for the first time, that it
intended to apply to strike out the action as an abuse of the process of the
court. Notice was also given that GW would seek the determination of   D
preliminary issues whether it had owed Mr Johnson a duty of care and
whether the damages which he claimed were in principle recoverable on the
facts pleaded. On 25 February 1998 it was ordered that preliminary issues
be tried, the second of which was:

> "to what extent (if at all) on the basis of and assuming the truth of the
> facts pleaded as set out above are any of the heads of damage pleaded in   E
> paragraphs 23 and 24 of the re-amended statement of claim irrecoverable
> as a matter of law by [Mr Johnson] by way of damages for the pleaded
> breaches of the duties owed to him."

In paragraph 6 of his re-amended statement of claim Mr Johnson pleaded
an implied term of his personal retainer of GW that it would exercise all due
skill and care in execution of that retainer, and a like duty of care in tort. In   F
paragraph 9 it was pleaded:

> "Without prejudice to the generality of paragraph 6 above it was the
> duty of [GW], in carrying out its retainer on behalf of [Mr Johnson] in
> accordance with the implied term pleaded in the said paragraph, or
> alternatively in discharging its duty of care in tort owed to [Mr Johnson],
> to (a) exercise all due skill and care in connection with the exercise of the   G
> said option to purchase land and/or any further steps which were
> necessary to obtain possession of the land; (b) advise [Mr Johnson]
> fully and accurately of all developments in connection with the exercise
> of the said option which might affect the financial requirements and
> prospects of [WWH]; (c) advise [Mr Johnson] of the implications of such
> developments for his personal financial situation and other business
> projects, including his existing liabilities and new financial commitments   H
> contemplated; (d) advise and/or warn [Mr Johnson] fully and accurately
> of any delay or difficulty in exercising the said option to purchase
> land, which might adversely affect [Mr Johnson's] personal financial
> situation and other business projects, including his existing liabilities

A    and new financial commitments contemplated; (e) advise and/or warn [Mr Johnson] fully and accurately of the implications of any advice given or steps taken by [GW] on behalf of [WWH] which might adversely affect [Mr Johnson's] personal financial situation and other business projects."

In paragraph 12 it was pleaded that GW had acted in breach of the terms pleaded in paragraphs 6 and 9 in connection with the exercise of WWH's

B    option to purchase the Burlesdon land, and in paragraph 16 it was pleaded that between February 1988 and November 1989 GW had acted negligently or in breach of the implied terms of its retainer pleaded in paragraphs 6 and 9 in advising Mr Johnson from time to time as to the likely duration and outcome of the earlier proceedings against Mr Moores. The claims for damages made by Mr Johnson in paragraphs 23 and 24 of his re-amended statement of claim are the subject of detailed consideration below.

C    The preliminary issues came for hearing at first instance before Pumfrey J who, in a careful judgment delivered on 21 May 1998, resolved them in favour of Mr Johnson. On the abuse issue he found that GW was estopped by convention from contending that the action was an abuse. Applying *Amalgamated Investment and Property Co Ltd v Texas Commerce International Bank Ltd* [1982] QB 84 he concluded:

D      "that in reaching the settlement, [GW] and Mr Johnson did act on the common assumption that the personal claim would be made, and would be entertained by the court. I think that it is now unconscionable for [GW] to allege that the personal claim is an abuse of process in the light of *Henderson v Henderson* (1843) 3 Hare 100."

E    He resolved the duty issue in favour of Mr Johnson. He concluded that the heads of damage claimed by Mr Johnson were not irrecoverable as a matter of law as damages for the breaches alleged by Mr Johnson.

GW appealed. In a judgment of the court (Nourse, Ward and Mantell LJJ) given on 12 November 1998, the Court of Appeal agreed with the judge that on the facts pleaded a duty of care had arguably been owed by GW to Mr Johnson. The Court of Appeal shared the judge's view on the difficulty

F    of the damage issue but agreed with his conclusion that the pleaded heads of damage were arguably recoverable, save as to one head of damage which it would have struck out.

The Court of Appeal held, differing from the judge, that there had been no estoppel by convention. But it also held that there had been an abuse under the rule in *Henderson v Henderson* (1843) 3 Hare 100. It said:

G      "Mr ter Haar submits that the rule has no application because different issues arise in the two sets of proceedings. In this action there are entirely new questions about the extent of the duty owed to the plaintiff personally and the losses he has suffered. On the other hand, there was in our view a substantial similarity, particularly as to whether or not [GW's] conduct as solicitors fell below the required standard in connection with the exercise of the option and the conduct of the Chancery litigation

H      [against Mr Moores] as well as the overlapping loss suffered by the company. This encompasses practically the whole of the ground traversed for six weeks in the company action. In our judgment, narrowly to circumscribe the application of the rule would defeat its purpose. Mr Johnson was the alter ego of the company: he controlled the

company's decisions and through him the company's claim was brought.  *A*
Within days after that writ was issued, he was intimating his personal
claim. He could have brought it then. Although his legal aid was then
limited in some way which is not clear to us, no explanation has been
given for the delay in removing whatever limitations had been imposed
and he had full cover by October, long before the trial. For reasons which
appeared good to him, he preferred not to delay the company action but
to pursue it vigorously before the company was forced into liquidation.  *B*
That does not, in our judgment, excuse him from failing to launch his
own claims. If he could have done so, he should have done so."

### Abuse of process

The rule of law depends upon the existence and availability of courts
and tribunals to which citizens may resort for the determination of  *C*
differences between them which they cannot otherwise resolve. Litigants
are not without scrupulous examination of all the circumstances to be
denied the right to bring a genuine subject of litigation before the court:
*Yat Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581, 590
per Lord Kilbrandon, giving the advice of the Judicial Committee; *Brisbane
City Council v Attorney General for Queensland* [1979] AC 411, 425 per
Lord Wilberforce, giving the advice of the Judicial Committee). This does  *D*
not however mean that the court must hear in full and rule on the merits of
any claim or defence which a party to litigation may choose to put
forward. For there is, as Lord Diplock said at the outset of his speech in
*Hunter v Chief Constable of the West Midlands Police* [1982] AC 529,
536, an
  *E*
"inherent power which any court of justice must possess to prevent
misuse of its procedure in a way which, although not inconsistent with
the literal application of its procedural rules, would nevertheless be
manifestly unfair to a party to litigation before it, or would otherwise
bring the administration of justice into disrepute among right-thinking
people. The circumstances in which abuse of process can arise are very
varied; those which give rise to the instant appeal must surely be unique.  *F*
It would, in my view, be most unwise if this House were to use this
occasion to say anything that might be taken as limiting to fixed
categories the kinds of circumstances in which the court has a duty
(I disavow the word discretion) to exercise this salutary power."

One manifestation of this power was to be found in RSC Ord 18, r 19 which
empowered the court, at any stage of the proceedings, to strike out any  *G*
pleading which disclosed no reasonable cause of action or defence, or
which was scandalous, frivolous or vexatious, or which was otherwise an
abuse of the process of the court. A similar power is now to be found in
CPR r 3.4.

GW contends that Mr Johnson has abused the process of the court by
bringing an action against it in his own name and for his own benefit when
such an action could and should have been brought, if at all, as part of or at  *H*
the same time as the action brought against the firm by WWH. The
allegations of negligence and breach of duty made against the firm by
WWH in that action were, it is argued, essentially those upon which
Mr Johnson now relies. The oral and documentary evidence relating to each

A    action is substantially the same. To litigate these matters in separate actions on different occasions is, GW contends, to duplicate the cost and use of court time involved, to prolong the time before the matter is finally resolved, to subject GW to avoidable harassment and to mount a collateral attack on the outcome of the earlier action, settled by GW on the basis that liability was not admitted.

B    This form of abuse of process has in recent years been taken to be that described by Sir James Wigram V-C in *Henderson v Henderson* 3 Hare 100, 114–115:

C    "In trying this question, I believe I state the rule of the court correctly, when I say, that where a given matter becomes the subject of litigation in, and of adjudication by, a court of competent jurisdiction, the court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. The plea of res judicata applies, except in special cases, not only to points upon which the

D    court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time."

Thus the abuse in question need not involve the reopening of a matter already decided in proceedings between the same parties, as where a party is

E    estopped in law from seeking to relitigate a cause of action or an issue already decided in earlier proceedings, but, as Somervell LJ put it in *Greenhalgh v Mallard* [1947] 2 All ER 255, 257, may cover

"issues or facts which are so clearly part of the subject-matter of the litigation and so clearly could have been raised that it would be an abuse of the process of the court to allow a new proceeding to be started in

F    respect of them."

A series of cases, mostly in recent years, has explored this form of abuse. Reference need not be made to all of them. In the *Yat Tung* case abuse was found where a claimant who had unsuccessfully sued a bank on one ground brought a further action against the same bank and another party on a different ground shortly thereafter. Giving the advice of the Judicial

G    Committee of the Privy Council, Lord Kilbrandon said, at pp 589–590:

"The second question depends on the application of a doctrine of estoppel, namely res judicata. Their Lordships agree with the view expressed by McMullin J that the true doctrine in its narrower sense cannot be discerned in the present series of actions, since there has not been, in the decision in no 969, any formal repudiation of the pleas raised

H    by the appellant in no 534. Nor was Choi Kee, a party to no 534, a party to no 969. But there is a wider sense in which the doctrine may be appealed to, so that it becomes an abuse of process to raise in subsequent proceedings matters which could and therefore should have been litigated in earlier proceedings."

03635-jpm Doc 173-3 Filed 01/13/17 Entered 01/13/17 22:34:28 Ex. C pa
Johnson v Gore Wood & Co (HL(E)) Pg 80 of 903 [2002] 2 AC
Lord Bingham of Cornhill

In *Brisbane City Council v Attorney General for Queensland* [1979]  A
AC 411 the Privy Council expressly endorsed Somervell LJ's reference to
abuse of process and observed, at p 425:

> "This is the true basis of the doctrine and it ought only to be applied
> when the facts are such as to amount to an abuse: otherwise there is a
> danger of a party being shut out from bringing forward a genuine subject
> of litigation."                                                        B

In *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529, in
which *Henderson v Henderson* was not cited, the plaintiff sought to
challenge in civil proceedings a decision in a criminal case against which he
had not appealed on the ground which he sought to raise in the civil
proceedings. The proceedings were struck out.

In *Vervaeke (formerly Messina) v Smith* [1983] 1 AC 145 the appellant,  C
who had failed in English proceedings to annul her marriage, had succeeded
in doing so in Belgium on different grounds and sought recognition in
England of the Belgian decree. Lord Hailsham of St Marylebone LC, at
p 157, described the rule in *Henderson v Henderson* as "both a rule of public
policy and an application of the law of res judicata" and said of it:

> "whatever the limits of *Henderson v Henderson* 3 Hare 100 (which  D
> I regard as a sound rule in ordinary civil litigation) may ultimately turn
> out to be, I believe that it must apply to a case like the present, where the
> petitioner in the first proceedings not merely does not rely on the grounds
> then already in theory available to her, but deliberately conceals the real
> facts (on which she now relies) from the court in order to put forward a
> bogus case which is radically inconsistent with them."                 E

*Ashmore v British Coal Corpn* [1990] 2 QB 338 involved an attempt to
reopen issues which had been decided adversely to the appellant's
contentions in rulings which, although not formally binding on her, had
been given in sample cases selected from a group of claims of which hers had
been one. The Court of Appeal held that it was not in the interests of justice
to allow her to pursue her claim. Reliance was placed on *Bragg v Oceanus
Mutual Underwriting Association (Bermuda) Ltd* [1982] 2 Lloyds Rep 132  F
in which Kerr LJ said, at p 137:

> "To take the authorities first, it is clear that an attempt to relitigate in
> another action issues which have been fully investigated and decided in a
> former action *may* constitute an abuse of process, quite apart from any
> question of res judicata or issue estoppel on the ground that the parties or
> their privies are the same. It would be wrong to attempt to categorise the  G
> situations in which such a conclusion would be appropriate."

In *House of Spring Gardens Ltd v Waite* [1991] 1 QB 241 the plaintiffs
sued three defendants in England to enforce a judgment which they had
obtained against those defendants in Ireland. The defendants pleaded in
defence that the Irish judgment had been obtained by fraud. That was a
contention which two of the defendants, but not the third (a Mr McLeod),  H
had raised in Irish proceedings to set aside the judgment, but the allegation
had been dismissed by Egan J. Summary judgment was given against the
three defendants in England but Mr McLeod appealed against that
judgment. The Court of Appeal held that Mr McLeod, like the other

03635-jpm    Doc 173-3    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
[2002] 2 AC                    Pg 81 of 903  Johnson v Gore Wood & Co (HL(E))
                                             Lord Bingham of Cornhill

A    defendants, was estopped from mounting what was in effect a collateral challenge to the decision of Egan J. It also held that Mr McLeod's defence was an abuse of process. Stuart-Smith LJ said, at p 255:

> "The question is whether it would be in the interests of justice and public policy to allow the issue of fraud to be litigated again in this court, it having been tried and determined by Egan J in Ireland. In my judgment
B    it would not; indeed, I think it would be a travesty of justice. Not only would the plaintiffs be required to relitigate matters which have twice been extensively investigated and decided in their favour in the natural forum, but it would run the risk of inconsistent verdicts being reached, not only as between the English and Irish courts, but as between the defendants themselves. The Waites have not appealed Sir Peter Pain's
C    judgment, and they were quite right not to do so. The plaintiffs will no doubt proceed to execute their judgment against them. What could be a greater source of injustice, if in years to come, when the issue is finally decided, a different decision is in Mr McLeod's case reached? Public policy requires that there should be an end of litigation and that a litigant should not be vexed more than once in the same cause."

D    *Arnold v National Westminster Bank plc* [1991] 2 AC 93 was a case of issue estoppel. Tenants invited the court to construe the terms of a rent review provision in the sub-underlease under which they held premises. The provision had been construed in a sense adverse to them in earlier proceedings before Walton J, but they had been unable to challenge his decision on appeal. Later cases threw doubt on his construction. The question was whether the rules governing issue estoppel were subject to
E    exceptions which would permit the matter to be reopened. The House held that they were. Lord Keith of Kinkel said, at p 109:

> "In my opinion your Lordships should affirm it to be the law that there may an exception to issue estoppel in the special circumstance that there has become available to a party further material relevant to the correct determination of a point involved in the earlier proceedings, whether or
F    not that point was specifically raised and decided, being material which could not by reasonable diligence have been adduced in those proceedings. One of the purposes of estoppel being to work justice between the parties, it is open to courts to recognise that in special circumstances inflexible application of it may have the opposite result, as was observed by Lord Upjohn in the passage which I have quoted above
G    from his speech in *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2)* [1967] 1 AC 853, 947."

In the passage referred to Lord Upjohn had said:

> "All estoppels are not odious but must be applied so as to work justice and not injustice and I think the principle of issue estoppel must be applied to the circumstances of the subsequent case with this overriding
H    consideration in mind."

*Talbot v Berkshire County Council* [1994] QB 290 arose out of a motor accident in which both the driver and his passenger were severely injured. The passenger sued the driver. The driver's insurers, without notice to the driver, made a third party claim against the Berkshire County Council,

03635-jpm   Doc 173-3   Filed 01/13/17   Entered 01/13/17 22:34:28   Ex. C pa
Johnson v Gore Wood & Co (HL(E))   Pg 82 of 903   [2002] 2 AC
Lord Bingham of Cornhill

claiming contribution as between joint tortfeasors but including no claim for    A
the driver's own injuries.  Not until after the expiry of the limitation period
for bringing a personal claim did the driver learn of the third party claim
against the county council.  At trial, the passenger succeeded in full, damages
being apportioned between the driver and the county council.  The driver
then sued the county council to recover damages for his own injuries.  On the
trial of preliminary issues, the judge held that the driver was prima facie    B
estopped from bringing the action but that there were special circumstances
which enabled the court to permit the action to be pursued.  The county
council successfully challenged that conclusion on appeal.    Stuart-
Smith LJ said, at p 298:

> "There can be no doubt that the [driver's] personal injury claim could
> have been brought at the time of [the passenger's] action.  It could have    C
> been included in the original third party notice issued against the council
> (RSC Ord 16, r 1(b)(c)); it could have been started by a separate writ and
> consolidated with or ordered to be tried with [the passenger's] action:
> Ord 4, r 9.  The third party proceedings could have been amended at any
> time before trial and perhaps even during the trial to include such a claim,
> notwithstanding that it was statute-barred, since it arose out of the same
> or substantially the same facts as the cause of action in respect of which    D
> relief was already claimed, namely, contribution or indemnity in respect
> of [the passenger's] claim: Ord 20, r 5.  In my opinion, if it was to be
> pursued, it should have been so brought."

Stuart-Smith LJ considered that the insurers' solicitors appeared to have
been negligent but that the claim against the county council should be struck
out unless there were special circumstances, and concluded that there were    E
not.  With his conclusions Mann and Nourse LJJ agreed.  Since the driver's
claim against the county council was held by the judge to be statute-barred, a
claim against the solicitors may have offered the driver his only hope of
recovery.

The plaintiff in C (A Minor) v Hackney London Borough Council [1996]
1 WLR 789 lived in the house of which her mother was tenant.  She suffered    F
from Down's syndrome and claimed in this action to have suffered personal
injury caused by the negligence and breach of statutory duty of the borough
council as housing authority.  Her mother had previously made a similar
claim which had been the subject of a consent order in the county court.  The
borough council applied to set aside a judgment entered in the plaintiff's
favour in default of defence and to strike out the claim on the ground that
the plaintiff's action was an abuse of the process of the court.  Reliance was    G
placed in particular on Yat Tung Investment Co Ltd v Dao Heng Bank Ltd
[1975] AC 581 and Talbot v Berkshire County Council [1994] QB 290.  This
argument was accepted by the judge, who held that the plaintiff's action
should have been advanced at the same time as her mother's, the more so as
the plaintiff was dependent on her mother.  The plaintiff's appeal against this
decision succeeded.  Simon Brown LJ said, at pp 794–795:    H

> "I therefore reject entirely the submission that Yat Tung Investment Co
> Ltd v Dao Heng Bank Ltd justifies extending the Talbot v Berkshire
> County Council principle—that an unlitigated monetary claim is barred if
> it could have been advanced and established in earlier proceedings (itself

A    to my mind an extended application of the res judicata doctrine)—to
     those not themselves party to the earlier proceedings.

          "It follows from all this that in my judgment the doctrine of res
     judicata even in its widest sense has simply no application to the
     circumstances of the present case and that the judge erred in ruling to the
     contrary. One does not, therefore, reach the point of asking here whether
     special circumstances exist to exclude it; C's erstwhile solicitors'
B    suggested negligence is, frankly, an irrelevance. Nor, in my judgment,
     does this case come within measurable distance of any other form of
     abuse of process based on public policy considerations analogous to those
     underlying the res judicata doctrine: see, for instance, the Court of
     Appeal's decision in *Ashmore v British Coal Corpn* [1990] 2 QB 338.

          "All that said, this judgment should not be taken as any
C    encouragement to lawyers or their clients to follow the course in fact
     adopted here. As the judge rightly recognised, in circumstances such as
     these, it is plainly in the public interest to have a single action in which the
     claims of all the affected members of the household are included rather
     than a multiplicity of actions . . ."

     *Barrow v Bankside Agency Ltd* [1996] 1 WLR 257 was one of the flood
D    of cases which arose out of losses in the Lloyd's insurance market.
     Mr Barrow was a member of an action group which had successfully sued a
     number of members' agents for negligent underwriting.     Having
     substantially succeeded, but recovered only a proportion of the damages he
     had claimed, Mr Barrow issued fresh proceedings against his members'
     agent on a different ground. It was clear that this claim, even if made earlier,
E    would not have been tried at the same time as the earlier action, since the
     scheduling of cases was the subject of detailed management by the
     Commercial Court. The members' agent contended that to bring this further
     claim, not raised at the time of the earlier proceedings, was an abuse. In the
     Court of Appeal it was said, at p 260:

          "The rule in *Henderson v Henderson* 3 Hare 100 is very well known.
F    It requires the parties, when a matter becomes the subject of litigation
     between them in a court of competent jurisdiction, to bring their whole
     case before the court so that all aspects of it may be finally decided
     (subject, of course, to any appeal) once and for all. In the absence of
     special circumstances, the parties cannot return to the court to advance
     arguments, claims or defences which they could have put forward for
     decision on the first occasion but failed to raise. The rule is not based on
G    the doctrine of res judicata in a narrow sense, nor even on any strict
     doctrine of issue or cause of action estoppel. It is a rule of public policy
     based on the desirability, in the general interest as well as that of the
     parties themselves, that litigation should not drag on for ever and that a
     defendant should not be oppressed by successive suits when one would
     do. That is the abuse at which the rule is directed."

H    The rule was described, at p 263, as a salutary one, and the court
     suggested that its application should not be circumscribed by unnecessarily
     restrictive rules. On the facts it was held that the procedure adopted by
     Mr Barrow was not an abuse. The court also held that if, contrary to its
     opinion, the case did fall within the mischief at which *Henderson v*

03635-jpm    Doc 173-3    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
Johnson v Gore Wood & Co (HL(E))    Pg 84 of 903    [2002] 2 AC
Lord Bingham of Cornhill

*Henderson* was directed, there were special circumstances which justified    A
non-application of the rule.

In *Manson v Vooght* [1999] BPIR 376, the plaintiff had sued
administrative receivers of a company of which he had been managing
director and principal shareholder in a 1990 action which culminated in a
judgment adverse to him in 1993. There were other proceedings leading to
other judgments, also given in 1993, relating to certain of the same issues:    B
proceedings to disqualify the plaintiff as a director, in which findings adverse
to him were made; and summonses issued in the liquidation of the company,
when the court refused to allow issues which had been decided in the
disqualification proceedings to be re-litigated. In 1994 the plaintiff issued a
further writ making claims against the administrative receivers and others.
His proceedings against the administrative receivers were struck out on the
ground that these claims should have been raised, if at all, in the 1990 action.    C
This decision was upheld by the Court of Appeal. Giving the leading
judgment May LJ said, at pp 387–388:

> "In my view, the use in this context of the phrase 'res judicata' is
> perhaps unhelpful, and this not only because it is Latin. We are not
> concerned with cases where a court has decided the matter; but rather
> cases where the court has not decided the matter, but where in a (usually    D
> late) succeeding action someone wants to bring a claim which should
> have been brought, if at all, in earlier concluded proceedings. If in all the
> circumstances the bringing of the claim in the succeeding action is an
> abuse, the court will strike it out unless there are special circumstances.
> To find that there are special circumstances may, for practical purposes,
> be the same thing as deciding that there is no abuse, as Sir Thomas    E
> Bingham MR came close to holding on the facts in *Barrow v Bankside
> Agency Ltd* [1996] 1 WLR 257. The bringing of a claim which could
> have been brought in earlier proceedings may not be an abuse. It may in
> particular cases be sensible to advance cases separately. It depends on all
> the circumstances of each case. Once the court's consideration is directed
> clearly towards the question of abuse, it will be seen that the passage from    F
> Sir James Wigram V-C's judgment in *Henderson v Henderson* 3 Hare 100
> is a full modern statement of the law so long as it is not picked over
> semantically as if it were a tax statute.
> "The extent of any coincidence of causes of action, facts or even the
> capacities in which parties are sued, though relevant, will not necessarily
> determine the outcome."
>                                                                              G

May LJ continued, at pp 388–389:

> "[Counsel for Mr Manson] submits that the kind of abuse of process
> relied on by the first defendant in this appeal is to be narrowly confined
> and precisely defined so that legitimate claims are not stifled and so that
> potential litigants know where they stand. Otherwise they may be driven
> to include in one proceedings related but distinct claims which might    H
> sensibly be left for later consideration. The law should not thus
> encourage premature litigation which may prove unnecessary. He further
> submits that delay is the subject of the law of limitation and should not
> feature additionally as an element of abuse.

A         "It is of course axiomatic that the court will only strike out a claim as an abuse after most careful consideration. But the court has to balance a plaintiff's right to bring before the court genuine and legitimate claims with a defendant's right to be protected from being harassed by multiple proceedings where one should have sufficed. Abuse of process is a concept which defies precise definition in the abstract. In particular cases, the court has to decide whether there is abuse sufficiently serious to justify

B  preventing the offending litigant from proceeding. In cases such as the present, the abuse is sufficiently defined in *Henderson* which itself is encapsulated in the proposition that the litigant could and should have raised the matter in question in earlier concluded proceedings. Special circumstances may negative or excuse what would otherwise be an abuse. But there may in particular cases be elements of abuse additional to the

C  mere fact that the matter could and should have been raised in the earlier proceedings."

May LJ added, at p 389:

         "Mr Manson relies on special circumstances to negative or excuse the abuse. He says that the scope of the 1990 action was limited because he had legal expenses insurance for that action which only covered some of

D  his claims and that the insurers were not prepared to support the claims which he now wants to bring. Although this may be an explanation, in my view it does not excuse the abuse nor does it amount to special circumstances. It is commonplace for litigants to have difficulties in affording the cost of litigation. But lack of means cannot stand as an excuse for abuse of process."

E         Last in this series of cases comes *Bradford and Bingley Building Society v Seddon* [1999] 1 WLR 1482, a decision later in time than the Court of Appeal's judgment in the present case but given by two of the same Lords Justices. Mr Seddon had made an investment on the advice of an accountant, Mr Hancock, which he had financed by taking a mortgage loan from the Bradford and Bingley Building Society. The investment failed.

F  Mr Seddon claimed damages or an indemnity against Mr Hancock, who admitted liability to indemnify Mr Seddon to the extent of about 75% of Mr Seddon's claim. Judgment was entered in Mr Seddon's favour for this admitted sum and Mr Hancock was given leave to defend as to the balance. Mr Seddon was unable to enforce his judgment as Mr Hancock had no money, and the residual claim was not pursued. The building society then proceeded against Mr Seddon to enforce the debt owed to it under the

G  mortgage loan. Mr Seddon sought to join as third parties Mr Hancock, in order to pursue the residual claim, and two of his partners, Mr Seddon's contention being that the advice tended to him had been given by the firm to which Mr Hancock and his partners belonged. An application to strike out the third party claim was upheld by the judge and Mr Seddon appealed. In the course of a judgment with which Nourse and Ward LJJ agreed,

H  Auld LJ said, at pp 1490–1491:

         "In my judgment, it is important to distinguish clearly between res judicata and abuse of process not qualifying as res judicata, a distinction delayed by the blurring of the two in the courts' subsequent application of the above dictum [of Sir James Wigram V-C in *Henderson v Henderson*

03635-jpm    Doc 173-3    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
Johnson v Gore Wood & Co (HL(E))    Pg 86 of 903    [2002] 2 AC
Lord Bingham of Cornhill

A 3 Hare 100]. The former, in its cause of action estoppel form, is an absolute bar to relitigation, and in its issue estoppel form also, save in 'special cases' or 'special circumstances': see *Thoday v Thoday* [1964] P 181, 197–198, per Diplock LJ, and *Arnold v National Westminster Bank plc* [1991] 2 AC 93. The latter, which may arise where there is no cause of action or issue estoppel, is not subject to the same test, the task of the court being to draw the balance between the competing claims of one party to put his case before the court and of the other not to be unjustly hounded given the earlier history of the matter . . .

"Thus, abuse of process may arise where there has been no earlier decision capable of amounting to res judicata (either or both because the parties or the issues are different) for example, where liability between new parties and/or determination of new issues should have been resolved in the earlier proceedings. It may also arise where there is such an inconsistency between the two that it would be unjust to permit the later one to continue."

Auld LJ continued, at pp 1492–1493:

"In my judgment mere 're'-litigation, in circumstances not giving rise to cause of action or issue estoppel, does not necessarily give rise to abuse of process. Equally, the maintenance of a second claim which could have been part of an earlier one, or which conflicts with an earlier one, should not, per se, be regarded as an abuse of process. Rules of such rigidity would be to deny its very concept and purpose. As Kerr LJ and Sir David Cairns emphasised in *Bragg v Oceanus Mutual Underwriting Association (Bermuda) Ltd* [1982] 2 Lloyd's Rep 132, 137, 138–139 respectively, the courts should not attempt to define or categorise fully what may amount to an abuse of process; see also per Stuart-Smith LJ in *Ashmore v British Coal Corpn* [1992] 2 QB 338, 352. Sir Thomas Bingham MR underlined this in *Barrow v Bankside Agency Ltd* [1996] 1 WLR 257, stating, at p 263B, that the doctrine should not be 'circumscribed by unnecessarily restrictive rules' since its purpose was the prevention of abuse and it should not endanger the maintenance of genuine claims; see also per Saville LJ, at p 266D–E.

"Some additional element is required, such as a collateral attack on a previous decision (see e g *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529; *Bragg's* case [1982] 2 Lloyd's Rep 132, per Kerr LJ and Sir David Cairns, at pp 137 and 139 respectively, and *Ashmore's* case [1990] 2 QB 338), some dishonesty (see e g per Stephenson LJ in *Bragg's* case, at p 139, and Potter LJ in *Morris v Wentworth-Stanley* [1999] 2 WLR 470, 480 and 481; or successive actions amounting to unjust harassment (see e g *Manson v Vooght* [1999] BPIR 376 . . .))."

The Court of Appeal held that Mr Seddon's third party proceedings were not an abuse of process, and the appeal succeeded.

It may very well be, as has been convincingly argued (Watt, "The Danger and Deceit of the Rule in *Henderson v Henderson*: A new approach to successive civil actions arising from the same factual matter" (2000) 19 CLJ 287), that what is now taken to be the rule in *Henderson v Henderson* has diverged from the ruling which Wigram V-C made, which was addressed to

03635-jpm    Doc 173-3    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
[2002] 2 AC                    Pg 87 of 903Johnson v Gore Wood & Co (HL(E))
                                           Lord Bingham of Cornhill

A    res judicata. But *Henderson v Henderson* abuse of process, as now understood, although separate and distinct from cause of action estoppel and issue estoppel, has much in common with them. The underlying public interest is the same: that there should be finality in litigation and that a party should not be twice vexed in the same matter. This public interest is reinforced by the current emphasis on efficiency and economy in the conduct of litigation, in the interests of the parties and the public as a whole. The
B    bringing of a claim or the raising of a defence in later proceedings may, without more, amount to abuse if the court is satisfied (the onus being on the party alleging abuse) that the claim or defence should have been raised in the earlier proceedings if it was to be raised at all. I would not accept that it is necessary, before abuse may be found, to identify any additional element such as a collateral attack on a previous decision or some dishonesty, but
C    where those elements are present the later proceedings will be much more obviously abusive, and there will rarely be a finding of abuse unless the later proceeding involves what the court regards as unjust harassment of a party. It is, however, wrong to hold that because a matter could have been raised in earlier proceedings it should have been, so as to render the raising of it in later proceedings necessarily abusive. That is to adopt too dogmatic an
D    approach to what should in my opinion be a broad, merits-based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before. As one cannot comprehensively list all possible forms of abuse, so one cannot formulate any hard and fast rule to determine whether,
E    on given facts, abuse is to be found or not. Thus while I would accept that lack of funds would not ordinarily excuse a failure to raise in earlier proceedings an issue which could and should have been raised then, I would not regard it as necessarily irrelevant, particularly if it appears that the lack of funds has been caused by the party against whom it is sought to claim. While the result may often be the same, it is in my view preferable to ask
F    whether in all the circumstances a party's conduct is an abuse than to ask whether the conduct is an abuse and then, if it is, to ask whether the abuse is excused or justified by special circumstances. Properly applied, and whatever the legitimacy of its descent, the rule has in my view a valuable part to play in protecting the interests of justice.

     Mr ter Haar, for Mr Johnson, submitted (as the judge had held) that GW was estopped by convention from contending that the bringing of an
G    action to enforce his personal claims was an abuse of process. In resisting GW's complaint of abuse, Mr ter Haar relied, as he did in the courts below, on three features of this case in particular. The first was the acute financial predicament in which Mr Johnson personally and WWH found themselves as a result, as Mr Johnson alleges, of GW's negligence. The burden of financing the continuing operation of WWH, and of its very expensive litigation against GW, fell on him. His means was stretched to the utmost.
H    The only hope of financial salvation lay in an early and favourable outcome to the company's claim against GW. Mr Johnson did not have a full legal aid certificate to pursue a personal claim. In any event, the addition of a personal claim would have complicated and delayed the trial of the company's claim, which might well have jeopardised the company's

survival. Secondly, Mr ter Haar relied on the conduct of the parties after the    A
settlement agreement was made (if, contrary to his earlier submission, there
was no estoppel by convention). He pointed out that $4\frac{1}{2}$ years elapsed from
the issue of Mr Johnson's writ in this action before GW first intimated their
intention to apply to strike out the proceedings as an abuse of the court's
process, during which period pleadings and evidence were exchanged,
considerable costs were incurred, a substantial payment into court was made    B
and a trial date fixed. This procedural history, he submitted, was evidence of
the expectation of the parties at the time when the company's action was
settled, and was in itself ground for rejecting GW's application: *Halliday v
Shoesmith* [1993] 1 WLR 1, 5. Thirdly, Mr ter Haar submitted that, to the
extent that issues litigated in the company's action were to be relitigated in
this action, it was because GW had insisted on this and rejected the
invitation of Mr Johnson to treat the evidence given in the earlier action as if    C
given in this action.

Two subsidiary arguments were advanced by Mr ter Haar in the courts
below and rejected by each. The first was that the rule in *Henderson v
Henderson* 3 Hare 100 did not apply to Mr Johnson since he had not been
the plaintiff in the first action against GW. In my judgment this argument
was rightly rejected. A formulaic approach to application of the rule would    D
be mistaken. WWH was the corporate embodiment of Mr Johnson. He
made decisions and gave instructions on its behalf. If he had wished to
include his personal claim in the company's action, or to issue proceedings in
tandem with those of the company, he had power to do so. The correct
approach is that formulated by Sir Robert Megarry V-C in *Gleeson v
J Wippell & Co Ltd* [1977] 1 WLR 510 where he said, at p 515:
                                                                                   E

"Second, it seems to me that the substratum of the doctrine is that a
man ought not to be allowed to litigate a second time what has already
been decided between himself and the other party to the litigation. This is
in the interest both of the successful party and of the public. But I cannot
see that this provides any basis for a successful defendant to say that the
successful defence is a bar to the plaintiff suing some third party, or for    F
that third party to say that the successful defence prevents the plaintiff
from suing him, unless there is a sufficient degree of identity between the
successful defendant and the third party. I do not say that one must be the
alter ego of the other: but it does seem to me that, having due regard to
the subject matter of the dispute, there must be a sufficient degree of
identification between the two to make it just to hold that the decision to
which one was party should be binding in proceedings to which the other    G
is party. It is in that sense that I would regard the phrase 'privity of
interest.'"

On the present facts that test was clearly satisfied.

The second subsidiary argument was that the rule in *Henderson v
Henderson* 3 Hare 100 did not apply to Mr Johnson since the first action
against GW had culminated in a compromise and not a judgment. This    H
argument also was rightly rejected. An important purpose of the rule is to
protect a defendant against the harassment necessarily involved in repeated
actions concerning the same subject matter. A second action is not the less
harassing because the defendant has been driven or thought it prudent to

A  settle the first; often, indeed, that outcome would make a second action the
   more harassing.
       On the estoppel by convention issue, Mr Steinfeld for GW submitted that
   the Court of Appeal had been right and the judge wrong. There had been no
   common understanding between the parties on the issue of abuse, a topic
   which had never been raised. There was nothing to suggest that GW had
B  tacitly agreed to forgo any defence properly open to it. Mr Steinfeld further
   submitted that the present proceedings did amount to an abuse, as the Court
   of Appeal had rightly held. Mr Johnson could have advanced his personal
   claim at the same time as the company's claim and therefore should have
   done so. The consequence of his not doing so was to expose GW to the
   harassment of further proceedings canvassing many of the same issues as
   had been canvassed in the earlier action, with consequential waste of time
C  and money and detriment to other court users. The facts relied on to excuse
   his earlier inaction were not accepted. He should have sought a full legal aid
   certificate earlier. He could not rely on lack of means. Any loss caused to
   Mr Johnson by GW's delay in applying to strike out could be compensated
   in costs.
       Neither party challenged the correctness in principle of Lord
D  Denning MR's statement in *Amalgamated Investment and Property Co Ltd
   v Texas Commerce International Bank Ltd* [1982] QB 84, 122 which,
   despite its familiarity, I quote:

       "The doctrine of estoppel is one of the most flexible and useful in the
       armoury of the law. But it has become overloaded with cases. That is
       why I have not gone through them all in this judgment. It has evolved
       during the last 150 years in a sequence of separate developments:
E      proprietary estoppel, estoppel by representation of fact, estoppel by
       acquiescence, and promissory estoppel. At the same time it has been
       sought to be limited by a series of maxims: estoppel is only a rule of
       evidence, estoppel cannot give rise to a cause of action, estoppel cannot
       do away with the need for consideration, and so forth. All these can now
       be seen to merge into one general principle shorn of limitations. When
F      the parties to a transaction proceed on the basis of an underlying
       assumption—either of fact or of law—whether due to misrepresentation
       or mistake makes no difference—on which they have conducted the
       dealings between them—neither of them will be allowed to go back on
       that assumption when it would be unfair or unjust to allow him to do so.
       If one of them does seek to go back on it, the courts will give the other
       such remedy as the equity of the case demands."
G
   The question is whether the parties to the settlement of WWH's action
   (relevantly, Mr Johnson and GW) proceeded on the basis of an underlying
   assumption that a further proceeding by Mr Johnson would not be an abuse
   of process and whether, if they did, it would be unfair or unjust to allow
   GW to go back on that assumption. In my judgment both these conditions
   were met on the present facts. Mr Johnson was willing in principle to try to
H  negotiate an overall settlement of his and the company's claims but this was
   not possible in the time available and it was GW's solicitor who said that the
   personal claim "would be a separate claim and it would really be a matter for
   separate negotiation in due course". It is noteworthy that Mr Johnson
   personally was party to the settlement agreement, and that the agreement

03635-jpm   Doc 173-3   Filed 01/13/17   Entered 01/13/17 22:34:28   Ex. C pa
Johnson v Gore Wood & Co (HL(E))   Pg 90 of 903         [2002] 2 AC
Lord Bingham of Cornhill

contained terms designed to preclude (in one instance) and limit (in another)   A
personal claims by him.  Those provisions only made sense on the
assumption that Mr Johnson was likely to make a personal claim.  GW did
not, of course, agree to forgo any defence the firm might have to
Mr Johnson's claim if brought, and the documents show that GW's solicitor
was alert to issues of remoteness and duplication.  Had Mr Johnson delayed
unduly before proceeding, a limitation defence would have become
available.  But an application to strike out for abuse of process is not a   B
defence; it is an objection to an action being brought at all.  The terms of the
settlement agreement and the exchanges which preceded it in my view point
strongly towards acceptance by both parties that it was open to Mr Johnson
to issue proceedings to enforce a personal claim, which could then be tried or
settled on its merits, and I consider that it would be unjust to permit GW to
resile from that assumption.   C

  If, contrary to my view, GW is not estopped by convention from seeking
to strike out Mr Johnson's action, its failure to take action to strike out over
a long period of time is potent evidence not only that the action was not seen
as abusive at the time but also that, on the facts, it was not abusive.  The
indicia of true abuse are not so obscure that an experienced professional
party, advised by leading counsel (not, at that stage, Mr Steinfeld), will fail   D
to recognise them.  It is accepted that Mr Johnson had reasons which he
regarded as compelling to defer prosecution of his personal claim.  If, as he
contended, the urgency of obtaining an early and favourable decision in the
company's action was itself a result of GW's breach of duty to the company
and to him, it would seem to me wrong to stigmatise as abusive what was, in
practical terms, unavoidable.  I agree with GW that it would certainly have
been preferable if the judge who tried the company's action, and thereby   E
became familiar with much of the relevant detail and evidence, had been
able at the same time or shortly thereafter to rule on the personal claim.
That would have been efficient and economical.  But there were reasons
accepted at least implicitly by both parties at the time for not proceeding in
that way, and GW could, if it wishes, limit the extent to which issues
extensively canvassed in the earlier action are to be reopened.  It is far-
fetched to suggest that this action involves a collateral attack on GW's non-   F
admission of liability in the first action when that action was settled by
insurers on terms quite inconsistent with any realistic expectation that
GW would not be found liable.

  In my opinion, based on the facts of this case, the bringing of this action
was not an abuse of process.  The Court of Appeal adopted too mechanical
an approach, giving little or no weight to the considerations which led   G
Mr Johnson to act as he did and failing to weigh the overall balance of
justice.  I would allow Mr Johnson's appeal.

*The recoverability of the damages claimed by Mr Johnson*

  By its notice of cross-appeal GW challenged the Court of Appeal's ruling
that all the heads of damage pleaded on behalf of Mr Johnson (with one
exception) were or might be recoverable in principle if the pleaded facts were   H
fully proved.
  GW's first argument before the House, applicable to all save two of the
pleaded heads of damage, was in principle very simple.  It was that this
damage, if suffered at all, had been suffered by WWH and Mr Johnson,

A  being for this purpose no more than a shareholder in the company, could not
sue to recover its loss. As the Court of Appeal pointed out in *Prudential
Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, 210:

"A derivative action is an exception to the elementary principle that
A cannot, as a general rule, bring an action against B to recover damages
or secure other relief on behalf of C for an injury done by B to C. C is the
B  proper plaintiff because C is the party injured, and, therefore, the person
in whom the cause of action is vested."

Here, it was argued, Mr Johnson was seeking to recover damage which had
been suffered by WWH.

Mr Johnson's response was equally simple. It was accepted, for purposes
of the application to strike out the damages claim, that GW owed a duty to
C  him personally and was in breach of that duty. Therefore, subject to
showing that the damage complained of was caused by GW's breach of duty
and was not too remote, which depended on the facts established at trial and
could not be determined on the pleadings, he was entitled in principle to
recover any damage which he had himself suffered as a personal loss
separate and distinct from any loss suffered by the company.

D  On this issue we were referred to a number of authorities which included
*Lee v Sheard* [1956] 1 QB 192; *Prudential Assurance Co Ltd v Newman
Industries Ltd (No 2)* [1982] Ch 204; *Heron International Ltd v Lord Grade*
[1983] BCLC 244; *R P Howard Ltd v Woodman Matthews & Co* [1983]
BCLC 117; *George Fischer (Great Britain) Ltd v Multi Construction Ltd*
[1995] 1 BCLC 260; *Christensen v Scott* [1996] 1 NZLR 273; *Barings plc v
Coopers & Lybrand* [1997] 1 BCLC 427; *Gerber Garment Technology Inc v
E  Lectra Systems Ltd* [1997] RPC 443; *Stein v Blake* [1998] 1 All ER 724 and
*Watson v Dutton Forshaw Motor Group Ltd* (unreported) 22 July 1998;
Court of Appeal (Civil Division) Transcript No 1284 of 1998.

These authorities support the following propositions. (1) Where a
company suffers loss caused by a breach of duty owed to it, only the
company may sue in respect of that loss. No action lies at the suit of a
shareholder suing in that capacity and no other to make good a diminution
F  in the value of the shareholder's shareholding where that merely reflects the
loss suffered by the company. A claim will not lie by a shareholder to make
good a loss which would be made good if the company's assets were
replenished through action against the party responsible for the loss, even if
the company, acting through its constitutional organs, has declined or failed
to make good that loss. So much is clear from *Prudential Assurance Co Ltd
G  v Newman Industries Ltd (No 2)* [1982] Ch 204, particularly at pp 222–
223, *Heron International*, particularly at pp 261–262, *George Fischer*,
particularly at pp 266 and 270–271, *Gerber* and *Stein v Blake*, particularly
at pp 726–729. (2) Where a company suffers loss but has no cause of action
to sue to recover that loss, the shareholder in the company may sue in respect
of it (if the shareholder has a cause of action to do so), even though the loss is
a diminution in the value of the shareholding. This is supported by *Lee v
H  Sheard* [1956] 1 QB 192, 195–196, *George Fischer* and *Gerber*. (3) Where a
company suffers loss caused by a breach of duty to it, and a shareholder
suffers a loss separate and distinct from that suffered by the company caused
by breach of a duty independently owed to the shareholder, each may sue to
recover the loss caused to it by breach of the duty owed to it but neither may

recover loss caused to the other by breach of the duty owed to that other.    A
I take this to be the effect of *Lee v Sheard*, at pp 195–196, *Heron
International*, particularly at p 262, *R P Howard*, particularly at p 123,
*Gerber* and *Stein v Blake*, particularly at p 726.    I do not think the
observations of Leggatt LJ in *Barings* at p 435B and of the Court of Appeal
of New Zealand in *Christensen v Scott* at p 280, lines 25–35, can be
reconciled with this statement of principle.

These principles do not resolve the crucial decision which a court must    B
make on a strike-out application, whether on the facts pleaded a
shareholder's claim is sustainable in principle, nor the decision which the
trial court must make, whether on the facts proved the shareholder's claim
should be upheld.    On the one hand the court must respect the principle of
company autonomy, ensure that the company's creditors are not prejudiced
by the action of individual shareholders and ensure that a party does not    C
recover compensation for a loss which another party has suffered.    On the
other, the court must be astute to ensure that the party who has in fact
suffered loss is not arbitrarily denied fair compensation.    The problem can be
resolved only by close scrutiny of the pleadings at the strike-out stage and all
the proven facts at the trial stage: the object is to ascertain whether the loss
claimed appears to be or is one which would be made good if the company
had enforced its full rights against the party responsible, and whether (to use    D
the language of *Prudential Assurance Co Ltd v Newman Industries Ltd
(No 2)* [1982] Ch 204, 223) the loss claimed is "merely a reflection of the loss
suffered by the company".    In some cases the answer will be clear, as where
the shareholder claims the loss of dividend or a diminution in the value of
a shareholding attributable solely to depletion of the company's assets, or a
loss unrelated to the business of the company.    In other cases, inevitably,    E
a finer judgment will be called for.    At the strike-out stage any reasonable
doubt must be resolved in favour of the claimant.

I turn to consider the heads of claim now pleaded by Mr Johnson.
(1) Collector Piece Video Ltd and Adfocus Ltd.    The claim is for sums which
Mr Johnson, acting on GW's advice, invested in these companies and lost.
This claim is unobjectionable in principle, as Mr Steinfeld came close to
accepting.    (2) Cost of personal borrowings: loan capital and interest.    The    F
claim is for sums which Mr Johnson claims he was obliged to borrow at
punitive rates of interest to fund his personal outgoings and those of his
businesses.    Both the ingredients and the quantum of this claim will call for
close examination, among other things to be sure that it is not a disguised
claim for loss of dividend, but it cannot at this stage be struck out as bad on
its face.    The same is true of Mr Johnson's claims for bank interest and    G
charges and mortgage charges and interest (which will raise obvious
questions of remoteness).    (3) Diminution in value of Mr Johnson's pension
and majority shareholding in WWH.    In part this claim relates to payments
which the company would have made into a pension fund for Mr Johnson:
I think it plain that this claim is merely a reflection of the company's loss and
I would strike it out.    In part the claim relates to enhancement of the value of
Mr Johnson's pension if the payments had been duly made.    I do not regard    H
this part of the claim as objectionable in principle.    An alternative claim,
based on the supposition that the company would not have made the
pension payments, that its assets would thereby have been increased and that
the value of Mr Johnson's shareholding would thereby have been enhanced,

A is also a reflection of the company's loss and I would strike it out. (4) Loss of 12·5% of Mr Johnson's shareholding in WWH. Mr Johnson claims that he transferred these shares to a lender as security for a loan and that because of his lack of funds, caused by GW's breach of duty, he was unable to buy them back. This claim is not in my view objectionable in principle. (5) Additional tax liability. If proved, this is a personal loss and I would not strike it out.

B The second limb of GW's argument on the cross-appeal was directed to Mr Johnson's claim for damages for mental distress and anxiety. This is a claim for general damages for

> "the mental distress and anxiety which he has suffered as a result of the protracted litigation process to which he has been subjected, the extreme financial embarrassment in which he and his family have found themselves, and the deterioration in his family relationships, particularly with his wife and son, as a result of the matters complained of in the re-amended statement of claim."

C

D Closely allied to this was a claim, pleaded at length, for aggravated damages "by reason of the fact that the manner of the commission of [GW's] tort was such as to injure his pride and dignity". GW contended that damages for mental distress and anxiety did not lie for breach of a commercial contract such as the present and that this was not a class of case in which aggravated damages were in principle recoverable. Mr ter Haar took issue with both these points.

E The general rule laid down in *Addis v Gramophone Co Ltd* [1909] AC 488 was that damages for breach of contract could not include damages for mental distress. Cases decided over the last century established some inroads into that general rule: see, generally, *McGregor on Damages*, 16th ed (1997), paras 98–104. But the inroads have been limited and McGregor describes as a useful summary a passage in *Watts v Morrow* [1991] 1 WLR 1421, 1445:

> "A contract-breaker is not in general liable for any distress, frustration, anxiety, displeasure, vexation, tension or aggravation which his breach of contract may cause to the innocent party. This rule is not, I think, founded on the assumption that such reactions are not foreseeable, which they surely are or may be, but on considerations of policy.
> "But the rule is not absolute. Where the very object of a contract is to provide pleasure, relaxation, peace of mind or freedom from molestation, damages will be awarded if the fruit of the contract is not provided or if the contrary result is procured instead."

F

G

G Your Lordships' House had occasion to touch on this question in *Ruxley Electronics and Construction Ltd v Forsyth* [1996] AC 344, an unusual case in which the issue concerned the measure of compensation recoverable by a building owner against a contractor who had built a swimming pool which was 18 inches shallower at the deep end than the contract specified. Lord Lloyd of Berwick said, at p 374:

H

> "*Addis v Gramophone Co Ltd* established the general rule that in claims for breach of contract, the plaintiff cannot recover damages for his injured feelings. But the rule, like most rules, is subject to exceptions. One of the well established exceptions is when the object of the contract is

03635-jpm  Doc 173-3  Filed 01/13/17  Entered 01/13/17 22:34:28  Ex. C pa
Johnson v Gore Wood & Co (HL(E))  Pg 94 of 903  [2002] 2 AC
Lord Bingham of Cornhill

to afford pleasure, as, for example, where the plaintiff has booked a    A
holiday with a tour operator. If the tour operator is in breach of contract
by failing to provide what the contract called for, the plaintiff may
recover damages for his disappointment: see *Jarvis v Swans Tours Ltd*
[1973] QB 233 and *Jackson v Horizon Holidays Ltd* [1975] 1 WLR 1468.

"This was, as I understand it, the principle which Judge Diamond
applied in the present case. He took the view that the contract was one
'for the provision of a pleasurable amenity'. In the event, Mr Forsyth's    B
pleasure was not so great as it would have been if the swimming pool had
been 7 feet 6 inches deep. This was a view which the judge was entitled to
take. If it involves a further inroad on the rule in *Addis v Gramophone Co
Ltd* [1909] AC 488, then so be it. But I prefer to regard it as a logical
application or adaptation of the existing exception to a new situation."

I do not regard this observation as throwing doubt on the applicability of    C
*Addis v Gramophone Co Ltd* in a case such as the present. It is undoubtedly
true that many breaches of contract cause intense frustration and anxiety to
the innocent party. I am not, however, persuaded on the argument presented
on this appeal that the general applicability of *Addis v Gramophone Co Ltd*
should be further restricted.

I would strike out Mr Johnson's claim for damages for mental distress    D
and anxiety. I would also strike out his claim for aggravated damages: I see
nothing in the pleaded facts which would justify any award beyond the basic
compensatory measure of damages.

### Conclusion

For these reasons I would allow Mr Johnson's appeal and dismiss GW's    E
cross-appeal, save that I would strike out his claims (identified in (3) above)
for pension payments and the enhanced value of his shareholding, and for
damages for mental distress and anxiety and aggravated damages. I would
order GW to pay Mr Johnson's costs before the Court of Appeal and the
judge, and the costs of the appeal and the cross-appeal to this House.

**LORD GOFF OF CHIEVELEY** My Lords,    F

### (1) The appeal

#### (a) Abuse of process

On the question whether there was an abuse of process on the part of the
plaintiff, my noble and learned friend, Lord Bingham of Cornhill, has
reviewed the facts and the relevant authorities in lucid detail. I find myself to    G
be in complete agreement with his analysis of the authorities, and with his
conclusion that on the facts there was no abuse of process on the part of the
plaintiff; and I do not propose to burden this opinion with a repetition of his
reasoning. I only wish to add a few words on the separate question of
estoppel, with regard to the nature of the estoppel on which the plaintiff
could, if necessary, have relied.    H

#### (b) Estoppel

The conclusion of the judge, and the contention of Mr ter Haar for the
plaintiff, was that the relevant estoppel was estoppel by convention.

A    Reliance was placed in particular on a well known passage in the judgment of Lord Denning MR in *Amalgamated Investment and Property Co Ltd v Texas Commerce International Bank Ltd* [1982] QB 84, 122:

"The doctrine of estoppel is one of the most flexible and useful in the armoury of the law. But it has become overloaded with cases. That is why I have not gone through them all in this judgment. It has evolved
B    during the last 150 years in a sequence of separate developments: proprietary estoppel, estoppel by representation of fact, estoppel by acquiescence, and promissory estoppel. At the same time it has been sought to be limited by a series of maxims: estoppel is only a rule of evidence, estoppel cannot give rise to a cause of action, estoppel cannot do away with the need for consideration, and so forth. All these can now
C    be seen to merge into one general principle shorn of limitations. When the parties to a transaction proceed on the basis of an underlying assumption—either of fact or of law—whether due to misrepresentation or mistake makes no difference—on which they have conducted the dealings between them—neither of them will be allowed to go back on that assumption when it would be unfair or unjust to allow him to do so.
D    If one of them does seek to go back on it, the courts will give the other such remedy as the equity of the case demands."

This broad statement of law is most appealing. I yield to nobody in my admiration for Lord Denning; but it has to be said that his attempt in this passage to identify a common criterion for the existence of various forms of estoppel—he refers in particular to proprietary estoppel, estoppel by
E    representation of fact, estoppel by acquiescence, and promissory estoppel— is characteristically bold; and that the criterion which he chooses, viz that the parties to a transaction should have proceeded on the basis of an underlying assumption, was previously thought to be relevant only in certain cases (for example, it was adopted by Oliver J in his important judgment in *Taylors Fashions Ltd v Liverpool Victoria Trustees Co Ltd (Note)* [1982]
F    QB 133) and, in particular, in the case of estoppel by convention, a species of estoppel which Lord Denning does not mention. Furthermore, if he intended that his broad statement of principle should apply in the case of estoppel by convention, a further problem arises in that, in relation to that doctrine, it has been authoritatively stated in *Spencer Bower & Turner, The Law Relating to Estoppel by Representation*, in the scholarly and much admired third edition (1977) by Sir Alexander Turner, at pp 167–168, that:
G
"Just as the representation which supports an estoppel *in pais* must be a representation of *fact*, the assumed state of affairs which is the necessary foundation of an estoppel by convention must be an assumed state of facts presently in existence . . . No case has gone so far as to support an estoppel by convention precluding a party from resiling from a promise or assurance, not effective as a matter of contract, as to future conduct or as
H    to a state of affairs not yet in existence. And there is no reason to suppose that the doctrine will ever develop so far. To allow such an estoppel would amount to the abandonment of the doctrine of consideration, and to accord contractual effect to assurances as to the future for which no consideration has been given."

03635-jpm   Doc 173-3   Filed 01/13/17   Entered 01/13/17 22:34:28   Ex. C pa
Johnson v Gore Wood & Co (HL(E))   Pg 96 of 903   [2002] 2 AC
Lord Goff of Chieveley

I myself suspect that this statement may be too categorical; but we cannot     A
ignore the fact that it embodies a fundamental principle of our law of
contract. The doctrine of consideration may not be very popular nowadays;
but although its progeny, the doctrine of privity, has recently been abolished
by statute, the doctrine of consideration still exists as part of our law.

I myself was the judge of first instance in *Amalgamated Investment and
Property Co Ltd v Texas Commerce International Bank Ltd* [1982] QB 84.
I remember the doctrine of estoppel by convention being urged upon me; but     B
the case was concerned with the scope of a guarantee, which was a matter of
law, and, in the light of the passage in *Spencer Bower & Turner* which I have
just quoted, I hesitated to adopt the doctrine. Cautiously, and I still think
wisely, I founded my conclusion on a broader basis of unconscionability. In
the Court of Appeal, however, both Eveleigh and Brandon LJJ expressly
founded the relevant parts of their judgments on the doctrine of estoppel by     C
convention. They did so relying on the statement of principle from *Spencer
Bower & Turner* which I have already cited, which limits the doctrine to
cases where there has been an agreed assumption as to *facts*, but nevertheless
applied that statement to a case where the agreed assumption (as to the
scope of the guarantee) was one of law. If Lord Denning's statement of
principle is to be read as applying to the case of estoppel by convention, he     D
implicitly rejected the statement of the law in *Spencer Bower & Turner*,
holding that there could be an estoppel whether the common underlying
assumption was one of fact or of law.

I accept that in certain circumstances an estoppel may have the effect of
enabling a party to enforce a cause of action which, without the estoppel,
would not exist. Examples are given in my judgment in *Amalgamated
Investment and Property Co Ltd v Texas Commerce International Bank*     E
[1982] QB 84, 105–107. But in my opinion it is not enough for that
purpose that the estoppel may be characterised as an estoppel by convention,
or that it can be said to be founded upon a common assumption by the
parties.

Against this background I am, despite my great admiration for Lord
Denning, reluctant to proceed on the basis of estoppel by convention in the
present case. The function of the estoppel is here said to be to preclude the     F
defendant firm from contending that Mr Johnson, by personally advancing a
separate claim to damages against the defendant firm instead of doing so at
the same time as pursuing his company's claim, was abusing the process of
the court. That, as I see it, must relate to a matter of law. It could, however,
be appropriate subject matter for an estoppel by representation, whether in
the form of promissory estoppel or of acquiescence, on account of which the     G
firm is, by reason of its prior conduct, precluded from enforcing its strict
legal rights against Mr Johnson (to claim that his personal proceedings
against the firm constituted an abuse of the process of the court). Such
an estoppel is not, as I understand it, based on a common underlying
assumption so much as on a representation by the representor that he does
not intend to rely upon his strict legal rights against the representee which is
so acted on by the representee that it is inequitable for the representor     H
thereafter to enforce those rights against him. This approach, as I see it, is
consistent with the conclusion of my noble and learned friend, Lord Millett,
who considers that the firm would be so precluded by virtue of its
acquiescence in the manner in which Mr Johnson had conducted the

A litigation hitherto. In the context of the present case, moreover, I can see no material difference between invoking promissory estoppel or acquiescence as the ground on which the defendant firm should be precluded from asserting that the plaintiff had abused the process of the court. The truth of the matter is that the defendant firm, by its conduct and in particular by participating in negotiations for settlement of the company's claim against it on the basis that Mr Johnson would thereafter be free to pursue his own

B personal claim against it, lulled Mr Johnson into a sense of security that he was free to pursue such a claim against the firm, without objection, in separate proceedings, with the effect that it became unconscionable for the firm to contend that his personal proceedings constituted an abuse of the process of the court. In the end, I am inclined to think that the many circumstances capable of giving rise to an estoppel cannot be accommodated

C within a single formula, and that it is unconscionability which provides the link between them.

For these reasons I would, like the remainder of your Lordships, allow the appeal; and I now turn to the cross-appeal of the defendant firm.

*(2) The cross-appeal*

D Here the question is whether certain heads of claim advanced by the plaintiff, Mr Johnson, against the defendant firm, should be struck out. The relevant heads of claim are usefully recorded in the opinion of my noble and learned friend, Lord Bingham of Cornhill. I do not propose to repeat them in this opinion. The Court of Appeal held that each of the heads of damage pleaded in paragraphs 23 and 24 of the re-amended statement of claim is recoverable as a matter of law by the plaintiff by way of damages for the

E breaches of duty pleaded by him, and so should not be struck out. It is against that decision that the defendant firm now cross-appeals to your Lordships' House.

The principal ground on which it is said by the respondent firm that some of these heads of claim should be struck out is derived from the well-known case of *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204. I agree with the analysis of that case, and of the other cases

F following upon it, set out in the opinion of my noble and learned friend, Lord Millett (which I have had the opportunity of reading in draft). I accordingly agree with his conclusion, post, p 126C–D that:

"On the assumption which we are bound to make for the purpose of this appeal, which is that the firm was in breach of a duty of care owed to Mr Johnson personally, he is in principle entitled to recover damages in

G respect of all heads of non-reflective consequential loss which are not too remote."

On that basis I, like Lord Millett, agree with my noble and learned friend, Lord Bingham of Cornhill, that the heads of damage specified by him as items 1, 2, 4 and 5 are unobjectionable and should not be struck out. Item 3 relates to the diminution in value of the plaintiff's pension policy set up by

H the company and accruing to the benefit of the plaintiff as part of his remuneration in his capacity as director of the company. In so far as the claim relates to payments which the company would have made into a pension fund for the plaintiff, I agree that the claim is merely a reflection of the company's loss and should therefore be struck out. But in so far as it

relates to enhancement of the value of his pension if the payments had been    A
made, it is unobjectionable and should be allowed to stand.

The second ground relates to the plaintiff's claims for general damages for
mental distress, and for aggravated damages based on the fact that the
manner of commission of the respondent firm's wrong was "such as to injure
his pride and dignity". I agree with my noble and learned friend, Lord
Bingham of Cornhill, that, as a matter of principle, damages on these
grounds are not generally recoverable: see *Addis v Gramophone Co Ltd*    B
[1909] AC 488; *Watts v Morrow* [1991] 1 WLR 1421, 1445, per
Bingham LJ; *McGregor on Damages*, paras 98–104. It is true that there has
in recent years been a softening of this principle in certain respects (see
*McGregor on Damages* and *Mahmud v Bank of Credit and Commerce
International SA* [1998] AC 20), but none of these developments has, so far
as I can see, gone so far as to allow recovery on the broad grounds here    C
pleaded. I also would therefore strike out these two heads of claim.

For these reasons, I agree with the order proposed by my noble and
learned friend, Lord Bingham of Cornhill, as to the disposal of both the
appeal and the cross-appeal. I also agree with the order proposed by him as
to costs.

**LORD COOKE OF THORNDON** My Lords, having had the advantage    D
of reading in draft the speech of my noble and learned friend, Lord Bingham
of Cornhill, I agree with all that he says on the subject of abuse of process.
The course adopted by the parties of settling Westway Homes Ltd's claim
against Gore Wood & Co, but leaving open any personal claim by
Mr Johnson against the same solicitors, subject to a cap on certain heads of
damages and an undertaking concerning personal guarantees, strikes me as a    E
sensible one: the personal claim against the solicitors plainly involves
different and more difficult issues. The belated raising by the defendants of
the contention, more ingenious than realistic, that the settlement had the
effect of preventing the personal claim seems to me closer to abuse of process
than the plaintiff's conduct in pursuing the claim. The defendants are saved
from that stigma by the acceptance of their contention by the Court of
Appeal, but I agree that on this part of the case the appeal of the plaintiff    F
must be allowed.

On the recoverability of personal damages, I have much more difficulty,
for the following reasons. It will be convenient to deal first with the claim
for quantifiable financial loss, secondly with the claim based on other forms
of suffering.

*Damages for quantifiable financial loss*    G

As the present is an action by one claiming to be a personal client against
solicitors, not an action by a shareholder against a company and directors,
*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982]
Ch 204, including the well known passage at pp 222–223, has only a limited
bearing. The cash box illustration given by the Court of Appeal (Cumming-
Bruce, Templeman and Brightman LJJ) is not helpful in this case because it    H
does not envisage any loss except of the company's £100,000. It is by no
means self-evident that, if the controlling shareholder had lost a valuable
business opportunity for want of prompt access to the company's money, he
would have been unable to recover damages for that loss caused by the

03635-jpm    Doc 173-3    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
[2002] 2 AC                    Pg 99 of 903 Johnson v Gore Wood & Co (HL(E))
                                                    Lord Cooke of Thorndon

A   defendant's deceit and theft of the cash box. The court did give as a possible
    instance of a recoverable personal loss the cost caused to the shareholder in
    consequence of a fraudulent circular, such as the cost of attending a meeting;
    but this single specific example is not fully illuminating. Nothing that I am
    about to say involves any criticism of the decision in the *Prudential* case or
    anything said in it. My point is simply that it was not concerned with the
    kind of issue arising in the present case and contains no observations about
B   this kind of issue. The same applies to *Stein v Blake* [1998] 1 All ER 724.
        I respectfully agree that the three numbered propositions set out in the
    speech of Lord Bingham are supported by the English authorities cited by
    him. But these authorities and the propositions are not comprehensive.
    Nor, as my noble and learned friend also indicates, do they resolve the
    crucial question arising on a strike-out application in a case such as the
C   present. This is a case about solicitors' negligence. The English authorities
    cited include only one relating to the not uncommon situation of a solicitor
    acting both for a client personally and for a company controlled by the
    latter. This is *R P Howard Ltd v Woodman Matthews & Co* [1983]
    BCLC 117. In that case the solicitor was negligent in failing initiate a timely
    application for statutory protection of the company's lease. The company
D   negotiated with the landlord a new lease on terms less favourable than could
    have been obtained with the bargaining power of an extant application
    (loss A). The new lease also stipulated that the shareholder could not sell
    his shares without the landlord's consent (loss B). Against the solicitor
    Staughton J awarded the company loss A and the shareholder loss B.
    Although it flowed from the company's loss of bargaining power, loss B was
    not suffered by the company. So, too, in the present case Mr Johnson claims
E   that at least the greater part of the losses for which he sues were not suffered
    by the company.
        As the report of *Christensen v Scott* [1996] 1 NZLR 273 may not be
    readily available in England, it is as well to reproduce here the whole of the
    relevant passage in the judgment of the Court of Appeal delivered by
    Thomas J. I must not conceal that I was a member of the court of five on
F   behalf of whom the judge spoke, although I confess to little independent
    recollection of the case. It was a case in which the defendants, firms of
    chartered accountants and solicitors, acted for the plaintiffs personally and
    in the course of doing so advised on channelling their assets into a company
    taking a lease of farm land. Naturally the defendants came to act for the
    company as well. By reason of alleged negligence on the part of the
    defendants the consent of the landlord's mortgagees was not obtained, nor
G   was a caveat registered against the title. Consequently the land was lost and
    the company failed. The company's claim against the defendants was settled
    by the liquidator for a sum alleged by the plaintiffs to be totally inadequate.
    The Court of Appeal held that the personal claims should not be struck out
    before trial. Thomas J said, at pp 280–281:

H       "We do not need to enter upon a close examination of the *Prudential
        Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204
        decision. It has attracted not insignificant and, at times, critical comment.
        See e g L C B Gower, *Gower's Principles of Modern Company Law*,
        5th ed (1992), pp 647–653; L S Sealy, 'Problems of Standing, Pleading
        and Proof in Corporate Litigation' (ed B G Pettet), p 1, esp pp 6–10; and

03635-jpan   Doc 173-3   Filed 01/13/17   Entered 01/13/17 22:34:28   Ex. C pa
Johnson v Gore Wood & Co (HL(E)) Pg 100 of 903   [2002] 2 AC
Lord Cooke of Thorndon

M J Sterling, 'The Theory and Policy of Shareholder Actions in Tort'   A
(1987) 50 MLR 468, esp pp 470–474. It may be accepted that the Court
of Appeal was correct, however, in concluding that a member has no right
to sue directly in respect of a breach of duty owed to the company or in
respect of a tort committed against the company. Such claims can only be
bought by the company itself or by a member in a derivative action under
an exception to the rule in *Foss v Harbottle* (1843) 2 Hare 461. But this is
not necessarily to exclude a claim brought by a party, who may also be a   B
member, to whom a separate duty is owed and who suffers a personal loss
as a result of a breach of that duty. Where such a party, irrespective that
he or she is a member, has personal rights and these rights are invaded, the
rule in *Foss v Harbottle* is irrelevant. Nor would the claim necessarily
have the calamitous consequences predicted by counsel in respect of the
concept of corporate personality and limited liability. The loss arises not   C
from a breach of duty owed to the company but from a breach of duty
owed to the individuals. The individual is simply suing to vindicate his
own right or redress a wrong done to him or her giving rise to a personal
loss.

"We consider, therefore, that it is certainly arguable that, where there
is an independent duty owed to the plaintiff and a breach of that duty
occurs, the resulting loss may be recovered by the plaintiff. The fact that   D
the loss may also be suffered by the company does not mean that it is not
also a personal loss to the individual. Indeed, the diminution in the value
of Mr and Mrs Christensen's shares in the company is by definition a
personal loss and not a corporate loss. The loss suffered by the company
is the loss of the lease and the profit which would have been obtained
from harvesting the potato crop. That loss is reflected in the diminution   E
in the value of Mr and Mrs Christensen's shares. They can no longer
realise their shares at the value they enjoyed prior to the alleged default of
their accountants and solicitors. (For a discussion of the policy issues
which arise in considering these questions, see Sterling, at pp 474–491.)

"In circumstances of this kind the possibility that the company and the
member may seek to hold the same party liable for the same loss may pose
a difficulty. Double recovery, of course, cannot be permitted. The   F
problem does not arise in this case, however, as the company has chosen
to settle its claim. Peat Marwick and McCaw Lewis accepted a
compromise in the knowledge that Mr and Mrs Christensen's claim was
outstanding. It may well be, as was acknowledged by Mr Pidgeon in the
course of argument, that an allowance will need to be made for the
amount already paid to the liquidator in settlement of the company's   G
claim.

"It is to be acknowledged, however, that the problem of double
recovery may well arise in other cases. No doubt, such a possibility is
most likely with smaller private companies where the interrelationship
between the company, the directors and the shareholders may give rise to
independent duties on the part of the professional advisers involved. But
the situation where one defendant owes a duty to two persons who suffer   H
a common loss is not unknown in the law, and it will need to be examined
in this context. It may be found that there is no necessary reason why the
company's loss should take precedence over the loss of the individuals
who are owed a separate duty of care. To meet the problem of double

A    recovery in such circumstances it will be necessary to evolve principles to determine which party or parties will be able to seek or obtain recovery. A stay of one proceeding may be required. Judgment, with a stay of execution against one or other of the parties, may be in order. An obligation to account in whole or in part may be appropriate. The interest of creditors who may benefit if one party recovers and not the

B    other may require consideration. As the problem of double recovery does not arise in this case, however, it is preferable to leave an examination of these issues to a case where that problem is squarely in point.

     "Essentially, Mr and Mrs Christensen are alleging that as a result of Peat Marwick and McCaw Lewis's breach of duty owed to them personally they suffered a personal loss, that is, a reduction in the value of their assets. Their assets in this case had been channelled into their

C    company. Thus, it is arguable that the diminution in the value of their shareholding is the measure of that loss. It may well be that when the evidence is heard it will be apparent that Mr and Mrs Christensen's claim is inflated, but that is a matter for the trial.

     "We are not prepared to hold at this stage that they do not have an arguable case to recover damages for the breach of an acknowledged

D    duty."

     When that passage is read as a whole, two features will be noted. It will be seen not only that the whole passage is throughout guarded and provisional, but also that the court recognised both that double recovery cannot be permitted and that the interests of creditors may require consideration. In this field, if a client is suing his own solicitor, it would

E    appear that only the problems of double recovery or prejudice to the company's creditors would justify denying or limiting the right to recover personal damages which, on ordinary principles of foreseeability, would otherwise arise. One other observation should be made about the passage in Thomas J's judgment. Although he did mention that *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204 had not gone without criticism, he did not find it necessary to examine that case closely.

F    I would repeat that in no way am I criticising it. On the contrary I accept it to the full.

     The next closest of the English reported cases cited is *Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427, 435. In that case (arising from the activities of Mr Leeson) a United Kingdom company was suing the auditors of its Singapore subsidiary; the auditors were also responsible for supplying

G    audit information for the group accounts. On a pre-trial appeal, Leggatt LJ stated the law in terms which, albeit briefer, are much the same as those of Thomas J in *Christensen v Scott* [1996] 1 NZLR 273 which case was cited by Leggatt LJ.

     *Gerber Garment Technology Inc v Lectra Systems Ltd* [1997] RPC 443 is more distant from the present case on the facts. It was a suit for infringement of patents in which some of the lost profits for which the

H    plaintiff company claimed damages were suffered by subsidiary companies in which it held all the shares. The decision was that, when a shareholder has a cause of action but his company has none, he can recover damages measured by the reduction in value of his shareholding; but that the plaintiff must prove the amount of his own loss and that it cannot be assumed that

03635-jfm   Doc 173-3   Filed 01/13/17   Entered 01/13/17 22:34:28   Ex. C pa
Johnson v Gore Wood & Co (HL(E))                                              [2002] 2 AC
Lord Cooke of Thorndon                Pg 102 of 903

A

this is the same as the loss suffered by the company. Such relevance as the case has lies in the reasoning of Hobhouse LJ in the Court of Appeal. At p 474 he described *Christensen v Scott* [1996] 1 NZLR 273 as "a good illustration of the application of the relevant principles". After an extensive quotation from the judgment in that case, he added, at p 475:

B

"There is no reason to suppose that this case would have been differently decided in England. The decision helpfully illustrates that, provided that the plaintiff can establish a personal cause of action and can prove a personal loss caused by the defendant's actionable wrong, then the fact that the loss is felt by the plaintiff in the form of the loss of the value of the plaintiff's shares in a company is no answer to the plaintiff's claim. (In that case, as in the present case, no question of remoteness arose.)"

C

Thus *Christensen v Scott* does not appear to have caused problems for English judges hitherto, and I would hope that this position might continue. But it is necessary to add some further discussion of principle, as on the facts the present case is not on all fours with that case or any of the others cited in argument.

D

Assuming that this is a fairly typical case of a man carrying on business wholly or partly through a company or companies controlled by him, the first question at a trial will be whether Gore Wood & Co owed duties to Mr Johnson personally as well as to Westway Homes Ltd. Such personal duties could arise from a contract of retainer or in tort because of the closeness of relations ("proximity"), or from both sources concurrently. *Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145 finally established in English law the legitimacy of recognising that professional advisers may owe to the same client a duty to exercise reasonable care and skill derived from both contract and tort law. Conceivably the rules as to remoteness or the measure of damages could produce different consequences; but in the interests of justice and the clarity of the law this should obviously be avoided unless forced upon the courts. The duty in such a case is most simply seen as a civil law obligation to conform to professional standards. In the argument it was not suggested that for the purposes of this appeal there is any material difference.

E

F

Although more elaborately pleaded here, the duty owed to the personal claimant would be to exercise reasonable care and professional skill in handling the legal side of his affairs and those of his relevant company. In this case it would include the elementary responsibility of exercising efficiently the company's option to purchase Mr Moores's land, on the basis that the risk of personal loss to Mr Johnson from a questionable exercise of the option was reasonably foreseeable by Gore Wood & Co. The duty was one of taking reasonable steps to safeguard his interests, not one of indemnity. Subject to that important qualification, there is some analogy with a contract of insurance When a solicitor is acting for both a shareholder personally and his company, the essence of the personal relationship is that the individual looks to the solicitor for care to provide personal financial protection.

G

H

That brings the discussion to what is perhaps the crucial point in this case. The required degree of personal protection will extend, I think, to protection against the operation of rules of law that might foreseeably restrict the

03635-jpm   Doc 173-3   Filed 01/13/17   Entered 01/13/17 22:34:287   Ex. C pa
[2002] 2 AC                    Pg 103 of 903   Johnson v Gore Wood & Co (HL(E))
                                              Lord Cooke of Thorndon

A   individual's right to recover damages if no duty were owed to him personally
    by the solicitor. In cases of the present class, two such rules may be relevant
    among other factors. One may be called the rule in *Prudential Assurance Co
    Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, using that as a
    shorthand to convey that a shareholder in a company has as such no right to
    recover from a third party damages for breach of the latter's duty to the
    company. The other may be called the rule in *The Lips*, using that as
B   shorthand for the proposition in *President of India v Lips Maritime Corpn*
    [1988] AC 395, per Lord Brandon of Oakbrook at p 425: "There is no such
    thing as a cause of action in damages for late payment of damages. The only
    remedy which the law affords for delay in paying damages is the
    discretionary award of interest pursuant to statute."
       But for the solicitor's duty owed to the individual client, such restrictions
C   could result in inability on the part of the latter to recover damages caused to
    him by the solicitor's negligence. Thus in the present case, whereas the
    option should have been exercised in a unquestionable manner in February
    1988, it was not until more than four years later that the land was belatedly
    conveyed to Westway Homes Ltd, and not until a further period of about
    eight months had elapsed that the company obtained a monetary settlement
    of its claim against the solicitors.
D
       Mr Johnson alleges (inter alia) that in the meantime the property market
    had collapsed, the development project had ceased to be financially
    advantageous, and he had incurred very high interest charges for personal
    borrowings. To the extent that he can establish at a trial that the delay in the
    obtaining by the company of the land or monetary compensation was caused
    or materially contributed to by negligence on the part of the defendant
E   solicitors, there would appear to be no sound reason for denying him
    personal relief for any damages foreseeably caused to him personally by the
    delay: provided always that double recovery is not sanctioned and the
    interests of the company's creditors are protected.
       While double recovery has to be avoided, at this pre-trial stage I would
    not rule out the possibility that, on the close scrutiny at trial spoken of by
F   Lord Bingham, it will be found that the ultimate agreed payment to the
    company was not intended to and did not in fact adequately compensate
    Mr Johnson for the company's want of title to the land in early 1988. It may
    be chiefly a matter of the timing. The rule in *The Lips* would not exclude the
    plaintiff's personal claim; he is not claiming damages for delay in paying
    damages to him. Rather he is claiming damages for the fact that his
    company did not have the land in 1988—a claim outside the provenance and
G   the purview of the rule in *The Lips*.
       Thus the true scope of the settlement in 1992 is one of the matters
    requiring examination. In the instant case the settlement covered a very
    large part of the company's claim. It may well have been a reasonable
    settlement, reached after having due regard to the interests of the company's
    creditors, who could not successfully claim that more should have been
    recovered. There may nevertheless be some possibility that, in addition to
H   any other right to personal damages that he may have against the solicitors,
    Mr Johnson could be heard to say against them that in any event he should
    be compensated for his company not having recovered fully. Such a
    possibility may be more significant in a case like *Christensen v Scott* [1996]
    1 NZLR 273 where the shareholder has opposed and complains of the

03635-jpm    Doc 173-3    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
Johnson v Gore Wood & Co (HL(E))    Pg 104 of 903    [2002] 2 AC
Lord Cooke of Thorndon

A    inadequacy of the company's settlement; but I do not think that it can be ignored in the present case at this stage.

In a company winding up the liquidator may be liable to the company for negligence on his part in making a compromise: see *In re Windsor Steam Coal Co (1901) Ltd* [1929] 1 Ch 151; *In re Home and Colonial Insurance Co Ltd* [1930] 1 Ch 102. Accordingly I think that in cases within that principle the court should avoid sanctioning not only double recovery, but also any B real prospect of double recovery. As this aspect was not explored in argument, it need not now be explored further.

Apart from the question of any shortfall in the company's recovery, I think that Mr Johnson could have a good personal claim against the solicitors for compensation on the basis already stated, that is to say on the basis that the damages claimed by him were not suffered by the company. Accordingly C I agree with Lord Bingham that the claimed heads of damages numbered in his speech 1, 2, 4 and 5 should not be struck out before trial, and that the same applies to the part of head 3 relating to the enhancement of the value of Mr Johnson's pension if the payments had been duly made. I am rather less clear that the remaining parts of head 3 should be struck out. Certainly, however, these claims relating to lost payments into a pension fund or retention of corresponding amounts in the company's assets look very much D like claims for double recovery. As the other members of your Lordships' Appellate Committee are in no doubt that they should be struck out, I am content to concur in that conclusion.

In short, agreeing that at the strike-out stage any reasonable doubt must be resolved in favour of the claimant, I think it safer to avoid fine distinctions, especially before trial; and, with the very limited exceptions just mentioned, to leave all the extant claims in this case of complicated facts E open for examination at trial. The open questions would include remoteness. And I would add one other cautionary remark. The trial judge would have to consider, not only issues of double recovery by Mr Johnson and the company, but also any issue of overlapping among Mr Johnson's claims themselves.

F    *Damages for general suffering*

In *Watts v Morrow* [1991] 1 WLR 1421, Bingham LJ said, at p 1445:

"A contract-breaker is not in general liable for any distress, frustration, anxiety, displeasure, vexation, tension or aggravation which his breach of contract may cause to the innocent party. This rule is not, I think, founded on the assumption that such reactions are not foreseeable, which G they surely are or may be, but on considerations of policy.

"But the rule is not absolute. Where the very object of a contract is to provide pleasure, relaxation, peace of mind or freedom from molestation, damages will be awarded if the fruit of the contract is not provided or if the contrary result is procured instead. If the law did not cater for this exceptional category of case it would be defective. A contract to survey the condition of a house for a prospective purchaser does not, however, H fall within this exceptional category.

"In cases not falling within this exceptional category, damages are in my view recoverable for physical inconvenience and discomfort caused by the breach and mental suffering directly related to that inconvenience and

03635-jpm   Doc 173-3   Filed 01/13/17   Entered 01/13/17 22:34:28   Ex. C pa
[2002] 2 AC                          Pg 105 of 903   Johnson v Gore Wood & Co (HL(E))
                                                     Lord Cooke of Thorndon

A  discomfort. If those effects are foreseeably suffered during a period when
   defects are repaired I am prepared to accept that they sound in damages
   even though the cost of the repairs is not recoverable as such. But I also
   agree that awards should be restrained, and that the awards in this case
   far exceeded a reasonable award for the injury shown to have been
   suffered. I agree with the figures which Ralph Gibson LJ proposes to
   substitute."

B
   I regard that as an authoritative statement of the present law of England
   regarding commercial contracts. The exceptional category is not confined,
   in my view, to contracts to provide pleasure and the like. For example,
   breaches of contracts for status such as membership of a trade union or a
   club may carry damages for injured feelings; but it is unnecessary to go into
C  that area further, as I accept that, if there was a contract between
   Mr Johnson and Gore Wood & Co, it is to be classified in English law as
   commercial in the sense that damages for mere distress are not available.
   Contract-breaking is treated as an incident of commercial life which players
   in the game are expected to meet with mental fortitude. For present
   purposes it may be assumed that the same principle applies in so far as the
   claim is grounded in tort: see *Hayes v James & Charles Dodd* [1990] 2 All
D  ER 815, 826, per Purchas LJ. A fuller discussion of these various matters
   can be found in *Mouat v Clark Boyce* [1992] 2 NZLR 559 (a stage of the
   litigation not under consideration by the Privy Council in *Clark Boyce v
   Mouat* [1994] 1 AC 428).
   But that does not quite dispose of Mr Johnson's claim for non-
   quantifiable damage. He alleges extreme financial embarrassment; it is said
E  that from a state of some prosperity he was reduced to subsistence on social
   security benefit. He also alleges deterioration in his family relationships,
   particularly with his wife and son. Although the pleader has treated them as
   mental distress, such consequences are in truth significantly more than
   mental distress. They are more akin to the physical inconvenience and
   discomfort referred to in Bingham LJ's third paragraph. In my opinion the
   common law would be defective and stray too far from reality, humanity
F  and justice if it remorselessly shut out even a restrained award under these
   heads. Hence I would leave the claim in this part of the case standing also,
   although only on the footing that damages could not be awarded merely for
   injured feelings, nor could aggravated damages be awarded merely on that
   account.
   English case law has fluctuated as to the recoverability of damages in
G  contract for mental distress, as is detailed in *McGregor on Damages* (1997),
   paras 98–106. See also Dr Harvey McGregor's preface at pp vii–viii. But it
   has been established since Victorian times that, by contrast with mere
   mental distress, damages are recoverable for substantial inconvenience and
   discomfort. Thus in *Hobbs v London and South Western Railway Co*
   (1875) LR 10 QB 111, a court including Cockburn CJ and Blackburn and
   Mellor JJ upheld an award to a husband and wife for the inconvenience of
H  having to walk home with young children four or five miles late on a
   drizzling night, although the wife's catching of a cold was found too remote.
   That case was applied by Barry J in *Bailey v Bullock* [1950] 2 All ER 1167 in
   awarding damages against solicitors for the inconvenience to the plaintiff of
   having to live in an overcrowded house. Such authorities are treated in

*McGregor on Damages*, paras 93 to 96, as surviving the recent restriction of  A
damages for mental distress. The third paragraph already quoted from
Bingham LJ in *Watts v Morrow* [1991] 1 WLR 1421, 1445 is largely
supported by them. The line may not always be easy to draw, and it is
particularly difficult before trial to assess the weight of the claims in the
present case. But both a changed way of life because of poverty and
damaged family relationships can be grievous forms of non-pecuniary harm.
I am respectfully unable to agree that they should be ruled out of the law's  B
purview.

Before parting with the case I would say something about *Addis v
Gramophone Co Ltd* [1909] AC 488. In severely confining damages for
wrongful dismissal, your Lordships' House of those days appears to have
seen the relationship of employer and employee as no more than an ordinary
commercial one. This is a world away from the concept now, and in  C
*Mahmud v Bank of Credit and Commerce International SA* [1998] AC 20 the
House accepted that there is an implied obligation of mutual trust and
confidence, and that an employer is under an implied obligation that he will
not, without reasonable and proper cause, conduct his business in a manner
likely to destroy or seriously damage that relationship. Damages for
financial loss, including impaired employment prospects, caused by harm to
reputation could be recovered. It is true that *Addis* was distinguished on the  D
ground that it related to injury to feelings caused by the manner of
termination of the relationship, which question did not arise in *Mahmud*: see
per Lord Nicholls of Birkenhead, at p 38, and Lord Steyn, at p 51. But the
philosophy is altogether different, as is the philosophy embodied in modern
employment legislation. Again, as Lord Bingham has pointed out, *Addis*
was not applied in *Ruxley Electronics and Construction Ltd v Forsyth*  E
[1996] AC 344. *Addis* has not uniformly been followed in the
Commonwealth: see *Brown v Waterloo Regional Board of Comrs of Police*
(1982) 136 DLR (3d) 49, a judgment of Linden J (the author of *Canadian
Tort Law*, now in its sixth edition). The decision was reversed on other
grounds, but Linden J's statements of principle were substantially accepted:
(1983) 150 DLR (3d) 729. According to that authority, an employee  F
wrongfully dismissed may recover damages for mental distress in some
circumstances. To the same effect is *Whelan v Waitaki Meats Ltd* [1991]
2 NZLR 74, which contains an instructive survey of the authorities by
Gallen J. I take leave to doubt the permanence of *Addis* in English law. But
it is not a question arising in the present case either; I make these
observations only to avoid being identified with any approbation of *Addis*.

For the reasons already given, I would allow Mr Johnson's appeal and  G
would dismiss the cross-appeal except as to the two claims identified by Lord
Bingham of Cornhill in his head 3 and as to aggravated damages. In the
result the one point on which I differ concerns the claims for damages for
financial embarrassment and injury to family relationships: those I would
permit to go to trial. I concur in the order for costs proposed by Lord
Bingham.

H

**LORD HUTTON** My Lords, I have had the advantage of reading in draft
the speech of my noble and learned friend, Lord Bingham of Cornhill. I am
in full agreement with his speech on the subject of abuse of process and I wish
to confine my observations to the issue whether the damages claimed by

A    Mr Johnson are recoverable as a matter of law.  The case advanced by
Mr Johnson is that he instructed a firm of solicitors, Gore Wood & Co
("GW"), to advise him personally as to the conduct of his businesses,
including the business of property development which he carried on through
a company Westway Homes Ltd ("WWH") of which he was the managing
director and in which he held the entire shareholding with the exception of
B    two shares, and that acting on behalf of WWH he also instructed GW to
advise that company.  He contends that in advising him as to the business
affairs of the company, GW owed him a duty of care in contract and tort and
in breach of that duty caused him very substantial financial loss.  The
question whether the damages claimed are recoverable comes before the
House as a preliminary issue and is to be approached on the basis that the
facts pleaded by Mr Johnson are capable of establishing a breach of a duty
C    owed to him which caused him loss.
     I consider it to be clear that where a shareholder is personally owed a duty
of care by a defendant and a breach of that duty causes him loss, he is not
debarred from recovering damages because the defendant owed a separate
and similar duty of care to the company, provided that the loss suffered by
the shareholder is separate and distinct from the loss suffered by the
company.  This principle was recently stated in the judgment in the Court of
D    Appeal delivered by Sir Christopher Slade in *Walker v Stones* [2001] QB
902, 932–933, that a claimant is entitled to recover damages where:

          "(a) the plaintiff can establish that the defendant's conduct has
     constituted a breach of some legal duty owed to him personally (whether
     under the law of contract, torts, trusts or any other branch of the law) and
E         (b) on its assessment of the facts, the court is satisfied that such breach of
     duty has caused him personal loss, separate and distinct from any loss
     that may have been occasioned to any corporate body in which he may be
     financially interested.  I further conclude that, if these two conditions are
     satisfied, the mere fact that the defendant's conduct may also have given
     rise to a cause of action at the suit of a company in which the plaintiff is
     financially interested (whether directly as a shareholder or indirectly as,
F         for example, a beneficiary under a trust) will not deprive the plaintiff of
     his cause of action; in such a case, a plea of double jeopardy will not avail
     the defendant."

     But a more difficult question arises where the shareholder claims a loss
which is not separate and distinct from the loss suffered by the company but
his loss flows from loss suffered by the company.  In *Prudential Assurance Co
G    Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, the claimants sued the
directors of the company alleging that they had issued a circular to the
shareholders containing a fraudulent misrepresentation concerning the true
value of certain assets, and the court stated, at pp 222–223:

          "But what [a shareholder] cannot do is to recover damages merely
     because the company in which he is interested has suffered damage.  He
H    cannot recover a sum equal to the diminution in the market value of his
     shares, or equal to the likely diminution in dividend, because such a 'loss'
     is merely a reflection of the loss suffered by the company.  The shareholder
     does not suffer any personal loss.  His only 'loss' is through the company,
     in the diminution in the value of the net assets of the company, in which

he has (say) a 3% shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company."

I shall call this statement "the *Prudential Assurance* principle".

In *Christensen v Scott* [1996] 1 NZLR 273, the Court of Appeal of New Zealand decided that where a plaintiff alleges a breach of duty owed to him personally by accountants and solicitors he is entitled to recover damages notwithstanding that his loss flows from loss suffered by a company in which he is a shareholder through a similar breach of duty owed to the company. In that case two shareholders claimed damages for the diminution in the value of their shareholding in a company caused by the negligence of their accountants and solicitors. In delivering the judgment of the court, after setting out part of the above passage in the judgment in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204 Thomas J stated, at p 280:

"It may be accepted that the Court of Appeal was correct, however, in concluding that a member has no right to sue directly in respect of a breach of duty owed to the company or in respect of a tort committed against the company. Such claims can only be bought by the company itself or by a member in a derivative action under an exception to the rule in *Foss v Harbottle* 2 Hare 461. But this is not necessarily to exclude a claim brought by a party, who may also be a member, to whom a separate duty is owed and who suffers a personal loss as a result of a breach of that duty. Where such a party, irrespective that he or she is a member, has personal rights and these rights are invaded, the rule in *Foss v Harbottle* is irrelevant. Nor would the claim necessarily have the calamitous consequences predicted by counsel in respect of the concept of corporate personality and limited liability. The loss arises not from a breach of the duty owed to the company but from a breach of duty owed to the individuals. The individuals is simply suing to vindicate his own right or redress a wrong done to him or her giving rise to a personal loss.

"We consider, therefore, that it is certainly arguable that, where there is an independent duty owed to the plaintiff and a breach of that duty occurs, the resulting loss may be recovered by the plaintiff. The fact that the loss may also be suffered by the company does not mean that it is not also a personal loss to the individual. Indeed, the diminution in the value of Mr and Mrs Christensen's shares in the company is by definition a personal loss and not a corporate loss."

The approach taken by the Court of Appeal of New Zealand has been approved in a number of judgments of the Court of Appeal. In *Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427 the plaintiff, a company holding shares in a subsidiary company, claimed damages against the defendants, a firm of accountants, in respect of loss it suffered through loss sustained by its subsidiary, BFS, on the ground that the defendants were in breach of duties of care owed both to the plaintiff and to the subsidiary in carrying out an

A    audit of the subsidiary's accounts. The defendants applied to set aside
service of the writ in reliance on the *Prudential Assurance* principle. The
defendants' application was rejected by the Court of Appeal and
Leggatt LJ stated, at p 435:

"[*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)*
[1982] Ch 204] decides that a shareholder in a company has no
B    independent right of action based on an allegation of diminution in the
value of his shares occasioned by damage to the company. Mr Kentridge
seeks to rely on it as authority for the proposition that where a company
may have a cause of action for damage caused to it by a tortfeasor, a
person who enjoys an independent right of action against the tortfeasor
cannot sue him, at least in so far as his damages are measured by a
C    diminution in the value of the company's shares. But in my judgment that
is a misapplication of the principle. If C & LS are in breach of a duty of
care owed to Barings in respect of audit information supplied to them and
the breach causes damage, Barings cannot be disentitled from suing
merely because the damages for which C & LS are said to be liable to
Barings would or might include damages for which they are said to be
liable to BFS. For C & LS are also in breach of a different duty, whether
D    contractual or tortious, owed to BFS. Whereas complications might arise
if these claims were made in separate actions, any risk of double jeopardy
or of double recovery, such as were envisaged by the New Zealand Court
of Appeal in *Christensen v Scott* [1996] 1 NZLR 273, 280–281, can be
avoided if both claims are made in the same action. It may be, for
instance, that C & LS are not liable to Barings for loss of the value of the
E    shares in either BFS or any company which has a cause of action against
C & LS for such loss.
"The present case differs from the *Prudential Assurance* case because
here the person in the position of shareholder, namely Barings, has a right
of action independent of the company, BFS. On the other hand, unlike
the situation in [*George Fischer (Great Britain) Ltd v Multi Construction
Ltd* [1995] 1 BCLC 260], BFS does have a right of action itself. As that
F    case shows, there is no legal principle that a holding company is unable to
recover damages for loss in the value of its subsidiaries, resulting directly
from a breach of duty owed to it, as distinct from a duty owed (or not
owed as the case may be) to the subsidiaries."

In *Gerber Garment Technology Inc v Lectra Systems Ltd* [1997] RPC 443
the plaintiff was entitled to damages for infringement of patent rights held by
G    it and sought to recover damages for losses suffered by subsidiary companies
in which it held all the shares, and which themselves had no cause of action,
and the defendant contended that the claim was barred by the *Prudential
Assurance* principle. That argument was rejected by the Court of Appeal
and Hobhouse LJ cited the judgment of the Court of Appeal of New Zealand
in *Christensen v Scott* [1996] 1 NZLR 273 and stated, at p 475:

H    "There is no reason to suppose that this case would have been
differently decided in England. The decision helpfully illustrates that,
provided that the plaintiff can establish a personal cause of action and can
prove a personal loss caused by the defendant's actionable wrong, then
the fact that the loss is felt by the plaintiff in the form of the loss of the

03635-jpm    Doc 173-3    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
Johnson v Gore Wood & Co (HL(E))    Pg 110 of 903    [2002] 2 AC
Lord Hutton

value of the plaintiff's shares in a company is no answer to the plaintiff's    A
claim. (In that case, as in the present case, no question of remoteness
arose.)"

The judgments in *Prudential Assurance* and *Christensen v Scott* are
difficult to reconcile, and it is also difficult to reconcile the judgment in
*Barings plc v Coopers & Lybrand* with the judgment in the former case
because the ground on which Leggatt LJ sought to distinguish it, namely,    B
that in *Prudential Assurance* the shareholders did not have an individual
right of action, is invalid, the court in *Prudential Assurance* stating, at p 222,
that the defendants owed the shareholders a duty to give sound advice.
*Gerber Garment Technology* can be distinguished from *Prudential
Assurance* on the ground that the companies in which the plaintiff held
shares did not themselves have a cause of action against the defendant. But    C
I consider that the ruling in *Prudential Assurance* that the shareholders could
not recover damages cannot be explained on the ground of causation, which
was the explanation advanced by Hobhouse LJ, at p 471; I think, in
agreement with the Court of Appeal of New Zealand in *Christensen v Scott,*
that the shareholders can be regarded as suffering a loss caused by breach of
duty of the defendant notwithstanding that their loss is reflective of loss    D
suffered by the company. Therefore I consider that the issue to be decided is
whether this House should follow the reasoning set out in *Prudential
Assurance* or the reasoning set out in *Christensen v Scott.*

My Lords, I consider, with respect, that part of the reasoning in
*Prudential Assurance* is open to criticism. In my opinion the view of the
Court of Appeal of New Zealand that the loss suffered by a shareholder
through the diminution in the value of his shareholding is a personal loss is a    E
more realistic assessment than the view of the Court of Appeal in *Prudential
Assurance* that the shareholder's loss is merely a reflection of the loss
suffered by the company and that the shareholder suffers no personal loss.
This view has been criticised in an article by Mr M J Sterling on "The Theory
and Policy of Shareholder Actions in Tort" (1987) 50 MLR 468, 470, 471:

"The description of the Court of Appeal is not wrong, in that the value    F
of a share is related to the present and expected future levels of dividend
of the company and the right to receive dividends is a right of
participation in the company, but it is suspiciously limited because a share
is commonly treated as a piece of personal property. The fact that a share
is valuable because it is a right of participation in a company does not
preclude one as a matter of logic from regarding it as a piece of
property . . .    G
"The Court of Appeal gave no reason for preferring their description of
a share to one which includes its nature as an item of personal property
but some good reason is surely necessary to justify exclusion of this
obvious characteristic. It is therefore suggested that, if necessary, a share
can be regarded as a piece of personal property and a shareholder could
be allowed to sue for injury to it."    H

In my respectful opinion there is force in this criticism. However, even if
this criticism be accepted, there remains the need to ensure that there is no
double recovery and that creditors and the other shareholders of the
company are protected. It was this need which was emphasised by

A  Millett LJ in *Stein v Blake* [1998] 1 All ER 724, 730, as the reason why the
   principle in *Prudential Assurance* should be followed:

> "If this action were allowed to proceed and the plaintiff were to recover
> for the lost value of his shareholding from the first defendant, this would
> reduce his ability to meet any judgment which might thereafter be
> obtained by the liquidators, or by any of the old companies which were
B> not in liquidation, to the prejudice of their creditors.  The plaintiff would
> have obtained by a judgment of the court the very same extraction of
> value from the old companies at the expense of their creditors that the
> first defendant is alleged to have obtained by fraud and deceit."

   In *Christensen v Scott* [1996] 1 NZLR 273 the court considered that the
   problem of double recovery did not arise in that case as the defendants had
C  settled the company's claim with the knowledge that the plaintiffs' claim was
   outstanding.   But the court recognised that double recovery cannot be
   permitted and that the interests of the creditors of a company must be
   protected.  In my opinion the resolution of the conflict between *Prudential
   Assurance* and *Christensen v Scott* narrows down to the issue whether, as
   held in the former case, the shareholder is debarred from bringing to trial an
D  action claiming loss where such loss is merely reflective of loss suffered by
   the company, or whether the shareholder is entitled to proceed to trial on
   such a claim, it being a matter for the trial judge, if the plaintiff establishes
   his claim, to ensure that there is no double recovery and that creditors and
   other shareholders of the company do not suffer loss, which was the course
   which Pumfrey J held should be followed.
      My Lords, whilst in a case such as *Christensen v Scott* there may be merit
E  in permitting an individual shareholder to sue, the decision in *Prudential
   Assurance* has stood in England for almost 20 years and, whilst the decision
   has sometimes been distinguished on inadequate grounds, it has been
   regarded as establishing a clear principle which the Court of Appeal has
   followed in other cases.   I further consider that the principle has the
   advantage that, rather than leaving the protection of creditors and other
   shareholders of the company to be given by the trial judge in the
F  complexities of a trial to determine the validity of the claim made by the
   plaintiff against the defendant, where conflicts of interest may arise between
   directors and some shareholders, or between the liquidator and some
   shareholders, the principle ensures at the outset of proceedings that where
   the loss suffered by the plaintiff is sustained because of loss to the coffers of
   the company, there will be no double recovery at the expense of the
G  defendant nor loss to creditors of the company and other shareholders.
   Therefore whilst I think that this House should uphold the *Prudential
   Assurance* principle, I also consider that it is important to emphasise that the
   principle does not apply where the loss suffered by the shareholder is
   separate and distinct from the loss suffered by the company.
      The five heads of claim pleaded by Mr Johnson have been set out in the
   speech of my noble and learned friend, Lord Bingham of Cornhill.   I consider
H  that the losses claimed in heads 1, 2, 4 and 5 are separate and distinct from
   loss sustained by WWH and that those heads of claim should not be struck
   out.   In respect of head 3 I am also in agreement with the opinion of Lord
   Bingham that because it is not a separate and distinct loss, Mr Johnson
   cannot claim in respect of the moneys which WWH would have paid into a

pension fund for him if those moneys had been available to it, and that that
part of the claim should be struck out, but that Mr Johnson can claim in
respect of enhancement of the value of the pension if the payments had been
made.

For the reasons given by Lord Bingham I would strike out Mr Johnson's
claims for damages for mental distress and anxiety and for aggravated
damages. Accordingly, I would allow Mr Johnson's appeal and dismiss
GW's cross-appeal, save that I would strike out his claim in head 3 for
pension payments (or, in the alternative, for the increase in the value of his
shareholding if those pension payments had not been made), and for
damages for mental distress and anxiety and for aggravated damages.
I would concur in the order for costs proposed by Lord Bingham.

**LORD MILLETT** My Lords, my noble and learned friend, Lord Bingham of
Cornhill, has recounted the facts and I need not set them out again at any
length. The appellant, Mr Johnson, is an entrepreneur who carried on
business through a number of companies which he owned and controlled.
One of them was Westway Homes Ltd ("the company"). Mr Johnson was its
managing director and virtually only shareholder. The respondent firm
("the firm") is a firm of solicitors. Mr Johnson was in the habit of instructing
the firm from time to time to act for him in connection with his personal
affairs as well as for his various companies.

In 1988 the company held a valuable option to buy land for development.
Mr Johnson instructed the firm to exercise the option on the company's
behalf. The firm accepted his instructions and served the appropriate notice,
but failed to do so in a manner which was incapable of challenge by the
vendor. The vendor claimed that the option had not been validly exercised,
and the company was obliged to bring proceedings for specific performance
against him in the Chancery Division ("the Chancery proceedings"). These
were not straightforward, and although the company was ultimately
successful it was unable to obtain title to the land until April 1992, that is to
say more than four years after it had exercised the option. It was awarded
damages and costs against the vendor, but these proved to be irrecoverable.

The firm's failure to deal with the option in a manner which put its
exercise beyond dispute caused the company substantial loss. As well as
having to bear the costs of the Chancery proceedings, it sustained heavy
financial loss as a result of the delay in obtaining title to the land. This loss
was of two kinds. First, until the company established its title, it was unable
to offer the land as security for its borrowings and so obtain a reduction in
the very high interest charges it was paying. Secondly, delay in obtaining
title to the land caused a corresponding delay in the commencement and
completion of the development and thus in the time when the company
could hope to realise any profit from the venture. As it happens, the delay
frustrated the development altogether, for the collapse in the property
market which took place during the currency of the Chancery proceedings
made the venture unprofitable. But this was obviously not foreseeable in
1988, or Mr Johnson would not have caused the company to exercise the
option and the vendor would not have resisted its claim to have done so.

In January 1991 the company brought proceedings against the firm for
professional negligence. The firm admitted that it had been retained by the
company to exercise the option and that it had owed the company a duty of

A    care in doing so. But it denied both liability and quantum. The action came
on for trial in October 1992 and was estimated to last 10 to 12 days. In
December 1992, after the trial had already lasted for six weeks and evidence
was still being given on behalf of the firm, the case was settled upon payment
by the firm of £1,480,000 and £320,000 towards the company's costs. The
sum of £1,480,000 represented the greater part of the damages claimed.

B        Mr Johnson has always claimed that the firm's negligence in the manner
in which it exercised the option also caused substantial financial loss to him
personally. In April 1993 he brought his own proceedings against the firm.
This can have come as no surprise. Mr Johnson had made no secret of his
intention to bring such a claim. He had indicated as much in January 1991,
well before the company's action came to trial, and his solicitors had been in
correspondence with the firm's insurers during 1991–92. On the eve of the

C    trial his solicitors told those representing the firm that his personal claim
would be pursued whether the current proceedings resulted in judgment or
settlement.   During the settlement negotiations in December 1992 the
parties' respective solicitors discussed the possibility of an overall settlement
of both Mr Johnson's personal claim and the company's claim, but the
paucity of information to enable his personal claim to be quantified made

D    this impossible. It was left that it was a separate claim which would be a
matter for separate negotiation in due course. In agreeing the terms on
which the company's claim was settled, Mr Johnson submitted to having
most of his personal claim capped at £250,000 excluding interest and costs,
and the company agreed to apply the settlement moneys in the discharge of
liabilities of the company in respect of which Mr Johnson had given personal
guarantees. This was designed to avoid the possibility of double recovery in

E    respect of these liabilities if Mr Johnson brought his own proceedings and
was successful.

        For the next $4\frac{1}{2}$ years the proceedings brought by Mr Johnson followed the
normal course.   The parties served and amended their pleadings and
exchanged witness statements. Mr Johnson served expert evidence. The
firm made a payment into court. A trial date was obtained. But then came a
sudden change of tack.   The firm instructed fresh leading counsel.   In

F    December 1997 the firm's solicitors indicated, for the first time, that it
intended to apply inter alia for an order to strike the action out as an abuse
of the process of the court. In February 1998 the court ordered the trial of
two preliminary issues: (i) whether the proceedings should be struck out as
an abuse of the process of the court; and (ii) to what extent (if at all) and
assuming the truth of the facts pleaded the heads of damages pleaded in

G    paragraphs 23 and 24 of the re-amended statement of claim were
irrecoverable by Mr Johnson as a matter of law by way of damages for the
pleaded breaches of duty owed to him.

        Mr Johnson pleaded his claim in both contract and tort, and alleged that
he had retained the firm to act for him personally as well as for the company
in connection with the exercise of the company's option. He alleged that the
firm had acted negligently in the manner in which it caused the option to be

H    exercised, and that it had from time to time negligently and with
unwarranted optimism advised him personally as to the likely duration and
outcome of the Chancery proceedings.

        On the first question, the judge (Pumfrey J) found that the proceedings
might well have been an abuse of the process of the court, but that in the

03635-jsm   Doc 173-3   Filed 01/13/17   Entered 01/13/17 22:34:28   Ex. C pa
Johnson v Gore Wood & Co (HL(E)) Pg 114 of 903          [2002] 2 AC
Lord Millett

light of the circumstances in which the company's action had been settled the    A
firm was estopped by convention from contending that they were. Both
parties had acted on the common assumption that Mr Johnson would bring
his own proceedings and that these would be entertained by the court. On
the second question he ruled that none of the heads of damage pleaded was
irrecoverable in law.

The Court of Appeal (Nourse, Ward and Mantell LJJ) allowed the firm's
appeal. It held that there was no excuse for Mr Johnson's failure to launch    B
his own claims when the company brought its action. "If he could have done
so", Mantell LJ said, "he should have done so". It held that there was no
estoppel by convention; the parties shared a common assumption that
Mr Johnson would bring his own proceedings, but they made no assumption
one way or the other whether the court would entertain them; they never
thought about the matter. On the second question the court differed from    C
the judge on the authorities, which it agreed were in an unsatisfactory state,
but held that, with only one exception, the pleaded heads of damage were
arguably recoverable. Both parties now appeal to the House. Mr Johnson
appeals on the first question; the firm cross-appeals on the second.

*Mr Johnson's appeal: abuse of process*
                                                                             D
In describing the proceedings brought by Mr Johnson as an abuse of the
process of the court, the Court of Appeal was seeking to apply the well
known principle which Sir James Wigram V-C formulated in *Henderson v
Henderson* (1843) 3 Hare 100, 114–115:

"... I believe I state the rule of the court correctly, when I say, that
where a given matter becomes the subject of litigation in, *and of*    E
*adjudication by,* a court of competent jurisdiction, the court requires the
parties to that litigation to bring forward their whole case, and will not
(except under special circumstances) permit the same parties to open the
same subject of litigation in respect of matter which might have been
brought forward as part of the subject in contest, but which was not
brought forward, only because they have, from negligence, inadvertence,
or even accident, omitted part of their case. *The plea of res judicata*    F
*applies,* except in special cases, not only to points upon which the court
was actually required by the parties to form an opinion and pronounce a
judgment, but to every point which properly belonged to the subject of
litigation, and which the parties, exercising reasonable diligence, might
have brought forward at the time." (My emphasis.)

As the passages which I have emphasised indicate, Sir James Wigram V-C    G
did not consider that he was laying down a new principle, but rather that he
was explaining the true extent of the existing plea of res judicata. Thus he
was careful to limit what he was saying to cases which had proceeded to
judgment, and not, as in the present case, to an out-of-court settlement.
Later decisions have doubted the correctness of treating the principle as an
application of the doctrine of res judicata, while describing it as an extension
of the doctrine or analogous to it. In *Barrow v Bankside Members Agency*    H
*Ltd* [1996] 1 WLR 257, Sir Thomas Bingham MR explained that it is not
based on the doctrine in a narrow sense, nor on the strict doctrines of issue or
cause of action estoppel. As May LJ observed in *Manson v Vooght* [1999]
BPIR 376, 387, it is not concerned with cases where a court has decided the

A   matter, but rather cases where the court has not decided the matter. But these various defences are all designed to serve the same purpose: to bring finality to litigation and avoid the oppression of subjecting a defendant unnecessarily to successive actions. While the exact relationship between the principle expounded by Sir James Wigram V-C and the defences of res judicata and cause of action and issue estoppel may be obscure, I am inclined

B   to regard it as primarily an ancillary and salutary principle necessary to protect the integrity of those defences and prevent them from being deliberately or inadvertently circumvented.

In one respect, however, the principle goes further than the strict doctrine of res judicata or the formulation adopted by Sir James Wigram V-C, for I agree that it is capable of applying even where the first action concluded in a settlement. Here it is necessary to protect the integrity of the settlement

C   and to prevent the defendant from being misled into believing that he was achieving a complete settlement of the matter in dispute when an unsuspected part remained outstanding.

However this may be, the difference to which I have drawn attention is of critical importance. It is one thing to refuse to allow a party to relitigate a question which has already been decided; it is quite another to deny him the

D   opportunity of litigating for the first time a question which has not previously been adjudicated upon. This latter (though not the former) is prima facie a denial of the citizen's right of access to the court conferred by the common law and guaranteed by article 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms (1953). While, therefore, the doctrine of res judicata in all its branches may properly be

E   regarded as a rule of substantive law, applicable in all save exceptional circumstances, the doctrine now under consideration can be no more than a procedural rule based on the need to protect the process of the court from abuse and the defendant from oppression. In *Brisbane City Council v Attorney General for Queensland* [1979] AC 411, 425 Lord Wilberforce, giving the advice of the Judicial Committee of the Privy Council, explained that the true basis of the rule in *Henderson v Henderson* 3 Hare 100 is abuse

F   of process and observed that it "ought only to be applied when the facts are such as to amount to an abuse: otherwise there is a danger of a party being shut out from bringing forward a genuine subject of litigation". There is, therefore, only one question to be considered in the present case: whether it was oppressive or otherwise an abuse of the process of the court for Mr Johnson to bring his own proceedings against the firm when he could

G   have brought them as part of or at the same time as the company's action. This question must be determined as at the time when Mr Johnson brought the present proceedings and in the light of everything that had then happened. There is, of course, no doubt that Mr Johnson *could* have brought his action as part of or at the same time as the company's action. But it does not at all follow that he *should* have done so or that his failure to do so renders the present action oppressive to the firm or an abuse of the

H   process of the court. As May LJ observed in *Manson v Vooght* [1999] BPIR 376, 387, it may in a particular case be sensible to advance claims separately. In so far as the so-called rule in *Henderson v Henderson* suggests that there is a presumption against the bringing of successive actions, I consider that it is a distortion of the true position. The burden should

03635-jpm Doc 173-3 Filed 01/13/17 Entered 01/13/17 22:34:28 Ex. C pa
Johnson v Gore Wood & Co (HL(E)) Pg 116 of 903 [2002] 2 AC
Lord Millett

always rest upon the defendant to establish that it is oppressive or an abuse **A**
of process for him to be subjected to the second action.

The rule in *Henderson v Henderson* 3 Hare 100 cannot sensibly be
extended to the case where the defendants are different. There is then no
question of double vexation. It may be reasonable and sensible for a plaintiff
to proceed against A first, if that is a relatively simple claim, in order to use
the proceeds to finance a more complex claim against B. On the other hand,
it would I think normally be regarded as oppressive or an abuse of process **B**
for a plaintiff to pursue his claims against a single defendant separately in
order to use the proceeds of the first action to finance the second, at least
where the issues largely overlap so as to form, in Sir James Wigram V-C's
words, at p 115, "the same subject of litigation".

Particular care, however, needs to be taken where the plaintiff in the
second action is not the same as the plaintiff in the first, but his privy. Such **C**
situations are many and various, and it would be unwise to lay down any
general rule. The principle is, no doubt, capable in theory of applying to a
privy; but it is likely in practice to be easier for him to rebut the charge that
his proceedings are oppressive or constitute an abuse of process than it
would be for the original plaintiff to do so.

Mr Johnson conceded that he and the company are privies. He was in a **D**
position to decide when to pursue the two claims and whether to pursue
them together or separately, and that is enough for present purposes. But
Mr Johnson and the company are different legal persons, each with its own
creditors, and that is a fact of critical significance. Mr Johnson's personal
claims raised difficult issues not present in the company's action: (i) did he
retain the firm to act for him personally? (ii) should the firm have foreseen
that failure to exercise the option properly would cause loss to Mr Johnson **E**
personally as well as to the company? (iii) which if any of his personal losses
were recoverable (the issues in the cross-appeal)? (iv) quantum. It was not
in the company's interest for his personal claims to be joined with its own
much simpler claim, or for its case to be delayed until Mr Johnson's own
case was ready for trial. Had the company been in liquidation and its action
brought by the liquidator, he would have been well advised to insist on **F**
separate trials and to object to any delay in the trial of the company's action.

In these circumstances I am satisfied that Mr Johnson, who was bound to
have regard to the interests of the company and its creditors, was entitled to
defer the bringing of his own claims until after the company's claim had been
resolved. Even if he had chosen to join the two claims in the same writ, it
would have been both possible and appropriate for separate trials to be held
of (i) liability (ii) quantum (company) (iii) Mr Johnson's title to sue and **G**
(iv) quantum (Mr Johnson); and for (iii) and (iv) to be held over until after
(i) and (ii) had been determined. Even as things are, there is no real question
of double vexation. The firm was always liable to be sued by two different
plaintiffs each with its own cause of action and its own heads of loss. The
only area of overlap is in relation to the standard of care which the firm
observed. Given that Mr Johnson and the company are privies, neither of
them could reopen an adverse judgment on this, being bound by issue **H**
estoppel; while the parties could make their own arrangements in the event
of a settlement.

Accordingly, I would reject the firm's contention that it was an abuse of
process for Mr Johnson to bring his action after the company's claim had

03635-jpm    Doc 173-3    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
[2002] 2 AC                    Pg 117 of 903    Johnson v Gore Wood & Co (HL(E))
Lord Millett

A   been resolved. Even if this were not the case, however, I agree with the trial
judge that it would be unconscionable for the firm to raise the issue after the
way in which it handled the negotiations for the settlement of the company's
action. I would not myself put it on the ground of estoppel by convention.
Like the Court of Appeal, I have some difficulty in discerning a common
assumption in regard to a matter about which neither party thought at all.

B   This is not to say that estoppel has no part to play in this field. I would
regard it as operating in the opposite way. Given that Mr Johnson was
entitled to defer the bringing of his own proceedings until after the
company's claims had been resolved, it would have been unconscionable for
him to have stood by without disclosing his intentions and knowingly
allowed the firm to settle the company's action in the belief that it was
dealing finally with all liability arising from its alleged negligence in the

C   exercise of the option. To bring his own claim in such circumstances would,
in my opinion, amount to an abuse of the process of the court. But nothing
like this took place.

    This makes it unnecessary to deal with Mr Johnson's submission that it is
too late for the firm to raise the issue. If necessary, however, I should have
regarded the delay as fatal. Indeed, I should have regarded it as more than
delay; I think it amounted to acquiescence. There is no proper analogy with

D   the case which discloses no cause of action. Although it is obviously
desirable to apply to strike out a claim which is doomed to fail at the earliest
opportunity, there is no point in proceeding with a trial which serves no
useful purpose. Even if the point is taken at the trial itself, it is a matter for
the trial judge to decide whether to hear the evidence and adjudicate on the
facts before deciding whether they give rise to liability, or to assume that the

E   plaintiff will establish his allegations and decide whether, as a matter of law,
they give rise to liability.

    But the premise in the present case is that Mr Johnson has a good cause of
action which he should have brought earlier if at all. I do not consider that a
defendant should be permitted to raise such an objection as late as this.
A defendant ought to know whether the proceedings against him are
oppressive. It is not a question which calls for nice judgment. If he defends

F   on the merits, this should be taken as acquiescence. It might well be
otherwise if the ground on which the proceedings are alleged to be an abuse
of process were different. But in a case of the present kind the court is not so
much protecting its own process as the interests of the defendant.

    Accordingly, I would allow Mr Johnson's appeal on the first question.

G   *The firm's cross-appeal: recoverable heads of damage*

    A company is a legal entity separate and distinct from its shareholders. It
has its own assets and liabilities and its own creditors. The company's
property belongs to the company and not to its shareholders. If the company
has a cause of action, this is a legal chose in action which represents part of
its assets. Accordingly, where a company suffers loss as a result of an
actionable wrong done to it, the cause of action is vested in the company and

H   the company alone can sue. No action lies at the suit of a shareholder suing
as such, though exceptionally he may be permitted to bring a derivative
action in right of the company and recover damages on its behalf: see
*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982]
Ch 204, 210. Correspondingly, of course, a company's shares are the

property of the shareholder and not of the company, and if he suffers loss as    A
a result of an actionable wrong done to him, then prima facie he alone can
sue and the company cannot. On the other hand, although a share is an
identifiable piece of property which belongs to the shareholder and has an
ascertainable value, it also represents a proportionate part of the company's
net assets, and if these are depleted the diminution in its assets will be
reflected in the diminution in the value of the shares. The correspondence    B
may not be exact, especially in the case of a company whose shares are
publicly traded, since their value depends on market sentiment. But in the
case of a small private company like this company, the correspondence is
exact.

This causes no difficulty where the company has a cause of action and the
shareholder has none; or where the shareholder has a cause of action and the
company has none, as in *Lee v Sheard* [1956] 1 QB 192, *George Fischer*    C
*(Great Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260, and
*Gerber Garment Technology Inc v Lectra Systems Ltd* [1997] RPC 443.
Where the company suffers loss as a result of a wrong to the shareholder but
has no cause of action in respect of its loss, the shareholder can sue and
recover damages for his own loss, whether of a capital or income nature,
measured by the diminution in the value of his shareholding. He must, of    D
course, show that he has an independent cause of action of his own and that
he has suffered personal loss caused by the defendant's actionable wrong.
Since the company itself has no cause of action in respect of its loss, its assets
are not depleted by the recovery of damages by the shareholder.

The position is, however, different where the company suffers loss caused
by the breach of a duty owed both to the company and to the shareholder. In
such a case the shareholder's loss, in so far as this is measured by the    E
diminution in value of his shareholding or the loss of dividends, merely
reflects the loss suffered by the company in respect of which the company has
its own cause of action. If the shareholder is allowed to recover in respect of
such loss, then either there will be double recovery at the expense of the
defendant or the shareholder will recover at the expense of the company and
its creditors and other shareholders. Neither course can be permitted. This    F
is a matter of principle; there is no discretion involved. Justice to the
defendant requires the exclusion of one claim or the other; protection of the
interests of the company's creditors requires that it is the company which is
allowed to recover to the exclusion of the shareholder. These principles have
been established in a number of cases, though they have not always been
faithfully observed. The position was explained in a well known passage
in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982]    G
Ch 204, 222–223:

"But what [the shareholder] cannot do is to recover damages merely
because the company in which he is interested has suffered damage. He
cannot recover a sum equal to the diminution in the market value of his
shares, or equal to the likely diminution in dividend, because such a 'loss'
is merely a reflection of the loss suffered by the company. The shareholder    H
does not suffer any personal loss. His only 'loss' is through the company,
in the diminution of the value of the net assets of the company, in which
he has (say) a 3% shareholding. The plaintiff's shares are merely a right of
participation in the company on the terms of the articles of association.

03635-jpm    Doc 173-3    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
[2002] 2 AC                        Pg 119 of 903son v Gore Wood & Co (HL(E))
                                         Lord Millett

A The shares themselves, his right of participation, are not directly affected
by the wrongdoing. The plaintiff still holds all the shares as his own
absolutely unencumbered property. The deceit practised upon the
defendant does not affect the shares; it merely enables the defendant to
rob the company. A simple illustration will prove the logic of this
approach. Suppose that the sole asset of a company is a cash box
B containing £100,000. The company has an issued share capital of 100
shares, of which 99 are held by the plaintiff. The plaintiff holds the key of
the cash box. The defendant by a fraudulent misrepresentation persuades
the plaintiff to part with the key. The defendant then robs the company of
all its money. The effect of the fraud and the subsequent robbery,
assuming that the defendant successfully flees with his plunder, is (i) to
denude the company of all its assets; and (ii) to reduce the sale value of the
C plaintiff's shares from a figure approaching £100,000 to nil. There are
two wrongs, the deceit practised on the plaintiff and the robbery of the
company. But the deceit on the plaintiff causes the plaintiff no loss which
is separate and distinct from the loss to the company. The deceit was
merely a step in the robbery. The plaintiff obviously cannot recover
personally some £100,000 damages in addition to the £100,000 damages
D recoverable by the company."

 It is indeed obvious that (on the given facts, where no consequential losses
are stated to have arisen) the defendant cannot be made liable for more than
£100,000 in total. It is equally obvious, however, that if the damages were
recoverable by the shareholder instead of by the company, this would
achieve the same extraction of the company's capital to the prejudice of the
E creditors of the company as the defendant's misappropriation had done.
 It has sometimes been suggested (see, for example, *George Fischer (Great
Britain) Ltd v Multi Construction Ltd* [1995] BCLC 260, 266G–I) that
*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch
204 is authority only for the proposition that a shareholder cannot recover
for the company's loss, and is confined to the case where the defendant is not
in breach of any duty owed to the shareholder personally. That is not
F correct. The example of the safe-deposit box makes this clear. It is the
whole point of the somewhat strained business of the key. The only reason
for this is to demonstrate that the principle applies even where the loss is
caused by a wrong actionable at the suit of the shareholder personally.
 *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* was
followed in *Stein v Blake* [1998] 1 All ER 724, where the facts bore some
G resemblance to the illustration in the earlier case. The defendant was a 50%
shareholder and the sole director of a group of companies ("the old
companies"). The plaintiff, who was the other 50% shareholder, alleged
that, in breach of fiduciary duty, the defendant had misappropriated the
assets of the old companies by purchasing them at an undervalue and
transferring them to other companies in his sole ownership. The plaintiff,
who could have brought a derivative action on behalf of the old companies,
H chose instead to bring a personal action, claiming that he had been deprived
of the opportunity to sell his shares in the old companies at their proper
value and had suffered personal loss. The Court of Appeal set aside an
earlier grant of leave to appeal from the judge's order striking out the
plaintiff's action.

03635-jpm    Doc 173-3    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
Johnson v Gore Wood & Co (HL(E)) Pg 120 of 903           [2002] 2 AC
Lord Millett

The plaintiff sought to distinguish *Prudential Assurance Co Ltd v*   A
*Newman Industries Ltd (No 2)* [1982] Ch 204 by arguing that the defendant
was in breach of a duty owed to him personally. But, as I pointed out, that
was not the problem. The problem was that the only conduct relied upon as
constituting a breach of that duty was the misappropriation of assets
belonging to the old companies, so that the only loss suffered by the plaintiff
consisted of the diminution in the value of his shareholding which reflected
the depletion of the assets of the old companies. The old companies had   B
their own cause of action to recover their loss, and the plaintiff's own loss
would be fully remedied by the restitution to the companies of the value of
the misappropriated assets. It was not alleged that the plaintiff had been
induced or compelled to dispose of his shares in the companies; he still had
them. If he were allowed to recover for the diminution in their value, and the
companies for the depletion of their assets, there would be double recovery.   C
Moreover, if the action were allowed to proceed and the plaintiff were to
recover for the lost value of his shares, the defendant's ability to meet any
judgment which the old companies or their liquidators might obtain against
him would be impaired to the prejudice of their creditors. The plaintiff
would have obtained by a judgment of the court the very same extraction of
value from the old companies at the expense of their creditors as the   D
defendant was alleged to have obtained by fraud.

*Heron International Ltd v Lord Grade* [1983] BCLC 244 was a case on
the other side of the line. In the course of a contested take-over bid, the
directors of the target company who owned a majority of the company's
voting shares were alleged, in breach of their duties both to the company and
to its shareholders, to have accepted proposals which would reduce the value
of the company's assets and hence of its shares and induce the shareholders   E
to accept the lower of two rival offers. The Court of Appeal granted the
shareholders injunctive relief. It observed that the decision of the directors,
if implemented, would cause loss in two directions. First, the company
would suffer loss to the extent that the value of its assets would be
depreciated. That loss would be borne exclusively by the company. It was
not a loss in respect of which the shareholders could recover, even if the
market value of their shares fell in consequence. The other loss would be to   F
the pockets of the shareholders because they were deprived of the
opportunity of accepting the higher offer. That loss would be suffered
exclusively by the shareholders. It was not a loss to the coffers of the
company, which would remain totally unaffected. That could readily be
demonstrated. If, as a result of the decision of the board which was
impugned, the take-over went through and the entire shareholding in the   G
company became vested in one bidder at a lower price than was available
from the other, the recovery of damages by the company would not
compensate the former shareholders for their loss. Only a direct action by
those shareholders in their own right, and not in right of the company, could
provide the necessary compensation.

In *R P Howard Ltd v Woodman Matthews & Co* [1983] BCLC 117 a
company and its principal shareholder brought an action in negligence   H
against a firm of solicitors, alleging that, as a result of the firm's failure to
advise on an application for a new tenancy under the Landlord and Tenant Act
1954, the company had been obliged to accept a new lease on terms less
favourable than those it would have obtained under the Act. In addition, the

A principal shareholder was obliged to agree that he would not sell his controlling interest in the company without the landlord's consent. The judge (Staughton J) distinguished *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204 on the ground that the shareholder was not seeking to recover a sum which merely reflected the loss suffered by the company but his own independent loss because his shares were less easily saleable and therefore had a lesser market value. This is capable of being

B misunderstood, but was correct on the facts, since the shareholder's claim was rightly limited to the loss arising from the requirement to obtain the landlord's consent to any sale of the shares. This was additional to and did not reflect the loss suffered by the company as a result of the terms of the new lease. The shareholder made no claim on his own account in respect of the diminution in the value of his shares due to this.

C     In *Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427 a parent company, brought an action in negligence against the auditors of a wholly-owned subsidiary. Leggatt LJ correctly distinguished both *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, where the shareholder had no independent cause of action of his own, and *George Fischer (Great Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260, where the company had none. Here each of them had its own cause of

D action. But he stated, at p 435B–E, that if the shareholder suffered loss as a result of a breach of duty on the part of the defendant owed to it, it could not be disentitled from suing merely because the damages claimed would or might include damages for which the defendant was liable to the company. There was, he said, no legal principle which debarred a holding company from recovering damages for loss in the value of its subsidiaries resulting

E directly from the breach of a duty owed to the holding company as distinct from a duty owed to the subsidiaries. I do not accept this as correct.
    In *Christensen v Scott* [1996] 1 NZLR 273 the company carried on the business of potato-farming on tenanted land. The landlord defaulted on a mortgage of the land and the mortgagee entered into possession and exercised its power of sale. Access to the standing crop was refused and the company was unable to harvest it, with disastrous financial consequences.

F The company went into liquidation and receivership, and the receiver and the liquidator brought proceedings for negligence against the company's professional advisers. The action was settled. The shareholders, who had guaranteed the company's debts, opposed the settlement, alleging that the sums offered by way of settlement were totally inadequate. In due course they brought their own proceedings, alleging that the defendants owed

G duties of care to them personally. They claimed damages representing the diminution in the value of their shareholdings arising from the defendants' negligence. The judge held that such damages reflected the company's loss and could not be recovered by the shareholders. The Court of Appeal of New Zealand allowed the shareholders' appeal.
    In giving the judgment of the court, Thomas J distinguished *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 104 on the

H ground that it did not necessarily exclude a claim brought by a shareholder to whom a separate duty was owed and who suffered his own personal loss as a result of that breach of duty. So far, of course, this is correct: *Heron International Ltd v Lord Grade* [1983] BCLC 244 and *R P Howard Ltd v Woodman Matthews & Co* [1983] BCLC 117 are just such cases. The judge

03635-jpm  Doc 173-3   Filed 01/13/17   Entered 01/13/17 22:34:28    Ex. C pa
Johnson v Gore Wood & Co (HL(E)) Pg 122 of 903          [2002] 2 AC
Lord Millett

observed that the fact that the loss was also suffered by the company did not      A
mean that it was not also a personal loss suffered by the shareholder.
"Indeed," he added, at p 280:

> "the diminution in the value of Mr and Mrs Christensen's shares in the
> company is by definition a personal loss and not a corporate loss. The
> loss suffered by the company is the loss of the lease and the profit which
> would have been obtained from harvesting the potato crop. That loss is      B
> reflected in the diminution in the value of Mr and Mrs Christensen's
> shares. They can no longer realise their shares at the value they enjoyed
> prior to the alleged default of their accountants and solicitors."

I cannot accept this reasoning as representing the position in English law. It
is of course correct that the diminution in the value of the plaintiffs' shares
was by definition a personal loss and not the company's loss, but that is not      C
the point. The point is that it merely reflected the diminution of the
company's assets. The test is not whether the company could have made a
claim in respect of the loss in question; the question is whether, treating the
company and the shareholder as one for this purpose, the shareholder's loss
is franked by that of the company. If so, such reflected loss is recoverable by
the company and not by the shareholders.
    Thomas J acknowledged that double recovery could not be permitted, but      D
thought that the problem did not arise where the company had settled its
claim. He considered that it would be sufficient to make an allowance for
the amount paid to the liquidator. With respect, I cannot accept this either.
As Hobhouse LJ observed in *Gerber Garment Technology Inc v Lectra
Systems Ltd* [1997] RPC 443, 471, if the company chooses not to exercise its
remedy, the loss to the shareholder is caused by the company's decision not      E
to pursue its remedy and not by the defendant's wrongdoing. By a parity of
reasoning, the same applies if the company settles for less than it might have
done. Shareholders (and creditors) who are aggrieved by the liquidator's
proposals are not without a remedy; they can have recourse to the
Companies Court, or sue the liquidator for negligence.
    But there is more to it than causation. The disallowance of the      F
shareholder's claim in respect of reflective loss is driven by policy
considerations. In my opinion, these preclude the shareholder from going
behind the settlement of the company's claim. If he were allowed to do so
then, if the company's action were brought by its directors, they would be
placed in a position where their interest conflicted with their duty; while if it
were brought by the liquidator, it would make it difficult for him to settle the
action and would effectively take the conduct of the litigation out of his      G
hands. The present case is a fortiori; Mr Johnson cannot be permitted to
challenge in one capacity the adequacy of the terms he agreed in another.
    Reflective loss extends beyond the diminution of the value of the shares; it
extends to the loss of dividends (specifically mentioned in *Prudential
Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204) and all
other payments which the shareholder might have obtained from the
company if it had not been deprived of its funds. All transactions or putative      H
transactions between the company and its shareholders must be disregarded.
Payment to the one diminishes the assets of the other. In economic terms, the
shareholder has two pockets, and cannot hold the defendant liable for his
inability to transfer money from one pocket to the other. In principle, the

A   company and the shareholder cannot together recover more than the shareholder would have recovered if he had carried on business in his own name instead of through the medium of a company. On the other hand, he is entitled (subject to the rules on remoteness of damage) to recover in respect of a loss which he has sustained by reason of his inability to have recourse to the company's funds and which the company would not have sustained itself.

B   The same applies to other payments which the company would have made if it had had the necessary funds even if the plaintiff would have received them qua employee and not qua shareholder and even if he would have had a legal claim to be paid. His loss is still an indirect and reflective loss which is included in the company's claim. The plaintiff's primary claim lies against the company, and the existence of the liability does not increase

C   the total recoverable by the company, for this already includes the amount necessary to enable the company to meet it.

On the assumption which we are bound to make for the purpose of this appeal, which is that the firm was in breach of a duty of care owed to Mr Johnson personally, he is in principle entitled to recover damages in respect of all heads of non-reflective consequential loss which are not too remote. Mr Johnson's principal complaint is that the firm negligently failed

D   to exercise the company's option in a manner which would be incontestable. Even if this constituted a breach of a duty owed to Mr Johnson personally as well as to the company, there was a single breach which made it impossible for the company to establish that it had exercised the option without litigation. In the event this delayed by four years the commencement of the development by the company and the time when the company could raise

E   money at normal commercial rates of interest on the security of the land and commence the proposed development. Damages in respect of these heads of damage are recoverable by the company, and in so far as they are reflected in the diminution in the value of Mr Johnson's shares in the company are not recoverable by him.

There is a subsidiary complaint, that the firm represented both to the company and to Mr Johnson personally that the Chancery proceedings were

F   certain of success and that judgment would be obtained within a relatively short time. These are separate representations which may be separately sued upon by each representee. In so far as Mr Johnson relied upon the representation made to him and suffered a separate and distinct loss qua representee and not merely qua shareholder or potential recipient of money from the company, he is entitled to recover.

G   Lord Bingham has identified the various heads of financial loss alleged in the statement of claim. I agree with his analysis and do not wish to add anything except in relation to Mr Johnson's pension. Mr Johnson claims that, but for its lack of funds resulting from the firm's failure to exercise the option properly, the company would have continued to make contributions to Mr Johnson's pension scheme. For the reasons I have endeavoured to state, Mr Johnson cannot recover the amount of the contributions which the

H   company would have made if it had had the necessary funds; this merely reflects the company's loss and is included in its own claim. Nor can Mr Johnson claim interest in respect of the lost contributions for the same reason. But Mr Johnson's claim in respect of the enhancement of his pension is a different matter. The problem here is one of remoteness of damage, not

03635-jp68    Doc 173-3    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex: C pa
Johnson v Gore Wood & Co (HL(E)) Pg 124 of 903        [2002] 2 AC
Lord Millett

reflective loss, for the loss (or strictly the net loss) is one which the company    A
could not have sustained itself. Had Mr Johnson carried on business in his
own name instead of through the medium of the company, then (subject only
to the question of remoteness) he would have been entitled to recover a sum
representing the lost increase in the value of his pension after giving credit
for the amount saved in respect of the contributions and interest. Such loss is
separate and distinct from the loss suffered by the company, and while        B
Mr Johnson's claim to recover it faces obvious difficulties it should not be
struck out at this stage. But if he does establish his claim, he will have to give
credit for the contributions which would have been required, whether by the
company (reflective loss) or by himself (which he has saved), together with
interest thereon.

For the reasons given by Lord Bingham, I too would strike out
Mr Johnson's claims to damages for mental distress and anxiety and        C
aggravated damages.

Accordingly, I would dismiss the cross-appeal while varying the order of
the Court of Appeal in the manner proposed.

> *Appeal allowed.*
> *Cross-appeal dismissed save that*        D
> *paragraphs 8 (except last sentence),*
> *10 and 13 of schedule of loss served*
> *pursuant to order of 16 October*
> *1998 and paragraph 24 of re-*
> *amended statement of claim of 31*
> *March 1994 be struck out.*
> *Defendants to pay plaintiff's costs in*        E
> *House of Lords and below, to*
> *include costs of appeal and cross-*
> *appeal.*

*Solicitors: Shoosmiths, Fareham; Beachcroft Wansbroughs.*

M G        F

TAB 29

*Joiner v George* [2003] BCC 298, English Court of Appeal

**298**                                                                              [2003] BCC

## Joiner & Anor v George & Ors.

[2002] EWCA Civ 160
Court of Appeal (Civil Division).
Aldous and Keene L JJ and Sir Christopher Slade.
Judgment delivered March 14, 2002.

> *Shares – Valuation – Expert evidence – 'Option agreement' permitted appellants to
> acquire 51 per cent shareholding in company at any time – Appellants sought to
> exercise right to acquire shares – Judge declined to order specific performance but
> awarded value of shares as damages – Appeal on amount of damages – Whether
> judge failed to take into account forecast growth potential of company – Whether
> judge wrong to exclude hindsight in calculating future revenue as at valuation date –
> Whether judge entitled to prefer principles on which respondents' expert calculated
> overheads – Whether value to be assessed on basis that company would have to pay
> certain licence fees for intellectual property – Materiality of respondents' offers to
> buy out appellants.*

This was an appeal against a decision of Park J valuing the shares of a company for the
purposes of damages when the respondents were in breach of contract in refusing to
transfer the shares.

'J' was a specialist in the technology of thixotropic gels. A particular application of
such gels was their use in connection with fibre-optic cables, and this had been J's field for
many years. In the mid to late 1980s he was involved with a company ('Syntec') which
went into administration in 1989. The administrators of Syntec sold the business to
'Astor'. J was disqualified as a director for seven years from 1993 as a result of his
conduct of the affairs of Syntec while he was involved in its management. In 1990 J and
his wife ('the appellants') acquired a new company ('Geltec') to carry on a new gel
business with a new gel product ('unigel'). Astor took proceedings against Geltec alleging
that Geltec's unigel business involved infringement of intellectual property rights which
Astor owned in consequence of its purchase of Syntec's business. Unigel was distributed
in the Far East by 'Arnhem', a company owned by the respondent businessmen, 'G' and
'R'. The financial position of Geltec deteriorated and it went into liquidation in 1992. J
and his wife then agreed with the respondents to set up a new company ('Unigel UK')
which acquired the unigel business from the liquidator of Geltec. The shares in Unigel
UK were owned by 'ITG' which was owned by the respondents. G was the sole director of
Unigel UK, appointed on behalf of ITG. J was retained as a consultant to ITG to provide
services to Unigel UK. An option agreement gave J and his wife the option to acquire
51 per cent of the shares in Unigel UK at any time for no monetary consideration. The
relationship between the parties broke down and there were exchanges about the
possibility of the appellants being bought out, which culminated in two offers made by the
respondents in March 1994: one of US$220,000 if J was not locked into Unigel UK or
otherwise precluded from competing and US$540,000 payable over five years if J was
locked in. Neither offer was accepted. In November 1994 the appellants gave formal
notice of exercise of their rights under the option agreement to acquire 51 per cent of
Unigel UK. In 1995 the appellants issued proceedings for specific performance of the
option agreement. The judge refused specific performance but held that the appellants
were entitled, as damages, to the market value of a 51 per cent shareholding in November
1994 on the basis that all personal antipathies were put aside and both sides recognised
the reality that they would need to come to terms. After hearing expert evidence from
both sides the judge adopted a capitalised earnings valuation which involved estimating a
figure for maintainable profit and multiplying it by a price-earnings ratio. On that basis
he valued such a holding at £129,000 and awarded that sum in damages. J and his wife
appealed arguing that the judge was wrong (i) not to take into account the forecast
growth potential of the company, (ii) to exclude all hindsight, (iii) to follow the principles

© 2003 Sweet and Maxwell Ltd
ocp2003 bcp   253 Mp   298—ocp23075

253-4-03

**CA**                      **Joiner v George**                      **299**

on which the respondents' expert calculated overheads, (iv) to allow licence fees payable to the respondents' Hong Kong company, and (v) to assess a value as at November 1994 which was lower than the respondents' offers of March 1994.

*Held,* dismissing the appeal:

1. The process of valuation of a shareholding in a case such as this could not be an exact science. Though it ultimately involved a finding of fact, elements leading up to such finding might well involve points on which different minds, approaching the matter judicially, could quite properly take different views. It could be that, on some of the conclusions of fact reached by the judge in his judgment on valuation, other minds would have taken different views. A figure substantially higher or lower than £129,000 might have been the result. But the judge considered all the issues with great care and his judgment was conspicuously clear, logical and fair. There was no substance in the criticisms of it based on failure to give sufficient reasons. There was no justification for interfering with the judge's decision.

2. The judge did not wrongly overlook the growth potential of Unigel UK in reaching his valuation figure. The growth potential was taken into account in selecting the price-earnings multiple to be applied. The judge had such potential in mind, as well as the reasons for approaching it with caution, in reaching the figure he did.

3. The court rejected J's complaint concerning hindsight in relation to the judge's calculation of future revenue. In the circumstances the judge was entitled to conclude that a valuer instructed on behalf of the respondent purchasers in November 1994 would in the real world have preferred the approach of the respondents' expert, which in accordance with the standing practices of valuation was tied to the most recent actual trading results, to the appellants' expert's approach which was based simply on J's best guess as to how Unigel UK was likely to perform in the future, even though J's forecast turned out to be reasonably accurate.

4. In the circumstances the judge was justified in concluding that the value of Unigel UK should be ascertained on the basis that, despite some uncertainties, it would have had to concede a licence fee payment to the respondents' Hong Kong company in order to be able to continue using the unigel name for its product, and that a rate of two and a half per cent would have been adopted by the parties.

5. In relation to overheads it was clear that the question of staff costs had been fully ventilated in argument before the judge and fully considered by him. The judge was entitled to prefer the principles on which the respondents' expert calculated his deduction of overheads and, having done so, to accept his figures without going through each item.

6. The judge, having reached his valuation figure, referred to the two offers by way of a comparative test. He regarded the lower offer as the relevant one because it had been made on the basis that J would not be tied in and he was right to say that that offer was made on that basis. The other offer was a mere prelude to further negotiations and was also not relevant because it required J to be locked into Unigel UK and, given the deteriorating relationship between the parties, it was fanciful to suppose that as at the valuation date the parties would have come to an arrangement which locked J into Unigel UK.

The following cases were referred to in the judgment of Sir Christopher Slade:

*Buckingham v Francis* (1986) 2 BCC 98,984; [1986] 2 All ER 738.
*Bwllfa and Merthyr Dare Steam Collieries (1891) Ltd v Pontypridd Waterworks Co* [1903] AC 426.
*Flannery v Halifax Estate Agencies Ltd* [2000] 1 WLR 377.
*Holt v IR Commrs* [1953] 2 All ER 1499.

**300**                    Joiner v George                    [2003] BCC
                      (Sir Christopher Slade)

*Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] BCC 864; [2001] 1 WLR 143; [2001]   A
UKHL 2.

Mr Joiner appeared in person representing himself and his wife.

Peter Cranfield (instructed by DMH, Brighton) for the respondents.

### JUDGMENT

B

**Sir Christopher Slade: Introduction**

1. On January 31, 2000 Park J delivered a judgment in which he held that the respondents to this appeal, Mr George and Mr Robinson, were in breach of contract by not causing a 51 per cent shareholding in a company named Unigel Ltd, but commonly known as 'Unigel UK', to be transferred to the appellant claimants, Mr and Mrs Joiner, when the appellants exercised an option to purchase that shareholding on November 23, 1994 ('the valuation date'). He declined to hold that they were entitled to specific performance, but held that they were   C entitled to damages.

2. The wording of the relevant part of the order was:

> 'The first and second defendants do pay to the claimants damages equal to the value, expressed in money, which a 51% shareholding in the English company Unigel Limited would have had to the claimants on 23 November 1994, such value to be ascertained by an inquiry in accordance with the directions set out in Annex A hereto, together with   D interest at 8% per annum from 23 November 1994 until the date on which the value is determined by the court.'

3. The inquiry directed by the judge took place before him over six days spread between May and June 2000. As before, Mr Joiner represented himself and his wife, and Mr George represented himself and Mr Robinson. Mr Joiner and Mr George also gave evidence, and each called evidence from an expert witness: Mr Fisher of Bruce Sutherland & Partners on behalf of   E Mr and Mrs Joiner, and Mr Faull of Hilton Sharpe & Clarke on behalf of Mr George and Mr Robinson.

4. By his second judgment delivered on July 28, 2000, the judge decided that the damages payable by the respondents to the appellants are £129,000, such damages to carry interest from November 23, 1994 to July 28, 2000 at 8 per cent per annum. He gave the appellants permission to appeal limited to the determination of the amount of damages.

5. The respondents sought permission to appeal out of time on liability and the amount of   F damages. On March 29, 2001 Aldous LJ granted them permission to appeal solely on the issue of the amount of damages. At a time when the respondents were still acting in person, Mr George settled grounds of cross-appeal. But counsel recently instructed on their behalf, Mr Peter Cranfield, has informed us that, having considered the cross-appeal with their legal advisers, the respondents have decided not to pursue it. Their case is that there was sufficient evidence to justify the judge's findings on each of the matters as to which the appellants make   G complaint. Correspondingly, though they disagree with his findings referred to in grounds 1 to 3 of their grounds of appeal, they now accept that they were within the legitimate range of the exercise of his judicial discretion.

6. As in the court below, Mr Joiner has appeared in person, representing himself and his wife. He has presented their case with clarity and courtesy. Mr Cranfield, counsel for the respondents has also greatly assisted us with an excellent skeleton argument and his oral   H submissions.

**The facts**

7. The background facts which are material for present purposes can be summarised relatively shortly. I extract them principally from the judge's two full and comprehensive judgments.

© 2003 Sweet and Maxwell Ltd
bcp2003 bcp   253 Mp   300—bcp23075

253-4-03

CA

**Joiner v George**                                       **301**
(Sir Christopher Slade)

8. Mr Joiner is a specialist in the technology of thixotropic gels. A thixotrope is a substance which forms a stable gel structure when it is at rest, but which becomes fluid when it is stirred or subjected to some other kind of force. A particular application of such gels is their use in connection with fibre-optic cables, and this has been Mr Joiner's field for about the last 20 years. He claims that he was originally involved in the invention of the concept. From the early 1980s he has been concerned as an entrepreneur in a number of business ventures to exploit it, supported throughout by his wife, the second appellant.

9. In the mid to late 1980s, he and a few other persons owned and ran a company called Synthetic Technology Ltd ('Syntec'). Its product was known as 'rheogel'. In 1989 it was placed in administration under Pt II of the Insolvency Act 1986. The distributor of its rheogel was Astor Chemicals Ltd ('Astor'), a large and financially strong company.

10. In December 1989 the administrators of Syntec sold the business of Syntec to Astor. Syntec was subsequently dissolved. In view of certain alleged aspects of Mr Joiner's conduct while concerned with its management, the High Court, on April 13, 1993, imposed on Mr Joiner a seven year disqualification from being a director pursuant to the Company Directors Disqualification Act 1986. (See [1993] BCC 549.)

11. After they had been deprived of Syntec's rheogel business, Mr and Mrs Joiner, in early 1990, acquired a new company, Gel Technology Ltd ('Geltec') to establish a new gel business. They owned this company in equal proportions. It called its product 'unigel'. Like Syntec's rheogel, the business of which had been bought by Astor, unigel is a thixotropic gel designed for use in connection with fibre-optic cables.

12. There was at least some degree of similarity between the two gels, rheogel and unigel. In February 1991 Astor began proceedings against Geltec, Mr Joiner and another director, Mr Bury, alleging that Geltec's unigel business involved infringements of intellectual property rights which Astor owned in consequence of its purchase of Syntec's business in 1989. Though Astor seems to have failed in an application for interlocutory relief, its action remained in existence and had some influence on the events which followed.

13. The respondents, Mr George and Mr Robinson, have at all material times been close business colleagues. In the late 1980s, Mr Robinson was resident in Hong Kong, where he had established a company known as Arnhem Technology Ltd ('Arnhem') in 1987 or 1988. By the time that it was relevant for this case, Arnhem was owned by himself and Mr George. They saw great opportunities for the optical fibre industry in Asian markets, particularly China, Taiwan and India. They wanted to develop Arnhem's business so as to represent non-local manufacturers of various products used in the industry, such as thixotropic gels.

14. The respondents first met Mr Joiner during the later part of the Syntec period. After Syntec had gone into administration and its business had been sold to Astor and Mr Joiner's new company, Geltec, started producing unigel, Arnhem became the Far East distributor for Geltec. In general it did not act as an agent remunerated by commissions. The usual pattern was that it bought quantities of unigel from Geltec and resold it to customers in China. Arnhem and its network of customers in China were one of the major sale outlets enjoyed by Geltec.

15. The respondents regarded unigel as an excellent product for exploitation within the fibre-optic cable market in China. In 1991 and 1992 there were a number of discussions between them and Mr Joiner about creating some more institutionalised relationship between them than the regular trading connection which had developed between Geltec and Arnhem. In the meantime, however, the financial position of Geltec was deteriorating. A winding-up petition was served on Geltec by a trade creditor in late 1991. Geltec was finally put into liquidation by an order of the court on July 29, 1992.

16. The more formal business connection between the appellants and the respondents began when, on September 16, 1992, they signed a document entitled 'Heads of Agreement'. It was for the most part drafted by Mr Joiner. The introductory paragraphs referred to Geltec and to

**Joiner v George**                      **[2003] BCC**
                    (Sir *Christopher Slade*)

Arnhem and recorded that the respondents were establishing a holding company named        A
International Technology Group Ltd ('ITG') registered in Hong Kong. They stated that the
parties had agreed 'to co-operate together to form a new UK registered company in order to
acquire such assets of [Geltec] as are necessary to continue the manufacture and distribution of
cable filling gels under the name Unigel'. The stated terms of the agreement included the
following. The parties were to procure a shelf company which would have its name changed to
'Unigel Ltd'. The appellants would initially subscribe for 51 shares of £1 each in this company,        B
which came to be commonly referred to as 'Unigel UK'. The opening directors would be the
two respondents 'on behalf of ITG'. Mr Joiner would be offered a position on the board 'when
his personal position with regard to past litigation with Astor Chemicals Ltd is clarified'. (The
judge found that the respondents were not at this time aware of Mr Joiner's disqualification as a
director.) Unigel UK would negotiate a loan of £45,000 from National Westminster Bank. The
respondents would 'negotiate the purchase from the receivers of all of [Geltec's]        C
manufacturing and laboratory equipment, all intellectual property rights including the
UNIGEL trade name and all goodwill attached to [Geltec's] business as per the attached
Schedule 1'. Conditionally on the loan from the bank being obtained, Unigel UK would
purchase the scheduled assets for £150,000 and certain further issues of shares would be made
to the appellants and the respondents and/or ITG. If the loan was unobtainable, the provisions
referred to in the last sentence were to be adjusted by 'mutual agreement'. Clause 18 recorded
the parties intention to complete a 'shareholders' agreement', but they never did.        D

17. On November 7, 1992 the appellants and respondents entered into the agreement which
has given rise to the present proceedings ('the option agreement'). Clause 1 varied the heads of
agreement by providing that Mr George would be the sole director, 'appointed on behalf of
ITG'. Clause 2 varied them by providing that all the shares in Unigel UK would be held by
ITG, but that the appellants 'will have the option to acquire ordinary shares in [Unigel UK]
representing up to 51% of the equity...' The option was to be exercisable at any time and no        E
monetary consideration was to be payable.

18. The contemplated shelf company having been acquired, matters proceeded on the basis
provided for by the option agreement. Mr George was the sole director of Unigel UK, and
remained such throughout the years which are relevant to the case. Neither Mr Joiner nor Mrs
Joiner ever became a director. Mr Joiner, however, in the capacity of a consultant to ITG,
provided services to Unigel UK. He had an office at the factory. The two issued shares in        F
Unigel UK were acquired by ITG, which in its turn was owned by the respondents. That
remained the position for several years. The appellants had such rights, if any, as were
conferred on them by the option agreement and by such provisions of the heads of agreement as
survived the option agreement.

19. Mr Joiner continued to be involved with Unigel UK and its business for about another
two years. Over this period unigel was produced at the factory. By far the largest customer was
Arnhem, for resales to customers in China. Arnhem did a good job in China. Unigel UK's        G
turnover increased and for most of the time the factory was busy.

20. Not later than December 8, 1993, ITG (which was wholly-owned and controlled by the
respondents) acquired a shelf company which, after about two months, changed its name to
'Unigel Limited'. I shall follow the judge in referring to it as 'Unigel HK', so as to distinguish it
from Unigel UK, the corporate name of which was and is also Unigel Limited.

21. On February 7, 1994, Unigel HK entered into an agreement with the liquidator of Geltec        H
('the Geltec agreement') to purchase whatever interest the liquidator owned in the assets which
had been used by Geltec in its thixotropic gels business. The judge found that the business
assets of Geltec thus sold consisted in effect of (i) the product name UNIGEL; (ii) any other
intellectual property rights of the unigel business which Geltec may have had; and
(iii) miscellaneous items of equipment of that business which had remained in the

253-4-03

CA

**Joiner v George**
*(Sir Christopher Slade)*

**303**

A    A    factory. The items thus sold to Unigel HK had in practice been used by Unigel UK with the acquiescence of the liquidator since the autumn of 1992. After they had been sold, Unigel UK continued to use them. Eventually, as will appear below, a royalty was introduced to be paid by Unigel UK to Unigel HK.

22. Relationships between the appellants and the respondents, which had originally been good, began to deteriorate fairly early in 1993 and got progressively worse over the rest of the year and into 1994. The appellants disliked the shareholding and management structure of Unigel UK. They had no shares. Neither of them was a director; Mr George as the single director was in sole management control of the company's business. There were other matters which caused friction. Mr George and Mr Joiner were working in the same building and did not get on.

23. In late 1993 and early 1994 there were exchanges about the possibility of the appellants being bought out. These culminated in two alternative offers made by the respondents on March 1, 1994. The judge, in para.21 of his second judgment, described these offers as 'US$220,000 if Mr Joiner was not locked in to Unigel UK or otherwise precluded from competing, and US$540,000 (partly by instalments over five years) if Mr Joiner was locked in'. Neither of these offers was accepted.

24. As 1994 progressed, things got steadily worse. On November 23, 1994 solicitors acting for the appellants gave formal notice of exercise by their clients of their rights under the option agreement to acquire a 51 per cent shareholding in Unigel UK. On December 2, 1994 ITG, in a letter signed by Mr Robinson, gave Mr Joiner one month's notice of termination of his consultancy agreement and instructed him no longer to attend at Unigel UK's premises. The locks in the building were changed.

25. On September 3, 1995 the appellants instituted proceedings against the respondents seeking specific performance of the option agreement. The outcome of those proceedings has been described in the introduction to this judgment. It is now necessary to summarise the judgment which is under appeal.

### The judgment on damages

26. The judge began (paras 4–6) by explaining the origin and effect of the words from the order: 'the value, expressed in money, which a 51% shareholding in ... Unigel Limited would have had to the claimants on 23 November 1994'. Those words merely reproduced the words in the judgment itself, as handed down. In the first draft of the judgment, circulated to the parties for minor corrections to be notified, the judge had simply referred to 'the market value' of a 51 per cent shareholding on the valuation date. However, Mr Joiner represented to him that that form of wording might have precluded him from arguing that, if he and his wife had acquired 51 per cent of the shares on that date, they would not have wanted to sell them, but would have wanted to keep them and to exercise the control which they would thereby have over the company's affairs. According to this argument, the real value to them of getting the shares would have lain in their market value, but in the ability to take charge of the business themselves and to run it successfully and profitably in the future. In fairness to Mr Joiner, the judge accordingly amended the wording of his judgment, so as to enable him to advance this line of argument, to which the judge aptly referred as the 'lost opportunity' argument (though Mr Joiner himself preferred a different description) if he thought fit. The judge further caused the essence of such wording to be reproduced in the consequential order.

27. Before the hearing began and at early stages in it, Mr Joiner had ambitions to develop the 'lost opportunity' argument (see para.7). In the end, however, while the judge left it open to him to develop it, he did not press it (see para.12). In any case, the judge thought there were two

**British Company Cases**
bcp2003 bcp  253 Mp  303—bcp23075

**304**                              **Joiner v George**                              **[2003] BCC**
                                  *(Sir Christopher Slade)*

specific factual points which effectively ruled it out (see paras 8–11). First, Mr Joiner was       A
subject to the director disqualification order, which had the best part of six more years to run
and restrained him from taking part in the promotion or management of the company. This
would have precluded him, in the judge's view, from exercising any control of the company in
practice. Furthermore, in the judge's view, while it would have been vital for Unigel UK to
have access to borrowing facilities, no lending institution would have been likely to offer
worthwhile facilities to a company whose controlling shareholder and moving spirit, even if       B
not a director, was under a disqualification. Secondly, even apart from the disqualification
order, Mr Joiner would not have been able to make a success of running Unigel UK, if he had
obtained 51 per cent control. For the minority shareholders controlled the distributor, Arnhem,
through which the great majority of Unigel UK's sales were made.

28.  Having rejected the 'lost opportunity' argument as the way to measure the damages, the
judge (para.12) said he had to fall back on the market value of the 51 per cent shareholding. For       C
this purpose, he thought it necessary to consider what would most probably have happened if
the respondents, in accordance with their contractual obligations, had caused a 51 per cent
shareholding to be transferred to the appellants. His conclusion (para.13) was that the
appellants would most probably have sold the shares. The judge thus needed to determine a
figure at which the appellants would have been able to sell them – a question which had to be
answered, in his view, by considering what in the 'real world', as opposed to the 'hypothetical       D
world', they would have done if they had got them on November 23, 1994.

29.  The judge's answer to this question was that the appellants would have sold them to the
respondents or to ITG or to 'some other George/Robinson vehicle'. The judge set out a number
of reasons for reaching this finding of fact in paras 14–22 of his judgment, but since neither side
has challenged it, these reasons need not be summarised in any detail. Essentially they were the
following. On the one hand, the appellants would in practice have needed to sell their       E
shareholding if they were going to get any value out of it, and the only realistic possible
purchasers would have been the respondents or a company, like ITG, controlled by them. On
the other hand, it was no less realistic to suppose that the respondents would have wanted to
retrieve control of Unigel UK for themselves and would have recognised the necessity of
paying a reasonable price to achieve that result.

30.  The judge (para.20) pointed out that, if the appellants had obtained 51 per cent of the       F
shares in Unigel UK on the valuation date, the respondents would have had to come to some
sort of terms with them or suffer a serious rupture in their supply arrangements for a significant
item of the specialist goods which Arnhem held itself out as being able to supply to the Far East
market. Furthermore, the offers which the respondents had made to the appellants to buy them
out earlier in 1994 showed that they had been prepared to raise and pay quite substantial sums
to be left in undisputed sole control of Unigel UK (para.21).

                                                                                                    G
31.  In the judge's view, however, (paras 23 and 24) two factors in particular would have
prevented the appellants from effectively holding the respondents to ransom and demanding an
excessive price for their shares in Unigel UK. First, if pushed too hard, the respondents could
have caused Arnhem to withdraw from selling gel for as long as it took to get a new
manufacturing facility established and in production. Secondly, prospective lenders would not
have been willing to lend them money if they had thought they were overpaying for what they
were buying; and the respondents would have been dependent on borrowing facilities. The sale       H
would thus have had to be at a 'sensible' price (para.25). The judge (para.26) summarised his
approach by saying that he proposed to form a view of 'what the value of a 51% holding in
Unigel UK would have been agreed to be in a sale where all personal antipathies were put aside
and where both parties recognised the reality that they would need to come to terms'. Both
experts agreed (para.27) that, in determining a value for the holding, it would first be necessary

© 2003 Sweet and Maxwell Ltd
bcp2003 bcp   253 Mp   304—bcp23075

**Joiner v George**
*(Sir Christopher Slade)*

**305**

3CC

was
run
This
ty in
K to
offer
en if
tion
had
em,

, the
For
ed if
cent
the
ne a
o be
tical

to determine what would have been the value of a 100 per cent holding. The judge rejected a
submission by Mr Joiner that the purchasers would have been willing to pay a price above
51 per cent of the value of the entirety. The 51 per cent holding in his view fell to be valued at
'a straight 51% of the value of 100%' (para.28).

32. In calculating the final figure which he reached, the judge was guided by the valuation
techniques explained by the experts (para.29). He identified three reasons for optimism as at
the valuation date. First, Unigel UK was a supplier to the telecommunications industry which
was then a high growth sector. Secondly, its principal product, unigel, was of a high quality.
Thirdly, the respondents believed that the market for it, particularly in the Far East, was
promising and they wanted to have a major presence in it.

33. On the other hand there were reasons for caution (paras 30–33). Unigel UK was a young
company which had been in business for only about two years and two of its predecessors,
Syntec and then Geltec, had failed. Furthermore the purchasers would be constrained to quite
some extent by the attitude of their prospective lenders. Any price paid at the valuation date
would have to be based on hopes for the future, since the break-up value of the company was
negligible. It had a share capital of £2 and its last published balance sheet showed a small
deficit on shareholders' funds. After further observations on the prospects of the company as at
the valuation date, the judge concluded that 'there would already be a worthwhile goodwill
value in it but not an extravagant amount'.

> the
mber
side
e the
their
sible
. On
ed to
y of

34. Before coming in detail to the expert evidence, the judge directed his attention to one
specific aspect of Unigel UK's position at the valuation date, namely the existence or otherwise
of a liability, actual or potential, to pay licence fees to Unigel HK for the use of intellectual
property. In this context the judge (paras 34–36) expressed his findings of fact as follows:

: the
ome
cant
East
hem
ums

'On 7 February 1994 the liquidator of Geltec had made an agreement with Unigel HK to
sell to it various assets of Geltec's former business, including "the intellectual property"
as defined. The idea was for Unigel HK to license the IP rights to Unigel UK in return for
licence fees. Mr Joiner was aware of this even if he was unenthusiastic about it. One of
the meetings in September 1994 when Mr Robinson was in the country took place at the
offices of Unigel UK's auditors. Mr Joiner was present. The principal subject matter of
the meeting was to seek advice about the payment of licence fees from Unigel UK to
Unigel HK, and the level at which they should be charged. However, at the valuation
date there was no licence agreement in place, and in practice Unigel UK was using the
product name "unigel" without payment to Unigel HK or anyone else. This did not
necessarily mean that it could go on doing that for ever, but it was the factual situation at
the valuation date.

have
g an
ould
new
l not
they
sale
l his
g in
side
30th
sary

On the face of it there was also a UK trade mark application for "unigel" in the name of
Unigel HK. There is some doubt as to the validity of this, because Mr Joiner's diligent
and impressive researches have shown that it was filed before the company which
eventually became Unigel HK even existed, let alone before it changed its name to
Unigel HK. However, if any point had been taken about this I assume that Unigel HK
could always have made a new application which would not have been subject to the
same possible challenge.

On 1 January 1995, after Mr Joiner had been excluded from the factory and from the
affairs of Unigel UK generally, a licence agreement was entered into between Unigel
HK and Unigel UK. It purported to license Unigel UK to use a large range of rights or
property which the agreement said were rights or property owned by Unigel HK,
including even the right to use any future name used by Unigel UK. The licence fee was
set at the high rate of 7½%. On 3 April 1995 it was replaced by a new licence agreement
which was identical except that the licence fee was reduced to 5%.'

Ltd
23075

**306**          Joiner v George          [2003] BCC
(Sir *Christopher Slade*)

35. The judge, however, expressed 'major misgivings' about these agreements as follows     A
(para.37):

> 'I am prepared to accept that Unigel HK may have had justification for charging a
> licence fee to Unigel UK for the use of the product name "unigel", although even that
> might have been debatable given Mr Joiner's discovery about the date of the trade mark
> application and the fact that Unigel UK was only applying its own corporate name to the     B
> product. Apart from a fee for the use of the name I cannot see on what basis the licence
> fee could realistically be justified. There were no patents or other established forms of
> intellectual property in existence. The licence agreements said that they applied to
> "formulations". But if Unigel UK knew what the formulations were – and it certainly
> would have done if Mr Joiner had continued to be involved in it – I believe that it was
> entirely free to use them and did not need any licence from Unigel HK before it could     C
> use them. The licence agreements purported to give to Unigel UK the right to exploit the
> name "Unifil", and presumably the associated right to market the Unifil equipment.
> However, on the basis of the evidence which I have heard I believe that the Unifil
> equipment was developed by Unigel UK, in the persons of Mr Joiner and Mr Sohal, and
> not by or on behalf of Unigel HK.'

36. In the face of these problems, the judge (para.38) indicated that, for the purpose of his     D
valuation exercise, he proposed to deal with the question of licence fees as follows:

> 'I believe that the value of Unigel UK at the valuation date ought to be ascertained on the
> basis that, despite some uncertainties, it would have to concede a licence fee payment if
> it wanted to go on using the name "unigel" for its product, or at least wanted to go on
> using the name without facing troublesome legal challenges. However the right to use
> the name was the limit of what it could plausibly be charged a licence fee for. As to the     E
> rate of fee, I think that, for the purpose of agreeing a share sale price in a transaction such
> as I postulated in para. 26 above (with vendors and purchasers both being prepared to
> give way to some extent in order to reach an agreement), a rate of 2½% would have been
> adopted.'

37. Then turning more specifically to the valuation process (para.39), the judge indicated
that he would 'endeavour to arrive at a price by a structured approach, guided by the expert
evidence, and not simply by some sort of intuition'. It was common ground that the price     F
should assume that Unigel UK was a going concern. 'On that basis' he said 'the core of the
value lay in the expectation as at the valuation date of future profits from its business'.

38. Though there were differences between their detailed valuations, both the experts,
Mr Fisher and Mr Faull, had accepted, as a norm, the basic concept of estimating a figure for
'maintainable profit' and multiplying it by a price-earnings ratio. Mr Faull had described a
valuation carried out simply that process as a 'capitalised earnings valuation'. This was the     G
sole method advocated by Mr Fisher. Mr Faull, however, referred to an alternative valuation
method which he called 'the adjusted net asset valuation' method. This differs from the
capitalised earnings valuation method in that the maintainable profit times price-earnings
formula is used to value not the company as a whole, but the goodwill of its business. The net
book value, positive or negative, of the company's other assets and its liabilities is then added
or deducted to arrive at a value of 100 per cent of the shares. Mr Faull favoured the adjusted net     H
asset method for Unigel UK, because he took the view that if a balance sheet had been drawn up
at the valuation date it would have shown net liabilities rather than net assets (para.40).

39. The judge, however, (para.42) did not adopt Mr Faull's view on this point. It took into
account a proportion of the licence fee of 7½ per cent of payable by Unigel UK to Unigel HK.
At the valuation date, no licence agreement existed and, even if one had existed, the highest fee

**Joiner v George**
*(Sir Christopher Slade)*

**307**

which the judge would have considered justifiable would have been 2½ per cent. At that level
of fee Unigel UK's balance sheet would have shown no or negligible net liabilities. In the
circumstances the judge thought it right to adopt the capital earnings valuation method.

40.   For this purpose (para.43) he had to begin by estimating the maintainable profit, which
fell to be calculated in three stages:

(1)   Take an item for maintainable revenue, anticipated as at the valuation date.

(2)   Deduct the direct costs of sales, to arrive at the 'gross profit'.

(3)   Deduct an appropriate amount for overheads.

41.   The experts differed on some of these three components of the calculation. As to the
first, Mr Fisher (using the 'discounted future earnings' method) had based his calculation of the
level of maintainable revenue on a forecast of future revenues made by Mr Joiner in January
1994 (see para.54 below) so far as the forecast related to the three years ahead. He had then
made deductions from those forecast revenues of three years ahead for direct costs and
overheads, so as to produce a forecast of future profit. From that last figure, he had discounted
back at ten per cent per annum to the valuation date, to give his figure of anticipated revenue.
Mr Faull, on the other hand, had derived his figure of anticipated revenue from the actual
trading figures of the accounting period which was current at that date, taking the period from
the last accounting date (March 31, 1994) back to the valuation date and then annualising the
figure.

42.   The judge (paras 44 and 45) preferred Mr Faull's approach to the calculation of revenue,
saying:

> '... [Mr Faull] says that actual figures are better than forecasts, and in any case
> Mr Joiner had a poor past record as a forecaster. I do not want to go into this last point. It
> is something of a sore point with Mr Joiner, particularly because the forecasts of future
> sales which he made in 1994 turned out with hindsight to have been reasonably accurate.
> However, hindsight ought to be excluded. Further, as matters appeared at the valuation
> date a valuer then might well have thought that there was something in the assertion that
> Mr Joiner was a poor forecaster. In any case I accept Mr Faull's view that the actual
> figures should be preferred to a forecast.
>
> In terms of figures there turns out not to be much difference between the amounts which
> the two experts would take for the revenue, though as I have explained they get to their
> respective amounts by different routes. I prefer Mr Faull's route on this aspect of the
> valuation. His figure for annual maintainable revenue, before direct costs and overheads,
> as perceived at the valuation date is £1m, and that is my figure also.'

43.   The judge then (para.46) considered the second element in the calculation of
maintainable profit, namely the deduction of the direct costs of earning the revenue. This he
treated as comprising three elements, of which only the third was controversial:

(1)   All direct costs other than elements (2) and (3). It was agreed that, in the trading period
up to the valuation date, these direct costs were running at the rate of 60.93 per cent of
sales. So, on the judge's assumed revenue of £1m, they would be £609,300.

(2)   Commissions, which Unigel UK paid on some of its sales. Scaling up the commissions
on the actual sales down to the valuation date, so as to assume they would apply
comparably to sales of £1m, gave assumed commissions of £57,524.

(3)   Licence fees. This was a disputed item. Mr Faull had deducted licence fees at
five per cent on sales. Mr Fisher had deducted nil. In accordance with his previous
conclusions, the judge considered a deduction of 2½ per cent appropriate, producing a

308                    **Joiner v George**                    **[2003] BCC**
                       (Sir *Christopher Slade*)

figure of £25,000. After deduction of these three sums representing direct costs from the   A
assumed annual revenue of £1m there was left a gross maintainable profit before
overheads of £308,176.

44. As to the deduction for overheads, the third element in the calculation of maintainable
profit, the judge (para.48) recorded that there was a marked difference between Mr Faull and
Mr Fisher. Mr Fisher based his provision for the overheads required to run the business on the
evidence of Mr Bury, a friend and former colleague of Mr Joiner. Mr Faull had taken the actual   B
overheads in the accounts for the accounting period current at the valuation date, with certain
adjustments. Mr Fisher and Mr Joiner suggested that a number of the expenses envisaged by
Mr Faull were too high, in particular for remuneration for directors and employees and for
travel and subsistence. The judge, however, (paras 48–51) ultimately accepted Mr Faull's
figure for overheads which was £256,327.

45. Deduction of that sum of £256,327 from the gross profit of £308,176 gave a   C
maintainable pre-tax profit of £51,849. Allowing for tax at the small companies rate of
25 per cent applicable at the valuation date produced a post-tax maintainable profit of £38,887
(para.51).

46. The judge said (para.52) that the next major stage in the valuation exercise was to select
a price-earnings ratio by which to multiply the post-tax maintainable profit. It was more or less   D
common ground that for this purpose the basic approach was to take an average price-earnings
ratio from the price-earnings ratios applicable to comparable quoted companies and then to
discount it to reflect the differences between such quoted companies and a company like
Unigel UK. However, the two experts differed as to the kinds of quoted companies to take as
comparables and also as to the extent to which the average of quoted price-earning ratios should
be discounted.

47. The judge (paras 53 and 54) agreed with Mr Fisher's view that, having regard to the   E
nature of the business of Unigel UK, quoted companies in the general manufacturing and
chemicals sectors should be taken as comparables, in preference to Mr Faull's view that the
comparables should be taken from the chemicals and telecommunications sectors. Mr Fisher
took the average price-earnings ratios of companies in his chosen sectors at the valuation date
and then took the average of those two averages – a process which gave him a ratio of 25.05.
The judge accepted and applied this figure of 25.05. However, he thought that the appropriate   F
discount to apply to it was 75 per cent, as suggested by Mr Faull, rather than 60 per cent as
suggested by Mr Fisher, to reflect the unquoted status of Unigel UK and all the other factors
which would tend towards caution for the company as it existed at the valuation date.

48. Accordingly, the judge concluded (para.56) that if the applicable price-earnings ratio
was to be derived from the average of two quoted sectors less a discount, he would take 25.05   G
less a discount of 75 per cent. This, rounded up to the nearest half produced a figure of
6.5 per cent, which he adopted.

49. The conclusion of the judge's exercise involved a simple calculation which (at para.61)
he summarised as follows:

> 'The post-tax maintainable profit must be multiplied by the selected price-earnings ratio
> to give a value for 100% of the shares in the company. So £38,887 is multiplied by 6.5,   H
> producing £252,766 for 100%. I have already said that, to scale this down to a value for
> Mr and Mrs Joiner's 51% interest, I will simply take 51% of it (see para. 28 above)
> Therefore I value their interest at £128,910, which I round up to £129,000.'

50. In an appendix to his judgment, the judge set out the stages of his calculation in
summary form. For ease of reference, I repeat this summary:

253-4-03

**3] BCC**

**CA**

**Joiner v George**
(Sir Christopher Slade)

**309**

om the
before

ainable
ull and
s on the
e actual
certain
ged by
and for
Faull's

gave a
rate of
38,887

o select
: or less
arnings
then to
ny like
take as
should

I to the
ng and
hat the
· Fisher
on date
'25.05.
opriate
cent as
factors

;s ratio
≥ 25.05
;ure of

ara.61)

;s ratio
by 6.5,
lue for
!bove).

:ion in

A

B

C

D

E

F

G

H

A

B

C

D

E

F

G

H

| | £ | £ |
|---|---|---|
| 1. Estimate of annual revenue | | 1,000,000 |
| 2. Deduct direct costs of earning revenue | | |
| (i) Costs other than (ii) and (iii) below (60.93%) | 609,300 | |
| (ii) Commissions on revenue of £1m | 57,524 | |
| (iii) Licence fees at 2½% | 25,000 | |
| | | (691,824) |
| 3. Gross profit before overheads | | 308,176 |
| 4. Deduct estimate of annual overheads | | (256,327) |
| 5. Pre-tax maintainable profit | | 51,849 |
| 6. Deduct tax at 25% | | (12,962) |
| 7. Post-tax maintainable profit | | 38,887 |
| 8. Select appropriate price earning ratio: 6.5 | | |
| 9. Multiply post-tax maintainable profit (line 7) by price earnings ratio of 6.5 (line 8) to give value of 100% | | 252,766 |
| 10. Multiply by 51% to give value of a 51% holding | | 128,910 |
| | | SAY 129,000 |

51. The judge (para.64) compared his valuation with the two offers which had been made to the appellants in early 1994 and were not accepted (see para.23 above). He said:

'As I said in paragraph 21 above there were two of them. Mr Joiner has understandably concentrated on the offer which aggregated to US$540,000. But that was the offer on the basis that Mr Joiner would be tied in for five years in such a way that he could not compete with Unigel UK. The other offer was on the basis that Mr Joiner would not be tied in, so that he would have been free to compete or work for a competitor. That is the offer which should be compared with my valuation, because in the events that happened, once Mr Joiner had been dismissed by ITG and excluded from Unigel UK's factory on 4 December 1994, he was free to compete and to work for competitors. Indeed he established his own consultancy, and I believe that he has acted as a consultant to at least one competitor, an Indian company called Savita. The offer which was made and not accepted was US$220,000, which at the exchange rate at the time was equivalent to £148,048.'

**The grounds of appeal**

52. In his notice of appeal Mr Joiner relies on five grounds:

(1)   'The judge was wrong not to take into account the forecast growth potential of the company.'

(2)   'The judge was wrong to exclude all hindsight.'

(3)   'In light of the unchallenged evidence of Mr Bury the judge was wrong to follow the principles on which Mr Faull calculated overheads.'

ell Ltd
-bcp23075.

**310**

**Joiner v George**
*(Sir Christopher Slade)*

**[2003] BCC**

(4)    'The judge was wrong to allow licence fees as it was contrary to the heads of
agreement.'

(5)    'The judge gives no reason for assessing the value as at 11/94 lower than defendants'
open offer of 3/94.'

53. I shall begin by considering the fifth ground of appeal since that was the ground with
which Mr Joiner himself, after some introductory observations, began his address to us.

### The respondents' offers of March 1994

54. Mr Joiner referred us to some of the background to the offers. On January 16, 1994, he
had sent a telefax to Mr Robinson indicating that 'if you make me the right offer for shares with
a suitable consultancy contract and it can be done quickly', he would accept. For this purpose,
he supplied his own share valuation, his method being to value the company in five years time,
based on forecasts and the current business plan, and then (by the discounted future earnings
method) to discount it back to give a current value. For this exercise he assumed that the
average selling price of gel was £3,500 per MT at a gross profit on raw material cost of
40 per cent. His figures were as follows:

'FORECAST

|  | MT | £ REVENUE | G/PROFIT | OVERHEAD | NET PROFIT |
|---|---|---|---|---|---|
| Year 1 | 300 | 1,050,000 | 420,000 | 200,000 | 220,000 |
| Year 2 | 400 | 1,200,000 | 480,000 | 350,000 | 130,000 |
| Year 3 | 500 | 1,750,000 | 700,000 | 360,000 | 340,000 |
| Year 4 | 600 | 2,100,000 | 840,000 | 380,000 | 460,000 |
| Year 5 | 700 | 2,450,000 | 980,000 | 400,000 | 580,000 |

Note: The overhead increases in year 2 to take account of additional production
facilities. (Either expansion of UK or new plant in China for example.)'

(As Mr Joiner pointed out to us, the figures of £1,200,000 and £480,000 relating to year 2 were
an obvious arithmetical error. They should have read £1,400,000 and £560,000.)

55. The next stage in the negotiation was a memo dated February 25, 1994 sent to Mr Joiner
by Mr George, setting out, 'only as an initial guideline for general discussion and
understanding' some suggested terms that might be required in any proposed agreement for the
sale by the appellants of their shares in Unigel UK. Clause 1 of these proposed terms embodied
a restrictive covenant which would in effect have precluded the appellants from competing in
the relevant market for five years. Clause 2 would have tied Mr Joiner into a contract of
employment for five years.

56. Mr Joiner responded in a memo dated February 27, 1994. In the last two paragraphs on
p.1 and the first paragraph on p.2 of that memo, he suggested that as a matter of law an effective
restraint could not be imposed on him, 'locking him out' of the gel market, but that the best
protection for the respondents would be to 'lock him in' to Unigel by providing sufficient
incentive in a consultancy agreement.

57. There followed a memo dated March 1, 1994 sent by the respondents 'for and behalf of
ITG [sic]' and addressed to Mr Joiner which contained the two offers which the respondents
said their backers had authorised them to make. It was not drafted by the respondents' legal
advisers. It contemplated that the parties' respective legal advisers would be instructed if
matters proceeded. Some of its provisions showed a certain lack of clarity. 'Offer No 1'
contained seven paragraphs. The first two paragraphs offered a purchase price of US$220,000
payable in two instalments. Offer No. 1 continued:

'The agreement would limit your ability to compete in any manner in the best possible
way and in the best interests of ITG/UNIGEL. However, everyone does recognise what
you have said on this matter.'

© 2003 Sweet and Maxwell Ltd
bcp2003 bcp   253 Mp   310—bcp23075

**Joiner v George**
(Sir *Christopher Slade*)

[This is the third paragraph of the offer, referred to in para.61 below.]

'There would also be a consultancy agreement that specified an agreed schedule of payments on a $ x/ hour/ day/ week basis geared to the actual amount of work undertaken in response to specific work requests from UNIGEL/ ITG.

We realise that perhaps the price in this offer may not be acceptable to you but this is all our backers/ bankers would be willing to risk given your requests to be free to pursue other business interests and other statements.'

58. The remaining paragraphs of offer No. 1 introduced offer No. 2 as follows:

'They have said that a far better option for both parties is one whereby you are more firmly locked into ourselves and locked out of competing by a more financially rewarding consultancy contract.

Unfortunately, this is more along the lines of the type of offer that you said in the past you would prefer not to take. However, it does tend to meet the requirements you mention in the first paragraph of page 2 of your memo of 27/02/94 so it may well be acceptable to you.'

Offer No 2 offered a purchase price of US$540,000 payable by instalments and, so far as material, continued as follows:

'There would be a term consultancy of 5 years with annual payments of $52,000.00 in return for 4% of the shares such that by the end of the consultancy ITG holds 100% of the shares.

The consultancy agreement would also specify an agreed schedule of payments on a $ x/ hour/ day/ week basis geared to the actual amount of work undertaken in response to specific work requests from UNIGEL/ ITG.

This amounts to a total of $540,000.00 payable to you plus the payments from the actual work performed under the consultancy agreement.'

59. The last page of the memo dated March 1, 1994 included the following paragraph:

'The above offers are dependent upon us supplying the bank with a detailed sales forecast by geographical area with justifications and a breakdown of what working capital is required and how it is to be spent and being accepted as reasonable.'

60. The judge (see para.51 above), having reached his final valuation figure, simply referred to the two offers by way of a comparative test. He regarded the lower offer No. 1 as the relevant one because it had been made on the basis that Mr Joiner would not be 'tied in so that he would have been free to compete or work for a competitor'. In para.21 of his judgment he had similarly described offer No. 1 as having been one of US$220,000 'if Mr Joiner was not locked in to Unigel UK or otherwise precluded from competing'.

61. Mr Joiner, who appeared to attach some importance to this point, suggested that these descriptions of offer No. 1 were wrong. The third paragraph of offer No. 1 in his submission demonstrated that offer No. 1, as well as offer No. 2, was made on the footing that Mr Joiner would be precluded from competing with Unigel UK, and that correspondingly, if the judge was to approach his valuation on the realistic basis which he postulated, he should have done so on the hypothesis that Mr Joiner would be 'locked into' the company, because that was what the parties had contemplated in March 1992.

62. I am unable to accept this submission, which picks the rather vague wording of the third paragraph of offer No. 1 out of its context and attaches undue weight to it. When the last five paragraphs of offer No. 1 are read as a whole and in conjunction with the last two paragraphs of p.1 and the first paragraph of p.2 of the memo dated February 27, 1994, it is in my judgment reasonably clear that the judge was right in saying that the first offer, unlike the second, was made on the basis that Mr Joiner would not be locked into the company (either by a full-time consultancy agreement or otherwise).

63. Having made this submission in regard to offer No. 1, Mr Joiner went on to submit that    A
the judge, in effecting his valuation, was wrong to disregard offer No. 2, as being immaterial.
On the contrary, he submitted, that offer, being a bona fide offer made by the respondents only
a few months before the valuation date, should have been taken as the basis or yardstick for the
price which the respondents would have been willing to pay for the appellants' shareholding as
at the valuation date.

64. There are in my judgment a number of reasons why this submission must be rejected. I    B
need refer to only two of them, given by Mr Cranfield on behalf of the respondents. First, offer
No. 2 was clearly no more than a tentative offer intended as a mere prelude to later negotiations
and dependant on the respondents' bank being satisfied as to a large number of matters, set out
on the last page of the Memo. Secondly, and conclusively, whatever may be the true
construction of offer No. 1, offer No. 2 was made on the basis that Mr Joiner would be locked
into Unigel UK. However, in paras 28–30 of his judgment on liability, the judge described the
rapidly deteriorating relationship between the parties. Indeed in para.30, he went so far as to    C
describe the relationship between Mr Joiner and Mr George during the weeks immediately
preceding the valuation as having become 'poisonous'. In those circumstances it is fanciful to
suggest that, as at the valuation date, the parties would have come to an arrangement which
locked Mr Joiner into Unigel UK. The clean break which in the event occurred was bound to
happen.

65. I would therefore reject Mr Joiner's submissions based on the two offers of March 1994.    D

### Hindsight

66. Mr Joiner's complaint concerning hindsight relates to the judge's calculation of future
revenue. Mr Fisher, in para.6.6 of his report, reproduced (without correction of the arithmetical
error) the forecasts (set out in para.54 above) made by Mr Joiner in January 1994, when
negotiating for the sale of his shares. In para.6.21 of his report, he expressed the opinion that    E
'the profits forecast by Mr Joiner in 1994 could at November 1994 be regarded as sustainable'.
He therefore adopted the forecast pre-tax profit for the year to March 31, 1997 of £340,000 as
maintainable and discounted this at a rate of ten per cent to arrive at a net present value. (He did
not go beyond 1997 because he said that the actual trade figures were distorted due to the
establishment of manufacturing facilities in China.)

67. The manner in which the judge dealt with this matter of forecasts is summarised in paras
41 and 42 above. Mr Joiner submitted that he was wrong in rejecting Mr Fisher's approach to    F
the estimate of revenue. He pointed out, as had Mr Fisher, that the sales revenue forecasts
which had been made by Mr Joiner in 1994 had in the event proved very accurate. Taking into
account the arithmetical error referred to in para.54 above, the three years' sales forecast by
Mr Joiner amounted to £4,200,000. The actual sales figures were £4,022,000. He submitted
that Mr Faull, in basing his valuation on actual trading figures as at November 1994, had taken
a 'blinkered' view. Mr Fisher, he submitted, had been right in thinking it appropriate to test the
reasonableness and reliability of Mr Joiner's forecasts against the actual trading results for the    G
company for the years ending March 1995, 1996 and 1997 and, having done so, to adopt those
figures.

68. Mr Joiner, while accepting that the basic rule in valuing shares in a company is to reject
evidence of events which occurred after the valuation date (see *Holt v IR Commrs* [1953] 2 All
ER 1499), relied on certain cases in which the courts have held that it was legitimate to look at
later events for the purpose of the particular valuation exercises they were called on to perform.    H
He placed particular reliance on the decision of the House of Lords in *Bwllfa and Merthyr Dare
Steam Collieries (1891) Ltd v Pontypridd Waterworks Co* [1903] AC 426.

69. In that case owners of coal mines under and near waterworks had given the undertakers
notice under s.22 of the Waterworks Clauses Act 1847 that they intended to work the coal. The
undertakers replied by a counter-notice requiring the mine owners not to work. Questions arose

© 2003 Sweet and Maxwell Ltd
bcp2003 bcp   253 Mp   312—bcp23075

CC                        CA                                    Joiner v George                    **313**
                                                           (Sir Christopher Slade)

as to the amount of the compensation properly payable to the mine owners. There were long
delays before the arbitration was completed. The House of Lords held that the statutory
compensation was to be assessed not by reference to a fixed date, the date of the counter-notice,
but by reference to what the coal owners would have made out of the coal during the whole
time it would have taken them to get it, so that evidence was admissible before the arbitrator
showing that coal rose in value after the date of the counter-notice. In a passage particularly
relied on by Mr Joiner and Mr Fisher, Lord Macnaghten (at p.431) said:

> 'Why should he listen to conjecture on a matter which has become an accomplished
> fact? Why should he guess when he can calculate? With the light before him, why
> should he shut his eyes and grope in the dark?'

However, by way of contrast, in the present case the damages do fall to be assessed by
reference to a fixed date, namely November 23, 1994. The *Bwllfa* decision is therefore of no
assistance to the appellants.

70.  A very recent decision, also relied on by Mr Joiner, was that of the House of Lords in
*Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] BCC 864; [2001] UKHL 2. This concerned
the valuation of a covenant to make four annual payments in a sublease of equipment for the
purpose of identifying the 'consideration' for a transaction within s.238(4)(b) of the Insolvency
Act 1986. Lord Scott of Foscote said at p.872:

> 'Mr Mitchell submitted that these ex post facto events ought not to be taken into account
> in valuing PCG's sublease covenant as at 10 November 1989. I do not agree. In valuing
> the covenant as at that date, the critical uncertainty is whether the sublease would
> survive for the four years necessary to enable all the four £312,500 payments to fall due,
> or would survive long enough to enable some of them to fall due, or would come to an
> end before any had fallen due. Where the events, or some of them, on which the
> uncertainties depend have actually happened, it seems to me unsatisfactory and
> unnecessary for the court to wear blinkers and pretend that it does not know what has
> happened. Problems of a comparable sort may arise for judicial determination in many
> different areas of the law. The answers may not be uniform but may depend upon the
> particular context in which the problem arises. For the purposes of s. 238(4) however,
> and the valuation of the consideration for which a company has entered into a
> transaction, reality should, in my opinion, be given precedence over speculation.'

71.  The particular context in which Lord Scott had regard to events which occurred after the
date of the sublease was for the purpose of confirming that the covenant, which could already
be seen as 'precarious' from the outset, in fact had a nil value. He recognised that the approach
which he adopted might not be applicable in other areas of the law. He was not stating any
general principle with regard to valuation, still less with regard to the valuation of shares in a
company.

72.  In *Buckingham v Francis* (1986) 2 BCC 98,984, Staughton J, in valuing the shares in a
company at a fixed date, (at p.98,986) reiterated the basic rule in saying 'The company must be
valued in the light of facts that existed at March 24, 1981', but added 'regard may be had to
later events for the purpose only of deciding what forecasts for the future could reasonably
have been made on March 24, 1981'. This addition was perhaps the judicial dictum most
helpful to Mr Joiner. He relied on it in support of his submission that regard might be had to the
post-November 1994 sales figures for the purpose of demonstrating that his forecasts of sales
figures made in January 1994 had been fairly accurate.

73.  The latter case, however, is certainly not authority for the proposition that forecasts of
future trading made before the valuation date should be preferred to the actual trading results of
the company for its most recent period of trading merely because, in the event, such forecasts
happen to tally reasonably well with the company's subsequent trading results. None of the
authorities on which Mr Joiner relies support the proposition that, for the purpose of valuing

314                          **Joiner v George**                          [2003] BCC
                          *(Sir Christopher Slade)*

shares in a company at a fixed date, its trading results after the valuation date should be         A
preferred to its trading results actually known at the valuation date.

74. In all the circumstances, I accept Mr Cranfield's submission that the judge was fully
entitled to conclude that a valuer instructed on behalf of the respondent purchasers in
November 1994 would in the real world have preferred Mr Faull's approach, which, in
accordance with the standing practices of valuation, was tied to the most recent actual trading         B
results, to Mr Fisher's approach which was based simply on Mr Joiner's best guess as to how
Unigel UK was likely to perform in the future. Mr Joiner criticised the judge's short statement
in para. 44 of his judgment that 'hindsight ought to be excluded', because the judge did not
support it by reference to reasons or decided cases. The judge, however, can in my opinion
readily be excused for failing to spell out reasons for what he regarded as a statement of the
general legal principles of share valuation so well established as to require no amplification.

75. I would therefore reject Mr Joiner's submissions based on hindsight.
                                                                                                         C

**Growth potential**

76. Before selecting his choice of method of valuation, the judge had said (para.39): 'Both
sides agree (and so do I) that the price should assume that Unigel UK was a going concern. On
that basis the core of the value lay in the present expectation (as at the valuation date) of future
profits from the company's business.' Both experts agreed that the company had growth         D
prospects. Mr Faull himself had observed (para.6.8(i) of his report) that 'the company was
engaged in a business that had significant potential for future growth'. Mr Joiner again
criticised the judge for following Mr Faull's approach in basing his estimate of the future
profits of the company on its actual recent trading results. The judge in adopting this course,
Mr Joiner suggested, entirely overlooked the growth potential of the company. The right
course to follow in his submission would have been to adopt Mr Fisher's approach of using a
forecast of the profit figures for three years forward (1997), based on Mr Joiner's forecast in         E
January 1994 that the company's revenues would increase year on year from £1,050,000 in
'year 1' to £1,750,000 in 'year 3'.

77. Under the previous heading 'Hindsight', I have already given reasons for concluding
that the judge was entitled to decline to base his valuation on Mr Joiner's forecasts. However, I
do not think it correct to say that the judge overlooked the growth potential of Unigel UK in
reaching his ultimate figure for the valuation of the shares. In para.29 of his judgment, as a
ground for optimism, he specifically referred to the fact that the company was a supplier to the         F
telecommunications industry 'which was very much a growth sector at the time'. In para.32,
however, he pointed out that while business sales had been on an upward trend over the two
years that the company had been in business, 'orders appeared to be erratic' and 'there certainly
was not a steady and consistent flow'; he there gave a number of reasons for caution in
estimating future profits.

78. The observation made by Mr Faull quoted in para.76 above was made by him in the part         G
of his report where he was considering what was the appropriate price-earnings multiple to be
applied to his figure for maintainable profit. But, as Mr Cranfield submitted in his skeleton
argument, Mr Faull specifically took the growth potential of Unigel UK into account in giving
his opinion as to where the price-earnings multiple to be applied to the company should fall
within the range which he considered suitable for a company such as Unigel UK with a high
turnover and low profit (see paras 6.7–6.10 of his report). For the reasons given in paras 52–53
of his judgment, the judge considered that Mr Faull's multiplier of 5 was too low and increased         H
his figure to 6.5. Paragraphs 53 and 54 of his judgment, while not referring in terms to the
company's growth potential, in my opinion show clearly that he had such potential in mind (as
well as the reasons for approaching it with caution) in reaching his figure of 6.5. The appellants
do not challenge this particular exercise of his discretion (see para.24 of their skeleton
argument). However, as Staughton J observed in *Buckingham v Francis* (above, at p.98,988):

'What one must guard against is making allowance for the same risks twice over — that is, in the assessment of future profits and also in the choice of a price/earnings ratio.'

It is in my judgment no less necessary to avoid making allowance twice over for the same growth potential. This the judge in the present case rightly avoided.

79. In my judgment therefore the judgment cannot be faulted by reference to Mr Joiner's submissions under the heading of growth potential.

### Licence fees

80. The manner in which the judge dealt with the question of the existence or otherwise of a liability on the part of Unigel UK as at the valuation date to pay licence fees to Unigel HK for the use of intellectual property rights has been fully set out in paras 34–36 above. As will have appeared, his conclusion was that, for the purpose of agreeing a share sale price in a transaction such as he postulated, a rate of 2½ per cent would have been adopted. He made a corresponding deduction from his estimate of Unigel UK's revenue, as a direct cost of earning that revenue.

81. Mr Joiner submitted that this conclusion was wrong because the charging of any licence fee to Unigel UK would have been contrary to the heads of agreement dated September 16, 1992. The provisions in the heads of agreement, summarised in para.16 above, had appeared to contemplate that (conditionally on the loan from National Westminster Bank being obtained) Unigel UK rather than Unigel HK would be the ultimate purchaser from Geltec's liquidator of its intellectual property rights and the UNIGEL trade name. Mr Joiner submitted that the heads of agreement were still in force at the valuation date and would have precluded the respondents through Unigel HK, of which they had control, charging Unigel UK with any licence fee for intellectual property rights.

82. This submission, however, attaches no weight to the Geltec agreement, made before the valuation date on February 7, 1994 by which Geltec's liquidator agreed to sell to Unigel HK various assets of Geltec's former business, including the 'intellectual property' as defined. Though the appellants at the trial on liability attempted to argue that, without their prior consent, Unigel HK should not have been set up at all or at least should not have been a party to the Geltec agreement, this argument met with no success (see pp.30 *et seq.* of the judgment on liability). There has been no appeal on this point. For present purposes therefore it has to be assumed that the Geltec agreement, so far as it extended, was a valid agreement which did not infringe the appellants' rights.

83. In regard to the Geltec agreement, the judge found as facts (para.34 of his judgment on damages) that the idea was for Unigel HK to license the intellectual property rights to Unigel UK in return for licence fees, that Mr Joiner was aware of this idea, and that in September 1994 he attended at a meeting at which the principal subject matter was to seek advice about the payment of licence fees by Unigel UK to Unigel HK and the level at which they should be charged. True it is that at the valuation date no licence agreement was yet in place and in practice Unigel UK was using the product name UNIGEL without payment to Unigel HK or anyone else. True it also is that the legal right of Unigel HK to charge a licence fee for the use of this product name was debatable for the reasons given in para.37 of the judge's judgment. But, as the judge pointed out, the mere fact that at the valuation date Unigel UK was using the product name without payment did not mean that it could go on doing so for ever. The whole legal situation was complex and problematic.

84. Taking all the circumstances into account, the judge was in my opinion amply justified in concluding that the value of Unigel UK at the valuation date should be ascertained on the basis that, despite some uncertainties, it would have to concede a licence fee payment if it wanted to continue using the name UNIGEL for its product, or at least wanted to do so without facing troublesome legal challenges. Nor do I think, he can be said to have erred when, as a matter of judgment, he decided that for the purpose of agreeing a share sale price in a transaction such as he postulated, a rate of 2½ per cent would, as a matter of compromise, have

---

*Left margin fragments:*

should be

was fully
:hasers in
which, in
ial trading
as to how
statement
ge did not
y opinion
ent of the
lification.

39): 'Both
ncern. On
) of future
id growth
ipany was
ner again
the future
iis course,
The right
of using a
forecast in
)50,000 in

oncluding
lowever, I
gel UK in
ment, as a
alier to the
n para.32,
er the two
e certainly
caution in

in the part
ltiple to be
s skeleton
t in giving
should fall
vith a high
iras 52–53
l increased
rms to the
n mind (as
appellants
r skeleton
p.98,988):

axwell Ltd
314—bcp23075

**316**                    Joiner v George                    **[2003] BCC**
                    (Sir *Christopher Slade*)

been adopted. Such figure, it will be noted, was far lower than the licence fees of 7½ per cent    A
and later five per cent agreed between Unigel UK and Unigel HK, albeit in different
circumstances, after the valuation date.

### Overheads

85. As will have appeared from para.44 above, the judge accepted Mr Faull's ultimate
figure for overheads at £256,327. The sources of this figure appear for the greater part from his    B
original report. Using his 'capitalised earnings' method he derived his figures for overheads
from Unigel UK's March 1995 accounts. In appendix 2 he set out the trading and profit and loss
account of the company for the year ended March 31, 1995 (the accounting year in which the
valuation date fell). This included a particularised list of overheads totalling £279,634. He used
these figures in appendix 3 to calculate the annualised trading figures of the company, and in
appendix 4 to calculate the 'maintainable profit' at the valuation date. In appendix 4 he derived    C
a final figure of £313,851 as the appropriate figure for overheads. Subsequently, Mr Faull
deducted from this last figure the figure of £50,073 for sales commissions shown in appendix 2
and the figure of £7,451 for additional commission shown in appendix 4, and added them as
costs of sale. These deductions left the sum of £256,327 adopted by the judge.

86. In contrast, Mr Fisher, for the purpose of carrying out his calculations under his
discounted future earnings method, had made his estimate of the potential level of overheads
required by the business primarily on the basis of the figures given by Mr Bury. He was a    D
chartered chemist and former business colleague of Mr Joiner with experience in gel
manufacturing, who had been asked in particular to give his opinion as to the resources
required to manufacture gels.

87. In his witness statement, Mr Bury gave detailed evidence about the production
capacities and appropriate staffing levels for gel production. He exhibited a schedule setting
out his estimate of the operating costs required to manufacture unigel and operate Unigel UK.    E
In it he used the same line items as appeared in the audited profit and loss account of the
company for the year ended March 1997. He gave two estimates, one for up to 500 MT per
year, using a small reactor, and one for up to 1000 MT per year, using a larger reactor. For
comparison he included a column showing the actual operating expenses incurred by the
company during the year ended March 31, 1997 (£666,609) which exceeded his estimate of
£385,400 by £281,209. Mr Bury concluded that this excess represented excessive expenditure    F
on overheads. Mr Fisher in his report (para.6.16) accepted Mr Bury's figures. In reliance on his
estimate of £385,400, he then produced his subsequent figures.

88. Mr Joiner's first submission under this head was that the judge erred in preferring the
figures produced by Mr Faull to those produced by Mr Fisher, based on the evidence of
Mr Bury, on which Mr Bury had not been cross-examined. There are in my judgment at least
two reasons why this submission must be rejected. First, the judge was not obliged to accept
Mr Bury's opinion (which was merely opinion) as to the costs of the future likely overheads of    G
Unigel UK in carrying on the business of manufacturing and selling Unigel products, when
there was other evidence of opinion, namely that of Mr Faull, which he preferred. Secondly,
the judge was entitled to find that, looking at the matter realistically, a purchaser in the position
of the respondents (or their valuer) would have preferred Mr Faull's overhead figures, which
were taken from Unigel UK's actual trading overhead figures and were thus tied to reality, to
Mr Fisher's approach, which was based simply on Mr Bury's opinion as to the future
overheads of a company engaged in a business of this nature.    H

89. Mr Joiner, recognising the difficulties facing his first submission referred to in para.88
above, while not abandoning it, directed the greater part of his argument before us under this
head to the judge's approach to the matter of overheads, based, as it was, on that of Mr Faull.
That approach, he submitted, was inconsistent. On the one hand, the judge disclaimed the use
of hindsight. On the other hand, he invoked hindsight at least to the extent that he took into the

© 2003 Sweet and Maxwell Ltd
bcp2003 bcp   253 Mp   316—bcp23075

reckoning the overheads of Unigel UK incurred during the period from the valuation date up to March 31, 1995.

90. I do not think there is any substance in this point. Any splitting up of the overheads for the year to March 1995 would inevitably have been a quite arbitrary and artificial operation. Furthermore, looking at the matter realistically, the appellants and the respondents, in negotiating a sale and purchase as at the valuation date in November 1994 would not in practice have been likely to conclude their negotiations until the overheads for the whole year had been ascertainable.

91. A further criticism of the judge's approach, relied on more strongly by Mr Joiner, related to his treatment of salaries, wages and directors' fees. He pointed out that Mr Faull in his report (para.5.4) had proceeded on the assumption of projected annual sales for Unigel UK of £1m at the valuation date.

92. In para.5.8 of his report, after referring to his calculation of overheads as set out in appendix 3, Mr Faull had said:

'That figure includes commission and the appropriate adjustment in respect of commission on a higher level of sales is shown at appendix 4. Certain other overheads could also be higher on a projected level of sales of £1m, but, as orders had been received and accepted of over £500,000 in the first six months of that accounting year . . . it would have been reasonable to assume at that time that no other overheads would significantly increase to achieve annual sales of £1m.'

93. That was the assumption on which Mr Faull said he would proceed. However, as Mr Joiner pointed out, as appendices 1 and 2 to the report had shown, while the salaries and wages paid by Unigel UK in the year ending March 31, 1994 had been £25,867, those paid in the subsequent year ending March 31, 1995 had been £60,300. On the assumption made by Mr Faull, the difference of £34,433 between these two figures must, it was submitted, have represented an excessive payment on overheads. To this latter sum had to be added a sum of £2,919 representing the difference between National Insurance contributions paid in the first year (£2,510) and those paid in the second year (£5,429).

94. To that sum of £2,919, it was submitted, further sums should be added because Mr George's evidence showed that after the valuation date two of his associates, Mr Coates and Mr Booker, had joined the company as consultants. Mr Coates had been paid £5,990 (rounded up) in respect of the year to March 31, 1995, and Mr Booker had been paid £400.

95. All these above-mentioned sums of £34,433, £2,919, £5,990, and £400 (totalling £43,742) in Mr Joiner's submission represented excessive expenditure by Unigel UK during the period between the valuation date and March 31, 1995, and should be deducted from any estimate of overheads accordingly.

96. Before the judge, Mr Joiner had further argued that the figure for overheads should be reduced so as to reflect travel and subsistence at a level sharply below that which Unigel UK was in fact incurring. This argument was rejected by the judge and was not pursued before us. Ultimately too, Mr Joiner did not pursue his earlier argument that one director, rather than two, would have sufficed after his departure.

97. At the conclusion of his opening address, Mr Joiner handed up to us a helpful revised version of the appendix to the judgment, which showed what in his submission would have been all the appropriate figures on the basis of the judge's general approach to the question of valuation. This revised version showed simply a deduction of the above-mentioned figure of £43,742 from the judge's estimate of overheads (£256,327). This represented his final response to the judge's estimate.

98. Having summarised, I hope fairly, what became Mr Joiner's ultimate submissions on the question of overheads, which I recognise as being of great importance to the appellants, I hope that it will not seem discourteous if I deal with them quite shortly. It is quite clear from

**318**                        Joiner v George                        **[2003] BCC**
                            *(Sir Christopher Slade)*

paras 48–49 of the judgment that the question of staff costs had been fully ventilated in      A
argument before the judge and had been fully considered by him. In para.49, having said that he
accepted the principles on which Mr Faull calculated his deduction of overheads, and that he
accepted his figures, the judge said:

> 'It would be excessive for me to go through all the contested items one by one. However,
> by way of example I accept Mr Faull's view that a company which was carrying on an
> export business with a turnover of £1m or more a year ought to have two directors. And I      B
> accept that his figure of £38,000 a year for each director is realistic. On staff costs more
> generally I do not accept Mr Joiner's assertion that Mr George and Mr Robinson
> introduced a "jobs for the boys" culture and employed too many people at too high
> salaries.'

99. Though Mr Joiner told us that his reference to the introduction of a 'jobs for the boys'
culture had been directed to a period after March 31, 1995, it is in my judgment clear that, in the
sentence last quoted, the judge was finding as a fact that, contrary to Mr Joiner's claim, Unigel      C
UK had not employed too many people at too high salaries at any relevant time. I can see no
grounds on which we can properly interfere with that finding of fact. Nor do I think that it was
incumbent on the judge, having decided the issue of principle in favour of Mr Faull's approach,
to go through each item of overheads and say why he preferred his figure to that of Mr Fisher
(derived from Mr Bury).

100. In my judgment therefore the appellants' submissions under that head must also be      D
rejected.

**Conclusion**

101. In conclusion, I would make these general observations. The process of valuation of a
shareholding in a case such as this cannot be an exact science. Though it ultimately involves a
finding of fact, elements leading up to such finding may well involve points on which different      E
minds, approaching the matter judicially, could quite properly take different views – in other
words, points to which there cannot be said to be exclusively one correct answer. It could be
that, on some of the conclusions of fact reached by the judge in his judgment on valuation, other
minds would have taken different views. A figure substantially higher or lower than £129,000
might have been the result. But the judge considered all the issues with great care and his
judgment seems to me to have been conspicuously clear, logical and fair. I can see no substance
in the criticisms of it based on the decision of this court in *Flannery v Halifax Estate Agencies*      F
*Ltd* [2000] 1 WLR 377, relating to the duty of the court to give sufficient reasons. This is not a
case in my judgment which would justify any interference with the judge's decision.

102. For the reasons given, I would dismiss this appeal.

**Keene LJ:** 103. I agree.

**Aldous LJ:** 104. I also agree.                                                              G

*(Appeal dismissed)*

                                                                                               H

© 2003 Sweet and Maxwell Ltd
bcp2003 bcp   253 Mp   316—bcp23075

TAB 30

*Kettlewell v Watson* (1882) 21 Ch D 685, English High Court

## KETTLEWELL v. WATSON.

[1879 K. 65.]

*Vendor's Lien for Unpaid Purchase-money—Sub-Purchaser—Land in Register County—West Riding Registry Act (2 & 3 Anne, c. 4) [Revised Ed. Statutes, vol. ii. p. 116]—Release of Lien on Part of Land—Constructive Notice—Imputed Notice—Notice through Solicitor or Agent—Purchaser for Value without Notice—Evidence—Onus Probandi.*

FRY, J.

1882

Jan. 24, 25, 26, 27, 28, 30; Feb. 1.

A vendor of land situate in a register county, part of whose purchase-money remains unpaid, is under no obligation to obtain for the unpaid amount any written security which can be registered, but is entitled to rely simply on his equitable lien, which he can enforce against sub-purchasers who have notice of it, actual or constructive.

And such a vendor will not, by registering the conveyance to his purchaser, if he retains the deed in his possession, lose his lien as against sub-purchasers from the original purchaser.

Land, belonging to the trustees of a charity, situate in the suburbs of *Leeds*, in the West Riding of *Yorkshire*, was sold by the trustees, with the sanction of the Charity Commissioners, to some estate agents, who occupied a good position in *Leeds*. They bought the land with the intention of re-selling it in small lots for building purposes. A receipt for the whole purchase-money, signed by the vendors, was indorsed on the conveyance, but only part of it was in fact paid. The vendors retained the deed in their possession, but, at the request of the purchasers, the vendor's solicitors registered a memorandum of it in the West Riding Registry. The vendors took no written security for their unpaid purchase-money, but relied only on their equitable lien. The purchasers sold the land again in lots, some of which were very small. None of the sub-purchasers had actual notice of the lien of the original vendors:—

*Held,* that the original vendors were entitled to enforce their lien against such of the sub-purchasers as had constructive notice of it.

One of the sub-purchasers, who bought a small lot for £42, allowed the purchasers at their suggestion to employ their own solicitor to prepare the conveyance to him. He did not in any other way employ a solicitor in the matter, and he made no inquiries about the title or the deeds, nor did he search the register:

*Held,* that, under these circumstances, it was not the duty of the solicitor to communicate the existence of the lien to the sub-purchaser, and that consequently notice of it could not be imputed to him through the solicitor:

*Held* also, that, having regard to all the circumstances, and especially to the smallness of the purchase-money, and the expense which a regular investigation of the title would have occasioned, it could not be said that the sub-purchaser had wilfully abstained from making inquiries with the view

686                          CHANCERY DIVISION.                    [VOL. XXI.

FRY, J.

1882

KETTLEWELL
v.
WATSON.

of not receiving notice of any prior charge, and that, consequently, he could not be fixed with constructive notice of the original vendor's lien, but was entitled to hold his plot free from it.

Another sub-purchaser employed no solicitor in the matter, and made no inquiries himself, but, as he said, left it to the original purchasers "to manage the business," and they prepared the conveyance to him, charging him for it:

*Held*, that he had made them his general agents in the matter, and that it was their duty as such to communicate the lien to him; that, consequently, it must be assumed that they did so, and that notice of the lien must be imputed to him.

The conveyances to the sub-purchasers contained the ordinary covenant by the original purchasers that the plots conveyed were free from incumbrances:

*Held*, that the covenantors not being solicitors, the fact that they entered into this covenant, though it was very improper for them to do so, did not, coupled with the other circumstances, shew that they were parties to a fraudulent scheme so as to rebut the legal presumption that they communicated the lien of the original vendors to the sub-purchasers for whom they acted as general agents, and that, consequently, the doctrine of *Kennedy* v. *Green* (1) did not apply.

The vendors at the request of two of the sub-purchasers released the plots which they purchased from the lien:

*Held*, that, it not being shewn that, when these releases were given, the vendors knew that the original purchasers had parted with any other portions of the land, the releases did not affect the right of the vendors to enforce their lien against the other sub-purchasers.

The action was brought by the original vendors against some of the sub-purchasers to enforce the lien against them. The Plaintiffs in their statement of claim alleged that three of the sub-purchasers, whose conveyances were expressed to be made for value, had in fact given no consideration for them, and they adduced evidence which proved this allegation in the case of one of the three:

*Held*, that, under the circumstances, the *onus* was on the Plaintiffs to prove the allegation in the case of the other two, and that they had failed to do so.

The doctrine of imputed and constructive notice discussed.

THIS was an action by vendors of land to enforce a lien for unpaid purchase-money.

The Defendants were persons who had derived title to different portions of the land from the original purchasers. The land was situate in the neighbourhood of *Leeds,* in the West Riding of *Yorkshire.*

The Plaintiffs were the trustees of a charity at *Leeds,* known as

(1) 3 My. & K. 699.

*Jenkinson's Hospital,* and were seised of the land in that character.
On the 21st of June, 1872, they entered into an agreement (sub-
ject to the approval of the Charity Commissioners) to sell the
land, which contained about four acres, to *B. H. Richardson &
T. H. Watson,* in fee, for £2523, and a deposit of £223 was then
paid to the Plaintiffs. *Richardson & Watson* were land and
estate agents occupying a good position at *Leeds.* On the 20th of
August, 1872, the Charity Commissioners made an order autho-
rizing the sale, and it was thereby ordered that the purchase-
money, when received by the trustees, should be forthwith paid
by them to the banking account of "The Official Trustees of
Charitable Funds," at the *Bank of England,* by whom the same
should be forthwith invested in the purchase in their names of
consols, to be held by them in trust for the charity, and subject to
the further order or direction of the Commissioners.

On the 15th of November, 1872, a deed was executed by which
the trustees, in consideration of £2523, expressed to be paid to
them by *Richardson & Watson* on or before the execution of the
deed, conveyed the land to *Richardson & Watson* in fee, to hold
the same, as to one undivided moiety thereof, to the use of
*Richardson* in fee, and, as to the other undivided moiety thereof, to
the use of *Watson* in fee. There was indorsed on the deed a receipt
for the whole. £2523, signed by the trustees. In fact nothing was
then paid to the Plaintiffs in addition to the deposit. After the
execution of the deed it was retained by the Plaintiffs' solicitors
as a protection to the Plaintiffs' lien for the unpaid balance of the
purchase-money. On the 1st of January, 1873, *Richardson &
Watson* paid the Plaintiffs a further sum of £800 on account of
the purchase-money. The remaining £1500 was never paid by
*Richardson & Watson,* but they continued to pay the Plaintiffs
interest on it. On the 10th of January, 1873, the Plaintiffs'
solicitors, at the request of *Richardson & Watson,* registered a
memorial of the purchase deed in the West Riding Registry at
*Wakefield.*

*Richardson & Watson* afterwards sold the whole of the land in
small portions to various persons, some of whom were the Defen-
dants to this action. The Plaintiffs alleged that such of those
persons as were not made Defendants to the action had acquired

FRY, J.

1882

KETTLEWELL
*v.*
WATSON.

688                        CHANCERY DIVISION.              [VOL. XXI.

FRY, J.         the portions which they had purchased without any notice of the
1882          Plaintiffs' lien.

KETTLEWELL          By a deed dated the 14th of January, 1873, *Richardson &*
*v.*          *Watson* granted 128 square yards of the land to *Timothy Watson*
WATSON.       in fee, the purchase-money being £42. He did not employ any
              solicitor in the matter, but he allowed *Richardson & Watson*, at
              their suggestion, to employ their own solicitor to prepare the con-
              veyance to him. He had no actual notice of the Plaintiffs' lien,
              and he made no inquiries about the title or the deeds, nor did he
              search the register. He died on the 30th of October, 1880, after
              the commencement of the action, having devised his real estate
              to his wife, the Defendant *Diana Watson.*

              By a deed dated the 16th of January, 1873, *Richardson &*
*Watson* granted 180 square yards of the land to the Defendant
*William Watson* in fee, the purchase-money being £42. He did
not employ any solicitor in the matter, but he allowed *Richardson*
*& Watson*, at their suggestion, to employ their own solicitor to
prepare the conveyance to him. He had no actual notice of the
Plaintiffs' lien, and he made no inquiries about the title or the
deeds, nor did he search the register.

              By a deed dated the 11th of December, 1873, *William Watson*
granted the 180 square yards to the Defendant *Eliza Ainley* in fee,
by way of mortgage. She had no actual notice of the Plaintiffs'
lien.

              By a deed dated the 1st of January, 1874, *Richardson &*
*Watson* granted 825 square yards of the land to *A. F. Holroyd* in
fee, and by another deed dated the same day they granted other
821 square yards of the land to *Holroyd* in fee. He was a clerk
in the office of *Richardson & Watson*, but it was not proved that
he had any actual notice of the Plaintiffs' lien. He, in fact, gave
no consideration for the conveyance to him, though each of the
deeds purported to be made in consideration of £200 paid by him.

              By a deed dated the 27th of February, 1874, *Holroyd* granted
the 825 square yards to the Defendant *James Padgett* in fee, by
way of mortgage, and by another deed dated the 30th of March,
1874, *Holroyd* granted the 821 square yards to *Padgett* in fee, by
way of mortgage. *Padgett* had no actual notice of the Plaintiffs'
lien. In his answer to interrogatories administered to him by the

Plaintiffs, he said that he did not employ any solicitor to act for
him on the respective occasions of his mortgages, but that he
left it to *Richardson & Watson* to manage the business, though
he did not give them any authority to employ a solicitor on his
behalf.

FRY, J.

1882

KETTLEWELL
*v.*
WATSON.

By two deeds dated respectively the 1st of April, 1874, *Holroyd*
granted the 825 square yards and the 821 square yards respec-
tively to the Defendant *Jane Hartley Carr* in fee, subject respec-
tively to the mortgages to *Padgett*.  She had no actual notice of
the Plaintiffs' lien, and she, like *Padgett*, did not employ any
solicitor, but left it to *Richardson & Watson* to manage the
business.

By a deed dated the 29th of September, 1873, *Richardson &
Watson* granted 1280 square yards of the land for value to *Henry
Hatherley* in fee.  By a deed dated the 30th of September, 1873,
*Hatherley* granted the 1280 square yards to *Alfred Law* and
others in fee, by way of mortgage, and on the 18th of November,
1873, he granted the 1280 square yards for value to the De-
fendant *Jane Hartley Carr* in fee, subject to the mortgage of the
30th of September, 1873.  The Plaintiffs admitted that the
mortgagees under that deed took their mortgage without any
notice of the Plaintiffs' lien, but they alleged that both *Hatherley*
and *Jane Hartley Carr* took their interests in the 1280 square
yards with actual and constructive notice of the lien.  The Plain-
tiffs alleged also that *Hatherley* gave no value for the conveyance
to him, but they adduced no evidence to prove this.  It was proved
that *Jane Hartley Carr* had no actual notice of the lien, but that
she, like *Padgett*, left it to *Richardson & Watson* to manage the
business.

By a deed dated the 12th of February, 1874, *Richardson &
Watson* granted 765 square yards of the land to *Holroyd* in fee.
It was not proved that he when he took this conveyance had any
actual notice of the Plaintiffs' lien, but he gave no 'consideration
for the conveyance, though it purported to be made for value.
By a deed dated the 13th of February, 1874, *Holroyd* granted
the 765 square yards to *William Eastwood* in fee, by way of mort-
gage.  There was no evidence that *Eastwood* employed any solicitor
or agent in reference to his purchase.  He had no actual notice

FRY, J.

1882

KETTLEWELL
*v.*
WATSON.

of the Plaintiffs' lien, but he made no inquiries as to the title or the deeds, and he did not search the register. He died on the 25th of December, 1876, having devised all estates vested in him by way of mortgage to the Defendants *Elizabeth Eastwood, L. A. Shepherd,* and *C. H. Marriott,* in fee, subject to the equities affecting the same, and having appointed the same three Defendants his executors.

By a deed dated the 2nd of September, 1874, *Holroyd* granted the 765 square yards to *Joseph Roberts* in fee, subject to the mortgage to *William Eastwood. Roberts* died on the 31st of May, 1878, having by his will devised all his real estate to the Defendants *James Roberts, H. H. Wylde,* and *William Richardson* in fee, upon certain trusts, and having appointed them also his executors.

By a deed dated the 3rd of November, 1874, *Richardson & Watson* granted 690 square yards of the land to *Henry Gallon,* in fee, the conveyance purporting to be made to him for value, and he by a deed dated the 4th of November, 1874, granted the same to *Padgett* in fee, by way of mortgage, and on the same day *Gallon* conveyed the equity of redemption for value to the Defendant *Mary Edwards* in fee, which equity of redemption she on the 14th of February, 1879, mortgaged to the Defendant *Joe Haworth.* The Defendants *Mary Edwards* and *Haworth* delivered no pleading, and did not appear. The Plaintiffs alleged that both *Gallon* and *Padgett* acquired the 690 square yards with actual and constructive notice of the Plaintiffs' lien. They did not at the trial prove actual notice against either of them, but they proved that *Padgett* acted in the same manner with reference to this mortgage as he did with respect to the mortgages which he took from *Holroyd.* The Plaintiffs alleged that *Gallon* in fact gave no value for his conveyance, but they did not attempt to prove this allegation at the trial.

By a deed dated the 1st of December, 1874, *Richardson & Watson* granted 763 square yards of the land for £200 to *Hatherley* in fee, and he, on the 31st of December, 1874, granted the same to *Jane Ainley* in fee, by way of mortgage, to secure £800, and on the 11th of March, 1876, *Hatherley* conveyed the 763 square yards for £300 to *Henry Taylor* in fee, subject to the mortgage, and he, on the 15th of March, 1878, mortgaged his equity of redemption

to the Defendants the *Midland Banking Company*. *Taylor* after-
wards filed a liquidation petition, under which the Defendants
*John Gordon* and *William Armistead* were appointed trustees of
his property. They delivered no pleading and did not appear.

The Plaintiffs alleged that both *Hatherley* and *Jane Ainley*
acquired their interests in the 763 square yards with actual and
constructive notice of the Plaintiffs' lien. In the opinion of the
Court it was proved that *Jane Ainley* had constructive notice of
the Plaintiffs' lien by reason of her having, like *Padgett*, left it to
*Richardson & Watson* to manage the business, but the Court held
that the Plaintiffs had failed to prove that *Hatherley* had any
notice of their lien.

By a deed dated the 5th of September, 1877, *Richardson &
Watson* granted 688 square yards of the land, for value, to the
Defendant *R. J. Chippendale.* He authorized *Richardson & Wat-
son* to employ their solicitor to prepare the conveyance, but he
in no other way employed any solicitor in the matter. He had
no actual notice of the lien, but he made no inquiries as to the
title or the title deeds, and he did not search the register.

By a deed dated the 27th of November, 1874, *Richardson &
Watson* granted 846 square yards of the land for £190 to *Henry
Taylor*, in fee, and he, on the 21st of May, 1875, conveyed the
same, with other property, to *D. Davis* and *William North*, in fee,
by way of mortgage to secure £2300, and on the 15th of March,
1878, he mortgaged his equity of redemption to the Defendants
the *Midland Banking Company.* The ultimate equity of redemp-
tion became afterwards vested in the Defendants *Gordon* and
*Armistead* as trustees in the liquidation of *Taylor.* The Plain-
tiffs admitted that *Davis* and *North* acquired their mortgage for
value without any notice of the Plaintiffs' lien, but they alleged
that *Taylor* acquired the 846 square yards with actual and con-
structive notice of the Plaintiffs' lien. In the opinion of the
Court, however, the Plaintiffs failed to prove this allegation.

By a deed dated the 13th of August, 1875, *Richardson & Wat-
son* granted 636 square yards of the land for £119 to *Taylor* in
fee, and he, on the 7th of March, 1876, conveyed the same to
*Eliza Hatton* in fee, by way of mortgage to secure £850, and, on
the 15th of March, 1878, he mortgaged his equity of redemption

FRY, J.

1882

KETTLEWELL
*v.*
WATSON.

of the 636 square yards to the Defendants the *Midland Banking Company*. The ultimate equity of redemption became afterwards vested in the Defendants *Gordon* and *Armistead*, as trustees in the liquidation of *Taylor*. The Plaintiffs admitted that *Eliza Hatton* acquired her mortgage without any notice of their lien, but they alleged that *Taylor* acquired the 636 square yards with actual and constructive notice of the lien. In the opinion of the Court, however, the Plaintiffs failed to prove this allegation.

On the 17th of February, 1879, *B. H. Richardson* filed a liquidation petition, under which his creditors appointed a trustee of his property. On the 12th of April, 1878, *T. H. Watson* filed a liquidation petition, under which a trustee was appointed, but on the 19th of May, 1879, he was adjudicated a bankrupt. The Plaintiffs proved in respect of their lien against the estates of *B. H. Richardson* and *T. H. Watson*, but no dividend had been paid by their estates.

The conveyances to the various purchasers from *Richardson & Watson* were respectively registered soon after their execution.

At different times two solicitors, named *Asling* and *Bladen*, acted for *Richardson & Watson*, and were employed by them to prepare conveyances to the sub-purchasers.

The Plaintiffs claimed a declaration that they were entitled to a lien or charge on the said several lands of the Defendants respectively for the sum of £1500, and interest thereon from the 1st of July, 1878, and their costs of the action; and that in default of payment by the Defendants, or some or one of them, the said several lands of the Defendants might be ordered to be sold, and the proceeds of sale applied in or towards payment of the £1500, interest and costs.

In answer to interrogatories administered to them by some of the Defendants, the Plaintiffs admitted that in two instances of sales by *Richardson & Watson* of portions of the land comprised in the deed of the 15th of November, 1872, viz., a sale in January, 1873, of 1310 square yards to one *Joseph Wood*, and a sale, in August, 1874, of 1856 square yards to one *Benjamin Wright*, the Plaintiffs' solicitors allowed the conveyances to be made freed from the Plaintiffs' lien. But, in the opinion of the Court, there was no evidence that, when the Plaintiffs thus released their lien,

they had any notice that other parts of the land had been sold by
*Richardson & Watson* to other persons.

FRY, J.
1882

KETTLEWELL
*v.*
WATSON.

. Some of the Defendants alleged that the Plaintiffs were by
acquiescence and *laches* debarred from any relief to which they
might otherwise have been entitled, on the ground that they, with
knowledge and notice of the facts, stood by and allowed the pro-
perty to be built on, and the deed of the 15th of November, 1872,
to be registered for the express purpose of enabling *Richardson &
Watson* to sell or mortgage the property in lots.

*Cookson*, Q.C., *W. G. Harrison*, Q.C., and *Langworthy*, for the
Plaintiffs :—

There was no negligence in our not having our lien evidenced
by some written document which could be registered. We were
entitled to rest on our equitable lien, and were under no obligation
to do anything more, and under the Act 2 & 3 Anne, c. 4, nothing
can be registered but a written document: *Sumpter* v. *Cooper* (1);
though there need not necessarily be a deed: *Credland* v.
*Potter* (2). And the circumstance that we, at the request of
*Richardson & Watson*, allowed the conveyance to them to be re-
gistered, did not, so long as we retained that deed in our posses-
sion, amount to any representation to any one who searched the
register that the property was free from any vendor's lien, and
cannot operate to deprive us of our lien. The Defendants, how-
ever, do not say that they searched the register. And the fact
that *Richardson & Watson* had not possession of the conveyance
to them was notice to any one dealing with them that there might
be a vendor's lien for unpaid purchase-money. Though the Defen-
dants have registered their conveyances the registration will not
avail to defeat our prior equity if they took with notice, actual or
constructive, of our lien: *Le Neve* v. *Le Neve* (3). We prove con-
structive notice of our lien against all the Defendants. Some of
them employed *Richardson & Watson* as their agents, and they
necessarily employed a solicitor to transact the business. When
the employment of an agent is such that he must necessarily
employ a sub-agent, the sub-agent is the agent of the original

(1) 2 B. & Ad. 223.              (2) Law Rep. 10 Ch. 8.
(3) 1 Amb. 436.
2 Z 2                                          1

694                      CHANCERY DIVISION.              [VOL. XXI.

FRY, J.
1882
KETTLEWELL
v.
WATSON.

principal, and notice to him is notice to the principal. We prove that the solicitors employed by *Richardson & Watson* knew that part of our purchase-money was unpaid. But, if *Richardson & Watson* were the only agents, still the doctrine of imputed notice through an agent applies to lay agents equally with solicitors: *Brotherton* v. *Hatt* (1); *Jennings* v. *Moore* (2). These cases are commented upon in *Le Neve* v. *Le Neve* (3) and adopted as good law. The test is whether it is the duty of the agent to disclose what he knows to his principal: if it is, the Court will assume that he did so, and that is an irrebuttable presumption: *Wyllie* v. *Pollen* (4).

[FRY, J. :—There is no magic in the agent being a solicitor.]

It is a question of common honesty: *Rolland* v. *Hart* (5). And, if the agent's duty conflicts with his interest, it will still be presumed that he performed his duty: *Bradley* v. *Riches* (6). The fact that the agent is not a paid agent makes no difference.

But, even if any of the Defendants employed no agent, still they must be taken to have had constructive notice of our lien. They should have inquired for the conveyance to *Richardson & Watson*, and if they had done so they would have learnt that it was in the possession of our solicitor.

[FRY, J. :—Must I not consider all the circumstances of each case ? *Agra Bank* v. *Barry* (7). There it was held that the mere non-production of the title deeds of an estate, when they were inquired for, was not enough to postpone a legal mortgagee to a prior equitable mortgagee with whom the deeds had been deposited.]

There inquiry was made, and a reasonable excuse was offered for the non-production of the deeds. But here no inquiry was made at all : *Jones* v. *Smith* (8). If a person designedly abstains from making inquiries, if he wilfully shuts his eyes in order that he may not receive notice, the Court will impute notice to him of those facts of which he would have received notice if he had inquired. And there may be negligence so gross that the Court

(1) 2 Vern. 574.
(2) Ibid. 609.
(3) 1 Amb. 436.
(4) 3 D. J. & S. 596.

(5) Law Rep. 6 Ch. 678.
(6) 9 Ch. D. 189.
(7) Law Rep. 7 H. L. 135.
(8) 1 Hare, 43.

will treat it as evidence of fraud, though there is no moral fraud: *West* v. *Reid* (1); *Hewitt* v. *Loosemore* (2); *Worthington* v. *Morgan* (3); *Peto* v. *Hammond* (4). In the case of the Defendant *Jane Hartley Carr*, she had constructive notice of our lien, even if her grantors had not. Only an equity of redemption was conveyed to her, and our equity is as good as hers, and, being prior in date, it ought to prevail: *Phillips* v. *Phillips* (5); *Cave* v. *Cave* (6). This applies to others of the Defendants.

FRY, J.

1882

KETTLEWELL
*v.*
WATSON.

*Glasse*, Q.C., *W. Barber*, Q.C.. and *Lockwood,* for the Defendants, *Elizabeth Ainley, James Padgett, Jane Hartley Carr, L. A. Shepherd, C. H. Marriott,* and *Jane Ainley* :—

The omission of the Plaintiffs to obtain some written document to evidence their lien for unpaid purchase-money, and their relying only on their equitable lien is a species of fraud, and is sufficient to deprive them of their lien. They enabled *Richardson & Watson* to shew a good title on the register: *Hine* v. *Dodd* (7). The register is notice to everybody. The fact that the Plaintiffs registered the purchase deed at the request of *Richardson & Watson* is at any rate enough to deprive them of their lien: *Smith* v. *Evans* (8).

As to constructive notice, the mere fact that one and the same solicitor is employed by both vendor and purchaser is not sufficient to prove that the purchaser had constructive notice of an equity affecting the vendor. The principle of constructive notice through a solicitor has been said to rest on the duty of the solicitor to communicate to his principal; in *Boursot* v. *Savage* (9), Vice-Chancellor *Kindersley* said that the true principle is that the solicitor is the *alter ego* of the client. The doctrine of constructive notice through a solicitor will not be extended, and the *onus* is on those who allege the employment of a solicitor to prove it: *Wyllie* v. *Pollen* (10). The doctrine of *Le Neve* v. *Le Neve* (11)

(1) 2 Hare, 249.                  (6) 15 Ch. D. 639.
(2) 9 Hare, 449.                  (7) 2 Atk. 275.
(3) 16 Sim. 547.                  (8) 28 Beav. 59.
(4) 30 Beav. 495.                 (9) Law Rep. 2 Eq. 134.
(5) 4 D. F. & J. 208, 215.        (10) 3 D. J. & S. 596.
                (11) 1 Amb. 436.

CHANCERY DIVISION.            [VOL. XXI.

FRY, J.    may not be confined to a solicitor, but there is a great distinction

1882      between a solicitor agent and a lay agent. Notice of a legal

KETTLEWELL  difficulty affecting the title to land may operate very differently

*v.*       on the mind of a lay agent and on the mind of a lawyer.

WATSON.
———        The fact that the land is in a register county is very material.
In *Agra Bank* v. *Barry* (1) Lord *Hatherley* pointed out (2) that
there is a very great distinction with regard to the imputation
of knowledge between land which is in a register county and
land which is not.

[FRY, J. :—Those observations of Lord *Hatherley* are addressed
to the constructive notice which is inferred from the omission to
make inquiries—not to the notice which is imputed through an
agent.]

A purchaser of land in a register county is not bound to make
inquiries about unregistered instruments, and, in the absence of
actual notice to him or his agent, his registered deed is entitled
to priority over a prior unregistered charge: *Lee* v. *Clutton* (3).

The Court must have regard to all the facts. Here the original
vendors were trustees of a charity, selling land subject to the
trust under an order of the Charity Commissioners, and the order
expressly required that the purchase-money should be invested in
a particular way. It might fairly be assumed by any ordinary
person that this had been done.

Again, all the sub-purchasers ought to have been made parties
to the action : *Peto* v. *Hammond* (4). *Richardson & Watson* were
committing a fraud, and that rebuts the presumption that, if they
were our agents, they would communicate the lien to us: *Kennedy*
v. *Green* (5).

As to the different Defendants for whom we appear, the case
wholly fails as against *Eastwood's* executors ; there is no evidence
that he employed either *Richardson & Watson*, or any solicitor,
as his agents in the matter.

This applies to others of our Defendants.

*James Padgett* acquired his title through a purchaser for value
and was himself a purchaser for value. Notice is not proved

(1) Law Rep. 7 H. L. 135.        (3) 45 L. J. (Ch.) 43 ; 46 L. J. (Ch.) 48.
(2) Ibid. 155.                   (4) 29 Beav. 91.
                    (5) 3 My. & K. 699.

against him; and even if he had notice, his mortgagors had no notice, and a purchaser for value without notice can give a good title even to a person who has notice. *Padgett* could not be bound to inquire whether the consideration which appears by the conveyance to *Holroyd* to have been given by him was in fact paid.

As to *Jane Hartley Carr*, she is entitled to redeem the mortgages subject to which she purchased, and to place herself in the position of the mortgagors, and, therefore, even if she had constructive notice of the Plaintiffs' lien, her equity is not a rival equity to theirs, but a distinct and a higher equity, and does not depend merely on its date.

*Waller*, Q.C., and *Bunting*, for the executors of *Roberts* :—

There is no sufficient evidence of constructive notice to *Roberts*. And, if *Holroyd* had notice, there is no evidence of notice to him in connection with the conveyance to *Roberts*. That is essential.

[FRY, J. :—*Holroyd* was a volunteer.]

*Rice* v. *Rice* (1) shews that an equitable mortgagee by deposit from a purchaser has a better equity than the unpaid vendor in respect of his lien for purchase-money.

[FRY, J. :—In that case the vendor had parted with the conveyance to the purchaser; in the present case the vendors retained the deed.]

But they registered it. Looking at all the circumstances our equity is better than that of the Plaintiffs. There was no reason why *Roberts* should inquire for the title deeds; they would in the natural course of things be in the possession of the mortgagee.

Again, how can the Plaintiffs assert any lien as against us, when without our consent they have released their lien as against the purchasers of other lots? That act operates as a release to us.

[FRY, J. :—The releases were executed before your right arose. And must it not be shewn that when the Plaintiffs gave the release, they knew that there were other sub-purchasers?]

(1) 2 Drew. 73.

FRY, J.

1882

KETTLEWELL
*v.*
WATSON.

FRY, J.
1882

KETTLEWELL
*v.*
WATSON.

*Byrne,* for the Defendants *William Watson* and *Diana Watson :—*

All that is proved against us is that *Asling* was employed to prepare the conveyances to us. That is not an employment of him as our solicitor. And there is no evidence that we employed *Richardson & Watson* as our agents.

Under the circumstances we were not guilty of any negligence in not inquiring for the conveyance to *Richardson & Watson*. On the abstract of title it appeared that the whole of the consideration had been paid to the Plaintiffs, and that the deed was registered. That was the representation made to us by *Richardson & Watson;* they were committing a fraud on us if there was a lien for unpaid purchase-money, and they were not at liberty to sell free from it. Therefore, the doctrine of imputed notice would not apply: *Cave* v. *Cave* (1). If a purchase-deed can be registered when the vendor intends to retain his lien for unpaid purchase-money, it will lead to gigantic frauds. The Plaintiffs, if they intended that *Richardson & Watson* should be able to deal with the estate, should have taken care to have some written agreement evidencing their lien which could have been registered. A letter would have been enough. *Lee* v. *Clutton* (2) is in our favour.

*J. Pearson,* Q.C., and *C. B. McLaren,* for the *Midland Banking Company :—*

The Court will not enforce a vendor's lien contrary to the intention of the parties. If it was intended to exist it should have been evidenced by some writing, and a memorial of the writing should have been registered. *Sumpter* v. *Cooper* (3) is distinguishable from the present case. There the claimant against the unregistered assignment was the assignee in bankruptcy of the assignor, and he could not be in a better position than the assignor himself. In *Credland* v. *Potter* (4) it was held that an unregistered further charge in favour of a first mortgagee of land in the *West Riding* must be postponed to a subsequent registered charge taken without notice of the former.

[FRY, J. :—There the further charge was in writing.]

(1) 15 Ch. D. 639.                    (3) 2 B. & Ad. 223.
(2) 45 L. J. (Ch.) 43 ; 46 L. J. (Ch.) 48.   (4) Law Rep. 10 Ch. 8.

VOL. XXI.]          CHANCERY DIVISION.                    699

: Here an absolute conveyance was registered.                    FRY, J.

[FRY, J. :—The memorandum on the register states nothing            1882
about the payment of the purchase-money.]                      KETTLEWELL
                                                                  *v.*
The principle of the decision in *Credland* v. *Potter* (1) applies,     WATSON.
otherwise the legal estate might be conveyed and no purchase-
money paid, so that the purchaser would be a trustee of the legal
estate for the vendor.    The Plaintiffs have enabled a fraud to be
committed when they had it in their power to prevent it.    The
object of the Act was that a perfect title should be obtained by
registration against all unregistered conveyances, legal or equit-
able, by way of charge or otherwise, and it applies, not only to a
case where there is an instrument in writing, but to a case where
there might have been, and ought to have been an instrument in
writing.    If the land had not been in a register county, and
the vendor had allowed the deed to get into the purchaser's pos-
session, he could not have enforced his lien for unpaid purchase-
money against a sub-purchaser without notice of it; the registra-
tration of the deed, when the land is in a register county, without
any notice of the lien on the register, is equivalent to allowing
the purchaser to have the deed in a case where there is no register.
The Plaintiffs have enabled *Richardson & Watson* to represent
themselves as absolute owners of the land free from any lien:
*George* v. *Milbanke* (2).    At any rate our equity is superior to that
of the Plaintiffs: *Rice* v. *Rice* (3).    We were not bound to inquire
about unregistered charges: *Agra Bank* v. *Barry* (4).    And it is
not shewn that *Taylor*, who conveyed to us, had any notice of the
lien, and he was a purchaser for value.

*J. Pearson*, Q.C., and *Colt*, for the Defendant *Chippendale* :—

*Chippendale* only gave authority to *Richardson & Watson* to
employ a solicitor to prepare his conveyance; there was no general
retainer of a solicitor in the matter, so that, even if the solicitor
had notice of the lien, it was not his duty to inform *Chippendale*
of it.    And, if *Richardson & Watson* were his agents, which we
say they were not, they were intentionally committing a fraud:

(1) Law Rep. 10 Ch. 8.              (3) 2 Drew. 73.
(2) 9 Ves. 190.           .    .    (4) Law Rep. 7 H. L. 135, 157.

FRY, J.
1882
KETTLEWELL
v.
WATSON.

*Cave* v. *Cave* (1).   And there was no negligence amounting to fraud on the part of *Chippendale* himself: *Agra Bank* v. *Barry* (2); *Ratcliffe* v. *Barnard* (3).

Also *Chippendale* is protected because he bought from a purchaser for value without notice.   At any rate, the Defendants cannot be made liable *in solido* for the whole £1500; each is at the most liable for the purchase-money which he paid for his lot, which is the only sum which the Plaintiffs could have claimed from him if he had known of their lien and had asked them to release it as against them.

*Cookson* in reply :—

One argument is that we were guilty of fraudulent negligence in not obtaining a written charge.

[FRY, J. :—I do not want to hear you as to that.]

Then it is said that by registering the conveyance to *Richardson & Watson* we armed them with a title which enures to the benefit of the sub-purchasers.   *Agra Bank* v. *Barry* does not lay down that the register is a protection to a person who does not search it.   Here the Defendants, or most of them, do not even allege that they searched the register.   Therefore, they are not in any better position than if the land was not in a register county.

[FRY, J. :—The Lords seem to have thought in *Agra Bank* v. *Barry* that a register absolves a purchaser from inquiring about deeds so fully as he would be bound to inquire if there was no register.]

The decision does not apply if the register is not searched at all.   And it proceeded upon the *Irish Registration Act*, which is different from the *West Riding Act*.

If any of the Defendants employed no agent or solicitor when they were making their purchases then they wilfully abstained from investigating the title or making any inquiries about the deeds.   Wilful abstention from inquiry about incumbrances is fraud in the eye of the Court, and a man who knows nothing about the law is in no better position than a lawyer.   Gross negligence

(1) 15 Ch. D. 639.          (2) Law Rep. 7 H. L. 135.
              (3) Law Rep. 6 Ch. 652.

amounts to fraud, though there may be no moral fraud : *Worthing-ton* v. *Morgan* (1).

The release of the lien as against some of the sub-purchasers does not affect the Plaintiffs' rights against the others.

*Smith* v. *Evans* (2) does not apply. *Lee* v. *Clutton* (3) decides nothing more than *Agra Bank* v. *Barry* (4).

As to the Defendant *Padgett*, it is true that a purchaser for value without notice can pass on a good title to any one; but *Holroyd* was a mere dummy. He gave no consideration. But it must be a *bonâ fide* purchaser : *Sugden's* Vendors and Purchasers (5). And if *A.* buys with notice of an incumbrance, and then sells to *B.* who has no notice, and *B.* sells to *C.* who has notice, the notice to *A.* is revived, and *C.* is liable to the incumbrance.

It is clear that the Defendant *Jane Hartley Carr* and those who are in the same position as she is, have only equities of the same nature as the equity of the Plaintiffs, and that of the Plaintiffs, being prior in date, must prevail.

As to the *Midland Banking Company*, they have not pleaded, nor have they proved, that the purchasers through whom they claim were purchasers for value without notice. The *onus* of proof is on them.

FRY, J. :—

Whatever may be the ultimate decision in this case, it is impossible to have listened to it without great pain, because it exhibits in a very forcible manner the dangers to which purchasers of small plots of land are exposed.

In this case a piece of land of about four acres has been subdivided into numerous parcels, which have been purchased, for small sums of money, by various persons, many of whom are now before the Court as litigants in this very expensive and elaborate litigation. Such purchasers are exposed to this difficulty, that they must either expend a large sum of money in investigating the title, according to the regular forms of conveyancing, or they

FRY, J.

1882

KETTLEWELL
*v.*
WATSON.

(1) 16 Sim. 547.          (3) 45 L. J. (Ch.) 43 ; 46 L. J. (Ch.) 48.
(2) 28 Beav. 59.          (4) Law Rep. 7 H. L. 135.
          (5) 13th Ed. p. 620.

FRY, J.
1882
KETTLEWELL v. WATSON.

must run the risk (which they might even not escape by that investigation) of finding themselves involved in a very heavy litigation. I cannot help making this observation having regard to the nature of the present case, but, of course, it does not in any way assist the determination of the numerous questions which have been argued before me. [His Lordship stated the facts, and continued:—]

The vendors, in my judgment, had a lien for the £1500, which was protected by the retention of the deed by Mr. *Dibb* their solicitor. It has been strenuously argued before me that they have lost that lien, and numerous are the arguments which have been adduced to support that contention.

In the first place, it is said that they have lost it, or are not entitled to enforce it, by reason of the *Registration Act* which applies to the West Riding of *Yorkshire,* in which this estate is situated. That Act, as we all know, requires the registration of every deed and will relating to land within the West Riding, and it declares that an unregistered deed shall be adjudged fraudulent and void against any subsequent purchaser or mortgagee for valuable consideration. It has been said that, whenever land is in a register county, and whenever a vendor could evidence his lien or equitable mortgage by writing, he is bound so to do, and that, if he does not do so, he loses his lien or equitable mortgage as against every person who puts his deed on the register. I cannot come to any such conclusion. The Act is plain. It does not apply to those interests in land which, as I think very unfortunately, Courts of Equity have allowed to be created without writing. It applies in terms only to deeds and wills. It has been held, by parity of reasoning, to apply to writings, but more than fifty years ago it was determined in the case of *Sumpter* v. *Cooper* (1) that it did not apply to an equitable mortgage created by deposit only. That case has, I believe, governed a great number of very large transactions, and, so far as my knowledge and belief go, it has always been considered to be the law, and I find that in a text-book so much used as Mr. *Dart's* book on Vendors and Purchasers the law is laid down as perfectly plain on the authority of that case. I cannot, therefore, shake what I believe to be the

(1) 2 B. & Ad. 223.

established law by any view of my own as to what may be ex-  FRY, J.
pedient.                                                    1882

Then it was contended that an agreement was entered into  KETTLEWELL
between the parties which extinguished the lien. It is enough   v.
for me to say that there is no evidence of such an agreement. It  WATSON.
might be added that, even if the agreement were proved, the De-
fendants would be in no better position than they are, because
that agreement for a deposit would take exactly the same place
as the equitable lien.

Then it is said that, by the course of dealing of the Plaintiffs,
and what has been called their lying by, they have lost their right
to enforce this lien. It appears that Mr. *Denison*, one of the
Plaintiffs, frequently passed one end of the land, and he may have
seen that building was going on upon it. It does not, however,
appear that he knew whether the buildings were on this particular
piece of land or on the neighbouring land, and there is really
nothing whatever to shew that the vendors knew that persons
were building on this land, and still less to shew that they knew
that persons were building on the land on the faith of the vendors'
lien not being enforced. Of course it might be that these persons
had taken an indemnity against the payment of the vendors' lien.

It is further said that the execution and registration of the con-
veyance to *Richardson & Watson* either put an end to the vendors'
lien or require that it should be postponed. The execution of the
conveyance, with a receipt for the whole purchase-money indorsed
on it, would, if the deed had been given up to the purchasers so as
to enable them to shew a clear title, have been a most material
and conclusive circumstance in favour of postponing the lien.
But the deed was not given up; it was retained by the vendors,
and no person could see the receipt, or the acknowledgment con-
tained in the body of the deed, without going to the office of Mr.
*Dibb*, who was the solicitor of the vendors, not of the purchasers,
and the fact that it was in his custody must have put any one who
asked for the deed on inquiry, to say the least. The registration
of the deed is not notice to all the world of the receipt of the
purchase-money, because the memorandum registered does not
state the receipt for the purchase-money, and therefore it appears
to me that it cannot interfere with the right of the vendors to

FRY, J.

1882

KETTLEWELL
v.
WATSON.

the lien which was created by the mere fact of the non-payment of the money.

Upon the whole I have no hesitation in coming to the conclusion that the Plaintiffs have not in any way lost their lien by any of the circumstances which have been relied upon.

. In this case it is asserted that the registered conveyances of the Defendants give them a good title as against the vendor's lien, which is not registered. It is not a contest between two instruments both capable of registration. That must be borne in mind throughout the whole case. The case really turns on the subtle and difficult doctrine of constructive notice. Of actual notice there is now no suggestion.

The constructive notice which is alleged is of two kinds. There is the notice through an agent, which Lord *Chelmsford* has called imputed notice. That is one kind of notice which has been relied on. The other is that which Lord *Chelmsford* thought would more properly be called constructive notice—I mean that kind of notice which the Courts have inferred against a person from his wilfully abstaining from making inquiry or inspecting documents. In the present case I have to apply the doctrine of constructive notice to a great number of transactions, under somewhat varying circumstances, and it appears to me, therefore, desirable to state what I conceive to be the principle of law applicable to constructive notice. The ground upon which the Courts have relieved against registered conveyances, or even against a prior legal title, seems to me to be fraud. The Court will not allow a man to avail himself of a legal estate which he has recovered, or of the right which he may have under a registered conveyance, when he, at the time he took the legal estate, or at the time of the registration of the conveyance, knew a fact which made it unconscionable for him to take the legal estate or to effect the registration. That unconscionable act requires, of course, the coincidence in the same person of the knowledge and of the act, because, if *A.* knows a thing, and *B.* does something inconsistent with *A.'s* knowledge, there is nothing fraudulent in the act; but, if *A.* knows something which renders it unconscionable for him to do the act, and he does it, then there is fraud. The fraud may be in an agent, he both knowing the fact and doing the act, in which case it may be

unlawful for the principal to avail himself of the fraudulent act FRY, J.
of his agent; or the fraud may be in the principal himself. The 1882
first question then which arises is, did the principal know of the KETTLEWELL
charge? If he did not, had he an agent who knew of the charge? v.
Then the next question is, was it the agent's duty to communicate WATSON.
that fact to the principal? If it was, the Court always holds that
he did communicate it, not because, in many cases, he did in fact
communicate it, but because, as I understand it, it would be too
dangerous to inquire whether the communication was really made;
it would open the door to perjury. Having found then that the
agent both knew the fact and communicated it to his principal,
the next step is to inquire whether the principal did an act which
was unconscientious, having regard to the knowledge which the
Court so imputes to him? That these are the principles on which
the Court has proceeded appears to me plain from the great case
of *Le Neve* v. *Le Neve* (1), in which Lord *Hardwicke* so lucidly
explained the principles on which he proceeded. He said (2):
"Consider, therefore, what is the ground of all this, and particu-
larly of those cases which went on the foundation of notice to the
agent. The ground of it is plainly this: that the taking of a
legal estate after notice of a prior right makes a person a *malâ
fide* purchaser; and not, that he is not a purchaser for a valuable
consideration in every other respect. This is a species of fraud,
and *dolus malus* itself; for he knew the first purchaser had the
clear right of the estate, and, after knowing that, he takes away
the right of another person by getting the legal estate." Then,
after referring to the definition of *dolus malus* in the civil law, he
says: "Now, if a person does not stop his hand, but gets the
legal estate when he knew the right was in another, *machinatur
ad circumveniendum*." Then he says (3): "Fraud or *mala fides*,
therefore, is the true ground on which the Court is governed in
the cases of notice, and it is a consequence of the decision of the
former question that notice to the agent is sufficient; for, if the
ground is the fraud or *mala fides* of the party, then it is all one
whether by the party himself or his agent; still it is a *machinatio
ad circumveniendum*." The Court, therefore, receives evidence of

(1) Amb. 436.            (2) Amb. 446.
(3) Amb. 447.

CHANCERY DIVISION.                  [VOL. XXI.

FRY, J.   the agency, and it receives evidence of the act of the principal,
1882   but it will not receive evidence whether the agent recollected the
KETTLEWELL  fact at the time or whether he communicated it to his principal.
*v.*   It deals with those matters by way of irrebuttable presumption
WATSON.  when the circumstances are known.

The kind of notice I have endeavoured to describe is that
which Lord *Chelmsford* called imputed notice. What is the
principle which applies to the other kind of notice with which I
am concerned in this case? I mean the notice said to be derived
from the wilful shutting of the eyes to documents or to facts.
That appears to me to rest really on the same principle, viz., that,
if you see a man behaving in a way which shews that he desires
to avoid knowing something, or having the knowledge of it
brought home to him, then you conclude that he knew enough to
make him desire not to have evidence of knowledge against him,
and, therefore, it has been said that there may be negligence
which amounts to fraud. That language has always seemed to
me not strictly accurate. What a man does through negligence
he does not do from a fraudulent motive. Fraud imports design
and purpose; negligence imports that you are acting carelessly
and without that design. But what is meant is this—that conduct
which might be negligent, or which might be attributable to negli-
gence, is really attributable to a design not to know any more,
and *is*, therefore, an indication that you knew that of which you
desired to avoid the evidence. I am perfectly aware that various
Judges have expressed this principle in various ways, and that it
is impossible to reduce to exact uniformity the principles which
they have laid down, but it appears to me that the more recent
authorities have gone back again to the true principle on which all
these cases have proceeded. Thus in *Ratcliffe* v. *Barnard* (1),
Lord Justice *James* referred to negligence of this sort as "wilful
negligence which leads the Court to conclude that the person is an
accomplice in the fraud." And in *Agra Bank* v. *Barry* (2) Lord
*Selborne*, in addressing the House of Lords, said (3) that the negli-
gence or omission to inquire after title deeds "may be evidence, if
it is not explained, of a design inconsistent with *bonâ fide* dealing,

(1) Law Rep. 6 Ch. 652, 654.    (2) Law Rep. 7 H. L. 135.
(3) Law Rep. 7 H. L. 157.

VOL. XXI.]              CHANCERY DIVISION.                    707

to avoid knowledge of the true state of the title." In other words,    FRY, J.
what you require is, evidence shewing a desire or fixed purpose to    1882
avoid knowing more.                                  KETTLEWELL

    There is another principle which undoubtedly is well established,    WATSON.
and is an exception from the doctrine of imputed notice, that
which is familiarly known by reference to the case of *Kennedy* v.
*Green* (1). There it was held that the presumption, which arises
from the duty of the agent to communicate what he knows to his
principal, may be repelled by shewing that, whilst he was acting as
agent, he was also acting in another character, viz., as a party to
a scheme or design of fraud, and that the knowledge which he at-
tained was attained by him in the latter character, and that there-
fore there is no ground on which you can presume that the duty
of an agent was performed by the person who filled that double
character. That I understand to be the principle of that class of
cases.

    Lastly, it appears to me plain that a *bonâ fide* purchaser for
value without notice may deal as he will with the estate which he
has acquired, that he has a right to have the whole world as pur-
chasers from him, and that he has a right, therefore, to convey,
even to a person cognizant of the infirmity of his title, any legal
or equitable interest which he has acquired, and that any person
who has acquired any legal or equitable interest under such a
purchaser is able to resist the claim of the Plaintiffs.

    I must now endeavour to apply these principles to the circum-
stances of each particular set of Defendants, the circumstances in
each case being different.

    The first Defendant is *William Watson*. He purchased a small
lot, which was conveyed to him by a deed of the 16th of January,
1873. He employed *Richardson & Watson* more or less as his
agents. His own evidence was of a vague and general descrip-
tion, and, if it had stood alone, would, I think, have imported the
employment of those persons as his general agents in the matter.
But, when I refer to the letters which passed at the time, as
well as to the statements made by him in his answer to interro-
gatories, I have come to the conclusion that his employment of
*Richardson & Watson* was only to prepare the conveyance to him,

                  (1) 3 My. & K. 699.

3635-jpm    Doc 173-3    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C pa
Pg 171 of 903

708    CHANCERY DIVISION.    [VOL. XXI.

FRY, J.
1882
KETTLEWELL
*v.*
WATSON.

and that they were not general agents as was the case in *Brother-ton* v. *Hatt* (1). *Richardson & Watson*, therefore, were not under any obligation from that mere agency to disclose the vendor's lien to *William Watson.*

It is then said that *Asling* was employed as solicitor, and that he knew of the Plaintiff's lien. The only evidence given of his knowledge is a letter of his dated the 10th of January, I think, which appears to me ambiguous. It does not conclusively shew that *Asling* was aware that any claim was made in respect of the lien; and it is consistent with his entertaining the idea that no lien was claimed, although he may have thought it might have been claimed. Therefore I cannot fix *William Watson* with imputed notice.

Then the next question is, was *William Watson's* own conduct such as to be evidence of fraud on the ground of his negligence? He and his father bought a small plot of land, for which they jointly paid the sum of £42. *Richardson & Watson*, from whom they bought, were persons of good position at that time as land agents in the town of *Leeds*. Their purchase had been made from the charity trustees, who had held this land for a long number of years. The costs of an investigation of the title would have been so onerous, as, no doubt, to have made the purchase impossible. I ask whether, under these circumstances, I can consider that *William Watson* shut his eyes with the view of not receiving notice of any prior charge? I cannot come to such a conclusion. As Lord *Selborne* said in *Agra Bank* v. *Barry* (2), the whole of the circumstances of each particular case must be attended to, and, looking at all the circumstances of this case, I cannot infer that *William Watson* had any fraudulent design, and I therefore dismiss the action as against him, and of course I dismiss it with costs.

With regard to *Diana Watson*, the representative of *Timothy Watson*, the same observations apply. I am not able to find any substantial difference between the two cases, and consequently I dismiss the action with costs against *Diana Watson*.

*Eliza Ainley* is the next Defendant. She is a mortgagee of *William Watson* and also of *Timothy Watson*, and, as I have

(1) 2 Vern. 574.    (2) Law Rep. 7 H. L. 135.

determined that they acquired the legal estate for value without
notice, it follows that they could give a good title to her. Con-
sequently, she is entitled to have the action dismissed against
her, with costs.

FRY, J.

1882

KETTLEWELL
v.
WATSON.

The next Defendant is *James Padgett*. He is a mortgagee of
two plots which were bought from *Richardson & Watson* by
*Holroyd*, who was a clerk in their office. It has not been shewn
that he had in fact any notice of the Plaintiffs' lien, but it has
been shewn that he was a volunteer, and that he was not therefore
a purchaser for value without notice.

The next inquiry is, whether *James Padgett* had or had not
notice of the Plaintiffs' lien, and that question in his case turns
upon his own statement in his answer to the Plaintiffs' interroga-
tories as to his employment of *Richardson & Watson*. His
statement, I am bound to say, appears to me to amount to a
general employment of *Richardson & Watson* to do all that they
ought to do to protect him. I am unable to say that it is a mere
employment to draw a particular conveyance. It seems to me it
is not distinguishable from the employment of the scriveners in
*Brotherton* v. *Hatt* (1), where it was held that ·they were not
merely persons employed to prepare the conveyance, but were
in the position of general agents. I think this was a general
agency in respect of the matter in hand, which made it the duty
of *Richardson & Watson* to communicate the lien to *Padgett*, and
they must be taken to have communicated it to him. The conse-
quence is that, in respect of this mortgage, *James Padgett* is a
purchaser with notice, and, as he did not buy from a purchaser for
value without notice, he is affected with notice of the lien.

With regard to *James Padgett* as a mortgagee of *Gallon*, the
circumstances are the same, with this difference, that whereas in
*Holroyd's* case it was proved by the Plaintiffs that he was a
volunteer, it has not been proved whether *Gallon* paid the
purchase-money or not. The conveyance to him has been pro-
duced, and it contains the usual statement that the purchase-
money has been paid and the usual receipt for the purchase-
money is indorsed on it. The Plaintiffs have alleged in their
pleadings that *Gallon* had notice of their lien. They have not

(1) 2 Vern. 574.

3 A 2                                          1

FRY, J.
1882
KETTLEWELL
*v.*
WATSON.
——

proved it, but they say that the burden of proving that *Gallon* had no notice rests with *Padgett*. It is not, in my judgment, necessary in the present case to determine whether that would be so under ordinary circumstances. In the present instance, the Plaintiffs have taken upon themselves the burden of proving that allegation. They have made it part of their case, and in the corresponding case of *Holroyd* they have made it part of their evidence, and I am bound to say I think it would be unfair to expect the Defendants to support the burden of proof when the Plaintiffs, both by allegation and evidence, have taken the burden of proof upon themselves under exactly similar circumstances. In the present case, therefore, I hold that, the Plaintiffs not having shewn that *Gallon* was a volunteer, and a deed having been pro-duced which states that he paid his purchase-money, they have not established a case against *Padgett* in respect of his mortgage from *Gallon*. In respect of that mortgage he is indeed a pur-chaser with notice, but he purchased from a *bonâ fide* purchaser for value without notice. Therefore the action must be dismissed against him with costs, so far as it relates to that mortgage.

I now come to the case of *Jane Hartley Carr*. She claims under two titles. She took in April, 1874, a conveyance of the equity of redemption in two plots from *Holroyd*, subject to the mortgage to *Padgett* to which I have just referred. She also took a conveyance from *Hatherley* of the equity of redemption of a plot which was in mortgage to *Alfred Law* and others. The first inquiry is, Had *Jane Hartley Carr* notice of the lien? She is in exactly the same position as *Padgett* with regard to that. She states, as he does, that she left the matter in the hands of *Richardson & Watson*, and, in my judgment, they were bound to communicate to her the existence of the lien, and they must be taken to have communicated it to her. She is therefore a purchaser with notice. She cannot protect herself by *Holroyd's* conveyance, because he is shewn to have been a volunteer, and, therefore, not a *bonâ fide* purchaser for value without notice.

With regard to her purchase from *Hatherley* the matter stands in this way. He is in exactly the same position as *Gallon*, and I hold that, considering the course the Plaintiffs have pursued, the burden of proving that *Hatherley* was a volunteer has been

VOL. XXI.]          CHANCERY DIVISION.                    711

assumed by them and not discharged. So far, therefore, as the    FRY, J.
Plaintiffs seek relief against *Jane Hartley Carr* in respect of the    1882
equity of redemption which she bought from *Hatherley*, I dismiss   KETTLEWELL
the action with costs.                                    *v.*
                                             WATSON.

The next group of Defendants consists of *Elizabeth Eastwood,*
*Lewis Alexander Shepherd,* and *Charles Henry Marriott,* who are
the devisees of *William Eastwood.* He was a mortgagee from
*Holroyd* under a deed of the 13th of February, 1874. There is
no evidence that *William Eastwood* employed *Richardson &*
*Watson* in any manner, or that he employed *Asling,* or *Bladen,* or
any other solicitor, and therefore no notice can be imputed to him.
The only question which has been raised is, whether the circum-
stances are such as to compel me to conclude that he had con-
structive notice by reason of his own negligence. I really know
nothing about the circumstances of his purchase, except the mere
fact that it was made, and I cannot therefore say that it is proved
to my satisfaction that he ought to be fixed with notice as
having been an accomplice in the fraud. I therefore dismiss the
action against his devisees, with costs.

I come next to the Defendants *Roberts, Wylde,* and *Richardson,*
who are the devisees of *Joseph Roberts.* On the 2nd of September,
1874, *Holroyd* conveyed the equity of redemption to him, subject
to the mortgage to *William Eastwood* to which I have already re-
ferred. Now *Holroyd* was not a purchaser for value without notice,
and he conveyed to *Roberts.* *Joseph Roberts,* therefore, in my judg-
ment, took only such equitable interest as *Holroyd* could convey.
That appears to me to be the result of the decision in *Phillips* v.
*Phillips* (1), which, I may observe in passing, does not apply to
the case of a purchase from a *bonâ fide* purchaser for value without
notice. *Holroyd* was not a *bonâ fide* purchaser for value without
notice. The equity, therefore, which *Joseph Roberts* took from
him was merely such as *Holroyd* had, and the only inquiry which
remains to be answered is this, Is there anything to displace the
priority of the Plaintiffs' equity ? With that question I have
already to some extent dealt, and it appears to me that there is
not. The retention by the Plaintiffs of the conveyance to *Richard-*
*son & Watson* makes the case exceedingly different from *Rice* v.

(1) 4 D. F. & J. 208.

FRY, J.

1882

KETTLEWELL
v.
WATSON.

*Rice* (1), in which the vendor gave up the deed to the purchaser, and, as I have already observed, the register contains no indication that the purchase-money was not paid. The Plaintiffs, therefore, did not arm *Richardson & Watson* with any instrument by which they could commit a fraud by representing that the vendor's lien for unpaid purchase-money had been satisfied. I see no ground for giving the Defendants' equity priority over that of the Plaintiffs, which is prior in date. I therefore pronounce judgment in favour of the Plaintiffs in respect of the interest of these three Defendants.

The next Defendant is *Jane Ainley*. On the 31st of December, 1874, *Hatherley* mortgaged to her. *Hatherley*, as I have already observed, is not shewn to have been a volunteer. *Jane Ainley* herself had notice, but, taking as she does from a person who, for the reasons which I have already given, I must hold to have been a purchaser for value without notice, I must dismiss the action as against her.

I now come to the case of the *Midland Banking Company*. They hold three securities which, for some purposes, seem to me to stand in different positions. The first two are securities of the 15th of March, 1878, by which *Taylor*, who was an original purchaser from *Richardson & Watson*, created second mortgages in favour of the bank, the first mortgagees having no notice of the Plaintiffs' lien. I will deal with those two securities first. It is not shewn, in my judgment, that *Taylor* had any notice. It does not appear that *Bladen* acted for him, and I cannot come to the conclusion that he had either constructive or actual notice. Therefore, with regard to those two mortgages, the bank claim an equitable interest under a person whom I hold to be a *bonâ fide* purchaser for value without notice, and the Plaintiffs can claim no relief as regards those mortgages. The other security is on a plot the equity of redemption of which had been sold by *Hatherley* to *Taylor*, and *Taylor* mortgaged that equity of redemption to the bank. There, in the same way, it not being shewn that *Hatherley* was not a purchaser for value without notice, I must hold that the bank have acquired a good title under him. The cases differ only in this, that the bank take immediately from the original purchaser in the one case, and derivatively in the other.

(1) 2 Drew. 73.

Lastly, I come to the case of the Defendant *Chippendale*. He took a conveyance in 1877 from *Richardson & Watson*, and he authorized them to employ their solicitor to prepare the deed. Their authority did not go beyond that. It is like the case of *William Watson*, with which I have already dealt. The solicitor himself seems to have conceived that he had only the duty of preparing the conveyance, and it is plain from his evidence that he had no knowledge whatever about the lien. The only inquiry, therefore, is, whether I am bound to hold that there was constructive notice by reason of the negligence of the solicitor. When I look at the fact that the title had been investigated by a large number of solicitors in *Leeds*, that it was a very small purchase, and that the interest of the client was really but small in the matter, I cannot come to the conclusion that Mr. *Malcolm*, the solicitor, shut his eyes for the purpose of committing a fraud.

I believe I have now decided all the cases. With regard to the costs, I can only add the Plaintiffs' costs to their security as against those persons against whom I have given relief. As against the others I dismiss the action with costs.

*Bunting* :—Does your Lordship think that in a case of this kind where there has been evidence with regard to ten different cases, the whole of the Plaintiffs' costs of the action ought to be charged against the two or three Defendants against whom they succeed? In three cases only out of ten your Lordship has found that the Defendants are liable. Are we to pay the costs of the evidence against the other Defendants which does not affect us? There is only the pleading as regards us, there is no evidence against us. I submit that the Plaintiffs' costs should be limited to those costs which have been incurred as regards the Defendants who are found liable.

*Fry*, J. :—My impression is that the taxing-master would in a case of this sort consider what part of the evidence was relative to your case.

*Bunting* :—I thought it required a special direction from your Lordship.

FRY, J.

1882

KETTLEWELL
v.
WATSON.

**714**                                    CHANCERY DIVISION.                    [VOL. XXI.

FRY, J.

1882

KETTLEWELL
*v.*
WATSON.

FRY, J. :—I think the taxing-master would consider it; at any rate I think he ought to do so.

*Bunting* :—I understand your Lordship's decision to proceed on one point which you have not touched in your judgment. I think your Lordship has assumed that the Plaintiffs' claim cannot be limited by reason of their having released some of the plots from it, unless it could be proved that their solicitor had notice, when he consented to the release, that the rest of the land had passed into the hands of other persons than *Richardson & Watson.*

FRY, J. :—Yes, I intended to say that. The argument put forward was this, that there had been a release of the Plaintiffs' lien by their giving it up in certain cases. I can conceive that if a person who was entitled to a lien upon properties, which he knew to belong to *A., B., C.,* and *D.,* released the lien to *A.,* he could not afterwards insist upon it as against *B., C.,* and *D.,* because he would, without their privity and consent, be increasing the burden on them. But it appears to me that, in order to raise such an equity, you must shew that he knew that the estate, which had originally been in one person, had got into the hands of various persons. No such evidence has been adduced in the present case.

Feb. 1. The case was on this day, by the direction of the Court, again placed in the paper, when

FRY, J., said :—

After I left the Court the day before yesterday it occurred to me that there was one point in the argument to which I had not sufficiently referred in my judgment. I mean the argument that the doctrine of *Kennedy* v. *Green* (1) applied, and that *Richardson & Watson* were parties to such a scheme of fraud as to repel the presumption of their communicating the Plaintiffs' lien to those persons who employed them. It was pressed upon me that there was a course of dealing by them which led to the suppression of their knowledge of the lien, that they persuaded the various purchasers to employ their solicitors, and that they themselves

(1) 3 My. & K. 699.

executed conveyances containing a covenant that the land was
free from incumbrances.

With regard to the last point it must be borne in mind that
*Richardson & Watson* were not solicitors, and, although it was
highly improper for them to enter into such a covenant while the
lien existed, yet it was not fraudulent if they at the same time
communicated the existence of the lien to the purchasers. And
that is the very point under inquiry.

With regard to the argument that they had a scheme for pre-
venting the disclosure of the lien, I cannot come to that conclusion
for this reason, that, although in many cases the purchasers
employed them as their general agents, in other cases the pur-
chasers did not, and *Richardson & Watson* appear to have made
no objection to the employment of independent solicitors whenever
the purchasers wished it. In several cases the independent solici-
tors obtained knowledge of the lien, and *Richardson & Watson* had
no difficulty in making arrangements with the Plaintiffs by which
the lien was in effect released. That being so, I cannot conclude
that *Richardson* and *Watson* were engaged in a scheme of fraud,
and, therefore, in my opinion the doctrine of *Kennedy* v. *Green* (1)
does not apply. I thought it right to refer to the argument on
this point, but it does not vary my order.

Solicitors for the Plaintiffs: *Paterson, Snow, & Bloxam,* agents
for *Dibb, Atkinson, & Braithwaite, Leeds.*

Solicitors for the Defendants: *Ridsdale, Craddock, & Ridsdale,*
agents for *G. Crumbie, York ; Layton & Jaques,* agents for *Schole-*
*field & Son, Dewsbury ; J. W. Hickin,* agent for *Lodge & Rhodes,*
*Leeds ; Ashurst, Morris, & Co.,* agents for *Bond & Barwick, Leeds ;*
*Torr, Janeways, & Co.,* agents for *Bulmer & Lawson, Leeds.*

(1) 3 My. & K. 699.

W. L. C.

FRY, J.

1882

KETTLEWELL
*v.*
WATSON.

TAB 31

*Kingate Global Fund Ltd v Kingate Management Ltd*
[2015] (Bda) 65 Com

2015] SC (Bda) 65 Com ( 25 September 2015)



# In The Supreme Court of Bermuda

## CIVIL JURISDICTION
## COMMERCIAL LIST
## 2010: No. 454

BETWEEN:-

    (1) KINGATE GLOBAL FUND LIMITED (In Liquidation)
    (2) KINGATE EURO FUND LIMITED (In Liquidation)

**Plaintiffs**

-and-

    (1) KINGATE MANAGEMENT LIMITED
    (2) FIM LIMITED
    (3) FIM ADVISERS LLP
    (4) FIRST PENINSULA TRUSTEES LIMITED
      (as Trustee of the Ashby Trust)
    (5) PORT OF HERCULES TRUSTEES LIMITED
      (as Trustee of the El Prela Trust)
    (6) ASHBY HOLDING SERVICES LIMITED
    (7) EL PRELA GROUP HOLDING SERVICES LIMITED
    (8) MR CARLO GROSSO
    (9) MR FEDERICO CERETTI
    (10) ASHBY INVESTMENT SERVICES LIMITED
    (11) EL PRELA TRADING INVESTMENTS LIMITED
    (12) ALPINE TRUSTEES LIMITED

**Defendants**

<u>**JUDGMENT ON PRELIMINARY ISSUES**</u>

**(In Court)**

Date of hearing: 11th – 15th and 18th – 19th May 2015[1]

Date of judgment:  25th September, 2015

Mr Adrian Beltrami QC and Mr Alex Potts, Sedgwick Chudleigh Ltd, for the
  Plaintiffs

Mr Saul Froomkin QC and Ms Venous Memari, Liberty Law Chambers Limited,
  for the First Defendant

Mr Thomas Lowe QC and Ms Sarah-Jane Hurrion, Hurrion & Associates Ltd, for
  the Second, Third, Eighth and Ninth Defendants

Mr Alan Boyle QC and Ms Katie Tornari, Marshall Diel & Myers Limited, for the
  Fourth to Seventh and Tenth to Twelfth Defendants

### Overview

1.    As this is quite a long judgment, it may assist the reader if I set out the
  different sections in a table of contents.   References in brackets are to
  paragraph numbers.  All the parties have met with some measure of success,
  albeit the Defendants more so than the Plaintiffs.

(1)    Introduction (2 – 3)
(2)    The parties (4 – 11)
(3)    The Funds' pleaded claims (12 – 21)
(4)    The preliminary issues (22 – 24)
(5)    The contractual framework (25 – 74)

---

[1] The Court invited supplemental written submissions, which were received on or before 28th August 2015, on two
authorities about which it had not been addressed in the course of argument: <u>Arnold</u> v <u>Britton</u> [2015] 2 WLR 1593
and <u>R (Al-Skeini)</u> v <u>Defence Secretary</u> [2007] QB 140.

       (i)   Articles of Association (30 – 42)

       (ii)  Information Memoranda (43 – 52)

       (iii) Administration Agreements (53 – 60)

       (iv) Manager Agreements (61 – 74)

(6)     Issue (1)(b) (75 – 116)

(7)     Issue (1)(a) (117 – 126)

(8)     Issue (2) (127)

(9)     Issue (3) (128 – 134)

(10)   Issue (4) (135)

(11)   Issue (5) (136 – 142)

(12)   Issue (6) 143 – 152)

(13)   Issue (7) (153 – 175)

(14)   Summary (176 – 178).

## Introduction

2.     This is a ruling on the trial of a number of preliminary issues.  They are all concerned with whether management fees ("the Disputed Fees") paid to the First Defendant ("KML") by the Plaintiffs ("Kingate Global" and "Kingate Euro", together "the Funds") under various management agreements ("the Manager Agreements") were contractually due to KML and, if so, whether the Funds are precluded from asserting a claim in unjust enrichment against KML and the various Defendants to whom the fees received by KML or their proceeds have been distributed.

3.     Applications for the trial of these preliminary issues were prompted by the decision of the Privy Council in <u>Fairfield Sentry Ltd</u> v <u>Migani & Ors</u> [2014] 1 CLC 611; [2014] UKPC 9 ("<u>Fairfield</u>").  The applications have been brought by the Trust Defendants (as defined below) and KML respectively.

## The parties

4.     The Funds were investment companies incorporated in the British Virgin Islands ("BVI").  Kingate Global was incorporated on 11th February 1994

3

and Kingate Euro on 19th April 2000. They were established as open-ended investment funds issuing non-participating, redeemable shares offered for subscription by means of information memoranda. Over time, they became "feeder funds" to Bernard L Madoff Investment Securities LLC ("BLMIS"), an investment company established and operated by the notorious fraudster Bernard L Madoff which acted as the Funds' investment adviser. The vast majority of monies raised by the Funds were transferred to BLMIS for investment on the Funds' behalf. In fact Mr Madoff was running a Ponzi scheme and none of the monies were invested. Upon Mr Madoff's arrest in December 2008 the Funds collapsed and were placed in liquidation in the BVI and Bermuda.

5.   Kingate Global commenced operations on 1st March 1994. There was a single class of shares, called Common Shares. On 1st March 1995 Kingate Global was recapitalised. It renamed the Common Shares as Class A Common Shares ("Class A Shares") and introduced a new class of shares called Class B Common Shares ("Class B Shares"). On 1st December 1995 the Fund introduced a further class of shares called DM Class Common Shares ("DM Shares"). Kingate Global redeemed the Class A Shares in 1997 and cancelled that share class designation in 1998, although Class B Shares continued to be named as such. On 1st January 1999 the DM Shares were renamed as Euro Class Shares and from 1st May 2000 the Class B Shares were renamed as US Dollar Shares. In around 2000 the DM Shares were "hived down" into Kingate Euro, ie shareholders of Kingate Global were given equal numbers of shares in Kingate Euro and the assets allocated to the DM Shares were transferred to Kingate Euro.

6.   KML is a company incorporated in Bermuda which at all material times acted as Manager or Co-Manager of the Funds. Under the Manager Agreements, and unless it had been grossly negligent, KML was entitled to monthly management fees. Their amount was to be calculated by the relevant Fund's Administrator ("the Administrator") by reference to the month end net asset value ("NAV") of the Fund and class of shares to which the fees related. The successive Administrators were all independent

4

financial services companies.  These calculations served a dual purpose, as they were also used to determine the subscription and redemption prices paid to the Fund by incoming investors and by the Fund to outgoing investors. As appears below, in the absence of bad faith or manifest error the calculations carried out by the Administrator were final and binding as between the Funds and the investors.  An important issue for determination by the Court is whether they were also final and binding as between the Funds and KML.

7.  The Second and Third Defendants ("FIM Ltd" and "FIM Advisers", together "FIM") are respectively a company and a limited liability partnership, both incorporated in England and Wales.  The Plaintiff alleges that at all material times until July 2005 FIM Ltd acted as a consultant to KML and the Funds, and that FIM Advisers acted in that capacity at all material times since July 2005.  FIM dispute this.

8.  The Eighth and Ninth Defendants ("Mr Grosso" and "Mr Ceretti") were at all material times directors of FIM Ltd and principals of FIM Advisers.  In this judgment I shall refer to the Second, Third, Eighth and Ninth Defendants collectively as "the FIM Defendants".

9.  The Fourth Defendant ("Ashby") is trustee of the Ashby Trust, of which Mr Grosso is a discretionary beneficiary, and the owner of the Sixth Defendant ("Ashby Holding Services").  The Fifth Defendant ("El Prela") is trustee of the El Prela Trust, of which Mr Ceretti is a discretionary beneficiary, and the owner of the Seventh Defendant ("El Prela Group Holding").

10.  The Twelfth Defendant ("Alpine Trustees") is a former trustee of the El Prela Trust.  The Tenth and Eleventh Defendants ("Ashby Investment Services" and "El Prela Trading Investments") are investment companies wholly owned by Ashby and El Prela respectively.

11.  KML has at all material times been owned beneficially by Ashby and El Prela.  At present, Ashby holds half of the issued share capital in KML indirectly through Ashby Holding Services and El Prela holds the other half

5

indirectly through El Prela Group Holding.  In this judgment I shall refer to the Fourth to Seventh and Tenth to Twelfth Defendants collectively as "the Trust Defendants".

### The Funds' pleaded claims

12.   The Funds have brought various non-fault based claims against the Defendants.  It is with these that this Ruling is directly concerned.  In the "Summary" section at the start of their Statement of Claim[2] they are summarised as follows:

"*16   In addition, from their establishment until November 2008, the Funds paid [KML] hundreds of millions of US dollars in fees.  The fees were calculated by reference to the Funds' net asset values.  Because of Mr Madoff's fraud, at all material times, the Funds' only significant asset was their money at the bank.  Accordingly, the Funds' net asset values were massively overstated, and the fees mistakenly overpaid.*

*17   The Funds' claim is:*

*17.1   in unjust enrichment on the ground of mistake, for the recovery of the overpaid fees from [KML] and/or [various of the Trust Defendants], as ultimate recipients of the fees, and/or Mr Grosso and Mr Ceretti, as ultimate recipients of the fees and/or ultimate beneficial owners of the shares in [KML];*

*17.2   alternatively, for orders based on the Funds' retention of legal title to the overpaid fees and/or their traceable proceeds;*

*17.3   alternatively, for declarations that [KML] and/or [various of the Trust Defendants] and/or Mr Grosso and Mr Ceretti hold the overpaid fees, together with their traceable proceeds, on trust for the Funds; ...*"

13.   The Trust Defendants, supported by the other Defendants, say that they have a complete defence to these claims, namely that KML was contractually entitled to all the management fees that it was paid as those fees were calculated by the Administrator.

---

[2] Or more accurately, the Re-Re-Re-Amended Statement of Claim, but that is a bit of a mouthful.

14.    The Funds have addressed this defence in their Reply[3] to the Trust Defendants' Defence.  Eg, they plead at para 15 that the Administrator made a manifest error in the calculation of the NAV in that:

"*15.1   it failed to verify the figures provided by BLMIS for the purpose of calculating the NAV; and/or*

*15.2   it ignored inconsistencies in the figures provided by BLMIS; and/or*

*15.3   it failed to consider and address inconsistencies in the figures provided by BLMIS adequately; and/or*

*15.4   it relied on [KML] and/or Mr Ceretti and/or Mr Grosso and/or FIM to verify the figures provided by BLMIS and/or to check the calculations of the NAV, and/or it permitted [KML] and/or Mr Ceretti and/or Mr Grosso and/or FIM to vary the calculations of the NAV, as pleaded in paragraph 18 below;*

*such that, in the premises, those determinations were not binding on the shareholders in the Funds ...*"

The Funds' case is that in those circumstances the NAV calculations are not binding as between the Funds and KML, even if, which is denied, they would have been otherwise.

15.    The Funds also plead that the NAV calculations that were carried out were not carried out by the Administrator:

"*18   Further and in any event ... the Funds' Administrator sought as a matter of settled practice [KML's] and/or FIM's and/or Mr Ceretti's and/or Mr Grosso's approval of and comments on calculations of the NAV before finalising the calculations and sending them to shareholders.  By way of example:*

*18.1   The Funds' Administrator's recorded 'MONTH END PROCEDURE' for Kingate Global provides, under the heading 'FINAL PROCEDURES':*

*'Send the final NAV to Federico [Ceretti] for approval before sending out faxes to Shareholders'.*

---

[3] As Re-Re-Re-Amended.

18.2    By fax dated 1 August 1995, Mr Ceretti indicated to Dan Voth of the Funds' Administrator that he believed the NAV for June to be wrong, and asked Mr Voth to amend the NAV accordingly.

18.3    By fax dated 4 January 1996, Dan Voth sought Mr Ceretti's approval of the 'FINAL NAV FOR CLASS A BEFORE PRICE IS PUBLISHED' on behalf of [KML]. Mr Ceretti responded on 5 January 1996, 'O.K.!!'

18.4    By fax dated 14 April 1997 addressed to Dan Voth, Mr Ceretti confirmed that the 'FINAL NAVS FOR KGF B AND DM ARE FINE'.

18.5    A memo dated 18 November 1997 prepared by Dan Voth notes that the NAV for the Class DM shares in Kingate Global had been restated for September 1997 and October 1997 due to a change in the method used for valuing forward contracts, and that Mr Ceretti had insisted that the NAV and share allocation for September subscriptions should be changed 'because it goes against his credibility as a "Hedge" fund manager'.

18.6    By email dated 1 November 2002 from the Funds' Administrator to KML, FIM's approval of the estimated NAV for the Funds was required 'before distribution to shareholders'. By email dated 4 November 2002 to KML, Mr Grosso responded that the estimates looked 'OK'.

18.7    By email dated 13 February 2008, the Funds' Administrator advised FIM of the NAV of both Funds for January 2008. Mr Ceretti responded by email dated 14 February 2008 querying the 'performance differential between the two funds', and asking the Funds' Administrator to check that forward contracts had been priced correctly.

19    In the premises, [KML] and/or FIM and/or Mr Ceretti and/or Mr Grosso had input as to and/or control over the calculations of the NAV, and accordingly those calculations were not calculations performed by the Funds' Administrator and were therefore not binding as between the Funds and Kingate Management."

16.    The Funds have supplied Voluntary Further and Better particulars of their Reply to the Trust Defendants in which they give a number of further examples of instances in which the Funds' Administrator sought KML's and/or FIM's and/or Mr Ceretti's and/or Mr Grosso's approval of and comments on calculations of the NAV before finalising the calculations and sending them to shareholders.

8

17.   In a Response to Request for Further and Better Particulars requested by the FIM Defendants, the Funds further clarified their case on control:

"*It is the Plaintiffs' case that [KML] (at least) exercised 'control over the NAV calculations' in that the Funds' Administrator sought their comments on and express approval of the NAV determinations before these were finalised and sent to the Funds' shareholders.  In such circumstances, the Plaintiffs aver that, as a matter of settled practice:*

*a.   The approval of [KML] was an absolute precondition to the finalisation of the NAV determinations and their publication.*

*b.   No NAV determination would have been finalised or published without the approval of [KML].*

*c.   KML had the power to influence the content of the NAV determinations, should it be dissatisfied with them, or to withhold its approval if it was not satisfied.*

*d.   [KML] held the power of sanction or veto over the finalisation and publication of the NAV determinations.*"

18.   The Funds have also brought various fault based claims against the Defendants. Although the Court is not presently concerned with the merits of those claims they are relevant to the determination of two of the preliminary issues.

19.   The Funds plead at para 106 of the Statement of Claim that KML, in performing and/or delegating the performance of its services under the Manager Agreements, breached its contractual and tortious duties to the Funds.  The alleged breaches, which are pleaded in some detail, focus on allegations that KML failed adequately or at all to carry out due diligence with respect to BLMIS; to monitor the investment advisory functions which it had delegated to BLMIS; or, insofar as it delegated responsibility for these tasks to FIM, to provide supervision to FIM.

20.   The Funds plead at para 107 of the Statement of Claim:

9

*"For the avoidance of doubt, and if necessary, the Funds aver that these breaches of duty, individually or collectively, amounted to 'gross negligence' by [KML], within the terms of the purported exclusionary provisions in the Manager Agreements."*

21.    The Funds plead at para 12.3.2 of the Reply to KML's Defence:[4]

*"By reason of [KML's] breaches of duty detailed in paragraphs 106 to 107 of the Amended Statement of Claim, [KML] induced the mistake which resulted in the Funds making overpayments of management fees."*

### The preliminary issues

22.    By an order dated 14th November 2014, the Court directed that there be a trial of the following preliminary issues.    The various paragraphs in the Statement of Claim and the Reply mentioned in the preliminary issues are all set out or summarised above.

(1)    (a)    Whether the NAVs were determined from time to time by the Administrator on the assumption (made for the purposes only of the Trust Defendants' and KML's Preliminary Issues Summonses) that KML, and/or FIM, and/or Mr Grosso and/or Mr Ceretti had input over the calculation of the NAV to the extent of control, on the basis pleaded at paragraphs 18 and 19 of the Reply[5];

(b)    If the answer to (a) is yes, were the Administrator's determinations of the NAV binding on the Funds for the purpose of calculating the fees due to KML pursuant to the Manager Agreements in force between the Funds and KML, in the absence of bad faith or manifest error;

[It will be more convenient to address 1(b) before considering 1(a) and that is what I propose to do.]

---

[4] As Amended.

[5] Re-Re-Re Amended Reply to the Trust Defendants' Defence

10

(2)     If the answer to issue (1)(b) is yes, whether the fees paid by the Funds to KML on the basis of those NAV figures, ie the Disputed Fees, were, in the absence of bad faith or manifest error, properly due to KML under the terms of the Manager Agreements;

(3)     If the answer to (2) is yes, and subject to issues (5) to (7), whether in consequence the Funds are precluded from asserting that the Disputed Fees, or any payments alleged by the Funds to originate from the Disputed Fees, are recoverable from: (a) KML; (b) the FIM Defendants; and (c) the Trust Defendants;

(4)     If the answer to any of issues (1) to (3) is no, whether the Defendants have a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML;

(5)     Whether the bad faith and/or manifest error of BLMIS constitutes bad faith and/or manifest error in relation to the calculation of the NAV, such that any determination of NAV made by the Administrator was not for this reason binding on the Funds and KML;

(6)     If the facts are as pleaded by the Funds at paragraph 15 of the Reply, whether the conduct of the Administrator constituted bad faith and/or manifest error for the purpose of the NAV calculations, such that any determination of NAV made by it was not for this reason binding on the Funds and KML;

(7)     If the breaches of duty pleaded at paragraphs 106 and 107 of the Statement of Claim are established, whether the Defendants are precluded from asserting a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML by reason of its inducement of the Funds' mistake.

23.     I propose to address each issue irrespective of the answers to the previous issues.  Whereas I am indebted to counsel for their detailed and careful submissions, I do not propose to address each and every point made by

11

them.  However I shall address what appear to me to be their main lines of argument.

24.   In approaching these issues I am not required to determine any issues of fact, save for inferences about the terms of the Administration Agreements and Manager Agreements in force during periods in which there are no extant executed copies.  I anticipate that any such inferences will prove non-controversial.

**The contractual framework**

25.   In order to understand the competing submissions on the Manager Agreements it is necessary to consider those Agreements in the context of other contractual documents relating to the Funds, namely the Articles of Association, the Information Memoranda published to potential investors, and the Administration Agreements.

26.   Alan Boyle QC, counsel for the Trust Defendants, with whom the other Defendants agreed on this point, submitted that these documents were the component parts of an interlocking whole, and that the Articles of Association, the Information Memoranda and the Administration Agreements formed part of the essential commercial background and matrix against which the Manager Agreements fell to be construed ("the Contractual Scheme").

27.   Adrian Beltrami QC, counsel for the Funds, while acknowledging that these documents formed part of the commercial background to the Manager Agreements, emphasised that the Manager Agreements must be construed in their own terms, and submitted that the background documents were of limited assistance in this task.

28.   The Articles of Association for both Funds were amended and restated. Each class of shares had its own Information Memorandum, which was amended and restated on a number of occasions – there were 23 different versions altogether.  Each class of shares also had its own Administration

12

Agreement and Manager Agreement, as amended from time to time. With respect to any period for which an executed copy of either or both of these Agreements for a particular class of shares has not been found, I draw the reasonable inference that during that period those shares were administered or managed on the terms *mutatis mutandis* of an Administration Agreement or Manager Agreement that was in force at the time with respect to another class of shares.

29.    When describing the contractual framework it will be helpful to start with the Articles of Association, then go on to the Information Memoranda and the Administration Agreements, and conclude with the Manager Agreements. This approach should not be taken to imply a preference for the approach of one party to the construction of these documents over that of another.

### *Articles of Association*

30.    The Articles of Association of Kingate Global were a contract between the Fund and its members. They provided for the issue (Regulations 11 – 13) and redemption (Regulations 44 – 54) of shares in the Funds at a price equal to the NAV per share. The issue price fell to be determined at the Valuation Day immediately preceding the applicable Dealing Day and the Redemption Price at the Valuation Day on which the shares were redeemed. The Dealing Day was the first Business Day of each month following the initial issuance of shares in each month, or such other day as the directors might determine by resolution. The Valuation Day was the last Business Day of each month following the initial issuance of shares in each month, or such other day as the directors might determine by resolution. The definitions of these capitalised terms were set out in Regulation 1. However no shares were to be issued (Regulation 14) or redeemed (Regulation 47) when the determination of NAV was suspended pursuant to Regulation 62. The latter Regulation provided that the directors might at any time suspend the determination of NAV, and the issue and redemption of any of the Fund's shares, during various specified extraordinary events.

13

31.    The NAV was to be determined by or under the direction of the Administrator as at each applicable Valuation Day under Regulations 55 – 64.  It was to be the fair market value at that date of all the assets of the Fund less all its liabilities (Regulation 55).  The liabilities included the fees of the Investment Adviser, the Manager and the Administrator earned but not yet paid (Regulations 55 and 56).  NAVs were to be determined by the Administrator in large part utilizing information supplied by the various advisers and managers of the Fund (Regulation 56 [1][6]).

32.    The Administrator was defined as Hemisphere Management Limited ("Hemisphere"), and any successor with whom the Fund entered into an administration agreement.  The Manager was defined as KML and any successor with whom the Fund entered into a management agreement (Regulation 1).

33.    Regulation 55 was amended in the Amended and Restated Articles of Association filed on 27th October 1995, which provided that the NAV of a class of shares, for the purpose of issuing and redeeming shares, shall be determined by or under the direction of the Administrator with the concurrence of the Directors at each applicable Valuation Day.  The definition of Class A Shares Manager remained *mutatis mutandis* the same as the definition of the Common Shares Manager, and the Class B Shares Manager was defined as KML and Tremont (Bermuda) Limited and any successor with whom the Fund entered into a management agreement (Regulation 1).

34.    If market quotations for the Fund's assets were not available or if the Administrator, in consultation with the Manager and the Investment Adviser, concluded that they were not indicative of fair value, those assets would be valued at their fair value as determined in good faith by the Administrator in consultation with the Manager and the Investment Adviser.  The Administrator could conclusively rely on fair value valuations provided by

---

[6] The numbers in square brackets do not occur in the Articles but have been included in this judgment for ease of reference.

the Manager and the Investment Adviser, and independent appraisals generally would not be obtained in these situations (Regulation 56 [2]).  The point was repeated but in broader terms and without qualification at Regulation 58:  no independent appraisals in respect of the NAVs would be required.  Regulation 58 also provided that the NAVs would be binding on all persons, ie investors and the Funds, absent bad faith or manifest error.

35.    Regulation 56 was amended in the Amended and Restated Articles of Association filed on 6th June 2000 so as to provide that where the Administrator determined that market prices or quotations did not fairly represent the value of particular assets it was authorized to assign a different value to them.  There was no longer any reference to consultation with a Manager or Investment Adviser, but there was a reference to the cost of appraisers or pricing services employed by the Fund, presumably to assist the Administrator in this task.  The statement at Regulation 58 (now Regulation 57) that there was no need for independent appraisals was dropped.  The Class B Shares Manager was renamed USD Class Manager. Manager was defined to mean the Class A Manager, the USD Class Manager, or any other person with whom the Fund entered into a Management Agreement.  Eg in relation to the DM Shares (Regulation 1).

36.    Returning to the unamended Articles, NAV was defined as the NAV of the Fund determined pursuant to the Articles (Regulation 1).  For purposes of calculation of the NAV: (i) the price of shares in the Fund for which applications had been made (net of commission etc) was deemed to be an asset of the Fund as of the time at which such shares were first deemed to be in issue (Regulation 60 (a)); and (ii) the price of shares in the Fund to be redeemed was, from the close of business on the Valuation Day on which they were redeemed until the Redemption Price was paid, deemed to be a liability of the Fund (Regulation 60(b)).  Thus the receipt of subscription monies and the payment out of redemption monies affected the calculation of NAV because they affected the amount of the Fund's assets.

37.    The NAV per share was to be an amount equal to the NAV of the Fund divided by the number of shares outstanding (Regulation 61).   For the

15

purpose of calculating such shares: (i) shares for which applications had been made under the Articles would be deemed to be in issue (ie outstanding) at the commencement of business on the relevant Dealing Day, ie the day on which they were allotted; and (ii) shares to be redeemed in accordance with the Articles would be deemed to remain in issue through the close of business on the Valuation Day on which they were actually redeemed (Regulation 64).

38.    The Articles of Association of Kingate Euro were in substantially the same terms.  The Administrator was defined as Hemisphere, and any successor with whom the Fund entered into an administration agreement.  The Manager was defined as KML and any successor with whom the Fund entered into a management agreement.  NAV was defined as the NAV of the assets belonging to the Fund or a class and/or series of shares and determined pursuant to the Articles (Regulation 1).

39.    There were provisions regarding the issue (Regulation 13) and redemption (Regulation 45) of shares for a consideration equal to the NAV at the applicable Valuation Date, and for the determination of the NAV of the shares (Regulations 55 – 60).

40.    The NAV of the shares, for the purpose of issuing and redeeming shares, was to be determined by or under the direction of the Administrator with the concurrence of the directors as at each applicable Valuation Date or such other occasion as the directors might determine.  It was the value at such date of all the assets belonging to the Fund less all its accrued debts and liabilities as calculated under the Regulations (Regulation 55).  Regulation 56 gave guidance as to how the value of all the assets and liabilities of the Fund might be determined at the discretion of the Administrator.  Eg the value of assets was to be recorded at their fair value as determined in good faith by the Administrator in the absence of current quotations or where the Administrator concluded that such quotations were not indicative of fair value (Regulation 56 (d)).  The liabilities of the Fund were to include the fees of the Manager and the Administrator earned or accrued but not yet paid (Regulation 56 (e)).

16

41.    The NAV of a share on any Valuation Date was to be calculated by dividing the NAV on that date by the total number of shares outstanding at the close of business on that date.  Shares called for redemption on a Valuation Date were to be deemed outstanding on that date whereas shares subscribed for on a Valuation Date were not to be deemed outstanding on that date (Regulation 57(b)).

42.    Any valuations made pursuant the Articles were to be binding on all persons in the absence of bad faith or manifest error (Regulation 58).  The directors might suspend the determination of the NAV of the Fund, and consequently the right of members to require the Fund to issue or redeem shares of that class, in certain specified extraordinary circumstances (Regulation 59).

### *Information Memoranda*

43.    The Information Memorandum formed part of the contract between the investor and the Fund, whether Kingate Global or Kingate Euro, because the Subscription Agreement for shares in the Fund provided that the subscription was on the terms of the relevant Information Memorandum and subject to the provisions of the Memorandum and Articles of Association of the Fund.  Thus, in the event of a discrepancy between the Information Memorandum and the Articles, the Articles would prevail.

44.    The purpose of the Memorandum was to inform potential investors about the Fund to help them decide whether they wanted to invest in it.  Taking the February 1994 Information Memorandum for the Common Shares as an example ("the February 1994 Memorandum"), it contained a Summary of key terms and concepts, and sections on the Fund, Investment Objectives, Investment Policy, Risk Factors, Management, Fees and Expenses, Shares of the Fund, Determination of NAV, Taxation and Additional Information.

45.    The section on Management explained that the Manager performed services pursuant to the Manager Agreement and summarised what they were.  It stated that the Manger received a monthly fee from the Fund calculated at an annual rate equal to 1.5% of the month-end NAV of the Fund, which was

17

generally payable as of the last Business Day of each month.  Under the Information Memoranda for Class B Shares and DM Shares, the monthly 1.5% management fee was to be divided between the Co-Managers.

46.    The section on Management also explained that pursuant to the Administration Agreement the Administrator was responsible *inter alia* for calculating, publishing or furnishing the subscription price of the shares in the Fund.

47.    The section on the Determination of NAV contained a fairly full summary of Regulations 55, 56, 58 and 61 of the Articles of Association, which dealt with this topic.  The following passages from that summary, including the guidelines to which they refer but which I have not set out, are repeated word for word in the 1994 Administration Agreements and Manager Agreements:

"*Net Asset Valuations are determined by the Administrator, in large part based upon information regarding the value of the Fund's portfolio assets provided by the Investment Advisors, as of the close of business on the last Business Day of each calendar month. The Fund generally seeks to have portfolio securities valued in accordance with the following guidelines.*

*Portfolio securities are valued at the last sale price reported on the principal securities exchange or market on which the securities are traded.  In the absence of reported sales prices on the valuation date, portfolio positions generally are valued at the last reported bid quotation in the case of securities held long and at the last reported offer quotation in the case of securities sold short.  In special circumstances in which the Administrator determines that market prices or quotations do not fairly represent the value of particular assets based on information provided by the applicable Investment Advisor, the Administrator is authorized to assign a value to such assets which differs from the market prices or quotations based on information provided by the applicable Investment Advisor.*

*Securities or other assets which are not generally marketable, including illiquid direct investments of the Fund, generally are valued at the lesser of cost or market price, and may be subject to an additional discount upon the recommendation of the Administrator. If appraisals are available, references can be made to such appraisals.  Shares of other investment funds will generally be valued at the Net Asset Value supplied by such funds, less any applicable redemption charges customarily imposed by such funds and less any*

18

*provision for non-accrued management and performance fees. The value of assets are recorded at their fair value as determined in good faith by the Administrator in the absence of current quotations or if the Administrator concludes that such quotations are not indicative of fair value by reason of illiquidity of a particular security or other factors.*

*In addition to special valuation calculations relating to illiquid securities, other special situations affecting the measurement of Net Asset Values may arise from time to time. Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio positions could have an adverse effect on the Fund's net assets if judgments regarding appropriate valuations made by the Administrator should prove incorrect. In the absence of bad faith or manifest error, the Net Asset Value calculations made by the Administrator are conclusive and binding on all shareholders.*"

48.     The section on Additional Information stated that the Information Memorandum was not intended to provide a complete description of the Fund's Memorandum or Articles of Association or the Agreements with the Manager and Administrator which the memorandum had summarised. It stated that copies of all such documents were available for inspection by shareholders and prospective investors during normal business hours at the Administrator's office in Bermuda. The 1st March 1995 version of the Information Memorandum relating to Class A Shares emphasised the point by stating that the information in the Memorandum was qualified in its entirety by the Memorandum of Association and Articles.

49.     The Information Memoranda for the other classes of shares were in substantially similar terms. They were amended and restated from time to time, eg to correspond with changes to the Articles. Presciently, under the heading "*Certain Risk Factors*" they included the warning that when the Fund invested with an Investment Adviser, the Fund did not have actual custody of the assets, and that there was therefore a risk that the assets with the Investment Advisor could be misappropriated. Subsequent versions of the Information Memoranda also warned that the information supplied by the Investment Adviser might be inaccurate or even fraudulent. See, eg, the Information Memorandum dated 1st May 2004 for Kingate Global:

19

"*Possibility of Fraud or Misappropriation*

*Neither the Fund nor the Custodian has actual custody of the assets.  Such actual custody rests with the Investment Adviser and its affiliated broker-dealer.  Therefore, there is the risk that the custodian could abscond with those assets.  There is always the risk that the assets with the Investment Advisor could be misappropriated.  In addition, information supplied by the Investment Advisor may be inaccurate or even fraudulent.  The Co-Managers are entitled to rely on such information (provided they do so in good faith) and are not required to undertake any due diligence to confirm the accuracy thereof.*"

50.   As to the calculation of NAV, on 1st May 2000 an Information Memorandum was issued for the US Dollar Shares.  The relevant part of the section headed "*Determination of Net Asset Value*" appears below and was the same or substantially the same in all subsequent Information Memoranda for US Dollar Shares.

"*Net Asset Value of the USD Shares is the market value of the Fund's total assets calculated as described below, less all accrued debts and liabilities, including (i) fees of the Co-Managers, the Administrator and the Bank earned or accrued but not yet paid, ...*

*The Administrator will determine the net asset value of the Fund's Portfolio assets attributable to the USD Shares at the close of business on the last Business Day of each calendar month. See 'CERTAIN RISK FACTORS'.  The Administrator will verify the prices attributed to the securities held by the USD Shares of the Fund by reference to pricing sources independent of the Investment Advisor whenever reasonably possible.*
. . . . .
*The value of assets are recorded at their fair value as determined in good faith by the Administrator in the absence of current quotations or if the Administrator ...determines that market prices or quotations do not fairly represent the value of particular assets, the Administrator is authorized to assign a value to such assets which differs from the market prices or quotations.  The cost of appraisers or pricing services employed [by] the Fund is an expense of the Fund and as such a charge against Net Asset Value of the USD Shares.*

*Prospective Investors should be aware that situations involving uncertainties as to the valuation of portfolio positions could have an adverse effect on the Fund's net assets if judgments regarding appropriate valuations made by the Administrator should prove incorrect.  See 'CERTAIN RISK FACTORS'.  In the absence of bad faith or manifest error, the Net Asset Value calculations of the USD Shares made by the Administrator are conclusive and binding on all shareholders.*

*The Net Asset Value per USD Share shall equal the Net Asset Value of the assets of the Fund attributable to the USD Shares divided by the number of outstanding USD Shares on the relevant valuation date.*"

51.   On 1st May 2000 an Information Memorandum was also issued for the Euro Shares.  The section headed "*Determination of Net Asset Value*" was in very similar terms.

"*Net Asset Value of the Shares is equal to the market value of the Fund's total assets calculated as described below, less all accrued debts and liabilities, including (i) fees of the Manager and the Administrator earned or accrued but not yet paid, ...*

*Net asset valuations attributable to the Shares are determined by the Administrator having regard to the value of the Fund's portfolio assets attributable to [the] Shares as of the close of business on the last Business Day of each calendar month.  See 'CERTAIN RISK FACTORS'.*

. . . . .

*The value of assets are recorded at their fair value as determined in good faith by the Administrator in the absence of current quotations or if the Administrator concludes that such quotations are not indicative of fair value by reason of illiquidity of a particular security or other factors.  In special circumstances in which the Administrator determines that market prices or quotations do not fairly represent the value of particular assets, the Administrator is authorized to assign a value to such assets which differs from the market prices or quotations.  The cost of appraisers or pricing services employed [by] the Fund is an expense of the Fund and as such a charge against Net Asset Value of the USD Shares.*

*Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio positions could have an adverse effect on the Fund's net assets if judgments regarding appropriate valuations made by the Administrator should prove incorrect.  See 'CERTAIN RISK FACTORS'.  In the absence of bad faith or manifest error, the Net Asset Value calculations of the Shares made by the Administrator are conclusive and binding on all shareholders.*

*The Net Asset Value per Share is equal to the Net Asset Value attributable to the Shares divided by the number of outstanding Shares on the relevant valuation date.*"

52.   By an Information Memorandum issued on 1st May 2004 for the Euro Shares the paragraph above beginning "*Net asset valuations attributable to the*

21

*Shares* ...” was amended to follow *mutatis mutandis* the paragraph beginning “*The Administrator will determine* …” in the Information Memoranda for the US Dollar Shares.

### Administration Agreements

53.  The Administration Agreements were contracts between the relevant Fund, KML and the Administrator.  The first such Agreement was made in 1994 in relation to the Common Shares.  The Fund was Kingate Global and the Administrator was Hemisphere.  The Interpretation clause defined NAV as meaning the NAV of all the shares calculated in accordance with Clause 4 of the Agreement as of the close of business on the last Business Day of each month.  It also provided that unless the context otherwise required, words and expressions in the Agreement should bear the same meaning as in the Articles of the Fund.  However any alteration or amendment of the Articles would not affect the Agreement without the affected party’s consent. (Clause 1.5).

54.  The Administrator was to act upon the terms contained in the Agreement and in accordance *inter alia* with the Articles of the Fund (Clause 2), and to observe and comply with the Articles and with the applicable provisions of any prospectus, explanatory memorandum or other such document relating to, and distributed by or on behalf of, the Fund (Clause 3.8).  The Information Memorandum would have fallen within the rubric of “*explanatory memorandum*”.  The Administrator’s duties included the calculation of the NAV pursuant to Clause 4, the calculation of the subscription and redemption prices of the shares at each subscription and redemption date, and the calculation of the fees of the Manager (Clauses 3.4.4 – 3.4.6).

55.  Clause 4 of the Administration Agreement dealt with the calculation of NAV.  Clauses 4.1 to 4.4 repeated verbatim the passages cited above from the February 1994 Memorandum, save that Clause 4.1 provided that NAVs were to be determined by the Manager or the Administrator.  The reference

22

to the Manager is anomalous and would appear to be a drafting error. There was a Clause 4.5 which is not found in the February 1994 Memorandum and which appears to be modelled on Regulation 56 [4] of the Articles of Association.

*"There will be deducted from the total value of the Fund's assets all accrued debts and liabilities, including (i) fees of the Investment Advisors, the Manager, the Consultant and the Administrator earned or accrued but not yet paid, (ii) a provision for the annual performance fees of the Manager and the Investment Advisors managed as of the valuation date, (iii) monthly amortization of organization costs, (iv) an allowance for the Fund's estimated annual audit and legal fees, and (v) any contingencies for which reserves are determined to be required. Net Asset Valuations will be expressed in U.S. Dollars, and any items denominated in other currencies will be translated at prevailing exchange rates as determined by the Administrator."*

56.   The Administration Agreement was restated and amended on 1st March 1995 so as to provide for the administration of both Class A and Class B Shares. It was further restated and amended on 1st May 2000 in relation to the Common Shares, which by now included the Class A Shares, Class B Shares and DM Class Shares. Although no Administration Agreement prior to that date has been found for the DM Shares, I draw the reasonable inference that the Administrator would have administered them on the same basis, *mutatis mutandis*, as the Class A and Class B Shares.

57.   Under the 1st May 2000 Administration Agreement, the Administrator's calculation of the NAV was expressly required to be carried out pursuant to the Information Memorandum, and the Administrator was required to co-ordinate with consultants and agents of the Fund and with the Co-Manager with regard to the Fund's currency hedging activities and obtaining price quotes in a manner consistent with the Information Memorandum (Clause 3.4.4). The fees to be calculated were the fees of the Co-Manager (Clause 3.4.6). Clause 4 of the Agreement was simplified so as to provide:

*"4.1   The Net Asset Value of the [Fund] and of each Share shall be calculated and computed in accordance with the [Information] Memorandum, as the same shall exist from time to time. An accurate copy of the definition of Net Asset Value as set forth in the Memorandum is attached hereto as an exhibit.*

23

> *4.2   In the absence of bad faith or manifest error, the Net Asset Calculations made by the Administrator shall be conclusive and binding on all shareholders.*"

58.    On 1st June 2007 Kingate Global and KML entered into an amended and restated Administration Agreement in relation to the Common Shares with a new Administrator, BISYS Hedge Fund Services Limited ("BISYS").

59.    Clause 4.1 provided that the duties of the Administrator in relation to the calculation of NAV were to:

> "*4.1.1   calculate and publish the net asset value per share for each class of shares issued by the [Fund] and the subscription and redemption prices per Share for each class of Shares issued by the [Fund] in accordance with the methodology contained in the Articles, the Offering memorandum or as directed by the Directors from time to time utilising, whenever reasonably practicable, such independent pricing services as chosen by the Administrator from time to time;*
>
> *4.1.2      oversee and review the calculation and payment of fees payable to the Administrator, the Manager and other service providers to the [Fund]; ...*"

60.    On 1st May 2000 Kingate Euro entered into an Administration Agreement with KML and Hemisphere.   On 1st June 2007 Kingate Euro and KML entered into an amended and restated Administration Agreement with BISYS.   Those agreements, which were in relation to the administration of the Euro Shares, were *mutatis mutandis* on the same terms as the agreements into which KML entered on those dates with Kingate Global.

### *Manager Agreements*

61.    The Manager Agreements were contracts between the relevant Fund and KML.   They can usefully be regarded as falling into three blocks.

### 1994 – 2004 ("the First Global Period")

62.    The first such agreement was concluded between Kingate Global and KML in relation to the Common Shares in 1994.   The Interpretation clause was identical to the Interpretation clause in the first Administration Agreement.

24

63.  The Manager was to act upon the terms contained in the Agreement and in accordance *inter alia* with the Articles (Clause 2) and to observe and comply *inter alia* with the Articles and with the applicable provisions of any prospectus, explanatory memorandum or other such document relating to the Fund and distributed by or on behalf of the Fund (Clause 3.3).  The Manager was authorised, subject to the overall policy and supervision of the directors, to exercise the functions, duties, powers and discretions exercisable by the directors under the Articles, either itself or wholly or in part through its authorised agents or delegates, on behalf of the Fund.  These included arranging for the performance of all accounting and administrative services which might be required by the Fund's operations (Clauses 3.1 and 3.4).

64.  The Manager was to be paid a management fee calculated at an annual rate equal to 1.5% of the month-end NAV of the Fund before any current accrual for a Performance Fee.  The management fee was generally payable as of the last Business Day of each month (Clause 6.1.1).  As no Performance Fees were ever paid I need not concern myself with the terms of the Manager Agreement relating to them.  Any dispute arising as to the amount of the Management and/or Performance Fee was to be referred to the Fund's auditors for settlement, who were entitled to make such further or other adjustments as might in the circumstances appear to them to be appropriate and whose decision was to be regarded as the decision of an expert and not of an arbitrator and was to be binding and final upon the parties (Clause 6.4). The dispute resolution provision was not included in any of the Manager Agreements under the Second Global Period or the Euro Period.

65.  Clause 4, which dealt with the calculation of NAV, was identical to clause 4 of the first Administration Agreement, save that Clause 4.1 did not contain any reference to the determination of NAV by the Manager.  Thus the Clause provided that "*Net Asset Valuations are determined by the Administrator ...*".

66.  The Manager Agreement was amended on 1st March 1995 so as only to provide for the administration of Class A Shares.  There is an unexecuted

25

copy of a Co-Manager Agreement dated 1995 in relation to the Class B Shares. The intended signatories were Kingate Global, KML, and Tremont (Bermuda) Limited ("Tremont"). The terms were *mutatis mutandis* the same as the terms for the Manager Agreement in relation to the Class A Shares. The Co-Managers were to be paid a Co-management fee calculated at an annual rate equal to 1.5% of the month-end NAV of the Fund attributable to Class B Shares. The Co-management fee was generally payable as of the last Business Day of each month. Appropriate adjustments would be made to account for capital contributions and withdrawals.

67.  There is no extant copy of any Manager or Co-Manager Agreement relating to the DM Shares. However a Termination Agreement and Release ("TAR") dated 31st March 1997 between Kingate Global, KML and Tremont noted that all three were parties to a Co-Manager Agreement dated 1st January 1996 with respect to the DM Shares, which was terminated by the TAR, and a Co-Manager Agreement dated 1st March 1995 with respect to the Class B Shares, which remained in force unaffected by the TAR.

68.  I draw the reasonable inferences that from 1st March 1995 the Class B shares were co-managed on the terms of the unexecuted copy of the Co-Manager Agreement; and that from or about 1st January 1996 the DM Shares were managed *mutatis mutandis* on the same terms until the TAR was executed, and thereafter *mutatis mutandis* on the same terms as the Class A Shares.

2004 – 2008 ("the Second Global Period")

69.  Subsequently, KML and Tremont entered into separate Co-Manager Agreements with Kingate Global. These were undated, but referred to the Restated Information Memorandum dated 1st May 2004. The Agreement between Kingate Global and KML set out the various administrative services for which the Co-Manager was responsible. These included, under the ultimate supervision of the directors, reviewing the calculation of the Fund's shares on the part of the Administrator and verifying the calculation of the management fees charged to the Fund (Clause 3.1 (e) and (f)).

26

70.   Clause 5.1 provided that as used in the Agreement, the NAV of the Fund and
of the shares should have the meaning assigned to it in the Information
Memorandum and should be calculated as described in the Information
Memorandum.  Clause 5.2 provided that the Co-Managers should receive a
monthly management fee at an annual rate of 1.5% of the NAV of the Fund
determined as of each Valuation Date (as defined in the Information
Memorandum) of each calendar month.  The fee was to be divided between
them as they should from time to time agree by separate agreement.  It was
to be payable as of the last Business Day of each calendar month.

71.   KML entered into a sole (rather than co-) Manager Agreement with Kingate
Global on 1st January 2006.  As to Administrative Services, it provided that
in accordance with the provisions of the Memorandum and Articles of
Association of the Fund, and under the ultimate supervision of the directors,
the Manager should assist the Fund (in a manner consistent with existing
practice) in the performance of certain of its administrative duties as might
be agreed between the parties from time to time (Clause 3.1).    The
provisions for the calculation of NAV and *mutatis mutandis* the monthly
management fee remained unchanged from the previous Agreement.

2000 – 2008 ("the Euro Period")

72.   On 1st May 2000 KML entered into a Manager Agreement with Kingate
Euro.  The Definitions section in Part 1 provided that all capitalized terms
used in the Agreement and not otherwise defined therein should have the
meaning set forth in the Information Memorandum.  The Manager was
entitled to a fixed monthly asset based management fee as such fee was
described in the Information Memorandum (Clause 4.1(a)).    Under the
ultimate supervision of the directors, the Manger was responsible for
performing or procuring the performance of, *inter alia*, all aspects relating to
the Fund's administration and accounting matters (Clause 3.1(f)).

73.   Clause 4.3 defined the scope of the Manager's liability to the Fund:

27

> "*The Manager (and any officer or director of the Manager) shall not be liable to the Fund or its Security holders for any error of judgment or for any loss suffered by the Fund or its security holders in connection with its services in the absence of gross negligence, wilful default, fraud, or dishonesty in the performance or non-performance of their obligations or duties.*"

74. All the Manager Agreements in all three periods included a clause in similar terms, although the Manager Agreements prior to 1st May 2000 referred to "*negligence*" rather than "*gross negligence*".

**(1)(b)   If the answer to (a) is yes [as to which, see below], were the Administrator's determinations of the NAV binding on the Funds for the purpose of calculating the fees due to KML pursuant to the Manager Agreements in force between the Funds and KML, in the absence of bad faith or manifest error?**

75. The Defendants submit that the Court should answer this question in the affirmative and that absent bad faith or manifest error KML was entitled to be paid 1.5% of the NAV as determined at the time by the Administrator. The Funds submit that the Court should answer this question in the negative and that KML was entitled to be paid 1.5% of the "true" NAV, adjusted to take into account the fact of the Madoff fraud when this was discovered.

76. The Defendants place great reliance on <u>Fairfield</u>.   The case concerned a mutual fund ("Fairfield") which was incorporated in the BVI and was closely analogous to the Funds.  Like them, it was a feeder fund for BLMIS, with which it placed about 95% of its assets.   The subscription and redemption prices for its shares were calculated monthly in accordance with the articles of association based on the NAV per share.  The calculation was carried out by the directors rather than an administrator, and any certificate as to the NAV per share or the subscription or redemption price was expressed in the articles to be binding on all persons.   Apart from these immaterial differences, the provisions in Fairfield's articles of association for the calculation of NAV were indistinguishable from the equivalent provisions in the Articles of Association of the Funds.

28

77.    Fairfield, like the Funds, was a victim of Mr Madoff's Ponzi scheme.  As a result, in December 2008 its directors suspended calculation of the NAV, thus effectively terminating the redemption of shares.   Fairfield was subsequently placed in liquidation in the BVI.

78.    The liquidators brought proceedings against a number of the members which had redeemed some or all of their shares before the calculation of NAV was suspended.  They sought to recover from the defendants the amounts paid out to them on redemption, on the footing that they were paid out in the mistaken belief that the assets were as stated by BLMIS, when there were in fact no such assets.   Any recoveries made on this basis could then be distributed rateably between all members, irrespective of when or whether they redeemed.

79.    Lord Sumption, giving the judgment of the Board, held at paras 18 and 19 that whether the defendants were unjustly enriched depended upon whether they were contractually entitled to receive the payments.  I shall consider unjust enrichment later in this judgment.  For now, I shall focus on the issue of contractual entitlement, which Lord Sumption framed thus at para 19:

" ... the Fund's claim to recover the redemption payments depends on whether it was bound by the redemption terms to make the payments which it did make. That in turn depends on whether the effect of those terms is that the Fund was obliged upon a redemption to pay (i) the true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or (ii) the NAV per share which was determined by the directors at the time of redemption. If (ii) is correct then, the shares having been surrendered in exchange for the amount properly due under the articles, the redemption payments are irrecoverable."

80.    Lord Sumption held at paras 21 – 24 that (ii) was correct and that the redemption payments were therefore irrecoverable.

"21 The starting point is the scheme of the articles. Articles 9 and 10 determine the status of investors as members of the Fund, a question which ought in principle to be capable of definitive resolution at any moment in the Fund's history. Both the subscription price under article 9 and the redemption price under article 10 depend on the NAV per share determined under article 11. Article 9(1)(a) provides that the issue of shares 'shall be made on the Dealing Day'. Article 9(1)(b) provides for the

29

*subscription price to be determined in accordance with article 9(2), which means that it is to be the NAV per share 'determined in accordance with Article 11'. Article 9(1)(c) provides for the subscription price to be payable at a time fixed by the directors, failing which any allotment for which payment is due may be cancelled. There are corresponding provisions of article 10 concerning redemptions. Article 10(1)(a) provides that the redemption of shares 'shall be made on the Dealing Day'. Article 10(1)(b) provides that the redemption is to be effected at the redemption price determined in accordance with article 10(2), which means the 'Redemption Price for each Share shall be the Net Asset Value per Share (as determined in accordance with Article 11)' on the dealing day. Under article 10(1)(c), that price must be paid as soon as practicable after the dealing day, being normally 30 days thereafter subject to specified and limited extensions. These provisions determine the amount due and the time of payment. Moreover, once the NAV per share for a given monthly valuation day is ascertained, subscriptions and redemptions effected at the corresponding subscription and redemption price will affect the determination of NAV per share on the following monthly valuation day. This is because the receipt of subscription moneys and the payment out of redemption moneys will affect the amount of the Fund's assets for the purpose of article 11(2). It will be apparent from this summary that the whole of this scheme depends upon the price being definitively ascertained by the dealing day and known to the parties shortly thereafter. It is unworkable on any other basis.*

*22 The Fund's case is that when article 10(2) defines the redemption price as the NAV per share 'determined in accordance with Article 11', it means the NAV correctly determined by dividing the NAV of the Fund by the number of shares in issue in accordance with articles 11(1)[b], 11(2) and 11(3). If this is right, the same must be true of article 9(1)(c), which fixes the subscription price by reference to the same provisions of article 11. The directors' determination of the NAV per share as at the valuation day, under article 11, was not definitive according to this analysis unless a certificate was issued pursuant to article 11(1)[c], and that would happen only if the directors chose to issue one.*

*23 In the Board's opinion, this is an impossible construction. If it were correct, an essential term of both the subscription for shares and their redemption, namely the price, would not be definitively ascertained at the time when the transaction took effect, nor at the time when the price fell to be paid. Indeed, it would not be definitively ascertained for an indefinite period after the transaction had ostensibly been completed, because unless a certificate was issued it would always be possible to vary the determination of the NAV per share made by the directors at the time and substitute a different one based on information acquired long afterwards about the existence or*

30

*value of the assets. This would not only expose members who had redeemed their shares to an open-ended liability to repay part of the price received if it subsequently appeared that the assets were worth less than was thought at the time. It would confer on them an open-ended right to recover more (at the expense of other members) if it later appeared that they were worth more. Corresponding problems would arise out of the retrospective variation of the subscription price long after the shares had been allotted. Indeed, it is difficult to see how the directors could perform their duty under article 9(1)(b) not to allot or issue a share at less than the subscription price if the latter might depend on information coming to light after the allotment had been made.*

*24 If, as the articles clearly envisage, the subscription price and the redemption price are to be definitively ascertained at the time of the subscription or redemption, then the NAV per share on which those prices are based must be the one determined by the directors at the time, whether or not the determination was correctly carried out in accordance with articles 11(2) and (3).*"

81.    I accept Mr Boyle's submission, with which the other counsel for the Defendants agreed, that, with respect to the calculation of NAV, the articles of association in <u>Fairfield</u> are materially indistinguishable from the Articles of Association of the Funds.  It follows that Lord Sumption's analysis of the articles in <u>Fairfield</u> is of binding effect with respect to the Funds' Articles. Even if it were not binding, I would find it wholly persuasive.  I am therefore satisfied that in the absence of bad faith or manifest error the monthly NAV determinations by the Administrator were final and binding upon the Funds and their members for the purposes of calculating the subscription and redemption prices of shares.

82.    That does not answer the question of whether in the absence of bad faith or manifest error the monthly NAV determinations were also final and binding upon the Funds for the purpose of calculating the monthly management fees due to KML.  This is really two questions.  First, whether the monthly NAV determinations by the Administrator for the purposes of the subscription and redemption of shares were to be used to calculate the monthly management fees due to KML.  Second, if they were to be used for that purpose, whether absent bad faith or manifest error they were final and binding or alternatively merely provisional and therefore open to correction if found to be incorrect.

31

83.   The answers will depend on the construction of the various Manager Agreements, which Mr Beltrami characterised as long term service agreements between the Funds and their managers. I was referred to a number of authorities to assist me with this task. They included ICS Ltd v West Bromwich BS [1998] 1 WLR 896, HL; Attorney General of Belize v Belize Telecom Ltd [2009] 1 WLR 1988; Re Sigma Finance Corp (in administrative receivership) [2010] BCC 40; Sebastian Holdings v Deutsche Bank [2010] 2 CLC 300, EWCA; Rainy Sky SA v Kookmin Bank [2011] 1 WLR 2900, UKSC; BMA Special Opportunity Hub Fund Ltd v African Minerals Finance Ltd [2013] EWCA Civ 416; and Marley v Rawlings [2015] AC 129, UKSC. In supplemental written submissions I was also addressed on two judgments which were not handed down until after the hearing before me: Arnold v Britton [2015] 2 WLR 1593, UKSC; and Wood v Sureterm Direct Ltd [2015] EWCA Civ 839.

84.   Lord Neuberger, with whose judgment Lord Sumption and Lord Hughes agreed, helpfully summarised the applicable principles in Arnold v Britton at para 15. Although directed to the interpretation of a particular clause in a number of leases, his summary is *mutatis mutandis* of general application.

"*When interpreting a written contract, the court is concerned to identify the intention of the parties by reference to 'what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean', to quote Lord Hoffmann in Chartbrook Ltd v Persimmon Homes Ltd [2009] AC 1101, para 14.*

85.   Thus the task of the court is to construe the parties' implied intention, ie the intention which is reasonably to be inferred from the contract read in the context of the relevant background knowledge, even though this may not correspond with the parties' actual, subjective intention. As Lord Hoffmann, giving the judgment of the Board in Attorney General of Belize v Belize Telecom Ltd, stated at para 16, that meaning is not necessarily or always what the authors or parties to the document would have intended. However there is no evidence of any such disparity in the present case.

86.   Lord Neuberger continued:

32

*And it does so by focussing on the meaning of the relevant words, in this case clause 3(2) of each of the 25 leases, in their documentary, factual and commercial context. That meaning has to be assessed in the light of (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the lease, (iii) the overall purpose of the clause and the lease, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions. In this connection, see Prenn [1971] 1 WLR 1381, 1384-1386; Reardon Smith Line Ltd v Yngvar Hansen-Tangen (trading as HE Hansen-Tangen) [1976] 1 WLR 989, 995-997 per Lord Wilberforce; Bank of Credit and Commerce International SA v Ali [2002] 1 AC 251, para 8, per Lord Bingham of Cornhill; and the survey of more recent authorities in Rainy Sky [2011] 1 WLR 2900 , paras 21-30, per Lord Clarke of Stone-cum-Ebony JSC."*

87.   As to the documentary context mentioned by Lord Neuberger, Thomas Lowe QC, counsel for the FIM Defendants, referred me to para 40 of the judgment of the Court given by Thomas LJ (as he then was) in <u>Sebastian Holdings</u> v <u>Deutsche Bank</u>:

"*The Supreme Court emphasised in <u>Re Sigma Finance Corp</u> [2009] UKSC 2 the need, when looking at a complex series of agreements, to construe an agreement which was part of a series of agreements by taking into account the overall scheme of the agreements and reading sentences and phrases in the context of that overall scheme.*"

That is a principle which assumes particular significance in the context of this case.

88.   There is sometimes a tension between two of the factors mentioned by Lord Neuberger, namely the language of the contract and business common sense. In <u>Rainy Sky</u>, giving the judgment of the Court, Lord Clarke stated at para 30 that:

"*... where a term of a contract is open to more than one interpretation, it is generally appropriate to adopt the interpretation which is most consistent with business common sense.*"

89.   In similar vein, in <u>Re Sigma Finance Corp (in administrative receivership)</u> Lord Collins, with whom Lords Hope and Mance agreed, warned at para 35 against an overly literal approach to construction:

33

> "*In complex documents of the kind in issue there are bound to be ambiguities, infelicities and inconsistencies. An over-literal interpretation of one provision without regard to the whole may distort or frustrate the commercial purpose. This is one of those too frequent cases where a document has been subjected to the type of textual analysis more appropriate to the interpretation of tax legislation which has been the subject of detailed scrutiny at all committee stages than to an instrument securing commercial obligations: cf. Satyam Computer Services Ltd v Upaid Systems Ltd [2008] EWCA Civ 487, [2008] 2 C.L.C. 864, at [2].*"

90.    On the other hand, in Arnold v Britton Lord Neuberger cautioned that commercial common sense, while a very important factor to take into account when interpreting a contract:

(1)    should not be invoked to undervalue the importance of the language of the provision which is to be construed (para 17);

(2)    should not be invoked retrospectively (para 19):

> "*The mere fact that a contractual arrangement, if interpreted according to its natural language, has worked out badly, or even disastrously, for one of the parties is not a reason for departing from the natural language*";

and that

(3)    a court should be slow to reject the natural meaning of a provision as correct simply because it appears to have been a very imprudent one for the parties to have agreed, even ignoring the benefit of hindsight (para 20).

91.    I am satisfied that a reasonable person, having all the background knowledge of the parties, which would have included the terms of the Articles of Association, Information Memoranda and Administration Agreements, would have understood the parties to the Manager Agreements to intend that the monthly NAV determinations by the Administrator for the purposes of the subscription and redemption of shares were to be used to calculate the monthly management fee due to KML.  I am therefore satisfied that this was an express contractual term.  There is no suggestion in any of the contractual documents that any other calculations were to be used for this purpose.

34

92.    As to the First Global Period:

(1)    The Manager Agreements in force during this period provided that (i) the management fee was calculated at an annual rate equal to 1.5% of the month end NAV of the Fund; and (ii) the NAVs were determined by the Administrator as of the close of business on the last Business Day of each calendar month.

(2)    The Administration Agreements in force during this period provided that: (i) the Administrator's duties included the calculation of the NAV; the calculation of the Subscription Price and the Redemption Price of the shares at each Subscription and Redemption Date; and the calculation of the fees of the Manager or Co-Manager; and (ii) NAVs were determined by the Administrator or Manager as of the close of business on the last Business Day of each calendar month.

93.    The Manager Agreements stated in express terms that the monthly management or co-management fee was to be calculated based upon the month end NAV for the Fund and that the NAV was determined by the Administrator.  From which I conclude that the monthly management fee was based upon the monthly NAV as determined by the Administrator.  The Administration Agreements, to which KML was also a party, provide contextual support for this construction although it is not dependent upon them.

94.    As to the Second Global Period:

(1)    The Co-Manager and Manager Agreements in force during this period provided that: (i) the Co-Managers shall be entitled, in the aggregate, to receive from the Fund a monthly management fee at an annual rate of 1.5% of the NAV of the Fund determined as of each valuation date of each calendar month; and (ii) the NAV of the Fund and of the US Dollar shares should have the meaning assigned to it in the Information Memorandum and should be calculated as described in the Information Memorandum.

(2)     The Information Memoranda in force during this period provided that: (i) the Administrator would determine the NAV of the Fund's Portfolio assets attributable to the US Dollar shares at the close of business on the last Business Day of each month; (ii) the Manager or Co-Managers received a monthly fee from the Fund calculated at an annual rate equal to 1.5% of the month end NAV of the Fund attributable to the US Dollar Shares; and (iii) the subscription and redemption prices for the shares were equal to the NAV per share at the Valuation or Redemption Date.

95.     The Co-Manager and Manager Agreements stated that the monthly co-management or management fee was to be calculated based upon the month end NAV for the Fund calculated as described in the Information Memoranda.   The Information Memoranda stated that the Administrator would determine the NAV.   From which I conclude that the monthly management fee was based upon the monthly NAV as determined by the Administrator.

96.     As to the Euro Period:

(1)     The Manager Agreements in force during this period provided that the Manager shall be entitled to a fixed, asset based monthly management fee as defined and described in the Information Memorandum.

(2)     The Information Memoranda in force during this period provided that: (i) NAVs attributable to the Euro Shares were determined by the Administrator having regard to the value of the Fund's portfolio assets attributable to Euro Shares as of the close of business on the last Business Day of each calendar month; (ii) the Manager or Co-Managers received a monthly fee from the Fund calculated at an annual rate equal to 1.5% of the month end NAV of the Fund attributable to the Euro Shares; and (iii) the subscription and redemption prices for the shares were equal to the NAV per share at the Valuation or Redemption Date.

36

97.    The Manager Agreements stated that the monthly management fee was to be calculated based upon the month end NAV for the Fund calculated as described in the Information Memoranda. The Information Memoranda stated that the Administrator would determine the NAV. From which I conclude that the monthly management fee was based upon the monthly NAV as determined by the Administrator.

98.    I therefore reject Mr Beltrami's submission, based on a detailed textual analysis, that all that the Manager Agreements provided was a methodology for the calculation of the management fee, and not that any given calculation carried out by the Administrator pursuant to that methodology was contractually binding.

99.    I also reject Mr Beltrami's submission that the power of the directors to suspend the calculation of NAV is indicative that such calculations were not intended to be a condition precedent for entitlement to payment of a management fee, and hence that there was no contractual requirement that they should be used for its determination. The calculation of NAVs was only ever likely to be suspended in extraordinary circumstances – as happened in this case when the Madoff fraud was uncovered. Uncertainty over whether and on what basis the manager would be paid in such circumstances, assuming that the Funds had sufficient assets to make such payments, is not sufficient to undermine what I am satisfied is the clear and obvious construction of the Manager Agreements as set out in the preceding paragraphs.

100.   The more difficult question is whether absent bad faith or manifest error the Administrator's monthly NAV calculations were final and binding on the Funds with respect to the calculation of management fees.

101.   I accept that, whereas the scheme for the subscription and redemption of shares would have been unworkable unless the monthly NAV calculations were final and binding, the contractual arrangements for the payment of management fees would have been workable if they were merely provisional and subject to correction. Though in my judgment the finality and certainty

37

of a final and binding determination makes better commercial sense than an arrangement whereby at some indeterminate date, maybe many years later, the management fees might fall to be recalculated.

102.    Further, considering the Manager Agreements in the context of the overall scheme of the Funds, it would be anomalous if the management fees calculated by the Administrator were final and binding as regards the NAV used to determine the monthly subscription and redemption fees but not as regards the monies owing to KML.  Particularly as management fees earned or accrued but not yet paid were one of the components of the calculation of NAV.

103.    The Manager Agreements did not expressly provide for what was to happen if it transpired that the monthly NAV determinations by the Administrator did not represent the "true" NAV of the Funds.  The question arises as to whether they did so by implication.  The principles applicable to implying a contractual term were authoritatively stated by Lord Hoffmann in <u>Attorney General of Belize</u> v <u>Belize Telecom Ltd</u> [2009] 1 WLR 1988:

"*17    The question of implication arises when the instrument does not expressly provide for what is to happen when some event occurs. The most usual inference in such a case is that nothing is to happen. If the parties had intended something to happen, the instrument would have said so. Otherwise, the express provisions of the instrument are to continue to operate undisturbed. If the event has caused loss to one or other of the parties, the loss lies where it falls.*

*18 In some cases, however, the reasonable addressee would understand the instrument to mean something else. He would consider that the only meaning consistent with the other provisions of the instrument, read against the relevant background, is that something is to happen. The event in question is to affect the rights of the parties. The instrument may not have expressly said so, but this is what it must mean. In such a case, it is said that the court implies a term as to what will happen if the event in question occurs. But the implication of the term is not an addition to the instrument. It only spells out what the instrument means.*

. . . . .

*21    It follows that in every case in which it is said that some provision ought to be implied in an instrument, the question for the court is whether such a provision would*

38

*spell out in express words what the instrument, read against the relevant background, would reasonably be understood to mean. It will be noticed from Lord Pearson's speech [in Trollope & Colls Ltd v North West Metropolitan Regional Hospital Board [1973] 1 WLR 601] that this question can be reformulated in various ways which a court may find helpful in providing an answer—the implied term must 'go without saying', it must be 'necessary to give business efficacy to the contract' and so on—but these are not in the Board's opinion to be treated as different or additional tests. There is only one question: is that what the instrument, read as a whole against the relevant background, would reasonably be understood to mean?"*

104.    Thus if it transpired that the monthly NAV determinations by the Administrator did not represent the "true" NAV of the Funds, then for the purpose of calculating management fees, and absent bad faith or manifest error, those NAV determinations would stand unless there was an implied term to the contrary.  This is because the parties had expressly agreed that it was on the basis of the NAV determinations that the management fees were to be calculated.

105.    Mr Beltrami submitted that, by analogy with conclusive evidence clause cases such as London and Regional Properties v Ministry of Defence [2008] EWCA Civ 1212, it would take the clearest possible terms to make the Administrator's determination final and binding.  If by that he meant that something more was required than an agreement that such determination was to be used to calculate the monthly management fee then I reject his submission.  The agreement was final and binding absent an implied term that it was not.

106.    Although Mr Beltrami did not accept that the Plaintiffs' construction required the implication of any terms, he did rely on several express terms of the Manager Agreements and, with respect to the Second Global Period and the Euro Period, the Information Memoranda, to support the construction for which he contended.  He would no doubt submit that they supported the implication of a term if in order to make good his case one needed to be implied.

39

107.   First, Mr Beltrami noted the recurring provision that in the absence of bad faith or manifest error the NAV calculations made by the Administrator were conclusive and binding on all shareholders but that there was no equivalent provision that they were conclusive and binding on managers. This was, he submitted, indicative that the NAV calculations were not intended to be so.

108.   Mr Boyle submitted in reply that the clause referred to shareholders because it had been taken from the Information Memorandum which was a document addressed to shareholders.  Had the clause been intended to provide that the NAV calculations were not binding on managers, he submitted, it would have said so in express terms.  In fact, Mr Boyle submitted, the clause did not make valuations binding which would otherwise not be binding – as was clear from <u>Fairfield</u> they were binding upon the shareholders in any event – but defined the only circumstances in which they would not be binding, namely bad faith and manifest error.  I accept Mr Boyle's submissions on this point.

109.   To the extent necessary, Mr Beltrami relied on the principle of interpretation "*expressio unius est exclusio alterius*".[7]  Both counsel referred me to various cases cited in the Fifth Edition of <u>Lewison on the Interpretation of Contracts</u>. As Jenkins LJ said in <u>Dean</u> v <u>Wiesengrund</u> [1955] 2 QB 120, EWCA, at 130 – 131, albeit in the context of a case of statutory construction:

"*... this principle is ... no more than an aid to construction, and has little, if any, weight where it is possible ... to account for the expressio unius on grounds other than an intention to effect the exclusio alterius.*"

110.   In my judgment the *expressio unius* principle is of little assistance in construing the "*conclusive and binding on all shareholders*" provision as it raises rather than answers the question of whether it is possible to account for the fact that the shareholders but not the manager are mentioned on grounds other than an intention to exclude the manager.

_____

[7] The expression of one thing is the exclusion of another.

111.   Mr Beltrami also relied on Clause 6.4 of the Manager Agreements during the First Global Period which provided that any dispute arising as to the amount of the management fee was to be referred to the Fund's auditors for settlement.   He submitted that it was difficult to understand the purpose of this provision in relation to management fees if any dispute related only to the arithmetic of the Administrator's calculation.   But, he submitted, the provision made perfect sense if the auditors were able to recalculate the "true" NAV for the purpose of adjusting management fees calculated on the basis of erroneous information.

112.   Mr Boyle replied that the real purpose of the provision was the resolution of disputes regarding the performance fee, the calculation of which was quite complicated.   The inclusion of the management fee in the clause was subsidiary to this purpose.   Thus, he submitted, its inclusion was not a reliable indicator of the potential ambit of the disputes over the management fee which the auditors might have been called upon to decide.   Tellingly, neither performance fees nor a dispute resolution mechanism featured in the Manager Agreements for the Second Global Period or the Euro Period.

113.   Even if the auditors were able to determine the "true" NAV for purposes of adjusting the management fee, it is not clear how that would assist Mr Beltrami.   The contractual position would then be that, absent an implied term to the contrary, the calculation of NAV by the Administrator was final and binding for purposes of determining the management fee unless and until it was varied by the auditors, at which point the auditors' calculation would become final and binding.   Insofar as relevant, the same would apply, *mutatis mutandis* to the calculation of the performance fee, which was not based on NAV.

114.   Although Mr Beltrami referred me to various agreements with other service providers, I was not taken through them in detail and find them of little assistance.

115.   Having found that it was an express term of the Manager Agreements that the monthly NAV determinations by the Administrator for the purposes of

the subscription and redemption of shares were to be used to calculate the monthly management fee due to KML, I am satisfied that there was no express contractual term that these determinations were merely provisional and open to correction if later found to be inaccurate. Neither was there any implied term to that effect as that is not what the instrument, read as a whole against the relevant background, would reasonably have been understood to mean.

116. Accordingly, I find that the Administrator's determinations of the NAV were binding on the Funds for the purpose of calculating the fees due to KML pursuant to the Manager Agreements in force between the Funds and KML, in the absence of bad faith or manifest error.

**(1)(a)   Whether the NAVs were determined from time to time by the Administrator on the assumption (made for the purposes only of the Trust Defendants' and KML's Preliminary Issues Summonses) that KML, and/or FIM, and/or Mr Grosso and/or Mr Ceretti had input over the calculation of the NAV to the extent of control, on the basis pleaded at paragraphs 18 and 19 of the Reply**

117. The Administrator compiled the components of the NAV calculation, which was based largely on figures supplied by BLMIS, carried out the NAV calculation based on those components, and then sent it out to the shareholders. However Mr Beltrami submitted that in spite of all this the Administrator did not determine the NAV within the meaning of the Manager Agreements because KML et al had the power to give or withhold approval of the NAV calculations, and hence to influence them. That is what was meant by "*control*" in the Funds' pleaded case.

118. I agree with Mr Lowe that the existence of "*control*" in the sense alleged did not mean that it was someone other than the Administrator who carried out the NAV determination. In other words, I am satisfied that a reasonable person having all the background knowledge which would have been available to the parties would have understood that, assuming "*control*" in

42

the sense alleged, the NAVs were determined from time to time by the Administrator within the meaning of "*determined*" and its cognates as they were used in the Manager Agreements and other documents within the Contractual Scheme.

119. This construction accords with the natural and ordinary meaning of "*determined*". It also makes good commercial sense. As I have found that the monthly NAV determinations by the Administrator for the purposes of the subscription and redemption of shares were to be used to calculate the monthly management fee due to KML, if the determinations were only purported for the one purpose they would only be purported for the other. This would undermine the certainty needed to make the scheme for the subscription and redemption of shares workable.

120. Moreover, I accept Mr Lowe's submission that absent bad faith or manifest error the Court should not look behind the ostensible NAV determination to enquire whether that determination was actual or merely purported. He relied on Lord Sumption's observations about the finality of the calculation of NAV for the purposes of subscription and redemption prices at para 24 of Fairfield, which is set out above. If it is final for that purpose then it is final for the purpose of calculating management fees.

121. I shall deal briefly with the authorities to which I was referred, although my finding on this issue is not dependent upon them. Mr Beltrami submitted that, by analogy with conclusive certification cases, the requirement that the NAV was to be determined by the Administrator was to be strictly construed and the Administrator was required to act independently. See North Shore Ventures Ltd v Anstead Holdings Inc ("North Shore") [2012] Ch 31, EWCA, per Sir Andrew Morritt C at para 46 (strictly construed) and Scheldebouw BV v St James Homes (Grosvenor Dock) Ltd [2006] EWHC 89 (TCC) *per* Jackson J (as he then was) at paras 36 – 36 (requirement to act independently).

122. The former case concerned the construction of a guarantee and the latter case the construction of a building contract, so the factual circumstances of

43

the certifications were somewhat different to the facts of the instant case. However Mr Beltrami submitted that the requirements of strict construction and independence were of general application where two parties appointed a third to make a determination binding upon them.

123. Assuming that this is correct, these authorities do not take the matter much further. I am satisfied that, assuming control in the sense alleged, the exercise undertaken by the Administrator counted as a determination within the meaning of the Manager Agreements and other documents within the Contractual Scheme when they are properly construed.

124. Mr Lowe submitted that as a matter of common law all that was required of the Administrator was that it carried out the NAV calculation rationally (in a public law sense) and in good faith. See, eg, the judgment of the Court given by Rix LJ in WestLB AG v Nomura Bank International Plc [2012] EWCA Civ 495 at para 30. This requirement is very similar to the express provision in the Contractual Scheme that in the absence of bad faith or manifest error the Administrator's determination would be final and binding on all shareholders. I accept that the Administrator was required to act rationally and in good faith, but this does not preclude a requirement that the Administrator was also required to act independently.

125. I am not required to determine whether control by KML et al was consistent with the Manager Agreements. Mr Beltrami submitted that the parties could not reasonably be taken to have intended that KML was in effect the arbiter of its fees. But as Mr Boyle submitted, the express terms of the Manager Agreements provided that the Manager should supervise the performance of the Funds' administrative and accounting functions.

(1) During the First Global Period, the Manager Agreement provided that, subject to the supervision of the directors, KML should have power to arrange for the performance of all accounting and administrative services which might be required by the Fund's operations (Clause 3.1).

(2)    During the Second Global Period, the Manager Agreements provided that under the ultimate supervision of the directors KML was responsible for performing or procuring the performance of *inter alia* reviewing the calculation of the Fund's shares on the part of the Administrator and verifying the calculation of the management fees charged to the Fund (Clause 3.1 (e) and (f)).

(3)    During the Euro Period, under the 1st May 2000 Manager Agreement, and under the ultimate supervision of the directors, the Manager was responsible for performing or procuring the performance of, *inter alia*, all aspects relating to the Fund's administration and accounting matters (Clause 3.1(f)).

126.    Be that as it may, for the reasons given above I am satisfied that the NAVs were determined from time to time by the Administrator on the assumption that KML et al had input over the calculation of the NAV to the extent of control, on the basis pleaded at paragraphs 18 and 19 of the Reply.

**(2)  If the answer to (1)(b) is yes, whether the fees paid by the Funds to KML on the basis of those NAV figures, ie the Disputed Fees, were, in the absence of bad faith or manifest error, properly due to KML under the terms of the Manager Agreements**

127.    In light of the answer to issue 1(b), I am satisfied that the Disputed Fees, were, in the absence of bad faith or manifest error, properly due to KML under the terms of the Manager Agreements.

**(3)  If the answer to (2) is yes, and subject to issues (5) to (7), whether in consequence the Funds are precluded from asserting that the Disputed Fees, or any payments alleged by the Funds to originate from the Disputed Fees, are recoverable from: (a) KML; (b) the FIM Defendants; and (c) the Trust Defendants**

45

128. The issue here is whether KML's contractual entitlement to payment of the management fees which it received defeats the Funds' claim for unjust enrichment. Consideration of this issue proceeds on the assumption that, subject to the contractual entitlement point, the unjust enrichment claim is properly arguable.

129. The Funds' case, as summarised in their written submissions, is that they made a mistake on each occasion on which they paid fees to KML, as these were calculated and paid by reference to the stated NAVs of the Funds and on the assumption that the monthly determinations were accurate. By reason of the fraud being perpetrated by Mr Madoff and BLMIS, the stated NAVs were in fact grossly overstated because they were based on assets which did not exist (because they had been misappropriated by BLMIS and used in order to maintain the Ponzi scheme). The true position was that at all material times the Funds were insolvent or nearly insolvent and that the "correct" NAVs were very different to those which were stated. Had the true position been known, the Funds would have paid no, or very substantially reduced, fees, and KML could not have claimed anything more.

130. The Funds have brought restitutionary claims against both KML, as the direct recipient of the fees, and the FIM Defendants and the Trust Defendants, as their indirect recipients. They accept that, should the defence of contractual entitlement defeat the claim in restitution against KML, it would also preclude the claim in restitution against the indirect recipients.

131. As Saul Froomkin QC, counsel for KML, submitted, the applicable legal principles are to be found at para 18 of Lord Sumption's judgment in Fairfield:

"*18    The basic principle is not in dispute. The payee of money 'cannot be said to have been unjustly enriched if he was entitled to receive the sum paid to him'*: Kleinwort Benson Ltd v Lincoln City Council *[1999] 2 AC 349 at 408B (Lord Hope). Or, as Professor Burrows has put it in his* Restatement of the English Law of Unjust Enrichment *(2012) at §3(6), 'in general, an enrichment is not unjust if the benefit was owed to the defendant by the claimant under a valid contractual, statutory or other legal obligation.' Therefore, to the extent that a payment made under a mistake discharges a contractual*

46

*debt of the payee, it cannot be recovered, unless (which is not suggested) the mistake is such as to avoid the contract: <u>Barclays Bank Ltd</u> v <u>W.J. Simms Son & Cooke (Southern) Ltd</u> [1980] QB 67 , 695. So far as the payment exceeds the debt properly due, then the payer is in principle entitled to recover the excess.*

*19    It follows that the Fund's claim to recover the redemption payments depends on whether it was bound by the redemption terms to make the payments which it did make.*"

132.    The passage was part of the *ratio* of the case in that, notwithstanding Mr Beltrami's submission to the contrary, it was a necessary link in the chain of reasoning which led the judge to his conclusion.  This is clear from the first sentence in para 19:   "*It follows that ...*".    In order to arrive at the conclusion that the Fund's claim to recover the redemption payments depended on whether it was bound by the redemption terms to make the payments which it did make, Lord Sumption first considered and rejected the possibility that the Fund had a restitutionary claim to the redemption payments.   As stated by Brooke LJ in <u>R (Al-Skeini)</u> v <u>Defence Secretary</u> [2007] QB 140, EWCA, at para 145:

"*The ratio decidendi of a case has been defined as any rule of law expressly or impliedly treated by the judge as a necessary step in reaching his conclusion, having regard to the reasoning adopted by him: <u>Cross & Harris, Precedent in English Law</u>, 4th ed (1991), p 72; and see <u>Dunnachie</u> v <u>Kingston upon Hull City Council [2004] ICR 481</u>, para 82.*"

133.    Lord Sumption's reasoning is therefore binding upon me.  I would find it strongly persuasive even if it were not.  I need not assess the merits of Mr Beltrami's bold submission that it was not in fact correct, or go behind the judgment to consider the authorities on which it was based.  (Although I shall have something to say about them when considering issue 7.)  For purposes of unjust enrichment, the facts of the present case are materially indistinguishable from the facts in <u>Fairfield</u>.  The Funds made payments which discharged the contractual debts which they owed to KML. Subject to issues (5) to (7) those payments cannot be recovered if mistaken as it was neither submitted, nor was it seriously arguable, that the mistake was such as to avoid the Manager Agreements.

47

134. I conclude that subject to issues (5) to (7), the Funds are in consequence precluded from asserting that the Disputed Fees, or any payments alleged by the Funds to originate from the Disputed Fees, are recoverable from any of the Defendants.

**(4)  If the answer to any of issues (1) to (3) is no, whether the Defendants have a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML**

135. If, however, the answer to any of issues (1) to (3) is no, the Defendants do not have a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML.

**(5)  Whether the bad faith and/or manifest error of BLMIS constitutes bad faith and/or manifest error in relation to the calculation of the NAV, such that any determination of NAV made by the Administrator was not for this reason binding on the Funds and KML**

136. This issue is straightforward.  Turning first to the linguistic context, the references to bad faith and manifest error in the Manager Agreements and the other documents in the Contractual Scheme are all in substantially the same terms as the reference in the Manager Agreement for the First Global Period (at clause 4.4):

> "*In the absence of bad faith or manifest error, the Net Asset Value Calculations made by the Administrator are conclusive and binding on all shareholders.*"

137. The reference needs to be considered in context:

> "*In addition to special valuation calculations relating to illiquid securities, other special situations affecting the measurement of Net Asset Values may arise from time to time. Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio positions could have an adverse effect on the Fund's net assets if judgments regarding appropriate valuations made by the Administrator should prove incorrect.  In the absence of bad faith or manifest error, the Net Asset Value calculations*

48

_made by the Administrator are conclusive and binding on all shareholders._" [Emphasis added.]

138. What the clause is saying is that judgments by the Administrator as to the calculation of NAV may prove incorrect but that unless the Administrator has acted in bad faith or made a manifest error those calculations will nonetheless be final and binding on all shareholders. This construction finds contextual support in that it occurs within clause 4, headed "_Net Asset Value_", which deals with the calculation of NAV by the Administrator.

139. The Manager Agreements fall to be construed in the context of the other documents in the contractual scheme.  As summarised earlier in this judgment, Kingate Global's Articles of Association provided at Regulation 58 that the NAVs would be binding on all persons absent bad faith or manifest error [Regulation 58].  This is in substance the same provision as appeared in the Manager Agreements.  Regulation 56[2] provided that the Administrator could conclusively rely on fair value valuations provided by the Manager and the Investment Adviser, and that no independent appraisals in respect of the NAVs would be required.  Their conclusiveness was not qualified by that Regulation.   Doubtless that is why independent valuations were not required.  As any valuations provided by the Manager or the Investment Adviser were conclusive, they could not be impugned on grounds of bad faith or manifest error.

140. During the Second Global Period and the Euro Period, the Manager Agreements provided that the Manager was entitled to a fixed monthly based management fee as described in the Information Memoranda.  The Information Memoranda included the standard provision that in the absence of bad faith or manifest error the NAV calculations made by the Administrator were conclusive and binding on all shareholders and referred to "_CERTAIN RISK FACTORS_".  These included the possibility of fraud or misappropriation by the Investment Adviser or other third party.  The reference to these risk factors emphasised the point made in the Manager Agreement for the First Global Period.  Notwithstanding third party fraud or misappropriation, the NAV calculations made by the Administrator would

49

be conclusive and binding on all shareholders absent bad faith or manifest error by the Administrator.

141. The commercial context supports this construction. It was an express term of the Manager Agreements that the monthly management fee due to KML was to be calculated based on the monthly NAV determinations by the Administrator for the purposes of the subscription and redemption of shares. Given the need for those calculations to be certain, it would make little commercial sense to expose the Funds to the risk that they could potentially be set aside on the basis of unknown and unknowable factors that were beyond the Administrator's control.

142. I conclude that the bad faith and/or manifest error of BLMIS does not constitute bad faith and/or manifest error in relation to the calculation of the NAV, such that any determination of NAV made by the Administrator was not for this reason binding on the Funds and KML.

**(6)  If the facts are as pleaded by the Funds at paragraph 15 of the Reply, whether the conduct of the Administrator constituted bad faith and/or manifest error for the purpose of the NAV calculations, such that any determination of NAV made by it was not for this reason binding on the Funds and KML**

143. On the alleged facts, this issue is concerned not with bad faith but with manifest error. A "*manifest error*" was defined by Lewison J (as he then was) in IIG Capital v Van Der Merwe [2008] 1 All ER (Comm) 435, Ch D, at para 52 as: "*one that is obvious or easily demonstrable without extensive investigation.*"  This definition was approved by the Court of Appeal of England and Wales in that case as reported at [2008] 2 All ER (Comm) 1185 at para 35.

144. The error need not be apparent on the face of the determination: it is permissible to examine the process by which the determination was arrived at and to show that the determination was obviously wrong by reference to an error in that process. See eg Axa Sun Life Services v Campbell Martin

50

[2011] 1 CLC 312, EWCA, *per* Stanley Burnton LJ at paras 72 – 74 and Rix LJ at para 108; and <u>IG Index Plc</u> v <u>Colley</u> [2013] EWHC 478, QB, *per* Stadlen J at para 813.

145. On the facts of this case, therefore, it would be permissible to go behind the NAVs and examine the calculations which gave rise to them.   If the Administrator made an obvious error in the calculations then that error would count as manifest.   But the calculations would have to be wrong on the basis of the material before the Administrator, rather than wrong on the basis of the true state of affairs as known to BLMIS and Mr Madoff.   Any irregularities in the process by which the Administrator calculated those figures would be relevant only insofar as they went to demonstrate that the figures were wrong.

146. The error need not be detected at the time.   In <u>IG Index Plc</u> v <u>Colley</u> due to the fraud of one of the defendants it went undetected for years.   See the judgment of Stadlen J at 826.   In <u>North Shore</u> the existence of a manifest error in the amount of debt certified as owing under a guarantee depended upon the Court of Appeal finding that a purported variation of a loan agreement had contractual effect.   As Smith LJ stated at para 61, the guarantors could see immediately that the certificate was incorrect, but they could not demonstrate that conclusively until the court had determined the issue of variation.   It is in that context that Sir Andrew Morritt's statement at para 53 that he could "*see no reason why the error must be manifest at the time of the certificate*" should be understood.

147. In the present case there was no error detected at the time.   But, as Mr Boyle submitted, any error should, to count as manifest, have been reasonably *capable* of detection by the Administrator at or near the time when it was made.   The possibility of prompt detection was important given the importance of the monthly NAV determinations for the redemption and calculation of shares.   In practical terms, therefore, the question is whether any error is something which the Administrator should have spotted.   The fact that no such error was in fact spotted by the Administrator is beside the point.

51

148. Turning to para 15 of the Reply, it will be recalled that the Administrator allegedly:

    (1)    failed to verify the figures provided by BLMIS for the purpose of calculating the NAV; and/or

    (2)    ignored inconsistencies in the figures provided by BLMIS; and/or

    (3)    failed to consider and address inconsistencies in the figures provided by BLMIS adequately; and/or

    (4)    relied on KML and/or Mr Ceretti and/or Mr Grosso and/or FIM to verify the figures provided by BLMIS and/or to check the calculations of the NAV, and/or it permitted KML and/or Mr Ceretti and/or Mr Grosso and/or FIM to vary the calculations of the NAV, as pleaded in paragraph 18 of the Reply.

149. These allegations are merely bare bones. The affidavit of Jeremy Scott filed on behalf of the Funds' Joint Liquidators put some flesh on them:

"*205.   From about January 2000, the Administrator started to carry out its own price checking of the securities bought and sold according to the Madoff monthly statements, in that it consulted publicly available sources (such as Bloomberg) in order to see whether the prices at which Madoff said (in the statements) the securities had been bought and/or sold corresponded with information published elsewhere. ...*

*206.   ... on at least one occasion, the price checking process generated inconsistencies which could not be verified by the Administrator. On that occasion, FIM (through Mr Grosso) advised the Funds to accept the figures provided by Madoff, notwithstanding the inconsistencies identified by the Administrator.*"

150. Mr Scott then went on to give details of that one occasion.  The Administrator contacted KML to draw to its attention valuation differences between BLMIS and Bloomberg.  The upshot was that one Mr Wetherhill, who was a director of the Funds and also of KML, and the Administrator took steps to convene Board Meetings of the Funds for the purpose of obtaining resolutions that following the advice of FIM they would utilise the prices provided by BLMIS, which resolutions were duly signed by the

52

directors. It would therefore appear that the four allegations are all interrelated.

151. Mr Boyle argued persuasively that on the strength of Mr Scott's affidavit the Administrator did not ignore or fail to address the inconsistency, but acted together with the Funds and KML to address it. There is considerable force in his submission that Mr Scott's affidavit would not support a finding of manifest error by the Administrator. However Mr Beltrami fairly pointed out that the purpose of the parties putting in evidence was to enable the Court to determine the construction issues based on a factual platform, and not to make good the pleaded allegations.

152. I therefore conclude that if the facts are as pleaded by the Funds at paragraph 15 of the Reply, then the conduct of the Administrator *may* have constituted manifest error (but not bad faith) for the purpose of the NAV calculations, such that any determination of NAV made by it was not for this reason binding on the Funds and KML. The facts are not pleaded with sufficient particularity for me to make a finding one way or the other.

**(7) If the breaches of duty pleaded at paragraphs 106 and 107 of the Statement of Claim are established, whether the Defendants are precluded from asserting a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML by reason of its inducement of the Funds' mistake**

153. Although the wording of this question was agreed by all parties prior to the hearing, there were two aspects of it that proved controversial. First, although the question is premised on a mistake by the Funds, Mr Lowe submitted that there was in fact no such mistake as the Funds were contractually obliged to pay the NAV as determined by the Administrator. Any mistake in the calculation of the NAV was therefore attributable, he submitted, to the Administrator and not the Funds.

154. The answer to this point is, as Mr Beltrami submitted, that the Funds' mistake was to believe that the information supplied by BLMIS was correct.

Had the Funds known the true state of affairs there is in my judgment an irresistible inference that they would have suspended the determination of NAV, as they did when the Madoff fraud was uncovered. Had they done so, the management fees to which KML was entitled – or at any rate those which fell to be calculated after the suspension – would have been substantially less.

155. Second, there was a lively debate as to whether for purposes of answering this question the Court should assume that the pleaded facts were sufficient to establish that KML induced the Funds' mistake. I read the question as requiring the Court to make that assumption. I am in any case unable to say from the pleadings whether or not the alleged breaches of duty induced the Funds' mistake: I can properly conclude only that they may have done.

156. On the assumption, which I make for the purposes of this question, that KML did induce the Funds' mistake, Mr Beltrami put his case in two ways. First, he submitted that such inducement negatived KML's contractual entitlement to the payment of management fees, at least insofar as such payment exceeded the "true" NAV of the Funds, whatever that might have been from time to time.

157. Mr Beltrami relied upon the principle that a party will not generally be entitled to take advantage of his own breach of contract as against the other party. This principle applies as much to a party seeking to obtain a benefit under a continuing contract as it does to a party who relies on his breach to avoid a contract and thereby escape his obligations. See the leading judgment of Lord Jauncey, with whom the other members of the House of Lords agreed, in Alghussein Establishment v Eton College [1988] 1 WLR 587 at 591 D – E and 594 C – D.

158. There are two further aspects of the principle which are material to the instant case. First, it is necessary to show that the contractual rights or benefits which the party in question is seeking to assert or claim arise as a direct consequence of that party's prior breach. See the leading judgment of Mr Justice Ribeiro PJ, with whom the other members of the Court of Final

54

Appeal of the Hong Kong Special Administrative Region agreed, in
<u>Kensland Realty Limited</u> v <u>Whale View Investment Limited</u> [2001] HKCFA
57 at para 95.

159. On the Funds' case, the overpayment of management fees arose as a direct
consequence of KML's breach of duty.   It is true that, as Mr Boyle
submitted, KML does not need to rely on a breach of duty to establish its
right to payment: it performed services under the Manager Agreements for
which it was contractually entitled to be paid.  But were it not for that breach
of duty then on the Funds' case the amount to which KML was entitled
would have been substantially less.

160. Secondly, the principle is one not of law but of construction.   See
<u>Alghussein Establishment</u> v <u>Eton College</u> *per* Lord Jauncey at 595 G – H.  It
is a presumption which will be rebutted if the agreement contains clear
express provisions to the contrary.  See the speech of Lord Jauncey at 595 C
– D, citing with approval the speech of Lord Diplock in <u>Cheall</u> v <u>Association
of Professional Executive Clerical and Computer Staff</u> [1983] 2 AC 180,
HL, at 189.

161. Mr Boyle submitted that as the Manager Agreements defined the scope of
KML's liabilities to the Funds there was no room for the application of the
presumption.  For ease of reference I shall repeat the specimen clause from
the Manager Agreement dated 1st May 2000 with Kingate Euro which is set
out earlier in this judgment.

*"The Manager (and any officer or director of the Manager) shall not be liable to the
Fund or its Security holders for any error of judgment or for any loss suffered by the
Fund or its security holders in connection with its services in the absence of gross
negligence, wilful default, fraud, or dishonesty in the performance or non-performance of
their obligations or duties."*

162. In my judgment this clause, like the similar clauses in the other Manager
Agreements, limits the circumstances in which KML may be liable to the
relevant Fund but does not limit the nature of that liability.  Thus the clause
contains a clear, express provision that the presumption will not apply in the

absence of gross negligence, wilful default, fraud, or dishonesty in the performance or non-performance by KML of its obligations or duties: it does not provide that the presumption will not apply if any one of those circumstances is present.

163.   The upshot is that I accept Mr Beltrami's submission that, on the assumption that KML induced the Funds' mistake, such inducement negatived KML's contractual entitlement to the payment of management fees insofar as such payment exceeded the "true" NAV of the Funds.   It follows that in those circumstances contractual entitlement cannot give rise to a defence to the Funds' claim in unjust enrichment.

164.   The alternative way in which Mr Beltrami put his case was that, assuming that KML was contractually entitled to the management fees which it received, the Funds should be permitted to recover the mistaken payments as the mistake was induced by KML's breach of duty.   He relied principally on two cases: Barclays Bank v Simms [1980] QB 677, HC, and Sybron v Rochem [1984] Ch 112, EWCA.

165.   In Barclays Bank v Simms, Goff J (as he then was) stated:

"*From this formidable line of authority certain simple principles can, in my judgment, be deduced: (1) If a person pays money to another under a mistake of fact which causes him to make the payment, he is prima facie entitled to recover it as money paid under a mistake of fact. (2) His claim may however fail if ... (b) the payment is made for good consideration, in particular if the money is paid to discharge, and does discharge, a debt owed to the payee (or a principal on whose behalf he is authorised to receive the payment) by the payer or by a third party by whom he is authorised to discharge the debt; ...*

. . . . .

*To these simple propositions, I append the following footnotes:*

*(a) Proposition 1. This is founded upon the speeches in the three cases in the House of Lords, to which I have referred. It is also consistent with the opinion expressed by Turner J. in Thomas v. Houston Corbett & Co. [1969] N.Z.L.R. 151, 167. Of course, if the money was due under a contract between the payer and the payee, there can be no recovery on this ground unless the contract itself is held void for mistake (as in Norwich Union Fire*

56

*Insurance Society Ltd.* v. *Wm. H. Price Ltd.* [1934] A.C. 455) or is rescinded by the plaintiff. ...

(c) *Proposition* 2 (b). This is founded upon the decision In *Aiken* v. *Short*,1 H. & N. 210, and upon dicta in *Kerrison* v. *Glyn, Mills, Currie & Co.*,81 L.J.K.B. 465. However, even if the payee has given consideration for the payment, for example by accepting the payment in discharge of a debt owed to him by a third party on whose behalf the payer is authorised to discharge it, that transaction may itself be set aside (and so provide no defence to the claim) if the payer's mistake was induced by the payee, or possibly even where the payee, being aware of the payer's mistake, did not receive the money in good faith: cf. *Ward & Co.* v. *Wallis* [1900] 1 Q.B. 675, 678-679, per Kennedy J."

[Paragraph breaks added for ease of reference.]

166. The footnote to Proposition 1 was evidently what Lord Sumption relied upon as authority for the proposition cited earlier in this judgment from <u>Fairfield</u> that:

"*to the extent that a payment made under a mistake discharges a contractual debt of the payee, it cannot be recovered, unless (which is not suggested) the mistake is such as to avoid the contract: ...*"

167. Mr Beltrami relied upon the footnote to Proposition 2(b).   However the footnote was directed to three party cases where A paid B to discharge a debt owed to B by C rather than two party cases where A paid B to discharge a debt owed to B by A.   The present case, like <u>Fairfield</u>, involves the latter situation.   Insofar as the footnote to Proposition 2(b) is applicable to two party cases, it does not – and does not purport – to override the requirement in the footnote to Proposition 1 that there can be no recovery of money paid under a mistake of fact unless the contract itself is held void for mistake.   As noted above, there is not and could not credibly be any suggestion that the Manager Agreements fall into this category.   In the premises, <u>Barclays Bank</u> v <u>Simms</u> does not assist Mr Beltrami.

168. In <u>Sybron</u> v <u>Rochem</u> the relevant defendant ("the Defendant") was employed by the relevant plaintiff ("the Plaintiff") in a senior management position.   During the period of the Defendant's employment they both made payments for the benefit of the Defendant to a pension and life assurance

57

scheme administered by the Plaintiff.  Upon the Defendant's early retirement and pursuant to the scheme the Plaintiff paid him a lump sum.

169.    It was a term of the scheme that if the Defendant was dismissed for fraud or serious misconduct the Plaintiff did not have to make any payment to the Defendant insofar as that payment was funded by the Plaintiff's contributions to the scheme.

170.    Unbeknown to the Plaintiff, the Defendant while still in its employ was engaged in a conspiracy with other employees of the Plaintiff and its affiliates to set up a business in direct competition with the Plaintiff and its affiliates.

171.    When the Plaintiff learned of the Defendant's activities it brought proceedings against him to recover the lump sum payment, less the contributions made by the Defendant, on the ground that the payment was made on a mistake of fact.  Had the Plaintiff known of the Defendant's misconduct it would have dismissed him and would not have made the payment.

172.    The Plaintiff succeeded both at first instance and on appeal.  The Court of Appeal held that the Defendant was under a duty to disclose the misconduct of the other employees to the Plaintiff notwithstanding that such disclosure would inevitably have disclosed his own misconduct.  His failure to do so was a fraudulent breach of his duty to the Plaintiff and one which induced the Plaintiff's mistake.

173.    The facts of <u>Sybron</u> v <u>Rochem</u> are far removed from the facts of the instant case.  In <u>Sybron</u> the Plaintiff was mistaken about a fact which would have entitled it to terminate the contract, which brings the case within Goff J's footnote to Proposition 1.  Moreover, the mistake was induced by the Defendant's fraudulent conduct.  In the instant case, the Funds' mistake would not have entitled them to terminate the Manager Agreements, and it was allegedly induced by KML performing its contractual duties

58

inadequately but not dishonestly.  Consequently <u>Sybron</u> v <u>Rochem</u> does not assist Mr Beltrami either.

174.    Assuming that KML was contractually entitled to the management fees paid, therefore, the Defendants are not precluded from asserting a contractual entitlement defence to the claim in unjust enrichment by reason of KML's inducement of the Funds' mistake.

175.    Nonetheless, I conclude that if the breaches of duty pleaded at paragraphs 106 and 107 of the Statement of Claim are established, the Defendants are precluded from asserting a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML by reason of its inducement of the Funds' mistake.  As stated above, this is because such inducement negatived KML's contractual entitlement to the payment of management fees insofar as such payment exceeded the "true" NAV of the Funds.

**Summary**

176.    The preliminary issues are therefore resolved as follows:

(1)    (a)    Whether the NAVs were determined from time to time by the Administrator on the assumption (made for the purposes only of the Trust Defendants' and KML's Preliminary Issues Summonses) that KML, and/or FIM, and/or Mr Grosso and/or Mr Ceretti had input over the calculation of the NAV to the extent of control, on the basis pleaded at paragraphs 18 and 19 of the Reply;

*Yes, the NAVs were determined from time to time by the Administrator.*

(b)    If the answer to (a) is yes, were the Administrator's determinations of the NAV binding on the Funds for the purpose of calculating the fees due to KML pursuant to the Manager Agreements in force between the Funds and KML, in the absence of bad faith or manifest error;

*Yes, the Administrator's determinations were binding on the Funds for that purpose.*

(2)    If the answer to issue (1)(b) is yes, whether the fees paid by the Funds to KML on the basis of those NAV figures, ie the Disputed Fees, were, in the absence of bad faith or manifest error, properly due to KML under the terms of the Manager Agreements;

*Yes, in the absence of bad faith or manifest error, the fees were properly due to KML.*

(3)    If the answer to (2) is yes, and subject to issues (5) to (7), whether in consequence the Funds are precluded from asserting that the Disputed Fees, or any payments alleged by the Funds to originate from the Disputed Fees, are recoverable from: (a) KML; (b) the FIM Defendants; and (c) the Trust Defendants;

*Yes, subject to issues (5) to (7), the Funds are so precluded.*

(4)    If the answer to any of issues (1) to (3) is no, whether the Defendants have a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML;

*No, in those circumstances they do not.*

(5)    Whether the bad faith and/or manifest error of BLMIS constitutes bad faith and/or manifest error in relation to the calculation of the NAV, such that any determination of NAV made by the Administrator was not for this reason binding on the Funds and KML;

*No, it does not.*

(6)    If the facts are as pleaded by the Funds at paragraph 15 of the Reply, whether the conduct of the Administrator constituted bad faith and/or manifest error for the purpose of the NAV calculations, such that any determination of NAV made by it was not for this reason binding on the Funds and KML;

60

*It may have constituted manifest error, such that any determination of NAV made by the Administrator was not binding on the Funds or KML.*

(7)     If the breaches of duty pleaded at paragraphs 106 and 107 of the Statement of Claim are established, whether the Defendants are precluded from asserting a defence to the claim in unjust enrichment insofar as this defence derives from alleged contractual entitlement on the part of KML by reason of its inducement of the Funds' mistake.

*Yes, in that event the Defendants are precluded on the basis that KML's inducement of the Funds' mistake negatived its contractual entitlement.*

177.    Thus in order to succeed on a mistake based claim the Plaintiffs must first establish fault on the part of the Administrator or KML.

178.    I shall hear the parties as to costs.

Dated this 25th day of September, 2015

_____

Hellman J

TAB 32

*Kleinwort Benson Ltd v Lincoln CC* [1999] 2 AC 349, House of Lords

2 A.C.

A                              [HOUSE OF LORDS]

KLEINWORT BENSON LTD.    .    .    .    .    .    APPELLANT

                              AND

LINCOLN CITY COUNCIL    .    .    .    .    .    .    RESPONDENT

B    SAME    .    .    .    .    .    .    .    .    .    APPELLANT

                              AND

BIRMINGHAM CITY COUNCIL    .    .    .    .    .    RESPONDENT

SAME    .    .    .    .    .    .    .    .    .    APPELLANT

C                              AND

SOUTHWARK LONDON BOROUGH COUNCIL    .    .    RESPONDENT

SAME    .    .    .    .    .    .    .    .    .    APPELLANT

                              AND

D    KENSINGTON AND CHELSEA ROYAL LONDON
       BOROUGH COUNCIL    .    .    .    .    .    .    RESPONDENT

                    [CONSOLIDATED APPEALS]

1998    March 9, 10, 11, 12, 16;        Lord Browne-Wilkinson, Lord Goff of
E       Oct. 29                          Chieveley, Lord Lloyd of Berwick,
                            Lord Hoffmann and Lord Hope of Craighead

*Restitution—Unjust enrichment—Money paid under mistake of law—
    Money paid to local authority under interest rate swap agreement—
    Settled understanding of law subsequently changed by judicial
    decision—Interest rate swap agreements held to be ultra vires
    local authorities—Payment subject of honest receipt by local
F   authority—Whether recoverable as being paid under mistake of
    law—Whether limitation period running from date of discovery of
    mistake—Limitation Act 1980 (c. 58), s. 32(1)(c)*

        On various dates between 1982 and 1985 the plaintiff bank
    entered into interest rate swap agreements with each of four local
    authorities. Each transaction was fully performed by both parties
    according to its terms and resulted in the bank paying to the
G   authorities sums totalling £811,208. Following a decision of the
    House of Lords in 1991 holding that such interest rate swap
    contracts were outside the statutory powers of local authorities
    the bank commenced proceedings in the Commercial Court
    against the four local authorities claiming restitution of the sums
    it had paid to them. Amounts totalling £388,114, representing
    sums which had been paid less than six years before the respective
H   writs had been issued, were recovered by the bank pursuant to
    summary judgment or voluntary repayment. With regard to the
    outstanding payments totalling £423,094 which had been made
    outside the six-year limitation period, the judge made orders for
    the trial of a preliminary issue as to whether the bank's claim that

Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))          [1999]

A

such payments had been made by it in the mistaken belief that
they were being made pursuant to a binding contract disclosed a
cause of action in mistake and, if so, whether the mistake was one
in respect of which the bank could rely on section 32(1)(c) of the
Limitation Act 1980[1] so that the period of limitation had not
begun to run until the bank had "discovered the . . . mistake . . .
or could with reasonable diligence have discovered it." The judge
held in each case that he was bound by authority to hold that
money paid under a mistake of law was not recoverable in
restitution and accordingly declined to answer the question
whether the bank could rely on section 32(1)(c). Having granted a
certificate that a point of law of general public importance was
involved in his decision in respect of which he was bound by
decisions of the Court of Appeal, leave was given for consolidated
appeals direct to the House of Lords.

B

On appeal by the bank:—

C

*Held,* allowing the appeals (Lord Browne-Wilkinson and Lord
Lloyd of Berwick dissenting), that on an application of the
principle of unjust enrichment the rule precluding recovery of
money paid under a mistake of law could no longer be maintained
and recognition should be given to a general right to recover
money paid under a mistake, whether of fact or law, subject to
the defences available in the law of restitution; that money paid
under a mistake of law was recoverable even where the payment
had been made under a settled understanding of the law which
was subsequently departed from by judicial decision or where the
payment had been received by the recipient under an honest belief
of an entitlement to retain the money; that there was no principle
in English law that money paid under a void contract was
irrecoverable on the ground of mistake of law where the contract
had been fully performed according to its terms; and that,
accordingly, since the relevant limitation period applicable to such
claims was that laid down by section 32(1)(c) of the Act of 1980,
namely six years from the date on which the mistake was or could
with reasonable diligence have been discovered, the facts pleaded
by the bank disclosed a cause of action in mistake which was not
time-barred (post, pp. 372H–373E, 375G–H, 379F–H, 381B–C,
385C–D, 386H–387A, E–F, 389C–F, 398C–D, 400H–401A, 405B–D,
411C–E, 413E–F, 414G–415B, 416F–417A, 418B–C).

D

E

F

*Bilbie v. Lumley* (1802) 2 East 469 and *Brisbane v. Dacres*
(1813) 5 Taunt. 143 overruled.

Decision of Langley J. reversed.

The following cases are referred to in their Lordships' opinions:

*Air Canada v. British Columbia* [1989] 1 S.C.R. 1161; 59 D.L.R. (4th) 161
*Attorney-General for Hong Kong v. Reid* [1994] 1 A.C. 324; [1993] 3 W.L.R.
    1143; [1994] 1 All E.R. 1, P.C.

G

*Baker v. Courage & Co.* [1910] 1 K.B. 56
*Beauchamp (Earl) v. Winn* (1873) L.R. 6 H.L. 223, H.L.(E.)
*Beaufort Developments (N.I.) Ltd. v. Gilbert-Ash N.I. Ltd.* [1999] 1 A.C. 266;
    [1998] 2 W.L.R. 860; [1998] 2 All E.R. 778, H.L.(N.I.)
*Bell Bros. Pty. Ltd. v. Shire of Serpentine-Jarrahdale* [1969] W.A.R. 155
*Bilbie v. Lumley* (1802) 2 East 469
*Brisbane v. Dacres* (1813) 5 Taunt. 143
*British Hydro-Carbon Chemicals Ltd. and British Transport Commission—
    Petitioners,* 1961 S.L.T. 280, H.L.(Sc.)

H

[1] Limitation Act 1980, s. 32(1)(c): see post, p. 366C.

2 A.C.                 Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))

A    *Chatfield v. Paxton (Note)* (1798) 2 East 471

*Commissioner of State Revenue v. Royal Insurance Australia Ltd.* (1994) 182 C.L.R. 51

*Cooper v. Phibbs* (1867) L.R. 2 H.L. 149, H.L.(I.)

*David Securities Pty. Ltd. v. Commonwealth Bank of Australia* (1992) 175 C.L.R. 353

*Dawnays Ltd. v. F. G. Minter Ltd. and Trollope and Colls Ltd.* [1971] 1 W.L.R. 1205; [1971] 2 All E.R. 1389, C.A.
B
*Derrick v. Williams* [1939] 2 All E.R. 559, C.A.

*Diplock, In re; Diplock v. Wintle* [1948] Ch. 465; [1948] 2 All E.R. 318, C.A.

*Dixon v. Monkland Canal Co.* (1831) 5 W. & S. 445, H.L.(Sc.)

*Dobbs v. Grand Junction Waterworks Co.* (1883) 9 App.Cas. 49, H.L.(E.)

*Donoghue v. Stevenson* [1932] A.C. 562, H.L.(Sc.)

*Downshire Settled Estates, In re; Marquess of Downshire v. Royal Bank of Scotland* [1953] Ch. 218; [1953] 2 W.L.R. 94; [1953] 1 All E.R. 103, C.A.
C
*Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32; [1942] 2 All E.R. 122, H.L.(E.)

*Guinness Mahon & Co. Ltd. v. Kensington and Chelsea Royal London Borough Council* [1999] Q.B. 215; [1998] 3 W.L.R. 829; [1998] 2 All E.R. 272, C.A.

*Hallett's Estate, In re; Knatchbull v. Hallett* (1880) 13 Ch.D. 696, C.A.

*Hazell v. Hammersmith and Fulham London Borough Council* [1990] 2 Q.B. 697; [1990] 2 W.L.R. 17; [1990] 3 All E.R. 33, D.C.; [1992] 2 A.C. 1; [1991] 2 W.L.R. 372; [1991] 1 All E.R. 545, H.L.(E.)
D
*Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465; [1963] 3 W.L.R. 101; [1963] 2 All E.R. 575, H.L.(E.)

*Henderson v. Folkestone Waterworks Co.* (1885) 1 T.L.R. 329, D.C.

*Hindcastle Ltd. v. Barbara Attenborough Associates Ltd.* [1997] A.C. 70; [1996] 2 W.L.R. 262; [1996] 1 All E.R. 737, H.L.(E.)

*Hollis' Hospital Trustees and Hague's Contract, In re* [1899] 2 Ch. 540
E
*Hydro-Electric Commission of the Township of Nepean v. Ontario Hydro* [1982] 1 S.C.R. 347; 132 D.L.R. (3d) 193

*James, Ex parte; In re Condon* (1874) L.R. 9 Ch.App. 609

*Kelly v. Solari* (1841) 9 M. & W. 54

*Kiriri Cotton Co. Ltd. v. Dewani* [1960] A.C. 192; [1960] 2 W.L.R. 127; [1960] 1 All E.R. 177, P.C.

*Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548; [1991] 3 W.L.R. 10; [1992] 4 All E.R. 512, H.L.(E.)
F
*Lister & Co. v. Stubbs* (1890) 45 Ch.D. 1, C.A.

*Lowry v. Bourdieu* (1780) 2 Doug. 469

*Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.* [1974] A.C. 689; [1973] 3 W.L.R. 421; [1973] 3 All E.R. 195, H.L.(E.)

*Morgan Guaranty Trust Co. of New York v. Lothian Regional Council,* 1995 S.C. 151; 1995 S.L.T. 299
G
*Northern Regional Health Authority v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644; [1984] 2 W.L.R. 676; [1984] 2 All E.R. 175, C.A.

*Pavey & Matthews Pty. Ltd. v. Paul* (1987) 162 C.L.R. 221

*Phillips-Higgins v. Harper* [1954] 1 Q.B. 411; [1954] 2 W.L.R. 117, 782; [1954] 1 All E.R. 116; [1954] 2 All E.R. 51n., C.A.

*Reg. v. Governor of Brockhill Prison, Ex parte Evans (No. 2)* [1999] Q.B. 1043; [1999] 2 W.L.R. 103; [1998] 4 All E.R. 933, C.A.
H
*Reg. v. Tower Hamlets London Borough Council, Ex parte Chetnik Developments Ltd.* [1988] A.C. 858; [1988] 2 W.L.R. 654; [1988] 1 All E.R. 961, H.L.(E.)

*Roberts, In re; Roberts v. Roberts* [1905] 1 Ch. 704, C.A.

*Rose v. Ford* [1937] A.C. 826; [1937] 3 All E.R. 359, H.L.(E.)

*Southern Pacific Co. v. Jensen* (1917) 244 U.S. 205

Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))                    [1999]

*Stacey v. Hill* [1901] 1 K.B. 660, C.A.                                                      A

*Stirling v. Earl of Lauderdale* (1733) Mor. 2930

*Westdeutsche Landesbank Girozentrale v. Islington London Borough Council*
    [1994] 4 All E.R. 890; [1994] 1 W.L.R. 938; [1994] 4 All E.R. 890, C.A.;
    [1996] A.C. 669; [1996] 2 W.L.R. 802; [1996] 2 All E.R. 961, H.L.(E.)

*Willis Faber Enthoven (Pty.) Ltd. v. Receiver of Revenue,* 1992 (4) S.A. 202

*Wilson and M'Lellan v. Sinclair* (1830) 4 W. & S. 398

*Wollongong, University of v. Metwally* (1984) 158 C.L.R. 447                                 B

*Woolwich Equitable Building Society v. Inland Revenue Commissioners* [1993]
    A.C. 70; [1992] 3 W.L.R. 366; [1992] 3 All E.R. 737, H.L.(E.)


The following additional cases were cited in argument:

*Auckland Harbour Board v. The King* [1924] A.C. 318, P.C.

*Barclays Bank Ltd. v. W. J. Simms Son & Cooke (Southern) Ltd.* [1980] Q.B.
    677; [1980] 2 W.L.R. 218; [1979] 3 All E.R. 522                                           C

*Biggs v. Somerset County Council* [1996] I.C.R. 364; [1996] 2 All E.R. 734,
    C.A.

*Bize v. Dickason* (1786) 1 Durn. & E. 285

*Davis v. Bryan* (1827) 6 B. & C. 651; 9 D. & R. 726

*Doll v. Earle* (1873) 65 Barb. (N.Y.) 298; (1874) 59 N.Y. 638

*Dunham, In re* (1872) 8 Fed.Cas. 37

*Flood v. Irish Provident Assurance Co. Ltd.* (1912) 46 I.L.T. 214; *(Note)* [1912]   D
    2 Ch. 597

*Flower v. Lance* (1875) 59 N.Y. 603

*Hastelow v. Jackson* (1828) 8 B. & C. 221

*Hicks v. Hicks* (1802) 3 East 16

*Hindcastle Ltd. v. Barbara Attenborough Associates Ltd.* [1997] A.C. 70; [1996]
    2 W.L.R. 262; [1996] 1 All E.R. 737, H.L.(E.)

*Jones v. Randall* (1774) 1 Cowp. 17                                                          E

*Julian v. Mayor of Auckland* [1927] N.Z.L.R. 453

*K.L. Tractors Ltd., In re* (1961) 106 C.L.R. 318

*Linz v. Electric Wire Co. of Palestine Ltd.* [1948] A.C. 371; [1948] 1 All E.R.
    604, P.C.

*Maskell v. Horner* [1915] 3 K.B. 106, C.A.

*Midland Great Western Railway of Ireland v. Johnson* (1858) 6 H.L.C. 799,
    H.L.(I.)

*Ministry of Health v. Simpson* [1951] A.C. 251; [1950] 2 All E.R. 1137, H.L.(E.)   F

*Moses v. Macfarlan* (1760) 2 Burr. 1005

*Munt v. Stokes* (1792) 4 Durn. & E. 561

*Phoenix Life Assurance Co., In re; Burges and Stock's Case* (1862) 2 J. & H.
    441; 31 L.J.Ch. 749

*Reg. v. Ireland* [1998] A.C. 147; [1997] 3 W.L.R. 534; [1997] 4 All E.R. 225,
    H.L.(E.)

*Rogers v. Ingham* (1876) 3 Ch.D. 351, C.A.                                                   G

*South Tyneside Metropolitan Borough Council v. Svenska International Plc.*
    [1995] 1 All E.R. 545

*Werrin v. The Commonwealth* (1938) 59 C.L.R. 150


APPEALS from Langley J.

   These were consolidated appeals by the plaintiff bank, Kleinwort
Benson Ltd., against the decisions of Langley J. dated 12 July 1996 in four   H
sets of proceedings brought against, respectively, Birmingham City Council,
Lincoln City Council, Southwark London Borough Council and
Kensington and Chelsea Royal London Borough Council, for restitution

A    of sums paid by the bank to the authorities under interest rate swap
agreements that were subsequently held to be void, whereby the judge held,
in relation to such sums as had been paid by the bank more than six years
after the date of the writs, on a preliminary issue as to (1) whether the
facts pleaded by the bank in its points of claim disclosed a cause of
action in mistake and (2) if so, whether such mistake was one in respect of
which the bank could rely on section 32(1)(c) of the Limitation Act 1980,
B    that issue (1) be answered in the negative. The bank had already recovered
such sums as had been paid within the limitation period from Birmingham
City Council (*Kleinwort Benson Ltd. v. Birmingham City Council* [1997]
Q.B. 380) and the other three authorities.

By an order dated 7 August 1996 the judge certified, pursuant to
section 12 of the Administration of Justice Act 1969, that a point of law
C    of general public importance was involved in his decision and that such
point of law was one in respect of which he was bound by decisions of the
Court of Appeal in previous proceedings. On 9 December 1996 the House
of Lords (Lord Browne-Wilkinson, Lord Steyn and Lord Hoffmann) gave
leave to appeal in the Birmingham, Lincoln and Southwark proceedings.
Leave to appeal in the Kensington and Chelsea proceedings was given by
the House of Lords (Lord Mustill, Lord Nolan and Lord Steyn) on
D    5 March 1997.

The facts are stated in the opinions of Lord Goff of Chieveley and
Lord Hope of Craighead.

*Richard Southwell Q.C.* and *Rhodri Davies* for the bank. The rule
derived from *Bilbie v. Lumley* (1802) 2 East 469 and *Brisbane v. Dacres*
E    (1813) 5 Taunt. 143 that money is not recoverable on the ground that it
was paid under a mistake of law ought no longer to apply. First, it has
become subject to too many exceptions and qualifications. [Reference was
made to the Law Commission Report, "Restitution: Mistakes of Law and
Ultra Vires Public Authority Receipts and Payments" (1994) (Law Com.
No. 227), pp. 11–15, paras. 2.5–2.15; *Cooper v. Phibbs* (1867) L.R. 2 H.L.
149; *Earl Beauchamp v. Winn* (1873) L.R. 6 H.L. 223; *Auckland Harbour*
F    *Board v. The King* [1924] A.C. 318; *Ex parte James; In re Condon* (1874)
L.R. 9 Ch.App. 609; *Reg. v. Tower Hamlets London Borough Council,*
*Ex parte Chetnik Developments Ltd.* [1988] A.C. 858, 874–877; *In re*
*Diplock; Diplock v. Wintle* [1948] Ch. 465; *Kiriri Cotton Co. Ltd. v. Dewani*
[1960] A.C. 192; *Woolwich Equitable Building Society v. Inland Revenue*
*Commissioners* [1993] A.C. 70; *Kelly v. Solari* (1841) 9 M. & W. 54; *Maskell*
G    *v. Horner* [1915] 3 K.B. 106 and *Westdeutsche Landesbank Girozentrale v.*
*Islington London Borough Council* [1994] 4 All E.R. 890, 934.] Secondly,
the rule has no foundation in principle, other than the maxim ignorantia
juris non excusat. The true meaning of that maxim is that ignorance of
the law does not excuse a failure to comply with a duty imposed by law:
the law does not impose a duty not to make mistaken payments. It is
inappropriate to apply the maxim to the payer but not to the payee.
H    [Reference was made to *Lowry v. Bourdieu* (1780) 2 Doug. 469; *Stirling v.*
*Earl of Lauderdale* (1733) Mor. 2930 and *Morgan Guaranty Trust Co. of*
*New York v. Lothian Regional Council,* 1995 S.C. 151.] Thirdly, the rule
cannot be reconciled with the principle of unjust enrichment: see *Fibrosa*

*Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32,   A
61; *Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548 and *Hydro-Electric Commission of the Township of Nepean v. Ontario Hydro* [1982] 1 S.C.R. 347, 357–370. The concern of the courts to protect recipients of payments from actions to recover the money long after the time of payment is now met by the defence of change of position.

Other common law jurisdictions have recognised that the rule is   B
undesirable and unnecessary. [Reference was made to the *Morgan Guaranty* case, 1995 S.C. 151; *Wilson and M'Lellan v. Sinclair* (1830) 4 W. & S. 398; *Dixon v. Monkland Canal Co.* (1831) 5 W. & S. 445; *Air Canada v. British Columbia* [1989] 1 S.C.R. 1161; *David Securities Pty. Ltd. v. Commonwealth Bank of Australia* (1992) 175 C.L.R. 353; *Willis Faber Enthoven (Pty.) Ltd. v. Receiver of Revenue,* 1992 (4) S.A. 202; the Judicature Amendment Act 1958 (New Zealand), sections 94A and 94B and the Law Reform (Property,   C
Perpetuities and Succession) Act 1962 (Western Australia), sections 23 and 24.] Nor do civil law systems draw any general distinction between mistake of fact and mistake of law: see *England, International Encyclopaedia of Comparative Law,* vol. X, ch. 5 and *Zweigert & Kotz, An Introduction to Comparative Law,* 2nd ed. 1987, vol. II, p. 261.

The principle stated in *Barclays Bank Ltd. v. W. J. Simms Son & Cooke (Southern) Ltd.* [1980] Q.B. 677, 695–696, that a person who has paid   D
money to another under a mistake of fact is prima facie entitled to recover it, should equally apply where the money is paid under a mistake of law, so that all common law claims for money paid under a mistake, whether of fact or of law, should be recoverable, subject only to the defences of change of position and settlement of an honest claim. Mistake in this context includes ignorance: see the *David Securities* case, 175 C.L.R. 353,   E
369.

The view of the Law Commission in its Report No. 227, pp. 42–47, paras. 5.2–5.13, that there is no mistake in the case of payments made in accordance with a settled view of the law which is subsequently altered by judicial decision, should be rejected. Judicial decisions declaratory of the law often have retrospective effect: see *Hazell v. Hammersmith and Fulham London Borough Council* [1992] 2 A.C. 1.   F

The proposal of Brennan J. in the *David Securities* case, 175 C.L.R. 353, 399 that there should be a defence of honest receipt to a claim for recovery of money is too wide. That would effectively limit recovery for mistake of law to cases of dishonesty.

It is open to the courts to abrogate the mistake of law rule since it is for them to develop the common law: see the *Woolwich* case [1993] A.C.   G
70; *Donoghue v. Stevenson* [1932] A.C. 562 *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465.

The fact that an ultra vires transaction has been fully performed provides no defence to an action for restitution: *Kleinwort Benson Ltd. v. Sandwell Borough Council* (sub nom. *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council* [1994] 4 All E.R. 890) and *Guinness Mahon & Co. Ltd. v. Kensington and Chelsea Royal London Borough Council*   H
[1999] Q.B. 215.

The cause of action for money paid under a mistake accrues when the mistaken payment is made: see *Baker v. Courage & Co.* [1910] 1 K.B. 56

2 A.C.                  Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))

A  and *Goff & Jones, The Law of Restitution,* 4th ed. (1993), pp. 767–768.
[Reference was also made to Birks, "No Consideration: Restitution after
Void Contracts" (1993) 23 W.A.L.R. 195, 228–230, n. 137; Burrows,
"Swaps and the Friction between Common Law and Equity" [1995] R.L.R.
15, 18–19; the *Fibrosa* case [1943] A.C. 32; the *Westdeutsche* case [1994]
4 All E.R. 890, 924–930; [1994] 1 W.L.R. 938, 943–945, 952–953; [1996]
A.C. 669, 710–711 and the *Guinness Mahon* case [1999] Q.B. 215, 226–228.]

B      The bank's claims are not statute-barred. Under section 26(c) of the
Limitation Act 1939 (now section 32(1)(c) of the Limitation Act 1980)
time runs from the date when the mistake was, or could with reasonable
diligence, have been discovered: see *In re Diplock; Diplock v. Wintle* [1948]
Ch. 465, 515–516 and *Phillips-Higgins v. Harper* [1954] 1 Q.B. 411, 418.
*Biggs v. Somerset County Council* [1996] I.C.R. 364 is distinguishable on its
C  facts.

       *Nicholas Underhill Q.C., Charles Béar* and *Mark West* for the local
authorities. The mistake of law rule, though unsupportable as traditionally
formulated, ought not to be abrogated in total. Recovery should not lie
where a payment was made in accordance with a common understanding
of the law which has since been shown to be mistaken. The declaratory
theory should have no role in the law of mistake. The policy of the law is
D  that the risk of subsequent changes in the law is taken by the payer.
[Reference was made to *South Tyneside Metropolitan Borough Council v.
Svenska International Plc.* [1995] 1 All E.R. 545; *David Securities Pty. Ltd.
v. Commonwealth Bank of Australia* (1992) 175 C.L.R. 353, 396–398;
*Henderson v. Folkestone Waterworks Co.* (1885) 1 T.L.R. 329; *Julian v.
Mayor of Auckland* [1927] N.Z.L.R. 453, 458; *Derrick v. Williams* [1939]
2 All E.R. 559, 565; *Commissioner of State Revenue v. Royal Insurance
E  Australia Ltd.* (1994) 182 C.L.R. 51, 89–90; *Werrin v. The Commonwealth*
(1938) 59 C.L.R. 150; *In re Dunham* (1872) 8 Fe.Cas. 37; *Doll v. Earle*
(1873) 65 Barb. (N.Y.) 298; (1874) 59 N.Y. 638; *Flower v. Lance* (1875)
59 N.Y. 603; *Birks, Introduction to the Law of Restitution,* 2nd ed. (1989),
p. 166; *Maddaugh & McCamus, Law of Restitution,* p. 260; *Burrows, Law
of Restitution,* 4th ed. (1993), pp. 118–120; Butler "Mistaken Payments,
Change of Position and Restitution" (*Essays on Restitution,* ed. Finn
F  (1990), pp. 105–106); Law Commission Report No. 227, pp. 42–48, paras.
5.2–5.16.]

       Alternatively, as proposed in the *David Securities* case, 175 C.L.R. 353,
399–400, recovery should not lie where the payee honestly believed that he
was entitled to the payment. The payer should take responsibility for his
mistake.

G      The better course is for the House to leave the existing law in place on
the basis that reform is imminent. The rule was expressly accepted in
*Midland Great Western Railway of Ireland v. Johnson* (1858) 6 H.L.C. 799.
[Reference was also made to *Cooper v. Phibbs,* L.R. 2 H.L. 149; *Rogers v.
Ingham* (1876) 3 Ch.D. 351; *Ministry of Health v. Simpson* [1951] A.C. 251;
and *Reg. v. Tower Hamlets London Borough Council, Ex parte Chetnik
Developments Ltd.* [1988] A.C. 858.] It is too deeply embedded in English
H  jurisprudence to be uprooted judicially: see the *Woolwich* case [1993] A.C.
70, 154, 192. Since the Government has accepted the Law Commission's
recommendations on the issue, it would be wrong for the courts to pre-
empt the process of legislative reform.

**Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))**                    **[1999]**

In any event, an action for recovery ought not to lie where the mistake    A
in question was a mistake as to whether the other party was legally bound
to perform a contract but where that party had in fact done so. Since the
bank got the entirety of what it bargained for, recovery of the money paid
would be a windfall. Claims for restitution of money paid under a void
contract are made on the basis that because of either a failure of
consideration or a mistake it would be unjust for the payee to retain the
money. Once the full consideration bargained for has been rendered, failure    B
of consideration can no longer be alleged and the mistake no longer gives
rise to any injustice. [Reference was made to Birks "No Consideration:
Restitution after Void Contracts" (1993) 23 W.A.L.R. 195, 230, n. 137;
*Bize v. Dickason* (1786) 1 Durn. & E. 285; *Moses v. Macfarlan* (1760) 2
Burr. 1005; *Davis v. Bryan* (1827) 6 B. & C. 651; 9 D. & R. 726; *In re
Phoenix Life Assurance Co.; Burges and Stock's* case (1862) 2 J. & H. 441;    C
*Flood v. Irish Provident Assurance Co. Ltd. (Note)* [1912] 2 Ch. 597; *Lowry
v. Bourdieu,* 2 Doug. 469; *Munt v. Stokes* (1792) 4 Durn. & E. 561;
*Hastelow v. Jackson* (1828) 8 B. & C. 221; *Linz v. Electric Wire Co. of
Palestine Ltd.* [1948] A.C. 371; *In re K.L. Tractors Ltd.* (1961) 106 C.L.R.
318; Swadling, "Restitution For No Consideration" (1995) R.L.R. 73,
75–80; and Millett, "Equity's Place in the Law of Commerce" (1997)
Chancery Bar Association Lecture.]    D

The decisions in *Westdeutsche Landesbank Girozentrale v. Islington
London Borough Council* [1994] 4 All E.R. 890, 930 and *Guinness Mahon
& Co. Ltd. v. Kensington and Chelsea Royal London Borough Council* [1999]
Q.B. 215 that there was no difference, in relation to the right to recover,
between closed and open swaps was wrong. Those decisions were based on
the inaccurate characterisation of the bank's ground of recovery as    E
"absence" of consideration. If the claim is properly characterised as failure
of consideration it is self-evident that no such failure has occurred.

Section 32(1)(c) of the Limitation Act 1980 has no application to
actions for the recovery of money paid under a mistake of law. The
paragraph should be construed as at the moment of its enactment in 1939.
Section 26(c) of the Limitation Act 1939 was enacted to deal with the
narrow point that in all cases where relief was sought from the    F
consequences of a mistake, the equitable rule should prevail and time
should only run from the moment the mistake was discovered or could
with reasonable diligence have been discovered. At the time the mistake of
law rule was an unchallenged pillar of the common law. The law can rarely
be said to be objectively ascertainable so as to be capable of being
"discovered" with reasonable diligence. It would require the application of    G
the fiction that the true state of the law is always discoverable.

*Béar,* following, referred additionally to *Jones v. Randall* (1774) 1 Cowp.
17.

*Southwell Q.C.* in reply. To create a defence of "common understanding"
of the law or "honest receipt" by the payee will prevent the assimilation of
mistakes of law and of fact. A settled law defence would lead to the
absurdity that the worse the legal advice the more likely that the payer    H
could show that he had made a mistake. In any event, *Hazell v.
Hammersmith and Fulham London Borough Council* [1992] 2 A.C. 1 did not
change the law or the facts from the time when the supposed swaps were

A    entered into: it disclosed the mistake which the local authorities and banks
alike had made in applying the Local Government Act 1972 to the normal
swap transaction. There was no relevant pre-existing authoritative opinion,
let alone a long-standing decision of the Court of Appeal, which was
departed from, as happened in *Hindcastle Ltd. v. Barbara Attenborough
Associates Ltd.* [1997] A.C. 70. A honest receipt defence cannot stand with
the principle that it is unjust for the recipient to retain a payment made
B    under a mistake. The existing defences are adequate. In particular, the
defence of change of position achieves the correct balance between
the public interest in the security of receipts and the public interest in the
recovery of money paid under a mistake by which the recipient has been
unjustly enriched.

The supposed swaps contracts were void because they were ultra vires
C    the local authorities. The ultra vires rule is not optional: it would be
incompatible with that rule for ultra vires transactions to become binding
on a local authority simply on the ground that the transaction has been
completed. The appearance of performance of a void contract does not
bar a claim to restitution based on failure of consideration or mistake. It
is wrong to say that the bank got what it bargained for: it did not bargain
for payments by the local authorities for which there was no contractual
D    basis and which carried an obligation to repay.

A payment which was mistaken when it was made cannot become
retrospectively unmistaken. No sufficient reason has been given as to why
the act of making the last mistaken payment on a void swap can destroy
the accrued causes of action existing as a result of earlier mistaken
payments. The correct approach is to be found in the *Westdeutsche* case
E    [1994] 4 All E.R. 890, 929, 941, namely, that only one underlying
transaction is involved—the first—with successive payments merely altering
the location and extent of the enrichment. [Reference was also made to
*Hicks v. Hicks* (1802) 3 East 16.]

As to limitation, limitation statutes need to be always speaking: see
*Reg. v. Ireland* [1998] A.C. 147, 158.

F         Their Lordships took time for consideration.


29 October.  LORD BROWNE-WILKINSON.  My Lords, I have had the
advantage of reading in draft the speech of my noble and learned friend,
Lord Goff of Chieveley which contains yet another major contribution to
the law of restitution.
G         Were it not for one matter, I would be in full agreement with his views.
But unfortunately he and the majority of your Lordships take the view
that when established law is changed by a subsequent decision of the
courts, money rightly paid in accordance with the old established law is
recoverable as having been paid under a mistake of law. I take the view
that the moneys are not recoverable since, at the time of payment, the
payer was not labouring under any mistake.
H         The majority view is that *Hazell v. Hammersmith and Fulham London
Borough Council* [1992] 2 A.C. 1 established that the swaps agreements
were void; that although the decision in *Hazell* postdated the last of the
payments made by the bank to the local authorities the decision operated

retrospectively so that under the law as eventually established the bank     A
were labouring under a mistake at the time they made each payment in
thinking that they were liable to make such payment. Therefore, in their
view, the bank can recover payments made under a mistake of law. My
view, on the other hand, is that although the decision in *Hazell* is
retrospective in its effect, retrospection cannot falsify history: if at the date
of each payment it was settled law that local authorities had capacity to
enter into swap contracts, the bank were not labouring under any mistake     B
of law at that date. The subsequent decision in *Hazell* could not create a
mistake where no mistake existed at the time.

There are two questions to be considered. First, when the common law
is changed by later judicial decision, have all payments made on the basis
of the previous law been made under a mistake of law? Second, in what
circumstances can it be said that there was earlier law which was changed     C
by judicial decision? Does there have to be a clear judicial decision
overruled by a later judicial decision of a higher court or is it enough that,
at the date of payment, there was a generally accepted view of the law
which view was upset by the later decision?

*Where the law is established by judicial decision subsequently overruled*
                                                                             D
I will take the case where the law has been established by a single
decision of the Court of Appeal made in 1930. In 1990 the payer makes a
payment which would only have been due to the payee if the Court
of Appeal decision was good law. The payer was advised that the Court
of Appeal decision was good law. In 1997 this House overruled the Court
of Appeal decision. Is the plaintiff entitled to recover the payment made
in 1990 on the ground of mistake of law?                                      E

There is, as I understand it, no dispute that in order to recover the
plaintiff has to have been labouring under the mistake at the date of
payment and to have made the payment because of that mistake. Certainly
that position has been accepted by the bank in their written reply and by
my noble and learned friend, Lord Goff of Chieveley. The question is
whether the subsequent overruling of the 1930 Court of Appeal decision
requires the court to hold that at the date of payment (1990) the law        F
(contrary to what the plaintiff had been advised) was not the law
established by the Court of Appeal decision of 1930.

The theoretical position has been that judges do not make or change
law: they discover and declare the law which is throughout the same.
According to this theory, when an earlier decision is overruled the law is
not changed: its true nature is disclosed, having existed in that form all     G
along. This theoretical position is, as Lord Reid said in the article "The
Judge As Law Maker" (1972–1973) 12 J.S.P.T.L. (N.S.) 22, a fairy tale in
which no one any longer believes. In truth, judges make and change the
law. The whole of the common law is judge-made and only by judicial
change in the law is the common law kept relevant in a changing world.
But whilst the underlying myth has been rejected, its progeny—the
retrospective effect of a change made by judicial decision—remains. As        H
Lord Goff in his speech demonstrates, in the absence of some form of
prospective overruling, a judgment overruling an earlier decision is bound
to operate to some extent retrospectively: once the higher court in the

A  particular case has stated the changed law, the law as so stated applies not only to that case but also to all cases subsequently coming before the courts for decision, even though the events in question in such cases occurred before the Court of Appeal decision was overruled.

Therefore the precise question is whether the fact that the later overruling decision operates retrospectively so far as the substantive law is concerned also requires it to be assumed (contrary to the facts) that *at the* B  *date of each payment* the plaintiff made a mistake as to what the law then was. In my judgment it does not. The main effect of your Lordships' decision in the present case is to abolish the rule that money paid under a mistake of law cannot be recovered, which rule was based on the artificial assumption that a man is presumed to know the law. It would be unfortunate to introduce into the amended law a new artificiality, viz., that C  a man is making a mistake at the date of payment when he acts on the basis of the law as it is then established. He was not mistaken at the date of payment. He paid on the basis that the then binding Court of Appeal decision stated the law, which it did: the fact that the law was later retrospectively changed cannot alter retrospectively the state of the payer's mind at the time of payment. As Deane J. said in the High Court of Australia in *University of Wollongong v. Metwally* (1984) 158 C.L.R. 447, D  478:

> "A Parliament may legislate that, for the purposes of the law which it controls, past facts or past laws are to be deemed and treated as having been different to what they were. It cannot, however objectively, expunge the past or 'alter the facts of history.'"

E  If that be true of statutory legislation, the same must a fortiori be true of judicial decision. In my judgment, therefore, if a man has made a payment on an understanding of the law which was correct as the law stood at the date of such payment he has not made that payment under a mistake of law if the law is subsequently changed.

I am fortified in that view by considering what will be the effect of your Lordships' decision. A payment which was initially irrecoverable will F  subsequently become recoverable. Consider the hypothetical case I have put. A payment was made in 1990 when the Court of Appeal decision was still valid. Under the existing law, the claim in restitution should apparently have arisen at the date of such payment: see *Baker v. Courage & Co.* [1910] 1 K.B. 56. Yet at that date there could be no question of any mistake. It would not have been possible to issue a writ claiming restitution on the G  grounds of mistake of law until the 1997 decision had overruled the 1930 Court of Appeal decision. Therefore a payment which, when made, and for several years thereafter, was entirely valid and irrecoverable would subsequently become recoverable. This result would be subversive of the great public interest in the security of receipts and the closure of transactions. The position is even worse because all your Lordships consider that the claims to recover money paid under a mistake of law are H  subject to section 32(1)(c) of the Limitation Act 1980, i.e. that in such a case time will not begin to run until the "mistake" is discovered. A subsequent overruling of a Court of Appeal decision by the House of Lords could occur many decades after payments have been made on the

faith of the Court of Appeal decision: in such a case "the mistake" would       A
not be discovered until the later overruling. All payments made pursuant
to the Court of Appeal ruling would be recoverable subject only to the
possible defence of change of position.

     With one possible exception, such judicial and other authority as there
is favours the view that there is no relevant mistake of law if the payment
is made on the basis of the law as it stood at the date of payment. As to
non-judicial authority the Law Commission has taken the view that there       B
would be no relevant mistake: Report No. 227 on Restitution: Mistakes of
Law and Ultra Vires Public Authority Receipts and Payments (Cm. 2731),
paragraphs 5.2–5.16. Not surprisingly, Professor Beatson shares that view:
see [1995] R.L.R. 280, 284; see also *Burrows, The Law of Restitution*,
4th ed. (1993), pp. 118–120.

     As to judicial authority there is a dearth of decisions directly in point.       C
Since the payment of money under a mistake of law was not recoverable
in any event, there is little discussion as to what constitutes a mistake of
law in that context. However, there are two English cases which throw
some light. In *Henderson v. Folkestone Waterworks Co.* (1885) 1 T.L.R.
329, the plaintiff had paid water rates to the defendant calculated in
accordance with the law as it was held to be by the Court of Appeal.
Subsequent to the date of payment, the House of Lords in *Dobbs v. Grand*       D
*Junction Waterworks Co.* (1883) 9 App.Cas. 49 changed, the law: if
calculated under the changed law the plaintiff had overpaid. He sought to
recover the overpayments on the ground that he had paid under
compulsion and under a mistake of law. It was apparently accepted by the
court that if both these factors (i.e. compulsion and mistake of law) were
present, the overpayment could be recovered. Counsel having submitted       E
that the payments had been made in ignorance of the law, Lord
Coleridge C.J. (who had been a member of the Court of Appeal overruled
in *Dobbs's* case) said:

        "Of what law? 1 was ignorant of it before the decision of the
     House of Lords. I had held to the contrary, and two eminent judges
     agreed with me. Can that be put as ignorance of law? Just see what       F
     consequences would follow that wherever there has been a reversal of
     judgment all the money that has been paid under the previous notion
     of the law can be recovered back! Has that ever been held? Can it be
     that every reversal of a decision may give rise to hundreds of actions
     to recover back money previously paid?"

In his judgment, Lord Coleridge C.J. dismissed the plaintiff's claim on the       G
grounds both that there was no element of compulsion in the payment and
that there was no relevant mistake of law. He said:

        "But here at the time the money was paid, which was before *Dobbs's*
     case, the law was in favour of the company, and there was no
     authority to show that it could be recovered back on account of a
     judicial decision reversing the former understanding of the law."       H

The other member of the court concurred but it is not clear on which of
the two grounds. The decision therefore is not of major authority but it
does show that Lord Coleridge was of the view that money was not paid

A    under a mistake of law just because a later change in the law altered the law as it had been at the date of payment.

   The other English case is *Derrick v. Williams* [1939] 2 All E.R. 559. In that case the plaintiff had accepted a payment into court on the basis that a Court of Appeal decision declared the law in a form which precluded the recovery of certain types of damages. Subsequently the House of Lords reversed the Court of Appeal decision and held that such damages were

B    recoverable. The plaintiff in *Derrick v. Williams* was trying to reopen the matter on the grounds that the subsequent decision of the House of Lords showed that he had been proceeding under a mistake of law when he accepted the money paid in. He relied on the equitable principle set out in *In re Roberts; Roberts v. Roberts* [1905] 1 Ch. 704 that a compromise made under a mistake of law can be set aside. The plaintiff's claim failed. Sir

C    Wilfrid Greene M.R. [1939] 2 All E.R. 559, 565 said that he rejected a contention that the mistake was one of fact and continued:

> "It was a mistake of law, and consisted of the fact that the plaintiff was under the belief that the law as laid down by this court … was correctly laid down. In that he was wrong, and he is asking the court to say that, having acted upon the basis of a mistaken view of the law,
D    now that the law has been enunciated by the highest tribunal, he is entitled to make another attempt. That is the thing which, it seems to me, cannot be permitted on principle. It appears to me to be completely indefensible. No shadow of authority was cited to us which would justify the proposition that, where, pursuant to the rules of court, a claim has been satisfied by money paid into court by the defendant, the plaintiff can afterwards come and say: 'I was wrongly
E    advised as to the law when I did this, because the law was not as then laid down by the Court of Appeal, but as subsequently enunciated by the House of Lords.' It would be an intolerable hardship on successful litigants if, in circumstances such as these, their opponents were entitled to harass them with further litigation because their view of the law had turned out to be wrong, and, unless I were constrained
F    by binding authority, I should be quite unable, on principle, to accept any such proposition."

   It is not clear to me whether this case was decided on the ground that payment into court raised special questions, or on the ground that there was no mistake of law because at the date of the withdrawal of the moneys paid into court the law was as stated by the Court of Appeal and not as

G    subsequently stated by the House of Lords. But the decision is at least consistent with the view that in deciding whether a person has acted under a mistake of law at a particular time, the question is whether they mistook the law as it then was without reference to subsequent retrospective change by later decisions.

   In *Commissioner of State Revenue v. Royal Insurance Australia Ltd.*
H    (1994) 182 C.L.R. 51 the High Court of Australia had to consider a payment made in pursuance of a statute which was subsequently repealed with retrospective effect, i.e. the case was analogous to that where the common law is changed by a later common law decision. The majority held that moneys paid under the retrospectively repealed statute were not

Lord
Browne-Wilkinson          **Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))**          [1999]

paid under a mistake of law at common law: see *per* Brennan J., at p. 89,          A
(with whom Toohey and McHugh JJ. agreed) and Dawson J., at p. 100. In
my judgment this is strong authority in favour of the view which I hold.

The only authority pointing the other way is a recent case in the Court
of Appeal decided since the conclusion of the argument in this case:
*Reg. v. Governor of Brockhill Prison, Ex parte Evans (No. 2)* [1999]
Q.B. 1043. In that case the plaintiff had been sentenced to a term of
imprisonment. She was detained by the Governor for a period correctly          B
calculated in accordance with the law as then laid down by a series of
decisions in the Divisional Court. That method of calculating the duration
of the sentence was subsequently disapproved by a later decision of the
Divisional Court which laid down (everyone has assumed correctly) a
different method of calculation. If that new method of calculation was
adopted the plaintiff had been detained for 59 days too long. The plaintiff          C
claimed damages for false imprisonment. The majority (Lord Woolf M.R.
and Judge L.J., Roch L.J. dissenting) held that the retrospective effect of
the change in the law produced by the last Divisional Court decision
prevented the Governor from relying as a defence on the law as it had
been declared by the earlier Divisional Court decisions which at the time
of the 59 days' detention laid down the relevant law. The Master of the
Rolls described the result as being "highly artificial:" it involved the          D
acceptance of Lord Reid's fairy tale but he held that the Court of Appeal
could not abandon the fairy tale. I do not propose to comment on that
decision (which may be coming on appeal to your Lordships' House)
beyond distinguishing it from the present case. In that case the question
was one of substantive law: what was the correct duration of the sentence?
In the view of the Court of Appeal, that fell to be determined by the law          E
as finally declared. Once that view had been reached, the Court of Appeal
were not concerned with the law as at the date of the detention: such law
was irrelevant since it could provide no defence. On the other hand, in the
present case what needs to be determined is not the substantive law at a
particular time but the state of the mind of the payer at that time. Was he
then under a mistake as to the law then current? That is a different
question.          F

In my view therefore, if, at the date of payment, the law was settled by
clear judicial authority then a payment in accordance with such law was
not made under a mistake of law even if the law has subsequently been
changed by later judicial decision. I am fortified in this view by the fact
that the bank in their written submissions in reply expressly accepted this
proposition. They concentrated their submissions on the question whether
it is ever possible to establish that at a particular date the law was "settled"          G
in the absence of a judicial decision to that effect. I find it surprising that
the majority of your Lordships are finding the law to be that which neither
of the parties contended for.

*Settled law in the absence of judicial decision?*

It is not suggested in the present case that before the decision of this          H
House in *Hazell's* case [1992] 2 A.C. 1 there was any judicial decision
which established that local authorities had the capacity to enter into swap
agreements. What is said is that, even in the absence of such a decision,

A   there was a "settled view" that local authorities had the necessary capacity
and that swap agreements were therefore valid. It is not for your Lordships
on these preliminary issues to seek to determine whether in fact there was
such a settled view of the law. However, your Lordships do have to decide
whether, if at the trial such a settled view is proved to have existed, it
would prevent the bank from recovering the moneys paid on the basis of
moneys paid under a mistake of law.

B   Much commercial and property activity occurs on the basis of law
which is not laid down by judicial decision. Such "law" consists of the
practice and understanding of lawyers skilled in the field. If, before
payment, the payer had sought advice in some cases he would have been
told that the law was dubious: if having received such advice he paid over,
he must have taken the risk that the law was otherwise and cannot
C   subsequently recover what he has paid. In other cases, he would have been
told that the law was clear and he could safely act on it. If in this latter
case the payer acted on the law as so advised and subsequently a court
held that the law was not as advised, can the payer recover his payment as
moneys paid under a mistake of law? In the ordinary case, the payer's
adviser will just have given wrong legal advice: as a result the payment will
have been paid under a mistake of law and will be recoverable. But in a
D   limited number of cases, of which this may be one, it is not really possible
to say that the legal adviser made a mistake in advising as he did. There
are areas of the law which are sparsely covered by judicial decision, for
example, real property, banking and regulatory law. In such areas the
commercial world acts, and has to act, on the generally held view of
lawyers skilled in the field. In such cases, a payer who sought advice would
E   receive the same advice from everyone skilled in the field. It used to be
said that the practice of conveyancers of repute was strong evidence of real
property law: see *In re Hollis' Hospital Trustees and Hague's Contract*
[1899] 2 Ch. 540, 551. As late as the middle of this century, Denning L.J.
said in *In re Downshire Settled Estates; Marquess of Downshire v. Royal
Bank of Scotland* [1953] Ch. 218, 279: "The practice of the profession in
these cases is the best evidence of what the law is; indeed, it makes law."
F   I doubt whether today anyone would claim that a uniform practice of
the profession makes the law. But in the present context it does have a
significant impact. In holding that money paid under a mistake of law is
recoverable, an essential factor is that the retention of the money so paid
would constitute an unjust enrichment of the payee. What constitutes the
unjust factor is the mistake made by the payer at the date of payment. If,
G   at the date of payment, it was settled law that payment was legally due,
I can see nothing unjust in permitting the payee to retain moneys he
received at a time when all lawyers skilled in the field would have advised
that he was entitled to receive them and the payer was bound to pay them.
Again it is critical to establish the position at the time of payment: if, at
that date, there was nothing unjust or unmeritorious in the receipt or
retention of the moneys by the payee in my judgment it was not an unjust
H   enrichment for him subsequently to retain the moneys just because the law
was, in one sense, subsequently changed.

In New Zealand and Western Australia the legislatures have provided
that moneys shall not be recoverable on the grounds of mistake of law if

paid at a time when there was a "common understanding" that they were    A
payable: New Zealand Judicature Amendment Act 1958, section 94A(2);
Western Australian Law Reform (Property, Perpetuities and Succession)
Act 1962, section 23(1). The Law Commission (Report No. 227) was not
happy with the concept of "common understanding" but did recommend
that money should not be recoverable if paid "in accordance with a settled
view of the law at the time;" see paragraphs 5.1–5.13 and clause 3 of the
draft Bill. The Law Commission considered that the law fell to be treated    B
as "settled" not only by judicial decision but also by reference to the legal
advice which the payer would have received if he had sought it:

> "had the payer taken advice from a qualified legal practitioner who
> was reasonably experienced in the field of law in question at the time
> of payment, and that practitioner had obtained access to all of the
> ordinarily available legal materials on the point of law in issue, he    C
> would have had no doubt in advising the payer that the law supported
> the payment:" paragraph 5.11.

My Lords, I agree with the views of the Law Commission and would
therefore have held that the bank would not be entitled to recover on the
grounds of mistake of law if at the time of payment the bank were, or if    D
they had sought advice would have been, advised by all lawyers skilled in
the field that the swaps agreements were valid.

My Lords, in these circumstances I find myself in a quandary. I am
convinced that the law should be changed so as to permit moneys paid
under a mistake of law to be recovered. I also accept, for the reasons given
by my noble and learned friend, Lord Goff of Chieveley, that the relevant    E
limitation period applicable to such a claim would be that laid down by
section 32(1)(c) of the Limitation Act 1980, i.e. six years from the date on
which the mistake was, or could with reasonable diligence have been,
discovered. The majority of your Lordships consider that such claim will
arise when the law (whether settled by existing authority or by common
consensus) is changed by a later decision of the courts. The consequence
of this House in its judicial capacity introducing such a fundamental    F
change would be as follows. On every occasion in which a higher court
changed the law by judicial decision, all those who had made payments on
the basis that the old law was correct (however long ago such payments
were made) would have six years in which to bring a claim to recover
money paid under a mistake of law. All your Lordships accept that this
position cannot be cured save by primary legislation altering the relevant    G
limitation period. In the circumstances, I believe that it would be quite
wrong for your Lordships to change the law so as to make money paid
under a mistake of law recoverable since to do so would leave this gaping
omission in the law. In my judgment the correct course would be for the
House to indicate that an alteration in the law is desirable but leave it to
the Law Commission and Parliament to produce a satisfactory statutory
change in the law which, at one and the same time, both introduces the    H
new cause of action and also properly regulates the limitation period
applicable to it.

I would dismiss these appeals.

2 A.C.                Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))

A      LORD GOFF OF CHIEVELEY.   My Lords, there are before your Lordships
consolidated appeals in four actions, each of which arises from the
unravelling of one or more interest rate swap transactions which,
following the decision of this House in *Hazell v. Hammersmith and
Fulham London Borough Council* [1992] 2 A.C. 1, proved to be void. The
process of unravelling transactions of this kind has produced a host of
problems, so much so that Professor Andrew Burrows stated in 1995 (see
[1995] R.L.R.

B  15) that "it is no exaggeration to say that one could write a book on the
restitutionary consequences of the decision in *Hazell*." I fear that any
such book will be growing in length as the cases, including the present
appeals, pass through the courts.

      The nature of an interest rate swap transaction is now very well known.
The description usually referred to is that of the Divisional Court in

C  *Hazell's* case [1990] 2 Q.B. 697, 739–741, the transactions in the present
cases being of the simple type there described. The essence of such a
transaction is that one party, known as the fixed rate payer, agrees to pay
to the other party over a certain period interest at a fixed rate on a
notional capital sum; and the other party, known as the floating rate payer,
agrees to pay to the former over the same period interest on the same
notional sum at a market rate determined in accordance with a certain

D  formula. In practice, a balance is struck at each relevant date and the
party who then owes the greater sum will pay the difference to the other
party.

      Interest rate swaps can fulfil many purposes, ranging from pure
speculation to more useful purposes such as the hedging of liabilities. One
form of interest rate swap involves an upfront payment, i.e. a capital sum

E  paid at the outset by one party to the other, which will be balanced by an
adjustment of the parties' respective liabilities. The practical result of this
is to achieve a form of borrowing. It appears that it was this feature which,
in particular, attracted local authorities to enter into transactions of this
kind, since they enabled local authorities subject to rate-capping to obtain
upfront payments uninhibited by the relevant statutory controls, though
they must in the process have been storing up trouble for themselves in the

F  future.

      The appellant in each of the four consolidated appeals is Kleinwort
Benson Ltd., a bank which was an early participant in the market for
interest rate swaps. Each of the respondents is a local authority. They may
be described in brief as Birmingham City Council, Southwark London
Borough Council, Kensington and Chelsea Royal London Borough Council

G  and Lincoln City Council. The bank entered into interest rate swap
transactions with each of the authorities. Following the decision of this
House in *Hazell*, the bank commenced proceedings against each of the
authorities claiming restitution of the sums it had paid to them under
these transactions. The total of the net payments made under them by the
bank was £811,208·90.

H      There are two features of these transactions which are of particular
relevance to the present appeals, no doubt flowing from the fact that the
bank participated in interest rate swaps at an early stage. The first is that,
at the time when proceedings were commenced by the bank, each of the
transactions was fully performed by both parties according to its terms

across the whole of the agreed period. The second is that not all of the    A
sums paid by the bank to the authorities were paid within the six-year
limitation period expiring with the date of the issue of the writs. Of the
net sum of £811,208·90 paid by the bank, £388,114·72 was paid within the
six-year period, and £423,094·18 represented earlier payments. The former
sum has been paid by the relevant local authorities to the bank. The latter
sum is in issue, and is the subject of the cases now under appeal.

. The claim of the bank in each of these cases is that the money in    B
question was paid by it under a mistake, viz. a mistaken belief that it was
paid pursuant to a binding contract between it and the relevant local
authority. The claims have been formulated in this way to avoid the six-
year time limit by bringing them within section 32(1)(c) of the Limitation
Act 1980. Section 32(1) provides:

> "Subject to subsections (3) and (4A) below, where in the case of    C
> any action for which a period of limitation is prescribed by this Act . . .
> (c) the action is for relief from the consequences of a mistake . . . the
> period of limitation shall not begin to run until the plaintiff has
> discovered the . . . mistake . . . or could with reasonable diligence
> have discovered it."

It is plain however that here the mistake relied upon is a mistake of law;    D
and under the law as it stands at present restitution will in general not be
granted in respect of money paid under a mistake of that kind. It follows
that, in the present proceedings, the bank is seeking a decision that that
long-established rule should no longer form part of the English law of
restitution—a decision which, as all parties to the present litigation
recognise, can only be made by your Lordships' House. As a result, on    E
12 July 1996 Langley J. (I understand by consent) made the following
orders in each of the four actions. First of all, he ordered the trial of two
preliminary issues, viz. (1) whether the facts pleaded by the bank disclosed
a cause of action in mistake; and (2) whether, if the answer to (1) was
"Yes," such a mistake was one in respect of which the bank could rely on
section 32(1)(c) of the Limitation Act 1980. The first of these two issues
raised directly the question whether money paid under a mistake of law is    F
recoverable in restitution. In each of the actions Langley J. gave a negative
answer to issue (1), on the basis that he was bound by Court of Appeal
authority to do so; and accordingly he did not give an answer to issue (2).
Next, he granted a certificate for an appeal (commonly called a leapfrog
appeal) directly to your Lordships' House pursuant to section 12 of the
Administration of Justice Act 1969. Leave to appeal was duly granted by    G
this House, which further ordered that the parties should have leave to
present arguments arising from the fact that each of the interest rate swap
transactions had been fully performed, thus adding a third issue to the
two which were the subject of Langley J.'s order.

As a result of the basis on which the appeals have come before the
House, the appellate committee has exceptionally lacked the benefit of
reasoned judgments of the courts below. However the loss of that benefit    H
has substantially been offset by arguments of exceptional quality addressed
to the committee by counsel, Mr. Richard Southwell and Mr. Rhodri
Davies for the bank, and Mr. Nicholas Underhill, Mr. Charles Béar and

**2 A.C.**          **Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))**          Lord Goff
of Chieveley

A    Mr. Mark West for the authorities. I sensed that some, if not all, of these members of the Bar are seasoned warriors in the continuing battle of the swaps.

I propose to consider the issues in the following order. I shall first consider Issue (1) as ordered by Langley J., which raises the question whether the rule precluding recovery of money paid under a mistake of law should remain part of English law. As part of that issue I shall also

B    consider whether, if the answer to that question is "No," there should be an exception to recovery on the ground of mistake of law (A) in cases where the money has been paid under a settled understanding of the law which has subsequently been changed by judicial decision, or (B) in cases where the money has been the subject of an honest receipt by the defendant. I shall refer to these two issues as Issue (1A) and Issue (1B)

C    respectively. I shall then consider the issue concerned with the impact upon recovery of the fact that all the interest rate swap transactions in question were fully performed. I shall refer to that issue as Issue (2). Finally I shall turn to consider the second issue as ordered by Langley J. which raises the question whether, on the true construction of section 32(1)(c) of the Act of 1980, the subsection applies to mistakes of law. That I shall refer to as Issue (3).

D

*Issue (1): Whether the present rule, under which in general money is not recoverable in restitution on the ground that it was paid under a mistake of law, should be maintained as part of English law*

In argument before the appellate committee the bank presented in its written case a fully developed argument for the abrogation of what I will,

E    for convenience, call the mistake of law rule. This did not however evoke a comparable argument by the authorities in defence of the rule. On the contrary, their submission was not that the rule should be retained, but rather that it should be reformulated. Their primary argument was that the House should not itself embark upon any such reformulation, but should leave that task to the Law Commission which already has the matter under consideration. Such a course would benefit the local

F    authorities because, quite apart from the fact that it is uncertain when, if ever, the Law Commission's proposed reforms will be enacted, they would not, if enacted as proposed, be retrospective in effect. Their secondary argument was that, if the House did decide to abrogate the present rule, it should do so in terms which provided a defence in cases in which the money has been paid under a settled understanding of the law, or in which

G    the money has been the subject of an honest receipt by the defendant. Such defences would recognise that the payee has, in such circumstances, a legitimate interest in retaining the payment, based on the need for certainty and finality in transactions.

Faced with this situation, it might be thought that your Lordships need do no more than accept that the present rule should no longer remain in its present form, and then proceed to consider whether reformulation of

H    the rule should be undertaken by this House or by the Law Commission and, if the former, whether the newly recognised right to recover money paid under a mistake of law should be subject to certain special limits as proposed by the authorities. I myself do not consider that such a course

would be appropriate. What is in issue at the heart of this case is the    A
continued existence of a long-standing rule of law, which has been
maintained in existence for nearly two centuries in what has been seen to
be the public interest. It is therefore incumbent on your Lordships to
consider whether it is indeed in the public interest that the rule should be
maintained, or alternatively that it should be abrogated altogether or
reformulated. Having said this, however, your Lordships are fully entitled
to recognise that the local authorities are in truth adopting a realistic    B
stance that, in the light of prolonged criticism of the rule by scholars
working in the field of restitution, and of recent decisions by courts in
other major common law jurisdictions, the case for retention of the rule in
its present form can no longer sensibly be advanced before your Lordships'
House. In these circumstances I do not have to consider this aspect of the
case in as much depth as might otherwise be regarded as appropriate,    C
though I have discovered that consideration of the case as a whole has
cast light on the formulation of the limits to the right of recovery which
lie at the heart of the case as presented to your Lordships' House.

*How the rule became established*

The origin of the rule is, as is very well known, the decision of the    D
Court of King's Bench in *Bilbie v. Lumley* (1802) 2 East 469. There an
underwriter paid a claim under a policy which he was entitled in law to
repudiate for non-disclosure. Although he knew the relevant facts, he was
not aware of their legal significance. He then claimed to recover the money
he had paid. In the brief report of the case by East it is recorded that
Lord Ellenborough C.J. asked plaintiff's counsel (Mr. Wood, later
Wood B.) "whether he could state any case where if a party paid money    E
to another voluntarily with a full knowledge of all the facts of the case, he
could recover it back again on account of his ignorance of the law."

No answer being given, Lord Ellenborough C.J. gave judgment against
the plaintiff. In his short judgment as reported, his reasoning is to be
found in two sentences, at p. 472: "Every man must be taken to be
cognisant of the law; otherwise there is no saying to what extent the excuse    F
of ignorance might not be carried. It would be urged in almost every
case."

Previous authority, such as it was (see *Jackson, History of Quasi-
Contract* (1936), pp. 58–61) shows no distinction being drawn between
mistakes of fact and law; on the face of the law reports the suggestion that
a mistake of law did not ground recovery appears to have emerged for the
first time in an obiter dictum of Buller J. in *Lowry v. Bourdieu* (1780)    G
2 Doug. 468, 471, the rule of non-recovery being based by him on the
maxim ignorantia juris non excusat—an observation invoked by Lord
Ellenborough in *Bilbie v. Lumley,* 2 East 469, 472. In 1802 Sir William
Evans published "An Essay on the Action for Money Had and Received."
(This has since been republished [1998] R.L.R. 1, the text having been
prepared for publication by Professor Peter Birks and Dr. Lionel Smith of
Oxford University; copies were helpfully supplied by Professor Birks to    H
members of the Appellate Committee and to counsel shortly before the
hearing of the present appeals.) In his essay (dedicated to Sir Edward Law,
shortly to be ennobled as Lord Ellenborough) Sir William strongly

2 A.C.            Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))            Lord Goff
of Chieveley

A    supported the opinion of Vinnius that money paid by mistake is
recoverable, whether the mistake is one of fact or law, and criticised the
contrary view of Pothier denying recovery where the mistake is one of law.
In a later publication in 1806 (his translation of *Pothier on Obligations*),
Sir William, disappointed by his dedicatee's decision in *Bilbie v. Lumley*
four years earlier, maintained at greater length but with great courtesy his
opinion that money paid under a mistake of law was generally recoverable
B    on that ground. In particular he stressed the limited field of application of
the maxim ignorantia juris non excusat. He stated, in vol. 2, at
pp. 394–395:

    "The rule in its terms is sufficiently satisfied, by holding that no man
    shall, under the pretence of an ignorance of the law, excuse himself
    from the performance of his own obligations, or acquire an advantage,
C    or avoid a detriment, when he has omitted using the means ordained
    by law for those purposes. Applied to the immediate subject matter, it
    has no reference to the point, of money paid under a mistaken idea
    of a preceding obligation."

The overall impression is that, in the 18th century, it was widely understood
that no distinction should be drawn in the present context between
D    mistakes of fact and law, but that towards the end of the century the view
was emerging that a mistake of law should not ground recovery. This view
must have been more widely held than the single dictum in *Lowry v.
Bourdieu* suggests, having regard to the strong terms in which Lord
Ellenborough C.J. expressed his judgment in *Bilbie v. Lumley*, and the
account given by Gibbs J. (in *Brisbane v. Dacres* (1813) 5 Taunt. 143,
E    155–157) of his experience as counsel in *Chatfield v. Paxton (Note)* (1798)
2 East 471 and of the universal opinion among the practitioners in the
Court of King's Bench that where money was paid with knowledge of the
facts it could not be recovered on the ground of mistake.

The decision in *Bilbie v. Lumley* was followed and applied by the
majority of the Court of King's Bench in *Brisbane v. Dacres* (Chambre J.
dissenting). There the commander of a naval vessel, H.M.S. *Arethusa*, had
F    paid to the admiral in command a proportion of freight received for the
carriage of publicly owned bullion on board the *Arethusa* in the belief that
this was due to the admiral as a matter of usage. On later discovering that
the money was not due because the usage had been discontinued, he
sought to recover it from the admiral's widow and executrix. It is important
to observe that the decision in *Bilbie v. Lumley* was expressly challenged in
G    this case. Here full argument was heard on the point, unlike *Bilbie v.
Lumley* itself which appears to have been decided on the basis of counsel's
concession. Judgment was reserved, and fully reasoned judgments were
delivered by all members of the court. Although the maxim ignorantia
juris non excusat was invoked by counsel, no member of the court founded
his judgment upon it; indeed the dissenting judge, Chambre J., 5 Taunt.
143, 158–159 stated (perhaps rather too narrowly) that the maxim applied
H    only in cases of "delinquency," and all the other judges appear to have
considered that it had no role to play in the recovery of money paid by
mistake. The question whether it was against conscience for the defendant
to retain the money was expressly addressed, notably in the judgment of

Lord Goff
of Chieveley        **Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))**        [1999]

the Chief Justice, Sir James Mansfield, and was answered by him in the    A
negative, because the admiral acted (as all admirals then did) in accordance
with what was generally believed to be his accustomed right, and in
particular because he might have changed his position on the faith of the
payment. However, the ratio decidendi is perhaps most clearly stated in the
leading judgment of Gibbs J. when he said, at p. 152:

> "We must take this payment to have been made under a demand of    B
> right, and I think that where a man demands money of another as a
> matter of right, and that other, with a full knowledge of the facts
> upon which the demand is founded, has paid a sum, he never can
> recover back the sum he has so voluntarily paid. It may be, that upon
> a further view he may form a different opinion of the law, and it may
> be, his subsequent opinion may be the correct one. If we were to hold
> otherwise, I think that many inconveniences may arise; there are many    C
> doubtful questions of law: when they arise, the defendant has an
> option, either to litigate the question, or to submit to the demand,
> and pay the money. I think, that by submitting to the demand, he
> that pays the money *gives* it to the person to whom he pays it, and
> makes it his, and closes the transaction between them."

See also p. 160, *per* Heath J. Such a conclusion might have provided the    D
basis for a more sophisticated development of this branch of the law,
founded upon a prima facie right of recovery subject to specific defences.
Unfortunately, however, this was not to be so. It seems that the rule
hardened, as rules are liable to do. In *Wilson and M'Lellan v. Sinclair*
(1830) 4 W. & S. 398, 409, Lord Brougham L.C. stated that since *Brisbane
v. Dacres* it had been considered an established point that the mistake must    E
be "in the fact." Furthermore, in *Kelly v. Solari* (1841) 9 M. & W. 54, 55
Parke B. said of *Bilbie v. Lumley* that "All that that case decides is, that
money paid with full knowledge of all the facts cannot be recovered back
by reason of its having been paid in ignorance of the law," a statement
which was reflected in the judgment of Lord Abinger C.B., at pp. 57–58.
These statements were made in the context of a case concerned with
mistake of fact, the issue being whether means of knowledge, as opposed    F
to full knowledge, of the facts was enough to preclude recovery. Even so,
the observations of the judges appear to have reflected an accepted opinion
that money paid under a mistake of law was not recoverable as such. At
all events the existence of the mistake of law rule became well established
in the course of the 19th century, and in the 20th century it was regularly
applied by courts of first instance and on occasion by the Court of Appeal.
It has however never fallen for consideration by your Lordships' House    G
before the present appeals, which are now being heard after many years of
criticism of the rule by scholars specialising in the law of restitution, and
after the rule itself has been discarded in a number of major common law
jurisdictions.

*Criticism of the rule*    H

Although *Bilbie v. Lumley*, 2 East 469 was the origin of the rule,
*Brisbane v. Dacres,* 5 Taunt. 143, in which the whole question was fully
argued and the decision in *Bilbie v. Lumley* reconsidered and affirmed in

2 A.C.              Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))        Lord Goff
                                                                           of Chieveley

A   reasoned judgments, might more properly have been regarded as
    encapsulating the reasoning on which the rule was based. Unfortunately,
    however, since the rule became hardened into the form stated in *Kelly v.
    Solari*, 9 M. & W. 54, many critics have concentrated their fire on *Bilbie v.
    Lumley*, and in particular on the easy target of what Lord Wright (in his
    *Legal Essays and Addresses* (1939), at p. xix) called the "hasty and ill-
    considered utterance" of Lord Ellenborough in which he invoked the
B   maxim ignorantia juris non excusat. This maxim, it has been pointed out,
    is properly directed to cases in which the defendant was charged with
    wrongdoing, whether civil or criminal, and has no place in the law of
    quasi-contract; see Professor Keener's *Law of Quasi-Contracts* (1893), at
    pp. 85 et seq., and Professor Woodward's *Law of Quasi-Contracts* (1913),
    at pp. 54 et seq. No reliance was however placed on the maxim by the
C   court in *Brisbane v. Dacres*, only 11 years after *Bilbie v. Lumley* was
    decided, and seven years after Sir William Evans had published his
    criticism of the use of the maxim in that decision, after which (despite the
    sweeping words of Lord Brougham L.C. in *Dixon v. Monkland Canal Co.*
    (1831) 5 W. & S. 445, 452) it should no longer have been regarded as
    providing the justification for the rule of non-recovery in English law.
    Professor Woodward was also critical of counsel (Mr. Wood) for failing to
D   reply to Lord Ellenborough's inquiry. In this he was surely unjust. The
    inquiry, as reported, should in the context properly be understood as
    directed towards the existence of any authority in which the point had
    been decided; and the answer could properly have been made that there
    was none, as indeed was confirmed in *Brisbane v. Dacres*. Professor Corbin
    in *Corbin on Contracts*, vol. 3, p. 756, section 617, was later to attribute
E   this "handy" rule to expediency. "When a court is convinced that
    restitution should not be decreed, in the pressure of work it is likely to
    seize upon the first plausible rule that becomes handy." I am bound to say
    that there is no evidence that the rule has any such origin; on the contrary,
    as the majority judgments in *Brisbane v. Dacres* show, the rule was
    perceived, after due deliberation, to rest on sound legal policy. This
    perception appears to have gained ground as the years passed by, fuelled
F   by an amalgam of fears on a number of scores—for example, that it would
    be easy to assert a mistake of law, which could not easily be refuted, and
    that this might be done in almost any case; that in many cases it would be
    inappropriate to reopen a settled transaction; and that the defendant,
    having received a payment made on the basis that it was due, might have
    put to use the money paid to him or otherwise have changed his position
G   on the faith of the payment. This mixture was so potent that the good
    sense of excluding all possibilities of this kind by the adoption of one
    simple rule must have appeared most compelling. Indeed, it comes as no
    surprise to learn that the adoption of a similar rule was considered in
    Roman law, and that (in the view of some commentators) the controversy
    on the subject was resolved in favour of its adoption. It is, I believe,
    unhistorical for us now to castigate our legal ancestors for adopting a
H   doctrine which was widely understood in their time to achieve practical
    justice. Indeed there is at least one scholar of distinction today who is
    reluctant to condemn the rule: see Professor Birks' *An Introduction to the
    Law of Restitution*, 2nd ed. (1989), pp. 164–167; and the difficulties now

faced in formulating satisfactory limits to a right to recover money paid    A
under a mistake of law reveal that there was more sense in the rule than
its more strident critics have been prepared to admit.

The main criticisms of the rule are now widely perceived as threefold
(see the Law Commission's Consultation Paper No. 120 on Restitution of
Payments Made Under a Mistake of Law (1991), paras. 2.24–2.26). First,
the rule allows the payee to retain a payment which would not have been
made to him but for the payer's mistake, whereas justice appears to    B
demand that money so paid should be repaid unless there are special
circumstances justifying its retention. Second, the distinction drawn
between mistakes of fact (which can ground recovery) and mistakes of law
(which cannot) produces results which appear to be capricious. It is usual
here to compare the results in *Bilbie v. Lumley*, 2 East 469 and *Kelly v.
Solari*, 9 M. & W. 54, each concerned with an action by an underwriter to    C
recover back money paid under an insurance policy under a mistake. In
the former case, where he did not appreciate that the law enabled him to
repudiate a policy for non-disclosure, his action failed; but in the latter,
where he forgot that the premium had not been paid and so the policy
had lapsed, his action was successful. The same comment can be made of
the exceptions and qualifications to which the rule became subject. These
are usefully listed in paras. 2.5–2.15 of the Law Commission's Report,    D
"Restitution: Mistakes of Law and Ultra Vires Public Authority Receipts
and Payments" (1994) (Law Com. No. 227). They are well-known, and it
is unnecessary for me to rehearse them in this opinion. It is however
legitimate to comment to that, apart from limits such as the recently
recognised defence of change of position and an as yet undefined limit in
cases in which the payment has been made in settlement of an honest    E
claim, these exceptions and qualifications are heterogeneous and in truth
betray an anxiety to escape from the confines of a rule perceived to be
capable of injustice; and that, as a result, the law appeared to be arbitrary
in its effect. Third, as a result of the difficulty in some cases of drawing
the distinction between mistakes of fact and law, and the temptation for
judges to manipulate that distinction in order to achieve practical justice
in particular cases, the rule became uncertain and unpredictable in its    F
application.

*Rejection of the mistake of law rule in the common law world*

It is perhaps easier for us now to see that the policy underlying the
rule can best be achieved, consistently with justice, by the recognition of a
right of recovery subject to specified defences to cater for the fears which    G
formerly appeared to require a blanket exclusion of recovery. However, the
blossoming of scholarly interest in the development of a coherent law of
restitution did not occur in the common law world until the middle of the
20th century, inspired by the pioneering work of Professors Seavey and
Scott in the *American Law Institute, Restatement of the Law, Restitution*
(1937). We may regret that it was not until late in the long history of the
common law that this should have occurred, but now the judges are able    H
to welcome the assistance which they receive from a number of
distinguished writers on the subject. There can be no doubt that it is this
scholarly work which has provided the prime cause for the rejection of the

A   mistake of law rule, either by legislation or by judicial decision, in countries throughout the common law world. This is due not only to specific criticism of the mistake of law rule as such, but still more to the combined effect of two fundamental changes in the law: first, recognition that there exists a coherent law of restitution founded upon the principle of unjust enrichment, and second, within that body of law, recognition of the defence of change of position. This is due essentially to the work of scholars. Once

B   that work had been published and widely read it was, I believe, inevitable that in due course both doctrines would be recognised by the judges, the time of such acceptance depending very much on the accidents of litigation. In fact, in England both were accepted by this House in 1991, in the same case, *Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548. Once both had been recognised it became, in my opinion, also inevitable that the mistake

C   of law rule should be abrogated, or at least reformulated, so that there should be a general right of recovery of money paid under a mistake, whether of fact or law, subject to appropriate defences. This is because a blanket rule of non-recovery, irrespective of the justice of the case, cannot sensibly survive in a rubric of the law based on the principle of unjust enrichment; and because recognition of a defence of change of position demonstrates that this must be proved in fact if it is to justify retention, in

D   whole or in part, of money which would otherwise be repayable on the ground that the payee was unjustly enriched by its receipt. The combined effect is not only that the mistake of law rule can no longer be allowed to survive, but also that the law must evolve appropriate defences which can, together with the defence of change of position, provide protection where appropriate for recipients of money paid under a mistake of law in those

E   cases in which justice or policy does not require them to refund the money. It is this topic which lies at the centre of the present appeals. As the argument before the appellate committee has demonstrated, the identification of such defences is by no means easy and, whatever your Lordships' House may decide, the topic is likely to continue to engage the attention of judges, scholars and law reformers for some years to come.

F      I have referred to the fact that the mistake of law rule has already been abrogated in other common law jurisdictions, either by legislation or by judicial decision. This material is, of course, well known to lawyers in this country, and has, I know, been studied by all members of the appellate committee, not of course for the first time, and is regarded with great respect. However, since it is conceded in these appeals by the respondent authorities that the mistake of law rule must at least be reformulated in

G   the manner indicated by them, I trust that I will be forgiven if I do not lengthen this opinion by an express consideration of, in particular, the relevant judicial pronouncements. I refer, of course, to the dissenting opinion of Dickson J., with whom Laskin C.J. agreed, in *Hydro Electric Commission of the Township of Nepean v. Ontario Hydro* [1982] 1 S.C.R. 347, 357–370, later to be adopted by La Forest J., with whom (on this point) Lamer, Wilson and L'Heureux-Dubé JJ. agreed, in *Air Canada v.*

H   *British Columbia* [1989] 1 S.C.R. 1161; 59 D.L.R. (4th) 161 and *David Securities Pty. Ltd. v. Commonwealth Bank of Australia* (1992) 175 C.L.R. 353. (I shall have to refer in particular to the dissenting judgment of Brennan J. in this case at a later stage, when I come to consider the

proposed defence of honest receipt.) From countries which, on this topic,    A
apply a system of law based on the civil law, I refer to the decisions of the
Appellate Division of the Supreme Court of South Africa in *Willis Faber
Enthoven (Pty.) Ltd. v. Receiver of Revenue*, 1992 (4) S.A. 202, and of the
Inner House of the Court of Session in *Morgan Guaranty Trust Co. of
New York v. Lothian Regional Council*, 1995 S.C. 151, each of whom also
rejected the mistake of law rule. The same conclusion was reached at an
earlier date by legislation in New Zealand (see section 94A of the          B
Judicature Act 1908, inserted by section 2 of the Judicature Amendment
Act 1958) and Western Australia (see section 23 of the Law Reform
(Property, Perpetuities and Succession) Act 1962). I shall have to refer to
the New Zealand and Western Australian legislation at a later stage, when
I come to consider the proposed exclusion of recovery in cases where
payments have been made under a settled understanding of the law           C
subsequently departed from by judicial decision. I should add that the
mistake of law rule either never applied, or has been abrogated, in a
number of states of the United States of America.

### The Law Commission

The Law Commission has, in its Report on the subject (to which I have     D
already referred), recommended that the mistake of law rule should be
abrogated (see paragraphs 3.1 et seq., and clause 2 of the draft Bill
appended to the report). For the reasons set out in paragraphs 3.8–3.12
the Commission has recommended that this change should be introduced
by legislation. This is a matter to which I will have to return later in this
opinion.                                                                    E

### Comparative law

The appellate committee was helpfully provided with material showing
the policy adopted in a number of civil law systems on the continent of
Europe towards the recovery of money paid under a mistake of law. This
demonstrates that, in the legal systems from which the material was drawn,   F
there is no blanket rule excluding recovery of money paid under a mistake
of law. It is of some interest that, in German law, recovery is not dependent
on proof of mistake (whether of fact or law) by the claimant. Paragraph
812–1 of the German Civil Code ("B.G.B.") confers a right to recover
benefits obtained without legal justification (ohne rechtlichen Grund).
A similar approach is, I understand, adopted in Italian law and has also
been adopted recently in France (see Cour de Cassation (Assemblée           G
Plénière) 2 avril 1993, D.1993.373). Paragraph 814 of the B.G.B. however
provides that a person cannot reclaim a benefit conferred by him if he
knew that he was not bound to confer it; but it seems that the burden
rests on the recipient to prove the existence of such knowledge (a striking
contrast with the common law, which requires the plaintiff to prove
mistake). It is of some interest however that a number of these cases, in     H
which it has been held that it is unnecessary for the plaintiff to prove that
he was mistaken, have been concerned with the recovery of taxes: see in
particular an early German case decided by the Reichsgericht in 1909
(RGZ 72, 152, 29 October 1909), and the recent French case, referred to

375

2 A.C.                Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))          Lord Goff
of Chieveley

A   above, which adopted the same position. In such cases, as was recently held by this House in *Woolwich Equitable Building Society v. Inland Revenue Commissioners* [1993] A.C. 70, English law, too, dispenses with any requirement that the money should have been paid under a mistake and indeed goes further, allowing recovery even if the taxpayer pays in the belief that the money is not due. Here is food for thought for both German and English comparative lawyers. In this connection I wish to

B   add in passing that, in *Commissioner of State Revenue v. Royal Insurance Australia Ltd.* (1994) 182 C.L.R. 51, 57, Mason C.J. stated that in *Woolwich* the House of Lords was "unwilling to acknowledge that causative mistake of law is a basis of recovery;" but, with respect, no question of recovery on the ground of a mistake of law arose in that case, because the Woolwich Building Society throughout asserted that the money was not due.

C   For present purposes, however, the importance of this comparative material is to reveal that, in civil law systems, a blanket exclusion of recovery of money paid under a mistake of law is not regarded as necessary. In particular, the experience of these systems assists to dispel the fears expressed in the early English cases that a right of recovery on the ground of mistake of law may lead to a flood of litigation, while at the same time it shows that in some cases a right of recovery, which has in the

D   past been denied by application of the mistake of law rule, may likewise be denied in civil law countries on the basis of a narrower ground of principle or policy.

*Conclusion on the first issue*

E   For all these reasons, I am satisfied that your Lordships should, if you decide to consider the point yourselves rather than leave it to the Law Commission, hold that the mistake of law rule no longer forms part of English law. I am very conscious that the Law Commission has recommended legislation. But the principal reasons given for this were that it might be some time before the matter came before the House, and that one of the dissentients in the *Woolwich* case (Lord Keith of Kinkel) had expressed the opinion that the mistake of law rule was too deeply

F   embedded to be uprooted judicially: [1993] A.C. 70, 154. Of these two reasons, the former has not proved to be justified, and the latter does not trouble your Lordships because a more robust view of judicial development of the law is, I understand, taken by members of the appellate committee hearing the present appeals. Moreover, especially in the light of developments in other major common law jurisdictions, not to mention

G   South Africa and Scotland, the case for abrogation is now so strong that the respondents in these appeals have not argued for its retention. In these circumstances I can see no good reason for postponing the matter for legislation, especially when we do not know whether or, if so, when Parliament may legislate. Finally I believe that it would, in all the circumstances, be unjust to deprive the appellant bank of the benefit of the decision of the House on this point. I would therefore conclude on

H   issue (1) that the mistake of law rule should no longer be maintained as part of English law, and that English law should now recognise that there is a general right to recover money paid under a mistake, whether of fact or law, subject to the defences available in the law of restitution.

Lord Goff
of Chieveley                Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))                |1999|

*Issue (1A): Payments made under a settled understanding of the law*    A

I turn now to a central question in these appeals. This relates to the
fact that the payments of which recovery is sought in these cases were
made under contracts which at the time were understood by all concerned
to be valid and binding, so that the payments themselves were believed to
be lawfully due under those contracts. This misunderstanding was, of
course, removed by the decision of this House in *Hazell's* case [1992]    B
2 A.C. 1 that the contracts were beyond the powers of the local authorities
involved and so void. The argument now advanced by the authorities is
that payments so made on the basis of a settled understanding of the law
which is later changed by a judicial decision should not be recoverable on
the ground of mistake of law.

This argument is based upon a view propounded by the Law
Commission in Consultation Paper No. 120, paragraphs 2.57–2.65 and,    C
after consultation, adopted by the Commission in its Report, paragraph
5.3, and in clause 3(1) of its draft Bill. The reasoning so adopted is set out
in paragraphs 2.57 and 2.65 of the Consultation Paper:

"2.57 One question is the effect of a judicial alteration of the law.
Where the general understanding of the law changes as a result of a
court decision should a payment made on the basis of the former    D
understanding of the law be recoverable? Where the law is changed by
legislation it would seem beyond doubt that a payment made on the
basis of the old law cannot be recovered on the basis of mistake
because there is no mistake of law at the time the payment was made:
at that time the law was indeed as the payer believed it to be. It seems
clear to us that as a matter of policy the result should be no different
where the law is effectively changed by judicial decision rather than    E
legislation.

"2.58 It can however be argued that a payment made before a
judicial 'change' of the law is indeed made as a result of a mistake
and therefore should be recoverable because of the commonly accepted
theory of the operation of the common law that judicial decisions are
declaratory and do not change the law. We believe that this would not    F
be a desirable result: to interpret the impact of the common law in
this manner is a mere fiction and should not be allowed to affect
substantive rights . . ."

In paragraph 5.3 of its Report, it was stated that:

"The Commission's provisional view was that it should not matter
whether a change occurs through legislation or judicial decision: the
payment should not be recoverable because in substance there has    G
been no mistake."

In support of this proposition *Henderson v. Folkestone Waterworks Co.*
(1885) 1 T.L.R. 329 was cited. The Commission then considered at some
length whether legislation was necessary to achieve this result, and
concluded that it was. The exact terms of the proposed legislation were
also considered at some length. In the result, clause 3 of the draft Bill (at    H
p. 196 of the Report) provides:

"(1) An act done in accordance with a settled view of the law shall
not be regarded as founding a mistake claim by reason only that a

2 A.C.                    Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))                    Lord Goff
of Chieveley

A   subsequent decision of a court or tribunal departs from that view. (2) A view of the law may be regarded for the purposes of this section as having been settled at any time notwithstanding that it was not held unanimously or had not been the subject of a decision by a court or tribunal."

B   The Law Commission's consultation paper and Report are, of course, concerned with legislative proposals for changes in the law, proposals which find their origin in a New Zealand statutory provision (section 94A(2) of the Judicature Act 1908, inserted by section 2 of the Judicature Amendment Act 1958) to which I shall refer later. In these appeals, however, your Lordships are concerned with the common law, albeit on the basis that the common law should now recognise that restitution may be granted in respect of money paid under a mistake of law. I therefore

C   ask myself first whether, on the ordinary principles of the common law, any such provision as that proposed by the Law Commission should be held to apply. This raises the question of what is meant by the declaratory theory of judicial decisions, which has long been held to underlie judicial decision-making.

D   *The declaratory theory of judicial decisions*

Historically speaking, the declaratory theory of judicial decisions is to be found in a statement by Sir Matthew Hale over 300 years ago, viz. that the decisions of the courts do not constitute the law properly so called, but are evidence of the law and as such "have a great weight and authority in expounding, declaring, and publishing what the law of this Kingdom

E   is:" see *Hale's Common Law of England,* 6th ed. (1820), p. 90. To the like effect, *Blackstone Commentaries,* 6th ed. (1774), pp. 88–89, stated that "the decisions of courts are the evidence of what is the common law." In recent times, however, a more realistic approach has been adopted, as in Sir George Jessel M.R.'s celebrated statement that rules of equity, unlike rules of the common law, are not supposed to have been established since time immemorial, but have been invented, altered, improved and refined from

F   time to time: see *In re Hallett's Estate; Knatchbull v. Hallett* (1880) 13 Ch.D. 696, 710. There can be no doubt of the truth of this statement; and we all know that in reality, in the common law as in equity, the law is the subject of development by the judges—normally, of course, by appellate judges. We describe as leading cases the decisions which mark the principal stages in this development, and we have no difficulty in identifying the

G   judges who are primarily responsible. It is universally recognised that judicial development of the common law is inevitable. If it had never taken place, the common law would be the same now as it was in the reign of King Henry II; it is because of it that the common law is a living system of law, reacting to new events and new ideas, and so capable of providing the citizens of this country with a system of practical justice relevant to the times in which they live. The recognition that this is what actually

H   happens requires, however, that we should look at the declaratory theory of judicial decision with open eyes and reinterpret it in the light of the way in which all judges, common law and equity, actually decide cases today.

A

When a judge decides a case which comes before him, he does so on the basis of what he understands the law to be. This he discovers from the applicable statutes, if any, and from precedents drawn from reports of previous judicial decisions. Nowadays, he derives much assistance from academic writings in interpreting statutes and, more especially, the effect of reported cases; and he has regard, where appropriate, to decisions of judges in other jurisdictions. In the course of deciding the case before him he may, on occasion, develop the common law in the perceived interests of justice, though as a general rule he does this "only interstitially," to use the expression of O. W. Holmes J. in *Southern Pacific Co. v. Jensen* (1917) 244 U.S. 205, 221. This means not only that he must act within the confines of the doctrine of precedent, but that the change so made must be seen as a development, usually a very modest development, of existing principle and so can take its place as a congruent part of the common law as a whole. In this process, what Maitland has called the "seamless web," and I myself (*The Search for Principle*, Proc. Brit. Acad. vol. LXIX (1983) 170, 186) have called the "mosaic," of the common law, is kept in a constant state of adaptation and repair, the doctrine of precedent, the "cement of legal principle," providing the necessary stability. A similar process must take place in codified systems as in the common law, where a greater stability is provided by the code itself; though as the years pass by, and decided cases assume a greater importance, codified systems tend to become more like common law systems.

B

C

D

Occasionally, a judicial development of the law will be of a more radical nature, constituting a departure, even a major departure, from what has previously been considered to be established principle, and leading to a realignment of subsidiary principles within that branch of the law. Perhaps the most remarkable example of such a development is to be found in the decisions of this House in the middle of this century which led to the creation of our modern system of administrative law. It is into this category that the present case falls; but it must nevertheless be seen as a development of the law, and treated as such.

E

Bearing these matters in mind, the law which the judge then states to be applicable to the case before him is the law which, as so developed, is perceived by him as applying not only to the case before him, but to all other comparable cases, as a congruent part of the body of the law. Moreover when he states the applicable principles of law, the judge is declaring these to constitute the law relevant to his decision. Subject to consideration by appellate tribunals, and (within limits) by judges of equal jurisdiction, what he states to be the law will, generally speaking, be applicable not only to the case before him but, as part of the common law, to other comparable cases which come before the courts, whenever the events which are the subject of those cases in fact occurred.

F

G

It is in this context that we have to reinterpret the declaratory theory of judicial decision. We can see that, in fact, it does not presume the existence of an ideal system of the common law, which the judges from time to time reveal in their decisions. The historical theory of judicial decision, though it may in the past have served its purpose, was indeed a fiction. But it does mean that, when the judges state what the law is, their decisions do, in the sense I have described, have a retrospective effect. That

H

A   is, I believe, inevitable. It is inevitable in relation to the particular case before the court, in which the events must have occurred some time, perhaps some years, before the judge's decision is made. But it is also inevitable in relation to other cases in which the law as so stated will in future fall to be applied. I must confess that I cannot imagine how a common law system, or indeed any legal system, can operate otherwise if the law is be applied equally to all and yet be capable of organic change.

B   This I understand to be the conclusion reached in *Cross and Harris, Precedent in English Law*, 4th ed. (1991), from which I have derived much assistance, when at p. 33 they ask the question: "what can our judges do but make new law and how can they prevent it from having retrospective effect?" This is also the underlying theme of Lord Coulsfield's evidence to the Scottish Law Commission quoted in paragraph 3.14 of their Discussion

C   Paper No. 99, on Judicial Abolition of the Error of Law Rule and its Aftermath (1996) (which I have read with interest and respect) in which, in the light of the decision of the Inner House in *Morgan Guaranty Trust Co. of New York v. Lothian Regional Council*, 1995 S.C. 151, and especially the notable judgment of my noble and learned friend, Lord Hope of Craighead in that case, they reconsider and resile from their previous proposal that Scots law should adopt a "settled understanding of the law"

D   provision along the lines proposed by our own Law Commission. The only alternative, as I see it, is to adopt a system of prospective overruling. But such a system, although it has occasionally been adopted elsewhere with, I understand, somewhat controversial results, has no place in our legal system. I wish to add that I do not regard the declaratory theory of judicial decision, as I have described it, as an aberration of the common

E   law. Since I regard it as an inevitable attribute of judicial decision-making, some such theory must, I imagine, be applied in civil law countries, as in common law countries; indeed I understand that a declaratory theory of judicial decision applies in Germany, though I do not know its precise form.

F   *Was the bank mistaken when it paid money to the local authorities under interest swap agreements which it believed to be valid?*

     It is in the light of the foregoing that I have to ask myself whether the Law Commission's "settled understanding of the law" proposal forms part of the common law. This, as I understand the position, requires that I should consider whether parties in the position of the appellant bank were mistaken when they paid money to local authorities under interest

G   swap agreements which they, like others, understood to be valid but have later been held to be void. To me, it is plain that the money was indeed paid over under a mistake, the mistake being a mistake of law. The payer believed, when he paid the money, that he was bound in law to pay it. He is now told that, on the law as held to be applicable at the date of the payment, he was not bound to pay it. Plainly, therefore, he paid the money

H   under a mistake of law, and accordingly, subject to any applicable defences, he is entitled to recover it. It comes as no surprise to me that, in the swaps litigation, it appears to have been assumed that money paid pursuant to interest rate swap agreements was paid under a mistake which, in *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council*

[1994] 4 All E.R. 890, 931E, was inevitably held by Hobhouse J. to have    A
been a mistake of law and so, on the law as it then stood, irrecoverable on
that basis. Not surprisingly, there is very little previous authority on the
question whether in such circumstances the money has been paid under a
mistake of law; but such authority as there is supports this view. The case
most frequently cited in this context is *Henderson v. Folkestone Waterworks
Co.*, briefly reported in 1 T.L.R. 329. This case is referred to in paragraph
2.65 of the Law Commission's Consultation Paper No. 120, and was relied    B
on in argument by Mr. Underhill on behalf of the respondent authorities.
In my opinion, however, it does not assist his argument. The plaintiff was
rated by the defendant water company at a rate which was legal under a
decision which was subsequently reversed by the House of Lords. He then
sought to recover the excess; in answer to the defendants' argument that
the payment was voluntary and so irrecoverable, he claimed that he paid    C
the money under compulsion. This argument was rejected by a Divisional
Court, consisting of Lord Coleridge C.J. and A. L. Smith J., on the ground
that the money, having been paid voluntarily under a mistake of law, could
not be recovered back. The only passage relied on consists of an
expostulation, in the course of argument, by Lord Coleridge C.J., who had
been party to the decision reversed by the House of Lords, when he said:
"I had held the contrary, and two eminent judges agreed with me. Can    D
that be put as ignorance of law?" Little or no importance can however be
attached to this intervention in the present context, since both members of
the court rejected the plaintiff's claim on the ground that the money was
paid voluntarily under a mistake of law, and was therefore irrecoverable.

    In *Derrick v. Williams* [1939] 2 All E.R. 559, following the reversal by
the House of Lords in *Rose v. Ford* [1937] A.C. 826 of the decision of the    E
Court of Appeal that damages could not be recovered for loss of
expectation of life, the plaintiff brought a fresh action seeking to recover
such damages notwithstanding that in a previous action on the same facts
he had taken out of court money paid in on the basis that no such
damages were recoverable. The Court of Appeal held that he could not do
this, and dismissed the second action. But in the course of his judgment
Sir Wilfrid Greene M.R. made it plain that the plaintiff had acted under a    F
mistake of law in taking the money out of court in the first action. He
said, at p. 565:

> "It was a mistake of law, and consisted of the fact that the plaintiff
> was under the belief that the law as laid down by this court in *Rose v.
> Ford* was correctly laid down. In that he was wrong, and he is asking
> the court to say that, having acted upon the basis of a mistaken view    G
> of the law, now that the law has been enunciated by the highest
> tribunal, he is entitled to make another attempt. That is a thing
> which, it seems to me, cannot be permitted on principle."

    The same view is expressed by Professor Burrows in *The Law of
Restitution*, 4th ed., pp. 118–119, where he points out that in the common
law the jurisprudential tradition is that "changes" are retrospective. He    H
continues:

> "On this retrospective view the payor did make a mistake of law at
> the time he made the payment and, in accordance with the proposed

A     abolition of the mistake of law bar, he would prima facie be entitled
to restitution."

He then proceeds to rehearse the arguments for and against legislative
change of the law in this respect.

B    *Should the House recognise a limit to recovery on the lines of the Law
Commission's proposal?*

      The question then arises whether, having regard to the fact that the
right to recover money paid under a mistake of law is only now being
recognised for the first time, it would be appropriate for your Lordships'
House so to develop the law on the lines of the Law Commission's
proposed reform as a corollary to the newly developed right of recovery.

C    I can see no good reason why your Lordships' House should take a step
which, as I see it, is inconsistent with the declaratory theory of judicial
decision as applied in our legal system, under which the law as declared
by the judge is the law applicable not only at the date of the decision but
at the date of the events which are the subject of the case before him, and
of the events of other cases in pari materia which may thereafter come

D    before the courts. I recognise, of course, that the situation may be different
where the law is subject to legislative change. That is because legislation
takes effect from the moment when it becomes law, and is only retrospective
in its effect to the extent that this is provided for in the legislative
instrument. Moreover even where it is retrospective, it has the effect that
as from the date of the legislation a new legal provision will apply
retrospectively in place of that previously applicable. It follows that

E    retrospective legislative change in the law does not necessarily have the
effect that a previous payment was, as a result of the change in the law,
made under a mistake of law at the time of payment. (I note in parenthesis
that in *Commissioner of State Revenue v. Royal Insurance Australia Ltd.*,
182 C.L.R. 51, the High Court of Australia was divided on the question
whether the retrospective legislation there under consideration had the
effect that a previous payment had been made under a mistake of law.) As

F    I have already pointed out, this is not the position in the case of a judicial
development of the law. But, for my part, I cannot see why judicial
development of the law should, in this respect, be placed on the same
footing as legislative change. In this connection, it should not be forgotten
that legislation which has an impact on previous transactions can ·be so
drafted as to prevent unjust consequences flowing from it. That option is

G    not, of course, open in the case of judicial decisions.

      At this point it is, in my opinion, appropriate to draw a distinction
between, on the one hand, payments of taxes and other similar charges
and, on the other hand, payments made under ordinary private
transactions. The former category of cases was considered by your
Lordships' House in *Woolwich Equitable Building Society v. Inland Revenue
Commissioners* [1993] A.C. 70, in which it was held that at common law

H    taxes exacted ultra vires were recoverable as of right, without the need to
invoke a mistake of law by the payer. Moreover reference was made, in the
course of the hearing, to the various statutory provisions (usefully
summarised in the Law Commission's Consultation Paper, No. 120,

pp. 74–84) which regulate the repayment of overpaid tax. For present    A
purposes it is of interest that, in the case of some taxes (including income
and corporation tax), no relief is given "in respect of an error or mistake
as to the basis on which the liability . . . ought to have been computed
where the return was in fact made on the basis of or in accordance with
the practice generally prevailing at the time when the return was made:"
see the proviso to section 33(2) of the Taxes Management Act 1970.

Two observations may be made about the present situation. (I of course    B
have it in mind that this is the subject of proposals for legislative reform
contained in the Law Commission's Report, but your Lordships are
concerned with the law as it stands at present.) The first observation is
that, in our law of restitution, we now find two separate and distinct
regimes in respect of the repayment of money paid under a mistake of law.
These are (1) cases concerned with repayment of taxes and other similar    C
charges which, when exacted ultra vires, are recoverable as of right at
common law on the principle in *Woolwich*, and otherwise are the subject
of statutory regimes regulating recovery; and (2) other cases, which may
broadly be described as concerned with repayment of money paid under
private transactions, and which are governed by the common law. The
second observation is that, in cases concerned with overpaid taxes, a case
can be made in favour of a principle that payments made in accordance    D
with a prevailing practice, or indeed under a settled understanding of the
law, should be irrecoverable. If such a situation should arise with regard to
overpayment of tax, it is possible that a large number of taxpayers may be
affected; there is an element of public interest which may militate against
repayment of tax paid in such circumstances; and, since ex hypothesi all
citizens will have been treated alike, exclusion of recovery on public policy    E
grounds may be more readily justifiable.

In the present case, however, we are concerned with payments made
under private transactions. It so happens that a significant number of
payments were in fact made under interest rate swap agreements with local
authorities before it was appreciated that they were void; but the number
is by no means as great as might conceivably occur in the case of taxes
overpaid in accordance with a prevailing practice, or under a settled    F
understanding of the law. Moreover the element of public interest is
lacking. In cases such as these I find it difficult to understand why the
payer should not be entitled to recover the money paid by him under a
mistake of law, even if everybody concerned thought at the time that
interest rate swap agreements with local authorities were valid.

Of course, I recognise that the law of restitution must embody specific    G
defences which are concerned to protect the stability of closed transactions.
The defence of change of position is one such defence; the defences of
compromise, and settlement of an honest claim (the scope of which is a
matter of debate), are others. It is possible that others may be developed
from judicial decisions in the future. But the proposed "settled
understanding of the law" defence is not, overtly, such a defence. It is
based on the theory that a payment made on that basis is not made under    H
a mistake at all. Once that reasoning is seen not to be correct, the basis
for the proposed defence is, at least in cases such as the present,
undermined.

2 A.C.          **Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))**          Lord Goff
of Chieveley

A    I wish further to add that the proposal that a payment made under a
settled understanding of the law, later proved to be erroneous, should be
irrecoverable, does not depend upon the lapse of any period of time after
the date of the payment in question. Take the present case. Suppose that,
shortly after the payment by the bank to a local authority of the first sum
due under an interest rate swap contract, it transpires that the contract
was ultra vires the local authority and so void, and that the sum so paid
B    was therefore not due. Let it also be assumed that there have been
relatively few transactions of this kind with local authorities, but enough
for it to be said that that sum was paid on the basis of· a settled
understanding that the money was lawfully due. I find it difficult to accept
that, for that reason alone, the payment would be irrecoverable as having
been paid under a mistake of law. Indeed it is a remarkable feature of the
C    proposed principle that, the longer ago .the payment was made, the less
likely is it to have been made under a settled understanding of the law. An
appropriately drawn limitation statute would surely produce a more just
result. This is a point to which I will return later in this opinion.
   For these reasons alone, therefore, I would reject the argument of the
local authorities on this point. But I wish to refer also to the insecure
foundation upon which the proposed provision is based, arising from the
D    difficulty of defining the circumstances in which it should apply. The New
Zealand statutory provision (section 94A(2) of the Judicature Act 1908)
excludes relief in respect of

   "any payment made at a time when the law requires or allows, or is
   commonly understood to require or allow, the payment to be made or
   enforced, by reason only that the law is subsequently changed or
E    shown not to have been as it was commonly understood to be at the
   time of payment."

The Western Australian statutory provision (section 23(2) of the Law
Reform (Property, Perpetuities and Succession) Act 1962) takes the same
form. It is recognised, however, that the concept of "common
understanding" of the law has given rise to difficulty (see, e.g., *Bell Bros.
F    Pty. Ltd. v. Shire of Serpentine-Jarrahdale* [1969] W.A.R. 155) and, on this
score at least, the statutory provision has been the subject of criticism. In
this country the Law Commission has attempted to improve on the New
Zealand statute by referring not to a common understanding of the law,
but instead to a "settled view of the law" which has been departed from
by a subsequent judicial decision. However, as Mr. Southwell pointed out
G    in argument, there could be much scope for argument over what constituted
a settled view of the law. Take the case of interest rate swap agreements.
These were assumed by the banks (and indeed by others concerned) to be
within the powers of local authorities; but this assumption appears to have
been based on practical grounds, rather than on advice about the legal
position. Nor do the local authorities appear to have addressed the legal
position until after the matter was raised by the Audit Commission in
H    1987, over five years after agreements of this kind began to. be entered into
by local authorities. Had the point arisen under a .statute in the form
recommended by the Law Commission, it would have been necessary to
consider whether the above circumstances gave rise to a "settled view of

the law." It is only necessary to pose the question to realise how difficult      A
it would have been to answer it in the present case, and very possibly in
the case of other payments made under private transactions. For this
reason alone it comes as no surprise that the Law Reform Commission of
British Columbia decided (see their Report No. 51 (1981), pp. 68 et seq.)
not to recommend the adoption of any such provision in that Province,
though they also considered, at p. 72, that the New Zealand statutory
provision "goes far beyond what is required." The Law Reform Committee      B
of South Australia (see their Report No. 84 (1984), p. 31) likewise did not
recommend the adoption of any such provision, though three years later
the Law Reform Commission of New South Wales (see their Paper No. 53
(1987), pp. 51–56, paragraphs 5.20–5.29) proposed the legislative adoption
of a similar but not identical provision. In Scotland, as I have already
recorded, the Scottish Law Commission at first recommended its adoption,
but later resiled from that recommendation. That this whole topic is one      C
of great difficulty can perhaps best be seen in the Scottish Law
Commission's Discussion Paper No. 99, in which the rival arguments for
and against legislative reform are rehearsed in some detail, and the
difficulties exposed. This division of opinion does not encourage statutory
adoption of a provision in these or comparable terms, still less its
recognition as part of the common law of this country.      D

*Issue (1B): Honest receipt*

This issue arises from a principle proposed by Brennan C.J. (then
Brennan J.) in *David Securities Pty. Ltd. v. Commonwealth Bank of
Australia* (1992) 175 C.L.R. 353, 399. It reads:

> "It is a defence to a claim for restitution of money paid or      E
> property transferred under a mistake of law that the defendant
> honestly believed, when he learnt of the payment or transfer, that he
> was entitled to receive and retain the money or property."

This principle was expressly proposed in order to achieve a degree of
certainty in past transactions. As Brennan J. said, at p. 398: "Unless some
limiting principle is introduced, the finality of any payment would be as      F
uncertain as the governing law."

In this part of the law there has long been concern, among common
law judges, about what is sometimes called the finality of transactions, and
sometimes the security of receipts. This concern formed a significant part
of the amalgam of concerns which led to the rule that money paid under
a mistake of law was irrecoverable on that ground. Now that that rule has      G
been abrogated throughout the common law world, attention has of course
shifted to the formulation of appropriate defences to the right of recovery.
The principle proposed by Brennan J. is, I believe, the most far-reaching
of the defences to the right of recovery that has yet been proposed.

Anything which falls from Brennan J. is, of course, entitled to great
respect. But I have to state at once that this proposal seems to have been
stillborn. Of the judges who sat with Brennan J. on the *David Securities*      H
case, none supported this proposal. I know of no judicial support which
the proposal has since received, nor of any support from any of the Law
Commissions which have considered this part of the law. The reason for

2 A.C.                 **Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))**          Lord Goff
of Chieveley

A this lack of support is, I believe, that the proposal is generally regarded as being wider than is necessary to meet the perceived mischief.

I start from the proposition that money paid under a mistake of law is recoverable on the ground that its receipt by the defendant will, prima facie, lead to his unjust enrichment, just as receipt of money paid under a mistake of fact will do so. There may of course be circumstances in which, despite the mistaken nature of the payment, it is not regarded as unjust B for the defendant to retain the money so paid. One notable example is change of the defendant's position. Another is the somewhat undefined circumstance that the payment was made in settlement of an honest claim. Yet, Brennan J.'s proposed defence is so wide that, if it was accepted, these other defences would in practice cease to have any relevance in the case of money paid under a mistake of law. Moreover in many cases of this kind C the mistake is shared by both parties, as for example in the case of the appeals now under consideration. In such cases, recovery by the plaintiff would automatically be barred by Brennan J.'s proposed defence. So sweeping is the effect of the defence that it is not perhaps surprising that it has not received support from others.

In my opinion, it would be most unwise for the common law, having recognised the right to recover money paid under a mistake of law on the D ground of unjust enrichment, immediately to proceed to the recognition of so wide a defence as this which would exclude the right of recovery in a very large proportion of cases. The proper course is surely to identify particular sets of circumstances which, as a matter of principle or policy, may lead to the conclusion that recovery should not be allowed; and in so doing to draw on the experience of the past, looking for guidance in E particular from the analogous case of money paid under a mistake of fact, and also drawing upon the accumulated wisdom to be found in the writings of scholars on the law of restitution. However, before so novel and far-reaching defence as the one now proposed can be recognised, a very strong case for it has to be made out; and I can discover no evidence of a need for so wide a defence as this. In particular, experience since the recognition of the right of recovery of money paid under a mistake of law F in the common law world does not appear to have revealed any such need.

For these reasons, with all respect to Brennan J., I am unable to accept that the defence proposed by him forms part of the common law.

*Issue (2): Completed transactions*

This issue was added, by leave of your Lordships' House, to the issues G set out in the order of Langley J. It arose from a footnote to an article by Professor Peter Birks entitled "No Consideration: Restitution after Void Contracts" (1993) 23 U.W.A.L.R. 195. In the article, Professor Birks was concerned to criticise the conclusion of Hobhouse J. in the *Westdeutsche* case [1994] 4 All E.R. 890 that the basis of recovery of money paid under void interest rate swaps agreements was absence of consideration, his H preferred view being that the true ground of recovery was failure of consideration. It formed part of his argument that a party who has received full performance under such a contract cannot recover the value of his performance, i.e. the money he has paid to the other party, because in such circumstances there has been no failure of consideration for his

payment. He has received what he wanted, and therefore there was no
unjust factor to provide a reason for restitution. However, in a section of
the article entitled "The alternative of restitution for mistake," he reached
the conclusion in the text that it seemed that, if the remedy of recovery of
money paid under a mistake was available in cases of mistake of law, his
earlier conclusion would be largely cancelled out. This was because, since
the effect of a mistake must be judged at the time when it was made, "it
would seem to follow that if the mistake causes the transfer where the
plaintiff never subsequently receives a complete performance, it must
equally cause it in the case of complete performance:" see p. 229. Moreover
"in the context of void contracts, no valid bargain being in issue, the
mistaken party cannot be barred from restitution because he received
something from the other, provided only that he can make counter-
restitution to the court's satisfaction:" see p. 230. His conclusion in the
text, at p. 231, was that it was "undeniable that, at least in jurisdictions
with a liberal regime for mistake, the refutation of Hobhouse J.'s novel
doctrine will have few practical consequences."

However on p. 230 he added a footnote which appears to have been an
afterthought. In this he said:

> "None the less there is one good argument against allowing
> restitution in this situation on the ground of this particular kind of
> mistake, namely the transferor's mistaken belief in his/her liability to
> make the transfer and the liability of the other to reciprocate. It is
> that after the execution of the supposed contract the force of this type
> of mistake is spent . . . Therefore, even though it is true, as is admitted
> in the text above, that the mistake will have been causative at the time
> of the performance, that mistake cannot on this reasoning be relied
> upon when matters have progressed to the point at which it can
> clearly be seen that the only prejudice which it might have entailed
> never in fact eventuated."

The question for consideration on this issue is whether the thesis contained
in the footnote is well founded.

It has to be said at once that the argument set out in the text of the
section of the article entitled "The alternative of restitution for mistake,"
from which I have quoted, is most formidable. It is well established that
the cause of action for the recovery of money paid under a mistake of fact
accrues at the time of payment. As authority for this proposition it is
usual to cite *Baker v. Courage & Co.* [1910] 1 K.B. 56, a decision of
Hamilton J. (later Lord Sumner) which, so far as I am aware, has never
been questioned. So if an agreement such as those presently under
consideration, under which a series of payments falls to be made, is held
to have been void so that each payment has been made under a mistake
of law, i.e. the mistaken belief of the payer that he was liable to make the
payment, the cause of action for the recovery of the money so paid will
accrue, in respect of each payment, on the date when the payment was
made. This will be true of each payment; and if the performance of the
supposed contract is completed, it will be as true of the final payment as
it will have been of all the previous payments. It follows that, if the
argument in Professor Birks's footnote is correct, at the moment when the

2 A.C.                    Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))          Lord Goff
of Chieveley

A  final payment is made under such a contract, not only will the final
payment itself be irrecoverable despite the fact that it was made under
precisely the same mistake as the previous payments made by him, but the
payer will somehow be divested of his accrued right to recover all those
previous payments.

In the light of this analysis, the only possible basis for the thesis in
Professor Birks's footnote would seem to be that, in the context of void
B  contracts, failure of consideration should be allowed to trump mistake of
law as a ground for recovery of benefits conferred. However an equally
strong argument may perhaps be made in favour of mistake of law
trumping failure of consideration, though either approach is antagonistic
to the usual preference of English law to allow either of two alternative
remedies to be available, leaving any possible conflict to be resolved by
C  election at a late stage. Neither of these two solutions was however relied
upon in argument in the present case; and it is in any event difficult to see
how Professor Birks's proposal in his footnote can here be reconciled with
the consequences of invalidity arising from the application of the ultra
vires doctrine. As a result, following the decision of the House of Lords in
Hazell [1992] 2 A.C. 1, it was ordered and declared that the items of
account (irrespective whether they represented payments or receipts)
D  appearing in the capital markets fund account of the local authority in
that case (Hammersmith and Fulham London Borough Council) for the
years under challenge were contrary to law (see pp. 43H–44A, per Lord
Templeman, with whose opinion the other members of the appellate
committee agreed). Of the interest rate swap transactions entered into by
the council, some were closed transactions, and a number were profitable,
but no exceptions were made for these in the declarations so made. As
E  Mr. Southwell submitted on behalf of the bank, it is incompatible with the
ultra vires rule that an ultra vires transaction should become binding on a
local authority simply on the ground that it has been completed. Moreover
the ultra vires rule is not optional; it applies whether the transaction in
question proves to have been profitable or unprofitable. If the argument in
Professor Birks's footnote is right, the result would be that effect would be
F  given to a contract which public policy has declared to be void.

In my opinion, these points are unanswerable; and they are reinforced
by further arguments advanced by Professor Burrows in his article entitled
"Swaps and the Friction between Common Law and Equity" [1995] R.L.R.
15, 18–19. I would accordingly decide this issue in favour of the bank.

G  *Issue (3): Does section 32(1)(c) of the Limitation Act 1980 apply to
mistakes of law?*

Section 32(1) of the Limitation Act 1980 provides:

"Subject to subsections (3) and (4A) below, where in the case of
any action for which a period of limitation is prescribed by this Act,
either—(a) the action is based upon the fraud of the defendant; or
H  (b) any fact relevant to the plaintiff's right of action has been
deliberately concealed from him by the defendant; or (c) the action is
for relief from the consequences of a mistake; the period of limitation
shall not begin to run until the plaintiff has discovered the fraud,

concealment or mistake (as the case may be) or could with reasonable    A
diligence have discovered it."

The question which arises under this issue is whether the actions
brought by the bank for the recovery on the ground of mistake of law of
money paid to the authorities under void interest swaps agreements
are actions for relief from the consequences of a mistake within
section 32(1)(c).    B

The precursor of section 32(1)(c) of the Limitation Act 1980 was
section 26(c) of the Limitation Act 1939, which was in the same terms.
That provision was enacted following upon the Fifth Interim Report of
the Law Revision Committee (1936) (Cmd. 5334). Paragraph 23 of the
Report stated that the equitable rule (that time should only run under the
Statutes of Limitation from the time at which the mistake was, or could    C
with reasonable diligence have been, discovered) did not apply to cases
which fell exclusively within the cognisance of a court of law (here referring
to *Baker v. Courage & Co.* [1910] 1 K.B. 56). Having stated that the
position was unsatisfactory, it recommended that in all cases when relief
was sought from the consequences of a mistake, the equitable rule should
prevail.

The submission of the bank was that their actions for the recovery on    D
the ground of mistake of law of money paid under void interest swap
agreements were actions for relief from the consequences of a mistake
within section 32(1)(c) of the Act of 1980. In support of this submission,
they relied, first, on *In re Diplock; Diplock v. Wintle* [1948] Ch. 465,
515–516, in which the Court of Appeal stated that section 26 of the Act
of 1939 would operate to postpone the running of time in the case of an    E
action at common law to recover money paid under a mistake of fact, and
would likewise apply to an analogous claim in equity to recover money
paid under a mistake of law. Second, they relied on the judgment of
Pearson J. in *Phillips-Higgins v. Harper* [1954] 1 Q.B. 411, 418 in which he
stated with reference to section 26 of the Act of 1939 that the essential
question was whether the action was for relief from the consequences of a
mistake, a familiar example of which was an action for the recovery of    F
money paid in consequence of a mistake. On this basis, it was submitted,
the bank's causes of action in the present cases fell clearly within
section 32(1)(c) of the Act of 1980.

In answer to this submission, the submission of the authorities was
twofold. First, they submitted that there was no mistake on the part of the
bank; but I have already explained that I am satisfied that they indeed    G
paid the money in question under a mistake of law. Second, they submitted
that section 32(1)(c) does not on its true construction apply to mistakes of
law. In this connection they relied in particular on the fact that the mistake
of law rule was in full force in 1939, when the provision was first enacted;
and they further submitted that the words of the subsection, which referred
to a mistake being "discovered," showed that the legislature was referring
to mistakes of fact rather than mistakes of law of which it would not be    H
apt to refer to such a mistake being "discovered," still less "discovered
with reasonable diligence." In my opinion, however, this verbal argument
founders on the fact that the pre-existing equitable rule applied to all

A   mistakes, whether they were mistakes of fact or mistakes of law: see, e.g., *Earl Beauchamp v. Winn* (1873) L.R. 6 H.L. 223, 232–235 and the dicta from *In re Diplock* to which I have already referred.

    I recognise that the effect of section 32(1)(*c*) is that the cause of action in a case such as the present may be extended for an indefinite period of time. I realise that this consequence may not have been fully appreciated at the time when this provision was enacted, and further that the

B   recognition of the right at common law to recover money on the ground that it was paid under a mistake of law may call for legislative reform to provide for some time limit to the right of recovery in such cases. The Law Commission may think it desirable, as a result of the decision in the present case, to give consideration to this question; indeed they may think it wise to do so as a matter of some urgency. If they do so, they may find

C   it helpful to have regard to the position under other systems of law, notably Scottish and German law. On the section as it stands, however, I can see no answer to the submission of the bank that their claims in the present case, founded upon a mistake of law, fall within the subsection.

*Conclusion*

D    In the result, I would answer the questions posed for your Lordships under the various issues as follows.

    Issue (1). The present rule, under which in general money is not recoverable in restitution on the ground that it has been paid under a mistake of law, should no longer be maintained as part of English law, from which it follows that the facts pleaded by the bank in each action disclose a cause of action in mistake.

E    Issue (1A). There is no principle of English law that payments made under a settled understanding of the law which is subsequently departed from by judicial decision shall not be recoverable in restitution on the ground of mistake of law.

    Issue (1B). It is no defence to a claim in English law for restitution of money paid or property transferred under a mistake of law that the defendant honestly believed, when he learnt of the payment or transfer,

F   that he was entitled to retain the money or property.

    Issue (2). There is no principle of English law that money paid under a void contract is not recoverable on the ground of mistake of law because the contract was fully performed.

    Issue (3). Section 32(1)(*c*) of the Limitation Act 1980 applies in the case of an action for the recovery of money paid under a mistake of law.

G    It follows that all four appeals must be allowed with costs.

    LORD LLOYD OF BERWICK. My Lords, of the sums claimed by the bank £388,114 has already been repaid by the four local authorities, either voluntarily, or pursuant to proceedings brought under R.S.C., Ord. 14 on the basis that there had been a total failure of consideration. The claim for the balance of £423,094 is prima facie time-barred. In order to meet

H   this difficulty, the bank relies on the alternative ground of mistake. It says that the payments made by it were made on the basis of a mistaken belief that there existed binding contracts between the bank and the authorities. In answer to the authorities' plea of limitation, it relies on section 32(1)(*c*)

of the Limitation Act 1980, which provides that when an action is for   A
relief from the consequences of a mistake, the period of limitation does
not begin to run until the mistake is discovered, or could with reasonable
diligence have been discovered. For the reasons given by my noble and
learned friend, Lord Goff of Chieveley, I agree that if there was here a
mistake on which the bank can rely, then it could not have discovered the
mistake until the House gave judgment in *Hazell v. Hammersmith and
Fulham London Borough Council* [1992] 2 A.C. 1; I agree also that the   B
bank is entitled to rely on section 32(1)(c) of the Limitation Act 1980,
with the result that time did not begin to run until the date of the
judgment in *Hazell,* namely 24 January 1991.

Was there then a mistake on which the plaintiffs can rely? It is common
ground that if there was a mistake, the mistake was one of law. For well
over a century the courts have recognised and enforced a distinction   C
between mistakes of fact and mistakes of law. The rule has been that,
unlike mistake of fact, money paid under a mistake of law cannot be
recovered. In a dissenting speech in *Woolwich Equitable Building Society v.
Inland Revenue Commissioners* [1993] A.C. 70, 154, Lord Keith of Kinkel
described the rule as being "too deeply embedded in English jurisprudence
to be uprooted judicially." So it is not surprising that Langley J. did not   D
give a reasoned judgment when the case came before him at first instance.
He was bound by authority to give judgment on the preliminary issues in
favour of the authorities. Nor do we have the assistance of reasoned
judgments in the Court of Appeal, since the appeal came direct to the
House under the leap-frog procedure.

The mistake of law rule has been so heavily and effectively criticised in
recent years that Mr. Underhill wisely did not seek to defend it. Lord   E
Goff's speech demonstrates with compelling force that the rule is indeed
indefensible. Instead of defending the rule, Mr. Underhill submits first that
the rule should be abrogated by Parliament rather than by the House in
its judicial capacity, and secondly that if the rule is abrogated without any
safeguards, there may be undesirable side effects. In particular
Mr. Underhill is concerned by what he called his paradigm case of a long-
standing decision of the Court of Appeal subsequently overruled by the   F
House of Lords. Should a person who has paid money on the faith of
the Court of Appeal decision be entitled to recover his money when the
decision is overruled by the House of Lords, perhaps many years later? Is
there in truth in such a case any mistake at all? Or, is it not more accurate
to say that there has merely been a failure to predict a change in the law?
I shall attempt to deal with each of these submissions in turn.   G

As to the first, Mr. Underhill invited your Lordships to exercise
restraint. The mistake of law rule has stood for many years, and legislation
to abolish the rule (so far as one can ever foretell such things) appears, he
said, to be imminent. It would be wrong to pre-empt the legislature,
especially as changes in other parts of the law might prove necessary. By
way of example, there might have to be an amendment to the Limitation
Act 1980. For mistake of law cannot have been in mind when   H
section 32(1)(c) was enacted.

I am not persuaded. Indeed I can imagine few areas of the law in
which it would be more appropriate for the House to take the initiative.

A    The mistake of law rule is judge made law. There are no considerations of social policy involved. The proposed change is consistent with, and less far-reaching than the change effected by the House in the *Woolwich* case. In Scotland the Inner House abrogated the mistake of law rule in *Morgan Guaranty Trust Co. of New York v. Lothian Regional Council*, 1995 S.C. 151 (despite the strong authority of Lord Brougham L.C. to the contrary), even though legislation might also have been said to be imminent following

B    on the Scottish Law Commission Discussion Paper No. 95 on Recovery of Benefits Conferred under Error of Law (1993). Elsewhere, in Canada, Australia and South Africa, the rule has been abolished by judicial decision. And we have the recommendation of the English Law Commission Report No. 227. It is true that the Law Commission was itself in favour of leaving the change to Parliament. But the Law Commission was not to

C    know that the opportunity for judicial decision would come so soon; in contrast, the prospect of legislation is still uncertain, and perhaps remote. For these reasons I would reject Mr. Underhill's first submission. The critics of the mistake of law rule have waited long enough. The plaintiffs in these proceedings should have the benefit of a change which is long overdue. That is not to say that the plaintiffs will necessarily succeed when the case comes on for trial. But at least the mistake of law rule should not

D    stand in their way as it would if we were to wait for Parliament to take a hand.

    I turn to Mr. Underhill's second submission. Here, as it seems to me, he starts more than half way home. For Mr. Southwell conceded in his reply (in my view correctly) that if parties enter into a contract in accordance with a decision of a Court of Appeal, (it is not suggested that

E    there was such a decision in the present case) and if the Court of Appeal decision is subsequently overruled by the House of Lords there could be no question of claiming restitution on the ground of mistake. For when the parties entered into the contract the law was as they believed it to be. How then could they claim to have been mistaken?

    But even more important than Mr. Southwell's concession is the Law

F    Commission Report itself. Annexed to the Report (No. 227) is a draft Bill. Clause 2 abrogates the mistake of law rule. It provides:

      "The classification of a mistake as a mistake of law or as a mistake of fact shall not of itself be material to the determination of a mistake claim; and no such claim shall be denied on the ground that the alleged mistake is a mistake of law."

G    Clause 3(1) provides:

      "An act done in accordance with a settled view of the law shall not be regarded as founding a mistake claim by reason only that a subsequent decision of a court or tribunal departs from that view."

H    Clause 3(1) is clearly consistent with Mr. Southwell's concession, and covers Mr. Underhill's paradigm case. But it goes wider. For it is not confined to cases where the law is settled by reason of a prior decision of the Court of Appeal. It covers other cases as well. It is this wider aspect of clause 3(1) of the draft Bill which has caused Mr. Southwell's concern.

Lord Lloyd
of Berwick          **Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))**          [1999]

But before I come to that concern, there is a more general point to be    A
made. Clause 3(1) of the draft Bill implements the recommendation in
paragraph 5.13 of the report. It reads:

> "Accordingly, we recommend that a restitutionary claim in respect of
> any payment, service or benefit that has been made, rendered or
> conferred under a mistake of law should not be permitted merely
> because it was done in accordance with a settled view of the law at    B
> the time, which was later departed from by a subsequent judicial
> decision."

That recommendation was the result of very extensive consultation by
the Commission. The arguments for and against the recommendation are
set out in paragraphs 5.1–5.13 of the report. In paragraph 5.9 the
Commission ask a number of questions which others have asked. How    C
"settled" does a view or understanding of the law have to be before a
payment based on that view or understanding becomes irrecoverable? The
answer given in paragraph 5.10 is as follows:

> "It is not realistic to restrict 'settled law' to propositions which arise
> only from statute or from judicial decisions—it is often only in the
> light of the actual operation of the law in practice and criticism or    D
> discussion of it in legal literature that these acquire a flavour of
> immutability. We believe that this is a common-sense question, and
> that it is one which the courts are particularly well-qualified to answer.
> Courts will be free, under our proposed formulation of the bar, to
> recognise a proposition as settled irrespective of the source from which
> it is derived. Equally, courts will be able to recognise that different
> sources of law carry different weight in establishing whether a    E
> particular proposition is settled."

The Law Commission recommendations have been accepted by two
successive governments of different political persuasions. No doubt if a
Bill were introduced in the form proposed by the Law Commission, an
amendment might be proposed and carried to delete clause 3. We cannot
tell. But for your Lordships to accept half the package proposed by the    F
Law Commission and reject the other half, would cause me some disquiet.
If that is to be the result, then the argument against pre-empting
Parliament becomes much stronger. I shall return to this point at the end
of my speech.

What then are the reasons for not accepting clause 3 of the draft Bill
as it stands? At the outset there is, as so often, a question of terminology.    G
Some of the commentators regard a provision such as is found in clause 3
of the Bill as providing the payee with a defence. This is the language used
by the Scottish Law Commission, and by my noble and learned friend,
Lord Hope of Craighead. I, for my part, find it easier to think of clause 3
as a safeguard (another term used by the Scottish Law Commission) rather
than a defence. The safeguard is needed because law, unlike facts, can
change. Facts are immutable, law is not. Where, therefore, mistake of law    H
is relied on to ground a claim for restitution, it is necessary to define what
one means by "mistake." That, as it seems to me, is the function of
clause 3. It does not create a defence to a general right of recovery. It is

A    not like the defence of change of position recognised by the House in
*Lipkin Gorman v. Karpnale* [1991] 2 A.C. 548. Clause 3 is more in the
nature of a defining clause. Its purpose is to clarify and delimit what is
meant by "mistake" in cases where the law has changed.

   This brings us to the central question. Nobody now suggests that the
common law is static. It is capable of adapting itself to new circumstances.
Is it then capable of being changed? Or is it only capable of being
B    developed? The common-sense answer is that the common law is capable
of being changed, not only by legislation, but also by judicial
decision. This is nowhere clearer than when a long-standing decision of
the Court of Appeal is overruled. Indeed in a system such as ours, where
the Court of Appeal is bound by its own previous decisions, the main
'    justification for the existence of a second tier appeal is that it enables the
C    House to redirect the law when it has taken a wrong turning. I am not
thinking of landmark cases such as *Donoghue v. Stevenson* [1932] A.C. 562
or *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465.
I am thinking of more ordinary cases, of which there may be one or two a
year, in which a line of recent Court of Appeal authority is overturned. By
way of example one can take two cases from the field of building contracts:
*Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.* [1974]
D    A.C. 689 overruling *Dawnays Ltd. v. F. G. Minter Ltd. and Trollope and
Colls Ltd.* [1971] 1 W.L.R. 1205, and *Beaufort Developments (N.I.) Ltd. v.
Gilbert-Ash N.I. Ltd.* [1999] 1 A.C. 266 overruling *Northern Regional Health
Authority v. Derek Crouch Construction Co. Ltd.* [1984] Q.B. 644. Or there
are the less frequent cases in which long-standing decisions are overruled,
such as *Hindcastle Ltd. v. Barbara Attenborough Associates Ltd.* [1997]
E    A.C. 70 overruling *Stacey v. Hill* [1901] 1 K.B. 660 and *Attorney-General
for Hong Kong v. Reid* [1994] 1 A.C. 324 disapproving *Lister & Co. v.
Stubbs* (1890) 45 Ch.D. 1.

   What then is the House doing when it overrules a line of Court of
Appeal authority? First and foremost it is determining what the law is in
relation to the case which it is deciding. It will then apply that law to the
facts of the particular case. Since the transaction giving rise to the case
F    will have occurred in the past, it can be said that to that very limited
extent (and the same is true of every decision of every court) it is applying
the law retrospectively.

   An inevitable consequence of determining the law in relation to a
particular case is that the same law will apply to other cases as yet
undecided, in which the same point arises. This is so whether the
G    transaction in question lies in the past or the future. So again, to that
limited extent, it can be said that the decision operates retrospectively. But
that, as it seems to me, is the full extent of any retrospective effect. There
is no way in which the decision can be applied retrospectively to cases
which have already been decided. Nor is there any logical reason why there
should be. It is the function of the court to decide what the law is, not
what it was. So when the House of Lords overrules a line of Court of
H    Appeal decisions it does not, and cannot, decide those cases again. The
law as applied to those cases was the law as decided at the time by the
Court of Appeal. The House of Lords can say that the Court of Appeal
took a wrong turning. It can say what the law should have been. But it

cannot say that the law actually applied by the Court of Appeal was other    A
than what it was. It cannot, in my learned and noble friend, Lord Browne-
Wilkinson's vivid expression, falsify history.

It follows that in such a case the House of Lords is doing more than
develop the law. It is changing the law, as common sense suggests, and as
Mr. Southwell was right to concede. If this view of what happens is
inconsistent with the declaratory theory of the court's function, then it is
time we said so. It always was a fairy tale.                                 B

If it is right that the House of Lords can change the law by overruling
a previous decision of the Court of Appeal, it must follow that a person
relying on the old law was under no mistake at the time, and cannot claim
to have been under a mistake ex post facto because the law is subsequently
changed. This is obviously true where the law is changed by legislation. In    *
my opinion it is equally true when the law is changed by judicial decision.  C
The point is put clearly by the Scottish Law Commission in Discussion
Paper No. 99 on Judicial Abolition of the Error of Law Rule and its
Aftermath (1996), paragraph 3.33 when summarising the views of the
Court of Session judges:

> "The Court of Session judges pointed to the oddity of providing
> that a payment is not to be recoverable by reason of a 'change' in the    D
> law. If it is indeed a change, the payment would ex hypothesi not be
> recoverable. We agree that any provision introducing the bar should
> not refer to a change in the law. If the courts do change the law, the
> reference is unnecessary; if they do not (because of the declaratory
> theory) it would be inappropriate for statute to state that they do."

The next question is whether the same reasoning applies where there is    E
no previous decision of the Court of Appeal directly in point. Can the
House of Lords "change" the law in those circumstances, or can it only
develop the law? I can see no difference in principle. The English common
law is not confined to decided cases. In the field of commercial law, for
example, the custom of merchants has always been a fruitful source of law.
It is true that a custom can be challenged in a court of law. But it does
not need a court of law to establish a custom. Custom is binding on the    F
parties irrespective of any judicial decision. Where therefore a long
established custom is rejected by a court of law on the ground that it is
inconsistent with statute, the law is "changed" just as much as when a
decision of the Court of Appeal is overruled by the House of Lords.
I repeat some sentences from the Law Commission Report No. 227 which
I have already quoted:                                                      G

> "It is not realistic to restrict 'settled law' to propositions which arise
> only from statute or from judicial decisions . . . Courts will be free ...
> to recognise a proposition as settled irrespective of the source from
> which it is derived."

I agree with these observations. There may of course be cases where    H
there is a dispute whether the law was settled at the time of the transaction.
But as the Law Commission again point out, this is just the sort of
common sense question which the courts are particularly well qualified to
answer.

2 A.C.            Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))            Lord Lloyd
of Berwick

A    There are two policy reasons which support the Law Commission's view point. The prospect of transactions being reopened many years after the event by a subsequent decision of the Court of Appeal or House of Lords is not one which the law should favour, especially in the field of commerce. It is true that in many cases the defendant would be able to rely on change of position as a defence. But this would not necessarily be so in every case. Certainty and finality, as has been said so often, are twin

B    policy objectives of the highest importance in formulating legal principles.

    Secondly, Mr. Underhill points out that if payer and payee are at one in believing the law to be in accordance with a settled understanding, there would appear to be no moral obligation resting on the payee to repay when the law is subsequently changed. Why, asks Mr. Underhill, should the payee's conscience be affected? Where is the unjust factor?

C    In my opinion this is a strong argument in favour of the Law Commission's proposals. For if the payee's conscience is affected in such a case, it would seem that it ought also to be affected if the law is subsequently changed by legislation. Yet nobody suggests that a subsequent change in the law by legislation can ground a claim in restitution.

    Even when the legislation is retrospective, it by no means follows, as Lord Goff points out, that a previous payment will have been made under

D    a mistake of law at the time of payment. My noble and learned friend, Lord Hope is of the same opinion. The correct analysis in his view is that there will have been no mistake of law when the payment was made. I respectfully agree. If the retrospective legislation positively requires a transaction to be reopened, the liability to repay will arise, not because the payee's conscience is affected, but by operation of statute: see *Commissioner of State Revenue v. Royal Insurance Australia Ltd.* (1994) 182 C.L.R. 51,

E    89, *per* Brennan J. But if that be so, it is difficult to defend, on policy grounds, a different rule for changes in the law effected by judicial decision. Appellate courts ought to be encouraged to change the law in those rare cases where change is needed. They should not be inhibited by the fear of reopening past transactions.

F    The policy arguments in favour of the Law Commission's proposals do not mean that, if the proposals are adopted, your Lordships would be indulging in a legislative act. As I have tried to demonstrate, clause 3 of the proposed Bill is in the nature of a defining clause. It tells us what mistake of law means. If your Lordships are entitled to abolish the judge-made mistake of law rule, as I firmly believe we should, we are surely entitled to define what it is that we are abolishing: quo modo oritur eodem

G    solvitur.

    Mr. Southwell argued that if your Lordships were to accept the Law Commission's proposal on settled law, it would neutralise much of the benefit flowing from the abolition of the mistake of law rule. I agree that the restricted definition of mistake of law contained in clause 3(1) of the draft Bill will confine the operation of clause 2. That, after all, is its purpose. I do not agree that it will render the whole exercise futile, or even

H    much less beneficial. Clause 3(1) only removes those cases from the operation of clause 2 where there has been a subsequent change of the law, or where, in the language of clause 3(1) itself, a court "departs from" a settled view of the law. In all other cases where a mistake of law has in

the past precluded a claim in restitution, for example, where a plaintiff has      A
been wrongly advised as to the law, whether settled or otherwise, clause 2
will have full effect.

It is said that the Scottish Law Commission in its 1996 Discussion
Paper resiled from the view expressed in its 1993 Discussion Paper No. 95
on Recovery of Benefits Conferred under Error of Law. In the former
paper the Commission favoured a statutory provision precluding repetition
in cases where there has been a change in the law, or in the common          B
understanding of the law, by subsequent judicial decision. The reason why
they favoured such a provision was because they regarded the safeguard as
"too important to be left to the uncertainties of judicial decisions:" see
paragraph 2.123. In the latter paper the Commission changed its mind as
to the need for a *statutory* provision. In other words the Commission came
down against the first and second of the possible options outlined in the     C
paper, both of which envisaged a *statutory* bar to recovery. Instead it
favoured the third possible option, namely to leave the development of
safeguards to the courts. No doubt it was influenced in its view by the
intervening decision of the Inner House in *Morgan Guaranty Trust Co. of
New York v. Lothian Regional Council,* 1995 S.C. 151. Whereas, therefore,
it is true to say that, for a variety of reasons, the Commission resiled from
its former preference for a statutory safeguard, it did not express any view   D
one way or the other, certainly no strong view, against a "settled law
exception" being implemented by the court.

Much of Mr. Southwell's final submissions were devoted to showing
that the decision of the House in *Hazell v. Hammersmith and Fulham
London Borough Council* [1992] 2 A.C. 1 did not change the law. There
had been no previous decision of any court that swap transactions were        E
intra vires, nor was there any settled law to that effect. So far as any
previous judicial decision is concerned he is, of course, right. But whether
or not it was settled law that the transactions were intra vires it is still too
soon to say. Mr. Southwell specifically accepted towards the end of his
reply that if the House were to agree with the Law Commission's proposals
then the question whether there was a settled view of the law in this case
would have to go back to the trial judge; see also Mr. Southwell's closing    F
submissions in writing. Mr. Underhill expressed some surprise at
Mr. Southwell's concession. But he nevertheless agreed.

In the course of his speech Lord Goff of Chieveley tests his view of the
law by applying it to the facts of the present case. He presupposes that the
payer at the date of payment believed that he was bound to pay. The payer
is then told in *Hazell's* case that, on the law applicable at the date of    G
payment, he was not bound to pay. Lord Goff concludes that the payer
paid under a mistake of law. But this assumes that the law applicable at
the date of payment was the same as the law stated in *Hazell's* case. If it
was, then of course the payer must have been mistaken. But if *Hazell's*
case changed the law, then it would not follow. My noble and learned
friend may well be right that *Hazell's* case did not change the law. But it
was common ground, as I understand it, that we are not yet in a position     H
to say one way or the other.

The only other point on which I would, with diffidence, disagree with
my Lord is where, towards the end of his speech, he assumes, for the

397

2 A.C.                Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))                Lord Lloyd
of Berwick

A    purpose of argument, that the plaintiffs paid on the basis of a settled
understanding of the law, later proved to be erroneous, but nevertheless
holds that the payment would not for that reason alone be irrecoverable.
For the reasons already mentioned, I find this hard to accept. I agree that
the payment might be recoverable on some other ground, for example,
total failure of consideration, assuming the claim was not time-barred, but
not on the grounds of mistake. For if there really was a settled
B    understanding of the law, then that was the law at the time of payment.
The payer was not mistaken. The subsequent change in the law could not
create a cause of action which, ex hypothesi, did not exist at the relevant
time. Even if the change were to come very soon after the payment it
would make no difference.

        I have not discussed any of the authorities, since on the crucial question
C    whether we should adopt the Law Commission's settled law proposal, I do
not regard the authorities, with one exception, as being of great assistance.
The exception is the *Royal Insurance Australia Ltd.* case, 182 C.L.R. 51
and, in particular, the observations of Brennan J., at p. 89 and Dawson J.,
at p. 100.

        Mr. Underhill invited your Lordships to give some guidance as to how,
if the question of settled law is to be remitted to the trial judge, that
D    question should be approached. I do not think it would be desirable to say
much in that connection, save to draw attention to paragraph 5.11 of the
Law Commission Report No. 227. That paragraph provides all the
guidance that can usefully be given at this stage. Thus it is not enough
that there should be a "common understanding," if by common
understanding is meant only the common understanding of the parties. It
E    must be a common understanding shared by their lawyers, and indeed by
lawyers in general. The essential requirement is that the plaintiff should be
able to prove that he made a mistake. At one extreme he will fail if he
paid in accordance with what lawyers generally believed to be the law at
the time of payment, whether he obtained legal advice or not. At the other
extreme he would fail if the law gave rise to serious doubts; for if lawyers
F    differed among themselves, it could not be said that one view rather than
another was mistaken.

        Last of all it is said that if *Hazell's* case did indeed change the law, it
would mean that these plaintiffs alone among many others would have
failed to recover. But the others have recovered on the ground of failure of
consideration, as indeed have the plaintiffs. It is only because these
plaintiffs are now seeking to recover in respect of payments which are
G    prima facie time-barred that they are relying on mistake of law at all.

        For the above reasons, I would answer the questions formulated by
Lord Goff of Chieveley as follows. Issue (1): subject to the answer to
Issue (1A), the facts pleaded in the statement of claim disclose a cause of
action in mistake; Issue (1A): moneys paid on the basis of a settled view
of the law which has been subsequently overturned by judicial decision are
not recoverable; Issues (1B), (2) and (3): as proposed by Lord Goff.

H        But a majority of your Lordships are of a different view. What are the
consequences? One consequence is that in all those cases where the House
of Lords has overruled a previous decision of the Court of Appeal it
would be open to those who have entered into transactions in reliance on

the previous decision to seek to reopen their transactions. This is a    A
consequence which, in the commercial field at any rate, I view with alarm.
My noble and learned friend, Lord Hoffmann, accepts that there is a
problem, but considers that the solution can be left to Parliament. It is
reasonable to assume that Parliament would start with the Law
Commission's proposals, which, as I have said, successive governments of
both main parties have accepted. But in the meantime there will be an
inevitable period of intense uncertainty. If your Lordships are not willing    B
to adopt the Law Commission's solution as it stands, it is surely better to
let Parliament adopt that solution, or some other solution, *before* our
decision rather than after.

   For myself, I would want to allow the appeal, if I could, along the lines
of the Law Commission's proposals. But as that is not to be, I consider
the second best course is to leave the abolition of the mistake of law rule    C
to Parliament, as the Law Commission itself envisaged. Like my noble and
learned friend, Lord Browne-Wilkinson, therefore, I would dismiss these
appeals.


   LORD HOFFMANN.   My Lords, it is no mere form of words to say that
I have had the privilege of reading in draft the speech of my noble and    D
learned friend, Lord Goff of Chieveley. It is, if I may be allowed
respectfully to say so, one of the most distinguished of his luminous
contributions to this branch of the law. On all but one of the questions
debated before your Lordships, I understand that it commands unanimous
assent. It would therefore be superfluous for me to add anything of my
own. But I should say something on the issue which divides your
Lordships, because I have to confess that on this point I have changed my    E
mind. At the end of the argument I was of opinion, perhaps not in a very
focused way, that a person who pays in accordance with what was then a
settled view of the law has not made a mistake. In fact it seemed to me
that one could go further and say that if he had acted in accordance with
a tenable view of the law, he had not made a mistake. In the first case he
was right, and in the second neither right nor wrong, but in both cases his
state of mind could be better described as a failure to predict the outcome    F
of some future event (scilicet, a decision of this House) than a mistake
about the existing state of the law.

   On reflection, however, I have come to the conclusion that this theory
was wrong, both in its stronger ("tenable view") and in its weaker ("settled
view") form. The reason, I think, is that it looks at the question of what
counts as a mistake in too abstract a way, divorced from its setting in the    G
law of unjust enrichment.

   The problem arises because (1) the law requires that a mistake should
have been as to some *existing* fact or (on the view which your Lordships
now take) the then *existing* state of the law but (2) a judicial statement of
the law operates retrospectively. So the question is whether the
retrospectivity of the law-making process enables one to say that holding a
contrary view of the law at an earlier stage was a mistake. This question    H
cannot be answered simply by taking a robust, common sense definition of
a mistake and saying that one does not believe in fairy stories. It is easy
to understand the expostulation of Lord Coleridge C.J. in *Henderson v.*

A    *Folkestone Waterworks Co.,* 1 T.L.R. 329 at the suggestion that, because
his judgment had been reversed by the House of Lords, he had been
"ignorant of the law." The common sense notion of a mistake as to an
existing state of affairs is that one has got it wrong when, if one had been
better informed, one could have got it right. But common sense does not
easily accommodate the concept of retrospectivity. This is a legal notion.
If the ordinary man was asked whether Lord Coleridge C.J. had made a
B    mistake, he would no doubt have said that in the ordinary sense, which
might carry some reflection on his competence as a judge, he had not. But
if he was asked whether he should be treated for the purposes of some
legal rule as having made a mistake, he might say "I don't know. You tell
me that the later decision operated retrospectively, which means that at
least for some purposes, it must be assumed to have been the law at the
C    time. Therefore it may be that for some purposes a person who held the
contrary view should be treated as having made a mistake. It all depends
upon the context. You had better ask a lawyer."

The lawyer would, I think, start by considering why, in principle, a
person who had paid because he held some mistaken belief should be
entitled to recover. The answer is that it is prima facie unjust for the
recipient to retain the money when, if the payer had known the true state
D    of affairs, he would not have paid. It has never been suggested that, in the
case of a mistake of fact, he could not recover if everyone would probably
have shared the same false belief. On the contrary, there was once a view
that he should not be able to recover if a reasonable person in his position
would *not* have shared his false belief, but this was repudiated in *Kelly v.
Solari,* 9 M. & W. 54. Since then, it has not mattered whether the person
E    making the payment could have discovered the true state of affairs or not.

The distinction therefore does not turn upon the fact that the person
ᵃ    making the payment could not have discovered the true state of affairs
about the law any more than about the facts. It turns upon the purely
abstract proposition that in principle (and leaving aside the problem of
Schrödinger's cat) the truth or falsity of any proposition of existing fact
could have been ascertained at the time, whereas the law, as it was
F    subsequently be declared to have been, could not.

One must therefore ask why, in the context of unjust enrichment, this
should make a difference. In both cases it has turned out that the state of
affairs at the time was not (or was deemed not to have been) what the
payer thought. In the case of a mistake of fact, it is because things were
actually not what he believed them to be. In the case of a mistake of law,
G    it is by virtue of the retrospectivity of the decision. Does the principle of
unjust enrichment require that this retrospectivity should be carried
through into the question of whether the payer made a mistake?

In my view, it would be very anomalous if it did not. Imagine a client
who has paid under what he thought to be a legal obligation. He had not
consulted a lawyer at the time, but seeks advice after a case in the House
of Lords which decides that the obligation was void. The lawyer tells him
H    that according to the House of Lords, he need not have paid. He asks
whether he can recover his money on the grounds of mistake. On the
"settled view" theory, the lawyer has to say: "No, because if you had
consulted me at the time, I would have told you that you were certainly

right to pay. Therefore you made no mistake." The client asks: "Does that     A
mean that the obligation was actually valid? If so, what has made it
invalid?" The lawyer has to answer "No, the House of Lords has told us
that it was always void. Nevertheless, you made no mistake. On the other
hand, if lawyers had regarded it as a doubtful point, or if any lawyer
would have told you then that the obligation was void, so that it would
have been extremely foolish of you not to have sought advice, then you
would have been able to recover."                                             B

My Lords, it seems to me that the imaginary client would have great
difficulty in understanding how these distinctions can arise out of a rule
giving a remedy for unjust enrichment. In each case he thought that the
obligation was valid and it has subsequently turned out that it was not. In
principle, the question should not turn upon what other people might have
thought was the law but upon what he thought was the law. And this has     C
turned out to have been wrong, however many lawyers might have agreed
with him at the time. So there ought to be a remedy in all cases or none.
I should mention that Mr. Southwell said in his written submissions in
reply that if someone made a payment because he had been told that the
Court of Appeal had decided that a person in such circumstances should
do so, he would not be treated as having made a mistake when the decision
was subsequently reversed. But he thought that the answer would be       D
different if he had not been told of the decision but came to the same
conclusion on first principles or by accident. He commented that this was
an absurdity, which might be thought to cast doubt upon the soundness
of the proposition. I think it is wrong. It does not matter why the payer
thought that the law required him to pay. Retention is prima facie unjust
if he paid because he thought he was obliged to do so and it subsequently     E
turns out that he was not.

An analogy was drawn in argument between a retrospective decision of     ↖
a court and a retrospective Act of Parliament. A failure to predict the
latter, it was said, could not possibly be a mistake and therefore why
should the former. I do not myself see why, in principle, if an Act of
Parliament requires that the law be deemed to have been different on an
earlier date, it should not follow that a person who acted in accordance     F
with the law as it then was should be deemed to have made a mistake.
This was the view of Mason C.J. in *Commissioner of State   Revenue v.
Royal Insurance Australia Ltd.*, 182 C.L.R. 51 and I respectfully think that
in principle he was right. But usually the question will turn upon the
construction of the statute: it may provide expressly for the refund of
money declared not to be owing, or such an obligation may be implied, or     G
it may be argued that the failure to provide expressly for repayment
showed a parliamentary intention that transactions under the previous law
should not be disturbed. I find the analogy of a retrospective Act of
Parliament, which can deal with the consequences of its retrospectivity,
unhelpful in dealing with a change of law by judicial decision. The judges
who change the law can use only the common law to remedy any injustices
which compliance with the previous law may have caused.                       H

I therefore do not think that there are any reasons of principle for
distinguishing cases in which a subsequent decision changes a settled view
of the law, or, for that matter, settles what was previously an unsettled view

A    of the law. The enrichment of the recipient is in each case unjust because he has received money which he would not have received if the payer had known the law to be what it has since been declared to have been.

There is, however, another ground for adopting the "settled view" theory and that is simply in order to preserve the security of past transactions. The argument is that where the law was thought to have been settled, there are likely to have been many transactions entered into in
B    reliance upon it. Therefore a rule which uniformly denies recovery in such cases would, on balance, do less harm than good.

The adoption of the "settled view" rule on these grounds would be a legislative act in a sense in which the abrogation of the mistake of law rule would not. The latter rule is, as my noble and learned friend, Lord Goff of Chieveley, has amply demonstrated, not founded upon any defensible
C    logic or principle. It is the proper business of your Lordships in a judicial capacity to clarify and develop the common law by restating rules in accordance with principle, even when this may require the correction of ancient heresies. But the adoption of the "settled view" rule would be founded purely upon policy; upon a utilitarian assessment of the advantages of preserving the security of transactions against the inevitable anomalies, injustices and difficulties of interpretation which such a rule
D    would create. That is not a course which I think your Lordships should take.

I accept that allowing recovery for mistake of law without qualification, even taking into account the defence of change of position, may be thought to tilt the balance too far against the public interest in the security of transactions. The most obvious problem is the Limitation Act, which as
E    presently drafted is inadequate to deal with the problem of retrospective changes in law by judicial decision. But I think that any measures to redress the balance must be a matter for the legislature. This may suggest that your Lordships should leave the whole question of the abrogation of the mistake of law rule to the legislature, so that the change in the law and the necessary qualifications can be introduced at the same time. There is obviously a strong argument for doing so, but I do not think that it should
F    prevail over the desirability of giving in this case what your Lordships consider to be a just and principled decision.

I should say in conclusion that your Lordships' decision leaves open what may be difficult evidential questions over whether a person making a payment has made a mistake or not. There may be cases in which banks which have entered into certain kinds of transactions prefer not to raise
G    the question of whether they involve any legal risk. They may hope that if nothing is said, their counter-parties will honour their obligations and all will be well, whereas any suggestion of a legal risk attaching to the instruments they hold might affect their credit ratings. There is room for a spectrum of states of mind between genuine belief in validity, founding a claim based on mistake, and a clear acceptance of the risk that they are not. But these questions are not presently before your Lordships.

H

LORD HOPE OF CRAIGHEAD. My Lords, the background to these consolidated appeals is to be found in sections 5 and 32(1)(c) of the Limitation Act 1980. Section 5 of that Act provides that an action founded

on simple contract shall not be brought after the expiration of six years    A
from the date on which the cause of action accrued. Section 32(1)(c)
provides that, where in the case of any action for which a period of
limitation is provided by the Act the action is for relief from the
consequences of a mistake, the period of limitation shall not begin to run
until the plaintiff has discovered the mistake or could with reasonable
diligence have discovered it.

Interest rate swap contracts first came into use in about 1981, and in    B
the following year they began to be used by local authorities. But it was
not until 30 May 1989 that Anthony John Hazell, the auditor appointed
by the Audit Commission for Local Authorities in England and Wales to
audit the accounts of Hammersmith and Fulham London Borough
Council, applied to the court for a declaration that the items of account
appearing in the capital market fund account relating to the interest rate    C
swaps which had been entered into by that local authority were contrary
to law and for an order for rectification of the accounts. By that date a
very large number of similar transactions had been entered into by
numerous other local authorities. Following the decision of this House in
*Hazell v. Hammersmith and Fulham London Borough Council* [1992] 2 A.C. 1
that, having regard to the provisions and limitations of the Local
Government Act 1972 regulating the function of borrowing, interest rate    D
swaps were ultra vires local authorities, actions were begun by both banks
and local authorities to obtain restitution under interest rate swap contracts
which, as a result of that decision, were held to be void. In those cases
where the contracts had only recently been entered into there was no
limitation problem. But in some others, particularly some of those
involving Kleinwort Benson Ltd. which was one of the first of several    E
merchant banks to have attracted business in this field, this was not so. In
their case, where the contracts had been entered into more than six years
previously, the limitation defence was available.

The right of a party to a void interest rate swap contract to recover its
net payments by an action for money had and received was established by
the decision of Hobhouse J. in *Westdeutsche Landesbank Girozentale v.
Islington London Borough Council* [1994] 4 All E.R. 890. His decision on    F
this point was upheld by the Court of Appeal. No question of limitation
was raised in the *Westdeutsche* case. But in *Kleinwort Benson Ltd. v.
Sandwell Borough Council*, in which certain of the issues of law arising on
the pleadings were tried together with the *Westdeutsche* case—as to which
there had been a full trial of the action on an agreed statement of facts
supplemented by oral evidence called by both sides—the limitation defence    G
was raised in regard to the first of four swaps, as the limitation period had
been exceeded in the case of that swap. Following dicta in *In re Diplock*
[1948] Ch. 465, 514, Hobhouse J. held that section 5 of the Limitation Act
1980 applied to causes of action for money had and received. His decision
that the limitation defence applied was not challenged in the Court of
Appeal.

No issue was raised in the Sandwell case as to whether the exception    H
under section 32(1)(c), as the action was for relief from the consequences
of a mistake, was available. The ground on which the plaintiffs had a
prima facie right to recover the net payments was held by Hobhouse J. to

2 A.C.              Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))      Lord Hope
                                                                        of Craighead

A    be absence of consideration: [1994] 4 All E.R. 890, 936. The plaintiffs had
     submitted that mistake gave them an additional ground on which they
     could base their claim. But Hobhouse J. held at p. 931E–F that the critical
     matter of which they were unaware was the provisions of the Local
     Government Act 1972 and their effect, as subsequently declared by the
     Divisional Court and the House of Lords in *Hazell's* case. He said that
     lack of knowledge of a statutory provision and its legal effect was an error
B    of law, with this result: "The plaintiffs accept that in this court I am bound
     by authority to hold that a mistake of law does not give a right to recover
     money at common law as money had and received."

         The swaps in the present cases involve a number of payments which
     were made more than six years before the writs were issued. The
     respondent authorities seek to rely on the limitation defence in regard to
C    these payments. So, in order to obtain the full restitution which would not
     otherwise be available to it, the appellant bank has renewed its alternative
     cause of action on the ground of mistake. It contends that section 32(1)(*c*)
     of the Limitation Act 1980 applies where the mistake is one of law.

         The first of the three issues, as stated in the agreed statement of facts
     and issues, relates to this alternative cause of action. It is whether the facts
     pleaded by the bank in the relevant paragraphs of its points of claim
D    disclose a cause of action in mistake. The answers to be given to the other
     two issues, as to whether recovery is available in the case of those swap
     contracts which have been fully performed—the "closed swaps"—and as
     to the limitation point, depend upon the answer which is to be given ,to
     the first issue. The primary question is whether there is a cause of action
     in mistake for money paid under a mistake of law.

E        Although this question has come before us in these appeals on
     preliminary issues it is, I think, necessary to have regard to at least part of
     the factual background. This is particularly important in the context of
     the discussion as to whether the bank was acting under a mistake of law
     when it made the payments. So I should like to begin by summarising my
     understanding of the facts before I turn to the questions of law which we
     must decide.

F
     *The facts*

         The points of claim state that the payments were made by the bank on
     the basis of a mistaken belief that they were being made pursuant to a
     binding contract. No details are given of the circumstances or nature of
     the alleged mistake, and there has been no request for further and better
G    particulars. The pleadings appear to have been framed on the assumption
     that there was no issue as to whether or not the bank was acting under a
     mistake when it made the payments, the only issue being whether the
     mistake was a mistake of law. It seems to have been assumed also, while
     the argument was being developed before Hobhouse J. in *Westdeutsche*,
     that all the payments in that case were made under a mistake. In the event
     it was sufficient for his purpose that there was no evidence of or allegation
H    in either case that the relevant bank was mistaken as to any actual fact:
     [1994] 4 All E.R. 890, 931E. He did not need to examine the matter further.
     The circumstances of the mistake affecting the payment made by
     Westdeutsche to Islington had however been the subject of evidence. It was

in the light of that evidence that Hobhouse J. made findings at, A
pp. 930J–931E, which I think are of some help as background to this case
although it cannot, of course, be assumed that the facts here are exactly
the same, as the judge in this case has not heard any evidence.

In the *Islington* case the investment banker employed by Westdeutsche
was telephoned in June 1987 by a firm of interest swap brokers asking
whether the bank would be interested in becoming a party to a swaps
transaction with a local authority. He assumed that any reputable local  B
authority would not enter into transactions which it was not empowered
to do. He believed that the swap contract was a proper contract for
Islington to undertake. He was confirmed in this belief by his knowledge
that local authorities had been engaging in the swaps market for a number
of years as ordinary participants in that market. So he assumed that in
making his agreement with Islington he was entering into a legal contract  C
with them. He was a commercial man, not a lawyer. There was no evidence
that he sought legal advice before he entered into the contract.

His position can be seen from the narrative which Hobhouse J.
provided, at pp. 896E–898D, to have been unremarkable. A sophisticated
market had developed since interest rate swaps first came into use in about
1981. It involved institutions in the position of market makers and a corps  D
of money brokers. As it became more complex it was recognised that it
needed to become more organised. A set of standard terms and conditions
was formulated by the British Bankers Association in association with the
Foreign Exchange Currency Deposit Brokers Association. The parties to
these contracts were normally regular participants in the money markets.
Local authorities were among the participants in the money markets, and
they were regarded as being institutions of unquestioned solvency. It was  E
assumed that interest rate swaps could legitimately be entered into with
them as an ancillary to their statutory borrowing and lending powers. The
Chartered Institute of Public Finance and Accountancy received advice to
this effect in the latter part of 1983. The absence of any legal risk was
based on what was understood to be the effect of paragraph 20 of Schedule
13 to the Local Government Act 1972.

This assumption continued to be acted upon uncritically until 1987. In  F
August of that year the Audit Commission and its officers made statements
which for the first time called into question their legality. The advice of
counsel was obtained that, unless they were actual hedging transactions in
relation to actual loans that fell within the powers of a local authority,
interest rate swap contracts were not within the powers of a local authority
under the Act of 1972. On 14 July 1988 a press release was issued by the  G
Commission publishing that advice and warning that auditors might
challenge items arising from such transactions that were not permitted by
the statute.

It appears therefore that at the time when the transactions in the
present case were entered into there was a general understanding, which
was shared by banks and local authorities as regular participants in the
money markets, that interest rate swap contracts were within the borrowing  H
and lending powers of local authorities. This understanding appears to
have based upon commercial assumptions which developed within the
money markets, not as a result of initiatives taken on legal advice by either

2 A.C.              Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))          Lord Hope
of Craighead

A    party to the transactions. When advice was taken by the Chartered Institute it confirmed what was already understood to be the position in the money markets. The formulation of standard clauses for use in the basic interest swap contracts—although not designed specifically for use in transactions with local authorities—no doubt added to the general understanding that there was no legal risk. It does not appear that any auditor of local authority accounts expressed doubt on the matter until
B    the issue was first raised in 1987 by the Audit Commission.

*The mistake of law rule*

   On the primary question whether the time has now come to end the rule that payments made under a mistake of law are not recoverable, I agree with my noble and learned friend, Lord Goff of Chieveley, that we
C    should decide the point now rather than leave this task to the Law Commission. Mr. Underhill said that he was not seeking to uphold the rule in its traditional form. What he sought to do was to draw attention to the problems which might arise if it were to be removed without regard to the consequences. He went on to develop arguments as to how those problems might be met in a way which, in these cases, would provide the
D    local authorities with a defence. For my part, I think that the case for a departure from the traditional rule is now unanswerable. But I also agree with my noble and learned friend that the taking of this step gives rise to difficult questions of policy and analysis.

   Three considerations have persuaded me that the mistake of law rule should no longer form part of English law.

   The first relates to the ground of the decision by Lord
E    Ellenborough C.J. in *Bilbie v. Lumley*, 2 East 469, following Buller J. in *Lowry v. Bourdieu* (1780) 2 Doug. 469. The maxim ignorantia juris non excusat, upon which Lord Ellenborough C.J. based his decision, had featured regularly in debates among the civilian lawyers as to whether a person who paid money under an error of law could obtain a remedy. The pleadings in the Scottish case of *Stirling v. Earl of Lauderdale* (1733) Mor. 2930, the relevant passages from which are to be found in the opinion
F    which I delivered in *Morgan Guaranty Trust Co. of New York v. Lothian Regional Council*, 1995 S.C. 151, 162–163, show that it was an important part of the petitioner's argument in the *Stirling* case that the maxim did not apply only to the law of delict. It had been applied by the many of the great civilian commentators to the case of indebiti solutio, to the effect that no action was competent where the sum was paid under an error of
G    law. This argument was met by the response that, while some commentators were of that view, others were of the contrary opinion. The petitioner's main point was that the great rule of equity is nemo debet locupletior cum alterius jactura. The maxim that every man is presumed to know the law ought to be applied equally to the recipient, who had taken what he ought to be presumed to have known was not due to him.

   In the light of this background Lord Wright's description, in the
H    preface to his *Legal Essays and Addresses* (1939), at p. xix, of Lord Ellenborough C.J.'s use of the maxim as "hasty and ill-considered" may seem to have been rather harsh. Anyone who was familiar with the debate which had been going on among the civilian lawyers for centuries would

have recognised the use of the maxim in this context as a legitimate part    A
of the argument. The Scottish institutional writer Erskine (Institutes III iii
54 (1773)) wrote: "Civilians are not agreed whether it takes place where
one pays the indebitium through a mistake in law; because by a known
maxim ignorantia juris neminem excusat." But there is now wide support
for the view that the maxim is out of place in this field and that it cannot
serve as the foundation for the rule barring recovery of moneys paid under    B
a mistake: *Hydro-Electric Commission of the Township of Nepean v. Ontario
Hydro* [1982] 1 S.C.R. 347, 358–361, *per* Dickson J.; *David Securities Pty.
Ltd. v. Commonwealth Bank of Australia* (1992) 175 C.L.R. 353, 402, *per*
Dawson J. agreeing with the reasoning of Mason C.J. and four other
members of the High Court on this point; *Willis Faber Enthoven (Pty.)
Ltd. v. Receiver of Revenue,* 1992 (4) S.A. 202, 221–223, *per* Hefer J.A.;
*Morgan Guaranty Trust Co. of New York v. Lothian Regional Council,* 1995    C
S.C. 151, 164, in my own opinion and, at p. 174, *per* Lord Cullen.

   The second consideration relates to the principle of unjust enrichment
itself, which now lies at the heart of the law of restitution in English law.
The principle was stated by Lord Wright in *Fibrosa Spolka Akcyjna v.
Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32, 61, in words which
restated in the English language the maxim nemo debet locupletari aliena    D
jactura of the civil law:

   "It is clear that any civilised system of law is bound to provide
   remedies for cases of what has been called unjust enrichment or unjust
   benefit, that is to prevent a man from retaining the money of or some
   benefit derived from another which it is against conscience that he
   should keep."                                                             E

   In the *Ontario Hydro* case [1982] 1 S.C.R. 347, 367–368 Dickson J.
said: "Once a doctrine of restitution or unjust enrichment is recognised,
the distinction as to mistake of law and mistake of fact becomes simply
meaningless."
   In *Air Canada v. British Columbia* [1989] 1 S.C.R. 1161, 1201 La
Forest J. said that he had no hesitation in following Dickson J.'s lead in    F
these matters:

   "In my view the distinction between mistake of fact and mistake of
   law should play no part in the law of restitution. Both species of
   mistake, if one can be distinguished from the other, should, in an
   appropriate case, be considered as factors which can make an
   enrichment at the plaintiff's expense 'unjust' or 'unjustified.'"          G

In the *David Securities* case, 175 C.L.R. 353, 375 Mason C.J. and others,
after referring to the statement by Dickson J. and to the description by
Deane J. in *Pavey & Matthews Pty. Ltd. v. Paul* (1987) 162 C.L.R. 221,
256–257 of unjust enrichment as a "unifying legal concept," said:

   "If the ground for ordering recovery is that the defendant has been     H
   unjustly enriched, there is no justification for drawing distinctions on
   the basis of how the enrichment was gained, except in so far as the
   manner of gaining the enrichment bears upon the justice of the case."

2 A.C.          **Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))**          Lord Hope
of Craighead

A    In the same case, at p. 393, Brennan J. said:

"When a defendant receives a payment which he has no right to
receive and which the plaintiff has paid to him by mistake, the
injustice of the defendant's enrichment does not depend on the nature
of the mistake that caused the payment to be made. Whether the
plaintiff made a mistake of law or a mistake of fact, the defendant,
B          having no right to receive the payment, is unjustly enriched by its
receipt. Then should the distinction between the two categories of
.    mistake make any difference to a finding of unjust enrichment?"

In answer to his own question he said that he agreed with the majority in
rejecting the distinction as critical to the question whether the defendant
has been unjustly enriched. He went on to say that he did not see the
C    distinction between mistakes of fact and mistakes of law as being
immaterial to the question whether the payment was recoverable. This is a
qualification to which I must return later. For the present it is sufficient to
note his agreement with the majority on the absence of any ground
for the distinction. Similar views were expressed in *Willis Faber* and in
*Morgan Guaranty* after a review of the civilian authorities. The unanimity
which has been expressed on this point, in which common law jurisdictions
D    are at one with those whose roots lie in the civil law, gives powerful
recognition to the unifying effect of the principle of unjust enrichment.
I do not think that the law of England, having accepted the principle, can
continue to resist its consequences.

The third consideration relates to the practical effects of the distinction.
I do not need to elaborate on this point. As Mr. Southwell explained, the
E    rule is subject to numerous exceptions and qualifications. I wish to mention
only a few examples. Relief may be given where the error of law is one as
to the construction of a private contract between the two parties which
affects them only: *Cooper v. Phibbs* (1867) L.R. 2 H.L. 149; *Earl
Beauchamp v. Winn* (1873) L.R. 6 H.L. 223; see also *British Hydro-Carbon
Chemicals Ltd. and British Transport Commission—Petitioners,* 1961 S.L.T.
280, *per* Lord Kilbrandon. And there is the exception which was described
F    by Lord Denning in *Kiriri Cotton Co. Ltd. v. Dewani* [1960] A.C. 192, 204
which applies where there is "something more" in addition to the mistake
of law such as something in the defendant's conduct which shows that he
was the one who was primarily responsible for the mistake. Experience has
shown that in practice the rule has tended to lead to unjust results and to
a desire to avoid the consequences. It is unsatisfactory that the law should
G    have had to resort to exceptions and qualifications, the subsequent
application of which to other cases can give rise to difficulty.

*Was there a mistake?*

Subject to any defences that may arise from the circumstances, a claim
for restitution of money paid under a mistake raises three questions.
(1) Was there a mistake? (2) Did the mistake cause the payment? And
H    (3) did the payee have a right to receive the sum which was paid to him?
The first question arises because the mistake provides the cause of
.action for recovery of the money had and received by the payee. Unless
the payer can prove that he acted under a mistake, he cannot maintain an

action for money had and received on this ground. The second question    A
arises because it will not be enough for the payer to prove that he made a
mistake. He must prove that he would not have made the payment had he
known of his mistake at the time when it was made. If the payer would
have made the payment even if he had known of his mistake, the sum paid
is not recoverable on the ground of that mistake. The third question arises
because the payee cannot be said to have been unjustly enriched if he was
entitled to receive the sum paid to him. The payer may have been mistaken    B
as to the grounds on which the sum was due to the payee, but his mistake
will not provide a ground for its recovery if the payee can show that he
was entitled to it on some other ground.

   In the present case the second and third questions do not appear to
present any difficulty. But the first question raises an issue of very real
importance. The answer which is given to it will have significant    C
implications for the future development of the law of restitution on the
ground of unjust enrichment.

   In my opinion the proper starting point for an examination of this
issue is the principle on which the claim for restitution of these payments
is founded, which is that of unjust enrichment. The essence of this principle
is that it is unjust for a person to retain a benefit which he has received at
the expense of another, without any legal ground to justify its retention,    D
which that other person did not intend him to receive. This has been the
basis for the law of unjust enrichment as it has developed both in the
civilian systems and in Scotland, which has a mixed system—partly civilian
and partly common law. On the whole, now that the common law systems
see their law of restitution as being based upon this principle, one would
expect them to apply it, broadly speaking, in the same way and to reach    E
results which, broadly speaking, were similar: *Zweigert and Kötz, An
Introduction to Comparative Law,* 2nd ed. (1987), vol. II, pp. 262–263, 267.

   What, then, is the function of mistake in the field of restitution on the
ground of unjust enrichment? The answer, one may say, is that its function
is to show that the benefit which has been received was an unintended
benefit. A declaration of intention to confer the benefit, even if
unenforceable, will be enough to justify the retention of the enrichment.    F
A mistake, on the other hand, will be enough to justify the restitutionary
remedy, on the ground that a benefit which cannot be legally justified
should not be retained where it was a mistaken and thus unintended
benefit.

   It may be helpful to mention the material we were given to illustrate
its function in the civilian systems. The details vary as between the major    G
civil codes. But in simple terms, the law looks for the absence of a legal
justification for the enrichment: *Zweigert and Kötz,* p. 232. If the payer
paid in the mistaken belief that he was under a duty to pay, it is prima
facie unjust that the payee should be allowed to retain what he received.
But the burden of proving that the payer knew that there was no duty,
and was not mistaken, is on the recipient: *England, International
Encyclopedia of Comparative Law* (1991), vol. X, pp. 8–9, para. 5-13.    H
Mistake in this context means lack of knowledge, and it makes no
difference whether this is of fact or of law: *England,* p. 18, para. 5-30. As
for the concept of enrichment, a person is enriched when he receives a

A   payment which the payer was not bound by any obligation to make to him. The payee is entitled to retain the payment if it was made to him voluntarily, as in the case of a gift. The enrichment is unjust if the person who made the payment did not do so voluntarily and there was no obligation to confer the benefit: *Zweigert and Kotz*, p. 261.

B   The approach of the common law is to look for an unjust factor, something which makes it unjust to allow the payee to retain the benefit: *Birks, An Introduction to the Law of Restitution*, 2nd ed. (1989), pp. 140 et seq. It is the mistake by the payer which, as in the case of failure of consideration and compulsion, renders the enrichment of the payee unjust. The common law accepts that the payee is enriched where the sum was not due to be paid to him, but it requires the payer to show that this was unjust. Whereas in civilian systems proof of knowledge that there was no

C   legal obligation to pay is a defence which may be invoked by the payee, under the common law it is for the payer to show that he paid under a mistake. My impression is that the common law tends to place more emphasis on the need for proof of a mistake. But the underlying principle in both systems is that of unjust enrichment. The purpose of the principle is to provide a remedy for recovery of the enrichment where no legal ground exists to justify its retention. But does it matter whether the

D   mistake is one of fact or one of law?

To answer this question one must have in mind both the state of mind of the payer and the state of the facts or the law about which there is said to have been a mistake. The state of mind of the payer must be related to the time when the payment was made. So also must the state of the facts or the law. That is the time as at which it must be determined whether the

E   payment was or was not legally justified. I agree with Brennan J.'s observation in the *David Securities* case, 175 C.L.R. 353 that the right to recover the amount paid by mistake accrues at the moment when the sum is received by the payee: see also *Baker v. Courage & Co.* [1910] 1 K.B. 56. The point of the inquiry is to show that, had the payer known the true state of the facts or the law at that time, he would not have made the payment to the payee.

F   The inquiry will not be a difficult one, where the mistake is said to have been one of fact, if the facts have not changed since the date of the payment and the payer is able to show that he paid due to a misunderstanding of them, to incorrect information or to ignorance. In such a case the requirements for recovery will normally be satisfied. Nor is it difficult to deal with the case where the facts have changed. In such a

G   case proof that the alleged state of the facts at the time did not emerge until afterwards will usually be sufficient to show that there was, at the time of payment, no mistake. The case may be more difficult where the mistake is said to have been a mistake of law. But I do not think that there is any essential difference in principle. A question of law may be as capable of being answered as precisely and with as much certainty as a question of fact, or it may be—as are some questions of fact—a matter of

H   opinion.

Nor is there any essential difference as between fact and law in regard to the payer's state of mind. This may vary from one of complete ignorance to a state of ample knowledge but a misapplication of what is known to

the facts. The mistake may have been caused by a failure to take advice,   A
by omitting to examine the available information or by misunderstanding
the information which has been obtained. Or it may have been due to a
failure to predict correctly how the court would determine issues which
were unresolved at the time of the payment, or even to foresee that there
was an issue which would have to be resolved by the court. As Mason C.J.
said in the *David Securities* case, at p. 374, the concept of mistake includes
cases of sheer ignorance as well as of positive but incorrect belief.   B

Cases where the payer was aware that there was an issue of law which
was relevant but, being in doubt as to what the law was, paid without
waiting to resolve that doubt may be left on one side. A state of doubt is
different from that of mistake. A person who pays when in doubt takes
the risk that he may be wrong—and that is so whether the issue is one of
fact or one of law. As for mistake, this may arise where there is no   C
suggestion that the law has changed since the payment was made. If it can
be demonstrated by reference to statute or to case law that the law was
overlooked or was applied wrongly, the position will be the same as that
where the mistake was one as to the state of the facts. It is very unusual
for a statute to provide for the law to be changed retrospectively, but this
is not unknown: see the War Damage Act 1965. If the law is changed
retrospectively by statute, so that a payment which was legally due when it   D
was paid has now become undue, the correct analysis will be that there
was no mistake at the time when it was made. The enrichment will have
been due to the fact that the law was changed retrospectively by the
statute.

What then is the position where the fact that the payment was not
legally due at the time when it was made was only revealed later by   E
subsequent case law? In posing this question I am not dealing with the
situation where a judgment of the court that a sum is due has become
final and been acted upon, but is afterwards overruled by a higher court
in a different case. The law of unjust enrichment does not disturb
transactions of that kind. Where the payment is made because the court
has held that the sum is due to be paid to the payee, the obligation to pay
is to be found in the order which has been made by the court. I am   F
dealing with the case where the payment was made on the understanding
that the law on the point was settled and that understanding was shown
by subsequent case law to have been wrong.

The answer to this question may be said to depend upon whether the
decision in question has changed the law or has merely declared what the
law always was. We were reminded of Lord Reid's observation that to say   G
that the judges never change the law is a fairy tale: 12 J.S.P.T.L. 22.
Experience has shown that the judges do from time to time change the
law, in order to adapt it to changed social conditions or in response to
other factors which show that the law has become out of date. But it
would be equally wrong to say that the judges never declare the law. It
may simply be that there was a gap which needed to be filled, or that there
was a defect in thinking which needed to be revealed so that a point could   H
be clarified. And to overturn an established line of authority is one thing.
It is quite another where there was no previous decision on a point which
no one had sought to bring before the court previously. It may be said

A    that a view of the law can be regarded as settled even where there is no
case law at all on the subject, because all those interested in it have acted
on a common understanding of what the law requires. But I would find it
difficult to accept that a judge who said that that common understanding
was wrong, and that the law was different from what everyone previously
had thought it was, had changed the law. It would seem to be more
accurate to say that, as it was for the judge to say what the law was he
B    was merely declaring what the law was and that he was not changing it.

On the whole it seems to me to be preferable to avoid being drawn into
a discussion as to whether a particular decision changed the law or
whether it was merely declaratory. It would not be possible to lay down
any hard and fast rules on this point. Each case would have to be decided
on what may in the end be a matter of opinion, about which there may be
C    room for a good deal of dispute. It is better to face up to the fact that
every decision as to the law by a judge operates retrospectively, and to
concentrate instead on the question—which I would regard as the critical
question—whether the payer would have made the payment if he had
known what he is now being told was the law. It is the state of the law at
the time of the payment which will determine whether or not the payment
was or was not legally due to be paid, and it is the state of mind of the
D    payer at the time of payment which will determine whether he paid under
a mistake. But there seems to me to be no reason in principle why the law
of unjust enrichment should insist that that mistake must be capable of
being demonstrated at the same time as the time when the payment was
made. A mistake of fact may take some time to discover. If there is a
dispute about this, the question whether there was a mistake may remain
E    in doubt until the issue has been resolved by a judge. Why should this not
be so where the mistake is one of law?

In the present case we have no evidence about the state of the law at
the time of the payments other than what can be derived from the agreed
facts. But the background, as it can be discovered from the judgment of
Hobhouse J. in the *Westdeutsche* case [1994] 4 All E.R. 890, is reasonably
clear. He said, at p. 931E, that the effect of the statutory provisions of
F    which the relevant bank had previously been unaware was subsequently
"declared" by the Divisional Court and the House of Lords in the *Hazell*
case [1992] 2 A.C. 1. His choice of language seems to me to have been
entirely appropriate. There had been no previous judicial decision on the
point until the practice in the money markets was challenged for the first
time in that case by the district auditor. Nor is it suggested that an opinion
G    had been expressed about it which could be regarded as authoritative in
the sense that it was binding on all parties including the auditor. If it were
necessary to decide this point, I do not think that it would be right to say
that the decision in the *Hazell* case "changed" the law. What it did was to
clarify a point which had been overlooked and was in need of
determination by the court. But the situation seems to me to be no
different in principle from one where the facts are shown, as a result of
H    inquiries which at the time of the payment were overlooked or not thought
to be necessary, to have been different from what they had been thought
to be at the time of the payment by the payer. Prima facie the bank is
entitled to restitution on the ground of mistake.

*The defences*                                                                    A

The question is whether the removal of the mistake of law rule requires, on grounds of public policy, that there should nevertheless be defences in mistake of law cases which are not available in mistake cases generally. It is appropriate as a first step however to recognise that the defences which are available generally already cover much of the ground where to allow recovery would lead to injustice. At this early stage it may be unwise to       B
assume, until the matter has been tested on a case by case basis, that there are significant gaps in mistake of law cases which still need to be filled. Despite the careful study which has been given to this subject by the two Law Commissions, I would be inclined to proceed cautiously at this stage.

The initial requirements already mentioned which the plaintiff must satisfy will do much to sort out those cases which deserve a remedy and those which do not. He must show that he acted under a mistake which       C
caused him to pay a sum which the payee was not legally entitled to receive. A payment made in the knowledge that there was a ground to contest liability will be irrecoverable: see *Kelly v. Solari*, 9 M. & W. 54, 58, *per* Lord Abinger C.B. Then there are the defences of undoubted general application, as well as that of estoppel which requires no elaboration. The first is that of change of position which was recognised in *Lipkin Gorman*      D
*v. Karpnale Ltd.* [1991] 2 A.C. 548. One of the examples which were given of its application by Lord Goff was where the plaintiff pays to the defendant under a mistake of fact and the defendant, while acting in good faith, pays the money or part of it to a charity. I think that it would be equally unjust to require the defendant to make restitution in such a case where the plaintiff pays the money under a mistake of law. The nature of the mistake makes no difference to the defendant who is acting in good      E
faith. Mason C.J. seems to have been viewing this defence as applicable generally when he said in the *David Securities* case, 175 C.L.R. 353, 385 that a defence of change of position was necessary to ensure that enrichment of the recipient was prevented only where this would be unjust in a case where the defendant had acted to his or her detriment on the faith of the receipt.

Then there is the defence that the money was paid as, or as part of, a      F
compromise. Brennan J. in the same case said, at p. 395, that, where a claim is satisfied by accord and satisfaction, a payment made in satisfaction is made in discharge of an obligation created by the accord: it is unaffected by any mistake as to the validity of the compromise. That must be so, irrespective whether the mistake is as to the facts or the law regarding its validity. In the *Ontario Hydro* case [1982] 1 S.C.R. 347, 380 Dickson J.      G
said that there was a head of public policy which recognised that there was a need to preserve the validity of compromises freely entered into with advice. I think that it is possible to find a more principled basis for the defence, as Brennan J. has suggested. But my main point is that it is available irrespective of the nature of the mistake.

It has been suggested that it should be a defence that the money was paid in settlement of an honest claim: *Goff and Jones, The Law of*      H
*Restitution*, 3rd ed. (1986), pp. 118–119. In the *Ontario Hydro* case, at p. 364, Dickson J. accepted that a payment made in these circumstances would be irrecoverable, even if later events indicated that the payer was

A  foolish to have acceded to the request for payment. It is not clear from his
brief comment whether he saw this defence as one which would be relevant
in mistake of law cases only. But in his summary of Dickson J.'s analysis
in the *Air Canada* case [1989] 1 S.C.R. 1161, 1201 La Forest J. treats this
defence as one which would be applicable to any case of enrichment at the
plaintiff's expense. In the *David Securities* case Mason C.J. in the majority
judgment, at p. 374, uses the expression "honest claim" to distinguish a
B  voluntary payment which is made irrespective of the validity or invalidity
of the obligation from the case where the payment is made under
compulsion or undue influence. It is clear that the majority saw such
factual circumstances, if relevant, as applicable to mistake of fact cases as
well as to mistake of law cases. This was one reason why they regarded
the mistake of law rule as broader and, as they put it, more preclusive
C  than was necessary.

    In the *Westdeutsche* case [1994] 4 All E.R. 890, 934 Hobhouse J. said
that the principle of voluntary payments could not be applied unless there
was a conscious appreciation by the payer that the contracts were or might
be void, and that on the evidence in the Islington case there clearly was
no voluntary assumption of risk in any respect that was relevant. It is not
D  clear, as there has been no evidence, whether there was a voluntary
assumption of risk in any of the cases which are before us in these appeals.
So I would not be prepared to say that it was a defence which in these
cases was available. It is sufficient for my purpose that, while the precise
limits of it have still to be clarified, it is a defence which applies generally
irrespective of the nature of the mistake.

    Two defences have however been suggested which are designed
E  specifically for cases where the mistake was a mistake of law. I take first
the defence which was formulated in the *David Securities* case by
Brennan J. in his dissenting opinion, at pp. 398–399. He said that it should
be a defence to a claim for money paid or property transferred under a
mistake of law that the defendant honestly believed when he learnt of the
payment or transfer that he was entitled to receive and to retain the money
F  or the property. I regret that, while I have derived much assistance from
his judgment, I am unable to agree with him on this point. I have some
difficulty in seeing why this defence, if there is merit in it as a means of
preventing recovery where this would be unjust, should be confined to
mistake of law cases. If an honest belief on the part of the payee can
overcome the fact that it is prima facie unjust that the payer should not
G  be able to recover what he paid under a mistake, why should this not be
so in all cases? The reason, I think, is that in mistake of fact cases such a
defence has never been recognised. To admit it now in such cases would
be to run counter to many authorities. The defence seems to me to be
based on expediency not on principle, and in any event to be too wide.
But there are other objections. It does not sit easily with the defence of
change of position. Indeed, in mistake of law cases, that defence would
H  become unnecessary. The element of good faith would seem to be enough
even though the defendant had not acted on the faith of the receipt. I
think that this shows that it is lacking in principle. It would also tend to
perpetuate the distinction between mistakes of fact and mistakes of law,

which is itself undesirable. The Law Commissions have not supported it.    A
I would not favour the adoption of the defence as part of English law.

    There remains the defence of common understanding or of settled law,
to which Mr. Underhill devoted much of his argument under this chapter.
This clearly is a defence which would be applicable only to the mistake of
law cases, and there is some justification for it on grounds of public policy.
It would tend to support certainty in the law and to preserve settled
transactions. In one or other of its formulations it has been supported by    B
various Law Commissions, but in neither case can it be said that that
support has been unqualified. The "common understanding" defence has
become part of the law in New Zealand and in Western Australia: see the
New Zealand Judicature Amendment Act 1958, section 94A(2); the
Western Australian Law Reform (Property, Perpetuities and Succession)
Act 1962, section 23(1). But in other jurisdictions these provisions have    C
been criticised. The Law Reform Commission of British Columbia, Report
No. 51 on Benefits Conferred under a Mistake of Law (1981), pp. 70–72,
said, after careful analysis, that they presented formidable problems of
definition and proof. A Western Australian case, *Bell Bros. Pty. Ltd. v.
Shire of Serpentine-Jarrahdale* [1969] W.A.R. 155, was referred to in order
to illustrate some of the difficulties. They concluded that the court had
ample tools for limiting recovery, and that the protection offered by these    D
provisions went far beyond what was required. Neither the Law
Commission nor the Law Commission for Scotland, although initially
attracted by them, have recommended their adoption in this country.

    The "settled law" defence is the one favoured by the Law Commission,
after consultation, in its Report (No. 227) on Restitution: Mistakes of Law
and Ultra Vires Public Authority Receipts and Payments (1994), para.    E
5.13. They have recommended that a restitutionary claim in respect of any
payment, service or benefit that has been made, rendered or conferred
under a mistake of law should not be permitted merely because it was
done in accordance with a settled view of the law at the time, which was
later departed from by a subsequent judicial decision. The Scottish Law
Commission in its Discussion Paper (No. 95) on Recovery of Benefits
Conferred under Error of Law (1993), para. 2.125, invited comments on    F
their provisional view that provision should be made by statute to preclude
the re-opening of settled payment transactions following a change in the
law, or in the common understanding of the law, effected by a judicial
decision. But in a subsequent Discussion Paper (No. 99) on Judicial
Abolition of the Error of Law Rule and its Aftermath (1996), para. 3.51,
which was published following the *Morgan Guaranty* case, 1995 S.C. 151    G
they proposed that a statutory bar to this effect should not be introduced.
On balance, after further consultation with the judiciary among others and
after examining the difficulties, they were of the view that the case for a
bar was not sufficiently strong to justify the intervention of a statute.

    One of the objections to the "settled law" defence is that it is incapable
of precise definition. Each case would have to be decided on the evidence,
that would create uncertainty, and it is difficult to predict the absurdities    H
which may result. One point however does appear to emerge from the
discussions so far. This is that a payment made on a settled view of the
law is more likely to be excusable, and thus to be one where restitution

2 A.C.                    Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))            Lord Hope
of Craighead

A would more obviously be justified, than a payment made as a result of one man's mistake or ignorance. Yet a mistake of law which the payer himself had made would not be caught by the defence. As Mr. Southwell said, the worse the legal advice the more likely the payer could show that the defence was not applicable. But I do not need to elaborate on this point. The valuable work done by the Scottish Law Commission has shown a need for caution which I consider to be entirely justified. I would

B not favour the introduction of such a defence judicially. Nor do I think that it would be right to apply it to this case, even if its recognition were to be thought to be desirable on grounds of public policy. The fact that restitution has already been given in many of the interest swap cases, albeit on the ground of failure of consideration, would create a situation which I would find unacceptable. Unless the defence can satisfy the test of

C denying restitution in all cases on the same facts it ought not, in fairness to all parties, to be applied in any of them.

*The completed swaps*

The reason why the swap contracts were held to be void was that they were ultra vires the local authorities. The purpose of the ultra vires

D doctrine is to protect the public: *Hazell v. Hammersmith and Fulham London Borough Council* [1992] 2 A.C. 1, 36F–G, *per* Lord Templeman. So it is a legitimate criticism of Mr. Underhill's argument for the local authorities that if, as he has contended, there is no claim for money had and received in the case of a completed swap the result will have been to give practical effect to a transaction which, on the doctrine of ultra vires, did not legally exist. All the items of account appearing within the capital

E markets fund account of the local authority in the *Hazell* case were held to be contrary to law, and the accounts were ordered to be rectified. This order extended to the swaps transactions which were entered into after July 1988 when the local authority was advised by the auditor that the transactions were of doubtful validity. It would be unsatisfactory if restitution were to be possible only in the case of the uncompleted

F transactions. That would leave any balance in favour of the local authorities without any item in the accounts which could properly be attached to it. It would not be possible for the bank to reopen the transactions as they are void. The grounds of decision in *Hazell* suggest that no distinction should be made between ultra vires transactions on the ground that in the one case they were completed and in the other they were not.

G In my opinion the law of restitution should provide a remedy in these cases irrespective of the stage which the transactions had reached. In expressing his decision on the *Sandwell* case in *Westdeutsche* [1994] 4 All E.R. 890, 930F–G Hobhouse J. said that it was irrelevant to the existence of a cause of action in connection with the payments made under the first Sandwell swap that the contract was fully performed. The Court of Appeal reached the same conclusion in *Guinness Mahon & Co. Ltd. v. Kensington

H and Chelsea Royal London Borough Council* [1999] Q.B. 215. I agree with those decisions, and I have nothing to add to what my noble and learned friend, Lord Goff of Chieveley has said about them. But restitution in those cases was not given on the ground of mistake, which is the ground

on which the bank needs to succeed if it is to be successful in meeting the    A
defence of limitation which has been raised by the local authorities.

Had it not been for what Professor Birks has said in footnote 137 at
p. 230 of his article "No Consideration: Restitution After Void Contracts,"
23 U.W.A.L.R. 195, I would not have thought that there was any difficulty
about restitution on the ground of mistake in the case of the completed
swaps. The assumption on which I proceed is that each payment was made
on either side in the belief that the sum was legally due to the other party    B
under the contract. The mistake was the same throughout the progress of
the transaction. The right to recover each payment on the ground of
mistake accrued when the sum was received by the payee. I do not think
that it makes any difference whether there was a single payment or a series
of payments or, where there was a series, whether the transaction was
interrupted or had run its course. Each payment is to be looked at    C
separately.

Professor Birks's argument is that after the execution of the proposed
contract the force of this type of mistake is spent because the matter has
proceeded to the point where the only prejudice which might be
entailed—non-performance by the other party—never in fact eventuated.
It was only the antecedent liability which was defective. But this seems to
be inconsistent with the principle that the cause of action is complete    D
when the payment is made and received by the payee. Brennan J. in the
David Securities case, 175 C.L.R. 353, 390 said that it is at that moment
that it can be determined whether and to what extent the payee has been
unjustly enriched. The argument also assumes, wrongly in my opinion, that
the payer's mistake was that the payee was obliged to reciprocate. That is
not the basis of the claim for restitution on the ground of mistake. The    E
mistake which the payer made was in believing that he was obliged to
make the payment because it was legally due to the payee. A further
difficulty is that it produces a result which is one-sided and unjust. The
authorities, unlike the bank, can say that the transactions which they
entered into were beyond their capacity. As their accounts must be rectified
the transactions, although closed, must be reopened to enable them to
recover the money which they had no power to pay out. In a case where    F
the bank was the net beneficiary it cannot retain the net benefit which it
received in the form of ultra vires payments from the local authorities. It
would be unjust if the bank was not to be able to recover its net loss in
those cases where the balance lies the other way.

Professor Burrows has given convincing reasons for rejecting this
argument: "Swaps and the Friction between Common Law and Equity"
[1995] R.L.R. 15, 18–19. I also am unpersuaded by Professor Birks on this    G
point. In my opinion completed transactions are in the same position as
transactions which were not completed when restitution is claimed on the
ground of mistake.

### Limitation

The bank's purpose in claiming restitution of the ground of mistake    H
has been to pre-empt the limitation defence by the local authorities. The
final question is whether, on the assumption that restitution on the ground
of mistake is available, the bank can take the benefit of the postponement

2 A.C.                 **Kleinwort Benson Ltd. v. Lincoln C.C. (H.L.(E.))**        Lord Hope
                                                                                    of Craighead

A     provision in section 32(1)(*c*) of the Limitation Act 1980. The answer to it
depends on whether the action is one for relief from the consequences of
a mistake within the meaning of that subsection.

    There is no difficulty about the language. The word "mistake" appears
in the subsection without qualification. There is nothing in the words used
in it which restricts its application to a mistake of fact. The origin of the
section suggests that the absence of restriction was intentional. In its Fifth

B     Interim Report on Statutes of Limitation (1936) (Cmd. 5334), pp. 31–32,
para. 23, the Law Revision Committee recommended that the equitable
rule of postponement should prevail in all cases where relief was sought
from the consequences of a mistake, and that time should only run from
the moment when the mistake was discovered or could with reasonable
diligence have been discovered. This recommendation was put into effect

C     in section 26(*c*) of the Limitation Act 1939, of which section 32(1)(*c*) is a
re-enactment. In *In re Diplock* [1948] Ch. 465, 515 the Court of Appeal
said that section 26(*c*) of the Act of 1939 would operate to postpone the
running of time in the case of an action to recover money paid under a
mistake of fact.

    But the distinction between mistake of fact and mistake of law as a
ground for recovery is not absolute. Relief is available where the mistake

D     of law relates to private rights: *Earl Beauchamp v. Winn*, L.R. 6 H.L. 223.
Private agreements made under a mistake of law may be set aside, and
relief will be given in respect of payments made under such agreements.
Other examples may be given where a cause of action for relief will be
available although the mistake was one of law. In *Reg. v. Tower Hamlets
London Borough Council, Ex parte Chetnik Developments Ltd.* [1988] A.C.

E     858, 874H–877C Lord Bridge of Harwich referred to a substantial line of
authority showing circumstances in which the court would not permit the
mistake of law rule to be invoked. These include payments made under an
error of law to or by a trustee in bankruptcy as an officer of the court:
*Ex parte James; In re Condon* (1874) L.R. 9 Ch.App. 609. It is hard to see
why in those cases the equitable rule which allows for the postponement
of the limitation period should not apply, to the effect that time will not

F     run until the claimant knew of the mistake or ought with reasonable
diligence to have known of it. If the postponement can apply in these
examples of mistake of law, I think that it ought to apply to mistakes of
law generally.

    The objection may be made that time may run on for a very long time
before a mistake of law could have been discovered with reasonable

G     diligence, especially where a judicial decision is needed to establish the
mistake. It may also be said that in some cases a mistake of law may have
affected a very large number of transactions, and that the potential for
uncertainty is very great. But I do not think that any concerns which may
exist on this ground provide a sound reason for declining to give effect to
the section according to its terms. The defence of change of position will
be available, and difficulties of proof are likely to increase with the passage

H     of time. I think that the risk of widespread injustice remains to be
demonstrated. If the risk is too great that is a matter for the legislature.
The problem does not arise under the statutory scheme which applies in
Scotland. The prescriptive period of five years under section 6 of the

418

Prescription and Limitation (Scotland) Act 1973 applies to any obligation    A
based on redress of unjustified enrichment: Schedule I, para. 1(*b*). It may
be extended only where the creditor was induced to refrain from making a
claim by fraud or error induced by the debtor's words or conduct or was
under a legal disability. Mistake on its own is not a ground for relief. It
may be that even in mistake of fact cases where restitution is available
under English law some further restriction of the circumstances where
indefinite postponement is available may be appropriate. But that is a    B
matter which is best considered by the Law Commission.

In my opinion the bank will be entitled to the benefit of section
32(1)(*c*) of the Act of 1980 if it can show that the payments which it seeks
to recover were made under a mistake of law.

In the result I would answer each of the questions under the issues
which are before us in the terms proposed by my noble and learned friend,    C
Lord Goff of Chieveley. I, too, would allow these appeals.

*Appeals allowed with costs.*

*Solicitors: Clifford Chance; Sharpe Pritchard.*

C. T. B.    D

E

[HOUSE OF LORDS]

REGINA v. CHIEF CONSTABLE OF SUSSEX, *Ex parte*
INTERNATIONAL TRADER'S FERRY LTD.

F

1998    June 9, 10, 11;                          Lord Slynn of Hadley, Lord Nolan,
        Nov. 11                          Lord Hoffmann, Lord Cooke of Thorndon
                                              and Lord Hope of Craighead

*Police—Duties—Law enforcement—Live animal exporters afforded police
protection against demonstrators at port—Chief Constable reducing
level of protection—Whether breach of duty to keep peace and    G
enforce law—Whether proper exercise of discretion*
*European Community—Free competition—Quantitative restriction—Chief
Constable reducing protection to live animal exporters against
demonstrators—Whether measure proportionate—Whether inade-
quacy of resources for effective policing affording public policy
defence—E.C. Treaty (O.J. 1992 C. 224, p. 6), arts. 34, 36*

Following protests by animal rights groups which caused major    H
ferry operators to stop carrying livestock cargo on their cross-
Channel ferries, the applicant company arranged to operate a
regular service across the Channel from the port of Shoreham.
The presence of large numbers of demonstrators necessitated a

TAB 33

*Les Laboratoires Servier v Apotex Inc* [2015] AC 430,
UK Supreme Court

Supreme Court                                       *A*

## Les Laboratoires Servier and another *v* Apotex Inc and others

### [2014] UKSC 55

2014  June 10;                                 Lord Neuberger of Abbotsbury PSC,   *B*
     Oct 29                Lord Mance, Lord Clarke of Stone-cum-Ebony,
                                               Lord Sumption, Lord Toulson JJSC

*Injunction — Interim — Undertaking as to damages — Holder of European patent*
   *obtaining interim injunction to restrain importation and marketing in United*
   *Kingdom of infringing product — Cross-undertaking in damages given to court*
   *— Patent declared invalid — Defendants seeking to enforce cross-undertaking —*
   *Whether damages for lost sales recoverable despite manufacture of defendants'*   *C*
   *products infringing valid foreign patent — Whether ex turpi causa defence*
   *available — Whether claimants precluded from raising defence by offer of*
   *unqualified cross-undertaking with knowledge of relevant facts*

In 2004 the first claimant, a French pharmaceutical company, obtained a
European patent for a particular form of perindopril erbumine, which was a drug
used in the treatment of hypertension. The second claimant, a related English   *D*
company, was the exclusive licensee under the United Kingdom designation of the
European patent. The defendants were the members of a group of English and
Canadian pharmaceutical companies. In 2006 the fourth defendant began to sell in
the United Kingdom perindopril erbumine tablets imported from Canada, where
they were manufactured by the first and second defendants. The claimants
commenced proceedings against the defendants for patent infringement and
obtained an interim injunction restraining them until trial from importing the   *E*
product or marketing it in the United Kingdom in return for a cross-undertaking by
the claimant that it would comply with any order the court might make if it should
find later that the injunction had caused loss to the defendants for which they
should be compensated. In 2007 the judge ruled that the European patent was
invalid for lack of novelty and obviousness, discharged the injunction and directed
an inquiry as to damages pursuant to the cross-undertaking. The Court of Appeal
affirmed that decision. In 2008 an inquiry into damages was held, but before   *F*
judgment was handed down the Federal Court of Canada ruled that, by
manufacturing, selling and exporting their perindopril erbumine tablets, the first
and second defendants had infringed a valid Canadian patent held by a company
related to the claimants. The claimants applied to amend their points of defence to
allege that damages were irrecoverable on public policy grounds because the
products which the defendants had lost the opportunity to sell in the United
Kingdom by virtue of the injunction would have been manufactured and imported   *G*
in breach of Canadian law. The judge held that it was too late to make such an
amendment and awarded the defendants £17·5m by way of damages. The Court of
Appeal permitted the amendment, and a different judge subsequently held that the
claim was barred by the ex turpi causa non oritur actio rule and ordered the
defendants to repay the £17·5m. The defendants appealed but conceded that there
should be deducted from the damages award an amount equivalent to what the
Canadian court would have ordered to be paid for infringement of the Canadian   *H*
patent involved in manufacturing and exporting products for sale in the United
Kingdom. The Court of Appeal allowed the appeal and held that the illegality
defence applied only where it was a just and proportionate response to the illegality
involved in the light of the policy considerations underlying the defence and that in

© 2015 The Incorporated Council of Law Reporting for England and Wales

431

A    all the circumstances of the case the illegality defence did not defeat the defendants'
     claim on the cross-undertaking.
         On the claimants' appeal—
         *Held*, (1), per Lord Neuberger of Abbotsbury PSC, Lord Clarke of Stone-cum-
     Ebony and Lord Sumption JJSC, that although the ex turpi causa rule was described
     as a defence it was in reality a rule of judicial abstention which precluded the judge
     from performing his ordinary adjudicative function, if that would lend the authority
B    of the state to the enforcement of an illegal transaction or to the determination of the
     legal consequences of an illegal act, and left the loss to lie where it fell; that acts which
     constituted "turpitude" for the purposes of the ex turpi causa rule were not confined
     to criminal acts but extended to acts which were quasi-criminal in that they were
     contrary to the public law of the state and engaged the public interest, which was the
     foundation of the illegality defence; that non-criminal acts which engaged the public
     interest included dishonesty or corruption even in the context of purely civil disputes,
C    and the infringement of rules which were enacted for the protection of the public
     interest and which attracted civil sanctions of a penal character; that the public
     interest was not engaged in torts, other than those of which dishonesty was an
     essential element, in breaches of contract and in statutory and other civil wrongs
     which offended against interests which were essentially private; that there was no
     reason for the law to apply the ex turpi causa rule and withhold its ordinary remedies
     in the latter category of cases because the public interest was sufficiently served by the
D    availability of a system of corrective justice which regulated the consequences as
     between the parties affected; that a breach of patent which only affected the
     patentee's private rights was no different in principle from a breach of rights founded
     on contract or tort; and that the only relevant interest affected in the present case was
     that of the patentee and that interest was sufficiently vindicated by the availability of
     damages for the infringements in Canada, which would be deducted from any
     damages recovered pursuant to the claimants' undertaking in England (post,
E    paras 23, 25, 28).
         *Holman v Johnson* (1775) 1 Cowp 341, *Burrows v Rhodes* [1899] 1 QB 816, DC,
     *Weld-Blundell v Stephens* [1920] AC 956, HL(E) and *Tinsley v Milligan* [1994] 1 AC
     340, HL(E) considered.
         (2) Dismissing the appeal, that, on the facts, the public interest was not engaged
     and there was no justification under the ex turpi causa rule for the forfeiture of the
     defendants' rights arising from the claimants' undertaking (post, paras 30, 32, 34,
F    63, 64).
         *Per* Lord Toulson JSC. There is no good public policy reason why the order
     sought by the claimants should place them in a better position than if they had not
     obtained the English injunction and why the defendants should be required to give
     greater credit to the claimant on account of its breach of the Canadian patent than
     the amount already assessed by the Canadian court as properly reflecting that breach.
     Cross-undertakings are a valuable feature of litigation, particularly commercial
G    litigation, and there is a public interest in their enforceability in bona fide disputes
     (post, paras 52, 53, 62, 63).
         Decision of the Court of Appeal [2012] EWCA Civ 593; [2013] Bus LR 80
     affirmed on different grounds.

     The following cases are referred to in the judgments:

     *Askey v Golden Wine Co Ltd* [1948] 2 All ER 35
H    *Bowmakers Ltd v Barnet Instruments Ltd* [1945] KB 65; [1944] 2 All ER 579, CA
     *Brown Jenkinson & Co Ltd v Percy Dalton (London) Ltd* [1957] 2 QB 621; [1957]
         3 WLR 408; [1957] 2 All ER 844; [1957] 2 Lloyd's Rep 1, CA
     *Burrows v Rhodes* [1899] 1 QB 816, DC
     *Columbia Picture Industries Inc v Robinson* [1987] Ch 38; [1986] 3 WLR 542;
         [1986] 3 All ER 338

© 2015 The Incorporated Council of Law Reporting for England and Wales

432
**Les Laboratoires Servier v Apotex Inc (SC(E))**                    [2015] AC

*Euro-Diam Ltd v Bathurst* [1990] 1 QB 1; [1988] 2 WLR 517; [1988] 2 All ER 23;    A
   [1988] 1 Lloyd's Rep 228, CA
*Everet v Williams* (1725) (1893) 9 LQR 197
*Gray v Thames Trains Ltd* [2009] UKHL 33; [2009] AC 1339; [2009] 3 WLR 167;
   [2009] 4 All ER 81, HL(E)
*Hall v Hebert* [1993] 2 SCR 159
*Hoffmann-La Roche (F) & Co AG v Secretary of State for Trade and Industry* [1975]
   AC 295; [1974] 3 WLR 104; [1974] 2 All ER 1128, HL(E)                    B
*Holman v Johnson* (1775) 1 Cowp 341
*Hounga v Allen (Anti-Slavery International intervening)* [2014] UKSC 47; [2014]
   1 WLR 2889; [2014] ICR 847 [2014] 4 All ER 595, SC(E)
*Palaniappa Chettiar v Arunasalam Chettiar* [1962] AC 294; [1962] 2 WLR 548;
   [1962] 1 All ER 494, PC
*Parkinson v College of Ambulance Ltd* [1925] 2 KB 1
*Safeway Stores Ltd v Twigger* [2010] EWHC 11 (Comm); [2010] Bus LR 974; [2010]    C
   3 All ER 577; [2010] EWCA Civ 1472; [2011] Bus LR 1629; [2011] 2 All ER
   841; [2011] 1 Lloyd's Rep 462, CA
*Shackell v Rosier* (1836) 2 Bing NC 634
*State Railway Authority of New South Wales v Wiegold* (1991) 25 NSWLR 500
*Stone & Rolls Ltd v Moore Stephens* [2009] UKHL 39; [2009] AC 1391; [2009]
   3 WLR 455; [2009] Bus LR 1356; [2009] 4 All ER 431; [2010] 1 All ER (Comm)
   125; [2009] 2 Lloyd's Rep 537, HL(E)                    D
*Tinsley v Milligan* [1992] Ch 310; [1992] 2 WLR 508; [1992] 2 All ER 391, CA;
   [1994] 1 AC 340; [1993] 3 WLR 126; [1993] 3 All ER 65, HL(E)
*United Project Consultants Pte Ltd v Leong Kwok Onn (trading as Leon Kwok Onn
   & Co)* [2005] SGCA 38; [2005] 4 SLR 214
*Vita Food Products Inc v Unus Shipping Co Ltd* [1939] AC 277; [1939] 1 All ER 513,
   PC
*Weld-Blundell v Stephens* [1920] AC 956, HL(E)                    E

The following additional cases were cited in argument:

*Mills v Baitis* [1968] VR 583
*ParkingEye Ltd v Somerfield Stores Ltd* [2012] EWCA Civ 1338; [2013] QB 840;
   [2013] 2 WLR 939; [2012] 2 Lloyd's Rep 679, CA
*St John Shipping Corpn v Joseph Rank Ltd* [1957] 1 QB 267; [1956] 3 WLR 870;
   [1956] 3 All ER 683; [1956] 2 Lloyd's Rep 413                    F

**APPEAL** from the Court of Appeal

   By claim form dated 1 August 2006 the claimants, Les Laboratoires
Servier and Servier Laboratories Ltd, sought injunctive relief and damages
against the defendants, Apotex Inc, Apotex Pharmachem Inc, Apotex
Europe Ltd and Apotex UK Ltd, for infringement of a European patent    G
granted on 4 February 2004, for an allegedly new form of perindopril
erbumine. On 3 August 2006 Mann J temporarily granted an interim
injunction restraining the defendants from marketing generic perindopril
erbumine in the United Kingdom and on 8 August 2006 he ordered that the
injunction should continue until trial. The claimants gave an undertaking to
comply with any order which the court might make if it should later find that
the injunction had caused loss to the the defendants for which it should be    H
compensated. On 11 July 2007 Pumfrey J [2007] EWHC 1538 (Pat) held
that the claimant's European patent was invalid, discharged the injunction
and directed an inquiry as to damages pursuant to the undertaking given by
the claimants.

© 2015 The Incorporated Council of Law Reporting for England and Wales

A        The claimants appealed. On 9 May 2008, the Court of Appeal dismissed
the appeal [2008] EWCA Civ 445.
         In June 2008 Norris J conducted the inquiry as to damages but before he
gave judgment the claimants applied for permission to amend their points of
defence to contend that the defendants should not be compensated for loss of
sales of products which would have been manufactured unlawfully in breach
B   of a Canadian patent, according to a judgment given in the Federal Court of
Canada on 2 July 2008. Norris J refused permission [2008] EWHC 2347
(Ch); [2009] FSR 220 and awarded the defendants damages in the sum of
£17·5m on 9 October 2008.
         The claimants appealed against the refusal of permission to amend the
points of defence. On 12 February 2010, the Court of Appeal [2010] EWCA
Civ 279 allowed the appeal and directed that the £17·5m should stand as an
C   interim payment pending determination of the new grounds of defence.
         By a judgment dated 29 March 2011 and an order dated 7 April
2011 Arnold J [2011] EWHC 730 Pat; [2011] RPC 574 ruled in favour of
the claimants and ordered repayment of the £17·5m with interest.
         The defendants appealed. On 3 May 2012, the Court of Appeal [2013]
Bus LR 80 allowed the appeal.
D        On 28 November 2012 the Supreme Court (Lord Neuberger of
Abbotsbury PSC, Lord Mance and Lord Wilson JJSC) granted an
application by the claimants for permission to appeal, pursuant to which
they appealed.
         The facts are stated in the judgments.

         *Iain Purvis QC* and *Andrew Lykiardopoulos QC* (instructed by
E   *Bristows LLP*) for the claimants.
         Both as a general proposition and on the facts of this case, a party cannot
seek damages under a cross-undertaking on the basis that the injunction
prevented it from making profits from a business which was founded on
illegality, in the present case patent infringement in Canada.
         The defendant is demanding payment by the claimants of profits which
it admits could only have been made by infringing the claimants' own
F   Canadian patent. That claim offends against at least two rules derived
from the maxim ex turpi causa non oritur actio: (1) the narrow rule that
the court will not award the profits of illegality (*Columbia Picture
Industries Inc v Robinson* [1987] Ch 38); and (2) the more general rule that
a claimant cannot bring a claim which is founded on his own illegal
conduct.
G        A claim for profits derived from an illegal activity is a paradigm case for
the operation of the maxim and should always be refused. The illegal act in
the present case was not trivial. It was the foundation of the entire claim
and the claimant was entirely responsible for it.
         The basis of the maxim is clear. It is a general statement of legal policy
but is not itself a rule. A system of rules can be identified from the maxim
in different areas of the law. In the field of the acquisition of interests in
H   property, it lies behind the rule that a party cannot enforce such an interest
acquired pursuant to an illegal transaction if he needs to rely on his own
illegal transaction in order to establish his title: *Tinsley v Milligan* [1994]
1 AC 340. In the field of the enforcement of contracts, it explains the rule
that the court will not enforce a contract which is expressly or impliedly

434
**Les Laboratoires Servier v Apotex Inc (SC(E))**                                   **[2015] AC**
Argument

forbidden by statute or which is entered into with the intention of    A
committing an illegal act: *Stone & Rolls Ltd v Moore Stephens* [2009] AC
1391.

The present case is concerned with claims for compensation which might
be in tort, contract, or as in the present case in equity, based on an
undertaking to the court. Both the narrow rule and the general rule apply in
this case.    B

Under the narrow rule, the maxim of ex turpi causa non oritur actio
applies so that a claimant will not be allowed to profit from his own
wrongdoing and compensation could not be awarded for damage arising
from a criminal penalty imposed by the courts. To allow recovery in such
cases would be to allow recovery for what is illegal and would put the courts
in the position of saying that the conduct was legal. The court has a limited    C
power to deny recovery to a claimant in tort on the ground that it would
undermine the integrity of the justice system: see *Hall v Hebert* [1993] 2 SCR
159.

The lost profits which are claimed are the direct consequence of the
infringement of a Canadian patent which the Canadian courts have ruled are
held by the claimants' sister company. The manufacture would have taken
place unlawfully in Canada and the defendants have to rely on an unlawful    D
act which is sufficiently causative of their claim. The lost profits which are
claimed are therefore the direct consequence of an illegal manufacture and
would be a direct pecuniary reward for an act of wrongdoing.

In those circumstances the narrow principle plainly applies to exclude the
claim. By awarding the damages claimed the court would inevitably be
rewarding and therefore vindicating the illegal conduct.    E

The courts have also applied the ex turpi causa maxim more generally
to deny claims for compensation in cases going beyond lost profits claims.
That wider principle has been stated in broad terms in many cases.
The court will not assist a claimant to recover compensation for
the consequences of his own illegal conduct: see *Stone & Rolls Ltd v
Moore Stephens* [2009] AC 1391, para 18, per Lord Phillips of Worth
Matravers.    F

In certain categories of cases claims have been allowed despite their
connection with illegal acts: (1) cases of pure inadvertence where the
claimant cannot really be regarded as personally responsible for the illegality
at all; (2) cases where the illegal behaviour of the claimant was caused or
induced by the actions of the defendant who is seeking to rely on the rule;
(3) where the act in question, whilst technically illegal, was essentially trivial    G
in the context of the claim; and (4) where the illegality is entirely collateral
and has no true causal relationship to the claim. [Reference was made to
*Burrows v Rhodes* [1899] 1 QB 816; *United Project Consultants Pte Ltd v
Leong Kwok Onn (trading as Leong Kwok Onn & Co)* [2005] 4 SLR 214;
*Safeway Stores Ltd v Twigger* [2011] Bus LR 1629 and *Gray v Thames
Trains Ltd* [2009] AC 1339.]

The authorities indicate that the court will not award compensation    H
where the claim or the relevant part of it is based substantially on a
non-trivial unlawful act for which the claimant can be considered properly
responsible. It is well established that moral judgment plays no part in the
application of the rule, whether in its narrow or wider form, Further, in no

© 2015 The Incorporated Council of Law Reporting for England and Wales

A  sense is the court exercising a discretion: see *Tinsley v Milligan* [1994] 1 AC
   340 and *Holman v Johnson* (1775) 1 Cowp 341.
      All the elements of the wider principle are also satisfied on the facts of
   the claimant's case. The claim is substantially founded on unlawful
   activity. The patent infringement was not an insignificant or collateral
   aspect of the manufacture of the drug. As the Court of Appeal itself
B  concluded, the necessary causal link between the illegality and the claim to
   lost profits was established. The defendants were entirely responsible for
   the wrongdoing and in no sense was it accidental or inadvertent. The
   defendants were, as both courts below held, taking a conscious commercial
   risk by going ahead with the manufacture and that was sufficient to trigger
   the illegality defence. This is not a case where the defendants were in any
   sense not responsible for the wrongdoing and it is not a case of trivial
C  illegality.
      The Court of Appeal was wrong to consider that the decision whether to
   deny a claim on the basis of illegality was to all intents and purposes a matter
   of discretion or a just and proportionate response involving the weighing of
   indefinable and nebulous factors which varied from case to case. The Court
   of Appeal's decision to allow the claim for lost profits founded on the
D  infringement of a valid patent was not a just and proportionate response to
   the illegality. It was not a response to the illegality at all.
      The defendants should be put in the position in which they would have
   been if they had not acted unlawfully.

      *Daniel Toledano QC, Tom Mitcheson QC* and *Harris Bor* (instructed by
   *Taylor Wessing LLP*) for the defendants.
E     The maxim ex turpi causa non oritur actio expresses not so much a
   principle as a policy which is based not on a single justification but on a
   group of reasons which must be applied in different situations. [Reference
   was made to *Holman v Johnson* (1775) 1 Cowp 341 and *Gray v Thames
   Trains Ltd* [2009] AC 1339.] A policy-based approach is very different from
   an approach which allows for the exercise of an unfettered or broad
   discretion which pays no heed to concrete policy considerations and
F  allows for decisions to be based purely on subjective judgment or public
   conscience.
      Under the policy-based approach every decision must be anchored on one
   or more of the policies. Those include consistency in the law, furthering the
   purpose of the rule which a claimant's illegal behaviour has infringed and
   the need to prevent a claimant profiting from his own wrong, deterrence and
G  punishment.
      It is evident from the authorities that before the illegality doctrine can be
   applied there is a need for culpability, reprehensibility, turpitude or
   iniquity. Most of the authorities dealing with ex turpi causa have involved
   criminal acts, and even where acts are criminal in nature, they have not
   always been considered serious enough. One consideration when
   determining turpitude is the level of knowledge held by a claimant of the
H  wrong which was committed. If an act is manifestly wrong and everyone
   knows it is a crime, for example murder, there is sufficient culpability. If
   not, it is necessary to inquire into the state of mind of the claimant.
   [Reference was made to *Burrows v Rhodes* [1899] 1 QB 816; *United
   Project Consultants Pte v Leong Kwok Onn (trading as Leon Kwok Onn &*

© 2015 The Incorporated Council of Law Reporting for England and Wales

436
**Les Laboratoires Servier v Apotex Inc (SC(E))**                    **[2015] AC**
**Argument**

*Co)* [2005] 4 SLR 214; *Columbia Picture Industries Inc v Robinson* [1987]    A
Ch 38; *St John Shipping Corpn v Joseph Rank Ltd* [1957] 1 QB 267;
*ParkingEye Ltd v Somerfield Stores Ltd* [2013] QB 840; *Mills v Baitis*
[1968] VR 583; *Stone & Rolls Ltd v Moore Stephens* [2009] AC 1391;
*Tinsley v Milligan* [1994] 1 AC 340 and *Safeway Stores Ltd v Twigger*
[2011] Bus LR 1629.]

The claimants' approach does not reflect the findings of earlier    B
authorities and would lead to an excessively wide and indiscriminate
application of the maxim ex turpi causa non oritur actio. The policy-based
approach was correctly applied by the Court of Appeal and the defendants
should not be barred from recovering damages under the cross-undertaking
covering sales in the United Kingdom on account of a hypothetical
infringement in Canada of a Canadian patent in circumstances where:
(1) the infringement would have been carried out with the honest and    C
reasonable belief that the patent was invalid; (2) the infringement would
have taken place prior to the patent being declared invalid by the Canadian
court; (3) the court would not have granted an interim injunction preventing
the infringement prior to the patent being declared invalid, and (4) the
defendant agreed to account for the infringement and therefore would not
be left with any benefit which the Canadian court would regard as properly
recoverable under Canadian law.    D

That conclusion satisfies all of the relevant policy considerations, most
importantly: (1) that there can be no relevant culpability when a
pharmaceutical patent is infringed in the honest and reasonable belief that it
is invalid; (2) that there will be consistency in the law because the defendant
will be in precisely the same position in English and Canadian law as it
would have been in had there been no interim injunction in the United    E
Kingdom; and (3) comity would be respected since nothing would remain in
the defendants' hands which the Canadian courts would regard as properly
recoverable under Canadian law.

If the claimants' appeal were allowed there would be a real risk that the
defendants would be left with irrecoverable loss and that the claimants
would be left in a better position than they would have been in had no
interim injunction been obtained in the United Kingdom. The claimants    F
would then enjoy an unjustified windfall even though it had wrongly
obtained the interim injunction.

The right approach would be to work out on a hypothetical basis what
would have happened absent the injunction. The hypothetical scenario is
straightforward to work out because key factual ingredients are known,
including that no interim injunction to restrain manufacture would have
been granted in Canada. Absent the English injunction manufacture would    G
have taken place in Canada since there was no interim injunction preventing
it. Sales would have been made lawfully in the United Kingdom and profits
made on those sales, but the defendants would have to pay in Canada an
amount ordered by the Canadian court as a result of the infringement of
the Canadian patent. The balance, if any, ought to be awarded to the
defendants on its claim pursuant to the cross-undertaking. That was the    H
conclusion of the Court of Appeal and it ought to be upheld.

*Purvis QC* replied.

The court took time for consideration.

© 2015 The Incorporated Council of Law Reporting for England and Wales

*A*   29 October 2014. The following judgments were handed down.

**LORD SUMPTION JSC** (with whom **LORD NEUBERGER OF ABBOTSBURY PSC** and **LORD CLARKE OF STONE-CUM-EBONY JSC** agreed)

*B*
*Introduction*
   1  This appeal is about the defence of illegality: ex turpi causa non oritur actio.
   2  The first claimant Les Laboratoires Servier is a French pharmaceutical company which originated the perindopril erbumine compound, an ACE inhibitor used for treating hypertension and cardiac insufficiency. The respondents are companies of the Apotex Group, a Canadian

*C* pharmaceuticals group specialising in the manufacture and marketing of generic pharmaceutical products. The parties have agreed that for the purpose of resolving the issues on this appeal, both groups can be treated as one entity without regard to the distinct corporate personality of the companies comprising them.
   3  A number of patents for the perindopril erbumine compound have been granted to Servier and its associated companies. In Europe, patent

*D* protection for the compound itself expired in June 2003. However, the corresponding Canadian patent for the compound will not expire until 2018. The present dispute relates to a United Kingdom patent not for the compound but for a specific crystalline form of the compound, which was granted to Servier. Its UK subsidiary Servier Laboratories Ltd was the exclusive licensee.

*E*   4  In March 2006 Apotex wrote to Servier to notify them that they intended to market generic perindopril in the UK, and at the end of July 2006, on obtaining marketing authorisation, they began to do so. On 1 August 2006, Servier began proceedings against Apotex for infringement of the UK patent. On 7 August, Mann J granted an interlocutory injunction restraining the importation and sale by the Apotex companies of generic

*F* perindopril erbumine in the United Kingdom. The injunction was obtained on Servier giving the ordinary undertaking to comply with any order that the court might make if it should later find that the order had caused loss to Apotex for which it should be compensated. Pumfrey J gave judgment on the claim on 11 July 2007 [2007] EWHC 1538 (Pat). He held that the patent had been infringed but that it was invalid, and discharged the injunction. Servier's appeal was dismissed by the Court of Appeal on 28 April 2008

*G* [2008] EWCA Civ 445.
   5  Meanwhile, separate proceedings were in progress in Canada for infringement of the Canadian patent for the compound itself. An interlocutory injunction had been refused in those proceedings. But on 2 July 2008, Snider J held that the Canadian patent was valid and infringed, and granted a final injunction. The Canadian Federal Court of Appeal dismissed Apotex's appeal on 30 June 2009, and leave to appeal to the

*H* Supreme Court of Canada was refused on 25 March 2010. A separate trial of damages is expected in November 2014.
   6  It is agreed that damages under the undertaking in the English proceedings fall to be assessed on the basis that but for the injunction Apotex would have sold in the United Kingdom an additional 3·6 million packs of

© 2015 The Incorporated Council of Law Reporting for England and Wales

perindopril erbumine tablets.   The active ingredient would have been   *A*
manufactured by Apotex Pharmachem Inc in Canada and sold at a 30%
mark-up to Apotex Inc.   Apotex Inc would have formulated it into tablets,
also in Canada, and sold the tablets to Apotex UK Ltd which would then
have sold them on the UK market.   Under the terms of the sale to Apotex UK
Ltd, Apotex Inc would have received 90% of the profits arising from UK
sales.   The assessment was heard before Norris J in June 2008, and judgment   *B*
was reserved.

7   In July 2008, after Snider J had given judgment in Canada but before
Norris J had given judgment on the assessment in England, Servier applied to
Norris J to re-amend their defence to plead two points arising out of Snider
J's judgment.   The first, which I shall call the "illegality point" was that it
was contrary to public policy for Apotex to recover damages for being
prevented from selling a product whose manufacture in Canada would have   *C*
been illegal there as an infringement of Servier's Canadian patent.   The
second, which I shall call the "cost of manufacture point" was that in
assessing Apotex's loss of profit the damages for infringement to which they
would be entitled in the Canadian proceedings should be treated as an
additional cost of manufacture, thereby reducing or eliminating the profit.
On 9 October 2008, Norris J gave judgment on the assessment: [2009] FSR   *D*
220.   He refused permission to amend, on the ground that the application
came too late and would cause undue prejudice to Apotex.   He then awarded
Apotex £17·5m damages plus interest of approximately £2·1m, to be split
90/10 between Apotex Inc and Apotex UK.   However, on 12 February
2010, the Court of Appeal allowed an appeal from the refusal of the
amendment, and directed that Norris J's award of damages should be
treated as an interim order pending determination of the new issues [2010]   *E*
EWCA Civ 279.

8   Subsequently, Lewison J made an order staying the second of the new
issues (the cost of manufacture issue) until damages had been assessed in
Canada.

*The judgments below*

9   The illegality point turns in this case on three issues: (1) Does the   *F*
infringement of a foreign patent rights constitute a relevant illegality
("turpitude") for the purpose of the defence? (2) If so, is Apotex seeking to
found its claim on it? (3) Is Servier entitled to take the public policy point
having given an undertaking in damages?

10   Arnold J gave judgment on these questions on 29 March 2011:
[2011] RPC 574.   He decided all three points in favour of Servier.   On the   *G*
first point, he held that a relevant illegality was one which was sufficiently
serious in all the circumstances of the case, including in particular whether
the illegal act was done with knowledge or deliberately.   On the second
point, he held that the claim was barred because Apotex could not make
good its claim for damages without affirming that it would have
manufactured the product in Canada, where it was illegal to do so.   On the
third point, he held that it was not inconsistent with the undertaking as to   *H*
damages for Servier to raise the illegality defence.   In the result, Arnold J held
that the whole of Apotex's claim on the undertaking was barred, and
ordered the repayment of the amount which they had received in satisfaction
of Norris J's judgment.

© 2015 The Incorporated Council of Law Reporting for England and Wales

A    11 Apotex appealed to the Court of Appeal. Shortly before the hearing of the appeal they conceded that any damages awarded in the Canadian proceedings should be deducted from Norris J's award irrespective of the fate of the public policy point. The Court of Appeal gave judgment on 3 May 2012 allowing the appeal [2013] Bus LR 80. The leading judgment was given by Etherton LJ, with whom Laws and Kitchin LJJ agreed. The essential point on which he differed from the judge was issue (1). In his view,

B    the infringement of Servier's Canadian patent was not a relevant illegality for the purposes of the defence. This was because in dealing with the illegality defence, the court, at para 73, was entitled "to take into account a wide range of considerations in order to ensure that the defence only applies where it is a just and proportionate response to the illegality involved in the light of the policy considerations underlying it." Etherton LJ considered that

C    this test was not satisfied because (i) Apotex honestly and reasonably believed the Canadian patent to be invalid; (ii) it was important as a matter of principle that Servier, having enjoyed a monopoly by virtue of the injunction, should have to pay when it was found not to be entitled to it; (iii) the sale of the tablets in the United Kingdom was not an infringement of the Canadian patent, whose effect was limited to Canada; (iv) the Canadian

D    court had refused to grant an interlocutory injunction restraining the manufacture of the active ingredient or its formulation into tablets in Canada; and (v) any public policy arising from the illegality of the manufacture and formulation of the product in Canada was sufficiently addressed by Apotex's concession that credit had to be given for the damages payable in the Canadian proceedings for the infringements committed there. If Etherton LJ had been satisfied that the infringement of

E    the Canadian patent was a relevant illegality, he would have upheld the illegality defence. This was because, like the judge, he considered that there was a sufficiently close causal relationship between the patent infringement and the loss suffered by virtue of the injunction; and because, like the judge again, he was not impressed by the suggestion that the taking of the illegality defence was inconsistent with the undertaking in damages.

F    12 The Court of Appeal approved the concession made by Apotex about the credit to be given for the damages for infringement payable in Canada. It followed that the financial consequences of its decision must depend on what happens on the assessment of damages in Canada.

*The illegality defence: a rule of law*

G    13 English law has a long-standing repugnance for claims which are founded on the claimant's own illegal or immoral acts. The law on this point was already well established when Lord Mansfield CJ articulated it in his celebrated statement of principle in *Holman v Johnson* (1775) 1 Cowp 341, 343:

"No court will lend its aid to a man who founds his cause of action on an immoral or an illegal act. If, from the plaintiff's own stating or

H    otherwise, the cause of action appears to arise ex turpi causa, or the transgression of a positive law of this country, there the court says that he has no right to be assisted. It is on that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the

© 2015 The Incorporated Council of Law Reporting for England and Wales

defendant was to bring his action against the plaintiff, the latter would    *A*
then have the advantage of it; for where both are equally in fault, *potior
est conditio defendentis.*"

The doctrine necessarily operates harshly in some cases, for it is relevant
only to bar claims which would otherwise have succeeded. For this reason it
is in the nature of things bound to confer capricious benefits on defendants
some of whom have little to be said for them in the way of merits, legal or    *B*
otherwise. Lord Mansfield CJ acknowledged this when he pointed out:

"The objection, that a contract is immoral or illegal as between
plaintiff and defendant, sounds at all times very ill in the mouth of the
defendant. It is not for his sake, however, that the objection is ever
allowed; but it is founded in general principles of policy, which the
defendant has the advantage of, contrary to the real justice, as between    *C*
him and the plaintiff . . ."

Lord Mansfield CJ's formulation begs many questions. But as these citations
show, two features of this area of law have been characteristic of it from the
outset. First, it is a rule of law and not a mere discretionary power.
Secondly, it is based on public policy, and not on the perceived balance of
merits between the parties to any particular dispute.    *D*

14    The question what is involved in "founding on an immoral or illegal
act" has given rise to a large body of inconsistent authority which rarely rises
to the level of general principle. The main reason for the disordered state of
the case law is the distaste of the courts for the consequences of applying
their own rules, consequences which Lord Mansfield CJ had pointed out two
centuries ago. The only rational way of addressing this problem, if these    *E*
consequences are regarded as intolerable, is to transform the rule into a mere
power whose actual exercise would depend on the perceived equities of each
case. The most notable modern attempt to achieve this transformation was
made by the Court of Appeal in *Euro-Diam Ltd v Bathurst* [1990] 1 QB 1, in
which the illegality defence was invoked in response to a claim on a property
insurance. The Court of Appeal placed the reported cases in a number of
distinct factual categories, united by a common principle. Kerr LJ,    *F*
delivering the only reasoned judgment, expressed that principle, at p 35, by
saying that the test was whether

"in all the circumstances it would be an affront to the public conscience
to grant the plaintiff the relief which he seeks because the court would
thereby appear to assist or encourage the plaintiff in his illegal conduct or
to encourage others in similar acts."    *G*

That question, he suggested, needed to be approached "pragmatically and
with caution, depending on the circumstances". Under this "public
conscience" test, the application of the illegality defence was not
discretionary in law. But it was clearly discretionary in nature. In substance
it called for a value judgment about the significance of the illegality and the
injustice of barring the claimant's claim on account of it.    *H*

15    This development had been foreshadowed by some earlier decisions
of the Court of Appeal. But it was decisively rejected by the House of Lords
in *Tinsley v Milligan* [1994] 1 AC 340. That appeal arose out of an
agreement under which two ladies bought a house to live in out of jointly

441

A owned funds. They agreed to vest it in one of them alone so that the other
could claim social security benefits on the fraudulent basis that she did not
own her home and was paying rent. In the ordinary course, the joint
purchase of property by two people in the name of one of them would give
rise to an equitable proprietary interest in the other. The question was
whether the assertion of this interest in a court of law was debarred by the
dishonesty of the parties' purpose. The Court of Appeal, by a majority, had
B applied the "public conscience" test. Ralph Gibson LJ dissented, observing
in his judgment [1992] Ch 310, 334:

   "In so far as the basis of the ex turpi causa defence, as founded on
public policy, is directed at deterrence it seems to me that the force of the
deterrent effect is in the existence of the known rule and in its stern
application. Lawyers have long known of the rule and must have advised
C many people of its existence."

   16   In the House of Lords, the Committee was divided on the correct test
as well as on the correct result. But it was unanimous in rejecting the public
conscience test, on the ground that it was unprincipled. The leading speech
on this point was that of Lord Goff of Chieveley. Like almost every court
which has reviewed the question, he took as his starting point the statement
D of Lord Mansfield CJ in *Holman v Johnson* 1 Cowp 341, 343. He observed
[1994] 1 AC 340, 355:

   "That principle has been applied again and again, for over 200 years.
It is applicable in courts of equity as well as courts of law: see, e g, the
notes to *Roberts v Roberts* (1818) Dan 143, 150–151 and *Ayerst v
Jenkins* (1873) LR 16 Eq 275, 283, per Lord Selborne LC. In
E 1869 Mellor J said that the maxim in pari delicto potior est conditio
possidentis 'is as thoroughly settled as any proposition of law can be:' see
*Taylor v Chester* (1869) LR 4 QB 309, 313. It is important to observe
that, as Lord Mansfield made clear, the principle is not a principle of
justice; it is a principle of policy, whose application is indiscriminate and
so can lead to unfair consequences as between the parties to litigation.
F Moreover the principle allows no room for the exercise of any discretion
by the court in favour of one party or the other."

Lord Goff acknowledged, at p 364D–E, that:

   "The real criticism of the present rules is not that they are unprincipled,
but rather that they are indiscriminate in their effect, and are capable
G therefore of producing injustice."

Indeed, in the case before him, he regarded the claimant's misconduct as
"relatively minor" and pointed out that she had already made amends for it
by repaying the sums dishonestly obtained in social security benefits.
However, he considered that the illegality defence was governed by
"established rules of law": p 364F. Endorsing the view of Ralph Gibson LJ in
H the passage from which I have cited above, he rejected, at p 358E–F, the
public conscience test as contrary to 200 years of authority, because it
required the court to:

   "weigh, or balance, the adverse consequences of respectively granting
or refusing relief. This is little different, if at all, from stating that the

© 2015 The Incorporated Council of Law Reporting for England and Wales

court has a discretion whether to grant or refuse relief. It is very difficult
to reconcile such a test with the principle of policy stated by Lord
Mansfield CJ in *Holman v Johnson* . . . or with the established principles
to which I have referred."

*A*

Its adoption, he said, p 363B:

"would constitute a revolution in this branch of the law, under which
what is in effect a discretion would become vested in the court to deal
with the matter by the process of a balancing operation, in place of a
system of rules, ultimately derived from the principle of public policy
enunciated by Lord Mansfield CJ in *Holman v Johnson*."

*B*

As he pointed out, at p 362G–H, short of treating the application of the rule
as discretionary, it is difficult to make a principled distinction between
degrees of iniquity.

*C*

17   Lord Browne-Wilkinson, at p 369B, agreed with Lord Goff on this
point, observing that:

"the consequences of being a party to an illegal transaction cannot
depend, as the majority in the Court of Appeal held, on such an
imponderable factor as the extent to which the public conscience would
be affronted by recognising rights created by illegal transactions."

*D*

The other members of the Committee all agreed with the speeches of Lord
Goff and Lord Browne-Wilkinson on this point.

18   The House was divided on the question what should be substituted
for the public conscience test. Lord Keith of Kinkel and Lord Goff favoured
a rule which would bar any claim tainted by a sufficiently close factual
connection with the illegal purpose, and would have dismissed the claim to
an equitable interest in the house on that ground. Lord Browne-Wilkinson,
with whom Lord Jauncey of Tullichettle and Lord Lowry agreed, preferred
the "reliance test" derived from the decision of the Court of Appeal in
*Bowmakers Ltd v Barnet Instruments Ltd* [1945] KB 65 and of the Privy
Council in *Palaniappa Chettiar v Arunasalam Chettiar* [1962] AC 294. The
effect of this test was that the claim was barred only if the claimant needed to
rely on (i e to assert, whether by way of pleading or evidence) facts which
disclosed the illegality: see Lord Browne-Wilkinson [1994] 1 AC 340,
370C–D, 375–376; cf Lord Jauncey, at p 366C–G. Both are intended to
exclude those consequences of an illegal act which are merely collateral to
the claim. Neither makes the application of the illegality defence dependent
on a value judgment about the significance of the illegality or the
consequences for the parties of barring the claim. For present purposes, it is
enough to point out that neither test is discretionary in nature. Neither of
them is based on achieving proportionality between the claimant's
misconduct and his loss, a concept derived from public law which is not
easily transposed into the law of obligations. On the contrary, Lord Goff
recognised, as Lord Mansfield CJ had before him, that the practical
operation of the law in this field will often produce disproportionately harsh
consequences.

*E*

*F*

*G*

*H*

19   The Court of Appeal was bound by *Tinsley v Milligan* [1994] 1 AC
340, and we have not been invited to depart from it on this appeal. It was,
however, suggested and accepted by Etherton LJ, that a wider view of the

© 2015 The Incorporated Council of Law Reporting for England and Wales

A  law was open to the courts in the light of Lord Hoffmann's observation in
*Gray v Thames Trains Ltd* [2009] AC 1339, para 30 that

> "the maxim ex turpi causa expresses not so much a principle as a
> policy. Furthermore, that policy is not based on a single justification but
> on a group of reasons, which vary in different situations."

B  I do not think that this dictum will bear the weight that has been placed on it.
A court will commonly examine the policy rationale of a rule of law in order
to discover what the rule is. This is what Lord Hoffmann was doing in the
passage cited, which introduces an extended discussion of the "various
rules" which the courts had evolved to deal with the dilemma that the denial
of relief to one party would confer an unjustified benefit on the other. These
rules did not seek to deal with the dilemma by leaving the court to make a
C  value judgment about the seriousness of the illegality and the impact on the
parties of allowing the defence. As Lord Hoffmann explained them, they
dealt with it by defining as a matter of law when the illegality defence
applied and when it did not. In Lord Hoffmann's view two rules were
relevant where the illegality defence was raised in answer to a claim for
compensation. There was a "narrower rule" that you cannot recover
D  damage which is the consequence of a sentence imposed on you for a
criminal act; and a wider rule that you cannot recover compensation for loss
which you have suffered in consequence of your own criminal act. The
former test operated automatically, once it was ascertained that the loss
claimed was a penalty imposed by a criminal court or the necessary
consequence of the sentence, such as loss of earnings during a period of
imprisonment. The latter test was simply a question of causation. Neither
E  the narrower nor the wider rule depended on the court's assessment of the
significance of the illegality, the proportionality of its application or the
merits of the particular case. Nor does anything else in the speeches justify a
test which would include such an assessment.

20  *Tinsley v Milligan* [1994] 1 AC 340 has had its critics. The Law
Commission in successive reports on the illegality defence made little secret
F  of its preference for the approach of the Court of Appeal in *Euro-Diam Ltd v
Bathurst* [1990] 1 QB 1. The Commission initially proposed the
introduction of a statutory scheme adopting a discretionary approach to the
application of the illegality defence, on the ground that the House of Lords'
decision in *Tinsley v Milligan* had ruled out the development of judge-made
law in that direction. They later withdrew that proposal, because recent
decisions of judges at first instance and in the Court of Appeal suggested to
G  them that the effect of that decision was being eroded by lower courts: see
*The Illegality Defence*: *A Consultative Report* (2009) (Consultation Paper
No 189), at paras 3.104–3.105, 3.123–3.124. At para 3.140 of the latter
report, the Commission observed that the public conscience test, although
rejected in *Tinsley v Milligan*, was nevertheless:

H  "useful in suggesting that the present rules should be regarded as no
more than guidance that help the court to focus its attention on particular
features of the case before it. What lies behind these 'rules' is a set of
policies. This is why the courts are sometimes required to 'bend' the rules
(if possible) to give better effect to the underlying policies as they apply to
the facts of the case before them."

© 2015 The Incorporated Council of Law Reporting for England and Wales

444
**Les Laboratoires Servier v Apotex Inc (SC(E))**                    **[2015] AC**
**Lord Sumption JSC**

I confess that I find this difficult to justify as an approach to authority or the     *A*
proper development of the law. It is directly inconsistent with the decision of
the House of Lords in *Tinsley v Milligan* and the whole of the reasoning
which underlies it. It makes the law uncertain, by inviting the courts to
depart from existing rules of law in circumstances where it is difficult for
them to acknowledge openly what they are doing or to substitute a coherent
alternative structure. The present position was to my mind accurately stated     *B*
by Lord Walker of Gestingthorpe when commenting on the Commission's
original proposals in *Stone & Rolls Ltd v Moore Stephens* [2009] AC 1391,
paras 130–131:

"130. . . . These proposals, if enacted by Parliament, would introduce
more flexibility into this area of the law (although without reintroducing
a general 'public conscience' discretion).     *C*
"131. . . . The present state of the law is as laid down by the majority
of the House in *Tinsley v Milligan* [1994] 1 AC 340. Any legislative
change is likely to widen the test, not to narrow it."

21  It follows that the disposition of this case by the Court of Appeal
cannot possibly be justified by the considerations put forward by
Etherton LJ. Etherton LJ rejected the illegality defence on the ground that     *D*
the infringement of Servier's Canadian patent was not "turpitude" for the
purpose of the illegality defence. However, he did not address the question
in what, as a matter of principle, turpitude consisted. He rejected the
argument of Servier that patent infringement was necessarily turpitude and
also the argument of Apotex that it never was. Instead, he held, at para 76,
that it "all depends on the precise circumstances". The circumstances to
which he attached importance were the five factors to which I have referred     *E*
above: see para 11. Of these factors the first (Apotex's honest belief in the
invalidity of the Canadian patent) was an assessment of the moral
culpability of Apotex's infringement. The other four were all part of a
complex inquiry into how far the infringement of the Canadian patent could
be said to matter in the particular circumstances of this case. Arnold J had
adopted much the same approach, although by reference to a narrower
range of factors. The difference between them was essentially that Arnold J     *F*
took a graver view of the infringements than Etherton LJ, partly because he
was less impressed by the argument that Apotex genuinely believed that the
Canadian patent was invalid, and partly because he attached more weight to
the importance of respecting the Canadian patents. This difference
encapsulates the vice of the test that they both applied. The answer
depended not on the character of the illegality but on largely subjective     *G*
judgments about how badly Apotex had behaved and how much it mattered.
This was a process, discretionary in all but name, whose outcome would
have been exceptionally difficult for either party's advisers to predict in
advance. In my opinion, it was contrary to established legal principle.

22  However, it does not follow that the courts should be insensitive to
the draconian consequences which the ex turpi causa principle can have if it
is applied too widely. The starting point in any review of the modern law     *H*
must be that we are concerned with a principle based on the application of
general rules of law and not on fact-based evaluations of the effect of
applying them in each individual case. However, the content of the rules
must recognise that within the vast and disparate category of cases where a

© 2015 The Incorporated Council of Law Reporting for England and Wales

445
[2015] AC                    Les Laboratoires Servier v Apotex Inc (SC(E))
                                                          Lord Sumption JSC

A  party in some sense founds his claim on an immoral or illegal act there are
   important differences of principle. The application of the ex turpi causa
   principle commonly raises three questions: (i) what acts constitute turpitude
   for the purpose of the defence? (ii) what relationship must the turpitude
   have to the claim? (iii) on what principles should the turpitude of an agent
   be attributed to his principal, especially when the principal is a corporation?
B  Each of these questions requires a principled distinction to be made between
   different kinds of immoral or illegal act and different ways in which they
   may give rise to claims. For present purposes, we are concerned only with
   the question what constitutes turpitude for the purposes of the defence. The
   question what relationship it must have to the claim arises only if that
   question is answered in favour of Servier, and no question of attribution
   arises in this case at all.

C
   *What is "turpitude"?*

   23  The paradigm case of an illegal act engaging the defence is a criminal
   offence. So much so, that much modern judicial analysis deals with the
   question as if nothing else was relevant. Yet in his famous statement of
   principle in *Holman v Johnson* 1 Cowp 341 Lord Mansfield CJ spoke not
D  only of criminal acts but of "immoral or illegal" ones. What did he mean by
   this? I think that what he meant is clear from the characteristics of the rule as
   he described it, and as judges have always applied it. He meant acts which
   engage the interests of the state or, as we would put it today, the public
   interest. The illegality defence, where it arises, arises in the public interest,
   irrespective of the interests or rights of the parties. It is because the public
   has its own interest in conduct giving rise to the illegality defence that the
E  judge may be bound to take the point of his own motion, contrary to
   the ordinary principle in adversarial litigation. In some contexts, notably
   the invalidity of contracts prohibited by law, the ex turpi causa principle can
   be analysed as part of the substantive law governing the parties' rights. The
   contract is void, and any right derived from it is non-existent. But in general,
   although described as a defence, it is in reality a rule of judicial abstention. It
F  means that rather than regulating the consequences of an illegal act (for
   example by restoring the parties to the status quo ante, in the same way as on
   the rescission of a contract) the courts withhold judicial remedies, leaving
   the loss to lie where it falls. This is so even in a contractual context, when the
   court is invited to determine the financial consequence of a contract's
   voidness for illegality. The ex turpi causa principle precludes the judge from
   performing his ordinary adjudicative function in a case where that would
G  lend the authority of the state to the enforcement of an illegal transaction or
   to the determination of the legal consequences of an illegal act.

   24  In Lord Mansfield CJ's day, and for some time thereafter, this rule of
   abstention was sometimes expressed as a principle protecting the innocence
   or dignity of the court against defilement. In the notorious "Highwayman's
   Case", *Everet v Williams* (1725) (unreported); but noted at (1893) 9 LQR
H  197, in which the court was invited to take an account between two
   highwaymen, it not only dismissed the claim as "scandalous and
   impertinent" but ordered the arrest of the plaintiff's solicitor and fined him.
   Two centuries later, in *Parkinson v College of Ambulance Ltd* [1925] 2 KB
   1, 13, Lush J said of a contract to procure an honour, that "no court could
   try such an action and allow such damages to be awarded with any propriety

© 2015 The Incorporated Council of Law Reporting for England and Wales

446
Les Laboratoires Servier v Apotex Inc (SC(E))                    [2015] AC
Lord Sumption JSC

or decency." Today, the same concept would be expressed in less self-    A
indulgent terms as a principle of consistency. This was the point made by
McLachlin J in her much-admired judgment in *Hall v Hebert* [1993] 2 SCR
159, 176:

"to allow recovery in these cases would be to allow recovery for what
is illegal. It would put the courts in the position of saying that the same
conduct is both legal, in the sense of being capable of rectification by the    B
court, and illegal. It would, in short, introduce an inconsistency in the
law. It is particularly important in this context that we bear in mind that
the law must aspire to be a unified institution, the parts of
which—contract, tort, the criminal law—must be in essential harmony.
For the courts to punish conduct with the one hand while rewarding it
with the other, would be to 'create an intolerable fissure in the law's    C
conceptually seamless web' . . . We thus see that the concern, put at its
most fundamental, is with the integrity of the legal system."

25  The ex turpi causa principle is concerned with claims founded on
acts which are contrary to the public law of the state and engage the public
interest. The paradigm case is, as I have said, a criminal act. In addition, it is
concerned with a limited category of acts which, while not necessarily    D
criminal, can conveniently be described as "quasi-criminal" because they
engage the public interest in the same way. Leaving aside the rather special
case of contracts prohibited by law, which can give rise to no enforceable
rights, this additional category of non-criminal acts giving rise to the defence
includes cases of dishonesty or corruption, which have always been regarded
as engaging the public interest even in the context of purely civil disputes;    E
some anomalous categories of misconduct, such as prostitution, which
without itself being criminal are contrary to public policy and involve
criminal liability on the part of secondary parties; and the infringement of
statutory rules enacted for the protection of the public interest and attracting
civil sanctions of a penal character, such as the competition law considered
by Flaux J in *Safeway Stores Ltd v Twigger* [2010] Bus LR 974.

26  There are dicta which suggest that the ex turpi causa principle may    F
be wider than this, that it may be engaged by a purely civil wrong such as a
tort or breach of contract. The clearest and best known of them is that of
Kennedy J in *Burrows v Rhodes* [1899] 1 QB 816, 828. He thought that no
claim for damages could be founded on an act "if an act is manifestly
unlawful, or the doer of it knows it to be unlawful, as constituting either a
civil wrong or a criminal offence." However, the only English case which he
cited as supporting this proposition so far as it relates to civil wrongs, is    G
*Shackell v Rosier* (1836) 2 Bing NC 634, which concerned a claim on a
contract to indemnify the plaintiff against damages and costs payable in
consequence of having published a *criminal* libel: see Tindal CJ, at
pp 645–646. *Weld-Blundell v Stephens* [1920] AC 956 concerned another
libel action. The plaintiff had been successfully sued for a libel contained in
a document which he had supplied to his accountant. The majority of the
House of Lords held that he could not recover the damages he had had to    H
pay to the defamed party from his accountant, who had negligently left the
document about so that it came to the former's attention. The difficulty
about this case is that its ratio has never been clear. Lord Dunedin proposed
to dismiss the claim on the ground that the plaintiff was relying on his own

© 2015 The Incorporated Council of Law Reporting for England and Wales

A  wrong, namely the libel by which he had incurred liability. Lord Sumner
decided the case on causation. He thought that the claim should be
dismissed on the ground that the plaintiff had had to pay damages because of
the libel, not the negligence. Lord Wrenbury thought that the claim should
be dismissed on both grounds, and specifically approved the dictum of
Kennedy J in *Burrows v Rhodes*. Viscount Finlay, who dissented, thought
that a civil wrong was not to be equated to a criminal act for the purpose of
B  the ex turpi causa principle: see p 971. Lord Parmoor, who also dissented,
made the same distinction: see pp 995–996.

27  In *Columbia Picture Industries Inc v Robinson* [1987] Ch 38, the
plaintiff had obtained an *Anton Piller* order for an improper purpose and
without full disclosure, against a defendant whose business consisted almost
entirely in the manufacture and sale of pirated videos. Scott J declined to
C  order an inquiry into damages under the plaintiff's undertaking because the
losses had been incurred in a business which was "illicit" albeit not criminal
under the law as it then stood. The point does not seem to have been argued
in any detail, if at all, and the reasoning was both brief and cryptic. The
judge appears to have reached his conclusion on two grounds. The first was
that under the then law the pirated tapes which were the stock-in-trade of
the defendant's business belonged to the copyright owners, so that the
D  defendant's inability to sell them caused him no loss. The second was that
the defendant's business was dishonest (the judge thought the case
analogous to the Highwaymans' Case). By this I think that he must have
meant that any sales that the defendant would have made but for the *Anton
Piller* order would have been made by dishonestly misleading his customers
about the origin of the videos. It is I think only on that footing the judge's
E  second reason can be justified. Scott J was not suggesting that a breach of
copyright was in itself a sufficient basis on which to raise the illegality
defence.

28  Apart from these decisions, the researches of counsel have uncovered
no cases in the long and much-litigated history of the illegality defence, in
which it has been applied to acts which are neither criminal nor quasi-
criminal but merely tortious or in breach of contract. In my opinion the
F  question what constitutes "turpitude" for the purpose of the defence depends
on the legal character of the acts relied on. It means criminal acts, and what
I have called quasi-criminal acts. This is because only acts in these categories
engage the public interest which is the foundation of the illegality defence.
Torts (other than those of which dishonesty is an essential element), breaches
of contract, statutory and other civil wrongs, offend against interests which
G  are essentially private, not public. There is no reason in such a case for the
law to withhold its ordinary remedies. The public interest is sufficiently
served by the availability of a system of corrective justice to regulate their
consequences as between the parties affected.

29  It is right to add that there may be exceptional cases where even
criminal and quasi-criminal acts will not constitute turpitude for the
purposes of the illegality defence. In *Gray v Thames Trains Ltd* [2009] AC
H  1339, para 83, Lord Rodger of Earlsferry suggested that some offences
might be too trivial to engage the defence. In general, however, the
exceptional cases are implicit in the rule itself. This applies in particular
where the act in question was not in reality the claimant's at all. Leaving
aside questions of attribution which arise when an agent is involved, and

© 2015 The Incorporated Council of Law Reporting for England and Wales

448
**Les Laboratoires Servier v Apotex Inc (SC(E))**                         **[2015] AC**
Lord Sumption JSC

which are no part of the present appeal, there is a recognised exception to    A
the category of turpitudinous acts for cases of strict liability, generally
arising under statute, where the claimant was not privy to the facts making
his act unlawful: see *Stone & Rolls Ltd v Moore Stephens* [2009] AC 1391,
paras 24, 27, per Lord Phillips of Worth Matravers. In such cases, the fact
that liability is strict and that the claimant was not aware of the facts
making his conduct unlawful may provide a reason for holding that it is not    B
turpitude at all. This is the most satisfactory explanation of the decision of
the Singapore Court of Appeal in *United Project Consultants Pte Ltd v
Leong Kwok Onn (trading as Leon Kwok Onn & Co)* [2005] 4 SLR 214,
where a taxpayer sought to recover from his accountant an administrative
penalty under a statutory provision dealing with the innocent submission of
an incorrect tax return: see paras 55, 57. More generally, the wrong alleged   C
against the defendant may consist precisely in causing an innocent claimant
to commit an offence of strict liability. The leading case is *Burrows v
Rhodes* [1899] 1 QB 816, which arose out of the Jameson Raid of 1895.
The plaintiff was induced to enlist in the raid, contrary to section 11 of the
Foreign Enlistment Act 1870 (33 & 34 Vict c 90), by the defendants'
fraudulent representation that it had the sanction of the Crown (which
would have made it lawful). In most cases of this kind the illegality defence   D
would not arise, for there would be no criminal act, the element of mens rea
being absent. But the pleadings in *Burrows v Rhodes* required the court to
make the rather artificial assumption that the plaintiff would have been
convicted under section 11 even without mens rea: see pp 830–832
(Kennedy J). The court held that even so, the defence was not available.
This was because the plaintiff was not aware of the facts making enlistment   E
illegal and on the assumption being made by the court he was criminally
liable only because that liability was strict. As Kennedy J suggested
at p 834, the exception would not necessarily have applied if Burrows had
been claiming damages arising directly from the sentence of a criminal
court or from some other penal sanction imposed on him by law. That
situation would have engaged Lord Hoffmann's "narrower rule", and in
that context it                                                                F

> "must be assumed that the sentence . . . was what the criminal court
> regarded as appropriate to reflect the personal responsibility of the
> accused for the crime that he had committed": *Gray v Thames Trains Ltd*
> [2009] AC 1339, para 41 (Lord Hoffmann).

Cf *Askey v Golden Wine Co Ltd* [1948] 2 All ER 35, 38 (Denning J);       G
*State Railway Authority of New South Wales v Wiegold* (1991)
25 NSWLR 500, 514 (Samuels JA). The application of the exception for
cases of strict liability may require a court to determine whether the
claimant was in fact privy to the illegality. To that extent, an inquiry into
the claimant's moral culpability may be necessary in such cases before his
act can be characterised in law as "turpitude". This may be a difficult
question, but it is not a question of degree. The conclusion will be a         H
finding that the claimant was aware of the illegality or that he was not.
It is a long way from the kind of value judgment implicit in the search
for a proportionate relationship between the illegality and its legal
consequences of the claim.

© 2015 The Incorporated Council of Law Reporting for England and Wales

449

A  *Conclusion*

30  In my opinion, the illegality defence is not engaged by the consideration that Apotex's lost profits would have been made by selling product manufactured in Canada in breach of Servier's Canadian patent. A patent is of course a public grant of the state. But it does not follow that the public interest is engaged by a breach of the patentee's rights. The effect

B  of the grant is simply to give rise to private rights of a character no different in principle from contractual rights or rights founded on breaches of statutory duty or other torts. The only relevant interest affected is that of the patentee, and that is sufficiently vindicated by the availability of damages for the infringements in Canada, which will be deducted from any recovery under Servier's undertaking in England. There is no public policy which

C  could justify in addition the forfeiture of Apotex's rights.

31  In those circumstances, the second and third issues before the Court of Appeal do not arise.

32  I would accordingly dismiss the appeal.

**LORD MANCE JSC**

33  The Court of Appeal approached the defence of illegality on the basis

D  that

"it required in each case . . . an intense analysis of the particular facts and of the proper application of the various policy considerations underlying the illegality principle so as to produce a just and proportionate response to the illegality", per Etherton LJ [2013] Bus LR 80, para 75.

E

This and the court's ensuing analysis of a number of the factors on which it relied fit uneasily with the clear-cut, if potentially harsh, approach applicable on the basis of *Tinsley v Milligan* [1994] 1 AC 340. Nevertheless, I arrive at the same result as the Court of Appeal, but by different reasoning.

34  I agree with Lord Sumption JSC that this appeal should fail on the simple basis that the manufacture and supply of product in breach of the

F  Canadian patent would, for the reasons he gives, at paras 23–30, not have involved turpitude such as to engage the maxim ex turpi causa actio non oritur.

35  The second and third issues which Lord Sumption JSC identifies, at para 22, do not therefore arise. I note only that the second might on the face of it have arisen, had it not been for the parties' agreement, noted by Lord

G  Sumption JSC, at para 2, that each group should be treated as one entity.

36  In fact, the European patent on which the present proceedings are based was owned by the first appellant, Les Laboratoires Servier, a licence under it being granted to the second appellant, Servier Laboratories Ltd, while the Canadian patent, which would have been infringed by further manufacture but for the English injunction, was owned by another company in the group, ADIR, with a licence under it being granted to Servier Canada

H  Inc.

37  In the Apotex group, as Lord Sumption JSC recounts in para 6, the active ingredient would have been manufactured by Apotex Pharmachem Inc, and then sold at a 30% mark-up to Apotex Inc, which would have made it into tablets, which it would then have sold to Apotex UK Ltd for a price

© 2015 The Incorporated Council of Law Reporting for England and Wales

equivalent to 90% of Apotex UK Ltd's profits on resale in the United    *A*
Kingdom.

38   The English proceedings and the injunction were issued against all
these three Apotex companies, as well as another, Apotex Europe Ltd. The
injunction ordered that:

"the defendants must not dispose of, offer to dispose of, or import in
the United Kingdom their generic perindopril erbumine product . . ."    *B*

on the basis of an undertaking that:

"if the court later finds that this order has caused loss to the
defendants, which shall include Apotex UK Ltd, and decides that the
defendants should be compensated for that loss, the claimants [that is
now, the two appellants] will comply with any order the court shall
make."    *C*

39   In the Canadian proceedings under the Canadian patent, Les
Laboratoires Servier and Servier Laboratories were included as plaintiffs,
but were struck out at trial as having no cause of action. The claim for
infringement of the Canadian patent ultimately succeeded in the names of
only ADIR and Servier Canada Inc against Apotex Inc and Apotex
Pharmachem Inc.    *D*

40   The basis of the agreement that each group should in the present
English proceedings be treated as one entity was not disclosed or explored.
There may well have been some undisclosed legal basis for treating the
individual group members as one entity or as having combined together.
Subject to that, there might, on the face of it, have been an argument that it
was only Apotex Inc and Apotex UK Ltd that would ever have disposed of,    *E*
offered to dispose of, or imported the product into the United Kingdom or
therefore were prevented from so doing by the injunction. Equally, there
might have been an argument that the only companies which could have had
any complaint under the Canadian patent would have been ADIR and
Servier Canada Inc (the latter not party to the English proceedings) and that
any complaint which they could have had would have been in respect of the
product's manufacture in and export from Canada, rather than in respect of    *F*
importation into, or disposition in, England.

41   That might then perhaps have meant that (i) the companies with
potential claims against Les Laboratoires Servier and Servier Laboratories
Ltd under the undertaking were Apotex Inc and Apotex UK Ltd, which
would exclude any claim in respect of Apotex Pharmachem Inc's loss of
profit, while (ii) the only relevant hypothetical cross-claim would have been    *G*
by ADIR against Apotex Pharmachem Inc and Apotex Inc, for loss of the
30% mark-up and the 90% profit that they would have made. The appellants
liable under the undertaking not being the same as the claimants under the
cross-claim, no set-off could then on the face of it have arisen.

42   This is all very tentative, since it was not explored. But it highlights a
certain distance between the subject matter of the undertaking and the
hypothetical cross-claim, which could have had some bearing on the answer    *H*
to the second question, had that arisen.

43   As to the third question, if the separate corporate identities of the
members of each group had been insisted upon, then it seems not beyond all
doubt that some point might have arisen under this question also. As it is,

© 2015 The Incorporated Council of Law Reporting for England and Wales

451

A however, Lord Sumption JSC correctly observes that no question of attribution arises.

44 This is not therefore the case in which to examine the difficult issues of attribution which may arise where a company acts through an agent—whether that be an agent who is only capable of binding the company vicariously or whether the agent may, for some purposes at least, also be equated with the company (e g because he is its alter ego or its sole
B controlling owner) and so be capable of binding it personally. Such issues were discussed in *Stone & Rolls Ltd v Moore Stephens* [2009] AC 1391, but do not require revisiting here.

45 Equally, this is not a case in which any question arises as to the correctness or otherwise of a decision such as that of the Court of Appeal in *Safeway Stores Ltd v Twigger* [2011] Bus LR 1629, which held that a
C company could not recover from directors or employees who had by involving the company in acts contravening the Competition Act 1998 caused it to incur a "personal" liability for penalties imposed under that Act.

**LORD TOULSON JSC**
46 In this appeal Servier is attempting to extend the doctrine of illegality beyond any previously reported decision in circumstances where I see no
D good public policy reason to do so.

47 Apotex's claim arises under a cross-undertaking in damages. The present proceedings were brought in England for alleged infringement of a UK patent. On 7 August 2006 Mann J granted Servier an interlocutory injunction restraining Apotex from importing and selling a chemical compound (generic perindopril erbumine) in the UK, on Servier giving the
E usual cross-undertaking in damages. On 11 July 2007 Servier's claim was dismissed and the injunction was discharged.

48 In parallel Canadian proceedings Apotex was found liable for infringement of Servier's Canadian patent for the same chemical compound. An interlocutory injunction had been refused. Damages in the Canadian proceedings remain to be assessed.

F 49 It is accepted that if the English interlocutory injunction had not been granted, Apotex would have imported and sold in the UK an additional 3·6 million packs of tablets. Apotex recognises that in calculating its damages under the cross-undertaking for loss of profits from the lost UK sales it must offset not only the costs of manufacture but also the amount which it would have had to pay in the Canadian action as damages for manufacturing the tablets in breach of the Canadian patent.

G 50 On an inquiry into damages on a cross-undertaking, as a matter of general principle the court's task is to put the party seeking to enforce the undertaking in the same position as if the injunction had not been granted. In *F Hoffmann-La Roche & Co AG v Secretary of State for Trade and Industry* [1975] AC 295, 361, Lord Diplock said:

H "[The court] retains a discretion not to enforce the undertaking if it considers that the conduct of the defendant in relation to the obtaining or continuing of the injunction or the enforcement of the undertaking makes it inequitable to do so, but if the undertaking is enforced the measure of the damages payable under it is not discretionary. It is assessed on an inquiry . . . at which [the] principles to be applied are fixed and clear. The

© 2015 The Incorporated Council of Law Reporting for England and Wales

A    assessment is made on the same basis as that on which damages for
breach of contract would be assessed if the undertaking had been a
contract between the plaintiff and the defendant that the plaintiff would
not prevent the defendant from doing that which he was restrained from
doing by the terms of the injunction . . ."

B    51    There has been no suggestion in this case that the conduct of Apotex
in relation to the injunction was such as to make it inequitable for the court
to enforce the undertaking. Arnold J did not proceed on that basis, nor has
Servier argued that the court should refuse to enforce the cross-undertaking
on discretionary grounds.

52    The order made by the Court of Appeal [2013] Bus LR 80 accords
with Lord Diplock's method of assessment. As Etherton LJ explained in his
C    judgment, at para 88, its effect is to place Apotex in precisely the position in
which it would have been if there had been no UK interlocutory injunction,
and it does not offend comity with Canada. Apotex will recover whatever
sum may be left after deducting, from the proceeds of the lost sales, both the
costs of the sales and the amount for which it would have had to account to
Servier in the Canadian proceedings by way of damages for patent
D    infringement. The result, Etherton LJ said, would neither be offensive to
comity with Canada nor infringe English public policy.

53    By contrast, the order sought by Servier would potentially place it in
a better position than if it had not obtained the English injunction for which
it gave a cross-undertaking. I use the word potentially, because it remains to
be seen how the Canadian court will calculate damages for the infringement
which led to UK sales by Apotex. It will be a simple matter to apply the same
E    approach to the lost sales as the Canadian court will apply in relation to
actual sales made by Apotex. The result may be that Apotex will be unable
to establish any loss, after deduction of the damages which it would have
had to pay in Canada, but that will depend on the outcome of the Canadian
proceedings.

54    Servier argues that Apotex's claim under the cross-undertaking is
F    barred by the doctrine of illegality. It does not contend that the contracts for
the lost sales would have been unlawful contracts under English law. It does
not suggest, for example, that at the date when the Canadian court found
that there had been a breach of the Canadian patent in the manufacture of
the tablets, UK purchasers of the tablets who had not yet paid for them could
have refused to make payment on the ground that the contracts of sale were
unenforceable by Apotex because of illegality. Servier submits, however,
G    that Apotex's claim under the cross-undertaking for loss of payments which
it would have received under contracts, lawful in themselves, is barred by
illegality because performance of the contracts would have involved or
resulted from breach of the Canadian patent. Etherton LJ said in his
judgment, and his statement has not been challenged, that infringement of a
Canadian patent constitutes a statutory wrong of strict liability under
H    Canadian law.

55    Servier is unable to cite any precedent for saying that a claim for
money otherwise payable under English law offends the doctrine of illegality
if it arises from a contract involving the commission of a strict liability tort
(whether as the object of the contract or in its performance).

© 2015 The Incorporated Council of Law Reporting for England and Wales

A    56   There are very few reported cases in which the doctrine of illegality
has been applied to tort. In *Brown Jenkinson & Co Ltd v Percy Dalton
(London) Ltd* [1957] 2 QB 621, the Court of Appeal held a contract to be
unenforceable which had as its object the commission of the tort of deceit,
but in that case Pearce LJ qualified his judgment by saying, at p 640, that in
none of the cases cited before the court had a plaintiff failed where he was
B   not fraudulently minded. Fraud for the purposes of deceit includes a false
statement made in reckless disregard whether it be true or false, but there is
no precedent for applying the doctrine of illegality to a tort of strict liability.
In this case the protagonists are pharmaceutical companies who were
involved in a bona fide commercial dispute about the validity of certain
patents.
C    57   Servier relies on the often quoted statement of Lord Mansfield CJ in
*Holman v Johnson* 1 Cowp 341, 343 in which he said that "The principle of
public policy is this; ex dolo malo non oritur actio". That statement made in
1775 remains a succinct statement of broad principle, but, as the cases over
the last 240 years demonstrate, it does not provide a simple measuring rod
for determining the boundaries of the principle. The case law is notoriously
untidy. In deciding whether the principle should be applied in circumstances
D   not directly covered by well-established authorities, it is right to proceed
carefully on a case by case basis, considering the policies which underlie the
broad principle. This has been said in the past by judges at the highest level.
     58   In *Vita Food Products Inc v Unus Shipping Co Ltd* [1939] AC 277,
293, Lord Wright said:

     "Each case has to be considered on its merits. Nor must it be forgotten
E    that the rule by which contracts not expressly forbidden by statute or
     declared to be void are in proper cases nullified for disobedience to a
     statute is a rule of public policy only, and public policy understood in a
     wider sense may at times be better served by refusing to nullify a bargain
     save on serious and sufficient grounds."

     59   In *Gray v Thames Trains Ltd* [2009] AC 1339, 1370, para 30, Lord
F   Hoffmann said:

     "The maxim ex turpi causa expresses not so much a principle as a
     policy. Furthermore, that policy is not based on a single justification but
     on a group of reasons, which vary in different situations."

     60   This observation was endorsed by Lord Phillips in *Stone & Rolls Ltd
v Moore Stephens* [2009] AC 1391, para 25, where he said that it is
G   necessary to give consideration to the policy underlying ex turpi causa in
order to decide whether the defence was bound to defeat a claim.
     61   In *Hounga v Allen (Anti-Slavery International intervening)* [2014]
1 WLR 2889, Lord Wilson JSC said in the judgment of the majority, at
para 42:

     "The defence of illegality rests on the foundation of public policy. 'The
H    principle of public policy is this . . .' said Lord Mansfield by way of
     preface to his classic exposition of the defence in *Holman v Johnson*
     (1775) 1 Cowp 341, 343. 'Rules which rest on the foundation of public
     policy, not being rules which belong to the fixed or customary law, are
     capable, on proper occasion, of expansion or modification': *Maxim*

© 2015 The Incorporated Council of Law Reporting for England and Wales

454
Les Laboratoires Servier v Apotex Inc (SC(E))                    [2015] AC
Lord Toulson JSC

*Nordenfelt Guns and Ammunition Co Nordenfelt* [1893] 1 Ch 630, 661    A
(Bowen LJ). So it is necessary, first, to ask 'What is the aspect of public
policy which founds the defence?'   and, second, to ask 'But is there
another aspect of public policy to which application of the defence would
run counter?'"

62    I would therefore make no criticism of the Court of Appeal for
considering whether public policy considerations merited applying the    B
doctrine of illegality to the facts of the present case. In so doing it adopted a
similar approach to that of the majority of this court in *Hounga v Allen*.

63    Cross-undertakings are a standard and valuable feature of litigation,
particularly but not only in commercial litigation. There is a public interest
in their enforceability in bona fide disputes. It saves the court from having to
make a more detailed—and therefore time consuming and expensive—
assessment of the merits at an interlocutory stage than might otherwise be    C
necessary, since the cross-undertaking is designed to protect the defendant
against the applicant gaining a financial advantage from obtaining an
injunction which is later set aside on the claim failing. I cannot see a good
public policy reason why Servier should be put in a better position than if the
English injunction had not been granted, or why Apotex should be required
to give greater credit to Servier on account of its breach of the Canadian    D
patent than the amount assessed by the Canadian court as properly reflecting
that breach.

64    There may come a case where it is necessary for this court to carry
out a detailed re-analysis of *Tinsley v Milligan* [1994] 1 AC 340, in the light
of subsequent authorities and the consultative and final reports of the Law
Commission (Consultation Paper No 189 and Law Com No 320), in which
the case has not for the first time been criticised; but nobody invited such a    E
reconsideration in this case. The argument in this case was about whether
the doctrine of illegality extends to the present case. I am satisfied that there
is no good reason why it does or should do so, and I agree that the appeal
should be dismissed.

*Appeal dismissed with costs.*    F

Shiranikha Herbert, Barrister

G

H

© 2015 The Incorporated Council of Law Reporting for England and Wales

TAB 34

*Lewis v Doran* [2004] NSWSC 608,
New South Wales Supreme Court

# NEW SOUTH WALES SUPREME COURT

CITATION:    Lewis & Anor v. Doran & Ors [2004]  NSWSC 608

CURRENT JURISDICTION:        Equity Division

FILE NUMBER(S):   4406/00

HEARING DATE{S):        8 to 12 March,  2004

JUDGMENT DATE:        09/07/2004

PARTIES:
Alan Edward Lewis - First Plaintiff
Doran Constructions Pty Ltd (In liq) - Second Plaintiff
Paul Adrian Doran - First Defendant
Peter Joseph Doran - Second Defendant
Michael Leo Doran - Third Defendant
John Cerriti Doran - Fourth Defendant
Doran Holdings Pty Ltd - Fifth Defendant
Doran Constructions  (Australia) Pty Ltd (In liq) - Sixth Defendant

JUDGMENT OF:    Palmer J

LOWER COURT JURISDICTION:        Not Applicable

LOWER COURT FILE NUMBER(S):        Not Applicable

LOWER COURT JUDICIAL OFFICER:    Not Applicable

COUNSEL:
S.R. Donaldson SC, P.S. Braham - Plaintiffs
A.S. Martin SC, S. Wells - 1st to 5th Defendants
P. Parker (Sol) - 6th Defendant - Submitting appearance

SOLICITORS:
Purcell Insolvency  Lawyers  - Plaintiffs
Christopher C. Freeman & Co - 1st to 5th Defendants
Kemp Strang - 6th Defendant - Submitting appearance

CATCHWORDS:
CORPORATIONS  - WINDING  UP - INSOLVENCY - Whether s.95A Corporations
Act has changed the law as established by Sandell v Porter - whether  a company
must show ability to pay all debts "from its own monies" - whether  availability of
unsecured borrowings may be taken into account - authorities and principles
discussed - UNCOMMERCIAL  TRANSACTION  - Whether company in group may
reasonably act for benefit of another company in group.

ACTS CITED:
- Bankruptcy Act 1914 UK - s.44(1)
- Bankruptcy Act 1925 (Cth) - s.95(1)
- Bankruptcy Act 1966 (Cth) - s.122
- Companies Act 1929 (UK) - s.265
- Companies Act 1936 (NSW) - s.208
- Companies Act 1961 (NSW) - s.222, s.293
- Companies Code 1981 (NSW) - s.451
- Corporations Act 2001 (Cth) - s.95A, s.232, s.597(14), s.588FA, s.588FB, s.588FC, s.588M, s.588FE, s.588FF, s.598, s.1317HB, s.1318
- Corporations Law - s.497, s.592
- Supreme Court Rules 1970 (NSW) - Pt 72

DECISION:
Liquidator's Amended Originating Process dismissed.


JUDGMENT:

**Introduction**

1       On 24 December 1997 the First Plaintiff ("the Liquidator") was appointed liquidator of the Second Plaintiff ("Constructions") by a resolution of creditors under s.497 *Corporations Law* (now the *Corporations Act 2001* (Cth) ("*CA*")).

2       Constructions, which carried on business as a builder, was a member of a group of companies ("the Doran Group") of which the First to Fourth Defendants were the directors ("the Directors"). Constructions was a wholly owned subsidiary of the Sixth Defendant ("DCA") and DCA was, in turn a wholly owned subsidiary of the Fifth Defendant ("Holdings").

3       These proceedings arise out of a restructuring of debt within the Doran Group on 1 November 1994. By a series of resolutions passed on that day by the Directors as directors of Holdings, Constructions and DCA, Holdings agreed to repay to Constructions a loan of $4.1M, Constructions agreed to lend $4.1M to DCA, and DCA agreed to pay $4.1M to Holdings in part repayment of its then indebtedness to Holdings.

4       The Liquidator asserts that immediately prior to the passing of these resolutions Holdings was a company with substantial assets and had the capacity to repay its debt of $4.1M to Constructions, whereas DCA had no substantial assets and did not have the capacity to repay the debt to Constructions which it incurred by virtue of the resolutions. The Liquidator claims that the effect of the resolutions on Constructions was to substitute for a realisable asset, namely a debt owing by Holdings, an unrealisable asset, namely a debt owing by DCA.

5       By an Amended Originating Process, amplified by Amended Points of Claim, the Liquidator alleges that Constructions was insolvent on 1 November 1994 when the resolutions effecting the debt restructure ("the Restructure") were passed. Alternatively, he alleges that Constructions became insolvent as a result of the Restructure.

6       The Liquidator claims that:

Retrieved from AustLII on 07 January 2017 at 02:23:09

Verify version

Signed by AustLII

– in consenting to or permitting the Restructure, each of the Directors breached his fiduciary and statutory duty to Constructions to act bona fide in its interests, to exercise reasonable skill, care and diligence in the performance of his duties, and to take into account the interests of its creditors;

– Holdings, through the Directors, knowingly assisted the breaches of fiduciary duty by the Directors and was involved in their breach of s.232 *CA*;

– the Restructure was an uncommercial transaction under s.588FA *CA* that is voidable under s.588FE(4) *CA*.

7        By deed dated 18 July 1995, Constructions gave a charge over its assets to secure its indebtedness to Holdings ("the Charge"). The Liquidator alleges that as at the date of the Charge Constructions was insolvent and that the Charge is an unfair preference under s.588FA and is voidable under s.588FE(4).

8        The Liquidator claims:

– damages against the Directors and Holdings both under the general law and under s.232 and s.1317HB *CA*;

– a declaration that the resolution passed by the Directors as directors of Constructions on 1 November 1994 effecting the Restructure is a voidable transaction under s.588FE *CA*;

– an order under s.588FF(1) or s.598 *CA* that the Directors and Holdings pay $4.1M to the Liquidator;

– an order under s.588FF(1)(e) releasing or discharging the Charge.

9        The Directors and Holdings deny that:

– as at 1 November 1994 Constructions was insolvent or that it became insolvent by reason of the Restructure;

– as at 18 July 1995 Constructions was insolvent;

– the Directors had any reasonable ground to suspect as at 1 November 1994 or 18 July 1995 that Constructions was, or was about to become, insolvent;

– the Directors breached any duty to Constructions, whether under the general law or under statute.

10       If the Directors are found to have acted in breach of their duties, they seek to be excused under s.1318 *CA*.

11       Although DCA has been joined as a defendant, no relief has been sought against it and it has filed a submitting appearance.


**Background**

12       The Doran family has had long history in the building and construction industry in and around the Newcastle area. The Directors' father was a builder and commenced the family

Retrieved from AustLII on 07 January 2017 at 02:23:09
Verify version

Signed by AustLII

business some time prior to 1950.  All of the Directors left school before their final year and began working as apprentices in their father's business. From their evidence in the witness box, it is very apparent that all Directors took a personal pride in the success of the Doran group of businesses and were jealous of its reputation.

13        Constructions was incorporated on 18 February 1977 to take over the family construction business. At that time the Directors were all appointed as directors of Constructions, its immediate parent, DCA, its ultimate parent, Holdings, and of some fourteen other companies in the Doran Group.  The activities of the companies in the Group were varied:  building and construction, property development, plant and machinery hire, operating a real estate agency, a tavern, two large shopping centres, two private hospitals and a medical centre.  By June 1991, Constructions had an annual turnover of some $50M.

14        The managing director of Constructions and of the Doran Group was the First Defendant, Paul Doran.  For convenient reference, and without intending disrespect, I will refer hereafter to each of the Directors by his first name.

15        Paul was born in 1942.  Although the youngest of the Directors, he is clearly the most experienced in business, management, finance and accounting.  He oversaw all of the business activities of the Group and is a highly intelligent, articulate and capable businessman.  In 1982 and 1983 he was President of the Newcastle Master Builders Association, and in 1998 and 1999 he was the National President of the Master Builders Association of Australia.

16        Peter was born in 1935.  He has less experience in accounting and management than Paul and was primarily responsible for the property development activities of the Group.

17        John was born in 1928.  He was a carpenter by trade, but in the latter years before his retirement he was engaged in the plant hire activities of the Group.  He had no involvement in management of the Group's business.

18        Michael was born in 1923.  He was principally involved in day-to-day construction and supervision on building sites and he had no participation in management in the Group's business.

19        Until 1989, Paul was responsible for supervising a small number of accounting staff employed by the Group, who prepared the primary accounting records.  From 1989 the Doran Group employed Mr Bradley S. Joyce, a qualified accountant, as the Group Financial Controller. In about 1994, Mr Joyce became Group General Manager.

20        From the time of its incorporation until its liquidation in December 1997, Constructions had engaged Price Waterhouse as its external accountants and auditors.  A partner of Price Waterhouse, Mr Linz, was the responsible audit partner.  Price Waterhouse prepared the company's annual accounts and documents for the Annual General Meetings and provided accounting advice as required.

21        Between about February 1989 and July 1992, the Doran Group sought advice from Ernst & Young and a firm of solicitors concerning the rationalising and restructuring of the Group.  It seems that one of the purposes of the restructuring was the saving of tax and another was to separate the property holding activities of the Group from the construction activities. Accordingly, DCA was to be the parent company of those companies in the Group carrying out building, construction and associated activities, and Holdings was to be the parent of the property owning companies.  As part of the restructuring, in July 1992 Holdings lent DCA $3,156,662 to enable DCA to purchase from Holdings all of the share capital in Constructions, and $1,655,069

Verify version

to enable it to purchase from Holdings the share capital of another company in the Group, Doran Property Services. This indebtedness of DCA to Holdings was the subject of the Restructure.

**The meetings of 1 November 1994**

22        At a meeting of the Directors, as directors of Constructions, on 28 October 1994, Mr Linz presented them with the audited accounts of Constructions for the year ended 30 June 1994. The accounts recorded Constructions as having an excess of current assets over current liabilities in an amount of $2,812,707. The accounts were approved by the Directors. On the same day the Directors, representing their family companies as shareholders, attended an Annual General Meeting of Constructions at which they adopted the accounts.

23        On 1 November 1994, the Directors attended directors' meetings of Holdings and Constructions. Also present were Mr Joyce, Mr C. Freeman, the Doran Group solicitor, and Mr Linz. The Directors assert that they have almost no actual recollection of what was discussed at the meetings, why the meetings were called, and what was the particular purpose which the Restructure was intended to achieve.

24        Evidence as to the purpose of the meetings was given by Mr Linz in a public examination conducted by the Liquidator in March 1999. The transcript of that examination has been tendered by the Liquidator, without objection. Mr Linz has not been called to give evidence in the proceedings but the tender of his evidence in the examination reveals clearly enough what he would have said. Mr Freeman, in an affidavit dated 28 November 2003, has also given evidence of what transpired at the meetings. Mr Freeman was not cross examined on this evidence. I will return to the evidence of Messrs Linz and Freeman shortly.

25        Mr Joyce also gave evidence and confirmed that he attended the meeting. He insisted that he had virtually no recollection of the meeting or the circumstances in which the Restructure was effected. His recollection was that it was part of the "tidying up" of the balance sheets of the Doran Group.

26        I should say at this point that I do not regard the evidence of the Directors and of Mr Joyce to the effect that they have almost no actual recollection of the Restructure and its purpose as reflecting adversely on their credit. I do not regard it as implausible or improbable that these witnesses have very little recollection of a single event which occurred almost ten years ago amongst all the other activities of an obviously large, complex and active group of companies, which involved a purely internal accounting transaction with the advice of their auditor, Mr Linz, and their solicitor, Mr Freeman, at a time when Constructions and the Doran Group generally were not facing an obvious financial crisis which the Restructure was designed to alleviate.

27        Further, in stating absence of recollection during cross examination, none of the Directors or Mr Joyce gave me the impression that he was intending to prevaricate or evade answering awkward questions. Accordingly, I accept that the Directors and Mr Joyce generally have no, or very little, recollection of the particular circumstances in which the Restructure came about.

28        There are two Minutes of directors' meetings for Holdings and one for Constructions, all dated 1 November 1994 and signed by Paul as Chairman. Clearly enough, the Minutes were prepared to show events occurring in an appropriate chronological sequence although there was probably only one discussion amongst the Directors. It is as well to follow the same sequence here.

29        The first Minute for Holdings relevantly records the following:

> "*BUSINESS*
>
> *The meeting was called to discuss the payment of the money due by Doran Constructions Australia Pty Limited to this Company being the money lent to Doran Constructions Australia Pty Limited to enable it to purchase shares in Doran Constructions Pty Limited and Doran Property Services Pty Limited. It was noted during the course of discussions that there existed no arrangements for repayment and that the loan was repayable on demand. The Balance Sheet of the Company needed to be tidied up to give a better view of the assets and liabilities of the Company to Financiers and inter group and intra group loans needed to be rationalised to limit any problems which may arise from the charging or payment of interest on those loans.*
>
> *RESOLVED*
>
> *The Company shall demand the repayment by Doran Constructions Australia Pty Limited of the sum of $4,592,145.62.*"

30    The Minute for Constructions relevantly records:

> "*BUSINESS*
>
> *The Company has received a request from Doran Constructions Australia Pty Limited, the holder of all of the issued shares in this Company, for a loan of $4,100,000.00 for a minimum term of six (6) years (with the right for early repayment without penalty) at such interest rate or rates as may from time to time be agreed upon by and between this Company and Doran Constructions Australia Pty Limited. The purpose of the loan was to enable Doran Constructions Australia Pty Limited to discharge part of the amount lent by Doran Holdings Pty Limited to Doran Constructions Australia Pty Limited. Doran Holdings Pty Limited required the payment to enable it to rationalise inter group and intra group lending and avoid any problems which might arise in the payment of interest. Doran Constructions Australia Pty Limited also requested a loan from this Company for the same purpose. This Company from time to time advanced moneys to Doran Holdings Pty Limited while Doran Holdings Pty Limited was the holder of the shares issued in this Company and the amount of that loan stood in excess of $4,100,000.00. The Board agreed that it would be in the interests of this Company to rationalise inter group and intra group loans and understood the commercial benefit to all parties to commence with a fixed term. The Board also thought that the loan should be used only for the purpose of rationalisation of loans and made this a condition of the giving of a loan.*
>
> *RESOLVED*
>
> *1. To demand repayment by Doran Holdings Pty Limited of the sum of $4,100,000.00 forthwith; and*
> *2. to loan the sum of $4,100,000.00 received from Doran Holdings Pty Limited to Doran Constructions Australia Pty Limited. Such sum to be used solely for the purpose of repaying an amount of $4,100,000.00 to Doran Holdings Pty Limited. The minimum term of the loan is to be six (6) years and the interest rate payable by Doran Constructions Australia Pty Limited will be that rate that shall from time to time be agreed upon by and between this Company and Doran Constructions Australia Pty Limited.*"

31    The second Minute for Holdings relevantly records:

"*BUSINESS*

*The meting was called to:*

*1. Discuss the request for payment of $4,100,000.00 by Doran Constructions Pty Limited being part of the loan moneys due to Doran Constructions Pty Limited. The Board noted that Doran Constructions Pty Limited stipulated that this money was to be utilised solely for the purpose of a loan to Doran Constructions Australia Pty Limited to enable Doran Constructions Australia Pty Limited to repay the amount due to this Company.*

2. *Discuss the request for payment of $492,145.62 by Doran Property Services Pty Limited being part of the loan moneys due to Doran Property Services Pty Limited. The Board noted that Doran Property Services Pty Limited stipulated that this money was to be utilised solely for the purpose of a loan to Doran Constructions Australia Pty Limited to enable Doran Constructions Australia Pty Limited to repay the amount due to this Company.*

3. *The Board was prepared to accept that this was the purpose of the repayments and that this was in the interests of this Company as it was part of the rationalisation of the inter group and intra group loans which was suggested should take place by the Group's Accountants at the Annual General Meeting of this Company.*

*RESOLVED*

1. *To repay to Doran Constructions Pty Limited the sum of $4,100,000.00.*

2. *To acknowledge the purpose of the repayment and to agree with both Doran Constructions Pty Limited and Doran Constructions Australia Pty Limited that the method of payment be by way of Journal Entry in the books of the Company and that accordingly the loan account of the Company to Doran Constructions Australia Pty Limited be reduced by $4,100,000.00 and by Doran Constructions Pty Limited be reduced by the same amount.*

3. *To repay to Doran Property Services Pty Limited the sum of $492,152.62.*

4. *To acknowledge the purpose of the repayment and to agree with both Doran Property Services Pty Limited and Doran Constructions Australia Pty Limited that the method of payment be by way of Journal Entry in the books of the Company and that accordingly the loan account of the Company to Doran Constructions Australia Pty Limited be reduced by $492,152.62 and by Doran Property Services Pty Limited be reduced by the same amount.*"

32      In accordance with the last resolution, journal entries effecting the Restructure were posted on 3 September 1995. There is no explanation in the evidence for the delay. It should be noted, however, that the Liquidator does not contest that the resolutions effecting the Restructure were actually passed on 1 November 1994.

Signed by AustLII

**The purpose of the Restructure**

33        The Liquidator contends that the Restructure was effected by the Directors with an actual improper purpose, so that they have thereby breached their fiduciary and statutory duties to Constructions. The Liquidator says that the Restructure was carried out at a time when the Directors knew that Constructions was facing large claims against it by a company called Beresfield Aluminium and by the University of Newcastle. The object of the Restructure, the Liquidator says, was nothing to do with the interests of Constructions itself but was, rather, to protect Holdings, a company of substance, from the consequences if these claims against Constructions were successful. If this purpose were established as the real purpose of the Restructure, it could be said that the Directors, as directors of Constructions, were acting with an ulterior purpose and were therefore in breach of their fiduciary and statutory duties to Constructions.

34        The Directors strongly deny that they had the purpose alleged by the Liquidator. The Liquidator concedes that there is no direct evidence in support of his allegation of improper purpose but he says that such a purpose should be inferred from the following circumstances:

–        the currency of litigation between Beresfield, Newcastle University and Constructions as at the date of the Directors' meetings;

–        the fact that the Restructure had the effect of reducing Holdings' exposure to an unsuccessful outcome of those proceedings;

–        the absence of any coherent or meaningful explanation by the Directors of any other purpose for the Restructure which might have been achieved;

–        the fact that the transaction had no benefit to Constructions because a realisable asset, namely the loan to Holdings, was replaced by an unrealisable asset, namely the loan to DCA;

–        the Directors' failure to call Mr Linz, upon whose advice the Restructure was allegedly entered;

–        the admission by Mr Linz in his examination that the purpose of the Restructure conveyed to him by Mr Joyce was related in some way to Constructions' foreshadowed court proceedings against the University and the need to *"make sure that everything was tidy in the companies"*, coupled with Mr Joyce's enquiry about *"voidable transactions"*.

**The claim by Beresfield Aluminium**

35        The directors deny that the Restructure was effected for any purpose related to the proceedings between Constructions and Beresfield. They point to the following uncontroverted facts.

36        Constructions maintained that it had a claim against Beresfield arising out of the construction of the Gosford Hospital which Constructions quantified in February 1993 at $532,551. On 4 June 1993, Beresfield asserted that it had a claim against Constructions for $401,492.

37        On 26 July 1993 the Project Architect determined that Beresfield's claim against Constructions was *"unsubstantiated"* except for minor adjustments. On 10 November 1993 the Project Superintendent rejected Beresfield's claim against Constructions except for the sum of

Retrieved from AustLII on 07 January 2017 at 02:23:09
Verify version

$53,779.   On 17 February 1994, the New South Wales Department of Health, as Principal, rejected Beresfield's claim.

38        On 18 October 1994, Beresfield amended its claim against Constructions to $449,100.

39        Beresfield's claim against Constructions was finally determined by arbitration in 1998, after Constructions was placed in liquidation.

40        Constructions' balance sheet as at 30 June 1994 did not recognise Beresfield's claim against Constructions as a debt or even as a contingent liability, nor did it recognise Constructions' claim against Beresfield as an asset. The Liquidator's accounting expert, Mr S.D. Pascoe, conceded that, on the facts recounted above, Constructions' accounts were correct in this regard.

41        These circumstances suggest that as at 1 November 1994 Beresfield's claim could reasonably have been regarded as unlikely to succeed and, in any event, would have appeared remote from resolution. The amount involved would not have seemed formidable in the context of Constructions' operations, quite apart from the fact that Constructions' claim against Beresfield exceeded Beresfield's claim against Constructions.

42        I am not satisfied that an inference should be drawn that Beresfield's claim against Constructions was regarded by the Directors as at 1 November 1994 as a present and substantial financial threat either to Holding or to Constructions. I am not satisfied that Beresfield's claim played any part in the Directors' reasons for the Restructure.


**Claim by the University**

43        Likewise, the Directors deny that the Restructure was effected to protect Holdings from a demand for repayment if a liquidator was appointed to Constructions as a result of the University's claim against Constructions being successful. They point to the following uncontroverted facts.

44        By 7 October 1993, Constructions had commenced arbitration proceedings against the University claiming $354,961 for variations and extras.  On 12 October 1993 the University filed a counter claim for alleged defective work.  By early July 1994, the University had provided an *"indicative cost estimate"* of $2.583M for rectification work.

45        On 7 July 1994 the hearing of the arbitration proceedings was vacated and adjourned to a date to be fixed.  In early December 1994, Constructions commenced proceedings in the Supreme Court of New South Wales against the University seeking damages in the sum of $4.375M.

46        It was not until 22 October 1996 that the University filed a Cross Claim in those proceedings seeking damages of $1,971,000.   A letter from Constructions' solicitors to Constructions dated 9 August 1996 gives some idea of the complexity of the proceedings and suggests that there had been previous indications that the University would not pursue its defects claim against Constructions.

47        On 26 March 1997, the Supreme Court ordered that the proceedings between Constructions and the University, together with related proceedings, be referred to a Reference under Pt 72 of the *Supreme Court Rules 1970* (NSW).  After Constructions was placed in liquidation on 27 December 1997, the Liquidator advised the Court that he would withdraw from

Retrieved from AustLII on 07 January 2017 at 02:23:09

Verify version

the proceedings, relevantly leaving only the University's Cross Claim against Constructions for determination. Accordingly, the Court formally dismissed Constructions' claim against the University.

48        On 13 May 1997, the Referee delivered a report of 151 pages in which he found that the University had established its Cross Claim against Constructions in the sum of $1,772,038. The Referee noted that no evidence had been filed by Constructions.

49        The Liquidator's expert, Mr Pascoe, conceded in cross examination that as at 1 November 1994 there was no quantifiable debt owed by Constructions to the University and that a balance sheet of Constructions as at that date would not be required to show such a debt.

**Mr Freeman's evidence as to the purpose of the Restructure**

50        Mr Freeman gave the following unchallenged evidence as to what transpired on 1 November 1994:

> *"During the Meetings there was a general discussion at which either Mr Paul Doran or Mr Bradley Joyce said words to the following effect:*
>> 'Doran Holdings is under pressure from bankers to regularise the loan accounts within the Doran Group.'
>
> *Mr Bradley Joyce set out details of the balances of the loan accounts on a white board. Mr Joyce then said words to the following effect:*
>> 'Doran Holdings and the rest of the property group should become liable for its own transactions and the construction group liable for its own transactions and that the loan accounts should be adjusted to reflect this principle.'
>
> *Mr Joyce then wrote on the white board the result that was to be achieved.*
>
> *Mr Peter Doran, I believe it was, who outlined the reasons for the banks' concern, said words to the following effect:*
>> 'The banks find the combined accounts of the property group [DH and its subsidiaries] and the construction group [DCA and its subsidiaries, which included DC] are too complex.'
>
> *He then said words to the effect:*
>> 'The banks want to see 2 separate groups – the property group and the construction group – so that when processing a loan for one group, they only need concern themselves with that group's accounts.'
>
> *He further said words to the effect:*
>> 'One of the things that must be done to satisfy the banks is to remove the cross collateralisation of the loan accounts between the 2 groups, so that each group will stand alone. What is being considered today will continue the process of separating the 2 groups.'
>
> *Mr Paul Doran or Mr Bradley Joyce said words to the following effect:*
>> 'If this result is to be achieved what are to be carried out what are the legal ramifications?'
>
> *I then said to Mr Martin Linz words to the following effect:*

'If this result is to be achieved what would that lead to any company being insolvent or subsequently becoming insolvent?'

*Mr Martin Linz said words to the following effect:*

'The companies have each just held their annual general meetings and there is no possibility of any insolvency arising.'

*Mr Martin Linz said to me words to the following effect in response to a question from me that I cannot now recall:*

'Movements in the loan accounts within the group are not uncommon, even in these amounts. They happen regularly, there is nothing unusual in the proposed movement of the loan accounts.'

*I then said to the directors of DH, DC and DCA words to the following effect:*

'Before moving the loan accounts you, as directors, must look at each company individually and ensure that the transactions do not lead to any one of the companies being insolvent or subsequently becoming insolvent. As directors of each company you have an obligation to each company, its shareholders and creditors to ensure that each company, as a result of the transaction, remains solvent.'

*Later during the meeting Mr Bradley Joyce said to me words to the following effect:*

'How would you suggest that the transactions be structured?'

*I replied with words to the following effect:*

'I would suggest that Holdings make a demand on Constructions Australia for the repayment of the $4,100,000 due by Constructions Australia to Holdings. Constructions Australia would then ask Constructions for a loan of $4,100,000.00 to enable Constructions Australia to repay Holdings. I would suggest that you give Constructions Australia some time to repay the loan to Constructions, say 5 to 6 years. This should ensure that DCA can repay the loan out of profit. Constructions would then make a demand on Holdings for the repayment of part of the moneys, amounting to $4,100,000.00, due by Holdings to Constructions to enable Constructions to loan such moneys to Constructions Australia so that Constructions Australia could repay Holdings. Holdings would repay the loan to Constructions on condition that Constructions lent such money to Constructions Australia for the purpose of Constructions Australia making the repayment to Holdings.'

*Mr Joyce then wrote the transactions on the white board for the directors to see."*

**Mr Linz's evidence as to purpose of Restructure**

51      In his public examination by the Liquidator Mr Linz gave evidence as to what transpired at the Directors' meetings on 1 November 1994.  As I have said, the transcript of his evidence was tendered by the Liquidator.  The Directors did not object to its tender, as they might have done, because it was not made admissible under s.597(14)  *CA*.  The Directors did not seek to have Mr Linz called for cross examination.  In these circumstances, I take both sides to accept Mr Linz's evidence.

52      Relevantly, Mr Linz's evidence was as follows:

Signed by AustLII

*"And what was the specific matter you were asked to give advice on?*
*Transaction in general, but in particular under what circumstances*
*would it be considered inappropriate.*

*Would what be considered inappropriate?*
*The ... a transaction between a forgiveness or a round robin of those*
*loan accounts between the companies, repayment of loans.*

*What did Mr Joyce say to you as best you can recall that you were*
*asked to then give advice about?*
*Um, he was continuing with the rationalisation of the group which*
*had been going on for a number of years. He wanted to tidy up loan*
*accounts. Continued to tidy up loan accounts between the entities. He*
*was ... the company was about to take action against the University*
*and he wanted to make sure that everything was tidy within the*
*companies and he wanted to know under what circumstances – or*
*just to ensure that those transactions, that the repayment of loans –*
*in what circumstances they would be seen to be voidable. He didn't*
*actually ask that but that's what he meant.*

*...*

*Yes, and no doubt you would have been concerned to ensure that the*
*advice you gave was correct advice?*
*Well, the advice I – well what I gave Brad was a copy of certain*
*copies of the Corporations Law in terms of voidable transactions and*
*gave him a brief explanation of that, but also noting that I am not a*
*lawyer, nor was I an insolvency expert, so really I could – my advice*
*went no further than that."*

53      On the following day, Mr Linz was questioned more closely by examining counsel. It
is, unfortunately, necessary to reproduce the transcript at some length because Counsel sought on
occasion to put words in Mr Linz's mouth which he seemed to accept. Yet by the end of his
evidence he succeeded, somewhat inarticulately, in making his position clear enough.

*"Now, in relation to the meeting on 1 November 1994 or at about that*
*time, you gave evidence yesterday that you could recall Mr Joyce*
*outlining the proposed round robin, correct? ∼ Yes.*

*And you said that he had referred to a desire to tidy up loan accounts?*
*∼ Yes.*

*What did he say about that? ∼ I can't remember much more than that.*

*The fact that he wanted to tidy up loan accounts? ∼ Yes.*

*You said that he said the company was about to take action against the*
*University? ∼ Yes.*

*What did he say about that? ∼ Um – he said that he wanted the –*
*wanted the group in a secure position before he – before they embarked*
*upon action against the University.*

*Did he explain anything more about that? ∼ Um – No, I can't*
*remember exactly what was said at that time.*

Verify version

*Was he talking about the Holdings Group being secure? ⁓ I would have thought so. But I – I can't remember that being discussed at the meeting, but that would make sense.*

*Do you recall whether he was explaining that before the proceedings were commenced against the University, he wanted to try and ensure that there was a separation between the Holdings Company and the Construction group of companies? ⁓ That – that would have largely happened as a result of the transactions discussed.*

*Yes. What I am asking you though is whether he said that that was what he wanted to achieve before the proceedings were commenced against the University? ⁓ I- um- generally. I can – I can't remember exactly, but that was part of – part of what I can remember as discussions.*

*And part of the considerations then was the fact that the claim was going to* [be] *made against the University and there was a desire to make Doran Holdings more secure in its position, having regard to that future claim? ⁓ Yes.*

*And more secure by being separated from the Construction companies, correct? ⁓ Well, that is correct. I can't remember it word for word what was actually discussed at the meeting I've had with Brad.*

*And in particular the reason for wanting some security or separation was the possibility of the counter claim being made by the University against Doran Constructions, correct? ⁓ Um – it was specifically put like that, I don't think.*

*Of course, you knew that there was anticipated to be a very significant counter claim by the University, didn't you? ⁓ Um – I – I can't remember what the situation was with the University at that time.*

*Do you remember yesterday we looked at the audit papers where that was referred to and the possibility of a $2.6 million dollar claim by the University ⁓ ? ⁓ Yes, I can.*

*⁓ against the company? ⁓ I can remember that being discussed yesterday from the audit file, yes.*

*And so at the time when this meeting took place, you were aware of that possibility of a very significant claim being made by the University against the Company? ⁓ Um – I can remember that claim from you taking me through the file yesterday. I can't remember whether I was aware of it at that meeting.*

*Well, certainly at the meeting, it would have been apparent to you that the only reason to talk about securing Holdings, having regard to this claim being made, was in the event that the claim went against Constructions? ⁓ Um – I don't know that it was that definitive. I think it was more explained that there was obviously a risk attached to any litigation, that it could go either way.*

*Then, in particular in relation to this litigation, was it not mentioned the fact that there was a potentially very large claim to be made by the University against Constructions? ⁓ Well – the – the audit files indicate that. I can't remember it from those discussions.*

Retrieved from AustLII on 07 January 2017 at 02:23:09                    Verify version

*Well, let me put it another way, when you were at this meeting and Mr Joyce refers to the university claim and the wanting to secure Holdings and separate it from Constructions what did you think he was talking about?* ~~ *Yes, I – I thought he was trying to – well, with the benefit of all the knowledge of going through and looking at the files and that now but not – not remembering what I was thinking about at that time he would have been wanting to secure the Holding Group. I can remember Paul Doran, in particular, thinking and telling his fellow directors that he thought that the university would be a positive result for them. So that was in my mind as well but, nevertheless, as I said, any litigation there was a risk attached to it and therefore you need to taken what defences you have to.*

*And the need to take these defences in contemplation of the risk was something that was discussed at the meeting you attended, is that right?* ~~ *It would have – yes.*

*What was the protection that was discussed, lest there was a negative result in the litigation at the university?* ~~ *It would have been the rationalisation of – continued rationalisation of this Group and separation of Constructions from Holdings.*
...
*You went to the meeting in your professional capacity to advise specifically on the topic of whether or not the transaction could be set aside at some later stage as being voidable?* ~~ *I knew it was one of the issues to be discussed.*
...
*And you've said that when you went to the meeting Mr Freeman spoke before you on the topic of the need for the Directors to satisfy themselves about the reasonableness of the transactions, correct?* ~~ *I can remember – yes, I – I can remember Mr Freeman discussing that with the brothers.*

*Do you recall hearing any discussion amongst the Directors about the reasonableness of the transactions?* ~~ *I can remember it being discussed, so the other brothers would have been involved. I can't remember whether all of them were or just one, I'm not sure.*

*What can you recall being said by the Directors?* ~~ *I remember the commerciality of the transaction being discussed.*

*What can you recall being said?* ~~ *I can only – I can remember discussions about the rationalisation carried out by – well, I'm not sure whether it was actually – Ernst and Young were actually referred to but I can remember discussions about previous rationalisations. This is very difficult because I've seen the minutes and I know what they say but you're asking me what I can remember of the meeting that I attended.*

*Of the Directors. That's right; of the Directors discussing you said the commerciality of the transactions?* ~~ *Yes.*

*What can you recall them saying?* ~~ *I – I can't remember precisely or even half precisely. I can remember a – a feeling or I have vague memory of – that they had carried out these kind of transactions previously. I can remember them saying that all their creditors were paid – being paid, have always been paid. I can remember – well, I can remember, again, the potential for a positive result from the university*

Retrieved from AustLII on 07 January 2017 at 02:23:09

Verify version

Signed by AustLII

*but I – I can't remember whether that was discussed at that meeting I
attended or whether it was just discussed at that time generally.*

*You can recall being discussed at this meeting the possibility of a
negative result from the university claim, can't you? ⁓ I can remember
– well, I can – I can remember the awareness that there was some risk
attached to the litigation that they were about to embark upon.*

*Indeed, the whole conversations about these transactions was
predicated, was it not, on the basis of a desire to separate Holdings from
Constructions because of this claim? ⁓ Yes.*

*In that context? ⁓ And as part of the general rationalisation of the
Group as well. If you like, I think this claim was – it presented some
urgency to it, to something which had been carried on in the past as
well.*

*Sorry, I didn't understand what you said. The claim had some urgency
attaching to it? ⁓ No, I think ...*

*Could you explain your last answer? ⁓ I mean what they were
discussion is – is something that had been discussed at these type of
transactions, the rationalisation of the Group, this is why it's difficult.
There have been discussions at just about every AGM I've been to, every
second meeting I've been to with – not every second meeting but often
with the Doran brothers, so how much of that was discussed at the time
at the particular meeting that I attended I can't remember. What I am
saying is these issues, continuing issues, were given some – certainly
given some urgency because they were about to embark upon litigation
against the university.*
...
*But nevertheless you discussed the commerciality of the transaction.
What did you say? ⁓ I would have discussed reasons why it was a –
why – why – justification for it being a commercial transaction but I
would have also said that I wasn't a lawyer, not an insolvency expert
and I imagine it's – it's something they didn't have expertise in.*

*Of course, at the time of this meeting you had been intimately involved
with the preparation of the accounts for the three relevant companies,
correct? ⁓ Yes.*

*On what basis did you say that it was a commercial – or did you present
– I'll start the question again. What matters did you put forward as
justifying the commerciality of the transaction? ⁓ Um, it was a
continuation of the rationalisation of the Doran Group which – you can
go back over the years it's done – it's a continual process year by year,
so it wasn't out of the ordinary for the Doran Group on that basis – um –
it simplified the Group had been – that both the Directors, or in
particular Paul Doran, Brad Joyce, wanted a simpler presentation to
financiers and always pushed for that."*

**Directors' evidence as to purpose of Restructure**

54        Paul Doran says that as at 1 November 1994 he believed that the University owed
money to Constructions, not the other way around.  He says that he appreciated that the
proceedings against the University would cost Constructions a considerable sum of money,  but he

Verify version

says that it *"never entered his head"* at the time that if a liquidator were appointed to Constructions the liquidator would call up the debt from Holdings in order to pay Constructions' creditors. He says that he believed Constructions to be solvent at that time. He resolutely denies that he understood the Restructure to be undertaken for the purpose of depriving a liquidator of Constructions of the right to claim repayment of Holdings' debt to Constructions.

55      The evidence of Peter Doran is vague as to when he became aware of the fact that the University was making a substantial claim against Constructions. He says that as at 1 November 1994 he was aware that Constructions was making a substantial claim against the University, but he says that he does not remember a claim by the University against Constructions until about 1996. He readily concedes that if such a claim by the University was known as at 1 November 1994 he would have been made aware of it. He resolutely denies that the Restructure was effected for the purpose of removing Holdings' assets from the reach of a liquidator of Constructions.

56      Peter gave the following evidence with some warmth:
> *"Q. I suggest to you the reason for the transaction on 1 November was to eliminate or reduce the exposure of Holdings' assets to Constructions' creditors?*
> *A. No, that's not right.*
>
> *Q. You don't recall the transaction?*
> *A. That's not right. We would not enter into any transaction that was tainted in any way, shape or form with that type of situation. We just wouldn't do that.*
>
> *Q. You consider that a wrong thing to do?*
> *A. Yes."*

57      Michael Doran's recollection of the 1 November 1994 meetings is virtually non-existent. He is completely inexperienced in financial affairs. As he said: *"I had nothing to do with the financial side of the business. I grew up as a hands-on man as an apprentice, and what-have-you, and that's all I know of building"*.

58      Michael recalls that in 1994 Constructions was involved in a dispute with the University, but he recalls virtually nothing about the dispute as he had more or less retired by that time. He says that in passing the resolutions effecting the Restructure he relied on Price Waterhouse to inform him whether there was any problem.

59      John Doran retired from working in the Doran Group in about 1990 although he continued as a director, attending only formal meetings as required. His experience was working in the erection of steel structures and in the hire of building equipment. He has only a rudimentary knowledge of finance and accounting. He says, and I accept, that he relied entirely on Price Waterhouse as to the accuracy of financial accounts and that to the extent that he can recollect anything about the Restructure he relied upon the fact, as he thought, that Price Waterhouse recommended it and that his brothers agreed to it. He said that he was aware that there was some claim by the University against Constructions, but could not remember whether it was bigger or smaller than Constructions' claim against the University. He said that he thought that the Restructure was done *"to pay our debts"*.

Retrieved from AustLII on 07 January 2017 at 02:23:09

Verify version

**Objective factors**

60        In assessing whether I should accept the Liquidator's submission that the Restructure
was effected with the actual purpose of removing from the reach of Constructions' creditors the
funds of Holdings I take into account the following considerations.

61        As a result of the Restructure, as at 1 November 1994 Holdings still owed $1.189M to
Constructions. Holdings repaid that sum after 1 November 1994 but advanced $1.225M to
Constructions after 30 June 1996. Such an advance, exposing the assets of Holdings to a fresh
claim by Constructions, would be inconsistent with a preconceived plan by the Directors to shield
Holdings' assets from claims by Constructions' creditors.

62        Further, the Directors and other companies in the Doran Group had given unlimited
guarantees to Westpac to secure Constructions' overdraft liabilities. As a matter of reality, it
must have been apparent to the Directors that if Constructions became insolvent shortly after 1
November 1994 it was likely that not only the assets of Constructions, but also the assets of
Holdings and their own personal assets would, directly or indirectly, be exposed to the claims of
Constructions' creditors.

**Conclusion as to purpose of Restructure**

63        I find that as at 1 November 1994 the Directors were aware that Constructions had a
claim against the University and that the University would probably make a substantial claim
against Constructions. I find that that matter was discussed at the meeting on 1 November. Paul
and, probably, Peter were aware of the foreshadowed amount of the University's claim but the
other two directors were probably not made aware. This circumstance in itself suggests that the
foreshadowed claim by the University was not seen by Paul and, probably, Peter in November
1994 as being of such disastrous consequences to Constructions that Michael and John should be
fully apprised of it.

64        I find, as a matter of inference, that by November 1994 it was clear to Paul and to Mr
Joyce, if not to the other Directors, that a major litigious battle with the University was looming.
Constructions commenced its proceedings against the University in the Supreme Court in early
December 1994, claiming $4.37M; Constructions could expect a substantial Cross Claim in
response. The Cross Claim was not forthcoming, however, until October 1996, which indicates
that the University's position was not clear cut and well known to Constructions by November
1994. What would have been clear to Paul and to Mr Joyce was that the dispute with the
University, if it went the full distance, would not be resolved for a long time and would be very
expensive to fight.

65        In my opinion, the most reliable evidence as to the purpose of the Restructure, as
discussed at the Directors' meeting on 1 November 1994, is given by Messrs Freeman and Linz.
On the basis of that evidence, which I accept, I find that the foreshadowed claim by the
University against Constructions was not the driving factor for the Restructure. The driving
factor was a desire on the part of the Directors to separate the financial affairs of the property
holding companies in the Doran Group, embodied in Holdings, from the financial affairs of the
building and construction companies, embodied in Constructions. That desire for separation did
not originate in a fear that the University's claim against Constructions would be successful and
would result in a liquidator being appointed to Constructions and making a demand upon
Holdings. The desire for separation originated in a perception, held for some time before
November 1994, that it would be easier to obtain finance for the property holding activities of the
Group if they were segregated from the building and construction activities.

Verify version

66      I am satisfied that the Directors' desire to achieve separation of the financial affairs of Holdings and Constructions was given a sense of impetus and focus by the impending litigation with the University. That litigation would have exemplified the problems and difficulties which could be caused to the property holding activities of the Group by litigation arising from the Group's building and construction activities. However, I accept that the Directors did not actually believe that the University's claim against Constructions would ultimately be successful and that it would result in the liquidation of Constructions. I accept Paul's evidence that he believed that the litigation would result in money being paid to Constructions.

67      Having regard to the evidence of Messrs Freeman and Linz and to the evidence of the Directors, which I accept, and to the objective factors referred to in paragraphs 60 to 62 above, I find that the Directors did not have an actual intention, in effecting the Restructure, to remove the assets of Holdings from the reach of the creditors of Constructions. I accept that they believed that at the time of the Restructure Constructions was solvent.

68      I now turn to the question whether Constructions was, in fact, solvent at the time of the Restructure.

**Constructions' balance sheet as at 31 October 1994**

69      Although both parties agree that the test prescribed for solvency by s.95A *CA* is a cash flow test, it is instructive to commence by examining the balance sheet position of Constructions as at 31 October, 1994.

70      Both sides' experts have prepared reconstructed balance sheets for Constructions showing its position immediately prior to the Restructure taking effect on 1 November, 1994. The differences may be summarised thus:

|  | Plaintiff's reconstruction $ '000 | Defendants' reconstruction $ '000 |
|---|---|---|
| CURRENT ASSETS |  |  |
| Cash | 6 | 6 |
| Receivables | 1,872 | 1,872 |
| Work in Progress | (150) | (150) |
| Outstanding Claims | 0 | 1,005 |
| Outstanding Claims | 0 | 28 |
| Other | 115 | 115 |
| Loan - Holdings | 5,289 | 5,289 |
| *Total Current Assets* | $7,132 | $8,165 |
|  |  |  |
| CURRENT LIABILITIES |  |  |
| Trade Creditors | (2,661) | (2,063) |
| Bank Overdraft | (1,812) | (1,812) |
| Loan - DCA | (99) | (99) |
| Employee Provisions | (111) | (111) |
| Accrued Charges | (17) | (17) |
| Tax Provision | 2 | 2 |
| *Total Current Liabilities* | $(4,698) | $(4,100) |
|  |  |  |
| WORKING CAPITAL | $2,434 | $4,065 |

| | | |
|---|---|---|
| NON CURRENT  ASSETS | | |
| Property, Plant & Equipment | 56 | 56 |
| Loan - Dyspane | 1,210 | 1,210 |
| *Total Non Current Assets* | $1,266 | $1,266 |
| | | |
| NON CURRENT  LIABILITIES | | |
| Mortgage Loan | (1,200) | (1,200) |
| Trade Creditors - Retentions | 0 | (598) |
| *Total Non Current Liabilities* | $(1,200) | $(1,798) |
| | | |
| NET  ASSETS | $2,500 | $3,533 |

71      The adjustment of $1,005,000  to Outstanding Claims  is explained  in the Report of the Directors' expert, Mr Bryant, in Appendix 4 as based on evidence as to the position of various claims  given in Paul Doran's affidavits, which evidence was not challenged in cross examination.

72      The adjustment of $598,000  to trade creditors results from a re-categorisation between current and non-current liabilities  and does not affect the competing calculations of Constructions' nett asset position.

73      I accept the analysis of the balance sheet position of Constructions expressed by Mr Bryant in his report.  I note that the Liquidator's expert, Mr Pascoe, said that he did not challenge Mr Bryant's analysis of the data underlying Mr Bryant's reconstruction of the balance sheet.

74      Mr Pascoe did not disagree with the following  conclusions which emerged in Mr Bryant's report:

–      as at 31 October 1994,  Constructions' recorded liabilities  were $5.9M;

–      included in the sum of $5.9M were trade creditors of $2.7M of which only approximately  $160,000  was analysed as due and payable at 31 October 1994;

–      also included in the sum of $5.9M  was a bank overdraft of $1.8M  of which only $994,000  was analysed as due and payable at 31 October, 1994.

**What actually happened  after 1 November  1994**

75      There is no dispute as to the following:

i)      as at 1 November 1994  there were present none of the usual indicia  of insolvency;

–      there was no history of dishonouring Constructions' cheques;

–      suppliers had not been delivering goods only on a COD basis;

–      Constructions had not been issuing post-dated or 'rounded sum' cheques;

–      Constructions had made no special arrangements with  its creditors;

–      Constructions was able to produce timely, audited accounts;

Retrieved from AustLII on 07 January 2017 at 02:23:09

Verify version

– Constructions had no unpaid group tax, payroll tax, workers compensation premiums or superannuation contributions;

– Constructions had received no demands from its bankers to reduce overdraft limits and it had a good relationship with its bankers;

– Constructions had received no statutory demands, solicitors' letters requiring payment of debts or legal proceedings for the payment of trade debts;

ii) as at 1 November 1994, Constructions' reconstructed balance sheet showed nett total assets of $3.5M and positive nett current assets;

iii) all of the $5.9M recorded as Constructions' liabilities as at 31 October was paid (or written back as no longer a liability) prior to Constructions' liquidation on 24 March 1997;

iv) funds of $5.1M were provided to Constructions by other companies in the Doran Group between 1 November 1994 and 24 December 1997;

v) as at 30 June 1995, shortly before the date upon which the Charge was given by Constructions to Holdings, Constructions had recorded liabilities of $3.5M, all of which had been paid or written back prior to 24 December 1997;

vi) of the $1.4M disclosed in Constructions' Report as to Affairs upon its liquidation, only $234,000 was owed to external creditors and none of the external creditors resulted from trading operations prior to 31 October 1994 or 30 June 1995;

vii) there were major decreases in the overdraft facility of Constructions during September and November 1996 and the overdraft was extinguished entirely in November 1996 when Holdings advanced a sum of $400,000 to Constructions;

viii) as at 24 December 1997, Constructions had no outstanding liability in relation to a mortgage facility of $1.2M previously taken out with St George Partnership Banking Limited;

ix) a loan from DCA to Constructions of $98,737 existing as at 31 October 1994 had been discharged by 24 December 1997;

x) as at 31 October 1994, total employee liabilities for Constructions were $110,666 but by 24 December 1997 Constructions had no employees and all of these amounts had either been paid or transferred to the account of Holdings;

xii) there is no evidence of any of the indicia of insolvency to which I have referred between 1 November 1994 and the winding up of Constructions in December 1997.

76      In short, for slightly more than three years after 1 November 1994 Constructions continued to subsist, paying its external debts with the assistance of funds provided by other companies in the Doran Group, without any complaint from its creditors or its financiers.

**Mr Pascoe's opinion as to solvency as at 31 October 1994**

77      The Liquidator's expert, Mr Pascoe, was of the opinion that as at 31 October 1994 Constructions was unable to pay its debts as they fell due despite the undoubted fact that, as the evidence shows, it actually did so for about three years thereafter. With respect, Mr Pascoe's analysis is flawed in at least three important respects.

Verify version

Signed by AustLII

78        The first flaw is that, although Mr Pascoe concedes that the test for insolvency is the cash flow test, Mr Pascoe did not actually apply that test to Constructions. What he did was to apply the "working capital test" and the "profits test", which he said *"are a given approximation of the cash flow test"*:  T34.54.

79        Mr Pascoe conceded, however, that the "working capital test" attempts to look at only those debts which may become due and payable over the next twelve months out of those assets of a company which can be realised within that period;  it does not look at those debts due and payable as at the alleged date of insolvency or at the assets available to pay those debts at that time.  Likewise, Mr Pascoe conceded that the "profits test" is a separate and distinct test from the cash flow test. He conceded that the "working capital test" is not determinative of insolvency because a working capital deficiency may not prevent a company with sufficient cash flow at the relevant time from paying its debts as they fall due.

80        The second flaw is that Mr Pascoe never ascertained what debts of Constructions were actually due and payable as at 31 October 1994 and whether those debts were paid as and when they fell due.  He took the total figure of $2.661M for trade creditors shown in the reconstructed balance sheet as at 31 October 1994 and applied the "working capital test" to that figure.

81        But, in truth, as Mr Bryant's analysis shows – and Mr Pascoe does not dispute it – only about $160,000 was owing to trade creditors as at 31 October 1994 and there is no evidence to suggest that those creditors were not paid according to their normal trading terms.  The absence of any indicia of insolvency as at 31 October 1994 and for about three years later suggests strongly that as at 31 October 1994 trade creditors were being duly paid and that that situation continued for a long time afterwards.

82        The third flaw is that Mr Pascoe disregarded the cash resources within the Doran Group which were available to pay its external creditors, both as at 31 October 1994 and thereafter.  As I have noted, funds of $5.1M were provided to Constructions by other companies in the Doran Group between 1 November 1994 and 24 December 1997.  Mr Pascoe takes the view that the cash flow test as prescribed by s.95A *CA* requires that a company's ability to pay its debts is determined, in all circumstances, only by reference to that company's own assets so that what he termed "voluntary payments" by other members of a group of companies must be disregarded.

83        Whether Mr Pascoe's view is correct has some significance in the case.  The Directors concede that on and after 31 October 1994 Constructions was unable to pay all its debts solely from the revenue derived from its trading and from its own assets. They concede that it was not able to discharge all of its liabilities except by means of advances from other companies in the Doran Group, principally from Holdings.  However, they say that the ability and willingness of other companies in the Doran Group to make cash available to Constructions as needed and not to call up those advances except at times when Constructions was conveniently able to repay was a resource available to Constructions at all relevant times which must be taken into account when determining its solvency.

**The test prescribed by s.95A *CA***

84        The fundamental question for determination is whether the definition of insolvency which now appears in s.95A *CA* has changed the pre-existing law which had developed around its predecessors in insolvency legislation.  The predecessors of s.95A defined insolvency as an inability to pay the debtor's debts *"from his own monies"*:  see e.g. s.44(1) *Bankruptcy Act 1914* UK;  s.95(1) *Bankruptcy Act 1925* (Cth);  s.265 *Companies Act 1929* (UK);  s.208 *Companies Act*

Verify version

Signed by AustLII

*1936* (NSW); s.222 and s.293 *Companies Act 1961* (NSW); s.122 *Bankruptcy Act 1966* (Cth); and s.451 *Companies Code 1981* (NSW).

85      The Exposure Draft Bill of the *Corporate Law Reform Bill* (Cth) published in February 1992, in the clause that ultimately became s.95A, defined insolvency as a debtor's inability to pay his or her debts as they became due and payable *"from his or her own money"*. It is legitimate to assume that the inclusion of those words was intended to convey that the case law which had developed around those words in prior insolvency legislation was to continue to be applicable.

86      However, when the Bill became law, the words *"from his or her own money"* were dropped. Section 95A now reads:
        **"Solvency and insolvency**

        *(1) A person is solvent if, and only if, the person is able to pay all the person's debts, as and when they become due and payable.*

        *(2) A person who is not solvent is insolvent."*

        No explanation of why the critical words were omitted from s.95A as enacted is to be found in the Harmer Report or in the Explanatory Memorandum.

87      It might be argued that the omission of the words *"from his or her own money"* removes the qualification on the definition of insolvency which had previously given rise to some difficulty, namely, whether or not a debtor's ability to obtain funds by means of unsecured loans was to be taken into account when assessing solvency.

88      In *Sandell v Porter* (1966) 115 CLR 666 the High Court had held that a debtor's ability to pay *"from his own monies"*, as required by s.95 *Bankruptcy Act*, included an ability to raise money by sale, pledge or mortgage of his assets. The decision was consistent with earlier authorities concerned with definitions of insolvency dependent upon the debtor's ability to pay *"from his own monies"*: see e.g. *Bank of Australasia v Hall* (1907) 4 CLR 1514, at 1528; *Rees v Bank of New South Wales* (1964) 111 CLR 210 at 218.

89      Founding upon those decisions, Courts considering definitions of insolvency which required ability to pay *"from his own monies"* have held that money obtained by unsecured borrowings is not treated as the debtor's *"own money"*: see e.g. *Re Armour* (1956) 18 ABC 69, at 74; *Kyra Nominees Pty Ltd (In liq) v National Australia Bank Ltd* (1986) 4 ACLC 400, at 405; *Taylor v Australia and New Zealand Banking Group Ltd* (1988) 13 ACLR 780, at 786; *Norfolk Plumbing Supplies Pty Ltd v Commonwealth Bank of Australia* (1992) 6 ACSR 601, at 615.

90      Yet even under the definitions of insolvency prior to s.95A *CA*, there were tensions in applying this proposition in all its strictness. In *Re RHD Power Services Pty Ltd (In liq)* (1990) 3 ACSR 261 at 263-264, (1990) 9 ACLC 27, McPherson SPJ said:
        *"But, in any event, the test of insolvency for the purpose of s.122(1) means the inability of the debtor* 'utilizing such cash resources as he has or can command, through the use of his assets, to meet his debts as they fall due'*: see* Sandell v Porter *(1966) 115 CLR 666, at 670, per Barwick CJ. To pay its debts the company here was using not its own assets but those of its holding company or of other members of the group. It has been said that under s.122(1)* 'money obtainable by unsecured borrowing is not treated as the debtor's own money'*: see* Taylor v Australia & New Zealand Banking Group Ltd *(1988) 13*

Verify version

> *ACLR 780, at 784, per McGarvie J. That may not always or necessarily be so because a person's ability to borrow without security may in some circumstances provide compelling evidence of his strong financial standing; but it is certainly true of a case like this, where the company has been able to trade only by receiving continuing financial assistance from its parent company."*

91      In *Re Adnot Pty Ltd and the Companies Act* (1982) 7 ACLR 212, (1982) 1 ACLC 307, Kearney J took into account in holding that a company was not insolvent the fact that any shortfall in meeting its liabilities would be met by another company in its group. At 217, his Honour said:

> *"The company, instead of having to resort to some outside lender, is in the fortunate position of having its fellow member of the group of companies to which it belongs, available in effect as a banker to provide funds required to meet any shortfall."*

92      Nevertheless, as the law prior to the enactment of s.95A *CA* stood, the weight of authority founded upon *Sandell v Porter* was heavily in support of the view that the requirement that a debtor be able to pay *"from his own money"* in order to demonstrate solvency excluded from consideration the debtor's ability to obtain unsecured loans.

93      Since the enactment of s.95A *CA* there have been only two judicial statements which I have been able to discover which have directly commented upon whether the omission of the words *"from his own money"* from the definition has changed the law.

94      In *Geraldton Building Co Pty Ltd v Woodmore* (1992) 8 ACSR 585 the plaintiff sued the directors of a company with which it had contracted and which became insolvent, seeking to recover its loss under the insolvent trading provisions of the then *Corporations Law*, s.592(1). The defendants sought an order summarily dismissing the plaintiff's claim on a number of grounds, one of which was that the company was solvent at the time that the debt was incurred. The defendants proved that at the time of the alleged insolvency the company had available to it an undrawn bank facility of more than $5M, although the facility was not secured over the company's assets.

95      The plaintiff argued, on the basis of the line of authority flowing from *Sandell v Porter*, that the phrase in s.592 *"will not be able to pay all its debts as and when they become due"* should be interpreted as meaning "will not be able to pay … from its own money", so that in accordance with authorities such as *Re Armour* and *Kyra Nominees* an unsecured borrowing could not be taken into account in determining solvency.

96      Master Bredmeyer, after referring to these authorities, said at 598:

> *"The principle enunciated there, and in the cases cited in support, is that one can look at moneys obtainable by the company by borrowing on its own assets, but the court should not look at moneys borrowable or obtainable by the company by borrowing on unsecured assets or on assets from directors or third parties. Thus, when a company is prima facie unable to pay its debts as and when they fall due, it is not relevant that a director could borrow money for the company on the collateral security of his own house. <u>That principle does not apply, in my view, to the facts of this case. That principle is concerned with the company's ability to borrow. It looks to the future. In considering the company's assets the court can take into account its ability to borrow only on the security of its own assets. That does not mean that the court should disregard previous borrowings, even though those borrowings were not secured on its</u>*

Verify version

*own assets. In this case, the bank facility of $30m was granted to the company on 18 July 1991, well before the critical period. It is true that it was secured against letters of set-off by certain named Indonesians, but it was a loan granted to the company and in the critical period between 15 February and 2 March 1992, $5.7m remained to be drawn down. That is, in my view, definitely an asset of the company available to it at that time for the payment of debts. The position would be different if that loan facility had been fully utilised at that time and the company deposed that it could borrow further moneys on securities provided by its directors. That is not the case here, and I consider I should regard this $5.7m loan facility as being moneys available to pay debts as and when they fall due. Of course, being a loan facility, it in itself is a debt owed by the company, but I am here concerned with the payment of debts falling due in that period or thereabouts, and there is no evidence before me that the repayment of moneys to the Standard Chartered Bank of Singapore was falling due at that time."* (Emphasis added.)

97      In *Harrison v Lewis* (2001) 19 ACLC 566, [2001] VSC 27, the liquidator sued the company's sole director under s.588M *CA* to recover losses from insolvent trading. The director conceded that as at the alleged date of insolvency the only way in which the company could have repaid all its debts then due was if the director utilised a credit facility in his own name, secured over his own assets, to borrow money and lend it to the company.

98      Mandie J referred to *Taylor v ANZ Banking Group Ltd* and *Sandell v Porter* and quoted the passage from *Re RHD Power Services* which I have set out above. His Honour was conscious that those cases were concerned with the definition of insolvency which required the debtor to be able to pay *"from his own money"*. His Honour continued (at 579; para 49):

*"I do not think that the absence in s.95A of the words* 'from its own money' *alters the proper approach to this question as referred to in the passages quoted above. Wine Bank was unable to pay its debts, in particular the debt to McGuigan which was then incurred and soon to fall due, from its own cash resources. I am satisfied that it had no expectation of significant income and no assets which could readily be sold or hypothecated. No sale of the nearly defunct business was reasonably imminent. The Citibank credit facility was the source of a potential loan, but a loan secured on the defendant's assets and not on the assets of Wine Bank. One debt would simply have been replaced with another debt which could not be repaid. Looking at the total picture, I would have concluded that Wine Bank was insolvent as at 6-12 February 1998."*

99      Two points should be made about the decision in *Harrison v Lewis*. First, his Honour does not give any reasons for his conclusion that the change in the definition of insolvency in s.95A *CA* has not changed the law. Second, his Honour's ultimate conclusion of insolvency was founded upon the particular factual circumstances of the case before him.

100     There have been a number of decisions since s.95A *CA* came into effect which have continued to apply the *Sandell v Porter* definition of insolvency: see *Metledge v Bambakit Pty Ltd* [2004] NSWSC 176; *McVeigh v Commissioner of Taxation* [2004] FCA 653; *Re United Medical Protection Ltd (Prov Liq appointed)* (2003) 47 ACSR 705, (2004) 22 ACLC 56, [2003] NSWSC 1031; *Australian Securities and Investments Commission v Plymin (No 1)* (2003) 175 FLR 124, (2003) 46 ACSR 126, [2003] VSC 123; *Bush v Wardair Pty Ltd* [2003] NSWSC 955; and *Expile Pty Ltd v Jabb's Excavations Pty Ltd* (2003) 45 ACSR 711, (2003) 21 ACLC 1354, [2003] NSWCA 163. However, in none of those cases has there been any discussion of the absence in s.95A *CA* of the words *"from its own monies"*, which was the critical feature of the

discussion in *Sandell v Porter* and in the line of authority flowing from it. The decisions implicitly assume that s.95A has not changed the pre-existing law but none of them turns on whether insolvency depends upon the availability of unsecured loans from a third party.

101      It has been observed extra-curially that one may conclude from the change in the definition of insolvency effected by s.95A *CA* that the pre-existing law has, indeed, been changed. Professor A.R. Keay in *McPherson: The Law of Company Liquidation* (4th Ed, LBC, 1999) says at p.438:

> "The omission of the words may simply mean that the legislature was intending to ensure that the position adopted in the cases – namely that a debtor was not required to have cash to pay the debts due provided there were assets that could be sold or mortgaged within a reasonable time was confirmed in the legislation. However, this was not necessary because the case law clearly provided that the words 'from his or her own money' prohibited neither a debtor's assets (where they could be sold) nor money raised on secured loan from being taken into account in determining solvency.
>
> It is submitted that there is a strong argument in favour of the proposition that the omission of these words signifies the legislature's intention that unsecured loan funds can be taken into account when determining a debtor's solvency ie the legislature omitted the words to reverse the position established by the cases that refused to consider unsecured borrowings in deciding whether a debtor was solvent at a particular point in time. This would be consistent with commercial practice. It is submitted that if a company can obtain funds from a lender of some substance, then a court should carefully consider the fact that that, in itself, may indicate that the debtor company is not insolvent."

102      The editors of CCH *Australian Corporations Commentary* (loose-leaf, CCH Australia, 2004) seem to suggest that s.95A now permits a pragmatic consideration as to whether unsecured borrowings from directors can be taken into account. At §141-010 they say:

> "Consideration will not, however, usually be taken of finance which can be obtained from the personal assets of a director of the company. Such finance cannot be described as the company's own money and will not put an otherwise insolvent company in the position of being able to pay its debts as they become due 'from its own money' *(noting that the solvency/insolvency test in sec 95A does not expressly require that the ability to pay must be from the company's* 'own money'*): Re Mike Electric (Aust) Pty Ltd (in liq) (1983) 1 ACLC 758. It is suggested, with respect, that the case may be different if the directors have an established history of supporting the company, for two reasons:*
>
>   *if it is likely that the directors will support the company, the position of the company would be no different than if it had a reasonable expectation of obtaining finance from an arm's length third party (such as a bank or investor);*
>
>   *the insolvent trading provisions of the Act provide a positive disincentive to directors to promise and then withdraw financial support."*

103      Likewise, the learned authors of *Ford's Principles of Corporations Law* (loose-leaf, Butterworths, 2000) suggest that unsecured borrowings are not now necessarily excluded from consideration. At p.20,158 under the heading *"The assets to be taken into account"* they say:

Verify version

*"According to Isaacs J in* Bank of Australasia v Hall *(1907) 4 CLR 1514.*

> If ... the debtor's position is such that he has property either in the form of assets in possession or of debts, which if realised would produce sufficient money to pay all his indebtedness, and if that property is in such a position as to title and otherwise that it could be realised in time to met the indebtedness as the claims mature, with money thus belonging to the debtor, he cannot be said to be unable to pay his debts as they become due from his own moneys.

> *Available resources include the value of property that can be readily sold, the amount that the company could borrow on the security of its property generally and in some cases what it can borrow by unsecured loan."*

104     Later on the same page, they say under the heading *"Unsecured borrowing"*:

*"Money obtainable by unsecured borrowing will not ordinarily be treated as an asset available:* Taylor v Australian and New Zealand Banking Group Ltd*;* Re Norfolk Plumbing Supplies Pty Ltd. *However, in some circumstances, ability to borrow without security from external sources provides compelling evidence of strong financial standing. Credit provided by the company's directors or proprietors may have to be rejected as a cash resource (*Re RHD Power Services Pty Ltd (in liq) *at 261) unless the court can be satisfied that the credit will continue:* Re Kerisbeck Pty Ltd. *Offers of credit by directors or proprietors prompt the question as to why they do not inject the money as share capital."*

*105*     *Re Kerisbeck Pty Ltd* (1992) 10 ACLC 619 was an application to wind up a company in insolvency. The applicant submitted that the company was unable to pay a substantial unsecured debt which was payable on demand to its director. The director gave evidence, which was accepted, that he did not intend to demand repayment of the debt in the immediate future. Harper J, therefore, refused to regard the debt as payable for the purpose of determining insolvency. In effect, as the learned authors of *Ford* say, his Honour was satisfied that the company was able to pay its other debts with the benefit of continuing unsecured credit from its director.

106     I think that I must approach the application of s.95A *CA* with two considerations in mind. First, the words of s.95A must be construed as they stand, without addition or subtraction. Second, the law both before and after the enactment of s.95A is unequivocally and emphatically clear that insolvency is, first and last, a question of fact *"to be ascertained from a consideration of the company's financial position taken as a whole. In considering the company's financial position as a whole, the Court must have regard to commercial realities. Commercial realities will be relevant in considering what resources are available to the company to meet its liabilities as they fall due, whether resources other than cash are realisable by sale or borrowing upon security, and when such realisations are achievable":* Southern Cross Interiors Pty Ltd (In liq) v Deputy Commissioner of Taxation *(2001) 53 NSWLR 213 at 224 (citations of authority omitted), (2001) 188 ALR 114, (2001) 164 FLR 430, (2001) 39 ACSR 305. Those propositions have been approved in *Australian Securities and Investments Commission v Plymin (No 1)* (supra), *Emanuel Management Pty Ltd v Foster's Brewing Group Ltd* [2003] QSC 205, (2003) 178 FLR 1, *Iso Lilodw' Aliphumeleli Pty Ltd (In liq) v Commissioner of Taxation* (2002) 42 ACSR 561, (2002) 50 ATR 391, [2002] NSWSC 644, *White Constructions (ACT) Pty Ltd (In liq) v White* (2004) 49 ACSR 220, [2004] NSWSC 71, and *Keith Smith East West Transport Pty Ltd (In liq) v Australian Taxation Office* (2002) 42 ACSR 501, [2002] NSWCA 264.

107        The question of a company's solvency may arise retrospectively or prospectively.  The question arises retrospectively where, for example,  a liquidator is seeking to recover an unfair preference or to set aside an insolvent transaction so that the issue is solvency as at a date prior to the winding up.  The question may arise prospectively where a company is sought to be wound up in insolvency and the company's ability to pay its debts must be determined  not only by reference to debts payable as at the date of trial but also by reference to its ability to pay debts which will fall for payment some time in the near future.

108        Where the question is retrospective insolvency, the Court has the inestimable benefit of the wisdom of hindsight.  One can see the whole picture, both before, as at and after the alleged date of insolvency.  The Court will  be able to see whether as at the alleged date of insolvency the company was, or was not, actually paying all of its debts as they fell due and whether it did, or did not, actually pay all those debts which, although not due as at the alleged date of insolvency, nevertheless became due at a time which, as a matter of commercial  reality and common  sense, had to be considered as at the date of insolvency.  By reference to what actually happened, rather than to conflicting experts' opinions as to the implications  of balance sheets, the Court's task in assessing insolvency as at the alleged date should not be very difficult.

109        Where the question is prospective insolvency, however, the Court's task is more difficult simply because foresight, rather than hindsight, is called into play.  One can appreciate the Court's reluctance to conclude that a company will  be able to pay those debts which must be taken into account as a matter of commercial  reality as at the relevant date only because it claims to have access to funds which a third party is said to be willing  to lend without security.

110        In such a case there is a considerable measure of trust, if not speculation, that 'things will  turn out all right in the end'.  If the third party is free to change its mind after the winding up application is dismissed, the company's creditors are left with their hopes disappointed and their debts unpaid.  Doubtless, it is this consideration which brought about the requirement  in the predecessors of s.95A *CA* that a company's solvency must depend on its ability to pay by recourse to its own assets rather than by recourse to the benevolence or to the whim  of others.

111        In my opinion, the omission of the words *"from its own monies"* from  the definition of insolvency in s.95A now leaves the Court free to determine  the question of retrospective insolvency free of a qualification which might well be appropriate to determine  only prospective insolvency.  The omission leaves the Court free to determine  insolvency, whether retrospective or prospective, as a question of commercial  reality having regard to the particular facts of the case.

112        So, where retrospective insolvency is in issue, the Court can take into account that as at and after the alleged date of insolvency the company actually paid all its debts as they fell due because a third party made funds available to it without security.  The Court can look at the arrangements which were actually made rather than artificially  excluding them from consideration because the arrangements did not fall within  the definition of payments from the debtor's *"own monies"*.  To look at what actually happened avoids the possibility that the Court is forced to conclude that, as a matter of law, a company could not pay all its relevant debts when, as a matter of fact, the company clearly <u>did</u> pay those debts.

113        On the other hand, where prospective insolvency is in issue the Court, as a general rule, would be sceptical of an assertion that a third party is willing  to advance funds unsecured on such terms as would not, in any event, bring about insolvency.  Such willingness on the part of a third party would have to be cogently demonstrated, if not as a matter of legal  obligation, then as a matter of commercial  reality.

114        The different considerations which arise in cases of retrospective insolvency and prospective insolvency were clearly  recognised by Bredmeyer M in *Geraldton Building* (supra), a

Verify version

case of retrospective insolvency.  The learned Master recognised as a fact that the company had a resource available to it at the relevant time in the form of a bank facility, even though the facility was not secured over assets of the company.  In recognising that facility as a resource of the company the Court simply acknowledged a commercial reality.  Likewise, in *Re Kerisbeck* (supra), a case of prospective insolvency, Harper J accepted as a fact that the director would continue to make existing unsecured credit available to the company, so that the company was not insolvent.

115      In my opinion, s.95A can work effectively as a definition of both retrospective and prospective insolvency if it is shorn of a gloss derived from the words *"from its own monies"*. Those words have been deliberately omitted from the definition and if the gloss which they have acquired in previous decisions is applied to questions of retrospective insolvency, the definition can operate to produce a commercially unrealistic, if not an absurd, result.

116      For those reasons I conclude that s.95A *CA* has changed the pre-existing law as to the definition of insolvency as stated in cases such as *Sandell v Porter*, and that it is no longer necessary in order to assess solvency to ascertain whether the company is able to pay all of its debts *"from its own monies"*, in the sense discussed in those cases.  In my opinion, s.95A requires the Court to decide whether the company is able, as at the alleged date of insolvency, to pay all its debts as they become payable by reference to the commercial realities.  If the Court is satisfied that as a matter of commercial reality the company has a resource available to pay all its debts as they become payable then it will not matter that the resource is an unsecured borrowing or a voluntary extension of credit by another party.

## Conclusion

117      In the present case, I have regard primarily to the following facts in determining Constructions' solvency as at 31 October 1994:

–      there is no evidence that, as at that date, Constructions had not been paying all of its debts as they became payable;

–      the evidence is that all debts payable by Constructions as at that date were subsequently paid or otherwise discharged without complaint from its creditors;

–      the evidence is that Constructions was able to continue paying its debts for some three years afterwards without complaint from its creditors.

118      In my view, it does not matter whether Constructions was able to pay its debts as at 31 October as well for about three years thereafter because other companies in the Doran Group made funds available to it.  What actually occurred in this respect proves that the funds of the other companies in the Group were a resource available to Constructions as a matter of commercial reality.

119      For these reasons, and also because I am of the view that the opinion of the Liquidator's expert, Mr Pascoe, is flawed in the ways I have described, I conclude that the Liquidator has failed to prove that Constructions was insolvent as at 31 October 1994.  However, I should go further:  I find that as at that date Constructions was, in fact, solvent.

## Insolvency as at 1 November 1994 and 18 July 1995

120      The factors to which I have referred in paragraph 75 were present also as at 1 November 1994 and as at the time the Charge was given, i.e. 18 July 1995.  For the reasons which

Verify version

I have explained, I conclude that the Liquidator has failed to prove that Constructions became insolvent as a result of the Restructure and that the company was insolvent as at 18 July 1995. Again, I find that as at that those dates Constructions was, in fact, solvent.

**Whether Restructure an uncommercial transaction**

121        Section 588FB(1) provides:
           "*Uncommercial transactions*

           *(1)  A transaction of a company is an uncommercial transaction of the company if, and only if, it may be expected that a reasonable person in the company's circumstances would not have entered into the transaction, having regard to:*

           *(a)  the benefits (if any) to the company of entering into the transaction; and*

           *(b)  the detriment to the company of entering into the transaction; and*

           *(c)  the respective benefits to other parties to the transaction of entering into it; and*

           *(d)  any other relevant matter."*

           Section 588FE(4) provides that a transaction is voidable if:
           "*(a) it is an insolvent transaction of the company; and*
           *(b) a related entity of the company is a party to it; and*
           *(c) it was entered into, or an act was done for the purpose of giving effect to it, during the 4 years ending on the relation-back day."*

           Section 588FC relevantly provides that a transaction is an insolvent transaction if, and only if it is:
           "*... an uncommercial transaction of the company, and:*

           *a)  any of the following happens at a time when the company is insolvent:*
           *(i) the transaction is entered into; or*
           *(ii)  an act is done, or an omission is made, for the purpose of giving effect to the transaction; or*

           *(b)  the company becomes insolvent because of, or because of matters including:*
           *(i) entering into the transaction; or*
           *(ii)  a person doing an act, or making an omission, for the purpose of giving effect to the transaction."*

122        For the reasons which I have given, I am not satisfied that Constructions was insolvent when the Restructure was entered into on 1 November 1994, or in September 1995, when the book entries giving effect to the Restructure were made. Neither am I satisfied that Constructions became insolvent by reason of the Restructure. For those reasons alone, I am not satisfied that the passing of the resolution effecting the Restructure by the Directors, as directors of Constructions,

Retrieved from AustLII on 07 January 2017 at 02:23:09

Verify version

and giving effect to the Restructure by the book entries was *"an insolvent transaction"* and therefore liable to be avoided under s.588FE(4).

123        For the sake of completeness I should give my conclusions as to whether the Restructure was *"an uncommercial transaction"*.

124        I accept that a transaction which provides a direct benefit for one company in a group of companies may provide an indirect benefit for another. In *Equiticorp Finance Ltd (in liq) v Bank of New Zealand* (1993) 32 NSWLR 50, (1993) 11 ACSR 642, (1993) 11 ACLC 952, Clarke and Cripps JJA said (at 146-147):

> *"Problems may, however, arise when particular companies form part of a group of companies. Mason J referred to them in* Walker v Wimborne *and pointed out that each transaction must be viewed according to the criterion of the interests of the company in the group which is about to participate in the transaction. Nonetheless, his Honour recognised that a transaction involving two companies in a group may benefit one of the companies directly but as well have derivative benefits for the other company: see also* Northside Developments Pty Ltd v Registrar-General *(1990) 170 CLR 146 at 183, per Brennan J. It may be accepted, therefore, that actions carried out for the benefit of the group as a whole may, in particular circumstances, be regarded as benefiting as well one or more companies in the group. This may occur even where, for instance, a company is providing a guarantee for its holding company or another company in the group. Similarly a transaction carried out for the benefit of one of the companies in the group, company A, may be seen to be for the benefit of another company in the group, company B."*

125        The evidence in the present case shows that the shareholding of the Doran Group of companies was held in equal shares by the four Directors, indirectly through their family companies. I accept the evidence of Michael Doran to the effect that the businesses in the Group were regarded as in reality one family business and that decisions by the Directors had to be unanimous if they were to be carried into effect. He said:

> *"If we weren't unanimous, we didn't do it."*

126        The evidence also shows that Holdings was regarded as the banker of the Group, providing money to the subsidiaries as required. It fulfilled that role both before and after 1 November 1994. The Group had also given cross guarantees: Holdings had given unlimited guarantees to secure Constructions' overdraft. The continuing financial welfare of Holdings was, therefore, of material benefit to Constructions.

127        As I have found in paragraph 65, the purpose of the Restructure was to segregate the property holding activities of the Group from the construction activities so that it would be easier to obtain finance for the property holding activities. But, as is evident from the advances made by Holdings to Constructions after 1 November 1994, money coming into Holdings from borrowings could be made available to Constructions if required.

128        In my opinion, having regard to Holdings' role as banker to the Doran Group, it could be seen as reasonably in the interests of Constructions to facilitate the Restructure so that Holdings could find it easier to borrow.

129        Similarly, because Holdings was unarguably solvent as at 1 November 1994 and would be ready to provide money to Constructions or to DCA thereafter, if needed, I do not think

that Constructions suffered an unreasonable detriment in that the Restructure replaced the debt from Holdings with the debt from DCA. I do not accept that DCA must have been seen at that time as incapable of repaying its debt to Constructions. There is no reason to suppose that if Constructions had required repayment of the DCA debt shortly after the Restructure and DCA itself had insufficient funds, Holdings would not have advanced the necessary funds to DCA.

130      For these reasons, if it had been necessary to do so, I would not have found that the Restructure was an *"uncommercial transaction"* on the part of Constructions.

**Breach of fiduciary and statutory duty**

131      It will have become clear from the foregoing reasons that I am not satisfied that Constructions was insolvent, near to insolvent, or at any risk of insolvency as at 1 November 1994.

132      Accordingly, in considering whether to enter into the Restructure, the Directors in exercising their statutory and fiduciary duties as directors of Constructions, had no duty, or even occasion, to consider the effect which the Restructure might have on the rights of Constructions' creditors: see e.g. *Equiticorp* at 144-146 and the cases there cited.

133      As I have held, the Directors did not enter into the Restructure for the purpose of replacing a valuable asset of Constructions with a worthless one, in order to deprive the University or Beresfield of the fruits of their litigious success, if that should be the outcome. The purpose which I have found motivated the Directors was not ulterior to the interests of Constructions nor was it unreasonable having regard to the interests of Constructions.

134      Further, I take into account the fact that the Directors expressly sought the advice of the Group's auditor and of its solicitor, neither of whom advised that what was proposed in the Restructure was wrong.

135      In all of these circumstances, I am unable to find that, in effecting the Restructure, the Directors did not act in good faith in the interests of Constructions or with lack of appropriate care and skill in the discharge of their duties as directors of Constructions.

**Whether Charge voidable**

136      As I have held that the Liquidator has failed to prove that Constructions was insolvent as at 18 July 1995 when the Charge was given to Holdings, the giving of the Charge was not an insolvent transaction within s.588FC *CA* and it is not voidable under s.588FE(4) *CA*.

**Orders**

137      For the reasons which I have given, I am of the opinion that the Liquidator has made out against the Directors none of the claims made in the Amended Originating Process. The Amended Originating Process will, therefore, be dismissed.

138      If so requested, I will stand these proceedings over for a short time to enable the parties to consider these reasons and to make submissions on costs.

– oOo –

Signed by AustLII

LAST UPDATED:          09/07/2004

Verify version

TAB 35

*Lewis v Doran* [2005] NSWCA 243,
New South Wales Court of Appeal

219 ALR 555, 54 ACSR 410, 23 ACLC 1,666, 2005 WL
2002366, [2006] ALMD 2482, [2006] ALMD 2480, [2006]
ALMD 2477, [2006] ALMD 2481, [2006] ALMD 2466


Keywords
Opinions
Giles JA
Hodgson JA
McColl JA
Background
The debt restructuring
"Business
Resolved
"Business
Resolved
"Business
Resolved
The liquidator's allegations
(i) Breach of statutory and fiduciary duties
(ii) Avoidance under the Law
The deed of charge
The Beresfield and University litigation
(i) Beresfield
(ii) The University
Other construction works
The August and September 1996 resolutions
The November and December 1997 resolutions
"Resolved
"Business
Resolved
"Provision of Funds by Doran Holdings Pty Limited to
Doran Constructions Pty Limited
Constructions goes into liquidation
Intra-group transactions
Palmer J's reasons
Insolvency as at 1 November 1994 and 18 July 1995
Was there the purpose of defeating creditors?
Did Constructions become insolvent as at 1 November
1994 as a result of entering into the transaction?
Was posting the journal entries an act done for the
purpose of giving effect to the transaction?
Was Constructions insolvent as at 4 September 1995?
Was Constructions' insolvency as at 24 December 1997
because of, or because of matters including, entering into
the transaction?

Was the debt restructuring in breach of the directors'
duties on the alternative basis?
Was the debt restructuring an uncommercial transaction?
Orders

*Alan Edward Lewis (as liquidator of Doran Constructions
Pty Ltd (in liq) - First Appellant*

*Doran Constructions Pty Ltd (in liq) - Second Appellant*

*Paul Doran - First Respondent*

*Peter Joseph Doran - Second Respondent*

*Michael Leo Doran - Third Respondent*

*John Cerriti Doran - Fourth Respondent*

*Doran Holdings Pty Ltd - Fifth Respondent*

*Doran Constructions (Australia) Pty Ltd (in liq) - Sixth
Respondent*

Docket Number(s):40635/04

New South Wales Court of Appeal

21 April 2005 & 22 April 2005, 18 August 2005


GilesHodgsonMcColl JJA

Related companies — debt restructuring — resolutions
that debt owed to company A by company B be replaced
by debt owed by company C — journal entries later made
— whether transaction in breach of directors' statutory
and fiduciary duties — whether an uncommercial
transaction within s 588FB of Corporations Law —
whether company A became insolvent because of the
transaction — whether transaction given effect by making
the journal entries and company A insolvent at that time
— consideration of whether voluntary assistance from
related companies material to insolvency — and of scheme
for avoidance of insolvent transactions within s 588FC of
the Law. D
D F Jackson QC & P S Braham - Appellants
A S Martin SC & S A Wells - Respondents
Purcell Insolvency Lawyers - Appellants
Christopher C Freeman & Co - First to Fifth Respondents
Kemp Strang Lawyers - Sixth Respondent

Giles JA

1   Doran Constructions Pty Ltd ("Constructions") was a wholly owned subsidiary of Doran Constructions (Australia) Pty Ltd ("DCA"). DCA and Doran Holdings Pty Ltd ("Holdings") were related companies, not in a parent/ subsidiary relationship but with common effective shareholdings, in the Doran group of companies ("the group"). The directors of all the companies in the group were Messrs Paul, Peter, Michael and John Doran (collectively, "the directors").

2   In a debt restructuring, by resolutions passed by the directors on 1 November 1994 DCA agreed to pay $4.1 million to Holdings in part repayment of its then indebtedness; Holdings agreed to pay $4.1 million to Constructions in part repayment of its then indebtedness; and Constructions agreed to lend $4.1 million to DCA. In the result, in place of a debt of $4.1 million payable by Holdings on demand, Constructions held a debt of $4.1 million payable by DCA in six years time.

3   Constructions went into liquidation on 24 December 1997. DCA had gone into liquidation shortly beforehand. DCA had repaid $1.449 million, but the balance of the DCA debt was worthless. The liquidator of Constructions, Mr Alan Lewis ("the Liquidator"), alleged that the debt restructuring was entered into in breach of the directors' statutory and fiduciary duties and was voidable under the Corporations Law ("the Law") as an insolvent transaction. He claimed $4.1 million from the directors and from Holdings, plus interest. (On appeal the Liquidator recognised that, at least for breach of the duties, account should be taken of the partial repayment by DCA.)

4   Palmer J held that the Liquidator's claims failed (*Lewis v Doran* [2004] NSWSC 668). This appeal by the Liquidator raised, but was not confined to, questions of intra-group support in determining solvency as at and after the debt restructuring and of causation of Constructions' insolvency at the time it went into liquidation.

**Background**

5   The Doran family had been engaged in the building and construction industry in and around Newcastle since at least the 1950s. The directors' father began the business, and all the directors went into it when they left school.

6   Constructions was incorporated in February 1977 and took over the family construction business. By the 1990s the group comprised some fourteen companies in addition to Constructions, DCA and Holdings. The companies in the group had varied activities; as well as building and construction work, they engaged in property development, plant and machinery hire, operating a real estate agency and a tavern, and conducting two large shopping centres, two private hospitals and a medical centre.

7   As did Palmer J, without intending disrespect I will refer to the directors by their given names. Paul was the managing director of the companies in the group. Palmer J described him as having the most experience in business, management, finance and accounting and as a highly intelligent, articulate and capable businessman. Peter was primarily responsible for the property development activities of the group. Michael was mainly involved in day to day construction and supervision on building sites, and did not participate in management of the group's businesses. John had been engaged in the plant and machinery hire activity, and was otherwise not involved in management of the group's businesses.

8   From 1989 Mr Bradley Joyce, a qualified accountant, was employed as the group's financial controller. In about 1994 he became the general manager within the group. At material times Price Waterhouse acted as external accountants and, at least until 30 June 1994, auditors, Mr Martin Linz being the responsible partner. Price Waterhouse prepared the annual financial statements and provided accounting advice as required.

9   Over the period 1989-1992 the composition of the group was altered, with advice also from Ernst & Young, accountants and Holman Webb, solicitors. One of the purposes was to make DCA the holding company of those companies in the group carrying on building, construction and associated activities and Holdings the holding company of the remaining

companies. As part of this process, in July 1992 Holdings lent $3,156,662 to DCA to enable it to purchase from Holding all the share capital in Constructions and a further $1,655,069 to enable it to purchase from Holdings all the share capital in another company in the group, Doran Property Services Pty Ltd ("DPS"). The loans were repayable on demand and "interest free reviewable every 3 years".

10    As at 31 October 1994 DCA owed Holdings $4,592,145. The July 1992 loans to DCA were a substantial component of DCA's debt, but there must have been other components of or movements in the DCA loan account prior to the debt restructuring.

11  As at 31 October 1994 Holdings owed $5,288,811 to Constructions. The debt represented loans made from time to time by Constructions over the preceding years, the detailed makeup being unclear. Holdings' indebtedness was shown in the audited accounts (as a non-current liability) at $3,802,094 as at 30 June 1993 and $5,335,967 as at 30 June 1994, but there was evidence that Holdings transferred over $1.2 million to Constructions in the fifteen months or so prior to 31 October 1994; there must have been a lot of movements in the loan account. The debt was repayable on demand and, so far as the evidence showed, interest free.

12  There were other inter-company loan accounts, apart from these debts between DCA, Holdings and Constructions. They included debts of Holdings to DPS of $1,382,575 and of Dyspane Pty Ltd ("Dyspane") to Constructions of $1,210,000 as at 31 October 1994.

**The debt restructuring**

13    Directors' meetings of at least Holdings and Constructions were held on 1 November 1994. All the directors were present. In attendance were Mr Joyce, Mr Linz and Mr Christopher Freeman, the solicitor for the group. There were two sets of minutes for Holdings and one for Constructions. All were signed by Paul as chairman.

14    Taking them in the appropriate sequence, the minutes of the meetings relevantly recorded as follows.

15  The first minutes for Holdings recorded —

> **"Business**
> The meeting was called to discuss the payment of the money due by Doran Constructions Australia Pty Limited to this Company being the money lent to Doran Constructions Australia Pty Limited to enable it to purchase shares in Doran Constructions Pty Limited and Doran Property Services Pty Limited. It was noted during the course of discussions that there existed no arrangements for repayment and that the loan was repayable on demand. The Balance Sheet of the Company needed to be tidied up to give a better view of the assets and liabilities of the Company to Financiers and inter group and intra group loans needed to be rationalised to limit any problems which may arise from the charging or payment of interest on those loans.
>
> **Resolved**
> The Company shall demand the repayment by Doran Constructions Australia Pty Limited of the sum of $4,592,145.62."

16  The minutes for Constructions recorded —

> **"Business**
> The Company has received a request from Doran Constructions Australia Pty

Limited, the holder of all of the issued shares in this Company, for a loan of $4,100,000.00 for a minimum term of six (6) years (with the right for early repayment without penalty) at such interest rate or rates as may from time to time be agreed upon by and between this Company and Doran Constructions Australia Pty Limited. The purpose of the loan was to enable Doran Constructions Australia Pty Limited to discharge part of the amount lent by Doran Holdings Pty Limited to Doran Constructions Australia Pty Limited. Doran Holdings Pty Limited required the payment to enable it to rationalise inter group and intra group lending and avoid any problems which might arise in the payment of interest. Doran Constructions Australia Pty Limited also requested a loan from this Company for the same purpose. This Company from time to time advanced moneys to Doran Holdings Pty Limited while Doran Holdings Pty Limited was the holder of the shares issued in this Company and the amount of that loan stood in excess of $4,100,000.00. The Board agreed that it would be in the interests of this Company to rationalise inter group and intra group loans and understood the commercial benefit to all parties to commence with a fixed term. The Board also thought that the loan should be used only for the purpose of rationalisation of loans and made this a condition of the giving of a loan.

**Resolved**

1. To demand repayment by Doran Holdings Pty Limited of the sum of $4,100,000.00 forthwith; and
2. to loan the sum of $4,100,000.00 received from Doran Holdings Pty Limited to Doran Constructions Australia Pty Limited. Such sum to be used solely for the purpose of repaying an amount of $4,100,000.00 to Doran Holdings Pty Limited. The minimum term of the loan is to be six (6) years and the interest rate payable by Doran Constructions Australia Pty Limited will be that rate that shall from time to time be agreed upon by and between this Company and Doran Constructions Australia Pty Limited."

17   The second minutes for Holdings recorded —

"**Business**
The meeting was called to:

1. Discuss the request for payment of $4,100,000.00 by Doran Constructions Pty Limited being part of the loan moneys due to Doran Constructions Pty Limited. The Board noted that Doran Constructions Pty Limited stipulated that this money was to be utilised solely for the purpose of a loan to Doran Constructions Australia Pty Limited to enable Doran Constructions Australia Pty Limited to repay the amount due to this Company.
2. Discuss the request for payment of $492,145.62

by Doran Property Services Pty Limited being part of the loan moneys due to Doran Property Services Pty Limited. The Board noted that Doran Property Services Pty Limited stipulated that this money was to be utilised solely for the purpose of a loan to Doran Constructions Australia Pty Limited to enable Doran Constructions Australia Pty Limited to repay the amount due to this Company.

3.  The Board was prepared to accept that this was the purpose of the repayments and that this was in the interests of this Company as it was part of the rationalisation of the inter group and intra group loans which was suggested should take place by the Group's Accountants at the Annual General Meeting of this Company.

**Resolved**

1.    To repay to Doran Constructions Pty Limited the sum of $4,100,000.00.

2.    To acknowledge the purpose of the repayment and to agree with both Doran Constructions Pty Limited and Doran Constructions Australia Pty Limited that the method of payment be by way of Journal Entry in the books of the Company and that accordingly the loan account of the Company to Doran Constructions Australia Pty Limited be reduced by $4,100,000.00 and by Doran Constructions

Pty Limited be reduced by the same amount.

3.    To repay to Doran Property Services Pty Limited the sum of $492,152.62.

4.    To acknowledge the purpose of the repayment and to agree with both Doran Property Services Pty Limited and Doran Constructions Australia Pty Limited that the method of payment be by way of Journal Entry in the books of the Company and that accordingly the loan account of the Company to Doran Constructions Australia Pty Limited be reduced by $492,152.62 and by Doran Property Services Pty Limited be reduced by the same amount."

18  The evidence did not include signed minutes of a directors' meeting of DCA recording corresponding business. Unsigned minutes, of a meeting on 31 October 1994 at which all directors were present, were probably an anticipatory draft; they relevantly recorded —

"The Company has received a demand from Doran Holdings Pty Limited for the repayment of $4,100,000.00 forthwith. This is part of the money lent by Doran Holdings Pty Limited to this Company to acquire the issued shares in Doran Constructions Pty Limited and Doran Holdings Pty Limited and was repayable on demand. The Board noted that its subsidiary Doran Constructions Pty Limited was owed by Doran Holdings Pty Ltd more than sufficient moneys to repay the amount demanded by Doran

Holdings Pty Limited. The Board was also aware of the advantages which might be obtained by this Company rationalising the inter group and intra group loans which might then limit any problems which might arise from the charging or payment of interest on loans. The Board was concerned about borrowing money, albeit inter group, without the provision of a reasonable time for repayment. The Board thought that a minimum period for repayment would be six (6) years, although it wished to retain the option for an early repayment without penalty. The Board thought that the interest rate should be such as should be agreed between the two Companies from time to time during the term"

19  It will be noted that, while the first minutes for Holdings referred to demanding repayment of $4.592 million, the unsigned DCA minutes referred to a demand for $4.1 million. From the second minutes for Holdings, $492,152.62 was to go from Holdings to DPS and from DPS to DCA, to allow a total repayment by DCA to Holdings of $4.592 million. The evidence did not include minutes of a directors' meeting of DPS recording corresponding business, and Holdings' journal entries next mentioned dealt only with $4.1 million.

20  Palmer J noted that the Liquidator did not contest that the resolutions effecting the debt restructuring "were actually passed on 1 November 1994"; I take this to extend to acceptance of the substance of the unsigned DCA minutes.

21  Nothing was done at the time further to the resolutions. There was evidence of some journal entries, as at 1 November 1994 but posted on 4 September 1995. The narration in Holdings' journal as to the repayment of $4.1 million by Holdings to Constructions was "Repayment of loan re Doran

Constructions as per Directors' meeting minutes attached". There was a corresponding narration in Constructions' journal, in which the narration as to the loan of $4.1 million by Constructions to DCA was "Loan advance to parent coy to facilitate repayment of its loan to D/Holdings as per Directors' meeting minutes attached". The narration as to the repayment of $4.1 million by DCA to Holdings was "Repayment of loan a/c from DCA as per Directors minutes attached". There were also entries in Holdings' journal concerning the repayment to DPS.

22  Palmer J said as to these entries that "[t]here is no explanation in the evidence for the delay" (at [32]).

23  It was accepted that Holdings had been in a position to pay $4.1 million to Constructions if demand were made. The principal asset of the substituted debtor, DCA, was its shares in Constructions and DPS; it also had receivables of the order of $400,000. After the debt restructuring, DCA's principal liabilities were $4.1 million owed to Constructions and the remaining $492,145 owed to Holdings. It had no operating revenue for the year ended 30 June 1994.

### The liquidator's allegations

24  Breach of the statutory or fiduciary duties sounded in damages. If the debt restructuring was avoided, Holdings' debt to Constructions would remain. For the damages claim, account would have to be taken of payments to Constructions in reduction of the substituted DCA debt. There was contention as to whether and how the partial repayment should be taken into account in the avoidance claim, in which there would be a wider question of undoing the transaction in other respects.

#### (i) Breach of statutory and fiduciary duties

25  Under s 232 of the Law, the directors owed a duty to Constructions to act honestly in the exercise of their powers and the discharge of their duties, and with the care and diligence that a reasonable person in a like position would exercise in the company's circumstances. They owed fiduciary duties

to Constructions to exercise their powers for proper purposes and for the benefit of the company. In discharging their duties to Constructions they had to take account, if the company was insolvent or the company's financial situation otherwise put them at risk, of the interests of creditors as well as those of the company.

26  The Liquidator alleged that the directors caused Constructions to enter into the debt restructuring in breach of these duties —

> (a)   because they acted not in the interests of Constructions and its creditors, but in order to protect Holdings from pending claims against Constructions by Beresfield Aluminium Pty Ltd ("Beresfield") and the University of Newcastle ("the University");
>
> (b)   alternatively, because to the detriment of Constructions and its creditors there was substituted for a debt payable on demand by Holdings, a company with substantial assets and the capacity to repay $4.1 million to Constructions, a debt payable in six years time by DCA, a company without substantial assets or the capacity to pay $4.1 million to Constructions.

27  The Liquidator contended that Holdings was under accessory liability because it was involved in the directors' breaches of duty. It is unnecessary in these reasons to deal separately with Holdings' liability. Reference in the reasons to the directors as parties extends where appropriate to include Holdings as a party.

**(ii) Avoidance under the Law**

28  By s 588FF of the Law, a company's liquidator could apply for various orders in relation to a transaction of the company which was voidable. By s 588FE(4), a transaction was voidable if it was an insolvent transaction of the company, a related entity of the company was a party to it, and —

> "(c)   it was entered into, or an act was done for the purpose of giving effect to it, during the 4 years ending on the relation-back day."

29   Holdings and DCA were related entitles of Constructions. The relation-back day was 24 December 1997, and the debt restructuring was within the preceding four years. Was the debt restructuring an insolvent transaction?

30   Section 588FC relevantly provided that a transaction was an insolvent transaction if, and only if, it was —

> "… an uncommercial transaction of the company, and:
>
> (a)   any of the following happens at a time when the company is insolvent:
>> (i)   the transaction is entered into; or
>> (ii)  an act is done, or an omission is made, for the purpose of giving effect to the transaction; or
>
> (b)   the company becomes insolvent because of, or because of matters including:
>> (i)   entering into the transaction; or
>> (ii)  a person doing an act, or making an omission, for the purpose of giving effect to the transaction."

31  Section 588FB(1) provided —

> "(1)   A transaction of a company is an uncommercial transaction of the company if, and only if, it may be expected that a reasonable person in the company's circumstances would not have entered into the transaction, having regard to:
>> (a)   the benefits (if any) to the company of entering into the transaction; and

> (b)    the detriment to the company of entering into the transaction; and
> (c)    the respective benefits to other parties to the transaction of entering into it; and
> (d)    any other relevant matter."

32  By s 95A —

> "95A(1)  A person is solvent if, and only if, the person is able to pay all the person's debts, as and when they become due and payable.
> (2)    A person who is not solvent is insolvent."

33  Before Palmer J the Liquidator alleged that the debt restructuring was an uncommercial transaction because it was entered into not in the interests of Constructions and its creditors, but to their detriment, see above as to breach of the directors' duties, and that —

> (i)    Constructions was insolvent as at 1 November 1994 at the time the transaction was entered into; alternatively
> (ii)    Constructions became insolvent as at 1 November 1994 as a result of entering into the transaction; alternatively again
> (iii)    Constructions was insolvent as at 4 September 1995 when an act was done for the purpose of giving effect to it, the act being posting the journal entries; alternatively again
> (iv)    Constructions' insolvency as at 24 December 1997 was because of, or because of matters including, entering into the transaction.

34  The Liquidator did not maintain on appeal that Constructions was insolvent as at 1 November 1994 when the transaction was entered into.

**The deed of charge**

35  On 18 July 1995 Constructions executed a deed of charge in favour of Holdings, by which it granted a fixed and floating charge over all its assets and undertaking to secure all money from time to time owing by it or any other person to whom Holdings provided accommodation at its request. The charge recited that Constructions had requested Holdings —

> "… to advance to it or provide security for [Constructions] to borrow from its Bankers and/or to forbear to sue [Constructions] in and for the sum of One Hundred Thousand Dollars ($100,000.00) upon the terms and conditions hereinafter appearing and [Constructions] may from time to time request [Holdings] to provide further advances and accommodation."

36  Before Palmer J the Liquidator had alleged that the charge was given in breach of the directors' duties and was voidable. His claims in that respect failed, and were not revived on appeal. The charge remained as an event in the group's life.

**The Beresfield and University litigation**

37    The Liquidator's case made much of Constructions' disputes with Beresfield and the University. They resulted in substantial debts in Constructions' winding-up, although the debts were not established until after the liquidation.

**(i) Beresfield**

38  Constructions entered into a contract with the Department of Health ("the Department") to build stage 3 of the Gosford Hospital. On 10 August 1990 it entered into a subcontract with Beresfield under which Beresfield was to supply and install curtain walling and aluminium doors and windows for the job. The subcontract price was $1,294,425.

39    Performance of the subcontract works was marked by Constructions' complaints as to delay and

workmanship. The subcontract works were certified practically complete on 17 March 1992. On 27 July 1992 Beresfield submitted a final claim for $731,927, and on 13 August 1992 it purported to refer to arbitration a dispute over the claim. There was contention over the effectiveness of the referral. In February 1993 Constructions made a claim for $532,551 against Beresfield.

40    There followed a prolonged course of correspondence between Beresfield, Constructions and the Department. It is not easy to understand what was going on, and the evidence did not well explain or the submissions explore it. Beresfield's claim was variously revised to figures in the order of $400,000. It seems to have been understood that the claim, or a large part of it, depended on whether the Architect or the Superintendent under the contract accepted it, or at least accepted a corresponding claim by Constructions as part of claims being made by Constructions against the Department; at one point Constructions was appointed Beresfield's agent to "seek a settlement" with the Department whereupon Beresfield would execute a deed of release. The Architect was asked to certify the claim(s), and said to the effect that he saw little substance in the Beresfield claim.

41    As at the end of October 1994 Beresfield's claim was for $449,100 and nothing was resolved. In November 1994 the Superintendent wrote rejecting the claim save for about $53,000. Constructions' claim against Beresfield seems to have lain dormant during the correspondence. Where this left Beresfield's claim against Constructions was unclear, but Paul's evidence was to the effect that he thought at the time that the Superintendent's stance vindicated that of Constructions.

42    In January 1995 the Department paid $1,005,226 to Constructions in settlement of Constructions' claims. It was a commercial settlement, without attribution to particular outcomes of claims. Paul agreed that the settlement included "a sum in respect of a number of Beresfield's claims against [Constructions]"; what was included was unclear. Paul said that nothing was paid to Beresfield because Constructions had a greater claim against Beresfield.

43    Beresfield then prosecuted its claim against Constructions. It is not clear whether the earlier referral was revived or there was a new referral to arbitration, but in March 1995 a preliminary conference was held in an arbitration in which Beresfield brought an increased claim and Constructions brought an increased counterclaim. The submissions in the arbitration concluded on 12 September 1997. On 12 January 1998 the arbitrator published an interim award in which he upheld Beresfield's claim to the extent of $447,980 plus interest and Constructions' counterclaim to the extent of $5,148.50 plus interest. Time was allocated for submissions on costs and calculation of interest. Constructions put no submissions, presumably because of the liquidation. On 12 March 1998 the arbitrator made a final award in favour of Beresfield for $656,756.80 plus costs of $470,762.

44    That was not the end. There was litigation over the interim and final awards, see *Doran Constructions Pty Ltd v Beresfield Aluminium Pty Ltd* [1999] NSWSC 499 (Brownie AJ, 21 May 1999); *Doran Constructions Pty Ltd v Beresfield Aluminium Pty Ltd* (2001) 17 BCL 215 (Brownie AJ, 8 February 2001); and *Doran Constructions Pty Ltd v Beresfield Aluminium Pty Ltd* (2002) 54 NSWLR 416 (CA, 8 May 2002). An application for special leave to appeal to the High Court was refused on 14 March 2003.

45    Paul gave evidence that as at 1 November 1994 he believed that Beresfield owed money to Constructions and Constructions did not owe money to Beresfield. In cross-examination it was suggested that Constructions should have passed on to Beresfield part of the settlement with the Department, and did not do so because it was short of money. Paul did not accept that it was due to shortage of money, and said that Beresfield declined to execute the deed of release. Paul's asserted belief as at 1 November 1994 was otherwise not challenged.

46    At least on appeal, the dispute with Beresfield was less prominent in the Liquidator's case than the dispute with the University.

**(ii) The University**

47  The University's Hunter Building was damaged in the earthquake of 1989. In December 1992 Constructions entered into a contract for remedial work. At the end of June 1993 Constructions delivered to the University a claim for prolongation and disruption costs. There was dispute, which was referred to arbitration, the claim then being for $354,961.35 plus interest. On 11 October 1993 the University served a counterclaim. The amount claimed is not clear, but by mid 1994 appears to have been of the order of $2.5 million. The arbitration was adjourned to a date to be fixed.

48  The University's claim appears to have been for defective work, and the correspondence suggests dispute over whether rectification work was due to defective design for which Constructions was responsible or to design for which it was not responsible or some other cause. The University terminated the contract, which Constructions also disputed. In early December 1994 Constructions brought proceedings in the Supreme Court claiming over $4 million from the University. In due course the arbitral claims were effectively brought within the proceedings.

49  Mediation of Constructions' claim, and the University's foreshadowed claim for rectification and other costs, was unsuccessful. The proceedings were complicated by claims against engineers and others, and by other proceedings between the University and its insurer over the work for which insurance reimbursement would be given. Only in October 1996 did the University actually cross-claim in the proceedings, claiming nearly $2 million and some further unquantified damages.

50  In March 1997 it was ruled that there should be concurrent references in the two proceedings. The order for reference was made on 8 August 1997. Constructions went into liquidation before the reference had progressed. The Liquidator withdrew from participation in the reference and the proceedings, and in March 1998 orders were made dismissing Constructions' claim. The University's cross-claim continued without opposition from the Liquidator.

51  On 13 May 1999 the referee delivered a report upholding the University's claim to rectification costs in the sum of $1,772,038. There was no detailed evidence of what happened thereafter, but the University ended up as a substantial creditor of Constructions.

52  Paul gave evidence that as at 1 November 1994, Constructions having claimed upon the University and there being no cross-claim, he believed that the University owed money to Constructions and Constructions did not owe money to the University. It was put to him in cross-examination that he must have anticipated a cross-claim to the effect of the counter-claim earlier served in the arbitration. He said, in substance, that there had been discussions with the insurer and he thought the problem might be resolved by the insurer agreeing to pay. The evidence was far from clear, but Paul declined to agree that he knew the University's claim was very likely to be pursued.

### Other construction works

53  Apart from the Gosford Hospital and Hunter Building jobs, as at 1 November 1994 Constructions had as current construction works jobs identified as Liverpool Aquatic Centre, Manly Library, Moorebank and Big Bear, and another eight jobs in their defects liability periods. After 1 November 1994 it commenced construction works for jobs identified as Kenthurst, Miranda and Holroyd Hospital, and tendered for a number of other jobs. Revenue could be expected on the expiry of the defects liability periods and from the jobs, and for the year ended 30 June 1995 Constructions' operating revenue was over $12 million, almost $6 million in the period from 1 November 1994. However, there was an operating loss for the year of $369,971, and the evidence indicated forecast losses on the Liverpool Aquatic Centre and Manly Library jobs and only a modest profit on the Moorebank job.

54  The evidence more generally was that Constructions' revenue was falling from that of previous years. Constructions had ceased trading by October 1997. There was some evidence that it ceased

to trade in July 1995, but the position was not made clear, and that may have meant that it was not seeking new jobs; it is likely that it was completing existing jobs. Whatever the position, it does not seem to have traded profitably from 1 November 1994 onwards.

**The August and September 1996 resolutions**

55    Unsigned minutes of directors' meetings of Constructions, Holdings and DPS on 27 August 1997 provided for resolutions to the effect that, once it had repaid DPS, Holdings would provide additional funds to Constructions and "the Doran Constructions (Australia) Pty Limited group" and receive a charge over their assets and the assets of DPS, the first $100,000 of the funds as a loan to Constructions and the funds beyond $100,000 to be treated as loans to DPS but "forwarded to [Constructions] … via [DCA] as a repayment of the loan amount owing to [Constructions] by [DCA]".

56    Signed minutes of directors' meetings of Constructions and Holdings on 18 September 1996, at which all the directors were present, recorded resolutions to the same effect, save that —

    (a)  the Holdings resolutions included —

        "4.    Doran Holdings Pty Limited would continue to monitor the overall situation and if thought appropriate at some time in the future, provide written notice to the Doran Constructions (Australia) Pty Limited group that no further funds would be made available for potential future commitments; and"

    (b)  the Constructions resolutions included —

        "(iii)    that Doran Holdings Pty Limited may cease the future provision of funds for potential

future commitments by providing notice in writing of such cessation."

**The November and December 1997 resolutions**

57    On 6 November 1997 Mr Linz wrote to Mr Freeman, seeking his contribution to current consideration of liquidation of DCA and the "situation" of Constructions, Holdings and DPS. He reported as follows. On 30 June 1997 DCA's shares in DPS had been sold to Holdings for $300,000. Prior to the sale DPS had forgiven a debt of $1,366,509 owed to it by DCA. The directors had been funding Constructions' litigation. DCA was thought no longer to serve a useful purpose, and it was proposed that it be put into members voluntary liquidation. Amongst other "rationalisation" of inter company loans and investments, the (balance of the) loan by Constructions to DCA could be written off, which would not disadvantage creditors because it "has no real value".

58    The minutes of a directors' meeting of Constructions on 28 November 1997, at which all the directors were present, recorded resolutions —

        "**Resolved**
        1.    That the terms and conditions attaching to loans from Doran Holdings Pty Limited under the following terms are accepted:
        • that repayment be at call;
        • that interest be charged at a rate to be negotiated between the parties;
        • that Doran Holdings Pty Limited may cease the future provision of funds for potential future commitments by providing notice in writing of such cessation.

2. Funds and property made available by PA Doran, PJ Doran, ML Doran and JC Doran to pay the legal fees of Doran Constructions Pty Limited are to be treated as loans from Doran Holdings Pty Limited and are made available on the same terms and conditions as previously agreed to between Doran Holdings Pty Limited and Doran Constructions Pty Limited.

3. To forgive the loan account owing by Doran Constructions (Australia) Pty Limited of approximately $2,552,361."

59  In his public examination Mr Linz said that he was asked to advise on how DCA could go into a members voluntary liquidation, because it "no longer served any purpose", and that he said it was necessary that it not have any creditors, so the DCA debt had to be forgiven; he advised that the loan had little if any value and creditors would not be disadvantaged.

60  It was held in subsequent proceedings that there had not been an effective forgiveness. On 28 November 1997 the directors of DCA resolved to place it into voluntary liquidation, and on 9 December 1997 the shareholders of DCA (effectively, the directors) resolved that it be wound up voluntarily. After the liquidation of Constructions, the Liquidator lodged a proof of debt in the winding-up of DCA claiming $2,552,361. In proceedings between the two liquidators (*Lewis v Cook* [2000] NSWSC 191; (2000) 18 ACLC 490), in March 2000 it was held that the purported forgiveness was ineffective because there had been neither valuable considerations nor a deed, and that in any event the forgiveness was an insolvent transaction voidable under s 588FE(3) of the Law. Austin J found that Constructions was insolvent as at 28 November 1997. His Honour held that, although DCA was in extremis, there was a slight possibility that Constructions might obtain a substantial judgment in the litigation then current with Beresfield and the

University, whereby its shares would be of value to DCA and DCA could repay part of the debt, that there was also practical value in Constructions being able to place DCA in insolvent liquidation rather than let it go into a members voluntary winding-up, and that a reasonable person would have been influenced by these matters not to forgive the debt. In April 2000 DCA was placed in insolvent liquidation.

61  On 10 December 1997 Mr Linz wrote to Ernst & Young for its views. He reported on the sale of the shares in DPS and the "rationalisation" of the intercompany loans and liquidation of DCA. He said that the directors were not certain how much longer they were willing to cover the legal expenses of Constructions, and that the legal disputes had continued for much longer than expected and could run into the next year or beyond in relation to the University; and that appointment of an administrator or liquidator to Constructions was under consideration.

62  The minutes of a directors' meeting of Holdings on 16 December 1997, at which all the directors were present, recorded —

"**Business**
1. Discuss the cessation of funds to be forwarded to Doran Constructions Pty Limited in order to assist the company to continue to pursue contractual and other legal claims.

**Resolved**
1. Doran Holdings Pty Limited is to provide written notice to the Doran Constructions Pty Limited and that no further funds would be made available for potential future commitments."

63  On 16 December 1997 Holdings wrote to Constructions, in a letter signed by Paul —

**"Provision of Funds by Doran Holdings Pty Limited to Doran Constructions Pty Limited**

In light of the continued protraction of legal claims being pursued by Doran Constructions Pty Limited and the escalating cost of legal fees to pursue these claims, the Directors of Doran Holdings Pty Limited have decided to cease the provision of funds by providing notice in writing of such cessation. This letter serves to provide the requisite notice."

**Constructions goes into liquidation**

64   Also on 16 December 1997, the directors of Constructions resolved to seek advice from Mr Lewis "as to the appropriate course of action required to be taken by the company". The advice, also from other professionals, was that Constructions be wound up. A meeting of creditors was called, and on 24 December 1997 it was resolved that Constructions be wound up. The Liquidator was appointed as liquidator.

65   The summary of creditors later prepared listed unsecured creditors totalling $4,476,011.50, including $1,127,518.80 for Beresfield and $2,986,000 for the University. Later again, unsecured creditors were said to total $4,527,990. External unsecured creditors other than Beresfield and the University totalled $358,494. Other than possibly in an insignificant amount, none resulted from trading operations prior to 1 November 1994 or 4 September 1995. Constructions had realisable assets of about $46,000, as established in March 2000 plus the balance of the DCA debt earlier forgiven, but the debt was worthless.

**Intra-group transactions**

66   In the period after 1 November 1994 substantial sums were paid by Holdings and DCA to Constructions. Holdings repaid to Constructions $1.189 million, the balance of its debt apart from the $4.1 million, between 1 November 1994 and 17 July 1995, and advanced a further $1.225 million to Constructions between 18 July 1995 and 24 December 1997. DCA paid $1.449 million to Constructions between 1 November 1994 and 24 December 1997, which was treated as part repayment of the $4.1 million debt although the debt was not due and payable. This $1.449 million was effectively all provided by Holdings to DCA, and amounted to payment by Holdings to Constructions via DCA.

67   As well, between 1 November 1994 and 24 December 1997 Dyspane was taken to have paid $1.21 million to Constructions in repayment of its indebtedness. This was described as Dyspane "assuming" a mortgage loan facility held by Constructions with a bank, and does not appear to have involved funds effectively provided by Holdings. (The evidence referred also to Dyspane lending $552,032.30 to Constructions in October 1995 - March 1996. The parties were agreed upon $1.21 million as the amount of Dyspane's payment to Constructions, and I do not attempt to fit this evidence into the picture.)

68   Schedules in evidence showed payments made by Holdings in amounts from as little as $600 to as much as $400,000, on about seventy occasions, sometimes to Constructions and sometimes to third parties on behalf of Constructions. The last payment was on 24 November 1997. Payments were particularly made to a bank and to lawyers, as to the latter I infer in connection with the Beresfield and University litigation.

69   The total of the payments by Holdings and Dyspane, rounded out, was the $5.1 million to which Palmer J referred as funds provided from cash resources within the group available to pay Constructions' external creditors, see later in these reasons.

**Palmer J's reasons**

70    Palmer J first considered the Liquidator's contention that the debt restructuring was entered into not in the interests of Constructions, but in order to protect Holdings in the event that claims against Constructions by Beresfield and the University succeeded. Holdings was exposed, the Liquidator suggested, because successful claims against Constructions could mean that Constructions went into liquidation, whereupon the Liquidator could call for payment of Holdings' indebtedness of $5.289 million (or whatever the indebtedness was at the time) and Holdings' assets would go to satisfy the claims.

71    His Honour was not satisfied that as at 1 November 1994 the claim by Beresfield against Constructions was regarded as a present and substantial financial threat, either to Constructions or to Holdings, and was not satisfied that it played any part in the directors' reasons for the debt restructuring. He found that as at 1 November 1994 the directors were aware that Constructions had a claim against the University and that the University would probably make a substantial claim against Constructions, that that matter was discussed at the meeting on 1 November 1994, and that it was clear to Paul and Mr Joyce, at least, that a major litigious battle with the University was looming. After discussion of the evidence given by Mr Freeman, Mr Linz (via the transcript of his evidence in his public examination) and the directors, and referring also to what he described as objective matters, his Honour said —

"65    In my opinion, the most reliable evidence as to the purpose of the Restructure, as discussed at the Directors' meeting on 1 November 1994, is given by Messrs Freeman and Linz. On the basis of that evidence, which I accept, I find that the foreshadowed claim by the University against Constructions was not the driving factor for the Restructure. The driving factor was a desire on the part of the Directors to separate the financial affairs of the property holding companies in the Doran Group, embodied in Holdings, from the financial affairs of the building and construction companies, embodied in Constructions. That desire for separation did not originate in a fear that the University's claim against Constructions would be successful and would result in a liquidator being appointed to Constructions and making a demand upon Holdings. The desire for separation originated in a perception, held for some time before November 1994, that it would be easier to obtain finance for the property holding activities of the Group if they were segregated from the building and construction activities.

66    I am satisfied that the Directors' desire to achieve separation of the financial affairs of Holdings and Constructions was given a sense of impetus and focus by the impending litigation with the University. That litigation would have exemplified the problems and difficulties which could be caused to the property holding activities of the Group by litigation arising from the Group's building and construction activities. However, I accept that the Directors did not actually believe that the University's claim against Constructions would ultimately be successful and

that it would result in the liquidation of Constructions. I accept Paul's evidence that he believed that the litigation would result in money being paid to Constructions.

67    Having regard to the evidence of Messrs Freeman and Linz and to the evidence of the Directors, which I accept, and to the objective factors referred to in paragraphs 60 to 62 above, I find that the Directors did not have an actual intention, in effecting the Restructure, to remove the assets of Holdings from the reach of the creditors of Constructions. I accept that they believed that at the time of the Restructure Constructions was solvent."

72  Palmer J then turned to whether Constructions was in fact solvent at the time of the debt restructuring.

73  His Honour accepted the reconstructed balance sheet for Constructions immediately prior to the debt restructuring prepared by the directors' expert, Mr Bryant, in preference to that prepared by the Liquidator's expert, Mr Pascoe.

74  His Honour said —

"75  There is no dispute as to the following:

i)  as at 1 November 1994 there were present none of the usual indicia of insolvency;

•    there was no history of dishonouring Constructions' cheques;

•    suppliers had not been delivering goods only on a COD basis;

•    Constructions had not been issuing post-dated or 'rounded sum' cheques;

•    Constructions had made no special arrangements with its creditors;

•    Constructions was able to produce timely, audited accounts;

•    Constructions had no unpaid group tax, payroll tax, workers compensation premiums or superannuation contributions;

•    Constructions had received no demands from its bankers to reduce overdraft limits and it had a good relationship with its bankers;

•    Constructions had received no statutory demands, solicitors' letters requiring payment of debts or legal proceedings for the payment of trade debts;

ii)  as at 1 November 1994, Constructions' reconstructed balance sheet showed net total assets of $3.5M and positive net current assets;

iii) all of the $5.9M recorded as Constructions' liabilities as at 31 October was paid (or written back as no longer a liability) prior to Constructions' liquidation on 24 March [sic: December] 1997;

iv) funds of $5.1M were provided to Constructions by other companies in the Doran Group between 1 November 1994 and 24 December 1997;

v) as at 30 June 1995, shortly before the date upon which the Charge was given by Constructions to Holdings, Constructions had recorded liabilities of $3.5M, all of which had been paid or written back prior to 24 December 1997;

vi) of the $1.4M disclosed in Constructions' Report as to Affairs upon its liquidation, only $234,000 was owed to external creditors and none of the external creditors resulted from trading operations prior to 31 October 1994 or 30 June 1995;

vii) there were major decreases in the overdraft facility of Constructions during September and November 1996 and the overdraft was extinguished entirely in November 1996 when

Holdings advanced a sum of $400,000 to Constructions;

viii) as at 24 December 1997, Constructions had no outstanding liability in relation to a mortgage facility of $1.2M previously taken out with St George Partnership Banking Limited;

ix) a loan from DCA to Constructions of $98,737 existing as at 31 October 1994 had been discharged by 24 December 1997;

x) as at 31 October 1994, total employee liabilities for Constructions were $110,666 but by 24 December 1997 Constructions had no employees and all of these amounts had either been paid or transferred to the account of Holdings;

xii) there is no evidence of any of the indicia of insolvency to which I have referred between 1 November 1994 and the winding up of Constructions in December 1997.

76    In short, for slightly more than three years after 1 November 1994 Constructions continued to subsist, paying its external debts with the assistance of funds provided by other companies in the Doran Group, without any complaint from its creditors or its financiers."

75  His Honour noted that Mr Pascoe was of the opinion that as at 31 October 1994 Constructions was unable to pay its debts as they fell due "despite the undoubted fact that, as the evidence shows, it actually did so for about three years thereafter". His Honour considered that there were at least three flaws in Mr Pascoe's opinion.

76  The first flaw, in his Honour's view, was that Mr Pascoe had not applied a cash flow test for insolvency, but a "profits test" and a "working capital test". The second and related flaw was expressed by his Honour —

> "80    The    second    flaw is that Mr Pascoe never ascertained what debts of Constructions were actually due and payable as at 31 October 1994 and whether those debts were paid as and when they fell due. He took the total figure of $2.661M for trade creditors shown in the reconstructed balance sheet as at 31 October 1994 and applied the 'working capital test' to that figure.
>
> 81    But, in truth, as Mr Bryant's analysis shows - and Mr Pascoe does not dispute it - only about $160,000 was owing to trade creditors as at 31 October 1994 and there is no evidence to suggest that those creditors were not paid according to their normal trading terms. The absence of any indicia of insolvency as at 31 October 1994 and for about three years later suggests strongly that as at 31 October 1994 trade creditors were being duly paid and that that situation continued for a long time afterwards."

77  The third flaw, on which argument focussed in the appeal, was —

"82  The third flaw is that Mr Pascoe disregarded the cash resources within the Doran Group which were available to pay its external creditors, both as at 31 October 1994 and thereafter. As I have noted, funds of $5.1M were provided to Constructions by other companies in the Doran Group between 1 November 1994 and 24 December 1997. Mr Pascoe takes the view that the cash flow test as prescribed by s 95A CA requires that a company's ability to pay its debts is determined, in all circumstances, only by reference to that company's own assets so that what he termed 'voluntary payments' by other members of a group of companies must be disregarded.

83    Whether Mr Pascoe's view is correct has some significance in the case. The Directors concede that on and after 31 October 1994 Constructions was unable to pay all its debts solely from the revenue derived from its trading and from its own assets. They concede that it was not able to discharge all of its liabilities except by means of advances from other companies in the Doran Group, principally from Holdings. However, they say that the ability and willingness of other companies in the Doran Group to make cash available to Constructions as needed and not to call up those advances except at times when Constructions

was conveniently able to repay was a resource available to Constructions at all relevant times which must be taken into account when determining its solvency."

78  Although his Honour did not refer to it, another of the directors' experts, Mr Hunter, had opined that, in determining a company's solvency, it should be asked whether the company "has the ability to access money from other people or sources and to raise funds from its bankers and stakeholders", and that Constructions "had adequate sources of alternative funding from its bankers and other members of the Doran Group to be able to pay all of its debts as and when they became due and payable". Mr Hunter had had regard to "the cash inflows from other members of the Doran Group". Mr Hunter did not exclude "voluntary payments" as a source of funds, provided the funds advanced were treated as deferred liabilities; he said that the critical question was whether the company could pay its debts. In the course of the hearing his Honour had observed that the difference between the "philosophical approaches" of Mr Pascoe and Mr Hunter (and Mr Bryant) was fairly clear and it was up to him to decide what the law required.

79  Palmer J's reasons turned to that matter. The predecessors to s 95A of the Law had referred to ability to pay the debtor's debts "from his own monies". After an extensive consideration of the legislation and the cases, his Honour said —

"106  I think that I must approach the application of s 95A CA with two considerations in mind. First, the words of s 95A must be construed as they stand, without addition or subtraction. Second, the law both before and after the enactment of s 95A is unequivocally and emphatically clear that insolvency is, first and last, a question of fact '*to be ascertained from*

*a consideration of the company's financial position taken as a whole. In considering the company's financial position as a whole, the Court must have regard to commercial realities. Commercial realities will be relevant in considering what resources are available to the company to meet its liabilities as they fall due, whether resources other than cash are realisable by sale or borrowing upon security, and when such realisations are achievable*: Southern Cross Interiors Pty Ltd (in liq) v Deputy Commissioner of Taxation* (2001) 53 NSWLR 213 at 224 (citations of authority omitted) …'"

80  After further discussion, his Honour concluded that the omission of "from his own monies" from s 95A removed an artificial restriction, and that —

"116.  … s 95A requires the Court to decide whether the company is able, as at the alleged date of insolvency, to pay all its debts as they become payable by reference to the commercial realities. If the Court is satisfied that as a matter of commercial reality the company has a resource available to pay all its debts as they become payable then it will not matter that the resource is an unsecured borrowing or a voluntary extension of credit by another party."

81  His Honour then said —

"117  In the present case, I have regard primarily to the following facts in determining Constructions'

solvency as at 31 October 1994:

> - there is no evidence that, as at that date, Constructions had not been paying all of its debts as they became payable;
> - the evidence is that all debts payable by Constructions as at that date were subsequently paid or otherwise discharged without complaint from its creditors;
> - the evidence is that Constructions was able to continue paying its debts for some three years afterwards without complaint from its creditors.

118    In my view, it does not matter whether Constructions was able to pay its debts as at 31 October as well for about three years thereafter because other companies in the Doran Group made funds available to it. What actually occurred in this respect proves that the funds of the other companies in the Group were a resource available to Constructions as a matter of commercial reality.

119    For these reasons, and also because I am of the view that the opinion of the Liquidator's expert, Mr Pascoe, is flawed in the ways I have described, I conclude that the Liquidator has failed to prove that Constructions was insolvent as at 31 October 1994. However, I should go further: I find that as at that date Constructions was, in fact, solvent.

**Insolvency as at 1 November 1994 and 18 July 1995**

120    The factors to which I have referred in paragraph 75 were present also as at 1 November 1994 and as at the time the Charge was given, i.e. 18 July 1995. For the reasons which I have explained, I conclude that the Liquidator has failed to prove that Constructions became insolvent as a result of the Restructure and that the company was insolvent as at 18 July 1995. Again, I find that as at that those dates Constructions was, in fact, solvent."

82    Palmer J then turned to whether the debt restructuring was an insolvent transaction. His Honour said —

> "122   For the reasons which I have given, I am not satisfied that Constructions was insolvent when the Restructure was entered into on 1 November 1994, or in September 1995, when the book entries giving effect to the Restructure were made. Neither am I satisfied that Constructions became insolvent by reason of the Restructure. For those reasons alone, I am not satisfied that the passing of the resolution effecting the Restructure by the Directors, as directors of Constructions, and giving effect to the Restructure by the book entries was 'an insolvent transaction' and therefore

liable to be avoided under s
588FE(4)."

83  His Honour went on to hold that in any event
the debt restructuring was not an uncommercial
transaction. He said that he accepted that a
transaction which provided a direct benefit for one
company in a group of companies might provide an
indirect benefit for another, referring to *Equiticorp
Finance Ltd (In Liquidation) v Bank of New Zealand*
(1993) 32 NSWLR 50 at 146-7, and that —

> "125    The evidence in
> the present case shows that
> the shareholding of the
> Doran Group of companies
> was held in equal shares
> by the four Directors,
> indirectly through their
> family companies. I accept
> the evidence of Michael
> Doran to the effect that
> the businesses in the Group
> were regarded as in reality
> one family business and that
> decisions by the Directors
> had to be unanimous if they
> were to be carried into effect.
> He said:
>
> > 'If we
> > weren't
> > unanimous,
> > we didn't
> > do it.'
>
> 126    The evidence also
> shows that Holdings was
> regarded as the banker
> of the Group, providing
> money to the subsidiaries
> as required. It fulfilled that
> role both before and after
> 1 November 1994. The
> Group had also given cross
> guarantees: Holdings had
> given unlimited guarantees
> to secure Constructions'
> overdraft. The continuing
> financial welfare of Holdings

was, therefore, of material
benefit to Constructions.

127    As I have found in
paragraph 65, the purpose
of the Restructure was
to segregate the property
holding activities of the
Group from the construction
activities so that it would
be easier to obtain finance
for the property holding
activities. But, as is evident
from the advances made by
Holdings to Constructions
after 1 November 1994,
money coming into Holdings
from borrowings could
be made available to
Constructions if required.

128    In my opinion, having
regard to Holdings' role
as banker to the Doran
Group, it could be seen as
reasonably in the interests
of Constructions to facilitate
the Restructure so that
Holdings could find it easier
to borrow.

129    Similarly, because
Holdings was unarguably
solvent as at 1 November
1994 and would be ready
to provide money to
Constructions or to DCA
thereafter, if needed, I do
not think that Constructions
suffered an unreasonable
detriment in that the
Restructure replaced the debt
from Holdings with the
debt from DCA. I do not
accept that DCA must have
been seen at that time as
incapable of repaying its
debt to Constructions. There
is no reason to suppose
that if Constructions had
required repayment of the
DCA debt shortly after

the Restructure and DCA itself had insufficient funds, Holdings would not have advanced the necessary funds to DCA."

84   Finally, his Honour returned to breach of the directors' duties. He said —

"131   It will have become clear from the foregoing reasons that I am not satisfied that Constructions was insolvent, near to insolvent, or at any risk of insolvency as at 1 November 1994.

132   Accordingly, in considering whether to enter into the Restructure, the Directors in exercising their statutory and fiduciary duties as directors of Constructions, had no duty, or even occasion, to consider the effect which the Restructure might have on the rights of Constructions' creditors: see e.g. *Equiticorp* at 144-146 and the cases there cited.

133   As I have held, the Directors did not enter into the Restructure for the purpose of replacing a valuable asset of Constructions with a worthless one, in order to deprive the University or Beresfield of the fruits of their litigious success, if that should be the outcome. The purpose which I have found motivated the Directors was not ulterior to the interests of Constructions nor was it unreasonable having regard to the interests of Constructions.

134   Further, I take into account the fact that the Directors expressly sought the advice of the Group's auditor and of its solicitor, neither of whom advised that what was proposed in the Restructure was wrong.

135   In all of these circumstances, I am unable to find that, in effecting the Restructure, the Directors did not act in good faith in the interests of Constructions or with lack of appropriate care and skill in the discharge of their duties as directors of Constructions."

### Was there the purpose of defeating creditors?

85   The Liquidator submitted that the directors had never advanced a "clear and coherent" explanation for the debt restructuring. He said that although they had denied that the purpose was to remove assets from the reach of Constructions' creditors, the judge had found that Paul, and probably Peter, were aware that the University was making a substantial claim against Constructions, and that Paul and Mr Joyce foresaw a "major litigation battle" with the University, with concomitant expense. His Honour regarded the impending litigation as providing "a sense of impetus and focus", but in the Liquidator's submission had given too little weight to that part of the evidence of Mr Linz in his examination in which he said that Mr Joyce wanted to tidy up the loan accounts because the company was about to take action against the University and he wanted the group "in a secure position" before it did so; in particular the evidence —

"You can recall being discussed at this meeting the possibility of a negative result from the university claim, can't you? ∼ I can remember - well, I can - I can remember the awareness that there was some risk attached to

the litigation that they were about to embark upon.

Indeed, the whole conversations about these transactions was predicated, was it not, on the basis of a desire to separate Holdings from Constructions because of this claim? ～～ Yes."

86   The Liquidator's submission was rather selective within Mr Linz's evidence. Mr Linz remembered Paul telling the other directors that "he thought the University would be a positive result for them". He was vague about what the group was to be secure against, but did not accept that there had been any "definitive" reference to the claim going against Constructions, rather that there was risk attached to any litigation. He recalled the directors discussing the transaction as part of the ongoing rationalisation of the group, wanting a simpler presentation to financiers which Paul and Mr Joyce had "always pushed for", which in Mr Linz's mind was "given some urgency" because Constructions was about to embark on litigation against the University.

87   Mr Freeman's evidence was squarely that the discussion was of simplifying the loan accounts within the group so that the construction companies and the property companies were responsible for their own transactions, under pressure from the group's banks to simplify the group structure. He said that Paul explained to those present that the banks wanted two separate groups "so that when processing a loan for one group, they only need concern themselves with that group's accounts". Mr Freeman said he gave advice as to the need to ensure that the debt restructuring did not put any of the participants into present or future insolvency, and suggested the debt restructuring which in fact took place. He was not cross-examined.

88   Although the judge did not refer to it, Mr Joyce described tidying up the loan accounts as part of an ongoing process of rationalisation, discussed with the directors, auditors and financiers. He said that the process of disconnecting the Holdings group and the Constructions group began in the late eighties and "it

continued all the way through during my time at the company". Mr Joyce's general recollection is of some significance, although he could not recall the meeting of 1 November 1994 in any detail.

89   The objective matters to which the judge referred were these. First, Holdings still owed $1.189 million to Constructions, and advanced $1.225 million to Constructions after 27 July 1995; his Honour considered that this was not consistent with "a preconceived plan by the Directors to shield Holdings' assets from claims by Constructions' creditors" (at [61]). Secondly, the directors and other companies in the group, including Holdings, had given unlimited guarantees to Constructions' banks Barclays and Westpac to secure its financing liabilities; his Honour considered that through the guarantees, the assets of Holdings remained exposed. In evaluating his Honour's regard to these matters it should not be forgotten that on 18 July 1995 Holdings took a charge over Constructions' assets and undertaking; but it did commit its assets to funding Constructions. The matters do tend against a purpose of defeating creditors. Although the judge did not refer to it, that the debt restructuring included DPS's debt tends the same way - there was no suggestion that DPS was at risk from claims against it.

90   Importantly, the judge specifically accepted the directors' evidence, which included that, although they had little recollection of the particular circumstances in which the debt restructuring came about, they denied the purpose alleged by the Liquidator. Paul said that it "never entered his head" that a liquidator might be appointed to Constructions who could call in Holdings' debt, and that he believed Constructions was solvent at the time. He and Peter were express in their denials, and the judge noted that Peter said "with some warmth" that he considered it a wrong thing to do and "We just wouldn't do that".

91   The judge's conclusion was in part credit-based, upon the view he took of the directors in giving evidence. I do not think it was contrary to incontrovertible facts or uncontested testimony, or glaringly improbable or contrary to compelling inferences: in this I take up the well-known principles of appellate restraint more recently expounded in

*Fox v Percy* (2003) 214 CLR 118. In my view, the Liquidator has not established that the judge was in error in finding that the directors thought that Constructions was solvent and did not have the purpose of defeating its creditors by removing Holdings' assets from their reach.

92    Whether the directors were in breach of their duties on the alternative basis alleged by the Liquidator is best left until after consideration of Constructions' solvency.

**Did Constructions become insolvent as at 1 November 1994 as a result of entering into the transaction?**

93    The Liquidator did not submit that the judge was in error in the view he took that s 95A called for regard to the "commercial realities", or in the view he took, earlier expressed in *Southern Cross Interiors Pty Ltd (in liquidation) v Deputy Commissioner of Taxation* (2001) 53 NSWLR 213 at 224 and repeated at his [106] in this case, that insolvency is a question of fact —

> "… to be ascertained from a consideration of the company's financial position taken as a whole. In considering the company's financial position as a whole, the Court must have regard to commercial realities. Commercial realities will be relevant in considering what resources are available to the company to meet its liabilities as they fall due, whether resources other than cash are realisable by sale or borrowing upon security, and when such realisations are achievable."

94    The Liquidator's submissions were to the following effect. As at 1 November 1994, Constructions' principal current assets were trade debtors of $1.872 million, a debt of $1.189 million payable by Holdings and a debt of $4.1 million payable in six years time by DCA. Its principal

current liabilities were trade creditors of $2.063 million and a bank overdraft of $1.812 million. (These excluded the unliquidated claims of Beresfield and the University, which were correctly not brought to account in the balance sheet at that time. Mr Pascoe had taken trade creditors of $2.661 million, but the judge accepted Mr Bryant's figure of $2.063 million; I have substituted this figure in the submission.) Constructions had sustained a trading loss for the year to 31 October 1994 of nearly $300,000, and Paul acknowledged in his evidence that it could not meet the demands of its creditors from its cash flow from its building activities. It had been dependent on recoverability of the Holdings debt in order to pay its creditors, it was said, and after the debt restructuring was dependent on recoverability of the DCA debt; but DCA had had no operating revenue in 1993-1994 year, its principal assets were its shareholdings in Constructions and DPS, and it had no realistic capacity to repay the debt which in any event was not repayable for six years. So, it was said, the judge correctly noted in his [83] the concession that Constructions could only pay its debts by means of advances from other companies in the group. The Liquidator submitted that the judge erred so far as he reasoned that, because it in fact paid its debts for three years after 1 November 1994, Constructions was solvent as at that date, and that the judge's further and more fundamental error was that Constructions was not solvent when its ability to pay its debts required voluntary assistance from related entities.

95    The judge did not simply reason that, because it in fact paid its debts for three years after 1 November 1994, Constructions was solvent as at that date. Such simple reasoning would have involved error, consider a hopelessly insolvent person who wins the lottery. His Honour took account of a host of matters in coming to his conclusion, prominent in which was that Constructions' debts had been paid for the three years but not as sufficient in itself; rather, as proof "that the funds of the other companies in the Group were a resource available to Constructions as a matter of commercial reality", see his [118].

96    The directors submitted that they did not concede, as the judge noted in his [83], that as at 1 November 1994 Constructions could only pay its debts by means

of advances from other companies in the group. They acknowledged Paul's evidence that Constructions could not meet the demands of its creditors from its cash flow from its building activities. But they said that it remained that Constructions could meet the demands of its creditors from its assets, and pointed to their counsel's statements, in answer to questions from the judge, that their contention was that Constructions' liabilities as at 1 November 1994 were satisfied from Constructions' cash flow together with repayment of loans by other companies in the group, and that at no stage did Constructions have to depend on voluntary payments "for" (I think meaning "from") Holdings. With respect, it may be that the judge misunderstood their position.

97    The directors submitted that as at 1 November 1994 Constructions was able to pay its debts from its cash flow and repayment of loans by other companies in the group, but that in any event regard to the commercial reality of repayment by DCA and provision of funds by Holdings was permissible and determinative in establishing its solvency.

98    As at 1 November 1994, the directors said, Constructions was owed $1.189 million by Holdings and $1.21 million by Dyspane. The worth of the Holdings debt was not in question, and in fact it was repaid by 17 July 1995. There was no reason to doubt the worth of the Dyspane debt, which was also repaid by 24 December 1997. In addition, Constructions was entitled to payment from the Department under the Gosford Hospital contract, a payment which in mid-January 1995 crystallised as a payment of $1.005 million and put its bank account in credit for $0.479 million, at which time it also had an undrawn overdraft facility of $0.59 million, increased on 13 February 1995 to $0.8 million. (Paul gave evidence to the effect that at all times the group's banks were content with the conduct of its accounts and were not pressing for reduction in overdraft accommodation.)

99    Further, the directors said, DCA did have a realistic capacity to repay its debt. They said that its balance sheet as at 30 June 1994 showed net assets of $658,761, which would remain after balancing adjustments in the debt restructuring; and that the directors' evidence that they believed it was able to repay the $4.1 million had the reasonable basis that

it could sell its shares in Constructions and DPS and could expect provision of funds by other companies in the group.

100  So far as the directors contended that DCA could have paid the $4.1 million from its own resources, they had the difficulty that Paul agreed in his evidence that, from its 1994 accounts, "unless funded in some way by Doran Holdings, there was no chance in the world that Doran Constructions Australia Pty Ltd would be able to repay such a debt". Paul thereafter asserted an expectation of repayment, but his explanation involved provision of funds by Constructions and DPS. Palmer J did not find that DCA could pay the DCA debt independently of provision of funds by other companies in the group, and in fact the part repayment was with funds of Holdings via DCA. In my opinion, when considering Constructions' solvency and otherwise it should be accepted that DCA could not have paid the $4.1 million from its own resources.

101   That   notwithstanding,   after   the   debt restructuring Constructions could call in $1.189 million from Holdings and $1.21 million from Dyspane, and was entitled to expect receipt of what proved to be over $1 million from the Department. It was necessary to consider when the amounts due to trade creditors were payable according to their terms of trading, see the judge's [80]-[81], and also whether the overdraft was immediately repayable; it was not suggested that the banks required reduction. Many companies would be insolvent if the test was whether they could immediately pay all their debts, but it is not. The Liquidator's submissions on appeal did not rely on a cash flow analysis of Constructions' position as at 1 November 1994 which took account of when debts were payable. The Liquidator's balance sheet comparison as at 1 November 1994, even given unprofitable trading, did not establish insolvency when there were available resources (Holdings' and Dyspane's debts, the claim on the Department), unless it was shown that as a matter of cash flow creditors could not be paid as and when payment fell due.

102   The Liquidator said that the $1.005 million from the Department could not be taken into account as funds available to Constructions unless there was

also taken into account "the corresponding liabilities, such as the amounts from the $1.005m payable to subcontractors (including Beresfield Aluminium)". His submissions did not descend to identification of the corresponding liabilities. Assuming the Beresfield claim of $449,100, there remained some $0.65 million available to Constructions. But that claim was at the time an unliquidated claim, and Constructions had a counterclaim for a greater sum. The net indebtedness was only established more than three years later, and even then the Liquidator seems to have thought that outcome sufficiently doubtful to warrant years of further litigation, up to the High Court.

103  The full $1.005 million was in fact available for Constructions' cash flow. Solvency or insolvency is a state on which directors and others act in current conduct, for example if the issue is trading while insolvent. Section 95A speaks of objective ability to pay debts as and when they become due and payable, but ability must be determined in the circumstances as they were known or ought to have been known at the relevant time, without intrusion of hindsight. There must of course be "consideration … given to the immediate future" (*Bank of Australasia v Hall* (1907) 4 CLR 1514 at 1528 per Griffith CJ), and how far into the future will depend on the circumstances including the nature of the company's business and, if it is known, of the future liabilities. Unexpected later discovery of a liability, or later quantification of a liability at an unexpected level, may be excluded from consideration if the liability was properly unknown or seen in lesser amount at the relevant time. The Beresfield claim was only established as a liability some years later, and then only with rejection of Constructions' counterclaim. In my opinion, the $1.005 million could be taken into account as funds available to Constructions.

104  The Liquidator pointed out that, according to its balance sheet as at 30 July 1995, Constructions still had trade creditors of $1.10 million. He said that by that date the balance of Holdings' debt had been repaid and the bank overdraft stood at $1.37 million. This, however, does not show that Constructions was insolvent as at 1 November 1994. It is still consistent with ability as at that date to pay debts as they fell due.

105  In my opinion, the Liquidator did not establish insolvency as at 1 November 1994, quite apart from the question of availability of funds of other companies in the group.

106  Palmer J found positively that Constructions was solvent, considering it sufficient that as a matter of commercial reality a company had available as a resource to pay its debts the voluntary extension of credit by another company, see his [116] above. His Honour was satisfied that the funds of other companies in the group were a resource so available to Constructions, see his [118].

107  Even when the test of insolvency referred to payment out of the debtor's own money, funds which could be gained from the use of the company's assets were a resource available to it: *Sandell v Porter* (1966) 115 CLR 666 at 670 per Barwick CJ —

> "But the debtor's own moneys are not limited to his cash resources immediately available. They extend to moneys which he can procure by realization by sale or by mortgage or pledge of his assets within a relatively short time—relative to the nature and amount of the debts and to the circumstances, including the nature of the business, of the debtor. The conclusion of insolvency ought to be clear from a consideration of the debtor's financial position in its entirely and generally speaking ought not to be drawn simply from evidence of a temporary lack of liquidity. It is the debtor's inability, utilizing such cash resources as he has or can command through the use of his assets, to meet his debts as they fall due which indicates insolvency."

108  The directors submitted that there was more than voluntary assistance from other companies in the group, and that Constructions raised money on the security of its assets because Holdings held the

charge granted on 18 July 1995. The charge was executed when the balance of Holdings' debt had almost been eliminated, with the result that future provision of funds would be by way of loan. There are difficulties in the submission. The payment of $1.449 million by DCA, in fact by Holdings via DCA, was not secured by the charge, and the provision of funds by Holdings does not seem to have been with regard to the security provided by the charge, which was not sound security. The charge was incidental, no doubt thought to be for the benefit of Holdings but not determinative in the provision of funds. The commercial reality of provision of the funds included that they were not of the nature of which Barwick CJ spoke.

109   Particularly when the limiting words are no longer part of the test, there is no compelling reason to exclude from consideration funds which can be gained from borrowings secured on assets of third parties, or even unsecured borrowings. If the company can borrow without security, it will have funds to pay its debts as they fall due and will be solvent, provided of course that the borrowing is on deferred payment terms or otherwise such that the lender itself is not a creditor whose debt can not be repaid as and when it becomes due and payable. It comes down to a question of fact, in which the key concept is <u>ability</u> to pay the company's debts as and when they become due and payable.

110   Even before the wording of s 95A, in *re RHD Power Services Pty Ltd* (1991) 9 ACLC 27 McPherson SPJ was prepared to pay regard to ability to borrow without security. Kearney J in *re Adnot Pty Ltd* (1982) 1 ACLC 307 took into account that the company "instead of having to resort to some outside lender, is in the fortunate position of having its fellow member of the group of companies to which it belongs, available in effect as banker to provide funds required to meet any shortfall" (at 311; the shortfall was until completion and sale of a shopping centre). In *re a company* (1986) BCLC 261 Nourse J declined to find that a company was unable to pay its debts as they fell due although it was being "propped up by loans made to it by associated companies and possibly by others" (at 262; his Lordship noted at 263 that he had evidence from a director to the effect that there was no question of the loans being

withdrawn, the loans not being repayable for some eighteen months).

111   The Liquidator's emphasis on voluntary assistance from other companies in the group was rather off the point. Provision of funds by a third party on the security of the company's assets is voluntary - the third party can decline. Voluntariness is material to whether the company is able to acquire funds, as part of ability to pay its debts as and when they become due and payable, but if the evidence establishes that the company is able to obtain funds, albeit they are voluntarily provided, that can suffice.

112   This approach is consistent with the acceptance that creditors may voluntarily defer payment whereby solvency is promoted. An illustration is *re Kerisbeck Pty Ltd* (1992) 10 ACLC 619. An unsecured debt was payable on demand to the company's director. The director gave evidence that he did not intend to demand repayment in the immediate future. The debt was therefore not regarded as due and payable. This was determinative of solvency. In substance, voluntary continuance of an unsecured borrowing brought solvency; it is difficult to see why the result would have been different if there had been acceptable evidence of voluntary provision of an unsecured borrowing.

113   In the present case, there was ample support for Palmer J's regard to availability of funds from other companies in the group, relevantly Holdings, additional to the $1.189 million balance of Holdings' debt and Dyspan's $1.21 million, sufficient to establish Constructions' ability to pay its debts as and when they fell due. Importantly, I do not think it was suggested that the funds made available, apparently repayable on demand, were to be regarded as immediately repayable so that Holdings itself was a creditor whose debt could not be repaid as and when it was due and payable. Nor was it suggested that regard could not be had to the availability of the funds because their provision by Holdings was in breach of the directors' duties owed to Holdings.

114   It was clear that Holdings had acted and continued to act as "banker to the Doran Group" (the judge's [128]). Mr Joyce said in terms in his affidavit that "Whilst I worked for the Doran

Group of Companies DH acted as the 'banker' for the Group. It lent money out to other members of the Group, including DC, as and when monies were required by that member." In cross-examination it was put to him, and he accepted, that money "moved back and forth between Holdings and Constructions throughout the whole of the time that [he was] with the Group".

115 A snapshot in time is Holdings balance sheet as at 30 June 1995, in which a schedule set out receivables for 1994 and 1995 all involving group entites—

|  | "1995 | 1994 |
|---|---|---|
| Loan - JC ML PJ PA Doran | 20,836 | 20,836 |
| Loan - Wharf Road Unit Trust | 515,534 | 780,334 |
| Loan - Wharf Road Unit Trust No 2 | 1,935 843 | 1,837,003 |
| Loan - Wharf Road Unit Trust No 3 | 1,165,978 | 2,025,548 |
| Loan - Doran Property Trust | 100 | 100 |
| Loan - Elermore Tavern Pty Limited | 740,413 | 967,074 |
| Loan - Doran Constructions (Australia) Pty Limited | - | 4,592,146 |
| Loan - Doran Health Care Pty Limited | 2,461,055 | 1,443,146 |
| Loan - Doran Nominees Pty Limited | 100 | 100 |
| Loan - Daytona Pty Limited | - | 540 |
| Loan - Aldo Unit Trust | 355,832 | 832 |
| Other loan - Grantlex Pty Limited | 149,829 | 189,189 |
| Other loan - Denprime Pty Limited | 149,829 | 189,189" |

required by DC." Peter's affidavit included that as at 1 November 1994 he was aware that from 1990 onwards Constructions had borrowed from and lent to other companies in the group and that other companies were "in a financial position to provide further assistance to [Constructions] as and when required". Michael and John gave evidence to the same effect.

116 In July 1992 Holdings had lent to DCA the money for the alteration of the group composition. As Mr Joyce accepted, the traffic was not one-way, and as at 31 October 1994 Holdings owed Constructions a significant sum; at least prior to 1 November 1994, there had been intra-group support as necessary. After 1 November 1994 Holdings did act as banker in that, after repayment of the $1.189 million balance of its debt, it paid $1.225 million to Constructions and $1.449 via DCA, and only ceased to do so upon withdrawing its support on 16 December 1997. At least on appeal, the Liquidator accepted that Holdings was capable of supporting Constructions so long as its directors were minded to do so, and that Holdings provided support until 16 December 1997.

117 As to intra-group support as necessary, Paul's affidavit included a description of arrangements with Westpac over the period 1992-1996 in which other companies in the group provided security and guarantees for facilities provided to Constructions. He specifically asserted, "As at 1 November 1994 I say, as a director of the other members of the Doran Group of companies, that the assets and revenue of those companies were also available to provide whatever financial assistance may have been

118 None of the directors was cross-examined to the contrary of these states of mind, which together with the evidence of what had occurred amply founded an expectation that, if Constructions needed money to pay its creditors, the money would be made available from within the group. The directors had the control whereby they could put the expectation into effect, and they did so until late in 1997.

119 I do not overlook the Liquidator's submission that the withdrawal of support in December 1997 showed the frailty of Constructions' position. The Liquidator said that it was at the mercy of Holdings and the other companies, and that the withdrawal of support showed that the funds of the other companies in the group were really not a resource available to Constructions. As a finding of fact, however, the ability as at 1 November 1994 was real, notwithstanding that in the latter part of 1997 circumstances changed and, with the withdrawal of support, the ability was lost.

120   In my opinion, error has not been shown in Palmer J's finding that Constructions was solvent.

**Was posting the journal entries an act done for the purpose of giving effect to the transaction?**

121   The judge appears to have accepted that it was, see his Honour's [122] referring to September 1995 "when the book entries giving effect to the Restructure was made" and to "giving effect to the Restructure by the book entries". The directors' written submissions on appeal did not contend to the contrary.

122   In the hearing of the appeal there was some debate on the matter. The second minutes for Holdings recorded that the "method of payment" by Holdings to Constructions was to be by journal entry. The same intent may be inferred for the other limbs of the debt restructuring. If the method of payment had been by cheque, at first sight the negotiation of the cheque would have been an act done for the purpose of giving effect to the transaction. The journal entries altered the loan accounts in the companies' books, and there was the equivalent of the passing of money by negotiation of a cheque. On the other hand, if the resolutions evidenced enforceable agreements, then it could be said that the entries were only formalities; were there enforceable agreements, and were the formalities acts done for the purpose of giving effect to the transactions?

123   As a late oral submission, the directors said that what mattered was the purpose, and posting the journal entries did not have the purpose of giving effect to the transaction: they were unnecessary because "the transaction was effective, it could have been sued on if it hadn't been performed". The directors were invited to develop the submission, but did not do so.

124   I consider it sufficient that posting the journal entries was doing what had been agreed should be done, maybe sufficient even if the resolution(s) had not stipulated the method of payment. Attaching legal significance, in the present context, to an act done for the purpose of giving effect to a transaction

seems to have been intended to catch an agreement entry into which was an uncommercial transaction if the company was insolvent when the agreement was performed. This is consonant with the view taken in the Full Federal Court in *Demondrille Nominees Pty Ltd v Shirlaw* (1997) 25 ACSR 535. It was agreed that a residential unit should be sold for $180,000 with $120,000 payable as the deposit and an acknowledgment that the deposit had been paid. The $120,000 had not been paid, and the agreement was found to have been an uncommercial transaction. The company was not insolvent at the time, but was insolvent at the time of a later deed which rescinded the agreement but recited the deemed payment of the $120,000. The Court held that the deed was for the substantial purpose of giving effect to the uncommercial transaction "because it gave effect to the 'credit' in favour of Demondrille which the agreement created" (at 549).

**Was Constructions insolvent as at 4 September 1995?**

125   Palmer J was not satisfied that Constructions was insolvent in September 1995, see his [122] above, for the reasons he had earlier given. The reasons must have been those leading to his opinion that Constructions was solvent because the funds of other companies in the group "were a resource available to Constructions as a matter of commercial reality" (his Honour's [119]).

126   The Liquidator submitted that, whatever Constructions' solvency as at 1 November 1994, by 4 September 1995 its position had changed for the worse. He said that by 4 September 1995 Constructions had "exhausted its loan from Holdings", meaning that the balance of $1.189 million had been repaid, and that Constructions had ceased to trade (this is uncertain); that it had trade creditors as at 30 September 1995 of $765,396 and a bank overdraft as at that date standing at $1.14 million; and that its only substantial asset was the debt of $4.1 million payable by DCA. Constructions' management accounts balance sheet as at 30 September 1995, showed net assets of $2,060,060, but it was said that that depended on recoverability of the DCA debt.

127 The directors contended that adjustments should be made to the balance sheet whereby Constructions' net assets were not $2,060,060 but $2,566,896. The adjustments were questionable, but not particularly material because they did not meet the Liquidator's contention that the positive net assets depended on recoverability of the DCA debt.

128 Again, the Liquidator's submissions did not rely on a cash flow analysis of Constructions' position as at 4 September 1995. Of the trade creditors, for example, only $405,000 was due and payable as at 30 September 1995. Putting less significant matters aside, Constructions' balance sheet as at 30 September 1995 included, albeit as a non-current asset, the debt from Dyspane of $1.21 million. (The debt from DCA was included as a current asset, albeit in terms not payable for another five years). Although the balance of Holdings' debt had been repaid, Constructions could call in $1.21 million from Dyspane. Trade debtors stood at $128,639. There was no reason to regard the bank overdraft as immediately due and payable, and the liabilities ultimately established to Beresfield and the University were no more or less real than they had been as at 1 November 1994. While the DCA loan, then standing at $4.01 million, underpinned the excess of assets over liabilities, again I do not think inability to pay debts as and when they fell due was proved.

129 In any event, on like reasoning to that earlier described I do not think error has been shown in Palmer J's conclusion that it had not been shown that Constructions was insolvent. Peter's evidence included the assertion that he believed Constructions was able as at August 1995 to pay its debts when they became due and payable because it was still trading, there were no problems with the payment of its creditors and "it had the backing of the Doran Group". The other directors were not so specific, but John said that he believed Constructions was able to pay its debts because "the Doran Group was financially sound". The finding of Holdings continuing as the banker of the group, and that Constructions had the resource of access to its funds and was able to pay its debts as and when they fell due, was readily available for 4 September 1995.

**Was Constructions' insolvency as at 24 December 1997 because of, or because of matters including, entering into the transaction?**

130 Palmer J held in his [120] that the Liquidator had "failed to prove that Constructions became insolvent as a result of the Restructure". The context in the reasons was insolvency as at 1 November 1994 and 18 July 1995, the latter being the date of the charge. His Honour said in relation to an insolvent transaction that he was not satisfied that Constructions was insolvent as at 1 November 1994 or in September 1995, or that it "became insolvent by reason of the Restructure" (at his [122]). It is not entirely clear whether his Honour was referring to insolvency on 1 November 1994 or in September 1995 by reason of the debt restructuring, or whether he meant that the debt restructuring was not the or a cause of insolvency thereafter.

131 For a time in the appeal it was in dispute, but eventually the directors agreed that the Liquidator had contended at the trial that Constructions had ultimately become insolvent because of the debt restructuring. Palmer J did not more expressly deal with that matter.

132 The Liquidator submitted that, if Constructions had not earlier been insolvent, it became insolvent on 16 December 1997 when Holdings resolved to cease making funds available. It was soon placed in administration, and the creditors resolved that it enter voluntary liquidation. But for the debt restructuring, the Liquidator said, withholding financial support "would not have been an option available to the directors of Holdings" The DCA debt was only repaid in part, $2.651 million remaining payable, and it was said that it followed that Constructions' insolvency arose "because of matters including the loss of its ability to recover the full amount of the loan from Holdings as at 31 October 1994".

133 This was an application of the "but for" approach to causation. In *March v E & M H Stramare Pty Ltd* (1991) 171 CLR 506 Mason CJ, with whom Deane, Toohey and Gaudron JJ relevantly agreed, favoured a "common sense" approach over the

"but for" approach, referring to the part played by "value judgments and the infusion of policy considerations" (at 515-6). The but for approach played an important role "as a negative criterion of causation", but was not an exclusive criterion (ibid).

134    It has been recognised that the common sense approach itself requires that the purpose of the inquiry into causation be identified, see for example *Environment Agency (formerly National Rivers Authority) v Empress Car Co (Abertillery) Ltd* (1999) 2 AC 22 at 29 per Lord Hoffman and *Allianz Australia Insurance Ltd v GSF Australia Pty Ltd* (2003) 57 NSWLR 321 at 330-1 per Santow JA; on further appeal (2005) 215 ALR 385 at 394-5 per McHugh J and 406 per Gummow, Hayne and Heydon JJ. Indeed, in the lastmentioned case Gummow, Hayne and Heydon JJ endorsed the doubt expressed by McHugh J in *March v E & M H Stramare Pty Ltd* at 532 that there is "any consistent commonsense notion of what constitutes a 'cause'." Causation in the law involves the attribution of legal responsibility, and a value judgment must be made having in mind the occasion for the enquiry into causation.

135    In *Demondrille Nominees Pty Ltd v Shirlaw* at 548 Foster, Lindgren and Madgwick JJ said that ss 588FB and 588FE of the Law were "the current attempt of the legislature to balance the interests of the unsecured creditors of a company being wound up and those who would otherwise be the beneficiaries of pre-winding up transactions entered into by the company". Their Honours said that their purpose was —

> "… to prevent a depletion of the assets of a company which is being wound up by, relevantly, 'transactions at an under-value' entered into within a specified limited time prior to the commencement of the winding up (see Explanatory Memorandum, para1014)"

136    Transactions at an undervalue were no doubt the primary target of the provisions, but the description of an uncommercial transaction in s 588FB(1) was not limited to such transactions. The description directed primary attention to a balancing of benefit and detriment, only in the broadest sense involving undervalue. A transaction could conceivably be one a reasonable person in the company's circumstances would not have entered into although for full value; or it could be one a reasonable person in the company's circumstances would have entered into although at an undervalue, for example a forced sale to overcome temporary illiquidity. For s 588FB(1), in addition to regard to benefits and detriments to the company, regard was to be had to the benefits to the other parties to the transaction. It appears to have been contemplated that a transaction detrimental to the company but beneficial to other parties to the transaction might not unreasonably be entered into. If, for example, there were no creditors and no prospect of creditors, it may be that the controller of the company could reasonably sacrifice its interests to the interests of other parties to the transaction.

137    Section 588FC added to the nature of the transaction the company's insolvency, either at the time the transaction was entered into or (put shortly) at the time it was given effect, or because the transaction was entered into or given effect. An uncommercial transaction was permissible, at least so far as the avoidance provisions were concerned, if the company was solvent at those times and did not become insolvent because of those happenings.

138    Directors should be in a position to conduct their company's affairs without running foul of the avoidance provisions, and I do not think an expansive notion of causation is consistent with that purpose. Where s 588FC(b) looks to an act or omission causing or contributing to insolvency, the insolvency should be quite closely related to the entry into or giving effect to the transaction; if it were not so, the provisions would not guide conduct towards validity, but would avoid transactions because of the turn of later events. The purpose cautions that, in the common sense approach, Constructions' circumstances as at 1 November 1994 and the passage of events after that date are important.

139    The directors said that Holdings had paid $2.674 million to Constructions, $1.225 million directly and $1.449 million via DCA. As well, $1.210 million

was paid by Dyspane. In substance, they said, Constructions was funded to the extent of $5.1 million in the three years after 1 November 1994, and there was no reason to conclude that, if Holdings had been left owing the whole debt of $5.239 million as at 1 November 1994, the same funding would not have been provided by repayment of the debt almost in full. It was insufficient, they submitted, to postulate inability to recover the full amount of the loan as at December 1997, when Constructions was solvent after the debt restructuring; three years had passed; $5.1 million had in fact been paid to Constructions; all creditors as at 1 November 1994 had long been paid; the major creditors in the insolvency (Beresfield and the University) were yet to have their debts established; and the later occasion for Holdings withdrawing support for the future was the prospect of extended and expensive litigation. The directors emphasised that none of the directors had been cross-examined to the effect that the debt restructuring changed the way in which Holdings funded Constructions' activities or affected the decision to withdraw support.

140  No bright line can be drawn in many questions of causation; this is one of them. It is by no means determinative to say that, but for the debt restructuring, withholding financial support would not have been an option. It is likely that, but for a number of transactions in its life, Constructions might have had more money or an entitlement to receive payment of more money. Nonetheless, and whatever the reasonable expectation of provision of funds by Holdings or other companies in the group, as a result of the debt restructuring Holdings could withhold funds. It had provided only $2.674 million, and if Beresfield and the University be put aside the external unsecured creditors of the order of $350,000 could not be paid unless it provided more funds. The debt restructuring need only have been one of a number of matters because of which Constructions became insolvent, see s 588FC(b), and if the debt restructuring was an uncommercial transaction I do not think it inconsistent with the purpose of the avoidance provisions that the directors exposed it to avoidance in the event of insolvency when there had not otherwise been made available to Constructions the amount of Holdings' debt. In my opinion, there was the necessary causation.

**Was the debt restructuring in breach of the directors' duties on the alternative basis?**

141  In addressing breach of directors duties Palmer J considered that, Constructions being solvent as at 1 November 1994, there was no occasion for the directors to consider the interests of creditors when undertaking the debt restructuring; his Honour considered that their purpose of achieving separation of the financial affairs of the property holding companies in the group (Holdings and subsidiaries) and the construction companies (DCA and subsidiaries), to make it easier to obtain finance for the property holding activities, was not "ulterior to the interests of Constructions" or "unreasonable having regard to the interests of Constructions" (see his [132]-[133] above).

142  This negatively expressed view must be seen together with his Honour's views, stated in addressing an uncommercial transaction, that money coming to Holdings could be made available to Constructions if required and (I repeat his [128] - [129]) —

> "128  In my opinion, having regard to Holdings' role as banker to the Doran Group, it could be seen as reasonably in the interests of Constructions to facilitate the Restructure so that Holdings could find it easier to borrow.
> 129  Similarly, because Holdings was unarguably solvent as at 1 November 1994 and would be ready to provide money to Constructions or to DCA thereafter, if needed, I do not think that Constructions suffered an unreasonable detriment in that the Restructure replaced the debt from Holdings with the debt from DCA. I do not accept that DCA must have been seen at that time as

incapable of repaying its debt to Constructions. There is no reason to suppose that if Constructions had required repayment of the DCA debt shortly after the Restructure and DCA itself had insufficient funds, Holdings would not have advanced the necessary funds to DCA."

143  The Liquidator challenged his Honour's reasons on both fronts. He said that the debt restructuring substituted for a debt owed by a company with significant resources a debt owed by a company with no realistic capacity to pay, and that, even if Constructions was solvent as at 1 November 1994, there was a "realistic possibility" that the interests of creditors would be prejudiced by the debt restructuring, because if Constructions failed successfully to resolve its disputes with Beresfield and the University it was unlikely to have sufficient funds to meet its liabilities to them. Further, he said, Constructions did not gain a commercial or financial benefit from the transaction. Thus, he submitted, a reasonable director acting in the interests of Constructions and considering the interests of creditors would have taken account of the possibility that the loan to DCA would prove irrecoverable, of the risk of relying on voluntary assistance from Holdings, and of the possibility that Beresfield and the University would make out their claims against Constructions, and would not have undertaken the debt restructuring.

144  Neither side's submissions explored any differences between or the intricacies of the various statutory duties and the overlapping fiduciary duties. I do not think it is necessary to do so.

145  In *Nicholson v Permakraft (NZ) Ltd* (in liq) (1985) 3 ACLC 453 Cooke J's statement of principles included (at 459) —

"The duties of directors are owed to the company. On the facts of particular cases this may require the directors to consider inter alia the interests of creditors. For instance, creditors are entitled to consideration, in my opinion, if the company is insolvent, or near insolvent, or of doubtful solvency, or if a contemplated payment or other course of action would jeopardise its solvency.

The criterion should not be simply whether the step will leave a state of ultimate solvency according to the balance sheet, in that total assets will exceed total liabilities. Nor should it be decisive that on the balance sheet the subscribed capital will remain intact, so that a capital dividend can be paid without returning capital to shareholders. Balance sheet solvency and the ability to pay a capital dividend are certainly important factors tending to justify proposed action. But as a matter of business ethics it is appropriate for directors to consider also whether what they do will prejudice their company's practical ability to discharge promptly debts owed to current and likely continuing trade creditors."

146  In *Kinsela v Russell Kinsela Pty Ltd (in liq)* (1986) 4 NSWLR 722 Street CJ, with whom Hope and McHugh JJA agreed, said (at 733) —

"I hesitate to attempt to formulate a general test of the degree of financial instability which would impose upon directors an obligation to consider the interests of creditors. For present purposes, it is not necessary to draw upon *Nicholson v Permakraft* as authority for any more than the proposition that the duty arises when a company is insolvent inasmuch as it is the creditors' money

which is at risk, in contrast to the shareholders' proprietary interests. It needs to be borne in mind that to some extent the degree of financial instability and the degree of risk to the creditors are inter-related. Courts have traditionally and properly been cautious indeed in entering boardrooms and pronouncing upon the commercial justification of particular executive decisions. Wholly differing value considerations might enter into an adjudication upon the justification for a particular decision by a speculative mining company of doubtful stability on the one hand, and, on the other hand, by a company engaged in a more conservative business in a state of comparable financial instability. Moreover, the plainer it is that it is the creditors' money that is at risk, the lower may be the risk to which the directors, regardless of the unanimous support of all of the shareholders, can justifiably expose the company."

147    For the reasons I have given, I consider that Constructions retained the ability to pay its debts as and when they fell due, and that as at 1 November 1994 the directors were justified in not seeing Beresfield and the University as creditors whose interests would be put at risk by what was done. On the judge's findings, while the expense of litigation was in prospect, liability to Beresfield and the University was not. His Honour's implicit finding that at the time they were not likely creditors was well open. I do not think his Honour has been shown to have erred in concluding that there was no occasion to consider the interests of Constructions' creditors.

148    It was necessary for the directors to consider the interests of Constructions, as a separate legal entity, in deciding whether to participate in the debt restructuring: *Walker v Wimbourne* (1976) 137 CLR 1 at 6-7. It has nonetheless been recognised that a transaction benefiting one company in a group may have derivative benefits for another company in the group, even if the companies are not parent and subsidiary. In *Northside Developments Pty Ltd v Registrar-General* (1990) 170 CLR 146 Brennan J observed (at 183) that "it may be for the benefit of solvent companies in a group to guarantee the liabilities of a holding company in order to benefit the guarantor companies as well as other members of the group". In *Equiticorp Finance Ltd (In Liquidation) v Bank of New Zealand* Clarke and Cripps JJA said (at 146-7) —

> "It may be accepted, therefore, that actions carried out for the benefit of the group as a whole may, in particular circumstances, be regarded as benefiting as well one or more companies in the group. This may occur even where, for instance, a company is providing a guarantee for its holding company or another company in the group. Similarly a transaction carried out for the benefit of one of the companies in the group, company A, may be seen to be for the benefit of another company in the group, company B."

149    In *Linton v Telnet Pty Ltd* (1999) 30 ACSR 465 it was said (at 472) that a loan to a director from the funds of company A, in order to secure his services for company A and company B, could be seen as for the benefit of company A "both directly and derivatively to the extent to which [the director's] services to [company B] ensured the supply of computers and otherwise the successful conduct of [company A's] retailing business". In *Equiticorp Finance Ltd (In Liquidation) v Bank of New Zealand* it was held that use of the funds of companies A to discharge the debt of the wholly owned subsidiary of related company B was in the interests of companies A, essentially because it was necessary to retain the support of the bank the loss of which would be detrimental to, amongst others in the group, companies A. Clarke

and Cripps JJA noted (at 147-9) the necessity for consideration of the interests of companies A as distinct from the group as a whole, so that companies A were not "sacrificed for the good of the other companies in the group", but accepted that the protection of the group as a whole was for the benefit of companies A.

150   The Liquidator contended that more ready finance for the property holding activities of the group gave no benefit to Constructions, it being engaged in the construction activities which were intended to be kept separate in the group composition. The directors responded that, when Holdings was to act and acted as banker to the group (by which I take up the more detailed discussion earlier in these reasons), its enhanced access to finance was for the benefit of Constructions.

151   The submissions did not address whether Holdings or its subsidiaries in fact experienced enhanced access to finance. Holdings' accounts showed a bank overdraft of nil as at 30 June 1995, $92,817 as at 30 June 1996 and $155,530 as at 30 June 1997. From Paul's evidence, it seems that the facilities held by Constructions were left in place. There is some tension between intended financial separation of the property holding activities and the construction activities, on the one hand, and Holdings thereafter acting as the banker to the group, on the other hand. Holdings' exercise of enhanced access to finance was not extensive. But it remains that increased financial capacity in Holdings could have been and to some extent may have brought funds to Constructions. The transaction was for the benefit of Constructions.

152   The interests of Constructions involved a balance of benefit and detriment, and there was also detriment. Instead of a debt of $4.1 million payable by Holdings on demand, Constructions held a debt of $4.1 million payable by DCA in six years time. DCA did not have the same financial substance as Holdings, quite apart from the deferred payment, and as to the deferred payment it may be noted that the unsigned DCA minutes recorded concern about "borrowing money, albeit inter group, without the provision of a reasonable time for repayment". I have earlier noted that it should be accepted that DCA

could not have paid the $4.1 million from its own resources.

153   Palmer J said that there was nonetheless not an "unreasonable detriment" (at [129]) to Constructions, because Holdings would put DCA in funds if it were necessary; implicitly, also that the deferral was not an unreasonable detriment because of the expectation that Holdings would provide funds before the strict time for payment of the DCA debt. His Honour plainly enough found that the directors had considered the interests of Constructions and that, on balance, the debt restructuring was in its interests.

154   It is established that courts "have traditionally and properly been cautious indeed in entering boardrooms and pronouncing upon the commercial justification of particular executive decisions": *Kinsela v Russell Kinsela Pty Ltd (in liq)* at 733. This is not a case of a straightforward comparison of the value of an asset with the consideration received, or the values of an original and a substituted asset. It is a case of a balance of commercial benefit and detriment in the light of the conduct of the group's businesses as "one family business" (the judge's [125]), with Holdings as the banker to the group. The caution is particularly pertinent in such a case.

155   For those reasons, I am not satisfied the primary judge was in error in holding that the Liquidator did not establish that the directors' decision was in breach of their statutory or fiduciary duties.

**Was the debt restructuring an uncommercial transaction?**

156   The definition of an uncommercial transaction in s 588FB(1) of the Law raises considerations similar to those material to breach of the directors' duties. The question is objective, whether a reasonable person in the company's circumstances would not have entered into the transaction, and free from the subjectivity involved in some of the directors' duties, compare *Equiticorp Finance Ltd (In Liquidation) v Bank of New Zealand* at 147-8. The curious introductory words, "it may be expected that a reasonable person …", were said in *Tosich Construction Pty Ltd (in liq) v Tosich* (1997) 78 FCR 363 not to qualify what a

reasonable person would have done, but to emphasise the objective nature of the inquiry (at 366-7).

157   It must positively appear that the reasonable person would not have entered into the transaction see *Tosich Construction Pty Ltd (in liq) v Tosich* at 367 —

> "What the Court must do is consider each of the matters to which reference is made in s 588FB(1) and, having regard to them, reach a conclusion as to whether a reasonable person in the company's circumstances would not have entered into the transaction. The company's circumstances must include the state of its knowledge, that is, of the knowledge of those who were relatively its directing mind. Only if the Court can conclude that a reasonable person in the company's circumstances would not have entered into the transaction does the section make that transaction uncommercial."

158   The parties applied the submissions concerning breach of the directors' duties also to an uncommercial transaction. The Liquidator emphasised that payment of the DCA debt depended on the "whim" of the directors in providing funds, in comparison to a right in Constructions to demand payment from Holdings, and said that in the result not only was that the debt was left unpaid in full but its balance was purportedly forgiven

in November 1997. He said that benefit through Holdings' enhanced access to finance should not be accepted, and that "[i]n the absence of a real benefit no reasonable person in the company's position would have entered into the transaction". The directors said that it was not a case of whim, but of reality at the time that funds would be provided as and when necessary.

159   What the reasonable person would not have done must be judged according to the circumstances at the time, including proper perception of the future, but without the influence of hindsight. It is not necessary to repeat earlier portions of these reasons for the matters to which regard is to be had for the purposes of s 588FB(1).

160   In my opinion, Palmer J is not shown to have erred in not being satisfied that the debt restructuring was an uncommercial transaction.

### Orders

161   I propose that the appeal be dismissed with costs.

Hodgson JA
162   I agree with Giles JA.

McColl JA
163   I agree with Giles JA.

© Thomson Legal and Regulatory
Limited ABN 64 058 914 668

[2005] NSWCA 243

End of Document                                                    © 2017 Thomson Reuters.

TAB 36

*Lord v Sinai Securities* [2005] 1 BCLC 295, English High Court

*a*

# Lord v Sinai Securities Ltd and others
## [2004] EWHC 1764 (Ch)

*b*

CHANCERY DIVISION

HART J

13, 14, 21 JULY 2004

*c*
*Winding up – Transaction at undervalue – Person 'connected with' company – Creditor unable to be restored to his position prior to transaction – Value of consideration received by company – Whether compromise entered into by directors in good faith and necessary for purpose of carrying on company's business – Whether compromise for benefit of company – Whether respondent a person connected with*
*d*
*company – Whether liquidator entitled to pursue claim to set aside onerous aspects of compromise – Insolvency Act 1986, ss 238, 239.*

In January 2000 S brought proceedings against C and others claiming to be the beneficial owner of the issued share capital of a company which owned 300 acres of land having development potential. The value of the land was
*e*
some £750,000 in its existing state and perhaps some £23m with appropriate planning permission. By an agreement dated 20 December 2000 the proceedings were compromised by S abandoning his claims and assigning whatever rights he had to the respondent, (thereby effectively leaving C in control of the company) and the company covenanting to make
*f*
a deferred payment of £6m to the respondent, secured on the land by a first charge. However, the moneys payable to the respondent were not paid when due two years later and the company was put into administration and then into liquidation. The liquidator applied to the court for relief under ss 238 and 239 of the Insolvency Act 1986 in respect of the company's liability to the respondent claiming that either it was a transaction for no
*g*
value or at an undervalue or alternatively, that the agreement and the associated charge on the land constituted a preference in favour of a creditor 'connected with' the company. The respondent applied to have the liquidator's application dismissed as having no real prospect of success because (i) the company had received consideration for its covenant in the form of benefits such as the abandonment by S of all his claims, having a
*h*
two-year period of grace in which to realise the land's development potential, and the resolution of disputes over the constitution of the board which had paralysed the company and prevented it from exploiting business opportunities, (ii) even if there had been a transaction at an undervalue the court could not make an order under s 238(3) 'restoring the position to what it would have been if the company had not entered into [the]
*i*
transaction' because it was impossible to put either S or the respondent back to the position they would have been in but for the transaction, (iii) the respondent was entitled to rely on s 238(5), which provided that no order was to be made in respect of a transaction at an undervalue if the court was satisfied that the company had entered into the transaction in

good faith and for the purpose of carrying on its business, and at the time *a*
there were reasonable grounds for believing that the transaction would
benefit the company, and (iv) in relation to the claim that the agreement and
charge constituted a preference under s 239, neither S nor the respondent
was a person 'connected with' the company.

**Held** – (1) It was doubtful whether the liquidator would be able to show *b*
that the company had received no consideration at all for its covenant to
pay the respondent £6m, having regard to the hotchpotch of benefits
alleged to have been obtained by the company under the compromise of the
proceedings. However, given that it would be difficult for the respondent to
value that hotchpotch of benefits and that receivers appointed by the *c*
respondent had in fact negotiated a sale of the land without the benefit of
planning permission for £7.5m, it was arguable that the agreement by the
company to pay the respondent £6m was a transaction at an undervalue.
(See [9]–[11], below.)
    (2) The court would not necessarily be deterred from making a
declaration under s 238 of the 1986 Act that a transaction had been made *d*
at an undervalue by the fact that a creditor could not be restored to the
position he was in immediately prior to the transaction, since the court's
primary, and possibly only, concern under s 238(3) was the restoration of
the company's position. The position of a counter-party such as a creditor
was a matter to be considered by the court as a general matter of discretion
but the court was not obliged to ensure that such a person was restored in *e*
every particular to the status quo before the transaction, since there would
be many cases where that would simply be impossible. (See [12]–[16],
below.)
    (3) Although the respondent could probably show that the agreement was
a transaction which had been entered into by the company's board in good
faith, it was arguable that it was not necessary for the purpose of carrying *f*
on the company's business and/or that there were not objectively reasonable
grounds for believing that it would benefit the company. Therefore the
liquidator would be permitted to pursue his case against the respondent
under s 238. (See [21]–[23], below.)
    (4) However, in respect of the claim under s 239 that the agreement and
the associated charge on the land constituted a preference in favour of a *g*
creditor who was a person 'connected with' the company, the respondent
was clearly not a connected person, and although S had a nominee on the
board of the company, that was not sufficient to make him a connected
person by reason of being a 'shadow director', since it could not be shown,
as required by s 251, that all the directors, or at least a consistent majority, *h*
were accustomed to act on his directions. Accordingly, the liquidator's
application under s 239 would not to be allowed to proceed. (See [24]–[29],
below.)

**Cases referred to in judgment**                                             *i*
*Hydrodam* (*Corby*) *Ltd, Re* [1994] 2 BCLC 180.
*MC Bacon Ltd, Re* [1990] BCLC 324.
*Paramount Airways Ltd, Re* [1992] BCLC 710, [1992] 3 All ER 1, [1993]
    Ch 223, [1992] 3 WLR 690, CA.

a  *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2, [2001]
      1 All ER 673, [2001] 1 WLR 143, HL.
    *Unisoft Group Ltd (No 3), Re* [1994] 1 BCLC 609.

    **Application**

b  By an application dated 12 February 2004 the first respondent, Sinai
    Securities Ltd, applied to have the application dated 19 January 2004 made
    by Jonathan Guy Lord, the liquidator of Rosshill Properties Ltd, for relief
    under ss 238 and 239 of the Insolvency Act 1986 in respect of the
    company's liability to the first respondent pursuant to an agreement dated
    20 December 2000, dismissed as having no real prospect of success. The
c  other ten respondents, Ronald Smith, Spread Trustee Co Ltd, Philip
    Carruthers, Charles Joseph Mchugh, Ralph Dieter Sacki, John Carnell,
    Jacqueline Carnell, Mukesh Nanubani Desai, Alexander Ragonesi and
    Hayle Harbour Co Ltd took no part in the proceedings. The facts are set
    out in the judgment.

d  *Lance Ashworth* (instructed by *Turner Parkinson*) for the liquidator.
    *Michael Driscoll QC* and *Timothy Harry* (instructed by *Beller & Co*) for
      the first respondent.

                                                                  *Cur adv vult*

e  21 July 2004. The following judgment was delivered.

    **HART J.**
        [1] By an application dated 19 January 2004 the liquidator of Rosshill
    Properties Ltd (Rosshill) seeks relief, inter alia, against the first respondent,
f  Sinai Securities Ltd (Sinai), under s 238 of the Insolvency Act 1986 (the
    1986 Act) in relation to an agreement dated 20 December 2000, whereby
    Rosshill covenanted to pay £6m to Sinai and granted a charge to Sinai to
    secure that covenant. Alternatively the liquidator seeks relief under s 239 of
    the 1986 Act on the ground that that covenant and its associated charge
    constituted a preference.
g      [2] The application before me is an application by Sinai dated
    12 February 2004 whereby it seeks to have the liquidator's application
    dismissed as having no real prospect of success. The actual form of Sinai's
    application invites the court to approach it on a number of alternative
    bases: directions to the liquidator under s 167(3) and/or s 168(5) of the
    1986 Act, striking out under CPR 3.4, or judgment under CPR Pt 24.
h  Nothing of substance turns on which of these jurisdictions is being invoked.
        [3] Rosshill is a company incorporated as an international business
    corporation under the laws of the British Virgin Islands. It owns 300 acres
    of land at Hayle Harbour in Cornwall which has development potential but
    which does not currently have and has not at any material time had any
    planning permission relevant to that potential. In order to realise that
i  potential it needed, in addition to a suitable planning permission, the
    co-operation of Hayle Harbour Co Ltd (HHCL), a harbour company
    incorporated by the Hayle Harbour Act 1989.
        [4] The agreement dated 20 December 2000 (the 2000 compromise) was
    an agreement to which both Rosshill and the 11 respondents to the

liquidator's application were parties. It was entered into in order to  *a*
compromise litigation which had been brought by Mr Ronald Smith
(Mr Smith) against 10 defendants (ie the parties to the present application
with the exception of Sinai). The underlying dispute was a dispute between
Mr Smith and one Philip Carruthers (Mr Carruthers) as to who was the
true beneficial owner of the issued share capital of Rosshill. Mr Carruthers
had a controlling interest in HHCL. Stripped to essentials, Mr Smith's  *b*
claims were that he was the beneficial owner of the issued share capital of
Rosshill, but that Mr Carruthers had so manipulated matters that he,
Mr Carruthers, was able to control the shareholding via the trustee of his
family trust (Spread Trustee Co Ltd (Spread)) and that, purporting to act on
behalf of Rosshill, Mr Carruthers had fraudulently incurred liabilities on
behalf of Rosshill to a number of parties, including a substantial liability to  *c*
a Mr Ralph Sacki in respect of which Mr Sacki had obtained both a
judgment and a charging order against the Hayle Harbour land.
Mr Carruthers' position by contrast was that Mr Smith had sold his
beneficial interest in the land and in the shares in Rosshill to Rosshill and
Mr Carruthers respectively for a sum which was agreed on 3 April 1998 to  *d*
be £1.4m (payable as to £1.3m by Rosshill and £100,000 by
Mr Carruthers) which sum was subsequently agreed to have been increased
to £1.805,000 on 23 September 1999. Mr Carruthers accordingly claimed
that Mr Smith was a creditor of himself and Rosshill in that sum (it is not
clear how much of the increased sum is alleged to have been Rosshill's as
opposed to Mr Carruthers' liability), and claimed that Mr Smith held the  *e*
land certificates to the Hayle Harbour land as security for that liability.

[5] The prize at stake in the proceedings was, in the final analysis, the
Hayle Harbour land owned by Rosshill. On the valuation material currently
before the court, the existing use value was at the date of the 2000
compromise perhaps some £750,000. On the other hand a valuation in
1988 making assumptions that appropriate planning permissions would be  *f*
available had put the value of the land at £23m. There was evidence that
Mr Carruthers was, in December 2000, hoping to achieve for Rosshill a
price of some £16–17m under a joint venture agreement being proposed to
a company called London & Amsterdam. That was on the assumption that
planning permission would be obtained. Receivers appointed by Sinai under
its charge have recently negotiated a sale of the land to an associated  *g*
company of London & Amsterdam for £7.5m without the benefit of
planning permission.

[6] The compromise of the Chancery proceedings took a complex form.
Its essence, however, so far as Mr Smith was concerned, lay in his
abandonment of his claims to the share capital of Rosshill, leaving  *h*
Mr Carruthers (through Spread) in control of Rosshill and thereby the
Hayle Harbour land. In return, Rosshill agreed to pay Sinai (to whom
Mr Smith appears to have assigned the benefit of his claims) £6m secured
by a charge on the land which also secured Mr Sacki. There was also a
provision whereby Mr Carruthers, albeit subordinated to the claims of
Mr Sacki and Sinai, became a secured creditor of Rosshill for up to £3m.  *i*
Rosshill's liability to Mr Sacki and to Sinai was not however to be
enforceable for a period of two years from the date of the agreement.
Mr Sacki was entitled to demand repayment of the Sacki debt on
1 November 2001 and was entitled to interest thereon at 3% over base

a  from 1 November 2000. Sinai was entitled to interest on the Sinai debt at a
   fixed rate of 8% per annum from 1 May 2002.
      [7] I should emphasise that the foregoing is an extremely compressed
   summary of the essential features only of what was a much more elaborate
   agreement.
      [8] The liquidator's claim under s 238 of the 1986 Act is based on the
b  proposition that Rosshill either received no consideration for its agreement
   to pay Sinai £6m (on that footing relying on s 238(4)(a)), alternatively that
   the consideration received by Rosshill had a value 'which, in money or
   money's worth, [was] significantly less than the value, in money or money's
   worth, of the consideration provided by [Rosshill]' (within s 238(4)(b)). The
c  claim is put in these alternative ways on the premise that either Mr Smith
   was right and he was entitled to the Rosshill shares (in which case Rosshill
   owed him nothing), or Mr Carruthers was right and Rosshill owed him at
   least £1.3m.
      [9] Sinai's case is that the liquidator's application is bound to fail at this
   stage of the argument. It is submitted that reliance on s 238(4)(a) cannot be
d  in point since on any view Rosshill received *some* consideration for its
   covenant: the abandonment by Mr Smith of all his claims removed the
   possibility of it being held in the proceedings that Mr Smith was a creditor
   of Rosshill; furthermore, although Mr Smith had not made any claim to the
   Hayle Harbour land in the proceedings, the 2000 compromise required him
   to give up any claims he might have as well to surrender the land
e  certificates; it also gave Rosshill a two-year period of grace in which to seek
   to realise the development potential of the land, and by stilling the disputes
   over the constitution of the board of Rosshill and its ownership, freed
   Rosshill from the corporate paralysis from which it otherwise suffered and
   which, so long as it continued, prevented it from exploiting the business
   opportunity represented by the deal with London & Amsterdam. As at
f  present advised I am inclined to agree with Sinai's submission that
   s 238(4)(a) can have no role to play in this case.
      [10] The more difficult issue lies in the application of s 238(4)(b). That
   sub-paragraph requires a comparison to be made between (a) the
   consideration provided by Rosshill and (b) the consideration which was
   given for it, the onus being on the liquidator to show that (b) was
g  significantly less than (a). It was submitted on behalf of Sinai that there was
   no real prospect of the liquidator discharging that onus. That submission
   depended on the proposition that Rosshill's agreement to pay £6m was
   valueless at the time it was made. The argument was that since the only
   evidence before the court of the value of the land was that it was worth
   £750,000, and since Rosshill had creditors (including Mr Sacki) in excess of
h  that sum, the covenant cannot have been worth anything. In support of that
   proposition, reliance was placed on the analysis of the value of a covenant
   to pay money contained in a speech of Lord Scott in *Phillips v Brewin
   Dolphin Bell Lawrie Ltd* [2001] UKHL 2, [2001] 1 All ER 673, [2001]
   1 WLR 143 particularly at [22] and [26]. Rosshill's covenant was simply
i  not bankable.
      [11] As an argument for dismissing the liquidator's application at this
   interlocutory stage, this proposition does not in my judgment work. It is
   open to the liquidator to establish by evidence that the covenant to pay £6m
   did have a substantial value. Given the fact that a sale of the property

without the benefit of planning permission has in fact been negotiated at a *a* price of £7.5m, it cannot be said that the liquidator has no prospect of establishing that the land had some similar value in December 2000. It seems to me that the greater difficulty is likely to be suffered by Sinai in putting a value on the consideration which it alleges that Rosshill received. On one possible view the hotchpotch of benefits alleged to have been obtained by Rosshill under the 2000 compromise are not capable of being *b* measured in money or money's worth, and for that reason are arguably not consideration which can be put in the scales against the measurable consideration given by Rosshill (cf Millett J in *Re M C Bacon Ltd* [1990] BCLC 324 at 340).

[12] Mr Driscoll QC's second submission on behalf of Sinai was that even *c* if the court were satisfied that there had been a transaction at an undervalue, there was no real prospect that the court would make any order against Sinai as a result. Section 238(3) provides that where an application has been made by a liquidator in respect of a transaction at an undervalue—

> 'the court shall, on such an application, make such order as it thinks *d* fit for restoring the position to what it would have been if the company had not entered into that transaction.'

[13] It was common ground that this provision does not mandate the making of an order once the transaction has been established to have been at an undervalue (and assuming the non-availability of a defence under *e* sub-s (5)). As Sir Donald Nicholls V-C pointed out in *Re Paramount Airways Ltd* [1992] BCLC 710 at 721, [1993] Ch 223 at 239, the discretion given by the sub-section is 'wide enough to enable the court, if justice so requires, to make no order against the other party to the transaction …' The argument here was that the impossibility of putting Mr Smith (or Sinai) *f* back into the position which he (or it) would have been in but for the transaction meant that there was no real prospect of the liquidator persuading the court to make any order at all under the section. Mr Smith had claims against Mr Carruthers (and Spread) to the shares in Rosshill and claims against purported creditors of Rosshill (including Mr Sacki) that Rosshill was not indebted to them. Mr Carruthers is now however *g* bankrupt and Rosshill has in the period since December 2000 apparently incurred further debts (allegedly in the millions) and is now of course in liquidation. Mr Sacki continues to enjoy the benefit of his charge and will continue to do so because the liquidator has taken the view that there are no grounds for applying to set it aside. Accordingly, it is submitted that it is simply impossible to conceive of any form of order which the court might *h* make which could restore Mr Smith to the position which he previously enjoyed.

[14] One possible answer to this submission was suggested by Mr Ashworth on behalf of the liquidator. He observed that if at the hearing of the application it were established that Mr Smith had never been anything other than an unsecured creditor of Rosshill (as had been *i* Mr Carruthers' case in the Chancery proceedings) there would be no difficulty in restoring him to *that* position. In my judgment there are two difficulties with that argument. First, it does not appear from the liquidator's application as currently formulated that he is proposing on this

*a* part of his case to prove that Mr Smith was no more than an unsecured creditor. The case is put in alternative, conditional, form: either Mr Smith was a shareholder or he was a creditor, and on either hypothesis the transaction was at an undervalue. If I am right about s 238(4)(a) this way of putting the case will have to be re-thought. Secondly, the argument overlooks the fact that what Mr Smith was compromising was his *claim* to
*b* be the shareholder beneficially, and his *claim* that Rosshill did not have an indebtedness in respect of the liabilities purportedly incurred on its behalf by Mr Carruthers. That claim must have been perceived as worth more to Mr Smith than his position as an unsecured creditor of Rosshill encumbered by those liabilities. Putting Mr Smith back in *that* position is now impossible.
*c*    [**15**] In my judgment the answer to Mr Driscoll QC's submission is that the court will not necessarily be deterred from making an order by the fact that Mr Smith cannot be put back into the position he was in immediately prior to the 2000 compromise. Suppose A owes B a debt of £1,000 which B agrees to release in exchange for A procuring C Ltd to sell to B land worth
*d* £1,100 for a consideration of £100. The transaction is completed, and thereafter A goes bankrupt and C Ltd into liquidation. It is possible to say that an order requiring the land to be re-vested in the company on payment of £100 to B will 'restore the position to what it would have been if [C Ltd] had not entered into [the] transaction', even though the result is to leave B worse off than he would have been as against A. There are two reasons why
*e* this is so. First, the relevant transaction for s 238 purposes is not the tri-partite arrangement between A, B and C Ltd, but simply the sale by C Ltd to B. Secondly, it is at least arguable that the court's primary, and possibly only, concern under s 238(3) is the restoration of the company's position: the position of the counter-party needs to be considered by the court as a general matter of discretion, but the court is not obliged to ensure
*f* that his position is restored in every particular to the status quo ante the transaction. There will be many cases where that is simply impossible.
   [**16**] I have accordingly concluded that it cannot be said on this ground that the liquidator has no real prospect of obtaining an order. I turn therefore to Mr Driscoll QC's third submission based on s 238(5).
*g*    [**17**] Section 238(5) provides that:

       'The court shall not make an order under this section in respect of a transaction at an undervalue if it is satisfied—(a) that the company which entered into the transaction did so in good faith and for the purpose of carrying on its business, and (b) that at the time it did so there were reasonable grounds for believing that the transaction would
*h*     benefit the company.'

   [**18**] Rosshill's entry into the 2000 compromise was specifically approved by its board at a meeting on 17 November 2000. The board then comprised Mr Carruthers, Mr McHugh, an associate of Mr Carruthers, and Mr Sampson who had been nominated to the board by Mr Smith. The
*i* proceedings of the meeting were recorded in what was obviously a carefully crafted minute, which, after appropriate disclosures had been made of the directors' personal financial interests, recorded as follows:

       'The Directors having taken into account the inability of the Company to control and manage its affairs for so long as the litigation

continued, the imminence and likelihood of outline planning permission *a*
being granted for the development of part of the Company's land, the
interest expressed by prospective purchasers or joint venture partners in
the development project, the very substantial gain in the value of the
Company that would result in the present solvency of the Company, it
was resolved that it would be in the best interests of the Company for a
settlement of the proceedings to be achieved. It was noted that the *b*
consequences of not achieving such a settlement would almost certainly
be the collapse of the Company and the failure to realise the substantial
gain which would result from a successful sale of the land or a joint
venture partnership and that this would not be in the interests of the
Company its shareholders or creditors.'
                                                                      *c*
[**19**] Mr Driscoll QC submitted that there were no grounds whatsoever
for doubting the veracity of that passage or the good faith of those who
participated in the meeting. Accordingly, he submitted, it was plain that,
unless the liquidator were able to suggest some foundation for a suggestion
to the contrary, the requirements of s 238(5)(a) and (b) were satisfied.

[**20**] In response to that submission, Mr Ashworth pointed to some *d*
evidence of Mr Carruthers which sought to suggest that *his* motivation in
entering into the 2000 compromise was physical intimidation by Mr Smith.
I agree with Mr Driscoll QC that this evidence has to be taken with a very
liberal pinch of salt. If Mr Carruthers had grounds for upsetting the 2000
compromise on such grounds it is astonishing that he never relied on them,
but instead sought to escape its consequences by the device of putting *e*
Rosshill into administration on the very eve of the expiration of the two
year period of grace which Rosshill enjoyed as a result of the 2000
compromise. I would therefore be prepared to discount entirely the prospect
of the liquidator being able to establish this as the 'real' reason for Rosshill
having been caused to enter into the 2000 compromise. *f*

[**21**] If that is right then Sinai will be able to establish 'good faith' in the
sense that the minute accurately and honestly reflects the thought processes
involved. That does not however by itself establish that the court will be
satisfied either that the decision was taken 'for the purpose of carrying on
[the company's] business' within s 238(5)(a) or that there were 'reasonable
grounds for believing that the transaction would benefit the company' *g*
within s 238(5)(b). The first of those requirements involves both subjective
and objective elements; the second is expressed in entirely objective terms.
The liquidator is in my judgment entitled to maintain a case that the
transaction was not necessary for the purpose of carrying on the company's
business and/or that there were not objectively reasonable grounds for
believing that it would benefit the company. *h*

[**22**] The difficulty which, as it seems to me, Sinai faces under s 238(5) is
that the principal advantage to Rosshill from the transaction lay in its being
freed from the corporate paralysis from which it suffered. To obtain a
release from that paralysis it was prepared to pay a price which (ex
hypothesi) exceeded the value to it of what it was to receive. Prima facie
that could only be justified if there was no other (or cheaper) means of *i*
removing the paralysis. It is not immediately apparent to me that such
means did not exist. In the final analysis the dispute which was producing
the paralysis was a dispute between Mr Carruthers and Mr Smith over who
was entitled to control Rosshill. On the face of it the adoption of some

*a*   procedure designed to allow Rosshill to continue in business notwithstanding the irresolution of that dispute would be a better course for Rosshill to have taken than the one it did take, namely the deployment of a substantial chunk of its assets on Mr Carruthers' behalf in buying out Mr Smith's claim to be the beneficial owner of the share capital. The course ultimately taken by Mr Carruthers of obtaining an administration order

*b*   was ostensibly one of those courses. An alternative might have been the appointment of a receiver, or provisional liquidators. Unless and until it be shown that some such solution was impossible the liquidator has some prospect in my judgment of being able to show that the requirements of s 238(5) are not satisfied.

*c*   [**23**] Accordingly, I do not consider that the liquidator should be shut out at this stage from pursuing his case against Sinai under s 238.

[**24**] The liquidator's case under s 239 has, however, to surmount a different obstacle. Under s 238, the transaction at an undervalue is impugnable if made within the period of 2 years ending with the onset of insolvency: see s 240(1)(a). That is satisfied in this case. The same period

*d*   applies in the case of a preference which is given to a person who is 'connected with' the company. In the case of a preference which is not a transaction at an undervalue and not given to a connected person the relevant period is, however, only 6 months: see s 240(1)(b).

[**25**] In this case the preference (if it was one) was given outside this six month period. It is necessary therefore for the liquidator to show that it was

*e*   given to a connected person. He faces three potential obstacles. First, he has to show that the person to whom it was given was a 'creditor'. To the extent that he here relies on Mr Smith as having been a creditor before the 2000 compromise itself, he has set himself the task of showing that Mr Carruthers' version of events was the correct one. It is not clear that the liquidator's application fully recognises this as currently formulated.

*f*   Secondly, he has to deal with the fact that the putative preference was given to Sinai rather than to Mr Smith. This possibly presents a difficulty more apparent than real. Thirdly, he has to show either that Sinai or Mr Smith was a connected person. It is not suggested that Sinai fits this bill.

[**26**] In argument various solutions were proposed to the first and second of these difficulties. Each of them depend on asserting, by one means or

*g*   another, that Mr Smith/Sinai was a creditor of Rosshill. Each of them therefore has to eschew the allegation that Mr Smith was a shareholder of Rosshill. Accordingly, the liquidator accepts that the only basis on which Mr Smith can be alleged to have been 'connected with' Rosshill is as a 'shadow director' of Rosshill: see s 249(a). The expression 'shadow

*h*   director' is defined by s 251 as:

> 'a person in accordance with whose directions or instructions the directors of the company are accustomed to act (but so that a person is not deemed a shadow director by reason only that the directors act on advice given by him in a professional capacity).'

*i*   [**27**] On the face of those words it is not enough to constitute Mr Smith a shadow director that one member of the board, Mr Sampson, was his nominee. It would have to be shown that all the directors, or at least a consistent majority of them, had been accustomed to act on Mr Smith's directions. Mr Ashworth submitted that this could not be the proper

construction of the provision, since it would expose an obviously *a*
unintentional lacuna in the legislation. I agree that the construction does
leave a lacuna: it is difficult to see why a director should be connected but
a person who controls a director is not. I am, however, unable to read s 251
as having the meaning contended for by Mr Ashworth, and, as he
recognised, there are two first instance authorities which are against him on
the point: see per Millett J in *Re Hydrodam (Corby) Ltd* [1994] 2 BCLC *b*
180 at 183 and (on the identical wording in s 741(2) of the Companies
Act 1985) Harman J in *Re Unisoft Group Ltd (No 3)* [1994] 1 BCLC 609
at 620.

[**28**] The only means of escape for the liquidator from this conclusion was
to seek to argue that the whole board had been 'accustomed' to act on
Mr Smith's directions, that custom having begun and ended on the day of *c*
the board meeting itself when a resolution compliant with Mr Smith's
wishes was passed. This seems to me a hopeless argument.

[**29**] Accordingly, the liquidator's application under s 239 is in my
judgment doomed to fail and ought not to be allowed to proceed to trial.

[**30**] I will hear further argument as to the form of order and further *d*
directions which are appropriate in the light of this judgment on the
occasion of its formal delivery.

*Sinai's application granted in part; liquidator's application dismissed in part.*

Martyn Gurr   Barrister.

TAB 37

*Madoff Securities International Ltd v Raven* [2013] EWHC 3147 (Comm),
English High Court

Case No: 2010 FOLIO 1468

Neutral Citation Number: [2013] EWHC 3147 (Comm)
**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Rolls Building, Fetter Lane
London, EC4A 1NL

Date: 18/10/2013

Before:

**THE HON. MR JUSTICE POPPLEWELL**
- - - - - - - - - - - - - - - - - - - -
Between:

| | |
|---|---|
| **MADOFF SECURITIES INTERNATIONAL LIMITED (In Liquidation)** | **Claimant** |
| - and - | |
| **(1) Stephen Raven** | **Defendants** |
| **(2) Leon Flax** | |
| **(3) Christopher James Dale** | |
| **(4) Philip John Toop** | |
| **(5) Malcolm Stevenson** | |
| **(6) Peter Barnet Madoff** | |
| **(7) Mark David Madoff** | |
| **(8) Andrew Howard Madoff** | |
| **(9) Sonja Kohn** | |
| **(10) Erko Incorporated** | |
| **(11) Tecno Development & Research Limited** | |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Pushpinder Saini QC, Robert Weekes, Tom Richards and Shane Sibbel** (instructed by **Taylor Wessing LLP**) for the **Claimant**
**Nicholas Yell** (instructed by **EMW Law LLP**) for the **1st Defendant**
**Ian Clarke and Lara Kühl** (instructed by **Radcliffes Le Brasseur**) for the **2nd Defendant**
**Philip Toop** (Litigant in Person) the **4th Defendant**
**Zoe O'Sullivan** (instructed by **Pitmans LLP**) for the **7th & 8th Defendants**
**Jonathan Crow QC and James Knott** (instructed by **Asserson Law Offices**) for the **9th & 11th Defendants**

Hearing dates: 10-13, 17-20, 24-27 June; 1-4, 8-11, 15-18 July 2013
- - - - - - - - - - - - - - - - - - - -

# Judgment

Index

| | |
|---|---|
| 1 Introduction | 1 |
| 2 The claims and defences in outline | 8 |
| 3 The parties | 30 |
| 4 The corporate history of MSIL | 61 |
| 5 Mrs Kohn's agreement with Bernard Madoff | 108 |
| 6 The research | 135 |
| 7 Financial and accounting treatment of the MSIL | 146 |
| Kohn Payments: | |
| a. Invoices | 146 |
| b Funding | 160 |
| c. Auditing | 164 |
| d. Accounting, including the "fees receivable" issue | 168 |
| 8 Directors' duties: the law | 187 |
| 9 MSIL Kohn payments: breaches of directors' duties | 210 |
| 10 MSIL Kohn payments: the directors' *Duomatic* defence | 266 |
| 11 MSIL Kohn payments: remedy/causation | 289 |
| 12 MSIL Kohn payments: the directors' no loss defence | 296 |

| 13 MSIL Kohn payments: the directors' ex turpi causa defence | 307 |
|---|---|
| 14 MSIL Kohn payments: the directors' limitation defence | 321 |
| 15 MSIL Kohn payments: the directors' claim for relief from sanction | 334 |
| 16 MSIL Kohn payments: the claim against Mrs Kohn, Erko and Tecno Gibraltar | 337 |
| 17 MSIL Kohn payments: Mrs Kohn's limitation and laches defence | 384 |
| 18 The Interest Payments: the facts | 391 |
| 19 The Interest Payments: breaches of directors' duties | 416 |
| 20 The Interest Payments: defences | 442 |
| 21 The Lifestyle Payments: claim and defences | 458 |
| 22 Conclusion and postscript | 469 |

**The Hon. Mr Justice Popplewell:**

## (1) Introduction

1.      On 29 June 2009, Bernard Madoff was sentenced by a Court of the Southern District of New York to 150 years in prison and ordered to forfeit US$170 billion.  The present claim is brought in the long shadow cast by his notorious Ponzi scheme fraud, perpetrated through his New York business for two decades or more.  But this case is not primarily about the Ponzi scheme.  None of the remaining Defendants knew of, or suspected, the fraud.  It is not suggested that they did, nor that they should have done.  Many lost their own savings as a result of the scheme.  All have had their lives turned upside down.  They are all victims of Bernard Madoff's fraud.

1.      During the three decades with which this case is concerned, Bernard Madoff enjoyed a reputation as a titan of Wall Street.  Prior to the revelation of the fraud in December 2008, he was to the world a self made billionaire, regarded within the financial industry, by participants and regulators alike, as a successful businessman of high standing and integrity.  His New York business filed audited statements of financial condition attesting to his enormous wealth and success.  His stature was enhanced by the senior positions he held within institutions at the heart of the US financial

establishment.  He served on several committees to advise the Securities & Exchange Commission; he was chairman of NASDAQ; he was vice chairman of the National Association of Securities Dealers; he was a director of the US Securities Industry Association.  His reputation was not built on his investment advisory business, which turned out to be a Ponzi scheme, but on his proprietary trading and market making business, which was conducted conventionally and legitimately with envied success for over forty years.

2.      From around 1960 to the end of 2000 Bernard Madoff's New York business was conducted under the trading style Bernard L. Madoff Investment Securities, of which he was sole proprietor.  Thereafter it was conducted through Bernard L. Madoff Investment Securities LLC which was incorporated as a New York company on 1 January 2001.  He was the sole director and owned all the shares.  In this judgment I use "BLMIS" to refer to both the incorporated and unincorporated entities.

3.      BLMIS had three divisions: investment advisory, market making and proprietary trading.  The investment advisory business was housed on the 17th floor of the firm's New York offices, separately from the market making and proprietary trading divisions which were on the 19th floor.  It was run by Frank DiPascali, under Bernard Madoff's personal supervision.  Personnel in the investment advisory business did not share information with the personnel in the market making and proprietary trading businesses: compliance policies and procedures expressly forbade any interaction between the businesses.

4.      The market making and proprietary trading divisions carried out legitimate and profitable business activities.  By contrast, BLMIS' investment advisory business engaged in no material investment activity.  The "investments" made for clients did not take place.  The investors' money was mixed with money from the legitimate trading activities in a variety of bank accounts, including in particular one held at JP Morgan ("the 703 account").  BLMIS issued to each of its clients monthly or quarterly statements which purported to show the securities which were owned and traded in the client's accounts with BLMIS, and the growth and profit in such accounts.  In reality there was no such trading, growth or profit.  When from time to time customers of BLMIS sought repayment of their investment, BLMIS would make payments which were consistent with the false account statements which the customers had been receiving.  In reality the customers' funds had been co-mingled and depleted by BLMIS's payments out of the scheme to other customers.  Towards the end of 2008, when requests for redemptions exceeded the amount of funds deposited by new customers, the scheme became unsustainable.  In early December 2008 BLMIS had generated about 5,000 client account statements, which together purported to show the clients' investments totalling approximately US$ 65 billion.  In fact at that time the investment advisory business had only about US$ 200 million in cash and no investments.

5.      This case is concerned with Bernard Madoff's London business, Madoff Securities International Ltd ("MSIL").  MSIL was not part of the Ponzi scheme.  It was conducting its own legitimate business in London.  At all material times Bernard Madoff was MSIL's executive CEO or chairman, and owned virtually all of the voting shares.  MSIL had a number of other directors apart from Bernard Madoff, the composition of the board varying over time.  The present claim is brought by the liquidators of MSIL against some of its former directors; and against Mrs Sonja Kohn,

an Austrian businesswoman who was very well connected with a range of influential individuals and institutions in the European financial and political world. Her introductions led to billions of dollars worth of investments in BLMIS in what turned out to be the Ponzi scheme.

6.     It is necessary to keep firmly in mind that the conduct and state of mind of the Defendants in this case falls to be judged against the widespread contemporary perception of Bernard Madoff as a man of integrity, whose honesty in all his business dealings was taken for granted; and as a man whose success and high standing in the financial world caused his views on financial matters to command widespread deference and respect. Mrs Kohn and the directors had no reason to suspect Bernard Madoff's fraud, and none for a moment did so. In common with the rest of the financial world, they believed Bernard Madoff to be a man of unquestioned probity whose high reputation and status was justified by his apparently formidable history of financial trading and investment.

## (2) The claims and defences in outline

7.     There are five directors against whom the claim is now pursued ("the director Defendants"). They are Mr Raven, Mr Flax, Mr Toop, Mr Mark Madoff and Mr Andrew Madoff. Mr Raven, Mr Flax and Mr Toop were directors of MSIL, based in MSIL's London office. So too were Mr Dale and Mr Stevenson, the third and fifth defendants with whom MSIL settled. There were other directors of MSIL in London from time to time during the relevant period whom MSIL has not sued. Three members of the Madoff family in addition to Bernard Madoff himself were also directors of MSIL, but worked principally from BLMIS's New York offices. They were Peter Madoff, Bernard Madoff's brother; and Mark and Andrew Madoff, Bernard Madoff's sons. MSIL discontinued the action against Peter Madoff, the sixth Defendant, on 4 April 2013. Mark Madoff is deceased; Andrew Madoff represents his late brother's estate in these proceedings.

8.     The claim relates to three sets of payments made by MSIL, to which I will refer as (i) "the MSIL Kohn Payments", (ii) "the Interest Payments" and (iii) the "Lifestyle Payments". The first of these was described by MSIL as its principal claim.

*(i) The MSIL Kohn Payments*

9.     The MSIL Kohn Payments were made by MSIL regularly throughout the period between 1992 and 2007 to entities connected with Mrs Kohn. They total US$27,059,054. Until 2001, the payments were made to the Tenth Defendant, Erko Incorporated, ("Erko"), a New York company dissolved in 1998. From 2002 to 2007 they were made to Tecno Development and Research Srl, an Italian company also now dissolved, ("Tecno Italy"). In 2007 they were made to the Eleventh Defendant, Tecno Development & Research Limited, a Gibraltar company ("Tecno Gibraltar"). The payments ceased in 2007 in circumstances to which I shall return. The payments were generally made quarterly and the annual totals were as follows:

| Year | MSIL Kohn Payments | | |
|------|------|------|------|
|      | Erko | Tecno Italy | Tecno Gibraltar |
| 1992 | $61,579.00 | | |
| 1993 | $165,900.00 | | |

| | | | |
|---|---|---|---|
| 1994 | $268,875.00 | | |
| 1995 | $277,200.00 | | |
| 1996 | $651,700.00 | | |
| 1997 | $1,625,300.00 | | |
| 1998 | $1,636,500.00 | | |
| 1999 | $1,500,000.00 | | |
| 2000 | $2,000,000.00 | | |
| 2001 | $2,871,000.00 | | |
| 2002 | | $2,325,000.00 | |
| 2003 | | $3,100,000.00 | |
| 2004 | | $2,876,000.00 | |
| 2005 | | $2,800,000.00 | |
| 2006 | | $2,800,000.00 | |
| 2007 | | $700,000.00 | $1,400,000.00 |
| 2008 | | | |
| **Total** | **$11,058,054.00** | **$14,601,000.00** | **$1,400,000.00** |

10.   The payments to Erko were made by cheque, collected by Mrs Kohn or her husband when in London.  The Erko cheques were, at least from 1996, paid into an account or accounts at Bank Gutmann AG (a private bank in Austria) in the name of Mrs Kohn's daughter.  The payments to Tecno Italy and Tecno Gibraltar were made by electronic bank transfer.  BLMIS funded MSIL to make all these payments in the way I describe in more detail below.

11.   Mrs Kohn had agreed with Bernard Madoff that such payments would be made by MSIL in return for services provided by her.  Mrs Kohn's evidence was that the payments were for a range of services which were essentially (a) introductions to important individuals and institutions (b) advice, information and ideas about global financial and economic matters, communicated at face to face meetings with Bernard Madoff and (c) written research.  Written research was delivered in very substantial quantities to both MSIL in London and BLMIS in New York.  MSIL's case is that the payments were simply for introducing investors' money into BLMIS's investment advisory business.  In addition to the MSIL Kohn Payments, between 1998 and 2008 over US$32 million was paid by BLMIS for her services, making a total of some US$59 million.

12.   It is worth emphasising that, large though these payments were, the total amount of the payments made by MSIL and BLMIS to the entities connected with Mrs Kohn was no more than a reasonable amount for the services which were in fact provided.  This was common ground.  Mrs Kohn was very well connected and very successful in making effective introductions, although she did not know at the time whether or how such introductions would flower into profitable business.  MSIL's case was that her introductions led to at least US$9 billion of funds being invested in BLMIS's investment advisory business.  Mrs Kohn did not know, and had no reason to suspect, that the investment advisory business was a fraudulent scheme.  Had it been what it appeared to be, it is accepted by MSIL that the introductions effected by her would justify the amount of the payments.  Indeed the unchallenged expert evidence before me established that the going rate for introductions leading to funds under management of that size was considerably greater.

13.   Each payment was covered by an invoice from, successively, Erko, Tecno Italy, and Tecno Gibraltar, although not all the invoices from the early years have survived. Some referred to "services" generally, some simply to "research" and some to a range of named services including "market researches", "analysis", "specific reports", "ideas and strategies for new business developments" and "business opportunities".

14.   In respect of these payments MSIL pursues claims against Mr Raven, Mr Flax, Mr Toop, Mr Andrew Madoff and Mr Mark Madoff by reason of their having been directors of MSIL for some or all of the time during which the MSIL Kohn Payments were made.  It alleges that so far as these directors were concerned, the payments were simply being made in return for the written research being delivered to MSIL's London offices, which was not passed on to New York; and that as the directors knew, the written research provided to MSIL was useless and of no value to MSIL, both because of its own poor and plagiarised quality and because it was irrelevant to the trading activities in which MSIL was engaged.  The claim against these directors is advanced on the basis that each was in breach of his duty as a director in making or permitting the payments because:

(1)   the payments constituted an unlawful distribution of capital to MSIL's shareholder, Bernard Madoff; and/or

(2)   the director was in breach of the duty to exercise powers for the purposes for which such powers are conferred; and/or

(3)   the director was in breach of the duty to act in the way he considers in good faith to be in the best interests of the company; and/or

(4)   the director was in breach of the duty to exercise reasonable care skill and diligence.

15.   The director Defendants deny that they were in breach of duty in any of the respects alleged.  In addition they advance the following alternative defences:

(1)   The payments were approved by the voting shareholders which affords a defence under the ***Duomatic*** principle.  Bernard Madoff held all bar one of the voting shares in MSIL, which was held by his brother Peter Madoff.

(2)   Any breach of duty was not causative of any loss: Bernard Madoff would have procured the payments to be made had the director not been in breach of duty as alleged.

(3)   MSIL has suffered no loss in respect of the payments because they were funded by BLMIS and so were cash neutral for MSIL.

(4)   The claim fails under the *ex turpi causa* doctrine, because it is MSIL's case that, albeit unbeknown to the directors at the time, the payments were funded from the fraudulent Ponzi scheme, and were part of it in the sense that the entities connected with Mrs Kohn were being paid for introductions to the scheme.

(5) Claims in respect of payments made before 8 December 2004 are time barred having occurred more than six years prior to the issue of the Claim Form.

(6) The directors should be afforded relief from sanction under section 1157 of the Companies Act 2006 and its statutory predecessors, on the grounds that they acted honestly and reasonably and ought fairly to be excused from liability.

16.    MSIL disputes the applicability or validity of the causation, no loss, and ex *turpi causa* arguments, and contends that relief from sanction is not available because the directors did not act honestly or reasonably.   MSIL contends that the ***Duomatic*** defence has no application for one or more of the following reasons:

(1) There was no unanimous informed approval by the voting shareholders because Peter Madoff held one voting share and he was unaware of the MSIL Kohn payments.

(2) The company was at the time of all the payments insolvent (albeit unknown to any of the Defendants) because it was funded from the proceeds of the Ponzi scheme, and all such funding was immediately repayable to BLMIS at the time of receipt; or alternatively was at least in a precarious financial state at the time of all the payments because it was dependant on funding from BLMIS.

(3) The transactions were not honest or bona fide transactions from the point of view of the directors or the relevant shareholder, Bernard Madoff.

17.    MSIL contends that no time bar applies because:

(1) each of the director defendants was guilty of fraud within the meaning of s. 21(1)(a) of the Limitation Act 1980; and/or

(2) each of the directors was guilty of deliberate concealment under s. 32(1)(b) and 32(2) of the Limitation Act 1980.

18.    Against Mrs Kohn, MSIL's claim is advanced on four bases, namely dishonest assistance constructive trust; knowing receipt constructive trust; a common law restitutionary claim; and a proprietary receipt based claim.  It is common ground that the first two, at least, require a finding that at least one director was in breach of a fiduciary duty.

19.    MSIL's case against Mrs Kohn can be summarised as follows.  The true reason for the MSIL Kohn Payments was for introductions to Bernard Madoff's investment advisory business.  The written research provided to MSIL was, as she knew, valueless per se and worthless to MSIL in its trading business.  It was provided merely as a pretext for the payments.  The pretext was maintained by false invoicing purporting to justify the payments as being for such research.  This dressing up of the payments by the provision of worthless research and false invoicing reflected Mrs Kohn's knowledge that the payments were not for MSIL's benefit or in MSIL's interests.

20.    Mrs Kohn disputes this analysis.  Her case is that the payments were for a range of services which she provided, and for which she was paid a proportionate amount pursuant to an agreement reached with the chief executive and owner of MSIL; it was

a matter of indifference to her whether the payments were made by BLMIS or MSIL, which she regarded simply as parts of Bernard Madoff's single global business; she did not regard the MSIL Kohn payments as being solely or even primarily for the written research; her services included the introduction of people, not money, which might result in benefit to the proprietary trading business as much as the investment advisory business; so far as she was concerned, the introduction of European connections might naturally benefit Bernard Madoff's London based business; in any event the research was not worthless to MSIL, or at least was not regarded by her as worthless to MSIL; the research was provided openly to the London office over many years in a way which would have been apparent to the directors in London and to the auditors; the payments and invoices were equally open and transparent; there was no secrecy and no one ever told her that the research should not be provided or that they thought it was a pretext for the payments; there was nothing false about the wording of the invoices, to which she paid little attention, and there was no intention to mislead anyone.

21.    Mrs Kohn contends that the claim in respect of payments made before 8 December 2004 is time barred by the Limitation Act 1980 or the doctrine of laches.  MSIL relies in this context on sections 21 and 32 of the Limitation Act 1980.

*(ii) The Interest Payments*

22.    The second set of payments in respect of which MSIL claims arise out of two subordinated loan agreements by which Bernard Madoff lent MSIL a total of US$62.5 million.  The first loan agreement was dated 28 November 2000 and was for US$37.5 million.  The second was dated 28 December 2001 and was for US$25 million.  The loans were at a commercial rate of 0.5% over LIBOR and on commercial terms.  The loan agreements were countersigned by the Financial Services Authority ("FSA").  Between 2002 and 2007 interest payments totalling about US$14 million were made in accordance with the terms of the agreements.  The loans were capitalised in 2007.

23.    MSIL's case is that these loans were unnecessary: MSIL had no need or use for such monies and was left with expensive and unused capital upon which it was obliged to pay interest.  MSIL has not alleged or sought to prove that the use to which MSIL put the capital generated less than the cost of the interest payments so that MSIL suffered a loss as a result of taking out the loans or making the contractual interest payments; nor has it sought to quantify the extent of any such loss.  The claim was advanced simply on the basis that MSIL did not need so much capital.  MSIL contends that the directors are under a liability to restore the amounts of the Interest Payments irrespective of any amounts earned by MSIL on the capital sums loaned under the subordinated loan agreements.

24.    There was a substantial dispute before and at the commencement of the trial as to how to deal with the issue as to what, if any, credit needed to be taken into account for money earned on the use of the capital borrowed under the loan agreements.  In particular the Defendants complained that they had not had proper disclosure in order to enable the question of loss fairly to be investigated, and the Claimant complained that the point had not been pleaded by the Defendants, save possibly Mr Toop, as it contended it needed to have been.  The question of the use to which the loans were put, and how much was earned by the use of the capital, is potentially relevant not only to arguments on loss, but also to the liability of the directors, whose perception

of whether the loans would cause or were causing a net loss to the company is relevant to whether they were in breach of duty. Following argument, it was agreed to treat the evidence available at the trial as sufficient on which the parties could address the liability questions, but that the question whether or to what extent MSIL had in fact suffered a loss, if the use of the capital fell to be taken into account, could not fairly be investigated on the basis of disclosure to date. Accordingly it was agreed that I would decide the liability issues on the basis of the evidence adduced at trial, and, if liability were established, I would also determine the issue of principle whether earnings from the proceeds of the subordinated loans are relevant to the measure of loss recoverable from the directors; but that if I should conclude that they did fall to be taken into account, I would not seek to decide the amount at this hearing: in that eventuality, if it arose, the question of how the issue would be dealt with would be revisited, including whether there should be a further hearing or whether the issue should be decided for or against either party as a pleading point or by reference to the burden of proof.

25.    The legal bases for the claims against the directors, and the directors' defences, mirror those in respect of the MSIL Kohn Payments. MSIL alleges breach of the same duties, save for the allegation of unlawful distribution of capital; the response of the directors is to deny breach and rely on the same additional defences.

*(iii) The Lifestyle Payments*

26.    The third element of the claim concerns payments by MSIL for goods or services which were made for the benefit of Bernard Madoff or members of his family. They included the purchase of a yacht and a car, and credit cards drawn on an account with an Isle of Man bank. The total of such payments in their currency of payment is €5,316,629, US$566,535 and £180,009. In every case the amount of these "lifestyle" payments was deducted from Bernard Madoff's director's loan account which was always in credit. The loan account comprised a loan from Bernard Madoff to MSIL repayable by MSIL to Bernard Madoff on demand. These payments therefore caused MSIL no economic loss because they reduced its loan obligation to Bernard Madoff.

27.    MSIL contends that a director's loan account is usually for the purposes of providing working capital to the company, and that in any event the loan by Bernard Madoff, albeit repayable on demand, provided money which became the company's money and the directors were under a duty not to apply such money for purposes other than those of the company itself.

28.    Again, the legal bases for the claims against the directors and their defences mirror those in respect of the MSIL Kohn Payments. MSIL alleges breach of the same duties, save for the allegation of unlawful distribution of capital; the response of the directors is to deny breach and rely on the same additional defences.

## (3) The parties

*MSIL*

29.    MSIL was incorporated on 11 March 1983 as Madoff Holdings Ltd and changed its name to MSIL on 14 October 1988. MSIL operated from offices in London. It was never very large, having a staff which reached a maximum of 26 employees in its last

years.  It was regulated by the FSA and its predecessors, the Securities and Futures Authority and the Securities Association.  Its auditors and tax advisers were Thomson McLintock which became part of Peat Marwick McLintock and then KPMG (collectively "KPMG").

30.   From 15 March 1983 and throughout the relevant period Bernard Madoff was a director of MSIL and its chief executive officer or executive chairman.  He would participate in almost all board meetings, which took place mostly in London, but sometimes in New York.  Bernard Madoff would usually participate in the London board meetings by phone or video conference, but sometimes attended in person.  He would have regular telephone conversations with the directors, and sometimes the traders, in London.  He would visit MSIL's offices a few times per year.  The impression I formed from the evidence which emerged during the trial was that despite some idiosyncrasies he was open to reasonable discussion.  He was not a tyrannical bully; he commanded loyalty, respect, and on the whole affection, from those who worked for him or with him.  Nevertheless he left all with the clear sense that MSIL was his company, in which he had the ultimate say; and, ironically, that he was anxious that his prestige and reputation should be protected and enhanced in all the company did.  As he was fond of saying, "It's my bat and ball", and "it's my name on the door."

31.   His brother Peter Madoff was also a director of MSIL throughout the relevant period, from 16 March 1983 shortly after its incorporation, until December 2008.  He participated in board meetings by phone or video conferencing, or occasionally in person, but played no executive role in MSIL's business until the last few years when he was concerned with compliance.  On 29 June 2012 he pleaded guilty to various offences involving the falsification of books and records of BLMIS and making false filings with the SEC.  He was ordered to forfeit property up to the value of $143.1 billion and sentenced to 10 years in prison. Neither the Claimant nor the Defendants have alleged in these proceedings that he was party to, or aware of, his brother's Ponzi scheme fraud.

32.   The shareholdings in the company varied over time but can be summarised as follows:

     (1)   Voting shares.  At all times Bernard Madoff held all the voting shares bar one, which was held by his brother Peter Madoff.  After 1987 the number of voting shares varied from time to time, between 252,297 and almost 58 million.

     (2)   Non voting shares. Prior to December 1998, Bernard Madoff held non voting shares, in addition to his voting shareholding, of between about 9% and 15% of the total shareholding.  His associates Mr Konigsberg and Mr Cohn had a similar sort of percentage between them.  In this period, therefore, Bernard Madoff owned about 85% or more of the company's equity.  After December 1998 when US$ denominated shares were issued, it is harder to calculate the relevant percentage holdings of non voting shares, but Bernard Madoff continued to hold a substantial proportion of the non voting shares in addition to virtually all the voting shares, and to be the largest beneficial owner of the company's shares.  Non voting shares were also held by Bernard Madoff's wife Ruth Madoff, his brother Peter, and his sons Mark and Andrew Madoff, as well as Mr Konigsberg and Mr Cohn.  So far as Mark and Andrew Madoff

were concerned they derived no benefit from these shares because they were obliged to pay any dividends declared on them to their father as interest repayments on loans Bernard Madoff made to them for subscription for the shares.

33.     MSIL's corporate history can be broken down into five phases:

(1) Between 1983 and 1986 the company does not appear to have conducted any substantial business.

(2) In 1987 and 1988, MSIL had a single trader, Miss Sutton, who was sent from BLMIS in New York to deal in US equities and American depository receipts of a number of UK companies.  MSIL traded such securities as principal, but entered into back to back trades with BLMIS.  Thus MSIL reported no dealing profits or losses in 1987 or 1988.

(3) From about 1988 to about 2001, MSIL traded in US stocks in Europe, primarily as agent for BLMIS; for most of this period it had three principal traders.

(4) From about 2001, MSIL traded in European and US securities on its own account as a proprietary trading firm.  The number of traders grew, and the areas of trading and strategies diversified.

(5) Following the revelation of Bernard Madoff's fraud on 10 December 2008, MSIL ceased trading and joint provisional liquidators of MSIL were appointed on 19 December 2008.  A winding up order was made on 15 December 2009.

34.     This case is concerned with events during phases 3 and 4.  It is necessary to describe the development and management of the company in greater detail in order to place the conduct and attitude of the directors in the context of the business and their management roles from time to time.   Before doing so I will introduce the Defendants.

*Mr Raven*

35.     Mr Raven was born in 1938 and spent the first 20 years of his career with a jobbing firm, becoming a senior partner in a firm employing about 120 staff which was merged into Ackroyd & Smithers PLC.  Between 1977 and 1987 he was a main board director of Ackroyd & Smithers, where he established its financial futures division and was actively involved in its merger with SG Warburg.  For the last two years of his time at the Warburg Securities Group, following its acquisition of Ackroyd & Smithers, Mr Raven fulfilled a compliance role, somewhat reluctantly because he wanted to remain involved in international trading.  For this reason he left Warburgs and having spent a brief period with County Nat West Securities, where he was deputy CEO, he resigned to join International City Holdings PLC and was the main board director in charge of a 400 strong international broking division.  He left International City Holdings PLC in 1991 and for the next three years, until 1994, was Chairman of Tradepoint Financial Network PLC a newly formed company operating a screen based dealing market.

36.     Apart from a two week period in 1983 when the company was being set up, Mr Raven first became a director of MSIL on 1 January 1992, initially on a part time non executive basis. From 1998 he started working for MSIL on a more full time basis and became full time chief executive officer in 2003. He was a director from 1 January 1992 until 15 December 2009. He started on a modest salary of about £5,000 per annum, reflecting his part time role, increasing to about £50,000 p.a. in 1994 and more than £300,000 p.a. (inclusive of bonuses) in 2008; in 2006 his remuneration totalled almost £1 million but this was as a result of special factors and is not representative of his general level of remuneration.

37.     When he became a director of MSIL in his mid 50s, Mr Raven was already a person of some standing in the City. In 1975, at an impressively young age, he had been elected to the Council of the London Stock Exchange ("LSE"), on which he remained until 1991. During that time he chaired the committee responsible for the creation of SEAQ International and the committee responsible for the formation of the London Traded Options Market; he served as deputy chairman of the Commissions and Dealing Committee; and he facilitated the merger of the LSE and the International Securities Regulatory Organisation so as to form the International Stock Exchange; he was chairman of a new committee of the LSE called the International Markets Committee formed in 1985 for the purposes of shepherding the introduction of a new category of membership of international broker dealers, in the context of the deregulation of the LSE's restrictive practices in 1986, colloquially referred to at the time as "Big Bang". He was a founding director of the London International Financial Futures Exchange ("LIFFE") and was appointed chairman of the Floor Trading Committee.

*Mr Flax*

38.     Mr Flax was born in South Africa in 1943 and became resident in the United Kingdom in April 1977. He was admitted to the South African Bar in 1964, although he never subsequently practised law. He obtained an MBA from Columbia University in New York in 1967. From 1967 to 1983 he worked for what can loosely be termed his family's business in South Africa, being a director from 1976. He remained a non executive director after 1983 until the business was sold in 1988.

39.     Mr Flax met Bernard Madoff in October 1986 and was offered a position with MSIL in London on a starting salary of £33,000 a year from 3 November 1986. Although his one page service contract dated 22 April 1987 refers to him as Director of Operations, the company had no employees when he joined. Linda Sutton, a young trader from the New York office of BLMIS was sent over. On 7 November 1986 Miss Sutton was appointed managing director and Mr Flax was appointed a director. He remained a director until 12 May 2009. His salary increased over time to reach about £100,000 pa (inclusive of bonuses) by 2008.

*Mr Toop*

40.     Mr Toop joined BLMIS as an assistant equity trader on the market making desk in August 1987 shortly after completing an MBA at New York University. Between 1987 and 1999 he worked as an equity trader for BLMIS, first on the market making desk until 1995, then moving to the proprietary trading desk. In 1999 he agreed at

Bernard Madoff's request to move to London on a three year assignment. As it turned out he never returned.

41.    Having moved to London Mr Toop was employed by MSIL as a trader on the trading desk between October 1999 and June 2002. Between June 2002 and December 2008 he managed the London trading desk. He became a director on 1 January 2003 and remained one until 23 December 2008.

42.    Mr Toop's remuneration was dependent in part on trading profits. He was paid about £67,000 p.a. in 2000 increasing to nearly £370,000 p.a. (inclusive of bonuses) by 2007.

*Mr Mark Madoff and Mr Andrew Madoff*

43.    Mark Madoff and Andrew Madoff each joined BLMIS upon graduating from university, in 1986 and 1988 respectively, and learned the business on the market making desk. By the mid 1990s they were jointly managing the market making desk at BLMIS. Mark Madoff continued to manage the market making desk after Andrew Madoff began to focus on the proprietary trading desk, although they were each involved in both aspects of the business. They reported directly to their uncle Peter Madoff, who oversaw the legitimate proprietary trading and market making business of BLMIS in New York.

44.    Neither brother was ever a director or shareholder of BLMIS and neither saw accounting records or bank statements for the firm as a whole. They were never privy to BLMIS' investment advisory business and never saw any records of transactions for the investment advisory business.

45.    Both brothers were appointed directors of MSIL by Bernard Madoff on 31 December 1998 when they became non voting shareholders. The brothers remained directors of MSIL until 10 December 2008. On that day their father confessed to them the fraud he had been committing. They immediately reported his crimes to the US authorities and he was arrested the following day. Exactly two years later, on 11 December 2010, Mark Madoff took his own life.

46.    Andrew Madoff has suffered a recurrence of the form of cancer which was originally diagnosed in 2003. He has recently undergone a stem cell transplant in Seattle and remains seriously unwell. He was not well enough to give evidence even by video link, although he had provided a witness statement before undergoing treatment.

*Mrs Kohn*

47.    Mrs Kohn has led a remarkable life. I regard its unusual course as important context for the assessment of her evidence and conduct in relation to the issues I have to decide. She was born shortly after the war as the only child of two holocaust survivors, and brought up in Vienna where her father traded in textiles, coffee and other commodities and then opened a chain of dry cleaning shops. She married her husband a month before she left school at the age of 18. She never attended university. Her first business, which she started before she was 20, involved selling custom jewellery, and she remained in the business of wholesaling and manufacturing

accessories and watches until the mid 1980s. During this time she brought up her five children.

48.     It was not until approaching early middle age that she first ventured into the world of finance. In 1984 she decided to study for the qualification required to obtain a broker licence for practice in the United States, and for those purposes prevailed upon the Zurich offices of Merrill Lynch to allow her to spend a few days there. Shortly after passing the exam, she moved with her family to New York for reasons connected with her children's education. In preparing for her move to the USA, she spoke to a number of Swiss contacts, and identified the lack of a Swiss Chamber of Commerce in New York as a gap she could fill. In founding this not for profit entity in New York after her arrival, she was able to make important contacts in New York and the Swiss financial sector.

49.     In about May 1985 she started working for Merrill Lynch in New York and spent two years in the international office. Encouraged by two of her clients at Merrill Lynch, in 1987 she established her own brokerage firm called Windsor, operating from office space within Oppenheimer and Co., to whose in house research she had access.

50.     In about 1990 she set up Eurovaleur. Its initial business model was to establish a European fund in which US citizens could invest, to be managed by local managers in different European countries. For these purposes she needed to develop a pool of trusted investment managers. The concept of Eurovaleur was of interest to Prudential Insurance Company and she travelled with a representative from Prudential through Europe meeting a large number of candidates for local fund managers in a number of European countries. The candidates included, amongst others, Commerzbank, SG Warburg, Kempen, Banca Intesa, Bank Austria and Raiffeisen. This laid the foundation of a strong European network of contacts with a variety of major European institutions, senior European bankers, finance ministers and others in the financial world.

51.     In the 1990s she also provided consultancy services to Bank Austria, developing ideas for them which were based on her experience obtained in the USA. Eurovaleur assisted Bank Austria to create a capital guarantee note product and in setting up a US denominated fund, amongst other services. Her cooperation with Bank Austria was formalised in 1994 with the establishment of a finance house, Medici Finanz, in which she held 90% of the shares, with Bank Austria holding 10% of the shares as her institutional partner. In 2003 Medici Finanz became Bank Medici and obtained a full banking licence which allowed it to carry out investment banking services. At that time Bank Austria increased its shareholding to 25%. Mrs Kohn was on Bank Medici's supervisory board and contributed ideas and introduced contacts to the bank; she was not however part of the executive managing board of Bank Medici.

52.     She became an advisor to the Austrian Minister of Economic Affairs in the 1990s and was also at one time an adviser to Austria's foreign minister.

53.     In 1996 she set up Infovaleur as a company for the provision of consultancy services, and introductions of European financial institutions to money managers, brokerage firms and investment banks; and to carry out research and analysis in relation to international markets. In the 1990s she also developed contacts with business leaders in the Arab world, leading to the establishment of a joint investment fund between

Emirates Bank and Bank Austria in November 1998. In the late 1990s, she established and developed FundsWorld. This was an online distribution platform for mutual funds. FundsWorld launched in September 1999, with Banca Intesa (now Intesa San Paolo IMS), one of the largest Italian financial institutions, as its institutional shareholder.

54.    Milan became a centre of her business operations in Europe, with an office there for FundsWorld, and Bank Medici, to service which she formed Tecno Italy. In 2005 Bank Austria's parent, HVB, was bought by the Italian banking group Unicredit. She pursued a number of business ventures in Italy, which did not ultimately mature to the point of making significant profits but again contributed to the breadth of her contacts.

55.    In 2007 she set up a Lichtenstein insurance company called PrivatLife in conjunction with Wiener Städtische, Austria's largest insurance company, to provide insurance policies as financial instruments which could be sold to Bank Medici distribution partners, private banks and investment advisors. This business never took off, as a result of the Madoff scandal and the consequent adverse publicity attached to Mrs Kohn.

56.    Prior to the 1990s, there were few senior European financiers on Wall Street and international communications were more difficult than they are today. Wall Street was less familiar with Europe, and Europeans had limited access to Wall Street. There were few international financial institutions which had significant branches both in the USA and Europe. Mrs Kohn's position and contacts meant that she was a bridge from the USA to a world which was not well known even to some of the most senior US financiers on Wall Street. The fact that she spoke English and a number of European languages, particularly German, Italian and French, also made her an efficient link between Europe and Wall Street. As a result Mrs Kohn developed a reputation in Europe both for knowing who did what on Wall Street, and for an ability to get meetings with those people. She was regularly approached by those in the European financial markets for assistance in getting introductions when they were coming to New York, not just with Bernard Madoff but with other influential individuals and institutions.

57.    Mrs Kohn and her family had invested approximately US$11.5 million of their own money in funds invested in BLMIS's investment advisory business. One striking feature of the Madoff debacle is that none of the entities she introduced to Bernard Madoff's investment advisory business have brought claims against her. For all their losses, none of them has suggested any fault or inappropriate behaviour on her part.

*Erko*

58.    Erko was incorporated as a company under the laws of New York on 15 April 1987. Mrs Kohn was the sole shareholder. Erko in turn held the shares in Windsor. Invoices for the MSIL Kohn payments were made in its name until 2002, and payments were made by cheque made out to it, which were, at least from 1996, paid by endorsement of the cheques directly into Mrs Kohn's daughter's bank account in Austria. This practice was not hindered by the fact that Erko was dissolved in June 1998.

*Tecno Gibraltar*

59.     Tecno Gibraltar was incorporated as a limited company under the laws of Gibraltar on 3 January 2007.  It invoiced and was paid for the last two MSIL Kohn payments of US$700,000 each in June and July 2007.

**(4) The corporate history of MSIL**

*Phase 1: 1983-1986*

60.     MSIL was incorporated on 11 March 1983 as Madoff Holdings Ltd and changed its name to MSIL on 14 October 1988.  It came into existence as a result of a social meeting between Bernard Madoff and Mr Raven in about 1983.  Mr Raven had been introduced to Bernard Madoff in the early 1970s by Maurice Cohn who was a close friend of Bernard Madoff and whom Mr Raven knew professionally.  Mr Raven was chairman of the Floor Trading Committee of "LIFFE" which was responsible for inviting suitable organisations to buy seats on the Exchange.  Mr Raven suggested that Bernard Madoff consider buying a seat on LIFFE for capital appreciation, not necessarily with a view to trading on the exchange himself, but in order to lease the seat out to a local operator.  Bernard Madoff decided to do so and asked Mr Raven to assist with the application procedure.  MSIL was incorporated for that purpose.  Mr Raven became a director of MSIL in March 1983 solely for the purposes of forming the company and resigned as a director two weeks later having fulfilled that purpose.  His wife became a director in his place.  She played no part in the governance of the company at any stage and ceased to be a director on 30 December 1988.

61.     MSIL acquired a seat on LIFFE on 13 April 1984.  So far as the evidence shows, MSIL did not conduct any substantial business for about four years.

*Phase 2: 1987-1988*

62.     In the latter part of 1986 Bernard Madoff decided that MSIL would sell its LIFFE seat because the price of seats had not greatly appreciated in value.  He asked Mr Raven what trading activity the company in London might be used for now that it had been set up, and Mr Raven suggested becoming a member of the LSE and trading on SEAQ International as a market maker in US securities.  Bernard Madoff asked Mr Raven to help steer him through the LSE membership process.

63.     Mr Flax was recruited as an office administrator to set up and run a London office, where he started on 3 November 1986.  Linda Sutton, a young trader from the New York office of BLMIS was sent over.  On 7 November 1986 Ms Sutton was appointed managing director and Mr Flax was appointed a director.  Mr Flax's role was initially just that of an administrator, consistent with his background in business administration.  He was not a trader and had very little stock exchange knowledge or experience.  He was not a qualified accountant.  The administrative role included tasks such as acquiring computers and other equipment necessary to set up a working office.  In the early months he was not responsible for any book keeping, payroll or other accounting records.  The office was in London Wall in the City.  In these early years Mr Flax spoke infrequently with Bernard Madoff.  If Bernard Madoff had cause to speak to someone in the firm he would usually ring Ms Sutton as his first point of contact.

64.     Rodney Yates joined MSIL in January 1987.  He was the retired finance director of Ackroyd & Smithers PLC, whom Mr Raven asked to join in order to secure LSE membership, which occurred on 1 February 1987.  On 1 March 1987, Ms Sutton was replaced as managing director by Mr Yates.  He was a qualified accountant and so undertook the book keeping, payroll and accounting function for the company.

65.     Miss Sutton traded in US equities and American depository receipts of a number of UK companies.  MSIL entered into such trades as principal, but entered into back to back trades with BLMIS.  It was therefore in effect trading as an agent for BLMIS and not generating any of its own profits or losses.

*Phase 3: 1988-2001*

66.     In September 1988 Anthony Marshall and John Purcell joined MSIL as traders for the purposes of trading US securities on SEAQ International, and became directors of MSIL on 6 September 1988 and 21 November 1988 respectively.  They were former colleagues of Mr Raven at the jobbing firm he had headed.  They were joined a year later by another trader, Colin Bond, who started in September 1989 and became a director on 16 October 1992.

67.     On 7 November 1988 there was a written agreement signed by Bernard Madoff and Mr Yates by which BLMIS appointed MSIL to act as its agent in entering into market making transactions.

68.     Mr Yates resigned as managing director on 30 December 1988 and left MSIL shortly thereafter.  Bernard Madoff asked Mr Flax to undertake the managing director role previously being performed by Mr Yates.  Mr Flax agreed to do so on the understanding that because he was not a qualified accountant or a practicing lawyer, he could perform the administrative aspects of the job but would need legal and accounting advice as and when necessary.  His salary was increased to £50,000 per year.  Although he nominally took over Mr Yates' duties as managing director, in practice between 1988 and 2001 the traders were running the operational side of the business with Bernard Madoff's input; Mr Flax was responsible for the day to day administration of the company, including bookkeeping, payroll, payment and company administration functions.  These included liaising with the auditors, regulators and tax authorities and with lawyers and tax advisers for this purpose.  He maintained the company's books and accounting records.  The statutory accounts were prepared by KPMG.

69.     At this stage, MSIL had five employees and its only business was the trading which Messrs Bond, Marshall and Purcell were carrying out.  The majority of the business was a niche market making service in US equities for financial institutions in Europe to enable them to trade before the New York Stock Exchange opened.  MSIL would offer a market in particular US equities, and would typically close out its book at the opening of the New York Stock Exchange.  This accounted for about 90% of its business.  In addition MSIL carried out a small amount of trading on behalf of European clients on an agency basis, using BLMIS to execute the trades and earning commission from the clients.  As a very small part of its business, MSIL also undertook some speculative trades taking a position on its own account.  Record keeping for all trading was undertaken in New York.  The profits made by MSIL on

its trading were recorded in accounts in New York designated "Q account", "QQ account" and "XX Account" (hereafter referred to as "the Q accounts").

70.    Mr Raven joined MSIL as a director on 1 January 1992.  He did so because he was asked as a friend of Bernard Madoff to keep an eye on the traders.  Until he started working more full time at MSIL in 1994 he spent little time at its office.

71.    Mr Marshall ceased to be a director on 31 March 1992, but remained engaged to carry out his trading function as a consultant.

72.    This was the nature of the business when the first MSIL Kohn payments were made at the end of 1992.  The directors at the time were Bernard Madoff and Messrs Raven, Flax, Purcell and Bond.

73.    In 1994 Mr Raven resigned from Tradepoint and agreed with Bernard Madoff to spend more time at MSIL, giving advice on building the business and using his City contacts to encourage them to trade orders with MSIL during London trading hours before the US market opened.  They agreed a salary of £50,000 per annum.  Mr Raven continued to regard himself as a non executive director and expected his involvement to last two or three years.  His efforts with his City contacts and a wider marketing campaign produced disappointing results.

74.    From the spring of 1996 to the spring of 1997 Mr Raven took time off from MSIL for medical reasons.  When he returned in 1997, Bernard Madoff asked him to oversee MSIL's move to new premises in Mayfair which took place in the last quarter of 1997.  Bernard Madoff was obsessive about the furnishing of the new office in Berkeley Street which he wanted to seem prestigiously expensive, and Mr Raven spent a considerable amount of time on the project.  He continued in an essentially non executive role so far as concerned the operation of MSIL's business.

75.    Following the move to Mayfair, between 1998 and 2000 Mr Raven attended MSIL's offices on a more regular basis and assisted Mr Flax when needed.  He shared an office with Mr Flax and was there three or four days a week.  At about this time Bernard Madoff became interested in acquiring a broking capability and Mr Raven spent several months negotiating clearing arrangements, which had to be unwound when the broking team MSIL hoped to acquire went elsewhere.

76.    In the late 1990s, the structure within MSIL was that the traders reported either to Bernard Madoff or Andrew Madoff.  Mr Flax managed all the office functions, reporting directly to Bernard Madoff.  Mr Raven assisted Mr Flax whenever he was asked to do so.

77.    Andrew and Mark Madoff were both appointed directors of MSIL by Bernard Madoff on 31 December 1998 when they became non voting shareholders.  They did not receive any remuneration as directors of MSIL, and although they received dividends on the MSIL shares, the dividends were offset by interest payments they were required to make on loans provided by their father for the purposes of the purchase of the shares.  Accordingly they never received any financial consideration in relation to their role at MSIL.  They did, however, regularly attend board meetings, usually by video link from BLMIS' office in New York.  They did not carry out any specific executive role, but during Phase 3 were aware of MSIL's levels of profitability and

trading because the trading was reflected in the Q accounts in BLMIS: Andrew Madoff would check the trading performance on a daily basis as with other trading accounts.

78.   In 1999, Bernard Madoff decided to send a senior trader from BLMIS to work at MSIL, and Mr Toop was approached to assume this role. He agreed to move to London on a three year assignment. Mr Toop was employed by MSIL as a trader on the trading desk from October 1999. Daniel Flax, Mr Flax's nephew, who was a trader with BLMIS moved at the same time.

79.   When Mr Toop began working at MSIL in 1999, the traders were on the second floor. The trading room was at the back, and Mr Raven and Mr Flax occupied the offices in the front. There was some antipathy between Mr Purcell and Mr Marshall, on the one hand, and Mr Raven on the other and it seems that for the most part Mr Raven and the other traders avoided each other.

*Phase 4: 2001-2008*

80.   In the summer of 2000 the first floor of the Mayfair building became available and Bernard Madoff decided to take on this floor because he had plans to enlarge MSIL's London business to establish a market making business in the newly formed NASDAQ Europe and a proprietary trading operation trading in European and US securities.

81.   In October 2000 MSIL approached the FSA to extend MSIL's business profile to enable it to trade on a new investment exchange called Jiway. MSIL joined Jiway by an agreement dated 20 November 2000. By the end of December 2000 MSIL deposited US Treasury Bills ("T-Bills") with a face value of US$10 million with Jiway.

82.   It was in this period that the first subordinated loan agreement was entered into on 28 November 2000 for US$37.5 million. At that time the directors were Bernard Madoff, Peter Madoff, Andrew Madoff, Mark Madoff, Mr Raven, Mr Flax, Mr Purcell and Mr Bond.

83.   Andrew Madoff had particular expertise in technology and was asked by his father to assume responsibility for the implementation of the trading systems required for the new direction of the business. To carry out that role, he visited MSIL's offices four or five times in a year. The refurbishment of the first floor was completed in July 2001, again to what Bernard Madoff wished to be prestigiously expensive standards. The first floor held the trading room, and from that time on the geographical division between the traders on the first floor, including Mr Toop, and the management staff on the second floor, including Mr Raven, Mr Flax and Mr Dale, reflected the separation of those aspects of the business.

84.   Andrew Madoff was involved in the decision that MSIL should establish a proprietary trading operation and in recruiting a team from Merrill Lynch to replace Mr Purcell and Mr Marshall who had been talking about retiring for several years. This new team of about five additional traders was led by Stephen Burnham and joined MSIL in about July 2001. Mr Stevenson also joined MSIL on 1 July 2001 as part of this team, as head of settlements in charge of the back office function. He had spent many years

in broking, merchant banking and trading before joining MSIL in his early 60s. He was subsequently appointed a director on 1 July 2005 and remained a director until 16 February 2009.

85. In the aftermath of 9/11 there was a falling out between Bernard Madoff and Mr Purcell, following which he and Mr Bond ceased to be directors in September 2001. Mr Marshall and Mr Purcell left MSIL at that time. Mr Bond stayed as a consultant until April 2003. This left Mr Flax and Mr Raven as the only London directors, and accordingly Mr Raven took on a larger managerial role assisting Mr Flax when needed. Of the two, Mr Raven could properly be described as the managing director.

86. The new trading also included a statistical arbitrage book, colloquially referred to as the black box, in which a large volume of trades in equities were undertaken according to predetermined algorithms which were based on a successful model used by BLMIS. The model proved to be less successful for MSIL.

87. Mr Dale began his employment with MSIL on 5 November 2001. He was a qualified chartered accountant who also came from Merrill Lynch. He initially worked in a financial control function in relation to MSIL's trading activity reporting to Mr Flax, but soon eclipsed him.

88. The second subordinated loan was entered into on 28 December 2001 and was for US$25 million. This was shortly after the first interest repayment under the first subordinated loan agreement, which was on 18 October 2001.

89. Barclays Capital became MSIL's clearing and settlement agent for its trading in European equities, which commenced in about January 2002. Andrew and Mark Madoff took on the role of supervising the traders' daily trading performance. The new trading system made it possible for them to review the London traders' positions from New York in real time. Andrew Madoff also spoke regularly on the telephone with Mr Toop and worked closely with Mr Stevenson and Mr Dale when they first joined MSIL. He would also participate in interviewing prospective recruits to the trading team.

90. In about July 2002 Mr Toop took over management of the London trading desk as Head of Trading in place of Mr Burnham who left after a dispute about the reduction of his salary. The market making business as part of NASDAQ Europe was not a success, and NASDAQ Europe closed down shortly after Mr Burnham left. Trading on Jiway was also not a success and had stopped by January 2003. Thereafter MSIL was carrying out proprietary trading.

91. Mr Toop became a director on 4 February 2003, although it made no difference to his day to day activities. Mr Dale also became a director of MSIL on 4 February 2003 and was from that time MSIL's Finance Director. He ceased to be a director on 21 May 2009.

92. Mr Raven did not at this stage have any specific management responsibility, and was asked by Bernard Madoff to organise a compliance function whose importance was enhanced by the expansion in MSIL's activities. Until then there were only minimum compliance procedures in place which Mr Flax had set up with advice from BLMIS' compliance department. Mr Raven appointed KPMG to advise on a structure and

produce a manual, but was disappointed with the result. On 3 March 2003, Peter Allen was engaged by MSIL as a compliance consultant. Mr Allen was a solicitor who had trained with a City law firm and was highly respected by the directors. He rewrote the compliance manual.

93.    In mid 2003 Andrew Madoff was diagnosed with cancer and stepped back from involvement in BLMIS' and MSIL's business whilst undergoing treatment. Mark Madoff took over his role in that respect. Andrew Madoff returned in a diminished capacity to BLMIS at the end of 2003 and left much of the responsibility delegated to his managers in the trading room at BLMIS. He gradually resumed his former responsibilities until late 2006, when his role at BLMIS became essentially part time and Mark Madoff took over his responsibilities.

94.    As a result of Andrew Madoff's cancer, in the later part of 2003, Bernard Madoff asked Mr Raven to undertake a full role as CEO assuming a general management responsibility for the business. Mr Raven's salary was increased to £130,000 and his position was formalised by a board resolution on 5 December 2003. Bernard Madoff's role was redesignated from executive CEO to executive chairman. The same minute noted that the recent activities of Peter, Andrew and Mark Madoff had been of a non executive nature and recorded a resolution designating them as non executive directors. The minute suggests that this was all done with a view to fulfilling new compliance requirements and for FSA purposes, rather than to create any significant change in roles.

95.    In 2005 Mr Toop planned to return to BLMIS in New York, but was persuaded by Bernard Madoff to stay on in London to build and expand the trading desk at MSIL as head of trading.

96.    In February 2004 Peter Allen became company secretary and on 9 May 2005 he was appointed a director. He resigned as a director on 11 August 2006, when Mr Dale took over the role of compliance officer, but Mr Allen carried on working for MSIL in a compliance role as a consultant until the end of 2008. Mr Allen and Mr Dale were assisted in their compliance roles by Ms Amber Wood, who had started as a receptionist in 2004, but moved to assist Mr Allen with compliance in 2005 and became compliance manager reporting to Mr Dale upon Mr Allen's resignation in 2006. She learned on the job and gained her FSA authorisation in June 2008. As part of the compliance revisions, Peter Madoff was appointed as an internal auditor in or around 2006, and made occasional visits to London for this purpose assisted by his daughter Shana.

97.    At the end of 2006 and during 2007, the compliance department undertook a wholesale risk assessment of MSIL's business in the light of three European directives. One was the Markets in Financial Instruments Directive 2008/10/EC ("MiFID"), which was due to come into force on 1 November 2007. This was used as a ground for Mr Raven to persuade Bernard Madoff to stop the MSIL Kohn payments, and the subventions from BLMIS by which they were funded, as I shall explain further below. The element of MiFID which afforded the grounds for the cessation was not anything to do with the propriety of the payments; it was that there were to be introduced requirements that contracts for the supply of services had to be adequately documented, and subject to risk assessment in relation to an alternative source of supply. As a result the last MSIL Kohn payment was made on 13 July

2007.  Tecno Gibraltar was thereafter paid exclusively by BLMIS.  Mr Raven wrote a letter dated 18 September 2007 to Tecno Gibraltar confirming that MSIL would not be availing itself of the latter's services in the future.

98.    In early 2007 Bernard Madoff decided to increase MSIL's capitalisation to US$ 200 million.  According to Mr Raven this was because he had increased the share capital in BLMIS US$ 800 million and wanted to keep MSIL capitalised at 25% of BLMIS' capitalisation.  This met resistance from Mr Raven, who considered that the additional loan capital would involve a burdensome overhead.  Bernard Madoff reconsidered the position and agreed to increase the capitalisation by share capital rather than loan capital.  This involved the conversion of the subordinated loans to share capital together with a further injection of US$37.5 million cash to make up a total of US$100 million.  On 18 September 2007 the two subordinated loan agreements, totalling US$62.5 million, were capitalised by a deed of termination and the issue to Bernard Madoff of 6.25 million voting shares of $10 nominal value.

99.    As a result of the increase in capital, Bernard Madoff wanted further to expand MSIL's trading desk by hiring experienced and proven successful traders to make use of it.  Over the next 18 months MSIL sought to replace less successful traders, and increased the overall number of traders.  By December 2008 MSIL had about 14 traders carrying out approximately 800 to 1000 trades daily with risk exposure of some US$50 million daily from a daily risk limit allocated to all the traders totalling some US$300 million.

100.    In this last phase of MSIL's trading activities from 2001, Mr Flax's role was gradually reduced.  From Mr Dale's appointment as finance director, Mr Flax ceased to be the person at MSIL responsible for inputting data into the ledger (this was taken on by another employee training to be an accountant, William Hui) or to have any involvement with compliance matters.  From 2003 Mr Flax no longer dealt with the accounts.  After Mr Dale's arrival he became more sidelined, and to some extent patronised, by the other directors.

101.    As is well known, 2007 and 2008 were turbulent times in financial markets.  In about May 2008, Mr Raven thought that MSIL should acquire £65 million in Gilts and, unusually, have them registered in its own name to protect against the credit risk involved in the usual practice of their being held by a third party nominee.  He arranged for the certificates to be held in a bank safety vault in MSIL's name.  In October 2008, Bernard Madoff instructed Mr Dale to sell the Gilts and buy T Bills.  Mr Dale did so and the proceeds were wired to BLMIS for the purchase.  Mr Raven was not pleased.  Injury was added to insult when following Bernard Madoff's arrest it was discovered BLMIS had simply not bought the T Bills and had been perpetrating another fraud on MSIL for over three years since September 2005.  The way this T Bills fraud was perpetrated was as simple as the Ponzi scheme itself.  MSIL's cash which was not required for trading was held on deposit in banks or in Gilts, T Bills or other securities.  Bernard Madoff regularly instructed Mr Dale to buy T Bills as a trade or for income, and such trades were executed through BLMIS as MSIL's counterparty in the normal way.  BLMIS provided the usual trade contracts and settlement statements evidencing the purchases.  When Bernard Madoff instructed Mr Dale to sell the T Bills, the apparent proceeds were paid to MSIL in London.  But in fact BLMIS never bought the T Bills, the trade contracts and settlement statements were a fiction, and the money coming back to MSIL from purported sale of T Bills

came from the 703 account.  This was concealed in the books of the proprietary trading and market making divisions of BLMIS by recording the incoming funds as "commission income".  Thus when the fraud was discovered, BLMIS owed MSIL the value of the T Bills which had been purchased from BLMIS in October and November 2008, but which BLMIS did not have, which should have been worth about US$160 million.

*Phase 5: December 2008 to date*

102.  On 10 December 2008 Bernard Madoff confessed to his sons Andrew and Mark that the investment advisory business was a gigantic Ponzi scheme.  They immediately reported him to the US Justice Department and the Securities and Exchange Commission.  On 11 December 2008 Bernard Madoff was arrested and the news began to break.  The following morning the London based MSIL directors met at the Arts Club to discuss MSIL's position.  They were all in a state of shock.  The company's solicitor, Mr Calligan of SJ Berwin, attended with a colleague to give advice.

103.  The Barclays Capital facility was withdrawn and the company ceased trading.  On 15 December 2008 a trustee for the liquidation of BLMIS was appointed by the New York court in accordance with the Securities Investor Protection Act 1970 ("the SIPA Trustee").  Joint provisional liquidators of MSIL were appointed by an order of the Companies Court on 19 December 2008.  A winding up order was made by Sales J on 15 December 2009.

104.  It was a matter in dispute before me whether at that time, or at any earlier time, MSIL was in fact insolvent.  The Claimant's case is that it was at all times in fact insolvent because it received its funding from BLMIS from monies attributable to the Ponzi scheme; and all such sums when received were immediately repayable to BLMIS.  What is not in dispute is that at all material times MSIL appeared to its directors, auditors and regulators to be solvent.  None of the Defendants had any reason to believe at the time of the events under scrutiny in this action that MSIL was insolvent or of doubtful financial integrity.  Indeed one of the central elements of the Claimant's claim is that throughout the period from 2000 to 2007 MSIL was heavily overcapitalised so far as the directors were concerned.

105.  On 8 December 2010 the liquidators of MSIL and the SIPA Trustee, on behalf of BLMIS, entered into an agreement in relation to pursuit of proceedings against the Defendants.  BLMIS agreed to subordinate any of its claims in the MSIL liquidation to an identified list of trade and employee creditors' claims in the liquidation (totalling about £5 million of which about £2 million was agreed or provisionally agreed), with the remainder of MSIL's assets to be paid to BLMIS.  The liquidators of MSIL and the SIPA Trustee agreed that these proceedings would be brought and that they would be funded by the SIPA Trustee.  On the same day, these proceedings were commenced without any letter before action or any other forewarning to the Defendants.  BLMIS was a Claimant along with MSIL, but by an order of 2 December 2011 Flaux J held that the Court had no jurisdiction over BLMIS' claims and set them aside.  The claim is therefore brought by MSIL alone, but by reason of the agreement between the liquidators and the SIPA Trustee of 8 December 2010, it is in substance being brought by and for the benefit of BLMIS, and indirectly, therefore,

for the benefit of the victims of the Ponzi scheme which Bernard Madoff carried out through BLMIS.

*MSIL's raison d'être*

106.    As I have explained, throughout MSIL's trading history, Bernard Madoff left everyone in London in no doubt that it was his business, upon which his reputation depended.   The direction of the business changed over time, in each case in accordance with what Bernard Madoff wanted to achieve.  MSIL never had a simple business model or an unchanging business strategy.  MSIL's future at any given stage was not necessarily a continuation of its current trading.  Its raison d'être was to carry out whatever business Bernard Madoff decided upon, or indeed no business at all. The fact that MSIL did no business, or very little business in Phases 1 and 2 reflected the fact that Bernard Madoff's main vision for MSIL was not driven by profit making. He had been treated as an outsider in Europe, who was not readily accepted, and this rankled.  It was for him a matter of pride and prestige to have a presence in London, and whilst he did not want to make losses, this was a secondary consideration to having a presence which would enhance his reputation.  In the 1990s Bernard Madoff used to remark to his sons that MSIL "carried its own weight" which Andrew Madoff took to mean break even profitability.  He seemed satisfied with this, and indeed pleased simply by the existence of MSIL, as relatively few US firms then had a presence within the UK and it conferred a level of status which he enjoyed.  This was why he wanted the offices to be finished to a high standard, and why MSIL's name was included on the letterhead and business forms of BLMIS.  This was reflected in his desire to see MSIL highly capitalised, and apparently profitable.  He advanced funds from New York to defray its expenses and boost its balance sheet and profit and loss account for this reason.  He regarded it as an outward symbol of prestige and success.

**(5) Mrs Kohn's agreement reached with Bernard Madoff**

107.    There are two significant matters in dispute under this head, namely the scope of the services for which the MSIL Kohn Payments were made, and the identity of the parties to the contract for those services.

108.    As to the first, Mrs Kohn's case was that that there were three strands to the services she agreed to provide and for which she was paid, namely (1) introductions of people, (2) advice, information and ideas about global financial and economic matters, communicated at face to face meetings with Bernard Madoff and (3) written research. She regarded the first of these as the most significant.  MSIL's case was that the payments were solely for introductions of money to Bernard Madoff's investment advisory business.

109.    As to the second, the Defendants' case is that the agreement was between MSIL as the paying party, and Erko, Tecno Italy and Tecno Gibraltar successively as the service provider.  MSIL's case was that the agreement was between Bernard Madoff and Mrs Kohn personally.

110.    Mrs Kohn's account of the genesis and history of her agreement with Bernard Madoff in relation to the MSIL Kohn payments was as follows.  She first met Bernard Madoff in about 1987 or 1988 as a result of an introduction from Mr Cohn.  Bernard Madoff

explained that he had a UK office, through which he said he carried out the same business as his US operation but which was targeted at European clients and investors. He appeared to be interested in seeing how Mrs Kohn could assist him with the international growth of his business. Mr Madoff spoke mostly about his market making business. He showed an interest in meeting some of the Europeans to whom Mrs Kohn said she could introduce him.

111.    Mrs Kohn formed the view that Bernard Madoff was the best representative of the market making industry in New York. She was able to introduce senior executives from a number of European institutions to Mr Madoff when they were in New York. Initially Mrs Kohn saw the ability to introduce European figures to those on Wall Street as an opportunity to strengthen relationships and an investment for potential future business, not something for which she would specifically charge.

112.    Following her first meeting with Bernard Madoff, Mrs Kohn's subsequent meetings began to develop a pattern. The meetings would take place at the New York Offices of BLMIS and Bernard Madoff would normally walk Mrs Kohn and those she was introducing through his trading floor, showing off its electronic trading capability which was touted by Mr Madoff as unique on Wall Street at the time. Meetings would typically last an hour, during which her guests would typically ask a variety of questions about Wall Street, financial markets in the United States and the development of electronic trading, amongst many other financial topics; and Mr Madoff would speak extensively about his market making operation, his dedication to the latest technology, and his international office in London. Bernard Madoff did not talk much about his money management or investment performance. He focused instead on trends in international markets and in finding out about the businesses of the people to whom Mrs Kohn was introducing him. The meetings were generally made at Mrs Kohn's instigation.

113.    Following the movement of the centre of her activities to Europe, Mrs Kohn met Mr Madoff less frequently, perhaps two or three times a year when she was visiting New York. They also met on two occasions at the offices of MSIL in London and once in a hotel in Milan.

114.    Once Mrs Kohn had made an introduction to Bernard Madoff, she generally dropped out of the picture in the sense that she was not told (and did not ask) whether any business relationship subsequently developed and if so what form it took. As Bernard Madoff became better known in Europe her contacts generally simply wanted her to set up a meeting. She was not given any power of decision or discretion to act on their behalf. She did not purport to give advice, and once an introduction had been made she generally had little feedback or follow up.

115.    The people whom Mrs Kohn introduced to Bernard Madoff were potential clients for his market making business as well as his investment advisory business. It appears from a letter from Bernard Madoff to the SEC dated 23 February 2006 that BLMIS's trading partners included Bank Austria, Westdeutsche Landesbank, Hypo Vereinsbank, Commerzbank, Banco Santander, and Bank of Bermuda, all of whom were introduced to Mr Madoff by Mrs Kohn. Mrs Kohn would not normally know the specific aspect of Bernard Madoff's business, if any, with which her contacts would be involved.

116.    Over time Mrs Kohn's relationship with Mr Madoff developed so that she was viewed as more than someone who could merely introduce useful individuals and institutions. Bernard Madoff viewed her as a well informed and well connected person who provided a window to the financial world outside the USA, which was the reputation she had developed generally in New York, and retained, at least with Bernard Madoff, after she moved back to Europe.

117.    Mrs Kohn would often follow up the ideas discussed by providing pieces of written research or extracts of relevant documents.  At first this was on an ad hoc basis. There came a time when written research was provided on a regular basis both to BLMIS in New York and MSIL in London.  Mrs Kohn's evidence was that at some stage in the late 1990s, Bernard Madoff said that he would like the ideas and analysis which she had always been providing to be provided in written form so they could be disseminated amongst his staff in order to give them a wider perspective on the financial world than their day to day jobs required of them; and that this was regarded by her as a formalisation of the previous practice of exchange of ideas and as being a requirement which was in addition to the introductions and face to face meetings which would continue.

118.    Her evidence was that Bernard Madoff also encouraged her to discuss her ideas with his colleagues in the UK, and when in the UK she would occasionally meet Mr Flax, and in later years Mr Raven, when they would also exchange ideas regarding global economic and financial trends.  There is documentary evidence to support at least one such occasion in a letter of 31 January 2005.  But Mrs Kohn's principal point of contact was Bernard Madoff himself, both at BLMIS and MSIL.  In New York she met Peter Madoff, Andrew Madoff and Mark Madoff occasionally.  In London she met Mr Flax and later Mr Raven occasionally and spoke to Mr Flax, and later Mr Dale, occasionally on the phone.  But these were essentially for administrative purposes, not occasions for the giving of advice or exchange of ideas.

119.    Agreement of the amount which Mrs Kohn would be paid went through three stages. Following one of their early meetings, Bernard Madoff told Mrs Kohn that some of the people she introduced were likely to bring valuable business and suggested agreeing terms for payment for the services at a rate commensurate to their value. He said that the guideline for calculating the amount payable would be the amount of money introduced and placed under management resulting from her introductions.  In the beginning this rate was fixed at 1% of assets under management, which was to reflect payment for all the services provided by Mrs Kohn.  Ms Jones, an assistant to Bernard Madoff, communicated to Mrs Kohn, on a quarterly basis, figures which Ms Jones said represented the amounts attributable to her introductions.  These were unverifiable by Mrs Kohn who simply accepted them.  After the calculations were made, she did not keep the figures which Ms Jones provided to her.

120.    The second stage was that at one of the meetings between Bernard Madoff and Mrs Kohn, he informed her that he wanted to reduce the fee for the services from 1% to 0.5%.  Mrs Kohn was unable to remember when this was, or the reasons he gave for the reduction, but this reduction was agreed.

121.    The third stage was reached at one of their meetings in or around 2001.  Bernard Madoff told Mrs Kohn, without any prior warning, that he wanted to change the basis of their contract once more.  Part of the reason he gave was that the pricing pattern

had recently changed from eighths to decimals, and therefore the margins on trading had been reduced which had had a knock on effect on his own business. He said that he wished to establish a fixed fee for the range of services which would be US$ 6.6 million per annum, payable in four quarterly payments. He justified this figure as being about 0.5% on funds of US$ 1.3 billion which at that time were held under management pursuant to introductions by Mrs Kohn. Bernard Madoff directed that the payment should be split with US$ 775,000 being billed quarterly to MSIL and US$ 875,000 being billed quarterly to BLMIS. Mrs Kohn did not know the basis on which Bernard Madoff made that division and did not ask. Although this change to a fixed fee came as a surprise to Mrs Kohn, the discussion was short and one sided; Bernard Madoff made clear that there was no room for discussion and she considered that she was not given any choice in the matter. She agreed to the new terms.

122.  From this time, in or around 2001, Mrs Kohn stopped receiving figures from Ms Jones purporting to reflect the value of investments arising from her introductions. Thereafter she was never told whether her introductions brought value to the market making business or led to the opening of managed accounts, how much money was invested in managed accounts (if any), nor what the returns were on the sums introduced through her, or any other relevant detail.

123.  The Claimant alleges that the amount of business from investors introduced by Mrs Kohn to Bernard Madoff had reached at least US$ 9.1 billion by December 2008. If that is right, the fixed fee of US$ 6.6 million is a small fraction of the amount which would have been payable had the 0.5% arrangement continued, which would have brought a fee in the region of US$ 45 million per annum. The US$ 6.6 million was subsequently calculated by Ms Jones as 0.0019% of the funds under management attributable to Mrs Kohn's introductions.

124.  It was never suggested by either Mrs Kohn or Bernard Madoff that the agreement should be reduced to writing. The only suggestion to that effect came from Mr Dale in a discussion with Mrs Kohn at the very end of 2006, driven by the forthcoming implementation of the MiFID regulations, but even then it was left on the basis that MSIL and she were content for it to remain an undocumented oral agreement.

125.  This narrative of how the amounts were agreed was not challenged, and there is no reason to doubt Mrs Kohn's evidence in this respect. It reveals what might seem a surprising naivety and lack of formality in one who had such a successful career in finance; but that is of a piece with Mrs Kohn's unusual personal background. It is not suggestive of any sinister purpose on Mrs Kohn's part. As far as she was concerned her activities were open for all to see, in the glass windowed offices of BLMIS where she met Bernard Madoff and in the written research she delivered to BLMIS and MSIL; the invoices and the payments were transparent to the London directors of MSIL and those administering them, just as they were for those administering them for BLMIS. They were transparent to anyone else who might wish to inquire into them such as compliance departments, internal or external auditors, and regulators.

126.  Mrs Kohn told Bernard Madoff that the invoices for the services would come from a company, which both understood to be a normal way of doing business. The designation of the recipient companies, successively Erko, Tecno Italy and Tecno Gibraltar, was suggested at each stage by Mrs Kohn and agreed by Bernard Madoff. Bernard Madoff in turn directed that invoices should be sent to his companies,

BLMIS and MSIL, and not to him personally. Initially he requested that the invoices be addressed to MSIL, to which Mrs Kohn agreed. In 1998 Bernard Madoff requested, and Mrs Kohn agreed, that invoices for the services should be provided both to MSIL and BLMIS in accordance with a split agreed between them. The split of the fixed fee was agreed in about 2001 as described above. It was Bernard Madoff who in 2007 requested her to invoice BLMIS only, although she had been forewarned by Mr Flax that the change might be necessary under new regulations in the UK.

127.    The relationship between Mrs Kohn and Bernard Madoff was purely a business one and they did not meet socially. They were not on close personal terms, and the relationship was one sided, in the sense that Bernard Madoff's status and reputation meant that he dictated the course and terms of the professional relationship.

*For what services were the payments made?*

128.    I accept the evidence of Mrs Kohn, summarised above, as to the threefold nature of the services which were to be, and were, provided. Most of the evidence I have summarised above was not challenged.

129.    MSIL's case to the contrary was based on two arguments. The first was that the services did not include the third element, the written research, because the written research was worthless. I reject that submission; the research was not worthless, nor was it regarded by Mrs Kohn as such, for the reasons I explain more fully below. The second was that the services did not include advice information and ideas about global financial and economic matters communicated at face to face meetings with Bernard Madoff. I was invited to reject this element of the services because it was said that Mrs Kohn's explanation for the payments had changed over time and had not until her evidence in these proceedings included a suggestion that the payments were for such advice and ideas. This was not an accurate criticism and does not undermine this aspect of her evidence.

*Who were the parties to the contract?*

130.    The evidence of Mrs Kohn as to how the arrangement arose and was operated, which I accept, establishes that the agreement for the services was with Bernard Madoff purporting to act on behalf of BLMIS and MSIL, not personally. The services were to be provided in relation to his businesses, and understood to be benefitting those businesses. It was agreed that the payments would be invoiced to BLMIS and MSIL, as they were, and would be paid by those entities, as they were. So far as MSIL was concerned, it was the corporate entity which made the payment for the services throughout, not Mr Madoff personally. Mr Raven's treatment of MSIL as party to the contract is evident from his letter of 18 September 2007 terminating the arrangement on behalf of MSIL. The Claimant argued that there was no binding contract to which MSIL was a party on the grounds that Bernard Madoff had no authority to bind MSIL to an arrangement from which it derived no substantive benefit, as to do so would have breached his fiduciary duties to the company. This argument fails for two reasons. First, as explained below, the services were of value to MSIL. Secondly, Bernard Madoff as chairman of MSIL had ostensible authority to bind the company, which would be unaffected by any breach of fiduciary duty owed by Bernard Madoff to the company, of which Mrs Kohn was not aware.

131.    The Claimant further argued that there was no binding contract to which MSIL was a party on the grounds that any alleged contract for research purporting to bind MSIL was in reality a sham as that term was defined by Diplock LJ in *Snook v London & West Riding Investments Ltd* [1967] 2 QB 786 at 802 and created no legal rights or obligations as between MSIL and Mrs Kohn.  The agreement was not a sham.  So far as Mrs Kohn was concerned it was for the full range of services, including advice and introductions as well as research, and she regarded all three as of potential benefit to MSIL.  So far as Bernard Madoff was concerned, it was not merely for the written research delivered in London, but also for advice and research provided to him in New York in his capacity as chairman and shareholder of MSIL, which had potential value to MSIL.

132.    The Claimant further argued that there was no binding contract to which MSIL was a party on the grounds that the research materials which Mrs Kohn caused to be delivered to MSIL's offices were incapable of constituting consideration which might justify the making of the MSIL Kohn Payments.  This argument again assumes, incorrectly, that the contract with MSIL was solely for the provision of the written research in London.  Moreover, as explained below, that research was of value to MSIL, and the court is not concerned, for the purposes of this argument with the adequacy of the consideration.

133.    As to the identity of the counterparty, I conclude that it was successively Erko, Tecno Italy and Tecno Gibraltar, rather than Mrs Kohn personally.  The agreement between Mrs Kohn and Bernard Madoff was that the invoices were to come from those companies and payment be made to them.  Although it was envisaged that it was Mrs Kohn who would personally be responsible for providing the services, which save for the written research were of a personal nature, there is no conceptual difficulty in parties agreeing that a corporate entity is to contract to provide services of a personal nature.  Such contracts are common in, for example, the sports and entertainment world.  The practice of invoicing by, and payment to, the corporate entities designated by Mrs Kohn with the concurrence of Bernard Madoff (and indeed those within MSIL in London who arranged for or knew of the payments) reflects agreement reached between Bernard Madoff and Mrs Kohn that the agreement would be with the companies identified by her.  The companies so designated were the contractual counterparties to the agreement with MSIL.  There is no need for the purposes of this action to undertake any further analysis of the anomalous position between 1998 and 2001 when Erko had in fact been dissolved.

**(6) The research**

134.    Mrs Kohn's recollection was that in the early years in which the MSIL Kohn Payments were made, she only provided written pieces of research to MSIL, or BLMIS, on an occasional or ad hoc basis; and that it was not until later, perhaps the late 1990s, that significant quantities of written research were provided on a regular basis to MSIL.  By contrast, Mr Flax's recollection was that from the time that the first payment was made there was written research provided, which he remembers keeping for the purposes of it being available to the auditors.  He said that he had a clear recollection that there were regular deliveries of written research from the outset, as well as additional ad hoc pieces on occasions.  He recalled showing a large pile to the auditors 9-12 inches high.  At one point in his evidence he referred to this as being in the first year in which a payment was made and recorded in the company

ledger. In another passage of his evidence he spoke of such an event as sparking a direct conversation between the KPMG partner and Bernard Madoff, which would put it in about 2000 or 2001. The evidence of the traders during Phase 3, Messrs Purcell, Bond and Marshall did not support Mr Flax's recollection. It was to the effect that before the office move from London Wall in 1997, the research was sporadic not regular. There is a fax from Mrs Kohn to Mr Flax of 29 December 1992 enclosing a study on business opportunities in the US/European Capital Markets which reads as if this were a one off ad hoc offering. Mr Flax fairly conceded that his recollection might be in error, and I conclude that it was. There was written research on an ad hoc basis from 1992, but it was not until later in the 1990s that substantial quantities of written research were provided on a regular quarterly basis.

135.   There is some uncertainty as to what written research was provided to MSIL. There was in evidence a very large volume of written research which had been provided or procured by Mrs Kohn: the trial bundle contained over 1,000 individual documents running to over 58,000 pages, which was said to be only an incomplete sample. However this had not come from MSIL's offices. The research had stopped being sent to MSIL in 2007 and had not been kept after that year's audit; it was routinely destroyed after about 18 months. With the exception of some documentation disclosed by Tecno Gibraltar for the last year in question, 2007, the materials before the Court came from what was found at BLMIS in New York. The evidence suggested that written material was not passed from MSIL to BLMIS, but that what was sent to London and New York was to some extent duplicative, although not identical. Mrs Kohn in her witness statement attached a listing of the research material under various headings, a list which she said had been prepared by her solicitors. Although her witness statement referred to this as having been sent to MSIL in London, it was clear from her evidence that the listing was for the purpose of showing the breadth of the topics covered, not which documents had gone where; the listing was done by her solicitors, not her, and she had not applied her mind to whether what was identified had gone to London rather than, or as well as, to New York. She was, understandably, unable to say what had gone where. All that can be said with confidence is that the material which post dates the middle of 2007 must have gone to New York and not to London because that was when the MSIL Kohn payments ceased and the written research stopped being sent to MSIL in London.

136.   Despite the uncertainty over which particular documents went to MSIL in London, as distinct from those going to BLMIS in New York, the consistent evidence from the MSIL witnesses was that there were significant volumes of written research regularly delivered to MSIL. Witnesses referred to it arriving in boxes, as well as sometimes in smaller packages. The parties conducted the case on the footing that the material before the Court could be taken to be representative of the nature and quality of the research provided to MSIL in London. Whether the statistical analyses of the content of the extant material can safely be treated as a valid guide to the content of the totality of what was sent to London seems to me more doubtful.

137.   The headings of Mrs Kohn's listing give a flavour of the subject matter of the written research. The categories were Banks/Banking Industry, Private Banking, Stock Exchanges, Technology and Mutual Fund market/online brokerage, Sovereign Wealth Funds, Hedge Funds, Investment Funds, Real Estate, New Industries/Investment, German language market, Company overviews/International finance, Research and

Consultancy industry, Financial Crisis, High Net Worth households/Billionaires and Charity, Luxury Goods, Family office, Financial Institutions/Financial Services and updates, Securities/Capital Markets/International Markets, Wealth Management, Country study, Internet/Telecom, Art Industry, E-Commerce/trade, Gambling Industry, S & P, Market Trends, E-Learning, Insurance, High Tech Industry/Technology, Agricultural Commodities, Currency Market, Oil Market/Energy/Commodities, Diamond Market, Off-shore, and Socially Responsible Investing.

138.    There were five strands of evidence as to the nature and value of the research. The first was its treatment by the traders at MSIL at the time. The evidence established that throughout the period during which it was provided it was not used by the traders, and was treated by them as of no value for their day to day activity. When it first arrived during Phase 3 the traders considered it, but swiftly concluded that it was a waste of time reading it. Thereafter the boxes in which it arrived were sometimes left unopened; on other occasions the traders might just flick through the contents to see what was there. Many of the traders during Phase 4 were unaware of its existence. The material was of no relevance to the daily trading being conducted in Phase 3 which required keeping abreast of developments within the hour or day. Nor was it used by the traders or management for the purposes of the trading during Phase 4.

139.    The second strand was evidence of the directors as to the value of the research. The Claimants relied on the transcripts of conversations which survived for the last three years of MSIL's trading, including in particular one between Mr Dale and Bernard Madoff on 20 April 2007, in which Mr Dale said that the research was not actually utilised and not of any value; and one between Mr Dale and Mrs Kohn on 29 May 2007, in which in the face of a request by Mr Dale to send only 7 of 64 prepared reports, Mrs Kohn nevertheless offered to send all 64, with Mr Dale persisting in asking Mrs Kohn not to send all 64 reports to MSIL and saying that he can *'justify the expense anyway'*. Mr Raven in his evidence confirmed that he did not regard the research as of any value to the traders. Mr Flax said in his evidence that he had told Bernard Madoff that the traders were not using it.

140.    The third strand was evidence about the production of the research which came from three witnesses:

(1) Mrs Kohn said that she was not involved in the details of the production of the written research, although she identified the topics and general approach; she did not recall significant quantities being produced during the Erko years; Tecno Italy's research documentation was produced by its employees, and local university students supplied for the purpose by a Professor de Sury, who was paid for doing so; the Tecno Gibraltar research was produced by its own employees. The few documents which have survived which cast light on the process, from the most recent Tecno Gibraltar period in 2007, give a different impression. They suggest that at least on occasion Mrs Kohn was giving instructions as to how to use the content of existing available material and to reformat it so as to present it as Tecno Gibraltar's own research product, the process characterised by the Claimant as plagiarism. She said that the purpose of the research was never designed to be stock research for the use of traders. She was proud that that many of the research pieces could be considered "outside the box" or "untraditional" because her general approach had always

been that growing a successful business is about innovation and the ability to tap into unchartered territory. As she put it "The research was designed to provide a thought provoking view of many different areas of international markets, each of which could, at any time, impact on each other and on the markets in which MSIL was operating."

(2) Jessica Crewe was a PhD graduate in comparative literature at the University of California, Berkeley, who was employed at the Eurovaleur offices in New York for about 6 months in 2004 to produce research, and on a few occasions thereafter in 2005 and 2006 on a freelance basis. She was given the topics and prepared the reports from publicly available sources, such as websites and online newspaper articles available by subscription. The reports involved a good deal of collation and composition by her, albeit that they were drawn from publicly available sources which were quoted or paraphrased. The sources were credited and identified. Each one took her about three weeks, and she was paid $200 to $300 per report for the freelance work.

(3) Susan Alexander had spent a considerable amount of her career writing financial research, and produced research on an ad hoc and freelance basis for Mrs Kohn from 1995. At the beginning it was in exchange for being allowed to use space in the Eurovaleur office, but in 2007 and 2008 she was being paid €1,000 per report.

141.   The fourth strand was statistical evidence as to the amount of research which was of potential worth or plagiarised. This included:

(1) Evidence on behalf of the Clamant from Dr Min Shi, a professional economist with an academic background. She had been given a selection of 546 of the research documents, which were reduced to a sample size of 337 once duplicates and post July 2007 documents had been removed. These were then further reduced to a sample size of 100 by eliminating those deemed to be irrelevant to MSIL based on their geographic coverage and topic. Dr Shi evaluated the remaining 100 reports and categorised them as either "directly useful", "potentially useful" or "not useful". She identified 87 of those 100 reports as not useful, 13 (from after 2002) as potentially useful and none as directly useful.

(2) Evidence of Moira Lavery, CEO of Proven, a firm which conducted an investigation into the sources of the research materials disclosed in these proceedings. She identified that, excluding duplications, there were 1648 unique documents in the combined disclosure from BLMIS/MSIL and Mrs Kohn/Tecno Gibraltar. Of those, 982 were reviewed, of which just over half were in the same format as Bank Austria/Unicredit documents. Of the remainder, 298 were copied from publicly available material in their entirety, and 138 contained some copied material.

142.   The uncertainties over whether the material analysed was representative of what went to MSIL, in terms of quantity rather than quality, make it impossible to use this evidence to reach reliable conclusions about the proportions of such material which was plagiarised or fell within a particular qualitative category of worth or usefulness.

143.    The fifth strand was expert evidence as to the quality and value of the material:

(1) Dr Shi opined on the usefulness of the sample she took, as summarised above. The criterion was usefulness for the day to day activities of the traders at MSIL in Phase 3 and 4.  She also opined on what would have been a reasonable market rate to pay for the Kohn research, having regard to its value to MSIL in this respect and the market price of research from other sources. She concluded that the research provided during Phase 3 was worth nothing because it was irrelevant to MSIL's trading, and that the remainder was worth at most a few thousand dollars a year.

(2) On behalf of Mrs Kohn, expert evidence was given by Mr Whiting, an equity investment analyst with a history of producing financial research.  He accepted that much of the research was of poor quality, and some plagiarised, but some was properly to be characterised as genuine research and of high quality, including, for example, quotations from face to face interviews conducted specifically for the research in question.  In his view, the great majority would have been within the quality spectrum of research circulating at the time, particularly in the earlier part of the period in question.  As to its value, he made the point that the nature of the research on a wide range of topics was such as to be of interest and value to the more strategic decision makers within a company, and that the value to the company could not simply be judged by whether it was of use to the traders in their day to day activity.  From this point of view it was useful to a company like MSIL as educational background or as thought provoking material for new business opportunities.  His evidence was that the monetary value of research is largely in the eye of the consumer, and that it was often provided as part of a bundle of advisory and execution services, such that it is impossible to use any market information to put a monetary value on such research as an individual element of a wider range of services being charged for.

144.    Drawing these strands together my conclusions are as follows:

(1) When the payments were first made in 1992, and for the following few years, the written research being provided was irregular and ad hoc.  It was not until towards the end of the decade that there was a substantial volume of written research provided regularly to MSIL on a quarterly basis.

(2) The material was retained by Mr Flax so as to be available for the auditors and was made available to them, following which it was regularly discarded.

(3) The research was not sent on from MSIL to BLMIS or to Bernard Madoff in New York.  What was provided to MSIL in London did, however, replicate material which was sent independently to Bernard Madoff at BLMIS.  The overlap between what was sent to London and what was sent to New York was substantial but not complete.

(4) The research covered a wide range of topics.  A very small part was aimed at specific topics which might have been of use or interest in the day to day trading activity of MSIL during Phase 4; but none of it was in fact regarded by anyone at MSIL as of any such use or value for that purpose at any stage.  For

the most part, however, it comprised political, economic and market information a good deal of which might potentially have been of use or interest at a more strategic level for anyone in the financial services sector. None of the London directors of MSIL treated it as of use or value for such purposes.

(5) A significant element of what was created and supplied could properly be described as original research.  It was not all drawn from sources which were available to the public generally.  Moreover some which was drawn from such sources, or from sources available to particular subscribers or other clients of particular organisations, involved manipulating the material from those sources by the collection and assimilation of available material and its presentation in a coherent and articulate form within a particular theme or topic.  This can properly be described as original research, which can be as much concerned with the collation and presentation of information already in the public domain as unearthing original raw data which is not.  This research was not a "sham", as the Claimants sought to categorise all the research.

(6) On the other hand there was a significant proportion of the research which was simply lifted word for word, or almost word for word, from publicly available reports and passed off as original work.  This plagiarised material may well have constituted the majority, and, at least in the later years, the distinct majority, of what was being supplied.

(7) As to the value of the research to MSIL:

(a) Both what I have described as original research and plagiarised research had potential commercial value.  I reject the submission that the second category can have had no value: research which is plagiarised in the sense described above can be of value to someone who has no immediate access to the source document(s) or has no desire to undertake the sourcing himself.  The impropriety lies in passing off the content as one's own, not in a deception as to whether the content is worth providing.  Plagiarism does not negate the value of what is provided but misrepresents the creator of that value. Mr Whiting's evidence, which I accept, was that the apparently plagiarised research was amongst the highest quality of the sample he reviewed.

(b) It is difficult to put a monetary value to the research in either category with any precision.  Dr Shi's valuation was limited to what might be of value to traders in their daily activity.  There was evidence of disbursements being made by Mrs Kohn or the entities connected with her for the preparation of the research in amounts measured in tens of thousands of dollars over several years.  On this conventional basis the value of the research which was relevant to MSIL's day to day trading activity in Phase 4 is to be measured in thousands of dollars per annum.

(c) The value of the research does not, however, fall to be considered solely by reference to the day to day trading activity of MSIL at any given time.  The value of the research for management decision making at a more strategic level is not to be judged by this criterion.  The strategic decision

making at MSIL fell to Bernard Madoff, not the London directors, so that their lack of use for the research is not a sure pointer to its strategic value. This aspect of its worth is impossible to measure in monetary terms. In this respect its value was real but immeasurable.

**(7) Financial and accounting treatment of the MSIL Kohn Payments: invoices, funding, auditing, accounting including the "fees receivable" issue**

*(a) The invoices*

145.    With one exception, all extant Erko invoices, that is to say those for the period 1992 to 2001 inclusive, bear the rubric "Services for period [date] to [date]", giving the dates of the quarterly period. They were addressed to "Madoff Securities" at the London address of MSIL. There are no extant invoices for the period between the first quarter of 1993 and the second quarter of 1997, but I infer that they were in the same terms. The one exception to this format is the first extant invoice, which although undated is probably for the last quarter of 1992, and is for "Research relating to Financial markets in Europe and the US".

146.    The format changed with the first Tecno Italy invoice dated 21 May 2002. This too was addressed to "Madoff Securities" at the London address, as were all subsequent invoices, and provided:

> "Market researches 1st Quarter 2002 among others
>
> -    Analysis of trends with special focus on global financial industrie and technologie
>
> -    Business opportunities in the countries of the common market
>
> -    Specific reports about various technologie applications in the financial sector
>
> -    Ideas and strategies for new business developments"

147.    The next and subsequent Tecno Italy invoices were in materially identical terms save that:

(1)    The introductory wording became "Market researches [quarter] and updating about these subjects:" followed by dropping the reference to the period so that the introduction was simply "Market researches and updating about these subjects:" and then becoming simply "Market researches: "

(2)    There was sometimes added a reference to a particular market, or area of research, for example "Chinas Economy and Capital Markets" or "Emerging Economy and Capital Markets" or "High and Ultra High Networth Individuals"

148.    When it came to the two Tecno Gibraltar invoices in 2007 they were in similar format, of which the first provided:

"Strategic Consulting and Market Researches

Among others:

- Real-Estate in Europe

- Mergers and Acquisitions

- Asset management industrie

- Banking Consolidation

- Ultra High Net Wealth Individuals: Their Investments, Portraits, Service Providers."

149. Between 1992 and 2002 invoices were submitted in the name of Erko. The documents show that Erko was incorporated as a company under the laws of New York on 15 April 1987, and that six months later Mrs Kohn was a shareholder and Erko was holding the shares in Windsor. The Erko invoices sent to MSIL are headed with Erko's name and the address of Mrs Kohn's parents in Vienna. Mrs Kohn's evidence was that until receipt of the Particulars of Claim, she had forgotten about Erko, and she cannot now recall over 20 years on exactly how or why Erko was set up. Her reconstruction of events, which she cannot independently recall, is that when Bernard Madoff first agreed to pay for the services, her parents arranged for the invoices to be issued by Erko. This reconstruction was made in the light of her evidence that the professional adviser handling her family's finances was Dr Mueller, a Swiss fiduciary who provided trust services, set up companies and advised on financial affairs and business structures; that all the professional advice that she and her family had received over the years had been in favour of operating business activities through corporate entities; that she saw her business dealings and earnings as being for the benefit of her family rather than herself; and that her parents when alive handled the family's financial affairs. Her reconstruction may be correct, although I think it more likely that she was the one who chose Erko as the recipient, and that she caused the invoices to be prepared with her parents' address. Erko was a company associated with her own broking business, Windsor. It was she who needed to ensure that Bernard Madoff would be content with the identity of the payee.

150. Whoever was responsible for identifying the recipient and issuing the invoices, I conclude that Mrs Kohn was responsible for the wording used. Only she knew, within her family, what services were being provided which were to be covered by the invoices. Documentation which has been disclosed for the 2007/8 period, when invoices were submitted to MSIL and BLMIS by Tecno Gibraltar, suggest a close involvement by her in the preparation of the invoices and a knowledge of their wording, as does her own evidence of a telephone discussion with Mr Dale in late 2006 (see below). The position is likely to have been the same for earlier periods.

151. In October 1997 a company called Erko International Limited was incorporated in the British Virgin Islands. Mrs Kohn believes that this company was set up by her parents with the assistance of Dr Mueller. Erko BVI submitted a number of the invoices for the BLMIS payments (but not the MSIL Kohn Payments). As with Erko, the invoices of Erko BVI bear her parents' address in Vienna as the correspondence

address. I infer that Erko BVI was designed to replace Erko which was dissolved in June 1998, but that the continuing invoicing of MSIL by Erko thereafter was an administrative oversight. Mrs Kohn's evidence is that she does not now recall being informed by her parents or Dr Mueller of this change, which would have been a corporate governance question she did not need to handle personally. Erko BVI was dissolved on 1 May 2005.

152.    The invoices for the MSIL Kohn payments between 2002 and 2007 were rendered by Tecno Italy, which was incorporated under the laws of Italy as a limited liability company on 21 February 2002 and had its registered office in Milan.

153.    Mr Flax's evidence was that the fact that Erko had been dissolved and was still submitting invoices was noticed by KPMG, who spoke to Bernard Madoff about it, which led to the invoices from Erko ceasing and being replaced by invoices from Tecno Italy. Mrs Kohn explained the reason for the change as follows. When her father was alive her mother deferred to her father as head of the family, although she had always been involved in the business activities of Mrs Kohn's father and took care of the accounting and day to day management of the family finances. When her father died in 2002 her mother took over that role with determination. Following the establishment of FundsWorld in 1999, Mrs Kohn had been spending increasing amounts of time in Europe due to the declining health of her parents. When her centre of operations shifted towards Italy her mother consulted Dr Mueller and they incorporated Tecno Italy with the assistance of Mr Florio, an Italian accountant. At first the director of Tecno Italy was Mrs Kohn's mother. In 2002 Mrs Kohn agreed with Bernard Madoff that the invoices would be issued by Tecno Italy, which is what happened from May 2002 onwards. In line with Mrs Kohn's mother's wishes, the shares in Tecno Italy were ultimately held by a trust which had been set up by Dr Mueller, of which her family were beneficiaries.

154.    Again, while this may be correct, I think that Mrs Kohn was underplaying her own role and that it is more probable that she was herself the driving force behind the change. It was she who would need to ensure that Bernard Madoff would be content with the identity of the payee, and explain the change to him. Tecno Italy was her business, sharing offices with her European ventures, including Bank Medici. As with the Erko invoices, and for the same reasons, I conclude that Mrs Kohn was herself responsible for the wording of the Tecno Italy invoices.

155.    It was submitted on behalf of MSIL that the reason for the change from Erko to Tecno Italy was that Mrs Kohn learned from Bernard Madoff that the UK revenue authorities were asking awkward questions about Erko and that the switch was to prevent any prying into payments which she knew to be improper. I have little hesitation in rejecting that suggestion. It was not supported by any evidence and is not an inference which can fairly be drawn from the documents. The source for the allegation was a list of routine queries in an Inland Revenue letter of 30 January 2002 seeking clarification of whether Erko was a connected party within the meaning of s. 839 ICTA 1988. It was not a connected party, which was all the response which was required, and which was given in a letter from KPMG of 25 March 2002. If the Inland Revenue were intent upon investigating the connectedness of the counterparty, neither MSIL nor Mrs Kohn would be in any different or better position in that regard by substituting Tecno Italy for Erko. I prefer the explanation provided by Mr Flax's evidence: the fact that Erko had been dissolved was picked up by the auditors. I infer

that the change originated in their drawing it to Bernard Madoff's attention, who raised it with Mrs Kohn.

156.   In 2007, invoices started to be provided in the name of Tecno Gibraltar in place of Tecno Italy.  Mrs Kohn explained the reason for this change as being that Dr Mueller had died in 2004 and it was decided by her and her mother to replace him with Hassans, a prominent Gibraltar law firm, which professed expertise in the sort of private client services which the family trusts and business affairs needed.  It was on Hassan's advice that Tecno Gibraltar was incorporated to replace Tecno Italy.  I see no reason to doubt this evidence. Tecno Gibraltar was incorporated under the laws of Gibraltar on 3 January 2007.  Its directors were a lawyer who worked for Hassans, Mr Netzer, together with Shlomo Amselem, who was recommended to Mrs Kohn as someone who could help with the daily administrative activities and research side of the company.  Mr Netzer died in October 2007.

157.   Again I conclude that Mrs Kohn was herself responsible for the wording of the Tecno Gibraltar invoices, as is borne out by the disclosed documents evidencing her discussions of their content with Mr Amselem.  It was Mrs Kohn's evidence in her witness statement that she had a conversation with Mr Dale at the end of 2006, in which the latter commented that some of the Tecno Italy invoices did not include the period of time the payments were intended to cover; and that she made sure that this was remedied in the invoices sent by Tecno Gibraltar.

158.   Tecno Italy was dissolved on 5 December 2008 following a process of voluntary liquidation which was commenced on 26 September 2007.

*(b) Funding*

159.   There is little doubt that the immediate source of the payments, at the time they were made to Erko, Tecno Italy and Tecno Gibraltar, was money which belonged to MSIL. In making the payments, MSIL was using its own beneficially owned assets.

160.   Nevertheless the payments were funded by BLMIS in the following way.  In the earliest days of MSIL's business activity, in Phase 2, the company's expenses would all be met by funding from BLMIS.  The trading by Ms Sutton was back to back with BLMIS and not producing any revenue in London.  This continued in Phase 3 when the profits on MSIL's trading were held in the Q accounts by BLMIS in New York. The profits on this trading were remitted to MSIL at the year end and treated in the audited accounts as "fees receivable" from BLMIS (see below).  During Phase 3, Mr Flax continued the practice started in Phase 2 of sending a written request for payment of expenses by fax to BLMIS, identifying the particular expense, for example bonuses, or in some cases just "general expenses".  Following his request the relevant sum would be transferred by BLMIS to MSIL.  The Erko payments were dealt with in accordance with this practice.  Mr Flax sent a request by fax to Bernard Madoff, typically identifying that Mr or Mrs Kohn was due to call, usually enclosing the Erko invoice, and asking for the relevant sum.  Such payments by MSIL to Erko were thus specifically funded in advance by BLMIS.  This practice continued throughout Phase 3 until at least 2001.  Mr Flax thought that it continued for some time thereafter.  In each case the funds were advanced without MSIL undertaking any concomitant liability.  They were donations of capital, not loans.  Although they were not impressed with a *Quistclose* trust, each was specifically advanced for the purpose of

the Erko payment. If for some reason that purpose had failed, Mr Flax and Bernard Madoff would have regarded the funding as due to be returned.

161.  During Phase 4 the position changed because MSIL was generating its own trading profits in London, from which some of its expenses could be met. Nevertheless the understanding of the directors was that BLMIS would continue to fund the payments, and it did so. This was no longer done by prior requests for funding of specific MSIL Kohn payments, but by requests for payments from BLMIS from time to time which were sufficient to enable MSIL to meet its expenses and show a profit, one major element of the expenses being the MSIL Kohn Payments. The funding therefore sometimes fell in advance of the relevant payment and sometimes by way of subsequent reimbursement. Again in each case the funds were advanced without MSIL undertaking any concomitant liability. There was no direct correlation between the amounts of these subventions from BLMIS and the amount of the MSIL Kohn Payments, but Mr Dale described the funding of the payments as being cash neutral for MSIL and at no monetary cost to the company. I accept that evidence. That may not have been the precise mathematical position in every year, but that was in general terms the effect of the subventions. That was also the relevant understanding of the directors, as all who knew of the payments said in their evidence. MSIL advanced its case on the footing that such funding was irrelevant; it did not seek to put its case on an alternative basis by reference to lesser sums in particular years having been met solely out of MSIL's profits. In dealing with the "no loss" argument, it did not suggest that there was any part of any of the payments to which the argument was inapplicable on the grounds that it had not been funded by BLMIS. Nor did MSIL seek to identify to what extent in the later years the subventions operated by way of prior funding and to what extent by subsequent reimbursement. Witnesses used the word "reimburse" to cover both circumstances without intending any particular temporal precision.

162.  Accordingly I find for the purposes of this action that the MSIL Kohn Payments were made from MSIL's assets but were funded in full by BLMIS for that purpose, in the earlier years by a specific prior transfer, and in later years by subventions before or after the MSIL payment, which made the payments cash neutral for the company. Those directors who knew of the payments reasonably believed that in a business sense they were not costing MSIL anything. The commercial reality for them was that the expense was being met in full by BLMIS.

*(c) Auditing*

163.  No representative of KPMG was tendered by any party to give oral evidence, and the relevant documentation was incomplete. No doubt a good deal has not survived, but in any event, the documentation before me emanating from KPMG was only part of the material which had survived, comprising merely particular documents or categories which the liquidators of MSIL had chosen to ask for. I did not have anything like a full record of exchanges between KPMG and the company in the former's role as auditors or tax advisers and I was left with an incomplete picture of the state of KPMG's knowledge and understanding.

164.  The evidence of Mr Flax and others, which I have no reason to doubt, was that in addition to fairly regular contact with KPMG in their role as tax advisers, the annual audit would last weeks and the auditors would crawl over the documentation. They

had unrestricted access to ask questions of the directors and the traders and regularly did so. The MSIL Kohn Payments, and their funding, were patent from the company's books, and all the documents evidencing both aspects were freely available to the auditors. So too was the body of written research received in London, which was retained for audit purposes each year. The payments were included by KPMG in the corporation tax returns which they prepared. There was nothing about MSIL's treatment of the MSIL Kohn payments, or their funding, which could properly be described as secret. The only respect in which the Claimant alleged that the auditors were misled was (a) that they were told that the research was of value to MSIL and (b) in relation to the accounting treatment of MSIL's funding as "fees receivable". I reject the suggestion that the auditors were misled in either respect. As to (a) I accept Mr Flax's evidence that he told KPMG that the research was valued by Bernard Madoff, which was what the latter had told him; he did not tell the auditors that it was of use for MSIL's business or that it was used by the traders. As to (b), I address and reject that allegation below.

165.    I conclude that the directors were reasonably entitled to believe, and did believe, that KPMG in their capacity as auditors and tax advisers were at all times fully aware of:

(1)    the nature of MSIL's business activity;

(2)    the timing and amounts of the MSIL Kohn Payments;

(3)    the invoices in respect of which they were paid;

(4)    the written research provided to MSIL;

(5)    the way in which these payments were funded by BLMIS; and

(6)    the way in which MSIL was more generally funded by BLMIS.

166.    I should mention two particular pieces of evidence which confirm Mr Flax's openness with the auditors. The first is a file note dated 21 February 2001 prepared by Mr Flax and sent to BLMIS in New York. I accept Mr Flax's evidence that a copy was provided to KPMG. It explains amongst other things how Mr Flax called for and allocated funds from BLMIS, including in terms the treatment of the funding of Erko payments (and personal payments for Bernard Madoff's benefit being deducted from his loan account). The second is Mr Flax' evidence, supported by some extant documents, which again I accept, that sometime around 2001 or 2002 a young auditor from KPMG raised the question of the Erko/Tecno payments and the written research during the audit and asked Mr Flax if he, the auditor, could speak to Bernard Madoff about them. Mr Flax suggested that it would be better if the partner at KPMG made the approach, and rang Bernard Madoff to tell him it was coming. Mr Flax heard back from Bernard Madoff that the latter had spoken to the KPMG partner, Mr Grimditch, about the payments, and there was no further query raised in relation to them in that year's audit or the audit in subsequent years. Mr Flax took this to indicate that KPMG were satisfied with Bernard Madoff's explanations for the payments being made by MSIL.

*(d) Accounting treatment; "fees receivable"*

167.    The way in which the MSIL Kohn payments were treated in the statutory accounts occupied a large, and in my view, disproportionate amount of time and attention in the trial.  The Claimant submitted that the description of the funding of MSIL, including funding of the MSIL Kohn Payments, as "fees receivable", was a false and misleading description of the payments; and that Mr Raven and Mr Flax were consciously dishonest in approving the accounts in those terms, or at the least recklessly indifferent to the truth.  The Claimant contended that this dishonest description of the funding as "fees receivable" is indicative of an awareness on the part of Mr Raven and Mr Flax that the MSIL Kohn Payments themselves should not have been being made; it was further said to support a conclusion that Mr Raven and Mr Flax acted dishonestly in relation to the making of the MSIL Kohn Payments themselves by acting in knowing or reckless disregard of MSIL's interests in relation to the payments, an allegation of dishonesty which was in turn advanced for the purposes of defeating the limitation defences by reliance on s. 21(1)(a) of the Limitation Act.  The Claimant further contended that the dishonest description of the funding as "fees receivable" in any event reflects adversely on the integrity and credibility of Mr Raven and Mr Flax.

168.    The Claimant relied in support on expert evidence from an accountant, Mr Wreford, as to how best accounting practice should have treated the payments.  I did not find his evidence of assistance in relation to the issues which I have to decide.  Mr Raven and Mr Flax had, and professed, no specialist accounting knowledge, and especially not that on which Mr Wreford based his opinions as to the proper accounting treatment.  The state of mind of Mr Raven and Mr Flax must be assessed by reference to their own experience and expertise and against the background that the accounts were prepared and approved by KPMG.

169.    The audited accounts for 1992, the first year in which an Erko payment was made, are representative of the treatment in the statutory accounts throughout Phase 3.  On the income side, the profit and loss account identified the main income of the company against the rubric "Fees receivable" (there was also an item for "operating profit" or "operating income", which was relatively insignificant in almost all years).  Funding of the Erko payments fell within this rubric, although not separately identified.  On the expenditure side, the profit and loss account had a single entry for "Administrative expenses".  The amount of the Erko payments was included in this total.  The payments were nowhere identified in the audited accounts by description or amount as components of the total.  Inspection of the notes to that item would have revealed that the identified expenses were less than the total; and that almost £100,000 of the administrative expenses was not explained in the accounts.  The same pattern, albeit with differing amounts, would have been apparent from the audited accounts for the subsequent years in Phase 3.  Accordingly for these years the MSIL Kohn payments were not separately identified in the accounts within the company's expenditure, although there was a sizeable and significant element of expenditure included in the profit and loss account total which was not explained in the accounts.

170.    In Phase 4, starting from the 2002 accounts, in addition to fees receivable and administrative expenses, the profit and loss account recorded a separate amount for trading profit on the income side and an additional amount for direct trading expenses on the expenditure side.  The funding of the MSIL Kohn Payments still fell within the

"fees receivable" entry, and the MSIL Kohn Payment amounts themselves were still included within the administrative expenses total throughout Phase 4, as in Phase 3.

171.    The "fees receivable" wording had been used in the audited accounts from the beginning of Phase 3, and was a compendious description for the two categories of payments by BLMIS to MSIL, namely the specific funding of expenditure, and the transfer of the trading profits made in the Q accounts.  The note to the entry in the accounts for 1992, reflecting the terms of the note in the accounts from the beginning of Phase 3, provided: "*Fees receivable.  These represent amounts received and receivable in respect of securities dealing and the provision of market making information to an unincorporated business: the business is owned by BL Madoff who is the chairman of the company.*"  From 1992 the funding of the Erko payments thus fell within this description, although not identified separately as such.  The Claimant contended that this description was in part false: the first half was justified by the fact that MSIL was trading as BLMIS' agent and received the Q account profits in respect of securities dealing; but the reference to market making information being provided to BLMIS was false.

172.    I do not consider that either Mr Flax or Mr Raven were dishonest in relation to this accounting treatment.  They honestly and reasonably believed that the description was justified.  In particular:

(1)    The wording was proposed and approved by KPMG.  The nature of the income was patent from the books being kept by Mr Flax, including specific requests for the funding of the MSIL Kohn Payments which identified the funding as being for such a purpose.

(2)    The traders were during this period in regular contact with BLMIS.  To some extent that inevitably involved information being provided from London about the markets in which the dealing was taking place, and the relevant dealing was market making.  It was reasonable for Mr Flax and Mr Raven to regard the information which was shared in such exchanges as falling within the rubric of "market making information", which is not a term of art.

(3)    This was a note to the accounts, to which neither of them can be expected to have paid close attention in the absence of some question arising by it being raised by the auditors.

173.    In 2002 and 2003, the note in the accounts to the fees receivable entry was in the same terms as before.  The wording of the note changed for the first time in the 2004 accounts.  From this year on it replaced the reference to market making information with a reference to research and analysis, so that it read: "*These represent amounts received and receivable in respect of securities dealing and the provision of research and analysis to [BLMIS]*".  From 2005 the word primarily was inserted so that the note read "*These primarily represent amounts received and receivable in respect of securities dealing and the provision of research and analysis to [BLMIS]*".

174.    The earlier "market making information" wording which was still used for the 2003 accounts was the subject of a management representation letter dated 29 March 2004 signed by Mr Raven and addressed to KPMG which was itself approved by a board resolution.  It provided: "*The level of fee income represents a reasonable level of*

*remuneration for the services provided to [BLMIS] by [MSIL]"*. The changed wording in the 2004 accounts was also subject to a similarly worded management representation letter signed by Mr Flax on 30 March 2005, and a similar one of 27 March 2007 was signed again by Mr Flax for the 2006 accounts.

175. The Claimant contended that from Phase 4 the rubric was now wholly false: the change in the trading pattern from agency trading rendered the first half of the note in the accounts false ("securities dealing"); and the reference to research and analysis was false because none was supplied to BLMIS by MSIL. Further, it was contended, even if the description of the services could in some way be justified, the terms of the management representation letters were false because the amount of the income could not possibly be justified as a reasonable level of remuneration for anything of that description.

176. There is considerable force in these contentions as a matter of objective analysis. What I have to consider, however, is the state of mind of Mr Flax and Mr Raven. In doing so I bear in mind the principles governing the approach to allegations of fraud or dishonesty. The standard of proof is the balance of probabilities, but the cogency and strength of the evidence required to prove dishonesty and fraud is heightened by the nature and seriousness of the allegation: *Re H* [1996] AC 563, 586. The court will be astute not to equate dishonesty or fraud with something akin to negligence, even gross negligence. When considering whether there has been recklessness as to the truth of a statement, not caring whether it be true or false, "not caring" does not mean not taking care; it means indifference to the truth, the moral obloquy of which consists in a wilful disregard of the importance of truth: see per Bowen LJ in *Angus v Clifford* [1891] 2 Ch 449, 471.

177. Mr Flax explained that at the very beginning of Phase 3 it was agreed between Mr Yates and the auditors that the expression market making information would be used to justify fees used to top up MSIL to keep it in profit; and that they would be described in the profit and loss account as "fees". He believed that MSIL was providing advice or information in one form or another to BLMIS which would justify that description. By the time the wording changed for the 2004 accounts in early 2005, he had become sidelined in relation to the finance department generally and was no longer involved in preparing the accounts, which were Mr Dale's province in conjunction with KPMG. He assumed, honestly and reasonably, that KPMG were well aware of the nature of the subventions which BLMIS were making, and that KPMG and Mr Dale shared his understanding that the amounts reflected Bernard Madoff's desire to see that MSIL was showing a profit. Although he was a director, he assumed that the accounts and the management letter were in a form which KPMG and Mr Dale approved with full knowledge of the position. He believed that if KPMG and Mr Dale were content to treat the income in the statutory accounts in this way, and the other directors too, it was an appropriate accounting treatment, and therefore appropriate for him to sign the management representation letter in these terms.

178. That Mr Flax's understanding about KPMG's knowledge and approval was a reasonable one is supported by a number of documents which suggest that KPMG were aware that the fees receivable were in part a subsidy, that KPMG approved the description of them as fees for services, and that KPMG knew that the value to be put on such "services" was a subjective one determined by Bernard Madoff himself. For

example a letter from KPMG to HMRC of 27 July 1992 states: "*As explained in the minutes of our meeting on 6 September 1990, the fees paid cover both dealing profits returned to the UK together with any further necessary subvention from BLMIS to cover expenses....This "top up" was intended to cover the company's expenses and ensure that the accounts did not show an overall loss after taking account of other income*". Further support is to be found in a note of a meeting with HMRC in which Mr Flax and KPMG participated on 14 February 1996, in Mr Flax's 21 February 2001 file note, and in an internal KPMG working paper from March 2005 setting out their critical audit objectives and findings based on discussions with MSIL. The latter records KPMG's understanding that the fee received from BLMIS was "*structured to represent the provision of market making services by [MSIL] to [BLMIS]. However the basis of the fee can be subjective*". Mr Flax's evidence, which I accept, was that what KPMG knew this to mean was that the value was decided by Bernard Madoff. This was what KPMG had been told in a management response recorded in a management report of 29 August 2003, although on that occasion the fee was described as being for advice from MSIL to BLMIS. The reference to "structuring" the fee was an indication that KPMG understood it to be in reality a subsidy, at least in part. The note continued: "*The directors state that they have discussed this stream of income with the Inland Revenue who are happy for it to be treated as fee income*". That was true. The note continued: "*KPMG advised the Directors that whilst for accounting purposes classification as fee income appeared to remain appropriate, they should ensure that appropriate documentation is in place over this income as it may be subject to an Inland Revenue challenge in the future.......Conclusion: The income should be classified as fee income.*"

179.    The Claimant relied on a manuscript note on a KPMG working document of 3 March 2008, which appears to record KPMG's understanding that MSIL was rendering research and analysis services to BLMIS and outsourcing those services to Tecno, so that the "research and analysis" in the fees receivable note is the same as the strategic research and analysis services being invoiced by Tecno (until the middle of 2007 which was the year under consideration). The evidence suggests that it was most likely Mr Hui who was the source for this note, whose maker remained unidentified. Neither gave evidence and the note comes very late in the history of events. I found it of little assistance in trying to assess KPMG's prior understanding.

180.    In the absence of any oral evidence from anyone involved at KPMG, and the incompleteness of the documentary evidence available, which is in any event not all of a piece, I am unable to reach any concluded view as to whether KMPG had full knowledge when they approved the accounting treatment; and it would not be right to do so on such incomplete evidence at a trial in which KPMG took no part, where the Claimant contends that such accounting treatment was professionally improper and amounted to a criminal offence. But the evidence before me supports the position of the directors that they believed KPMG had given its approval to the accounting treatment on the basis of full access to all the information necessary to inform such a view. That was Mr Flax's belief. I acquit Mr Flax of any dishonesty in respect of the accounting treatment of the funding or the management representation letters.

181.    Mr Raven too held such a belief, but he had his doubts whether it was justifiable. At least in the last few years, he was uncomfortable with this treatment in the accounts. The high water mark of the Claimant's case was its reliance on a transcript of a call

between Mr Raven and Mr Dale on 12 October 2007 which includes the following passages:

> 'I didn't want to sign the auditor's letter last year – about us giving advice to Madoff New York, because we all know that it is a sham. We don't.'

> 'We can talk to ourselves and convince ourselves that it's all right and Bernie can be part of that conversation and say "Well, you know this is what I want the London office for", and all that sort of thing, we can convince ourselves, but in front of a third party, whether that be a regulator, the Stock Exchange or the auditors or what, you and I know it is a sham. We are getting 2 or 3 or whatever many millions of dollars it is a year to make our figures look better.'

> 'What I am saying is that if we do feel that we want to give advice then I think we have to do it in accordance with the regulations… and it just may be so onerous on us to do that, just to, you know, really support what I think is a bit of a sham, that we may turn round and say that it is not worth doing.'

> 'I have always been worried about this angle that we have adopted for the last two or three years of me and others giving this advice to Bernie which he pays so highly for.'

> 'I think people will say "Look, you know, don't treat us as fools. Where is the proof, where is this research? Why would anyone in the world pay $3 million for that? You are just doing it to build your balance sheet" et cetera, and "You are creating a false impression"'

> '….it is misleading the tax people in our country, it is misleading the regulators here.'

> "…..but I have been uncomfortable with it for two or three years, not necessarily for MiFID even, for the old rules"

182.    I was not persuaded by Mr Raven's attempt under cross-examination to suggest that his concerns related only to a proposal in a draft representation letter that he be named personally as giving advice. No such document was found and the language quoted above shows a concern in relation to the portrayal of the activities of the company as a whole, not merely the portrayal of his own conduct. Some allowance should be made for the context of the conversation. Mr Raven was seeking to persuade Mr Dale to use MiFID as a ground for persuading Bernard Madoff to put an end to the MSIL Kohn Payments and the subvention funding so as to put MSIL's finances on a footing independent of BLMIS. Mr Dale was opposed to such a course, and Mr Raven may have been putting his case in more forceful and exaggerated terms than those which would more accurately have reflected his state of mind over the years. Nevertheless it is clear from this conversation that he had had concerns for at least two or three years that the accounting treatment was deceptive and difficult to justify.

183.    On the other hand there are several passages in this conversation which support his evidence that his attitude throughout was that it was not improper to go along with this accounting treatment, although he was uncomfortable about it, because KPMG were happy with it. As he put it at one point:

> *"Now, I'm happy—well, I'm not happy, I can go along with it at the moment under the old rules pre-MiFID because we have done it, it is established, the auditors are happy with it., but everything is going to change with MiFID..."*

184.    In a conversation with Mr Dale three days later on 15 October 2007, in the same context, Mr Raven again said he was unhappy that he had to sign documents saying that MSIL was giving advice to BLMIS notwithstanding that the auditors had sanctioned it to date. The word he used was "swallowed" but he did not mean that he thought that the auditors had been misled. The attitude of his finance director Mr Dale, as exemplified in this conversation, was to reassure him that the accounting treatment was appropriate, as was approving and signing the management representation letter. This was Mr Dale's stance throughout as finance director, as he confirmed in his evidence to me; he confirmed that the auditors were happy with this wording in full knowledge of the nature of the payments being received and that there was no question of the auditors being deceived. I can readily accept that that was the view he presented to Mr Raven at the time. It is consistent with the transcript of a conversation on 12 September 2006 between Mr Dale and Bernard Madoff in which Mr Dale said that the auditors had asked him about it and been satisfied with his response that it was the same as had always been done. Mr Raven did not think that KPMG had been misled. Mr Raven met the suggestion that he knew that the terms of the management representation letters misled KPMG with the response that the terms of the letters were the responsibility of his finance department and KPMG, and that if such letters, drafted as they were by KPMG, were presented to the board for approval in those terms, KPMG and the finance department were effectively putting them forward as appropriate. I accept that this was genuinely his attitude at the time. He did not focus on the particular passage in it dealing with fees receivable. Although this might be said to display a lack of intellectual rigour as to the function of the management representation letter and a slackness in signing it without sufficiently focussing on all its content, it was not dishonest, nor was he reckless as to the truth of what he was signing, in the sense of being indifferent to whether it was true or not. The same is true of the wording to be sent to KPMG in a memo drafted by Mr Dale which went under his name to Bernard Madoff on 28 August 2003 and resulted in the wording of the management response in the report of 29 August 2003: he did not focus upon the wording and was happy to leave it to Mr Dale to sort out with KPMG.

185.    My conclusion is that in relation to the accounting treatment of income as "fees receivable", and what was said about it in the management representation letters, there was no dishonesty on Mr Raven's part. He did have concerns about the potentially deceptive nature of this accounting treatment, but they were assuaged in his mind by the approval of his finance department and, as he saw it, KPMG, so as to be relegated to a residual feeling of discomfort, rather than a belief that the accounting treatment was inappropriate or unacceptable. Nor was he recklessly indifferent to the propriety of the accounting treatment: he was consciously and positively satisfied that he could go along with it and that what was being done was not dishonest or improper.

**(8) Directors' duties: the law**

186.    Before addressing the duties of which the director Defendants are alleged to be in breach, I should identify one duty of which there is no surviving allegation of breach. It is the duty to be found in s. 171 (a) of the Companies Act 2006, and the previous common law which it codified, which provides that a director must act in accordance

with the company's constitution and must not make dispositions which are ultra vires the company.  In its written opening submissions the Claimant did allege a breach of this duty, on the grounds that irrespective of the subjective views of the directors, the research was of no value and accordingly the MSIL Kohn payments were a gratuitous disposition of corporate assets for no consideration, and as such ultra vires. Following argument I ruled that such an allegation had not been pleaded.  There was no application to further amend the Particulars of Claim.

*The duty to act in good faith in the interests of the company*

187.    It is trite law that a director owes a duty to the company to act in what he honestly considers to be the interests of the company.  This may be regarded as the core duty of a director.  It is a fiduciary duty because it is a duty of loyalty.  The predominant interests to which the directors of a solvent company must have regard are the interests of the shareholders as a whole, present and future.  The duty is now codified in s.172 (1) Companies Act 2006 with effect from 1 October 2007 in the following terms:

"(1)    A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole, and in doing so have regard (among other matters) to–

(a)   the likely consequences of any decision in the long term,

(b)   the interests of the company's employees,

(c)   the need to foster the company's business relationships with suppliers, customers and others,

(d)   the impact of the company's operations on the community and the environment,

(e)   the desirability of the company maintaining a reputation for high standards of business conduct, and

(f)   the need to act fairly as between members of the company"

188.    For the most part the directors' conduct in this case occurred prior to October 2007 and falls to be considered under the common law, but nothing in this case turns upon any distinction, to the extent there be any, between the duty at common law and the statutory codification.

189.    As expressed in the classic formulation by Lord Greene MR in ***Re Smith & Fawcett Ltd*** [1942] Ch 304, 306, the duty is to act in what the director believes, not what the court believes, to be the interests of the company.  The test is a subjective one.  As Jonathan Parker J put it in ***Regentcrest Plc v Cohen*** [2001] BCC 494, at [120]:

"The question is not whether, viewed objectively by the court, the particular act or omission which is challenged was in fact in the interests of the company; still less is the question whether the court, had it been in the position of the director at the relevant time, might have acted differently. Rather, the question is whether the director honestly believed that his act or omission was in the interests of the company. The issue is as to

the director's state of mind. No doubt, where it is clear that the act or omission under challenge resulted in substantial detriment to the company, the director will have a harder task persuading the court that he honestly believed it to be in the company's interest; but that does not detract from the subjective nature of the test"

190.    It is legitimate, and often necessary, for there to be division and delegation of responsibility for particular aspects of the management of a company.  Nevertheless each individual director owes inescapable personal responsibilities.  He owes duties to the company to inform himself of the company's affairs and join with his fellow directors in supervising them.  It is therefore a breach of duty for a director to allow himself to be dominated, bamboozled or manipulated by a dominant fellow director where such involves a total abrogation of this responsibility: see ***Re Westmid Packing Services Ltd; Secretary of State for Trade & Industry v Griffiths (No 3)*** [1998] BCC 836 at 842B-843D; ***Re Barings Plc  (No 5)*** [1999] 1 BCLC 433 at486h-489c; ***Lexi Holdings Plc v Luqman No2*** [2008] 2 BCLC 725 per Briggs J at [31], [32] and [2009] BCC 716 per Sir Andrew Morritt C at [37].  Similarly it is the duty of each director to form an independent judgment as to whether acceding to a shareholder's request is in the best interests of the company: ***Lonrho Ltd v Shell Petroleum*** [1980] 1 WLR 627, 634F.  The duty to exercise independent judgment is now reflected in s. 173 Companies Act 2006.

191.    Moreover, it has long been established that a trustee who knowingly permits a co-trustee to commit a breach of trust is also in breach of trust.  A director who has knowledge of his fellow director's misapplication of company property and stands idly by, taking no steps to prevent it, will thus not only breach the duty of reasonable care and skill (which is not fiduciary in character: ***Ultraframe v Fielding*** [2005] EHWC 1638 (Ch), [1300]-[1302]), but will himself be treated as party to the breach of fiduciary duty by his fellow director in respect of that misapplication by having authorised or permitted it: ***Walker v Stones*** [2001] QB 902, 921D-E; ***Gidman v Barron and Moore*** [2003] EWHC 153 (Ch) at [131]; ***Neville v Krikorian*** [2006] EWCA Civ 943, [49]-[51] and ***Lexi Holdings v Luqman (No. 1)*** [2007] EWHC 2652 (Ch) at [201]-[205].

192.    In fulfilling this personal fiduciary responsibility, a director is entitled to rely upon the judgment, information and advice of a fellow director whose integrity skill and competence he has no reason to suspect: see ***Dovey v Cory*** [1901] AC 477 at 486, 492.  Moreover, corporate management often requires the exercise of judgement on which opinions may legitimately differ, and requires some give and take.  A board of directors may reach a decision as to the commercial wisdom of a particular transaction by a majority.  A minority director is not thereby in breach of his duty, or obliged to resign and to refuse to be party to the implementation of the decision.  Part of his duty as a director acting in the interests of the company is to listen to the views of his fellow directors and to take account of them.  He may legitimately defer to those views where he is persuaded that his fellow directors' views are advanced in what they perceive to be the best interests of the company, even if he is not himself persuaded.  A director is not in breach of his core duty to act in what he considers in good faith to be the interests of a company merely because if left to himself he would do things differently.

193.    Where a director fails to address his mind to the question whether a transaction is in the interests of the company, he is not thereby, and without more, liable for the consequences of the transaction.  In such circumstances the Court will ask whether an honest and intelligent man in the position of a director of the company concerned could, in the whole of the existing circumstances, have reasonably believed that the transaction was for the benefit of the company: *Charterbridge Corp Ltd v Lloyds Bank Ltd* [1970] Ch 62 at 74E-F.  If so, the director will be treated as if that was his state of mind.

*The duty to exercise powers for the purposes for which they are conferred*

194.    A director owes a fiduciary duty to exercise the powers conferred on him by the constitution for the purposes for which they were conferred.  The duty is now enshrined in s. 171(b) of the Companies Act 2006.  Although the duty often overlaps with the duty to act in what is honestly considered to be the interests of the company, the duties are distinct.  A power may be exercised for an improper purpose notwithstanding that the directors bona fide believe it is being exercised in the company's best interests.  That was held to be the position in *Hogg v Cramphorn Ltd* [1967] 1 Ch 254, 266G-269A.

195.    The court will apply a four stage test (see *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] AC 821, 835F-H; *Extrasure Travel Insurances v Scattergood* [2003] 1 BCLC 598 at [92]), which involves identifying (1) the power whose exercise is in question, (2) the proper purpose for which such power was conferred (3) the substantial purpose for which the power was exercised in the instant case and (4) whether that purpose was proper.

196.    There is an issue between the parties as to whether liability is strict or depends upon knowledge or fault on the part of the directors.  The Defendants contended that a director will not be liable unless he knew or ought reasonably to have known the facts which make the payment improper.  They relied on the judgment of Lord Walker in *Progress Property Co Ltd v Moore* [2011] 1 WLR 1, with which the other members of the Supreme Court agreed.  That case was concerned with an unlawful payment of a dividend.  At paragraph [32] Lord Walker said that he agreed with a passage in the judgment of Lord Hamilton in *Clydebank Football Club v Steedman* 2002 SLT 109, where the latter said at [79]:

> "It is plain, in my view, that directors are liable only if it is established that in effecting the unlawful distribution they were in breach of their fiduciary duties (or possibly of contractual obligations, though that does not arise in the present case). Whether or not they were so in breach will involve consideration not only of whether or not the directors knew at the time that what they were doing was unlawful but also of their state of knowledge at that time of the material facts. In reviewing the then authorities Vaughan Williams J in *In re Kingston Cotton Mill* Co *(No 2)* [1896] Ch 331, 347: 'In no one of [the cases cited] can I find that directors were held liable unless the payments were made with actual knowledge that the funds of the company were being misappropriated or with knowledge of the facts that established the misappropriation.'

Although this case went to the Court of Appeal, this aspect of
the decision was not quarrelled with (see [1896] 2 Ch 279)."

197.    The decision in **Progress Property** was delivered a few weeks after the decision of the
Supreme Court in **Revenue and Customs Commissioners v Holland,  In Re
Paycheck Services 3 Ltd** [2010] 1 WLR 2793 to which Lord Walker was also a party.
In that case, also concerned with unlawful payment of a dividend, the main issue was
whether the defendant was a shadow director so as to owe the relevant duties.  The
Court of Appeal and majority of the Supreme Court held that he was not, as a result of
which the content of the duties and liability for their breach did not fall for decision.
Lord Hope in the Supreme Court at [45]-[47] and Rimer LJ in the Court of Appeal
([2010] Bus LR 259) at [81]-[84] identified two conflicting lines of authority as to
whether liability was strict or fault based.  Lord Hope expressed a preference for the
view, without deciding it, that in the case of an unlawful payment of a dividend, a
director who causes the payment to be made is under a strict liability to make good
such misapplication of the company's property, subject only to relief from sanction if
he establishes that he acted honestly and reasonably.  In the Court of Appeal, Rimer
LJ said that he found the arguments in support of that view compelling.  Lord Clarke
also agreed with Rimer LJ's views at [146].  Lord Walker at [124] expressed
agreement with Rimer LJ on "the other issues", which would apparently include this
one, but I find it difficult to reconcile that agreement with the sentiments expressed in
the passage from Lord Hamilton's judgment which he endorsed in **Progress Property**.

198.    Both **Progress Property** and **Paycheck Services 3** were concerned with unlawful
distribution of dividends, but the language used by Lord Hope and Rimer LJ was
sometimes that of misapplication of company property more generally, and some of
the cases cited were not dividend cases.  For this reason the Claimant contended that
the preference for a rule of strict liability applied equally to the duty not to apply
company property for an improper purpose.

199.    I incline to the view that such liability is fault based: a director's liability in relation to
misapplication of a company's property by exercising a power otherwise than that for
which it was conferred cannot arise unless he knows that it is an improper purpose or
of the facts which make the purpose improper.  But I do not need to decide this
question in the light of the conclusions I reach below.

*Unlawful distribution of capital*

200.    A limited company not in liquidation may not return assets to its shareholders except
by way of a reduction of capital approved by the court; profits may be distributed to
shareholders (normally by way of dividend) but only out of distributable profits
computed in accordance with provisions of the Companies Acts: see **Progress
Property** at [1].  This is essentially a judge made rule, almost as old as company law
itself, designed for the protection of creditors, sometimes known as the rule in **Trevor
v Whitworth**, after the House of Lords decision of that name ((1887) 12 App Cas
409), **Progress Property**  at [15].  It has been codified in successive Companies Acts.
Section 263 of the Companies Act 1985 (in force from 1 July 1985 to 5 April 2008,
now replaced by sections 829 and 830 of the Companies Act 2006) provided as
follows:

'**Certain distributions prohibited.**

(1)   A company shall not make a distribution except out of profits available for the purpose.

(2)   In this Part, "distribution" means every description of distribution of a company's assets to its members, whether in cash or otherwise, except distribution by way of—

    (a)       an issue of shares as fully or partly paid bonus shares,

    (b)       the redemption or purchase of any of the company's own shares out of capital (including the proceeds of any fresh issue of shares) or out of unrealised profits in accordance with Chapter VII of Part V,

    (c)       the reduction of share capital by extinguishing or reducing the liability of any of the members on any of the company's shares in respect of share capital not paid up, or by paying off paid up share capital, and

    (d)      a distribution of assets to members of the company on its winding up.

(3)   For purposes of this Part, a company's profits available for distribution are its accumulated, realised profits, so far as not previously utilised by distribution or capitalisation, less its accumulated, realised losses, so far as not previously written off in a reduction or reorganisation of capital duly made.

201.   The prohibition is also reflected in MSIL's Articles of Association, Article 29.01 of which provides as follows:

> "The Company shall not make any distribution of any kind or in any form of the Company's assets to members of the Company (other than as provided in Section 45(2) of the 1980 Act) except out of its undistributed and uncapitalised accumulated realised profits after deducting its accumulated realised losses (so far as such losses have not previously been written off in a reduction or reorganisation of capital) nor shall the Company apply an unrealised profit in paying up debentures or any amounts which are unpaid on its issued shares."

202.   A transaction which offends this principle is to be treated as ultra vires in the looser and wider sense of the term identified in *Rolled Steel Products (Holdings) Ltd v British Steel Corporation* [1986] Ch 246 at 276-278 per Slade LJ and 302 per Browne-Wilkinson LJ: see *Progress Property* at [15].

203.   The judgments of Lord Walker and Lord Mance in *Progress Property* at [1], [16]-[31], [36], [42], and of Hoffmann J in *Aveling Barford Ltd v Perion Ltd* [1989] BCLC 626, identify the correct approach to transactions impugned on this basis. Whether a transaction infringes the rule is a question of categorisation or characterisation based on substance, not form. The label attached to the transaction by the parties is not decisive. Sometimes the exercise for the court will be a purely objective one in which the subjective intentions of the directors are irrelevant: for example a distribution described as a dividend, but actually paid out of capital, is unlawful, however technical the error and however well-meaning the directors who caused it to be paid. But where what is impugned purports to be a transaction of a different character to a distribution, such as for example a contract for the purchase of assets or services, the intentions of the parties to the transaction are often highly

relevant to the categorisation exercise, being one in which the court is inquiring whether the transaction was in substance that which it purported to be. The question whether the transaction was in substance a disguised distribution of capital may be heavily influenced by whether that was the intention of the parties. In such a case an attempt to dress up a transaction as something different from what it is, is likely to provoke suspicion, and may lead to the conclusion that its true characterisation is a distribution of capital, although not all cases involving some pretence or dressing up will justify that conclusion. As Lord Walker put it at [30], pretence is often a badge of bad conscience. On the other hand the court will not recategorise an arm's length transaction if the directors intended it to be in substance that which its form purports to be.

204.    In this context the parties again relied on the passages in the **Progress Property** and **Paycheck 3** cases, and the lines of authority there considered, for rival contentions as to whether liability of directors for an unlawful distribution of capital is strict, subject to relief from sanctions, or fault based. Again I do not need to decide this question in the light of the conclusions I reach below.

*The duty to exercise reasonable care skill and diligence*

205.    A director has a duty by virtue of his office to exercise reasonable care skill and diligence. The duty is now codified in s 174 Companies Act 2006 in the following terms:

> "**174    Duty to exercise reasonable care, skill and diligence**
>
> (1)    A director of a company must exercise reasonable care, skill and diligence.
>
> (2)    This means the care, skill and diligence that would be exercised by a reasonably diligent person with–
>
> > (a)    the general knowledge, skill and experience that may reasonably be expected of a person carrying out the functions carried out by the director in relation to the company, and
> >
> > (b)    the general knowledge, skill and experience that the director has."

206.    The standard of care required of a director is to be determined not only subjectively by reference to his particular knowledge, skill and experience but on general, objective criteria: ***D'Jan of London Ltd, Copp v D'Jan*** [1993] BCC 646, 648D-E and s. 174(2).

207.    A director employed under a contract of employment is bound by an implied term thereof to exercise reasonable skill and care. Mr Flax, Mr Toop and Mr Raven had contracts of employment (although not reduced to writing in Mr Raven's case). Andrew and Mark Madoff did not and received no remuneration.

208.    Directors' and employees' duties to exercise reasonable care, skill and diligence are not fiduciary in character.

## (9) MSIL Kohn payments: breaches of directors' duties

*Acting in good faith in the interests of MSIL*

209.   I shall consider the position of each director Defendant in turn.  It is convenient to consider first Mr Flax, who knew of the payments from their start.

*Mr Flax*

210.   Mr Flax signed the cheques in respect of the Erko invoices and signed or approved almost all the electronic transfers made to Tecno Italy.  He accepted that he was responsible for effecting the payments throughout the whole period between 1992 and 2007.

211.   Mr Flax was a patently honest witness whose meticulous and conscientious nature gave him a good grasp of detail, both in his conduct at MSIL and in his evidence to me.  His recollection was generally sound, and its reliability was borne out by the extant documents and the evidence of other witnesses, although there were a few occasions when his recollection was less sure, as was to be expected of evidence covering events going back over more than 25 years without the survival of many relevant documents.

212.   The starting point for the present inquiry is that Mr Flax honestly and reasonably believed that the MSIL Kohn payments were being fully funded by BLMIS and were cash neutral for MSIL.  There was, so far as he was concerned, no significant risk of MSIL being in a position of having to make the payments without such funding.  That is not sufficient of itself to make them in MSIL's interests: some perceived benefit must have been identified, not merely the absence of detriment.  But it does mean that the perceived value of the benefit to MSIL need only have been relatively slight for Mr Flax to hold the honest perception that they were in MSIL's interests.  To my mind one of the major flaws in this aspect of the Claimant's case against each of the director Defendants is that it invites the Court to ignore the funding of the payments when assessing whether the conduct of the directors was a breach of their duties.  It proceeds on the hypothesis that the directors need to justify a perception that the company was receiving something worth the millions of dollars paid out by the company.  But that is to ignore the reality of the position in which they found themselves.  Whatever the merits of the arguments as to whether the company can with hindsight be seen to have suffered a loss (by reason of the then unimagined Ponzi scheme), or of whether a director's breach of duty gives rise to a strict liability to account irrespective of loss to the company, I can see no justification for ignoring the funding when assessing the state of mind of the directors and what they perceived to be in the interests of the company at the time.  I have little doubt that had there been no funding from BLMIS, the directors would not have contemplated these large payments, which MSIL could not afford out of its own resources.  But they were not being asked to make or sanction payments which were to be borne out of MSIL's own resources.  It is true that the immediate source for the payments was money which belonged to MSIL but the payments were only made because MSIL was given an equivalent sum by BLMIS, often in advance, for the specific purposes of enabling it to make the payment.

213.   At one stage of Mr Saini QC's questioning of Mr Raven, following an intervention on my part, Mr Saini QC confirmed that the case which he was putting was that it would have been legitimate for MSIL to make the payments, and be reimbursed by BLMIS

for them, provided it did not pretend in its accounts that it was paying for something of value and giving something of value to BLMIS in return for the funding. Two days later his questioning corrected the position by making clear that the Claimant's objection was to the payments being made, not simply to their accounting treatment. I would not regard the earlier confirmation of his case as a binding concession, despite the Defendants' reliance upon it. But I hope it is not unfair to treat the slip as reflective of the reality of the position facing the directors, which was that the propriety of making the payments could not be divorced from the context of their funding.

214.    Mr Flax did not have the skill or knowledge himself to assess the value of the written research being received.    The reports appeared to him to be substantial and professionally formatted and produced. When he became aware that the traders did not think that the material was particularly helpful, he raised the matter on the phone with Bernard Madoff and asked him whether he thought he was receiving value for money.  Bernard Madoff told Mr Flax that Mrs Kohn was a good analyst who spoke to him in New York and was only being paid what a good analyst would be paid. Mr Flax was told that the research had the potential to pay for itself and that a single good idea could justify the payments. In this and subsequent discussions Bernard Madoff said that he found Mrs Kohn's advice to be of great value. This was a reference to advice she gave in their face to face meetings, not just written research.

215.    Mr Flax was aware that the traders continued to treat the research received in London as of no practical value to their day to day activity, and raised the question of the value of the research on a number of occasions with Bernard Madoff on the phone. Mr Flax remained unhappy about the payments because he regarded it as his function to raise the question whether the payments were value for money. When he raised it, Bernard Madoff became increasingly annoyed and made clear, in colourful language, that Mr Flax did not have the knowledge or experience to contradict his judgment about trading. Bernard Madoff made clear to Mr Flax in no uncertain terms that he got value from the research.

216.    Mr Flax did not believe that the written research which was sent to London was sent on to New York, but he was told by Bernard Madoff, and believed, that Bernard Madoff was receiving research in New York. He was not asked at the trial whether he thought that it was the same as, or overlapped with, the material received in London. Whatever he thought the content of the research received by Bernard Madoff in New York to be, he was entitled to treat it as something which Bernard Madoff received in his capacity as a director and shareholder of MSIL, and that was in fact how he viewed it. In this context he said "*MSIL consisted of the individuals sitting in London and an individual sitting in New York in the shape of the chairman of MSIL and its major shareholder and that was Bernard Madoff. And Bernard Madoff, in his capacity as Chairman, the major shareholder, sitting in New York, .........told me in no uncertain terms that he got value from Mrs Kohn's research*". He said the same more generally about Mrs Kohn speaking to Bernard Madoff, namely that he treated her as speaking to the chairman and major shareholder of MSIL.

217.    Mr Flax's evidence, which I accept, was that he thought that MSIL received a benefit from Mrs Kohn's services in two respects. The first was that the advice and research was of value to Bernard Madoff, as the latter had repeatedly told him, and he regarded something which MSIL's chairman and major shareholder treated as of value as being

for that reason of value to MSIL.  As he put it at one point: "*If the chairman and major shareholder of MSIL tells me he's getting a benefit from it, I have very great difficulty arguing with that.*"  Secondly Bernard Madoff told him that he passed on the advice he received from Mrs Kohn to the traders in London when he spoke to them on the phone; the traders were therefore getting the benefit of her advice, not simply the written research.

218.  Mr Flax was further reassured that the payments were proper ones to make in the interests of MSIL by the following factors:

(1) The chairman and major shareholder of the company was instructing him to make the payments and telling him they were of benefit.  He had no reason to question Bernard Madoff's competence, integrity or motives.  On the contrary, he was one of the lowest paid directors and Bernard Madoff was a titan of Wall Street.  He held Bernard Madoff in the high respect which the latter's record and reputation commanded.  His trust and respect is reflected in the fact that he and his wife had about $3 million invested with Bernard Madoff through family trusts, which was lost in the collapse of the Ponzi scheme.

(2) There was no secrecy about the payments within MSIL.  All the London directors (except perhaps Mr Stevenson) were aware of them.  None of his fellow directors and no one in the compliance department expressed the view to him at any time that the payments were improper, illegitimate or other than in the best interests of MSIL.  On the contrary, he raised the issue on one occasion with Peter Allen, and understood that the latter spoke to Mr Raven about it, who in turn spoke to Bernard Madoff.  Mr Flax believed that Mr Raven had raised the matter with Bernard Madoff on more than one occasion and had received responses which satisfied him.

(3) The payments were openly recorded in the books and their accounting treatment was sanctioned by the audit team from KPMG, who were fully aware of them, and of the written research which was made available to them.  Mr Flax did not mislead the auditors.  The payments were noticed during the audits from the beginning and Mr Flax was asked about them.  He told KPMG that the research was valued by Bernard Madoff, which was what the latter had told him and what he believed; he did not tell the auditors that it was of use for MSIL's business or that it was used by the traders.  He could not recall either way whether he had told the auditors that it was not used by the traders, but in any event the auditors were free to talk to the traders and did so without Mr Flax being present.  He had no reason to think that they would have concealed their views about the usefulness of the research if it had been raised.  On one occasion in about 2000 or 2001 Mr Grimditch of KPMG took the matter up with Bernard Madoff and appeared to be satisfied by whatever he was told.  Mr Flax was reasonably entitled to believe, and did believe, that KPMG were at all times fully aware of the nature of MSIL's business activity, the timing and amounts of the MSIL Kohn Payments, the invoices in respect of which they were paid, the written research provided to MSIL, the way in which these payments were funded by BLMIS, and the way in which MSIL was more generally funded by BLMIS.

219. Mr Flax could legitimately treat these as being sufficient grounds for treating the payments as being in MSIL's interests, as he did. Three aspects of the relevant duty are here relevant:

(1) The fact that the payments cost MSIL nothing in commercial terms, and involved no significant foreseeable risk, means that the perceived value of the benefit to MSIL need only have been relatively slight for Mr Flax and others to hold the honest perception that they were in MSIL's interests.

(2) In the particular circumstances of this case, the interests of MSIL which fell to be taken into account in relation to the payments are to be closely associated with those of Bernard Madoff himself. The directors reasonably believed that all times the company was solvent, and had no reason to suspect that the payments were contrary to the Companies Acts or otherwise unlawful; the funding was coming from BLMIS which was heavily regulated in New York. The predominant interests to which the directors were required to have regard were those of the shareholders, including the minority non voting beneficial interests of Bernard Madoff's family and close associates. Bernard Madoff was at all times the predominant beneficial owner of the shares and the controlling shareholder. MSIL's corporate history was one which reflected Bernard Madoff's personal decision from time to time as to what business it would conduct. Its funding was dependent on him. It was Bernard Madoff's vision for the development of MSIL which would determine its future direction and financial health, and indeed its future existence. He could at any time have closed the business or caused it to change the nature of its business activity. He had the power under Article 17.05 of the Articles, as a greater than 95% voting shareholder, to appoint and dismiss directors without a general meeting. Generally, what was in Bernard Madoff's interests was likely to be in the interests of the minority shareholders and the long term success of the company. Giving effect to his wishes was something which itself was likely to promote the success of MSIL; conversely denying his wishes was unlikely to promote the success of the company. The Defendants contended that the directors were entitled to treat Bernard Madoff's interests as being the interests of MSIL. I would not go so far as to equate the two, but I accept that provided the company was solvent, and not doing anything contrary to the Companies Acts or otherwise unlawful, as was the apparent position at the time, a director who honestly believed that a payment was in accordance with the wishes of Bernard Madoff could treat that alone as a reason for believing the payment was in the interests of MSIL. Whether that was a sufficient reason would have to be weighed against any countervailing factors, such as cost and risk, but neither had a significant part to play in relation to these payments.

(3) Directors bring different experience and expertise to the joint exercise of corporate management. Whilst each is required to exercise his independent judgment, he may legitimately defer to the views of those with greater experience or expertise than him. Where there is a director who has a record and reputation for outstanding skill and experience in the company's business activity, his fellow directors are entitled to accord a high degree of deference and trust to his views as to what is in the company's best interests. It would be

unfair and unrealistic to expect Mr Flax, or any of the other directors, to have done anything other than attach great weight to the views of Bernard Madoff in deciding what was in the interests of MSIL. To take the view, as Mr Flax to some extent did, that Bernard Madoff knew best, was not a dereliction of the duty to exercise independent judgment. It was a legitimate recognition that Bernard Madoff's high standing in the financial world reflected a level of skill and experience which did indeed equip him to know what was best for the company, and put him in a much better position to make that judgment than Mr Flax or any other director.

220.  The Claimant's case against Mr Flax, as against each of the director Defendants, relied upon three propositions as being true to their knowledge (in addition to proceeding on the premise, which I regard as a false one, that the funding falls to be ignored). The three propositions were:

(1) The MSIL Kohn Payments were solely for the written research and no other services or benefits were received by MSIL in exchange for them.

(2) The research supplied to MSIL by Mrs Kohn was useless and of no value to MSIL, both because of its own poor and plagiarised quality and because it was irrelevant to the trading activities in which MSIL was engaged.

(3) The research was never passed on by MSIL to BLMIS or any other entity. It was simply stored at MSIL to show to the auditors in the event that the MSIL Kohn Payments were questioned.

221.  As to (1), that was not what Mr Flax was told by Bernard Madoff and not what he believed. He believed that the payments were also for advice received by Bernard Madoff from Mrs Kohn in New York and that Bernard Madoff passed on that advice to the traders in London. On more than one occasion in his evidence he said that he was clear that the payments were only for research and nothing else, but the context of those answers, and of his evidence as a whole, suggested that what he was referring to as research was all the information being provided by Mrs Kohn, not simply the written documentary material delivered in London.

222.  As to (2), the research was not in fact worthless to MSIL for either of the reasons advanced. The value of the research which was relevant to MSIL's day to day trading activity in Phase 4 is to be measured in thousands to low tens of thousands of dollars per annum. The value of the research for management decision making at a more strategic level throughout Phases 3 and 4 was real but immeasurable. In any event Mr Flax was not in a position to assess the value of the research himself and reasonably believed that he should defer to Bernard Madoff's view that the research and advice which the latter was receiving was worth what was being paid for it. Given that the payments were being funded by BLMIS and costing MSIL nothing, there did not need to be any great value to the research to justify the payments, quite apart from any value in the advice from Mrs Kohn which Mr Flax thought was being passed on by Bernard Madoff to the traders.

223.  As to (3) Mr Flax did not believe that the research which was sent to London was sent on to New York, but he was told by Bernard Madoff, and believed, that Bernard

Madoff was receiving research in New York and believed he was doing so in his capacity as the chairman and a major shareholder of MSIL.

224.   In these circumstances I conclude, without any real hesitation, that Mr Flax honestly considered the MSIL Kohn Payments to be in the interests of MSIL and was not in breach of his duty to act in what he considered in good faith to be the interests of MSIL.

*Mr Raven*

225.   Apart from a two week period in 1983 when the company was being set up, Mr Raven first became a director on 1 January 1992, initially in a non executive role.  His executive role increased over the decade in the way I have described above, and by about 2001 he was the senior of the two directors left in place at that time.  From 2003 he was playing the full role of a CEO.  He signed a number of the cheques for the Erko payments, including one in October 1999, and signed or approved a number of the electronic transfers to Tecno Italy.

226.   I found Mr Raven's evidence on the whole to be candid and reliable, conformably to the widespread testimony of those who had worked with him as a man of unquestioned integrity and ability.  There were occasions on which he was keen to give the impression that he was more detached from the detail of what was happening than seemed to me likely, or was borne out by the documents.  At times he put forward arguments to defend his position which did not hold water.  This defensiveness was understandable given that he had been uncomfortable about both the payments and their accounting treatment at the time, and that he was responsible for stopping them in 2007.  But there were many occasions during his days in the witness box on which he volunteered answers which were frank and quite obviously not designed to assist his case.  In relation to the central issues in the case I feel able to treat him as an honest and reliable witness.

227.   His evidence was that he did not really focus on the payments until he became CEO in 2003.  I accept that that is so, but he must have been aware both of the payments and the written research from a much earlier time.  I find that he became aware of the payments within a few years of joining the company as a non executive director.  The research and the Erko payments were no secret and were openly discussed between Mr Flax and the other traders/directors.

228.   In assessing Mr Raven's state of mind in relation to the payments, the important starting point is that, like Mr Flax, he honestly and reasonably believed that the payments were being matched by the funding from BLMIS, and involved no real cost to MSIL.

229.   Mr Raven was told of the conversations which Mr Flax had had with Bernard Madoff in relation to the research and Mrs Kohn.  Accordingly he knew from these reports that Bernard Madoff's attitude was that Mrs Kohn was a good analyst who spoke to him in New York and was only being paid what a good analyst would be paid; that the research had the potential to pay for itself and that a single good idea could justify the payments; that he found Mrs Kohn's advice to be of great value; and that he got value from the research.  Mr Raven did not think that the written research being received in London was being sent on to New York, but he thought that Bernard

Madoff was receiving research in some form in New York, whether identical or overlapping with that sent to London, as well as advice in face to face meetings.

230. Mr Raven himself raised the topic with Bernard Madoff from time to time, on what was probably about ten or more occasions in all. Mr Raven queried whether MSIL should be paying so much for the research as it seemed to him to be very expensive, to which Bernard Madoff responded to the effect that he regarded it as good research and of real value and he wanted MSIL to take and pay for it. Bernard Madoff told Mr Raven that the latter was not qualified to say whether the research was good or not. Mr Raven also learned from his conversations with Bernard Madoff that apart from research or information from Mrs Kohn, Bernard Madoff valued Mrs Kohn for her contacts. Mr Raven tried on a number of occasions to persuade Bernard Madoff to put an end to the payments, but Bernard Madoff was insistent (until Mr Raven was able to use the introduction of MiFID to persuade him in 2007).

231. Mr Raven candidly accepted in his evidence that when he focussed on the payments, he did not regard them as providing any benefit to MSIL. In his witness statement he described telling Bernard Madoff in 2007, when using MiFID to convince the latter to put an end to them, that they were "not in MSIL's interests". He agreed with the description of them as a mechanism being used by Bernard Madoff to pay Mrs Kohn or the entities associated with her.

232. He was uncomfortable about them and wanted to put an end to them for two reasons. The first was that he saw his mission as being to build MSIL into a profitable business which could be independent from BLMIS; he therefore wished to remove the payments and the subventions from each side of the profit and loss account because they were inconsistent with MSIL operating as an independent business. Secondly he was, as I have explained, uncomfortable about the accounting treatment of the income which funded the payments. Neither of these reasons for wishing to put an end to the payments and their funding reflected any concern as to the propriety of the payments as such; Mr Raven had none. But it was for these reasons that he was keen to use the introduction of MiFID to persuade Bernard Madoff to put an end to them, and in this he was successful.

233. The Claimant contended that Mr Raven's admission that he did not see any benefit to MSIL in the payments being made, and that he tried to persuade Bernard Madoff that they were not in MSIL's interests, was sufficient to establish a breach of his duty as a director. In my judgment that is to ignore what Mr Raven knew of Bernard Madoff's views. Mr Raven's personal view was that he did not consider there was any value to MSIL in the research, or anything else being provided in return for the funded payments. But he honestly believed that Bernard Madoff did. His attitude was captured in his answer given in cross examination:

> "When the research started coming in, in the mid to late 1990s, whenever it was, I had absolutely no idea what it was, whether it was good, bad or indifferent. Mr Madoff wanted it, Mr Madoff made it quite clear he was going to continue to pay for it and receive it, and so that's fine, for me. My chairman and the shareholders said "You are going to take research", I am not going to argue against that ……………because I had huge

> *respect for Mr Madoff and his successes and his position in the*
> *industry, in New York and with us in London"*

234. I have already identified three factors which inform the inquiry as to whether Mr Flax
was acting in what he considered to be the interests of MSIL. They are equally
applicable to the inquiry in Mr Raven's case. In summary they are (1) the fact that the
payments cost MSIL nothing in commercial terms and involved no significant
foreseeable risk, means that the perceived value of the benefit to MSIL need only
have been relatively slight for Mr Raven to hold the honest perception that they were
in MSIL's interests; (2) provided the company was solvent, and not doing anything
unlawful or contrary to the Companies Acts, as was the apparent position at the time,
a director who honestly believed that a payment was in accordance with the wishes of
Bernard Madoff could treat that alone as a reason for believing the payment was in
the interests of MSIL; and (3) to take the view, as Mr Raven did, that Bernard Madoff
knew best, was not a dereliction of the duty to exercise independent judgment, but a
legitimate recognition that Bernard Madoff's high standing in the financial world
reflected a level of skill and experience which did indeed equip him to know what
was best for the company, and put him in a better position to make that judgment than
Mr Raven.

235. There is, in Mr Raven's case, a fourth consideration to be kept in mind, namely that
corporate management requires some give and take. A director is not in breach of his
core duty to act in what he considers in good faith to be the interests of a company
simply because if left to himself he would do things differently. Mr Raven regarded
Bernard Madoff as a friend of many years standing whom he trusted and respected; he
would express his views to Mr Madoff candidly; sometimes his views would prevail
and he would persuade Bernard Madoff to his course, but on other occasions if they
could not agree on matters relating to the business, he would defer to Bernard
Madoff's views. One answer of Mr Raven is illustrative:

> *"Q: Did you not consider, as the managing director, certainly*
> *from 2001, you had the responsibility to form an independent*
> *view as to the usefulness and appropriateness in respect of this*
> *research? A: My Lord, I had my views, I had my views about a*
> *lot of things, Mr Madoff didn't agree with them all, I didn't*
> *agree with a lot of his, that's what running a business is all*
> *about."*

236. If left to himself, Mr Raven would have done things differently, at least from 2003
when he focused on the payments. But he was entitled to go along with them and
treat them as being in the interests of MSIL, as he honestly did, in the light of his
belief that they were cost neutral to MSIL and that Bernard Madoff wanted them to be
paid and regarded the research as of value. There was no breach of duty in his
deferring to the views of Bernard Madoff. This is not a case of a director allowing
himself to be dominated or manipulated by a dominant director in a way which
involved a total abrogation of responsibility. It is a case of a director honestly and
reasonably deferring to the views of a fellow director with whom he disagreed but
whom he was entitled to treat as having greater wisdom and experience.

237.    In these circumstances I conclude that Mr Raven honestly considered the MSIL Kohn Payments to be in the interests of MSIL and was not in breach of his duty to act in what he considered in good faith to be the interests of MSIL.

*Mr Toop*

238.    Mr Toop was employed by MSIL as a trader on the trading desk from October 1999; he took over management of the London trading desk in about July 2002; he became a director on 4 February 2003; he remained Head of Trading until December 2008. He was not himself involved in effecting any of the payments.

239.    I had the advantage of hearing from Mr Toop throughout the trial, not only whilst giving his evidence, but also whilst conducting his defence as a litigant in person, making oral submissions and cross examining witnesses. He did so with conspicuous skill, fairness and dignity despite the obvious emotional trauma inflicted by these proceedings. He gave his evidence in a straightforward fashion. I have no hesitation in treating him as an honest and reliable witness.

240.    As with Mr Flax and Mr Raven, the starting point is that Mr Toop honestly and reasonably believed that the MSIL Kohn payments were being fully funded by BLMIS and were cash neutral for MSIL. There was, so far as he was concerned, no significant risk of MSIL being in a position of having to make the payments without such funding.

241.    So far as the written research received in London was concerned, Mr Toop knew about it some time after he arrived in 1999, probably in around 2000. He never saw any of the traders using it and did not use it himself. He gave it a cursory glance when he saw the boxes on a handful of occasions. All he could specifically recollect about what he saw was that some of it related to Eastern Europe. It was not something he spent any time specifically looking at and it was not "on his radar", as he put it. At the Arts Club meeting on 12 December 2008 he described the research as "garbage", but this was a comment he made following the revelation of Bernard Madoff's fraud which caused him to be suspicious about the payments after the event. He had not formed any view about its quality before then. It was not "on his radar" because he never regarded it as meant for MSIL in London. He assumed at the time that the research was being passed on from London to New York. The basis for his assumption was that it was being paid for by BLMIS in New York, and was being received in London because Mrs Kohn was based in Europe. That was a reasonable, albeit mistaken, assumption to have made. He did not know whether Mr Raven, Mr Flax or Mr Dale looked at the research.

242.    So far as the payments were concerned, he probably became aware of the fact of them at a management meeting early in his time at MSIL, although he did not become aware of the scale of the payments until he saw a spreadsheet provided by Mr Dale for a different purpose which referred to Tecno. It is impossible to date when this occurred, other than that it is likely to have been after Mr Dale became finance director in 2003. In his final written submissions Mr Toop accepted that he knew of the approximate amount of the payments from 2005 onwards. It was not suggested that Mr Toop became aware of the payments from the annual accounts which he signed and approved each year from 2003 as a director.

243.    Mr Toop was anxious to emphasise his management role as being focussed on the trading activities of the company.  The thrust of his defence was that he relied on the other directors to oversee the activities for which they were managerially responsible, and the MSIL Kohn Payments were the responsibility of Messrs Raven, Flax and Dale.  He pointed to a discussion at a dinner on 7 July 2004 with Mr Raven and Andrew Madoff, of which Mr Raven prepared a minute, at which he, Mr Toop, was criticised by Mr Raven for seeking to get involved with areas which were not his responsibility.  No doubt this incident, and his somewhat fractious relationship with Mr Raven, discouraged him from questioning matters outside his area of managerial responsibility.  However this did not relieve him of his personal responsibility as a director to exercise some independent judgment as to whether the MSIL Kohn Payments were in the interests of MSIL.  This he failed to do.  He reasonably assumed that there was nothing wrong with MSIL making the payments, but he did not address his mind to the specific question whether or how they conferred any benefit on MSIL as opposed to BLMIS.

244.    The question therefore arises whether an honest and intelligent man in his position (Mr Toop was both) could reasonably have believed that the payments were in MSIL's interests.  The answer is that he could, for the following reasons:

(1)    The fact that the payments cost MSIL nothing in commercial terms and involved no significant foreseeable risk, means that the perceived value of the benefit to MSIL need only have been relatively slight for someone in Mr Toop's position to hold the honest perception that they were in MSIL's interests.

(2)    Provided the company was solvent, and not doing anything contrary to the Companies Acts or otherwise unlawful, as was the apparent position at the time, a director who honestly believed that a payment was in accordance with the wishes of Bernard Madoff could treat that alone as a reason for believing the payment was in the interests of MSIL.

(3)    Mr Toop held Bernard Madoff in the high respect which the latter's record and reputation commanded.  He had worked with him in New York from 1987 and regarded the way he treated his employees as that of a head of a family.  Mr Toop's attitude was that "New York knew best" how things should be done.  If Bernard Madoff, as the chairman and effectively sole owner of MSIL, regarded the research as being of value, he would have deferred to that view without hesitation.  That would not be a dereliction of the duty to exercise independent judgment, but a legitimate recognition that Bernard Madoff's skill and experience put him in a better position to make that judgment than Mr Toop.

(4)    So far as he was aware, the payments were openly recorded in the books and their accounting treatment was sanctioned by the audit team from KPMG.  There was no secrecy about the payments within MSIL.  All the London directors (except perhaps Mr Stevenson) were aware of them.  None of his fellow directors and no one in the compliance department expressed the view to him at any time that the payments were improper, illegitimate or other than in the best interests of MSIL.  He was entitled to defer to their views.

(5) The services provided by Mrs Kohn could honestly and reasonably be perceived as of benefit to MSIL in a number of ways:

(a) Mrs Kohn was introducing Bernard Madoff to leading figures in the European financial services industry. There was some intangible benefit to MSIL, the company which bore his name, from this PR activity.

(b) Bernard Madoff wanted to grow the London business, as he explained to the London directors at a dinner on 4 October 1993, by raising its profile in the media and with contacts. A market making business needs clients so that any introductions capable of leading to potential new clients would be of benefit.

(c) The written research was of value to MSIL. On a conventional basis the value of the research which was relevant to MSIL's day to day trading activity in Phase 4 is to be measured in thousands to low tens of thousands of dollars per annum. The value of the research for management decision making at a more strategic level was real but immeasurable.

(d) The New York and London businesses were closely intertwined. A benefit received only in New York could honestly and reasonably be perceived as being of indirect benefit to MSIL in London.

245. I therefore conclude that Mr Toop was not in breach of his duty to act in what he considered in good faith to be the interests of MSIL.

*Andrew Madoff and Mark Madoff*

246. Andrew and Mark Madoff were both appointed directors of MSIL by Bernard Madoff on 31 December 1998 when they became non voting shareholders.

247. The Claimant alleges that they were at all material times aware of the MSIL Kohn Payments. This is denied on behalf of each of them. In resolving this issue I am hampered by the fact that neither gave evidence before me. Mark Madoff took his life three days after these proceedings were issued. Andrew Madoff provided a signed witness statement but was not well enough to give oral evidence even by video link.

248. In his witness statement, Andrew Madoff states that he did not know of the MSIL Kohn Payments or the provision of research to MSIL at any time before these proceedings; and that he believes that his brother Mark was equally unaware of them. I find myself unable to accept that evidence for the following principal reasons:

(1) Mr Purcell described both Mark and Andrew Madoff as very diligent. Mr Flax described Andrew Madoff as very much on the ball. Each brother occupied a position of considerable responsibility in BLMIS' successful proprietary trading and market making business and each must have been financially capable and sophisticated. They were not passive directors of MSIL. They regularly attended board meetings. Andrew Madoff was particularly involved in overseeing the transition to the proprietary trading business between 2000 and 2003 before he became ill with cancer, and again thereafter from 2004. Such was his involvement that Mr Raven thought of him as MSIL's deputy

chairman.  Mark Madoff took over this role for a period in 2003 and again from late 2006.  In early 2006 Andrew Madoff was involved in a compliance review during which the impact of MiFID was considered.

(2) On 16 January 2001, Mr Flax sent to Mark Madoff by email a one page memorandum setting out the net amount due to MSIL at 31 December 2000. It included the results of the Q accounts, and a number of expenses which fell to be deducted.  In the second category there was a line stating "Settling the Erko bill in respect of 1999 $187,500", a line stating "Increase in Bernard L Madoff's loan $1,215,967.27 (of which $750,000 relates to Erko)" and two lines each of which stated "Market making information fees used to settle Erko charges in 2000 $750,000".  According to Mr Flax, it was sent to Mark Madoff for the purposes of his being able to work out the bonuses to be paid to the London traders.  Although the most important aspect of it for these purposes was the part setting out the results of the Q accounts, in calculating the bonuses he would have to have stripped out the expenses.  His response on 29 January 2001 demonstrates that he had focussed not only on the Q account results but also on at least one item of the expenses.  It seems to me improbable that Mark Madoff would not have noticed the reference to Erko in four separate places referring to substantial sums.  If he did not already understand the reference he would have inquired.

(3) Andrew Madoff's evidence is that he took an interest in the trading performance and profitability of MSIL.  In the annual accounts with which he was concerned as a director for his first four years (1998-2001) the operating profit was identified in the profit and loss account as comprising mainly fees receivable less administrative expenses.  He would therefore have had to focus on the administrative expenses, which would have revealed to him that there were substantial expenses not explained in the notes.  Moreover he would have been bound to understand that the income booked as "fees receivable" was greater than was accounted for by the return of profit on the Q accounts.  An interest in the profitability of MSIL would likely have involved understanding the Erko payments and their funding as an element on each side of the profit and loss account.

(4) That he did focus on the expenses of MSIL is confirmed by paragraphs 42 and 62 of his witness statement in which he explains that he was aware from discussions with his father and Mr Raven what salaries were paid and of the larger overhead expenses such as rent; that he knew from this that the traders' profits were covering expenses; and that he remonstrated with his father that the amount of rent being paid for MSIL's Berkeley Square offices was too high.  If he focussed on the amount of the rent, the substantial size of the MSIL Kohn Payments is such as equally to have attracted his attention.

(5) Whilst Mr Raven and Mr Flax said that they did not recall any discussion with either brother about the payments, Mr Flax said in evidence that he thought all signatories to the board resolution dated 29 March 2005, which included both Madoff brothers, knew that substantial payments were being made to Mrs Kohn, although he was not asked about the basis for this belief.

(6)   As I conclude below, the payments were known to Peter Madoff, to whom Andrew and Mark reported at BLMIS. I can see no reason, and none was advanced, as to why he should have concealed their existence from his nephews. Their size made them a likely topic for discussion between the three who all took an active role in MSIL's governance.

(7)   Mr Raven's evidence was that he would have been surprised if Bernard Madoff had not discussed the payments and their funding with his sons. Andrew Madoff said in his witness statement that he believed that his father hid requests for payment of funds to cover the payments from him and his brother because he was aware that the brothers would object to them. This does not sit easily with the fact that the payments and their funding were no secret amongst all the London directors of MSIL or the auditors. It seems to me improbable that Bernard Madoff would have expected to keep the payments and their funding secret from his sons when they were such a large part of either side of the profit and loss account of MSIL. After all he made his sons directors of MSIL and knew they were playing an active part in its governance.

(8)   If either of Andrew or Mark Madoff became aware of the MSIL Kohn Payments each would have told the other. They spent their entire working life together at BLMIS and saw each other most days. The payments were substantial and beyond MSIL's resources without funding (which Andrew Madoff was told by his father came from the latter's personal wealth). The payments would very likely have given rise to comment and discussion between the brothers.

249.   I find therefore that each of Andrew and Mark Madoff were aware of the payments and their funding from at least mid 2000 onwards.

250.   Did the brothers think that the payments were in the best interests of MSIL? The Claimant submitted that the logical inference was that they did not, else there would have been evidence put forward saying so. The alternative explanation, which I find more probable, is that they did not specifically address their minds to the question, knowing that the payments were essentially cash neutral for MSIL and that the expense was that of their father or BLMIS. My assessment is that Andrew Madoff has sought to distance himself and his brother from the payments as a defensive tactic, not only for the purpose of these proceedings but in the light of civil claims brought against them in the US. I do not draw the inference that he has done so because he or his brother believed at the time that the payments were not in MSIL's interests.

251.   I have not overlooked the assertion in paragraph 57 of Andrew Madoff's witness statement that Bernard Madoff hid the payments and funding from them because "he was aware that if [they] knew about these payments [they] would object to them". The assertion that Bernard Madoff was aware that they would have objected to the payments was put forward as an explanation for the brothers' ignorance of the payments, which I have rejected. Moreover it is an explanation put forward with the benefit of hindsight as an assessment of Bernard Madoff's state of mind, rather than an assertion that Bernard Madoff's perception was correct and that they would in fact have objected. But in any event, it would be wrong to equate an objection to the payments with a belief that they were not in MSIL's interests. Objection would have

been equally consistent with a belief that they were not in the interests of BLMIS or Bernard Madoff as the party on whom the brothers knew the expense was falling, and consistent with their having taken no specific view as to MSIL's independent interests.  I conclude that they, like Mr Toop, reasonably assumed that there was nothing wrong with MSIL making the payments, but did not address their mind to the specific question whether or how they conferred any benefit on MSIL as opposed to BLMIS.

252.  The question therefore arises whether an honest and intelligent man in the position of each brother could reasonably have believed that the payments were in the interests of the company.  The answer is that he could, for the following reasons:

(1) The fact that the payments cost MSIL nothing in commercial terms and involved no significant foreseeable risk, means that the perceived value of the benefit to MSIL need only have been relatively slight for the brothers to hold the honest perception that they were in MSIL's interests.

(2) Provided the company was solvent, and not doing anything contrary to the Companies Acts, or otherwise unlawful, as was the apparent position at the time, a director who honestly believed that a payment was in accordance with the wishes of Bernard Madoff could treat that alone as a reason for believing the payment was in the interests of MSIL.

(3) The brothers held Bernard Madoff in the high respect which the latter's record, reputation and position as paterfamilias commanded.  If Bernard Madoff, as the chairman and effectively sole owner of MSIL, regarded the research as being of value, they would ultimately have deferred to his view even had they raised objections.  That would not be a dereliction of the duty to exercise independent judgment, but a legitimate recognition that Bernard Madoff's position equipped him to know what was best for the company, and put him in a better position to make that judgment than the brothers.

(4) There was no secrecy about the payments within MSIL.  So far as the brothers were aware, the payments were openly recorded in the books and their accounting treatment was sanctioned by the audit team from KPMG.  They would have presumed that all the London directors were aware of them.  None of their fellow directors and no one in the compliance department expressed the view to them at any time that the payments were improper, illegitimate or other than in the best interests of MSIL.  The brothers were entitled to look to the English directors, MSIL's compliance personnel, and MSIL's auditors, all operating in London, to alert them to any impropriety in an English company being used as the conduit for the payments.  They were entitled to defer to the views of their fellow directors in this respect.

(5) The services provided by Mrs Kohn could honestly and reasonably be perceived as of benefit to MSIL in a number of ways:

(a) Mrs Kohn was introducing Bernard Madoff to leading figures in the European financial services industry.  There was some intangible benefit to MSIL, the company which bore his name, from this PR activity.

(b) Bernard Madoff wanted to grow the London business, as he explained to the London directors at a dinner on 4 October 1993, by raising its profile in the media and with contacts.  A market making business needs clients so that any introductions capable of leading to potential new clients would be of benefit.

(c) The written research was of value to MSIL.  On a conventional basis the value of the research which was relevant to MSIL's day to day trading activity in Phase 4 is to be measured in thousands to low tens of thousands of dollars per annum. The value of the research for management decision making at a more strategic level was real but immeasurable.

(d) The New York and London businesses were closely intertwined.  A benefit received only in New York could honestly and reasonably be perceived as being of indirect benefit to MSIL in London.

253.    I therefore conclude that neither Andrew nor Mark Madoff was in breach of his duty to act in what he considered in good faith to be the interests of MSIL.

*Exercising powers for the purposes for which they are conferred*

254.    Applying the four stage test:

(1) In this case the relevant power being exercised was the power to apply the company's property to fulfil its contractual obligations.  It is important to keep in mind that the conduct which is said to constitute the relevant breach of duty is the making or permitting of the payments.  It is not causing MSIL to enter into the contract with the Kohn entities, which none of the Defendant directors did.

(2) The purpose for which the power was conferred was the fulfilment of the company's contractual obligations.

(3) The purpose for which the power was exercised was the fulfilment of MSIL's contractual obligations to make the payments.

(4) Accordingly there was no exercise of a power for a purpose other than that for which it was conferred.

*Unlawful distribution of capital*

255.    The Claimant contended that the payments were for no value, or no significant value, to MSIL and were in substance part of a transaction in which the benefit was conferred on Bernard Madoff because the payments were in return for introductions to his investment advisory business.  Insofar as that was a benefit to the business of BLMIS, it was a benefit to Bernard Madoff personally as its proprietor, both when unincorporated and when subsequently incorporated with him as its sole shareholder. Mr Clarke submitted that it was not open to the Claimant to rely on Bernard Madoff's status as the shareholder of BLMIS after its incorporation for these purposes because although the pleaded case was wide enough to encompass such an allegation, the argument advanced at the time of seeking permission to amend from Field J was that

the services were for the benefit of Bernard Madoff personally rather than BLMIS. The transcript of the hearing before Field J does not, in my view, support such a submission. The point is open to the Claimant.

256.   The Defendants contended that the short answer to this allegation was that the payments were in fulfilment of contractual obligations of MSIL; as such they were to a third party and in discharge of contractual obligations owed by MSIL, not Bernard Madoff or BLMIS. In my judgment this does not take sufficient account of the need to examine the substance of the transaction. The relevant inquiry is to identify whether the transaction was one in which, viewed through the prism of the knowledge and intentions of the protagonists at the time, the payments were made to confer a substantial benefit on Bernard Madoff; if contracting in the name of MSIL was merely part of the transactional structure and the benefit was intended to be conferred not on MSIL but on Bernard Madoff, the use of MSIL as the contracting party would be merely a matter of form rather than substance.

257.   If one ignores the funding of the payments, there is considerable force in the Claimant's submission that the substance of the arrangement was one in which there was payment by MSIL for what were substantially, although not exclusively, benefits to BLMIS rather than MSIL; and that such benefits were for MSIL's shareholder, Bernard Madoff as proprietor of BLMIS. Where a company makes payments to discharge a liability which is in form that of the company but in substance a contractual obligation to pay for benefits to be received not by the company but by the shareholder, that may readily be treated as a distribution to the shareholder.

258.   But one cannot ignore the funding of the payments by BLMIS. To my mind such funding is fatal to this aspect of the Claimant's case for two reasons.

259.   If the matter is looked at as one of substance, rather than form, the relevant transaction is not merely the payment out by MSIL in each case. The relevant transaction is a payment which was matched by a donation of capital by BLMIS. It was either specifically funded in advance for that purpose; or it was funded in advance by a generic expenses payment which was intended to be sufficient so as to be used in part for that purpose; or it was funded by reimbursement in circumstances where there was a reasonable and legitimate expectation, always fulfilled, that such reimbursement would occur. Even if one assumes for these purposes that the services for which the payments were made conferred no benefit on MSIL, and that the beneficiary of the services for which payment was being made was solely BLMIS, and therefore indirectly Bernard Madoff as its proprietor, the payments were reasonably expected to be, and were in fact, cash neutral for MSIL because BLMIS was funding them. Even on the Claimant's case, the payments by MSIL were not to confer any net economic benefit on BLMIS or Bernard Madoff personally, because it was an integral part of the arrangements, at least as understood by Bernard Madoff and the London directors, that the payments had been or would be matched by funds from BLMIS. If the payments to Mrs Kohn's recipient companies are to be regarded as for Bernard Madoff's personal benefit by virtue of being paid for benefits enjoyed by BLMIS of which he was proprietor (in its unincorporated and incorporated form), in my view the funding is equally to be regarded as made by him in the same capacity. In substance there was no distribution of anything from MSIL in the direction of Bernard Madoff or BLMIS, and there was never expected or intended to be by any director or shareholder of MSIL.

260.    If Company A wishes to pay for services it is to receive from a third party by donating
capital to its wholly owned subsidiary, Company B to pay the third party for the
services, can it really be said that the substance of the transaction when Company B
pays the third party for the services is that Company B is distributing capital to its
shareholder, Company A?  Where there is such funding in advance for this purpose,
this seems to me unarguable (I say nothing about cases where the funding is not by
donation of capital but is by way of loan where Company B assumes a concomitant
liability to repay Company A).    Where there is an arrangement for subsequent
reimbursement, rather than prior funding, the position may not always be so clear.  I
would readily accept that there may be cases in which a mere hope or expectation of
subsequent reimbursement would not prevent a payment being an unlawful
distribution at the time it was made; it may be a distribution of capital with the
company assuming a risk of the hoped for reimbursement not materialising.  All will
depend upon the facts of each case.  But so far as this case is concerned, the fact that
some part of the funding was by way of reimbursement is not sufficient to make the
prior payment a distribution of capital because:

   (1)   The Claimant has not sought to identify or quantify what payments fall into
this category of subsequent reimbursement rather than prior funding; they have
therefore failed to establish any payment as having been the subject of
subsequent reimbursement.  This may be because any such payment might not
in any event qualify as a distribution of capital: if there was no need for prior
funding it may have been because MSIL was able to make the payment out of
distributable profits.

   (2)   By the time payments started to be made without prior funding, there was an
established track record of BLMIS funding the payments and an understanding
that BLMIS would continue to do so.  It was unthinkable to all involved that
Bernard Madoff would leave MSIL out of pocket for these large payments so
as to risk the solvency and reputation of the company bearing his name, and he
never did so.  The arrangement between the parties would have given rise at
the least to a confident expectation of subsequent reimbursement, reasonably
held and always fulfilled; it would probably have amounted to a contractual
commitment.    In the circumstances of this case I would treat such an
arrangement for reimbursement as sufficient to prevent the benefits of the
services for which payments were being made as being distributions to
Bernard Madoff.

261.    The second reason why in my judgment the funding is fatal to this aspect of MSIL's
case is that once it is taken into account, it is legitimate to treat the funded discharge
of MSIL's contractual liability as being in substance, as well as form, for a
concomitant benefit conferred on MSIL.  There was some benefit to MSIL in the
services for which the payments were being made.  It does not need to have been very
great when the substance of the arrangement was that the payments would cost MSIL
nothing.

262.    I have not overlooked MSIL's case that funding by BLMIS came from stolen monies
so as to give rise to an immediate right in BLMIS to repayment from MSIL, with the
result that the funding was ineffective and should be ignored.  However this involves
invoking an illegitimate element of hindsight into the characterisation of the
transaction.  The transaction falls to be characterised by reference to the knowledge

and intentions of the protagonists at the time. Neither Bernard Madoff nor the London directors knew or intended that the funding should be repayable. Moreover I reject the argument that the funding falls to be repaid to BLMIS for the reasons explained below when addressing the *Duomatic* defence.

*Failure to exercise reasonable skill and care*

263.    In the case of Mr Raven and Mr Flax I have concluded that they honestly believed that the payments were in the interests of MSIL. Their belief was reasonable for the reasons explained above. There was no failure to exercise reasonable skill and care in relation to the payments or their funding.

264.    In the case of Mr Toop and the Madoff brothers I have concluded that they failed to address their minds to the question whether the payments were in the interests of MSIL. This was a breach of their duty to exercise reasonable skill and care.

**(10) MSIL Kohn payments: the directors' *Duomatic* defence**

265.    The Defendant directors relied upon what is commonly known as the ***Duomatic*** principle, which takes its name from the decision in ***In re Duomatic Ltd*** [1969] 2 Ch 365. In that case Buckley J said at 373:

> "where it can be shown that all shareholders who have a right to attend and vote at a general meeting of the company assent to some matter which a general meeting of the company could carry into effect, that assent is as binding as a resolution in general meeting would be."

266.    Neuberger J summarised the principle in the following terms in ***EIC Services Ltd v Phipps*** [2003] 1 WLR 2360 at [122]:

> "The essence of the ***Duomatic*** principle, as I see it, is that, where the articles of a company require a course to be approved by a group of shareholders at a general meeting, that requirement can be avoided if all members of the group, being aware of the relevant facts, either give their approval to that course, or so conduct themselves as to make it inequitable for them to deny that they have given their approval. Whether the approval is given in advance or after the event, whether it is characterised as agreement, ratification, waiver, or estoppel, and whether members of the group give their consent in different ways at different times, does not matter."

267.    As Lawton LJ explained in ***Multinational Gas v Multinational Services*** [1983] Ch 258, 269E, where such approval is given to acts of a director, the approval precludes the company asserting any liability against the director because the adoption of the director's acts by the shareholders in agreement with each other makes the director's acts the acts of the company itself.

268.    It follows that the ***Duomatic*** principle does not permit shareholders to do informally what they could not have done formally by way of written resolution or at a meeting:

*Re New Cedos Engineering Co Ltd* [1994] 1 BCLC 797, 814g-h; *Atlas Wright (Europe) Ltd v Wright* [1999] BCC 163, 174G-H. Accordingly the principle can not apply to relieve the directors of liability in respect of transactions which are ultra vires in either the narrow or the wider sense in which the expression is used (see *Rolled Steel* [1986] Ch 246 at 276-278, 302-3). Therefore this defence would not be capable of applying to breaches which amounted to unlawful payment of dividends (see *Aveling Barford* at 630-631, 632; *Secretary of State for Business Innovation and Skills v Doffman* [2011] 2 BCLC 541 at [41]). Nor can it provide a defence where there has been the exercise of powers for an improper purpose: *Rolled Steel* at 277C. In each case the shareholders in general meeting could not lawfully do that which they have approved the directors in doing. In the current case the principle would therefore only be of potential application to breaches by the directors of their duty to act in what they considered to be the interests of the company, or their duty to exercise reasonable care skill and diligence.

269.   The Claimant's first riposte is that there was no unanimous shareholder approval because at all material times one voting share was held by Peter Madoff and he neither knew of the payments nor approved them. The Claimant had sued Peter Madoff as the Sixth Defendant, and until reamendment of its Particulars of Claim on 7 May 2013, a little over a month before trial, it was the Claimant's pleaded case that Peter Madoff did know of the MSIL Kohn Payments. But having discontinued against him on 2 April 2013, the Claimant put in evidence a brief witness statement from him in which he denied any knowledge of the payments. He was unavailable to attend the hearing but arrangements were made for him to be cross examined by videolink from the penitentiary in the United States where he is serving his 10 year prison sentence. He chose to invoke the Fifth Amendment in response to almost every question asked, even where inappropriate, such that he simply refused to allow any investigation and testing of his evidence by cross examination.

270.   None of the other Defendant directors who gave evidence to me sought to suggest that they had had any conversation with Peter Madoff from which it was apparent that he knew of the payments (another indication of their integrity since such a conversation could easily and plausibly have been invented in support of their case). Nevertheless I have little hesitation in concluding that he was aware of the payments and approved them for the following reasons:

(1)   Mr Flax sent a memorandum to Bernard Madoff and Peter Madoff on 17 December 1993 which included the following: "I expect a bill from Erko for the 4th quarter. It usually arrives after the month-end, and I normally accrue the amount due and the fees receivable to cover it".

(2)   Mr Flax sent a memorandum to Bernard Madoff and Peter Madoff on 18 January 1994 which referred to an amount due to Erko of $51,650 having been accrued in the accounts.

(3)   The memorandum attached a spreadsheet detailing the remittances from BLMIS to MSIL in 1993. The spreadsheet expressly referred in four separate places to Erko payments or Erko funding.

(4)   Peter Madoff participated in arrangements for meetings with Mrs Kohn or those whom she introduced.

(5) Peter Madoff headed BLMIS' proprietary trading and market making business and must have been a capable and sophisticated financial operator. He was a director of MSIL throughout the relevant period, from 16 March 1983, shortly after its incorporation, until December 2008. He participated in board meetings by phone or video conferencing, or occasionally in person. He became an internal auditor of MSIL in around 2006. It would have been apparent to him from the annual accounts that there were considerable administrative expenses in the profit and loss account total which were not explained in the notes, of which a major element was commonly the MSIL Kohn Payments. He is likely to have taken an interest in the profitability of MSIL, and any interest in the profitability of MSIL is likely to have involved understanding the MSIL Kohn Payments and their funding as an element on each side of the profit and loss account.

(6) As I have concluded above, the payments were known to Andrew and Mark Madoff who reported to him at BLMIS. I can see no reason, and none was advanced, as to why they should have concealed them from their uncle and boss. The size of the payments made them a likely topic of conversation for the three men who were actively involved in the governance of MSIL.

(7) Mr Raven's evidence was that he would have been surprised if Bernard Madoff had not discussed the payments and their funding with his brother. I can see no reason for him not doing so. It seems to me improbable that Bernard Madoff would have expected to keep the payments and their funding secret from his brother when they were such a large part of either side of the profit and loss account of MSIL and were no secret in London.

(8) There is nothing to suggest that Peter Madoff objected to the payments or their funding. If, as I conclude, he was aware of the MSIL Kohn payments from an early stage, it is readily to be inferred that he approved them.

271. The Claimant's second riposte is that the *Duomatic* principle is inapplicable because at all times MSIL was insolvent or of doubtful solvency. In such circumstances the principle has no application because the interests of creditors "intrude" such that unanimous shareholder approval is no longer sufficient; it is in a practical sense the creditors' assets and not the shareholders' assets which, through the medium of the company, are under the management of the directors, and the interests of the company are in reality the interests of existing creditors alone: see *Brady v Brady* (1987) 3 BCC 535, 552 per Nourse LJ; *West Mercia Safetywear Ltd v Dodd* (1988) 4 BCC 30, 33 per Dillon LJ, approving a dictum of Street CJ in *Kinsela v Russell Kinsela Pty Ltd* [1986] 4 NSWLR 722, 730; *Facia Footwear v Hinchcliffe* [1998] 1 BCLC. 218, 228b per Sir Richard Scott V-C; *Re MDA Investment Management Ltd* [2004] 1 BCLC 217, per Park J at [70]; *Ultraframe Ltd v Fielding* [2005] EWHC 1638 (Ch), at [1304] per Lewison J.

272. On behalf of Andrew and Mark Madoff it was contended that the *Duomatic* principle remained applicable if the directors honestly and reasonably believed the company to be solvent, notwithstanding that with the benefit of hindsight it could be shown to be insolvent or of doubtful solvency. I was not attracted to this submission. I am inclined to think that what matters is the solvency of the company objectively ascertained, an approach supported by principle and the authority of *Lexi v Luqman*

*(No 1)* [2007] EWHC 2652 (Ch) and ***Tradepower (Holdings) Ltd v Tradepower (Hong Kong) Ltd*** [2010] 1 HKC 380, a decision of the Hong Kong Court of Final Appeal of which Lord Walker of Gestingthorpe was a member. However since the point does not arise for decision I would prefer to express no concluded view upon it. As a matter of fact, all the directors did at all material times reasonably believe that MSIL was solvent.

273.    The Claimant's allegation of insolvency proceeded in three stages:

(1) All, or almost all, the payments from BLMIS to MSIL were derived from money stolen by Bernard Madoff from customers as part of his Ponzi scheme.

(2) They were for that reason immediately repayable by MSIL to BLMIS from the moment of receipt.

(3) If the payments from BLMIS were at all times repayable to BLMIS, MSIL was at all times balance sheet insolvent, and unable to pay its debts (including the obligation to repay BLMIS) when they fell due.

274.    MSIL's records evidence 264 payments by BLMIS to MSIL over the relevant period, totalling a little over US$607 million. The major categories making up this total were:

(1) "fees receivable" (which in Phase 3 included the trading profits on the Q accounts);

(2) payments made to MSIL by way of the subordinated loans in 2000 and 2001 of US$62.5 million;

(3) cash payments purporting to be proceeds of T-Bill trading carried out by BLMIS on behalf of MSIL between 2005 and 2008, totalling about US$330 million.

(4) injections of capital of about US$200 million, including US$100 million on 26 June 2007 (which includes the US$62.5 million of loans converted to share capital on that date plus a further capital injection of US$37.5 million).

275.    It is convenient to start with stage three of the Claimant's argument, because apart from the allegation that the BLMIS payments were repayable, there is no doubt that the company was not merely solvent but sufficiently highly capitalised that a large proportion of the payments needs to be attributable to stolen funds for the argument to be engaged. Exactly how much was addressed in the evidence of Mr Wreford who was asked to assume that all payments received by BLMIS were immediately repayable, alternatively that all those other than the return of profits on the Q accounts were immediately repayable.

276.    This analysis revealed that the net asset shortfall (i.e. balance sheet insolvency) on this hypothesis was as follows (note these figures are in £ Sterling):

(1) If the Q account profits fall to be treated as legitimate payments which are not refundable:

(a) The net asset shortfall between 1992 and 1999 varied between about £1 million and £4 million;

(b) In 2000 and 2001 it was less than £1 million;

(c) From 2002 to 2004 it was less than £5 million;

(d) From 2005 it sunk to a maximum of a little over £10 million before becoming about £8 million.

(2) If the Q account profits fall to be treated as illegitimate payments which are refundable:

(a) The net asset shortfall between 1992 and 2004 deteriorated year on year in most years from about £3 million to about £20 million;

(b) In 2005 it sunk to a maximum of about £28 million before returning to about £23 million.

277. As to the first stage of the argument, Ms Collura, a forensic consultant, conducted an exercise to identify the source of these payments, which from the records of BLMIS totalled about US$609.2 million. Her evidence was that of the US$609.2 million:

(1) About US$516.5 million came directly from the 703 account and two other accounts which were in turn wholly funded by the 703 account. An analysis of the activity into and out of the 703 account between December 1998 and December 2008 (no bank records were available for the earlier period) revealed inflows of approximately US$120 billion into that account, of which Ms Collura said in her witness statement approximately 97% related to BLMIS investment advisory business customer deposits. In her evidence she corrected that to say that approximately 97% of the payments into the 703 account were *directly* from such customer deposits; and that the majority of the c. 3% balance was also *indirectly* derived from such deposits because it represented income from investments of funds in the account which had themselves derived from the customer deposits. She quantified such income as "the majority, you know, 99% of the other inflows" (i.e. of the approximately 3% balance). These were clearly not exact calculations which she had done. If the 99% and 97% figures are used, this would leave some US$36 million of the 703 account funds as representing monies not emanating from customer deposits (1% x 3% x US$120 billion). She made clear that she was not suggesting that the 703 account received no funds other than those emanating directly or indirectly from customer deposits.

(2) Some US$35 million came from six bank accounts used by the BLMIS proprietary trading business. Between December 1998 and December 2008 these accounts in turn had received some US$815 million directly or indirectly from investment advisory business customer deposit accounts. The proprietary trading business and market making business had also, of course, made trading profits. The gross inflows into the main account at Bank of New York (the 621 account) were approximately US$21.6 billion, the net inflows being approximately US$1.6 billion after netting outflows such as trading

related transactions.  Accordingly the source of the US$35 million could not
be attributed simply to monies derived from the Ponzi scheme.

(3) Approximately US$57.6 million came from four accounts which Ms Collura
categorised as "BLMIS/Madoff personal accounts".  Three of these, in
Bernard Madoff's personal name, were wholly funded from investment
advisory business customer deposit accounts.  The other, in the name of
BLMIS, was an account at Bear Stearns which Ms Collura described as
"primarily funded" from investment advisory business customer deposit
accounts.  She described these four accounts as having received "billions of
dollars" from the investment advisory business customer deposit accounts but
did not attempt to quantify what element of the Bear Stearns account was
funded otherwise.

278.    Ms Collura had been working full time on the investigation of BLMIS' records for the
purposes of the liquidation for almost five years, as part of a team varying in number
between 20 and 50.  As a result she was as well placed as anyone to address the
source within BLMIS of the payments to MSIL.  But even with such advantages,
there was a good deal of uncertainty and imprecision as to the extent to which funds
received by MSIL could be traced to customer deposits in the investment advisory
business.  On the whole, the analysis was presented by reference to totals and sub
totals rather than as a tracing exercise for each individual BLMIS/MSIL payment.
There was no attempt to plot the position temporally to fit with the net asset shortfall
identified by Mr Wreford from time to time.  This may have been due to some extent
to the extensive intermingling of funds in numerous bank accounts, the sheer volume
of the transactions within BLMIS and of the 264 payments by BLMIS to MSIL, and
the length of time over which the transactions occurred, quite apart from the absence
of some bank records.  But it was clear that the forensic analysis undertaken by the
investigatory team over 5 years had been very detailed indeed.  I infer that if the
MSIL payments could have been traced any more securely to the stolen monies, Ms
Collura would have done so.

279.    In these circumstances I am satisfied that at least US$71 million (the total of US$36m
in (1) and US$35m in (2) above), and quite possibly considerably more, of the
payments which went from BLMIS to MSIL can not be traced back even indirectly to
customer deposits in the BLMIS investment advisory business and therefore treated as
stolen monies.  This is greater than the greatest net asset shortfall identified by Mr
Wreford at any stage, even assuming that the Q account profits would fall to be
repaid.  Even assuming that the Claimant is correct in its contention at stage two that
any sums derived from the fraudulent Ponzi scheme were immediately repayable to
BLMIS or Bernard Madoff, these figures suggest that at no time was MSIL insolvent.

280.    In fact in order for the insolvency argument to be engaged, it would have required all
but a few million pounds of the funding to be shown to be derived from the fraudulent
investment advisory business (which a fortiori was not the case); and on any view
there was no insolvency after 2005 whatever the source of payments to MSIL by
BLMIS.  This is because:

(1) The Q account profits were earned by MSIL by its agency trading and the
payment of those profits by BLMIS from tainted funds, unknown to MSIL,
would not render them repayable.  They were paid for good consideration.  On

this basis the net asset shortfall was less than £5 million for all years until 2005.

(2) A large part of the payments said to be repayable from 2005 comprise the US$330 million or so receipts from the Treasury Bill trading in 2005 to 2008. These were, so far as MSIL was concerned, arms length transactions with BLMIS under which trading profits were earned. Unknown to MSIL (other than Bernard Madoff), BLMIS had not in fact purchased the T Bills which it purported to have purchased and for which it was paid by MSIL. But that would not render the receipts refundable, even had they been funded in full from proceeds of the Ponzi scheme. Moreover the Claimant's inclusion of some US$330 million for these payments ignores the fact that MSIL paid to BLMIS some US$487.7 million for the purported purchase of the T Bills. If the transactions are to be treated as void, BLMIS would have to give credit for the US$487.7 million.

281. I have been able to reach these conclusions, despite the inherent difficulties in the forensic evidence, without resort to the burden of proof. But had I had to do so, I would have held that the burden was one which the Claimant had failed to discharge. The legal burden of proving solvency generally lies on the party invoking the *Duomatic* principle: see *Lexi v Luqman (No 1)* [2007] EWHC 2652 (Ch) per Briggs J at [193]. But the evidential burden falls on the Claimant in this case to establish the matters it relies upon as demonstrating insolvency. That is so for several reasons. According to its accounts and records, MSIL was solvent, and indeed highly capitalised. It was only insolvent if it owed debts to BLMIS which at the time BLMIS never asserted. Since the Claimant asserts the existence of such debts, it is for the Claimant to prove that which it asserts. Moreover the burden of proving that the funding came from stolen monies would have fallen on BLMIS in any claim against MSIL it would notionally have made for repayment of funding; equally it must fall on MSIL vis a vis the directors if MSIL seeks to establish that liability. If the Court were left in doubt as to whether the payments were funded from stolen monies, it could not conclude that BLMIS would have had a claim that the funding was repayable and accordingly there would be no basis for finding insolvency. Thirdly, in reality it was only the Claimant who had the material and resources to make such an analysis of the source of funding. It was in a position to do so because it had the assistance of the SIPA Trustee of BLMIS, for whose benefit these proceedings are being brought, and because part at least of such an analysis was being conducted for the purposes of the liquidations. The enormous volume of material from BLMIS' accounts and records was not available for scrutiny or analysis by the Defendants, for whom the cost of analysis would not in any event have been proportionate.

282. Moreover, I would in any event reject the Claimant's insolvency argument at stage two also. The Claimant argued that MSIL was under a restitutionary obligation to return stolen monies either at common law as money had and received, or in equivalent circumstances in equity, relying on *Barros Mattos Junior v MacDaniels Ltd* [2004] EWHC 1188 (Ch), [2005] 1 WLR 247, at [15] per Laddie J; *Banque Belge v Hambrouck* [1921] 1 KB 321, 355-356 per Atkin LJ; *Lipkin Gorman v Karpnale Ltd* [1991] 2 AC 548 at 566E and at 565H-566A per Lord Templeman. MSIL would have a defence of change of position, however, by reason of its use of

the funds for MSIL's business. This would be unaffected by any knowledge on the part of Bernard Madoff that the funds were stolen. The relevant persons whose state of mind is here relevant are those responsible for changing MSIL's position, namely the innocent directors in London causing MSIL to make the payments. I also have some doubt whether the sums could in any event be repayable to BLMIS, rather than those from whom they had been stolen, although that would not be fatal to the insolvency issue, which depends upon there being an obligation for their repayment irrespective of the person or entity to whom it was owed.

283. The Claimant had an alternative argument. It was that even if MSIL was not balance sheet insolvent at any time, nevertheless MSIL was dependent on BLMIS for funding, such funding was dependent on the continuation of the Ponzi scheme, and a business which is dependent for its survival on stolen money is obviously in a state of grave financial peril. I am unpersuaded that this would take MSIL outside the scope of the *Duomatic* principle. If MSIL had been denied funding by BLMIS, it would have ceased trading, save perhaps towards the very end of its history; but it would not have been insolvent. Upon such cessation it would have been able to pay its debts in full in any liquidation. A risk of ceasing to trade and going into solvent liquidation is not to be equated with insolvency. A subsidiary is not to be regarded as insolvent merely because its future activity depends upon the support of its parent. It is irrelevant for these purposes whether the risk of funding drying up arises from the whim of the funder or circumstances which would preclude its ability to continue the funding. What matters for the *Duomatic* principle is the current and foreseeable solvency of the company, for it is only if such solvency is doubtful that the interests of creditors intrude.

284. The Claimant's final riposte to the Defendants' reliance on the *Duomatic* principle was that in order for shareholders to be able to ratify a transaction, the transaction must be bona fide or honest, relying on the dictum of Sir Andrew Morritt C. in *Re Bowthorpe Holdings Ltd* [2003] 1 BCLC 226 at [50] and the authorities there cited. It was contended that the Defendants cannot satisfy that requirement in this case because (a) the directors' own acts were dishonest and (b) Bernard Madoff was involved in a fraud and not acting bona fide: he consented to the application of MSIL's corporate property in making the payments in order to serve his own ends of covering up his fraud and laundering the proceeds of that fraud.

285. This argument needs to be unpicked to identify the legal and factual issues involved. I have found that none of the director Defendants was acting other than honestly and in good faith. The legal issue is therefore whether the *Duomatic* principle is inapplicable where the directors are acting honestly but the shareholders approve the transaction acting in bad faith, in this case for the dishonest purposes of furthering a fraud. The factual issues depend upon the state of mind and intentions of the voting shareholders. The bad faith and fraudulent purpose alleged against them in MSIL's opening and closing submissions, by reference to paragraph 68 of the Re-amended Particulars of Claim, is that Bernard Madoff was using MSIL as a vehicle for money laundering the proceeds of his fraudulent Ponzi Scheme. The allegation is not that Bernard Madoff was acting fraudulently or in bad faith because the services for which the payments were being made were to assist the success of his investment advisory business which was a fraud. It is that the payments themselves were approved as a mechanism for concealing the proceeds of the fraud. That seems to me to require the

Claimant to establish that the funding for the MSIL Kohn payments was traceable to the investment advisory business customer deposits; and that both Peter Madoff and Bernard Madoff knew or believed that to be the case. I was not referred to any evidence which established either of these aspects. As I have indicated when considering the solvency of MSIL by reference to the funding of all its payments, the source of the payment is not established as being the Ponzi scheme merely by establishing that it was made from the 703 account, or from the accounts categorised as BLMIS proprietary trading accounts. The untainted amount feeding the source accounts from which the funding of the payments came exceeds the total of all the MSIL Kohn Payments of some US$27m. Still less was there any evidence about Bernard Madoff's understanding of the source of funding. Moreover there was no evidence, or indeed allegation, that Peter Madoff was aware of the Ponzi scheme. This is to my mind fatal to this aspect of the Claimant's argument.

286.    It is therefore unnecessary for me to express a concluded view on the legal issue, and I would prefer not to do so in the light of the fact that the arguments were not fully developed.

287.    My conclusion, therefore, on the ***Duomatic*** issue is that, insofar as making or permitting the MSIL Kohn payments constituted a breach by the directors of a duty to act in what was perceived to be the interests of the company, or a failure to exercise reasonable care skill and diligence, the transactions were ratified by the unanimous approval of the voting shareholders. Such ratification makes such acts the acts of the company, of which it can make no complaint against the directors, and is a complete defence to such allegations of breach. This applies to the breaches by Mr Toop and the Madoff brothers in failing to address their minds to whether the payments were in the interests of MSIL.


**(11) MSIL Kohn payments: remedy/causation**

288.    Having found that the director Defendants were not in actionable breach of duty, the remaining issues of remedy and causation do not arise, but I should address the various arguments and record my relevant findings of fact.

289.    The directors accepted that if the Claimant made good its allegation that the payments were unlawful distributions of capital, the appropriate remedy would be restoration of the loss caused by the payments, but contended that for any other breach of duty the applicable remedy is compensation to the extent that the Claimant can show loss caused by the breach. This requires an investigation into the counterfactual hypothesis of what would have happened had the duty been fulfilled. On behalf of each director it was contended that had he declined to make or permit the payment, Bernard Madoff would simply have replaced him with a compliant director and the payments would have been made in any event.

290.    The Claimant contended that if it established a breach of any fiduciary duty by a director Defendant, the appropriate remedy was restoration of the trust (subject to relief from sanctions in an appropriate case), without inquiry into the counterfactual hypothesis of what would have happened if the duty had been fulfilled. This applied not only to unlawful payments of dividends but to any breach of fiduciary duty

resulting in misapplication of the company's property. On the Claimant's case, such counterfactual inquiry was only necessary for the purposes of its claim for breach of the duty to exercise reasonable care skill and diligence.

291. I accept the submissions of the Claimant as correctly stating the law where the breach comprises an act of misapplication, rather than an omission. It is well established that the directors of a company are in a similar position in respect of the company's property as trustees (see *JJ Harrison (Properties) Ltd v Harrison* [2002] BCC 729 per Chadwick LJ at [25]) and the basic remedy for a misapplication of company property in breach of fiduciary duty, as with trustees misapplying trust property, is restitution; the liability is not merely to compensate the company for the loss said to have been caused by the breach assessed on a tortious basis: see *Bishopsgate Investment Management Ltd (in liquidation) v Maxwell (No 2)* [1994] 1 WLR 261 per Hoffmann LJ at 265a-266a; *Bairstow v Queens Moat Houses Plc* [2002] BCC 91 per Robert Walker LJ at [49]-[54]; *Re Loquitur* [2003] STC 1394 per Etherton J at [135]-[137]; *In Re Paycheck Services 3* (sup) per Rimer LJ at [96]-[98] and Lord Hope at [46], [48], [49]. There is therefore no room for an inquiry as to whether the transfer would have been made but for the breach or what would have happened had the transfer not been made.

292. On the other hand where the breach which leads to the misapplication of company property comprises an omission, such as total inactivity, it is necessary for the company to establish what would have happened had the duty been complied with, and that but for the breach the transaction or loss would not have occurred: see *Bishopsgate v Maxwell (No 2)* (sup) at 264c-f; *Lexi Holdings Plc v Luqman No 2* [2008] 2 BCLC 725 per Briggs J at [28], [40] and [2009] BCC 716 per Sir Andrew Morritt C. at [18], [36], [38].

293. I have concluded that Mr Toop and the Madoff brothers were in breach of their duty to exercise reasonable skill and care by failing to address their minds to the question whether the payments were in the interests of MSIL. This was not causative of any loss. Had they done so they would have concluded that the payments were in the interests of MSIL, and the payments would still have been made.

294. As to the remaining factual issues, I would have found that, if the directors were under a duty not to make or permit the payments, such a breach by each director was causative of the payments being made. If any of the directors had made clear that he regarded it as improper to make or permit the payments, the probable outcome would have been a collective discussion and in the absence of agreement the taking of legal advice, the upshot of which (on the hypothesis now being considered) would have been that none of the directors should make or permit the payments. In those circumstances the directors would collectively have refused to make or permit the payments. If the directors had collectively refused to continue making the payments, it is likely that Bernard Madoff would not have insisted upon them being routed through MSIL and would have made them from BLMIS, as he did from mid 2007 when he was persuaded by Mr Raven to stop using MSIL. Mr Raven was able to persuade Bernard Madoff to stop using MSIL for the payments by relying on the introduction of MiFID. My assessment is that Bernard Madoff would equally have climbed down if faced with a collective revolt by the directors.

**(12) MSIL Kohn payments: the directors' no loss defence**

295. The directors rely upon the funding of the payments by BLMIS to argue that MSIL suffered no loss and that accordingly no sums were recoverable for any actionable breaches of duty established against them. To this the Claimant makes two responses.

296. The first response is that the payments were made from MSIL's own assets and the obligation of a delinquent director is to restore such assets so that any reimbursement or funding from BLMIS as a third party is irrelevant.

297. There were two aspects to this argument. One was that the issue of loss is *legally* irrelevant to the remedy for any breach of fiduciary duty resulting in misapplication of the company's property, which is restoration of the property, subject to relief from sanction. The Claimant relied upon the authorities to which I have referred in the context of causation, namely *Bairstow v Queens Moat Houses Plc* [2002] BCC 91 per Robert Walker LJ at [49]-[54]; *Re Loquitur* [2003] STC 1394 per Etherton J at [135]-[137]; *In Re Paycheck Services 3* (sup) per Rimer LJ at [96]-[98], Elias LJ at [124] – [125] and Lord Hope at [46], [48], [49]. But these do not seem to me to support the proposition here advanced, so as to require one to ignore any benefit which is received by the company from the very transaction which constitutes the breach. I address below whether the funding is to be treated as part of the same transaction or is collateral, but as I understood this aspect of the Claimant's argument it was that questions of loss were simply legally irrelevant and that there was an obligation on the delinquent director to pay back to the company the full amount paid away by the company, without further inquiry into the effect of the transaction. The other aspect of the argument was that the funding by BLMIS is *factually* irrelevant as collateral or subsequent to the breach.

298. I cannot accept either aspect of this argument. In the cases referred to, which were unlawful dividend cases, the Court was concerned to emphasise that the obligation of the director as quasi trustee is to restore the trust estate, so that issues of causation and remoteness which would apply to a tortious claim do not arise. There is therefore no room for an inquiry as to whether the distribution would have been made but for the breach or what would have happened had the distribution not been made. But they do not compel one to ignore the effect on the company of the transaction comprising the distribution itself. The measure of a trustee's liability to restore the trust estate is that which is necessary to put the trust estate in the same position as if there had been no breach. Other than in cases of restoration in specie, this involves restoring the value of the trust estate to the extent that it has been diminished by the breach: see *Lewin on Trusts* 18th edn. 39-09, 39-18 and *Target Holdings Ltd v Redferns* [1996] 1 AC 421, at 432E-H, 433G-H, 434D-G, 435B-C, 436C-D, 437D-E. This requires that there be taken into account the value of any benefit conferred on the trust estate by the transaction which gives rise to the breach. If a trustee applies trust moneys in the acquisition of an unauthorised investment, he is liable to restore to the trust the amount of the loss incurred on its realisation, not the price of the investment: see *In Re Duckwari (No 2)* [1999] Ch 253, 262; *Knott v. Cottee* (1852) 16 Beav 77. To require restoration of the full price of the investment, without crediting its value, would not be restoration of the trust estate but augmentation. Thus breaches of trust comprising unauthorised but profitable investments ("judicious" breaches of trust in the famous expression attributed to Selwyn LJ in *Perrins v Bellamy* [1899] 1 Ch 797, 798) give rise to no monetary liability because the benefit to the trust estate exceeds the loss. The principle does not generally apply to profit and loss which arises from

distinct breaches, but will do so where they can properly be characterised as part of the same transaction: see ***Bartlett v Barclays Trust Co (No 1)*** [1980] 1 Ch 515 per Brightman J at 538C-E.

299.    A similar principle applies in claims for damages in contract and tort, or for equitable compensation: a claimant cannot recover for avoided loss save where the benefit which diminishes or avoids the loss is collateral: ***British Westinghouse Co v Underground Railway*** [1912] AC 673; *McGregor on Damages* 18th Edn 7-097 to 7-167.  The benefit will not be treated as collateral if it is received as a result of the transaction giving rise to the loss: ***Smith New Court Securities v Citibank*** [1997] AC 254 per Lord Browne-Wilkinson at 266H.  The question is whether the breach which caused the loss also caused the benefit, in the sense that the benefit and the loss are part of a single continuous transaction, which is primarily a question of fact in each case: see ***Needler Financial Services v Taber*** [2002] Lloyd's Rep PN 32 per Sir Andrew Morritt V-C at [24] and ***Rubenstein v HSBC Bank Plc*** [2012] CLC 747 per Rix LJ at [133]-[136].

300.    There is nothing in the authorities upon which MSIL relied which compels a different approach to breaches of duty by a director which result in payment away of the company's assets, even in the case of unlawful dividends.  Restoration of the trust estate by a delinquent director should take account of the benefit received by the company from the unlawful transaction which gives rise to the distribution.  In the cases relied on there was none.  But the same may not always be true.  For example purchase of an asset at an overvalue from a shareholder is capable of being categorised as an unlawful dividend; the measure of the director's liability is the overvalue, not the full price paid for the asset which the company has acquired.

301.    In this case the funding of the MSIL Kohn Payments was not collateral.  When the funding took place in advance of the payment, the funding was for the specific purpose of the payment being made.  The payment would not have been made but for the funding, and the funding would not have been provided had the payment not been going to be made.  Funding and payment were clearly two aspects of a single transaction.  Where the funding came by way of subvention after the payment, the same is equally true.  One purpose of the subvention was specifically to make MSIL whole in respect of the payment, and its amount was determined by that which was necessary to render the transaction cash neutral for MSIL.

302.    The Claimant relied heavily on the decision of the Court of Appeal in ***VTB Capital plc v Nutritek International*** [2012] CLC 431.  In that case the claimant, VTB alleged that it had been induced to lend money to a defaulting debtor, RAP, by fraudulent misrepresentations for which the defendants were jointly liable.  VTB was the English subsidiary of a Russian state owned bank,  VTB Moscow, who had lent it the funds to enable it to make the loan to RAP.   It was accepted that the fraudulent misrepresentations gave rise to both the loan by VTB to RAP and the loan by VTB Moscow to VTB which funded it; and that VTB would not have been prepared to grant the loan to RAP had it not had a source of funds available to enable it to do so.  The Court considered and rejected an argument that the claimant had suffered no loss.  Because the issue arose on a jurisdiction challenge by the defendants, the threshold was no more than whether there was a serious issue that the claimant had suffered a loss, but Lloyd LJ, giving the judgment of the Court, expressed himself in language which determined the point.  At [110] he identified that the funds borrowed from the

VTB Moscow were, once received, the property of VTB that there was an immediate loss to VTB at the latest when it parted with that property by making the loan to RAP, albeit that the loss became crystallised later.  He went on to say:

> "111. Furthermore, we dismiss the argument that the judge erred in rejecting the submission that the funds that VTB received from VTB Moscow had to be taken into account. Those funds were not a 'benefit received as a result of the transaction' in Lord Browne-Wilkinson's words. They were not a 'benefit'; they were the source of the funding for the loan to RAP, rather than some additional benefit that resulted from the transaction overall and in consequence of the tort of the defendants. That is the type of 'benefit' which we think Lord Browne-Wilkinson had in mind. That analysis reflects what Viscount Haldane stated in *British Westinghouse v Underground Electric* [1912] AC 673 at 689, where he said:
>
> > "... when in the course of his business, he has taken action arising out of the transaction, which action has diminished his loss, the effect in the actual diminution of the loss he has suffered may be taken into account ... The subsequent transaction, if to be taken into account, must be one arising out of the consequences of the breach and in the ordinary course of business. This distinguishes such cases from a quite different class of case illustrated by *Bradburn* ... The reason of that decision was that it was not the accident, but a contract wholly independent of the relation between the plaintiff and the defendant which gave the plaintiff the advantage."
>
> 112. The fact that VTB would not have parted with the money in the first place without being put in funds by VTB Moscow is irrelevant. VTB Moscow's funding, under the separate and distinct Participation Agreement, was the source of VTB's loan to RAP, not the consequence. Moreover, money is not the same as a physical object, which, once lost, might only be the subject of one damages claim (although there can be successive claims in respect of the same object, e.g. in conversion). Logically, the fact that the ultimate source of the funds defrayed by VTB to RAP was another party cannot diminish VTB's loss. Otherwise, if Mr Lazarus' argument were correct, then it would equally follow that VTB would have suffered no loss if the source of the funds advanced to RAP was another, entirely unconnected, third party as opposed to VTB Moscow."

303.    In my judgment there is a critical distinction between the position of VTB and that of MSIL in the current case.  VTB's funding was by way of a loan under which it undertook a concomitant liability to repay VTB Moscow.  The relationship between them was not that of agency or trusteeship but one of debtor and creditor: see [110]. The funding was not therefore a benefit to VTB in the sense that it improved its

balance sheet. Its receipt of the proceeds of the loan as an asset was matched by a concomitant liability to repay the loan to VTB Moscow. What the Court was considering when addressing whether the funding was a relevant benefit was whether it qualified as such simply because as a matter of practicality it enabled VTB to enter into the transaction. That is quite different from the position where the funding is by way of donation, as was the case for the payments by BLMIS to MSIL. In such circumstances, MSIL received a real and immediate net asset benefit when it was put in funds by BLMIS to make the payments. The net asset benefit was matched by the loss suffered by the making of the payments to the Kohn entities, such that the overall result of both aspects of the transaction was asset neutral for MSIL. By contrast the overall result of the transaction for VTB was a loss, because it had lost the assets which it acquired from its parent but retained a liability to repay that funding.

304. The second response by the Claimant is that the funding did not prevent a loss to MSIL because the funds were immediately repayable to BLMIS at and from the moment they were received, as a result of what is now known to have been the Ponzi scheme fraud. I have rejected this argument when considering insolvency in relation to the ***Duomatic*** defence above.

305. Accordingly I conclude that the no loss defence succeeds in defeating the claim.

### (13) MSIL Kohn payments: the directors' ex turpi causa defence

306. The doctrine ex turpi causa non oritur actio is a rule of public policy which was explained by Lord Mansfield CJ in ***Holman v Johnson*** (1775) 1 Cowp 341 , 343 in the following terms:

> "No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causa, … there the court says he has no right to be assisted. It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff."

307. The Defendants' argument is that it is of the essence of MSIL's claim that in making the MSIL Kohn Payments, MSIL was being used by Bernard Madoff as a vehicle to perpetrate and conceal the fraud perpetrated by the Ponzi scheme and to launder the proceeds of such fraud. The Claimant's case was in this respect set out in paragraph 68 of the Reamended Particulars of Claim in the following terms:

> "In fact, while MSIL may have carried on certain legitimate trading activities, its primary function, as pleaded more particularly below, was to facilitate the concealment of Bernard Madoff's Ponzi scheme and the distribution of the fruits thereof to Bernard Madoff, his family and third parties, including in particular Sonja Kohn. MSIL was abused by Bernard Madoff: (i) as a cover for his fraud (Bernard Madoff would falsely represent that substantial volumes of investment activity were undertaken in London by MSIL on behalf of BLMIS, but none was); (ii) to launder money stolen from BLMIS's customers and

> return it to BLMIS's market-making and proprietary trading
> businesses, which were run by Mark and Andrew Madoff; and
> (iii) as a vehicle for making payments including the MSIL
> Kohn Payments, Interest Payments and Madoff Family
> Lifestyle Payments. The fact that MSIL was an apparently
> legitimate, FSA-regulated entity assisted Bernard Madoff's
> purposes, particularly the laundering of money."

308.   The Defendants must establish two elements. The first is that there is a sufficient
connection between the illegality and the Claimant's claim. The second is that the
unlawful conduct and state of mind of Bernard Madoff is to be attributed to MSIL so
as to make the fraudulent and unlawful purposes of Bernard Madoff, which are relied
upon as founding the illegality, those of MSIL itself.

*Connection*

309.   The modern authorities do not all speak with one voice on the nature and degree of
connection required between the illegality and the claim in order for the *ex turpi
causa* doctrine to be engaged. In *Tinsley v Milligan* [1994] 1 AC 340, the House of
Lords was unanimous in disapproving a "public conscience" test which had
previously held favour in a number of Court of Appeal decisions, but was divided
over the correct test. The majority held that the relevant test was whether the claimant
had to plead or rely upon his own illegality ("the reliance test"). The minority
favoured a broader test of whether the claim was tainted by illegality. Some
subsequent authority suggests that a more flexible approach applies at least outside
the context of property rights, and that the appropriate test is of a sufficient degree of
linkage (e.g. "inextricably linked") or of causation: see for example *Cross v Kirby*
[2000] All ER (D) 212 per Judge LJ at [103], *Gray v Thames Trains* [2009] 1 AC
1139 per Lord Hoffmann at [30]-[31] and [54]. But in *Stone & Rolls Ltd v Moore
Stephens* [2009] 1 AC 1391, the reliance test was reaffirmed expressly by Lord
Walker at [131], and implicitly by Lord Scott at [96] and [103], and perhaps also by
Lord Brown at [205] and Lord Mance at [208]). Only Lord Phillips at [21]-[25]
treated the reliance test as neither sufficient nor determinative. In the recent decision
of the Court of Appeal in *Jetivia SA and Urs Brunsweiler v Bilta (UK) Limited (in
liquidation)* [2013] EWCA Civ 968, Patten LJ, giving the judgment of the Court,
quoted from the speech of Lord Browne-Wilkinson in *Tinsley v Milligan* laying down
the reliance test and said at [18]:

> "It is clear from this passage that a distinction is being made
> between reliance on the illegal act as the basis of the cause of
> action and (as in *Tinsley v Milligan*) the enforcement of a
> property or other legal right which although historically the
> product of an illegal act or transaction, has an independent
> existence from it. Although there have been subsequent *dicta* in
> this court suggesting that some causal connection less than the
> reliance test is sufficient to engage the *ex turpi causa* rule (see
> e.g. *Cross v Kirby* [2000] CA Transcript No. 321 per Beldam
> LJ), the House of Lords has re-affirmed reliance as the correct
> test in *Stone & Rolls Ltd v Moore Stephens* [2009] 1 AC 1391
> (see Lord Walker of Gestingthorpe at [131], Lord Scott at [96]
> and Lord Mance at [208]) and neither party to this appeal has

suggested that it does not represent a correct statement of the
law."

310.    I propose to follow this clear statement of principle in a decision by which I am bound
and adopt the reliance test.

311.    Applying the reliance test, MSIL's claim is not founded on any illegality.  The claim
against the directors does not require MSIL to plead or prove any wrongdoing on the
part of Bernard Madoff.  The Ponzi scheme merely constitutes the occasion for the
claim, not the basis for it, nor an ingredient of it.

312.    The submission on behalf of the Madoff brothers, adopted by the other director
Defendants, was that it was critical to bear in mind that MSIL's case was that the
money which was paid out constituted the proceeds of the fraud.  But although this
was indeed one of MSIL's arguments advanced for the purposes of establishing
insolvency when seeking to meet the Defendants' reliance on the *Duomatic* principle,
it is not an allegation upon which MSIL has relied or needs to rely for the purposes of
advancing its claim against the Defendant directors.  Moreover and in any event I
have rejected it on the facts, having found that the funding of the payments can not be
traced to the customer deposits acquired in the fraud.

*Attribution*

313.    There is a general principle, often called the *Hampshire Land* principle, that in a claim
brought by a company for losses caused by a director's fraud or other unlawful
conduct, the law will not attribute to the company the fraud or other unlawful conduct
of the director when the company is itself the victim of that conduct:  *In re
Hampshire Land Co* [1896] 2 Ch 743; *Belmont Finance v Williams Furniture*
[1979] Ch 250, *Stone & Rolls Ltd v Moore Stephens* [2009] 1 AC 1391 at [137]-
[156].  *Stone & Rolls* is authority for the proposition that there is an exception to the
*Hampshire Land* principle, of uncertain ambit, in the case of a "one man company"
where the fraudster or fraudsters whose conduct or knowledge is sought to be
attributed to the company is or are the "sole actor" in the sense that there is no
separate constituency of directors or shareholders who are innocent of his/their fraud.
But even in the case of such a "sole actor", the *Hampshire Land* principle remains
applicable where the claim is against the delinquent directors or those associated with
their wrongdoing: see *Jetivia v Bilta* at [75] and [78]-[82] explaining *Stone & Rolls*.

314.    The director Defendants cannot bring themselves within the *Stone & Rolls* exception.
Although it is notoriously difficult to extract a ratio from the judgments in that case,
the decision does not itself support an exception to the *Hampshire Land* principle
outside the context of a "one man company" or a "sole actor", which formed a critical
part of the reasoning of Lord Walker and Lord Brown.  MSIL was not such a one man
company and Bernard Madoff was not such a sole actor.  MSIL had independent and
innocent shareholders at all times, being some or all of Peter, Andrew, Mark and Ruth
Madoff and Mr Konigsberg and Mr Cohn.  It had active independent directors.  None
of them were party to the fraud here relied on.

315.    The Defendants contended that they did not need to bring themselves within the sole
actor exception to the *Hampshire Land* principle.  They contended that the principle
was not engaged in the first place, because MSIL was not the victim of Bernard

Madoff's fraud but merely the vehicle or instrument through which the fraud was in part perpetrated or concealed. It was only a secondary victim in the sense that it suffered loss as a result of a fraud targeted at others, namely the victims of the Ponzi scheme. This reflects the language of the pleading which is in substance that that Bernard Madoff abused MSIL by using it as an instrument for his fraud.

316.   In *Stone & Rolls*, the Court of Appeal and two of the majority of the Supreme Court expressed the view that the status of the company as a secondary victim in that case, as opposed to the intended target of the fraud, did not prevent attribution, either because it did not trigger the *Hampshire Land* principle (Rimer LJ at [72]-[73], Lord Phillips at [55], Lord Walker at [172]), or because it did not prevent the sole actor exception applying (Lord Walker at [174]). Lord Brown at [198] left the position open. By contrast, Lord Mance at [230] to [234] treated the use of the company as a mere tool for the fraudulent scheme as sufficient to make it a victim so as to trigger the *Hampshire Land* principle.

317.   In *Jetivia v Bilta* the Court of Appeal treated the company as the intended victim of the fraud but held that if it were merely a secondary victim that would still be sufficient to trigger the *Hampshire Land* principle: see Patten LJ at [35], [75] and [77]. However the language of these passages, and of [42] and [52], emphasises that the company's status as secondary victim was sufficient to trigger the principle in that case because the defendants were seeking to attribute to the company the very wrong in which they were complicit, so as to prevent the company's claim to recover against them for such wrong. The *Hampshire Land* principle is identified and summarised in [42] in terms which treat the company as the victim *because* its claim is based on the unlawful conduct of the particular director which is the subject matter of the attribution question, the policy being to preclude that director, and those complicit with him in the fraud, from relying upon their own wrong. In this respect the fact that the auditors in *Stone & Rolls* were innocent of the fraud which was the conduct sought to be attributed to the company in that case, was treated as a crucial point of distinction, both in this context (see [52]) and in the context of the sole actor exception (see [81]).

318.   The balance of this authority suggests that the *Hampshire Land* principle is not triggered where the company is used as an instrument of a fraud targeted against a third party victim, resulting in loss to the company only as a secondary victim, in circumstances where the attribution is invoked by those not party to the relevant fraud. That would allow the attribution of Bernard Madoff's fraudulent knowledge and conduct to MSIL for the purposes of the *ex turpi causa* defence in the present case. The defence in the present case seeks to apply Bernard Madoff's knowledge and perpetration of the Ponzi scheme fraud to MSIL for the purposes of a claim which is made by MSIL not against him, but against the other directors, who were innocent of knowledge of the Ponzi scheme or participation in it. Their liability potentially arises irrespective of the Ponzi scheme.

319.   The *ex turpi* defence therefore fails solely on the ground that the reliance test is not met. Had it been, the defence would have succeeded on the issue of attribution.

**(14) MSIL Kohn payments: the directors' limitation defence**

320. In relation to breaches of contract and the duty to exercise reasonable skill and care, the limitation period is six years (Limitation Act 1980 ss. 2, 5, 36). In relation to directors' breaches of fiduciary duty the limitation period is governed by s. 21 of the Limitation Act 1980 so as to be the same as that for trustees (***Paragon Finance Plc. v D B Thakerar & Co*** [1999] 1 All ER 400, 415-6; ***Gwembe Valley Development Company Ltd v Koshy*** [2004] 1 BCLC 131 at [90]). It is six years unless the action is in respect of any fraud or fraudulent breach of trust. Section 21 provides in material part.

> "(1) No period of limitation prescribed by this Act shall apply to an action by a beneficiary under a trust, being an action—"
>
> > (a)      in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy; […]
>
> (3) Subject to the preceding provisions of this section, an action by a beneficiary to recover trust property or in respect of any breach of trust, not being an action for which a period of limitation is prescribed by any other provision of this Act, shall not be brought after the expiration of six years from the date on which the right of action accrued. […]

321. In each case the six year period is subject to extension where there is deliberate concealment of facts relevant to the Claimant's cause of action within the meaning of section 32 which provides in material part:

> "(1) …….where in the case of any action for which a period of limitation is prescribed by this Act, either—
>
> > (b) any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; […]
>
> the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it.'
>
> (2) 'For the purposes of subsection (1) above, deliberate commission of a breach of duty in circumstances in which it is unlikely to be discovered for some time amounts to deliberate concealment of the facts involved in that breach of duty.'

*Dishonesty*

322. On behalf of Mr Flax it was argued that s. 21(1)(a) could have no application because it is necessary to show that fraud is an essential ingredient in the cause of action; and that the breaches of duty alleged against Mr Flax are pursued on the basis that it is unnecessary to prove fraud in order to establish breach of fiduciary duty. Mr Clarke relied on ***Beaman v ARTS*** [1949] 1 KB 550, 557-8. That case is not directly in point; it was concerned with s. 26 (a) of the Limitation Act 1939 governing cases "based on fraud", now re-enacted in s. 32(1)(a) Limitation Act 1980, a provision upon which the

Claimant does not seek to rely. Nevertheless he is right to submit that to come within the disapplication of any limitation period provided for in s. 21(1)(a) the cause of action alleged must be for fraudulent breach of trust. Fraudulent or dishonest breach of fiduciary duty is a distinct cause of action from simple breach of fiduciary duty, and it requires dishonesty (in the sense described below) as a necessary element: *Paragon Finance plc v D B Thakerar & Co* [1999] 1 All ER 400, 406c-f. But the fallacy in the argument is that the Claimant alleges both causes of action. The claim is advanced as one for fraudulent breach of fiduciary duty, and is none the less so by reason of the fact that the Claimant's claim is also pursued in the alternative for simple breach of fiduciary duty without proof of dishonesty. The claim for breach of fiduciary duty without dishonesty does not mean that fraud is not a necessary ingredient of its separate cause of action for dishonest breach.

323.    The exception in s. 21(1)(a) only applies where the director's conduct is dishonest: *Armitage v Nurse* [1998] Ch 241, 260F-G. In this context, as Millett LJ explained at 251E-F, dishonesty:

> "connotes at the minimum an intention on the part of the trustee to pursue a particular course of action, either knowing that it is contrary to the interests of the beneficiaries or being recklessly indifferent whether it is contrary to their interests or not.
>
> It is the duty of a trustee to manage the trust property and deal with it in the interests of the beneficiaries. If he acts in a way which he does not honestly believe is in their interests then he is acting dishonestly. It does not matter whether he stands or thinks he stands to gain personally from his actions. A trustee who acts with the intention of benefitting persons who are not the objects of the trust is not the less dishonest because he does not intend to benefit himself."

324.    In *Fattal v Walbrook Trustees (Jersey) Ltd* [2010] EWHC 2767 (Ch) Lewison J said at [79] that he took this to mean "that in order to establish dishonesty it is necessary to show that a trustee deliberately committed a breach of trust which he did not honestly believe was in the interests of the beneficiaries". Drawing on the analysis of Rattee J and the Court of Appeal in *Walker v Stones* [2001] QB 902, he summarised the position as follows at [81]

> "……what is required to show dishonesty in the case of a professional trustee is:
>
> i) A deliberate breach of trust;
>
> ii) Committed by a professional trustee:
>
>> a) Who knows that the deliberate breach is contrary to the interests of the beneficiaries; or
>>
>> b) Who is recklessly indifferent whether the deliberate breach is contrary to their interests or not; or

c) Whose belief that the deliberate breach is not contrary to the interests of the beneficiaries is so unreasonable that, by any objective standard, no reasonable professional trustee could have thought that what he did or agreed to do was for the benefit of the beneficiaries.

325.   In these passages the reference to a "deliberate" breach of trust is a reference to the act or omission which constitutes the breach being a deliberate one.   It is not a requirement of deliberate breach in the sense of a conscious intention that the act or omission should amount to a breach of trust.   The director must take a conscious decision to perform the act or omission in question.   In the case of an omission this requires a deliberate and conscious decision to abstain from doing something rather than a mere negligent failure to do so as a result of not applying one's mind to the question.

326.   I have found that Mr Raven and Mr Flax each reasonably considered that the payments were in the interests of MSIL.   They were not guilty of any dishonesty in making the payments.

327.   Mr Toop and the Madoff brothers were not themselves responsible for making the payments.   They assumed there was nothing wrong with them but failed to apply their minds to the question how they might be in MSIL's interests.   That was not a deliberate omission.   There was no deliberate breach of trust.   Moreover they did not act with reckless indifference as to whether the payments were in the interests of the company.   They simply failed to exercise the independent judgment required of them in relation to an aspect of the business being handled by their fellow directors.   This was a breach of the duty to exercise reasonable diligence and care, not dishonesty.

328.   The conduct of the director Defendants in relation to the accounting treatment of the payments and their funding, and contact with the auditors, was not dishonest, as I have explained earlier in this judgment.

329.   Against the Madoff brothers, MSIL made a further and separate allegation of dishonesty.   This was that in relation to BLMIS' fraudulent T Bill trading, between 2005 and 2008, they knew that the US$310 million received by BLMIS from MSIL was fraudulently recorded in BLMIS' books as "commission income" due from MSIL.   The evidence to which I was referred by the Claimant in support of this allegation was exiguous.   The treatment of the sum as commission income was attested to in a paragraph from the witness statement of Ms Collura which in turn relied upon a number of documents which did not on their face self evidently support the proposition.   There was no evidence to link the Madoff brothers to knowledge of these documents.   The evidence relied upon did not meet the necessary degree of cogency to make out an allegation of dishonesty, which I therefore reject.   Even had this allegation been made good, I would not have treated it as supporting a conclusion that the brothers were guilty of any dishonesty in relation to the MSIL Kohn Payments.   In any event it would not have assisted MSIL's case on limitation because the alleged dishonesty fell within the period six years prior to the issue of the Claim Form.

*Concealment*

330.   The Claimant's argument relied upon three propositions.  First, that the directors' breaches of duty were deliberate.  Second, that their breaches of duty were committed in circumstances where it was unlikely that they would be discovered for some time where (a) Bernard Madoff was the controlling shareholder of MSIL, (b) he personally brokered the arrangement with Mrs Kohn whereby the MSIL-Kohn Payments would be made, and (c) the directors were party to the making of false statements to MSIL's auditors in relation to the filing and approval of MSIL's accounts; specifically, the failure to inform the auditors that the sums being paid to Mrs Kohn were not in fact payments for research services properly supplied to MSIL (but were in reality payments made by MSIL for Mr Madoff's benefit) was an act of concealment.  Third that the Claimant did not discover that "concealment" until after the appointment of the Joint Provisional Liquidators on 19 December 2008, and could not with reasonable diligence have discovered the concealment before then: the concealment could not reasonably have been discovered earlier in circumstances where (a) the only members of MSIL's Board were the wrongdoers (i.e., the directors), (b) those directors had misled MSIL's auditors, and (c) those directors had wrongfully failed to disclose their own misconduct.

331.   These propositions were not made good.  As to the first, the conduct complained of against Mr Toop and the Madoff brothers was negligent, not deliberate.  As to the second, there was no concealment.  The payments and their funding were patent from MSIL's books and records, and were known to the auditors, who were not misled by any of the Defendants.  They were openly discussed amongst the directors and with the compliance department.  There was nothing secret about them, or about the written research which was being delivered to London.  If, contrary to my findings, the making of the payments constituted a breach of duty, there was nothing in the circumstances in which the payments were made which made it unlikely that such breach would be discovered for some time.  As to the third, anyone within the company could with reasonable diligence have discovered the payments throughout the time that they were being made.  Mr Bond, Mr Purcell, Mr Marshall, Mr Allen, Ms Wood, and Mr Hui all knew of them, against none of whom does the Claimant allege wrongdoing.

332.   Accordingly the claims against all the director Defendants in respect of MSIL Kohn payments made before 8 December 2004 are time barred.

 **(15) MSIL Kohn payments: the directors' claims for relief from sanction**

333.   Section 727 of the Companies Act 1985, replaced in identical terms by section 1157 of the Companies Act 2000, provides that:

> "If in proceedings for negligence, default, breach of duty or breach of trust against-
>
> an officer of the company…
>
> it appears to the court hearing the case that the officer or person is or may be liable but that he acted honestly and reasonably, and that having regard to all the circumstances of the case…he ought fairly to be excused, the court may relieve him, either

> wholly or in part, from his liability on such terms as it thinks
> fit."

334.   I have found that Mr Raven and Mr Flax acted honestly and reasonably in making the payments.  Although the Madoff brothers and Mr Toop were in breach of duty in failing to apply their minds to whether the payments were in the interests of the company, they nevertheless acted reasonably within the meaning of that word in the section.  It is apparent from the fact that the section is applicable to liability for negligence that "reasonably" is a broad concept, such that the relief is potentially available even where the director has been in breach of his duty to exercise reasonable care.  In **Re D'Jan of London** [1993] BCC 646 Hoffmann LJ said at page 649:

> "It may seem odd that a person found to have been guilty of
> negligence, which involves failing to take reasonable care, can
> ever satisfy a court that he acted reasonably. Nevertheless, the
> section clearly contemplates that he may do so and it follows
> that conduct may be reasonable for the purposes of section 727
> despite amounting to lack of reasonable care at common law."

335.   Had I found that any of the director Defendants was  liable or potentially liable in respect of any of the MSIL Kohn Payments, I would have held that he ought fairly to be excused from any liability in the circumstances, in particular where:

(1) he acted reasonably and honestly throughout;

(2) the payments caused MSIL no loss;

(3) the directors did not seek or obtain any benefit from the payments;

(4) the payments were approved with full knowledge by all the voting shareholders of the company;

(5) the degree of fault, if any, was venial; and

(6) the consequences of imposing any personal liability would be unduly harsh, and disproportionate to any degree of fault.

**(16) MSIL Kohn payments: the claim against Mrs Kohn, Erko and Tecno Gibraltar**

336.   The claim was advanced primarily against Mrs Kohn personally, including the receipt based claims which were advanced on the basis that the payments were received by Erko, Tecno Italy and Tecno Gibraltar ("the Recipient Companies") as agents or nominees on her behalf.  The receipt based claims were maintained against Erko and Tecno Gibraltar on the alternative basis that they were the beneficial recipients of the relevant payments, rather than she.  Erko's position as a defendant is anomalous.  The claim was maintained against Erko on this alternative basis, notwithstanding that the company was dissolved in 1998 and that MSIL's case was that it had not received any of the payments in any capacity because the Erko payments were made by cheques which were endorsed in favour of Mrs Kohn's daughter, Ms Herzog, and paid into the latter's account at Bank Gutmann in Austria.  Asserson Law Offices remained

solicitors on the record for Erko, but no evidence or representations were put forward on its behalf at the trial.

337.    The Claimant asserts liability against Mrs Kohn by reference to four causes of action:

(1) dishonest assistance constructive trust;

(2) knowing receipt constructive trust;

(3) a restitutionary claim;

(4) a proprietary claim.

*Dishonest assistance constructive trust*

338.    In order to establish this cause of action the Claimant must establish:

(1) a breach of fiduciary duty,

(2) assisted by the defendant,

(3) dishonestly.

339.    The opening and closing written submissions on behalf of Mrs Kohn contain a heading which treats the first ingredient as being a "breach of fiduciary duty *causing loss*" (my emphasis), suggesting that loss is a necessary ingredient in addition to breach. The point was not supported by authority, nor was it addressed or developed further in argument on either side. The liability of a dishonest assistant is an accessory liability which confers a personal remedy against the assistant to account in equity as if he were the trustee in breach of trust (see *Lewin on Trusts* 18th Edn 40-09). Accordingly I accept that the liability of the assistant depends upon proof of loss to the same extent as the liability of the party in breach of trust or fiduciary duty whom he assists, but no further. The liability of the assistant is for such loss as the party in breach of fiduciary duty would be liable for. It is not necessary to show that the assistance itself is causative of any loss.

*Breach of fiduciary duties by directors*

340.    I have held that none of the director Defendants was in breach of fiduciary duty. But this is not an end to MSIL's case in dishonest assistance against Mrs Kohn, because MSIL seeks to rely upon Mr Dale being in breach of fiduciary duty in making the payments. This limits the claim to the payments after 4 February 2003 when Mr Dale first became a director.

341.    Mr Crow QC described this argument, aptly in my view, as a shabby point pulled out of the hat in closing. I confess that when this argument was articulated in MSIL's written closing submissions it took me by surprise. It was not adverted to in the written or oral opening of MSIL, which relied solely on allegations of breaches by the directors who remained active defendants at the trial. It is fair to say that it is within the pleaded case, and the list of issues settled in February 2012, because both were drafted and served before MSIL settled with Mr Dale. But I had understood that the breaches of fiduciary duty being relied on were solely those of the remaining

Defendants and that the dishonest assistance claim against Mrs Kohn was parasitic on such breach being established. I therefore have considerable reservations about whether it is fair to allow MSIL to advance such a case. I will nevertheless address it.

342. MSIL relied essentially on what was said to be Mr Dale's acceptance of fault contained in his witness statement in the following passages:

(1) *"The whole process of receipt of "fees receivable" and the making of the MSIL-Kohn Payments was, I now recognise, improper and inappropriate. I accept that I should have recognised this at the time. It was not in MSIL's best interests to make the MSIL-Kohn Payments because MSIL could not afford them without the fee income and did not need them to carry out its trading business."*

(2) *"Although I believed that the research was not worth the money being paid for it, I did not tell KPMG this."*

(3) *"In my view the research provided by the Kohn entities was irrelevant and of no value to MSIL. No-one at MSIL used the research. Sometimes it remained unopened or was simply left on the second floor of the office. None of the traders came looking for it. It was obviously not relevant to MSIL's business and was merely regurgitated from pre-existing material containing extracts from other publications. I understood it to be the mechanism to enable the MSIL-Kohn Payments to be continued to be made through MSIL, in that the research was sent to justify the amount and frequency of the MSIL-Kohn Payments."*

(4) *"I now recognise that it was not in MSIL's best interests to continue making these payments and that they were inappropriate, unnecessary and unsustainable having regard to MSIL's core business. I should have recognised this at the time. I chose not to act on the multiple indications given in the conversations I had with Mr Madoff and Mrs Kohn, and which were confirmed in my discussions with Stephen Raven."*

(5) *"I knew there was no economic benefit to MSIL making such payments, and was not aware of any goods or service which Mrs Kohn, Erko or Tecno provided to MSIL at all – let alone any service worth $700,000 a quarter. In hindsight, although I spoke to Stephen Raven, I should have done more than this given my concerns and I should have challenged the payments."*

343. The circumstances in which Mr Dale came to give this evidence on behalf of MSIL are noteworthy. In his Defence, verified by a statement of truth, he had maintained that he believed he had been acting in MSIL's interests, and denied any breach of duty. He was not a rich man and had substantially exhausted his limited resources on legal fees before the trial, at which he could not afford to be represented. He was facing a claim which would have made him bankrupt, and which he explained was causing and would cause considerable domestic strain. He was offered the ability to settle for £20,000 plus the possibility of having to pay a further £130,000 out of future income if he earned enough prior to April 2015 to be able to afford it (in accordance with a defined formula). At the time he gave evidence he had not earned enough for any part of the £130,000 to be payable. In return he had to agree to sign a witness

statement in agreed terms, drafted initially by MSIL's solicitors, and to give evidence for MSIL. For pragmatic reasons, which I do not criticise, he accepted a settlement on these terms. The settlement agreement warranted the accuracy of the witness statement, so that Mr Dale was potentially at risk of losing the benefit of the settlement if he departed from it in any material respect. The witness statement purported to accept his own wrongdoing. It purported to explain the departure from the evidence in his Defence by being "assisted by the additional evidence disclosed by the Claimant" although it emerged that he had not himself considered such disclosure.

344.    This put Mr Dale in an uncomfortable position in giving his evidence. I accept that within this difficult straightjacket he was doing his best to answer questions honestly and helpfully, but this background requires me to treat with considerable caution his apparent conversion to an acceptance of fault. However that may be, it is tolerably clear that at the time of the events in question he did think that the MSIL Kohn Payments were in MSIL's interests. He believed that Bernard Madoff had a bona fide commercial reason for the payments being made and that was sufficient to make him happy with them. Mr Dale was told of Bernard Madoff's responses to Mr Flax and Mr Raven when they raised the matter with him. Accordingly he knew that Bernard Madoff's attitude was that Mrs Kohn was a good analyst who spoke to him in New York and was only being paid what a good analyst would be paid; that he got value from the research; that the research had the potential to pay for itself; that a single good idea could justify the payments; that he found Mrs Kohn's advice to be of great value; and that apart from research or information from Mrs Kohn, Bernard Madoff valued Mrs Kohn for her contacts. Mr Dale was himself told by Bernard Madoff in a conversation of 20 April 2007 that the payments were not just for research but for the services which Mrs Kohn provided to Bernard Madoff including introductions and her perspective on European institutions and markets, all of which the latter regarded as of great benefit. Mr Dale did not think that the written research received in London was of value to the traders, although he did not know whether or to what extent it was being used, but he believed that it was sent to Bernard Madoff in New York, which was what Bernard Madoff told him: in the conversation of 20 April 2007  Bernard Madoff told him that Mrs Kohn was providing the same information to him as to MSIL in London and that he was using it to make his decisions globally, i.e. including those for MSIL. Mr Dale was himself keen to persuade Mr Raven of the desirability of continuing to make the payments when the latter was seeking to use MiFID as a ground to put an end to the payments and their funding. Mr Dale believed that the payments, and their funding, were properly accounted for in the statutory accounts. Mr Dale did not mislead the auditors, his fellow directors, or those within MSIL who were concerned with compliance, and he did not believe that anyone else had.

345.    Accordingly I reject the allegation that Mr Dale was in breach of fiduciary duty.

*No loss*

346.    I have concluded that had any of the directors been in breach of fiduciary duty, such breach gave rise to no loss and so none would have been liable for any loss. That is fatal to a claim against Mrs Kohn for assisting such alleged breaches of fiduciary duty.

*Assistance*

347.    The relevant acts of assistance on which MSIL relies against Mrs Kohn are that she delivered the research; invoiced MSIL for the payments and, so MSIL alleges, ostensibly in respect of that research; and made arrangements to receive the payments by collecting cheques or providing transfer details.

348.    Mr Crow QC submitted that if there was a breach of duty by the Defendant directors in authorising or making the payments, the Claimant's allegation that Mrs Kohn assisted in that breach is unsustainable on the face of MSIL's own pleading because the breach of duty alleged against the Defendant directors is that they caused or permitted the payments to be made, *knowing that those payments were not due in respect of the research that was delivered*; whereas by providing the research, delivering the invoices which were allegedly referable only to the research, and collecting the payments ostensibly in respect of that research, Mrs Kohn was (on the Claimant's case) attempting to *deceive* the Defendant directors into believing that *the payments were indeed due in respect of that research*.  It was submitted that that cannot constitute any form of assistance to the directors in relation to their alleged breach of duty in causing or permitting payments to be made, which was a breach consisting of conduct with the knowledge that they were *not* due in respect of the research.

349.    I do not think that this fairly characterises the case against Mrs Kohn, which does not depend upon any attempt by her to deceive the directors; it is, or includes, a case that that she and the directors alike intended the research to be window dressing as an excuse for payments which all knew or suspected to be for a different purpose.

350.    But in any event I feel unable to accept the submission as legally sound.  In my judgment it fallaciously treats the ingredient of assistance as having to encompass the mental element which renders the conduct of the fiduciary a breach of trust or fiduciary duty; whereas what is required, or at least is sufficient, for the ingredient of assistance, is simply conduct which in fact assists the fiduciary to commit the act which constitutes the breach of trust or fiduciary duty.  A dishonest participant in a transaction takes the risk that it turns out to be a breach of trust or fiduciary duty.  It is not necessary for the assistant to know, or even suspect, that the transaction is a breach of trust, or the facts which make it a breach of trust, or even what a trust means; it is sufficient if he knows or suspects that the transaction is such as to render his participation dishonest: *Agip (Africa) Ltd v Jackson* [1990] Ch 265, per Millett J at 294, *Barlow Clowes International Ltd v Eurotrust International Ltd* [2006] 1 WLR 1477 per Lord Hoffmann at [28]; *Abou-Rahmah v Abacha* [2007] 1 All ER Comm 827 per Rix LJ at [39].  So accessory liability on the part of a dishonest assistant requires no more from his point of view than the actus reus of assisting by participation in the transaction, and the mens rea of dishonesty.  It is not necessary that the assistance should play any part in the mental state of the fiduciary, still less that it should assist the mental state of the fiduciary in a way which is necessary to render the fiduciary's act a breach of trust or fiduciary duty.

351.    Mrs Kohn assisted the payments to be made by providing the research, submitting invoices, collecting the Erko cheques and providing details for, and receiving, the electronic transfers.  That is sufficient to make out this ingredient.

*Dishonesty*

352.    The test involves a subjective and objective element. The subjective element requires the court to consider what the defendant actually knew or understood or believed or suspected at the time of his conduct. The objective element requires the court to determine whether or not, with that state of mind, the relevant conduct was dishonest, applying an objective standard. There is no requirement of conscious dishonesty; the test for dishonesty does not require that the assistant considers that he is acting dishonestly. See **_Twinsectra Ltd v Yardley_** [2002] 2 AC 164 explained in **_Barlow Clowes Ltd v Eurocrest_** [2006] 1 WLR 1476; **_Abou-Rahmah v Abacha_** [2007] 1 All ER (Comm) 827. The principle that heightened cogency of evidence is needed to prove allegations of fraud is applicable to this issue: **_Re H & Ors_** [1996] AC 563, at 586-587; **_AG of Zambia v. Meer_** [2008] EWCA Civ 1007, at [294].

353.    I had the advantage of hearing Mrs Kohn giving evidence over one day in March 2013, when she was being cross examined in relation to her response to disclosure orders ancillary to a worldwide freezing order, as well as at the trial. On the whole I found her to be a reliable and honest witness, although as I shall explain below there were some aspects of her evidence, in which she sought to distance herself from events or documents, which I feel unable to accept.

354.    The following elements of the evidence are important to an assessment of Mrs Kohn's honesty:

(1)    Until December 2008, Mrs Kohn had no reason to question the integrity of Bernard Madoff. On the contrary his reputation and apparent success commanded confidence and respect for his probity and financial prowess. That Mrs Kohn had such confidence and respect is apparent from the fact that she was responsible for investing about US$11.5 million of her own family's wealth in funds invested with BLMIS.

(2)    Mrs Kohn knew that MSIL (through Bernard Madoff) had made an agreement for the provision of her services which included introductions, information and research. Those were legitimate and valuable services, which she provided.

(3)    The sums paid to her in respect of those services, including the MSIL Kohn Payments, were no more than reasonable remuneration for the value of the services provided. That is apparent on the evidence before me, and is what she believed at the time.

(4)    She made no secret about the provision of those services. The face to face meetings were made in Bernard Madoff's glass fronted office for all his fellow directors and staff to see. The written research was openly provided and discussed with the London directors. She had no reason to believe that the directors of MSIL were unaware of the full range of services she was providing (and Messrs Raven, Flax and Dale at least were, as I have explained, aware that she was providing services by way of introductions, information and advice apart from the written research).

(5)    She made no secret of the invoicing for the services, or of the payments themselves. The invoices were sent by post. She or her husband collected the Erko cheques making no secret of their visits for that purpose. The electronic payments were, she correctly assumed, paid through the company's usual

facilities and recorded openly in its books. She had no reason to think that Mr Flax or others she dealt with at MSIL treated the payments with any secrecy. She discussed aspects of the payments, such as VAT, with Mr Flax, Mr Raven and Mr Dale. She reasonably believed that the payments were being made with the full knowledge of the numerous directors of MSIL over a period of 16 years. At no time did anyone at MSIL raise with her any doubt as to her entitlement to the payments or their propriety.

(6) She never received any complaints from MSIL that the services she was providing were not worth the sums paid.

(7) She knew that MSIL was audited by KPMG and regulated by the FSA (or its predecessor). She never received any inquiries from the auditors or from the regulators with regard to the payments and was not told that they had made any. As a result, she reasonably believed that the payments were fully visible to MSIL's auditors and regulators and that they had not questioned their propriety.

(8) She reasonably believed that MSIL was solvent throughout the period over which the payments were made.

(9) She believed that the services she provided conferred substantial benefits on MSIL. This was true of introductions as well as information, advice and research. Mrs Kohn did not distinguish between Bernard Madoff's American and English companies, an understandable approach not least because BLMIS' own publicly promulgated material itself blurred any such distinction. She was indifferent whether the payments were made by MSIL or BLMIS, which she regarded as part of Bernard Madoff's single global business. She believed that her introductions brought value to the businesses in both America and in England. She regarded her introductions as valuable to MSIL as well as BLMIS: they were introductions of people, not money, and, so she believed, useful to any proprietary trading business which she understood to be operated by BLMIS in New York and MSIL in London. She had also understood from Bernard Madoff that he operated the managed accounts of his investment advisory business through both BLMIS and MSIL. Her evidence, which I accept, was that whenever he mentioned the managed accounts, which was not often, he gave her the impression that investment activity was undertaken in London as well as in New York. Indeed it is MSIL's pleaded case (Reamended Particulars of Claim paragraph 68) that Bernard Madoff would falsely represent that substantial volumes of investment activity were undertaken in London by MSIL on behalf of BLMIS. When Bernard Madoff requested that invoices be sent to his English company, MSIL, Mrs Kohn assumed that any investment activity which was undertaken on behalf of the people whom she had introduced, who were primarily Europeans, would have been undertaken in London by MSIL.

355. These circumstances do not suggest dishonesty. Quite the reverse. If secrecy is the badge of dishonesty, in the memorable phrase of Millet J in *Agip v Jackson* (sup) at 294, the converse is true: transparency is the hallmark of honesty.

356.  Moreover there is no apparent motive or benefit to Mrs Kohn in the dishonesty which
      the Claimant alleges.  She was providing legitimate services for which she was not
      overcharging.  If she had thought there was an obstacle to being paid by MSIL, rather
      than BLMIS, it is difficult to see why she would not have raised it or why in such
      circumstances she would not simply have been paid solely by BLMIS, as happened
      after 2007.

357.  The Claimant's submission that Mrs Kohn was dishonest rested on three propositions:

      (1)  The payments were solely in return for the written research.

      (2)  Mrs Kohn knew the research to be valueless per se and worthless to MSIL in
           its trading business; it was provided merely as a pretext for the payments.

      (3)  The pretext was supported by false invoicing purporting to justify the
           payments as being for such research.

358.  As to (1), I have concluded that the payments were not solely or even primarily for
      the written research.

359.  As to (2), I have concluded that the research was not valueless either per se, or to
      MSIL in its trading business.  It had some value, in the way I have described, and Mrs
      Kohn believed it to have greater value because of her understanding of MSIL and
      BLMIS as a single global business.  She was not told, and had no reason to believe,
      that the research was not used by the traders or the management in London.  On the
      contrary there is evidence from 2007 of Mr Dale asking for specific pieces of written
      research on a number of occasions, both on the phone and in writing.

360.  Nevertheless, there was a significant proportion of the research which was simply
      lifted word for word, or almost word for word, from existing reports, and passed off
      as original work.  This plagiarised material may well have constituted the majority,
      and, at least in the later years, the distinct majority, of what was being supplied.  I
      conclude that Mrs Kohn knew this was happening and was responsible for it.  I felt
      unable to accept her evidence that she was not involved in the details of the
      production of the written research and merely identified the topics and general
      approach.  It was she who was responsible to Bernard Madoff for providing the
      written research in a form which he wanted, and the extent of the plagiarism could not
      have escaped her knowledge.  The few documents which have survived which cast
      light on the process, from the most recent Tecno Gibraltar period in 2007, suggest that
      at least on occasion she was herself giving instructions as to how to use the content of
      existing available material and to reformat it so as to present it as Tecno Gibraltar's
      own research product.

361.  My assessment is that the plagiarism reflected a desire on her part to ensure a
      substantial volume of physical documentation.  That is not to say that she regarded it
      as of no potential value to MSIL.  The reverse was true.  The plagiarism was not
      indulged in because it was thought that the material was irrelevant to MSIL, but
      because it provided a cheaper and easier method of producing substantial
      documentation than would have been the case with original research.  She was not
      creating the research as a mere pretext for the payments.  But she was concerned to
      ensure that the volume of documentary research which was delivered was substantial.

362.    Although she was anxious to create volume in this way, this does not support an inference that she regarded the services she was providing to MSIL as of no value or that she thought the payments by MSIL were not justified or were not in MSIL's interests.  My assessment is that she felt the need to put greater emphasis on the physical material because she was receiving very large payments in return for what was predominantly an intangible service which left no record; and that she felt instinctively uncomfortable about this, acting as she was in a role which had no structure or precedent of which she was aware.  Her instinct was that the substantial payments she was receiving would be more easily explicable to anyone enquiring into them the greater the volume of documentary product which could be pointed to.  This instinct was articulated in a telephone conversation with Mr Dale on 29 May 2007 in which she explained that she "very much wanted you to have more quantity there, just in case people are asking you what is the reason for the bills".  The Claimant contended that this was an acceptance by her that the payments were *solely* in respect of the written research.  In the light of the totality of the evidence, that is to put upon the use of the definite article a weight which it will not bear.  This comment was simply a reflection of her view that the greater the tangible evidence of her services the better.  Her desire for volume was in order to provide more ostensible justification for that which was already justifiable, and honestly believed to be justifiable.  It was not intended to deceive MSIL's directors, who knew, so she believed, the range of services she was providing to Bernard Madoff.

363.    As to (3), the wording of the invoices, it is not right to characterise the invoices as purporting to be solely for research.  All bar one of the Erko invoices do not make any reference to research; they are simply for "services".  The Tecno Italy invoices include reference to "business opportunities" and "ideas and strategies".  Nevertheless in the Tecno Italy and Tecno Gibraltar period, the wording places predominant emphasis on research.  Most strikingly, there is no express reference at any stage to introductions, which Mrs Kohn regarded as the principle element of her services in terms of justifying the payments, or to commissions which might have been the most obvious description of payment for such introductions.

364.    I have found that Mrs Kohn was herself responsible for the wording of all the Erko and Tecno invoices at each stage, notwithstanding her attempt in evidence to distance herself from them.  I do not think it would be right to draw the inference that they were drafted with an intention to deceive.  Mrs Kohn's desire to distance herself from the wording of the invoices is explained by the extent to which the claim against her relies so heavily on their terms, which are mischaracterised as all being for research.  I accept her evidence that she did not regard the invoices as something to which she attached great importance.  The use of her parents' address and the error in continuing to use Erko after its dissolution are indicative of a casual approach to the invoicing process, which is consistent with her unusual personal and professional history.  The wording had no bearing on the amount of the payments, which were already agreed, and they served only to trigger the payments.  The tendency to emphasise the research in the wording, and the absence of express reference to introductions, was again a reflection of her instinct to emphasise the tangible element of her services over the intangible.  It does not support an inference of dishonesty in relation to the payments themselves.

365.    In these circumstances I have concluded, without any real hesitation, that Mrs Kohn was not acting dishonestly in any material respect in relation to the invoicing and receipt of the MSIL Kohn Payments.

*Knowing receipt constructive trust*

366.    In order to make out this cause of action MSIL must establish:

>    (1) a transfer of assets in breach of trust or fiduciary duty; and

>    (2) beneficial receipt by the defendant of property traceable to such assets; and

>    (3) knowledge on the part of the defendant which renders receipt of the property unconscionable.

>    ***El Ajou v. Dollar Land Holdings plc*** [1994] 2 All ER 685, 700;

>    ***Bank of Credit and Commerce International (Overseas) Ltd v. Akindele*** [2001] Ch 437

367.    Where the claimant is a company, and the claim is in respect of monies paid out by the company under a contract, then unless that contract is set aside as being invalid, the recipient may rely upon the contract to justify the receipt.  In such circumstances no question of knowing receipt arises: ***Criterion Properties plc v. Stratford UK Properties LLC*** [2004] 1 WLR 1846, per Lord Nicholls at [4]:

>    "If ... the agreement is found to be valid and is therefore not set aside, questions of 'knowing receipt' by [the defendant] do not arise. So far as [the defendant] is concerned there can be no question of [the company]'s assets having been misapplied. [The defendant] acquired the assets from [the company], the legal and beneficial owner of the assets, under a valid agreement made between him and [the company]".

368.    The principle applies in the present case.  The payments were made pursuant to valid contractual obligations owed to the Recipient Companies under a contract which is valid.  That is fatal to this cause of action.

369.    I have concluded that there was no breach of fiduciary duty by the directors in making the payments, nor any loss to MSIL caused by the payments.  That too is fatal to this cause of action.

370.    As to receipt, MSIL argued that the Recipient Companies were nominees or agents for Mrs Kohn in respect of receipt of the payments (cf ***Prest v. Petrodel Resources Ltd***, [2013] 3 WLR 1 at [33]); or in the case of Erko that the payments were received by Ms Herzog rather than Erko because the cheques were endorsed and paid into the latter's account at Bank Gutmann; and that in this respect Ms Herzog was her mother's agent or nominee for receipt.  MSIL argued in the alternative that Mrs Kohn was the ultimate beneficial recipient of the payments from those companies by virtue of the onward payment to destinations which were in whole or in part for her benefit. The evidence of Mr Doxey addressing some of the complex onward payments raises numerous questions which were not explored during the hearing (although some were

touched on during Mrs Kohn's cross examination in support of the freezing order in March 2013).

371.   Given my other findings it is not necessary to determine the detailed factual issues which these arguments raise, and I will not burden this already over lengthy judgment by doing so.  I should record that Mr Crow QC submitted that the only pleaded basis for alleging beneficial receipt by Mrs Kohn was by lifting the veil, a basis which cannot survive the decision of the Supreme Court in *Prest v. Petrodel Resources Ltd*, with the result that arguments based on nominee or agency status were not open to the Claimant.

372.   As to unconscionability, Mrs Kohn's knowledge was not such as to render receipt and retention of the payments unconscionable.  They were no more than reasonable remuneration for services legitimately provided by her and she acted honestly in relation to them in all material respects.

*Restitutionary claim*

373.   This is a common law claim for unjust enrichment.  It again raises questions as to the extent to which Mrs Kohn beneficially received the payments, either through the Recipient Companies, or her daughter, as her agent or nominee; or by reason of onward payments.  Again I can deal with the claim without the need to resolve the complex factual issues thereby raised.  It fails for five reasons.

374.   First, in paragraph 178 of its written opening MSIL averred that the claim lay against the recipient of "misapplied" trust property, the misapplication arising by reason of the alleged breach by the directors of their fiduciary duties.  The claim was at that time not clearly pleaded, but became the subject of subsequent amendment to the Points of Claim at paragraph 259AA(2) where again the allegation was of receipt of "misapplied monies".  The plea was based on the existing pleaded allegations "for the avoidance of doubt", in which again the allegation of a restitutionary obligation in paragraph 259 was premised on receipt with knowledge that the directors were making the payments in breach of fiduciary duty (paragraph 258).  MSIL thereby assumed the burden of establishing that the payments were made in breach of fiduciary duty.  I have concluded that there was no such breach.  An alternative plea that the payments were made for no consideration fails with my rejection of MSIL's case that the payments were solely for the written research and that the written research was of no value.

375.   Secondly, there can be no unjust enrichment where payments are made pursuant to a valid contract which is fully or partly performed, just as there can be no claim in knowing receipt: *Taylor v Motability Finance Ltd* [2004] EWHC 2619 (Comm) at [23]; *MacDonald Dickens & Macklin v Costello* [2012] QB 244 at [23].

376.   Thirdly, any enrichment was not unjust.  It was no more than reasonable remuneration for legitimate services performed.

377.   Fourthly, if there had been any unjust enrichment of the Recipient Companies or Mrs Kohn, it would not have been at the expense of MSIL, who suffered no loss and for whom the payments were cash neutral by reason of the funding by BLMIS.

378.    Fifthly, the cause of action is subject to a change of position defence.  Mrs Kohn and Tecno Gibraltar contend that they have changed their position in good faith by reason of the MSIL Kohn Payments and that it would be inequitable for them to have to repay or restore such payments or any part of them in that, in reliance upon the anticipated and actual receipt of such of the MSIL Kohn Payments as were payable to them, which they believed in good faith were due and payable in consideration for the provision of the services:

> (1) they did not insist upon payment being made in full by BLMIS rather than MSIL; and/or
>
> (2) they continued to provide or to procure the provision of the services over a period of about 16 years; and/or
>
> (3) they arranged for payments to be received into the hands of third parties, and/or
>
> (4) they expended and/or allowed sums to be expended and/or refrained from taking steps to prevent sums from being expended in the normal course of living and/or business expenses, and/or investments.

379.    The first two of these are clearly made good on the evidence, and the third and fourth are made out to at least a significant extent.  That is sufficient to make good the change of position defence.

*Proprietary claim*

380.    It is not clear to me what property MSIL is laying claim to by reliance on this cause of action, and in whose hands it is alleged currently to be found.  It is said to apply to "the Payments or their proceeds".  So far as the payments themselves are concerned, none is in the hands of a defendant.  None went to Mrs Kohn directly; some of the Erko payments went into her daughter's account at Bank Gutmann but have moved on in a complicated sequence of transactions to other accounts and destinations, some allegedly controlled by Mrs Kohn or members of her family.  Erko has been dissolved.  Tecno Italy has been dissolved and is not a defendant.  Tecno Gibraltar was recipient of only two payments in 2007, which again have moved on.  So far as "proceeds" are concerned, the Claimant's case on what assets currently in existence are traceable to the payments, and where they are now to be found is unclear to me, as is whether those who might be holding them are parties to the proceedings.  I can, however, address this cause of action without attempting to resolve these uncertainties, because it fails on two other grounds.

381.    First, as was common ground, it is necessary to establish that the payments were made by the directors in breach of fiduciary duty.  I have rejected that allegation.

382.    Secondly, it is an answer to such a claim that the property is received as a bona fide purchaser for value without notice of the alleged wrongdoing.  Mrs Kohn and the Recipient Companies were in that position.  The payments were made pursuant to a contract between MSIL and the Recipient Companies in respect of which the latter gave full value.  Mrs Kohn acted on behalf of the Recipient Companies in good faith and without notice of any wrongdoing by the directors.

**(17) MSIL Kohn payments: Mrs Kohn's limitation and laches defence.**

383.    Under s. 21(3) Limitation Act 1980, the time limit for the claims in dishonest assistance and knowing receipt constructive trust is six years, subject to the potential application of:

    (1) s. 21(1)(a) (an action in respect of a fraudulent breach of trust to which the trustee was a party or privy);

    (2) s. 32(1)(a) (an action based on the fraud of the defendant);

    (3) s. 32(1)(b) and s32(2) (deliberate concealment of a fact relevant to the right of action).

384.    *Section 21(1)(a)*.  A claim can not become one in respect of a fraudulent breach of trust by virtue of any dishonesty established against the dishonest assistant.  The trust referred to is not the constructive trust imposed by reason of his assistance but the trust the breach of which he has assisted.  There must be a fraudulent breach of trust by the trustee of that trust, in this case by a director.  See *Lewin on Trusts*, at §44-49A & §44-55 (3rd Supplement to the 18th ed.); ***Paragon Finance plc v. DB Thakerar & Co*** [1999] 1 All ER 400, at 408; ***Gwembe Valley Developments Ltd v. Koshy*** [2004] 1 BCLC 131, at [86]-[91]***; Central Bank of Nigeria v. Williams*** [2013] QB 499, at [37].  My finding that the directors acted honestly precludes the application of this subsection.

385.    Were I wrong in this conclusion the equitable doctrine of laches would have been applicable, but I decline to speculate on whether or to what extent it would have affected the claim upon hypothetical findings of dishonesty which I have not made.

386.    *Section 32(1)(a)*.  A dishonest assistance constructive trust claim is a claim based on fraud because the dishonesty of the assistant is an essential ingredient in the cause of action.  I shall assume, without deciding, that the unconscionability ingredient of a knowing receipt claim also brings it within the subsection.  Application of the subsection does not extend the six year period in this case because MSIL could with reasonable diligence have discovered the conduct of Mrs Kohn which is alleged to have been dishonest or unconscionable when it occurred or shortly thereafter.  The invoicing and payments were open and transparent and reflected in the company's books and accounts.  The research was available in London for all to see, including directors, staff and auditors.

387.    *Section 32(1)(b)*.  For the reasons I have given there was no deliberate concealment and so this subsection has no application.  Nor, for the avoidance of doubt, does section 32(2).

388.    For the purposes of the restitutionary claim, MSIL relied solely on the application of s. 32 to defeat the six year limitation period.  Such reliance fails for the reasons I have given.

389.    Accordingly the dishonest assistance and knowing receipt constructive trust claims, and the restitutionary claim, are time barred in respect of payments made prior to 8 December 2004.

**(18) The Interest Payments: the facts**

390.    Under the two subordinated loan agreements Bernard Madoff lent MSIL a total of US$ 62.5 million.  MSIL's case is that this capital was neither needed nor deployed towards MSIL's trading operations, and that the Interest Payments constituted an unnecessary and burdensome overhead.

391.    The first loan agreement was dated 28 November 2000 and for $37.5 million; the second was dated 28 December 2001 and was for $25 million.  Each was signed by Mr Raven on behalf of MSIL and was the subject of a board resolution signed by the directors, including by Mr Raven, Mr Flax, Mark Madoff and Andrew Madoff.  The interest rate was 0.5% over LIBOR, payable quarterly in arrears.  That was a commercial rate; indeed Mr Dale thought it would have been difficult for MSIL to achieve as good a rate from a commercial lender.  The loans were on standard commercial terms.  The loan agreements were countersigned by the FSA.  The first was terminable upon 3 months notice by either side after two years, and the second on two years' notice, subject to certain conditions and SFA/FSA approval and compliance.  Between 2002 and 2007 interest payments totalling about US$ 14 million were made in accordance with the terms of the agreements (save that it appears they were paid annually rather than quarterly).  This figure includes withholding tax on the interest payments, which was paid directly by MSIL to HMRC.  On 18 September 2007 the loans were capitalised by a deed of termination and the issue to Bernard Madoff of 6.25 million voting shares of US$10 nominal value.

392.    The loans were approved by the FSA and the board.  The agreements, loan proceeds and interest repayments were recorded in the company's books and accounts.  There was nothing secret about them.

*Rationale for the loans*

393.    The first loan came towards the end of Phase 3 and in preparation for Phase 4 of MSIL's trading.  Bernard Madoff had had plans from the summer of 2000 to enlarge MSIL's London business to establish a market making business in the newly formed NASDAQ Europe and a proprietary trading operation trading in European and US securities.

394.    The Directors report in the 2000 statutory accounts referred to the subordinated loan agreement and said simply that "these funds were obtained in order to increase the firm's working capital and resources available to it".  The 2001 accounts referred to the second loan again as "in order to increase the firm's working capital and resources available to it" and continued by way of explanation: "The company acquired adjacent premises and recruited additional personnel in order to commence trading as principal in Pan-European securities.  To facilitate this objective the company has become a member of NASDAQ Europe SA, a recognised investment exchange, and a member of the London Clearing House.  Trading in Pan-European securities commenced in January 2002".

395.    The directors placed emphasis on two aspects of the contemplated trading in Phase 4 as justification for the loans.  The first was MSIL's intended trading on the new exchange Jiway, to which MSIL signed up eight days before the first loan.  Shortly

before that Mr Flax and Mr Raven sent Bernard Madoff a memo on 8 November 2000 raising questions they expected the FSA to ask in relation to MSIL's capitalisation and intended trading on Jiway. These questions included, at points 7 and 8, '*if these trades are back to back, why do we need so much capital*' and '*If Jiway requires MSIL to have additional capital, on what basis has Jiway determined the amount.*' Bernard Madoff responded to Mr Flax and Mr Raven over the phone that Jiway had a 'formula' and that Jiway required MSIL to have a minimum of US$65 million before MSIL could trade on it. The evidence suggests that in fact the amount which Jiway required, and was actually provided, proved to be only US$10 million, reduced to US$5 million perhaps as early as 10 January 2001 (there was some doubt as to the accuracy of the date). Trading on Jiway was not a success and had stopped by January 2003.

396.    The second aspect relied on was the more general expansion into proprietary trading with a particular emphasis on the statistical arbitrage book, colloquially referred to as the black box, in which a large volume of trades in equities were to be undertaken according to predetermined algorithms which were based on a very successful model used by BLMIS. As to the statistical arbitrage book, Mr Bond, who was initially in charge of the book in what he described as its test phase, said that it was envisaged that it would require "an awful lot of money" because it involved purchasing hundreds of stocks and holding them for months or even a year without margin. Mr Byrom, a trader who worked on the book from 2005 until it closed, said that the (gross) positions reached about $200 million. Mr Toop also quantified the outer limits reached on its long and short positions as at one point slightly more than $100 million on each side and that it required that amount of capital because it was not trading on margin. I accept that this was the position reached at some point with the black box and could reasonably have been foreseen as a consequence of the black box trading when the loans were agreed, although for most of the period between 2001 and its demise it required much less capital.

397.    As to the trading expansion more generally, Mr Purcell, who was a director at the time of the first loan and gave evidence for the Claimant, said that the loan did not seem surprising to him in the context of the declared aim of Mr Raven and Bernard Madoff to build the business. Mr Bond, who was also a director when the first loan was executed and a consultant at the time of the second loan, regarded the first loan as an important precursor to the development of the business through the arrival of Mr Burnham's team in 2001 and both loans as good for the company in the context of Bernard Madoff looking to expand the business generally. Mr Flax's understanding was that one purpose of the company being well capitalised was to enable Bernard Madoff to take up trading opportunities as and when they arose and that in doing so he was taking a long term view of his UK business. Mr Dale was not involved at the time the loans were agreed, but the capital became his responsibility not long thereafter. He regarded it as justified by MSIL's ongoing plans to expand.

*Was MSIL overcapitalised?*

398.    The company's capital position at the time the loans were entered into appears from the statutory accounts to have been that at the 2000 year end MSIL had total capital and reserves of some £31 million, not including the first subordinated loan; and at the 2001 year end, some £33 million not counting the second loan. In a letter to the FSA of 12 November 2001, Mr Raven said that the company was capitalised at US$75

million.  During Phase 3 when MSIL was trading on an agency basis it had no need for capital beyond regulatory requirements so that the majority of such capital would have been available for the expansion of its trading activities in Phase 4.

399.    MSIL's case that the loan capital was unnecessary relied primarily on admissions of the Director defendants themselves rather than any accounting analysis.

400.    In a witness statement, Mr Raven said *'It is true that this loan interest was a "burdensome overhead"'*, and explained that he *'spoke to BM on many occasions about the burden of MSIL having to pay interest on capital it was not using for trading purposes.'*  In an interview with the Serious Fraud Office on 9 June 2009 Mr Raven discussed the subordinated loans at length in relation to Bernard Madoff's proposal for a further subordinated loan of US$100 million in 2007.  Mr Raven had a discussion with Bernard Madoff, in 2007 in which he stated that he would much rather cease the current practice of Bernard Madoff loaning MSIL money, MSIL paying interest on that loan out of its earnings, and Bernard Madoff sending money back to MSIL in the form of subventions to cover the interest payments where MSIL's own generated profits were insufficient.  Mr Raven termed this practice *'a charade'*.  Bernard Madoff was eventually convinced by Mr Raven to provide the additional funds by way of share capital, not loan, and to terminate and capitalise the existing subordinated loans as share capital.  In discussing these 2007 events, Mr Raven stated in his 2009 SFO interview that

> (1) when he took over MSIL as CEO most of MSIL's capital was in subordinated loans and only about US$20 million was being used in MSIL's day to day trading;
>
> (2) between 2001 and 2007 MSIL only used US$20 to US$30 million in its trading, against a background of about US$100 million in capital;
>
> (3) Bernard Madoff had explained to him in 2007 that the main reason why MSIL was so over capitalised was because he liked to have MSIL capitalised at a quarter of the capital of the New York firm.

401.    Mr Flax said in an interview on 6 August 2009 that he was aware that MSIL was (in his words) *'very handsomely capitalised'*, having *'a hell of a lot of capital'*, and that of the US$200 million which MSIL enjoyed in capital by the end of Phase 4, he did not think even at this late stage that MSIL was *'using more than US$25 million long and short together'* in its trading activities.  Mr Toop accepted in an interview on 8 June 2009 that at all times there was a *'significant surplus'* of MSIL's capital over what MSIL was actually using for trading and he accepted in his Defence that he *'knew when he became a Director in 2003 that not all of MSIL's capital was required for equity trading'*.  Mr Toop in his final written submissions accepted that MSIL had excess capital for trading and that he was aware of that position.

402.    Andrew Madoff said in his witness statement that Bernard Madoff *'was constantly insisting that BLMIS should have excess capital as a sign of its financial strength and stability, and it was the same with MSIL.'*

403.    This picture was corroborated by other witnesses.  Amber Wood said that she was generally aware that MSIL was very highly capitalised; when considering the position

for the purposes of the introduction of the Capital Requirements Directive in and after January 2007, she thought only about £30 million of MSIL's capital was part of MSIL's trading book and that the company had significantly more funds than it actually needed on a day-to-day basis. Mr Dale's witness statement evidence was that MSIL only used a small percentage of its capital for proprietary trading purposes and that "*I knew that the subordinated loans were unnecessary and not utilised*". In a conversation with Bernard Madoff on 12 January 2007 Mr Dale said that MSIL was only using US$20 to US$30 million of its capital. David Calligan's evidence was that Mr Dale reported during the Arts Club meeting that even by October 2008 MSIL was still only using US$50 million of its then US$200 million in capital, with the surplus being invested in T-Bills. Mr Stevenson said in an interview of 5 June 2009 that he knew from the settlements system that the probable maximum of MSIL's capital used in trading at any time was US$40 million. Peter Allen, in an interview on 15 July 2009, estimated that MSIL only employed around US$30 million in its prime brokerage account for the purposes of its trading activities. This picture was further supported by a number of analyses undertaken by Mr Doxey.

404.   That is not to say that none of the capital from the loans was ever used to generate trading profits. Mr Dale described the proceeds of the loans being to some extent invested in the proprietary trading by the company, the remainder being invested in deposit bearing accounts, gilts, T Bills and IPOs. A number of documents showing the trading limits and positions of the traders from time to time, especially in the later years, lend support to the suggestion that the capital from the loans was in part required and utilised as regulatory and trading capital, although to a limited extent. The high water mark from the Defendants' point of view was an Oracle database document identified by Mr Toop which he had produced at about the 2006 year end analysing the performance by his traders, which suggested that the average daily net position (long and short) of all traders at the end of each day over the year was about US$79m. This suggests some use of the capital provided by the subordinated loans, but no figures were available to calculate how much. A conversation between Mr Dale and Bernard Madoff of 26 June 2007 referred to having US$100 million of capital available to cover positions at that time.

405.   I conclude that the Claimant has established on the evidence that throughout the period between 2001 and 2007, the capital derived from the subordinated loans was largely, but not wholly, surplus to trading and regulatory requirements. For some of the period some was used to cover trading positions, but even then it was usually not a majority of the loan proceeds. In that sense, and to that extent, it was unnecessary capital.

406.   That is not to say, however, that there is no advantage for a company like MSIL in being highly capitalised. It assists in the recruitment and retention of traders, who know that their trading capacity will be limited by available capital. It improves creditworthiness, so as to render the company more attractive to trading partners concerned with counterparty risk. It may enable it to negotiate better margin terms. It better equips the company to weather adverse market conditions, as the recent banking crisis has so dramatically demonstrated. It may equip the company to take swift advantage of business opportunities. It enhances the standing and prestige of a company, which was one of Bernard Madoff's reasons for wanting to keep BLMIS and MSIL highly capitalised. In these circumstances I find difficulty in knowing

where to draw the line between a company which is well capitalised (permissible and desirable) and one which is "overcapitalised" (impermissible). Mr Allen in his interview rejected the description "overcapitalised" in favour of "extremely well capitalised". The Claimant's case simply assumed that any capital beyond that immediately needed for trading and regulatory purposes rendered MSIL "overcapitalised". I do not accept that that is so for a business like MSIL in Phase 4, which was looking to expand and build a new business. In my view, for the relevant period it would be more accurate to characterise MSIL as highly capitalised than overcapitalised.

*Loss: return on the capital*

407.    The Claimant's case, in its final articulation, was not that there was anything wrong per se in being so highly capitalised, but that the vice of the transactions lay in being unable to service the interest on the loans from trading profit or investment income used from deploying the capital. The written closing submissions argued: "Whilst there is nothing wrong with being highly capitalised *per se*, there is where the capitalisation takes place at an interest cost in circumstances where the company cannot or does not at least generate sufficient profits to cover the making of such interest payments." This assumes that the vice in entering into such a loan agreement is not merely that the capital is not required for trading purposes, but is additionally a knowledge or belief that it would be loss making in that way. The gravamen of the complaint is not merely that the loans were "unnecessary" but additionally that they were "burdensome" in that they cost MSIL more than the benefit conferred.

408.    The loans became part of MSIL's funds available as working capital. To the extent not required for trading, such capital was usually invested in low risk fixed income investments such as bank deposits or gilts. There is no detailed evidence of the return on capital earned in this way from the two subordinated loans. There was no disclosure on the question by the Claimant, nor any financial analysis put forward by any witness for the Claimant. As I have explained, the dispute at the beginning of the trial as to how to deal with this issue resulted in agreement to address the liability questions on such evidence as was available at the trial. On those issues the Claimant bears the burden of proof. I bear in mind that the Claimant has access to the underlying documentation which would have enabled it, had it so chosen, to conduct a financial analysis of the position. By contrast the Defendants were not provided with the material to enable them to do so, but were left to construct argument on the point on the basis of such very limited documentary material as was disclosed for different purposes.

409.    I confess that I was surprised that the Claimant hoped to make good a claim against the directors on this basis whilst at the same time maintaining that it did not need to address what return on use of the capital was in fact achieved by MSIL, or whether and to what extent it was less than the interest payments. Whatever the relevance of such question for the purposes of meeting a "no loss" argument, the allegation of breach of duty by the directors must posit that they knew or believed that the loan agreements suffered from this loss making vice. I recognise of course that it is important to focus on the knowledge and expectation of the directors at the time of the impugned transaction, not merely the subsequent result; one may hypothesise a director who believes that a transaction will be loss making which unexpectedly turns out to be profitable. Nevertheless I find it inherently unlikely that a director will have

been acting against what he perceives to be the interests of the company where, without any secrecy, he causes the company to take a loan, on commercial terms, approved by a regulator, which is then employed earning returns which are sufficient to service the interest repayments and is not in fact loss making for the company. Directors do not normally enter into such transactions intending the company to suffer a loss. Where the company makes no such loss, clear and cogent evidence will be required that such a result confounded the director's expectations before one can safely reach the conclusion that he was not acting in good faith.

410.   Mr Raven's evidence in his SFO interview suggested that the return was less than the rate of interest on the loans because generally they were lucky to achieve LIBOR for the fixed income investments. His recollection was that margin over LIBOR for the loans had been reduced from 0.5% to 0.25% and his answers spoke in terms of being lucky to earn LIBOR on deposits and therefore of losing a quarter percent as a result of the interest payments. This was obviously a generalised observation rather than an attempt to quantify the exact position from time to time. Nevertheless the tenor of the answers was clearly that in general terms the returns were less than the interest payments over parts of the period, and that latter were being subsidised by the subventions.

411.   Mr Dale's evidence was that sometimes the earnings were more than sufficient to cover the cost of the repayments and sometimes inadequate: for at least several years he was getting a better rate from the banks than 0.5% over LIBOR; at other times he was receiving a lower rate of return. Over the whole period he regarded the position as neutral: there was probably neither a loss nor a profit as a result of taking out the loans. Mr Dale was better placed than Mr Raven to give evidence on the issue, as the man who had day to day responsibility and control over the treasury function. Given the pressures imposed upon him by his settlement agreement, I see no reason to doubt the honesty of this evidence in favour of the defendants, which is consistent with answers given by him in earlier interviews. It is supported by Mr Flax's evidence, which I accept, that he looked at the interest paid and earned and did a calculation (as I understood it for the purpose of the proceedings, not at the time) which revealed that "there wasn't very much in it. So either it [the capital from both loans] was profitably employed or it didn't cost us very much over the period." He described it as "more or less a wash" meaning overall neither profitable or loss making.

412.   On the limited material available I conclude (solely for the purposes of deciding issues of liability) that there were some times when use of the capital rendered the loans loss making, in the sense that the trading profits and investment income generated by the loan capital was less than the amount of the interest repayments, and some when it rendered them profitable. Over the period between 2000 and 2007 the overall effect of taking out the loans was neither profitable nor loss making but roughly break even.

*Loss: funding*

413.   In periods when the interest payable exceeded the trading and investment returns, there would potentially be a loss to MSIL. But because MSIL was funded by BLMIS in the way I have described earlier in this judgment, there was no net cost to MSIL even for such periods. In October 2001, at the beginning of Phase 4, Mr Flax made a written request in advance for funds specifically for the purpose of making the first

interest payment on the first loan.  Thereafter BLMIS provided subventions to MSIL from time to time, at MSIL's request, which were calculated to be sufficient to enable MSIL to meet its expenses and show a profit.  The expenses covered included interest payments on the loans.  Such subventions therefore covered the interest repayments so far as necessary, not only on a cash flow basis but on a net cost basis: if and to the extent that they would otherwise have been a drain on MSIL's capital or profits, they were made up by the subventions.  Again this was not a precise mathematical exercise, but was the broad effect of the subventions.  This was the understanding and perception of the directors.  It meant that regardless of the return on capital, the interest obligation would be at worst cash neutral for MSIL.

414.   The upshot is that the Claimant has not shown that the loans were loss making to MSIL even ignoring the subventions.  If the subventions are taken into account they were not loss making for MSIL, but profitable.  The allegations of breach of duty by the directors fall to be considered against that background.

## (19) The Interest Payments: breach of directors' duties

*The alleged breaches*

415.   The legal bases for the claims against the directors, and the directors' defences, mirror those in respect of the MSIL Kohn Payments.  MSIL alleges breach of the same duties, save for the allegation of unlawful distribution of capital.  The directors deny breach and rely on the same additional defences.  MSIL alleges that the directors were in breach by (1) causing MSIL to enter into the loan agreements (save Mr Toop who was not then a director) and (2) causing or permitting the Interest Payments to be made.  MSIL does not rely upon a failure to terminate the agreements in accordance with their terms as a separate breach, but relies upon the fact that the provisions of the loans permitted termination to support its argument that the Interest Payments themselves gave rise to a separate breach because they were not an inevitable consequence of entering into the agreements in the first place.

*Good faith interests of MSIL/ reasonable skill and care*

*Mr Flax*

416.   Mr Flax drafted the first agreement and signed the board resolutions approving both agreements.  He was himself responsible for many of the transfers by which the Interest Payments were made.

417.   Mr Flax believed that the first loan was to facilitate the expansion of trading and in particular because of the capital requirements of joining Jiway.  That was supported by Bernard Madoff having told him that joining Jiway would require a capital deposit of US$65 million. The Claimant submitted that Mr Flax should have made his own inquiries as to Jiway's capital requirements and in failing to do so he did not exercise his own independent judgment or was negligent.  I regard this criticism as unfounded. He acted honestly and reasonably in relying on Bernard Madoff in this respect, in a conversation to which Mr Raven was party.  Jiway was not his area of expertise, nor was it his function to gainsay Bernard Madoff on what capital would be desirable for the latter's plans for the company.

418.  Mr Flax understood that the second loan was required because of MSIL's future expansion plans, both for the black box, and more generally for use by traders as and when the expansion of trading developed.  Mr Flax also understood that one purpose of the company being well capitalised was to enable Bernard Madoff to take up trading opportunities as and when they arose and that in doing so he was taking a long term view of his UK business.

419.  In this way Mr Flax honestly believed that both loans were in the interests of MSIL. That was a reasonable belief in circumstances where:

(1)  The loans were on commercial terms, approved by the FSA and recorded openly in the company's books and accounts.

(2)  The loans were determined and approved by those directors most closely concerned with the future trading activity, including not merely Bernard Madoff himself but also Mr Raven and Andrew Madoff.  By contrast Mr Flax had no trading expertise or experience.  He was entitled to rely on the judgment of his fellow directors.

(3)  The transactions were in accordance with the wishes of Bernard Madoff, the chairman and almost sole voting shareholder.  Mr Flax was entitled to treat this as a consideration which made them in MSIL's interests for the reasons I have explained in relation to the MSIL Kohn Payments.

(4)  Bernard Madoff's plans for the expanded trading in Phase 4 were not rigidly formulated, so far as Mr Flax was or ought to have been aware, and could reasonably have been expected to be fluid depending on developing circumstances such as market conditions, business opportunities and the quality of available recruits.

(5)  Whatever the deployment of the capital, there was no reason for Mr Flax to think MSIL would suffer a loss.  The transaction was expected to be, at worst, cost neutral to MSIL: if some were not used to generate trading profit, there was no reason to believe that the combination of the investment income on that part and the trading profits would be insufficient to cover the interest payments; and to the extent that the interest payments were not exceeded by the trading profits and investment income generated by the use of the capital, any shortfall would be made good by the subventions by BLMIS.

420.  For the same reasons Mr Flax acted honestly and reasonably in causing or permitting the Interest Payments to be made when they fell due.  The Claimant alleged that he should have monitored the capital position so as to put a stop to the payments when the failure of Jiway, and the statistical arbitrage book, removed at least in part what he had understood as the rationale for agreeing the loans.  This again I regard as a misplaced criticism.  The loans were understood to be for the expansion in trading generally, which Mr Flax knew was in fact taking place by the recruitment of traders and development of trading patterns over the period.  The capitalisation of the company was not Mr Flax's area of concern or responsibility and he was not in a position to judge the future capital needs of the company as it expanded.  It was not his responsibility to monitor how the capital was employed in trading or in investments, which was Mr Dale's function.  None of Bernard Madoff, Andrew

Madoff, Mark Madoff, Mr Raven, Mr Dale or Mr Toop suggested to Mr Flax that the extent of capitalisation of the company required reconsideration. MSIL was contractually obliged to make the Interest Payments. Mr Flax still had no reason to think that the continued existence of the loans was contrary to MSIL's interests or was causing a loss. There was no negligence or breach of duty on Mr Flax's part in remaining comfortable with the status quo.

421.   Mr Flax was not in breach of his duties to act in what he perceived to be the interests of MSIL and to exercise reasonable skill and care.

*Mr Raven*

422.   Mr Raven signed both agreements on behalf of MSIL and the board resolutions approving them. He was himself responsible for some of the transfers by which the Interest Payments were made, and was aware of all of them.

423.   Mr Raven understood that Bernard Madoff wanted to capitalise the company for the purposes of its expansion. When the agreements were entered into he believed that the loans were desirable for the development of the business, including joining Jiway, becoming a registered market maker for NASDAQ Europe and proprietary trading including the statistical arbitrage book.

424.   In this way Mr Raven honestly believed that the loans were in the interests of MSIL. His belief that loans for these purposes were in the interests of MSIL was a reasonable belief in circumstances where:

(1)   The loans were determined and approved by Bernard Madoff. The transactions were in accordance with the wishes of Bernard Madoff, the chairman and almost sole voting shareholder. Mr Raven was entitled to treat this as a consideration which made them in MSIL's interests for the reason I have explained in relation to the MSIL Kohn Payments.

(2)   Bernard Madoff's plans for the expanded trading in Phase 4 were not rigidly formulated, so far as Mr Raven was or ought to have been aware, and could reasonably have been expected to be fluid depending upon developing circumstances such as market conditions, business opportunities and the quality of available recruits.

(3)   There was no reason to think at the time the loans were taken out that the capital would not be required for the trading; the black box trading alone might foreseeably have required capitalisation to this extent.

(4)   The loans were on commercial terms, approved by the FSA and recorded openly in the company's books and accounts.

(5)   Whatever the deployment of the capital, there was no reason to think MSIL would suffer a loss. The transaction was expected to be, at worst, cost neutral to MSIL: if some were not used to generate trading profit, there was no reason to believe that the combination of the investment income on that part and the trading profits would be insufficient to cover the interest payments; and to the extent that the interest payments were not exceeded by the trading profits and

investment income generated by the use of the capital, any shortfall would be made good by the subventions by BLMIS.

425.    At some time after he became CEO in 2003 Mr Raven became uncomfortable with the burden of making the Interest Repayments.  By 2007 he was keen to put an end to them and succeeded in persuading Bernard Madoff to do so by terminating the loans and capitalising them.  His motivation for doing so was his belief that during at least some periods the earnings on the unused capital at LIBOR was a quarter percent below the repayment amounts; and the funding of this by the subventions by Bernard Madoff in order to repay himself made no commercial sense.  It was this aspect he regarded and described as "cockeyed", "cockamamie" and "a charade".

426.    His desire to put an end to the loans was driven by the same two considerations as those which led him to seek to put an end to the MSIL Kohn Payments.  The first was that he saw his mission as being to build MSIL into a profitable business which could be independent from BLMIS; he therefore wished to remove any resort to the subventions because they were inconsistent with MSIL operating as an independent business.  Secondly he was, as I have explained, uncomfortable about the accounting treatment of the subventions as "fees receivable".

427.    It is difficult to identify when between 2003 and 2007 he came to this view.  It was only in 2007 that he was able to overcome Bernard Madoff's initial resistance: he described Bernard Madoff as getting a bit shirty about it when he tried to be "firm" with him.  He also faced opposition from Mr Dale, who saw an advantage in the capital remaining a dollar denominated loan.  But whenever it was that he first formed the view that the payments ought if possible to stop, I do not think it can be said that thereafter he was not acting in what he perceived to be MSIL's interest in going along with the Interest Payments, merely because he personally thought it desirable to put an end to the loans, in circumstances where:

(1)    The existing arrangements were in accordance with the wishes of Bernard Madoff; and

(2)    The subventions meant that there was no net cost to MSIL; and

(3)    The arrangements were not the subject matter of any adverse comment or criticism from any of the auditors, the regulators or his finance or compliance colleagues, all of whom were aware of the loans, the Interest Payments and the subventions; and

(4)    His Finance Director was arguing in favour of maintaining the loans.  Mr Dale was better placed to form a view on the cost and return of the capital, and it appears from the evidence I have heard that Mr Raven's understanding of the cost to MSIL was unjustified or at least exaggerated.

428.    He was entitled to take the view, as he did, that MSIL's interests were best served by trying to persuade Bernard Madoff and Mr Dale round to his view, as he ultimately succeeded in doing, and in the meantime for the company to fulfil its contractual obligation to make the Interest Payments.  Mr Dale was, after all, better placed to form a view whether they were making a loss on the investments of unused capital, a

topic on which it appears from the evidence I have heard that Mr Raven was overly concerned.

429.    Mr Raven was not in breach of his duties to act in what he perceived to be the interests of MSIL and to exercise reasonable skill and care.

*Mr Toop*

430.    The loans were entered into before Mr Toop became a director in 2003, but he soon became aware of them. They were discussed in a board meeting of 31 December 2003. He was not personally involved in making the Interest Payments but knew they were being made.

431.    Mr Toop thought that being highly capitalised was an advantage for MSIL, in particular because it would help him to attract traders who always wanted as much capital backed trading capacity as possible. This informed his honest belief that the existence of the loans was in MSIL's interests.

432.    That was a reasonable belief in circumstances where:

(1)    The loans had been agreed and approved by the board before he became a director.

(2)    The transactions were in accordance with the wishes of Bernard Madoff, the chairman and almost sole voting shareholder. Mr Toop was entitled to treat this as a consideration which made them in MSIL's interests for the reason I have explained in relation to the MSIL Kohn Payments.

(3)    There were advantages for MSIL in being highly capitalised.

(4)    Bernard Madoff's plans for the expanded trading in Phase 4 were not rigidly formulated, so far as Mr Flax was or ought to have been aware, and could reasonably have been expected to be fluid depending upon developing circumstances such as market conditions, business opportunities and the quality of available recruits.

(5)    Whatever the deployment of the capital, there was no reason for Mr Toop to think MSIL was suffering or would suffer a loss. The transaction was expected to be, at worst, cost neutral to MSIL: if some were not used to generate trading profit, there was no reason to believe that the combination of the investment income on that part and the trading profits would be insufficient to cover the interest payments; and to the extent that the interest payments were not exceeded by the trading profits and investment income generated by the use of the capital, any shortfall would be made good by the subventions by BLMIS.

(6)    The loans were on commercial terms, approved by the FSA and recorded openly in the company's books and accounts. Mr Toop was not made aware of any adverse comment or criticism of the arrangements from any of his finance or compliance colleagues, the auditors, or the regulators, all of whom were aware of the loans, the Interest Payments and the subventions.

433.   Mr Toop was not in breach of his duties to act in what he perceived to be the interests of MSIL and to exercise reasonable skill and care.

*Andrew and Mark Madoff*

434.   Each knew the loans were being made and signed the board resolution approving them. Each must also have been aware that the Interest Payments were being made in accordance with their terms to service the loans.

435.   Andrew Madoff's evidence was that there was no discussion of the loans or their purpose between them and their father, but that the amount of capitalisation did not seem unusual and Bernard Madoff was constantly insisting that BLMIS should have excess capital as a sign of its strength and stability and it was the same with MSIL. The level of capitalisation did not raise any concerns or suspicions.

436.   In my judgment this was sufficient to entitle them to conclude, as I find they did, that the loans were in MSIL's interests. In particular:

(1)   The loans were on commercial terms and there was no reason to think they would cause a loss to MSIL.

(2)   The loans were desired by Bernard Madoff as the majority shareholder and approved by his brother Peter as the only other voting shareholder.

(3)   There were advantages for MSIL in being highly capitalised which I have addressed above, including the demonstration of financial strength and stability which their father identified.

(4)   They were aware of the plan to expand MSIL's trading in general terms and of a number of the specifics. They were party to the board meeting approving MSIL joining Jiway. Andrew Madoff was involved in introducing the new systems for the new trading in London, and must have been aware of the intention to start the statistical arbitrage book. Minutes of a management meeting he attended in 2002 suggest that he envisaged it would run at a US$100m span ($50m short and $50m long). In these circumstances the brothers could reasonably have expected that further capital might be needed.

437.   If I had concluded that they had failed to address their mind to the question whether the loans were in MSIL's interest, I would still have concluded that they would not have been in breach of fiduciary duty because an honest and intelligent man in the position of each brother could reasonably have believed that the loans were in the interests of the company. That was the belief of those in London whose function it was to address such questions, including Mr Raven and Mr Flax, whose belief that the loans were in MSIL's interests was honest and reasonable for the reasons I have addressed.

438.   Neither Andrew nor Mark Madoff was in breach of his duties to act in what he perceived to be the interests of MSIL and to exercise reasonable skill and care.

*Exercise of powers for improper purpose*

439.    Entering into the loan agreements was not a breach of this duty by the directors.  The power exercised was the power to borrow money.  The purposes for which it was conferred included raising capital for potential use by the company in its business. The purpose for which it was exercised was to raise capital for potential use by the company in its business.  The power was not exercised for a purpose other than that for which it was conferred.

440.    The same is true of the making of the Interest Payments themselves, which were the fulfilment of contractual obligations properly undertaken towards Bernard Madoff.

## (20) The Interest Payments: defences

*Duomatic*

441.    Peter Madoff was aware of the loan agreements having signed the board resolutions approving them and was aware of the resulting interest obligations and of the Interest Payments.  I readily infer that he approved them.

442.    I reject the Claimant's arguments that the ***Duomatic*** principle is inapplicable because MSIL was insolvent or of doubtful solvency or because the transaction must be bona fide or honest.  The reasons which I have given when considering those arguments in the context of the MSIL Kohn Payments apply equally and mutatis mutandis to the Interest Payments.  The Claimant did not establish that the loan capital provided by Bernard Madoff itself came from the proceeds of the fraud, nor that any subventions supporting the Interest Payments did so.

443.    Accordingly if, and insofar as, entering into the subordinated loans or making the Interest Payments had constituted a breach by the directors of a duty to act in what was perceived to be the interests of the company, or a failure to exercise reasonable care skill and diligence, the company can make no complaint against the directors. The unanimous approval of the voting shareholders is a complete defence to any claim for such breach.

*Causation/remedy*

444.    I have accepted the Claimant's contention that if it established a breach of any fiduciary duty by a director Defendant in misapplying company property, the appropriate remedy would be restoration of the property (subject to relief from sanctions in an appropriate case), without inquiry into the counterfactual hypothesis of what would have happened if the duty had been fulfilled; and that such counterfactual inquiry was only necessary for the purposes of its claim for breach of the duty to exercise reasonable care skill and diligence.

445.    On behalf of Andrew and Mark Madoff it was argued that a distinction arises between breach in entering into the agreements and breach in the making of the Interest Payments; the former was said not to involve any misapplication of company property or engage the director's trustee like obligation to restore company property disbursed in breach of fiduciary duty.  I disagree.  The restoration principle applicable to the issues of causation and remedy applies to the making of the loan agreements as much as to the Interest Payments themselves.  Committing the company to the obligation to make payments is for these purposes itself a misapplication of the company's property

(on the present hypothesis that it is in breach of the director's fiduciary duties). The position is akin to that in **Forster v Outred** [1982] 1 WLR 86 where a claimant who agreed to mortgage her house as security for an advance to her son suffered damage as soon as she entered into the mortgage deed in reliance on the negligent advice of her solicitors. If the loan agreements had been for a fixed term with no early termination provisions, such that interest payments were an unavoidable fulfilment of existing contractual obligations, the alienation of the company's assets would have arisen solely through the directors having entered into the agreement. There could be no doubt in such circumstances that the loan agreement itself was the instrument by which the company's property was alienated. The same is no less true merely because the agreements in this case contained termination provisions (which were not in fact invoked) so as to impose a separate subsequent duty upon the directors to consider whether to make the payments.

446.    As to the remaining factual issues, I would have found that if the directors were under a duty not to enter into the agreements, or not to make or permit the payments, such a breach by each director was causative of the payments being made. If any of the directors had made clear that he regarded it as improper, the probable outcome would have been a collective discussion and the taking of legal advice, the upshot of which (on the hypothesis now being considered) would have been that none of the directors should make or permit the loan agreements or the payments. In those circumstances the directors would collectively have refused to do so, and in that eventuality, it is likely that Bernard Madoff would not have insisted upon it (the hypothesis being that the capital was known to be unnecessary and burdensome).

*No loss*

447.    This issue falls to be considered in the context of the slightly curious procedural position which has been reached by the agreement of the parties. For the purposes of this argument it is agreed that I should not decide (without further investigation and full disclosure, or a decision for another day on the pleadings) whether the Interest Payments exceeded the return on use of the loan capital, notwithstanding that for liability purposes I have found on the presently available evidence that they do not do so, viewed over the entire life of the loans. I must therefore assume, for the purposes of the no loss argument, the possibility of such potential loss to MSIL. But I describe it as a potential loss because any such loss would have been made good by the subventions. The no loss argument falls to be addressed on this basis.

448.    I have rejected the argument that the funding did not prevent a loss to MSIL because the funds were immediately repayable to BLMIS at and from the moment they were received as a result of what is now known to have been the Ponzi scheme fraud when considering insolvency in relation to the **Duomatic** defence above. The remaining issue is therefore whether the subventions fall to be ignored as collateral third party payments.

449.    Whilst the position is perhaps less clear cut than for the MSIL Kohn Payments, because only one of the Interest Payments has been identified as having the specific funding in advance, I reach the same conclusion, that the funding of the payments was not collateral. The purpose of the reimbursement was to make MSIL whole in respect of the Interest Payments amongst other expenses, so as to render the payments at worst cash neutral for MSIL.

450.    Accordingly the no loss defence succeeds in defeating the claim.

*Ex turpi causa*

451.    This defence arises from the Claimant's allegation that Bernard Madoff's true motive in procuring the unnecessary and burdensome loan agreements was to launder the proceeds of his fraud.

452.    The defence fails because the allegation of money laundering is not a necessary part of the Claimant's case.  The liability of the directors depends upon their own acts and state of mind.  Bernard Madoff's motives form no necessary part of the claim against them; and in any event it is not established that the loans in fact employed money deriving from Bernard Madoff's fraud.

*Limitation*

453.    The limitation period is six years.  None of the directors was guilty of a fraudulent breach of trust so as to engage s. 21(1) (a) Limitation Act 1980.  Nor was there any deliberate concealment within s.32(1)(b) or 32(2).

454.    This bars the claim insofar as it relies upon the breach being the loan agreements themselves: *Forster v Outred* [1982] 1 WLR 86.  On behalf of the Defendants it was argued that this barred the whole claim because the loss was suffered at the moment the agreements were entered into and the payments were merely the consequence of the agreements.  I cannot accept this argument.  It is a false analysis to treat the Interest Payments as merely fulfilment of the contractual commitments already undertaken.  Because of the termination provisions, the directors had a real decision to make as to whether to continue to make the payments.  Had they been in breach in relation to those decisions, it would have been no answer to say that they were causing the company to fulfil its existing contractual obligations because they were in a position where they could have avoided the continuation of such obligations.

455.    Accordingly the claim is time barred in respect of Interest Payments made prior to 8 December 2004.

*Relief from sanction*

456.    Had I found that any of the director Defendants was liable or potentially liable in respect of any of the Interest Payments, I would have held that he ought fairly to be excused from any liability in the circumstances, in particular where:

        (1) he acted reasonably and honestly throughout;

        (2) the payments caused MSIL no loss;

        (3) the directors did not seek or obtain any benefit from the payments;

        (4) the payments were approved with full knowledge by all the voting shareholders of the company;

        (5) the degree of fault, if any, was venial; and

(6) the consequences of imposing any personal liability would be unduly harsh, and disproportionate to any degree of fault.

## (21) The Lifestyle Payments: claims and defences

457.    The third element of the claim concerns payments by MSIL for goods or services which were made for the benefit of Bernard Madoff or members of his family. They occurred between 2002 and 2008 and included:

(1) payments between 17 June 2003 and 23 October 2008 totalling €5,138,647.26 for the purchase of a new Leopard Type 27 Sport motor yacht, *"Bull"*, and related expenses;

(2) payments between 25 March 2008 and 28 November 2008 totalling £139,532.45 in respect of an Aston Martin motor car bought for Peter Madoff;

(3) payments between 5 March 2008 and 12 December 2008 totalling €136,695.49 from an account at Fairbairn Private Bank (IOM) Ltd in the Isle of Man by the use of credit cards issued to Bernard Madoff, Ruth Madoff and the captain of *Bull*. These were used primarily for petrol and other expenses in connection with the yacht.

(4) cash withdrawals from the Fairbairn account between 5 March 2008 and 2 December 2008, again for the private benefit of Bernard Madoff and his family.

(5) a miscellany of other payments to Bernard Madoff or members of his family for their private benefit, including US$207,519.82 towards antiques, artworks, jewellery and furniture.

458.    The total of the payments in their currency of payment is €5,316,629, US$566,535 and £180,009. The payments were made from funds in MSIL's bank accounts.

459.    The payments were all made at Bernard Madoff's request. In every case the amount of these payments was deducted from Bernard Madoff's director's loan account which was always in credit. The payments therefore reduced MSIL's liability towards Bernard Madoff by an equivalent amount, which was how they were treated by Mr Flax and recorded in the company's books and accounts. The loan account was a ledger account, not a separate bank account, representing loans from Bernard Madoff to MSIL which were of no fixed term, interest free and repayable by MSIL to Bernard Madoff on demand. Mr Flax's understanding was that the account was always intended to be available to facilitate payments on behalf of Mr Madoff rather than to provide working capital for MSIL. The loans appeared in the ledger as a separate account, and in the annual accounts under "creditors, amounts falling due within one year- loan from director". The balance was confirmed annually by Bernard Madoff in a signed document required by KPMG for audit purposes. The payments themselves were meticulously recorded by Mr Flax in the general ledger, as was their deduction from Bernard Madoff's loan account. There was nothing secret about the payments or their deduction from the loan account. The company's books recording them were audited by KPMG. KPMG were aware of the practice and

raised no concerns.  The arrangement was formally recorded in a letter from Mr Dale to Bernard Madoff dated 7 November 2007.

460.    Mr Flax and Mr Raven were aware of the payments and responsible for making them, and knew that they were to be debited to Bernard Madoff's loan account.  Mr Toop was aware of the Fairbairn account, which he was told was because Bernard Madoff wanted a Euro denominated credit card; he was aware of the issue of two credit cards issued on the account, which he was told by Mr Dale was for the captain of the yacht's use and for fuel; he was told by Mr Dale that payments would be deducted from the loan account, with which he was not previously familiar.  He was not aware of any of the other payments.  Andrew Madoff and Mark Madoff were similarly aware of the Fairbairn account and its purpose.  Additionally Andrew Madoff was aware of a payment for a garden bench for himself.  He and Mark Madoff were not aware of any other payments.

461.    MSIL contends that a director's loan account is usually for the purposes of providing working capital to the company, and that in any event the loans by Bernard Madoff which were represented by the director's loan account, albeit repayable on demand, provided money which became the company's money.  It argues that the directors were in breach of duty in applying such money to purchase goods and services which were not for the benefit of the company itself.

462.    This argument is misconceived.  The money was applied to discharge, pro tanto, the company's obligations to Bernard Madoff.  He requested such payments in his capacity as creditor.  There would not have been any breach or impropriety in the money being paid to him, rather than at his request to the provider of the goods and services, as the Claimant accepted.  It is not suggested that the directors believed or had reason to believe that the company was insolvent or of doubtful solvency, or that the payments unfairly prejudiced other creditors.  It is not suggested that the directors believed or had reason to suspect that the making of direct payments in this way involved any illegality or money laundering.  In these circumstances discharging the debt by paying a third party at the debtor's request is no different from discharging it by paying the debtor directly.  To describe this conduct as acting otherwise than in MSIL's interests, or as exercising powers for an improper purpose, or as negligent, seems to me unarguable.  The directors honestly and reasonably believed that the payments of which they were aware would reduce the loan account, which is what happened.  The allegation of breach of duty is in my judgment hopeless.

463.    MSIL criticised Mr Raven for referring to this loan account as a current account belonging to Bernard Madoff which the latter was free to spend as he wished, on the grounds that the money used in fact came from accounts in the company's name.  This criticism too is misplaced.  The analogy with a bank account is in the circumstances of this case a sound one.  The account represented a debt payable on demand by MSIL to Bernard Madoff, just like a customer's current account with a bank where the credit balance on the account represents a debt owed by the bank.  Bernard Madoff could instruct MSIL to reduce the debt pro tanto by asking it to make payments to third parties, just as can a customer to its bank.  A bank uses its own assets to fulfil customer payment instructions, but the bank's directors are not thereby in breach of duty in employing the bank's assets to purchase goods and services to be enjoyed by the customer.

464. Mr Toop unearthed a document published by HMRC in May 2013 entitled "Director's Loan Accounts Toolkit" which envisaged charging to a director's loan account expenses incurred by the company for the personal benefit of the director. Whilst this is not something which was available to the MSIL directors at the time of the Lifestyle Payments, it nevertheless supports the conclusion there was no impropriety in the practice.

465. MSIL argued that the payments did not go to discharge any loan obligation on the grounds that the loan was a sham because Bernard Madoff never intended the loan account to be repaid. There was no support for this suggestion in the evidence, and it is belied by his use of the loan account for the payments under consideration. But in any event it is irrelevant to the allegations of breach of duty by the directors who honestly and reasonably believed it to be a genuine obligation. MSIL did not allege otherwise.

466. MSIL also argued that "In any event MSIL's liability was to return the stolen money it received, and it did not satisfy that liability by spending it on a yacht for Bernard Madoff or an Aston Martin for his brother." I found this rhetoric no more coherent than its other arguments. It was not established that the loan account was funded by stolen money. But even if it had been, there was no suggestion that the directors knew or suspected such to be the case. Moreover if the obligation was "to return" the money received from Bernard Madoff, that is pay an equivalent amount to him, as alleged, I do not understand why making payments to third parties at Bernard Madoff's request would not fulfil such obligation.

467. That is sufficient to dispose of this claim. Had I concluded that there was any breach of duty, the claim would have failed for the following additional reasons:

    (1) The alleged breaches caused no loss.

    (2) The payments were known to and approved by Bernard Madoff and Peter Madoff and the directors have a ***Duomatic*** defence save to the claim based on improper exercise of powers.

    (3) Claims in respect of payments prior to 8 December 2004 are time barred. The Claimant did not pursue its claim of fraud so as to engage s.21(1)(a) Limitation Act 1980. There was no deliberate concealment within the meaning of s. 32(1)(b) or 32(2).

    (4) I would have granted relief from sanction because the directors acted honestly and reasonably in making or permitting such of the payments of which they were aware.

## (22) Conclusion and postscript

468. All claims against each Defendant fail and are dismissed.

469. I cannot forbear from recording the commendable dignity and restraint which I have observed in each of Mr Raven, Mr Flax, Mr Toop and Mrs Kohn throughout the trial. Bernard Madoff's fraud itself blighted their lives and tainted their good names simply by association, quite apart from the financial losses suffered by some from

investments in the Ponzi scheme. To this was added the burden of this unfounded claim, making serious allegations of dishonesty, which threatened financial ruin and personal humiliation. It was commenced without forewarning – some discovered they were the subject of the claim by reading of it in the newspapers – and has been pursued aggressively and relentlessly over several years, on occasion with an unfair degree of hyperbole (for example referring to the MSIL Kohn Payments as "secret kickbacks" when there was nothing secret about them and on MSIL's own case they were introductory commissions which were not excessive). Mrs Kohn has suffered poisonous press releases by the SIPA Trustee (for example referring to her as Bernard Madoff's "criminal soul mate whose greed and dishonest inventiveness equalled his own") and been subject to a worldwide freezing order and extensive disclosure of her family's assets and affairs. Neither Mr Flax nor Mr Raven, both in their seventies, is in the best of health. In Mr Toop's case the strain of conducting his own defence without legal representation was evident, although he never surrendered his dignity or lost his mordant sense of humour. The stress imposed on them and their families by these proceedings must have been immense, just as it must also have been on Andrew Madoff, seriously ill with cancer, and his and his brother's families. I very much regret that I must have added to their burden by the time it has taken to prepare this judgment. Their honesty and integrity has been vindicated. The resolute and temperate way they have conducted themselves in these proceedings does them great credit.

TAB 38

*Manifest Shipping Co Ltd v Uni-Polaris Insurance Co Ltd*
[2003] 1 AC 469, House of Lords

469

[2003] 1 AC         Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))

A                   House of Lords

# Manifest Shipping Co Ltd *v* Uni-Polaris Insurance Co Ltd and others

## [2001] UKHL 1

B   2000 Oct 9, 10, 11, 12           Lord Steyn, Lord Hoffmann, Lord Clyde,
    2001 Jan 18                   Lord Hobhouse of Woodborough
                                      and Lord Scott of Foscote

*Insurance — Marine — Unseaworthiness — Total loss of vessel — Insurers not liable
if ship sent to sea in unseaworthy state with privity of the assured — "Blind eye
knowledge" of unseaworthiness alleged — Obligation to observe utmost good*
C   *faith — Extent of obligation at claim stage — Whether assured privy to
unseaworthiness of Marine Insurance Act 1906 (6 Edw 7, c 41), ss 17, 39(5)*
*Ships' names — Star Sea*

     The assured was one of a group of companies which were controlled by a
shipowning family who were beneficial owners of a fleet of over 30 vessels.
Following engine room fires two of the vessels became constructive total losses. In
D   each case the captain and crew had failed to use the full flood carbon dioxide
($CO_2$) extinguishing system correctly and the engine room dampers were found to
have been faulty so that the engine room could not have been fully sealed meaning
that had the $CO_2$ system been discharged correctly it would not have worked
effectively. Just over a year later a third vessel in the fleet became a constructive total
loss following an engine room fire. Again the engine room dampers were faulty and
the captain had not known how to use the $CO_2$ system. The insurers refused to meet
the assured's claim for the loss of the third vessel on the grounds that (i) she was
E   unseaworthy because her captain and crew were incompetent and the engine room
dampers were faulty, the owners had been privy to that unseaworthiness by virtue of
"blind eye" knowledge and consequently the insurers were not liable for the loss
pursuant to section 39(5) of the Marine Insurance Act 1906[1] and (ii) the owners were
in breach of their duty to observe the utmost good faith pursuant to section 17 of the
Act in that, there had been a failure to disclose material information by, inter alia,
claiming legal privilege for reports into one of the earlier fires, failing to disclose them
F   until privilege was waived on the second day of the trial, and that consequently the
insurers were entitled to avoid the contract. The judge rejected the section 17 defence
but found that the owners had had blind eye knowledge of the unseaworthiness of
the vessel and were entitled to recover only for the loss which would have occurred
if the $CO_2$ system had been used and worked effectively. The Court of Appeal upheld
the judge's decision on the section 17 defence but allowed the assured to recover the
full insured value of the vessel on the ground that although the owners had been
G   negligent they had not had blind eye knowledge of the unseaworthiness.
     On appeal by the insurers—
     *Held,* dismissing the appeal (1) that an assured could not be said to be privy to the
unseaworthines of his vessel by virtue of blind eye knowledge unless it was shown
that he had had a suspicion or belief that the vessel was unseaworthy and had
deliberately refrained from making relevant inquiries; that to establish privity it was
necessary to show on a subjective basis that the reason why the assured had failed to
make investigations was that he had not wanted to know the state of the vessel for
H   certain, and negligence or gross negligence was insufficient; that the evidence did not
sustain a finding of blind eye knowledge; and that, accordingly, privity was not made
out against the shipowners (post, paras 1–3, 25, 26, 35–36, 115–117).

        [1] Marine Insurance Act 1906, s 17: see post, para 18.
       S 39(5), see post, para 15.

470
**Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))**                  **[2003] 1 AC**

*Cia Maritima San Basilio SA v Oceanus Mutual Underwriting Association*    A
*(Bermuda) Ltd (The Eurysthenes)* [1977] QB 49, CA applied.

(2) That since there was a distinction between a lack of good faith which was
material to the making of an insurance contract and a lack of good faith during the
performance of the contract different obligations were involved at pre-contract and
post-contract stages; that while in the pre-contract stages there was a positive duty to
disclose all information which was material to the risk proposed and the assessment
of the premium it would be disproportionate for the insurer to be able to avoid the    B
contract ab initio by reason of the post-contract failure of the assured to reveal all
facts which the insurer might have an interest in knowing and which might affect his
conduct; that when a claim was being made under the policy the duty was one of
honesty and required that the claim was not made fraudulently; and that,
accordingly, the shipowners were not in breach of the duty to observe the utmost
good faith; that further (per Lord Steyn, Lord Hoffmann, Lord Clyde and Lord
Hobhouse of Woodborough) once the parties were engaged in litigation the rationale    C
for the duty of good faith no longer applied because the parties were governed by the
Rules of Court and, consequently, the duty was superseded by the rules of litigation
(post, paras 1–2, 4, 7, 51–52, 54, 56–57, 72, 75–77, 94–95, 96, 106–111).

*Piermay Shipping Co SA v Chester (The Michael)* [1979] 2 Lloyd's Rep 1, CA
considered.

*Black King Shipping Corpn v Massie (The Litsion Pride)* [1985] 1 Lloyd's Rep
437 disapproved.    D

Decision of the Court of Appeal [1997] 1 Lloyd's Rep 360 affirmed.

The following cases are referred to in their Lordships' opinions:

*Bank of Nova Scotia v Hellenic Mutual War Risks Association (Bermuda) Ltd* [1988]
    1 Lloyd's Rep 514
*Banque Keyser Ullmann SA v Skandia (UK) Insurance Co Ltd* [1990] 1 QB 665;
    [1989] 3 WLR 25; [1989] 2 All ER 952, CA; [1991] 2 AC 249; [1990] 3 WLR    E
    364; [1990] 2 All ER 947, HL(E)
*Bates v Hewitt* (1867) LR 2 QB 595
*Bell v Lever Bros Ltd* [1932] AC 161, HL(E)
*Beresford v Royal Insurance Co Ltd* [1937] 2 KB 197; [1937] 2 All ER 243, CA
*Black King Shipping Corpn v Massie (The Litsion Pride)* [1985] 1 Lloyd's Rep 437
*Boulton v Houlder Bros & Co* [1904] 1 KB 784, CA
*Britton v Royal Insurance Co* (1866) 4 F & F 905    F
*Cantiere Meccanico Brindisino v Janson* [1912] 3 KB 452, CA
*Carter v Boehm* (1766) 3 Burr 1905
*Chandris v Argo Insurance Co Ltd* [1963] 2 Lloyd's Rep 65
*Cia Maritima San Basilio SA v Oceanus Mutual Underwriting Association*
    *(Bermuda) Ltd (The Eurysthenes)* [1977] QB 49; [1976] 3 WLR 265; [1976] 3 All
    ER 243, CA
*Cia Naviera Vascongada v British & Foreign Marine Insurance Co Ltd (The Gloria)*    G
    (1935) 54 Ll L Rep 35
*Cie Financiere et Commerciale du Pacifique v Peruvian Guano Co* (1882) 11 QBD 55,
    CA
*Colonial Bank v European Grain and Shipping Ltd* [1989] AC 1056; [1989] 2 WLR
    440; [1989] 1 All ER 545, HL(E)
*Container Transport International Inc v Oceanus Mutual Underwriting Association*
    *(Bermuda) Ltd* [1984] 1 Lloyd's Rep 476, CA    H
*Cory v Patton* (1872) LR 7 QB 304
*Dalglish v Jarvie* (1850) 2 Mac & G 231
*Galloway v Guardian Royal Exchange (UK) Ltd* [1999] Lloyd's Rep IR 209, CA
*Goldschmidt v Marryat* (1809) 1 Camp 559
*Goulstone v Royal Insurance Co* (1858) 1 F & F 276

A   *Graham Joint Stock Shipping Co Ltd v Motor Union Insurance Co Ltd* [1922] 1 KB
563, CA
*Henderson v Underwriting and Agency Association Ltd* [1891] 1 QB 557, DC
*Iron Trades Mutual Insurance Co Ltd v Cia De Seguros Imperio* (unreported) 31 July
1990, Hobhouse J
*Jones v Gordon* (1877) 2 App Cas 616, HL(E)
*Lek v Mathews* (1927) 29 Ll L Rep 141, HL(E)

B   *Leon v Casey* [1932] 2 KB 576, CA
*Liberian Insurance Agency Inc v Mosse* [1977] 2 Lloyd's Rep 560
*Lishman v Northern Maritime Insurance Co* (1875) LR 10 CP 179
*London Assurance v Mansel* (1879) 11 Ch D 363
*Mutual and Federal Insurance Co Ltd v Oudtshoorn Municipality* 1985 (1) SA 419
*NSW Medical Defence Union Ltd v Transport Industries Insurance Co Ltd* (1985)
4 NSWLR 107

C   *New Hampshire Insurance Co v MGN Ltd* [1997] LRLR 24, CA
*Niger Co Ltd v Guardian Assurance Co Ltd* (1921) 6 Ll L Rep 239, CA; (1922)
13 Ll L Rep 75, HL(E)
*Orakpo v Barclays Insurance Services* [1995] LRLR 443, CA
*Overseas Commodities Ltd v Style* [1958] 1 Lloyd's Rep 546
*Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501; [1994]
3 WLR 677; [1994] 3 All ER 581, HL(E)

D   *Pawson v Watson* (1778) 2 Cowp 785
*Phoenix General Insurance Co of Greece SA v Halvanon Insurance Co Ltd* [1985]
2 Lloyd's Rep 599
*Piermay Shipping Co SA v Chester (The Michael)* [1979] 2 Lloyd's Rep 1, CA
*Polurrian Steamship Co v Young* (1913) 19 Com Cas 143
*Probatina Shipping Co Ltd v Sun Insurance Office Ltd* [1974] QB 635; [1974] 2 WLR
666; [1974] 2 All ER 478, CA

E   *Rego v Connecticut Insurance Placement Facility* (1991) 593 A 2d 491
*Reid & Co Ltd v Employers' Accident and Livestock Insurance Co Ltd* (1899) 1 F
1031
*Royal Boskalis Westminster NV v Mountain* [1997] LRLR 523; [1999] QB 674;
[1998] 2 WLR 538; [1997] 2 All ER 929, CA
*Sailing Ship Blairmore Co Ltd v Macredie* [1898] AC 593, HL(Sc)
*Standard Oil Co of New York v Clan Line Steamers Ltd* [1924] AC 100, HL(E)

F   *Standard Steamship Owners' P & I Association (Bermuda) Ltd v Oceanfast Shipping
Ltd* (unreported) 6 March 1996, Mance J
*Thomas and Tyne and Wear Steamship Freight Insurance Association* [1917] 1 KB 938
*Twizell v Allen* (1839) 5 M & W 337
*Village Main Reef Gold Mining Co Ltd v Stearns* (1900) 5 Com Cas 246

The following additional cases were cited in argument:

G   *Anghelatos v Northern Assurance Co Ltd* (1922) 13 Ll L Rep 291, CA
*China Traders' Insurance Co Ltd v Royal Exchange Assurance Corpn* [1898] 2 QB
187, CA
*Gibson v Small* (1853) 4 HL Cas 353, HL(E)
*Grand Champion Tankers Ltd v Norpipe A/S* [1984] AC 563; [1984] 2 WLR 942;
[1984] 2 All ER 243, HL(E)
*Harding v Bussell* [1905] 2 KB 83, CA

H   *Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd* [1989] QB 433;
[1988] 2 WLR 615; [1988] 1 All ER 348, CA
*Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC
500; [1995] 3 WLR 413; [1995] 3 All ER 918, PC
*SA des Minerais v Grant Trading Inc (The Ert Stefanie)* [1989] 1 Lloyd's Rep 349, CA
*SA d'Intermediaries Luxembourgeois v Farex Gie* [1995] LRLR 116, CA

472
**Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))**                    [2003] 1 AC

**APPEAL** from the Court of Appeal                                              A

This was an appeal by the defendant representative insurers, Uni-Polaris
Insurance Co Ltd and La Réunion Européenne, with leave of the House of
Lords (Lord Lloyd, Lord Nolan and Lord Hoffmann) given on 27 October
1997 from a decision of the Court of Appeal (Leggatt, Henry and Waller LJJ)
delivered on 20 December 1996 allowing an appeal by the plaintiff assured,
Manifest Shipping Co Ltd, from a decision of Tuckey J delivered on
16 November 1994.                                                               B

The facts are stated in the opinions of Lord Hobhouse of Woodborough.

*Gordon Pollock QC* and *David Foxton* for the defendant insurers. The
Court of Appeal's approach to the assured's privity to unseaworthiness for
the purposes of section 39(5) of the Marine Insurance Act 1906 was unduly
narrow in two respects. First, in failing to allow for a state of mind of       C
recklessness, or indifference, to the issue of seaworthiness which historically
underlies the concept of privity in this context. Second, in failing to consider
the assured's state of mind with regard to the adequacy of the systems in
operation to ensure the seaworthiness of the fleet.

Although the implied warranty as to seaworthiness does not apply to time
policies there have always been limits to an assured's ability to recover from   D
his insurer under a time policy for damage caused by the accidental incursion
of seawater due to unseaworthiness. Those limits had been sketched out
only in outline from before the passage of the Act, but they reflected a
perception that the insurer could not recover where the proximate cause, or
at least a direct cause, of the loss was unseaworthiness in respect of which
the shipowner was "culpable". Moreover there was nothing to suggest that
the relevant requirement of culpability could only be satisfied by knowledge:   E
see *Gibson v Small* (1853) 4 HL Cas 353; *Thomas v Tyne and Wear
Steamship Freight Insurance Association* [1917] 1 KB 938. Something more
than mere negligence as to unseaworthiness is required. However, the issue
is not simply one of "knowledge". The essence of the exception is that it
applies where the unseaworthy state of the ship has been "connived" at in a
conscious way by the shipowner. This may be because of knowledge, but,         F
recklessness, in the sense of conscious risk taking, will also suffice. There is
no real difference in blameworthiness between someone who acts with
knowledge of a state of affairs, and someone who acts without caring
whether that state of affairs exists or not. A shipowner who sends his ship to
sea in circumstances in which he is indifferent to its firefighting capabilities,
or who is conscious of a risk that they are or may be inadequate, should be in  G
no different a position to one who knows of unseaworthiness, or who
deliberately closes his eyes to such unseaworthiness. Blind eye knowledge
must mean an assured failing to acquire the relevant knowledge deliberately.
These are all shades on a continuous spectrum of conscious or wilful
conduct, and are far removed from mere negligence. It is no part of the
bargain between assured and insurer that the former will be indemnified
against the consequences of such conscious risk taking. Although             H
Roskill LJ in *Cia Maritima San Basilio SA v Oceanus Mutual Underwriting
Association (Bermuda) Ltd (The Eurysthenes)* [1977] QB 49 rejected the
argument that section 39(5) could be traced back to notions of "wilful
misconduct", there is nothing in the judgments in that case to exclude a state

A  of mind of recklessness or conscious risk running from the concept of "privity". If they do so, they are wrong.

The concept of "privity" within section 39(5) of 1906 Act extends to a shipowner who knows that the system which he operates in his management of his fleet is inadequate to ensure the seaworthiness of his vessels in the relevant respect, but who permits the vessels to sail regardless: see *Grand*

B  *Champion Tankers Ltd v Norpipe A/S* [1984] AC 563. Such a shipowner consciously runs the risk of unseaworthiness, and "connives in" the unseaworthiness of his vessel. In requiring either knowledge of the relevant facts, or a suspicion as to those matters and a decision not to make further enquiries for fear of having certain knowledge, the Court of Appeal applied an overly narrow concept of privity.

[Submissions were made on the facts].

C  Unlike sections 18 to 20 (which refer only to the assured), section 17 of the Marine Insurance Act 1906 imposes a mutual duty of good faith. There is no temporal limitation in section 17 to events before the bargain is made. Hence, whilst section 17 can apply pre-contract, there is now a considerable body of authority to support the view that the duty of the utmost good faith which it enshrines will also apply after the contract has been entered into, in

D  particular whenever the assured asks the insurer to make a decision: *Black King Shipping Corpn v Massie (The Litsion Pride)* [1985] 1 Lloyd's Rep 437; *Overseas Commodities Ltd v Style* [1958] 1 Lloyd's Rep 546; *Liberian Insurance Agency Inc v Mosse* [1977] 2 Lloyd's Rep 560; *Phoenix General Insurance Co of Greece SA v Halvanon Insurance Co Ltd* [1985] 2 Lloyd's Rep 599.

E  It is clear that the basis of the doctrine of the utmost good faith as it operates before the contract is signed cannot be an implied term of the contract of insurance. Rather its juridical basis is a relationship arising as a matter of general law, imposed by a codifying statute—and before that by rules originating in the jurisdiction of courts of equity to prevent impositions: *Banque Keyser Ullmann SA v Skandia (UK) Insurance Co Ltd* [1990] 1 QB 665.

F  As sections 18 to 20 merely exemplify certain spheres of operation of the general relationship in section 17, it would be artificial to suggest that the juridical basis of that relationship differs in the pre- and post-contractual contexts. In each case the relationship exists because of a rule of positive law, now enshrined in statute: see *Bank of Nova Scotia v Hellenic Mutual War Risks Association (Bermuda) Ltd* [1988] 1 Lloyd's Rep 514; *Orakpo v*

G  *Barclays Insurance Services* [1995] LRLR 443; *The Litsion Pride* [1985] 1 Lloyd's Rep 437.

There is nothing in section 17 which supports the Court of Appeal's view that the only obligation when presenting a claim is to abstain from fraud. The duty of utmost good faith requires much more than simply the absence of bad faith, although where there has been bad faith the duty has been breached. Ex hypothesi the duty can be breached without conduct that is

H  fraudulent. It is simply not possible to define "the utmost good faith" as the absence of the tort of deceit, however much male fides there may have been: *Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501; *Container Transport International Inc v Oceanus Mutual Underwriting Association (Bermuda) Ltd* [1984] 1 Lloyd's Rep 476;

*Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd* [1989]    A
QB 433.

An important feature of a relationship of the utmost good faith which the
Court of Appeal's formulation fails to allow for is an obligation of
disclosure, a concept which has long been recognised as an incident of
contracts of insurance, even at the claims stage: *Banque Keyser Ullmann SA v
Skandia (UK) Insurance Co Ltd* [1990] 1 QB 665; *The Litsion Pride* [1985]    B
1 Lloyd's Rep 437. Such a duty is necessary because, just as at inception, the
assured will have a monopoly of knowledge of many matters relevant to the
claim and to the underwriter's decision whether or not to pay it and in what
amount, and because the utmost good faith nature of the relationship
precludes one party from taking advantage of his monopoly of knowledge in
his dealings with the other: see *Orakpo v Barclays Insurance Services* [1995]
LRLR 443; *Graham Joint Stock Shipping Co Ltd v Motor Union Insurance    C
Co Ltd* [1922] 1 KB 563. It is difficult to reconcile an obligation of
disclosure with a requirement only to abstain from fraud. Common law
fraud recognises no duty to speak, nor any concept of fraudulent non-
disclosure. "Equitable fraud" ventured beyond cases of dishonest
misrepresentation to encompass wider concepts of disclosure, fair dealing
and equality of bargaining power. Indeed in earlier times, any breach of the
doctrine of the utmost good faith in the pre-contractual context was often    D
described as "fraud" in this wider sense: see *Carter v Boehm* (1766) 3 Burr
1905. Consequently, it is not possible to say as a matter of language or law
that observing the utmost good faith requires only that a party abstain from
fraud. No further definition of the concept of utmost good faith is necessary.
However, such a relationship obviously requires fair dealing, and full
disclosure, between the parties.    E

Although the relationship of the utmost good faith continues after a
contract has been signed as well as before, and its legal basis does not
change, the operation of the relationship is not identical in these contexts. In
the pre-contract stage, negligent and even wholly innocent
misrepresentation or non-disclosure suffice to breach the duty. This reflects
the fact that the duties embodied in sections 18–20 of the 1906 Act are far
from any ordinary understanding of lack of good faith: *SA d'Intermediaries    F
Luxembourgeois v Farex Gie* [1995] LRLR 116. However, in the context of
presenting and prosecuting a claim, sections 18–20 have no application.

The remedy of avoidance can sometimes be Draconian. It is not,
however, a remedy of the insurer's choosing, but one stipulated for by
section 17. There is no other remedy. No doubt it is the potentially
Draconian nature of the remedy which has led courts to attempt to identify    G
another remedy for breach of the duty at the claims stage, namely the failure
of the claim: *The Litsion Pride* [1985] 1 Lloyd's Rep 437; *Reid & Co Ltd v
Employers' Accident and Livestock Insurance Co Ltd* (1899) 1 F 1031. The
difficulty with such a suggestion is the apparent conflict with the clear
provision in section 17. This defence is relied on in the alternative.
However, whatever concern there may be at the effects, in certain cases, of
the remedy of avoidance, this provides no basis for altering the content of the    H
duty of utmost good faith. If some requirement of "proportionality" is to be
introduced, that is a legislative matter.

The obligation of disclosure inherent in a relationship of the utmost good
faith is not terminated or supplanted by the commencement of litigation: see

A  *Royal Boskalis Westminster NV v Mountain* [1997] LRLR 523. In marine insurance, the "ship's papers" cases provide a substantial body of authority for the view that the relationship of insurer and assured continues during litigation, and that as a result those parties should be placed under wider obligations in relation to production of documents than those provided for by the general procedural rules. For the history of the order see *Twizell v Allen* (1839) 5 M & W 337; *Boulton v Houlder Bros & Co* [1904] 1 KB 784;

B  *Goldschmidt v Marryat* (1809) 1 Camp 559; *Henderson v Underwriting and Agency Association Ltd* [1891] 1 QB 557; *Village Main Reef Gold Mining Co Ltd v Stearns* (1900) 5 Com Cas 246. The foundation for the order was the recognition that even during litigation there is a mutual duty of utmost good faith: see *Graham Joint Stock Shipping Co Ltd v Motor Union Insurance Co Ltd* [1922] 1 KB 563; *Anghelatos v Northern Assurance Co*

C  *Ltd* (1922) 13 LlL Rep 291; *Leon v Casey* [1932] 2 KB 576; *Harding v Bussell* [1905] 2 KB 83; *China Traders' Insurance Co Ltd v Royal Exchange Assurance Corpn* [1898] 2 QB 187. Although the orders were certainly procedural, involving as they did the production and disclosure of documents, the significant fact is that the courts consistently appealed to the substantive characteristics of a contract of marine insurance to justify the procedural order made. No legal mechanism has been suggested by which

D  the relationship can be terminated or supplanted in respect of a rejected or litigated claim, still less one which can reconcile such a state of affairs with the fact that the duty may well continue in respect of other aspects of the assured/ insurer relationship.

The Court of Appeal's suggestion that the obligation of disclosure is supplanted in proceedings by the rules as to discovery confuses two different

E  concepts. The obligation of disclosure which arises by virtue of the utmost good faith is concerned with the communication of material facts to the insurer of which the assured has knowledge, but of which the insurer is ignorant. It is not concerned with the production of documents. If an assured was aware, from an expert's report obtained for the purposes of litigation, that the subject matter of a proposed policy of marine insurance was unseaworthy, he would be required to disclose the fact to the insurer

F  pursuant to his duty of the utmost good faith, regardless of the fact that the document was immune from production whether under rules of discovery or pursuant to a subpoena duces tecum.

If the Court of Appeal is correct, an insured can seek to negate his obligation of disclosure at the claims stage by treating any request by underwriters for information or any failure to respond favourably to a

G  demand for immediate payment as a rejection of the claim, and commencing legal proceedings immediately. Indeed, in the context of a major marine casualty, it is not possible to distinguish the presentation of the claim from litigation of it. The entire process is handled by solicitors, on a footing of imminent or actual litigation, from the outset.

If the utmost good faith has not been observed in the presentation of the claim this should be attributed to the assured for the purposes of both

H  sections 17 and 39(5) by applying the "primary rule of attribution", namely that the acts of a director of the management company who had not been excluded from participation in the relevant aspect of the company's business, fell to be attributed to the company: see *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500 and *SA des*

*Minerais v Grant Trading Inc (The Ert Stefanie)* [1989] 1 Lloyd's Rep 349.    A
Further, the conduct of agents to whom an assured has delegated particular
matters in dealings with insurers will be attributed to the assured for the
purposes of section 17 ( even in circumstances in which the secondary rules of
attribution provided for in sections 18(1), 19 and 20(1) do not apply): see
*The Litsion Pride* [1985] 1 Lloyd's Rep 437; *Piermay Shipping Co SA v
Chester (The Michael)* [1979] 2 Lloyd's Rep 1.                                  B
    [Submissions were made on the facts.]

    *Jonathan Sumption QC, Stephen Hofmeyr QC* and *Rebecca Sabben-
Clare* for the assured.  The leading case on what constitutes privity is the
decision of the Court of Appeal in *Cia Maritima San Basilio SA v Oceanus
Mutual Underwriting Association (Bermuda) Ltd (The Eurysthenes)* [1977]
QB 49 in which the earlier authorities were reviewed.  It is authority for two   C
main points: (i) that privity involves either actual knowledge of the
unseaworthiness or turning a blind eye to it, not mere negligence; (ii) that it
must be the personal privity of the assured, i e of its "head men", not simply
that of employees or other agents for whom it may be vicariously liable.  As a
matter of language, "privity" necessarily involves knowledge of some kind.
A person cannot be privy to a state of affairs of which he is ignorant.  He is
ignorant of it even if he ought not to have been.                               D
    The reason why the law equates turning a blind eye with actual
knowledge is that it is the state of mind of a person who deliberately avoids
acquiring actual knowledge.  Such a person must be actually conscious that
the relevant fact may be true before he can be said deliberately to avoid
knowing it: see *The Eurysthenes* [1977] QB 49; *Cia Naviera Vascongada v
British & Foreign Marine Insurance Co Ltd (The Gloria)* (1935) 54 LlL Rep.   E
This approach is not only supported by authority.  It is fundamental to the
value of the cover conferred by a marine policy.  Subject to express
exceptions and to those imported by the general law, the policy covers loss
caused by marine perils notwithstanding that they caused it only by virtue of
the unseaworthiness of the vessel.  In a time policy there is no implied
warranty of seaworthiness at any stage: section 39(1).  If the concept of       F
privity extends beyond actual knowledge and beyond the deliberate
avoidance of actual knowledge of suspected facts, then it must extend to
cases where the assured is merely negligent in failing to know the facts or
appreciate their significance.  Yet many marine casualties can be traced to
some feature of the vessel's condition at the outset of the relevant voyage,
and in most such cases it is possible to say that the exercise of due care to
discover and rectify it would have avoided the loss.  If that is enough for the   G
purposes of section 39(5), then there is no cover for a major class of casualty
attributable to the assured's personal negligence.
    The language of section 39(5) of the Marine Insurance Act 1906 can
usefully be contrasted with the language used in section 503(1) of the
Merchant Shipping Act 1894, which refers to "actual fault or privity" on the
owner's part.  Fault and privity are two different things.                      H
    The application of these principles would not enable a shipowner to run
his fleet in a manner which is calculated to avoid knowledge.  The more the
head men of a company distance themselves from its operations, the more
likely it is that less senior personnel will be found to have the combination of

477
**[2003] I AC**          Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))

A   responsibility and autonomy necessary to make them the assured for the
    purposes of section 39(5).

    The notion of what is involved in turning a blind eye to suspected facts is
    not peculiar to the law of marine insurance. It applies generally in cases
    where a person's rights or liabilities depend on his knowledge of some fact:
    see, for example, *Jones v Gordon* (1877) 2 App Cas 616. It has never been
    held in such cases that negligent ignorance will do, or that a blind eye can be
B   turned to unsuspected facts.

    [Submissions were made on the facts.]

    The duty of utmost good faith owed by an assured at the point of making
    a claim is a duty of honesty and no more. If a claim is honestly made, the
    insurer is not entitled to avoid the policy on the basis that there were errors
    or omissions on relevant matters in the information supplied in support of it,
C   however those errors or omissions may have come about. Although, by
    virtue of section 18(1), a contract of insurance may be avoided for non-
    disclosure in the making of the contract, without it being necessary to prove
    fraud or even culpability, there is no reason to regard it as having the same
    content at every stage of the life of the contract, and a number of reasons
    why it should not.

D   As applied to the making of the contract, the duty of utmost good faith
    was first overtly recognised in English law in a series of decisions of Lord
    Mansfield: see *Carter v Boehm* 3 Burr 1905; *Pawson v Watson* (1778)
    2 Cowp 785. It came to be regarded as an incident of limited classes of
    contract, pre-eminently insurance contracts. As applied to the formation of
    a contract, the duty is not an implied term as it arises at a time before the
    contract is made, and it gives rise to no other legal remedy apart from
E   avoidance: see *Bell v Lever Bros Ltd* [1932] AC 161; *Banque Keyser
    Ullmann SA v Skandia (UK) Insurance Co Ltd* [1990] 1 QB 665. The most
    satisfactory view of the juridical basis of the duty as applied to the formation
    of the contract is that it rests not so much upon a "duty" of the assured
    properly so called, as on a legal assumption, derived from mercantile
    practice, about the basis on which a contract of insurance is made, coupled
    with a recognition that if the facts are materially different from those put
F   before the underwriter, the basis of the contract has gone and it may be
    avoided.

    The juridical basis for the application of the duty of utmost good faith to
    the later stages of the life of the contract is rather different and is of
    comparatively late development. There is even now no general duty on the
    part of the assured to disclose further facts after the contract has been made:
G   see *Cory v Patton* (1872) LR 7 QB 304; *Lishman v Northern Maritime
    Insurance Co* (1875) LR 10 CP 179; *Niger Co Ltd v Guardian Assurance Co
    Ltd* (1922) 13 Ll L Rep 75; *NSW Medical Defence Union Ltd v Transport
    Industries Insurance Co Ltd* (1985) 4 NSWLR 107; *New Hampshire
    Insurance Co v MGN Ltd* [1997] LRLR 24. There is, however, a specific
    duty of utmost good faith in the making of claims, which the courts have
    held to be broken by a person who puts forward a claim fraudulently: see
H   *Britton v Royal Insurance Co* (1866) 4 F & F 905; *Orakpo v Barclays
    Insurance Services* [1995] LRLR 443; *Galloway v Guardian Royal
    Exchange (UK) Ltd* [1999] Lloyd's Rep IR 209. See also *Goulstone v Royal
    Insurance Co* (1858) 1 F & F 276. The duty arising at this stage is
    satisfactorily analysed as an implied term of the contract: see *Bank of Nova*

478
**Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))**                [2003] 1 AC

*Scotia v Hellenic Mutual War Risks Association (Bermuda) Ltd* [1988]    A
1 Lloyd's Rep 514; *Orakpo v Barclays Insurance Services* [1995] LRLR 443.

There are strong considerations of commercial convenience and legal policy which suggest that the duty is narrower at the claims stage than it is at the stage when the contract is made. The essential purpose of the extensive disclosure required of the assured when the contract is being made is to put the parties on an equal footing in their ability to assess the risk. In that context there is no reason to distinguish between innocent and fraudulent    B
nondisclosure if the facts not disclosed are material in either case. Pre-contractual investigation by the underwriter is neither normal nor, in most cases, possible. By comparison, when a claim is made, although the facts may be obscure, the underwriter can, and in practice does, appoint specialists and experts to investigate.

The remedy for a breach of the duty, avoidance, is draconian. This may    C
represent substantial justice where the breach consists in the non-disclosure of facts critical to the making of the contract, even if the non-disclosure is wholly innocent. The effect of avoidance in that situation is simply to restore the underwriter to the position he was in before he bound himself on a false basis. The position of an underwriter considering a claim is completely different. His decision is not discretionary, for he is already    D
bound. The claim is either within the scope of the cover or it is not, and if it is, he must pay. If the claim is good, but there has been non-disclosure in its presentation, the effect of avoidance is that he is discharged from an obligation to pay a claim within the scope of the cover. That may be consistent with the mutual duty of utmost good faith in a case where the assured has tried to deceive the underwriter, but not when he has made an    E
honest mistake.

In spite of the breadth of the duty which is owed at the earlier stage, its impact is limited by the need for the underwriter to show both that the facts withheld were objectively material to the assessment of the risk and that their non-disclosure actually induced the particular underwriter to write the risk or to do so on the terms he did: see *Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501. By definition, if the underwriter is    F
seeking to avoid the contract on account of a pre-contractual non-disclosure, he has entered into the contract and is presumably saying that he was induced to do so by the non-disclosure. But it is difficult to see what place inducement can have in most cases of non-disclosure at the claims stage. If inducement has no practical role in most cases where a breach of the duty is said to have arisen at the claims stage, then there is everything to be said for the narrower test of materiality, which would require the    G
underwriter to show that the facts withheld would have made the difference between the claim being good or bad. Yet on that basis, the underwriter is sufficiently protected by the consideration that a bad claim will fail: see *Royal Boskalis Westminster NV v Mountain* [1997] LRLR 523.

With the possible exception of *The Litsion Pride* [1985] 1 Lloyd's Rep 437 there is no case in which the courts have held that the duty of utmost    H
good faith requires more than honesty at the claims stage, and no case in which any wider duty has been regarded as appropriate to the requirements of the business. On the contrary there is an impressive consensus of opinion to the effect that nothing less than dishonesty will do: see *Britton v Royal Insurance Co* (1866) 4 F & F 905; *Orakpo v Barclays Insurance Services*

A  [1995] LRLR 443; *Galloway v Guardian Royal Exchange (UK) Ltd* [1999] Lloyd's Rep IR 209; *The Michael* [1979] 2 Lloyd's Rep 1; *Royal Boskalis Westminster NV v Mountain* [1997] LRLR 523; *Standard Steamship Owners' P & I Association (Bermuda) Ltd v Oceanfast Shipping Ltd* (unreported) 6 March 1996; *Halsbury's Laws of England*, 4th ed reissue, vol 25 (1994), p 348, paras 492–493; *Welford & Otter-Barry, Fire*

B  *Insurance*, 4th ed (1948), p 289; *Clarke, Law of Insurance Contracts*, 3rd ed (1997), pp 746–755; *MacGillivray on Insurance Law*, 9th ed (1997), paras 19–59. That consensus is right in principle and should be endorsed.

There is no support in the authorities for a test based on "culpable" non-disclosure, save possibly *The Litsion Pride* [1985] 1 Lloyd's Rep 437. If culpability is the test it is far from clear what it means. In any event a test of culpability necessarily recognises that the content of the duty of utmost good

C  faith is different when the contract is made and when claims are made and paid, since at the earlier stage it is well established that even wholly innocent non-disclosure may give rise to a right to avoid.

Whether the duty of utmost good faith in the making of a claim subsists once the underwriter has rejected it and the parties are locked in litigation must depend on exactly the same principles as the existence of such a duty in

D  the first place i e what is reasonable and necessary between parties dealing honestly and fairly with each other in that situation.

There are many circumstances in which a party may be said to owe a duty of honesty or a wider duty of disclosure in the course of litigation. But any such duty does not exist as an incident of the contract of insurance and, consequently, there can be no right to avoid the contract for breach of it. No

E  duty of utmost good faith arising from the contract of insurance is called for at all in the course of litigation. The only relevant duties are those imposed on litigants by the rules and by orders of the court, and avoidance is not available for breach of them.

Once litigation has begun, the parties are adversaries, at least in relation to the particular claim. The rules and orders of the court suffice to ensure that sufficient disclosure is made to serve the interests of justice. If

F  something relevant is not disclosed, it may be because its disclosure is not required in the interests of justice e g because it is privileged. In significant respects the duty contended for would conflict with the rules and practice of the courts. On the face of it, as a contractual duty arising independently of the law relating to the conduct of litigation, it would displace any claim to privilege in relevant material, whether by the assured or by the underwriter.

G  It would displace any discretion vested in the courts governing the production of material or the consequences of its non-production, since production would become a matter of right and a right of avoidance for non-production would be automatic. It would also give rise to the court in major insurance litigation having to deal not only with the merits of the claim but with disputes as to the manner in which the adversaries and their advisers had conducted it. The courts in Connecticut have taken the view that once

H  parties are joined they are no longer ruled by the insurance rules: see *Rego v Connecticut Insurance Placement Facility* (1991) 593 A 2d 491.

Although there are cases in which the courts have proceeded on the assumption that there is a duty of utmost good faith applicable even to the conduct of litigation, they have always been careful to limit it to a duty not

480
**Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))**        [2003] 1 AC
Lord Steyn

to maintain a claim in the absence of an honest belief that it is justified: see,    A
for example, *The Michael* [1979] 2 Lloyd's Rep 1.

The origins of the underwriters' right to obtain an order for ship's papers
before service of their defence are described in *Arnould's Law of Marine
Insurance and Average,* 16th ed (1981), vol 2, paras 1347–1350, and in the
judgments of Scrutton LJ in *Leon v Casey* [1932] 2 KB 576 and Lord
Denning MR in *Probatina Shipping Co Ltd v Sun Insurance Office Ltd*
[1974] QB 635, 640–642. The order was a historical anomaly because it is    B
the only example of something akin to discovery being ordered by a court of
common law before certain of the powers of courts of equity were conferred
on them by statute in the middle of the nineteenth century. This procedure
cannot be indicative of a duty of good faith in the making of claims
persisting after the commencement of litigation because any duty of good
faith must give rise to a substantive right, whereas the right to call for ship's    C
papers was always procedural. An underwriter never could call for ship's
papers without an order of the court, the availability of which has since 1936
been discretionary and governed exclusively by rules of court. It has never
been available except in marine insurance cases, although the duty of good
faith, whatever its content, is common to all insurance. Furthermore, such
orders were enforced through the sanctions of the court. It has never been    D
suggested that failure to comply with an order for ships' papers entitled the
underwriter to avoid the policy.

Persons whose acts constitute those of the company are (1), under the
primary rule of attribution, the board of directors acting as a board and
shareholders acting unanimously and (2), under the ordinary rules of agency,
agents with regard to the matters with which they are entrusted: see
*Meridian Global Funds Management Asia Ltd v Securities Commission*    E
[1995] 2 AC 500.

[Submissions were made on the facts.]

*Pollock QC* replied.

Their Lordships took time for consideration.

18 January 2001. **LORD STEYN**    F
My Lords,
1   I have had the advantage of reading the speeches of Lord Clyde,
Lord Hobhouse of Woodborough and Lord Scott of Foscote. For the reasons
they give I would also dismiss the appeal.

**LORD HOFFMANN**    G
My Lords,
2   I have had the advantage of reading in draft the speeches prepared by
my noble and learned friends, Lord Hobhouse of Woodborough and
Lord Scott of Foscote, and for the reasons which they give I would dismiss
the appeal.

**LORD CLYDE**    H
My Lords,
3   Section 39(5) of the Marine Insurance Act 1906 concerns the case
where "with the privity of the assured, the ship is sent to sea in an
unseaworthy state." The underwriters argue that the assured had "blind-eye

481
[2003] 1 AC          Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))
Lord Clyde

A  knowledge" of the two particular respects in which the ship was
unseaworthy. Blind-eye knowledge in my judgment requires a conscious
reason for blinding the eye. There must be at least a suspicion of a truth
about which you do not want to know and which you refuse to investigate.
The argument on that approach then fails on the facts. I am not able to spell
out of the judgment of Tuckey J any finding that the insured, or particularly
any of those whose states of mind may be attributed to that of the insured,
B  suspected any incompetence on the part of the master of the *Star Sea*, let
alone any suspicion of his incompetence in the particular respect which
mattered. That is sufficient to dispose of this part of the case; but in any
event there is no finding of a suspicion on the part of the insured of the
defective state of the dampers which contributed to the loss.

4  As regards the other chapter in the case I consider that it also fails on
C  the facts. Even if the defendants were correct in requiring fair dealing and
disclosure at the stage of the litigation I am not persuaded that the evidence
supports the proposition that there was in fact any "culpable non-
disclosure", as it was termed, on the part of the insured. As regards the
obligations in law of an insured at the stage of a disputed claim I take the
view that there is no duty upon the insured to make a full disclosure of his
own case to the other side in a litigation. I see no practical justification for
D  such an obligation at that stage. Unlike the initial stage when the insurer
may rely very substantially upon the openness of the insured in order to
decide whether or not to agree to provide insurance cover, and if so at what
level of premium, the insurer has open to him means of discovery of any facts
which he requires to know for his defence to the claim. Moreover I have
found no precedent to support the defendants' proposition; if anything
E  the authority at least of *MacGillivray on Insurance Law*, 9th ed (1997),
para 19–59 points in the opposite direction. The idea of a requirement for
full disclosure superseding the procedural controls for discovery in litigation
is curious and unattractive, and one which would require to be soundly
based in authority or principle.

5  What has caused me greater difficulty is the broad provision in
F  section 17 which appears to be unlimited in its scope. The expression
"utmost good faith" appears to derive from the idea of uberrimae fidei,
words which indeed appear in the sidenote, but whose origin I have not been
able to trace. The concept of uberrima fides does not appear to have derived
from civil law and it has been regarded as unnecessary in civilian systems
(*Professor T B Smith, A Short Commentary on the Law of Scotland* (1962),
p 836, quoting M A Millner "Fraudulent Non-Disclosure" (1957) 76 SALJ
G  177, pp 188–189). Indeed more recently the suggestion has been advanced
in the Court of Appeal in South Africa that the concept should be jettisoned:
*Mutual and Federal Insurance Co Ltd v Oudtshoorn Municipality*
1985 (1) SA 419, 433. *Blackstone's Commentaries,* 4th ed (1876), vol II,
Chapter 30, pp 412–413 states that the very essence of contracts of marine
insurance "consists in observing the purest good faith and integrity", but in
H  *Carter v Boehm* (1766) 3 Burr 1905, 1910, Lord Mansfield refers simply to
"good faith".

6  On the face of it the comprehensive degree of disclosure which the
phrase implies and the absence of any limitation upon the period over which
the obligation is to extend gives some support to the defendants' contention.
But if the view which I have preferred is correct and the highest degree of

openness is not required at the stage of a disputed claim, then the superficial meaning of section 17 cannot be correct. One solution is to impose a limit upon the period of the relationship between the parties to which the statutory provision is meant to apply so that it would only apply to pre-contract negotiations. That can be supported by the fact that the section is placed in a group of provisions dealing with disclosure and representation. The special provisions which immediately follow section 17 may embellish the general rule which applies at the period of formation, but not be exhaustive of it. But that solution now appears to be past praying for. In these circumstances the alternative remains available of adopting a flexible construction of the concept of utmost good faith. The latter course was the one which the insured has adopted and which I would accept.

7    Since even after the contract is entered into the relationship between the parties should in any event be coloured by considerations of good faith, the point is in some respects academic. But once it is recognised that in a contract of insurance, and indeed in certain other contracts, an element of good faith is to be observed, and that that element may impose certain duties particularly of disclosure between one party and the other, duties which may vary in their content and substance according to the circumstances, then a question may arise as to the utility of the concept of an utmost good faith or an uberrima fides. In my view the idea of good faith in the context of insurance contracts reflects the degrees of openness required of the parties in the various stages of their relationship. It is not an absolute. The substance of the obligation which is entailed can vary according to the context in which the matter comes to be judged. It is reasonable to expect a very high degree of openness at the stage of the formation of the contract, but there is no justification for requiring that degree necessarily to continue once the contract has been made.

8    I agree that the appeal should be dismissed.

## LORD HOBHOUSE OF WOODBOROUGH

My Lords,

9    On 8 November 1989, brokers acting for the Kollakis group of companies renewed with underwriters the marine hull and machinery cover on the 40 or so vessels in their fleet for a further year. One of the vessels was the Cypriot motor vessel *Star Sea*, built in 1974 and having a gross tonnage of 6,925 tons. She was a dry cargo vessel having her engine room and accommodation amidships and four refrigerated holds suitable for carrying bananas and this was the trade in which she was primarily employed. The trade is seasonal and it was usual for the Kollakis group to lay up their refer vessels during the late summer and autumn. The *Star Sea* was laid up in the Piraeus during which time annual maintenance and repairs were done by local contractors. She sailed on her first voyage following lay-up on 28 November 1989 manned by a Maldivian crew with Greek officers. Before she sailed she was inspected by a class surveyor and her cargo ship safety certificate, covering among other things fire safety, was renewed. The renewed insurance cover had attached on 25 November. Her insured value was US$ 3·2m. The insurance was governed by English law and no specific clauses in the policies have been relied on by either side on this appeal. The provisions of the Marine Insurance Act 1906 apply. Loss by fire is a peril insured against.

483

**[2003] 1 AC**    Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))
Lord Hobhouse of Woodborough

A   10   Between November 1989 and May 1990, no incident occurred
relevant to this appeal. There was a minor engine room fire in March but
this was simply dealt with using fire extinguishers. In January there was also
a question of the efficiency of the emergency fire pump drawing water from
the forepeak. A temporary fire pump was provided which satisfied the local
surveyor but the suction in the forepeak was left in a condition where it
B   would not draw unless the tank was filled; it was normally empty when the
vessel was laden. However nothing now turns on these matters; they did not
contribute to what was subsequently to occur.

11   On 27 May 1990 the *Star Sea* sailed from Corinto, Nicaragua bound
for Zeebrugge laden with a cargo of bananas, mangoes and coffee. Two
days out, on the morning of 29 May, a fire was accidentally started in the
engine room workshop where the third engineer was using an oxyacetylene
C   torch and it flashed back to the oxygen gas bottles. Attempts to use
extinguishers on the fire were defeated by smoke. After two and a half
hours the master decided to use the $CO_2$ system. The actions then taken
were not effective to put out the fire and it continued to burn although for a
while the crew thought it had been extinguished.

12   The vessel had sent out distress calls and these were responded to.
D   The first vessel to arrive departed during the afternoon because the crew
thought that the fire was out and that they did not need further assistance.
During the early evening it became only to obvious that this was not so. The
fire spread to the accommodation. A tug arrived during the early hours of
the following day and the fire was unsuccessfully fought for the next day
using the tug's monitors. The vessel was towed into Balboa arriving on
E   1 June with the fire still burning. At Balboa the fire was eventually
extinguished but the damage was so extensive that the vessel had become a
constructive total loss ("CTL").

13   Notice of abandonment was given to underwriters on 12 June. It
was not accepted. On 10 July the underwriters agreed to put the assured in
the same position as if a writ had been issued. The writ in the action
endorsed with points of claim was issued on 3 August and served a month
F   later. The writ named two representative underwriters as defendants.

14   At the trial of the action before Tuckey J [1995] 1 Lloyd's Rep 651,
various issues of fact and law were raised by the defendants in response to
the claim. Only two are now of relevance.

15   The first is the defence that arises under section 39(5) of the Act. For
voyage policies there is an implied warranty (section 39(1)) that at the
G   commencement of the voyage the ship shall be seaworthy, i e, reasonably fit
in all respects to encounter the ordinary perils of the seas of the adventure
insured (section 39(4)). Such a warranty must be exactly complied with,
whether it be material to the risk or not, and if not complied with the insurer
is discharged from liability as from the date of the breach of warranty
(section 33(3)). The policy in question here is a time policy, not a voyage
H   policy. Section 39(5) provides:

"In a time policy there is no implied warranty that the ship shall be
seaworthy at any stage of the adventure, but where, with the privity of the
assured, the ship is sent to sea in an unseaworthy state, the insurer is not
liable for any loss attributable to unseaworthiness."

484

Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))          [2003] 1 AC
Lord Hobhouse of Woodborough

16   There are therefore three elements in this defence. First, there must   A
have been unseaworthiness at the time the vessel was sent to sea. Secondly,
the unseaworthiness must have been causative of the relevant loss: *Thomas v
Tyne and Wear Steamship Freight Insurance Association* [1917] 1 KB 938.
Thirdly, the assured must have been privy to sending the ship to sea in that
condition. At the trial it was accepted that this defence could only defeat the
claim for the CTL. The vessel had become a CTL under the policy because
the fire had not been put out until it had caused such extensive damage to the   B
vessel that the cost of repairing the damage would have exceeded her insured
value. But some damage would have been caused by the fire in any event. It
was accepted that the occurrence of the original fire was not attributable to
any unseaworthiness; accordingly this defence would not bar a recovery for
the lesser (but nevertheless substantial) partial loss.

17   Tuckey J found that the vessel had been unseaworthy in two respects   C
which had concurrently caused the vessel to be so severely damaged that she
became a constructive total loss. He also found that the assured had been
privy to the vessel putting to sea unseaworthy in those respects. Therefore he
held that the defence was made out in so far as the CTL claim was
concerned.

18   The second defence was said to arise under section 17 of the Act:   D

   "*Insurance is uberrimae fidei* 17 A contract of marine insurance is a
   contract based upon the utmost good faith, and, if the utmost good faith
   be not observed by either party, the contract may be avoided by the other
   party."

The case of the defendants was that the assured was under a continuing duty
of the utmost good faith to disclose to them any information material to the
claim and which might affect their decision to pay or defend the claim. The   E
defendants argued that this duty continued notwithstanding that litigation
had started and had been broken by the assured's (and their lawyer's) failure
to disclose certain facts material to the defence under section 39(5).
Accordingly, the defendants said, they were entitled to avoid the whole
contract ab initio—with retrospective effect—and therefore had a complete
defence to the whole of the claim, both the CTL and the partial loss.   F

19   Tuckey J held that this defence failed both in law and on the facts.
He therefore gave judgment for the assured limited to the partial loss (giving,
on his assessment, a recovery of some US$ 1·7m).

20   Both sides appealed to the Court of Appeal. The Court of Appeal
(Leggatt, Henry and Waller LJJ) [1997] 1 Lloyd's Rep 360 in a judgment of
the court delivered by Leggatt LJ dismissed the appeal of the defendants but
allowed the appeal of the assured, reversing certain of the judge's findings of   G
fact in relation to the first defence. The Court of Appeal therefore entered
judgment for the assured in respect of their claim for a CTL. It is from this
decision that the defendants have with the leave of your Lordships' House
brought this appeal. The defendants submit that both defences should have
succeeded. Since the utmost good faith defence (section 17) arises in
connection with the privity defence (section 39(5)), I will take the privity   H
defence first.

*Section 39(5): the relevant unseaworthiness*

21   The judge found that the vessel was unseaworthy in a number of
respects when she set sail from Corinto. These reflected the age of the vessel

485

[2003] 1 AC          Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))
Lord Hobhouse of Woodborough

A   and a low standard of maintenance. But he found that the failure to put out
the fire on the morning of 29 May was attributable to only two of them. The
vessel was equipped with a $CO_2$ fire extinguishing system. This system
worked on the principle of discharging a large quantity of $CO_2$ gas into the
engine room so as to suffocate and thereby extinguish the fire by depriving it
of free oxygen. For the system to be effective a number of conditions have to
be observed. It should be used as soon as possible, before the fire has spread
B   to other spaces. The engine room must first have been sealed closing all the
vents and other apertures through which $CO_2$ might escape or oxygen enter
thus prejudicing the suffocation of the fire. The full amount of $CO_2$ should
be discharged at one time into the engine room so as to flood it with the gas
and maximise the suffocating effect. The attempt at around noon on 29 May
to put out the fire using $CO_2$ was not successful because the attempt had
C   been left until some two hours after the fire had started, the engine room
could not be sealed as the funnel dampers were in a defective condition and
could not be fully closed, and only half of the $CO_2$ was used for the attempt.
The $CO_2$ was kept in a special store outside the engine room holding
four banks of bottles. The contents of the bottles could be discharged
directly into the engine room by pulling a lever. The wires leading from the
lever to two of the banks were broken. The system for discharging the
D   bottles had not been properly maintained. When the lever was pulled only
two of the banks were discharged. Had the need to discharge all four banks
at the same time been appreciated the other two banks could have been
discharged by different means but this need was not appreciated and it was
not done at that time.

22 The judge found that the failure to use the $CO_2$ earlier and the failure
E   to use all four banks of bottles at once was attributable to the incompetence
of the master in that he was ignorant of what was required for the successful
use of the $CO_2$ system. He held that this disabling lack of knowledge on the
part of the master amounted to unseaworthiness: *Standard Oil Co of New
York v Clan Line Steamers Ltd* [1924] AC 100. The judge found that the
defective condition of the funnel dampers which made it impossible to shut
them fully also amounted to unseaworthiness. On the hearing of the appeal
F   these findings were not challenged. The defendants also conceded that, for
the purposes of making good the defence under section 39(5), it was
necessary for them to establish that the assured was privy to both of these
aspects of unseaworthiness. Thus it was conceded that, if the defendants fail
to show privity in respect of the master's incompetence, the defendants'
defence under section 39(5) fails regardless of what may have been the
G   position about the condition of the dampers: see the Court of Appeal
judgment, [1997] 1 Lloyd's Rep 360, 378. The concession was repeated
before your Lordships. Whether or not this concession was correctly made
has therefore not been the subject of argument before your Lordships: for the
purposes of this case, I proceed on the basis of the concession.

*Privity: the law*
H   23 It was accepted that the assured (however defined) did not have
actual direct knowledge of the relevant unseaworthiness. But it was argued
that the assured had a state of mind which was equivalent to knowledge—
so-called "blind eye knowledge". This was the type of knowledge which the
judge [1995] 1 Lloyd's Rep 651, 664 held had been proved.

486

**Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))**         **[2003] 1 AC**
**Lord Hobhouse of Woodborough**

24   The expression was used by Lord Denning MR in *Cia Maritima San       A
Basilio SA v Oceanus Mutual Underwriting Association (Bermuda) Ltd (The
Eurysthenes)* [1977] QB 49, 68 in relation to a defence of privity under
section 39(5) which had been raised in answer to a claim under a policy of
marine insurance:

"To disentitle the shipowner, he must, I think, have knowledge not
only of the facts constituting the unseaworthiness, but also knowledge     B
that those facts rendered the ship unseaworthy, that is, not reasonably fit
to encounter the ordinary perils of the sea.   And, when I speak of
knowledge, I mean not only positive knowledge, but also the sort of
knowledge expressed in the phrase 'turning a blind eye'.   If a man,
suspicious of the truth, turns a blind eye to it, and refrains from inquiry—
so that he should not know it for certain—then he is to be regarded as
knowing the truth.   This 'turning a blind eye' is far more blameworthy     C
than mere negligence.   Negligence in not knowing the truth is not
equivalent to knowledge of it."

Geoffrey Lane LJ in the same case, at p 81, stressed that privity meant
knowledge and consent and was not equivalent to negligence.   But he added
the word "believed": "I add the word 'believed' to cover the man who
deliberately turns a blind eye to what he believes to be true in order to avoid   D
obtaining certain knowledge of the truth."   Roskill LJ discussed the point,
at p 76.   He was prepared to accept the expression "conscious realisation".
He agreed with what Lord Denning MR had said.   He added :

"If the facts amounting to unseaworthiness are there staring the
assured in the face so that he must, had he thought of it, have realised     E
their implication upon the seaworthiness of his ship, he cannot escape
from being held privy to that unseaworthiness by blindly or blandly
ignoring those facts or by refraining from asking relevant questions
regarding them in the hope that by his lack of inquiry he will not know for
certain that which any inquiry must have made plain beyond possibility
of doubt."

25   All these formulations reject the suggestion that even gross          F
negligence will suffice.   The use of the word "suspicion" and "belief" are
indicative of the strength of the suspicion that is required.   But perhaps the
most helpful guide is to be found in what was said by Roskill and Geoffrey
Lane LJJ about the reason for refraining from inquiry—"in the hope that
by his lack of inquiry he will not know for certain"—"in order to
avoid obtaining certain knowledge of the truth".   It is probable that        G
Lord Denning MR was saying the same thing when he used the phrase "so
that he should not know it for certain".   The illuminating question therefore
becomes "why did he not inquire?"   If the judge is satisfied that it was
because he did not want to know for certain, then a finding of privity should
be made.   If, on the other hand, he did not inquire because he was too lazy or
he was grossly negligent or believed that there was nothing wrong, then
privity has not been made out.   An ambiguity has arisen from the use by      H
Roskill LJ of the phrase "had he thought of it".   This suggests that the test
may be objective.   If so, that is not correct.   The test is subjective: Did the
assured have direct knowledge of the unseaworthiness or an actual state of
mind which the law treats as equivalent to such knowledge?

487

[2003] I AC                Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))
                                              Lord Hobhouse of Woodborough

A      26  This conclusion is in line with what Branson J had said 40 years
earlier in *Cia Naviera Vascongada v British & Foreign Marine Insurance Co
Ltd (The Gloria)* (1935) 54 Ll L Rep 35, 58:

        "I think that if it were shown that an owner had reason to believe that
        his ship was in fact unseaworthy, and deliberately refrained from an
        examination which would have turned his belief into knowledge, he
B       might properly be held privy to the unseaworthiness of his ship. But the
        mere omission to take precautions against the possibility of the ship being
        unseaworthy cannot, I think, make the owner privy to any unsea-
        worthiness which such precaution might have disclosed."

If the shipowner *deliberately* refrains from examining the ship in order not
to gain direct knowledge of what he has reason to believe is her unseaworthy
C   state, he is privy to the ship putting to sea in that unseaworthy state.
       27  The section refers to the privity of the assured; the privity must be of
an individual who is to be identified with the assured. The owners of the *Star
Sea* were the Manifest Shipping Co Ltd (the plaintiffs in the action), a
Cypriot company beneficially owned by the Kollakis family.      The
management of the vessel was in fact delegated to an English company based
in London, Kappa Maritime Ltd.  At the material times the directors of
D   Kappa were Captain Stefanos Kollakis and his sons Pantelis and George,
who were concerned with commercial and operational matters, and
Mr Nicholaidis, the technical director.  The registered managers were a
Greek company, Charterwell Maritime SA, based in the Piraeus.   Its
directors were Captain Stefanos and a Mr Faraklas (who was also the sole
director of Manifest).  The role of Mr Faraklas was in fact subordinate to
E   that of Mr Nicholaidis and the other directors of Kappa. The judge held that
Captain Stefanos and his two sons and Mr Faraklas were to be treated as
coming within "the assured" for the purposes of section 37(5); the Court of
Appeal considered that Mr Nicholaidis did as well.  Nothing however turns
on this in the present case and I will proceed on the basis that the state of
mind of any of these individuals may have been relevant to the question of
F   privity.

*Privity: the facts*

       28  The defendants' case on privity was based upon what had happened
the previous year to two of the other vessels in the Kollakis fleet. In February
1989 the *Centaurus* was alongside in Wilmington, Delaware, when there
was a fire in the engine room.  The crew initially did nothing to fight the fire
G   and simply summoned the local fire brigade who were not able to put out the
fire until some 15 hours later.  The vessel was fitted with a $CO_2$ system but
the Korean officers did not use it as they should because they apparently had
the extraordinary belief that its use would in some way damage the engines.
They left its use until it was too late for it to be effective to extinguish the fire.
It also emerged that the engine room could not be effectively sealed.  The
H   vessel was a constructive total loss.
       29  The other vessel was the *Kastora*.  She also had Korean officers and
crew.  In April 1989 she was at sea in the Carribean.  There was an engine
room fire which again was not put out and allowed to spread so that the
vessel became a constructive total loss.  On this occasion the crew did use the
$CO_2$ within about half an hour of the start of the fire but it was not effective

488
**Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))**          [2003] 1 AC
Lord Hobhouse of Woodborough

because the funnel dampers were not closed. The surveyor instructed by    A
Kappa was a Dr Atherton who inspected the vessel twice. The first time was
fairly soon after the fire. He then observed that one of the funnel dampers
was sticking in a partially open position but thought that this might be due
to its having been distorted in the fire: see his first report dated 22 May 1989.
In mid-September he inspected the vessel again and reported that "an
examination of the dampers themselves revealed that these were in poor
condition and would not have provided an effective seal in the ventilator    B
trunking": see his second report dated 22 September 1989.

30    There was no dispute that relevant individuals for the purpose of
section 39(5) were aware of these facts. To lose two ships within the space
of two months through engine room fires which should have been capable of
being extinguished was remarkable and disturbing. The judge found that
the assured's response was "completely inadequate". So far as the crews    C
were concerned, Captain Stefanos and the others concerned in the
management of the fleet decided that the Korean crews and officers were not
good enough. They were influenced in this not only by their experiences
with the *Centaurus* and the *Kastora* but also with the need to have
competent and reliable crews for vessels engaged in the carriage of
refrigerated cargoes. They changed over to having entirely Greek-officered    D
vessels. This was the reason why the *Star Sea* when she came out of lay-up
was given Greek officers. The master appointed to the *Star Sea* had been
with the fleet for over 11 years with a good record of service, had been at sea
for many years before that and had obtained his master's certificate in 1978.
There was no evidence that the managers or any of the relevant persons
believed that the captain they had appointed to the *Star Sea* was anything
other than competent and experienced. But it was also the case that they    E
took no steps to check his knowledge of the right way to use the $CO_2$ system.

31    So far as the maintenance of the equipment in engine rooms was
concerned, the managers of the fleet did not take any special steps. It
appears that they continued to rely upon the same maintenance procedures
as before. In respect of the *Star Sea*, the managers engaged contractors to
carry out necessary repairs and maintenance in the engine room before she    F
returned to service in November 1989. They put her through the required
surveys in order to obtain the renewal of her safety certificates. In January
1990 at Zeebrugge, further inspections were carried out. However, neither
in relation to the *Star Sea* nor in relation to other vessels did the management
specifically require or instruct their superintendents to check the state of the
dampers and other engine room sealing components.

32    As is shown by the judge's findings as to the state of seaworthiness of    G
*Star Sea* when she sailed from Corinto, the managers were at fault. The steps
that they had taken to prevent any repetition of the disastrous engine room
fires were inadequate, as he put it, "completely inadequate". The judge
declined to find that there was any actual knowledge on the part of the
relevant persons. He continued [1995] 1 Lloyd's Rep 651, 664:

"However, I do find that there was blind eye knowledge on the part of    H
the assured. The inadequate response to the earlier fires and the state of
the *Star Sea* on 27 May [1990], demonstrate in my judgment that the
assured did not want to know about her unseaworthiness in the relevant
respects. What it comes down to specifically is this. With the message

A   staring them in the face, that the $CO_2$ systems on *Centaurus* and *Kastora*
    had not been used so as to prevent those ships from becoming
    constructive total losses, the assured took no effective steps to ensure that
    this would not happen again. The incompetence of the master and the
    state of the safety equipment for sealing the engine room, essential to the
    effectiveness of the $CO_2$ system on *Star Sea* show only too clearly how
B   ineffective those steps were and how inadequately equipped she was to
    fight a fire effectively. The assured did not want to know about the
    competence of the master to use the $CO_2$ system effectively. It is not easy
    to find a reason for this, since it would not have involved much time or
    money to ensure that the master was competent. The assured did not
    want to know about the state of the safety equipment. One reason for this
    is not difficult to find: money. This was an elderly vessel for which, as
C   I find, there was a tight budget for repairs. A good deal of time and
    money had been spent on repairing in lay-up and maintaining at sea the
    reefer machinery which was, of course, essential to its revenue earning
    ability."

    33  Thus he does use the phrases drawn from the previous cases—"the
    assured did not want to know"—"staring them in the face"—but it is all
D   postulated upon the inadequacy of the response to the earlier fires not upon
    any belief that would relate to the *Star Sea* herself. Whatever might be said
    about a tendency to skimp on repairs, nothing at all (as the judge himself
    points out) was to be gained by failing to check the master's state of
    knowledge of using $CO_2$ and taking the simple steps, with no adverse costs
    implications, necessary to put any deficiency right. This is the point which
E   was taken up by the Court of Appeal [1997] 1 Lloyd's Rep 360.
    Leggatt LJ said, at p 377, "an allegation that they ought to have known [is]
    not an allegation that they suspected or realised but did not make further
    inquiries". He reviewed the evidence and continued, at p 378:

        "Accordingly, on the evidence, it was simply not open to the judge to
        make a finding that any of the individuals 'suspected' or 'believed' that
F       the master was incompetent, lacking the basic knowledge on how to
        utilise $CO_2$. The judge, it is right to say, himself recognised that it was not
        easy to find a reason why, in making a decision to change the crew,
        anyone should do so to persons it was 'suspected' or 'believed' would
        render the ship unseaworthy. Negligence there may have been in failing
        to ensure that the master was instructed, but 'suspicion' in the minds of
        any of the relevant individuals that an incompetent master might be being
G       used was simply not established."

    34  The Court of Appeal therefore reversed the finding of the judge. This
    sufficed (on the concession which had been made) to defeat the defence
    under section 39(5). They accordingly did not need to deal in detail with the
    question of privity in relation to the dampers. They pointed out, correctly,
    that the judge had not made a finding that any of the relevant individuals had
H   suspected or believed that the *Star Sea* might be unseaworthy because of
    defects in the dampers. A finding of negligence to a very high degree did not
    suffice for a finding of privity.
    35  There may have been two sources of the difference between the
    Court of Appeal and the judge on this part of the case. The one was the

490
Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))                    [2003] 1 AC
Lord Hobhouse of Woodborough

confusion which has arisen from one of the phrases used by Roskill LJ in    A
*The Eurysthenes* [1977] QB 49 upon which I have already commented so as
to have led to the use of an objective and not a subjective test. The other is
the related point that evidence may provide support for making an inference
that a person had a certain state of mind but may also be consistent with
different states of mind. Thus the inadequate response to the previous
casualties was evidence consistent with a number of states of mind of those
concerned with the management of the fleet and does not without more        B
establish that there was privity in relation to any individual vessel.

36    I agree that the Court of Appeal were right to reverse the judge's
findings of fact and to allow the owners' appeal. The evidence did not on the
correct view of the law sustain the finding of privity. The defence under
section 39(5) therefore fails.

                                                                            C
*The section 17 defence: the facts*

37    The facts relied upon by the defendants arose from the facts
concerning the dampers on the *Kastora* as reported by Dr Atherton to the
owners. His first report in May 1989 had noted that they had not been
closed but did not criticise their maintenance; his second in September 1989
did. The reports went to Mr Nicholaidis who told the judge that he did not    D
pick up this addition in the second report. Tuckey J disbelieved him and
found further that Mr Nicholaidis had told Mr Faraklas that the dampers on
the *Kastora* needed to be overhauled and repaired. In the present litigation
the owners did not disclose Dr Atherton's reports, treating them as
privileged. Further they did not disclose that he had, on his second visit to
that vessel, found the dampers in a defective condition. They served a
factual witness statement from Dr Atherton which did not refer to that fact.    E
The witness statements of the Kollakis brothers also did not refer to
Dr Atherton's second report. The defendants also relied upon a brokers'
letter written in conjunction with negotiations for the settlement of the
action which they said was similarly misleading in relation to the *Kastora*
casualty. The defendants thus alleged that there had been a failure to
observe the utmost good faith in that there had been a failure to disclose
material information and misleading statements had been made. Their         F
allegations involved also the owners' solicitors who were conducting the
litigation on the owners' behalf and included allegations that what was done
was done deliberately and that the untruths were reckless.

38    The judge rejected the substance of all these allegations. The various
statements were not untrue and should not have misled. The brokers' letter
was open to criticism but it was not dishonest, nor was it written recklessly.    G
The judge however did disbelieve what Mr Nicholaidis had said in his
witness statement and in his oral evidence. Mr Nicholaidis was not
responsible for the conduct of the litigation or the prosecution of the claim.
The solicitors had treated the first Atherton report as privileged as indeed it
was. They had been unaware of the existence of the second Atherton report
until the second day of the trial as it had been temporarily mislaid amongst
the papers for litigation relating to the *Kastora* casualty with which the    H
solicitors were not concerned. The judge did not make a finding of fraud
against the owners.

39    The Court of Appeal upheld the judge's findings. In relation to the
question of fraud, the case advanced by the defendants was that the decision

*A*  to claim privilege for the Atherton reports was deliberate in the appreciation that its disclosure would weaken the owners' case. But, as the Court of Appeal pointed out, it was accepted that the reports were protected by legal privilege and it was believed by the solicitors that the owners were not under an obligation to disclose privileged documents unless and until they should choose to put them in evidence or call a witness who would be going to refer

*B*  to them. Thus actual fraud was not alleged and it was at no stage alleged that the claim was being put forward fraudulently without an honest belief that it was a claim that the owners were entitled to make. Therefore, if a finding of fraud was necessary for the defendants to succeed on their defence under section 17, they would fail. Neither the judge nor the Court of Appeal made such a finding against the owners.

*C*    40    Before your Lordships the defendants contended that there was a positive duty of fair dealing and disclosure any breach of which would amount, in effect, to constructive fraud giving rise to the section 17 remedy of an entitlement to avoid the contract. But the defendants also had to contend that the duty extended up to and included the pursuit of any claim in litigation since this was the stage at which the matters upon which they relied had occurred. Thus, the defendants argued that it was a breach of that

*D*  duty for the assured to claim privilege for a document which might assist the insurer to resist the claim.

### Section 17: the legal problems

     41    Section 17 raises many questions. But only two of them are critical to the decision of the present appeal—the fraudulent claim question and the

*E*  litigation question. It is however necessary to discuss them in the context of a consideration of the problematic character of section 17 which is overlaid by the historical and pragmatic development of the relevant concept both before and since 1906.

     42    The history of the concept of good faith in relation to the law of insurance is reviewed in the speech of Lord Mustill in *Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501 and in a valuable and

*F*  well researched article (also containing a penetrating discussion of the conceptual difficulties) "Mapping the doctrine of utmost good faith in insurance contract law" by Howard Bennett [1999] LMCLQ 165. The acknowledged origin is Lord Mansfield's judgment in *Carter v Boehm* 3 Burr 1905. As Lord Mustill points out, Lord Mansfield was at the time attempting to introduce into English commercial law a general principle of

*G*  good faith, an attempt which was ultimately unsuccessful and only survived for limited classes of transactions, one of which was insurance. His judgment in *Carter v Boehm* was an application of his general principle to the making of a contract of insurance. It was based upon the inequality of information as between the proposer and the underwriter and the character of insurance as a contract upon a "speculation". He equated non-disclosure

*H*  to fraud. He said, at p 1909:

     "The keeping back [in] such circumstances is a fraud, and therefore the policy is void. Although the suppression should happen through mistake, without any fraudulent intention; yet still the underwriter is deceived, and the policy is void."

492
**Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))**          **[2003] 1 AC**
**Lord Hobhouse of Woodborough**

It thus was not actual fraud as known to the common law but a form of          A
mistake of which the other party was not allowed to take advantage. Twelve
years later in *Pawson v Watson* (1778) 2 Cowp 785, 788, he emphasised that
the avoidance of the contract was as the result of a rule of law:

> "But as, by the law of merchants, all dealings must be fair and honest,
> fraud infects and vitiates every mercantile contract. Therefore, if there is
> fraud in a representation, it will avoid the policy, as a fraud, but not as a          B
> part of the agreement."

**43**    Echoes of his more universal approach could still be found nearly a
century later in a judgment of Lord Cockburn CJ in *Bates v Hewitt* (1867)
LR 2 QB 595, 606–607:

> "If we were to sanction such [non-disclosure], especially in these days,          C
> when parties frequently forget the old rules of mercantile faith and
> honour which used to distinguish this country from any other, we should
> be lending ourselves to innovations of a dangerous and monstrous
> character, which I think we ought not to do."

**44**    It was probably the need to distinguish those transactions to which
Lord Mansfield's principle still applied which led to the coining of the          D
phrases "utmost" good faith and "uberrimae fidei", phrases not used by Lord
Mansfield and which only seem to have become current in the 19th century.
Storey used the expression "greatest good faith", *Wharton's Law Lexicon*
14th ed (1938), p 1020 "the most abundant good faith"; a Scottish law
dictionary (*Trayner, Latin Maxims and Phrases*, 2nd ed (1876), p 590) used
"the most full and copious" good faith; some English judges referred to
"perfect" good faith (Willes J in *Britton v Royal Insurance Co* (1866) 4 F & F          E
905) and Lord Cockburn CJ to "full and perfect faith" (*Bates v Hewitt*, LR 2
QB 595, 606). But "utmost" became the most commonly used epithet and
its place was assured by its use in the 1906 Act. The connotation appears to
be the most extensive, rather than the greatest, good faith. The Latin phrase
was likewise a later introduction. It has been suggested that its use may have
been inspired by the use of similar language in Book IV of the *Codex of*          F
*Justinian* (4.37.3) in relation to the contract of partnership. The best view
seems to be that it had been unknown to Roman law and had no equivalent
in Roman law: *Mutual and Federal Insurance Co Ltd v Oudtshoorn*
*Municipality* 1985 (1) SA 419, 432 per Joubert JA . The first recorded use of
the phrase in the law reports was by Lord Commissioner Rolfe (later Lord
Cranworth LC) in *Dalglish v Jarvie* (1850) 2 Mac & G 231, 243 in          G
connection with the duty of disclosure to the court which arises when an
ex parte application is made for an injunction; the phrase was however
already current by that date as the judgment shows.
**45**    Lord Mansfield's universal proposition did not survive.    The
commercial and mercantile law of England developed in a different direction
preferring the benefits of simplicity and certainty which flow from requiring
those engaging in commerce to look after their own interests.          H

> "Ordinarily the failure to disclose a material fact which might
> influence the mind of a prudent contractor does not give the right to avoid
> the contract. The principle of caveat emptor applies outside contracts of
> sale. There are certain contracts expressed by the law to be contracts of

493

A    the utmost good faith, where material facts must be disclosed; if not, the
contract is voidable. Apart from special fiduciary relationships, contracts
for partnership and contracts of insurance are the leading instances. In
such cases the duty does not arise out of contract; the duty of a person
proposing an insurance arises before a contract is made, so of an
intending partner." Per Lord Atkin in *Bell v Lever Bros Ltd* [1932]
B    AC 161, 227.

46    In relation to insurance Lord Mansfield was specifically addressing
"concealments which avoid a policy". This concept of avoidance most
obviously applies to the making of the contract and derives, as he said in
*Pawson v Watson* 2 Cowp 785 and as confirmed by Lord Atkin, from the
application of a rule of law not from the parties' agreement. Later
C    developments have applied the requirement of disclosure to matters
occurring after the making of the contract of insurance, namely, the affidavit
of ship's papers and the making of fraudulent claims; I will have to discuss
these further. But, apart from some dicta, this has still been as a matter of
the application of a principle of law and not through an implied contractual
term. Nor was there any case prior to the Act where the principle was used
otherwise than as providing a basis for resisting liability; no case was cited
D    where the principle gave a remedy in damages, as would the tort of deceit or
the breach of a contractual term. Whether there was a remedy in damages
for a failure to observe good faith was finally and authoritatively considered
by the Court of Appeal in *Banque Keyser Ullmann SA v Skandia
(UK) Insurance Co Ltd* [1990] 1 QB 665, affirmed by your Lordships' House
[1991] 2 AC 249, 280. In order to answer the question, both Steyn J at first
E    instance ([1990] 1 QB 665, 699 et seq) and the Court of Appeal (p 773 et
seq) examined the basis of the requirement that good faith be observed.
Having concluded on the authorities that the correct view was that the
requirement arose from a principle of law, having the character I have
described, the Court of Appeal held that there was no right to damages.
47    The arguments of counsel in the present case disclosed a certain
amount of common ground between them. The principle of utmost good
F    faith is not confined to marine insurance; it is applicable to all forms of
insurance (*London Assurance v Mansel* (1879) 11 Ch D 363, *Cantiere
Meccanico Brindisino v Janson* [1912] 3 KB 452 ) and is mutual as section 17
itself affirms by using the phrase "if the utmost good faith be not observed by
*either* party" and as was expressly stated by Lord Mansfield in *Carter v
Boehm* 3 Burr 1905.
G    48    Secondly, both counsel submitted that the utmost good faith is a
principle of fair dealing which does not come to an end when the contract
has been made. A different inference might have been drawn both from the
language of section 17 and from its place in the Act—beneath the heading
"Disclosure and Representations" and above sections 18 to 21 which
expressly relate to matters arising before the making of the contract. But
there is a weight of dicta that the principle has a continuing relevance to the
H    parties' conduct after the contract has been made. Why indeed, it may be
asked, should not the parties continue to deal with one another on the basis
of good faith after as well as before the making of the contract? In his book
upon the Act published in 1907, Sir MacKenzie Chalmers added this note to
section 17: "Note: The general principle is stated in this section because the

494

**Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))**          **[2003] 1 AC**
**Lord Hobhouse of Woodborough**

special sections which follow are not exhaustive." (*The Marine Insurance*     A
*Act 1906*, 1st ed (1907), p 25.). There are many judicial statements that the
duty of good faith can continue after the contract has been entered into. The
citations which I make during the course of this speech will demonstrate this.
To take just one example for the moment, in *Overseas Commodities Ltd v
Style* [1958] 1 Lloyd's Rep 546, 559, McNair J referred to the obligation of
good faith towards underwriters being an obligation which rests upon the
assured "throughout the currency of the policy". However, as will also        B
become apparent from the citation, the content of the obligation to observe
good faith has a different application and content in different situations. The
duty of disclosure as defined by sections 18 to 20 only applies until the
contract is made.

49    Thirdly, both counsel accept and assert that the conclusion of the
Court of Appeal in the *Banque Keyser* case [1990] 1 QB 665 is good law and     C
that there is no remedy in damages for any want of good faith. Counsel also
drew this conclusion from the second half of section 17—"may be avoided
by the other party". The sole remedy, they submitted, was avoidance. It
follows from this that the principle relied upon by the defendants is not an
implied term but is a principle of law which is sufficient to support a right to
avoid the contract of insurance retrospectively.

50    Having a contractual obligation of good faith in the performance of    D
the contract presents no conceptual difficulty in itself. Such an obligation
can arise from an implied or inferred contractual term. It is commonly the
subject of an express term in certain types of contract such as partnership
contracts. Once parties are in a contractual relationship, the source of their
obligations the one to the other is the contract (although the contract is not
necessarily exclusive and the relationship which comes into existence may of    E
itself give rise to other liabilities, for example liabilities in tort). The primary
remedy for breach of contract is damages. But the consequences of breach of
contract are not confined to this. The contractual significance of the breach
may go further. It may also amount to a breach of a contractual condition
which will excuse or suspend the other party's obligation to continue to
perform the contract. It may be a repudiatory breach, or evidence a
renunciation, which entitles the other party to terminate the contract and     F
sue for damages. However any such release only applies prospectively and
does not affect already accrued rights: *Colonial Bank v European Grain and
Shipping Ltd* [1989] AC 1056. Ordinarily, the right to the indemnity accrues
as soon as the loss has been suffered: *Chandris v Argo Insurance Co Ltd*
[1963] 2 Lloyd's Rep 65.

51    The right to avoid referred to in section 17 is different. It applies     G
retrospectively. It enables the aggrieved party to rescind the contract ab
initio. Thus he totally nullifies the contract. Everything done under the
contract is liable to be undone. If any adjustment of the parties' financial
positions is to take place, it is done under the law of restitution not under the
law of contract. This is appropriate where the cause, the want of good faith,
has preceded and been material to the making of the contract. But, where
the want of good faith first occurs later, it becomes anomalous and           H
disproportionate that it should be so categorised and entitle the aggrieved
party to such an outcome. But this will be the effect of accepting the
defendants' argument. The result is effectively penal. Where a fully
enforceable contract has been entered into insuring the assured, say, for a

495

[2003] 1 AC          Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))
Lord Hobhouse of Woodborough

A    period of a year, the premium has been paid, a claim for a loss covered by the
insurance has arisen and been paid, but later, towards the end of the period,
the assured fails in some respect fully to discharge his duty of complete good
faith, the insurer is able not only to treat himself as discharged from further
liability but can also undo all that has perfectly properly gone before. This
cannot be reconciled with principle. No principle of this breadth is
B    supported by any authority whether before or after the Act. It would be
possible to draft a contractual term which would have such an effect but it
would be an improbable term for the parties to agree to and difficult if not
impossible to justify as an implied term. The failure may well be wholly
immaterial to anything that has gone before or will happen subsequently.

    52    A coherent scheme can be achieved by distinguishing a lack of good
faith which is material to the making of the contract itself (or some variation
C    of it) and a lack of good faith during the performance of the contract which
may prejudice the other party or cause him loss or destroy the continuing
contractual relationship. The former derives from requirements of the law
which pre-exist the contract and are not created by it although they only
become material because a contract has been entered into. The remedy is the
right to elect to avoid the contract. The latter can derive from express or
D    implied terms of the contract; it would be a contractual obligation arising
from the contract and the remedies are the contractual remedies provided by
the law of contract. This is no doubt why judges have on a number of
occasions been led to attribute the post-contract application of the principle
of good faith to an implied term.

    53    The principle relied on by the defendants is a duty of good faith
requiring the disclosure of information to the insurer. They submit that the
E    obligation as stated in section 17 continues throughout the relationship with
the same content and consequences. Thus, they argue that any non-
disclosure at any stage should be treated as a breach of the duty of good
faith: it has the same essential content and gives rise to the same remedy—
the right to avoid.

    54    In the pre-contract situation it is possible to provide criteria for
F    deciding what information should be disclosed and what need not be. The
criterion is materiality to the acceptance of the risk proposed and the
assessment of the premium. This is spelled out in the 1906 Act and was
the subject of the *Pine Top* case [1995] 1 AC 501. But when it comes to post-
contract disclosure the criterion becomes more elusive: to what does the
information have to be material? Some instructive responses have been
given. Where the contract is being varied, facts must be disclosed which are
G    material to the *additional* risk being accepted by the variation. It is not
necessary to disclose facts occurring, or discovered, since the original risk
was accepted material to the acceptance and rating of that risk. Logic would
suggest that such new information might be valuable to the underwriter. It
might affect how hard a bargain he would drive in exchange for agreeing to
the variation; it might be relevant to his reinsurance decisions. But it need
H    not be disclosed. In *Lishman v Northern Maritime Insurance Co* (1875)
LR 10 CP 179, 182 Blackburn J said:

        "concealment of material facts known to the assured before effecting
    the insurance will avoid the policy, the principle being that with regard to
    insurance the utmost good faith must be observed. Suppose the policy

were actually executed, and the parties agreed to add a memorandum    A
afterwards, altering the terms: if the alteration were such as to make the
contract more burdensome to the underwriters, and a fact known at that
time to the assured were concealed which was material to the alteration,
I should say the policy would be vitiated.  But if the fact were quite
immaterial to the alteration, and only material to the underwriter as being
a fact which showed that he had made a bad bargain originally, and such
as might tempt him, if it were possible, to get out of it, I should say that    B
there would be no obligation to disclose it."

55    Blackburn J is adopting a similar approach to that which he adopted
in the leading case *Cory v Patton* (1872) LR 7 QB 304 which concerned
whether there was a duty to disclose adverse facts discovered between the
time that the underwriter had accepted the risk by initialling the slip binding    C
in honour only, and the issue of the legally binding policy.  Blackburn J said,
at pp 308–309, that the underwriter cannot depart "from the terms thus
agreed on [in the slip] without a breach of faith"; and the assured need not
disclose to the underwriter "information which ought to have no effect on
him, but would expose him to a temptation to break his contract . . . he is
not bound to lead his neighbour into temptation".  The duty of good faith is
even-handed and is not to be used by the opposite party as an opportunity    D
for himself acting in bad faith.

56    The decision in *Cory v Patton* was endorsed by the 1906 Act.  What
Blackburn J said in the *Lishman* case was followed in many subsequent
cases, for example, *Niger Co Ltd v Guardian Assurance Co Ltd* (1922)
13 Ll L Rep 75, particularly per Lord Buckmaster, at pp 76–77; *Iron Trades
Mutual Insurance Co Ltd v Cia De Seguros Imperio* (unreported) 31 July    E
1990; *Bank of Nova Scotia v Hellenic Mutual War Risks Association
(Bermuda Ltd)* [1988] 1 Lloyd's Rep 514.  In the *Niger* case an additional
argument was advanced.  The policy in that case was one which covered the
assured for a number of years but it included a cancellation clause which
allowed the insurance company to cancel the policy.  The risk turned out to
be more onerous than had been expected because there was a tendency for
considerable quantities of goods to accumulate in the up-river warehouse    F
from which they were to be dispatched.  The insurance company sought to
avoid the policy or resist a claim because this post-contract development of
which the assured was aware had not then been disclosed by the assured to
the insurance company.  Obviously the development was of interest to the
insurance company and might have led it to exercise its right of cancellation.
But the Court of Appeal ((1921) 6 Ll L Rep 239, particularly per Bankes LJ,    G
at p 245) and the House of Lords held that such facts need not be disclosed.
(See also *New Hampshire Insurance Co v MGN Ltd* [1997] LRLR 24.)
A similar decision has been reached in Australia, *NSW Medical Defence
Union Ltd v Transport Industries Insurance Co Ltd* (1985) 4 NSWLR 107.

57    These authorities show that there is a clear distinction to be made
between the pre-contract duty of disclosure and any duty of disclosure which
may exist after the contract has been made.  It is not right to reason, as the    H
defendants submitted that your Lordships should, from the existence of an
extensive duty pre-contract positively to disclose all material facts to the
conclusion that post-contract there is a similarly extensive obligation to
disclose all facts which the insurer has an interest in knowing and which

497

A  might affect his conduct.  The courts have consistently set their face against
allowing the assured's duty of good faith to be used by the insurer as an
instrument for enabling the insurer himself to act in bad faith.  An inevitable
consequence in the post-contract situation is that the remedy of avoidance of
the contract is in practical terms wholly one-sided.  It is a remedy of value to
the insurer and, if the defendants' argument is accepted, of disproportionate
benefit to him; it enables him to escape retrospectively the liability to
B  indemnify which he has previously and (on this hypothesis) validly
undertaken.  Save possibly for some types of reinsurance treaty, it is hard to
think of circumstances where an assured will stand to benefit from the
avoidance of the policy for something that has occurred after the contract
has been entered into; the hypothesis of continuing dealings with each other
will normally postulate some claim having been made by the assured under
C  the policy.

*Ships' papers*

    58    The order for ship's papers was an order made by the common law
courts for the disclosure, on affidavit, of all the documentary material which
had come into existence in relation to the ship which had suffered the
D  casualty and had any possible relevance to the claim.  It was made in actions
brought by the assured under contracts of marine assurance and covered
wider classes of document than those directly within the possession or power
of the plaintiff.  The classes of document were set out in the form of order
which was by the end of the 19th century in a standard form and was
formalised in an appendix to the Rules of the Supreme Court (latterly
Ord 72, r 10).  The sanction was the stay of the action until the order had
E  been complied with.  Compliance with the order was onerous and the
sanction left the assured with little choice but to comply or to abandon his
claim.  The order never extended to non-marine insurance.  In the last
century, although still formally permitted by the Rules of the Supreme Court
in all marine insurance actions, the order was as a matter of judicial policy
confined to those cases where the underwriter defendants were prepared to
F  state through counsel that they proposed to plead that the vessel had been
wilfully cast away with the privity of the assured (i e scuttling): *Probatina
Shipping Co Ltd v Sun Insurance Office Ltd* [1974] QB 635.  Within the last
40 years, the order has become obsolete; it has been recognised that it is
largely unnecessary even in scuttling cases and had become an instrument of
unjust delay (a view expressed by Greer LJ as early as 1932: *Leon v Casey*
[1932] 2 KB 576, 588–589).
G    59    There was throughout a paradox involved in the order.  It was an
order justified on the basis of the assured's duty of good faith towards the
underwriter and accordingly to make full disclosure of all matters which
might be material to the claim.  But it was never made save in marine
insurance cases and the attempt to obtain an order in connection with other
types of insurance were rebuffed: *Twizell v Allen* (1839) 5 M & W 337
(claim in general average, no common law discovery), *Henderson v
H  Underwriting and Agency Association Ltd* [1891] 1 QB 557 (insurance of
goods carried by post Cadiz to Syria), *Village Main Reef Gold Mining Co
Ltd v Stearns* (1900) 5 Com Cas 246 (land transit policy).  The order was
only made by the court in the exercise of its powers and was not as such a
contractual right of the insurer.  Neither failure to give that discovery

498
Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))                [2003] 1 AC
Lord Hobhouse of Woodborough

without an order nor failure to comply with the order have ever been treated    A
as providing a ground for the insurer to avoid the policy; it merely was the
precursor of seeking from the court an order for such discovery or resisting
the lifting of the stay. Yet it was repeatedly said by judges that the order was
made because of a continuing duty of good faith and disclosure owed by the
assured to the insurer: for example, Mathew LJ in *Boulton v Houlder Bros
& Co* [1904] 1 KB 784, 791–792:                                                  B

"It is an essential condition of a policy of insurance that the
underwriters shall be treated with good faith, not merely in reference to
the inception of the risk, but in the steps taken to carry out the contract.
That being the meaning of the contract, effect is given to it by means of
the order for discovery of ship's papers, and the affidavit with relation to
them."                                                                           C

60    Historically, it seems probable that the original reason for advancing
this justification was the need to establish a jurisdiction in the common law
courts to make an order for discovery: *Goldschmidt v Marryat* (1809)
1 Camp 559; *Twizell v Allen* 5 M & W 337; *Graham Joint Stock Shipping
Co Ltd v Motor Union Insurance Co Ltd* [1922] 1 KB 563. But it must be
recognised that these statements of justification continued to be repeated by
judges (myself included) long after that need had ceased. But it must also be   D
recognised that, whatever the continuing duty was, it was of a different
character to that which exists pre-contract. Its extent was different. Its
enforcement was in the discretion of the court and required an order from
the court. Its breach did not give rise to the right to avoid the contract: so,
whatever it was, it was not the obligation referred to in section 17 nor was it
the subject matter of Lord Mansfield's judgment in *Carter v Boehm* 3 Burr    E
1905. Similarly, it can be taken to support the argument of the owners in the
present case that the section 17 obligation does not extend into litigation.

*Fraudulent claims*

61    This question arises upon policies which up to the time of the making
of the claim are to be assumed to be valid and enforceable. No right to avoid   F
the contract had arisen. On ordinary contractual principles it would be
expected that any question as to what are the parties' rights in relation to
anything which has occurred since the contract was made would be
answered by construing the contract in accordance with its terms, both
express and implied by law. Indeed, it is commonplace for insurance
contracts to include a clause making express provision for when a fraudulent
claim has been made. But it is also possible for principles drawn from the      G
general law to apply to an existing contract—on the better view, frustration
is an example of this as is the principle that a party shall not be allowed to
take advantage of his own unlawful act. It is such a principle upon which the
defendants rely in the present case. As I have previously stated there are
contractual remedies for breach of contract and repudiation which act
prospectively and upon which the defendants do not rely. The potential is
also there for the parties, if they so choose, to provide by their contract for   H
remedies or consequences which would act retrospectively. All this shows
that the courts should be cautious before extending to contractual relations
principles of law which the parties could themselves have incorporated
into their contract if they had so chosen. The courts should likewise be

A  prepared to examine the application of any such principle to the particular class of situation to see to what extent its application would reflect principles of public policy or the over-riding needs of justice. Where the application of the proposed principle would simply serve the interests of one party and do so in a disproportionate fashion, it is right to question whether the principle has been correctly formulated or is being correctly applied and it is right to question whether the codifying statute from which the right contended for is
B  said to be drawn is being correctly construed.

62  Where an insured is found to have made a fraudulent claim upon the insurers, the insurer is obviously not liable for the fraudulent claim. But often there will have been a lesser claim which could properly have been made and which the insured, when found out, seeks to recover. The law is that the insured who has made a fraudulent claim may not recover the claim
C  which could have been honestly made. The principle is well established and has certainly existed since the early 19th century: *Halsbury's Laws of England*, 4th ed reissue, vol 25 (1994), p 284, para 492, *Welford & Otter-Barry, Fire Insurance*, 4th ed (1948), p 289 et seq. This result is not dependant upon the inclusion in the contract of a term having that effect or the type of insurance; it is the consequence of a rule of law. Just as the law
D  will not allow an insured to commit a crime and then use it as a basis for recovering an indemnity (*Beresford v Royal Insurance Co Ltd* [1937] 2 KB 197), so it will not allow an insured who has made a fraudulent claim to recover. The logic is simple. The fraudulent insured must not be allowed to think: if the fraud is successful, then I will gain; if it is unsuccessful, I will lose nothing.

E  63  In *Goulstone v Royal Insurance Co* (1858) 1 F & F 276, which concerned a fire policy and a plea that the claim was fraudulently exaggerated, Pollock CB directed the jury, at p 279, that if the claim "was wilfully false in any substantial respect", they should find for the defendant as the plaintiff had in that case "forfeited all benefit under the policy". In *Britton v Royal Insurance Co* 4 F & F 905, also a fire insurance case where it was alleged that the insured took advantage of the fire to make a fraudulent
F  claim, Willes J directed the jury, at p 909:

"The law upon such a case is in accordance with justice, and also with sound policy. The law is, that a person who has made such a fraudulent claim could not be permitted to recover at all. The contract of insurance is one of perfect good faith on both sides, and it is most important that such good faith should be maintained. It is the common practice to insert
G  in fire policies conditions that they shall be void in the event of a fraudulent claim; and there was such a condition in the present case. Such a condition is only in accord with legal principle and sound policy. It would be most dangerous to permit parties to practise such frauds, and then, notwithstanding their falsehood and fraud, to recover the real value of the goods consumed. And if there is wilful falsehood and fraud in the
H  claim, the insured forfeits all claim whatever upon the policy. This, therefore, was an independent defence; quite distinct from that of arson . . ."

Willes J stressed to the jury, at p 911, that it was of the utmost moment that insurances should be enforced fairly and protected from fraud.

500

**Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))**      **[2003] 1 AC**
**Lord Hobhouse of Woodborough**

64    These authorities link the defence to the observation of good faith    *A*
but are specifically based upon the actual fraud of the insured in making the
claim. These judgments do not use the language of avoidance of the policy
ab initio but refer to the forfeiture of "all benefit under the policy" or "all
claim" upon it. It seems that the language used at the time in express clauses
was similar. The textbooks substantially adopt the same approach: see, for
example, most recently *Clarke, The Law of Insurance Contracts*, 3rd ed
(1997), p 746 et seq.    *B*

65    Modern authorities have not however always adopted this analysis.
In *Orakpo v Barclays Insurance Services* [1995] LRLR 443, the insurance
covered damage to a building. The insurance contract was in any event
voidable since it had been induced by material misrepresentation but the
defendant insurance company had also relied upon the defence that
the claim was grossly exaggerated and fraudulent. In the Court of Appeal    *C*
the defence was apparently argued upon the basis of implied term on the
assumption that the continuing duty of good faith should be so analysed.
The appellant plaintiff was appearing in person. The Court of Appeal
dismissed his appeal holding unanimously that there had been a
misrepresentation. But, obiter, there was a difference of opinion on the
fraudulent claim defence. Staughton LJ, dissenting, was of the opinion that
any breach of an implied term or the duty of good faith would not have been    *D*
so fundamental as to entitle the insurer to be discharged from liability. The
majority, Hoffmann LJ and Sir Roger Parker, held that the insurer would on
that ground as well have had a defence to the whole of the claim. The
decision of Hoffmann LJ was arrived at applying contractual principles: he
was concerned with an implied term, at p 451:

"I think that the insurance company should be able to trust the assured    *E*
to put forward a claim in good faith. Any fraud in making the claim goes
to the root of the contract and entitles the insurer to be discharged. One
should naturally not readily infer fraud from the fact that the insured has
made a doubtful or even exaggerated claim. In cases where nothing is
misrepresented or concealed, and the loss adjuster is in as good a position
to form a view of the validity or value of the claim as the insured, it will be    *F*
a legitimate reason that the assured was merely putting forward a starting
figure for negotiation. But in cases in which fraud in the making of the
claim has been averred and proved, I think it should discharge the insurer
from all liability."

Sir Roger Parker said, at p 452:

"The appellant submits that the law, in the absence of a specific clause,    *G*
is that an insured may present a claim which is to his knowledge
fraudulent to a very substantial extent, but may yet recover in respect of
the part of the claim which cannot be so categorised. To accept this
proposition involves holding that, although an insurance contract is one
of utmost good faith, an assured may present a positively and
substantially fraudulent claim without penalty, save that his claim will to    *H*
that extent be defeated on the facts . . . I can see . . . every reason why he
should not recover at all."

Sir Roger also referred to the question whether, in the absence of an express
clause providing that the claim *and* the policy should be avoided, the claim

A   only should be forfeit, and a dictum in a Scottish case (*Reid & Co Ltd v
Employers' Accident and Livestock Insurance Co Ltd* (1899) 1 F 1031)
which, contrary to *Britton's* case 4 F & F 905, would hold that only the
excess should be disallowed in the absence of an express clause. Sir Roger
concluded:

B          "In my judgment this is not so. It appears to me that it is contrary to
reason to allow an insurer to avoid a policy for material non-disclosure or
misrepresentation on inception, but to say that, if there is subsequently a
deliberate attempt by fraud to extract money from the insurer for alleged
losses which had never been incurred, it is only the claim which is forfeit."

66   These dicta do not assist the defendants in the present case on the
critical point whether anything less than actual fraud in the making of a
C   claim brings the principle into play. Counsel have assured your Lordships
that in the present case nothing turns upon whether the claim is wholly
forfeit or the whole policy is treated as forfeit as well. The authority of
*Britton's* case is that the whole claim is forfeit, which was what was material
in the *Orakpo* case. As regards the question, academic in the *Orakpo* case
and academic in the present case save as a pleading point, whether the
D   making of a fraudulent claim would entitle the insurer to avoid the contract
ab initio, that is a point upon which the judgments in the *Orakpo* case
cannot be treated as fully authoritative in view of the contractual analysis
there adopted. The language of Hoffmann LJ is fully justified on that
contractual analysis: "goes to the root of the contract and entitles the insurer
to be discharged". The fraud is fundamentally inconsistent with the bargain
and the continuation of the contractual relationship between the insurer and
E   the assured.

67   The same subject matter is discussed in two later cases to which
I should refer. The first is the decision of the Court of Appeal in *Galloway v
Guardian Royal Exchange (UK) Ltd* [1999] Lloyd's Rep IR 209, a case
similar to *Orakpo* involving a householder's insurance, a material
misrepresentation in the proposal form and a fraudulent claim. The
F   plaintiff's claim under the policy failed on both grounds. As regards the
fraudulent claim defence, the Court of Appeal followed and applied what
had been said by Willes J in *Britton's* case. On the point of difference
between Staughton LJ and Hoffmann LJ and Sir Roger Parker in the *Orakpo*
case, they preferred the view of the latter on the seriousness of any fraud in
the making of a claim. Lord Woolf MR referred also to the speech of
Viscount Sumner in *Lek v Mathews* (1927) 29 Ll L Rep 141, 145 stressing
G   the seriousness of any fraudulent claim unless it could be treated as de
minimis. "The policy of the law in this area, it seems to me", said Lord
Woolf, at p 213, "must be to discourage the making of fraudulent claims".
Millett LJ in a short concurring judgment stressed the seriousness of such
fraud and the public interest in discouraging it. In that context he expressed
himself in terms similar to those of section 17, stating, at p 214, that the
court should consider the fraudulent claim itself and then consider whether
H   "the making of that claim by the insured is sufficiently serious to justify
stigmatising it as a breach of his duty of good faith so as to avoid the policy".
Whilst this case puts the principle on the basis of a rule of law not an implied
term, it did not need to consider, nor is it clear that they were focusing on,
the distinction between something which would defeat any claim under the

502
Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))          [2003] 1 AC
Lord Hobhouse of Woodborough

policy and something which avoided the contract ab initio with all that that    A
would entail. The case does not support the submission that something less
than a fraudulent claim will suffice to give the insurer a defence.

68    The other decision is that of Rix J in *Royal Boskalis Westminster
NV v Mountain* [1997] LRLR 523, reversed on grounds which do not affect
the value of the judgment of Rix J in relation to the principle of good faith,
at p 591 et seq. He powerfully questions whether in relation to claims the    B
right of the insurer to repudiate all liability can extend beyond the making of
a fraudulent claim to an innocent failure to disclose. He points out the
difficulties which would arise in relation to the test of materiality and
remedy. Again, the judgment underlines the relevance of fraud.

69    Other cases contain dicta which support one or other of the
arguments before us but otherwise do not add to the discussion. For
example, in the House of Lords in the *Banque Keyser* case [1991] 2 AC 249,    C
282, Lord Jauncey of Tullichettle said:

   "There is, in general, no obligation to disclose supervening facts which
   come to the knowledge of either party after the conclusion of the contract
   (*Lishman v Northern Maritime Insurance Co* (1875) LR 10 CP 179),
   subject always to such exceptional cases as a ship entering a war zone or
   an insured failing to disclose all facts relevant to a claim."    D

This puts the obligation in wide terms independent of any question of fraud
equivalent to those used in section 18 of the 1906 Act. *Britton's* case 4 F & F
276 although cited was not referred to in any of the judgments nor were its
implications considered. The relevant question was different, whether a
failure to make full disclosure at the time of making the relevant contract
could give rise to a claim in damages.    E

70    In *Piermay Shipping Co SA v Chester (The Michael)* [1979] 2 Lloyd's
Rep 1, 21–22, a barratry case in which the defence was raised of a want of
good faith in presenting and persisting in a claim for a loss by perils of the
seas, Roskill LJ giving the judgment of the Court of Appeal rejecting the
defence said: "The relevant test must be honest belief." The insurers had to
prove that a fraudulent claim had been made or maintained by the insured.
If it were the law that any non-disclosure would have sufficed to enable the    F
insurers to avoid the contract ab initio, the case would have had to be
approached very differently and the result might have been different.

71    Finally, mention should be made of the judgment of Hirst J in *Black
King Shipping Corpn v Massie (The Litsion Pride)* [1985] 1 Lloyd's Rep 437
which has been used in a number of cases to support a general view of the
post contract duty of good faith. It was an exceptional case in that it    G
involved a war risks policy under which the insured shipowners were
entitled to send their ship into a highly dangerous war risk zone in the
Persian Gulf against an obligation to pay a heavy additional premium
calculated on the length of time spent in the zone. The policy, however did
not require the shipowner to declare in advance that the ship was entering
the zone but permitted declarations after it had done so. As a result the
shipowners had a strong motive only to declare the entry if the vessel    H
suffered a loss and that is what they did. Hirst J held that this practice was
not a breach of contract but was done with the fraudulent intent of depriving
the insurer of the additional premiums to which it was entitled. He held that
the insurer was not liable to pay the claim. There had been a breach of the

503

[2003] 1 AC      Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))
Lord Hobhouse of Woodborough

A   duty of good faith. The remedy was not confined to electing to avoid the policy; the insurer had elected not to avoid it. The insurer was entitled to rely on the breach as giving it a defence to the claim of the mortgagee of the vessel, the only effective plaintiffs in the action. The particular claim was only fraudulent in so far as the broker had not been truthful in dealing with the insurers at that stage. The reasoning adopted by Hirst J has been criticised both by academic writers and by other judges in later cases.

B   I consider that it should not any longer be treated as a sound statement of the law. In so far as it decouples the obligation of good faith both from section 17 and the remedy of avoidance and from the contractual principles which would apply to a breach of contract it is clearly unsound and cannot survive the Court of Appeal judgment in the *Banque Keyser* case [1990] 1 QB 665, upheld by your Lordships' House [1991] 2 AC 249. In so far as it is

C   based upon the principle of the irrecoverability of fraudulent claims, the decision is questionable upon the facts since the actual claim made was a valid claim for a loss which had occurred and had been caused by a peril insured against when the vessel was covered by a held covered clause. It is not necessary to examine whether there might or might not have been some other basis upon which the case could be decided in favour of the insurer as one feels it clearly ought to have been. But what is clear is that the judgment

D   of Hirst J is not a sound basis for the arguments advanced by the defendants in the present case.

    72   For the defendants to succeed in their defence under this part of the case the defendants have to show that the claim was made fraudulently. They have failed to obtain a finding of fraud. It is not enough that until part of the way through the trial the owners (without fraudulent intent) failed to

E   disclose to the defendants all the documents and information which the defendants would have wished to see in order to provide them with some, albeit inadequate, evidential support for their alleged defence under section 39(5). The defence under section 17 fails. It must be added that, on the facts found, had the defendants' defence succeeded it would have produced a wholly disproportionate result. The defence under section 39(5) failed after a full disclosure and investigation of all the material evidence.

F   The claim was in fact a good one which the owners were, subject to quantum, entitled to recover under the policy. The defendants were liable to pay it. The policy was valid and enforceable. For the defendants successfully to invoke section 17 so as to avoid the policy ab initio and wholly defeat the claim would be totally out of proportion to the failure of which they were complaining. Fraud has a fundamental impact upon the

G   parties' relationship and raises serious public policy considerations. Remediable mistakes do not have the same character.

*In litigation*

    73   The point here is whether the obligation of good faith and disclosure continues to apply unqualified once the parties are engaged in hostile litigation before the courts. There is no authority directly on this point. It

H   was decided in favour of the owners by both courts below. There are however dicta in cases which show that the judges concerned contemplated that the obligation of good faith could continue to apply during litigation. Thus, by way of example, Viscount Sumner in *Lek v Mathews* 29 Ll L Rep 141, 145 said in relation to an express clause that he was inclined to think

504
**Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))**                    **[2003] 1 AC**
**Lord Hobhouse of Woodborough**

that it would extend to false statements during the course of the trial. It is     A
therefore right to consider what effect the commencement of legal
proceedings has upon the relationship of the parties. Similarly some of the
judgments in the ship's papers cases treat the order for ship's papers as an
application of the obligation of good faith.

74  Before the litigation starts the parties' relationship is purely
contractual subject to the application of the general law. If one party has a     B
right such as that given by section 17 it derives from the contract itself or
from the application of the general law to the contractual relationship.
These rights continue unimpaired unless one party has exercised a right of
avoidance or termination. The insured has or may have a claim against the
insurer. The insurer may have accepted the claim or may have rejected it.
The insurer may have done so in a manner which evinces an intention not to
be bound by the contract or, more probably, may simply be requiring to be     C
satisfied that there is a valid claim covered by the policy. But the insured will
either have or not have a cause of action against the insurer. Indeed, in
relation to CTL cases, and the present case is such a case, the English
doctrine of ademption makes the date of the issue of the writ the
determinative date for deciding upon the validity of the notice of
abandonment: *Sailing Ship Blairmore Co v Macredie* [1898] AC 593. That     D
is why it is normal for the assured to ask the underwriter to put him in the
same position as if a writ had been issued: *Polurrian Steamship Co v Young*
(1913) 19 Com Cas 143.

75  When a writ is issued the rights of the parties are crystallised. The
function of the litigation is to ascertain what those rights are and grant the
appropriate remedy. The submission of the defendants in this case is that,
notwithstanding this, one party's *conduct of the litigation* can not only     E
change that party's substantive rights but do so retrospectively avoiding the
contract ab initio. It cannot be disputed that there are important changes in
the parties' relationship that come about when the litigation starts. There is
no longer a community of interest. The parties are in dispute and their
interests are opposed. Their relationship and rights are now governed by the
rules of procedure and the orders which the court makes on the application
of one or other party. The battle lines have been drawn and new remedies     F
are available to the parties. The disclosure of documents and facts are
provided for with appropriate sanctions; the orders are discretionary within
the parameters laid down by the procedural rules. Certain immunities from
disclosure are conferred under the rules of privilege. If a party is not happy
with his opponent's response to his requests he can seek an order from the
court. If a judgment has been obtained by perjured evidence remedies are     G
available to the aggrieved party. The situation therefore changes
significantly. There is no longer the need for the remedy of avoidance under
section 17; other more appropriate remedies are available. The same points
have been persuasively made by Callahan AJ sitting in the Supreme Court of
Connecticut in *Rego v Connecticut Insurance Placement Facility* (1991) 593
A 2d 491, 497.

76  I recognise that it is possible for something to be done in the     H
litigation which may amount to a contractual act; the delivery of pleadings
and similar documents are a form of communication. Such communication
can have a contractual significance which can and will still be given effect to.
Thus it is possible by a pleading to repudiate a contract or accept a

[2003] 1 AC          Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))
                                                    Lord Hobhouse of Woodborough

A    repudiation as terminating the contract. Similarly, a claim or defence may affect the substantive rights of a landlord and tenant inter se. But the acts and omissions of the assured relied upon by the defendants in the present case are not of that character. They are solely relevant as alleged failures to observe good faith under section 17. The section 17 principle is a principle of law and if its rationale no longer applies and if its operation, the conferment of a right of avoidance, ceases to make commercial or legal sense

B    then it should be treated as having been exhausted or at the least superseded by the rules of litigation. It will also very often be the case that by the time the litigation has started the cover has expired or its subject matter has ceased to exist so as to make the continuing relationship of insurer and insured no longer current and the observation of good faith only significant to the litigation.

C        77   I am therefore strongly of the view that once the parties are in litigation it is the procedural rules which govern the extent of the disclosure which should be given in the litigation, not section 17 as such, though section 17 may influence the court in the exercise of its discretion. The cases upon ship's papers, far from supporting the continuing application of the duty of good faith in truth support the opposite conclusion. As previously discussed, the fact that orders for ship's papers were only made in marine

D    insurance despite the fact that the principle of good faith applies to all insurance and the fact that the order was a matter of discretion not of right shows that it is a procedural remedy not a matter of contract although the principle of good faith clearly influenced the attitude of the court to making such an order. But, most conclusively, the fact that the remedy was to obtain an order from the court and not to avoid the contract shows both the limits

E    of the principle and the change of relationship which comes about when the parties are in hostile litigation.

         78   Therefore this point must be decided against the defendants as well.

     *Conclusion*

         79   I have in the course of this speech referred to some cases from other
F    jurisdictions. It is a striking feature of this branch of the law that other legal systems are increasingly discarding the more extreme features of the English law which allow an insurer to avoid liability on grounds which do not relate to the occurrence of the loss. The most outspoken criticism of the English law of non-disclosure is to be found in the judgment in the South African case to which I have already referred, the *Mutual and Federal Insurance* case 1985 (1) SA 419. There is also evidence that it does not always command

G    complete confidence even in this country: *Container Transport International Inc v Oceanus Mutual Underwriting Association (Bermuda) Ltd* [1984] 1 Lloyd's Rep 476; the *Pine Top* case [1995] 1 AC 501. Such authorities show that suitable caution should be exercised in making any extensions to the existing law of non-disclosure and that the courts should be on their guard against the use of the principle of good faith to achieve results which are only questionably capable of being reconciled with the mutual character

H    of the obligation to observe good faith.

         80   My Lords, the judgment of the Court of Appeal should be affirmed and the appeal should be dismissed with costs. Your Lordships were invited by the appellants to make a special order for costs relating to the adjournment of the hearing of this appeal from its previously scheduled date.

506

Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))          [2003] 1 AC
Lord Hobhouse of Woodborough

Having considered the submissions of the parties I do not consider that it     A
would be appropriate to make the special order asked for.  In so far as the
respondents may seek to recover any additional costs as a result of the
adjournment, that will be a matter to be scrutinised on taxation in the usual
way.

### LORD SCOTT OF FOSCOTE
My Lords,                                                                    B
81   There are two issues of some general importance that arise in this
appeal.  The first point arises under section 17 of the Marine Insurance Act
1906:

"A contract of marine insurance is a contract based upon the utmost
good faith, and, if the utmost good faith be not observed by either party,
the contract may be avoided by the other party."                        C

Sections 18, 19 and 20 of the Act spell out in some detail the content of the
duty of disclosure owed by the assured to the insurer before the contract is
concluded and the yardstick for assessing whether a representation made by
the assured to the insurer is material and is true.  It might have been possible
at one time to treat section 17 as merely an introduction to sections 18,
19 and 20.  But if that were ever possible it is so no longer.  The duty of     D
utmost good faith has been held to apply where an assured is obliged under
an existing policy to give notice of entry into a war risk zone (*The Litsion
Pride* [1985] 1 Lloyd's Rep 437) and to the obligation of an assured to give
notice when seeking to take advantage of a "held covered" clause in an
existing policy: *Overseas Commodities Ltd v Style* [1958] 1 Lloyd's Rep
546; *Liberian Insurance Agency Inc v Mosse* [1977] 2 Lloyd's Rep 560.  It    E
has been held, also, to give rights of inspection under reinsurance treaties:
*Phoenix General Insurance Co of Greece SA v Halvanon Insurance Co Ltd*
[1985] 2 Lloyd's Rep 599.  And the section 17 duty has repeatedly been held
to be owing in the context of claims.  A dishonest claim constitutes a breach
by the assured of section 17 and entitles the insurers to avoid the insurance
contract.                                                                     F
82   The present case involves a claim.  The respondent on this appeal,
Manifest Shipping Company Ltd ("Manifest"), made a claim under policies
of marine insurance in respect of which the appellant insurers have been
sued as representative underwriters.  The vessel insured was the *Star Sea*.  It
was insured against marine perils, including fire, for US$ 3·2m.  As a result
of a fire in the engine room workshop on 29 May 1990, the *Star Sea* became
a constructive total loss.  A claim was made and on 3 August 1990 a writ was    G
issued.  The writ was served on 4 September 1990.  It has not been suggested
that the claim was not honestly made nor that the continued prosecution of
the claim was or is dishonest.  What is complained of is, first, that two
accident reports into the causes of a fire on a vessel, the *Kastora*, which, like
the *Star Sea*, was part of a fleet of over 30 vessels beneficially owned by the
Kollakis family, had not been disclosed to the insurers.  Both reports had
been made by Dr Atherton, the shipowner's expert.  As to the first report,      H
privilege was claimed for it.  Privilege would have been claimed for the
second report as well, but the second report had been accidentally mislaid
and overlooked and was not rediscovered until the second day of the trial.
Privilege was eventually, during the trial, waived in respect of both reports.

A The insurers' complaint, however, is that the claim was formally made and
persisted in for a considerable period without disclosure of these reports.
The failure to disclose them is categorised as a breach of the section 17 duty
of utmost good faith and the insurers claim to be entitled, as a consequence,
to avoid the insurance contract.    The insurers complain, also, that a
Mr Nicholaidis, a director of Kappa Maritime Ltd, an English company that
managed the Kollakis fleet, gave certain evidence which the trial judge,
B Tuckey J disbelieved.    Mr Nicholaidis had particular responsibility for
technical matters and his giving of the disbelieved evidence is represented as
constituting a breach by the assured of its continuing section 17 duty of
utmost good faith.  The trial judge, Tuckey J, concluded that the section 17
duty owed by the assured came to an end once court proceedings had been
commenced.    At that point, in his view, court procedures and court
C sanctions, embodied in Rules of Court and practice directions, would
supersede and replace any statutory obligations under section 17.  He said,
[1995] 1 Lloyd's Rep 651, 667:

> "I think, as a matter of principle, that the English courts should hold
> that once insurers have rejected a claim, the duty of utmost good faith in
> relation to that claim comes to an end.  There is a logic to this which was
D well summarised by the court in Connecticut."

83    The judge's reference to the Connecticut court is a reference to the
judgment of the Supreme Court of Connecticut in *Rego v Connecticut
Insurance Placement Facility* 593 A 2d 491.  Callahan AJ, in whose opinion
the other justices concurred, said, at p 497:

> "If the insurer denies liability and compels the insured to bring suit, the
E rights of the parties are fixed as of that time for it is assumed that the
> insurer, in good faith, then has sound reasons based upon the terms of
> the policy for denying the claim of the insured.  To permit the insurer to
> await the testimony at trial to create a further ground for escape from its
> contractual obligation is inconsistent with the function the trial normally
> serves."

F 84    The Court of Appeal, in the present case [1997] 1 Lloyd's Rep 360,
did not endorse Tuckey J's conclusion that the section 17 duty came to an
end where court proceedings began, but arrived at the same result via a
different route.  The Court of Appeal held, at p 371, that at the claim stage,
and after the claim had been made, the section 17 duty required no more
than that the claim should not be made, or persisted in, fraudulently:

G > "When the assured makes his claim, the duty of utmost good faith
> requires that it should not be made fraudulently; and we are prepared to
> contemplate that the duty not to present a fraudulent claim subsumes a
> duty not to prosecute a claim fraudulently in litigation.  There is no need
> to demand more of the assured than that, if the Draconian remedy is to
> apply."

H 85    So, on this first point, the issues for your Lordships are, first, the
duration of the section 17 duty—does it continue beyond the making of the
claim and the issue of court proceedings prosecuting the claim?—and,
second, the content of the duty at the claim stage and thereafter—was the
Court of Appeal right in confining the duty to a duty to refrain from the

508
**Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))**          [2003] 1 AC
Lord Scott of Foscote

fraudulent presentation or prosecution of a claim and, more particularly,    A
can the matters on which the insurers rely suffice to constitute a breach of the
assured's section 17 duty?

86    The second important point for decision arises under section 39(5)
of the 1906 Act:

"In a time policy there is no implied warranty that the ship shall be
seaworthy at any stage of the adventure, but where, with the privity of the    B
assured, the ship is sent to sea in an unseaworthy state, the insurer is not
liable for any loss attributable to unseaworthiness."

87    The policies under which the *Star Sea* was insured were time policies.
Tuckey J, at trial, found that the *Star Sea* was unseaworthy in two relevant
respects. First, he found that the master was incompetent in not knowing the
manner in which the vessel's $CO_2$ fire extinguishing system should properly    C
be used. Secondly, he found that the condition of the port and starboard
engine room dampers was such that when operated they did not provide an
effective seal, thereby reducing the efficacy of the $CO_2$ system. He found that
both these matters were causative in enabling the fire to spread and to render
the vessel a constructive total loss. But for the combined effect of these
failures, the indemnity to which the assured would have been entitled would
have been limited to US$1·7m—as opposed to US$3·2m, the insured value    D
of the vessel.

88    The critical issue was whether the assured knew of the two matters
in respect of which unseaworthiness was found. This issue required an
examination of the concept of "privity". It was not alleged that any of the
individuals whose state of mind might be taken to be that of the assured for
section 39(5) purposes had actual knowledge that the *Star Sea* was    E
unseaworthy in either of the two respects found. What was said, however,
was that there was "blind-eye" knowledge. It was common ground that each
of the two Kollakis brothers, Mr Pantelis (Lou) Kollakis and Mr George
Kollakis, could be treated as the assured for section 39(5) purposes.
Tuckey J concluded that, in addition, a Mr Faraklas should be so treated.
Mr Faraklas was one of the two directors of Charterwell Maritime SA, a
Greek company based in Piraeus and the registered managers of the *Star Sea*.    F
He was also the sole director of the assured. Tuckey J considered the
position of Mr Nicholaidis but concluded he did not qualify for inclusion.
On this point, the Court of Appeal disagreed. So there are, in the end, four
individuals, namely, the Kollakis brothers, Mr Faraklas and Mr Nicholaidis,
whose state of mind has to be considered. Tuckey J, addressing himself to
the states of mind of the Kollakis brothers and Mr Faraklas, made a finding    G
of "blind-eye" knowledge on the part of the assured in respect both of the
incompetence of the master regarding the $CO_2$ fire-fighting equipment and
of the defective state of the *Star Sea's* dampers. He reached this conclusion
by the following route. There had, within the period of 15 months or so
before the *Star Sea* embarked upon its disastrous voyage, also been a fire
leading to a constructive total loss on two other vessels in the Kollakis fleet,
namely the *Centaurus* and the *Kastora*. The accident reports that followed    H
these fires had revealed a degree of ignorance on the part of the master of
each vessel of the proper use to be made of $CO_2$ firefighting equipment and
of the possibility (in the case of the *Centaurus*) and the near certainty (in the
case of the *Kastora*) that the faulty state of the vessel's dampers had

A   prevented, or would have prevented if the $CO_2$ equipment had been properly
used, the effective sealing of the site of the fire. Tuckey J found on the
evidence that the accident report relating to the *Centaurus* had come to the
attention of the assured. Two reports on the fire on the *Kastora* had been
made, both by Dr Atherton. Tuckey J found that the assured, via one or
other of the Kollakis brothers or Mr Faraklas, had become aware of the
master's excessive delay in ordering the $CO_2$ firefighting equipment to be
B   used and of the defective state of the vessel's dampers.

89   He then posed the question [1995] 1 Lloyd's Rep 651, 663: "So
much for what the assured learned from the two earlier fires. What did they
do about it?" and answered the question by saying "I am in no doubt that the
assured's response to the earlier fires was completely inadequate". In the
following passage, at p 664, the judge expressed his conclusion on the
C   critical issue of privity:

    ". . . I do find that there was blind eye knowledge on the part of the
    assured. The inadequate response to the earlier fires and the state of the
    *Star Sea* on 27 May [1990], demonstrate in my judgment that the assured
    did not want to know about her unseaworthiness in the relevant respects."

D   Tuckey J reduced the assured's recovery from the US$3·2m to US$1·7m. He
did so on the footing that the *Star Sea* was, "with the privity of the assured",
sent to sea in May 1990 with a master incompetent in the use of $CO_2$
firefighting equipment and with faulty dampers incapable of sealing off the
engine room. The Court of Appeal disagreed that the requisite privity had
been demonstrated. The court concluded [1997] 1 Lloyd's Rep 360, 377,
that the judge's findings relevant to this issue "[come] down simply to a
E   finding of negligence, albeit negligence in a high degree". The court,
therefore, allowed the assured to recover the full US$3·2m. Accordingly, the
question of principle for your Lordships is what, short of actual knowledge,
has to be shown for a section 39(5) finding of "privity" to be made.

90   Before your Lordships the allegations on the back of which a breach
of the section 17 duty is sought to be constructed are levelled against
F   Mr Nicholaidis and against the assured's solicitors, Hill Taylor Dickinson,
whose partner, Mr Mallin, had charge of the case. As against
Mr Nicholaidis, the allegation is that he dishonestly included in his witness
statement a passage which his knowledge was untrue. As against the
solicitors, the allegation is that Mr Mallin resorted to underhand and
unconscionable, albeit not dishonest, tactics in suppressing the Atherton
reports for as long as possible. Mr Jonathan Sumption, for the assured, has
G   taken us through the relevant facts in order to submit that they simply do not
sustain the weight that the insurers need them to bear. The importance of
the section 17 issue in your Lordships' House relates to law and principle.
But charges against Mr Mallin of underhand or unconscionable conduct and
against Mr Nicholaidis of dishonesty are, I am sure, of more importance to
them than the state of marine insurance law. It would not, in my opinion, be
right to decide the section 17 issue in favour of the assured on grounds
H   simply of legal principle. The solicitors and Mr Nicholaidis are entitled, in
my opinion, to have your Lordships' view as to whether, on the evidence the
serious allegations made against them are sustainable.

91   In my opinion, the allegations are not sustainable. Let me take first
the allegations against Mr Mallin. He was, I will assume, responsible for the

**Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))**          [2003] 1 AC
Lord Scott of Foscote

decision not to disclose to the insurers the existence of privileged documents,      A
namely, the two Atherton reports until such time as the privilege had been
waived.    This is not surprising.    It was common ground before your
Lordships that the reports were privileged.  Solicitors do not disclose in
litigation documents which are entitled to privilege.  They would risk being
sued if they did. Mr Gordon Pollock, counsel for the insurers, suggested to
your Lordships that Mr Mallin's motive in withholding the first report (the      B
second was missing until the second day of the trial) was to improve the
assured's chances of obtaining a favourable settlement before trial. There
was, however, no evidence at all to support that suggestion.    It had
apparently never been put to Mr Mallin that that had been his motive.
Mr Pollock explained that his suggestion was based upon an inference that
that had been the motive. My Lords, I do not think an imputation of a
discreditable motive can be properly so based.  Mr Mallin was entitled to      C
have the imputation put to him so that he could deal with it. The inference is
neither an obvious one nor an inescapable one. The obvious inference, and
the one that in the absence of any other evidence I would myself draw, is that
the withholding of a privileged document is no more than the instinctive
action of a solicitor experienced in litigation. Mr Pollock drew our attention
to the judge's description of passages in Dr Atherton's witness statement as
being "disingenuous" in that no reference was made in the statement to the      D
contents of his two reports: see pp 670–671. Mr Pollock invited us to infer
that Mr Mallin had asked Dr Atherton to draft his witness statement
omitting any reference to his reports.    But this, too, was not put to
Mr Mallin. Moreover, at p 671, Tuckey J expressly exonerated Mr Mallin
from criticism arising out of the contents of Mr Atherton's witness
statement.                                                                      E

92  In my opinion, the evidence in the case does not warrant any
imputation of underhand or unconscionable behaviour against Mr Mallin.
I am prepared to assume, without deciding, that the conduct of solicitors in
conducting litigation can be attributed for section 17 purposes to the
assured, their client. The insurers' section 17 case, however, in so far as it is
based upon the conduct of Mr Mallin in the conduct of the litigation, is      F
based upon conduct that it is accepted was not dishonest and that cannot,
for the reasons I have given, be characterised as underhand and
unconscionable.

93  As to Mr Nicholaidis, it is true that Tuckey J preferred other
evidence to that given by Mr Nicholaidis. But in doing so he did not say that
he thought Mr Nicholaidis had given dishonest evidence. A charge of giving
dishonest evidence against a witness requires, in my opinion,      G
something more than that the judge has not accepted his evidence and has
preferred the evidence of someone else. Leggatt LJ in the Court of Appeal
used the word "dishonesty" when referring to Mr Nicholaidis' state of mind:
p 367.  But in the passage in question, Leggatt LJ was addressing the
question whether Mr Nicholaidis' knowledge and state of mind could be
taken to be that of the assured for section 17 purposes. He held that it could
not. He was not, as I read the judgment, adding a finding of the giving of      H
dishonest evidence to the findings about Mr Nicholaidis that Tuckey J had
made.

94  Leggatt LJ went on to say that Mr Nicholaidis' evidence about what
he knew of the defective state of the fire dampers on the *Kastora*—the

3635-jpm    Doc 173-3    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C par
Pg 585 of 903

A  evidence that had been disbelieved by the judge—could not be attributed to
the assured.  I respectfully agree with that conclusion.  It follows that
Mr Nicholaidis evidence and state of mind does not constitute a route
whereby a section 17 breach of duty can be brought home to the assured.
I now turn to the section 17 point of principle.

95  It is accepted that the section 17 duty of the utmost good faith
B  continues to apply after the conclusion of the insurance contract. It does not
follow, however, that the content is the same after the contract as before.
Indeed it cannot be. Sections 18 to 20 prescribe the contents of the pre-
contract duty in terms which are inapplicable thereafter. It is very possible
for the duty that pre-contract is owed by an assured to be broken by an act or
omission which would not in ordinary language be described as a breach of
good faith at all. Under section 18(1) the assured is deemed to know, and is
C  therefore under an obligation to disclose, "every circumstance which, in the
ordinary course of business, ought to be known by him": see also
section 19(a). So an honest failure to disclose something of which the
assured was in fact unaware may constitute a breach of duty. Consider also
the concept of materiality. The duty to disclose extends to "every material
circumstance" known to the assured (section 18(1)) or to the assured's agent
D  (section 19(a)). The test of what is material is an objective one. An honest
belief by the assured, or the agent, that a particular circumstance is not
material, or an honest oversight of the materiality of a particular
circumstance, will not assist the assured if, objectively viewed, the
circumstance was material. I need not, perhaps, labour the point that a
breach of section 18 or section 19 duty may arise notwithstanding the good
faith of the assured. The addition of the adjective "utmost" does not affect
E  the point.

96  It seems to me clear, therefore, that the content of the duty of
"utmost good faith" post-contract must be examined afresh and is not
coloured by the extent of the duty owed by the assured pre-contract. That
this is so is demonstrated also by authority. *Cory v Patton* 7 QB 304
establishes the general proposition that the duty on the assured to disclose a
F  fact material to the risk being undertaken by the insurer does not continue
after the insured has become bound by the insurance contract.

97  *Niger Co Ltd v Guardian Assurance Co Ltd* 13 Ll L Rep 75
concerned a continuing policy terminable by three months notice. It was
held in your Lordships' House that no duty lay on the assured to disclose to
the insurers post-contract facts which, if known, might have induced the
insurer to exercise its right to terminate the contract. Lord Sumner said,
G  at p 82:

"The object of disclosure being to inform the underwriter's mind on
matters immediately under his consideration, with reference to the taking
or refusing of a risk then offered to him, I think it would be going beyond
the principle to say that each and every change in an insurance contract
creates an occasion on which a general disclosure becomes obligatory,
H  merely because the altered contract is not the unaltered contract, and
therefore the alteration is a transaction as the result of which a new
contract of insurance comes into existence. This would turn what is an
indispensable shield for the underwriter into an engine of oppression
against the assured."

98   In the same case in the Court of Appeal 6 Ll L Rep 239, 245,   *A*
Bankes LJ had commented:

> "if people enter into contracts of insurance for long periods, it would
> be a wise precaution to insert some provision requiring notice to be given
> them if the nature of the risk does alter or vary appreciably."

99   Plainly enough, neither in the Court of Appeal nor in this House was   *B*
it regarded as a breach of the section 17 duty for the assured to fail to
disclose facts within his knowledge which, if disclosed, might have induced
the insurer to terminate the policy.

100   *Cory v Patton* and *Niger Co Ltd v Guardian Assurance Co Ltd*
were followed in New South Wales by Rogers J in *NSW Medical Defence
Union Ltd v Transport Industries Insurance Co Ltd* 4 NSWLR 107.   *C*
Rogers J held that it was not a breach of the continuing duty of good faith for
an assured to fail to volunteer to the insurer information material to whether
the insured would exercise a right to give notice terminating the contract.

101   Finally on this point I should refer to *New Hampshire Insurance Co
v MGN Ltd* [1997] LRLR 24.   Counsel for the insurer had submitted that
where under a policy there was continuing cover subject to a right on the
insurers to cancel on notice, an obligation of disclosure lay on the assured   *D*
and extended to facts relevant to a decision by the insurer whether or not to
cancel.   The Court of Appeal rejected this submission.   Potter J, at first
instance, described it as "an unwarranted extension of the principle of
disclosure" ( p 47).

102   These authorities make clear that the content of the duty of good
faith owed by an assured post-contract is not the same as the duty owed in   *E*
the pre-contract stage.   So what is the content of the duty owed at the claim
stage?   It is, at least, that of honesty in the presentation of a claim.

103   In *Britton v Royal Insurance Co* 4 F & F 905, 909 Willes J told a
jury that:

> "The law is, that a person who has made such a fraudulent claim could
> not be permitted to recover at all.   The contract of insurance is one of   *F*
> perfect good faith on both sides, and it is most important that such good
> faith should be maintained . . . It would be most dangerous to permit
> parties to practise such frauds, and then, notwithstanding their falsehood
> and fraud, to recover the real value of the goods consumed."

104   Views to the same effect were expressed in *Orakpo v Barclays
Insurance Services* [1995] LRLR 443 and in *Galloway v Guardian Royal*   *G*
*Exchange (UK) Ltd* [1999] Lloyd's Rep IR 209.   *The Michael* [1979]
2 Lloyd's Rep 1 was a case in which a claim under a policy of marine
insurance had been presented honestly.   But after the claim had been
presented the assured became aware, or had grounds to suspect, that the loss
of the insured vessel had been caused not, as had been thought, by perils of
the seas, but by scuttling.   This information had not been passed on to the   *H*
insurers.   The insurers' reliance on this non-disclosure to avoid the policy
failed on the facts.   The court was not prepared to find or infer that the claim,
honestly presented, had subsequently been dishonestly maintained.
Roskill LJ dealt with this issue in the following passage, at p 22:

A     "As to the allegation of subsequently maintaining a fraudulent claim, Piermay and Mr Pierrakos are not to be found guilty of fraud merely because, with the wisdom of hindsight, they had information which might, if appreciated at its true value, have led them to the truth at an earlier date. A plaintiff in litigation is not maintaining a fraudulent claim merely because during interlocutory proceedings he or his solicitors become aware of evidence which may militate against the correctness of

B the plaintiff's case and its likelihood of ultimate success. The relevant test must be honest belief."

105   *The Michael* [1979] 2 Lloyd's Rep 1 is, in my opinion, a very important case for present purposes. It seems to me that in order to succeed on the section 17 issue Mr Pollock must persuade us that it was wrongly

C decided. It is true, as Mr Pollock pointed out, that the insurer's case in *The Michael* was presented as one of fraud on the part of the assured. It was not argued that a lower degree of culpability would suffice. There is, however, no hint in Roskill LJ's judgment in *The Michael* that the insurer's were trying to jump a hurdle higher than was necessary.

106   Mr Pollock, in support of the submission that the section 17 duty attending the presentation and prosecution of a claim might be broken by

D culpable conduct falling short of fraud, relied on remarks made by Hirst J in *The Litsion Pride* [1985] 1 Lloyd's Rep 437. The Litsion Pride was insured against war risks but, in the event of the vessel sailing to certain specified destinations, the insurers could exact an additional premium at their discretion. The time was the Gulf War. Bandar Khomeini in the Persian Gulf was, it was agreed, the most dangerous port in the Gulf. A voyage there

E would be bound to attract an additional premium at a very high rate. The vessel sailed to Bandar Khomeini without notification being given to the insurers. It came under attack and sank. A letter purporting to pre-date the voyage and to give notice of the vessel's destination was concocted by the assured in order to deceive the insurers into believing that the failure to give notice of the voyage before its commencement was due to an innocent oversight. Hirst J held that the falsely dated letter was a fraud directly

F connected to the claim and a breach of the section 17 duty of utmost good faith. I do not think anyone would dissent from that conclusion. But Mr Pollock, counsel for the insurers before Hirst J had submitted that a breach of the duty "might be established for instance by proof of deliberate non-disclosure [or] misrepresentation, albeit negligent or even innocent, by either the owners or the broker": see, p 507. Mr Kentridge QC, counsel for

G the assured, had submitted that, once the contract had been concluded, "the sole duty of the assured was not to act vis-à-vis the underwriter in a fraudulent manner": see p 508. But Hirst J did not accept that the post-contract duty was so confined and held, at p 512, that: "the duty in the claims sphere extends to culpable misrepresentation or non-disclosure". Before us, Mr Pollock has resiled from the contention that, post-contract, merely negligent or innocent misrepresentation or non-disclosure could

H constitute a breach of the continuing section 17 duty. But he has maintained his submission that fraud or dishonesty is not essential and that conduct which can fairly be described as unconscionable could suffice.

107   Two recent cases in which this issue has been considered merit attention. The first is the judgment of Rix J in *Royal Boskalis Westminster*

**Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))**          **[2003] 1 AC**
**Lord Scott of Foscote**

*NV v Mountain* [1997] LRLR 523. Rix J, at p 597, was troubled by the          A
notion that the post-contractual duty of good faith could extend beyond
fraud to some unspecified degree of culpability. He found, on the facts of the
case, at p 601, that "non-fraudulent but culpable and deliberate
misrepresentation and non-disclosure have been proved, albeit they were
subsequently repented of and remedied". He held that the insurers had
failed to establish that the misrepresentations and non-disclosures had been
material and that the insurers were not entitled under section 17 to avoid the          B
policy.

108    Mance J in *Standard Steamship Owners' P & I Association
(Bermuda) Ltd v Oceanfast Shipping Ltd* (unreported) on 6 March 1996,
described as "extravagant . . . [the] proposition that mere negligence in the
presentation of a claim could lead to avoidance of the whole contract of
insurance".          C

109    In my opinion, the ambit of the post-contract section 17 duty
cannot be considered without account also being taken of the difficulties of
materiality that troubled Rix J in *the Royal Boskalis* case. Let it be supposed
that Mr Pollock is right and that non-disclosure not involving any dishonesty
may entitle an insurer to avoid the policy. Materiality becomes highly
relevant. It can only be the non-disclosure of material facts or information
that can lead to the Draconian remedy of avoidance. But what is to be the          D
yardstick by which materiality is measured? A decision to disclose or not to
disclose would have to be taken at an early stage. Delayed disclosure would
expose the assured to similar charges to those being made in the present case
where disclosure of the two *Kastora* reports was made in the course of the
trial. The assured will often not know where, in the spectrum that runs from
"interesting" at one end to "issue determinative" at the other, the facts or          E
information in question should be placed. A similar problem in connection
with the discovery of documents led to the rule that "a document, which, it is
not unreasonable to suppose, may tend either to advance the case of the
party seeking discovery, or to damage the case of his adversary" should be
disclosed: *Cie Financiere et Commerciale du Pacifique v Peruvian Guano Co*
(1882) 11 QBD 55, 60. If Mr Pollock is right, what other test of materiality
is proposed? None has been suggested. In the present case, let it be          F
supposed that nothing in either of the two reports is determinative of any
issue in the claim. Nonetheless, it is submitted that a decision not to give
early disclosure of them constitutes a section 17 breach and entitles the
insurer to avoid the contract. If that were right, an assured would have to be
advised to swamp his insurer with a mass of facts and information which
might have some conceivable relevance to an issue in the case. This duty of          G
disclosure could not logically be limited to information contained in
documents. It would, if Mr Pollock is right, extend also to information
imparted orally. A duty that required such massive disclosure at the claim
stage lacks any commercial justification or sense.

110    These difficulties make clear, in my opinion, that Mr Pollock's
submission cannot be accepted. The presentation of a dishonest or
fraudulent claim constitutes a breach of duty that entitles the insurer to          H
repudiate any liability for the claim and, prospectively at least, to avoid any
liability under the policy. Whether the presentation of such a claim should
be regarded as a breach of a continuing duty under section 17 that entitles
the insurer to avoid the policy with retrospective effect, enabling any

515

**[2003] 1 AC**          Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))
Lord Scott of Foscote

A   payments made in satisfaction of previous unimpeachable claims to be
recovered by the insurer, is more debatable. It is not necessary in the present
case to decide that point. Nor is it necessary to decide what the position
would be, if a claim that had been honestly begun were dishonestly
continued. I have in mind a claim for the loss of goods that, post-claim, were
found or otherwise restored to the insured owner. I can see a great deal of
force in the argument that the section 17 duty does not apply to conduct in
B   the prosecution of litigation, as to which the Rules of Court that govern
litigation constitute the regulatory code. A decision as to that, too, is best
left for a case where the point is critical to the result.

111   I would, however, limit the duty owed by an insured in relation to a
claim to a duty of honesty. If the duty derives from section 17, none the less
this limitation does not, in my opinion involve a judicial re-writing of
C   section 17. On the contrary, it would be the creation out of section 17 of a
duty that could be broken notwithstanding that the assured had acted
throughout in good faith that would constitute a re-writing of the section.
Unless the assured has acted in bad faith he cannot, in my opinion, be in
breach of a duty of good faith, utmost or otherwise. For these reasons,
I agree with Tuckey J and the Court of Appeal in concluding that the
insurers' section 17 claim cannot succeed.
D

*The section 39(5) issue*

112   Did the assured have blind-eye knowledge of the unseaworthiness
of the *Star Sea*? It is as well to return to the language of the sub-section.
What is required is "privity" on the assured's part of the unseaworthiness.
"Privity" in its ordinary meaning connotes knowledge. "Blind-eye"
E   knowledge approximates to knowledge. Nelson at the battle of Copenhagen
made a deliberate decision to place the telescope to his blind eye in order to
avoid seeing what he knew he would see if he placed it to his good eye. It is,
I think, common ground—and if it is not, it should be—that an imputation
of blind-eye knowledge requires an amalgam of suspicion that certain facts
may exist and a decision to refrain from taking any step to confirm their
F   existence. Lord Blackburn in *Jones v Gordon* (1877) 2 App Cas 616, 629
distinguished a person who was "honestly blundering and careless" from a
person who

"refrained from asking questions, not because he was an honest
blunderer or a stupid man, but because he thought in his own secret
mind—I suspect there is something wrong, and if I ask questions and
make farther inquiry, it will no longer be my suspecting it, but my
G   knowing it, and then I shall not be able to recover."

Lord Blackburn added "I think that is dishonesty."

113   In *The Eurysthenes* [1977] 1 QB 49, 68 Lord Denning MR gave the
following description of "blind-eye" knowledge: "If a man, suspicious of the
truth, turns a blind eye to it, and refrains from inquiry—so that he should
not know it for certain—then he is to be regarded as knowing the truth."
H   114   Roskill LJ, in the same case, made clear that "privity" in
section 39(5) "must mean that he is privy to the unseaworthiness and not
merely that he has knowledge of facts which may ultimately be proved to
amount to unseaworthiness" and then turned to "blind-eye" knowledge. He
said, at p 76:

**Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))**          [2003] 1 AC
Lord Scott of Foscote

A
"If the facts amounting to unseaworthiness are there staring the
assured in the face so that he must, had he thought of it, have realised
their implication upon the unseaworthiness of his ship, he cannot escape
from being held privy to that unseaworthiness by blindly or blandly
ignoring those facts or by refraining from asking relevant questions
regarding them in the hope that by his lack of inquiry he will not know for
certain that which any inquiry must have made plain beyond possibility
of doubt."
B

I have some difficulty with Roskill LJ's inclusion in the cited passage of the
qualification "had he thought of it". If the assured had not "thought of it" he
would, presumably, not have realised the implications of the facts. His
refraining from inquiry would not then have been attributable to the hope
that he would not know for certain. I do not, myself, see how a failure to
think about the facts, and hence a failure to realise their implications, can
afford the basis for a finding of blind-eye knowledge. I respectfully prefer
the formulation by Geoffrey Lane LJ, at p 81:
C

"Knowledge of what?    Again the subsection is clear.    It says
'unseaworthiness', not 'facts which in the upshot prove to amount to
unseaworthiness'. Accordingly it seems clear to me that if this matter
were res integra, the section would mean that the assured only loses his
cover if he has consented to or concurred in the ship going to sea when he
knew or believed that it was in an unseaworthy condition. I add the word
'believed' to cover the man who deliberately turns a blind eye to what he
believes to be true in order to avoid obtaining certain knowledge of the
truth."
D

Geoffrey Lane LJ's formulation was very similar to that of Branson J in *The
Gloria* 54 Ll L Rep 35, 58:
E

"I think that if it were shown that an owner had reason to believe that
his ship was in fact unseaworthy, and deliberately refrained from an
examination which would have turned his belief into knowledge, he
might properly be held privy to the unseaworthiness of his ship. But the
mere omission to take precautions against the possibility of the ship being
unseaworthy cannot, I think, make the owner privy to any
unseaworthiness which such precaution might have disclosed."
F

Leggatt LJ in the present case, after referring to *The Eurysthenes* and *The
Gloria*, concluded [1997] 1 Lloyd's Rep 360, 377:
G
"what the defendant underwriters had to establish was a suspicion or
realisation in the mind of at least one of the relevant individuals that *Star
Sea* was unseaworthy in one of the relevant aspects, and a decision not to
check whether that was so for fear of having certain knowledge about it."

115    Save that, having regard to the judge's findings on causation, and
the insurers' concession (referred to by my noble and learned friend
Lord Hobhouse of Woodborough), the suspicion or realisation of unsea-
worthiness had to be of both, and not simply of one, of the relevant aspects,
I agree with that formulation. There must be a suspicion of the relevant
unseaworthiness, and a decision not to check. Unless there is a decision not
to check, not to obtain confirmation of what is suspected, there will, in my
H

517
**[2003] 1 AC**          Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))
Lord Scott of Foscote

A  opinion, be no privity, no blind-eye knowledge, however seriously negligent the failure to check may be. It is in this respect that, in agreement with Leggatt LJ, I think Tuckey J was in error. He made no finding of a deliberate decision not to enquire on the part of any of the individuals who, for this purpose, could constitute the assured. Such a finding was, in my view, an essential condition of a conclusion of blind-eye knowledge. It is not acceptable, in my opinion to assume, from the judge's conclusion of blind-eye knowledge that he did find that one or other of the individuals had made a deliberate decision not to enquire.

B

116 In summary, blind-eye knowledge requires, in my opinion, a suspicion that the relevant facts do exist and a deliberate decision to avoid confirming that they exist. But a warning should be sounded. Suspicion is a word that can be used to describe a state-of-mind that may, at one extreme,
C  be no more than a vague feeling of unease and, at the other extreme, reflect a firm belief in the existence of the relevant facts. In my opinion, in order for there to be blind-eye knowledge, the suspicion must be firmly grounded and targeted on specific facts. The deliberate decision must be a decision to avoid obtaining confirmation of facts in whose existence the individual has good reason to believe. To allow blind-eye knowledge to be constituted by a decision not to enquire into an untargeted or speculative suspicion would be
D  to allow negligence, albeit gross, to be the basis of a finding of privity. That, in my opinion, is not warranted by section 39(5).

117 In the present case, on the facts, I can see no sufficient basis for attributing to any of the four individuals blind-eye knowledge of either of the two respects of unseaworthiness. The incompetence of the masters of the *Centaurus* and the *Kastora* did not put the Kollakis brothers, Mr Faraklas or
E  Mr Nicholaidis in a position in which they were bound to inquire into the competence of every other master in the Kollakis fleet. The master of the *Star Sea*, although recently appointed to the *Star Sea*, had been with the fleet for over 11 years and there was no evidence of any previous incompetence on his part. He had held a master's certificate since 1978.

118 As to the dampers, outside contractors had been hired to overhaul the *Star Sea's* fire dampers while the vessel was laying-up in Piraeus before
F  commencing its final voyage. Tuckey J [1995] 1 Lloyd's Rep 651, 663, expressed the opinion that:

"It was not enough merely to instruct outside contractors to overhaul dampers. The evidence shows that the decision as to what dampers to overhaul was effectively made by the contractors' foreman. In view of the state of the dampers on *Star Sea* after the fire, it is quite clear, I think, that
G  work should have been done to her dampers in lay-up which was not done."

The judge went on to say that some system should have been in place to ensure that the necessary work had been done.

119 These findings go to negligence, perhaps gross negligence, but they are, in my opinion, no basis for a finding of blind-eye knowledge. The judge
H  made no finding against either of the Kollakis brothers or against Mr Faraklas of a suspicion or belief that the dampers were defective. And, as Leggatt LJ in the Court of Appeal pointed out [1997] 1 Lloyd's Rep 360, 378, "there is no reason to suppose that the finding would have been made on this aspect fixing Mr Nicholaidis with a suspicion or belief where others were not". I agree

518

**Manifest Shipping Co v Uni-Polaris Insurance Co (HL(E))**          [2003] 1 AC
**Lord Scott of Foscote**

that the evidence did not justify a finding that these four individuals, whether    A
viewed individually or collectively, sent the *Star Sea* on its voyage in an
unseaworthy state believing or suspecting that that might be so.

120   I therefore agree with the Court of Appeal's conclusion that
Tuckey J's finding in favour of the insurers on the section 39(5) issue
cannot be sustained. For these reasons and those given by Lord Hobhouse
of Woodborough in his opinion, which I have had the advantage of reading
in draft, I would dismiss the appeal.                                          B

*Appeal dismissed with costs.*

*Solicitors: Ince & Co; Hill Taylor Dickinson.*

B L S
C

————

D

House of Lords

# Johnson *v* Unisys Ltd

## [2001] UKHL 13

2001  Feb 5, 6;          Lord Bingham of Cornhill, Lord Nicholls of Birkenhead,    E
      March 22                Lord Steyn, Lord Hoffmann and Lord Millett

*Employment — Wrongful dismissal — Damages — Employee awarded*
  *compensation for unfair dismissal — Subsequent claim of wrongful dismissal*
  *based on manner of dismissal — Whether damages recoverable*

The plaintiff employee was employed by the defendant from 1971 until 1987,
when he was made redundant. During that time he was subject to considerable work-    F
related stress and the employer was aware that he had special psychological needs. In
1990 he was re-employed by the employer but was summarily dismissed in 1994
following allegations concerning his conduct. The employee's complaint of unfair
dismissal was upheld by an industrial tribunal though he was held to have contributed
to his dismissal by 25%. The employee then commenced proceedings against the
employer for damages for wrongful dismissal claiming that, because of the manner in
which he had been dismissed, he had suffered a mental breakdown and was unable to    G
work. The employee alleged that, in breach of an implied term of his contract of
employment that the employer would not, without reasonable and proper cause,
conduct itself in a manner calculated and likely to destroy or seriously damage the
relationship of trust and confidence, the employer had in the manner of dismissing
him harmed his professional development, health, financial welfare and future
employment prospects. On the employer's summons, the judge struck out the claim
as disclosing no reasonable cause of action. The Court of Appeal upheld that decision.    H

On appeal by the employee—
*Held*, dismissing the appeal, that (per Lord Bingham of Cornhill, Lord Nicholls
of Birkenhead, Lord Hoffmann and Lord Millett) under Part X of the Employment
Rights Act 1996 Parliament had provided the employee with a limited remedy for the
conduct of which he complained; that, although it was possible to conceive of an

TAB 39

*Marks & Spencer plc v BNP Paribas Securities Services Trust Co (Jersey) Ltd*
[2016] AC 742, UK Supreme Court

742
**Marks & Spencer plc v BNP Paribas Securities Services (SC(E))**           [2016] AC

Supreme Court                                              *A*

# Marks and Spencer plc *v* BNP Paribas Securities Services Trust Co (Jersey) Ltd and another

## [2015] UKSC 72

2015 Oct 7;                      Lord Neuberger of Abbotsbury PSC,       *B*
Dec 2           Lord Clarke of Stone-cum-Ebony, Lord Sumption,
                             Lord Carnwath, Lord Hodge JJSC

*Contract — Construction — Implied term — Principles applicable in determining whether terms to be implied into commercial contract — Relevance of well-established, clear and general understanding of position under general law — Extent to which implication of terms matter of construction*
*C*
*Landlord and tenant — Lease — Apportionability of rent — Commercial lease requiring rent to be paid quarterly in advance — Break clause allowing tenant to terminate lease on specified date — Tenant exercising break clause and claiming repayment of rent paid for period after termination of lease — Whether advance rent payment apportionable in time under general law — Whether term to be implied requiring apportionment — Apportionment Act 1870 (33 & 34 Vict c 35), s 2*[1]
*D*

Under four commercial leases, which had been negotiated and drafted by specialist solicitors, rent was payable "yearly and proportionately for any part of a year by equal quarterly instalments in advance" on the usual quarter days. Each lease contained a break clause allowing the tenant to terminate the lease on 24 January 2012 by giving the landlords six months' prior written notice, provided that, on the break date, there were no arrears of rent and the tenant had paid the landlords a break premium equivalent to one year's rent. In early July 2011 the tenant served a break notice on the landlords. It then paid a full quarter's rent in December 2011 and the break premium a few weeks later. As a result of those payments the break notice was effective and the lease determined on 24 January 2012. Subsequently the tenant claimed repayment of rent which it had paid for the period after the termination of the lease, on the basis that a term entitling it to such repayment should be implied into the lease. The judge allowed the claim. The Court of Appeal allowed the landlords' appeal, holding that no such term could be implied into the lease.
*E*

*F*
On appeal by the tenant—

*Held*, dismissing the appeal, (1) that a term would be implied into a detailed commercial contract only if that were necessary to give the contract business efficacy or so obvious that it went without saying; that the implication of a term was not critically dependent on proof of an actual intention of the parties when negotiating the contract but was concerned with what notional reasonable people, in the position of the parties at the time at which they had been contracting, would have agreed; and that it was a necessary but not sufficient condition for implying a term that it appeared fair or that the court considered that the parties would have agreed it if it had been suggested to them (post, paras 14–21, 57, 75, 77).
*G*

*Attorney General of Belize v Belize Telecom Ltd* [2009] 1 WLR 1988, PC considered.

(2) That, given the well-established, clear general understanding that rent was not apportionable in time at common law and that section 2 of the Apportionment Act 1870 did not apply to rent payable in advance, it would be wrong, save in a very clear case, to attribute to a landlord and a tenant who had entered into a full and professionally drafted lease an intention that, on the exercise of a break clause, the
*H*

---

[1] Apportionment Act 1870, s 2: see post, para 43.

© 2016 The Incorporated Council of Law Reporting for England and Wales

A tenant should be able to recover an apportioned part of the rent payable and paid in advance; that although, on the facts, the tenant had a powerful case for contending that it was necessary for business efficacy that a rent apportionment term should be implied into the lease that implication was not necessary to make the lease work or to avoid absurdity; and that, accordingly, in the absence of express words to the contrary, the Court of Appeal had been right to conclude that the tenant's claim failed (post, paras 33–35, 37, 42–46, 49–50, 54, 56, 57, 74, 75).

B   *Ellis v Rowbotham* [1900] 1 QB 740, CA approved.

*Per curiam*. In a case where the court had real doubt as to the correct meaning of a statute, it should favour the meaning which has been generally assumed to be correct for a long period, especially when the basis of that assumption is a judicial decision (post, paras 45, 57, 75).

*Per* Lord Neuberger of Abbotsbury PSC, Lord Clarke of Stone-cum-Ebony, Lord Sumption and Lord Hodge JJSC. Construing the words which the parties have used

C  in their contract and implying terms into the contract both involve determining the scope and meaning of the contract and so are part of its construction or interpretation in a broad sense (post, paras 26, 28, 76).

*Per* Lord Neuberger of Abbotsbury PSC, Lord Sumption and Lord Hodge JJSC. Construing the words used and implying additional words are different processes governed by different rules. In most, possibly all, disputes about whether a term should be implied into a contract, it is only after the process of construing the express

D  words is complete that the issue of an implied term falls to be considered (post, paras 26, 28).

Decision of the Court of Appeal [2014] EWCA Civ 603; [2014] L & TR 26 affirmed.

The following cases are referred to in the judgments:

*Aberdeen City Council v Stewart Milne Group Ltd* [2011] UKSC 56; 2012 SC
E  (UKSC) 240, SC(Sc)
*Arnold v Britton* [2015] UKSC 36; [2015] AC 1619; [2015] 2 WLR 1593; [2016] 1 All ER 1, SC(E)
*Atkins International HA v Islamic Republic of Iran Shipping Lines (The APJ Priti)* [1987] 2 Lloyd's Rep 37, CA
*Attorney General of Belize v Belize Telecom Ltd* [2009] UKPC 10; [2009] 1 WLR 1988; [2009] Bus LR 1316; [2009] 2 All ER 1127; [2009] 2 All ER (Comm) 1;
F  [2009] 2 BCLC 148, PC
*BP Refinery (Westernport) Pty Ltd v Shire of Hastings* (1977) 180 CLR 266
*Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd* [1997] AC 191; [1996] 3 WLR 87; [1996] 3 All ER 365, HL(E)
*Canas Property Co Ltd v KL Television Services Ltd* [1970] 2 QB 433; [1970] 2 WLR 1113; [1970] 2 All ER 795, CA
*Capital and City Holdings Ltd v Dean Warburg Ltd* (1988) 58 P & CR 346, CA
G  *Capron v Capron* (1874) LR 17 Eq 288
*Crema v Cenkos Securities plc* [2010] EWCA Civ 1444; [2011] 1 WLR 2066; [2011] Bus LR 943; [2011] 2 All ER (Comm) 676, CA
*Ellis v Rowbotham* [1900] 1 QB 740, CA
*Equitable Life Assurance Society v Hyman* [2002] 1 AC 408; [2000] 2 WLR 798; [2000] 2 All ER 331, CA
*Foo Jong Peng v Phua Kiah Mai* [2012] SGCA 55; [2012] 4 SLR 1267
H  *Geys v Société Générale, London Branch* [2012] UKSC 63; [2013] 1 AC 523; [2013] 2 WLR 50; [2013] ICR 117; [2013] 1 All ER 1061, SC(E)
*Hildebrand v Lewis* [1941] 2 KB 135; [1941] 2 All ER 584, CA
*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896; [1998] 1 All ER 98; [1998] 1 BCLC 531, HL(E)
*Jackson v Dear* [2013] EWCA Civ 89; [2014] 1 BCLC 186, CA

*Liverpool City Council v Irwin* [1977] AC 239; [1976] 2 WLR 562; [1976] 2 All ER 39, HL(E)

*Mediterranean Salvage and Towage Ltd v Seamar Trading and Commerce Inc* [2009] EWCA Civ 531; [2010] 1 All ER (Comm) 1; [2009] 2 Lloyd's Rep 639, CA

*Moorcock, The* (1889) 14 PD 64, CA

*Philips Electronique Grand Public SA v British Sky Broadcasting Ltd* [1995] EMLR 472, CA

*Reigate v Union Manufacturing Co (Ramsbottom) Ltd* [1918] 1 KB 592, CA

*Sembcorp Marine Ltd v PPL Holdings Pte Ltd* [2013] SGCA 43

*Shirlaw v Southern Foundries (1926) Ltd* [1939] 2 KB 206; [1939] 2 All ER 113, CA

*Stena Line Ltd v Merchant Navy Ratings Pension Fund Trustees Ltd* [2011] EWCA Civ 543; [2011] Pens LR 223, CA

*Trollope & Colls Ltd v North West Metropolitan Regional Hospital Board* [1973] 1 WLR 601; [1973] 2 All ER 260, HL(E)

*William Clun's Case* (1613) 10 Co Rep 127a

The following additional cases were cited in argument:

*Brown's Operating System Services Ltd v Southwark Roman Catholic Diocesan Corpn* [2007] EWCA Civ 164; [2008] 1 P & CR 7, CA

*Park Air Services plc, In re* [2000] 2 AC 172; [1999] 2 WLR 396; [1999] 1 All ER 673; [1999] 1 BCLC 155, HL(E)

*Rainy Sky SA v Kookmin Bank* [2011] UKSC 50; [2011] 1 WLR 2900; [2012] Bus LR 313; [2012] 1 All ER 1137; [2012] 1 All ER (Comm) 1; [2012] 1 Lloyd's Rep 34, SC(E)

*United Scientific Holdings Ltd v Burnley Borough Council* [1978] AC 904; [1977] 2 WLR 806; [1977] 2 All ER 62, HL(E)

*William Hill (Football) Ltd v Willen Key & Hardware Ltd* (1964) 108 SJ 482

*York v Casey* (1998) 31 HLR 209, CA

**APPEAL** from the Court of Appeal

By a claim form the claimant tenant, Marks and Spencer plc, claimed against the defendant landlords, BNP Paribas Securities Services Trust Co (Jersey) Ltd and BNP Paribas Securities Services Trust Co Ltd, recovery of the apportioned rent, which it had paid in advance on 25 December 2011 in accordance with the terms of four commercial leases, in respect of the period after 24 January 2012, the date on which it had determined the leases in the exercise of its right under a break clause in each lease. On 16 May 2013 Morgan J allowed the claim [2013] EWHC 1279 (Ch); [2013] L & TR 31.

The landlords appealed. On 14 May 2014 the Court of Appeal (Arden, Jackson and Fulford LJJ) [2014] EWCA Civ 603; [2014] L & TR 26 allowed the appeal.

On 11 November 2014 the Supreme Court (Lord Neuberger of Abbotsbury PSC, Lord Clarke of Stone-cum-Ebony and Lord Carnwath JJSC) granted the tenant permission to appeal, pursuant to which it appealed. The issue for the Supreme Court, as set out in the parties' statement of agreed facts and issues, was whether the lease contained an implied term entitling the tenant, in the event of the lease terminating on 24 January 2012 pursuant to the break clause, to repayment of an apportioned part, attributable to the period after that break date, of the basic rent, car park rent and insurance charge paid on the quarter day preceding the first break date.

The facts are stated in the judgment of Lord Neuberger of Abbotsbury PSC.

© 2016 The Incorporated Council of Law Reporting for England and Wales

745
[2016] AC        Marks & Spencer plc v BNP Paribas Securities Services (SC(E))
Argument

*A*  *Guy Fetherstonhaugh QC* and *Kester Lees* (instructed by *King & Wood Mallesons LLP*) for the tenant.

A term can be implied into a contract if it would spell out in express words what the contract, read against the relevant background, would reasonably be understood to mean: see *Attorney General of Belize v Belize Telecom Ltd* [2009] 1 WLR 1988, paras 16–18, 21–22, 27. The court has

*B*  no power to improve upon the instrument. It is only concerned to discover what the instrument means, i e the meaning which it would convey to a reasonable person having all the background knowledge which would reasonably be available to the audience to whom the instrument is addressed (see *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900); it is not necessarily the meaning intended by the parties. The question of implication only arises when the instrument does not expressly provide for what is to

*C*  happen when some event occurs. The most usual inference in such a case is that nothing is to happen since, if the parties had intended something to happen, the instrument would have said so. However, in some cases, the reasonable addressee would understand the instrument to mean something else. In such a case, the court implies a term as to what will happen if the event in question occurs. The previous tests, including the necessary for business efficacy (*Reigate v Union Manufacturing Co (Ramsbottom) Ltd*

*D*  [1918] 1 KB 592, 605) and officious bystander (*Shirlaw v Southern Foundries (1926) Ltd* [1939] 2 KB 206, 227) tests, were expressions of a single test to be applied by the court. Reasonableness, whilst a requirement, is insufficient. The court must be satisfied that it is what the contract actually means. Implication is thus part of the process of contractual interpretation, of which one question only should be asked: what would the

*E*  reasonable man with the background knowledge of the parties reasonably understand the parties to have meant by their agreement? The role which necessity plays in that process is to require a term to be implied if the contract cannot work in the way in which the reasonable man would expect upon reading it; it is not necessary to show that the contract cannot work at all without the implied term. The advantage of such an approach is that:

*F*  (a) it assimilates the test for implication of terms with the general principles for contractual interpretation, replacing the unsatisfactory dichotomy which arises if reasonableness applies to conventional interpretation, but absolute necessity applies to implication (see *Aberdeen City Council v Stewart Milne Group Ltd* 2012 SC (UKSC) 240, para 33); (b) it avoids the harshness of outcomes where the express terms of an agreement may work perfectly well, in the sense that both parties are able to perform their express obligations,

*G*  but the consequences would contradict what any reasonable person would understand the contract to mean; (c) it does not abandon the useful concept of necessity, but uses it by reference to what is necessary to achieve the reasonable expectations of the parties, instead of that which is necessary to make the contract work; (d) it resembles the original formulation of the rule adopted in *The Moorcock* (1889) 14 PD 64, and frees that rule from its misapplication in later authority; (e) it disposes with the confusion which

*H*  has arisen as to whether either or both of the business efficacy and officious bystander tests must be satisfied; (f) it does not open the floodgates for contractual disputes; to the contrary, in answering the test, a party will only succeed if it is able to show that the proposed term must be implied in order to achieve the reasonable understanding of the parties; (g) moreover,

© 2016 The Incorporated Council of Law Reporting for England and Wales

additional safeguards reside in the requirements that the term must (i) be *A* necessary to achieve the only reasonable expectation of the reasonable addressee (*Liverpool City Council v Irwin* [1977] AC 239); (ii) be reasonable; (iii) be clearly formulated to meet the lacuna in the express terms, in relation to the reasonable expectation identified by the reasonable addressee (*Jackson v Dear* [2014] 1 BCLC 186); and (iv) not be inconsistent with the express terms of the contract (*Equitable Life Assurance Society v Hyman* [2002] 1 AC 408); and (h) although this formulation develops the law, it does so in a way in which the law was already travelling and already has a substantial body of support, in the courts and elsewhere: see *Chitty on Contracts*, 31st ed (2012), vol I, para 13-006. *B*

The application to the lease of such a test compels the implication of a term as to reimbursement of rent paid for the period after the termination of the lease given that (1) implication of a rental apportionment term-end *C* mechanism was accepted by the landlord (consistently with *United Scientific Holdings Ltd v Burnley Borough Council* [1978] AC 904, 935 and *In re Park Air Services plc* [2000] 2 AC 172, 187); (2) implication of a service charge apportionment and reimbursement mechanism upon exercise of the break clause was also accepted by the landlord; (3) apportionment of all rents was allowed in the event of conditions precedent being satisfied prior to the rent *D* payment day; (4) overpaid rents were demonstrably not intended as compensation; and (5) rents are payments for use and occupation of premises, and not compensation for the loss of that use and occupation. In all those circumstances, it can safely be concluded that the lease was an imperfect document which failed to make provision for a number of foreseeable contingencies and it would reasonably have been understood to *E* mean that reimbursement of the appropriate part of the rents should be made. Even if the more stringent pre-*Belize* test—of business efficacy/officious bystander/absolute necessity—is seen to be appropriate, the proposed implied term surpasses those thresholds in any event. *Ellis v Rowbotham* [1900] 1 QB 740 should be overruled, and that will make the case for implied reimbursement all the stronger. The Apportionment Act 1870 does not expressly limit itself to rent payable in arrear, even if that was *F* the primary mischief at which the Act was directed. The language of section 2 is clear. Construing *Ellis v Rowbotham* as applying to all rents would be fair and justifiable and would avoid the inconsistency in forfeiture cases whereby the tenant is entitled to retain the rent which it would otherwise have been obliged to pay on the quarter day following the forfeiture date, but only where rent is payable in arrear. [Reference was made to *York v Casey* (1998) *G* 31 HLR 209 and *Brown's Operating System Services Ltd v Southwark Roman Catholic Diocesan Corpn* [2008] 1 P & CR 7.]

*Nicholas Dowding QC* and *Mark Sefton* (instructed by *Allen & Overy LLP*) for the landlords.

*Attorney General of Belize v Belize Telecom Ltd* [2009] 1 WLR 1988 does not resile from the proposition that a term should only be implied into a contract if it is necessary to give the contract business efficacy: see *H* paras 16–22, 31. The interpretation of a contract is the ascertainment of the meaning the document would convey to a reasonable person having all the background knowledge reasonably available to the parties: see *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR

© 2016 The Incorporated Council of Law Reporting for England and Wales

A    896, 912. The meaning which the document would convey to such a person
is most obviously to be gleaned from the words which the parties have chosen
to use in their document, and by which they have expressed and recorded the
matters on which they are in agreement: see *Arnold v Britton* [2015] AC
1619, para 17. There is good reason for that approach: see Lord
Grabiner QC, "The Iterative Process of Contractual Interpretation" (2012)

B    128 LQR 41. Commercial common sense in the process of interpretation is
important: see *Arnold v Britton* [2015] AC 1619, para 21. Although
*Attorney General of Belize v Belize Telecom Ltd* [2009] 1 WLR 1988
categorises the law of implied terms as falling within the general law of
interpretation of contracts, there is nevertheless a difference of process
between construing the words which the parties have chosen to use in their
contract, and implying matters into that contract about which, by definition,

C    the parties have not expressed agreement: see *Philips Electronique Grand
Public SA v British Sky Broadcasting Ltd* [1995] EMLR 472, 481 and
*Mediterranean Salvage and Towage Ltd v Seamar Trading and Commerce
Inc* [2010] 1 All ER (Comm) 1, para 16. The power of the court to imply a
term into a contract is not a power to do so to address a matter which the
court supposes the parties would have agreed had they discussed it; or which
it would have been reasonable for them to agree; or a matter which the court,

D    knowing what has transpired, expects with hindsight that it will find
addressed in the contract, as and when it comes to read it: see *Philips
Electronique Grand Public SA v British Sky Broadcasting Ltd* [1995] EMLR
472, 482. The danger contained in the tenant's reformulation of the test for
implied terms is that it invites the court to focus on what it would expect to
find in the document, and therefore to focus on its expectation of what the

E    parties will have agreed, rather than on what they did in fact agree. The court
might, therefore, wrongly rewrite a contract merely because its terms seem
somewhat unexpected. The importance of the classic formulation of the test
in *BP Refinery (Westernport) Pty Ltd v Shire of Hastings* (1977) 180 CLR
266, 283 and, in particular, the importance of the proposition that the
implied term must be necessary to give business efficacy to the contract, is

F    that it fashions a tool for differentiating between (i) terms which, looking at
the matter with hindsight, and knowing what has transpired, the court might
expect the parties to have agreed, but which did not in fact form part of their
contract, and (ii) terms which the parties did necessarily agree, because they
necessarily follow from the matters on which the parties did express
themselves to be in agreement. The requirement of business efficacy invites
the court to identify, applying the normal rules of construction to the terms

G    which the parties have expressly agreed, what the parties' intentions were for
their contract—or, more strictly, what were the shared intentions which the
words in the document would have communicated to a reasonable person
having the same background knowledge reasonably available to the
parties—and then to discern whether it is a necessary part of those intentions
that a further but unexpressed term must have been a part of the parties'
bargain. All subsequent decisions of the Supreme Court and the Court of

H    Appeal, in which a view has been expressed on the point, have concluded that
*Attorney General of Belize v Belize Telecom Ltd* [2009] 1 WLR 1988 did not
dispense with the requirement of necessity: see *Geys v Société Générale,
London Branch* [2013] 1 AC 523, para 55; *Arnold v Britton* [2015] AC 1619,
para 112; *Mediterranean Salvage and Towage Ltd v Seamar Trading and*

© 2016 The Incorporated Council of Law Reporting for England and Wales

*Commerce Inc* [2010] 1 All ER (Comm) 1, paras 15, 18 and *Crema v Cenkos*   A
*Securities plc* [2011] 1 WLR 2066, para 39. A term cannot be implied if it
would be inconsistent with an express term of the contract—but that test has
the potential to distract, by inviting a debate about whether the proposed
implied term is or is not technically inconsistent with an express term of the
agreement. A more apt formulation would be whether the implied term
would lie uneasily beside the express terms of the contract: see *Atkins*   B
*International HA v Islamic Republic of Iran Shipping Lines (The APJ Priti)*
[1987] 2 Lloyd's Rep 37, 42 and *Mediterranean Salvage and Towage Ltd v*
*Seamar Trading and Commerce Inc* [2010] 1 All ER (Comm) 1, para 48. It is
another way of expressing the proposition in *Attorney General of Belize v*
*Belize Telecom Ltd* [2009] 1 WLR 1988 that the implied term must be the
only meaning of the contract consistent with its other provisions. The more   C
uneasily the implied term lies beside the express terms of the agreement, the
more improbable it is that it articulates the only meaning of the contract
consistent with those express terms. The default position is that the express
provisions of the contract are to operate undisturbed: see *Crema v Cenkos*
*Securities plc* [2011] 1 WLR 2066, para 38. That respects the proposition
that the contract belongs to the parties, and contains the words which the
parties have chosen to use to identify their contractual rights and obligations.   D
The more detailed the contract, the stronger the presumption against an
implied term, because the more closely the parties have defined their rights
and obligations, the more difficult it is for the reasonable person reading it to
conclude that other rights and obligations had been intended but were not
expressed: see *Philips Electronique Grand Public SA v British Sky*
*Broadcasting Ltd* [1995] EMLR 472, 482 and *Lewison, The Interpretation*   E
*of Contracts* 5th ed (2011), p 300, para 6.04. It is important to formulate the
question to be posed to the officious bystander with the utmost care, as the
manner in which the question is formulated will often determine the likely
answer: see *Lewison, The Interpretation of Contracts*, para 6.09.

The scheme of the lease (i) expressly identifies the financial performance
required from the tenant if it is to terminate the lease early; (ii) expressly
identifies obligations which will accrue if early termination does occur;   F
(iii) expressly identifies a financial obligation which will accrue on the part of
the landlord in favour of the tenant in the event the tenant elects not to
terminate early; but (iv) makes no express provision for a financial obligation
to fall on the landlord if the tenant does elect to terminate early. It cannot be
said that the only meaning consistent with those provisions is that the tenant
had the right to a rebate if it chose to extinguish the lease early. The lease is a
long and comprehensive document negotiated between substantial   G
commercial parties represented by leading firms of solicitors and, therefore,
the reasonable reader would conclude that the parties had set out in the
document all the matters on which they were in agreement. The reasonable
reader would also conclude that, if the parties had meant the tenant to be
given a rebate in consequence of extinguishing the landlord's income stream,
they would have expressly provided for it. The lease expressly provides for
the financial performance required of the tenant to terminate the lease early;   H
for rights and obligations to accrue in the event of termination; and for a
financial obligation on the part of the landlord if the tenant chooses not to
extinguish the lease early. The parties, therefore, did direct their minds
clearly to the rights and obligations which were to exist on the break date, in

A    the event of both termination and non-termination.  The lease contains
express provision for the tenant to pay the landlord a quarter's rent on the last
quarter day before the break date, and that express provision does not, on a
true construction, oblige the landlord to repay any part of the sum which it
has received.  The implied term for which the tenant contends is either
inconsistent with, or at the very best lies uneasily alongside, the matters for
which the parties did make express provision.  The break clause is a unilateral
B    right entitling the tenant to terminate the term early, provided that it complies
with various pre-conditions, including the payment of the quarter rent in full.
A reasonable person would understand the lease to mean that, if the
pre-condition were to be complied with, the landlord would be entitled to
retain the benefit of it in full.  The right to extinguish the lease early was for
the sole benefit of the tenant and under the tenant's sole control.  The
C    undesirability of early termination is the reason why the agreement provided
for the landlord to credit the tenant with £150,000 if it chose not to
extinguish early.  In that commercial context it is improbable that, if the
parties had meant for early extinguishment of the lease to be the occasion for
a rebate, the parties would have left the obligation unexpressed.  The
practical effect of an obligation on the part of the landlord to repay some of
the rent which it had already received would create uncertainty, because it
D    would retrospectively alter the tenant's prior obligation to pay the quarter's
rent, and it is unlikely that that is what sensible commercial parties would
have meant to agree.  At the time when the lease was granted and varied there
had been a series of decisions in which the courts had consistently held that
rent payable in advance was not apportionable where the lease was
terminated before the next rent day: see *Ellis v Rowbotham* [1900] 1 QB 740;
E    *William Hill (Football) Ltd v Willen Key & Hardware Ltd* (1964) 108 SJ 482;
*Canas Property Co Ltd v KL Television Services Ltd* [1970] 2 QB 433 and
*Capital and City Holdings Ltd v Dean Warburg Ltd* (1988) 58 P & CR 346.
A reasonable person, knowing that, would readily understand that if the
parties had meant for part of the rent payable in advance to be repayable to
the tenant, they would have said so, because otherwise the landlord would be
entitled to retain the rent in full, in accordance with the established law.  *Ellis*
F    *v Rowbotham* [1900] 1 QB 740 should not be overruled.  The mischief which
the Apportionment Act 1870 was intended to cure was the injustice to a
landlord whose rent was payable in arrears, if the lease were to come
prematurely to an end before the date for payment.  Since there was no
common law right for the landlord to apportion the rent for time, the
landlord would be paid nothing.  It is clear from the Act, construed as a
G    whole, and in particular section 3, that Parliament intended the statute to
apply only to rent payable in arrears, not in advance: see *Capron v Capron*
(1874) LR 17 Eq 288, 296.  The correctness of the decision has never been
doubted.  Overruling *Ellis v Rowbotham* would potentially have far reaching
effects on many contracts entered into on the footing that the decision was
good law.  In any event, it would make no difference to the outcome of the
appeal since the tenant did not comply with the break conditions before the
H    last quarter day and, therefore, it would still not have been entitled to only
pay an apportioned part of the rent on the last quarter day.

   *Fetherstonhaugh QC* replied.

   The court took time for consideration.

© 2016 The Incorporated Council of Law Reporting for England and Wales

2 December 2015. The following judgments were handed down.          *A*

**LORD NEUBERGER OF ABBOTSBURY PSC** (with whom **LORD SUMPTION** and **LORD HODGE JJSC** agreed)

*Introductory*

1   This appeal concerns a tenant's break clause in a lease. The lease had    *B*
been granted for a term expiring on 2 February 2018, and, in the normal
way, the rent was payable in advance on the usual quarter days. The tenant
exercised its right under the break clause to determine the lease on
24 January 2012, after it had paid the full quarter's rent due on 25 December
2011. The issue is whether it can recover from the landlords the apportioned
rent in respect of the period from 24 January to 24 March 2012. The          *C*
resolution of that issue turns on the interpretation of the lease, and it
requires the court to consider the principles by reference to which a term is to
be implied into a contract.

*The contractual documentation*

2   The defendants were the landlords and the claimant was the tenant    *D*
under four sub-underleases of different floors in a building known as
The Point ("the building") in Paddington Basin, London W2. Each
sub-underlease was set out in a schedule to a deed made on 15 January 2010,
which varied or "restated" the provisions of a previous sub-underlease
which had been granted to the claimant in 2006. The origin of most of the
provisions of each of the four sub-underleases granted in 2010 is to be found
in the four sub-underleases granted in 2006. In this judgment, it is only    *E*
necessary to refer to one of the four deeds ("the deed"), the sub-underlease it
granted ("the lease") and the sub-underlease ("the earlier lease") it replaced,
as any differences between the four deeds, the four 2010 sub-underleases and
the four 2006 sub-underleases are irrelevant for present purposes.

3   The lease demised the third floor of the building ("the premises")
together with the use of two car parking spaces to the claimant "for a term of
years starting on 25 January 2006 and ending on 2 February 2018". The      *F*
reddendum reserved a rent consisting of (a) "the basic rent" and (b) "the car
park licence fee". The basic rent was "£919,800 plus VAT per annum",
which was to be "reviewed in accordance with schedule 4", which provided
for reviews on certain specified "review dates". The basic rent was to be
"paid yearly and proportionately for any part of a year by equal quarterly
instalments in advance on the [usual] quarter days". As at 25 December    *G*
2011, the basic rent was £1,236,689 per annum plus VAT. The car park
licence fee was £6,000 per annum, which was to "be paid by equal quarterly
instalments in advance on the [usual] quarter days". The lease was validly
excluded from the ambit of sections 24 to 28 of the Landlord and Tenant Act
1954, which meant that, if not determined before 2 February 2018, the lease
would end on that date.

4   Clause 8.1 of the lease entitled the claimant (so long as it remained the    *H*
tenant) to determine the lease, by giving the landlords six months' prior
written notice (a "break notice") to take effect on the "first break date",
namely 24 January 2012, and clause 8.2 provided for a "second break date"
of 24 January 2016. Clause 8.3 stipulated that a break notice would only

751

A   have effect "if on the break date there are no arrears of basic rent or VAT on basic rent". Clause 8.4 provided that a break notice would only take effect on the first break date "if on or prior to the first break date the tenant pays to the landlord the sum of £919,800 plus VAT". Clause 8.5 was concerned with consequential conveyancing machinery. Clause 8.6 entitled the landlords to "waive compliance with all or any of the conditions . . . set out in clause 8.3". Clause 8.7 stated that if "the provisions of this clause are
B   complied with" the lease should end on the break date "without prejudice to the rights of either party in respect of any previous breach by the other". A very similar clause to clause 8 was contained in the earlier lease: hence the choice of break dates, which were on anniversaries of the date of grant of the earlier lease.

5   Schedule 5 to the lease dealt with insurance. In brief, the landlords
C   covenanted to insure the building against specified risks, and the tenant was obliged to "pay to the landlord . . . a fair proportion [assessed by reference to the ratio of the floor area of the premises to that of the building] of every premium payable by the landlord . . . for insuring the building . . .". These payments were "reserved as rent".

6   Schedule 7 to the lease was concerned with the services which the landlord covenanted to provide to the occupiers of the building, and the
D   service charge which the tenant was to pay in return. The service charge, which was reserved as rent, was to be "a fair proportion" (assessed in a similar way to the insurance rent) of the cost to the landlords of providing the services. This was initially to be based on an annual estimate, which was to be paid "on account" in advance by equal instalments on the usual quarter days. Paragraph 4.5 of the schedule provided for payment by the tenant of a
E   balancing sum in ten working days if the actual expenditure was greater than the payment on account, and paragraph 4.6 entitled the tenant to be credited with any "overpayment . . . against the next . . . payment on account", if the expenditure was less than the payment on account.

7   As is almost invariably the case with modern commercial leases, the lease was a very full and detailed document. It ran to some 70 pages, including 15 pages of tenant's covenants and nine pages of landlords'
F   covenants, and it included, in clause 5, a right for the landlords to forfeit the lease for non-payment of rent or other breach of covenant by the tenant. The provisions for review of the basic rent in schedule 4 ran to four pages, and required a periodic review of the rent to the then-current market rental value of the premises as at certain specified "review dates". Paragraph 8 of schedule 4 stated that if the reviewed rent was not determined by a review
G   date, rent at the preceding rate is to be payable and, once the reviewed rent is determined, a balancing figure is payable by the tenant to the landlords.

8   It is not necessary to say much about the deed, save that clause 4 provided that, if the tenant did not exercise its right to break the lease (and the other three sub-underleases) on 24 January 2012, the landlords would pay the tenant £150,000 by crediting it against the tenant's liability for the rent due on the following quarter day, 25 March 2012.

H

*The factual background*

9   On 7 July 2011, pursuant to clause 8.1, the claimant tenant served a break notice on the defendant landlords to determine the lease on 24 January 2012. On 19 July 2011, the defendants invoiced the claimant for

© 2016 The Incorporated Council of Law Reporting for England and Wales

its share of the insurance rent premium under schedule 5 ("the insurance rent") in respect of the year from 1 July 2011, in the sum of £14,972·85 plus VAT, which the claimant paid two weeks later.

10   Shortly before 25 December 2011, the claimant paid the defendants the rent due on that date in respect of the quarter from that date up to and including 24 March 2012, the day before the next quarter day, thereby ensuring that clause 8.3 of the lease was satisfied. This rent consisted of the basic rent (as reviewed) of £309,172·25 plus VAT, and the car park licence fee of £1,500. On or about 18 January 2012, the claimant paid the defendants £919,800 plus VAT, pursuant to clause 8.4 of the lease. As a result of these payments, the break notice served on 7 July 2011 was effective, and the lease determined on 24 January 2012.

11   On 3 September 2012, more than eight months after the expiry of the lease, the defendants served on the claimant a service charge certificate in respect of the services provided in the calendar year 2011. This showed that the cost of the services had been less than the estimate, and the defendants credited the claimant with its excess payment.

12   Although there were similar issues about the car park licence fee, the insurance rent and the service charge, the principal issue between the parties at trial was whether the claimant was entitled to be refunded a sum equal to the apportioned basic rent in respect of the period 24 January 2012 (when the lease expired) and 25 March 2012, given that the claimant had paid the basic rent (in the sum of £309,172·25 plus VAT) on 25 December 2011 in respect of that period even though the lease had expired on 24 January 2012. In a carefully reasoned judgment, Morgan J held that the claimant was so entitled [2013] L & TR 31. For reasons given by Arden LJ (with whom Jackson and Fulford LJJ agreed), the Court of Appeal allowed the defendants' appeal [2014] L & TR 26.

13   The claimant now appeals to this court, contending, as it did in the courts below, that there should be implied into the lease a term that, if the tenant exercises the right to break under clause 8 and the right to break consequently determines on 24 January, the landlords ought to pay back a proportion of the basic rent paid by the tenant due on the immediately preceding 25 December ("the apportioned sum"), being apportioned in respect of the period 24 January up to and including the ensuing 24 March 2012. A similar issue arises in relation to the car park licence fee and the insurance rent, which I shall deal with at the end of this judgment.

*Implied terms in contracts*

14   It is rightly accepted on behalf of the claimant that there is no provision in the lease which expressly obliges the landlords to pay the apportioned sum to the tenant. Accordingly, it follows that in order to succeed the claimant has to establish that such an obligation must be implied into the lease.

15   As Baroness Hale of Richmond JSC pointed out in *Geys v Société Générale, London Branch* [2013] 1 AC 523, para 55, there are two types of contractual implied term. The first, with which this case is concerned, is a term which is implied into a particular contract, in the light of the express terms, commercial common sense, and the facts known to both parties at the time the contract was made. The second type of implied terms arises because, unless such a term is expressly excluded, the law (sometimes by

© 2016 The Incorporated Council of Law Reporting for England and Wales

A  statute, sometimes through the common law) effectively imposes certain terms into certain classes of relationship.

16   There have, of course, been many judicial observations as to the nature of the requirements which have to be satisfied before a term can be implied into a detailed commercial contract. They include three classic statements, which have been frequently quoted in law books and judgments.
B  In *The Moorcock* (1889) 14 PD 64, 68, Bowen LJ observed that in all the cases where a term had been implied, "it will be found that . . . the law is raising an implication from the presumed intention of the parties with the object of giving the transaction such efficacy as both parties must have intended that at all events it should have". In *Reigate v Union Manufacturing Co (Ramsbottom) Ltd* [1918] 1 KB 592, 605, Scrutton LJ said that "A term can only be implied if it is necessary in the business sense to give efficacy to the
C  contract". He added that a term would only be implied if "it is such a term that it can confidently be said that if at the time the contract was being negotiated" the parties had been asked what would happen in a certain event, they would both have replied: " 'Of course, so and so will happen; we did not trouble to say that; it is too clear.' " And in *Shirlaw v Southern Foundries (1926) Ltd* [1939] 2 KB 206, 227, MacKinnon LJ observed that, "Prima facie that which in any contract is left to be implied and need not be expressed
D  is something so obvious that it goes without saying". Reflecting what Scrutton LJ had said 20 years earlier, MacKinnon LJ also famously added that a term would only be implied "if, while the parties were making their bargain, an officious bystander were to suggest some express provision for it in their agreement, they would testily suppress him with a common 'Oh, of course!' "

E  17   Support for the notion that a term will only be implied if it satisfies the test of business necessity is to be found in a number of observations made in the House of Lords. Notable examples included Lord Pearson (with whom Lord Guest and Lord Diplock agreed) in *Trollope & Colls Ltd v North West Metropolitan Regional Hospital Board* [1973] 1 WLR 601, 609, and Lord Wilberforce, Lord Cross of Chelsea, Lord Salmon and Lord
F  Edmund-Davies in *Liverpool City Council v Irwin* [1977] AC 239, 254, 258, 262 and 266 respectively. More recently, the test of "necessary to give business efficacy" to the contract in issue was mentioned by Baroness Hale JSC in *Geys v Société Générale* [2013] 1 AC 523, para 55 and by Lord Carnwath JSC in *Arnold v Britton* [2015] AC 1619, para 112.

18   In the Privy Council case *BP Refinery (Westernport) Pty Ltd v Shire of Hastings* (1977) 180 CLR 266, 283, Lord Simon of Glaisdale (speaking
G  for the majority, which included Viscount Dilhorne and Lord Keith of Kinkel) said that:

"for a term to be implied, the following conditions (which may overlap) must be satisfied: (1) it must be reasonable and equitable; (2) it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it; (3) it must be so
H  obvious that 'it goes without saying'; (4) it must be capable of clear expression; (5) it must not contradict any express term of the contract."

19   In *Philips Electronique Grand Public SA v British Sky Broadcasting Ltd* [1995] EMLR 472, 481, Bingham MR set out Lord Simon's formulation, and described it as a summary which "distil[led] the essence of

754
Marks & Spencer plc v BNP Paribas Securities Services (SC(E))          [2016] AC
Lord Neuberger of Abbotsbury PSC

much learning on implied terms" but whose "simplicity could be almost      A
misleading." Bingham MR then explained, at pp 481–482, that it was
"difficult to infer with confidence what the parties must have intended when
they have entered into a lengthy and carefully-drafted contract but have
omitted to make provision for the matter in issue", because "it may well be
doubtful whether the omission was the result of the parties' oversight or of
their deliberate decision", or indeed the parties might suspect that "they are
unlikely to agree on what is to happen in a certain . . . eventuality" and "may    B
well choose to leave the matter uncovered in their contract in the hope that
the eventuality will not occur." Bingham MR went on to say, at p 482:

    "The question of whether a term should be implied, and if so what,
    almost inevitably arises after a crisis has been reached in the performance
    of the contract. So the court comes to the task of implication with the
    benefit of hindsight, and it is tempting for the court then to fashion a term    C
    which will reflect the merits of the situation as they then appear.
    Tempting, but wrong. [He then quoted the observations of Scrutton LJ in
    the *Reigate* case, and continued] it is not enough to show that had the
    parties foreseen the eventuality which in fact occurred they would have
    wished to make provision for it, unless it can also be shown either that
    there was only one contractual solution or that one of several possible       D
    solutions would without doubt have been preferred . . ."

    20 Bingham MR's approach in the *Philips* case was consistent with his
reasoning, as Bingham LJ in the earlier case *Atkins International HA v
Islamic Republic of Iran Shipping Lines (The APJ Priti)* [1987] 2 Lloyd's Rep
37, 42, where he rejected the argument that a warranty, to the effect that      E
the port declared was prospectively safe, could be implied into a voyage
charterparty. His reasons for rejecting the implication were "because the
omission of an express warranty may well have been deliberate, because
such an implied term is not necessary for the business efficacy of the charter
and because such an implied term would at best lie uneasily beside the
express terms of the charter."
    21 In my judgment, the judicial observations so far considered represent    F
a clear, consistent and principled approach. It could be dangerous to
reformulate the principles, but I would add six comments on the summary
given by Lord Simon in the *BP Refinery* case 180 CLR 266, 283 as extended
by Bingham MR in the *Philips* case [1995] EMLR 472 and exemplified in
*The APJ Priti* [1987] 2 Lloyd's Rep 37. First, in *Equitable Life Assurance
Society v Hyman* [2002] 1 AC 408, 459, Lord Steyn rightly observed that the
implication of a term was "not critically dependent on proof of an actual      G
intention of the parties" when negotiating the contract. If one approaches
the question by reference to what the parties would have agreed, one is not
strictly concerned with the hypothetical answer of the actual parties, but
with that of notional reasonable people in the position of the parties at the
time at which they were contracting. Secondly, a term should not be implied
into a detailed commercial contract merely because it appears fair or merely
because one considers that the parties would have agreed it if it had been     H
suggested to them. Those are necessary but not sufficient grounds for
including a term. However, and thirdly, it is questionable whether Lord
Simon's first requirement, reasonableness and equitableness, will usually, if
ever, add anything: if a term satisfies the other requirements, it is hard to

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   think that it would not be reasonable and equitable. Fourthly, as Lord
Hoffmann I think suggested in *Attorney General of Belize v Belize Telecom
Ltd* [2009] 1 WLR 1988, para 27, although Lord Simon's requirements
are otherwise cumulative, I would accept that business necessity and
obviousness, his second and third requirements, can be alternatives in the
sense that only one of them needs to be satisfied, although I suspect that in
practice it would be a rare case where only one of those two requirements

B   would be satisfied. Fifthly, if one approaches the issue by reference to the
officious bystander, it is "vital to formulate the question to be posed by [him]
with the utmost care", to quote from *Lewison, The Interpretation of
Contracts* 5th ed (2011), p 300, para 6.09. Sixthly, necessity for business
efficacy involves a value judgment. It is rightly common ground on this
appeal that the test is not one of "absolute necessity", not least because the

C   necessity is judged by reference to business efficacy. It may well be that a
more helpful way of putting Lord Simon's second requirement is, as
suggested by Lord Sumption JSC in argument, that a term can only be
implied if, without the term, the contract would lack commercial or
practical coherence.

  22   Before leaving this issue of general principle, it is appropriate to refer
a little further to the *Belize Telecom* case, where Lord Hoffmann suggested

D   that the process of implying terms into a contract was part of the exercise of
the construction, or interpretation, of the contract. In summary, he said at
para 21 that "There is only one question: is that what the instrument, read as
a whole against the relevant background, would reasonably be understood
to mean?" There are two points to be made about that observation.

  23   First, the notion that a term will be implied if a reasonable reader of

E   the contract, knowing all its provisions and the surrounding circumstances,
would understand it to be implied is quite acceptable, provided that (i) the
reasonable reader is treated as reading the contract at the time it was made
and (ii) he would consider the term to be so obvious as to go without saying
or to be necessary for business efficacy. (The difference between what
the reasonable reader would understand and what the parties, acting
reasonably, would agree, appears to me to be a notional distinction without

F   a practical difference.) The first proviso emphasises that the question
whether a term is implied is to be judged at the date the contract was made.
The second proviso is important because otherwise Lord Hoffmann's
formulation may be interpreted as suggesting that reasonableness is a
sufficient ground for implying a term. (For the same reason, it would be
wrong to treat Lord Steyn's statement in *Equitable Life Assurance Society v

G   Hyman* [2002] 1 AC 408, 459 that a term will be implied if it is "essential to
give effect to the reasonable expectations of the parties" as diluting the test
of necessity. That is clear from what Lord Steyn said earlier on the same
page, namely that "The legal test for the implication of . . . a term is . . .
strict necessity", which he described as a "stringent test".)

  24   It is necessary to emphasise that there has been no dilution of the
requirements which have to be satisfied before a term will be implied,

H   because it is apparent that the *Belize Telecom* case [2009] 1 WLR 1988 has
been interpreted by both academic lawyers and judges as having changed the
law. Examples of academic articles include Chris Peters, "The Implication of
Terms in Fact" [2009] CLJ 513, Paul S Davies, "Recent Developments in the
Law of Implied Terms" [2010] LMCLQ 140, John McCaughran, "Implied

© 2016 The Incorporated Council of Law Reporting for England and Wales

756
Marks & Spencer plc v BNP Paribas Securities Services (SC(E))                    [2016] AC
Lord Neuberger of Abbotsbury PSC

Terms: The Journey of the Man on the Clapham Omnibus" [2011] CLJ 607    A
and JW Carter and Wayne Courtney, "*Belize Telecom*: a reply to Professor
McLauchlan" [2015] LMCLQ 245. And in *Foo Jong Peng v Phua Kiah Mai*
[2012] 4 SLR 1267, paras 34–36, the Singapore Court of Appeal refused to
follow the reasoning in the *Belize Telecom* case at least in so far as "it suggest
[ed] that the traditional 'business efficacy' and 'officious bystander' tests are
not central to the implication of terms" (reasoning which was followed in
*Sembcorp Marine Ltd v PPL Holdings Pte Ltd* [2013] SGCA 43). The    B
Singapore Court of Appeal were in my view right to hold that the law
governing the circumstances in which a term will be implied into a contract
remains unchanged following the *Belize Telecom* case.

    25  The second point to be made about what was said in the *Belize
Telecom* case concerns the suggestion that the process of implying a term is
part of the exercise of interpretation. Although some support may arguably    C
be found for such a view in the *Trollope* case [1973] 1 WLR 601, 609, the
first clear expression of that view to which we were referred was in *Banque
Bruxelles Lambert SA v Eagle Star Insurance Co Ltd* [1997] AC 191, 212,
where Lord Hoffmann suggested that the issue of whether to imply a term
into a contract was "one of construction of the agreement as a whole in its
commercial setting." Lord Steyn quoted this passage with approval in the    D
*Equitable Life* case [2002] 1 AC 408, 459, and, as just mentioned, Lord
Hoffmann took this proposition further in the *Belize Telecom* case [2009]
1 WLR 1988, paras 17–27. Thus, at para 18, he said that "the implication of
the term is not an addition to the instrument. It only spells out what the
instrument means"; and at para 23, he referred to "The danger . . . in
detaching the phrase 'necessary to give business efficacy' from the basic
process of construction". Whether or not one agrees with that approach as a    E
matter of principle must depend on what precisely one understands by the
word "construction".

    26  I accept that both (i) construing the words which the parties have
used in their contract and (ii) implying terms into the contract, involve
determining the scope and meaning of the contract. However, Lord
Hoffmann's analysis in the *Belize Telecom* case could obscure the fact that    F
construing the words used and implying additional words are different
processes governed by different rules.

    27  Of course, it is fair to say that the factors to be taken into account on
an issue of construction, namely the words used in the contract, the
surrounding circumstances known to both parties at the time of the contract,
commercial common sense, and the reasonable reader or reasonable parties,
are also taken into account on an issue of implication. However, that does    G
not mean that the exercise of implication should be properly classified as
part of the exercise of interpretation, let alone that it should be carried out at
the same time as interpretation. When one is implying a term or a phrase,
one is not construing words, as the words to be implied are ex hypothesi not
there to be construed; and to speak of construing the contract as a whole,
including the implied terms, is not helpful, not least because it begs the
question as to what construction actually means in this context.    H

    28  In most, possibly all, disputes about whether a term should be
implied into a contract, it is only after the process of construing the express
words is complete that the issue of an implied term falls to be considered.
Until one has decided what the parties have expressly agreed, it is difficult to

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   see how one can set about deciding whether a term should be implied and if
so what term.  This appeal is just such a case.  Further, given that it is a
cardinal rule that no term can be implied into a contract if it contradicts an
express term, it would seem logically to follow that, until the express terms
of a contract have been construed, it is, at least normally, not sensibly
possible to decide whether a further term should be implied.  Having said
B   that, I accept Lord Carnwath JSC's point in para 71 to the extent that in
some cases it could conceivably be appropriate to reconsider the
interpretation of the express terms of a contract once one has decided
whether to imply a term, but, even if that is right, it does not alter the fact
that the express terms of a contract must be interpreted before one can
consider any question of implication.

C   29  In any event, the process of implication involves a rather different
exercise from that of construction.  As Bingham MR trenchantly explained
in the *Philips* case [1995] EMLR 472, 481:

    "The courts' usual role in contractual interpretation is, by resolving
    ambiguities or reconciling apparent inconsistencies, to attribute the true
    meaning to the language in which the parties themselves have expressed
    their contract.  The implication of contract terms involves a different and
D   altogether more ambitious undertaking: the interpolation of terms to deal
    with matters for which, ex hypothesi, the parties themselves have made
    no provision.  It is because the implication of terms is so potentially
    intrusive that the law imposes strict constraints on the exercise of this
    extraordinary power."

E   30  It is of some interest to see how implication was dealt with in the
recent case in this court of *Aberdeen City Council v Stewart Milne Group
Ltd* 2012 SC (UKSC) 240.  At para 20, Lord Hope of Craighead DPSC
described the implication of a term into that contract as "the
product of the way I would interpret this contract".  And at para 33, Lord
Clarke of Stone-cum-Ebony JSC said that the point at issue should be
resolved "by holding that such a term should be implied rather than by a
F   process of interpretation."  He added that "The result is of course the
same".

31  It is true that the *Belize Telecom* case [2009] 1 WLR 1988 was a
unanimous decision of the Judicial Committee of the Privy Council and that
the judgment was given by Lord Hoffmann, whose contributions in so many
areas of law have been outstanding.  However, it is apparent that Lord
G   Hoffmann's observations in the *Belize Telecom* case, at paras 17–27, are
open to more than one interpretation on the two points identified in
paras 23–24 and 25–30 above, and that some of those interpretations are
wrong in law.  In those circumstances, the right course for us to take is to say
that those observations should henceforth be treated as a characteristically
inspired discussion rather than authoritative guidance on the law of implied
terms.
H   32  Having made those general remarks about implied terms, I turn to
consider the specific issue on this appeal, namely the claimant's contention
that it is entitled to claim the apportioned sum from the defendants by virtue
of an implied term to that effect in the lease.  I shall start by focussing on the
terms of the lease and the deed, and then turn to the broader picture.

© 2016 The Incorporated Council of Law Reporting for England and Wales

*The arguments based on the provisions of the lease and the deed*          A

33   Each quarter's rent paid in advance under a modern commercial
lease, such as the lease in this case, can fairly be said to be referable to the
tenant's use and enjoyment of the demised premises for the forthcoming
quarter.   Accordingly, the sum of £309,172·25 plus VAT due on
25 December 2011, and paid shortly before that date, can fairly be said, at
least in general terms, to have been envisaged as being the tenant's quid pro          B
quo for being able to occupy and enjoy the premises up to 25 March 2012.
There is therefore real force in the contention that, if the defendants can
retain the apportioned sum, it would be unfairly prejudicial to the claimant
and a pure windfall for the defendants.   A provision that the defendant
landlords should reimburse the claimant tenant the apportioned sum would
thus seem to be reasonable and equitable.

34   The claimant's case is reinforced by the fact that, as explained in          C
para 4 above, the two break dates of 24 January 2012 and 2016 owe their
origin to the date of grant of the earlier lease, and that date was dependent
on the date on which the head-landlord gave its consent to the grant of the
earlier lease.   Thus, it can fairly be said that the parties had agreed the terms
of the break clause, not knowing whether the break dates would be shortly
after, shortly before or even on, a quarter day.   This supports the notion that
they are unlikely to have intended that the apportioned rent was intended to          D
be retained by the landlords as part of the compensation for the tenant's
operation of the break clause.   This point is mildly weakened by the fact that
the parties could have varied the break dates, or the terms of clause 8, when
they came to renegotiate in 2010 the terms originally agreed in the 2006
lease, but it still has force.

35   A further point on which the claimant relies arises from the fact that          E
the basic rent is stipulated in the lease to be "paid yearly *and proportionately
for any part of a year* by equal quarterly instalments in advance" (emphasis
added).   It is common ground that the effect of the italicised words is that, if
the lease had had to run its full course to 2 February 2018, the tenant would
only have had to pay an apportioned part of the basic rent due on 25 December
2017, because, as at that date, the parties would have known that the lease
would expire before the next quarter day, 25 March 2018.   In the present          F
case, it is common ground that, because the claimant had not paid the sum of
£919,800 plus VAT due under clause 8.4 before 25 December 2011, it would
not have been known as at that date whether the lease would come to an end
before 25 March 2012, and the tenant therefore had to pay the quarter's rent
in full: it only became clear that the lease would determine on 24 January
2012 when the claimant paid the £919,800 plus VAT on 18 January.          G
However, if the claimant had paid the £919,800 plus VAT before
25 December 2011, the claimant argues (rightly in my view) that it would
have been clear on 25 December 2011 that the lease would end on
24 January 2012, so that the claimant would only have had to pay an
appropriate proportion of the basic rent on 25 December 2011.   The
claimant accordingly contends that commercial common sense mandates
that it should be in the same financial position whether it pays the £919,800          H
plus VAT before 25 December 2011 or chooses to wait, as it is entitled to,
until after 25 December 2011 to pay that sum.   (I might add that this point is
somewhat reinforced when one considers what would have happened if the
tenant had waited till the second break date to determine the lease: because

© 2016 The Incorporated Council of Law Reporting for England and Wales

A   clause 8.4 only applies to the first break date, the tenant would have been
    entitled to pay only an apportioned part of the quarter's basic rent on
    25 December 2015.)

    36   The claimant raised other points which, to my mind, had less force.
    Thus, the fact that the basic rent was payable "yearly *and proportionately
    for any part of a year*" was said of itself to support the implied term for
B   which the claimant contends. Given that the italicised words did not justify
    the claimant paying only an apportioned part of the rent due on
    25 December 2011 on the facts of this case, those words appear if anything
    to undermine the claimant's case: the fact that the lease expressly provided
    that only part of a quarter's rent was to be paid in some circumstances could
    fairly be said to undermine the notion that one should imply a term which
    has a similar effect in other circumstances.
C   37   There is considerable force in the points discussed in paras 33–35
    above, and between them they help make out a powerful case for contending
    that it is necessary for business efficacy that the term contended for by the
    claimant should be implied into the lease. However, it is necessary to
    consider the countervailing arguments.

    38   The defendants rely on the fact that the lease is a very detailed
D   document, which had been entered into between two substantial and
    experienced parties, and had been negotiated and drafted by expert
    solicitors. In particular, the lease makes provision for a large number of
    contingencies. Accordingly, it is said, with obvious justification, that the
    observations of Bingham MR in the *Philips Electronique* case [1995] EMLR
    472, quoted in para 19 above are particularly in point.
E   39   More specifically, the defendants refer to the express provisions
    relating to the payment of money in connection with clause 8. First, there is
    the payment of £919,800 plus VAT under clause 8.4. It is said that, while it
    involves no logical inconsistency, it is somewhat peculiar to imply into the
    lease a term requiring the landlords to pay the tenant around £200,000 plus
    VAT on 25 January 2012, when the lease has an express term requiring the
    tenant to pay the landlords around £900,000 plus VAT by 24 January 2012:
F   the implied term "lie[s] uneasily" with the express terms to use Bingham LJ's
    expression in *The APJ Priti* [1987] 2 Lloyd's Rep 37, 42. Secondly, there is
    the condition in clause 8.3 which required the tenant to have paid all rent
    due on 25 March 2012 if it wished to exercise the right to break. Given that
    the effect of that provision is that the tenant must have paid rent for the
    whole quarter ending on 25 March 2012, it can again be said to be
G   somewhat peculiar to imply a term requiring the landlord to repay the tenant
    most of that sum.

    40   Clauses 8.3 and 8.4 of the lease, together with clause 4 of the deed,
    which provided that the tenant would be paid £150,000 if it did not exercise
    its right to break, show how carefully and fully the parties considered and
    identified their rights against each other in relation to clause 8 of the lease.
    There is force in the argument that these three provisions show that the
H   parties had directed their minds to the specific question of what payments
    were to be made between them in connection with clause 8, and in particular
    what sums were to be paid if the right to break either was implemented or
    was not implemented, and that this renders it inappropriate for the court to
    step in and fill in what is no more than an arguable lacuna.

© 2016 The Incorporated Council of Law Reporting for England and Wales

41   There is, in my view, less force in the defendants' reliance on   *A*
paragraph 8 of schedule 4 to the lease (discussed in para 7 above). I see the
logic of the argument that the fact that the rent review provisions expressly
dealt with a similar point is an indication that the parties must have
intentionally excluded any reference to such a point in clause 8. However,
the rent review provisions were no doubt taken from a previous precedent,
and, while careful thought would have been given to their precise terms, a
provision such as paragraph 8 of schedule 4 would have been in any   *B*
sophisticated modern rent review clause. Having said that, I suppose that it
might be said that the defendants could make something of the fact that such
a provision is not normally included in a standard break clause, but I think
that is too remote from the issue in this case to be of any help, and it is,
sensibly, not a point which was developed, or even raised, in argument.

*C*

*The general law on apportionment of rent payable in advance*

42   The arguments discussed so far have focussed on the terms of the
lease (and the deed) and their commercial effect. However, it is also
necessary to consider the established legal background against which the
lease was entered into, and in particular the general attitude of the law to
the apportionability of rent payable in advance.   *D*

43   It has long been well established that rent, whether payable in arrear
or advance, is not apportionable in time in common law. Accordingly, if a
lease under which the rent was payable in arrear was forfeited or came to an
end prematurely for some other reason, the landlord loses the right to
recover the rent due on the rent day following that determination, at least
according to the common law: see e g *William Clun's Case* (1613) 10 Co Rep
127a. Parliament sought to remedy this initially in a limited way through the   *E*
now repealed section 15 of the Distress for Rent Act 1737 (11 Geo 2, c 19)
and the Apportionment Act 1834 (4 & 5 Will 4, c 22), and then more
comprehensively through the Apportionment Act 1870, which is still in
force. Section 2 of the 1870 Act prospectively provides that "All rents,
annuities, dividends, and other periodical payments in the nature of income"
should "like interest on money lent, be considered as accruing from day to
day, and shall be apportionable in respect of time accordingly."   *F*

44   There is no doubt that section 2 applies to rent payable in arrear, as
was held by Malins V-C in *Capron v Capron* (1874) LR 17 Eq 288. In *Ellis v
Rowbotham* [1900] 1 QB 740 the Court of Appeal held that the 1870 Act
did not apply to rent payable in advance and, ever since then, it has been
assumed that this was the law. At the invitation of the court, it was argued
on behalf of the claimant that the *Ellis* case should be overruled. I am   *G*
satisfied that it should be approved. In their brief reasoned judgments, both
AL Smith and Romer LJJ explained that (i) the mischief that the 1870 Act
was concerned to correct related solely to rent in arrear, and (ii) rent paid in
advance could not be said to be "accruing from day to day", unlike rent in
arrear. There is no reason to doubt the first reason. As to the second reason,
it has obvious force if one treats the statutory reference to a sum "accruing"
as a liability to pay the sum accruing. The conclusion reached in the *Ellis*   *H*
case is also supported by the reference to "interest on money lent", because
interest has virtually invariably been payable in arrear. In addition, sections
3 and 4 of the 1870 Act, which are consequential provisions expressed to
apply to "The apportioned part of *any such* rent, annuity, dividend, or other

© 2016 The Incorporated Council of Law Reporting for England and Wales

761

A    payment" (emphasis added), can only apply to rent or other payments
payable in arrear, and not in advance, as they deal with the date when such
rent or other payments are to be treated as having become due after the
relevant event (i e, in the case of rent, determination of the lease).

45    Even if we were considering the effect of section 2 in the absence of
the long standing decision in the *Ellis* case, I would have concluded that the
B    section did not apply to rent paid in advance, essentially for the reasons
summarised in para 44 above. However, like Collins LJ who concurred in the
conclusion reached in the *Ellis* case, at p 743, I would not have regarded
the issue as "altogether free from doubt", in the light of the very wide words
of the section ("*All* rents, annuities" etc). As it is, the conclusion is
reinforced by the fact that the *Ellis* case has stood for well over 100 years,
and has been followed and applied in a number of first instance and Court of
C    Appeal decisions without any expressions of doubt as to its correctness: see
e g *Hildebrand v Lewis* [1941] 2 KB 135, 139 where the Court of Appeal,
citing the *Ellis* case in support, described it as "well settled that where rent is
payable in advance the Apportionment Act does not apply". I find it difficult
to accept that this court could properly rule that a statute had a meaning
which we thought was simply wrong, however long that meaning had been
assumed to be correct. None the less, I consider that, in a case where we had
D    real doubt as to the correct meaning of a statute, we should favour the
meaning which has been generally assumed to be correct for a long period,
especially when the basis of that assumption is a judicial decision. In this
case, however, it is not necessary to go even that far, because, as just
explained, I consider that the conclusion reached by the Court of Appeal 115
years ago in the *Ellis* case [1900] 1 QB 740 was correct.
E    46    It follows from this conclusion that neither the common law nor
statute apportions rent in advance on a time basis. And this was, correctly,
generally understood to be the position when the deed and the lease were
negotiated and executed. The claimant's argument, by contrast, is that a
term should be implied into the lease that the basic rent payable in advance
on 25 December 2011 should effectively be apportioned on a time basis.
F    The fact that the lease was negotiated against the background of a clear,
general (and correct) understanding that rent payable in advance was not
apportionable in time, raises a real problem for the argument that a term can
be implied into the lease that it should be effectively apportionable if the
lease is prematurely determined in accordance with its terms.

47    The point can be taken a little further. It is a very well established
rule that a landlord who forfeits a lease under which the rent is payable in
G    advance is entitled to payment of the whole of the rent which fell due on the
quarter day preceding the forfeiture. The rule was well described by Lord
Denning MR in *Canas Property Co Ltd v KL Television Services Ltd* [1970]
2 QB 433, 442, where he addressed a case where the rent was payable in
advance on the usual quarter days and the landlord forfeited the lease by
serving a writ (now a claim form) "for instance, on 25 April". He said, citing
the *Ellis* case, that, given that "the rent is payable in advance, the writ should
H    claim for the whole quarter's rent due *in advance* on March 25 . . . and
mesne profits from June 24 . . . to the date of delivery of possession." (It
may well be that the mesne profits should run from the date of service of the
writ, but nothing hangs on that for present purposes.) Lord Denning MR
contrasted the position where the landlord forfeited a lease under which the

© 2016 The Incorporated Council of Law Reporting for England and Wales

rent was payable in arrear, where, he said, the writ should claim "rent at the    A
rate of . . . from March 25 . . . to the date of service of the writ and mesne
profits" thereafter. Lord Denning MR's approach was followed and applied
by the Court of Appeal in *Capital and City Holdings Ltd v Dean Warburg
Ltd* (1988) 58 P & CR 346.

48   Thus, it is clear that, where a lease provides for payment of rent in
advance on the usual quarter days, and the landlord forfeits the lease during    B
the currency of a quarter, he is entitled to retain the whole of the rent due on
the quarter day immediately before the forfeiture if it has been paid, and, if it
has not been paid, he is entitled to recover and retain the whole of that rent.

*Conclusions*

49   If one concentrates on the factors identified in paras 33–35 above,
there appears to be a strong case for the implied term for which              C
Mr Fetherstonhaugh QC powerfully argued on behalf of the claimant. The
point made in para 33 supports the contention that, not merely would an
implied term be fair, but that clause 8 could be said to work rather unfairly
without the implied term. The point made in para 35, supported by what is
said in para 34, provides real support for the proposition that, without
the implied term, clause 8 would operate in a rather capricious way. On the    D
other hand, as Mr Dowding QC rightly said on behalf of the defendants, the
factors identified in paras 38–40 above chime with the warnings given by
Bingham MR in the *Philips* case [1995] EMLR 472 and his reasons for
rejecting an implied warranty in *The APJ Priti* [1987] 2 Lloyd's Rep 37. The
lease is a very full and carefully considered contract, which includes express
obligations of the same nature as the proposed implied term, namely
financial liabilities in connection with the tenant's right to break, and that    E
term would lie somewhat uneasily with some of those provisions.

50   There is little point in resolving the hypothetical question whether,
in the absence of the points discussed in paras 43–49 above, I would have
concluded that a term should be implied as the claimant contends. Even if
I would have reached that conclusion, I consider that it could not have stood
once one faced up to the clear and consistent line of judicial decisions which    F
formed the backcloth against which the terms of the lease, and in particular
the provisions of clause 8, were agreed. Save in a very clear case indeed, it
would be wrong to attribute to a landlord and a tenant, particularly when
they have entered into a full and professionally drafted lease, an intention
that the tenant should receive an apportioned part of the rent payable and
paid in advance, when the non-apportionability of such rent has been so
long and clearly established. Given that it is so clear that the effect of the    G
case law is that rent payable and paid in advance can be retained by the
landlord, save in very exceptional circumstances (e g where the contract
could not work or would lead to an absurdity) express words would be
needed before it would be right to imply a term to the contrary.

51   I accept that refusing to accede to the proposed implied term in this
case can lead to the operation of clause 8 having the somewhat curious effect    H
discussed in para 35 above. However, while the difference in result between
the tenant paying the £919,800 plus VAT before or after 25 December 2011
can fairly be said to be capricious or anomalous, it does not begin to justify a
suggestion that the contract is unworkable. Indeed, the result cannot be said
to be commercially or otherwise absurd, particularly as it is entirely up to the

© 2016 The Incorporated Council of Law Reporting for England and Wales

763

A  tenant as to when that sum is paid. Further, the fact that rent payable in advance is not apportionable can always lead to potential unfairness. For instance, a landlord with a right to forfeit on 23 March for a continuing breach of covenant could wait for three days to re-enter, in order to be able to receive the whole of the rent due in respect of the quarter to 24 June.

B  52  It is instructive to see how Morgan J, who accepted the claimant's case that there was an implied term, approached the question of apportionment of rent in the event of a forfeiture. After referring to the *Ellis* case [1900] 1 QB 740, he said [2013] L & TR 31, para 38 that he "consider[ed] that the parties are to be taken to have contracted against the background of the established law", and he would not have been "prepared to imply such a term in a forfeiture case". However, he held that such a term could be implied where the lease determined under clause 8, but not where it
C  determined as a result of a forfeiture, because (i) "at the date of the lease . . . there was no established law to the contrary in the case of a tenant's break clause", whereas there was in relation to forfeiture, and (ii) "it is significant that the parties agreed that the lessee could only break the lease if it paid a sum equivalent to one year's rent to compensate the lessor for the fact that it is losing its income stream from the break date."

D  53  I am unconvinced by either of those reasons. The first reason effectively ignores the point that the reasoning in *Ellis* [1900] 1 QB 740, *Canas* [1970] 2 QB 433 and *Capital and City* 58 P & CR 346 applies equally to a case where a lease determines by forfeiture as it does to a case where it determines by exercise of a right to break. The second distinction appears rather to point the opposite way, as explained in para 39 above. The fact that the tenant has to make a payment of over £900,000 plus VAT by
E  24 January 2012 in order to exercise the right to break, lies uneasily with the notion that one should imply a term that the tenant should be paid around £200,000 plus VAT the following day, but no such problem exists with implying such a term on a forfeiture. Another reason was advanced before us, namely that forfeiture normally arises because of some failure on the part of the tenant. I agree that it does, but not always; more importantly, I do not see that as a justification for rejecting an implied term in relation to a
F  forfeiture if such a term is to be implied in relation to the exercise of a break clause. Further, given that the exercise of the break clause is in the hands of the tenant, and the exercise of a right to forfeit is in the hands of the landlords, any argument for an implied term based on fairness is stronger in relation to forfeiture than in relation to clause 8.

54  Once one discards the two reasons given by the judge for reaching a
G  different conclusion as to an implied term on the exercise of the break clause from that which would apply on a forfeiture, it seems to me that the logic of the analysis of Morgan J, who has considerable experience in this field, is that the claimant's case should fail in relation to the basic rent, as the Court of Appeal concluded.

55  Finally, I turn to the car park licence fee and the insurance rent. The reasons for rejecting the claimant's argument in relation to the basic rent
H  apply equally to the car park licence fee: indeed, the position is a fortiori as the reservation of the car park licence fee includes no words such as "and proportionately for any part of a year", and the sum involved is very small in relative terms. So far as the insurance rent is concerned, the position is less clear. It is in a sense a payment for a service, and, as Morgan J rightly

concluded, the service charge should be apportioned. However, that *A* conclusion is based on the provisions of paragraph 4.6 of schedule 7 to the lease, summarised in para 6 above, which enables the service charge to be apportioned, through the medium of a payment to the tenant: the reference to a credit plainly extends to giving effect to the credit, through payment, once the landlord and tenant relationship has come to an end. I do not consider the service charge to be a good analogy, because the service charge *B* is paid for various ongoing services rather than a one-off contribution to a single payment, and because there is no such provision in schedule 5, summarised in para 5 above, in relation to the insurance rent. The claimant argues that the reference to a "fair proportion" in schedule 5 coupled with fact that there is no reference to the period for which the landlords should take out the insurance renders it easy to imply the term for which the claimant contends. In my view, however, unless it could be shown to have *C* been unreasonable for the defendants to have insured the building for the whole of the ensuing year when they did so, the reasons for dismissing this appeal in relation to the basic rent and the car park licence fee apply equally to the insurance rent. After all, the insurance rent is a single annual sum, specifically reserved as rent, with no provision for apportionment, and it became payable in full in July 2011; further, the money involved is, *D* relatively speaking, small. It is almost invariable for a landlord, indeed for any property owner, to insure its property on an annual basis, unless there is a specific reason not to do so, and that was clearly the established practice in the present case. It may be that the landlords could not have recovered the insurance rent for a full year in a case where it would have been unreasonable for them to have expected the tenant to pay for a full year's cover. However, no such argument was advanced in this case, and it was *E* probably too late to do so in any event, as the insurance rent had been paid for the year in question.

56   Accordingly, I would dismiss this appeal.

### LORD CARNWATH JSC

57   I agree that the appeal should be dismissed for the reasons given by Lord Neuberger of Abbotsbury PSC so far as addressed to the issues between *F* the parties. I add some brief comments only on the issue of implied terms, and in particular Lord Neuberger PSC's comments on the status of the Privy Council judgment in *Attorney General of Belize v Belize Telecom Ltd* [2009] 1 WLR 1988.

58   Unlike him, I would have been content to take my starting point not in the 19th century cases (such as *The Moorcock* (1889) 14 PD 64), but in *G* the most modern treatment at the highest level. That is undoubtedly to be found in the judgment of the Privy Council in the *Belize* case [2009] 1 WLR 1988. It is important to remember that this was not an expression of the views of Lord Hoffmann alone, as is implied in some commentaries, but was the considered and unanimous judgment of the Board as a whole (including Baroness Hale of Richmond, and Lord Rodger of Earlsferry, Lord Carswell, Lord Brown of Eaton-under-Heywood, none of them known for lack of *H* independent thought). In the leading textbook on the subject (*Lewison, The Interpretation of Contracts*, 5th ed with the 2nd supplement), the judgment is realistically taken to "represent the current state of the law of England and Wales": p 284, para 6.03. The rest of that chapter contains an illuminating

A  discussion of the working out of the principles stated by Lord Hoffmann, as applied by the courts in different contractual contexts and different factual situations. We would need very good reasons for treating the judgment as less than authoritative, and we have not been asked by the parties to do so.

  59   In the present case, there has been no dispute as to the authority of the *Belize* judgment, only as to its interpretation. The claimants seek to interpret it as supporting a more liberal approach than the traditional
B  "necessity" test (in the words of their printed case):

    "those courts which purport to follow *Belize*, but in so doing apply the tests of business efficacy, absolute necessity and the officious bystander, are departing from the test decided by the Privy Council. The issue, therefore, is whether the type of necessity that is required for the
C    implication of a term is what may be termed (a) absolute necessity (i e the contract simply will not operate without the term); or (b) reasonable necessity (i e the contract will not operate as it must reasonably have been intended by the parties to operate)."

The defendants by contrast submit that, properly understood, the judgment should not be read as involving any watering down of the traditional tests.

D  60   To my mind there is no doubt that the defendants' interpretation is correct. This is so, whether one looks to the words of Lord Hoffmann alone, or to subsequent authority in the higher courts of this country. The claimants have sought to support their submission by a commendably thorough review of the many cases in which the *Belize* case has been cited, in this country and in other common law jurisdictions. In my view, with the possible exception of the Singapore case referred to by Lord Neuberger PSC
E  to which I will come, such support is lacking.

  61   Very soon after it was given, the *Belize* judgment was subject to detailed consideration by Lord Clarke of Stone-cum-Ebony MR in the Court of Appeal in *Mediterranean Salvage and Towage Ltd v Seamar Trading and Commerce Inc* [2010] 1 All ER (Comm) 1. The judgment was "adopted" also by Rix LJ: para 48. As the third member of the court, Toulson LJ was more
F  cautious at that early stage, deciding the appeal on the narrow basis that the implied term had not been shown by the owners to be "necessary", and their case was not improved by substituting "any of the other formulations of the test discussed in the cases": para 63.

  62   Lord Clarke MR began by predicting (accurately as it has turned out) that Lord Hoffmann's analysis "will soon be as much referred to as his approach to the construction of contracts in *Investors Compensation*
G  *Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, 912–913": para 8. He observed that "the implication of a term is an exercise in the construction of the contract as a whole": para 9, citing the two House of Lords authorities referred to by Lord Hoffmann. He then quoted extensively from the judgment, including its citation of Lord Simon of Glaisdale's summary of the tests for implication of a term: see Lord
H  Neuberger PSC, para 18. He did not see the judgment as involving a loosening of the traditional tests, at para 15:

    "It is thus clear that the various formulations of the test identified by Lord Simon are to be treated as different ways of saying much the same thing. Moreover, as I read Lord Hoffmann's analysis, although he is

© 2016 The Incorporated Council of Law Reporting for England and Wales

emphasising that the process of implication is part of the process of     A
construction of the contract, he is not in any way resiling from the often
stated proposition that it must be necessary to imply the proposed term.
It is never sufficient that it should be reasonable."

In support he cited also the speech of Lord Wilberforce in *Liverpool City
Council v Irwin* [1977] AC 239, 253–254, rejecting the more flexible
approach proposed in the Court of Appeal by Lord Denning MR. Lord     B
Clarke MR also noted (para 17) the contrast drawn by Bingham MR in
*Philips Electronique Grand Public SA v British Sky Broadcasting* [1995]
EMLR 472, 481 (a passage cited by Lord Neuberger PSC at para 29)
between the court's "usual role" in contractual interpretation of finding the
"true meaning" of the words actually used by the parties, and the "more
ambitious undertaking" involved in "the interpolation of terms to deal with     C
matters for which . . . [they] have made no provision." Lord Clarke MR
concluded this passage by noting the "stress" laid by the authorities on "the
importance of the test of necessity. Is the proposed implied term necessary to
make the contract work?": para 18.

63   The claimants cite a number of later cases in the Court of Appeal in
which the *Belize* judgment has been discussed in some detail (notably *Crema*     D
*v Cenkos Securities plc* [2011] 1 WLR 2066, para 42ff, per Aikens LJ; *Stena*
*Line Ltd v Merchant Navy Ratings Pension Fund Trustees Ltd* [2011] Pens
LR 223, para 36ff, per Arden LJ and *Jackson v Dear* [2014] 1 BCLC 186,
para 15ff, per McCombe LJ, adopting the summary of the cases by Briggs J
at first instance). None of these involves any material departure from Lord
Clarke MR's analysis. More significantly it gains direct support from the     E
succinct observation by Baroness Hale of Richmond JSC (herself a party to
the *Belize* judgment) in *Geys v Société Générale, London Branch* [2013]
1 AC 523, para 55 (paraphrased by Lord Neuberger PSC, at para 15), where
she referred to:

"those terms which are implied into a particular contract because, on
its proper construction, the parties must have intended to include them:
see *Attorney General of Belize v Belize Telecom Ltd* [2009] 1 WLR 1988.     F
Such terms are only implied where it is necessary to give business efficacy
to the particular contract in question."

64   The claimants refer also to the treatment of the *Belize* judgment in
other common law countries, including Canada, Australia, New Zealand
and Hong Kong. None of these citations raises any doubt as to the authority
of the *Belize* judgment, nor any reason to question Lord Clarke MR's     G
interpretation of it. The one exception appears to be the Singapore Court of
Appeal, in which (as Lord Neuberger PSC points out at para 24) the
judgment has been subject to detailed and critical analysis in *Foo Jong Peng v*
*Phua Kiah Mai* [2012] 4 SLR 1267 (followed in *Sembcorp Marine Ltd v*
*PPL Holdings Pte Ltd* [2013] SGCA 43). Their analysis draws, inter alia, on
criticisms made by Paul S Davies, "Recent Developments in the Law of     H
Implied Terms" [2010] LMCLQ 140. I note that there is no criticism in that
article of Lord Clarke MR's judgment as such. Rather it is cited as a
supposed example of the less than "wholly enthusiastic" reception which the
*Belize* judgment is thought to have received in later cases.

© 2016 The Incorporated Council of Law Reporting for England and Wales

3635-jpm    Doc 173-3    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C par
Pg 619 of 903

A    65    That and other academic articles, as well as the judgment of the
Singapore Court of Appeal, have themselves been subject to critical
examination in a recent article by Professor Richard Hooley, "Implied Terms
after *Belize Telecom*" [2014] CLJ 315, in which he welcomes, at p 347, the
"doctrinal coherence to interpretation and implication" brought by the
*Belize* judgment. Other academic views, before and since, are cited by Lord
Neuberger PSC, at para 24.

B    66    I see no purpose in reviewing the respective academic contributions
in any detail, given the weight of judicial authority for the proposition (with
which I understand we all agree) that the judgment is not to be read as
involving any relaxation of the traditional, highly restrictive approach to
implication of terms. Once that point is established, then I am not convinced
with respect that the other points made by the Singapore court are sufficient

C    to justify undermining the authority of the Board's reasoning. The passage
from the court's conclusion [2012] 4 SLR 1267, para 36 quoted by Lord
Neuberger PSC (para 24) needs to be read in its full context:

    "In summary, although the process of the implication of terms does
    involve the concept of interpretation, it entails *a specific form or
    conception of which is separate and distinct from the more general

D    *process of interpretation* (in particular, interpretation of the express
    terms of a particular document). Indeed, the process of the implication of
    terms necessarily involves a situation where it is precisely because the
    express term(s) are missing that the court is compelled to ascertain the
    presumed intention of the parties via the 'business efficacy' and the
    'officious bystander' tests (both of which are premised on the concept of

E    necessity). In this context, terms will not be implied easily or lightly.
    Neither does the court imply terms based on its idea of what it thinks
    ought to be the contractual relationship between the contracting parties.
    The court is *concerned only with the presumed intention of the
    contracting parties because it can ascertain the subjective intention of the
    contracting parties only through the objective evidence* which is available
    before it in the case concerned. In our view, therefore, although the *Belize*

F    test is helpful in reminding us of the importance of the general concept of
    interpretation (and its accompanying emphasis on the need for objective
    evidence), we would respectfully *reject that test in so far as it suggests that
    the traditional 'business efficacy' and 'officious bystander' tests are not
    central to the implication of terms*. On the contrary, both these tests
    (premised as they are on the concept of necessity) are an integral as well as

G    indispensable part of the law relating to implied terms in Singapore."
    (Emphasis added.)

    67    This summary is useful because it draws together in short form the
threads of an elaborate and carefully considered judgment. As I read it the
key points come down to three: (i) although the implication of terms is one
aspect of "the concept of interpretation", it should be treated as "separate
and distinct from the more general process of interpretation"; (ii) the court is

H    concerned not with "what it thinks ought to be the contractual relationship
between the contracting parties", but rather with their "presumed intention"
as ascertained through "objective evidence"; (iii) the central place of the
"business efficacy" and "officious bystander" tests should be affirmed as "an
integral as well as indispensable part" of the law of Singapore.

© 2016 The Incorporated Council of Law Reporting for England and Wales

768
Marks & Spencer plc v BNP Paribas Securities Services (SC(E))          [2016] AC
Lord Carnwath JSC

68   The first point is an interesting debating point, but to my mind of    A
little practical significance. It is not a point addressed by the parties before
us—understandably, if they regarded it (as I would) as settled, if not by the
*Belize* judgment itself, then by the authorities relied on by Lord Hoffmann
(noted by Lord Neuberger PSC at para 25). Lord Neuberger PSC (para 28)
prefers a sequential approach: first interpretation, then implication.
However, as he accepts (para 26) both processes are parts of the exercise of    B
"determining the scope and meaning of the contract."

69   On this point also I see no reason to depart from what was said in the
*Belize* case. While I accept that more stringent rules apply to the process of
implication, it can be a useful discipline to remind oneself that the object
remains to discover what the parties have agreed or (in Baroness Hale JSC's
words in the *Geys* case [2013] 1 AC 523, para 55) "must have intended" to    C
agree. In that respect it remains, and must be justified as, a process internal
to the relationship between the parties, rather than one imposed from
outside by statute or the common law (see the distinction noted by Lord
Neuberger PSC: para 15).

70   Nor do I agree that support for such a division can be found in the
judgments referred to by Lord Neuberger PSC: that is, the judgments of
Bingham MR in the *Philips* case [1995] EMLR 472, and of this court in the    D
*Aberdeen City Council* case 2012 SC (UKSC) 240. The passage from the
former is useful as emphasising the narrow constraints on implication. But
I do not read Bingham MR as treating it as a notionally separate exercise
from that of interpretation. (Nor did Lord Clarke MR when quoting the
same passage in the *Mediterranean Salvage* case [2010] 1 All ER (Comm) 1:
see above.) The contrast rather is between two aspects of the court's task
in respect of "contractual interpretation": the "usual role" involving the    E
resolution of ambiguities in the language used by the parties, and the
"extraordinary power" involving interpolation of terms that they have not
used.

71   In the same way the passages cited from the *Aberdeen City Council*
case do not appear to support a sharp distinction between interpretation and
implication, still less for the necessity of a sequential approach. No one
thought it necessary to refer to the *Belize* case [2009] 1 WLR 1988. Lord    F
Clarke MR preferred implication, but acknowledged that the two processes
achieved the same result. There is no indication that he had changed his
view since the *Mediterranean Salvage* case. He seems to have treated them
as two sides of the same coin. Lord Hope of Craighead DPSC who gave the
lead speech (which also had majority support) clearly saw them as part of a
single exercise: the implied term was the "product" of interpretation. The    G
case seems if anything to illustrate an "iterative", rather than sequential,
process: see Lord Grabiner QC, "The Iterative Process of Contractual
Interpretation" (2012) 128 LQR 41. The results of different interpretative
techniques were considered and compared, in the light of the language used
and its business context, to achieve a result which best represented the
assumed intentions of the parties.

72   On the second point, in so far as there is a difference from the    H
Singapore court, I prefer the approach of Lord Neuberger PSC which seems
to me entirely consistent with the *Belize* case [2009] 1 WLR 1988. As he says
(para 21), one is concerned not with "the hypothetical answer of the actual
parties", but with that of "notional reasonable people in the position of the

© 2016 The Incorporated Council of Law Reporting for England and Wales

A  parties at the time at which they were contracting", or in other words of Lord Hoffmann's "reasonable addressee": the *Belize* case, para 18.

73  On the third point, there is no doubt as to the continuing significance of the traditional tests, as summarised by Lord Simon. If however the Singapore court intended thereby to prescribe a more rigid application of those tests, whether individually or cumulatively, I prefer the approach of the Board in the *Belize* case, para 27:

B

"The Board considers that this list is best regarded, not as [a] series of independent tests which must each be surmounted, but rather as a collection of different ways in which judges have tried to express the central idea that the proposed implied term must spell out what the contract actually means, or in which they have explained why they did not think that it did so."

C

This passage is also cited, albeit with only qualified approval, by Lord Neuberger PSC, at para 21.

74  In conclusion, while I accept that Lord Hoffmann's judgment has stimulated more than usual academic controversy, I would not myself regard that as a sufficient reason to question its continuing authority. On the contrary, properly understood, I regard it as a valuable and illuminating synthesis of the factors which should guide the court. Applying that approach to the present case leaves me in no doubt that the appeal should be dismissed.

D

### LORD CLARKE OF STONE-CUM-EBONY JSC

75  I agree that the appeal should be dismissed for the reasons given by Lord Neuberger of Abbotsbury PSC. I only add a few words of my own because of the debate between Lord Neuberger PSC and Lord Carnwath JSC on Lord Hoffmann's view on the relationship between the approach to construction and the approach to the implication of a term which he expressed on behalf of the Judicial Committee of the Privy Council in *Attorney General of Belize v Belize Telecom Ltd* [2009] 1 WLR 1988. I do so in part in order to clarify what I said in the cases referred to by Lord Carnwath JSC, especially *Mediterranean Salvage and Towage Ltd v Seamar Trading and Commerce Inc* [2010] 1 All ER (Comm) 1 and *Aberdeen City Council v Stewart Milne Group Ltd* 2012 SC (UKSC) 240.

E

F

76  As Lord Carnwath JSC says, at para 62, I did not doubt Lord Hoffmann's observation that "the implication of a term is an exercise in the construction of the contract as a whole". I recognise, however, in the light of Lord Neuberger PSC's judgment, especially, at paras 22–31, that Lord Hoffmann's view involves giving a wide meaning to "construction" because, as Lord Neuberger PSC says, at para 27, when one is implying a word or phrase, one is not construing words in the contract because the words to be implied are ex hypothesi and not there to be construed. However, like Lord Neuberger PSC (at para 26) I accept that both (i) construing the words which the parties have used in their contract and (ii) implying terms into the contract, involve determining the scope and meaning of the contract. On that basis it can properly be said that both processes are part of construction of the contract in a broad sense.

G

H

77  I agree with Lord Neuberger PSC and Lord Carnwath JSC that the critical point is that in the *Belize* case [2009] 1 WLR 1988 the Judicial

© 2016 The Incorporated Council of Law Reporting for England and Wales

770
**Marks & Spencer plc v BNP Paribas Securities Services (SC(E))**        [2016] AC
**Lord Clarke of Stone-cum-Ebony JSC**

Committee was not watering down the traditional test of necessity. I adhere
to the view I expressed at para 15 of my judgment in the *Mediterranean
Salvage and Towage* case [2010] 1 All ER (Comm) 1 (which is quoted by
Lord Carnwath JSC, at para 62) that in the *Belize* case, although Lord
Hoffmann emphasised that the process of implication was part of the
process of construction of the contract, he was not resiling from the often
stated proposition that it must be necessary to imply the term and that it is
not sufficient that it would be reasonable to do so. Another way of putting
the test of necessity is to ask whether it is necessary to do so in order to make
the contract work: see the detailed discussion by Lord Wilberforce in
*Liverpool City Council v Irwin* [1977] AC 239, 253–254.

*Appeal dismissed.*

JILL SUTHERLAND, Barrister

A

B

C

D

E

F

G

H

© 2016 The Incorporated Council of Law Reporting for England and Wales

TAB 40

*OJSC Oil Company Yugraneft v Abramovich*
[2008] EWHC 2613 (Comm), English High Court

Neutral Citation Number: [2008] EWHC 2613 (Comm)

Case No: 2007 FOLIO 1545

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 29/10/2008

Before :

**MR JUSTICE CHRISTOPHER CLARKE**
- - - - - - - - - - - - - - - - - - - -
Between :

OJSC OIL COMPANY YUGRANEFT                    **Claimant**
(in liquidation)
- and -
(1) ROMAN ARKADIEVICH ABRAMOVICH        **Defendants**
(2) MILLHOUSE CAPITAL UK LIMITED
(3) BORIS BEREZOVSKY

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Michael Swainston QC, Rupert D'Cruz & Paul Wright** (instructed by **Clyde & Co LLP**) for
the **Claimant**

**Mark Howard QC, Daniel Jowell & Stephen Midwinter** (instructed by **Skadden, Arps,
Slate, Meagher & Flom (UK)**) for the **First and Second Defendants**
**Barbara Dohmann QC** (instructed by **Cadwallader**) for the **Third Defendant**

Hearing dates: 9th – 22nd July 2008
- - - - - - - - - - - - - - - - -

# Judgment

**MR JUSTICE CHRISTOPHER CLARKE:**

1.      In the present action the Claimant - OJSC Oil Company Yugraneft ("Yugraneft") –
        claims damages against the first defendant - Roman Arkadievich Abramovich ("Mr
        Abramovich"), and the second defendant - Millhouse Capital UK Limited
        ("Millhouse"). I shall refer to these two hereafter as "the defendants".  Yugraneft
        claims to have been the victim of a massive fraud directed by Mr Abramovich
        whereby its interest in a joint venture company named Sibneft-Yugra was effectively
        reduced from 50% to less than 1% as a result of which it has suffered a loss of billions
        of dollars.

2.       Mr Abramovich is a Russian citizen who made his fortune there and is now one of
        the world's richest men. From 2000 to July 2008 he was Governor of the Russian
        province of Chukotka.  Millhouse is an English corporation which has been validly
        served within the jurisdiction. Its exact role in the events which follow is a matter of
        dispute.

*The applications in the Commercial Court*

*Jurisdiction*

3.    Mr Abramovich contests jurisdiction on the grounds that at the time of the issue of the Claim Form he was not resident within the jurisdiction for the purposes of Article 2 of the Judgments Regulation. He applies to have the service of the Claim Form set aside on that account. Yugraneft contends that it is well arguable that he was so resident but, if it is not, seeks permission to serve him out of the jurisdiction.

*Merits*

4.    Both Mr Abramovich and Millhouse invite the Court to dismiss Yugraneft's claims against them under CPR 24 or 3.4 upon the basis that they have no realistic prospect of success. Mr Abramovich's application is made without prejudice to his application contesting jurisdiction.

*The Companies Court application*

5.    Yugraneft is a Russian corporation which is now in liquidation in Russia. Its liquidator is Mr Mikhail Kotov, who was appointed as Liquidator on 28th May 2007. Further details of the history leading to the liquidation are set out in my judgment in respect of the Companies Court application.

6.    On 12th November 2007 a petition was filed in the Companies Court by Sibir, Yugraneft's parent company, and OAO Moscow Oil and Gas Company ("MOGC"), seeking to wind Yugraneft up in England. The avowed purpose of the petition was to secure the appointment of an English liquidator who would carry forward the Commercial Court action.

7.    On 14th November 2007 Evans-Lombe, J., appointed Mr Stephen Cork as provisional liquidator of Yugraneft.  In addition to their applications to have the claim against them dismissed, Mr Abramovich and Millhouse seek to have the appointment of Mr Cork as provisional liquidator set aside and invite the Court to declare that it declines to exercise its insolvency jurisdiction over Yugraneft.  This application is made in the Chancery Division. The Claim Form was issued, and the other applications were made, in the Commercial Court. I have sat as a judge of both the Chancery Division and the Commercial Court.

8.    The current proceedings are a sequel to (i) an unsuccessful attempt by Sibir, Yugraneft's parent company, to launch proceedings in the British Virgin Islands ("BVI") against six BVI companies, Sibneft, and Mr Abramovich and (ii) a series of ultimately unsuccessful proceedings brought by Yugraneft in Russia.

9.    The application by Mr Abramovich and Millhouse to have the proceedings against them dismissed rests on the basis (i) that the proper law, or one of the proper laws, of any claim that Yugraneft may have against them is the law of Russia, and that by that law Yugraneft has no claim; and/or (ii) that as a result of what has happened in Russia and the BVI no claim is maintainable.

*The parties and other relevant companies*

10.    Yugraneft is a Russian oil company. Its ultimate parent and controlling shareholder is Sibir Energy Plc ("Sibir"), which currently owns (indirectly) 99.368% of its shares. Sibir is incorporated in England but it carries on business entirely in Russia, where its assets are located. It is managed from Moscow. The principal shareholders of Sibir are Mr Chalva Tchigirinsky and the City of Moscow. The Chief Executive is Mr Henry Cameron. Sibir is the funder of the present proceedings. It procured the consent of Mr Kotov, Yugraneft's liquidator, to the initiation of those proceedings and then petitioned, with MOGC, for the appointment of an English provisional liquidator and the winding up of Yugraneft. Messrs Clyde & Co represented Sibir for the presentation of the petition and now represent Yugraneft.

11.    Sibir did not always own most of Yugraneft. In 2002 and 2003, at the time of the wrongs that are complained of, Sibir was, either directly or indirectly, the 99% shareholder in Yugraneft.  At the time of the proceedings in the BVI in 2005, Sibir had a total indirect interest in Yugraneft of about some 61%. Some of that interest was held through MOGC of which the City of Moscow held, through Central Fuel Company ("CFC")"), 55% of the shares.  In 2007 the CFC exchanged its shares in MOGC for shares in Sibir, the result of which was that Sibir became again virtually the sole owner of Yugraneft. The details are set out in Appendix 4.

12.    OAO Siberian Oil Company ("Sibneft") is a giant Russian oil company. Until its sale to Gazprom in 2005, Sibneft was beneficially owned, at least in large part, by Mr Abramovich. There is a dispute as to whether Mr Berezovsky also owned an interest in Sibneft to which I refer in paragraph 166 below.  The President of Sibneft at the material time was Mr Eugene Shvidler and its General Manager was Mr Alexander Korsik. Mr Abramovich's interest in Sibneft was held by 5 Cypriot companies (i) White Pearl Investments Ltd; (ii) Heflinham Holdings Ltd (iii) N.P. Gemini Holdings Ltd; (iv) Marthacello Co Ltd; and (v) Kindselia Holdings Ltd.  Yugraneft alleges that all of these entities were under the control of Millhouse.

*The history*

13.    I set out below such of the history, which extends over 8 years and involves litigation in three jurisdictions, as I take to be necessary in order to address the issues. In doing so I acknowledge the assistance provided by the summaries of the parties, much of which I have adopted.

14.     In 2000 Yugraneft held licences for the development of certain oil fields, including, in particular, the South Priobskoye & Palyanovskoye oil fields in the Khanty Mansiysk region of Russia. It had, however, lost its previous financial backer and did not have sufficient funds to exploit those fields as required by the licences and had urgent need of new financing.

15.    In or about the late summer of 2000 negotiations took place in Russia between representatives of Sibir and Sibneft. Mr Alexander Tchigirinsky, the brother of Mr Chalva Tchigirinsky, represented Sibir and Mr Shvidler represented Sibneft. There is a dispute as to whether the negotiations then included Mr Abramovich and Mr

Luzkhov, the Mayor of Moscow.   Further negotiations took place in Russia principally between Mr Korsik, the general manager of Sibneft and Mr Cameron, the Chief Executive Officer of Sibir together with Mr Sergei Demine, one of Mr Cameron's deputies at Sibir's representative office in Moscow.

*The Co-operation Agreement[1]*

*Sibneft agrees to lend to Sibneft-Yugra*

16.    On 23rd November 2000 Mr Cameron for Sibir and Mr Korsik for Sibneft executed in Russia a document in Russian headed (in translation) "*Principles of cooperation between [Sibir] and [Sibneft]*". Under this document Sibir was to set up a company, eventually called Sibneft-Yugra, to which Yugraneft was to transfer the licences for the South Priobskoye, Palyanovskoye and Kamennoye oil fields.  Sibneft was to purchase 50% of the company at nominal value and was to finance its activities "*to the full*". The financing was to take the form of a loan to the joint venture company at 17% per annum. Repayment of the loan was to start as soon as the company had positive cash flows. In the event that Sibneft-Yugra could obtain a cheaper loan, the credit granted by Sibneft was to be replaced with a cheaper loan. Once the loan was repaid the positive cash flow of the company was to be shared equally between Yugraneft and Sibneft.

17.    The new company was to be managed by a board with equal representation from Sibir and Sibneft. The Chairman was to be nominated by Sibneft and the company was to be under Sibneft's operational management. The executive officer of the company was to be nominated by Sibneft.  In the event that the new company was not set up, or the licences were not transferred to it, or Sibneft did not obtain 50% of its shares, Sibneft would obtain half of Sibir's shares in Yugraneft and Yugraneft would be obliged to repay the loan provided by Sibneft to the new company.

*2001*

18.    On 10th January 2001 LLC Oil Company Sibneft-Yugra ("Sibneft-Yugra") was established. It was officially incorporated on 6th February 2001. Sibneft-Yugra is a company of the OOO type. Such companies do not have shares but what are called "*participation interests*". Under Russian law these take the form of nominal share capital in which the members of the company participate. Any changes in the number of the participation interests or in the names of the participants must be reflected in the foundation documents of the company and registered. The registration of the constitutional documents of such a limited liability company and all amendments, including the admission of new members, is administered by Russian governmental authorities in Russia upon application by the company itself.

19.    The original nominal share capital of Sibneft-Yugra was 10,000 roubles and Sibneft and Yugraneft participated as to 5,000 roubles each.

---

[1] This document, like all other documents recording the events on which the dispute turns, is in Russian.

20.    On 10th January 2001 Mr Matevosov, a senior Vice-President of Sibneft, was appointed the General Director of Sibneft-Yugra. The board of directors was also elected and consisted of (in addition to Mr Matevosov) Mr Korsik, Mr Schegolev, Mr Novikov, Mr Cameron, Mr Jordan, Mr Demine and Mr Schupakov. The first four are Sibneft and the second four are Yugraneft people.

*Sibneft lends to Yugraneft at 17% against the security of Yugraneft shares*

21.    For some reason there was a delay in the transfer of the oil licences from Yugraneft to Sibneft-Yugra. As a result Yugraneft undertook the initial development of the oil fields with finance made available to it by Sibneft. On 12th January 2001 two Loan Agreements (Nos 1 and 2), in Russian, were executed under which Sibneft agreed to lend Yugraneft a total of up to $ 100 million at a rate of 17% per annum. The agreements were subject to Russian law. The repayment date was on or before 14th January 2002.  The loans were to be secured by pledges of the shareholdings of Sibir subsidiaries in Yugraneft which were agreed to have a total assessed value of $ 34,000,000.

22.    On 18th January 2001 share pledge agreements were drawn up between three subsidiaries of Sibir (Farrell Resources, SF International and Dalehurst Ltd) and Sibneft. Under these agreements, which were governed by Russian law and provided for Russian jurisdiction, the Sibir subsidiaries pledged their shares in Yugraneft to Sibneft as security for the loans under the Loan Agreements. The shares pledged came to just over 49% of the total share capital of Yugraneft.  The shares were valued under the pledge agreements at $ 35.115m.

23.    On 18th January 2001 Mr Cameron (of Sibir) wrote to Mr Korsik (of Sibneft) referring to Loans 1 and 2 and the pledges.  He noted that it was anticipated that the joint venture company (i.e. Sibneft-Yugra) would be incorporated and the licences transferred to Sibneft-Yugra before the maturity of the loans.  He noted that if they were not, Sibneft had agreed to prolong the life of the loans until the transfer of the licences (or until some arrangement acceptable to both parties had been entered into) and that interest on the loans would accrue every six months and would be added to the loans, and would not be repayable until the two loans were repaid.  When the licences were transferred to Sibneft-Yugra, Sibneft would provide it with a further loan to allow it to purchase from Yugraneft all of its assets (at the amount of the two prior loans plus capitalized interest).  Upon receipt of such consideration, the letter recorded, Yugraneft would repay the two loans (plus capitalized interest) and Sibneft would discharge the pledges.

24.    On 23rd March a meeting of the Board of Directors of Yugraneft, chaired by Mr Tchigirinsky, took place. The directors elected Mr Matevosov as general director of Yugraneft with effect from 26th March 2001.  It is accepted in the Particulars of Claim (PoC) that this was done at Sibneft's proposal, because Sibneft would be undertaking the development of the fields and providing the finance, and was accepted by Sibir and Yugraneft.

25.    On about 26th June 2001 Yugraneft resolved to sell all its assets to Sibneft- Yugra. On 25th July 2001 Sibneft agreed to lend Sibneft-Yugra up to $ 150 million at 17% interest for investment in oil fields and purchase of property from Yugraneft. The

agreement was in Russian and was subject to the jurisdiction of the Arbitrazh court for the Omsk Region.

26.     On 26th December 2001 the relevant licences were transferred to Sibneft-Yugra.

*Millhouse*

27.     Millhouse was incorporated in England on 24th September 2001. Shortly afterwards Mr Eugene Tenenbaum, a Canadian accountant, who had previously been head of corporate finance at Sibneft, and Ms Maria Elia were appointed directors. She has no day-to-day role in the management of the company. Mr Tenenbaum was the managing director. Millhouse initially had a modest office in Weybridge and then, by 2005, one in London at Chelsea Football Club's offices at Stamford Bridge.  On 20th November 2001 Mr Tenenbaum and Ms Elia signed a very wide general power of attorney in favour of Mr David Davidovich, which included power to establish a representative office in the Russian Federation. The function of a representative office is not to run a general business but to represent, and look after the Russian-related affairs of, a foreign company. Mr Davidovich, who had previously worked as a senior business adviser to Mr Shvidler, the President of Sibneft, established the Representative Office of Millhouse in Moscow in February 2002. The office was on one side of the river and Sibneft's premises, where Mr Davidovich also had an office, was on the other.  He continued to have an office at Sibneft and to act as a senior business adviser to Mr Shvidler. In April 2006 the Representative Office was separately incorporated as a Russian company, Millhouse LLC. Mr Shvidler is its current Chairman. It had originally been intended that Mr Shvidler should be Millhouse's Chairman. But in the event he was neither its Chairman, Director nor manager. On his evidence, which is in dispute, he provided some general assistance to Millhouse from 2004 onwards (for which he was paid) but did not exercise any executive function for it until April 2006.

28.     The events that I have described in the previous paragraphs are either undisputed or appear from documents that there is no reason to question.  The events that I describe in paragraphs 29 – 64 also appear from the documents. I shall revert hereafter to the highly disputed events which are said to have occurred in between.

*The first EGM*

*Dilution of Yugraneft's interest in Sibneft-Yugra from 50% to 5 %*

29.     By a notice dated 9th September 2002 Mr Korsik, on behalf of Sibneft, requisitioned an Extraordinary General Meeting of Sibneft-Yugra. The notice recorded the fact that the development of the oil fields required "*considerable financing*" but that:

> "*the vulnerable situation on the oil market and a possibility of attraction of investment on conditions of not less than 15% annual interest make questionable the economic efficiency of the whole project*".

It noted that, following a search for financing on more favourable terms, Sibneft had obtained preliminary consent to financing (of up to $30m) at a low rate of interest (Libor +3%) from Carroll Trading S.A ("Carroll"), Shaw Invest & Finance Corp ("Shaw") and Tranquillo Trading S.A. ("Tranquillo") on condition that each should acquire a 15% participation interest in Sibneft-Yugra. Carroll and Shaw are BVI companies. Tranquillo is Panamanian.

30.    The notice sought (a) the admission of Carroll, Shaw and Tranquillo as members; (b) the increase in Sibneft-Yugra's capital to 100,000 roubles; (c) the adoption of a new revised Memorandum of Incorporation and amendments to the Charter; and (d) the appointment of a new board of Sibneft-Yugra consisting of Mr Matevosov, Mr Korsik, Mr Novikov, Ms Nikulina, Ms Lobanova, Mr Freyman, Mr Aristarkhov and Mr Shmyrev.  The notice was received and signed by Mr Matevosov on the same day as General Director of Sibneft-Yugra.

31.    On 10th and 11th September 2002 Carroll, Shaw and Tranquillo (collectively "*the first set of offshore[2] companies*") each applied to acquire 15% of the charter capital of Sibneft-Yugra. Each notice indicated a preparedness to arrange the financing of Sibneft-Yugra for up to $ 10 million. Mr Matevosov signed for them on behalf of Sibneft-Yugra.

32.    Carroll and Shaw were vehicles for investments by Mr Abramovich in Aeroflot. Yugraneft believes that Tranquillo was another such vehicle.

33.    On 17th September 2002, Mr Korsik gave notice on behalf of Sibneft, to Mr Matevosov, in his capacity as General Director of Yugraneft, of the forthcoming EGM of Sibneft-Yugra on 28th September at the offices of Sibneft in Moscow and the agenda therefor.  The notice stated that information in connection with the EGM could be found at Sibneft's offices and included an agenda detailing, inter alia, the proposed resolutions to admit Carroll, Shaw and Tranquillo as members and the proposed change in board composition. Yugraneft contends that no one at Sibir or Yugraneft (apart from Mr Matevosov) was informed of, or knew of, the proposed issue of new capital.

*The first power of attorney*

34.    On 25th September 2002, Mr Matevosov, as General Director of Yugraneft, provided a Power of Attorney under Russian law to Mr Davidovich, the head of Millhouse's Moscow Representative office enabling him to represent Yugraneft at the EGM of 28th September 2002, to attend it, vote on all items of the agenda, obtain all documents provided, and sign all documents necessary for the execution of his powers and the revised versions of the constituent documents of the company.

*The first dilution – to 5%*

35.    On 28 September the EGM of Sibneft-Yugra took place at Sibneft's offices in Moscow. Present were Mr Korsik, representing Sibneft and acting as Chairman, and

---

[2] I continue to use this description even in respect of proceedings in the BVI where the two BVI companies were, in BVI terms, onshore.

Mr Davidovich, representing Yugraneft (pursuant to the power of attorney referred to in the previous paragraph) and acting as Secretary.  According to the minutes of the meeting it was agreed :

<blockquote>

(i)     to accept the 3 offshore companies (Carroll, Shaw and Tranquillo) as additional members of Sibneft-Yugra on the basis of a payment of 15,000 roubles each;

(ii)    to increase the charter capital of Sibneft-Yugra to 100,000 roubles based on the receipt of an additional 45,000 roubles from the 3 companies and an additional 45,000 roubles from Sibneft;

(iii)   to adopt new Articles of Association and to modify the company's Charter;

(iv)   to appoint a new board.  The new board members were: Mr Matevosov, Mr Korsik, Mr Novikov, Mr Nikulina, Ms Lobanova, Mr Freyman, Mr Aristarkhov and Mr Shmyrev.  These individuals were, according to Yugraneft, employed by or connected with Millhouse and represented Mr Abramovich's interests.

</blockquote>

36.      The Charter and Articles of Association of Sibneft-Yugra were amended so as, inter alia, to reflect the increase in charter capital and the new members.  The amendments to the Charter were signed by Mr Korsik, Mr Davidovich, Mr Truskoliavskaya, Ms Andreeva and Mr Efremov. One of them amended Clause 3.1 so as to read:

> *"Charter capital of the Company consists of nominal value of its participants shares and is equal to the amount of 100,000 roubles"*

Another amended Clause 3.2 so as to provide that the shareholders had, in the case of Sibneft, *"50% of the shares of the Company's charter capital. Nominal value is 50,000 roubles"* and to make similar provision, mutatis mutandis, in the case of the other shareholders.

37.      The amendments to the company's incorporation documents were registered with the tax office of the Khanty-Mansisyk Autonomous District of Russia on 10 October 2002.[3]

38.      The result of the EGMs and the amendments to the Sibneft-Yugra charter was that the percentages of the participation interests became:

| | |
|---|---|
| Sibneft | 50% |
| Carroll, Shaw and Tranquillo | 15% each |
| Yugraneft | 5%. |

*The Security Agreement*

---

[3] See the judgment dated 4 April 2007 of the Arbitrazh Court of Khanty-Mansisyk Autonomous District in Case No. A75-9221/2006.

39.    On 28th September 2002, i.e. the same day as the EGM, an agreement ("the Security Agreement") was purportedly concluded in Russian between Sibneft, Caroll, Shaw and Tranquillo and Yugraneft. Mr Davidovich signed it on behalf of Yugraneft.  Mr Korsik signed it for Sibneft. The Security Agreement provided that Caroll, Shaw and Tranquillo would provide loans to Sibneft-Yugra. Yugraneft was to be at liberty to repay the loans on behalf of Sibneft-Yugra. If it did so, Yugraneft was to be allowed to repurchase the interests in Sibneft-Yugra owned by Caroll, Shaw and Tranquillo at no more than their nominal value (i.e. 15,000 roubles x 3). The agreement was to be effective for one year.

40.    According to Mr Davidovich the reason for dealing with matters in this way was because of doubts as to whether Yugraneft's shares were already pledged, and for reasons relating to taxation (see paragraph 20 of his third witness statement). He says that he faxed a copy of the Security Agreement to Mr Tchigirinsky. Mr Tchigirinsky denies ever receiving such a fax.

*The first set of offshore companies lends to Sibneft-Yugra*

41.    By Agreements dated 20th February 2003 the first set of offshore companies agreed to lend to Sibneft-Yugra amounts totalling $ 32.9 million with interest at 6% repayable in 3 years. Mr Matevosov signed on behalf of Sibneft-Yugra. The defendants have produced payment orders which purport to vouch payment of about that amount. These agreements were governed by English law.  These loans appear to have been new money, the 2001 loans not having been repaid.

*The second EGM*

*Dilution of Yugraneft's interest in Sibneft-Yugra from 5% to 0.98 %*

42.    On 22nd January 2003, Carroll, Shaw and Tranquillo each made applications, signed on their behalf by their directors (respectively Mr Truskolyavskaya, Ms Andreyeva and Mr Efremov), to make an additional contribution of 70,000 roubles each to the charter capital of Sibneft-Yugra. On the same day, Sibneft, by notice signed by Mr Korsik, informed Sibneft-Yugra of its proposal to make a further contribution of 210,000 roubles (i.e. 70,000 x 3)  to the charter capital of Sibneft-Yugra, and asked to leave the amount of its share participation in the capital of the company unchanged. The applications were signed and acknowledged on behalf of Sibneft-Yugra by Mr Tsitsinov (the Executive Director of Sibneft-Yugra).  Again, according to Yugraneft, no one at Sibir or Yugraneft was informed or knew of the proposed issue of new capital.

*The second power of attorney*

43.    A second EGM of Sibneft-Yugra was called. On 3rd February 2003, Mr Matevosov gave Mr Davidovich a further power of attorney, in the same form as before, authorising him to participate, vote, and sign documents on behalf of Yugraneft at the second EGM.

*The second EGM*

44.   The second EGM was held on 4th February 2003 in Khanty-Mansiysk. According to the minutes, the participants of the meeting included, as before, Mr Korsik on behalf of Sibneft, and Mr Davidovich on behalf of Yugraneft.  Also present at this meeting were the three Russian directors of Carroll, Shaw and Tranquillo: Anna Andreyeva, Oleg Efremov and Maria Truskoliavskaya. At this meeting, the charter capital of Sibneft-Yugra was increased to 520,000 roubles in accordance with the applications of Sibneft, Carroll, Shaw and Tranquillo for additional capital contributions totalling 420,000 roubles.  Decisions were made to adopt a further new version of the company's incorporation agreement and to make further appropriate amendments to the company's Charter.

45.   The result of the issue of the additional charter capital was that the capital of, and participation interests in, Sibneft-Yugra became as follows:

| Shareholder | Interest in roubles | Percentage |
|---|---|---|
| Sibneft | 260,000[4] | 50% |
| Carroll | 85,000[5] | 16.34% |
| Shaw | 85,000 | 16.34% |
| Tranquillo | 85,000 | 16.34% |
| Yugraneft | 5,000 | 0.98%. |

46.   On 13th February 2003, the amendments to the company's incorporation documents were registered with the tax office and the corresponding changes were introduced into the Charter of Sibneft-Yugra. Clause 3.1 was amended so as to provide that the amount of the charter capital of the company was 530,000 roubles. Clause 3.2 was amended to provide, in the case of Sibneft, that the nominal value of the share was 260,000 roubles and that the share was 50% of the Charter capital of the company, and, similarly in relation to the other participants.

47.   According to Mr Davidovich, the reason for this second meeting was that Sibneft had miscalculated the value of the participation interests that would need to be issued to the first set of offshore companies in order to give effect to the Security Agreement. The error was corrected by a further issue at the second meeting. Yugraneft disputes this account.

48.   Mr Davidovich's evidence in the BVI was that in October 2003 he was alerted to the fact that Yugraneft had not made any repayment of the 6% loans. He telephoned Mr Tchigirinsky to remind him and to ask whether Yugraneft had got the financing yet. He was told that it was not in place but was expected soon. Either then or later he agreed by telephone a further year for repayment. Then, when discussing the position internally with his accounting and legal teams he thought that it was important for Sibneft to have increased control over the foreign nominee companies holding its interest. As a result he asked Sibneft's lawyers in Moscow to arrange a transfer of all rights to claim the repayment of loans and to transfer the 49% interest in Sibneft-Yugra to "*three nominee companies which were closer to Sibneft and which would be*

---

⁴     i.e. 5,000 + 45,000 + 210,000
⁵     i.e. 15,000 + 70,000

*consolidated with the international financial statements of the Sibneft Group*".  He did this after consultation with Mr Shvidler.

49.    The reason why the new nominee companies – Richard, Gregory and Ferenco (see paragraph 57 below) – would be closer to Sibneft than their predecessors appears to be that there were (or came to be) in existence call option agreements dated 1st January 2000 between Sibneft and the owners of the three new offshore companies, although the document in respect of Ferenco is missing. Under the call options, which were for an indefinite period, Sibneft could purchase the shares of each of the new companies for the nominal value of each company's charter capital (up to $ 100,000) from a named individual - Ms Evdokimova in the case of Richard and Mr Osipov in the case of Gregory, both of whom were Millhouse personnel. In addition the three new companies entered into management agreements to provide management services. These documents are curious in that none of the three companies were in fact incorporated by 1st January 2000; but only later in the year.  The actual date of execution of the documents is unknown.

50.    Mr Davidovich has also produced management agreements and call options in respect of Richard and Gregory, both dated 1st January 2004. The call options have the same individuals as sellers, but give the right to buy to Sibneft Oil Trading Co ("SOTC"). There are signed and unsigned versions of these documents. In respect of Ferenco there is an unsigned 1st January 2004 call option in respect of which Joanna Elia, a Meritservus person, is expressed to be the seller. According to Mr Davidovich in 2004 the management and call option agreements were reassigned to SOTC.  The call options were not exercised prior to the sale of Sibneft to Gazprom (see paragraph 64 below).

51.    There has also been produced a signed call option agreement  dated 6th August 2003 between SOTC and Farleigh International Ltd in which the latter company is said to have been (contrary to anything that appears in the Cypriot share register) the owner of Ferenco. All these agreements are subject to English law.

52.    Whatever was the date of execution of these documents, their effect appears to have been to place the second set of offshore companies firmly within the Sibneft Group with effect from a date that precedes the sale of most of Sibneft to Gazprom in September 2005, to which I refer below. According to the defendants that is what was intended, the first set of offshore companies not being controlled by Sibneft or Millhouse (but by whom they were controlled is, on that hypothesis, unclear).

53.    Mr Michael Swainston, Q.C. for Yugraneft,  submits that this documentation means that the exact mode of Mr Abramovich's enrichment is not clear; and that it is possible (in the light of the fact that a transfer of the shareholding in Ferenco to SOTC is only recorded in the Cypriot register as happening in 2007 by virtue of a transfer dated 29th January 2007) that there was some separate transaction whereby the second set of offshore companies was transferred to Gazprom outside the sale of the Sibneft interest. In the light of the sale and purchase agreement, to which I refer in paragraph 129 below, this seems to me implausible. Further Yugraneft's claim to participate in the consideration for the sale of Sibneft to Gazprom assumes that that consideration relates to the participation interests (although if consideration was provided in some other way Yugraneft would claim to participate in that).

54.    The accounting position was purportedly explained by Miss Tatyana Breeva, who was
       Sibneft's Vice President (Finance), but now works for Russdragmet, which operates
       the gold project of Highland Gold Mining Ltd ("Highland Gold"), in which Mr
       Abramovich has invested.

55.    The gist of her evidence is that the first set of offshore companies was not
       consolidated in the 2002 accounts because Sibneft did not then control, and had no
       legal interest in, them, or in their interest in Sibneft-Yugra, which was liable to be
       returned to Yugraneft if Yugraneft secured the necessary finance. But after the
       transfer the position was different. This appears to be because by the time of the
       transfer the likelihood was that the interest would remain with them. Accordingly the
       second set of companies was consolidated in the Sibneft 2003 accounts.

56.    The accuracy and appropriateness of this treatment is in dispute: see the letter from
       Grant Thornton of 26th June 2008.  In particular it is suggested, inter alia,  (i) that, if
       all six companies were nominees for Sibneft, the first set should have been included
       in the December 2002 accounts; (ii) that, if Yugraneft had a right to repurchase the
       49% interest that interest should not have been included in either the 2002 *or* the 2003
       year end accounts; (iii) that, if included, there should have been a note referring to the
       right of redemption; and (iv) that if that option was, as Ms Breeva suggested, no
       longer a relevant factor because the actions taken by Yugraneft since March 2004 had
       confirmed that it was not going to fulfil the terms of the Security Agreement, that
       was, in respect of the 2003 accounts,  a *non-adjusting* post balance sheet event.

       *The transfer to the second set of offshore companies*

57.    However that may be, in November 2003 the participation interests in Sibneft-Yugra
       held by Carroll, Shaw and Tranquillo were sold by them to three other companies for
       nominal consideration. They were: Richard Enterprises S.A.  ("Richard"), Gregory
       Trading S.A.  ("Gregory") and Ferenco Investment & Services Limited ("Ferenco") -
       collectively "*the second set of offshore companies*". Richard and Gregory were each
       incorporated in the BVI; Ferenco was incorporated in Cyprus.  Richard & Gregory
       had held Mr Abramovich's interest in two Cypriot companies which held part of his
       interest in Sibneft. They and Ferenco appear to be Abramovich investment vehicles.

58.    According to Miss Breeva on 1st October 2003 (and as recorded in the agreement of
       26th November referred to in paragraph 60 (iii) below) Sibneft acquired from Shaw,
       Carroll and Tranquillo the debts owed to them by Sibneft-Yugra and this was done
       through separate assignments of which she had located that between Shaw and
       Sibneft: see paragraph 68 below.

59.    All of the offshore companies are alleged by Yugraneft to have been owned, directly
       or indirectly by Mr Abramovich and controlled and managed by Millhouse on his
       behalf: PoC paras 35 and 49.

60.    The sale of the participation interests of Sibneft-Yugra by the first to the second set of
       offshore companies occurred as follows:

       (i)      On 28th/29[th] October 2003, each of Carroll, Shaw and Tranquillo (by
                their directors) issued notifications to the other participants in Sibneft-
                Yugra (Sibneft and Yugraneft) of their intention to sell their

respective participation interests (16.34% of the authorized capital of Sibneft-Yugra valued at 85,000) roubles at a price of US$2,700 to, respectively, Richard, Ferenco and Gregory.  On 29 October 2003, Mr Matevosov, on behalf of Yugraneft, signed notices on behalf of Yugraneft in which he declined to exercise Yugraneft's pre-emption rights to purchase the 16.34% interest.  Mr Poltorak, President of Sibneft, signed similar notices on the part of Sibneft.

(ii)    The three agreements for the sale and purchase of the participation interests in Sibneft-Yugra for nominal consideration were concluded in Moscow[6] and were governed by Russian law (clause 6.1 and 9.2).

(iii)    On 26th November 2003, Richard, Gregory and Ferenco purportedly concluded an agreement with Sibneft and Yugraneft under which they each undertook to assume the obligations of Carroll, Shaw and Tranquillo under the Security Agreement. These included the obligation to restore the 49% interest to Yugraneft on repayment of the loan. Mr Matevosov signed on behalf of Yugraneft.

(iv)    On 26 November 2003, there was an EGM of Sibneft-Yugra.   The meeting approved the amendment of the Charter and Articles of Association of Sibneft-Yugra recording the transfer of the participation interests to the second set of offshore companies. Clause 3.2. was now to provide that Sibneft had a nominal share value of 260,000 roubles and that that constituted 50% of the authorised capital; and appropriate amendments were made for the second set of offshore companies each to have shares of 85,000 roubles constituting 16.34% of the capital.

61.    Yugraneft's evidence is, as appears to be the case, that none of the documentation which brought about or records the dilution of its interest in Sibneft-Yugra was signed by anyone who was independent of entities associated with Mr Abramovich; and that all those who acted for the six offshore companies were employed by or connected with Millhouse.

62.    Sibneft's accounts for the year ending 31st December 2003, issued in mid  2004, contain the following note:

*"In December 2003 the Company increased its share in Sibneft-Yugra up to 99% for the nominal consideration"*

There was no reference to any equity of redemption (or equivalent) existing in Yugraneft's favour until November 2004 under the agreement of 26th November 2003.

63.    Between December 2003 and April 2004 Sibir learnt of the dilutions.[7] In December 2003 an employee of Ernst & Young, who were Sibneft's auditors, hinted to Mr Betsky of Sibir that the dilutions may have occurred and followed that up with an e-

---

[6] See Mr Kotov's criminal complaint at p.8 section 5.
[7] See Mr Cameron's Affidavit in the BVI at paras 65 – 66.

mail of 6th December which suggested that he should check the ownership status of Sibneft-Yugra. By April 2004 due diligence by the City of Moscow in the course of negotiations for a joint venture with Sibir had revealed what had occurred. According to Mr Davidovich's evidence, in April 2004 Yugraneft started publicly to allege that it had been defrauded by Sibneft and made clear that it had no intention to repay the loans.

64.    On or about 28th September 2005 the majority shareholding in Sibneft held by  Mr Abramovich's Cypriot offshore companies was purchased by Gazprom, the Russian state oil company for about $ 13.1 billion and renamed "*Gazpromneft*": see paragraph 129 below. About $ 2.9 billion of the proceeds was invested (indirectly) in a Russian based steel company called Evraz and a Jersey company called Highland Gold, whose business is in Russia: see paragraph 132 below.

*The disputed area*

*The defendants' contentions*

*The Co-Financing Agreement*

65.    According to Mr Davidovich[8] Mr Chalva Tchigirinsky had approached him in the spring of 2002 with a view to changing the financing arrangements for Sibneft-Yugra. He wanted to reduce the interest rate that Sibneft-Yugra was then paying on Sibneft's loans of 17% in order to improve the valuation of the company and thus allow Yugraneft to realize an earlier return from the project.  In April and May 2002 a series of meetings took place at Mr Tchigirinsky's offices in Moscow. Mr Tchigirinsky proposed that Yugraneft should become a 50% co-financier of the project and that both parties would provide finance to Sibneft-Yugra at the lower rate of 6%.  A record of the timing of telephone calls from the Representative Office to Mr Tchigirinsky from October 2002 onwards has been produced which, according to Mr Davidovich, represents calls in relation to the second dilution. On Mr Tchigirinsky's account these calls are likely to have been dealing with a dispute about the Moscow Oil Refinery (see paragraph 72 below).

*Sibneft agrees to lend to Sibneft-Yugra and Yugraneft becomes a debtor to Sibneft*

66.    Towards the end of May 2002 it became apparent that Mr Tchigirinsky would be unable to obtain financing to put the contemplated arrangements into effect. Accordingly, the parties agreed that Sibneft would, for an interim period until Yugraneft could borrow the necessary funds to lend to Sibneft-Yugra, itself provide 100% of the financing to Sibneft-Yugra at 6% interest and Yugraneft would owe Sibneft 50% of the money lent ("the Co-Financing Agreement"). In order to secure the loan from Sibneft to Sibneft-Yugra (for which Yugraneft was responsible) Mr Tchigirinsky agreed to transfer Yugraneft's participation interests in Sibneft-Yugra to Sibneft (or companies acting on its behalf) subject to a right of repurchase by Yugraneft if its borrowing was repaid within a year. In particular, Sibneft (or a company acting for it) would enter into a new loan agreement at 6% in return for the transfer to it of Yugraneft's participation interests in Sibneft-Yugra.

---

[8] This appears first from his statements in the BVI proceedings.

**67.** The Security Agreement of 28th September 2002 was part of the agreed arrangements. What happened at the EGMs put into effect the agreements that had been reached in April and May 2002. The first set of offshore companies acting on behalf of Sibneft entered into agreements to provide loans to Sibneft-Yugra of up to $ 38 million and did provide about $ 33.8 million. They received their participation interests by way of security. This was new money. By an amendment dated 17th February 2003, the Loan Agreement of 25th July 2001 was amended so as to provide for interest at 6% instead of 17%.

**68.** The defendants rely, by way of corroboration of their case upon (i) certain documents evidencing payments which purport to show that the loans were made to Sibneft-Yugra's bank account in Russia; and (ii) the record of the timing of telephone calls between Mr Davidovich and Mr Tchigirinsky between October 2002 and August 2003, to which I referred in paragraph 65 above; (iii) an assignment agreement of 1st October 2003 whereby Shaw assigned its rights under its loan to Sibneft-Yugra to Sibneft and (iv) a payment order for the benefit of Shaw of $ 12.3 million, the value of the loan.

**69.** Yugraneft failed to repay and after various warnings and extensions of time Yugraneft lost the opportunity to repurchase its interest in Sibneft-Yugra.

*Yugraneft's contentions*

**70.** Yugraneft contends that what has happened is nothing less than fraud on a grand scale. Its 50% interest in Sibneft-Yugra has been reduced to less than 1% by meetings called by individuals in the Sibneft/Abramovich camp giving notice to other individuals in the same camp but not to anyone at Yugraneft (or elsewhere) who was in the Sibir camp. In colloquial terms almost all of its interest has been stolen from it.

**71.** Yugraneft and Mr Tchigirinsky deny that the Co-Financing agreement was ever entered into, and assert that the Security Agreement of 28th September 2002 is a sham or a "*concoction*" as was the transfer agreement to the second set of offshore companies. They contend that it is incredible that the alleged co-financing agreement with Mr Davidovich has no documentary record; that there is no correspondence about the Co-Financing agreement or the Security Agreement (nor trace of the fax allegedly sending it to Mr Tchigirinsky); nor any documentation recording Yugraneft's acceptance of the issue of the new participation interests. Nor is it credible that Yugraneft should risk the foreclosure of the whole of its extremely valuable interest in Sibneft-Yugra (as to which see paragraph 128 below) in support of a loan of much less than the value of that interest. It was also odd to have removed all the Sibir nominee directors from Sibneft-Yugra at the first EGM, a matter not said to have been discussed with Mr Tchigirinsky. In addition, after the dilutions came to light Mr Korsik of Sibneft made a number of statements suggesting that they were part of some "*broader set of agreements*" (never explained) without indicating that they were in effect the enforcement of security for a loan.

**72.** In April 2004 Mr Abramovich is said to have told Mr Yuri Luzhkov, the Mayor of Moscow, that the reason he had diluted Yugraneft's interest in Sibneft-Yugra was to repay Mr Tchigirinsky for his having blocked attempts by Sibneft in 2001 and 2002 to take over the Moscow Oil Refinery.

*10th September 2002*

73.    Yugraneft has produced a document dated 10th September 2002 which purports to be the minutes of a meeting of the Board of directors of Yugraneft. Mr Tchigirinsky is described as being in the Chair and the other Board Members present are said to be Mr Cameron and a Mr Tolley, who is an Australian and who was the technical director, but not on the board, of Yugraneft from April 2000 to April 2004.   Mr Cameron is recorded as saying that the company needed a new Director General and recommended Mr Mark Tolley. Motions were carried to remove Mr Matevosov from his position as Yugraneft's Director General from 10th September and to elect Mr Tolley to that position as from that date and to sign an agreement with him.

74.    Mr Cameron's evidence both in the BVI and these proceedings is that the meeting took place as recorded in the minute. Mr Tchigirinsky's evidence in the present proceedings is to the same effect.   Mr Kotov, in one version of his complaint to the Russian Senior Investigator, which may well be an earlier draft (see paragraphs 133-4 below) also suggested that Mr Matevosov was informed of the decision to remove him but "*kept on deliberately acting as if he were the sole executive body of Yugraneft*".   The allegation that Mr Matevosov was removed as General Director at this meeting but continued to act as such was repeatedly made by Yugraneft in the Russian Courts in proceedings which I later describe.

75.    Mr Matevosov disputes this account of events, as does Sibneft. He denies that he was removed as General Director in September 2002.  His position has been upheld by a series of judgments in which the Russian Courts have ruled that Mr Tolley was never appointed as General Director of Yugraneft.  Those decisions were based on Mr Tolley's evidence before those courts.  On 5th July 2005 Mr Tolley gave oral evidence before the Khanty-Mansiysk Arbitrazh Court that he was never appointed as General Director, and that he had not been approached in relation to the General Director role until September 2003, when he was approached by Mr Cameron - a full year after the meeting which he is supposed to have attended and at which he was supposedly appointed. He has confirmed that evidence in a statement in these proceedings.

76.    In addition the Articles of Yugraneft provide that the quorum for a meeting of the Board is one half of the elected board members, of whom there were to be no less than 5. Accordingly the quorum would be at least 3. Mr Tolley was not a director at 10th September 2002, so that a Board consisting of Mr Tchigirinsky and Mr Cameron would have been unquorate.

77.    In their evidence in these proceedings Mr Cameron and Mr Tchigirinsky state that they held the 10th September meeting, at which Mr Tolley was present, in Mr Cameron's office but thereafter took no steps to implement the decision in order not to declare war on Sibneft. According to a letter from Ashurst, who represented Sibir in the BVI, Mr Tolley told him in 2005 that he recalled being asked *in 2002* if he was prepared to take the position of General director but failed to recall the meeting even when prompted by Mr Cameron telling him that it had been "*informal in nature*" and had taken place when Mr Tchigirinsky "*popped in*" to Mr Cameron's office.

*The position of Millhouse*

78.    Yugraneft claims that Mr Davidovich of Millhouse was, with Mr Matevosov of Sibneft, one of the key perpetrators of the fraud; and that Mr Tenenbaum must have been aware of it.

79.    Millhouse was not a defendant in the BVI proceedings to which I refer in paragraphs 96 ff below. Yugraneft claims that it has become apparent since then that Millhouse's role was very much more than that of a service company dealing with the personal interests of Mr Abramovich and others. Instead it was, for all relevant purposes, Mr Abramovich's agent. Millhouse's role  became clearer, it is said, partly as a result of documents disclosed in the course of the BVI proceedings, which revealed that the individuals who were officers of, or represented, the offshore companies were Millhouse personnel, and partly as a result of further researches, including extensive company searches, where that has been possible.

80.    These have revealed more about the activities of Millhouse personnel and also, Yugraneft claims, that the offshore companies are investment vehicles of Mr Abramovich. Since, until Millhouse LLC was formed, Millhouse was legally responsible for the acts of all Millhouse employees both in Russia and England, the discovery of the extent of Millhouse's role is relied on by Yugraneft as materially altering the centre of gravity of the case, which thereby acquired a markedly more English flavour, particularly insofar as it points to the involvement of Mr Tenenbaum.

81.    The product of these researches is complex. I set out in Appendix 3 to this judgment a summary of some of what Yugraneft claims the researches show.

82.    The upshot is that there appears to be a web of companies, largely in the BVI and Cyprus, which hold various interests, personal and business, some very sizeable, of which Mr Abramovich is, or would appear to be, the ultimate owner. The Cypriot companies are ultimately owned, so far as the legal title is concerned, by Deloittes's or Mr Demetris Ioannides, who was a director of Meritservus Ltd and Meritservus (Trustees) Ltd, two Deloitte Cypriot service companies, or by other Meritservus personnel. Many of the companies in the web have directors who are officers or members of staff of Millhouse companies, or senior members of Meritservus' management team. The holders of the interests and the groupings change from time to time.

83.    Ferenco was owned either by Esios Investments Ltd or Finservus (Trustees) Ltd, two Deloitte service companies, who presumably held their interests for Mr Abramovich. The owners and directors of the four BVI offshore companies do not appear on any public register. The ultimate legal owners of Tranquillo appear to be two Panamanian lawyers. But it seems likely that both sets of offshore companies are Mr Abramovich's direct or indirect investment vehicles.  For the purposes of this application the defendants  are prepared to proceed on the basis that the six offshore companies were beneficially owned by Mr Abramovich although, in respect of the second set, clearly within the Sibneft group[9].

84.    Millhouse appears to have had (and was certainly understood to have had) an asset management role on behalf of Sibneft shareholders in relation to a number of very

---

[9] Until the proposed merger with Yukos in 2003, Mr Abramovich had a 92% interest in Sibneft,

sizeable Russian transactions. Its representatives sat on the boards of companies such as Aeroflot and handled the sale of Sibneft to Gazprom. Whether or not it, itself, as opposed to Mr Abramovich or someone else, controlled the offshore companies, Mr Matevosov and Mr Davidovich, using Millhouse personnel, were able to orchestrate the two EGMs and the transfer of the Sibneft-Yugra participation interests from the first to the second set of offshore companies.

85.    The exercise casts, however, only limited light on the extent to which the activities of Millhouse employees in *London*, such as Mr Tenenbaum and Mr Paul Heagren, a British chartered accountant, as opposed to the activities of its employees in *Moscow*, at the Representative Office, such as Mr Davidovich, played any active role at any material time in relation to (a) Sibneft, (b) the offshore companies, or (c) the sale of Mr Abramovich's interest in Sibneft to Gazprom.  The matters principally relied on by Yugraneft to establish a London link are (see Appendix 3) firstly the fact that Mr Tenenbaum, previously of Sibneft, was Managing Director of Millhouse, which was an English company, and a close business associate of Mr Abramovich, and that Mr Shvidler settled in London in 2004.   Secondly, it is said that the six offshore companies are investment vehicles for Mr Abramovich, which were intrinsically likely to be administered and dealt with offshore – where Mr Abramovich's interests would be sheltered – and could easily be dealt with by a relatively small English staff under the command of Mr Tenenbaum, Mr Abramovich's trusted confidant.

86.    The directors of Sibneft-Yugra who replaced Mr Cameron and others at the first dilution meeting included Millhouse people. Millhouse people were involved as officers and representatives of the two sets of offshore companies. Millhouse then handled the sale of Mr Abramovich's 72 per cent shareholding in Sibneft and the reinvestment of part of the proceeds in Evraz. The investment in Evraz was made by a BVI company called Greenleas International Holdings Ltd taking a 48% interest in Lanebrook Ltd, an English company, which had an 82.61% interest in Evraz. Mr Shvidler and Mr Tenenbaum went on the board.

87.    As a result there are, according to Professor Sergeev, the Russian law academic instructed by Yugraneft, a raft of claims in Russian law (subject to the Russian time bar point) against Millhouse: see paras 31 ff of his first report.  There is also, he contends, a claim against Mr Abramovich in delict and in unjust enrichment under Article 1102 of the Civil Code which obliges

> " a person who has acquired .. property (the recipient)
> ...without grounds, established by the law, other legal acts or a
> transaction, at the expense of another person (the victim) shall
> be obliged to return to the latter the property acquired".

"*Property*" is widely defined and interpreted so as to cover even the use of a building of a claimant or the value of work carried out on the defendant's building. He also expresses the view (which Mr Rozenberg, the Russian law practitioner instructed by the defendants, does not share) that, logically (there being no authority), it is immaterial that there are a number of steps between the wrongdoing in question and the enriched party so long as the trail from the claimant to the defendant establishes that the latter has been enriched without legal basis at the expense of the former. That could apply to Mr Abramovich's receipt of the proceeds of the sale of Sibneft shares.

*Previous proceedings        Overview*

88.     Yugraneft and Sibir between them have brought three previous sets of proceedings (i) in the BVI; (ii) before the Russian arbitrazh courts; and (iii) before the Russian criminal investigation authorities.

*Russian civil proceedings*

89.     From May 2004 onwards Yugraneft has launched a series of proceedings in Russia challenging, in various different ways, the lawfulness of the increases in the charter capital of Sibneft Yugra at the two EGMs and the resulting diminution in Yugraneft's share in Sibneft-Yugra.  Despite some initial success they have not succeeded in establishing either that the meetings were unlawfully convened or that Mr Matevosov or Mr Davidovich acted in an unlawful manner.

90.     I set out in an appendix to this judgment (Appendix 1) the details of the various actions.  I summarise the upshot of those proceedings below.

*Khanty-Mansiysk*

*Defendants: Sibneft-Yugra, Carroll, Shaw & Tranquillo*

91.     Yugraneft brought separate actions in or about May 2004 in the Arbitrazh Court of the Khanty-Mansiysk Autonomous District against Sibneft-Yugra and against each of Carroll, Shaw and Tranquillo.  Yugraneft's claim against Sibneft-Yugra was that the resolutions passed at the EGMs were invalid because they were not attended by authorised representatives of Yugraneft which had only learned of the increase in charter capital on 12th March 2004.  Yugraneft filed the alleged minutes of 10th September 2002 in support. Between May 2004 and November 2005 the case went up the appellate ladder twice, firstly from the Arbitazh Court to the Arbitrazh Appeal Court and then to the Federal Arbitrazh Court of Western Siberia, which ordered a new trial; and then up the same ladder but including this time a regional appellate court immediately below the Federal Arbitazh Court. The result was a conclusion that Mr Matevosov had continued as General Director of Yugraneft after 10th September 2002 and was its duly authorised representative at the EGMs and that it was not established that Mr Tolley was ever appointed General Director of Yugraneft.

*Moscow*

*Defendants: Gregory and Tranquillo*

92.     In 2004 Yugraneft first brought an action in the Moscow Arbitrazh Court against Gregory and Tranquillo. This case went from the Arbitrazh Court to the Arbitrazh Appeal Court to the Federal Arbitration Court. The Courts held that Yugraneft's pre-emption rights had not been violated, as Yugraneft alleged, by the issue of the capital of Sibneft-Yugra to Gregory and Tranquillo that Mr Matevosov had continued as general director of Yugraneft until 4th March 2004 and had acted as such when signing the notices on 29th October 2003.

*Defendants: Ferenco and Shaw*

93.    Yugraneft next brought a claim in the same court against Ferenco and Shaw alleging that the sale by Shaw to Ferenco was a breach of Yugraneft's pre-emption rights because Mr Matevosov had been dismissed and in any event his acts were not in accordance with the interests of Yugraneft. This case also went up the curial ladder. Yugraneft was successful in May 2005 when the judge accepted that Mr Matevosov had been dismissed but, with the production of Mr Tolley's statement of 23rd June 2005 the appeal court, accepted that he had not been replaced by Mr Tolley and that Yugraneft's rights had not been violated; and this was upheld by the Federal Court.

*Defendant: Richard*

94.    Yugraneft brought a further claim against Richard alleging that its pre-emption right to purchase was violated by the disposition by Caroll of its stake in Sibneft-Yugra. This was rejected at first instance and on appeal on the ground that Yugraneft had not produced original minutes of the 10th September 2002 meeting and the documents showed that Mr Matevosov had continued to act as managing director thereafter.

*Defendants: Sibneft-Yugra and the first set of offshore companies*

95.    At some date in 2005/6 Yugraneft commenced an action against Sibneft-Yugra, Sibneft and the first set of offshore companies alleging that the increase in the authorised share capital of Sibneft-Yugra at the EGMs did not take place in that the additional contributions were not provided. This claim also failed.

*The BVI proceedings*

 *The issue of proceedings*

96.    On 11th July 2005 Sibir, then advised by a different legal team, issued proceedings in the High Court of the BVI against (a) the six offshore companies; (b) Sibneft and (c) Mr Abramovich. Sibir claimed in the body of the Statement of Claim that Sibneft (together with Mr Abramovich) and the offshore companies were liable to account to Sibir for the value of shares in Sibneft-Yugra with a nominal value of 255,000 roubles (in the case of Sibneft and Mr Abramovich) and 85,000 roubles (in the case of the offshore companies) which they had acquired as a result of the improper dilution of Sibneft-Yugra's capital.

97.    Sibir alleged that Sibneft had breached its fiduciary duties to Sibir under what was described as "*the joint venture agreement*" (JV), i.e. the agreement of 23rd November 2000, by instituting and orchestrating the two EGMs and the subsequent transfer of the shares in Sibneft-Yugra to the second set of offshore companies, and that Sibneft had acted in bad faith and fraudulently for its own benefit. Sibir relied on the fact that the EGMs took place at Sibneft's offices, that Mr Matevosov was a vice-president of Sibneft who acted on its instructions and that Mr Davidovich was, so it was alleged, acting on Mr Abramovich's instructions. Reliance was placed on the fact that he was an associate of Mr Abramovich and a director of the Moscow representative office of Millhouse, which was said to be the company through which Mr Abramovich owned his beneficial interest in the majority of the capital of Sibneft.

98.    Mr Abramovich was said to have dishonestly procured, incited, or assisted Sibneft's breaches of fiduciary duty: paragraph 37.2.

99.    The six offshore companies were said to have received their interests in the charter capital of Sibneft-Yugra knowing that those interests represented the proceeds of Sibneft's breaches of its fiduciary duties to Sibir. The first set of offshore companies was said to have parted with its interest to the second set for no consideration and the second set to have received them as a volunteer.

100.    The relief claimed was an order against the offshore companies to account to Sibir for the value of their 16.34% interests in Sibneft-Yugra, and that Sibneft and Mr Abramovich account for 49%.

*The freezing order*

101.    When the Claim Form and Statement of Claim were issued Sibir applied without notice for various forms of injunctive relief against the second set of offshore companies, Sibneft and Mr Abramovich (including in their case a freezing order), and for permission to serve the non BVI defendants outside the jurisdiction. On 13th July 2005 Sibir was granted interim relief against the defendants, including the appointment of a receiver of the 85,000 roubles interests of the second set of offshore companies in Sibneft-Yugra and a freezing order against Sibneft and Mr Abramovich for $ 1 billion. Permission was given to serve the non BVI defendants out of the jurisdiction.

102.    In the affidavit in support sworn by Mr Cameron and the accompanying skeleton argument  Sibir made plain that they claimed that the dilutions of Sibir's interest in Sibneft-Yugra was a "*truly egregious*" fraud committed by Sibneft, which had abused the power conferred on it by the joint venture agreement; that Mr Abramovich instigated the fraud with Sibneft;  that in resolving to increase Sibneft-Yugra's capital Messrs Matevosov, Davidovich and Korsik were acting on behalf of Sibneft and also for Mr Abramovich, with whom they were closely associated.  The six offshore companies were said to be Sibneft's nominees, Sibneft in turn being controlled, and, for the most part, beneficially owned by Mr Abramovich.

103.    At this stage Sibir appears to have been under the impression that the second set of offshore companies had received share certificates in Sibneft-Yugra somewhere. In its skeleton argument Sibir asserted that the result of the dilutions was that Sibneft increased its interest in Sibneft-Yugra, and that, as it had been publicly admitted that it was the beneficial owners of the shares held (sic) by the second set of offshore companies, all three were nominee vehicles owned and/or controlled by Sibneft.

104.    Sibir contended that the law governing the receipt based claims against the second set of offshore companies was the law of the country where they received the shares. It stated that it was unaware where that was but invited the BVI court to apply BVI law either on the presumption that any foreign law was the same as BVI law or as the law of the forum. In respect of the first three offshore companies, Sibneft and Mr Abramovich, Sibir suggested that the claims (in knowing assistance and against Sibneft in contract) were governed by Russian law.

105.    The claims against the first set of offshore companies were said in the skeleton to be fault based claims[10] in relation to which the court should ask itself what was the proper law of the relationship between the claimant and the defendants, whether under that law the claimant would have an actionable claim against the defendants in respect of breach of duty and whether that duty would be regarded by the BVI courts as giving rise to a liability to account as a constructive trustee. Sibir was content to assume that Russian law applied to the relationship between Sibir and the first set of offshore companies, Sibneft and Mr Abramovich, and asserted, relying – at that time – on the expert evidence on Russian law of Dr Eva Micheler of the LSE that Sibir had an actionable claim under Russian law, including a claim in delict under Article 1064[11] against those defendants.

106.    Sibir accepted that, if Sibneft could establish (a) that the profit sought to be claimed from Sibneft was reflective of the loss suffered by Yugraneft and (b) that Yugraneft had available to it, both in law and in fact, a cause of action against Sibneft to recover the loss, then Sibir could not bring its present claim. But it contended that Yugraneft was prevented from pursuing its claim because Sibneft was attempting in Russia to gain control of Yugraneft, then in bankruptcy, relying on acknowledgments of debts executed by Mr Matevosov at Sibneft's behest.  If those attempts failed, Yugraneft could be joined as a co-claimant to the proceedings, thereby affording a complete answer to the defence.

*The expert evidence*

107.    Sibir then filed further expert evidence from Professor Butler, a Professor of Law at Pennsylvania State University and Professor Emeritus of Comparative Law at the University of London. The defendants filed evidence from Mr Mikhail Rozenberg of the Moscow office of Chadbourne & Park. The former is a distinguished expert on, and the latter a distinguished practitioner of, Russian law. Mr Rozenberg has also produced four expert reports for the purpose of these applications.

108.    Mr Rozenberg expressed the view in his first affidavit of 12th August 2005 that the JV agreement was not binding in Russian law and that *no contractual claim* could be made under it. He thought that the only potential tort claim was a claim by Yugraneft or Sibir (in which case the damages would be awarded to Yugraneft) against Mr Matevosov or his nominee as the actual tortfeasor, and those who facilitated or induced the fraud who might be criminally liable as conspirators and might also be held liable for compensation, if conspiracy was established. But this could only be done in the course of or after criminal proceedings and on the basis of a criminal conviction.

109.    Professor Butler took the place of Dr Micheler, who had produced a short report on 7th July 2005 under time pressure. He  expressed the view that the JV agreement was *contractually binding* in Russian law and that Sibir could claim against Sibneft under it.  He also expressed the view that, in the absence of any development of the law on Article 1064 so as to embrace recovery for economic loss, neither Sibir nor Yugraneft

---

[10] Despite the fact that the first set of offshore companies had received the 49% interest in Sibneft-Yugra and then transferred it to the second set, the skeleton did not advance a receipt based claim against them, whereas the Statement of Claim did.

[11] *"Harm caused to the person or property of an individual, and harm caused to the property of a legal entity shall be subject to full compensation by the person who caused the damage".*

had any claim in tort against any of the defendants, since Sibir's claim was not for physical damage. Nor was there "*on present facts*" any claim by Sibir or Yugraneft against Mr Matevosov or Mr Davidovich. Apart from proceedings alleging irregularities in the resolutions passed at the EGMs the only claim was by Sibir against Sibneft under the JV agreement.

110. Mr Rozenberg  agreed in his responding affidavit that tortious claims by Sibir and Yugraneft  against the defendants  would fail for the reasons expressed by Professor Butler i.e. because the claim was for economic damage (para 42 and 51). But he also said that Yugraneft might have a legitimate claim against Mr Matevosov for damages based on (inter alia) Article 1064 (para 50). These propositions appear inconsistent. In the present proceedings Mr Rozenberg repeats his agreement with Professor Butler that Yugraneft has no claim against any of the defendants, or Mr Matevosov or M Davidovich. He referred to paras 52, 51 and 54 of his second affidavit.

111. No one addressed the possibility of a claim in unjust enrichment under Article 1102.

112. The BVI defendants sought to strike out the proceedings on the ground that the claim against them was bad and that Russia was clearly the more appropriate forum. The other defendants sought to set aside service of the Claim Form and the Statement of Claim on the ground that the court had no jurisdiction to hear it or should not exercise any jurisdiction that it had.

113. By this time it had become apparent that there were no physical shares in Sibneft-Yugra. The participation interests were issued, held, recorded, varied, transferred and received in Russia where the constitutional documents and the variations thereof were held. In its skeleton argument for the hearing in September 2005 (paras 45 – 48) Sibir now argued (influenced, no doubt, by its realisation of the position) that the claim in *knowing receipt* against the second set of offshore companies should be determined by whether the court of the forum regarded the conduct of the defendant as unconscionable (rather than the law of Russia where the proceeds of the breach were received – para 46) ; and that the court's conclusion on knowing receipt should be the same as its conclusion on knowing assistance.  It submitted that there should be no stay of the claims against the BVI companies because there was no claim against them in Russia.

114. At the hearing Sibir asserted, in the words of the judge, that all of its claims against the offshore companies were "*consistent with its pleaded case in "knowing receipt"*"", and that the Court's conclusion in knowing receipt should be the same as in regard to dishonest assistance. It was not necessary to support a claim in dishonest assistance that the assistance was actionable under the applicable foreign law, and it should not be necessary in knowing receipt either.

*The first instance judgment*

115. Hariprashad-Charles, J (hereafter Charles, J) held that the causes of action in knowing receipt against all the BVI defendants, which, as she rightly observed was the claim pleaded, were governed by Russian law. She considered the jurisprudence relating to the English law choice of law rules (which BVI law follows) for claims both in knowing receipt and dishonest assistance.  She rejected the submission that both claims were governed by BVI law as the *lex fori*. She found that the claims in

knowing receipt were governed by Russian law as the law of the obligation because Russia was the place where the relevant property – the participation interests - was held, received, transferred and existed. As Aldous, LJ, said in *Macmillan Inc v Bishopsgate Investments Ltd* [1998] 1 WLR 387 "*shares are property in the nature of a chose in action which is immoveable in the sense that it remains at the place of the company's incorporation*". Since there was, as was common ground, no claim in Russian law against the BVI defendants they were entitled to judgment.

116.    In respect of dishonest assistance the judge found that:

> "*115    Sibir is wrong to suggest that the principle of double actionability does not apply to equitable claims. On the contrary, whilst the Court of Appeal rejected "full blown double actionability", it did not tenuously suggest that "double actionability" did not apply. The judgment in Grupo Torras is wholly inconsistent with Sibir's current position.*
>
> *116    The result of applying the rule is that Russian law must be the proper law of the dishonest assistance claim, as it was entirely in Russia that the assistance was rendered. It is not denied that in Russia the BVI defendants are under no civil liability.*"

117.    Despite the phraseology of paragraph 116 I take the judge to be saying that double actionability applied and that, therefore the claim had to be actionable under both English and Russian law.

118.    Having held that the knowing receipt and dishonest assistance claims were governed by Russian law, the judge found, in the light of the common ground, that they all failed.  That left the claim against Sibneft as the only claim with any real prospects of success in Russian law against any of the defendants.  Since the only arguable claim was against Sibneft under a contract governed by Russian law and Sibneft was not a BVI resident there was no 'gateway' to jurisdiction against any of the foreign defendants (including Mr Abramovich and Sibneft) and so service against them was set aside. Permission to serve out had been sought on the basis that the non BVI defendants were necessary and proper parties to a claim against the BVI defendants.

119.    In addition, Charles J considered whether, if there had been a good cause of action against the BVI defendants, and hence jurisdiction to hear the claim against the other defendants, the Court should, in any event, stay proceedings on the grounds of *forum non conveniens*.  Sibir maintained that Russia was not the appropriate forum because under Russian law neither it, nor Yugraneft, had any claim against anyone except Sibneft.  It was unjust that it should be forced to bring proceedings in a jurisdiction where it had no arguable case against 7 out of the 8 defendants.

120.    The judge rejected the contention that this meant that the claims should not be brought in Russia.  She held that the case was "*overwhelmingly concerned*" with Russia. Accordingly, she would, in any event, have stayed the proceedings on the basis that BVI was *forum non conveniens*.  As it was she dismissed the claims against the BVI defendants and set aside the order giving permission to serve the foreign defendants.

*The appeal*

121. Sibir appealed. In its skeleton argument on appeal it relied on the fact that all the acts giving rise to the claims pleaded against the BVI defendants took place in Russia and that under Russian law none of the BVI defendants was under any civil liability to Sibir.

122. The Court of Appeal of the Eastern Caribbean dismissed the appeal. It found that the claims in knowing receipt against the BVI defendants were governed by Russian law and, as was common ground, would therefore stand no chance of success. By this stage the claims against the BVI defendants were put only in knowing receipt, as pleaded[12].

123. The Court found that Russian law applied (and not BVI law as the law of the forum, as Sibir had claimed) on the basis that the proper law of the obligation to restore an enrichment  obtained at someone else's expense was the law of the country with which the obligation had the closest and most real connection.

124. As to that Barrow, JA, said (para 24):

> "In the instant case all the connecting factors are with Russian law.  These are listed by the Respondents as follows:
>
>  – Russia is the country where the enrichment (in the sense of both immediate receipt and of the place of enjoyment of the ultimate benefit) took place;
>
>  – Russia is the country where the Claimant suffered its alleged loss (where its participation interests were allegedly diminished);
>
>  – Russia is the country of habitual residence and centre of operations of both the Claimant (which does business only in Russia) and all of the Defendants (all of which operate solely in Russia and have Russian directors);
>
>  – Russia is the country where any allegedly fiduciary relationship (or its Russian equivalent) was created and Russian law was the law governing any such relationship (i.e. by virtue of the alleged JV Agreement and/or the appointment of Matevosov as director of Yugraneft);
>
>  – Russia is the country where any original "constructive trust" or "equity" (or its Russian equivalent) arose (by virtue of the alleged breach of the alleged JV Agreement in Russia);

---

[12] The appellant's argument on appeal focused on the dismissal of the claim against the BVI defendants (or the stay that would have been granted in the alternative) – I infer upon the footing that, in the event of success, the judge's order setting aside her previous order giving permission to serve out would, itself, be set aside.  The question as to the law of dishonest assistance (directly applicable to Mr Abramovich) was subsumed by the appellants into their argument on the law applicable to knowing receipt because they said that the lex fori was applicable to a claim in knowing assistance, as the law of the court which judges unconscionability, and that the same should apply to knowing receipt.

> *– Russia is the country where the original fiduciary relationship (or its Russian equivalent) was alleged to have been breached (by virtue of the alleged breach of the alleged JV Agreement);*
>
> *– Russia is the country where the "participation interests" were issued and hence where the disposal and loss was allegedly caused;*
>
> *– Russia is the country of incorporation of the company in respect of the alleged loss of whose participation interest the Claimant seeks restitution (Sibneft-Yugra is Russian company, as is Yugraneft)."*

125.   The Court concluded that:

> *"……the situation in the instant case is as uncomplicated as clarity could desire. As shown by the respondents' listing of connecting factors, <u>all</u> connections are with Russia. …In the instant case there are no factual circumstances and particular issues that could possibly permit the application of any other law but Russian law. It seems clear to me that whatever reference point may be chosen, the law that has the closest connection (indeed, any connection) with the claim or the issue is Russian law."*

*The sale to Gazprom*

126.   In about June 2005, representatives of Gazprom (in particular, Alexei Miller, its CEO) approached Mr Abramovich in Moscow with a view to Gazprom purchasing the majority shareholding in Sibneft (amounting to 72.663%) held by the five Cypriot companies referred to in paragraph 129 below.  The detailed negotiations for the sale were conducted in Russia, led by Mr Davidovich for the sellers, and Mr Chiuchenko, a member of Gazprom's board and the head of its legal department for Gazprom. Mr Shvidler was also involved. The price was over $13 billion. Yugraneft claims that Millhouse *in London* organised and concluded the contract for the sale. There is nothing that amounts to evidence to that effect and the evidence of Mr Abramovich, Mr Davidovich, Mr Matevosov, Mr Shvidler and Mr Tenenbaum is to the contrary. There is also no evidence that the sale was prompted by the dispute about Sibneft-Yugra.

127.   According to the evidence of Mr Davidovich, as a result of the ongoing legal dispute between Sibneft and Yugraneft over Sibneft-Yugra, no consideration was paid by Gazprom for the disputed participation interests in Sibneft-Yugra and, correspondingly, no warranties were given by the sellers. This is   corroborated by a valuation by Citigroup of 27th September 2005 presented to Gazprom. This assumes a net holding of 50% only.

128.   Whether it is correct that no part of the consideration was, or should be treated as being, attributable to the disputed interest is debatable. The total Priobskoye field was described by one analyst in June 2008 as the "*pearl of Western Siberia*" and the South

field, which is about 40% of the field, was producing 125,000 bpd in 2007. In 2006 Sibneft-Yugra was reporting a post tax profit of about $ 138 million. According to Mr Cameron the value of Yugraneft's interest in Sibneft-Yugra is $ 2 billion. In June 2004 Sibir referred to a valuation of $ 115 million, which is said not to reflect the true commercial value on the grounds that it was made in the context of a proposed joint venture between Sibir and the City of Moscow to establish the Moscow Oil and Gas company which would be an integrated production, refining, and distribution company. The $ 115 million is said to have been artificially low because it was prepared on a "*formalistic basis*" involving taking a discretionary view of various different valuation methods. One of those focused only on the acquisition cost of licences, which was relatively low; and another element was discounted cash flow, which assumed lower production figures than have been achieved and aggressive discounting of the income stream. Sibir was content not to argue for a realistic commercial value in order not to depress the City's proportionate interest in the venture to such an extent that it was put off embarking upon it: see Mr Cameron's statement of 26th June paras 3-8.

129.   The agreement between the five Cypriot companies and Gazprom Finance S.A. for the sale of the majority interest in Sibneft was concluded by a Sale and Purchase agreement dated 28th September 2005.  As is apparent from that agreement the Sibneft group included Richard, Gregory and Ferenco.  Those 3 companies are specified in Schedule 1 as subsidiaries of Sibneft. Gazpromneft, as Sibneft is now known, continues to hold through Richard, Gregory and Ferenco, the disputed participation interests in Sibneft-Yugra to this day.

130.   Charles J delivered judgment on 29th November 2005. The next day she considered and rejected applications for relief, pending the appeal, against the second set of offshore companies, restraining them from disposing of their interest in Sibneft-Yugra. No application was made to restrain any disposition of the proceeds of sale of Sibneft.

131.   Some of the proceeds of the sale have been invested in acquiring a substantial interest [about 37%] in Evraz Group S.A. ("Evraz") a Luxembourg company traded on the LSE with interests in Russia and North America for about $ 2.9 billion and an interest in Highland Gold, a Jersey company, that only does business in Russia, where its gold mines and management are, for about $ 400 million.

132.   Mr Tenenbaum's evidence is that the proceeds of the sale of the Sibneft shares to Gazprom were paid to the Cypriot companies offshore and that the vast bulk of those proceeds has not been brought into England. However, monies received from Gazprom were paid into accounts with other monies in them, from which Millhouse was paid. The only transfers that he can recall falling within this category are payments made to Millhouse for services in the UK since October 2005, certain payments made in relation to property owned by or on behalf of Mr Abramovich and monies spent in the operation of Chelsea FC. The maximum amounts are about £ 13.2 million in the case of Millhouse, £ 247 million in respect of Chelsea, and £ 76 million on property. None of the monies are retained by Millhouse. The accounts from which Millhouse was paid appear to have been accounts of companies known as Aretino Holdings Ltd ("Aretino") and Calmera Trading & Services Ltd ("Calmera") (see paragraph 23 of Mr Heagren's witness statement and the accounts of Millhouse). Calmera and Aretino were in 2005 and thereafter owned by Finservus.

### The Russian criminal proceedings

*The complaint*

133. In September 2006 Mr Kotov, Yugraneft's liquidator, lodged a formal criminal complaint in Russia with the Office of the Public Senior Investigator of the City of Moscow. The complaint runs to just over 20 pages and attached over 70 supporting documents.   It alleges (according to one version) that Mr Abramovich, Mr Matevosov, Mr Davidovich and Mr Korsik:

> "*and other persons, guided by lucrative impulse, formed an organized group and by means of fraud and breach of trust caused an extensive property damage to the owner* [Yugraneft]".

134. This may well be an earlier draft (see paragraph 136 below). Another draft, which may be the final one, asserts that:

> "[*Mr*] *Matevosov, being the person forming the management functions in the commercial organisation Yugraneft...together with other persons forming the organised group, used his powers contrary to the lawful interests of the organisation with the aim of gaining profit and advantage for himself and other persons and to harm other person, which caused serious property damage to Yugraneft and its shareholders*"

135. The criminal complaint specifies a large cast of persons involved, wittingly or otherwise, in the affairs complained of, including employees or officers of Sibneft and Millhouse's representative office. So far as I can see they are all Russian.

136. Surprisingly Mr Kotov does not appear to have retained a copy of the complaint in Russian as filed. Two copies of the draft complaint were provided to Clyde's, one in Russian and one in English. The English version records that the Board decided to dismiss Mr Matevosov as director on 10th September 2002, and so informed him.  The Russian version does not. Mr Kotov believes that the Russian version is a later draft and that the complaint, as filed, did not contain that contention.

137. The complaint also stated that the members of the organised criminal group abused the trust of the board of Yugraneft, succeeded in getting Matevosov elected as managing director of the company and by so doing got the opportunity to manage Yugraneft operationally and to dispose of the funds entrusted to it. However, according to the minutes of the board meeting of 23rd  March 2001 when Mr Matevosov was appointed, Mr Cameron recommended his election and the only persons present were connected with Sibir. The complaint also suggests that the offshore companies never fulfilled their obligations to provide financing for Sibneft-Yugra. It attributes the conduct of the offshore companies to Sibneft.

138. The Russian authorities investigated the claim. This included a lengthy interview of Mr Tchigirinsky and Mr Davidovich (who submitted his own documents).

*The first ruling*

139.    On 9th February 2007, the Senior Investigator of the Department of Internal Affairs of the 2nd Department of the Investigation Division of GSU (Head Investigation Department) of GUVD (Head Department of Internal Affairs) of the City of Moscow, Lieutenant Colonel of Justice R.G. Fedorov, issued a "*Ruling on Refusal to initiate Criminal Prosecution*" ("the first ruling").

140.    The first ruling rejected the complaint.  The first ruling accepted that the increase in the charter capital in Sibneft–Yugra had been agreed between Mr Tchigirinsky and Mr Davidovich in order to provide security for the loan made by Sibneft in respect of the Claimant's share of the costs of development of the project.  It rejected Mr Tchigirinsky's evidence that there had been no such agreement.  The Senior Investigator also noted that the legitimacy of the increase in the charter capital had been upheld by the civil courts.  He decided that the files submitted by the Claimant were "*devoid of elements essential to the crimes stipulated*" in the criminal code.

141.    His conclusions included the following:

      (a)    No representative of Sibneft or its affiliated companies was a member of the Board of Directors of Yugraneft and there were no facts that showed any pressure on the part of Sibneft on the directors of Yugraneft.

      (b)    There was an agreement between Mr Tchigirinsky and Mr Davidovich that, in summary: (i) Yugraneft would take over 50% of the requisite investment needed by Sibneft-Yugra and Sibneft and Yugraneft would co-invest in the development of fields at a lower interest rate of 6%; (ii) in view of the insufficiency of Yugraneft's funds, Sibneft would cover the financing for an interim period and Yugraneft would repay 50% of the loans in due course and (iii) the 49% participation interest in Sibneft-Yugra was to serve as collateral security for the loans. Notwithstanding the claim of Mr Tchigirinsky that there was no such agreement, "*the events to follow, which were recorded in the documents under the verification, prove the fact that there had been such agreement between Mr Tchigirinsky and Mr Davidovich and that the members of Sibneft-Yugra and the persons under their control performed their activities strictly within the framework of this agreement*".

      (c)    It was "*confirmed by the results of the verification that the aggregate amount of the share participation in the authorized capital of Sibneft-Yugra granted to the creditors as a collateral security on the loans approximately equalled 49%, which was exactly planned through the initial agreement between Mr Davidovich and Mr Tchigirinsky*".

      (d)    "*The legality of the resolutions taken at the general meetings, the actions taken by Mr A.R. Matevosov to convene and hold the said meetings, his issue of powers of attorney on behalf of Yugraneft in favour of Mr Davidovich, the powers and authorities and actions of the other participants of the meetings and, in particular, those of Mr A.L. Korsik, have been confirmed by the rulings of the arbitration courts of*

the first and appeal instances in Khanty Mansiysk autonomous region and the Federal [State] Arbitration court of Western Siberian circuit."

(e)     "The legality of the sale of shares in the authorized capital of Sibneft-Yugra to [Ferenco], [Richard] and [Gregory] and also the legitimacy of Mr A.R. Matevosov's actions to waive the preemptive right to buy the shares for sale in the name of Yugraneft have been confirmed by the awards of the first and appeal instances of the [State] Arbitration court of the city of Moscow and the Federal [State] Arbitration court of the Moscow circuit."

(f)     "The holding of the 49% of the share participation in the authorized capital of LLC Sibneft-Yugra by the foreign company creditors was the result of the due performance of the civil law obligations and this was established in the arbitration court rulings."

(g)     "The General Director of Sibneft-Yugra Mr A.R. Matevosov acted within the range of the powers and authorities granted to him under the Company Articles of Association in the interests of the Company and its shareholders and provided for the production activity and the respective financing of its costs within the scope of the civil law obligations which are not prohibited by the Russian Federation law."

**142.**     A copy of the ruling was sent to Mr Kotov with an explanation of his right to appeal.

**143.**     On 20 June 2007 the Deputy Senior Investigator for Moscow rescinded the decree of refusal to initiate criminal proceedings and the evidence was returned to the Investigation Unit for further examination. The Senior Investigator re-opened his investigation and again interviewed Mr Davidovich.[13] He appears to have done so in response to enquiries from a member of the Duma.

*The second ruling*

**144.**     On 22 October 2007, the Main Internal Affairs Directorate issued a second decree of refusal to initiate criminal proceedings ("the second ruling"). This ruling reiterated the conclusions reached in the first ruling and provided further grounds for those conclusions. It noted the following:

(1)     "On the basis of further examination it has been established that the statement of the Arbitration Administrator of OAO "ANK Yugraneft", M S Kotov, that A R Matevosov employed his authority in conjunction with other persons against the lawful interests of that organisation and with a view to obtaining benefit and advantage for himself and others and causing harm to OAO "ANK Yugraneft" and its shareholders is

---

[13] Mr Davidovich's 1st witness statement at para 64.

> *not borne out by the documents and evidence obtained in the course of examination*".

> (2) "*Thus, the actions of A R Matevosov in concluding the loan agreements...were not unlawful in nature, do not represent the exercise by A R Matevosov of his authority against the lawful interests of OAO "ANK Yugraneft", and were not aimed at infringing the lawful rights and interests of that organisation and its shareholders*".

> (3) "*...an agreement did exist between D L Davidovich and Sh P Tchigirinsky, and [that] the stakeholders in OOO "NK Sibneft'-Yugra" and the individuals controlled by them acted in strict compliance with that agreement*".

> (4) "*... the actions of A R Matevosov, V V Tsitsinov and D L Davidovich, do not display the attributes of criminal offences as envisaged by Articles 201, 159, 160 and 196 of the UK RF* [the Russian Federation Criminal Procedural Code]*.*"

145.  Again the ruling was sent to Mr Kotov with an explanation of his right to appeal. Mr Kotov has not done so.

*Sibir petitions the English Companies Court*

146.  On 12 November 2007, Sibir (together with its subsidiary, MOGC) petitioned the Companies Court for an order winding up Yugraneft as an unregistered company in England and seeking the appointment of a provisional liquidator. Clyde & Co (Yugraneft's current solicitors) acted for Sibir for that application. The petitioners also applied for the appointment of a provisional liquidator.

147.  The application was supported by a Skeleton Argument and two affirmations of Mr Friedman of Clyde & Co, which exhibited a number of supporting documents including a report by Professor Sergeev of Saint Petersburg University.

148.  The skeleton and the affirmation in support made (amongst other things) the following points:

> i.  Sibir was the ultimate controlling shareholder of Yugraneft. Between it and its subsidiaries, Sibir owned 99.368% of the shares in Yugraneft;

> ii.  Sibir represented just over 71.5% (and, with related entities, slightly over 75%) of claims against Yugraneft eligible to vote in its liquidation;

> iii.  Sibir annexed a draft Particulars of Claim identical to the Particulars of Claim subsequently served in the Commercial Court proceedings which it proposed to issue in England;

    iv.   Sibir would be funding the costs of pursuing the claims and providing an indemnity in respect of any adverse order for costs;

    v.   Mr Friedman made the petition having obtained information from Mr Tchigirinsky (described as "*the individual with the principal interest in the First Petitioner*" – Mr Friedman's First Affirmation, para 3), Mr Cameron and Mr Luzkhov; and

    vi.   Mr Kotov consented to and supported the petition for winding up.

149.    The first and second defendants contend that the application was misleading in a number of important respects. I consider these contentions in a separate judgment in relation to the application to set aside the appointment of the provisional liquidator.

*The Commercial Court proceedings*

150.    The present proceedings were issued on 14th November 2007. Yugraneft claims that its 50% participation interest in Sibneft-Yugra:

> "*has been stolen by means of dilution and sold to Gazprom as part of the sale of [Mr Abramovich's] controlling interest in Sibneft*"

and that Millhouse Capital, inter alia through Mr Davidovich, and Mr Abramovich knew of the fraud on Yugraneft, and that "*the proceeds of sale of Yugraneft's interest within the sale of Gazprom derived from the fraud*".

151.    The defendants do not contend that Yugraneft has failed to raise a good arguable case that the dilution of its interest in Sibneft-Yugra was fraudulent. If, which is hotly disputed and cannot presently be decided, there never was an undocumented co-financing agreement, and the dilutions came about secretly so far as anyone not in the Millhouse/Abramovich/Sibneft camp was concerned, in order to punish Mr Tchigirinsky for the position he had taken in the Moscow Oil Refinery dispute, the whole arrangement was dishonest. As will become apparent the defendants' case is that, for a number of specific reasons, Yugraneft's claims are not maintainable.

*Yugraneft's claims*

152.    Yugraneft puts forward three sets of claims. Firstly, it puts forward a claim in dishonest assistance in English law or, in the alternative, if Russian law governs, a tort claim in Russian law against Millhouse and Mr Abramovich. Secondly, it advances an equitable proprietary claim against Mr Abramovich and in part against Millhouse in English Law. Thirdly, it puts forward a claim against Mr Abramovich alone in knowing receipt or unjust enrichment in English law or, in the alternative, if Russian law governs, unfounded enrichment in Russian law.

*The claims in dishonest assistance against Millhouse and Mr Abramovich*

*English law*

153.  In English law, the Claimant claims against each of the Defendants on the basis of the English 'equitable wrong' of dishonest assistance. The claim is founded on the activities of Mr Matevosov and Mr Davidovich. The appointment by the former of the latter as representative of Yugraneft at the EGMs where the dilutions occurred is said to be part of a dishonest scheme orchestrated by Millhouse to steal Yugraneft's interest in Sibneft-Yugra for the benefit of Mr Abramovich.

154.  Mr Matevosov and Mr Davidovich are alleged to have breached the following provisions of Russian civil law (PoC 91-92 & 99):

> (i)     *Article 53(3)* of the *RF Civil Code* (obligation to act in the interests of the entity you represent in good faith and reasonably);
>
> (ii)    (Mr Matevosov) *Article 71(1)* of the *RF Law on Joint Stock Companies* (similar obligation specific to directors);
>
> (iii)   (Mr Davidovich) *Article 182(3)* of the *RF Civil Code* (a representative is not to enter into transactions on behalf of the person he represents in the interests of another person whose representative he is at the same time);
>
> (iv)    *Article 1064(1)* of the RF *Civil Code* (causing harm to property)
>
> (v) *Article 1080* of the *RF Civil Code* (joint infliction of harm to property)
>
> (vi)    (Mr Davidovich) *Article 10(1)* of the *RF Civil Code* (obligation not to act with the sole purpose of inflicting harm).

The obligations in (i) (ii) (iii) are said to be duties towards Yugraneft which English law would characterise as fiduciary.

155.  Each of them is also alleged to have committed crimes in Russian law contrary to Chapter 21 of the RF Criminal Code (PoC 99) namely:

> (1)     *Theft,* contrary to Article 158;
>
> (2)     *Swindling,* contrary to Article 159;
>
> (3)     *Misappropriation or Embezzlement*, contrary to Article 160;
>
> (4)     *Infliction of Damage on Property by Deceit or Breach of Trust*, contrary to Article 165.

156.  On the basis of these breaches of Russian law by Mr Matevosov and Mr Davidovich the claims in dishonest assistance against Millhouse and  Mr Abramovich are then expressed in paragraphs 104 to 106 of the Particulars of Claim as follows:

> *"104. Further or alternatively, Millhouse Capital has been guilty of dishonest procurement of and assistance in the breaches of fiduciary duty by Mr Davidovich and Mr Matevosov set out above. More particularly:*
>
> *(1)    Their acts were part of a scheme orchestrated by Millhouse Capital to steal and dispose of the interest in Sibneft-Yugra stolen from Yugraneft; and*
>
> *(2)    The conduct of Mr Davidovich was part of his role as head of the Moscow Representative Office of Millhouse Capital and Executive Investment Manager of Millhouse Capital in managing Mr Abramovich's investments, including Mr Abramovich's controlling shareholding in Sibneft; and*
>
> *(3)    Millhouse Capital has orchestrated the sale of Yugraneft's interest in Gazprom and the holding and reinvestment of the proceeds.*
>
> *105. Mr Abramovich is vicariously liable for the conduct of Millhouse Capital as aforesaid.*
>
> *106. Further or alternatively, since the dilution scheme would only have been implemented with (at the least) Mr Abramovich's prior approval, he is liable in his own right for dishonestly procuring the breaches of fiduciary duty of Mr Matevosov and Mr Davidovich as aforesaid."*

The relief sought in respect of the dishonest assistance claim includes "equitable damages" against each of Millhouse and Mr Abramovich.

*Russian law*

157.    The counterpart in Russian law of the English dishonest assistance claims against the First and Second Defendants are the claims alleged against them under Article 1064 of the Russian Civil Code in tort or delict (PoC paras 121-122). That article provides:

> *"Harm caused to the person or property of an individual, and harm caused to the property of a legal entity shall be subject to full compensation by the person who caused the damage."*

158.    The claim in tort against Millhouse in Russian law relies principally on the acts of Mr Matevosov and Mr Davidovich in the alleged theft of the bulk of Yugraneft's participation interest in Sibneft-Yugra and the disposal thereof. Millhouse is said to be vicariously responsible for Mr Davidovich's actions under Article 1080 of the Russian Civil Code (liability of a legal entity to compensate for harm caused by its employees while carrying out their duties). In the alternative it is alleged that Millhouse Capital subsequently "*ratified*" the actions of Mr Davidovich.

159.    As regards Mr Abramovich, it is alleged that, since Millhouse was operating under Mr Abramovich's "*broad mandate*", Mr Abramovich is jointly liable for its conduct (PoC 122(8)) and, accordingly, that he, too, is liable in tort or delict under Article 1064.

*The equitable proprietary claim*

160.    The Particulars of Claim (paragraphs 107-109) allege that the assets of Mr Abramovich managed by Millhouse represent in significant measure the interest in Sibneft-Yugra stolen from Yugraneft or dividends derived from that interest. To that extent Yugraneft, it is said, can trace its property ("*the proceeds of the fraud*") "*into the hands of Mr Abramovich and/or Millhouse*". Accordingly, it seeks "*appropriate declarations and accounts*" and/or claims that "*the proceeds*" are held on "*constructive trust*" and/or claims that "*the assets of Mr Abramovich held by Millhouse Capital*" are subject to an equitable proprietary lien. Yugraneft thereby asserts a claim to what is said to be traceable trust property that has been applied in breach of trust and is now in "*the hands*" of Mr Abramovich and/or Millhouse. It seeks to establish either (a) a constructive trust of such monies or (b) to enforce an equitable proprietary lien to secure its personal claim against the (constructive) trustee in respect of its receipt of property.

161.    On these grounds, Yugraneft seeks an order:

> "*for an account of all the monies and assets of Mr Abramovich and/or all of the monies and assets controlled by Millhouse Capital which derive from the interest stolen from Yugraneft... and a declaration that such monies and assets and any product thereof or accretions thereto are subject to a constructive trust and/or equitable proprietary lien in favour of Yugraneft*" (PoC para 128).

In addition, it claims to be entitled to a declaration that such a constructive trust or lien binds Millhouse, and to the appointment of a receiver over the assets controlled by Millhouse Capital (PoC para 129).

*The personal 'receipt based' claims*

*English law*

162.    The third category of claims is the 'receipt based' claims. In English law, two 'receipt based' claims are brought against Mr Abramovich: (i) knowing receipt and (ii) unjust enrichment.

163.    The claim in *knowing receipt* is brought on the basis that the proceeds of the fraud have been received into or into the control of "*entities*" which are controlled by Millhouse or its agents on behalf of Mr Abramovich; and that both Mr Abramovich and Millhouse knew of the provenance of the proceeds of the "*fraud*". (PoC paras 102-103).

164.    The claim in *unjust enrichment* is brought on the basis that Mr Abramovich has been enriched unjustly at the expense of Yugraneft in consequence of the breaches of fiduciary duty of Messrs Davidovich and Matevosov and/or their breaches of Russian criminal and civil law, and he is liable to account for the proceeds of the fraud and holds the proceeds as constructive trustee for Yugraneft. (PoC para 110).

*Russian law*

165.    In Russian law, on which Yugraneft relies in the alternative to English law, the corresponding claim is brought in "*unfounded enrichment*" under Articles 1102-1105

of the Russian Civil Code (the obligation to return unfounded enrichment).  The basis of this allegation is that Mr Abramovich:

> "*has been enriched to the extent that the proceeds of sale of his interest in Sibneft to Gazprom represent the interest stolen from Yugraneft and to the extent that he has received dividends referable to the stolen Yugraneft interest*" (PoC para 116(1);

and that:

> "*What happened in substance was that Mr Abramovich received the benefit of the bulk of Yugraneft's participation interest in Sibneft-Yugra*" (PoC para 116(2)).

*The claim against Mr Berezovsky*

166.    Yugraneft's claim against Mr Berezovsky is based on the fact that Mr Berezovsky is suing Mr Abramovich alleging that the sale of his interest in Sibneft to Mr Abramovich was procured by unlawful pressure and claiming an interest in the proceeds of the sale by Mr Abramovich of a controlling interest in Sibneft.

167.    Yugraneft claims that, if and to the extent that Mr Berezovsky is entitled to part of the proceeds of sale of Mr Abramovich's controlling interest in Sibneft he is not entitled to do so at the expense of Yugraneft and would hold any proceeds received by him which derive from the inclusion in Sibneft's assets of Yugraneft's (stolen) interest in Sibneft-Yugra on constructive trust for Yugraneft.

*The reverse summary judgment application*

168.    Millhouse and Mr Abramovich contended that:

   a)    all the claims made against them are either governed by Russian law or must be civilly actionable by that law;

   b)    under that law the claims have no realistic prospects of success because with one possible exception they are all time barred, since under Russian law civil claims are time barred after 3 years from knowledge of the violation of the right. These claims were brought in November 2007, over 3 years after Yugraneft knew of the essential facts, which it did by no later than April/May 2004;

   c)    the only possible claim under Russian law would be a claim based on a finding that a crime has been committed made by the Russian court or investigating authority. No such finding has been made. The Senior Investigator has twice issued reasoned rulings, binding in Russian law, that there are no grounds for suspecting that a crime has been committed and Yugraneft has chosen not to appeal those rulings; any Russian court would dismiss any claim in civil proceedings because, in the absence of a criminal finding it would be time barred, and because the court would defer to the rulings of the Senior Investigator;

d)      if the claims were governed by English law then all of the receipt based claims and part of the dishonest assistance/tort claim against the first two defendants are bound to fail because the claimant's restitution and related claims depend upon an ability to trace into the increased charter share capital issued to the offshore companies and thence through Sibneft into the increased value of Mr Abramovich's shares in Sibneft. This cannot be done for a number of reasons, the first of which is that no proprietary interest arose in Yugraneft in the increased share capital at the outset;

e)      Yugraneft is in any event estopped by the decision of the High Court of the BVI and the Supreme Court of the Eastern Caribbean from pursuing the receipt based claims against Mr Abramovich or it would be an abuse of process to allow it to do so;

f)      These proceedings are in any event an abuse of process because :

> *"all of the claims ... are premised upon alleged crimes in Russian law or alleged breaches of fiduciary duties in Russian law against individuals (Mr Davidovich and Mr Matevosov) that are citizens of, and resident of Russia where they are alleged to have committed the crimes or breaches of fiduciary duties under that foreign law.   It is obviously wrong that a Claimant should be permitted to bring such claims in circumstances where (a) in a host of claims and applications, the courts and criminal authorities of the foreign jurisdiction have consistently held that these individuals' conduct was lawful and ruled that there is no evidence that they have committed any crimes; (b) in further proceedings brought in another jurisdiction (the BVI) the Claimant (or its privy) conceded and relied upon the assertion that there were no valid civil claim against those individuals and (c) to the extent that any of the civil claims (or crimes) alleged to exist under the foreign law have not been specifically adjudicated upon by the foreign courts that is purely because the Claimant has chosen not to bring those specific claims in the proper jurisdiction or has chosen not to appeal.  In all these circumstances, this claim is an instance of forum shopping and an abuse of process."*

### Governing laws

169.      I turn then to consider the governing law of the claims.

### The governing law of the dishonest assistance claim

*The rival submissions*

*Yugraneft*

170.      Yugraneft contends that where a claim in dishonest procurement/assistance is raised in English proceedings, relating to obligations owed by directors or agents of a foreign company, the issue as to what those obligations are and whether they have

been breached will be determined by the foreign law. English law will, then, determine whether the duties in question should be categorised as fiduciary in nature. If they are, English law will apply its own approach to dishonest assistance, save that regard will be had to the law and custom of the foreign jurisdiction in considering whether a defendant has acted dishonestly. In the alternative Yugraneft claims that double actionability applies.

*The defendants*

171.    The defendants submit that the *lex fori* cannot be the appropriate choice of applicable law for a number of reasons.

172.    Firstly, such a choice is contrary to the well established general principle that a civil wrong committed elsewhere must be civilly actionable under the law of the place where the wrong occurred: *Phillips v Eyre* (1869) LR 4 QB 225; (1870) LR 6 QB 1; *Carr v Fracis Times & Co* [1902] AC 176.

173.    In *Boys v Chaplin* [1971] AC 356 the majority of the House of Lords held, overruling *Machado v Fontes* [1897] 2 QB 231, that a claim for damages in tort arising out of events in a foreign country had, in addition to being actionable in English law, to be civilly actionable (and not just the subject of criminal liability) in the foreign jurisdiction. Lord Wilberforce gave the reason:

> "*The broad principle should surely be that a person should not be permitted to claim in England in respect of a matter for which civil liability does not exist, or is excluded, under the law of the place where the wrong was committed.*"

174.    The principle and the decision was approved by the Privy Council in *Red Sea Insurance Co Ltd v Bouygues SA* [1995] 1 AC 190. It is subject to two exceptions (i) where the foreign law of the place where the wrong was committed has no real connection with the proceedings the foreign law will be displaced in favour of the law with the most substantial connection to the circumstances of the case: see *Boys v Chaplin* [1971] AC 356, 391-392 and *Kuwait Airways Corp v Iraqi Airways* [2002] UKHL 19 at [157] – [158][14]  and (ii) where liability does not exist under the foreign law because of the existence of a provision of that foreign law which is wholly repugnant to English "public policy"

175.    Secondly, the defendants submit, it is contrary to the general approach in English conflict of law rules which is to subject claims in the law of obligations to the law with which the obligation has its closest and most real connection: see *Dicey* (14th Edn) at 34-014. The law of the forum may well not satisfy that test (sometimes by a large margin). To choose it as the applicable law would divorce private international law from its underlying justification that justice requires that the court should apply that law which is consistent with the reasonable and legitimate expectations of the

---

[14]    In *Red Sea Insurance v Bouygues SA*, the Privy Council was prepared to operate the exception by dispensing with the requirement for any liability under the law of the forum and only applied the *lex causae*.

parties to the transaction or occurrence involved and, secondly, that, in the interest of promoting international comity and transactions, uniformity should be achieved where possible: **Dicey** 1 - 005-6

176.    The *Private International Law (Miscellaneous Provisions) Act 1995* abolished the double actionability rule in the case of tort in favour of the *lex causae*: see paragraph 220 below. It would be paradoxical if the correct approach is to abandon the *lex causae* in favour of the *lex fori*.

177.    Thirdly, equitable claims are not intrinsically different. The need to adjudge whether a defendant's conduct is unconscionable should not free the claimant from the need to prove civil liability under the law of the place where the events giving rise to liability took place. In the absence of some compelling reason there should be no difference of approach in private international law as between legal and equitable claims. As Tipping J, giving the leading judgment of the New Zealand Court of Appeal in *Attorney General of England and Wales v R* [2002] NZLR 91 at 103, said :

> "It is difficult to see the logic or overall desirability of making a distinction between legal issues and equitable issues when deciding which legal system should govern the contract in question. The making of such a distinction can lead to quite unnecessary difficulties and potential inconsistencies. It would also tend to depart from the general direction in which most legal systems comparable to ours have been moving in recent times.
>
> Law and equity should be viewed as a consistent whole. The individual influences of the earlier discrete streams now work together to produce the appropriate outcome. While many doctrines are still recognisable as legal or equitable and an understanding of their historical origins often remains helpful, the focus now should be on their combined influence rather on their originally separate functions. It would be anomalous to apply one system of law to an issue which would have arisen at law, and another to an issue which would have been for the Courts of Equity to deal with. I make these remarks simply to note the point and to endorse the acceptance of the parties that all issues fall to be determined according to English law."

178.    Fourthly, reliance is placed on **Dicey**'s comment at 2-035:

> "**Equitable claims.**  It will be apparent from what has been said that there may well be a lack of exact correspondence between the internal divisions of English domestic law and those of the conflict of laws.  One area in which the problem of characterisation may be seen to be particularly acute is when an English court is called upon to deal with a claim which, if it were wholly domestic, would be regarded as equitable.  When such a case contains a foreign element, the question arises whether there is a category of issue labelled "equitable issues" for the purpose of choice of law.  In some cases, such as where an application is made for specific performance of a contract, it will be clear that the issue is contractual, or contractual in part and procedural in part.  In others, such as where it is alleged that a defendant has committed a wrong which corresponds to the equitable wrongs of knowingly receiving trust property, or dishonestly assisting another in a breach of trust, it is arguable that the issue of substantive liability is to be characterised as

> *tortious.  In still others, such as where it is alleged that a company director owes duties of loyalty to the company, it is arguable that the issue of substantive liability is to be characterised as falling within the category of issues reserved to the law of incorporation.  These instances lend no support to the proposition that the term "equitable" has a discrete role to play in the characterisation of issues for the purpose of choice of law."* [15]

179. Paragraph 34-033 of **Dicey** observes:

> *"Though it has been said that, as equity acts in personam, equitable claims are governed by the lex fori, this almost certainly means no more than that a court may order equitable remedies in accordance with its own procedural law over a defendant subject to its personal jurisdiction in respect of rights which have been found to arise under the law identified by its choice of law rules.  Given the similarity between equitable wrongs on the one hand, and torts, and breaches of contract on the other, it may be appropriate to regard claims which would in domestic law be equitable wrongs as being governed by the choice of law rules applicable to these areas of law, rather than by Rule 230 [the rule for restitution], at least where the measure of recovery is not determined by reference to the enrichment of the defendant."*

180. Footnote 12 comments on the proposition that equitable claims are governed by the *lex fori*, noting that "*this would be tantamount to saying that there is no choice of law applicable to equitable claims*".

181. Further, insofar as it is said that equity acts when it regards the acts of a defendant as unconscionable and that, *therefore*, the unconscionability of actions should be judged by an English court of equity (if the defendant is properly before it) the conclusion does not necessarily follow from the premise. If susceptibility to the jurisdiction means that English law is applicable as the lex fori, there will be many defendants against whom claims are determined under English law when they and their actions may have nothing to do with England.  Mr Swainston submitted that the rules on domicile meant that a defendant would only be brought before the court if he had some substantial connection with this country. But that cannot be guaranteed. Jurisdiction may be founded on service whilst temporarily present or on the basis that the individual is a proper party to a claim brought against another in circumstances where a stay may not be obtainable.

182. Other academic writers have rejected the lex fori as the applicable law for equitable restitutionary claims. The authors of *Cheshire & North's Private International Law* (13th Edn, 1999) note that to choose the *lex fori* (at 677):

> *".. encourages forum shopping; bears a parochial appearance; the applicable law would be uncertain until the place of trial had been determined; it can lead to injustice to the defendant who may be liable under English law in a case involving events having little connection with England and which may*

---

[15] The text goes on to state that "*But other cases, principally Australian, tend to suggest that there may be a category of issues which, being labelled as "equitable", are as such governed by the lex fori.*"  However, commenting on this sentence, footnote 62 remarks: "*the Australian approach finds little support in England*".

> *involve no liability under the law of the country abroad where the relevant events took place."*

183.    Other anomalies would arise. If the lex fori applies to a claim against the defendants for dishonest assistance governed by English law Yugraneft would find itself with a more favourable limitation period than that applicable against, say, Mr Davidovich whose breach of fiduciary duty, which the defendants are said to have abetted, is subject to Russian law.

184.    Fifthly, the constituent elements of a claim in "knowing assistance" provide no reason why it should be treated as governed by the *lex fori*. The difference between such a claim and a claim in knowing receipt has often been stated. As Hoffmann LJ put it in ***Polly Peck International v Nadir & Others*** (Judgment of the Court of Appeal dated 17 March 1993, Lexis Transcript):

> *"Although both knowing assistance and knowing receipt give rise to the equitable remedy of accountability as a constructive trustee, the two causes of action are very different. Liability for knowing assistance is based upon wrongful conduct, namely knowing participation in a fraudulent breach of trust or fiduciary duty. Its common law analogy is conspiracy to defraud. Liability for knowing receipt is restitutionary based upon the beneficial receipt of money or property known to belong in equity to someone else. The equitable remedy depends upon the existence of a trust or fiduciary duty, but the breach of trust or duty need not have been fraudulent. The nearest common law analogy is money had and received."*

185.    There is no reason why the lex fori should be the applicable law in respect of an accessory liability for dishonest participation in a breach of trust particularly given that in an action of the tort of conspiracy to defraud a claimant must show (under common law and now under statute) that the acts constituting the conspiracy are civilly actionable under the law of the place where the conspiracy was, in substance, committed. See, for example, per Mance J in ***Grupo Torras SA v Al-Sabah*** [1999] CLC 1469 at 1653-1654. In the Court of Appeal the judgment (paragraph 123) while recording that the notion that dishonest assistance could be regarded as a tort had been firmly rejected in ***Metall und Rohstoff AG v Donaldosn Lufkin & Jennette Inc*** [1990] 1 QB 391, 474 in the context of RSC O.11 r. 1(1) (f) recalled that in ***Dubai Aluminium Co Ltd v Salaam*** [1999] Ll Rep 415, 467 Rix, J had recognised that equitable wrongdoing, although not a tort in the eyes of English law, had marked similarities with it.

*The authorities*

186.    A series of recent authorities bear on the question whether actionability according to the law of the place where the events occurred is required for a claim in dishonest assistance: ***Arab Monetary Fund v Hashim***; ***Dubai Aluminium***; and ***Grupo Torras*** (at first instance and on appeal).

***Arab Monetary Fund v Hashim***

187.    In ***Arab Monetary Fund v Hashim*** (29th July 1994), upon which Yugraneft particularly relies, Chadwick J was concerned with a contribution claim brought by

First National Bank of Chicago and its affiliates ("FNBC") against Dr Hashim. The claimant, the Arab Monetary Fund ("AMF"), had sought damages against FNBC on the grounds that it had knowingly assisted Dr Hashim, AMF's former director-general, to misappropriate AMF's money. FNBC settled with AMF for $ 13.45 million and sought contribution from Dr Hashim, who had earlier been found liable to the AMF. Chadwick J addressed the question:

> "*whether and in what circumstances an English Court ought to recognise and enforce an equitable claim for monetary compensation based on fault where the fault alleged lies wholly in things done or not done in a foreign jurisdiction. This is a question to which the authorities provide no easy answer*".

He went on say (at pp.22-23) that "*The general rule is that the English court applies its own law; but, in so doing, takes into account (for the purposes of negating liability) the law of the country in which the act was done*" and added that this principle applies not only to "*tort (in the strict, common law, sense)*" but also to "***Barnes v Addy** constructive trust*" claims.

188. Then, having expressed a first requirement that the cause of action must be actionable as a matter of English law, Chadwick J went on to state (at pp.23-24):

> "*The second requirement as it seems to me, was that the English Court must have satisfied itself that there is no rule of any relevant foreign law which …would provide a defence to the AMF's cause of action; or – as it might, perhaps, be put in the context of a Barnes v Addy constructive trust claim – would make it inequitable to hold that an FBC defendant should be treated as if it were a trustee. If, as the authorities show, the basis of such a claim is dishonesty or lack of probity on the part of the defendant, then it must be right to judge honesty or dishonesty in the light of all relevant circumstances; and those circumstances must include relevant provisions of the local law.*
>
> ***It follows that I think the appropriate course, in the present case, is to examine the evidence as to Swiss law not for the purposes of identifying any rule of that law which the English court would have been concerned to enforce, but rather for the purposes of deciding whether, having regard to the legal framework within which FNBC and its affiliates were conducting the operation of the numbered accounts at its Geneva branch, there was such dishonesty or lack of probity as would have made it equitable for the English court to treat those defendants as if they were trustees.*"[16]

189. The defendants submit that the passage in bold risks confusing two separate issues. The first issue is whether the claim is civilly actionable under the applicable foreign law. If the claim is not civilly actionable under the applicable law, that will provide a complete defence to the English claim. The second issue is whether there was such dishonesty or lack of probity as would have made it equitable for the English court to treat those defendants as if they were trustees as a matter of English law. The two

---

[16] Bold added as in other citations.

issues are distinct.  Whilst it may be appropriate to adjudge dishonesty "*in light of all relevant circumstances*" including the "*local law*" or "*legal framework*", that is separate and additional to the requirement that the claim should also be actionable where the events giving rise to the claim took place.

190.    Chadwick J then considered the submission of counsel for Dr Hashim that the AMF could not have succeeded in a claim against FNBC unless it was shown that "*the conduct complained of would have been actionable as a civil wrong in the Swiss courts*" and counsel's reliance upon the statement of principle of Lord Wilberforce that "*a person should not be permitted to claim in England in respect of a matter for which civil liability does not exist, or is excluded, under the law of the place where the wrong was committed*".

191.    Chadwick J then said (at p. 24):

> "*Lord Wilberforce was, of course, making those observations in the context of a claim for the recovery of damages for personal injury.  Although the obligations in the passage cited are general in nature, **I am not at all sure that Lord Wilberforce would have taken the view that conduct which was properly to be regarded as dishonest in the light of the relevant provisions of the local law – but, in respect of which the local law gave no civil remedy – ought not to be the subject of a successful Barnes v Addy constructive trust claim in England.**  That was not a question which he can be taken to have had in mind.  It is reasonably clear that Lord Donovan and Lord Pearson would not have taken that view – see, ibid, at pages 383 D and 405F….*"

192.    It is not clear why exactly Chadwick J was not at all sure of this. If conduct which amounted to dishonesty in English eyes was not actionable by the foreign law, e.g. because it only involved economic loss, it is difficult to see why that would not be covered by Lord Wilberforce's reasoning. Lords Donovan and Pearson would not have taken that view because they accepted that it was sufficient that the conduct was criminal (even if not civilly actionable) – a view that was rejected by the Privy Council in **Red Sea**, a case to which Chadwick, J referred: p 21.

193.    In the event Chadwick J did not have to resolve his doubts, which remained obiter. Instead, he expressed himself:

> "*….. content to assume that [counsel] is correct in his submission that the AMF would not have succeeded against the AMF Defendants in the English court if it were established that the conduct complained of was not actionable as a civil wrong under Swiss law.  For the reasons which I shall explain below I am satisfied that the conduct of [the defendant] in relation to the operation of the numbered accounts…in relation to the disposal of those accounts – would have been actionable as a civil wrong in the Swiss courts.  It is unnecessary, therefore, to decide whether that was a necessary requirement.*"

194.    The defendants submit that, if Chadwick J was suggesting that Lord Wilberforce's statement of "*broad principle*" was applicable only to claims "*for recovery of damages for personal injury*", he was incorrect.  There is no good reason to suppose that Lord Wilberforce would not apply his "*broad principle*" equally to an equitable claim for dishonest assistance which is analogous to a tort.   I agree.

### Dubai Aluminium Co Ltd v Salaam

195.    In **Dubai Aluminium Co Ltd v Salaam** [1999] 1 Lloyd's Rep 415, Rix J cited the passage from Chadwick J's judgment set out in paragraph 188 above. Rix J went on to consider dishonesty *"as a matter of English law"* against the background of Dubai *"custom and practice"* that might *"in theory"* be relevant (although not in practice as most of the acts were carried on outside Dubai). The case is, however, of no real assistance because, as the Court of Appeal observed in **Grupo Torras v Al-Sabah** [2001] CLC 221 at 134:

> *"Rix J did not find it necessary to go further into the appropriateness of double actionability to a claim for dishonest assistance, since he had no evidence of Dubai law (and it is therefore reasonable to infer that this point was not raised on the pleadings)."*

### Grupo Torras v Al Sabah

196.    In **Grupo Torras v Al Sabah** [1999] CLC 1469, Mance J. had to determine conflict of laws questions in respect of claims against the defendants alleging conspiracy to defraud and liability as a constructive trustee (in dishonest assistance or knowing receipt). First, he held (at p 1653) that the choice of law rule for conspiracy claims was the double actionability rule in tort[17] and that the question for the courts was to *"look back over the series of events constituting it [the alleged tort] and ask themselves "Where in substance did this cause of action arise?"* On that basis, he found (at 1654H-1657) that the claims in conspiracy were, depending upon the particular transactions, governed in some cases by Spanish law, in other cases by English law and in one case by the law of Switzerland. He then considered actionability under Spanish law and found, *inter alia*, that the defendant Mr Folchi, who was GT's lawyer, was contractually liable in Spanish law (at 1662G-1663D). The claims against Mr Folchi included claims in conspiracy (which the judge rejected) and dishonest assistance (which he upheld) in respect of all the transactions with which he was said to be involved.

197.    In a subsequent passage Mance, J considered the claim for liability as a constructive trustee. He referred, inter alia, to the judgment of Chadwick J of 29th July in **AMF v Hashim.** He said at 1670H-:

> *" Chadwick J expressly rejected as irrelevant to a dishonest assistance claim whether or not the relevant foreign law recognised the concept of proprietary rights under a trust: see p.42. A dishonest assistance claim is based on fault, and is not a claim to enforce a proprietary interest against the holder of the fund.*
>
> *The approach taken by Chadwick J at pp.45-46 [i.e. to judge honesty or dishonesty in the light of, inter alia, relevant provisions of the local law] was adopted by Rix J in Dubai Aluminium Ltd v Salaam [1999] 1 Ll Rep 415 at pp. 452-453. The alternative approach, which Chadwick J identified and evidently did not prefer (although on the facts before him, he did not have to*

---

[17] The age of the case was such that the **Private International Law (Miscellaneous Provisions) Act 1995** was inapplicable.

> *decide whether it was correct) would require full actionability under the relevant foreign law as well as under English law.  I call this the full double actionability approach.  I propose, sitting at first instance, simply to follow the view which Chadwick J preferred and Rix J adopted in these two previous first instance cases.  But in this case also, it seems to me unlikely that the difference between that and the full double actionability approach would be decisive.*
>
> *In judging whether there is any role at all for foreign law, it seems appropriate to apply a similar 'substance' test to that applicable in tort.  Mr Folchi's assistance was in substance rendered in Spain, although his activity in Geneva on 2/3 October 1990 was significant.  Having regard to what I have said earlier in this judgment about his conduct, his knowledge and attitude, the conclusion which I reach is his conduct would be regarded as displaying a lack of honesty or probity in Spain."*

198.    It is unclear precisely what Mance J took the "*full double actionability approach*" to mean.  He may have meant, as I think he did, no more than that the action complained of must be actionable (to the same extent) as a civil wrong in the place where it occurred. That was the alternative approach which Chadwick, J, did not prefer.

### *Grupo Torras* – *Court of Appeal*

199.    Two defendants appealed to the Court of Appeal: Sheikh Khaled who was successful, and Mr Folchi who was not. Mr Folchi appealed against the finding of dishonest assistance in respect of all of the transactions on which claims were maintained against him.

200.    It was common ground on the appeal that Mr Folchi was, as a matter of Spanish law, civilly liable to AMG for breach of contract. The Court noted at 260D-E: "*Mr Davies accepted that Mr Folchi would, on the judge's findings, have been liable to civil proceedings brought in Spain for breaches of his contractual duty as GT's lawyer.*" The Court of Appeal also upheld Mance J's findings that Mr Folchi had acted dishonestly in respect of each one of the transactions: see paragraphs 83 to 113.

201.    The Court referred to **Dicey**'s expression of the double-actionability rule (then in Rule 205) viz:

> *"(1)    As a general rule, an act done in a foreign country is a tort and actionable as such in England, only if it is both:*
>
>> *(a)    actionable as a tort according to English law, or in other words is an act which, if done in England, would be a tort; and*
>>
>> *(b)    actionable according to the law of a foreign country where it was done.*
>
> *(2)    But a particular issue between the parties may be governed by the law of the country which, with respect to that issue, has the most significant relationship with the occurrence and the parties"*

202. The Court then referred to **Boys v Chaplin**, and the different approach taken by Lord Wilberforce and Lord Pearson. It then referred to the judgment of Chadwick, J in **Arab Monetary Fund v Hashim**. It first recorded that Chadwick, J had stated the basic reasons why the English court inquires into and acts on the law of a foreign country, as stated by Selwyn LJ in **The Halley** [1868] LR 2 PC 193:

> *"in these and similar cases the English court admits the proof of the foreign law as part of the circumstance attending the execution of the contract, or as one of the facts upon which the existence of the tort, or the right to damages, may depend, and then it applies and enforces its own law so far as applicable to the case thus established".*

and went on to observe that Lord Wilberforce and Lord Pearson had cited this with approval in **Boys v Chaplin** and that Chadwick J had treated the principle as being "*general, and not restricted to claims in tort in the strict common law sense*".

203. The court then cited the passages of Chadwick, J's judgment referring to the two requirements, to which I have referred in paragraph 188 above. The formulation of these two requirements appears to me to constitute a form of double actionability. In referring to the need to have "*no rule of any relevant foreign law which ... would provide a defence to the AMF's cause of action*" Chadwick, J appears to have had in mind rules which might render Dr Hashim's actions not unconscionable; but, as he recognised, there are other potential rules which would provide a defence.

204. The Court then referred to the fact that Mance J had indicated that he proposed to do the same as Chadwick, J. The Court then proceeded to set out the arguments of Counsel for Mr Folchi. Those were, so far as presently relevant, that the dishonest assistance claim had a closer connection with Spanish law than any other system, including English law. The submission was that, under Spanish law, which the judge should have applied, Mr Folchi was not liable for loss unless caused by his breach (he being liable under Spanish law for breaches of his contractual duty as GT's lawyer) and that it had not been so caused. The rival submission for GT on the issue of causation was that no foreign law could be relevant "*because the English court is concerned with English causes of action*".

205. The Court recorded (para 141) the submission that the judge was wrong not to apply

> *"the test of "full double actionability" (meaning, as we understand it, that Mr Folchi could not be held liable in the English court for dishonest assistance if the evidence of Spanish law showed that it did not recognise a liability with essentially the same ingredients and basis of liability). But Mr Davies produced no authority in support of that proposition and it appears to us to be contrary to a line of binding authority, including the decision of the House of Lords in **Boys v Chaplin** and the decision of this court in **Kuwait Oil Tanker Co v Al-Bader** [2000] 2 All ER (Comm) 27. In delivering the judgment of the Court in the latter case Nourse, LJ said (para 171):*

>> *"The rationale of the rule that the act or omission of the defendant must be actionable abroad in civil proceedings between the same*

*parties is by way of safeguard against imposing liability upon a defendant in England as the lex fori for acts in respect of which there would be no liability in the lex loci delicti. However it is not necessary for the act or omission to be characterised as a tort or delict under the foreign law, provided that there is a right of recovery to a similar extent by civil action. The reasons of policy which dictate that the defendant should not be held liable in circumstances where, or to the extent that, he would not be held civilly liable in the country where the relevant acts or omissions took place, do not dictate that the legal basis of such liability should be the same. Indeed, the degree to which systems of civil law differ the world over, and the diversity of conceptual routes by which they impose liability on a defendant to compensate or otherwise make restitution to a claimant in respect of a civil wrong, militate against the requirement that the court of the lex fori should enmesh itself in an exercise of characterisation and fine distinction as between the remedies afforded by different jurisdictions to achieve a similar result".*

206.    The Court later said:

*" 142 ……Neither side challenged the judge's inevitable finding that Mr Folchi's assistance was substantially rendered in Spain, or his fining as to where the conspiracies were carried out (Croesus and Wardbase in Spain, Oakthorn I and II in England, Pincinco in Switzerland). Neither side sought to use the latter findings as a basis for varying the usual non-statutory tort rule cf rule 203(2) in the 12th and 205 (3) in the 13th editions of Dicey and Morris... The position which Mr Davies most stoutly defended , and sought to hold to the last, was his point as to the need for individual liability and a sufficient causal link between individual fault and the ensuing loss.*

*143.    This was a point which Mr Davies had already taken in relation to an accessory liability for dishonest assistance under English law, regardless of any foreign element. We have already considered and rejected it, so far as English law is concerned (para 119).*

*144.    However, the point become rather more formidable, at any rate as a theoretical point, when the Spanish dimension is added. Mr Folchi's putative liability under Spanish law would be for loss caused by breaches of his individual contractual duty to GT. It would not, on the judge's findings as to Spanish law, be an accessory liability for the wrongdoing of the conspirators. The need for a sufficient causal link between the defendant's fault and the claimant's loss cannot be regarded as a procedural rather than a substantive matter. The line of reasoning (based on **The Halley**) which led Lord Pearson in **Boys v Chaplin**, to award general as well as special damages, seems not to have prevailed over the alternative line of reasoning followed by Lord Wilberforce and adopted and extended by the Privy Council in **Red Sea Insurance**.*

> *145.    However in s V.1 (f) of his judgment, dealing with Spanish law, the judge did make a clear finding about Mr Folchi's individual responsibility for loss suffered by GT…"*

207.    The judgment then sets out a passage from Mance J's judgment dealing with Spanish law. Mance J had recorded that it was common ground that, in respect of contractual or extra contractual liability, individual causal responsibility would have to be shown. He then held that Mr Folchi was the lynch-pin of arrangements which were made for, and the instructions which were given in respect of, the relevant transaction and that had he taken any steps to stop them, their further implementation would have been impossible.

208.    The judgment of the Court of Appeal  concludes:

> *"This passage is expressed hypothetically because it is part of the judgment dealing with Spanish law in relation to the conspiracy claims. The judge was not prepared to hold that Mr Folchi was a conspirator. But his findings of fact about what Mr Folchi did know, or shut his eyes to, take his conclusion out of the sphere of hypothesis. The assistance that Mr Folchi gave in all the transactions was crucial and without it they could not have taken place as they did. He was just as much a linchpin giving dishonest assistance as he would have been if he was a conspirator. It was the obvious duty of an honest lawyer to make more enquiries as to why very large sums of money were being dealt with in highly questionable ways, and to stop the transactions if he did not receive satisfactory explanations. Mr Davies' point on causation fails on the facts".*

209.    I draw the following conclusions from the judgment.

210.    Firstly, the Court did not proceed upon the basis that it was sufficient to found liability that Mr Folchi was properly before the English Court and would have been under an accessory liability under English law whether or not his acts or omissions caused the loss claimed, i.e. GT's argument that "*the English court is concerned with English causes of action*" (see paras 142 – 144)[18]. If it had done so it would not have been necessary to consider any question of double actionability, full or otherwise, or whether the need to prove a causal link between fault and loss was a procedural or a substantive matter. If English law alone governed, then, once dishonest assistance was established, any other substantive law would be irrelevant and the argument for Mr Folchi would have failed *in limine*.

211.    Secondly, the Court rejected a test of "*full double actionability*", in the sense in which it used that term, i.e. that Mr Folchi could not be liable in an English court for dishonest assistance if Spanish law did not recognise a liability with essentially the same ingredients and basis of liability: para 141.

212.    Thirdly, the Court recognised the need for double actionability in the sense that Mr Folchi had to be shown to be civilly liable under Spanish law to the same extent as in

---

[18] In that case it would be necessary to prove, in a case of dishonest assistance that the defendant was an accessory to the breach of trust but not that the acts which made him so were, themselves, causative of the loss caused by the breach.

English law: see the citation from *Kuwait Oil Tanker* in para 141. I see nothing in the judgment which indicates that the Court was doing no more than decide that, if it was necessary to apply Spanish law, GT would still succeed.  It would have been odd for the Court to set out the double actionability rule and decide that *full* double actionability was not necessary,   citing a judgment that indicated that "ordinary" double actionability was sufficient, if it meant that double actionability of whatever kind might not be required at all.

213.    Fourthly, it found that double actionability had been shown. The appeal failed, not on the law i.e. that it was irrelevant to consider Spanish law, but on the facts, namely that the individual causal responsibility required by Spanish law had been established.

214.    The Court of Appeal did not hold that all that the Court needed to do, in a case of dishonest assistance, was to make its assessment of *"dishonesty"* against the *"background"* of the local law or custom. It had already concluded that Mr Folchi's conduct was dishonest before embarking upon its analysis.  It proceeded to consider causation under Spanish law because the claimant needed to establish civil liability *"to a similar extent"*.

### *KOTC v Al Bader*

215.    Yugraneft also placed reliance on *KOTC v Al Bader* [2000] 2 AER (Comm) 271 which was referred to by the Court of Appeal in *Grupo Torras*. In that case claims were made against directors, and another defendant who owed equivalent duties to the claimant, for misappropriation of the claimant's monies. The Court of Appeal approved a passage in Chadwick, J's judgment  of 15th June 1994 in *AMF v Hashim*, in which he said – in a case in which the claimant sought to recover from Dr Hashim on the ground that he had acted in breach of fiduciary duties which he owed under the law of Abu Dhabi -  that the correct questions were:

> "(i) *What is the proper law which governs the relationship between the Defendant and the person for whose benefit those powers have been conferred, (ii) what, under that law, are the duties to which the Defendant is subject in relation to those powers, (iii) is the nature of those duties such that they would be regarded by an English court as fiduciary duties, and (iv) if so, is it unconscionable for the Defendant to retain those assets.*"

216.    I do not regard that passage, or the Court's approval of it, as touching upon the question of double-actionability in a claim in knowing receipt or knowing assistance. The Court of Appeal had made it plain before the citation that, although the trial judge had approached this claim on the basis that the defendants were constructive trustees (as would be the case in a claim in knowing receipt) they "*plainly*" were not. They were directors, or the equivalent, who were to be *treated* as if they were *actual* trustees. They owed obligations under the law of Kuwait to make restitution to the claimant of the funds misapplied by them. Chadwick, J, had held that the law of the UAE was the law of the relationship between Dr Hashim and that under that law Dr Hashim owed duties which would be characterised in England as fiduciary: see pages 319 and 328. He had referred to and relied on **Dicey** Rule 201 (2) (a), the predecessor rule to Rule 205, and decided that, giving effect to Rule 201 as a whole, there was nothing in it inconsistent with the formulation cited in the previous paragraph.

**217.** Accordingly, as I hold, in order to succeed in a claim in dishonest assistance it is necessary at common law for Yugraneft to show that the defendants are civilly liable under Russian law to the same extent as in English law.

**218.** There remains for consideration (a) the applicable test for determining whether or not there is any applicable role for foreign law; and (b) the impact of the *Private International Law (Miscellaneous Provisions) Act 1995*.

**219.** As to the former, the test adopted in *Grupo Torras* in relation to the claim for dishonest assistance was to ask where in substance the cause of action was committed i.e. the same test as for tort[19]: see Mance J at 1671B. The Court of Appeal recorded at para 142 that no one challenged the "*inevitable*" finding that Mr Folchi's assistance was substantially rendered in Spain.

### *Private International Law (Miscellaneous Provisions) Act 1995*

**220.** Part III of the Act provides as follows:

#### CHOICE OF LAW IN TORT AND DELICT

##### *9 Purpose of Part III*

*(1) The rules in this Part apply for choosing the law (in this Part referred to as "the applicable law") to be used for determining issues relating to tort or (for the purposes of the law of Scotland) delict.*

*(2) The characterisation for the purposes of private international law of issues arising in a claim as issues relating to tort or delict is a matter for the courts of the forum.*

*…………*

*(4) The applicable law shall be used for determining the issues arising in a claim, including in particular the question whether an actionable tort or delict has occurred.*

*(5) The applicable law to be used for determining the issues arising in a claim shall exclude any choice of law rules forming part of the law of the country or countries concerned.*

*(6) For the avoidance of doubt (and without prejudice to the operation of section 14 below) this Part applies in relation to events occurring in the forum as it applies in relation to events occurring in any other country.*

*(7) In this Part as it extends to any country within the United Kingdom, "the forum" means England and Wales, Scotland or Northern Ireland, as the case may be.*

*(8) In this Part "delict" includes quasi-delict.*

##### *10 Abolition of certain common law rules*

---

[19] *Metall & Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 QB 291.

*The rules of the common law, in so far as they–*

> *(a) require actionability under both the law of the forum and the law of another country for the purpose of determining whether a tort or delict is actionable; or*

> *(b) allow (as an exception from the rules falling within paragraph (a) above) for the law of a single country to be applied for the purpose of determining the issues, or any of the issues, arising in the case in question,*

*are hereby abolished so far as they apply to any claim in **tort or delict** which is not excluded from the operation of this Part by section 13 below.*

### 11 Choice of applicable law: the general rule

*(1) The general rule is that the applicable law is the law of the country in which the events constituting the tort or delict in question occur.*

*(2) Where elements of those events occur in different countries, the applicable law under the general rule is to be taken as being–*

> *(a) for a cause of action in respect of personal injury caused to an individual or death resulting from personal injury, the law of the country where the individual was when he sustained the injury;*

> *(b) for a cause of action in respect of damage to property, the law of the country where the property was when it was damaged; and*

> *(c) in any other case, the law of the country in which the most significant element or elements of those events occurred.*

*(3) In this section "personal injury" includes disease or any impairment of physical or mental condition.*

### 12.    Choice of applicable law: displacemnt of general rule

*(1) If it appears, in all the circumstances, from a comparison of–*

> *(a) the significance of the factors which connect a tort or delict with the country whose law would be the applicable law under the general rule; and*

> *(b) the significance of any factors connecting the tort or delict with another country,*

*that it is substantially more appropriate for the applicable law for determining the issues arising in the case, or any of those issues, to be the law of the other country, the general rule is displaced and the applicable law for determining those issues or that issue (as the case may be) is the law of that other country.*

*(2) The factors that may be taken into account as connecting a tort or delict with a country for the purposes of this section include, in particular, factors relating to the parties, to any of the events which constitute the tort or delict in question or to any of the circumstances or consequences of those events.*

221.    Although for domestic purposes a claim in dishonest assistance is not a tort; *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 QB 391.474; *Dubai Aluminium Co Ltd v Sallam* [1999] Ll Rep 415, 467, it may be that its proper characterisation for the purposes of private international law is as a tort. If so, the court would have to apply only the law of the country in which the events constituting the dishonest assistance occurred or, if they occurred in more than one, the law of the country in which the most significant element or elements of those events occurred, unless section 12 applies.

222.    I do not think it is necessary to determine the question of characterisation. The only matter that is relevant for the purposes of the defendants' application is whether Russian law is applicable, either by itself or in combination with English law.

223.    If it was necessary, I would strongly incline to holding that a claim in dishonest assistance was, for the purposes of the 1995 Act a "tort".  In *Harding v Wealands* [2006] UKHL the House of Lords  assumed that Parliament intended that the expression "*questions of procedure*" used in Part III should be understood in the way that it would be understood in the field of private international law; and that the scheme of Part III would not work on any other basis[20]. The same must apply to the expression "*tort*". Dishonest assistance, a form of equitable wrongdoing, is so closely analogous to a claim in tort (as characterised for purely domestic purposes) that it should, I would have thought, be so characterised for private international law purposes.

*Where was the wrong committed?*

224.    I am also satisfied that in substance the cause of action was committed in Russia.  The result would be the same if the question was where the most significant elements covering the wrong occurred, or which law had the closest and most real connection to the facts giving rise to the claim (the tests in restitution and trusts).  The connecting factors with Russia are set out in the judgment of the Court of Appeal of the BVI: see paragraph 124 above.   In the BVI proceedings Sibir contended (not without justification) that "*All the acts giving rise to the claims pleaded against the BVI defendants took place in Russia*".  Much the same applies to the present claim. I set out in Appendix 2 to this judgment a further list of specific matters (derived, like that in paragraph 185, from a list of the defendants) establishing the overwhelmingly Russian connection.

*English factors*

225.     If one looks for factors that connect the claim to England, they are few and far between. Millhouse was incorporated in London, but Mr Davidovich operated out of its Moscow Representative Office (which later became a separate Russian company), of which he was head. Yugraneft contends that the instructions to carry out the dilutions may have been given by Mr Abramovich from London. But this is belied by the evidence of Mr Abramovich's movements. Mr Abramovich has given very detailed evidence as to his movements, which, partly because of the security protection he enjoys, are a matter of record, which there is no reason to doubt. The

---

[20] The House held that the quantification of damages was to be regarded as a matter of procedure for private international law purposes

EGMs took place in September 2002 and February 2003. Mr Abramovich spent only one full day in England in 2002, on 18 March 2002, and two part days on 17th and 19th March.  He spent only 25 full days in England in 2003 (and 72 part days) – but none before 23 March 2003. Between the EGMs and around the time of the EGMs he was largely in Russia: see Mr Abramovich's Second Statement at paragraphs 57-59.

226. Yugraneft contends that it is inconceivable that Mr Davidovich and Mr Matevosov acted without the knowledge and approval of  Millhouse Capital in London and Sibneft in Russia, and, in particular, Mr Shvidler of Sibneft and Mr Tenenbaum of Millhouse Capital. Mr Tenenbaum is a Canadian accountant, experienced in corporate finance and mergers and acquisitions. According to his evidence his role at Sibneft was to assist with Western orientated corporate finance such as Eurobonds, syndicated loans and pre-export finance. He was not involved in any Russian financing or Russian M & A deals. He had already moved to London by the time the Sibneft-Yugra licences were confined. He has no operational experience in oil and gas.

227. Mr Davidovich is a Russian businessman resident in Russia, who, on his evidence, did not visit England until July 2003. Mr Tenenbaum was paid considerably less than the $ 7 million paid to Mr Davidovich.

228. No document or witness statement produced shows that Mr Tenenbaum was involved in or aware of Mr Davidovich's actions. Mr Tenenbaum's evidence, and that of Mr Heagren and Mr Davidovich, is that at the time of the EGMs (in September 2002 and February 2003) Millhouse in London was a very small operation.  It was set up because of Mr Tenenbaum's desire to move to London from Moscow. Millhouse was established as a consultancy service and provider of administrative support to the major shareholders of Sibneft, their shareholders and ultimate beneficial owners including Mr Abramovich, in relation to their *personal* i.e. private assets owned or leased outside Russia. In the case of Mr Abramovich these were, in September 2001 principally a château in France, some real estate in England and elsewhere, a yacht, a plane and a helicopter. They now include assets worth hundreds of millions of dollars, with properties, acquired and renovated, in the UK, France, Sardinia, the USA and St Barts, and Chelsea FC.

229. In 2002 Millhouse had a small office in Weybridge, Surrey. It housed Mr Tenenbaum and 2 employees. In 2003 this grew slightly to Mr Tenenbaum and 5 employees. It has now increased to 28, providing consultancy services including analysing possible acquisitions of personal assets (such as a property in Colorado) and Mr Abramovich's personal affairs including his complicated travel arrangements by yacht and aeroplane. About 6 of them work on matters connected with Chelsea. Millhouse has never owned any significant assets or shares (as its accounts confirm) or controlled any companies.

230. By contrast the Moscow Representative Office (formed in February 2002) had 40 people working for it and 80 employees in 2003.  Mr Heagren and Mr Tenenbaum have listed all of the employees of Millhouse Capital over the period.

231. The evidence of Mr Tenenbaum and Mr Davidovich is that Mr Davidovich operated under a general power of attorney, which has been produced, and which gave him power to run the Moscow operation autonomously. That is what he did. There was little regular contact between them about business matters during 2002-4. Millhouse

in London and its Representative Office in Moscow were in practice two different organisations. Mr Tenenbaum was principally responsible for providing consultancy services to clients on matters relating to their private assets and interests. In the case of Mr Abramovich that was his varied real estate, Chelsea FC, and extensive travel arrangements. Mr Davidovich was responsible for providing corporate support and services in connection with their clients' business interest in Russia. The only two instances where, at the relevant time, Mr Tenenbaum had any material business dealings in Russia were (i) when he handed over to his successor at Sibneft; and (ii) when he was involved in the ultimately abortive Sibneft-Yukos merger. The intention was to merge the new Yukos/Sibneft entity with, or sell it to, an international oil and gas company. He gave some advice on international matters. He also assisted Sibneft in 2003 with regard to a proposed joint venture between Sibneft and Royal Dutch Shell. Mr Heagren describes in his witness statement (paras 17-19) how the two offices operated:

> "…from the time that Millhouse Capital was established, there was a clear division of responsibilities between the English office and the Representative Office in Moscow. Any consultancy services with regard to any Russian transactions or investments would be dealt with by employees of Millhouse's Representative Office in Moscow. Already shortly after its establishment, the Representative Office was a much more significant operation with a much larger team of employees than Millhouse Capital in London. All the people who worked for the Representative Office always carried out their duties completely independently from Millhouse Capital in England. No directions or supervision or instructions came from our side. Apart from the obvious fact that the handful of us working at Millhouse Capital in England did not have the requisite background and experience to instruct the Russian employees about Russian business, it would have been impractical if the Representative Office had to answer to or take directions from people in England. Each office had its own remit and carried out its duties and responsibilities independently of the other. In addition, until quite recently, only a few of the Millhouse Capital employees in England spoke any Russian and only very few of the employees of the Representative Office in Moscow had a working command of English. To the limited extent that there has been any communication between the two offices, it has, therefore, at times been rather difficult.
>
> The operations of the Representative Office essentially became the operations of a separate Russian company, Millhouse LLC in April 2006. However, little has changed in a practical or operational sense. Mr Tenenbaum and I (and our colleagues at Millhouse Capital) play no role in the duties or operations of Millhouse LLC just as we played no role in the duties or operations of the Representative Office.
>
> Neither I, nor, to the best of my knowledge, anybody else at Millhouse Capital in England had, therefore, any involvement in any domestic Russian projects in 2002 or 2003. We certainly had no involvement in anything to do with the Sibneft-Yugra project which, as I understand it, was a Sibneft project in any case. I do not recall any operational or other Sibneft issues being addressed from the office in England."

232.    Mr Tenenbaum's evidence, which is to the same effect, is that he was not in a position
        to give and did not give any directions or instructions to Mr Davidovich in relation to
        Sibneft-Yugra and that he only became aware of Sibneft-Yugra in Spring 2004, when
        Sibir published various statement sin the press complaining of the dilution of its
        interest.  He adds (para 31 of his first statement):

        "*I have searched my files, emails and documents from 2002 to 2004 and I can
        confirm that I have in my possession no records or documents or other
        communications that relate to Sibneft-Yugra.  I have asked the other officers
        and employees of Millhouse Capital from the relevant period to do so as well
        and they have confirmed the same to me*".

        Mr Heagren has also undertaken a search of his relevant files and, as expected, found
        nothing related to Sibneft-Yugra. Mr Tenenbaum's evidence is that he has had no
        communications with any of the officers or directors of the six offshore companies in
        the relevant period (Mr Heagren's evidence is the same); nor the lawyers working for
        the Representative Office. Some of the new appointees to the Sibneft-Yugra board he
        had never met. Some he had met from his time at Sibneft but either had no
        communication with in 2002 or 2003 or only on matters unrelated to Sibneft-Yugra.
        At the time most of the London office's efforts were devoted to the acquisition of
        Chelsea.

233.    This evidence of Mr Tenenbaum's non-involvement is corroborated by that of Mr
        Shvidler, Mr Davidovich, and Mr Abramovich.  In those circumstances and in the
        absence of any cogent evidence to the contrary, it seems to me that there is no realistic
        prospect of establishing that Mr Tenenbaum in England procured or instructed Mr
        Davidovich in relation to his acts at the EGMs in Russia or that he ran the dilution
        companies or managed the dilutions. A mass of documentary material shows, and the
        evidence of Mr Tenenbaum and Mr Heagren attests, that almost all of the individuals
        employed by Millhouse who were involved in the acts of the six offshore companies
        were Russians acting in Russia: see the list of Millhouse people connected to the six
        offshore companies and Sibneft-Yugra compiled by Yugraneft. Further, even if all the
        companies in the charts of company structures produced on behalf of Yugraneft are
        taken to be Mr Abramovich's nominees, it does not follow that Mr Tenenbaum in
        London was ordaining what they, and, in particular, the two sets of offshore
        companies, should do. Nor does the fact that Ms Maria Elia was a director of
        Millhouse and works for Meritservus show that that was so.

234.    Even if Mr Tenenbaum had been involved, that would not in my judgment, even
        arguably, be sufficient to make the place where in substance the wrong took place as
        England.

235.    The last matter for consideration is the significance, if any, of the sale of the shares in
        Sibneft to Gazprom. I do not regard this as taking the matter any further. Firstly, as
        will be apparent hereafter, I do not accept that the sale of the shares in Sibneft to
        Gazprom may be regarded as part of any dishonest assistance. Yugraneft may have
        (or have had) a claim against Sibneft, Gregory, Richard and Ferenco, as asserted (in
        effect for it) by Sibir in the BVI. But it cannot trace into a proportion of the shares in
        Sibneft held by Mr Abramovich (through the six Cypriot companies).  Even if it
        could, the relevant events took place in Russia, where the sale to Gazprom was
        negotiated and implemented. That is the evidence of Mr Shvidler and Mr Abramovich

which there is no reason to doubt. The proceeds of the Sibneft sale amounted to $ 13.1 billion of which only a small proportion has been expended in England. According to the evidence of Mr Heagren and Mr Tenenbaum it amounts, since October 2005 to, at most, £ 13.2 million on services from Millhouse, and £ 325.23 million on Chelsea Football club and property in England.

236.    Accordingly, if the claim in dishonest assistance is to be regarded as a claim in tort for the purposes of the 1995 Act, the applicable law is that of Russia.

**The governing law of the receipt based claims**

237.    Yugraneft's claims include three receipt based claims against Mr Abramovich: (i) knowing receipt; (ii) unjust enrichment; and (iii) a claim to a proprietary interest which seeks the imposition of a constructive trust or a proprietary lien over assets. The first two are personal "restitutionary" claims (see **Dicey** 34-041) which do not assert any proprietary right over the defendant's assets as the latter claim does. Yugraneft contends that these claims are governed by English law: PoC 100. The receipt based claims are not brought against Millhouse, save to the extent that certain related relief is sought against Millhouse in the event that the proprietary claim against Mr Abramovich is established.

238.    The basis for these claims is the allegation that the six offshore companies are to be regarded as Mr Abramovich's nominees, holding their property for him. On that footing Mr Abramovich received the participation interests in 2002 and 2003. The transfer of the interests from the first to the second set of offshore companies merely transferred an already received interest from one hand to another.

239.    Rule 230 of **Dicey** (14th Edition) provides:

> "(1) The obligation to restore the benefit of an enrichment obtained at another person's expense is governed by the proper law of the obligation.
>
> (2) The proper law of the obligation is (semble) determined as follows:
>
> > (a) If the obligation arises in connection with a contract, its proper law is the law applicable to the contract.
> >
> > (b) If it arises in connection with a transaction concerning an immovable (land), its proper law is the law of the country where the immovable is situated (lex situs);
> >
> > (c) If it arises in any other circumstances, its proper law is the law of the country where the enrichment occurs."

240.    The commentary explains that the general principle of English law is:

> "to subject claims in the law of obligations to the law with which the obligation has its closest and most real connection" i.e. "of identifying the law which has the most significant connection with the claim".

241.   The principle in Rule 230 (2) has been so interpreted in *Cheshire & North's Private International Law* (13th Edn 199) at p 685 and by the Outer House of the Court of Session in *Baring Bros & Co v Cunninghame DC* (1996) TLR, 30th September where Lord Penrose held  that a restitutionary obligation is governed by the law of that obligation and noted expressly that this meant the law of the country with which, in light of all the facts and circumstances, "*the critical events had their closest and most real connection*".

242.   A number of dicta support the view that claims in unjust enrichment (absent a contractual relationship between the parties and other than claims to land) are governed by the law of the place of enrichment: *In re Jogia* [1988] 1 WLR 484, 495-6 (per Sir Nicolas Browne-Wilkinson); *Arab Bank New York Ltd v Barclays Bank* [1952] 2 TLR 920, 924; *El Ajou v Dollar Land Holdings plc and another* (Millett J) [1993] 3 All ER 717 (rev'd though not on restitution and private international law issues [1994] 2 All ER 685); *Hongkong and Shanghai Banking Corp v United Overseas Bank* [1993] 3 All ER 717 at 736; *Thahir v Pertamina* [1994] SLR 257.

243.   But as **Dicey** points out at paras 34-030 ff there may be cases in which there is a divergence between the place of enrichment and the law which has the closest connection with the claim.

244.   In *Barros Mattos Jnr v Macdaniels Ltd* [2005] EWCH 1323 Lawrence Collins, J, examined a number of authorities, including some of the above, and concluded that the weight of dicta on the applicable law of receipt-based restitutionary claims supported the application of the law of the place of receipt. But he also said that:

> "117   ……There is, however, no decision of the Court of Appeal in which approval of Rule 200(2) (c)[21], or the application of a similar principle, is the ratio. Rule 200(2) (c) is a tentative formulation of the application of the basic principle in Rule 200(1) where the parties have no prior connection. There is no decision that Rule 200(2)(c) must be treated as a free-standing rule mechanically applying the law of the place where bank accounts are kept irrespective of the factual circumstances and irrespective of the particular issue.
>
> 118      Here parties in Nigeria agreed that one was to sell to the other dollars for delivery in Switzerland in exchange for Nigerian currency in Nigeria. This is just the kind of case where the law of the place of the enrichment will not necessarily give an answer which corresponds to the law which has the closest connection with the claim or with the issue"

245.   The Court of Appeal of the Eastern Caribbean approached the matter thus:

> "Lawrence Collins J showed in that review that it is not in all instances the law of the place of enrichment will be the proper law and stated so in his conclusion. As I understand the cases this is essentially because the law of the place of enrichment will not invariably be the law that has the closest connection with the claim. **Dicey and Morris** makes this very point. **Cheshire & North** makes the point even more firmly and argues against the tentative

---

[21]   Rule 200 was the corresponding rule in the 13th edition.

> *Rule 200(2) (c) and in favour of "a flexible solution". However, while there may be debate whether the principle contained in Rule 200(1) is to be applied by reliance upon even a tentatively advanced clause (2)(c), in my respectful view the review by Lawrence Collins J and the discussion of the cases in both of the leading texts put it beyond argument, not just that the obligation to restore the benefit of an enrichment obtained at another's expense is governed by the proper law of the obligation, which the appellant accepts, but (to use again the language of Cheshire and North) that "The proper law of the obligation refers to the law of the country with which the obligation has the closest and most real connection." That was the premise on which all the treatments proceeded."*

246.    I agree with this view. I reject the suggestion that a claim in knowing receipt with a foreign element is to be regarded as determined simply by asking whether or not the receipt is such that, in the eye of English equity, it cannot in conscience be kept or disposed of otherwise than by restoration to the equitable owner. Any obligation to restore an unjust enrichment, including a claim in knowing receipt as well as a claim in unjust enrichment itself, must in principle be determined by its proper law, which is, intrinsically, that law which has the closest connection with that obligation. Rule 230 (2) (a) – (c) indicates what, in the instances to which it refers, is likely to constitute that law. But the indicators of the likely result of the application of the principle cannot replace the principle itself.  In the case of (c) the place of enrichment may, depending on the facts, be of the greatest importance or very little importance at all.

247.    If there is a contractual or similar relationship between the claimant and the defendant, the law of that relationship is likely to govern. If the parties are complete strangers and the defendant is a recipient from a wrongdoer, the place of receipt is likely to be relevant, although that may well not be so if, for instance, the place of receipt is a transitory home. If the defendant is the primary wrongdoer or the instigator of, or someone vicariously responsible for, the wrongdoing, it is likely to be relevant to examine where the wrongdoing and its effects took place.  As **Dicey** puts it at  34-06:

> *"[2 (c)] is not to be applied whenever the centre of gravity of the factors relevant to the obligation indicates that the proper law is different; and this will be more likely when the claim arises in connection with a wrong committed by the defendant against  the claimant"*

*Application of the test*

248.    In *El Ajou v Dollar Land Holdings* [1994] 2 AER 685 Hoffmann, LJ, explained the elements of a cause of action in knowing receipt. The plaintiff must show:

> *"…first, a disposal of the assets in breach of fiduciary duty; secondly, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff[22]; and, thirdly, knowledge on the part*

---

[22] In that case the tracing was possible because the bank accounts through which the proceeds had passed were charged in equity with the repayment of the claimant's money.

*of the defendant that the assets he received are traceable to a breach of his fiduciary duty"*

*The defendants' submissions*

249.    The defendants submit that, in the light of that exposition of the matters giving rise to a claim in knowing receipt, the closest connection of all of them is with Russia. As to the first, the *fiduciary duty* relied on by Yugraneft is said to arise from the duties owed in Russian law as a result of the position of Mr Matevosov as director, and Mr Davidovich as representative of Yugraneft, a Russian corporation. Further the disposal of assets relied on occurred in Russia where the EGMs took place and where the additional participation units were issued. The entity deprived of a beneficial interest in Sibneft-Yugra was Yugraneft, both of them Russian corporations.

250.    As to the second, the beneficial *receipt* of the assets took place in Russia where the offshore companies and/or Sibneft obtained the participation interests that were allotted to them. Those interests exist in Russia and are vouched only in the form of entries in the records in Russia. Insofar as it is relevant to look at any enhanced value received by Mr Abramovich in respect of his shares in Sibneft that arose in Russia.

251.    As to the third, *knowledge* on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty was acquired in Russia where Mr Abramovich (and Mr Matevosov) were at the material time.

*Discussion*

252.    Since the law applicable to the receipt based claims is the proper law of the obligation to make restoration, it is not in my view necessary to examine the elements of the English action for knowing receipt in order to determine the nexus between those elements and Russia. That would be to assume that English law is applicable in order to determine whether Russian law was. Nevertheless the exercise is not without value insofar as it illustrates the factors likely to be material in a restitutionary claim.

*The claimants' submissions*

253.    Yugraneft alleges that English law applies because Mr Abramovich has been enriched in England and, as Rule 230 (2) (c) indicates, that should be treated as the proper law of the obligation to restore. The basis upon which this is said to be so is that Mr Abramovich has elected to make England "*the major base of his personal and business affairs from which he enjoys and controls his wealth*" (PoC 100 (5); his affairs are, so far as presently relevant controlled by Millhouse, an English company; which is said to control "*the proceeds of the fraud*" on his behalf (PoC 100(2)); his "*real enrichment*" has been in England from which the sale of his stake in Sibneft to Gazprom was managed; he has invested some of the proceeds of the sale of the Sibneft shares in England.

254.    I do not accept this analysis. Any unjust enrichment in this case took place upon the acquisition of additional participatory interests in Sibneft-Yugra in September 2002 and February 2003. If Mr Abramovich was the person enriched because the offshore

companies are entities which hold their assets as nominees for him or for Millhouse as his agent (PoC 102), this happened in September 2002 and February 2003. Any obligation to restore arose then. What he did with his riches thereafter is nothing to the point on that question, save that the benefit which, in economic terms, he derived from the participation interests or their economic value, may be a measure of the value of his enrichment.

255.    In determining which system of law is applicable, it is, therefore, necessary to focus on the events of 2002/2003.   When I do so, it seems to me clear that the proper law of the obligation is Russia, where the wrongs occurred, where the new participation interests were issued, and where the relevant enrichment occurred. That is the country with which the obligation has its closest and most real connection.

256.    There is an issue, with which I deal hereafter, as to whether Mr Abramovich was resident in England at the date of the service of the claim form in 2007. But, whatever the answer to that question, there is, in my view, no realistic prospect of establishing that Mr Abramovich was resident in England in 2002 and 2003.  He was at that time resident in Russia and not in England.

257.    On his evidence, which I see no reason to doubt (see para 468 - 470 below) he spent practically no time in England in 2002 or before March 2003 and only 25 full days in England in the whole of 2003. Thus, even if his place of residence in 2002/3 is to be regarded as the place of his enrichment, that place was not, for Mr Abramovich, England. The fact, if it be such, that Mr Abramovich subsequently became resident in England would not alter the position.

258.    If the arrangements for the dilutions were being made by Millhouse *in London*, the position would not alter. Those arrangements were being made, on Yugraneft's case, at the behest of Mr Abramovich in Russia. In any event, as I have said, in the light of the evidence of Mr Tenenbaum, Mr Heagren and Mr Davidovich, and in the absence of any cogent evidence to the contrary, there does not seem to me to be any realistic prospect of establishing that the dilutions were managed by Mr Tenenbaum in England.

259.    Even if Mr Abramovich was resident in England (as well as Russia) in 2002/3 I would not have regarded that as a compelling factor in favour of English law.  That would not alter the place where the wrongs were committed or where the relevant enrichment occurred.

260.    The fact that in September/October 2005, some three years after the first EGM, Mr Abramovich sold his shares in Sibneft does not alter the position.  Even if the proceeds of the sale of the Sibneft shares represent the traceable proceeds of the participation interests (which they do not: see paragraphs 348 - 372 below) any obligation to make restitution or to account arises, as I have said, from the unlawful enrichment in 2002 and 2003. The law of the putative obligation to make restoration cannot alter retrospectively according to the manner of disposition of the interest received.

261.    In any event the realisation of the proceeds took place in Russia (by the sale of shares in Sibneft to Gazprom by a sale agreement made in Russia and subject to Russian law). But there is no evidence, or reason to believe, that the bulk of the proceeds are

held in London. The evidence is that only a very small proportion of the proceeds may have returned to London. Yugraneft seeks to say that the sale of Sibneft and the disposition and reinvestment of the proceeds was managed from Millhouse *in London*; but there seems to be no realistic prospect of establishing that. Even if there was it would make no difference.

262. Accordingly, as I hold, the knowing receipt claims are subject to the law of Russia. Exactly the same considerations as are set out in paragraphs 240 to 263 above apply to the claim in unjust enrichment, which falls squarely within Rule 230.

**Actionability under Russian law**

263. In the BVI Sibir accepted that Sibir and Yugraneft had no claims under Russian law and that the only feasible claim under that law was a claim by Sibir under the joint venture agreement. Yugraneft now claims that, on the contrary it does have good claims under that law. The defendants dispute that on several grounds. However, they accept that, without prejudice to their estoppel and abuse of process claim, the points of law that are in dispute cannot be resolved upon a summary application. They claimed, however that there are two grounds upon which the claims in Russian law are bound to fail. The first ground is that the claims are time barred. The second was that they would be bound to fail in the light of the rulings of the Senior Investigator.

*Time bar*

264. Section 1 of the *Foreign Limitation Periods Act 1984* provides as follows:

> "*1.      Where in any action or proceedings in a court in England and Wales the law of any other country falls (in accordance with rules of private international law applicable by any such court) to be taken into account in the determination of any matter--*
>
> *(a) the law of that other country relating to limitation shall apply in respect of that matter for the purposes of the action or proceedings; and*
>
> *(b) except where that matter falls within subsection (2) below, the law of England and Wales relating to limitation shall not so apply.*
>
> *(2) A matter falls within this subsection if it is a matter in the determination of which both the law of England and Wales and the law of some other country fall to be taken into account.*
> *………*
>
> *(4) A court in England and Wales, in exercising in pursuance of subsection (1)(a) above any discretion conferred by the law of any other country, shall so far as practicable exercise that discretion in the manner in which it is exercised in comparable cases by the courts of that other country.*
>
> *(5) In this section "law", in relation to any country, shall not include rules of private international law applicable by the courts of that country or, in the case of England and Wales, this Act.*

265.    The effect of this section is that the limitation period is governed by the *lex causae*, or, if there are two *leges causae*, the limitation periods of both laws apply. In respect of the dishonest assistance claim Russia is one of the *leges causae*, and probably the sole one. In respect of the knowing receipt claim it is the only *lex causae*.

266.    Section 2 of the Act provides :

> "*2.  Exceptions to s. 1*
>
> *(1)        In any case in which the application of section 1 above would to any extent conflict (whether under subsection (2) below or otherwise) with public policy, that section shall not apply to the extent that its application would so conflict.*
>
> *(2)        The application of section 1 above in relation to any action or proceedings shall conflict with public policy to the extent that its application would cause* **undue hardship** *to a person who is, or might be made, a party to the action or proceedings...*"

*Russian law of limitation*

267.    Articles 195-6 and 198- 200 of the Civil Code of the Russian Federation provide:

> "**Article 195   The Concept of the Limitation Period**
>
> *The limitation period shall be recognised as the term fixed for the protection of the right by the claim of the person whose right has been violated.*
>
> **Article 196      The General Term of the Limitation Period**
>
> *The general term of the limitation period shall be laid down as three years*
>
> **Article 198      Invalidity of the Agreement on Changing the Terms of the Limitation period**
>
> *The terms of the limitation period and the order of their counting shall not be changed by an agreement between the parties.*
>
> *The grounds for the suspension and the interruption of the proceeding of the terms of the limitation period shall be laid down by the present Code and by the other laws*
>
> **Article 199      Application of Limitation Period**
>
>> *1.        The court shall accept a claim seeking to protect a right for consideration irrespective of expiration of the limitation period.*
>>
>> *2.        The limitation period shall be applied by the court only upon the application of the party to the dispute, filed before the court has passed the decision*

> *A counterparty to a dispute may demand the application of a limitation period, in which case the court would be bound by such a demand by the defendant and would have to dismiss the claim*

> ### Article 200   The Start of the Proceedings of the Term of the Limitation Period

>> 1.  *The proceeding of the term shall start from the day when the person has learned or should have learned about the violation of his right. Exceptions to this rule shall be established by the present Code and by the other laws."*

268.   It is not disputed that, subject to the question as to when the limitation period starts, the mandatory 3 year limitation period applies to the claims in Russian law alleged against the defendants: see the reports, commissioned for the defendants, of Mr Rozenberg (Report 1, paras 22-56) and Professor Maggs (Report 1, para 18). Mr Rozenberg did not, in his first report, address any question of limitation in the event of a criminal finding. In his second report he said that this was, inter alia, because a criminal conviction is currently impossible. The instructions given on behalf of the claimant to Professor Sergeev in respect of his first report invited him to consider *"Whether any claim that Yugraneft may have against Millhouse Capital or Mr Abramovich would be time barred on the basis of limitation"*.   His report did not answer that question.

269.   There can be no doubt but that Yugraneft was aware of what it asserts to be the violation of its rights more than 3 years before these proceedings were issued on 14th November 2007. It was so aware in or around March or April 2004. It began its first proceedings in Russia seeking to invalidate the decisions at the EGMs on 21st  May 2004.   Mr Cameron described 21st May in an affidavit submitted to the Eastern Caribbean Supreme Court as *"less than six weeks after Sibir learned of the dilution"*.

*Professor Sergeev's second report*

270.   In his second report Professor Sergeev accepted that the provisions set out in paragraph 268 above were the general Russian law provisions on limitation. He said that his conclusions on the issue of limitation were not included in his first report of 12th November 2007 (although he had explained his position to Clyde & Co[23]) *"because of the clear view that I had formed that there was no limitation problem with Yugraneft's claims"*. Given the existence of the general 3 year limitation period and the fact that his reasons, given in the second report, for saying that it was not applicable are somewhat recondite, his failure to express his *"clear view"* is surprising.

271.   In his first report (paras 45) Professor Sergeev had explained that Russian civil law does not recognise a free standing claim of *"civil fraud"*:

---

[23] As expounded in para 40 of Mr Friedman's first witness statement of 14th March 2008.

> "In reality and as a matter of **practice**, civil claims based on an allegation of
> fraud[24] can only be brought once a "finding" that such conduct has taken
> place has been made in criminal proceedings. This is because it is most
> difficult to persuade a Russian civil court to consider claims based on
> allegations of criminal conduct unless that conduct has been the subject of a
> ruling in criminal proceedings or as part of a criminal investigation or is
> supported by evidence produced in such proceedings or investigations. The
> civil court's reluctance in this regard is not based on any **substantive**
> provision which prevents then from making such findings. Nor is it based on
> any procedural requirement to this effect reflected in any provision of the
> Russian Civil, Arbitration or Criminal Procedural Codes. It is merely a matter
> of 'court practice' that stems from the civil courts' traditional 'dislike of
> trespassing on issues which it considers to be more appropriately the subject
> of criminal proceedings"[25].

272.    He then went on to state that a civil claim of fraud may be brought against anyone
against whom a finding in criminal proceedings is made even if that person was not
the accused, as is explicitly recognised in Article 54 of the Criminal Procedural Code
which states that:

> "An individual or a legal entity who pursuant to the Civil Code of the
> Russian Federation bears liability for damage caused by an offence, may
> be summoned as a civil defendant"

Thus, if criminal proceedings are commenced, and result in a finding, against A & B,
a civil claim may be brought against C under Article 1102, based on that finding, even
though C was not a defendant in the criminal proceedings and no finding was made
that he was the beneficiary of the fraud.

273.    He had also explained that there are a number of circumstances in which criminal
proceedings will be terminated without either a conviction or an exonerative decision.
This may be on account of the death of the accused, an amnesty, or the expiry of a
time limit or a change of circumstances. The termination of the criminal proceedings
will not result in the dismissal of any civil claim made in those proceedings but such a
claim will then not have been considered. The claimant would have to commence, and
will be entitled to commence, a claim on the same basis in the civil courts. When
proceedings are brought to an end for such a reason it is open to a court to make
findings of fact on the evidence it has considered e.g. that a crime has taken place and
the claimant will be able to rely upon such findings in support of his civil claim. In the
absence of a court finding a claimant may be able to rely upon the conclusions of the
investigator or prosecutor – in reality accusations based on the investigation carried
out and evidence collected by the prosecuting authorities.    In such a case – see
footnote 6 to Mr Rozenberg's second report - the statute of limitation will be
calculated from the moment the criminal investigation authorities "*render the
respective act*".

---

[24] Both experts have used "fraud" in this context as meaning fraudulent behaviour which amounts to criminal
conduct.
[25] It is not clear to me, but it is unnecessary to decide, how far this practice extends. Taken to its logical
conclusion it would mean that every day wrongs (such as assaults or negligent road traffic accidents) were not
civilly actionable absent a prosecution.

274.    In the case of a conviction the sentence of a criminal court establishing the circumstances of the crime is binding for the purposes of subsequent civil proceedings whether in the arbitazh courts or the courts of general jurisdiction:  Article 69 (4) of the **Arbitrazh Procedure Code**[26] and Article 61 (4) of the **Civil Procedure Cod**e.  If the relevant defendant is acquitted no question of bringing a claim based on his alleged crime can arise[27].

*Professor Sergeev's views on limitation*

275.    In his second report Professor Sergeev explained that :

> "**As part of the same practice** the Russian courts in such cases link the commencement of the limitation period to the date on which the competent authority makes a finding that the relevant activities constituted a crime. This is **deemed** to be the date on which the person whose rights are infringed became aware or should have become aware of the infringement within the meaning of paragraph 1 of Article 200 of the Civil Code."

276.    Professor Sergeev stated that the rationale for this special approach is this. The practice of the court only to allow civil claims based on an allegation of fraud to be brought once a "*finding*" that such conduct has been made in criminal proceedings limits the victim's ability to prove the infringement of his rights in a civil court as long as the relevant violations have not been determined to have constituted a crime. So the court considers, "*justly*", that the moment when the victim becomes aware or should become aware of the infringement of his right is the moment when the finding is made in the criminal proceedings. This is the case even if the actions that are construed as a civil offence have already been the subject of a civil claim that has been dismissed.

277.    He gives as an example a shareholder who brings a civil claim contesting a decision allegedly made at a meeting of the company which the shareholder claims does not exist. The shareholder may fail to prove that and have his claim dismissed. But if the non-occurrence of the meeting is established in a criminal trial there can be either a re-trial or a fresh trial on the basis of that finding. In the latter case the limitation period will begin from the date when the relevant actions are construed as an offence by the competent authority in the subsequent criminal proceedings. As Professor Sergeev puts it:

> ".. in terms of its legal significance the classification of an infringer's actions as a criminal offence is equivalent to the party's awareness that his right has been infringed and therefore a circumstance which the law links to a commencement of the limitation period" (para 16 2nd report).

278.    Russian law provides time limits (6 – 10 years) within which criminal proceedings must be concluded. Yugraneft claims that in respect of some of the criminal conduct

---

[26] "*A criminal court sentence that came into legal force is mandatory for an arbitration court on the issues of whether certain actions took place and whether such actions were committed by certain individuals*".

[27] **Article 306 (2)** of the **Criminal Procedure Code** requires the criminal court to dismiss a civil claim brought in criminal proceedings if those proceedings result in a not guilty verdict or the court terminates the proceedings on the grounds that no offence has been committed or that, although the offence was committed the defendant was not involved.

alleged the period is 10 years. The effect of the practices described in the previous paragraph is, thus, that a relevant finding may be made at any time up to the end of the criminal limitation period in which case the limitation period for the related civil claim may not expire until three years after the relevant finding.

279.    Applying these principles Professor Sergeev concludes that the alleged actions of Messrs Matevosov and Davidovich amount to criminal offences under **Articles 159** and **165** of the **RF Criminal Code**; that the limitation period for liability for such offences is "*at least*" 6 years and that, **if** the actions of the parties involved in the dilutions were construed by a criminal court or other competent authority as a fraud or some other criminal offence, the civil limitation period would commence from the date of that finding and only expire three years after that date: 2nd Report para 18.3. The decision of the Senior Investigator may be reviewed at any time and on unlimited occasions until the expiry of the limitation period for criminal liability.

*Mr Rozenberg's response  -Reports 2 and 3*

280.    In his second report Mr Rozenberg claimed that a distinction had to be made between (a) the statute of limitation applicable to a civil law claim for compensation; and (b) the statute of limitation applicable to a claim for compensation for damages inflicted by a crime[28].   The latter claims can only succeed where the competent court considering the criminal case finds that a crime has been committed.

281.    Civil claims for compensation of losses inflicted by a crime may be filed (a) as part of ongoing criminal proceeding; or (b) in the civil courts following a criminal conviction.  Claims in the former category are usually resolved by a criminal judge at the same time as he gives a (guilty) verdict in the criminal case. But he may leave the claim to be adjudicated upon by a civil judge after the verdict if, for instance, the claim is complex and its resolution would delay the verdict. It is rather uncustomary for claims to be filed in the second way.

282.    The latter statement is in dispute. Professor Sergeev says that in about every fourth criminal case the civil claim is transferred for consideration in civil proceedings and that lodging a civil claim following the results of a criminal case is commonplace.

283.    Theoretically it might be possible to file a civil claim for compensation for losses inflicted by a crime before the initiation of criminal proceedings and in anticipation of such proceedings. But, if this were done, the civil court would probably be bound to stay the claim pending the resolution of the criminal proceedings unless there is some delict independent of an allegation of crime that may give rise to civil liability on the part of the defendant. (Professor Sergeev's view is that, while suspension is possible, this would be an exceptional step). If, however, the competent state authorities have issued a ruling refusing to initiate the anticipated criminal proceedings on the basis that no crime has been committed, the civil claim for compensation of losses inflicted by a crime would be dismissed by the civil court. Other claims not based on the commission of a crime could, however, be brought.

---

[28] Mr Rozenberg cannot have been referring to two different limitation statutes but to the limitation provisions as applicable to the two different sets of circumstances.

284.    Accordingly the time limit for a civil claim not based on the commission of a crime is the general three year period which begins when the claimant has or ought to have knowledge of the violation of his right. But he agrees with Professor Sergeev that the limitation period with respect to a claim for compensation for damages inflicted by a crime starts to run from the moment that the criminal conviction becomes effective. But there are no reasonable prospects of such a conviction.

285.    Mr Rozenberg expresses the latter view on the basis that there have been two refusals to initiate proceedings. Mr Kotov has a right to ask for a review of these decisions by the prosecutor or head of the investigating body and a right of appeal to the court under *Articles 123-5* and *Article 148* of the *RF Criminal Procedure Code*. The court cannot direct the commencement of a prosecution. But it can declare the actions or failure to act of the relevant official unlawful or improper and "*state his or her obligation to correct the committed violation*". Section 1.5 of *Article 27 of that Code* provides that a criminal prosecution of a suspect or an accused shall be terminated where there is an unchallenged ruling against the suspect or accused refusing to initiate criminal proceedings which was issued by the competent criminal investigation authority.

286.    No such challenge has been made to the refusals, which have legal effect as an expression of the authoritative will of the competent authorities as to the absence of any grounds to initiate criminal proceedings against Messrs Davidovich and Matevosov on the basis of the dilutions. In the light of the content of the rulings any further application for the initiation of criminal proceedings would have no realistic prospect of success; and in the absence of any criminal conviction for fraud no civil law claim against them may be brought.

*Professor Sergeev's third report*

287.    Professor Sergeev returned to the fray in his third report. In it he expressed agreement with the statements in Mr Rozenberg's second report that "*The limitation period for civil claims based on a criminal conviction starts to run from the moment that the relevant conviction enters into force*" and "*from the moment that the relevant act is issued by the criminal prosecution authority*". He summarised his views thus:

> (1)    When a fraud occurs, the period within which a criminal verdict or finding can be made in respect of the fraud commences;

> (2)    A civil claimant who wants to bring a civil claim in respect of the fraud and any consequent damage needs, **in practice**, a criminal finding in order to support his case, which may be brought either within criminal proceedings, or separately and later in civil proceedings;

> (3)    Accordingly, the first procedural step is for the civil claimant to make a complaint to the investigating authorities to encourage them to investigate the fraud;

> (4)    Assuming that it is found in the course of the criminal proceedings that the crime has indeed taken place, the criminal process which is set in motion will provide a relevant finding or conviction qualifying the relevant actions as criminal conduct, subject to the circumstances.

(5)     The last effective finding in the case will be the trigger for a 3-year period (for unjust enrichment and damages claims) within which a civil claim can be brought against the defendant (both the person who has committed the crime and the relevant third party).

(6)     If the proceedings terminate for reasons other than conviction (say, the death of the accused or an amnesty or the expiry of the period for criminal liability) the decision terminating the proceedings will ordinarily recite the state of the investigation and the evidence collected. If that includes evidence suggestive of fraudulent conduct, that will be taken as crystallising the claimant's knowledge and as starting the 3 year period for a civil claim. It will also be sufficient to interest a civil judge in the case, so that a claim can be brought;

(7)     The overall limit for bringing a civil claim is the criminal litigation period plus 3 years, on the basis that a relevant finding could be made in the criminal proceedings until the last day of the criminal limitation period which would initiate the 3 year period.

In his view "*the commencement of the limitation period does not begin before a competent body or a court issues a finding qualifying the relevant actions … as criminal*"

*Mr Rozenberg's fourth report*

**288.**    In his fourth expert report Mr Rozenberg produced a summary of his three earlier reports. In it he stated that the requirement of a finding of crime by a Russian criminal court or Russian investigative authorities in criminal proceedings as the pre-requisite for a successful civil claim based on allegations of fraud:

"*derives from the **substantive jurisprudence** and practice of the Russian court based on the fundamental provision of the RF Constitution and RF Criminal Procedure Code (i.e. the principle of presumption of innocence, see Art 49 of the RF Constitution and Article 14 of the RF Criminal Procedure Code) that, unless and until there has been an actual finding of criminal liability in criminal proceedings in Russia, civil claims based on allegations of criminal conduct will not succeed*"

cp Professor Sergeev: see paragraph 272 above.

**289.**    He also contended that

"*In the absence of a criminal case or criminal charges, a civil claim (including a civil claim based on allegations of fraud or other criminal acts) which has not been brought within a limitation period of 3 years, **would be considered as time barred**"*

*Professor Sergeev's last word*

290.    In a letter of 7th July 2008 Professor Sergeev commented on certain paragraphs of Mr Rozenberg's fourth report.  In it he insisted that a relevant criminal finding is **not** a condition precedent in relation to a fraud related claim (or any other civil claim based on a criminal offence). It is merely a ***practical*** hurdle (unidentified in any substantive or even procedural law) that has to be met for reason of court practice, which is not a source of law in Russia. It is purely ***evidential*** in nature as is illustrated by the fact that a civil judge may accept findings in a criminal case which is terminated without a verdict. A criminal conviction is not part of the cause of action in Article 1064 (delict) or 1102 (restitution):

>  *"The argument that civil claims based on criminal conduct will not succeed on the ground that there is no civil cause of action before an actual finding of criminal liability in criminal proceedings in Russia .. is completely incorrect".*

291.    He then expresses disagreement with the view that a fraud based claim would be time-barred after three years if no relevant criminal finding confirming the alleged fraud was made:

>  *"4.      As I have repeatedly stated, in a fraud based claim a victim's knowledge of the violation of his rights within the meaning of Article 200 (1) of the Russian Civil Code **becomes legally effective** on the date of a relevant finding. This is the fundamental rationale of the court practice by which the three year limitation period for bringing a claim is not deemed to commence until such a finding has been made. So, for example, if in this case a relevant criminal finding is made on the last day of the criminal liability period applicable to the actions alleged by Yugraneft, the limitation period in relation to its claims would not expire until three years after that date..*
>
>  *5.      It follows **logically** that, if there is no such finding[29], Yugraneft's possible knowledge about the violation of its rights would not be deemed in law to have crystallised <u>and therefore the limitation period in relation to its civil law claims would simply not be triggered.</u> If a claim based on the alleged fraud were brought at this point**, the claimant would fail for evidential reasons because he would not be able to get the civil court to entertain the fraud allegations in his case without a relevant criminal finding**. In this case on the basis of legislative provisions on the commencement of the limitation period currently in force **and taking into account the particularities of their application to civil law claims** based on criminal conduct, the court **should not dismiss the claim on limitation grounds".***

---

[29] The antecedent to "*no such finding*" in paragraph 5 appears to be "*[no] relevant criminal finding …[by] the last day of the criminal liability period*" rather than  "*[no] relevant criminal finding*".

292.  He ends by observing, in effect, that the 3 year limitation period does not run from actual knowledge of the fraud regardless of whether that knowledge is crystallised by a criminal finding. If that were so it would be impossible to explain what happens if a finding of the relevant conduct to be criminal is made later than 3 years after the crime since there is no basis under the Civil Code for a limitation period that has expired to start running anew. There are provisions in Chapter 12 of the Russian Civil Code for the suspension of the limitation period but none of them are applicable here.

*Submissions*

293.  The defendants submit that the special approach of the Russian Courts in respect of convictions or findings in criminal proceedings is inapplicable in present circumstances since there have been none.

*Discussion*

294.  It is apparent from this summary of the experts' views that they are divided as to whether, if a claim were brought in Russia now, relying on conduct that amounts to a crime, it would or should be dismissed (i) on the ground that there has been no criminal finding *and* that the limitation period has expired, as Mr Rozenberg claims; or (ii) only on the former ground, as Professor Sergeev claims, the limitation period not having begun.

295.  That issue seems to be one which is unlikely to arise in Russia. If, as Mr Rozenberg claims, a Russian court will not, as a matter of *substance*, entertain a claim based on conduct which amounts to a crime in the absence of a criminal finding, then, any such claim will be dismissed if there is no such finding. If, as Professor Sergeev states, it will not do so as a matter of *practice*, a Russian court is likely either to dismiss such a claim or at least to stay it. In each case it would not be necessary for the court to determine whether the claim was also statute barred.

296.  In relation to each of the claims it is necessary for Yugraneft to show that the defendants are civilly liable in Russian law. That involves showing (a) that they are substantively valid and (b) that they are not time-barred.

297.  As to (a) the defendants do not contend that, if there is no applicable time bar, Yugraneft still has no claim. But it is common ground that, insofar as the claims are founded (as they all are) on criminal conduct they would, in the absence of a criminal finding, fail either as a matter of substance (Mr Rozenberg) or practice (Professor Sergeev)[30]. But, although they would fail either way, different consequences would attend the manner of their failure.

298.  In determining whether or not a defendant would be liable under a foreign law an English court will ignore any bar to recovery which is purely **procedural.** Thus, as *Dicey* points out at para 35-050, by reference to ***General Steam Navigation Co v Guillou*** (1843) 11 M & W 877, if the foreign law regards the defendant as under *no liability* unless other persons are sued first that rule is substantive and must be applied

---

[30] There may be a dispute as to whether the Russian Court's refusal to entertain cases based on criminal conduct arises only if the pleadings specify that the conduct is criminal and identify a particular crime; or also arises if the facts pleaded amount to a crime. The defendants are content to proceed on the basis that the latter is, as Yugraneft claims, the case. That is, in any event, what I understand the experts to be saying.

to English proceedings. If the foreign law regards the defendant as *liable* but makes that liability conditional on others being sued first the rule is procedural only and is to be ignored. Similarly if the foreign law provides that civil proceedings cannot be brought until a criminal prosecution has been brought, that requirement would be treated by an English court as procedural and a matter for the *lex fori*; ***Scott v Seymour*** (1862) 1 H & C 219, 230 and 234-7. See, also ***Grupo Torras SA v Al-Sabah*** [1999] CLC 1469 at 1661-1662.

299.    According to Professor Sergeev, under the *substantive* law a civil action is maintainable for what amounts to a crime without a criminal finding, provided that the facts amounting to a crime give rise to liability under the Civil Code. If Professor Sergeev is right, the position in this respect is similar to that in ***Scott v Seymour***. Indeed the present case is, if anything, stronger in favour of the lex fori than ***Scott v Seymour***. In the latter case the law of the Kingdom of Naples required a prosecution (for assault) to precede a claim for compensation. Here it is the practice of the court that does so.

300.    I am wholly satisfied that Professor Sergeev's view is a tenable one. Indeed it seems to me likely to be right. If so, the absence of any criminal finding does not mean that Yugraneft's crime-founded claims cannot, in an English court, be regarded as civilly actionable.

301.    It is not clear to me whether Mr Rozenberg is, in truth, intending to say that, as a matter of substantive law, there is no liability for claims founded on criminal conduct, rather than that a claimant will not succeed in his action without one. If the former, then, since there has been no such finding, Yugraneft would not have had, when proceedings were commenced, and does not have now any cause of action based on facts which amount to a crime.

302.    Under both approaches the three year limitation period would never in practice run from actual awareness (if it preceded the date of the criminal finding). If the matter is one of substance the law precludes a civil recovery based on a crime without a criminal finding; and, so soon as there is such a finding, the claimant's knowledge will be treated as arising upon conviction. If the matter is one of practice, the court will not entertain a claim based on a crime until there is a criminal finding, when the position on knowledge is the same.

*The Russian law of limitation*

303.    The facts which amount to a crime may, as in this case, be ones which the victim knows as soon as the crime occurs. A victim's knowledge of the crime, actual or constructive, is not dependent on whether the relevant authorities have secured a criminal conviction or given a finding in respect of the offence.

304.    Yugraneft contends that the special limitation period (applicable in the event of a criminal finding[31]) has not expired in Russia because the date of its deemed knowledge has not occurred and will not occur unless and until there is such a finding. So the starting point for the limitation period is not and cannot yet be determined. It

---

[31] i.e. a conviction or a ruling which is regarded as sufficient to enable a Russian civil court to entertain a civil claim based on criminal conduct.

cannot be said that the period has expired until such a finding occurs and three years elapse thereafter. As a result (a) the limitation period may never begin (if there never is a finding); (b) if it begins the date of its beginning is uncertain, save that it cannot begin later than the date of expiry of the relevant criminal time limit; and (c) whether and when it begins is dependant on whatever decisions are made to bring criminal proceedings and whatever rulings are made within them.

305.   If, therefore, a crime was committed in Russia, of which the claimant was aware, on January 1st 2000, and of which the defendant was convicted on 1st January 2004, and proceedings were commenced in England on 1st January 2005, the English Court would not regard the claim as time barred in Russian law. If Article 200 alone applied that would be so. But, for English law purposes, the Russian law of limitation includes, Yugraneft submits, the practice which the Russian courts apply that, in the event of an established crime, the Article 200 period is applicable only from the date of the conviction.

306.   That example does not, however, address the position where there is no criminal conviction or finding.   Since a Russian court will not entertain claims based on criminal conduct without a criminal finding, and, if there is such a finding, will treat knowledge as "*crystallising*" at its date, it can, in one sense be said that, for practical purposes, the limitation period for a civil claim based on criminal conduct is 3 years from the date of conviction and that, in such cases, Article 200 in practice applies only from the date of conviction.

307.   Professor Sergeev's evidence makes clear that, in the event of a criminal finding, the court will deem the claimant's knowledge of the underlying criminal conduct to arise at the date of the conviction, regardless of whether he *in fact* had it before. This formulation suggests that such deeming will only be done *if* there is a criminal *finding* and not if there is only an *allegation* of a crime or even a finding in an English civil court of facts which would amount to a crime in Russian law. It will be made when a Russian court, applying Russian standards of proof and evidence, convicts. On that basis, in the absence of such a finding, the practice is inapplicable so that the only limitation period laid down in the law is Article 200.

308.   However, in his letter of 7th July Professor Sergeev refers to the victim's knowledge becoming "*legally effective*" or "*crystallizing*" on the date of a relevant finding, and his overall conclusion appears to be that, even upon the expiry of the criminal liability period, the court should not dismiss the claim on limitation grounds. He would seem to be saying not only that, in the event of a finding, the victim will be deemed to have acquired knowledge only at that date, but also that, in the absence of a finding, he will be deemed *not* to have acquired it at all.  I can think of no other grounds upon which, after the expiry of the criminal limitation period without a finding, the court should not dismiss the claim on limitation grounds, unless, as a matter of practice, when criminal conduct is in issue, and no criminal finding has been made, the Russian Court will simply decline to address any question of limitation.

309.   That this is what Professor Sergeev may be saying, at any rate impliedly, appears in particular from paragraph 5 of his letter, which I set out again:

> "It follows **logically** that, if there is no such finding Yugraneft's possible knowledge about the violation of its rights would not be deemed in law to have

*crystallised and **therefore** the limitation period in relation to its civil law claims would simply not be triggered. If a claim based on the alleged fraud were brought at this point**, the claimant would fail for evidential reasons because he would not be able to get the civil court to entertain the fraud allegations in his case without a relevant criminal finding**. In this case on the basis of legislative provisions on the commencement of the limitation period currently in force **and taking into account the particularities of their application to civil law claims** based on criminal conduct, the court **should not** [32] dismiss the claim on limitation grounds".*

310.    With due respect to Professor Sergeev, the logic does not seem to me to follow. The fact that, if there is a criminal finding, the victim is *deemed* to have acquired his knowledge of it at its date, does not necessarily mean that, in the absence of such a finding, he is deemed to have been ignorant – a presumption that is otiose if there is no criminal finding in existence and singularly otiose at the expiry of the criminal liability period. The rule of practice about knowledge can be regarded as a special provision applicable in the event of a criminal finding, but irrelevant in its absence.

311.    If the sole matter at issue was whether or not the Russian courts, applying Russian law and procedure, would or could dismiss a claim based on criminal conduct on the ground of limitation, in the absence of a criminal finding, at any rate at the end of the criminal liability period, I would not have thought it appropriate, despite my doubts about Professor Sergeev's logic, to attempt to resolve the question on a summary application.

312.    But the question for decision is, in my judgment, somewhat different. Yugraneft's claims would be unmaintainable in Russia for want of a criminal finding. However, for private international law purposes it is necessary to ignore the Russian practice not to entertain civil claims based on criminal conduct in the absence of a finding, as being a procedural matter. Yugraneft invokes that principle. But, if the Court is to ignore the practice then, as it seems to me, it should ignore the whole of it. Professor Sergeev's report makes clear that the practice of deeming the victim's knowledge to crystallize upon the event of a criminal finding is part and parcel of its practice not to entertain a claim based on criminal conduct in the absence of a criminal finding. This is not surprising. The need to deem (often contrary to the fact) that knowledge only arose when the criminal finding was given is necessitated, as a matter of justice, by the court's refusal to entertain claims in the absence of a criminal finding. There is no need for such deeming otherwise.

313.    In those circumstances the question for the English Court is: what, leaving aside the Russian practice not to deal with cases based on criminal acts in the absence of a criminal finding, but, in the event of a criminal finding, to assume knowledge arises only from its date, is the Russian law of limitation? To that question, there seems to me only one answer. The law is as laid down in Article 200 of the Russian Civil Code.

314.    Such a conclusion seems to me to make good sense; and to avoid the curious result which is said otherwise to arise, namely that, under Russian law there is (i) in the event of an allegation of non criminal conduct, a three year time limit from

---

[32] I note that Professor Sergeev does not say that it could not.

knowledge of the violation of the claimant's right; (ii) in the event of a criminal finding a three year limit from the date of the finding, which is, in practice, a pre-condition for any claim at all; but (iii) if the claim is brought in England under Russian law, there is no limit, at least until a Russian criminal finding is made, and if none is made then no limit ever.

315.    I have not forgotten that *Section 4* of the *1984 Act* requires the Court to apply:

> "*so much of the relevant law of* [Russia] *as (in any manner) makes provision with respect to a limitation period being applicable to the bringing of proceedings in respect of that matter in the courts of that country* [including]-
>
> (a) *… so much of that law as relates to, and to the effect of, the application, extension, reduction or interruption of that period.*"

It is, also, material to note that the relevant foreign law may provide that proceedings may be brought within an indefinite period: *section 4 (2).*

316.    In my judgment the relevant law does not include a practice, or part of a practice, which, if the claimant is to have any claim at all, the English Court is bound to ignore.

317.    Accordingly there is in my judgment no realistic way in which Yugraneft can establish that it has a cause of action in Russian law in respect of either criminal (or non criminal) conduct which is not time-barred.

*Section 2 (2) of the FLPA*

318.    Yugraneft contends that the application of section 1 of the Act would cause it, at least arguably, undue hardship. Yugraneft has attempted diligently to pursue its rights but has been stymied by decisions of the Russian investigative authorities, which are only explicable on the basis of incompetence or improper influence. In this respect they rely upon reports made by Professor Eksarkhopulo, the professor of criminalistics and criminal procedure at the University of St Petersburg.

319.    He explains that there are 3 phases of the criminal process. First there is a *pre-investigation examination* when the relevant authorities receive and consider a report of a crime. Then there is the *pre-trial investigation stage.* Then there are the *court proceedings* themselves. The *pre-investigation examination* can be made by an Investigator, a police body or a police officer. The general time for making a decision about whether to commence the pre-investigation examination is three days. This can be extended by the head of the investigative body for up to 30 days. The investigator has a power to request documentary inspection at the pre-investigation examination stage. But he has much wider powers at the next stage, including power to require witnesses to answer questions under threat of criminal liability if they refuse to give information or knowingly give false information. An investigator is bound to initiate a criminal case if there are grounds to do so. Grounds means: "*the existence of sufficient information indicating signs of a crime*": Article 140.2 of the *Criminal Procedure Code* i.e. grounds for suspicion of a crime, even though the exact crime is not known. An investigator is required to refuse to initiate a criminal case if there are no such grounds: Article 148. But in this case, according to many scholars, the information received must prove with certainty that there are no signs.

320.   Professor Eksarkhopulo expresses the view that both rulings were "*unjustified, unmotivated and unlawful*". The chief points of his evidence are as follows:

   a)   The first stage should last 3 days. During that time the purpose of the investigation is to see whether there could have been a fraud. It is extraordinary that the Investigators did not take the case beyond that stage but instead extended that period. The effect of so doing was that none of those involved was interviewed under penalty of perjury and no relevant criminal finding (including incriminating evidence) could emerge.

   b)   The Senior Investigator purported to weigh up and resolve acute conflicts of evidence, preferring the account of Mr Davidovich about the alleged oral co-financing agreement to that of Mr Tchigirinsky, without sufficient reasoning. He did not present to Mr Tchigirinsky for comment any of the documents which are said to corroborate Mr Davidovich's argument that the dilutions were part of a legitimate security arrangement. He  chose to rely on those documents even thought they all emanated from persons associated with Mr Davidovich without inquiring whether any independent person representing Yugraneft's interests was aware of them.  He failed to take account of the possibility that the documents had been created in order to conceal the fraud.

   c)   He relied on the findings of the Russian civil courts when he must have known of their practice not to determine allegations of fraud without a criminal finding. He relied on the fact that the transactions and document relied on by Sibneft had never been contested on the grounds of deception, abuse of trust and that their legality had not been challenged, when these contentions had been raised in the BVI and, in so far as they were not raised in the Russian civil courts, that was because of that practice.

   d)   After a legitimate enquiry from a member of the Duma, the investigating authority rescinded its initial decision on the grounds that it was flawed, but then delivered another one in virtually identical terms.

321.   Professor Eskarkhopulo indicates that decisions of this inadequacy are common in relation to criminal cases in the commercial sphere; since investigators often lack practical experience in the sphere of economics; have an excessive caseload and low wages. It is common for inappropriate pressure to be exerted on them by influential people. Corruption is quite widespread. Between September 2007 and late 2008 some 23,000 rulings have been made by prosecutors in relation to refusals to initiate criminal proceedings. Particular difficulty arises in procuring the investigation of criminal cases against influential people and honest investigators who try to discharge their responsibilities have been penalised by being dismissed, forced to retire, or prosecuted.

322.   Yugraneft contends that the decision not to prosecute was perverse and that it would be most unjust, within the meaning of section 2 (2) of the 1984 Act that it should be

precluded from making a claim in respect of an egregious fraud on account of such unacceptable inactivity.

323.   This contention is inconsistent with Yugraneft's claim that the Russian requirement of a prior criminal finding is not a provision of substantive law but a practice to which the English court will not give effect. If so, the refusal of the authorities to prosecute, whether competent or not, has not deprived Yugraneft of the ability to sue in England within the three year time limit. There is, moreover, nothing unjust *per se* about a time limit of three years from knowledge. If, on the other hand, a prior criminal finding is a requirement of substantive law, its absence is fatal to the claims regardless of the limitation position.

324.   In any event, I am not persuaded that Yugraneft will suffer undue hardship by reason of the two refusals. Professor Eksarkhopulo's strictures may or may not be well founded. But Yugraneft has a remedy by way of appeal to a court. It is far from apparent to me that any such right of appeal is illusory. The decision can be administratively reviewed at any time until the expiry of the criminal limitation period. I do not regard it as an undue hardship for Yugraneft, a Russian entity and regular Russian litigant, to be dependent, if a prosecution is to be achieved, on a successful appeal to a Russian court and a change of heart from the prosecuting authorities.

*Abuse of rights*

325.   In his second report (at paragraphs 22-26), Professor Sergeev suggests that the Claimant might be able to invoke the doctrine of "*Abuse of rights*". *Article 10* of the *RF Civil Code* provides:

> "*(1) Actions of citizens and legal persons taken exclusively with the intention to cause harm to another are not allowed, nor is abuse of a legal right allowed in other forms ...*
>
> *(2) In the case of failure to observe the requirements provided by Paragraph 1 of the present Article, the court, commercial court or court of private arbitration may refuse the person protection of the right belonging to him.*"

326.   Professor Sergeev suggests that this provision applies to a defendant's right to rely on the expiry of a limitation period as a defence.   He understood the facts to be that Millhouse Capital obstructed Yugraneft from protecting its infringed rights by pursuing appropriate claims against it. It did so (a)  by concealing  the fact that it controlled on behalf of Mr Abramovich all of the offshore companies that participated in the dilutions and subsequently held and then sold Yugraneft's stolen interest in the capital of Sibneft-Yugra; (b) by using complex corporate entities including those offshore companies; and (c) by doing so gave a semblance of lawfulness to the dilutions and obstructed Yugraneft from discovering the full picture as a result of which it lacked reliable information as to what was happening and as to the connection of the relevant participants, and the involvement of Millhouse and Mr Abramovich.

327.   Professor Sergeev cites a case from the North Caucasus District Federal Arbitration Court in which a claimant sought to invalidate a resolution made at a shareholders'

meeting. The defendant wrongly failed to include the claimant in the register of shareholders. As a result the claimant was prevented from challenging the decision at the meeting until the mistake was corrected. The defendant refused to correct the register which meant that the claimant was forced to begin separate court proceedings seeking to establish its standing as a shareholder. This meant that the claimant was completely disabled from lodging its claim challenging the resolution at the shareholders' meeting within the limitation period. Since the claimant's own wrongful behaviour directly prevented the bringing of the claim within the limitation period, the Court regarded the defendant's reliance on the limitation period as an "abuse of rights".

328.  Mr Rozenberg doubts whether the Russian courts can ever apply the abuse of rights doctrine in the context of limitation periods. The Northern Caucasus decision was not subject to review by the Supreme Arbitazh Court and he could find no other example of a court adopting a similar approach. In January 2002 the Federal Arbitrazh Court of the Ural District stated that the abuse of right concept was inapplicable to the defendant's petition to apply the statute of limitation. He states that it is beyond doubt that even if the doctrine, a concept rarely applied by the Russian courts, is applicable to a limitation defence, it would have to be applied narrowly only to very exceptional circumstances: see Mr Rozenberg's 3rd Expert Report at paras 14-22.

329.  On that material it is arguable that Article 10 (2) is capable of applying to a limitation plea. But it does not seem to me that there is any realistic prospect of Yugraneft establishing that the abuse of right doctrine applies to preclude the defendants in the present case from relying on a limitation defence. Whatever information Yugraneft claims it lacked, there is no basis for the allegation that it did not have sufficient information to bring its claims against either Mr Abramovich, who was a party to the BVI proceedings, or Millhouse within the limitation period.

330.  It has long been part of Yugraneft's claim that Millhouse and Mr Abramovich were involved in the dilutions. In Sibir's Statement of Claim in the BVI proceedings at paragraph 38.3 it alleged:

> *"Mr Davidovich is an associate of Abramovich, and the managing director of the Moscow representative office of Millhouse Capital Limited (the English company through which Abramovich owns his beneficial interest in the majority of the issued share capital of Sibneft) and accustomed to act on behalf of and in accordance with the instruction of Abramovich. It is to be inferred that Mr Davidovich voted for the resolutions proposed at each of the September 2002 EGM and the February 2003 EGM on the instructions and/or at the behest of Abramovich."*

331.  In the BVI proceedings Mr Abramovich was said to have procured Sibneft's breaches of duty. Messrs Matevosov, Davidovich and Korsik were said to be acting both for Sibneft and Mr Abramovich and the six offshore companies were said to be nominees for Sibneft which was controlled by him. The fact that Millhouse lawyers had helped draft the dilution documents and that Millhouse employees were directors or representatives of the offshore companies appeared in the course of the BVI proceedings.

332.    Similar allegations were made in the Russian proceedings. In what may be the draft version of the Russian criminal complaint, (the final version being received by the authorities on January 31st 2007) several of the directors of the offshore companies were identified as Millhouse employees - see at p.10(c)-(d). The "*criminal gang*", including Mr Abramovich, is described as controlling the offshore companies – pages 11-12).

333.    The company filings from which details were obtained to construct the charts of the corporate relationships put before me are publicly available.

334.    The claims against Mr Abramovich in the present proceedings include a claim for unfounded enrichment. In the light of the allegations made in the BVI and the information gleaned therein and thereafter, and the allegations made in the Russian criminal proceedings, there was nothing to prevent Yugraneft making the present claim against Mr Abramovich in time. Whether the offshore companies were nominees for Sibneft, and hence for Mr Abramovich, or for Millhouse and hence for him, or for him by some other route, makes little difference to Yugraneft's case which has always been, in essence, that Mr Abramovich was the puppet master of the six offshore companies. Further, according to Professor Sergeev the unfounded enrichment claim is dependent only on Mr Abramovich having received the benefit of the alleged fraud following the sale of that benefit to Gazprom at the expense of Yugraneft, without legal basis: 1st Report paras 36-42. That has always been Yugraneft's case.

335.    In short there was no obstacle to bringing the present claim in unjust enrichment in time sufficient to mean that the raising of a limitation point constituted an "*abuse of rights*". The same applies to a claim against Millhouse and Mr Abramovich in tort. Dishonest assistance by Mr Davidovich of Millhouse and by Mr Abramovich has been asserted from the start.

*Ratification*

336.    In his 1st Report at paragraph 33, Professor Sergeev noted that if the power of attorney granted to Mr Davidovich was:

> "*of a general nature (in other words that it granted him the right to undertake any legal actions on behalf of Millhouse Capital in Russia) any votes he cast at the Dilution Meetings for the purposes of advancing the interests of Millhouse Capital would be regarded as actions falling within the scope of such power of attorney*".

At paragraph 34, he then went on to consider what the position would be if his acts "*fell outside the scope of his authority*". In this case, Professor Sergeev suggested that "*if [Millhouse] accepted the benefit of any fraud and sold it with knowledge of the fraud*" (referring presumably to Millhouse's later acts in 2005, in assisting in the sale of the Sibneft shares), this could have amounted to a "*ratification*" in Russian law. Article 183 (2) of the Civil Code provides that:

> "*The subsequent approval of a transaction by the representee shall create, amend and terminate for him the civil rights and duties by the relevant transaction from the moment of its being effected*".

337.    Yugraneft suggested in its skeleton argument that an act of ratification occurring in 2005 would be an act falling within 3 years of the bringing of the proceedings and hence within the limitation period.  If so, this would mean that the claim against Millhouse might survive the time bar.

338.    In fact, as it appears, Mr Davidovich acted for Millhouse under a general power of attorney.  Accordingly, the possibility that Millhouse might have ratified in 2005 actions taken in 2002 or 2003 on behalf of Millhouse does not arise – as Professor Sergeev, who originally did not have access to the actual power of attorney, accepts: Report 2 para 33.4 and 35.

339.    In his 2nd Report at paragraph 35, Professor Sergeev suggests that the ratification point might still arise if, as he takes Mr Rozenberg to be suggesting, "*Mr Davidovich did not act at the relevant participants' meetings of Sibneft-Yugra as a representative of Millhouse Capital (which appears to be M.A. Rozenberg's position)*".  See also paragraph 67 of Professor Sergeev's 3rd Report.

340.    The defendants contend that Professor Sergeev has misconstrued the position.  Millhouse could only possibly have "ratified" Mr Davidovich's conduct if there was some absence of authority for him to act for Millhouse.  There was no such want of authority – as he had a general power of attorney giving him very broad powers indeed.  The Defendants' position is not that he did not represent Millhouse owing to a lack of authority but rather that, on that occasion, Mr Davidovich was not acting for Millhouse at all, but for other parties (i.e. for Yugraneft or for Sibneft).  If this is correct, Millhouse cannot have "ratified" his conduct.  As Professor Maggs explains in his 3rd report:

> "*It stands to reason that the existence of a general power of attorney means that no question of "ratification" can arise.  There are only two possibilities: either (on the Claimant's case) it could be found that Mr Davidovich in acting at the meetings was acting for Millhouse; alternatively, on the Defendant's case, it will be found that he was acting for Yugraneft or Sibneft.  In the former case (i.e. Davidovich acting for Millhouse) it is obvious that no later ratification would be required or could arise.  In the latter case (Davidovich acting for Yugraneft and/or Sibneft), equally no "ratification" by Millhouse would be possible because, ex hypothesi, Mr Davidovich would have been found to have been acting at the meetings as a representative of a different party (viz. Yugraneft and/or Sibneft).  If Mr Davidovich were to be found to have been acting at the EGMs for Yugraneft and/or Sibneft rather than Millhouse, the later acts of Millhouse in assisting with the sale of Sibneft's shares could clearly not alter that finding.  I am sure that even Professor Sergeev's overly broad interpretation of "ratification" could not stretch to encompass later acts retrospectively changing the person for whom a representative has acted.*"

341.    Save that it seems to me possible to argue that, in relation to the EGMs, Mr Davidovich was acting for Yugraneft/Sibneft *and* Millhouse, I see no answer to Professor Maggs' analysis. I do not think that any question of ratification by Millhouse realistically arises.

342. Accordingly, as I hold, the present claims, whether in knowing assistance, knowing receipt or unjust enrichment, or their Russian equivalents, cannot succeed. They were brought outside the 3 year limitation period laid down by Article 200 of the Civil Code. There is no basis for the allegation of "*abuse of rights*" and no question of ratification arises. The claims should be dismissed because they are bound to fail as a matter of Russian law, and Yugraneft cannot recover if its claims are not civilly actionable under that law.

*English law*

*Has Yugraneft's property been taken?*

343. In respect of the knowing receipt, unjust enrichment and proprietary claims, it is necessary to determine whether or not the defendants can be said to have received any property of Yugraneft. I turn, therefore, to consider the process of following and tracing in English law.

*Equitable proprietary claims*

344. Yugraneft asserts a proprietary claim to the proceeds of the sale of the shares of Sibneft which are said to be currently held by Mr Abramovich or by Millhouse. Those proceeds are identified as "*the proportion of the purchase price paid by Gazprom for Mr Abramovich's interest in Sibneft which was attributable to inclusion in the sale of Yugraneft's share in Sibneft-Yugra*" (para 89(6) PoC - see also para 64 PoC). Yugraneft alleges that these "*assets of Mr Abramovich managed by Millhouse Capital represent, in significant measure, the interest in Sibneft-Yugra stolen from Yugraneft and/or dividends derived from that interest since the theft of it*" (PoC para 107). It states that it is "*entitled to trace its property into the hands of Mr Abramovich and/or Millhouse*" (PoC para 109). On this basis, Yugraneft seeks declarations and accounts, as well as to assert a constructive trust or equitable proprietary lien over what it calls the "*proceeds of the fraud*".

345. Yugraneft also claims a proprietary right to the assets into which those proceeds have, it infers, subsequently been reinvested. In particular, it suggests that it has a proprietary right over the shares in Evraz or some part of them (see paras 67-74). It is on the basis of this proprietary claim that Yugraneft brings its contingent claim against Mr Berezovsky. In particular, it alleges that, if Mr Berezovsky were to have his claim satisfied by Mr Abramovich out of the proceeds of the sale of Mr Abramovich's Sibneft shares, then Mr Berezovsky would "*hold any proceeds received by him which derive from the inclusion in Sibneft's assets of Yugraneft's stolen interest in Sibneft-Yugra on constructive trust for Yugraneft and/or subject to an equitable lien in favour of Yugraneft to the extent of such part*" (PoC para 126).

346. The defendants claim that Yugraneft has no such proprietary claim to the proceeds of the sale of the Sibneft shares because it cannot establish a right to trace from its original participation interest into the proceeds of the sale of the Sibneft shares or into any assets purchased with those proceeds. Accordingly, the Claimant's proprietary claim for a constructive trust/proprietary lien and consequential accounts, declarations and enquiries should be summarily dismissed.

*Tracing*

81

347.    Tracing is a process by which one property is identified as the substitute of another. As Lord Millett explained in **Foskett v McKeown** [2001] 1 AC 102:

> *"Following is the process of following the same asset as it moves from hand to hand. Tracing is the process of identifying a new asset as the substitute for the old. Where one asset is exchanged for another, a Claimant can elect whether to follow the original asset into the hands of the new owner or to trace its value into the new asset in the hands of the same owner...*
>
> *Tracing is thus neither a claim nor a remedy. It is merely the process by which a Claimant demonstrates what has happened to his property, identifies its proceeds and the persons who have handled or received them, and justifies his claim that the proceeds can properly be regarded as representing his property. Tracing is also distinct from claiming. It identifies the traceable proceeds of the Claimants' property. It enables the Claimant to substitute the traceable proceeds for the original asset as the subject matter of his claim. But it does not affect or establish his claim."*

348.    In the same case Lord Millett and Lord Steyn approved the following passage from Professor Birks' article "*The Necessity of a Unitary Law of Tracing*":

> *"The tracing exercise once completed, it can then be asked what rights, if any, the plaintiff can, on his particular facts, assert.  It is at that point that it becomes relevant to recall that on some facts those rights will be personal, on others proprietary, on some legal and on others equitable."*

From this: "[it] *follows that the tracing exercise must be carried out first.  Only then can the court consider what rights (if any) the claimant has in the assets that have been identified as being trust property or their identifiable substitutes*" (per Lewison J in **Ultraframe v Fielding** [2005] EWHC 1638 (4) at [1464]). If, as a result of the exercise Yugraneft cannot establish that the proceeds of the sale of Sibneft to Gazprom are a substitute for an asset of its own, no proprietary claim to them will arise. If it can, its rights to the substitute thus identified will have rights in respect of the proceeds which are not discretionary but proprietorial: see Lord Browne-Wilkinson at 109.

349.    In order to be able successfully to trace property it is necessary for the claimant, firstly, to identify property of his, which has been unlawfully taken from him ("a proprietary base"); secondly, that that property has been used to acquire some other new identifiable property. The new property may then have been used to acquire another identifiable asset ("*a series of transactional link*s"). Thirdly the chain of substitutes must be unbroken.

350.    As to the first, as Millett LJ said in **Trustee of the Property of FC Jones & Son (A Firm) v Jones** [1997] Ch 159.170, tracing is the process *by which the plaintiff establishes what has happened to his property and makes good his claim that the asset which he claims can properly be regarded as representing his property"*.

351.    As to the second, Lord Millett summarised the matter in **Foskett v McKeown**:

> *"The simplest case is where a trustee wrongfully misappropriates trust property and uses it exclusively to acquire other property for his own benefit. In such a case the beneficiary is entitled at his option either to assert his beneficial ownership of the proceeds or to bring a personal claim against the trustee for breach of trust and enforce an equitable lien or charge on the proceeds to secure restoration of the trust fund...*
>
> *Both remedies are proprietary and depend on successfully tracing the trust property into its proceeds. A beneficiary's claim against a trustee for breach of trust is a personal claim. It does not entitle him to priority over the trustee's general creditors unless he can trace the trust property into its product and establish a proprietary interest in the proceeds. If the beneficiary is unable to trace the trust property into its proceeds, he still has a personal claim against the trustee, but his claim will be unsecured.*
>
> *The beneficiary's proprietary claims to the trust property or its traceable proceeds can be maintained against the wrongdoer and anyone who derives title from him except a bona fide purchaser for value without notice of the breach of trust. The same rules apply even where there have been numerous successive transactions, so long as the tracing exercise is successful and no bona fide purchaser for value without notice has intervened.*
>
> *A more complicated case is where there is a mixed substitution. This occurs where the trust money represents only part of the cost of acquiring the new asset. As Ames pointed out in 'Following Misappropriated Property into its Product' (1906) Harvard Law Review 511, consistency requires that, if a trustee buys property partly with his own money and partly with trust money, the beneficiary should have the option of taking a proportionate part of the new property or a lien upon it, as may be most for his advantage.*
>
> *Accordingly, I would state the basic rule as follows. Where a trustee wrongfully uses trust money to provide part of the cost of acquiring an asset, the beneficiary is entitled at his option either to claim a proportionate share of the asset or to enforce a lien upon it to secure his personal claim against the trustee for the amount of the misapplied money. It does not matter whether the trustee mixed the trust money with his own in a single fund before using it to acquire the asset, or made separate payments (whether simultaneously or sequentially) out of the differently owned funds to acquire a single asset."*

352.    It is not sufficient to show no more than that possession of the claimant's asset by the defendant enabled the claimant to make a profit or obtain an asset that he would not otherwise have earned. Thus in ***Satnam Investments Ltd v Dunlop Heywood*** [1993] 3 All ER 652, the defendants, who were the claimant's agents handed confidential information to a business rival which had used it to acquire a development site which the claimant had wanted. The Court of Appeal rejected the suggestion that the rival (Mobaine) was a constructive trustee of the site for the claimant: Nourse LJ said:

> *"Clearly, DH and Mr Murray can be regarded as trustees of the information and, clearly, Morbaine can be regarded as having been a knowing recipient of it. However, even assuming, first, that confidential information can be treated*

> *as property for this purpose and, secondly, that but for the disclosure of the information Morbaine would not have acquired the Brewery Street site, we find it impossible, in knowing receipt, to hold that there was a sufficient basis for subjecting the Brewery Street site to the constructive trust for which Satnam contends. The information cannot be traced into the site and there is no other sufficient nexus between the two."*

353.    As to the third, once a right to trace has been lost, it is extinguished.

*The defendants' submissions*

354.    The defendants submit, and I agree, that the claimant's pleaded case involves the following tracing exercise:

(1)    "Tracing" from the original participation interest held by Yugraneft into the new participation interests in Sibneft-Yugra issued to Carroll, Shaw, and Tranquillo (PoC paras 34-37);

(2)    Imputing the receipt by Carroll, Shaw and Tranquillo to Mr Abramovich personally i.e. treating their ownership of the participation interests as his ownership; (See PoC para 36)

(3)    Imputing the receipt by Richard, Gregory, and Ferenco on 3rd November 2003 to Mr Abramovich i.e. treating their ownership as equally being his ownership (PoC paras 48-52);

(4)    Upon the supposed transfer of the participation interests held by Richard, Gregory and Ferenco into Sibneft,[33] "tracing" the "value" of the participation interests received by Sibneft, or owned or controlled by Sibneft, into the "increased value" of the shares in the consolidated Sibneft group, which shares were held by offshore companies (which offshore companies were themselves indirectly owned by Mr Abramovich);

(5)    "Tracing" into the increased value of any dividends issued by Sibneft attributable to the presence of the Sibneft-Yugra participation interests that are received by the offshore companies.

(6)    Imputing the receipt of the increased value of the shares and of any increased dividends received held by the offshore companies to receipt by Mr Abramovich personally.

(7)    Tracing from the Sibneft shares into the cash proceeds of the sale of those shares to Gazprom to the extent that those cash proceeds were allegedly inflated by virtue of the presence of participation interests in Sibneft-Yugra owned by the Sibneft group.[34]

---

[33]  Alleged in the Particulars of Claim to have taken place in December 2003: PoC paras 53-57.

[34]  It will be recalled that the defendants' evidence is that there was, in fact, no increased value paid for Mr Abramovich's shares as a result of the inclusion of these assets within the Sibneft group.

    (8) Imputing the receipt of those cash proceeds by offshore companies to receipt by Mr Abramovich personally.

    (9) Tracing into the assets (or part of the assets) that have been purchased with that part of the cash proceeds of the sale of the Sibneft shares attributable to the increased value (PoC paras 63-74).

    (10)    Imputing the ownership of those assets to Mr Abramovich personally.

355. The defendants contend that all 10 steps are fallacious but, for immediate purposes, confine themselves to steps (1) and (4).

356. As to (1), Yugraneft's original property was 5000 roubles of nominal charter capital. Its initial participation interest in Sibneft-Yugra was governed by Sibneft-Yugra's Articles of Association. Article 3 provided that Sibneft-Yugra's registered capital "*shall be made up of the nominal value of its Members* [participation interest]. *The Company's registered capital shall be 10,000…roubles"*. . The chose in action represented by those participation interests remains where it always has been – with Yugraneft. No property has ever been substituted for it. No question of substitution can arise when nothing has taken the place of that chose, nor have the new participation interests been obtained by the use of, or in exchange for, Yugraneft's original interest.

357. Yugraneft contends that it may be regarded as having had 49.8%, part of its original 50% interest taken or converted so as to become an interest of the first, and then the second, set of offshore companies. But the reality is that Yugraneft had issued to it a participation interest in Sibneft-Yugra which, as with ordinary shares, was denominated in roubles and totalled 5,000 out of a total capital of 10,000 roubles. Mathematically 5,000 is 50% of 10,0000. So Yugraneft's interest could accurately be described, and defined adjectivally, as a 50% interest in Sibneft-Yugra. But a percentage does no more than express a ratio between two figures. What Yugraneft obtained was a 5,000 rouble participation interest, and that it has never lost.

358. The creation of the new participation interests, which were not issued to it, has meant that the ratio which Yugraneft's 5,000 rouble interest bears to the totality of the participation interests has greatly diminished. But that does not mean that there has been a transfer of Yugraneft's share; any more than there is a transfer of ordinary shares, when the company issues many more than the original number of shares to others. Creation (by issuing) and transfer of shares are two different things: *Re VGM Holdings Ltd* [1942] Ch 235 at 240-1.

359. Nor is there any basis for saying that when the new participation interests were issued to the offshore companies they were the property of Yugraneft. No provision of Russian law indicates that that is so.

360. Professor Sergeev draws attention (at paragraph 27 of his first report) to a number of provisions of the Civil Code and of the Articles of Sibneft-Yugra which refer to "*the size of the share*" of each participant in the company's share capital, which according to Article 14 (2) of the *Law on Limited Liability Companies* is to be "*determined as a percentage or in the form of a fraction …[corresponding] to the ratio between the nominal value of this share and the company's share capital* ". He also refers to the

fact that Article 3.2 of the Articles states that the shares shall be allotted to the Member as follows

> "[Sibneft]        has 50% of shares of the Company's charter capital. Nominal value of equity is 5,000 roubles
>
> [Yugraneft]       50% of the registered capital with a nominal value of 5,000 roubles
>
> On the date of the registration of the Company 100% of the charter capital was paid by shareholders' money."

The references cited by Professor Sergeev were made in order to show that a participation interest was not simply a chose in action for 5,000 roubles. It carried with it a right to participate in the company proportionate to the size of the share as a percentage of all shares, so that an unlawful act which reduced that value, because, by the creation of additional participation interests it reduced the size of the share, was capable of amounting to harm within **Article 1064**: see paragraph 28 of the report.

361.    I can see nothing in the provisions to which he refers, or in the amendments to the charter that were made in 2002 and 2003, to indicate that a participation interest is anything other than an interest of a particular nominal value in roubles, which constitutes, and is described or defined as, a percentage of the totality of interests issued. That interest will carry with it all the rights under the company's charter attaching to the holder of shares of a nominal value of (say) 5,000 roubles. The original charter capital was 10.000 roubles. Yugraneft had 5,000 roubles out of that, which was 50%. But the charter could be, and was, amended so as to increase the original capital (and, thereby alter the size of the shares i.e. the percentages) and create new participation interests which are necessarily not the same as the original ones. That reduced the value of Yugraneft's 5,000 rouble interest. But I cannot see how that made the new interests in any way belong to Yugraneft; or deprived Yugraneft of its 5,000 rouble interest.

362.    In his commentary on Article 1102 Professor Sergeev states that a claim for unjust enrichment requires that (i) the defendant received property; (ii) that he did so without legal basis; and (iii) that he received the property at the expense of another. As I stated in paragraph 87 above, he expresses the view that it does not matter if there are a number of steps between the wrongdoing in question and the enriched party as long as the trail to the defendant establishes that the latter has been enriched without legal basis. He also says that it may be the law that a claim to unjust enrichment could be made against participants of companies which have received the property which is the object of the enrichment. On that footing Mr Abramovich would be held liable if he received the benefit of the alleged fraud following the sale of that benefit to Gazprom[35]. All that is required is that he receives property without legal basis at the expense of the claimant.  But that is not the same as saying that the interests which were issued to the dilution companies (and still remain with them) became in some (unexplained) manner the property of Yugraneft.

---

[35] Professor Sergeev's report does not address the question whether Mr Abramovich was enriched when the participation interests were issued, and, if so, whether in Russian law he is to be regarded as enriched again thereafter.

363.    These considerations alone are sufficient to destroy Yugraneft's claim to follow or trace into the offshore companies.

364.    Even if that obstacle could be overcome, and the new participation interests in Carroll, Shaw and Tranquillo could be regarded as belonging to Yugraneft, what Yugraneft seeks is to trace into the proceeds of the sale of Sibneft to Gazprom, on the footing that a part of the (increased) value of the shares in Sibneft represents the value of the interest in Sibneft-Yugra which Sibneft acquired prior to the sale by virtue of Richard, Gregory and Ferenco having become its subsidiaries prior to the sale.

365.    It does not, however, seem to me possible to regard any increased value of Mr Abramovich's shareholding in Sibneft, or any increased amount paid for that shareholding, as in any real sense a substitute for the participation interests in Richard, Gregory and Ferenco. What happened was that the second set of offshore companies either were in, or came into, the ownership of the Sibneft group, when Mr Abramovich already owned a majority interest in Sibneft. In consequence, on Yugraneft's case, the value of Sibneft shares increased. At best there is a causal connection between the transfer and the increased value (value not itself being an asset) when what is required is a transactional link by which a new asset is exchanged for, and acquired with, the old one. The mere fact that a defendant has benefited from a breach of trust does not give rise to claims in knowing receipt or restitution. Nor, if tracing is no longer possible, can the claimant assert a lien over the trustee's assets to reflect the extent to which they might have been swollen by the contribution of the claimant's assets: **Snell** 28-41.

366.    Mr Swainston sought to derive assistance from certain passages in the speeches of Lord Browne-Wilkinson and Lord Millett in *Foskett v McKeown* [2001] 1 AC 102, where they observed that when monies are traced into a defendant's bank account, the chose in action represented by the defendant's right against the bank to demand payment of the balance of the account remained the same but its value increased. So, in the present case the value of Mr Abramovich's shareholding in Sibneft increased by the inclusion in the Sibneft group of the second set of offshore companies, and Yugraneft was, it is submitted, entitled to trace into that increased value.

367.    I do not regard the analogy as apposite. In the case postulated by Lords Browne-Wilkinson and Millett, the trust monies paid into the bank are substituted by an enhanced chose in action against the bank. To the extent that the right to claim from the bank was for an increased amount, that right was obtained by the use of the trust monies and in exchange for them. In the present case Mr Abramovich's rights as a shareholder in Sibneft were not acquired by the use of the participation interests, nor were those rights a substitute, or exchanged, for the participation interests.

368.    Mr Swainston submitted that if a person who has received property paid to him by a mistake of which he is aware is to be regarded as a constructive trustee of that property how much more should that be the case if someone such as Mr Abramovich has received the benefit of a fraudulent scheme of which he was the architect. I disagree. In the circumstances postulated Mr Abramovich would be liable as a dishonest assistant. But if the proceeds of the sale to Gazprom are not trust property he cannot come under any liability in knowing receipt.

369.    Nor is there any realistic possibility of piercing the corporate veil and treating Sibneft as if it was Mr Abramovich. In ***Trustor v Smallbone (No 2)*** [2001] 1 WLR 1177 the issue was whether the defendant was liable, together with the company, in knowing receipt in respect of assets received by the company which he controlled. Morritt LJ held:

> "[14] *Counsel for Trustor submitted that the circumstances were such as to warrant the court 'piercing the corporate veil' and recognising the receipt by Introcom as the receipt by Mr Smallbone. He suggested that the authorities justified such a course in three, potentially overlapping, categories, namely (1) where the company was shown to be a façade or sham with no unconnected third party involved, (2) where the company was involved in some impropriety and (3) where it is necessary to do so in the interests of justice and no unconnected third party is involved...*

> *[17] ... The issue is whether the court is entitled to regard the receipt by Introcom as the receipt by Mr Smallbone ...*

> *[21] ... I consider that I should follow the later decisions of the Court of Appeal in* **Adams v Cape Industries plc** *[1990] Ch 433 and* **Ord v Belhaven Pubs Ltd** *[1998] BCC 607 and decline to apply so broad a proposition as that for which counsel for Trustor contends in the third principle referred to in paragraph 14 above.*

> *[22] The second proposition also appears to me to be too widely stated unless used in conjunction with the first. Companies are often involved in improprieties ...but it would make undue roads into the principle of Salomon's case if an impropriety not linked to the use of the company's structure to avoid or conceal liability for that impropriety was enough...*

> *[23] In my judgment the court is entitled to 'pierce the corporate veil' and recognise the receipt of the company as that of the individual(s) in control of it if the company was used as a device or façade to conceal the true facts thereby avoiding or concealing any liability of those individuals."*[36]

370.    Morritt LJ did, in the event, pierce the corporate veil because he found that the companies were shams created for the purpose of receiving monies diverted by the defendants in breach of their fiduciary duties. There is no realistic basis for contending that Sibneft is a façade or a sham. At all material times it was, and it remains, one of the largest oil companies in the world dealing in petroleum exploration, refining and marketing.

371.    Accordingly, as I hold, Yugraneft has no realistic prospect of establishing a right to trace any asset of its own into the increased value of the Sibneft shares or the proceeds of the sale of those shares or into any assts purchased with those proceeds. Nor has it

---

[36] This paragraph was cited with approval by Cooke J in ***Kensington International Limited v Republic of the Congo*** [2005] EWHC 2684 (Comm) at [188]. See also Cooke J's general discussion of piercing the corporate veil at [177]–[190], which was adopted in ***Raja v Hoogstraten and others*** (***Amendment to Particulars of Claim***) [2006] EWHC 2564 (Ch) at [30] per Pumfrey J.

any right to trace into any dividends paid by Sibneft. These too are not a substitute for any Yugraneft asset.

*Consequences*

372.   The effect of rejecting Yugraneft's proprietary claim for want of a proprietary base is that its personal restitutionary claims in knowing receipt must fail, because such a claim requires that the claimant establish that the defendants has received its property at some stage. As Millett J said in ***Boscawen v Bajwa*** [1996] 1 WLR 328,334:

> *"Tracing properly so-called, however, is neither a claim nor a remedy but a process. Moreover, it is not confined to the case where the plaintiff seeks a proprietary remedy; it is equally necessary where he seeks a **personal remedy against the knowing recipient** or knowing assistant. It is the process by which the plaintiff traces what has happened to **his property**, identifies the persons who have handled or received it, and justifies his claim that the money which they handled or received (and, if necessary, which they still retain) can properly be regarded as representing his property."*

373.   Mr Swainston relied on ***A.G. for Hong Kong v Reid*** [1994] AC 1 as showing that there may be a duty to account for property to someone who was not the original owner of the property. In that case a Crown servant in Hong Kong was bribed and purchased two properties in New Zealand with the bribe. On those facts he was held to hold the properties on constructive trust for the Crown. But this was because the bribe, when received by him, although in *law* his property, was owed in equity to the Crown, to which he owed a duty to account for the bribe since as a fiduciary it was unconscionable for him to retain the benefit of it. As soon as the bribe was received it was held on constructive trust for the Crown. See, also, ***Daraydan Holdings Ltd v Solland International Ltd*** [2005] Ch 119.

374.   In *El Ajou* the defendants received what was traceable as the plaintiff's property because English law, which was held to be the *lex causae*, (there being no proof of any foreign law in any event), treated the monies as they passed through various Continental bank accounts as subject to a charge in favour of the plaintiff.

375.   So, also, a person who acquires property of another with knowledge that that property has been transferred by mistake; or who steals such property, so that, in either case, his conscience is affected,  is liable to account for the property of which he is a constructive trustee: ***Westdeutsche Bank v Islington LBC*** [1996] AC 669, 715B-C, 716 C-D.

376.   Profits derived by a fiduciary from an opportunity, obtained as a result of acting as a fiduciary, which he is bound to use (if at all) only for the benefit of his principal, are regarded as profits for which the false fiduciary, and any company which has acquired the rights to the profits with knowledge of the circumstances, is accountable: ***Boardman v Phipps [1967] 2 AC 46; Cook v Deeks*** [1916] AC 554 (*"the defendants cannot retain the benefit of such contract for themselves but must be regarded as holding it on behalf of the  company"*). A contract obtained by use of a "corporate opportunity", obtained as a result of being a trustee, may thus be regarded as held on trust for the entity to which the fiduciary duty is owed; and the opportunity itself might be regarded as a trust asset; but it does not follow that equity can trace from the

contract into any specific asset of the fiduciary: ***Ultraframe (UK) Ltd v Fielding & Ors*** [2005] EWHC at paras 1473 and 1491.

377.   Profits made by a third party who is a stranger to the trust, even if made as a result of the rendering of dishonest assistance, do not belong in equity to the beneficiary but are only subject to a personal obligation to account: **Snell** 28-45-6.

378.   Yugraneft cannot and does not seek to rely on a "remedial constructive trust", i.e. the imposition of a trust as a remedy in an *ex post facto* exercise of judicial discretion. This would, by way of remedy, confer a proprietary interest in an asset to the claimant. Such a remedy is currently not recognized by English law.  See ***Re Polly Peck International Plc (No.2) v Stone*** [1998] 3 All ER 812 (C.A.) at 823-827 and at 830-831.

*Unjust enrichment*

379.   Similar considerations apply in respect of the claim in unjust enrichment.  In ***Lipkin Gorman v Karpnale*** [1991] 2 AC 548 the claimant solicitors sought to recover from the gaming club at which their compulsive gambler partner used their money for gaming. He had obtained cash for gaming by getting a subordinate to cash cheques drawn on the firm's client account. In one instance he had endorsed a banker's draft drawn in favour of the firm to the club.

380.   Lord Goff held that, in a case such as this:

> *"..the [claimant] has to establish a basis upon which he is entitled to the money. This (at least, as a general rule) he does by showing that the money is his legal property..If he can do so, he may be entitled to succeed in a claim against the third party for money had and received to his use, though not if the third party has received the money in good faith and for valuable consideration. The cases in which such a claim has succeeded are, I believe, very rare…This is probably because, at common law, property in money, like other fungibles, is lost as such when it is mixed with other money. Furthermore, it appears that in these cases the action for money had and received is not usually founded upon any wrong by the third party, such as conversion; nor is it said to be a case of waiver of tort. It is founded simply upon the fact that, as Lord Mansfield said, the third party cannot in conscience retain the money – or, as we say nowadays, for the third party to retain the money would result in his **unjust enrichment** at the expense of the owner of the money.*

> *So, in the present case, the solicitors seek to show that the money in question was **their money** at common law. But their claim in the present case for money had and received is nevertheless a personal claim; it is not a proprietary claim, advanced on the basis that money remaining in the hands of the respondents is their property. Of course there is no doubt that, even if legal title to the money did vest in Cass immediately on receipt, nevertheless he would have held it on trust for his partners, who would accordingly have been entitled to trace it in equity into the hands of the respondents. However your Lordships are not concerned with an equitable tracing claim in the present case since no such case is advanced by the solicitors, who have been content*

> *to proceed at common law by a personal action, viz an action for money had and received.…On this aspect of the case, therefore, the only question is whether the solicitors can establish legal title to the money when received by [the partner] from the bank by drawing cheques on the client account without authority."*

381.    The House of Lords held that at common law the firm was the owner of the chose in action constituted by the indebtedness of the bank to it and therefore could trace into the direct product of that property, namely the money drawn from the firm's bank account by the partner, and follow it into the hands of the casino.  It is clear that the requirement that an asset of the claimant should have come into the hands of the defendant was regarded as an essential element of the cause of action.

382.    I would not, however, on a summary application, be minded to regard Yugraneft as unable to claim in unjust enrichment. In ***Banque Financière de la Cité v Parc (Battersea) Ltd*** [1999] 1 AC  221, the House was concerned with a restitutionary claim in relation to a financial transaction of some complexity. The majority of the House determined the matter on the basis of equitable subrogation. But Lord Steyn, whilst agreeing that the same conclusion could be reached by the application of principles of subrogation, proceeded on the basis that there were four questions:

> *"(1)    Has OOL benefited or been enriched?*
>
> *(2)    Was the enrichment at the expense of BVC?*
>
> *(3)    Was the enrichment unjust?*
>
> *(4)    Are there any defences?"*

Having answered "Yes" to the first three questions and "No" to the fourth, he held that the appellants were entitled to recover.

383.    Lord Clyde held that the principle of unjust enrichment, more fully expressed in the Latin formulation, *nemo debet locupletari aliena jactura,* required at least that the plaintiff should have sustained a loss through the provision of something for the benefit of some other person with no intention of making a gift, that the defendant should have received some form of enrichment, and that the enrichment has come about because of the loss.

384.    It may be that these formulations, particularly the former, provide a route by which, on the alleged facts, Yugraneft could recover against Mr Abramovich in unjust enrichment, similarly to the way in which Professor Sergeev contends that it may recover under Article 1102. I do not, however, intend to add to a lengthy judgment by determining whether they do.

385.    The result is that, if I was wrong to conclude that the knowing receipt and unjust enrichment claims are governed by the law of Russia, I would have concluded that the knowing receipt (but not necessarily the unjust enrichment) claim would fail in English law.

*Dishonest assistance*

386.    Yugraneft's claim against Millhouse in dishonest assistance rests on (a) the acts of Mr
Davidovich (and certain other Millhouse employees) in relation to the issue of the
additional participation interest at the EGMs; and (b) Millhouse's actions in
"*orchestrat[ing] the sale of Yugraneft's interest in Gazprom and the holding and
reinvestment of the proceeds*"

387.    Yugraneft's claim is, as I have held, governed by Russian law, either entirely, or in
the sense that the matters complained of must be actionable by both Russian and
English law.

388.    In relation to (a) the defendants do not submit that if the dishonest claim was solely
governed by English law it should be summarily struck out. But, in relation to (b), the
claim is, the defendants submit, defective in English law. In order to render the
defendant liable in dishonest assistance it is not necessary to show that the assistance
has caused loss or damage additional to that resulting from the original breach of
trust. Nor is it the case that there can be no dishonest assistance after the original
breach of trust.

389.    As Lord Millett observed in ***Twinsectra* Ltd v Yardley** [2000] 2 AC 164
(dissenting but not on this point):

> "*Liability is not restricted to the person whose breach of trust or fiduciary
> duty caused their original diversion. His liability is strict. Nor is it limited to
> those who assist him in the original breach. It extends to everyone who
> consciously assists in **the continuing diversion** of the money. Most of the
> cases have been concerned, not with assisting in the original breach, but in
> **covering it up** afterwards by helping to launder the money.*"

390.    But the assistance must have had some causative significance: see ***Brown v Bennett***
[1999] 1 BCLC, 659 ("*..if there is no causative effect and therefore no assistance
given by the person, namely Oasis, on whom it is sought to establish the liability as a
constructive trustee, for my part I cannot see that the requirements of conscience
require any remedy at all*"). The position is accurately stated in ***Lewin*** at 40-21:

> "*In those cases where the breach of trust consists of misappropriation of
> assets, the breach will not end when the assets have initially been removed
> from the trust fund, but when they have been hidden away, beyond the reach of
> the beneficiaries who might seek their recovery.*"

391.    In the present case the alleged breach of trust by Mr Matevosov and/or Mr
Davidovich happened years before the sale of Gazprom in late September 2005. The
sale of the shares in Sibneft to Gazprom had no causative effect in relation to any
breach of trust. That sale did not involve a continuing diversion of trust assets, the
putting of trust assets out of reach, or a covering up of the original breach of trust. The
Sibneft shares were never an asset into which Yugraneft could trace.  Even if the new
participation interests are to be regarded as trust assets, they remain to this day with
the second set of offshore companies. The sale of Sibneft to Gazprom has made no
difference. The fraud relied on had been widely alleged and proceedings in the BVI
and Russia commenced before the sale to Gazprom. Between the first instance
hearing in the BVI and the hearing in the Court of Appeal Sibir unsuccessfully sought

an injunction against Sibneft and the second set of offshore companies to preserve the participation interests in the light of the impending sale.

392.    In my judgment the defendants are right to say that the "orchestration" of the sale to Gazprom and of the reinvestment of the proceeds do not amount to dishonest assistance. But that does not render them irrelevant to the dishonest assistance claim. There is authority that a claim may be made against a dishonest assistant either for compensation for loss which the claimant has suffered as a result of the misapplication of trust property or other breach of trust; or for an account (as a personal not a proprietary remedy) of any profit that the dishonest assistant may make from his dishonest assistance or from the underlying breach of trust: *Fyffes Group v Templeman* [2000] 2 Lloyd's Rep 643; *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch). It seems to me at least arguable that any profit made by Mr Abramovich by reason of the inclusion of the participation interests in Sibneft when it was sold to Gazprom, was attributable to and resulted from the original dishonest assistance in relation to the EGMs (if there was any), even though the sale itself was not a further act of dishonest assistance, and that Mr Abramovich would be accountable (on a personal basis) therefore. If, as the defendants assert, no value was attributed to the 49% interests by either of the parties to the sale, and Mr Abramovich has, in effect, given them away, he is, nevertheless, accountable for whatever their true value was when he did so.

*Issue Estoppel and Abuse of Process*

393.    The defendants further maintain that, even if I were to conclude that Yugraneft's claims enjoyed a real prospect of success on their face, Yugraneft is barred from maintaining them on the grounds of issue estoppel or abuse of process. They originally relied on the following contentions:

(i)    Yugraneft is bound by the finding of the BVI courts that the receipt of the participation interests by the BVI offshore companies was legitimate. This precludes any argument that receipt by those companies was illegitimate (which in turn precludes any argument that receipt by those companies gives rise to any claim against Millhouse or Mr Abramovich).

(ii)    Yugraneft is bound in these proceedings by the findings of the Russian courts that the issue of the participation interests to the offshore companies was lawful and legitimate. This precludes any argument that the issue of the participation interests was unlawful or illegitimate (which in turn precludes any argument that the issue of those participation interests gives rise to any claim against Millhouse or Mr Abramovich).

(iii)   Yugraneft is not entitled in these proceedings to depart from the case which was advanced on its (or its privy's) behalf in the BVI proceedings and relied upon before both the first instance and appeal courts to the effect that there is no claim in Russian law against the offshore companies or Mr Abramovich.

(iv)    Yugraneft is bound in these proceedings by the rulings of the Russian criminal Investigator to the effect that Mr Matevosov and Mr Davidovich

committed no crime in relation to the issue of the participation interests to the offshore companies.

*The proceedings in the BVI*

394.  I have already set out the nature of the proceedings in the BVI by Sibir against the six offshore companies, Sibneft and Mr Abramovich. The claim alleged that Sibneft had obtained the value of Yugraneft's interest in Sibneft-Yugra in breach of fiduciary duties owed under the joint venture agreement and that Mr Abramovich had dishonestly assisted in that breach. The receipt of the participation interests by the offshore companies was said to have been unlawful. The breach of duty consisted of Mr Davidovich's votes for the issue of the administration shares.

395.  The BVI offshore companies successfully applied to strike out the claim against them on the grounds that the receipt based claims were subject to Russian law and that, as was then common ground, there was, under Russian law no cause of action against them.

396.  In order for there to be an issue estoppel there must be (i) a final and conclusive judgment on the merits by a court of competent jurisdiction; (ii) between the same parties or their privies; and (iii) the issue decided in the former case on which the estoppel is sought to be founded must be the same as the issue in the later case and must have been necessary for the earlier decision: ***Carl Zeiss Stiftung v Rayner & Keeler*** [1967]1 AC 853; ***Desert Sun Loan v Hill*** [1996] 2 AER 847,854.

397.  Issue estoppel is subject to a limited exception in:

> "*the special circumstance that there has become available to a party further material relevant to the correct determination of a point involved in the earlier proceedings, whether or not that point was specifically raised and decided, being material which could not by reasonable diligence have been adduced in those proceedings*" ***Arnold v National Westminster Bank plc*** [1991] 2 AC 93.109.

398.  The first condition is satisfied.

*Privity of interest – Sibir and Yugraneft*

399.  As to the second, the question is whether Sibir and Yugraneft were privies. In ***Gleeson v J Whippell & Co Ltd*** [1977] 1 WLR 510,515 Megarry, VC, stated this test:

> *'Second, it seems to me that the substratum of the doctrine is that a man ought not to be allowed to litigate a second time what has already been decided between himself and the other party to the litigation. This is in the interest both of the successful party and of the public. But I cannot see that this provides any basis for a successful defendant to say that the successful defence is a bar to the plaintiff suing some third party, or for that third party to say that the successful defence prevents the plaintiff from suing him, **unless there is a sufficient degree of identity between the successful defendant and the third party. I do not say that one must be the alter ego of the other: but it does seem to me that, having due regard to the subject-matter of the dispute,***

MR JUSTICE CHRISTOPHER CLARKE
Approved Judgment

OJSC OIL COMPANY V ROMAN ARKADIEVICH
ABRAMOVICH & ORS

> *there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was party should be binding in proceedings to which the other is party*. It is in that sense that I would regard the phrase "privity of interest".'

400.    There are a number of decisions in which a shareholder has been held to be the privy of the company which he/it owned: e.g. ***Johnson v Gore Wood*** [2002] 2 AC 1, where the test enunciated by Megarry, VC in ***Gleeson*** was satisfied when the claimant in the previous proceedings was the corporate embodiment of Mr Johnson (who accepted that he and the company were privies); and ***Mamidoil v Okta*** [2003] 1 Lloyd's Rep 1, where Aikens, J, determined that there was privity of interest between Elpet and Okta, of which Elpet had become the 69.46% owner. The shareholder was bound by the decision against its subsidiary.

401.    The fact that a person has given financial assistance, or even an indemnity, to a party does not, however, mean that he becomes his privy: ***Mercantile Investment v River Plate Trust*** [1894] 1 Ch 574 at 594-5, cited in ***Carl Zeiss*** at 911. In ***Gleeson*** Megarry J said that an agreement to indemnify creates no privity and that merely having some interest in the outcome is insufficient.

*Yugraneft's submissions*

402.    Yugraneft contends that there is no privity between it and Sibir. The claim brought by Sibir in the BVI for breach of the joint venture was a claim which could *only* be brought by it. Sibir could not bring proceedings on behalf of Yugraneft because they would have been merely reflective of Yugraneft's loss. Sibir and Yugraneft are different entities under different control. Sibir is, and always has been, its own master. Yugraneft, however, at the time of the proceedings in the BVI was under bankruptcy administration, and under the control of Mr Kotov, its External Administrator.  Mr Kotov was not invited to approve the BVI proceedings. The claims which Yugraneft now brings in respect of its own interest have been appraised by Mr Kotov and the English provisional liquidator.

403.    Yugraneft further contends that the ***Gleeson*** formulation requires that it should be just to hold one party bound by a finding against another party, and such a result would not be just.

404.    I regard that latter submission as tending to a gloss on the formulation, which relates to whether, having regard to the subject-matter of the current dispute, there is sufficient *identification* between A and B to make it just to determine that a decision against A in a previous suit is binding against B in the current one.  The focus is on the nature of the relationship between A and B rather than a broad question of whether holding B bound by the decision against A would be a just result.

405.    The matters relied on by Yugraneft are these. Firstly, the BVI proceedings were not conducted on the footing that Sibir was fighting Yugraneft's battle or bringing claims on behalf of Yugraneft with its authority. I do not find that a wholly accurate characterisation. Sibir did not purport to act on behalf of Yugraneft. But it did claim to recover a loss which was a reflection of Yugraneft's loss, upon the basis that Yugraneft was being impeded in making its own claim in Russia. As to that Yugraneft submits that in ***Mamidoil*** the subsidiary failed to establish that a contract to which it

was a party was no longer binding. It was the appropriate disputant and it was right that its (69.46%) parent should not be able to go behind that. Here Sibir was the wrong claimant and Yugraneft, the correct claimant, should not be bound by the fact that the wrong claimant failed.

406.     Secondly, the proceedings were conducted on the basis that the offshore companies were nominees of Sibneft, whereas, as it now turns out, they are likely to be Mr Abramovich's investment vehicles. This does not seem to me a compelling consideration. The offshore companies were said to be owned and controlled by Sibneft for whom they were nominees (SoC 13 and July 2005 skeleton para 21). Sibneft was also said to be controlled by Mr Abramovich, its ultimate beneficial owner (SoC para 9). What was and is effectively being said in both sets of proceedings is that the offshore companies were, either directly or indirectly, the puppets or nominees of Mr Abramovich.

407.     Thirdly, in the BVI proceedings the defendants proceeded on the basis, supported by Mr Rozenberg, that nothing in the BVI proceedings would obstruct any claims by Yugraneft per se[37] .That may be so. But the fact that Yugraneft can sue in Russia for whatever claim it may have does not mean that it would be unjust for it to be unable to claim here. England has a doctrine of issue estoppel. Russia does not.

408.     Fourthly, Yugraneft submits that it is apparent that Professor Butler, the expert then retained, did not consider sufficiently the availability of fraud claims, when, as Professor Sergeev's evidence shows, fraud claims and related restitution claims are available. In effect Yugraneft asserts that the concession that Yugraneft had no Russian law claims was wrongly made. If, however, it is otherwise just to treat two parties as privies, the inadequacy of the expert evidence adduced in the prior proceedings cannot be a sufficient ground not to do so. The object of securing finality would be wholly defeated if parties could claim to relitigate the same issue with a different set of experts, or better counsel, or different tactics on the grounds that their original ones could have been better.

*Conclusion on privity as between Yugraneft and Sibir*

409.     Whether or not there is a sufficient identity of interest is very much dependant on the facts of any particular case.

410.     The defendants point to a number of substantial factors which may be said to make it just to hold that the decision against Sibir in the BVI in favour of the BVI offshore companies should be binding in proceedings in which Yugraneft, instead of Sibir, is the claimant. Sibir is now, indirectly, the 99.38% owner of Yugraneft.  It is the promoter and funder of this action, which it encouraged the liquidator to initiate.  If it is not the formal controller of the proceedings, it must have a dominant influence on their conduct. Sibir and Yugraneft share the same solicitors.  In the BVI proceedings it was seeking restitution from the offshore companies to itself of Yugraneft's 49% interest in Sibneft-Yugra, or what was said to represent it, a claim which was reflective of Yugraneft's loss. That that was so was recognised in the argument in

_____

[37] Mr Rozenberg's view was: "*Based on the above, the consideration of the Sibir Claim in BVI does not prevent per se consideration of Yugraneft's similar claim in the Russian state arbitration court based on the same merits under Articles 148 or 150 of APC because Yugraneft is not a party in the Sibir Claim.*"

those proceedings where it was said that there were special reasons why it was entitled to claim.[38]    If it had been successful in its action it could not honestly have retained the value of Yugraneft's interest without accounting for it to Yugraneft, at least so far as was necessary to satisfy its creditors.

411.    There are, however, a number of countervailing considerations. At the time of the BVI judgments upon which the estoppel is sought to be founded, Sibir had a 43.6% interest in Yugraneft, those shares being pledged to Sibneft. It also had a 31.49% interest in MOGC, which in turn owned 55% of Yugraneft, giving it a further indirect interest of 17.32%, making a total of 60.92%. (The history of its interest is set out in Appendix 4). This is not a case of a wholly owned subsidiary suing where its parent has failed. Yugraneft was in administration. Sibir was not making any decisions on its behalf.  Only Mr Kotov could act or litigate on its behalf: see Sergeev 3, paragraph 63. He was not asked to approve the BVI proceedings, much less any actions taken in them.

412.    The interests of Sibir and Yugraneft are not identical. Yugraneft had creditors other than Sibir, although not many.  Sibir and related entities represent slightly over 75% of creditors' claims against Yugraneft which are eligible to vote in its liquidation. Of the remaining 25%, 22.44% of creditors claims eligible for voting purposes belong to Sibneft, now Gazpromneft.  The Gazpromneft claim for voting purposes is about 261 million roubles. The total Gazpromneft claim is for 607 million roubles (about £ 12 million). The total claims in the liquidation are about £ 30 million. But these pale into insignificance by comparison to the size of Yugraneft's claim in these proceedings which Yugraneft puts at not less that $ 2 billion.

413.    The claim in the BVI was brought for breach of the joint venture agreement to which Sibir, and not Yugraneft, was a party. Sibir's assertion that Yugraneft had no claim was advanced by Sibir because Sibir's claim would or might otherwise fail. That was in its interests but not necessarily in those of Yugraneft. The effect of assimilating Yugraneft and Sibir would be to foist upon Yugraneft decisions made by a company which was the ultimate beneficial owner of 60.92%, but which was not entitled to control it, in an action which it did not authorise. If a subsidiary company, having the primary claim, loses and its parent or owner is estopped from suing again, on the ground that it was behind the subsidiary, the estoppel works no prejudice on the subsidiary and its creditors. The subsidiary has already lost. But, if the parent loses and the subsidiary is estopped the subsidiary is prevented from bringing a claim it might have won.  If Mr Kotov had been involved he would, in the interests of all the creditors, have to have considered Yugraneft's position very carefully before accepting that it had no claim in Russian law. Had he taken independent advice, as he would have been bound to do, there is a good chance that he would have been advised that there was a well arguable claim on the merits, as appears from the evidence of (i) Professor Sergeev, in particular in relation to Article 1102, which was not addressed in the BVI; (ii) Dr Micheler, who thought that Article 1064 covered economic damage; and (iii) Mr Rozenberg who had thought that there was a claim against Mr Matevosov and Mr Davidovich and any co-conspirators, provided there was a conviction.   And the defendants would have accepted as they do now that there is, subject to the time bar point, an arguable claim.

---

[38] See also Yugraneft's skeleton argument in these proceedings, para 3: *"The loss claimed by Sibir was on the face of it bound to be reflective of loss suffered by Yugraneft"*.

414.    I do not regard this question as free from difficulty. Deciding what it is just to hold requires consideration of a number of relevant factors and a determination of where, looking at the matter overall, justice lies. I have come to the conclusions that justice lies in treating Sibir and Yugraneft as having privity of interest. Sibir is the real party to this litigation and the person which will, overwhelmingly, benefit from its success. It is now effectively the owner of Yugraneft and was directly or indirectly the majority shareholder at the time. The most potent point against treating the two as privies is that this will prejudice the creditors of Yugraneft, other than Sibir, who will, ipso facto, be deprived of the benefit of a potential claim, and that Mr Kotov did not authorise the BVI proceedings.    But the amount of their claims is miniscule in comparison to the claims in this litigation. This action is in reality being advanced almost wholly for Sibir's benefit, and at its expense. The lack of authority from Mr Kotov, although not irrelevant, is not a bar to privity.  If Sibir had succeeded in the action it would have been unjust to allow Yugraneft to ignore it, and claim a further $ 2 billion itself. It would be equally unjust to have allowed Yugraneft to advance in the BVI, almost exclusively for the benefit of Sibir, or to advance here a claim which Sibir itself had failed to establish. Given that Sibir has lost, Yugraneft ought not to be allowed to take over the running wholly unaffected by Sibir's failure.

*Privity of interest:     Abramovich and Millhouse*

415.    Millhouse was not a party to the BVI proceedings. Mr Abramovich was.  In the event the judgment of the court in relation to him was that permission would not be given to serve him out of the jurisdiction. But that judgment in his favour was based on the fact that there was no claim against any of the BVI companies because the receipt by the BVI companies of the participation interests was not actionable by Sibir.

416.     Millhouse claims to be nothing more than a service company which provides services to various companies.  In the BVI Sibir claimed that Mr Abramovich was the ultimate beneficial owner of the majority of the capital and controller of Sibneft,  that each of the second set of offshore companies were beneficially owned and/or controlled by Sibneft which was the beneficial owner of those companies' interests in Sibneft-Yugra, and that Sibneft would not act in the dilution without the prior knowledge and approval of Mr Abramovich and that Mr Davidovich of Millhouse acted at the EGMs on his instructions and/or at his behest . This was the basis of a claim in knowing assistance, not in knowing receipt. An account was sought from him of the value of the 49% interest in Sibneft-Yugra.

417.    Yugraneft claims in these proceedings, as the basis of its claim in *knowing receipt*, that the proceeds of the fraud have been received by Mr Abramovich beneficially, in that they have been received into the hands of the offshore companies which "*have no independent control over the assets and hold them to the bidding of Millhouse Capital as agent for Mr Abramovich or of Mr Abramovich himself*": PoC para 102.  This is in effect an averment that the offshore companies and Mr Abramovich are as one i.e. of privity of interest.

418.    In those circumstances justice as, it seems to me, requires that a decision in the BVI that the receipt of Sibneft-Yugra participation interests, pursuant to the two EGMs, by two BVI companies in each set of offshore companies,  does not give rise to liability for knowing receipt in Russian law (with the consequence that the remaining defendants, including the other two offshore companies and  Mr Abramovich could

not be served) should be binding in proceedings against  Mr Abramovich and Millhouse, in which the complaint is that Mr Abramovich, through or assisted by Millhouse, has received those interests unlawfully because receipt by the offshore companies is to be regarded as receipt by him. If the claim is that the offshore companies and Mr Abramovich are, for receipt purposes, one and the same, it is just to regard them as one and the same for estoppel purposes.  The question of estoppel must be addressed on the hypothesis that the claimant's averments are established.

*Identity of issues*

419.   The principal question for the BVI courts, once the applicability of Russian law was determined, was whether Sibir had any claim under that law against the BVI companies arising out of their receipt of the participation interests allotted to them at the September 2002/February 2003 EGMs. The four BVI offshore companies sought to strike out Sibir's claims against them on the basis that it did not. Charles J and the Court of Appeal decided that that was so: see paragraphs 92-3 and paragraph 10 of the judgment of the Court of Appeal.

420.   The court decided that Sibir had no receipt based cause of action against the BVI defendants.   Charles J also decided, *obiter*, that, if Sibir's claim had been maintainable, she would, nevertheless, have stayed the action on the ground that the proceedings were overwhelmingly concerned with Russia.

421.   The court's decision on that question did not depend on any distinction between one offshore company and another.  Nor, in the light of the expert evidence, did it depend on whether Sibir or Yugraneft was the claimant. It depended on whether an offshore company receiving a participation interest in Sibneft-Yugra pursuant to the EGMs was liable in respect of that receipt under Russian law. The agreed evidence was that it was not.  The relevant paragraph of Charles J's judgment – paragraph 91 – records that:

> "*Sibir must show that its civil claim under Russian law has a real prospect of success. Its own evidence shows that it cannot. The affidavit of Professor Butler is quite clear: there is no claim against any of the defendants other than Sibneft in Russian law*".

422.   Charles J's judgment does not in terms refer to any possible claim by Yugraneft and, in those circumstances I do not think she can be taken to have *decided* any more than that in Russian law Sibir would have no claim[39] . If that is too strict a view, and she must be taken to have decided that no company (whether Sibir or Yugraneft) had a claim, her decision in respect of Yugraneft was unnecessary for her decision against Sibir.

423.   Sibir had put forward the present inability of itself and Yugraneft to recover from the defendants in Russia (a) as a defence to any contention that Sibir could not claim because it was suing for reflective loss; and (b) as a ground for refusing a stay, if the proceedings against the BVI defendants were not struck out. The first point became

---

[39] The judgment – at paragraph 165 – refers under the heading "*Sibir's claims not actionable in Russia*" to the fact that "*none of the Defendants except Sibneft have actionable claims* [sc against them] *in Russian law*".

moot once it appeared that Russian law applied and Sibir had no claim under it. As to the second, the absence of a claim by Sibir or Yugraneft against any of the defendants was not a necessary part of the court's reasoning. This was, firstly because the court's decision on stay was only necessary in the event that the judge was wrong to dismiss the claims, which she was not, and secondly because, even on that footing, she decided that a stay was appropriate because of the overwhelming link with Russia. Her decision was not dependent on Yugraneft having no claim and would have been the same whether it did or not.

424.    In those circumstances it does not seem to me that the court decided any issue, or any issue necessary for its decision, which would estop Yugraneft *per rem judicatam* from maintaining any receipt based claim or any claim in knowing assistance.

   *Abuse of process*

425.    That conclusion is not determinative, since it is open to the court to dismiss proceedings as an abuse of process even though the somewhat technical conditions for an estoppel are not met.

   *Sibir's case in the BVI*

426.    In the BVI Professor Butler, instructed by Sibir, stated that there was no cause of action against the defendants except Sibneft under Russian law. Sibir argued that this fact was a prime reason why the Court should not stay proceedings in favour of Russia. Professor Butler's evidence was common ground and was accepted by Charles, J and the BVI Court of Appeal.

427.    The defendants do not contend that Charles J's finding (or at least acceptance – see paragraph 165 of the judgment) that there was no cause of action against Mr Abramovich and the non-BVI offshore companies was a necessary part of her reasoning because she ultimately came to the conclusion that that fact did not prevent Russia from being the most appropriate forum: see paragraph 424-5 above. What they do contend is that, Sibir having advanced the argument in the BVI that no cause of action existed it would be an abuse of process for Yugraneft to perform a volte face and argue the opposite.

428.    In this respect they refer to the statement of Lord Diplock in **Hunter v Chief Constable of the West Midlands Police** [1981] 3 WLR 906 :

   "... abuse of the process of the High Court... concerns the inherent power which any court of justice must possess to prevent misuse of its procedure in a way which, although not inconsistent with the literal application of its procedural rules, would nevertheless be manifestly unfair to a party to litigation before it, or would otherwise bring the administration of justice into disrepute among right-thinking people. The circumstances in which abuse of process can arise are very varied ..."

429.    They also refer, by way of an analogy to a US doctrine described as "judicial estoppel" under which a party who assumes a particular position in litigation and succeeds in persuading the court to accept that position may not be permitted to take

an inconsistent position in later litigation. The Court of Appeals for the Sixth Circuit explained the position in *Edwards v Aetna Life and Casualty* 690 F 2s 595 (1982):

> "*The policies supporting judicial estoppel are different from those that support the more common doctrines of issue preclusion, equitable and collateral estoppel. Courts apply equitable estoppel to prevent a party from contradicting a position taken in a prior judicial proceeding.… Equitable estoppel enables a party to avoid litigating, in the second proceeding, claims which are plainly inconsistent with those litigated in the first proceeding. Because the doctrine is intended to ensure fair dealing between the parties, the courts will apply the doctrine only if the party asserting the estoppel was a party in the prior proceeding and if that party has detrimentally relied upon his opponent's prior position. See Id. at 689-90. Collateral estoppel prevents relitigation of factual matters that were fully considered and decided in a prior proceeding. Thus, collateral estoppel operates to prevent repetitive litigation. ….*
>
> *The doctrine of judicial estoppel applies to a party who has successfully and unequivocally asserted a position in a prior proceeding; he is estopped from asserting an inconsistent position in a subsequent proceeding.… Unlike equitable estoppel, judicial estoppel may be applied even if detrimental reliance or privity does not exist. …. This distinction reflects the difference in the policies served by the two rules. Equitable estoppel protects litigants from less than scrupulous opponents. Judicial estoppel, however, is intended to protect the integrity of the judicial process. ... Scarano v. Central R. Co., 203 F.2d 510, 512-13 (3rd Cir. 1953) ("such use of inconsistent positions would most flagrantly exemplify that playing 'fast and loose with the courts' which has been emphasized as an evil the court should not tolerate.") The essential function of judicial estoppel is to prevent intentional inconsistency; the object of the rule is to protect the judiciary, as an institution, from the perversion of judicial machinery. ... Collateral estoppel is essentially a finality rule, which serves to conserve judicial resources by precluding the litigation of issues previously decided. Judicial estoppel addresses the incongruity of allowing a party to assert a position in one tribunal and the opposite in another tribunal. If the second tribunal adopted the party's inconsistent position, then at least one court has probably been misled. ….*"

430.    Sibir mounted a claim based on the contention that the receipt by the six offshore companies of the participation interests (knowingly assisted by Mr Abramovich) was unlawful. It failed in that attempt since the BVI Courts, held that the relevant law is the law of Russia, by which law Sibir has no claim. They did so as a result of Sibir's own contention that there was no claim in Russian law by Sibir (or Yugraneft). Now through Yugraneft, its privy, it seeks to bring a claim in knowing receipt against Mr Abramovich and Millhouse, on the footing that the receipt was unlawful in Russian law. Yugraneft also seeks to bring a claim in knowing assistance against Mr Abramovich when Sibir had previously claimed that the BVI court should refuse a stay on the ground that neither it not Yugraneft had any claim. That seems to me an abuse of the process of the courts. Part of the rationale for the doctrine is the protection of the Court's process and avoidance of the harassment of defendants. Sibir's changes of tack and jurisdiction, alleging, at one moment, that the claims are

governed by BVI law as the place of receipt, then BVI law as the law of the forum, then English law as the place of enrichment, and that Russian law (a) does not and (b) does afford a remedy, seems to me to offend on both counts. This is not only an example of forum shopping but of issue switching which the courts should not be prepared to tolerate.

*New evidence*

431.    Mr Swainston submits that the evidence that has come in during and after the BVI proceedings provides an exception to any estoppel that might otherwise arise. The new evidence consists of the information that the Russian individuals, in addition to Mr Matevosov and Mr Davidovich, involved in the EGMs and the transfer between the two sets of offshore companies were, for the most part, Millhouse personnel. He relies on the fact that  the BVI proceedings were conducted on the basis that the offshore companies were nominees of Sibneft when it now looks, on the basis of the investigation carried out in 2007, as if they are part of a group of offshore companies which the London office of Millhouse was established to administer/manage/control and that Millhouse, directed from London, orchestrated the arrangements to dilute Yugraneft's interest, the sale of Gazprom and the reinvestment of the proceeds.

432.    Since I do not regard Sibir as estopped from bringing its claim it is not necessary to decide whether the exception applies. I do not regard the matters that Yugraneft relies on to be such as to undermine my conclusion on abuse of process.

433.    Accordingly, I would also strike the proceedings out against both defendants as an abuse of the process of the court.

*Russian civil proceedings*

434.    I have set out in paragraphs 89-95 above and in Appendix 1 the proceedings in Russia which have been taken by Yugraneft against the offshore companies in Sibneft in which it has alleged that the issue of the participation interest to the offshore companies was unlawful and in each of which Yugraneft ultimately failed.

435.    The following decisions are of particular relevance:

(a)    The Decision of the Arbitrazh Court of the **Khanty-Mansiysk Autonomous Region,** Case No. A75-4601/2005 dated *5th July 2005*, upheld through various stages of appeal. This found (amongst other things) that Mr Matevosov acted legitimately in giving a power of attorney to Mr Davidovich to represent Yugraneft at the EGMs, and that Mr Davidovich was present and voted at the EGMs as an authorized representative of Yugraneft.

(b)    The judgment on appeal dated *19 July 2005* in Case No. 09AP6918/05-GK by the **Ninth Arbitrazh Appeal Court in Moscow**. This dismissed Yugraneft's claim that (amongst other things) Mr Matevosov had acted contrary to the company's interests. That judgment was upheld on further appeal by a Judgment dated 15 December 2005 of the Federal Arbitrazh Court which held that the

actions of Mr Matevosov in waiving Yugraneft's right to purchase the participation interests had been legitimate.

(c)     The judgment on appeal dated *23 November 2005* in Case No. F04-7976/2005(16692-A75-21) of the **West Siberian District Federal Arbitrazh Court** in which the Court concluded that "*Based on a complete analysis of available evidence, the lower court made the correct conclusion about the lack of violations of the rules of material law when holding the [EGMs]*"

(d)     The judgment dated *4 April 2007* of the Arbitrazh Court of **Khanty-Mansiysk Autonomous District** in Case No. A75-9221/2006 finding that the issue of the additional charter capital at the EGMs was valid and lawful, again upheld through various appeals up to the Federal Arbitration Court of West Siberia (leave to appeal from there to the Supreme Court of the Russian Federation being refused).

436.    In combination, therefore, the Russian courts between them have decided that Mr Matevosov (i) acted legitimately and not contrary to Yugraneft's interest in giving a power of attorney to Mr Davidovich, who attended the EGMs as an authorised representative of Yugraneft – Case (a); (ii) that the holding of the EGMs did not violate Yugraneft's rights- Cases (c) and (d); (iii) that the issue of additional capital threat was valid and lawful – Cases (c) and (d); and (iv) that Mr Matevosov did not act unlawfully in waiving Yugraneft's pre-emption rights – Case (b).

437.    The defendants originally relied upon these decisions as giving rise to an estoppel or as making the continuation of these proceedings an abuse. They submitted that, if there was some valid claim under Russian law in relation to the alleged illegitimacy of the issue of the participation interests which has not been adjudicated upon, then it could and should have been put forward in at least one of the Russian actions, relying on the classic statement of Wigram, V-C in **Henderson v Henderson** 3 Hare 100 at p 114. The continuing validity of that doctrine was affirmed by Lord Bingham in **Johnson v Gore Wood** [2002] 2 AC 1. The doctrine applies to cases in which the earlier action was before the courts of another country: **House of Spring Garden v Waite** [1991] 1 QB 241,255; **Desert Sun Loan Corp v Hill** [1996] 2 AER, 847.

438.    The defendants did not, however, in the end seek to maintain their contention, and, in my judgment rightly so. The Russian courts, as is common ground, will not entertain a claim based upon the allegations that there has been criminal conduct in the absence of a criminal finding. In those circumstances all of the decisions of the Russian Court are, at best, decisions that, leaving aside any question of criminal conduct, the actions impugned are lawful. They cannot be taken to have determined the position in Russian law if, as is alleged in this action, Mr Matevosov and Mr Davidovich committed a number of criminally fraudulent acts at the behest of Mr Abramovich: see Sergeev 3 para 43-45. Nor would there appear to be any issue estoppel under Russian law against Mr Abramovich, without which there can be none in English law: **Nouvion v Freeman** [1890] 15 App.Cas1;**Zeiss**.

439.    In those circumstances Yugraneft cannot be estopped from raising claims which are founded, as all of Yugraneft's claims are, on the arguable contention that what those

individuals did was criminal and gives rise to civil liability under the Russian Civil code in consequence. Nor is it an abuse of process for Yugraneft to seek to do so.

*Mr Abramovich's domicile*

440.    The claim form was issued on 14th November 2007. Mr Abramovich was served in London on the same day, when the claim form was delivered at Flat 2, 39 Lowndes Square.   Whether he was properly served depends on whether he was then domiciled in London.

441.    If Mr Abramovich was domiciled in England when served, Yugraneft would be able to avail itself of the rule set out in the judgment of the ECJ in ***Owusu v. Jackson*** [2005] QB 801, the effect of which is that if a defendant is domiciled in a Member State of the EU[40] the court has no power to stay proceedings brought against him on the grounds that there is an alternative more appropriate forum for the trial of the action.

442.    Article 2 of the ***Judgments Regulation 44/2001***, ("the Regulation") provides:

> *"Subject to this Regulation, persons domiciled in a Member State shall, whatever their nationality, be sued in the courts of that Member State.*

443.    By Article 59 of the Regulation, the domicile of a defendant is to be established by reference to the internal law of each Member State. In England, section 41 of the ***Civil Jurisdiction and Judgments Act 1982*** provides:

> *"41    (3) Subject to subsection (5), an individual is domiciled in a particular part of the United Kingdom if and only if—*
>
> > *(a) he is resident in that part; and*
> >
> > *(b) the nature and circumstances of his residence*
> > *Indicate that he has a substantial connection with that part.*
> ...........
>
> *(6) In the case of an individual who—*
>
> > *(a) is resident in the United Kingdom, or in a particular part of the United Kingdom; and*
> >
> > *(b) has been so resident for the last three months or more,*
>
> *the requirements of subsection (2)(b) or, as the case may be, subsection (3)(b) shall be presumed to be fulfilled unless the contrary is proved."*

444.    Three matters may be noted at the outset. The first is that the Act contemplates that a person may be resident but the circumstances of his residence may not indicate that he has a substantial connection with England, as will be the case if section 41 (3) (a) is satisfied but not section 41 (3) (b). Conversely, a person may have a substantial

---

[40] Other than Denmark

connection with the UK but not be resident here. The second is that it is possible to have more than one residence. The third is that the rule that a defendant must ordinarily be sued in the place of his domicile is for the protection of the defendant. In *Owusu* the ECJ held:

> "42    The legal protection of persons established in the Community would also be undermined [if a stay was possible]. *First, a defendant, who is generally better placed to conduct his defence before the courts of his domicile, would not be able, in circumstances such as those of the main proceedings, reasonably to foresee before which other court he could be sued.*"

It would be inconsistent with that purpose if a defendant were to be treated as domiciled if he had only a tenuous connection with this country, with the result that the defendant could be sued there in any case however remote its connection to the place in question and however inappropriate it might be to do so.

445.    The question for the court is as to whether Yugraneft can show a good arguable case that Mr Abramovich was resident within the jurisdiction at the date at which the claim form was issued (*Canada Trust v Stolzenberg (No 2)* [2002] 1 AC 1). In that case the meaning of "*good arguable case*" was considered in *Canada Trust* by Waller LJ in a passage with which Lord Steyn, the only member of the House of Lords to consider the point, expressed agreement, in which he concluded that:

> "Good arguable case" reflects in that context that one side has a much better argument on the material available. It is the concept which the phrase reflects on which it is important to concentrate, i.e. of the court being satisfied or as satisfied as it can be having regard to the limitations which an interlocutory process imposes that factors exist which allow the court to take jurisdiction.'

a formulation endorsed by Lord Rodger in *Bols Distilleries BV v Superior Yacht Services Ltd* [2007] 1 WLR 12.

446.    In *Dubai Bank Ltd v Abbas* [1997] ILPr 308, the issue was whether Mr Abbas, who was said to be the beneficial owner of a substantial London property, was domiciled in England so that he could be served with proceedings under what was then Order 11 rule 1(1)(a). The test to be applied was summarised in the judgment of Saville LJ (with whom Simon Brown and Aldous LJJ agreed) as follows:

> "Although there was some discussion before us on what is meant by the word resident in s 41 of the Civil Jurisdiction and Judgments Act 1982, it seemed to me that the parties were really little apart on this aspect of the case. The leading case is *Levene v Commissioners of Inland Revenue* [1928] AC 217. Although this was a tax case, it is clear that the meaning given to the word in that case was its ordinary meaning, uncoloured by the fact that it was used in a revenue context: see the case itself and *Shah v Barnet London Borough Council* [1983] 2 AC 309, [1983] 1 All ER 226 at 341 of the former report. Mr Pickering QC for Mr Abbas suggested that although the present case is not a Convention case, since s 41 was applicable to Convention cases, it would be correct to have regard to European sources in ascertaining the meaning of the word in this section. I would not necessarily dissent from this, but since there

> *appears to be nothing in these sources to suggest that the ordinary English*
> *meaning of the word should be displaced or modified, the suggestion carries*
> *the matter no further. On the basis of Levene it seems to me that a person is*
> *residient for the purposes of s 41 (3) in a particular part of the United*
> *Kingdom if that part is for him **a settled or usual place of abode**.*
>
> ***A settled or usual place of abode** of course connotes some degree of*
> ***permanence or continuity**. In his judgment Potter J said that s 41(6)*
> *suggested that the threshold for residence under the 1982 Act was low. With*
> *respect, I do not find any such suggestion in this sub-section. It is true that the*
> *sub-section provides a rebuttable presumption of substantial connection if the*
> *residence has lasted for the last three months or more, but it provides no*
> *guidance on the question whether or not the person has become resident.*
> *Depending on the circumstances of the particular case time may or may not*
> *play an important part in determining residence. For example, a person who*
> *comes to this country to retire and who buys a house for that purpose and*
> *moves into it, selling all his foreign possessions and cutting all his foreign ties,*
> *would to my mind be likely to be held to have become immediately resident*
> *here. In other cases it may be necessary to look at how long the person*
> *concerned has been here and to balance that factor with his connections*
> *abroad. Since the answer to the question depends on the circumstances of*
> *each case, I did not find the other authorities cited to us of any real*
> *assistance."*

447.   The test has been applied in two recent cases concerning the residence of Mr Oleg
Deripaska, a high-profile Russian "oligarch". In ***High Tech International v***
***Deripaska*** [2006] EWHC 3276 (QB) Eady J held that Mr Deripaska was not
domiciled in England. He noted that it is possible to have more than one 'domicile'
for the purposes of the Regulation (paragraph 7) and then recorded some important
considerations in the case before him (paragraphs 10 and 11):

> *"[10] Mr Deripaska... owns two valuable homes in this jurisdiction, one in*
> *Weybridge and the other in Belgrave Square. He acquired the Weybridge*
> *property in September 2001 and Belgrave Square in April 2003. I am told that*
> *currently they are together worth approximately £40m. Although they are*
> *owned through a corporate structure, largely for reasons concerned with*
> *inheritance tax, there is no dispute that Mr Deripaska is beneficially entitled*
> *and responsible for the outgoings.*
>
> *[11] It is an important part of the evidence that Mr Deripaska is extremely*
> *wealthy, his financial worth being measured in hundreds of millions of pounds.*
> *He is one of the world's most wealthy individuals and has substantial interests*
> *in a number of businesses, most particularly Rusal. Moreover, it is also an*
> *important part of the background that he has homes in other parts of the world.*
> *There are houses under construction in Beijing and Kiev and land acquired*
> *with a view to building in Montenegro. There are several homes in Russia itself.*
> *There are two houses in France and a further one under construction. There is*
> *another in Sardinia and a house under lease in New Delhi. I am told that there*
> *are, either completed or under construction, a total of over 20 houses in various*

> *parts of the world. It is thus clear that the background circumstances against which my conclusions have to be reached are unusual."*

448.    The judge recorded the submission that the Belgrave Square property was Mr Deripaska's home when he was in England but observed that the requirement for a degree of permanence or continuity applied even in the contract of a second or third home. He considered the evidence as to Mr Deripaska's movements, which showed that he spent "*up to 90 days*" a year in England,[41] though only between 37 and 47 were spent (or partly spent) in 2005 – the year preceding issue of the claim form. As to nights he spent a minimum of 20 and a maximum of 27. The Judge  noted that (at paragraph [24]):

> *"[24] Mr Hunter accepted that the matter of residence is not to be judged according to 'a numbers game', and that it is appropriate to address the quality and nature of the visits in question. Mr Deripaska is, if I may say so, very much a modern phenomenon. It makes it very difficult to draw useful comparisons with precedents from a different era. He is truly an international businessman and jets about the world for frequent and brief business meetings. Miss Page may have hit the nail on the head when she considered the ordinary meaning of 'residence'. While it may make sense to speak of Mr Cadwallader being resident in Scotland for the months of August and September, or of Mr Theron being resident during his monthly visits, it hardly rings true to say of Mr Deripaska that he was resident for (say) last Tuesday afternoon or next Thursday morning. It would be a misuse of language."*

449.    The judge concluded that there was no good arguable case that Mr Deripaska was resident in England.

450.    In ***Cherney v Deripaska*** [2007] EWHC 965 (Comm), Langley J considered all of the factors said to give rise to residence in England (paragraph 39) including ownership of expensive properties here, and family and business connections. He accepted that Mr Deripaska had "*significant business interests in England*" which appear to have included an English-based service company and several English business advisers.[42] That notwithstanding, Langley J reached the conclusion that Mr Deripaska was not resident in England for the purposes of the Regulation (paragraph 45):

> *"[45] In agreement with Eady J, I do not accept this submission. It is not a numbers game, although the numbers hardly support Mr Cherney's case. The 'quality' of the use of the house is, I think, equally important. In many ways its use by Mr Deripaska resembles that of a private hotel. It is infrequent, intermittent, and generally fleeting. The house has the character of continuity and permanence; its use does not. It cannot, I think, in any normal sense of those words, be described as a 'settled or usual place of abode' of Mr Deripaska. In my judgment, as at 26 November 2006, Mr Cherney has failed to show a good arguable case that Mr Deripaska was resident at 5, Belgrave Square and so domiciled there for the purposes of the Jurisdiction Regulation and Judgment Order. It is therefore unnecessary to consider the second limb of para 9(2) of the Judgment Order (para 13) but it requires the nature and*

---

[41] According to counsel's submission, recorded at paragraph 33 of the judgment.
[42] See Eady J's judgment at paragraphs 31 and 32

> *circumstances of the 'residence' to indicate a substantial connection with this country and so on my findings cannot be fulfilled. The same applies to para 9(6)."*

451.   Mr Swainston draws attention to the fact that in ***Dubai Aluminium*** the court referred to residence as meaning the "*settled or usual place of abode*". I do not, however, read the decision of the court as using those adjectives antithetically, but rather as differently nuanced ways of saying much the same thing. This appears particularly so given that the court regarded the phrase as connoting some degree of permanence or continuity.

452.   Mr Swainston also draws attention to the Scottish case of ***Daniel v Forster*** 1989 SLT 90.

453.   In that case the issue was whether the defendant was resident in Scotland. The defendant operated a rest home in Cove in Dunbartonshire which he had purchased from the pursuers in the spring of 1987 and which he operated in partnership with the matron. His family home was in St Leonard's on Sea, which was his residence for tax purposes. He had a business there and another business, a rest home, in the West Country. He also had a half interest in a cottage in Elgin. Between 27th June, when he moved into the home to get it operating, and October 1987, which I infer was the date of raising of the action, he had resided at the rest home for periods of between 2 and 10 days with a fortnight between each visit. Since 27th June he had made between 20 and 40 visits to the home and on most, if not all, occasions resided there for a period of days at a time.

454.   The Sheriff, having observed that he had not been addressed on the concept of residence in any depth, and that the parties' solicitors appeared wrongly to think that it was impossible to have more than one residence, pointed out that the Act makes no mention of "principal" or "main" residence. He referred to a number of authorities including ***Shah v Barnet London Borough Council*** [1983] 1 AER 226 in which Lord Scarman had quoted from two 1928 tax cases:

> *"In each the House saw itself as seeking the natural and ordinary meaning of the words. In **Levene v Inland Revenue** [1928] AC 217, 255, Viscount Cave, LC said: "I think that [ordinary residence] connotes residence in a place with some degree of continuity and apart from accidental or temporary absences". In **Inland Revenue v Lysaght** [1928] AC 234, 243 Viscount Sumner said : "I think the converse to "ordinarily" is "extraordinarily" and that part of the regular order of a man's life, adopted voluntarily and for settled purposes, is not "extraordinarily", In Levene's case ...Lord Warrington said: "I do not attempt to give any definition of the word "resident". In my opinion it has no technical or special meaning for the purposes of the Income Tax Act. "Ordinarily resident" also seems to me to have no such technical or special meaning. In particular it is impossible to restrict its connotation to its duration. A member of this House may well be said to be ordinarily resident during the Parliamentary session and in the country during the recess. If it has any definite meaning I should say it means according to the way a man's life is usually ordered".*

455.   The House of Lords held in ***Shah*** that according to the natural and ordinary meaning of the phrase a person was "*ordinarily resident*" in the United Kingdom if he

habitually and normally resided lawfully in the United Kingdom from choice and for a settled purpose throughout the prescribed period except for temporary or occasional absences. Furthermore a specific and limited purpose, such as education could be a settled purpose, It was irrelevant that the applicant's permanent residence or "*real home*" might be outside the United Kingdom or that his future intention or expectation might be to live outside the United Kingdom.

456.    The Sheriff also cited a number of Scottish cases including **Reid v Inland Revenue** 1926 SLT 368 in which Lord President Clyde said that "*from the point of view of time, "ordinarily" would stand in contrast to "casually*" and that he was not sure "*that there is anything impossible in a person "ordinarily residing "in two places, although no doubt he cannot be physically present in more than one place at the same time. Would it be clearly wrong to say of His Gracious Majesty that he ordinarily resides at Windsor Castle and at Buckingham Palace?*" (or for that matter Holyrood House and Balmoral Castle).

457.    Lastly the Sheriff referred to Lord Scarman in **Shah**:

> "*And there must be a degree of settled purpose. The purpose may be one or there may be several. It may be specific or general. All the law requires is that there is a settled purpose. This is not to say that the propositus intends to stay where he is indefinitely; indeed his purpose, while settled, may be for a limited period. Education, business or profession, employment health, family or merely love of the place spring to mind as common reasons for a chose of regular abode. And there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled*".

458.    On the facts the Sheriff held that the pattern of the defendant's stay at the nursing home was that he stayed there between 2-3 days and 7-10 days, with a fortnight gap in between, under a voluntary arrangement for a settled purpose as part of the regular order of his life for the time being, the occupation being neither casual nor occasional nor the accommodation temporary. Accordingly he held the defendant to have been domiciled in the Sheriffdom of Dumbarton for three months prior to the raising of the action.

*The facts*

459.    I set out in the following paragraphs the evidence given by or on behalf of Mr Abramovich bearing on his residence. I have no reason to doubt its accuracy.

460.    Mr Abramovich is a Russian citizen. He was born in what is now Russia and brought up and educated in Russia. He speaks Russian and is not fluent in English. At the time that the claim form was purportedly served he was the governor of Chukotka province[43]. He spends more time in Russia than anywhere else and his business and personal interests are focused on Russia. His current business interests consist in particular of major investments in the Evraz group, the largest steel producer in Russia, and in Highland Gold, both of which are centered in Russia and run from

---

[43] That may not necessarily mean that he stayed much in its windswept and inhospitable landscape. He has an apartment in Anadyr.

there by Russians. Virtually all of the business associates with whom he is said to have dealt in these proceedings are Russian. Prior to 2004 he spent virtually no time in England. In 2007, he spent only 57 full days here, virtually all in connection with football matches. Mr Abramovich is the Chairman of the Federation of Jewish Communities of Russia and involved in a number of sports and charitable projects there.

461.  Mr Abramovich is a Russian taxpayer. When he enters the United Kingdom he does so on a business visa (the business being his ownership of Chelsea FC), having no leave to remain. He is not treated as resident in the UK for tax purposes. His non resident status has never been challenged by the Inland Revenue. It is submitted on his behalf that this must be an important factor, not least because the courts have sought to give the word the same '*ordinary*' meaning in both tax cases (such as *Levene*) and jurisdiction cases (such as *Abbas*). It makes sense to do so. Resident for jurisdiction purposes but not resident for tax purposes is a distinction to be avoided if possible.

462.  The current Inland Revenue practice is always to regard a person as resident in the United Kingdom if he is here for 183 days or more in any tax year. The normal rule, up to April 2008, was that days of arrival in and departure from the UK were ignored in counting the days spent in the UK. If a person is here for less than 183 days a further set of practice rules apply as follows:

> *"**Coming to the UK permanently or indefinitely***
>
> 3.1.  *You are treated as **resident and ordinarily resident** from the date you arrive if you home has been abroad and you intend*
>
> > *(i)      To come to the UK to live here **permanently***
> >
> > *(ii)     To come and remain here for **three years or more***
>
> *You 'remain' in the UK if you are here on a continuing basis and any departures are for holidays and business trips*
>
> ***Short term visitors***
>
> ***Residence***
>
> 3.3.  *You will be treated as **resident** for a tax year if:*
>
> > • *You are in the UK for 183 days or more in the tax year...*
> >
> > • *You visit the UK regularly and after four tax years your visits during those years average 91 days or more a tax year....You are treated as resident from the fifth year.*

463.    The Inland Revenue practice cannot be determinative, but it is apparent from that practice (a) that coming to England for more than 91 days (as determined by IR practice) does not automatically mean that you are to be regarded as resident in the UK; and (b) that, in its terms, Mr Abramovich would not be regarded as resident.

464.    Mr Abramovich is a billionaire. His overall wealth is said to be such that the £30 million that he has spent on the only property he now owns in England, Lowndes Square, represents less than 0.5% of his estimated net worth. He has spent considerably larger sums on yachts and properties outside England. His houses, yachts etc are in no sense his principal assets.

465.    Mr Abramovich was divorced in March 2007. His ex-wife, who is Russian, received all his previously owned English properties (except for Lowndes Square) as part of the divorce settlement. These included an estate in Sussex and two houses in Chester Square. Both before and after the divorce she had come to spend a considerable amount of time in England, where their children were and are being educated. In *High Tech* (para 30), Eady J noted that the independent actions of an individual's family should not be taken to affect the assessment as to whether that individual is resident in England. That must particularly be so, it is submitted, in the case of someone who, at the date at which residence is to be determined, was a former wife.

466.    Mr Mark Howard, QC, for the defendants, helpfully summarised the further evidence bearing on Mr Abramovich's connection with England under five headings: (a) the number of days he spent in England; (b) his ownership of property in England; (c) his ownership of Chelsea Football Club; (d) the significance of Millhouse and (e) the significance of his children being educated in England.

*Number of days spent in England*

467.    The underlying data[44] is set out as an exhibit to Mr Abramovich's second witness statement and can be summarised as follows:

| Year | Full days & Part days | Full days in England | Average length of stay (in full days) | Longest stay (in full days) |
|------|------|------|------|------|
| 2000 | 22 | 10 | 1.43 | 5 |
| 2001 | 7 | 3 | 1.50 | 3 |
| 2002 | 3 | **1** | 1.00 | 1 |
| 2003 | 72 | **25** | 0.89 | 10 |
| 2004 | 153 | 67 | 1.40 | 6 |
| 2005 | 162 | 83 | 1.98 | 10 |

---

[44] There is an issue as to the approach to be taken if Mr Abramovich leaves the UK at 1900 and arrives in Moscow at 2330 English time, but 0200 Moscow time. Do you date his arrival as being on the same day as he left (which in English time it is) or on the next day (which in Russian time it is)? The defendants take the former approach, which increases the number of full days in Russia. Yugraneft takes the latter, which decreases it. I do not propose to resolve this question. There is very little difference in the resulting figures,

| | | | | |
|---|---|---|---|---|
| **2006** | 189 | 110 | 2.68 | 20 |
| **2007** | **130** | **56** | 1.47 | 11 |

It is right to note that in 2006 Mr Deripaska had up to the issue of proceedings on 13th November spent 19 nights in England and 179 in Moscow.

468.  The most relevant year is 2007, the year in which the claim form was issued. In that year, Mr Abramovich spent 56 full days in England with an average length of stay of 1.47 and a longest stay of 11 full days (during which he attended 4 football matches). Mr Howard submits that it would be a perversion of language to suggest that one can infer from those figures that England was Mr Abramovich's "*usual or settled*" place of abode.

469.  These figures show that Mr Abramovich spent virtually no time at all in England prior to 2003, and only 25 full days in England in 2003 itself. Mr Abramovich's statement contains, in an exhibit, a detailed breakdown of those days. Almost all of the days in 2003 came after September 2003 (by which time he owned Chelsea FC). One cannot infer from these figures that Mr Abramovich orchestrated the dilution of Yugraneft's interest in Sibneft-Yugra from England in September 2002 – February 2003.

470.  In 2005 and in 2006 Mr Abramovich spent more time in England than before. But the average length of his stays remained very short (at 1.98 and 2.68 full days respectively). Some of the visits were very short indeed. The figures reveal no pattern similar to that of a person who regularly spends substantial stretches of time in a hunting lodge, holiday home, or constituency. A very large percentage of visits are connected with football – between 71% and 92%, 79% in 2007. Some of the longer visits were when Chelsea was playing more than one match. It is right to note, however, that, on Mr Abramovich's evidence his principal reason for spending time in England in the early days of his acquisition of Chelsea (which he acquired in 2003) was the fact that his children were at school here.

471.  The only pattern revealed is that his visits increase with the start of the football season and decrease with its closure. In 2007 he came to England considerably less than before. His visits were almost exclusively related to his attendance at football matches. Such visits are not the sort of visit that necessarily suggest an intention to make England one's home or usual or settled place of abode.

472.  It cannot be suggested that Mr Abramovich altered his behaviour in 2007 in order to avoid the court's jurisdiction. The first notice that he had of these proceedings came after the claim form was issued and purportedly served. In its application to the Companies Court in mid-November 2007, Yugraneft's justification for the appointment of a provisional liquidator in England was the supposed need for secrecy in order to ensure that Mr Abramovich did not alter his behaviour in anticipation of the receipt of proceedings. The actual reason for the reduction of Mr Abramovich's time spent in England in 2007 was his divorce in March of that year

473.  Yugraneft draws attention to the comparison between the days Mr Abramovich spent in England and those he spent in Russia. Thus in 2006 he spent 110 full days in England and 48 full days in Russia. From 1st January to 14th November 2007 he spent 54 full days in England and 61 full days in Russia. While these comparisons are relevant they have to be approached with some caution. It is perfectly possible for a

man, who is resident in Russia, as Mr Abramovich plainly is, but who jets all over the world in his private aeroplane or sails the seas in one or other of his yachts, to spend full days in Russia which do not greatly exceed those he spends in England, without thereby becoming an English resident. According to his evidence he boards an aeroplane between 10 and 15 times a month.

### Ownership of property in England

474.    Mr Abramovich owns (and at the time of issue of the claim form owned) one property in England – a collection of 7 or 8 flats in 39 Lowndes Square in London. He has spent about £30 million acquiring them and has applied for planning permission to knock them together into a single dwelling, which will no doubt involve expenditure on a grand scale. Mr Abramovich uses the flats at Lowndes Square as his base in England during his brief visits to England which are generally connected with watching football matches. These interests are less extensive than Mr Deripaska's ownership of a luxurious London residence and a further residence in Weybridge, which were held to be insufficient to establish residence on his part by both Eady J and Langley J.

475.    Mr Abramovich owns similarly, or more, expensive properties in several jurisdiction such as two ski-chalets in Colorado, a villa in St Barts, a house in Sardinia and a chateau in France on which he has spent €230 million. He also charters several yachts on which he spends a considerable amount of time. These are in addition to his 3 residential properties in Russia, which he regards as his home. He rents a grand historic house from the Russian Government. He owns Mr Brezhnev's former house in Moscow which he is currently renovating. Mr Abramovich is sufficiently wealthy to maintain expensive properties wherever it suits him to do so. He leases aircraft for use when he is in England.

476.    As a citizen of the Russian Federation, Mr Abramovich is required to have a registered address. His registered address is (or at any rate was when he made his witness statements) in Chukotka.  I do not attach much importance to this. The registered address is a formality which may bear very little relationship to a person's real residence.

### Chelsea Football club

477.    Mr Abramovich is famous in England largely because he has been since July 2003 the owner of Chelsea Football Club and has spent extremely large sums hiring expensive footballers and managers.  He has, however, no executive function in the Club. As the team became more established and successful, he began to spend less time on football matters and in England.

478.    Mr Howard submits that this prompts no inference of English residence but is an example of a modern phenomenon – the purchase by wealthy foreign individuals of English football clubs. Examples are the purchase of Manchester United by the American businessman Malcolm Glazer; of Liverpool by the American businessmen Tom Hicks and George Gillett; of Manchester City by the former Thai Prime Minister Thaksin Shinawatra; and of Heart of Midlothian by the Lithuanian businessman Vladimir Romanov.

479.    Mr Abramovich purchased Chelsea as a hobby and a leisure interest. It is not a business investment: and the sums that Mr Abramovich has given to the club (circa £ 500 million) far exceed any return that could possibly be expected.

480.    One of the reasons why Mr Abramovich chose to purchase Chelsea (rather than a club in somewhere such as Italy or Spain) was that it was easier for a foreigner to obtain a club in England where many of the clubs are publicly owned, compared with other countries such as Italy or Spain where there are legal and regulatory regimes that make it impossible.

481.    Mr Abramovich is also the founder and sponsor of the Russian National Academy of Football, and other Russian sports federations, the main investor in a new arena for a top Russian hockey team, which he been supporting financially for longer than Chelsea, and the supporter of an Israeli charitable football tournament.

482.    Mr Abramovich has no substantial business interest in England other than Chelsea FC.

*Millhouse*

483.    Millhouse, a company registered in England and Wales, is said to be a company that provides consultancy services in respect of Mr Abramovich's properties and investments outside Russia, including Chelsea Football Club. It was, as I have already noted, set up in England because its managing director, Mr Tenenbaum, wanted to live in England. Mr Abramovich has no role at Millhouse. It is a company whose services he employs for a fee set at market consultancy rates. Mr Abramovich has also employed the services of many companies in Cyprus and the BVI. It is submitted that the location of the company that provides management services in relation to Mr Abramovich's assets located outside Russia says nothing about where Mr Abramovich makes his home or his usual or settled place of abode. Whilst everything must depend on the circumstances, I agree that in this case that is so.

484.    The real focus of Millhouse's operation is in Russia. As Mr Tenenbaum and Mr Heagren explain (see paragraphs 231-2 above), the Millhouse Representative Office in Moscow has always been a much larger and more substantial operation, with more employees and advising in respect of more valuable transactions, than the Millhouse office in England. Since 3rd April 2006, i.e. prior to the issue of the claim form, Millhouse LLC, a separate legal entity, has, in effect, taken over the role played by the Moscow Representative Office of Millhouse and remains significantly larger than Millhouse Capital (UK) Ltd in England.

485.    The accounts of Millhouse for 31st December 2006 reveal an operating profit before tax of just over £ 320,000 and total net assets of £ 603,000 of which    £ 125,000 constituted tangible fixed assets (plant and fixtures and fittings).

*Children educated in England*

486.    Mr Abramovich has five children. His first child started going to school in England in 2004 and the second in 2005. For a while his then wife lived with him and their three younger children at the estate at which they then lived in or near Moscow and commuted to and from England while the two eldest children were at school. She

tired of this commuting and in September 2005, by which time the next two children had started school, she began to live in England during the term time, initially at the estate in Sussex. He flew in and out of England to visit them. The estate proved to be too far away from the school of the eldest son and, for a while his wife and children, when in London, (and he when he was there) stayed in the main ground floor apartment at Lowndes Square. That proved too cramped and in March 2006 one of the houses in Chester Square, which he had acquired in 2005, became the London base for his wife and children. Mr Abramovich continued to use Lowndes Square for himself, even after his family's London base was in Chester Square. He then bought the house next door. The two properties are used as a single property by his ex-wife. Since the divorce (in Russia) in March 2007 he does not visit his wife, and chiefly sees his children outside term time in Russia or on holidays outside England e.g. on his yacht.  The centre of his relationship with his children is not in England.

*Conclusion*

487.   I am not persuaded that Yugraneft has much the better of the argument on whether at the date of the issue of the claim form Mr Abramovich was resident in England and Wales. On the contrary it appears to me that, despite his ownership of Chelsea and his property in Lowndes Square, he was resident in Russia and not in England. Purchases of expensive property in England which, in the case of a man of ordinary wealth, would suggest settlement here, may have no such significance to someone for whom money is no object. Mr Abramovich's use of the Lowndes Square property (intended to become a single property) does not indicate that in November 2007 it was his usual or settled place of abode. It was not then the place in which, even for limited periods, he habitually and normally resided for a settled purpose. It was a place to which he came when visiting London largely in order to indulge his extravagant hobby of owning a football club and watching it play football. Those visits were in 2007 limited in number and short in length. I do not ignore the position in 2005 and 2006 when the number of full days spent in England was higher (between 67 – 110), as was the average number of full days (1.40 – 2.68). But even then the stays were intermittent and, on average, short lived. Further the "numbers game", which disputants in this area decry and then play or find themselves forced to play, does not take into account the changing circumstances of Mr Abramovich's life and of his visits which, certainly by November 2007 were far from indicating sufficient permanence, continuity, or settlement to constitute residence.

*Permission to serve out*

488.   In those circumstances, Yugraneft would require permission to serve out, in order to bring Mr Abramovich within the reach of the court's jurisdiction. Since I have already decided that the claim against Millhouse (and Mr Abramovich) is unmaintainable, there is no claim to which Mr Abramovich is a necessary or proper party.

489.   But even if I am wrong on that, and the claim against Millhouse and Mr Abramovich is sustainable, England is not the most appropriate forum, which is Russia, largely for the reasons set out in the judgments of the BVI courts. English law is not the relevant law. The critical events occurred in Russia. The critical issue is whether or not there has been a great fraud, as allegedly admitted to the Mayor of Moscow (in Russian), or an agreement (made in Russia between Russians) that Yugraneft's Sibneft-Yugra

interest would, in effect, be mortgaged for a debt that has not been repaid. The claim is about the conduct of Russians in Russia under Russian law.

490.    *Owusu* mandates that any claim, if valid, against Millhouse must be determined here. But that is not a ground for bringing in a defendant if England is an inappropriate forum. It is obvious to me that the primary reason for suing Millhouse, with minimal net assets, is to provide the anchor on which to tether a claim against Mr Abramovich. Had it been relevant I would have loosed the chain.

491.    Yugraneft contends that the failure to initiate a prosecution results from incompetence or corruption or both; and that, on that account, England should be regarded as the forum conveniens. I reject this.

492.    Firstly, this case is in no way comparable to *Cherney v Deripaska*, [2008] EWHC 1530 (Comm), in which the claimant, a Russian exile and *persona non grata* in Russia was given permission to serve out in circumstances where the agreement sued on, as a result of which he claimed a 20% interest in the largest aluminium company in the world, was made in England. The evidence gave grounds for believing that if the proceedings took place in Russia (a) he faced a greater risk of assassination (there having been a previous Russian originated attempt on his life); (b) there was a real risk that he might be arrested on trumped up charges; (c) and, because of the very close links between Mr Deripaska and the Russian state, he might very well not receive a fair trial.

493.    Here Yugraneft a Russian company, one of whose shareholders is the City of Moscow, is a seasoned litigator in Russia. It has not been without success. In the bankruptcy proceedings it has enjoyed complete success, as appears from the course of proceedings summarised in Appendix 5. It is open to it to appeal the investigator's refusal but it has decided not to do so. Mr Kotov says that he did not initiate an appeal because he considered it likely that it would be dismissed for reasons unconnected with the merits of the complaint. This view appears to be based on a conversation reported to him by an officer at the Ministry of Internal affairs involved in pre-investigative research into the complaint which that officer had had with Mr Davidovich in which the latter had said that the investigation "*has no prospects*", "*does not mean anything*" and "*will be closed anyway so there is no point in you talking to me*"[45].

494.    Professor Eksarkhopulo's evidence indicates that there can be real problems in securing the prosecution of important people for economic crimes, and that a thriving practice has grown up known as "*raiding*" whereby property is unlawfully seized in the belief that no criminal case will come of it as a result of the investigators' incompetence or corruption. Yugraneft claims that there are well recognised problems of corruption in the Russian Courts. Presidents Putin and Medvedev have acknowledged as much, as has Valery Zorkin, the President of the Constitutional Court. In October 2004 he told Izvestiya that

---

[45] He also gives evidence of a threatening conversation from a man who claimed to be representative of the security service of a particular bank, acting on behalf of unidentified clients who advised him not to take any "*inappropriate action*" (undefined) in that regard.

> "*the courts are very vulnerable to attack from business in the form of corruption. Bribe-taking in the courts has become one of the strongest corruption markets in Russia. Judicial corruption is built into various corruption networks operating at different levels of power: for example, networks for causing criminal cases to collapse and for taking over businesses*".

In May 2008 President Medvedev expressed the "*particular concern of the state*" in relation to the "*corruption in the law enforcement bodies and the judiciary*".

495.    Reliance is placed on the evidence of Mr Vladimir Soloviev, a Russian broadcaster with a colourful background, who claims to be, inter alia, an investigative journalist. He refers to a failure by the Chairwoman of the Federal Arbitazh Court of Moscow Circuit to procure a prosecution against him for pointing out that she had obtained in dubious circumstances four apartments in Moscow, one of them at an undervalue from a party in a case before her at a cost of 50 times her judicial salary. He also refers to a defamation action brought by Mr V. Boyev, an adviser in the Presidential Department for personnel issues and State awards, who took exception to reports he made about the latter's exercise of improper influence over judges. The action was withdrawn when he obtained the evidence of a judge that Mr Boyev had requested that she change her ruling and told her that if she did not her reappointment as Deputy Chairwoman was in jeopardy.

496.    I have no doubt that Russia has had, and has, corruption problems with some of its judges; and that there is a widespread public perception of judicial corruption and political interference in the judicial process: see "*Striving for Judicial Independence*", IBA Human Rights Institute Report, June 2005. Professor Eskarkhopulo gives evidence of specific examples of judicial corruption in his second report. I am equally clear that there are many judges who are not corrupt. The evidence is insufficient to persuade me that, if there was an appeal from the investigator's refusal to initiate a prosecution, it would be likely to be determined contrary to its merits because Yugraneft was the complainant or because Mr Davidovich, Mr Matevosov or Mr Abramovich were the respondents. The litigation in which Yugraneft has so far engaged does not bear tell tale indicia of impropriety such as repeated determinations of different cases by the same judge without good reason, departure from normal curial practice, irrational conclusions or the like. Since Yugraneft has not attempted to appeal the Investigator's refusals it is not possible to know what a Russian judge would make of the submissions cogently advanced before me in reliance on Professor Eskarkhopulo's material, or to say that, in the event of a favourable judicial ruling, a subsequent prosecution would, for improper reasons, be doomed never to take place.

497.    Lastly, if and insofar as reliance is placed upon the unsatisfactory nature of a system in which claims based on commercial fraud must await the outcome of a criminal prosecution which may never be brought, that is a characteristic of Russian law under which Sibir and Yugraneft, (behind which there lies, amongst others, the City of Moscow) and Mr Abramovich have chosen to do business. It was at one time part of English law so far as felonies were concerned.

*Conclusion*

498.    I summarise below what I have decided:

(a)     the claims against Millhouse and Mr Abramovich in *dishonest assistance* need to be actionable under Russian law. They are not actionable under Russian law because of the operation of the time bar in Article 200 of the Civil Code;

(b)     the *receipt based claims* against Mr Abramovich are governed by Russian law. They, also, are not actionable under that law on account of the same time bar;

(c)     even if the claim against Mr Abramovich in *knowing receipt* was subject to English law it would fail because Yugraneft's 5,000 rouble interest in Sibneft-Yugra was never received by anyone else and Mr Abramovich has not received any property which belongs to Yugraneft;

(d)     if and insofar the claims in *knowing assistance* are governed by English law, the arrangements made for the sale of shares in Sibneft to Gazprom, and the reinvestment thereof do not constitute knowing assistance, although those events may be relevant to any claim to an account of profits;

(d)     the *proprietary* claim fails because it is not possible to trace any asset of Yugraneft into either set of offshore companies or into any property in the hands of Mr Abramovich or his agent or nominee;

(e)     the claims are an abuse of process.

Accordingly the claims against Millhouse and Mr Abramovich should be dismissed on those grounds.

499.   Next I have decided the following matters, some of which, in the light of my previous conclusions, are, in fact moot :

(f)     that Yugraneft does not have a good arguable case that Mr Abramovich was resident in England & Wales on 14th November 2007;

(g)     that, in the light of my conclusion that there is no tenable case against Millhouse, there is no ground on which permission should be granted to serve Mr Abramovich out of the jurisdiction;

(h)     that, even if there was, England would not be the appropriate forum for the determination of the dispute, firstly because there is no tenable claim against Mr Abramovich and secondly because, if there was, the appropriate forum is Russia

500.   I shall, therefore, set aside the service of the proceedings on Mr Abramovich. I decline to give permission to serve him outside the jurisdiction

501.    I cannot leave this case without expressing my appreciation of the diligence of
counsel, who have obviously devoted many hours of industry to the compilation of
very full, helpful and well annotated submissions, have made full oral submissions,
and have produced substantial written material during the course of the hearing; and
to their solicitors who have prepared and expertly assembled a very large amount of
evidential and other material. My appreciation would have been even greater if the
deficiencies to which I refer in Appendix 6 had been absent.


# APPENDIX 1

# RUSSIAN PROCEEDINGS

*Khanty-Mansiysk*

1.    In about May 2004 Yugraneft brought separate actions in the Arbitrazh Court of
the Khanty-Mansiysk Autonomous District against Sibneft-Yugra and against
each of Carroll, Shaw and Tranquillo.  The six offshore companies were later
joined as third parties in the claim against Sibneft-Yugra.  Sibneft-Yugra was later
joined as a third party to the claim against Carroll, Shaw and Tranquillo.    The
claim against Carroll, Shaw and Tranquillo were stayed pending resolution of the
claim against Sibneft-Yugra.

2.    Yugraneft's claim against Sibneft-Yugra sought the invalidation of the resolutions
adopted at the EGMs on the grounds that they were not attended by an authorized
representative of Yugraneft (and alleging that Yugraneft only learned of the

increase in charter capital on 12 March 2004). In support of its argument, Yugraneft filed the alleged minutes of the board of directors of Yugraneft dated 10 September 2002. The claim led to a series of judgments:

(1) By a judgment dated 19 and 23 August 2004 in Case No.A75-2368-G/04, the **first instance Arbitrazh Court of Khanty Mansiysk** rejected Yugraneft's claim. It noted that the resolution of 10 September 2002 to remove Mr Matevosov in place of Mr Tolley was not supported by any other supporting documents (including subsequent minutes of the meeting of the board of directors, orders of accession, documents issued by state authorities or banking documents) whilst the fact that Mr Matevosov continued *de facto* to act as managing director was supported by a number of documents (powers of attorney, tax documents, banking document etc). The Court found that Mr Davidovich "*was present at and voted for resolutions on the agenda of extraordinary general meetings of members of Sibneft-Yugra as an authorized representative of Yugraneft*". The Court rejected Yugraneft's claim that the meetings were not called in accordance with the proper procedure under Russian company law.

(2) The judgment was upheld by the **appellate court of Khanty Mansiysk** on 27 October 2004.

(3) By a judgment dated 24 March 2005, the **Federal Arbitrazh Court of the West Siberian Circuit** in Case F04-617/2005 (8534-A75-30) overturned the judgments below and remitted the matter for a new trial. The Court accepted that the procedure for calling the meeting was valid. It also accepted that Mr Matevosov continued to act as *de facto* director. However, it found that the court below had failed to assess the allegation that, after Mr Matevosov's removal, he avoided transferring the corporate documentation and seal of the company to Mr Tolley thereby disabling him from performing his functions.

(4) On 23 June 2005, Mr Mark Tolley made a notarized statement in which he said that he had never served as Yugraneft's General Director, received any compensation, managed the activities of Yugraneft, issued any orders dismissing Mr Matevosov, or notified him of dismissal and did not take any action to obtain from Mr Matevosov any documents or seals of Yugraneft.

(5) On 5 July 2005, the **first instance Arbitrazh Court of Khanty Mansiysk** in Case No. A-75-4601/2005 received the notarized statement of Mr Tolley in evidence. Yugraneft challenged the authenticity of Mr Tolley's notarized statement. The court then heard evidence from Mr Tolley himself. Mr Tolley's evidence to the Court was that he had never concluded any contract to act as, nor carried out, nor been compensated for carrying out, the duties of chief officer of Yugraneft, nor taken any action to dismiss Mr Matevosov from office as a director of Yugraneft. He explained by reference to his personal diary that he was not approached in relation to the General Director role until a year later, in September 2003. In light of Mr Tolley's testimony and statement and the documents, the court concluded that any resolution that may have been taken by the Board of Directors on 10 September 2002 was not implemented and that, accordingly, Mr Matevosov continued to be General Director. The

Court further concluded that Mr Davidovich was an authorized representative of Yugraneft at the EGMs.

(6) By a judgment dated 12 July 2005 in Case No. A-75-4601/2005, the **appellate Arbitrazh Court of Khanty Mansiysk** amended the order of the court below to clarify that, as the extract from the order of 10 September 2002 was not complete, Yugraneft had also failed to prove that Mr Tolley was ever appointed as General Director to begin with.

(7) On appeal to the **Arbitrazh Court of the Khanti Mansiysk Autonomous Region**, in written submissions filed on 12 August 2005, Yugraneft argued that Mr Davidovich could not have acted within his power of attorney because, by reducing its proportionate interest in Sibneft-Yugra, he was not acting in the interests of Yugraneft. Mr Davidovich (and Matevosov)'s conduct was said to have violated s 53(3) of the RF Civil Code. This is one of the two civil law provisions that Yugraneft relies on to found its allegation of breach of fiduciary duty in the present case.

(8) By a judgment dated 18 August 2005 in Case No. A-75-4601/2005, the Court upheld the first instance court's rulings on essentially the same grounds as the court below and held, inter alia, that Mr Davidovich was authorized to act at the meetings.

(9) By a judgment dated 23 November 2005 in Case No. F04-7976/2005(16692-A75-21) the **West Siberian District Federal Arbitrazh Court** recorded that Yugraneft "*cites the substantial violations of sub-clause 2, clause 2, Article 33 and paragraph 1, clause 8, Article 37 of the Federal Law "On Limited Companies" since questionable decisions have been made in the absence of proper representation of the company as a partner with a 50 percent interest in the authorized capital*". The Court concluded that there were "*no grounds to find in favour of the complainant's cassation appeal*" and that "*Based on a complete analysis of available evidence, the lower court made the correct conclusion about the lack of violations of the rules of material law when holding the company partners meetings*".

*Moscow*

*Gregory and Tranquillo*

3.      An action was brought in 2004 by Yugraneft in the Moscow Arbitrazh Court against Gregory and Tranquillo. Sibneft-Yugra appeared as a third party. Yugraneft alleged that the sale of the participation interests by Gregory to Tranquillo violated its pre-emption rights or rights of first refusal:

(1) By a judgment dated 30 December 2004, the **City of Moscow Arbitrazh Court** in Case No. 40-30097/04-24-355 held that Yugraneft's pre-emption rights had not been violated by the issue of the charter capital of Sibneft-Yugra. The Court rejected the proposition that Mr Matevosov did not act as general director in signing the notices issued on 28th and 29th October 2003 and waiving Yugraneft's rights of first refusal.

(2) On appeal, by a judgment dated 7 April 2005, the **City of Moscow Ninth Arbitrazh Appellate Court** (in Case No. 09AP-1412/05-GK) upheld the judgment. It rejected the argument that Mr Matevosov was dismissed from the position of general director on 10 September 2002 (in place of Mr Mark Tolley). The court found, in summary, that the documents before the court confirmed Mr Matevosov continued to function as general director through to 4 March 2004, that the state register did not record any change of general director until 9 March 2004 and that no evidence was produced that Mr Matevosov was dismissed under the provisions of the Russian Labour Code.

(3) On further appeal to the **Federal Arbitration Court for the Moscow District, Yugranef**t alleged in its written submissions to that court that Mr Matevosov in 2002 transferred property from Sibneft-Yugra at reduced prices to Sibneft subsidiaries and that, because his actions were harming the company, the directors resolved to dismiss him. Yugraneft suggested that Mr Matevosov refused to comply with this decision, continued to act for Yugraneft and "*performing actions aimed at further transfer from the company* [*of*] *the property owned by it*". The submissions also noted that Mr Davidovich voted on the resolutions under a power of attorney, noting "*From 2001 he has been the Managing Director in the Moscow office of Millhouse Capital Limited UK which owns 57% of shares in Sibneft Plc*".

(4) In its judgment dated 29 July 2005 (in Case No. 40-30097/04-24-355), however, the Federal Arbitrazh Court upheld the judgment of the Appellate Court, and rejected the appeal noting, in particular, that there was "*no evidence that A.R. Matevosov evaded transferring the powers of director general to Mark [Tolley]*".

*Ferenco and Shaw*

4.    In its next action, Yugraneft brought a claim in the Moscow Arbitrazh Court against Ferenco and Shaw alleging that the sale by Shaw to Ferenco of its participation interests was a breach of Yugraneft's pre-emption rights because (a) Mr Matevosov had been dismissed and (b) in any event, Mr Matevosov's acts were not in accordance with the interests of Yugraneft. In relation to the latter, in its written submissions to the Court Yugraneft alleged that Mr Matevosov's acts "*resulted in fact in denial of actual benefits which the Claimant would have received as a shareholder of "Sibneft-Yugra" open joint-stock company and contradict the principles of reasonable business practice and good faith in execution of the duties of an executive body of a company (art 53 of the Civil Code of the RF, Art 71 of the Federal Law "On Limited Companies")*". (These are the same provisions that are alleged to have been violated by Mr Matevosov in the present case: see PoC at paragraph 92).

5.    The claim resulted in a series of rulings:

(1) At first instance, Yugraneft was successful. By a judgment dated 16 May 2005 in Case No. A40-30094/04-61-366, the judge of **first instance** accepted the claims of Yugraneft that Mr Matevosov had been dismissed as General Director on 10 September 2002, that Mr Matevosov had impeded Mr Tolley from taking over as general director and, accordingly, that the pre-emption rights of Yugraneft had been violated. It ordered reinstatement of the interest.

(2) However, by a judgment dated 19 July 2005 in Case No. 09AP6918/05-GK, the **Ninth Arbitrazh Appeal Court**, overturned the lower court's judgment. The Appeal Court noted, in particular, that it had been

> "*presented with a declaration by Mark Tolley with a notary-certified signature endorsing it. In the said declaration M.Tolley stated that he had never performed the obligations of ANK Yugraneft plc's Managing Director, had not signed any contracts or other agreements with ANK Yugraneft plc or its shareholders for the performance of the function of Managing Director of the company, had never issued any declarations or acceptance of position of Managing Director, and had not signed as Managing Director any documents on behalf of ANK Yugraneft plc*".

The court accepted that Mr Matevosov was not replaced as General Manager by Mr Tolley and that the pre-emption rights of Yugraneft were not violated.

(3) By a judgment dated 15 December 2005, the **Federal Arbitrazh Court** dismissed the further appeal by Yugraneft. The Court recorded Yugraneft's argument that the court below "*failed to take into consideration the fact that A.R. Matevosov was performing his duties of general director of OAO ANK Yugraneft illegitimately and that such actions cannot cause legality of the company's waiver to buy the disputed share*". The Federal Arbitrazh Court concluded, in summary, that all of the evidence showed that Mr Matevosov continued in his role as General Manager and noted that "*the legitimacy of actions of A.R Matevosov in his general director capacity at the time of signature of the waver to acquire the disputed share has been established by legally effective resolutions of Moscow Arbitration court in case No. 40-30097/04-24-355* {i.e. the first instance judgment in respect of Gregory and Tranquillo} *[and] of Arbitration court for Khanty-Mansiysk autonomous district in case No. A75-4601/2005*" {i.e. the first instance judgment in respect of Sibneft-Yugra}.

(4) By a judgment dated 6 April 2006 in Case No.3341/06, the **Supreme Arbitrazh Court** of the Russian Federation rejected Yugraneft's application for leave to appeal to the Praesidium of the Supreme Arbitrazh Court.

*Richard*

6.    Yugraneft brought a further claim against Richard in the Moscow City Arbitrazh Court. Sibneft-Yugra and Carroll were third parties. Yugraneft alleged that its pre-emption right to purchase was violated by the disposition by Carroll of its stake in the authorized capital of Sibneft-Yugra to Richard. The claim failed:

(1) By a judgment of the *Moscow City Arbitrazh Court* dated 26 September 2005 in Case No. A40-30099/04-22-311 the Moscow Arbitrazh Court rejected the claim on the basis that Yugraneft had failed to provide the original Minutes of the meeting of 10th September 202 at which it was alleged that Mr Matevosov was dismissed as general director of Yugraneft and the documents before it showed that Mr Matevosov continued to act in that capacity.

(2) On appeal, the **Ninth Arbitrazh Court of Appeal** upheld the decision by a judgment dated 10 and 13 January 2006 in Case No.09AP-13759/05-GK.

*Sibneft-Yugra*

7.      A further action was commenced in the Moscow City Arbitrazh Court in or around 2005-6 against Sibneft-Yugra, Sibneft and the first set of offshore companies.  The second set of offshore companies was joined as third parties (as was the tax inspectorate).  Yugraneft alleged that the increase in the authorized share capital of Sibneft-Yugra at the EGMs did not take place.  It appears to have been alleged that the additional contributions of charter capital based on the EGMs were never provided.

8.      On 26 October 2006, the claim was transferred to the Khanty-Mansiysk Arbitration Court. On 1 March 2007, Sibneft was replaced by Gazpromneft, its legal successor, as defendant. A series of judgments found against Yugraneft:

(1) By a judgment dated 4 April 2007 the **Arbitrazh Court of Khanty-Mansiysk Autonomous District** in Case No. A75-9221/2006 found that the issue of the additional charter capital at the EGMs was valid and lawful.  It found that the additional contributions by the offshore companies and by Sibneft were duly paid and evidenced by payment orders and bank statements and had been registered with the tax authorities.

(2) By a judgment dated 14 June 2007 the **Arbitrazh Court of Appeal of Khanty-Mansiysk** upheld the decision of the court below

(3) The **Federal Arbitration Court of West Siberia** dated 31 August 2007 upheld the decision.

(4) On 24 December 2007 the **Supreme Arbitration Court of the Russian Federation** refused leave to appeal.

# APPENDIX 2

1.    The EGMs, at which the dilutions complained of, and from which any obligation to make restitution or compensation arose, took place in Russia.

2.    The dishonest assistance was, on the claimant's case, primarily provided by Mr Davidovich, a Russian citizen resident in Russia, exercising a Russian power of attorney, issued by Mr Matevosov, the Russian General Director of Yugraneft, a Russian company, to issue the additional participation interests in Sibneft-Yugra, another Russian company.  Mr Matevosov was an employee of Sibneft, also a Russian company.

3.    It is suggested that neither of those two would have acted without reference to Mr Tenenbaum, Mr Schvidler or Mr Abramovich. Even if Mr Tenenbaum was involved, the latter two were resident in Russia.

4.    In the light of the evidence of Mr Tenenbaum, Mr Heagren and Mr Davidovich and in the absence of any cogent evidence to the contrary there does not seem to me to be a realistic prospect of establishing that the dilutions were managed by Mr Tenenbaum.

5.    The two sets of offshore companies operated through Russian officers and directors (except for Ferenco, whose officers were Cypriot). All of the meetings at which the decisions affecting Sibneft-Yugra took place were held in Russia.

6.    The participation interests are interests in a Russian company (Sibneft-Yugra). Those interests were issued by registration on constitutional documents administered by governmental authorities in Russia upon application by the Russian General Director of that company in Russia.

7.    The other participant at the first EGM was Mr Korsik, a Russian resident and citizen, representing Sibneft (another Russian company, where he worked) at the meeting.

8.    The new board approved at the first meeting (Mr Korsik, Mr Matevosov, Mr Novikov, Mr Shmyrev and Ms Lobanova, Mr Freiman, Mr Aristarkho and Ms Nikulina) consisted entirely of Russians, resident in Russia.

9.    The acts of "*further disposal*" relied upon by the Claimant (at paragraphs 48 – 50 of its Particulars of Claim) and the "*transfer of Yugraneft's interest to*

*Sibneft*" are entirely Russian events involving Russians. The second set of offshore companies to which the additional participation interests were sold operated principally through Russian officers and directors. The transfer was effected by registration in like manner as the original issue.

10.    All of the individuals who are alleged to have carried out specific acts on behalf of the Second Defendant in rendering the alleged dishonest assistance (namely, Mr Davidovich, Mr Peretiatko, Ms Pavlova, Ms Sukhanova, Mr Aristarkhov, Ms Lobanova and Mr Osipov) were Russian citizens, resident in Russia (Mr Osipov moved to Millhouse in London in March 2005) and who carried out all of their relevant acts in Russia. Mr Davidovich was exercising a Russian power of authority.

11.    All of the key individuals involved in the Sibneft-Yugra project for Sibneft were resident in Russian and acted in Russia: Mr Korsik, Mr Shvidler, Ms Breeva and Ms Novikov.

12.    The directors of **Carroll** were Mr Thorkov, Ms Lobanov, Ms Trouskoliavkaya and Mr Peretyatko. All were resident in Russia and carried out all their acts in relation to Sibneft-Yugra in Russia.

13.    The directors of **Shaw** were Ms Andreeva and Ms Pavlova. Both were resident in Russia and carried out all their acts in relation to Sibneft-Yugra in Russia.

14.    The persons authorized to act on behalf **Tranquillo**'s Panamanian Directors were Mr Efremov and Ms Sukhanova. Both were Russians, resident in Russia and carried out their acts in relation to Sibneft-Yugra in Russia.

15.    The directors of **Gregory** were Mr Osipov and Ms Moreva. Both were resident in Russia and carried out all their acts in relation to Sibneft-Yugra in Russia.

16.    The directors of **Richard** were Ms Evdokimova and Ms Gromova. Both were resident in Russia and carried out all their acts in relation to Sibneft-Yugra in Russia.

17.    The directors of **Ferenco** were Ms Damiana, Ms Christofidu and Ms Elia. Both Ms Christofidu and Ms Elia, who carried out the acts in relation to the EGMs, were resident in Cyprus but carried out all their acts in relation to Sibneft-Yugra in Russia.

18.    The joint venture on which Yugraneft relies was between a Russian company (Sibneft) and the Claimant's parent Sibir a company which, although incorporated in England and listed on the AIM, does business entirely in Russia (and is majority owned by a Russian businessman, Mr Tchigirinsky). The joint venture involved an oil exploration project entirely in Russia. The "Principles of Cooperation", outlining the initial arrangement, was a document in Russian (only) and related exclusively to Russian assets and investments. Yugraneft itself is a Russian company, as is Sibneft-Yugra (which takes its name from its two original Russian owners – Sibneft and Yugraneft).

19.    The underlying fiduciary duties (the breach of which are alleged to form the basis of the First and Second Defendant's liability) were duties alleged to be owed to Yugraneft in Russian law by Russian citizens resident in Russia (namely Mr Matevosov and Mr Davidovich) to a company incorporated in Russia (Yugraneft).  Russia was the country where the alleged breaches of these fiduciary duties took place and the country with the closest connection to those duties and to the breach of those duties. It was, therefore, the country where any constructive trust or equity or obligation to restore the property first arose.

20.    Russia was the country where the Claimant's alleged property was taken and, accordingly, where any loss or damage was sustained.  It was in Russia that the Claimant's participation interests were allegedly diminished or "taken".  Russia was also the place where the offshore companies (or, through them, Sibneft or Mr Abramovich) were enriched. If the transfer to Sibneft was to "*enhance the value of Mr Abramovich's shares in Sibneft*", those shares were equally shares in a Russian company.

21.    Mr Abramovich was at the time of the relevant events unquestionably resident in Russia and not in England.

**APPENDIX 3**

## YUGRANEFT'S CLAIMS ABOUT THE WEB OF COMPANIES CONTROLLED BY MILLHOUSE

1.    Mr Friedman, in his third witness statement claims that the evidence shows:

> (i)    that Millhouse is an investment manager whose activities are guided by Mr Abramovich, Mr Tenenbaum and Mr Shvidler;
>
> (ii)   that it has undertaken transactions which transfer a large amount of Mr Abramovich's wealth outside Russia;
>
> (iii)  that its strategic role is focused on London; and
>
> (iv)   that it controls Mr Abramovich's assets through a web of offshore holdings which are administered by a combination of Millhouse representatives and offshore local service providers. The favoured jurisdictions are Cyprus and the BVI and the favoured providers are linked to or connected with Deloittes namely Meritservus Ltd[46], Caribbean Corporate Services Ltd ("CCS"), and others.

2.    As to (i), he refers to a Sibneft Press Release of 24th October 2001 which stated:

> *"A group of core shareholders in Sibneft will entrust management of an extensive portfolio of assets spanning key sectors of the Russian economy to a newly created asset management group, Millhouse Capital. The assets will include an 88% stake in Sibneft ….The company will also manage a series of other investments held by Sibneft's core shareholders, including investments in the airline, electricity, automobile, pulp and paper processing, insurance and banking industries. Millhouse Capital will manage assets, but will not own significant assets itself …"*

3.    He cites press coverage at the time which referred to Sibneft shareholders revealing that they had consolidated their oil, metal, aviation and other assets into Millhouse Capital which would manage assets with a total value of $ 3-4 billion including shares in a range of companies, such as Sibneft, RusAl, Aeroflot etc. The central role of Millhouse Capital (which was set up by Deloitte in October 2001) in Mr Abramovich's affairs was consistently commented on in the press thereafter.  Millhouse was said, inter alia, to have controlled over 70% of the shares in Sibneft and to be centrally involved in the sale of Sibneft shares to Gazprom. Many reports actually described Millhouse as on the other side of the deal.

4.    Thus Millhouse and Gazprom made a joint press announcement that the deal had been done. The deal was, on the defendants' evidence, negotiated by Mr Davidovich and Mr Shvidler.  They were Millhouse people. Gazprom itself thought that it was dealing with Millhouse.  According to Gazprom's annual report for 2005:[47]

---

[46] Meritservus Ltd is described as a service provider company of Deloitte & Touch in an SEC filing.
[47]    30/108/243

"*In October 2005, Gazprom acquired a 72.66% shareholding in the oil company OAO "Sibneft" **from Millhouse** for US$13.079 billion bringing its shareholding in OAO "Sibneft" up to 75.68%.*

Dresdner Bank acted for Gazprom in the transaction.  It too thought that it was dealing with Millhouse according to its Annual Report for 2005[48]:

"*In 2005, Dresdner Kleinwort acted as a sole financial adviser to Gazprom on the largest Russian M&A transaction to-date.  OAO Gazprom acquired 72.66% stake in OAO NK Sibneft **from Millhouse** for approximately US$13.1 billion in cash.  In addition, Dresdner Kleinwort jointly led the acquisition financing for the transaction acting as Coordinating Mandated Lead Arranger, Joint Bookrunner and Facility Agent ...*"

The same statement appears in its 2006 Annual Report[49]. The press reporting was similar e.g.:

(a)  Prime-Tass Business News Agency for 27th July 2005:

"*Russia's West Siberian Depositary nominally holds 72.54% in Sibneft.  Roman Abramovich, probably Russia's richest man, is widely believed to control the stake through its offshore company Millhouse.  Deutsche Bank nominally holds 20% in the company.  Russian oil major YUKOS is a beneficial owner of a 20% stake.*"

(b)  Euromoney's EuroWeek for 30th September 2005:

"*Russia to pay $10 bn early, Gazprom secures Sibneft ....
Gazprom, the state-controlled gas utility, this week bought outright control of Russia's fifth largest oil producing company, Sibneft, in a deal worth $13.1 bn – making it the biggest ever M&A deal in the country.  Gazprom will acquire 72.7% of Sibneft from Millhouse – an offshore investment company controlled by Chelsea football club owner Roman Abramovich – taking its holding to 75.7% ...*"

(c)  Associated Press Online for 29th September 2005:

"*Russia's state gas monopoly Gazprom struck a deal Wednesday to pay $13.01 billion for control of the private Sibneft oil company ...
Gazprom signed the agreement Wednesday with Sibneft's owner, Millhouse – a holding company controlled by Chelsea soccer club owner, billionaire Roman Abramovich, believed to be among a handful of tycoons on good terms with the Kremlin ...*"

---

[48]    30/108/166 at 184
[49]    30/108/195 at 203

5.    Until March 2003 Mr Abramovich held an interest in Aeroflot through **Caroll** and **Shaw.** In an interview with Vedemosti, a Russian newspaper in June 2003 Mr Shvidler explained that Millhouse had initially assembled its Aeroflot stake with a view to resale, and sold it as soon as a proper offer came along. It is to be inferred that Millhouse was managing Mr Abramovich's interest in Aeroflot via Caroll and Shaw. Caroll and Shaw appointed Mr Davidovich, Mr Osipov (head of mergers and takeovers at Millhouse and M Tuzhilin (head of corporate management at Millhouse) to the board of Aeroflot in May 2002.

6.    As to (ii) he refers to the sale of the interests of Mr Abramovich in the following companies:   RusAl and Ruspromotovol in 2003; two State power plants in April 2004; and Sibneft in 2005. A Russian newspaper reported that the proceeds of the latter would be transferred to "*the accounts of offshore companies controlled by Mr Abramovich's London-based subsidiary, Millhouse Capital*". That sale raised about $ 13 billion, which he presumes went to the Cypriot companies through which Mr Abramovich held his Sibneft shares, because those companies were the sellers in an earlier abortive transaction with Yukos and the shares were substantially returned to them when the transaction was reversed.

7.    Of that $ 13 billion only $ 3 billion appears to have been invested in Russia viz (i) a 48% interest in Evraz Group S.A., which has expanded very substantially outside Russia; and (ii) $ 623 million in a pharmaceutical company, which interest has now been sold. The acquisition of the 48% was made through the purchase of the shares of Lanebrook Ltd a Cypriot company, the acquisition being made by one of Millhouse Capital's offshore companies. The remainder must have been initially received by the Cypriot companies or some of them.

8.    As to (iii) the reports of the transactions referred to in paragraph 4 above make clear that Millhouse had a strategic role in them. That that strategic role was focused *in London* is said to arise from (a) the fact that Millhouse was established as an English company; (b) that Mr Tenenbaum is a longstanding friend and business colleague of Mr Abramovich and is described on the Chelsea FC website as one of his closest associates. Mr Shvidler, who bought an expensive house in London in 2004, is a senior figure in the activities of Millhouse. He is reported as saying in June 2003 that his work with Millhouse Capital was his "*primary work*". Mr Tenenbaum and Mr Shvidler went on the board of Evraz. After the creation of Millhouse LLC in 2006 Millhouse had 45 employees, but the wage bill increased, suggesting that those 45 were in the higher echelons.  According to Mr Tenenbaum's statement in these proceedings it has, at the time of the statement 28 employees in England. His salary in 2005 and 2006 was £ 900,000, which is inconsistent with a limited role.

9.    As to (iv) the results of company searches show a large web of interconnected offshore vehicles which hold or have held at various times Mr Abramovich's assets of both a business and a personal nature (e.g. properties, planes, yachts etc).

10.    Mr Friedman exhibits a series of company structure charts at different dates. What they show includes the following.

11.    So far as the six offshore companies are concerned, in December 2000 **Richard**

and **Gregory** (two of the second set) owned Heflinham and Kindselia, both Cypriot companies. Heflinham and Kindselia owned part of Mr Abramovich's acknowledged shareholding in Sibneft. **Richard** and **Gregory** must, therefore, have been vehicles for Mr Abramovich's personal interest along with Heflinham and Kindselia.

12.   In December 2000 Esios Investments, a Cypriot company, owned both Gemini and **Ferenco** (the 3rd of the second set of Dilution Companies). Gemini was one of the Cypriot companies which held Mr Abramovich's acknowledged shareholding in Sibneft. Esios, Gemini, and **Ferenco** must be vehicles for his interest.

13.   By 1st January 2002 the ownership of Gemini and **Ferenco** had been transferred to *Finservus (Trustees) Ltd*, another Cypriot company. (Its shares were originally owned by Deloittes but then transferred to Demetris Ioannidis, who is a director of Meritservus Ltd and other Meritservus companies and head of the Meritservus organisation in Cyprus). The implication must be that Finservus is a vehicle for Mr Abramovich's personal interests.

14.   This is corroborated by the ownership by Finservus of various other companies associated with Mr Abramovich within the Millhouse group of offshore companies: e.g. (i) Tristan Holdings Ltd; (ii) Electus Investments Ltd [50](which owned Millhouse Capital UK Ltd); (iii) between November 2002 and May 2005 Blue Ocean Yacht Management Ltd[51], which manages Mr Abramovich's yachts; and (iv) Calmera Trading & Services Ltd and (v) Aretino Holdings Ltd both of which made payments to Millhouse according to Millhouse's accounts.

15.   Calmera and Aretino are mentioned by Mr Tenenbaum and Mr Heagren as possible routes by which some of the money from the sale of Mr Abramovich's interest in Sibneft may have reached Millhouse and/or Chelsea FC. This is a further basis for inferring that the offshore companies were vehicles for Mr Abramovich's personal interest.

16.   That **Ferenco** is a vehicle for Mr Abramovich's personal interest is also demonstrated by the Option Agreement dated August 2003 between Sibneft Oil Trade Company Limited ("SOTC") as buyer and Farleigh as seller. Farleigh is a vehicle for Mr Abramovich's personal investment interests as appears from certain transactions concerning Pharmstandard involving shares in Augment Investments Ltd ("Augment").

17.   According to the Ferenco Option Agreement, Farleigh was the owner of Ferenco. But according to Ferenco's corporate documents Farleigh was never a shareholder in Ferenco. On the contrary, Ferenco was owned first by Esios and then by Finservus. According to the Cypriot Registry Finservus only transferred Ferenco's shares to SOTC on 29th January 2007: If the Ferenco Option Agreement is genuine, it could only have been concluded on the basis that Ferenco could readily have been transferred to Farleigh before Farleigh sold to SOTC. This may have been the case because Ferenco was owned first by Esios and then by Finservus both of which have owned various personal interests for Mr Abramovich at different times. Again the

---

[50] Elects had as directors Mr Ioannidis, Mr Tenenbaum, and Ms Panchenko, who may have been the Deputy Governor of Chukotka.
[51] By 2008 Blue Ocean was owned by Corpserve (Trustees) Ltd, which was owned by Mr Ioannides.

implication is that Finservus is a vehicle for his personal interests. The likelihood is that Finservus owned Farleigh as well as Ferenco.

18.    The matters set out in the previous paragraphs provide additional support for the inference that Farleigh was a vehicle for Mr Abramovich's personal interests, as was Ferenco.

19.    Accordingly the second set of offshore companies all appear to be vehicles for Mr Abramovich's personal interests which were managed by Millhouse on his behalf.

20.    The Sibneft-Yugra participation interests were transferred to the second set of offshore companies by the first set (Carroll, Shaw and Tranquillo) for a nominal consideration.

21.    Carroll, Shaw and Tranquillo also appear to be vehicles for Mr Abramovich's personal interests in the control of Millhouse. Firstly, the transfer was for nominal consideration. Secondly, Richard, Gregory, Carroll and Shaw, the second set of offshore companies, have the same BVI address.  Thirdly, Carroll and Shaw held Mr Abramovich's acknowledged interest in Aeroflot which was one of those transferred into the management of Millhouse according to the 24th October 2001 announcement. Millhouse representatives on the board of Aeroflot included (a) Mr Davidovich; and (b) Mr Osipov (head of Takeovers and Mergers at Millhouse). Mr Osipov moved to the London office in 2005 to deal, Yugraneft suggests, with the sale (and the proceeds) of Mr Abramovich's interest in Sibneft to Gazprom. So did Ms Vilia Nikolina who had worked at the Representative Office and had been one of the Millhouse people who went on the board of Sibneft-Yugra. Yugraneft also suggests that there are various reasons why Mr Abramovich would wish to move asset offshore, such as actual or potential difficulties with the Russian authorities.

22.    All of the offshore companies are thus. It is said, within the offshore group of companies *run by Mr Tenenbaum.*

23.    Mr Abramovich's 92% interest in Sibneft (the remaining 8% being on the market) was held through six Cypriot companies: (i) White Pearl, (ii) Gemini, (iii) Marthacello, (iv) Kravin, (v) Heflinham, and (vi) Kindselia. These companies were themselves owned (mainly) by other Cypriot companies in the Meritservus stable. All six companies were involved in 2003 in an attempted merger with Yukos under which part of the shareholding in Sibneft was to be sold in return for a shareholding in the merged entity, but 20% was to be sold to Yukos for $ 3 billion. In fact the merger did not go through and the shares in Sibneft of five of the companies other than Kravin were transferred back (according to a judgment of the Moscow Arbitazh Court of 10th February 2005 – where Kravin is not mentioned). The 20% interest appears to have stayed with Yukos (in return for the $ 3 billion), so that Mr Abramovich's previous 92% interest in Sibneft reduced to 72%. Mr Tenenbaum was to have been on the board of the merged entity. Mr Shvidler's evidence is that Mr Tenenbaum had, after he moved to London, some involvement in the "*proposed international aspects of the merger with Yukos*" and a proposed merger with Royal Dutch Shell.

24.    There is no distinction between the structures which hold Mr Abramovich's

"personal" assets – like planes, boats and houses – and the structures which hold his business interests.   All are run through offshore entities controlled by Millhouse. Thus the yachts are operated through Blue Ocean, which was owned by Finservus and then (indirectly) by Mr Ioannides. Mr Abramovich's two planes, with his personal livery, are owned by Crocus Corporation AVV, a company incorporated in Aruba, whose directors are Maria Elia and Panagiotis Nikou, who are Meritservus personnel, and the other by Conibair Holdings Ltd, a BVI company administered by CCS. Maria Elia is a director of Millhouse. She was also a director of Finservus from August 2004. She was not on the board of any of the six offshore companies.

25.   Some of his Lowndes Square properties were at one time held by BVI companies owned directly or indirectly by CCS.  Chelsea FC is ultimately owned by Taverham Holdings Ltd, a BVI company of which Mr Abramovich is the sole beneficial owner. It in turn owns Isherwood Investments Ltd, a Cypriot company, which owns Chelsea Ltd which owns Chelsea FC plc. Maria Elia is a director of Isherwood and the company secretary is Meritservus (Secretaries) Ltd.

26.   Yugraneft also relies upon the charts for what they do not reveal i.e. any involvement by Mr Davidovich or Mr Shvidler as director or shareholder with the Meritservus companies or the offshore companies. This, it is suggested, is because Mr Tenenbaum was co-ordinating their activities, and was the safe pair of hands into which Mr Abramovich entrusted his interests including the proceeds of the sale of his interests in Sibneft.

# APPENDIX 4

1.   Prior to June 200 Sibir held 30.8 % of Yugraneft. In June 2000 it increased its stake to 69.2%

2.   By 31st December 2001 Sibir had increased its share to over 99%.

3.   In or by August 2003 Sibir and the Central Fuel Company ("CFC"), a company owned by the City of Moscow agreed on the establishment of a joint venture in the form of the Moscow Oil & Gas Company ("MOGC").

4.   CFC contributed to the joint venture its shareholding in the Moscow Oil Refinery and other assets in return for a 55% stake in MOGC.  Sibir contributed that part of its shareholding in Yugraneft (which then held nothing other than the Sibneft-Yugra shares) which was not already pledged to Sibneft as security for Loans 1 and 2. That amounted to about 55% of the shares of Yugraneft. In return it received a 31.49% stake in MOGC. It was envisaged that Sibir would ultimately contribute the remainder of its shares (about 44%) in Yugraneft, when the pledges to Sibneft were discharged, and receive in turn share in MOGC which would ring its holding up to 45%.

5.    The effect of that was that, at the time of the BVI proceedings Sibir held about 44% of the shares of Yugraneft (pledged to Sibneft). These are described as a 43.6% interest held indirectly, in the accounts of Sibir for the year ending 31st December 2004. But Sibir also owned a 31.49% interest in MOGC which, itself, owned 55% of Yugraneft. So the total interest, direct or indirect, of Sibir in Yugraneft was 43.6% + 17.32% [31.49% x 55%] = 60.92% of Yugraneft.

6.    In summer 2007 the CFC transferred all of its shares in MOCG to Sibir in exchange for shares in Sibir with the result that Sibir held over 99% of Yugraneft.

# APPENDIX 5

## 2005

1.    On 6th April Sibir defeated Sibneft's objections to the registration of Sibir's claims and Sibneft's application to stay the bankruptcy proceedings.

2.    On 31st May the 9th Arbitrazh Appeal Court varied the order of 6th April but did not allow Sibneft's appeal.

3.    On 3rd June Sibneft lost its appeal in the bankruptcy proceedings against allowing Sibir's claim to a debt of $3 million.

4.    On 27th July, Sibneft's application was passed to the President of the Supreme Arbitrazh Court.

5.    On 6th September, the Federal Arbitration Court of Moscow allowed Yugraneft's appeal against the 9th Appeal Court's decision of 31st May in favour of Sibneft and sent the case to the 9th Arbitrazh Appellate Court for review.

6.    On 3rd October Sibir defeated Sibneft's appeal claiming that the bankruptcy of Yugraneft violated its rights.   Sibneft's application for a review of the decision of 30th December 2004 was refused.

7.    On 14th June Sibneft's claim to avoid a loan agreement between Sibir and Yugraneft was dismissed by the Moscow Arbitrazh Court.

8.    On 11th October Sibneft's appeal to the 9th Arbitrazh Appeal Court was dismissed.

9.    On 3rd November the 9th Arbitrazh Appeal Court dismissed Sibneft's case that the Order of 6th April should be overturned.

10.    On 27th December the Federal Arbitrazh Court for Moscow District rejected Sibneft's cassation complaint seeking to overturn the Order of 6th April.

# APPENDIX 6

1.      There were 45 volumes of documents. They contain swathes of duplication. I doubt that it was really necessary to photocopy them all.

2.      In any event a core bundle should have been provided which at least included (a) the primary documents relating to the events in question in chronological order; (b) the relevant provisions of the Russian Civil and Criminal Codes; and (c) in respect of the BVI proceedings the Statement of Claim, the judgments, and Sibir's skeleton arguments for the hearings before Charles J in July 2005, at first instance and in the Court of Appeal.

3.      I was told that when consideration was given to a core bundle, it was thought that it was too late. It was not.  Upon my request a core bundle was compiled as the case proceeded, which was helpful, but an inadequate substitute for a proper bundle compiled in advance. The one compiled is not, in the event, complete – it does not, for instance, include all the relevant sections of the Russian Civil and Procedure Codes.

4.      The authorities extend to some 14 volumes, 9 being provided by Clydes and (in the end) 5 by the defendants' counsel's Chambers. The latter started off as four but, as is not uncommon, one of them was so overstuffed as to make it unusable. There is considerable duplication between the two. Reports of huge size have been photocopied on single sheets (i.e. not on both sides of the paper) in their entirety, when only limited portions could, on any view, have been required. It was surely unnecessary for the claimants to copy 528 pages of the Insolvency Rules or the entirety of  *Ultraframe* – 494 pages; and *Three Rivers* – 294 pages

5.      The compilation was on occasion eccentric. *El Ajou* was included at first instance by one side and in the Court of Appeal by the other. *Grupo Torras* in the Court of Appeal had to be included by the defendants in a small set of additional authorities.  The claimants' index does not always marry with the contents of the files.

6.      These failings, which are neither unfamiliar, nor, in the overall scale of things, momentous, ought not to occur. They add, unnecessarily and avoidably, to the burden of dealing expeditiously with a case of this magnitude.

TAB 41

*Patel v Mirza* [2016] UKSC 42, UK Supreme Court



**Trinity Term**
**[2016] UKSC 42**
*On appeal from: [2014] EWCA Civ 1047*

# JUDGMENT

## Patel (Respondent) *v* Mirza (Appellant)

**before**

**Lord Neuberger, President**
**Lady Hale, Deputy President**
**Lord Mance**
**Lord Kerr**
**Lord Clarke**
**Lord Wilson**
**Lord Sumption**
**Lord Toulson**
**Lord Hodge**

## JUDGMENT GIVEN ON

**20 July 2016**

**Heard on 16 and 17 February 2016**

| *Appellant* | *Respondent* |
|---|---|
| Matthew Collings QC | Philip Shepherd QC |
| | Professor Graham Virgo |
| (Instructed by Mischon de Reya) | (Instructed by K A Arnold & Co) |

**LORD TOULSON: (with whom Lady Hale, Lord Kerr, Lord Wilson and Lord Hodge agree)**

*Introduction*

1.      "No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act." So spoke Lord Mansfield in *Holman v Johnson* (1775) 1 Cowp 341, 343, ushering in two centuries and more of case law about the extent and effect of this maxim. He stated that the reason was one of public policy:

> "If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causa, or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the defendant was to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are equally in fault, potior est conditio defendentis."

2.      Illegality has the potential to provide a defence to civil claims of all sorts, whether relating to contract, property, tort or unjust enrichment, and in a wide variety of circumstances.

3.      Take the law of contract. A contract may be prohibited by a statute; or it may be entered into for an illegal or immoral purpose, which may be that of one or both parties; or performance according to its terms may involve the commission of an offence; or it may be intended by one or both parties to be performed in a way which will involve the commission of an offence; or an unlawful act may be committed in the course of its performance. The application of the doctrine of illegality to each of these different situations has caused a good deal of uncertainty, complexity and sometimes inconsistency.

4.      *Holman v Johnson* involved a claim for the price of goods which the plaintiff sold to the defendant in Dunkirk, knowing that the defendant's purpose was to smuggle the goods into England. The plaintiff was met with a defence of illegality. The defence failed. Lord Mansfield held that knowledge on the part of the plaintiff that the defendant intended to smuggle the goods did not affect the plaintiff's entitlement to recover the price of the goods, since he was not himself involved in

Page 2

the smuggling. By contrast, in *Pearce v Brooks* (1866) LR 1 Ex 213 a claim by a coachbuilder against a prostitute for the hire of what was described in the law report as an "ornamental brougham" was held to be unenforceable for illegality after the jury found that the defendant hired it for the purpose of prostitution and that the plaintiff knew that this was her purpose. It would seem that the difference between *Holman v Johnson* and *Pearce v Brooks* had to do with the type of goods supplied, because in both cases the plaintiff knew that the defendant was entering into the contract for an illegal or immoral purpose. In *JM Allan (Merchandising) Ltd v Cloke* [1963] 2 QB 340, 348, Lord Denning MR endeavoured to rationalise the authorities by saying that "active participation debars, but knowledge by itself does not". However, the Law Commission commented in its discussion of the subject in its Consultation Paper on *Illegal Transactions: the Effect of Illegality on Contracts and Trusts*, LCCP 154 (1999) that the case law lacks clear guidance on what amounts to "participation" in this context.

5.      It is unclear to what extent the doctrine of illegality applies to a contract whose object includes something which is in some respect unlawful, or the performance of which will involve some form of illegality, but not in a way which is central to the contract. In *St John Shipping Corpn v Joseph Rank Ltd* [1957] 1 QB 267, 288, Devlin J said:

> "If a contract has as its whole object the doing of the very act which the statute prohibits, it can be argued that you can hardly make sense of a statute which forbids an act and yet permits to be made a contract to do it; that is a clear implication. But unless you get a clear implication of that sort, I think that a court ought to be very slow to hold that a statute intends to interfere with the rights and remedies given by the ordinary law of contract. Caution in this respect is, I think, especially necessary in these times when so much of commercial life is governed by regulations of one sort or another, which may easily be broken without wicked intent."

6.      As to illegality in the manner of performance of a contract, Mance LJ observed in *Hall v Woolston Hall Leisure Ltd* [2001] 1 WLR 225, 246, that the conceptual basis on which a contract not illegal nor prohibited at the time of its formation may become unenforceable due to the manner of its performance is open to debate. In *Anderson Ltd v Daniel* [1924] 1 KB 138 a claim for the price of goods was held to be unenforceable because the seller had failed to give the buyer an invoice containing details which the seller was required to give him by statute. In the *St John Shipping* case Devlin J rejected the interpretation that the claim in *Anderson Ltd v Daniel* failed because in the course of performing a legal contract the plaintiff had done something illegal. The correct interpretation, he said, was that "the way in which the contract was performed turned it into the sort of contract that

was prohibited by the statute": [1957] 1 QB 267, 284. In the *St John Shipping* case the claim was for freight under a charter party. In the course of taking on bunkers the vessel was overloaded and the master thereby committed an offence, for which he was prosecuted and fined £1,200. The extra freight earned by the overloading was £2,295 and to that extent the ship owners stood to profit from their wrong. The cargo owners refused to pay that part of the freight. Devlin J rejected their defence. He held that since the goods had been delivered safely, the ship owners had proved all that they needed. He was not prepared to construe the statute as having the effect of making the contract prohibited. If it had been otherwise, the ship owners would not have been entitled to any freight and would therefore have suffered an additional penalty, much greater than that provided for by Parliament, for conduct which might have been unintentional.

7.     In *Ashmore, Benson, Pease and Co Ltd v Dawson* [1973] 1 WLR 828 the Court of Appeal adopted a different approach. Manufacturers of heavy engineering equipment entered into a contract of carriage with road hauliers. There was nothing illegal in the formation of the contract, but the hauliers overloaded the vehicles which were to transport the load, in breach of road traffic regulations, and one of the lorries toppled over during the journey as a result of the driver's negligence. The manufacturers' transport manager was present when the goods were loaded and was aware of the overloading. A claim by the manufacturers for the cost of repair of the damaged load was rejected on grounds of illegality. The Court of Appeal did not perform the same analysis as had Devlin J in the *St John Shipping* case. They held simply that the manufacturers participated in the illegal performance of the contract and were therefore barred from suing on it.

8.     These and other cases led the Law Commission to describe the effect that unlawful performance has on the parties' contractual rights as very unclear. (Consultative Report on the Illegality Defence, LCCP 189 (2009), para 3.27.)

9.     In this case the issue is whether Lord Mansfield's maxim precludes a party to a contract tainted by illegality from recovering money paid under the contract from the other party under the law of unjust enrichment (to use the term now generally favoured by scholars for what used previously to be labelled restitution and, before that, quasi-contract). On one side it is argued that the maxim applies as much to such a claim as to a claim in contract, and that the court must give no assistance to a party which has engaged in any form of illegality. On the other side it is argued that such an approach would not advance the public policy which underlies Lord Mansfield's maxim, once the underlying policy is properly understood.

*Structure of this judgment*

10.    With that introduction I turn to the facts of Mr Patel's claim and how it was decided in the courts below: see paras 11-16. A central part of their judgments, and of Mr Mirza's argument, concerns the doctrine of reliance applied by the House of Lords in *Tinsley v Milligan* [1994] 1 AC 340: see paras 17-20. That decision led to the Law Commission conducting a comprehensive review of the law of illegality and making proposals for addressing what the Commission perceived to be its unsatisfactory features: see paras 21-49. Paras 33-39 concern European law and its potential impact on our domestic law. The approach adopted in Australia, Canada and the USA is considered at paras 50-66. Paras 67-81 address developments since the Law Commission's report, including three recent decisions of this court which laid bare a division of opinion about the framework for deciding issues of illegality. Paragraphs 82-94 contain a section entitled "The law at a crossroads". This leads to the critical part of the judgment, which considers the way forward and ends in a summary and proposal for the disposal of this appeal: paras 95-121. The reader who is more interested in what the judgment has to say about the future than the past will no doubt wish to concentrate on the final section.

*Mr Patel's claim*

11.    The essential facts can be shortly told. Mr Patel transferred sums totalling £620,000 to Mr Mirza for the purpose of betting on the price of RBS shares, using advance insider information which Mr Mirza expected to obtain from RBS contacts regarding an anticipated government announcement which would affect the price of the shares. Mr Mirza's expectation of a government announcement proved to be mistaken, and so the intended betting did not take place, but Mr Mirza failed to repay the money to Mr Patel despite promises to do so. Mr Patel thereupon brought this claim for the recovery of the sums which he had paid. The claim was put on various bases including contract and unjust enrichment. A fuller account of the facts is given in the judgments of the courts below and in the judgment of Lord Neuberger.

12.    The agreement between Mr Patel and Mr Mirza amounted to a conspiracy to commit an offence of insider dealing under section 52 of the Criminal Justice Act 1993. In order to establish his claim to the return of his money, it was necessary for Mr Patel to explain the nature of the agreement.

13.    A defendant's enrichment is prima facie unjust if the claimant has enriched the defendant on the basis of a consideration which fails. The consideration may have been a promised counter-performance (whether under a valid contract or not), an event or a state of affairs, which failed to materialise. (See Professor Andrew Burrows' *A Restatement of the English Law of Unjust Enrichment*, 2012, p 86, para

15). In *Sharma v Simposh Ltd* [2013] Ch 23, at para 24, the Court of Appeal cited with approval Professor Birks' summary of the meaning of failure of consideration in his revised edition of *An Introduction to the Law of Restitution* (1989), p 223:

> "Failure of the consideration for a payment … means that the state of affairs contemplated as the basis or reason for the payment has failed to materialise or, if it did exist, has failed to sustain itself."

For Mr Patel to show that there was a failure of consideration for his payment of moneys to Mr Mirza, he had to show what the consideration was, and that required him to establish the nature of their agreement.

14.    Applying the "reliance principle" stated in *Tinsley v Milligan* [1994] 1 AC 340, the judge held that Mr Patel's claim to recover the sum paid was unenforceable because he had to rely on his own illegality to establish it, unless he could have brought himself within the exception of the doctrine known, misleadingly, as locus poenitentiae; and that he could not bring himself within that exception since he had not voluntarily withdrawn from the illegal scheme.

15.    In the Court of Appeal the majority agreed with the judge on the reliance issue, but disagreed with him on the application of the locus poenitentiae exception. They held that it was enough for the claim to succeed that the scheme had not been executed. Gloster LJ agreed with the majority that Mr Patel's claim should succeed but she took a different approach to it. She began her thoughtful analysis with a cri de coeur (para 47):

> "As any hapless law student attempting to grapple with the concept of illegality knows, it is almost impossible to ascertain or articulate principled rules from the authorities relating to the recovery of money or other assets paid or transferred under illegal contracts."

In summary, she rejected the view that *Tinsley v Milligan* was to be taken as laying down a rule of universal application that the defence of *ex turpi causa* must apply in all circumstances where a claim involves reliance on the claimant's own illegality. It was necessary in her view to consider whether the policy underlying the rule which made the contract illegal would be stultified by allowing the claim. In addressing that issue, relevant factors included the degree of connection between the wrongful conduct and the claim made, and the disproportionality of disallowing the claim to the unlawfulness of the conduct. She identified the mischief at which the

offence of insider trading was aimed as market abuse by the exploitation of unpublished price-sensitive information obtained from a privileged source. If no such activity occurred, Gloster LJ said that it was hard to see on what basis public policy should bar the return of money which had previously been intended to be used for that purpose. Mr Patel was not seeking to make a benefit from wrongdoing, and she did not consider that such an outcome would be just and proportionate.

16.    On the issue of reliance, Gloster LJ did not consider it necessary for Mr Patel to establish that the intended betting on RBS shares was to be done with the benefit of insider information; it would have been enough for him to establish that the funds had been paid for the purpose of a speculation on the price of the shares which never took place. If, however, she were wrong on that issue, she agreed with the other members of the court on the locus poenitentiae issue.

*The reliance principle and Tinsley v Milligan*

17.    The facts of *Tinsley v Milligan* are well known. Miss Tinsley and Miss Milligan each contributed to the purchase of a home. It was vested in Miss Tinsley's sole name, but on the mutual understanding that they were joint beneficial owners. It was put in her sole name so as to assist Miss Milligan to make false benefit claims from the Department of Social Security (DSS), which she did over a number of years with Miss Tinsley's connivance. The money obtained from the DSS helped them to pay their bills, but it played only a small part in the acquisition of the equity in the house. Eventually Miss Milligan confessed to the DSS what she had done and made terms with it, but the parties fell out. Miss Tinsley gave Miss Milligan notice to quit and brought a claim against her for possession. Miss Milligan counterclaimed for a declaration that the property was held by Miss Tinsley on trust for the parties in equal shares.

18.    The Court of Appeal by a majority decided in favour of Miss Milligan by applying the test whether it would be "an affront to the public conscience" to grant the relief claimed by her. The House of Lords unanimously rejected the "public conscience" test, but by a three to two majority upheld the Court of Appeal's decision. The leading speech was given by Lord Browne-Wilkinson. His starting point was that title to property can pass under an unlawful transaction; but he held that the court would not assist an owner to recover the property if he had to rely on his own illegality to prove his title. The Court of Appeal had recognised that distinction in *Bowmakers Ltd v Barnet Instruments Ltd* [1945] KB 65 in a case concerning personal property, referred to in more detail at para 111 below, and Lord Browne-Wilkinson held that the same applied to real property in which the claimant had a beneficial interest. Lord Browne-Wilkinson held that it was enough for Miss Milligan to show that she had contributed to the purchase of the property and that there was a common understanding that the parties were joint owners. She did not

have to explain why the property had been put into Miss Tinsley's sole name. If the relationship between them had been that of daughter and mother, and each had contributed to the purchase of a property in the daughter's name, the result would have been different, because there would then have been a presumption of advancement in the daughter's favour. The mother would in those circumstances have had to rely on the illegal nature of the transaction to rebut the presumption, and her claim would therefore have been defeated by the doctrine of illegality. Lord Browne-Wilkinson acknowledged the procedural nature of this approach at [1994] 1 AC 340, 374:

> "The effect of illegality is not substantive but procedural. The question therefore is, 'In what circumstances will equity refuse to enforce equitable rights which undoubtedly exist.'"

19.    Lord Goff, in the minority, held at p 356 that if A puts property in the name of B intending to conceal A's interest for a fraudulent or illegal purpose, neither law nor equity will allow A to recover the property, and equity will not assist him in asserting an equitable interest in it. It made no difference whether A's case could be advanced without reference to the underlying purpose. He recognised, at p 363, the resulting hardship and said that he did not disguise his unhappiness at the result, but he did not regard it as appropriate for the courts to introduce a discretion. He considered, at p 364, that reform should be instituted only by the legislature, after a full inquiry by the Law Commission, which would embrace not only the advantages and disadvantages of the present system, but also the likely advantages and disadvantages of a discretionary system. He added that he would be more than happy if a new system could be evolved which was both satisfactory in its effect and capable of avoiding the kind of result which in his judgment flowed from the established rules in cases such as *Tinsley v Milligan*.

20.    *Tinsley v Milligan* has been the subject of much criticism in this and other jurisdictions, for its reasoning rather than its result, but this is the first time in this jurisdiction that its reasoning has been directly called into question. Two decades have since passed since the decision and it is right to trace the developments which have occurred in that period.

*Law Commission*

21.    After the decision in *Tinsley v Milligan* the Law Commission included the illegality defence in its Sixth Programme of Law Reform (1995) (Law Com 234). It undertook a full inquiry of the kind which Lord Goff envisaged. It published its first consultation paper, *Illegal Transactions: The Effect of Illegality on Contracts and Trusts* (LCCP 154), in 1999. The responses, and developments in the case law, led

the Commission to re-consider the problems and its proposals for reform. In 2009 it issued a further public consultation paper, *The Illegality Defence: A Consultative Report* (LCCP 189). In 2010 it issued its final confirmatory report, *The Illegality Defence* (Law Com 320). In relation to trust law, it proposed statutory reform and it produced a draft bill. In relation to the law of contract and unjust enrichment, the Commission considered that there were serious problems but that they were capable of being, and could best be, tackled by the process of judicial development. In 2012 the government announced that it did not intend to take forward the Commission's recommendation for statutory reform of the law relating to trusts, because it did not consider reform of this area of the law to be a pressing priority for the government.

22.    From its study of the case law and academic writing, the Commission identified the principal policy rationales for the illegality doctrine as 1) furthering the purpose of the rule infringed by the claimant's behaviour, 2) consistency, 3) prevention of profit from the claimant's wrongdoing, 4) deterrence and 5) maintaining the integrity of the legal system. It observed that these rationales were not mutually exclusive but overlapped to a greater or lesser degree. A sixth possible rationale, punishment, was controversial. The large majority of consultees considered that punishment was a matter for the criminal courts (to which one might add regulators) and should not be invoked in determining parties' civil disputes. (LCCP 189, paras 2.5-2.31.)

23.    The conclusion that the illegality defence presented serious problems represented the overwhelming view of academic commentators and consultees generally. The Commission analysed the problems under four heads - complexity, uncertainty, arbitrariness and lack of transparency. It did not suggest that the problems resulted generally in unsatisfactory outcomes, but it was critical of the way in which they were reached. It said that, on the whole, the case law illustrated the judges threading a path through the various rules and exceptions in order to reach outcomes which for the most part would be regarded as fair between the parties involved, although there were instances of results which the Commission considered to be unduly harsh, for example in unlawful employment cases. Generally, the courts managed to avoid unnecessarily harsh decisions either by creating exceptions to the general rules or by straining the application of the relevant rules on the particular facts so as to meet the justice of the case. Seldom was there an open discussion in the judgments of the considerations which led the court to its decision. (LCCP 189, paras 3.50-3.60.)

24.    The Commission considered that *Tinsley v Milligan*, and cases following it, exemplified the problems of arbitrariness, uncertainty and potential for injustice. The rule applied in that case was arbitrary in that the question whether the illegality affected the recognition or enforcement of the trust depended not on the merits of the parties, nor the policies underlying the illegality defence, but on a procedural issue. Moreover the effect of applying the reliance principle in cases involving the

presumption of advancement gave that presumption an overriding importance which it was never intended to have. It led to uncertainty because there was much confusion over what exactly amounted to "reliance", particularly when the claimant was seeking to establish an equitable interest under a constructive trust. It had the potential to force the court into unjust decisions because, by focusing on procedural matters, the reliance principle precluded the court from paying attention to the policies that justified the existence of the defence, or taking into account such matters as the seriousness of the illegality and the value of the interest at stake. (Law Com 320, paras 2.13-2.15.)

25.    The Commission examined the law in other jurisdictions, European law and European human rights law. In its first consultation paper in 1999 the Commission's proposed recommendation was to introduce statutory reform on the lines of the New Zealand model. The New Zealand Illegal Contracts Act 1970, section 7, provides that the court may grant to any party to an illegal contract "such relief by way of restitution, compensation, variation of the contract, validation of the contract in whole or part or for any particular purpose, or otherwise howsoever as the court in its discretion thinks just". In its 2009 consultative report the Commission noted that the operation of this provision had been widely heralded as a success; that it had not created the deluge of litigation that was feared by some commentators; and that this model of reform, with slight variations, had been recommended by the law reform bodies of several other Commonwealth jurisdictions (LCCP 189, para 3.81). Nevertheless, in its 2009 consultative report and in its final report the Commission did not recommend statutory change (except in relation to trusts) for a combination of reasons. Although the proposal for statutory reform in the 1999 consultation paper had been supported by a majority of consultees, a minority had made critical comments which persuaded the Commission that judicial reform was a better way forward, and the Commission found difficulties in drafting a satisfactory statutory model. Most importantly, developments in the case law and the critical responses of consultees led the Commission to conclude that it was open to the courts to develop the law in ways that would render it considerably clearer, more certain and less arbitrary.

26.    Among domestic authorities, the Commission referred to the decisions of the House of Lords in *Bakewell Management Ltd v Brandwood* [2004] 2 AC 519 and *Gray v Thames Trains Ltd* [2009] AC 1339.

27.    Bakewell bought an area of land registered as a common. Owners of neighbouring properties had for years driven across the land to reach the public highway. Bakewell brought an action to prevent them from continuing to do so. The defendants claimed to have acquired rights of way by prescription, but by driving across the land without the owner's consent they had committed offences under the Law of Property Act 1925. So to establish their property rights the defendants had to rely on conduct which was criminal. This, Bakewell submitted, they were not

entitled to do. Its argument was rejected. The House of Lords held that public policy did not prevent the defendants from acquiring an easement where the landowner could have made a grant which would have removed the criminality of the user. Lord Walker, with whom Lord Bingham and Lady Hale agreed, said at para 60:

> "I do not see this as reintroducing the 'public conscience' test which this House disapproved in *Tinsley v Milligan* [1994] 1 AC 340. It is merely a recognition that the maxim ex turpi causa must be applied as an instrument of public policy, and not in circumstances where it does not serve any public interest: see for instance *National Coal Board v England* [1954] AC 403, 419."

28.     *Gray v Thames Trains Ltd* was a case in tort. Mr Gray developed post-traumatic stress disorder through being involved in a major railway accident, which caused him to suffer depression and a substantial personality change. He was previously of unblemished character but two years after the accident, and while under medical treatment, he pursued and stabbed to death a man who had stepped in front of his car. His plea of guilty to manslaughter on the ground of diminished responsibility was accepted and he was ordered to be detained in a mental hospital. He sued the train operator for negligence and liability was admitted. His claim for damages included compensation for his loss of liberty, damage to reputation and loss of earnings during his detention. The House of Lords held that public policy precluded him from recovering damages under those heads. The leading opinion was given by Lord Hoffmann, with whose reasoning Lord Phillips (subject to certain additional observations) and Lord Scott agreed.

29.     Lord Hoffmann observed, at paras 30-32, that the maxim *ex turpi causa* expresses not so much a principle but a policy based on a group of reasons, which vary in different situations. The courts had therefore evolved varying rules to deal with different situations. Because questions of fairness and policy were different in different cases and led to different rules, one could not simply extrapolate rules applicable to one situation and apply them to another. It had to be assumed that the sentence was what the criminal court regarded as appropriate to reflect Mr Gray's personal responsibility for the crime he had committed. It was therefore right to apply the rule that he could not recover damages for the consequences of the sentence, reflecting an underlying policy based on the inconsistency of requiring someone to be compensated for a sentence imposed because of his personal responsibility for a criminal act. It was also to right to apply a wider rule that you cannot recover damage which is the consequence of your own criminal act, reflecting the idea that it is offensive to public notions of the fair distribution of resources that a claimant should be compensated (usually out of public funds) for the consequences of his own criminal conduct.

30.    Lord Phillips said, at para 15, that he would reserve judgment as to whether the *ex turpi causa* maxim should apply if it were clear from the judge's sentencing remarks that the claimant's offending behaviour played no part in the decision to impose a hospital order, or, where the claimant's criminal act demonstrated a need to detain him both for his own treatment and for the protection of the public, if the judge made it clear that he did not believe that the claimant should bear significant personal responsibility for his crime. Lord Brown agreed with Lord Phillips' reservations.

31.    Lord Rodger said, at paras 78-83, that the civil court must assume that the order made by the criminal court was appropriate to reflect Mr Gray's personal responsibility for the crime he had committed. The right approach on the facts of the case was that the court must "cleave to the same policy as the criminal court". However, he considered that the approach might well be different if the offence of which he had been convicted was trivial but revealed that he was suffering from a mental disorder, due to the defendant's fault, which made a hospital order appropriate.

32.    The Law Commission drew from the various judgments a readiness on the part of the judges to examine the policy reasons which justified the application of the illegality defence and to explain why those policies applied to the facts of the case.

33.    The Commission also considered the question how far illegal conduct may deprive claimants of rights under European Union law (LCCP 189, paras 3.82-3.89). Some contractual rights are now derived from EC directives. For example, the right to equal pay granted by the Equal Pay Directive (directive 75/117/EEC) is implied as a term into the employment contract. In other cases, such as the Sale of Consumer Goods Directive (directive 99/44/EC), EU law provides remedies that depend on the existence of a contract. The issue may therefore arise whether a national illegality doctrine which prevents a party from enforcing a contract is compatible with the EU law from which the contractual right arose.

34.    In the 1990s various breweries let pubs to tenants on terms containing beer ties. These were found to be unenforceable because they breached article 81 (previously article 85) of the European Community Treaty. The issue then arose whether the fact that the tenant had been party to an illegal contract precluded him from claiming damages from the brewery. In *Gibbs Mew plc v Gemmell* [1999] 1 EGLR 43, 49 the Court of Appeal held that this was so, because "English law does not allow a party to an illegal agreement to claim damages from the other party for loss caused to him by being a party to the illegal agreement" (per Peter Gibson LJ).

35.    In *Courage Ltd v Crehan* (Case C-453/99) [2002] QB 507, the Court of Appeal referred the question to the European Court of Justice, which took a different view. Advocate General Mischo expressed the view, at paras 38-43, that although the individuals protected by article 81 were primarily third parties (consumers and competitors), a rule which automatically excluded a party to the agreement from the protection of article 81 was "too formalistic and does not take account of the particular facts of individual cases"; and that a party which was too small to resist the economic pressure imposed on it by the more powerful undertaking had more in common with a third party than with the author of the agreement. (The potential parallel with the relationship in some cases between an employer and an employee is obvious.)

36.    The court agreed with the Advocate General. It held that where a contract was liable to restrict or distort competition, community law did not preclude a rule of national law from barring a contracting party from relying on his own illegal actions, if it was established that that party bore significant responsibility for the distortion of competition. In that context the matters to be taken into account by the national court included the respective bargaining power and the conduct of the parties to the agreement in the economic and legal context in which they found themselves. It was for the national court to ascertain whether the party who claimed to have suffered loss through concluding such a contract was in a markedly weaker position than the other party, such as seriously to compromise or even eliminate his freedom to negotiate the terms of the contract. An absolute bar to an action being brought by a party to a contract which violated the competition rules would not advance the full effectiveness of the prohibition contained in the Treaty, but rather the reverse.

37.    The effect of the court's decision was not to treat article 81 as intended for the protection of parties who infringed it, as a class, but to treat it as a matter for the national court to determine whether on the facts of a particular case a party should be regarded as sinned against rather than sinning, and therefore entitled to damages for the consequences of the offending provision of the agreement.

38.    The potential impact of European law was referred to, obiter, by Mance LJ in *Hall v Woolston Hall Leisure Ltd* [2001] 1 WLR 225. The claimant was dismissed from her employment as a chef when her employer became aware that she was pregnant. She brought a claim in the industrial tribunal for compensation under the Sex Discrimination Act 1975. The Act pre-dated the Equal Treatment Directive (76/207/EEC) but gave effect to its provisions. Mrs Hall succeeded on liability, but it emerged during the remedies hearing that her employer was defrauding the Inland Revenue by falsely pretending that her net salary of £250 per week was her gross salary. She was aware of the fraud, because she was given pay slips which showed her gross pay as £250, deductions of £63.35 and net pay of £186.65. She knew that this was untrue, but when she raised the matter with her employer she was told that

this was the way in which they did business. The tribunal held that the contract was tainted by illegality and that she had no right to compensation under the Act. Its decision was upheld by the appeal tribunal but reversed by the Court of Appeal, which held that her acquiescence in the employer's conduct was not causally linked with her sex discrimination claim and that public policy did not preclude her from enforcing her statutory claim. Mance LJ observed additionally that the Act should as far as possible be read as providing the same scope of protection as the Directive. Mrs Hall's position fell within the wording and purpose of the Directive despite the tribunal's finding of her knowledge of the fraud on the Inland Revenue.

39.    That case did not involve the direct enforcement of a contractual obligation, but in cases where European Union rights depend on the existence of a contract (for example, in the consumer context), the Law Commission doubted whether the Court of Justice would be content with a system of domestic illegality rules which were formalistic and did not allow room for a proportionate balancing exercise to be carried out on the basis of clear principles of public policy (LCCP 189, para 3.89).

40.    Where the terms or performance of a contract involve breach of a legislative provision, it is rare (as the Commission noted) for the statute to state expressly what are to be the consequences in terms of its enforceability. (For an example of an express statutory unenforceability provision, see section 127(3) of the Consumer Credit Act 1974, which arose for consideration in *Wilson v First County Trust Ltd (No 2)* [2004] 1 AC 816.) It is to be noted that in the present case, as Gloster LJ pointed out, section 63(2) of the Criminal Justice Act 1993 stipulated that "No contract shall be void or unenforceable by reason only of section 52", presumably because of a concern that if a contract which involved insider dealing contrary to section 52 were void, there could be undesirable consequences for parties down the line. The question whether a statute has the implied effect of nullifying any contract which infringes it requires a purposive construction of the statute, as illustrated by the decision of the Court of Appeal in *Hughes v Asset Managers plc* [1995] 3 All ER 669 which the Commission commended.

41.    If a contract involving prohibited conduct is not void as a matter of statutory construction, the Commission recommended that in deciding whether a claim arising from it should be disallowed by reason of illegality, the court should have regard to the policies that underlie the doctrine. It stressed that it was not advocating a general discretion, but a principled evaluation recognising (as Lord Walker put it in the *Bakewell* case, at para 60) that the maxim *ex turpi causa* must be applied as an instrument of public policy and not in circumstances where it would not serve the public interest. The Commission identified a number of potentially relevant factors: most importantly, whether allowing the claim would undermine the purpose of the rule which made the relevant conduct unlawful, and, linked to that question, the causal connection between the illegality and the claim (including how central the illegality was to the contract), the gravity of the conduct of the respective parties and

the proportionality of denying the claim. (LCCP 189, para 3.142) The Commission recommended a broadly similar approach to the maxim *ex turpi causa* in cases of unjust enrichment, tort and enforcement of property rights.

42.    The Commission considered that it was within the power of the courts to develop the law in that direction and that there were signs of willingness to do so. The underlying principles were already to be found in the case law and courts were in practice influenced by them in reaching their decisions, in some cases more openly than in others.

43.    In relation to the application of the illegality defence to claims of unjust enrichment, the Commission carried out a detailed review in its 1999 consultation paper (LCCP 154, paras 2.32-2.56) and a further review in its 2009 consultative report (LCCP 189, paras 4.1-4.62). An unjust enrichment claim may simply be to unwind the transaction by repayment of moneys paid and restoration of the parties to their original position, or it may take the form of a claim for recompense for benefits provided by one party to the other (a quantum meruit claim).

44.    The Commission observed that one might have expected to find that illegality has little role to play as a defence to a claim for unjust enrichment, since the claimant is not seeking to execute the contract. However, after a more liberal start, the courts adopted a much tougher stance, applying the *ex turpi causa* maxim to such claims unless the claimant could bring himself within certain recognised exceptions. These were a) duress, b) possibly ignorance of a fact or law that rendered the contract illegal, c) possibly membership of a vulnerable class protected by statute and d) locus poenitentiae. The locus poenitentiae exception has given rise to difficult and conflicting case law, which was meticulously analysed in the judgments of the courts below in the present case with different conclusions. I do not propose to repeat their analysis because I do not consider it necessary to do so. The topic has only acquired importance because of the strictness of the basic rule which the courts have applied.

45.    Not every case, however, has received such strict treatment. In *Mohamed v Alaga & Co* [2000] 1 WLR 1815 the Court of Appeal took a more flexible approach. The plaintiff, a Somali translator and interpreter, sued the defendant solicitors for breach of a contract by which he was to introduce Somali refugees to the firm, and assist in the preparation and presentation of their asylum claims, in consideration for a half share of the legal aid fees received by the firm. Alternatively, he claimed payment for his professional services as a translator and interpreter on a quantum meruit. His claim was struck out on the ground that the alleged fee sharing contract contravened rules which had statutory force under the Solicitors Act 1974 and that he was therefore precluded by the doctrine of illegality from claiming payment for services provided under the contract. The Court of Appeal restored the claim for payment on a quantum meruit.

46.    Lord Bingham CJ (with whom the other members of the court agreed) differentiated between the claims for breach of contract and quantum meruit. As to the former, he held that the purpose of the prohibition in the statutory rules was the protection of the public, and that it would defeat the purpose of the prohibition if a non-solicitor party to the agreement could invoke the court's aid to enforce the agreement. As to the quantum meruit claim, Lord Bingham acknowledged that on one view of the case the plaintiff was seeking to recover part of the consideration payable under an unenforceable contract. But he preferred to view it as a claim for a reasonable reward for professional services rendered. He considered it relevant (obviously to the question of the public interest in permitting or disallowing the claim) that the parties were not equal in blameworthiness. The firm could be assumed to know the rules and the likelihood was that it had acted in knowing disregard of them. By contrast, Lord Bingham had no difficulty in accepting that the plaintiff was unaware of any reason why the firm should not make the agreement, which was a common type of agreement in other commercial fields.

47.    Mr Matthew Collings QC for Mr Mirza submitted in this case that *Mohamed v Alaga & Co* was a one off case and either represents an exception, peculiar to its particular facts, to the general rule that a party is not entitled to payment for services rendered under an illegal contract or was wrongly decided.

48.    The Commission considered that the policies which underlie the illegality defence are less likely to come into play where parties are attempting to undo, rather than carry out, an illegal contract. As in the case of contractual enforcement, it recommended that a decision on disallowing a particular restitutionary claim for illegality should be based openly on the policies underlying the defence, taking into account the same sort of factors (such as the relative conduct of the parties and the proportionality of denying the claim).

49.    I have said that the Commission examined the law of other jurisdictions. Before considering developments in domestic law since the Commission's final report, it is convenient at this stage to refer to the law in Australia, Canada and the USA.

*Australia*

50.    In *Nelson v Nelson* [1995] HCA 25; (1995) 184 CLR 538, the High Court of Australia considered essentially the same issues as in *Tinsley v Milligan*, which it declined to follow. As the widow of a mariner who had served in World War 1, Mrs Nelson was eligible under the Defence Service Homes Act 1918 to buy a house with the benefit of a subsidy from the Commonwealth of Australia, provided that she did not own or have a financial benefit in another house. She provided the money to buy

a house in Bent Street, Sydney, but the transfer was taken in the names of her son and daughter. Their common intention was that Mrs Nelson should be the beneficial owner of the house. The reason for putting the Bent Street property in the names of her children was to enable her to buy another property with the benefit of a subsidy under the Act. This she did. One year later the Bent Street property was sold. By this time Mrs Nelson and her daughter had fallen out, and a dispute arose as to who was entitled to the sale proceeds. Mrs Nelson and her son brought proceedings against the daughter for a declaration that the proceeds were held by the son and daughter in trust for their mother. The daughter opposed the claim and sought a declaration that she had a beneficial interest. Under *Tinsley v Milligan* the daughter would have succeeded, because the illegal purpose of the parties in arranging for the property to be transferred into the names of the children would have prevented Mrs Nelson from rebutting the presumption of advancement in their favour.

51.    The High Court unanimously rejected that approach. The majority (Deane, McHugh and Gummow JJ) held that the court should use its equitable jurisdiction to grant the declaration sought by Mrs Nelson, with the proviso that it should be subject to terms designed to ensure that the benefit wrongly obtained on the purchase of the second property should be repaid to the Commonwealth. The minority (Dawson and Toohey JJ) would have made the declaration without any such proviso, since the Commonwealth was not a party to the proceedings and should in their view be left to decide what action, if any, it wished to take.

52.    Toohey J said at pp 595-597:

> "Once we are in the realm of public policy we are in a rather shadowy world. It is perhaps the more shadowy here because Mrs Nelson is not asking the court to enforce a contract but rather to give effect to the resulting trust which would ordinarily arise once the presumption of advancement has been rebutted.
>
> …
>
> To allow the result in such a situation to be determined by the procedural aspects of a claim for relief is at odds with the broad considerations necessarily involved in questions of public policy.
>
> …

> Although the public policy in discouraging unlawful acts and refusing them judicial approval is important, it is not the only relevant policy consideration. There is also the consideration of preventing injustice and the enrichment of one party at the expense of the other (*St John Shipping Corpn v Joseph Rank Ltd* [1957] 1 QB 267, 288-289, per Devlin J)."

McHugh J, at p 609, described as unsatisfactory a doctrine of illegality that depended upon the state of the pleadings. He said at p 611:

> "The doctrine of illegality expounded in *Holman* was formulated in a society that was vastly different from that which exists today. It was a society that was much less regulated. With the rapid expansion of regulation, it is undeniable that the legal environment in which the doctrine of illegality operates has changed. The underlying policy of *Holman* is still valid today - the courts must not condone or assist a breach of statute, nor must they help to frustrate the operation of a statute … However, the *Holman* rule, stated in the bald dictum: 'No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act' is too extreme and inflexible to represent sound legal policy in the late twentieth century even when account is taken of the recognised exceptions to this dictum."

53.    McHugh J went on to suggest that except in a case where a statute made rights arising out of a particular type of transaction unenforceable in all circumstances, a court should not refuse to enforce legal or equitable rights on the ground of illegality if to do so would be disproportionate to the seriousness of the conduct or if it would not further the purpose of the statute. He said at 612-613:

> "It is not in accord with contemporaneous notions of justice that the penalty for breaching a law or frustrating its policy should be disproportionate to the seriousness of the breach. The seriousness of the illegality must be judged by reference to the statute whose terms or policy is contravened. It cannot be assessed in a vacuum. The statute must always be the reference point for determining the seriousness of the illegality."

McHugh J's approach was cited with approval by a majority of the High Court in *Fitzgerald v F J Leonhardt Pty Ltd* [1997] HCA 17; (1997) 189 CLR 215.

54.    Noting the criminal sanctions which were available under the Act (imprisonment for up to two years) and the ability of the Commonwealth to recover any payments wrongly obtained by Mrs Nelson, the court did not consider that it should impose a further sanction by refusing to enforce her equitable rights, particularly when such a refusal would result in a penalty out of all proportion to the seriousness of her conduct (pp 570-571 per Deane and Gummow JJ, 590-591 per Toohey J and 616-617 per McHugh J).

*Canada*

55.    In *Hall v Hebert* [1993] 2 SCR 159 the owner of a car allowed a passenger to drive it in the knowledge that he had drunk a large amount of beer during the course of the evening. The car overturned and the driver suffered head injuries. The Supreme Court held that the driver's claim against the owner in negligence was not barred by illegality, but that there should be a reduction in damages for contributory negligence. The judgment of the majority was given by McLachlin J.

56.    She held that the courts should be allowed to bar recovery in tort on the ground of the plaintiff's illegal or immoral conduct only in very limited circumstances. The basis of the power lay in the duty of the courts to preserve the integrity of the legal system and it was exercisable only where that concern was in issue. It was in issue where a damage award in a civil suit would allow a person to profit from illegal or wrongful conduct, or would permit an evasion or rebate of a penalty prescribed by the criminal law. In such instances the law refused to give by its right hand what it took away by its left hand.

57.    McLachlin J emphasised the importance of defining what was meant by profit when speaking of the plaintiff profiting from his or her own wrong. It meant profit in the narrow sense of a direct pecuniary award for an act of wrongdoing. Compensation for something other than wrongdoing, such as for personal injury, would not amount to profit in that sense. Compensation for the plaintiff's injuries arose not from the illegal character of his conduct, but from the damage caused to him by the negligent act of the owner in letting him drive. It represented only the value of, or substitute for, the injuries he had suffered by the fault of another. He would get nothing for being engaged in illegal conduct. McLachlin J accepted that there might be cases where a claim should be barred from tort recovery which did not fall within the category of profit, in order to prevent stultification of the criminal law or the evasion of a criminal penalty, but the underlying principle was that the use of the power to deny recovery on the ground of illegality was justified only where the claim would introduce inconsistency into the fabric of the law.

58.    In *Still v Minister of National Revenue* (1997) 154 DLR (4th) 229 an American citizen lawfully entered Canada and applied for permanent residence status. Pending consideration of her application, acting in good faith, she accepted employment but did so without obtaining a work permit as required by the Immigration Act 1985. She was subsequently laid off and submitted a claim for benefits under the Unemployment Insurance Act 1985. Her claim was rejected on the ground that the employment on which she relied in order to found her claim was prohibited under the Immigration Act. She appealed successfully to the Federal Court of Appeal.

59.    The judgment of the court was given by Robertson JA. The court accepted that her employment without a work permit was expressly prohibited by the Immigration Act. It acknowledged that under what it described as the "classical model" of the illegality doctrine, the fact that the applicant acted in good faith was irrelevant; her employment under an illegal contract could not constitute insurable employment for the purposes of the Unemployment Insurance Act. However, it said at para 24 that in recognition of the rigidity and oft-times unfair application of the classical illegality doctrine, the courts had developed several ways in which a party may be relieved of the consequences of illegality where appropriate. The difficulty with those exceptions arose from "the legal manoeuvring that must take place to arrive at what is considered a just result". The court examined, at paras 25-36, a line of authorities of the Ontario courts which showed the courts turning from the classical model towards a modern approach. It expressed the view, at para 42, that the classical model had lost its persuasive force, and was now honoured more in the breach than in its observance through the proliferation of so-called judicial "exceptions" to the rule. The new approach involved an examination of the purpose underlying the relevant prohibition, and its rationale was explained by McLachlin J in *Hall v Hebert*.

60.    After citing McLachlin J's judgment in *Hall v Hebert*, the court said at para 49:

> "As the doctrine of illegality rests on the understanding that it would be contrary to public policy to allow a person to maintain an action on a contract prohibited by statute, then it is only appropriate to identify those policy considerations which outweigh the applicant's prima facie right to unemployment insurance benefits. … While on the one hand we have to consider the policy behind the legislation being violated, the Immigration Act, we must also consider the policy behind the legislation which gives rise to the benefits that have been denied, the Unemployment Insurance Act."

61.    The court proceeded to consider the objectives underlying each of the two Acts. As to the policy consideration that a person should not benefit from his or her own wrong, the court regarded it as a critically significant fact that she had not deliberately broken the law but acted in good faith, and it noted that during her employment both the applicant and her employer had contributed to the unemployment insurance fund. Taking account of the objectives underlying each Act and the facts of the case, it concluded that denial of the application was not required in order to preserve the integrity of the legal system and would be disproportionate to the breach involved in failing to have obtained a work permit.

*USA*

62.    The American Law Institute's Restatement (2nd) of Contracts (1981) states at para 178(1):

> "A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement in such terms."

63.    *Nizamuddowlah v Bengal Cabaret Inc* (1977) 399 NYS 2d 854 provides a practical example in the case of a devious and oppressive employer. The central defendant (the effective owner of the company named as first defendant) met the plaintiff in Bangladesh and offered to employ him at the defendant's restaurant in New York City. The plaintiff was to work for an initial period of three months without payment, after which he was to be paid a waiter's salary. The plaintiff accepted the offer. The defendant arranged for the plaintiff's travel and entry to the USA on a visitor's visa, and he also promised to obtain a resident visa or "green card" for him. The plaintiff worked for the defendant for 20 months, but he received no payment despite several demands. He also made repeated inquiries about his green card, but the defendant persistently stalled him. The plaintiff eventually managed to obtain a green card through his own efforts and sued the defendant to recover wages under the Minimum Wage Act. The defendant sought the dismissal of the action on the ground that the contract was illegal.

64.    By working in the USA before he obtained a green card the plaintiff violated the immigration laws, and the judge was not prepared to accept his plea of ignorance, since he was warned in his application form for a visitor's visa that gainful employment would constitute a breach of his visa conditions. The judge concluded that he had willingly fallen in with the defendant's proposal because of his strong desire to emigrate to the USA. The judge identified the public harm liable to result

from the type of conduct exposed by the case: employment of aliens such as the plaintiff in times of high unemployment deprived citizens and legally admitted aliens of jobs; their employment on substandard terms could depress wages and working conditions; and it could diminish the effectiveness of labour unions.

65.    However, the judge found that the defendant was the main perpetrator, intent on evading and taking advantage of the immigration laws. He said that knowing about the immigration laws, and aware that a party to an illegal contract could not ask a court to help him to carry out his illegal objective, the defendant ran his enterprise without fairly compensating his employees. The judge concluded that the equitable course was that the plaintiff should be paid on the basis of unjust enrichment, and he calculated the amount of the award by reference to the statutory minimum wage.

66.    The New York Supreme Court, Appellate Division, upheld the judgment at (1979) 415 NYS 2d 685. Observing that the Minimum Wage Act contained no indication of a legislative intent to protect only American workers, the court said:

> "Even illegal aliens have the right to pursue civil suits in our courts, and the practice of hiring such aliens, using their services and disclaiming any obligation to pay wages because the contract is illegal is to be condemned. The law provides penalties for aliens who obtain employment in breach of their visa obligations, but deprivation of compensation for labor is not warranted by any public policy consideration involving the immigration statutes."

*Developments since the report of the Law Commission*

67.    The Court of Appeal supported and followed the approach of the Law Commission in *Les Laboratoires Servier v Apotex Inc* [2012] EWCA Civ 593, [2013] Bus LR 80 and *ParkingEye Ltd v Somerfield Stores Ltd* [2013] QB 840. In the latter case ParkingEye contracted to provide a system of automated monitoring of car parking at Somerfield's supermarkets. The system recorded vehicle registration numbers and customers would be charged for staying beyond a set period. The contract was to be for an initial term of 15 months and ParkingEye's remuneration was to come from the charges levied over that period. Overstayers were to be sent letters of demand in a standard form agreed between the parties in advance of the conclusion of the contract. If the first demand did not result in payment, it was to be followed by a series of further demands in stronger terms. The third pro forma letter was deceptive because it falsely represented that ParkingEye had the authority and intention to issue proceedings against the customer if payment

was not made within a stipulated period. Six months into the contract Somerfield
repudiated it for reasons unconnected with the letters of demand. By that time the
monitoring system had been installed at 17 of its stores. ParkingEye's claim for
damages was met with a defence which included a plea of illegality based on the
intended use of deception in the performance of the contract.

68.    The trial judge rejected the defence and awarded ParkingEye damages of
£350,000 for loss of profits caused by Somerfield's repudiatory breach. The Court
of Appeal upheld his decision. The legally objectionable letter was only a small part
of the intended performance of the contract and was not essential to it. The judge
had found that ParkingEye did not appreciate that the letter would be legally
objectionable when the parties agreed on its form, and that, if someone had pointed
the matter out, the letter would have been changed. When its objectionable nature
occurred to Somerfield, the proper and reasonable course would have been for
Somerfield to raise the matter with ParkingEye and continue to honour the contract,
so long as ParkingEye made the necessary alteration and performed the contract in
a lawful manner, as it would have done. The court held that denial of ParkingEye's
claim was not justified by the policies underlying the doctrine of illegality and would
have led to a disproportionate result.

69.    In that case I said at paras 52-53:

> "Rather than having over-complex rules which are
> indiscriminate in theory but less so in practice, it is better and
> more honest that the court should look openly at the underlying
> policy factors and reach a balanced judgment in each case for
> reasons articulated by it.
>
> 53.    This is not to suggest that a list of policy factors should
> become a complete substitute for the rules about illegality in
> the law of contract which the courts have developed, but rather
> that those rules are to be developed and applied with the degree
> of flexibility necessary to give proper effect to the underlying
> policy factors."

70.    On the relevance of ParkingEye's state of mind, I referred at para 66 to
*Waugh v Morris* (1873) LR 8 QB 202. The case arose from a charter party under
which a cargo of hay was to be shipped from Trouville to London. On arrival in
London the master learned that a few months before the conclusion of the contract
an order had been published under the Contagious Diseases (Animals) Act 1869
making it illegal to land hay brought from France. The master refrained from landing
the cargo and, after some delay, the charterer transhipped and exported it.

Meanwhile the contractual laydays had expired and the owner claimed for detention. The charterer resisted the claim on the ground that the contract was void for illegality, because its purpose was the delivery of the consignment to London, which was prohibited by law. The defence was rejected.

71.     Giving the judgment of the court, Blackburn J said that all that the owner had bargained for was that on the ship's arrival in London the freight should be paid and the cargo unloaded. He contemplated that it would be landed and thought that this would be legal; but if he had thought of the possibility of the landing being prohibited, he would probably and rightly have expected that the charterer would not violate the law. Blackburn J said at 208:

> "We quite agree, that, where a contract is to do a thing which cannot be performed without a violation of the law it is void, whether the parties knew the law or not. But we think, that in order to avoid a contract which can be legally performed, on the ground that there was an intention to perform it in an illegal manner, it is necessary to show that there was the wicked intention to break the law; and, if this be so, the knowledge of what the law is becomes of great importance."

72.     Since the decisions of the Court of Appeal in *Les Laboratoires Servier v Apotex Inc* and the *ParkingEye* case, there have been three decisions by the Supreme Court involving the doctrine of illegality. The first was *Hounga v Allen* [2014] 1 WLR 2889, a case with features similar to *Nizamuddowlah v Bengal Cabaret Inc*. Miss Hounga was a 14-year old Nigerian. Mr and Mrs Allen offered to employ her as a home help in the UK in return for schooling and £50 per month. With their help she entered the UK on false identity documents and obtained a six months' visitor's visa. The plan was masterminded by Mrs Allen's brother who lived in Lagos. He drafted an affidavit for Miss Hounga to swear, giving her surname as that of Mrs Allen's mother and a false date of birth. The affidavit led to the issue of a passport in that name. Mrs Allen's family then arranged for Miss Hounga to be taken to the British High Commission in Lagos, where she produced a document purporting to be an invitation from Mrs Allen's mother pretending to invite her granddaughter to visit her in the United Kingdom. The High Commission was duped into issuing her with entry clearance. Mrs Allen's brother then bought a ticket for Miss Hounga to travel to England. On arrival at Heathrow Miss Hounga confirmed to an immigration officer that the purpose of her visit was to stay with her grandmother. Subsequently a psychologist reported that Miss Hounga, who was illiterate, had low cognitive functioning, a learning disability and a developmental age much lower than her chronological age. Nevertheless she knew that she had entered the UK on false pretences, that it was illegal for her to remain beyond six months and that it was illegal for her to take employment in the UK.

73.    After her arrival Miss Hounga lived at the Allens' home, looking after their children and doing housework. She was not enrolled in a school or paid any wages. She was told by Mrs Allen that if she were found by the police she would be sent to prison. This caused her extreme concern. Mrs Allen also subjected her to serious physical abuse. After 18 months an incident occurred in which Mrs Allen beat Miss Hounga, threw her out of the house and poured water over her. Miss Hounga slept that night in the Allens' garden in wet clothes. Next day they refused to let her back in, and she made her way to a supermarket car park, where she was found and taken to the social services department of the local authority.

74.    Miss Hounga brought claims against the Allens in the employment tribunal for unfair dismissal, breach of contract and unpaid wages. They were dismissed on the ground that her contract of employment was unlawful. She appealed unsuccessfully to the appeal tribunal and she did not seek to appeal further. Neither the Court of Appeal nor the Supreme Court therefore had occasion to consider whether she was entitled to be paid for the services which she rendered on a quantum meruit (by analogy with cases such as *Mohamed v Alaga & Co* and *Nizamuddowlah v Bengal Cabaret Inc et al*).

75.    Miss Hounga also claimed to have been the victim of the statutory tort of unlawful discrimination under the Race Relations Act 1976, section 4(2)(c), in relation to her dismissal. The tribunal found that she had been dismissed because of her vulnerability consequent upon her immigration status. She was therefore the victim of unlawful discrimination and she was awarded compensation for her resulting injury to feelings. The tribunal's order was set aside by the Court of Appeal, which held that the claim was tainted by the illegal nature of her employment and that for the court to uphold it would be to condone the illegality, but it was restored by the Supreme Court. The leading judgment was given by Lord Wilson, with whom Lady Hale and Lord Kerr agreed.

76.    Lord Wilson did not consider that the solution of the case lay either in asking whether Miss Allen needed to rely on an illegal contract or in asking whether there was an inextricable link between the illegality to which she was a party and her claim. At the heart of the judgment Lord Wilson set out his approach in para 42:

> "The defence of illegality rests on the foundation of public policy. 'The principle of public policy is this …' said Lord Mansfield by way of preface to his classic exposition of the defence in *Holman v Johnson* (1775) 1 Cowp 341, 343. 'Rules which rest on the foundation of public policy, not being rules which belong to the fixed or customary law, are capable, on proper occasion, of expansion or modification': *Maxim Nordenfelt Guns and Ammunition Co v Nordenfelt* [1893] 1 Ch

> 630, 661 (Bowen LJ). So it is necessary, first, to ask 'What is
> the aspect of public policy which founds the defence?' and,
> second, to ask 'But is there another aspect of public policy to
> which the application of the defence would run counter?'"

77.    On the first question, drawing on the judgment of McLachlin J in *Hall v Hebert*, Lord Wilson addressed the policy consideration of preserving the integrity of the legal system and not allowing persons to profit from their illegal conduct. He concluded that an award of compensation for damage to Miss Hounga's feelings was not a form of profit from her employment; it did not permit evasion of a penalty prescribed by the criminal law; and it did not compromise the integrity of the legal system. Conversely, he said that application of the defence could encourage those in the situation of Mrs Allen to believe that they could discriminate against people like Miss Hounga with impunity and could thereby compromise the integrity of the legal system. On the second question, Lord Wilson said that the Court of Appeal's decision ran strikingly counter to the public policy against forms of people trafficking and in favour of the protection of its victims. Weighing the policy considerations, he concluded that insofar as any public policy existed in favour of applying the illegality defence, it should give way to the public policy to which its application would be an affront.

78.    *Hounga v Allen* was a case in tort, but Lord Wilson's approach to the illegality defence was applied by the Court of Appeal in *R (Best) v Chief Land Registrar* [2016] QB 23, where the issue was whether a claim to be registered under the Land Registration Act 2002 ("LRA") as the proprietor of a residential building by adverse possession was barred by illegality. The circumstances were that part of the relevant period of possession involved the commission of trespass which constituted a criminal offence under section 144 of the Legal Aid, Sentencing and Punishment of Offenders Act 2012 ("LASPOA").

79.    Sales LJ (with whom McCombe LJ agreed) expressed the view, at para 51, that the best guidance on the relevant analytical framework was to be found in Lord Wilson's judgment (from which he quoted para 42 and the passage which followed it). Applying that guidance, he examined the public policy considerations underlying the provisions of the LRA governing acquisition of title to land and the public policy considerations underlying section 144 of LASPOA. He concluded that the mischief at which section 144 was aimed was far removed from the intended operation of the law of adverse possession and that public policy did not preclude the claim for registration.

80.    After *Hounga v Allen* came the decision of the Supreme Court in *Les Laboratoires Servier v Apotex Inc* [2015] AC 430. The issue of illegality arose in the context of a claim to enforce a cross-undertaking in damages given as a condition

of an interlocutory injunction in proceedings which ultimately failed. The claim was therefore akin to a claim in contract. The facts were somewhat complicated but do not matter for present purposes. The court held unanimously that the Court of Appeal had reached the right result, but the majority of this court expressed the view, at para 21, that the Court of Appeal's decision could not possibly be justified by the considerations put forward by that court, which had in broad terms followed the approach commended by the Law Commission. I expressed a different view, at para 62, observing that the Court of Appeal had adopted a similar approach to that taken by this court in *Hounga v Allen*.

81.    After *Les Laboratoires Servier v Apotex Inc* came *Bilta (UK) Ltd v Nazir (No 2)* [2016] AC 1. There was a sharp division of opinion about the proper approach to the defence illegality between, on the one hand, a strictly rule-based approach and, on the other hand, a more flexible approach by which the court would look at the policies underlying the doctrine and decide whether they militated in favour of the defence, taking into account a range of potentially relevant factors. The majority did not consider it necessary to resolve the difference in that case, since it did not affect the result, but Lord Neuberger said at para 15 that it needed to be addressed as soon as appropriately possible.

*The law at a crossroads*

82.    In his *Restatement of the English Law of Contract* (Oxford University Press, 2016), pp 221-222, Professor Andrew Burrows explained the difficulty of attempting to state the law in relation to illegality:

> "Leaving aside the law on what one can loosely label 'statutory illegality' [cases where a statute makes a contract or a contract term unenforceable by either or one party] the law on the effect of illegality in contract (which one may loosely refer to as 'the common law of illegality') is in a state of flux …

> Traditionally, two Latin maxims have often been referred to without greatly illuminating the legal position: ex turpi causa non oritur actio ('no action arises from a disgraceful cause') and in pari delicto potior est conditio defendentis ('where both parties are equally in the wrong the position of the defendant is the stronger'). As previously understood, illegality in the law of contract - as developed from those Latin maxims - was governed by a series of rules which tended to distinguish, for example, between illegality in formation and illegality in performance. Unfortunately, commentators and courts have

found it very difficult to state those rules with confidence and precision. Hence the textbook treatments not only differ from each other but are characterised by long-winded attempts to explain the law. Sharp propositions when offered by the courts or the books have to be qualified by reference to cases or hypothetical examples that do not fit those rules; and convincing justifications of those rules have proved elusive. More recently, therefore, and in line with a similar trend in respect of illegality as a defence in tort, some courts have favoured greater flexibility culminating in a 'range of factors' approach aimed at achieving a proportionate response to contractual illegality in preference to the traditional rule-based approach."

83.    Since the law was at a crossroads, Professor Burrows set out alternative possible formulations of a "rule-based approach" and a "range of factors approach".

84.    One possible version of a rule-based approach, at p 224, which *Tinsley v Milligan* and *Les Laboratoires Servier v Apotex Inc* could be interpreted as supporting, would be a single master rule based on reliance:

"If the formation, purpose or performance of a contract involves conduct that is illegal (such as a crime) or contrary to public policy (such as a restraint of trade), a party cannot enforce the contract if it has to rely on that conduct to establish its claim."

85.    An alternative rule-based formulation, at p 225, saw the reliance rule as only one of a number of rules and essentially confined to the creation of property rights. On this approach a formulation of the rules might be:

"Rule 1. A contract which has as its purpose, or is intended to be performed in a manner that involves, conduct that is illegal (such as a crime) or contrary to public policy (such as a restraint of trade) is unenforceable (a) by either party if both parties knew of that purpose or intention; or (b) by one party if only that party knew of that purpose or intention.

Rule 2. If rule 1 is inapplicable because it is only the performance of a contract that involves conduct that is illegal or contrary to public policy, the contract is unenforceable by

the party who performed in that objectionable way but is enforceable by the other party unless that party knew of, and participated in, that objectionable performance.

Rule 3. Proprietary rights created by a contract that involves conduct that is illegal or contrary to public policy will not be recognised unless the claimant can establish the proprietary rights without reliance on that conduct."

86.     Professor Burrows identified six criticisms of those rules and, more generally, of a "rule-based" approach to illegality.

87.     First, the difficulty with the *Tinsley v Milligan* reliance rule, whether as a master rule or as a rule restricted to cases involving the assertion of proprietary rights, was that it could produce different results according to procedural technicality which had nothing to do with the underlying policies. The decision of the Court of Appeal in *Collier v Collier* [2002] EWCA 1095; [2002] BPIR 1057 provides a good illustration. A father granted a lease of property to his daughter to hold on trust for him in order to deceive creditors. His claim to beneficial title was rejected on the ground of illegality, because it was held that he needed to rely on the illegal purpose in order to rebut the presumption of illegality which arose in favour of the daughter. Mance LJ considered at paras 105-106 what appeared to be the distinction introduced by *Tinsley v Milligan* between a beneficial interest which could be established by "some objectively provable and apparently neutral fact" and a beneficial interest arising only from an agreement made for an unlawful purpose. He described the effect as "little more than cosmetic" where the court was perfectly well aware of the close involvement of both parties in the illegality. Tempted as he was to adopt a severely limited view of the meaning of reliance (encouraged by the judgment of Dawson J in *Nelson v Nelson*), he rightly did not consider that it was open to the Court of Appeal on the authorities to do so. He expressed strong sympathy with the criticisms of the law expressed by the Law Commission, and he concluded at para 113 that he had no liking for the result which the court was compelled to reach.

88.     Second, the difficulties with rule 1 were illustrated by the *ParkingEye* case. The illegality in that case went to the contract as formed, because from the outset it was intended to send out to customers a form of letter of demand which contained some deliberate inaccuracies. The rule as stated did not permit differentiation between minor and serious illegality or between peripheral and central illegality. To have deprived ParkingEye of what would otherwise have been a contractual entitlement to damages of £350,000 would have been disproportionate. Moreover, as Sir Robin Jacob pointed out in that case, at paras 33-34, there was something odd

about a rule which differentiated according to whether the intention was formed before or after the contract was made.

89.    Third, as with the criticism of rule 1, the reference in rule 2 to performance that involved illegal conduct drew no distinction between serious criminality and relatively minor breach of a statutory regulation.

90.    Fourth, although a purported advantage of firm rules is greater certainty, the cases do not always fit the rules because courts have often sought ways around them when they do not like the consequence. The flexible approach would not only produce more acceptable results, but would in practice be no less certain than the rule-based approach.

91.    Fifth, although Lord Mansfield made it clear in *Holman v Johnson* that the illegality defence operates as a rule of public policy and is not designed to achieve justice between the parties, that does not mean that any result, however arbitrary, is acceptable. The law should strive for the most desirable policy outcome, and it may be that it is best achieved by taking into account a range of factors.

92.    Sixth, although it may be argued that if there are deficiencies in the traditional rules, the way forward is to refine the rules to remove the deficiencies by appropriate exceptions, that task is one which has never been satisfactorily accomplished. The reason is that there are so many variables, for example, in seriousness of the illegality, the knowledge and intentions of the parties, the centrality of the illegality, the effect of denying the defence and the sanctions which the law already imposes. To reach the best result in terms of policy, the judges need to have the flexibility to consider and weigh a range of factors in the light of the facts of the particular case before them.

93.    If a "range of factors" approach were preferred, Professor Burrows suggested, at pp 229-230, that a possible formulation would read as follows:

> "If the formation, purpose or performance of a contract involves conduct that is illegal (such as a crime) or contrary to public policy (such as a restraint of trade), the contract is unenforceable by one or either party if to deny enforcement would be an appropriate response to that conduct, taking into account where relevant -
>
> > (a)    how seriously illegal or contrary to public policy the conduct was;

(b)    whether the party seeking enforcement knew of, or intended, the conduct;

(c)    how central to the contract or its performance the conduct was;

(d)    how serious a sanction the denial of enforcement is for the party seeking enforcement;

(e)    whether denying enforcement will further the purpose of the rule which the conduct has infringed;

(f)    whether denying enforcement will act as a deterrent to conduct that is illegal or contrary to public policy;

(g)    whether denying enforcement will ensure that the party seeking enforcement does not profit from the conduct;

(h)    whether denying enforcement will avoid inconsistency in the law thereby maintaining the integrity of the legal system."

Professor Burrows noted that the final factor is capable of a wider or narrower approach, depending on what one understands by inconsistency.

94.    The reference to what is an "appropriate response" brings to the surface the moral dimension underlying the doctrine of illegality, which inevitably influences the minds of judges and peeps out in their judgments from time to time. *Tinsley v Milligan* caused disquiet to Lord Goff and others precisely because its reasoning jarred with their sense of what was just and appropriate.

*The way forward*

95.    In *Yarmouth v France* (1887) 19 QBD 647, 653, Lord Esher MR said:

> "I detest the attempt to fetter the law by maxims. They are
> almost invariably misleading: they are for the most part so large
> and general in their language that they always include
> something which really is not intended to be included in them."

In *Lissenden v C A V Bosch Ltd* [1940] AC 412, 435, Lord Wright quoted Lord
Esher's words and added:

> "Indeed these general formulae are found in experience often
> to distract the court's mind from the actual exigencies of the
> case, and to induce the court to quote them as offering a ready
> made solution."

96.    The maxims *ex turpi causa* and in pari delicto are no exception. It is
interesting that, according to Professor JK Grodecki, Lord Mansfield himself was
"conscious that if the brocard in pari delicto was to be a beneficial rule of
jurisprudence it should not be allowed to become rigid and inflexible": *In pari
delicto potior est conditio defendentis* (1955) 71 LQR 254, 258. Professor Grodecki
gave examples including *Smith v Bromley* (1760) 2 Doug KB 696n; 99 ER 441 and
*Walker v Chapman* (1773) Lofft 342, 98 ER 684.

97.    In *Smith v Bromley* (the earliest case in which the maxim in pari delicto
appears to have been used) Lord Mansfield granted recovery to the plaintiff of
money paid by the plaintiff to procure her brother's discharge from bankruptcy,
which was an illegal consideration. As he explained, Lord Mansfield, at p 698,
regarded it as in the public interest that the plaintiff should be repaid notwithstanding
the illegal purpose of the payment:

> "Upon the whole, I am persuaded it is necessary, for the better
> support and maintenance of the law, to allow this action; for no
> man will venture to take, if he knows he is liable to refund."

98.    In *Walker v Chapman* the defendant, who was a page to the King, offered to
take a bribe of £50 from the plaintiff in return for securing him a place in the
Customs. The bribe was paid but the plaintiff did not obtain the appointment and so
he sued for the return of his money. It was argued for the defendant that no action
would lie, the plaintiff being party to an iniquitous contract, and that the law would
not suffer a party to "draw justice from a foul fountain". Lord Mansfield rejected
the defence, distinguishing between a claim to overturn an illegal contract and a
claim to obtain benefit from it. Later judges have taken a different and stricter
approach.

99.    Looking behind the maxims, there are two broad discernible policy reasons for the common law doctrine of illegality as a defence to a civil claim. One is that a person should not be allowed to profit from his own wrongdoing. The other, linked, consideration is that the law should be coherent and not self-defeating, condoning illegality by giving with the left hand what it takes with the right hand.

100.    Lord Goff observed in the Spycatcher case, *Attorney General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109, 286, that the "statement that a man shall not be allowed to profit from his own wrong is in very general terms, and does not of itself provide any sure guidance to the solution of a problem in any particular case". In *Hall v Hebert* [1993] 2 SCR 159 McLachlin J favoured giving a narrow meaning to profit but, more fundamentally, she expressed the view (at 175-176) that, as a rationale, the statement that a plaintiff will not be allowed to profit from his or her own wrongdoing does not fully explain why particular claims have been rejected, and that it may have the undesirable effect of tempting judges to focus on whether the plaintiff is "getting something" out of the wrongdoing, rather than on the question whether allowing recovery for something which was illegal would produce inconsistency and disharmony in the law, and so cause damage to the integrity of the legal system.

101.    That is a valuable insight, with which I agree. I agree also with Professor Burrows' observation that this expression leaves open what is meant by inconsistency (or disharmony) in a particular case, but I do not see this as a weakness. It is not a matter which can be determined mechanistically. So how is the court to determine the matter if not by some mechanistic process?  In answer to that question I would say that one cannot judge whether allowing a claim which is in some way tainted by illegality would be contrary to the public interest, because it would be harmful to the integrity of the legal system, without a) considering the underlying purpose of the prohibition which has been transgressed, b) considering conversely any other relevant public policies which may be rendered ineffective or less effective by denial of the claim, and c) keeping in mind the possibility of overkill unless the law is applied with a due sense of proportionality. We are, after all, in the area of public policy. That trio of necessary considerations can be found in the case law.

102.    The relevance of taking into account the purpose of the relevant prohibition is self-evident. The importance of taking account of the relevant statutory context is illustrated by *Hardy v Motor Insurers' Bureau* [1964] 2 QB 745. The Road Traffic Act 1960 required a motorist to be insured against the risk of causing death or personal injury through the use of a vehicle on a road, but a line of authorities established that a contract to indemnify a person against the consequences of a deliberate criminal act is unenforceable. The plaintiff, a security officer at a factory, was injured when he was trying to question the driver of a van, who drove off at speed and dragged him along the road. The driver was convicted of unlawfully

causing grievous bodily harm. The driver being uninsured, the plaintiff sued the defendant under an agreement between the defendant and the Minister of Transport, by which the defendant agreed to satisfy any judgment against a motorist for a liability required to be covered under a motor insurance policy. The defendant relied on the maxim *ex turpi causa*, arguing that a contract purporting to insure the driver against his own deliberate criminal conduct would have been unlawful. The defence was rejected. Diplock LJ said at p 767:

> "The rule of law on which the major premise is based - ex turpi causa non oritur actio - is concerned not specifically with the lawfulness of contracts but generally with the enforcement of rights by the courts, whether or not such rights arise under contract. All that the rule means is that the courts will not enforce a right which would otherwise be enforceable if the right arises out of an act committed by the person asserting the right (or by someone who is regarded in law as his successor) which is regarded by the court as sufficiently anti-social to justify the court's refusing to enforce that right."

He observed that the purpose of the relevant statutory provision was the protection of persons who suffered injury on the road by the wrongful acts of motorists. This purpose would have been defeated if the common law doctrine of illegality had been applied so as to bar the plaintiff's claim.

103.    *Hounga v Allen* and *R (Best) v Chief Land Registrar* are illustrations of cases in which there were countervailing public interest considerations, which needed to be balanced.

104.    As to the dangers of overkill, Lord Wright gave a salutary warning in *Vita Food Products Inc v Unus Shipping Co Ltd* [1939] AC 277, 293:

> "Nor must it be forgotten that the rule by which contracts not expressly forbidden by statute or declared to be void are in proper cases nullified for disobedience to a statute is a rule of public policy only, and public policy understood in a wider sense may at times be better served by refusing to nullify a bargain save on serious and sufficient grounds."

105.    To similar effect Devlin J questioned "whether public policy is well served by driving from the seat of judgment everyone who has been guilty of a minor

transgression" in *St John Shipping Corpn v Joseph Rank Ltd* [1957] 1 QB 267, 288-289.

106.    In *Saunders v Edwards* [1987] 1 WLR 1116, 1134, Bingham LJ said

> "Where issues of illegality are raised, the courts have (as it seems to me) to steer a middle course between two unacceptable positions. On the one hand it is unacceptable that any court of law should aid or lend its authority to a party seeking to pursue or enforce an object or agreement which the law prohibits. On the other hand, it is unacceptable that the court should, on the first indication of unlawfulness affecting any aspect of a transaction, draw up its skirts and refuse all assistance to the plaintiff, no matter how serious his loss nor how disproportionate his loss to the unlawfulness of his conduct."

107.    In considering whether it would be disproportionate to refuse relief to which the claimant would otherwise be entitled, as a matter of public policy, various factors may be relevant. Professor Burrows' list is helpful but I would not attempt to lay down a prescriptive or definitive list because of the infinite possible variety of cases. Potentially relevant factors include the seriousness of the conduct, its centrality to the contract, whether it was intentional and whether there was marked disparity in the parties' respective culpability.

108.    The integrity and harmony of the law permit - and I would say require - such flexibility. Part of the harmony of the law is its division of responsibility between the criminal and civil courts and tribunals. Punishment for wrongdoing is the responsibility of the criminal courts and, in some instances, statutory regulators. It should also be noted that under the Proceeds of Crime Act 2002 the state has wide powers to confiscate proceeds of crime, whether on a conviction or without a conviction. Punishment is not generally the function of the civil courts, which are concerned with determining private rights and obligations. The broad principle is not in doubt that the public interest requires that the civil courts should not undermine the effectiveness of the criminal law; but nor should they impose what would amount in substance to an additional penalty disproportionate to the nature and seriousness of any wrongdoing. *ParkingEye* is a good example of a case where denial of claim would have been disproportionate. The claimant did not set out to break the law. If it had realised that the letters which it was proposing to send were legally objectionable, the text would have been changed. The illegality did not affect the main performance of the contract. Denial of the claim would have given the defendant a very substantial unjust reward. Respect for the integrity of the justice

system is not enhanced if it appears to produce results which are arbitrary, unjust or disproportionate.

109.    The courts must obviously abide by the terms of any statute, but I conclude that it is right for a court which is considering the application of the common law doctrine of illegality to have regard to the policy factors involved and to the nature and circumstances of the illegal conduct in determining whether the public interest in preserving the integrity of the justice system should result in denial of the relief claimed. I put it in that way rather than whether the contract should be regarded as tainted by illegality, because the question is whether the relief claimed should be granted.

110.    I agree with the criticisms made in *Nelson v Nelson* and by academic commentators of the reliance rule as laid down in *Bowmakers* and *Tinsley v Milligan*, and I would hold that it should no longer be followed. Unless a statute provides otherwise (expressly or by necessary implication), property can pass under a transaction which is illegal as a contract: *Singh v Ali* [1960] AC 167, 176, and *Sharma v Simposh Ltd* [2013] Ch 23, paras 27-44. There may be circumstances in which a court will refuse to lend its assistance to an owner to enforce his title as, for example, where to do so would be to assist the claimant in a drug trafficking operation, but the outcome should not depend on a procedural question.

111.    In *Bowmakers* [1945] 1 KB 65 the claim was for conversion of goods which had been obtained by the plaintiffs and supplied to the defendant under transactions which were assumed to be tainted by illegality. The Court of Appeal rightly said, at p 71, that "a man's right to possess his own chattels will as a general rule be enforced against one who, without any claim of right, is detaining them or has converted them to his own use, even though it may appear either from the pleadings, or in the course of the trial, that the chattels in question came into the defendant's possession by reason of an illegal contract between himself and the plaintiff", but it added the qualifying words "provided that the plaintiff does not seek, and is not forced, either to found his claim on the illegal contract or to plead its illegality in order to support his claim". The objections to the proviso have already been identified. It makes the question whether the court will refuse its assistance to the claimant to enforce his title to his property depend on a procedural question and it has led to uncertain case law about what constitutes reliance. The court ended its judgment, at p 72, by saying:

> "We are satisfied that no rule of law, and no considerations of public policy, compel the court to dismiss the plaintiffs' claim in the case before us, and to do so would be, in our opinion, a manifest injustice."

That conclusion, rather than the answer to a procedural question, should have been the end of the illegality defence, since it is based on public policy.

112.    In *Tinsley v Milligan*, even if Miss Milligan had not owned up and come to terms with the DSS, it would have been disproportionate to have prevented her from enforcing her equitable interest in the property and conversely to have left Miss Tinsley unjustly enriched.

113.    Critics of the "range of factors" approach say that it would create unacceptable uncertainty. I would make three points in reply. First, one of the principal criticisms of the law has been its uncertainty and unpredictability. Doctrinally it is riven with uncertainties: see, for example, paras 4-8 above. There is also uncertainty how a court will in practice steer its way in order to reach what appears to be a just and reasonable result.  Second, I am not aware of evidence that uncertainty has been a source of serious problems in those jurisdictions which have taken a relatively flexible approach. Third, there are areas in which certainty is particularly important. Ordinary citizens and businesses enter into all sorts of everyday lawful activities which are governed by well understood rules of law. Lord Mansfield said in *Vallejo v Wheeler* (1774) 1 Cowp 143, 153:

> "In all mercantile transactions the great object should be certainty: and therefore, it is of more consequence that a rule should be certain, than whether the rule is established one way or the other. Because speculators in trade then know what ground to go upon."

The same considerations do not apply in the same way to people contemplating unlawful activity. When he came to decide cases involving illegality, Lord Mansfield acted in accordance with his judgment about where the public interest lay: see paras 96-98.

114.    In *Tinsley v Milligan* Lord Goff considered that if the law was to move in a more flexible direction, to which he was not opposed in principle, there should be a full investigation by the Law Commission (which has happened) and that any reform should be through legislation. Realistically, the prospect of legislation can be ignored. The government declined to take forward the Commission's bill on trusts because it was not seen to be "a pressing priority for government" (a phrase familiar to the Commission), and there is no reason for optimism that it would take a different view if presented with a wider bill. In *Clayton v The Queen* (2006) 231 ALR 500, para 119, Kirby J said that waiting for a modern Parliament to grapple with issues of law reform is like "waiting for the Greek Kalends. It will not happen" and that "Eventually courts must accept this and shoulder their own responsibility for the

state of the common law". The responsibility of the courts for dealing with defects in the common law was recently emphasised by this court in *R v Jogee* [2016] 2 WLR 681, para 85, and *Knauer v Ministry of Justice* [2016] 2 WLR 672, para 26. In each of those cases the court decided that it should depart from previous decisions of the House of Lords. That is never a step taken lightly. In departing from *Tinsley v Milligan* it is material that it has been widely criticised; that people cannot be said to have entered into lawful transactions in reliance on the law as then stated; and, most fundamentally, that the criticisms are well founded.

115.    In the present case I would endorse the approach and conclusion of Gloster LJ. She correctly asked herself whether the policy underlying the rule which made the contract between Mr Patel and Mr Mirza illegal would be stultified if Mr Patel's claim in unjust enrichment were allowed. After examining the policy underlying the statutory provisions about insider dealing, she concluded that there was no logical basis why considerations of public policy should require Mr Patel to forfeit the moneys which he paid into Mr Mirza's account, and which were never used for the purpose for which they were paid. She said that such a result would not be a just and proportionate response to the illegality. I agree. It seems likely that Lord Mansfield would also have agreed: see *Walker v Chapman*. Mr Patel is seeking to unwind the arrangement, not to profit from it.

116.    It is not necessary to discuss the question of locus poenitentiae which troubled the courts below, as it has troubled other courts, because it assumed importance only because of a wrong approach to the issue whether Mr Patel was prima facie entitled to the recovery of his money. In place of the basic rule and limited exceptions to which I referred at para 44 above, I would hold that a person who satisfies the ordinary requirements of a claim in unjust enrichment will not prima facie be debarred from recovering money paid or property transferred by reason of the fact that the consideration which has failed was an unlawful consideration. I do not exclude the possibility that there may be particular reason for the court to refuse its assistance to the claimant, applying the kind of exercise which Gloster LJ applied in this case, just as there may be a particular reason for the court to refuse to assist an owner to enforce his title to property, but such cases are likely to be rare. (At para 110 I gave the example of a drug trafficker.) In *Tappenden v Randall* (1801) 2 Bos & Pul 467, 471, 126 ER 1388, 1390, a case of a successful claim for the repayment of money paid for an unenforceable consideration which failed, Heath J said obiter that there might be "cases where the contract may be of a nature too grossly immoral for the court to enter into any discussion of it: as where one man has paid money by way of hire to another to murder a third person". The case was mentioned by the Law Commission (LCCP 189, para 4.53), but there is a dearth of later case law on the point. This is hardly surprising because a person who takes out a contract on the life of a third person is not likely to advertise his guilt by suing. But as a matter of legal analysis it is sufficient for present purposes to identify the framework within which such an issue may be decided. No particular reason has

been advanced in this case to justify Mr Mirza's retention of the monies beyond the fact that it was paid to him for the unlawful purpose of placing an insider bet.

117.   In support of his argument that this purpose was sufficient to disentitle Mr Patel from obtaining the return of his money, Mr Collings relied on cases such as *Parkinson v College of Ambulance Ltd* [1925] 2 KB 1. In that case the plaintiff made a donation to a charity to secure a knighthood. When the honour failed to materialise he sued for the return of his money. The claim was rejected.

118.   Bribes of all kinds are odious and corrupting, but it does not follow that it is in the public interest to prevent their repayment. There are two sides to the equation. If today it transpired that a bribe had been paid to a political party, a charity or a holder of public office, it might be regarded it as more repugnant to the public interest that the recipient should keep it than that it should be returned. We are not directly concerned with such a case but I refer to it because of the reliance placed on that line of authorities.

119.   Since criticism was made of the Court of Appeal's decision in *Mohamed v Alaga and Co*, I would affirm its correctness and reject the view that it should somehow be confined to its own peculiar facts. With hindsight, it is perhaps unfortunate that this court did not have the opportunity of considering a claim by Miss Hounga for a quantum meruit.

*Summary and disposal*

120.   The essential rationale of the illegality doctrine is that it would be contrary to the public interest to enforce a claim if to do so would be harmful to the integrity of the legal system (or, possibly, certain aspects of public morality, the boundaries of which have never been made entirely clear and which do not arise for consideration in this case). In assessing whether the public interest would be harmed in that way, it is necessary a) to consider the underlying purpose of the prohibition which has been transgressed and whether that purpose will be enhanced by denial of the claim, b) to consider any other relevant public policy on which the denial of the claim may have an impact and c) to consider whether denial of the claim would be a proportionate response to the illegality, bearing in mind that punishment is a matter for the criminal courts. Within that framework, various factors may be relevant, but it would be a mistake to suggest that the court is free to decide a case in an undisciplined way. The public interest is best served by a principled and transparent assessment of the considerations identified, rather by than the application of a formal approach capable of producing results which may appear arbitrary, unjust or disproportionate.

121.    A claimant, such as Mr Patel, who satisfies the ordinary requirements of a claim for unjust enrichment, should not be debarred from enforcing his claim by reason only of the fact that the money which he seeks to recover was paid for an unlawful purpose. There may be rare cases where for some particular reason the enforcement of such a claim might be regarded as undermining the integrity of the justice system, but there are no such circumstances in this case. I would dismiss the appeal.


**LORD KERR: (agrees with Lord Toulson)**


122.    For the reasons given by Lord Toulson, with which I completely agree, I consider that this appeal should be dismissed.


123.    The approach commended by Lord Toulson does not involve engaging with "an open and unsettled range of factors" - Lord Mance at para 192 of his judgment. On the contrary, as I see it, Lord Toulson's judgment outlines a structured approach to a hitherto intractable problem. It is an approach, moreover, which, if properly applied, will promote, rather than detract from, consistency in the law. And it has the added advantage of avoiding the need to devise piecemeal and contrived exceptions to previous formulations of the illegality rule.


124.    Central to Lord Toulson's analysis is the "trio of considerations" which he identified in para 101 of his judgment. The first of these involves an examination of the underlying purpose of the "prohibition which has been transgressed". By this, I understand Lord Toulson to mean the reasons that a claimant's conduct should operate to bar him or her from a remedy which would otherwise be available. That such reasons should be subject to scrutiny is surely unexceptionable. Whether in order to preserve "the integrity of the legal system" (*per* McLachlin J in *Hall v Hebert* [1993] 2 SCR 159 at 169) or to allow a proper understanding of the true nature of the public policy imperative for recognising a defence of illegality, the purpose of the denial of a remedy to which the claimant would otherwise be entitled should be clearly understood.


125.    As it happens, McLachlin J disagreed with Cory J's suggestion that the doctrine of *ex turpi causa non oritur actio* should be replaced with a power vested in the courts to reject claims on "considerations of public policy" - p 168. But what is the preservation of the integrity of the legal system, if not a public policy consideration? Moreover, the underpinning of the preservation of that integrity (which McLachlin J said was that a person in a civil suit should not be permitted "to profit from illegal or wrongful conduct" or to benefit from "an evasion or rebate of a penalty prescribed by the criminal law") is *par excellence* a public policy

consideration. And McLachlin J seemed to acknowledge as much when she said (at p 169) that the principle could be described "by an old-fashioned Latin name or by the currently fashionable concept of 'public policy'".

126.   It is doubtful that a public policy consideration in the context of the defence of illegality could now be properly described as a "currently fashionable" concept. Indeed, in a number of cases that I will refer to briefly below, the maxim *ex turpi causa* has been recognised in this country as an *expression of policy*, rather than a principle. And in Canada it appears to be accepted that the weighing of public policies is the proper approach to take in order to determine whether a defence of illegality should be allowed to prevail. In *Still v Minister of National Revenue* (1997) 154 DLR (4th) 229 (which is discussed by Lord Toulson in paras 58 *et seq* of his judgment) the Federal Court of Appeal considered that the doctrine of illegality now "rests on the understanding that it would be *contrary to public policy* to allow a person to maintain an action on a contract prohibited by statute" (emphasis supplied). On that basis, Robertson JA, who delivered the judgment of the court, said that it was necessary to identify the policy considerations which outweighed the applicant's right to a remedy. Although this was said in relation to competing policy goals in two items of legislation, there is no reason not to adopt the same approach in evaluating rival policy considerations in the non-statutory context.

127.   To take this case as an example, why should Mr Mirza's wrongful retention of Mr Patel's money not be weighed against the undoubted illegality on the part of Mr Patel in entering an agreement to wrongly benefit from Mr Mirza's claimed ability to obtain access to insider information? If one concentrates on the illegal nature of the contract to the exclusion of other considerations, an incongruous result in legal and moral terms may be produced. This can be avoided by taking into account and giving due weight to the second and third of Lord Toulson's considerations *viz* countervailing public policies which would be wrongly discounted by denial of the claim and the proportionality of refusing to acknowledge its legitimacy.

128.   It is, of course, possible to reach the same outcome that a weighing of the competing policy considerations produces by treating this case as one of unjust enrichment which warranted returning the parties to the position that they occupied before the transaction. This is on the basis that the court is not required to give effect to the illegal contract in order to find that Mr Mirza should not be allowed to retain Mr Patel's money. It would "simply return the parties to the status quo ante where they should always have been." - Lord Sumption at para 268. That seems to me, however, to be a much more adventitious and less satisfactory route to the proper disposal of the case than that represented by a rounded assessment of the various public policy considerations at stake.

129.    Moreover, if the *ex turpi causa* axiom is itself no more than an expression of policy, the taking into account of countervailing policy considerations, in order to decide whether to give effect to it in a particular instance, is the only logical way to proceed. That it is, in truth, a policy based rule has been clearly recognised. In *Gray v Thames Trains Ltd* [2009] UKHL 33; [2009] AC 1339, para 30, Lord Hoffmann said that the maxim expressed, "not so much a principle as a policy" and that it did not have a single basis of justification but was rather based on "a group of reasons which vary in different situations". And in *Stone and Rolls Ltd v Moore Stephens* [2009] UKHL 39; [2009] AC 1391, para 25 Lord Phillips expressly endorsed what Lord Hoffmann had said about the public policy nature of *ex turpi causa*, observing that it was necessary to consider the policy underlying it, in order to decide whether the defence of illegality was bound to defeat a claim.

130.    Finally, in *Les Laboratoires Servier v Apotex Inc* [2012] EWCA Civ 593; [2013] Bus LR 80, after referring (in para 66) to the Law Commission's recommendation in its 2010 Report (Law Com 320) to the effect that the illegality offence should be allowed where its application could be firmly justified by one or more of the rationales underlying it existence, Etherton LJ said, at para 73:

> "It is clear, then, that the illegality defence is not aimed at achieving a just result between the parties. On the other hand, the court is able to take into account a wide range of considerations in order to ensure that the defence only applies where it is a just and proportionate response to the illegality involved in the light of the policy considerations underlying it."

131.    Lord Sumption has said in para 262(iii) of his judgment in this case that this court in *Les Laboratoires Servier* [2015] AC 430 had overruled the view expressed by the Court of Appeal that "an illegal act might nevertheless found a cause of action if it was not as wicked as all that". That may be so, but I do not understand the judgment of this court in *Les Laboratoires Servier* to have expressly rejected the notion that whether the defence should be available depends on an examination of the policy considerations which underlie it in any particular instance and those which militate against it. At para 61 of his judgment in *Les Laboratoires Servier* Lord Toulson quoted with approval the statement of Lord Wilson in *Hounga v Allen* [2014] 1 WLR 2889 at para 42 to the effect that, in considering whether to allow a defence of illegality, "it is necessary, first, to ask 'What is the aspect of public policy which founds the defence?' and, second, to ask 'But is there another aspect of public policy to which application of the defence would run counter?'" The decision in *Hounga* was not mentioned in the judgment of the majority in *Les Laboratoires Servier*.

132.    Lord Sumption did refer to *Hounga*, however, in the later case of *Bilta (UK) Ltd v Nazir (No 2)* [2016] AC 1. He sought to explain the decision in *Hounga* on the basis that Ms Hounga did not rely, and did not need to rely, on the circumstances in which she had entered the United Kingdom (she had entered illegally). This is correct but she *did* need to rely on the fact of her employment in advancing a claim for unlawful discrimination in her dismissal from that employment. Since the employment was not legally sanctioned, she was therefore confronted with the illegality defence and, indeed, the Court of Appeal had held that the illegality of the contract of employment formed a material part of Ms Hounga's complaint and that to uphold it would be to condone the illegality. It was held in *Hounga* that the appellant's claim was not inextricably linked to her illegal conduct. On that account her action could not be defeated on the basis that her contract of employment was illegal. But Lord Wilson's discussion of the manner in which competing public policy considerations should be viewed, in calculating whether a defence of illegality should be permitted to defeat an otherwise viable claim, unquestionably forms part of the ratio of the decision.

133.    The way is now open for this court to make its choice between, on the one hand, cleaving to the rule-based approach exemplified by *Tinsley v Milligan* [1994] 1 AC 340 and, arguably, the decision of the majority in *Les Laboratoires Servier*, and, on the other, a more flexible approach, taking into account the policy considerations that are said to favour recognising the defence of illegality, those which militate against such recognition and the proportionality of allowing the defence to prevail. In *Bilta (UK) Ltd* Lord Neuberger said that the proper approach to the defence of illegality needed to be addressed by this court "as soon as appropriately possible" - para 15. This case unmistakably presents us with the opportunity to address the question and for the reasons given by Lord Toulson, I believe that the approach which he commends is plainly to be preferred.

134.    A rule-based approach to the question of the effect of illegality on the availability of a remedy has failed to deliver on what some have claimed to be its principal virtues *viz* ease of application and predictability of outcome. This case exemplifies the point. There was a sharp but perfectly respectable difference of view in the judgments of the Court of Appeal as to whether the necessary ingredient of reliance on the illegal aspect of the agreement between Mr Mirza and Mr Patel was present. This is hardly surprising. In many situations in which transactions between parties are tainted by some form of illegality, it is not always easy to decide what it is that needs to be relied on when an unravelling of those transactions or some means of dealing with their failure is sought.

135.    On the question of unravelling or unpicking an agreement, I do not consider that *Tinsley* is an example of the court conducting an unravelling exercise or of its returning the parties to the *status quo ante*. This much is clear from the speech of Lord Browne-Wilkinson at 376F of the report:

"… Miss Milligan established a resulting trust by showing that she had contributed to the purchase price of the house and that there was common understanding between her and Miss Tinsley that they owned the house equally. She had no need to allege or prove *why* the house was conveyed into the name of Miss Tinsley alone, since that fact was irrelevant to her claim: it was enough to show that the house was in fact vested in Miss Tinsley alone. The illegality only emerged at all because Miss Tinsley sought to raise it. Having proved these facts, Miss Milligan had raised a presumption of resulting trust. There was no evidence to rebut that presumption. Therefore, Miss Milligan should succeed." (original emphasis)

136.    In effect, in *Tinsley* the majority *gave effect* to rather than unravelled the illegal agreement made between the parties. The agreement was that the ownership of the house should be shared equally between Miss Milligan and Miss Tinsley, and that they should represent to the Department of Social Security that it was owned solely by Miss Tinsley. It was because Miss Milligan did not need to rely on the illegal component of the agreement (that they make the false representation to the department) that she was able to succeed. This was not, therefore, a case of unravelling the agreement or restoring the parties to the *status quo ante.* To the contrary, it was an instance of segregating the illegal part of the agreement from that which, it was considered, could be enforced. Reference to or reliance on the objectionable part could thereby be avoided. To claim that such a contrivance produces a predictable, much less a certain, outcome, for such arrangements is, I believe, extremely far-fetched.

137.    Even if the claim to predictability of outcome for the reliance test could be made good, however, it is questionable whether particular weight should be given to this consideration in circumstances where a claimant and defendant have been parties to an agreement which is plainly illegal. Certainty or predictability of outcome may be a laudable aim for those who seek the law's resolution of genuine, honest disputes. It is not a premium to which those engaged in disreputable conduct can claim automatic entitlement. For the reasons I have given, however, I do not believe that outcomes are easier to forecast on a rule-based approach.

138.    Quite apart from the difficulty in predicting whether a claimant has to rely on the illegal dimension of an agreement in order to advance his claim, there is something unattractive and contrived about the means by which attempts have to be made in order to avoid the spectre of reliance. Professor Burrows in his *Restatement of the English Law of Contract* (Oxford University Press) outlined what he described as his single reliance master rule at p 224 in this way:

"If the formation, purpose or performance of a contract involves conduct that is illegal (such as a crime) or contrary to public policy (such as a restraint of trade), a party cannot enforce the contract if it has to rely on that conduct to establish its claim."

139.    In this case the formation of the contract, its purpose and its performance *all* involved illegality. Under the single reliance master rule, it is said that all of this can be ignored because it is not necessary to rely on the terms of the agreement, other than to demonstrate that there was no legal basis for the payment of the money to Mr Mirza. So, the looming presence of illegality does not require to be confronted at all. The issue is side-stepped and avoided. This cannot be the correct way in which to deal with the impact of illegality - in fact, under this approach, illegality is not addressed at all. It is surely better and more principled to examine why illegality should or should not operate to deny Mr Patel a remedy.

140.    Returning the parties to the status quo ante likewise side-steps the issue of illegality. This approach proceeds on the basis that the transaction should simply never have taken place or that the parties should be returned to the condition that they ought always to have occupied. The contract is unpicked because it should not have been made. Mr Mirza is deprived of the money because it is unjust enrichment. No examination of the effect that the illegality has is warranted; recognition that there has been unjust enrichment is all that is required.

141.    This is objectionable not only because it effectively ignores the illegality that surrounded the making of the contract but also because it produces an inconsistent result with that which is founded on a breach of contract claim. This leads to what Professor Peter Birks, in an article entitled, *"Recovering Value Transferred under an Illegal Contract"* (2000) 1 TIL 155, describes as self-stultification. Entitlement to restitution of money paid on foot of an illegal contract on the basis of unjust enrichment makes a nonsense, he says, of refusal to enforce the contract and, at p 160, it is "important that the law as stated in one area should not make nonsense of the law as stated in another".

142.    Self-stultification can be avoided by adoption of the approach suggested by Lord Toulson. His mode of analysis requires examination of the justification for the defence of illegality in whatever context it arises, not a decision to circumvent the defence because of the type of remedy that is claimed. That appears to me to be a much more principled approach than one which avoids having to engage with the merits of the defence at all. Not having to engage with the merits on the basis that one does not have to rely on the illegality is a matter of fortuity. Because of that incidental circumstance an avenue to an equivalent outcome to that which would result from enforcement of the contract opens up. An examination of the impact of

the illegality becomes irrelevant. That this should be a matter of happenstance is deeply unsatisfactory.

143.   Lord Toulson's solution to this question also permits readier access to investigation of the traditional justifications for the *ex turpi causa* maxim - preservation of the integrity of the legal system and preventing profit from wrongdoing. If, on examination of the particular circumstances of the case, these can be shown to weigh heavily in the balance, it is more likely that the defence will be upheld. Carving out an exception to the application of the defence on the basis that it does not affect a claim for unjust enrichment where the illegality of the claimant does not require to be relied on does nothing to directly protect or uphold these values.

144.   For these reasons and those given by Lord Toulson, I would dismiss the appeal.


**LORD NEUBERGER:**

145.   The present appeal concerns a claim for the return of money paid by the claimant to the defendant pursuant to a contract to carry out an illegal activity, and the illegal activity is not in the event proceeded with owing to matters beyond the control of either party.

*The specific issue on this appeal*

146.   In such a case, the general rule should in my view be that the claimant is entitled to the return of the money which he has paid. In the first place, such a rule ("the Rule") is consistent with the law as laid down in the 18th century by two eminent judges, one of whom is regarded as the founder of many aspects of the common law, including illegality; in addition it has support from some more modern cases. Secondly, the Rule appears to me to accord with policy, which is particularly important when illegality arises in the context of a civil claim. Thirdly, the Rule renders the outcome in cases in one area of a very difficult topic, that of contracts involving illegality, and the maxim *ex turpi causa non oritur actio* (ie that no claim can be based on an illegal or immoral arrangement), relatively clear and certain.

147.   I turn first to the authorities. In *Smith v Bromley* (1760) 2 Doug KB 696n, the Court of King's Bench permitted a plaintiff to recover money she had paid to someone who had agreed to procure her brother's discharge from bankruptcy, which

was an illegal consideration. Lord Mansfield CJ said at p 698 in the course of his judgment that, although the payment had been made for an illegal purpose:

> "Upon the whole, I am persuaded it is necessary, for the better support and maintenance of the law, to allow this action; for no man will venture to take, if he knows he is liable to refund."

Lord Mansfield subsequently followed this approach in *Walker v Chapman* (1773) Lofft 342, where a bribe to the defendant to secure a job for the plaintiff in Government service was held recoverable, in circumstances where the job was not in fact obtained.

148.    In *Neville v Wilkinson* (1782) 1 Bro CC 543, 547 Lord Thurlow LC approved this approach, and "declared his opinion" that:

> "[I]n all cases where money was paid for an unlawful purpose, the party, though *particeps criminis*, might recover at law; and that the reason was, that if courts of justice mean to prevent the perpetration of crimes, it must be not by allowing a man who has got possession to remain in possession, but by putting the parties back to the state in which they were before."

149.    In the following century, the same approach was adopted in *Taylor v Bowers* (1876) 1 QBD 291 (which involved transfer of goods rather than of cash). Cockburn CJ said at first instance at p 295 that it was "well established" that "where money has been paid, or goods delivered, under an unlawful agreement, but there has been no further performance of it", then "the party paying the money or delivering the goods may repudiate the transaction, and recover back his money or goods". The Court of Appeal agreed, and at p 300 Mellish LJ, with whom Baggallay JA and Grove J agreed, said this:

> "To hold that the plaintiff is enabled to recover does not carry out the illegal transaction, but the effect is to put everybody in the same situation as they were before the illegal transaction was determined upon, and before the parties took any steps to carry it out ..."

It is true that the actual decision in that case can be justified on the ground that property in the goods concerned had never passed (which was the basis of James LJ's judgment), but it seems to me that the reasoning of Mellish LJ, like that of

Cockburn CJ, reflects the proposition found in the 18th century judgments I have quoted.

150.    It is also fair to say that Fry LJ doubted the correctness of Mellish LJ's dictum in *Kearley v Thomson* (1890) 24 QBD 742, 746, and that in some subsequent cases the principle has not been applied. An obvious example is *Parkinson v College of Ambulance* [1925] 2 KB 1, where a donor was held to be disentitled from recovering a gift to a charity obtained by the charity's illegal (and dishonest) promise to obtain an honour for the donor. I consider that that case was wrongly decided. It seems to me that the judgment in that case got close to representing what Bingham LJ described as the court "on the first indication of unlawfulness affecting any aspect of a transaction, draw[ing] up its skirts and refus[ing] all assistance to the plaintiff, no matter how serious his loss nor how disproportionate his loss to the unlawfulness of his conduct" (which he considered to be "unacceptable") - *Saunders v Edwards* [1987] 1 WLR 1116, 1134. I agree with the view that the decision in *Parkinson* represented "a new and regrettable extension of the scope of the maxim" of *ex turpi causa* (to quote from Professor Grodecki's article (1955) 71 LQR 254, 263), and I consider that it should be overruled.

151.    The Rule also derives some support from the Court of Appeal's decision in *Tribe v Tribe* [1996] Ch 107, where the plaintiff was held to be entitled to recover shares which he had transferred to his son in order deceptively to improve his negotiating position in relation to an anticipated claim by his landlord, which in the event did not materialise. The question for the Court of Appeal was whether, following the controversial decision of the House of Lords in *Tinsley v Milligan* [1994] 1 AC 340 (the details of which are set out in paras 17-19 above), the father could "rebut the presumption of advancement by giving evidence of his illegal purpose", to quote from Millett LJ's judgment at pp 129H-130A. It was held that he could, on the basis that "[t]he transferor can lead evidence of the illegal purpose whenever it is necessary for him to do so provided that he has withdrawn from the transaction before the illegal purpose has been wholly or partly carried into effect" - per Millett LJ at pp 134G-H.

152.    There is some support in the cases for the notion that different considerations should apply depending whether the claimant's claim for return of money or property paid pursuant to an unperformed illegal contract is based on a common law claim or a claim in equity (compare the Privy Council decisions in *Singh v Ali* [1960] AC 167 and *Chettiar v Chettiar* [1962] AC 294). I do not consider that such a distinction is appropriate (and it may be that in that connection I differ from Millett LJ in *Tribe* at p 129G - although see at p 130E). I agree with Lord Browne-Wilkinson's observation in *Tinsley* at p 371, where he said that "[i]f the law is that a party is entitled to enforce a property right acquired under an illegal transaction, … the same rule ought to apply to any property right so acquired, whether such right is legal or equitable".

153.    That proposition is supported, as I see it, by the second reason supporting the Rule, namely policy. As Millett LJ said in *Tribe* at p 133F, "the justification for this rule [which precludes the court from lending its assistance to a man who founds his cause of action on an illegal or immoral act] is not a principle of justice but a principle of policy", citing Lord Mansfield in *Holman v Johnson* (1775) 1 Cowp 341, 343. That approach is also supported by Lord Hoffmann in *Gray v Thames Trains Ltd* [2009] AC 1339, para 30, where he went on to say that the "policy is not based upon a single justification but on a group of reasons, which vary in different situations". Similarly, in *Bakewell Management Ltd v Brandwood* [2004] 2 AC 519, para 60, Lord Walker said that "the maxim *ex turpi causa* must be applied as an instrument of public policy, and not in circumstances where it does not serve any public interest".

154.    More broadly, it appears to me that policy supports the Rule, in part for the simple reasons given in the passages cited in para 147 above. Further, as Lord Mance points out, there is obvious attraction in the notion that, if all transfers made pursuant to an unexecuted illegal contract are re-transferred, then the parties are back in the position that they were, ie as if there had been no illegal contract, which again would seem to comply with policy.

155.    It also appears to me that the Rule is consistent with the approach adopted in McLachlin J's analysis in the Canadian Supreme Court case *Hall v Hebert* [1993] 2 SCR 159, 176. She explained that the basic justification for refusing relief to a plaintiff who relied on an illegal contract was that "to allow recovery … would be to allow recovery for what is illegal. It would put the courts in the position of saying that the same conduct is both legal, in the sense of being capable of rectification by the court, and illegal. It would, in short, introduce an inconsistency in the law". Later at pp 179-180, she suggested that the court's "power" to refuse relief in a claim where illegality is involved "is a limited one" and that the use of the power "is justified where allowing the plaintiff's claim would introduce inconsistency into the fabric of the law, either by permitting the plaintiff to profit from an illegal or wrongful act, or to evade a penalty prescribed by criminal law". This approach (which is more fully analysed by Lord Mance) finds an echo in Lord Rodger's observation in *Gray*, para 82, that "the civil court should cleave to the same policy as the criminal court".

156.    For some time, it was assumed that the Rule could be invoked not merely when the anticipated illegal purpose not been proceeded with at all, but with the super-added requirement that it had not done so because of the "repentance" of the plaintiff who was seeking to get his money back. Like Millett LJ in *Tribe* at p 135D-E, I would reject that notion. As he said, "[j]ustice is not a reward for merit", and in any event the notion that repentance is needed "could lead to bizarre results". Further, a claimant's repentance may be born of, or combined with, self-interest, in which case, if repentance is the essential factor, the court would face a real difficulty.

Page 49

In my opinion, the notion that the application of a rule should depend on whether or not the claimant has repented typifies the inappropriately moralistic approach of some courts when they have to deal with claims based in some way on illegality, which was rightly criticised by Bingham LJ in *Saunders* [1987] 1 WLR 1116, 1134. Rather, the courts should adopt a more objective and analytical approach like that of McLachlin J in *Hall.*

157.   Quite apart from principle, it appears to me that the Rule would establish, or maintain, a degree of clarity and certainty in relation to one aspect of the law on the vexed topic of the effect of illegality on contractual claims. One thing which is clear from reading only some of the large number of judgments on the law on that topic over the past 350 years is the inconsistency of reasoning and outcome in different cases. Those responsible for making and developing the law in any area must strive to achieve as much clarity and as much certainty as are consistent with principle and practicality.

158.   There is, I acknowledge, some attraction in the point that the need for certainty in this area is diminished by the fact that parties to an arrangement which is illegal have less cause for complaint if the law is uncertain. However, criminals are entitled to certainty in the law just as much as anyone else. In any event, third parties are often affected by the enforceability of rights acquired or lost under contracts, and innocent third parties, it could be said with force, are in a particularly strong position to expect certainty and clarity from the law. Quite apart from this, there is a general public interest in certainty and clarity in all areas of law, not merely because it is a fundamental aspect of the rule of law, but also because the less clear and certain the law on any particular topic, the more demands there are on the services of the courts.

159.   That leaves open two issues. First, the issue of what constitutes an illegal contract for the purpose of the Rule. In my view, as a general proposition, the rule would apply to any contract where the illegality would result in the court (if it could otherwise do so) not being able to order specific performance of the contract or damages for its breach. It would thus normally apply to any contract whose performance would inevitably involve the commission of a crime (i) because the whole purpose of the contract was the commission of a crime (eg a contract killing), or (ii) because it was a contract whose essential ingredient was the commission of a crime (the present case is an example), or (iii) because the contract could not be performed without the commission of a crime. In practice, of course, category (iii) would cover the other two categories, but setting out the three categories may help to illustrate the extent of the application of the rule.

160.   As to category (iii), I have difficulties in seeing how a court could order specific performance of a contract which necessarily involved one or other of the

parties committing a crime (even a minor crime). Requiring the contract to be performed would involve the court ordering a party to act illegally: that cannot be a course open to a court. For the same reason I have difficulties in seeing how a court could normally award damages for breach of such a contract. Conceptually, damages are a substitute for non-performance, and performance is not something the court can award; and it seems inconsistent with the court's function to penalise a defendant in damages for not doing something illegal or to compensate a claimant for not having a benefit which would have required either or both of the parties doing something illegal. For the court to make an order for specific performance or damages in such cases would seem to infringe the principle of consistency discussed in the judgment of McLachlin J in *Hall*.

161.    The second issue is foreshadowed by the fact that I have described the Rule as being generally applicable. That is because the need for certainty must, particularly given the importance of policy, yield to the fact that, in this difficult and potentially multi-faceted area, there will inevitably be exceptions. Experience and common sense both suggest that any attempt to lay down a clear and inflexible rule on even one aspect of the topic of illegality in the context of contractual claims will lead to difficulties. (Both the majority and the minority reasoning in *Tinsley* are a good example of this). Indeed, the very fact that the approach of the courts in cases on this topic is based on policy suggests that strict immutable rules are inappropriate. Nonetheless, that does not negate any attempt to identify principles such as that suggested by McLachlin J and general rules such as that described in the cases mentioned in paras 147 and 148 above. The fact that the approach of the law to contracts with an illegal aspect is based on policy does not discharge judges from the normal duty of ensuring that the law on any topic is as clear and certain as it can be.

162.    By way of example, I would mention two possible exceptions. First, where one of the parties, especially the defendant, is in a class which is intended to be protected by the criminal legislation involved, it may well be inappropriate to invoke the Rule. Secondly, there could well be no recovery (or only partial recovery) by a plaintiff where the defendant was unaware of the facts which gave rise to the illegality - especially if he had received the money and had altered his position so that it might be oppressive to expect him to repay it. There will no doubt be other exceptions, but I do not think that that undermines the usefulness of having the Rule as the prima facie or presumptive approach. (I discuss in paras 172-175 below with the test for determining whether it is appropriate to apply the Rule in any particular case).

163.    In the present case, Mr Patel paid £620,000 to Mr Mirza pursuant to a contract, under which Mr Mirza was to use the money to trade in RBS shares with the benefit of inside information for their common benefit. That was a contract whose agreed fundamental purpose was illegal. In fact, the anticipated inside

information was not forthcoming and the contract effectively lapsed. I can see no good reason on these simple facts for not applying the Rule and accordingly I consider that Mr Patel is entitled to the return of the £620,000.

*Venturing further*

164.    The majority, and indeed Lord Mance and Lord Sumption, would go wider in their judgments on this appeal, by laying down some wider and more general principles or rules relating to the effect of illegality on contracts. There is considerable attraction in doing so, not least because the law is in a state of uncertainty. The reasoning of the majority in the most recent decision of the House of Lords, *Tinsley*, is generally thought to be unsatisfactory: for a convincing analysis see the judgments in the decision of the High Court of Australia in *Nelson v Nelson* (1995) 184 CLR 538 (discussed more fully in paras 50-54 above). And the result arrived at by the minority in *Tinsley* is plainly unsatisfactory. I fear that the different approaches adopted by members of this court in the recent cases of *Hounga v Allen* [2014] 1 WLR 2889, *Les Laboratoires Servier v Apotex Inc* [2015] AC 430 and *Bilta (UK) Ltd v Nazir (No 2)* [2016] AC 1 have left the law on the topic in some disarray. As I said in *Bilta*, para 15, "the proper approach to the defence of illegality needs to be addressed by this court (certainly with a panel of seven and conceivably with a panel of nine Justices) as soon as appropriately possible".

165.    Nonetheless, there are arguments for not looking more widely at the issue of illegality in the contractual context. Thus, in all three recent Supreme Court cases (as in the present one), while there are some fairly sharp differences of opinion as to the proper approach, there is no real dispute as to the outcome. More broadly, the common law traditionally develops on a case by case basis, and there are self-evident dangers for a court to paint on an unnecessarily broad canvas, particularly bearing in mind that it is proceeding by reference to the facts of one particular case. And that can be said to be particularly true in the area of illegal contracts, where, as already mentioned, experience has shown that it is a topic fraught with difficulties, as is evidenced by the fact that the reasoning and outcomes in a number of cases concerning contracts affected by illegality over the past 300 years are hard to reconcile. Reading those cases also shows that it would be impossible to envisage, and therefore to cater for, every type of problem which might arise in this field.

166.    Nonetheless, it seems to me right to venture further in this case, essentially for the reasons summarised in para 164 above.

167.    The first general point I should make is that, in my view, even where the contemplated illegal activity has been performed in part or in whole, it would be right to apply the Rule in appropriate cases. Thus, in the case of an illegal contract

where money is paid by the claimant to the defendant, and the contract is then partly or wholly performed by the defendant paying a lesser sum to the claimant, I do not see why, at least in the absence of good reasons to the contrary, the court should not order that the claimant should recover the money that he paid the defendant, albeit reduced by the lesser sum which the claimant subsequently received from the defendant. Similarly, where the contract is wholly performed.

168.    In effect, the reasons supporting the application of the Rule in cases where the illegal activity has not occurred, apply for the same reasons to contracts where the contemplated illegal activity has been wholly or partly performed. And there is the added reason of consistency with a case where the contract has not been performed. Thus, in my view, if the defendant in this case had only been able to purchase just a few shares on inside information and had accounted to the claimant for the proceeds of sale of those shares in the sum of, say £10,000, the contract would have been partly performed, but I consider that the claimant could have successfully sued to recover the £620,000 he had paid, less the £10,000 which he had received.

169.    There are, I think, three arguments against such a conclusion. The first is that there are a number of judgments, including those in and *Taylor v Bowers* 1 QBD 291, *Kearley v Thomson* 24 QBD 742 and *Tribe v Tribe* [1996] Ch 107, where it has been expressly stated that the Rule only applies where the "illegal purpose has [not] been wholly or partly performed" to quote from Millett LJ in *Tribe* at p 124E. However, perhaps particularly once one strips away the notion that repentance is irrelevant, I can see no good reason for not extending the rule to partly or even wholly performed contracts where *restitutio in integrum* can be achieved in practical terms and would be consistent with policy and proportionality. In the present case, for example, it would seem to be penal on the claimant that he could be deprived of £610,000 (and by the same token it would seem absurdly gratuitous that the defendant could benefit to the tune of £610,000) simply because the contract had been performed to a small extent.

170.    Secondly, it may be argued that, once the contract has been partly performed, the basis for *restitutio in integrum* has gone. But that argument is only right if the basis of the Rule is total failure of consideration. In my view, that is not necessarily the correct analysis (unless the illegal consideration for which the money was paid is treated in law as no consideration, because it is illegal). Indeed, in the end, the correct analysis is not the centrally important issue, given that the question as to how the court deals with illegal contracts is ultimately based on policy. The ultimate function of the courts in common law and equity is to formulate and develop rules of a clear and practical nature. Now that the judiciary (rightly) pay more attention than we did to legal books and articles, we judges can look to legal academics not only to identify what they think are judicial inconsistencies and errors, but also to

develop and modify their analyses of legal principles when we consider it necessary to change, develop or clarify the law.

171.    Thirdly, it may be said that application of the Rule would result in the court sometimes getting precious close to enforcing an illegal contract - a course which the court most certainly cannot take, as already mentioned. I accept that application of the Rule would sometimes involve the court making an order whose effect in practice is similar to performance of the illegal contract. But there is nothing in that point. If a particular outcome is correct, then the mere fact that the same outcome could have been arrived at on a wrong basis does not make it the wrong outcome. Indeed, it is worth noting that the outcome in *Tribe* was precisely what it would have been if the contract in question had been enforced. The father had transferred the shares on the basis that it would help him avoid a threatened claim and that they would be transferred back when the claim was no longer threatened; he sought an order for the retransfer after the threat had gone away, and application of the rule resulted in that order.

172.    That, of course, leaves open what would constitute "an appropriate case" for the application of the Rule and "good reasons to the contrary" for these purposes. The exceptions which I have referred to in para 162 above would be examples of where it might not be appropriate to invoke the Rule. However, it seems to me to be clear that there could be many other circumstances where application of the Rule would not be appropriate in circumstances where the illegal activity has been wholly or partly put into effect.

173.    In that connection, some assistance can be obtained from the guidance given by McLachlin J. Beyond that, it may be that some or all of the factors identified by Professor Burrows in the passage quoted by Lord Toulson in para 93 above could be relevant depending on the facts and issues in any particular case. However, I am not convinced that it is helpful to list all the potentially relevant factors and say that it is a matter for the court in each case to decide which of those factors apply in that case and what weight to give them. Once a judge is required to take into account a significant number of relevant factors, and the question of how much weight to give each of them is a matter for the judge, the difference between judgment and discretion is, I think, in practice pretty slight.

174.    I have come to the conclusion that the approach suggested by Lord Toulson in para 101 above provides as reliable and helpful guidance as it is possible to give in this difficult field. When faced with a claim based on a contract which involves illegal activity (whether or not the illegal activity has been wholly, partly or not at all undertaken), the court should, when deciding how to take into account the impact of the illegality on the claim, bear in mind the need for integrity and consistency in

the justice system, and in particular (a) the policy behind the illegality, (b) any other public policy issues, and (c) the need for proportionality.

175.   I must admit that I was initially not attracted by this approach because it seemed close to giving a discretion to judges when it comes to deciding how to deal with a claim based on a contract with an illegal element. However, on further reflection, it appears to me that, unlike the multi-factorial approach proposed by Professor Burrows, the structured approach proposed by Lord Toulson is not akin in practice to a discretion, and, in any event, it is the best guidance that can sensibly be offered at the moment. Experience shows that it is simply not possible to identify a more helpful or rigorous test. When considering whether it is possible to give more specific or firm guidance, I have considered some examples, which ultimately have helped to persuade me that greater clarity, strictness or specificity is simply not possible, at any rate at this stage, and they have served to conform the aptness of the approach set out in para 101 above.

176.   A simple example is a case where the consideration for which the claimant paid or owed money was inherently illegal, rather than happening to involve an illegal act in order to be achieved. In such cases, it seems to me that considerations of certainty and policy indicate that the claimant should generally be able to refuse to pay any money which is due under the contract and, indeed, to recover the money he had paid. Thus, if the claimant paid a sum to the defendant to commit a crime, such as a murder or a robbery, it seems to me that the claimant should normally be able to recover the sum, irrespective of whether the defendant had committed, or even attempted to commit, the crime. If the defendant had not attempted the crime, the Rule would generally apply. If he had actually succeeded in carrying out the crime, he should not be better off than if he had not done so. I suppose one could justify that conclusion on the ground that the law should not regard an inherently criminal act as effective consideration.

177.   That example might appear to suggest that more specific guidance could be given. However, even in relation to cases of the type described in para 176, there could be exceptions such as those mentioned in para 162 above. And, bearing in mind the enormous number of different crimes and different factual circumstances which could arise, it would be little short of foolhardy to imagine that there could not be other cases of this type where it would be inappropriate to apply the Rule.

178.   Further, different considerations would often, I suspect very often, apply where the contract was not inherently illegal, but necessarily involved an illegal action. An extreme case might be where an employer employed a builder to carry out construction work which they both knew would inevitably require the builder to park illegally - say on a double red line. As already explained in para 160 above, if the defendant refused to carry out the work, the contract could not be enforced

prospectively by the employer, but he would be entitled to recover any money he had paid. However, if the builder carried out the work, the employer would not be able to avoid liability to pay in full: the fact that the defendant could not perform his obligations under the contract without committing a relatively technical and incidental crime would not deprive him of the right to payment in full for such performance.

179.    However, greater problems and uncertainties could arise in other cases - eg where the nature of the criminal activity was more serious and/or more central to the activity involved, where the illegal activity was expressly included in the contract, or where one of the parties did not know or intend that the activity in question to be carried out was illegal but the other did, or where the proceedings arose out of the fact that such a contract had only been partly performed.

180.    Further, where a claimant has performed his part of a contract which was inherently lawful but was unlawful for some other reason, there is real room for debate in any particular case whether he should be entitled to claim payment on a *quantum meruit* basis, even though he cannot enforce his right to contractual payment - compare *Mohamed v Alaga & Co* [2000] 1 WLR 1815 and *Taylor v Bhail* [1996] CLC 377. While it would be possible to lay down a general rule as to whether or not a claimant could recover in such a case, it seems to me to be more satisfactory for the outcome to turn on the factors mentioned in para 174 above.

181.    Similarly, it seems to me that the justification for the decision of the majority in *Tinsley* was, as Lord Toulson says, that it would have been disproportionate to have refused to enforce Miss Milligan's equitable interest in the relevant property on the grounds of her illegal activity, and the policy behind the law making the activity in question illegal was not infringed by acceding to her claim.

182.    It is also worth referring back to the two examples set out in para 162 above. If the purpose of rendering an activity illegal is to protect a class of persons which includes only one of the parties to the contract, then, absent any other argument based on policy or proportionality, it would seem appropriate that that party should not be disadvantaged by the illegality, and/or should be entitled to rely on the fact that the activity is illegal, as against the other party. And, if a claimant seeks recovery of money paid to a defendant under a contract which can only be performed illegally, and has not been performed, proportionality and policy may well justify the court refusing repayment if the defendant has spent the money and was unaware of the facts giving rise to the illegality at the time he spent it.

183.    I would make three concluding points. First, quite apart from being persuaded by the reasons which justify the approach I have summarised in para 174 above, I

consider that the fact that it is consistent with judgments of the courts in Australia and Canada, as explained by Lord Toulson in paras 50-61 above is a good reason for adopting the approach. When considering how to characterise, or whether to develop, any fundamental principle of the common law, it is normally sensible for a judge to consider how the principle has been approached in other common law jurisdictions, and it is desirable, if not always achievable, that all common law jurisdictions adopt the same approach.

184.    Secondly, I should briefly address the fact that the criminal law and the Proceeds of Crime Act 2002 ("POCA") may inevitably have some impact on the rights and duties of parties who have entered into contracts with an illegal connection. The involvement of the criminal law played a very important part in the judgment of McLachlin J in *Hall v Hebert*. It seems to me to have two main components. First, it is for the criminal law, not the civil law, to penalise a party or parties for entering into and/or performing a contract with an illegal component. Secondly, in so far as the civil law is fashioned by judges in a particular case, they must ensure that it is not inconsistent with the criminal law.

185.    So far as POCA is concerned, it enables the courts, through statutory powers, to do that which a common law judge cannot do, and which many might think was the best outcome in many of the more serious cases involving illegality, namely to ensure that the proceeds of crime are retained by neither party, but are paid over to the Government. This is not the occasion to discuss the effect of POCA, save to say that I would take some persuading that the common law should be influenced by the fact that POCA is or is not being invoked in any particular case, although the civil courts should not make any order, or at least permit the enforcement of any order, if its effect would run counter to the provisions of POCA or to any step which was being contemplated under POCA by the relevant authorities.

186.    Finally, I should say that, although my analysis may be slightly different from that of Lord Toulson, I do not think that there is any significant difference between us in practice. I agree with his framework for arriving at an outcome, but I also consider that there is a prima facie outcome, namely *restitution in integrum*.

**LORD MANCE:**

187.    That the law of illegality, particularly as it results from *Tinsley v Milligan* [1994] 1 AC 340, merits at the highest level the consideration now being given to it, I would be among the first to accept. I indicated as much as a party to the unsatisfying decision which the Court of Appeal had to reach in *Collier v Collier* [2002] BPIR 1057: see in particular para 106. Whether it is, however, appropriate

to abandon basic principles going back nearly 250 years, resting on the sound appreciation of as a great a judge as Lord Mansfield CJ and approved and elucidated by the Supreme Court of Canada in an authoritatively reasoned judgment in 1993, is a different matter.

188.   The basic problem, identified clearly and succinctly by Lord Mansfield in *Holman v Johnson* (1775) 1 Cowp 341, is that there are at least three potential interests when questions of illegality arise for consideration: those of two parties and the public interest. It is, as he said, for reasons of public interest that an otherwise good cause of action may sometimes fail, where there has been illegality. In the absence of any relevant statutory power, the court has no direct power to mediate between these three interests, by for example requiring the public interest to be satisfied by a payment to the public purse. It does not even have the power, conferred by statute in New Zealand, to vary or validate an illegal contract in part "or otherwise howsoever" (New Zealand Illegal Contracts Act 1970, section 7).

189.   The application of the principle stated by Lord Mansfield was expanded in scope after his day (notably by Lord Eldon in *Muckleston v Brown* (1801) 6 Ves 52 as described by Lord Browne-Wilkinson in *Tinsley v Milligan* at p 372F. But, more recently it has diminished, *Tinsley v Milligan* being itself actually an example of this, in so far as it confirmed both that legal title to property could pass under an illegal contract and that equitable title was capable of recognition. The court's recognition of the equitable title was, however, made subject to the (problematic) pre-condition that the claimant could avoid reliance on illegality by relying on a procedural presumption. The court was able, in *Tinsley v Milligan*, to derive this presumption from the objectively demonstrable contribution made by Miss Milligan to the cost of acquiring the property. At the same time the court was prepared to ignore the fact, perfectly well-known to it, of the parties' illegal intentions.

190.   In common with Lord Toulson (paras 100-101), I consider that valuable insight into the appropriate approach to the significance of illegality under today's conditions is found in the judgment of McLachlin J (as she was) writing for the majority the Supreme Court of Canada in *Hall v Hebert* [1993] 2 SCR 159. The case concerned a claim in tort by a passenger against the owner of a car, who lost the keys when they fell out of the ignition when the car stalled and who decided in these circumstances that his passenger (who he knew to have drunk 11 or 12 bottles of beer) should drive while he tried to push-start the car. Unsurprisingly, the manoeuvre led to the passenger losing control, the car turning over and the passenger being injured. The Canadian Supreme Court upheld the passenger's claim, subject to contributory negligence.

191.   The majority in the Canadian Supreme Court rightly regarded the case as one of "great importance". A number of points emerge with great clarity from McLachlin J's judgment:

> i)      First, rejecting Cory J's suggestion that "a power to reject claims on considerations of public policy" should replace the maxim *ex turpi causa non oritur action*, McLachlin J expressed her concern that public policy would provide no "clear guidance as to when judges could exercise this draconian power and upon what grounds". She went on:

>> "I fear that unless placed upon a firm doctrinal foundation and made subject to clear limits, this general power to invalidate actions on grounds of public policy might prove more problematic than has the troubled doctrine of ex turpi causa non oritur actio. We would be trading one label for another without coming to grips with the fundamental problem." (p 169)

> ii)     Second, she saw tort, not contract, as the real problem area in relation to illegality, expressing the view that:

>> "The use of the doctrine of ex turpi causa to prevent abuse and misuse of the judicial process is well established in contract law and insurance law, where it provokes little controversy. The same cannot be said for tort." (p 171)

> iii)    Third, after examining authorities where the maxim applied to prevent claimants from profiting or obtaining exemplary damages in circumstances of illegality, she identified its rationale in today's world, in terms which have equal relevance to contract and tort:

>> "The narrow principle illustrated by the foregoing examples of accepted application of the maxim of ex turpi causa non oritur actio in tort, is that a plaintiff will not be allowed to profit from his or her wrongdoing. This explanation, while accurate as far as it goes, may not, however, explain fully why courts have rejected claims in these cases. Indeed, it may have the undesirable effect of tempting judges to focus on the issue of whether the plaintiff is 'getting something' out of the tort, thus carrying the maxim into the area of compensatory damages where its use has proved so controversial, and has defeated just claims for compensation. A more satisfactory explanation for

these cases, I would venture, is that to allow recovery in these cases would be to allow recovery for what is illegal. It would put the courts in the position of saying that the same conduct is both legal, in the sense of being capable of rectification by the court, and illegal. It would, in short, introduce an inconsistency in the law. It is particularly important in this context that we bear in mind that the law must aspire to be a unified institution, the parts of which - contract, tort, the criminal law - must be in essential harmony. For the courts to punish conduct with the one hand while rewarding it with the other, would be to 'create an intolerable fissure in the law's conceptually seamless web': Weinrib ['Illegality as a Tort Defence' (1976) 26 UTLJ 28], at p 42. We thus see that the concern, put at its most fundamental, is with the integrity of the legal system." (pp 175-176)

iv)    Fourth, McLachlin J said that such compensatory damages as were claimed in *Hall v Hebert* are

"not properly awarded as compensation for an illegal act, but only as compensation for personal injury. Such damages accomplish nothing more than to put the plaintiff in the position he or she would have been in had the tort not occurred. No part of the award which compensates injury can be said to be the profit of, or the windfall from, an illegal act." (p 176)

In substance, McLachlin J can in this passage be said to have been applying a reliance test in tort. To establish a right to compensation, all that the plaintiff had to rely on was the tortious conduct, consisting of the causing of injury by negligent driving.

v)    Finally, she concluded that:

"there is a need in the law of tort for a principle which permits judges to deny recovery to a plaintiff on the ground that to do so would undermine the integrity of the justice system. The power is a limited one. Its use is justified where allowing the plaintiff's claim would introduce inconsistency into the fabric of the law, either by permitting the plaintiff to profit from an illegal or wrongful act, or to evade a penalty prescribed by criminal law. Its use is not justified where the plaintiff's claim is merely for compensation for personal injuries sustained as a consequence of the negligence of the defendant." (pp 179-180)

192.   In my opinion, what is called for is a limited approach to the effect of illegality, focused on the need to avoid inconsistency in the law, without depriving claimants of the opportunity to obtain damages for wrongs or to put themselves in the position in which they should have been. This will offer the opportunity of resolving such problems as have, rightly, been identified in the present law, without replacing it wholesale with an open and unsettled range of factors. The latter might, in McLachlin J's words, "prove more problematic than has the troubled doctrine of ex turpi causa" itself.

193.   McLachlin J's emphasis on the admissibility of compensatory claims leads me to the principle traditionally addressed under the head of *locus poenitentiae*. This principle in fact had a relevant role in the *Tinsley v Milligan* in so far as it was recognised as demonstrating that "the effect of illegality is not to prevent a proprietary interest in equity from arising or to produce a forfeiture of such right: the effect is to render the equitable interest unenforceable in certain circumstances": per Lord Browne-Wilkinson, p 374D. But its true significance is considerably greater. Where it applies, it fulfils a not dissimilar function to a claim for damages in tort. It puts the parties back in the position that they should have been in, in this case but for the entry into of the contract which was or became affected and unenforceable by reason of the illegality.

194.   In early authorities the principle was put in wide terms. *Smith v Bromley* (1760) 2 Doug KB 696n was a case where the plaintiff was able to recover money she had paid to procure her brother's discharge from bankruptcy, which was an illegal payment. The primary reason was that the law making it illegal was for the protection of bankrupts and their families (so that the plaintiff and the defendant were *non in pari delictu*). An editor's footnote (F7) on p 697 gives this as one of two exceptions to the principle that, in a case of illegality, matters are left to lie where they fall (*potior est conditio defendentis*). But Lord Mansfield CJ reinforced this reason by the more general consideration at p 698, that, although the payment had been made for an illegal purpose:

> "Upon the whole, I am persuaded it is necessary, for the better support and maintenance of the law, to allow this action; for no man will venture to take, if he knows he is liable to refund."

The other exception identified in the footnote was that where the "contract is not executed, there is a *locus poenitentiae*, the *delictum* is incomplete, and the contract may be rescinded by either party".

195.   In *Neville v Wilkinson* (1782) I Bro Ch 543, 547, Lord Thurlow LC approved this approach, and "declared his opinion" that:

> "[I]n all cases where money was paid for an unlawful purpose, the party, though particeps criminis, might recover at law; and that the reason was, that if courts of justice mean to prevent the perpetration of crimes, it must be not by allowing a man who has got possession to remain in possession, but by putting the parties back to the state in which they were before."

196.   In *Taylor v Bowers* (1876) 1 QBD 291 possession of goods had been passed by the plaintiff, their owner, to A, in exchange for fictitious bills of exchange, in order to deceive creditors. But no compromise was achieved with creditors, "the illegal transaction was not carried out", and "it wholly came to an end" (p 300). In these circumstances, the plaintiff successfully sought recovery of the goods:

> "To hold that the plaintiff is enabled to recover does not carry out the illegal transaction, but the effect is to put everybody in the same situation as they were before the illegal transaction was determined upon, and before the parties took any steps to carry it out." (p 300)

The plaintiff was not seeking to enforce the illegal transaction, "but, on the contrary, setting it aside" and "not setting up his own fraud in order to make a title, but … repudiating the fraud and setting up his own prior rightful title as owner of the goods" (p 301).

197.   Like Lord Sumption (paras 245-252), I see this principle of rescission as having become unduly limited with time, particularly in 20th century authority, and I consider that it should be restored to its former significance and generalised. Further, I consider that there is no reason why rescission should necessarily be restricted, as it was even in these earlier authorities, by reference to a test of execution or carrying out of the illegal purpose. The logic of the principle is that the illegal transaction should be disregarded, and the parties restored to the position in which they would have been, had they never entered into it. If and to the extent that the rescission on that basis remains possible, then prima facie it should be available.

198.   In addition, as at present advised, I would not see any necessary objection to permitting rescission after part performance, by making, where possible, appropriate adjustments for benefits received. Equally, picking up points in Lord Neuberger's judgment (para 162) which I have read since writing the bulk of this judgment, I would not as at present advised see an imbalance or lack of parity of delict between the parties as a necessary or even probable bar to rescission, though I would agree that, in accordance with general principle, factors such as change of position could well preclude rescission. Complications may also arise in a context where a benefit

received under an illegal transactions is capable of forfeiture under the Proceeds of Crime Act 2002. We did not hear submissions on the position in such circumstances, and I express no opinion on it.

199.    On the above basis, reliance on illegality remains significant as a bar to relief, but only in so far as it is reliance in order to profit from or otherwise enforce an illegal contract. Reliance in order to restore the status quo is unobjectionable. The result is, as I see it, not dissimilar to that which (leaving aside the potential effects of section 7) results under section 6(1) of the New Zealand Illegal Contracts Act 1970, providing that:

> "Notwithstanding any rule of law or equity to the contrary, but subject to the provisions of this Act and of any other enactment, every illegal contract shall be of no effect and no person shall become entitled to any property under a disposition made by or pursuant to any such contract …"

200.    The approach I adopt avoids unsatisfactory results such as that reached in *Collier v Collier*, where it would have been entirely possible to achieve rescission even though the illegal scheme had been in some measure "executed" or "carried out". The father there could require the restoration of the property of which he had for an illegal purpose allowed his daughter to have the legal title. Similarly, in a situation like that in *Tinsley v Milligan*, it should be possible to avoid reliance on the artificial procedural concept of a presumption of a resulting trust. Such a presumption was available in that case to give effect to (though without necessarily referring to) the parties' actual intentions regarding equitable ownership or the reason (although the court was well aware of it) for structuring the transactions as they were. But, as *Collier v Collier* demonstrates, an artificial procedural presumption of this nature cannot be relied upon to be available in every case.

201.    In future, Miss Milligan should simply be able to reverse the effect, as between herself and Miss Tinsley, of the property transactions which they arranged for the illegal purpose, which they carried out, of deceiving public authorities. Because the court would be reversing, rather than enforcing the illegal transactions, the court could take into account both the objective fact of joint contributions and the parties' actual and, by itself, legal purpose of joint ownership. Setting on one side the transactions by which they sought to achieve their illegal purpose, the underlying equitable interests, which they shared based on their contributions and intentions, would be enforceable as such. The court could on that basis order the property to be registered in the joint names of Miss Tinsley and Miss Milligan.

202.    It follows from what I have so far said that I cannot accept Lord Toulson's view (para 116) that it is unnecessary to consider the scope of *locus poenitentiae*. The underlying concept behind locus poenitentiae is restitutionary. It recognises that neither an admission of nor reliance on illegality is a bar to relief involving the reversal of an illegal transaction. In the full restitutionary sense I have discussed, the concept must be seen as an integral part of the overall principle governing illegality, and as the corollary of McLachlin J's limited rationalisation of that principle. Understood in that sense, free of early 20th century moralising, it restores the position to what it would and should have been, without any illegality. It avoids windfall benefits and disproportionate losses, without involving the positive enforcement of or the recovery of profits based on illegal bargains. No doubt, however, it would be desirable to avoid the moral undertones of the Latin brocard, and to encapsulate the full width of the modern principle, by referring in future simply to parties' normal entitlement to reverse the effects of an illegal transaction, where possible, even though the transaction may have been wholly or in part executed or carried into effect.

203.    It also follows that in the present case I consider that no problem exists about recognising that Mr Patel is entitled to require Mr Mirza to return the stake which Mr Patel put up for the illegal purpose of use by Mr Mirza to make profits for their joint benefit by misuse of inside information. The claim does not seek to enforce or profit by the illegality. It seeks merely to put the position back to where it should have been, and would have been had no such illegal transaction ever been undertaken. I add that, having written the above and read Lord Neuberger's judgment in draft, it seems to me that, thus far, my analysis is essentially the same as that which Lord Neuberger describes in his judgment as "the Rule".

204.    Before leaving the case, I must however return to the suggestion, unnecessary in my view for the resolution of this appeal, that the law of illegality should be generally rewritten. The new approach is advocated primarily by Lord Toulson, but Lord Neuberger appears, unless I have misunderstood him, to suggest that it could serve both as a potential modification or qualification of the Rule and as an approach to be adopted to claims positively to enforce a contract, and to claims for damages for breach of contract or a quantum meruit for services rendered under an illegal contract (see his paras 174-175 and 178-180). The new approach is ostensibly based by Lord Toulson on *Hall v Hebert*, but it is transmuted by the statement (by Lord Toulson in para 101) that:

> "one cannot judge whether allowing a claim which is in some way tainted by illegality would be contrary to the public interest, because it would be harmful to the integrity of the legal system, without a) considering the underlying purpose of the prohibition which has been transgressed, b) considering conversely any other relevant public policies which may be

rendered ineffective or less effective by denial of the claim, and
c) keeping in mind the possibility of overkill unless the law is
applied with a due sense of proportionality. We are, after all, in
the area of public policy. That trio of necessary considerations
can be found in the case law."

205.    Under consideration c), it is then indicated (paras 107 and 108) that:

"107.   In considering whether it would be disproportionate to
refuse relief to which the claimant would otherwise be entitled,
as a matter of public policy, various factors may be relevant.
Professor Burrows' list is helpful but I would not attempt to lay
down a prescriptive or definitive list because of the infinite
possible variety of cases. Potentially relevant factors include
the seriousness of the conduct, its centrality to the contract,
whether it was intentional and whether there was marked
disparity in the parties' respective culpability.

108.   The integrity and harmony of the law permit - and I
would say require - such flexibility. ..."

The reference to Professor Burrows' list is to the list which Lord Sumption sets out
and analyses in his paras 259 and 260.

206.   What is apparent is that this approach, would introduce not only a new era
but entirely novel dimensions into any issue of illegality. Courts would be required
to make a value judgment, by reference to a widely spread mélange of ingredients,
about the overall "merits" or strengths, in a highly unspecific non-legal sense, of the
respective claims of the public interest and of each of the parties. But courts could
only do so, by either allowing or disallowing enforcement of the contract as between
the two parties to it, unless they were able (if and when this was possible) to adopt
the yet further novelty, pioneered by the majority of the Australian court in *Nelson
v Nelson* [1995] HCA 25, (1995) 184 CLR 538, of requiring the account to the public
for any profit unjustifiably made at the public expense, as a condition of obtaining
relief.

207.   Although other jurisdictions are invoked, it is notable how slender the basis
for doing so is. It comes down to the New Zealand statute and the Australian
authorities of *Nelson v Nelson* and *Fitzgerald v F J Leonhardt Pty Ltd* [1997] HCA
17, (1997) 189 CLR 215. We have no idea or information as to whether or not the
approach there has proved unproblematic for the profession or the courts. What we

do however have is an authoritative decision of the Canadian Supreme Court in *Hall v Hebert*, which does not in any way support the wholesale abandonment of a clear cut test, but rather explains and redefines the principle *ex turpi causa* in a manner which (consistently with the way in which the common law usually develops) offers every prospect of avoiding the evident anomalies which an over formalistic approach has in the past evidenced.

208.    Lord Toulson also starts his judgment with a series of paragraphs (1 to 9) instancing what are supposed to be problems existing under the present law. I would only say as to *Holman v Johnson* (1775) 1 Cowp 341 and *Pearce v Brooks* (1866) LR 1 Ex 213 that the question what constitutes knowing participation sufficient to render a contract unenforceable is a discrete problem, which is unlikely to be resolved any more simply under the "range of factors" approach now advocated. Likewise, the *St John Shipping* case [1957] 1 QB 267 and *Ashmore Benson Pease & Co Ltd v A V Dawson Ltd* [1973] 1 WLR 828 arose in areas where the purpose and effect of statutory provisions were central to the decision (as it was in cases such as *Hall v Woolston Hall Leisure Ltd* [2001] 1 WLR 225, *Still v Minister of National Revenue* (1997) 154 DLR (4th) 229 and *Nizamuddowlah v Bengal Cabaret Inc* (1977) 399 NYS 2d 854, mentioned by Lord Toulson in paras 6, 58-61 and 63-66). Questions as to the effect of collateral or minor illegality (such as parking on a double red line, instanced by Lord Neuberger in para 178) on the enforceability of contractual rights have not, I believe, led to real difficulty in achieving just solutions under these and other authorities (compare also McLachlin J's view cited in para 191(ii) above) - and certainly not to such difficulty as to justify tearing up the existing law and starting again. Again, the new approach now advocated, with its wide range of additional factors, over and above statutory purpose and effect, would be unlikely to avoid similar analysis of statutory policy and similarly nice issues. More importantly, these are problems in areas far removed from the present, and do not to my mind throw any light on the issues we have to decide on this appeal.

209.    For the reasons I have given, which correspond with those given by Lord Clarke and Lord Sumption, I would dismiss this appeal.

**LORD CLARKE:**

210.    As I see it, there is no disagreement between members of the court as to the correct disposal of this appeal. It is that the appeal must be dismissed because Mr Patel is entitled to restitution of the £620,000 that he paid to Mr Mirza on the basis that otherwise Mr Mirza would be unjustly enriched. As it seems to me, the application of orthodox principles of unjust enrichment, rescission and *restitutio in integrum* leads to this conclusion. Those principles are consistently set out by Lord Mance and Lord Sumption. Although Lord Sumption sets out a broader statement of principle, he agrees with Lord Mance and *vice versa*. As it seems to me, there is

no difference between their approach and the application by Lord Neuberger of what he calls "the Rule", which he defines in paras 145 and 146, as the right to return of money paid by the claimant to the defendant pursuant to a contract to carry out an illegal activity and the illegal activity is not in the event proceeded with owing to matters beyond the control of either party. Lord Sumption, at para 252, emphasises that the Rule arises automatically and by operation of law; a "right to restitution that in principle follows from the legal ineffectiveness of the contract …". I do not understand Lord Neuberger or Lord Mance to disagree with that. As Lord Neuberger says in para 146, the Rule is consistent with authority and with policy and renders the outcome in cases of contracts involving illegality and the maxim *ex turpi causa non oritur action* relatively clear and certain.

211.    As Lord Neuberger says at para 154, in agreement with Lord Mance, there is obvious attraction in the notion that, if all transfers made pursuant to an unexecuted illegal contract are re-transferred, then the parties are back in the position they were, ie as if there had been no illegal contract, which would seem to comply with public policy.

212.    This approach does not require any balancing of a series of different factors. It simply applies the principles derived from the authorities to the facts of the case. Lord Neuberger, Lord Mance and Lord Sumption have referred in detail, and (so far as I can see) consistently, to the authorities over very many years. None of them supports a balancing of the kind suggested by Lord Toulson. To my mind the most important sources are the judgments of Lord Mansfield CJ in *Holman v Johnson* (1775) 1 Cowp 341 and McLachlin J (now CJ) in *Hall v Hebert* [1993] 2 SCR 159.

213.    Lord Mance sets out in para 191 what he calls a number of points which emerge with great clarity from McLachlin J's judgment. I will not repeat those passages here. The critical point for present purposes is that she stressed the importance of having a firm doctrinal foundation for what she described as a narrow principle. She was concerned, at p 169, that public policy would provide "no clear guidance as to when judges could exercise this draconian power and upon what grounds". The draconian power was "a power to reject claims on considerations of public policy". On the facts of *Hall v Hebert* she concluded that such compensatory damages as were claimed in that case were not properly to be regarded as awarded as compensation for an illegal act but only as compensation for personal injury. Then, as Lord Mance says, finally she concluded that:

> "there is a need in the law of tort for a principle which permits judges to deny recovery to a plaintiff on the ground that to do so would undermine the integrity of the justice system. The power is a limited one. Its use is justified where allowing the plaintiff's claim would introduce inconsistency into the fabric

> of the law, either by permitting the plaintiff to profit from an
> illegal or wrongful act, or to evade a penalty prescribed by
> criminal law. Its use is not justified where the plaintiff's claim
> is merely for compensation for personal injuries sustained as a
> consequence of the negligence of the defendant."

214.   I entirely agree with that approach. I have always thought that the power of
the court to deny recovery on the ground of illegality should be limited to well
defined circumstances. I agree with Lord Mance in para 192 that, in the absence of
such circumstances, claimants should not be deprived of the opportunity to obtain
damages for wrongs or to put themselves in the position in which they should have
been. As I see it, there is no need to replace that approach with what he calls an open
and unsettled range of factors.

215.   I agree with Lord Sumption's opinion in this regard. As he puts it at para 257,
the search for principle which led McLachlin J to identify consistency as the
foundation of this area of the law was a response to Cory J, who had favoured a
more flexible approach which would have depended upon whether the relevant
public policy required that result on the facts of each case. The majority, including
McLachlin J, did not agree. In para 258 Lord Sumption draws attention to the similar
opinion of Lord Goff in *Tinsley v Milligan* [1994] 1 AC 340 at 358E-F, where he
objected to the "public conscience test" adopted in the Court of Appeal, under which
the court must "weigh, or balance, the adverse consequences of respectively granting
or refusing relief". Lord Goff added that that was "little different, if at all, from
stating that the court has a discretion whether to grant or refuse relief" and that it
was very difficult to reconcile with the principle of policy stated by Lord Mansfield
in *Holman v Johnson*. As Lord Sumption observes, on this point Lord Goff was
supported by the whole of the Appellate Committee.

216.   Between paras 259 and 265 Lord Sumption considers what he calls the "range
of factors" approach and gives his reasons for rejecting it. I agree with him, and will
not repeat his reasoning here, save for the following passage at para 262(iv):

> "The 'range of factors' test discards any requirement for an
> analytical connection between the illegality and the claim, by
> making the nature of the connection simply one factor in a
> broader evaluation of individual cases and offering no guidance
> as to what sort of connection might be relevant. I have already
> observed that the reliance test is the narrowest test available. If
> it is no longer to be decisive, the possibility is opened up of an
> altogether wider ambit for the illegality principle, extending to
> cases where the relevant connection was remote or non-existent

> but other factors not necessarily involving any connection at
> all, were thought to be compelling."

In short, such a test does not apply the principles laid down in the cases, and is inconsistent with the approach in *Tinsley v Milligan* and, in particular, the reliance test.

217.   In para 265 Lord Sumption says that he cannot agree with the conclusion of Lord Toulson (at para 109) that the application of the illegality principle should depend on

> "the policy factors involved and … the nature and
> circumstances of the illegal conduct, in determining whether
> the public interest in preserving the integrity of the justice
> system should result in the denial of the relief claimed."

I agree with Lord Sumption that this is far too vague and potentially far too wide to serve as the basis on which a person may be denied his legal rights. As he says, it converts a legal principle into an exercise of judicial discretion, in the process exhibiting all the vices of "complexity, uncertainty, arbitrariness and lack of transparency" which Lord Toulson attributes to the present law. The illegality defence deprives claimants of their legal rights. The correct response for us is not to leave the problem to a case by case evaluation by the lower courts by reference to a potentially unlimited range of factors, but to address the problem by supplying a framework of principle which accommodates legitimate concerns about the present law.

218.   Lord Mance expresses much the same conclusion in paras 204 to 207, with which I also agree. It is to my mind noteworthy that Lord Toulson puts his conclusion thus in para 109:

> "The courts must obviously abide by the terms of any statute,
> but I conclude that it is right for a court which is considering
> the application of the common law doctrine of illegality to have
> regard to the policy factors involved and to the nature and
> circumstances of the illegal conduct in determining whether the
> public interest in preserving the integrity of the justice system
> should result in denial of the relief claimed. I put it in that way
> rather than whether the contract should be regarded as tainted
> by illegality, because the question is whether the relief claimed
> should be granted."

219.   The striking feature of that approach is as I see it that it puts the question, not whether the contract should be regarded as tainted by illegality but whether the relief claimed should be granted. That seems to me to be essentially a question of discretion, or at least a consideration of all the relevant factors in order to decide where the balance should be struck. As I see it, there is no support in any of the authorities for that approach and it is directly contrary to many of the cases referred to by Lord Sumption and Lord Mance, in particular the reasoning of the majority in *Hall v Hebert* and of the House of Lords in *Tinsley v Milligan*, where it was expressly rejected by Lord Goff. It would be close to reviving the public conscience test. In my opinion the question posed in para 109 is the wrong question.

220.   I recognise that common law principles develop from time to time. Two such developments are relevant here. The first is this. Lord Sumption and Lord Mance both focus on the scope of the principle of *restitutio in integrum*, as does Lord Neuberger. For example, Lord Neuberger first sets out the basis of the Rule, which seems to me to be consistent with the principles identified by Lord Sumption and Lord Mance. Thus in much of his judgment, notably in paras 145 to 160, Lord Neuberger stresses that the Rule supports the importance of certainty in the law. He then gives some examples of possible extensions of the Rule. So, for example, he says in paras 167 to 169 that the Rule may apply where the illegal contract is wholly or partly performed by the plaintiff paying a lesser sum to the defendant. I agree, but that is on the basis that it is essentially ordering restitution so far as appropriate in accordance with the underlying principle embodied in the Rule. As Lord Neuberger puts it in para 169, there is no good reason for not extending the Rule to partly or even wholly performed contracts where *restitutio in integrum* can be achieved in practical terms and would be consistent with policy and proportionality. As I read his judgment, save at the very end his approach is orthodox and contemplates a development of the legal principles identified by Lord Sumption and Lord Mance.

221.   The second relevant development is this. It is now recognised that some of the reasoning in *Tinsley v Milligan* can no longer stand: see in particular Lord Sumption at paras 236 to 239 and Lord Mance at paras 199 to 201. It is I think now accepted on all sides that, if *Collier v Collier* [2002] BPIR 1057 came before the courts today it would be decided differently. That is not however because the court will adopt the proposals of Lord Toulson but because the relevant legal principles have developed in a normal way.

222.   Finally, I should note that it is not in dispute that the appeal should be dismissed on conventional principles.

223.   I recognise that Lord Neuberger has expressed some support for the approach of Lord Toulson but I am not persuaded by his reasoning that it is appropriate.

**LORD SUMPTION: (with whom Lord Clarke agrees)**

224.    Two questions arise on this appeal. The first is whether the contract between these parties is affected by the principle of public policy *ex turpi causa non oritur actio* (the illegality principle, as I shall call it). The second is whether, if so, Mr Patel is entitled to restitution of the £620,000 that he paid to Mr Mirza.

225.    The first question has divided the courts below. The Deputy Judge (David Donaldson QC) and the majority of the Court of Appeal (Rimer LJ and Vos LJ) thought it plain that Mr Patel's claim was founded on an illegal agreement and could not be sustained unless he could invoke a special exception for executory agreements. They considered that there was such an exception. Gloster LJ on the other hand declined to see the problem in terms of rule and exception. At the risk of a rather crude summary of her thoughtful analysis, I would summarise her reasons as follows. Her first and main point (paras 67, 69-70, 72, 79-80) was that the rationale of the illegality rule did not require Mr Patel to be denied restitutionary relief, because it did not involve enforcing his contract with Mr Mirza or enabling him to derive any benefit from it. Mr Patel's right to restitution was, she considered, "collateral". Second, that Mr Mirza and Mr Patel were not equally blameworthy because Mr Mirza was a finance professional while Mr Patel was not, and would not necessarily have known that insider dealing was illegal. Third, section 63(2) of the Criminal Justice Act 1993 provided that no contract should be void or unenforceable by reason of the prohibition of insider dealing in section 52. The fourth was that Mr Patel did not need to rely on the illegal character of his agreement with Mr Mirza in order to recover the money. It was enough that he had paid it for a speculation that never occurred.

*The illegality principle and its rationale*

226.    The present appeal exposes, not for the first time, a long-standing schism between those judges and writers who regard the law of illegality as calling for the application of clear rules, and those who would wish address the equities of each case as it arises. There are recent statements of this court in support of both points of view: see *Les Laboratoires Servier v Apotex Inc* [2015] AC 340 and *Hounga v Allen* [2014] 1 WLR 2889, paras 44-45. It also raises one of the most basic problems of a system of judge-made customary law such as the common law. The common law is not an uninhabited island on which judges are at liberty to plant whatever suits their personal tastes. It is a body of instincts and principles which, barring some radical change in the values of our society, is developed organically, building on what was there before. It has a greater inherent flexibility and capacity to develop independently of legislation than codified systems do. But there is a price to be paid for this advantage in terms of certainty and accessibility to those who are not professional lawyers. The equities of a particular case are important. But there are

pragmatic limits to what law can achieve without becoming arbitrary, incoherent
and unpredictable even to the best advised citizen, and without inviting unforeseen
and undesirable collateral consequences.

227.    Ancient as it is, the classic statement of the principle as it has traditionally
been understood remains that of Lord Mansfield CJ in *Holman v Johnson* (1775) 1
Cowp 341:

> "The objection, that a contract is immoral or illegal as between
> plaintiff and defendant, sounds at all times very ill in the mouth
> of the defendant. It is not for his sake, however, that the
> objection is ever allowed; but it is founded in general principles
> of policy, which the defendant has the advantage of, contrary
> to the real justice, as between him and the plaintiff, by accident
> if I may so say. The principle of public policy is this; *ex dolo
> malo non oritur actio*. No court will lend its aid to a man who
> founds his cause of action upon an immoral or an illegal act. If,
> from the plaintiff's own stating or otherwise, the cause of
> action appears to arise *ex turpi causa*, or the transgression of a
> positive law of this country, there the court says he has no right
> to be assisted."

228.    There was a time when the courts approached the application of the illegality
principle on the footing that a court should not be required to sully its hands by
dealing with criminal ventures. In *Everet v Williams* (1725), noted at (1893) LQR
197, the notorious case in which two highwaymen sought an account of the division
of their profits, the court not only dismissed the action but fined the plaintiff's
solicitors for the indignity visited upon it. There are periodic echoes of this attitude
in later cases, notably *Parkinson v College of Ambulance Ltd* [1925] 2 KB 1, 13, in
which Lush J thought that no adjudication on a contract to procure an honour could
be undertaken with "propriety or decency". This notion has sometimes been thought
to derive support from Lord Mansfield's reference to the court withholding its aid.
But the truth is that it has rarely risen above the level of indignant judicial asides.
There are many purposes for which courts must necessarily inquire into the illegal
acts of litigants. There are principled exceptions to the illegality principle, which
may entitle a party to base a claim on an illegal act. There are statutory schemes of
apportionment which may require liability for dishonest acts to be distributed among
the wrongdoers. The notion of judicial abstention could never be unqualified, nor
has it been historically. The law, as Bingham LJ observed in *Saunders v Edwards*
[1987] 1 WLR 1116, 1134, must

> "steer a middle course between two unacceptable positions. On
> the one hand it is unacceptable that any court of law should aid

> or lend its authority to a party seeking to pursue or enforce an
> object or agreement which the law prohibits. On the other hand,
> it is unacceptable that the court should, on the first indication
> of unlawfulness affecting any aspect of a transaction, draw up
> its skirts and refuse all assistance to the plaintiff, no matter how
> serious his loss nor how disproportionate his loss to the
> unlawfulness of his conduct."

229.    In its consultative report of 2009, *The Illegality Defence* (LCCP 189), at para
2.5, the Law Commission identified six policy rationales for the rule, which could
be found in the case-law and the academic literature. They were: (1) furthering the
purpose of the rule which the claimant's illegal behaviour has infringed; (2)
consistency; (3) the need to prevent the claimant profiting from his or her own
wrong; (4) deterrence; (5) maintaining the integrity of the legal system; and (6)
punishment.

230.    By "maintaining the integrity of the legal system" (rationale (5)), the Law
Commission meant sparing the judiciary from involvement in serious wrongdoing:
see para 2.24. I have given my reasons for rejecting this rationale. The Law
Commission itself (paras 2.28-2.29) rejected rationale (6), punishment, on the
ground that although rules of civil law might have a punitive effect, this was no part
of their purpose. With very limited exceptions, such as certain rules of causation in
fraud cases or the rare occasions for awarding punitive damages, I think that this is
correct. The other four rationales overlap. All of them to my mind are subsumed in
no (2), the principle of consistency. The most influential statement of that principle
is to be found in the much admired judgment of McLachlin J delivering the judgment
of the majority of the Supreme Court of Canada in *Hall v Hebert* [1993] 2 SCR 159,
169:

> "Whether we describe the principle under which judges are
> allowed to deny recovery to a plaintiff by an old-fashioned
> Latin name or by the currently fashionable concept of 'public
> policy', the underlying problem remains the same: under what
> circumstances should the immoral or criminal conduct of a
> plaintiff bar the plaintiff from recovering damages to which he
> or she would otherwise be entitled.

> My own view is that courts should be allowed to bar recovery
> in tort on the ground of the plaintiff's immoral or illegal
> conduct only in very limited circumstances. The basis of this
> power, as I see it, lies in duty of the courts to preserve the
> integrity of the legal system, and is exercisable only where this
> concern is in issue. This concern is in issue where a damage

> award in a civil suit would, in effect, allow a person to profit
> from illegal or wrongful conduct, or would permit an evasion
> or rebate of a penalty prescribed by the criminal law. The idea
> common to these instances is that the law refuses to give by its
> right hand what it takes away by its left hand."

After examining cases in which damages were refused when they represented a loss of benefits which would have been derived from an illegal contract or activity, she observed, at p 176:

> "A more satisfactory explanation for these cases, I would
> venture, is that to allow recovery in these cases would be to
> allow recovery for what is illegal. It would put the courts in the
> position of saying that the same conduct is both legal, in the
> sense of being capable of rectification by the court, and illegal.
> It would, in short, introduce an inconsistency in the law. It is
> particularly important in this context that we bear in mind that
> the law must aspire to be a unified institution, the parts of which
> - contract, tort, the criminal law - must be in essential harmony.
> For the courts to punish conduct with the one hand while
> rewarding it with the other, would be to 'create an intolerable
> fissure in the law's conceptually seamless web'."

Her conclusion, at pp 179-180, was that:

> "… there is a need in the law of tort for a principle which
> permits judges to deny recovery to a plaintiff on the ground that
> to do so would undermine the integrity of the justice system.
> The power is a limited one. Its use is justified where allowing
> the plaintiff's claim would introduce inconsistency into the
> fabric of the law, either by permitting the plaintiff to profit from
> an illegal or wrongful act, or to evade a penalty prescribed by
> criminal law."

*Hall v Hebert* was a tort case, and the implications of illegality are not in all respects the same in the law of tort as in they are other branches of law. I shall return to this point below. But, as McLachlin J pointed out in the passage cited, the law is a unified institution. At the most fundamental level of policy, its internal coherence requires that contract, tort and criminal law should be in harmony.

231.    In practice the illegality principle has almost invariably been raised as a defence to a civil claim based on a breach of the criminal law. In *Les Laboratoires Servier v Apotex Inc* [2015] AC 430, this court held that with immaterial exceptions the defence is available only in such cases. This conclusion tends to reinforce the significance of the principle of consistency as a rationale. The civil courts of the state cannot coherently give effect to legal rights founded on criminal acts which are contrary to the state's public law. There is no reason to regard this as any less important according to whether the civil claim lies in contract or tort.

232.    The English courts have taken a broader view than McLachlan J did of what constitutes "profiting" from an illegal act, but that is by the way. Her rationalisation of the illegality principle as being based on the consistency and internal coherence of the law has been consistently adopted in England in tort and contract cases alike by this court and by the Appellate Committee of the House of Lords before it: see *R v Islam* [2009] AC 1076, para 38 (Lord Mance); *Stone and Rolls Ltd v Moore Stephens* [2009] 1 AC 1391, paras 128 (Lord Walker), 226 (Lord Mance); *Hounga v Allen* [2014] 1 WLR 2889, para 43 (Lord Wilson); *Les Laboratoires Servier v Apotex Inc* [2015] AC 430, para 24 (Lord Sumption); *Bilta (UK) Ltd v Nazir (No 2)* [2016] AC 1, para 172 (Lord Toulson and Lord Hodge). In *Gray v Thames Trains* [2009] 1 AC 1339, Lord Hoffmann (with whom the rest of the Appellate Committee agreed) put forward the principle of consistency as the rationale of what he called the "narrower rule" precluding the recovery of damages representing loss directly arising from the sentence of a criminal court. He was inclined to think that the "wider rule" that a person cannot recover for damage which is the consequence of his own criminal act was based on a different principle concerned with "public notions of the fair distribution of resources": para 51, and cf Lord Rodger at para 84. Certainly, the inconsistency of awarding damages representing loss arising from a criminal sentence is more obvious and direct than it is when the claimant is claiming other damages causally flowing from his commission of a crime. But it seems to me, as it did to McLachlan J and those who have adopted her approach more generally, that the internal coherence of the law is also the reason why it will not give effect in a civil court to a cause of action based on acts which it would punish in a criminal court. As Lord Hughes put it in *Hounga v Allen* (para 55), a dissenting judgment but not on this point, "the law must act consistently; it cannot give with one hand what it takes away with another, nor condone when facing right what it condemns when facing left."

*When is a civil claim "founded" on an illegal act?*

233.    The starting point is that the courts exist to provide remedies in support of legal rights. It is fundamental that any departure from that concept should have a clear justification grounded in principle, and that it should be no more extensive than is required by that principle. The underlying principle is that for reasons of

consistency the court will not give effect, at the suit of a person who committed an illegal act (or someone claiming through him), to a right derived from that act.

234.    The test which has usually been adopted for determining whether this principle applies is the reliance test. The question is whether the person making the claim is obliged to rely in support of it on an illegal act on his part. The reliance test is implicit in Lord Mansfield's statement of principle, which assumes that the plaintiff's action is "founded on" his illegal act. But the modern origin of the test is the decision of the Court of Appeal in *Bowmakers Ltd v Barnet Instruments Ltd* [1945] 1 KB 65, which concerned a hire purchase agreement illegal under wartime regulations. When the hirer disposed of the goods, the owner was held entitled to damages for conversion notwithstanding the illegality, because his right of action was based on his ownership. He could establish that without relying on the illegal hire purchase agreement. The reliance test was subsequently approved by the Privy Council in *Singh v Ali* [1960] AC 167 and *Chettiar v Chettiar* [1962] AC 294 and by the House of Lords in *Tinsley v Milligan* [1994] 1 AC 340. All of these decisions, were about title to property, real or personal. But in *Clunis v Camden and Islington Health Authority* [1998] QB 978 the Court of Appeal applied it to a claim in tort. In *St John Shipping Co Ltd v Joseph Rank Ltd* [1957] 1 QB 267, 291-292, Devlin J had applied it to a claim for freight under a contract of carriage. In *Hewison v Meridian Shipping Services PTE Ltd* [2003] ICR 766, the Court of Appeal applied it to a concurrent claim for damages in contract and tort in which the measure of damages depended on the terms of a contract. The claimant's action for damages against his employer for an injury at work failed because in order to prove his loss of earnings he had to show that he would have continued to deceive his employer about his fitness to operate machinery, as he had in the past.

235.    There is, as these decisions suggest, nothing about the reliance test that limits its relevance to certain causes of action. But the test may apply in different ways, depending on what it is that the law regards as illegal. In a tort case or a property case it is generally enough to identify the illegal act and demonstrate the dependence of the cause of action upon the facts making it illegal. In a contract case, the position is less straightforward. A contract may be affected by illegality because terms lawful in themselves are intended to be performed in an illegal way or for an illegal purpose not apparent from the contract itself. This does not mean that contracts vitiated by this circumstance can be enforced simply by putting the case without reference to the illegal purpose or proposed mode of performance. It is enough to give rise to the defence that the claimant must rely on a contract which is in fact illegal, whether that is apparent from the terms or not.

236.    The problem about the reliance test is not so much the test itself as the way in which it was applied in *Tinsley v Milligan*. The facts of that case are well known. Ms Tinsley and Ms Milligan contributed in approximately equal shares to the cost of buying a house in which both of them intended to live and run their lodging rooms

business. They decided that it would be conveyed into the sole name of Ms Tinsley so as to enable Ms Milligan to defraud the Department of Social Security by pretending that she did not own her home and paid rent. Ms Tinsley claimed an order for possession on the footing that she was the sole owner. The Appellate Committee held by a majority that Ms Milligan was entitled to assert a 50% interest in the house notwithstanding the illegal purpose for which it had been conveyed into Ms Tinsley's sole name. There were two stages in the reasoning of Lord Browne-Wilkinson, who delivered the leading speech for the majority. The first was that where property is transferred for an illegal purpose, the transferee nevertheless obtains a good title, notwithstanding that the transaction being illegal it would not have been specifically enforced. This is so whether the title in question is legal or equitable. The decision of the majority on this point settled a question on which there had been inconsistent authorities dating back to the beginning of the 19th century. It did so in a way which reflected the law's traditional reluctance to disturb settled titles. The result represents a notable difference between the law relating to the creation of legal or equitable titles and the law relating to contractual obligations generally. It means that although a contract may be vitiated by its illegal purpose or the illegal way in which it was intended to be performed, this is not true of title to property. It followed in that case that Ms Tinsley had a good title to the disputed property. The second stage of the reasoning was that an equitable interest in the property would also be recognised, provided that the person claiming it was not "forced to plead or rely on the illegality" (p 376E). In Ms Milligan's case, equity presumed a resulting trust in her favour by virtue only of her contribution to the purchase price. She did not therefore have to plead or prove the reasons why the property had been conveyed into Ms Tinsley's sole name. It followed that she could make good her claim to an interest.

237.    The problem about this is that it makes the illegality principle depend on adventitious procedural matters, such as the rules of pleading, the incidence of the burden of proof and the various equitable presumptions. If Ms Tinsley had been a man and Ms Milligan had been his daughter, the decision would have gone the other way because the presumption of resulting trust would have been replaced by a presumption of advancement. She would have had to rebut it by reference to the actual facts. This is what the Privy Council decided in *Chettiar v Chettiar* [1962] AC 294 and the Court of Appeal in *Collier v Collier* [2002] BPIR 1057, in both of which property was gratuitously transferred for an illegal purpose by a father to his son or daughter. The father was accordingly unable to establish his interest. Yet the distinction between these cases and *Tinsley v Milligan* is completely arbitrary. This is because the equitable presumptions operate wholly procedurally, and have nothing to do with the principle which the court is applying in illegality cases.

238.    In *Nelson v Nelson* (1995) 184 CLR 538, the majority's analysis in *Tinsley v Milligan* was criticised on this ground in the High Court of Australia: see pp 579-580 (Dawson J), 592-593 (Toohey J), 609-610 (McHugh J). In my opinion, these

criticisms are justified, although I would not go as far as McHugh did in *Nelson v Nelson*. He, alone among the judges of the High Court of Australia, would have jettisoned the reliance test altogether. What then is the true principle? In property cases, as the House held in *Tinsley v Milligan*, title is not vitiated by an antecedent illegal arrangement. An equitable interest in property may accordingly arise from a tainted scheme. Whether an equitable interest exists depends on the intentions of the parties. The true principle is that the application of the illegality principle depends on what facts the court must be satisfied about in order to find an intention giving rise to an equitable interest. It does not depend on how those facts are established. Ms Milligan was entitled to the interest which she claimed in the property because she paid half of the price and there was no intention to make a gift. That was all that the court needed to be satisfied about. Likewise, if *Collier v Collier* were to come before the courts today, the result should be the same notwithstanding that the equitable presumption went the other way. Mr Collier leased his property to his daughter for an illegal purpose, namely to deceive his creditors in the event that he became insolvent. He had an equitable interest in the property because the lease was gratuitous and there was no intention to make a gift. It would make no difference to the recognition of that interest that the purpose of the transaction was illegal. Why he chose to organise his affairs in that way would no doubt emerge in the course of the evidence, but would be irrelevant to the facts which founded his claim. The point was well made by Dawson J in *Nelson v Nelson*, at p 580:

> "There may be an illegal purpose for the transfer of the property and that may bear upon the question of intention, but it is the absence of any intention to make a gift upon which reliance must be placed to rebut the presumption of advancement. Intention is something different from a reason or motive. The illegal purpose may thus be evidentiary, but it is not the foundation of a claim to rebut the presumption of advancement."

239.   Shorn of the arbitrary refinements introduced by the equitable presumptions, which in any event apply only in property cases, the reliance test accords with principle. First, it gives effect to the basic principle that a person may not derive a legal right from his own illegal act. Second, it establishes a direct causal link between the illegality and the claim, distinguishing between those illegal acts which are collateral or matters of background only, and those from which the legal right asserted can be said to result. Third, it ensures that the illegality principle applies no more widely than is necessary to give effect to its purpose of preventing legal rights from being derived from illegal acts. The reliance test is the narrowest test of connection available. Every alternative test which has been proposed would widen the application of the defence as well as render its application more uncertain.

240.    This last objection applies in particular to the main alternative test which has been proposed in the case law, namely that the facts relied upon should be "inextricably linked" with the illegal act. The difficulty about inextricable linkage as a test of connection is that it is far from clear what it means. On the face of it, the only link between the illegal act and the claim which is truly "inextricable", is a link based on causation and necessary reliance. So far as the test of inextricable linkage broadens the required connection more widely, it seems to me to be contrary to principle. Its vices may be illustrated by reference to the decision in *Cross v Kirkby* [2000] EWCA Civ 426, The Times 5 April 2000, where it was first proposed by Beldam LJ. The facts were that a hunt saboteur started a fight with a hunt follower at a meet and came out of it worst. He ended up with a fractured skull, and sued the hunt follower for damages occasioned by his injuries. The main issue was whether the hunt follower had defended himself with excessive force. Beldam LJ held that he had not. But in case he was wrong about that, he held that the saboteur's injuries were inextricably linked with the fact that he had started the fight, so that his claim was barred by the illegality principle. Otton LJ agreed generally with Beldam LJ, but Judge LJ agreed only on the primary ground. To my mind, Beldam LJ's alternative ground was unprincipled. It only arose if the hunt follower responded to the attack with excessive force, and on that footing it was irrelevant who started the fight. The illegality principle served simply to deprive the plaintiff of a proper claim arising from the unlawful use of excessive force against him. The case illustrates the tendency of any test broader than the reliance test to degenerate into a question of instinctive judicial preference for one party over another.

*Exceptions*

241.    To the principle that a person may not rely on his own illegal act in support of his claim, there are significant exceptions, which are as old as the principle itself and generally inherent in it. These are broadly summed up in the proposition that the illegality principle is available only where the parties were *in pari delicto* in relation to the illegal act. This principle must not be misunderstood. It does not authorise a general enquiry into their relative blameworthiness. The question is whether they were <u>legally</u> on the same footing. The case law discloses two main categories of case where the law regards the parties as not being *in pari delicto*, but both are based on the same principle.

242.    One comprises cases in which the claimant's participation in the illegal act is treated as involuntary: for example, it may have been brought about by fraud, undue influence or duress on the part of the defendant who seeks to invoke the defence. The best-known example is *Burrows v Rhodes* [1899] 1 QB 816, where the illegality consisted in the plaintiff having enlisted in the defendant's private army for the Jameson raid, contrary to the Foreign Enlistment Act 1870. The illegality principle was held not to arise because he had been induced to do so by the defendant's fraudulent misrepresentation that the raid had the sanction of the Crown, which if

true would have made it legal. Cases in which the illegality consisted in the act of another for which the claimant is responsible only by virtue of a statute imposing strict liability, fall into the same category: see *Osman v J Ralph Moss Ltd* [1970] 1 Lloyd's Rep 313; *Les Laboratoires Servier v Apotex* [2015] AC 430, para 29. In such cases, however, the construction and purpose of the statute in question will call for careful attention.

243.    The other category comprises cases in which the application of the illegality principle would be inconsistent with the rule of law which makes the act illegal. The paradigm case is a rule of law intended to protect persons such as the plaintiff against exploitation by the likes of the defendant. Such a rule will commonly require the plaintiff to have a remedy notwithstanding that he participated in its breach. The exception generally arises in the context of acts made illegal by statute. In *Browning v Morris* (1778) 2 Cowp 790, 792, Lord Mansfield expressed the point in this way:

> "Where contracts or transactions are prohibited by positive statutes for the sake of protecting one set of men from another set of men, the one, from their situation and condition being liable to be oppressed or imposed upon by the other, there the parties are not *in pari delicto*; and in furtherance of these statutes, the person injured, after the transaction is finished and completed, may bring his action and defeat the contract."

The classic modern illustration is *Kiriri Cotton Co Ltd v Dewani* [1960] AC 192, in which a tenant was held entitled to recover an illegal premium paid to the landlord, notwithstanding that his payment of it involved participating in a breach of an ordinance regulating tenancies. Lord Denning, delivering the advice of the Privy Council, observed at p 205 that: "The duty of observing the law is firmly placed by the Ordinance on the shoulders of the landlord for the protection of the tenant." *Hounga v Allen* [2014] 1 WLR 2889 on its facts illustrates the same principle. The claimant had been illegally trafficked into the United Kingdom by her employer. Her vulnerability on that account enabled her employer to exploit and ultimately to dismiss her. An attempt to bar her claim for unlawful discrimination on account of her participation in her own illegal trafficking failed. There was no claim under the employment contract itself, which was illegal, but it may well be that a claim for a *quantum meruit* for services performed would have succeeded on the same ground. There is New York authority for such a result: see *Nizamuddowlah v Bengal Cabaret Inc* (1977) 399 NYS 2d 854.

244.    Protective statutes are the plainest examples of rules of law which implicitly exclude the operation of the illegality principle, but they are not the only ones. Some statutes, on their proper construction, are inconsistent with the application of the illegality principle even if they are in no sense protective. The statutory prohibitions

against the overloading of ships are wholly directed to the operational safety of ships and their crews. On that ground, among others, Devlin J held in *St John Shipping Corpn v Joseph Rank Ltd* [1957] 1 QB 267 that a breach of the Merchant Shipping (Safety and Load Line Conventions) Act 1932 did not justify shippers and bill of lading holders in defending an action for freight. For the same reason, the illegality principle has been held to have no application to claims to contribution under the Civil Liability (Contribution) Act 1978. The reason is that this would be inconsistent with the scheme of the Act: *K v P* [1993] Ch 140. In *Stone and Rolls Ltd v Moore Stephens* [2009] AC 1391, three members of the Appellate Committee, Lord Phillips, Lord Scott and Lord Mance, regarded the application of the illegality principle to an auditor's negligence as turning on the purpose of the auditor's statutory functions, although they reached different conclusions about what that purpose was.

*Restitution and loci poenitentiae*

245.   The next question is whether the illegality principle bars an action for the recovery of the money which Mr Patel paid under the contract.

246.   English law does not have a unified theory of restitution. Failure or absence of basis, which supplies such a theory in most civil law systems, was rejected as the overarching rationale of the law of restitution in *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70, 172 (Lord Goff). For the moment, therefore, as Lord Hoffmann observed in *Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2007] 1 AC 558, para 21, "the claimant has to prove that the circumstances in which the payment was made come within one of the categories which the law recognizes as sufficient to make retention by the recipient unjust."

247.   It is nonetheless true that failure of basis is the reason (or at least a reason) why the retention of a benefit is treated in some categories of case as unjust. One of these is the category of case in which a money benefit is conferred on the recipient under or in anticipation of a contract and the basis for that transfer has failed, for example by frustration, total failure of consideration or want of contractual capacity or *vires* on the part of one of the parties. As a general rule, benefits transferred under a contract which is void or otherwise legally ineffective are recoverable: *Westdeutsche Landesbank Girozentrale v Islington London Borough Council* [1994] 4 All ER 890 (Hobhouse J), approved (*obiter*) on appeal to the House of Lords [1996] AC 669, 681-682 (Lord Goff), 714 (Lord Browne-Wilkinson), 723 (Lord Woolf). In *Guinness Mahon & Co Ltd v Kensington and Chelsea Royal London Borough Council* [1999] QB 215, the Court of Appeal held that the ineffectiveness of the transaction was a ground of restitution independent of total failure of consideration, and therefore available even if the contract had been partly performed. The reason, as Morritt LJ observed (p 230) is that: "The bank did not get

in exchange for that performance all it expected, for it did not get the benefit of the contractual obligation."

248.   One would expect the same reasoning to apply where the contract is unenforceable for illegality. In fact, however, the courts have not said this. The reason is that they have treated restitution as being available only where the payer was entitled to a *locus poenitentiae* in which to withdraw from the transaction. The breadth of this *locus* has varied with judicial fashion, but for much of the 20th century it was very narrowly interpreted indeed. This approach is not consistent with the recognition of a general right to the restitution of money paid under an illegal contract, in spite of the close analogy with other cases of ineffective contracts.

249.   In one sense, the contract between these parties may be said to have been frustrated by the failure of the inside information to materialise, or to have resulted in a total failure of consideration because as a result the shares were never purchased. But that cannot be an adequate explanation of the reason why someone in Mr Patel's position may be entitled to restitution even on the limited basis which the concept of a *locus poenitentiae* allows. That concept permits the recovery of money paid even before (indeed, especially before) the time for performance has arrived, and therefore in many cases before the contract was frustrated or the question of failure of consideration could arise. The ground of restitution in these circumstances can only be that the contract was illegal and that the basis for the payment had failed.

250.   Of course, in order to demonstrate that the basis for the payment had failed, Mr Patel must say what that basis was, which would necessarily disclose its illegality. In my opinion, the reason why the law should nevertheless allow restitution in such a case is that it does not offend the principle applicable to illegal contracts. That principle, as I have suggested above, is that the courts will not give effect to an illegal transaction or to a right derived from it. But restitution does not do that. It merely recognises the ineffectiveness of the transaction and gives effect to the ordinary legal consequences of that state of affairs. The effect is to put the parties in the position in which they would have been if they had never entered into the illegal transaction, which in the eyes of the law is the position which they should always have been in.

251.   The judges who first formulated the modern law of illegality at the end of the 18th century had no difficulty about this. In *Smith v Bromley* (1760) 2 Doug 696n, 697, one of Lord Mansfield's earliest statements on this area of law, he thought that restitution of an illegal consideration was "necessary for the better support and maintenance of the law". In *Neville v Wilkinson* (1782) Lord Chancellor Thurlow referred to this statement and "declared his opinion, that, in all cases where money was paid for an unlawful purpose, the party, though *particeps criminis*, might recover at law; and that the reason was, that if courts of justice mean to prevent the

perpetration of crimes, it must be not by allowing a man who has got possession to remain in possession, but by putting the parties back to the state in which they were before". This was the basis on which relief was granted, at any rate by Mellish LJ and Bagallay LJ, in *Taylor v Bowers* (1876) 1 QBD 291 traditionally regarded as the leading case, and by Lord Atkinson delivering the advice of the Privy Council in *Petherpermal Chetty v Muniandi Servai* (1908) LR 35 Ind App 98, 103.

252.    In the course of the twentieth century, the law took a different and to my mind less satisfactory turn. The courts began to treat the right of restitution as depending on the moral quality of the plaintiff's decision to withdraw. They reasoned that if the object of allowing restitution was to encourage withdrawal from an illegal venture, it ought to be withheld if the claimant had withdrawn involuntarily, for example because the other party withdrew first or the venture became impossible or failed for some reason other than his genuine regret. Although there are earlier traces of this notion, it is first overtly expressed in *Parkinson v College of Ambulance* [1925] 2 KB 1, 16, where Lush J suggested that there was no *locus poenitentiae* if there was no penitence. It may be said to have reached its high point in the three decisions in *Alexander v Rayson* [1936] 1 KB 169, *Berg v Sadler & Moore* [1937] 2 KB 158 and *Bigos v Bousted* [1951] 1 All ER 92. The concept of penitential withdrawal leads to difficult distinctions and suggests an enquiry into a party's state of mind of a kind which the law rarely contemplates. It was rejected, rightly to my mind, by Millett LJ in *Tribe v Tribe* [1996] Ch 107, 135 "Justice is not a reward for merit", he said: "restitution should not be confined to the penitent." I agree. But for the same reason I would reject the suggestion that Millett LJ went on to make that the right to restitution should still depend on the voluntary character of the plaintiff's withdrawal. As with the notion of penitence, this is to put a moral gloss on a principle that depends simply on the right to restitution that in principle follows from the legal ineffectiveness of the contract under or in anticipation of which the money was paid.

253.    The courts' view about when the right of restitution ceases to be available has closely reflected the way in which they have analysed that right. At the outset, and throughout the 19th century, they held that the right of restitution ceased in contract cases once the contract had been executed at least in part. The reason for this was that they viewed the right of restitution as arising from a principle analogous to rescission for mistake or misrepresentation. They therefore applied to it the then current doctrine that an executed contract could not be rescinded at law except for fraud. In *Lowry v Bourdieu* (1780) 2 Doug 468, 471, Buller J observed that in this context there was a "sound distinction between contracts executed and executory; and if an action is brought to rescind a contract, you must do it while the contract continues executory". Lord Mansfield, who sat in that case, presumably agreed, for he had expressed the same view less expansively in *Browning v Morris* (1778) 2 Cowp 790. Later, when the courts came to regard the *locus poenitentiae* as depending on the moral quality of the plaintiff's reason for resiling, they reframed the proposition so as to suggest that the right of restitution ceased to be available

when the illegal purpose of the venture had been carried out. This might be the same as the point of time when the contract was executed. But it might be later, as in the numerous cases where a person nominally transferred his property to another with a view to defrauding his creditors. This test seems to me to be practically unworkable. Are we to distinguish between cases where the relevant representation was never made to the creditors and cases where it was but they did not believe it? More fundamentally, it proceeds from the same spurious moral gloss on the legal principle as the notion that the claimant's withdrawal must have been voluntary or penitent. The rule against rescinding executed contracts has now gone, and the limitation to cases in which the unlawful purpose has not been carried out never was sound. The rational rule, which I would hold to be the law, is that restitution is available for so long as mutual restitution of benefits remains possible. In most such cases, the same facts will give rise to a defence of change of position.

254.    I would also reject the dicta, beginning with *Tappenden v Randall* (1801) 2 B&P 467, 470 and *Kearley v Thomson* (1890) 24 QBD 742, 747, to the effect that there may be some crimes so heinous that the courts will decline to award restitution in any circumstances. There are difficulties about distinguishing between degrees of illegality on what must inevitably be a purely subjective basis. But the suggestion is in any event contrary to principle. If I pay £10,000 to a hitman to kill my enemy, he should not kill my enemy and should not have £10,000. The fact that when it comes to the point he is unwilling or unable to kill my enemy does not give him any legal or moral entitlement to keep the £10,000. If he does kill him, the rational response is the same. He should be convicted of murder, but he should never have received the money for such a purpose and by the same token should not be allowed to retain it. Of course, in practice, this is all rather artificial. In a case involving heinous crimes, both parties would be exposed to confiscation orders under the Proceeds of Crime Act 2002. St Thomas Aquinas thought the ideal solution to such a conundrum was that neither party should have the money, which should be paid to charity: *Summa Theologica* II.2, Q 62, para 5. The courts have no power to order that, but statute has now intervened to produce something like the same result.

255.    I say nothing about cases in which an order for restitution would be functionally indistinguishable from an order for enforcement, as in a case of an illegal loan or foreign exchange transaction. The traditional view is that if the law will not enforce an agreement it will not give the same financial relief under a different legal label: *Boissevain v Weil* [1950] AC 327. I am inclined to think that the principle is sound, but I should prefer not to express a concluded view on the point. It is not the position here.

*The rule-based approach and the "range of factors" approach*

256.    I can now return to the judicial schism to which I referred at the outset of this judgment.

257.    A convenient starting point is the Supreme Court of Canada's decision in *Hall v Hebert*, to which I have already referred. It is important to remember that the search for principle which led McLachlin J to identify consistency as the foundation of this area of law was a response to the judgment of Cory J in the same case. He had favoured a more flexible test for applying the illegality principle, which would have depended on whether the relevant public policy required that result on the facts of each case: see p 205. That approach was not accepted by the rest of the court. Part of McLachlin J's concern about it arose from

> "the absence of clear guidance as to when judges could exercise this draconian power and upon what grounds. I fear that unless placed upon a firm doctrinal foundation and made subject to clear limits, this general power to invalidate actions on grounds of public policy might prove more problematic than has the troubled doctrine of *ex turpi causa non oritur actio*. We would be trading one label for another without coming to grips with the fundamental problem." (p 169)

258.    In *Tinsley v Milligan* [1994] 1 AC 340, a similar view was taken by Lord Goff. I have cited extensively from this part of his speech in my judgment in *Les Laboratoires Servier v Apotex Inc* [2015] AC 430, para 16, and the exercise need not be repeated here. In summary, Lord Goff objected to a test for applying the illegality principle which would require the court to "weigh, or balance, the adverse consequences of respectively granting or refusing relief" (p 358E-F). The adoption of such a test, he considered, at p 363, "would constitute a revolution in this branch of the law, under which what is in effect a discretion would become vested in the court to deal with the matter by the process of a balancing operation, in place of a system of rules, ultimately derived from the principle of public policy enunciated by Lord Mansfield CJ in *Holman v Johnson*". On this point, Lord Goff was supported by the whole of the Appellate Committee.

259.    For many years, the chief critic of this approach was the Law Commission, which at one stage proposed legislation along the lines of the New Zealand Illegal Contracts Act 1970 to make the application of the illegality principle subject to a broad judicial discretion. More recently, Professor Burrows has proposed that the same solution should be adopted by judicial decision, in his *Restatement of the Law of Contract* (2016). He would make the application of the illegality principle

dependent, at any rate in contract cases, on a "range of factors" approach. This would require the judge to assess whether to deny a remedy would be an "appropriate response" to the claimant's conduct, taking account where relevant of eight factors. These factors are for the most part derived from the Law Commission's Consultative Report (paras 8.3, 8.11). They are: (a) how seriously illegal or contrary to public policy the conduct was; (b) whether the party seeking enforcement knew of, or intended, the conduct; (c) how central to the contract or its performance the conduct was; (d) how serious a sanction the denial of enforcement is for the party seeking enforcement; (e) whether denying enforcement will further the purpose of the rule which the conduct has infringed; (f) whether denying enforcement will act as a deterrent to conduct that is illegal or contrary to public policy; (g) whether denying enforcement will ensure that the party seeking enforcement does not profit by the conduct; (h) whether denying enforcement will avoid inconsistency in the law, thereby maintaining the integrity of the legal system. Lord Toulson, in his judgment on the present appeal, supports this approach while suggesting that yet further factors may also be relevant.

260.    With the arguable exception of (a) and (d) all of the considerations identified by Professor Burrows have been influential factors in the development of the rules of law comprised in the illegality principle as it stands today. Thus (b) is reflected in the requirement that, except where the making of the contract was itself illegal, there should have been some degree of participation by the claimant in the illegal act. It is also reflected in the exception for cases in which he was liable for the acts of another by virtue only of a rule imposing strict liability. As to (c), the purpose of the reliance test is to confine the illegality principle to cases in which the illegal act was truly central. Factor (e) is the basis of the exception discussed earlier in this judgment for cases in which the application of the illegality principle would be inconsistent with the legal rule which makes the act illegal, for example because its object is the protection of someone in the position of the claimant. It is also the basis on which claims are allowed for the restitution of money paid under an illegal contract. As to (f) and (g), there can be no doubt that historically the hope of deterring illegal conduct and depriving those responsible of any benefit arising from it have been important factors in the development of the illegality principle, although I personally doubt whether any but the best-advised litigants have enough knowledge of the law to be deterred by it. Factor (h), as I have suggested, is the most widely accepted rationale for the illegality principle in the modern law.

261.    The real issue, as it seems to me, is whether the "range of factors" identified by the Law Commission and Professor Burrows are to be regarded (i) as part of the policy rationale of a legal rule and the various exceptions to that rule, or (ii) as matters to be taken into account by a judge deciding in each case whether to apply the legal rule at all. As matters stand, the former approach represents the law. The latter would require the courts to "weigh, or balance, the adverse consequences of respectively granting or refusing relief" on a case by case basis, which was the very

proposition that the House of Lords unanimously rejected in *Tinsley v Milligan*. We are entitled to change the law, but if we do that we should do it openly, acknowledging what we are doing and assessing the consequences, including the indirect consequences, so far as we can foresee them. In my opinion, it would be wrong to transform the policy factors which have gone into the development of the current rules, into factors influencing an essentially discretionary decision about whether those rules should be applied. Neither party contended for such a result, and their reticence was in my view entirely justified. It would be unprincipled and uncertain, and far from confining the ambit of the illegality principle to its essential minimum, it could only broaden it beyond its proper limits. Perhaps most important of all, justice can be achieved without taking this revolutionary step.

262.    The reason why the application of the "range of factors" test on a case by case basis is unprincipled is that it loses sight of the reason why legal rights can ever be defeated on account of their illegal factual basis. It is I think right to make four points:

i)    Whatever rationale one adopts for the illegality principle, it is manifestly designed to vindicate the public interest as against the interests and legal rights of the parties. That is why the judge is required to take the point of his own motion even if the parties have not raised it, as the deputy judge did in this case. The operation of the principle cannot therefore depend on an evaluation of the equities as between the parties or the proportionality of its impact upon the claimant.

ii)    The "range of factors" test largely devalues the principle of consistency, by relegating it to the status of one of a number of evaluative factors, entitled to no more weight than the judge chooses to give it in the particular case. The criminal law, which is in almost every case the source of the relevant illegality, is a critical source of public policy. It is the prime example of the "positive law" (Lord Mansfield's phrase) which has always moulded the law of illegality in civil proceedings. The courts cannot consistently or coherently recognise legal consequences for an act which the law treats as punishable. Gloster LJ, for example, thought it relevant that there was no finding that Mr Patel knew that insider dealing was illegal. Yet that would have been of no relevance in a criminal court, and it is difficult to see why it should be any more relevant in a civil one. Professor Burrows' factor (f) (whether denying enforcement will ensure that the party seeking enforcement does not profit by the conduct) is surely fundamental to the principle of consistency, and not just a factor to be weighed up against others.

iii)    The main justification for the "range of factors" test has always been that it enables the court to avoid inflicting loss on the claimant

disproportionate to the measure of his badness. This was the instinct that led the Court of Appeal in *Euro-Diam Ltd v Bathurst* [1990] 1 QB 1 to propose that the illegality principle should be applied only where the alternative would be shocking to the public conscience. That concept was rejected in *Tinsley v Milligan*. Since then, it has been suggested that there may be cases at the opposite end of the spectrum of gravity, in which the offence was too trivial to engage the illegality principle: see *Gray v Thames Trains Ltd*, at para 83 (Lord Rodger). One would expect most if not all such offences to be covered by the exception for cases in which the application of the illegality principle would be inconsistent with the legal rule which makes the act illegal. But, extremes apart, it is difficult to reconcile with any kind of principle the notion that there may be degrees of illegality, as Professor Burrows' factor (a) seems to envisage. If the application of the illegality principle is to depend on the court's view of how illegal the illegality was or how much it matters, there would appear to be no principle whatever to guide the evaluation other than the judge's gut instinct. This was why this court recently rejected the view expressed by the Court of Appeal in *Les Laboratoires Servier v Apotex Inc* [2013] Bus LR 80 that an illegal act might nevertheless found a cause of action if it was not as wicked as all that.

iv)    The "range of factors" test discards any requirement for an analytical connection between the illegality and the claim, by making the nature of the connection simply one factor in a broader evaluation of individual cases and offering no guidance as to what sort of connection might be relevant. I have already observed that the reliance test is the narrowest test available. If it is no longer to be decisive, the possibility is opened up of an altogether wider ambit for the illegality principle, extending to cases where the relevant connection was remote or non-existent but other factors not necessarily involving any connection at all, were thought to be compelling.

263.    The reason why the adoption of a "range of factors" test on a case by case basis would be uncertain is obvious in the light of these considerations. An evaluative test dependent on the perceived relevance and relative weight to be accorded in each individual case to a large number of incommensurate factors leaves a great deal to a judge's visceral reaction to particular facts. Questions such as how illegal is illegality would admit of no predictable answer, even if the responses of different judges were entirely uniform. In fact, it is an inescapable truth that some judges are more censorious than others. Far from resolving the uncertainties created by recent differences of judicial opinion, the range of factors test would open a new era in this part of the law. A new body of jurisprudence would be gradually built up to identify which of a large range of factors should be regarded as relevant and what considerations should determine the weight that they should receive. No one factor would ever be decisive as a matter of law, only in some cases on their particular facts. The size of the authorities bundles in this and other recent appeals to this court

on the illegality principle is testimony to the volume of litigation which the principle has generated in every period of its history. I do not suppose that those who are about to enter into an illegal transaction are in the habit of studying the decisions of the courts on the point, but those who advise them after the event do, and the resultant uncertainty is likely to generate a great deal of wasteful and unnecessary litigation. I would readily accept that certainty is not the only value, or even necessarily the most important. But we are concerned in this case with the law of contract, an area in which the value of certainty is very great. It is one thing to say that a legal right may be overridden by a rule of law. It is another thing altogether to make a legal right, and particularly a contractual right, dependent on a judge's view about whether in all the circumstances it ought to be enforced.

264.    Finally, I would point out that the adoption of such a revolutionary change in hitherto accepted legal principle is unnecessary to achieve substantial justice in the great majority of cases. The unsatisfactory features of the illegality principle as it has traditionally been understood have often been overstated, in part because of the way in which they were emphasised by Lord Goff in *Tinsley v Milligan*. It was, he said, "not a principle of justice; it is a principle of policy, whose application is indiscriminate and so can lead to unfair consequences as between the parties to litigation" (p 355B-C). That observation, however, reflected his view that no equitable interest in property could ever be claimed where the legal title had been vested in another for dishonest purposes. The law had been stated in this way by Lord Eldon at the beginning of the 19th century: see *Muckleston v Brown* (1801) 6 Ves 52 and *Curtis v Perry* (1802) 6 Ves 739. But Lord Eldon's approach, although adopted by Lord Goff, was rejected by the majority of the Committee. When the law of illegality is looked at as a whole, it is apparent that although governed by rules of law, a considerable measure of flexibility is inherent in those rules. In particular, they are qualified by principled exceptions for (i) cases in which the parties to the illegal act are not on the same legal footing and (ii) cases in which an overriding statutory policy requires that the claimant should have a remedy notwithstanding his participation in the illegal act. Properly understood and applied, these exceptions substantially mitigate the arbitrary injustices which the illegality principle would otherwise produce. At the same time, the wider availability of restitutionary remedies which will result from the present decision will do much to mitigate the injustices which have hitherto resulted from the principle that the loss should lie where it falls.

265.    For these reasons, I regret that I cannot agree with the conclusion of Lord Toulson (para 109) that that the application of the illegality principle should depend on

> "the policy factors involved and … the nature and circumstances of the illegal conduct, in determining whether

> the public interest in preserving the integrity of the justice
> system should result in the denial of the relief claimed."

In my opinion, this is far too vague and potentially far too wide to serve as the basis on which a person may be denied his legal rights. It converts a legal principle into an exercise of judicial discretion, in the process exhibiting all the vices of "complexity, uncertainty, arbitrariness and lack of transparency" which Lord Toulson attributes to the present law. I would not deny that in the past the law of illegality has been a mess. The proper response of this court is not to leave the problem to case by case evaluation by the lower courts by reference to a potentially unlimited range of factors, but to address the problem by supplying a framework of principle which accommodates legitimate concerns about the present law. We would be doing no service to the coherent development of the law if we simply substituted a new mess for the old one.

*Application to the present case*

266.    Against that background it is in my view entirely clear that the transaction into which these parties entered was affected by the illegality principle. The agreement pleaded, and found by the deputy judge to have been made, was not simply that Mr Mirza would place bets on movements of RBS shares for the joint account of himself and Mr Patel, but that he would do so with the benefit of inside information. Subject to immaterial exceptions, section 52 of the Criminal Justice Act 1993 makes it an offence for a person in possession of inside information to deal or encourage another person to deal in "securities", including contracts for differences. This was accordingly an agreement for Mr Mirza to commit a criminal offence. It was also a criminal conspiracy to that end.

267.    Section 63(2) of the 1993 Act provides that: "No contract shall be void or unenforceable by reason only of section 52." The contracts affected by section 52 are contracts by way of dealing in securities. It follows that if Mr Mirza had placed the spread bets with IG Index, as he had conditionally promised to do, the contract would have been enforceable as between himself and IG Index. But Mr Patel could not have obtained specific performance of the distinct contract between himself and Mr Mirza or damages for breach of it. This is because, first, he would have had to rely on the contract, which provided as one of its terms that the dealing should be carried out with the benefit of inside information. Mr Patel could not have avoided this result by simply characterising it as an agreement to speculate in RBS shares without referring to the basis on which it was agreed that that should happen. Secondly, none of the possible exceptions apply. The parties were on the same legal footing. Both would be liable to conviction for conspiracy in a criminal court, and any difference in the degree of their fault would be relevant only to the sentence. Section 52 of the Criminal Justice Act 1993 is not a statute designed to protect the

interests of persons entering into an agreement to commit the offence of insider dealing, and there is no other overriding statutory policy which requires their participation in the offence to be overlooked when it comes to determining its civil consequences.

268.    However, restitution still being possible, none of this is a bar to Mr Patel's recovery of the £620,000 which he paid to Mr Mirza. The reason is simply that although Mr Patel would have to rely on the illegal character of the transaction in order to demonstrate that there was no legal basis for the payment, an order for restitution would not give effect to the illegal act or to any right derived from it. It would simply return the parties to the status quo ante where they should always have been. The only ground on which that could be objectionable is that the court should not sully itself by attending to illegal acts at all, and that has not for many years been regarded as a reputable foundation for the law of illegality. This was Gloster LJ's main reason for upholding Mr Patel's right to recover the money. Although my analysis differs in a number of respects from hers, I think that the distinction which she drew between a claim to give effect to a right derived from an illegal act, and a claim to unpick the transaction by an award of restitution, was sound.

269.    In the circumstances, Mr Mirza's only arguable defence was that he had paid the money to Mr Georgiou, the intermediary who had proposed the deal. But the judge declined to make a finding to this effect, and rejected a defence of change of position on the ground that even if it was true, Mr Mirza had had no reason to repay the money to anyone but Mr Patel from whom he had received it.

270.    The Court of Appeal gave judgment for Mr Patel for £620,000 with interest. For the reasons which I have given, which correspond to those given by Lord Mance and Lord Clarke, I would dismiss the appeal against that order.

TAB 42

*Pena v Coyne (No 1)* [2004] 2 BCLC 703, English High Court

a

# Pena v Coyne and another (No 1)

## [2004] EWHC 2684 (Ch)

b

CHANCERY DIVISION

ROBERT HILDYARD QC (SITTING AS A DEPUTY JUDGE OF THE HIGH COURT)

16, 17 MARCH, 14 JUNE 2004

c

*Transactions defrauding creditors – Transaction at an undervalue – Value of consideration – Purpose of transaction – Transfer of property to company controlled by director partly in return for release of loan account – Transferor company went into liquidation – Whether transfer transaction at an undervalue – Whether value of consideration provided by director to be*
d *taken as value of proof of debt rather than full value of loan account – Whether purpose of transaction to put assets beyond reach of claimant creditor – Insolvency Act 1986, s 423.*

The claimant, P, was one of three directors of Vintageset Ltd, a company incorporated in 1989. Vintageset acquired a property, with the assistance of
e a mortgage and of loans from the directors, for the purpose of carrying on a restaurant business. P managed the restaurant until 1994, when he fell out with another of the directors, U. Thereafter, P remained a director and shareholder but U and his wife ran the restaurant. From 1997, the restaurant business was only marginally solvent, but the property was valuable and U began to develop it by turning it in part, or in whole, into a
f dwelling. In 2000, P demanded repayment of loans made to Vintageset. In 2001, P obtained an order for a substantial interim payment and Vintageset went into liquidation. Later, P discovered that the property had been sold to the defendant company, Sunmoor, which was controlled by U and his wife, for £575,000, of which £164,000 was treated as satisfying off part of U's loan account with Vintageset. Vintageset was left with no substantial assets
g and was unable to pay any of its indebtedness to P. P issued proceedings to set aside the sale of the property, under s 423 of the Insolvency Act 1986, on the basis that the sale was a transaction at an undervalue and that the consideration received by Vintageset, consisting of the release of part of U's loan account, should be ignored since in that way U and Sunmoor received
h value considerably in excess of the value of U's claim in the prospective liquidation of Vintageset. After various failures on the part of Sunmoor to abide by orders of the court, Sunmoor was debarred from further defending the claim (the October order). P then applied for, and obtained, a declaration that the sale by Vintageset to Sunmoor was a transaction at an undervalue within s 423 of the 1986 Act (the December order). Sunmoor
i applied to set aside both orders. The claimant contended that the test to be applied on the application to set aside was that under CPR 39.3(5).

**Held** – (1) CPR 39.3(5) only applied where there had been a trial which the applicant had failed to attend and it was not the applicable rule in the

context because the hearing which culminated in the December order was *a*
not a trial of the action. The order sought by P was expressly based on and
justified by the default of Sunmoor in respect of the October order rather
than on the merits. Further the hearing of an application notice under
CPR Pt 23 was not a trial. Applying CPR 23.11 and 3.9 the issues were
whether the reasons given by Sunmoor for its various defaults justified relief
from sanctions and the setting aside of the December order and whether *b*
there was sufficient merit in Sunmoor's defence to warrant the matter
proceeding to trial.

(2) On the evidence, U and his wife, and thus Sunmoor, were disposed to
do as little as possible as late as possible in response to the orders of the
court and eventually did too little too late and had compounded that by
failing to offer a detailed personal explanation. Notwithstanding the court's *c*
concerns about their conduct and attitude, if there were real merit in
Sunmoor's case the court would be inclined (subject to suitable conditions)
to view even that as not disqualifying Sunmoor from relief.

(3) Although it was not possible on the evidence to fix the value of the
property in 2000 with any precision or certainty, it was very likely that the *d*
property could have been sold for more than £575,000, which was not
within the range of values indicated by the valuation evidence, the lowest
being £625,000. That difference was substantial. Further the value of the
consideration provided by Vintageset was enhanced by the fact that there
was conferred on U a significant benefit beyond the value of a claim for
£164,000 against Vintageset in its insolvent liquidation, with the corollary *e*
that the real value of the consideration provided by Sunmoor and U could
not properly be taken as £575,000 but a considerably lesser figure. Having
regard to the admitted insolvency of Vintageset at the time of the
transaction the consideration provided to Vintageset was the sum of
£411,000 odd and the amount that would have been paid out to U in
respect of a proof of debt in the sum of £164,000 odd. Or, looking at the *f*
other side of the transaction, the value provided by Vintageset was not only
the value of the property but also the value to U of receiving in effect
payment in full of the debt of £164,000 which was in fact otherwise plainly
not recoverable in full.

(4) Section 423 was concerned with actual value, not book value, and it
was a relevant consideration that P received no benefit from the reduction *g*
of U's loan account because Vintageset had no assets.

(5) Even if the purpose of the transaction when originally conceived was
to allow the restaurant business to continue and to permit development of
the property, the purpose of implementing the transaction immediately prior
to the by then inevitable insolvent liquidation of Vintageset was caught by *h*
s 423(3). Even if it was contended that U's motivation was his own
advantage rather than to put the property or its value beyond the reach of
P the first could not be achieved without the second. Putting the property
beyond the reach of P was a substantial purpose of the transaction.

(6) The December order should not be set aside at least in so far as it
declared that the sale of the property was a transaction at an undervalue *i*
within s 423. The form of relief would be considered at a further hearing.

a **Cases referred to in judgment**
*Agricultural Mortgage Corp plc v Woodward* [1995] 1 BCLC 1, CA.
*Chapple v Williams & Emett* [1999] CPLR 731, CA.
*Chohan v Saggar* [1994] 1 BCLC 706, CA.
*IRC v Hashmi* [2002] EWCA Civ 981, [2002] 2 BCLC 489.
*Jyske Bank* (*Gibraltar*) *Ltd v Spjeldnaes* [1998] TLR 604.
b *MC Bacon Ltd, Re* [1990] BCLC 324.
*National Bank of Kuwait v Menzies* [1994] 2 BCLC 306.
*TSB Bank plc v Katz* [1997] BPIR 147.
*Walker v WA Personnel Ltd* [2002] BPIR 621.
*Woodhouse v Consignia plc* [2002] EWCA Civ 275, [2002] 2 All ER 737,
c [2002] 1 WLR 2558.


**Application**
The second defendant, Sunmoor Ltd, applied to set aside two court orders
made in its absence: an order of Peter Smith J dated 8 October 2003 by
which Sunmoor was debarred from further defending the claim and an
d order of HH Judge Weeks QC of 8 December 2003 declaring that the sale
by Vintageset Ltd to Sunmoor Ltd of a property in London on or about
27 July 2000 constituted a transaction at an under value within the
meaning of s 423 of the Insolvency Act 1986.


e *Simon Williams* (instructed by *Pittalis & Co*) for the claimant.
*Sara Williams* (instructed by *Brindley Twist & James*) for the first
   defendant.
*William Henderson* (instructed by *Hamlins*) for the second defendant.


*Cur adv vult*
f

14 June 2004. The following judgment was delivered.


**ROBERT HILDYARD QC.**


g INTRODUCTION
   [**1**] By this application the second defendant, a limited company called
Sunmoor Ltd (Sunmoor), seeks to set aside certain orders of the court made
in its absence.
   [**2**] These include, in particular, an order made on 8 December 2003, the
effect of which is both to determine these proceedings against it, and to do
h so in manner which (so it is submitted on behalf of Sunmoor) is unjust both
to itself and potentially to other persons interested.
   [**3**] In these proceedings the claimant has sought to set aside a sale of
property at 8/9 Blacklands Terrace, Chelsea, London SW3 (the property) by
a company called Vintageset Ltd (Vintageset) to Sunmoor. Vintageset is now
in creditors' voluntary liquidation, and the first defendant is its liquidator.
i  [**4**] The basis of the claim is that such sale was a transaction at an
undervalue for the purposes of s 423 of the Insolvency Act 1986 and
reviewable accordingly at the instance of a 'victim' of such transaction.
   [**5**] The claimant contends that he is such a 'victim'. This is on the basis
that Vintageset, having sold the property for significantly less than its true

*a*

value, has been left with no assets after paying off its secured creditors and cannot pay sums it owes him. These sums include a debt of £249,520 plus assessed costs which the court by order dated 3 July 2001 had ordered to be paid by way of interim payment on account of a claim for in excess of £490,000. Vintageset went into creditors' voluntary winding up very shortly after that order.

*b*

[6] The first defendant considered the transaction to be at an undervalue. However, he apparently lacked the funds to pursue any claim. Further, it appears that Vintageset had no other unsecured creditors by the time of its winding up apart from the claimant and Mr Ulloa: Mr Ulloa's evidence is that they were all paid off. In such circumstances, the claimant was the only person both interested and able to bring proceedings; and he was given the requisite permission of the court to do so by an order made by Lindsay J on 30 June 2003.

*c*

[7] After failures on the part of Sunmoor to abide by orders of the court, and in particular having defaulted in complying with an order of Peter Smith J dated 8 October 2003 (the October order), Sunmoor was (pursuant to the terms of the October order) debarred from further defending the claim. As I shall explain in more detail later, Sunmoor was not represented or present at the hearing which culminated in the October order.

*d*

[8] The October order also gave the claimant permission, in the event of such default on the part of Sunmoor, to seek such relief as might be appropriate. Further to that, on 24 November 2003 the claimant issued an application notice for a declaration that the sale of the property from Vintageset to Sunmoor 'constituted an undervalue and that the property be sold with all consequential directions required'. The ground stated for the application, and for the order sought, was that Sunmoor had failed to comply with the October order. It is not disputed that this application notice was validly served.

*e*

[9] The application was heard on 8 December 2003 by HH Judge Weeks QC. Apart from an intervention on the part of counsel on its behalf without proper (or perhaps any) instructions, Sunmoor again was neither represented nor appeared at that hearing. After short submissions on behalf of the claimant and the first defendant in support of the order sought, HH Judge Weeks made an order (the December order), which was in material ways different from the order sought, particularly so as to afford better protection to third parties, as follows:

*f*

*g*

'1. There be a declaration that the sale by Vintageset Limited to the Second Defendant of the property known as 819 Blacklands Terrace, London, SW3 2SP registered at HM Land Registry under title numbers NGL55818 and NGL 378370 ("the Property") on or about the 27th July 2000 constituted a transaction at an under value within the meaning of section 423 of the Insolvency Act 1986;

*h*

2. There be a declaration that the said transaction was entered into for the purpose either of putting the Property beyond the reach of the Claimant or of otherwise prejudicing his interests in relation to his claim for repayment of loans made to Vintageset Limited;

*i*

3. The Property be vested in the First Defendant as the liquidator of Vintageset Limited;

a   4. The Property be sold by public auction or by private treaty, the
    First Defendant using his best endeavours to obtain vacant possession
    for the purposes of such sale;
        5. The First Defendant does appoint solicitors and agents approved
    by the Claimant for the purposes of such sale;
        6. The costs of the sale, any monies secured on the Property and the
b   sum of £11,145.03 ordered to be paid to the Claimant by order dated
    the 8th October 2003 be paid by the First Defendant from the net
    proceeds of sale;
        7. The balance be held by the First Defendant for the purposes of the
    liquidation of Vintageset Limited, but there shall be no distribution to
    the creditors by the First Defendant, save as authorised by paragraphs 6
c   and 8 of this order, without the consent of the Claimant or the approval
    of the court;
        8. The costs of the action of the Claimant and the First Defendant be
    assessed if not agreed on the indemnity basis and be paid to the
    Claimant or retained by the First Defendant as part of the costs of the
d   said liquidation.'

    [10] Sunmoor's applications to set aside and/or stay both the October
order and the December order and for permission to serve an amended
defence were first issued on 18 December 2003. They are resisted by the
claimant and by the first defendant, the liquidator of Vintageset.
    [11] It is not suggested that the applications were not made with sufficient
e  alacrity; nor in the circumstances could it be. Sunmoor's solicitors have
acted with commendable speed. They were first instructed on 11 December
2003. Having been supplied with a draft of the December order on
16 December 2003, Sunmoor's application on 18 December was supported
by a detailed witness statement by Ms Amanda Pullinger (Ms Pullinger) on
f  its behalf.
    [12] Ms Pullinger's first witness statement sought to explain the
difficulties that had befallen Sunmoor and Mr and Mrs Ulloa. In particular,
it described how they had relied on a person (Mr Ferguson) who
represented that he was a solicitor and that he could and would act for
them, when in fact he was not, did next to nothing on their behalf, and is
g  now (so I understand) being investigated by the police.
    [13] Sunmoor's contention, in brief summary, is that its failure to comply
with the October order and its predicament thereafter is the consequence of
fraud on the part of Mr Ferguson and it should not be deprived of
defending itself by reason of having fallen prey to him. It is submitted on its
behalf that this is not the proper occasion to weigh the merits of its defence;
h  but that it has at the least an arguable case which cannot fairly be
concluded on paper and without a proper trial.
    [14] Against that (again in brief summary) both the claimant and the first
defendant contend that Sunmoor and Mr and Mrs Ulloa in reality have only
themselves to blame and have demonstrated no good or sufficient reason
either for Sunmoor's failure to comply with the October Order, nor for its
i  failure to attend or be represented at the hearing before HH Judge
Weeks QC in December 2003. Furthermore, as to the merits, they contend
that Sunmoor cannot show that it has reasonable prospects of success such
as to warrant re-opening this matter.
    [15] Both the definition of the issues for decision at this stage, and the

question as to what test I should apply in respect of these applications,   *a*
have, somewhat unusually perhaps, been complicated by the fact that there
is a disagreement between the parties as to whether the hearing which
culminated in the December order was the trial of the action.

*b*

THE TEST TO BE ADOPTED AND THE ISSUES

[16] Counsel for the claimant and the first defendant submit that it was,
and that therefore the test that I should apply is that prescribed by
CPR 39.3(5). Sunmoor, on the other hand, submits that it was not, and that
the relevant test is to be found either in CPR 3.9, alternatively CPR 12, or   *c*
(as a further alternative) in CPR 23.11.

[17] Put shortly, the rules relied on by counsel for Sunmoor focus
primarily on whether there was some reason for default and what prejudice
would result from granting relief. Subject to addressing the particular
considerations specified in the rules, a relatively broad discretion is in that
context given to the court. In exercising its discretion, the merits of the   *d*
applicant's substantive case are not irrelevant; but the emphasis is on a
balance of prejudice.

[18] By contrast, the rule relied on by counsel for the claimant and the
first defendant, CPR 39.3(5), provides that the court may grant an
application under that rule only if the applicant can show, not only that it
acted promptly and had some good reason for not attending, but also that   *e*
it had 'a reasonable prospect of success at the trial'. That puts the merits of
the case more to the fore, though the hurdle is not a high one. The rule is in
mandatory terms.

[19] As to this procedural dispute, I have reached the firm conclusion that
CPR 39.3(5) is not the applicable rule in the present context. That rule only
applies where there has been a trial which the applicant failed to attend.   *f*
The premise of the submissions on behalf of the claimant and the first
defendant in this regard was that the hearing before HH Judge Weeks QC
was a trial for these purposes. I do not accept that premise.

[20] First, in the present case, the order sought by the application notice
was expressly stated to be based on and justified by the default of the
second defendant in respect of the October order, rather than on the merits.   *g*
The hearing was not in the Trial List. The hearing had none of the
characteristics of a trial. No reasoned judgment was given as if there had
been a trial.

[21] Secondly, application notices are governed by CPR Pt 23. The
hearing of an application notice is just that, and not a trial. Furthermore,   *h*
CPR 23.11 specifically addresses the question as to what is to happen if a
party fails to attend the hearing of an application. The court may either
re-list the application, or (further to the clarification in CPR PD 23.12.2) it
may set aside, vary, discharge or suspend it (or indeed exercise any of its
other powers with regard to it). Neither CPR 23.11 nor CPR PD 23.12.2
specifies any special restriction on the exercise of such power, though of   *i*
course it must be exercised judicially.

[22] An analogy may be where the court has made an order which
includes a term that the statement of case of a party shall be struck out if
the party does not comply with the order. This was substantially the effect

*a*  of the October order. In such a case, express provision is made for 'Judgment without trial'.

[**23**] For these reasons I reject the submission made on behalf of the claimant and the first defendant (together 'the respondents') that the applicable rule is CPR 39.2.

*b*  [**24**] However, any resulting difference may not be great: because it seems to me that in exercising the court's powers for the purposes of CPR 23.11, I should consider all the circumstances, including especially the matters adumbrated in CPR 3.9. That is for three main reasons. First, Sunmoor is also seeking relief from the October order. Secondly, it seems to me that it is appropriate to read CPR 23.11 as subject to CPR 3.9 where the application includes such relief. Thirdly, the circumstances adumbrated comprise a

*c*  guide, even if not rules, as to the proper way to approach the exercise of the court's powers in such a context as this.

[**25**] Further, it seems to me that I should, in considering all the circumstances, also assess whether the defence sought to be raised has a sufficient prospect of success to warrant a trial. Although such an

*d*  assessment is not expressly mandated by CPR 3.9, it is obviously permissible, and as it seems to me it is appropriate: there would be no purpose in requiring the claim to go to trial if there is plainly and obviously no defence to it: and see per Lord Woolf MR in *Chapple v Williams & Emett* [1999] CPLR 731.

[**26**] It follows that, in my view, the issues which arise for resolution for

*e*  the purposes of the present application are:

(1) whether the reasons given by Sunmoor for its various defaults in all the circumstances (including those adumbrated in CPR 3.9) justify (a) Sunmoor being relieved from the sanctions imposed by the October order and (b) the discharge of the December order; and

(2) whether there is or may be sufficient merit in Sunmoor's defence to

*f*  warrant the matter proceeding to trial.

[**27**] Before addressing those issues in turn it is necessary to set out briefly the relevant background and procedural history.

BACKGROUND FACTS

*g*  [**28**] Vintageset was incorporated on 19 December 1989. Its original directors were the claimant, Mr Ulloa and a third 'partner' (to use Mr Ulloa's description in his first affidavit), namely Mr Jesus Farinas (Mr Farinas).

[**29**] Vintageset acquired the property and the restaurant business carried on there in October 1990, apparently with the benefit of a substantial

*h*  mortgage from Caledonian Bank plc (Caledonian Bank) and further loans from the 'partners'. There is some suggestion that the claimant funded Mr Farinas's share; but this is disputed. Vintageset opened and carried on a restaurant business at the property from 1991 onwards until mid 2000.

[**30**] The claimant was manager of the restaurant business until March 1994, when, after a disagreement with Mr Ulloa, he ceased to be actively

*i*  involved. Although it seems he remained a director and shareholder, the claimant had (according to his own evidence) little or no involvement in its affairs between 1994 and 2000. Between 1994 and the sale of the property and restaurant business to Sunmoor in July 2000, Mr Ulloa ran Vintageset's restaurant business with the help of his wife. Mr Ulloa blames the claimant

as being the author of the restaurant's financial difficulties; the claimant    *a*
counters that it is the fault of Mr Ulloa. Except in explaining their
animosity now, the details of this dispute between them are not relevant.

[**31**] The third of the original 'partners' (as Mr Ulloa describes the original
directors and shareholders in his first affidavit), Mr Farinas appears to have
left in 1993. It appears from a judgment given in proceedings in the Queen's
Bench to which I refer in para 44 below that Mr Farinas and Mr Ulloa also    *b*
fell out; but no details have been given, and, again, neither that dispute nor
the position of Mr Farinas appear to be relevant to the matters now in
issue.

[**32**] As implied above, it seems that Vintageset's restaurant business did
not prosper, and that from 1994 onwards it was teetering near or on the
brink of insolvency. It remained afloat only with the assistance of funding    *c*
from Caledonian Bank and the loans made by the original partners. At least
from 1997 onwards it appears that its solvency was at best marginal and
dependent upon none of those loans being called in.

[**33**] However, the property (which was mortgaged to Caledonian Bank)
remained valuable, and it appears that from late 1998 onwards Mr Ulloa    *d*
and Vintageset turned their attentions to maximising that value by turning
it in part or whole into a dwelling (partly for themselves and partly for
rental income) and refurbishing it.

[**34**] On 4 December 1998, planning permission was granted for the
erection of an additional storey for residential use. In May 1999 permission
was given for a change of use from a restaurant to a single family dwelling;    *e*
and in February 2000 planning permission was given for the use of part of
the first floor (which I understand was the restaurant kitchen) as a
self-contained flat.

[**35**] It is also apparent that at the end of November 1999 Mr and
Mrs Ulloa were seeking to raise funds to purchase the property, either in
their own names or through a company (in fact, Sunmoor). In evidence are    *f*
two offer letters from the Bank of East Asia Ltd, one dated 29 November
1999 offering a loan facility of £450,000 secured on the property and a
policy on the life of Mr and Mrs Ulloa in a sum of not less than £30,000 to
'Sunmoor T/A El Blason Restaurant', and the other dated 30 November
1999 offering a loan facility of £450,000 on substantially the same terms to
Mr and Mrs Ulloa personally 'to assist with the purchase of [the property],    *g*
which is for letting'.

[**36**] It does not appear that either was accepted, because there is also in
evidence a further offer letter from the same bank (the Bank of East
Asia Ltd) dated 17 April 2000 again offering a facility to Sunmoor of
£450,000 on the same security as before. The purpose of the facility was    *h*
now expressed to be 'to assist with the purchase of [the property] at a total
consideration of £575,000 which is in self-occupation'. There is a resolution
of Sunmoor's directors dated 11 May 2000 approving and recording
acceptance of that offer, and the offer letter itself appears to have been
signed as accepted. The copy legal charge in the evidence is, however, dated
13 March 2001: this is not explained.    *i*

[**37**] The terms of the offer letter from the Bank of East Asia included a
requirement for the borrower (Sunmoor) to 'top-up' the security if the
lending bank should at any time consider the loan to exceed 70% of the
open market value of the borrower's interest in the property. This suggests

a  that the facility of £450,000 was at the time that it was made available considered to be no more than 70% of the value of the property. This would put a value on the property then of in excess of £650,000.

[38] In this regard, before making these offers it is apparent that the Bank of East Asia Ltd commissioned a firm of surveyors and valuers, namely Taylors Business Surveyors and Valuers Ltd (Taylors) to value the property
b  and the restaurant business for secured lending purposes.

[39] Taylors' valuation is dated 22 June 1999, and ascribed values at that date as follows:

(1) Estimated realisation price (assuming 12 months sale period, planning consents in place, and verified trading details): £750,000
c  (2) Estimated restricted realisation price (assuming only 180 day sale period, planning consents in place, but no verified trading accounts): £650,000

(3) Estimated realisation price (as in (1) but also assuming development of second floor flat in line with planning permission): £900,000

(4) Estimated realisation price (as in (2) but assuming development of
d  second floor flat in line with planning permission): £800,000

Taylors explained that they considered there to be little value in the existing business on top of the substantial property value, bearing in mind the consent available to convert to a residential dwelling.

[40] Pausing there, it may be noted that all this was being done prior to any re-emergence of the claimant. He does not appear to have been in
e  contact with Mr and Mrs Ulloa or Vintageset at all between 1994 and mid-2000. There is nothing to suggest that the claimant made any inquiry as to the state of Vintageset's financial position in all that time. Indeed, it seems (again according to his own evidence) that it was only when (in June 2000) he became aware of building works at the property that he thought to make such inquiries, and especially as to the value of the property.
f  [41] The claimant's evidence in this regard is that his solicitors first wrote to Mr and Mrs Ulloa on 14 June 2000. This was followed up with further correspondence (including replies from Mr Ulloa in good English, expressing 'tremendous surprise' about the claimant's sudden interest in Vintageset). The exchange culminated in a formal demand (by letter dated 29 November 2000 from the claimant's solicitors to Vintageset) for
g  repayment of his loans to Vintageset which (according to his evidence) exceeded £490,000.

[42] It appears that in the meantime the claimant's solicitors were making their own enquiries as to the value of the property; and there is an informal valuation prepared at their instance by a firm of chartered surveyors called
h  Meredith & Co suggesting an asking price of £850,000 and a value of 'circa £750,000' as a restaurant premises (without change of use).

[43] The claimant's demand for repayment was not met; and the claimant issued proceedings in the Queen's Bench Division under action number HQ 0100729. On the claimant's application for summary judgment or alternatively for an interim payment on account, Deputy Master Fontaine in
i  an order made on 15 June (dated 3 July 2001) declined the former (summary judgment) but did order Vintageset to pay £249,520 on account by 31 August 2001, together with summarily assessed costs of £4,751.18 (to be paid by 29 June 2001).

[44] Deputy Master Fontaine gave a reasoned judgment. Although the

quantification of the claimant's debt is not a matter before me, certain *a*
aspects of that judgment may be of relevance in the present context.

[45] First, it seems plain from its terms that the deputy master was given
no inkling that the property had by that time already been sold to Sunmoor;
on the contrary, it is clear that he was under the impression that Vintageset
owned the property and would be in a position to raise money on that
security whereby to pay off amounts due. Secondly, the deputy master felt *b*
unable to accept the evidence of Vintageset's accountant, Mr Simon Poon
(Mr Poon); as I shall explain later, Mr Poon also has a central role in
respect of the matters in issue in these proceedings, and has made a witness
statement in support of Sunmoor. The deputy master described his evidence
in the proceedings before him as 'unconvincing and unsatisfactory and
unsupported by any independent evidence, although he must have access to *c*
the Company's financial records'. Thirdly, the deputy master also expressed
considerable reservations about Mr Ulloa's conduct in the proceedings,
noting the lack of particularity in his evidence and stating that he would
have expected him 'to be considerably more co-operative towards the court
in relation to the Defendant's duties of disclosure'. Fourthly, the deputy *d*
master made clear that it was this very lack of evidence which caused him
to conclude that the matter should not be dealt with summarily, but proceed
to trial subject to a substantial payment on account.

[46] I shall return to the deputy master's observations later, since they
have echoes in the conduct of Mr Ulloa in the present proceedings. In the
meantime I return to the background sequence of events. *e*

[47] The response of Mr Ulloa to the deputy master's order was to give
notice pursuant to s 98 of the Insolvency Act 1986 of a resolution to place
Vintageset into creditors' voluntary winding up. Such a resolution was
passed on 11 July 2001, and the first defendant, Mr Martin Coyne, a
licensed insolvency practitioner, was appointed Vintageset's liquidator
accordingly (the liquidator). *f*

[48] It was at about this time, it seems, that the claimant was made aware
(by letter to the claimant's solicitors from the liquidator dated 5 July 2001
and thus shortly before his appointment) that the property had been sold. In
that letter the liquidator advised the claimant that he had been approached
in June 2001 concerning the financial position of Vintageset, and had been
told then both of the litigation between that company and the claimant and
also 'that the freehold property held by the company had been sold to a *g*
business connected to Mr Ulloa some time ago at market value, and the net
proceeds have been utilised to discharge creditors of Vintageset Limited'.

[49] The sale of the property to Sunmoor had in fact taken place on
27 July 2000. The price was £575,000. A further curiosity in the matter is *h*
that the transfer of the property to Sunmoor was not registered until
20 April 2001. This is not explained.

[50] Mr Poon (who was Vintageset's accountant from about 2 January
1997 until its liquidation, and has been Sunmoor's accountant since 2000)
has given evidence that it was he who determined that price (of £575,000).

[51] Mr Poon states that his method was to take the figure of £650,000 in *i*
Taylors' report and discount that by 20% based on his 'experience of
dealings with forced sales and liquidators' sales of restaurant and licensed
premises' and the possibility that Vintageset might have to cease to trade
before even the restricted sale period of 180 days had expired. He then

*a* 'reassessed the price upwards so as to get a figure 80% of which was £450,000' which was the sum that the Bank of East Asia was prepared to lend, resulting in a figure of £562,500, which he rounded up to £575,000. He states that he 'considered that this represented at least as much as the Company or its liquidator would have obtained on a forced sale of the Property and business in the open market'. Mr Poon is a chartered

*b* accountant, not a valuer, but he states that he does have liquidation experience. He states that both Mr Ulloa (for Vintageset) and Mrs Ulloa (for Sunmoor) accepted his advice.

[52] Mr Poon has also given evidence as to the rationale of the sale. His evidence (in para 13 of his first witness statement, dated 26 January 2004) is as follows:

*c*

> 'It was apparent from … correspondence that [the claimant] had ceased to be content leave outstanding the question of the loans made to him by the Company [Vintageset]. I was aware that there was a dispute between Mr Pena and Mr Ulloa as to what the Company owed Mr Pena, but it appeared that it owed him some £97,000 on any
> *d* footing … Having regard to the other debts of the Company and to the difficulty or impossibility of the Company raising finance from other sources I concluded that if Mr Pena required the repayment of his loan account there was no reasonable prospect of the Company not going into insolvent liquidation. Accordingly I advised Mr Ulloa that if he continued to run the business through the Company he was at risk of
> *e* an order being made under s.214 Insolvency Act 1986 that he be personally liable for its debts. The situation made it more important that the proposed sale to Sunmoor Ltd should take place as soon as possible, but did not alter the primary reason for that sale, that is to say to enable the restaurant business to be carried on and the Property to be
> *f* developed by the building of the flat.'

This evidence seems to be adopted by Sunmoor and Mr and Mrs Ulloa.

[53] It appears, again from Mr Poon's evidence, that the purchase price was satisfied (or treated as satisfied) by the application of £411,215 of the moneys borrowed from the Bank of East Asia (£450,000) for the

*g* redemption of the Caledonian Bank's charge on the property, and the writing off of some £164,000 from Mr Ulloa's loan account with Vintageset.

[54] After expenses and miscellaneous charges, there remained to Sunmoor only some £6,400 of the moneys borrowed from the Bank of East Asia. It would appear that in those circumstances, in order to extend and

*h* refurbish the second floor of the property for use as a dwelling, Mr and Mrs Ulloa procured Sunmoor to grant them a 99-year lease of the second floor, which leasehold interest they then charged to the Bank of Scotland by way of legal charge dated 26 September 2000 as security for a loan to them (the principal amount of which is not evident but in respect of which the amount outstanding is stated by Mr Ulloa to have been about £270,000 in

*i* June 2003).

[55] As for Sunmoor, it has only two de jure directors, namely Mr Ulloa's wife, Maria Dolores Martinez (Mrs Ulloa) and Mr Roy Lipman. It is contended by the claimant, however, that Mr Ulloa is a shadow director. The only issued share is held in the name of Mrs Ulloa. I do not take it to

be seriously disputed that Sunmoor is the creature of Mr and/or Mrs Ulloa.  *a*

[56] There continues to be a restaurant at the property. The restaurant itself is, according to Mr Ulloa's second witness statement, now managed by a company called DT 100 Ltd pursuant to a written agreement dated 1 December 2002. It is unclear what Mr and Mrs Ulloa's connection with that company, or otherwise with the restaurant, now is; but I note that in his first witness statement, dated 6 June 2003, Mr Ulloa stated that he was  *b* the manager of the restaurant, that it is his business and how he makes his living, and that his wife works there full time as well when not required to look after her parents. This apparent inconsistency is not explained.

[57] The result of all of this, put summarily, is that both the restaurant business and the property (which is in a fashionable part of Chelsea) are now owned by Sunmoor, which is owned by Mr and/or Mrs Ulloa. For this  *c* they have had to pay £411,000 odd, and write off £164,000 of Vintageset's indebtedness to Mr Ulloa (though they have also paid for substantial refurbishment of the property). Vintageset on the other hand, has been left with no, or no substantial, assets, and unable to pay any substantial part of its indebtedness to the claimant.  *d*

[58] That the claimant has sought to challenge this result may not be thought to be altogether surprising. Of course, whether the challenge founds a valid claim in law may be a different matter.

PROCEDURAL HISTORY

[59] The procedural history of the claim prior to the December order may  *e* be summarised as follows.

[60] The proceedings were commenced (with the permission of the court as above described) by claim form issued on 3 June 2003. The claim is brought under CPR Pt 7.

[61] On the same date, the claimant sought a freezing injunction against  *f* Sunmoor. This was heard and granted by Laddie J, who ordered ('the freezing order') that (until the return date of 9 June 2003) Sunmoor should not in any way dispose of or deal with or diminish the value of the property.

[62] Sunmoor was further ordered ('the disclosure order') to provide to the claimant's solicitors (unless it would thereby incriminate itself) within 48 hours of service of the freezing order (a) details of all of its assets in  *g* England and Wales and (b) full details of all dealings or attempted dealings with the property (with, if it had been disposed of, the date of that disposal). All such details were also ordered to be verified on affidavit within three working days of such service.

[63] Presumably with the assistance of Sunmoor's then solicitors (Lawson-Cruttenden & Co of 10/11 Gray's Inn Square, London) an  *h* affidavit was prepared for Mr Ulloa ('Mr Ulloa's first affidavit'), which appears to have been sworn on 6 June 2003, in purported compliance with the disclosure order. That affidavit stated the property to be Sunmoor's only asset and provided copy accounts for Sunmoor for the year ended 30 November 2002. Mr Ulloa explained that the property had been sold to  *i* Sunmoor in July 2000 on the basis of 'the independent valuation obtained by the Bank of East Asia', and confirmed that Sunmoor had no intention of disposing of the property.

[64] The claimant was not satisfied with this affidavit (which Mr Ulloa has subsequently explained was prepared in a hurry), in particular because

*a* it contained no documentation relating to the mortgage with the Bank of East Asia. On the return date (9 June 2003) before Peter Smith J, Mrs Ulloa undertook on behalf of Sunmoor (as its director) not to deal with or dispose of the property until trial or further order and to provide to the claimant's solicitors its consent to a caution within 24 hours. Mrs Ulloa also undertook to comply in full with paras 6 and 7 of the disclosure order by

*b* 4pm on 16 June 2003. The application was then stood over to the first open date after 30 June 2003.

[65] On 16 June 2003 Mr Ulloa made and served a further affidavit (Mr Ulloa's second affidavit) giving details of the layout of the property after its refurbishment, and disclosing that the first floor flat was occupied by Mr and Mrs Ulloa as licensees, and that they had together been granted

*c* by Sunmoor a 99-year lease of the second floor flat (the second floor lease). Mr Ulloa explained that the consideration for the second floor lease had been his and his wife's expenditure on the renovation of the property (in the sum of approximately £270,000), which he stated had been funded by a loan from the Bank of Scotland secured by a mortgage.

*d* [66] Mr Ulloa's second affidavit did not satisfy the claimant either. By letter dated 18 June 2003 his solicitors requested further information and documents in the form of 12 questions (the 12 questions). The 12 questions sought to elicit more detailed information and documentation as to the sale of the property to Sunmoor; documentation as to any mortgage or charge on the property; the redemption statement with respect to Caledonian

*e* Bank's charge on the property whilst owned by Vintageset; and details as to the occupation of the property and the management of the restaurant. The claimant's solicitors asked for a full reply by 20 June 2003.

[67] Lawson-Cruttenden & Co did not reply to that letter. It appears from a witness statement made later (on 22 January 2004) by Mr Roy Lipman (who became a director of Sunmoor on 23 June 2003) that some time in

*f* July 2003 they ceased to act for Sunmoor. Mr Roy Lipman does not explain why, beyond citing conduct which he says 'I considered to be totally unprofessional, the details of which I need not go into at this time.' Mr Lipman recommended Mr and Mrs Ulloa to Mr Ferguson, who he had known previously and who he believed to be a solicitor in partnership with Mr Joseph Harrington (Mr Harrington) of a firm called Harringtons in

*g* Brighton.

[68] Neither Mr Ferguson nor anyone else from Harringtons responded to the 12 questions (or indeed to the letter of 18 June 2003 at all), despite a further letter from the claimant's solicitors dated 14 July 2003 expressing disappointment at the lack of any reply and threatening to restore the

*h* matter to court.

[69] On 14 July 2003 Sunmoor faxed to the court a half-page defence in Action No HC 03 C0247 denying any indebtedness to the claimant, asserting that 'he is indebted to us', and denying all the claims.

[70] Then by letter dated 14 July 2003 another firm of solicitors, called D Peake & Co of Milton Keynes informed the claimant's solicitors that they

*i* were to be instructed for Sunmoor, and had been in correspondence and telephone communication with Mr Lawson-Cruttenden with a view to taking over the matter subject to agreeing a 'viable fee retainer arrangement'. D Peake & Co explained that the defence referred to above had been prepared by Mr Lipman, that Mr Lawson-Cruttenden had

prepared a holding document that did little more than amplify Mr Lipman's *a*
effort, and that 'a more radical defence document' was required. D Peake
& Co asked the claimant's solicitors to forbear from any 'precipitous
procedural action whilst we sort ourselves out with our client'. They appear
to have sent a copy of their letter to Lawson-Cruttenden & Co.

[**71**] By letter dated 17 July 2003 the claimant's solicitors informed D *b*
Peake & Co that they had received no holding defence from
Mr Lawson-Cruttenden, and that though they had received Mr Lipman's
effort, they had no idea who he was (noting that he was not recorded as a
director of Sunmoor). They further informed D Peake & Co that they had
restored the matter to the court for hearing on 24 July 2003. This was
subsequently adjourned to 6 August 2003. *c*

[**72**] By letter dated 5 August 2003, D Peake & Co notified the claimant's
solicitors that Lawson-Cruttenden had come off the court record but that D
Peake & Co themselves had not yet agreed a fee retainer and could not act
for Sunmoor. D Peake & Co stated that they would inform the claimant's
solicitors of any change in this regard. Nothing more has been heard from
them. *d*

[**73**] In these circumstances, the claimant's solicitors fixed a hearing of the
matter for 8 October 2003, and wrote to Mr Ulloa personally to inform
him accordingly and to warn him that if the 12 questions were not
answered in full, they would inform the court that he was in breach of the
court's order. Neither Mr Ulloa nor his wife, nor Mr Lipman, nor anyone
else, made any response. *e*

[**74**] No one appeared on behalf of Sunmoor at the hearing before Peter
Smith J on 8 October 2003 either. The court ordered Sunmoor to answer
the 12 questions by 4pm on 22 October 2003, and to verify such answers in
an affidavit exhibiting all documents in respect of the information provided
(including all documents requested in the 18 June letter) by 4pm on
29 October 2003. The court further ordered that in default of compliance *f*
Sunmoor be debarred from defending the action and the claimant 'have
permission to seek such relief as appropriate'. Lastly, Sunmoor was ordered
to pay costs for the hearings of 3 and 9 June of £7,932.53 and for the
hearing on 8 October of £3,212.50.

[**75**] Even now there was no response from Sunmoor, or from Mr and
Mrs Ulloa or anyone else on their behalf. On 20 November 2003, the *g*
claimant issued the application notice to which I have referred above. The
only substantive response from Sunmoor consisted of two letters, both
apparently prepared by Mr Poon and dated 1 December 2003. The first
letter purported to require service at Sunmoor's registered office (at the
same address as Mr Poon's firm of chartered accountants, Farmiloes). The *h*
second of these letters informed the claimant's solicitors of the name of
Sunmoor's two directors and that Mr Lipman was ill in Brazil. It also (in
contrast with Mr Ulloa's first affidavit) stated that Sunmoor no longer
traded as a restaurant and described Sunmoor's business activity as property
management.

[**76**] I have already described the hearing thereafter before HH Judge *i*
Weeks QC on 8 December 2003 and the consequent December order, and
then the involvement of Hamlins for Sunmoor.

SUNMOOR'S REASONS

[77] Although counsel for Sunmoor suggested to me that the October order was a disproportionate response to the failure to answer the 12 questions, the main thrust of Sunmoor's application to vary or set aside the October order and the December order has been that it was disastrously misled and let down by persons whom it believed it could rely on.

*b* [78] With the short preface that I do not accept that in all the circumstances the October order was disproportionate, but rather seems to me the almost inevitable consequence of the disregard for the need both for full compliance with the disclosure order made to give teeth to the freezing order and a careful and detailed answer to the 12 questions, I turn to the reasons and excuses offered on the part of Sunmoor for this prima facie *c* unacceptable disregard of orders of the court over a period of some six months.

[79] As summarised in counsel for Sunmoor's skeleton argument, essentially Sunmoor's explanation and excuse is that its controllers believed that at all times from July 2003 to 10 December 2003 the matter was being *d* properly dealt with by Mr Ferguson and/or Harringtons, whereas in fact of course it was not, and Sunmoor was not being represented at all as a result of fraud on the part of Mr Ferguson, who has never been employed by Harringtons and was not a solicitor at all.

[80] This explanation has been expanded in witness statements made on behalf of Sunmoor by Ms Amanda Pullinger, a partner in Hamlins and by *e* Mr Lipman (as a director of Sunmoor). Neither Mr Ulloa nor Mrs Ulloa has addressed the issue; neither of them has made any witness statement in this regard; neither (so far as I am aware) attended court at the hearing before me.

[81] The events as depicted in this evidence are as disturbing as they are extraordinary. Regrettably, and largely in consequence of the lack of any *f* evidence from Mr and Mrs Ulloa and a lack of detail in the evidence of Mr Lipman, the depiction of events is also incomplete.

[82] Subject to that, the following further details emerge from the available evidence:

(1) Mr Lipman's recommendation of Mr Ferguson to Mr and Mrs Ulloa appears to have been based on his having been acquainted with *g* Mr Ferguson when the latter was working at another firm of solicitors in Brighton, and on a chance meeting with him in (I assume) about July.

(2) Harringtons are a firm of criminal defence solicitors. Its principal is Mr Joseph Harrington (Mr Harrington), a criminal practitioner with no experience of civil matters. According to Mr Harrington, Mr Ferguson did *h* qualify as a solicitor in Scotland; but never in England and Wales.

(3) Mr Harrington confirmed to Ms Pullinger that Mr Ferguson was never a partner or employee of his firm; but that he (Mr Ferguson) had undertaken some work for the firm as an 'agent', and had referred some criminal matters in use to the firm. Ms Pullinger has exhibited a business card apparently in use by Mr Ferguson which is headed 'Harringtons Solicitor' *i* and underneath that 'Criminal Defence Specialists' and gives the impression that 'AB Ferguson' (who I take to be Mr Ferguson) is a partner or employee of that firm.

(4) Mr Lipman states in his witness statement that he and Mr Ulloa met with Mr Ferguson and a barrister whom Mr Ferguson called 'Simeon Foyle'

at a wine bar opposite the law courts (the meeting there being at _a_
Mr Ferguson's request, in place of meeting at the chambers of 'Simeon
Foyle'). Mr Lipman states that it was apparent that Mr Ferguson and
'Simeon Foyle' knew each other well, and that 'Simeon Foyle' seemed to
have some knowledge of the case against Sunmoor.

(5) Ms Pullinger was provided by Mr Lipman with, and has exhibited, a
purported receipt signed by Mr Ferguson dated 20 July 2003 _b_
acknowledging receipt 'for Harringtons' of the sum of £2,000 'on account
of work conducted in the above matter'.

(6) Ms Pullinger also states that she was informed by Mr Ulloa that on
20 November 2003 Mr Ferguson urgently requested further payment to
enable him to instruct counsel for the hearing on 8 December 2003. A
receipt from Abbey National plc shows that Mr Ulloa paid £750 by direct _c_
payment into Mr Ferguson's account there on that day (20 November
2003). Mr Ulloa told Ms Pullinger that he paid a further sum of £5,000 to
Mr Ferguson on the next day. Mr Ulloa did apparently query why he was
being asked to pay Mr Ferguson directly; the latter told him it was because
he had personally disbursed such amounts to counsel. There is no evidence _d_
as to what became of the money.

(7) Ms Pullinger states that Mr Ulloa told her that he became very
concerned after receiving notice by fax on 26 November 2003 of the
hearing on 8 December 2003, and that he travelled to Brighton to meet
with Mr Ferguson as matter of urgency the next day. The meeting was in a
pub (at Mr Ferguson's request). Mr Ferguson apparently continued to _e_
reassure Mr Ulloa to the effect that everything was under control, that the
claimant's solicitors were simply trying to exert pressure, and that he would
be writing a letter (which he promised to circulate to Mr and Mrs Ulloa and
Mr Poon) to confirm the claimant's agreement that the hearing fixed for
8 December had been vacated.

(8) Ms Pullinger states that Mr and Mrs Ulloa (and Mr Lipman) became _f_
concerned once more when none of them received the copy correspondence
Mr Ferguson had promised to circulate. Mr Lipman apparently telephoned
Mr Harrington from Brazil on 1 December 2003, to discover that ('to my
horror') he denied that Mr Ferguson worked for him at all, though he
admitted that he had allowed Mr Ferguson to use a business card with the
firm's name on it. _g_

(9) Further telephone calls took place between Mr Lipman in Brazil and
Mr Harrington. According to Mr Lipman, Mr Harrington eventually
established that the barrister who had been involved at the instance of
Mr Ferguson was in fact Mr Simeon Thrower of 11 Old Square, Lincoln's
Inn (Mr Thrower). _h_

(10) Also according to Mr Lipman, Mr Harrington informed him that his
firm had never received any of the money paid to Mr Ferguson and had
never gone on the court record as Sunmoor's solicitors. Mr Harrington
initially agreed that his firm would now go on the record only for the
purposes of the hearing on 8 December, after which Sunmoor would have
to obtain alternative representation; but Ms Pullinger states in her witness _i_
statement that Mr Thrower explained to her that Mr Harrington
subsequently changed his mind.

(11) Any such change of mind was not, according to Mr Lipman, ever
communicated to him (and he was in Brazil at the time); his evidence is that

*a*  he believed that Sunmoor would be represented by Mr Thrower duly instructed by Harringtons on 8 December 2003.

(12) Similarly, Ms Pullinger states that she is informed by Mr Ulloa that Mr Harrington never informed them that his firm would not go on the record and, on the contrary, reassured them that Mr Thrower would be instructed to represent Sunmoor at the 8 December hearing.

*b*  (13) Ms Pullinger, who says that she has spoken personally to both Mr Harrington and Mr Thrower, states that Mr Thrower told her that originally Mr Harrington had agree that his firm would go on the record, and had instructed him to attend the hearing, but ultimately changed his mind on 4 December, having failed to establish any contact with Mr Ferguson.

*c*  (14) Mr Thrower did attend at the hearing on 8 December, but without instructions. Having allowed him a brief explanation (the content of which is not before me), HH Judge Weeks declined to hear further from him in such circumstances.

(15) Sunmoor was thus not represented at the hearing on 8 December. Mr Lipman was in Brazil. Despite the story of deceit that had emerged,
*d*  neither Mr Ulloa nor Mrs Ulloa saw fit to attend. There is no evidence from either Mr Ulloa or Mrs Ulloa themselves as to this strange pattern of events.

BALANCING THE CONSIDERATIONS

[83] The question next is whether this extraordinary and unsettling story
*e*  provides a proper basis for now allowing Sunmoor's application to vary or set aside the October and December orders. This requires me to consider in turn the matters adumbrated in CPR 3.9, as required by that rule, which the Court of Appeal has emphasised should be gone through sequentially and systematically: see *Woodhouse v Consignia plc* [2002] EWCA Civ 275,
*f*  [2002] 2 All ER 737, [2002] 1 WLR 2558).

[84] Any consideration of the interests of the administration of justice (as required by CPR 3.9(1)(a)) is likely to involve a balance between competing considerations. This is certainly so in the present case. On the one hand, both the disclosure order and the October order were plain in their terms, and yet ignored. It is in the interests of the administration of justice that the failure to abide by an order of the court should not easily be excused. On
*g*  the other hand, the evidence is that Mr and Mrs Ulloa, and Mr Lipman, on behalf of Sunmoor, thought that they were being properly represented by Harringtons. They were not only let down, but the victims (according to their evidence) of a fraud on the part of Mr Ferguson, who took some £5750 of their money under the pretence of being a solicitor employed by
*h*  Harringtons when he was not a solicitor at all, and could and did do nothing of value for them. Unless they are in some way themselves personally at fault, it seems to me that the interests of the administration of justice favour the grant of the relief sought.

[85] As to CPR 3.9(1)(b) the application for such relief has been made promptly; and as to CPR 3.9(1)(c) (d) and (f) Sunmoor's failure to comply
*i*  was plainly not intentional; and whether its excuse for the breaches of the disclosure order and the October order is a good one again largely depends upon whether the fault was wholly that of Mr Ferguson and his fraud. CPR 3.9(1)(e) is difficult to address separately in the circumstances: Sunmoor's default in respect of the October order has led to the December

order; the question is whether these defaults were in consequence of *a*
Sunmoor having been misled. CPR 3.9(1)(g) has no relevant application
here.

[86] In relation to CPR 3.9(1)(h) and (i), the effect on Sunmoor of failing
to comply with the October order was to expose itself to the risk of
summary disposal of its defence which in fact eventuated in the form of the
December order. It has obtained no advantage, save, if it succeeds now, *b*
some further delay. Likewise, the effect on the claimants and the first
defendant of granting the relief sought (subject to wasted costs, which
Sunmoor has agreed it must pay) is delay; this is a relevant but not powerful
factor in all the circumstances of this case. Against that, the effect for
Sunmoor of granting the relief it seeks is obvious: it would live to fight the *c*
action on its merits.

[87] So I return to what seem to me to be the core questions, which are
(a) whether Sunmoor's plight can be fairly said to be wholly the fault of
Mr Ferguson and (b) whether there are any other circumstances, including
the merits of the case, which tip the balance one way or the other.

[88] As to (a), there are a number of curiosities and gaps in the *d*
explanation of events offered on behalf of Sunmoor. Not least is the choice
(apparently at the instance of Mr Lipman) of Mr Ferguson and
Harringtons, who even on the story put forward by Mr Ferguson were
criminal defence lawyers, and whom Mr Lipman seems barely to have
known, and of whom Mr and Mrs Ulloa do not seem to have made any
enquiry as to suitability. This is the more surprising given that a firm *e*
holding itself out as a commercial practice, D Peake & Co, had been
approached to replace Lawson-Cruttenden & Co at the same time as the
first meetings between Mr Lipman and Mr Ulloa with 'Simeon Foyle' and
Mr Ferguson in a wine bar opposite the law courts at the end of July 2003.
No explanation has been provided in this regard. Indeed it is one of the
other gaps in the account that D Peake & Co, who (according to its letter to *f*
the claimant's solicitors dated 17 July 2003) had become involved
sufficiently to prepare and send a 'hefty instruction bundle' to counsel has
not been mentioned in the evidence on behalf of Sunmoor at all, and the
directors of Sunmoor are stated to have understood they were being
represented by Harringtons from July 2003 onwards.

[89] The complete absence of any correspondence from Harringtons and *g*
Mr Ferguson is also noteworthy. No doubt it may have been difficult for
Mr Ferguson to get letter-headed paper (though another remarkable fact in
the case is that he apparently had been given a key to Harringtons' office by
Mr Harrington). But it is odd that Sunmoor's directors and Mr Ulloa
accepted this. *h*

[90] More generally, the approach of Mr and Mrs Ulloa is a surprising
and (to my mind) unsatisfactory one. Given the importance of the matter to
them, and the plain import of the disclosure order and then the October
order, it is extraordinary that (on the account provided on their behalf)
there is so little evidence of any real attempt on their part to seek reliable
advice. Their decision not to attend the hearing before HH Judge *i*
Weeks QC, after discovering that they had (on the account offered) been
defrauded by Mr Ferguson and thereby caused to be in breach of court
orders and in imminent peril of serious sanctions and the loss of the
proceedings, is to my mind inexplicable; and their failure to provide any

*a*  direct evidence likewise. I appreciate that English is not their first language; and Ms Pullinger has stated that their 'less than complete command of English' has caused her difficulties. But there are letters apparently written by Mr Ulloa in almost faultless English; and he had after all been able to make two previous affidavits in respect of the disclosure order. It is difficult to accept that language was a bar to him and his wife assisting the court by
*b*  providing evidence and attending court both in December and at the hearing before me.

[**91**] Counsel for Sunmoor sought to persuade me that, not being a director of Sunmoor, it was unremarkable that Mr Ulloa has not himself put in evidence; that a lack of detail was excusable at an interlocutory stage; and that there was little Mr or Mrs Ulloa could add to Mr Lipman and
*c*  Ms Pullinger. However, the fact that Mr Ulloa is not a director of Sunmoor may be the case de jure; but his close involvement with his wife in its affairs (to put it no higher) is clear. He saw no difficulty previously in making affidavits on its behalf. The potentially final nature of the December order is sufficient, to my mind, to dispose of any suggestion that the most detailed account of the events in question was unnecessary. And I do not consider
*d*  that the evidence of Mr Lipman and Ms Pullinger excused Mr and Mrs Ulloa from providing the court with their reasons, for example, for not disclosing the sale of the property before Deputy Master Fontaine; for dispensing with Lawson-Cruttenden & Co; for not proceeding with D Peake & Co; for entrusting the matter to Mr Ferguson and criminal defence
*e*  solicitors; for not having attended in December; and for not choosing or being unable to attend before me.

[**92**] I have indeed found it difficult to avoid the conclusion that Mr and Mrs Ulloa have been less than forthcoming and open with the court. In this regard, there is an echo from the debt proceedings in 2001, when (in giving judgment) Deputy Master Fontaine described Mr Ulloa's conduct as
*f*  'disingenuous to say the least' and said that he would have expected 'Mr Ulloa to be considerably more co-operative towards the Court in relation to [Vintageset's] duties of disclosure'. Moreover, the deputy master had no reason to know then, since this was kept from him, of the sale of the property; and he was left to proceed on the basis that the property remained in Vintageset and might be available for it to raise money whereby to pay
*g*  off the claimant. (In fact, this non-disclosure in a sense rebounded on Mr and Mrs Ulloa to the extent that it provided the deputy master with a reason against requiring the claimant to seek a winding up; but that does not alter the fact of non-disclosure.)

[**93**] It is possible that Mr and Mrs Ulloa have still not appreciated the
*h*  gravity of their position and that of their company Sunmoor: but this seems to me to be unlikely. The alternative, and the impression I have formed, is that, despite the efforts latterly made on their behalf by Hamlins, Mr and Mrs Ulloa have demonstrated a surprising detachment and lack of concern for court orders. Perhaps in consequence, the explanations offered on their behalf by other witnesses seem to me to be less than complete; they are not
*i*  such as to convince me that fault lies exclusively with others. It seems to me, on the basis of the evidence presented, that Mr and Mrs Ulloa (and thus Sunmoor) were disposed to do as little as possible as late as possible in response to orders of the court, and eventually did too little, too late, and

have compounded this by failing to offer a detailed personal explanation.          *a*

[94] Nevertheless, the circumstances are extraordinary. Notwithstanding my concerns about their conduct and attitude, if there were real merit in Sunmoor's case I would be inclined (subject to suitable conditions) to view even this as not disqualifying Sunmoor from relief, given the apparent behaviour of Mr Ferguson (if accurately depicted, and of course he has, unsurprisingly perhaps, not chosen to give evidence either). I turn,          *b* therefore, to issue (2) as I have described it in para [26] above, and the merits of the substantive proceedings.

MERITS OF DEFENCE

[95] As a preliminary matter, I was initially concerned about the form of          *c* the proceedings, which (given the fact that Vintageset was when they were commenced already in the course of winding up) I think would more usually be brought by originating application in the Companies Court under the provisions of the Insolvency Rules 1986. However, I am satisfied that my concern (which I should acknowledge was not shared by counsel for any of the parties) was misplaced.          *d*

[96] It is clear that (with the permission of the court) an application under s 423 of the Insolvency Act 1986 may be brought under CPR Pt 7 in any division of the High Court; and although the commencement of winding-up proceedings (for example, after a resolution to wind up the company) gives the option of bringing an application under s 423 I am persuaded that the option is not mandatory: and see *TSB Bank plc v Katz* [1997] BPIR 147;          *e* also *Jyske Bank (Gibraltar) Ltd v Spjeldnaes* [1998] TLR 604.

[97] As to s 423 itself, to trigger the application of the section in respect of an impugned transaction (and thereby the remedial powers of the court under s 425 of the Insolvency Act 1986) it must be shown that the transaction impugned was entered into 'at an undervalue' within s 423(1)          *f* and that the transaction was entered into for one or more of the purposes set out in s 423(3).

[98] In the context of a transaction of sale, the consideration paid in money or money's worth must be shown to be 'significantly less' than the value of the property sold: s 423(1)(c).

[99] Section 423(3) provides that an order shall only be made if the court          *g* is satisfied that a transaction at an undervalue has been entered into by the transferor for the purpose:

(a) of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or

(b) of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.          *h*

[100] Unlike under the provisions s 423 replaced (and in particular, s 172 of the Law of Property Act 1925), there is no longer any need to establish dishonest intent. But equally, and unlike in other contexts in the Insolvency Act 1986 (for example, s 239(6), in relation to preferences), there is no inbuilt presumption with regard to the transferor debtor's accompanying motive, even in cases where the transaction has been entered into with a          *i* closely connected person. Nor even (contrary to the recommendation of the Cork Committee) is there any express provision that the court should be entitled to infer the requisite purpose whenever this is the natural and probable consequence of the debtor's actions, though the court may yet

a  apply that presumption as a matter of general law.

[101] In this case, Sunmoor seeks to defend the sale of the property on the basis that:

(a) the value of the consideration it provided was £575,000, and that was not significantly less than the value of the property at the time;

b  (b) the purpose of the transaction was not to defeat or prejudice the claimant or any other creditor, but (in the words of paras 11 and 12 of Mr Poon's witness statement) 'to enable the restaurant business to be carried on and the Property to be developed by the building of the flat';

(c) the re-emergence of the claimant and the fact of his claims meant that there was no reasonable prospect of Vintageset going into insolvent liquidation and that situation (to quote again from para 12 of Mr Poon's

c  witness statement) 'made it more important that the proposed sale ... should take place as soon as possible', but this 'did not alter the primary reasons for the sale'.

VALUE OF THE PROPERTY

d  [102] On this first issue (as to whether the sale of the property was at an undervalue) counsel for Sunmoor submitted that there was no established value for the property in 2000. There was a variety of valuations suggesting a broad range of values before refurbishment from £400,000 on a restricted realisation price basis (that is to say, assuming a requirement to complete on a date which does not allow a reasonable period for proper marketing)

e  calculated by reference to the trading performance of the restaurant) to £750,000 estimated realisation price assuming a 12-month selling period. This variation, and the fact that after meeting there remained a disagreement between valuers, meant that the question of value could not be concluded on paper without further evidence and cross-examination at trial.

f  [103] Counsel for the claimant, on the other hand, first submitted that whatever might be the true value of the property, it was significantly more than the price paid. Except on a restricted realisation price basis (that is, a basis which assumes that the sale must be concluded within 180 days) there was no valuation below £625,000. Taylor's, which both Mr Ulloa and

g  Mr Poon say was the valuation relied on, had estimated £650,000 in June 1999 on a restricted realisation price basis (rising to £750,000 if a longer marketing period were allowed). Counsel for the claimant submitted secondly, that there was no basis for a forced sale valuation and that Mr Poon's approach (which I have described in para 51 above) was based on what the Bank of East Asia would lend rather than the value of the

h  property and on that account, and because a forced sale basis was inappropriate, was patently and fundamentally flawed.

[104] To the submissions for the claimant, counsel for the first defendant added that part of the consideration provided by Sunmoor should in any event be discounted, in so far as the true effect had been to enable Mr Ulloa's debts to be paid off in preference to any other creditor.

i  [105] As it seems to me, these submissions raise three points to be considered. The first is whether the price of £575,000 could reasonably be said to be no less than the value of the property at the date of the transaction. The second is, to the extent of any shortfall whether it could reasonably be said not to be significant. The third is whether the value of

the consideration provided by Sunmoor was really £575,000.    *a*

[106] I agree with counsel for Sunmoor that it is not possible on the present evidence and at the present stage to fix the value of the property in 2000 with any precision or certainty. But I agree also with counsel for the claimant that it is not necessary to do so to determine whether the sale of the property was at an undervalue for the purposes of s 423. It seems to me that it is very likely that the property could and should have been sold for    *b* more than £575,000. As to this, my reasons are as follows:

(1) I do not think that the valuation of £400,000 by Pinders can for these purposes be relied upon. It was made in 1998. It was a valuation of the business by reference to the performance of the restaurant rather than the value of the property. It assumed that planning permission for a flat was unlikely: but by the time of the sale planning permission had been obtained    *c* for residential use. It is well below what the Bank of East Asia were prepared to lend on the security of the property. It is well below a valuation for Caledonian Bank in 1991 (by a firm called Tretheweys in Plymouth) which suggested a value even then at a low point in the market of £550,000). I note that the relevant report by Pinders, though exhibited, was    *d* not even mentioned in the skeleton argument put forward on Sunmoor's behalf.

(2) A valuation of £450,000 (by the same valuer, Pinders) was simply an informal apportionment of the value of the restaurant business including the property; and is likewise unreliable.

(3) Other valuations all attached a considerably higher value. Thus, Last    *e* & Mazin (instructed by the claimants in 2003) estimated £900,000 as at July 2000; Meredith & Co (also instructed by the claimant, estimated, on an informal 'walk-by basis', and assuming no planning permission for residential use) a value of £750,000 (as at June 2000); and Hilbery Chaplin Porter (instructed by the liquidator in 2002) attached values as at July 2000 of between £625,000 and £640,000. Taylors' lowest value, as already    *f* mentioned, was £650,000 in 1999.

(4) Mr Poon's approach is difficult to accept. It depends on either applying a very substantial discount to an already discounted valuation to reflect a forced sale; or on extrapolating a figure from the amount that the Bank of East Asia was prepared to lend (which itself was based on the Taylors valuation of at least £650,000). Mr Poon is not, of course, a valuer.    *g*

(5) A fundamental premise of Mr Poon's approach was to assume a forced sale. But when he made the 'valuation' Vintageset does not appear to have been in any hurry. According to Mr Poon's own evidence, after identifying in December 1998 the possibility of purchasing the property from Vintageset through a new company financed by the Bank of East Asia    *h* thereafter (to quote para 7 of Mr Poon's witness statement) 'matters progressed fairly slowly' and it was not until May 1999 that a valuation was commissioned. It was not until November 1999 that the first offer letters were received, and not until April 2000 that the offers in fact accepted were made. The sale itself did not take place until July 2000. None of this suggests urgency. The fact appears to be that the urgency was not    *i* injected until the claimant came on the scene; and it seems fanciful to suggest that the claimant would not have been prepared to agree to a deferment to allow for a proper sale exposure to get a better price.

(6) In short, I do not consider any real weight can or could at trial be

*a*  attached to the process adopted and the value asserted by Mr Poon; and apart from his say-so, there is no evidence to support a price of less than £625,000 even supposing a restricted sales period, and the preponderance of the available evidence (especially Taylors, whose independence and expertise Sunmoor and Mr Ulloa especially emphasised) suggests a higher value.

*b*      (7) On that basis, £575,000 is not within the range of values indicated by the valuation evidence.

[107] Whether the shortfall between £575,000 and the lowest likely value should be regarded as significant for the purposes of s 423 is really a matter of impression. But whether considered in proportionate or percentage terms, or in absolute terms, the difference is not insubstantial; and in my
*c*  view, Sunmoor would, to my mind, have no realistic prospect of defending a difference of £575,000 and £625,000 as being insignificant.

[108] Even allowing, therefore, for the uncertainties inherent in any process of assessing competing valuations, I have concluded that Sunmoor has no realistic prospect of successfully defending the value attached to the
*d*  property by Mr Poon. My conclusion that accordingly Sunmoor has no realistic prospect of defending this claim is reinforced by my conclusion on the third point (which is whether the consideration paid by or on behalf of Sunmoor can on any realistic basis be treated as having a value of £575,000).

*e*  VALUE OF CONSIDERATION

[109] As to that third point, the question is whether it is open to Sunmoor to rely on the diminution of Mr Ulloa's loan account as equivalent to actual payment, even though the effect was that Mr Ulloa and Sunmoor received value considerably in excess of the true value of Mr Ulloa's claim against
*f*  the company in its prospective liquidation, whereas the claimant (as the only other substantial creditor) at most stood to benefit only by the small potential increase in his proportionate share of Vintageset's assets in its liquidation.

[110] Counsel for the claimant and for the first defendant both submitted that the answer is that treating part of Mr Ulloa's loan account as
*g*  extinguished by the transfer was the equivalent of a preference and that this part of the 'consideration' should be ignored in assessing the aggregate received by Vintageset for the property. Counsel for the second defendant countered that any question of preference was not before the court.

[111] I have reached the conclusion that counsel for the claimant and the first defendant are correct in their contention that the real value of the
*h*  consideration in money or money's worth provided by Sunmoor and Mr Ulloa cannot properly be taken as £575,000, but a considerably lesser figure.

[112] Alternatively (it being in a sense the flip-side of the same coin) the value of the consideration provided by Vintageset was enhanced further by the fact that there was conferred on Mr Ulloa a significant benefit beyond
*i*  the value of a claim for £164,000 against Vintageset in its insolvent liquidation.

[113] In my view, having regard to the admitted insolvency of Vintageset at the time of the transaction, the consideration provided to Vintageset was (a) the sum of £411,000 odd and (b) the amount that would have been paid

out to Mr Ulloa in respect of a proof of debt in the sum of £164,000 odd. *a*
Or, looking at the other side of the transaction, the value provided by
Vintageset was not only the value of the property, but also the value to
Mr Ulloa of receiving (in effect) payment in full of the debt of £164,000
(which was in fact otherwise plainly not recoverable in full).

[**114**] As it seems to me, s 423 is directed to actual value, not book value,
to the realities and not paper entries. The real economic effect of the *b*
transaction must be considered, and the true benefit and detriment of the
transaction assessed: and see per Slade LJ in *Agricultural Mortgage
Corp plc v Woodward* [1995] 1 BCLC 1 at 10–12.

[**115**] I also consider that, though the consideration received by Vintageset
is to be looked at from the company's point of view (see per Millett J in *Re
MC Bacon Ltd* [1990] BCLC 324 at 340 (a case on s 238) and *National* *c*
*Bank of Kuwait v Menzies* [1994] 2 BCLC 306 (confirming the same
principle applies in the context of s 423 as in the context of s 238)), it is
relevant whether what the company receives is of value, and if so what
value, to those interested in the company at the time of the transaction. The
reduction of Mr Ulloa's loan account was of value to those interested in the *d*
liquidation of Vintageset (other than Mr Ulloa himself) to the extent that
their rateable entitlement to its available assets increased: but since it had
no assets that benefit was illusory. The 'victim' in the person of the
claimant, claiming in right of the prejudice to his interests suffered in
consequence of the alleged undervalue received by Vintageset, received no
benefit from this reduction. It would seem to me to be strange if this were *e*
not a relevant consideration having regard to the purpose of s 423.

[**116**] I should perhaps make clear that this analysis is not based on
characterising part of the transactions as a preference. It is based simply on
assessing whether there was a disparity in real value between what
Vintageset gave and what it got, in terms of the assets available in its
insolvent liquidation. It may be that the preference analysis put forward by *f*
counsel is also available; but no claim has been made under s 239 and I do
not decide the issue on that ground.

[**117**] The upshot is that, in my judgment, it is plain that Vintageset
received consideration of a value significantly less than the value of the
property it transferred to Sunmoor; and Sunmoor has no realistic prospect
of persuading the court otherwise. *g*

PURPOSE OF THE TRANSACTION

[**118**] Even so, and as mentioned previously, s 423(3) provides that an
order may only be made if the court is satisfied that the transaction was
made for one of the proscribed purposes. *h*

[**119**] Counsel for Sunmoor submitted that the claimant's hypothesis that
the sale of the property was entered into for the purpose of prejudicing his
interests in relation to his claim for repayment of his loans to Vintageset
was destroyed by the fact that the sale had been decided in 1999 and before
the claimant re-emerged upon the scene or intimated his claim. The real
reason for the sale was that Vintageset had tried and failed to raise money, *i*
and that the only way of refinancing the restaurant business and
development of the property was through a new company to which the
property had been transferred. According to Mr Poon it was he and
Mr Lipman (then an acquaintance of Mr Ulloa with whom Mr Poon states

*a*  he discussed the problem in May 1998) who suggested obtaining finance by using a new company to purchase the property with funds provided by the Bank of East Asia (who, he states, had made clear that it would not lend to Vintageset but had expressed interest in lending to a new company).

[120] Counsel for the claimant countered this with the submission that there was no sign of the transaction actually being effected until after the
*b*  claimant had made his intentions known. He pointed out that there was no evidence of pressure on Vintageset from Caledonian to sell; and that the building works at the property had been commenced by February 2000 and did not seem dependent for their financing on the transaction. He also emphasised that the loan from the Bank of East Asia only exceeded by less than £7,000 the amount needed to discharge Vintageset's existing secured
*c*  borrowings, and any depiction of the exercise being designed to finance further development of the property or the business was fanciful. Further, he invited the court to draw adverse inferences from the fact (which was not disputed) that the transaction had been concealed (it was never mentioned to the claimant in correspondence between June and November 2000, and
*d*  it was kept from Deputy Master Fontaine as I have already described).

[121] Counsel for the first defendant supported the claimant's submissions and suggested that it was hard to see why, if the purpose of the transaction was not to prejudice the claimant, his re-emergence made the need for the sale more urgent. She urged the court to query why Sunmoor had been so anxious to achieve a sale prior to liquidation, given that it
*e*  could have purchased the property from the liquidator; and to consider the ultimate result of the transaction which she suggested was to enable part of Mr Ulloa's debts to be paid off in preference to any other creditor.

[122] As it seems to me, it is important to distinguish between the purpose of the transaction when originally conceived, and the purpose of implementing the transaction immediately prior to the (by then inevitable)
*f*  insolvent liquidation of Vintageset in July 2000.

[123] As to the original conception of the transaction, it seems to me that I must accept for present purposes, and in the absence of cross-examination, the evidence of Mr Ulloa and Mr Poon that the purpose was to enable the restaurant business to be carried on and the property to be developed by the building of the flat. I think I must also accept for present purposes that the
*g*  Bank of East Asia would not have been prepared to lend to Vintageset. But that evidence does not answer the question raised by counsel for the claimant as to how the purpose asserted could be fulfilled given that the amount of the loan from the Bank of East Asia was very little more than Vintageset's existing secured borrowing which was to be repaid, leaving
*h*  nothing substantial over for development of the restaurant or the building.

[124] The answer, I think, emerges from another passage in Mr Poon's witness statement. In para 8 Mr Poon explains that though the Bank of East Asia 'was not prepared to lend for the purposes of directly financing the building works which Mr Ulloa proposed to effect to the property … it was and remained content that the proposed 2nd Floor flat might be used as
*i*  security for the borrowings needed from other sources for its construction'. In other words, the transaction funded by the Bank of East Asia loan was the means to make available the property as security for further borrowing from another lender for the proposed flat and other redevelopment.

[125] When the claimant re-emerged and asserted his very substantial

claim, this plan was fundamentally threatened. The urgent extraction of the  *a*
property from Vintageset before its liquidation to make it available for use
as security free of indebtedness (other than to the Bank of East Asia) and to
enable Mr and Mrs Ulloa to develop the residential potential of the
property became essential.

[**126**] The question then is whether this reveals a purpose such as to
trigger the application of s 423. In my view, it plainly does. To achieve their  *b*
aims Mr and Mrs Ulloa and their company, Sunmoor, had in effect to cut
free the property from the claimant's claims, with the inevitable
consequence of leaving the claimant with claims against a company with no
remaining assets, and thus greatly prejudiced. Even if it is contended that
their motivation was their own advantage rather than to put the property
(or more accurately its value) beyond the reach of the claimant, the first  *c*
could not be achieved without the second. I do not consider that Sunmoor
has any realistic argument that putting the property beyond the reach of the
claimant was not a substantial purpose of the transaction: and as to it being
sufficient for the claimant to show that such was a substantial purpose of
the transaction impugned, see *IRC v Hashmi* [2002] EWCA Civ 981,  *d*
[2002] 2 BCLC 489.

CONCLUSION

[**127**] In all the circumstances I have concluded that I should not set aside
the December order, at least in so far as it declared the sale of the property
to Sunmoor to have been a transaction at an undervalue for a purpose  *e*
falling within s 423.

[**128**] However, I am concerned about the form of the rest of the
December order, which was, of course, made without the court having the
assistance of counsel on behalf of Sunmoor.

[**129**] It was common ground between the parties that there would have  *f*
been no proper objection to Sunmoor appearing and being represented for
the purposes of making submissions to the court in this regard. In other
words, it is common ground that nothing in the October order should or
would have prevented that.

[**130**] It was also common ground that a feature of the provisions of
ss 423 to 425, in contrast to the law they replaced (which provided only for  *g*
an impugned transaction to be reversed), is that the court is given a very
broad discretion as to the appropriate remedy (a non-exclusive selection is
provided in s 425). Further, counsel for Sunmoor relied on *Chohan v Saggar*
[1994] 1 BCLC 706 in support of his submission that any order under s 425
should seek, so far as practicable, to restore the position to what it would
have been if the transaction had not been entered into and to protect the  *h*
victims of it. As Nourse LJ put it ([1994] 1 BCLC 706 at 714):

'It is not a power to restore the matter generally, but in such a way as
to protect the victim's interests; in other words, by restoring assets to
the debtor to make them available for execution by the victims. So the
first question the judge must ask himself is what assets have been lost to  *i*
the debtor. His order should, so far as practicable, restore that loss.'

[**131**] Counsel for Sunmoor submitted that the appropriate order was not
rescission but an order for the payment by Sunmoor of the difference
between the value of the property in July 2000 and the price paid, together

a   with interest on the amount of that difference from July 2000 at the rate
which the company would have obtained, charged on the property. He
submitted that the December order was unfair in depriving Mr and
Mrs Ulloa of their expenditure on the property.

[132] Counsel for the claimant and for the first defendant disputed this
and submitted that, if and in so far as materially prejudiced, Mr and
b   Mrs Ulloa would have a claim in unjust enrichment (though they did not
elaborate further).

[133] There is a real danger in the court creating or giving encouragement
to the notion that a transferee in a transaction at an undervalue may always
buy his way out of trouble later by offering to make up the shortfall at a
later date if the transaction is successfully impugned: and see per HH
c   Havelock-Allan QC in *Walker v WA Personnel Ltd* [2002] BPIR 621 at
634–635.

[134] Nevertheless, in the present circumstances, I have some sympathy
with counsel for Sunmoor's concerns in this regard. The prejudice to
Mr and Mrs Ulloa of setting aside the transaction and restoring the
d   property to Vintageset for sale in its liquidation is considerable; and it is an
important factor also that Mr Ulloa is (according to the cessation accounts)
Vintageset's largest creditor (in right of his loan account), though the figures
are yet to be agreed by the first defendant (the liquidator).

[135] There is an obvious problem with the solution counsel for Sunmoor
proposes, which is that I have not felt able to determine the value of the
e   property; only that such value was significantly more than the consideration
paid for it. I do not consider it would be right to require a valuation
exercise to be undertaken and tested in court: that would amount to a
litigation of issues which I have determined should be treated as concluded
and which would cause great delay and expense. Some other solution must
be found.

f   [136] One might be for the claimant to be paid by Sunmoor an amount
equivalent to the sums that he would recover pursuant to proof in the
liquidation of Vintageset, with interest, and secured by a charge over the
property: but that charge would have to come behind the Bank of East Asia
and the Bank of Scotland, and the solution might founder accordingly.
Other solutions may be preferable.

g   [137] Rather than put forward a miscellany of suggestions, or adopt an
impractical solution, I propose to direct a further hearing of this matter for
the purposes of submissions on the form of relief. I will hear argument
when this judgment is handed down as to whether any further evidence
would be appropriate; and also whether notice should be given to Bank of
h   East Asia and the Bank of Scotland. Any further appropriate directions can
be considered at that stage. At the further hearing I can then decide whether
(and if so, how) to vary the relevant part of the December order on a more
informed basis.

*Order accordingly.*

i

                              Gareth Williams   Barrister.

TAB 43

*Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] 1 WLR 143,
House of Lords

[2001] 1 WLR                    Phillips v Brewin Dolphin Bell Lawrie Ltd (HL(E))

A                                    House of Lords

### *Phillips and another v Brewin Dolphin Bell Lawrie Ltd and another

### [2001] UKHL/2

B    2000  Oct 30, 31;                                    Lord Steyn, Lord Hutton,
     2001  Jan 18                      Lord Hobhouse of Woodborough,
                                              Lord Millett and Lord Scott of Foscote

*Insolvency — Transaction at undervalue — Linked contracts — Purchaser wanting to buy company's business without paying for goodwill — Company transferring goodwill to subsidiary and selling subsidiary to purchaser for £1 — Purchaser's*
C    *parent company leasing computer equipment used in business from company — Company liquidator subsequently contending subsidiary sold at undervalue — Whether lease part of consideration for sale — Whether transaction at undervalue — Insolvency Act 1986 (c 45), s 238*

In October 1989 the plaintiff company negotiated to sell its stockbroking business to the first defendant, B Ltd for a price of £1·25m. The relevant part of the
D    business, including the goodwill, was transferred to a wholly-owned subsidiary of the company, and for tax and regulatory reasons the sale was effected by two agreements made in November 1989 by which the company sold the subsidiary's share capital to B Ltd for £1, and sublet the computer equipment used in the business, which it held on lease, to B Ltd's parent company, P Ltd, for four years at an annual rent of £312,500 payable in arrears. B Ltd made a loan to the company of £312,500 intended to be set off against the first rental payment when due, and undertook to discharge certain redundancy obligations of the company. The sublease agreement
E    was made in breach of a covenant in the agreements with the owners of the computer equipment prohibiting the assignment or subletting of the equipment. Before the sublease was entered into with P Ltd, B Ltd had decided not to use the computer equipment to run its business but to update its own existing computer system. Two months later, and before the first payment under the sublease became due, the owners of the computer equipment terminated the company's leases for non-payment of rent. P Ltd claimed that it was discharged from further performance of the sublease
F    agreement. The company was wound up in April 1990. On an application by the liquidator under section 238 of the Insolvency Act 1986[1] for a declaration that the share sale agreement was a transaction at an undervalue, the judge held that payments made under the sublease agreement were not to be treated as consideration for the transfer of the shares and that the share sale agreement had been a transaction at an undervalue, and ordered B Ltd to pay the liquidator the amount of the undervalue, namely the difference between the value of the shares, assessed at
G    £1,050,000, and the value of the redundancy obligations, assessed at £325,000. The Court of Appeal dismissed an appeal by B Ltd and P Ltd and held that the share sale agreement alone was the relevant transaction for the purposes of section 238 and that that transaction had been at an undervalue.
     On appeal by B Ltd and P Ltd—
     *Held*, (1) that the issue was to identify under section 238(4)(b) of the Act not the "transaction" but the "consideration" for the transaction entered into by the
H    company, which was a question of fact notwithstanding that it might involve issues of law such as the construction of a document; that it was irrelevant by whom the consideration was provided, and it could include the value of a collateral agreement entered into by the company with a third party; and that it was clear that the

[1]  Insolvency Act 1986, s 238(4)(b): see post, p 145G.

A

consideration for the company's shares included the benefit of the entry by P Ltd into the sublease agreement whereby the purchase price of £1·25m would be paid by four annual payments of £312,500 each (see post, pp 145A–E, 150G–151A, D–F).

(2) Dismissing the appeal, that in assessing the value in money or money's worth of the sublease agreement, the court was entitled to give precedence to reality over speculation, by having regard to events which had occurred after the agreement was entered into; that since B Ltd had decided before the date of the sublease agreement not to use the computer equipment in its business and since the agreement itself was made in breach of the company's covenant, the sublease agreement was precarious and speculative from the outset; that in those circumstances it was for the party who relied on the agreement as consideration to establish its value, and the defendants were unable to do so; that, taking into account subsequent events, the value of the sublease agreement was nil and added nothing to the consideration for the share sale; and that, accordingly, since there was no reason to differ from the judge's conclusion, that the value of the company's shares was £1,050,000, the sale of the shares was at an undervalue and, in exercise of the discretion conferred by section 238(3) of the Act, the liquidator would be ordered to give credit for the loan of £312,500 made to the company by P Ltd against the sum due from B Ltd (see post, pp 151H–152E, 153A–F, G–154B, D–G).

Decision of the Court of Appeal [1999] 1 WLR 2052; [1999] 2 All ER 844 affirmed.

B

C

D

The following case is referred to in the speech of Lord Scott of Foscote:

*M C Bacon Ltd, In re* [1990] BCLC 324

The following additional cases were cited in argument:

*Agricultural Mortgage Corpn plc v Woodward* [1995] 1 BCLC 1, CA
*Attorney General v Equiticorp Industries Group Ltd* [1996] 1 NZLR 528
*Chohan v Saggar* [1994] BCC 134, CA
*Duckwari plc, In re* [1999] Ch 253; [1998] 3 WLR 913, CA
*Jeffrey Bigelow Design Group Inc, In re* [1992] 956 F 2d 479
*Paramount Airways Ltd, In re* [1993] Ch 223; [1992] 3 WLR 690; [1992] 3 All ER 1, CA
*Philips v Ward* [1956] 1 WLR 471; [1956] 1 All ER 874, CA
*Phipps v Boardman* [1967] 2 AC 46; [1966] 3 WLR 1009; [1966] 3 All ER 721, HL(E)
*Royal Bank of Canada v North American Life Assurance Co* [1996] 1 SCR 325
*Rubin v Manufacturers Hanover Trust Co* (1981) 661 F 2d 979
*Tosich Construction Pty Ltd v Tosich* (1997) 23 ACSR 466

E

F

**APPEAL** from the Court of Appeal

This was an appeal by leave of the House of Lords (Lord Hoffmann, Lord Hutton and Lord Hobhouse of Woodborough) granted on 26 October 1999, by the defendants, Brewin Dolphin Bell Lawrie Ltd (formerly Brewin Dolphin & Co Ltd) and Private Capital Group Ltd from a decision of the Court of Appeal (Lord Woolf MR, Morritt and Laws LJJ) on 17 March 1999 affirming a decision dated 28 January 1998 of Evans-Lombe J who, on an action brought by the first plaintiff, Ian Peter Phillips, as liquidator of the second plaintiff, A J Bekhor & Co, ordered that the sale to the first defendant of shares in Bekhor Securities Ltd, a wholly-owned subsidiary of the second plaintiff, was a sale at an undervalue for the purposes of section 238 of the Insolvency Act 1968.

The facts are stated in the opinion of Lord Scott of Foscote.

G

H

A      *Gregory Mitchell QC, Ewan McQuater* and *Christopher Hare* for the
defendants.
    *Michael Briggs QC* and *Richard Slade* for the plaintiffs.

   Their Lordships took time for consideration.

   18 January.   **LORD STEYN.**

B   My Lords,
   1   For the reasons given by Lord Scott of Foscote in his opinion I would
also make the order which he proposes.

**LORD HUTTON**
   My Lords,
   2   I have had the advantage of reading in draft the speech prepared by
C   my noble and learned friend, Lord Scott of Foscote, and for the reasons
which he gives I would dismiss the appeal and make the order which he
proposes.

**LORD HOBHOUSE OF WOODBOROUGH**
   My Lords,
D      3   I have had the advantage of reading in draft the speech to be delivered
by my noble and learned friend, Lord Scott of Foscote. I agree with the order
which he is to propose and with the reasons which he will give.

**LORD MILLETT**
   My Lords,
   4   I have had the advantage of reading in draft the speech prepared by
E   my noble and learned friend, Lord Scott of Foscote. I agree with it, and with
the order he proposes.

**LORD SCOTT OF FOSCOTE**
   My Lords,
   5   Section 238 of the Insolvency Act 1986 provides a remedy where a
company goes into liquidation within two years after entering into a
F   transaction at an undervalue. Where the section applies the liquidator may
apply to the court for an order (subsection (2)) and the court:

> "shall, on such an application, make such order as it thinks fit for
> restoring the position to what it would have been if the company had not
> entered into that transaction" (subsection (3)).

G   Subsection (4)(b) elucidates the meaning of a transaction at an undervalue:

> "a company enters into a transaction with a person at an undervalue
> if . . . the company enters into a transaction with that person for a
> consideration the value of which, in money or money's worth, is
> significantly less than the value, in money or money's worth, of the
> consideration provided by the company."

H   The company in the present case is A J Bekhor & Co ("AJB").   On
10 November 1989 AJB entered into agreements with Brewin Dolphin & Co
Ltd ("Brewin Dolphin") and into agreements with Private Capital Group
Ltd ("PCG"). PCG was the parent company of Brewin Dolphin. These
agreements were linked. I will describe later the nature of the link and how

it arose.  The purpose of the agreements was the sale of AJB's stockbroking    A
business to Brewin Dolphin.  On 17 October 1989, in order to facilitate and
set the stage for the sale, AJB sold its stockbroking business and business
assets to Bekhor Securities Ltd ("BSL"), a wholly-owned subsidiary, for a
consideration of £1.  The transfer of the business to Brewin Dolphin was to
be brought about by a transfer of the BSL shares.  Accordingly, under one of
the 10 November 1989 agreements with Brewin Dolphin, AJB transferred to
Brewin Dolphin its shares in BSL.  Brewin Dolphin thus acquired AJB's        B
business.  AJB received in return (i) from Brewin Dolphin, the assumption by
Brewin Dolphin of AJB's obligations to its employees, including, in
particular, the obligation to make redundancy payments; and (ii) from PCG,
under one of the 10 November 1989 agreements between AJB and PCG, a
covenant by PCG to pay AJB £312,500 per annum for four years, the first
payment to be made on 10 November 1990.  This agreement was expressed      C
to be a computer equipment leasing agreement and the payments were
expressed to be rent payable for the right to use the computer equipment.
The total "rent" to be paid over the four years was £1·25m.  It was by no
means a coincidence that £1·25m was the sum that it had been agreed would
be paid for the stockbroking business.  The computer equipment in question
was not owned by AJB but had been leased from two lessors, Wirral          D
Equipment Ltd and Asterrose Ltd.  Each of the leases required the consent of
the lessor to any subletting by AJB.   Consent to the subletting of the
equipment by AJB to PCG had neither been sought nor given.  On account of
default by AJB in paying the rent due under these head leases, the head leases
were terminated in early 1990 and the computer equipment was recovered
by the head lessors.  This took place before the date, 10 November 1990, on
which the first payment of £312,500 was due to be paid to AJB under the    E
10 November 1989 sublease to PCG.  So PCG treated the sublease as having
been brought to an end by the termination of the head leases, and
consequently made none of the £312,500 payments.

   6  In the negotiations between AJB and Brewin Dolphin that had led to
the 10 November 1989 agreements, the value of AJB's stockbroking
business, and the sum to be paid for it, had first been agreed at £2·5m but
later negotiated down to the £1·25m.  There were two reasons why, under    F
the form the transaction finally took, the £1·25m was to be paid to AJB not
by Brewin Dolphin, the purchaser of the business, but by PCG as rent for the
computer equipment spread over four years.   One reason was that
PCG hoped to be able to deduct the "rent" from its taxable profits.  The
other reason was that the payment of £1·25m for the goodwill of the
stockbroking business would have prompted requirements by the regulatory   G
authority for additional capital funding for that business.

   7  AJB was, at the time of these agreements, in deep financial trouble.
A winding up order was made against AJB on 25 April 1990.  The petitioners
were Wirral and Asterrose.  On 4 May 1990 an administrative receiver was
appointed by AJB's debenture holder.  There is no dispute but that AJB is,
and was when the winding up order was made, hopelessly insolvent.
                                                                            H
   8  On 24 June 1994 Mr Phillips, the liquidator and administrative
receiver of AJB, and AJB in liquidation commenced proceedings against
Brewin Dolphin and PCG.  It was contended that the transaction under
which AJB had transferred its shares in BSL to Brewin Dolphin, thereby, in
effect, transferring its stockbroking business to Brewin Dolphin, was a sale

A   at an undervalue. An order against Brewin Dolphin under section 238 was sought. As against PCG, payment of the four annual sums of £312,500 was claimed. The payment of these was said to be the means by which "part of the value of the share capital of BSL was due to be paid to [AJB]".

*The judgment of Evans-Lombe J*

B     9   The trial took place before Evans-Lombe J [1998] 1 BCLC 700. An important issue at the trial was the extent to which the 10 November 1989 agreement under which the BSL shares were transferred to Brewin Dolphin and the 10 November 1989 agreement under which PCG was to make the four annual £312,500 payments should be treated as together providing the consideration for the transfer to Brewin Dolphin of the BSL shares. The judge held that the two agreements were linked "in the sense that it was

C   never contemplated that one would not be entered into without the other". (There is an obviously unintentional double negative in this sentence.) This finding of fact by the judge was not challenged in the Court of Appeal or before your Lordships. Brewin Dolphin and PCG were, said the judge, contending on the one hand that the 10 November 1989 sublease of the computer equipment was to be treated as a separate transaction, capable of

D   being treated as at an end on the recovery of the equipment by the head lessors, but contending on the other hand that PCG's covenant in the sublease should be treated as part of the consideration for Brewin Dolphin's purchase of the BSL shares. The judge said, at pp 723–724:

E       "It seems to me that it is not open to the defendants to put forward these two contentions simultaneously. If the payments made under the lease agreement were, in truth, part of the consideration for the purchase of the BSL shares under the share purchase agreement, then the lease agreement is not to be treated as a contract for the hire of goods within section 7 of the 1982 Act. Failure to ensure that PCG would be in position to enjoy possession of the leased equipment was not a breach going to the root of the share acquisition agreement nor did it constitute a

F   repudiation of that agreement nor has the consideration for that agreement wholly failed, nor does the doctrine of eviction by title paramount have the effect of terminating that agreement."

    10   PCG and Brewin Dolphin were, he said, trying to "blow hot and cold". He held that it was not open to Brewin Dolphin and PCG to represent the four £312,500 payments as being part of the consideration for the

G   shares, and, thus, of the stockbroking business. PCG's intention had been to set-off the four £312,500 payments against profit for the purposes of corporation tax. This could not be done if the payments were in truth part of the purchase price of the BSL shares. The judge concluded, therefore, that the covenant to make the payments under the computer equipment sublease had to be left out of account in considering whether, in selling the BSL shares to Brewin Dolphin, AJB had entered into a transaction at an undervalue.

H   Leaving out of account the covenant to make the four annual payments of £312,500 the judge then set about the task of considering, on the one hand, what the value was of the shares, i e in effect what the value was of AJB's stockbroking business, and, on the other hand, what the value was of the consideration that AJB had received.

11   As to the value of the consideration received by AJB, the judge took    A
account of the obligation cast on Brewin Dolphin under the share sale
agreement to meet redundancy costs. These costs, he noted, were the reason
why, in the negotiations, an initial valuation of the business of £2·5m was
reduced by £500,000 in early September 1989. The redundancy obligations
were in the event discharged by Brewin Dolphin at a net cost, after the gross
cost had been taken into account for corporation tax purposes, of £325,000.
The judge's calculation of this figure has not been challenged nor has his    B
conclusion that the £325,000 should be treated as consideration given by
Brewin Dolphin for the BSL shares. The £325,000 was, he held, the only
consideration given for the shares that could be taken into account. I have
already explained why he declined to allow the value of PCG's covenant to
pay the four £312,500 payments to be taken into account, notwithstanding
that the total, £1·25m, was the sum it had been agreed AJB should receive    C
for the business.

12   On 9 November 1989 PCG had lent AJB £312,500 as a loan for a
year intended to be repaid by set-off against the £312,500 payment that
would become due on 10 November 1990. Consistently with his view about
the "rent" to be paid by PCG under the sublease, the judge declined to allow
that £312,500 to be treated as consideration for the transfer of the shares.

13   As to the value of the shares, the judge noted that Brewin Dolphin/    D
PCG had treated £1·25m payable over a period of four years as the value of
the stockbroking business. He discounted the £1·25 m to £875,000 in order
to arrive at the value as at 10 November 1989. He took into account certain
other business assets and put a total value of £1,050,000 on the value of the
BSL shares as at 10 November 1989.

14   It had been argued for Brewin Dolphin that for section 238 purposes    E
the value of the stockbroking business, and thus of the shares, was no more
than nominal. Various pieces of evidence were referred to and various
arguments were advanced in support of this contention but, at the end of the
day, the judge declined "to depart from the prima facie value which results
from what Brewin Dolphin were prepared to spend in acquiring the
BSL shares". He deducted the £325,000 from the £1·05m and ordered
Brewin Dolphin to pay £725,000 with interest. He dismissed the claim    F
against PCG.

*The Court of Appeal*

15   Both Brewin Dolphin and PCG appealed. It is not clear to me why
PCG did so. AJB cross-appealed, reviving the claim that PCG should be held
liable to AJB in respect of the sums covenanted to be paid under the sublease    G
notwithstanding that all the subleased equipment had been recovered by the
head lessors. The Court of Appeal dismissed both the appeal and the cross-
appeal. Their grounds, however, were rather different from those of the
judge.

16   The judge had held that the 10 November 1989 share sale agreement
and the 10 November 1989 computer equipment sublease were linked in
that one would not have been entered into without the other and the four    H
£312,500 payments under the sublease were the means by which the agreed
consideration of £1·25m for the shares was to be paid to AJB. But he held
that Brewin Dolphin and PCG were barred from relying on the £312,500
payments as part of the consideration for the shares. Morritt LJ, with whose

[2007] 1 WLR                    Phillips v Brewin Dolphin Bell Lawrie Ltd (HL(E))
                                                        Lord Scott of Foscote

A  judgment Laws LJ and Lord Woolf MR agreed, took a stricter approach to
   the identification for section 238 purposes of the "transaction".
   Morritt LJ said that unless the sublease agreement could be said to be a
   sham, or unless there had been an artificial division of the real transaction
   entered into by the parties, the form of the agreement into which the parties
   had entered would be determinative in identifying the transaction on which
B  section 238 would bite. He identified the two issues before the court as being
   (1) the value of the shares in BSL to be taken into account for section 238
   purposes and (2) the value of the consideration for those shares provided to
   AJB. And he said [1999] 1 WLR 2052, 2060:

        "The first two issues to which I referred earlier, particularly the second,
   depend on ascertaining, for the purposes of section 238 of the Insolvency
C  Act 1986, what was the transaction alleged to have been entered into by
   the company at an undervalue. The allegation of the liquidator is that the
   share sale agreement was the transaction so that only the consideration
   passing to and from the company thereunder is to be taken into account.
   This was disputed by Brewin Dolphin on the basis that the court must
   have regard to the whole transaction not just that part of it the liquidator
   seeks to challenge. This is a point of some importance on the true
D  construction and application of section 238. It is true that the word
   'transaction' is very widely defined. It is also true, as submitted by
   counsel for Brewin Dolphin, that, given the purposes of sections 238, 339
   and 423 to which it applies, the court should not strain to narrow the
   definition by judicial decision. However, the word 'transaction' is to be
   construed and applied as part of section 238 as a whole . . . First, the
E  transaction must be identified by reference to the person (or persons, for
   the singular must include the plural) with whom the company entered
   into it. Only the elements of the transaction between the company and
   that person may be taken into account. Thus, without more, a contract
   between the company, A, and B cannot be part of a transaction entered
   into by the company, A, with C. I introduce the caveat 'without more' to
   guard against cases where the transaction is artificially divided. The
F  second limit appears to me to flow from the comparison the statute
   requires the court to make. In each case it is necessary to ascertain
   the consideration to be received by the company. In the case of
   section 238(4)(a) the transaction is either a gift or 'on terms that provide
   for the company to receive no consideration'. In other cases, as provided
   for in subsection (4)(b), the task is to ascertain the value of the
G  consideration provided by the other person 'for' the consideration
   provided by the company. Whether or not the word 'consideration' in
   those contexts is confined to its legal meaning it clearly connotes the quid
   pro quo for that which it is alleged the company disposed of at an
   undervalue."

   Then, addressing himself to the facts of this case, Morritt LJ concluded that
H  "the transaction" was the share sale agreement alone. He explained his
   conclusion in the following passage, at p 2061:

        "First, the parties acting at arm's length and for readily understandable
   commercial reasons chose so to structure the deal between them so that
   on the face of the documents the share sale agreement and the lease

agreement effected two separate, though linked, transactions. There is no    A
indication that this different treatment was a sham or otherwise
colourable. If parties in such circumstances choose so to structure their
commercial dealings in my view the court should give full weight to their
intentions. Second, for the reasons I have already given, the share sale
agreement and the lease agreement cannot be the same transaction for the
purposes of the section because, though the company was party to both of    B
them, only Brewin Dolphin was party to the first and only PCG party to
the second. Third, the parties to the lease agreement . . . unambiguously
attributed the four annual payments of £312,500 to rent due thereunder
for possession and use of the computer equipment to which it related.
The promise to make those payments cannot be recharacterised as
consideration from PCG or Brewin Dolphin 'for' the shares being sold by
the company."                                                                C

17 For those reasons, different from those of the judge,
Morritt LJ declined to allow the value of PCG's covenant to pay the
£312,500 to be treated as part of the consideration for the shares.
18 On the values to be attributed to the shares on the one hand and to
the consideration given for the shares on the other, Morritt LJ agreed with
the judge. So the appeal and cross-appeal were dismissed.                    D
19 This appeal by Brewin Dolphin and PCG is brought with the leave of
your Lordships' House. There is no cross-appeal by AJB. So PCG stands
excused from any liability to AJB under the 10 November 1989 sublease.
The four payments of £312,500 each are not going to be made.

*The first issue*                                                            E

20 The first issue for your Lordships to decide is whether Evans-
Lombe J and the Court of Appeal were right in declining to allow PCG's
covenant in the sublease to be taken into account in assessing the value of the
consideration for which AJB entered into the share sale agreement. Evans-
Lombe J would, I think, have allowed it but for the view he took about
Brewin Dolphin and PCG "blowing hot and cold". The Court of Appeal    F
based its decision on the form of the agreements into which the parties had
entered. In my respectful opinion, neither approach was right. One must,
obviously, start with the share sale agreement. That was the agreement
under which AJB agreed to divest itself of its allegedly valuable asset,
namely, the shares in BSL. It is worth repeating the language of
section 238(4)(b): "the company [AJB] enters into a transaction [the share
sale agreement] with that person [Brewin Dolphin] for a consideration the    G
value of which . . ." etc. The subsection does not stipulate by what person or
persons the consideration is to be provided. It simply directs attention to the
consideration for which the company has entered into the transaction. The
identification of this "consideration" is in my opinion, a question of fact.
It may also involve an issue of law, for example, as to the construction of some
document. But if a company agrees to sell an asset to A on terms that    H
B agrees to enter into some collateral agreement with the company, the
consideration for the asset will, in my opinion, be the combination of the
consideration, if any, expressed in the agreement with A and the value of
the agreement with B. In short, the issue in the present case is not, in my

A    opinion, to identify the section 238(4) "transaction"; the issue is to identify
the section 238(4) "consideration".

21    On the facts of this case it is, in my opinion, plain that the
consideration for the BSL shares was, apart from obligations assumed by
Brewin Dolphin under the share sale agreement itself, the entry by PCG nto
the sublease agreement under which it covenanted to pay £312,500
per annum for four years. The facts are fully and clearly set out in Evans-
B    Lombe J's judgment and are concisely and accurately summarised by
Morritt LJ [1999] 1 WLR 2052, 2056–2058. Both set out the relevant part
of a memorandum prepared in September 1989 by Brewin Dolphin's finance
director. The memorandum described what had been agreed:

C    "The basic concept is that Brewin Dolphin purchases the trade of [AJB]
for a consideration of £1·25m payable over four years . . . The detailed
scheme is as follows: (1) [AJB] forms [BSL] as a subsidiary. [AJB] sells its
business excluding its computer and other fixed assets to [BSL] . . . [AJB]
sells [BSL] to Brewin Dolphin . . . The purchase consideration would be
£1 . . . (2) [AJB] enters into a finance lease for the computer and other
assets with PCG. PCG enters into an operating lease with Brewin
Dolphin for the computer, the lease payments to be yearly in arrears for
D    four years at a rate of £312,500. This means that the purchase price will
be tax allowable and there will be no goodwill."

So the purchase price of £1·25m was to be paid under the sublease in four
annual payments of £312,500 each. No other conclusion is, in my opinion,
possible but that on those facts the consideration for the BSL shares included
the benefit of the covenant given by PCG under the sublease. In In re
E    M C Bacon Ltd [1990] BCLC 324, 340 my noble and learned friend,
Lord Millett, then a Chancery judge, analysed the requirements of
section 238(4)(b). He said:

"To come within that paragraph the transaction must be (i) entered
into by the company; (ii) for a consideration; (iii) the value of which
measured in money or money's worth; (iv) is significantly less than the
F    value; (v) also measured in money or money's worth; (vi) of the
consideration provided by the company."

In my respectful opinion, that is a useful breakdown of the statutory
requirements. In the present case the agreement for the sale of the shares was
entered into for a consideration which included the benefit of the sublease
agreement. So I now move on to the issues of value.

G
*What was the value, in money or money's worth, of PCG's covenant under
the sublease?*

22    This was not an issue which either Evans-Lombe J or the Court of
Appeal had to consider. The approaches of each, different though they were,
were alike in treating this issue as irrelevant. Naturally enough Mr Mitchell,
counsel for Brewin Dolphin and PCG, contends that the value of the
H    covenant was its face value. He points out that there is not, and never has
been, any question as to PCG's ability to pay. I agree that there is no doubt
as to PCG's ability to pay but the value of the covenant needs, in my opinion,
to be investigated a little more deeply. The covenant was, according to the
sublease, given in exchange for the right to use the computer equipment. But

it appears that, by the end of September 1989, Brewin Dolphin had decided     A
not to use the equipment in order to run the business it was negotiating to
acquire but, instead, to update its own existing computer system. This
decision did not, of course, affect the willingness of PCG to pay the
£312,500 per annum for four years. The amount of those payments was
attributable to the purchase, via the BSL shares, of AJB's business and was
not attributable in the least to any value placed on the right to use the
computer equipment. Nonetheless, the payments, according to the terms of     B
the sublease, were for the right to use the computer equipment. The
computer equipment, as Brewin Dolphin and PCG knew, was held by
AJB under head leases from Wirral and Asterrose. Under each of these head
leases, the lessee, AJB, was barred from assigning or subletting any of the
equipment. The bar was expressed as an absolute one. It was not subject to
the lessor's consent first being obtained or anything of that character. In     C
each head lease the events on the occurrence of which the lessor would
become entitled to terminate the lease include (i) failure by the lessee to pay
the due rent, (ii) the appointment of an administrative receiver of the lessee's
assets, and (iii) breach by the lessee of any of the terms of the lease. The right
to terminate was expressed to be exercisable "at any time [after the event in
question] notwithstanding any subsequent acceptance by the lessor of any     D
rental . . ."

23    The 10 November 1989 sublease, under which the four £312,500
payments were to be made, constituted, ipso facto, a breach by AJB of a term
of the head leases. So the head leases became terminable at any time by the
head lessors and the equipment comprised in the sublease could at any time
have been repossessed by the head lessors. The repossession of the computer
equipment, which is what happened, would, and did, bring to an end the     E
sublease and the payment obligations of PCG. So, what was the value, in
money or money's worth, of a covenant by PCG that was so precarious?

24    Mr Mitchell suggested that the covenant was worth something,
because the benefit of the sublease, and of PCG's obligation to pay the
£312,500 sums, could have been assigned by AJB to the head lessors. There
is, however, no evidence that the head lessors would have had any interest at
all in such an assignment. If a covenant with the precarious character of     F
PCG's covenant in the sublease is to have value attributed to it for
section 238 purposes, the value must, in my opinion, be placed on a more
firm footing than that of speculative suggestion. The actual events that took
place in 1990, before any payment under the sublease had become due, are
in my opinion, relevant. First, within a week of the date of the sublease
agents for the head lessors wrote to AJB complaining about the sublease and     G
threatening proceedings. In January 1990 AJB defaulted in payment of the
rents due under the head leases and shortly thereafter the head lessors
demanded the return of the equipment. On 5 February PCG confirmed that
neither it nor Brewin Dolphin would obstruct the repossession of the
equipment by the head lessors and on 23 February 1990 solicitors for
PCG wrote to solicitors for AJB notifying them that "our client intends to
accept your clients' repudiatory breach of the agreement between them.     H
Alternatively there has been a total failure of consideration by your clients in
relation to the lease of equipment dated 10 November 1989."

25    PCG's covenant, which had been precarious at the outset, had
become worthless by 23 February 1990 at the latest. To complete the point,

A  AJB went into compulsory winding up in April 1990 and an administrative receiver was appointed in May. These events would inevitably have led the head lessors to terminate the head leases and recover their equipment, if they had not done so previously, thereby bringing the sublease to an end.

    26  Mr Mitchell submitted that these ex post facto events ought not to be taken into account in valuing PCG's sublease covenant as at 10 November
B  1989. I do not agree. In valuing the covenant as at that date, the critical uncertainty is whether the sublease would survive for the four years necessary to enable all the four £312,500 payments to fall due, or would survive long enough to enable some of them to fall due, or would come to an end before any had fallen due. Where the events, or some of them, on which the uncertainties depend have actually happened, it seems to me unsatisfactory and unnecessary for the court to wear blinkers and pretend
C  that it does not know what has happened. Problems of a comparable sort may arise for judicial determination in many different areas of the law. The answers may not be uniform but may depend upon the particular context in which the problem arises. For the purposes of section 238(4) however, and the valuation of the consideration for which a company has entered into a transaction, reality should, in my opinion, be given precedence over
D  speculation. I would hold, taking account of the events that took place in the early months of 1990, that the value of PCG's covenant in the sublease of 10 November 1989 was nil. After all, if, following the signing of the sublease, AJB had taken the sublease to a bank or finance house and had tried to raise money on the security of the covenant, I do not believe that the bank or finance house, with knowledge about the circumstances surrounding the sublease, would have attributed any value at all to the
E  sublease covenant.

    27  Where the value of the consideration for which a company enters into a section 238 transaction is as speculative as is the case here, it is, in my judgment, for the party who relies on that consideration to establish its value. PCG and Brewin Dolphin are, in the present case, unable to do so.

    28  For these reasons I, as did Evans-Lombe J and the Court of Appeal
F  for different reasons, would treat the value of the consideration for which AJB entered into the share sale agreement as being confined to the value of the consideration under that agreement. The sublease covenant, in my opinion, adds nothing.

*The value of the consideration given by the company*

G  29  On this issue, Mr Mitchell submitted that AJB's business as at 10 November 1989 was worthless and that the BSL shares were therefore valueless. This submission was based on the fact that AJB appears to have been hopelessly insolvent and by November 1989 was trading at a substantial loss of £13,000 odd per day. The judge's findings on the value of the BSL shares are conveniently summarised at paragraph 4.3 of AJB's case:

H      "(1) Bekhor's business assets were an attractive package to buyers such as Brewin Dolphin. (2) It could not be inferred that Brewin Dolphin was the only potential purchaser. (3) Brewin Dolphin was a reasonably well informed potential purchaser from the class of typical purchasers. (4) The contemporary view of what a reasonably well-informed potential purchaser was prepared to pay was some evidence in assessing the market

A    value of the BSL shares. (5) Brewin Dolphin had been prepared to pay about £1,050,000 for the BSL shares."

30    I respectfully agree with this approach. The value of an asset that is being offered for sale is, prima facie, not less than the amount that a reasonably well informed purchaser is prepared, in arms' length negotiations, to pay for it.

B    31    On this issue the judge reached his figure of £1,050,000 after hearing and assessing the evidence, including expert evidence. It has not been demonstrated that in doing so he misdirected himself. The Court of Appeal reviewed the judge's conclusion. Morritt LJ at p 2063, described his conclusion as "eminently sensible and evidently right" and upheld it. Your Lordships have, in my opinion, been provided with no reason to come to any different conclusion.

C

*The £312,500 loan*

32    In my opinion, in agreement with the judge and the Court of Appeal, AJB succeeded in establishing that, for the purposes of section 238, it had entered into a transaction, namely the share sale agreement, at an undervalue and that the amount of the undervalue was £725,000,
D    i e £1,050,000 less £325,000. The order made by the judge and upheld by the Court of Appeal required Brewin Dolphin to pay that sum, with interest, to AJB. Neither before the judge nor before the Court of Appeal was any account taken of the £312,500 loan that had been made by PCG to AJB on 9 November 1989 and that had been intended to be repaid by set-off against the same amount due on 10 November 1990. In my opinion, however, that
E    sum ought to be taken into account. It constituted an advance payment, as a loan, of a part of the consideration that had been given for the BSL shares. The receipt of that sum was an advantage that AJB would not have received but for its entry into the share sale agreement and the sublease agreement.

33    PCG has proved for that sum in the liquidation of AJB, but what, if any, dividend will be received is not known. I imagine it will be negligible.

F    34    Under section 238(3), the court has a broad discretion to make "such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction". In my opinion, an order under the subsection that did not take account of AJB's receipt of the £312,500 would be unfair to Brewin Dolphin and PCG. I would, therefore, vary the order against Brewin Dolphin by allowing credit to be taken for the £312,500 and interest thereon. The interest should run from the same date
G    and at the same rate as the interest on the sum payable by Brewin Dolphin. PCG will, of course, have to withdraw its proof for the £312,500 in the liquidation. With that variation to the order made by Evans-Lombe J, however, I would uphold the order and dismiss the appeal.

*Appeal dismissed.*
*Order of Evans-Lombe J varied.*    H
*Question of costs adjourned.*

*Solicitors: Goodman Derrick; CMS Cameron McKenna.*

                                                    S H

TAB 44

*Quinn v CC Automotive Group Ltd* [2010] EWCA Civ 1412

Neutral Citation Number: [2010] EWCA Civ 1412

Case No: 2010/0443/B2

**IN THE HIGH COURT OF JUSTICE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM**
**HHJ Belcher**
**7HD01993**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 16/12/2010

Before :

**LORD JUSTICE MUMMERY**
**LORD JUSTICE SULLIVAN**
and
**LORD JUSTICE GROSS**

- - - - - - - - - - - - - - - - - - - - -

Between :

| | |
|---|---|
| **Paul Quinn** | **Appellant** |
| **- and -** | |
| **CC Automotive Group Limited t/a Carcraft** | **Respondent** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Paul Lakin** (instructed by **Chadwick Lawrence Solicitors**) for the **Appellant**
**Mark Harper** (instructed by **Greenhalghs**) for the **Respondent**

Hearing dates : 18/11/2010
- - - - - - - - - - - - - - - - - - - - -

# Judgment

Black Horse v Quinn

**Lord Justice Gross:**

INTRODUCTION

1.      The issue on this appeal is which of two innocent parties should bear the loss caused by a rogue.

2.      For reasons to which I shall come, in a careful judgment, HHJ Belcher held that the loss fell on Mr. Quinn, the Defendant/Part 20 Claimant and dismissed his claim against CC Automotive Group Limited t/a Carcraft, the 1ˢᵗ Part 20 Defendant.

3.      From that judgment ("the judgment"), Mr. Quinn ("A") appeals.  Carcraft ("R") seeks to uphold the judgment and, by a Respondent's Notice, contends additionally that the claim was rightly dismissed for a number of reasons rejected by the Judge.

4.      The rogue, a Mr. Abeed Khan ("K") is the 2ⁿᵈ Part 20 Defendant.  At the time in question, K was employed by R as a car salesman.

THE FACTS

5.      The facts, taken essentially from the judgment, can be shortly summarised.

    i)      As of July, 2005, A was in possession of a Silver Jaguar ("the Silver Jaguar"), the subject of a hire purchase agreement arranged through the Claimant in the original proceedings, Black Horse Limited ("Black Horse").

    ii)     The wedding of the A's daughter was due to take place (and, happily, so far as we are aware, did take place) on the 22ⁿᵈ July.  A wished to purchase a new Jaguar, preferably red, for the occasion.  With that in mind, A went to R's showroom in Leeds on the 4ᵗʰ July.

    iii)    At the showroom, A met K and discussed the purchase of a Blue Jaguar ("the Blue Jaguar").   In the event, A agreed to purchase the Blue Jaguar; he paid, then and there, a reservation fee of £100 in cash (and, subsequently, on the 8ᵗʰ July, an additional £400 by credit card) – so a total deposit of £500.  It may be noted that the Blue Jaguar was not present in the showroom at the time. The transaction was handled on R's behalf by K. It was agreed that A would pay £7,500 for the Blue Jaguar, together with the Silver Jag in part exchange.  As part of the deal, R would be responsible for paying and clearing the outstanding finance with Black Horse on the Silver Jaguar, together with arranging (hire purchase) financing for the Blue Jaguar.  The Judge observed, rightly, that this was not an unusual transaction.

    iv)     As the Judge held and was not in dispute before this Court, later on the 4ᵗʰ July, K telephoned A's wife ("Mrs Quinn") to say that he had located a Red Jaguar and invited A and Mrs Quinn to return to the showroom on the 5ᵗʰ July, with a view to buying the Red Jaguar instead of the Blue Jaguar.  Accordingly, on the 5ᵗʰ July, A and Mrs Quinn again went to R's premises, where K showed them a Red Jaguar on a computer screen; they were told that the car was physically in Bury, hence they were shown the picture/s on the screen.

v)      In the event, A decided to purchase the Red Jaguar ("the Red Jaguar") instead of the Blue Jaguar and, thereafter, K arranged for the return of the deposit paid on the Blue Jaguar.

vi)     On the 14th July, A and Mrs Quinn met K at a motorway service station on the M62.  The meeting was brief but included the cancellation of the agreement for the Blue Jaguar and signing the finance agreement for the Red Jaguar. The terms of the purchase of the Red Jaguar, apparently finalised at this meeting, were the same as those for the Blue Jaguar; a part exchange price of £7,500, with finance to be arranged by R, who would pay and clear the outstanding finance on the Silver Jaguar.  In fact, it would appear that no deposit was ever paid on the Red Jaguar.  As recorded by the Judge, neither A nor Mrs Quinn thought it odd to meet K at the service station;  Mrs Quinn said that they thought K was "thoroughly charming" and doing everything he could to ensure that they had the Red Jaguar in time for the 22nd July wedding.

vii)    On the 20th July, Mrs Quinn received a telephone call from K; he was going to collect the Red Jaguar that day and they arranged to meet at the same service station – it was more convenient than travelling to Leeds.  K also said that an additional £700.00 was required, as the Judge noted, "as Black Horse had not allowed enough finance".   Mrs Quinn said they could only afford £400.  K said that was in order and that the balance (£300) could be paid later.

viii)   A, Mrs Quinn and K duly met at the service station at about 20.00 on the 20th July.  A looked over the car and was very happy with it. K gave A the keys for the Red Jaguar;  A gave K the keys for the Silver Jaguar, together with £400 in cash and various documents relating to the vehicle.

ix)     In these circumstances, A cancelled the standing order for the finance payments in respect of the Silver Jaguar.  However, in August 2005, A received a no doubt unwelcome letter from Black Horse advising him that the money owing on the Silver Jaguar had not been settled. Subsequent investigations revealed that K had not cleared the finance on the Silver Jaguar; instead K had sold the Silver Jaguar to a *bona fide* purchaser for value without notice of the fraud.

x)      Inevitably, Black Horse brought proceedings against A for the outstanding balance on the original finance agreement in respect of the Silver Jaguar and, on the 19th February, 2008, obtained judgment against him in the amount of £11,134.65, plus costs amounting to £3,372.50.   A has since obtained a judgment against K but, in practical terms, that judgment must be assumed to be worthless.

xi)     As it transpired, the Red Jaguar had never belonged to R or formed part of its stock.  Despite extensive inquiries, it has never been established exactly where the vehicle came from. To that, I add, that its subsequent fate too is uncertain – counsel could not tell us (though it matters not to the decision in this case) whether A still has it. But it necessarily follows from this history that K had no <u>actual</u> authority from R to sell the Red Jaguar.  Accordingly, the dispute has been concerned with K's <u>apparent</u> authority.

6.      It is against this background that A has pursued R in these (third party) proceedings, essentially on the basis that R is vicariously liable for K's deceit.

THE JUDGMENT

7.      As to matters of fact and as already underlined, the Judge found that the A and Mrs Quinn had been shown the Red Jaguar on a desktop computer at R's premises; moreover, A had there (i.e., at R's premises) and then confirmed that he wished to purchase the Red Jaguar.  Having heard the evidence of A and Mrs Quinn, the Judge further held that they both impressed her as "entirely honest witnesses".  Later in her judgment, the Judge said this:

> " ...at no point did either of them consider that Mr Khan was, or might be, acting outside the scope of his employment/authority. "

8.      Against this background, I turn to the core reasoning in the judgment.  The Judge concluded that K had apparent authority to sell the Red Jaguar to A, to deal with part exchange of the Silver Jaguar and to assist in the arrangement of finance on behalf of Carcraft. The Judge said this:

> " 41.  In my judgment, whilst Mr. Khan had actual authority only to sell vehicles belonging to Carcraft, in assessing his apparent authority I have to consider what a third-party, a customer such as Mr. Quinn would properly consider Mr. Khan could do in the ordinary course of business.  Plainly Mr. Khan was employed as a car salesman to sell cars. It would have been unusual, and no doubt, considered very odd if Mr. Quinn had asked Mr. Khan for proof of his authority. Had he done so, he would have received proof that Mr. Khan was authorised by Carcraft to sell cars on their behalf. From Mr. Quinn's point of view that is exactly what Mr Khan went on to do. In my judgment, there is nothing which occurred at Carcraft's premises which would or should have led Mr. Quinn to consider that Mr. Khan was doing anything other than what he was authorised to do, namely selling a vehicle belonging to Carcraft. In the circumstances…Mr. Quinn was….entitled to assume that the red Jaguar he was shown on a desktop computer at Carcraft's premises was a vehicle owned by Carcraft and, therefore, a vehicle Mr. Khan was entitled to sell, and had apparent authority to sell on behalf of Carcraft…."

If it was necessary to express the matter in terms of vicarious liability, the Judge accepted (at [43]) that the deceit practised by K on A "was closely connected with Mr Khan's employment".   K was employed as a salesman to sell R's cars; the "wrong alleged" was "deceit in selling a car which he led Mr. Quinn to believe was a car belonging to Carcraft".  That wrong had a "sufficiently close connection" with K's employment.

9.      Having reached this conclusion and notwithstanding the fact findings she had already
        made as to A's and Mrs Quinn's state of mind, the Judge said that the issue she had to
        decide was:

> " 44. …..whether a reasonable person in Mr. Quinn's position
> would have been put on enquiry that Mr. Khan was acting
> outside his employment and therefore lacked authority to bind
> Carcraft."

10.     The Judge dismissed a variety of factors relied on by R as putting A on inquiry.
        These included the deposit on the Blue Jaguar being repaid by R; A not being asked
        for and not paying a deposit for the Red Jaguar; differences in the paperwork between
        this transaction and A's previous dealings with R; a number of K's unfulfilled
        promises; the location of two meetings at a motorway service station.

11.     However, the Judge went on to conclude, adversely to A:

> " 50. ….the demand for the £700 in cash and Mr. Khan's
> willingness to accept £400 with the balance to follow later, was
> sufficiently unusual that Mr. Quinn ought to have been put on
> enquiry at that time.  I am satisfied  that those aspects of this
> matter which ought to have put Mr Quinn on enquiry were
> matters which he overlooked in his desire to have the red
> Jaguar ….and to have it in time for his daughter's wedding.  I
> do not criticise him for that and I was impressed by this
> family's desire to make their daughter's wedding as perfect as
> possible. However the issue I have to decide is whether Mr
> Quinn should have been on enquiry such that he cannot rely
> upon Mr. Khan's apparent authority in connection with the
> transaction. I have enormous sympathy for the position that Mr.
> Quinn now finds himself in. However, I find that he should
> have been on enquiry and that in those circumstances he cannot
> succeed in his claim against Carcraft. These matters would also
> sever the chain of causation in relation to the vicarious liability
> for any deceit. "

12.     As to whether A was put on enquiry, even if the test was subjective, it nevertheless
        incorporated "an element of objectivity"; namely, whether A "was or should have
        been on enquiry"; a claimant could not "simply ignore the facts or bury his head in the
        sand". On the findings made by the Judge and in his desire to have the Red Jaguar in
        time for the wedding, A had overlooked matters which ought to have put him on
        enquiry.  This was so, even if the test was subjective.

> "54. …..To put this another way, based on the findings of fact I
> have made, whether applying the objective test as to whether a
> reasonable person would have been put on enquiry, or the
> subjective test as to whether Mr. Quinn was or ought to have
> been put on enquiry, I reach the same conclusion. "

13.     In a nutshell, therefore, although K had apparent authority to act on behalf of R in
        connection with the transaction involving the Red Jaguar, A was or ought to have

been put on enquiry – because of K's demand for the extra £700 and his willingness to accept £400, with the balance to follow later. The upshot is that the Judge dismissed A's Part 20 Claim against R.

## THE RIVAL CASES

14.    For A, Mr. Lakin underlined the facts as found by the Judge – in particular, that K had apparent authority to sell the Red Jaguar to A, that the deceit practised by K on A was closely connected with K's employment and that neither A nor Mrs Quinn at any point considered that K was, or might be, acting outside the scope of his employment or authority.   On those fact findings, the Judge ought to have decided the Part 20 Claim in A's favour.   The Judge erred in importing an "inquiry" test, alternatively in applying an objective rather than a subjective test to any such "inquiry".   On the facts (again as found by the Judge), A must have relied upon K.   As a matter of policy, as between A and R, it was just that R should bear the loss occasioned by K, whom R had put in a position that allowed him to commit the fraud – the more especially given R's own evidence that K had previously been employed by R in Rochdale and that, once inquiries were made, R's employees in Rochdale readily spoke of K's involvement in criminal matters and of his being known to the police.

15.    For R, Mr. Harper submitted that the Judge had been correct to dismiss the Part 20 Claim, both for the reason (as to the £700) she gave and for the additional reasons contained in the Respondent's Notice. The Judge had been wrong to hold that K had apparent authority to conclude the contract relied upon by A; the only representation made by R was that K had authority to sell and deal with R's cars on behalf of R – but the Red Jaguar had never been a car owned by R.   Further, the Judge had been wrong to conclude that K's deceit of A was committed in the course of his employment and/or was closely connected to it. Additionally, the Judge had been wrong to reject the further factors (already mentioned) which R submitted should have put A on inquiry.   The demand for the extra £700 had been the straw which broke the camel's back.   Any apparent authority enjoyed by K did not extend to this transaction as it developed; even if it did, it was irrational for A to rely upon it.   The transaction had crossed the line as soon as it proceeded outside the showroom; there were simply too many unusual factors and too many differences between this transaction and A's previous dealings with R.

16.    I gratefully acknowledge the assistance furnished in this appeal by both counsel and their helpfully succinct submissions.

## THE LEGAL FRAMEWORK

17.    In the course of their submissions, counsel drew the Court's attention to a number of authorities, including such seminal decisions as *Lloyd v Grace Smith & Co.* [1912] AC 716; *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd.* [1964] 2 QB 480; *Morris v CW Martin & Sons Ltd* [1966] 1 QB 716; *Armagas Ltd. v Mundogas SA* [1986] AC 717; *Lister v Hesley Hall Ltd* [2001] UKHL 22; [2002] 1 AC 215.   Furthermore, counsel advanced submissions on the recent decision in the Court of Final Appeal of the Hong Kong Special Administrative Region *Thanakharn v Akai Holdings Limited,* Final Appeal No. 16 of 2009 (Civil) and Final Appeal No. 9 of 2010 (Civil), after the Court alerted them to this authority, in which the substantive judgment was given by Lord Neuberger of Abbotsbury NPJ.    For present purposes,

the relevant principles, derived from these authorities, can be relatively shortly summarised. (As to terminology, in undertaking that summary, "employer/employee" and "principal/agent" will be used interchangeably and the "representee" will be referred to as "the third party".)

18.    First, dishonest conduct of an employee perpetrated with no intention of benefiting the employer "is of a different character from blundering attempts to promote the employer's business interests" and is governed, in the field of vicarious liability, "by a set of principles and a line of authority of peculiar application":  Lord Keith of Kinkel, in *Armagas v Mundogas*, at p.780.  The "genesis of these principles" as Lord Keith put it (*ibid*), can be traced back to the statement of Holt CJ in *Hern v Nichols* (1700) 1 Salk. 289:

> " Seeing somebody must be a loser, by this deceit, it is more
> reason that he that employs and puts a trust and confidence in
> the deceiver should be a loser, than a stranger."

That passage was described, with approval, by Diplock LJ (as he then was), in *Morris v Martin* (at p.733), as expressing an "old, robust and moral principle". More recently, Lord Millett has spoken of vicarious liability "…as a species of strict liability….best understood as a loss-distribution device….":  *Lister v Hesley Hall*, at [65].

19.    Secondly, however, these principles are to be confined within the limits that justice requires. So, plainly, an employer will not be liable for *all* the deceits or frauds of his employees; without more, an employer will not be liable unless the fraud itself falls within the actual or apparent authority of the employee. Moreover, it is settled law that an employer is not liable for the dishonest tort of his employee merely because the latter's employment has given him the opportunity to commit it:  Lord Keith, in *Armagas v Mundogas (ibid)*.

20.    Thirdly, an employer will or will likely be liable to an innocent party for the loss occasioned by the fraudulent misrepresentation of his employee acting within the scope of his apparent authority; statements of the highest authority address this question:

i)        The principal may be liable for the fraud of his agent committed when "purporting to act in the course of business such as he was authorised, or held out as authorised, to transact on account of his principal":  Earl Loreburn, in *Lloyd v Grace Smith* (at p.725); or, as Lord Denning MR in *Morris v Martin*, at p.727, summarised *Lloyd v Grace Smith* -  the solicitor's clerk was "acting within the *apparent* scope of his authority".

ii)       Treating apparent authority as, essentially, a species of estoppel by representation (see, at p. 503), Diplock LJ, in *Freeman & Lockyer v Buckhurst Park*, listed (at pp. 505-6) a number of conditions which must be fulfilled so as to entitle a contractor to enforce against a company a contract entered into on its behalf by an agent who had no actual authority to do so; insofar as here relevant these are as follows:

" (1) that a representation that the agent had authority to enter on behalf of the company into a contract of the kind sought to be enforced was made to the contractor:

(2) that such representation was made by a person or persons who had 'actual' authority to manage the business of the company either generally or in respect of those matters to which the contract relates;

(3) that he (the contractor) was induced by such representation to enter into the contract, that is, that he in fact relied upon it; ….. "

iii)    In *Armagas v Mundogas*, at p.783, Lord Keith said that it would be just for an employer to bear such loss in circumstances where:

" …..the employer by words or conduct has induced the injured party to believe that the servant was acting in the lawful course of the employer's business. "

Conversely, those circumstances do not exist where:

"…….such belief, although it is present, has been brought about through misguided reliance on the servant himself, when the servant is not authorised to do what he is purporting to do, when what he is purporting to do is not within the class of acts that an employee in his position is usually authorised to do, and when the employer has done nothing to represent that he is authorised to do it."

iv)    It is instructive that in these passages considering apparent authority, Diplock LJ focused upon the authority of the agent to enter into "contracts of the kind" sought to be enforced and Lord Keith highlighted the "class of acts" that an employee in the position of the rogue is usually authorised to do.   The representation, however made (whether by words or conduct), must of course emanate from the employer (or principal) rather than from the servant (or agent) himself.

21.    Fourthly, another way of considering the same question is furnished by *Lister v Hesley Hall*, a case concerned with deliberate wrongdoing on the part of the employee, albeit not involving misrepresentation.    This authority invites concentration upon the closeness of the connection between the work the employee had been engaged to do and the torts committed; if that connection is sufficient, then the torts may be regarded as having been committed within the scope of the employee's employment and the employer should be held vicariously liable for them: see the head note, at p.215. This analysis avoided the paradox that the greater the fault of the servant, the less the liability of the master:  see, *per* Lord Steyn, at [24].

22.    Fifthly and whichever analysis is adopted, when considering the scope of the employee's (or agent's) employment (or authority), a "broad approach" was to be adopted, as explained by Lord Clyde in *Lister v Hesley Hall*::

> " 42. ….in considering the scope of the employment a broad approach should be adopted…..
>
> 43. If a broad approach is adopted it becomes inappropriate to concentrate too closely upon the particular act complained of. Not only do the purpose and the nature of the act have to be considered but the context and the circumstances in which it occurred have to be taken into account….. "

In this regard, Lord Clyde may perhaps be seen as echoing the observations of Lord Macnaghten in *Lloyd v Grace Smith*, at p.739, when disapproving of the Court of Appeal's reasoning:

> " They look at the execution of the deeds by which Sandles cheated Mrs. Lloyd out of her property as if it were an isolated transaction – as a thing standing by itself; whereas the trick was so cunningly contrived as to seem to the victim of the fraud a mere matter of course – a trifling incident in the business about which the firm was being employed."

I would add that hindsight is to be avoided.

23.    Sixthly, it is a necessary condition of the employer's liability to the third party for the deceit of the employee that the representation, as to the employee's authority in respect of the transaction in question, was relied upon by the third party:  *Freeman & Lockyer v Buckhurst Park,* at p.506.

   i)    Plainly, there can be no reliance on such a representation if the third party did not have an honest belief in the employee's authority; so too, if the third party turns a "blind eye" to suspicions as to the apparent authority of the employee: see the discussion in *Akai*, at [49] – [62].  However, the touchstone is honest belief and, possibly, "irrationality" – a point conceded in *Akai (ibid)* and upon which it is unnecessary to express any concluded view.

   ii)    However and consistent with principle in the field of misrepresentation, the question of the "reasonableness" of the third party's belief is neither here nor there.    As pithily summarised in *Spencer Bower, Turner and Handley, Actionable Misrepresentation* (4th ed.), at para. 188:

> " A man who has told an untruth, innocently or fraudulently, cannot complain that the representee acted on the faith of his misstatement in the manner in which he, the representor, intended that he should. He can never be heard to say that another should not have believed the lie that he was told for the purpose of inspiring that belief, or plead that if the representee had not been such a fool , no harm would have been done. The representee never owed any duty to the representor to be careful, to be active in suspicion, or diligent in research when it was the very purpose of the misrepresentation to put his mind at rest. "

The observations of Lord Neuberger in *Akai*, at [52] and the sources there referred to, are to the same effect.

iii)    To my mind, an analysis founded on reliance and belief leaves little room for any consideration of whether the third party was "put on enquiry". If there is proper scope for such consideration, it would seem to arise as an aspect of whether the third party turned a "blind eye" to his suspicions as to the employee's apparent authority; possibly too, there could be debate as to whether the third party was put on enquiry if the employee was acting outside of the usual authority of a person holding the position he holds: see *Bowstead and Reynolds on Agency* (19th ed.), at paras. 8-054 – 8-055. But on no view can it be said that the third party is put on enquiry because of mere unreasonableness in failing to see through the employee's deceit; *a fortiori*, if the transaction is within the class of acts that an employee in the position of the rogue is usually authorised to do.

## DISCUSSION

24.    In my judgment, once the relevant legal principles have been clarified then, in the light of the Judge's findings of fact, the conclusions in this case readily follow.

25.    First and with respect to R's renewed argument to the contrary, the Judge was plainly right to conclude that K had apparent authority to sell the Red Jaguar to A and to deal with related matters of part exchange and financing. As the Judge underlined, with understatement, it would have been "very odd" if A had asked K for proof of his authority; had such a question been asked, the answer would have been that K was authorised by R to sell cars on its behalf. In my view, K's dealings with A both within and outside R's showroom were comfortably within the class of acts that an employee in K's position is usually authorised to do. Put another way and as also held by the Judge, the deceit practised by K on A was closely connected with K's employment as a car salesman by R.

26.    Secondly, the Judge found as a fact – unchallenged on this appeal – that A and Mrs Quinn were "entirely honest witnesses" and that at no point did either of them consider that K was or might be acting outside the scope of his employment or authority. It necessarily follows from those fact findings that A believed and relied upon the representation that K had authority to sell the Red Jaguar to him and deal with the related matters of part exchange and financing. No question arises of A not having an honest belief in K's apparent authority to do so; nor, likewise, does any question arise of A turning a "blind eye" to any suspicions as to A's apparent authority.

27.    Thirdly, I agree with A's argument on the appeal that the Judge fell into error in importing an "inquiry" test, *a fortiori*, in applying an objective "reasonableness" test in relation to the inquiry thus imported. Having regard to the conclusions which the Judge had already reached – both as to K's apparent authority and A's honest belief in and reliance upon R's representation as to that authority - there was neither room nor need for any "inquiry" test. That A and, for that matter, Mrs Quinn were taken in by K's deceit, whereas by the exercise of reasonable care they may not have been, is neither here nor there. The transaction involving the Red Jaguar was, it is to be emphasised, within the class of acts – and squarely so – that a car salesman such as K

is usually authorised to do.  This point does not benefit from elaboration and is sufficient, in my judgment, to decide the appeal in A's favour.

28.    Fourthly, I would go further, even if it is not strictly necessary for the outcome of the appeal to do so. Both K's request for the additional £700 (and acceptance of £400, leaving the £300 balance to be paid later), together with the other factors relied upon by R as putting A on inquiry, are to be considered in context and without the benefit of hindsight.   In the light of the Judge's earlier conclusions as to A and Mrs. Quinn, it is difficult, with respect, to see how any conclusion could be reached as to these matters – other than that they involved further manifestations of the apparently very helpful (and plausible) K doing everything he could to ensure delivery of the Red Jaguar in time for the 22nd July wedding.   To the extent that the Judge reached a different conclusion with regard to the £700, that conclusion is based on inference, rather than primary fact – and, with respect to the Judge, I am unable to agree. Accordingly, had it mattered, I would have concluded that A neither was nor ought to have been put on inquiry.

29.    Fifthly, as a matter of policy, the conclusion to which I have come accords  with the "old, robust and moral principle" spoken of by Diplock LJ and dating back to the observations of Holt CJ set out above. Granted that both A and R were innocent parties, on the facts of this case it is right that R, not A, should bear the loss occasioned by K's deceit.

30.    With respect to the Judge's careful judgment and for the reasons given, I would allow the appeal.

**LORD JUSTICE SULLIVAN:**

31.    I agree.

**LORD JUSTICE MUMMERY:**

32.    I also agree.