# EXHIBIT C

## Part 3

TAB 45

*Re Ayala Holdings Ltd (No 2)* [1996] 1 BCLC 467

a

# Re Ayala Holdings Ltd (No 2)

CHANCERY DIVISION (COMPANIES COURT)
KNOX J
19, 20 MAY 1993

b

*Liquidator – Assignment – Assignment to creditor – Property of the company – Company in compulsory liquidation – Liquidator assigning rights to and choses in action relating to dispositions of property of company after commencement of winding up to creditor – Whether assignment effective – Insolvency Act 1986, s 127, Sch 4, para 6.*

c

In 1985 the company contracted with the Kuwaiti Ministry of Public Works (the ministry) to fit out and furnish a conference centre. The company employed as its local agent a Kuwaiti company which arranged financing of the contract through its own bankers, the National Bank of Kuwait. As a
d condition of providing the facilities the bank required and the company executed an assignment of all moneys to become due to the company from the ministry under the contract and a recourse agreement under which those moneys would be paid direct by the ministry to the company's account with the bank. By April 1987 the works were substantially completed but final settlement was held up pending defects being remedied. In August 1987 the
e company gave the bank irrevocable instructions for the allocation of funds yet to be received from the ministry under the contract. Meanwhile the company was in financial difficulties and on 19 January 1988 a winding-up petition was presented against the company which was wound up in November 1989. Between 30 September and 31 December 1989 the bank recovered payment from the ministry in respect of final settlement under the contract which it
f applied in discharging the company's liability to the bank and to the Kuwaiti company. Questions arose as to the right of the bank to pay or retain such moneys received from the ministry after the commencement of the winding up. In November 1991 M, a creditor of the company in the winding up, acting in person, applied for relief against the bank seeking to have these issues raised
g and determined on his application in the winding up, the liquidator being without funds to pursue the litigation. The judge struck out his claim that non-registration under s 395 of the Companies Act 1985 rendered the transactions void against the liquidator on the ground that the company acting through the liquidator was the proper plaintiff but he allowed M to challenge the payments under s 423 of the Insolvency Act 1986 as
h transactions entered into at an undervalue because no proceedings had been brought by the liquidator. Subsequently, the liquidator applied to be joined as a party to the action commenced by M and by an assignment dated 10 February 1993 made pursuant to resolutions passed by the company assigned to M all rights to and choses in action relating to or in any way arising out of or in connection with the action, including the right of applying
i to the court to assert the voidness under s 127 of the Insolvency Act 1986 of the impeached transactions by the bank which M did not have before the assignment in his favour, and the conduct of the proceedings in his name.

Thereafter the liquidator, through his assignee M, applied to the court for relief against the bank. The judge directed, inter alia, that the questions: (i) who was the applicant, and (ii) whether the liquidator of a company in *a* compulsory liquidation had power to assign to a creditor of the company rights to have dispositions of the property of the company after the commencement of the winding up declared void and to recover such sums from the party effecting such disposition, should be determined as preliminary issues in the action. M contended that the rights were effectively rights which *b* were the property of the company which a liquidator could sell under Sch 4, para 6 of the Insolvency Act 1986.

**Held** – Although the assets of a company were assignable by sale under para 6 of Sch 4 to the 1986 Act the rights conferred upon a liquidator in relation to the conduct of the litigation were not because they were an incident of the *c* office of liquidator. Accordingly, the deed of assignment did not operate to vest in M any rights which the liquidator might have to exercise under s 127 of the 1986 Act or s 395 of the 1985 Act in relation to the payments made by the bank after the commencement of the winding up of the company. Furthermore, the application was made by the liquidator in conjunction with *d* M. However, since M had no locus standi because of the ineffectiveness of the assignment he should be struck out as an applicant.

### Cases referred to in judgment

*Ayala Holdings Ltd, Re* [1993] BCLC 256.

*Barleycorn Enterprises Ltd, Re, Mathias & Davies (a firm) v Down* [1970] 2 *e* All ER 155, [1970] Ch 465, [1970] 2 WLR 898, CA.

*Independent Automatic Sales Ltd v Knowles & Foster* [1962] 3 All ER 27, [1962] 1 WLR 974.

*MC Bacon Ltd, Re (No 2)* [1990] BCLC 607, [1991] Ch 127, [1990] 3 WLR *f* 646.

*Ramsey v Hartley* [1977] 2 All ER 673, [1977] 1 WLR 686, CA.

### Preliminary issues

By order dated 3 March 1993 Sir Mervyn Davies directed that five *g* preliminary issues be heard in proceedings brought by Theodoulos Papanicola, the liquidator of Ayala Holdings Ltd, through his assignee, Rowan Gavin Paton Menzies, a creditor in the liquidation, against the respondent, the National Bank of Kuwait. The court gave judgment on two of the issues, namely (i) who was the applicant, and (ii) the extent to which an *h* assignment made between the liquidator and the creditor, Mr Menzies, was effective as an assignment to the latter of the rights to have dispositions of the property of the company after the commencement of the winding up declared void and to recover such sums from the party effecting such dispositions. The facts are set out in the judgment.

*i*

*Richard Hacker* (instructed by *Simmons & Simmons*) for the bank.

Rowan Menzies and Theodoulos Papanicola appeared in person.

KNOX J. This is a judgment on two of the five preliminary issues directed by
Sir Mervyn Davies, on 3 March 1993, to be heard. Paragraph 2 of that order
*a* has the following two paragraphs:

'That there be determined as preliminary issues the following questions,
namely:

(a) the identity of the applicant(s) . . .

*b* (d) the extent to which the assignment dated 10th February 1993 made
between Theodoulos Papanicola and Rowan Gavin Paton Menzies is
effective as an assignment to Mr. Menzies of the right to bring any
proceedings, claims or causes of action which Mr. Papanicola and/or
Ayala Holdings Limited may be entitled to bring or assert against the
Respondent and, if so, which proceedings, claims and causes of action.'

*c*
The respondent is the National Bank of Kuwait. Mr Papanicola was
appointed liquidator of Ayala Holdings Ltd (the company) on 27 January
1993; that was in replacement of an earlier liquidator.

In brief, the issue which I have to decide is whether it is possible for there
to be an assignment by the liquidator of a company in compulsory liquidation
*d* to a creditor of the company of rights to have dispositions of the property of
the company after the commencement of the winding up, declared void, and
to recover the sums involved from the party effecting such a disposition. That
is the question which in my view arises under that preliminary issue in para
(d), which I read.

*e* The actual assignment in question is by no means free of difficulties of
construction, but the National Bank of Kuwait, through its counsel, Mr
Hacker, has indicated that it does not wish to rely on any inaccuracy of
drafting in that assignment in describing the rights intended to be assigned,
since any such defects could easily be cured by a further assignment if the only
defect is one of drafting.

*f* The early history of this matter has been set out very lucidly by Chadwick J
in a judgment which he gave in this action on 9 October 1992 (*Re Ayala
Holdings Ltd* [1993] BCLC 256), and I gratefully adopt that description. It
reads as follows (at 258–259):

*g* 'Mr Rowan Menzies is a creditor in the liquidation of the company. By
notice dated 27 November 1991 he made application, purportedly under
Pt 7 of the Insolvency Rules 1986, SI 1986/1925, for certain relief against
the National Bank of Kuwait. On 5 March 1992 that application was
amended, with the leave of the registrar, to include relief sought in a
document entitled "The Pleadings of the Applicant" which Mr Menzies
*h* had delivered to the bank on or about 18 February 1992. The document
itself was ordered to stand as his points of claim. By notice dated
25 March 1992 the bank applied to strike out Mr Menzies's application
and his points of claim. The bank's application to strike out has now been
heard before me [ie Chadwick J]. The company, Ayala Holdings Ltd, was
formed in 1976. It was engaged in the business of fitting out and
*i* furnishing substantial and prestigious buildings outside the United
Kingdom; and in particular, in the Middle East. The circumstances which
have given rise to Mr Menzies's application arose in connection with a

contract entered into by the company in December 1985 for the fitting
out and furnishing of the Kuwaiti Conference Centre. The other
contracting party was the Kuwaiti Ministry of Public Works. The value    *a*
of the contract was some KD4.8m; that is to say approximately £11m at
the rates of exchange then prevailing. In connection with the contract the
company employed, as its local agent or sponsor, a Kuwaiti company,
Al Julaiah Trading and Contracting Co. The financing of the contract
was arranged by Al Julaiah on behalf of the company through its own    *b*
bankers, the National Bank of Kuwait. The effect of those arrangements
was, inter alia, that the bank became bankers to the company. Among the
facilities provided by the bank were the issue of a performance bond
guaranteed by Al Julaiah, the provision of an advance guarantee and the
opening of letters of credit for the benefit of the company's suppliers. As
a condition of providing the facilities the bank required and the company    *c*
executed an assignment of all moneys to become due to the company
from the Ministry of Public Works under the contract and a recourse
agreement under which those moneys would be paid direct by the
ministry to the company's account with the bank. The recourse
agreement was registered with the Ministry of Justice in Kuwait as    *d*
required under the local law. By April 1987 the works under the contract
were substantially completed. Moneys remained due from the Ministry of
Public Works. The company had a residual liability in respect of defects
during a maintenance period. Settlement of the final account was held up
pending the snagging work which had to be done in respect of defects.
The company was in some financial difficulty. The applicant [ie Mr    *e*
Menzies] contends, in his points of claim, that it had already become
insolvent. It seems to me to be reasonably clear that some arrangements
had to be made in Kuwait to ensure that, notwithstanding the company's
financial difficulties, the snagging works were done so that settlement and
final payment under the contract could be achieved. In July 1987 Mr    *f*
Mark Maley, the managing director of the company, visited the bank in
Kuwait. He was accompanied by the managing partner of Al Julaiah.
Following that visit – and, so it is alleged in the points of claim, as a result
of that visit – the company, by letter dated 19 August 1987, gave to the
bank instructions for the allocation of funds yet to be received from the
Ministry of Public Works under the contract. Those instructions, which
were expressed to be irrevocable, were to the following effect. The first    *g*
KD300,000 was to be credited to the account of Al Julaiah at the bank.
Thereafter the funds were to be applied to extinguish the company's
overdraft indebtedness on its No 1 account with the bank. Surplus funds
were then to be transferred to the Al Julaiah account. The company's
financial difficulties were not resolved. The petition to wind up was    *h*
presented on 19 January 1988. That petition was strenuously opposed
during 1988 and for the greater part of 1989. Mr Menzies himself was an
opposing creditor. It may well be that his opposition was founded upon
the expectation that, if a final settlement of the account in respect of the
Kuwaiti contract could be achieved and payment obtained from the
Ministry of Public Works, the company would have sufficient funds to    *i*
pay its debts in full. By July 1989 a final settlement had been negotiated
in Kuwait and an agreement between the company and the Ministry of

Public Works was about to be signed. The amount to be paid was
KD450,525 or thereabouts. Mr Menzies learned that this money was to
be paid in Kuwait to Kuwaiti creditors, thereby excluding English
creditors from any benefit. He applied to this court and obtained
injunctions or undertakings restraining the company from signing the
settlement agreement. Those restraints were lifted by an order made by
Millett J on 13 September 1989. In their place it was ordered by consent,
inter alia, that the company should instruct the bank not to pay any
moneys to Al Julaiah until documents proving that Al Julaiah was a
secured creditor were produced to the court or to Mr Menzies. The bank
was also to be instructed by the company that, if it did make any payment
to Al Julaiah, that payment might be recovered by the company in
proceedings against the bank. The instructions required by that order
were given to the bank by the company's solicitors. The bank expressed
the view, in a letter dated 27 September 1989, that it was bound by the
law of Kuwait to give effect to the irrevocable instructions given in the
letter dated 19 August 1987 unless restrained by an order of the court. As
a result Mr Menzies learnt of the existence of that letter dated 19 August
1987. On 4 October 1989 Mr Menzies informed the bank – wrongly as
it appears to me – that the effect of the order of 13 September 1989 was
to restrain the bank from making payment to Al Julaiah in accordance
with the irrevocable instructions of 19 August 1987.'

I pause there to record the fact that Mr Menzies, in the course of his address
to me, accepted that Chadwick J was right in the view he expressed in that
sentence I have just read, as to the effect of the order of 13 September 1989. I
continue with Chadwick J's judgment (at 259–261):

'The disclosure to Mr Menzies of the irrevocable instructions which had
been given by the company to the bank in August 1987 appears to have
brought about a fundamental change in his attitude towards the winding
up of the company. He ceased to oppose the petition and became a
supporting creditor. He, himself, applied for the appointment of a
provisional liquidator. That appointment was made on 2 November
1989. Some three weeks later the company was wound up. At some date
between 30 September and 31 December 1989 – the precise date, I think,
is not known to Mr Menzies – the bank recovered payment of
KD387,662 or thereabouts from the Ministry of Public Works in respect
of the Kuwaiti contract. It applied this, first, in discharging the company's
liability on its current account in the amount of KD277,967 and second
by a transfer of KD110,266 to the account of Al Julaiah with the bank.
The effect is that the bank and Al Julaiah have been paid in full out of the
proceeds due to the company in respect of the final settlement under the
Kuwaiti contract. Prima facie, any disposition of the company's property,
including any disposition of moneys due to it under the Kuwaiti contract
by way of payment out of its bank account, made after 19 January 1988,
the date of the presentation of the petition upon which it was ordered to
be wound up, is void unless the court otherwise orders (see ss 127 and
129 of the Insolvency Act 1986). In relation to payments made or moneys
retained by the bank after 19 January 1988 out of the moneys received

from the Ministry of Public Works under the Kuwaiti contract the application of s 127 of the 1986 Act must depend upon the effect of the security arrangements made in December 1985 and, perhaps, on the effect of the irrevocable instructions given in August 1987. In particular, as it seems to me, it must be open to question (i) whether the effect of the assignments and the recourse agreement entered into in December 1985 was, under the law which governed those arrangements, to dispose of the company's interest in the proceeds of the Kuwaiti contract as at that date; and if so (ii) whether that disposal – which was by way of security – is properly to be regarded as the creation of a charge to which the provisions of s 395 of the Companies Act 1985 would have applied; and further (iii) whether the liquidator is entitled to rely on the provisions of s 395 of the Companies Act 1985 to defeat a claim by the bank that the proceeds of the Kuwaiti contract were not the property of the company at the time of the relevant disposals in 1988 and 1989. It is common ground that no particulars of any charge that might have been created in December 1985, or subsequently in August 1987 or at all, were registered as required by s 395 of the Companies Act. The right of the bank to retain moneys and its obligation to make payments, out of the proceeds of the Kuwaiti contract received from the Ministry of Public Works after the commencement of the winding up in January 1988 is a matter which one would expect to be investigated by the liquidator and, if necessary, resolved by the court on an application by the liquidator under s 168 of the Insolvency Act 1986 or in other proceedings brought by him in the company's name for that purpose. But in the present case, I am told by Mr Menzies that at the time when his application was made in November 1991 the liquidator was without funds. I understand that the liquidator may still be in a position where he is unable to take any steps in the liquidation which require the funding of complex litigation. It is in these circumstances that Mr Menzies, as a creditor of the company acting in person, seeks to have these issues raised and determined on his own application in the winding up. His ability to conduct proceedings in person does, of course, avoid, or substantially reduce, the expense that the liquidator would incur if he were to instruct solicitors and counsel. Conversely, the conduct of proceedings by Mr Menzies in person is likely to have the effect of increasing the costs to the bank of such proceedings; in that, although Mr Menzies conducts himself as an advocate with courtesy, moderation and some skill, the issues are not simple and do call for some detailed knowledge of the legislation and of the general law relating to insolvency. Proceedings in this field, which are conducted in person by a litigant who is not a lawyer experienced in insolvency matters are inevitably likely to be more prolonged, and so more expensive, than proceedings brought with expert legal assistance. The notice of 27 November 1991 seeks the following substantive relief. By para (i) it seeks a declaration that failure to register the security of the National Bank of Kuwait under the Companies Act 1985 made the security void against the liquidator. By para (iii) it seeks an order that the National Bank of Kuwait pay the liquidator the sterling equivalent of four sums paid or retained by it after the commencement of the winding up. Those sums are: "(a) KD191,000 paid to Al Julaiah in February 1988 (but wrongly described

in the notice as paid in February 1989) [and I pause there to record that
Mr Menzies accepted that correction in the course of his address to me];
(b) KD80,000 said to have been paid to Al Julaiah in February 1989; (c)
KD278,000-odd, to which I have already referred, retained by the bank
out of the final settlement moneys to discharge the company's overdrawn
account; (d) KD110,000-odd paid to Al Julaiah out of the final settlement
moneys at the end of 1989." The application is said to have been made
under the Insolvency Act 1986. As I have indicated it purports to be an
application under Pt 7 of the Insolvency Rules 1986. It seems to me,
therefore, that, whatever might be the position if the relief were sought by
Mr Menzies under the general law in independent proceedings between
Mr Menzies and the bank, as to which I express no view, I must approach
the bank's present application to strike out on the basis that Mr Menzies's
application of November 1991 cannot be allowed to proceed unless it is
properly to be regarded as an application made by a creditor under some
identifiable provision in the 1986 Act or under the rules. Prima facie, the
proper plaintiff in proceedings to recovery property or obtain
reimbursement for the benefit of a company in liquidation is the company
itself acting through its liquidator. The circumstances in which such
proceedings can properly be brought in winding up by a person other
than the company or its liquidator – for example a creditor or a
contributory – are, I think, to be regarded as exceptions to that general
principle, introduced by the legislation. The bank is, as it seems to me,
entitled to take the position that it ought not to be required to face
proceedings by Mr Menzies as a creditor in person unless he can bring
himself within one or other of the relevant statutory provisions which
confer upon him the privilege of proceeding by way of application in the
winding up. In my view there is nothing in the 1986 Act which enables
Mr Menzies, as a creditor, to seek, in proceedings in this liquidation, a
declaration against the bank as chargee to the effect that a charge is void
against the liquidator by reason of s 395 of the Companies Act 1985. He
may be entitled to apply for directions, under s 168 of the 1986 Act,
requiring the liquidator to dispute the validity of that charge; but that is
not the application which he has made in his notice of 27 November
1991. Nor, as it appears to me, would it be a useful application for him
to make in present circumstances, unless there was some proposal for
funding the proceedings which he wants the liquidator to bring. It
follows, therefore, that para (i) of the notice of 27 November 1991
cannot be allowed to proceed.'

I pause there to record that Chadwick J also struck out a challenge that was
made by Mr Menzies against the National Bank of Kuwait on the basis that
the latter had been guilty of misfeasance within s 212 of the 1986 Act, on the
footing that it had taken part in the management of the company. That
decision is not now challenged before me nor is it a claim that is now sought
to be advanced. On the other hand, Chadwick J held in relation to a challenge
which he treated Mr Menzies as seeking leave to make to the three payments
by the National Bank of Kuwait to Al Julaiah under s 423 of the 1986 Act as
transactions entered into at an undervalue that it was not a claim by Mr
Menzies as a creditor and that it would be bound to fail in limine because the

statutory requirement in that section could not be satisfied on the basis of the
allegations made in the points of claim. He also rejected a submission by the
National Bank of Kuwait that it was so inconceivable that any court would as    *a*
a matter of discretion make an order under that section against a bank which
had honoured a payment instruction in good faith that the claim ought not to
be allowed to proceed. It is not necessary for me to go into his reasons.

Finally, Chadwick J gave leave for Mr Menzies to pursue his application
under s 423 to the extent indicated, but before doing so he said (at 266–267):   *b*

'I have already indicated that there appear to me to be issues in relation
to the moneys paid or retained by the bank after the commencement of
the winding up in January 1988 which might be expected to be the subject
of investigation by the liquidator. If there were to be proceedings brought   *c*
by the liquidator to recover such moneys the claims and issues raised by
Mr Menzies in the present application would be subsumed in the
liquidator's proceedings and I would not think it right to give leave to Mr
Menzies to proceed independently under s 423 of the 1986 Act. But in the
absence of proceedings by the liquidator, to refuse Mr Menzies the leave
which he requires would in effect be to preclude any investigation of these   *d*
matters by the court.'

Effectively, Mr Menzies's claim under s 423 was, in principle, given leave
to be advanced but placed in cold storage while it was ascertained whether the
liquidator, not then Mr Papanicola but a Mr Voight, would bring the wider      *e*
claim under s 168 or otherwise into which Mr Menzies's claims would be,
likely, subsumed. Mr Menzies accepted that he was in effect in a straitjacket
in making his claim under s 423, whereas the liquidator who, unlike Mr
Menzies, could assert a claim that s 127 voided the disputed transactions in
1989, was in a far better position to assert rights on behalf of creditors.

Chadwick J's order, as corrected in various respects, included the following,   *f*
that is to say: that paras (i) and (iii) (c) of Mr Menzies's application dated 27
November 1991 be struck out. That is the claim, first of all, to assert directly
the invalidity due to non-registration and the invalidity under s 127 or
otherwise of the retention by the bank in its own favour as opposed to
payments by the bank to Al Julaiah.                                              *g*

Second, Chadwick J ordered that the application by the bank to strike out
para (ii) of Mr Menzies's application should be stood over for 14 days with a
proviso that if the liquidator of the company should within that period or such
further period as the court might allow make an application for relief in the
liquidation, para (iii) of the application should be struck out. All further
proceedings in the application were ordered to be stayed for 14 days subject    *h*
to a similar proviso that if the liquidator should within 14 days or such further
period as the court might allow make an application for relief in the
liquidation against the National Bank of Kuwait the latter should be at liberty
to apply to the court for a further stay upon proceedings in the application.
Then para 4 provided that if the liquidator did not make any such application    *i*
within the permitted period the applicant, Mr Menzies, should be given leave
to make an application under s 423 of the 1986 Act and to proceed in the
application in so far as he claimed relief against the National Bank of Kuwait

under that section. Some directions were given in regard to pleadings and the filing of evidence. The direction on the costs was as follows:

'The costs of the respondent's application to be the respondent's costs in cause [the respondent, of course, being the National Bank of Kuwait] provided that there shall be liberty to apply to vary such order for costs in the event that the liquidator makes the application referred to in paras 2 and 4.'

Leave to appeal was refused by Chadwick J but was granted to the National Bank of Kuwait by the Court of Appeal; that appeal has still to be heard and is, I was told, listed for a date in October 1993.

There were abortive negotiations for a different licensed insolvency practitioner from Mr Papanicola to be appointed liquidator in place of the original liquidator and extensions of time were obtained from Chadwick J as contemplated in that order which I have just read; but it is not necessary for me to go through the details of that since no point on time is taken on behalf of the National Bank of Kuwait.

The next material event is that on 11 December 1992 Mr Menzies was granted an option by the administrative receivers of a company called Ayala Design and Build Ltd to purchase, for £40,000, the latter's debt from Ayala Holdings which was in fact by far the largest of the company's debts. The details of this transaction do not affect the assignability of the rights which are claimed to have been assigned by Mr Papanicola but the transaction did, in fact, render Mr Menzies able to control the majority voting in creditors' meetings in the company's liquidation.

A draft of an intended application proposed to be made by the gentleman who was proposed to be substituted for the original liquidator but, in the event, never was, was prepared and placed before Chadwick J. It described the applicant as the proposed substitute liquidator, a gentleman called Christopher Guy Adams, and the respondent was the National Bank of Kuwait: the body of the draft application reads as follows:

'Take notice that I intend to apply to the judge, Mr. Justice Chadwick, on Friday 11th December 1992 at 10.30 for applications as follows: (i) That I hereby join the application of Mr. R.G.P. Menzies against the National Bank of Kuwait (NBK); (ii) Alternatively, that I hereby take over the application of Mr. R.G.P. Menzies against NBK; (iii) That Mr. R.G.P. Menzies be given leave to have conduct of the proceedings in my name; (iv) That any orders for costs awarded in favour of NBK during forthcoming proceedings be payable by Mr. R.G.P. Menzies personally; (v) That in any event the substantive application ((vi) below) be heard immediately; (vi) The substantive application is for a declaration and order as follows. That all payments made between 20th January 1988 and 31st December 1989 by the National Bank of Kuwait purportedly on behalf of Ayala Holdings Ltd., either to itself or to Al Julaiah Trading & Contracting Company, be void unless validated; that any party wishing to validate must apply within 14 days together with a supporting affidavit; and failing such application, payments made during the above-mentioned period be void.'

Then there was a space for a signature which, it being a draft, was not there.
That was before Chadwick J when the matter came before him on
15 January 1993, when he made the following order:

'(1) that PROVIDED that the application presently before the Court in
draft form [and that is the draft I have just read] is made by the Liquidator
on or before 5th February 1993 the Plaintiff do file such further evidence
as it wishes to rely on [and then he gave directions for the filing of
evidence on each side]

(2) that PROVIDED that the said Application be made in the form of the
said draft the first issue to be determined at the hearing of the said
Application presently floating from 5th March 1993 is that under
paragraphs (i), (ii) and (iii) of the said Application that is to say who
continues the said Application . . . [and then there were provisions for
fixing hearings]

(4) that the Application pursuant to s 423 of the Insolvency Act 1986
be stayed until after 5th February 1993 and thereafter until after
Judgment in the Application either made by the Liquidator PROVIDED
that such Application has been made by 5th February 1993 or until
further Order.'

On 27 January 1993, as I have already mentioned, Mr Papanicola was
appointed liquidator and Mr Adams therefore dropped out of the picture,
never having actually taken over as liquidator, and the assignment which is
the subject matter, or the occasion of the issue that I have principally now to
decide was made on 10 February 1993. It was made pursuant to one of the
several resolutions that were passed at a meeting of the liquidation committee
of the company. The relevant resolutions are, first of all, as follows:

'it was resolved that Mr. Papanicola be joined as a party to the action
already commenced by Mr. Menzies;

it was resolved that the benefit of the liquidator's action be assigned to
Mr Menzies on the terms set out in the draft assignment produced at the
meeting or terms substantially in line therewith;'

and I pause there to mention that the draft, I was told, was in exactly the same
terms as the document that was subsequently signed the same day.

'It was resolved that the liquidator be given all powers contained in
schedule 4 of the Insolvency Act [he said "1985" but he clearly meant]
1986;'

and those resolutions were all passed, as were two others, but I need not read
them.

I turn, then, to the assignment in question. As I said, it is dated the same
day, 10 February 1993, and is made between Mr Papanicola on the one part
and Mr Menzies on the other. It recites Mr Papanicola's appointment as
liquidator, that Mr Menzies was a creditor of the company and that he had
brought proceedings in the liquidation of the company.

The fourth recital is in the following terms:

'It is intended that the Liquidator be joined as a party to the said
proceedings for the purpose of the better conduct thereof and for the
a     purpose of bringing in to the Liquidation for the benefit of the general
body of creditors certain monies disposed of by National Bank of Kuwait
(the Respondents in the aforementioned proceedings).'

The first of the operative clauses reads as follows:

b     'I. In consideration of the covenants hereinafter appearing the
Liquidator as Liquidator of Ayala Holdings Limited hereby transfers
conveys and assigns absolutely to Mr. Menzies all rights to and choses in
action relating to or in any way arising out of or in connection with the
aforementioned action to the effect that hereafter Mr. Menzies (subject as
c     hereinafter mentioned) shall be solely entitled to continue the said
proceedings in the name of the Liquidator in the name of Ayala Holdings
Limited.
II. Mr. Menzies shall pay to the Liquidator 90 per cent of any sum or
sums he may receive or to which he may become entitled as a result of his
prosecuting the said proceedings after deduction from such sums as he
d     may receive or become entitled to his proper and reasonable costs of the
prosecution of the said proceedings such costs to be agreed between him
and the Liquidator or taxed by the Court.
III. Save as set out in paragraph II above Mr. Menzies hereby agrees
that he will not seek any costs from the Liquidator or from Ayala
Holdings Limited save to the extent that Mr. Menzies may be entitled to
e     prove in the Liquidation of Ayala Holdings as an unsecured creditor.
IV. Mr. Papanicola hereby undertakes to provide Mr. Menzies with
such reasonable assistance as Mr. Menzies may need from time to time
for the purposes of prosecuting the said proceedings.
V. Mr. Menzies undertakes to continue to prosecute the said
f     proceedings diligently and as speedily as may be practicable.
VI. Mr. Menzies undertakes not to compromise the said proceedings
other than with the prior written consent of the Liquidator or his
representatives.'

g     Paragraph VIII, which I need not read in full, is an undertaking by Mr
Menzies effectively to keep the liquidator informed of progress and to allow
him to see documents and attend meetings.
As a result of that assignment the draft application which I read a few
moments ago, when Mr Adams was expecting to go into the saddle, was
amended and is, in fact, in its amended form the application now before me.
h     It lists as the applicant Mr Theodoulos Papanicola and describes him as
'through his assignee, Rowan Gavin Paton Menzies' and the respondent is, of
course, the National Bank of Kuwait.
The body of the application is in the same terms as the draft that I have
already read with certain significant amendments. First, para 1. Instead of
reading 'I hereby join the application' ('I' being the liquidator), it reads, 'I,
i     having joined the application of Mr. Menzies v. the National Bank of Kuwait
with the sanction of the liquidation committee'.
Paragraph 2 is deleted in the amended version.

Paragraph 3, instead of asking that Mr Menzies be given leave to have
conduct of the proceedings in the liquidator's name says that, 'as I have
assigned to Mr. R.G.P. Menzies the conduct of the proceedings in my name',   *a*
so it is turned into a recital of fact rather than a request for relief. A similar
alteration occurs in relation to orders for costs because the amended version
takes the form of an asseveration: 'it follows that any order for costs awarded
in favour of N.B.K. during the forthcoming proceedings be payable by Mr.
R.G.P. Menzies personally.'
                                                                              *b*
Five and six are in the same terms.

This time it is signed by Mr Menzies, as I understand it, dated 10 February
1993, and the signature has below it 'Rowan Gavin Paton Menzies as assignee
of Theodoulos Papanicola'; and it gives as the address for service Mr
Menzies's address. It is addressed, of course, to the solicitors for the National
Bank of Kuwait.                                                               *c*

That came before Sir Mervyn Davies and he made the order, the paragraphs
of which I have already read.

In that state of affairs Mr Menzies's argument is, essentially, that this is
effectively covered by the decision in *Ramsey v Hartley* [1977] 2 All ER 673,
[1977] 1 WLR 686. I take the headnote in [1977] 1 WLR 686 at 686–687      *d*
because it is considerably more succinct:

'The plaintiff bought shares in a company, and as a result sustained
financial loss. He brought an action against, inter alia, the fifth defendant,
a firm of accountants, claiming that they had been negligent in preparing
the accounts on the basis of which he had bought the shares. After issuing
his writ, he was adjudicated bankrupt. By a deed of assignment, his          *e*
trustee in bankruptcy assigned to him all those rights in title to and choses
in action relating to or arising out of the matters giving rise to his claim
against the defendants, he agreeing to indemnify the trustee against costs
and to pay him 35 per cent. of the net proceeds if the action were
successful. In answer to a letter from the fifth defendant's solicitors, his  *f*
solicitors confirmed that their client had been assigned his claim against
them by the trustee. On a summons by the fifth defendants for security
for costs, the master held that a mere right to litigate could not be
assigned, that the purported assignment to the plaintiff by his trustee in
bankruptcy had been of a mere right to litigate and was accordingly
invalid and that therefore the action was not properly constituted, the       *g*
trustee being neither the plaintiff nor a plaintiff, and he stayed the action.
The deputy judge in chambers allowed an appeal by the plaintiff, holding
that the action was properly constituted. [There is then a passage about
security, which I need not read at this stage.] On appeal by the fifth
defendant:—*Held*, dismissing the appeal, (1) that section 55(1) of the      *h*
Bankruptcy Act 1914, which enabled a trustee in bankruptcy to sell any
part of the bankrupt's property vested in him, including "things in
action" gave him the right to assign a chose in action even where the
assignee was the bankrupt himself; that the plaintiff's solicitors' letter had
constituted sufficient notice of the assignment which was a valid legal
assignment on which the plaintiff was entitled to sue; and that,              *i*
accordingly, the plaintiff's action was properly constituted and the
deputy judge had been right in allowing it to proceed . . .'

I need not read the rest of the headnote which is concerned with other matters, such as security for costs.

a   Mr Menzies pointed to the very close similarity that undoubtedly exists between the relevant provisions of the Bankruptcy Act 1914, with which *Ramsey v Hartley* was concerned, and the parallel provisions of the Insolvency Act 1986; in particular he pointed to the closeness in the definition of the word 'property' which in s 167 of the Bankruptcy Act 1914 is as follows; and it is quoted, in fact, in Megaw LJ's judgment ([1977] 2 All ER 673 at 679, [1977] 1 WLR 686 at 692):

b

'"Property" includes money, goods, things in action, land, and every description of property, whether real or personal and whether situate in England or elsewhere; also obligations, easements and every description c   of estate, interest, and profit, present or future, vested or contingent, arising out of or incident to property as above defined.'

The parallel definition is somewhat more brief in the 1986 Act, but I accept there is no significant difference for present purposes; in fact it reads as follows in s 436:

d

'"property" includes money, goods, things in action, land and every description of property wherever situated and also obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property.'

e   It is, obviously, very wide.

The next and equally important provision which has substantially identical terms is the power of sale vested in the trustee in bankruptcy on the one hand and the liquidator, under the 1986 Act, on the other. So far as the Bankruptcy Act 1914 is concerned, the relevant passage is in s 55, again cited by Megaw f   LJ. It reads as follows ([1977] 2 All ER 673 at 679, [1977] 1 WLR 686 at 693):

'Subject to the provisions of this Act, the trustee may do all or any of the following things:—(1) Sell all or any part of the property of the bankrupt (including the goodwill of the business, if any, and the book g   debts due or growing due to the bankrupt), by public auction or private contract, with power to transfer the whole thereof to any person or company, or to sell the same in parcels.'

The provision that is relevant in the 1986 Act is in Sch 4, Pt III, para 6, and h   it reads:

'Power to sell any of the company's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels.'

i   Schedule 4 is introduced by ss 165 and 167 of the 1986 Act. Section 167 is the one with which I am concerned, which regulates winding up by the court, and that provides in sub-s (1) that:

'Where a company is being wound up by the court, the liquidator may—(a) with the sanction of the court or the liquidation committee, exercise any of the powers specified in Parts I and II of Schedule 4 to this Act [and then there is a bracket which describes what those provisions are], and (b) with or without that sanction, exercise any of the general powers specified in Part III of that Schedule.'

So this power of sale, in fact, is one which does not need the sanction either of the court or the liquidation committee, and it will be recalled that the liquidation committee did, in fact, by its resolution confer all the powers exercised by a liquidator in any part of Sch 4.

I should (in parenthesis) mention that Pt II which is therefore exercisable by the liquidator now, includes para 4, which reads:

'Power to bring or defend any action or other legal proceeding in the name and on behalf of the company.'

Mr Menzies is certainly a creditor and he claims to be the largest, or potentially the largest, creditor; that is a circumstance which, in my judgment, does not touch the assignability of the liquidator's rights. It may or may not make Mr Menzies a suitable assignee, and a more suitable assignee than others, if the rights are assignable; but that is an entirely separate question from the one of whether the rights are in fact assignable. The right which is claimed to have been assigned, as I understand it, is the right which Mr Menzies accepts, in the light of Chadwick J's judgment, that he did not have before the assignment in his favour, of applying to the court to assert the voidness under s 127 of the 1986 Act of the impeached transactions by the National Bank of Kuwait by way of appropriation in its own favour of sums paid to it in right of the company so as to discharge the company's indebtedness to the National Bank of Kuwait and also the payments to Al Julaiah that are challenged. This claim also depends upon establishing that the National Bank of Kuwait cannot rely on the security arrangements made in December 1985 or on the effect of the irrevocable instruction given in August 1987, and that question would be, it would seem, likely to be much affected, if not entirely governed, by the question of whether non-registration under s 395 of the Companies Act 1985 rendered those transactions void as against the liquidator.

Mr Menzies's submission to me is that all these rights are effectively rights and therefore property of the company which a liquidator can sell under Sch 4, para 6 of the 1986 Act. In reply he referred me to a number of authorities, both in *Halsbury's Laws of England* and reported cases in the House of Lords, for the proposition that where a statute is unambiguous in its terms the court's duty is to give effect to it notwithstanding that the results of doing so may appear inconvenient or perverse. Those are not in doubt; the question is, what does para 6 of Sch 4 to the 1986 Act mean when it uses the expression, which it does, 'property of the company'?

In my judgment Mr Menzies's argument overlooks an important distinction between property of the company, on the one hand, and the rights and powers of a liquidator, on the other. The property of a company includes rights of action against third parties vested in a company at the commencement of the

winding up and to that extent the principles in *Ramsey v Hartley* undoubtedly
apply and such rights can, as I see it, be sold by a liquidator pursuant to para

*a*  6 of Sch 4. What is to be distinguished in my view are the statutory privileges
and liberties conferred upon liquidators as such and indeed upon trustees in
bankruptcy who are officers of the court and act under the court's direction.
In relation to the non-registration of a charge registrable under s 395 of the
Companies Act 1985 or, more precisely, its predecessor, s 95 of the
Companies Act 1948, I was referred to *Independent Automatic Sales Ltd v*

*b*  *Knowles & Foster* [1962] 3 All ER 27, [1962] 1 WLR 974, in the course of
which Buckley J said ([1962] 3 All ER 27 at 29, [1962] 1 WLR 974 at 979–
980):

*c*       'A preliminary point arises in this action. The company is in creditors'
       voluntary liquidation. It is asserting in the action that certain hire-
       purchase agreements are not the subject of a charge in favour of the
       defendants by reason of the fact that any charge which may have been
       created over them has not been registered in accordance with the
       provisions of s. 95 of the Companies Act, 1948. The defendants have two
       other defences to the action which I need not at the moment consider or

*d*    mention, but the point is taken on their behalf that the company is not a
       proper plaintiff in such proceedings, on the ground that s. 95 does not
       make void a charge which is not duly registered as against the company
       itself, but makes the charge void against the liquidator of the company
       and any creditor of the company. In those circumstances, it is said that
       the company itself cannot sustain an action in effect asking for a

*e*    declaration that the charge is void.'

Buckley J then dealt with a pleading point, with which I am not concerned,
and went on to say ([1962] 1 WLR 974 at 981):

*f*       'What I have to consider is whether the company itself can have any
       good cause of action arising out of the non-registration of a charge
       registrable under section 95 of the [Companies Act 1948], and I think the
       answer to that question is in the negative. The charge is not made void as
       against the company; the charge is only made void as against the
       liquidator and as against creditors of the company. The purpose of the

*g*    section is to enable the liquidator to deal with the assets of the company
       in the liquidation in a way which he would not otherwise be able to adopt
       for the benefit of the company's creditors. But if, in the event, the
       company turns out to be to any extent solvent, so that the subject-matter
       of the charge eventually comes back into the unfettered ownership of the

*h*    company, it comes back encumbered with the charge notwithstanding the
       non-registration. It seems to me that the rights of the company are wholly
       unaffected by the section, and consequently, I think on that ground the
       company is not a proper party to assert that the charge is void for lack of
       registration.'

*i*  This illustrates the limited nature of the statutory interference with parties'
rights consequent upon non-registration of registrable charges on company
property and it fits in with that limited interference, that the rights which are

conferred, are conferred to enable liquidators to collect the relevant assets, as
Buckley J has stated.

I was also referred to the decision of Millett J in *Re MC Bacon Ltd (No 2)*     *a*
[1990] BCLC 607, [1991] Ch 127. In that case a liquidator claimed to recover
out of assets subject to a floating charge given to a bank costs that he had
himself incurred and been ordered to pay to the bank in consequence of
unsuccessful proceedings by him against the bank on the footing of an alleged
voidable preference and wrongful trading. The issues were different from the     *b*
matter before me but some of Millett J's reasoning is of assistance. He said
([1990] BCLC 607 at 611, [1991] Ch 127 at 136–137):

'The next and in my judgment crucial question is whether the costs of
the proceedings are "expenses of the winding up". The expenses of the      *c*
winding up and the order in which they are payable out of the assets are
listed in r 4.218(1) of the 1986 rules. The liquidator submits that the costs
and expenses in question fall within paragraph (a) as: "expenses properly
chargeable or incurred by . . . the liquidator in preserving, realising or
getting in any of the assets of the company." The liquidator submits that
the phrase "the assets of the company" in para (a) as in the opening words     *d*
of r 4.218(1) must be construed in the light of the decision of the Court
of Appeal in *Re Barleycorn Enterprises Ltd, Mathias & Davies (a firm) v
Down* [1970] 2 All ER 155, [1970] Ch 465 and includes the floating
charge assets. The proceedings, he submits, were brought at least in part
for the purpose of realising or getting in those very assets. They were
brought in order to recover (i) the assets subject to the bank's fixed and     *e*
floating charge, which was alleged to be a voidable preference; and (ii) a
further "contribution to the company's assets", as provided by s 214 of
the 1986 Act in the case of wrongful trading. The fact that the
proceedings were unsuccessful, he claims, can make no difference to the
characterisation of the costs incurred in bringing them. In my judgment,     *f*
however, the proceedings were not brought for the purpose of realising
or getting in any assets of the company (however that phrase is defined)
and, even if they were, the fact that they were unsuccessful makes all the
difference to the application of para (a). The proceedings were not
brought by or on behalf of the company nor were they brought in order
to recover assets belonging to the company at the date of the winding up.     *g*
All such assets were charged to the bank and any claim to recover them
was vested in the bank. The proceedings were brought (i) to set aside the
bank's charge (fixed as well as floating) as a voidable preference, and (ii)
to obtain compensation for wrongful trading by way of an order for
contribution to the assets of the company. Neither claim could have been
made by the company itself. This has nothing to do with the fact that the      *h*
claims were made against the bank as holder of a floating charge. The
same would be true if the proceedings had been brought against a third
party.'

The next paragraph deals with the effect of a voidable preference; I can omit     *i*
that and move in my quotation to his conclusion, which is in the following
words ([1990] BCLC 607 at 612, [1991] Ch 127 at 137):

a
'It follows, in my judgment, that a claim to set aside a voidable
preference is not a claim to realise or get in any asset of the company.
That must be so whether the preference took the form of the payment of
a debt or the grant of a security. The only difference is that in the latter
case the claim wears a greater semblance of being a claim to get in the
assets of the company because the assets comprised in the security belong
to the company. But in truth the claim is not to get in the assets comprised
in the security but to set aside the security.'

b

Those passages, in my view, underline the fundamental distinction between
assets of a company and rights conferred upon a liquidator in relation to the
conduct of the liquidation. The former are assignable by sale under para 6 of
Sch 4, the latter are not because they are an incident of the office of liquidator.
c  This conclusion is, in my view, supported by the special status of the
liquidator in company law. Section 143(1) defines his duties:

'The functions of the liquidator of a company which is being wound up
by the court are to secure that the assets of the company are got in,
d   realised and distributed to the company's creditors and, if there is a
surplus, to the persons entitled to it.'

Section 234 contains specific provisions with regard to the getting in of the
company's property and provides as follows:

e   '(1) This section applies in the case of a company where . . . (c) the
company goes into liquidation . . . and "the office-holder" means . . . the
liquidator . . .
(2) Where any person has in his possession or control any property,
books, papers or records to which the company appears to be entitled, the
f   court may require that person forthwith (or within such period as the
court may direct) to pay, deliver, convey, surrender or transfer the
property, books, papers or records to the office-holder.'

There is also, of course, in s 167 the provision to which I have already made
reference that introduces the power of the liquidator to exercise the powers
g  specified in Sch 4 to the Act, some with consent, others without it. Moreover
it appears to me that the special provisions in s 167(3) would be bypassed in
a most undesirable way if Mr Menzies's submission was correct.
Section 167(3) reads as follows:

h   'The exercise by the liquidator in a winding up by the court of the
powers conferred by this section is subject to the control of the court, and
any creditor or contributory may apply to the court with respect to any
exercise or proposed exercise of any of those powers.'

Now, if Mr Menzies is right in submitting that a liquidator can assign any
i  of his powers the assignee, who is not a liquidator, would be free from any
such control and I find it very difficult to envisage that Parliament could have
contemplated that that was a permissible state of affairs. Similarly, in relation

to the provisions in s 168(5) parallel considerations apply. Section 168(5) reads:

*a*

'If any person is aggrieved by an act or decision of the liquidator, that person may apply to the court; and the court may confirm, reverse or modify the act or decision complained of, and make such order in the case as it thinks just.'

*b*

In exactly the same way an assignee would not be subject to those provisions and that seems to me to be something which is quite different from what Parliament must have contemplated.

*Ramsey v Hartley* [1977] 2 All ER 673, [1977] 1 WLR 686 does not touch this aspect of the case, in my judgment, since the rights there assigned were   *c* plainly the property of the bankrupt. Indeed the defendants – or the fifth defendant, more precisely – in that case were in a cleft stick on this aspect, in that if a right of action against it were not property of the company, it never vested in the trustee in bankruptcy at all and, in those circumstances, it is not surprising that there was scarcely any challenge to the proposition that the right to sue the fifth defendant was comprised in the expression 'property of   *d* the bankrupt'.

For those reasons I answer the issue regarding the effectiveness of the deed of assignment by saying that it did not operate to vest in Mr Menzies any rights which the liquidator may have to exercise rights under s 127 of the 1986 Act or s 395 of the Companies Act 1985 in relation to the payments   *e* specified in para 6 of the application of 17 November 1992 as amended on 10 February 1993.

I was also asked to deal at this stage with the first of the points directed to be heard as preliminary issues by Sir Mervyn Davies, namely who is the applicant; this is indeed an unusual question for a court to have to decide but   *f* there is a degree of ambiguity in the status of Mr Papanicola.

It is clear enough, in my judgment, that Mr Menzies has made this application; he claimed to be an assignee and it was on that footing that he principally made his application before me. So there is no problem as to his being an applicant. Somewhat less clear is whether Mr Papanicola is an applicant. When I asked him whether he was applying, the reply which I   *g* received was, 'I don't make the application. I do not challenge the right of Mr. Menzies to make the application, but it is not my application'. That, of course, is an indication from Mr Papanicola of his present attitude with regard to the future prosecution of this application. It cannot, of course, determine what the true construction is of the documents that are before me and that must turn,   *h* really, as I see it, on the application, as amended on 10 February 1993, which is before the court.

There is no doubt that 'I' in that application, which I have read and do not repeat, must mean Mr Papanicola. No other construction of the word 'I' is possible in the context of para 1: that reads:

*i*

'I, having joined the application of Mr. Menzies against the N.B.K., with the sanction of the liquidation committee . . .'

On the face of it, 'I' in that paragraph means Mr Papanicola and it must also mean the same three lines higher – 'Take notice that I intend to apply to
*a*  the judge'. On the other hand, there is a statement by Mr Papanicola in the body of the application that he has assigned to Mr Menzies the conduct of the proceedings in his name. That is in no sense inconsistent with the proceedings being the proceedings of Mr Papanicola; indeed it is more consistent with that than with the view that they are solely Mr Menzies's proceedings.

*b*  The only really solid ground that I can see for suggesting that this is not Mr Papanicola's application is that it is signed by Mr Menzies 'as assignee for Theodoulos Papanicola' and that suggests that it was Mr Menzies's application as the successor in title of Mr Papanicola rather than as an application by both Mr Papanicola and Mr Menzies.

There appears to have been an impression gained by Mr Menzies and, it
*c*  may be, by Mr Papanicola too, that Chadwick J required the liquidator to be a party to the application if there was to be an effective assignment. I do not accept that as being what Chadwick J said because the proposals before Chadwick J – and indeed some of the possibilities he investigated in the course of his judgment and after – were not directed at the assignment situation and I do not read him as having made any finding on this score. Indeed, it clearly
*d*  is not the case, that, if the rights were assignable, it would be necessary for the liquidator to be a party to the application because on that hypothesis the liquidator would be in a position to drop out of the picture altogether and assign his rights to the third party; so that this misapprehension is, indeed, I think a misapprehension, but it can hardly govern the true construction of the
*e*  application.

I have come to the conclusion that, treating it as a piece of English, it is not possible to avoid the conclusion that it is in fact an application made by Mr Papanicola with which Mr Menzies, as Mr Papanicola's proposed assignee, associated himself. That is how I answer the first of the preliminary issues, namely that the application was made, up to now, by Mr Papanicola in
*f*  conjunction with Mr Menzies.

**KNOX J.** I have to deal with costs. I have not formally given my decision, which I have to now, on paras (e) and (c) in the preliminary issues directed to be heard on 3 March by Sir Mervyn Davies.

*g*  I stand (c) over generally, because the probability is that this may well never need to be argued and I can see no utility in incurring the costs involved in an argument on the question.

(e) is on the question of whether any order and, if so, what order, should be made on para 4 of the application and whether it is appropriate at the time of the determination of the preliminary issues for the court to make any other
*h*  order concerning the costs of the application. That I construe, in the context of para 4 of the application, which reads, 'It follows that any orders for costs awarded in favour of N.B.K. during forthcoming proceedings be payable by Mr. Menzies personally' as raising the question of whether it is appropriate for the court at this stage to make any order or direction regarding the incidence of costs on the substantive issue, if and when it comes to be decided.
*i*  In my judgment it would be wholly inappropriate for me to seek to tie the judge who hears that matter, if and when it is decided, in any way and at the end of the day I did not understand Mr Menzies to dispute that proposition.

Accordingly, it seems to me that I ought to answer question (e) that no order should at this stage be made concerning the costs of the application, other than the costs of the preliminary issue.      *a*

That brings me to the questions which I have had argued before me yesterday and today.

In my judgment it would be right for Mr Menzies to pay the bank's costs in that respect, because the issue was occasioned by an ingenious but, in my view, unsuccessful scheme for getting round the difficulties that he is involved    *b*
with in relation to the impecuniosity of those who seek to represent the creditors of this company. He was unsuccessful and I think I can see no basis upon which I should depart from the usual practice of ordering costs to follow the event.

As regards Mr Papanicola, although no doubt it will come as a surprise to him, I have held that he is a party to the application and on that basis, I fear,   *c*
he finds himself jointly liable with Mr Menzies. What the situation is between the two of them it is not for me to inquire, but in my judgment they are both liable to pay the bank's costs to be taxed on the standard basis.

Two further points remain outstanding. One is whether I should order those costs to be taxed and paid forthwith. There should only be one taxation, I have some difficulty in seeing how there could be more, but the possibility    *d*
has been canvassed and in so far as it needs a direction from me I do direct that both in relation to Mr Menzies's liability and that of Mr Papanicola there be only one taxation of the bank's costs, if not agreed.

Finally, there is the question that has been raised as to whether it would be appropriate for me to strike out Mr Menzies as an applicant. I think that is, really, a formality because the decision I have given is that he has no locus    *e*
standi because of the ineffectiveness, on the view which I take of the law, of the assignment in his favour of 10 February 1993 and I think it would be tidier if I struck him out rather than leave it in the air as a result of the decisions that I have given and the rather unclear form in which the application at present stands. Therefore I propose to include a direction in the order to that effect.    *f*

Mr Menzies asks for leave to appeal. In my judgment this is not an appropriate case in which it is for me to give leave. There is always, of course, the possibility of his getting leave from the Court of Appeal.

*Order accordingly.*

   *g*

Mary Rose Plummer   Barrister.

TAB 46

*Re Brabon* [2001] 1 BCLC 11, English High Court

# Re Brabon

_a_

## Treharne v Brabon and others

CHANCERY DIVISION
JONATHAN PARKER J

_b_ 25–28, 31 JANUARY, 1–4, 7 FEBRUARY, 3 MARCH 2000

_Winding up – Bankruptcy – Insolvency – Whether transactions at an undervalue – Transactions defrauding creditors – Sale of land by mortgagee not transaction entered into by bankrupt – Consideration provided on sale_
_c_ _by mortgagor was value of land free from mortgage – No relief for trustee in bankruptcy in relation to sale of land at undervalue in case of negative equity – Trustee failed to show that substantial purpose of transactions was to put assets out of reach of creditors – Insolvency Act 1986, ss 339, 423._

In 1997 certain areas of land in East Sussex were together sold by NB, his
_d_ wife, PB, and their son, BB, to a property development company (Silver) for £670,000 for residential development. Between contract and completion NB was adjudged bankrupt. On completion, four areas of land in the sole ownership of PB, together with an access road, and one area of land in the joint ownership of PB and BB were transferred to Silver by a single transfer at a price of £566,000. Two other areas owned by NB before his bankruptcy
_e_ were transferred to Silver by PB by way of sale as mortgagee, in one case as second mortgagee under a charge granted to her by NB and in the other as transferee of a first charge granted by NB to a building society. The consideration for those sales was £29,000 and £75,000. In both cases the entire sale price was paid to the mortgagees in partial satisfaction of the indebtedness secured by the charges. NB's trustee in bankruptcy took
_f_ proceedings against NB, PB and BB alleging that a number of earlier transactions relating to one or more of the areas of land were shams and/or transactions defrauding creditors for the purposes of s 423 of the Insolvency Act 1986, and against Silver alleging that the conveyance to Silver by PB as mortgagee of the two areas of land held by NB before his bankruptcy
_g_ constituted transactions at an undervalue under s 339 of the 1986 Act.

**Held** – (1) The transfers of land by PB as mortgagee were not transactions 'entered into' by NB for the purposes of s 339. The relevant transaction for the purposes of s 339 was not the contract for sale but the actual disposal of those properties in favour of Silver and those disposals were made by PB as
_h_ mortgagee in exercise of her power of sale. The charges in favour of PB were valid and effective and were not shams. Even if the contract for sale was specifically enforceable against NB the contract was superseded by the actual transfers. A transfer by way of sale not by the bankrupt but by the bankrupt's mortgagee was not a transaction 'entered into' by the bankrupt. Therefore the trustee's claims against Silver under s 339 failed.
_i_ (2) There was negative equity in those two areas of land since the outstanding indebtedness secured on them exceeded the trustee's highest valuations. On a sale of mortgaged property by the mortgagor the value of

the consideration provided by the mortgagor for the purposes of s 339(3)(c) was not the value of the mortgagor's equity of redemption but the value of the land free from the mortgage. Therefore if the two areas of land had been transferred by the bankrupt there would have been a transaction at an undervalue for the purposes of s 339. However in the case of negative equity the court would not have granted the trustee in bankruptcy relief under s 339 since even if the mortgaged property had been sold at the price contended for by the trustee the entirety of the proceeds would have been applicable towards satisfaction of the secured debt, and no part of the proceeds would have been receivable by the bankrupt or trustee.

*Re MC Bacon Ltd* [1990] BCLC 324 applied.

(3) The site was marketed by five firms of estate agents over more than two years before the sale to Silver. Therefore the sale to Silver was a sale on the open market conducted in a manner which had the effect of determining the actual market value of the site at the relevant time. Therefore the price paid by Silver was not an undervalue. However as a matter of the apportionment of the overall consideration to the two areas, the amount attributed to them was less than their true market value as part of the site and accordingly if relief had been otherwise available under s 339 against Silver the court would have granted relief in relation to those two transfers on the basis that they were transactions at undervalues.

(4) A number of previous transactions within NB's family relating to the areas of land were transactions at an undervalue but the trustee failed to show that a substantial purpose of the transactions was to put assets out of the reach of the bankrupt's creditors. Therefore the trustee was not entitled to relief under s 423 and his claims failed.

**Cases referred to in judgment**

*Arbuthnot Leasing v Havelet Leasing* (No 2) [1990] BCC 637.

*Chohan v Saggar* [1992] BCC 306.

*Eichholz, Re* [1959] 1 All ER 166, [1959] Ch 708, [1959] 2 WLR 200.

*MC Bacon Ltd, Re* [1990] BCLC 324.

*Moon v Franklin* [1996] BPIR 196.

*Royscot Spa Leasing Ltd v Lovett* [1995] BCC 502, CA.

**Applications**

The trustee in bankruptcy of Neville Audley Brabon took proceedings against Mr Brabon, his wife, and their son, alleging that a number of earlier transactions within the Brabon family relating to one or more areas of land sold in 1997 to Silver (Building and Construction) Ltd were transactions defrauding creditors for the purposes of s 423 of the Insolvency Act 1986 and/or were ineffective to divest Mr Brabon of his beneficial interest and should be set aside. As against Silver the trustee further claimed that the transfer to Silver of two of the areas of land which were held by Mr Brabon immediately before his bankruptcy were transactions at an undervalue for the purposes of s 339 of the 1986 Act. The facts are set out in the judgment.

*Stephen Atherton* (instructed by *Wilde Sapte*) for the trustee.

*Charles Gratwicke* (instructed by *Harris Segal*) for the Brabons.

*a*

*David Marks* (instructed by *Russell-Cooke, Potter & Chapman*) for Silver (Building and Construction) Ltd.

*Cur adv vult*

*b*    3 March 2000. The following judgment was delivered.

## JONATHAN PARKER J.

INTRODUCTION

*c*    Neville Audley Brabon, the third respondent in these consolidated proceedings, was adjudged bankrupt on 3 October 1997. The claimant in these proceedings, Stephen Treharne, is his trustee in bankruptcy. Mr Brabon formerly practised as a solicitor, but he was struck off the roll of solicitors in December 1994 and subsequently pleaded guilty to a number of charges of dishonesty arising out of the conduct of his solicitor's practice.

*d*    In the proceedings, which were commenced on 3 December 1997 in the Hastings County Court (and subsequently transferred to the High Court), the trustee seeks relief in respect of seven adjoining areas of freehold land lying to the north of North Trade Road in Battle, East Sussex, together with an access road leading from North Trade Road. I shall hereafter refer to the respective areas of land as 'Barbarossa', 'Hillcrest', 'Wendy', 'High Hedges', *e*    'Little Meads', 'the ransom strips' and 'the open land'; and to the access road as 'the roadway'.

Immediately prior to 11 July 1997, the freehold in two of the seven areas (Barbarossa and Hillcrest) was vested in Mr Brabon; the freehold in a further four areas (Wendy, Little Meads, the ransom strips and the open land) was *f*    vested in Mr Brabon's wife, Mrs Penelope Brabon (the first respondent in the proceedings); and the freehold in the remaining area (High Hedges) was vested jointly in Mrs Brabon and their son Benjamin Brabon (the second respondent in the proceedings). Mrs Brabon also owned the roadway.

By a contract dated 11 July 1997, and exchanged on that date, Mr and Mrs Brabon and Benjamin Brabon agreed to sell the seven areas of land and *g*    the roadway to a developer, Silver (Building and Construction) Ltd (Silver), for £670,000. Silver is the fourth respondent in the proceedings. The contract also granted Silver an option to purchase an adjoining area of land ('the option land') for a further £60,000. The option land formed part of Mr and Mrs Brabon's adjoining property known as the Meads, and is also served by *h*    the roadway. The contract was conditional on the grant of planning permission for the erection of 11 dwelling houses. In the event this condition was treated as fulfilled, in that although the determinative planning permission was not granted until a few days after completion, Silver had agreed in the meantime to treat the contract as unconditional.

*i*    As at the date of Mr Brabon's bankruptcy (3 October 1997), the contract remained uncompleted.

In December 1997 these proceedings were commenced, in anticipation of the contract being completed.

As against Mr and Mrs Brabon and Benjamin Brabon, the trustee alleges that a number of earlier transactions relating to one or more of the areas of land the subject of the contract entered into within the Brabon family, and involving one or more of Mr Brabon, Mrs Brabon, Benjamin Brabon, Mr Arthur Brabon (Mr Brabon's father, who was made bankrupt on 28 August 1997), and Chislelane Ltd (a company owned initially by Mr Brabon and Benjamin Brabon, and subsequently by Mrs Brabon and Benjamin Brabon: as to which see further below), were transactions defrauding creditors for the purposes of s 423 of the Insolvency Act 1986 (the 1986 Act), and/or were ineffective to divest Mr Brabon of his beneficial interest; and he seeks orders setting aside those transactions.

When the proceedings were commenced (ie before completion of the contract), the relief sought by the trustee against Silver was the setting aside of the entire contract as a transaction at an undervalue, for the purposes of s 339 of the 1986 Act; alternatively as a transaction defrauding Mr Brabon's creditors, for the purposes of s 423 of the 1986 Act.

The trustee applied for, and was granted, interlocutory injunctive relief restraining completion of the contract pending trial. On 31 January 1998 the injunction was discharged by consent, on terms that part of the proceeds of sale be held in the joint names of the solicitors for the trustee and for the Brabon family. The way was then clear for completion.

Completion took place on 13 March 1998. On completion, the four areas of land in the sole ownership of Mrs Brabon, together with the roadway, plus the one area of land in the joint ownership of Mrs Brabon and Mr Benjamin Brabon, were transferred to Silver by a single transfer at a price of £566,000. The two remaining areas formerly in the ownership of Mr Brabon (Barbarossa and Hillcrest) – Mr Brabon's title to those plots having vested in the trustee on his bankruptcy – were in each case transferred to Silver by Mrs Brabon by way of sale as mortgagee. In the case of Barbarossa Mrs Brabon sold as second mortgagee under a charge granted (or purportedly granted) to her by Mr Brabon dated 31 January 1994. In the case of Hillcrest Mrs Brabon sold in her capacity as transferee of a first charge granted by Mr Brabon to Nationwide Building Society dated 5 April 1982. The consideration for the sale of Barbarossa was £29,000; the consideration for the sale of Hillcrest was £75,000. Thus, the total consideration paid by Silver for the seven areas of land and the roadway was £670,000 (equal to the contract price).

Following completion, Silver exercised its option to acquire the option land for a further £60,000. I shall hereafter refer to the entirety of the land transferred to Silver on 13 March 1998 plus the option land as 'the site'. The total consideration paid by Silver for the site was thus £730,000.

On 28 October 1998 the trustee applied for permission to amend the relief sought against Silver in the light of the fact that, the site having been transferred to Silver, an order setting aside the contract was no longer appropriate. The application for permission to amend was heard by me, in the course of the pre-trial review on 22 January 1999. The application was unopposed, and I granted it. The amended relief sought by the trustee against Silver is a declaration in the following terms:

a

'… that the conveyance of the properties set out in the schedule hereto by [Mr Brabon] to [Silver] pursuant to [the contract] constituted transactions at an undervalue under s 339 of the [1986 Act] and/or constituted transactions defrauding creditors under s 423 of the Act.'

b

It is apparent from the terms of this amended relief that it is framed on the basis that Barbarossa and Hillcrest were transferred to Silver by Mr Brabon, whereas, as I have already noted, they were in fact sold and transferred to Silver by Mrs Brabon as mortgagee. It is not clear to me how the amendment came to be framed on an erroneous basis. The trustee plainly must have appreciated that, since he was not himself a party to the completion arrangements for the purpose of transferring Mr Brabon's title to Barbarossa and Hillcrest, those two areas of land would have to be dealt with in some

c

other way; and the evidence establishes that the trustee was informed that it was proposed that they would be transferred to Silver by way of mortgagee sale (although there is some doubt as to the extent to which the trustee was informed of the details of this proposal). At all event, the trustee was apparently content not to be a party to the sale of the site to Silver, presumably on the footing that his claims against Silver were effectively

d

secured by the deposit of part of the proceeds of sale in the joint names of the solicitors.

It is also apparent from the terms of the amended relief that the trustee is confining his claim against Silver to the sales of Barbarossa and Hillcrest. It was explained to me that he took this course in the light of the fact that the sales of the remaining areas were not transactions entered into by

e

Mr Brabon, and that in consequence relief under s 339 of the 1986 Act (transactions at an undervalue) would not be available in relation to the sales of those areas. On the face of it, the same consideration would appear to apply to the sales of Barbarossa and Hillcrest, which were in the event effected by Mrs Brabon as mortgagee. However, the trustee's case is that the

f

sales by Mrs Brabon as mortgagee are properly to be regarded as no more than conveyancing mechanics to give effect to the transaction into which Mr Brabon entered when he signed the contract.

In the event the trustee has not pursued any claim under s 423 as against Silver. Hence the only claims which the trustee makes against Silver are that the sales of Barbarossa and Hillcrest were transactions entered into by

g

Mr Brabon at an undervalue, for the purposes of s 339 of the 1986 Act.

The trustee appears by Mr Stephen Atherton of counsel; Mr Brabon, Mrs Brabon and Benjamin Brabon by Mr Charles Gratwicke of counsel; and Silver by Mr David Marks of counsel.

h

THE RELEVANT STATUTORY PROVISIONS

Section 339(1) of the 1986 Act provides that where a bankrupt has at any 'relevant time' (as defined in s 341) entered into a transaction with any person at an undervalue, the trustee in bankruptcy may apply for an order under the section. Section 339(2) provides that, on an application made under sub-s (1), the court shall make such order as it thinks fit for restoring

i

the position to what it would have been if the bankrupt had not entered into the transaction. Section 339(3)(c) provides that a bankrupt enters into a transaction with a person at an undervalue if he enters into a transaction

with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the bankrupt.

Section 341(1)(a) of the 1986 Act provides that, subject to sub-s (2), 'relevant time' means, in the case of a transaction at an undervalue, the period of five years ending with the date of presentation of the bankruptcy petition. Section 341(2) provides that where a bankrupt enters into a transaction at an undervalue at a time which is within that period, that time is not a relevant time for the purposes of ss 339 and 341 unless the bankrupt was insolvent at the time, or became insolvent in consequence of the transaction. However, s 341(2) is expressly disapplied where the transaction takes place within two years of the presentation of the bankruptcy petition. The transaction under challenge in the context of the trustee's claims against Silver (the transfers of Barbarossa and Hillcrest) took place only a month or so before the presentation of the bankruptcy petition against Mr Brabon. Accordingly in order to succeed on his claims under s 339 against Silver the trustee does not have to discharge the burden of establishing that Mr Brabon was insolvent at the time, or that he became insolvent in consequence of those transactions.

Section 423 applies to transactions entered into at an undervalue (including gifts and other transactions for no consideration) where the court is satisfied that the transaction was entered into by a person for the purpose of putting assets beyond the reach of his creditors or of otherwise prejudicing claims by creditors. Where the court is so satisfied, it may make such order as it thinks fit for restoring the position to what it would have been if the transaction had not been entered into and for protecting the interests of creditors prejudiced, or capable of being prejudiced, by the transaction. There is no time limit in respect of claims under this section.

Section 425(2)(a) provides that an order made under s 423 may affect the property of, or impose any obligations on, any person whether or not he is the person with whom the debtor entered into the transaction, save that such an order shall not prejudice any interest in property which was acquired from a person other than the debtor and was acquired in good faith, for value and without notice of the relevant circumstances.

A GENERAL DESCRIPTION OF THE SITE

The site lies to the north-west of North Trade Road, which runs approximately NE/SW. The only access to the site is via the roadway, which is an unmade-up track. The roadway leads from North Trade Road at right-angles in a north-westerly direction. The entrance to the roadway from North Trade Road lies between two houses fronting North Trade Road. To the left (if one faces the track from North Trade Road) is a house called 'High Hedges'. This is not to be confused with the area of land referred to as High Hedges. The house High Hedges, together with its garden, was carved out of a larger area by the Brabon family some time ago, and is not relevant to these proceedings. The land referred to as High Hedges consists of the remainder of this larger area, which was retained by the Brabon family when the site of the house High Hedges was conveyed away. The greater part of the land so retained lies to the rear (ie to the north-west) of the land conveyed away, but also included in the retained land is a small triangular piece of land

a  in front of the house at the corner where the roadway meets North Trade Road (doubtless retained in order to facilitate the development of the site at some time in the future).

To the right of the entrance to the track is a house called 'Byways' which (like the house High Hedges) is not relevant to these proceedings. Byways formerly formed part of the property lying immediately to its rear, viz the Meads, where Mr and Mrs Brabon live. As in the case of the area referred to as High Hedges (and no doubt for the same reason) on conveying away
b  Byways the Brabon family retained, as part of the Meads, a triangular parcel of land at the corner where the roadway meets North Trade Road. This latter triangular parcel of land is larger than the equivalent parcel of land retained as part of the area referred to as High Hedges on the other side of the roadway (ie on the opposite corner), and it extends some distance down the
c  roadway. It is one of two relatively small areas of land which together form what I refer to as the ransom strips. Continuing down the roadway, passing (on the left) the house High Hedges and (on the right) Byways, one reaches (on the left) the area referred to as High Hedges and (on the right) the option land (which is part of the garden of the Meads). The Meads is the next property on the right, adjoining the option land. Thereafter, the roadway
d  turns at right-angles towards the north-east, and runs more or less parallel with North Trade Road. Adjoining the roadway to the right as one travels down it, and a few feet after rounding the corner, is another relatively small triangular-shaped piece of land. This is the other area which makes up what I refer to as the ransom strips. The ransom strips would require to be incorporated in any proposal to widen the roadway as part of any
e  development of the site (hence the appellation ransom strips).

Continuing along the roadway in a north-easterly direction, one passes (on the left-hand side – ie to the north-west) first Wendy then Barbarossa, before reaching Hillcrest, where the roadway ends.

Little Meads lies to the rear of the area referred to as High Hedges,
f  adjoining its north-western boundary. Little Meads has access to the roadway at the apex of the corner where the roadway turns north-eastward. To the rear of Little Meads, Wendy, Barbarossa and Hillcrest (ie to the north-west) lies a larger area which is the area referred to as the open land.

So far as the topography of the site is concerned, it is relevant to note that the rear of the site (including the rear gardens of Little Meads, Wendy,
g  Barbarossa and Hillcrest) slopes steeply downhill in a north-westerly direction, towards the open land.

THE CONVEYANCING HISTORY

Given the complexity (and, in a number of respects, the obscurity) of the conveyancing in relation to the site, for most of which Mr Brabon was
h  responsible in his capacity as solicitor acting for the Brabon family, it is convenient to deal separately with the various areas of land the subject of the trustee's claims in these proceedings.

*Barbarossa*

Mr Brabon purchased Barbarossa in his own name in November 1984. He
i  was registered as sole proprietor on 25 March 1985. Part of the purchase price was provided by way of loan from the Halifax Building Society, secured by a first charge.

According to Mr Brabon, in November 1988 he granted his father Mr Arthur Brabon (who was then living at Little Meads, of which he was registered proprietor) a right to live at Barbarossa for the rest of his life, in consideration of Mr Arthur Brabon transferring Little Meads to Mrs Brabon. It is at least common ground that in or about November 1988 Mr Arthur Brabon moved from Little Meads to Barbarossa, and that he continued to live there until shortly before the sale of Barbarossa to Silver. In evidence is a written agreement dated 1997 and made between Mr Arthur Brabon, Mr Brabon and Mrs Brabon, whereby Mr Arthur Brabon purports to surrender his right to occupy Barbarossa on completion of the sale of Barbarossa to Silver in consideration of Mr Brabon providing him with suitable alternative accommodation for the rest of his life. Further, there is in evidence a copy of a conveyance dated 24 November 1988 whereby Mr Arthur Brabon transferred Little Meads to Mrs Brabon. It is the trustee's case that Mr Brabon was at all material times the beneficial owner of Little Meads, and the trustee relies on the terms of the conveyance as supporting that contention. (I shall return to the terms of the conveyance when dealing with the conveyancing history of Little Meads.) The trustee also challenges the existence of a right for Mr Arthur Brabon to occupy Barbarossa for the rest of his life.

Also in evidence is a promissory note dated 31 January 1994, executed by Mr Brabon as a deed, whereby he purportedly charged Barbarossa with the repayment to Mrs Brabon of a sum of £70,000 'value received' with interest. The charge was not registered at the land registry until April 1997. The sale of Barbarossa to Silver was effected by Mrs Brabon in purported exercise of her power of sale under the charge contained in the promissory note, at the price of £29,000. It is the trustee's case as against the Brabon family (although it is not a case which the trustee seeks to make as against Silver) that the promissory note is a sham in that there was in reality no such debt owed by Mr Brabon to Mrs Brabon, and hence no valid charge in her favour.

Thus, the principal issues in relation to Barbarossa are:

(1) (as against Silver) whether the sale of Barbarossa to Silver for £29,000 was a transaction at an undervalue, for the purposes of s 339 of the 1986 Act;

(2) whether Mr Arthur Brabon acquired an enforceable right to occupy Barbarossa for the rest of his life; and

(3) whether the promissory note created a valid charge in favour of Mrs Brabon, and/or whether it can be impeached as a transaction defrauding creditors, for the purposes of s 423 of the 1986 Act.

*Hillcrest*

Hillcrest was purchased by Mr Brabon on or about 5 April 1982. Part of the purchase price was provided by way of loan by Nationwide Building Society, secured by a first charge on the property. Mr Brabon was registered as sole proprietor on 17 June 1982. On 21 February 1990 Mr Brabon granted a second charge over the property in favour of Lloyds Bank, to secure all moneys from time to time owing to the bank by Mr Brabon. The evidence is that at the date of the sale to Silver a sum of £300,000 or thereabouts was owing to the bank, secured by this second charge.

a
In evidence is a promissory note in Mr Brabon's handwriting dated 11 April 1996 in similar form to the promissory note relating to Barbarossa, to which I have already referred. The promissory note in relation to Hillcrest purports to charge Hillcrest with the repayment to Mrs Brabon of the sum of £3,920 'value received' with interest.

b
On 11 March 1998, Nationwide Building Society transferred its first charge to Mrs Brabon in consideration of a payment of £14,781.59. Two days later, on 13 March 1998, Mrs Brabon exercised the power of sale under that charge in selling and transferring Hillcrest to Silver for £75,000.

As in the case of Barbarossa, it is the trustee's case as against the Brabon family that the promissory note is a sham in that there was no debt of £3,920 owed by Mr Brabon to Mrs Brabon, and hence no valid charge in favour of Mrs Brabon.

c
Thus, the principal issues in relation to Hillcrest are:

(1) (as against Silver) whether the sale of Hillcrest to Silver at the price of £75,000 was a transaction at an undervalue, for the purposes of s 339 of the 1986 Act; and

d
(2) (as against the Brabon family) whether the promissory note created a valid third charge in favour of Mrs Brabon, and/or whether it can be impeached as a transaction defrauding creditors, for the purposes of s 423 of the 1986 Act.

*Wendy*

Wendy was purchased on 3 October 1984 by a company called Chislelane Ltd (Chislelane). Chislelane was formed by Mr Brabon for the purpose of purchasing Wendy, and throughout Chislelane's existence (it was dissolved on 7 January 1997) Wendy remained its only asset. At all material times Mr Brabon was the only director of Chislelane. The issued share capital of Chislelane consisted of 100 ordinary shares of £1 each, of which (initially) 95 were registered in the name of Mr Brabon and five in the name of Benjamin Brabon.

f
Chislelane was registered as sole proprietor of Wendy on 28 November 1984. On 24 May 1985 Chislelane granted a first charge over Wendy in favour of Royal Bank of Scotland.

g
In evidence is a written agreement and assignment, drawn up by Mr Brabon and dated 1 March 1994, whereby Mr Brabon purports to sell to Mrs Brabon for the price of £97,000 (receipt of which sum is expressed to be acknowledged) his 95 shares in Chislelane, together with certain other assets which are not the subject of these proceedings. The trustee contends (as against the Brabon family) that this document too is a sham, and that the expressed consideration of £97,000 was never paid.

h
On 31 July 1996 Chislelane transferred Wendy to Mrs Brabon for an expressed consideration of £60,000. The consideration is said by Mr and Mrs Brabon to consist of the assumption by Mrs Brabon of liability for £30,000 of the sum owing by Chislelane to Royal Bank of Scotland, coupled with a waiver by Mrs Brabon of £30,000 of the debt owed to her by Chislelane resulting from her having paid the interest on Chislelane's debt to Royal Bank of Scotland. Once again, it is the trustee's case that this consideration is illusory and that in reality the transfer was gratuitous. The trustee accepts that £60,000 was the open market value of Wendy in July 1996, so no valuation issue arises in relation to Wendy.

On the same day, 31 July 1996, Mrs Brabon charged Wendy to Royal Bank of Scotland as security for Mr Brabon's indebtedness to the bank.

On 30 August 1996 Mrs Brabon was registered as sole proprietor of *a* Wendy.

On 13 March 1997 Mrs Brabon transferred Wendy to Silver on completion of the sale of the site.

Thus, the principal issues in relation to Wendy are:

(1) whether Mrs Brabon provided consideration for the transfer of *b* Wendy, and if so in what amount or value;

(2) whether the 1994 agreement and assignment was a 'sham'; and

(3) in any event, whether the transfer of Wendy was a transaction defrauding creditors, for the purposes of s 423 of the 1986 Act.

*High Hedges*

Although a copy of the relevant transfer is not in evidence, Mrs Brabon's *c* evidence is that in 1979 High Hedges was purchased by herself, Mr Brabon, Mr Arthur Brabon and Mrs Olive Brabon (Mr Arthur Brabon's wife and Mr Brabon's mother), and that it was transferred into their joint names, as tenants in common in equal shares. This account is consistent with a transfer dated 27 April 1991 (a copy of which is in evidence). Mrs Olive Brabon died *d* on 15 June 1987, and Mr Brabon was the sole beneficiary under her will. By the 1991 transfer, Mr Brabon assigned his beneficial share in High Hedges (which would appear to have increased to a half share on his mother's death) to Mr Arthur Brabon and Mrs Brabon, and he retired as a trustee.

It is asserted by Mr and Mrs Brabon that the assignment of Mr Brabon's beneficial share in High Hedges was made in consideration of a contribution *e* of £4,000 made by Mrs Brabon towards the purchase of the Meads (Mr and Mrs Brabon's matrimonial home). According to Mr Brabon (and there is no evidence to contradict this) the Meads is owned jointly by Mr and Mrs Brabon. Mr Brabon asserts that there was further consideration for the assignment of his beneficial share in that Mrs Brabon agreed that he should *f* have the entire benefit of a loan of £100,000 secured on the Meads.

On 16 January 1992, for no consideration, Mr Arthur Brabon and Mrs Brabon declared themselves trustees of High Hedges for Mrs Brabon and Benjamin Brabon. On 4 April 1997 Mr Arthur Brabon retired as a trustee and was replaced by Benjamin Brabon (who was by that time of full age). On 14 April 1997 Mrs Brabon and Benjamin Brabon were registered at *g* the land registry as joint proprietors of High Hedges. Hence the need for Benjamin Brabon to be party to the contract, and to the transfer of High Hedges to Silver.

The trustee's case is that the assignment of Mr Brabon's beneficial share was not supported by consideration: ie that it was a voluntary assignment. He contends in the first place that the consideration referred to was never in *h* fact provided by Mrs Brabon; in any event, he contends, Mrs Brabon's agreement to Mr Brabon having the entire benefit of a loan secured on property in their joint names cannot in law amount to consideration for the assignment of Mr Brabon's beneficial share. On that basis, he contends that Mr Brabon's beneficial share remained vested in him under a resulting or *i* constructive trust. Alternatively, if the assignment was not a voluntary assignment, he contends that the transfer dated 4 April 1997 into the joint names of Mrs Brabon and Benjamin Brabon was a transaction defrauding

*a*   creditors for the purposes of s 423 of the 1986 Act, in respect of which he is entitled to relief against Mrs Brabon and Benjamin pursuant to s 425 of the 1986 Act.

Thus, the principal issues in relation to High Hedges are:

(1) whether the assignment of Mr Brabon's beneficial share was a voluntary assignment;

(2) if so, whether Mr Brabon's beneficial share remained vested in him under a resulting or constructive trust; and

*b*   (3) if not, whether the subsequent transfer by Mrs Brabon and Mr Arthur Brabon into the joint names of Mrs Brabon and Benjamin Brabon can be impeached as a transaction defrauding creditors, for the purposes of s 423 of the 1986 Act.

*c*   *Little Meads*

As noted earlier, in the section dealing with Barbarossa, by a conveyance dated 24 November 1988 Mr Arthur Brabon transferred Little Meads to Mrs Brabon. It is Mr and Mrs Brabon's case that this transfer was made in consideration of Mr Brabon granting Mr Arthur Brabon the right to live at Barbarossa for the rest of his life. The transfer itself refers to an 'agreement to exchange', although no such written agreement has come to light.

*d*   Mr Brabon's evidence is that this is a reference to the arrangement for the granting to Mr Arthur Brabon of a right to occupy Barbarossa for the rest of his life in exchange for the transfer of Little Meads to Mrs Brabon.

Clause 1 in the operative part of the conveyance begins as follows:

*e*

    'In consideration of the said agreement as to exchange the Vendor [i.e. Mr Arthur Brabon] at the direction of the said NEVILLE AUDLEY BRABON as Beneficial Owner hereby conveys …'

The trustee points to the words 'as beneficial owner' as evidence that at the date of the conveyance Mr Brabon was the beneficial owner of Little Meads.

*f*   He further asserts that the conveyance to Mrs Brabon was for no consideration, and that in consequence Mr Brabon remained the beneficial owner; alternatively, he contends that the conveyance was a transaction defrauding creditors for the purposes of s 423 of the 1986 Act.

Thus, the principal issues in relation to Little Meads are:

*g*   (1) whether at the date of the conveyance to Mrs Brabon (24 November 1988) Mr Brabon was the beneficial owner of Little Meads;

(2) whether any consideration was provided for the conveyance (and if so, in what amount or value);

(3) if no consideration was provided, whether the beneficial interest in Little Meads remained vested in Mr Brabon under a resulting or constructive

*h*   trust or on the basis of 'sham'; alternatively

(4) whether the conveyance was a transaction defrauding creditors, for the purposes of s 423 of the 1986 Act.

*The ransom strips*

*i*   On 6 January 1992 the ransom strips were transferred by Mr Brabon to Mr Arthur Brabon, and on the same day Mr Arthur Brabon declared that he held them on trust for Mrs Brabon. The transfer to Mr Arthur Brabon was expressed to be in consideration of the grant by Mr Arthur Brabon, as owner

of the roadway, of rights of way over the roadway in favour of the Meads. However, by a deed of gift dated 24 November 1988 Mr Arthur Brabon had already transferred the roadway to Mrs Brabon, with the consequence that as at 6 January 1992 Mrs Brabon already owned the roadway and Mr Arthur Brabon was not in a position to grant rights of way over it. In the light of the earlier transfer of the roadway, Mrs Brabon accepted in evidence that there was no consideration for the 1992 transfer of the ransom strips.

On 17 July 1996 Mr Arthur Brabon 'as nominee' transferred the ransom strips to Mrs Brabon for no consideration, purportedly pursuant to the 1992 declaration of trust. On 29 August 1996 Mrs Brabon was registered at the land registry as sole proprietor of the ransom strips.

The trustee attacks the 1992 transfer under s 423, and he seeks relief in relation to the 1996 transfer under s 425. Further he submits that the 1996 transfer was a transaction at an undervalue entered into by Mr Arthur Brabon, susceptible of challenge under s 339 by Mr Treharne in his capacity as trustee in bankruptcy of Mr Arthur Brabon. In that connection, Mr Atherton referred in the course of his submissions to the possibility of the proceedings being amended so as to enable Mr Treharne to pursue a claim under s 339 in his capacity as trustee in bankruptcy of Mr Arthur Brabon. Had an application for permission to amend the proceedings in that way been made, I would have been reluctant to grant it at such a late stage. In the event, however, no such application was made. Accordingly, I am not concerned with any claims in the bankruptcy of Mr Arthur Brabon.

Thus, the principal issues in relation to the ransom strips are:

(1) whether the 1992 transfer (which was admittedly gratuitous) is impeachable under s 423; and

(2) whether relief is available in relation to the 1996 transfer under s 425.

*The open land*

On 1 February 1989 Mr Brabon transferred the open land to Mrs Brabon for an expressed consideration of £30,000. No application for the registration of Mrs Brabon as sole proprietor was made until 12 December 1991. Registration was effected on 16 December 1991.

The trustee contends that no consideration was in fact provided by Mrs Brabon, and that the transfer was executed for the purpose of defrauding Mr Brabon's creditors.

Thus, the principal issues in relation to the open land are:

(1) whether Mrs Brabon provided consideration for the transfer of the open land on 1 February 1989; and

(2) if not, whether the beneficial interest in the open land remained vested in Mr Brabon under a resulting or constructive trust or on the basis of 'sham'; alternatively

(3) whether the transfer of the open land was a transaction defrauding Mr Brabon's creditors, for the purposes of s 423 of the 1986 Act.

*The roadway*

According to Mr Brabon, the roadway was originally owned by his maternal grandfather. Mr Brabon's evidence is that following the death of his grandfather, the roadway was vested in his mother the late Mrs Olive Brabon, who, in 1986, conveyed it into the joint names of herself and her

husband Mr Arthur Brabon. As noted earlier, in connection with the ransom strips, by a deed of gift dated 24 November 1988 Mr Arthur Brabon

*a* transferred the roadway to Mrs Brabon as donee.

The conveyancing in relation to the roadway is highly confusing, and it is the trustee's case that Mr Brabon deliberately made it so.

The trustee contends that at the date of the deed of gift the roadway (which, as is common ground, had a significant value) was beneficially owned by Mr Brabon. On that footing, the trustee's case is that the deed of

*b* gift is impeachable under s 423 of the 1986 Act.

Thus, the principal issues in relation to the roadway are:

(1) whether, as at 24 November 1988, Mr Brabon was the beneficial owner of the roadway;

(2) if so, whether the deed of gift is impeachable under s 423.

*c*

THE PROCEDURAL HISTORY

Initially, there were two applications by the trustee, both issued on 3 December 1997 in the Hastings County Court and served on the following day: one against Mr and Mrs Brabon and Benjamin Brabon (the Brabon respondents), seeking relief in relation to what I may call the 'intra-family'

*d* transactions, as described earlier in this judgment; the other against the Brabon respondents and Silver, seeking (at that stage) an order setting aside the contract.

The application against the Brabon respondents (which has not been subsequently amended) seeks relief in respect of Wendy and the ransom strips under ss 339 and 423 of the 1986 Act; in respect of High Hedges, Little

*e* Meads and the open land under s 423 of the 1986 Act; and in respect of Barbarossa and Hillcrest under ss 339, 340 (preferences) and 423 of the 1986 Act. However, as already noted, the trustee has not in the event mounted any claim under s 339 in respect of the intra-family transactions: his claims under s 339 relate only to the sales of Barbarossa and Hillcrest to Silver. Nor has

*f* he pursued any claim under s 340. His claims in relation to the intra-family transactions are brought under s 423 of the 1986 Act, further or alternatively on the basis that where assets have been transferred voluntarily by Mr Brabon the transferee holds such assets on a resulting or constructive trust for Mr Brabon and the beneficial interest in such assets accordingly

*g* forms part of his estate.

Given these changes in the way in which the trustee has put his case at trial, it is readily apparent, albeit with the benefit of hindsight, that the task facing the court in this complicated case would have been made immeasurably easier had there been a direction for pleadings. Equally, I have no doubt that it would have been of considerable assistance to the respondents and their

*h* advisers had the trustee been required to plead his case. However, so far as I am aware no direction for pleadings was sought at any stage by any party: at all events, no directions for pleadings was given.

Returning to the procedural history, on 3 December 1997 the trustee applied ex parte in the Hastings County Court for, and was granted, injunctive relief restraining completion of the contract, such injunctive relief

*i* to continue until 11 December 1997. On 4 December 1997 the trustee issued formal applications for a continuation of that injunctive relief, returnable on 11 December 1997.

The applications came before his Honour Judge Kennedy QC on 11 December 1997. The judge continued the injunctions and gave directions as to service of evidence and as to exchange of experts' reports as to the value of the site. He also gave liberty for the proceedings to be transferred to the High Court (as they subsequently were).

In relation to experts' reports, Judge Kennedy directed that such reports were to be exchanged not later than 7 February 1998, and were to be agreed so far as possible. He further directed that all experts were to meet and consult together to produce a joint statement of issues agreed or disputed, to be filed not later than 21 February 1998. Regrettably, I have to record that in the event the four expert valuers retained by the parties (one by the trustee, two by Silver and one by the Brabon respondents) have been unable to reach agreement on any relevant issue. The experts met twice (although the valuer retained by the Brabon respondents did not attend the second meeting), but neither meeting resulted in any useful progress. It is a sad commentary on the experts' collective failure in this respect that the 'Schedule of Unresolved Matters', lodged shortly before the trial (and almost two years out of time), lists no less than 24 unresolved issues, including such basic issues as 'Marketing of the Site', 'Build Costs', the application of parts of the 'Red Book' (a reference to the BICS practice statements and guidance notes), and 'Topography'. Although not included in the list of unresolved issues, it also became apparent in the course of the hearing that not even the acreage of the site had been agreed.

On 30 January 1998 the injunctions were discharged by his Honour Judge Rich, sitting as a judge of the High Court (to which the proceedings had by then been transferred). The order was made by consent, and, as I noted earlier, on terms that part of the proceeds of sale be deposited in the joint names of the solicitors for the trustee and for the Brabon family. It is also to be noted that the order provided that the trustee should, so far as necessary, consent to and join in the transfer and conveyance to Silver of the land the subject of the contract. As noted earlier, the trustee did not in the event participate in the arrangements for completion of the contract; in particular, he did not transfer Mr Brabon's freehold interest in Barbarossa or Hillcrest, leaving them to be transferred by way of sale by a mortgagee (in the event, Mrs Brabon).

I have already referred to the trustee's subsequent application to amend the application against Silver, and to the amended relief now sought against Silver.

The two applications were subsequently consolidated.

THE WITNESSES

*The witnesses of fact*

I heard the following witnesses of fact: Mr Treharne (the trustee); Mr Richard Silver (of Silver); Mr John Pilcher (senior partner of Wood & Pilcher, estate agents); Mr Benjamin Freeman (a partner in Freeman Forman, estate agents); Mr Nigel Coates (a partner in Russell-Cooke, Potter & Chapman, solicitors); Mr David White (a partner in Thomson Snell & Passmore, solicitors); Mr Ted Sear (a former employee of a company called Wilcon Homes Ltd); Mr Brabon; and Mrs Brabon.

*a*

As to the evidence of Mr Treharne, Mr Pilcher, Mr Freeman, Mr Coates and Mr White, suffice it to say that I am entirely satisfied that each of these witnesses was doing his best to assist the court to the best of his recollection, and I accept their evidence without qualification.

The same considerations apply to Mr Silver. He was subjected to a searching cross-examination by Mr Atherton, but I am fully satisfied that he too was a witness whose evidence can be relied upon.

*b*

Mr Ted Sear falls, I regret to say, into an entirely different category. In giving his evidence he was at times evasive; at other times self-contradictory. In the circumstances, save in one important respect to which I shall refer later, I am unable to place any significant reliance on his evidence on any disputed issue.

*c*

I turn next to Mr Brabon. In assessing the general reliability of Mr Brabon's evidence I naturally bear in mind that he has been convicted on a number of counts of dishonesty relating to the conduct of his solicitor's practice, to which he pleaded guilty. Plainly, therefore, I must approach his evidence with particular caution. At the same time, it does not follow from the fact of his convictions that he may not be telling the truth when giving evidence in this court. In that sense, I must take him as I find him.

*d*

I am satisfied that in giving evidence Mr Brabon was doing his best to give a true account of the various transactions which are in issue in these proceedings. At times his evidence was confused, but I am satisfied that he was not deliberately setting out to spread confusion. Rather, I gained the strong impression from seeing and hearing him give evidence that, notwithstanding a strong entrepreneurial instinct which (in earlier days) appeared to be yielding some success in commercial terms, he is (to put it charitably) not a man to whom paperwork and matters of administration come easily. On a number of occasions in the course of his evidence he frankly admitted that he had made mistakes in the conveyancing relating to intra-family transactions, and I am satisfied that they were genuine mistakes and not a guise for something more sinister. The conveyancing is on any footing sloppy and careless in a number of respects, but I do not regard that in itself as suggesting dishonesty or an improper purpose, particularly when one takes into account the family context. On the contrary, it might be said that a person who is setting out to achieve a dishonest or improper purpose will take particular care to avoid obvious mistakes in the documentation.

*e*

*f*

*g*

In cross-examination, Mr Atherton put it to Mr Brabon a number of times that he had deliberately misled his bankers (the NatWest Bank) as to the ownership of the various areas which make up the site, by representing that he was the owner of the entire site. Mr Brabon's evidence, however, was that the bank was at all material times fully aware of the position in relation to the ownership of the site, and was not concerned about it. I am satisfied that Mr Brabon did not set out deliberately to deceive the bank, and that he genuinely believed that the bank was aware of the position in relation to ownership of the site.

*h*

*i*

All in all, I am satisfied that in giving his evidence Mr Brabon was doing his best to give a truthful and accurate account of the various transactions about which he was asked questions, although the fact that his evidence

about these transactions was in some respects muddled and confused means that I must be cautious about accepting his evidence in the absence of corroboration from other sources.

That brings me to Mrs Brabon.

I found Mrs Brabon to be an impressive witness. I have no doubt that in giving her evidence she was trying to give a truthful and accurate account of events, to the best of her recollection. She is not a lawyer, still less is she an expert in conveyancing; nor was she privy to much of Mr Brabon's financial dealings, including his dealings with the NatWest Bank. On the other hand she is (if I may say so) plainly an intelligent woman, and she was able to explain in clear terms her own understanding of the various transactions in which she was involved, and of the intentions underlying those transactions. Moreover, she was open in acknowledging the limits of her recollection in relation to certain of the transactions in issue. I am satisfied that Mrs Brabon's evidence may be relied upon.

*The expert witnesses*

I heard valuation evidence from the following expert witnesses:

On behalf of the trustee: Mr Colin Jennings (of Edward Symmons & Partners);

On behalf of Silver: Mr Peter King (a sole practitioner); and

Mr John Pike (of General Accident Property Services); and

On behalf of the Brabon respondents: Mr John Turner (of Turner Morum).

I have already referred to the regrettable inability of the four experts to reach even a measure of agreement on any of the material issues to which their reports are directed. In the circumstances, suffice it to say that I am grateful for such assistance as they were able to give me.

THE CLAIMS AGAINST SILVER

It is convenient to address first the trustee's claims against Silver, since (as will, I hope, have become evident from the earlier section of the judgment dealing with the conveyancing history of the various areas of land the subject of the contract) the claims against Silver are different in quality from the claims against the Brabon respondents. The claims against Silver are limited to Barbarossa and Hillcrest, and they are based only on s 339 of the 1986 Act (transactions at an undervalue). The issues for decision in relation to Silver, therefore, are whether the transfers of Barbarossa and Hillcrest to Silver for a consideration of £29,000 and £75,000 respectively were transactions at an undervalue for the purposes of s 339: in other words, whether they were (a) transactions 'entered into' by Mr Brabon for the purposes of s 339 (the s 339 issue), and (b) transactions at an undervalue, in that the prices paid for the respective properties were significantly less than their then open market value ('the valuation issue').

I turn, therefore, to the facts material to the trustee's claims against Silver.

*The material facts*

In September 1994 Mr Brabon instructed Mr White of Thomson Snell & Passmore to act for the Brabon family on the sale of the site. Thereafter, five firms of estate agents were instructed to market the site, including Wood &

Pilcher and Freeman Forman. Mr Pilcher (of Wood & Pilcher) received his instructions from Thomson Snell & Passmore in November 1994, and Mr Freeman (of Freeman Forman) was instructed at about the same time.

So far as Mr Pilcher was concerned, the procedure his firm adopted for marketing the site did not differ from the procedures customarily adopted by the firm when marketing development opportunities. He offered the site, on a 'subject to planning' basis, to a wide selection of developers, from large national companies to small local developers operating in the Battle area. At the time, he was also marketing two other sites in the area (one some seven miles away and the other some ten miles away) and he found that these other sites aroused greater interest among developers than the site. By January 1995, however, he had received three offers for the site. Buxton Homes Ltd had offered £670,000, subject to detailed planning permission for 11 detached houses; Priestmere Homes Ltd had offered £675,000, also subject to planning; and Berkeley Homes (Sussex) Ltd (Berkeley Homes) had offered £788,000 subject (inter alia) to planning permission for 12 detached houses and to a satisfactory soil test. Mr Pilcher was aware of the sloping nature of the site, and of the fact that this would have an impact on the market value of the site should extra groundworks be required.

On 30 January 1995 Mr Pilcher was instructed by Mr Brabon to accept the Berkeley Homes offer. He accordingly wrote to Thomson Snell & Passmore with a view to a draft contract being prepared. However, he was subsequently informed that Berkeley Homes had received a report from their soil specialists which suggested that a substantial additional sum would have to be spent on the construction of foundations. He passed this information on to Mr Brabon, who was concerned at this extra liability, as it would clearly have an effect on the sale value of the site. Mr Pilcher had a meeting with Berkeley Homes, who were in principle still interested in purchasing the site, and it was arranged that further soil tests would be carried out.

In June 1995, following further soil tests and further discussions with Mr Pilcher, Berkeley Homes put in a revised offer of £500,000 subject to the same conditions and taking into account the ground conditions. However, Mr Brabon instructed Mr Pilcher not to accept this revised offer, and Mr Pilcher accordingly proceeded to offer the site to numerous other developers.

In July 1995 Mr Pilcher received an offer from John Walker Homes Ltd in the sum of £465,000. He duly submitted this offer to Mr Brabon, who turned it down. At this point Mr Pilcher went back to the companies who had made offers at the same time as Berkeley Homes, to see if they were willing to renew their offers. It appears that none did so. By this time, Mr Pilcher, who was speaking to developers on a daily basis, was finding it increasingly difficult to create interest in the site from prospective purchasers. He found that one of the major concerns of any prospective purchaser was the lack of comparable sites within the immediate vicinity of the site. He was also aware that the value of development land in the area tended to decrease the nearer it was to the coast.

In August 1996 Mr Pilcher received an offer from Crofton Place Developments Ltd in the sum of £670,000, subject to planning permission for 11 houses and a number of other conditions. He discussed this offer with Mr and Mrs Brabon, and it was decided to accept it. Thomson Snell & Passmore were duly instructed. However, the offer did not proceed.

By this time, Mr and Mrs Brabon were pressing Mr Pilcher to try to achieve a sale at a price in excess of £650,000. Mr Pilcher's understanding from what they told him was that due to their current financial position it was essential that they achieved a figure in excess of £650,000. However, although Mr Pilcher managed to generate some interest from developers at figures below £650,000 he could not persuade them to go above that figure. Berkeley Homes were still interested, but not at a level which was acceptable to Mr and Mrs Brabon; and this despite Mr Pilcher's attempts to persuade them that Berkeley Homes, having spent a substantial sum investigating the site and preparing draft plans of a possible future development, would be prepared to offer a commercial price for the site.

In April 1997 Mr Pilcher received an offer from Wealden Homes Ltd in the sum of £680,000, subject to conditions. He was instructed to accept it, and once again contacted Thomson Snell & Passmore. However, Wealden Homes subsequently withdrew their offer, saying that they needed more time.

By June 1997 Mr Pilcher had been offering the site for sale for more than two years. He was also aware that other agents were also trying to sell the site. A number of developers whom he contacted told him that they had already received particulars of the site from other agents. He accordingly advised Mr and Mrs Brabon that any offer over £650,000 should be seriously considered, particularly bearing in mind the knowledge they had acquired from their dealings with Berkeley Homes of the potential cost of additional groundworks. In oral evidence, Mr Pilcher described Mr and Mrs Brabon's insistence on achieving as high a price as possible as one of his major problems in trying to find a purchaser for the site.

In June 1997 Millward Designer Homes Ltd offered £725,000 for the site, but the offer was not taken up in view of the higher offer made by Silver, through Freeman Forman.

In Mr Pilcher's opinion, the price eventually paid by Silver (£730,000) was a fair open market value, taking into account the need to carry out additional groundworks, as confirmed by the report obtained by Berkeley Homes.

In the meantime, Mr Freeman (of Freeman Forman) had also been trying to find a purchaser for the site, but with similar lack of success. He was aware of Mr Pilcher's dealings with Berkeley Homes, and of the fact that other estate agents had been retained. In November 1996 Mr Freeman received a conditional offer from Whiteoaks Developments Ltd in the sum of £625,000, and in March 1997 he received a conditional offer from Howard Developments Ltd for £690,000. However, both offers were subsequently withdrawn.

In March 1997 one of the other firms of estate agents retained by Mr Brabon, Atherton Joyes, received an offer for the site from Wilcon Homes (acting by Mr Ted Sear) in the sum of £700,000.

Mr Brabon decided to accept the Wilcon offer, and on 9 May 1997 Mr White of Thomson Snell & Passmore sent a draft contract to Wilcon's solicitors.

In the meantime, in April 1997 Mr Freeman was approached by Silver (acting by Mr Bob Sear, the brother of Mr Ted Sear of Wilcon). Mr Freeman sent Silver particulars of the site. The 'guide price' for the site was £690,000. Silver made an initial offer at that price.

Mr White imposed a deadline for Wilcon to exchange contracts which, in the event, Wilcon was unable to meet.  By this stage (June 1997) both Millward Designer Homes and Silver were offering £700,000 for the site. Mr Freeman was able to persuade them to bid against each other, and Millward Designer Homes bid £710,000. Silver matched that offer. Millward Designer Homes then offered £725,000. On learning of Millward Designer Homes' latest bid, however, Silver pulled out, saying that it did not wish to participate in an auction. Mr Freeman accordingly gave Millward Designer Homes the opportunity to exchange contracts within 14 days at a price of £725,000. About ten minutes later, however, Mr Silver rang Mr Freeman back and said that Silver had reconsidered its position and was prepared to go higher. Mr Silver then offered £730,000 and subsequently £750,000 for the site. However, it was decided by Mr Brabon that Mr Freeman should not deal further with Silver at that stage, but that Millward Designer Homes should be allowed the agreed 14-day period to exchange at £725,000.

In the event, Millward Designer Homes failed to exchange within the 14-day period, and Mr Freeman was instructed by Mr Brabon to accept Silver's offer of £730,000. Mr Brabon did not consider the higher offer of £750,000 to be a genuine offer; rather, he regarded it as a tactical attempt to clear away the competition. As Mr Freeman put it in oral evidence:

> 'It was not regarded seriously, rightly or wrongly; the client was not happy it was a serious offer. He felt it was a spur of the moment "Well, try that and see what he says" sort of thing, just to rock the boat.'

On 30 June 1997 Mr Freeman faxed Silver's solicitors, Russell-Cooke, Potter & Chapman, with a sale advice form advising them of the acceptance of Silver's offer. Correspondence followed between Mr Coates of Russell-Cooke and Mr White of Thomson Snell, and in due course the contract was drawn up. There was no discussion between Mr Coates and Mr White as to apportionment of the purchase price of £670,000 for the site less the option land. Mr Coates took the view that apportionment of the price as between the various component parts of the land the subject of the contract was entirely a matter of the vendors.

On 1 July 1997 Lloyds Bank obtained a valuation of Hillcrest in the sum of £75,000. The valuation was on a 'stand-alone' basis (ie Hillcrest was not valued as part of the site as a whole).

On 11 July 1997 contracts were exchanged with Silver.

Following exchange of contracts, Mr Silver instructed architects to apply for planning permission for 12 houses on the site. Subsequently, following protracted negotiations with the highway authority concerning the entrance to the access road, Mr Silver instructed the architects to limit the initial application to eight houses.

At the time of exchange of contracts, Mr Silver was aware that some levelling of the site would be required. However, since the boundary of the local development zone lay only a few feet to the north-west of the proposed sites of the houses to be built on the land at the rear of the site, and since any levelling of the site would have to be contained within the development zone, the extent of the levelling which could be undertaken would be strictly limited. However, it subsequently became apparent to Silver, from discussions which took place between Mr Bob Sear and the planning authority, that the planning authority was willing to move the boundary of the development zone further away from the site of the proposed houses at the rear of the site. This had two consequences. In the first place, it allowed Silver to create rear gardens for the houses in question, and thereby make them more attractive to a purchaser. In the second place, and more importantly, it enabled Silver to carry out a much greater degree of levelling. Thus, whereas Berkeley Homes' plan had provided for split-level houses at the rear of the site in order to cater for the steep slope at that point, moving the boundary of the development zone enabled Silver to lower the proposed access road to the plots at the rear of the site (which was to follow the line of the roadway, incorporating the ransom strips) and to construct the houses themselves on a single level, thereby increasing their sale value. As Mr Silver put it in oral evidence:

'we have now started to look at a completely different scheme in essence, simply because … we are talking about a concept which had not been conceived, simply because the parameters which constrained it were more flexible than we had previously assumed.'

Following exchange, Mr Silver engaged Mr Freeman to advise Silver in relation to the marketing of the proposed development, and provided him with provisional plans. On 1 August 1997 Mr Freeman met Mr Bob Sear for a preliminary discussion as to the prices which might be achieved for completed houses. In the course of that meeting they discussed levelling the site so far as possible so as to avoid a split-level design for the houses. They both took the view that a split-level design would not be as attractive to purchasers as a single-level design.

On 5 August 1997, having considered the plans, Mr Freeman wrote to Mr Bob Sear setting out provisional sale prices for 11 houses on the land the subject of the contract (ie the site less the option land), on the basis that the site would be levelled so far as possible and that the houses would not be of a split-level design. The total of Mr Freeman's provisional selling prices for 11 houses amounted to £2,845,000. If one includes the option land (which is directly comparable to four of the plots in respect of each of which Mr Freeman gave a provisional selling price of between £175,000 and £190,000), the total gross sale value of the site, on Mr Freeman's figures, comes to approximately £3.1m.

On 14 August 1997 the NatWest Bank presented a bankruptcy petition against Mr Brabon.

*a*

On 3 October 1997 Mr Brabon was adjudged bankrupt.

On 9 October 1997 the local planning authority recommended that planning permission be granted for 8 houses, although formal planning permission was not at that stage granted.

On 10 October 1997 the trustee was appointed as Mr Brabon's trustee in

*b*   bankruptcy.

On that day or shortly thereafter, the trustee's solicitors, Wilde Sapte, were informed by Mr Paul Smith of a firm called PTS Land, acting on behalf of Wilcon, that Wilcon had been competing with Silver to purchase the site and that Wilcon was prepared to pay a substantially higher price for it. In a letter

*c*   dated 3 November 1997 Mr Smith informed the trustee that Wilcon had asked him to submit an improved offer of £900,000. Asked about this offer in evidence, Mr Ted Sear accepted that it had been made, but went on to say that it did not follow that Wilcon would actually have paid that sum. He also stated in evidence that Wilcon would not have paid more than £700,000 for the site at the time. In re-examination, Mr Ted Sear said that the offer of

*d*   £900,000 had been made 'to cut out the opposition, hoping that we could possibly have another go at the scheme'. As he put it later in his re-examination: 'We would have offered anything really to have secured the site.' Having heard and seen Mr Ted Sear giving evidence, I have no doubt at all that he was fully capable of making a falsely inflated offer for that very purpose – as Mr Marks described it, a 'spoiling bid'. At the very least,

*e*   therefore, Wilcon's purported offer of £900,000 must be treated with the greatest scepticism. I go further, however. I am satisfied that the offer was no more than a tactical step by Wilcon, in the nature of a spoiling bid, with a view to preventing Silver from acquiring the site.

On 6 November 1997 Mr White (of Thomson Snell, for the Brabon

*f*   family) wrote to the trustee setting out the current position in relation to the sale of the site. In the course of his letter, he said:

> 'We appreciate that Mr Brabon's bankruptcy means that he can no longer be a party to the transfers. We have reported the position to the respective mortgagees and are at present waiting to hear from them with
*g*   their comments. You will of course no doubt appreciate that in view of Mr Brabon's bankruptcy the mortgagees will themselves wish to complete the relevant transactions.'

Mr White explained in oral evidence that he made this comment on the

*h*   footing (which he believed to be correct) that there was negative equity in relation to each of the two properties, Barbarossa and Hillcrest.

On 11 November 1997 Mr White wrote again to the trustee informing him that Nationwide Building Society proposed to join in the transfer of Hillcrest to transfer as mortgagees. The letter concluded:

*i*

> 'We are presently waiting to hear from the other mortgagees and will keep you advised.'

On 14 November 1997 Mr Freeman valued Barbarossa at £29,000, on the basis that Mr Arthur Brabon had a right to occupy it for the rest of his life.

On 27 November 1997 Wilde Sapte (for the trustee) wrote to Russell-Cooke (for Silver) inquiring whether any apportionment of the purchase price between the various plots had been agreed or discussed with Thomson Snell. Russell-Cooke responded that Wilde Sapte should take that matter up with Thomson Snell.

On 3 December 1997 these proceedings were commenced, and the trustee filed a witness statement contending that the contract price of £670,000 for the site less the option land was an undervalue. I have already related the ensuing procedural history, involving the grant of injunctive relief restraining completion, and the subsequent discharge of the injunction by consent, on terms.

On 4 December 1997 formal planning permission was granted for eight houses on the site.

On 9 December 1997 Silver formally waived the condition in the contract for the obtaining of planning permission for 11 houses on the site less the option land, and the contract thereupon became unconditional.

On 18 December 1997 Mr Ted Sear wrote to Wilde Sapte saying that in July 1997 Wilcon would have been prepared to offer £800,000-£900,000 to secure the site. In the circumstances, I am unable to attach any credence to that statement. It was, I am satisfied, no more than a further tactical move to try to prevent the sale to Silver.

On 3 February 1998 Mr White (of Thomson Snell) wrote to Mr Coates (of Russell-Cooke) saying:

> 'In view of the number of different titles and the interests of the respective mortgagees we believe that the simplest means of achieving completion will be for there to be three Transfers. One from the Nationwide Building Society in respect of Hillcrest; one from Halifax PLC in respect of Barbarossa; and one from [Mr and Mrs] Brabon in respect of the residue of the land.'

Although the trustee was well aware of the fact that the sale of the site was proceeding, he did not take any step to involve himself in the arrangements for completion. In particular, he raised no objection to Barbarossa and Hillcrest being the subject of sales by mortgagees.

In the event, as I related earlier, Mrs Brabon took a transfer of the Nationwide charge on Hillcrest and transferred Hillcrest to Silver as mortgagee under that charge. On completion of the sale of Hillcrest at the price of £75,000, some £15,000 of the proceeds was paid to Mrs Brabon in satisfaction of the first charge and the balance of some £60,000 was paid to Lloyds Bank as second chargee in partial satisfaction of the debt of some £300,000 secured by the second charge. In addition, Lloyds purported to transfer its second charge to Benjamin Brabon for an additional £10,000, although it is hard to see how that transfer could have operated to confer any security rights on Benjamin Brabon, since the property subject to the charge had been sold to Silver free from the charge.

So far as Barbarossa is concerned, the entirety of the sale price of £29,000 was paid to the Halifax Building Society in partial satisfaction of the indebtedness secured by its first charge (which stood at about £33,000).

Having set out the material facts, I can now turn to the first of the two issues identified earlier, viz the s 339 issue.

*The section 339 issue*

As noted earlier, s 339(1) provides that:

> '… where an individual is adjudged bankrupt and he has at a relevant time … *entered into a transaction* with any person at an undervalue, the trustee of the bankrupt's estate may apply to the court for an order under [the] section.' (My emphasis.)

The short question is whether the transfers of Barbarossa and Hillcrest by Mrs Brabon as mortgagee (in the case of Hillcrest, as transferee of Nationwide's first charge) are, or fall to be treated as, transactions 'entered into' by Mr Brabon, for the purposes of the section.

In my judgment, the answer to that question is no.

Had the contract dated 11 July 1997 been completed prior to Mr Brabon's bankruptcy, with Mr Brabon executing transfers of Barbarossa and Hillcrest, then of course the position would have been otherwise. But, as I have related, that is not what happened.

In my judgment the relevant 'transaction' in relation to Barbarossa and Hillcrest, for the purposes of s 339, is not the contract but the actual disposals of those properties in favour of Silver; and as matters turned out those disposals were made not by the trustee but by Mrs Brabon as mortgagee, in exercise of her power of sale. In the case of Hillcrest, there can be no question as to the existence of the necessary power of sale under the Nationwide mortgage: and in relation to Barbarossa, I have earlier found the charge in favour of Mrs Brabon to have been a valid and effective charge.

Nor, in my judgment, is it possible to dismiss the fact that Barbarossa and Hillcrest were transferred to Silver by way of sale by Mrs Brabon as mortgagee as mere 'conveyancing mechanics'. The matter can be tested in this way. Let it be assumed that Nationwide Building Society had elected to sell to Silver as mortgagee, instead of transferring its charge to Mrs Brabon and thereby enabling her to do so. In such circumstances, it would (as it seems to me) have been impossible to equate that transaction with a transfer by Mr Brabon; and the same considerations must apply to Mrs Brabon as transferee of the Nationwide charge.

Mr Atherton sought to rely on the fact that the contract would have been specifically enforceable against Mr Brabon, and hence against the trustee. I accept that there is no reason to suppose that the contract was not specifically enforceable against Mr Brabon, and subsequently against the trustee, subject always to the trustee's right to resist completion of the sales of Barbarossa and Hillcrest on the ground that such sales were at an undervalue. But in the event Silver was content to take transfers of those properties by way of sale from a mortgagee, and in my judgment those transfers effectively superseded the contract.

In the end, however, one comes back to the plain words of the subsection. In my judgment the words 'entered into' by the bankrupt do not extend to a transfer by way of sale not by the bankrupt but by the bankrupt's mortgagee. *a*

On that short ground, the trustee's claims against Silver must in my judgment fail.

In the light of that conclusion, it is strictly unnecessary to address the valuation issue. However, lest I be wrong on the s 339 issue, and so that relevant findings and conclusions may not be wanting, I now turn to the valuation issue. I do so on the footing that the sales of Barbarossa and Hillcrest to Silver were transactions entered into by Mr Brabon, within the meaning of s 339. *b*

*The valuation issue*

The trustee's case on the valuation issue is put in alternative ways. In the first place, the trustee contends that the sale price of £730,000 for the entire site (including the option land) was a significant undervalue (his expert witness, Mr Jennings, puts the value at £900,000); and that that undervalue must affect those parts of the overall sale price which were, in effect, apportioned to Barbarossa and Hillcrest, viz. £29,000 and £75,000 respectively. In the alternative, he submits that those apportioned sale prices were in themselves significant undervalues. *d*

The respondents join issue on the allegation of undervalue, but they also take what is in effect a preliminary point in the context of the valuation issue. Assuming for this purpose that (contrary to the conclusion reached above) the sales of Barbarossa and Hillcrest were transactions 'entered into' by Mr Brabon for the purposes of s 339, what has to be valued (they submit) is Mr Brabon's equity of redemption, since on any footing it is only the value of the equity of redemption which can be said to have been 'consideration provided by' him; and they go on to submit that even on Mr Jennings' valuations of Barbarossa and Hillcrest there was negative equity in each case (in relation to Barbarossa this submission assumes a finding that Mrs Brabon's second charge is a valid charge, securing an indebtedness of £70,000 with interest). *f*

I accordingly address this preliminary point; and I do so first in relation to Barbarossa.

So far as Mrs Brabon's charge over Barbarossa is concerned, her evidence is that in January 1994 she lent Mr Brabon a sum of £71,250, being the proceeds of a loan which she had obtained from Nationwide Building Society (and which was in turn secured on an area of land which has not been identified in evidence and which is described in the documentation only as 'Plot past The Meads'), and in return took a charge over Barbarossa to secure the repayment of £70,000 of that sum. The documentation establishes that she obtained a loan of £71,250 from Nationwide Building Society in January 1994, and that the proceeds of the loan were paid into Mr Brabon's solicitor's practice account. Mr Brabon explained in evidence that he needed a total of some £160,000 in order to, as he put it, 'try and correct the errors' (a reference to the deficiency in the practice's client account). Under cross-examination Mrs Brabon was adamant that, although she had not seen the promissory note at the time, she understood that in return for the loan she was to be granted a charge over Barbarossa and that that was the basis on which she made the loan. Asked in cross-examination whether she expected

Mr Brabon to repay the loan, she replied that she certainly would have hoped that he would have been able to. In fact, as I shall later relate, by January 1994 Mr Brabon was in very serious financial difficulties due to the downturn in the property market, quite apart from the need to make good the deficiency on his practice's client account, and there was a possibility that he might become bankrupt. In such circumstances it would have been highly imprudent of Mrs Brabon to provide him with funds otherwise than by way of loan, properly secured. In cross-examination Mr Atherton asked her why she did not simply give her husband the money, if he was in trouble. She replied:

> 'Certainly not. Why should I do that? I cannot see any reason why I should just give money or borrow money if I am not getting something in return, and I understood at the time that I would be getting a charge over Barbarossa, and fully expected to have the money returned to me.'

Mr Brabon gave evidence to similar effect.

I accept Mr and Mrs Brabon's evidence on this issue, and I find that the £71,250 was paid to Mr Brabon by way of loan from Mrs Brabon and not as a gift; that the loan was made on the understanding that Mrs Brabon would be granted a charge over Barbarossa; and accordingly that the promissory note dated 31 January 1994 created a valid second charge over Barbarossa in favour of Mrs Brabon to secure the repayment of £70,000 with interest.

The trustee contends that the promissory note was never intended to have legal effect, but was to be kept for a 'rainy day', in case Mr Brabon should have need to produce it. I reject that contention. As set out below in the section of the judgment dealing with Mr Brabon's financial circumstances, as from February 1993 (when NatWest Bank revalued the property portfolio at substantially lower values than previously) it was appreciated by Mr Brabon (and no doubt by Mrs Brabon too) that Mr Brabon could not thereafter be supported with what I may call 'family funds', but that the various members of the family needed so far as possible to preserve their own assets. This is consistent with the funds provided to Mr Brabon by Mrs Brabon being provided by way of loan rather than by way of gift.

The trustee further contends that the ledger entry purporting to record receipt of the funds into Mr Brabon's practice account can be explained on the basis that Mr Brabon was acting as Mrs Brabon's solicitor in relation to the transaction in question. Further, he suggests that the fact that the charge is not for the full sum suggests that the promissory note may not be genuine. He also seeks to pray in aid the fact that one of the charges of dishonesty to which Mr Brabon pleaded guilty concerned the creation, between 8 and 12 January 1994, of a false ledger card purporting to evidence a transaction involving Mrs Brabon (not being a transaction relating to Barbarossa). However, as I have said, I accept the evidence of Mrs Brabon on this issue.

Nor does the delay in registration, on which the trustee also relies, take the matter any further, in my judgment. I also reject Mr Atherton's assertion that the whole transaction is 'riddled with unreality', on the footing that one

would have expected a gift rather than a loan. As I have already concluded, as from February 1993 (if not earlier) Mrs Brabon was not disposed to make gifts to Mr Brabon, given his then financial position.

On the footing, therefore, that the promissory note created a valid charge over Barbarossa to secure repayment of £70,000 to Mrs Brabon, it follows that even if one takes Mr Jennings' highest valuation of Barbarossa (£97,500, on a vacant possession basis) there was negative equity in the property, given that some £33,000 was outstanding under the first charge in favour of the Halifax. Hence even if Barbarossa had been sold for £97,500, no part of the proceeds would have been receivable by Mr Brabon, or by the trustee.

The same applies to Hillcrest, which Mr Jennings values at £288,000. As noted earlier, some £300,000 was outstanding under the second charge in favour of Lloyds Bank, in addition to the £15,000 or thereabouts owing under the first charge granted, originally, to Nationwide Building Society. The fact that Lloyds Bank was content to release (or transfer) its charge for only £75,000 (£60,000 from the proceeds of sale and an additional £10,000 from Benjamin Brabon) does not mean that there was any value in the equity of redemption. No doubt it was a commercial decision on the part of Lloyds Bank to write off the balance of the indebtedness on the footing that it was irrecoverable. As in the case of Barbarossa, therefore, even if Hillcrest had been sold for £288,000 no part of the proceeds would have been receivable by Mr Brabon, or by the trustee.

The question therefore arises whether in these circumstances, even assuming in the trustee's favour that Mr Jennings' valuations are correct, the trustee is entitled to relief under s 339.

In *Re MC Bacon Ltd* [1990] BCLC 324 a liquidator applied to set aside a debenture granted by the company on the ground that it was a voidable preference, alternatively that it was a transaction at an undervalue for the purposes of s 238 of the 1986 Act. Section 238(4) defines a transaction at an undervalue in similar terms to the definition in s 339(3)(c). Millett J held that the liquidator's claim that the grant of the debenture was a transaction at an undervalue was misconceived, since by granting security rights over its assets the company had not depleted or diminished the value of its assets, and had not given away anything capable of valuation in monetary terms. Millett J said (at 340–341):

'The mere creation of a security over a company's assets does not deplete them and does not come within [the definition of a transaction at an undervalue]. By charging its assets the company appropriates them to meet the liabilities due to the secured creditor and adversely affects the rights of other creditors in the event of insolvency. But it does not deplete its assets or diminish their value. It retains the right to redeem and the right to sell or remortgage the charged assets. All it loses is the ability to apply the proceeds otherwise than in satisfaction of the secured debt. That is not something capable of valuation in monetary terms and is not customarily disposed of for value. In the present case the company did not suffer that loss by reason of the grant of the debenture. Once the bank had demanded a debenture the company could not have sold or charged its assets without applying the proceeds in reduction of the

*a*

overdraft … By granting the debenture the company parted with nothing of value, and the value of the consideration which it received in return was incapable of being measured in money or money's worth.'

I respectfully agree with, and adopt, that reasoning. But the converse also applies. Just as the grant of security rights over an asset does not diminish the value of that asset in the hands of the grantor of those rights, with the

*b*

consequence that in granting such rights the grantor has not parted with anything of value, so (in my judgment) on a sale of the asset the value of the consideration provided by the seller is the value of the asset free from the security rights. I therefore reject the respondents' submission that on a sale of mortgaged property by the mortgagor the value of the consideration provided by the mortgagor for the purposes of s 339(3)(c) is the value of the

*c*

land subject to the mortgage, ie the value of the mortgagor's equity of redemption. The value of the consideration provided by the mortgagor in such circumstances is the value of the land free from the mortgage. If the value of the land free from the mortgage is significantly less than the price paid for it, then the transaction is a transaction at an undervalue for the purposes of s 339. However, the distinction between the value of the

*d*

property free from the mortgage and the value of the equity of redemption will be of no practical significance where, on a sale at full value, some part of the proceeds would be receivable by the mortgagor (ie where there is an equity in the property), since on either basis any undervalue will impact in the first instance on the mortgagor.

*e*

The question which arises in the instant case, however, is what is the position where there is negative equity, ie where the equity of redemption in the mortgaged property is worth nil. In such circumstances the value of the consideration provided by the mortgagor on a sale is, for reasons given above, the value of the land free from the mortgage, with the result that there

*f*

has been a transaction at an undervalue for the purposes of s 339. But at the same time even if the property had been sold for its full value no part of the proceeds of sale would have been receivable by the mortgagor, and in that sense the mortgagor has parted with nothing of value.

In my judgment the answer to this apparent conundrum is that once it is established (as it has been established in the instant case in relation to

*g*

Barbarossa and Hillcrest) that even if the mortgaged property had been sold at the price contended for by the trustee in bankruptcy the entirety of the proceeds would have been applicable towards satisfaction of the secured debt, and no part of the proceeds would have been receivable by the bankrupt, the issue of undervalue becomes academic so far as the trustee in bankruptcy is concerned. That being so, I am for my part unable to conceive

*h*

of any basis upon which the court would, in such circumstances, grant the trustee in bankruptcy relief under s 339.

In the result, therefore, although I do not accept the respondents' analysis I concur in their conclusion that the fact that (as I have found) there was negative equity in the case of both Barbarossa and Hillcrest is fatal to the

*i*

trustee's claims under s 339.

For completeness, however, I go on to consider the further questions which arise in the context of the valuation issue.

I turn first to the question whether the sale price of £730,000 for the entire site (including the option land) was a significant undervalue.

It should be made clear at this stage, if it is not already clear, that there is no suggestion that Silver was in any way connected with the Brabon family, or that it was anything other than a bona fide purchaser of the site without notice of any irregularities or improprieties. So far as Silver is concerned, it simply purchased the site on the open market, and paid open market value for it.

Plainly, where a property has been sold on the open market, after having been properly advertised and marketed, the sale price will in general represent the open market value of the land at the date of sale. This accords with the definition of market value in the Red Book (see Practice Statement 4) as:

'[T]he estimated amount for which an asset should exchange on the date of valuation between willing buyer and a willing seller in an arm's length transaction after proper marketing wherein the parties had each acted knowledgeably, prudently and without compulsion.'

Where there has been an *actual* exchange of that nature, there will be no scope for estimating the open market value. The actual price paid will be the open market value.

In the instant case, the experts were faced with the somewhat unusual question whether the price paid on a sale of the site apparently on the open market, was in reality significantly less than the open market value of the site. The expert witnesses recognised that if in fact the site had been properly marketed, then a process of estimation of its 'true' market value would be an academic exercise. However, in the opinion of Mr Jennings (on behalf of the trustee) the site had not been properly marketed prior to the sale to Silver – an opinion with which Silver and its witnesses, principally Mr Pilcher and Mr Freeman, emphatically disagree. Mr Jennings having expressed that opinion, the respondents' three experts (Mr King and Mr Pike on behalf of Silver and Mr Turner on behalf of the Brabon respondents) were obliged to approach the valuation issue by testing the price actually paid against what in their opinion was the market value of the site, ignoring the actual sale to Silver. On that approach, Messrs King, Pike and Turner are all of opinion that the price of £730,000 was not an undervalue. It is accordingly necessary, before turning to the question of valuation, to address the question whether the site was properly marketed prior to the sale to Silver.

In the light of the facts set out earlier in this judgment, there can in my judgment be no substance in Mr Jennings' contention that the site was not properly marketed. Five firms of estate agents were marketing the property, over more than two years. However, Mr Jennings maintained in evidence that a multiple agency tends to lead to a sale at a price which is less than that which could be achieved by a sole agent. The respondents' experts, together with Mr Pilcher and Mr Freeman, strongly disagreed with that proposition. I take the same view. With all respect to Mr Jennings, his proposition seems to me to defy reality. If it were true, no sensible vendor would retain more

than one agent; yet multiple agency is a commonplace. Indeed, it seems to me

*a*  that, if anything, competition between agents is more likely to produce a better result for the vendor.

It was suggested to Mr Brabon in cross-examination that by July 1997 his financial situation was so parlous that he was desperate to achieve a quick sale, and to that end was prepared to accept less than the full value of the site. Mr Brabon denied that; and I accept his evidence in that respect. The notion that Mr Brabon was prepared to accept less than the full value of the site

*b*  simply does not fit the facts, as I have set them out earlier in this judgment. Further, I have already concluded that the so-called Wilcon offer of £900,000, made in November 1997, was not a real offer.

In my judgment, therefore, the sale to Silver was a sale on the open market, conducted in a manner which had the effect of determining the *actual* market

*c*  value of the site at the relevant time.

In the light of that conclusion, it is unnecessary to consider the expert evidence as to what was the open market value of the site, on the footing that the sale to Silver did not itself determine what was its market value. However, for completeness, I proceed to do so briefly.

*d*  Mr Jennings values the site as a whole, as at July 1997, at between £900,000 and £1,080,000; Mr Pike at £690,000; Mr King at £725,000–£745,000; and Mr Turner at £730,000.

Th experts are agreed that there are basically two methods of valuing development land. One is the direct comparison method, which (as its name implies) involves taking the prices paid for comparable sites as the basis for

*e*  arriving at a market value of the subject site. The other is the residual method, which involves estimating the gross development value of the subject site, factoring in estimated construction costs (including an allowance for any abnormal costs due to the physical and/or topographical characteristics of the site) together with an allowance for development profit, and thereby arriving at a sum which a developer might reasonably be

*f*  expected to be able to afford to pay for the site if he is to make a reasonable profit out of it.

Mr Jennings' preference is for the residual method; he regards the direct comparison method as 'relatively crude'. Messrs Pike, King and Turner take the opposite view; they regard the residual method as crude, and only to be

*g*  adopted as a last resort if no comparables are available.

I prefer the views of Messrs Pike, King and Turner to those of Mr Jennings on this question. As I see it, if direct comparables are available, they will in general provide the most reliable basis for valuation. Applying the residual method to sites which in physical terms are not directly comparable may, as Mr Turner pointed out, be a useful method of achieving something

*h*  approaching a true comparison with the subject site. But beyond that it seems to me that the residual method involves so many assumptions, and so many imponderables, that its results need to be treated with considerable caution. It also suffers, as I see it, from the weakness that the open market development value of a site is not necessarily equal to the maximum sum

*i*  which a particular developer may be willing to pay for it. The successful bidder at an auction might not have reached his limit, but it does not follow that the price at which the land was knocked down to him was not the open market value of the land. So, apart from its other drawbacks, the residual

method is only of use, as it seems to me, as a rough guide to what developers *in general* could reasonably afford to pay for the land. I make this point because Mr Jennings' reports are based on calculations of what *Silver* could afford to pay for the site; calculations which are in turn based on post-contract material with which Silver has provided him. Mr Jennings seeks to work back from a gross development value of £3.1m, a figure which derives from Mr Freeman's advice in his letter dated 5 August 1997. Mr Jennings suggests that since, based on a gross development value of £3.1m, Silver stands to make a handsome profit from the development, ergo he must have paid less than market value for it. Mr Jennings even went so far, in oral evidence, as to state as a general proposition that where a developer makes what he terms a 'superprofit' from the development of a particular site, he must have paid less than market value for that site. With due respect to Mr Jennings, that reasoning seems to me to be plainly fallacious.

As already noted, in adopting the residual method Mr Jennings starts with the figure of £3.1m, that being the figure reached by Mr Freeman in August 1997 (extrapolating his figure for 11 houses to include the option land). But in so doing Mr Jennings is, as I understand him, relying on hindsight and ignoring the fact that (as I related earlier) by the time Mr Freeman gave his advice important developments had taken place since contract, in that by August 1997 it had become clear that the development could take the form of single-level, instead of split-level, houses and that its gross development value was correspondingly higher than originally thought. At the date of the contract, by contrast, all those who expressed interest in the site were proceeding on the basis of the plans prepared by Berkeley Homes, who were proposing to build split-level houses. I prefer the views of Mr King and Mr Turner that, without the benefit of hindsight, and based (therefore) on the Berkeley Homes plan, the gross development value of the site as at 11 July 1997 was substantially less than the £3.1m figure subsequently advised by Mr Freeman. Mr King values it at £2.95m and Mr Turner at £2.825m. I find that it fell within that range.

Further, Mr Jennings makes no allowance for the fact that (as Mr Pilcher and Mr Freeman testified, and as Messrs King, Pike and Turner also stressed) the site was a 'difficult' site, in that the Battle area had not proved popular in the market for new homes in East Sussex, and few developers had taken the risk of entering that market. Mr Jennings relied as a comparable on another development being carried out by Silver in the Battle area, known as the Highgrove development. That development consisted of six houses, two of which had been sold by 11 July 1997 and a further one was under offer. However, as Mr Silver said in evidence, the Highgrove scheme was a 'ground-breaking scheme', involving a degree of speculation. By 11 July 1997 it seemed to be going well, and no doubt that was one of the considerations which persuaded Mr Silver to offer £730,000 for the site; but at the same time there was plainly a speculative element – a significant commercial risk – in developing the site, and that element needs to be taken into account in assessing the market value of the site. In my judgment, Mr Jennings takes insufficient account of that factor in reaching his valuation of £900,000.

I further agree with Messrs King, Pike and Turner that other sites relied on as comparables by Mr Jennings – one in West Sussex, one in Oxfordshire and two in London – are not sufficiently comparable with the site to form a useful basis for valuing the site. It is clear from the evidence of Mr Pilcher and Mr Freeman, to which I have already referred, that the site was a particularly difficult one to market, given the apparent lack of attraction of the Battle area for new home buyers.

Mr Jennings also takes insufficient account, in my judgment, of the 'abnormal' development costs which are to be associated with a steeply sloping site. I agree with Messrs King, Pike and Turner that 'abnormals' are a significant factor in valuing the site.

A further criticism of Mr Jennings' reports, which in my judgment carries some weight, is that his figure of £900,000 as the open market value of the site as a whole is the same as the value which he reached when preparing a preliminary report for NatWest Bank in June 1997, notwithstanding that in that preliminary report he mistakenly included additional areas of land as part of the site, and he also assumed planning permission for 15 rather than 12 houses. Although he maintained in evidence that in preparing his subsequent reports, in which those errors were corrected, he was not influenced by his original (erroneous) valuation, I have no doubt that he was to some extent so influenced – albeit unwittingly – and that his original valuation has to some extent coloured his subsequent reasoning and conclusions.

All in all, therefore, I prefer the views of Messrs King, Pike and Turner as to the market value of the site as a whole as at 11 July 1997, and I agree with and accept their conclusion that the price of £730,000 paid by Silver for the site as a whole was not an undervalue.

I now turn to the question of the market values of Barbarossa and Hillcrest, valued separately; and to the question whether the prices paid for those properties (£29,000 and £75,000 respectively) represented significant undervalues.

Mr Jennings values Barbarossa on a vacant possession basis at £97,500, and Hillcrest at £288,000. Mr King values Barbarossa on a vacant possession basis at £79,433 if one treats it as part of the site (£75,000 on a stand-alone basis), and Hillcrest at £228,523 if one treats it as part of the site (£100,000 on a stand-alone basis). Mr Turner values Barbarossa on a vacant possession basis at £89,177 and Hillcrest at £140,070, treating them as parts of the site.

If and in so far as it is appropriate to value Barbarossa subject to a right for Mr Arthur Brabon to occupy it for the rest of his life, Mr Jennings values it at £56,750; Mr King at £29,000 to £30,000; and Mr Turner at £40,000 to £45,000.

Mr Jennings' apportionment is based upon his figure of £900,000 as representing the market value of the site as a whole. Further, there is a difference of approach so far as the apportionment of the value of the entire site is concerned between Mr Jennings on the one hand and Mr King and Mr Turner on the other. Mr Jennings favours apportioning on a plot by plot basis, attributing a land value of 30% of the anticipated sales value for each plot (the 30% representing approximately the proportion which £900,000 bears to £3.1m). This process would, as I understand it, accord no apportioned value at all to the roadway, notwithstanding that the roadway,

at least at the point where it meets North Trade Road, is the key to any development of those plots which do not enjoy direct access onto North Trade Road. By contrast, Mr King and Mr Turner favour what Mr Turner termed a 'layered ransom approach' which involves taking account of the relative bargaining strengths of each of the component parts of the site inter se. On the layered ransom approach, a significant value is accorded to the roadway, and various other adjustments are required as between the various component parts of the site.

Quite apart from the fact that, given my earlier conclusions, Mr Jennings' base figure of £900,000 overstates the market value of the site in July 1997 by £160,000, I further take the view that the layered ransom approach to apportionment is the correct approach in the circumstances of this case. In my judgment, the fact that as at July 1997 all the component parts of the site happened to be owned by members of the Brabon family is immaterial to the question of apportionment, and I do not accept Mr Jennings' contrary view.

On that footing, I turn to the valuations of Mr King and Mr Turner.

In the first place, it is in my judgment plainly appropriate to value each component part of the site as part of the site, and not on a stand-alone basis. I can therefore ignore Mr King's valuations on a stand-alone basis.

As to the valuations of Mr King and Mr Turner on the footing that each component part is to be valued as part of the whole site, I have the following observations. Mr King was retained by Silver, and in consequence he has not carried out any separate valuations of any other parts of the site apart from Barbarossa and Hillcrest (those being the only two parts of the site which form the subject of the trustee's claims against Silver). Mr Turner, on the other hand, retained by the Brabon family, has conducted an apportionment in relation to every part of the site. Mr Turner's apportionment accords a value of 12.2% of the overall value of the site (£730,000) to Barbarossa and 19.2% to Hillcrest. The most valuable part of the site, on Mr Turner's apportionment, is High Hedges at £168,131 (23%). This is due to the pre-eminent position of High Hedges in relation to notional ransom payments – a position which derives mainly, as I understand the position, from the retention of the small triangle of land at the corner of the roadway and North Trade Road, to which I referred earlier. Mr Turner's apportionment is internally consistent and appears to me to be based on a correct approach. By contrast, Mr King's valuation of Hillcrest at £228,523 (31.3% of the overall value) appears difficult to justify, once it is accepted that (as Mr Turner has concluded, and in my view rightly concluded) the application of the layered ransom approach will result in High Hedges having a higher apportioned value than Hillcrest. If High Hedges is to be accorded a value in excess of Mr King's 31.3% for Hillcrest, it is difficult to see how (on Mr King's figures) the full apportionment process could work, since only some 33% at most of the overall value would remain to be apportioned amongst the other parts of the site, whereas on Mr Turner's figures the apportioned values of the remainder of the site total some 57.8% of the overall value.

Further, whereas Mr Turner has proceeded on the assumption that access to Hillcrest will be had over Barbarossa, and that an adjustment to their respective values is required in that respect, Mr King has not done so. An examination of the available plans (and in particular from app 6 to

Mr King's second report, entitled 'Overlay of Berkeley draft Layout') certainly suggests that on the basis of the Berkeley Homes plan Mr Turner's

*a*  assumption that the only access to developed plots on Hillcrest would be via Barbarossa is a correct assumption. On that footing, I consider that Mr Turner was right to include an element of ransom in the valuation of Barbarossa, at the expense of Hillcrest.

For those reasons, I prefer Mr Turner's valuations of Barbarossa (on a vacant possession basis) and of Hillcrest to those of Mr King. Further, I

*b*  accept Mr Turner's apportionment in toto, in relation to the rest of the site, in preference to the valuations of Mr Jennings. This will become relevant when I come to consider the 'intra-family transactions'.

In so far as it is relevant to value Barbarossa on the basis that at the relevant time Mr Arthur Brabon had a right to occupy it for the rest of his

*c*  life, Mr Jennings values Barbarossa at £56,650; Mr King at £29,000-£30,000; and Mr Turner at £40,000-£45,000. Once again, I reject Mr Jennings valuation, for the reasons already given. Mr King arrives at his figure of £29,000-£30,000 by reference to a 20-year period at 7.5%. Mr Turner arrives at his valuation of £40,000–£50,000 on the basis of a development value of £89,000, which is in turn based on the 'layered ransom

*d*  approach'. As between Mr King and Mr Turner, Mr Turner's approach seems to me to be more appropriate in the circumstances of this case, and I accordingly I accept his valuation of £40,000–£50,000. If it were necessary to arrive at a precise figure, I would conclude that the value of Barbarossa in July 1997 subject to a right for Mr Brabon to occupy it for the rest of his life

*e*  was £40,000.

As I see it, however, for the purposes of the trustee's claim against Silver, Barbarossa falls to be valued on a vacant possession basis, and as part of the site as a whole. The sale was not subject to any right of occupation (in any event, so far as the evidence goes any such right of occupation would not have been binding on the Halifax as first mortgagee). As to the price paid,

*f*  the fact that Mr Coates did not concern himself with apportionment of the overall consideration of £730,000 does not alter the fact that the purchase prices paid for Barbarossa and Hillcrest were £29,000 and £75,000 respectively.

Accordingly, had I concluded that relief was otherwise available under s 339 against Silver, I would have granted relief in relation to the sale of

*g*  Barbarossa on the basis that it was a transaction at an undervalue for the purposes of the section, the undervalue being the difference between £29,000 and £89,177, ie £60,177; and I would have granted relief in relation to Hillcrest on the basis that it was a transaction at an undervalue for the purposes of the section, the undervalue being the difference between £75,000

*h*  and £140,070, ie £65,070. For reasons given earlier, however, I have concluded that the trustee's claims under s 339 must fail in any event, regardless of the valuation issue.

In the result, therefore, for the reasons given above I conclude that the trustee's claims against Silver fail.

*i*  In summary, those reasons are: (1) that the sales of Barbarossa and Hillcrest were, in form and in substance, sales by Mrs Brabon as mortgagee; and as such were not transactions 'entered into' by Mr Brabon, for the purposes of s 339; and (2) that even if they were transactions 'entered into'

by Mr Brabon for the purposes of s 339, no relief is available to the trustee under that section since, on the facts, had the sales been at full value no part of the proceeds of sale would have been available for unsecured creditors.          *a*

THE CLAIMS AGAINST THE BRABON RESPONDENTS

*Section 423 of the 1986 Act*
    In order to succeed in obtaining relief under s 423 of the 1986 Act in the instant case the trustee has to establish (1) a 'transaction at an undervalue' *b* (defined in terms which are identical to those of the definition of the same expression in s 339), which is (2) entered into by Mr Brabon (3) for the purpose '(a) of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or (b) of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make' (see s 423(3)). The trustee's claims in the instant case *c* fall under (a), and I will hereafter refer to that purpose as 'the relevant purpose'.
    Mr Atherton submits that it is enough for the trustee to establish that the relevant purpose was a 'substantial' purpose, and that he does not have to go further and establish that it was a 'dominant' purpose.          *d*
    In *Chohan v Saggar* [1992] BCC 306 at 323 Mr Evans-Lombe QC, sitting as a deputy High Court judge, construed s 423(3) as requiring a claimant to demonstrate 'a dominant purpose to remove assets from the reach of actual or potential claimants or creditors, but as not excluding the possibility that there might also be other purposes behind the relevant transfer'. Similarly, in *Moon v Franklin* [1996] BPIR 196 (the judgment was delivered in June 1990) *e* Mervyn Davies J considered that the correct test was 'predominant purpose'. In *Royscot Spa Leasing Ltd v Lovett* [1995] BCC 502, for the purposes of an interlocutory application the Court of Appeal was content (without deciding the point) to adopt a test of 'substantial' purpose, which it regarded as a lesser test, albeit in circumstances where it found that the applicant had failed that test (so that it would, a fortiori, have failed the stricter test of 'dominant' *f* purpose).
    On the other hand, it is not necessary for the trustee to establish a dishonest intent on the part of the debtor in carrying out the transaction in question. In *Arbuthnot Leasing v Havelet Leasing (No 2)* [1990] BCC 637 at 644, Scott J accepted that the debtor company had not acted with any *g* dishonest intent in putting assets out of the reach of a prospective judgment creditor, yet he held that the relevant purpose was established. In that case the debtor company had received legal advice that the transaction in question could properly be carried out, and in carrying out the transaction it was motivated by a desire to protect the position of creditors generally. Nevertheless the relevant purpose was present. Scott J accepted that *h* execution of the judgment which the creditor was likely to obtain would have done great damage to the debtor company's business, but he pointed out that by the transaction in question assets were deliberately put out of the reach of that creditor. See also *Re Eichholz* [1959] 1 All ER 166, [1959] Ch 708.
    In addressing Mr Atherton's submission, I start with the words of *i* s 423(3), set in the context of the mischief at which the section is directed. The subsection itself does not apply any epithet to the word 'purpose'. Still less does it indicate on its face that the relevant purpose must be the

transferor's only purpose. If such a limitation were to be implied, s 423 would, as Mr Evans-Lombe QC observed in *Chohan v Saggar* ([1992] BCC

*a*  306 at 321), be robbed of all practical effect, since the debtor could escape its application merely by establishing the existence of some other purpose in addition to the relevant purpose. So the fact that there may be an additional purpose or purposes cannot in itself serve to defeat a claim under the section. Once that is accepted, and given that, notwithstanding that s 423 is entitled 'Transactions defrauding creditors', it is not necessary for the trustee to

*b*  establish dishonesty, I confess that I find some difficulty in distinguishing between a 'dominant' purpose and a 'substantial' purpose. On the basis that there is a difference, however, and that 'substantial purpose' is indeed a lesser test than 'dominant purpose', I am content to proceed in the instant case on the footing that 'substantial purpose' is the correct test. I emphasise,

*c*  however, that I do so on the same basis as the Court of Appeal in *Royscot Spa Leasing Ltd v Lovett* [1995] BCC 502: that is to say, on the basis that if the trustee cannot meet the lesser test, a fortiori he could not meet the stricter one.

*Mr Brabon's financial circumstances*

*d*  The trustee invites the court to infer from Mr Brabon's financial circumstances at the time of the various transactions under challenge that in each case a substantial purpose of the transaction was to put assets out of the reach of creditors. I therefore turn to the evidence as to Mr Brabon's financial circumstances.

The relevant evidence consists principally of the contemporary

*e*  documentation, coupled with the oral evidence of Mr Brabon. As indicated earlier, Mrs Brabon played little part in Mr Brabon's dealings with NatWest Bank.

Although, as I commented earlier, Mr Brabon's evidence in relation to the conveyancing aspects of the various transactions under challenge in these proceedings was in many respects muddled and confused, his evidence about

*f*  his dealings with NatWest Bank did not suffer from those defects. His recollection was as clear as one could reasonably expect, given the lapse of time, and in particular he was (as I noted earlier) adamant that he did not mislead the bank about the ownership of the various areas which together make up the site. I accept Mr Brabon's evidence as to his dealings with the

*g*  NatWest Bank, and I find that he did not intend to mislead the bank on the question of ownership, and that at all material times the local branch manager of the bank (initially Mr Jacobs, who was replaced by Mr Nicholson) knew the true position in that respect.

On that footing, I turn to the facts relating to Mr Brabon's financial circumstances.

*h*  From about the early 1980s onwards Mr Brabon was carrying on the business of dealing in investment property on behalf of himself and his family, viz his parents, Mrs Brabon and Benjamin. Until March 1994 (when the Law Society intervened in his practice) Mr Brabon was responsible for all the conveyancing on behalf of the family. He explained in oral evidence that

*i*  he was putting the site together for planning and resale, and that he divided up the ownership of the various parts of the site between different members of the family with a view to equalising their assets for tax purposes. I accept that evidence.

Through the 1980s the property market continued to rise, and Mr Brabon borrowed from his bank (the NatWest Bank) to finance the purchase of additional properties. The bank was content to lend for this purpose.

In 1989 Mr Brabon purchased two farms, Clover Hill Farm and Cripps Hall Farm. He put Clover Hill Farm on the market immediately for resale. As to Cripps Hall Farm, initially his plan was to develop it himself as a residence for some or all of the family. The bank provided finance for the purchase of the two farms, and it was agreed that interest on the loans should be rolled up.

At this stage, Mr Brabon was applying any spare cash towards the purchase of additional properties, and in consequence was finding it difficult to service his bank borrowings. However, his asset base (at then current valuations) was considerably in excess of his borrowings, by a ratio of approximately 3:1.

From about mid-1989 the property market went into decline, and the value of the Brabon family property portfolio began to fall. This led Mr Brabon to abandon his plan to develop Cripps Hall Farm himself, and he placed it on the market for resale, along with Clover Hill Farm. However, no buyers were forthcoming.

Notwithstanding this, the bank remained content at this stage for the interest on the farm loans to continue to be rolled up.

By October 1990 Mr Brabon's cash-flow difficulties had become more serious, but the bank was still content to support him. In an internal memorandum dated 15 October 1990, Mr Nicholson (who had by then taken over from Mr Jacobs) said:

> 'As you know, we are dealing with a highly reputable individual, possessed of substantial assets, but because of his various borrowings his liquid position remains far tighter than either he or we would wish. There is little more that he can do at the present time to generate sales or lettings and we are receiving his full co-operation in doing all he can to at least cover interest in the meantime …'

By March 1991 it had become apparent that there was little or no equity left in Clover Hill Farm, and the rolled up interest on the two farm loans amounted to more than £20,000. By this stage, the bank was becoming increasingly concerned at the level of its exposure. Mr Brabon, however, remained confident that he had a strong capital position, notwithstanding the difficulties he was experiencing in servicing his borrowings, and notwithstanding his continuing inability to sell the farms. Mr Brabon told me in evidence (and I accept) that he still did not feel under any pressure from the bank.

By mid-1992 the position had worsened. The farms were still unsold, and property values had dropped still further. Mr Brabon accepted that it was at about this time that, as he put it, the balance of power shifted, in the sense that he recognised that he was thereafter dependent on the bank's continued support if he was to survive financially. Under cross-examination, Mr Brabon described the downturn in his financial position in these terms:

a

'Perhaps wrongfully [sc wrongly], I was using cashflow to buy additional buildings, when with hindsight I should not have bought additional buildings and should have used it to service these funds. In other words, I was going forward, building up a property portfolio, using every penny to inject into buying more assets. That turned out to be wrong because of what happened in the recession. I accept that, yes.'

b

In the course of an internal memorandum dated 16 June 1992 Mr Nicholson said:

c

'Mr Brabon acknowledges our deep concern and recognises that the lack of tangible progress in the short term could bring serious consequences, i.e. borrowings being called in, security realised and possible bankruptcy.'

By September 1992 Mr Brabon's borrowings from the NatWest amounted to some £1.4m.

d

In February 1993 the bank obtained revaluations of the Brabon family property portfolio, which valued the properties at very substantially lower values than previously. Mr Brabon did not accept these valuations, regarding them as 'totally out of line with anything I had seen before'; but at the same time he realised that his financial position had by this stage become very serious. He told me that he was very concerned as to what the bank's attitude would be in the light of these valuations. He continued:

e

'the whole family idea had been to get through, to help each other to get through, but suddenly, when confronted with valuations which are in some cases a quarter of what had been obtained 18 months before had to consider what the Bank's real position was at that point of time in February 1993 … Obviously members of my family would not go on helping me beyond that point, because of my changed position, based on those suddenly new valuations. Previously I would have had the use of funds to help me through … The family were concerned about their own assets, because previously they had helped me, and if, in helping me, it meant using assets I could get through, then that is what would be done. But if the bank had adopted a different attitude in February 1993, based on those valuations, there was no point in my family providing for me, or the use of additional assets'.

f

g

I accept that evidence.

h

As noted earlier, in March 1994 Mr Brabon's solicitor's practice was taken over, following intervention by the Law Society.

On 24 August 1994 the bank demanded repayment, in the sum of £1.2m.

On 22 December 1994, following an investigation by the Law Society, Mr Brabon was struck off the roll of solicitors.

i

Subsequently, Mr Brabon pleaded guilty to a number of charges of dishonesty (none of which related to any of the transactions under challenge in these proceedings), and was sentenced to two and a half years' imprisonment.

*The various 'intra-family' transactions under challenge*

On 24 November 1988 the following relevant transactions took place.

(1) Mr Arthur Brabon conveyed Little Meads to Mrs Brabon, at the direction of Mr Brabon. The trustee seeks to construe the words 'as beneficial owner' as referring to Mr Brabon, and as demonstrating that Mr Brabon was the beneficial owner of Little Meads. I will refer to this conveyance as 'the Little Meads conveyance'.

(2) Mr Arthur Brabon ('as beneficial owner') conveyed the roadway to Mrs Brabon by way of gift. I will refer to this conveyance as 'the roadway conveyance'.

As noted earlier, it is contended by the Brabon respondents that at about the same time Mr Brabon granted Mr Arthur Brabon (who was then living at Little Meads) a right to occupy Barbarossa rent free for the rest of his life, in consideration of Mr Arthur Brabon transferring Little Meads to Mrs Brabon. This, it is said, explains the references in the Little Meads conveyance to 'an Agreement as to exchange made between [Mr Brabon] and [Mr Arthur Brabon] AND DATED THE 24th DAY OF NOVEMBER 1988', and to Mr Arthur Brabon conveying Little Meads to Mrs Brabon 'at the direction of [Mr Brabon]'. The trustee contends that no such 'Agreement as to exchange' ever existed, and that no right of occupation of Barbarossa was ever granted to Mr Arthur Brabon. The trustee further contends that even if such a right of occupation was granted, the Little Meads conveyance was a transaction at an undervalue since, on the footing that Mr Brabon was the beneficial owner of Little Meads immediately prior to the Little Meads conveyance, he received no consideration for the disposal of that beneficial interest. Conversely, if Mr Brabon was not the beneficial owner of Little Meads, any right of occupation granted to Mr Arthur Brabon was a transaction at an undervalue since Mr Brabon received nothing in return.

In support of his contention that no agreement for exchange existed, the trustee relies on the agreement (dated only '1997') whereby Mr Arthur Brabon purported to relinquish his right of occupation of Barbarossa in order to enable Barbarossa to be sold to Silver with vacant possession, in consideration of Mr Brabon providing him with suitable alternative accommodation. The agreement, which was drawn up by Thomson Snell & Passmore, recites that Mr Arthur Brabon 'is entitled to occupy [Barbarossa] during his lifetime rent free having previously agreed to give up all claim to any part of the estate of [the late Mrs Olive Brabon]'. This recital, the trustee points out, is wholly inconsistent with the existence of an agreement for exchange in the terms contended for by the Brabon respondents.

Mr Brabon told me in evidence that he could not understand to what the recital referred, and that in any event he was the sole executor and beneficiary under his mother's will. He said he cannot have read the agreement thoroughly, but that he was told that it was an agreement whereby his father would move out of Barbarossa to enable the sale to Silver to go through, on the basis that he (Mr Brabon) would provide him with somewhere else to live. As to the reference in the Little Meads conveyance to an 'Agreement as to exchange', Mr Brabon told me that it had been agreed between him and his father that in consideration of his father conveying Little Meads to Mrs Brabon he would allow his father to occupy Barbarossa

rent free for the rest of his life, but that he did not think that a formal
agreement to that effect had ever been drawn up and signed. He thought a
*a* formal agreement had been prepared, but he could not produce it.

Addressing first the trustee's contention as to the meaning and effect of the
words 'as beneficial owner' in the Little Meads conveyance, it seems to me
that this contention is unsustainable. As I read the deed, the expression 'as
beneficial owner' is plainly being used in the conveyancing sense, in
connection with the incorporation of covenants as to title. I find that
*b* immediately prior to the Little Meads conveyance Mr Arthur Brabon was the
beneficial owner of Little Meads. This is consistent with the terms of an
earlier conveyance, dated 15 October 1986, whereby Mrs Olive Brabon
conveyed Little Meads into the joint names of herself and her husband,
Mr Arthur Brabon, as joint tenants. As noted earlier, Mrs Olive Brabon died
*c* on 15 June 1987.

As to the grant to Mr Arthur Brabon of a right of occupation of
Barbarossa, the recital in the 1997 agreement makes no sense on any basis,
and only serves to illustrate the muddled treatment of the conveyancing in
this case. I am satisfied, however, that agreement was reached in or about
*d* November 1988 between Mr Brabon and Mr Arthur Brabon whereby
Mr Arthur Brabon would give up his property Little Meads in favour of
Mrs Brabon, in consideration of Mr Brabon granting him the right to occupy
Barbarossa for the rest of his life. It is significant in this connection, as it
seems to me, that in August 1984 Mr Brabon had informed Mr Jacobs at the
NatWest Bank (according to Mr Jacobs' internal memorandum) that:
*e*

'[I]n due course his plans will be for parents to move from Little Meads
into Barbarossa.'

*f* I find that a formal document was prepared to give effect to the agreement,
but that the document was never completed and signed. However, the
agreement was carried into effect in that Mr Arthur Brabon moved from
Little Meads to Barbarossa.

As to undervalue, the Little Meads conveyance was clearly a transaction at
an undervalue so far as Mr Arthur Brabon was concerned, in that he was
*g* giving up the absolute ownership of one property in exchange for a right to
occupy another property for the rest of his life. Equally, the Little Meads
conveyance coupled with the grant of a right of occupation of Barbarossa
was also a transaction at an undervalue so far as Mr Brabon was concerned,
in that he received nothing in return for the grant of that right. But I am
*h* satisfied that it was not a purpose (still less a substantial purpose) of the
transaction to put assets out of the reach of Mr Brabon's creditors. In
November 1988 the property market was still buoyant, and so far as
Mr Brabon was concerned no cloud had as yet appeared on the horizon.

As to the gift of the roadway, the trustee submits that the beneficial owner
of the roadway was 'whoever suited [Mr Brabon] at the time', and that
*i* Mr Brabon was the true donor of the roadway. I am satisfied, however, that
the donor was indeed Mr Arthur Brabon, and that at the date of the gift
Mr Brabon had no beneficial interest in the roadway. Further, although by

definition the gift was a transaction at an undervalue for the purposes of s 423, I find that it was not a purpose of the gift to put assets out of the reach of Mr Brabon's creditors.

I conclude, therefore, that the trustee is not entitled to relief under s 423 in respect of the above transactions.

I turn next to the transfer dated 1 February 1989 whereby Mr Brabon transferred the open land to Mrs Brabon, for an expressed consideration of £30,000.

The first question which arises is whether the expressed consideration was in fact paid. Mr Brabon told me in evidence that Mrs Brabon would have paid the £30,000. He could not say how it had been paid but suggested that it might have been dealt with by way of set off in relation to other property transactions between himself and Mrs Brabon. He referred to the fact that Mrs Brabon herself owned a portfolio of properties. He could not produce any documentary record of the payment having been made, but pointed out that he was no longer in possession of documents relating to his solicitor's practice. Mrs Brabon told me that she had paid £30,000 for the open land, but she too was unable to produce any documentary evidence of the payment, despite a thorough search.

I accept Mrs Brabon's evidence that she provided consideration to the value of £30,000 for the transfer of the open land, although the consideration may have taken the form of an adjustment in relation to some other property deal between herself and Mr Brabon rather than a cheque for that sum. I bear in mind that a finding that the expressed consideration was not paid or provided would involve a finding of dishonesty on the part of Mr Brabon (who drew the transfer). However, I can see no reason why, in February 1989, Mr Brabon should have been tempted to act dishonestly in relation to the transfer by stating a fictitious consideration. Mrs Brabon had her own portfolio of properties and was in a financial position to provide the consideration, and the possibility of the future bankruptcy of Mr Brabon had not at that stage raised its head.

As to the value of the open land in February 1989, Mr Jennings and Mr Turner are agreed that £30,000 represented its then market value. Hence, the transfer of the open land in February 1989 was not a transaction at an undervalue.

I further find that it was not a purpose of the sale of the open land to put assets out of the reach of Mr Brabon's creditors; Mr Brabon's purpose in selling the open land was to provide himself with additional cash with which to service his borrowings.

I therefore conclude that the trustee is not entitled to relief under s 423 in relation to this transaction.

I turn next to the transfer dated 27 April 1991 whereby High Hedges was transferred out of the joint names of Mr Brabon, Mrs Brabon and Mr Arthur Brabon into the joint names of Mrs Brabon and Mr Arthur Brabon, who declared that they held it as tenants in common in equal shares. The effect of this transfer was to assign Mr Brabon's beneficial share in High Hedges to Mrs Brabon and Mr Arthur Brabon. (The case proceeded on the basis that it was a one-quarter share, although it would appear to have been a half share: see the section of this judgment dealing with the conveyancing history.)

There is nothing on the face of the transfer to suggest that it was other than a gift of Mr Brabon's beneficial share, and in his first affidavit in these proceedings Mr Brabon referred to it as such ('I decided to give my share to my wife'). In a later affidavit, however, Mr Brabon suggests that there was consideration for the transfer, in that Mrs Brabon had contributed £4,000 towards the construction costs on the Meads, and that she had allowed Mr Brabon the full use of a loan of £100,000 raised on the security of the Meads (which was owned by them jointly). The affidavit continues:

> 'It was agreed that I could use her £50,000 for my own purposes, and in return I gave her a quarter share in High Hedges.'

When it was put to him in cross-examination that this was a different story, he replied: 'No, that just explains why I gave it to her'.

In her affidavit, Mrs Brabon stated:

> 'The transfer of [Mr Brabon's] share to me was in consideration of a contribution I made of £4,500 towards the matrimonial home of The Meads which was to be put into joint names.'

In a later affidavit, and in oral evidence, she corrected the figure to £4,000. She makes no mention in either affidavit of any loan raised on the security of the Meads, but in oral evidence she did refer to Mr Brabon wanting to borrow money on the security of the Meads.

I accept that Mrs Brabon contributed £4,000 towards the cost of refurbishing the Meads, but in relation to the assignment of Mr Brabon's beneficial share in High Hedges that was past consideration (the Meads was purchased in 1975). Further, although in 1979 a loan of £100,000 was raised on the security of the Meads, of which Mrs Brabon allowed Mr Brabon to enjoy the full benefit, I find that there was no agreement between Mr Brabon and Mrs Brabon that in consideration of her doing so Mr Brabon would assign his beneficial share in High Hedges to her and Mr Arthur Brabon. In any event, I accept Mr Atherton's submission that Mrs Brabon's conduct in allowing Mr Brabon to enjoy the full benefit of the loan raised on the security of the Meads (of which Mrs Brabon was a joint owner) cannot constitute consideration for this purpose.

I therefore conclude that the assignment of Mr Brabon's beneficial share in High Hedges to Mrs Brabon and Mr Arthur Brabon was a voluntary assignment, not supported by consideration. It follows that it was a transaction at an undervalue for the purposes of s 423.

Had it been necessary to address the question of valuation, I would have valued a one quarter beneficial share in High Hedges at £5,000 (based on Mr Turner's valuation), and a one half share at £10,000.

I turn, then, to the question whether it was a transaction entered into by Mr Brabon for the purpose of putting assets out of the reach of his creditors.

I find that it was not entered into by Mr Brabon for that purpose. Although, as related earlier in this judgment, by April 1991 Mr Brabon's financial circumstances had taken a turn for the worse and the NatWest Bank was becoming increasingly concerned at the level of its exposure, Mr Brabon remained confident that his difficulties would be overcome, and

he did not at that stage feel under pressure from the bank. I conclude that, in divesting himself of his interest in High Hedges in favour of Mrs Brabon and Mr Arthur Brabon, Mr Brabon's purpose was simply to compensate Mrs Brabon for the money which she had expended on the Meads and for allowing him to have the use of the entirety of the loan raised on the security of the Meads.

I turn next to the transfer dated 6 January 1992 whereby Mr Brabon transferred the ransom strips to Mr Arthur Brabon, who then declared that he stood possessed of them on trust for Mrs Brabon.

The form of transfer had been drafted for execution by Mr Arthur Brabon, and contained (presumably by way of intended consideration) a grant by him of rights over the roadway in favour of the Meads. However, as Mr Arthur Brabon had given the roadway to Mrs Brabon by the deed of gift dated 24 November 1988, he plainly could not have granted rights of way over it, even if he had executed the form of transfer. In the circumstances it is accepted by the Brabon respondents that the 1992 transfer was a voluntary transfer. Hence it was a transaction at an undervalue for the purposes of s 423.

Had it been necessary to address the question of valuation, I would have accepted Mr Jennings' valuation of the ransom strips at £5,000, as at January 1992 (Mr Turner did not value the ransom strips as at that date).

As to the purpose or purposes of the transaction from Mr Brabon's point of view, Mr Brabon described the purpose of the transaction in the following terms in the course of his cross-examination:

'In 1992 the family were in dispute with the neighbours at the end of the private roadway about the building and also about access on to our private roadway, the family private roadway. Originally [the ransom strips] were to be transferred to my wife, but at the last minute we decided not to transfer them to my wife because litigation looked imminent … At the last minute, after discussion with my wife, because my wife did not want to go into court and did not want disputes with the neighbours, I transferred it to my father.'

Mrs Brabon confirmed this account in her affidavit evidence, and was not cross-examined about it.

On the basis of the available evidence, I am not prepared to infer that one of Mr Brabon's purposes in divesting himself of the ransom strips was to put them out of the reach of his creditors. Although by January 1992 Mr Brabon's financial position had become more precarious, on his evidence (which I accept) he did not as yet regard the balance of power as having shifted to the NatWest Bank. I find that his only substantial purpose in so doing was to benefit other members of his family; initially his intention was to benefit Mrs Brabon, but as the transaction was carried out its purpose was to benefit Mr Arthur Brabon.

Chronologically, the next transaction which I have to consider is the charge over Barbarossa created in favour of Mrs Brabon by the promissory note dated 31 January 1994. However, I concluded earlier that this was a valid charge to secure repayment of £70,000 of a larger loan made by Mrs Brabon to Mr Brabon, and accordingly I need not consider it further.

I turn next to the third charge purportedly created over Hillcrest in favour of Mr Brabon by the promissory note dated 31 July 1996. I accept Mrs Brabon's evidence that she lent Mr Brabon £3,920, the funds coming from the current account of a caravan business called Castle View Statics which Mrs Brabon was carrying on at that time. Hence no question of a transaction at an undervalue arises. In any event, the charge could not amount to a transaction at an undervalue, for the reasons given by Millett J in *Re MC Bacon Ltd* [1990] BCLC 324. Accordingly the trustee's claim in respect of this transaction must fail.

Lastly, I turn to the sale of Wendy by Chiselane to Mrs Brabon on 31 July 1996, for an expressed consideration of £60,000 (a figure which, as is common ground, represented its current market value).

The trustee contends that the evidence shows that Wendy was originally purchased by Mr Brabon with his own funds. He submits that this is consistent with the fact that Chiselane did not register the Royal Bank of Scotland charge until some ten months after the purchase had been completed. In my judgment, however, the fact that there was a delay in registration is a thoroughly unsafe basis for a finding that Chiselane was not the purchaser of Wendy, or that Wendy was not purchased with Chiselane's funds. On the evidence, I am satisfied that Chiselane purchased Wendy with its own funds, with the aid of the loan from the Royal Bank of Scotland.

The trustee further contends that no consideration was provided for Mrs Brabon's purported purchase on 1 March 1994 of (among other things) Mr Brabon's shareholding in Chiselane. I find that that was not the case. Once again I accept Mrs Brabon's evidence that she paid Mr Brabon £97,000 as consideration for the sale of the assets the subject of the March 1994 agreement. The funds represented the proceeds of loans which Mrs Brabon had raised on the security of properties which she owned in Hastings, viz 1 Lower Park Road, and 9 Blomfield Road.

As to the sale of Wendy by Chiselane to Mrs Brabon on 31 July 1996, I accept Mrs Brabon's affidavit evidence that £30,000 of the consideration was provided by her assuming liability for the sum then outstanding under a first charge in favour of the Royal Bank of Scotland to secure the loan obtained by Chiselane to finance the purchase of Wendy (the sum then outstanding being approximately £30,000), and that the remaining £30,000 of the consideration was provided by Mrs Brabon forgiving £30,000 of a larger sum then owing to her by Chiselane in respect of interest on that loan which Mr Brabon had paid out of her own resources.

Since, on those findings, Chiselane received full value for its disposal of Wendy, no question of a transaction at an undervalue can arise; still less a transaction entered into by Mr Brabon.

I accordingly conclude that the trustee's claim in respect of Wendy fails.

CONCLUSION

For the reasons set out above, I conclude that the trustee's claims fail, and that the action must be dismissed as against all the respondents.

*Order accordingly.*

<div align="right">Celia Fox    Barrister.</div>

TAB 47

*Re Capital Annuities Ltd* [1979] 1 WLR 170, English High Court

170

suitable measure of corporation tax having been exacted; but that is the    A
fault, if fault it be, of the provisions of the Act of 1970, which were
doubtless enacted at the behest of the Crown but which, in this instance,
have provided the very weapon which has been turned against it. This
appeal falls to be dismissed.

*Appeal dismissed with costs.*

B

Solicitors: *Solicitor of Inland Revenue; Linklaters & Paines.*

C

---

[CHANCERY DIVISION]

*\* In re* CAPITAL ANNUITIES LTD.

1978  Feb. 15, 16, 17, 20, 21, 22;                                    Slade J.  D
       March 14

*Company—Winding up—Insurance company—Scheme for reduc-
tion of " amount " of company's " contracts " proposed by
Policyholders Protection Board—Proof that company " unable
to pay its debts "—Court's jurisdiction and discretion to order
reduction of sums payable under contracts—Insurance Com-
panies Act 1974 (c. 49), s. 50—Policyholders Protection Act     E
1975 (c. 75), s. 17 (2)*

An insurance company, which specialised solely in annuity
contracts and, therefore, carried on long-term insurance
business, as defined in section 83 (2) (*a*) of the Insurance
Companies Act 1974, presented its own petition for a winding
up order on April 30, 1976, and the official receiver was
appointed as provisional liquidator. The Policyholders Protec-   F
tion Board, after detailed consideration, caused a scheme to
be prepared for assistance to the company under section 16 of
the Policyholders Protection Act 1975 and, accordingly,
issued a summons seeking (i) an order pursuant to section 50
of the Act of 1974 [1] reducing the amount of the company's
liabilities under relevant long-term policies within the meaning
of section 17 (2) of the Act of 1975 [2] and of any benefits
provided for under such policies which had not fallen due to    G
be paid by the company prior to April 30, 1976, or alterna-
tively the date of such order, to the extent specified in an
actuary's report; (ii) an order further reducing the amount of
such liabilities and benefits to the extent specified in section
17 (2) (*a*) of the Act of 1975, viz. to 90 per cent. of the
amounts which would otherwise have been payable in accord-
ance with the terms of the policies, and (iii) an order dismiss-
ing the winding up petition. Evidence was given, inter alia,   H
that the company's assets amounted to £1,326,885, and its
present liabilities to £1,592,442, leaving a shortfall of £265,557.
On the summons: —

*Held,* dismissing the summons, that it was a condition
precedent to the exercise of the court's jurisdiction under
section 50 of the Insurance Companies Act 1974 that the

[1] Insurance Companies Act 1974, s. 50: see post, p. 176H.
[2] Policyholders Protection Act 1975, s. 17 (2): see post, p. 177H—178C.

**1 W.L.R.** **In re Capital Annuities Ltd. (Ch.D.)**

A   company should have been " proved to be unable to pay its debts "; that the phrase " unable to pay its debts " in section 50 bore the same meaning as it bore in sections 222 and 223 of the Companies Act 1948; that mere evidence that a company had insufficient liquid assets to pay all its presently owing debts did not by itself prove that the company was " unable to pay its debts," within the meaning of those sections and, since it had not been proved to the court's

B   satisfaction that the present contingent and prospective liabilities of the company exceeded the present value of the assets, the court lacked jurisdiction to grant the relief sought by the board in paragraphs (i) and (ii) of their summons (post, pp. 181H, 182E–G, 186H—187B, H—188F).

*In re European Life Assurance Society* (1869) L.R. 9 Eq. 122 applied.

C   *Per curiam.* (i) The court's power, under section 50 of the Insurance Companies Act 1974, to reduce " the amount of the contracts of the company " is restricted to a company's current contracts of insurance, but the court has jurisdiction to reduce all sums prospectively payable under insurance contracts current at the date of presentation of the petition notwithstanding that such sums might have ripened into presently payable debts since the presentation of the petition. The court has no jurisdiction to reduce debts under insurance

D   contracts which had become due by the date of presentation of the petition. The court would generally select the date of presentation of the petition as the proper time for ascertaining the then current contracts which are to be reduced, though the court might in special circumstances select a later date (post, pp. 188G—189C, 195D–F, G).

*In re Great Britain Mutual Life Assurance Society* (1880) 16 Ch.D. 246, C.A.; (1881) 19 Ch.D. 39; (1882) 20 Ch.D. 351,

E   C.A. followed.

(ii) In making an order for reduction, the court must have in mind that it is doing so " in the place of making a winding up order." In exercising its discretion, the court must carefully compare the financial position of the policyholders if the order for reduction is made with their financial position in the event of a winding up order, where the general rule is that a company's liabilities fall to be discharged pari passu. It

F   is, however, impossible to derive from the wording of section 50 of the Act of 1974 any jurisdictional requirement that all the company's contracts should be reduced either precisely equally or on a principle of broad equality, though considerations of broad equality are relevant to the manner in which the court will exercise its discretion (post, p. 197E–H).

Dicta of Buckley J. in *In re Nelson & Co.* [1905] 1 Ch. 551, 566–567 and Jessel M.R. in *In re Great Britain Mutual*

G   *Life Assurance Society* (1882) 20 Ch.D. 351, 353, C.A. considered.

(iii) Although the court has jurisdiction to order a proposed reduction in the amount of the company's contracts without directing meetings of policy holders, or further advertisements or communication with policyholders, the court is far from satisfied that it would have been appropriate in the present case to exercise its jurisdiction without giving the policy-

H   holders affected the right to object to the board's scheme for reduction (post, pp. 199G—200B).

The following cases are referred to in the judgment:

*Briton Medical and General Life Assurance Co. Ltd., In re* (1886) 54 L.T. 14.

*Briton Medical and General Life Association, In re* (1887) 3 T.L.R. 670

*Crook* v. *Edmondson* [1966] 2 Q.B. 81; [1966] 2 W.L.R. 672; [1966] 1 All E.R. 833, D.C.

The Weekly Law Reports, February 23, 1979

**In re Capital Annuities Ltd. (Ch.D.)**    **[1979]**

*European Life Assurance Society, In re* (1869) L.R. 9 Eq. 122.    A

*Fidelity Life Assurance Ltd., In re* (unreported), July 23, 1976, Oliver J.

*Fidelity Life Assurance Ltd., In re* (unreported), December 9, 1976, Slade J.

*Flagstaff Silver Mining Co. of Utah, In re* (1875) L.R. 20 Eq. 268.

*Globe New Patent Iron and Steel Co., In re* (1875) L.R. 20 Eq. 337.

*Great Britain Mutual Life Assurance Society, In re* (1880) 16 Ch.D. 246, C.A.; (1881) 19 Ch.D. 39; (1882) 20 Ch.D. 351, C.A.

*Law Car and General Insurance Corporation, In re* [1913] 2 Ch. 103,    B
C.A.

*Nelson & Co., In re* [1905] 1 Ch. 551.

*Northern Counties of England Fire Insurance Co. In re (Macfarlane's Claim)* (1880) 17 Ch.D 337.

*(Macfarlane's Claim)* (1880) 17 Ch.D. 337.

The following additional cases were cited in argument:    C

*Albert Life Assurance Co., In re* (1870) L.R. 9 Eq. 706; (1871) 6 Ch.App. 381.

*Dynamics Corporation of America, In re* [1976] 1 W.L.R. 757; [1976] 2 All E.R. 669.    •

*English Assurance Co., In re* (1872) L.R. 14 Eq. 72.

*Grunwick Processing Laboratories Ltd. v. Advisory, Conciliation and Arbitration Service* [1978] A.C. 655 [1978] 2 W.L.R. 277; [1978] 1 All    D
E.R. 338, C.A. and H.L.(E.).

*N.F.U. Development Trust Ltd., In re* [1972] 1 W.L.R. 1548; [1973] 1 All E.R. 135.

*Nicholl v. Eberhardt Co.* (1888) 58 L.J.Ch.N.S. 399.

*Patrick and Lyon Ltd., In re* [1933] Ch. 786.

PETITION AND SUMMONS    E

On April 30, 1976, Capital Annuities Ltd., a company which was incorporated on November 19, 1968, and which carried on ordinary long-term insurance business as defined in section 83 (2) of the Insurance Companies Act 1974, specialising solely in annuity contracts, presented its own petition for winding up by the court. Mr. John Byerley Clemetson, senior official receiver in companies liquidation, was    F
appointed provisional liquidator. After detailed consideration, the Policyholders Protection Board caused a scheme to be prepared for assistance to the company under section 16 of the Policyholders Protection Act 1975, in the form of a draft agreement intended to be entered into between (1) the board, (2) the company, and (3) Commercial Union Assurance Co. Ltd., providing for immediate discharge of all known liabilities other than in respect of policies falling within the scope of    G
the Act of 1975—by payment in full or by payment of such less amount as particular creditors might be willing to accept—and thereafter for the company to continue to operate as a closed fund, with a view to payment in full, to all policyholders, of the benefits under such policies as and when they fell due, but as reduced by orders to be sought in a summons to the court, in accordance with recommendations contained in an    H
actuary's report.

By summons, dated February 8, 1978, the board accordingly sought (1) an order, pursuant to section 50 of the Insurance Companies Act 1974, reducing the amount of the company's liabilities under relevant long-term policies, within the meaning of section 17 (2) of the Policy-holders Protection Act 1975, and of any benefits provided for under such policies which had not fallen due to be paid by the company prior to

**1 W.L.R.**                    **In re Capital Annuities Ltd. (Ch.D.)**

A    April 30, 1976, or alternatively the date of such order, to the extent
specified in Appendix II to the actuary's report.  (2) An order pursuant
to section 50 further reducing the amount of such liabilities and benefits
to the extent specified in section 17 (2) (a) of the Act of 1975, i.e. to
90 per cent. of the amount which would otherwise have been payable in
accordance with the terms of the policies.  (3) An order dismissing the
winding up petition.

B        The facts are stated in the judgment.


*David Oliver* for the board.
*William Stubbs* for the company.
*David Richards* for the official receiver.
*John Chadwick* as amicus curiae.

C                                                    *Cur. adv. vult.*


March 14.  SLADE J. read the following judgment.  There are before
me, first, a petition for a winding up order in respect of Capital Annuities
Ltd. and secondly, a summons issued by the Policyholders Protection
Board asking that certain contracts of the company be reduced by an order
pursuant to section 50 of the Insurance Companies Act 1974 and that the
D    winding up petition shall be dismissed.  The summons by necessary impli-
cation raises important questions both as to the nature and extent of the
court's jurisdiction under section 50 of that Act and as to the manner in
which that jurisdiction should be exercised.  It also raises issues as to the
inter-relation between that section and the Policyholders Protection Act
1975.

E        I am told that the board regard this as a test case.
The company was incorporated on November 19, 1968, under the
Companies Acts 1948 to 1967, as a company limited by shares.  Its
nominal capital is £250,000 divided into 250,000 shares of £1 each.  The
amount of the capital paid up or credited as paid up is £200,000.  Its
objects are to grant annuities of all kinds and to carry on the business
of insurance and reinsurance and guarantee.  The business carried on by
F    the company has in fact been " ordinary long-term insurance business,"
as defined in section 83 (2) of the Act of 1974, specialising solely in
annuity contracts.
On September 25, 1975, the company decided to cease taking on
new business.  Since then it has effectively been run as a closed fund.
On April 30, 1976, it presented to the court its own petition for a
G    winding up order and the official receiver was appointed provisional
liquidator.  The board were also notified.  The position of the company
as at the end of April 1976 is to be found summarised in paragraphs 7
to 13 of the petition as follows:

"7.  As at the close of business on April 27, 1976, the company
had in excess of £175,000 standing to the credit of its bank account
H        with National Westminster Bank Ltd. and has no other bank
borrowings or similar indebtedness.  Its total liabilities including
uncleared cheques (other than future or contingent liabilities) did
not then exceed £90,000.
" 8.  Under the terms of the policies issued by the company, most
of the company's liabilities will have fallen due for discharge by the
end of 1984.  Whilst the dates on which such liabilities would in
the normal course of events fall due are spread over the period until

1984, most of the company's policies provide that annuitants may A surrender their policies in advance of their normal maturity date and receive payments representing discounts on the current actuarial values of their policies.

" 9.    The company has prepared a forecast of its cash flow for the period to 1984 which was examined and approved by the company's actuaries and auditors.    The said cash flow forecast was based on certain assumptions regarding, inter alia, mortality rates, expected B dates for the sale of certain assets in which the company is interested and the rate at which annuitants will surrender their policies in advance of their normal maturity dates.    The said cash flow forecast indicates that all the liabilities of the company (present, future or contingent) would be discharged by the company on their due dates.    In preparing the said cash flow forecast, the directors have C assumed that the rate at which annuitants would in the future surrender their policies would be comparable with the company's past experience of the rate at which annuitants surrender their policies.

" 10.    The company and its advisers are in the course of preparing audited accounts for the year ended December 31, 1975. D

" 11.    The valuation of assets of insurance companies is governed by regulations made by the Secretary of State in the exercise of his powers under sections 78 and 86 of the Insurance Companies Act 1974.    Such regulations which have not previously applied to accounts of the company, provide, inter alia, that land owned by insurance companies and debts owed to insurance companies should be valued, in effect, at the amount which they would realise on an E immediate open market sale.    It is necessary to apply this basis to all the assets of the company consisting of land and debts, notwithstanding that it is anticipated that it would not be necessary to realise a substantial part of such assets immediately in order to meet the company's expected liabilities.

" 12.    Whilst the accounts of the company for the year to December F 31, 1975, have not yet been audited, the directors anticipate that they will show that the actuarial valuation of the company's liabilities will materially exceed the valuation of its assets.    The directors consider it likely that the publication of audited accounts showing such figures would result in a loss of confidence in the company in which event it is probable that annuitants would G surrender their policies at a rate substantially in excess of the rate previously experienced by the company.    In such circumstances the company would be unable to meet its liabilities to annuitants as they fell due.

" 13.    Accordingly, the directors consider that, taking into account the company's contingent and prospective liabilities, the company is unable to pay its debts within the meaning of section 223 (d) of the H Companies Act 1948 and at a meeting of the board of directors of the company held on April 28, 1976, the directors resolved that the company should present a petition to the court for an order that the company be wound up."

As a result of the presentation of the petition, the board were immediately faced with the problem of how they could best perform

A their duties in relation to the company under the Act of 1975. The board are established as a body corporate under section 1 (1) of the Act of 1975. Under section 1 (2) their principal functions are:

"... (a) to take the measures provided for by sections 6 to 16 ... for the purpose of indemnifying (in whole or in part) or otherwise assisting or protecting policyholders and others who have been or B may be prejudiced in consequence of the inability of insurance companies carrying on business in the United Kingdom to meet their liabilities under policies issued or securities given by them; and (b) for the purpose of financing their expenditure on the performance of their functions under those sections, to impose levies, in accordance with [the Act of 1975], on insurance companies and other persons engaged in the insurance industry in the United Kingdom; ..."

C
Under section 3 (1) of the Act of 1975, the board's functions of indemnity, assistance and protection under the Act are exercisable only where the insurance companies in question are "authorised insurance companies." Section 3 (2) contains a definition of an "authorised insurance company," which covers the company in the present case. Under section 4 (1) the board's assistance or protection is confined to a D "United Kingdom policy" as defined by section 4 (2); all relevant policies in the present case fall within such definition.

Sections 6 to 11 of the Act of 1975 impose on the board a number of duties in relation to a "company in liquidation," as defined in section 5 (4). The company in the present case is not yet a "company in liquidation" within this definition, but, if a winding up order were to be E made, it would become so. Sections 10 and 11 contain a number of provisions which, in effect, oblige the board to make or offer protection or financial assistance to policyholders of a company in liquidation under the terms of any "long term policy," as defined by section 10 (1). All the policies of the company in the present case are "long term policies" within this definition. For present purposes it is unnecessary to sum- F marise the long and complicated provisions of sections 10 and 11, as amplified or qualified by sections 12, 13 and 14, which set out the obligations which would, in the event of the liquidation of the company, fall on the board in relation to policyholders. I need only mention two points. First, it would in very broad terms be the duty of the board to pay 90 per cent. of accrued claims under policies and, if reasonably practicable, to secure continuity of insurance for any policyholder to G the extent of securing that he received 90 per cent. of any future benefit under his policy: see in particular sections 10 (2), 11 (3) and 11 (4). Secondly, however, this and any other duty imposed on the board by sections 6 to 11 would be subject to compliance on the part of the policyholder with any conditions imposed by the board with respect to the total or partial assignment to the board of, inter alia, the policy- H holder's rights under the policy: section 13 (4).

It appears, therefore, that in the event of a liquidation, it would be open to any policyholder of the company effectively to reject any arrange- ments for continuity of insurance which might be made for him by the board, by refusing to comply with the conditions imposed by the board, as to the assignment to the board of his rights under the policy. Thus, in this event, it would be open to him to take his chance as an ordinary creditor on a liquidation without any assistance from the board. The

**Slade J.**          In re Capital Annuities Ltd. (Ch.D.)          **[1979]**

fact that the policyholders would have this right to prove as ordinary
creditors in the event of a liquidation is a material one in relation to
the board's present summons, for reasons which will appear.

Sections 16 and 17 of the Act of 1975 confer on the board wide powers
—not obligations—to protect policyholders of an authorised insurance
company *not* being a company in liquidation, if it is a " company in
financial difficulties " for the purposes of section 16. This definition
includes, inter alia, a " company in provisional liquidation " within the
meaning of section 15. The company in the present case falls within
this definition and is thus " a company in financial difficulties." A
policyholder of such company is eligible for protection under section
16, if he complies with certain conditions set out in section 16 (9), with
which all the policyholders of the company in the present case comply.

Sections 16 (6) (8) and 17 of the Act of 1975 impose some
important restrictions on certain important powers conferred on the
board by section 16 (3) and (4). Subject to these restrictions, however,
section 16 (2) empowers the board to exercise the powers conferred on
them by section 16 (3) and (4) for the purpose of safeguarding policy-
holders of a " company in financial difficulties," who are eligible for
protection under section 16, or any class or description of such policy-
holders:

> " . . . to any extent appearing to the board to be appropriate in any
> case or in any class or description of case, against loss arising from
> the financial difficulties of the company."

Subject to these restrictions, section 16 (3) empowers the board to

> " . . . take any measures appearing to them to be appropriate for
> securing or facilitating the transfer of all or any part of the insurance
> business carried on by a company in financial difficulties to another
> authorised insurance company, on terms (including terms reducing
> the liabilities or the benefits provided for under any policies)
> appearing to the board to be appropriate in any case or in any class
> or description of case."

In this case, however, the board are at present minded to exercise their
powers not under section 16 (3) but under section 16 (4). Subject to the
like restrictions, section 16 (4) confers on it the following further powers:

> " . . . in any case where it appears to the board that it would be
> practicable to secure the purpose mentioned in subsection (2) above
> by giving assistance to the company in financial difficulties to enable
> it to continue to carry on insurance business, the board may take
> such measures as appear to them to be appropriate for giving such
> assistance."

I observe that in practice, apart from the Act of 1975, one important
method by which insurance companies in financial trouble have in the
past been enabled to continue to carry on insurance business has been
by an invocation of section 50 of the Act of 1974 or its predecessors.
This section provides:

> " In the case of an insurance company which has been proved to
> be unable to pay its debts, the court may, if it thinks fit, reduce the
> amount of the contracts of the company on such terms and subject
> to such conditions as the court thinks just, in place of making a
> winding up order."

1 W.L.R.                    In re Capital Annuities Ltd. (Ch.D.)                    Slade J.

A  Reverting to section 16 of the Act of 1975, subsection (5) contains pro-
visions which to some extent might appear to echo section 50 of the Act
of 1974:

> "Without prejudice to the generality of subsection (4) above, the
> board may make the giving of any assistance to a company in
> financial difficulties under subsection (4) above conditional on the
B > reduction of any liabilities or benefits provided for under any policies
> of the company to any extent appearing to them to be appropriate
> in any case or in any class or description of case."

Section 16 (6) of the Act of 1975 imposes the first of the restrictions
affecting the board's powers under subsections (3) and (4). It provides
that the board shall not exercise any of the latter powers in any case
C  where it appears to them:

> "(a) persons who were members of the company at the relevant
> time; or (b) persons who had any responsibility for or who may have
> profited from the circumstances giving rise to the company's financial
> difficulties; would benefit to any material extent as a result of any
> measures the board may take under either of those subsections. . . ."

D  "The relevant time" as defined by subsection (6) would, in the present
case, be the time of appointment of the provisional liquidator. For the
purpose of applying this subsection, however, the board would be bound
to disregard any benefit which might accrue to persons falling within
class (a) or (b) who were policyholders of the company in their capacity
as such: see section 16 (7). Subsection (8) imposes the second of the
E  restrictions affecting the board's powers under section 16 (3) and (4).
It provides, in effect, that the board shall not exercise these powers in
any case:

> ". . . where it appears to the board that to take whatever measures
> may be required for the assistance of the policyholders in question
> under sections 6 to 11 above in the event of the company's going
F > into liquidation would cost them less than to take the measures in
> question under subsection (3) or (4) above."

In other words, the board have to make financial assessments of (i)
the probable amount that it would cost the board to meet their obliga-
tions to assist policyholders under sections 6 to 11 in the event of the
relevant company going into liquidation and (ii) the probable cost of
G  taking proposed measures in pursuance of section 16 (3) or (4). If the
second sum would exceed the first, the board would be precluded from
exercising their powers under section 16 (3) or (4).

The third restriction on the last-mentioned powers of the board is to
be found in section 17 of the Act of 1975. Under section 17 (1) they
are precluded from taking any measures under section 16 (3) and (4)
H  in respect of "long term policies" *other than measures allowed by
section 17 (2)* in any case ". . . where it appears to the board that to
take those measures would cost them more than to take measures allowed
by subsection (2) below." Section 17 (2) provides:

> "The measures allowed by this subsection are any measures open
> to the board under subsection (3) or (4) of section 16 above for the
> purpose of safeguarding policyholders of a company in financial

The Weekly Law Reports, February 23, 1979

·178

Slade J.              In re Capital Annuities Ltd. (Ch.D.)              [1979]

difficulties which involve the imposition by the board, as a pre-    A
requisite of their incurring any expenditure or liabilities for that
purpose, of conditions requiring—(a) the reduction of all liabilities
of the company under relevant long term policies and of all
benefits provided for under any such policies which have not fallen
due to be paid by the company before the time when the reduction
is to take effect, to 90 per cent. of the amount which would other-    B
wise have been payable in accordance with the terms of the policies;
and (b) the reduction of all premiums under any such policies which
have not fallen due before that time to 90 per cent. of the amount
which would otherwise have been so payable.    A long term policy
is a relevant long term policy for the purposes of this subsection if
it is included in any transfer secured or facilitated by the board under
subsection (3) of section 16 or in any business continued by virtue    C
of any assistance given by the board under subsection (4) of that
section."

Section 17 (3), which is subsidiary to subsection (2), lays down the
general rule that the " benefits " mentioned in section 17 (2) (a) are not
to include any bonus provided for under any policy, unless it was declared
before the time when the relevant reduction of liabilities and benefits is    D
to take effect.

Thus, where long term policies are involved—as in the present case—
the board, before exercising the powers conferred on them by section
16 (3) or (4) in their full generality, are obliged not only to make the
cost comparison with a liquidation compelled by section 16 (8); they are
also obliged to assess the probable cost of the measures allowed by    E
section 17 (2). Even in the case where a liquidation would not be
cheaper, if the measures allowed by section 17 (2) would be cheaper than
any other measures allowed by section 16 (3) or (4), the board's discretion
under sections 16 and 17 is limited to the taking of section 17 (2)
measures.

Section 17 (4), (5) and (6) then proceed to deal with what are    F
called " excessive benefits." Under section 17 (4) the board are obliged
to refer to an independent actuary any long term policy which qualifies
for protection under sections 16 and 17, if it appears to the board that:

" . . . the benefits provided for thereunder are or may be excessive
in any respect, having regard to the premiums paid or payable and to
any other terms of the policy . . ."    G

Section 17 (5) then states what is to happen in a case where an actuary
to whom a policy is thus referred confirms the board's prima facie view.
It provides:

" Where an actuary to whom a policy of a company in financial
difficulties is referred under subsection (4) above makes to the board
a report in writing—(a) stating, with respect to any of the benefits    H
provided for under the policy, that in his view the benefit or benefits
in question are excessive; and (b) recommending, accordingly, that
for the purposes of any measures to be taken by the board in pur-
suance of subsection (3) or (4) of section 16 above for safeguarding
the policyholder in question against loss arising from the financial
difficulties of the company any such benefit should be treated as

1 W.L.R.                In re Capital Annuities Ltd. (Ch.D.)                Slade J.

A       reduced or (as the case may be) disregarded; the board may
        determine in the light of any recommendation contained in the
        actuary's report that any benefit to which that recommendation
        relates shall be treated as reduced or disregarded for those purposes."

        The permissive phrase " may determine " in section 17 (5) indicates
        that the board have a discretion whether or not to follow a recommen-
B       dation contained in the actuary's report. Section 17 (6), however,
        provides that where, in a case falling within section 17 (5), the board do
        determine that the benefit in question shall be *disregarded* for the
        purposes there mentioned, the conditions imposed by the board under
        section 17 (2) " shall," i.e. must, include conditions requiring the can-
        cellation of that benefit or (as the case may be) of any liability represent-
C       ing that benefit. Section 17 (7) contains corresponding provisions to
        cover the case falling within section 17 (5) where the board determine
        that the benefit in question shall be treated as *reduced*; in such a case
        the conditions imposed by the board under section 17 (2) (*a*) are to apply
        in relation to the policy:

            " . . . as if the amount of that benefit or (as the case may be) of
            any liability representing that benefit, as reduced in accordance
D           with the board's determination, were the amount which would other-
            wise have been payable in accordance with the terms of the policy."

        Following the presentation of the winding up petition in the present
        case, the board considered whether they should perform their duties in
        relation to the company in a liquidation or by means of measures taken
        outside liquidation under section 16 of the Act of 1975. After detailed
E       consideration of the relative costs of these alternatives, as appears
        from an affidavit sworn by the board's chairman, Mr. Colin North Smith,
        they came to three conclusions, namely:  (1) that in the circumstances,
        the scope for measures under section 16 of the Act of 1975 was limited to
        measures involving the imposition by the board of the conditions referred
        to in section 17 (2), read in conjunction with section 17 (4), (5) and (6);
F       (2) that the taking of such measures would probably not leave policy-
        holders of the company in a worse position than performance by the
        board of their duties in a liquidation of the company; (3) that the taking
        of such measures would be less expensive for the board than a liquidation.
        As a result the board have caused a scheme to be prepared providing
        for assistance to the company under section 16 of the Act of 1975, subject
        to the conditions referred to in section 17 (2), in the form of a draft
G       agreement intended to be made by the board, the company and
        Commercial Union Assurance Co. Ltd.  Broadly the agreement provides
        for the immediate discharge of all known liabilities of the company—by
        payment either in full or of such less amount in any particular case as
        the creditor in question is willing to accept in satisfaction of his claim—
        other than liabilities in respect of policies falling within the Act of
H       1975 and for the company thereafter to continue to operate as a closed
        fund with a view to the payment in full to all policyholders of the benefits
        under such policies, as reduced by the orders sought on the present
        summons, as and when they fall due.
        For this purpose, the draft agreement provides for the assets and the
        business of the company, so far as it continues, to be managed by the
        Commercial Union, which would be entitled to call upon the board for

financial assistance as therein specified, if at any time the company's    A
assets proved insufficient to discharge its liabilities as they accrued due.
Sums so provided by the board would be debts of the company due to the
board, repayable with interest but postponed to the payment in full of
any policy benefits as reduced.  In the event that the assets of the
company proved more than sufficient to pay in full all policy benefits
as reduced, the board would reserve the right to require the company to
make further payments to policyholders, up to a maximum in the case    B
of each policy of the amount of the benefit which would have been
payable had no reduction been effected.

The reductions in respect of which orders are sought by the board's
summons include reductions for " excessive benefits " under section 17
of the Act of 1975.  It appeared to the board that benefits under policies
issued by the company might be " excessive."  The board, therefore, in    C
accordance with section 17 (4), referred its policies to an actuary, Mr.
J. W. Peacock.  In a report to the chairman and members of the board,
dated August 15, 1977, the actuary expressed the view that the benefits
under some but not all of the company's policies were " excessive " and
recommended that the excessive benefits should be reduced or disregarded
to the extents respectively specified in appendix II to his report.  In this    D
appendix II, the actuary set out details of the reductions, if any,
recommended in respect of the several classes of policies of the company;
the reductions varied in amount, but the highest recommended was one
of 10 per cent. in respect of certain cash options attached to the com-
pany's 10-year high income bonds (1st issue) purchased between March 1,
1973, and May 31, 1973.  He further recommended that all guaranteed
surrender values expressed to be available in any policies issued as part    E
of the company's high income bonds purchased between October 1,
1971, and April 30, 1974, should be disregarded, where any such policy
was surrendered independently of its counterpart policy making up the
bond.

At a meeting of the board held on November 16, 1977, the board,
pursuant to section 17 (5) of the Act of 1975 and in the light of these    F
recommendations, determined that benefits under the relevant policies
issued by the company should be treated as reduced or disregarded as
the case might be, as recommended in the report.  The board are not
obliged to take any measures whatever in accordance with sections 16 and
17, in preference to allowing the company to be wound up.  However,
the effect of their last-mentioned " determination " is to oblige them to
incorporate the recommended reductions and disregard of benefits in    G
any measures which they may choose to take under section 17 (2): see
sections 17 (6) and (7).  And on the figures the board, as I have
mentioned, have concluded that the measures open to them under
sections 16 and 17 are confined to those mentioned in section 17 (2).

Significantly, however, sections 16 and 17 and their allied sections
of the Act of 1975, contain no provisions obliging policyholders to accept    H
reductions of the nature specified in section 17 (2) or further reductions
and disregard of benefits of the nature specified in section 17 (6) or (7).
A scheme which involved the taking of measures by the board for the
purpose of safeguarding policyholders, in accordance with sections 16
and 17, would clearly be futile if it still left it open to any dissentient
policyholder who did not receive his benefits in full, to petition for the
winding up of the company.

A    *The relief sought by the board's summons*

In these circumstances, the relief sought by paragraph (i) of the board's summons, issued on February 8, 1978, is

> " an order pursuant to section 50 of the Act of 1974 reducing the
> amount of the liabilities of the above-named company under relevant
> long-term policies within the meaning of [section 17 (2) of the Act
B    of 1975] and of any benefits provided for under any such policies
> which had not fallen due to be paid by the company prior to April
> 30, 1976, or alternatively the date of such order to the extent
> specified in appendix II . . . "

to the actuary's report. Paragraph (ii) seeks an order pursuant to section 50 further reducing the amount of the said liabilities and benefits
C    (as reduced pursuant to (i) above) to the extent specified in section 17 (2) (*a*) of the Act of 1975. This means an order effecting – I quote from section 17 (2) (*a*) of the Act of 1975:

> " . . . the reduction of all liabilities of the company under relevant
> long term policies and of all benefits provided for under any such
> policies which have not fallen due to be paid by the company before
D    the time when the reduction is to take effect, to 90 per cent. of
> the amount which would otherwise have been payable in accordance
> with the terms of the policies."

The wording of the subsection thus referentially incorporated in the summons, draws a clear distinction between (a) benefits provided for under the relevant policies which have not fallen due to be paid before
E    the time when the reduction is to take effect and (b) liabilities of the company under such policies which *have* fallen due to be paid before such time—i.e. accrued liabilities. An affidavit of Mr. J. B. Clemetson, the senior official receiver, sworn on February 14, 1978, shows that there were 3,059 policies of the company in issue as at April 30, 1976, and that sums totalling in the aggregate £84,266 had accrued due under
F    some of them but were unpaid at that date. Paragraph (ii) of the summons thus seeks a reduction of these accrued liabilities of the company, as well as a reduction of the benefits provided for under continuing policies. Paragraph (iii) of the summons seeks an order dismissing the winding up petition.

The Department of Trade has instructed Mr. Chadwick to appear before me for the purpose of making submissions in opposition to the
G    board's summons, not because the department itself has any objection in principle to the relief sought being granted, but because it is desirable that the court should have the benefit of such argument from an amicus curiae. Mr. Chadwick, like all other counsel in the case, has given me great assistance in a difficult matter.

H    *The evidence as to the company's financial state*

It is a condition precedent to the exercise of the court's jurisdiction under section 50 of the Act of 1974 that the company shall have been " proved to be unable to pay its debts." The evidence relied on by the board and the company in support of their assertions that the company is " unable to pay its debts " within the meaning of section 50 substantially comprises six items. First there is a common form affidavit sworn on April 30, 1976, by Mr. J. R. Scott Roberts, a director of the

Slade J.    **In re Capital Annuities Ltd. (Ch.D.)**    [1979]

company, verifying the statements in the petition. Mr. Stubbs on A
behalf of the company referred me to the words in rule 30 of the
Companies (Winding-up) Rules 1949 (S.I. 1949 No. 330), which provide
that " such affidavit shall be sufficient prima facie evidence of the statements
in the petition." He submitted that this affidavit is thus sufficient prima
facie evidence that the company is unable to pay its debts. I cannot accept
this submission. The relevant paragraphs of the petition have already been
quoted. Paragraph 7 thereof indicates that as at April 27, 1976, the B
company had cash at the bank amply sufficient to meet its total
liabilities, including uncleared cheques, other than future or contingent
liabilities. Paragraphs 8 to 12 do no more than state the reasons why
(as it stated in paragraph 13) the directors " consider " that taking into
account the company's contingent and prospective liabilities the com-
pany is unable to pay its debts within the meaning of section 223 (d) of C
the Companies Act 1948. I, of course, accept this affidavit as evidence
of the directors bona fide *belief* that the company is unable to pay its
debts within this meaning, but cannot accept it as evidence of the *fact*
of the company's inability to pay its debts, which is nowhere stated in
this carefully, and no doubt very properly, drafted petition.

[His Lordship then considered the evidence, items two to five, and
continued:] Sixthly, reliance is placed on an affidavit sworn by Mr. D
Clemetson on February 16, 1978, in which he gives details of the current
cash position of the company and of its current liabilities other than to
policyholders. This affidavit exhibits a statement which shows cash
assets of £1,326,885 and present liabilities of £1,592,442, representing an
estimated shortfall of £265,557. Of the liabilities, by far the greater
part is represented by a debt of £1,457,000 owed by the company to the E
board in respect of interim payments of 70 per cent. to policyholders,
which have been made pursuant to powers conferred on the board by
section 15 of the Act of 1975. The statement points out that there
remains a further liability to policyholders amounting to 30 per cent.
of their accrued claims, in the order of £600,000.

What then are the conclusions to be reached as to the company's
solvency or insolvency, on the basis of the evidence before the court? F
In my judgment they must be these. (a) It has not been proved that
the present, contingent and prospective liabilities of the company exceed
the present value of its assets. (b) It has not been proved that, given a
little time within which to realise assets to discharge the accrued liabili-
ties of the company, the company could not discharge both these
liabilities and its future liabilities to policyholders, as and when such G
future liabilities fell due. (c) It has, however, been proved by Mr.
Clemetson's affidavit of February 16, 1978, that the company has
insufficient cash with which *immediately* to discharge all its present
accrued liabilities.

*Questions as to jurisdiction arising on section 50 of the Insurance* H
*Companies Act 1974*

Section 50 of the Act of 1974 raises the following questions of
construction, each of which has to be determined for the purpose of
deciding whether the court would have jurisdiction to grant the relief
sought by paragraphs (i) and (ii) of the summons in the present case.
(A) Does the phrase " unable to pay its debts " in section 50 of the Act
of 1974 bear the same meaning as it bears in sections 222 and 223 of the

A  Companies Act 1948 or some other, and if so, what meaning?  (B) On the evidence before the court, has the company been proved to be " unable to pay its debts " in the relevant sense?  (C) What is the meaning of the phrase " the amount of the contracts " in the context of section 50?  (D) Does section 50 empower the court to reduce the amount of any and, if so, which contracts that have ripened into present debts before the date of the order effecting the reduction?  (E) Does
B  section 50 empower the court to reduce " the amount of the contracts " otherwise than pari passu?  (F) Has the court jurisdiction to effect a reduction without giving the policyholders who would be affected by its order the opportunity to object?

Only if all these six questions are answered substantially in the manner contended for by the board, will the court even have jurisdiction to
C  grant the relief sought by paragraphs (i) and (ii) of the board's summons. These questions must, therefore, be answered before any questions of discretion are dealt with.

*Question (A As to) above*

Substantially the submissions made by Mr. Chadwick in this context
D  were that an insurance company can be " proved to be unable to pay its debts " within the meaning of section 50, only if it is proved that its existing, contingent, and prospective liabilities exceed its existing and probable assets.  On the other hand Mr. Oliver, on behalf of the board, and Mr. Stubbs, on behalf of the company, in effect submitted that the phrase " unable to pay its debts " bears the same meaning as
E  it bears in sections 222 and 223 of the Companies Act 1948 and that the relevant inability can accordingly be proved by any of the alternative methods that would be open under those sections.  The conflicting arguments have necessitated an interesting review of the relevant past, as well as present, legislation.

The phrase " unable to pay its debts " has had a long history in the legislation relating to companies.  Section 79 (4) of the Companies Act
F  1862 gave the court jurisdiction to wind up any company under the Act " whenever the company is unable to pay its debts."  Section 79 (5) gave the court such jurisdiction " whenever the court is of opinion that it is just and equitable that the company should be wound up." Section 80 of that Act provided:

" A company under this Act shall be deemed to be unable to pay
G  its debts, (1) Whenever a creditor, by assignment or otherwise, to whom the company is indebted, at law or in equity, in a sum exceeding £50 then due, has served on the company, by leaving the same at their registered office, a demand under his hand requiring the company to pay the sum so due, and the company has for the space of three weeks succeeding the service of such demand neg-
H  lected to pay such sum, or to secure or compound for the same to the reasonable satisfaction of the creditor: (2) Whenever, in Eng-land and Ireland, execution or other process issued on a judgment, decree, or order obtained in any court in favour of any creditor, at law or in equity, in any proceeding instituted by such creditor against the company, is returned unsatisfied in whole or in part: (3) Whenever, in Scotland, the induciae of a charge for payment on an extract decree, or an extract registered bond, or an extract

A registered protest have expired without payment being made : (4)
Whenever it is proved to the satisfaction of the court that the
company is unable to pay its debts."

In 1869, however, the decision in *In re European Life Assurance
Society* (1869) L.R. 9 Eq. 122 illustrated that there was one important
limitation to this statutory definition of inability to pay debts; it did not
enable the court in assessing ability or inability, to take into account
the contingent or prospective liabilities of a company.  In that case, Sir
William James V.-C., at p. 127, accepted the argument that " inability
to pay [its] debts " for the purposes of the Act of 1862 referred to " debts
absolutely due—that is to say, debts for which a creditor may go at once
to the company's office and demand payment . . ." He pointed out that
the case had been put substantially not on the grounds of actual inability
to pay debts absolutely due, but on the ground that it was just and
equitable—within the meaning of section 79 (5) of the Act of 1862—
that the company should be wound up.  He said, at p. 128:

> " . . . it would be just and equitable to wind up a company like
> this assurance company if it were made out to my satisfaction
> that it is, not in any technical sense, but plainly and commercially
> insolvent—that is to say, that its assets are such, and its existing
> liabilities are such, as to make it reasonably certain—as to make
> the court feel satisfied—that the existing and probable assets would
> be insufficient to meet the existing liabilities.  I take it that the
> court has nothing whatever to do with any question of future
> liabilities . . . "

Sir William James V.-C. applying this test and not being satisfied that
the company was commercially insolvent within the test, dismissed the
petition.

Perhaps in the light of this decision, the jurisdiction of the court to
make winding up orders in the case of life assurance companies but not
other companies, was extended by section 21 of the Life Assurance
Companies Act 1870, which, so far as material for present purposes,
provided:

> " The court may order the winding up of any company, in accor-
> dance with the Companies Act 1862, on the application of one or
> more policy holders or shareholders, upon its being proved to the
> satisfaction of the court that the company is insolvent, and in
> determining whether or not the company is insolvent the court shall
> take into account its contingent or prospective liability under policies
> and annuity and other existing contracts; . . . "

Section 21 was immediately followed by section 22 of the Act of 1870,
which is the earliest forerunner of section 50 of the Act of 1974 and
provided:

> " The court, in the case of a company which has been proved to be
> insolvent, may, if it thinks fit, reduce the amount of the contracts
> of the company upon such terms and subject to such conditions as
> the court thinks just, in place of making a winding up order."

It is significant that though, in section 21 of the Act of 1870, the
legislature expressly referred to the winding up jurisdiction conferred
by the Act of 1862, it did not use the time-honoured phrase appearing

A  in sections 79 and 80 of the latter Act, "the company is unable to pay its debts", instead it used the phrase "the company is insolvent." I feel little doubt that this was a deliberate choice of language, and that the legislature used the word "insolvent" in the same sense as that used by Sir William James V.-C. in *In re European Life Assurance Society*, L.R. 9 Eq. 122, in the passage already cited, namely having existing and probable assets insufficient to meet its liabilities, but subject to the rider

B  that, for this purpose, a life assurance company's contingent or prospective liabilities under policies and annuity and other existing contracts should be taken into account, in addition to its existing liabilities. Correspondingly, I feel little doubt that the phrase "has been proved to be insolvent," as appearing in section 22 of the Act of 1870, which gave the court power to reduce the amount of contracts "in place of

C  making a winding up order" must be given a similar sense.

In the case of companies other than life assurance companies, the court remained precluded from taking into account the "contingent or prospective liability" of a company for the purposes of determining whether a company was "unable to pay its debts" within the meaning of the Act of 1862, until section 28 of the Companies Act 1907 speci-

D  fically directed it to take into account liabilities of this nature for this purpose.

There then followed the Companies (Consolidation) Act 1908, which repealed the Act of 1862. Sections 129 (v) and (vi) of the Act of 1908 substantially reproduced section 79 (4) and (5) of the Act of 1862. Section 130 (i), (ii) and (iii) of the Act of 1908 substantially reproduced section 80 (1), (2) and (3) of the Act of 1862. Section 130 (iv) of the

E  Act of 1908 substantially reproduced section 80 (4) of the Act of 1862 with the rider added by section 28 of the Act of 1907. It read:

"A company shall be deemed to be unable to pay its debts . . . if it is proved to the satisfaction of the court that the company is unable to pay its debts, and, in determining whether a company is unable to pay its debts, the court shall take into account the con-

F  tingent and prospective liabilities of the company."

From 1907 onwards, therefore, one species of "inability to pay its debts" specifically recognised by the legislature as a ground for the making of a winding up order in respect of any company incorporated under the Companies Acts was the possession of assets insufficient to meet its existing, contingent and prospective liabilities. The Acts of

G  1907 and 1908, however, did not refer to sections 21 and 22 of the Act of 1870 which remained in full force and effect. Accordingly, immediately after the passing of the Act of 1908 the court would have had jurisdiction to wind up a life assurance company on the grounds, inter alia, that it was "unable to pay its debts" within the meaning of section 130 of the Act of 1908 or on the ground that it was "insolvent" within

H  the meaning of section 21 of the Act of 1870. The jurisdiction to wind up a company on the latter ground, however, was no longer required, because section 129 (v) of the Act of 1908, read in conjunction with section 130, was in terms manifestly wide enough to empower the court to wind up a company in a case where it was shown that its assets were insufficient to enable it to discharge its existing, contingent and prospective liabilities.

The Assurance Companies Act 1909 was passed for the expressed

The Weekly Law Reports, February 23, 1979

Slade J.          In re Capital Annuities Ltd. (Ch.D.)          [1979]

purpose of consolidating and amending and extending to other companies    A
carrying on assurance or insurance business the law relating to life
assurance companies and for other purposes connected therewith. This
Act repealed the whole of the Act of 1870. It contained no provision
replacing the jurisdiction of the court to wind up a company on the
ground of insolvency, which had been conferred by section 21 of the
Act of 1870—save that section 15 gave certain rights to policyholders to
apply for the winding up of an assurance company in accordance with    B
the Act of 1908. The reason for this is plain; as has already been
explained, sections 129 (v) and 130 of the Act of 1908 had by that time
given the court all the powers that were required for this purpose. It
was, however, necessary for the Act of 1909 to contain a provision
replacing section 22 of the Act of 1870. This was done by section 18
of the Act of 1909 which provided:    C

> " The court, in the case of an assurance company which has been
> proved to be unable to pay its debts, may, if it thinks fit, reduce
> the amount of the contracts of the company upon such terms and
> subject to such conditions as the court thinks just, in place of making
> a winding up order."

In this new section there were thus two significant departures from    D
the wording of section 22 of the Act of 1870. First, it was expressed
to apply in the case of an " assurance company," which phrase was
given an extended meaning by section 1 of the Act of 1909. Secondly,
the phrase " proved to be unable to pay its debts " was substituted for
the phrase " proved to be insolvent." In its context, I feel no doubt
that the reference to " unable to pay its debts " in section 18 of the Act    E
of 1909 was intended to bear the same meaning as that phrase bore in
the Act of 1908, which had become law the previous year and was
frequently expressly referred to in the Act of 1909. Accordingly, in my
judgment, the inability of an assurance company to pay its debts, for
the purpose of section 18 of the Act of 1909, could be proved by any
of the means that would have sufficed for the purpose of sections 129 (v)    F
and 130 of the Act of 1908.

The subsequent history of the relevant legislation can be shortly
stated. Sections 129 and 130 of the Act of 1908 were in due course
successively replaced by sections 168 and 169 of the Companies Act
1929 and then by sections 222 and 223 of the Companies Act 1948
which contain no variations material for present purposes. Section 18
of the Act of 1909 was successively replaced by section 18 of the    G
Insurance Companies Act 1958 and then by section 50 of the Act of
1974. Both the latter Acts were consolidating Acts. " There is a
presumption in construing a consolidating statute that it is not intended
to alter the law enacted by any statute which it repeals . . . ": see *Crook
v. Edmondson* [1966] 2 Q.B. 81, 91 *per* Winn L.J.

In the circumstances I conclude that, just as the phrase " unable to    H
pay its debts " in the Act of 1909 bore the same meaning as it bore in
the Act of 1908, so the phrase bears the same meaning in section 50 of
the Act of 1974, as it bears in sections 222 and 223 of the Act of 1948.
The fact that some other sections of the Act of 1974—for example
sections 44 and 46—expressly refer to one or both of sections 222 and
223 of the Act of 1948 does not lead me to a different conclusion.

1 W.L.R.                    In re Capital Annuities Ltd. (Ch.D.)                    Slade J.

A    *Question (B) above*

On the basis of this premise as to the proper construction of section 50 of the Act of 1974, Mr. Oliver and Mr. Stubbs invited me to hold that it has been proved that this company is " unable to pay its debts " within the meaning of sections 222 and 223 of the Companies Act 1948. As I have already indicated, I do not think it has yet been proved that
B    the present contingent and prospective liabilities of the company exceed the present value of its assets; accordingly no inability to pay its debts in this sense has been proved. Equally there have not occurred any of the specific events set out in section 223 (a), (b) or (c) of the Act of 1948, which give rise to the statutory presumption of inability to pay its debts. Mr. Oliver, however, submitted that the evidence contained in Mr. Clemetson's affidavit sworn on February 16, 1978, itself proves that the
C    company is unable to pay its debts. He referred me to a passage from the notes to section 223 in *Buckley on the Companies Acts,* 13th ed. (1957), p. 460 which reads:

"The particular indications of insolvency mentioned in paragraphs (a), (b) and (c) are all instances of commercial insolvency, that is of the company being unable to meet current demands upon it.
D    In such a case it is useless to say that if its assets are realised there will be ample to pay 20 shillings in the pound: this is not the test. A company may be at the same time insolvent and wealthy. It may have wealth locked up in investments not presently realisable; but although this be so, yet if it have not assets available to meet its current liabilities it is commercially insolvent and may be wound
E    up."

I think that Mr. Oliver's submissions in this context really amounted to this. The most recent figures adduced by Mr. Clemetson indicate that the amount of the cash presently in his hands is £265,557 less than what would be required to discharge the company's present liabilities and that there remains a further liability to policyholders of about
F    £600,000 in respect of their accrued claims. In these circumstances, it was submitted, there would be no answer to a winding up petition presented at the suit of one of these unpaid creditors; there would be a manifest inability to pay " debts absolutely due," within the judgment of Sir William James V.-C. in *In re European Life Assurance Society,* L.R. 9 Eq. 122.

G    I would probably have acceded to this submission, if it had been put forward by one such creditor, who had made a request for payment, which had not been complied with within a reasonable time, even though such a request did not amount to a demand falling within section 223 (a) of the Act of 1948. Neglect in payment of a sum as to which a statutory notice has been given is only one of several ways of showing inability to pay debts, which may be shown in any other way: see *In re*
H    *Globe New Patent Iron and Steel Co.* (1875) L.R. 20 Eq. 337 and *In re Flagstaff Silver Mining Co. of Utah* (1875) L.R. 20 Eq. 268. A failure by the company to pay an admitted creditor within a reasonable time after demand would be likely to provide ample evidence of such inability.

I cannot, however, accept that mere evidence that a company, such as the company in this present case, has for the time being insufficient liquid assets to pay all its presently owing debts, *whether or not repay-*

Slade J.                In re Capital Annuities Ltd. (Ch.D.)                [1979]

*ment of such debts has been demanded,* by itself proves inability on its
part to pay its debts, within the meaning of sections 222 and 223 of the
Act of 1948 or section 50 of the Act of 1974. The company, for all I
know, may have other assets which would or could readily be realised
in a few days and would suffice for the discharge of all its immediate
accrued liabilities. It may, for all I know, have other assets which,
while they would take longer to realise, would at present values suffice
for the discharge of all its contingent and prospective liabilities. It is
significant that at the date of presentation of the petition, the company
did have liquid assets amply sufficient to meet all its accrued liabilities.
It is only the policy of the official receiver in refraining from realisation
of assets other than calling in mortgage debts—a policy of which I am
not in the least critical—which has resulted in the present cash flow
deficiency of the company. What the company's position would be if a
different policy were immediately to be adopted, is quite impossible to
determine on the evidence.

   I see no reason to doubt that both the directors of the company and
the board have formed the bona fide opinion that the company is
commercially insolvent. This opinion may very well be a correct one.
I would have been very ready to accept its correctness, if it had been
supported by evidence as to approximate present day values of the
company's assets and liabilities. Furthermore in referring to such evi-
dence, I do not necessarily refer to full-scale, formal valuations, which
I recognise may be very expensive and slow to produce. The legislature,
however, no doubt for very good reason has made it a condition prece-
dent to the exercise of the court's jurisdiction under section 50 of the
Act of 1974 that the company concerned shall have been " proved to
be unable to pay its debts." This is a condition which the court cannot
treat casually or disregard. For the reasons which I have indicated, I
cannot accept that the evidence now before me, based as it is almost
entirely on figures and assumptions which were produced or made in
1975 and may well by now require very substantial amendment, proves
such inability on the part of the company in the present case.

   In these circumstances, as matters stand, I must, on these grounds
if no other, at present decline to make orders of the nature sought by
paragraphs (i) and (ii) of the board's summons. Since, however, the
summons raises a number of further important points of principle on
which I have had the benefit of full and careful argument, I should
attempt also to deal with questions (C) to (G) to which I have referred.

*Question (C) above*

   The subject matter which the court is empowered by section 50 of
the Act of 1974 to reduce is not expressed as comprising either the
" debts " or the " liabilities " of the company—only " the amount of the
contracts of the company." The section gives the court no power to
reduce any obligations of the company arising otherwise than under
contract. In my judgment there is only one rational explanation why
the legislature should have confined the court's jurisdiction to reducing
a company's *contractual* obligations: this is that the " contracts "
referred to in section 50 of this Act—which deals with companies carry-
ing on insurance business—are insurance contracts and no others. This
was the clear conclusion reached by Oliver J., who referred to a similar
expression in section 48 (5) of the Act of 1974 *In re Fidelity Life*

**1 W.L.R.**            **In re Capital Annuities Ltd. (Ch.D.)**            **Slade J.**

A    *Assurance Ltd.* (unreported), July 23, 1976. The correctness of this con-
clusion has not been challenged before me and I respectfully agree
with it. It is borne out by the fact that apparently in none of the
numerous reported decisions relating to section 22 of the Act of 1870,
to which I shall have to refer, was it ever suggested either by the court
or in argument that the section gave the court any power to reduce
contracts other than life assurance contracts.

B       A problem arises as to the meaning of the word "amount" in the
phrase "the amount of the contracts." This is not perhaps a happy
use of language since, strictly speaking, a contract does not have an
"amount." In my judgment, however, effect can be given to the phrase
only by construing it as meaning substantially "the sum or sums pay-
able under the contracts." A third and major problem arising from the
C   phrase is whether the phrase "the amount of the contracts" embraces
(i) merely the amounts prospectively payable under a company's con-
tracts of insurance or (ii) both the amounts prospectively and presently
payable under such contracts. I now turn to this question, which is
substantially question (D) above.

D   *Question (D) above*

        Looking at the wording of section 50 of the Act of 1974 and its
predecessors entirely in isolation and in the absence of authority, I would
have regarded the phrase "the amount of the contracts of the company"
as inappropriate to include sums which had ripened into present debts
under contracts. The jurisdiction given to the court is exercisable "in
place of making a winding up order." The wording of the section, with
E   its use of the word "*contracts*" rather than debts or liabilities, appears
to me prima facie to contemplate current contracts which will continue
in existence if no winding up order is made. The section, as has already
appeared, gives no jurisdiction to reduce the amounts payable by the
company under contracts entered into with persons other than policy-
holders, whether or not such amounts have become presently payable.

F   There is a good reason why the legislature should empower the court,
in place of making a winding up order, to reduce the amounts pros-
pectively payable by both insurer and insured under insurance contracts,
even though it does not empower it to reduce the amounts prospectively
payable under other contracts. For it may be especially in the interests
of policyholders that their contractual rights should be maintained on a
continuing, albeit reduced, basis, rather than being replaced by a bare
G   right to prove in a liquidation. There would, however, appear to be no
logical reason why a section contained in an Act which was intended
for the protection of policyholders should place policyholders entitled to
matured debts in a worse position than other persons entitled to
matured debts. In these circumstances, in the absence of authority, I
would have construed the phrase "the amount of the contracts of the
H   company" as including no more than sums prospectively payable under
current insurance contracts of the company.

        Would such a conclusion, however, involve the further conclusion
that the court had no jurisdiction to reduce any sums whatever which,
at the date of the order of the court, had already become presently pay-
able under contracts of the relevant company? Again in the absence
of authority, while regarding the question as a more difficult one, I
would have been inclined to think that it did. I would have recognised

10-03635-jpm    Doc 173-4    Filed 01/13/17    Entered 01/13/17 22:34:28    Ex. C part 3
Pg 88 of 461
The Weekly Law Reports, February 23, 1979

190

Slade J.        In re Capital Annuities Ltd. (Ch.D.)        **[1979]**

A    it as arguable that, since the jurisdiction conferred by section 50 was exercisable in place of making a winding up order and since a winding up order, if made, would relate back to the date of the petition, likewise section 50 would empower the court to make an order for reduction relating back to the date of the petition seeking the winding up order, in the place of which the section 50 order was made. In the absence of authority, however, I would have inclined to the view that this point
B    was a bad one.

In my judgment, however, all these matters have been settled by judicial decision—including a decision of the Court of Appeal. The earliest case to which I should refer in this context is *In re Great Britain Mutual Life Assurance Society* (1880) 16 Ch.D. 246. There, two petitions had been presented for the winding up of a mutual life assur-
C    ance society, the first on October 28, 1880, by a Mrs. Popham, the second on October 30, 1880, by other persons. The society admitted its insolvency and on November 19, 1880, a winding up order was made by Sir Charles Hall V.-C. on the second petition. Mrs. Popham, being dissatisfied with the order made as to costs, appealed from the order. On the hearing of the appeal, counsel appearing for the society and a committee of policyholders asked that the winding up order might be discharged
D    and that the court should exercise its powers of reducing the amount of the policies under section 22 of the Act of 1870. The directors of the society offered to call meetings of the policyholders under section 91 of the Act of 1862, for the purpose of ascertaining their views. The Court of Appeal acceded to this application and discharged the winding up order on the basis that meetings of policyholders would be called.
E    The judgment of Sir George Jessel M.R., at pp. 254–255, illustrates that dominant factors influencing the court were

"... the enormous loss that will be inflicted upon these unfortunate policyholders if we were to wind up the company, giving them each only a small fraction of the estimated value of their policies; that persons, many of whom from advancing age or infirmity may not
F    be able to effect fresh policies in other societies, will, if the company is allowed to go on with a reduction of contracts, eventually receive the full amount of the reduced values of their policies, paying their premiums during their lives, which would be a very great benefit and advantage to them, besides other advantages which they may obtain in the shape of bonuses, if the society should ultimately prove more prosperous than is anticipated...".
G

A few weeks later, on January 19, 1881, after ascertaining the wishes of the policy holders, the Court of Appeal directed in general terms that it should be referred to Hall V.-C. to settle a scheme for reduction of the contracts of the Great Britain Mutual Life Assurance Society pursuant to section 22 of the Act of 1870. It appears, however, that the Court of Appeal gave no directions whatever as to the contracts which
H    should be included in such a scheme. On January 27, 1881, Hall V.-C. ordered that it be referred to a referee to inquire and report upon what terms and subject to what conditions the society's contracts should be reduced in place of making a winding up order and to settle a scheme for reducing such contracts for the approval of the court.

Subsequently, the referee took the view that certain questions had to be determined by the court before he could carry out his instructions.

1 W.L.R.              In re Capital Annuities Ltd. (Ch.D.)              Slade J.

A  He therefore settled a special case for the opinion of the court. The
matter then came back before Hall V.-C.: see *In re Great Britain Mutual
Life Assurance Society* (1881) 19 Ch.D. 39. The first question that fell
for determination was whether the date of presentation of Mrs. Pop-
ham's petition or some other and what date was to be taken as the one
upon which the rights of all or some of the six classes of policyholders
were to be determined and from which the scheme to be settled was to
B  take effect: see p. 41. Hall V.-C.'s brief answer to this question is to be
found at p. 44 :

    " The Court of Appeal having required a scheme to be prepared
    for a reduction of the contracts instead of making a winding up
    order, I think I am not going too far in saying that the order is
    one which must be considered as an order for the actual reduction
C   of the contracts, and an order which shall date from the time which
    would have been fixed if there had been a winding up order, and if
    the court had not come to the conclusion that instead thereof a
    reduction should take place, and a scheme be prepared. Therefore,
    I hold that the date of the presentation of the first petition for
    winding up is that at which the calculations should be made for
D   settling the scheme."

    It is clear from the report of the argument of Mr. Karslake Q.C.,
appearing for the class represented by Mrs. Popham, that he had
expressly ventilated the question " what are the contracts " for the
purpose of giving effect to the direction of the Court of Appeal that a
scheme should be settled for the reduction of " the contracts " pursuant
E  to section 22 of the Act of 1879: see 19 Ch.D. 39, 41–42. It is in my
judgment equally clearly implicit from the passage from his judgment
cited above that Hall V.-C. regarded the direction as embracing any
" contracts " which subsisted at the date of presentation of the first
petition.

    However, the question whether the word " contracts " was apt to
F  include matured debts or merely referred to current contracts did not
fall to be argued until the second question was put to Hall V.-C. This
question was substantially whether the claims on policies which had
matured before the presentation of Mrs. Popham's petition should be
paid in full or be reduced. Mr. Karslake Q.C., at p. 44, submitted
that the object of section 22 of the Act of 1870 was to benefit merely
policyholders whose policies were current and that the court was only
G  authorised to reduce current contracts. In effect, therefore, he was
submitting that the word " contracts " in section 22 did not include
matured debts. Mr. Hastings Q.C. submitted that under the wording
of section 22 of the Act of 1870 the court might reduce the amount of
*all* contracts of the company and that, if matured claims were not
reduced, the claimants would get a substantial advantage which they
H  would not get under a winding up order. Hall V.-C., at p. 45, implicitly
rejected the latter submissions and held that any policy which had
matured into a debt before the presentation of Mrs. Popham's petition
was " outside the scheme."

    I pause here to comment that Mr. Oliver forcibly submitted that the
taking of a date as a dividing line in this manner was quite unnecessary
in the *Great Britain Mutual Life Assurance Society* case and is unneces-
sary in any similar case. The reference to " the amount of the con-

Slade J.          In re Capital Annuities Ltd. (Ch.D.)          [1979]

tracts " in the section, he submitted, is apt to include both the amounts   A
presently payable and the amounts prospectively payable under any
insurance contract; there is, therefore, no need to establish a dividing
line between classes of insurance contracts by reference to date; nor is
there any reason why, as a matter of jurisdiction, the court should not
reduce the whole lot.  If the correctness of his premise as to the meaning
of the phrase " the amount of the contracts " were to be accepted, the
logic of his conclusion would seem unanswerable.  In my judgment,   B
however, it is reasonably clear that both the referee, in submitting his
questions, and Hall V.-C., in answering them, proceeded on the footing
that the phrase " the amount of the contracts " included merely the
amounts prospectively payable under insurance contracts and that for
this reason the date from which the scheme to be settled was to take
effect assumed such importance.  In deciding that any policy which   C
had matured into a debt before the presentation of Mrs. Popham's
petition was " outside the scheme," Hall V.-C. was not in my judgment
exercising a mere discretion; he was consciously rejecting the arguments
of Mr. Hastings Q.C. that section 22 of the Act of 1870 gave the court
jurisdiction to reduce matured claims.

This decision of Hall V.-C. then went to appeal: see *In re Great*   D
*Britain Mutual Life Assurance Society* (1882) 20 Ch.D. 351.  It is sig-
nificant that on the appeal no attempt was made to argue that claims
under policies which had matured before the presentation of the petition
could be included in the scheme for reduction; by that time all interested
parties appear to have accepted that such claims could not be included.
The claim of the appellants was that those policyholders whose claims
had ripened into present debts since the presentation of the petition, but   E
before any order was made for a scheme of reduction, ought not to be
affected by the reduction.  Mr. Eddis Q.C. for the appellants submitted,
at p. 352, that it was inappropriate to draw an analogy between an order
under section 22 of the Act of 1870 and a winding up order and that,
as the winding up order had been discharged, the case stood exactly on
the same footing as if it had never been made.  He pointed out that   F
the persons whose claims had matured before the presentation of the
petition would only have received a dividend under a winding up, but
that under the scheme they were paid in full.

If the Court of Appeal had regarded section 22 as bearing the con-
struction for which Mr. Oliver now contends, this was surely the moment
at which it could, and I think would, have pointed this out.  That court
(with Jessel M.R. presiding) had directed the scheme in the *Great Britain*   G
*Mutual Life Assurance Society* case in the first place.  On hearing the
appeal it could, if Mr. Oliver's submissions were well founded, have
pointed out that Hall V.-C. had looked at the matter from entirely the
wrong point of view; that the court had jurisdiction to reduce all con-
tractual liabilities whatsoever of the society to policyholders; and that
the anomaly referred to by Mr. Eddis Q.C. in argument arose not so   H
much because the claims which had ripened into debts *since* the presen-
tation of the petition *were* being reduced, but because the claims which
had ripened into debts *before* such presentation were *not* being reduced,
as they could and should have been.  Instead, the Court of Appeal
dismissed the appeal without calling on the respondents' counsel and
delivered judgments, which clearly indicated that Hall V.-C. had dealt

1 W.L.R.                    In re Capital Annuities Ltd. (Ch.D.)                    Slade J.

A    with the matter in the correct manner. Jessel M.R. said in the course
     of his judgment, at pp. 353–354:

          " This is an appeal from Hall V.-C., and raises an important question
          as to the mode of acting under the Life Assurance Companies Act
          1870, section 22. The theory of the enactment is, that if the
          company is insolvent the court may reduce the contracts instead
B         of making a winding up order; that is, it may in substance give the
          persons entitled to the benefit of those contracts a dividend of a
          special kind. The meaning of the Act is this, that it should be
          ascertained what the company can pay, and that the contracts
          should be reduced accordingly. If the company can only pay half
          its liabilities, reduce its contracts by one half. The persons entitled
          under the contracts thus get more than they could under a winding
C         up order, because they are saved the costs of winding up proceedings,
          and the result is advantageous to every one to whom the company
          is under a liability. That being so, on what principle ought the
          court to fix the period for ascertaining the contracts? It is sub-
          mitted by those who have claims which have ripened into debts
          since the presentation of the winding up petition, but before any
D         order was made for a scheme, that they ought to be paid in full.
          If the winding up had gone on they would have got only a dividend
          from the liquidator, and why are they under the scheme to be placed
          in a better position as between themselves and the other parties who
          have entered into contracts with the company, than they would have
          been if the winding up had gone on? The scheme is a substitution
          for a winding up order; the company instead of paying its debts
E         pays a dividend, and the substitution of a scheme for a winding up
          order ought not to alter the rights of the parties inter se. That
          the persons whose claims had ripened into actual debts before the
          presentation of the petition are to be paid in full, is no argument
          for extending that privilege to other people. The legislature
          probably considered that there would be but few persons whose
F         claims had ripened into debts before the presentation of the petition,
          and that their case need not be attended to, since, if a company
          does not pay its policies, proceedings are speedily taken for winding
          it up. That a few persons so circumstanced get an advantage which
          may be considered unfair, is no reason for extending that advantage
          to other people."

G    A little later in his judgment Jessel M.R. said, at p. 354:

          " I am of opinion that as a general rule the proper time for
          ascertaining the contracts is the time of the presentation of the
          petition, though I do not mean to say that under the discretion given
          by section 22 the court might not fix another time if there were
          special circumstances to take the case out of the general rule."

H    Baggallay L.J. said, at pp. 354–355:

          " The section does not specify any day, and therefore it is not
          necessary to say, and I do not say, that under no circumstances
          could a day be fixed different from the day of the presentation of
          the petition; but it seems right to hold that unless there are special
          circumstances that day is the proper day."

     Holker L.J. said, at p. 355:

194

" The section gives the court a wide discretion; the reduction is to    A
be made 'upon such terms and subject to such conditions as the
court thinks just '. To determine what is just the court must look to
the circumstances of each case. And, in my opinion, it would not
be just here to vary the scheme in the way asked by the appellants.
The effect of the variation would be to pay in full a number of
persons who if the winding up had gone on would only have received
dividends."                                                             B

It is, I think, clear that the Court of Appeal in this case regarded
the court, when exercising its powers under section 22 of the Act of
1870, as being left with a residue of discretion as to whether the reduction
thereby effected should extend to all insurance contracts of the company
still current and continuing at the date of presentation of the relevant
winding up petition or only to those insurance contracts of the company    C
current and continuing at some *subsequent* date. In my judgment,
however, it is implicit in the decision of the Court of Appeal that it
regarded the court, when exercising such powers, as having no juris-
diction to reduce contracts of the company which had matured *before*
the date of the relevant petition—in other words that the phrase " the
contracts of the company " in section 22 did not extend to such contracts.    D
For example this is, in my judgment, made clear in one sentence of the
passage from the judgment of Jessel M.R. already read at pp. 353–354:

" The legislature probably considered that there would be but few
persons whose claims had ripened into debts before the presentation
of the petition, and that their case need not be attended to, since,
if a company does not pay its policies, proceedings are speedily    E
taken for winding it up."

Jessell M.R. in this sentence was plainly referring to the court's juris-
diction rather than its discretion and was offering a probable explanation
as to the reason why the legislature had not given it jurisdiction to
reduce those claims of policyholders which had ripened into debts before
presentation of the petition. Though he considered that the persons    F
so circumstanced would get an advantage " which may be considered
unfair," he did not suggest that there was anything which the court
could do about it in the exercise of its discretion; he merely expressed
the view that the receipt of an advantage of this nature by such persons
was no reason for extending it to others. Holker L.J., who thought it
would be unjust to vary the scheme in the manner asked, because the
effect of the variation would be " to pay in full a number of persons who    G
if the winding up had gone on would only have received dividends," did
not suggest that the court had power to reduce claims of policyholders
which had matured at the date of the petition.

Mr. Oliver emphasised the anomalies that may be said to arise if, on
an order for reduction of insurance contracts, the critical date is taken
as being the date of the petition, bearing in mind that for the purpose    H
of valuing insurance policies on a winding up the critical date is taken as
being the date of the winding up order: see *MacGillivray & Parkington
on Insurance Law,* 6th ed. (1975), para. 411 and the cases there cited.
However, in the *Great Britain Mutual Life Assurance Society* case
counsel, in his argument for the appellants, referred to the decision in *In re
Northern Counties of England Fire Insurance Co. (Macfarlane's Claim)*

A  (1880) 17 Ch.D. 337 relating to the valuation of insurance policies
on a winding up—a decision which, on its particular facts, was not
followed in the later case of *In re Law Car and General Insurance
Corporation* [1913] 2 Ch. 103. The Court of Appeal, however, was
unimpressed by these comparisons with the principles applicable for the
purpose of valuing policies on a winding up.

B  In the absence of authority, I suspect that I would have held that
section 22 of the Act of 1870 did no more than empower the court to
reduce the amounts prospectively payable under life assurance policies
which were still current at the date of the court's order. Such a decision
would have given full force to the use by the legislature of the word
" contracts," as opposed to " debts " or " liabilities." Furthermore, on
the one hand, it would have avoided the anomaly that would be pro-
C  duced by Mr. Oliver's construction, namely, that persons entitled to
presently payable debts under insurance contracts would be exposed to a
risk of reduction without their consent to which other present creditors
of the company would not be subjected; on the other hand it would
have avoided the apparent anomalies relied on by Mr. Eddis Q.C. in
argument before the Court of Appeal in *In re Great Britain Mutual Life
Assurance Society*, 20 Ch.D. 351, 352, and by Mr. Oliver before me,
D  which are involved in drawing an analogy between an order under the
section and a winding up order.

It is now too late, however, to construe in this manner section 22 of
the Act of 1870, or section 50 of the Act of 1974, the wording of which
does not differ from it in any material respect. I must follow the clear
import of the Court of Appeal decision in the *Great Britain Mutual Life
Assurance Society* case which, in my judgment, has by necessary
E  inference established the following propositions: (a) the phrase " the
amount of the contracts of the company " in the context of section 22 of
the Act of 1870—and likewise section 50 of the Act of 1974—means the
sums prospectively payable under the company's current insurance
contracts; (b) the section nevertheless gives jurisdiction to the court to
F  reduce all sums which were prospectively payable under insurance con-
tracts current at the date of presentation of the petition seeking the
winding up order in place of which the order for reduction is made,
notwithstanding that such sums may have ripened into presently payable
debts since the date of such presentation and that the relevant contracts
may have become no longer current contracts by the time that the
court comes to make its order; (c) the date of presentation of the relevant
G  petition is the date which the court will generally select as the proper
time for ascertaining the then current contracts which are to be reduced,
though it may in special circumstances, in the exercise of its discretion,
select a later date; (d) the court has no jurisdiction to reduce debts due
under insurance contracts which had become presently payable debts by
the date of presentation of the relevant petition.

H  In *In re Briton Medical and General Life Association* (1887) 3
T.L.R. 670, Stirling J., in approving a scheme for the reduction of con-
tracts under section 22 of the Act of 1870, designated the date of
presentation of the relevant petition as the relevant date upon which
the contracts which were to be reduced should be ascertained. He
apparently considered this the " just and equitable " course: see p. 670.
It does not, however, appear to have been even suggested in the course

Slade J.                    **In re Capital Annuities Ltd. (Ch.D.)**                    **[1979]**

of the case, either in argument or by the court, that justice and equity    A
might require the reduction of debts which had matured under insurance
contracts before the presentation of the petition.

Finally in his judgment in *Fidelity Life Assurance Ltd. In re*
(unreported), July 23, 1976, Oliver J. had this to say in relation to section
50 of the Act of 1974:

> " The section is a re-enactment of a provision which appeared in    B
> substantially the same form in section 22 of the Life Assurance
> Companies Act 1870. That section has been applied in a small
> number of reported cases but it is not altogether easy to deduce
> from them any clear construction. It is clear, however, from the
> judgment of Sir George Jessel M.R. in *In re Great Britain Mutual
> Life Assurance Society,* 20 Ch.D. 351, that he at any rate regarded
> the words ' the contracts of the company ' in the section as meaning    C
> those subsisting contracts of insurance of the company which had
> not actually matured prior to the presentation of the petition, and
> this meets with some support in the judgment of Hall V.-C., in the
> same case, where he seems to have adopted from counsel the argu-
> ment to this effect. And this, if I may say so, very respectfully,
> must, I think, be right, for it can hardly be thought that the legis-    D
> lature intended, without any of the safeguards of a scheme of
> arrangement, to enable the court to reduce the claims of creditors
> with accrued debts. What the court has power to reduce is not the
> liabilities of the company but the ' amount of the contracts.' This
> clearly, I think, means contracts of insurance (for instance see the
> similar expression in section 48 (5) of the Act) and it seems to me    E
> an inappropriate expression to apply to debts already accrued due,
> even if those debts themselves arose from contracts of insurance."

Mr. Oliver, while accepting that what Oliver J. had said in this
passage was necessary for his decision in the case, albeit on a subsidiary
point, invited me not to follow it on the ground that it did not represent
a correct statement of the law. Though the point is far from easy, I    F
reject this submission. For the reasons which I have thought it right
to elaborate in detail out of deference to Mr. Oliver's strenuous and able
argument in this context, I have come to the same conclusion as Oliver
J. I think I must follow his decision and my interpretation of the Court
of Appeal decision in *In re Great Britain Mutual Life Assurance Society*
20 Ch.D. 351.    G

My short answer to question (D), therefore, is that section 50
empowers the court to reduce the amount of any insurance contracts
which have ripened into presently payable debts at a date later than the
date of presentation of the relevant petition, but, subject to this, limits
the court's jurisdiction to reducing the amounts of sums *prospectively*
payable under insurance contracts.    H

For this further reason, therefore, I am unable to make the order
sought by paragraphs (i) and (ii) of the summons, because they seek,
inter alia, the reduction of amounts totalling £84,266·40 which were
presently due to policyholders on April 30, 1976, when the petition was
presented. I shall, however, proceed to deal with the two outstanding
questions relating to jurisdiction.

1 W.L.R.          In re Capital Annuities Ltd. (Ch.D.)          Slade J.

A   *Question (E) above*

The next of these questions is whether section 50 of the Act of 1974 empowers the court to reduce "the amount of the contracts" of the company concerned otherwise than pari passu. In my judgment it is clear that the section cannot render it implicitly obligatory that any reduction should proceed on a basis of strict arithmetical equality for

B   the simple reason that in most cases strict equality of this nature would be quite impossible to achieve, still less to prove. The same assurance company may, and in most cases will, issue policies of widely differing natures, which may not only entitle the holders to the payment of specified sums at specified dates or in specified events, but may also give policyholders a wide variety of further rights, such as a right to share in profits, rights of surrender etc. While attempts can, of

C   course, be made to value such further rights for the purpose of achieving a fair reduction, the process of valuation cannot be effected by a mere reference to actuarial tables. It will involve the making of a number of assumptions in relation to such matters as rates of interest, tables of mortality etc.; and the selection of the proper assumptions will itself inevitably involve an element of discretion.

D   There are, however, a number of judicial dicta which appear to suggest that, in order to fall within the section, a scheme must proceed upon a principle of "broad equality" of reduction in the case of all the policies concerned: see for example *In re Nelson & Co.* [1905] 1 Ch. 551, 566-567, *per* Buckley J.; see also *In re Great Britain Mutual Life Assurance Society,* 20 Ch.D. 351, 353, *per* Jessel M.R. in a passage which has been cited earlier in this judgment.

E   In my judgment, as this passage well illustrates, the court, in making an order for reduction, must have it constantly in mind that, ex hypothesi, it is doing so "in the place of making a winding up order." In other words, in exercising its discretion, it has to make a careful comparison between (a) the financial position of the policyholders if the order for reduction is made and (b) their financial position in the event

F   of a winding up order. As Mr. Chadwick put it, any scheme for reduction ought to reflect the position in a winding up. And, of course, the general rule in a winding up is that a company's liabilities fall to be discharged pari passu: see section 302 of the Companies Act 1948.

In my judgment, however, it is impossible to derive from the wording of section 50 of the Act of 1974 or its predecessor any jurisdictional requirement that all the contracts of the company should be reduced, if

G   at all, either precisely equally or even on a principle of "broad equality." As a matter of language, "the amount of the contracts of the company" will be reduced if the sums payable under *all or any* of its contracts are reduced. Furthermore "broad equality" is far too imprecise a concept to constitute a yardstick by which to determine the court's jurisdiction. In my judgment, considerations of broad equality are relevant in relation

H   to the manner in which the court will exercise its discretion under section 50, but not in relation to jurisdiction.

I should add that Oliver J. in *In re Fidelity Life Assurance Ltd.* (unreported), July 23, 1976, and I myself in an unreported decision given on December 9, 1976, on a subsequent application made in the same matter had to consider, inter alia, whether the court's jurisdiction under section 50 was limited by any requirement of equality. I think that nothing in either of these two judgments conflicts with what I have

**Slade J.**            **In re Capital Annuities Ltd. (Ch.D.)**            **[1979]**

said in this context in this present judgment. Oliver J. did say in one   **A**
passage in his judgment:

> " I do not, therefore, think that the section necessarily involves or
> indeed could practically involve a precise pari passu reduction, so
> long as the scheme of reduction propounded does not proceed upon
> a principle of inequality."

I think it clear, however, that in its context, this observation related to   **B**
discretion rather than jurisdiction. Considerations of equality or other-
wise will merely feature among those factors which will influence the
court in deciding whether or not to make an order for reduction and, if
so, subject to what terms and conditions.

In my judgment, therefore, the fact that the scheme proposed in
the present case would not provide for strict equality between the various   **C**
policyholders, and in particular the special provisions for reduction of
" excessive benefits," would not deprive the court of jurisdiction to
approve it. Furthermore, in exercising its discretion in this context,
the court would no doubt take note of the fact that in the event of a
winding up, section 12 of the Act of 1975 would cause any " excessive
benefits " under policies to be subject to a special reduction in so far as
the board were concerned.   **D**

*Question (F) above*

In relation to jurisdiction, the only remaining question is whether the
court would have jurisdiction to effect the desired reduction without
giving the policyholders who would be affected by its order the oppor-
tunity to object. Section 50 of the Act of 1974, like section 22 of the   **E**
Act of 1870, is accompanied by no directions in the same Act for the
calling of meetings of policyholders. In some earlier cases concerning
the latter section, the court nevertheless directed the holding of meetings
of policyholders under section 91 of the Companies Act 1862, the equiva-
lent of section 346 of the Companies Act 1948: see, for example, *In re
Great Britain Mutual Life Assurance Society,* 16 Ch.D. 246 and   **F**
*In re Briton Medical and General Life Assurance Co. Ltd.* (1886)
54 L.T. 14. Meetings were not ordered to be called in *In re Nelson &
Co.* [1905] 1 Ch. 551, but in that case, Buckley J. saw insuperable
objections to the scheme in any event, so that the question of meetings
did not arise.

In this context I venture to repeat what I said in my judgment in *In re
Fidelity Life Assurance Ltd* (unreported), December 9, 1976,   **G**

> " Section 50 of the Act of 1974, as I have said, is the descendant
> of section 22 of the Act of 1870, which was in similar terms. The
> latter Act, like the Act of 1974, made no specific provision for the
> calling of meetings of policyholders or for the ascertainment of their
> views. Yet the legislature in 1870, in a different context, gave policy-
> holders or shareholders statutory rights to be informed and to   **H**
> object in regard to schemes of a different nature. Thus section
> 14 of the Life Assurance Companies Act 1870, which was a pre-
> decessor of section 42 of the Act of 1974, itself gave a minority of
> policyholders, representing a tenth or more of the total amount
> assured in any assurance company, the right to veto a scheme for
> the amalgamation of two or more life assurance companies, or for
> the transfer of life assurance business. Section 42 of the Act of

**1 W.L.R.**            **In re Capital Annuities Ltd. (Ch.D.)**            **Slade J.**

A    1974 similarly contains specific provisions designed to ensure that
policyholders shall have the right to be informed of and object to
a scheme for a transfer of long-term business carried on by an
insurance company. Section 2 of the Joint Stock Companies
Arrangement Act 1870—which was a predecessor of section 206
of the Companies Act 1948—gave the court power to order meetings
of creditors, or classes of creditors of the company in course of
B    liquidation and to sanction a scheme of arrangement if a specific
majority agreed to the scheme; provisions on the same lines are
included in section 206 of the Companies Act 1948 in a more
developed version.

" In these circumstances it may fairly be commented that while
the procedure of calling meetings and requiring statutory majorities
C    has been a familiar one to the legislature, at least since 1870, the
legislature in enacting section 50 of the Act of 1974 did not think
it necessary or appropriate to require the calling of meetings or
the obtaining of statutory majorities in that particular context, any
more than the legislature thought it necessary so to provide in enacting
section 22 of the Act of 1870.    It seems to me a reasonable inference
that if in enacting either section 22 of the Act of 1870 or section 50 of
D    the Act of 1974, it had intended that the calling of meetings of policy-
holders should be a condition precedent to the exercise of its jurisdic-
tion under those sections, it would have said so in express terms.    One
good reason, among others, for the omission to impose this condition
may perhaps be that a principal purpose of each of those sections was
to mitigate, by means of an order under the section, the loss to policy-
E    holders that could be caused by the expense of a liquidation; this was
described as a purpose of the earlier section by Sir George Jessel M.R.
in *In re Great Britain Mutual Life Assurance Society*, 20 Ch.D.
351, 353.    This purpose could be largely defeated if the exercise of the
court's jurisdiction under section 50 of the Act of 1974 always and
inevitably had to be preceded by one or more expensive and largely
purposeless meetings. . . ."

F
In that case, in the end, I made an order under section 50 without
directing meetings of policyholders.    That was a very special case, how-
ever, if only because after an investigation of the position of the policy-
holders under the scheme and their position on a winding up, I was
satisfied that there were no reasonable financial grounds upon which an
affected policyholder could reasonably object to the arrangement from
G    a strictly financial point of view.

So far as I know, that is the only case in which the court has made
an order under section 50 of the Act of 1974 or its predecessors without
meetings of policyholders first having been held.    I am nevertheless
satisfied that the court would have jurisdiction in the present case to
order the proposed reduction without directing meetings of policyholders
H    or any further advertisements or communication with policyholders.    I
am far from satisfied, however, that on the basis of the evidence now
before the court it would be appropriate for it to exercise its discretion in
this manner without at least giving the policyholders who would be affected
by its order the right, by some means or other, to voice their objections,
if any.    This evidence is of far less compelling character than was the
evidence in the *Fidelity Life Assurance Ltd.* case.    It has not yet con-
vinced me that at least some policyholders—for example those holders

of the company's 10-year high income bonds whose contracts would be   A
subject to a 10 per cent. reduction under the relief sought in paragraph
(i) of the summons and a further 10 per cent. reduction under the relief
sought in paragraph (ii), amounting to a total reduction of 19 per cent.—
might not perhaps do better in a liquidation, if they were to reject any
arrangements then made by the board for securing continuity of
insurance and rely on their simple rights of proof, without support from
the board; the evidence in this context is in my judgment quite incon-   B
clusive.

Mr. Oliver submitted that a mere comparison of the financial
consequences for policyholders on a liquidation and in the absence of a
liquidation would not in any event be the appropriate test for the court
to adopt, in the exercise of the discretion given to it by section 50.
The real comparison, he submitted, was between the two alternatives   C
facing the company for practical purposes, namely, (a) an expensive
liquidation, involving a process of forced sales and the payment to
policyholders of lump sums after long intervals in satisfaction of their
rights or (b) a less expensive scheme organised with the assistance of the
board involving the continuation of the policy benefits, subject to a reduc-
tion of a maximum of 19 per cent. and with a guarantee against future
insolvency.                                                             D

The policyholders, it was submitted, contracted not for a liquidation
but for continuing cover; a scheme as fair and sensible as this should not
be rejected merely because, in the event of a liquidation, some policy-
holders who rejected any arrangements for continuing insurance offered
by the board might conceivably receive lump sums, which had an actuarial
value rather greater than that of their rights under the scheme.  It was   E
submitted that the relevant test is whether a scheme in general is just
and equitable and that the proposed scheme passes this test.

I wish to say nothing that might be thought to fetter the discretion
of the court in this context if this scheme were to be brought back to it in
a revised form.  It may be helpful to the parties, however, to express my
own provisional views.  I fully appreciate that any attempts to compare   F
benefits in a liquidation and under a reduction scheme must be a
somewhat rough and ready process, if only because (among many other
reasons) it cannot be postulated with any certainty what assumptions
would be made by the court when the valuation process came to be carried
into effect on a winding up.  I also recognise the added expenses and
delays that a liquidation would be likely to involve.  Nevertheless it has
to be borne in mind that the court, whenever it orders a reduction under   G
section 50, is compelling policyholders to accept a scheme involving the
receipt of reduced benefits from the company concerned.  By contrast,
in the event of a winding up, they could—by rejecting any arrangements
for continuing insurance offered by the board—obtain a lump sum which
they would be free, if they chose and so far as it sufficed, to employ in
the purchase of equivalent rights from another company.  In a clear case,   H
where the court was satisfied on the evidence that such lump sum
would not in all probability suffice to enable them to purchase continuing
rights as valuable as those that would be conferred by a scheme, the
court might well consider it a purposeless waste of time and money to
give them the opportunity to object; it might consider that any such
objection was in due course almost bound to be overruled by the court in

**1 W.L.R.**                    In re Capital Annuities Ltd. (Ch.D.)                    **Slade J.**

A   the exercise of its discretionary jurisdiction. In any other case, however, I would expect the court to be very cautious before ordering in effect a partial expropriation of policyholders' rights in exercise of its jurisdiction under section 50, without at least having given them an opportunity to be heard or to object. I accept that the policyholders did not contract for a liquidation but for continuing cover. Neither, however, did they contract for a reduction of their agreed benefits.

B   I appreciate that the guidance which could be afforded to the court by meetings of classes of policyholders might be of limited assistance, bearing in mind the difficulty, or, perhaps, practical impossibility, of ascertaining the amounts for which each policyholder should be treated as a creditor of the company. An order that meetings be summoned, however, would not necessarily be the only course open to the court so as

C   to ensure that policyholders at least knew of the proposed scheme and had the opportunity to object to it at their own risk as to costs. What concerns me at present is that while all the policyholders would have had at least a theoretical opportunity to acquire knowledge of the winding up petition by reason of its advertisement, many, indeed perhaps most of them, will have had no similar opportunity to gain knowledge of the scheme which is now proposed to take the place of a winding up order

D   or to voice any objection to it. In such circumstances, in the absence of clear evidence that it was improbable that any policyholder could suffer financial loss from the scheme—as compared with a winding up order—it would take a lot to persuade me that it was right for the court to exercise its jurisdiction by making an order under section 50, under present circumstances, even if jurisdiction to do so existed.

E

*Conclusions*

  For the reasons given in answers to questions (B) and (D) above, I do not think I have jurisdiction to make an order in the precise form of the order sought by the board and on the evidence at present before me. I suspect that the difficulties caused by the present lack of sufficient

F   evidence as to the company's inability to pay its debts might be capable of being met without undue difficulty by the adduction of further evidence. As I have already indicated, I would not contemplate that such evidence need necessarily comprise a series of full-scale professional valuations of the company's assets and liabilities; something in the nature of a revised statement of affairs verified by persons who could depose to the approximate present values of the company's various assets and liabilities now,

G   in 1978, might well suffice. It is also possible, though I do not know if this would be a practical proposition, that the form of order sought could be recast, so as to exclude from the proposed reduction all debts which had matured by the date of presentation of the winding up petition.

H   As appears from Mr. North Smith's affidavit, the board consider that the scheme for reduction would be less expensive for the board than a liquidation. In this sense the present application may fairly be said to be made for the board's own benefit. Nevertheless I have no reason to doubt that the scheme has been prepared by the board and supported by the company's directors in the genuine belief that (as Mr. North Smith states) it probably will not leave policyholders of the company in a worse position than performance by the board of their duties in a liquidation.

The Weekly Law Reports, March 2, 1979

Slade J.                In re Capital Annuities Ltd. (Ch.D.)                [1979]

Considerable care, thought and expense has clearly gone into its prepara-    A
tion and presentation.

In all the circumstances, I am not minded to dismiss the board's
summons here and now, unless Mr. Oliver, on their behalf, invites me
to take this course. If, instead, he were to invite me to adjourn the
matter so as to enable the board to reconsider their position in the light
of this judgment, I would regard such an application sympathetically,
subject to any submissions to the contrary by other counsel. It should,    B
however, be emphasised that nothing in this judgment should be read as
fettering the discretion of this court, in the event of any revised scheme
for reduction being brought back to it for consideration.    Though I have
attempted to make a few observations as to principles which might
influence the court in the exercise of its discretion under section 50 of
the Act of 1974, in case these may assist the parties, these observations    C
are all obiter.    I have thought it neither necessary nor appropriate in
this judgment to consider whether, on the assumption that it fell within
the court's jurisdiction, the scheme in the form hitherto proposed would
on the facts be just and equitable or beneficial to the policyholders.
Indeed, for reasons already appearing, I do not think that the evidence at
present before the court would enable it to form a clear view as to the
merits or otherwise of the scheme.    D

In default of any application by the board for an adjournment, I
would be minded to make an immediate order for the winding up of the
company.    Though it has not yet been proved to my satisfaction that the
company is " unable to pay its debts " within the meaning of sections 222
and 223 of the Act of 1948, I am satisfied that, in default of a scheme
under section 50 of the Act of 1974, it would in all the circumstances    E
be just and equitable that it should be wound up.

> *Summons dismissed.*
> *Leave to appeal.*
> *Petition adjourned with liberty to*
>     *restore on two days' notice.*    F
> *Compulsory winding up order made*
>     *on July 26, 1978.*

Solicitors: *Herbert Smith & Co.; Allen & Overy; Herbert Smith & Co.;*
*Treasury Solicitor.*

                                    T. C. C. B.    G

TAB 48

*Re Casa Estates (UK) Ltd* [2014] 2 BCLC 49,
English Court of Appeal

*a*

# Re Casa Estates (UK) Ltd (in liquidation)

*b*

# Carman v Bucci

[2013] EWHC 2371 (Ch), [2014] EWCA Civ 383

*c*

CHANCERY DIVISION (COMPANIES COURT)

WARREN J

19 JUNE, 31 JULY 2013

*d*

COURT OF APPEAL, CIVIL DIVISION

SULLIVAN, MCFARLANE AND LEWISON LJJ

12, 13 MARCH, 3 APRIL 2014

*e*

*Transaction at undervalue – Relevant time – Connected person – Inability to pay debts – Tests for cash-flow and balance-sheet insolvency – Relationship between tests for inability to pay debts – Company's business introducing investors to property in Dubai – Dubai property market* *f* *crashing – Company going into insolvent liquidation – Liquidator challenging payments made to connected person – Whether payee rebutting presumption that company unable to pay debts at time of payments – Whether balance-sheet test excluded if company paying debts as they fell due – Insolvency Act 1986, ss 123(1)(e), (2), 238, 240(2).*

*g*

The appellant, Mrs Bucci, was the company secretary of Casa Estates (UK) Ltd, which was under the day-to-day management of her husband, Mr Bucci. The company's principal business was that of introducing investors to property in Dubai. It had an agent and intermediary in Dubai called Casa Dubai Real Estate Brokers LLC. Casa UK agreed to pay Casa *h* Dubai a monthly retainer and Casa Dubai agreed to pay Casa UK commission on sales at an average rate of 6%. Casa UK received money from investors who wanted to invest in property in Dubai. It transmitted the money to Casa Dubai for onward transmission to developers in Dubai. When Casa UK received customer deposits it had an obligation to account to the customer for those deposits, until such time as the deposits had been *i* applied towards the purchase of property in Dubai by payment to the developers. Casa UK did not maintain a client account, but mixed depositors' moneys with its own. In late 2008 the property market in Dubai collapsed, Casa Dubai failed and Casa UK went into insolvent liquidation. It was wound up compulsorily on its own petition with a net deficit as

regards creditors of £1,222,027. Its creditors included investors whose    *a*
payments to the company had not been paid to the vendor in Dubai.
Mr and Mrs Bucci were also the shareholders of another company (GUL)
which carried on a loss-making drinks business. It went into liquidation
owing about £474,000 to Casa UK. In the two years before its liquidation
Casa UK had made a number of payments to Mrs Bucci, totalling about
£104,000, which the respondent liquidator challenged under the Insolvency    *b*
Act 1986 ss 238 and 239. His Honour Judge Purle QC decided that the
payments sought to be recovered constituted transactions at an undervalue
within s 238. However, by virtue of s 240(2) the payments were not
recoverable because the company was not at the time unable to pay its
debts within the meaning of s 123. He found that there was no real
prospect of Casa UK ever recovering its loan from GUL. The expert    *c*
evidence was that if the GUL loan was eliminated as an asset of value, then
Casa UK was insolvent on a balance-sheet basis. However, he found that it
had been solvent on a cash-flow basis and had been paying its debts as they
fell due until the end of 2008. It had not reached 'the point of no return'
until that time. The liquidator appealed and when the appeal came before    *d*
Warren J the Supreme Court in *BNY Corporate Trustee Services Ltd v
Eurosail-UK-2007–3BL plc* [2013] UKSC 28, [2013] 1 BCLC 613, [2013]
1 WLR 1408 had disapproved the 'point of no return' test. Since Judge
Purle QC had applied the wrong test, Warren J reconsidered the matter and
concluded that Mrs Bucci had not rebutted the presumption that Casa UK
was insolvent at the times that it made the disputed payments to her.    *e*
Warren J found that Judge Purle QC had not dealt with some important
evidence relating to cash-flow solvency and had also not considered how it
was that debts continued to be paid. In Warren J's view the continued
payment of debts was only possible because new deposits from investors
were used to pay old debts. Warren J also concluded that, taking into
account loans from the directors as contingent liabilities and attributing no    *f*
significant value to the GUL loan, the company was balance-sheet insolvent
from the end of March 2007. Mrs Bucci appealed arguing that if a company
was cash-flow solvent under s 123(1)(e), there was no need to consider
whether it was also balance-sheet solvent under s 123(2), unless it had
contingent or prospective liabilities: the trial judge found that the company
was cash-flow solvent, and so there was no warrant for examining whether    *g*
it was balance-sheet insolvent.

**Held** – (1) The balance-sheet test in s 123(2) was not excluded merely
because a company was for the time being in fact paying its debts as they    *h*
fell due. The two tests stood side by side. They were part of a single
exercise, to determine whether a company was unable to pay its debts. In
addition, when applying the cash-flow test it was not enough merely to ask
whether the company was for the time being paying its debts as they fell
due. In an appropriate case the court had to consider how it was managing
to do so. Judge Purle had failed to consider that question and it was open to    *i*
Warren J to do so. He found that Casa UK was only able to continue to pay
its debts as they fell due by taking new deposits, and using them to pay off
old debts. He was entitled to make that finding and to conclude that
Mrs Bucci had not rebutted the presumption that Casa UK was cash-flow

*a* insolvent at the time that it made the payments to her. *BNY Corporate Trustee Services Ltd v Eurosail-UK 2007–3BL plc* [2013] UKSC 28, [2013] 1 BCLC 613 applied.

(2) If the GUL loan had no significant value, then whatever value it did have could not have made any difference. The experts agreed that if the GUL loan was given no value then Casa UK was balance-sheet insolvent at *b* all relevant times. That was not, in itself, determinative of the issue under s 123(2), but it was difficult to see how it could not lead to the conclusion that Casa UK was insolvent on a balance-sheet basis. There was no credible evidence that the balance sheet would improve in the near future. Judge Purle QC recognised that when Casa UK took a deposit from an investor it incurred a liability to that investor. But he did not ask how those liabilities *c* were to be satisfied. After the Dubai crash it appeared that the amount owed to depositors exceeded the amount in the hands of Casa Dubai, giving rise to the inference that Casa UK had used depositors' moneys for its own purposes. Judge Purle QC applied the wrong test. Warren J was entitled to make findings for himself about balance-sheet insolvency and the appeal *d* court would not interfere with those findings.

### Cases referred to in judgment

*Barclays Bank Ltd v Quistclose Investments Ltd* [1968] 3 All ER 651, [1970] AC 567, [1968] 3 WLR 1097, HL.

*BNY Corporate Trustee Services Ltd v Eurosail-UK 2007–3BL plc* [2011] *e* EWCA Civ 227, [2011] 2 BCLC 1, [2011] 3 All ER 470, [2011] 1 WLR 2524, CA; *affd* [2013] UKSC 28, [2013] 1 BCLC 613, [2013] 3 All ER 271, [2013] 1 WLR 1408, SC.

*Byblos Bank SAL v Al-Khudhairy* [1987] BCLC 232, CA.

*Cheyne Finance plc, Re* [2007] EWHC 240 (Ch), [2008] 1 BCLC 741, *f* [2008] 2 All ER 987.

*Company (No 006794 of 1983), Re a* [1986] BCLC 261

*European Life Assurance Society, Re* (1869) LR 9 Eq 122.

### Appeal

*g* Russell John Carman, the liquidator of Casa Estates (UK) Ltd, appealed from the judgment of his Honour Judge Purle QC dated 17 December 2012 refusing the liquidator's application under the Insolvency Act 1986, ss 238 and 239 to recover payments made by the company to Joanne Marie Bucci, the respondent, as a connected person, and holding that the respondent had not rebutted the presumption in s 240(2) that the company was insolvent at *h* the times that it made the disputed payments to her. The facts are set out in the judgment.

*Hermann Boeddinghaus* (instructed by *Geldards LLP*) for the appellant.
*James Morgan* (instructed by *Shakespeares Legal LLP*) for the respondent.
*i*

*Judgment was reserved.*

31 July 2013. The following judgment was delivered.

52                    Butterworths Company Law Cases        [2014] 2 BCLC

**WARREN J.**                                                    *a*

INTRODUCTION

[1] This is an appeal from the judgment of his Honour Judge Purle QC
dated 17 December 2012 ('the Judge' and 'the Judgment'). The applicant in    *b*
the proceedings is the appellant in this appeal ('Mr Carman') in his capacity
as liquidator of Casa Estates (UK) Ltd ('the Company'). Mr Carman sought
the recovery from the respondent in this appeal ('Mrs Bucci') of payments
made to her or for her benefit under s 238, alternatively in relation to some
of the payments under s 239, of the Insolvency Act 1986. References to
section numbers in this judgment are to that Act unless otherwise indicated.    *c*

[2] The payments in question fall into two categories:

(i) The first category (totalling some £55,783) consists of remuneration
and pension contributions made during the course of 2007 and 2008 in
respect of services which Mrs Bucci claimed to have provided to the
Company. Mr Carman sought to recover these payments, in whole or in
part, as payments at undervalue pursuant to s 238. Of that amount    *d*
£16,283.32 was paid in the years ending 5 April 2007 and 5 April 2008,
£29,999 in the year ending 5 April 2009, with pension contributions
totalling £9,500 paid over the same periods.

(ii) The second category (totalling some £48,205) consists of three
payments of £4,000 each between January and July 2008 (described in the
Company's accounts as 'dividends') and a payment to HMRC of £36,205    *e*
made in discharge of a tax liability of Mrs Bucci. She accepted that the three
payments could not be justified as dividends but she claimed to have been a
creditor of the Company and that the three payments and the payment to
HMRC discharged the amount owing. Mr Carman disputed that Mrs Bucci
was a creditor but advanced the alternative case (in case the Judge should
have held that she was a creditor) that the payments were recoverable as    *f*
preferences pursuant to s 239.

[3] In relation to the second category, the Judge rejected Mrs Bucci's case
that the payments were made as repayment of loans owing to her. There is
no appeal against that decision. Section 239 ceases to be of relevance. In
relation to both categories, the Judge decided that all of the payments    *g*
sought to be recovered by Mr Carman constituted transactions at
undervalue within s 238.

[4] However, he also decided that the payments were not recoverable
because the time of each payment was not a relevant time by virtue of
s 240(2), on the basis that payment, the Company was not 'unable to pay
its debts within the meaning of section 123 …' and did not become unable    *h*
to do so as a result of the payment in question.

[5] Mr Carman now appeals on the basis that the Company was, contrary
to the Judge's conclusion, unable to pay its debts within the meaning of
s 123. He says that the Judge erred in law in the approach which he
adopted to the issue whether the Company was unable to pay its debts and
gave inappropriate weight to various factors which he identified. He also    *i*
submits that certain payments received by the Company never became its
own assets but were held on *Quistclose* trusts (*Barclays Bank Ltd v
Quistclose Investments Ltd* [1968] 3 All ER 651, [1970] AC 567), a factor
which Mr Boeddinghaus (who appears for Mr Carman) submits has a

*a*  serious impact on the answer to the question of solvency. There is a dispute about whether this point was properly raised before the Judge and, if not, whether or not I should allow it to be raised for the first time on this appeal.

*b*  THE STATUTORY PROVISIONS

[6] I have found it helpful to set out parts of ss 123, 238 and 240 very early in this judgment. Section 123 provides so far as material:

'(1) A company is deemed unable to pay its debts—

*c*  (a) if a creditor (by assignment or otherwise) to whom the company is indebted in a sum exceeding £750 then due has served on the company, by leaving it at the company's registered office, a written demand (in the prescribed form) requiring the company to pay the sum so due and the company has for 3 weeks thereafter neglected to pay the sum or to secure or compound for it to the reasonable satisfaction of the creditor, or

*d*  (b) if, in England and Wales, execution or other process issued on a judgment, decree or order of any court in favour of a creditor of the company is returned unsatisfied in whole or in part, or

...

(e) if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due.

*e*  (2) A company is also deemed unable to pay its debts if it is proved to the satisfaction of the court that the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities.'

[7] Section 238 provides so far as material:

*f*  '(1) This section applies in the case of a company where—

...

(b) the company goes into liquidation;

and 'the office-holder' means ... the liquidator ...

(2) Where the company has at a relevant time (defined in section 240) entered into a transaction with any person at an undervalue, the office-holder may apply to the court for an order under this section.

*g*  (3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction.

(4) For the purposes of this section and section 241, a company enters

*h*  into a transaction with a person at an undervalue if—

(a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration, or

(b) the company enters into a transaction with that person for a

*i*  consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company.

...'

[8] Section 240 provides so far as material:

'(1) Subject to the next subsection, the time at which a company enters into a transaction at an undervalue or gives a preference is a relevant time if the transaction is entered into, or the preference given—

(a) in the case of a transaction at an undervalue or of a preference which is given to a person who is connected with the company (otherwise than by reason only of being its employee), at a time in the period of 2 years ending with the onset of insolvency (which expression is defined below),

(b) in the case of a preference which is not such a transaction and is not so given, at a time in the period of 6 months ending with the onset of insolvency

...

(2) Where a company enters into a transaction at an undervalue or gives a preference at a time mentioned in subsection (1)(a) or (b), that time is not a relevant time for the purposes of section 238 or 239 unless the company—

(a) is at that time unable to pay its debts within the meaning of section 123 in Chapter VI of Part IV, or

(b) becomes unable to pay its debts within the meaning of that section in consequence of the transaction or preference;

but the requirements of this subsection are presumed to be satisfied, unless the contrary is shown, in relation to any transaction at an undervalue which is entered into by a company with a person who is connected with the company.

(3) For the purposes of subsection (1), the onset of insolvency is—

...

(e) in a case where section 238 or 239 applies by reason of a company going into liquidation at any other time, the date of the commencement of the winding up.'

[9] It was common ground before the Judge (and this remains the position before me) that Mrs Bucci was a person connected with the Company, so that the relevant period within which a transaction is open to attack is two years before the onset of insolvency and the statutory (rebuttable) presumption of insolvency applies to transactions at an undervalue.

THE FACTS

[10] Paragraphs 4 to 11 of the Judgment contain a summary of certain agreed facts and certain findings by the Judge. I do not need to repeat them in full. The following can be taken from those paragraphs and other parts of the Judgment:

(i) The Company was incorporated on 23 February 2005 and carried on business as an introducer of investors to Dubai property. It received payments from investors by way of deposits for properties and payment of instalments towards the purchase price. It appears also to have operated as a dealer in its own right. It was under the day-to-day management of its sole director, Franco Bucci ('Mr Bucci') who is Mrs Bucci's husband. Mrs Bucci was company secretary. They were the owners of the company, as equal shareholders. There were no other shareholders. Since it did not

*a*  broker sales of any UK properties, it was not required to, and did not in fact, keep a separate client account.

(ii) Casa Dubai Real Estate Brokers LLC ('Casa Dubai') was the Company's agent and intermediary in Dubai. It was incorporated in the UAE and was owned (as required under the local law) by two UAE nationals. Mr Bucci acted as general manager of Casa Dubai.

*b*  (iii) The Company ceased trading in December 2008 following the collapse of the Dubai property market. One of the developers with which the company dealt, Al Barakah, which promised investors a 50% return in six months, was unable to meet its obligations. Mr Bucci quickly reached the conclusion that the company could not survive in the light of Al Barakah's failure.

*c*  (iv) Mr and Mrs Bucci were also the sole shareholders of Gianluca (UK) Ltd ('GUL'). Initially, both Mr and Mrs Bucci appear to have provided consultancy services to third parties through GUL, at least down to June 2007. Mrs Bucci is an experienced businesswoman in her own right.

(v) In June 2007 GUL launched a drinks distribution business. It entered
*d*  into a loan agreement with the Company in June 2007 (resulting in a total of over £474,000 being lent by the Company to GUL by December 2008) which Mr Bucci signed for both parties. Advances were made between January 2007 and December 2008. GUL was loss-making from the start of its drinks business, though its turnover was on the increase until it ceased to trade, and Mr Bucci doubtless hoped that it would, with the company's
*e*  financial support, come good eventually. It entered into creditors' voluntary liquidation on 29 January 2009, following the Company ceasing to trade. Mr Bucci in its statement of affairs identified the Company as a creditor for £480,044, though the true figure was slightly less than this.

(vi) There is no doubt that moneys were in fact advanced to GUL, and that GUL was throughout its existence dependent on the company for its
*f*  viability. The Buccis, had the Company continued in business and been profitable, would probably have declared dividends so as to cover the outstanding loan, effectively treating it as repaid by their dividends. They saw the moneys taken out of the Company and put into GUL as surplus funds available to the shareholders.

(vii) The Company was wound up compulsorily on its own petition by an
*g*  order made on 4 March 2009. According to the statement of affairs provided by Mr Bucci, the Company had a net deficit as regards creditors of £1,222,027. Its creditors include investors who found that their payments to the Company had not been paid to the vendor in Dubai.

(viii) The petition had been presented on 15 January 2009. That therefore
*h*  became the date of the onset of insolvency for the purpose of the relevant statutory provisions to which I have referred. All the payments with which the Judge was concerned were made in the period of two years ending with the onset of insolvency. GUL had already been wound up with assets of under £15,000 and liabilities (mainly in the shape of unpaid loans from the Company) of over £500,000.

*i*  [11] Mr Boeddinghaus records in his skeleton argument – and there can be no doubt that this is right as a matter of fact – that the Company failed to keep adequate accounting records and that it has been difficult to state with accuracy the financial position of the Company at any time (and in particular to ascertain which of the funds controlled by the Company

represented investor payments which had not been paid to the Dubai *a* vendors/developers). The Company filed no accounts for the years ended 31 December 2007 and 31 December 2008.

[12] It is also the case that the Company dealt with something around 750 customers from its introductions business, being paid a commission averaging 6% by the developers/vendors concerned. The Company itself also acquired a number of properties which, according to Mr Bucci, were *b* financed out of the Company's profits. The Company also introduced a number of investors to a scheme with a developer called Al Barakah which promised a return of 50% over six months. After the collapse of Lehman Brothers in September 2008, there was a slow-down of the Dubai property market and developers stopped paying commissions. Mr Morgan says – this *c* may not actually be in evidence but I do not think it is controversial – that in particular Al Barakah itself became the subject of media attention in early December and in early January 2009, creditors were notified that it was insolvent. This left the Company with a liability under a guarantee to Mr Lees, one of its customers, in the sum of some £280,000.

[13] There is one other piece of financial information which I would *d* mention at this stage. Mr Bucci's evidence was that the Company was owed, prior to the crash, some £745,000 by developers (to be paid through Casa Dubai) but because of their financial difficulties, it was not realisable. It is certainly the case that that money never reached the Company although some of it may have reached Casa Dubai. By that time, the prospect of recovery from Casa Dubai had vanished. *e*

[14] The Judge dealt with the two categories of payment (the first category in paras 16–30 and the second in paras 31–42) reaching the conclusion that all of the payments were payments at undervalue. There is no appeal from those findings. In principle, therefore, s 238 was of application but that was subject to the provisions of s 240(2). *f*

[15] The Judge then addressed the question of solvency in the remainder of the Judgment. It is worth setting out what he said in para [44] in some preliminary remarks directed to s 123:

'There is no suggestion in this case that any creditor served a statutory demand or obtained any judgment against the company at any time. In fact, there was no creditor pressure at any time, and the *g* company was in fact paying its debts as they fell due. The company had no cash-flow problem at the time of any of the payments. The question therefore is whether the company was at the material times deemed to be unable to pay its debts on the ground that the value of the company's assets was less than the amount of its liabilities, taking into account its contingent and prospective liabilities. This is what is sometimes called *h* the "balance-sheet test" as opposed to the "cash-flow test" otherwise applicable.'

[16] The Judge was therefore dismissive of the suggestion that there was a cash-flow problem and that the Company was insolvent under the cash-flow test. The focus of his decision was therefore on the balance-sheet *i* test.

[17] Before I turn to the Judge's findings about the Company's solvency and the way in which he applied the cash-flow test and the balance-sheet test, I wish to say something about the authorities on s 123.

*a*  THE AUTHORITIES ON SECTION 123

[18] So far as s 123(1)(e) is concerned useful guidance is to be found in the decision of the Supreme Court in *BNY Corporate Trustee Services Ltd v Eurosail-UK 2007–3BL plc* [2013] UKSC 28, [2011] 2 BCLC 1, [2013] 1 WLR 1408, affirming the approach of Briggs J (as he then was) in *Re Cheyne Finance plc* [2007] EWHC 240 (Ch), [2008] 1 BCLC 741. The

*b*  discussions in both Lord Walker's speech in *Eurosail* and in the judgment of Briggs J in *Cheyne* include a review of the predecessor legislation. Until the Insolvency Act 1985, the words 'as they fall due' did not appear in the relevant insolvency legislation. Nor did express reference to the test of 'the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities'. Instead, one test of a

*c*  company being deemed to be unable to pay it debts was found in s 518(1)(e) of the Companies Act 1985, the test being 'if it is proved to the satisfaction of the court that the company is unable to pay its debts (and, in determining that question, the court shall take into account the company's contingent and prospective liabilities)'. That single test was replaced by the

*d*  two complementary provisions of what are now s 123(1)(e) and s 123(2). In that context, Lord Walker, at [34] of his speech approved of what Briggs J had said in [56] of his judgment:

'56. In my judgment, the effect of the alterations to the insolvency test made in 1985 and now found in s 123 of the 1986 Act was to replace

*e*  in the commercial solvency test now found in s 123(1)(e), one futurity requirement, namely to include contingent and prospective liabilities, with another more flexible and fact sensitive requirement encapsulated in the new phrase "as they fall due".'

[19] Briggs J went on, in [57] to note that,

*f*  'in the case of a company still trading, and where there is therefore a high degree of uncertainty as to the profits of its future cash flow, an appreciation that s 123(1)(e) permits a review of the future will often make little difference. In many, if not most, cases the alternative balance-sheet test will afford a petitioner for winding up a convenient

*g*  alternative means of proof of a deemed insolvency.'

[20] Briggs J did not address s 123(2) any further than that. He at least clearly saw s 123(2) as adding something of importance to s 123(1)(e). Before looking at what he said, I need to mention some of the authorities to which Lord Walker referred.

*h*  [21] The first (see [28] of his speech) is *Re European Life Assurance Society* (1869) LR 9 Eq 122. In the course of his judgment, Sir James Wigram V-C said (at 128) that the court,

'… has nothing whatever to do with the question of the probability

*i*  whether any business which the company may carry on tomorrow or hereafter will be profitable or unprofitable. That is a matter for those who may choose to be the customers of the company and for the shareholders to consider.'

[22] The next case is *Re a Company (No 006794 of 1983)* [1986] BCLC

261 (also referred to as *Bond Jewellers*), decided by Nourse J on   *a*
21 December 1983. As Lord Walker described it (see at [30] of his speech),

> 'It concerned a tenant company with a propensity for postponing
> payment of its debts until threatened with litigation. Nourse J felt
> unable to make an order under s 223(d), and considered, but ultimately
> did not make an order on, the "just and equitable" ground in s 222(f).   *b*
> The case is of interest as illustrating (at p 263) that the phrase "as they
> fall due", although not part of the statutory text, was understood to be
> implicit in s 223(d). It is also of interest for the judge's observation on
> the second point in s 223(d) (now embodied, in different words, in
> s 123(2) of the 1986 Act):
>
>> "Counsel says that if I take into account the contingent and   *c*
>> prospective liabilities of the company, it is clearly insolvent in
>> balance-sheet terms. So indeed it is if I treat the loans made by the
>> associated companies [I remark in relation to this that these were loans
>> which the Judge had concluded had been used to prop up the company]
>> as loans which are currently repayable. However, what I am required to
>> do is to 'take into account' the contingent and prospective liabilities.   *d*
>> That cannot mean that I must simply add them up and strike a balance
>> against assets. In regard to prospective liabilities I must principally
>> consider whether, and if so when, they are likely to become present
>> liabilities." '

[23] That case was considered by Nicholls LJ in *Byblos Bank SAL v*   *e*
*Al-Khudhairy* [1987] BCLC 232, observing that the considerations leading
to Nourse J's conclusions did not appear from the report. Nicholls LJ did
not see anything inconsistent in what Nourse J had said with his own
conclusions (which I will come to in a moment).

[24] That brings me to *Byblos Bank*. The company was insolvent looking   *f*
at its balance sheet alone. But the company had a hope of receiving a
further capital injection. Nicholls LJ held that the focus of what was then
the relevant provision, s 223(d) of the Companies Act 1948, was on the
assets and liabilities of the company at the time when insolvency was
alleged and that account could not be taken of future assets. It is worth
repeating the citation from the judgment of Nicholls LJ in the speech of   *g*
Lord Walker:

> 'Construing this section first without reference to authority, it seems
> to me plain that, in a case where none of the deeming paras (a), (b) or
> (c) is applicable, what is contemplated is evidence of (and, if necessary,
> an investigation into) the present capacity of a company to pay all its   *h*
> debts. If a debt presently payable is not paid because of lack of means,
> that will normally suffice to prove that the company is unable to pay its
> debts. That will be so even if, on an assessment of all the assets and
> liabilities of the company, there is a surplus of assets over liabilities.
> That is trite law.
> It is equally trite to observe that the fact that a company can meet all   *i*
> its presently payable debts is not necessarily the end of the matter,
> because para (d) requires account to be taken of contingent and
> prospective liabilities. Take the simple, if extreme, case of a company
> whose liabilities consist of an obligation to repay a loan of £100,000

a    one year hence, and whose only assets are worth £10,000. It is obvious
that, taking into account its future liabilities, such a company does not
have the present capacity to pay its debts and as such it 'is' unable to
pay its debts. Even if all its assets were realised it would still be unable
to pay its debts, viz, in this example, to meet its liabilities when they
became due. It might be that, if the company continued to trade, during
b    the year it would acquire the means to discharge its liabilities before
they became presently payable at the end of the year. But in my view
paragraph (d) is focusing attention on the present position of a
company. I can see no justification for importing into the paragraph,
from the requirement to take into account prospective and future
liabilities, any obligation or entitlement to treat the assets of the
c    company as being, at the material date, other than they truly are. Of
course a company's prospects of acquiring further assets before it will
be called upon to meet future liabilities will be very relevant when the
court is exercising its discretion: for example, regarding the making of a
winding-up order or the granting of short adjournments of a
d    winding-up petition.'

[25] What I think can be taken from the decisions of Nourse J and
Nicholls LJ, read with the analysis of the law undertaken by Briggs J, is that
the starting point under the pre-1985 legislation was to examine cash-flow
insolvency – to see whether a company is commercially able to pay its debts
e    as they fall due – and then to examine whether future liabilities have any
impact on the conclusion. Balance-sheet insolvency is not irrelevant to the
ability to pay debts as they fall due.

[26] It is fair to say, however, that the precise relationship between the
two limbs of the pre-1985 section was never clearly and fully analysed and
did not, on the facts of the particular cases, need to be analysed. Further,
f    even in relation to cash-flow insolvency, the cases do not disclose factual
situations where the company has put off paying debts which have fallen
due and where the creditors have simply failed to complain or make
demands for payment.

[27] Moreover, within the old section, there were two tests, albeit perhaps
hidden away. On the face of the old section, there was only one question: is
g    the company unable to pay its debts? Implicit in that (see Lord Walker
at [30]) was the phrase 'as they fall due'. But if it was clear that a company
was balance sheet insolvent, it could nonetheless be wound up
notwithstanding that it was cash-flow solvent. Even applying the discredited
'point of no return' test, a company might fail that test and yet be able to
pay its debts as they fall due. *A fortiori*, following the decision of the
h    Supreme Court in *Eurosail*, it remains possible for a company to pass the
s 123(1)(e) test but fail the s 123(2) test.

[28] Returning to Lord Walker's speech in *Eurosail*, after observing the
difference as a matter of form between the current statutory test and the
position under the Companies Act 1985, he noted that there is no
i    indication of how the two new provisions – s 123(1)(e) and s 123(2) –
interact. He then went on at [37]:

'[37] Despite the difference of form, the provisions of s 123(1) and (2)
should in my view be seen, as the Government spokesman in the House
of Lords indicated, as making little significant change in the law. The

*a*

changes in form served, in my view, to underline that the "cash-flow" test is concerned, not simply with the petitioner's own presently due debt, nor only with other presently due debt owed by the company, but also with debts falling due from time to time in the reasonably near future. What is the reasonably near future, for this purpose, will depend on all the circumstances, but especially on the nature of the company's business. That is consistent with the *Bond Jewellers* case (*Re A Company (No 006794 of 1983)*) [1986] BCLC 261, *Byblos Bank SAL v Al-Khudhairy* [1987] BCLC 232 and *Re Cheyne Finance plc* [2008] 1 BCLC 741. The express reference to assets and liabilities is in my view a practical recognition that once the court has to move beyond the reasonably near future (the length of which depends, again, on all the circumstances) any attempt to apply a cash-flow test will become completely speculative, and a comparison of present assets with present and future liabilities (discounted for contingencies and deferment) becomes the only sensible test. But it is still very far from an exact test, and the burden of proof must be on the party which asserts balance-sheet insolvency ...'

*b*

*c*

*d*

[29] One can see, therefore, that both under the old section and under s 123 there were, and are, two different ways of showing that a company is unable to pay its debts. The first is that the company is unable to pay its debts as they fall due. As part of that exercise, account can be taken of future and contingent debts falling due within the reasonably near future. The second is whether liabilities exceed assets. Although the separation of the old section into two separate subsections may not have been intended to effect a significant change in the law, that separation is, I think, an indication of how the draftsman saw the pre-existing law. As Lord Walker noted, once the court has to move beyond the reasonably near future, any attempt to apply the cash-flow test becomes speculative. A comparison of assets and liabilities becomes the only sensible test. In applying that test, the judgment of Nicholls LJ in *Byblos Bank* shows that account can only be taken of existing assets: the logic of his reasoning means that expected profits cannot be taken into account as an asset in assessing the cash-flow test any more than the balance-sheet test. That is not to say that the anticipated income and outgoings over the 'reasonably near future' cannot be taken into account. If one is applying a cash-flow test then *ex hypothesi* one is dealing with a situation which is not, in the view of the court, speculative but is capable of rational prediction with some degree of certainty.

*e*

*f*

*g*

[30] Further, in applying the balance-sheet test, future and contingent liabilities only need to be taken into account: they do not have to be brought into the balance at their face value or even a discounted value to reflect the time to the date of payment. Instead, all the relevant circumstances have to be considered and the result, as in *Eurosail* itself, may be that the liabilities are of a nature such that they do not result in the total assets being less than the total liabilities. There is, however, nothing in that approach which mandates bringing in liabilities which are immediately payable at anything less than their full value. Once one moves away from a pure cash-flow assessment (taking into account prospective and contingent liabilities in cases where the debts will be due in the reasonably near future),

*h*

*i*

a    it seems to me to follow, inevitably, that the solvency of a company with
     contingent and prospective liabilities will properly be judged on a
     balance-sheet test; if its current liabilities exceed its current assets, then it
     will be insolvent even if it has managed (and is likely to be able to manage
     in the reasonably near future ) to pay all of its debts from time to time, for
     instance by a series of loans from its backers such as shareholders and
b    directors.

     [31] The decision of the Court of Appeal in *Eurosail* (see [2011] 2 BCLC
     1, [2011] 1 WLR 2524) had generated a considerable amount of discussion
     in the light of certain things that Lord Neuberger MR had said. In his
     discussion, Lord Neuberger adopted the approach of Professor Sir Roy
     Goode in *Principles of Corporate Insolvency Law* (3rd edn, 2005) where
c    the professor had written:

          'If the cash-flow test were the only relevant test [for insolvency] then
          current and short-term creditors would in effect be paid at the expense
          of creditors to whom liabilities were incurred after the company had
          reached the point of no return because of an incurable deficiency in its
d         assets.'

     [32] Lord Neuberger reasoned to the conclusion which adopted the 'point
     of no return' as the test which the court is to apply in deciding upon
     insolvency under s 123(2). The 'point of no return' was, however, expressly
e    rejected by Lord Walker as a paraphrase of the test in section 123(2) (see
     [42] and [48] of his speech), albeit that it 'illuminates' the purpose of the
     subsection as Toulson LJ had put it in his own judgment in the Court of
     Appeal. Lord Walker at [42] of his speech explained his approach further
     when agreeing with the following passage from Toulson LJ's judgment
f    at [119]:

          'Essentially, s 123(2) requires the court to make a judgment whether it
          has been established that, looking at the company's assets and making
          proper allowance for its prospective and contingent liabilities, it cannot
          reasonably be expected to be able to meet those liabilities. If so, it will
          be deemed insolvent although it is currently able to pay its debts as they
g         fall due. The more distant the liabilities, the harder this will be to
          establish.'

     [33] The last sentence in that quotation puts the same point as was made
     by Lord Neuberger in [62] of his own judgment when he said:

h         'Clearly, the closer in time a future liability is to mature, or the more
          likely the contingency which would activate a contingent liability, and
          the greater the size of the likely liability, the more probable it would be
          that s 123(2) will apply.'

i    [34] Notwithstanding what Lord Walker said, the difference in form
     between the old and the new provisions cannot be wholly ignored. What
     the new form achieves is to throw into focus the distinction between
     considerations of cash flow and considerations of assets and liabilities. It
     requires the court to focus clearly on the debts which are due or will fall
     due in the reasonably near future when applying s 123(1)(e) and which

debts are future debts to be brought into account under s 123(2). A given    *a*
liability of a company, it seems to me, either is or is not a debt which is to
be taken into account in applying s 123(1)(e). If it is such a debt (because it
is due or will fall due within the reasonably near future) then it will be
taken into account in assessing whether the company is able to pay its debts
as they fall due. But if it is not such a debt, then the liability is necessarily
a prospective or contingent liability. On this hypothesis, the debt is not    *b*
taken into account in assessing cash-flow solvency and it is necessary to go
on to consider s 123(2). In doing so, the court has to make a judgment
about whether the company can (adopting the approach of Toulson LJ
approved by Lord Walker) reasonably be expected to meet its liabilities –
not just the future liabilities but all of the company's liabilities. I do not, in
any case, detect in what Lord Walker said (or indeed in Toulson LJ's    *c*
analysis in the section of his judgment dealing with the history of the
provision) a rigid demarcation between s 123(1)(e) and s 123(2). They
feature as part of a single exercise, namely to determine whether a company
is unable to pay its debts.

[35] Consider then a company which is balance-sheet insolvent on the    *d*
basis of its current debts that is to say debts which have fallen due for
payment or will in the reasonably near future fall due for payment. Those
are precisely the debts which need to be taken into account in making an
assessment under the cash-flow test in accordance with s 123(1)(e). It is
difficult to see how the company could then be said, with nothing more, to
be cash-flow solvent. However, immediate cash-flow problems might be    *e*
subject to amelioration; for instance, immediate debts could be covered by a
short term loan or by an overdraft facility, although that assumes the
creation of new liabilities on the part of the company which will either be
themselves liabilities which will fall due for payment within the reasonably
near future, in which case the cash-flow problem still arises, or one posits a
series of loans running past the reasonably near future, in which case the    *f*
commercial reality is no different from that of a prospective liability to
which it would be appropriate to apply s 123(2), with liabilities exceeding
assets. The same would apply if a particular creditor (eg a shareholder or
director) agreed to postpone the calling-in of his debt. In contrast, if
immediate liabilities were to be financed by further long-term funding, then
that funding would give rise to a prospective or contingent liability which    *g*
would not fall to be taken account of when applying the s 123(1)(e) test;
but that is just the sort of case where the test in s 123(2) would apply with
the result in this example, that liabilities exceed assets.

*h*

THE JUDGE'S APPROACH AND FINDINGS
[36] Reading the Judgment as a whole, there can be no doubt that the
Judge applied the 'point of no return' test in reaching his conclusion about    *i*
balance-sheet insolvency. He did not consider, or apply in the alternative,
any other test. He was right to apply that test in the light of the law as was
when he delivered the Judgment.
[37] Mr Boeddinghaus submits that had the Judge applied the correct test
he would inevitably have come to the conclusion that the Company was

a   unable to pay its debts within the meaning of s 123 when each of the payments was made.

[**38**] Further, he says that the Judge was incorrect in what he said in para [47] of the Judgment:

b   '[**47**] Whilst those comments [ie of Lord Neuberger] primarily concerned the approach to be taken towards prospective and contingent liabilities, its effect is not so limited. Take, for example, the case of a company which is dependent upon the support of its directors. The directors' loan accounts may, in strict analysis, be current liabilities, but, if the directors have no immediate intention of calling the loans in, the company could not be said to have reached the point of no return, even c   if the size of the directors' loan accounts meant that current liabilities exceeded current assets. The company would not in those circumstances be deemed to be unable to pay its debts under s 123(2).'

[**39**] He was wrong, Mr Boeddinghaus submits, not only because, once again, he was adopting the 'point of no return' test, but also because he was d   inadmissibly treating a present liability as if it were simply a contingent or prospective liability. A present liability is precisely that – a liability which is due for immediate payment – and if the value of a company's assets are less than the amount of its liabilities due for immediate payment, it falls within s 123(2).

[**40**] In late 2008, there was a generally unanticipated collapse in the e   Dubai property market, after the last of the payments was made to Mrs Bucci: see para [49] of the Judgment. It is on that basis and on the basis of the lack of creditor pressure referred to in para [44] (see para [15] above) that the Judge was able to make the finding, in that paragraph, that the Company was solvent on a cash-flow basis until the collapse. He did so, f   according to Mr Boeddinghaus, notwithstanding that Mrs Bucci's own expert, Mr Vigar, gave no evidence at all on the question of cash-flow insolvency in his expert report nor in evidence in chief: his only evidence was in cross-examination and there was nothing unhelpful to Mr Carman's case in what he said.

[**41**] It is true that very little was said about cash-flow insolvency on g   behalf of Mrs Bucci. However, her evidence and that of Mr Bucci was that the Company was profitable and had met all of its liabilities and in that the Judge appears to have agreed with them (although I have some observations to make later). Mr Vigar dealt with it only very briefly in his expert report. At section 2 he set out how his opinion on the questions raised in his instructions could be summarised. He stated in 2.1 that 'the cash-flow h   position is considered in 2.5 below' and in 2.5 he stated that the Company remained solvent throughout 2008 until the cash deposits held in Dubai could not be recalled. His detailed reasons were stated to be contained in section 3. Most of the report is concerned with the balance sheet and not with cash flow. Cash flow is dealt with in a very short section, 3.5, of the i   report, incorporating appendix 5 to the report. Appendix 5 summarised the Company's net assets month by month throughout 2008. Mr Vigar acknowledged that the figures for May and June looked 'highly suspect' so that it would be prudent to average the two months. He concluded that the Company was making profits up to and including July when it started to make losses. But the Company 'remained solvent throughout 2008 until the

cash funds held in Dubai could not be recalled'.

[42] Appendix 5 comprises a table setting out the reconstructed balance sheet for each month of 2008. It shows a positive balance each month increasing from just over £356,000 in January to £990,500 in August and then decreasing to £763,000 in December but with a sudden glitch in May when a deficit of nearly £610,000 is shown. The assets include the GUL loan, the amount of which is shown as increasing from nearly £299,000 in January to just over £474,000 in December.

[43] Mrs Bucci's then counsel (Mr David Berkley QC) included a single paragraph in his skeleton argument to the effect that the Company held large cash reserves; there was no evidence of any demands, pressing creditors, unsatisfied debts or anything else to suggest that until December 2008 the Company was not meeting its liabilities or paying its debts as they fell due. It operated its bank accounts without default and had a £50,000 overdraft facility. But for the Dubai crash, it would have continued to meet its obligations.

[44] His closing written submissions were also quite brief on the issue of cash flow comprising three material paragraphs, 12.3 to 12.5. In summary:

(i) The Company was not facing creditor claims. The evidence was of a cash-rich company.

(ii) The explanations given by Mr Bucci for not having forwarded deposits or instalments to developers was consistent with his attempting to safeguard and ringfence investors' money. He was able to show that moneys had been withheld because of poor performance or non-performance by developers.

(iii) Bank balances at June 2008 show healthy balances (something over £97,000 in total and the Company had the use of a £50,000 overdraft facility).

[45] I ought to record at this point that Mr Carman himself, in his first witness statement at para 47, explained that the Company was cash-flow solvent but this was because it took substantial deposits from investors wishing to purchase properties. He said that it was, at the time of his witness statement, unclear whether, through the set-off arrangements (as to which see para [47] below), these moneys were transferred in full to Casa Dubai or whether they were ever remitted to the Dubai developers.

[46] In paras [50]–[52] of the Judgment, the Judge set out very briefly some further factual aspects. It is worth setting them out in full:

'[50] The company's profit consisted primarily of its commission from sales. It did however receive customer deposits for ultimate onward transmission to the developer via Casa Dubai. To save on exchange control losses, the company retained some customer deposits. Some were passed on to Casa Dubai directly. Others were treated as remitted to Casa Dubai via a set-off arrangement against moneys due the other way. (The set-off operation is explained in the liquidator's letter to Mr Lees, an investor, dated 7 August 2009). The company did not set up a separate account for handling customer deposits. Technically, those arrangements gave rise to liabilities of the company towards its depositors until such time as the deposits were paid to the developer in satisfaction of the customers' contractual obligations. There were

*a*    corresponding amounts due from Casa Dubai in respect of moneys remitted to and still held by Casa Dubai or treated as remitted under the set-off arrangements.

[51] There was a rapid expansion of the business in 2007 and 2008. This increased the apparent profits of the company up to July 2008 (as ascertainable from its SAGE accounts system) but also resulted in *b*    additional liabilities to customers whose deposits had not reached the developer, either because the development had not reached the appropriate stage justifying payment or because the developer could not hold deposits. The SAGE accounting system was operated in a way which was far from ideal. Nevertheless, the SAGE records gave a *c*    broadly accurate picture of the company's profitability, a point confirmed by Mr Vigar.

[52] As a result of the sudden collapse of the property market in Dubai, which post-dated the September 2008 collapse of Lehman Brothers by over two months, Casa Dubai failed and the company's substantial liabilities to its customers crystallised, without the possibility of recovering any of those liabilities from Casa Dubai, or outstanding *d*    commissions. However, until that point, the company's liabilities to customers were effectively contingent upon the failure of Casa Dubai or the developers. The company had no cash-flow difficulties until then, and had not reached the point of no return. When it did so, it reached the point of no return very suddenly, and ceased its business.'

*e*

[47] It is apparent from the way the Judge expressed himself in para [50] that he accepted the evidence about set-off. This was a set-off of commissions due against money due to developers. According to Mr Bucci, a client would pay the Company in the UK. The administrator would advise *f*    the Dubai office (that is Casa Dubai) that payment had been received. Casa Dubai would pay the developer from commissions received from developers. If the commissions were not enough to pay the developer, a transfer would be requested from the company in the UK and sufficient funds would be transferred. It is not at all clear to me from what I have been shown how this would actually work in practice given that *g*    commissions averaged at 6% but deposits were of a larger percentage than that. Further, it is not on every sale that a commission was immediately payable.

[48] Moreover, there ought ordinarily not to have been more than a very few days between receipt of moneys by the Company from a customer and its onward transmission, via Casa Dubai, to the developer. It is clear from *h*    the evidence, however, that if all deposits and instalment payments had been paid to the developers in that time-scale, the Company would not have been able to build up funds with which to make the GUL loans and incur other expenditure in acquisition of its own properties nor would it have ended up with liabilities, by the time it went into liquidation, of over £640,000 to customers. In that context, even if the explanation given by Mr Bucci about *i*    why certain deposits and instalments were retained, the expenditure of those moneys in other ways, such as loans to GUL or acquisition of illiquid assets, would have resulted in those assets being unavailable to meet the Company's cash-flow needs. Given that, ordinarily, a new deposit ought to have been passed across within a very few days, it would not have been

available to meet outstanding deposits or instalments. The whole edifice
depended, it seems to me, on a continuing flow of new business at the same
or even greater level than in the past.

[49] Mr James Morgan, who now appears for Mrs Bucci, asserts that the
Company was profitable even during 2008, a profit driven by average
monthly commissions of around £120,000, pointing out that the Judge
accepted that the SAGE reports from which this figure was derived gave a
broadly accurate picture of the Company's profitability. But a currently
profitable company is not necessarily either cash-flow solvent or
balance-sheet solvent, so the Judge's finding of fact does not lead inevitably
to a conclusion of cash-flow solvency.

[50] Mr Boeddinghaus does not accept that the Judge could properly have
decided that the Company was profitable. The SAGE reports were not
reliable (not a fault of SAGE but of the way it was operated). The
spreadsheet produced by Mr Vigar (his appendix 5 mentioned above) itself
relied on the SAGE reports. The spreadsheet contains a line at the bottom
showing the monthly increase (or in one case decrease) in assets throughout
the year. This is what was relied on by Mr Vigar as demonstrating the
profitability of the Company. However, if one takes appendix 5 at face
value, the balance sheet reveals a positive position even if one strips out of
assets the amount of the GUL loan from time to time, and attributes a nil
value to it. I do not understand how that factor is consistent with what was
recorded by the Judge namely that the experts were agreed that if the GUL
loan was valued at nil, the Company was balance-sheet insolvent at all
times after 31 December 2007. It is not possible, either, to see how the
monthly balance sheets are consistent with a starting point on 31 December
2007 of a net deficit (of £30,161 on Mr Minshall's figures). And even
Mr Vigar stated in his report that the figures for May and June looked
'highly suspect'.

[51] It is important to record what the Judge said in para [56] of the
Judgment namely that the experts were agreed that the Company was
marginally insolvent on a balance-sheet basis in March 2007. I am not sure
that is a totally correct summary: Mr Vigar had produced a balance sheet
which showed a position of net liabilities of £10,750 at March 2007. The
expert for Mr Carman, Mr Minshall, agreed that the Company was
insolvent on that date but did not, so far as I can see, ever commit himself
to that figure, being of the view that the data was unreliable. In any case,
this was not really of much relevance on the Judge's approach since he
concluded that the Company had not reached the 'point of no return' and
was not, therefore, insolvent.

[52] Moving ahead to December 2007, the Judge stated that the
Company was balance-sheet solvent taking into account the GUL loans at
face value but not if the loan was valued at nil. In his view (see para [57] of
the Judgment) it did not matter which:

'Either way, the company had not reached the point of no return, and
was trading profitably. Business was increasing, and there was no
likelihood of the company being called upon to refund the customer
deposits. The company continued to trade profitably overall in 2008.'

[53] This, unfortunately, seems to ignore why the company was not called
on to refund deposits, a matter about which the Judge made no finding. It

a  might well have been because the depositors did not know that their
deposits had not been paid,

[54] The Judge said that he was able to reach the conclusion which he did
without needing to place any value on the GUL loan. He said in para [58]
that he was inclined to the view, without deciding, that the GUL loan had
no value. That, he acknowledged, weakened the balance sheet but did not

b  'point to the company having reached the point of no return'. The
Company was able to make the payments it did to GUL and to Mrs Bucci
'precisely because it had not reached the point of no return, and had been
trading profitably overall in 2007 and 2008'. However, in para [10], he had
said that he did not consider that GUL was ever good for the money it
owed to the Company or that it would be proper to regard the loans as

c  having any significant value when considering the Company's solvency
following the advances. It is not immediately obvious how the statements
by the Judge in paras 10 and 58 are to be reconciled: I shall explain how I
consider this can, and should be, done later in this judgment (see at
para [99] below).

d  [55] Both experts were, as the Judge said in para [58] of the Judgment, of
the view that if the GUL loans were valued at nil, the Company was
insolvent in December 2007 and at all times after that. That was not an end
of the matter because, as he explained, neither expert was applying the test
of 'point of no return'. Each expert,

e      'approached the matter as a mathematical exercise. This is a helpful
starting point, but does not answer the question of when the point of no
return was reached, which is a question I have to answer based on the
evidence as a whole'

f  [56] Carrying out that exercise, the Judge concluded that the 'point of no
return' was reached in December 2008 and not before. He placed particular
reliance on the explanations given by Mr Bucci of the business activities,
both in the UK and in Dubai, with which he was involved. Even though
Mr Bucci was subject to sometimes justified criticisms by Mr Boeddinghaus,
for example in not segregating customers' moneys in a separate account and

g  in keeping records that were at times shambolic, the Judge accepted
Mr Bucci's explanations of the course the business was taking throughout
2007 and 2008. Mr Bucci had emphasised the suddenness of the Dubai
property collapse, and that, until then, the business was viable and the
Judge accepted that evidence.

h  [57] The Judge saw the result of the Dubai crash in this way at para [60]
of the Judgment:

      '[60] The result of the Dubai crash is that the Company's liabilities
towards depositors, which would but for the crash have been dealt with
in the ordinary course of business, have come to fruition, without any

i  possibility of recoupment from Casa Dubai. This itself excited the
suspicion of Mr Boeddinghaus, but I do not consider this evaporation
to be the responsibility of Mr Bucci, or a reason for rejecting his
evidence concerning the company's trading activities. Any balance sheet
prepared with hindsight can now show the gloomiest of pictures, with

customer balances in Dubai being written down to nil whilst the
liabilities remain. That was not the position until the end of 2008,
however.'

[58] I have already mentioned the absence of any express reference to a
trust claim or to authorities such as *Quistclose* in Mr Boeddinghaus'
submissions to the Judge. The matter did come up later, however. After
delivering the Judgment, the Judge heard two applications from
Mr Boeddinghaus one of which was an application for permission to
appeal. In the course of an oral judgment on that application the Judge said:

  'In addition, it is said by Mr Boeddinghaus that the position is
  transformed if, as Mr Vigar appeared to accept, the depositors' moneys
  were treated as trust assets. I am not satisfied that that would have any
  material impact upon whether or not the company was or was not able
  to pay its debts at the material times. The fact is that the company,
  rightly or wrongly, mixed up depositors' assets with its own assets, and
  that gave rise to a liability which would have been discharged in the
  ordinary course of business but for the Dubai property crash, because if
  the property market had not crashed and the developers had not failed,
  then the developments would have been completed, the payments
  would have been made and the company would have been discharged
  from all liability. It seems to me that, by not setting up a separate
  account for customer deposits, the company increased its own
  liabilities, which must be recognised, but, equally, what must be
  recognised is that the assets available to it to match those liabilities were
  also increased. The fact that there might have been created within the
  accounting systems a notional trust account does not alter the fact that
  the moneys were in fact treated as the company's and mixed up with its
  own, and that its liabilities and assets must be looked at at any given
  moment against the facts as they were and not in the light of the facts as
  they should have been.'

[59] This reflects, I think, a passage in the cross-examination of Mr Vigar
where he accepted (i) that the Company should have had a client account
but never did have one; (ii) that the moneys belonged to the clients until it
was passed over to Dubai (by which was meant not Casa Dubai but the
developer); and (iii) that the moneys were in effect trust moneys (perhaps a
matter for the Judge rather than the witness). And it reflects what the Judge
himself said in the exchange with Mr Boeddinghaus when making the
application for permission to appeal: 'I was thinking more of the cases that
you get from time to time: "Has the company set up an effective trust
account to protect people currently putting in money?" and things like that.
You look at what the company did'.

[60] The possibility of a trust was mentioned in one of the documents in
the trial bundle, namely a proof of debt from Mr Rashid, a solicitor. He was
an intending purchaser of a property in Dubai and states in his proof of
debt form that he had paid 20% of the purchase price to the Company 'for
onward distribution to the developer but was unlawfully retained by [the
Company] … The money was subject to a purpose trust and should fall
back to myself as the payer since it falls outside [the Company's] insolvent

*a*  estate'. There was no evidence to suggest that the developer was in fact paid the 20%.

[61] Apart from that, there was no focus on the trust point. It was not addressed in the witness statements or skeleton arguments for trial; it was not a point which Mrs Bucci had addressed, since it had not been raised.

[62] Before turning to the grounds of appeal, I should make one further *b*  comment about para [60] of the Judgment. The Judge stated that, but for the crash, the Company's liability to depositors would have been met in the ordinary course of business. The ordinary course of business, however, involved the continued receipt of deposits through new sales and the generation of commission. Although the Judge clearly considered that the liabilities of existing depositors would be met in this way, he made no *c*  finding about the consequences of the further business which he envisaged or the longer-term position; indeed, he did not even mention this aspect. There was not a Ponzi scheme, as the Judge found, but he did not suggest that the existing liabilities (which related not only to deposits but also to instalment payments of the purchase price) would be met simply out of *d*  commission rather than by utilisation of future deposits and instalment payments to generate cash flow. The way in which the liabilities would be met is clearly a factor which needs to be taken into account in assessing solvency, certainly once one moves away from the 'point of no return' test and possibly even applying such a test. If a liability can only be discharged by creating another liability (eg by borrowing from a bank or receiving *e*  deposits or instalment payments which have to be applied contractually in a particular way) then the net asset position is not changed. The Company may not, on that basis, have been cash-flow insolvent but that is not to say that it was not balance-sheet insolvent.

*f*  THE GROUNDS OF APPEAL

[63] The grounds of appeal were as originally formulated as follows:

(i) The Judge erred in law in holding that the moneys paid to the Company by investors (which were moneys paid by them to meet their deposits or instalment payment obligations in respect of property purchases in Dubai) became the property of the Company which it could use for its *g*  own commercial purposes.

(ii) Alternatively, the Judge erred in fact in so holding.

(iii) Of particular importance in that context are (i) the (incorrect) reliance by the Judge, in concluding that the moneys became assets of the Company, on the absence of a separate client account and (ii) the (correct) view of *h*  Mrs Bucci's own expert that the Company ought to have kept a separate client account.

[64] Accordingly, the Judge should have held that the moneys were trust moneys, held on *Quistclose* trusts for the purpose of meeting deposit and instalment payment obligations on the part of investors. The practical consequence of that, it is said, is that if moneys advanced by investors and *i*  held by the Company (or used for its own commercial purposes) were taken out of account when considering the Company's financial position, the Judge would have concluded that the Company was insolvent at all material times, not only on a balance-sheet basis but on a cash-flow basis.

[65] The grounds of appeal also allege that the Judge erred in fact in that

his conclusions on the question of insolvency were against the weight of the    *a*
evidence in that:

   (i) He failed to attach any weight to the fact that the GUL loan had no
value.

   (ii) He accepted (when he should not have done) the explanation put
forward by Mr Bucci that the Company had applied moneys paid by
investors by the operation of a set-off system when the explanation was not    *b*
credible nor would they account for the fact that commission payable by
developers to the Company cannot have matched in amount the sums paid
by investors.

   (iii) He gave insufficient weight to the circumstances of the Company's
last 18 months of trading in concluding that the Company's point of no
return was not reached until December 2008.    *c*

   [66] I can deal with those last three matters quite briefly.

   (i) As to the first, he expressly stated that the judge reached his conclusion
without placing any value on the GUL loan. He therefore recognised that
the test which he was applying – the 'point of no return' test – would
operate in the context of an adjusted balance sheet which ignored the    *d*
amount of the loan as an asset. It is difficult to see what more weight he
could have given to the point. Mr Boeddinghaus' complaint is surely not
that the Judge attached no weight to the nil value of the loan but that,
having done so, he reached the wrong conclusion: but that is a different
point.

   (ii) As to the second, I am wholly unconvinced by this. I do not    *e*
understand why Mr Bucci's explanation is said not to be credible. The Judge
accepted it and that is not a finding with which I should interfere. The
Judge did not suggest, I should add, that *all* of the deposits were paid in this
way and to have done so would have been contrary to Mr Bucci's own
explanation of how the set-off operated. In particular, his evidence was that
if Casa Dubai did not have enough money (representing commissions) in    *f*
hand, further funds would be remitted from the UK.

   (iii) Since the 'point of no return' does not provide the right test, it
becomes irrelevant whether the Judge was right or wrong. The question
now is whether applying the correct test, I am in a position to be able to
decide whether the Company was unable to pay its debts giving due weight
to the factor which Mr Boeddinghaus identifies.    *g*

   [67] In his skeleton argument (produced before the decision of the
Supreme Court in *Eurosail*), Mr Boeddinghaus submitted that, if the 'point
of no return' test was the correct test, it had no application in the present
case. He took issue with the Judge's statement at para [47] of the Judgment
to this effect: that although Lord Neuberger's comments primarily    *h*
concerned the approach to be taken towards prospective and contingent
liabilities, the effect of that approach is not so limited. Mr Boeddinghaus'
submission is that Lord Neuberger was addressing only the effect of
prospective and contingent liabilities in a case where the company is not
balance-sheet insolvent on the basis only of its current liabilities (and so
would be able, at least apparently, to continue trading). In the present case,    *i*
prospective and contingent liabilities were not in issue and there was no
need to invoke the 'point of no return' test at all. Had the Company not
made use of investor moneys, and on the correct assumption that the GUL
loan had no value, the Company could not have continued to pay its debts

*a*  because (as both experts believed) it was insolvent on a balance-sheet basis.

[68] Following the decision of the Supreme Court, Mr Boeddinghaus produced a further skeleton argument in which he submitted that it is now clear that Mr Carman's claim should succeed. The 'point of no return' test had been rejected and Mrs Bucci was unable to demonstrate, applying the correct test, that the Company had sufficient assets to be able to meet even

*b*  its present liabilities: the burden of proof falls on her under s 240(2) under which the requirement that a company is unable to pay its debts is presumed to be satisfied unless the contrary is shown by the company.

[69] At this stage, I should mention that Mr Morgan identifies what he describes as a complete change of emphasis in Mr Carman's case, with another change – the allegation of a *Quistclose* trust – being an entirely new

*c*  issue which he submitted Mr Carman should not be entitled to raise at this late stage. That change of emphasis is the reliance in this appeal on cash-flow insolvency which, according to him, hardly featured in the hearing below. Mr Carman's counsel, in opening, stated that balance-sheet insolvency was the key issue. Let me get that point out of the way now.

*d*  Cash-flow insolvency is not a new point raised for the first time in this appeal as is shown by the matters I have mentioned at para [41] above. The emphasis of a case frequently changes as it works its way up the court system. That does not mean to say that a particular cannot be given greater prominence on an appeal. Mr Boeddinghaus is perfectly entitled to make what he can of cash-flow insolvency on this appeal.

*e*

DISCUSSION

[70] The first question I wish to address is the one of legal dispute between the parties. The question can be asked this way: if a company has current liabilities the amount of which exceeds the value of its assets, is it

*f*  necessarily deemed unable to pay its debts under s 123(2)? By 'current' I intend to refer to liabilities which are currently due for payment or which will fall due for payment in the reasonably near future and which are therefore relevant to the cash-flow test. I deliberately do not insert the word 'current' before assets because, in the present case, it is not suggested that

*g*  there are any contingent or prospective assets (to use the mirror of contingent and prospective liabilities) the amount of which have to be brought into account. Of course, Mr Bucci's evidence was that he hoped that the Company would have a future income stream by way of commission, a hope which was dashed by the property collapse in Dubai. But it cannot sensibly be argued that that hope (before it was dashed) could

*h*  be brought into account as an asset in its own right.

[71] On a literal reading of s 123(2), Mr Boeddinghaus is correct. On the hypothesis underlying the question as I have formulated it, the value of the debts clearly is less than the amount of the liabilities and the difficulties which arise out of how prospective and contingent debts are to be taken account of simply do not arise.

*i*  [72] Mr Morgan submits that this literal reading is not the correct approach. Rather, the starting point is s 123(1)(e) and whether a company is able to pay its debts as they fall due. In answering this question, the court is to take account of the company's ability to pay its debts over the reasonably short period. He relies on the passage which I have cited from

*Cheyne* and the approval by Lord Walker of what Toulson LJ had said in    *a*
the Court of Appeal. In particular, he submits that what Lord Walker said
lends powerful support to the view that the short term, and indeed the
reasonably foreseeable future, is dealt with by s 123(1)(e) and that recourse
to s 123(2) is appropriate only once one has to move from the reasonably
near future, when application of the cash-flow test becomes speculative and
a comparison of present assets with present and future liabilities becomes    *b*
the only sensible test. And so, Mr Morgan submits, if the company *is* able
to pay its debts as they fall due, s 123(2) is a means of deeming the
company insolvent on the basis of its present, *prospective and contingent*
debts. But it is not concerned with deeming a company to be insolvent on
the basis of its present assets and liabilities alone when otherwise it can pay
its debts as they fall due. Recourse only needs to be had to s 123(2) where    *c*
there are in fact prospective or contingent debts. In any case, the court
should not apply a mechanistic test but should conduct a value judgment as
to whether in all the circumstances it is or was at the relevant time
reasonably likely that the company will be able to meet its liabilities.

[73] I have already considered *Eurosail* and other cases earlier in this    *d*
judgment. There are, however, some additional points to make in the light
of the submissions of both Mr Boeddinghaus and Mr Morgan.

[74] The first point to note is that neither Briggs J nor Lord Walker was
addressing the question which I have identified. Briggs J's focus was on the
way in which the cash-flow test was to apply and, in that context he
concluded that it involved an element of futurity, 'as they fall due' replacing    *e*
'taking into account its prospective and contingent liabilities' which had
appeared in the Companies Act 1985. He expressly recorded that in many
cases 'the alternative balance-sheet test will afford a petitioner a convenient
alternative means of proof of a deemed insolvency'.

[75] The second point to note arises from the example given by    *f*
Nicholls LJ in *Byblos Bank* contained in the passage of his judgment set out
at para [24] above. This was the extreme (to use Nicholls LJ's own word)
example of a company liable to repay a £100,000 loan one year hence and
whose only asset was worth £10,000. It was obvious that such a company
did not have the present capacity to pay its debts and as such was 'unable to
pay its debts'. If one alters Nicholls LJ's example a little, and posits that the    *g*
debt of £100,000 is immediately payable but is one which the creditor
(suppose a shareholder) has indicated he does not, for the moment, intend
to call in, then the company is, I suggest, as insolvent as the one in
Nicholls LJ's example. On Mr Morgan's approach, it would not be
insolvent because it can pay its debts as they fall due and the case is not one
of a prospective or contingent liability. Perhaps that is not fair to    *h*
Mr Morgan: he could say that a debt which has been postponed in this way
is properly to be seen as a prospective debt and is thus to be treated as such
in the application of the test adumbrated by Lord Walker (and Toulson LJ).

[76] Before moving away from *Byblos*, it seems to me that the passage of
the judgment of Nicholls LJ starting with the words 'It might be that, if the    *i*
company continued to trade …' to the end of the extract set out at
para [24] above does lends some support to Mr Boeddinghaus' position. On
the basis, as stated by Lord Walker, that s 123 is not intended to represent
a significant change in the law, it remains the case that the future
profitability of a company cannot result in the assets of the company at any

*a*   time being treated as other than what they are.

[77] I do, nonetheless, accept that there is some force in Lord Neuberger's observations in [44] of his judgment in *Eurosail* in the Court of Appeal. In that paragraph, he said that in practical terms it would be rather extraordinary if s 123(2) was satisfied every time a company's liabilities exceeded its assets: many companies are solvent and successful, and many *b* companies early on in their lives would be deemed unable to pay their debts if this was the meaning of s 123(2). He rejected Mr Sheldon's submission, made to meet that point, to the effect that the court had a discretion to refuse to make a winding-up order in such circumstances.

[78] I consider that one must treat with some circumspection Lord Neuberger's rejection of Mr Sheldon submission. Toulson LJ took the *c* view (see [118]) that there may well be situations in which a company may be unable to pay its debts within the meaning of s 123(2) but for a particular reason the court does not consider that the best course would be to order that it should be wound up. And Nicholls LJ, albeit in a slightly different context, acknowledged that the prospect of a further injection of *d* capital was something to be taken account of in the exercise of the discretion whether to wind up a company. Moreover, Lord Neuberger's practical concerns were an important element in driving him to the conclusion that the 'point of no return' was the correct test. With that test having been rejected, the consequence may be that what Lord Neuberger regarded as an extraordinary result will be commonplace.

*e*   [79] One can return, then, to the words of Toulson LJ, expressly approved by Lord Walker, and ask 'whether it [the company] cannot reasonably be expected to be able to meet those liabilities'. A reading of the passage from which those words are taken shows that 'those liabilities' are prospective and contingent liabilities but there can be no doubt, in my view, that the question raised by Toulson LJ subsumes the question whether the *f* company is in fact not able to meet its current liabilities. This is a different question from cash-flow insolvency. A company may be able to pay its debts as they fall due by obtaining a loan from a bank or from a shareholder or director and, depending on the facts, this may mean that s 123(1)(e) does not apply. But such a loan would not improve its balance sheet and it would remain necessary, in my view, to consider s 123(2) as a *g* separate matter. I therefore reject Mr Morgan's submission that it is necessarily only s 123(1)(e) which is engaged, and not s 123(2), in cases of immediate liabilities exceeding assets.

[80] I do, of course, accept that the deeming provision of s 123(2) may not apply even though the balance sheet shows a large deficit. That was the *h* case in *Eurosail* itself because prospective and contingent liabilities were brought into the balance sheet on the basis of certain accounting conventions. On that basis, *Eurosail* was in the position of having net liabilities of £75m but was still held not to be insolvent. Those liabilities reflected, however, a large amount of long-term debt in relation to which the outcome was wholly speculative: see [49] of Lord Walker's speech. It *i* was for that reason that Lord Walker considered that it had not been demonstrated that the company was unable to pay its debts.

[81] But I also reject Mr Boeddinghaus' submission that an excess of immediate liabilities over assets necessarily means that the company is insolvent, at least when it is expressed in that unqualified way. It still has to

*a*

be asked, I consider, whether the company cannot reasonably be expected to meet its liabilities. The answer to the question, when asked in the context of immediate liabilities exceeding assets, may be clear on the facts of a particular case and I accept that the court might be relatively easily satisfied that the company is insolvent. I would go this far with Mr Boeddinghaus, that is to say that I accept that the starting point must be that a company which has immediate liabilities which exceed assets is unable to pay its debts. Although, in the case of a winding-up petition, it is for the petitioner to establish to the satisfaction of the court that the case falls within s 123(2), the fact that a balance sheet shows a deficit is, by itself, enough to raise a prima facie case of insolvency; there is then an evidential burden on the company to show why it can, notwithstanding its balance sheet, reasonably be expected to meet its liabilities.

*b*

*c*

[82] That approach meets, in my view, the sort of example given by Lord Neuberger. If one asks why a successful company or a start-up company with such a balance-sheet deficit is not unable to pay its debts, the answer can only be given by looking at the facts of the particular case which show, for some reason, that the liability will be met. Start-up companies (those early in their lives as contemplated by Lord Neuberger at [44]) are solvent because those financing them have confidence in their eventual profitability and either provide term loans (so that one is looking at prospective debts and not immediate debts) or loans payable on demand but with the expectation that the loans will not be called on for some time. Although it is not for the court to speculate about the commercial success of a company, it can, and sometimes must, take a view, on the evidence, about the likelihood of loans being called in and of the likelihood of the company being able to meet them when called in. For example, if a company has a significant balance-sheet deficit all of which can be attributed to shareholder loans which, in practice, will not be called in so long as the company is profitable, it may be possible to reach the conclusion that the company is not unable to pay its debts. But if, to take an extreme example, there is no prospect at all of the company ever making sufficient profit to repay the loans, it would not be correct to describe the company as able to pay its debts when considering the application of s 123(2) even if it is able to meet its liabilities as they fall due in the short term and even though the expectation is that the company will continue to trade for the foreseeable future.

*d*

*e*

*f*

*g*

[83] From what I have already said, it can be seen that Mr Morgan's submission takes no account of the future beyond the reasonable period contemplated by Lord Walker's analysis in relation to the cash-flow basis. But as I have already observed, there is not a rigid division between s 123(1)(e) and s 123(2) and considerations relevant to one will inform the other. It is still necessary to look to the future in cases where it is suggested that a current liability such as a director's loan account can be ignored on the basis that it will not be called in. Lord Walker explained (see [37] of his speech) that a cash-flow test becomes completely speculative once a court has to move beyond the reasonably near future (a period depending on all the circumstances) and hence a comparison of present assets with present and future liabilities becomes the only sensible test. Similarly, if it is necessary to rely on the future state of the affairs of the company, and in particular its retained profits over a period of many months or even years,

*h*

*i*

*a*  in order to justify a departure from a strict arithmetical comparison, the foundation for that future state of affairs must be firm; otherwise it is mere speculation and the balance-sheet test is no more sensible than the cash-flow test.

[84] In the present case, it is said that the loan accounts standing to the credit of Mr and Mrs Bucci were long term loans and would not be paid
*b*  out unless and until the Company could afford to do so. They accounted for a significant figure. If they were left out of account as liabilities, the balance sheet as of 31 December 2007 might have produced a positive figure rather than a deficit.

[85] They cannot, however, simply be left out of account in assessing whether liabilities exceed assets. It still remains pertinent to ask whether the
*c*  Company could be reasonably expected to meet the liability in respect of those accounts in due course. If the time for repayment is pushed beyond the reasonably near future, then the loan falls to be treated, I think, in the same was as any other prospective or contingent liability to which the balance-sheet test is applicable. If that liability can, for s 123(2) purposes,
*d*  be brought into account at some value less than its actual amount, then it may be difficult for a potential petitioner to satisfy the court that the value of the assets is less than the amount of its liabilities. But if that cannot be done, I see no reason why s 123(2) should not apply with the result that the Company is deemed unable to pay its debts.

[86] The present case is different. It is one where, for reasons I come to
*e*  next, the burden is on Mrs Bucci to demonstrate that the Company was able to pay its debts. That, in my judgment, requires her to show, on the balance of probabilities, that the loans would be repaid. Toulson LJ observed, in a situation where the burden is on the person asserting insolvency to prove it, that the more distant the prospective and contingent liabilities are, the harder it will be to establish that the company cannot
*f*  reasonably be expected to be able to meet its liabilities. In my view, the same applies in reverse: where the burden is on a person (Mrs Bucci in the present case) to rebut the presumption of insolvency, the further into the future one needs to go the harder it will be to prove that the company can reasonably be expected to be able to meet its liabilities.

[87] Turning to the burden of proof, it seems to me that the principal
*g*  function of s 123 (appearing as it does in the group of sections starting at s 122 under the heading 'Grounds and effect of winding-up petition') is to define the situations in which a company is, or is deemed to be, unable to pay its debts for the purposes of bringing winding-up proceedings under s 122 – see s 122(1)(f). But that is not its only purpose. Section 123 is also
*h*  invoked in relation to administration applications: see para 11(1) of Sch B1 where the court has to be satisfied that the company is or is likely to become unable to pay its debts, a phrase which has the same meaning as in s 123: see para 11. In these cases, it is clear that the court must be satisfied on a balance of probabilities that the company is unable to pay its debts. This burden is reflected in what Lord Walker said at [49], a burden to show
*i*  the court 'on the balance of probabilities, that a company has insufficient assets to be able to meet all its liabilities …'. He said that the movements of currencies and interest rates prior to the final redemption dates were incapable of prediction with any confidence with the consequence that 'the court could not be satisfied that there will eventually be a deficiency'.

Because matters were speculative, it could not be said with confidence that *a* the debts would not be satisfied so that the burden on the person alleging insolvency was not satisfied. It is relevant to note that the existence of the liabilities of the company was not in question: the issue was whether the assets were insufficient to meet those liabilities and, because of the need for speculation about the match of assets and liabilities in the future, it could *b* not be said that the liabilities would not be met.

[88] It is not a corollary of those conclusions that the court would necessarily have been satisfied, had it needed to decide, on a balance of probabilities that the company did have sufficient assets to meet its liabilities. It is the nature of speculation that it is uncertain either way. The conclusion was not that, on the balance of probabilities, there would not be *c* a deficiency. The conclusion was that the uncertainty and speculation about the outcome meant that the court could not be satisfied that there would be an *eventual* deficiency, and thus that its assets were less than its liabilities. In other words, there was a possibility that the company would in the long term be able to meet its liabilities at the time when they fell due for payment. *d*

[89] Under s 240, the burden is the other way round in the case of persons connected with the company. Where there is an alleged transaction at undervalue, the time of the transaction is not a 'relevant time' unless one or both of the conditions of s 240(2) are fulfilled. Condition (a) is that 'at that time [the company] is unable to pay its debts within the meaning of section 123 …'. The subsection goes on to provide that the requirements of *e* those conditions are presumed to be satisfied unless the contrary is shown in the case of a transaction with a person connected with the company, as in the present case. In the case of a transaction with a person who is not connected with the company, it is clear that the burden would be on the applicant (eg a liquidator) to show that the company was unable to pay its debts. The position would be no different from that which obtains in *f* relation to the presentation of a petition for winding up.

[90] In the case of a transaction with a connected person, the position is different. The result of the presumption is that the burden is on the person seeking to uphold the validity of the transaction (Mrs Bucci in the present case) to show the contrary, that is to say to show that the requirements of s 240(2) are not satisfied. In other words, Mrs Bucci must show that the *g* Company was able to pay its debts within the meaning of s 123.

[91] In my judgement, reading ss 123 and 240(2) together, it is necessary for Mrs Bucci to prove to the satisfaction of the court both (i) that the Company was at material times not unable to pay its debts as they fell due and (ii) that the value of the Company's assets equalled or exceeded the *h* amount of its liabilities, taking into account its contingent and prospective liabilities (but note the argument dealt with in para [123] below). Adapting the analysis of Lord Walker and making necessary adjustments to the approach of Toulson LJ in [119] of his judgment, the court has to make a judgment about whether it has been established that, looking at the Company's assets and making proper allowance for its prospective and *i* contingent liabilities, it can reasonably be expected to meet those liabilities. In the context of *Eurosail* itself, it would not have been possible, had there been a similar reversal of the burden of proof, to reach that conclusion any

*a*  more than it was possible to reach the conclusion actually arrived at when the burden was on the liquidator.

[92] There is one further point to make in the context of s 240. It relates to what Lord Neuberger regarded as 'rather extraordinary': see [44] of his judgment. In saying what he did, he did not address the different context of s 238. It is not at all extraordinary to my mind that a transfer at undervalue *b*  should be open to attack if it was made at a time when the amount of the company's immediate liabilities exceeded the value of its assets in the case of a transaction with a connected person. Thus if a company was to be put into winding up in reliance on a failure to meet a statutory demand pursuant to s 123(1)(a), I do not think that it would be extraordinary for the liquidator to be able to recover property transferred to a connected *c*  persons at an undervalue a few months before the date of the statutory demand, if it can be demonstrated that the company's balance sheet then showed liabilities immediately due exceeding assets. Some caution must be exercised in the weight to be attached to the 'extraordinary' result which Lord Neuberger perceived.

*d*  [93] There has been some debate about the nature of the Company's obligations in relation to the moneys received by investors and the extent of its liabilities as a result. Mr Boeddinghaus wishes to assert that these moneys never became assets of the Company but were held on *Quistclose* trusts, the purpose of the trusts being to pay to the developer/vendor of a property the relevant deposit or instalment payment received by the *e*  Company from its client. The application of moneys for any other purpose was a breach of trust and/or contract; the moneys were simply not properly available to meet other obligations so that, in assessing whether the Company was cash-flow solvent, reliance could not be placed on the availability of these funds other than for the payment of the actual deposit or instalment to which the relevant receipt related. Further, these funds were *f*  not assets when it came to assessing the ability of the Company to pay its debts for the purposes of s 123(2). I will deal with that aspect later.

[94] Assuming for the moment that the *Quistclose* argument is not available to Mr Carman, it remains the case that the Company had a liability matching each payment received by it. To the extent at any time that the moneys received by the Company by way of deposit and instalment *g*  payments exceeded payments to the vendors, the Company had a contractual liability to pay the developer or to return the money to the client for instance if the sale fell through for some reason. As the Judge said in para [50] of the Judgment, the arrangements gave rise to liabilities to clients until the deposits were paid to the developer in satisfaction of the *h*  client's obligation to the developer. So too in his *ex tempore* judgment refusing permission to appeal, he considered that, by not setting up a separate client account, it had to be recognised the Company increased its liabilities. One way or another, it seems to me, the Company had a liability, for the purposes of s 123(2), in respect of moneys received equal to the amount received and not applied in payment to developers.

*i*  [95] It is here that Mrs Bucci faces a dilemma. Either she accepts that all of the liabilities of the Company were ones giving rise to debts which were immediately due and payable or would become so within the reasonably near future or she does not accept that in which case the liabilities which she rejects as immediate are properly to be seen as prospective or contingent

liabilities. Under the first scenario, the Company fails the cash-flow test at a given time unless it can be shown that it had at that time the liquid resources necessary to meet those liabilities. If she maintains that certain liabilities are only future liabilities, then she may make it easier to satisfy the cash-flow test but she is left having to satisfy the balance-sheet test since the case would then be one of prospective and contingent liabilities.

[96] Before I address the components of that dilemma, there are some additional points to make. The first is that Mr Morgan makes play of the fact that the balance-sheet position indicating a deficiency at 31 December 2007 needed to place reliance on the directors' loan accounts. If those were taken out of the equation, then even on Mr Minshall's figures, assets exceeded liabilities. That is true, but there is no scope for the sort of speculation which arose in *Eurosail* about the value to be placed on those loan accounts. Those accounts would, one day, become payable. In contrast, in *Eurosail* it could not be said what, if anything, would be owing at maturity. Accordingly, if s 123(2) is in play, the argument which Mrs Bucci would need to deploy is that the loans are in effect prospective liabilities which might not be called in for a long time and that it is therefore not possible to say that the Company cannot reasonably be expected to be able to meet those liabilities.

[97] The next point is that it was common ground that if the value of the GUL loan was nil, then the Company was insolvent in December 2007 and thereafter. As the Judge put it at para [57] of the Judgment, the Company was balance-sheet solvent (having been in a position, I would add, of net liability as shown in the balance sheet in March 2007) if the GUL loan was taken into account at the amount outstanding as at 31 December 2007 but not if the loan was valued at nil. The Judge's conclusion at para [10] of the Judgment was that GUL was never good for the money. I suppose that could mean that part of the loan might be repaid but even if that is so, the Judge did not consider that it would be proper to regard the GUL loan as having any significant value when considering the company's solvency following the advances. I take that to mean that as at 31 December 2007, the advances made by that time were such that, if the value of the GUL loans was nil, the Company was insolvent. The Judge also stated that he did not consider that it would be proper to regard the loans as having any significant value when considering the Company's solvency following the advances. I take that, likewise, to mean that no significant value should be attached to the GUL loans as at 31 December 2007 in respect of advances which had been made by that time. But in para [58] the Judge appears to have left the matter more open, simply saying that he was *inclined* to accept the evidence of Mr Carman's expert that the value of the GUL loan was indeed nil.

[98] Mr Morgan submits to me (i) that the Judge did not make up his mind because it was unnecessary for him to do so and (ii) that it is difficult to see how the Judge could be seen as having made a final decision without resolving the points of difference between the experts. In any event, the Judge pointed out that this was not simply a mathematical exercise so that, according to Mr Morgan, neither expert adopted the right approach. But nor, I add, did the Judge adopt the correct approach since he adopted the wrong test – the 'point of no return' – as he was bound to do in the state of the law as it stood before the decision of the Supreme Court in *Eurosail*. On

a   my view of the law, the experts were right to adopt the approach of comparing assets and liabilities, at least as their starting point.

[99] If Mr Morgan is right in the submission which I have just numbered (i) and (ii), then I cannot myself answer the question whether the Judge's inclination was in fact correct unless it is possible to do so by an examination of their reports and what they actually said in oral evidence. I

b   have not been taken through their reports to see where they disagree and why, although I have read them both carefully, as well as their joint agreed statement. Still less have I had the advantage of hearing and seeing the two experts in order to resolve their differences. That was the function of the Judge but he, having adopted the 'point of no return' test, did not need to resolve the issue. However, it seems to me that the clear thrust of the Judge's

c   actual decision was that the GUL loans were of no significant value at any time after any of the advances had been made. I take that as his finding of fact (or perhaps mixed fact and law) which is one I should not interfere with unless I am sure it was wrong (which I am not – indeed it seems to me likely to have been correct). If there is an apparent inconsistency between

d   what he said in para [10] and para [58], it can be resolved by drawing a distinction between the GUL loans having no significant value and having no value at all. An insignificant value would not, on the figures, make any difference to the solvency or otherwise of the Company at any material time.

[100] Given the agreement between the experts that if a nil value is

e   attributed to the GUL loans the Company was insolvent as at 31 December 2007 and at all times thereafter, Mrs Bucci obviously has a steep uphill task to persuade the court, the burden being on her if s 123(2) is in point at all, that the Company could reasonably expect to be able to repay the directors' loans when they were likely to be called in and thus to rebut the presumption of insolvency under s 240(2).

f   [101] The position prior to 31 December 2007 is problematical. I do not understand Mr Vigar to have accepted that the Company was then insolvent in the sense required by s 123 even ignoring the amount of the GUL loan. However, the starting point even for Mr Vigar has to be that the liabilities did exceed the assets, albeit on one view only marginally, on that date since that much was common ground. The presumption under s 240(2)

g   is that the Company was then unable to pay its debts by virtue of s 123(2) with the burden being on Mrs Bucci to show the contrary. A deficit on balance sheet is not an attractive launching pad for an argument by her that the Company was, in fact, solvent although it is at least a theoretical possibility.

h   [102] I will consider that point further in a moment. But before I do, I should record that, according to Mr Carman's evidence which has not been challenged on this point, the only payment made to Mrs Bucci or to HMRC by way of pension contributions before 5 April 2007 was one small payment of £416.67. Accordingly, the position prior to that date was of little significance and no point was taken to distinguish the state of

i   solvency of the Company on the making of that payment from the state of solvency on 31 March 2007. In practice, therefore, if the Company was deemed insolvent under s 123(2) on 31 March 2007, it can be taken to have

been insolvent on the occasion of that small payment too.

[103] Turning to the actual figures:

(i) It was and remains common ground that the Company was in a marginal net liability position of £10,751 on 31 March 2007 as shown in the balance sheet prepared by Mr Vigar. This deficit reflected a figure for long-term creditors of £12,486. There was no directors' loan. Indeed, the directors' accounts appeared to be overdrawn. I have not been told anything about the nature of the long-term creditors or about how long term the loans are. In the application of s 123(2) (if it applied in the first place) I can see no reason for bringing it into account at other than its face value when taking account of prospective and contingent liabilities.

(ii) As at 31 December 2007, Mr Minshall stated the deficit to be £30,116. This included a loan by the directors of the Company of £35,615. Although included under the heading 'Long Term Liabilities' I do not know anything about the terms of this loan. It may be that it is simply a loan payable on demand with an understanding that it would not in fact be called unless and until the Company could afford to pay it. There were also differences between the experts which the Judge left unresolved, although the figures concerned were modest – £3,256 in respect of depreciation and £2,833 in respect of the existence or otherwise of a debt owing to Let's Talk Marketing. Ignoring those items, if the directors loans are stripped out, the Company would not have been in deficit at all according to the balance sheet prepared by Mr Minshall.

(iii) However, Mr Minshall's balance sheet must be read subject to the substance of his report. The figure which he shows under Creditors short term is actually an asset of £58,456. That is a figure which results from figures extracted from SAGE (and adopted by Mr Vigar in his second reconstruction of the balance sheet): debtors at £10,788,369, creditors at £11,096,056 and Casa Dubai funds held in Dubai of £366,143 (a figure which matches the figure shown in Mr Carman's second reconstruction of the balance sheet). In relation to the SAGE figures for debtors and creditors, Mr Minshall stated (see para 21 of his report) that he did not accept either of those figures, although the difference between them was 'more credible'. He thought it entirely feasible, in the light of the factors related at paras 47 and 48 of his report, that the creditors figure is materially understated. The Judge did not deal with this aspect of the evidence.

[104] As I have already noted, the Judge referred to the Company as trading profitably. It seems that he placed reliance – indeed this may be the sum total of his reasoning – on appendix 5 to Mr Vigar's report. I have already explained that I do not understand how that appendix is consistent with the common ground that, if the GUL loan is valued at nil, the Company showed net liabilities on the balance sheet at all times from and after 31 December 2007. There is more to say about profit, however. In para 90 of his report, Mr Minshall expressed the view that there was no adequate information for Mr Vigar to reach the conclusion about profit which he did. Mr Minshall had earlier on given his analysis which justified that view. Mr Minshall commented that it was unclear whether, in making his statement about profit, Mr Vigar had considered the Company's position with specific reference to either its actual accounts or results. I have been shown no evidence that he did so. The Judge did not address Mr Minshall's criticism; indeed, his justification for his conclusion about

*a*   profitability appears to me to be slightly circular. Thus, he expressed the view that the SAGE figures gave a broadly accurate picture of the Company's profitability 'a point confirmed by Mr Vigar'. But there was nothing, at least nothing I am aware of, which would have led the Judge to conclude that the SAGE reports did give a valid indication other than Mr Vigar's statement to that effect. So, it seems, the Judge accepted the

*b*   picture presented by the SAGE reports simply because Mr Vigar says that they presented an accurate picture. The Judge did not refer to Mr Minshall's evidence about the unreliability of the SAGE reports or give any reasons why he preferred Mr Vigar to Mr Minshall on this topic. I have not been taken to those reports nor received any submissions about their reliability and can form no independent view of my own.

*c*   [105] In addition, Mr Minshall was highly critical of appendix 5, which he dealt with in para 103 of his report. I do not set those criticisms out at length in this judgment. They appear to me to have considerable force. They were not addressed by the Judge.

  [106] As already noted, not much was said about cash-flow insolvency on

*d*   behalf of Mrs Bucci. More was said on behalf of Mr Carman although he acknowledged that the Company was cash-flow solvent but only on the basis that it was using deposits from later purchasers to pay the deposits of earlier purchasers. I have already set out the Judge's reasoning on this issue in para [40] above referring to paras 44 and 49 of the Judgment. Essentially, his conclusion was based on the fact that the Company had not in practice

*e*   had any cash-flow difficulty until the collapse of the Dubai property market in late 2008.

  [107] The asserted absence of creditor pressure is, however, only part of the picture. As a matter of fact, there were at least four creditors who did express concern about the non-transfer of their deposits to the developer. I

*f*   say at least because they were four of a larger group where the details concerning payment or not as the case may be of deposits was not before the court. Those amounts relevant to those four creditors amounted to a modest sum, around £10,000 in total. The Judge did not mention them expressly in the Judgment: perhaps he considered them *de minimis* and not such as to affect the profitability of the Company and its ability to meet its liabilities. Mr Bucci gave an explanation in cross-examination of why the

*g*   moneys had not been remitted although it is not clear whether that related to all four cases. It is not clear whether the Judge accepted that evidence. although there is perhaps an indication that he did in para [51] of the Judgment (see para [46] above).

  [108] Perhaps more significant is what is contained in para 61 of

*h*   Mr Minshall's report where, in addressing the four cases just referred to, he produced a table concerning the ageing of creditors. As he put it:

> 'I have also created an age-analysis of the creditors received and verified into the liquidation (*ie excluding the other creditors not yet verified*)

*i*      The analysis reveals the following: ...'

  [109] There follows a table headed 'Ageing of creditors'. This lists against each month a figure for the debts incurred that month outstanding and still outstanding at the time of the liquidation. I do not propose to set out the table in this judgment, but it can be seen that for all months in 2008,

significant amounts of unpaid debts accrued. And for 2007, significant *a*
amounts accrued in May, June, August and September and December. This
resulted in a total outstanding at the commencement of the liquidation of
over £648,000. Mr Minshall concluded that:

> 'As is seen, there are substantial creditors of considerable age
> implying that the Company was not remitting funds onwards to its *b*
> developers, and/or [Casa Dubai] on a timely basis. This material
> supports the hypothesis that the Company was unable to pay this debts
> as they fell due.'

[110] It is also the case that Mr Bucci himself stated in his Preliminary
Information Questionnaire that there were 34 clients exposed to losses of *c*
over £488,00 in relation to the failure, as the question is framed in the PIQ,
'to supply goods or services for which its customers have paid a deposit,
paid in part or paid in full'. Read in conjunction with the schedule of ageing
creditors, this is confirmation of a failure over a substantial period to pay
significant sums of money which were on any view due for payment. There
was also evidence in the form of an attendance note of a meeting between *d*
Mr Carman and Mr Bucci on 8 October 2009 in which Mr Bucci is
recorded as saying that he compiled the list of creditors (that is to say, the
34 creditors referred to above) by collating complaints from investors who
had stated that their funds had not been invested. Mr Boeddinghaus
submits that the fact of such non-payment is of itself evidence of the
Company's inability to pay its debts as they fell due. *e*

[111] The Judge did not address the evidence referred to in the preceding
four paragraphs in the Judgment. It does not seem to me that any of these
matters is a trivial matter. The evidence ought properly to have been
considered in assessing the cash-flow solvency of the Company.

[112] The Judge treated insolvency under s 123(1)(e) and s 123(2) as *f*
discrete matters. It does not appear that counsel then acting for Mrs Bucci
addressed to the Judge the argument which Mr Morgan has addressed to
me to the effect that s 123(2) is concerned only with prospective and
contingent debts so that a company whose balance sheet shows a deficit on
the basis of current liabilities is not necessarily insolvent. Accordingly, the
Judge dealt with the issue of balance-sheet insolvency as a separate matter *g*
and, applying the 'point of no return' test concluded that the Company was
not balance-sheet insolvent. Applying that test, he did not need to deal with
another argument which Mr Morgan makes namely that, if the directors'
loan accounts as at 31 December 2007 are ignored, the Company was not
balance-sheet insolvent. Since the loans would not in practice be called in, it
could reasonably be expected that the Company, given its profitability, *h*
[would] be able to meet all of its liabilities.

[113] The problem which I face with that argument, however, is that I do
not have the material to enable me to make a fully-informed decision about
this. I have already dealt (see paras [104] and [105] above) with what the
evidence (including the expert evidence) revealed about profitability. I note
also the fairly generalised comments in a number of paragraphs in the *i*
Judgment: examples can be found in paras 51, 57, 58 and 59 containing
references to profitability and viability.

[114] All in all, it does seem to me that there are reasons to doubt that the
Company was profitable and, given the absence of consideration by the

*a*  Judge to the matters raised by Mr Minshall, it must be open to question when the directors' loan accounts could in practice be paid off if, indeed, they could be paid off out of profit at all.

[**115**] There is a risk, it seems to me, in attaching too much weight to the suggestion that the directors would not have called in their loans. That clearly has an impact on cash-flow solvency because it may be possible to *b*  leave out of account altogether a postponed loan in assessing what cash is available to meet other immediate creditors. But the fact that the loan may be postponed does not improve the balance-sheet position.

[**116**] Accordingly, if one is looking at the balance-sheet test rather than the cash-flow test, the question (given that the burden of proof is on Mrs Bucci under s 240(2)) is whether the Company can reasonably be *c*  expected to meet its liability on directors' loan accounts in the context of its liabilities overall. The further into the future one posits the need to repay the account, the harder it is to satisfy that requirement – this is the converse of what Toulson LJ said where the burden is the other way round: 'The more distant the liabilities, the harder this will be to establish'.

*d*  [**117**] This is particularly so given that the making of profit in order to meet the liability depends on the effectiveness of sales and the earning of commission. The payment of outstanding liabilities depended on the utilisation of deposits in respect of new sales (and possibly on instalment payments in respect of previous and future sales). Those sales would, themselves, have generated further liabilities in the form of an obligation to *e*  make onward transmission of the new deposits to developers. This may not have been a Ponzi scheme, but the onward payment of deposits from earlier sales required, in the light of the way the Company was actually run, the utilisation of deposits from future sales. It is not at all clear to me how it can be said that the Company could reasonably expect to meet the liabilities on directors' loan account at any time before the collapse of the Dubai *f*  property market albeit that the Company could continue trading in the way which it did.

[**118**] So far as the 31 March 2007 balance sheet is concerned, I have addressed this at para [103](i) above. There is insufficient evidence – or if there was evidence before the Judge, it has not been drawn to my attention – to satisfy me on a balance of probabilities that the Company could *g*  reasonably be expected to meet the long-term creditors of £12,486. Accordingly, the Company was, in my judgment, balance-sheet insolvent as at 31 March 2007. It follows from what I have said already that it was therefore balance-sheet insolvent throughout the tax year 2006–07.

[**119**] For the period from 31 March 2007 to 31 December 2008, there is *h*  no material which has been drawn to my attention to show that the Company's balance sheet would have shown a positive net asset position attributing a nil value to the amount outstanding on the GUL loan. Indeed, by the time we get to the 31st December, the position is a deficit of over £30,000 on Mr Minshall's figures. Mr Vigar's figures show a rather smaller deficit – about £9,000 – if one strips out the GUL loan from the balance *i*  sheet produced by him.

[**120**] I have addressed the 31 December 2007 balance sheet at para [103](ii), (iii) above. Attributing a nil value to the GUL loan at all times (which I do) the Company was balance-sheet insolvent at all material times unless the directors' loans can be left out of account. For the reasons

given above, in particular in paras [115] to [117] above, I do not consider  *a*
that they can be left out of account.

[121] My conclusion, therefore, is that, subject to the matter identified in
para [123] below, Mrs Bucci is unable to rebut the presumption which
arises under s 240(2) in respect of balance-sheet insolvency. The Company
was at all material times in a position of net liabilities as disclosed by the
balance sheets prepared by both experts if the GUL loan is valued at nil.  *b*
Given the burden of proof, there is nothing, in my judgment, in the
argument that the directors' loan accounts would be left outstanding. I am
bound to say that, even if the burden had remained on Mr Carman rather
than Mrs Bucci, I would be satisfied, on the evidence before me, that the
assets were less than the liabilities. It seems to me that the loan accounts
cannot effectively be left out of account since, sooner or later, the  *c*
indebtedness would have to be paid.

[122] I therefore reach a different conclusion from the Judge. But he was
applying a different test – the 'point of no return'. He cannot be criticised
for doing that since that test represented the law at the time when he gave
his decision. But it does mean that the exercise which he carried out was  *d*
flawed and one which must be put right on appeal.

[123] The matter referred to in para [121] above is this. It is the argument
that if all of a company's liabilities are immediate or will be so within the
reasonably near future, s 123(2) does not come into play. In other words,
when applying the cash-flow test under s 123(1)(e), all of the company's
liabilities are taken into account and there is therefore no need to look  *e*
further to s 123(2). On the facts of the present case, I do not consider that
there is any scope for the application of this argument. It could not be
suggested that, had the Company stopped trading on any particular date
after 31 March 2007, that it would have been able to meet all of its
liabilities: its balance sheet shows (valuing the GUL loan at nil) an excess of
liabilities over assets. It would not then have been able to pay its debts as  *f*
they fell due. Its ability to do so depended on having sufficient cash flow
which in turn depended on receiving further deposits and/or instalment
payments. However, the further income received by the Company would
have given rise to a further immediate debt, or one due in a very few days,
so that, in my view, it could not be said that the Company was able to pay  *g*
its debts as they fell due. The new moneys received would not, properly,
have been available to pay the old debts at all.

[124] But even if that were not a problem, it remains the case that
cash-flow solvency could be established, even on Mr Morgan's argument,
only if the directors' loan account could be left out of account. It is my  *h*
view, in accordance with the analysis carried out earlier in this judgment,
that the regular postponement of the debt on directors' loan accounts will
result inevitably in a liability which is not due in the reasonably near future
and will become a postponed debt. If that happens, then s 123(2) must
come into play if it is not already in play. In that case, the position is as
discussed above.  *i*

CONCLUSION

[125] My conclusion, therefore, is that Mrs Bucci is unable to rebut the
presumption which arises under s 240(2) with the result that each of the

a  payments in the first and second categories identified in para [2] above was
made at a relevant time. Mr Carman's appeal therefore succeeds.

FURTHER ISSUES

[126] This conclusion makes it unnecessary to consider Mr Carman's
b  submission based on the existence of a *Quistclose* trust. The points having
been argued, I will express my views very briefly indeed.

[127] In the first place, I do not consider that this is a point which
Mr Carman should be permitted to raise on this appeal. There was nothing
in Mr Carman's witness statements which raised the point and nothing, so
far as I am aware from what I have been told, in Mr Boeddinghaus'
c  skeleton arguments before the Judge. The issue of trust was touched on in
cross-examination but the only mention in Mr Boeddinghaus' written
closing was a single reference to Mrs Bucci's expert's oral evidence where he
referred to client money as trust moneys. No cases were referred to the
Judge in support of the imposition of a trust although, no doubt, the Judge
was familiar with the *Quistclose* concept. It was not until the application
d  for permission to appeal that the matter took on any significance. The
Judge plainly thought that it made no difference as one can see from the
passage which I have set out at para [58] above. It was, in any case, too late
for the matter to be raised so as to be considered as part of the trial process
with relevant findings being made in a judgment. Had the point been clearly
e  raised before the matter came to trial, one can imagine that some evidence
addressing the point would have been adduced by each side – certainly by
Mrs Bucci. She will have no opportunity to do so if I allow the point to be
raised now. The existence of a trust of the nature alleged is not purely a
matter of law; rather, it represents an application of the law to specific facts.
In the present case, I cannot be sure that the relevant factual evidence was
f  all put before the Judge and he was not, in any case, invited to make any
findings. In my view, it is now far too late to raise the point.

[128] But in the second place, I incline to the view (but do not decide) on
the evidence before me that the existence of such a trust is made out. The
evidence such as it is supports the view that Company received investor's
deposits and other payment on the basis of an obligation to apply those
g  moneys only for the authorised purpose, namely the payment of the
relevant deposit or making of the other payment, giving rise to a trust to
apply the moneys for that purpose and no other.

[129] On that basis, the case for saying that the Company was cash-flow
insolvent would be even stronger than it is. Although Mr Morgan has
submitted that the Company was cash-flow solvent at all times, I consider
h  that he would be in great difficulty in even maintaining an argument to that
effect if there was a *Quistclose* trust.

A FINAL POINT

[130] It might be suggested that I should not have reached any conclusion
i  about whether Mrs Bucci is able to rebut the presumption of insolvency in
relation to the balance-sheet test on the basis that further findings of fact
are required and perhaps the admission of further evidence. If that were
right – obviously I do not think it is – the correct course would be to allow
the appeal and remit the matter to the Judge. It would then be entirely for

him whether to allow any further evidence to be given and whether to allow          *a*
Mr Carman to raise the *Quistclose* point or any other point.


DISPOSITION

[**131**] Mr Carman's appeal is allowed. Each of the payments in the first
and second categories referred to in para [2] above is a transaction falling          *b*
within s 238 made at a relevant time within s 240.


*Appeal allowed.*

                                                                                      *c*

**Appeal**
Mrs Bucci appealed.


*Hermann Boeddinghaus* and *Alexander Cook* (instructed by *Geldards*) for          *d*
   the appellant.
*John Randall* QC and *James Morgan* (instructed by *Shakespeares*) for the
   respondent.


                                        *Judgment was reserved.*  *e*


3 April 2014. The following judgments were delivered.


**LEWISON LJ.**                                                                       *f*


THE ISSUE

[**1**] The legal issue raised in this appeal is: when is a company deemed to
be unable to pay its debts, with the result that it is insolvent? The          *g*
procedural issue is whether the intermediate appeal court was entitled to
substitute its own evaluation of the facts upon which the answer to the legal
question depends.

[**2**] The issue arises in the context of an application by the liquidator of
Casa Estates (UK) Ltd ('Casa UK') to recover moneys paid out by the
company to Mrs Bucci under transactions which were transactions at an
undervalue. Since Mrs Bucci was a person connected with the company, she          *h*
had the burden of rebutting the statutory presumption that it was not
insolvent at the time when the payments were made. His Honour Judge
Purle QC decided that she had discharged that burden. But on appeal
Warren J disagreed with his Honour Judge Purle QC and held that she had
not. Warren J's judgment is at [2013] EWHC 2371 (Ch), and is available on          *i*
BAILII.

[**3**] Mrs Bucci, represented by Mr John Randall QC and Mr James
Morgan, appeals. The appeal is resisted by Mr Hermann Boeddinghaus and
Mr Alexander Cook, appearing on behalf of the liquidator.

THE LEGISLATION

[4] Section 123 of the Insolvency Act 1986 defines when a company is deemed to be unable to pay its debts. Section 123(1)(e) says that a company is deemed to be unable to pay its debts:

'… if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due.'

[5] Section 123(2) says that:

'A company is also deemed unable to pay its debts if it is proved to the satisfaction of the court that the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities.'

[6] The test in s 123(1)(e) is usually known as the test of cash-flow solvency; and the test in s 123(2) as the test of balance-sheet solvency, although these are no more than convenient shorthands.

[7] Section 238 enables an office holder, such as a liquidator, to apply to the court for an order reversing a transaction made at a significant undervalue by an insolvent company. In the case of a transaction with a person connected with the company this potentially applies to a transaction made in the two years preceding the onset of insolvency: s 240(1). It will apply if, at the time of the transaction, the company is unable to pay its debts within the meaning of s 123. But in the case of a transaction made with a person connected with the company, the company is presumed to be unable to pay its debts, unless the contrary is shown: s 240(2). Hence the burden lay on Mrs Bucci to rebut the presumption of insolvency.

HIS HONOUR JUDGE PURLE QC'S JUDGMENT

[8] Casa UK was incorporated on 23 February 2005. It was under the day-to-day management of Mr Bucci. His wife, Mrs Bucci, was the company secretary. The company's principal business was that of introducing investors to property in Dubai. It had an agent and intermediary in Dubai called Casa Dubai Real Estate Brokers LLC ('Casa Dubai'). By a written agreement dated 1 January 2007 Casa UK agreed to pay Casa Dubai a monthly sum in the nature of a retainer equivalent to £10,000. Casa Dubai, in turn, agreed to pay Casa UK commission on sales at an average rate of 6%. That latter agreement does not appear to have been recorded in writing. In his first witness statement Mr Carman, Casa UK's liquidator, said that the precise relationship between Casa UK and Casa Dubai was unclear. I do not believe that it has since been materially clarified.

[9] Thus the business model is, to some extent, obscure but in the main it seems to have worked as follows. Casa UK would receive moneys from an investor who wanted to invest in property in Dubai. In theory it would then transmit the moneys to Casa Dubai in Dubai, for onward transmission to the developer. Arrangements between Casa UK and Casa Dubai were subject to a set-off arrangement. The details of the set-off are also obscure; and are also not contemporaneously recorded in writing. Casa UK was liable to pay the £10,000 a month retainer to Casa Dubai. Casa Dubai was,

on the other hand obliged to pay commission to Casa UK. It was also to *a*
make payments to developers in Dubai on behalf of Casa UK's clients. The
set-off apparently enabled Casa Dubai to withhold commission due to Casa
UK by setting off those commissions against new client moneys received by
Casa UK. Casa Dubai would then pay over the withheld moneys in its
hands to the developers in Dubai. Casa UK would transmit to Casa Dubai
any shortfall in payments due to the developers. None of the accounts of *b*
the set-off arrangement expressly refer to the payment by Casa UK of the
monthly retainer to which Casa Dubai was contractually entitled. The key
point about the set-off system (whatever its details were) was that, as
Mr Bucci confirmed in his cross-examination, the flow of money was
always from the UK to Dubai. No profits were in fact remitted from Dubai *c*
to the UK.

[10] Casa UK's filed accounts for the periods to December 2005 and
December 2006 showed modest profits of £2,695 and £53,794 respectively.
Although Casa UK's entitlement was an entitlement to commission only,
these accounts recorded the gross sales price as part of its turnover. No
further accounts were filed for later periods. *d*

[11] As his Honour Judge Purle QC pointed out, when Casa UK received
customer deposits it had an obligation to account to the customer for those
deposits, which was itself a liability to the customers until such time as the
deposits had been correctly applied towards the purchase of property in
Dubai by payment to the developers. Casa UK did not maintain a client
account, but mixed depositors' moneys with its own. Nor did its accounting *e*
systems enable depositors' moneys to be accurately identified with any
confidence. The combination of the lack of a client account, and the fact
that depositors' moneys were treated as part of Casa UK's own turnover led
the liquidator's expert accountant, Mr Minshall, to comment in his report:

> 'The Company did not operate a client account. As a result, it *f*
> processed many millions of pounds that passed through its accounts
> and treated them as its own.'

[12] He adhered to that view in cross-examination.

[13] What is also puzzling is the existence of certain written agreements in
the case papers. Casa UK introduced some investors (no more than four) to *g*
a scheme with a developer in Dubai called Al Barakah. These investors
included a Mr Lees. The scheme promised investors a return on their
investment of 40% within six months. However, the case papers include a
written agreement dated 25 September 2008. It is made between Casa UK
itself and Mr Lees. Casa UK agreed to invest £200,000 'on behalf of'
Mr Lees as part payment towards a property investment in Dubai. It also *h*
agreed to pay Mr Lees within six months a guaranteed return of 40% on
his investment and to repay the initial investment itself. Thus the overall
effect of this agreement is that Casa UK had a liability to pay Mr Lees the
equivalent of £280,000 (partly in sterling and partly in dirhams) within six
months. Given that Casa UK's own entitlement to profit was its 6%
commission, it is wholly unclear where anyone thought that the money *i*
would come from to honour its commitment to Mr Lees; although Casa UK
asserted that it would have had a matching claim against Al Barakah. In his
first witness statement Mr Carman, Casa UK's liquidator, said that those
investors whom Casa UK introduced to the Al Barakah scheme were

a provided with post-dated cheques drawn in Casa UK's own bank accounts. This arrangement was sometimes referred to as a guarantee. But in fact it was not a guarantee at all. It was a primary liability on the part of Casa UK to make the promised payments to Mr Lees.

[14] In the course of 2007 and 2008 Casa UK made payments to Mrs Bucci amounting to £103,988 in aggregate. It is no longer contested

b that these payments were made in connection with transactions at an undervalue.

[15] His Honour Judge Purle QC recorded that the experts were agreed that Casa UK was 'marginally insolvent on a balance-sheet basis' in March 2007. During the same period covered by the payments made to Mrs Bucci,

c Casa UK also made loans amounting to £474,259 to another company called Gianluca (UK) Ltd ('GUL'). GUL was another company owned and controlled by Mr and Mrs Bucci. It was in the drinks distribution business, but it was loss-making from the start. His Honour Judge Purle QC found that there was no real prospect of Casa UK ever recovering its loan from GUL; and that it therefore had no significant value as part of Casa UK's

d assets. The experts called before his Honour Judge Purle QC agreed that if the GUL loan were eliminated as an asset of value, then Casa UK was 'balance sheet' insolvent at all material times from December 2007 onwards.

[16] His Honour Judge Purle QC said that there was a rapid expansion of Casa UK's business in 2007 and 2008. That, he said, 'increased the

e apparent profits of the company up to July 2008 … but also resulted in additional liabilities to customers whose deposits had not reached the developer, either because the development had not reached the appropriate stage or because the developer could not hold deposits.' He did not explain why he used the phrase 'apparent profits' rather than 'profits'. Mr Randall suggested that what the judge must have meant was that if the market

f crashed, Casa UK would not be able to survive.

[17] In late 2008 the property market in Dubai did indeed collapse. His Honour Judge Purle QC found that the collapse was 'sudden and not generally anticipated'. It was that collapse that pushed Casa UK into insolvent liquidation. As he put it at [52]:

g       'As a result of the sudden collapse of the property market in Dubai, which post-dated the September 2008 collapse of Lehman Brothers by over two months, Casa Dubai failed and [Casa UK's] substantial liabilities to its customers crystallised, without the possibility of recovering any of those liabilities from Casa Dubai, or outstanding commissions. However, until that point, [Casa UK's] liabilities to

h customers were effectively contingent upon the failure of Casa Dubai or the developers.'

[18] I do not understand the last sentence of that extract. The judge had already held at [50] that the receipt of money from customers created an obligation on the part of Casa UK towards the depositors. That is plainly

i correct, because Casa UK, as agent for the depositors, had an obligation to account. But that obligation was not contingent: it was an immediate liability. Nor could Casa UK's liability towards its depositors have been contingent on failure by the developers. If the money paid by depositors had actually reached the developers, Casa UK would have correctly applied the

depositors' money and its own obligation would have been discharged. *a*
Whether the developer subsequently failed was the client's risk: not Casa
UK's. Mr Randall accepted that this part of the judge's judgment was a
muddle.

[**19**] Until late December 2008 his Honour Judge Purle QC considered
that Casa UK had been cash-flow solvent. He explained his reasons for that *b*
conclusion at [44]. They were as follows. There was no suggestion that any
creditor had served a statutory demand or obtained a judgment against
Casa UK. There was no creditor pressure and Casa UK was in fact paying
its debts as they fell due. It had no cash-flow problem at the time of any of
the payments to Mrs Bucci. The cash-flow problems arose only after the
collapse of the Dubai property market in late 2008; and when the problems *c*
materialised Casa UK reached the point of no return very suddenly and
ceased business. At [57] the judge said that at the end of December 2007:

    'Business was increasing, and there was no likelihood of [Casa UK]
    being called upon to refund the customer deposits.'

[**20**] This is a puzzling observation for two reasons. First, since the *d*
business consisted of paying customers' deposits to developers, the question
of refunding them would not normally arise. Second, the way the judge has
phrased his observation suggests that if there had been a likelihood of Casa
UK being called upon to refund deposits (ie to comply with its obligation to
account) it would not have been able to do so. That ties in with *e*
Mr Randall's suggested explanation of the judge's use of the phrase
'apparent profits' earlier in his judgment.

[**21**] Casa UK went into insolvent liquidation in March 2009 with a
deficiency as regards creditors of some £1.2m. The deficiency as regards
investors has been variously estimated. It is between £488,000 at its lowest,
and £1.05m at its highest. The liquidator and Mr Minshall arrived at *f*
figures of £630,000 and £648,000 respectively.

[**22**] As I have said his Honour Judge Purle QC held that Casa UK had
been paying its debts as they fell due up to the end of 2008 when the Dubai
property market collapsed suddenly. He held, therefore that at the time of
the payments to Mrs Bucci it was not cash-flow insolvent. He further held
that its liabilities to depositors were contingent and that, taking into *g*
account those contingent liabilities, Casa UK had not reached the point of
no return until the end of 2008.

[**23**] The phrase 'the point of no return' was one that had been coined by
Prof Sir Roy Goode QC and applied by the Court of Appeal in *BNY
Corporate Trustee Services Ltd v Eurosail-UK-2007–3BL plc* [2011] EWCA
Civ 227, [2011] 2 BCLC 1, [2011] 1 WLR 2524. It is abundantly clear that *h*
that was the test that his Honour Judge Purle QC applied: not least because
he used the phrase throughout his discussion of Casa UK's solvency: see
[47], [52], [56], [57], [58] and [59].

THE JUDGMENT OF WARREN J                                                    *i*

[**24**] By the time that the appeal in this case reached Warren J the Supreme
Court had considered the appeal in *Eurosail* and had said that the 'point of
no return' test was not the appropriate test: [2013] UKSC 28, [2013]
1 BCLC 613, [2013] 1 WLR 1408. It is not easy to distil Warren J's

a  judgment, but I think that the key points are these:

(i) The test that his Honour Judge Purle QC applied, namely the 'point of no return' test, had been shown by the Supreme Court's decision in *Eurosail* not to be the right test: see [36], [66](iii) and [122].

(ii) Thus the question for Warren J was whether, applying the right test, he was in a position to decide whether Casa UK was unable to pay its debts:
b  see [66](iii).

(iii) In reaching his conclusion on cash-flow solvency his Honour Judge Purle QC had not dealt with some of the important evidence. In particular (a) there were at least four creditors who had expressed concern about the non-transfer of their deposits to the developer; (b) there was a table of creditors which showed an increase in the amount of aged creditors, thus
c  indicating that debts were accruing and not being paid; (c) Mr Bucci had himself stated that there were 34 clients exposed to losses of over £488,000 for goods and services that had not been supplied, and that that list of clients had been compiled by collating complaints from investors who had said that their funds had not been properly invested: see [107] to [110].

d  (iv) His Honour Judge Purle QC had also not considered how it was that debts continued to be paid. In Warren J's view the continued payment of debts was only possible because new deposits from investors were used to pay old debts: see [48], [62] and [117].

(v) There was no material on which it could be said that, if no significant value was attributed to the GUL loan, Casa UK would ever be able to meet
e  its liabilities, including contingent liabilities. Those liabilities included directors' loans, but they could not be excluded. Casa UK was balance-sheet insolvent as at 31 March 2007 and thereafter: see [118] to [120].

[25] Warren J therefore concluded, contrary to his Honour Judge Purle QC's decision, that Mrs Bucci had not rebutted the presumption that Casa UK was insolvent at the times that it made the disputed payments to
f  her. He reached this conclusion largely on the basis that Casa UK was unable to pay its debts as they fell due: see [123]. As he put it:

'It could not be suggested that, had the Company stopped trading on any particular date after 31 March 2007, that it would have been able to meet all of its liabilities: its balance sheet shows (valuing the GUL
g  loan at nil) an excess of liabilities over assets. It would not then have been able to pay its debts as they fell due. Its ability to do so depended on having sufficient cash flow which in turn depended on receiving further deposits and/or instalment payments. However, the further income received by the Company would have given rise to a further
h  immediate debt, or one due in a very few days, so that, in my view, it could not be said that the Company was able to pay its debts as they fell due. The new moneys received would not, properly, have been available to pay the old debts at all.'

THE MAIN ARGUMENTS

i  [26] Mrs Bucci's argument is that if a company is cash-flow solvent, there is no need to consider whether it is also balance-sheet solvent, unless it has contingent or prospective liabilities. The trial judge found that the company was cash-flow solvent; and so there was no warrant for examining whether it was balance-sheet insolvent. If it is necessary to examine whether a

company is balance-sheet insolvent, then a judgment has to be made    *a*
whether it really is balance-sheet insolvent. It is not simply a mechanical
exercise of comparing assets and liabilities.

EUROSAIL

[**27**] In my judgment the following points emerge from the decision of the    *b*
Supreme Court in *Eurosail* (and in particular the judgment of Lord Walker):

(i) The tests of insolvency in s 123(1)(e) and 123(2) were not intended to
make a significant change in the law as it existed before the Insolvency
Act 1986: para [37].

(ii) The cash-flow test looks to the future as well as to the present:
para [25]. The future in question is the reasonably near future; and what is    *c*
the reasonably near future will depend on all the circumstances, especially
the nature of the company's business: para [37]. The test is flexible and
fact-sensitive: para [34].

(iii) The cash-flow test and the balance-sheet test stand side by side:
para [35]. The balance-sheet test, especially when applied to contingent and
prospective liabilities is not a mechanical test: para [30]. The express    *d*
reference to assets and liabilities is a practical recognition that once the
court has to move beyond the reasonably near future any attempt to apply
a cash-flow test will become completely speculative and a comparison of
present assets with present and future liabilities (discounted for
contingencies and deferment) becomes the only sensible test: para [37].    *e*

(iv) But it is very far from an exact test: para [37]. Whether the
balance-sheet test is satisfied depends on the available evidence as to the
circumstances of the particular case: para [38]. It requires the court to make
a judgment whether it has been established that, looking at the company's
assets and making proper allowance for its prospective and contingent
liabilities, it cannot reasonably be expected to meet those liabilities. If so, it    *f*
will be deemed insolvent even though it is currently able to pay its debts as
they fall due: para [42].

[**28**] In the course of his judgment in *Eurosail* Lord Walker approved
what he described as the 'perceptive judgment' of Briggs J in *Re Cheyne
Finance plc* [2007] EWHC 2402 (Ch), [2008] 1 BCLC 741. Two of the
points that Briggs J made bear on our case:    *g*

(i) Cash-flow solvency or insolvency is not to be ascertained by a
blinkered focus on debts due at the relevant date. Such an approach will in
some cases fail to see that a momentary inability to pay is only the result of
temporary illiquidity. In other cases it will fail to see that an endemic
shortage of working capital means that a company is on any commercial
view insolvent, even though it may continue to pay its debts for the next    *h*
few days, weeks, or even months: para [51].

(ii) Even if a company is not cash-flow insolvent, the alternative
balance-sheet test will afford a petitioner for winding up a convenient
alternative means of proof of a deemed insolvency: para [57].

*i*

DISCUSSION

[**29**] It is in my judgment clear from *Eurosail* and its approval of *Cheyne
Finance* that the balance-sheet test in s 123(2) is not excluded merely
because a company is for the time being in fact paying its debts as they fall

a   due. In the case of *Eurosail* that is clear from Lord Walker's approval at [42] of what Toulson LJ had said in the Court of Appeal, and his description of the two tests as standing side by side. In the case of *Cheyne Finance* it is clear from Briggs J's description of the balance-sheet test as an alternative test. Thus I agree with Warren J at [34] that the two tests feature as part of a single exercise, namely to determine whether a company is

b   unable to pay its debts. In addition, even when applying the cash-flow test it is not enough merely to ask (as his Honour Judge Purle QC did) whether the company is for the time being paying its debts as they fall due. As Briggs J said in *Cheyne Finance* a realistic examination may reveal that a company is on any commercial view insolvent, even though it may continue to pay its debts for the time being.

c   [30] Warren J was at pains to point out that he was not (and we are not) dealing with a Ponzi scheme. But a hypothetical corporate Ponzi scheme will test the point. In the early stages of a Ponzi scheme money flows in from investors promised high returns. Money from new investors is used to pay the promised returns to existing investors. On the face of it therefore

d   the company is managing to pay its debts as they fall due. But the underlying reality is that, sooner or later, the whole house of cards will collapse. The accumulating liabilities to new investors cannot hope to be matched by any real investments: they are dependent on the continued inflow of new money. When that dries up, the game is up. In any commercial sense the company is insolvent from the beginning. What a

e   commercial approach requires the court to do is not to stop automatically at the answer to the question: is the company for the time being paying its debts as they fall due? In an appropriate case it must go on to inquire: how is it managing to do so?

[31] It certainly seems counter-intuitive (to me at least) that a company that manages to stave off cash-flow insolvency by going deeper and deeper

f   into long-term debt is not insolvent. It may be able to trade its way out of insolvency, and thus avoid going into insolvent liquidation, but that is a different matter. Equally if (as Warren J held) Casa UK was only able to continue to pay its debts as they fell due by taking new deposits, and using them to pay off old debts, in any commercial sense the company was

g   insolvent, whether on a cash-flow basis or a balance-sheet basis.

[32] So the question is twofold: was Warren J entitled to go behind his Honour Judge Purle QC's conclusion that Casa UK was cash-flow solvent up to December 2008; and, if he was, did he find (on a sustainable basis) that Casa UK was using new deposits to pay old debts?

h   CASH-FLOW SOLVENCY

[33] His Honour Judge Purle QC's conclusion was expressed at [44] and repeated at [49]. But that, in my judgment, is all it is: a conclusion.

[34] It was not in dispute that Casa UK had been paying debts when creditors required to be paid. But the liquidator did not accept that that meant that Casa UK was cash-flow solvent. In their letter of 16 March

i   2010 the liquidator's solicitors wrote:

'The fact that the Company made its other payment obligations on time does not rebut the presumption that the company intended to prefer Mrs Bucci. On a cash-flow basis the Company was regularly

receiving substantial sums of money but those moneys belonged to investors: they were not sums that the Company was entitled to use to discharge its own liabilities. They should therefore be ignored when calculating whether or not the Company was cash-flow insolvent. If they are left in then it is unsurprising that the Company was able to meet cash-flow obligations at those points, through the misuse of investors' money.'

[35] In his first witness statement Mr Carman had said at [47] that the company 'was … able to remain cash-flow solvent by taking substantial deposits from investors wishing to purchase properties in [Dubai].' In the same witness statement he said at [52] that Casa UK's cash reserves were 'restricted largely to money received by investors which was meant to be remitted to [Casa Dubai]'. He amplified this in his third witness statement by referring to instances where the moneys had not been remitted to Casa Dubai. He repeated that evidence in cross-examination. His evidence was supported by that of Mr Minshall. Thus the liquidator's case was clear and consistent. Casa UK was able to meet its debts by the misuse of investors' money. The mere fact, therefore, that there were no statutory demands or judgments, and no creditor pressure proved nothing. Remarkably neither Mr nor Mrs Bucci, nor their expert witness Mr Vigar, answered the liquidator's case in their written material. That silence is eloquent. Mr Bucci, in cross-examination, denied the suggestion but he had no detailed figures to work with.

[36] His Honour Judge Purle QC did not comment on any of the liquidator's evidence on this part of the case. He simply failed to deal with the liquidator's case as put. Accordingly, in my judgment his Honour Judge Purle QC stopped his inquiry too early. Superficially Casa UK may have been managing to pay its debts as they fell due; but his Honour Judge Purle QC did not ask himself how it managed to do that.

[37] In my judgment, given that he did not pursue the inquiry as far as he should have done, it was open to Warren J to do so himself on the basis of the evidence before him. I do not accept Mr Randall's submission that Warren J was required to answer the question: what would his Honour Judge Purle QC have decided if he had applied the correct test? Nor do I accept his submission that if the answer to that question was unclear then the case should have been remitted to his Honour Judge Purle QC. In my judgment if an appeal court comes to the conclusion that the lower court has applied the wrong legal test, it is entitled to apply the correct legal test itself. I have already summarised Warren J's relevant findings of fact. In my judgment we should not interfere with those findings. Warren J was in my judgment entitled to find that Mrs Bucci had not rebutted the presumption that Casa UK was cash-flow insolvent at the time that it made the payments to her. He did not need to go any further.

BALANCE-SHEET SOLVENCY

[38] Warren J noted a tension between his Honour Judge Purle QC's finding that the GUL loan had no 'significant' value, and his inclination to find that it had 'no' value. I do not think that this matters. If the GUL loan had no significant value, then whatever value it did have cannot have made any difference. The experts agreed that if the GUL loan was given no value

*a*    then Casa UK was balance-sheet insolvent at all relevant times. While that, in itself, may not be a conclusive answer to the question whether Casa UK was insolvent within the meaning of s 123(2), it is difficult to see how it could not lead to that conclusion in the case of a trading company unless there was credible evidence that the balance sheet would improve in the near future. His Honour Judge Purle QC did not refer to any such evidence.

*b*    [39] His Honour Judge Purle QC recognised that every time that Casa UK took a deposit from an investor it incurred a liability to that investor. But I do not consider that he ever asked himself the question: how were those liabilities to be satisfied? His Honour Judge Purle QC said at [60]:

*c*        'The result of the Dubai crash is that [Casa UK's] liabilities towards depositors, which would but for the crash have been dealt with in the ordinary course of business, have come to fruition, without any possibility of recoupment from Casa Dubai, which seems to have evaporated.'

*d*    [40] Again, this is a puzzling observation. In the ordinary course of business depositors' money would have been paid over to developers, thus discharging Casa UK's obligation to account. If the amount that Casa UK owed depositors after the crash had been *matched* by moneys held by Casa Dubai under the set-off arrangement which became irrecoverable, then one might conclude that nothing had gone wrong with the accounting. But if the amount owed to depositors *exceeded* the amount in the hands of Casa Dubai, then the inference must be that Casa UK had used depositors' moneys for its own purposes. The claims made by investors were of the order of £650,000. Although the moneys in the hands of Casa Dubai were said to be of the order of £1.6m, the experts agreed that there was no underlying material to substantiate that claim. His Honour Judge Purle QC did not analyse the evidence about that.

*e*

*f*    [41] Mr Randall fastened on a passage at [47] of his Honour Judge Purle QC's judgment in which he said that if a company was dependent on loans from its directors, then if the directors have no intention of calling in the loans, the company might not have reached the point of no return even if its current liabilities exceeded its current assets. I do not consider that this passage supports the conclusion that Casa UK was not balance-sheet insolvent. In the first place, his Honour Judge Purle QC's observation was illustrative only. It was not accompanied by a finding of fact that Casa UK was such a company. Second, in fact Casa UK repaid all directors' loans (almost in full) very shortly before it went into insolvent liquidation. So this was not a case in which the directors left their money in the company. Third, in the passage in question his Honour Judge Purle QC was applying the wrong test.

*g*

*h*    [42] Again in my judgment Warren J was entitled to make the findings for himself. Again I do not consider that we should interfere with those findings.

*i*

THE PRESUMPTION

[43] Finally, Mr Randall criticised Warren J for having said that he was not in a position to make findings of fact on some of the matters debated before him. But this overlooks the statutory presumption that the company

was insolvent when the payments were made. A presumption is a *a*
provisional conclusion that must be displaced by contrary evidence. It is not
the same as a trial at which the court starts, so to speak, with a blank sheet
of paper. If the judge is not in a position to make a finding of solvency, the
presumption prevails. Equally, if he is not in a position to make one or more
findings about the building blocks in the case that the company was solvent,
then the presumption is not displaced. I do not, therefore, consider that this   *b*
criticism undermines Warren J's overall conclusion.

RESULT
   [**44**] I would dismiss the appeal.
                                                                                  *c*

**McFARLANE LJ.**
   [**45**] I agree.

**SULLIVAN LJ.**
   [**46**] I also agree.                                                         *d*

*Appeal dismissed.*

                        Charlotte Hennessey    Solicitor (non-practising).

TAB 49

*Re Cheyne Finance plc* [2008] 2 All ER 987, English High Court

All England Law Reports    28 May 2008

Ch D                    Re Cheyne Finance                    987

# Re Cheyne Finance plc

### [2007] EWHC 2402 (Ch)

CHANCERY DIVISION

BRIGGS J

17 OCTOBER 2007

*Company – Insolvency – Inability to pay debts – Company unable to pay its debts as they fall due – Value of company's assets less than amount of liabilities taking into account contingent and prospective liabilities – Meaning of 'as they fall due' – Insolvency Act 1986, s 123(1)(e), (2).*

In the definition of inability to pay debts in s 123[a] of the Insolvency Act 1986 commercial insolvency and balance sheet insolvency are split apart. In place of the mandatory requirement before 1985 to take account of contingent and prospective liabilities there has been added in s 123(1)(e) the phrase 'as they fall due' after 'debts' so that the subsection reads: '(1) A company is deemed unable to pay its debts . . . (e) if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due.' The mandatory requirement to consider contingent and prospective liabilities now only appears in s 123(2) which reads '[a] company is also deemed unable to pay its debts if it is proved to the satisfaction of the court that the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities'. Those changes do not prevent reference to prospective, that is, future, debts under s 123(1)(e). When separating out balance sheet insolvency from commercial insolvency the legislature did not merely remove the requirement to include contingent and prospective liabilities in framing s 123(1)(e) but added what in Australian jurisprudence has always been regarded as the key words of futurity, namely the phrase 'as they fall due'. In this context 'fall due' is synonymous with 'become due'. The effect of the alterations to the insolvency test now found in s 123 of the 1986 Act was to replace in the commercial solvency test now in s 123(1)(e) one futurity requirement, namely to include contingent and prospective liabilities, with another more flexible and fact-sensitive requirement encapsulated in the new phrase 'as they fall due'. The extent to which future debts will be relevant to a company's solvency under s 123(1)(e) will be heavily dependent on the particular facts. Where the company is still trading, so that the profile of the future cashflow is very uncertain, regard to future debts may make little difference. Where its business is in run-off, and its future cashflow known, future debts may be of critical relevance (see [28], [36], [51]–[58], below).

*Bank of Australasia v Hall* (1907) 4 CLR 1514, *Byblos Bank SAL v Al-Khudhairy* [1987] BCLC 232 and *Southern Cross Interiors Pty Ltd (in liq) v Deputy Commissioner of Taxation* (2001) 188 ALR 114 considered.

---

a    Section 123, so far as material, provides: '(1) A company is deemed unable to pay its debts . . . (e) if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due. (2) A company is also deemed unable to pay its debts if it is proved to the satisfaction of the court that the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities . . . '

988                  All England Law Reports            [2008] 2 All ER

**Notes**

For inability to pay debts, see 7(3) *Halsbury's Laws* (4th edn) (2004 reissue) para 446.

For the Insolvency Act 1986, s 123, see 4 *Halsbury's Statutes* (4th edn) (2004 reissue) 976.

**Cases referred to in judgment**

*Bank of Australasia v Hall* (1907) 4 CLR 1514, Aus HC.

*Byblos Bank SAL v Al-Khudhairy* [1987] BCLC 232, CA.

*Cuthbertson & Richards Sawmills Pty Ltd v Thomas* (1998) 28 ACSR 310, Aus CT SC.

*European Life Assurance Society, Re* (1869) LR 9 Eq 122.

*Hymix Concrete Pty Ltd v Garrity* (1977) 13 ALR 321, Aus HC.

*Lewis (as liquidator of Doran Constructions Pty Ltd) v Doran* (2005) 219 ALR 555, [2005] NSWCA 243.

*Sandell v Porter* (1966) 115 CLR 666, Aus HC.

*Southern Cross Interiors Pty Ltd (in liq) v Deputy Commissioner of Taxation* (2001) 188 ALR 114, NSW SC.

*Taylor v Australia and New Zealand Banking Group Ltd* (1988) 13 ACLR 780, Vic SC.

**Application for directions**

The receivers of the business and assets of Cheyne Finance plc (Cheyne) appointed on 4 September 2007 pursuant to a security trust deed dated 3 August 2005 made between Cheyne and the Bank of New York applied to the court for directions. The questions for determination by the court are set out at [18], below. Four interested parties made submissions, appearing on the basis that their anonymity was to be preserved. The facts are set out in the judgment.

*Richard Sheldon QC* and *Barry Isaacs* (instructed by *Lovells LLP*) for the receivers.

*William Trower QC* and *Richard Fisher* (instructed by *Hunton & Williams LLP*) for party A.

*Simon Mortimore QC* and *Hilary Stonefrost* (instructed by *Milbank Tweed Hadley and McCloy LLP*) for party B.

*Martin Pascoe QC* and *David Allison* (instructed by *Ashurst and Kay Scholer LLP*) for party C.

*Stuart Isaacs QC* and *Daniel Bayfield* (instructed by *Jones Day, Herbert Smith* and *Sidley Austin*) for party D.

17 October 2007. The following judgment was delivered.

**BRIGGS J.**

[1] This is a second urgent application for directions by receivers of the business and assets of Cheyne Finance plc (Cheyne), appointed on 4 September 2007 pursuant to a security trust deed (the trust deed) dated 3 August 2005 between Cheyne and the Bank of New York.

[2] I heard and determined an earlier application in mid-September (see [2007] EWHC 2116 (Ch)). The opening paragraphs of my judgment on that application are a sufficient general introduction to this application.

[3] That application raised an issue as to how the receivers should apply moneys coming into their hands during the period between their appointment and the happening, if one should happen, of an insolvency event, as defined. That issue turned on a question of construction of the trust deed. The only factual

Ch D                    Re Cheyne Finance (Briggs J)                    989

a  assumption then required was that at that time an insolvency event had not
   occurred.

   [4] My decision on that application, which has not been appealed, was that
   pending the happening of an insolvency event the receivers should apply moneys
   coming into their hands, first, in prompt payment of the debts of senior creditors
   and any prior debts as and when they fell due; secondly, in making provision for
b  payment of the same classes of debt not yet due and, if that left any surplus—which
   then seemed unlikely, at least in the short term—in the manner provided for in the
   payment priority established in cl 12.1(c) and following of the trust deed.

   [5] I shall refer in this judgment to debts of senior creditors and those ranking
   in priority to them collectively as 'senior debts'. I use that phrase rather than
   'senior obligations', which is a defined term with a slightly narrower meaning in
c  the common terms agreement.

   [6] I preferred the 'pay as you go' construction over a rival 'pari passu'
   construction pursuant to which full provisioning for payment of all senior debts
   was to take precedence over payment on time and in full of such debts as and
d  when they fell due. I was not asked by the receivers on that occasion to construe
   the definition of 'insolvency event' in the common terms agreement, principally
   because, as at that time, the receivers had not formed the view that Cheyne was
   insolvent on any arguable construction of that definition, or even that Cheyne was
   balance sheet insolvent, a concept apparently deliberately omitted from the
   common terms agreement and trust deed by confining the incorporation of the
e  Insolvency Act 1986 definition so as to exclude s 123(2).

   [7] It appeared to be more or less assumed, both by the receivers and the
   proponents of the rival arguments on that occasion, that for as long as the
   receivers had the wherewithal to pay senior debts actually due and those falling
   due in the very near future then they could not make an insolvency event
f  determination even though they regarded a default in payment of senior debts as
   inevitable in the middle or longer term future (see para [7] of my earlier
   judgment).

   [8] My determination of the issue of construction then raised did not depend
   upon that assumption about the meaning of insolvency event, and I then regarded
g  it as one which might need to be tested if the receivers' expectations as to Cheyne's
   longer term ability to pay its senior debts changed.

   [9] Intensive work which has since been carried out by and at the receivers'
   direction into Cheyne's likely future cash flow has caused a change in the
   receivers' expectations and has precipitated an urgent need for the meaning of the
h  insolvency event definition to be determined.

   [10] The happening of an insolvency event depends upon a determination by
   the receivers that Cheyne is, or is about to become, unable to pay its senior debts.
   The receivers do not suggest that the courts should usurp their function by making
   that determination itself, a process which might involve factual issues being
j  determined by an adversarial process. Rather they invite the court to decide
   whether, on certain assumed facts, Cheyne is or is about to become unable to pay
   its debts within the meaning of the insolvency event definition. They recognise
   that the fact-finding part of the task entrusted to them is to remain their
   responsibility and the invitation to the court to decide the insolvency question on
   assumed facts is in substance designed as a convenient vehicle for resolving all
   relevant issues of construction of the insolvency event definition.

990                          All England Law Reports              [2008] 2 All ER

THE ASSUMED FACTS

[11] These are stated fully but concisely in the second witness statement of Neville Barry Kahn, one of the three receivers. Since they are, by definition, not in dispute before me I need only summarise their consequences. They are derived from work done by the receivers in defining the dates upon which the senior debts will all fall due and the amounts falling due on each relevant date, and from work done and opinions formulated by the receivers' chosen valuers on the amounts of cash capable of being made available for payment on those dates on various hypotheses as to the manner in which the receivers carry out the necessary asset realisation programme.

[12] By way of introduction, first, it is plain that Cheyne could not pay its senior debts in full as they fall due merely by letting its own investments run to maturity and collecting the resulting cash. The investments must be sold in an uncertain market before maturity so that any estimation of Cheyne's incoming cash flow is critically dependent upon assumptions about the future market for Cheyne's assets, and in particular about the effect on that market, in which Cheyne is a substantial player, of any particular sales campaign.

[13] Secondly, in advising as to Cheyne's likely incoming cash flow in the future, its advisors have, I suspect prudently and inevitably, taken and projected forward present market values and avoided subjective guesswork as to where the market may move hereafter.

[14] Thirdly, the valuers have subjected to intense scrutiny the effect upon realisations of Cheyne's marketing programme driven, as it is, by the need to meet predictable and extremely large payment obligations in the near and medium term future. Their opinion is that sales at the volume and rate required to pay senior debts as and when they fall due will probably incur forced sale discounts in ranges lying between 0% and 7%, depending upon the class of asset involved.

[15] The results of this exercise may be stated as follows. (a) If the receivers were able to avoid incurring any discounts from open market value by reason of the size and timing of their sales programme, they would, by selling at present market values, just be able to pay all senior debts on time and in full. The prospect of avoiding incurring such discounts is regarded by the receivers, on advice, as unlikely. (b) If forced sale discounts are encountered at the mid-point of each of the ranges advised by the valuers as being the most likely, then Cheyne will default in paying its senior debts as they fall due in February 2009, with a consequential shortfall as against debts falling due then or thereafter. (c) If higher but still realistically possible discounts are incurred, default with a consequentially larger shortfall could occur as early as November 2008. (d) The receivers have considered whether there is any method of realisation of Cheyne's investment portfolio which holds out the prospect of realising better value than forced sales at the rate necessary to pay all senior debts in full and on time. Following tentative negotiations their present view is that best value would be obtained by a sale of the whole portfolio to an investment bank in return for an underwritten note. This would, they think, hold out a better and indeed realistic prospect of paying all senior debts in full but not on time, ie not in accordance with the maturity dates of those debts. This is because the cash flow profile required, when aggregated with Cheyne's existing cash assets to match the maturity dates of the senior debts, would not be obtainable on an underwritten note received on a negotiated sale of the investment portfolio.

[16] Mr Kahn summarises the position in his second witness statement as follows:

Ch D                     Re Cheyne Finance  (Briggs J)                     991

*a*

'As described above, the Receivers are currently in a position to continue with the "pay as you go" approach to approximately 31 October 2007.

The Receivers also have a substantial investment portfolio of assets in their hands.  However, the best current assessment is that the high level of asset sales required to continue with the "pay as you go" approach would involve Cheyne Finance selling assets for discounted prices which would in turn deplete its balance sheet and render it unable to pay some of its late-maturing Senior Obligations.'

*b*

[17] A recent further sale means that Cheyne can now pay due debts from liquid funds until 14 November, but it is agreed before me that I should assume, and the receivers do not suggest otherwise, that the circumstances of that recent sale have no effect on the best current assessment which I have described, namely that default and a consequential shortfall will occur in relation to senior debts.

*c*

THE QUESTIONS RAISED BY THIS APPLICATION

[18] Having formed the view that the sales programme necessary to pay senior debts as they fall due is not the method likely to realise best value for Cheyne's senior creditors, the receivers therefore ask for the following questions to be determined by the court. (1) Whether, on the assumption that the facts stated in Mr Kahn's second witness statement are true, Cheyne Finance plc is unable or about to become unable to pay its debts to senior creditors as they fall due within the meaning of insolvency event.  (2) If the answer to question 1 is 'No', (a)(i) are the receivers obliged to sell assets of Cheyne Finance plc to ensure that so far as is possible it pays its debts to senior creditors as they fall due?  If the answer to (i) is 'Yes', are the receivers nevertheless permitted to cause Cheyne Finance plc to enter into a sale, the consequence of which is that the debt of any senior creditor which would be paid in full as it falls due absent the sale is not paid in full as it falls due?  Would such a sale render Cheyne Finance plc unable, or about to become unable, to pay its debts as they fall due to senior creditors within the meaning of insolvency event?  (b) Are the receivers permitted to cause Cheyne Finance plc to enter into a sale, the consequence of which is that it continues to pay senior obligations in full as they fall due, but which renders it certain or most likely that not all senior obligations will be paid in full as they fell due?  Would such a sale render Cheyne Finance plc unable or about to become unable to pay its debts as they fall due to senior creditors within the meaning of insolvency event?

*d*

*e*

*f*

*g*

[19] That formulation of the questions is the subject of an agreed amendment made at the outset of the hearing, and differs in that respect from the form as it appears in the application notice.

[20] I have heard submissions from four interested parties, and I will call them parties A, B, C and D.  All have appeared, as on the last occasion, on the basis that their anonymity is to be preserved.  But this time all the parties also seek that the hearing be conducted, and judgment given (at least at this stage) in private, so as to avoid confidential information—for example, about the receivers' expectations and advice as to the value of its portfolio—falling into the public domain.  Maintaining anonymity of the parties will therefore, unlike on the last occasion, not have the compensating advantage that the hearing and judgment be conducted and given in public.  I have therefore sought and obtained on a confidential basis from the receivers the identity of all parties, which is not to be placed on the court file or otherwise made public.

*h*

*j*

[21] Party A, as before, represents all senior creditors with short maturity dates for whom continuation of the pay as you go regime is preferable to an early

declaration of an insolvency event.  Party B, again as before, represents all senior creditors whose interests would be served by an early declaration of an insolvency event.  Party C is a member of the class represented by party B.  Party D are a group of holders of subordinated debt, ie not senior creditors.  The debt in question consists of mezzanine capital notes ranking below the senior obligations in the payment priority established by cl 12 of the trust deed.  On the assumed fact that continuing with pay as you go is less likely than the determination of an immediate insolvency event to yield anything for them, they also support party B on the issues before me.

[**22**]  Question 1 is the most important question and has occupied most of the court's time.  Strictly, question 2 falls away if question 1 is answered in the affirmative, but I have been requested by all parties, other than party D, to decide question 2 in any event, regardless of the outcome of question 1.  To an extent, the analysis of the issues underlying question 2 sheds light on the answer to question 1, to which I now turn.

[**23**]  The definition of insolvency event in the common terms agreement is as follows:

> '**Insolvency Event** means a determination by the Manager or any Receiver that the Issuer [Cheyne] is, or is about to become, unable to pay its debts as they fall due to Senior Creditors and any other persons whose claims against the Issuer are required to be paid in priority thereto, as contemplated by Section 123(1) of the United Kingdom Insolvency Act 1986 (such subsection being applied for this purpose only as if the Issuer's only liabilities were those to Senior Creditors and any other persons whose claims against the Issuer are required under the Security Trust Deed to be paid in priority thereto).'

[**24**]  The argument on question 1 has revealed two related issues as to the construction of the insolvency event definition in the common terms agreement, namely: 1. to what extent, if at all, is it permissible for the receivers to have regard to senior debts falling due in the future when addressing Cheyne's commercial solvency (the future debts question); and, 2. with what degree of confidence must the receivers have formed the view that Cheyne is or is about to become unable to pay its relevant debts as they fall due before they can properly make an insolvency event determination (the standard of proof question).  Most of the debate has centred on the first of those two questions.

*The future debts question*

[**25**]  For party A, Mr Trower QC and Mr Fisher submitted that on the question whether Cheyne is unable to pay its debts as they fall due only those senior debts which are presently due are to be considered.  On the question whether Cheyne is about to become so unable, then that admits in addition only those senior debts which are about to become—ie on the point of becoming—due, and excludes all senior debts with medium or longer term maturities.

[**26**]  Parties B, C and D all submit that, both in principle and because all Cheyne's senior debts have fixed maturity dates and amounts and because Cheyne is in run-off rather than a going concern, all senior debts can and must be considered whenever falling due.

[**27**]  In its essentials, party A's submission was simple, and may be summarised as follows. (1) Leaving aside s 123(1)(a), (b), (c) and (d) of the 1986 Act, none of which apply on the assumed facts, the deliberate omission of sub-s (2) shows that the parties agreed that the receivers had to apply the English test of commercial or

All England Law Reports    28 May 2008

| Ch D | Re Cheyne Finance (Briggs J) | 993 |
|------|------------------------------|-----|

*a*  cash flow insolvency to be found in s 123(1)(e). (2) When compared with s 123(2), the language of s 123(1)(e) omits, and therefore requires to be ignored, all contingent and prospective liabilities. (3) The draftsmen of the insolvency legislation were perfectly capable of requiring reference to the future where it was intended (see, apart from s 123(2), ss 8 and 89 of the 1986 Act, and ss 152, 173(3)(b), s 643(1)(b)(ii) and s 714(3)(b)(ii) of the Companies Act 1985). (4) Any doubt as to

*b*  the admissibility of future events, including the falling due of future debts, is resolved in the trust deed by the phrase 'is about to become'. (5) There is nothing uncommercial in the parties to the trust deed adopting a clear and simple test of insolvency which excludes the need to make difficult judgments about the value of Cheyne's assets in the future, even if, as Mr Trower accepted, it introduces an element of priority in favour of short maturity as against long maturity senior

*c*  debts, which is not found spelled out in terms in the payment priority in cl 12.

[28] Attractively though those submissions were presented, I have come to the conclusion that they lead to the wrong result and must be rejected. My reasons follow.

[29] Section 123(1)(e) dates only from the Insolvency Act 1985. There is very little authority on its present form, and its previous form was rather different.

*d*  Putting on one side the improbability that the draftsman of, still less the parties to, the common terms agreement or the trust deed knew its history, that history may be summarised as follows.

[30] Section 80 of the Companies Act 1862 provided to the extent relevant as follows:

*e*
> 'A Company under this Act shall be deemed to be unable to pay its Debts . . . Whenever it is proved to the satisfaction of the Court that the Company is unable to pay its debts.'

[31] In *Re European Life Assurance Society* (1869) LR 9 Eq 122, it was held that

*f*  'debts' in s 80 meant only those actually due. Furthermore, prospective creditors had no locus to petition.

[32] Section 28 of the Companies Act 1907 both permitted prospective creditors to petition and required the court to have regard to contingent and prospective liabilities when applying the 1862 Act. That new provision was consolidated in the Companies (Consolidation) Act 1908 in s 130 in the following

*g*  form:

> 'A company shall be deemed to be unable to pay its debts . . . (iv) if it is proved to the satisfaction of the court that the company is unable to pay its debts, and, in determining whether a company is unable to pay its debts, the court shall take into account the contingent and prospective liabilities of the

*h*  company.'

[33] No substantive change occurred in 1929 in s 169(4) of that Act; or in 1948 in s 223(d) of that Act; nor indeed in s 518(1)(e) of the Companies Act 1985, despite slight changes in the language.

*j*  [34] During the long period from 1907 to 1985 English courts addressed the questions posed by, for example, s 223(d) of the 1948 Act, without any rigid distinction between commercial and cash flow insolvency on the one hand and balance sheet insolvency on the other. The submission that commercial insolvency could not be established by reference to future debts could not have succeeded. This is reflected, for example, in the decision of the Court of Appeal in *Byblos Bank SAL v Al-Khudhairy* [1987] BCLC 232, in which inability to pay debts

within s 223 of the Companies Act 1948 was incorporated into a debenture as a trigger for the appointment of receivers.  Nicholls LJ said this (at 247):

> 'Construing this section first without reference to authority, it seems to me plain that, in a case where none of the deeming paras (*a*), (*b*) or (*c*) is applicable, what is contemplated is evidence of (and, if necessary, an investigation into) the present capacity of a company to pay all its debts.  If a debt presently payable is not paid because of lack of means, that will normally suffice to prove that the company is unable to pay its debts.  That will be so even if, on an assessment of all the assets and liabilities of the company, there is a surplus of assets over liabilities.  That is trite law.
>
> It is equally trite to observe that the fact that a company can meet all its presently payable debts is not necessarily the end of the matter, because para (*d*) requires account to be taken of contingent and prospective liabilities. Take the simple, if extreme, case of a company whose liabilities consist of an obligation to repay a loan of £100,000 one year hence, and whose only assets are worth £10,000.  It is obvious that, taking into account its future liabilities, such a company does not have the present capacity to pay its debts and as such it "is" unable to pay its debts.  Even if all its assets were realised it would still be unable to pay its debts, viz, in this example, to meet its liabilities when they became due.'

[**35**] Mr Trower described this as a case about balance sheet insolvency.  I disagree.  Nicholls LJ is speaking about the ability of the company to meet its liabilities when they became due.  What is striking, and for present purposes persuasive, is his explanation that the phrase 'is unable to pay' is a reference to the company's present capacity, not to the date upon which relevant debts will fall due.

[**36**] In the 1985 Act, repeated in s 123 of the 1986 Act, commercial and balance sheet insolvency are for the first time split apart.  In place of the mandatory requirement to take account of contingent and prospective liabilities there has been added in s 123(1)(e) the phrase 'as they fall due' after 'debts'.  The mandatory requirement to consider contingent and prospective liabilities now only appears in s 123(2).  There is no English authority on the question whether, as Mr Trower submitted, those changes prevent reference to prospective, ie future, debts under s 123(1)(e).

[**37**] To the limited extent that academic writers have addressed this point, they are divided.  In their *Annotated Guide to the Insolvency Legislation* (9th edn, 2006) Sealy and Millman say this (vol 1, p 149):

> 'Paragraph (e) (as [Companies Act 1985] s.518(1)(e)) formerly read: "if it is proved to the satisfaction of the court that the company is unable to pay its debts (and, in determining that question, the court shall take into account the company's contingent and prospective liabilities)".  This formula was unhelpful in that it ran together two issues: (1) the question whether current debts could be met as they fell due, i.e. "commercial" solvency; and (2) the question whether the company would ultimately prove solvent if its future as well as its present liabilities were brought into the reckoning.  The confusion was resolved by the amendment made by [the Insolvency Act 1985]: contingent and prospective liabilities are no longer to be taken into account for the purposes of para.(e), while insolvency calculated on a balance-sheet basis becomes a separate test under s.123(2).'

All England Law Reports    28 May 2008

| Ch D | Re Cheyne Finance (Briggs J) | 995 |
|---|---|---|

a   [38] The English version of Professor Keay *McPherson's Law of Company Liquidation* (2001) reaches the same conclusion.

[39] Professor Goode in his *Principles of Corporate Insolvency Law* (3rd edn, 2005) treats the developed Australian jurisprudence on this question as applicable to cash flow insolvency under s 123(1)(e), and as permitting what he describes as 'an element of futurity', at least by reference to the near future. In fact, the Australian

b   jurisprudence is not necessarily limited to considering debts falling due in the near future, although typical fact situations may often impose that restriction in practice.

[40] The third edition of Professor Fletcher *The Law of Insolvency* (2002) assumes that contingent and prospective liabilities logically have no part to play in the cash flow evaluation of the company's affairs.  For reasons which appear from the

c   Australian jurisprudence, I doubt that supposed logic.

[41] There is a wealth of Australian authority on the question of whether a cash flow or commercial insolvency test permits references to debts which will fall due in the future, ie in English terminology 'prospective debts', rather than 'prospective or contingent liabilities'.  The reason why this question has, unlike in

d   England, been analysed in such detail in Australia is probably that neither the Australian courts nor legislature have developed a balance sheet test of the type found in s 123(2).

[42] Prior to 1992 the statutory test for insolvency in force in Australia was one based on inability to pay debts as they become due—see, for example, ss 107–109 of the Queensland Insolvency Act 1874.

e   [43] In *Bank of Australasia v Hall* (1907) 4 CLR 1514, Griffith CJ said this (at 1527):

f   'It was argued that only debts then actually payable and the amounts of which were then actually ascertained should be taken into consideration. One answer to this argument is that the matter for determination is the ability of the debtor, which is a state or condition that cannot be determined without having regard to all the facts.  Another answer is that the debts referred to are not his debts 'then' payable, but his debts "as they become due"—a phrase which looks to the future.'

At 1528 he said this:

g   'The words "as they become due" require, as already pointed out, that some consideration shall be given to the immediate future;  and, if it appears that the debtor will not be able to pay a debt which will certainly become due in, say, a month (such as the wages payable by Robertson for the month of July) by reason of an obligation already existing, and which may before that day

h   exhaust all his available resources, how can it be said that he is able to pay his debts "as they become due" out of his own moneys?'

The only dissenting judge, Higgins J, agreed on the meaning of the phrase 'as they become due'.  At 1554 he said this:

j   'The critical words are "as they become due"; so that, on the one hand, a debtor in making a payment or giving a security to a creditor, has to take into account, not only his debts immediately payable, but his debts which will become payable . . .'

[44] In *Sandell v Porter* (1966) 115 CLR 666, construing s 95 of the Bankruptcy Acts 1924 to 1960, Barwick CJ said this (at 670):

996          All England Law Reports          [2008] 2 All ER

'The conclusion of insolvency ought to be clear from a consideration of the
debtor's financial position in its entirety and generally speaking ought not to
be drawn simply from evidence of a temporary lack of liquidity. It is the
debtor's inability, utilizing such cash resources as he has or can command
through the use of his assets, to meet his debts as they fall due which indicates
insolvency.'

[45] In *Hymix Concrete Pty Ltd v Garrity* (1977) 13 ALR 321, Jacobs J (with whom
Barwick CJ and Gibbs J agreed) said (at 328) that an inability to pay debts as they
become due was to be recognised in an endemic shortage of working capital rather
than in a temporary lack of liquidity. Such an analysis requires some review of the
future.

[46] In *Taylor v Australia and New Zealand Banking Group Ltd* (1988) 13 ACLR
780, McGarvie J said (at 811) that the question of whether a company was able to
pay its debts as they fell due was a question of fact to be decided as a matter of
commercial reality in the light of all the circumstances. In that case the company
had sold its main business asset and paid off its overdraft with part of the proceeds.
In deciding whether it was then insolvent for the purposes of a preference claim
against the bank the judge conducted a detailed review of the company's present
and future debts before concluding that its finite assets were insufficient to enable
it to pay them as they fell due.

[47] From 1992 onwards the question of whether a company was solvent was
to be decided pursuant to a formula now to be found in s 95A of the Corporations
Act 2001, which is as follows. Under the heading 'Solvency and insolvency'—

'(1) A person is solvent if, and only if, the person is able to pay all the
person's debts, as and when they become due and payable.
(2) A person who is not solvent is insolvent.'

The familiar phrase 'as and when they become due' has been supplemented by the
words 'and payable'.

[48] In *Cuthbertson & Richards Sawmills Pty Ltd v Thomas* (1998) 28 ACSR 310
Einfeld J said this (at 319):

'Certain predicted events about which there is little uncertainty, such as the
planned sale of a major asset or the falling due of a substantial loan, may
influence whether the company is able to pay its debts as they become due
and payable . . .'

At 320 he said this:

'In essence the issue of a company's solvency should be viewed as it would
by someone operating in a practical business environment.'

[49] In *Southern Cross Interiors Pty Ltd (in liq) v Deputy Commissioner of Taxation*
(2001) 188 ALR 114, Palmer J held that the addition of the words 'and payable'
added nothing to the old formula based on 'due'. In his judgment, both in English
and in Australian company legislation the word 'due' had always meant 'due and
payable'.

[50] Finally, in *Lewis (as liquidator of Doran Constructions Pty Ltd) v Doran* (2005)
219 ALR 555, [2005] NSWCA 243, para 103 there is a helpful explanation of the
question how far into the future the inquiry as to present insolvency may go. In
short, it is a fact-sensitive question depending upon the nature of the company's
business and, if known, of its future liabilities.

| Ch D | Re Cheyne Finance (Briggs J) | 997 |
|------|------------------------------|-----|

*a*
[51] It is clear from that brief review of the Australian decisions that in an environment shorn of any balance sheet test for insolvency, cash flow or commercial insolvency is not to be ascertained by a slavish focus only on debts due as at the relevant date. Such a blinkered review will, in some cases, fail to see that a momentary inability to pay is only the result of a temporary lack of liquidity soon to be remedied, and in other cases fail to see that due to an endemic shortage of

*b*
working capital a company is on any commercial view insolvent, even though it may continue to pay its debts for the next few days, weeks or even months before an inevitable failure.

[52] Furthermore, the common sense requirement not to ignore the relevant future was found to be implicit in the Australian cases in the simple phrase 'as they become due'.

*c*
[53] Returning to the English legislation, it is, in my view, critical to note that when separating out balance sheet insolvency from commercial insolvency in 1985 the legislature did not merely remove the requirement to include contingent and prospective liabilities in framing s 123(1)(e) out of its predecessor, but added what in Australia have always been regarded as the key words of futurity, namely

*d*
the phrase 'as they fall due'. In that context 'fall due' is, in my judgment, synonymous with 'become due'.

[54] Mr Trower submitted that the existence of the balance sheet test in s 123(2) makes an Australian type of approach to the commercial insolvency test unnecessary, because a company will always be balance sheet insolvent in

*e*
circumstances where a review of future debts shows that it is commercially insolvent. I disagree. First, I can see no good reason why the developed understanding in Australia of the nature of the exercise required by the phrase 'unable to pay debts as they become (or fall) due' should not be recognised when the same phrase is, for the first time, deliberately inserted into the English insolvency test. The Australian approach makes commercial sense, whereas the

*f*
blinkered approach of ignoring the future does not.

[55] Secondly, a company may not always be balance sheet insolvent where an Australian style test for commercial insolvency is satisfied, as in this example: The company has £1,000 ready cash and a very valuable but very illiquid asset worth £250,000 which cannot be sold for two years. It has present debts of £500, but a

*g*
future debt of £100,000 due in six months. On any commercial view the company clearly cannot pay its debts as they fall due, but it is, or would be, balance sheet solvent.

[56] In my judgment, the effect of the alterations to the insolvency test made in 1985 and now found in s 123 of the 1986 Act was to replace in the commercial

*h*
solvency test now in s 123(1)(e), one futurity requirement, namely to include contingent and prospective liabilities, with another more flexible and fact sensitive requirement encapsulated in the new phrase 'as they fall due'.

[57] In the case of a company which is still trading, and where there is therefore a high degree of uncertainty as to the profile of its future cash flow, an appreciation

*j*
that s 123(1)(e) permits a review of the future will often make little difference. In many, if not most, cases the alternative balance sheet test will afford a petitioner for winding up a convenient alternative means of proof of a deemed insolvency.

[58] The irony of the present case is that the insolvency event test, when applied by the receivers appointed under the trust deed, will be in relation to a company in run-off, closed to future business, when its future cash flow profile is abnormally clear and when no balance sheet alternative test is available.

[59] This leads me to my second main reason for rejecting party A's case on the future debts issue. In my judgment, the presumed common intention to be derived from the parties' choice to define inability to pay debts by reference to s 123(1) rather than s 123(2) is simply that they wished Cheyne's solvency to be adjudicated on a commercial rather than balance sheet basis, and nothing more than that. The definition incorporates the whole of s 123(1), not just s 123(1)(e). The common feature of the lettered sub-subsections of s 123(1) is that they are indiciae of commercial rather than balance sheet insolvency. Companies which fail to pay their judgment debts or, without good reason, to respond to statutory demands, are usually unable to pay their debts as they fall due regardless of the state of their balance sheets.

[60] Even if my view as to the meaning and effect of s 123(1)(e) were wrong and a higher court concluded that it was to be interpreted as imposing the blinkers for which Mr Trower contends, it would, in my judgment, be perverse to conclude that the parties to the common terms agreement and trust deed intended that consequence, because of its potentially bizarre and uncommercial effects in the context of the affairs of Cheyne. In my last judgment I questioned whether, if the receivers had sold all Cheyne's assets for cash, and knew for sure that it would default in the distant rather than near future, it could not be determined to be insolvent until that distant event of default was about to occur. The receivers would be obliged to go on paying early maturing senior debts in full, knowing that a failure to pay anything in respect of later maturing debts of identical seniority was a racing certainty. I cannot envisage any reason why the parties to the common terms agreement and trust deed should have intended thereby to confer an absolute priority on the holders of early maturing senior debt. The manner in which that priority would impact on senior creditors would depend, not upon anything to be found in the payment priority, but upon the unpredictable outcome of a run-off which, at the time both of the framing of the contractual documents and the making of any investment in Cheyne pursuant to them, must have been regarded by the participants as an unpleasant but hopefully remote future risk.

[61] Mr Trower accepted that his construction had that consequence but submitted that it was commercially understandable because later maturing paper carried a slightly higher coupon and because investors with later maturity dates are always exposed to greater risks due to the longer time line in which those risks may occur.

[62] In my judgment, the extra coupon on the longer notes does not begin to explain a deliberate choice of Mr Trower's construction in preference to that advocated by parties B–D. Furthermore, incurring a risk of future adverse events, such as is inherent in the pay as you go regime during a run-off while insolvency is merely a risk rather than a probability, is different in kind from a contractual choice absolutely to prefer earlier senior debt where insolvency is not merely a risk but a dead certainty.

[63] Party A's construction also produces a conflict between the insolvency event definition and the receivers' obligation under cl 10.2(a) of the trust deed, whereas the alternative construction does not. Clause 10.2(a), it will be recalled, is as follows:

'It shall be a term of any appointment of a Receiver under subclause 10.1 that such Receiver shall, unless and until an Insolvency Event Notice is delivered by the Security Trustee in accordance with Clause 9:

Ch D                    Re Cheyne Finance  (Briggs J)                    999

a    (a) manage the Security Assets and the business of the Chargor with the objective of arranging for timely payment in full of the Chargor's obligations to the Senior Creditors and any creditors ranking in priority to the Senior Creditors in the Payment Priority and . . . in each case as and when they fall due for payment in accordance with Clause 12 below . . .'

b    [64] In my judgment, the management objective thereby identified is to ensure, if possible, the timely payment in full of all senior debts as and when they fall due. It would be extraordinary if, during a run-off period when the receivers knew that a medium or long term default was inevitable but could not determine an insolvency event until just before default occurred, they were to be saddled with an impossible objective, impossible because they knew that good c    management could not enable all senior debts to be paid in full.

[65] Mr Trower submitted that it was implicit in cl 10.2(a) that if a choice had to be made between payments of all debts in full or payment of early maturing debts on time, the receivers had to choose a management method best calculated to secure the latter, even if it caused a greater failure to achieve the former. Again, d    I disagree because of the commercially bizarre results which this would produce. I put to Mr Trower the example where Cheyne had liabilities of £1bn falling due in one month and £6bn falling due in six months. To raise the £1bn would require a fire sale for £3bn of a portfolio which, if sold in an orderly manner over six months, could raise £6bn. Plainly, no commercially rational framers of the trust deed would impose upon the receivers an obligation to effect that fire sale. Yet Mr e    Trower submitted on that precise example that this is what cl 10.2(a) required.

[66] On the alternative construction there is substantial harmony between the definition of insolvency event and cl 10.2(a). For as long as, paying due regard to future debts, it appears that Cheyne can pay all its senior debts in full as they fall due, the obligation in cl 10.2(a) is attainable. Once it appears that Cheyne can no f    longer expect to pay all its senior debts in full as and when they fall due, the objective in cl 10.2(a) ceases to be attainable, but the receivers can at exactly the same time determine that there has been an insolvency event. All debts are then accelerated and the cl 10.2(a) obligation ceases to apply.

[67] Party A's best point, in my judgment, was the effect of the phrase 'or is about to become' in the insolvency event definition. As a matter of language, the g    phrase does, on the face of it, point to a review only of the immediate future, and may suggest that the draftsman thought, so that the parties should be presumed to have intended, that 'is unable' otherwise required the receivers to wear the blinkers for which Mr Trower contended, and then lifted the blinkers slightly so as to permit a very restricted look ahead at debts which will fall due imminently.

h    [68] If the test whether Cheyne is unable to pay its debts when they fall due permits a review of all Cheyne's future senior debt then it is hard to envisage how, if Cheyne is about to fail that test, it is not already insolvent. Mr Mortimore QC for party B suggested that 'is about to become' was designed to deal with a situation where the receivers proposed a transaction which, once consummated, would j    cause Cheyne to fail the test, rather like a preference which renders a company insolvent under s 240(2)(b) of the 1986 Act.

[69] I cannot see how the discharge of the cl 10.2(a) duty while Cheyne is not insolvent could lead to a situation where the proposed transaction makes it insolvent on party B's approach to the future debts issue. As will appear, on party A's approach the answer to that question may be different. It may be that, in truth, the phrase 'or is about to become' is a piece of thoughtless drafting which

All England Law Reports   28 May 2008

adds little or nothing to 'is'.  Though mindful that contracts should, if possible, be construed to avoid such a conclusion, the other factors which lead me to resolve the future debts question against party A's construction easily outweigh this apparent contra-indication.

[**70**] I therefore conclude that the definition of insolvency event does permit the receivers to have regard to Cheyne's ability to pay senior debts falling due in the future.

### The standard of proof question

[**71**] I turn, therefore, to the standard of proof question.  Here the rival contentions range between party C's Australian type submission that the receivers should determine an insolvency event unless satisfied on the balance of probabilities that Cheyne will be able to pay all senior debts when they fall due, to party A's submission that the receivers should not determine an insolvency event unless satisfied that there is no reasonable prospect that Cheyne will be able to pay its debts when they fall due.  In the middle lay parties B and D's submission that the burden was on the receivers to satisfy themselves of Cheyne's insolvency on the balance of probabilities.

[**72**] Party A's approach would prevent an insolvency event where, as on the presently assumed facts, the prospect that Cheyne will pay its senior debts in full when they fall due is less than likely but more than fanciful.  By contrast, all the other parties advocated the balance of probabilities which, regardless of the burden of proof which separated party C's submission from that of parties B and D, would require a determination of insolvency on the assumed facts.

[**73**] In using the language of litigation (standard and burden of proof, balance of probabilities, reasonable and fanciful prospects), both counsel and I have borne in mind throughout that the trust deed calls for experienced professionals working in the commercial world to make the determination, not the court at the end of a trial or a summary judgment application under CPR Pt 24.  The language is, however, useful because it compresses well understood concepts into short phrases.

[**74**] I have come to the conclusion that the level of confidence with which, before determining an insolvency event, the receivers must consider that Cheyne is or is about to become unable to pay its senior debts as they fall due is better reflected in a balance of probabilities than in a view that the contrary prospect is so unlikely as to have become fanciful.  They must be satisfied (a state of mind which calls for careful and thorough inquiry), that inability to pay is more likely than not.  My reasons follow.

[**75**] Parties B to D are entitled to take some comfort from the fact that the incorporation of s 123(1) as the relevant test of itself uses a definition which is framed to be used in court and resolved on a balance of probabilities, even though the test is, in fact, to be applied outside court and not by a judge.  By contrast with a state of mind requisite for a finding of wrongful trading—that is, knowledge that there was no reasonable prospect that the company would avoid going into insolvent liquidation—which is used as a test for directors' personal liability, the insolvency event test is imposed upon the receivers in the trust deed to determine the time at which run-off by fiduciaries with pay as you go is replaced by a pari passu distribution by the same fiduciaries in accordance with the payment priority.  If that change is postponed for as long as there is more than a fanciful prospect of payment in full, its consequences may work grave prejudice to senior creditors with later maturing debts out of all proportion to the prejudice to early

All England Law Reports   28 May 2008

| Ch D | Re Cheyne Finance (Briggs J) | 1001 |
|------|------------------------------|------|

*a*   maturing creditors of becoming subject to pari passu distribution of assets realised to produce best value rather than early cash. The fact that the market for Cheyne's investment portfolio may go up as well as down may well make it hard to say that the prospect of payment in full is only fanciful, even though unlikely.

*b*   [76] Being satisfied on the balance of probabilities is, in my judgment, typical of the standards on which commercial fiduciaries are accustomed to act when making important business decisions in the best interests of their beneficiaries. I can see no good reason in the present case to impose any higher hurdle.

[77] The assumed facts are, as I have said, summarised by the passage in the second witness statement of Mr Kahn (para 93), where he states that on the receivers' best current assessment Cheyne is now unable to pay all its senior debts as they fall due. Accordingly, I answer question 1 in the affirmative.

*c*

*Question 2*

[78] It follows that question 2 does not strictly arise on the assumed facts, since the receivers will presumably make a determination of insolvency if those facts do not change for the better. I am asked nonetheless to address question 2 in any event in case, on appeal, a different answer is given to question 1 than that which I have given. I shall do so briefly, reflecting the brevity of the submissions made on these further questions.

*d*

[79] I do so, first, on the assumption that I am correct in my construction of insolvency event, but assuming that, perhaps because the assumed facts change or are found to differ from the true facts, the receivers nonetheless do not make an insolvency event determination. A future default in paying senior debts is therefore assumed to be improbable, but there may still be a real risk of it.

*e*

[80] *Question 2(a)(i).* In advance of an insolvency event cl 10.2(a) of the trust deed requires the receivers to manage the assets so as to maximise the prospect (which, although probable, may be still subject to real risk), of a timely payment in full of all senior debts. If a proposed asset sale maximises that prospect, then the receivers should sell. If not, they should not. The question as framed omits the words 'all', 'timely' and 'in full', which should be added to any affirmative answer.

*f*

[81] *Question 2(a)(ii).* On my construction of insolvency event, the answer must be No. Such a sale would convert Cheyne from a company probably able to pay all senior debts in full on time, and therefore solvent, into one that could not. No sensible interpretation of cl 10.2(a) could permit such a sale, not least because it would cause an insolvency event where it was otherwise improbable.

*g*

[82] *Question 2(b).* On my construction of insolvency event the answer must again be No, because if there has been no insolvency event absent the sale Cheyne will probably be able to pay all its senior debts in full, and cl 10.2(a) requires the receivers to maximise that prospect, whereas the sale would prevent it.

*h*

[83] I turn now to question 2 on the alternative construction of insolvency event to that which I have preferred. On that construction it is, on the assumed facts, probable, but not necessarily certain, that Cheyne will fail to pay all senior debts in full as they fall due, but the receivers are unable to declare an insolvency event, so remain bound by cl 10.2(a) of the trust deed.

*j*

[84] One of the reasons why I have rejected that construction of insolvency event is that, in my judgment, it gives rise to extraordinary difficulties in understanding how the cl 10.2(a) duty is to be performed, it being unlikely that the stated objective can be achieved in full. The same problems are magnified if future default is not merely probable, but certain.

[**85**] *Question 2(a)(i)*.  Again, in my judgment, the answer must be Yes, but with the addition of the words 'all', 'on time' and 'in full'.  Where a proposed sale increases the prospects of achieving that objective from, for example, just better than fanciful to, for example, just less than even, then they should sell.  If not, they should not sell.

[**86**] *Question 2(a)(ii)*.   This question raises the problem that a proposed transaction may affect the prospects of achieving different parts of the cl 10.2(a) objective in different ways.   For example, a proposed sale may substantially increase the prospects of payment of all senior debts in full, but at the price of making it certain that some will be paid late.  The portfolio sale referred to in the assumed facts is just such a transaction.

[**87**] Unsurprisingly, on my construction of insolvency event, cl 10.2(a) provides no answer to this conundrum.   On the alternative construction of insolvency event no other provision of the trust deed does either.   In my judgment, the receivers would have to make that choice by applying their own judgment as to which course would best serve the interests of the senior creditors as a whole.  I reject party A's submission that cl 10.2(a) impliedly prefers prompt payment of early maturing debts over all other parts of the stated objective.

[**88**]  The consequence of such a decision may be to accelerate the date when, on the alternative construction of insolvency event, an actual or imminent default in payment of a senior debt on time triggers an insolvency event.  If so, so be it.  If the beneficial transaction made such a default imminent, then it would trigger an immediate insolvency event even prior to the sale.  But to treat that consequence as meaning that therefore the receivers should not sell would be to allow the tail to wag the dog.   It would almost, by definition, be a transaction which the receivers would wish to pursue after an insolvency event, so the fact that a decision to sell would trigger an insolvency event would not, in my judgment, matter.

[**89**] *Question 2(b)*.   This question presumably contemplates some kind of distressed sale which, although it fails to achieve best value, generates the early cash necessary to postpone an immediate or early insolvency event constituted by an actual or imminent default.   On the alternative construction it would not trigger an insolvency event.  Again, unsurprisingly, in my view, cl 10.2(a) provides no clear answer to this conundrum.  I would answer it, like question 2(a)(ii), by reference to the receivers' judgment as to the best interests of the senior creditors as a whole.  From the evidence it seems most unlikely that the receivers would think that such a transaction was in the best interests of senior creditors as a whole, unless perhaps the increased probability of a later default was marginal, whereas the proposed transaction secured major advantage in terms of earlier payment.

[**90**]  In my judgment, the receivers would not be obliged slavishly to effect any sale which would postpone an early or imminent default regardless of the gravity of later defaults thereby caused by failing to obtain best value.

*Directions accordingly.*

Giovanni D'Avola   Barrister.

TAB 50

*Re European Life Assurance Society* (1869) LR 9 Eq 122,
English High Court

EQUITY CASES. [L. R.

V.-C. J.
,1869
Oct. 2, 13, 15.

## *In re* EUROPEAN LIFE ASSURANCE SOCIETY.

*Winding-up—Companies Act,* 1862—*Life Assurance Company—Tests of
Solvency.*

Inability of a company to pay its debts under sect. 80 of the *Companies Act,*
1862, is an inability to pay debts actually due, for which a creditor could
claim immediate payment.

The Court will not order a company to be wound up under the just and
equitable clause by reason of any liabilities not immediately payable unless it
is reasonably certain that the existing and probable assets will be insufficient
to meet the existing liabilities, and will not in any case take into account the
possible liabilities or profits which may accrue in respect of future business.

THESE were two Petitions for winding up the *European Life
Assurance Society.* The society was established as the *People's
Provident Assurance Society* in 1854, and in 1859, upon an amalga-
mation with the *European Life Insurance and Annuity Company,*
its name was changed by Act of Parliament (22 Vict. c. 25) to
the *European Assurance Society.* No less than thirty-three different
companies had become amalgamated with, and were now repre-
sented by, the society. The original capital was £200,000, divided
into 80,000 shares of £2 10s. each. In 1862 the capital was in-
creased to £1,000,000, consisting of 400,000 £2 10s. shares. Up
to May, 1868, 308,863 shares had been subscribed for, of which
2294 were fully paid up, and 10s per share had been called up on
the remainder. In July, 1869, a call of 5s. per share was made for
the purpose of discharging a debt of £15,000 to Messrs. *Hopkinson,*
bankers of the society; but this call, though paid by most, had not
been paid by all the shareholders, and had produced £50,000 only
instead of £75,000. The society had issued a large number of life
and fidelity policies, and granted annuities to a considerable amount,
the income in respect of these particulars being large. The claims
against the society were also, as it was stated, large, and there were
at the time of presenting the Petition claims on policies amounting
to £100,000, many of which would be immediately payable.

The Petitioner *Crawford* was a director, and the holder of 400
shares in the society, and held a policy for £300 upon his own life.
He was also interested in two other policies on the lives of debtors
of his, and had been agent of the society in *Edinburgh.*

The Petitioner *Coupe* was the holder of 3000 shares in the society.

*Crawford* stated that as a director he had from time to time objected to divers acts and proceedings recommended by the manager and actuaries of the society, and in particular to the appropriation in 1867 of £70,000 by way of bonus to the share and policy holders. He had also endeavoured to effect a reduction in the fees paid to the directors, commission to agents, and in the expenses generally, and in 1868 and 1869 to the payment of any dividend to the shareholders. A committee of investigation was appointed on his motion in December, 1868, but had found the greatest difficulty in obtaining from the officers of the company the information required, and the recommendations of the committee had been disregarded. After stating that the Petitioner felt bound in the interests of all concerned in the affairs of the society to present this Petition, and that, though hoping that some provision might yet be made for the maintenance of the business of the company, was satisfied that the interposition of the Court at the present time was essential, the Petition alleged as follows:—" The moneys available at the head office in *London* for the payment of the current claims against the company do not exceed £10,000, and these moneys are made up of what remains of the sums received on the call, and of the premiums received from day to day. There are also sums due from the several agents of the company at home and abroad, but these sums, together with those available at the head office, are utterly insufficient to meet the amounts becoming due on policies which have already matured into claims, and the liabilities are necessarily increasing daily. The company is, in fact, altogether insolvent, and unable to pay its debts. Its assets over and above the moneys already mentioned, and what is unpaid on the shares, are comparatively trifling."

The Petition of *Coupe* (who was stated in the affidavits in opposition to his Petition to be in arrear in respect of, and without means of paying, the call of July last) contained similar allegations as to the society, the pecuniary condition of which was unsatisfactory and unsound, being unable to pay its debts, or continue its business with any prospect of success; the great drain on its resources from numerous deaths among the assured, and the heavy charges for expenses of management, and the absence of any suffi-

V.-C. J.

1869

*In re*
EUROPEAN
LIFE
ASSURANCE
SOCIETY.

V.-C. J.

1869

*In re*
EUROPEAN
LIFE
ASSURANCE
SOCIETY.

cient reserve fund; that the society had been compelled to use up all its available funds and securities, and make a call of 5s. per share, for the mere purpose of providing ready money to meet current and pressing liabilities, and, in reality, to stave off the period when stoppage should become imperative; that the real cause of the recent discontinuance of the business carried on by the society in the *United States* was the withdrawal of the government license, such withdrawal being based upon the unsatisfactory and unsound pecuniary condition of the society; and, lastly, that any postponement of the winding up of its affairs must involve a waste of its assets.

The total sums insured upon current policies amounted to about £8,750,000; the premium income receivable being about £290,000 per annum. The average age of the lives assured was stated as forty-two years, and the average duration of the policies as nine years. The liability under annuities was £140,000, and the claims accrued on life policies were £120,000.

The balance sheet of the society of the 31st of December, 1868, was as follows:

GENERAL BALANCE SHEET OF THE EUROPEAN ASSURANCE SOCIETY, DECEMBER 31, 1868.

*Dr.*

| | £ | s. | d. | £ | s. | d. |
|---|---|---|---|---|---|---|
| Subscribed Capital .. .. .. .. | .. | | | 779,349 | 11 | 0 |
| (Capital paid-up £183,798 16s. 6d.) | | | | | | |
| SUNDRY ACCOUNTS: | | | | | | |
| Deposits .. .. .. .. .. | 2,818 | 18 | 3 | | | |
| *British Nation* (Share Account) .. .. | 765 | 7 | 0 | | | |
| *Royal Naval and Military* ditto .. .. | 2,751 | 5 | 9 | | | |
| Agents' Bonus .. .. .. .. | 2,325 | 0 | 0 | | | |
| *Hopkinson & Co.* .. .. .. .. | 5,000 | 0 | 0 | | | |
| *British Reversionary Company* .. .. | 816 | 0 | 8 | | | |
| *Etna Company* .. .. .. .. | 3,624 | 8 | 11 | | | |
| Sundry Accounts .. .. .. .. | 147 | 4 | 5 | | | |
| | | | | 18,248 | 5 | 0 |
| Liability under Assurances, or Balance of present Value of Sums Assured over present Value of Annual Premiums and present Value of Annuities of £17,943 3s. 7d. .. .. .. | .. | | | 312,486 | 0 | 0 |
| Life Claims admitted and not admitted, viz.:— | | | | | | |
| Admitted .. .. .. | 60,506 | 3 | 5 | | | |
| Not admitted .. .. | 39,232 | 3 | 2 | | | |
| | | | | 99,738 | 6 | 7 |
| Guarantee Claims admitted .. .. .. | 1,299 | 4 | 6 | | | |
| Ditto under investigation, £20,414 17s. 1d. (It is estimated that the payments on this Account will not exceed .. .. .. .. | 10,000 | 0 | 0 | | | |
| | | | | 11,299 | 4 | 6 |
| Balance in favour of Company .. .. | .. | | | 107,205 | 18 | 2 |
| | | | £ | 1,328,327 | 5 | 3 |

VOL. IX.]                    EQUITY CASES.                        125

General Balance Sheet of the European Assurance Society, December 31, 1868.   V.-C. J.

*Cr.*

1869
*In re*
European
Life
Assurance
Society.

| | £ | s. | d. | £ | s. | d. |
|---|---|---|---|---|---|---|
| Consols .. .. .. .. .. .. | 32,000 | 0 | 0 | | | |
| *Indian Government* Debentures.. .. .. | 10,550 | 0 | 0 | | | |
| | | | | 42,550 | 0 | 0 |
| *United States* Stock .. .. .. .. | 29,938 | 13 | 0 | | | |
| *Buffalo City* Bonds .. .. .. .. | 11,663 | 16 | 8 | | | |
| | | | | 41,602 | 9 | 8 |
| *Melbourne* Property .. .. .. .. | .. | | | 6,650 | 2 | 7 |
| Value of Annuities receivable by the Government as per last Valuation .. .. .. .. | 9,083 | 6 | 0 | | | |
| Instalments of Annuities due .. .. .. | 792 | 19 | 5 | | | |
| Reversions as per last Valuation .. .. | 7,958 | 3 | 9 | | | |
| Railway Debentures .. .. .. .. | 6,000 | 0 | 0 | | | |
| *Alexandra Hotel* Debentures .. .. .. | 4,100 | 0 | 0 | | | |
| Loans and Mortgages, including Interest due .. | 57,207 | 11 | 1 | | | |
| Amount due from *International Insurance Company* .. .. .. .. .. .. | 1,000 | 0 | 0 | | | |
| Amount due from *Mercantile Union* .. .. | 920 | 10 | 10 | | | |
| Purchase of Business Account .. .. .. | 261,817 | 15 | 10 | | | |
| | | | | 348,880 | 6 | 11 |
| Loans on Policies .. .. .. .. | 68,337 | 4 | 5 | | | |
| Half Credit Premiums .. .. .. .. | 38,359 | 5 | 4 | | | |
| | | | | 106,696 | 9 | 9 |
| Leases of Premises .. .. .. .. | 9,037 | 7 | 0 | | | |
| Furniture, Fixtures, and Fittings .. .. | 4,045 | 17 | 2 | | | |
| | | | | 13,083 | 4 | 2 |
| Agents' Balances.. .. .. .. .. | 71,559 | 16 | 6 | | | |
| Premiums in course of payment at Chief Office .. | 5,847 | 10 | 4 | | | |

SUNDRY ACCOUNTS—FIRE DEPARTMENT.

| | £ | s. | d. | £ | s. | d. |
|---|---|---|---|---|---|---|
| Cash in hand and at Bankers.. | 188 | 10 | 7 | | | |
| Consols .. .. .. | 883 | 15 | 0 | | | |
| Loan .. .. .. .. | 65 | 0 | 0 | | | |
| Agents' Balances .. .. | 4,611 | 5 | 4 | | | |
| | | | | 5,748 | 10 | 11 |

DEPOSITS.

| | £ | s. | d. | £ | s. | d. |
|---|---|---|---|---|---|---|
| *Melbourne* .. .. .. | 25,000 | 0 | 0 | | | |
| *Sydney* .. .. .. | 9,445 | 15 | 7 | | | |
| *India* .. .. .. .. | 1,007 | 8 | 0 | | | |
| *New York* .. .. .. | 6 | 0 | 11 | | | |
| *London* .. .. .. | 1,500 | 0 | 0 | | | |
| | | | | 36,959 | 4 | 6 |

CURRENT ACCOUNTS.

| | £ | s. | d. | £ | s. | d. |
|---|---|---|---|---|---|---|
| At *London* Bankers .. .. | 11,090 | 10 | 0 | | | |
| *Melbourne* Bankers .. | 913 | 19 | 7 | | | |
| *Sydney* Bankers .. .. | 104 | 2 | 8 | | | |
| *India* Bankers .. .. | 1,036 | 0 | 5 | | | |
| | | | | 13,144 | 12 | 8 |

| | £ | s. | d. |
|---|---|---|---|
| (Agents' Balances total) | 83,155 | 17 | 9 |
| (Fire & Deposit total) | 50,103 | 17 | 2 |
| Cash in hand .. .. .. .. | 54 | 2 | 9 |
| Estimated Value of Re-assurances with other Offices—at least .. .. .. .. | 40,000 | 0 | 0 |
| Capital at Call .. .. .. .. | 595,550 | 14 | 6 |
| | £1,328,327 | 5 | 3 |

EQUITY CASES.                    [L. R.

V.-C. J.        The effect of the evidence and the arguments fully appears in
1869        the judgment.

*In re*
EUROPEAN          Mr. Serjt. *Sargood*, and Mr. *Higgins*, appeared in support of
LIFE        *Coupe's* Petition.
ASSURANCE
SOCIETY.
                 Mr. *Dickinson*, Q.C., and Mr. *Kekewich*, in support of *Crawford's*
Petition.

    Mr. *Glasse*, Q.C., and Mr. *Millar*, for the society, and

    Mr. *Fry*, Q.C., and Mr. *Bevir*, for fourteen shareholders, repre-
senting £8370, and for 3657 policy-holders, representing £1,456,000
in assurances, opposed the Petition.

    Mr. *Amphlett*, Q.C., Mr. *Karslake*, Q.C., and Mr. *Whitehorne*, also
appeared.

    The following cases were cited: *Ex parte Spackman* (1); *In re
Anglo-Greek Steam Company* (2); *In re National Live Stock In-
surance Company* (3); *In re Suburban Hotel Company* (4); *In re
Joint Stock Coal Company* (5).

SIR W. M. JAMES, V.C. :—

    Since this case was first brought before me I have applied my
mind to it, and the same reason which induced me to hear it as
soon as possible in the vacation—namely, the enormous magnitude
of the interests involved, and the great embarrassment which the
hanging over of a matter of this kind must occasion both to the
company and to the persons having dealings with it, induces me
now not to defer the delivery of the decision which I am about to
pronounce. This case is a novel one in some respects. A Petition
has been presented by a shareholder — though there are two
Petitions they are in substance the same—asking the Court to
wind up the company under one of the clauses in the Act of Par-
liament by which a company may be wound up—for it is not
imperative on the Court to issue a winding-up order—whenever a
company is unable to pay its debts, or whenever the Court is of

(1) 1 Mac. & G. 170.            (3) 26 Beav. 153.
(2) Law Rep. 2 Eq. 1.           (4) Law Rep. 2 Ch. 737.
                (5) Law Rep. 8 Eq. 146.

opinion that it is just and equitable that it should be wound up. With regard to the payment of debts, there are certain things given as *indicia* of inability to pay debts, followed by the general clause empowering the Court to make the order whenever it is proved to its satisfaction that the company is unable to pay its debts. Now, it is not suggested that the company has been unable to pay its debts in the sense that it has failed to pay every demand which has been made upon it. It is not suggested that it has not found the money to meet everything that has become payable in due course; it is not suggested that it has vexatiously or dishonestly disputed claims for the purpose of not discharging them; and it is not suggested, therefore—at all events, there is no evidence before me—that in the sense of debts actually due within the meaning of the 1st clause of the 80th section of the Act any debt due and payable has not been paid. But it is contended that the company is unable to pay its debts in the sense that it has been obliged to pay them out of assets not properly applicable to them, and that it has only been able to pay its debts in, as it were, a hand-to-mouth way by applying current income to discharge past liabilities—a proceeding which I agree, as has been said in the course of the arguments, would not be justifiable on the part of such a company. The contract with the policy-holder is, that the assets of the company, at the time when the claim matures, shall be the fund out of which the claim shall be satisfied; and no doubt the taking of all the premiums accruing due after that in payment of past liabilities would be an improper application of the assets. Of course all that must be considered in a practical business-like way. It cannot be pretended that a call ought to be made if there is money in the hands of the society, debts due, or assets existing at the time of the maturity of the claim, applicable to the satisfaction of that claim. I think that the Petitioners have not made out a case at all in any sense of inability to pay debts within the meaning of the Act of Parliament. I apprehend that Mr. *Glasse* is right in his construction, that inability to pay debts must refer to debts absolutely due—that is to say, debts for which a creditor may go at once to the company's office and demand payment The case has therefore been put, really and substantially, not upon the ground of actual inability to pay a debt actually due, but

V.-C. J.

1869

*In re*
EUROPEAN
LIFE
ASSURANCE
SOCIETY.

EQUITY CASES.  |L. R

V.-C. J.
1869
*In re*
EUROPEAN
LIFE
ASSURANCE
SOCIETY.
———

upon another ground—a very important one in regard to these companies—viz., upon the ground of the application of the 5th sub-section of the 79th section to cases which are *ejusdem generis*, or to be governed by some reference to other cases specially provided for—that is, "whenever the Court is of opinion that it is just and equitable that the company should be wound up." I agree that this is a jurisdiction which this Court has no more right to refuse to exercise than any other jurisdiction which is given to it by Act of Parliament. The Court is bound to exercise that jurisdiction of winding up if it is of opinion upon hearing the whole case that it is just and equitable—not that it is prudent, but that it is just and equitable—that the company should be wound up. And in my view of the law of the case it would be just and equitable to wind up a company like this assurance company if it were made out to my satisfaction that it is, not in any technical sense but, plainly and commercially insolvent—that is to say, that its assets are such, and its existing liabilities are such, as to make it reasonably certain—as to make the Court feel satisfied—that the existing and probable assets would be insufficient to meet the existing liabilities. I take it that the Court has nothing whatever to do with any question of future liabilities, that it has nothing whatever to do with the question of the probability whether any business which the company may carry on to-morrow or hereafter will be profitable or unprofitable. That is a matter for those who may choose to be the customers of the company and for the shareholders to consider. I have to look at the case simply with reference to the solvency or insolvency of the company, and in doing that I have to deal with the company exactly as it stood on the day to which the evidence relates—viz., the 31st of December, 1868, which I assume to represent substantially the state in which the company stands now. I must take it as if all the business which the company ever intended to do was then done, as if its business were confined to its existing contracts, and as if it did not mean to enter into one single fresh contract or do anything more. Then, having regard to the state of the assets and the liabilities at that time, is it proved to my satisfaction that the company is unable or will be unable to meet the claims under its existing contracts? Now, it was pressed very much upon me that, in looking

at that, I was not to regard the subscribed but uncalled-up capital
of the company.  I am unable to take that view.  It appears to
me that that is about the first asset which one looks to in testing
the solvency or insolvency of a company like this; and I cannot
help thinking that this explains a great deal of the evidence given
by the actuaries in support of the Petition.  The evidence of the
actuaries is this: They say, having regard to the length of time
which the company has been in existence, and the income which
it has received for years on policies averaging nine years in dura-
tion, it ought to have had invested a sum, in round numbers, of
about a million sterling, at 4 per cent., in order to be in what
they call a safe position.  I think I am justified in saying that
every one of these affidavits is based upon the assumption and
theory that this should be treated as a mutual assurance society—
that is to say, having nothing but the assurance funds to be re-
sorted to, and that then, in order to put it in a state of what they
deem adequate security for an office of that kind having lived so
many years, it should at this time have such a fund as that; but
they wholly disregard the share capital.  One of them, indeed,
says he does not regard that at all.  Now, I think that that kind
of evidence—which, assuming the company to be a mutual assur-
ance society, and to have nothing whatever to look to but the
accumulated premiums and the future premiums, states that it
would require a sum of one million, and that this company has not
a million or anything like it—is very far short of the evidence
which it is incumbent on the Petitioners to produce to satisfy this
Court that there is that insolvency which would make it just and
equitable for it to interfere.  Passing from the evidence of the
actuaries, I have to consider that which pressed on my mind for a
long time during these proceedings, viz., the society's balance
sheet itself on the 31st of December, 1868, with the corrections
which it appeared to me ought to have been made in it.  That
balance sheet as it stands represents the company as not only being
solvent, but as having its whole capital intact, and as having
£107,000 besides — that is to say, with £800,000 odd beyond
the sum necessary to meet its liabilities.    But on the side of the
assets there is inserted a sum of £261,000 for the purchase of busi-
ness account.  That item ought never to have appeared there.  I am

V.-C. J.

1869

In re
EUROPEAN
LIFE
ASSURANCE
SOCIETY.

EQUITY CASES.                          [L. R.

V.-C. J.

1869

*In re*

EUROPEAN
LIFE
ASSURANCE
SOCIETY.

sorry to find it there. I cannot conceive that that could have been
properly represented as an asset. It may have been a very judicious
investment, but it ought never to have been an investment out of the
assurance fund. If the company thought of doing such a thing as
that, what they ought to have done was to have called up from their
shareholders capital, and no part of the assurance money should
have been invested in buying the goodwill of a business, and having
bought that goodwill it certainly ought not to have been put down
as an asset available, in any sense of the word, for the purpose of
meeting the liabilities set down on the other side of the account.
I, therefore, deduct this £261,000 from the side of the assets.
Then, on the other side, it did appear to me for a long time that
it would be necessary to add to the amount of the liabilities, which
are taken at £312,000, that further sum which Mr. *Walker* in his
cross-examination stated would have to be added to them if the
expenses were included, which seem to have reached in the past
year to £70,000, a very large amount, which I am told is likely
to be diminished. During a considerable part of the hearing I
was much impressed with that view, but I do not think it is a sound
one. It does seem at first sight a startling thing to say "I take
the gross income, and I don't deduct anything for the expenses."
But then there is force in what Mr. *Woolhouse* says in his affidavit,
that these expenses are for the purpose of acquiring new business.
I am testing now what are the assets to meet the existing liabilities
of the company; and if the company were content to say, "We
are willing to go on; we have got our existing contracts; only,
rather than incur the expense for agents, for offices, and the like,
we are content to receive the premiums that are due upon our
existing policies, and to apply those premiums as they may be
wanted, and provide for payment of the existing liabilities"—if
they were minded to take that course, and not to be competitors
with other offices for fresh insurances, I do not know why they
need take £70,000 a year for expenses, or even incur any large
proportion of that sum. I think, therefore, that Mr. *Woolhouse*
has made the true answer—that nothing like that sum ought to be
expended, and that some reduction must be made in respect to
that. If I were to take upon myself to appoint a manager as
receiver of the premiums due from the policy-holders, all the policy-

holders would have to pay their money, for that is in their con-
tract, without putting the company to any further expense. Then
I do not think there is that inaccuracy in the estimate of the
liabilities which was first pressed upon me, and I cannot add to it
that three-quarters of a million, or any great portion of it, in test-
ing the question of solvency. It is also urged on the other side
that we cannot take all the £595,000 of unpaid-up capital as avail-
able assets, and that the fact that a call for upwards of £70,000 pro-
duced only £50,000 is a proof that it is not all to be relied on;
but I think, in the absence of any evidence of the insolvency of the
shareholders, it would be far too wide and speculative for the Court
to act upon the assumption that the shareholders are not able to
pay that capital which they have undertaken to pay.    Therefore
it appears to me that, as far as the case now stands, taking the
liabilities accruing upon the calculations in this balance sheet, and
taking the assets as including the unpaid part of the share capital,
it is not open to any shareholder, and it is not open to any policy-
holder (for upon that all their rights are the same) to say, " I ask
the Court to put an end to all contracts now existing, because I
have made out to the satisfaction of the Court that the company
will be unable to discharge its liabilities under those contracts
when they arise." Any suspicion that mismanagement may con-
tinue is a thing with which this Court has, of course, nothing to do.
Profit or loss, prudence or imprudence, are matters with which this
Court has nothing whatever to do.    This Court gives no opinion
whether persons ought or ought not to trust the company.    It has
simply to deal with those matters which are properly before it.
The Petitioners have failed to prove that which it was requisite for
them to prove—viz., that this company is insolvent, and that being
so, the Petitions are dismissed with costs.

Solicitors : Messrs. *Freshfield ;* Messrs. *Lewis, Munns, Nunn, &
Longden ;* Messrs. *G. L. P. Eyre & Co.*

V.-C. J.

1869

*In re*
EUROPEAN
LIFE
ASSURANCE
SOCIETY.

TAB 51

*Re Fairway Magazines Ltd* [1993] BCLC 643

a

# Re Fairway Magazines Ltd
# Fairbairn v Hartigan

CHANCERY DIVISION
MUMMERY J

b   21, 22, 29 JULY 1992

*Floating charge – Floating charge in favour of director – Connected person –
Whether charge constituting preference – Whether floating charge created at
same time as consideration provided to company – Whether new moneys pro-
vided to company at time of creation of charge – Insolvency Act 1986, ss 238,*

c   *240, 245.*

The applicant was a director of F Ltd and had guaranteed the overdraft of the
company with its bank, C & Co, up to a limit of £70,000. By an arrangement
dated 21 August 1990, the applicant agreed to grant F Ltd a borrowing facility
of £75,000 and the company agreed to secure its repayment by a debenture. On

d   28 August the applicant advanced £15,000 to the company. On 27 September
the company executed a floating charge in favour of the applicant which was
registered in early October. Two sums of £10,000 were paid in to F Ltd's account
with C & Co in November 1990 and January 1991 respectively. The company
went into liquidation and the applicant sought a declaration that the sums

e   advanced by the applicant were secured by the floating charge created in his
favour by the company.

Held – (1) The applicant had successfully rebutted the presumption created
by s 239(6) of the Insolvency Act 1986 that the floating charge executed
in his favour by F Ltd had been done with the desire of putting the appli-

f   cant in a better position than he would be in should the company go into
insolvent liquidation. Accordingly, the charge was not invalid as being a pref-
erence.

(2) The charge created in favour of the applicant in September 1990 was
validly created within the terms of s 245(2) (*a*) of the 1986 Act at the same time
as the payment of the £15,000 was made to the company and therefore the

g   floating charge was valid to the extent of this sum.

(3) Since the payment of the two sums of £10,000 into the company's bank
account did not go to swell the assets of the company but had the effect of
reducing the applicant's liability under his guarantee to C & Co, they did not
constitute the provision of new moneys within the meaning of s 245 and the

h   floating charge to the extent of £20,000 was void under this section.

### Cases referred to in judgment

*Beacon Leisure Ltd, Re* [1992] BCLC 565.
*Columbian Fireproofing Co Ltd, Re* [1910] 2 Ch 120, CA; *affg* [1910] 1 Ch
    758.

i   *Matthew Ellis Ltd, Re* [1933] Ch 458, [1933] All ER Rep 583, CA.
*MC Bacon Ltd, Re* [1990] BCLC 324.
*Orleans Motor Co Ltd, Re* [1911] 2 Ch 41.

*Shoe Lace Ltd, Re* [1992] BCLC 636.
*Stanton (F & E) Ltd, Re* [1929] 1 Ch 180, [1927] All ER Rep 496.
*Whyte (G T) & Co Ltd, Re* [1983] BCLC 311.                              *a*

Case also cited
*Brightlife Ltd, Re* [1986] BCLC 418, [1986] 3 All ER 673, [1987] Ch 200.

### Application                                                          *b*

The applicant sought (i) a declaration that repayment of the sums (with interest
accrued thereon) and paid by the applicant to the company pursuant to a written
loan agreement made on 21 August 1990 between (1) the company and (2) the
applicant was validly secured by a debenture dated 27 September 1990 and
granted by the company in favour of the applicant; (ii) a declaration that on the
true construction of the said debenture payment of the sums due to the applicant   *c*
from the company fell to be made out, inter alia, of the book debts and the
value of the goodwill and trade connections of the company in priority to the
preferential and unsecured creditors of the said company by reason of the specific
fixed charges created by clause 1(d) and 1(f) of the said debenture. The facts
are set out in the judgment.
                                                                        *d*

*Nigel Davis QC* (instructed by *Denton Hall Burgin & Warrens*) for the applicant.
*Stephen Moverley Smith* (instructed by *Underwood & Co*) for the respondent.

                                                          *Cur adv vult*

                                                                        *e*

29 July 1992. The following judgment was delivered.

### MUMMERY J.

*Introduction*

    The issue on this application is whether a debenture granted by a company,    *f*
Fairway Magazines Ltd (Fairway) to one of its directors, Mr Anthony Fairbairn
(the applicant) five months before Fairway went into creditors' voluntary liqui-
dation with an estimated deficiency of over £220,000, validly secures repayment
of five sums paid by the applicant at various times pursuant to a written loan
agreement made with Fairway about a month before the debenture was granted.
    The applicant submits that the debenture secures repayment of a total sum of    *g*
£43,000 with interest. He seeks a declaration to that effect. His application is
opposed by Mr Patrick Hartigan (the respondent) in his capacity as liquidator
of Fairway. The respondent submits, first, that the debenture is a voidable
preference falling within s 239 of the Insolvency Act 1986 and that the court
should discharge it in whole under s 241(1)(c). Alternatively, it is submitted that   *h*
the floating charge created by the debenture on the undertaking and property of
Fairway is invalid under s 245 of the 1986 Act to the extent of £35,000, because
(a) £15,000 of that sum was paid by the applicant to Fairway before, and not
'at the same time as, or after, the creation of the charge' within the meaning of
s 245(2)(a) of the 1986 Act; and (b) two payments of £10,000 were not 'paid
... to the company' at all, within the meaning of s 245(2)(a).                  *i*
    I now turn to the facts relevant to the determination of these issues. Fairway
was incorporated on 23 January 1984 and, until it went into creditors' voluntary

liquidation on 27 February 1991, it carried on a magazine publishing business. The main title 'Pro-Shop' was a magazine distributed to suppliers concerned with golfing equipment. It was a success. Other titles were not.

The original shareholders and directors of Fairway were the applicant's two sons, Robert, who was managing director and responsible for day-to-day management throughout, and James, a solicitor, who resigned in 1988, but continued to be involved in the giving of legal advice. A family friend, Mr Gowland, was also a director.

The applicant did not become a shareholder or director until 1989. By that time Fairway faced increasing financial difficulties. The applicant became involved in attempts to solve those difficulties. After the failure of a new magazine 'Sportstyle' it was decided to inject further capital into Fairway. The applicant contributed capital in return for 3,000 shares. He also guaranteed Fairway's overdraft with the National Westminster Bank, initially up to a limit of £15,000, as set by a guarantee of 15 June 1988. Fairway changed its bankers later to Coutts & Co, and the National Westminster Bank guarantee has been superseded. Coutts & Co made overdraft facilities available to Fairway and also a separate loan account of £30,000.

The applicant initially guaranteed the overdraft with Coutts on 4 June 1989 up to a limit of £30,000. He gave a guarantee for an additional £20,000 on 27 November 1989. On 5 June 1990 he gave another guarantee in which the reference to a limit on it was deleted. It is agreed that that was a mistake and there is no dispute that that guarantee was for an additional £20,000. The position therefore was that the applicant's maximum personal guarantee liability to Coutts on the Fairway overdraft was £70,000. There was also a £20,000 guarantee by Mr Gowland. The bank had required an increase in the guarantee in June 1990 because they had granted a temporary increase in the overdraft facility to Fairway up to £60,000. The bank has no charge or debenture in respect of the overdraft.

The immediate cause of the financial difficulties encountered in early 1990 was that it had been decided by Fairway to distribute the 'Pro-Shop' magazine throughout Europe under the title 'Pro-Shop Europe'. This had the effect of increasing Fairway's costs. Fairway had to increase its advertising rates and that led to difficulties in collecting advertising revenue. Fairway's borrowing therefore increased as its financial position deteriorated.

It was in August 1990 that the applicant agreed to provide a borrowing facility to Fairway up to a maximum of £75,000. It was to be paid by instalments on dates to be agreed. The applicant had himself obtained a facility for this amount from the National Westminster Bank by means of a second mortgage on his own home. The applicant's evidence is that the purpose of the agreement was to keep alive the hopes of rescuing the company. That is also the evidence of his son, Robert, the executive director of Fairway. The terms of the facility are contained in a written loan agreement dated 21 August 1990. It was prepared by the applicant's solicitor son. It was also that son who suggested that payments to be made by the applicant to the company should be secured by debenture.

Clause 1 of the loan agreement provides:

'The lender shall grant to the company a borrowing facility of £75,000, such sum to be paid in instalments on dates to be agreed between the

company and the lender from time to time, the first such instalment of
£15,000 to be paid on 28 August 1990.'

The agreement made provision for payment of interest and repayments at a
rate of £750 per month, the entire indebtedness to be repaid on or before 1
December 1998. It was agreed in cl 6 that the company would grant a debenture
to the lender to secure its indebtedness from time to time under the loan
agreement.

The applicant's case is that, in reliance on the promise of the debenture and
in anticipation of its execution, he agreed to advance, and did advance, the sum
of £15,000 to the company on 28 August 1990; that is about a month before
the debenture was executed. The immediate purpose of the payment was to
reduce the bank overdraft which had temporarily exceeded its limit of £60,000
set in April 1990. In April Coutts had made it clear that they were looking for
a reduction in the level of borrowing, as they considered it to be quite high
enough. It was the maximum amount which the bank felt it was able to make
available at that time. It was made clear that the directors should monitor the
company's drawings to ensure that the limit should not be exceeded at any time.
The overdraft, as at the date when the £15,000 was advanced by the applicant,
had risen to £76,525; that is well in excess of the £60,000 limit.

The debenture, which was stated to be granted pursuant to the terms of the
loan agreement, contained originally in its drafting a reference to 'of even date.'
That was deleted. The debenture was not executed on behalf of Fairway until
27 September. The applicant had signed the debenture on the same day as the
loan agreement. The only reason for the delay in signing on behalf of Fairway
was that Robert was slow in executing and returning the debenture to the
solicitors. It was registered on 13 October 1990. It appeared from evidence
given in cross-examination by the applicant that he himself was away on holiday
for about three weeks in the intervening period (the end of August and first ten
days or so of September) and so was not around to chase up the execution of
the debenture by Fairway.

The debenture contained fixed and floating charges. Specifically it included in
cl 1(d)—

'a specific fixed charge on all book debts and other debts now and from
time to time due or owing to the company.'

Counsel for the applicant stated that, at this level of decision, he was con-
strained by authority to accept that that in fact created a floating charge on
book debts. He expressly stated that he wished to reserve his right to argue the
contrary in a higher court. It was accepted on behalf of the respondent liquidator
that the charge on goodwill contained in cl 1(g) of the debenture was a fixed
charge.

At the indication of his son, Robert, given as and when money was required
to pay Fairway's creditors, the applicant paid further sums; £6,000 on 8 October
1990, £2,000 on 19 October 1990, and two sums of £10,000 each on 13
November 1990 and 22 January 1991. The latter payments were transferred
direct into the Fairway account at Coutts at the request of the applicant and
had the effect of reducing pro tanto the amount owing by Fairway to Coutts.
No repayments of principal or interest have been made by Fairway to the

applicant. The bank has now made demand for repayment by Fairway and has
called upon the applicant to honour his guarantees.

*a*   It is necessary to examine in more detail the circumstances in which the
debenture was granted and the payments made by the applicant. The relevant
facts appear from the affidavit evidence of the applicant and his son, Robert,
and the affidavit of the respondent and also from cross-examination of the
applicant.

*b*   The position appears to be this. From about April 1990 until early 1991
efforts were made on behalf of the company to find a purchaser for the goodwill
of the 'Pro-Shop Europe' title. That was Fairway's only asset of significant value,
possibly worth as much as £200,000. It was intended that, if it was sold, the
proceeds should be used to reduce the overdraft with Coutts. Negotiations with
prospective purchasers were carried out by Robert who had consulted a number
*c*   of agencies, including Touche Ross. It appears that in June 1990 there were
three possible purchasers in view. Negotiations were not broken off until early
1991 when the prospective purchaser then negotiating encountered problems of
its own. It was considered essential that, in order to preserve the goodwill
attaching to the name, the magazine should continue to be published regularly.
More money was needed for this purpose, to pay printing expenses and so on.
*d*   In order to obtain more money to enable Fairway to continue trading, in the
hope that a take-over would ultimately take place, Fairway entered into the loan
agreement and debenture arrangement with the applicant.

The applicant accepts that he personally benefited from the two payments of
£10,000 each, since they had the effect of reducing his liability to Coutts under
*e*   the guarantees up to the limit of £70,000; that was reduced to £50,000. The
applicant gave evidence that he did not want to find himself, having paid those
two sums, still liable for the full amount of Fairway's indebtedness up to £70,000.
An agreement was made between the applicant and Mr Goodban, manager of
the Hanover Square branch of Coutts, in early November 1990, that the two
payments of £10,000 would result in the reduction of the guarantee liability pro
*f*   tanto. The applicant made it clear in his evidence that he was not willing to put
further sums into Fairway, unless his guarantee liability to the bank was reduced
in that way. The applicant denies that this was the sole purpose for making the
two £10,000 payments. He contends that they were also made for the benefit
of Fairway, because Fairway was thereby enabled to continue trading while
negotiations for the sale of the 'Pro-Shop Europe' title were taking place. The
*g*   applicant, it should be added, would not have agreed to make any of the loans
without the debenture. He was advised on that point by his solicitor son. In all,
the applicant submits that he is no better off than he would have been if he had
never entered into the loan agreement. If there had been no loan agreement, no
debenture and no payments, his maximum exposure regarding Fairway would
*h*   have been £70,000 on the guarantee to Coutts. As a result of the loan agreement
he has paid sums totalling £43,000 and he still remains liable to the bank on a
guarantee up to a limit of £50,000. That liability is unsecured on any view of
the matter.

I now turn to deal with the three points which have been argued before me. I
shall deal with the preference point first. The statutory provisions are contained
*i*   in ss 239 to 241 of the 1986 Act. Section 239 applies where a company goes
into liquidation. It is provided in sub-s (2):

'Where the company has at a relevant time (defined in the next section)
given a preference to any person, the office-holder [in this case the liqui-
dator who is respondent] may apply to the court for an order under this    *a*
section.'

The 'relevant time' referred to in s 240(1)(*a*) is the time the preference is given,
if the preference is given—

'in the case of a transaction at an undervalue or of a preference which    *b*
is given to a person who is connected with the company ... at a time in
the period of 2 years ending with the onset of the insolvency ...'

That latter expression is defined in s 240(3)(*b*): the onset of insolvency is, in
the case of a company which goes into liquidation, the date of the commencement    *c*
of the winding up.
    I return to s 239(3), which provides:

'Subject as follows, the court shall, on such an application, make such
order as it thinks fit for restoring the position to what it would have been    *d*
if the company had not given that preference.'

Subsection (4) reads:

'For the purposes of this section and section 241, a company gives a
preference to a person if − (*a*) that person is one of the company's creditors    *e*
or a surety or guarantor for any of the company's debts or other liabilities,
and (*b*) the company does anything or suffers anything to be done which
(in either case) has the effect of putting that person into a position which,
in the event of the company going into insolvent liquidation, will be better
than the position he would have been in if that thing had not been done.'    *f*

Subsection (5) provides:

'The court shall not make an order under this section in respect of a
preference given to any person unless the company which gave the pref-
erence was influenced in deciding to give it by a desire to produce in    *g*
relation to that person the effect mentioned in subsection (4)(*b*).'

Subsection (6) reads:

'A company which has given a preference to a person connected with    *h*
the company (otherwise than by reason only of being its employee) at the
time the preference was given is presumed, unless the contrary is shown,
to have been influenced in deciding to give it by such a desire as is
mentioned in subsection (5).'

The only other provision I need mention is s 241(1)(*c*), which provides:    *i*

'... an order ... with respect to a transaction or preference entered into

*a*

or given by a company may ... (c) release or discharge (in whole or in part) any security given by the company...'

On those provisions it is common ground that the applicant is a guarantor of Fairway's liability to the bank: that by creation of the debenture Fairway has put the applicant into a position which, in the event of the company going into insolvent liquidation, is a better position than he would have been in if the debenture had not been granted; and that the applicant, as a director of Fairway, was a person connected with it at the time when the debenture was granted; and that the debenture was granted during the relevant period.

*b*

Fairway is therefore presumed, unless the contrary is shown, to have been influenced in deciding to give a preference by a desire to produce, in relation to the applicant, the effect, by means of the debenture, of putting him in a position which in the event of insolvent liquidation, is better than the position he would have been in if the debenture had not been created.

*c*

The question is, therefore, one of fact: has the applicant discharged the burden of showing the contrary? That is, that Fairway was not influenced, in deciding to create the debenture, by a desire to better the applicant's position in the statutory sense.

*d*

I was referred to two cases from which a number of points were made about the operation of these provisions. The two cases were *Re M C Bacon Ltd* [1990] BCLC 324 and *Re Beacon Leisure Ltd* [1992] BCLC 565. The points of particular relevance are these. First, the new statutory test of preference in s 239 is completely different from the old law of fraudulent preference. It is no longer necessary to prove commercial dishonesty in the form of a dominant intention to prefer. The test is whether the decision was influenced by a desire to produce the effect identified in the statute, that effect being to improve the creditor's position in the event of an insolvent liquidation.

*e*

Secondly, a desire to produce that effect is a subjective state of mind. As it is subjective, there may often be no direct evidence of that state of mind. The existence of the state of mind may, however, be inferred from all the relevant circumstances, and contrary to the denials of those whose state of mind is inquired into to determine what state of mind is to be attributed to the company making the decision.

*f*

Thirdly, it does not follow that, because there was a desire to grant the debenture or to make the payment, there was a desire to prefer the creditor in the event of insolvency. If the company is influenced by 'proper commercial considerations' and not by a 'positive wish to improve the creditor's position in the event of its insolvent liquidation', then the debenture will be valid. If a desire to prefer is present, however, it is sufficient that it influences the decision. It does not have to be the sole or decisive influence on the decision.

*g*

Finally, the relevant time to consider is the time when the decision is made to grant the debenture, not the date of the execution of the debenture itself. In this case the relevant date is the date of the agreement on 21 August 1990.

*h*

Taking note of those points and applying the statutory provisions, I have reached the conclusion that the applicant has shown that, on the balance of probabilities, the decision made to grant the debenture to secure the sums paid under the loan agreement was not influenced by a desire to prefer the applicant. I am satisfied that the company was solely influenced by commercial considerations in its decision, namely the need to raise money from some source

*i*

other than the bank, which had placed an upper limit on the overdraft, in order
to keep the publication of the magazine going while negotiations were in progress
for the sale of its valuable title. As the applicant said in cross-examination, it
was important to keep the magazine afloat; credibility with a purchaser would
be lost if publication stopped.

I accept the evidence of Robert, which was not challenged by cross-exam-
ination, and the evidence of the applicant that the debenture was given so that
more money could be obtained to enable the company to continue trading.
There was no desire to improve the position of the applicant in the event of an
insolvent liquidation. The desire was to keep the company going by a cash
injection to alleviate cash flow difficulties. In the words of the applicant in cross-
examination 'the intention was to keep the wheels on the wagon.'

Without those payments the company could not have continued trading and
the sale negotiations could not have continued. At the date of the decision to
grant the debenture on 21 August no arrangement had been made with the bank
to treat payments to the company as having any effect on the guarantee liability
of the applicant to the bank. I find in favour of the applicant on the preference
point.

I now turn to two points which arise in relation to the avoidance of the
floating charge. Both points arise on s 245(2)(a) of the 1986 Act. That provides:

'Subject as follows, a floating charge on the company's undertaking or
property created at a relevant time is invalid except to the extent of the
aggregate of – (a) the value of so much of the consideration for the creation
of the charge as consists of money paid, or goods or services supplied, to
the company at the same time as, or after, the creation of the charge …'

Subsection (3) provides:

'Subject to the next subsection, the time at which a floating charge is
created by a company is a relevant time for the purposes of this section if
the charge is created – (a) in the case of a charge which is created in favour
of a person who is connected with the company, at a time in the period of
2 years ending with the onset of insolvency …'

It is common ground that the floating charge was created in favour of a person
connected with the company. The applicant was a director. It is also common
ground that the charge was created at a time in the period of two years ending
with the onset of insolvency of Fairway.

The first point that arises on the provisions of s 245(2)(a) concerns the timing
of the payment of £15,000. The statutory requirement is that the money paid
as consideration for the creation of the charge should be paid to the company
'at the same time as, or after, the creation of the charge'. The applicant paid the
sum of £15,000 to the company on 28 August 1990. The debenture was not
executed on behalf of Fairway until 27 September 1990. The charge was created
when the formal instrument of debenture was executed: *Re Columbian Fire-
proofing Co Ltd* [1910] 2 Ch 120. The 28 August is not the same time as, or
after, 27 September. The respondent therefore submitted that the floating charge
is invalid, at least to the extent of the £15,000. In my judgment, this submission

is fallacious, as a matter of statutory construction, as a matter of common sense
and as a matter of authority.

a    As a matter of construction, the expression 'at the same time as' cannot mean
that the payment of the money and the creation of the charge have to take place
at the very same moment of time. The practicalities of the situation mean that
there will inevitably be a gap in every case between the time of payment and the
time of creation of the charge.

b    As a matter of common sense, there is no reason for invalidating a charge
simply because the parties, for example, take a 15-minute coffee break between
the execution of the charge and the payment of the money.

As a matter of authority, two decisions on the earlier equivalent provisions
enacted in s 212 of the Companies (Consolidation) Act 1908 and re-enacted in
subsequent Companies Acts establish that the following is the correct approach

c    to the question whether a payment which precedes the creation of a charge is
properly regarded as having been made at the time of creation. The two cases
are *Re Columbian Fireproofing Co Ltd* [1910] 2 Ch 120 and *Re F & E Stanton
Ltd* [1929] 1 Ch 180, [1927] All ER Rep 496.

It appears from those cases that the proper approach to the question is first,
the court must look at the real substance of the transaction. The court is not

d    engaged in a mechanical timekeeping or a clock watching exercise when applying
these provisions. Secondly, the answer to the question must turn on the particular
circumstances of the case. Thirdly, if a payment is made on account of the
consideration for the creation of the charge in anticipation of its execution and
in reliance on a promise to execute the debenture, the court may regard such a

e    payment as made at the time of the creation of the charge. And, fourthly, if there
has been a delay between the payment and the creation of the charge, it is
necessary for the party seeking to maintain the validity of the floating charge to
adduce a satisfactory explanation for the delay. An explanation will not be
satisfactory if it appears that the delay in the creation of the debenture has been
procured by, suggested by or acquiesced in by the debenture holder.

f    On this approach I am satisfied that the floating charge validly secures the
payment of £15,000.

It was, however, argued on behalf of the respondent that this is no longer the
correct approach because the language of s 245(2)(a) of the 1986 Act differs
significantly from the language of the equivalent provisions in the earlier legis-
lation. In those provisions the wording was 'at the time of or subsequently to

g    the creation of...' The law has changed, it was submitted, and reliance was
placed on the decision of Hoffmann J in *Re Shoe Lace Ltd* [1992] BCLC 636 at
638 where he said that: 'There is no authority upon the meaning of "at the same
time as" in s 245.' He also said that he could derive no principle from the earlier
authorities and he commented that the words 'at the same time as' emphasised

h    that contemporaneity was an objective matter. In other parts of his judgment,
however, Hoffmann J recognised the importance of the commercial context of
this statutory requirement. He asserted that a business-like approach to the
question of timing was appropriate and that contemporaneity is a question of
fact and degree, a question which, in his words, is properly formulated as
'whether the language of the statute appropriately describes the facts of the

i    particular case' (see at 640).

In my judgment, although the language of s 245(2) is different from the earlier
provisions the approach to be adopted is that adopted in the earlier cases. The

language of s 245(2)(a) is appropriate to describe what happened in this case. The applicant paid £15,000 under the terms of the loan agreement; he paid it as a matter of urgency because of the state of Fairway's overdraft with Coutts; he paid it in anticipation of the execution of the debenture and in reliance on a promise to grant him a debenture. The delay which occurred between payment and execution has been explained and the delay is not such, in my view, as to prevent the two events from being regarded as taking place at the same time for the purposes of s 245(2)(a).

The second point which arises on s 245(2)(a) is whether, on the facts of this case, the applicant has fulfilled the statutory requirement that the money which constitutes consideration for the charge has been 'paid ... to the company'. This potentially affects the two payments of £10,000 each. It is submitted, on behalf of the respondent, that this requirement has not been satisfied because the two payments were made by the applicant, not to the company for its benefit, but to Coutts Bank for his own personal benefit. In accordance with the agreement made between the bank and the applicant for the reduction of his guarantee liability to the bank, the bank credited payment to Fairway's account with the result that Fairway's overdraft was reduced by a total of £20,000 and the applicant's guarantee liability was correspondingly reduced by a similar amount.

The statutory purpose of this requirement and the approach to construction appear from two cases under the earlier legislation: *Re Orleans Motor Co Ltd* [1911] 2 Ch 41 and *Re Matthew Ellis Ltd* [1933] Ch 458, [1933] All ER Rep 583. There is also a decision of Nourse J more recently in *Re G T Whyte & Co Ltd* [1983] BCLC 311. It appears from these cases that the general purpose of the provision is to prevent a company, which is on its last legs, from creating a floating charge to secure past debts or to secure moneys which do not go to swell its assets and become available for creditors. See per Parker J in *Re Orleans Motor Co Ltd* [1911] 2 Ch 41 at 49.

The question in each case is whether, in all the circumstances, the payment is in substance to the company for its benefit. If the effect of a payment, which is in form made to the company, is merely to substitute a secured debt for an unsecured debt, then the payment is not in substance a payment to the company. Thus, in *Re Orleans Motor Co Ltd* the floating charge was held not to secure payments which had been made by the directors. The directors were guarantors of the company's bank overdraft. The bank was pressing for payment under the guarantees. Payments were made by cheques drawn in favour of the company which the company was obliged to pay to the bank in reduction of the overdraft. The company issued debentures to the directors to secure those payments. It was held by Parker J that the sums were not secured by the debentures, because they never became part of the company's assets to do with as it liked. The company was under an obligation to hand those sums to the bank in discharge of the overdraft. That operated for the benefit of the directors.

It was submitted on behalf of the applicant that this case is distinguishable from *Re Orleans Motor Co Ltd* because the facts in that case disclosed what one judge later described as 'transparent subterfuge', a blatant attempt by underhand conduct to get a benefit for one creditor at the expense of another. That, it was submitted, is not the case here. Although it is accepted that the applicant derived a benefit from the payments, because of the reduction in his guarantee liability, the payments were not made for his sole and exclusive benefit.

They were also for the benefit of Fairway because they enabled Fairway to
continue trading during the currency of the negotiations.

*a*    It was submitted, on behalf of the applicant, that the case bore less resemblance
to *Re Orleans Motor Co Ltd* than it did to the Court of Appeal decision in *Re
Matthew Ellis Ltd* [1933] Ch 458, [1933] All ER Rep 583 where, as here, it was
said that the payments were made as part of a business transaction enabling the
company to continue trading with a particular firm. In that case the particular

*b*    firm consisted of three partners, one of whom was also chairman of the company.
He made a loan to the company which was secured by the debenture. The loan
made by the chairman of the company was then used to pay the debts of the
firm in which he was one of the partners. The payments were made to the
company because they were, in substance, a business transaction which secured
the goodwill of a firm which was willing to continue to supply goods to the

*c*    company on credit and so kept the business of the company going. So, on the
facts of that case, both the chairman who made the payment and the company
which granted him the debenture benefited from the payment. It was unlike a
payment made solely on account of the guarantee in the *Re Orleans Motor Co
Ltd* case where the company never received any benefit from the payment. In
*Re Orleans Motor Co Ltd* the directors simply used the company as a conduit

*d*    for payment to the bank via its account.

It was submitted, on behalf of the applicant, that the case bore less resemblance
I confess I have not found this an easy point. I have come to the conclusion,
after consideration, that I cannot distinguish the facts of this case from *Re
Orleans Motor Co Ltd*. In both cases the persons claiming to be secured by
debenture were directors of the company; were guarantors of the company's

*e*    overdraft at the bank; and made payments which never became available to the
company to use as it liked, but instead were intended to be and were, in fact,
used to reduce the company's bank overdraft; that, in turn, had the effect of
reducing the directors' guarantee liability. In *Re Orleans Motor Co Ltd* Parker J
said that the debenture was not valid security for the amounts paid by the
guarantors to the bank in those circumstances. I think I am compelled to hold

*f*    the same in respect of the two payments of £10,000 each. I should, however,
add that in so holding I do not find that there was any dishonest or underhand
conduct on the part of any of those involved for the applicant or on the part of
the applicant himself. As Nourse J said in *Re G T Whyte & Co Ltd* [1983]
BCLC 311 at 317: 'The presence of such conduct is not a statutory prerequisite
for the operation of those provisions.'

*g*    In the result, I find in favour of the applicant on the preference point and on
the timing point, but I reject his submissions on the question whether the
payment was to the company.

*Order accordingly.*

                                            Hazel Hartman   Barrister.

TAB 52

*Re Hampton Capital Ltd* [2016] 1 BCLC 374, English High Court

*a*

# Re Hampton Capital Ltd

# Murphy and another v Elite Performance Cars Ltd and others

*b*

# Hampton Capital Ltd v Elite Performance Cars Ltd and others

### [2015] EWHC 1905 (Ch)

*c*

CHANCERY DIVISION (COMPANIES COURT)

GEORGE BOMPAS QC (SITTING AS A DEPUTY JUDGE OF THE HIGH COURT)

*d*

14, 15 JUNE, 9 JULY 2015

*Restitution – Unjust enrichment – Money stolen from company – Defence – Change of position – Shadow director of H Ltd persuading T Ltd to pay over moneys to H Ltd and instructing directors of H Ltd to make fraudulent payments to third parties – Whether H Ltd and administrators entitled to recover payments from innocent third parties – Whether H Ltd dealing with third parties – Whether transaction between H Ltd and third parties – Whether third party bona fide purchaser without notice – Whether third party changing position – Whether unjust or inequitable to order restitution – Insolvency Act 1986, s 238 – Companies Act 2006, s 40.*

*e*

*f*

*Administration – Transaction at undervalue – Shadow director of company instructing directors to make fraudulent payments to third parties – Whether company dealing with third parties – Whether transaction between company and third parties – Whether engagement or communication between company and third parties – Whether administrators of company entitled to recover payments from third parties – Insolvency Act 1986, s 238 – Companies Act 2006, s 40.*

*g*

AM, an undischarged bankrupt, was a shadow director of and the driving force behind H Ltd. He was also a plausible con-man. He persuaded a construction company, T Ltd, to enter into a joint development project with H Ltd and to lend H Ltd approximately £1.4m supposedly for the payment of fees for anticipated funding for the project. In the event the funding was never forthcoming and instead AM instructed H Ltd's directors to make large payments out of the £1.4m to third parties who had no connection with H Ltd or the proposed development. In particular, £335,000 was paid to the first defendant, E Ltd, which sold luxury cars, and £282,000 was paid to the third defendant, K, who provided credit for AM at casinos for the amount he received to enable AM to gamble. When T Ltd became aware that the development project was a sham it caused administrators of H Ltd to be appointed with a view to recovering the £1.4m. H Ltd brought

*h*

*i*

*a*   an action against E Ltd and K to recover the amounts paid to them, contending that none of the payments to them were made for the purposes of H Ltd's business or otherwise for the benefit of H Ltd, that the director who made the payments had no authority to do so, and that E Ltd and K had been unjustly enriched at H Ltd's expense. H Ltd's administrators also applied for orders under s 238 of the Insolvency Act 1986 against E Ltd and

*b*   K, claiming the same amounts as H Ltd. Under s 238 the court had power to make an order restoring the position at the behest of administrators if it was found that the company had 'entered into a transaction with any person at an undervalue', which was defined in s 238(4) as a 'gift' or a 'transaction … on terms that provide for the company to receive no consideration' or 'a consideration … which is significantly less than the

*c*   value … of the consideration provided by the company'. E Ltd was not represented at the trial and its defence was struck out. K claimed that AM had given him plausible explanations as to why his credit at the casinos had to be channelled through K, and contended by way of defence (i) that he had provided full consideration in good faith for the payments he received

*d*   and was therefore a bona fide purchaser without notice, and as he was a person 'dealing with [the] company in good faith' the directors of H Ltd were free under s 40 of the Companies Act 2006 to bind the company; (ii) that it would be inequitable to order him to make repayment as he had changed his position when he paid out money to the casinos equal to the payments he had received; and (iii) that he was entitled to rely on the

*e*   defence of ministerial receipt because he had received the money only as agent for AM.

**Held** – (1) H Ltd was entitled to judgment on its claim against E Ltd because even if E Ltd was an innocent third party which had received money from H Ltd without knowing it to be stolen, E Ltd had been unjustly

*f*   enriched at the expense of H Ltd, as there was no contract between H Ltd and E Ltd, H Ltd had received no consideration for the monies it had paid out, and the payments were made in fraud of H Ltd's creditors insofar as they were gratuitous dispositions of H Ltd's money. Since the money paid over to E Ltd was stolen from H Ltd and E Ltd had not put forward a defence of change of position it was liable to repay the money received from

*g*   H Ltd under the principle that the recipient of stolen money was personally liable to the person whose money had been stolen unless he was a bona fide purchaser without notice. (See paras [15], [29]–[31], below.) *Lipkin Gorman* (*a firm*) *v Karpnale Ltd* [1992] 4 All ER 512 applied. *Criterion Properties v Stratford UK Properties* [2006] 1 BCLC 729 considered.

*h*   (2) The administrators' claim against E Ltd under s 238 of the 1986 Act failed because the payments were not 'gifts' and were not transactions which fell within s 238(4). What the language of s 238(4) required was the entering into of a transaction between two parties, which entailed some engagement or at least communication between the two parties and not merely a disposition of money which resulted in one party's money ending

*i*   up in the bank account of the other without anything being said or done by that other. Since the director of H Ltd who made the payments to E Ltd had virtually no contact at all with E Ltd beyond causing money to be remitted to E Ltd it could not be said that H Ltd had 'dealt' with E Ltd or entered into a transaction with E Ltd within s 238(4)(a) on any terms at all, let

alone on terms providing for H Ltd to receive no consideration. (See paras [36]–[39], below.)

(3) K could not claim to be a bona fide purchaser without notice on the basis that he had provided full consideration in good faith for the payments he received, as he had not purchased anything from anyone and had not entered into any transactions with the company. Section 40 of the 2006 Act was not relevant because although s 40(2) explained that a person 'deals with' a company if 'he is a party to any transaction or other act to which the company is a party', s 40 did not result in a recipient of money paid by a company being entitled to rebut an unjust enrichment claim simply by saying that his receipt was in good faith, because although the good faith of the recipient was likely to be a necessary condition of the recipient's defence, it was not by itself a sufficient condition to rebut a claim of unjust enrichment. (See paras [57]–[58], below.)

(4) Although K might well have received the company's money in a ministerial capacity, since he received the money for the benefit of AM, he was acting for AM in doing so and to that extent received the payments in a ministerial capacity, and therefore could argue that he had changed his position, the relevant issue was whether, having regard to the circumstances in which he received the payments, it would be unjust or inequitable to allow restitution. The test as to the defendant's required state of knowledge sufficient to result in an order for repayment of the amount paid but not retained was the same for an action for restitution at common law as that for an account in equity as a constructive trustee on the basis of knowing receipt, namely whether the defendant's knowledge was sufficient to make it unconscionable for him to retain the benefit of receipt of the money. Since K had acted in good faith and had paid the initial £125,000 to a casino for AM's benefit without knowing that the money had come from H Ltd the company's claim for restitution of that amount from K failed. On the other hand, K was aware that subsequent payments had come from H Ltd and knew enough to have had reasonable grounds for suspecting the money paid to him after the first £125,000 was stolen, which was sufficient to disqualify him from a change of position defence. Therefore, given that the payments made to K were made in fraud of H Ltd's creditors using money stolen from H Ltd, it would not be unjust or inequitable to order K to make restitution to H Ltd to the extent of £157,000. (See paras [15], [43], [59], [61]–[72], below.) *Lipkin Gorman (a firm) v Karpnale Ltd* [1992] 4 All ER 512 and *Bank of Credit and Commerce International* (*Overseas*) *Ltd v Akindele* [2000] 4 All ER 221 applied.

(5) The administrators' claim against K under s 238 of the 1986 Act failed because K had not 'dealt' with H Ltd for the purposes of s 40 of the 2006 Act and no transaction had been 'entered into' by K and H Ltd within s 238(4)(a). (See para [73], below.)

## Cases referred to

*Bank of Credit and Commerce International* (*Overseas*) *Ltd* (*in liq*) *v Akindele* [2000] 4 All ER 221, [2001] Ch 437, [2000] 3 WLR 1423, CA.

*Criterion Properties v Stratford UK Properties* [2004] UKHL 28, [2006] 1 BCLC 729, [2004] 1 WLR 1846.

*a*  *Lipkin Gorman* (*a firm*) *v Karpnale Ltd* [1992] 4 All ER 512, [1991] 2 AC
    548, [1991] 3 WLR 10, HL.
    *MC Bacon Ltd, Re* [1990] BCLC 324.

**Action and application**

*b*  By application notice issued on 10 January 2014 Anthony Murphy and Paul
    Robert Boyle, the joint administrators of Hampton Capital Ltd (the
    company), applied for orders under s 238 of the Insolvency Act 1986 to
    recover payments made by the company to the first defendant, Elite
    Performance Cars Ltd, the third defendant, Oswald Kanzira and the fourth
    defendant, Erkan Akbas, on the authority of the second defendant, Paul
*c*  Commerford. By claim form issued on 10 January 2014 the company
    brought an action against the same defendants claiming amounts equal to
    the sums claimed by the administrators. The claim against the second
    defendant was settled before trial. The facts are set out in the judgment.

*d*  *Siward Atkins* (instructed by *Mischon de Reya*) for the administrators and
    the company.
    Mr Kanzira in person.
    The first and fourth defendants did not appear and were not represented.

                                                    *Judgment was reserved.*

*e*  9 July 2015. The following judgment was delivered.

**GEORGE BOMPAS QC.**

    [1] This is a judgment given following the trial of (a) an application by the
    Joint Administrators of Hampton Capital Ltd ('the Company') made by
*f*  application notice issued on 10 January 2014 for orders under s 238 of the
    Insolvency Act 1986 ('the 1986 Act') in respect of various payments made
    by the Company, and (b) an action started by the Company by claim form
    issued on the same date claiming amounts equal to the sums forming the
    subject of the s 238 claims.
    [2] I shall refer to the Company and the Administrators collectively as 'the
*g*  Claimants'. At the trial they were represented by counsel, Mr Siward
    Atkins. On their behalf Mr Anthony Murphy, one of the Administrators,
    gave both written and oral evidence.
    [3] The respondents to the application and the defendants in the action
    were the same. However, the case against the Second Respondent/
    Defendant, Mr Paul Commerford, had been settled before the trial. He had
*h*  served a defence and made a witness statement. He was called by the
    Claimants to give evidence at the trial.
    [4] Of the remaining respondents and defendants only the third,
    Mr Oswald Kanzira, was present at the trial. He represented himself. He
    made his submissions, and gave his oral evidence, with clarity, restraint and
    dignity.
*i*  [5] The First Defendant, Elite Performance Cars Ltd ('Elite'), was not
    represented at the trial. It had served a skeleton argument for the trial. The
    individual who was to have made submissions on Elite's behalf, a director
    of Elite, had been available for the start of the notified trial window, but
    was no longer available when the trial started. There was no application

made for the trial to be adjourned. The trial therefore proceeded in Elite's
absence, after I had made an order under CPR 39.3(1) striking out its
defence.

[6] The Fourth Defendant, Mr Erkan Akbas, was not present at the trial.
His whereabouts are unknown and there was no evidence that he had been
given any notice of the trial. In those circumstances the trial did not proceed
on the claims against him, and they remain alive: I have directed that as
regards the Fourth Defendant the trial is to be adjourned with liberty to the
Claimants or the Fourth Defendant to apply to have it relisted.

[7] Against Elite and Mr Kanzira the Company's only basis of claim is a
personal one at common law for restitution: the Company makes no
proprietary claims, and its personal claims do not include any constructive
trust claim (for example for knowing receipt). As mentioned, the
Administrators claim against these two defendants under s 238 of the 1986
Act.

BACKGROUND

[8] The Company was incorporated on 26 January 2012. Its first director
and shareholder was a Mr Sean Lewis. He resigned as a director on 12 July
2012, when Mr Commerford became a director. He was a director until
5 December 2012, when he was replaced by a Mr Alani Kusimo.
Mr Commerford's defence states that during this period Mr Commerford
was the sole director and shareholder; and in his written evidence he
confirmed what he said in his defence concerning his involvement in the
Company.

[9] There is no evidence of the Company having had any activity or assets
before July 2012. From then on it was the creature of a Mr Alick
Mayweather: at that time he approached Tolent Construction Ltd ('Tolent')
ostensibly with a view to assisting in the purchase and development of a site
in Seaham, Co Durham, owned by a subsidiary of Tolent. Mr Mayweather
was at the time an undischarged bankrupt. He has not appeared before me
and not taken any part in these proceedings, and so I have not heard what
he might say about the matters I am about to describe.

[10] The evidence given by Mr Murphy, and indeed by Mr Commerford,
is that Mr Mayweather was the driving force behind the Company. It is
clear that the Company to all intents and purposes was his creature. He had
responsibility for and had the conduct of all negotiations with Tolent, so
Mr Commerford told me. Mr Commerford himself never had any
negotiations with anyone on behalf of the Company; all he did was to
disburse the Company's money from its bank as directed by
Mr Mayweather. Mr Commerford's function as a de jure director was to
give effect to Mr Mayweather's instructions.

[11] Mr Mayweather appears to have been a plausible con-man. I was
told by Mr Commerford and Mr Kanzira that he was convincing. In his
approach to Tolent he must have been remarkably convincing and
successful. His pitch was that Tolent would be engaged as the contractor to
develop the Seaham site once the Tolent subsidiary had been purchased. To
this end the purchase was to be carried out by a newly formed off-shore
company, with which Tolent in October 2012 entered into a share sale
agreement to sell its subsidiary for some £7.6m. The Company's part in this
was that it was supposedly to procure funding for the transaction; although

*a*  Mr Commerford in his defence said 'it was not made clear to' him 'what precise role the Company was to play in the acquisition of Coolmore', Coolmore Ltd being the Tolent subsidiary which owned the Seaham site.

   [12] Between October 2012 and January 2013 Tolent provided to the Company, by various instalments ranging from £15,000 to £324,000, an aggregate of approximately £1.4m in respect of fees for the anticipated

*b*  funding. The anticipated funding was never forthcoming, and the payments to or at the request of the Company were made by Tolent without any documentation being forthcoming from the Company. This eventually, after a period of several months, led Tolent to make investigations in the course of which it learnt that the Company had made large payments to third parties but that otherwise what had become of the £1.4m or what remained

*c*  for the Company was unexplained. In consequence Tolent caused the Administrators to be appointed.

   [13] Before me there has been some argument as to whether or not the monies paid by Tolent were monies lent to the Company. Mr Commerford in his defence had put forward a case that in fact the monies were lent by

*d*  Tolent to Mr Mayweather rather than to the Company. This point was relied upon by Mr Kanzira in support of an argument that what was paid to him by the Company and applied by him for the benefit of Mr Mayweather could have been in reduction of a debt due from the Company to Mr Mayweather, or indeed Mr Mayweather's money.

   [14] In evidence is a witness statement made by Tolent's Chairman and

*e*  Chief Executive, a Mr Wood. This statement supported Tolent's application to have the Administrators appointed. Mr Wood explained in his statement that the monies provided by Tolent had been provided by way of loan to the Company. Further, Mr Commerford's defence also states that he, Mr Commerford, 'cannot speak to the true nature of the arrangement that had been reached between Mr Wood and Mr Mayweather', that his

*f*  conclusion that Tolent was lending money to Mr Mayweather and not to the Company 'appears from documents disclosed by Mr Wood', but further that 'none of the payments made by Tolent to the Company were documented, invoiced, receipted or subject to any written agreements'. Hardly surprisingly, in view of the last point, I was not shown any documents concerning the Tolent payments, and none which might point to

*g*  the payments having been by way of loan to Mr Mayweather personally rather than, as Mr Wood stated, to the Company. Accordingly, I conclude that insofar as monies standing to the credit of the Company's bank were drawn and paid to any of the Defendants, they were the product of money lent by Tolent to the Company.

*h*  [15] The Company was, as Mr Murphy has stated and I find, insolvent at all times when it was making the payments which have formed the subject of the claims against Elite and Mr Kanzira. It was liable to Tolent for the totality of what had been paid by Tolent; and it had as assets only what remained in its bank account after the depredations of Mr Mayweather. The payments were all made, in short, in fraud of the Company's creditors,

*i*  insofar as they were gratuitous dispositions of the Company's money. My conclusion, as appears, is that the Company received no consideration for the monies it paid out.

CLAIMS AGAINST ELITE

[16] One of the third parties identified by Tolent as a recipient of the Company's money was Elite. It received from the Company's bank account a total of £335,000. The payments making up this total, and the dates were: £5,000 on 21 November 2012; £65,000 on 26 November 2012; £100,000 on 3 December 2012; a further £15,000 on 3 December 2012; two payments, each of £20,000, on 4 December 2012; and £110,000 on 19 December 2012. In every case the payment was made by bank transfer to Elite's bank.

[17] All but the last of these payments were effected by Mr Commerford: while a director he was the person with the mandate from the Company's bank. The last of the payments was effected by Mr Kusimo.

[18] Mr Commerford's position set out in his defence (and confirmed in his witness statement) in relation to the various payments he authorised (and these include not only payments to Elite but also those to Mr Kanzira discussed below) is that they were made by him as the Company's director and sole shareholder. He said in his defence that 'Each and every payment identified in the particulars of claim as being authorised by [him] was genuinely and in good faith considered by him to be in the interest of the Company and made to promote its success'. He was misled by Mr Mayweather, so he says, into making the payments he did, in each case (that is including the payments to Elite and to Mr Kanzira) having been told and believing that the payment was in some way to further the project of developing the Seaham site.

[19] In relation to the Elite payments specifically he said in his defence (confirmed in his witness statement) that he was directed to make them; that he was told that the payments were required for the purposes of obtaining funding from outside investors to finance the purchase of the Tolent subsidiary and that Elite was one such investor or represented one such investor, and also were needed for fees or other upfront funding costs. He said he asked Mr Mayweather whether the payments to Elite were needed for purchasing vehicles, and told Mr Mayweather that he would not authorise them for that purpose.

[20] I have serious misgivings about the reliability of Mr Commerford's evidence concerning his authorisation of payments from the Company's bank account, in particular in relation to the payments to himself and to Mr Kanzira (as I explain later). In the case of the payments to Elite a possible, in my view the likely, conclusion is that Mr Commerford did what he did because that is what he was told to do so by Mr Mayweather, and that he did not regard it as any part of his business what the payments were for or why he was being asked to make them: it was enough that Mr Mayweather wanted them.

[21] In making this finding I have not overlooked the fact, urged on me by Mr Atkins, that Mr Commerford did eventually resign as a director in December 2012. Mr Commerford said that he resigned because he became concerned about the activities of Mr Mayweather. However, I do not see this as demonstrating that before that time Mr Commerford had been doing anything at all to consider the interests of the Company; rather it suggests to me that Mr Commerford had realised that he was now deeply implicated in the dissipation of the money obtained from Tolent and hoped to remove

*a*  himself from the scene before the Company's inevitable collapse.

[22] The Claimant's case against Elite is simple. It is that none of the payments was 'for the purposes of the Company's business or otherwise for the benefit of the Company'. It is said that in consequence the payments were 'void'. And it is said that this gives rise to a right for the Company to reclaim in restitution from Elite an amount equal to the payments made to

*b*  it: as I have already said, the claim is not a proprietary one but a personal one. It is no part of the Claimant's case that Elite knew, suspected or was on notice of any impropriety or irregularity in the payments.

[23] I do not accept that the payments were 'void', if by that it is meant that the payments never happened or were in some sense a nullity. As it happens, for all but the £110,000 payment Mr Commerford, as the

*c*  Company's sole director, did have authority to give instructions to the bank to effect the payments: he was the person who gave the instructions and whom the bank was entitled to obey, so that the disposition of the Company's funds was not made by the bank without authority. This is so whether, as Mr Commerford says, he genuinely believed the payments he

*d*  authorised to be for what he called 'the Coolmore Project', being in some way associated with bringing in investors, having been misled in this respect by Mr Mayweather if the true purpose was the acquisition of vehicles from Elite; or whether, as I think more likely, he was indifferent as to the purpose for which the payments were being made and made them simply because he had been told to. Had the payments been 'void' no doubt the Company

*e*  would have been claiming against its bank that the bank had no authority to debit its account and making a claim against the bank for the amount debited.

[24] I take it that what is being asserted by the Claimants when characterising the payments as 'void', as the Company does in its particulars of claim, is that the payments made to Elite were of money stolen from the Company. The dispositions in favour of Elite were of course

*f*  not of cash but by way of bank transfer, so that Elite received the benefit of a credit to its bank account (and hence a chose in action rather than cash). Mr Atkins submitted, and I accept, that this makes no difference. What had happened was that by causing Mr Commerford to instruct the Company's bank to make transfers to Elite's bank, Mr Mayweather had brought about

*g*  the misappropriation of the Company's money, the money being paid away from the Company for his benefit and with nothing to do with the Company, and with the result that inevitably Tolent would be left unpaid. What was received by Elite was just as much stolen money as the money handed to the casino in *Lipkin Gorman (a firm) v Karpnale Ltd* [1992]

*h*  4 All ER 512, [1991] 2 AC 548 referred to below.

[25] So far as concerns the £110,000 payment, I infer that Mr Mayweather procured Mr Kusimo likewise to make a payment in favour of Elite with nothing to do with the Company, so that as to this payment the position is no different from the other payments to Elite. I should add that I reach the same conclusion as regards the last two of the

*i*  payments made from the Company to Mr Kanzira, discussed below, payments procured by Mr Kusimo rather than Mr Commerford.

[26] What this gives rise to is a claim in which an innocent third party, in this case Elite, has received from a company various sums of money stolen from the company, and is then sued by the company for an amount equal to

those sums. Against Elite the case is that it has been unjustly enriched at the expense of the Company by an amount equal to the payments and, absent any change of position defence, is liable to repay to the Company the full amount of the claims.

[27] I was referred by Mr Atkins to very little in the way of authority to support his clients' claims against an unrepresented company and a litigant in person. The only decided case on unjust enrichment which Mr Atkins drew to my attention, in his closing submissions, was *Criterion Properties v Stratford UK Properties* [2004] UKHL 28, [2006] 1 BCLC 729, [2004] 1 WLR 1846. He referred me to the passage in the opinion of Lord Nicholls of Birkenhead at para [4] to support his argument as to the various payments being void and as to the consequences of these being void. In that passage Lord Nicholls was clarifying a point on which the court below had been confused, confusing on the one hand the principles on which an agreement made by a company through its agents will be binding on the company in cases where the agents' authority is in question, with those required for establishing a 'knowing receipt'. What Lord Nicholls said was as follows:

> 'If a company (A) enters into an agreement with B under which B acquires benefits from A, A's ability to recover these benefits from B depends essentially on whether the agreement is binding on A. If the directors of A were acting for an improper purpose when they entered upon the agreement, A's ability to have the agreement set aside depends upon the application of familiar principles of agency and company law. If, applying these principles, the agreement is found to be valid and is therefore *not* set aside, questions of "knowing receipt" by B do not arise. So far as B is concerned there can be no question of A's assets having been misapplied. B acquired the assets from A, the legal and beneficial owner of the assets, under a valid agreement made between him and A. If, however, the agreement *is* set aside, B will be accountable for any benefits he may have received under the agreement. A will have a proprietary claim, if B still has the assets. Additionally, and irrespective of whether B still has the assets in question, A will have a personal claim against B for unjust enrichment, subject always to a defence of change of position. B's personal accountability will not be dependent on proof of fault or "unconscionable" conduct on his part. B's accountability, in this regard, will be "strict".' (Lord Nicholls' emphasis.)

[28] I accept that this passage supports Mr Atkins' argument on unjust enrichment. The proposition for which Lord Nicholls' comments are authority is that the recipient of benefits paid under an avoided contract will be personally liable to the provider of the benefits, the liability being 'strict', subject to a defence of change of position. However, for reasons I have explained, it does not seem to me that the present case turns on any question of an agent's actual or ostensible authority to bind the principal when causing a bank transfer. The position could have been different if (which is not this case) there were an issue as to the validity of a contract made between the Company and the recipient of a payment and the payment was made pursuant to the contract.

[29] More immediately relevant to the issues in the present case is the

*a*   leading case of *Lipkin Gorman v Karpnale Ltd* [1992] 4 All ER 512, [1991] 2 AC 548, which I drew to the parties' attention in argument. That is authority for Mr Atkins' submission that the recipient of stolen money, unless a bona fide purchaser without notice, is personally liable to the person whose money has been stolen. But of course that case is also authority for the proposition that the recipient may have an available

*b*   change of position defence. The parameters of the defence were not stated in the case, however, but were left to be refined in future cases. As Lord Bridge of Harwich said ([1992] 4 All ER 512 at 516, [1991] 2 AC 548 at 558):

*c*   'I agree with my noble and learned friend Lord Goff of Chieveley that it is right for English law to recognise that a claim to restitution, based on the unjust enrichment of the defendant, may be met by the defence that the defendant has changed his position in good faith. I equally agree that in expressly acknowledging the availability of this defence for the first time it would be unwise to attempt to define its scope in abstract terms, but better to allow the law on the subject to develop on

*d*   a case by case basis.'

*e*   [30] In relation to the payments to Elite the Company has satisfied me that there was no contract with Elite and that what was paid over was money stolen from the Company. It is for Elite to make out any change of position defence; and this it has not done. Its receipt from the Company has the result that it has been unjustly enriched at the expense of the Company, and should repay what it received.

[31] For this reason I am satisfied that the Company should be given judgment against Elite for the sum of £335,000.

*f*   [32] There was an alternative claim for restitution advanced by the Company. This was for £315,000 of the £335,000. The submission was that there was a total failure of consideration, if the money had been paid for a purchase which was never effected. The difference between the £335,000 and the £315,000 is explained in this way. The Joint Administrators were told by a representative of Elite that £20,000 of the £335,000 of payments was in respect of vehicle hire. Of the remaining

*g*   £315,000, £110,000 was explained to the Joint Administrators as having been paid for the purchase of a Ferrari car which was never delivered; and the balance was told to the Joint Administrators as having been for the purchase of vehicles which had not been and would not be delivered to the Company.

*h*   [33] In view of my conclusion concerning the claim for £335,000 it is unnecessary for me to consider the claims concerning the £315,000 of payments. It is sufficient for me to record, however, that the Claimants have put before me evidence to support the conclusion that Elite did not provide to the Company any of the cars for which, according to the representative of Elite, the £315,000 was paid.

*i*   [34] The Administrators, in their ordinary application, made an alternative claim to the remaining £315,000: because there was no consideration and the Company was insolvent when the payments were made, the payments are within s 238 of the 1986 Act, so it was argued, as transactions with the Company at an undervalue and the Court should

make an order 'for restoring the position to what it would have been' had *a*
the payments not been made.

[35] I have found the case under s 238 of the 1986 Act difficult.
Sub-section (4) defines transactions at an undervalue. To be within the
purview of s 238 there must be a 'transaction with a person at an
undervalue' if the Court is to make an order (under sub-section (3)) 'for
restoring the position to what it would have been if the company had not *b*
entered into that transaction'. The sub-section (4) definition is as follows:

> 'For the purposes of this section and section 241, a company enters
> into a transaction with a person at an undervalue if—(a) the company
> makes a gift to that person or otherwise enters into a transaction with
> that person on terms that provide for the company to receive no *c*
> consideration, or (b) the company enters into a transaction with that
> person for a consideration the value of which, in money or money's
> worth, is significantly less than the value, in money or money's worth,
> of the consideration provided by the company.'

[36] The difficulty I have with the Administrators' s 238 claim is that on *d*
the evidence Mr Commerford did not intend to make a gift to Elite when he
instructed any of the payments; and I have no ground for thinking that
Mr Kusimo did so either. Mr Commerford's evidence, indeed, is that his
intention was positively not to have the Company make a gift. If it is
Mr Mayweather's intention which is in point, the likely inference to be
drawn is that he intended to misappropriate the money and had some *e*
arrangement with Elite which might help him in that regard. I reach this
conclusion because Mr Commerford told me, and it is therefore the
Claimant's case, that there had been payments which, on Mr Mayweather's
instruction, he (Mr Commerford) made to himself so that payments could
be made to Mr Mayweather through a casino. Also the payments to *f*
Mr Kanzira, which I will discuss later, were made for the personal benefit of
Mr Mayweather, including to enable him to gamble, and not as gifts to
Mr Kanzira.

[37] On the other hand if the payments were not 'gifts', in order to fall
within s 238(4)(a) they would have to be 'transactions with' Elite, being
'transactions … on terms that provide for the company to receive no *g*
consideration'. Yet the submission to me on behalf of the Administrators
has been that Mr Commerford had virtually no contact at all with Elite
beyond causing money to be remitted to Elite. Indeed, I was pressed by the
Claimants with the case that the Company never dealt with Elite at all, or at
any rate that there was no evidence of it having ever done so.
Mr Commerford's evidence is that he attended Elite's premises twice, in *h*
each case simply to make a payment (one of £5,000 and one of £65,000),
having no discussion there with Elite whatsoever; and the remaining
payments he made on Mr Mayweather's instruction. It is therefore by no
means apparent to me that within s 238(4)(a) the Company 'dealt' with
Elite or entered into a transaction with Elite on any terms at all, let alone on
terms providing for the Company to receive no consideration. *i*

[38] I am aware that s 436 of the 1986 Act contains a definition of
'transaction' as including a 'gift, agreement or arrangement' and references
to 'entering into a transaction' are to be construed 'accordingly'.
Nevertheless, I cannot accept that the mere transmission of money, the mere

*a*  making of a payment, without any form of dealing between the paying company and the payee, can constitute the entering into of a transaction by the company with the payee (at any rate where the transaction is not a 'gift'). What is required, on the language of s 238(4), is the entering into of a transaction between two parties. Without straining the language of the section, this must require some engagement, or at least communication,

*b*  between the two parties and not merely a disposition of money which results in one party's money landing up in the bank account of the other without anything said or done by that other.

[39] For this reason I reject the Administrators' claim against Elite and will not make any order against Elite under s 238 of the 1986 Act.

*c*

CLAIM AGAINST MR KANZIRA

[40] Between 21 September 2012 and 28 December 2012 payments amounting to £282,000 were made from the Company's account to Mr Kanzira's account. These were as follows: £125,000 on 21 September

*d*  2012; £5,000 on 1 November 2012; £10,000 on 19 November 2012; £10,000 on 22 November 2012; £57,000 on 23 November 2012; £35,000 on 21 December 2012; and £40,000 on 28 December 2012. All but the last two of these payments were instructed by Mr Commerford: the last two were instructed by Mr Kusimo. On receipt of each of these payments Mr Kanzira allowed his account to be drawn upon to the extent of the

*e*  amounts received, the drawing being in favour of one or other of three casinos for the benefit of Mr Mayweather (the casino providing funds to Mr Mayweather).

[41] The three casinos in question were places where both Mr Kanzira and Mr Mayweather resorted for gambling and entertainment. Mr Kanzira

*f*  and Mr Mayweather had met in a casino. Mr Kanzira explained that Mr Mayweather was a big gambler and in the casinos was 'treated like a god' by the managers; and he explained that he believed Mr Mayweather to be very wealthy.

[42] The Company's pleaded case in relation to these payments is the same as in relation to the payments to Elite, namely that the person who

*g*  caused the making of the payments 'had no authority to do so because none of the payments was for the purposes of the Company's business or otherwise for the benefit of the Company'. It is said that in the circumstances 'the payments were thus void' and that Mr Kanzira must restore all of the payments (or the value of them). Further, it is said that the payments were merely gratuitous misappropriations of the Company's

*h*  money, that Mr Kanzira furnished no consideration for the payments, and that on this basis also Mr Kanzira must restore the money.

[43] For the same reasons as in the case of Elite, I conclude that the Company is entitled to say that what was received by Mr Kanzira was money stolen from the Company. Below I consider the defences put forward by Mr Kanzira to the Company's claim for repayment.

*i*  [44] As in the case of Elite, the Administrators make an alternative claim based on s 238 of the 1986 Act, this being for the total of £282,000.

[45] Mr Kanzira has a pleaded defence, which he had signed with a truth statement, and also Further Information which he had likewise signed. He made a witness statement in these proceedings. As mentioned earlier,

besides making oral submissions he went into the witness box and gave oral evidence on oath.

[46] In giving his oral evidence Mr Commerford specifically confirmed certain paragraphs of his defence; and it seems to me that his witness statement, together with the answers he gave in his oral evidence, sufficiently confirmed the rest. In summary his evidence is that, as in the case of the payments to Elite, he authorised the payments believing them to be in the interests of the Company and for its purposes, in particular the payment of expenses for furthering the acquisition of the Tolent subsidiary. He says he did not know that the payments would be to enable Mr Mayweather to obtain money from the Company. He was, he says, misled by Mr Mayweather.

[47] Mr Kanzira gave evidence that each of these payments was made into his bank account and that in each case (other than with small exceptions where he paid cash to Mr Mayweather) the full amount was drawn out in payment to a casino for the credit of Mr Mayweather. He says he accepted Mr Mayweather's explanations as to why it was necessary for Mr Kanzira to receive money and to pay a casino, rather than for Mr Mayweather himself to pay the casino. In the case of the first payment, the £125,000 which came to be paid in September 2012, the explanation given by Mr Mayweather was that Mr Mayweather did not have his personal debit card, only a company one, and had recently moved 'from Manchester to London and had not yet received his new card'; and Mr Kanzira understood that a casino would not take payment on a company card. Mr Kanzira was asked in cross-examination what explanation Mr Mayweather had given him in relation to the subsequent payments. He said that he could not remember but that Mr Mayweather must have given him some explanation.

[48] Mr Kanzira told me that in the case of the £125,000 paid in September 2012, the first of the payments, at the time when his account was debited he did not know that what had been credited to his account had come from the Company. This he only discovered shortly afterwards, when he saw his bank statement.

[49] After that, when he was asked by Mr Mayweather to repeat what had been done, he did know that the money which had come to his account had come from the Company. But he says that he was told by Mr Mayweather and believed that the Company belonged to Mr Mayweather and that the money credited to his account had been caused to be paid by a director of the Company (whom he understood to be one 'Paul' and whom he believes now to be Mr Commerford) at the direction of Mr Mayweather.

[50] Mr Kanzira's evidence concerning Mr Commerford centred on a telephone conversation, which Mr Commerford said that he could not recall. This conversation took place, so Mr Kanzira said, after the payment of the £125,000 and before the remaining payments, when Mr Kanzira had discovered from his bank that the source of the £125,000 had been the Company and when Mr Mayweather wanted a repeat transaction. Mr Mayweather, said Mr Kanzira, telephoned Mr Commerford in Mr Kanzira's presence so that 'his director' could confirm that the payment had been 'done' by Mr Commerford, and so that Mr Kanzira would agree to provide further funds for Mr Mayweather. With the phone on loudspeaker Mr Commerford confirmed his directorship; and then also

*a*  Mr Mayweather explained to Mr Commerford that he needed Mr Commerford to send money to Mr Kanzira's account and would provide account details. What then happened, according to Mr Kanzira's witness statement, was that from time to time Mr Mayweather would tell Mr Kanzira that money had been paid to his account and that he wanted to have the money paid out by Mr Kanzira for him.

*b*  [51] Except in one respect I accept Mr Kanzira's evidence; in particular I accept his evidence concerning the telephone conversation with Mr Commerford. I also think it likely that this conversation did involve Mr Commerford, and not some unknown third party. The one respect concerns what Mr Kanzira said about the explanations given to him by Mr Mayweather in relation to the various payments after the first.

*c*  [52] I should record, in relation to the telephone conversation, that Mr Commerford said that he could not remember having had the conversation described by Mr Kanzira. However, it seems to me the sort of conversation which might well have taken place. Mr Commerford's witness statement contains an explanation of events in relation to Elite which shows

*d*  that he was willing to go to Elite's showroom, at short notice and at considerable personal inconvenience, at Mr Mayweather's instruction and without any worthwhile explanation, in order to make a payment; and I cannot see why it would have been remarkable and memorable for him to take an instruction from Mr Mayweather in the manner described by Mr Kanzira.

*e*  [53] There is a further finding I would make about Mr Commerford's evidence. He had caused large amounts to be transferred from the Company's account to his own, which he explained he had paid on to casinos to provide credit for Mr Mayweather. Doing this, he said, was believed by him to be a way of providing funds to Mr Mayweather for legitimate expenditure for the Company. In contrast, he said that he did not

*f*  think that Mr Kanzira was to provide credit for Mr Mayweather, but rather believed Mr Kanzira to be someone who needed to be paid in relation to the obtaining or capitalisation of the overseas company, having been told this by Mr Mayweather.

[54] I do not accept that Mr Commerford believed Mr Kanzira to be a potential investor or someone who would help with potential investors. As

*g*  I have explained, I conclude that Mr Commerford was indifferent as to the way that the Company's money was applied, simply taking Mr Mayweather's instructions. I very much doubt that he was told anything about Mr Kanzira. Indeed, if Mr Commerford had been told the truth, that Mr Kanzira was to provide credit for Mr Mayweather, Mr Commerford

*h*  would no doubt still have made the payment to Mr Kanzira, just as he had done when paying himself to provide funds for Mr Mayweather.

[55] The feature which distinguishes the Company's claim against Mr Kanzira from that against Elite is that Mr Kanzira gave up something which, he says and I accept, he would not have given up unless he had first received the payments made to him. That is to say, Mr Kanzira made the

*i*  payments he did because he had first been paid and because he had agreed with Mr Mayweather that he would make the payments once he had himself been paid.

[56] In his statements of case and submissions Mr Kanzira has put

forward various defences to the claims made by the Claimants.

(i) He says that in good faith he provided full consideration for the payments he received and is therefore a bona fide purchaser without notice; and he says that insofar as necessary, any transaction he had with the Company is subject to s 40 of the Companies Act 2006 (the 2006 Act) so that the transaction is binding on the Company.

(ii) He says that by paying out money to the casinos equal to the payments he had received he had in good faith changed his position, so that it would be wrong, 'inequitable' in the words of Lord Goff in *Lipkin Gorman* (*a firm*) *v Karpnale Ltd* [1992] 4 All ER 512 at 534, [1991] 2 AC 548 at 580, to order him to make any repayment.

(iii) He says that the money was only received by him as agent for Mr Mayweather and that he has a defence of ministerial receipt.

[57] It seems to me that Mr Kanzira's first defence cannot be sustained: he did not purchase anything from anyone, and further he did not enter into any transactions with the Company. His agreement was with Mr Mayweather and was for him to pay amounts to Mr Mayweather's credit once he had been paid. He knew that Mr Mayweather was not a director of the Company. He has not alleged in his defence or in his witness statement that he entered into any contract with the Company to pass on money for Mr Mayweather as and when paid by the Company. Indeed, his pleaded case (which I accept) is that he had no transactions with the Company. Further, his case of 'ministerial receipt' is that he was acting for Mr Mayweather when he received payments from the Company and was obliged to pass them on for the benefit of Mr Mayweather, in this respect his principal.

[58] Section 40 of the 2006 Act, as I see it, has no relevance to the matter. This provides, by sub-section (1), that—

> 'In favour of a person dealing with a company in good faith, the power of the directors to bind the company, or authorise others to do so, is deemed to be free of any limitation under the company's constitution.'

Sub-section (2) explains that a person 'deals with' a company if 'he is a party to any transaction or other act to which the company is a party'. However, I do not understand s 40 to have the result that any recipient of money paid by a company is entitled to meet an unjust enrichment claim simply by saying that his receipt was in good faith. While the good faith of the recipient is likely to be a necessary condition of the recipient's defence, it will not by itself be a sufficient condition.

[59] The second and third of Mr Kanzira's defences may be taken together. Traditionally the defence of 'ministerial receipt' would allow an agent to argue for a change of position defence which might not otherwise be available to a claim to recover from him a payment made for his principal under a mistake of fact. In the present case I think that Mr Kanzira can indeed contend that his receipt of the payments from the Company was for the benefit of Mr Mayweather, that in receiving them he was acting for Mr Mayweather, and that to this extent he can say that he received the payments in a ministerial capacity: Mr Commerford (and no doubt Mr Kusimo) made the payments to Mr Kanzira because that was what he was instructed to do, and Mr Mayweather gave that instruction

*a* because he wanted the money and intended it to be paid on to him.

[60] Mr Atkins submitted that Mr Kanzira cannot say his receipt of the Company's money was a ministerial receipt because what Mr Kanzira chose to do with the payments made to him was a matter for him. I do not accept Mr Atkins' analysis. Leaving aside the fact that, as it has turned out, the money paid to Mr Kanzira had been paid to him improperly, from *b* Mr Kanzira's perspective he received the payments because he had an arrangement with Mr Mayweather to pay on for Mr Mayweather's benefit the corresponding amount once received. Had Mr Kanzira received a payment and then kept it for himself, for all he knew it would have been open to Mr Mayweather to sue him for the money.

[61] Ultimately, however, the question whether Mr Kanzira's receipt was *c* 'ministerial' is not the one which matters. What is relevant is whether Mr Kanzira's payments are causally linked with his receipts from the Company, that causal link being an essential element in any change of position defence. In other words, as it seems to me, the relevance of the circumstances in which Mr Kanzira received the payments is part of the *d* inquiry as to whether Mr Kanzira can claim that his payments for Mr Mayweather's benefit are to be recognised as providing him a defence to the Company's claim that he has been unjustly enriched at the Company's expense. Given my conclusion that Mr Kanzira would not have made the payments for Mr Mayweather if he had not first received what he did, and that he would not have received what he did had he not first indicated to *e* Mr Mayweather that he was willing to make the payments if he was first paid, I am satisfied that the only remaining question is whether nevertheless Mr Kanzira is unable to show that it would be unjust, or inequitable, to allow restitution.

[62] As to this, to show that restitution would be unjust Mr Kanzira will need to show, in the words of Lord Goff in *Lipkin Gorman (a firm) v* *f* *Karpnale Ltd* [1992] 4 All ER 512 at 533, [1991] 2 AC 548 at 579 that his change of position is 'bona fide' and not 'in bad faith, as where the defendant has paid away the money with knowledge of the facts entitling the plaintiff to restitution' ([1992] 4 All ER 512 at 534, [1991] 2 AC 548 at 580).

[63] It was accepted on behalf of the Claimants, in the course of the *g* closing argument, that Mr Kanzira had been acting in good faith when he received the Company's payments and paid out monies to the casino. What is accepted by this, as I understand, is that Mr Kanzira did not know, when he made payments from his account to casinos for Mr Mayweather's benefit, that he had been the recipient of money which had been wrongfully *h* paid to him and could not properly be applied for Mr Mayweather. It follows also, I think, the acknowledgment made on behalf of the Claimants, that they accept that Mr Kanzira acted in good faith, implies also that Mr Kanzira did not have constructive knowledge that the money paid to him was stolen.

[64] However, this leaves open the question whether what Mr Kanzira *i* knew and thought of the circumstances in which he received and made the various payments is sufficient to prevent him from escaping liability in common law restitution. As to this, by Mr Atkins the Claimants submit that Mr Kanzira was sufficiently on notice that the payments to him were of money stolen from the Company and therefore his further payments for

Mr Mayweather were at his own risk, so that his payments for *a* Mr Mayweather cannot in the circumstances provide an answer to the Claimants' case that he has been unjustly enriched at the Company's expense.

[65] Mr Atkins did not make detailed submissions as to the law concerning the test to be applied in deciding whether or not what was known to or thought by Mr Kanzira, and what he did in response, would *b* disqualify him from a successful change of position defence. What guidance I have been given is to be found in the *Lipkin Gorman* case and, it may be, in *Bank of Credit and Commerce International* (*Overseas*) *Ltd v Akindele* [2000] 4 All ER 221, [2001] Ch 437. The *Akindele* case was referred to in the speech of Lord Nicholls in the *Criterion Properties* case from which I *c* have quoted earlier in this judgment.

[66] The *Akindele* case was one in which the claimant's case was put forward as a constructive trust case. Nourse LJ, giving the leading judgment of the Court of Appeal, set out a detailed exposition of previous case law concerning the state of mind required for a defendant to be found liable for knowing receipt, and concluded ([2000] 4 All ER 221 at 235, [2001] *d* Ch 437 at 455F) that 'The recipient's state of knowledge must be such as to make it unconscionable for him to retain the benefit of the receipt'.

[67] The Company's claim against Mr Kanzira has not been put forward in constructive trust. Nevertheless, I cannot see a principled reason why, in a case such as the present, the legal test as to the defendant's required state of knowledge sufficient to result in an order for repayment of the amount *e* paid but not retained should differ according to the cause of action, for restitution at law or for an account in equity as a constructive trustee on the basis of knowing receipt. Therefore in approaching the evidence I ask myself whether what was known to Mr Kanzira was sufficient to make it unconscionable for him now to refuse to repay the Company.

[68] There is a significant difference between the £125,000 paid to *f* Mr Kanzira in September 2012 and the remainder of the payments made to him. As to the first, Mr Kanzira had paid away £125,000 to the casino for Mr Mayweather's benefit before he knew that the money paid to him had not come from Mr Mayweather. This being so, I conclude that the Company is not entitled to restitution of that sum from Mr Kanzira: what he did was in good faith, and there is no ground for suggesting that what he *g* knew at the time should result in his being liable to repay £125,000 to the Company.

[69] The subsequent payments are different. When these were made Mr Kanzira knew he had received the Company's money. The fact that the first £125,000 had come from the Company was now known to him; and he knew when asked by Mr Mayweather to make the further payments that *h* what he was himself to receive would come from the Company. He had plainly become concerned about the propriety of what was being done, as it was for that reason that Mr Mayweather arranged the brief conversation with Mr Commerford.

[70] I think Mr Kanzira had been right to be concerned. He knew that *i* casinos will not take payment from companies. There must have been a reason for the stance taken by casinos. He knew that Mr Mayweather wanted to pay the casinos, but not to do that himself direct. Further, he knew that Mr Mayweather required an arrangement for obtaining money

*a*  from the Company for the casinos which did not involve the Company paying Mr Mayweather the money.

[71] Mr Kanzira submitted that indeed he had made the inquiry, referred to above, but that he was given sufficient to allay his concern, this being in his conversation with Mr Mayweather and Mr Commerford which I have already described. Against this Mr Atkins argued that what was said by

*b*  Mr Commerford on the telephone was insufficient to justify Mr Kanzira in thinking that it was proper for the Company's money to be paid to him to pay on for Mr Mayweather, even if Mr Kanzira may have decided that it was acceptable for him to pay.

[72] With considerable hesitation in view of the Claimants' acknowledgment that Mr Kanzira acted in good faith, I have reached the

*c*  conclusion that Mr Kanzira knew enough to have reasonable grounds for suspecting the money paid to him after the first £125,000 to be stolen; and I have reached the conclusion that this is sufficient to disqualify him from his change of position defence as to those subsequent payments, it not being inequitable for him to be ordered to repay the amount of those payments.

*d*  In particular, I reject his submission that what he was told by Messrs Mayweather and Commerford was sufficient to remove any concerns.

(i) In the first place Mr Kanzira could not tell me what reason Mr Mayweather had given to him to explain why he needed to involve Mr Kanzira, or why he needed to have the money come to Mr Kanzira from the Company for further payment for his benefit. As it seems to me, if

*e*  Mr Kanzira had been told a reason by Mr Mayweather he could not have failed to remember it, as it must have been a notable one. Mr Kanzira had in the case of the first payment been led to believe that the money would be coming from Mr Mayweather who on the evening when first speaking with Mr Kanzira did not happen to be in a position to pay the casino himself immediately because he did not have a debit card with him, having moved

*f*  recently from Manchester. Obviously it was a surprise to Mr Kanzira that the payment to him had come from the Company, and not from Mr Mayweather, as he had expected. Now he was to accept money from the Company for further payments for Mr Mayweather; and that was a matter of concern to him as otherwise the telephone with Mr Commerford would not have taken place. There is no obvious reason why his

*g*  involvement was needed at all.

(ii) Second, Mr Kanzira gave an explanation as to why he continued to assist Mr Mayweather once he knew the money was coming from the Company: he felt that having once done Mr Mayweather a favour in helping him he could not refuse to continue. As he explained it, once you

*h*  commit yourself you cannot keep changing. His reaction was not that there was nothing wrong and he liked helping an acquaintance, but rather was that he could not back away. However, it seems to me that once he knew that money was coming from the Company, not Mr Mayweather, he could have backed away perfectly easily, as he was being asked to accept payment from a different source.

*i*  (iii) Third, Mr Kanzira never had from Mr Commerford any explanation as to why it was right for the ompany to be paying over money to Mr Kanzira to pass on to Mr Mayweather. The fact that a voice on a telephone announced itself as a company director and took an instruction from Mr Mayweather as to a future payment can hardly have helped

Mr Kanzira to any understanding on the point which mattered, namely why     *a*
the Company should be paying for Mr Mayweather's gaming at and credit
from casinos.

[73] This then brings me to the Administrators' claim against Mr Kanzira
under s 238 of the 1986 Act. As to this, it seems to me that claim faces real
difficulty. The Claimants have submitted, in relation to Mr Kanzira's     *b*
argument based on s 40 of the 2006 Act, that the Company did not deal
with Mr Kanzira in relation to the payments made to him. If that is right, as
I think it is, the Administrators' claim against him under s 238 of the 1986
Act will fail for the reason that there will not have been any transaction
'entered into' by the Company with Mr Kanzira, and there is no evidence
that the Company made him a gift. This is a point which I have considered     *c*
already in relation to the payments made to Elite.

[74] During the trial there were arguments addressed to me by Mr Atkins
on a further issue in relation to the s 238 claim. This issue arises if it is
assumed (contrary to my conclusion) that Mr Kanzira had agreed with the
Company, by Mr Commerford or Mr Mayweather, that he would make
payments to Mr Mayweather if the Company first made, and in return for     *d*
the Company making, payments to him.

[75] The requirement, in the s 238(4) definition of undervalue
transactions other than in cases of gifts, is that the terms of the transaction
with another person must have provided for the company to receive no
consideration (para (a)), or that the transaction entered into with the other
person must be 'for a consideration' of significantly less value, 'in money or
money's worth', than 'the consideration provided by the company'     *e*
(para (b)). The submission made by Mr Atkins was that the exercise
required by para (b) is to look at the matter only from the perspective of the
company in question and to compare what it received with what it gave,
considering the extent to which the company was measurably worse off as
a result of the transaction. This submission was in order to meet the     *f*
difficulty that from Mr Kanzira's point of view he gave as much in value as
he received, and that looked at in that way there could not have been an
undervalue transaction.

[76] To support his submission Mr Atkins invited me to look at the
well-known case of *Re MC Bacon Ltd* [1990] BCLC 324. In that case     *g*
Millett J, as he then was, held that the creation of security over a company's
assets did not qualify as a transaction at an undervalue because it did not
deplete the value of the company's assets to a measurable extent in money
or money's worth, so that there could be no comparison with the value of
any consideration moving from the recipient of the security. This part of
Millett J's decision has not met with universal acceptance, but it is     *h*
unnecessary for me to spend time considering it. What Mr Atkins relies
upon is the comment of Millett J (at 340), that sub-s 238(4)(b)—

'requires a comparison to be made between the value obtained by the
company for the transaction and the value of the consideration
provided by the company. *Both values* must be measurable in money or
money's worth and both *must be considered from the company's point*     *i*
*of view* .'(My emphasis.)

[77] On this basis Mr Atkins submits that s 238(4) requires, in short,
consideration of the impact of the relevant transaction on the company's net

Ch D          Re Hampton Capital Ltd (George Bompas QC)          393

*a*  assets. Accordingly, if a company engages with a third party to do something, which the third party does, the fact that the value of the consideration provided by the third party may be equal to or greater than anything given up by the company will not matter if what the company has given up has a measurable value and the outcome of the transaction is that the company's assets have been depleted.

*b*  [78] It is unnecessary for me to reach any conclusion on this argument, and therefore I will say no more about it: success on this would not result in the Administrators' s 238 claim succeeding.

[79] In the result, therefore, as regards Mr Kanzira the Company's claim succeeds, but only to the extent of £157,000; while the Administrators' claim against him under s 238 of the 1986 Act fails.

*c*

*Order accordingly.*

Peter Hutchesson  Barrister (NZ).

TAB 53

*Re MC Bacon Ltd* [1990] BCLC 324, English High Court

# Re MC Bacon Ltd

*a*

CHANCERY DIVISION
MILLETT J
23–27, 30, 31 OCTOBER, 1–3, 6–10, 13, 14, 30 NOVEMBER 1989

*Company in financial difficulties – Bank unwilling to continue to support the*  *b*
*company unless it was granted a charge – Charge executed by the company in*
*favour of the bank – Whether this constituted a preference or a transaction at*
*an undervalue – Insolvency Act 1986, ss 238, 239.*

B Ltd had an overdraft facility of £300,000 with its bank without having to
execute any security in favour of the bank. In December 1986 the main customer  *c*
of B Ltd abruptly terminated its business with the company which created
serious business difficulties for it. The two directors of B Ltd retired from active
management in the affairs of the company handing over control to a son of
one of them. In April 1987 B Ltd was operating very close to its overdraft limit
and, when the bank was informed of the loss by B Ltd of its major customer
and also of the fact that the two directors of B Ltd were ceasing to play an  *d*
active role in the management of the company's affairs, it indicated that it
would require security. In May a report by bank officials stated that B Ltd was
insolvent but that there were reasonable grounds for thinking that the company
could trade out of its difficulties. In the same month the bank demanded as a
condition of its continued support that a first mortgage debenture be executed  *e*
in its favour over B Ltd's fixed and floating assets and this was granted in its
favour. The bank appointed an administrative receiver on 4 September 1987
and the applicant in the present proceedings was appointed liquidator of B Ltd
on 7 September 1987. The applicant applied to have the bank's debenture set
aside (i) under s 239 of the Insolvency Act 1986 as a voidable preference or (ii)
under s 238 of the Act as a transaction at an undervalue.  *f*

**Held** – Application dismissed. (1) To show that a transaction was a voidable
preference within the meaning of s 239 it was necessary to show that the
company was influenced by a desire to produce the effect set out in s 239(4)(*b*).
Desire was subjective and a company would not be taken to desire all the
necessary consequences of its acts as there were acts that a company may have  *g*
had to carry out which were not in its interests but which could be regarded
as the unavoidable price of obtaining a sought after advantage. Direct evidence
of the desire to prefer the creditor was not necessary. What had to be proved
was that at the time the company decided to enter into the transaction in
question it was influenced by a desire to achieve the effect in s 239(4)(*b*) and it  *h*
was not necessary to show that had the desire not been present the company
would not have entered into the transaction. On the facts, the company had
no choice but to grant the bank security if it wanted to continue to trade as
the bank's support was necessary to prevent the company from going into
liquidation. Accordingly, there was no desire on the part of the company to
achieve the effect set out in s 239(4)(*b*) and the debenture was not void as a  *i*
preference.

(2) The granting of the debenture in favour of the bank was not a gift nor

was it made without consideration as the bank provided consideration by not
calling in its overdraft and by providing fresh advances to B Ltd. Accordingly,
*a* the granting of the debenture did not fall within s 238(4)(*a*). Nor was it possible
to characterise the granting of the debenture as a transaction at an undervalue
within s 238(4)(*b*) since the mere creation of a security did not deplete the
company's assets and therefore the company did not provide a consideration
measured in money or money's worth as was required by that subsection.
*b* Accordingly, the transaction was not one at an undervalue.

Cases cited
*Bath Glass Ltd, Re* [1988] BCLC 329.
*Butcher v Stead* (1875) LR 7 HL 839, [1874–80] All ER Rep 1198, HL.
*Cutts (TW) (a bankrupt), Re, ex p Bognor Mutual Building Society v Trustee*
*c*    *in bankruptcy* [1956] 2 All ER 537, [1956] 1 WLR 728, CA.
*Destone Fabrics Ltd, Re* [1941] 1 All ER 545, [1941] Ch 319, CA.
*FLE Holdings Ltd, Re* [1967] 3 All ER 553, [1967] 1 WLR 1409.
*Kushler (M) Ltd, Re* [1943] 2 All ER 22, [1943] Ch 248, CA.
*Matthews (FP & CH) Ltd, Re* [1982] 1 All ER 338, [1982] 1 Ch 257, CA.
*d* *Mortimer (Thomas) Ltd, Re* (1925) [1965] 1 Ch 186 (note).
*Nakkuda Ali v Jayaratne* [1951] AC 66, PC.
*R v Braithwaite* [1983] 2 All ER 87, [1983] 1 WLR 385, CA.
*R v Harrison* [1938] 3 All ER 134, CCA.
*Sharp v Jackson* [1899] AC 419, [1895–99] All ER Rep 755, HL.
*Thompson v Freeman* (1786) 1 Term Rep 155, 99 ER 1026.
*e* *Yeovil Glove Co Ltd, Re* [1964] 2 All ER 849, [1965] 1 Ch 148, CA.

Application
By an originating application issued on 28 September 1987, Ian Clark, the
liquidator of MC Bacon Ltd (the company) applied to set aside a debenture
*f* dated 20 May 1987 granted by the company to the second respondent, National
Westminster Bank plc (the bank) (i) under s 239 of the Insolvency Act 1986 as
a voidable preference, or (ii) under s 238 of the Act as a transaction at an
undervalue. The first respondent, Peter Richard Copp, was the administrative
receiver of the company, having been appointed by the bank on 4 September
1987. The facts are set out in the judgment.
*g*

*Geoffrey Vos* and *David Lord* for the applicant, the liquidator.
*John Lindsay QC* and *Anthony Mann* for the respondents.

*h*                                                            *Cur adv vult*

30 November. The following judgment was delivered.

MILLETT J. MC Bacon Ltd (the company) was formed in 1973 as part of a
management buy-out by Mr Michael Creal (Mr Creal), Mr Sidney Glover (Mr
*i* Glover) and Mr Alex Knight (Mr Knight). It carried on business as a bacon
importer and wholesaler. Mr Creal and Mr Glover were executive directors
and ran the business. Mr Knight was a non-executive director who had helped

to finance the buy-out, and his shareholding was eventually bought in by the company.

Traditional bacon was the cornerstone of the business for the first 10 years. In 1983, in response to the requirements of its principal customer, Dee Corporation, the company diversified into the supply of pre-packaged manufactured products such as gammon steaks, gammon joints and rashered bacon, and ran down the traditional side of the business. In December 1986 Dee Corporation, which by then was responsible for nearly 60% of the company's turnover, abruptly withdrew its custom. Mr Creal and Mr Glover considered putting the company into immediate liquidation but, after taking legal advice, they decided to continue trading. A substantial number of employees were made redundant and the company attempted to regain sales volume with reduced overheads, but it made substantial losses as well as incurring liability to make redundancy payments in the process. It struggled on for some months but was unsuccessful. It eventually went into creditors' voluntary liquidation on 24 August 1987 with an estimated deficiency as regards unsecured creditors of £329,435.

At the date of liquidation the company's overdraft at the second respondent, National Westminster Bank (the bank) stood at £235,530. The overdraft was secured by a debenture dated 20 May 1987 granted by the company. On 4 September 1987 the bank demanded payment and on the same day it appointed the first respondent as administrative receiver of the company. The applicant was appointed liquidator of the company at a meeting of creditors on 7 September 1987.

The applicant now claims to have the debenture set aside (i) under s 239 of the Insolvency Act 1986 (the 1986 Act) as a voidable preference, or (ii) under s 238 of the 1986 Act as a transaction at an undervalue. Originally the applicant also alleged that from 15 April 1987 onwards the bank was a shadow director of the company and claimed that it had thereby rendered itself responsible for what was alleged to have been the wrongful trading of the company on and after 15 May 1987. These last mentioned allegations were rightly abandoned by the applicant after six days of the oral evidence. As a result, I can set out the facts at shorter length and in less detail than would otherwise have been the case.

1 *The facts*

Up to 24 October 1986, when its financial year ended, the company traded profitably. It was able to keep within its overdraft limits and its account at the bank went into credit from time to time during the year. There was no 'hard core' borrowing. The company successfully resisted all attempts by the bank to obtain a debenture. In January 1986 the bank released the directors from their guarantees. In April 1986 it increased the company's overdraft facilities to £300,000 and offered to reduce the rate of interest if a debenture were provided. In May it conceded the reduction in the rate without requiring a debenture rather than risk the loss of the account to a competitor.

Mr Creal and Mr Glover were in their late fifties. They intended to retire when they were 60 and had originally expected to sell the company on their retirement. But Mr Creal's son, Mr Martin Creal (whom I shall call 'Martin' in order to distinguish him from his father and without intending any disrespect thereby) joined the company in February 1982 when he was aged 24, and their

intentions changed. Martin was appointed a director and was groomed for eventual succession. Mr Glover still intended to retire when he was 60 and sell

*a* his shares, but Mr Creal wanted Martin to take over the company when the time was right.

The loss of the company's main customer in December 1986 came as a severe blow. Thirty-six employees were immediately made redundant. Mr Creal was despondent and his first thought was to put the company into liquidation.

*b* Martin, however, was keen to continue trading and to try to turn the company round. Mr Creal discussed the position with the company's solicitors and auditors and was advised that liquidation could be an over-reaction. Mr Creal told them that the loss of the Dee Corporation was 'a set-back but not a disaster'. He said that the company was very solvent, and was advised to monitor the figures carefully for a time to see whether significant trading losses

*c* were being incurred, to ensure that the company did not work its way through its reserves.

While Mr Creal and Mr Glover both thought that the company could be pulled round, the loss of the company's major customer and the need to reduce the size of the company hastened their decision to retire and hand the business over to Martin. Mr Creal no longer had the energy or inclination for the task.

*d* Mr Glover was 22·5 stone and suffered from arthritis. He was no longer prepared to do manual work, as full involvement in what had once again become a small company would require. They both had financial interests outside the company. Mr Glover in particular was engaged in small scale property development through a company called Medallion Properties Ltd

*e* (Medallion), which he owned jointly with a small builder. He and Mr Creal were willing to provide Martin with advice and support but they brought forward the date of their retirement to coincide with the end of the current tax year. Martin for his part was keen to have the opportunity and the responsibility for returning the company to profit.

On 5 January 1987 Mr Glover called on Mr Hill, the manager of the

*f* Southwark branch of the bank where the company's account was maintained. He did not tell Mr Hill of the loss of the company's major customer, for he saw no advantage to the company in doing so. But he told Mr Hill that he and Mr Creal wanted to sell their shares to Martin and leave the company. He asked Mr Hill how the bank would react to a request to lend Martin £160,000

*g* in order to buy out Mr Creal and himself. Mr Hill told him that it would not be an acceptable proposition. He also told Mr Glover that Martin had only been with the company for four years, that the bank would want to consider whether it would wish to continue the present facilities with him in charge, and that in those circumstances the bank would certainly be looking for a debenture.

*h* Early in the new year Mr Glover resigned as joint managing director and it was formally agreed that effective management of the company should be transferred to Martin. This made no difference to the way in which the company's affairs were conducted in practice. Mr Glover remained a director and continued to be responsible for the company's financial administration and the production of monthly management accounts. Martin continued to spend

*i* virtually all his time in the factory and seldom visited the company's office at 192–194 Trundley's Road, Southwark, some 200 yards distant. On 19 January 1987 it was agreed that Mr Creal and Mr Glover would retire on 3 April, that

Mr Creal would remain as non-executive unpaid chairman and that Mr Glover should sever his connection with the company.

During the next few weeks Mr Creal and Mr Glover were heavily engaged *a* with the company's solicitors and accountants in arranging the terms on which they would retire. These were carried into effect on Friday 3 April 1987 when (i) Mr Glover resigned as a director and secretary of the company and was paid a golden handshake of £50,000 of which £25,000 was paid immediately and £25,000 was prudently paid on the Monday following (the first day of the new *b* tax year); (ii) Mr Creal resigned as an executive director and accepted the position of unpaid non-executive director and chairman; (iii) Martin, now the only executive director, was appointed secretary; (iv) Martin bought out Mr Glover's 20% shareholding for £7,500; (v) Mr Creal granted Martin an option to buy out his own shareholding at the same price per share exercisable at any time between 1 May 1990 and 30 April 1992. It was also agreed that in lieu of *c* the bonus payments to Mr Creal and Mr Glover for the year 1985/86 the company should pay a total of £80,000 into their self-administered joint pension fund, of which they were two of the three trustees. This sum represented pension contributions of £55,000 on behalf of Mr Creal and £25,000 on behalf of Mr Glover.

It has not been alleged that these payments were in any way improper. Mr *d* Creal, Mr Glover and Martin knew that the company was in a difficult financial position and that it needed time to pull it round, but they had no reason to think that it was technically insolvent or that it could not be pulled round. They knew that Martin might not succeed, and they agreed that if he failed they would reimburse him the cost of buying Mr Glover out. *e*

The company's cash position was weak. Its overdraft remained at a low level throughout January, February and most of March but it rose strongly on 25 March to £248,569, still well within the limit of the facility but making it difficult to fund payments totalling £130,000. To ease the pressure on the overdraft, the pension fund made a temporary unsecured loan of £46,000, which was paid into the company's account on 26 March and repaid to the *f* pension fund on 6 April, by which time other receipts had reduced the company's overdraft to £203,350.

To fund Mr Glover's golden handshake, it had already been agreed that Medallion would buy the company's office premises at 192–194 Trundley's Road for £40,000. Unfortunately it transpired that the title to the property was vested not in the company but in a wholly-owned subsidiary which had been *g* struck off the register, so that it would be necessary to have the subsidiary restored to the register and the property transferred to the company before Medallion could buy it. All this would take time and, in the event, was not completed when the company went into liquidation on 24 August. In the meantime and in order to assist the company's cash flow, Medallion paid the *h* £40,000 to the company on account of the purchase price. This sum was received by the company on 6 April.

In order to fund the £80,000 which it paid to the pension fund, the company borrowed the money back from the pension fund on the security of a debenture dated 3 April 1987 which had been prepared by the company's solicitors for execution on that date and which was duly delivered to the Registrar of *i* Companies for registration (just in time) on 23 April 1987.

On 14 April Mr Craig, the audit partner with the actual conduct of the

company's audit, visited the company's offices to discuss the completion of the
1985/86 accounts with Mr Glover. Although Mr Glover had retired and no
longer held any official position in the company, he was willing to make himself
available to discuss the figures. Mr Craig took the opportunity to review the
latest management accounts for the 18 weeks to 27 February 1987 and discussed
them with Mr Glover. They showed a loss of £91,000 for the four months, of
which £61,000 had been incurred in January and February. Mr Glover told Mr
Craig that the directors, by which he meant Mr Creal and Martin, had discussed
the figures and the possible courses of action available. He indicated that they
would make a final decision on the future viability of the company based
on the six months' figures to 30 April, which Mr Craig was told should be
available by 12 May. Mr Craig noted that the company would be saving
some £80,000 a year in future by not having to pay remuneration to Mr Creal
or Mr Glover.

Mr Craig did not attempt a trial balance but Mr Glover recalled his telling
him that the company was at or near to insolvency. This was certainly the case.
The company's net assets appearing in the draft accounts at 24 October 1986
were £261,000 (or £323,000 if provision for deferred taxation is written back
as being no longer necessary) from which £91,000 losses since the year end to
the end of February 1987, and £130,000 payments to Mr Creal and Mr Glover
would fall to be deducted, leaving only £40,000 (or £102,000). But these figures
include plant and machinery valued at over £200,000 on a going concern basis
and take no account of any further losses incurred since the end of February.
Clearly the company's viability as a going concern depended on the continued
support of the bank, while it would soon become technically insolvent (if it
was not so already) if it was unable to stem its continuing trading losses in the
relatively near future.

Mr Craig took the opportunity to explain to Mr Glover the provisions of
the Act relating to trading while insolvent. I infer that he explained that
directors could be made personally liable if they permitted the company to
continue to trade when they knew or ought to have concluded that there was
no reasonable prospect that the company would avoid going into insolvent
liquidation.

The overdraft rose sharply after 9 April, reaching £299,379 on 14 April. Mr
Hill asked Mr Glover to come and see him as a matter of urgency as the
overdraft was right up to the limit. Mr Glover saw him on 15 April. In the
course of the meeting he told Mr Hill for the first time of the loss of the Dee
Corporation's custom, of his own and Mr Creal's retirement, and of the sale
of his own shareholding to Martin. He said that although he had resigned as
a director he had returned to take control of the company's accounting pro-
cedures. He told Mr Hill that there was a meeting of the directors to be held
on 21 April, and Mr Hill asked to be provided with a full report following that
meeting together with a cash flow forecast for 1987 and management accounts
to 31 March. He also asked for the bank's form showing quick assets
and liabilities to be completed and told Mr Glover that he should advise the
directors that, with his own departure, and Mr Creal's intending to take a
back seat and make Martin managing director, the bank would require a
debenture.

Mr Glover told me that well before 3 April he had warned Mr Creal and
Martin that:

'The time is going to come when we are going to have to give the bank
a debenture. They are going to demand a debenture and when they ask
for it we are going to have to give it.'                                    *a*

This is plausible evidence and I accept it. Mr Hill had already indicated as
much in January when he had not known of the loss of the Dee Corporation
or of the worsening financial position of the company.

Less plausibly, Mr Glover also told me that it was he himself who first raised    *b*
the possibility of the bank taking a debenture by saying to Mr Hill: 'I think it
is time you had a debenture'. I reject this evidence. It is not consistent with Mr
Hill's note of the interview or his report to his regional office in which he said
that he wished to take a mortgage debenture over the company 'as a matter of
urgency'. Mr Glover was much given to reconstruction rather than recollection
and was not always consistent. His very first reference to the bank's debenture    *c*
was in terms of the bank having asked for a debenture, while his claim to have
initiated the subject was progressively weakened as he admitted first that he
may have been 'prodded subconsciously' and later merely 'prodded'. But Mr
Hill had no need to 'prod' Mr Glover into offering a debenture; he was in a
position to demand one, and I am sure that he did. I also doubt that Mr Glover
actually said to Mr Hill: 'It is time you had a debenture', though he may well    *d*
have thought it. Mr Glover's evidence is chiefly valuable for the insights which
it provides of his thought processes at the time. I accept it only to the extent
of finding that, when Mr Hill demanded a debenture, Mr Glover recognised
that the time had come when the demand was justified and could not reasonably
be resisted.                                                               *e*

On the same day (whether before or after the meeting with Mr Hill can no
longer be determined) Mr Glover took steps to procure the company to repay
the £40,000 which Medallion had paid in anticipation of a contract of purchase
of Trundley's Road. In order to fund the repayment the company resolved to
borrow the money from the only source of finance available to it, now the bank
overdraft was at its limit, namely the pension fund. It borrowed the money on    *f*
terms that the loan should be repayable on 15 January 1987 and be secured by
a debenture. The debenture was dated 15 April. The £40,000 was borrowed
from the pension fund and paid out to Medallion on the same day. It was
repaid by the company to the pension fund on 30 April by which time the
overdraft at the bank had been reduced to below £200,000.

Mr Glover returned to Mr Hill on 21 April with the bank's quick assets/    *g*
liabilities form duly completed. This showed quick assets £389,000, quick
liabilities £640,000 (including bank overdraft £270,000) and fixed assets
£362,000. Mr Glover discussed these figures with Mr Hill and assured him that
the company could trade within a maximum overdraft of £300,000. Mr Hill
warned him that the limit must not be exceeded in any way. In the course either    *h*
of this or of the previous conversation on 15 April, Mr Glover told him that
the pension fund was also proposing to take a debenture, and Mr Hill told him
that if there was any attempt by the pension fund to resist the bank having
first priority with its debenture, the bank's continued support would not be
forthcoming. Mr Glover accepted that. He told me, and I accept, that when he
and Mr Creal had taken the pension fund debenture they had recognised that    *i*
it would have to be subordinated to the debenture which they fully expected
the bank would eventually demand.

On the same day (again whether before or after his discussion with Mr Hill can no longer be determined) Mr Glover telephoned the auditors. He was
*a* unable to speak to an audit partner and was put through to Mr David Taylor, the taxation partner. There is a dispute as to what Mr Glover actually said. According to Mr Taylor's attendance note made immediately afterwards, Mr Glover 'advised that it was now likely the company would go into liquidation'. He also mentioned that 'beforehand both the Bank and the pension fund were
*b* executing debentures'. Mr Taylor understood, though Mr Glover did not say, that this was 'in the hope that their loans would be secured'. In his letter to the company's solicitors written that same day, Mr Taylor said that he believed that they would by now have been advised by Mr Glover that 'there is a possibility the company will be put into liquidation'. In evidence to me Mr Glover denied that he ever said that the company 'would' go into liquidation;
*c* he said only that it 'could' go into liquidation. That is plainly right. Neither of Mr Taylor's versions suggests otherwise. The difference between them is not whether the company 'would' or 'could' go into liquidation, but as to the degree of likelihood that it could.

Both parties have invited me to resolve this conflict but I am unable to do
*d* so. I do not know what prompted Mr Glover's call. It is possible that he had just completed the management accounts for March and discovered that the company had continued to make heavy losses, but there is no evidence of this. Without knowing what prompted Mr Glover to make the call and whether he was referring to the possibility of the bank withdrawing support and forcing a liquidation or to the possibility of Mr Creal and Martin giving up the struggle,
*e* I find it impossible to reach a conclusion. But it is quite unnecessary to do so. It is sufficient to find, as I do, that Mr Glover was referring to an insolvent liquidation; that he recognised that there was a distinct possibility of the company going into insolvent liquidation in the near future; and that this was sufficiently likely to warrant putting the auditors on notice of the fact but not to warrant the taking of any further step, for Mr Glover took none. Mr Glover
*f* remembered that there was great urgency in getting the pension fund debenture to the Registrar of Companies and that it had to be biked there on 23 April, but this was due to the imminence of the 21-day deadline for delivery, not to the imminence of liquidation.

Another meeting took place between Mr Glover and Mr Hill on 27 April
*g* when Mr Hill suggested that the bank's financial services section should visit the company. Mr Glover welcomed this; he seems to have thought that the section would provide some kind of management consultancy service. In fact, of course, the bank's main object was to obtain advice whether the directors were likely to be able to pull the company round and restore it to profitable trading. On 30 April Mr Hill wrote confirming the date of the section's
*h* forthcoming visit and stated:

> '... the prime purpose of the Section's involvement is to derive, from
> available data and discussion with key management, a reliable infor-
> mation base on which the Bank can base its response to the future
> financing requirements of the business. A secondary, but complementary
> aim, is to highlight to management any areas emerging during the assess-
> ment that warrant attention, where appropriate suggesting possible
> courses of action.'

[1990] BCLC 324

On 5 May Mr Hill wrote again. His letter contained the following passages:

'I write to confirm that subject to certain conditions given below the   *a*
Bank will continue to support your Company to the extent of an overdraft
maximum of £300,000 pending the outcome of that investigation. I must
emphasise however that in view of the serious position in which the
Company now finds itself, the Bank's support from here on is on a day-
to-day basis with repayment on demand. The first essential of the Bank's   *b*
continuing support is the provision of a first mortgage debenture over
the Company's fixed and floating assets including a specific charge over
the freehold of 192–194 Trundley's Road. If that property remains in the
name of the subsidiary, then it will be necessary for that Company to
give a charge and guarantee the account of the Company ... You will
understand that there can be no question of the pension fund taking a   *c*
debenture to protect its position on a pari passu basis with the Bank and
if such a move is contemplated it must be made clear that the bank's
continued support as I have outlined is dependent upon its proposed
debenture and fixed charge over the property having first priority.'

Mr Glover and Martin took comfort from this development. They persuaded   *d*
themselves that the bank had decided that the company was worth supporting
at least for the time being and that they would obtain helpful advice from the
Section on how best to restore the company to profitability. If they had
been contemplating the possibility of imminent liquidation on 21 April, that
possibility had now receded in their minds.   *e*

The company's management accounts for the six months to 24 April 1987
were ready by 12 May. They showed a loss of £301,000 for the half year, and
when account is taken of the payments totalling £130,000 made to Mr Glover
and the pension fund, this means that the company had made a trading loss of
£171,000 in the six months, that is to say a further trading loss of £80,000
during March and April. A trial balance as at 24 April showed net assets of   *f*
£27,000, assuming that a provision for deferred taxation was not required. But
the fixed assets included plant and machinery valued at £232,000 on a going
concern basis. The company was almost certainly technically insolvent.

Two members of the section attended the company's premises between 12
and 14 May. Mr Glover made himself available for questioning. At the end of
their investigation Mr Glover naturally asked them: 'How did we do?' He was   *g*
told to wait for the report. He was, however, given to understand that the
section would not be recommending an immediate withdrawal of support by
the bank and he took comfort from this.

On 15 May one of the members of the section telephoned the bank's regional
office and reported that the company appeared to be insolvent, that there were   *h*
reasonable grounds for thinking that the company could recover, that there
was an urgent need for changes and that each of the management had a different
objective.

On 19 May Martin returned to the bank the debenture which had been sent
to him by the bank a few days earlier. It was not properly executed for, in Mr
Creal's absence on holiday, Martin was the only signatory. The defect was   *i*
attended to and the document re-executed on 29 May. It was dated 20 May.

It is not necessary to rehearse later events at length. An edited copy of the

section's report was forwarded to the company by Mr Hill on 12 June under cover of a letter which called for further information including a business plan

*a* and an integrated profit and loss and cash flow forecast and which continued:

'Whilst the Bank awaits this information and the completion of its existing security, it will grant an overdraft facility of £250,000 until the middle of next month, and that should be adequate for the company's

*b* requirements, bearing in mind that Mr Glover has indicated that the account can work within a ceiling of £230,000. You will appreciate that £250,000 will, therefore, be regarded as a strict maximum from hereon. This facility is, of course, entirely dependent on the Bank satisfactorily concluding its present security, namely a 1st Mortgage Debenture over the company's fixed and floating assets, with the Pension Fund directors,

*c* giving the Deed of Postponement to the necessary extent, in respect of the Debenture they have registered, and giving the Deed of Satisfaction in respect of the Debenture that has been repaid.'

The bank's terms were accepted. A deed of postponement of the £80,000

*d* debenture was executed by the trustees of the pension fund and a memorandum of satisfaction of the £40,000 debenture was filed. On 17 June Mr Glover, Mr Creal and Martin met to discuss the section's report. They were disappointed at the lack of practical advice in the report and considered the alternatives of liquidation or continuing to trade. They decided to continue trading. The section had recommended that Mr Glover should take over the role of managing

*e* director for a short period and that the company should consider recruiting an outsider. Mr Glover realised that there was no hope of attracting an outsider to be managing director and he was unwilling to accept the position himself, but he agreed to accept responsibility 'without portfolio'. It was agreed that Martin should continue 'in the title of managing director but to in fact be directed by' Mr Glover.

*f* By the end of June Mr Glover and Mr Creal realised that their best hope was to sell the company as a going concern. Mr Glover was prepared to sell it for £1. That way he would at least save the pension fund's £80,000. He had always assumed that if the company failed the pension fund's debenture would be worthless, ranking as it did behind that of the bank.

*g* Mr Glover did not produce the information which Mr Hill had requested and eventually Mr Hill realised that there was no one in the company capable of producing it, but, if it were produced, it would not portray an acceptable situation. He had lost all confidence in the company's management. On 30 July his assistant wrote to Martin:

*h* '... our sanctioning authority ... confirm that they are prepared to continue to allow the company an overdraft facility of £250,000 *maximum for a further 2 months*, during which period it is hoped that a sale of the company will be concluded. The bank's continued support is, however, subject to the opening of a *separate Wages & Salaries Account* ... Finally,

*i* it is considered strongly advisable that the directors should seek advice from their legal advisers *as the provisions of the Insolvency Act 1986*, given the position portrayed in the recent report by our Financial Services Section.'

The bank was no longer supporting an insolvent company to enable the
directors to trade out of difficulty but to give them the opportunity to try to
find a purchaser. Hence the advice contained in that last passage.                    *a*

The company had continued to make losses throughout the period and its
cash flow came under increasing strain. The auditors visited the company on
20 August and saw the management accounts for July. They recommended
immediate liquidation. The company went into liquidation on 24 August.

I am satisfied that at all material times and in particular from 14 April      *b*
onwards Mr Glover, Mr Creal and Martin knew (i) that the company was
actually or virtually insolvent and (ii) that if the bank withdrew its support at
any time the company would be forced into immediate liquidation. Mr Glover
was well aware of the danger that the company might go into insolvent
liquidation. I have little doubt that the repayment of £40,000 to Medallion on
15 April was motivated by a desire to avoid the risk of losing it in that event.   *c*

Mr Glover assumed that if the company failed the pension fund debenture
would be worthless because it would rank behind the bank's debenture, and
its existence provided no motive for him to encourage the company to continue
to trade unless he believed that it could survive. He was, however, less sanguine
than Martin. He was motivated primarily by a sense of loyalty and a desire
that Martin should be given a chance to prove himself. But I am satisfied that,   *d*
like the others, Mr Glover genuinely believed throughout that the company
could be pulled round if it was given time. I express no opinion whether that
was a reasonable belief for any of them to hold, for that is a question which
may fall for decision in other proceedings and is unnecessary to decide in these.

I reject the allegation that Martin was merely a cat's-paw and that Mr       *e*
Glover's was the controlling mind of the company. The decision to continue
trading and not to liquidate, which was a continuing one, and the decision to
grant the bank a debenture, were made by all three men. Martin and, to a lesser
extent, Mr Creal, looked to Mr Glover for advice, particularly on financial
matters and in relation to the bank, and his influence was very great indeed;
but the decisions were the decisions of all of them.                              *f*


2 *Voidable preference*


*The law*
Section 239 of the Act provides, so far as material:                              *g*


'... (4) For the purposes of this section and section 241, a company
gives a preference to a person if – (*a*) that person is one of the company's
creditors or a surety or guarantor for any of the company's debts or other
liabilities, and (*b*) the company does anything or suffers anything to be    *h*
done which (in either case) has the effect of putting that person into a
position which, in the event of the company going into insolvent liqui-
dation, will be better than the position he would have been in if that
thing had not been done.

(5) The court shall not make an order under this section in respect of    *i*
a preference given to any person unless the company which gave the
preference was influenced in deciding to give it by a desire to produce in
relation to that person the effect mentioned in subsection (4)(*b*) ...'

So far as I am aware, this is the first case under the section and its meaning has been the subject of some debate before me. I shall therefore attempt to provide some guidance.

The section replaces s 44(1) of the Bankruptcy Act 1914, which in certain circumstances deemed fraudulent and avoided payments made and other transactions entered into in favour of a creditor 'with a view of giving such creditor ... a preference over the other creditors'. Section 44(1) and its predecessors had been construed by the courts as requiring the person seeking to avoid the payment or other transaction to establish that it had been made 'with the dominant intention to prefer' the creditor.

Section 44(1) has been replaced and its language has been entirely recast. Every single word of significance, whether in the form of statutory definition or in its judicial exposition, has been jettisoned. 'View', 'dominant', 'intention' and even 'to prefer' have all been discarded. These are replaced by 'influenced', 'desire', and 'to produce in relation to that person the effect mentioned in sub-s (4)(b)'.

I therefore emphatically protest against the citation of cases decided under the old law. They cannot be of any assistance when the language of the statute has been so completely and deliberately changed. It may be that many of the cases which will come before the courts in future will be decided in the same way that they would have been decided under the old law. That may be so, but the grounds of decision will be different. What the court has to do is to interpret the language of the statute and apply it. It will no longer inquire whether there was 'a dominant intention to prefer' the creditor, but whether the company's decision was 'influenced by a desire to produce the effect mentioned in sub-s (4)(b)'.

This is a completely different test. It involves at least two radical departures from the old law. It is no longer necessary to establish a *dominant* intention to prefer. It is sufficient that the decision was *influenced* by the requisite desire. That is the first change. The second is that it is no longer sufficient to establish an *intention* to prefer. There must be a *desire* to produce the effect mentioned in the subsection.

This second change is made necessary by the first, for without it it would be virtually impossible to uphold the validity of a security taken in exchange for the injection of fresh funds into a company in financial difficulties. A man is taken to intend the necessary consequences of his actions, so that an intention to grant a security to a creditor necessarily involves an intention to prefer that creditor in the event of insolvency. The need to establish that such intention was dominant was essential under the old law to prevent perfectly proper transactions from being struck down. With the abolition of that requirement intention could not remain the relevant test. Desire has been substituted. That is a very different matter. Intention is objective, desire is subjective. A man can choose the lesser of two evils without desiring either.

It is not, however, sufficient to establish a desire to make the payment or grant the security which it is sought to avoid. There must have been a desire to produce the effect mentioned in the subsection, that is to say, to improve the creditor's position in the event of an insolvent liquidation. A man is not to be taken as *desiring* all the necessary consequences of his actions. Some consequences may be of advantage to him and be desired by him; others may not affect him and be matters of indifference to him; while still others may be

positively disadvantageous to him and not be desired by him, but be regarded
by him as the unavoidable price of obtaining the desired advantages. It will
still be possible to provide assistance to a company in financial difficulties
provided that the company is actuated only by proper commercial consider-
ations. Under the new regime a transaction will not be set aside as a voidable
preference unless the company positively wished to improve the creditor's
position in the event of its own insolvent liquidation.

There is, of course, no need for there to be direct evidence of the requisite
desire. Its existence may be inferred from the circumstances of the case just as
the dominant intention could be inferred under the old law. But the mere
presence of the requisite desire will not be sufficient by itself. It must have
influenced the decision to enter into the transaction. It was submitted on behalf
of the bank that it must have been the factor which 'tipped the scales'. I
disagree. That is not what sub-s (5) says; it requires only that the desire should
have influenced the decision. That requirement is satisfied if it was one of the
factors which operated on the minds of those who made the decision. It need
not have been the only factor or even the decisive one. In my judgment, it is
not necessary to prove that, if the requisite desire had not been present, the
company would not have entered into the transaction. That would be too high
a test.

It was also submitted that the relevant time was the time when the debenture
was created. That cannot be right. The relevant time was the time when the
decision to grant it was made. In the present case that is not known with
certainty. It was probably some time between 15 April and 20 May, although
as early as 3 April Mr Glover and Mr Creal had resigned themselves to its
inevitability. But it does not matter. If the requisite desire was operating at all,
it was operating throughout.

### The evidence

Mr Glover and Martin both gave evidence; Mr Creal did not. I accept Martin
as a reliable witness. Mr Glover was far from reliable, but I accept him as an
honest witness who tried his garrulous best to help the court. His recollection
was poor and much of his evidence consisted of inaccurate reconstruction. It
was chiefly valuable for the insights it gave of his own and others' motives. He
was defensive in relation to his own responsibility for permitting the company
to continue to trade and insisted that after 3 April he had ceased to be a
director. I am satisfied that he remained a de facto director and that he was a
party to and greatly influenced all decisions of importance in relation to financial
matters. In relation to the bank's debenture, however, he did not take sides but
gave his evidence fairly and impartially. He had either not worked out that it
was in the interests of the pension fund, even if it were only an unsecured
creditor, that the bank's debenture should be set aside, or, if he had, he did not
allow it to affect his evidence.

I am satisfied that throughout the period from 15 April to 29 May Mr Glover,
Mr Creal and Martin knew (i) that the company was probably insolvent and
might not be able to avoid an insolvent liquidation; (ii) that its continuing to
trade was entirely dependent on the continued support of the bank; (iii) that if
the debenture which Mr Hill had asked for were not forthcoming the bank
would withdraw its support; and (iv) that if the bank withdrew its support the
company would be forced into immediate liquidation. I am also satisfied that

they had decided to continue trading in a genuine belief that the company could
be pulled round. It follows that they had no choice but to accede to the bank's
*a* request for a debenture. I accept Martin's evidence: 'It was viewed as a simple
decision. Either we gave the bank a debenture or they called in the overdraft.'

That sufficiently explains the decision to grant the debenture and there is no
justification for inferring any other reason. There is no evidence that either
Martin or Mr Creal wanted to improve the bank's position in the event of an
*b* insolvent liquidation and there is no reason why they should. I find as a fact
that in deciding to grant the debenture to the bank neither of them was
motivated by any desire except the desire to avoid the calling in of the overdraft
and to continue trading. That, however, is not the end of the matter. They
were greatly influenced by Mr Glover's recommendation that the debenture
should be granted, and I turn to examine his evidence to see whether he was
*c* influenced by a desire to improve the bank's position in the event of a liquidation
for, if he was, then, in my judgment, the company's decision was similarly
influenced, even though Mr Glover did not communicate any such desire to
the others.

Mr Glover's evidence was to the same effect. He knew that if the company
was to continue to trade it had no choice but to grant the debenture. He had
*d* a further reason for recommending it to the others. He believed that a debenture
was not valid unless the company continued to trade for six months after it
was given. Accordingly, he conceived the eccentric notion that if the bank took
a debenture it would have to continue to support the company for a further
six months. As he put it:

*e*

'A. I viewed the bank, that the bank, having got the debenture, would
then have to give us credit for a further six months...

Q. What was the point in giving the bank a debenture, in your
mind?  A. In the first and foremost, to secure an overdraft of £250,000
for a guaranteed six months.'

*f*

Counsel who appeared for the applicant (Mr Vos) accepted this evidence but
claimed that there was another consideration which also operated on Mr
Glover's mind, namely a desire to improve the bank's position in the event
of the company's insolvent liquidation. He submitted that this was not as
*g* idiosyncratic as it might appear, for Mr Glover and Medallion as well as the
pension fund all banked at the Southwark branch of the bank; Medallion had
an overdraft and anticipated making a request for a further facility in the near
future; and Mr Glover would have wanted to keep on the right side of Mr Hill.
He even claimed that Mr Glover felt a sense of guilt for having allowed the
overdraft to become so high (even though it never exceeded the permitted limit)
*h* and so morally responsible for the position in which the bank found itself.
Either explanation would lend credence to the otherwise implausible, but as a
reason for agreeing to grant the debenture neither is supported by the evidence
and neither was put to Mr Glover. I reject both.

I am satisfied that throughout the period Mr Glover's relationship with the
bank was an arm's length one and that in dealing with the bank on the
*i* company's behalf he was not affected by personal financial considerations. It
is noteworthy (i) that he did not tell Mr Hill of the loss of the Dee Corporation
for some months because he saw no advantage to the company in doing so; (ii)

that he did not tell Mr Hill of his own or Mr Creal's actual retirement until afterwards, even though he knew that Mr Hill would be sufficiently concerned to demand a debenture in that event; (iii) that although he learned of the company's probable insolvency on 14 April he would not have gone to see Mr Hill on 15 April if Mr Hill had not summoned him; and (iv) that on or after 21 April he never warned Mr Hill of the imminence of liquidation or the urgency if a debenture was to be taken in time.

Counsel for the applicant (Mr Vos) relied on several passages in Mr Glover's evidence in which he equated the bank's debenture with the pension fund debenture, and appeared to be saying that he had been concerned to protect the bank's position in the event of the company's liquidation. When asked why he agreed to give the bank a debenture, for example, he replied:

'Because the pension fund was having a – about to have a debenture, or was under way with a debenture. I believe the pension fund was under way with having a debenture. And it seemed logic that the bank should have a debenture too.'

But here Mr Glover was looking at the request from the bank's point of view. He was saying no more than that he recognised that it was reasonable for the bank to ask for a debenture.

Counsel for the applicant submitted that (i) Mr Glover obviously arranged for the pension fund to have a debenture because he desired to improve its position as a creditor in the event of the company's insolvency; (ii) he also desired to give the bank a first debenture even if only to avoid the calling in of the overdraft; (iii) it follows that he must have desired to put the bank ahead of the pension fund in the event of the company's insolvency; (iv) and it follows that it must have desired to put the bank ahead of the unsecured creditors in the event of the company's insolvency.

In fact, priority between the debenture holders was not a matter for the company but for the debenture holders themselves. The bank demanded priority and the pension fund conceded it. But, in any case, in my judgment, the syllogism confuses desire with intention and breaks down at (iii). Mr Glover intended the bank to rank ahead of the pension fund but he obviously did not desire it. It was the price he had to pay for the bank's continued support.

Counsel for the applicant strongly relied on the following passages in Mr Glover's evidence:

'The debenture for the pension fund was tidied up. I felt it was right and proper that the debenture for the bank should have been tidied up ... On the broad sense, I was worried that both the bank and the pension fund had not got a debenture because I considered them my responsibility ... I was charged with protecting the pension fund and the bank. That is how I saw my charge. That was my side of the business ... I was in no way involved with the trading of the company or the suppliers. I was involved with the bank and, secondly, the pension fund. I would have deemed it my responsibility, since I deal with the bank and the pension fund, to protect them ... I never thought about the other creditors of the company ... because they were Mike Creal's responsibility. It was not my side of the business.'

Counsel placed the strongest reliance on the following answers by Mr Glover
when he was dealing with the telephone call to Mr David Taylor on 21 April:

'Q. Who rang?   A. There is no question. I rang David Taylor. And I,
for some unknown reason, would have been agitated. I was disturbed.
And it is the one thing of all this I cannot – it is a statement to David
Taylor where, in my agitation, I would have said to David: "David, I
must get this tidied up because this company could go into liquidation".
Q. And what did you tell him you were going to get tidied up?   A. It
was already in process: a debenture on the – a debenture on behalf of the
bank and a debenture on behalf of the pension fund.'

This was reconstruction, not recollection, and in relation to the bank's
debenture it was nonsense. There was a great deal of excitement on 21 or 22
April in delivering the pension fund debenture to the registrar before the
deadline expired, but the bank did not send the form of debenture which it was
seeking to the company until 14 May. Mr Glover cannot have been agitated
about the need to deal with the bank's debenture as a matter of urgency on 21
April and, if he had been, he would have rung Mr Hill, not Mr Taylor. Nor is
this merely an error of date. There was no time at which Mr Glover's answer
can have been true, and he later corrected it by saying that in this conversation
he had not been concerned about the bank's debenture.

Despite this, counsel for the applicant (Mr Vos) relied on it as betraying an
anxiety on Mr Glover's part lest the company should go into liquidation before
the bank had obtained a debenture. There could be no explanation for a desire
to ensure that the bank had a debenture even though the company went into
insolvent liquidation immediately afterwards, it was submitted, except a desire
that the bank's position as a creditor should be improved in that event.

Normally, no doubt, that would be so. In the present case it would sit
uneasily with Mr Glover's belief that a debenture was invalid unless the
company continued to trade for six months, but then Mr Glover did not always
think logically. However, the key to Mr Glover's evidence is to be found in
another series of answers to questions from me:

'Q. You thought it was your responsibility to protect the bank, but
you did not think it was your responsibility to get the debenture regi-
stered?   A. No. No, no.

Q. I do not entirely understand.   A. No, no. No, no. I think we will
find that the bank's solicitors are responsible for registering their own
charge or debenture. [He was wrong.]

Q. I only want to understand what you mean by saying you thought
you were responsible for protecting the bank, because the bank would
not be protected if it was not registered?   A. Ah, well, not to – forgive
me. Not in the sense that I would protect the bank in – one would say in
the wide legal sense. The bank was somebody I dealt with and therefore,
having said that a debenture was given – was to be given – obviously I
was going to follow it through to see that a debenture was given.'

That, in my judgment, is all it came to. Mr Glover dealt with the bank, it
was 'his side of the business', and he saw it as his responsibility to ensure that

the company did what he had told the bank it would do. He had promised Mr
Hill that the company would give the bank a debenture and he would have
been upset if the company had gone into liquidation before it had done so. But    *a*
he was not concerned whether the bank registered the debenture, even though
he knew that it would not be valid unless it was registered, because he did not
regard that as his responsibility. He was not worried that the company might
go into liquidation before the bank obtained a *valid* security. That was a matter
of indifference to him. It follows, and I find, that he was not actuated by a    *b*
desire to improve the bank's position as a creditor in the event of the company's
liquidation.

*Conclusion*
I dismiss the applicant's claim to set the debenture aside as a voidable preference.
                                                                                  *c*

3 *Transaction at an undervalue*
Section 238 of the 1986 Act is concerned with the depletion of a company's
assets by transactions at an undervalue. Section 238(4) of the Act defines a
transaction at an undervalue as follows:

> 'For the purposes of this section and section 241, a company enters    *d*
> into a transaction with a person at an undervalue if – (a) the company
> makes a gift to that person or otherwise enters into a transaction with
> that person on terms that provide for the company to receive no con-
> sideration, or (b) the company enters into a transaction with that person
> for a consideration the value of which, in money or money's worth, is    *e*
> significantly less than the value, in money or money's worth, of the
> consideration provided by the company.'

The granting of the debenture was not a gift, nor was it without consider-
ation. The consideration consisted of the bank's forbearance from calling in
the overdraft and its honouring of cheques and making of fresh advances to the    *f*
company during the continuance of the facility. The applicant relies therefore on
para (b).
To come within that paragraph the transaction must be (i) entered into by
the company; (ii) for a consideration; (iii) the value of which measured in
money or money's worth; (iv) is significantly less than the value; (v) also    *g*
measured in money or money's worth; (vi) of the consideration provided by
the company. It requires a comparison to be made between the value obtained
by the company for the transaction and the value of consideration provided by
the company. Both values must be measurable in money or money's worth and
both must be considered from the company's point of view.
In my judgment, the applicant's claim to characterise the granting of the    *h*
bank's debenture as a transaction at an undervalue is misconceived. The mere
creation of a security over a company's assets does not deplete them and does
not come within the paragraph. By charging its assets the company appropriates
them to meet the liabilities due to the secured creditor and adversely affects the
rights of other creditors in the event of insolvency. But it does not deplete its
assets or diminish their value. It retains the right to redeem and the right to    *i*
sell or remortgage the charged assets. All it loses is the ability to apply some-
 proceeds otherwise than in satisfaction of the secured debt. That is not some-

thing capable of valuation in monetary terms and is not customarily disposed of for value.

*a*      In the present case the company did not suffer that loss by reason of the grant of the debenture. Once the bank had demanded a debenture the company could not have sold or charged its assets without applying the proceeds in reduction of the overdraft; had it attempted to do so, the bank would at once have called in the overdraft. By granting the debenture the company parted

*b*    with nothing of value, and the value of the consideration which it received in return was incapable of being measured in money or money's worth.

Counsel for the applicant (Mr Vos) submitted that the consideration which the company received was, with hindsight, of no value. It merely gained time and with it the opportunity to lose more money. But he could not and did not claim that the company ought to have received a fee or other capital sum in

*c*    return for the debenture. That gives the game away. The applicant's real complaint is not that the company entered into the transaction at an undervalue but that it entered into it at all.

In my judgment, the transaction does not fall within sub-s (4), and it is unnecessary to consider the application of sub-s (5) which provides a defence

*d*    to the claim in certain circumstances.

4 *Conclusion*

In my judgment, the granting of the debenture to the bank was neither a voidable preference nor a transaction at an undervalue and I dismiss the application.

*e*
*Application dismissed.*

Solicitors: *William Prior & Co* (for the applicant); *Wilde Sapte* (for the respondents).

*f*
                                                    Jacqueline Metcalfe    Barrister.

TAB 54

*Re New Cap Reinsurance Corporation* [2011] EWHC 677 (Ch),
English High Court

Neutral Citation Number: [2011] EWHC 677 (Ch)

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: Tuesday, 15th March 2011

**Before**:
**MR. JUSTICE LEWISON**

-  - - - - - - - - - - - - - - - - - - -

**IN THE MATTER OF NEW CAP REINSURANCE CORPORATION LIMITED (IN
LIQUIDATION) AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

**Between:**

| | |
|---|---|
| **(1) NEW CAP REINSURANCE CORPORATION LIMITED (IN LIQUIDATION)** **(2) JOHN RAYMOND GIBBONS** | **Applicants** |
| - and - | |
| **(1) AE GRANT AND OTHERS (NAMED IN SCHEDULE 1) AS MEMBERS OF LLOYD'S SYNDICATE 991 FOR THE YEAR 1997 YEAR OF ACCOUNT** **(2) AE GRANT AND OTHERS (NAMED IN SCHEDULE 2) AS MEMBERS OF LLOYD'S SYNDICATE 991 FOR THE 1998 YEAR OF ACCOUNT** | **Respondents** |

- - - - - - - - - - - - - - - - - - - -

Transcript of the Shorthand/Stenographic Notes of Marten Walsh Cherer Ltd.,
1st Floor, Quality House, 6-9 Quality Court, Chancery Lane, London WC2A 1HP.
Telephone No: 020 7067 2900
email: info@martenwalshcherer.com

- - - - - - - - - - - - - - - - - - - -

**MR. GABRIEL MOSS QC** and **MR. BARRY ISAACS** (instructed by **Mayer Brown
International LLP**) for the Applicants.
**MR. ROBIN KNOWLES CBE, QC** and **MS. BLAIR LEAHY** (instructed by Edwards,
Angell, Palmer & Dodge LLP) for the Respondents.

- - - - - - - - - - - - - - - - - - - -

# Judgment

**Mr. Justice Lewison:**

1.   New Cap Reinsurance Corporation Limited ("New Cap") is an Australian reinsurer. It was licensed in Australia and conducted its business in Australia. It is now in insolvent liquidation. The respondents are members of two Lloyd's syndicates for the 1997 and 1998 years of account, which placed reinsurance with New Cap through an English broker and New Cap's Australian reinsurance sub-broker.

2.   The reinsurance contracts were subject to English law and the jurisdiction of the English courts. Both reinsurances also contained an arbitration clause which stipulated that the seat of any arbitration was to be London; and the proper law of the arbitration was to be English law. Each reinsurance contract also contained a commutation clause.

3.   Following significant losses which were incurred during the 1997 and 1998 underwriting years, New Cap and the respondents entered into a commutation agreement in December 1998. Under that agreement, New Cap agreed to make a lump sum payment to the respondents. This payment was calculated on the basis of a 7.5% discount. In return New Cap was released from liability under the reinsurances. Just over three months before New Cap went into administration, it made two payments from its Australian bank account to AE Grant Underwriting Agencies Ltd, as agent for the respondents. The first of these payments was for US$2 million on about 8th January 1999; and the second was for US$3.98 million on about 4th January 1999.

4.   On 19th April 2002, just inside the relevant limitation period, Mr. Gibbons, as New Cap's liquidator, brought proceedings in New South Wales under the Corporations Act 2001. The proceedings alleged that the two payments constituted unfair preferences and were thus voidable transactions under that Act. These proceedings were one of a number proceeding in parallel against defendants in various jurisdictions around the world. The respondents refused to accept service of the proceedings and refused to submit to the jurisdiction of the Australian court. However, the court authorised substituted service and the respondents were served in accordance with the order of the Australian court on 23rd January 2003.

5.   The respondents declined to enter an appearance in Australia and took no formal part in the proceedings, although they were made aware of them; and they argued their case, or parts of it, in correspondence which was drawn to the attention of the Australian court. They say that proceedings in Australia would have involved them incurring increased costs and inconvenience as against proceedings in England. They say they have throughout been willing to submit to the jurisdiction of an appropriate tribunal so that the merits of the liquidator's claim can be addressed.

6.   Barrett J. decided the question of jurisdiction as a preliminary issue and decided that the Australian court had jurisdiction. In a judgment delivered on 30th September 2008, White J. found that New Cap was insolvent at all relevant times from 31st December 1998, including as at the date of the two payments. The finding of insolvency at the date of the payments was a crucial building block in the liquidator's claim. On 17th December 2008, Barrett J. delivered judgment on the liquidator's substantive claim. He decided that each of the payments was an unfair preference; and hence liable to be set aside under the Corporations Act. He also considered some of the defences that the respondents had raised in correspondence and rejected them. More specifically he

held, first, that the arbitration clause did not apply to the liquidator's application; and, second, that although the respondents had alleged that they had a defence based on good faith, they had adduced no evidence before the court and therefore had not made out that defence.

7.  Barrett J. also considered whether his order could be registered in England under the Foreign Judgments (Reciprocal Enforcement) Act 1933  ("the 1933 Act")  and decided that it could not. He therefore issued a letter of request to the English court. Paragraph 1 of Barrett J's order declared that the two payments were voidable transactions within the meaning of Part 5.7(B) of the Corporations Act 2001. By paragraph 2 ordered that the defendants listed in a schedule to the orders were to pay, first, the sum of US$2.697 million-odd under section 588 FF(1)(a) of the Corporations Act and a further sum of just over US$ 1 million as interest on the principal sum. He also ordered that the defendants listed in the second schedule to the orders to pay the sum of US$3.283 million-odd and a further sum of interest on that principal sum.

8.  The letter of request set out a history of the proceedings and then contained a request in the following terms: "This Court hereby requests the High Court of Justice of England and Wales to exercise its jurisdiction under Section 426 of the *Insolvency Act* 1986 to act in aid of and assist this Court, if and insofar as the High Court of Justice in England considers it just and appropriate, by:

> "(a) Ordering that AE Grant & Others, Lloyd's Syndicate Number 991 for the 1997 year of account (being the persons identified in Schedule 1 to the declarations, orders and directions a copy of which is annexed to this Letter of Request and marked 'A') pay to New Cap Reinsurance Corporation Limited (in liquidation) each of the sums of money ordered by Order 2 of those declarations, orders and directions, as well as the costs thereby ordered to be paid by the defendants."

9.  There was a similar request as regards the 1998 year of account. The letter continued:

> "In the alternative: (i) Ordering that the Liquidator be at liberty to file and serve proceedings in the High Court of Justice of England and Wales in, or substantially to the effect of, the form annexed to this Letter of Request and marked 'B'; AND FURTHER  (ii) Declaring that the proper law to be applied by the High Court of Justice of England and Wales for the determination of any such proceedings commenced pursuant to that liberty is the law of Australia."

> It also contained ancillary requests.

10.  The liquidator  puts his case in two ways. First, he says that the court should exercise its power under section 426 of the Insolvency Act 1986. Second, he says that the court also has power at common law to assist a foreign liquidator and should do so. The respondents say that contrary to Barrett J's conclusion, the only theoretical means of enforcement of the Australian court's order is via the 1933 Act. They say that there is no power at common law that survives the 1933 Act. They say that section 426 does not confer enforcement jurisdiction on the English court when neither the 1933 Act nor the common law gives such jurisdiction.  If there is a discretion under section 426, they say that it should not be exercised in the liquidator's favour. The liquidator says that the 1933 Act does not apply to orders made in insolvency proceedings.

11.    The 1933 Act was enacted following the report of a committee chaired by Greer LJ. The Committee reported in December 1932. At that time, personal bankruptcy was governed by the Bankruptcy Act 1914. Under Section 122 of that Act the courts exercising insolvency jurisdiction throughout the British Empire were required to act in aid of each other and, upon a request by the non-English court, could exercise the jurisdiction of either court.

12.    The mischief that the Committee was asked to consider was the problem for English businesses in enforcing judgments abroad. The perceived solution to the problem was to encourage foreign countries to recognise English judgments by granting reciprocal rights of enforcement for foreign judgments in order to replace the cumbersome procedure for bringing an action in England on a foreign judgment. In so recommending the Committee drew on the example of the Administration of Justice Act 1920 which allowed the registration of judgments from other countries within the British Empire. That system, under the 1920 Act, plainly existed in parallel with section 122 of the Bankruptcy Act 1914.

13.    The report annexed to it a draft Bill, substantially in the form of the eventual Act, and a commentary on the draft Bill. In paragraph 4 of the Report, the Committee said: "It is not necessary for our present purpose to consider the effect in England of foreign judgments in bankruptcy proceedings or in proceedings connected with the administration of the estates of deceased persons or other similar classes of judgments." This indicates that insolvency was not part of the Committee's remit and that the Bill was not intended to encompass such matters.

14.    The report also annexed to it draft conventions which had been negotiated with Belgium, France and Germany. None of those conventions extended to insolvency matters. The Committee explained that one of the purposes of its recommendations was to enable such conventions to be negotiated. That, too, supports the view that insolvency was not intended to be included within the ambit of the 1933 Act as foreshadowed by the quotation from paragraph 4.

15.    The way in which the 1933 Act works is by enabling the Crown to direct that the Act shall apply to a particular country either generally or in relation to a particular class of judgment. The Act then applies to whatever country and/or class of judgment is specified in the order; but it applies only to the kind of judgments specified in section 1(2), which provides: "Subject to sub-section (2A) of this section, a judgment of a recognised court is within this sub-section if it satisfies the following conditions: namely, (a) it is either final and conclusive as between the judgment debtor and the judgment creditor, or requires the former to make an interim payment to the latter, and (b) there is payable under it a sum of money not being a sum payable in respect of taxes or other charges of a like nature or in respect of a fine or other penalty, and (c) it is given after the coming into force of the Order in Council which made that court a recognised court." Sub-section (2A) does not matter for present purposes.

16.    Under section 2 a judgment creditor may apply to register a judgment to which the Act applies. Once registered, a foreign judgment may be enforced as if it were a judgment of the English court. However, this is subject to the power (and in some cases the duty) of the court to set aside the registration. The grounds for setting aside are contained in section 4. Section 4(1) provides as follows:

> "On an application in that behalf duly made by any party against whom a registered judgment may be enforced, the registration of the judgement – (a) shall be set aside if the registering court is satisfied—(i) that the judgment is not a judgment to which this Part of this Act applies or was registered in contravention of the foregoing provisions of this Act; or (ii) that the courts of the country of the original court had no jurisdiction in the circumstances of the case; or (iii) that the judgment debtor, being the defendant in the proceedings in the original court, did not (notwithstanding that process may have been duly served on him in accordance with the law of the country of the original court) receive notice of those proceedings in sufficient time to enable him to defend the proceedings and did not appear; or (iv) that the judgment was obtained by fraud; or (v) that the enforcement of the judgment would be contrary to public policy in the country of the registering court; or (vi) that the rights under the judgment are not vested in the person by whom the application for registration was made;

> "(b) may be set aside if the registering court is satisfied that the matter in dispute in the proceedings in the original court had previously to the date of the judgment in the original court been the subject of a final and conclusive judgment by a court having jurisdiction in the matter."

17.    Section 4(2) deals with cases in which the country of the original court is to be deemed to have had jurisdiction. It deals with three separate cases: first, the case of a judgment given "in an action in personam"; second, the case of a judgment given of which the subject matter was immovable property or an action in rem, and third, by sub-section (2)(c): "in the case of a judgment given in an action other than any such action as is mentioned in paragraph (a) or paragraph (b) of this subsection, if the jurisdiction of the original court is recognised by the law of the registering court."

Section 6 of the Act provides:

> "No proceedings for the recovery of a sum payable under a foreign judgment, being a judgment to which this part of this Act applies, other than proceedings by way of registration of the judgment, shall be entertained by any court in the United Kingdom."

18.    Two of the definitions in section 11 are relevant. They are, first, the definition of "Judgment", which reads as follows: "'Judgment' means a judgment or order given or made by a court in any civil proceedings, or a judgment or order given or made by a court in any criminal proceedings for the payment of a sum of money in respect of compensation or damages to an injured party."   The phrase "a judgment or order given or made by a court in any civil proceedings" is followed in the text of the Act by a comma.

19.    In his judgment, Barrett J. held that his order could not be registered because it was not an order for the payment of money in respect of compensation or damages to an injured party. However, in so deciding, Barrett J. overlooked the comma after the phrase "In any civil proceedings,".  Commas in Acts of Parliament can be significant as Sir Roger Casement found to his cost.

20.    Mr. Moss QC, appearing for the liquidator, did not feel able to support Barrett J's reasoning. In my judgment, the final phrase of the definition qualifies orders made in criminal proceedings only. Any doubt about that is laid to rest by the report of the Committee on which the Act was based. The particular ground, therefore, that Barrett J. gave for concluding that his judgment could not be registered under the 1933 Act is, in my respectful opinion, erroneous.

21.    The second relevant provision is section 11(2), which provides: "For the purposes of this Act, the expression 'action in personam' shall not be deemed to include any matrimonial cause or any proceedings in connection with any of the following matters, that is to say, matrimonial matters, administration of the estates of deceased person, bankruptcy, winding up of companies, lunacy or guardianship of infants."

22.    It is plain from section 11(2) that the order under consideration in the present case is not a judgment in personam for the purposes of the Act. Nor is it a judgment in personam for the purposes of the common law. This is clearly established by *Cambridge Gas Transportation Corp v. Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508 and *Rubin v. Eurofinance SA* [2011] 2 WLR 121. I should mention that Mr. Knowles QC said that *Rubin* is wrong, but that must be decided by someone above my pay grade.

23.    If, therefore, the judgment falls within the 1933 Act at all, it will do so under section 4(2)(c). But in my judgment the 1933 Act does not apply to orders made in insolvency proceedings at all. The report of the Committee makes it clear that that was not its intention; and the fact that the 1933 Act left section 122 of the Bankruptcy Act in place also shows that there was no intention to include bankruptcy within its scope. This is in contrast with section 7 of the 1933 Act, which provides that if the Crown directs that the 1933 Act is to apply to the Crown's dominions outside the United Kingdom, then the Administration of Justice Act 1920 shall cease to apply. Of the two parallel systems that were in place before the passing of the 1933 Act, the 1933 Act was only meant to replace one of them.

24.    In addition, as mentioned, the 1933 Act only applies to the extent that an Order in Council so provides. The relevant order in the present case is the Reciprocal Enforcement of Foreign Judgments (Australia) Order 1994. Article 4 of the Order says that the Act will apply to judgments for the payment of money given by a recognised court "in respect of a civil or commercial matter". By 1994 the phrase "civil or commercial matter" was one that was used in international conventions, notably the Brussels Convention, which is specifically mentioned in the agreement between the United Kingdom and the Government of Australia, which is itself scheduled to the 1994 Order. Under the Convention, civil and commercial matters do not include insolvency proceedings, and that remains the position under the Judgments Regulation that has replaced the Brussels Convention.

25.    Mr. Knowles argues that the 1993 Act divides the world into civil, on the one hand, and criminal, on the other; and that the Order uses the phrase "civil or commercial" for the purpose of excluding criminal proceedings. But if that was so, why use the phrase "civil or commercial" rather than just "civil"? In my judgment, the draftsmen of the 1994 Order chose the phrase "civil or commercial" in order to capitalise on its established meanings in international conventions.

26.    The ambit of insolvency proceedings will include claims by an office holder to satisfy transactions entered into by the insolvent before the onset of insolvency. Lord Hoffmann said as much in *Re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852 and the Court of Appeal so held in *Rubin*. These kinds of claim differ from claims in contract or claims to title to immovable property. That kind of claim is one that can be brought by the company itself, whether or not it is insolvent. A claim to set aside a transaction entered into before the onset of insolvency is a claim which arises only as a result of the insolvency legislation itself and can be brought only by the office holder. Thus, in my judgment, Barrett J's order is part of the insolvency proceedings.

27.    I hold, therefore, that Barrett J's order is not one to which the 1933 Act applies or could apply. Even if parts of Barrett J's order could have been registered under the 1933 Act, the whole of it could not have been because it contained declarations as well as orders for the payment of money. By virtue of section 8 of the 1933 Act, the respondents are bound by the declaration unless the judgment, if registered, could have been set aside, but in the light of of *Rubin* Mr Knowles concedes that it could not.

28.    In my judgment, therefore, the position is as follows. First, there is power at common law for this court to assist the Australian court and, second, in any event, this court has power under section 426 to assist the Australian court.

29.    The next question is should either of those powers be exercised? I start with section 426. Section 426(4) provides: "The courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in any other part of the United Kingdom or any relevant country or territory." Australia is a relevant country as a result of the The Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986.

30.    Section 426(5) provides: "For the purposes of subsection (4) a request made to a court in any part of the United Kingdom by a court in any other part of the United Kingdom or in a relevant country or territory is authority for the court to which the request is made to apply, in relation to any matter specified in the request, the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction. In exercising its discretion under this subsection, a court shall have regard in particular to the rules of private international law."

31.    Thus the combination of the letter of request and section 426(5) gives the English court authority to act, whether or not it would otherwise have had the power to do so. The power includes the application not only of its own law but also the law of the foreign country from which the request came.

32.    Although section 426(4) is couched in mandatory terms, it is common ground that the court retains a discretion, but the discretion is a limited one. The discretion should be exercised in favour of assisting a foreign court unless it would be improper to do so. The scope of the discretion has been considered twice by the Court of Appeal in *Hughes v. Hannover Re* [1997] 1 BCLC 497, and *England v. Smith* [2000] BPIR 28. Morritt LJ gave the leading judgment in both cases. To the untutored eye, they exhibit different approaches; but the latter case must be taken as having explained the former.

New Cap Reinsurance v. AE Grant

The latter case emphasises the mandatory terms in which section 426(4) is drawn; the important public policy of comity between nations; and the weight that must be given to the very fact that a foreign court has asked for assistance, all the more so if the foreign court has itself considered whether a request should be made.

33.     In addition, the fact that there may be differences at the margins between our insolvency law and the insolvency law of the foreign state will rarely be of importance; first, because the Secretary of State will have taken that into account in deciding whether to designate the foreign state at all, and second because section 426 itself gives the English court power to apply the law of the foreign state.

34.     In the present case, the respondents had ample opportunity to participate in the Australian proceedings. They chose not to do so formally but tried to secure the best of both worlds by arguing their case in correspondence which was then placed before the Australian court. The Australian court considered the liquidator's application in painstaking detail. The respondents have also participated out of court in the insolvency by voting on various matters and by submitting proofs of debts.

35.     Mr. Knowles says that his clients are willing to be sued in England and have a good defence on the merits; but the seat of the insolvency is Australia and I do not accept that Lloyd's syndicates are hampered in conducting proceedings in Australia. Moreover, even if Mr. Knowles is right about the 1933 Act, his clients are still bound by the declaration with the result that these defences could not be run. Like Ward LJ in *Rubin*, I have little sympathy for the respondents' position. They took their chance and the law has moved against them.

36.     The only other factor that Mr. Knowles relies on is that the claim is stale. I cannot see that that is a factor of any weight, especially since Mr. Knowles' alternative is that the liquidator begins all over again in England, which would make the claim even more stale.

37.     In my judgment, there is every reason to assist the Australian court and no reason not to.

38.     That leaves the position at common law. Strictly speaking, it is unnecessary to consider this since I hold that I have power under section 426. Nevertheless, it is clear from *Rubin* that in cases where section 426 does not apply, the common law power to assist survives. It is not so clear from *Re HIH Casualty and General Insurance Ltd* whether the common law is superseded by or runs in parallel with the statutory power. Lords Hoffmann and Walker said that the powers were parallel. Lords Scott and Neuberger thought that the statutory power succeeded the common power, and Lord Phillips was, if I may respectfully say so, somewhat gnomic. But in *Rubin* the Court of Appeal applied the approach of Lords Hoffmann and Walker, so that is the path that I must follow.

39.     On the basis that the common law power subsists in parallel with the statutory power, the discretionary considerations that have led me to exercise the statutory power would lead me to exercise the common law power in favour of assisting the Australian court. By either or both of these routes, therefore, I grant the relief sought by the liquidator.

MR. MOSS: I am much obliged, my Lord. The next matter is that of costs. I, respectfully ask for the costs of the proceedings to be assessed if not agreed. There is just one slight quirk that has been pointed out to me, and that is that some costs were reserved to your Lordship in a consent order of Floyd J., which your Lordship will find at tab 7 of volume 1.

MR. JUSTICE LEWISON: Was that the stay, which was part of your application? What was that?

MR. MOSS: This was, as your Lordship may recall, an application for a preliminary issue. We objected to that and the respondents agreed to have that dismissed. As I understand it – I think no one attended on that occasion – correspondence shows that the objections to the costs included the costs of the third witness statement of the liquidator. Your Lordship will see that point at paragraph 4 of the order. That, apparently, was based on the fact that some of the evidence in Mr. Gibbons' third witness statement would be relevant to the trial and therefore not entirely wasted. Since we have won the trial, it must follow that we should have these costs, too, in our respectful submission.

My learned friend will probably have some applications after the issue of costs. We would appreciate a period of ten minutes. We have thought about this quite carefully. We just want to finalise our position on this application.

MR. JUSTICE LEWISON: Costs, Mr. Knowles?

MR. KNOWLES: First of all, I am not going to seek to sub-divide costs in relation to a witness statement or not, and nor do I, in the light of your Lordship's decision, resist an order in the normal form on the standard basis. There is a link with the question of appeal, which I will ask your Lordship to entertain in ten minutes time if that is sensible. I will be suggesting that there is an arrangement pending any appeal which can keep the financial sums in a suitable shared location; for example, a joint account. I just signal that as well.  So far as the costs in a self-contained way are concerned, there is nothing I can add.

MR. JUSTICE LEWISON: In that case, I will rise for ten minutes or so. I will not take a great deal of persuading that it is an appropriate case for permission to appeal. Whether I go further and say it is a suitable case for a leapfrog, which is one of the things that Mr. Knowles canvassed, is a different question.

**(Adjourned for a short break)**

**(For continuation, see main transcript proceedings)**

TAB 55

*Re Oasis Merchandising Services Ltd* [1998] Ch 170,
English Court of Appeal

[1998]

[COURT OF APPEAL]                                                    A

*In re* OASIS MERCHANDISING SERVICES LTD.

1996   July 22, 23;                    Peter Gibson, Otton and Hutchison L.JJ.
       Oct. 9

*Insolvency—Winding up—Liquidator—Action against director of insol-*    B
*vent company for wrongful trading—Champertous agreement with*
*third party in return for share in fruits of action—Whether fruits of*
*action "company's property"—Whether agreement necessary for*
*winding up company's affairs and distributing assets—Whether*
*action to be stayed—Insolvency Act 1986 (c. 45), s. 214, Sch. 4,*
*paras. 6, 13*

The liquidator of an insolvent company commenced proceed-    C
ings against five directors under section 214 of the Insolvency Act
1986[1] for wrongful trading. Since the company had no assets to
fund the proceedings and the creditors were unwilling to do so,
the liquidator, with the consent of the liquidation committee and
the Companies Court, made an equitable assignment of the fruits
of the action to a specialist litigation support company in return
for the assignee agreeing to fund the action. The agreement    D
provided that the liquidator would conduct the proceedings and
any settlement negotiations in accordance with the requirements
and directions of the litigation support company. Some of the
directors sought a stay of the action on the grounds that it was
champertous and an abuse of process. The judge granted the stay.

On appeal by the litigation support company:—

*Held,* dismissing the appeal, that a distinction was to be drawn
between assets which were the property of the company at the    E
time of the commencement of the liquidation and property
representing it, including rights of action which arose and might
have been pursued by the company itself prior to the liquidation,
and assets which only arose after the liquidation of the company
and were recoverable only by the liquidator pursuant to statutory
powers conferred on him; that, since the fruits of the claim for
wrongful trading assigned by the liquidator were not the property
of the company at the commencement of the liquidation but were    F
subsequently acquired by him alone through the exercise of his
statutory rights they were not "the company's property" within
paragraph 6 of Schedule 4 to the Act of 1986; that the power
under paragraph 13 of Schedule 4 "to do all such other things as
may be necessary for winding up the company's affairs and
distributing its assets" was not wide enough to cover the
agreement reached with the litigation support company, nor did    G
it give the liquidator authority to enter a champertous agreement
which would otherwise be unlawful; and that, accordingly, the
stay had been correctly granted (see post, pp. 181D–G, 182E–G,
184B–C, 185E–H, 186E–187B).

*In re Yagerphone Ltd.* [1935] Ch. 392 and *In re M.C. Bacon*
*Ltd.* [1991] Ch. 127 approved.

*Per curiam.* The fact that the liquidator was an officer of the
court pursuing an application under section 213 or 214 of the Act    H

[1] Insolvency Act 1986, s. 214: see post, p. 175C–D.
Sch. 4, para. 6: see post, p. 178A.
Para. 13: see post, p. 186E–F.

A    of 1986 and conducting litigation with a public or penal element is relevant to the propriety of his act in entering into the agreement and the correctness of the court in authorising that act. There is much to be said for allowing a liquidator to sell the fruits of an action provided it does not give the purchaser the right to influence the course of, or interfere with the liquidator's conduct of, the proceedings (see post, p. 186A–C).

Decision of Robert Walker J. [1995] 2 B.C.L.C. 493 affirmed.

B

The following cases are referred to in the judgment of the court:

*Ayala Holdings Ltd. (No. 2), In re* [1996] 1 B.C.L.C. 467
*Ayerst v. C. & K. (Construction) Ltd.* [1976] A.C. 167; [1975] 3 W.L.R. 16; [1975] 2 All E.R. 537, H.L.(E.)
*Bang & Olufsen U.K. Ltd. v. Ton Système Ltd.* (unreported), 16 July 1993; Court of Appeal (Civil Division) Transcript No. 834 of 1993, C.A.

C    *Camdex International Ltd. v. Bank of Zambia* [1996] 3 W.L.R. 759; [1996] 3 All E.R. 431, C.A.
*Cyona Distributors Ltd., In re* [1967] Ch. 889; [1967] 2 W.L.R. 369; [1967] 1 All E.R. 281, C.A.
*Esal (Commodities) Ltd., In re* [1993] B.C.L.C. 872; sub nom. *London and Overseas (Sugar) Co. Ltd. v. Punjab National Bank* (unreported), 19 November 1993; Court of Appeal (Civil Division) Transcript No. 1352
D    of 1993, C.A.
*Glegg v. Bromley* [1912] 3 K.B. 474, C.A.
*Grovewood Holdings Plc. v. James Capel & Co. Ltd.* [1995] Ch. 80; [1995] 2 W.L.R. 70; [1994] 4 All E.R. 417
*Guy v. Churchill* (1888) 40 Ch.D. 481
*M.C. Bacon Ltd., In re* [1991] Ch. 127; [1990] 3 W.L.R. 646
*Magor and St. Mellons Rural District Council v. Newport Corporation* [1950]
E    2 All E.R. 1226, C.A.
*Movitor Pty. Ltd. v. Sims, In re* (1996) 19 A.C.S.R. 440
*Park Gate Waggon Works Co., In re* (1881) 17 Ch.D. 234, C.A.
*Ramsey v. Hartley* [1977] 1 W.L.R. 686; [1977] 2 All E.R. 673, C.A.
*Robbie (N. W.) & Co. Ltd. v. Witney Warehouse Co. Ltd.* [1963] 1 W.L.R. 1324; [1963] 3 All E.R. 613, C.A.
*Seear v. Lawson* (1880) 15 Ch.D. 426, C.A.
F    *Trendtex Trading Corporation v. Credit Suisse* [1982] A.C. 679; [1981] 3 W.L.R. 766; [1981] 3 All E.R. 520, H.L.(E.)
*Yagerphone Ltd., In re* [1935] Ch. 392

The following additional cases were cited in argument:

*Leitch (William C.) Brothers Ltd., In re* [1932] 2 Ch. 71
*Leitch (William C.) Brothers Ltd., In re (No. 2)* [1933] Ch. 261
G    *Weddell v. J. A. Pearce & Major* [1988] Ch. 26; [1987] 3 W.L.R. 592; [1987] 3 All E.R. 624

APPEAL from Robert Walker J.

By originating application dated 12 October 1992 Barry John Ward, the liquidator of Oasis Merchandising Services Ltd., brought proceedings under section 214 of the Insolvency Act 1986 against the first to fifth
H    respondents, Timothy Aitken, Michael Scorey, Jonathan Aitken Kidd, Jonathan Aitken and John Hemingway, who were or had been directors, or were alleged to have been shadow directors, of the company. The first, second, fourth and fifth respondents applied for a stay of the proceedings

on the ground that they were being funded by the sixth respondent,    A
London Wall Litigation Claims Ltd. ("L.W.L."), under a champertous
agreement made on 18 November 1991 between the company, the
liquidator and L.W.L., and constituted an abuse of process. On 7 June
1995 Robert Walker J. stayed the proceedings.

By a notice of appeal dated 27 June 1995 L.W.L. appealed with the
leave of the judge on the grounds, inter alia, that (1) the judge, having
held that the fruits of the claim under section 214 of the Act of 1986    B
would be "property" within section 436 of that Act and having accepted
that the agreement dated 18 November 1991 was a sale of such fruits to
L.W.L. in consideration of the latter's financing the prosecution of such a
claim, erred in holding that the assignment of the fruits would not be a
sale of the company's property; (2) the judge erred in principle (a) in
holding that to be the property of the company such a claim had to have    C
been an asset of the company immediately before its liquidation began,
(b) in holding that such a claim could not be property of the company
because upon its liquidation a company ceased to be the beneficial owner
of its assets, which became subject to a statutory trust for its creditors,
and (c) in failing to recognise that public policy and interest required any
process for obtaining assets for distribution among creditors in a winding    D
up to be lawful, notwithstanding that an agreement by a liquidator to
finance the process would otherwise be champertous; and (3) the judge
erred in holding on authority that the fruits of a claim for wrongful
trading under section 214 of the Act of 1986 were not property of the
company concerned because the authorities relied on were distinguishable
or alternatively ought to be overruled.

The facts are stated in the judgment of the court.    E


*Robert Wright Q.C.* for L.W.L. The agreement between the liquidator
and L.W.L. is exempt from the rule against champerty, being either an
agreement for the sale of the property of the insolvent company or an
agreement to do an act necessary for the winding up of the company and
the distribution of its assets: see *Seear v. Lawson* (1880) 15 Ch.D. 426, 433    F
and paragraph 6 of Schedule 4 to the Insolvency Act 1986. Absolute
assignments of claims in bankruptcy cases (including liquidation cases) in
consideration of a share of the proceeds are lawful: see *Seear v. Lawson,
In re Park Gate Waggon Works Co.* (1881) 17 Ch.D. 234; *Guy v. Churchill*
(1888) 40 Ch.D. 481; *Ramsey v. Hartley* [1977] 1 W.L.R. 686 and *Bang
and Olufsen U.K. Ltd. v. Ton Système Ltd.* (unreported), 16 July 1993;    G
Court of Appeal (Civil Division) Transcript No. 834 of 1993. Such
assignments are sales for the purposes of the Insolvency Act 1986: see
*Weddell v. J. A. Pearce & Major* [1988] Ch. 26, 34–35.

The proceeds of a successful claim for wrongful trading are property
within section 436 of the Act of 1986 because section 214 of the Act so
provides. A liquidator can enter into an arrangement with a third party to
sell any part of the property of the company in the discharge of the duty    H
to realise the company's assets: see *In re Movitor Pty. Ltd. v. Sims* (1996)
19 A.C.S.R. 440 and *Magor and St. Mellons Rural District Council v.
Newport Corporation* [1950] 2 All E.R. 1226.

A    The judge thought that if upheld the agreement would result in the liquidator abdicating his investigatory duties: see *In re Ayala Holdings Ltd. (No. 2)*[1996] 1 B.C.L.C. 467. However, the reality was different.

Even though L.W.L. had general control of the proceedings, the agreement provided that the liquidator was to conduct proceedings through his solicitors, and to comply only with lawful directions and to give L.W.L. assistance only so far as the law and the rules of court

B    permitted. Once a liquidation starts all assets of the company are subject to a statutory trust for the benefit of the creditors and, after them, the contributories: see *Ayerst v. C. & K. (Construction) Ltd.* [1976] A.C. 167, 176–180. The sum recovered under section 214 is a contribution to the assets of the company and subject to the statutory trust. The judge was wrong to reach a contrary decision by relying on decisions founded on

C    earlier legislation. [Reference was made to *In re William C. Leitch Brothers Ltd.* [1932] 2 Ch. 71; *In re William C. Leitch Brothers Ltd. (No. 2)* [1933] 1 Ch. 261 and *In re Cyona Distributors Ltd.* [1967] Ch. 889, 902D, 904D, 907C.]

As to *In re M.C. Bacon Ltd.* [1991] Ch. 127 and *In re Ayala Holdings Ltd. (No. 2)* [1996] 1 B.C.L.C. 467, they should be distinguished or overruled.

D    The distinction between an absolute sale of a bare cause of action and a sale of the fruits of litigation made in *Grovewood Holdings Plc. v. James Capel & Co. Ltd.* [1995] Ch. 80, 87C is contrary to the principle that a liquidator has power to realise assets free from the law of champerty. If the present agreement does not fall within the exemption relating to sales because the proceeds are part of the assets of the company, it should be

E    upheld under paragraph 13 of Schedule 4 to the Act of 1986.

*Elspeth Talbot Rice,* for the first and second respondents, adopted the argument of the fourth and fifth respondents.

*Robin Dicker* for the fourth and fifth respondents. The sale agreement involved both maintenance and champerty but the issue is whether it was exempt from the rules that treat such a contract as contrary to public policy: see *Ramsey v. Hartley* [1977] 1 W.L.R. 686, 693–694, 698, 699H.

F    Neither a claim for wrongful trading under section 214 of the Act of 1986, nor the fruits of such a claim, are "property" of the company within the meaning of paragraph 6 of Schedule 4 to the Act of 1986: see *N. W. Robbie & Co. Ltd. v. Witney Warehouse Co. Ltd.* [1963] 1 W.L.R. 1324. A claim for wrongful trading does not exist prior to the making of a winding up order. The claim must be brought in the liquidator's name.

G    The power under section 214 to apply to the court for a declaration that a person is liable to contribute to the company's assets is an incident of the liquidator's office: see *In re Ayala Holdings Ltd. (No. 2)* [1996] 1 B.C.L.C. 467, 480I, 483C and *In re M.C. Bacon Ltd.* [1991] Ch. 127, 137A–E, 138E–F. The power is additional to and separate from the liquidator's duty under section 144 to take control of all the property and things in action to which the company is entitled. The court has a

H    discretion whether or not to make an order under section 214. It can only order that a person make a contribution to the company's assets. Whereas the property of the company falls to be distributed in the first instance to secured creditors and not to the general body of unsecured creditors,

statutory causes of action enure for the benefit of the latter and not the    A
former: see *In re Yagerphone Ltd.* [1935] Ch. 392; *In re William C. Leitch
Brothers Ltd.* [1932] 2 Ch. 71; *In re William C. Leitch Brothers Ltd.
(No. 2)* [1933] 1 Ch. 261 and *In re Esal (Commodities) Ltd.* [1993]
B.C.L.C. 872, 883G. Any contribution made under section 214 to the
company's assets is held by the liquidator on a statutory trust for the
general body of creditors: see *Ayerst v. C. & K. (Construction) Ltd.* [1976]
A.C. 167, 176–180.    B

Public policy does not require the court to uphold an agreement such
as the present which involves trafficking in litigation. To uphold the sale
agreement would be inconsistent with the public policy enshrined in the
Conditional Fee Agreements Order 1995 (S.I. 1995 No. 1674) and the
Conditional Fee Agreements Regulations 1995 (S.I. 1995 No. 1675). It
would be contrary to public policy for a liquidator, an officer of the court,    C
to be entitled to relinquish or fetter his duties regarding the pursuit and
conduct of a wrongful trading claim in favour of a stranger who was
intent on making a profit from that claim.

*Wright Q.C.* replied.

The liquidator and the third respondent did not appear and were not
represented.    D

*Cur. adv. vult.*

9 October. PETER GIBSON L.J. handed down the following judgment
of the court. In English law maintenance (the giving of assistance or
encouragement to a litigant by a person with no interest in the litigation
nor any other motive recognised by the law as justifying his interference)
and champerty (maintenance of a plaintiff bringing an action in    E
consideration of a share in the fruits of the action) are no longer crimes
or torts. But the abolition of such criminal and tortious liability in 1967
has left unaffected any rule of law that a contract involving maintenance
or champerty is to be treated as contrary to public policy or otherwise
illegal: section 14(2) of the Criminal Law Act 1967. This appeal raises the
question of the validity of a prima facie champertous agreement, entered    F
into by a liquidator in purported exercise of a statutory power of sale, to
assign to a purchaser the fruits of an action brought by the liquidator in
exercise of a statutory power conferred on him alone in respect of alleged
wrongful trading by directors.

It is an appeal by the sixth respondent, London Wall Litigation Claims
Ltd. ("L.W.L."), with the leave of Robert Walker J. from his order of
7 June 1995. By that order the judge on the application of the first,    G
second, fourth and fifth respondents stayed proceedings brought under
section 214 of the Insolvency Act 1986 ("the section 214 action") by the
liquidator of Oasis Merchandising Services Ltd. ("the company") against
the first to fifth respondents, who had at some stage been directors, or are
alleged to have been shadow directors, of the company. Before instituting
those proceedings the liquidator had on 18 November 1991 entered into
an agreement with L.W.L. whereby L.W.L. would fund the section 214    H
action. On 16 October 1991 the Companies Court gave the liquidator
authority to enter into the agreement. The judge set aside the order of
Mr. Registrar Pimm giving that authority. The liquidator was given leave

Ch.                    In re Oasis Merchandising Ltd. (C.A.)

A    to appeal but after serving a notice of appeal he has taken no part in the
     hearing before this court.
         The company was incorporated in 1985. It traded in video and audio
     cassettes and associated products. It went into administrative receivership
     on 9 November 1987 and, being insolvent, was compulsorily wound up on
     17 January 1988. The liquidator came to the conclusion that there was a
     prima facie case against the first to fifth respondents for wrongful trading.
B    On 12 October 1992 he commenced the section 214 action by issuing an
     originating application against those respondents, claiming relief under
     section 214. The section 214 action is being contested by them. It is
     unnecessary to say anything further about the issues in it. L.W.L. on its
     own application was joined as the sixth respondent shortly before the
     hearing before the judge.
C        Section 214 allows the liquidator of a company in the course of the
     winding up to bring proceedings against a person who is a present or
     former director (including a shadow director) of that company if it appears
     to the liquidator in the course of the winding up that subsection (2)
     applies. It applies in relation to a person if (i) the company has gone into
     insolvent liquidation, (ii) at some time before the commencement of the
     winding up that person knew or ought to have concluded that there was
D    no reasonable prospect that the company would avoid going into insolvent
     liquidation, and (iii) that person was a director of the company at that
     time. The relief which may be granted is in this form: "the court, on the
     application of the liquidator, may declare that that person is to be liable
     to make such contribution (if any) to the company's assets as the court
     thinks proper:" section 214(1). Section 215(2) (3) and (4) provides that
E    where the court makes a declaration under section 214(1) it may give
     certain further directions, including, where it makes a declaration in
     relation to a creditor, that any debt owed by the company to the creditor
     and interest thereon be postponed.
         The company had no assets which could be utilised to fund wrongful
     trading proceedings because on 12 September 1986 the company created a
     debenture in favour of Beaverbrook Investment Plc., which as a secured
F    creditor has been entitled to realise the entire assets of the company. Nor
     are the creditors of the company, none of whom is owed more than
     £30,000, able or willing to fund such proceedings.
         The liquidator obtained the consent of the liquidation committee as
     well as of the Companies Court before entering into the agreement five
     weeks after the commencement of proceedings. L.W.L. is not a creditor of
     the company. Its main business is described in its accounts as "the
G    provision of specialist litigation support service for liquidators." The
     agreement recited that due to the statutory basis of the section 214 action
     it had to be brought by the liquidator in his name and not by the
     company, that the liquidator was unwilling to incur liability for the costs
     and expenses of pursuing the proceedings against the first to fifth
     respondents and that L.W.L. had agreed to finance the proceedings.
H    Recital (G) was in this form:

         "The liquidator considers it desirable that he himself and/or [the
         company] by him should sell and assign to L.W.L. all the 'fruits' of
         the section 214 action and (as provided in ... clauses 2 and 3 below)

In re Oasis Merchandising Ltd. (C.A.)                    [1998]

his or [the company's] rights in respect of the fruits of any other
action or actions upon the terms hereof and in this agreement or the
schedules hereto the said 'fruits' shall mean any sum or sums of
money (including any amount or amounts which shall have been
received in respect of interest costs charges disbursements and
expenses) received by the liquidator as plaintiff or as liquidator of
[the company] or by [the company] (i) under and by virtue of final
judgment in or compromise or settlement of ... the section 214 action;
or (ii) in any way received from all or any of the [first to fifth
respondents] (whether directly or indirectly) or from any other
defendant or defendants or from any third person or persons on their
behalf in settlement of any such claim or claims against all or any of
them and whether before or after any proceedings shall have been
issued or commenced."

By clause 2 of the agreement:

"In consideration of the undertakings by L.W.L. herein contained
to the liquidator [the company] acting by the liquidator and the
liquidator himself in respect of his rights in respect of ... the fruits of
the section 214 action hereby sells and assigns to L.W.L. absolutely
all of the said rights of himself and [the company] respectively: (i) in
the section 214 action to be brought by the liquidator on behalf of
[the company] against the [first to fifth respondents] or any one or
more of them ..."

That assignment was expressed to be an equitable assignment of the fruits.
By clause 4(a) the liquidator was to institute, carry on and prosecute
the section 214 action and to do all such lawful acts and things as L.W.L.
might require for the purpose of instituting, carrying on and prosecuting
the section 214 action. Clause 4(b) required him to retain named solicitors
to conduct the section 214 action. By clause 5 the liquidator was to
conduct the section 214 action and in particular any settlement negotiations
in accordance with the requirements and directions of L.W.L. and in
making such requirements and directions L.W.L. was to be entitled to
have regard to its own best interests as it should think fit. By clause 6 the
liquidator was to compromise or settle the action and take out of court
any moneys which had been paid into court as L.W.L. advised and upon
such terms as L.W.L. considered fit.
This clause was subject to the following proviso:

"Provided further that notwithstanding the foregoing the liquidator
shall be entitled to compromise settle or withdraw from [the
section 214 action] and to decline to commence any proceedings or to
take any such moneys out of court without the agreement of L.W.L.
if the leading counsel having the conduct of the relevant case and
approved or chosen by L.W.L. shall have advised that any such
compromise settlement or withdrawal or taking of moneys out of
court should be made in the best interests of the liquidator and/or
[the company] and before giving any such advice counsel shall be
instructed to assume that [the company] has adequate financial
resources of its own with which to finance [the section 214 action]

A    without recourse to L.W.L. and to ignore the financial effect of this agreement."

Clauses 7 and 8 contained detailed undertakings by L.W.L. to finance litigation. Much of the remainder of the agreement was concerned with the division between the company and L.W.L. of the fruits of the litigation. As the judge said:

B    "The general effect of these provisions ... is in substance for [L.W.L.] to be reimbursed for its expenditure on the litigation and ... for the excess to be divided in varying percentages for different tranches of excess, with the liquidator's percentage rising from 10 per cent. to a maximum of 50 per cent. on any excess of £500,000. As a matter of form, however, this is expressed as additional consideration for the
C    purchase by [L.W.L.] of all the fruits."

By a further agreement dated 19 May 1992 the sole shareholder of L.W.L. was to pay £100,000 into a deposit account to be charged by the liquidator to secure any order for costs which might be made in favour of the first to fifth respondents against the liquidator.

The form of the agreement was no doubt governed by the fact that a
D    claim under section 214 is incapable of outright legal assignment because it can only be made and pursued by a liquidator. It also reflects the natural desire of L.W.L. to retain as much control as possible over the litigation which it is to fund.

The basis of the application for a stay was that the agreement was champertous and the section 214 action being funded by L.W.L. thereunder was an abuse of process. The judge described the issue before
E    him as whether the agreement was, in relation to the section 214 action, contrary to public policy on the ground of champerty. He considered a number of authorities on trustees in bankruptcy and liquidators assigning rights of action or rights in the fruits of a action and pointed out that there are three routes by which one person may seek to dispose of, and another person may seek to acquire, the prospect of benefiting from current or future litigation against a third party. The first is the transfer
F    of property carrying with it the right to prosecute any cause of action closely related to that property, such as the assignment of a debt. Such a transfer and any action brought by the transferee to enforce that right are not champertous: see, for example, *Camdex International Ltd. v. Bank of Zambia* [1996] 3 W.L.R. 759. The second is the assignment of a bare cause of action or bare right to litigate. Such assignments offend public policy:
G    see, for example, *Trendtex Trading Corporation v. Credit Suisse* [1982] A.C. 679. The third is the assignment of the damages or other monetary compensation that may be awarded in an action in which judgment has not yet been given. Such an assignment, being an agreement to assign future property (damages if and when awarded), operates in equity and if supported by consideration will be valid and no question of unlawful maintenance or champerty will arise, at any rate when the assignee has no
H    right to influence the course of the proceedings: see *Glegg v. Bromley* [1912] 3 K.B. 474.

It was common ground before the judge, as it is before us, that the agreement is one for the assignment of the fruits of litigation, falling

In re Oasis Merchandising Ltd. (C.A.)                          [1998]

within the third category, rather than a transfer of property carrying a    A
right of litigation or a legal or equitable assignment of a cause of action.
It was not disputed by the liquidator or L.W.L. that the agreement was
champertous. But it was contended by them that the power conferred on
the liquidator by paragraph 6 of Schedule 4 to the Act of 1986 "to sell
any of the company's property" gave statutory authority to the sale of the
fruits of the section 214 action and so made valid what otherwise would
be void for champerty.                                                       B

The first, second, fourth and fifth respondents contended that the fruits
of a section 214 claim were not "the company's property" within the
meaning of paragraph 6 of Schedule 4, and that construction was upheld
by the judge. He also said that this view was supported by the fact that
proceedings under section 214 had a public or penal element and that in
such litigation the court was entitled to expect to have the assistance of    C
the liquidator, aware as he would be of his statutory responsibilities, and
that even a partial loss of control by the liquidator of the litigation was
objectionable. The judge accordingly granted a stay and of the court's
own motion withdrew the authority given by Mr. Registrar Pimm to the
liquidator to enter into the agreement.

L.W.L. now appeals. Mr. Robert Wright on its behalf again accepts    D
that the agreement is champertous, but submits that there are two strands
of public policy involved. One is the rule which prohibits an outsider with
no commercial interest in the litigation, apart from obtaining a share of
the proceeds, from financing the litigation for that share. The other is the
rule that a liquidator should be able to obtain financial assistance under
agreements which would otherwise be champertous to enable moneys to
be recovered for the benefit of creditors. He submits that the agreement is    E
lawful because it was a sale of the company's property within paragraph 6
of Schedule 4. Alternatively he submits that the agreement is lawful
because entering it was an act necessary for winding up the company's
affairs and distributing its assets and so it was an act which the liquidator
had power to undertake under paragraph 13 of Schedule 4.

There is a long line of authorities to the effect that, where a trustee in    F
bankruptcy or a liquidator wishes to exercise a power of sale to assign a
cause of action for valuable consideration, the trustee or liquidator can
enter into an agreement which otherwise would be void for maintenance
or champerty. Thus in *Seear v. Lawson* (1880) 15 Ch.D. 426 this court
held that a trustee in bankruptcy could make an outright assignment of a
cause of action against the grantee of property conveyed by the bankrupt.
As Sir George Jessel M.R. said, at p. 433:                                    G

"The proper office of the trustee is to realise the property for the sake
of distributing the proceeds amongst the creditors. Why should we
hold as a matter of policy that it is necessary for him to sue in his
own name? He may have no funds, or he may be disinclined to run
the risk of having to pay costs, or he may consider it undesirable to
delay the winding up of the bankruptcy till the end of the litigation.    H
Considering these things, it seems to me to be a priori probable that
he would be entitled to sell it, but I prefer to rest my decision upon
the plain words of the statute."

A   He held that a chose in action vested in the bankrupt before his bankruptcy fell within the words "all the property" of the bankrupt which the trustee was empowered to sell.

In *In re Park Gate Waggon Works Co.* (1881) 17 Ch.D. 234 a liquidator was similarly held by this court to be entitled to assign outright a cause of action against a director for misfeasance. In *Guy v. Churchill* (1888) 40 Ch.D. 481 Chitty J. considered an assignment by a trustee in
B   bankruptcy of a chose in action on terms that the trustee and the assignee would share the fruits of the litigation. He said, at p. 488:

> "The policy of the statute appears to be to give power to the trustee
> ... to make arrangements in reference to choses in action which are
> considered beneficial to the creditors. It would be a strange and
> inconsistent result to say that although the right of action may be
C   > sold out and out it cannot be disposed of on the terms that some
> part of the fruit of the action if successful shall come back to the
> bankrupt's estate for division among his creditors."

That decision was applied by this court in *Ramsey v. Hartley* [1977] 1 W.L.R. 686, where it was held that the statutory power of sale could be exercised by a trustee in bankruptcy assigning to the bankrupt himself a
D   chose in action in return for a share of the fruits of the litigation.

Similarly in *Bang & Olufsen U.K. Ltd. v. Ton Système Ltd.* (unreported), 16 July 1993; Court of Appeal (Civil Division) Transcript No. 834 of 1993 this court held that a liquidator can assign a cause of action in return for a share of the fruits of the action, there being no valid distinction on this point between the law of bankruptcy and the insolvent company legislation.
E   In *Grovewood Holdings Plc. v. James Capel & Co. Ltd.* [1995] Ch. 80, 86 Lightman J. aptly summarised the state of the law in this way:

> "Accordingly the authorities established beyond question that both a
> trustee in bankruptcy and a liquidator are given statutory power to
> sell a cause of action on terms that the assignees by way of
> consideration will pay over a share of the recoveries. This statutory
F   > power necessarily precludes any challenge on grounds of maintenance
> or champerty to such an agreement."

The *Grovewood* case was a case where the sale by a liquidator to an outsider, who was to fund an action in negligence against the company's stockbroker and adviser, was not of the cause of action but of a beneficial interest in the fruits of the action. Lightman J. held that such a transaction
G   was a "sale" of the company's property within paragraph 6 of Schedule 4. It is not suggested in this court that an assignment for valuable consideration such as was effected by the agreement was not a sale for the purposes of paragraph 6. Lightman J. went on to hold that paragraph 6 conferred no exemption from the law of champerty on a sale of fruits of litigation (as opposed to the sale of a bare cause of action) when the sale included provision for the purchaser to finance the litigation, and that
H   accordingly the proceedings were champertous and an abuse of process and would be stayed.

In the present case Robert Walker J. in obiter comments said that he had considerable difficulty with that part of Lightman J.'s judgment on

In re Oasis Merchandising Ltd. (C.A.)                    [1998]

which the *Grovewood* case was decided. Mr. Dicker for the fourth and    A
fifth respondents disclaimed any reliance on this part of Lightman J.'s
judgment and accordingly we have heard no argument on the point. We
will confine ourselves to saying that we see considerable force in Robert
Walker J.'s comments and that we in particular agree with him when he
says [1995] 2 B.C.L.C. 493, 504 that it is a question of construing the
statutory power of sale. That seems to us to be the primary question in
the present case.                                                        B

It is to be noted at the outset that the present case is dissimilar to all
the other cases to which we have referred, none of those cases relating to
the assignment of the fruits of litigation when an essential part of the
cause of action (viz. that it should appear to the liquidator in the course
of the winding up that section 214(2) applied) did not arise until after the
liquidation or bankruptcy commenced.                                    C

The starting point must be paragraph 6, allowing, as it does, the
liquidator to sell "any of the company's property." The reference to the
property of the company imports the extended meaning given to
"property" by section 436, viz.:

> "'property' includes money, goods, things in action, land and every
> description of property wherever situated and also obligations and    D
> every description of interest, whether present or future or vested or
> contingent, arising out of, or incidental to, property;..."

Under the provisions relating to the insolvency of individuals, a
bankrupt's estate is defined in a way that recognises that there is a
distinction between, on the one hand, property belonging to or vested in
the bankrupt at the commencement of the bankruptcy and, on the other    E
hand, property which by virtue of a provision of the Act of 1986 is
comprised in that estate or treated as falling within such property
belonging to or vested in the bankrupt at the commencement of the
bankruptcy: section 283(1) of the Act of 1986. By section 307 the trustee
may by notice claim for the bankrupt's estate any property which has
been acquired by or has devolved upon the bankrupt since the
commencement of the bankruptcy, and by section 351 references to        F
property comprised in the bankrupt's estate include any property which
could be such property if a notice in respect of it were given under
section 307. By paragraph 9 of Schedule 5 the trustee in bankruptcy has
power to sell any part of the property for the time being comprised in the
bankrupt's estate.

In contrast the provisions relating to company insolvency do not define    G
the property of a company which liquidators can sell (save to the extent,
already noted, that "property" is given an extended meaning in
section 436). By section 143 the liquidator's functions in a compulsory
winding up are to secure that the assets of the company are got in, realised
and distributed. He is required to take into his custody or under his
control "all the property and things in action" to which the company is
or appears to be entitled (section 144(1)), but in addition and quite    H
separately from that duty the liquidator is given certain powers to apply
to the court, and if the application is successful there will be an increase
in the distributable assets, even though the company as such was never

Ch.                    In re Oasis Merchandising Ltd. (C.A.)

A   entitled to make that application. The statutory provisions do not expressly
state that such after-acquired assets are "the property of the company."
   The effect of the commencement of the liquidation of a company is
that all assets then held by the company become subject to a statutory
trust for unsecured creditors and, if there is a surplus, for contributories:
*Ayerst v. C. & K. (Construction) Ltd.* [1976] A.C. 167. A secured creditor
and his security fall outside the statutory trust to the extent that the
B   creditor relies on his security. However he can value or realise the security
and prove for the balance as an unsecured creditor or he can surrender
his security and prove for the whole debt as an unsecured creditor.
   The phrase "the company's property" is to be found not only in
paragraph 6 of Schedule 4, but also in provisions relating to the powers
of an administrator or administrative receiver, each of whom has the like
C   power to sell "the property of the company:" paragraph 2 of Schedule 1.
That must have the same meaning as in paragraph 6 of Schedule 4. It
would be very surprising if an administrator or an administrative receiver
(who could continue to act after a liquidator was appointed) was
empowered to sell the fruits of a future action under section 213 or
section 214 by the liquidator. If such fruits fall within "the property of a
company," it is hard to see why they are not caught by a debenture
D   holder's fixed and floating charge over all present and future assets of a
company. But Mr. Wright does not contend for such a result.
   Considerations such as these lead us to consider whether a distinction
should not be drawn between assets which are the property of the
company at the time of the commencement of the liquidation (and the
property representing the same), including rights of action which arose
E   and might have been pursued by the company itself prior to the
liquidation, and assets which only arise after the liquidation of the
company and are recoverable only by the liquidator pursuant to statutory
powers conferred on him. The scheme of the Act of 1986 suggests that
only the former falls within "the property of the company" which an
administrator or administrative receiver or liquidator can sell. Thus a right
of action against directors for misfeasance which the liquidator (amongst
F   others) can enforce under section 212 of the Act of 1986 and the fruits of
such an action are property of the company capable of being charged by
a debenture, because the right of action arose and was available to the
company prior to the winding up. But with this can be contrasted the
right of action by a liquidator, and the fruits of such an action, for
fraudulent preference or fraudulent or wrongful trading, which are not the
G   property of the company and are not caught by a debenture: see *Gough,
Company Charges*, 2nd ed. (1996), p. 122.
   Such a distinction is supported by a number of authorities. First in
*In re Yagerphone Ltd.* [1935] Ch. 392 Bennett J. held that a debenture
charging all the present and future assets of a company did not cover
money recovered by the liquidators from fraudulently preferred creditors,
because it never became part of the general assets of the company, but
H   when received by the liquidators was impressed in their hands with a trust
for those creditors amongst whom they had to distribute the assets of the
company. Russell L.J. in *N. W. Robbie & Co. Ltd. v. Witney Warehouse
Co. Ltd.* [1963] 1 W.L.R. 1324, 1338 explained the decision in this way:

In re Oasis Merchandising Ltd. (C.A.)                    [1998]

"a statutory right in and only in the liquidator to make such a [fraudulent    A
preference] claim could never have been property of the company subject
to the charge."

In *In re M.C. Bacon Ltd.* [1991] Ch. 127 Millett J. was concerned with
the question whether costs of certain proceedings instituted by the
liquidator were expenses in realising or getting in the assets of the
company and as such entitled to priority under rule 4.218(1)(*a*) of
the Insolvency Rules 1986 (S.I. 1986 No. 1925). The proceedings were    B
(1) to challenge the validity of a future charge as a voidable preference
and (2) to make the bank liable under section 214. Millett J. in answering
the question in the negative referred to each of the limbs of the proceedings
and said, at p. 136, that the proceedings were not brought by or on behalf
of the company nor were they brought in order to recover assets belonging
to the company at the date of the winding up. He pointed out that neither    C
claim could have been made by the company itself. After referring with
approval to *In re Yagerphone Ltd.* [1935] Ch. 392, he said that a claim to
set aside a voidable preference was not a claim to realise or get in any
asset of the company. He continued, at p. 138:

> "In my judgment, the same reasoning applies with even greater
> force to a claim brought under section 214 of the Act, which can be    D
> brought only by a liquidator not an administrator and in the absence
> of an insolvent liquidation cannot be brought at all. In any case, I do
> not see how an application for such an order under the section can
> properly be described as an attempt to realise or get in an asset of
> the company. This must, in my view, mean an existing asset and,
> until the order has been made and complied with, there is no such
> asset."                                                                 E

Mr. Wright accepts that Millett J. correctly recognised that a claim
under section 214 is not an asset of the company, but submits that the
decision does not affect the question whether the proceeds of a claim
under section 214 are included in "the company's property" for the
purposes of paragraph 6 of Schedule 4. Robert Walker J. [1995]
2 B.C.L.C. 493, 501 thought that the reasoning of Millett J. was general    F
in its application and followed it. We respectfully agree, supporting as it
does the distinction which we would draw between the property of the
company at the commencement of the litigation (and property representing
the same) and property which is subsequently acquired by the liquidator
through the exercise of rights conferred on him alone by statute and which
is to be held on the statutory trust for distribution by the liquidator.    G

A similar distinction is drawn in *In re Ayala Holdings Ltd. (No. 2)*
[1996] 1 B.C.L.C. 467. In that case Knox J. was concerned with the
effectiveness of an assignment by the liquidator to a creditor of all rights
to and choses in action relating to or in any way arising out of or in
connection with an action against a secured creditor. The rights
purportedly assigned included the right to assert that certain dispositions
of the company's property after the commencement of the winding up    H
were void under section 127 of the Act of 1986 and that certain charges
on the company's property were void under section 395 of the Companies
Act 1985 as against the liquidator for non-registration. The assignee

Ch.                          In re Oasis Merchandising Ltd. (C.A.)

A   argued that the assigned rights were property of the company which a
liquidator can sell under paragraph 6 of Schedule 4. Knox J. posed the
question: what does paragraph 6 mean when it used the expression
"company's property?" He continued, at p. 480:

B     "In my judgment [the assignee's] argument overlooks an important
distinction between property of the company, on the one hand, and
the rights and powers of a liquidator on the other. The property of a
company includes rights of action against third parties vested in a
company at the commencement of the winding up and to that extent
the principles in *Ramsey v. Hartley* [1977] 1 W.L.R. 686 undoubtedly
apply and such rights can, as I see it, be sold by a liquidator pursuant
to paragraph 6 of Schedule 4. What is to be distinguished in my view
are the statutory privileges and liberties conferred upon liquidators as
C     such and indeed upon trustees in bankruptcy who are officers of the
court and act under the court's direction."

Knox J. went on to cite two passages from Millett J.'s judgment in *In re
M.C. Bacon Ltd.* [1991] Ch. 127, 136–137, and continued, at p. 483:

D     "Those passages, in my view, underline the fundamental distinction
between assets of a company and rights conferred upon a liquidator
in relation to the conduct of the liquidation. The former are assignable
by sale under paragraph 6 of Schedule 4, the latter are not because
they are an incident of the office of liquidator. This conclusion is, in
my view, supported by the special status of the liquidator in company
law."

E   Mr. Wright points out that *In re Ayala Holdings Ltd. (No. 2)* [1996]
1 B.C.L.C. 467 was concerned with the question whether a liquidator can
abdicate his duties by assignment and that section 214 was not in issue.
But, as Robert Walker J. observed [1995] 2 B.C.L.C. 493, 501, if a claim
under section 127, which relates to the avoidance of any dispositions of
"the company's property" after the commencement of the winding up and
which therefore is likely to affect assets belonging to the company before
F   the commencement of the winding up, cannot be assigned, Knox J.'s
general distinction between the company's property and rights conferred
upon the liquidator is even more strongly applicable to section 214.

  It is also relevant to note the authorities on the predecessors to
section 213 of the Act of 1986 relating to fraudulent trading, though it
should be borne in mind that the relief that could be granted under
G   section 75 of the Companies Act 1928, section 275 of the Companies Act
1929 and section 332 of the Companies Act 1948 on the application of the
official receiver, liquidator, a creditor or a contributory was a declaration
that the guilty party should be personally responsible for all or any of the
debts or other liabilities of the company as the court might direct. Under
section 213, like section 214, the court may declare on the application of
the liquidator alone that any guilty party is liable to make such
H   contributions to the assets of the company as the court thinks proper. The
effect of the earlier fraudulent trading provisions was that recoveries
ordered to be made in respect of fraudulent trading were to swell the
assets of the company to be distributed in accordance with the statutory

scheme: see *In re Esal (Commodities) Ltd.* [1993] B.C.L.C. 872, affirmed    A
by this court sub nom. *London and Overseas (Sugar) Co. Ltd. v. Punjab
National Bank* (unreported), 19 November 1993; Court of Appeal (Civil
Division) Transcript No. 1352 of 1993, in which obiter dicta to the
contrary of Lord Denning M.R. and Danckwerts L.J. in *In re Cyona
Distributors Ltd.* [1967] Ch. 889 were disapproved. In the *Esal* case, at
p. 883, Lindsay J. said that he saw sums recovered under section 332 of
the Act of 1948 in a way corresponding to that whereby the recoveries of    B
a liquidator from a fraudulent preference were held by Bennett J. in *In re
Yagerphone Ltd.* [1935] Ch. 392 to be impressed with a trust for those
creditors to whom distributions were to be made in the liquidation. In our
judgment the wording of section 213 even more clearly requires the same
result, only the liquidator now being able to bring fraudulent trading
proceedings and the recoveries being contributions to the assets of the    C
company held on the statutory trust.

Mr. Wright placed heavy reliance on a recent decision in the Australian
Federal Court *In re Movitor Pty. Ltd. v. Sims* (1996) 19 A.C.S.R. 440. In
that case the liquidator of a company sought directions from the court as
to whether he could enter into a funding arrangement (involving both
maintenance and champerty) with an insurer in respect of proposed
proceedings by the liquidator against former directors of the company for    D
insolvent trading. Drummond J. held that the liquidator could do so in
exercise of a statutory power to sell all or any part of "the property of the
company" in aid of performing his duty of realising the company assets.
He said, at pp. 444–445:

> "The provision by strangers to the litigation of funds to insolvency
> administrators for the purpose of enabling them to pursue worthwhile    E
> claims on behalf of the entity under administration when, without
> that assistance, good claims might not be able to be prosecuted, will
> often serve a good public purpose. The policy of the legislature ...
> will frequently be frustrated because the insolvency administrator will
> often not have access to the financial resources necessary to pursue,
> for the benefit of the administration, claims which have reasonable
> prospects of success."                                                    F

After considering various authorities, to many of which we have already
referred, he said that to do that which Parliament has authorised, either
expressly or by necessary implication, cannot involve the doing of anything
that is unlawful. He continued, at p. 449:

> "Whether he sells a bare right of action or the fruits of the action,    G
> the only authority a liquidator has to make any such sale is this
> statutory power. It has long been accepted that a trustee in bankruptcy
> can lawfully sell a bare right of action owned by the insolvent to a
> stranger with no interest in it, although that would involve
> maintenance or champerty but for the fact that he sells under the
> statutory authority. A liquidator has the same power. In my opinion,
> there is no reason why this statutory authority should not make    H
> lawful any other sale of the insolvent company's property by a
> liquidator, including the sale of a share in the proceeds of an action
> belonging to the company to a person with no interest in the litigation

Ch.                    In re Oasis Merchandising Ltd. (C.A.)

A    on terms that that person is to have control of the litigation, although
     that would involve champerty but for the transaction being made
     under that authority. This will be the position, provided only that the
     subject matter of the sale is 'property of the company' within the
     statutory power."

     He referred to Millett J.'s remarks in *In re M.C. Bacon Ltd.* [1991] Ch.
B    127, 138, which we have already cited, and continued, at p. 450:

     "But given the differences between the insolvent trading provisions
     of section 214 of the English legislation and those of sections 588M
     and 588W of the Corporations Law, this decision provides no
     authority, in my opinion, for contending that the property of the
     company does not include the expected fruits of an action brought
     under section 588M or under section 588W. The right of the liquidator
C    to recover damages created by each of these sections is described as a
     right to recover from the director and the holding company an
     amount equal to the loss or damage suffered as a result of the
     company's insolvent trading in which the director and the holding
     company were implicated 'as a debt due to the company.' That 'debt'
     arises once the conditions of liability have been fulfilled, something
D    that must occur prior to commencement of any action for recovery
     under either section. Such a 'debt' can properly be regarded as part
     of the property of the company which the liquidator is empowered to
     sell. Even if the rights to compensation created by sections 588M and
     588W are not regarded as true debts but rights sui generis, *Magor
     and St. Mellons Rural District Council v. Newport Corporation* [1950]
     2 All E.R. 1226, 1230–1231 is authority for holding that they are still
E    well capable of falling within the definition of 'property of a company'
     in the relevant provisions of the Corporations Law."

     We see the force of the policy argument expounded by Drummond J.,
     but the actual decision is in our judgment readily distinguishable. Indeed
     that judge himself distinguished what Millett J. said on section 214 because
     that provision was different from the Australian provisions. Both section
F    588M and section 588W of the Corporations Law allowed the liquidator
     to recover "as a debt due to the company" an amount equal to the loss
     or damage resulting from insolvency. The debt arose once the conditions
     of liability were fulfilled. That is not the language of section 214. We
     would add that we were referred by Mr. Dicker to *Gough, Company
     Charges,* pp. 122–123, in which the author, an Australian solicitor, draws
G    attention to the fact that in Australia recoveries made by the liquidator
     under the Corporations Law for insolvent trading cannot form part of the
     assets charged by a fixed and floating charge over all present and future
     assets of the company and that there is a specific provision that moneys
     so recovered are not available to pay a secured debt of the company
     unless all the company's unsecured debts have been paid in full. For
     completeness we should say that the *Magor and St. Mellons* case [1950]
H    2 All E.R. 1226, relating as it does to the question whether the right of a
     council to a financial adjustment was property within the meaning of
     section 100 of the Local Government Act 1888 (51 & 52 Vict. c. 41), does
     not appear to us to provide relevant assistance.

In re Oasis Merchandising Ltd. (C.A.)                    [1998]

Like Robert Walker J. we therefore conclude that on its true    A
construction "the company's property" in paragraph 6 of Schedule 4 does
not include the fruits of litigation brought by the liquidator under section
214. The judge also found that his conclusion was strongly
supported by the consideration that the liquidator pursuing an application
under section 213 or section 214 was not conducting ordinary civil
litigation but litigation with a public or penal element and any loss of
control by the liquidator of that litigation was objectionable. For our part    B
we regard that as relevant not to the question whether the fruits of such
litigation are "the company's property" within paragraph 6 of Schedule 4
but to the propriety of the liquidator's act in entering into the agreement
and the correctness of the Companies Court in authorising that act. As a
matter of policy we think that there is much to be said for allowing a
liquidator to sell the fruits of an action for the reasons given by    C
Drummond J., provided that it does not give the purchaser the right to
influence the course of, or to interfere with the liquidator's conduct of, the
proceedings. The liquidator as an officer of the court exercising a statutory
power in pursuing the proceedings must be free to behave accordingly. We
are far from happy with the right of interference given to L.W.L. by the
agreement, which, as it now stands, does enable L.W.L. to dictate how
the liquidator is to conduct the action (see in particular clause 5). Indeed,    D
despite Mr. Wright's argument to the contrary, it seems to us to enable
L.W.L. to prevent the liquidator from exercising his statutory power under
section 168(3) of the Act of 1986 to apply to the court for directions in
relation to this litigation, though we should record Mr. Wright's offer on
behalf of L.W.L. that the agreement should take effect as if the liquidator
retained that power. The proviso to clause 6 on which Mr. Wright placed    E
reliance is by its terms limited in its application. It is to be noted that the
rights of the insurer under the funding agreement in *In re Movitor Pty.
Ltd. v. Sims*, 19 A.C.S.R. 440 were considerably less than those of L.W.L.
under the agreement.

Mr. Wright relied in the alternative on the power contained in
paragraph 13 of Schedule 4 enabling the liquidator "to do all such other
things as may be necessary for winding up the company's affairs and    F
distributing its assets." We are not persuaded that that power is wide
enough to cover the present circumstances. It is limited to what is
necessary for winding up the company's affairs and distributing its assets.
Let us assume, without deciding, that, where a liquidator considers it
desirable to exercise a power to apply to the court for relief under
section 214, that is for winding up the company's affairs. The liquidator's    G
statement in his affidavit of 11 July 1991, viz. that unless he was able to
conclude the agreement and thereby fund the action the wrongful trading
proceedings could not be brought, must now be viewed against the fact
that the liquidator has negotiated a contingency agreement with a large
and highly reputable firm of solicitors for the pursuit of his claims, as
appears from a letter dated 30 April 1996 from those solicitors to the
solicitors of the fourth and fifth respondents. Whilst that would appear    H
not to cover all the expenses of the litigation, it does suggest that the
liquidator no longer regards the agreement as the only way of funding the
section 214 action.

A    But in any event we cannot accept that general words such as are to
be found in paragraph 13 of Schedule 4 (in contrast to the specific power
of sale in paragraph 6 of Schedule 4) must be taken to give statutory
authority to do that which otherwise is unlawful under the general law. In
our judgment that power does not give the liquidator carte blanche to do
an illegal act such as entering a champertous agreement.

B    For these reasons, which owe much to the judge's lucid judgment and
to Mr. Dicker's admirable argument, we would dismiss this appeal.

*Appeal dismissed.*
*Leave to appeal refused.*

C    *Solicitors: Ingledew Brown Bennison & Garrett; Jay Benning & Peltz;*
*Ashurst Morris Crisp.*

[Reported by JOHN SPENCER ESQ., Barrister]

D ———

E    PHONOGRAPHIC PERFORMANCE LTD. v. A.E.I. REDIFFUSION
MUSIC LTD.

[Ch. 1996 P. No. 7285]

1997   June 9; 18                                    Lightman J.

F    *Copyright—Broadcast—Sound recordings—Incidental copying for broad-*
*casting purposes—Whether statutory right to make copies including*
*right to retain copies more than 28 days after first use for*
*broadcasting purposes—Copyright, Designs and Patents Act 1988*
*(c. 48) ss. 68, 135C(1) (as inserted by Broadcasting Act 1990*
*(c. 42), s. 175(1))*

G    The defendant provided a music service to subscribers,
transmitting by satellite selections of tracks copied from its library
of sound recordings. The plaintiff, a licensing body which owned
the copyright in most of the sound recordings transmitted by the
defendant, sought an injunction to compel the defendant to
comply with its obligation under section 68 of the Copyright,
Designs and Patents Act 1988[1] to destroy copies of any sound
recordings within 28 days of those copies first being used for
broadcasting purposes.

H    On the plaintiff's application under R.S.C., Ord. 14A for the
determination of the question whether section 135C(1) of the Act

[1] Copyright, Designs and Patents Act 1988, s. 68: see post, p. 193B–D.
S. 135C, as inserted: see post, p. 194A–B.

TAB 56

*Re Ovenden Colbert Printers Ltd* [2014] 1 BCLC 291,
English Court of Appeal

*a*

# Re Ovenden Colbert Printers Ltd

# Hunt v Hosking and others

*b*
[2013] EWCA Civ 1408

COURT OF APPEAL, CIVIL DIVISION

ELIAS, KITCHIN AND McCOMBE LJJ

*c*
15 NOVEMBER 2013

*Winding up – Transaction at undervalue – Company agreeing that accountant entitled to fees out of distributions to be received from companies in liquidation – Moneys received into accountant's client account* *d* *– Payments made from client account in favour of liquidator of paying companies – Payments said to be repayment of personal loan by liquidator to accountant – Liquidator of receiving company challenging payments from client account as transactions at undervalue – Liquidator's application bound to fail for lack of relevant transaction entered into by company whether payments authorised or not – Liquidator's appeal dismissed –* *e* *Insolvency Act 1986, s 238.*

The appellant was the liquidator of Ovenden Colbert Printers Ltd ('Ovenden'). The respondent had been appointed joint liquidator of two connected companies ('the CSM companies') which owed in excess of *f* £1.3m to Ovenden. In December 2003 Ovenden entered into a fee agreement with its then accountant, Mr Temple, authorising him to receive any distributions from the liquidation of the CSM companies, to hold those distributions in an account to the order of Ovenden, and to transfer to his own account agreed fees in the sum of 25% of any distribution in excess of £250,000. In 2005 the agreement was varied to provide that if the *g* distributions from CSM group in favour of Ovenden exceeded the sum of £916,967, then the agreed fee would be the amount received in excess of £750,000. Distributions were made from the CSM companies in favour of Ovenden amounting to in excess of £1.275m. Mr Temple became entitled to a payment of £256,502.34 on the basis of the 2003 agreement, rising to £526,502.34 on the basis of the 2005 variation. He made a series of *h* payments out of the client account amounting to over £500,000 including payments totalling £224,951.11 to the respondent or at his direction. The respondent maintained that Mr Temple was his personal friend and that he was repaying personal loans which the respondent had made to him. Ovenden went into administration and then liquidation, with the respondent as one of the liquidators. The appellant replaced the respondent *i* as liquidator and advanced a series of serious allegations against Mr Temple and the respondent. He contended that Mr Temple had no entitlement to any fees and provided no consideration for the 2003 agreement or the 2005 variation; moreover, both of the agreements were entered into as a result of fraudulent misrepresentations made by Mr Temple to the directors of

Ovenden and the signature on the 2005 variation on behalf of Ovenden was *a*
a forgery. The appellant contended that the respondent knew that
Mr Temple had no proper entitlement to the moneys he was paying over to
him. The appellant claimed that the payments made by Mr Temple to or for
the benefit of the respondent were transactions at an undervalue within
s 238 of the Insolvency Act 1986, either on the basis that they were
transactions between Ovenden and the respondent or that the payments *b*
were transactions between Ovenden and Mr Temple and the court had
power to make an order against the respondent as a third party who had
received benefits from the transactions. The judge found that, however the
case might be put, the payments were not transactions which Ovenden had
'entered into' for the purposes of s 238; they were either payments that
Mr Temple was authorised to make under the agreements, which were not *c*
themselves challenged, or the payments constituted a breach of trust and so
could not be attributed to Ovenden. On appeal the appellant relied only on
the second way of putting the case: the payments made by Mr Temple out
of the client account were transactions within the meaning of s 238 between
Ovenden and Mr Temple; Mr Temple had no contractual entitlement to any
of the moneys and, as a result, the transactions were entered into at an *d*
undervalue. The respondent argued that none of the payments made by
Mr Temple from his client account constituted a transaction entered into by
Ovenden, and thus an essential requirement of s 238 was incapable of being
satisfied and the claim was bound to fail.
                                                                        *e*

**Held** – The requirement that the company had itself entered into a
transaction connoted the taking of some step or act of participation by the
company. The term 'transaction' was widely defined in s 436 as including a
gift or arrangement. Thus the composite requirement required the company
to make the gift or make the arrangement or in some other way be party to
or involved in the transaction in issue so that it could properly be said to *f*
have entered into it. The improper withdrawal by Mr Temple of the funds
he held on trust, if that was what it was, did not constitute a dealing
between him and Ovenden. Nor could it be said that Mr Temple was acting
as agent for Ovenden in making the impugned payments. The alternative
way the case could be put was that Mr Temple was authorised or entitled to
make the impugned payments, albeit that they were made for no or *g*
inadequate consideration. However, when Mr Temple took the funds from
the client account and paid them over to the respondent it required no
further act or step by Ovenden beyond the 2003 agreement and the 2005
variation, and neither of those was said to constitute or form part of a
relevant transaction. It followed that the actions of Mr Temple in *h*
withdrawing the funds from the client account and paying them over to the
respondent were not transactions entered into by Ovenden for the purposes
of s 238.
    *Manson v Smith* [1997] 2 BCLC 161 and *Re Brabon* [2001] 1 BCLC 11
applied.
                                                                        *i*

**Cases referred to in judgment**
*Brabon, Re, Treharne v Brabon* [2001] 1 BCLC 11.
*Ingram v Inland Revenue Comrs* [1999] 1 All ER 297, [2000] 1 AC 293,
    [1999] 2 WLR 90, HL.

*a*  *Manson v Smith* [1997] 2 BCLC 161, CA.
    *Smith* (*Administrator of Cosslett* (*Contractors*) *Ltd*) *v Bridgend County
        Borough Council* [2001] UKHL 58, [2002] 1 BCLC 77, [2002] 1 All ER
        292, [2002] 1 AC 336, [2001] 3 WLR 1347.
    *Stone & Rolls Ltd* (*in liq*) *v Moore Stephens* (*a firm*) [2009] UKHL 39,
*b*      [2009] 2 BCLC 563, [2009] 4 All ER 431, [2009] 1 AC 1391, [2009]
        3 WLR 455.

**Appeal**

Stephen Hunt, the liquidator of Ovenden Colbert Printers Ltd ('Ovenden'),
appealed against the order of Peter Smith J made on 22 February 2013
*c*  ([2013] EWHC 311 (Ch), [2013] 2 BCLC 388) whereby he struck out a
claim brought by Mr Hunt against Mr Andrew Hosking pursuant to ss 238
and 241 of the Insolvency Act 1986 alleging that Mr Hosking had received
or benefited from payments made by Ovenden which constituted
transactions at an undervalue entered into by Ovenden within a period of
two years ending with the commencement of its insolvency. The facts are set
*d*  out in the judgment of Kitchin LJ.

    *Simon Davenport QC* and *Peter Shaw* (instructed by *Stevensdrake*) for the
        appellant.
    *Antony Zacaroli QC* and *Stephen Robins* (instructed by *CMS Cameron
        McKenna LLP*) for the respondents.

*e*

**KITCHIN LJ.**

INTRODUCTION

    **[1]** This is an appeal by Mr Stephen Hunt, the liquidator of Ovenden
*f*  Colbert Printers Ltd ('Ovenden'), against the order of Peter Smith J made
on 22 February 2013 ([2013] EWHC 311 (Ch), [2013] 2 BCLC 388)
whereby he struck out a claim brought by Mr Hunt against Mr Andrew
Hosking.
    **[2]** The claim was brought pursuant to ss 238 and 241 of the Insolvency
Act 1986 ('the 1986 Act'). Mr Hunt alleges that Mr Hosking has received
*g*  or benefited from payments made by Ovenden which constitute
transactions at an undervalue, and that these transactions were entered into
by Ovenden within a period of two years ending with the commencement of
its insolvency.
    **[3]** The judge held that the claim had no prospect of success. On this
appeal, Mr Hunt contends that the judge fell into error, that his order
*h*  should be set aside and that directions should be given for the further
conduct of the claim. He argues that there are substantial issues of fact
concerning the circumstances in which the payments were made which
cannot be resolved on a summary judgment or 'strike out' application, and
that it is therefore not possible to say that the claim is bound to fail.
    **[4]** For his part, Mr Hosking accepts that he has received certain
*i*  payments and recognises that, for the purposes of this application, this
court must proceed, as did the judge, on the basis that the various factual
allegations made by Mr Hunt will be established at trial. However, he
maintains that the claim as formulated must nevertheless fail because the
particular payments which he has received were not the result of any

transaction which was entered into by Ovenden in the relevant period.   *a*
Accordingly, the requirements of s 238 cannot be fulfilled and no claim may
be made against him under s 241. The judge was therefore right to strike
the claim out.

BACKGROUND                                                               *b*

[5] The background relevant to this appeal may be summarised as
follows. Mr Hosking is a licensed insolvency practitioner and was for some
time a partner in Grant Thornton UK LLP. In 2002 Mr Hosking was
appointed joint liquidator of two connected companies, CSM Group Ltd
and CSM Sheet Fed Ltd ('the CSM companies'). The CSM companies owed   *c*
Ovenden in excess of £1.3m and accordingly Ovenden was prospectively
entitled to a substantial dividend from their liquidation.

[6] On 17 December 2003 Ovenden entered into a fee agreement ('the
2003 agreement') with its then accountant, Mr Alan Temple, a sole
practitioner trading as Scott Temple Wilshire & Co ('STW'). Mr Hosking
maintains that the purpose of this agreement was to reward Mr Temple for   *d*
the work he had carried out for Ovenden in formulating its claim in the
liquidation of the CSM companies and providing information to himself as
liquidator of those companies to assist him in bringing claims against their
former directors and accountants.

[7] The 2003 agreement authorised Mr Temple to receive any
distributions from the liquidation of the CSM companies, to hold those   *e*
distributions in an account to the order of Ovenden, and to transfer to his
own account agreed fees. In that regard the agreement provided:

'We authorise you to transfer from the proceeds to your office
account, the agreed fees in the sum of 25% of any distribution in excess
of £250,000.                                                           *f*
The balance of the funds are to be held to our account and released
only as instructed in writing by ourselves, such instructions shall include
copies of any board minutes pertaining thereto.'

[8] On the same day, 17 December 2003, Ovenden wrote to Mr Hosking
in his capacity as liquidator of the CSM companies authorising him to pay
the dividends due to Ovenden into a client account maintained by STW.   *g*

[9] On 28 January 2005 the 2003 agreement was purportedly varied in
the following terms:

'Due to the additional work performed by Scott Temple Wilshire
& Co since the original agreement above, this agreement is amended,
such that if the distributions from C/S/M Group in favour of Ovenden   *h*
Colbert Printers Ltd exceeds the sum of £916,967, then Scott Temple
Wilshire & Co are entitled to retain fees of the difference between the
sum received and £750,000, which is the maximum amount Ovenden
Colbert Printers Ltd will be entitled to.'

This variation ('the 2005 variation') was ostensibly signed by a Mrs N A   *i*
Waugh on behalf of Ovenden.

[10] Over the period November 2004 to May 2005 distributions were
made from the CSM companies in favour of Ovenden amounting to in
excess of £1.275m. These sums were paid by Mr Temple into a client

*a*  account at Barclays Bank plc designated 'Scott Temple Wilshire & Co Client Account'.

[11] On the basis of the 2003 agreement, Mr Temple became entitled to a payment of £256,502.34. On the basis of the 2005 variation, however, his entitlement rose to £526,502.34.

*b*  [12] Between 10 December 2004 and 6 October 2005 Mr Temple made a series of payments out of the client account amounting to a total of £570,292 (a sum which exceeded his entitlement under either agreement, although nothing has been made of that in these proceedings). Of these, payments totalling £224,951.11 were made to Mr Hosking or to persons on his behalf. It is these payments to or for the benefit of Mr Hosking which are attacked in these proceedings. Mr Hosking maintains that Mr Temple

*c*  was his personal friend and that Mr Temple was simply repaying personal loans which Mr Hosking had made to him.

[13] On 6 April 2006 Ovenden filed notice of intention to appoint an administrator. Mr Hosking and one of his partners, Mr Anthony Flynn, were appointed as joint administrators. The company subsequently went

*d*  into creditors' voluntary liquidation, with Mr Hosking as one of the liquidators. On 9 January 2009 a final meeting of creditors was held, following which the company would ordinarily have been dissolved. However, upon an application made to the court by a creditor and a former director, the dissolution of the company was deferred and Mr Hunt was appointed liquidator.

*e*  [14] In his capacity as liquidator of Ovenden, Mr Hunt now advances a series of very serious allegations against Mr Temple and Mr Hosking. So far as Mr Temple is concerned, Mr Hunt contends that he had no entitlement to any fees and provided no consideration at all for the 2003 agreement or the 2005 variation. Moreover, he continues, both of these agreements were entered into as a result of fraudulent misrepresentations made by

*f*  Mr Temple to the directors of Ovenden as to the further work he was being asked or required to undertake. He also asserts that the signature of Mrs Waugh on the 2005 variation was a forgery. As for Mr Hosking, Mr Hunt contends that he must always have known that Mr Temple had no proper entitlement to the moneys he was paying over to him.

*g*

MR HUNT'S CLAIMS

[15] As I have mentioned, Mr Hunt's claims against Mr Hosking are founded on ss 238 and 241 of the 1986 Act.

*h*  [16] Section 238 confers on a liquidator a right to apply to the court to have certain transactions entered into by a company at an undervalue set aside. It reads:

'238 *Transactions at an undervalue* (*England and Wales*)
(1) This section applies in the case of a company where—(a) the company enters administration, or (b) the company goes into liquidation; and "the office-holder" means the administrator or the liquidator, as the case may be.

*i*
(2) Where the company has at a relevant time (defined in section 240) entered into a transaction with any person at an undervalue, the office-holder may apply to the court for an order under this section.

(3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction.

(4) For the purposes of this section and section 241, a company enters into a transaction with a person at an undervalue if—(a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration, or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company.

(5) The court shall not make an order under this section in respect of a transaction at an undervalue if it is satisfied—(a) that the company which entered into the transaction did so in good faith and for the purpose of carrying on its business, and (b) that at the time it did so there were reasonable grounds for believing that the transaction would benefit the company.'

**[17]** 'Transaction' is defined in s 436 in these terms:

' "Transaction" includes gift, agreement or arrangement, and references to entering into a transaction shall be construed accordingly.'

**[18]** The transaction must have been entered into at a relevant time, which is defined in s 240:

'240 *"Relevant time" under ss 238, 239*

(1) Subject to the next subsection, the time at which a company enters into a transaction at an undervalue or gives a preference is a relevant time if the transaction is entered into, or the preference given—(a) in the case of a transaction at an undervalue or of a preference which is given to a person who is connected with the company (otherwise than by reason only of being its employee), at a time in the period of 2 years ending with the onset of insolvency (which expression is defined below).'

**[19]** Section 241(2) permits orders to be made against third parties who have received a benefit from a transaction falling within s 238. It reads:

'241 *Orders under ss 238, 239*

...

(2) An order under section 238 or 239 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the company in question entered into the transaction or (as the case may be) the person to whom the preference was given; but such an order—(a) shall not prejudice any interest in property which was acquired from a person other than the company and was acquired in good faith and for value, or prejudice any interest deriving from such an interest, and (b) shall not require a person who received a benefit from the transaction or preference in good faith and for value to pay a sum to the office-holder, except where that person was a party to the transaction or the payment is to be in respect of a preference given to that person at a time when was a creditor of the company.'

**[20]** Mr Hunt maintains that the payments made by Mr Temple to or for

*a* the benefit of Mr Hosking were transactions at an undervalue. Originally the case was advanced in two ways, described as 'route 1' and 'route 2'. Route 1 was that the payments were transactions between Ovenden and Mr Hosking. Route 2 was that the payments were transactions between Ovenden and Mr Temple, and that the court has power to make an order against Mr Hosking as a third party who has received benefits from those

*b* transactions.

[21] There are two other important matters I must mention at this stage concerning the nature of the case which Mr Hunt advances. First, the claim is founded entirely on ss 238 and 241 of the 1986 Act. Mr Hunt was invited by the judge to consider whether he wished to amend to plead a different or additional case, such as a claim against Mr Temple for breach

*c* of trust and a claim against Mr Hosking for dishonest assistance in breach of trust, but, after a short adjournment, he chose not to do so.

[22] Second, Mr Hunt identifies the relevant transactions within the meaning of s 238(2) as being the payments rather than the 2003 agreement or the 2005 variation. The 2003 agreement was, of course, entered into

*d* more than two years before the onset of insolvency. However, the 2005 variation falls within that two-year window. Nevertheless, it has been made clear by Mr Hunt, and it was confirmed to this court during the course of the appeal hearing, that it forms no part of his case that this was or formed part of a transaction impugned under s 238 and no application has been made to set it aside.

*e*

THE DECISION OF THE JUDGE

[23] The judge found both route 1 and route 2 unarguable. In summary, he found that, however the case might be put, the payments attacked by Mr Hunt were not transactions which Ovenden had entered into. Moreover, they were either payments that Mr Temple was authorised to make or they

*f* were not; in the former case, they could not be attacked unless the agreements were themselves challenged, and they had not been; in the latter case, the payments constituted a breach of trust and so could not be attributed in any way to Ovenden.

*g* THE APPEAL

[24] On this appeal, Mr Hunt only pursues route 2. Mr Simon Davenport QC who has appeared on behalf of Mr Hunt, as he did below, has developed the route 2 argument in the following way.

[25] First, the payments made by Mr Temple out of the client account were transactions within the meaning of s 238 between Ovenden and

*h* Mr Temple. These payments included the payments made directly to Mr Temple or to his office account and also, importantly for present purposes, the payments made to Mr Hosking. The payments made to Mr Hosking constituted a sub-set of the totality of the payments and, although they were made directly from the client account to Mr Hosking, they involved, as a first step, the intervention of Mr Temple who treated the

*i* moneys paid over as his own.

[26] Second, Mr Temple had no contractual entitlement to any of the moneys taken from the client account for the reasons I have summarised above and, as a result, the transactions were entered into at an undervalue. The evidential support for these allegations is set out in Mr Hunt's second

witness statement to which we were taken in the course of the hearing.  *a*
There is Mr Hunt explains that the investigations he has carried out suggest
that all of the work which Mr Temple claims to have undertaken for
Ovenden had already been undertaken and paid for prior to December
2003 so there was no consideration for the 2003 agreement; at that time
Mr Temple had no reason to believe that any further work would be
required; such additional work that Mr Temple in fact undertook thereafter  *b*
was very minor and paid for separately; there is good reason to believe that
Ms Waugh's signature on the 2005 variation is a forgery; there was in any
event no consideration for the 2005 variation; and Mr Temple positively
misled Ovenden at all times about the work he had done and was required
to do. In summary, Mr Hunt continues, Mr Temple misapplied Ovenden's
money and deceived its directors.  *c*

[27] Third, the court may make an order against Mr Hosking under
s 241(2) of the 1986 Act in so far as he has received a benefit from the
transactions because he was not acting in good faith. In support of this
contention Mr Hunt relies upon a number of matters, including the
following: the payments were made to Mr Hosking out of STW's client  *d*
account and very shortly after STW had received the dividend payments
from the CSM companies; Mr Hosking, as liquidator of the CSM
companies, knew that substantial dividends were being paid to STW's client
account; the personal loans made by Mr Hosking to Mr Temple were not
due for repayment until 2007 and they carried no interest; Mr Hosking was
in any event substantially overpaid; and Mr Hosking has sought to justify  *e*
the payments made to Mr Temple on the basis that Mr Temple had
conducted substantial work for the benefit of Ovenden when he must have
known at all times that Mr Temple had not carried out any such work.

[28] Mr Davenport further submits that all of the factual matters to
which I have referred are complex and that there is every reason to suppose
that further investigations will add to or alter the available evidence. In  *f*
these circumstances the case is wholly unsuitable for summary
determination.

[29] Mr Hosking accepts that, this being an appeal on a point of law from
a strike-out order, we must assume that it can be established at trial that
Mr Temple acted in breach of his fiduciary duty as a trustee of the funds
held in the client account. That is plainly right. But it seems to me that we  *g*
must also consider the possibility that Mr Temple was acting within the
scope of his authority and consider the merit of the claim on that basis too.
Similarly, we must assume that Mr Hosking was not acting in good faith
when he received the benefits relied upon and so cannot rely upon the
defence afforded by s 241(2)(a) and (b).  *h*

[30] Nevertheless, Mr Antony Zacaroli QC, who has appeared in this
appeal on behalf of Mr Hosking, submits, and I agree, that a claim against
him under s 241 can only succeed if a claim under s 238 is first established.
He also submits that this is something Mr Hunt cannot do because an
essential ingredient of any claim under s 238 is that there has been a
transaction into which a company has itself entered. In this case, however,  *i*
none of the payments made by Mr Temple from his client account
constituted a transaction entered into by Ovenden and thus the
requirements of s 238 are incapable of being satisfied.

[31] The requirement that the company has itself entered into a

a  transaction is an essential part of any claim under s 238 and comprises two interrelated elements: first, that there is a transaction; and second, that the transaction is something which the company has itself entered into.

[32] As I have explained, the term 'transaction' is widely defined in s 436 as including a gift or arrangement. If it were necessary for the purposes of this decision, I would therefore be disposed to find it is broad enough to

b  encompass a payment made by a company or by an agent of the company acting within the scope of his authority. But to focus unduly on the term 'transaction' risks obscuring the need for the second and vital element, namely the requirement that the transaction be something that the company has 'entered into'. This expression connotes the taking of some step or act of participation by the company. Thus the composite requirement requires

c  the company to make the gift or make the arrangement or in some other way be party to or involved in the transaction in issue so that it can properly be said to have entered into it, and of course it must have done so within the period prescribed by s 240.

[33] These notions are reflected in the decision of Jonathan Parker J in *Re*

d  *Brabon, Treharne v Brabon* [2001] 1 BCLC 11. In that case the trustee of a bankrupt alleged that transfers of land by a mortgagee were transactions at an undervalue within the scope of s 339 of the 1986 Act. A claim against the purchaser failed because the transfers were not transactions entered into by the bankrupt. Jonathan Parker J said ([2001] 1 BCLC 11 at 34):

e  'In the end, however, one comes back to the plain words of the subsection. In my judgment the words "entered into" by the bankrupt do not extend to a transfer by way of sale not by the bankrupt but by the bankrupt's mortgagee.'

[34] So also, the unilateral misappropriation by a director of the assets of a company does not constitute a dealing between him and the company.

f  This issue arose in *Manson v Smith* [1997] 2 BCLC 161 in the context of r 4.90 of the Insolvency Rules 1986, SI 1986/1925 and an attempt by a director of an insolvent company to set off a sum he had been ordered to pay in misfeasance proceedings against the balance due to him on his loan account. In rejecting his application for permission to appeal, Millett LJ

g  said at 164 (a passage subsequently cited with approval by Lord Hoffmann in *Smith* (*Administrator of Cosslett* (*Contractors*) *Ltd*) *v Bridgend County Borough Council* [2001] UKHL 58, [2002] 1 BCLC 77 at [35], [2002] 1 AC 336 at [35]):

h  'First, r 4.90 and its predecessors require there to be mutual debts or mutual dealings. When Mr Manson improperly withdrew money from the company this did not constitute a dealing between him and the company. A misappropriation of assets is not a dealing. Mr Manson will object to the following analogy, but I hope he will forgive me for it is only an analogy: the thief who steals my watch does not deal with me. Similarly, the man who steals money from a company does not

i  obtain the money by a dealing within r 4.90. Accordingly, his liability to repay money he has misappropriated cannot be set off against any debt owing to him by the company.'

[35] Similarly, in *Stone & Rolls Ltd* (*in liq*) *v Moore Stephens* (*a firm*) [2009] UKHL 39, [2009] 2 BCLC 563, [2009] 1 AC 1391, Lord Phillips

said at [46] that an English court would not attribute to a company the act
of its managing director in dishonestly transferring the company's funds
into his own account.

[36] I come then to apply these principles in the context of the present
case and in doing so I must consider the two ways the case can be put. The
first and primary argument advanced by Mr Davenport on Mr Hunt's
behalf is that Mr Temple has misappropriated the funds he held on trust for
Ovenden because he had no right to take the moneys and make the
payments to Mr Hosking. But here Mr Hunt faces precisely the difficulty
encountered by Mr Manson in *Manson v Smith*. The improper withdrawal
by Mr Temple of the funds he held on trust, if that is what it was, did not
constitute a dealing between him and Ovenden.

[37] Nor can it be said that Mr Temple was acting as agent for Ovenden
in making the impugned payments. Mr Davenport disclaimed any such
contention and he was right to do so. Mr Temple was a trustee of the funds
but, as Lord Hoffmann explained in *Ingram v Inland Revenue Comrs*
[1999] 1 All ER 297 at 305, [2000] 1 AC 293 at 305, a trustee in English
law is not an agent for his beneficiary. He contracts in his own name with
a right of indemnity against the beneficiary for the liabilities he has
incurred.

[38] That brings me to the second way the case can be put, namely that
Mr Temple was in some way authorised or entitled to make the impugned
payments, albeit that they were made for no or inadequate consideration.
However, in my judgment this argument also faces an insuperable difficulty.
When Mr Temple took the funds from the client account and paid them
over to Mr Hosking it required no further act or step by Ovenden beyond
the 2003 agreement and the 2005 variation, and, as I have said, neither of
these is said to constitute or form part of a relevant transaction. The
payments themselves were not a gift by Ovenden to Mr Temple, nor did it
enter into a further transaction of any other kind with him. It follows that
the actions of Mr Temple in withdrawing the funds from the client account
and paying them over to Mr Hosking were not transactions entered into by
Ovenden, just as the transfers of land were not entered into by the bankrupt
in *Re Brabon*.

[39] Mr Zacaroli also submits that, on this second hypothesis, the claim
must fail for a further reason. He says that if Mr Temple was entitled to be
paid the fees he claimed then there could be no undervalue because
whenever a company makes a payment in discharge of an actual obligation,
the value of the consideration given (the payment) necessarily equals the
value of the consideration received (the discharge of the obligation to make
that payment). I recognise the force of this submission, however I am not
persuaded that it necessarily addresses all the ways in which Mr Hunt
challenges the 2003 agreement and the 2005 variation, notwithstanding
that he is not seeking to set aside either agreement and neither is said to
constitute or form part of a relevant transaction. In the circumstances and
since it is not necessary for me to express a final conclusion upon it, I prefer
not to do so.

[40] For the reasons I have given I believe the claim against Mr Hosking
under ss 238 and 241 must fail and the judge was right to strike it out. I
would therefore dismiss the appeal.

*a*  **McCOMBE LJ.**

[41] I agree.

**ELIAS LJ.**

[42] I also agree. Mr Davenport submitted that the purposes of s 238, namely to protect creditors of an insolvent company, would be better served
*b*  if the withdrawal of money by Mr Temple was treated as a relevant transaction at that time when the money was actually lost to the company. That may be so, but like Kitchin LJ I can see no legitimate way in which s 238 can be construed to achieve that result. The section catches transactions entered into by the company. As I understand it,
*c*  Mr Davenport QC was asserting that there was a continuing authority for Mr Temple to withdraw the money at least until that authority was revoked or exercised. I agree; but that is precisely why it was not necessary for the company to enter into any further distinct transaction at the point when Mr Temple withdrew the funds. Any relevant transaction would have to be the underlying agreement by which the authority was conferred, in this case
*d*  either the 2003 agreement or the 2005 variation, but neither of these was relied upon.

*Appeal dismissed.*

TAB 57

*Re Pan Ocean Co Ltd* [2014] EWHC 2124 (Ch), English High Court

Neutral Citation Number: [2014] EWHC 2124 (Ch)

Case No: 04446 of 2013

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 30/06/2014

**IN THE MATTER OF PAN OCEAN CO. LTD**

**AND IN THE MATTER OF THE CROSS-BORDER**
**INSOLVENCY REGULATIONS 2006**

Before :

**MR JUSTICE MORGAN**
- - - - - - - - - - - - - - - - - - - - -

BETWEEN:

**FIBRIA CELULOSE S/A**                           Applicant
- and -
**(1) PAN OCEAN CO. LTD**                          Respondents
**(2) MR YOU SIK KIM**

AND BETWEEN:

**MR YOU SIK KIM**                                 Applicant
- and -
**FIBRIA CELULOSE S/A**                            Respondent

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Matthew Collings QC and Mr Alexander Winter** (instructed by **Thomas Cooper LLP**)
for **Fibria Celulose S/A**
**Mr Mark Phillips QC and Mr Stephen Robins** (instructed by **DLA Piper UK LLP**) for **Pan Ocean Co Ltd** and **Mr You Sik Kim**

Hearing dates: 2, 3 and 4 April 2014
- - - - - - - - - - - - - - - - - - - - -

# Judgment

**Mr Justice Morgan:**

*Introduction*

1.     This case involves the interpretation and application of the Cross-Border Insolvency Regulations 2006 ("the CBIR"). In particular, it concerns the scope of the relief that may be granted by the Companies Court upon recognition of a foreign insolvency proceeding. For convenience, I have set out the relevant provisions of the CBIR in an appendix to this judgment.

2.     Pan Ocean Co Ltd ("the Company") is a shipping company, incorporated under the laws of the Republic of Korea on 28 May 1996. The Company is undergoing an insolvency process, described as rehabilitation, in Korea. That process has been recognised by the Companies Court under the CBIR as a foreign main proceeding.

3.     The Company has the benefit of a long term shipping contract with Fibria Celulose S/A ("Fibria"). Fibria is a Brazilian company described in the evidence before me as the world's largest producer of wood pulp. The administrator regards that contract as likely to be very profitable for the Company and its continued existence as being important to the rehabilitation of the Company. Conversely, Fibria regards the contract as onerous to it.

4.     The contract is governed by English law. The express terms of the contract confer on Fibria the right to terminate it by reason of the Korean insolvency process in relation to the Company. Those terms are valid and enforceable in English law. The administrator of the Company contends that those terms are not valid and enforceable under Korean insolvency law. Fibria contends that the administrator is not right about that but, in any event, the position under Korean insolvency law is irrelevant.

5.     Both the administrator and Fibria have made applications to the Companies Court under the CBIR. The administrator contends that the Companies Court has power to grant him relief which includes an order that Fibria must not exercise its right to terminate the contract. Fibria counters by saying that the Companies Court has no such power, alternatively that it should not exercise any such power.

6.     Mr Collings QC and Mr Winter appeared on behalf of Fibria and Mr Phillips QC and Mr Robins appeared on behalf of the administrator and the Company.

*The contract*

7.     On 31 August 2011, the Company and Fibria entered into four separate contracts, on similar terms. Prior to the hearing before me, the administrator of the Company elected to terminate three of those contracts and it is accepted that those three contracts have been effectively terminated. The administrator does not wish to terminate the remaining contract which is the relevant contract for present purposes. This contract was described as "Contract of Affreightment No. 1" but as it is now the only relevant contract, I will simply refer to it as "the contract".

8.     The contract was made on 31 August 2011 between Fibria as "the Charterers" and the Company as "the Owners". By clause 2, Fibria undertook to provide for the shipment of, and the Company undertook to carry, the cargoes identified in the contract. The

Company was to provide newly constructed vessels to enable it to perform the contract. The period of the contract was defined by reference to the dates on which the vessels were delivered; the contract was a long term contract which was to continue for 25 years from the date on which the last such vessel was delivered from the relevant construction shipyard. The contract identified the intended loading ports as two ports in South America and it identified the intended discharging ports as various ports in the United States of America and in the Far East (one of which was in South Korea). The contract fixed the freight rates payable by Fibria to the Company. Either party could assign the contract in the circumstances therein set out.

9.     Clause 28 of the contract included the following provisions:

"28     TERMINATION FOR DEFAULT

28.1     A Party (the "non-defaulting Party") shall be entitled to terminate this Contract with immediate effect upon notice in writing to the other Party (the "defaulting Party") if any of the following events shall occur:

(a)     a defaulting Party is in material breach of its material obligations pursuant to this Contract and that breach has not been remedied by the defaulting party within a period of 60 days after the non-defaulting Party first notified the defaulting Party in writing of that breach; or

(b)     a defaulting Party is in material breach of its material obligations pursuant to this Contract three times (whether consecutively or not), during any period of 6 (six) months; or

(c)     a defaulting party ceases wholly or substantially to carry on its business;

(d)     a defaulting Party becomes unable (or reasonably appears to the non-defaulting Party to become unable) to pay its debts as they fall due;

(e)     any formal declaration of bankruptcy or any formal statement to the effect that a defaulting Party is insolvent or likely to become insolvent is made by that defaulting Party or by its directors or, in any proceedings, by a lawyer acting for that defaulting Party; or

(f)     an administrator is appointed (whether by a court or otherwise) in respect of a defaulting Party otherwise than for the purpose of a reconstruction or amalgamation without insolvency previously approved by the non-defaulting Party (which approval shall not be unreasonably withheld). Whilst any application to appoint an administrator is pending or following the giving or filing of an administration notice the defaulting party must (to the extent that it may lawfully do so and it would not be in breach of any contractual restriction by

which it is then bound) continue to carry on its business without disruption; or

(g) a provisional liquidator is appointed in respect of a defaulting Party or a winding up order is made in relation to a defaulting Party; or

(h) a resolution is passed, an administration notice is given or filed, an application or petition to a court is made or presented or any other step is taken by or on behalf of a defaulting Party for or with a view to the winding up of a defaulting Party or for the appointment of a provisional liquidator or administrator in respect of a defaulting party otherwise than for the purpose of a reconstruction or amalgamation without insolvency previously approved by the non-defaulting Party (which approval shall not be unreasonably withheld); or

(i) an administration notice is given or filed, an application or petition to a court is made or presented or any other step is taken by a creditor of a defaulting Party for the winding up of that defaulting Party or the appointment of a provisional liquidator or administrator in respect of that defaulting Party unless the proposed winding up, appointment of a provisional liquidator or an administrator is being contested in good faith with the aim to have any application or petition dismissed or withdrawn within 90 days of being presented or within 90 days of the administration notice being filed or given or other steps or actions being taken to ensure that no administration will take place and (in either such case) the Party carries on its business without disruption ; or

(j) an event analogous to any of the events referred to in paragraphs (b) to (i) (inclusive) occurs under the laws of any applicable jurisdiction in relation to the defaulting Party."

10.    By clause 32 of the contract it was agreed:

"32    LAW AND ARBITRATION

This Contract and any non-contractual obligations arising out of or in connection with it, shall be governed by and construed in accordance with English law. Any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

    … "

*The effect of clause 28 in English law*

11.    Clause 28.1 may be invoked by either party to the contract if the other party is a "defaulting Party". The first three events specified in the clause, in sub-paragraphs (a), (b) or (c), do not turn on the insolvency of the defaulting party. The remaining sub-paragraphs of clause 28.1, to a greater or lesser extent, define the relevant event by reference to the fact of insolvency or to the taking of some step in an insolvency process.

12.    In some jurisdictions, a clause which allows a party to a contract to terminate the contract by reason of the insolvency of the counterparty is called an *ipso facto* clause. In certain jurisdictions in the United States, such clauses are automatically invalid. In Canada, the court has power to stay the exercise of rights under such clauses. Later in this judgment, I will consider how such clauses are treated under Korean insolvency law.

13.    There was no dispute before me as to the efficacy in English law of the provisions in clause 28.1 of the contract which allow termination by reason of an insolvency event. It was accepted that those provisions are valid in English law. In particular, it was accepted that the rule of insolvency law, known as the anti-deprivation rule, does not strike down those provisions.

14.    Although there was no argument as to the approach of an English court to the insolvency provisions in clause 28.1 of the contract, it is helpful for present purposes to understand why those provisions do not infringe the anti-deprivation rule or any other rule of English insolvency law. The scope of the anti-deprivation rule has been considered recently by the Supreme Court in Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd [2012] AC 383. There were some differences in the approach taken by Lord Collins JSC (with whom Lords Walker, Phillips, Hope, Baroness Hale and Lord Clarke JJSC agreed) and Lord Mance JSC but no difference which is relevant for present purposes.

15.    Lord Collins expressed his conclusions as to the anti-deprivation rule at [102] – [106]:

> "102.    It would go well beyond the proper province of the judicial function to discard 200 years of authority, and to attempt to re-write the case law in the light of modern statutory developments. The anti-deprivation rule is too well-established to be discarded despite the detailed provisions set out in modern insolvency legislation, all of which must be taken to have been enacted against the background of the rule.
>
> 103.    As has been seen, commercial sense and absence of intention to evade insolvency laws have been highly relevant factors in the application of the anti-deprivation rule. Despite statutory inroads, party autonomy is at the heart of English commercial law. Plainly there are limits to party autonomy in the field with which this appeal is concerned, not least because the interests of third party creditors will be involved. But, as

Lord Neuberger stressed [2010] Ch 347, para 58, it is desirable that, so far as possible, the courts give effect to contractual terms which parties have agreed. And there is a particularly strong case for autonomy in cases of complex financial instruments such as those involved in this appeal.

104.    No doubt that is why, except in the case of a blatant attempt to deprive a party of property in the event of liquidation (*Folgate London Market Ltd v Chaucer Insurance plc* [2011] EWCA Civ 328), the modern tendency has been to uphold commercially justifiable contractual provisions which have been said to offend the anti-deprivation rule: *Money Markets International Stockbrokers Ltd v London Stock Exchange Ltd* [2002] 1 WLR 1150; *Lomas v JFB Firth Rixson Inc* [2010] EWHC 3372 (Ch); and the judgments of Sir Andrew Morritt C and the Court of Appeal in these proceedings. The policy behind the anti-deprivation rule is clear, that the parties cannot, on bankruptcy, deprive the bankrupt of property which would otherwise be available for creditors. It is possible to give that policy a common sense application which prevents its application to bona fide commercial transactions which do not have as their predominant purpose, or one of their main purposes, the deprivation of the property of one of the parties on bankruptcy.

105.    Except in the case of well-established categories such as leases and licences, it is the substance rather than the form which should be determinant. Nor does the fact that the provision for divestment has been in the documentation from the beginning give the answer, nor that the rights in property in question terminate on bankruptcy, as opposed to being divested. Nor can the answer be found in categorising or characterising the property as "property subject to divestment on bankruptcy."

106.    If the anti-deprivation principle is essentially directed to intentional or inevitable evasion of the principle that the debtor's property is part of the insolvent estate, and is applied in a commercially sensitive manner, taking into account the policy of party autonomy and the upholding of proper commercial bargains, these conclusions on the present appeal follow."

16.    Lord Mance said at [177]:

"177.    However, [counsel] advanced propositions which would mean that any provision for termination on bankruptcy, which would deprive the trustee or liquidator of the opportunity of continuing the contract and so the bankrupt estate of future potential advantage, would infringe the principle. There is in my opinion no basis for any such rule. Where a contract provides for the performance in the future of reciprocal

> obligations, the performance of each of which is the quid pro
> quo of the other, I see nothing objectionable or evasive about a
> provision entitling one party to terminate if the other becomes
> bankrupt. That is particularly so, having regard to the purpose
> and character of the present transaction, viewed rather more
> broadly than the Court of Appeal did in its detailed reasoning."

17.  <u>Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd</u> is of
further interest in the present case for the following reason. The contractual provisions
which were under review in that case were triggered by the relevant company filing
for Chapter 11 protection in the US Bankruptcy Court. Judge Peck sitting in the US
Bankruptcy Court for the Southern District of New York made a declaration that the
contractual provisions in question were ineffective because they were in breach of the
US Bankruptcy Code: see <u>Re Lehman Bros Holdings Inc</u> 422 BR 407.  Nonetheless,
the contractual provisions were governed by English law and the English courts held
that they were effective under English law although the relief granted was confined to
declaratory relief; the position is explained by Lord Collins at [30] – [35] and by Lord
Mance at [173] – [174]. The judgments in the English courts did not have to deal with
any application under article 21 of the CBIR for an order restraining any party from
relying upon the contractual provisions which were effective in English law but
ineffective under the US Bankruptcy Code.

*The assignment*

18.  On 30 December 2011, the Company assigned absolutely to certain Marshall Islands
companies, controlled by the Company, all its rights, title and interest in and to, and
all benefits accruing to it under, the contract and on the same day, those Marshall
Islands companies assigned to ABN AMRO Bank N.V. all of their rights, title and
interest in and to, and all benefits accruing to it under, the contract (which had just
been assigned to them by the Company). Copies of these assignments were not in the
evidence before me.

19.  Also on 30 December 2011, the Company (and the Marshall Islands companies) gave
written notice to Fibria of the assignments referred to above. In this notice, the
Company was referred to as the "Bareboat Charterer", the Marshall Islands companies
were referred to as the "Registered Owners" and ABN AMRO Bank N.V. was
referred to as the "Security Agent". By this notice, the Company and the Registered
Owners requested Fibria to acknowledge the assignments. Fibria was asked to note
(amongst other things):

(1)      until Fibria received notice to the contrary from the Security Agent, it was to
pay all sums due under the contract to the Company;

(2)      following notice from the Security Agent to do so, Fibria was to pay all sums
due under the contract to the Security Agent;

(3)      the Company remained liable to perform all  present and future obligations
assumed by it under the contract.

20.  The notice of assignment contained the following further provisions (the reference to
the  "COA" is to the contract):

"Further:

1. We, the Bareboat Charterer, the Registered Owners and the Security Agent refer to the COA and hereby request, if you intend to exercise any right to cancel, rescind or otherwise terminate the COA, in whole or in part, that you notify the Security Agent in writing at its address above stated … and that by such notice you grant the Security Agent the option to either maintain the COA (the "Step-in Option") or to agree to the cancellation, rescission or termination of the COA in whole or in part (the "Termination Option"). Following receipt of such notice the Security Agent may elect by notice in writing to you (an "Election Notice") at your address above … within sixty (60) days of receipt of your notice, to either maintain the COA or agree to the cancellation, rescission or termination of the COA in each case in whole or in part and, if in part, with a pro rata reduction in the cargo quantities to be shipped pursuant to the COA and the number of Vessels required to service the same.

2. If the Security Agent elects to maintain the COA, the Security Agent shall have the right to either remedy the breach by the Bareboat Charterer which gave rise to the aforesaid cancellation, rescission or termination rights within sixty (60) days of the date of the Election Notice or to replace the Bareboat Charterer as the disponent owner of the Vessel and replace the same with a company (the "Substitute Disponent Owner") to assume the Bareboat Charterer's rights and obligations under the COA and so as to be substituted for the Bareboat Charterer under the COA by way of a transfer or novation of the COA in favour of such Substitute Disponent Owner or by entry into of a new contract of affreightment on materially the same terms and conditions, mutatis mutandis, as the COA. Any such Substitute Disponent Owner shall be subject to your prior written approval but such approval shall not be unreasonably withheld or delayed, provided that your rights and obligations under the COA (as transferred or novated) or under any new contract or affreightment entered into shall be on materially the same terms and conditions, mutatis mutandis, as the COA, except as may be otherwise expressly agreed by you. For the avoidance of doubt, if the proposed Substitute Disponent Owner, or any company that is to provide in your favour a guarantee of the obligations of such Substitute Disponent Owner on terms acceptable to you, is not (in your reasonable opinion) of similar (or better) financial standing, market reputation and of similar (or better) operational, technical, logistical and commercial capabilities as the Bareboat Charterer, any refusal by you to accept it as a Substitute Disponent Owner under this provision shall be deemed reasonable.

> 3. If the Security Agent elects to agree to the cancellation, rescission or termination of the COA in part, the COA shall remain otherwise in full force and effect with a pro rata reduction in the cargo quantities to be shipped pursuant to the COA and the number of vessels required to service the same and we request your confirmation of your agreement thereto."

21.    The notice of assignment stated that the assignments of the benefit of the contract (first to the Marshall Islands companies and then to the Security Agent) were by way of security only. The notice further stated that the notice and any acknowledgment of it given by Fibria and any non-contractual obligations arising from or in connection therewith should be governed by and construed in accordance with the law of England and Wales.

22.    On 17 January 2012, Fibria wrote to the Company, and to the Registered Owners and the Security Agent, acknowledging the notice of the assignments, as requested. In particular, by its acknowledgment Fibria undertook and confirmed:

(1)    that Fibria agreed to comply with the instructions in the notice of assignment;

(2)    that Fibria agreed to the provisions in the notice of assignment which included those relating to the Step-in Option and the Termination Option and further agreed to enter into a transfer or novation agreement  in relation to the contract or a new contract of affreightment on materially the same terms and conditions, mutatis mutandis, as the contract to give effect to any election by the Security Agent to exercise the Step-in Option, subject to paragraph 2 of the notice of assignment;

(3)    that the assignments were by way of security only.

23.    The parties before me accepted that the terms of the acknowledgement were valid and enforceable in English law.

*Further facts*

24.    By June 2013, the Company had become insolvent on a cash-flow basis although it continued to be solvent on a balance sheet basis as a going concern. On 7 June 2013, the Company presented a petition to the Bankruptcy Court (Fifth Division) of the Seoul Central District Court for the commencement of rehabilitation proceedings. The Company did not seek or obtain Fibria's consent to the making of this application.

25.    On 12 June 2013, Fibria wrote to the Security Agent referring to the contract, the assignments, the notice of assignment and the acknowledgment referred to above. Fibria stated in its letter that it was entitled to terminate the contract. It set out the text of sub-clauses (h) and (j) of clause 28.1 of the contract. It wrongly referred to the text of clause 28.1 (j) as being in clause 28.1(i). By the letter, Fibria gave formal notice to the Security Agent:

(1)    of the Company's application on 7 June 2013 to the Seoul Central District Court;

(2)    of Fibria's belief that it was entitled to terminate the contract under clauses 28.1(h) and (i) (the letter probably intended to refer to clause 28.1(j)) and/or any other application clause;

(3)    that Fibria granted to the Security Agent the Step-in Option and the Termination Option;

(4)    that Fibria awaited an Election Notice from the Security Agent.

26.    Also on 12 June 2013, Fibria notified the Company of the notice it had sent to the Security Agent.

27.    Shortly after 12 June 2013, the Company replied to Fibria stating that Korean courts did not recognize the validity of the provisions relied upon by Fibria (the Company's letter specified clauses 28.1 (h) and (i)) and that Fibria was not entitled to terminate the contract by reason of the Company's application in the rehabilitation proceedings. The Company further stated that under Article 119 of the Debtor Rehabilitation and Bankruptcy Act of Korea ("the DRBA") it was the custodian of the Company who would have the option to elect to terminate or maintain the contract and that the custodian would certainly elect to perform the contract.

28.    On 17 June 2013, the Korean Court made an order commencing rehabilitation proceedings in relation to the Company and appointed joint administrators. (There is now only one administrator, Mr You Sik Kim, who became the sole administrator following the resignation of the former joint administrator on or about 7 November 2013.) Mr Kim has stated that a rehabilitation process in Korea is broadly comparable to an English administration coupled with a scheme of arrangement or company voluntary arrangement. This categorisation was not the subject of any further analysis or dispute at the hearing before me.

29.    On 18 June 2013, the Security Agent responded to Fibria's notice to it of 12 June 2013 and suggested that discussions should take place.

30.    On 21 June 2013, the administrator of the Company applied in the Companies Court in London for the Korean rehabilitation proceedings to be recognised as foreign main proceedings under Article 17 of Schedule 1 to the CBIR.

31.    On 25 June 2013, the Companies Court (Warren J) made an order under the CBIR recognising the Korean rehabilitation proceedings as foreign main proceedings in respect of the Company. Warren J made further orders pursuant to articles 20(6) and 21(1)(g) of the CBIR. These orders provided that there was to be: (1) no enforcement of securities; (2) no repossession of goods; (3) no legal process against the Company or its property; (4) no appointment of an administrative receiver; and (5) no winding up petition. In some cases, the prohibited matters could proceed with the consent of the administrator or of the Companies Court. At the hearing before me, it was stressed that the orders made by Warren J were not confined to the automatic effects of recognition of a foreign main proceeding which are provided for by article 20 of the CBIR. However, it does not seem to me to matter whether the orders simply gave effect to article 20 or modified it under article 20(6) and added relief under article 21. There was nothing in those orders which prevented the administrator applying subsequently for further relief under article 21, as the administrator has now done.

Around the same time as orders were made in the Companies Court, the Company obtained broadly similar recognition orders in a number of other countries.

32.     On 2 July 2013, the Company wrote to Fibria. The letter directly concerned another contract of affreightment which has since been terminated. However, what was said in relation to that other contract was also relevant to the contract with which I am concerned. The letter stated that Fibria was not entitled to terminate such a contract. The letter enclosed a letter of advice, dated 1 July 2013, from attorneys in Seoul. The attorneys advised that the contract was, in Korean law, a "bilateral executory contract" and the administrator of the Company was entitled to elect to terminate or to continue the contract. If the administrator elected to continue the contract, the counterparty would be entitled to receive full payment or other benefit under the contract without any impairment of its position by reason of the rehabilitation. The attorneys further advised that clause 28 or parts of it were to be regarded as an *ipso facto* clause and that the Supreme Court of Korea had held that there may be circumstances in which such a clause might be invalidated or, at least, its operation might be restricted until the conclusion of the rehabilitation proceedings. They then advised that it was highly likely that the *ipso facto* clause would be deemed ineffective in Korea. Finally, they said that by reason of the rules as to cross-border insolvency, the clause would also be invalid under Brazilian law.

33.     On 11 July 2013, Fibria wrote again to the Security Agent, without prejudice to its earlier notice of 12 June 2013. In its letter, Fibria referred to the Company's application to the Korean court of 7 June 2013 and the order of the Korean court on 17 June 2013. Fibria stated that the Company was unable (and/or it reasonably appeared to Fibria that the Company was unable) to pay its debts as they fell due and that Fibria intended to terminate the contract pursuant to clauses 28.1 (d), (f), (h) and (j) thereof. Fibria notified the Security Agent that Fibria granted it the Step-in Option and the Termination Option and awaited the Security Agents' Election Notice.

34.     On 16 July 2013, solicitors for Fibria requested permission from the administrator of the Company for Fibria to commence arbitration proceedings against the Company under the contract. Such permission has not since been forthcoming.

35.     On 14 August 2013, the solicitors for the administrator sent to Fibria a copy of the administrator's notice dated 13 August 2013 confirming, pursuant to article 119 of the DRBA, that the Company would continue to perform the contract as an executory contract.

36.     The administrator was not obliged to apply to the Korean court for its approval of his decision to elect to perform the contract but he did so apply and, on 1 October 2013, that court approved that decision.

37.     On 22 November 2013, a rehabilitation plan in relation to the Company was approved by the Company's creditors and by the Korean court. In a witness statement dated 10 February 2014, the administrator has stated that the income and profits generated for the Company under the contract are crucial to the ability of the Company to perform the rehabilitation plan.

*The applications*

38.     On 15 August 2013, Fibria applied in the Companies Court for permission pursuant to article 20(6) of the CBIR and/or paragraph 2(3) of the order of Warren J of 25 June 2013 to commence and prosecute an arbitration against the Company seeking declaratory relief as to Fibria's entitlement to terminate the contract. The evidence in support of the application drew attention to a statement made by the administrator, in his application for recognition, to the effect that the Company was unable to pay its debts as they fell due and Fibria reserved its right to serve a further notice under clause 28.1 of the contract relying on clause 28.1(e). The administrator's evidence in opposition to this application included evidence that the contract is highly profitable to the Company and that the administrator wishes to preserve the contract and to perform it in the interests of the Company and its creditors. The administrator says that Fibria will not suffer any prejudice as a result of the insolvency process in relation to the Company in that Fibria's rights under the contract will not be affected in any way by that insolvency process.

39.     On 10 February 2014, the administrator of the Company applied in the Companies Court for relief under article 21 of the CBIR directing that Fibria is not entitled to exercise any right of termination under clauses 28 of the contract and/or such further or other relief as the court thought fit. The administrator filed evidence in support of its application and that evidence provided detailed information as to the ongoing process of restructuring of the Company.

40.     On 24 March 2014, the administrator of the Company applied in the Companies Court under articles 21, 25 and 27 of the CBIR for relief in the form of the Companies Court issuing a letter of request to the Korean court. An attached draft letter of request asked the Korean court to exercise its powers under article 641 of the DRBA to give its opinion to the English court as to whether clause 28 of the contract was void and unenforceable pursuant to Korean insolvency law.

41.     At the hearing of these applications, the administrator put forward a draft order setting out the relief which he sought. The draft order defined clause 28 of the contract as "the Insolvency Termination Clause". The draft order then sought a declaration as to the position under the Insolvency Termination Clause on the assumption that that clause was void and unenforceable as a matter of Korean insolvency law. The position contended for by the administrator was that the Companies Court had jurisdiction under article 21(1) of the CBIR to make an order restraining Fibria from relying on the Insolvency Termination Clause in England and Wales and that it would be a proper exercise of discretion for the Companies Court of make such an order. The draft order also provided for a letter of request to be issued to the Korean court in accordance with the application made on 24 March 2014. The draft order continued by seeking an order that the application dated 10 February 2014 for relief under article 21 of the CBIR be adjourned to be restored when the Korean court had responded to the letter of request. Finally, the draft order suggested that Fibria's application for permission to commence arbitration proceedings be adjourned.

*The position of the Security Agent*

42.     The Security Agent has not been made a party to the above applications. I was told that representatives of the Security Agent were present in court during the hearing before me but they took no part in that hearing. I inquired of the parties as to the position of the Security Agent in the light of the relief sought by the applications. As

explained earlier, Fibria has given notice to the Security Agent pursuant to the acknowledgement of the notice of assignment. On the face of it, the result of Fibria's notice is that the Security Agent has a right to elect either to maintain the contract or to agree to its termination. If the Security Agent were to elect to maintain the contract, then the Security Agent would be entitled to replace the Company with a Substitute Disponent Owner by way of a transfer or novation of the contract or by the entry into a new contract. In such cases, Fibria would not be entitled to take further steps to terminate the contract with the Company.

43.    I was told by counsel for the administrator and for Fibria that, notwithstanding the position under the acknowledgement of the notice of assignment, it remained relevant to determine the position in relation to Fibria's ability to serve notice of termination under clause 28.1 of the contract. I was told that the Security Agent supported the Company's attempt at restructuring and the Company's stance that Fibria was not entitled to terminate the contract under clause 28.1. The Security Agent therefore wanted to know whether Fibria did have the ability to terminate the contract under clause 28.1. On the assumption that it is held that Fibria did not have the ability to terminate the contract under clause 28.1, then the Security Agent would not feel it necessary to elect to maintain the contract nor would it wish to agree to the termination of the contract but it would simply not respond to the notice served on it by Fibria. If Fibria later attempted to terminate the contract under clause 28.1, the Security Agent would be able to rely on the fact that (on this assumption) that Fibria was not able so to act.

44.    Conversely, if it were held that Fibria was entitled to terminate the contract under clause 28.1, then the Security Agent would have to consider its position further and make its election under the acknowledgement of the notice of assignment. I understand that Fibria has agreed to extend the time within which the Security Agent is to makes its election under the acknowledgment of the notice of assignment so that the time for its election is suspended while the present applications are pending.

45.    Accordingly, both Fibria and the administrator of the Company ask the court to deal with the applications which have been made to it and, in particular, to decide the scope of the powers of the court to grant relief under article 21 of the CBIR.

*Korean law*

46.    The parties did not agree on the relevant principles of Korean insolvency law. I heard expert evidence as to Korean insolvency law from two Korean lawyers. The administrator called Mr Eunjai Lee and Fibria called Mr Duk-Kyou Hyun. I have concluded that I should not myself decide the dispute between these two experts and so I do not need to describe the witnesses in greater detail nor need I set out the detailed points which divided them. I will however summarise the positions they adopted as to the relevant principles of Korean insolvency law.

47.    Mr Lee relied on article 119 of the DRBA. He also referred in passing to article 32-2 of that Act because that article was referred to in one of the cases to which he drew my attention. However, his view was essentially based on article 119. Article 119 does not apply to all contracts but only to certain unperformed bilateral contracts. It did not appear to be in dispute that the contract in the present case comes within the type of unperformed bilateral contract which is governed by article 119.

48.    Under article 119, the custodian of a company undergoing rehabilitation may choose to cancel or terminate an unperformed bilateral contract. Further, article 119 appears to allow the custodian to require the other party to fulfil its obligations under such a contract. It is said that it would be inconsistent with that right for the counterparty to be able to terminate the contract by reason of the fact of the rehabilitation.

49.    The statutory predecessor of article 119 was considered by the Korean Supreme Court in its decision of 6 September 2007 in <u>Allied Domecq (Holdings) plc v The trustee of Jinro Co Ltd</u>. Mr Lee accepted that parts of the reasoning in that decision were not wholly clear in relation to the impact of article 119 on an insolvency termination clause. The Supreme Court held that, in a case not governed by article 119, an insolvency termination clause would be valid. The Supreme Court then considered the type of contract which came within article 119 and referred to the nature of the obligations under the particular unperformed bilateral contract in that case. It then held that the contract in that case was not governed by article 119.

50.    Article 119 was further considered in <u>Radcliff Corporation v The receiver of Samsun Logix</u> (decision dated 11 January 2010). In that case, Samsun Logix ("Samsun") chartered a vessel under a time charterparty which was governed by English law. It then entered rehabilitation and the owner of the vessel asserted that Samsun had no intention of performing the charterparty and had repudiated it, giving the owner the right to treat the charterparty as at an end and to claim damages. The court held that the effect of article 119 was that the owner was not entitled to terminate the charterparty on the grounds of Samsum's repudiation of it because that would infringe the receiver's option to terminate, or to continue, the unperformed bilateral contract.

51.    In <u>Korea Real Estate Investment & Trust Co Ltd v The receiver of Poonglim Co Ltd</u> (decision dated 17 July 2013) it was held that article 119 and article 32-2 prevented a counterparty of the debtor company relying upon an insolvency termination clause to terminate a building contract under which the debtor company was to build an apartment building. The court appeared to hold that such was the automatic effect of article 119 in relation to an unperformed bilateral contract.

52.    The most recent decision as to the operation of article 119 is <u>Trustee of Tongyang Networks Co Ltd v Standard Chartered Bank Ltd</u> (a decision of 24 January 2014). That case concerned a contract under which the debtor company was to provide services to the bank. The contract contained an insolvency termination clause and the bank gave, or proposed to give, notice  to terminate pursuant to that clause. The trustee of the debtor company argued that the bank's right to terminate should be considered null and void by reason of article 119 or, alternatively, the bank should refrain from terminating the contract at least during the period of the rehabilitation. The court considered the earlier decision in <u>Allied Domecq</u> and held that to achieve a proper balance between the purpose of rehabilitation and the principle of freedom of contract and the counterparty's need to be able to trust the debtor company, it was necessary to look at all the circumstances, such as the nature of the contract, the necessity to protect the debtor and the counterparty and other relevant factors. The court then conducted a detailed examination of what it regarded as the relevant factors and held that article 119 did not render the insolvency termination clause null and void. I was told that the trustee has appealed that decision to a higher court.

53.     Mr Lee's view was that the decision in the <u>Standard Chartered Bank</u> case was simply wrong and that in the case of an unperformed bilateral contract which is within article 119, an insolvency termination clause is null and void and cannot be exercised by the counterparty of the debtor company. Mr Hyun relied on the decision in the <u>Standard Chartered Bank</u> case and said that the effect of article 119 would not be automatic in this case but would require the Korean court to consider all the circumstances. I suggested to Mr Hyun that if one carried out in the present case a similar exercise to that carried out in the <u>Standard Chartered Bank</u> case, then the result was likely to be that the Korean court would hold that the insolvency termination provisions in clause 28.1 of the contract were null and void or unenforceable. Mr Hyun suggested that, in the present case, the Korean court would be influenced by the fact that the contract was an international shipping contract governed by English law and that Korean court would not wish to damage Korea's position as a trading nation.

54.     In the event, I do not think that it is necessary for the purposes of the present applications for me to determine the disputes as to the operation of Korean law. It is sufficient for me to say that there is a good arguable case that the insolvency termination provisions in clause 28.1 of the contract are automatically void by reason of article 119. Further, even if the insolvency termination provisions in clause 28.1 are not automatically void, there is a good arguable case that they would in fact be held to be void after a Korean court considered all of the relevant circumstances.

55.     Having reached those conclusions, I note that there are potential points of Korean law which were not explained by the experts. The precise operation of article 119 is unclear. Does it make the insolvency termination clause null and void or only render it unenforceable during the rehabilitation? What if the counterparty serves a termination notice before the Korean court gives a ruling on the enforceability of the insolvency termination clause? On my own reading of the Korean decisions, it seems to me to be likely that the counterparty would not be able to rely on that notice as effective if the Korean court were later to hold that the insolvency termination clause was null and void or even just unenforceable.

56.     I also note that the experts confined themselves to discussing the effect of article 119 on clause 28.1 of the contract without regard to the later arrangements which were brought into existence by the acknowledgment of the notice of assignment. I consider that it might be very relevant indeed, and it might even be determinative, in Korea to assess the position by reference to the later arrangements and not by reference to clause 28.1 alone. I can see how it might be argued that if clause 28.1, or parts of it, were invalid or unenforceable, then the later provisions which were premised on the enforceability of clause 28.1 did not have effect. However, I could also see force in an argument that whatever Korean insolvency law might make of clause 28.1, if it stood alone, it would have to evaluate the later arrangements separately. The position of the company and its creditors is quite different in a case where clause 28.1 is relied on by Fibria to terminate the contract at its option and a case where clause 28.1 is relied on by Fibria and the consequence is either that the Security Agent exercises the Step-in Option so that the contract is transferred or novated or, if the contract is terminated, then it is terminated at the option of the Security Agent rather than at the option of Fibria.

*The submissions for the parties*

57.     Mr Phillips' approach, on behalf of the administrator, was to focus on the relief which
        might be ordered by the court under article 21(1) of the CBIR. He concentrated on the
        power conferred by article 21(1) to grant "any appropriate relief". He submitted that
        the court was entitled to grant any relief which it considered to be appropriate in all
        the circumstances. Mr Phillips addressed me in great detail and relied on an extensive
        citation of decided cases in various jurisdictions, and many other materials, which he
        submitted were valuable when considering the meaning of "any appropriate relief" in
        article 21(1) and when deciding what relief was appropriate in this case. In the
        alternative to these submissions, he put forward a narrower submission that the court
        had power pursuant to article 21(1)(a) of CBIR to stay proceedings and that included
        a power to restrain Fibria from serving a termination notice under clause 28.1 of the
        contract. I pay tribute to the thoroughness and quality of Mr Phillips' submissions. It
        is not necessary for me to attempt to summarise everything which was said in the
        course of these wide-ranging submissions as I consider that I can identify the essential
        points which were made when I discuss my approach to the issues which arise.

58.     Mr Collings, for Fibria, submitted that its rights to terminate the contract were
        governed by English law, as to which there was no dispute. Korean insolvency law
        was irrelevant, certainly in the Companies Court. He submitted that the power
        conferred by article 21(1)(a) to grant a stay of proceedings could not be interpreted to
        extend to an order restraining Fibria from serving a notice pursuant to clause 28.1 of
        the contract. He further submitted that the power of the court to grant "any
        appropriate relief" did not permit the court to give relief in accordance with Korean
        insolvency law and, in any event, the relief sought was not appropriate.

*Discussion: preliminary remarks*

59.     The administrator's primary object at the hearing of these applications was to obtain
        the determinations set out in his draft order as to the court's jurisdiction and discretion
        under article 21 of the CBIR in relation to clause 28.1 of the contract (or, at any rate,
        those parts of clause 28.1 which deal with various insolvency events). The
        determinations set out in the draft order are expressly on the assumption that clause
        28.1 is void and unenforceable as a matter of Korean insolvency law. I have already
        described the rival opinions as to the relevant Korean insolvency law and my
        conclusion that the administrator has a good arguable case that the insolvency
        termination provisions in clause 28.1 of the contract are automatically void by reason
        of article 119 or, if not automatically void, he has a good arguable case that they
        would in fact be held to be void after a Korean court considered all of the relevant
        circumstances. Accordingly, for the sake of the following analysis, I will assume that
        a Korean court would regard (at least) those parts of clause 28.1 which provide for
        termination by notice following an insolvency event in Korea, as being inoperative or
        (at least) in suspense during the Korean insolvency.

60.     The administrator relied, principally, on the power of the recognising court, pursuant
        to article 21(1), to grant "any appropriate relief" and, in the alternative, on the power,
        pursuant to article 21(1)(a), to order a stay of proceedings.  Before dealing with the
        specific points which arise in relation to these two ways of putting the case, I should
        comment briefly on other points which are referred to in articles 21 and 22 but which
        were not examined at the hearing.

61.     Article 21 allows the court to grant relief "where necessary to protect the assets of the debtor or the interests of the creditors". The meaning of the phrase "the assets of the debtor", and how that phrase might apply to the contract in this case, was not really explored at the hearing before me. It seemed to me that there might have been two issues in that respect. The first was as to whether the benefit of the contract had ceased to be an asset of the debtor because it had been assigned to the Marshall Islands companies and then to the Security Agent. If the point had been raised, it may be that the answer would have been that because the assignments were by way of security only, the Company retained a right to redeem the security and it was that right (rather than the benefit of the contract) which was an asset of the debtor. However, as the point was not raised and the assignments were not put in evidence, I will say no more about that subject. The second possible question might have been whether the relevant asset of the debtor in this case is in relation to a contract which is not subject to termination (pursuant to the insolvency termination provisions in clause 28.1) or whether the asset of the debtor was the contract subject to the possibility of such termination. If the asset of the debtor was the latter, then an order of the court which prevented Fibria exercising its contractual rights under clause 28.1 would not merely "protect" the assets of the debtor but would enhance the assets of the debtor. However, as this point was not argued, I will not deal with it further. In any case, I note that article 21 allows relief to be granted to protect "the interests of the creditors", seemingly as an alternative to it being granted to protect the assets of the debtor.

62.     Further, there was no real examination of the possible application of article 22 in this case. Article 22(1) provides that the court must be satisfied, when granting or denying relief under article 21, that the interests of the creditors and other interested persons must be adequately protected. It may be that it could be said that Fibria would be "adequately" protected if it were able to enjoy the benefit of the contract in all other respects even though it was prevented from taking advantage (pursuant to clause 28.1) of the insolvency of the Company to free itself of a contract which was onerous from its point of view.

*Article 21(1)(a) of the CBIR*

63.     Although the administrator relied on article 21(1)(a) as an alternative to his argument based on the words "any appropriate relief" in article 21(1), it is more logical for me first to consider the specific relief which is referred to in article 21(1)(a).

64.     Article 21(1)(a) allows the recognising court to grant a stay on "the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities". The administrator contended that the service by Fibria of a notice to terminate under clause 28.1 would be within this wording in article 21(1)(a). Article 21(1)(a) allows the court to grant such a stay "to the extent that they have not been stayed under paragraph (1)(a) of article 20". The administrator accepted that the service of such a notice had not already been stayed under article 20(1)(a). Article 20(1)(a) also refers to the "commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities". However, article 20(2) provides that the stay which is automatically imposed by article 20(1)(a) is to be "the same in scope and effect" as if the debtor (in the case of a company) had been the subject of a winding up order under the Insolvency Act 1986. It is agreed that the scope and extent of a stay, in the

case of a company ordered to be wound up, is to be found in section 130(2) of the Insolvency Act 1986. Section 130(2) provides that "no action or proceeding shall be proceeded with or commenced against the company or its property" except with the leave of the court. Accordingly, in order for the administrator in the present case to rely on article 21(1)(a), he has to accept that he cannot rely on article 20(1)(a) and that must be because the scope of article 20(1)(a) is not wider than the scope of section 130(2) of the 1986 Act and, further, that the service of a notice to terminate under clause 28.1 of the contract does not involve an "action or proceeding [being] proceeded with or commenced against the company or its property" within the meaning of section 130(2) of the 1986 Act. Thus, the administrator is in effect submitting that although the service of a notice to terminate pursuant to clause 28.1 of the contract is not "an action or proceeding" within the meaning of section 130(2) of the 1986 Act, it is "an individual action" or "an individual proceeding" within article 21(1)(a) of the Model Law.

65.   I can accept the words "action" and "proceeding" in article 21 need not have the same meaning as those words in section 130(2) of the 1986 Act. I therefore need to look at the Model Law and any matters which assist me in construing it, together with any authorities which might be relevant.

66.   The first thing to note is that article 21(1)(b) refers to "execution against the debtor's assets"; this suggests that the draftsman of the Model Law considered that some forms of execution against the debtor's assets would not involve the commencement or continuation or individual actions or individual proceedings. Further, article 21(1)(g) allows the court to grant any relief of the kind provided under paragraph 43 of schedule B1 to the Insolvency Act 1986. Paragraph 43 of schedule B1 creates a moratorium in relation to different kinds of legal process. In particular, paragraph 43(6) provides that there may be no legal process instituted or continued against the company or the property of the company except with the consent of the administrator or the permission of court. Article 21(1)(g) refers to relief under paragraph 43 of schedule B1 as being "additional relief", that is, additional to the relief specified in sub-paragraphs (a) to (f) of article 21(1). However, these textual points on their own do not offer much guidance as to the scope of article 21(1)(a).

67.   I have considered the Guide to Enactment which deals with the relevant wording in articles 20 and 21 at paragraphs 145, 146 and 155. Paragraph 145 indicates that the reference to "an action" will cover "actions before an arbitral tribunal". Paragraph 146 suggests that the word "proceedings" can extend to "enforcement measures initiated by creditors outside the court system". The Guide to Enactment does not further describe the measures it had in mind save to say that, in some states, creditors were allowed to take such "measures".

68.   The provision formerly contained in section 11 of the Insolvency Act 1986, imposing a moratorium in the case of an administration of a company, referred in section 11(3)(c) to "steps" to enforce a security or to repossess goods and in section 11(3)(d) to "no other proceedings and no execution or other legal process" being "commenced or continued". These provisions were construed by the Court of Appeal in Bristol Airport plc v Powdrill [1990] Ch 744 and by Millett J in Re Olympia & York Canary Wharf Ltd [1993] BCC 154. In the second of these cases, it was held that a notice given by a party to a contract in order to make time of the essence of the other party's

contractual obligation and a notice accepting a repudiatory breach as terminating the contract were not "proceedings" or "other legal process" within section 11(3)(d).

69.    In Bristol Airport plc v Powdrill, Sir Nicolas Browne-Wilkinson V-C said at page 765:

> "... the natural meaning of the words 'no other proceedings ... may be commenced or continued' is that the proceedings in question are either legal proceedings or quasi-legal proceedings such as arbitration ... the reference to the 'commencement' and 'continuation' of proceedings indicates that what Parliament had in mind was legal proceedings. The use of the word 'proceedings' in the plural together with the words 'commence' and 'continue' are far more appropriate to legal proceedings (which are normally so described) than to the doing of some act of a more general nature."

70.    In Re Olympia & York Canary Wharf Ltd, Millett J said at page 157-158:

> "It is not necessary in this case to consider where the line is to be drawn between the commencement or continuation of "proceedings" on the one hand or of "legal process" on the other. But in my judgment both concepts are well known. Together they embrace all steps in legal proceedings from the issue of initiating process, to their final termination in the process of execution or other means of enforcement of a judgment such as the appointment of a receiver by way of equitable execution or the making of a charging order or other steps for the enforcement of the court's judgment without execution. But the phrase is not apt to describe the taking of non-judicial steps such as the service of a contractual notice in order to crystallise the liability of the party on whom the notice is served.
>
> In my judgment, support for that conclusion can be derived from the use of the words "commenced or continued" in sec. 11(3)(d) of the 1986 Act. If the service of a contractual notice is part of a legal process, I am unable to understand what legal process it is supposed to commence or continue. The words "commence or continue" indicate a process which has an independent existence of its own apart from the step by which it is commenced or continued; a process which either continues after or was in existence before the taking of the relevant step.
>
> Further support for my conclusion, if it were needed, may be derived from a consideration of the legislative purpose for which sec. 10 and sec. 11 were enacted. They are intended to impose a moratorium upon the creditors of the company in order to assist the administrator in his attempts to achieve the statutory purpose for which he was appointed. They are couched in procedural terms and are designed to prevent

creditors from depriving the administrator of the possession of property which may be required by him for the purpose of the administration."

71.    Both these cases construed the particular provisions of section 11(3)(d) having regard to the other language used in section 11 and the purpose of that section. The language of article 21 is certainly not the same as the language of section 11. These two decisions of the English courts cannot therefore be determinative of the meaning of article 21 (1)(a). Nonetheless, the discussion in those cases, and particularly in the second case, is helpful in elucidating the general concepts normally involved in the words "actions or proceedings", particularly when coupled with the words "commencement or continuation".

72.    Mr Phillips did not refer me to any English authority which assisted his argument as to the meaning of article 21(1)(a). However, he referred to Canadian decisions as to section 11(4) of the Companies' Creditors Arrangement Act ("the CCAA"), a Canadian statute. Part IV of the CCAA implemented in Canada, with modifications, the Model Law but section 11(4) is not in Part IV. Accordingly, the Canadian decisions dealing with section 11(4) do not directly deal with the meaning of article 21 of the Model Law. The position in Canada, pursuant to section 11(4) of the CCAA, became relevant in the English case of AWB Geneva SA v North America Steamships Ltd, Canada [2007] 1 CLC 749 (Field J) and [2007] 2 Lloyd's Rep 315 (Court of Appeal). In AWB, the Claimants had entered into contracts with a Canadian company which had then entered a process of insolvency governed by the CCAA. The Claimants contended that the Canadian company had committed certain events of default and, pursuant to the express terms of the contract, the Claimants were not obliged to perform certain obligations otherwise imposed on them by the contracts. The office holder in the Canadian insolvency applied to the Canadian court under section 11(4) of the CCAA for an order preventing the Claimants relying on the events of default as producing the result, in accordance with the contractual provisions, that the Claimants did not have to perform the contracts.

73.    Section 11(4) of the CCAA gave the court power, in particular, to restrain "proceedings taken or that might be taken in respect of the company" and "the commencement of or proceeding with any other action, suit or proceeding against the company". In AWB, Field J heard expert evidence as to Canadian law and he summarised the matter in this way at [11] – [14]:

> "11 … in broad terms, the CCAA provides a regime that corresponds to the combined effect of the provisions of UK insolvency law relating to administrations (Schedule B1 of the Insolvency Act 1986 ["the 1986 Act"]) and compromises or schemes of arrangement (Part 1 of the 1986 Act providing for company voluntary arrangements, and section 425 of the Companies Act 1985 ["the 1985 Act"]).
>
> 12 Section 11(4) of the CCAA empowers the Court to make an order staying "proceedings" taken or that might be taken in respect of the company. "Proceedings" has been construed to include extra-judicial conduct that could impair the ability of the debtor company to continue in business. In Norcen Energy

Resources Ltd v Oakwood Petroleums Ltd (1988) 72 CBR (NS) 1, the Court restrained a joint venture party of a debtor company from relying on the insolvency of the debtor company to replace it as the operator under a petroleum operating agreement. In Re T Eaton Co (1997) 46 CBR (3d) 293, the Court restrained tenants in shopping centres from terminating leases on the basis of co-tenancy clauses requiring the debtor company's store to stay open. And in Re Playdium Enterprises Corp (2001) 31 CBR (4th) 302, the Court restrained a party from relying on its contractual right to object to an assignment.

13 In Re Doman Industries (2003) 41 CBR (4th) 29 Tysoe J explained the purpose of such stays in these terms:

> "In my view, there are numerous purposes of stays under s.11 of the CCAA. One of the purposes is to maintain the status quo among creditors while a debtor company endeavours to reorganise or restructure its financial affairs. Another purpose is to prevent creditors and other parties from acting on the insolvency of the debtor company or other contractual breaches caused by the insolvency to terminate contracts or accelerate the repayment of the indebtedness owing by the debtor company when it would interfere with the ability of the debtor company to reorganise or restructure its financial affairs. … [A] further purpose is to prevent the frustration of the reorganisation or restructuring plan after its implementation on the basis of events of default or breaches which existed prior to or during the restructuring period."

14 It is clear from the evidence of the Trustee's expert on Canadian insolvency law, the Hon James M Farley QC, a former Justice of the Superior Court of Ontario, that stays are commonly granted under section 11 (4) of the CCAA to restrain counterparties to contracts with the debtor company from relying on any pre-CCAA plan breaches of those contracts committed by the debtor company that would allow those counterparties to exercise remedies against the debtor company. Mr Farley gives examples of such orders in his report. In two of these the order provided that no person who is a party to any contract or lease to which the debtor company is a party may accelerate, terminate, rescind, refuse to perform or otherwise repudiate its obligations thereunder by reason of any defaults or events of default arising out of the insolvency of the applicant."

74.    Mr Phillips provided me with copies of Norcen Energy Resources Ltd v Oakwood Petroleums Ltd (1988) 72 CBR (NS) 1, Re T Eaton Co (1997) 46 CBR (3d) 293, Re Playdium Enterprises Corp (2001) 31 CBR (4th) 302 and Re Doman Industries (2003) 41 CBR (4th) 29. So far as I could see, the judges in those cases did not discuss the meaning of the word "proceedings", much less did they attempt to define it.

Accordingly, I find that any persuasive force which these decisions might otherwise have had is greatly diminished.

75.     Having considered the material relied upon by the parties, I conclude that I am considerably assisted by the discussion in Bristol Airport plc v Powdrill [1990] Ch 744 and Re Olympia & York Canary Wharf Ltd [1993] BCC 154 as to the ordinary and well understood meaning of a phrase such as "the commencement or continuation of individual actions or individual proceedings" (the wording used in article 21(1)(a)). Applying that meaning, I consider that the service of a notice to terminate under clause 28.1 of the contract is not the commencement or continuation of an individual action or proceeding within article 21(1)(a). Accordingly, I reject the argument for the administrator that the court has power under article 21(1)(a) to restrain Fibria from serving a termination notice under clause 28.1.

76.     It was not said that the service of a termination notice under clause 28.1 came within any other sub-paragraph of article 21(1). In particular, it was not said that the claimed jurisdiction was conferred by article 21(1)(g) which refers to additional relief (including relief under paragraph 43 of schedule B1 to the Insolvency Act 1986) that might be available to a British insolvency office holder under the law of Great Britain.

*Appropriate relief*

77.     The principal way in which the administrator put his case in relation to article 21 was to contend that the Companies Court had jurisdiction to make an order restraining Fibria from relying on clause 28.1 pursuant to the court's power to grant "any appropriate relief". It was submitted that the words "any appropriate relief" were not defined and that the words should be given their ordinary meaning. For the order sought to come within those words, the order must be such that it could properly be described as the grant of "relief". If it could be so described, then the court had to decide whether that relief was "appropriate". It was said that these words deliberately gave the court very wide powers to do what it thought fit. If the court thought it was appropriate to order relief which would be available to the administrator in the Korean court applying Korean insolvency law, then the English court could grant that relief. In so doing, the English court was not applying Korean law. Article 21 of CBIR was part of English law and it was English law which was being applied when the English court granted the same sort of relief as would be available in the Korean court under Korean insolvency law.

78.     It was submitted that the phrase "any appropriate relief" was not cut down by the heads of relief specified in paragraphs (a) to (g) of article 21(1) because article 21(1) stated that any appropriate relief "included" those heads of relief; this showed that "any appropriate relief" was wider than the specified heads and that the specified heads were not intended to be an exhaustive statement of what could be ordered by way of appropriate relief.

79.     The administrator is right that the words "appropriate relief", taken on their own, are wide words. Although the argument in the present case focussed on the appropriateness of the English court granting the sort of relief which a Korean court would grant, applying Korean insolvency law, it is only right to acknowledge that if the administrator is right in his approach to article 21, then the English court has power to grant any relief which it thinks fit, whether that relief would be available

under the law of the state of the foreign proceedings or under English law or, indeed, under some other system of law. On this basis, the English court would have power to reflect the fact that Fibria is a Brazilian company and to apply Brazilian law, if the English court thought that relief under Brazilian law was appropriate. Indeed, the English court could express approval for the insolvency laws which apply in some entirely different jurisdiction and persuade itself that it was appropriate that such laws should be applied in the case before it. Further, if the court has power to do what it thinks is appropriate, it may not be necessary to find that the relief which is sought is relief which is available under any current system of law anywhere. If there were a pending proposal, for example from the Law Commission, to reform English insolvency law, then on the administrator's approach, the English court would have power to anticipate that reform and to hold that granting relief in accordance with the proposed reform would be "appropriate". Whilst some of these examples are more fanciful than others, they do indicate that the administrator's submissions result in the English court having the widest possible power to do whatever it thinks fit, whether its order is in accordance with the law of the foreign insolvency proceedings or not.

80.    The administrator's argument that the scope of "any appropriate relief" is not cut down by the terms of sub-paragraphs (a) to (g) which are matters "included" in the appropriate relief but not exhaustive of the appropriate relief does reflect the ordinary meaning of the language of article 21. Nonetheless, I consider it somewhat surprising that sub-paragraph (g) is expressed in the way in which it is if it had really been intended that the phrase "any appropriate relief" permitted the recognising court to grant relief which it would not be able to grant in an insolvency conducted in accordance with the laws of the recognising court. A power for the recognising court to grant relief in that way would be a very significant power. It is odd to think that such a power was intended without there being any specific reference to the recognising court's ability to apply the law of a foreign state, or even to do something which no system of law anywhere would allow. This is particularly so in view of the terms of sub-paragraph (g) which deliberately limit relief under that sub-paragraph to relief which would be available to a British insolvency office holder under the law of Great Britain.

81.    Having made these comments on the possible literal readings of article 21, I ought not to construe article 21 without regard to the other matters which I am able to consider when determining its meaning. In that regard, regulation 2 of the CBIR provides that, for the purpose of ascertaining the meaning and effect of the CBIR, the court may consider certain documents, in particular, the UNCITRAL Model Law, the documents of the working group relating to the preparation of the Model Law and the Guide to Enactment of the Model Law.

82.    As regards the documents of the working group relating to the preparation of the Model Law, I was asked by Mr Phillips to consider the note dated 26 September 1995 which was prepared in advance of a meeting of the working group in October and November 1995. Paragraph 6 of this note stated that it was intended to set out possible solutions that might be adopted in relation to various problems. Paragraphs 42 to 54 of the note are material as background to the present issue. In relation to setting out the effects of recognition of a foreign proceeding, one approach was to provide a detailed and exhaustive list of all the consequences which would follow from recognition: see paragraph 42. A second possible approach was to specify that the

effect of recognition would be determined by the application of the law of one of the two countries involved. Here there could be two variants. Variant 1 would involve, essentially, the application of the law of the state in which the foreign proceedings were opened. Variant 2 would involve, essentially, the application of the law of the recognising state. The note identified earlier legislative examples of one or other of these variants being adopted. It was suggested that variant 1 could be justified from a dogmatic point of view whereas variant 2 would be more easily applied in practice. An alternative would be for the two systems of law to be applied in combination: see paragraph 52. It was then stated at paragraph 53 that the choice of law could be left to the recognising state and section 426(5) of the Insolvency Act 1986 was given as an example of this possibility. Finally, at paragraph 54, it was stated that the effects of recognition could be left to judicial discretion and reference was made to section 304 of the United States Bankruptcy Code where the court was empowered to order "other appropriate relief".

83.    Having met in October and November 1995, the working group reported on 1 December 1995. The possible legislative approaches to the effects of recognition were discussed at paragraphs 46 to 59. The arguments for and against the application of the law of the recognising state or the application of the law of the state in which the foreign proceedings were opened were described, as was a possible approach leaving it to the recognising court to choose between the two systems of law. The report appeared to favour a list of automatic consequences of recognition followed by a power for a judge to specify additional effects of recognition involving factors which would be familiar to judges in different legal systems: see paragraphs 56 and 59. At paragraph 134, the report set out a draft provision dealing with the effects of recognition. By paragraph (1)(e) of that draft, a foreign representative was able to ask the recognising court to grant "other appropriate relief" under the law of the state in which the foreign proceeding was opened (unless forbidden by local law); this draft was subject to a possible further qualification which referred to the law of the jurisdiction in which a limited proceeding has been commenced. This part of the draft was then discussed at paragraphs 154 to 166. The discussion identified competing arguments as to the law which should be available to the recognising court. Paragraph 165 referred to the law of the foreign proceeding but subject to limitations based on the law of the recognising state. However, paragraph 165 ended by saying that the matter needed to be returned to later.

84.    Although Mr Phillips took me to these reports of the working group, no one at the hearing referred to two further reports of the working group which were dated 24 October 1996 and 19 February 1997. I find that these two later reports are more helpful as regards the final adopted version of the Model Law. The report of 24 October 1996 referred to a draft article (then numbered article 12) which identified the relief which could be granted by the recognising court. Article 12(2)(b) permitted the recognising court to grant "any appropriate relief including" certain specified heads of relief. Article 12(2)(b)(v) referred to "other relief which may be available under the laws of the State of the foreign proceeding or under the laws of the enacting State …". This draft provision was discussed at paragraph 133 of the report where it was stated that the provision referring to relief under the laws of the State of the foreign proceeding was widely thought to be unrealistic and so that the reference to foreign law should be deleted, although the wording might be retained as an option which the enacting state might choose to implement.

85.    The report dated 19 February 1997 referred to a draft article (then numbered article 17) which came very close to the final adopted form of the Model Law. The earlier reference to the relief which was available under the laws of the State of the foreign proceeding had been removed so that the relevant provision referred only to relief available under the laws of the recognising State. At paragraphs 51 and 52 of the report, there was discussion as to whether the draft article 17 should be amended by the addition of words such as "under the conditions of the law of this State" at appropriate places. This suggestion was objected to on the ground that it was implicit by virtue of the discretionary nature of the relief available under article 17 that the court would have regard to its own law. The report also stated that the court should not be prevented from granting relief if that was found to be useful and fair. At paragraph 57, commenting on the provision which became article 21(1)(g), the report stated that the working group accepted the proposal to restrict the relief to that available to the insolvency administrator in the enacting state.

86.    The Model Law was adopted by the United Nations General Assembly on 15 December 1997. Article 21 of the Model Law, as adopted, referred to "any appropriate relief, including" and sub-paragraph (g) of article 21(1) referred to:

> "(g)      Granting any additional relief that may be available to [the office holder] under the laws of this State."

87.    My reaction to the discussions of the working group is that it seems improbable that the working group, having deleted (from what is now article 21(1)(g) ) a power for the recognising court to apply the law of the foreign proceeding, intended to bring back in such a power under the general wording which refers to "any appropriate relief".

88.    I was referred to two versions of the Guide to Enactment, one published in 1999 and the other in 2014. It was submitted that the 1999 version was the one referred to in regulation 2 of CBIR. I will refer to that version but, in any event, the following passages from the 1999 Guide are essentially repeated in the 2014 Guide. Paragraphs 20(b) and 154 of the 1999 Guide state:

> "20.      With its scope limited to some procedural aspects of cross-border insolvency cases, the Model Law is intended to operate as an integral part of the existing insolvency law in the enacting State. This is manifested in several ways.…
>
> (b)      The Model Law presents to enacting States the possibility of aligning the relief resulting from recognition of a foreign proceeding with the relief available in a comparable proceeding in national law.…
>
> 154.      Post recognition relief under article 21 is discretionary, as is pre-recognition relief under article 19. The types of relief listed in article 21, paragraph 1, are typical or most frequent in insolvency proceedings; however, the list is not exhaustive and the court is not restricted unnecessarily in its ability to grant any type of relief that is available under the law of the enacting state and needed in the circumstances of the case."

Re: Pan Ocean Co Ltd

89.    Turning to more general matters, I note that what can be called the common law of recognition proceeds on the basis that the recognising court applies its own law and not the law of the state in which the foreign proceedings were opened: see <u>Cambridge Corporation v Unsecured Creditors</u> [2007] AC 508 at [22]. This is to be contrasted with the position under section 426(5) of the Insolvency Act 1986 and Article 4 of the EC Regulation on Insolvency Proceedings 2000. In those two cases, the applicable law is clearly defined so that it is not restricted to (in the case of section 426(5)) or is not (in the case of Article 4) the law of the state which is asked to grant relief. The working group referred to section 426(5) and an earlier draft of the EC Regulation but did not adopt language which is comparable to those legislative precedents.

90.    The scope of article 21 of the CBIR was one of the issues raised in <u>Rubin v Eurofinance SA</u> [2013] 1 AC 236. In that case it was suggested that a judgment of a New York court should be recognised in England pursuant to article 21. I note that counsel who submitted that the judgment could be recognised under article 21 said that under the CBIR the court could grant "appropriate relief including any type of relief which is available under the law of the enacting state". At [28], Lord Collins referred to paragraph 20(b) of the Guide to Enactment and stated that enacting states could make available "the type of relief that would be available in the case of a domestic insolvency". Lord Collins dealt further with the CBIR at [133] – [144] and he said at [141] – [143]:

"141    The respondents say that (a) the power under article 21 is to grant any type of relief that is available under the law of the relevant state, and that the fact that recognition and enforcement of foreign judgments is not specifically mentioned in article 21 as one of the forms of relief available, does not mean that such relief cannot be granted; (b) the recognition and enforcement of the judgments of a foreign court is the paradigm means of co-operation with that court; and (c) the examples of co-operation in article 27 are merely examples and are not exhaustive.

142    But the CBIR (and the Model Law) say nothing about the enforcement of foreign judgments against third parties. As Lord Mance pointed out in argument, recognition and enforcement are fundamental in international cases. Recognition and enforcement of judgments in civil and commercial matters (but not in insolvency matters) have been the subject of intense international negotiations at the Hague Conference on Private International Law, which ultimately failed because of inability to agree on recognised international bases of jurisdiction.

143    It would be surprising if the Model Law was intended to deal with judgments in insolvency matters by implication. Articles 21, 25 and 27 are concerned with procedural matters. No doubt they should be given a purposive interpretation and should be widely construed in the light of the objects of the Model Law, but there is nothing to suggest that they apply to

the recognition and enforcement of foreign judgments against
third parties."

91.    Re Atlas Bulk Shipping A/S [2012] Bus LR 1124 is an interesting example of the
Companies Court granting relief under article 21(1)(g) but no issue arose in that case
of the court granting a type of relief which was not available in the case of a domestic
insolvency: see at 1131G.

92.    The text books appear to favour a limitation on the relief which might be granted
under article 21 to relief which would be available under domestic law in relation to a
domestic insolvency: see Fletcher on Insolvency in Private International Law, 2nd ed.
at para. 8.38 and Sheldon on Cross Border Insolvency, 3rd ed. at paras. 3.91 – 3.100.

93.    Mr Phillips cited a number of decisions of courts in the United States and Canada. Mr
Collings did not make submissions to me in relation to those cases but I obviously
need to consider them. Before doing so, I will refer to the relevant statutory provisions
in the United States and in Canada.

94.    Before the Model Law was implemented in the United States, cases in that
jurisdiction which were ancillary to foreign insolvency proceedings were dealt with
under section 304 of the former Bankruptcy Code. Under section 304(b)(3) the court
was able to order "other appropriate relief" and section 304(c) set out matters which
should guide the court when asked to make an order under section 304(b). The Model
Law was implemented in the United States by Chapter 15 of Title 11 of the
Bankruptcy Code. Sections 1519, 1520 and 1521 are similar to articles 19, 20 and 21
of the CBIR. The Model Law was implemented in Canada by Part IV (sections 44 –
61) of the CCAA. Section 48 of the CCAA gives the court power to make certain
orders on recognition of a foreign proceeding. Further, by section 49(1), the court may
make any order "that it considers appropriate" including certain specified orders.

95.    In Re Atlas Shipping A/S 404 BR 726 (Bankr SD NY, 2009) the New York court held
that many of the principles underlying section 304 of the former Bankruptcy Code
remained in effect in relation to Chapter 15. It was said that the jurisdiction to grant
"appropriate relief" was "exceedingly broad".

96.    In Gandi Innovations Holdings LLC (Bankr WD Texas, 2009) the Texas court
recognised a foreign proceeding in Canada. The Canadian court had made an order
under the CCAA prohibiting the termination of executory contracts without the leave
of the court. The Texas court acting under section 1521 of the Bankruptcy Code made
its own order to the same extent as the Canadian order.

97.    Re Condor Insurance Co Ltd 601 F 3d 319 (Fifth Circuit 2010) is a decision of the
United States Court of Appeals. The case concerned a Nevis insurance company
which was the subject of a winding up order in Nevis. The United States court
recognised the Nevis proceedings as foreign main proceedings. The case raised the
question whether there was power under section 1521 of the Bankruptcy Code to
apply foreign law (Nevis Law) for the purpose of avoiding fraudulent transfers. The
alternative of opening proceedings in the United States under chapter 7 of the
Bankruptcy Code was not available because the company was a foreign insurance
company. Under chapter 7, the United States court would have had extensive powers
to avoid fraudulent transfers. The court held that it had the power to apply Nevis law

because it could grant "appropriate relief" under section 1521. The discussion in the case is complicated by a number of provisions in section 1507 and 1521 as to the bringing of avoidance claims in the United States courts but it is not necessary to refer to those matters for present purposes. The court referred to the deliberations of the UNCITRAL working group, as follows:

> "UNCITRAL's Working Group on Insolvency Law examined three potential approaches to the question of which law a recognizing court should apply. The first approach would allow the recognizing court to apply its own law. This was favored by some countries concerned with the potential lack of familiarity with foreign law by recognizing courts. The second approach would apply the law of the main proceeding. This approach was favored by some as it "would lead to a more consistent, harmonized result, in view of divergences among national insolvency laws" and would help "avoid abetting debtors seeking to conceal assets behind another law that might provide a haven for those assets." A third approach was to permit the recognizing court to apply either the law of the main proceeding or its own law—a solution which might "provide flexibility needed to limit insulation of assets from insolvency proceedings." However this approach drew concern that it might raise the potential that a foreign representative "would be enabled to exercise more powers than those that would be available to the representative under the law of the appointing jurisdiction." "

98.    In the quoted passage, the United States court referred to the working group report dated 1 December 1995. The court did not specifically refer to the reports dated 24 October 1996 and 19 February 1997. The court then continued:

> "The final provision did not accept any of these three approaches in full. Rather, the Model Law permitted the recognizing court to grant any appropriate relief and granted standing to the foreign representatives to bring avoidance actions under the law of the recognizing state. This purposefully left open the question of which law the court should apply--in deference to the choice of law concerns expressed by the United States."

99.    The United States court then explained that the application of foreign avoidance law in a chapter 15 ancillary proceeding raised fewer choice of law concerns as the court was not required to create a separate bankruptcy estate. The court also stated that its decision was supported by earlier decisions as to the scope of section 304 of the former Bankruptcy Code and cited Re Metzler 78 BR 674 (Bankr SDNY 1987). The court added that Congress had intended that the case law in relation to section 304 should apply unless contradicted by chapter 15.

100.    In Re Hartford Computer Hardware Inc (2012) 94 CBR (5th) 20, the Canadian court recognised United States chapter 11 proceedings. Under section 49 of the CCAA, the Canadian court was asked to recognise and make effective in Canada an order made

in the United States court. It was pointed out that one part of the United States order could not be made by a Canadian court in relation to a Canadian insolvency under its domestic insolvency provisions: see section 11(2) of the CCAA. The Canadian court held that under section 49 of the CCAA it could make any order which it considered appropriate and it concluded that the order requested was indeed appropriate. It also held that the provisions of the CCAA which gave effect to the public policy restrictions in article 6 of the Model Law should be construed restrictively and that the order sought did not raise any public policy issues.

101.   Re Sino-Forest Corporation 501 BR 655 (58 Bankr Ct Dec 226 2013) concerned section 1507, rather than section 1521 of the United States Bankruptcy Code: see footnote 3 to the judgment. Section 1507 allows the United States court to provide "additional assistance" to a foreign representative. The court was asked to recognise an order made by the Canadian court in a Canadian insolvency proceeding. It was held, following, Re Metcalfe & Mansfield Alt. Invs 421 BR 685, that the United States court should apply its ordinary principles as to enforcement of foreign judgments and comity pursuant to chapter 15 and it did not need to ask itself whether it could or would have made the same order if the insolvency had been proceeding before a United States court under its own chapter 11.

102.   I was also shown a number of decisions of the American and Canadian courts where the recognising court granted relief which was available under the domestic law of the recognising state in a case of a domestic insolvency. These decisions are not of any assistance as to the present debate about the scope of "appropriate relief" in article 21.

103.   Mr Phillips argued that article 6 of CBIR demonstrated that the reference to "appropriate relief" must include relief that was not available under English law. It was submitted that relief which was available under English law could not be "manifestly contrary to the public policy of Great Britain or any part of it". It was then submitted that if the court held that appropriate relief under article 21(1)(a) was confined to relief which was available under English law, then article 6 could never apply and would be otiose. Therefore to prevent article 6 being otiose, the court should hold that "appropriate relief" could include relief only available under foreign law and in such a case the court could ask itself whether it would be "manifestly contrary to the public policy of Great Britain or any part of it" to give effect to foreign law.

104.   This argument as to the significance of article 6 ignores the fact that article 6 is not restricted to dealing with cases which might involve the grant of "appropriate relief" within article 21(1). Article 6 deals with all of the provisions of the CBIR, which include many specific provisions. It may therefore be the case that an application is made to the court to take action under such a specific provision, where the court may have to consider whether the action in question would be contrary to public policy in English law. The operation of article 6 in this way is illustrated by Re Jurgen Toft 453 BR 186 (2011), a decision of a New York Bankruptcy Court. In that case, Dr Toft was the subject of insolvency proceedings in Germany. The German court made an order permitting the administrator in the insolvency to intercept Dr Toft's postal and electronic mail. The English court granted recognition and enforcement of that order. The administrator applied in the United States for a similar order relying on the express power to order the delivery of information contained in section 1521(a)(4) of the Bankruptcy Code. The New York held that the order sought was contrary to

United States public policy within section 1506 of the Bankruptcy Code (which implemented article 6 of the Model Law).

*Conclusion on "any appropriate relief"*

105.    The non-exhaustive words "any appropriate relief" are capable of being given a wide literal meaning. However, the very width of their literal meaning, which is illustrated in paragraph 79 above, makes me somewhat cautious about construing the words literally. Those considerations suggest to me that it was not intended that the words should be given such a wide literal meaning.

106.    The decision in <u>Re Condor Insurance Co Ltd</u> appears to support an interpretation of those words which would allow the recognising court to give effect to an order of the court of the foreign proceedings even if the recognising court could not itself have made such an order in its own domestic proceedings. I recognise that article 8 of the CBIR directs the Companies Court to have regard to the need to promote uniformity in the application of the Model Law. However, I have concerns about applying the decision in <u>Re Condor Insurance Co Ltd</u> to article 21 of the CBIR for two separate reasons. The first is that, with respect to the judges in that case, I do not think that their description of the various reports of the working group on the Model Law was accurate. Secondly, their reasoning relied on the position which pertained under section 304 of the former US Bankruptcy Code before the implementation of the Model Law. I can see that if the position under section 304 of the former Code was that the US court could grant "any appropriate relief" and that it had been established that those words allowed the US court to apply the law of the foreign proceedings, then the same words should have the same effect in section 1521 of the Bankruptcy Code, which implemented the Model Law. However, there is no comparable legislative history in Great Britain and it is open to me to conclude that the United States have implemented the Model Law in a way which is not identical to the way in which it has been implemented in Great Britain.

107.    I am directed by reg. 2 of the CBIR to consider the documents relating to the working group on the Model Law. On my reading of the reports of the working group, it was not intended that "any appropriate relief" would allow the recognising court to go beyond the relief it would grant in relation to a domestic insolvency. I do not think that there is sufficient in the discussion in those reports which would allow me to conclude (as the court concluded in <u>Re Condor Insurance Co Ltd</u>) that the words "any appropriate relief" were intended to replicate the position under section 304 of the former US Bankruptcy Code. I also note that whenever the legal position under article 21 has been described in an English case or in a textbook on the CBIR, the discussion proceeds on the basis that "any appropriate relief" allows the court to grant the same sort of relief as it would grant in relation to a domestic insolvency.

108.    Accordingly, I am not persuaded that that the words "any appropriate relief" allow me to grant relief which would not be available to the court when dealing with a domestic insolvency.

109.    I have also considered whether I would be prepared to grant to the administrator the relief which he seeks in this case, even if I held that I had power to do so pursuant to the words "any appropriate relief" in article 21. I have concluded that I would not have been prepared to do so.

Re: Pan Ocean Co Ltd

110.    The contract in this case was made between a Korean company and a Brazilian
        company. The parties chose the law which was to govern their contract. They chose
        English law rather than Korean or Brazilian law. Under English law, in the events
        which have happened, if the Security Agent does not elect to transfer or novate the
        contract, then the contract can be brought to an end, either by an election to that effect
        on the part of the Security Agent, or by a termination notice given by Fibria. If the
        contract is brought to an end, under English law, then Fibria is not committed to the
        contract for the remainder of the 25 year term. If the Company claims freight from
        Fibria, then Fibria will not be obliged to pay. Conversely, if Fibria is restrained from
        terminating the contract, then it will be committed to the contract for the remainder of
        the 25 year term and will be obliged to pay freight for that period.

111.    Rubin v Eurofinance SA supports the view that the relief available under article 21 is
        of a procedural nature and that the article should be given a wide interpretation in
        relation to matters of procedure. There is considerable scope for argument as to
        whether the relief sought in a particular case is of a procedural or of a substantive
        nature. I will not attempt to define which matters are procedural and which are
        substantive. However, having explained the difference between Fibria being entitled
        to terminate the contract and not being so entitled, it seems to me that this difference
        goes well beyond matters of procedure and affects the substance of the parties' rights
        and obligations under the contract.

112.    In some cases, it can be argued that anyone who does business with a foreign
        company which might thereafter enter a process of insolvency, governed by the
        insolvency law of its country of registration, should expect that the insolvency will be
        governed by that law. Indeed, statements to that effect have been made in In re Atlas
        Shipping S/A [2012] Bus LR 1124 at [26] and AWB Geneva SA v North America
        Steamships Ltd, Canada [2007] 1 CLC 749 at [31]. However, in the present case, the
        parties had deliberately chosen English law as the law of the contract. Whereas the
        parties might have expected that a Korean court would apply Korean insolvency law
        to the insolvency of the Company, they might have been very surprised to find that an
        English court would apply Korean insolvency law to the substantive rights of the
        parties under a contract which they had agreed should be governed by English law.

113.    Different jurisdictions adopt different approaches to *ipso facto* clauses. I have referred
        earlier to the position in the United States, Canada and Korea. As it happens, the
        position in English law has been recently reviewed by the Supreme Court in Belmont
        Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd. The Supreme Court
        took full account of the policy considerations behind the choice which is to be made
        as to the enforceability of such provisions. If Korean law is as the administrator
        contends, then Korea views these policy questions differently from this jurisdiction. If
        I have a free hand, as the administrator contends, to do what I consider to be
        appropriate in this case, I am not tempted to prefer the policy choice which is made in
        Korean law over the policy choice recently reaffirmed by the Supreme Court in
        relation to English law. In this case, I consider that it is appropriate for the Companies
        Court to apply English law and to give effect to the parties' choice of English law.

114.    Even if the decision in Re Condor Insurance Co Ltd were a persuasive authority in
        this jurisdiction, it is readily distinguishable from the present case. In that case, the
        US court had extensive powers to set aside avoidance transactions in a domestic
        insolvency. The issue for the court was much more to do with matters of procedure

than of substance. The present case is more to do with matters of substance than of procedure. Further, in that case, the US court was applying its established principles of comity to the order of the foreign court. There is no comparable order of the Korean court in this case.

*The effect of my conclusion on the applications*

115.    I do not have power under article 21(1)(a) to order a "stay" in relation to Fibria's entitlement to serve a termination notice under clause 28.1 of the contract. I do not have power under article 21(1) to make an order restraining Fibria from serving such a notice; if I had such power, I would not exercise it as I would hold such an order was not "appropriate relief". In any case, if it is said that I should do what a Korean court would do in this case, then I am not persuaded that a Korean court would make an order restraining the service of a termination notice. On my understanding of the expert evidence, what the Korean court would do would be to hold that a termination notice, if served, would be ineffective to determine the contract. Thus, it is not necessary or appropriate to make an order restraining Fibria from serving a termination notice.

116.    I have reached the above decisions on the assumptions as to Korean law contended for by the administrator. On those assumptions, I am not prepared to grant the relief sought by the administrator under article 21. Accordingly, I do not need to know the answer to the questions of Korean law that arise and I will not therefore send a request to the Korean court to give me the answers to such questions.

117.    As to Fibria's application for permission to commence an arbitration, I raised at the hearing the question whether it was necessary for there to be an arbitration between Fibria and the Company as to the enforceability of clause 28.1 in English law. I understood at the hearing there was no issue about that. It may be any question as to the enforceability of clause 28.1 in English law would also affect the various assignees of the benefit of the contract. Those persons are not parties to the present proceedings but, in any event, as they are not the subject of the Korean insolvency, and are not the subject of Warren J's order of 25 June 2013, Fibria does not need permission to bring any relevant proceedings to determine such an issue (if there is one) between Fibria and those persons.

118.    I will hear counsel as to the appropriate orders to make to give effect to this judgment.

## APPENDIX

1. The Cross-Border Insolvency Regulations 2006 were made pursuant to section 14 of the Insolvency Act 2000 and came into force on 4 April 2006.

2. By reg. 1(2), "the UNCITRAL Model Law" is defined to mean the Model Law on cross-border insolvency as adopted by the United Nations Commission on International Trade Law on 30 May 1997.

3. Reg. 2 provides for the UNCITRAL Model Law to have the force of law in the following way:

    "2. (1) The UNCITRAL Model Law shall have the force of law in Great Britain in the form set out in Schedule 1 to these Regulations (which contains the UNCITRAL Model Law with certain modifications to adapt it for application in Great Britain).

    (2) Without prejudice to any practice of the courts as to the matters which may be considered apart from this paragraph, the following documents may be considered in ascertaining the meaning or effect of any provision of the UNCITRAL Model Law as set out in Schedule 1 to these Regulations—

    (a) the UNCITRAL Model Law;

    (b) any documents of the United Nations Commission on International Trade Law and its working group relating to the preparation of the UNCITRAL Model Law; and

    (c) the Guide to Enactment of the UNCITRAL Model Law (UNCITRAL document A/CN.9/442) prepared at the request of the United Nations Commission on International Trade Law made in May 1997."

4. Reg. 3 provides:

    "3. (1) British insolvency law (as defined in article 2 of the UNCITRAL Model Law as set out in Schedule 1 to these Regulations) and Part 3 of the Insolvency Act 1986 shall apply with such modifications as the context requires for the purpose of giving effect to the provisions of these Regulations.

    (2) In the case of any conflict between any provision of British insolvency law or of Part 3 of the Insolvency Act 1986 and the provisions of these Regulations, the latter shall prevail. "

5. The form of the Model Law whichias given effect is set out in Schedule 1 to the Regulations.

6.  By article 1(1) it is provided that the Model Law applies where assistance is sought in Great Britain by a foreign court or a foreign representative in connection with a foreign proceeding.

7.  Article 2 contains relevant definitions, which include the following:

    "For the purposes of this Law—

    (a) "British insolvency law" means—

    (i) in relation to England and Wales, provision extending to England and Wales and made by or under the Insolvency Act 1986 (with the exception of Part 3 of that Act) or by or under that Act as extended or applied by or under any other enactment (excluding these Regulations); …

    …

    (g) "foreign main proceeding" means a foreign proceeding taking place in the State where the debtor has the centre of its main interests;

    (h) "foreign non-main proceeding" means a foreign proceeding, other than a foreign main proceeding, taking place in a State where the debtor has an establishment within the meaning of sub-paragraph (e) of this article;

    (i) "foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation or liquidation;

    (j) "foreign representative" means a person or body, including one appointed on an interim basis, authorised in a foreign proceeding to administer the reorganisation or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding;

    …

    (q) references to the law of Great Britain include a reference to the law of either part of Great Britain (including its rules of private international law)."

8.  Articles 6, 7 and 8 provide:

    "Article 6. Public policy exception

Nothing in this Law prevents the court from refusing to take an action governed by this Law if the action would be manifestly contrary to the public policy of Great Britain or any part of it.

Article 7. Additional assistance under other laws

Nothing in this Law limits the power of a court or a British insolvency officeholder to provide additional assistance to a foreign representative under other laws of Great Britain.

Article 8. Interpretation

In the interpretation of this Law, regard is to be had to its international origin and to the need to promote uniformity in its application and the observance of good faith. "

9.  Chapter II (articles 9 to 14) provides for foreign representatives and creditors to have access to courts in Great Britain.

10.  Chapter III (articles 15 to 24) provides for recognition of a foreign proceeding and relief. Articles 19 to 23 are in the following terms:

"Article 19. Relief that may be granted upon application for recognition of a foreign proceeding

1.  From the time of filing an application for recognition until the application is decided upon, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including—

(a) staying execution against the debtor's assets;

(b) entrusting the administration or realisation of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy; and

(c) any relief mentioned in paragraph 1 (c), (d) or (g) of article 21.

2.  Unless extended under paragraph 1(f) of article 21, the relief granted under this article terminates when the application for recognition is decided upon.

3.  The court may refuse to grant relief under this article if such relief would interfere with the administration of a foreign main proceeding.

Article 20. Effects of recognition of a foreign main proceeding

1.  Upon recognition of a foreign proceeding that is a foreign main proceeding, subject to paragraph 2 of this article—

(a) commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities is stayed;

(b) execution against the debtor's assets is stayed; and

(c) the right to transfer, encumber or otherwise dispose of any assets of the debtor is suspended.

2.  The stay and suspension referred to in paragraph 1 of this article shall be—

(a) the same in scope and effect as if the debtor, in the case of an individual, had been adjudged bankrupt under the Insolvency Act 1986 or had his estate sequestrated under the Bankruptcy (Scotland) Act 1985, or, in the case of a debtor other than an individual, had been made the subject of a winding-up order under the Insolvency Act 1986; and

(b) subject to the same powers of the court and the same prohibitions, limitations, exceptions and conditions as would apply under the law of Great Britain in such a case,

and the provisions of paragraph 1 of this article shall be interpreted accordingly.

3.  Without prejudice to paragraph 2 of this article, the stay and suspension referred to in paragraph 1 of this article, in particular, does not affect any right—

(a) to take any steps to enforce security over the debtor's property;

(b) to take any steps to repossess goods in the debtor's possession under a hire-purchase agreement;

(c) exercisable under or by virtue of or in connection with the provisions referred to in article 1(4); or

(d) of a creditor to set off its claim against a claim of the debtor,

being a right which would have been exercisable if the debtor, in the case of an individual, had been adjudged bankrupt under the Insolvency Act 1986 or had his estate sequestrated under the Bankruptcy (Scotland) Act 1985, or, in the case of a debtor other than an individual, had been made the subject of a winding-up order under the Insolvency Act 1986.

4. Paragraph 1(a) of this article does not affect the right to—

(a) commence individual actions or proceedings to the extent necessary to preserve a claim against the debtor; or

(b) commence or continue any criminal proceedings or any action or proceedings by a person or body having regulatory, supervisory or investigative functions of a public nature, being an action or proceedings brought in the exercise of those functions.

5. Paragraph 1 of this article does not affect the right to request or otherwise initiate the commencement of a proceeding under British insolvency law or the right to file claims in such a proceeding.

6. In addition to and without prejudice to any powers of the court under or by virtue of paragraph 2 of this article, the court may, on the application of the foreign representative or a person affected by the stay and suspension referred to in paragraph 1 of this article, or of its own motion, modify or terminate such stay and suspension or any part of it, either altogether or for a limited time, on such terms and conditions as the court thinks fit.

Article 21. Relief that may be granted upon recognition of a foreign proceeding

1. Upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—

(a) staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities, to the extent they have not been stayed under paragraph 1(a) of article 20;

(b) staying execution against the debtor's assets to the extent it has not been stayed under paragraph 1(b) of article 20;

(c) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under paragraph 1(c) of article 20;

(d) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(e) entrusting the administration or realisation of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court;

(f) extending relief granted under paragraph 1 of article 19; and

(g) granting any additional relief that may be available to a British insolvency officeholder under the law of Great Britain, including any relief provided under paragraph 43 of Schedule B1 to the Insolvency Act 1986.

2. Upon recognition of a foreign proceeding, whether main or non-main, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court, provided that the court is satisfied that the interests of creditors in Great Britain are adequately protected.

3. In granting relief under this article to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under the law of Great Britain, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

4. No stay under paragraph 1(a) of this article shall affect the right to commence or continue any criminal proceedings or any action or proceedings by a person or body having regulatory, supervisory or investigative functions of a public nature, being an action or proceedings brought in the exercise of those functions.

Article 22. Protection of creditors and other interested persons

1. In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph 3 of this article or paragraph 6 of article 20, the court must be satisfied that the interests of the creditors (including any secured creditors or parties to hire-purchase agreements) and other interested persons, including if appropriate the debtor, are adequately protected.

2. The court may subject relief granted under article 19 or 21 to conditions it considers appropriate, including the provision by the foreign representative of security or caution for the proper performance of his functions.

3. The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or of its own motion, modify or terminate such relief.

Article 23. Actions to avoid acts detrimental to creditors

1. Subject to paragraphs 6 and 9 of this article, upon recognition of a foreign proceeding, the foreign representative has standing to make an application to the court for an order under or in connection with sections 238, 239, 242, 243, 244, 245, 339, 340, 342A, 343, and 423 of the Insolvency Act 1986 and sections 34, 35, 36, 36A and 61 of the Bankruptcy (Scotland) Act 1985.

2. Where the foreign representative makes such an application ("an article 23 application"), the sections referred to in paragraph 1 of this article and sections 240, 241, 341, 342, 342B to 342F, 424 and 425 of the Insolvency Act 1986 and sections 36B and 36C of the Bankruptcy (Scotland) Act 1985 shall apply—

(a) whether or not the debtor, in the case of an individual, has been adjudged bankrupt or had his estate sequestrated, or, in the case of a debtor other than an individual, is being wound up or is in administration, under British insolvency law; and

(b) with the modifications set out in paragraph 3 of this article.

3. The modifications referred to in paragraph 2 of this article are as follows—

(a) for the purposes of sections 241(2A)(a) and 342(2A)(a) of the Insolvency Act 1986, a person has notice of the relevant proceedings if he has notice of the opening of the relevant foreign proceeding;

(b) for the purposes of sections 240(1) and 245(3) of that Act, the onset of insolvency shall be the date of the opening of the relevant foreign proceeding;

(c) the periods referred to in sections 244(2), 341(1)(a) to (c) and 343(2) of that Act shall be periods ending with the date of the opening of the relevant foreign proceeding;

(d) for the purposes of sections 242(3)(a), (3)(b) and 243(1) of that Act, the date on which the winding up of the company commences or it enters administration shall be the date of the opening of the relevant foreign proceeding; and

(e) for the purposes of sections 34(3)(a), (3)(b), 35(1)(c), 36(1)(a) and (1)(b) and 61(2) of the Bankruptcy (Scotland) Act 1985, the date of sequestration or granting of the trust deed shall be the date of the opening of the relevant foreign proceeding.

4.  For the purposes of paragraph 3 of this article, the date of the opening of the foreign proceeding shall be determined in accordance with the law of the State in which the foreign proceeding is taking place, including any rule of law by virtue of which the foreign proceeding is deemed to have opened at an earlier time.

5.  When the foreign proceeding is a foreign non-main proceeding, the court must be satisfied that the article 23 application relates to assets that, under the law of Great Britain, should be administered in the foreign non-main proceeding.

6.  At any time when a proceeding under British insolvency law is taking place regarding the debtor—

(a)  the foreign representative shall not make an article 23 application except with the permission of—

(i)  in the case of a proceeding under British insolvency law taking place in England and Wales, the High Court; or

(ii)  in the case of a proceeding under British insolvency law taking place in Scotland, the Court of Session; and

(b)  references to "the court" in paragraphs 1, 5 and 7 of this article are references to the court in which that proceeding is taking place.

7.  On making an order on an article 23 application, the court may give such directions regarding the distribution of any proceeds of the claim by the foreign representative, as it thinks fit to ensure that the interests of creditors in Great Britain are adequately protected.

8.  Nothing in this article affects the right of a British insolvency officeholder to make an application under or in connection with any of the provisions referred to in paragraph 1 of this article.

9.  Nothing in paragraph 1 of this article shall apply in respect of any preference given, floating charge created, alienation, assignment or relevant contributions (within the meaning of section 342A(5) of the Insolvency Act 1986) made or other transaction entered into before the date on which this Law comes into force. "

11. Chapter IV (articles 25 to 27) provides for cooperation with foreign courts and foreign representatives. Article 25 provided:

"Article 25. Cooperation and direct communication between a court of Great Britain and foreign courts or foreign representatives

1. In matters referred to in paragraph 1 of article 1, the court may cooperate to the maximum extent possible with foreign courts or foreign representatives, either directly or through a British insolvency officeholder.

2. The court is entitled to communicate directly with, or to request information or assistance directly from, foreign courts or foreign representatives."

12. Article 27 provides:

"Article 27. Forms of cooperation

Cooperation referred to in articles 25 and 26 may be implemented by any appropriate means, including—

(a) appointment of a person to act at the direction of the court;

(b) communication of information by any means considered appropriate by the court;

(c) coordination of the administration and supervision of the debtor's assets and affairs;

(d) approval or implementation by courts of agreements concerning the coordination of proceedings;

(e) coordination of concurrent proceedings regarding the same debtor."

TAB 58

*Re Paramount Airways Ltd* [1993] Ch 223, English Court of Appeal

A      us in deciding the questions with which we have been concerned on this
       appeal. Equally, however, we have not had to consider whether our
       decision would have been different if all the provisions of the Act of
       1992 had already come into force.

       RUSSELL L.J.    I agree.

B      FARQUHARSON L.J.    I also agree.

                                              *Appeal allowed.*
                                              *Declaration accordingly.*
                                              *Order for costs to be agreed.*

C      *Solicitors: Sharpe Pritchard for Director of Legal and Secretarial*
       *Services, Oldham Borough Council; Treasury Solicitor.*

                                                              M. I. H.

D                              —— —— ——

                           [COURT OF APPEAL]

E      *In re* PARAMOUNT AIRWAYS LTD. (IN ADMINISTRATION)

       1992   Feb. 11, 12, 13; 27            Sir Donald Nicholls V.-C., Taylor and
                                                              Farquharson L.JJ.

       *Insolvency—Transaction at undervalue—Service out of jurisdiction—*
           *Director transferring company's money to bank in Jersey—Bank*
F          *having no place of business in England—Company's administrators*
           *seeking order for recovery of money from bank—Whether*
           *jurisdiction to make order against foreign bank—Insolvency Act*
           *1986 (c. 45), s. 238—Insolvency Rules 1986 (S.I. 1986 No. 1925),*
           *r. 12.12*

              The administrators of a company issued an originating
       application against a bank registered in Jersey seeking, inter
G      alia, declarations that the transfer to the bank of considerable
       sums of money belonging to the company by one of its directors
       constituted transactions at an undervalue within the meaning of
       section 238 of the Insolvency Act 1986,[1] and also orders for
       repayment. The bank carried on business in Jersey but not in
       England and Wales. The administrators also commenced
       proceedings by writ against the director and others in respect of
H      those transactions, claiming that the bank was liable to the
       company as constructive trustee for those sums. The registrar
       granted the administrators leave to serve the originating

       [1] Insolvency Act 1986, s. 238(2)(3): see post, p. 233D–E.

**In re Paramount Airways Ltd. (C.A.)**                              **[1993]**

application on the bank in Jersey pursuant to rule 12.12 of the    A
Insolvency Rules 1986.[2] Mervyn Davies J. granted the bank's
application to set aside the registrar's order, holding that section
238 of the Act of 1986 did not have extraterritorial effect so as
to include a foreigner resident abroad, and that "any person" in
the section could not apply to the bank.

On the administrators' appeal:—

*Held*, allowing the appeal, that it was not possible, in
construing the expression "any person" in section 238 of the    B
Insolvency Act 1986, to identify any particular limitation which
could be said to represent the presumed intention of Parliament
in enacting the legislation, and the words had to be given their
literal meaning, unrestricted as to persons or territory; and that
the court, therefore, had jurisdiction under section 238 to make
an order against a foreigner resident abroad; that, having regard
to the unambiguous terminology of rule 12.12(1) of the    C
Insolvency Rules 1986, the jurisdiction deriving from it to order
service out of the jurisdiction was not to be confined, by
analogy, to cases falling within R.S.C., Ord. 11, r. 1(1); and
that, accordingly, the judge's order would be set aside and the
registrar's order restored (post, pp. 239D–E, 241C–E, H–242A, C).

Dicta of Lord Scarman and Lord Wilberforce in *Clark v.
Oceanic Contractors Inc.* [1983] 2 A.C. 130, 145, 152, H.L.(E.)
applied.                                                          D

*Ex parte Blain; In re Sawers* (1879) 12 Ch.D. 522, C.A.
distinguished.

*Per curiam.* By virtue of sections 423(2) and 238 of the Act
of 1986 the court has an overall discretion wide enough to
enable it, if justice so requires, to make no order against the
other party to the transaction. In particular, if a foreign element
is involved the court will need to be satisfied that, in respect of
the relief sought against him, the defendant is sufficiently    E
connected with England for it to be just and proper to make
the order against him despite the foreign element (post,
pp. 239G–240A, 242C).

Decision of Mervyn Davies J. [1992] Ch. 160; [1991]
3 W.L.R. 318; [1991] 4 All E.R. 267 reversed.

The following cases are referred to in the judgment of Sir Donald    F
Nicholls V.-C.:

*Blain, Ex parte; In re Sawers* (1879) 12 Ch.D. 522, C.A.
*Clark v. Oceanic Contractors Inc.* [1983] 2 A.C. 130; [1983] 2 W.L.R. 94;
     [1983] 1 All E.R. 133, H.L.(E.)
*Company (No. 00359 of 1987), In re A* [1988] Ch. 210; [1987] 3 W.L.R.
     339; [1987] 3 All E.R. 137
*Galbraith v. Grimshaw* [1910] A.C. 508, H.L.(E.)                    G
*Jogia (A Bankrupt), In re* [1988] 1 W.L.R. 484; [1988] 2 All E.R. 328
*Ormiston, Ex parte; In re Distin* (1871) 24 L.T. 197
*Rousou's Trustee v. Rousou* [1955] 1 W.L.R. 545; [1955] 2 All E.R. 169;
     [1955] 3 All E.R. 486
*Sill v. Worswick* (1791) 1 H.Bl. 665
*Tucker (A Bankrupt), In re* [1988] 1 W.L.R. 497; [1988] 1 All E.R. 603
*Tucker (R. C.) (A Bankrupt), In re, Ex parte Tucker (K. R.)* [1990] Ch.    H
     148; [1988] 2 W.L.R. 748; [1988] 1 All E.R. 603, C.A.
*Vocalion (Foreign) Ltd., In re* [1932] 2 Ch. 196

---

[2] Insolvency Rules 1986, r. 12.12: see post, p. 241A–C.

Ch.                              In re Paramount Airways Ltd. (C.A.)

A    The following additional cases were cited in argument:

Anglo-African Steamship Co., In re (1886) 32 Ch.D. 348, C.A.
Attock Cement Co. Ltd. v. Romanian Bank for Foreign Trade [1989]
    1 W.L.R. 1147; [1989] 1 All E.R. 1189, C.A.
Bishopsgate Investment Management Ltd. v. Maxwell [1993] Ch. 1; [1992]
    2 W.L.R. 991; [1992] 2 All E.R. 856, C.A.
Clark v. Oceanic Contractors Inc. [1981] 1 W.L.R. 59
B    Cooke v. Charles A. Vogeler Co. [1901] A.C. 102, H.L.(E.)
Mackinnon v. Donaldson, Lufkin and Jenrette Securities Corporation [1986]
    Ch. 482; [1986] 2 W.L.R. 453; [1986] 1 All E.R. 653
Seagull Manufacturing Co. Ltd., In re [1992] Ch. 128; [1991] 3 W.L.R. 307;
    [1991] 4 All E.R. 257
Shilena Hosiery Co. Ltd., In re [1980] Ch. 219; [1979] 3 W.L.R. 332; [1979]
    2 All E.R. 6
C    Spiliada Maritime Corporation v. Cansulex Ltd. [1987] A.C. 460; [1986]
    3 W.L.R. 972; [1986] 3 All E.R. 843, H.L.(E.)
Theophile v. Solicitor-General [1950] A.C. 186; [1950] 1 All E.R. 405,
    H.L.(E.)
Tracomin S.A. v. Sudan Oil Seeds Co. Ltd. (Nos. 1 and 2) [1983] 1 W.L.R.
    1026; [1983] 3 All E.R. 137, C.A.

D    The following cases, although not cited, were referred to in the skeleton
arguments:

Air-India v. Wiggins [1980] 1 W.L.R. 815; [1980] 2 All E.R. 593, H.L.(E.)
Ashtiani v. Kashi [1987] Q.B. 888; [1986] 3 W.L.R. 647; [1986] 2 All E.R.
    970, C.A.
Attorney-General for Alberta v. Huggard Assets Ltd. [1953] A.C. 420; [1953]
E    2 W.L.R. 768; [1953] 2 All E.R. 951, P.C.
Babanaft International Co. S.A. v. Bassatne [1990] Ch. 13; [1989] 2 W.L.R.
    232; [1989] 1 All E.R. 433, C.A.
Banque des Marchands de Moscou (Koupetschesky) v. Kindersley [1951] Ch.
    112; [1952] 1 All E.R. 1269, C.A.
Compania Merabello San Nicholas S.A., In re [1973] Ch. 75; [1972]
    3 W.L.R. 471; [1972] 3 All E.R. 448
F    Derby & Co. Ltd. v. Weldon (No. 6) [1990] 1 W.L.R. 1139; [1990] 3 All
    E.R. 263, C.A.
Draper (C. E. B.) & Son Ltd. v. Edward Turner & Son Ltd. [1965] 1 Q.B.
    424; [1964] 3 W.L.R. 783; [1964] 3 All E.R. 148, C.A.
Dulles' Settlement, In re [1951] Ch. 265; [1950] 2 All E.R. 1013, C.A.
English, Scottish and Australian Chartered Bank, In re [1893] 3 Ch. 385,
    C.A.
G    Farrell v. Alexander [1977] A.C. 59; [1976] 3 W.L.R. 145; [1976] 2 All E.R.
    721, H.L.(E.)
Gold Star Publications Ltd. v. Commissioner of Police of the Metropolis
    [1981] 1 W.L.R. 732; [1981] 2 All E.R. 257, H.L.(E.)
Haiti (Republic of) v. Duvalier [1990] 1 Q.B. 202; [1989] 2 W.L.R. 261;
    [1989] 1 All E.R. 456, C.A.
Holmes v. Bangladesh Biman Corporation [1989] A.C. 1112; [1989] 2 W.L.R.
H    481; [1989] 1 All E.R. 852, H.L.(E.)
Macleod v. Attorney-General for New South Wales [1891] A.C. 455, P.C.
Reg. v. West Yorkshire Coroner, Ex parte Smith [1983] Q.B. 335; [1982]
    3 W.L.R. 920; [1982] 3 All E.R. 1098, C.A.
Whitney v. Inland Revenue Commissioners [1926] A.C. 37, H.L.(E.)

APPEAL from Mervyn Davies J.

On 29 November 1990 the joint administrators of Paramount Airways Ltd., Roger Arthur Powdrill and Joseph Beaumont Atkinson, issued an originating application against the respondent, Hambros Bank (Jersey) Ltd., seeking, inter alia, (1) a declaration that the payment of £346,800 made on or about 31 July 1989 into the account of Anser General Investments S.A. held with the bank, effectively reducing the indebtedness of Anser General Investments S.A. to the bank, constituted a transaction at an undervalue within section 238 of the Insolvency Act 1986; (2) an order that the bank pay to the administrators the sum of £346,800; (3) a declaration that the payment of £1,300,000 made on or about 4 July 1989 into the account of Anser General Investments S.A. with the bank, effectively reducing the indebtedness of Anser General Investments S.A. to the bank, constituted a transaction at an undervalue within section 238 of the Act of 1986; and (4) an order that the bank pay to the administrators the sum of £1,300,000.

On 30 November 1990 Mr. Registrar Buckley made an order granting the administrators liberty to serve the originating application by post upon the bank at 13, Broad Street, St. Helier, Channel Islands. On 19 June 1991 Mervyn Davies J. set aside the registrar's order on the ground that section 238 of the Act of 1986 did not have extraterritorial effect so as to apply to a foreign bank incorporated and resident abroad having no place of business in the United Kingdom, with the consequence that the court had no jurisdiction to make an order under the section against the bank.

By a notice of appeal dated 22 July 1991 the administrators appealed on the grounds, inter alia, that (1) the judge had erred in law in holding that the court had no jurisdiction to make any order under section 238 of the Act of 1986 against the bank; (2) the judge should have held that the words "any person" in section 238 meant (in the case of a company) any company, whether or not registered in England and Wales, or having a place of business in England and Wales, or carrying on business in England and Wales at the time of the transaction complained of; alternatively, that those words (in the case of a company) meant any company with a sufficient connection with England and Wales: and that, on the facts of the case, there was a sufficient connection; and in either case the court accordingly had jurisdiction to entertain the originating application against the bank, and to grant leave under rule 12.12 of the Insolvency Rules 1986 to serve the bank in Jersey; and (3) in construing section 238 of the Act of 1986 the judge had erred in failing (i) to hold that the bank, even though a Jersey company, was within the class of persons with respect to whom Parliament was to be presumed to be legislating in section 238; (ii) to give sufficient weight to the mischief which the section was intended to remedy, and/or to the disastrous practical consequences for all insolvencies with any international element if the operation of the section were limited to those within England and Wales at the time of the transaction complained of; (iii) to give sufficient weight to the legislative context of the section and related sections; and (iv) to give sufficient weight to the fact that the transactions dealt with by the sections necessarily had a connection with England and Wales in

A    that they involved a disposition of the property of a person or company
the subject of insolvency proceedings before the courts of England and
Wales.

By a respondent's notice the bank notified its intention of contending
that the judge's decision should be affirmed on the additional ground
that he should in any event have exercised his discretion under rule
12.12 and set aside the registrar's order on the ground that it was not a
B    proper case for service of the originating application out of the
jurisdiction; and in particular because (i) the bank had at all relevant
times no presence in, and/or sufficient connection with, England and
Wales; and/or (ii) the judge should have applied and/or had regard to
the provisions of R.S.C., Ord. 11 and, had he done so, should have
concluded that the claims raised did not fall within the ambit of the
C    order and that leave to serve out should thus be refused.

The facts are stated in the judgment of Sir Donald Nicholls V.-C.

*Nicholas Merriman Q.C.* and *Richard Salter* for the administrators.
On its true construction section 238 of the Insolvency Act 1986 gives the
court jurisdiction to make orders against "any person" provided that the
criteria laid down in sections 238 and 241 are satisfied. The "territorial
D    principle" in *Ex parte Blain; In re Sawers* (1879) 12 Ch.D. 522 is not an
invariable rule of law but a rebuttable presumption used to construe
statutes expressed in general terms: see *Clark v. Oceanic Contractors
Inc.* [1983] 2 A.C. 130, 145, 152. The court should treat the presumption
simply as one of the factors to be taken into account.

The wording, structure, subject matter, scheme and legislative history
E    of the Act show that Parliament intended that the provisions of the Act
should apply to offshore companies as well as persons in England and
Wales. Difficulties of enforcement can be dealt with on a practical basis:
either the administrator will not bring proceedings or leave to serve out
can be refused under rule 12.12 of the Insolvency Rules 1986. Moreover,
comity does not require an implied territorial limitation. Decisions on
F    predecessor provisions have been concerned with the construction of the
rules governing leave to serve proceedings out of the jurisdiction, not
with any implied territorial limitation: see *Rousou's Trustee v. Rousou*
[1955] 1 W.L.R. 545; [1955] 3 All E.R. 486.

There has been a shift in the law's attitude to assertion of jurisdiction
over foreigners: see *Tracomin S.A. v. Sudan Oil Seeds Co. Ltd. (Nos.
G    1 and 2)* [1983] 1 W.L.R. 1026 and *In re Vocalion (Foreign) Ltd.* [1932]
2 Ch. 196. The *Ex parte Blain* presumption is weak where the English
courts are already seised of the primary subject matter and the conduct
which Parliament is regulating has an English connection and effects
within England. Since section 238 contains an express definition of the
classes of person to whom it applies, no additional limitations on those
classes should be implied. *In re Tucker (R.C.) (A Bankrupt), Ex parte
H    Tucker (K.R.)* [1990] Ch. 148 is distinguishable since it was concerned
with the special case of the power to summon witnesses on a private
examination in bankruptcy. [Reference was also made to *In re Seagull
Manufacturing Co. Ltd.* [1992] Ch. 128.]

In re Paramount Airways Ltd. (C.A.)                    **[1993]**

Prior to 1962 there was no statutory power, corresponding to R.S.C.,    A
Ord. 11, authorising the Bankruptcy Court to assert extraterritorial
jurisdiction against persons other than the debtor. This deficiency was
remedied by the Bankruptcy (Amendment) Rules 1962 (S.I. 1962 No.
295 (L. 3)): see *In re Jogia (A Bankrupt)* [1988] 1 W.L.R. 484. Rule
12.12 of the Insolvency Rules 1986 expressly dissociated jurisdiction to
grant leave for service out of the jurisdiction in insolvency proceedings
from Order 11: see *In re Tucker (A Bankrupt)* [1988] 1 W.L.R. 497. It    B
is improbable that Parliament intended by the Act of 1986 to reduce the
court's jurisdiction and, in particular, to restrict the remedies available
to the trustee in bankruptcy formerly conferred by section 42 of the
Bankruptcy Act 1914 and section 172 of the Law of Property Act 1925.
[Reference was made to *Bishopsgate Investment Management Ltd. v.
Maxwell* [1993] Ch. 1.]                                                   C

The Act of 1986 contains no limitation on those companies which
may be made the subject of the primary jurisdiction similar to the
conditions which have to be satisfied in respect of a debtor before a
bankruptcy petition can be presented. Under Part V of the Act the
court has jurisdiction to wind up "any unregistered company," which
includes overseas companies: see section 220. The courts have developed    D
a flexible test for assuming this jurisdiction: see *In re A Company (No.
00359 of 1987)* [1988] Ch. 210. Although there are no limitations on the
phrase "any person" the courts should, when deciding whether to make
an order, take into account (a) the closeness of connection between the
transaction in question and this country and (b) the likelihood of benefit
accruing to the creditors.

It is necessary, in order to obtain leave under rule 12.12 of the Rules    E
of 1986, to satisfy the court that the case is a proper one for leave to be
granted in the exercise of the court's discretion. [Reference was made to
*Spiliada Maritime Corporation v. Cansulex Ltd.* [1987] A.C. 460.]

*Nigel Davis* for the bank. Section 238 should be construed in
conformity with the principle in *Ex parte Blain; In re Sawers*, 12 Ch.D.
522, 526, that English legislation, unless the contrary is expressly enacted    F
or plainly to be implied, is presumed to be applicable only to British
subjects or to foreigners abroad who have come to this country and
made themselves subject to the jurisdiction: see *In re Tucker (R.C.)
(A Bankrupt), Ex parte Tucker (K.R.)* [1990] Ch. 148. [Reference was
made to *Cooke v. Charles A. Vogeler Co.* [1901] A.C. 102.] The making
of an order under the section against a foreigner depends on establishing
his presence in the jurisdiction at the time of the transaction. The    G
*Ex parte Blain* principle is not merely a factor to be taken into
consideration but involves an initial presumption that Parliament does
not intend to legislate extraterritorially: see *Clark v. Oceanic Contractors
Inc.* [1983] 2 A.C. 130. [Reference was made to *Mackinnon v.
Donaldson, Lufkin and Jenrette Securities Corporation* [1986] Ch. 482.]
Thus the administrators have to establish that the section by express    H
words or necessary implication has extraterritorial effect. Section 426 of
the Act of 1986 illustrates the limited jurisdictional approach contemplated
by Parliament.

Ch.                    *In re Paramount Airways Ltd. (C.A.)*

A       *Rousou's Trustee v. Rousou* [1955] 1 W.L.R. 545 does not support
the administrators' case. It would be surprising if the Act of 1986 were
to extend to money received in a foreign country. On the administrators'
argument an innocent foreign recipient of property transferred abroad
under a transaction valid under local law could fall within the section.
That would be repugnant to international law. [Reference was made to
*Cheshire & North's Private International Law*, 11th ed. (1987), p. 911;
B       *Dicey & Morris, The Conflict of Laws*, 11th ed. (1987), vol. 2, pp. 1110–
1112; *Sill v. Worswick* (1791) 1 H.Bl. 665; *Galbraith v. Grimshaw* [1910]
A.C. 508 and *In re Vocalion (Foreign) Ltd.* [1932] 2 Ch. 196.] The
*Ex parte Blain* principle is neither outdated (see *Clark v. Oceanic
Contractors Inc.* [1983] 2 A.C. 130) nor superseded: see *In re Seagull
Manufacturing Co. Ltd.* [1992] Ch. 128 and *Theophile v. Solicitor-
C       General* [1950] A.C. 186.
        Section 238 is not aimed primarily at wrongdoing, but at the fair
distribution of assets among creditors. Even if it is aimed at wrongdoing,
it does not follow that it should be construed liberally. In any event,
some limitation should be implied by analogy with R.S.C., Ord. 11. It is
unlikely that Parliament intended to enlarge the jurisdiction of the court
by the insolvency rules. As to the exercise of discretion, this was not a
D       proper case for granting leave to serve out of the jurisdiction since the
discretion ought to be exercised by analogy with Order 11 and the
claims do not fall within any of the paragraphs of Ord. 11, r. 1(1).
        *Merriman Q.C.* in reply. *In re Jogia (A Bankrupt)* [1988] 1 W.L.R.
484; *In re Shilena Hosiery Co. Ltd.* [1980] Ch. 219; *In re Tucker
(A Bankrupt)* [1988] 1 W.L.R. 497 and *Rousou's Trustee v. Rousou*
E       [1955] 1 W.L.R. 545 show that sections 42 and 44 of the Bankruptcy
Act 1914, section 172 of the Law of Property Act 1925 and section 320
of the Companies Act 1985 were all treated as applying to foreign
recipients of property. It was against that background that the Act of
1986 was passed. Section 426(4), which empowers English courts to
assist foreign courts exercising insolvency jurisdiction, is plainly based
on the expectation that foreign courts will make extraterritorial orders
F       affecting persons or property within the jurisdiction of the English
courts, and that English courts will act similarly.
        As to the relationship between exercise of discretion and assumption
of jurisdiction, see *Attock Cement Co. Ltd. v. Romanian Bank for
Foreign Trade* [1989] 1 W.L.R. 1147. Where the jurisdiction under
section 238 is unlimited and unfettered the exercise of jurisdiction
extraterritorially must be based on demonstration of a sufficient
G       connection with this country. As to connecting factors, see *Clark v.
Oceanic Contractors Inc.* [1981] 1 W.L.R. 59, 65. As to the need for a
statutory authority to serve out of the jurisdiction, see *In re Anglo-
African Steamship Co.* (1886) 32 Ch.D. 348.

                                                *Cur. adv. vult.*

H
        27 February.   The following judgments were handed down.

        SIR DONALD NICHOLLS V.-C.   All legal systems have to deal with the
situation which arises where a debtor is unable to pay his debts. Under

English law, where the debtor is a corporate body, its assets are sold,    A
the proceeds distributed among its creditors, and then the debtor ceases
to exist, i.e., it is dissolved. The law is more merciful to an individual.
His property is sold and the proceeds distributed among his creditors.
Thereafter, in due course, he is discharged from bankruptcy and is
permitted to resume a normal life, freed from the burden of his past
debts.

This simple scheme has to be buttressed by statutory provisions    B
concerned to prevent abuse by debtors and to achieve a fair distribution
of a debtor's property among his creditors. In some circumstances it
would not be reasonable that a disposition of property made by an
individual before his bankruptcy, or by a company before being wound
up, should be allowed to stand. This may be because of the purpose for
which the disposition was made, or because of the time at which it was    C
made. One instance is where a debtor, anticipating insolvency, seeks to
discharge one of his debts in priority to the others. For example, a
company may pay off its bank overdraft ahead of its other liabilities
because the directors have given personal guarantees to the bank. The
directors are anxious to relieve themselves of their personal liability, so
they decide to use what money is available in repaying the bank and to
leave those who have supplied goods to the company to whistle for their    D
money. Another instance is when an individual, anxious about the
consequences of his insolvency, gives away his property shortly before
he becomes bankrupt. For example, he transfers his share of his house
to his wife. Fairness to his creditors demands that he should not be able
to deplete his assets in this way in a deliberate attempt to put them
beyond the reach of his creditors.                                          E

Successive statutes, principally the Bankruptcy Acts and the
Companies Acts, contained provisions regulating this subject matter.
They were something of a hotchpot. The provisions are to be found now
in the Insolvency Act 1986. They comprise a coherent, modernised and
expanded code. Section 238 enables the court, in prescribed circum-
stances, to make orders restoring the original position where a company
has made gifts or entered into other transactions at an undervalue.    F
Section 239 gives the court a like power in respect of a transaction by a
company which has put a creditor or guarantor into a better position in
the event of the company going into insolvent liquidation than otherwise
would have been the case. Sections 339 and 340 contain similar, although
not identical, provisions where an individual is adjudged bankrupt. The
question raised by this appeal concerns the territorial scope of these    G
provisions and, in particular, of the phrase "any person" in section
238(2). The applicants, who are the administrators of an English
company, Paramount Airways Ltd., claim that the words mean exactly
what they say: any person. Hence the expression is apt to include the
respondent bank, Hambros Bank (Jersey) Ltd. ("Hambros Jersey").
The contrary argument is that Hambros Jersey is outside the ambit of
the section, because the apparent width of the phrase is subject to an    H
implied limitation that the expression applies only to (1) British subjects
and (2) all persons present in England and Wales at the time of the
impugned transaction. Hambros Jersey does not fall within either of

A these heads. Hambros Jersey is part of the Hambros Bank Group, but it is a Jersey company. It carries on business in Jersey, and does not carry on business in England and Wales. Mervyn Davies J. [1992] Ch. 160 upheld this argument and implied a limitation, although in not precisely these terms. He held that section 238 applies to British subjects, companies registered in England, foreigners present in England and, possibly, foreign companies carrying on business in England. The

B administrators have appealed from that decision.

*The facts*

Before turning to the precise terms of the statutory provisions I must set the scene by referring to the facts. For the purposes of this appeal the barest outline is sufficient. Paramount Airways Ltd. ("the company")

C is a company which carries on business as a charter airline. On 7 August 1989 an administration order was made in respect of the company. In the present proceedings the joint administrators are alleging that in July 1989 the company had £1·3m. standing to the credit of its bank account in England. The company is also said to have been the beneficial owner of £346,800 held by solicitors in London. These two sums of money

D were then transferred from England to Jersey by being paid, on the instructions of Mr. Ferriday, a director and chairman of the company, to the credit of a bank account held by Ryco Trust Ltd., a Jersey company, with Hambros Jersey. Ryco is a company administration agent which is said to have managed Anser General Investments S.A., a Panamanian company, on behalf of Mr. Ferriday. Anser is alleged to be owned and controlled by Mr. Ferriday. On the instructions of Ryco the money was

E then transferred to Anser and paid into an account which Anser maintained in Jersey with Hambros Jersey. The payments were in reduction of Anser's overdraft. The administrators are alleging that the company's money was misappropriated and paid away for no benefit to the company. They assert that the payments to Anser were transactions at an undervalue made at a time when the company was unable to pay its debts and within the relevant period of time stipulated in section 240.

F They seek an order that Hambros Jersey restore the money to the company. They are alleging that the benefit Hambros Jersey received from partial repayment of the overdraft was not acquired in good faith and for value and without notice of the relevant circumstances.

Hambros Jersey has denied this claim, but it admits, for the purposes only of this appeal, that (subject to the jurisdiction point) the

G administrators have an arguable case against the bank under section 238. An originating application was issued by the administrators on 23 November 1990, and on 30 November 1990 the registrar gave leave to serve these proceedings out of the jurisdiction. Hambros Jersey applied to set aside that order, and it is against the judge's decision of 14 June 1991 acceding to that application that this appeal was brought.

H The company, acting by the administrators, also commenced actions against Mr. Ferriday and others in England and Jersey in respect of these transactions. The primary claim against Hambros Jersey is that it is liable to the company as constructive trustee for the sums of £1·3m. and £346,800. Hambros Jersey has submitted to the jurisdiction of the

English court in respect of the claims in the English action, and the    A
Jersey action has been stayed. Subject to one argument to which I shall
come, concerning the proper application of the relevant insolvency rule,
Hambros Jersey does not challenge the judge's view that, if the court
has jurisdiction to grant leave to serve these section 238 proceedings on
Hambros Jersey out of the jurisdiction, this was a proper case for the
court to exercise its discretion in favour of granting leave.
                                                                         B

*An aid to construction*

Next I must refer to an established principle of statutory construction
which looms large on this appeal. The principle was stated by James L.J.
in *Ex parte Blain; In re Sawers* (1879) 12 Ch.D. 522, 526, in a much
quoted passage:

> "It appears to me that the whole question is governed by the broad,    C
> general, universal principle that English legislation, unless the
> contrary is expressly enacted or so plainly implied as to make it the
> duty of an English court to give effect to an English statute, is
> applicable only to English subjects or to foreigners who by coming
> into this country, whether for a long or a short time, have made
> themselves during that time subject to English jurisdiction."          D

Brett and Cotton L.JJ. gave judgments to the like effect. That
decision concerned the scope of the expression "the debtor" in the
Bankruptcy Act 1869 (32 & 33 Vict. c. 71). The court held that, despite
its literal width, the expression did not embrace two Chileans resident in
Chile who had never been to England, although they were partners with
persons in England carrying on a business here.                          E
The principle was the subject of authoritative exegesis by the House
of Lords recently in the tax case of *Clark v. Oceanic Contractors Inc.*
[1983] 2 A.C. 130. I need refer only to passages in the speeches of Lord
Scarman and Lord Wilberforce. Commenting on the judgments in *Ex
parte Blain*, 12 Ch.D. 522, Lord Scarman said [1983] 2 A.C. 130, 145:

> "Put into the language of today, the general principle being there    F
> stated is simply that, unless the contrary is expressly enacted or so
> plainly implied that the courts must give effect to it, United
> Kingdom legislation is applicable only to British subjects or to
> foreigners who by coming to the United Kingdom, whether for a
> short or a long time, have made themselves subject to British
> jurisdiction. Two points would seem to be clear: first, that the
> principle is a rule of construction only, and secondly, that it        G
> contemplates mere presence within the jurisdiction as sufficient to
> attract the application of British legislation. Certainly there is no
> general principle that the legislation of the United Kingdom is
> applicable only to British subjects or persons resident here. Merely
> to state such a proposition is to manifest its absurdity. Presence, not
> residence, is the test."                                               H

Lord Wilberforce said, regarding the "territorial principle," at p. 152:

> "That principle, which is really a rule of construction of statutes
> expressed in general terms, and which as James L.J. said a 'broad

A    principle,' requires an inquiry to be made as to the person with respect to whom Parliament is presumed, in the particular case, to be legislating. Who, it is to be asked, is within the legislative grasp, or intendment, of the statute under consideration? The contention being that, as regards companies, the statute cannot have been intended to apply to them if they are non-resident, one asks immediately—why not?"

B    From these observations the task before the court on this appeal can be distilled in this form: the court is concerned to inquire as to the persons with respect to whom Parliament is presumed to have been legislating when using the expression, "any person," and in making that inquiry Parliament is to be taken to have been legislating only for British subjects or foreigners coming to the United Kingdom, unless the contrary is expressed (which it is not here) or is plainly implicit.

C

### The sections

D    In summary form, the provisions of the relevant sections are as follows. Section 238 applies in the case of a company in respect of which an administration order has been made or which has gone into liquidation. "Company" means, in short, a company registered under the Companies Acts: see sections 251 and 735(1) of the Companies Act 1985. Section 238(2) and (3) provides:

> "(2) Where the company has at a relevant time . . . entered into a transaction *with any person* at an undervalue, the [administrator or liquidator] may apply to the court for an order under this section.
> (3) . . . the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction." (My emphasis.)

E

F    In short, a transaction at an undervalue means a gift or a transaction for a consideration which is significantly less in value than the consideration provided by the company: subsection (4). An order is not to be made under the section if the company entered into the transaction in good faith and for the purpose of carrying on its business and at the time there were reasonable grounds for believing the transaction would benefit the company: subsection (5).

    Section 239, concerned with preferences, applies in the same circumstances as section 238. Subsections (2) and (3) provide:

G

> "(2) Where the company has at a relevant time . . . given a preference *to any person*, the [administrator or liquidator] may apply to the court for an order under this section. (3) . . . the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not given that preference." (My emphasis.)

H    Giving a "preference" means doing anything which has the effect of putting one of the company's creditors, or a guarantor for any of the company's debts, into a better position in the event of the company going into liquidation than otherwise would have been the case:

subsection (4). An order is not to be made under the section unless, in    A
deciding to give the preference, the company was influenced by a desire
to produce that effect: subsection (5). Where a preference is given to a
person "connected with the company," the court is to presume that the
company was so influenced unless the contrary is shown: subsection (6).

Sections 240 and 241 contain ancillary provisions. Section 240 sets
out an elaborate definition of the expression "relevant time." For
present purposes it is sufficient to note that the expression embraces the    B
period of two years prior to the onset of insolvency in the case of
transactions at an undervalue and of preferences given to a person
connected with the company, provided that at the time of the transaction
the company was unable to pay its debts or it became unable to pay its
debts by reason of the transaction. In the case of other preferences the
period is six months. Section 241 lists some of the types of orders the    C
court may make under section 238 or section 239. The court may
require any property transferred as part of the transaction to be vested
in the company, release any security given by the company, require
"any person" to make payments to the administrator or liquidator in
respect of benefits received by him from the company, provide for a
guarantor whose obligations have been discharged to be under revived
obligations, provide for security to be given for the discharge of    D
obligations imposed by the order and for the priority which such security
shall have, and provide for the extent to which persons may be able to
prove in the winding up. Subsection (2) is in wide terms, enabling the
court to make an order against a person even though he was not a party
to the transaction with the company:

> "(2) An order under section 238 or 239 may affect the property    E
> of, or impose any obligation on, *any person* whether or not he is
> the person with whom the company in question entered into
> the transaction or . . . the person to whom the preference was
> given; . . ." (My emphasis.)

There is a saving in respect of interests which were acquired, for value
and in good faith and without notice of the relevant circumstances, from    F
a person other than the company.

Sections 238 and 239 are matched by comparable provisions, in
sections 339 to 342, regarding individuals who are adjudged bankrupt.
Section 339, concerning transactions at an undervalue, provides:

> "(1) . . . where an individual is adjudged bankrupt and he has at a
> relevant time . . . entered into a transaction *with any person* at an    G
> undervalue, the trustee of the bankrupt's estate may apply to the
> court for an order under this section. (2) The court shall, on such
> an application, make such order as it thinks fit for restoring the
> position to what it would have been if that individual had not
> entered into that transaction." (My emphasis.)

Section 340 makes corresponding provision for an application to the    H
court, and for the court making an order, where an individual has given
a preference "to any person." "Relevant time" is defined in similar
terms to those applicable to companies so far as preferences are

A  concerned, but a more extended period, of five years, is provided for
transactions at an undervalue. The need for insolvency at the relevant
time does not apply to transactions at an undervalue entered into less
than two years before the individual is adjudged bankrupt. Section 342,
regarding the orders which the court may make, is in similar terms to
section 241.

B  Finally, section 423, coupled with sections 424 and 425, makes
provision regarding "transactions defrauding creditors." This section
applies whether or not insolvency proceedings of any kind have been
taken, and it applies however long before the application to the court
the transaction being impugned was entered into. Where the debtor has
been adjudged bankrupt or is a company which is being wound up or in
relation to which an administration order is in force, the application can
C  only be made by the official receiver, the trustee of the bankrupt's
estate, the liquidator or the administrator or, with the leave of the
court, by a victim of the transaction. In other circumstances an
application may be made by a victim of the transaction, viz., a person
who is, or is capable of being, prejudiced by the transaction. Shortly
stated, the section applies to transactions "with another person" entered
into by way of a gift, or in consideration of marriage or for a
D  consideration significantly less in value than the consideration provided
by the debtor: subsection (1). The court has power to make such order
as it thinks fit for restoring the position to what it would have been if
the transaction had not been entered into and also, in this case, for
protecting the interests of persons who are the victims of the transaction:
subsection (2). A prerequisite to making such an order is that the court
E  is satisfied that the transaction was entered into by the debtor for the
purpose either of putting assets beyond the reach of a person who is
making, or may at some time make, a claim against him, or of otherwise
prejudicing the interests of such a person in relation to such a claim:
subsection (3).

*The persons in respect of whom Parliament was legislating*

F  It will have been seen from the above summary that, on its face, the
legislation is of unlimited territorial scope. To be within the sections a
transaction must possess certain features. For instance, it must be at an
undervalue and made at a time when the company was unable to pay its
debts, the company must be in the course of being wound up in England
or subject to an administration order, and so on. If a transaction
G  satisfies these requirements, the section applies, irrespective of the
situation of the property, irrespective of the nationality or residence of
the other party, and irrespective of the law which governs the transaction.
In this respect the sections purport to be of universal application. The
expression "with any person" merely serves to underline this universality.
It is, indeed, this generality which gives rise to the problem.

H  In these circumstances one is predisposed to seek for a limitation
which can fairly be read as implicit in the scheme of the legislation.
Parliament may have been intending to legislate in such all-embracing
terms. Parliament may have intended that the English court could and
should bring before it, and make orders against, a person who has no

connection whatever with England save that he entered into a transaction,    A
maybe abroad and in respect of foreign property and in the utmost good
faith, with a person who is subject to the insolvency jurisdiction of the
English court. Indeed, he might be within the sections and subject to
orders even though he had not entered into a transaction with the
company or debtor at all. Such an intention by Parliament is possible.
But self-evidently in some instances such a jurisdiction, or the exercise
of such a jurisdiction, would be truly extraordinary.    B

The difficulty lies in finding an acceptable implied limitation. Let me
say at once that there are formidable, and in my view insuperable,
objections to a limitation closely modelled on the formula enunciated in
*Ex parte Blain*, 12 Ch.D. 522 as explained by Lord Scarman in *Clark v.
Oceanic Contractors Inc.* [1983] 2 A.C. 130, 145. The implied limitation
for which Hambros Jersey contended is riddled with such serious,    C
glaring anomalies that Parliament cannot be presumed to have intended
to legislate in such terms.

In the first place, to treat presence of the other party within England
and Wales as the factor which determines whether a transaction is
within the ambit of the sections would be to adopt a criterion which
would be capricious in the extreme. A transaction with a foreigner who
is resident here would be outside the embrace of the legislation if he    D
happened to be abroad, or chose to be abroad, at the time the
transaction was effected. Conversely, a foreign national resident abroad
would find that the transaction with him was within the Act if, and only
if, he was physically present in this country at the time of the transaction.
Secondly, this criterion would leave outside the scope of the legislation a
transaction by a debtor with an overseas company wholly controlled by    E
him. Siphoning money abroad in this way is a typical case to which the
new legislation must have been intended to apply. Thirdly, this test
would draw a distinction between the position of British subjects and
others on a matter of substantive law affecting property transactions. It
would be surprising if Parliament had such an intention today. Fourthly,
this test would mean that there was no remedy under the Act in respect
of a transaction with an overseas company, or a foreigner living here but    F
abroad at the crucial moment, even if the subject matter was English
land. Mr. Davis felt constrained to accept that such a case might be
within the purview of the legislation. This concession betrays the
weakness of Hambros Jersey's argument. If a transaction relating to
English land is within the legislation regardless of the identity or
whereabouts of the other party to the transaction, why should not this    G
equally be so with regard to a transaction relating to shares in an
English company? Or United Kingdom Government stocks? Or money
in an English bank account? What this shows is that the physical
absence or presence of the other party at the time of the transaction by
itself bears no necessary relationship to the appropriateness of the
transaction being investigated and made the subject of an order by an
English court. As a sole touchstone it is useless.    H

The oddities do not end there. Hambros Jersey's contention, if
correct, would mean that the jurisdiction of the English court under the
sections would be much more restricted than the circumstances in which

Ch.                    In re Paramount Airways Ltd. (C.A.)                    Sir Donald
Nicholls V.-C.

A    an individual may be adjudged bankrupt or a company may be wound
up by the English court. Under section 265 the English court has
jurisdiction, for example, over a debtor who is a foreign national who
has never lived or been here so long as, at a time within the last three
years, he was a member of a firm which carried on business in this
country. As to companies, under section 221 the court has jurisdiction
to wind up overseas companies, a subject to which I shall return. Given
B    the width of the ambit of these basic provisions, it would be surprising if
Parliament is to be taken to have intended to limit the sections now
under consideration as Hambros Jersey contended. Particularly, perhaps,
since English law provides for the distribution of the assets of the
insolvent among all the creditors worldwide. English law does not erect
a "ring fence" to exclude creditors living abroad.

C        For completeness I mention one further small pointer in the same
direction, if one be needed. It is of a linguistic nature. As already seen,
the sections make special provision for transactions with persons who
are connected with the company or are associates of the debtor. For
example, a company which has given a preference to a person connected
with the company is rebuttably presumed to have been influenced by a
desire to prefer that person. Under the statutory definitions one of the
D    circumstances in which a person is connected with a company is where
the person is a company which is under common control: see sections
249 and 435(6). Section 435(11) provides that for this purpose "company"
includes any body corporate, whether incorporated in England or
elsewhere. These provisions do not sit happily with the implied limitation
for which Hambros Jersey contended.

E        For these reasons Parliament cannot be taken to have been legislating
only for transactions with the two classes of persons within Hambros
Jersey's suggested limitation. So I cast around to see whether there is
some other limitation implicit in the legislation: is there some other class
with respect to whom Parliament is to be presumed to have been
legislating? For example, in *In re Tucker (R. C.) (A Bankrupt), Ex parte
Tucker (K. R.)* [1990] Ch. 148, where the application of the *Ex parte
F    Blain*, 12 Ch.D. 522 principle was urged, this court declined to construe
the words "any person" in section 25 of the Bankruptcy Act 1914 as
embracing British subjects wherever they might be, and held that the
power given to the court by that section to summon persons before it
was even more limited and extended only to persons who were available
to be served in England.

G        In the end I am unable to discern any satisfactory limitation. I am
unable to identify some other class. The case for some limitation is
powerful, but there is no single, simple formula which is compelling,
save for one expressed in wide and loose terms (e.g., that the person, or
the transaction, has a "sufficient connection" with England) that would
hardly be distinguishable from the ambit of the sections being unlimited
territorially and the court being left to display a judicial restraint in the
H    exercise of the jurisdiction. I mention, to dismiss, some examples of
unacceptable simple tests. One possibility might be that the section
applies only to transactions with persons who are available to be served
with process in England and Wales. Such a limitation would have similar

defects to those discussed above. Another possibility is that the    A
transactions are confined to those governed by English law. But the
remedies given by the sections include personal remedies, such as an
order that the recipient of property transfer it back to the company, or
an order that the other party to a transaction pay a sum of money to the
trustee of the bankrupt's estate. It would be odd if a transaction were
outside the section in all circumstances solely because it was governed
by a foreign law even though, for instance, all the parties were in this    B
country at all times. The same objection applies to a third possibility,
namely, that the sections apply only to dealings with property, immovable
or movable, situate in England and Wales at the relevant time.

Authority does not provide any guidance. Surprisingly, the court
seems never to have decided this "territoriality" question in relation to
the predecessor sections in the earlier Acts, such as sections 42 and 44    C
of the Bankruptcy Act 1914, section 320 of the Companies Act 1948 and
section 172 of the Law of Property Act 1925. The questions which arose
turned on the construction of the then rules concerning leave to serve
proceedings out of the jurisdiction: *Rousou's Trustee v. Rousou* [1955] 1
W.L.R. 545 and, later, [1955] 3 All E.R. 486; *In re Jogia (A Bankrupt)*
[1988] 1 W.L.R. 484; and *In re Tucker (A Bankrupt)* [1988] 1 W.L.R.
497. One analogy prayed in aid in the course of argument on the    D
present appeal was the "relation back" doctrine applied in English
insolvency. This still exists in a limited form in relation both to
companies and to individuals, in that where a person is adjudged
bankrupt or a company is wound up by the court, dispositions of
property made by the debtor or the company after a prescribed date,
usually the date of the presentation of the petition for a bankruptcy    E
order or a winding up order, are void unless the court otherwise orders:
sections 127 and 284. There is some authority that, although under
English law the assignment of a bankrupt's property to the trustee in
bankruptcy operates as a worldwide assignment of all his property
wherever situated (sections 283, 306 and 436), the relation back principle
applies only to property situated in England: *Galbraith v. Grimshaw*
[1910] A.C. 508, especially *per* Lord Dunedin, at p. 513.    F

Given that the remedies under consideration in the present case are
primarily of an in personam character, perhaps a closer analogy is to
cases concerned with the circumstances in which English courts have
granted or refused injunctions to restrain creditors, who have not proved
in an English bankruptcy, from taking proceedings abroad or compelling
them to refund property obtained abroad. The decided cases are few    G
and mostly not of recent date. Residence in England was used as the
test in some cases such as *Sill v. Worswick* (1791) 1 H.Bl. 665 and *Ex
parte Ormiston; In re Distin* (1871) 24 L.T. 197. Likewise, in relation to
companies Maugham J. in *In re Vocalion (Foreign) Ltd.* [1932] 2 Ch.
196 held that it would be more conducive to substantial justice to permit
foreign proceedings, brought by a creditor domiciled overseas, to
proceed. In *Dicey & Morris, The Conflict of Laws*, 11th ed. (1987), vol.    H
2, pp. 1110–1111, the test propounded is of residence at the time the
other party received the payment. A different view is espoused in
*Cheshire & North's Private International Law*, 11th ed. (1987), p. 914.

Ch.                    In re Paramount Airways Ltd. (C.A.)                    Sir Donald
                                                                            Nicholls V.-C.

239

A The suggestion made there is that it is only equitable that the jurisdiction cannot be exercised against a creditor unless the same conditions are applicable to him at the time he receives the payment as are applicable to jurisdiction over the debtor. This would be a wider test than residence.

 There are areas of doubt and real difficulty here. There are unresolved conflict of laws problems. There is a crying need for an

B international insolvency convention. As it is, the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters 1968 does not apply to bankruptcy, winding up and analogous proceedings. Section 426(4) of the Act of 1986 envisages co-operation between United Kingdom courts and the insolvency courts of other countries, but the only order made so far is of limited application: see

C the Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986 (S.I. 1986 No. 2123).

 In my view the solution to the question of statutory interpretation raised by this appeal does not lie in retreating to a rigid and indefensible line. Trade takes place increasingly on an international basis. So does fraud. Money is transferred quickly and easily. To meet these changing conditions English courts are more prepared than formerly to grant

D injunctions in suitable cases against non-residents or foreign nationals in respect of overseas activities. As I see it, the considerations set out above and taken as a whole lead irresistibly to the conclusion that, when considering the expression "any person" in the sections, it is impossible to identify any particular limitation which can be said, with any degree of confidence, to represent the presumed intention of Parliament. What

E can be seen is that Parliament cannot have intended an implied limitation along the lines of *Ex parte Blain*, 12 Ch.D. 522. The expression therefore must be left to bear its literal, and natural, meaning: any person.

*The court's discretion: a sufficient connection with England*

F This conclusion is not so unsatisfactory as it might appear at first sight. The matter does not rest there. Parliament is to be taken to have intended that the difficulties such a wide ambit may create will be sufficiently overcome by two safeguards built into the statutory scheme. The first lies in the discretion the court has under the sections as to the order it will make. Section 423(2) provides that the court "may" make such order as it thinks fit for restoring the position and protecting

G victims of transactions intended to defraud creditors. Sections 238, 239, 339 and 340 provide that the court "shall," on an application under those sections, make such order as it thinks fit for restoring the position. Despite the use of the verb "shall," the phrase "such order as it thinks fit" is apt to confer on the court an overall discretion. The discretion is wide enough to enable the court, if justice so requires, to make no order against the other party to the transaction or the person to whom

H the preference was given. In particular, if a foreign element is involved the court will need to be satisfied that, in respect of the relief sought against him, the defendant is sufficiently connected with England for it to be just and proper to make the order against him despite the foreign

element. This connection might be sufficiently shown by the residence of    A
the defendant. If he is resident in England, or the defendant is an
English company, the fact that the transaction concerned movable or
even immovable property abroad would *by itself* be unlikely to carry
much weight. Likewise if the defendant carries on business here and the
transaction related to that business. Or the connection might be shown
by the situation of the property, such as land, in this country. In such a
case, the foreign nationality or residence of the defendant would not *by*    B
*itself* normally be a weighty factor against the court exercising its
jurisdiction under the sections. Conversely, the presence of the defendant
in this country, either at the time of the transaction or when proceedings
were initiated, will not necessarily mean that he has a sufficient
connection with this country in respect of the relief sought against him.
His presence might be coincidental and unrelated to the transaction. Or    C
the defendant may be a multinational bank, carrying on business here,
but all the dealings in question may have taken place at an overseas
branch.

      Thus in considering whether there is a sufficient connection with this
country the court will look at all the circumstances, including the
residence and place of business of the defendant, his connection with
the insolvent, the nature and purpose of the transaction being impugned,    D
the nature and locality of the property involved, the circumstances in
which the defendant became involved in the transaction or received a
benefit from it or acquired the property in question, whether the
defendant acted in good faith, and whether under any relevant foreign
law the defendant acquired an unimpeachable title free from any claims
even if the insolvent had been adjudged bankrupt or wound up locally.    E
The importance to be attached to these factors will vary from case to
case. By taking into account and weighing these and any other relevant
circumstances, the court will ensure that it does not seek to exercise
oppressively or unreasonably the very wide jurisdiction conferred by the
sections.

      I pause to observe that this would not be the first time that, in this    F
field, Parliament has conferred on the English court a jurisdiction of
unlimited territorial application. Section 221 provides that an unregistered
company may be wound up under the Act. This embraces all overseas
companies, but in practice this has not given rise to difficulties. Despite
the width of the statutory provision, the English court does not exercise
its jurisdiction to wind up a foreign company unless a sufficient
connection with England and Wales is shown and there is a reasonable    G
possibility of benefit for the creditors from the winding up: see the
review of the authorities by Peter Gibson J. in *In re A Company*
*(No. 00359 of 1987)* [1988] Ch. 210.


*The court's discretion: leave to serve abroad*

      The other safeguard arises at an earlier stage of the proceedings, and
provides an additional protection for persons who are abroad and not    H
able to be served with proceedings in this country in the usual way.
They are not to be brought here unless the court first grants leave for
the proceedings to be served on them abroad. In this regard the

03635-jpm   Doc 173-4   Filed 01/13/17   Entered 01/13/17 22:34:28   Ex. C pa
Pg 332 of 461

241
Ch.                      In re Paramount Airways Ltd. (C.A.)              Sir Donald
Nicholls V.-C.

A   difficulties of interpretation which existed under the old bankruptcy rules have been cured by the unambiguous terms of rule 12.12 of the Insolvency Rules 1986:

"(1) Order 11 of the Rules of the Supreme Court, and the corresponding County Court Rules, do not apply in insolvency proceedings. (2) A bankruptcy petition may, with the leave of the court, be served outside England and Wales in such manner as the court may direct. (3) Where for the purposes of insolvency proceedings any process or order of the court, or other document, is required to be served on a person who is not in England and Wales, the court may order service to be effected within such time, on such person, at such place and in such manner as it thinks fit, and may also require such proof of service as it thinks fit. (4) An application under this rule shall be supported by an affidavit stating—(*a*) the grounds ⌐n which the application is made, and (*b*) in what place or country the person to be served is, or probably may be found."

Applications under the sections with which this appeal are concerned are "insolvency proceedings:" rule 13.7.

Hambros Jersey contended that the jurisdiction conferred by this rule can only properly be exercised by analogy to R.S.C., Ord. 11, so that leave should not be granted unless the case falls within one of the paragraphs of Ord. 11, r. 1(1). This is not a tenable interpretation of rule 12.12 of the Rules of 1986, given the clear language of paragraph (1) of the rule and given also that by their nature proceedings under the Insolvency Act 1986 cannot be expected to be addressed by Ord. 11, r. 1.

Thus the second safeguard is that he who wishes to serve the proceedings abroad must first obtain an exercise by the court of its discretion in his favour. In deciding whether the case is a proper one for service out of the jurisdiction, one of the circumstances the court will take into account is the strength or weakness of the plaintiff's claim in the proceedings. There must be a real issue, between the plaintiff and the defendant, which the plaintiff may reasonably ask the court to try. As Millett J. observed in *In re Tucker (A Bankrupt)* [1988] 1 W.L.R. 497, 502B, the plaintiff must make out a sufficiently strong case to justify his being given leave. How strong that case should be depends on the circumstances of the particular case. Where a foreign element is involved one of the factors which the court will consider is the apparent strength or weakness of the plaintiff's claim that the defendant has a sufficient connection with England, in respect of the relief sought in the proceedings.

*Conclusion*

For these reasons I am not able to accept Hambros Jersey's submissions on the proper interpretation of section 238(2). The judge was persuaded into error on this point. It is not necessary to consider the facts further in this case, since Hambros Jersey does not challenge

**Sir Donald**
**Nicholls V.-C.**                    In re Paramount Airways Ltd. (C.A.)                    [1993]

the judge's view on the way the court's discretion under rule 12.12    A
should be exercised (save on the one point I have rejected).

I would therefore allow this appeal, set aside the judge's order and
restore the order of the registrar. These proceedings should be permitted
to proceed in England, hand-in-hand with the action in respect of which
the bank has submitted to the jurisdiction of the English court. When
the judge hears these proceedings he will have further evidence before
him and he will make findings of fact on disputed issues such as whether    B
Hambros Jersey had notice of the alleged misappropriation of some
£1·65m of the company's money. It will be for him to decide, in the
light of all the evidence, whether in respect of the relief claimed
Hambros Jersey has a sufficient connection with England for it to be
just for the English court to grant such relief. The grant of leave to
serve Hambros Jersey abroad does not preclude the bank from raising    C
this issue as a defence at the trial.

TAYLOR L.J.    I agree.

FARQUHARSON L.J.    I also agree.

*Appeal allowed with costs in*    D
*Court of Appeal and below.*
*Leave to appeal refused.*

*Solicitors: Norton Rose; Wilde Sapte.*

[Reported by CHRISTOPHER CHAMPNESS ESQ., Barrister]    E

F

G

H

TAB 59

*Re Stealth Construction Ltd* [2011] EWHC 1305 (Ch),
English High Court

Neutral Citation Number: [2011] EWHC 1305 (Ch)

Case No: 2553 of 2010

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**MANCHESTER DISTRICT REGISTRY**

Civil Justice Centre
Manchester

Date: 20/05/2011

**Before** :

**MR JUSTICE DAVID RICHARDS**
**VICE CHANCELLOR OF THE COUNTY PALATINE OF LANCASTER**

**IN THE MATTER OF STEALTH CONSTRUCTION LIMITED**
**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**
- - - - - - - - - - - - - - - - - - - -

BETWEEN

| | |
|---|---|
| **ELLIOTT HARRY GREEN LIQUIDATOR OF STEALTH CONSTRUCTION LIMITED)** | **Applicant** |
| **- and -** | |
| **JOANNA ELIZABETH IRELAND** | **Respondent** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Mr James Morgan** (instructed by **Freeth Cartwright LLP**) for the Applicant
**Mr John Pennie (solicitor, Dickinson Dees)** for the Respondent

Hearing date: 18 May 2011
- - - - - - - - - - - - - - - - - - - -

# Judgment

**Mr Justice David Richards :**

*Introduction*

1.    The liquidator of Stealth Construction Limited (the company) applies for a declaration that the grant on 9 December 2008 of a second legal charge over a property owned by it to secure loans totalling £300,000 made by the respondent, Joanna Elizabeth Ireland, was a preference under s.239 of the Insolvency Act 1986.  He applies for orders that the charge be set aside and that Mrs Ireland pay the sum of £130,414.09 paid to her as holder of the charge.

2.    The charge was created pursuant to an agreement or arrangement made in October 2007, when Mrs Ireland advanced £145,000 as the first part of her loan.  The loans were made for the purpose of, and duly applied in, the purchase of the property.  The principal issues which arise are, first, whether the agreement or arrangement created binding obligations or gave rise to an equitable interest in or charge over the property, and, secondly, when the operative decision to grant the legal charge was made and whether it was influenced by a desire to put Mrs Ireland in a better position in an insolvent liquidation.

*The Facts and evidence*

3.    The facts are largely uncontroversial.  The liquidator and his solicitor provided witness statements in support of the application.  Neither had direct knowledge of any relevant matter and their evidence was based on documents available to them and on interviews conducted by the liquidator.

4.    Evidence in opposition to the application was given by Mrs Ireland and Philip Saunders, a partner in Saunders Bearman, solicitors who had acted for the company. Each provided witness statements on which they were, quite briefly, cross-examined. Mrs Ireland was not significantly challenged on any of her evidence.  She was an entirely reliable and truthful witness with a clear recollection of relevant events, who gave her evidence in a straightforward and impressive manner, all the more so as she has been very seriously ill.  Mr Saunders was challenged on part of his evidence, giving rise to the only real issue of fact in this case, and I will consider the quality of his evidence when dealing with that issue.

5.    Neither party called the former directors of the company.

6.    The company was incorporated in April 2007 and commenced business shortly afterwards.  Its directors and equal shareholders were Susan Gillis and Manuel Costa. Miss Gillis was an interior designer and Mr Costa ran two construction companies. Their intention was to use their skills and experience in the purchase, redevelopment and sale or letting of luxury residential properties in London.

7.    Between August 2007 and March 2008 the company purchased three properties in Primrose Hill and St John's Wood.  These purchases were funded in each case by loans made by Royal Bank of Scotland (RBS) and a number of individuals.  Loans were also made to fund the redevelopment of the properties.

8.    The property relevant to the present application was 20 Hill Road, St John's Wood, London NW8.  Contracts of purchase at a price of £2.85m, with £142,500 payable on exchange, were exchanged on 26 October 2007.  Because the vendors needed to obtain a grant of probate, it was agreed that completion would be delayed until early 2008.  The purchase was completed on 25 March 2008.

9.    The purchase of the property was funded by loans of £2m from RBS and £300,000 from Mrs Ireland and by further loans from other individuals.  A first legal charge over the property was granted to RBS immediately on completion on 25 March 2008. The second legal charge in favour of Mrs Ireland, in issue in these proceedings, was granted on 9 December 2008.

10.    Mrs Ireland and Miss Gillis are sisters.  On a number of occasions during the autumn of 2007 Miss Gillis asked Mrs Ireland if she wished to invest in the company.  Miss Gillis stayed with Mrs Ireland and her husband over the weekend of 20/21 October 2007.  In discussions over the weekend, Mrs Ireland agreed to lend £300,000 to the company for a term of one year, with interest at the rate of 15% payable at six-monthly intervals.  The purpose of the loan was to assist in the purchase of the property.  Miss Gillis told Mrs Ireland that the bulk of the purchase price would be paid out of a loan from RBS secured by a first charge.  Mrs Ireland told Miss Gillis that she would require a second charge over the property.

11.     On Monday 22 October 2007, Miss Gillis emailed Mrs Ireland as follows:

> *"Hi Jo*
>
> *Firstly thank you for a wonderful day yesterday.  Perry had a brilliant time and can't wait to come back.*
>
> *Regarding the deposit for hill road we are trying to agree to only transfer 5% in his account and he will try and do it with that.*
>
> *Therefore can you please transfer over £145,000 to:*
>
> *[Bank]*
>
> *[sort code]*
>
> *Saunders bearman client a/c*
>
> *[account number]*
>
> *I will let him know that it is from you and needs to go against hill road*
>
> *Also I will draw up a document that I will send to you having it signed by stealth but will make sure that both me and manuel have signed it.*
>
> *I will also arrange for you to have second charge over hill road and will instruct Phillip to draw that document up for you.*
>
> *Hope that this is alright.*
>
> *Have a wonderful time in Rome*
>
> *Lots and lots of love*
>
> *Suzy"*

12.     On the same day Mrs Ireland replied:

> *"Suzy,*
>
> *Do remind me tomorrow.*
>
> *Any news on the cooker,*
>
> *Jo"*

13.     On 23 October 2007 Mrs Ireland transferred £145,000 to the account of the company's solicitors Saunders Bearman.  They received instructions to apply it in payment of the deposit on exchange of contracts for the purchase of the property and did so on 26 October 2007.   There is an issue, to which I will later return, as to what,

if any, instructions were given to Saunders Bearman as to the terms of the loan or the giving of a second charge on the property.

14.    Also on 23 October 2007, Miss Gillis sent an unsigned letter to Mrs Ireland in the following terms:

> "*Dear Jo*
>
> *RE: 20 HILL ROAD LONDON NW8*
>
> *Further to our various discussions I confirm that you have agreed to lend to stealth the sum of £300,000 (three hundred thousand pounds) in relation to the purchase and development of the above mentioned property.*
>
> *The sum loaned has been done so on the following basis:*
>
> *£145,000*    *23rd October 2007 for the sole purpose of exchange*
>
> *£155,000*    *on completion which will be on production of probate but in any event not sooner than the 8th January 2008 with a long stop date of end of March 2008.*
>
> *Interest is as follows:*
>
> *15% on the whole amount to be paid as stated below:*
>
> *7.5% by the 23rd of April 2008*
>
> *7.5% by the 23rd of October 2008*
>
> *In the event that stealth construction makes more than 20% net profit on the whole project then stealth shall pay a further 50% of any proceeds over the 20% net profit.*"

15.    Mrs Ireland's evidence, which I accept, is that the profit share provision included at the end of the letter had not been agreed or discussed with her. The letter was not signed by Miss Gillis or anyone else on behalf of the company or by Mrs Ireland.

16.    As the letter makes clear, it was envisaged that completion of the purchase would be delayed until January 2008 at the earliest pending production of a grant of probate. In fact it did not occur until 25 March 2008 when the balance of the purchase price, amounting to £2,715,165, was paid. It was funded by a loan of just under £2m from RBS, the second tranche of £155,000 of the loan from Mrs Ireland (less interest due on the first tranche of £5,875) and further loans from other individuals.

17.    Mrs Ireland assumed that the necessary steps would have been taken by the company to grant her the second charge which had been agreed in her discussions with Miss Gillis on 20/21 October 2007. She was very seriously ill throughout the period from

October 2007 until well into 2009 and quite naturally the grant of the charge was the least of her concerns.

18.    In October 2008, when the loan and accrued interest became payable, Miss Gillis and Mr Costa told her that the company was facing at least cash-flow difficulties and was unable to pay the sums then due.  Her husband suggested that she should check whether the second charge had in fact been granted and enquiries by a solicitor friend disclosed that it had not.  Mrs Ireland was understandably very angry and upset and made it very clear to her sister that she expected the charge to be granted.

19.    Steps were then taken to put the second charge in place.  The consent of RBS as first chargee was required under the terms of its security and first Miss Gillis and then Saunders Bearman, in a letter dated 27 November 2008, requested its consent, which was given.  Under cover of a letter dated 26 November 2008, Saunders Bearman sent a draft charge to Miss Gillis.  In the letter, Mr Saunders wrote that she was going to let him see the letter between her and Mrs Ireland recording the loan, which would be annexed to the charge, and in a postscript stated that he had received from her the two letters dated 23 October 2007 and 28 February 2008 and that he had amended the charge on that basis.

20.    Under cover of a compliments slip dated 26 November 2008 Mr Saunders sent the revised draft charge to Mrs Ireland.  Mr Saunders wrote on the compliments slip:

> "*Enclosed a fresh print of the second charge – there was a mistake in the one sent to Suzy.  I'm sorry that this was not put into place (your security) that is on completion.  It should have been.*"

21.    The second charge was executed on behalf of the company and dated 9 December 2008.  It was duly registered both with the registrar of companies under the Companies Act and on the title register at the Land Registry.

22.    The company failed to repay loans to other lenders and on 16 June 2009 a petition was presented to wind up the company based on a debt of £483,750.  A winding-up order was made on 29 July 2009.  In August 2009, RBS appointed receivers of the three properties owned by the company and charged to it, and in due course the properties were sold and RBS was fully repaid the sums due to it.

23.    In December 2009, the net surplus of £130,414.09 arising in respect of the property at Hill Road was paid to Mrs Ireland as holder of the second charge.

24.    The one disputed issue of fact is whether Miss Gillis or anyone else instructed Saunders Bearman to prepare the second charge in favour of Mrs Ireland in the autumn of 2007 or at any other time before October or November 2008.

25.    Mr Saunders' evidence, which Mr Morgan for the liquidator challenged in cross-examination, was that he was instructed in October 2007 on behalf of the company to prepare the charge.  He proposed to prepare the charge and arrange for its execution once the purchase was completed but as a result of the delays in completion he forgot to do so until reminded by Miss Gillis in the autumn of 2008.  I reject this evidence. Saunders Bearman's file has been inspected and there is no document referring to any

such instructions or the possibility of a second charge until November 2008. There is no file note of any conversation on the subject with Miss Gillis and no letter or email to or from Miss Gillis or anyone else referring to a charge.

26.    Mr Saunders knew that completion would be delayed until January 2008 at the earliest, but his file contains no reminder to prepare the charge on completion. It was his standard practice to annex the terms of a loan to a security document, but he did not have the letter of 23 October 2007 until 26 November 2008 nor is there any evidence that he knew the terms of the loan until then. When asked for an explanation as to why he did not ask for details of the loan agreement in October 2007, he could give none. He had no contact with Mrs Ireland on the subject.

27.    Mr Saunders says that he knew that the consent of RBS would be required but through inefficiency did not approach RBS in 2007 for its consent. However, he wrote to the solicitors for RBS on 29 October 2007 concerning the proposed loan by RBS and the security for it but made no mention of a second charge and the need for the consent of RBS.

28.    While I accept, as Mr Saunders suggested, that he is not meticulous in preparing file notes, I am satisfied that by reference to these factors, combined with the unconvincing tenor of his evidence, that he did not receive instructions to prepare the second charge until late 2008. He has accepted that in June 2009 he concocted a letter, on which he forged Mrs Ireland's signature, which stated, untruthfully as he must have known, that her loan of £300,000 was to Miss Gillis personally to enable her to introduce capital into the company. This letter was prepared in connection with entirely personal loans made by Mrs Ireland to Miss Gillis. Miss Gillis was very embarrassed that she had not provided the security over her own home which she had promised for these personal loans. Mr Saunders told me that a complaint about this has been made to the Solicitors Regulatory Authority and that it is currently the subject of an investigation. I will say no more about it, save that it does demonstrate a willingness on Mr Saunders' part to do what he can to assist Miss Gillis and save her from personal embarrassment.

*Section 239 Insolvency Act 1986*

29.    Section 239(2)–(6) provides as follows:

> "*(2) Where the company has at a relevant time (defined in the next section) given a preference to any person, the office-holder may apply to the court for an order under this section.*
>
> *(3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not given that preference.*
>
> *(4) For the purposes of this section and section 241, a company gives a preference to a person if—*

> (a) *that person is one of the company's creditors or a surety or guarantor for any of the company's debts or other liabilities, and*
>
> (b) *the company does anything or suffers anything to be done which (in either case) has the effect of putting that person into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if that thing had not been done.*
>
> (5) *The court shall not make an order under this section in respect of a preference given to any person unless the company which gave the preference was influenced in deciding to give it by a desire to produce in relation to that person the effect mentioned in subsection (4)(b).*
>
> (6) *A company which has given a preference to a person connected with the company (otherwise than by reason only of being its employee) at the time the preference was given is presumed, unless the contrary is shown, to have been influenced in deciding to give it by such a desire as is mentioned in subsection (5)."*

30.    'Relevant time' is defined, for the purposes of s.239, by s.240(1) as being either, in the case of a preference given to a person who is connected with the company, any time in the period of 2 years ending with the onset of insolvency or, in any other case, any time in the period of 6 months ending with the onset of insolvency. In the present case, the onset of insolvency means the commencement of the winding up of the company, i.e. 16 June 2009: s.240(3)(e). Persons connected with a company are defined in a combination of ss.249 and 435 and, relevantly for present purposes, include a sister of a director of the company. A time is not 'a relevant time' unless the company was at that time unable to pay its debts within the meaning of s.123 or became so in consequence of the transaction.

*Issues and common ground*

31.    There is common ground between the parties on a number of issues.

32.    First, it is accepted that, because Mrs Ireland and Miss Gillis are sisters, Mrs Ireland is a person connected with the company. This has two consequences. The first is that the 'relevant time' for the purposes of s.239(2) is any time within two years ending on 16 June 2009 when the winding-up of the company commenced. Therefore execution of the charge in December 2008, and the agreement made in October 2007, occurred at 'a relevant time'. The second is that, if the company gave a preference to Mrs Ireland by the execution of the second charge, the company is presumed, unless the contrary is shown, to have been influenced in deciding to give it by a desire to put Mrs Ireland into a position which, in the event of the company going into insolvent liquidation, would be better than would otherwise have been the case, in other words, to prefer her.

Green and Ireland

33.    Secondly, the liquidator does not contend that the company was or became insolvent, as defined in s.240 (2), in October 2007.  Equally, it is accepted on behalf of Mrs Ireland that the company was insolvent, as so defined, from October 2008.

34.    The issues between the parties are these.

35.    First, Mrs Ireland does not accept that the execution of the second charge in December 2008 constituted a preference, as defined in s.239(4)(b), by reason of the rights already enjoyed by her as a result of the agreement made in October 2007 and the application  of her loans in the purchase of the property.

36.    Secondly, and if the execution of the charge satisfied s.239(4)(b), Mrs Ireland submits that the company's decision to grant the charge was taken in October 2007 and was not influenced by a desire to put her in a better position.  The liquidator submits that the decision was taken in late 2008 and that Mrs Ireland has not rebutted the statutory presumption that it was influenced by a desire to put her in a better position.

37.    This focus on the date of decision, for the purposes of the relevant desire, rather than the date on which the legal charge was executed, stems from the terms of s.239(5) and (6) and authorities beginning with *Re MC Bacon Ltd* [1990] BCC 78 to which I will later refer.

*Rights conferred on Mrs Ireland in October 2007*

38.    The liquidator accepts that over the weekend of 20/21 October 2007 an oral agreement was made between Miss Gillis on behalf of the company and Mrs Ireland that Mrs Ireland would lend a total of £300,000 to the company to be applied towards the purchase of the property, repayable after one year, carrying interest at 15% per annum, and secured by a second legal charge on the property.

39.    The liquidator submits that a contract to grant a second legal charge had to be in writing and satisfy the other requirements of s.2 of the Law of Property (Miscellaneous Provisions) Act 1989.  He submits that these requirements were not satisfied and that therefore there was no obligation enforceable against the company to grant the second legal charge.

40.    The liquidator further submits that Mrs Ireland has not made out any other basis for an enforceable security interest in the property.

*(i) Section 2 Law Property (Miscellaneous Provisions) Act 1989 (the 1989 Act)*

41.    Section 2, so far as relevant, provides as follows:

> "*2 Contracts for sale etc. of land to be made by signed writing.*
>
> *(1) A contract for the sale or other disposition of an interest in land can only be made in writing and only by incorporating all the terms which the parties have expressly agreed in one document or, where contracts are exchanged, in each.*
>
> *(2) The terms may be incorporated in a document either by being set out in it or by reference to some other document.*

MR JUSTICE DAVID RICHARDS
Approved Judgment

Green and Ireland

> *(3) The document incorporating the terms or, where contracts are exchanged, one of the documents incorporating them (but not necessarily the same one) must be signed by or on behalf of each party to the contract.*
>
> *(5) ...*
>
> *nothing in this section affects the creation or operation of resulting, implied or constructive trusts.*
>
> *(6) In this section—*
>
> *"disposition" has the same meaning as in the Law of Property Act 1925;*
>
> *"interest in land" means any estate, interest or charge in or over land or in or over the proceeds of sale of land."*

42.     It is not disputed that a contract for the grant of a charge on land is a contract for the disposition of an interest in land and that therefore s.2 applies to any such contract made between the company and Mrs Ireland.

43.     The only documents which may be said to record or constitute the contract were the exchange of emails on 22 October 2007 and the letter dated 23 October 2007. The latter cannot satisfy s.2, first because it does not mention or refer to the grant of security, and secondly because it was not signed by or on behalf of Mrs Ireland or, as it seems to me, the company.

44.     The exchange of emails on 22 October 2007 was in electronic form, and hard copies have been printed only in the context of the subsequent dispute. The liquidator accepts, adopting the reasoning of HHJ Pelling QC in *J.Pereira Fernandes SA v Mehta* [2006] 1 WLR 1543 in the context of the statutory requirements for a guarantee, that Miss Gillis on behalf of the company and Mrs Ireland, by inserting their names at the end of the emails sent by them respectively, had 'signed' them for the purposes of s.2.

45.     Section 2 (3) requires also that the document incorporating the terms be signed by or on behalf of each party. The liquidator accepts that Miss Gillis' email to Mrs Ireland and Mrs Ireland's reply constitutes a single document for these purposes. In my view, this is right where, as here, the second email is sent as a reply and so creates a string, as opposed to be simply a new email referring to an earlier email. It is the electronic equivalent of a hard copy letter signed by the sender being itself signed by the addressee.

46.     The points taken by the liquidator are twofold. First, the exchange of emails on 22 October 2007 do not constitute or contain a contract at all, but at best evidence in part an oral agreement made on 20/21 October 2007. Secondly, and in any event, the emails do not incorporate all the terms expressly agreed by the parties.

47.     In my judgment, both points are well-founded. Miss Gillis' email contains a request that Mrs Ireland should transfer £145,000 to Saunders Bearman, combined with

statements that she will send a document signed by Mr Costa and herself, presumably setting out the agreed terms, and that she will arrange for a second charge to be given. Mrs Ireland's reply states only, 'do remind me tomorrow'. The emails are not expressed in terms which suggest binding obligations on the parties, nor do they state the terms of any contract but on the contrary state that a further document will be drawn up. In my judgment, leaving aside issues under s.2, neither party could maintain an action on the basis that these emails were themselves a contract, save possibly a unilateral contract that if Mrs Ireland advanced £145,000, the company would create a second legal charge on the property to secure it.

48.    In any event, the emails do not incorporate all the terms which the parties have expressly agreed. The emails contain no reference to either the date of repayment or the rate interest and dates for payment of interest, all of which had been agreed on 20/21 October 2007. Further, the agreement was for a loan totalling £300,000, not a loan of £145,000.

49.    Both sides relied on the decision of the Court of Appeal in *North Eastern Properties Ltd v Coleman* [2010] 1 WLR 2715. In that case, a distinction was drawn between the terms of the contract of sale or disposition of the interest in land (the land contract) and other terms which commercially formed part of a composite transaction but were not, nor intended to be, terms of the land contract. In this case, it seems clear to me that the terms referred to above were terms of the land contract. The total amount of the loan, its repayment date, the terms as to interest and the obligation to grant a second charge to secure both principal and interest were all terms of the one agreement, not collateral contracts forming part of a composite transaction in commercial terms.

50.    It follows that no enforceable contract for the grant of a charge in favour of Mrs Ireland was made in October 2007.

*(ii) Other rights*

51.    Mr Pennie on behalf of Mrs Ireland submitted that, even if no enforceable contract was made, Mrs Ireland acquired an equitable right, which became an equitable interest in the property on completion in March 2008, resulting from the combination of the agreement in fact made for the grant of a second charge to secure Mrs Ireland's loans, the making of the loans by her and the application of the borrowed money, as agreed, towards the payment of the deposit and purchase price.

52.    Mr Pennie made clear that he was not seeking to assert a resulting, implied or constructive trust, so that the exception for them in s.2(5) of the 1989 Act was not in point. He developed his submission principally by reference to *Holroyd v Marshall* (1862) HLC 191. That case however was concerned with rights arising as a result of a specifically enforceable contract, which therefore run precisely into the difficulty posed by the need for compliance with s.2 of the 1989 Act.

53.    I conclude that no case has been made out that following the making of her loan Mrs Ireland had any enforceable right to the grant of a security over the property or any equitable interest in the property following completion of its purchase.

*Was the grant of the charge dated 9 December 2008 a preference to Mrs Ireland?*

54.    The test of a preference contained in s.239(4)(b), is whether the act in question "has the effect of putting that person into a position which, in the event of the company going into solvent liquidation, will be better than the position he would have been in if that thing had not been done."

55.    In the light of my decision that Mrs Ireland acquired no security rights or rights to the grant of security before the grant of the charge on 9 December 2008, it necessarily follows that the test for a preference is satisfied. Mrs Ireland thereby became a secured creditor rather than an unsecured creditor. Further, even if the company had earlier created an equitable charge, it would have been void for non-registration as against a liquidator or any creditor.

*The decision to grant the charge*

56.    As I earlier mentioned, it is the decision to give a preference, rather than the giving of the preference pursuant to that decision, which must be influenced by the desire to produce the effect set out in s.239(4) (b). For these purposes, therefore, the relevant time is the date of the decision, not the date of giving the preference.

57.    In *Re MC Bacon Ltd* [1990] BCC 78, the company reached the limit of its overdraft facility on 14 April 1987. It was loss-making and had lost a major customer, and the directors were planning to retire. The bank was insisting that a debenture be granted if it was to continue to provide facilities to the company. Discussions took place during the second half of April and the first half of May. The company executed a debenture towards the end of May. In considering the time at which the company must be influenced by the desire to put the other party in a better position, Millet J said at p.88:

> "*It was also submitted that the relevant time was the time when the debenture was created. That cannot be right. The relevant time was the time when the decision to grant it was made. In the present case that is not known with certainty. It was probably some time between 15 April and 20 May, although as early as 3 April Mr Glover and Mr Creal had resigned themselves to its inevitability. But it does not matter. If the requisite desire was operating at all, it was operating throughout.*"

58.    In *Re Fairway Magazines Ltd* [1992] BCC 924, a director agreed to provide funding to the company under the terms of a written loan agreement dated 21 August 1990, which provided for the grant of a debenture to secure the loans. Advances were made under the agreement and on 27 September 1990 the debenture was executed. It was signed by the lender on the same date as the loan agreement and the only reason for the delay in execution by the company was that the director who was to sign on behalf of the company was slow in doing so and returning it to the company's solicitors. Mummery J referred to *Re MC Bacon Ltd* as relevant for a number of purposes, including:

> "*Finally, the relevant time to consider is the time when the decision is made to grant the debenture, not the date of the execution of the debenture itself. In this case the relevant date is the date of the agreement on 21 August 1990.*"

59.    By contrast, in *Wills v Corfe Joinery Ltd* [1997] BCC 511, where two directors lent sums to a company in January 1994 on terms that they would not be called in for a year and were repaid by the company in February 1995, Lloyd J held that the decision to repay was made not when the loans were made on the agreed terms as to the date of repayment, but when the cheques for repayment were signed in February 1995. He said at p.513:

> "*However, I do not accept that January 1994 was the date by reference to which it is appropriate to consider whether, in giving the preference that undoubtedly was given, the company was influenced by the relevant desire. It seems to me that all that happened in January 1994 at most was that the loans became repayable in January 1995. A lot of debts were payable by the company in January 1995 and a lot of them were not paid. The fact that the directors' loan accounts were repayable in January 1995 does not lead to the conclusion that there was not a relevant decision to give the preference by actually paying those debts. It seems to me that the relevant decision to make the payments was and could only have been made at the time, or immediately before the time, when the cheques were drawn, that is to say, on 2 February and 6 February 1995. Even if, as I am prepared to accept for present purposes, what passed in January 1994 meant that there was an obligation on the company to pay the debt in January 1995, it was necessary for the board to review at that time whether to honour that obligation. If the board had known that the company was insolvent or would be made insolvent by honouring that obligation, it could not have made the payment.*"

60.    Most preferences involve the payment of some debts in preference to others. All debts stem from an enforceable obligation to make the payment. If the decision to incur the debt, rather than the later decision to pay it, was the relevant time at which the company's desire was to be judged, the payment of debts would rarely constitute a preference under s.239.

61.    It might be argued that there is a distinction between the payment of debts on the one hand and other obligations, such as an obligation to grant a security, on the other. I do not see why in principle that should be so. Even if there had been an enforceable obligation incurred in October 2007 to grant a charge, there would in ordinary circumstances after a delay of 12 or so months be a further decision to comply with the obligation, just as in the case of a debt there would be a further decision to comply with the obligation to pay the debt. Precisely the same considerations would apply in the former case as Lloyd J said would apply in the latter:

> "*it was necessary for the board to review at the time whether to honour that obligation. If the company had known that the*"

> *company was insolvent or would be made insolvent by honouring that obligation, it could not have made the payment.*"

62. The position is, of course, all the stronger in a case such as the present where the company was not subject to any enforceable obligation to grant the charge. It would be a voluntary act and, after an interval of 12 months or more, would necessarily involve a decision to proceed with the grant of the charge.

63. In my judgment, the question of when the decision is made is a question of fact to be determined in the particular circumstances of each case. An existing contractual obligation is neither necessary nor of itself sufficient. There was no prior obligation to grant a debenture in *Re M C Bacon Ltd* but on the facts of the case Millett J found that the decision to do so had been made at some time in the period of negotiations up to 20 May 1987. In *Re Fairway Magazines Ltd,* where the delay in execution of the debenture was simply because the director had been slow to sign for the company, the company's decision was found to have been when the loan agreement was made, and the lender signed the debenture, a few weeks earlier. By contrast, on the very different facts of *Wills v Corfe Jointer Ltd*, the decision to repay the loans was made long after the loans were made and the obligation to repay them was incurred.

64. Because Miss Gillis and Mr Costa did not give evidence, I do not know what discussions or decisions in fact took place in October to December 2008, except that the instructions to prepare the charge were given to Mr Saunders in that period. That itself is some evidence that the decision was then taken to grant the charge. In circumstances where there has been a delay of over a year and where the company was under no obligation to grant the charge, and where even then the charge was granted only because Mrs Ireland raised the issue, the reasonable inference is that Miss Gillis, whether on her own or with Mr Costa, decided that the company should proceed to grant the charge to Mrs Ireland.

65. The time for judging whether the company was influenced by a desire to improve the position of Mrs Ireland is therefore about November 2008. This is entirely an issue of the thought processes of the directors of the company. They knew that the company was unable to pay its debts, including the debt to Mrs Ireland, as they fell due. Objectively it would seem likely that Miss Gillis wished to improve the position of her sister but in any event, without calling Miss Gillis and/or Mr Costa to give evidence, Mrs Ireland is unable to rebut the presumption created by s.239(6).

*Conclusion*

66. It follows that the liquidator has established the requirements of s.239 and is entitled to the relief claimed under that section.

67. I wish only to add this. Mrs Ireland is an entirely innocent participant in all this, as no doubt are other creditors of the company. Section 239 focuses not on the conduct or state of mind of the creditor concerned, but on that of the directors or others acting for the company. In many cases, the preferred creditor will share the desire to be preferred but this need not be so. It is not the case with Mrs Ireland who reasonably believed that she already had the benefit of a charge until October 2008 and that she

received no more than her due.  The result in this case implies no criticism of her at all.

TAB 60

*Re Taylor Sinclair (Capital) Ltd* [2001] 2 BCLC 176,
English High Court

# Re Taylor Sinclair (Capital) Ltd (in liquidation)

*a*

# Knights v Seymour Pierce Ellis Ltd and another

*b*

CHANCERY DIVISION (COMPANIES COURT)

ROBERT ENGLEHART QC (SITTING AS A DEPUTY HIGH COURT JUDGE)

13 JUNE 2001

*c*

*Winding up – Transaction at undervalue – Company received money which it held to the order of another – Money paid to first respondent at second respondent's request – Company's liquidator sought repayment on basis that payment was transaction at undervalue – Whether there was a 'transaction' between company and first respondent – Whether company received consideration – Whether transaction at relevant time – Whether purpose to defraud creditors – Insolvency Act 1986 ss 238, 240, 423.*

*d*

Taylor Sinclair (Capital) Ltd (the company) was incorporated by A in order to purchase a cargo vessel in connection with which it had some involvement with the State Bank of India. In June 1995 the company occupied office space in a building in London where the second respondent, S, had an office from which he dealt with the affairs of a US company, Powerhouse, of which S was a director and the executive chairman. S and A apparently became involved in trying to raise finance from the State Bank of India and Powerhouse forwarded some US$360,000 (£225,510.84) to the company to pay for a guarantee to be provided by the bank. At that time S owed £200,000 to the second respondent stockbrokers for shares in Powerhouse which he had instructed them to buy on his behalf. The money transferred from Powerhouse enabled the company to draw two cheques for £100,000 in favour of the second respondent which were credited to S's account. Apart from transmission and receipt of the two cheques there were no dealings or any communication between the company and the second respondent. The company and Powerhouse both went into liquidation and the liquidator sought repayment of the £200,000 from S, as first respondent, and from the second respondent on the basis that there was a transaction at an undervalue within s 238 or 423 of the Insolvency Act 1986.

*e*

*f*

*g*

**Held** – (1) As between the company and the second respondent there was no transaction within s 238. All that happened was that two cheques for £100,000 were transmitted from the former to the latter. There was nothing in the nature of any agreement or arrangement between them and no evidence of any communication at all between them. As far as the company was concerned, it was dealing with money which it held to the order of Powerhouse and in accordance with S's and therefore Powerhouse's instructions. The second respondent thought that it was receiving for the credit of S's account money which S had personally borrowed from the company.

*h*

*i*

a
The word 'transaction' embraced a potentially wide range of possibilities and the definition in s 436 of the 1986 Act was of broad ambit but s 238 did envisage that, apart perhaps a mere gift which was expressly included, a transaction would be something which involved some element of dealing between the parties to it.

*Clarkson v Clarkson* [1994] BCC 921, CA, considered.

b
(2) Even if there was a transaction capable of coming within s 238, the company could not be said to have entered into it on terms that it was to receive no consideration within s 238(4)(a). The company received money from Powerhouse for which it was obliged to account to Powerhouse. In making the onward payments to the second respondent on the instructions of S the company was not parting with its own money at all. The consideration it
c
received for making the payments was the performance of its obligation to account to Powerhouse. Furthermore, the company did in fact itself receive benefit for what it did, by retaining the balance of £25,510.84 with S's approval. Thus, the overall net effect was not to deplete the company's funds but rather to increase them. Accordingly the court would make no order against the second respondent under s 238(3).
d
(3) The court could not conclude on the evidence that the company was in fact insolvent for the purposes of s 240(2)(a) at the time of the payments to the second respondent. Nor did the company become unable to pay its debts in consequence of the payments within s 240(2)(b). However, if the payments did not discharge the company's obligation to account to Powerhouse, the only
e
realistic inference on the evidence was that the company did not have the money to repay Powerhouse and would therefore have become insolvent so that the payments would have been made at a relevant time for the purposes of s 238(2).

f
(4) There was a transaction between the company and S within s 238. The transaction comprised the inflow of the £225,510.84, the outflow of the £200,000 and the retention by the company of the balance of £25,510.84. Nevertheless the court would make no order against S because the transaction did not take place at a relevant time, and the company did not enter into the transaction with S on terms that it was to receive no consideration but rather on terms that it was to receive £25,510.84.
g
(5) The application under s 423 failed because there was no evidence which would justify a finding that the purpose of either the company or S in entering into any of the possible permutations of transaction was a purpose falling within either limb of s 423(3). The purpose of the transaction from the point of view of either respondent was not to defraud creditors. The company's
h
purpose was to assist Powerhouse in the person of S and to obtain £25,510.84 for itself. S's purpose was to misappropriate Powerhouse's money. But neither the company nor S had in mind the avoidance or hindrance of some claim which was being made or might be made against either of them.

i
**Cases referred to in judgment**

*Clarkson v Clarkson* [1994] BCC 921, CA.

*MC Bacon Ltd, Re* [1990] BCLC 324.

**Application**

By originating application of 16 October 1998 the liquidator of Taylor Sinclair
(Capital) Ltd sought an order pursuant to s 238 or s 423 of the Insolvency Act
1986 for repayment by the respondents to the company of £200,000
representing the amount of two cheques for £100,000 drawn in favour of the
first respondent company at the behest of the second respondent. The claim
was resisted by the first respondent. The second respondent did not appear and
was not represented.

*Roger Ellis QC* (instructed by *Bower Cotton Partnership*) for the liquidator.
*David Chivers* (instructed by *Memery Crystal*) for the first respondent.
The second respondent did not appear and was not represented.

**ROBERT ENGLEHART QC.**

*Introduction*

   [1] I have to determine a claim by the claimant, in his capacity as the
liquidator of Taylor Sinclair (Capital) Ltd (the company) that an order should
be made against the respondents for repayment to that company of £200,000.
That represents the amount of two cheques for £100,000 drawn in favour of
the first respondent at the behest of the second respondent. As appears from
the originating application of 16 October 1998, the claim is brought pursuant
to s 238, or s 423, of the Insolvency Act 1986. The claim is resisted by the first
respondent. As for the second respondent, he is currently serving a term of 4½
years' imprisonment and did not appear before me. It was common ground
between Mr Ellis QC, who appeared for the claimant, and Mr Chivers, who
appeared for the first respondent, that it is the second respondent who must
bear the primary culpability for the events which constitute the factual
background against which the claim is to be decided.

*The parties*

   [2] The claimant (the liquidator) is, as I have said, the liquidator of the
company. The company plainly never had any worthwhile assets of its own. It
was incorporated (with a nominal share capital of £50,000 of which only £2
was paid up) in April 1995, that is only shortly before it made the two
payments of £100,000 which underlie the present application. The evidence,
at least such as is available, suggests that the company was never much more
than a corporate shell. No trace of any tangible assets nor of any books or
records of the company, if any were ever kept, has been discovered. The sum
total of what the liquidator has been able to trace by way of business records
consists of bank statements for two accounts, one a business current account
and the other a business high interest account, maintained in the company's
name with the Royal Bank of Scotland. Whilst no documentary evidence of
assets or trading other than what can be seen from the bank statements has
emerged, it is also fair to say that it seems only to have been the unsatisfied
default judgment in favour of the American company mentioned below which
drove the company into liquidation. No creditor other than that American
company has come forward.

   [3] The liquidator is also the liquidator in this jurisdiction of a US company
incorporated in Colorado and called Powerhouse Resources Inc. That
company, which I shall call Powerhouse, was formerly called Com-Tek

Resources Inc and features considerably in the relevant events. Indeed, it was an unsatisfied default judgment obtained by Powerhouse against the company for £230,700 odd which led to the company's liquidation. That sum represented the amount, plus interest, of two cheques drawn by Powerhouse in favour of the company. It was evidently those cheques which provided the funds out of which the company was enabled to make the two payments with which the present application is concerned.

[4] The first respondent company, which I shall call Ellis & Partners, is a well established stockbroker and member of the London Stock Exchange. There is no suggestion other than that it is a highly reputable company. The evidence before me included affidavit evidence from Mr Mattocks, a director of Ellis & Partners, which was not challenged in any respect. Mr Mattocks was available to be, but was not, cross-examined on his affidavits. Before me Mr Ellis for the liquidator expressly accepted, albeit formally for the purposes of the present case only, that Ellis & Partners acted bona fide throughout. They were innocently caught up in events for which they were in no way to blame.

[5] The second respondent, Mr Stone, was the person who on the evidence before me was guilty of improper and unlawful conduct in the misappropriation of Powerhouse's money. As I have mentioned, he is now serving a lengthy term of imprisonment. On 5 December 2000 he was convicted at the Southwark Crown Court of offences of conspiracy to defraud, false accounting, theft and incitement to false accounting. Counts 2 (conspiracy to defraud) and 8 and 9 (theft) of the indictment refer specifically to the two Powerhouse cheques drawn in favour of the company which I have mentioned. Mr Stone was at the material time the executive chairman of Powerhouse working in London. Mr Stone understandably did not participate in the case before me at all. It is right to say that he had previously sworn affidavits in the proceedings. But there are serious grounds for doubting the truth of what Mr Stone deposed about various material matters. Nevertheless, I do not need to elaborate, for neither the liquidator nor Ellis & Partners sought to place reliance on anything which Mr Stone had said or offered by way of explanation in these affidavits.

*The evidence*

[6] There was a not inconsiderable amount of copy documentation put before me although directly relevant material was fairly limited in quantity. I gratefully acknowledge that the parties did not at the hearing refer me to more than a small part of the copy documentation. Moreover, Mr Mattocks' evidence being undisputed, I only heard oral evidence from one witness with any personal knowledge of material events. This was Mr Kimmins, an individual who had some knowledge of dealings between Mr Stone as chairman of Powerhouse and the company represented by its sole director, Mr Anderson. Mr Kimmins was called to give evidence on behalf of the liquidator in accordance with an affidavit which he swore on 22 January 1999. His cross-examination was brief, and his explanation for what occurred was not challenged by Mr Chivers. I have to say that to my mind the evidence of Mr Kimmins was in several respects not at all satisfactory and cried out for further explanation. However, Mr Ellis, having himself called Mr Kimmins, could not cross-examine him; and Mr Chivers for Ellis & Partners barely sought to do so. In these circumstances, I considered that it would not be right for me to do as Mr Ellis robustly invited me to do, that is roundly reject some

of what his own witness had said on material points and simply rely instead on what some of the copy documents seemed to show. Irrespective of the procedural dubiety of a party seeking to impeach the veracity of his own witness, there were other substantial reasons why I did not think this would be appropriate. Firstly, on the basis of Mr Kimmins' unchallenged evidence this was not a case where one could necessarily assume that documentation accorded with reality; as Mr Kimmins put it: 'Mr Stone wanted to get the paperwork in place'. Second, at least one document to which Mr Ellis referred me was apparently, and as Mr Ellis himself submitted, a forgery. I did not consider that this is a case where one should take all copy documents at face value. Third and in any event, the copy documents on which Mr Ellis relied as being inconsistent with Mr Kimmins' evidence, notably letter agreements dated 12 June 1995 and 28 June 1995, did not in themselves in my view so obviously point to a conclusion which was in conflict with the most material part of what Mr Kimmins seemed to be saying. I therefore turn to consider the factual background.

## The factual background

[7]  Powerhouse was a company with oil and gas business interests. It sought to raise money on the London Unlisted Securities Market. On 17 January 1995 it issued a circular in respect of a share offer and placing. The document records Mr Stone as a director and executive chairman of Powerhouse. Ellis & Partners acted as one of the sub-underwriters on the offer and placing. It seems that the offer and placing was not a success; some of the sub-underwriters were left with stock which they did not wish to hold. It was Mr Mattocks' evidence that Mr Stone decided personally to buy 25m of the new 25p Powerhouse shares in order to reduce, as he put it, the 'overhang in the market'. Mr Stone instructed Ellis & Partners to buy the shares for him, which they did. Subsequently, there was some further dealing in Powerhouse shares between Ellis & Partners and Mr Stone, but it is unnecessary to go into the detail.

[8]  There was, of course, a risk to Ellis & Partners in making such a large purchase of shares on Mr Stone's account. However, they were not unduly concerned. They understood from an earlier unrelated transaction that Mr Stone was a wealthy man and, in any case, they would not release shares to Mr Stone until he paid them. Nevertheless, it seems that Mr Stone was indeed having difficulty raising the money to pay Ellis & Partners for Powerhouse shares he had bought and which Ellis & Partners were holding for him. Settlement had to be carried forward with Mr Stone saying that he would be borrowing funds from various sources to pay Ellis & Partners. Ultimately, Mr Stone's account with Ellis & Partners was in fact paid off. Part of the payment consisted of two cheques, each for £100,000, which were drawn in favour of Ellis & Partners by the company on, respectively, 12 and 28 June 1995. The signatories to the cheques for the company were Mr Anderson and Mr Kimmins. It is not clear precisely how these cheques were transmitted to Ellis & Partners; nothing like a covering letter has come to light. However, Ellis & Partners did not regard it as in any way suspicious that they were receiving cheques drawn in their favour from the company for crediting to Mr Stone's account. It was Mr Mattocks' unchallenged evidence:

a
> 'I recollect that Mr Stone said he had borrowed the money from the
> company, and accordingly the cheques were credited to his account in
> good faith.'

In a second affidavit Mr Mattocks further said:

b
> 'Mr Stone had told me to expect two cheques each in the sum of
> £100,000 from the company shortly before they were received, and to
> credit them to his account. There was nothing unusual about this, as
> clients would often arrange for third parties to make payments in
> settlement of their accounts.'

c
[9]  In fact, albeit entirely unknown to Ellis & Partners, the two amounts of
£100,000 were not loans by the company to Mr Stone at all. In June 1995 the
company occupied office space in the building in Knightsbridge, London,
where Mr Stone also had an office from which he dealt with Powerhouse's
affairs and also, apparently, conducted dealings for another company in the
financial services sector. According to Mr Kimmins, the company had been
d
incorporated by Mr Anderson, whom Mr Kimmins assisted, in order to
purchase a cargo vessel in connection with which it had some sort of
involvement with the State Bank of India. Mr Stone was trying to raise finance
for Powerhouse and Mr Anderson was willing to assist by acting, in some
unspecified way, as a middleman between Powerhouse and the State Bank of
India.

e
[10]  Whilst the factual background of Mr Stone's involvement with the
company is by no means clear it is undoubtedly the case that on or about 12
or 13 June 1995 the company received and paid into its bank account a cheque
drawn by Powerhouse in its favour for £111,961.18. The documents,
assuming that they reflect a genuine transaction, show that this was the sterling
equivalent of US $180,000, and this was what Mr Mottram of Powerhouse
f
reported to the other directors of Powerhouse by a memorandum of 13 June
1995. Of course, it was virtually contemporaneously with this payment to the
company that the company then drew the first cheque for £100,000 in favour
of Ellis & Partners with which these proceedings are concerned. It was the
receipt from Powerhouse of the £111,961.38 which put the company in
g
sufficient funds to pay Ellis & Partners the £100,000.

[11]  In the copy documents there is a letter agreement dated 12 June 1995
signed by Mr Anderson for the company and countersigned by Mr Stone for
Powerhouse. This – again assuming it reflects a genuine transaction – provides
some overt, albeit incomplete, rationale for why Powerhouse would have been
paying the company US$180,000, ie £111,961.38. The letter agreement
h
records that the company is to provide a State Bank of India guarantee for
US$4.5m 'to underwrite the funding of the Tangxia Power Station', it being
apparently envisaged that Powerhouse would be undertaking this power
station project with a loan to be provided by a third party. For the State Bank
of India guarantee Powerhouse was to pay (presumably to, directly or
indirectly, the State Bank of India who would be issuing the guarantee) 10%
i
of the face value, ie US$450,000. Under the heading 'Fees', the letter
agreement records that there was to be a 'facility fee' of US$180,000 payable by
Powerhouse on signature of the letter agreement but does not expressly say to

whom it is to be paid. But, the US$180,000 (a) was to be treated as part payment of the US$450,000 payable by Powerhouse if and when the guarantee were provided and (b) was to be refunded to Powerhouse in the event that the guarantee was not provided by the company.

[12]  According to Mr Kimmins' affidavit, the reason why Powerhouse paid the company the £111,961.18 was – rather opaquely – said to be:

> 'so that [the company] would be able to demonstrate to [State Bank of India] its ability to meet liability for fees for the raising of the letter of guarantee.'

In oral evidence, Mr Kimmins said that it was Powerhouse, not the company, which wanted to demonstrate that it had the ability to pay under the proposed transaction. However, and whatever the reality of what was going on, the point where Mr Kimmins was adamant in evidence was that the £111,961.18 was not money which was, or was ever to be, due to the company itself. If the guarantee transaction had ever come about, the money would have been payable to the State Bank of India. In the meantime, as far as the company was concerned, it was Powerhouse's money and it was for Powerhouse, acting by Mr Stone, to say what should be done with the money. According to Mr Kimmins, he was in fact unhappy about the company holding the money.

[13]  There was a second virtually identical transaction effected on or about 28 June 1995. Here, the letter agreement of that date refers to a further State Bank of India guarantee for an additional US$4.5m. On this occasion the US$180,000 was paid at the then rate of exchange by Powerhouse's cheque in favour of the company for £113,549.66. It was this payment which enabled the company in turn to draw the second cheque in favour of Ellis & Partners for £100,000.

[14]  There is no suggestion that Mr Kimmins, or indeed Mr Anderson, had any idea that the company's two cheques for £100,000 were to be used to pay off Mr Stone's personal share dealing account with Ellis & Partners. Apart from the mere transmission of the two cheques to Ellis & Partners there were no dealings or any communication at all between the company and Ellis & Partners. Indeed, there is nothing to suggest that Mr Kimmins, Mr Anderson or anyone else at the company even knew that Ellis & Partners were stockbrokers. The evidence was that, as far as the company was concerned, the £200,000 was to be held to the order of Powerhouse at Ellis & Partners. It was Mr Kimmins' evidence that the £225,510.84 (£111,961.18 plus £113,549.66) was Powerhouse's money, he was not happy about the company having it and the £200,000 was transferred to Ellis & Partners simply because Mr Stone, purportedly acting on behalf of Powerhouse, so directed. As for the balance of the £225,510.84, Mr Stone told Mr Anderson and Mr Kimmins that the company could keep it in satisfaction of a claim the company had for reimbursement of expenses in relation to another matter.

[15] Notwithstanding Mr Kimmins' unchallenged and uncontradicted evidence that as far as the company was concerned the £225,510.84 was Powerhouse's, not the company's, money, I was invited by Mr Ellis to hold that it was indeed money to which the company was itself beneficially entitled. It may be that, as Mr Ellis submitted, Powerhouse would not in law have retained a proprietary right such as would have enabled Powerhouse to have

mounted a claim to trace and recover the proceeds of the two cheques. Nevertheless, I consider that on the evidence I must conclude that the company did not itself have any entitlement to be paid and use for its own purposes the money represented by the cheques. Mr Kimmins specifically disclaimed any such entitlement in his evidence; moreover, I do not regard the two letter agreements as necessarily being inconsistent with his evidence, particularly given that the US$180,000 was to be part of the US$450,000. If State Bank of India guarantees had materialised, the money would doubtless have been destined for the State Bank of India. In the meantime, however, it was money which was held to the order of Powerhouse and for which the company was accountable to Powerhouse.

*Section 238*

[16] Section 238 'is concerned with the depletion of a company's assets by transactions at an undervalue': *Re MC Bacon Ltd* [1990] BCLC 324 at 340. The obvious purpose of the section is to restore to a company for the benefit of its creditors money or other assets which ought not to have left the company. There is a counterpart for personal insolvency in s 339. It is the liquidator's case in the present proceedings that as between the company and Ellis & Partners there was a transaction by which the company parted with £200,000 and received no consideration at all. I am not concerned with transactions for an allegedly inadequate consideration and s 238(4)(b). The directly material parts of s 238(2)–(4) read as follows:

'(2) Where the company has at a relevant time (defined in section 240) entered into a transaction with any person at an undervalue, the [liquidator] may apply to the court for an order under this section.

(3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction.

(4) For the purposes of this section and section 241, a company enters into a transaction with a person at an undervalue if—

(a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration, or

(b) …'

[17] The effect of s 240 is to limit the restorative surgery which a court is empowered to make under s 238. Two conditions have to be fulfilled before a transaction can lead to the making of an order under s 238(3), as amplified by s 241. First, the transaction must have been entered into by the company within two years prior to the onset of insolvency. In the present case there is no issue but that this requirement is satisfied. Second, and critically for the present case, a transaction will only have been entered into *at a relevant time* if the company either (a) at the time was unable to pay its debts or (b) became unable to pay its debts in consequence of the transaction: s 240(2). Inability to pay debts has to be judged by reference to s 123.

*The issues under s 238*

[18] On the arguments addressed to me the following were the principal issues which arose:

(1) Did the mere transmission of the £200,000 by the company to Ellis & Partners constitute a 'transaction' between them for the purposes of s 238?

(2) If so, was it a transaction on terms that the company was to receive no consideration?

(3) If so, did it take place at a relevant time in that either the company was then unable to pay its debts or the company became unable to pay its debts in consequence of the transaction?

(4)Was there a transaction between the company and Mr Stone which was entered into at a relevant time and on terms that provided for the company to receive no consideration?

*Decision under s 238*

[**19**] As between the company and Mr Stone I consider that there undoubtedly was a transaction; I shall consider later what were the terms of the transaction as to consideration for the company. But, as between the company and Ellis & Partners all that happened was that two cheques for £100,000 were transmitted from the former to the latter. There was certainly nothing in the nature of any agreement or arrangement between them and indeed no evidence (leaving aside an extremely vague reference in para 7 of Mr Kimmins' affidavit) of any communication at all between them. Moreover, the company and Ellis & Partners were in their respective perceptions engaged in very different 'transactions'. It is not easy to spell out just what was *the* 'transaction' to which they were parties. As far as the company was concerned, it was dealing with money which it held to the order of Powerhouse and in accordance with Powerhouse's instructions. As for Ellis & Partners, it thought that it was receiving for the credit of Mr Stone's account money which Mr Stone had personally borrowed.

[**20**] It is right to say that the word 'transaction' as a matter of ordinary language embraces a potentially wide range of possibilities. Furthermore, the inclusive definition of s 436 of the 1986 Act is of broad ambit. It reads:

> ' "transaction" includes a gift, agreement or arrangement, and references to entering into a transaction shall be construed accordingly.'

Doubtless, one should be wary of circumscribing the width of the statutory language of s 238 lest the evident policy of the section be undermined. Nevertheless, as I read the section it does envisage that, apart perhaps from the case of a mere gift which is expressly included within ss 238 and 436, a transaction will be something which involves at least some element of dealing between the parties to the transaction. Not only is this implicit in the word 'transaction' itself, but it is reinforced by the references in s 238 to (a) the 'entry into' a transaction (b) 'with a person' and (c) 'on terms that provide'. Whilst plainly an actual contract is not required in order for there to be a transaction, the language of the section is redolent of contract and mutual dealing.

[**21**] I was referred in this connection by Mr Chivers to the observations of Judge Weeks QC, sitting as a High Court Judge, in *Clarkson v Clarkson* [1994] BCC 921 at 926. That was a very different case which arose in the context of s 339 of the 1986 Act. One point was whether an appointment

under a power contained in a policy of insurance could properly be categorised as a 'transaction' for the purposes of s 339. In rejecting the argument the judge noted the width of the word 'transaction' but continued:

*a*

> 'Nevertheless "transaction", in my judgment, has connotations of two persons involved in a dealing which are emphasised by the references to "transaction with any person". An appointment seems to me to be a different matter and not caught by the wide words of s. 339(3)(a).'

*b*

An appeal against the decision was dismissed by the Court of Appeal. Hoffmann LJ, in giving the leading judgment, did not expressly consider what was involved in the word 'transaction'. But, it would seem from his remarks at [1994] BCC 921 at 929 that he would not have disagreed with what Judge Weeks had said.

*c*

[22] In the present case there was no element at all of any sort of dealing between the company and Ellis & Partners. All that happened as between them was the transmission and receipt of the cheques for £100,000. I therefore conclude that there was in the particular circumstances of this case no 'transaction' within the scope of s 238 as between the company and Ellis & Partners. But, even if there was a transaction capable of coming within s 238, this is in any event not a case where the company can be said to have entered into it on terms that it was to receive no consideration at all for the payment of the £200,000. Mr Ellis disclaimed any reliance on the 'significantly less valuable consideration' provisions of s 238(4)(b). The fact here was that the company received money from Powerhouse for which it was obliged to account to Powerhouse. In making the onward payments to Ellis & Partners on the instructions of Mr Stone, purportedly acting as the chairman of Powerhouse, the company was not in commercial reality parting with its own money at all. For the company, the consideration which it was to receive from making the payments was the performance of its obligation to account to Powerhouse. Mr Stone had with Powerhouse's apparent approval arranged for Powerhouse's funds to come to the company; it is difficult to see why he would not have had at least ostensible authority vis-à-vis the company to act on behalf of Powerhouse in arranging the onward transmission of those funds. Furthermore, the company did in fact itself receive benefit for what it did, although it must be acknowledged that the company's transaction *with Ellis & Partners* (assuming it was such) cannot readily be described as having been 'entered into on terms that provided for the company to receive' this consideration. The company retained for itself £25,510.84 with, according to Mr Kimmins' evidence, Mr Stone's approval. Thus, the overall net effect on the company of the entire affair was not to deplete the company's funds but rather to increase them by £25,510.84.

*d*

*e*

*f*

*g*

*h*

[23] I should now deal briefly with the 'relevant time' point. Mr Ellis sought to persuade me that immediately after the company's receipt of the £111,961.18 from Powerhouse the company was in fact insolvent within the meaning of s 123. He pointed to the company's bank statements. Its current account seems only to have been opened with the credit of the Powerhouse cheque for £111,961.18 on 15 June 1995; until then, there is no evidence of the company having had any operative bank account at all. On the same day there was debited to the account a cheque for £5,500. This was cheque number

*i*

2, cheque number 1 being the first cheque for £100,000 in favour of Ellis &
Partners debited to the account on 19 June 1995. Thus, submitted Mr Ellis, the
company had by reason of the £5,500 debit already become unable to repay
Powerhouse the full £111,961.18. However, the company's bank statements
for both current and high interest accounts show numerous credits and debits,
albeit for relatively modest amounts, over the ensuing year. There is no
evidence at all as to what the company was doing, but there certainly was
something being carried on by way of business activity. In these circumstances,
I would not think it right on the minimal evidence available affirmatively to
find an inability to pay debts (within s 123) simply because of a single debit of
£5,500.

[24]  I turn to the second limb of s 240(2). The payment of £200,000 to Ellis
& Partners would have taken place at a relevant time if in consequence of that
payment the company became unable to pay its debts. On the findings which
I have made, the company did not become unable to pay its debts in
consequence of the payments to Ellis & Partners. However, I agree with
Mr Ellis to this extent. If the payments to Ellis & Partners did not discharge
the company's obligation to account to Powerhouse, the only realistic
inference on the evidence is that the company did not have the money to repay
Powerhouse. Mr Chivers sought to persuade me that I should not infer an
inability to repay Powerhouse because the amount of available information
about the company, its assets and liabilities was so sparse. He stressed that it
is for a liquidator in a s 238 application to prove that a company entered into
a transaction at a relevant time. I agree that the amount of available
information about the company's assets and liabilities is minimal. But,
everything which is known about the company points to it never having had
anything like the amount of money or realisable assets required to repay
Powerhouse in full once the £200,000 had gone to Ellis & Partners. The
picture which Mr Kimmins gave in his oral evidence was of a company of no
substance at all. And his evidence is supported by what can be seen from the
company's bank statements and the other information contained in the
liquidator's affidavit of 15 May 2001 which I admitted in evidence at the
hearing. Accordingly, if I had concluded that notwithstanding the payments to
Ellis & Partners the company remained accountable to Powerhouse, I would
also have concluded that the payments to Ellis & Partners were made at a
relevant time for the purposes of s 238(2).

[25]  In the result, I make no order against Ellis & Partners under s 238(3).
It remains for me to consider whether such an order should be made against
Mr Stone. As I have already indicated, I am in no doubt but that there was a
'transaction' as between the company and Mr Stone. The transaction would
cover the inflow of the £225,510.84, the outflow of the £200,000 and the
retention by the company of the balance of £25,510.84.  Nevertheless, in the
light of my previous findings I do not think it appropriate to make an order
against Mr Stone under s 238(3). In brief, this is because:

(a) for the reasons I have set out, the transaction did not take place at a
relevant time; and

(b) the company did not enter into the transaction with Mr Stone on terms
that it was to receive no consideration but, rather, on terms that it was to
receive £25,510.84.

a Of course, in order to avoid any possible misunderstanding I emphasise that I am not intending in any way to suggest that the liquidator, say in his role as liquidator of Powerhouse, may not have a remedy against Mr Stone. On the contrary, on the evidence which I heard I would have thought that Mr Stone would indeed have a liability to Powerhouse enforceable by the liquidator in his capacity as Powerhouse's liquidator. All that I am saying is that I do not think that a s 238 application by the liquidator in his capacity as liquidator of the company is the appropriate route.

b

*Section 423*

[**26**] I can deal with this aspect of the liquidator's application quite briefly. There was very little argument about s 423 at the hearing before me. Section 423, headed 'Transactions defrauding creditors', also strikes at transactions entered into at an undervalue. In many ways the requirements of the section are similar to those of s 238, although it is potentially broader in scope in that (a) s 423 has no 'relevant time' restriction and (b) a s 423 claim may be brought by a victim, not just a liquidator or administrator. Some of what I have held in relation to s 238 is relevant also to the liquidator's case under s 423. In addition, however, and critically, there is s 423(3) which reads:

c

d

'(3) In the case of a person entering into [a transaction at an undervalue], an order shall only be made if the court is satisfied that it was entered into by him for the purpose—

(a) of putting assets beyond the reach of a person who is making, or may at any time make, a claim against him, or

e (b) of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.'

[**27**] The short answer to the case under s 423 is that there was no evidence which would justify a finding that the purpose of either the company or Mr Stone in entering into any of the possible permutations of transaction was f a purpose falling within either limb of s 423(3). The company's purpose was to assist Powerhouse in the person of Mr Stone and, no doubt, to obtain the £25,510.84 for itself. As for Mr Stone, his purpose evidently was to misappropriate Powerhouse's money for his own personal benefit. But, neither the company nor Mr Stone had in mind the avoidance or hindrance of some g claim which was being made or might be made against either of them. In short, it was not the defrauding of a creditor which was the purpose of the transaction from either of their points of view.

*Conclusion*

[**28**] In the result the liquidator's application must be dismissed. I will, of h course, hear the parties on any matters arising out of this judgment.

*Order accordingly.*

Kenneth Dow Esq    Barrister.

TAB 61

*Re Thoars, Reid v Ramlort Ltd* [2003] 1 BCLC 499,
English High Court

*a*  # Re Thoars (decd), Reid v Ramlort Ltd

[2002] EWHC 2416 (Ch)

CHANCERY DIVISION
SIR ANDREW MORRITT V-C
*b*  7, 15 NOVEMBER 2002

*Winding up – Transactions at an undervalue – Value of consideration
provided by bankrupt – Preliminary issue as to whether and to what extent
value should be assessed taking into account subsequent events – Whether
preliminary issue susceptible of just determination – Insolvency Act 1986,*
*c*  *s 339.*

On 1 February 1994, T took out a unit-linked life insurance policy with
Skandia Life. On 1 February 1996 the annual premium, which was variable,
was £1,176 for a sum payable on death then amounting to £185,568. On
*d*  19 July 1996, T, who was suffering from cirrhosis of the liver, was put on
the active list for a liver transplant. On 26 July 1996 T assigned the benefit
of the policy to the defendant (Ramlort) by means of a written declaration of
trust which was not expressed to be made for any consideration. On
18 September 1996 T underwent a liver transplant. The following day he
died both intestate and insolvent. The claimant (R) was appointed the
*e*  judicial factor of T's insolvent estate in 1997. In 1999 R commenced
proceedings seeking to set aside the assignment of the policy under s 339 of
the Insolvency Act 1986 on the grounds that it was a transaction at an
undervalue, made at a relevant time under s 341, by reference to the sum
payable on death as at 1 February 1996, namely £185,598. Ramlort
*f*  contended that when assigned the policy had no value or none exceeding its
surrender value of £71.96. In addition it asserted that it gave good
consideration for the declaration of trust by reimbursing the deceased for the
premium due on 1 February 1996, agreeing to pay the remaining premiums
as and when they fell due and paying the deceased £1,900. The registrar
adjourned the application to the judge for the determination of a preliminary
*g*  issue. The issue was to what extent (if at all) the value of the consideration
provided by T to Ramlort by the declaration of trust should be assessed in
the knowledge of and/or taking into account the fact that T underwent a liver
transplant operation on 18 September 1996 and died the following day.

**Held** – (1) The court might in appropriate circumstances have regard to
*h*  subsequent events in assessing the value of consideration in money or
money's worth as required by s 339(3)(c). Reality should be given precedence
over speculation. The same valuation principles should be applied to both the
consideration received by the insolvent and the consideration disposed of by
the insolvent. If subsequent events were admissible because they resolved
previous uncertainties there was no logical basis for limiting their effect so as
*i*  to exclude increases in value. The value of the consideration in money or
money's worth was to be assessed as at the date of the transaction, and if at
that date value was dependent on the occurrence or non-occurrence of some

event and that event occurred before the assessment of value had been
completed then the valuer might have regard to it, but the valuer was entitled
and bound to take account of all other matters relevant to the determination   *a*
of value as at the date of the transaction. Subsequent events, though
admissible, were only evidence on which the valuer might rely. The actual
value remained a question of fact for his determination on all the evidence.
  *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] 1 BCLC 145 applied.
  (2) The preliminary issue was not susceptible of just determination in   *b*
accordance with its terms. The preliminary issue was inappropriate because
the value of the policy as at 26 July 1996 was a question of fact for the
determination of the court on all the evidence. It would depend on the court's
evaluation of the expert valuation evidence. That might, in turn, depend on
the court's evaluation of medical evidence as to the cause of death because
the deceased died of cardiac arrest, not from cirrhosis of the liver, and   *c*
whereas death caused by the latter was more or less expected depending on
whether or not the deceased had a liver transplant, it remained to be decided
whether there was any expectation of death from the former and if so to what
extent.

## Cases referred to in judgment   *d*

*Bwllfa and Merthyr Dare Steam Collieries (1891) Ltd v Pontypridd
  Waterworks Co* [1903] AC 426, HL.
*Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2, [2001] 1 BCLC
  145, [2001] 1 WLR 143, HL.

## Preliminary issue   *e*

Mr Reid as the judicial factor of the insolvent estate of Mr Allan McLean
Thoars (deceased) applied to set aside the assignment by Mr Thoars to the
defendant company, Ramlort Ltd, of a life assurance policy as a transaction
at an undervalue under s 339 of the Insolvency Act 1986 and the registrar
adjourned the application to the judge for the determination of a preliminary   *f*
issue as to the extent to which the value of the consideration provided by Mr
Thoars to Ramlort Ltd by the declaration of trust made on 26 July 1996
should be assessed in the knowledge of and/or taking into account the fact
that Mr Thoars underwent a liver transplant operation on 18 September
1996 and died the following day. The facts are set out in the judgment of Sir
Andrew Morritt V-C.   *g*

*Stephen Davies QC* (instructed by *Peterkins*) for the applicant.
*Guy Newey QC* (instructed by *Clintons*) for the respondent.

*Cur adv vult*   *h*

15 November 2002. The following judgment was delivered.

## SIR ANDREW MORRITT V-C.

  [1] On 1 February 1994 Allan McLean Thoars (the deceased) took out a
unit-linked life insurance policy with Skandia Life Assurance Co Ltd (the
policy). On 1 February 1996 the annual premium, which was variable, was   *i*
£1,176 for a sum payable on death then amounting to £185,568. On 19 July
1996 the deceased, who was suffering from cirrhosis of the liver, was put on

the active list for a liver transplant. On 26 July 1996 the deceased assigned the benefit of the policy to the defendant (Ramlort) by means of a written declaration of trust which was not expressed to be made for any consideration. On 18 September 1996 the deceased underwent a liver transplant. The following day he died both intestate and insolvent.

[2] The claimant (Mr Reid) is the judicial factor of the deceased's insolvent estate, having been so appointed by the sheriff for the area in which the deceased lived, namely Grampian, Highlands and Islands, on 16 September 1997. On 12 March 1999 he commenced these proceedings. He seeks an order to set aside the assignment of the policy under s 339 of the Insolvency Act 1986 on the grounds that it was a transaction at an undervalue.

[3] Section 339 provides:

'(1)  Subject as follows in this section and sections 341 and 342, where an individual is adjudged bankrupt and he has at a relevant time (defined in section 341) entered into a transaction with any person at an undervalue, the trustee of the bankrupt's estate may apply to the court for an order under this section.

(2) The court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if that individual had not entered into that transaction.

(3) For the purposes of this section and sections 341 and 342, an individual enters into a transaction with a person at an undervalue if— (a) he makes a gift to that person or he otherwise enters into a transaction with that person on terms that provide for him to receive no consideration, (b) he enters into a transaction with that person in consideration of marriage, or (c) he enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the individual.'

[4] Section 341(1)(a) prescribes the relevant time for the purposes of s 339 as a time within five years prior to the presentation of the petition on which the individual was adjudicated a bankrupt. But, by virtue of s 341(2), a time not within the last two years of that period is not relevant unless the individual was insolvent at that time or became insolvent in consequence of the transaction. In the case of a transaction between that individual and an associate of his it is presumed that those conditions are satisfied unless the individual establishes the contrary.

[5] It is not in dispute that the declaration of trust was executed by the deceased at a relevant time. Mr Reid relies on the sum payable on death as at 1 February 1996, namely £185,598, and contends that his claim comes within each of the grounds set out in s 339(3). This is disputed by Ramlort. It contends that the policy had no value or none exceeding its surrender value of £71.96. In addition it asserts that it gave good consideration for the declaration of trust by reimbursing the deceased for the premium due on 1 February 1996, agreeing to pay the remaining premiums as and when they fell due and paying the deceased £1,900.

[6] The parties have given disclosure and exchanged the reports of experts on the valuation of the policy. They have not exchanged witness statements or the reports of medical experts. On 27 November 2001 Mr Registrar Jaques adjourned the application to the judge for the determination of a preliminary issue in the following terms:

> 'To what extent (if at all) the value of the consideration provided by Mr Thoars to Ramlort Ltd by the declaration of trust made on 26th July 1996 should be assessed in the knowledge of and/or taking into account the fact that he underwent a liver transplant operation on 19th September 1996 and died during surgery on that date.'

The formulation of the preliminary issue misstates the facts because the transplant was carried out on 18 September and the deceased died, not during surgery on that day, but on the following day, 19 September, when in intensive care after the operation had been completed.

[7] I did not understand that order to have been made by consent but neither side appealed. For reasons I will explain later I do not consider such a preliminary issue to be susceptible of just determination in accordance with its terms. But in view of the delays which have already occurred in the resolution of this dispute I should give such guidance as I properly can in advance of findings of relevant facts.

[8] The essential point is the extent, if any, to which subsequent events may be regarded in assessing the value of consideration in money or money's worth as required by s 339(3)(c). That the court may in appropriate circumstances have regard to subsequent events in assessing values is not in doubt. In *Bwllfa and Merthyr Dare Steam Collieries (1891) Ltd v Pontypridd Waterworks Co* [1903] AC 426, 431 Lord Macnaghten said:

> 'If the question goes to arbitration, the arbitrator's duty is to determine the amount of compensation payable. In order to enable him to come to a just and true conclusion it is his duty, I think, to avail himself of all information at hand at the time of making his award which may be laid before him. Why should he listen to conjecture on a matter which has become an accomplished fact? Why should he guess when he can calculate? With the light before him, why should he shut his eyes and grope in the dark?'

[9] In *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2, [2001] 1 BCLC 145, [2001] 1 WLR 143 the House of Lords considered the entitlement of a court to have regard to subsequent events in ascertaining the value of the consideration in money or money's worth received by an insolvent company. The question arose under s 238(4)(c) which is in substantially the same terms as s 339(3)(c).

[10] The facts of that case were complicated. In essence an insolvent company, AJB, transferred its stockbroking business to a subsidiary of PCG and received in exchange the benefit of a covenant by PCG to pay an annual rent of £312,500 for four years contained in an agreement for the subletting

by AJB to PCG of certain computer equipment which AJB held under a head lease. It was necessary to value the benefit of that covenant and compare it with the value of the business being sold, namely £1.25m.

*a*

[11] The date of the transaction was 10 November 1989. As at that date the headlease was terminable at the will of the headlessor because the sub-lease was in breach of an absolute covenant against assigning or sub-letting. Repossession of the equipment would terminate the sub-lease. As Lord Scott of Foscote, with whom the other members of the appellate committee agreed, said (para 23):

*b*

> 'So, what was the value, in money or money's worth, of a covenant by PCG that was so precarious?'

*c*

He then referred to a number of events occurring between 10 November 1989 and 23 February 1990 and concluded (para 25) that:

> 'PCG's covenant, which had been precarious at the outset, had become worthless by 23 February 1990 at the latest.'

*d*

[12] Lord Scott of Foscote referred to the submission of counsel for PCG that such ex post facto events should not be taken into account in valuing PCG's covenant as at 10 November 1989 and continued, in para 26:

*e*

> 'I do not agree. In valuing the covenant as at that date, the critical uncertainty is whether the sublease would survive for the four years necessary to enable all the four £312,500 payments to fall due, or would survive long enough to enable some of them to fall due, or would come to an end before any had fallen due. Where the events, or some of them, on which the uncertainties depend have actually happened, it seems to me unsatisfactory and unnecessary for the court to wear blinkers and pretend that it does not know what has happened. Problems of a comparable sort may arise for judicial determination in many different areas of the law. The answers may not be uniform but may depend upon the particular context in which the problem arises. For the purposes of s 238(4), however, and the valuation of the consideration for which a company has entered into a transaction, reality should, in my opinion, be given precedence over speculation. I would hold, taking account of the events that took place in the early months of 1990, that the value of PCG's covenant in the sublease [as] of 10 November 1989 was nil. After all, if, following the signing of the sublease, AJB had taken the sublease to a bank or finance house and had tried to raise money on the security of the covenant, I do not believe that the bank or finance house, with knowledge about the circumstances surrounding the sublease, would have attributed any value at all to the sublease covenant.

*f*

*g*

*h*

> [27] Where the value of the consideration for which a company enters into a s 238 transaction is as speculative as is the case here, it is, in my judgment, for the party who relies on that consideration to establish its value. PCG and Brewin Dolphin are, in the present case, unable to do so.'

*i*

[13] Counsel for Ramlort submitted that *Phillips* was distinguishable on any one of four grounds. First, the relevant valuation in that case was the consideration received by the insolvent whereas this case concerns the consideration disposed of by the insolvent. It was suggested that this distinction had a real difference because though an insolvent should be discouraged from selling his assets for a speculative consideration he should not be impeded in selling assets of a speculative value for tangible consideration. I am unable to accept this distinction. It is not warranted by the terms of the subsection nor by the mischief against which it is aimed, namely a reduction in the net assets of the insolvent. Such a reduction is achieved by a mismatch between that which is disposed of and that which is received. The same valuation principles should be applied to both elements.

[14] Second, it is suggested that Lord Scott of Foscote based his conclusion on the inability of the defendants to establish the value of the covenant. By contrast, in this case each party has produced the report of an expert on the valuation of the policy. This submission relates to para 27 of the speech of Lord Scott of Foscote. I do not read that paragraph as qualifying in any way what is said in para 26. On the contrary it is the consequence of applying the principles set out in para 26 which leads to the conclusion in para 27 that PCG had failed to discharge the onus of establishing the [face] value of the covenant.

[15] Third, counsel for Ramlort points out that in *Phillips* subsequent events were relied on as confirmation that the asset of precarious value in fact had none whereas in this case Mr Reid seeks to rely on subsequent events to increase the value of the policy. It is true that such a distinction may be drawn but I do not see why it should lead to any difference. If subsequent events are admissible because they resolve previous uncertainties then I can see no logical basis for limiting their effect so as to exclude increases in value.

[16] Finally, counsel for Ramlort submitted that the use of the subsequent events in *Phillips* to confirm a nil value accorded with common sense, but their use in this case to give to the policy any value beyond the nominal would not. This is not a ground for distinguishing *Phillips*, though it may be good reason for scrutinising its application with care.

[17] For all these reasons I reject the contention of counsel for Ramlort that I am not bound by the ratio decidendi of *Phillips*. I take that ratio to be that (1) the value of the consideration in money or money's worth is to be assessed as at the date of the transaction, (2) if at that date value is dependent on the occurrence or non-occurrence of some event and that event occurs before the assessment of value has been completed then the valuer may have regard to it, but (3) the valuer is entitled, indeed bound, to take account of all other matters relevant to the determination of value as at the date of the transaction. The first proposition appears from the second sentence of the passage in para 26 I have quoted in para 12 above. The second proposition is reflected in the third sentence of that quotation. In my view the third proposition is inherent in the last two sentences of para 26 and the first sentence of para 27 of the speech of Lord Scott of Foscote.

[18] Counsel for Ramlort submitted that on the facts of this case it would be wrong to assess the value of the policy as at 26 July 1996 by reference to the death of the deceased on 19 September 1996. He pointed to absurdities which would arise in comparable cases, for example, the accidental and

*a*  premature death of a young and healthy life assured, the sale of a lottery ticket at cost, the purchase or sale of quoted shares before the disclosure of market sensitive information, the sale of land with hope value which is subsequently realised or the sale of residential property the value of which goes up in line with the market. In all these cases, he submitted, the use of subsequent events to increase the value would be unjust.

*b*  [19] Counsel for Mr Reid recognised the force of these submissions. In his reply he accepted that subsequent events should not be taken into account unless and to the extent that they were both relevant and foreseeable at the time the transaction was entered into.

[20] In my view the examples of absurdity given by counsel for Ramlort cannot be so easily disposed of. In each case the subsequent event is foreseeable though its likelihood ranges from the remote (the lottery ticket), through the possible (sale of land with hope value) to the probable (the sale of residential property). The solution in my view lies in the third proposition to which I have referred. Subsequent events, though admissible, are only evidence on which the valuer may rely. The actual value remains a question of fact for his determination on all the evidence. In the same way that Lord Scott of Foscote referred in para 26 to the likelihood of AJB raising money on the security of the covenant so the valuer is entitled to consider the likelihood of a lottery ticket being sold for more than the value of the stake before the draw has been carried out, notwithstanding that he knows that thereafter it entitled the holder to £5m.

*c*

*d*

*e*  [21] This conclusion demonstrates the inappropriateness of the preliminary issue in this case. The value of the policy as at 26 July 1996 is a question of fact for the determination of the court on all the evidence. It will depend on the court's evaluation of the expert valuation evidence. That may, in turn, depend on the court's evaluation of medical evidence as to the cause of death because the deceased died of cardiac arrest, not from cirrhosis of the liver. Death caused by the latter was more or less expected depending on whether or not the deceased had a liver transplant; but was there any expectation of death from the former and if so to what extent? It is not for me, on the trial of this or any other preliminary issue, to express any view as to how the judge at the trial should resolve the issues of fact. The decision of the House of Lords in *Phillips* shows that evidence as to when the deceased died and why is admissible but it is for the judge at trial to determine what, if any, effect on the value of the policy as at 26 July 1996 those facts may have.

*f*

*g*

[22] In these circumstances I do not consider that it would be appropriate to give an answer to the preliminary issue. Not only is it factually inaccurate but any answer may appear to limit the scope of the fact-finding exercise to be conducted by the judge at trial. In my view the sooner that exercise is completed the better. I will invite counsel to formulate directions designed to ensure that the trial of the application takes place as soon as possible.

*h*

*i*  *Order accordingly.*

Celia Fox    Barrister.

TAB 62

*Resolution Chemicals Ltd v H Lundbeck A/S* [2013] EWCA Civ 924,
English Court of Appeal

Case No: A3/2013/1002

Neutral Citation Number: [2013] EWCA Civ 924
**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION, PATENTS COURT**
**The Hon Mr Justice Arnold**
**[2013] EWHC 739 (Pat)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: Monday 29th July 2013

Before :

**LORD JUSTICE LONGMORE**
**LORD JUSTICE MOORE BICK**
and
**LORD JUSTICE FLOYD**
- - - - - - - - - - - - - - - - - - - -
**Between:**

**RESOLUTION CHEMICALS LIMITED**            **Respondent**
                                            **/Claimant**

**- and -**
**H. LUNDBECK A/S**                          **Appellant/**
                                            **Defendant**

- - - - - - - - - - - - - - - - - - - -
(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
165 Fleet Street, London EC4A 2DY
Tel No:  020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)
- - - - - - - - - - - - - - - - - - - -

**Andrew Waugh QC** and **Miles Copeland** (instructed by **Wragge & Co. LLP**) for the
**Appellant**
**Michael Tappin QC** and **Mark Chacksfield** (instructed by **Olswang LLP**) for the
**Respondent**
- - - - - - - - - - - - - - - - - - - -
**Judgment**

**Lord Justice Floyd :**

1.    European Patent (UK) No. 0 347 066 ("the Patent") and its foreign counterparts have been extensively litigated all over the world, including in this country. The Patent is now the subject of a supplementary protection certificate (SPC/GB02/049) ("the SPC"). The Patent and SPC relate to escitalopram, a single enantiomer of the compound citalopram, a drug used for the treatment of depression. The proprietor of the Patent is H. Lundbeck A/S ("Lundbeck"), a Danish pharmaceutical company. The UK counterpart of the Patent was ultimately held valid in revocation proceedings in the UK commenced in December 2005 by Generics (UK) Limited and later joined by a number of other generic pharmaceutical companies including, in February 2006, Arrow Generics Limited ("Arrow") ("the 2005 proceedings"). Before and at the time of the final judgment in the 2005 proceedings the claimant in the present revocation action ("Resolution") was part of the same group of companies as Arrow. Resolution is now an independent company and, in this action, has launched its own attack on the SPC relying on invalidity of the Patent, claiming that it has better evidence than Arrow had, and new prior art. Lundbeck contends that Resolution is precluded from bringing the action because it is in privity of interest with Arrow, which is in turn estopped from bringing a similar action as a result of the judgment in the 2005 proceedings. Whether Resolution was precluded in this way was the subject of a preliminary issue tried by Arnold J in this action. By his order of 12 April 2013, Arnold J held that Resolution was not precluded from challenging the validity of the Patent or the SPC. Lundbeck appeals with the judge's permission. Mr Waugh QC and Mr Copeland presented Lundbeck's case. Mr Tappin QC and Mr Chacksfield did so for Resolution.

2.    In addition to its contention that Resolution was precluded from bringing its claim by privity of interest with Arrow, Lundbeck originally sought summary judgment on the ground that Resolution's claim had no prospect of success. That application was ordered to be determined at the same time as the preliminary issue. Arnold J dismissed that application and there is no appeal from his judgment and order in that respect. A claim that Resolution was precluded from bringing the claim by reason of privity of interest with companies in the Teva group who were also parties to the previous revocation action is also not pursued on appeal.

3.    The judge recorded that it was common ground that "*Arrow Generics would be precluded by issue estoppel and the doctrine of abuse of process from challenging the validity of the SPC on the ground that the Patent is invalid.*" There was some debate before us about the precise terms of the concession, in particular as to whether Arrow would be precluded on both grounds or just one or the other without specifying which. The debate as to which type of estoppel bound Arrow might be of significance, as I explain further below.

**Factual Background.**

4.    The judge made detailed findings of fact, having received written evidence and heard live witnesses. What follows is a summary of his principal findings which remain relevant in the light of the more limited issues before us.

*Resolution, and its involvement with citalopram and escitalopram*

5.    Resolution was established in 1986 as a manufacturer of active pharmaceutical ingredients ("APIs"). At that time it was part of the Amerpharm Group. It came under a succession of different owners, but in 2001 it was sold to Arrow Group ApS, a holding company for a new group of companies founded by Anthony Tabatznik ("Mr Tabatznik"). Between 2001 and 2009 the Arrow Group grew rapidly. Arrow was another English company in the Arrow Group throughout this period. Resolution and Arrow were therefore sister companies within the Arrow Group.

6.    The business model for most companies in the group other than Resolution was to buy in marketing authorisations ("MAs") for products. For such products, the MA would stipulate the manufacturer of the API and details of the manufacturing method. It would not have been possible for Resolution to take over the manufacture of such APIs. Resolution continued to sell four APIs to Merck Generics (one of its previous owners) and sold two APIs to companies in the Arrow Group, but those intra-Group sales amounted to only about 4% of its sales during the period it was part of the Arrow Group. Conversely, while Resolution was part of the Arrow Group, companies in that group launched over 400 products, but only two contained APIs sourced from Resolution.

7.    In 2009 the Arrow Group was purchased by Watson Pharmaceuticals Inc, which hived off Resolution in order to meet requirements imposed by the United States Federal Trade Commission. Since December 2009 Resolution has been an independent company, majority owned by a US investment bank. Under its new ownership, Resolution has adopted a new business model which is more akin to that of a generic pharmaceutical supplier than that of an API manufacturer.

8.    Throughout the period 2001 to 2009 the ultimate beneficial owner of the Arrow Group, and hence of both Resolution and Arrow, was Mr Tabatznik. Mr Tabatznik was the Chief Executive Officer of the Arrow Group and one of the directors of Resolution.  There was some dispute at the trial over the extent of Mr Tabatznik's control over the day to day affairs of Resolution.  The dispute arose in the light of an apparent conflict between the evidence given by Mr Greenwood for Resolution and some statements made to the European Commission in connection with an inquiry by the Commission into agreements between Lundbeck, Arrow and Resolution.  The judge concluded at [21]:

> "I think the position is reasonably clear. Mr Tabatznik controlled the Arrow Group, including Resolution. Accordingly he had control of Resolution's activities in the sense that, if he wanted Resolution to do something, Resolution would do it (or try to do so). That included manufacturing citalopram or escitalopram (as to which, see below). As Mr Greenwood put it, "it was his chemistry set". Thus Mr Tabatznik set the strategic direction for Resolution. He would also intervene if he was not satisfied with Resolution's progress (as he did in July 2004, as discussed below). Nevertheless, most of the time, Mr Tabatznik left Mr Greenwood and his colleagues alone. It was Mr Greenwood and his colleagues who decided how to pursue Resolution's projects, who to employ, what commercial

> partners to work with, budgets and so on. Mr Greenwood met Mr Tabatznik just three or four times a year to discuss how Resolution's projects were progressing, particularly the THC project which Mr Tabatznik was most interested in. There were also occasional telephone calls, usually from Mr Greenwood to Mr Tabatznik rather than the other way around. Thus on a day-to-day basis Resolution was essentially independently managed."

9.    Mr Waugh complained that the judge was prepared to accept that Mr Greenwood's evidence could be reconciled with the statements to the Commission. Nevertheless he did not quarrel with the findings which the judge actually made in the passage I have quoted above. In those circumstances the question of whether the judge should have been so generous to Mr Greenwood is academic, and it is not necessary to say any more about it.

10.    The judge did hold that Mr Tabatznik took charge of major patent matters affecting companies within the Arrow Group with the assistance of Dr Andrew Lowrie, who was the Group's Head of European Patent Litigation.

11.    Between 1998 and 2004 Resolution worked on the development of citalopram, the racemic (mixed enantiomer) compound of which escitalopram is a single enantiomer component. Resolution developed a process which it believed would not infringe Lundbeck's patents. For part of that time it worked on the practical development of this process in co-operation with a company called Neuland, an API manufacturer in India. Although Neuland made 10 large laboratory scale batches, it was not able to get the process to work. The batches were destroyed and the patent applications and patents allowed to lapse, ultimately, by 2005.

12.    In January 2002 there was a meeting between Mr Tabatznik, on behalf of the Arrow Group, and representatives of Lundbeck to discuss the Arrow Group's interest in citalopram. Following the meeting Lundbeck wrote to "Arrow Resolution" seeking undertakings not to infringe the patents. Mr Tabatznik replied on Resolution notepaper suggesting a meeting. On 24 January 2002 Lundbeck on the one hand and Arrow and Resolution on the other entered into a settlement agreement. The agreement was signed by Mr Tabatznik on behalf of both Arrow and Resolution. Some litigation for infringement of a patent relating to citalopram ensued but did not proceed beyond February 2002. The judge said it was unclear why Mr Tabatznik involved Resolution in this litigation, since it was unable to manufacture citalopram at the time. Arrow did launch a citalopram product some time in 2004. The API was not supplied by Resolution.

13.    None of the above had anything to do with escitalopram. This history was relied on by Lundbeck to show what might happen if Arrow became involved in escitalopram.

14.    In early November 2001 escitalopram was amongst a list of drugs which Resolution identified as representing generic opportunities. During one of the meetings in January 2002 to discuss the citalopram litigation, Mr Tabatznik asked representatives of Lundbeck whether Lundbeck would give a licence under the escitalopram patents. The judge concluded that it was possible that Mr Tabatznik was considering asking Resolution to make escitalopram at that time.

15.    In early September 2002 Mr Tabatznik asked Resolution to review routes for the synthesis of escitalopram. In September 2002 Dr McHattie recorded in a memo that he had found and reviewed the Patent and noted a couple of ideas for synthesis. In October 2002 Mr Greenwood told Mr Tabatznik that, if Mr Tabatznik still wanted him to look at escitalopram, he could make some after the receipt of the 50 kg of citalopram which was then being manufactured for it by Neuland.  No more was done for over 10 months.

16.    In September 2003 Dr McHattie asked Dr Lowrie to look for patents and patent applications for escitalopram. Dr Lowrie replied attaching copies of four patents and applications, including the Patent. This led to requests for copies of more patents, which Dr Lowrie sent in October and November 2003. In about October 2003 Dr McHattie and his colleagues produced a document entitled "Routes for the Preparation or Resolution of Escitalopram". This set out a number of routes covered by Lundbeck patents and applications and some possible routes not covered by existing patents. The purpose of this was to enable Resolution or a subcontractor to manufacture escitalopram. Nothing further was done to that end. No laboratory work was done. There was no prospect of Resolution being able to make escitalopram on a commercial scale, or at acceptable purity and cost when it had been unable to achieve that with citalopram.   The cost of this work was £1,155.20 in internal costs in 2003.

17.    In July 2004 Mr Greenwood sent Mr Tabatznik an email dated 22 July 2004 in which he identified four generic suppliers of escitalopram and continued:

> "Dick [Binnington, API sourcing manager for the Arrow Group] to look and see if we can get a supply. Failing that, I will look to Neuland."

18.    The judge accepted Mr Greenwood's evidence that he was trying to be helpful to other companies in the Arrow Group by identifying suppliers of escitalopram and by offering to try to get it manufactured by Neuland if Mr Binnington was unable to source it, but that he did not expect Mr Binnington to be unsuccessful. He maintained that Resolution was unable to make citalopram, let alone escitalopram, at that time and that he would have had no confidence in Neuland's ability to do so. In the event Mr Binnington was successful in sourcing escitalopram for Arrow.

19.    The judge found that these events marked the end of Resolution's involvement with escitalopram while it was a member of the Arrow Group. Resolution's costs incurred in connection with this project in 2004 amounted to just £64.95.

20.    Arrow was in due course granted marketing authorisations for escitalopram. However it did not name Resolution as the source of such escitalopram.  It would not have been possible for Resolution to supply escitalopram to Arrow under those MAs even if Resolution was able to manufacture escitalopram at that time, which it was not.  By 6 February 2006, the date when Arrow joined the 2005 proceedings, there were already seven different manufacturers of escitalopram oxalate who had submitted Drug Master Files to the US Food and Drug Administration.

*The 2005 proceedings*

21.   The 2005 proceedings were concluded when the House of Lords dismissed the claimants' (including Arrow's) appeals on 25 February 2009. There were also separate proceedings brought by all the claimants for revocation of the SPC on grounds independent of validity of the Patent, commenced in March 2007. In May 2009 Arrow discontinued their claim for revocation of the SPC. Resolution was not at any stage a party to any of the claims. The judge found that Resolution was not asked whether it could or would supply Arrow (or any other company in the Arrow Group) with escitalopram at the time of the escitalopram litigation. Nor was it asked to assist in the manufacture or supply of escitalopram at that time. Mr Greenwood was unaware of the litigation. However, it is fair to point out that Mr Tabatznik, as a director of Resolution, was.

## The law on privity of interest

22.   Privity of interest provides an exception to the general principle of the law of estoppel that the estoppel binds only the parties to the previous litigation. The rules of law compendiously described as estoppels are very broadly based on the principle that nobody should be vexed twice in the same cause. Thus, in cause of action estoppel, party A will not be allowed to litigate the question of whether a cause of action exists with a counterparty B more than once. The successful litigant and the public have an interest in this being the law. The litigant has an interest in not being vexed twice in the same cause. The public also has an interest in ensuring that the scarce resources available for resolving disputes are used efficiently. There is however no reason in principle why a different party, C, who has the same complaint against B should not be free to litigate the same question. Notwithstanding, for example, the fact that A may have lost a first action, fairness normally demands that C should not be precluded by the manner in which A conducted the first action from bringing his own action, calling his own evidence and challenging the evidence called by B.

23.   These principles apply to actions for revocation of patents as they do to any other type of action. Whilst the final revocation of a patent is a judgment *in rem* and therefore can be relied on by the world at large, a judgment that a patent is valid determines issues only between the parties to the revocation action. Third parties may launch second and subsequent attacks on the patent. It is not necessary for any such party attacking a patent to show any particular interest: the cause of action is vested in "any person": see Patents Act 1977 section 72. The patentee does, however, receive some protection from successive, unsuccessful attacks in terms of the costs order the court may make, but that is all: see Patents Act 1977 section 65.

24.   The law recognises that there are some classes of case where fairness demands that party C should be precluded from re-litigating a matter even although he was not a party to the previous proceedings between A and B. One of these is where party C is in "privity of interest" with A. Privity of interest has been said to be a "somewhat narrow" doctrine: see per Sir Robert Megarry V-C in *Gleeson v J Wippell & Co* [1977] 1 WLR 510 at 515 A. That case concerned clerical shirts. Denne had manufactured shirts which were designed by Wippell. Miss Gleeson contended that Wippell had copied her shirt. She first sued Denne (and not Wippell) and lost on the ground that Wippell had not copied her shirt. In the later, separate action against Wippell it was contended by Wippell that Miss Gleeson was estopped from raising

the same complaint against Wippell. Wippell was thus seeking to take advantage of privity of interest with Denne. Its design of shirt, which it had supplied to Denne had been held not to infringe in the previous action. Sir Robert Megarry dealt with the principles to be applied in this way at pages 515-6:

> "First, I do not think that in the phrase 'privity of interest' the word 'interest' can be used in the sense of mere curiosity or concern. Many matters that are litigated are of concern to many other persons than the parties to the litigation, in that the result of a case will at least suggest that the position of others in like case is as good or as bad as, or better or worse than, they believed it to be. Furthermore, it is a commonplace for litigation to require decisions to be made about the propriety or otherwise of acts done by those who are not litigants. Many a witness feels aggrieved by a decision in a case to which he is not party without it being suggested that the decision is binding upon him.
>
> Second, it seems to me that the substratum of the doctrine is that a man ought not to be allowed to litigate a second time what has already been decided between himself and the other party to the litigation. This is in the interest both of the successful party and of the public. But I cannot see that this provides any basis for a successful defendant to say that the successful defence is a bar to the plaintiff suing some third party, or for that third party to say that the successful defence prevents the plaintiff from suing him, unless there is a sufficient degree of identity between the successful defendant and the third party. I do not say that one must be the alter ego of the other: but it does seem to me that, having due regard to the subject matter of the dispute, there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was party should be binding in proceedings to which the other is party. It is in that sense that I would regard the phrase 'privity of interest'. Thus in relation to trust property I think there will normally be a sufficient privity between the trustees and their beneficiaries to make a decision that is binding on the trustees also binding on the beneficiaries, and vice versa.
>
> Third, in the present case, I think that the matter may be tested by a question that I put to Mr. Skone James in opening. Suppose that in the Denne action the plaintiff, Miss Gleeson, had succeeded, instead of failing. Would the decision in that action that Wippell had indirectly copied the Gleeson drawings be binding on Wippell, so that if sued by Miss Gleeson, Wippell would be estopped by the Denne decision from denying liability? Mr. Skone James felt constrained to answer Yes to that question. I say "constrained" because it appears that for privity with a party to the proceedings to take effect, it must

> take effect whether that party wins or loses. … In such a case,
> Wippell would be unable to deny liability to Miss Gleeson by
> reason of a decision reached in a case to which Wippell was not
> a party, and in which Wippell had no voice. Such a result
> would clearly be most unjust. Any contention which leads to
> the conclusion that a person is liable to be condemned unheard
> is plainly open to the gravest of suspicions. A defendant ought
> to be able to put his own defence in his own way, and to call his
> own evidence. He ought not to be concluded by the failure of
> the defence and evidence adduced by another defendant in
> other proceedings unless his standing in those other
> proceedings justifies the conclusion that a decision against the
> defendant in them ought fairly and truly to be said to be in
> substance a decision against him."

25.    Sir Robert Megarry's second principle carries the approval of Lord Bingham in
*Johnson v Gore Wood* [2002] 2 AC 1.

26.    One type of case where privity is recognised is where C knows of proceedings
between A and B in which his rights are being tested but stands back and does
nothing. An example of such a case was *House of Spring Gardens Ltd v Waite* [1991]
QB 241. In that case a joint tortfeasor had, in full knowledge of the circumstances,
declined to participate in an unsuccessful action by his co-tortfeasors to set aside (on
the grounds of fraud) a judgment against them all. When it was sought to enforce the
original judgment against him he sought to raise the fraud allegation, claiming that he
was not a party to the action to set aside. Stuart-Smith LJ said at page 254AB:

> " ... he was content to sit back and leave others to fight his
> battle, at no expense to himself. In my judgment that is
> sufficient to make him privy to the estoppel…"

27.    Stuart-Smith LJ derived this principle from the judgment of Lord Penzance in
*Wytcherley v Andrews* (1871) LR 2 P&M 327 at page 328:

> "There is a practice in this court, by which any person having
> an interest may make himself a party to the suit by intervening,
> and it was because of the existence of this practice that the
> judges of the Prerogative Court held, that if a person, knowing
> what was passing, was content to stand by and see his battle
> fought by someone else in the same interest, he should be
> bound by the result, and not be allowed to re-open the case.
> That principle is founded on justice and common sense, and is
> acted upon in courts of equity where, if the persons interested
> are too numerous to be all made parties to the suit, one or two
> of the class are allowed to represent them; and if it appears to
> the court that everything has been done bona fide in the
> interests of the parties seeking to disturb the arrangement, it
> will not allow the matter to be re-opened."

28.    That statement had been approved by Lord Denning giving the judgment of the Privy
Council in *Nana Ofori Atta II v Nanu Aba Bonsra II* [1958] AC 58 at pages 102-3. It

is clear that the principle derives from what we would now call class or representative actions, where an action is brought in the name of one party as representative of a class of persons with an identical interest. It is not open to a represented party subsequently to launch fresh proceedings of his own.

29. It can be seen that Sir Robert Megarry's test: "*having due regard to the subject matter of the dispute, there must be a sufficient degree of identification between the two*" embraces two concepts. The first is concerned with the interest which the subsequent litigant, C, has in the subject matter of the first action. In *Gleeson,* Wippell was very interested, in one sense, in the subject matter of the action against Denne, as its design of shirt was impugned in that action. But that was not a sufficient interest in circumstances where there was what Sir Robert Megarry described as "a trade relationship between the two, in the course of which Denne, at Wippell's request, copied a Wippell shirt: but that is all". The second concept concerns the identity of the parties. Thus in *Zeiss No 2* [1967] 1 AC 853 at pages 911-2 Lord Reid suggested:

> "A party against whom a previous decision was pronounced may employ a servant or engage a third party to do something which infringes the right established in the earlier litigation and so raise the whole matter again in his interest. Then, if the other party to the earlier litigation brings an action against the servant or agent, the real defendant could be said to be the employer, who alone has the real interest, and it might well be thought unjust if he could vex his opponent by relitigating the original question by means of the device of putting forward his servant."

30. In this example the new party has no interest in the previous litigation, but would be estopped because, in effect, he represents the party in the first action. That party has the identical interest in the previous action. In *Gleeson*, there was no identity of parties in this sense.

31. It is not necessary for the purposes of this appeal to seek to define precisely what interest in the subject matter of the previous litigation is required. The sort of interest dismissed by Sir Robert Megarry in *Gleeson* in his first principle is clearly inadequate. There are passages in the judgment of Aldous LJ in *Kirin-Amgen Inc v Boehringer Mannheim GmbH* [1997] FSR 289 which suggest that a legal interest may be necessary in the subject matter of the previous action as opposed to a commercial interest: see pages 307-309. I have not found that a particularly helpful criterion in the present case which is solely concerned with successive revocation actions. At one level Arrow and Resolution had the same legal interest in the revocation of the Patent, but that was a legal interest which they shared with all the world. If Resolution is to be bound, it must I think be possible to identify some more concrete consequence for its business which revocation of the Patent would have achieved. Unless that is so, although it can be said that Resolution could have joined the 2005 proceedings, there is no reason to hold that they should.

32. Drawing this together, in my judgment a court which has the task of assessing whether there is privity of interest between a new party and a party to previous proceedings needs to examine (a) the extent to which the new party had an interest in the subject matter of the previous action; (b) the extent to which the new party can be

said to be, in reality, the party to the original proceedings by reason of his relationship with that party, and (c) against this background to ask whether it is just that the new party should be bound by the outcome of the previous litigation.

33. In *Johnson v Gore Wood* [2002] 2 AC 1, Mr Johnson wished to bring a personal action for negligence against solicitors. A company controlled by Mr Johnson, W, had previously compromised an action against those solicitors based on the same allegations of negligence. One issue in the House of Lords was whether Mr Johnson's claim was an abuse of process of the kind thought to have originated in the speech of Wigram V-C in *Henderson v Henderson* 3 Hare 100 and developed in later cases such as Y*at Tung Investment Co Ltd v Dao Heng Bank Ltd* [1975] AC 581. The House of Lords rejected that contention. Lord Bingham of Cornhill warned against the incorporation into that principle of formulaic requirements and presumptions and advocated a broad merits-based approach: see page 31A-F. Lord Bingham also endorsed the approach to privity in *Gleeson*: see page 32 C-G.

34. It has subsequently been argued in this court in *Aldi Stores Limited v WSP Group plc and others* [2007] EWCA Civ 1260; [2008] 1 WLR 748 that, given the approval in the House of Lords of the statement of the law by Sir Robert Megarry as to privity of interest, there is a necessary preliminary question in determining whether there is abuse of process, that there should be a sufficient degree of identification between the respective defendants. Thomas LJ, with whom Wall and Longmore LJJ agreed, rejected that argument at [10]:

> "I cannot accept this argument. Lord Bingham made clear in his speech that the approach should be a "broad merits-based judgment" and not formulaic. It is clear he was approving the passage in the judgment of Sir Robert Megarry as the "correct approach" and not as a statement of rigid application. The fact that the Defendants to the original action and to this action are different is a powerful factor in the application of the broad-merits based judgment; it does not operate as a bar to the application of the principle."

35. The present case was argued before the judge, in the appeal skeletons and, in the main, orally before us solely on the basis of the requirements of privity as explained in *Gleeson*. Approaching the case in that way, it made no difference whether Arrow were barred by issue estoppel or by abuse of process estoppel. Neither side referred the judge to *Aldi Stores*. But if Arrow were only estopped on the basis of abuse of process, the broad merits-based approach would seem to be appropriate. I will deal briefly with the broad merits-based approach at the end of this judgment, in case it leads to a different result.

**The judgment**

36. At [105] of his judgment, the judge rejected the notion that the mere fact that Resolution was part of the same group as Arrow was enough to make Resolution a privy of Arrow. He concluded at [108] that Resolution had no actual interest in escitalopram in 2006. At [109] he dismissed the relevance of Resolution's earlier interest in citalopram, which had, in any event, ceased by 2004, or at the latest 2005. At [111] he said:

"Given that Resolution had no interest in escitalopram at the time of the previous proceedings, I conclude that there was no privity of interest between Resolution and Arrow Generics with regard to those proceedings."

## The grounds of appeal

37. The following are the principal grounds of appeal:

i) The judge's findings of fact did not justify or support his conclusions in [108] to [111] of his judgment. His findings should have led him to the opposite conclusion. The judge made "errors of principle" in his application of the law to the facts.

ii) That this is so can be tested by considering the position if Resolution had remained within the Arrow Group and under Mr Tabatznik's control. In such circumstances Resolution would not have been able "*to re-litigate the validity of the Patent simply by designating Resolution the claimant and recommencing proceedings in their name*". If that were so it would violate the principle that no person should be twice vexed in the same cause. If Resolution is not estopped in such circumstances, the principle of estoppel in the context of a corporate structure becomes inoperable.

iii) The judgment should have had regard to certain particular matters:

a) The Arrow Group organised itself so that patent litigation was "handled by Mr Tabatznik assisted by Dr Lowrie on behalf of all members of the Group". The judge had so found but had not addressed the consequences.

b) Resolution, through Mr Tabatznik, had knowledge of the earlier proceedings, but elected to stand back and allow the earlier proceedings to be run on its behalf.

c) Resolution was Mr Tabatznik's "chemistry set" and it was he who set Resolution's strategic direction. Resolution and Arrow served and therefore shared the same interests, being those of Mr Tabatznik and the Arrow Group as a whole.

d) Resolution had a direct legal interest in the outcome of the previous litigation in that its "freedom to operate" was not academic given the funding of Resolution by the Arrow Group, the earlier identification of escitalopram as an opportunity, its API manufacturing and sub-contracting activities and its investigations into routes of making escitalopram.

e) The fact that findings of the judge did not support his conclusion that Resolution's interest in escitalopram was at an end in 2006:

i) escitalopram was amongst a list of drugs identified by Resolution as opportunities;

ii)    Mr Tabatznik enquired about a licence for escitalopram;

iii)    Mr Tabatznik asked for a review of routes to escitalopram;

iv)    Resolution investigated those routes;

v)    Resolution would if necessary look to sub-contract the manufacture of escitalopram.

*Did the judge make an error of principle?*

38.    Although nowhere spelled out in this way in his grounds of appeal, Mr Waugh made a number of points which he said the judge had not had proper regard to.  He first suggested that the judge gave insufficient weight to the principle that nobody should be vexed twice in the same cause.  I am unable to accept this.  The principles which the judge set out and applied are firmly based on that principle.  But there is of course an equally important further principle in play, namely that an independent party should be free to bring a separate claim for revocation of the Patent.  The principles which have been developed in the cases, and which the judge applied, have regard to these competing principles.  Sales J put it very well in *Seven Arts Entertainment Ltd v Content Media Corp plc* [2013] EWHC 588 (Ch) at [73]:

> "As stated above, the basic rule is that, before a person is to be bound by a judgment of a court, fairness requires that he should be joined as a party in the proceedings, and so have the procedural protections that carries with it. This includes the opportunity to call any evidence he can to defend himself, to challenge any evidence called by the claimant and to make any submissions of law he thinks may assist his case. Although there are examples of cases in which a person may be found to be bound by the judgment of a court in litigation in relation to which he stood by without intervening, in my judgment those cases are illustrations of a very narrow exception to the general rule. The importance of the general rule and fundamental importance of the principle of fair treatment to which it gives expression indicate the narrowness of the exception to that rule."

39.    Next Mr Waugh suggested that, in the context of abuse of process estoppel, a relevant further consideration is exactly how onerous the further litigation will be, and how vexed the defendant has already been.  Even if this is correct as a statement of principle, I do not see how it can assist Lundbeck in the present case.  If the judge was right that Resolution had no interest in the 2005 proceedings, and is not bound by privity of interest, then it is entitled to bring the proceedings, even if they are burdensome, and even if Lundbeck has previously had to defend proceedings at the suit of Arrow.  It might conceivably be relevant on a "broad, merits-based approach".  But that was not the basis on which the judge was invited to decide the case.  If that approach is to be taken, other considerations, such as the fact that Resolution is now a wholly independent company, come into play.

40.    Mr Waugh's final point of law was that the principle that nobody should be twice vexed applies more strongly where two related claimants are seeking to bring successive proceedings against the same defendant than it does where the same claimant seeks to bring successive actions against related defendants. No authority was cited for this proposition and I am very doubtful that it is correct. However it is of no relevance here. We are not concerned here, with how strongly the principle should be applied, but whether it applies at all.

41.    In my judgment, Lundbeck has not established that the judge made any error of law. Except in the limited respect concerning the reconciliation of statements made to the European Commission which I have already dealt with, Mr Waugh makes no criticism of the judge's factual findings. Accordingly success on this appeal has to be on the basis that the facts found by the judge admit of only one possible answer, i.e. that Resolution is bound by the judgment in 2005 proceedings.

*Is Lundbeck's test a valid one?*

42.    Lundbeck's ground (ii) is that one can demonstrate that there is a flaw in the judge's approach because it would permit obviously abusive conduct, namely it would allow Mr Tabatznik and Arrow to commence an action immediately after the failure of the 2005 proceedings "by designating Resolution as the claimant and recommencing proceedings in their name". The problem with this demonstrative is that no principle relied on by the judge would permit such conduct. I have already accepted that there is a clear exception recognised in the cases that where a party to previous litigation employs a new party to re-litigate the case on his behalf he will normally be prevented from doing so. That, of course, is not what is or could be alleged here. It is not alleged that there is any subsisting relationship between Arrow and Resolution. No case was sought to be made that Arrow and Resolution were together seeking to undermine the integrity of the estoppel created by the previous decision.

*Did Resolution "stand back and let Arrow fight its battle for it"?*

43.    Lundbeck's ground (iii)(a) and (b) seek to characterise the case as one where the 2005 proceedings were being conducted on Resolution's behalf and with the knowledge of Resolution through Mr Tabatznik. It is also suggested that the judge should have found that this was the case, and also that Resolution stood back and let Arrow fight the battle, and should not now be allowed to take up arms again.

44.    I think there are a number of answers to this way of looking at the case. Firstly, the judge's finding at [22] was that Mr Tabatznik took charge of major patent matters *affecting* companies within the Arrow Group. It was not that Mr Tabatznik conducted all patent matters *on behalf of* all companies in the Group. So it made sense for Arrow to apply to revoke the Patent as they were the company with an interest in having it revoked. If other companies subsequently acquired an interest in seeing the Patent revoked, there is no reason to treat the earlier litigation as having been conducted on their behalf, when it was commenced at a time when they were not affected by the Patent. Secondly, the notion that Resolution stood back and allowed Arrow to fight its battle simply failed on the facts. Subject to Mr Waugh's argument about Resolution's residual interest in escitalopram, Resolution had no battle to fight in February 2006. It could not make citalopram, let alone escitalopram, and its involvement in any consideration of escitalopram had ceased. Moreover, although

Resolution must be taken to have known, through Mr Tabatznik, that the litigation was going on, it had no reason to suppose that it had any further relevance to its business.

45.    Mr Waugh sought to give this part of the case some impetus by referring to the decision of the Court of Appeal in *Special Effects Ltd v L'Oréal SA* [2007] EWCA Civ 1, [2007] RPC 15.   The claimant in that case was the proprietor of the trade mark SPECIAL EFFECTS. L'Oréal SA had previously opposed the claimant's application for the trade mark, relying upon use of its mark SPECIAL FX by L'Oréal UK. The opposition failed and the claimant then brought proceedings for infringement against both L'Oréal SA and L'Oréal UK in respect of use of the mark SPECIAL FX. The defendants counterclaimed for a declaration that the claimant's trade mark was invalidly registered on the same legal grounds as those which had previously been relied on unsuccessfully in the opposition proceedings. The Chancellor, Sir Andrew Morritt, held that L'Oréal SA was precluded by cause of action estoppel from repeating its challenge to the mark, and that L'Oréal UK was bound by the estoppel as L'Oréal SA's privy. The Court of Appeal allowed the defendants' appeal, holding that L'Oréal SA was not barred by cause of action estoppel, issue estoppel or abuse of process from raising the same challenges again.

46.    The Court of Appeal went on to make some observations about the privity point, although it was not necessary to decide it as the underlying estoppel was held not to exist.   Lloyd LJ delivering the judgment of the court said this:

"81.    The Chancellor's decision on the point was expressed as follows, in paragraph 55:

'The principle to be applied is that formulated by Sir Robert Megarry in *Gleeson v Wippell* and approved by the House of Lords in *Johnson v Gore Wood* … . What must be ascertained is whether there is a sufficient degree of identity between the First Defendant and the Second Defendant to make it just that the decision in the opposition proceedings should be binding on the Second Defendant in these proceedings. In my judgment the answer to that question is in the affirmative. The Second Defendant could have been joined as a party to the opposition proceedings. In his evidence in the opposition proceedings M. Monteiro evidently regarded the First and the Second Defendants as one person; hence his references to 'my company' in contexts which can now be seen to refer to the Second Defendant alone. Both are concerned with marks which are owned by the First Defendant and used by the Second Defendant in its business in the UK, the former as owner the latter as licensee. The dispute with the claimant concerns the validity and use of their rival marks. Both defendants are members of the same group. Even accepting that the First Defendant is not entitled to give directions to the Second Defendant there is no reason to think that the ultimate holding

company cannot give directions to both of them. In my view, prima facie, each company in a group is to be regarded as the privy of every other company in the group unless it demonstrates the contrary. Otherwise the principles of estoppel will become largely inoperable in a corporate structure.'

82.    It seems to us that in the last two sentences of that paragraph the Chancellor went further than was necessary for his decision. With respect, we could not agree with so general a principle. However, it seems to us that the decision may have been justifiable on a more limited and specific basis, which forms part of the Chancellor's reasoning in his paragraph 55. The First Defendant holds such registered trade marks as there are in the L'Oreal group. It was accordingly appropriate that it should have been the party which opposed the application for registration by Mr and Mrs Jones. The Second Defendant is the operating company in the UK for the L'Oreal group; in the course of its business it uses registered marks under licence from the First Defendant. It was, therefore, the company which did such acts as the Claimant complains of. If a corporate group such as L'Oreal chooses to arrange its affairs, no doubt for good reason, in such a way that matters such as trade mark oppositions, as well as applications and the holding of registered trade marks, are conducted by one company, for the benefit of others in the group, and others then use marks of which the first is the registered holder, or other marks, not yet registered, of which the first would be the holder if a registration was obtained, then it seems to us that it might well be consistent with what Sir Robert Megarry V-C said in *Gleeson v J Wippell & Co Ltd* [1977] 1 W.L.R. 510 at 515 (approved by Lord Bingham in *Johnson v Gore Wood* [2002] 2 AC 1 at 32) to regard any constraint on the first, whether by way of cause of action estoppel, issue estoppel or abuse of process, as applying also to the second as its privy. The proposition enunciated by Sir Robert Megarry was that, 'having due regard to the subject matter of the dispute, there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was a party should be binding in proceedings to which the other is a party'. It would be relevant to consider the corporate structure adopted by L'Oreal, and the arrangements of which Mr Monteiro gave evidence within the group. The Claimant could reasonably rely on the fact that information was provided by the Second Defendant and used in the course of the opposition proceedings. In *Gleeson* Sir Robert Megarry said that for employees of one company, not associated with the litigant, to give evidence on behalf of the litigant in the earlier litigation, did not constitute the first a privy of the litigant, but this seems to us a very different relationship, such that the assistance

> given with the evidence would be relevant. This is also emphasised by the way in which Mr Monteiro spoke of 'my Company' in relation to both the First Defendant and the Second Defendant without distinction. We do not decide the point, but it seems to us that the Claimant's contentions as regards privity might have a substantial basis, even though on less general grounds than those expressed by the Chancellor."

47. It seems to me that these observations are of little relevance to the present case. L'Oreal UK had been using the mark in question at the time of the opposition proceedings and plainly intended to continue to do so. There was a real sense therefore in which the opposition proceedings had been conducted on its behalf and for its benefit. The evidence which its witnesses gave in the proceedings was given because it had a real interest in the outcome of the proceedings. They were no doubt following the progress of the proceedings with interest as the outcome would directly affect the legality of its past and future sales. It had a concrete interest in the outcome. Nothing could really be further from the facts of the present case.

*Should the judge have concluded that Resolution had an interest in the outcome of proceedings?*

48. For the reasons identified in his ground (iii) Mr Waugh submits that in 2006 Resolution had a legal interest in the outcome of the 2005 proceedings. He described this as Resolution's freedom to operate created by the revocation of the Patent. The high point of this case was the statement in 2004 that, in the event of failure to obtain a source of supply, Mr Greenwood would "look to Neuland". This meant that there was a contingent possibility that Resolution could be called upon to enter into a development program with Neuland similar to that which it had unsuccessfully undertaken with Neuland in relation to citalopram. If the analogy is pursued, such a project would have involved a route being identified by Resolution and passed on to Neuland to put into practice. Accordingly Resolution had a real reason for obtaining freedom to operate by revoking the Patent.

49. I think all this is far too speculative. It is not a sufficiently concrete interest in the outcome of the previous proceedings. The true position was that Resolution was simply not in a position to make or have made citalopram or escitalopram. Its previous efforts had failed and their current efforts had ceased. As to the specific matters relied on in ground (iii)(e)(i) to (vi), the dates on which they occurred are informative. The identification of citalopram as a generic opportunity, for what it is worth, was in 2001. The enquiry about the escitalopram licence, the review of routes for manufacture of escitalopram, and Mr Greenwood's statement that he would if necessary make some escitalopram were all in 2002. The investigation of routes ended in 2004 as did Resolution's interest in escitalopram. Thereafter Resolution's interest was no different from any other company with a general interest in generic products. That cannot be sufficient to make it just to hold Resolution bound by the earlier proceedings.

**Conclusion on privity**

50. The extent of the identity between Arrow and Resolution is that they were part of a group of companies under the common control of Mr Tabatznik. There was no

subsisting relationship between them in 2006 pursuant to which the 2005 proceedings were being conducted by Arrow for Resolution's benefit. Resolution was Mr Tabatznik's chemistry set, but he was not playing with it to make escitalopram. Resolution had no concrete interest in the 2005 proceedings. It would be quite unjust to hold Resolution bound by the outcome. The judge was entitled to come to that conclusion.

## A broad, merits-based judgment?

51.    As Lord Millett said in *Johnson v Gore Wood*, particular care is necessary in the application of the principle of abuse of process estoppel to the case of privies: see page 60C:

> "It is likely in practice to be easier for [the privy] to rebut the charge that his proceedings are oppressive or constitute an abuse of process than it would be for the original plaintiff to do so."

52.    I would not come to any different conclusion applying a broad merits-based approach. Indeed, if anything, the case for Resolution is stronger as it would I think be proper to take into account the fact that Resolution is now independent of the Arrow Group and operating under a different business model. As Lord Millett again points out in *Johnson v Gore Wood*, the question of whether the new proceedings are abusive has to be determined at the time when those proceedings are brought, in the light of everything that had happened by then: see page 59G.

## Disposal

53.    For the reasons I have given therefore, I would dismiss this appeal.

## Lord Justice Moore-Bick

54.    I agree.

## Lord Justice Longmore

55.    I agree also.

TAB 63

*Revenue and Customs Commissioners v Holland, Re Paycheck Services Ltd*
[2010] 1 WLR 2793, UK Supreme Court

2793

A

Supreme Court

## *Revenue and Customs Commissioners *v* Holland and another*

### *In re* Paycheck Services 3 Ltd and others

B

[2010] UKSC 51

2010 July 21, 22;          Lord Hope of Craighead DPSC, Lord Walker of
Nov 24                     Gestingthorpe, Lord Collins of Mapesbury, Lord Clarke of
                           Stone-cum-Ebony JJSC, Lord Saville of Newdigate

*Company — Director — Breach of duty — De facto director — Companies upon
insolvency disclosing substantial deficiency as to tax liability — Defendant
human director of corporate director of insolvent companies — Whether
defendant to be treated as de facto director of insolvent companies — Whether
liable for misuse of company's assets — Insolvency Act 1986 (c 45) (as amended
by Enterprise Act 2002 (c 40), s 2, Sch 17, para 18), s 212(1)(a)*

C

The defendants operated as their trading company PS Ltd, of which they were the
sole directors, each holding half the issued share capital. PS Ltd itself held all the
issued share capital of P(DS) Ltd and P(SS) Ltd, companies which had been
D incorporated to act as sole corporate director and company secretary respectively of
each of 42 composite companies. The defendants were the sole directors of P(DS) Ltd
and P(SS) Ltd. The issued share capital in the composite companies comprised one
voting A share, which was held by PST Ltd, a company of which the defendants were
the sole directors, each holding half the issued share capital. The composite
companies paid regular dividends to their shareholders, which were calculated by a
E software programme on PS Ltd's computer on the basis of figures entered into
the computer by the first defendant. The computer programme then generated a
document purporting to be a minute of a directors' meeting of the relevant composite
company. Acting on professional advice, the defendants had specifically structured
the composite companies with the aim of ensuring that none of them became liable
for higher rate corporation tax ("HRCT"). Initially the revenue accepted that the
composite companies were exempt from HRCT but in April 2002 they changed their
F position. In August 2004 the defendants received advice from leading counsel that
the composite companies were liable to pay HRCT. Between April 2002 and August
2004 and thereafter until the companies went into liquidation in October 2004
dividends continued to be paid on the assumption that the composite companies
would only be liable for small companies corporation tax. Consequently, there was a
substantial deficiency in the liquidation of each of the composite companies in respect
of the HRCT liability. The revenue issued proceedings under section 212 of the
Insolvency Act 1986, as amended[1], contending that the defendants had been de facto
G directors of the composite companies and that, by causing them to pay dividends
without making provision for liabilities, they were guilty of misfeasance and breach
of their directorial duties and that, in those circumstances, the dividends were
unlawful distributions which, subject to relief, the defendants were liable to repay.
The judge found that the first defendant (though not the second) had been a de facto
director of the composite companies and, as such, was liable, as from a date shortly
after the receipt of leading counsel's advice, for the continued unlawful payment of
H dividends without making provision for HRCT. On the first defendant's appeal, the
Court of Appeal held that, although there might be circumstances in which the
human director of a corporate director could so act as to cause himself to be regarded
as a de facto director of the subject company, something more would be required

[1] Insolvency Act 1986, s 212, as amended: see post, para 21.

A
than the mere performance by him of his duties as a de jure director of the corporate director of the composite companies and it allowed the appeal on the ground that, on the facts, the first defendant was not a de facto director of the composite companies.

On the revenue's appeal—

*Held*, dismissing the appeal (Lord Walker of Gestingthorpe and Lord Clarke of Stone-cum-Ebony JJSC dissenting), that the question whether the first defendant was acting as de facto director of the composite companies, so as to impose on him fiduciary duties in relation to those companies, must be approached on the basis that the corporate director of the composite companies and the first defendant were in law separate persons, each with their own separate legal personality; that the mere fact of acting as a director of a corporate director of a company was not enough to make an individual a de facto director of that company; that, so long as the first defendant's acts were entirely within the ambit of the discharge of his duties and responsibilities as a director of the corporate director, it was to that capacity that his acts had to be attributed; and that since, on the facts, the first defendant had done no more than discharge his duties as the director of the corporate director of the composite companies, he had not acted as de facto director of the composite companies so as to make him responsible for the misuse of their assets (post, paras 25, 39–43, 52, 53, 93, 94–96, 97–100).

B

C

*In re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180 approved.

*Salomon v A Salomon & Co Ltd* [1897] AC 22, HL(E) applied.

*Lo-Line Electric Motors Ltd, In re* [1988] Ch 477 and *In re Kaytech International plc* [1999] 2 BCLC 351, CA considered.

D

Decision of the Court of Appeal [2009] EWCA Civ 625; [2010] Bus LR 259 affirmed.

The following cases are referred to in the judgments:

*Bairstow v Queens Moat Houses plc* [2001] EWCA Civ 712; [2001] 2 BCLC 531, CA
*Belmont Finance Corpn v Williams Furniture Ltd (No 2)* [1980] 1 All ER 393, CA
*Bulawayo Market and Offices Co Ltd, In re* [1907] 2 Ch 458
*Canadian Land Reclaiming and Colonising Co (Coventry and Dixon's case)* (1880) 14 Ch D 660, CA
*Chameleon Mining NL v Murchison Metals Ltd* [2010] FCA 1129
*Channel Collieries Trust Ltd v Dover, St Margaret's & Martin Mill Light Railway Co* [1914] 2 Ch 506, CA
*City Equitable Fire Insurance Co Ltd, In re* [1925] Ch 407, CA
*County Life Assurance Co, In re* (1870) LR 5 Ch App 288
*County Marine Insurance Co, In re (Rance's case)* (1870) LR 6 Ch App 104
*Daido Asia Japan Co Ltd v Rothen* [2002] BCC 589
*Dovey v Cory* [1901] AC 477, HL(E)
*Eurostem Maritime Ltd, In re* [1987] PCC 190
*Exchange Banking Co, In re (Flitcroft's case)* (1882) 21 Ch D 519, CA
*Fayers Legal Services Ltd v Day* (unreported) 11 April 2001, Patten J
*Foss v Harbottle* (1843) 2 Hare 461
*Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2 QB 480; [1964] 2 WLR 618; [1964] 1 All ER 630, CA
*Gebo Investments (Labuan) Ltd v Signatory Investments Pty Ltd* [2005] NSWSC 544
*Gibson v Barton* (1875) LR 10 QB 329, DC
*Hydrodam (Corby) Ltd, In re* [1994] 2 BCLC 180
*John Morley Building Co v Barras* [1891] 2 Ch 386
*Kaytech International plc, In re* [1999] 2 BCLC 351, CA
*Kingston Cotton Mill Co (No 2), In re* [1896] 1 Ch 331
*Lands Allotment Co, In re* [1894] 1 Ch 616, CA
*Lo-Line Electric Motors Ltd, In re* [1988] Ch 477; [1988] 3 WLR 26; [1988] 2 All ER 692
*Loquitur Ltd, In re* [2003] EWHC 999 (Ch); [2003] STC 1394; [2003] 2 BCLC 442

E

F

G

H

A   *Mahony v East Holyford Mining Co Ltd* (1875) LR 7 HL 869, HL(I)
    *Mangles v Grand Collier Dock Co* (1840) 10 Simons 519
    *Mea Corpn Ltd, In re* [2006] EWHC 1846 (Ch); [2007] 1 BCLC 618
    *Moorgate Metals Ltd, In re* [1995] 1 BCLC 503
    *Morris v Kanssen* [1946] AC 459; [1946] 1 All ER 586, HL(E)
    *Murray v Bush* (1873) LR 6 HL 37, HL(E)
    *New Par Consols Ltd, In re* [1898] 1 QB 573, DC
B   *Osler Institute Inc v Forde* (2003) 333 F 3d 832
    *Parmalat Securities Litigation, In re* (2010) 684 F Supp 2d 453
    *Primlake Ltd v Matthews Associates* [2006] EWHC 1227 (Ch); [2007] 1 BCLC 666
    *R v Lawson* [1905] 1 KB 541, CCR
    *Rama Corpn Ltd v Proved Tin and General Investments Ltd* [1952] 2 QB 147;
      [1952] 1 All ER 554
    *Richborough Furniture Ltd, In re* [1996] 1 BCLC 507
C   *Royal British Bank v Turquand* (1856) 6 E & B 327
    *Salomon v A Salomon & Co Ltd* [1897] AC 22, HL(E)
    *Scavuzzo v The Queen* [2006] 2 CTC 2429
    *Secretary of State for Trade and Industry v Deverell* [2001] Ch 340; [2000] 2 WLR
      907; [2000] 2 All ER 365, CA
    *Secretary of State for Trade and Industry v Hall* [2006] EWHC 1995 (Ch); [2009]
      BCC 190
    *Secretary of State for Trade and Industry v Hollier* [2006] EWHC 1804 (Ch); [2007]
D     Bus LR 352
    *Secretary of State for Trade and Industry v Tjolle* [1998] 1 BCLC 333
    *Selangor United Rubber Estates Ltd v Cradock (No 3)* [1968] 1 WLR 1555; [1968]
      2 All ER 1073; [1968] 2 Lloyd's Rep 289
    *Standard Chartered Bank v Pakistan National Shipping Corpn (Nos 2 and 4)* [2002]
      UKHL 43; [2003] 1 AC 959; [2002] 3 WLR 1547; [2003] 1 All ER 173; [2003]
      1 Lloyd's Rep 227, HL(E)
E   *Ultraframe (UK) Ltd v Fielding (No 2)* [2005] EWHC 1638 (Ch); [2006] FSR 293
    *West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250, CA
    *Western Counties Steam Bakeries and Milling Co, In re* [1897] 1 Ch 617, CA
    *Wheeliker v Canada* (1999) 172 DLR (4th) 708

    The following additional cases were cited in argument:

F   *Australian Securities Commission v AS Nominees Ltd* (1995) 133 ALR 1
    *Bartlett v Barclays Bank Trust Co Ltd (Nos 1 and 2)* [1980] Ch 515; [1980] 2 WLR
      430; [1980] 1 All ER 139; [1980] 2 All ER 92
    *Bath v Standard Land Co* [1911] 1 Ch 618, CA
    *Bristol and West Building Society v Mothew* [1998] Ch 1; [1997] 2 WLR 436; [1996]
      4 All ER 698, CA
    *Dubai Aluminium Co Ltd v Salaam* [2002] UKHL 48; [2003] 2 AC 366; [2002]
      3 WLR 1913; [2003] 1 All ER 97; [2003] 1 Lloyd's Rep 65, HL(E)
G   *Fletcher v Green* (1864) 33 Beav 426
    *HR v JAPT* [1997] Pens LR 99
    *Kensington International Ltd v Republic of Congo* [2005] EWHC 2684 (Comm);
      [2006] 2 BCLC 296
    *Knott v Cottee* (1852) 16 Beav 77
    *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378; [1995] 3 WLR 64; [1995]
      3 All ER 97, PC
H   *Sunlight Incandescent Gas Lamp Co Ltd, In re* [1900] 2 Ch 728
    *Target Holdings Ltd v Redferns* [1996] AC 421; [1995] 3 WLR 352; [1995] 3 All ER
      785, HL(E)
    *Williams v Natural Life Health Foods Ltd* [1998] 1 WLR 830; [1998] 2 All ER 577,
      HL(E)
    *Wilson v Lord Bury* (1880) 5 QBD 518, CA

2796
**Revenue and Customs Comrs v Holland (SC(E))**                    [2010] 1 WLR
**Lord Hope of Craighead DPSC**

**APPEAL** from the Court of Appeal                                                    A

The Revenue and Customs Commissioners appealed, with permission of
the Supreme Court (Lord Walker of Gestingthorpe, Lord Mance, Lord
Collins of Mapesbury JJSC) granted on 5 November 2009, against a decision
of the Court of Appeal (Ward, Rimer, Elias LJJ) on 2 July 2009 allowing an
appeal by the first defendant, Michael Holland, against a decision of
Mr Mark Cawson QC, sitting as a deputy High Court judge, on 24 June       B
2008 [2008] EWHC 2200 (Ch); [2009] Bus LR 1 that he was a de facto
director of 42 companies (whose various names were distinguished only by
numbers: Paycheck Services 3 Ltd to Paycheck Services 12 Ltd, Paycheck
Services 14 Ltd to Paycheck Services 44 Ltd and PC (45) Ltd), which had
entered into administration on 19 October 2004 and then into liquidation,
and that, pursuant to section 212 of the Insolvency Act 1986, he should      C
contribute to their assets.

The facts are stated in the judgment of Lord Hope of Craighead DPSC.

*Michael Green QC* and *Adam Sher* (instructed by *Solicitor, Revenue and
Customs*) for the revenue.
*Peter Knox QC, Aidan Casey* and *Helen Pugh* (instructed by *Neil
Myerson LLP, Altrincham*) for the first defendant.                            D
The second defendant did not appear and was not represented.

The court took time for consideration.

24 November 2010. **LORD HOPE OF CRAIGHEAD DPSC**

1   This is an appeal by HM Revenue and Customs ("HMRC") against a
decision of the Court of Appeal (Ward, Rimer and Elias LJJ) dated 2 July      E
2009: [2010] Bus LR 259. The court allowed an appeal by Mr Michael
Holland ("Mr Holland") against an order dated 4 July 2008 by Mr Mark
Cawson QC, sitting as a deputy High Court judge of the Chancery Division,
following a judgment which he issued on 24 June 2008: [2008] EWHC 2200
(Ch); [2009] Bus LR 1. The trial over which the deputy judge presided arose
out of 42 originating applications issued by HMRC on 27 July 2006 against   F
Mr Holland and his wife Linda. The applications were made under
section 212 of the Insolvency Act 1986. It was alleged that Mr and
Mrs Holland were de facto directors of 42 insolvent companies of which
HMRC is the only creditor, and that they had been guilty of misfeasance and
breach of duty in causing the payment of dividends to the companies'
shareholders between 24 April 2002 and 19 October 2004 when the          G
companies had insufficient distributable reserves to pay their creditors.
Orders were sought requiring them to contribute sums to the assets of the
insolvent companies by way of compensation in respect of their misfeasance
and breach of duty of amounts totalling in excess of £3·5m.

2   The background to the litigation was the setting up by Mr and
Mrs Holland in 1999 of a complicated structure of companies, including the
42 companies of which they were alleged to be de facto directors. Their      H
business was the administering of the business and tax affairs of contractors
working in various sectors, but mainly that of information technology. Each
contractor was taken on as an employee of one of the 42 companies and
allotted a non-voting share. This enabled him to be rewarded on a weekly or
monthly basis by way of both salary and dividends. The contractors'

2797
[2010] I WLR                     Revenue and Customs Comrs v Holland (SC(E))
                                              Lord Hope of Craighead DPSC

A   services were provided to clients through an agency which paid the parent
    company. The intention was to provide the same tax advantages to the
    non-voting shareholders/employees as they would have enjoyed had they
    each set up and run their own individual service companies, while relieving
    them of the administrative burden of doing so. It was of the essence of
    this scheme that each of the 42 companies would be liable to pay corporation tax
B   at the small companies' rate under section 13 of the Income and Corporation
    Taxes Act 1988. So long as they were not regarded as "associated" for the
    purposes of section 416 of the 1988 Act, they could achieve this aim
    provided that each company kept its profits below the £300,000 threshold,
    which it did. As it turned out, however, the scheme was doomed to fail.
    By the operation of section 417(3) of the 1988 Act Mr Holland, as the settlor
    of the one share in each company which had voting rights, fell to be treated
C   as being in control of them. The result was that the 42 companies were
    treated as associated for tax purposes. Because their collective turnover
    exceeded the £300,000 threshold, each company was liable for higher
    rate corporation tax ("HRCT"). Dividends had been paid after making
    provision only for corporation tax at the lower rate. So there was a
    substantial deficiency in the liquidation of each company in respect of its
    HRCT liability.
D
    3   The deputy judge dismissed the claims against Mrs Holland, and there
    has been no appeal against that decision. He took a different view of the
    position of Mr Holland. He found that he was a de facto director of each
    of the 42 companies and so was answerable to HMRC's claims under
    section 212. He divided the allegations against Mr Holland into three
    different periods. First, in respect of the period from 24 April 2002 to
E   18 August 2004, the deputy judge held that Mr Holland was at no stage
    liable or, if he was, that he ought to be relieved from liability pursuant to
    section 727 of the Companies Act 1985. Second, he held that Mr Holland
    was entitled to a short period of grace from 19 to 22 August 2004 as,
    although he was liable for the payment of dividends during this period,
    the circumstances were such that he was entitled to be relieved under
F   section 727 from that liability. Third, in respect of the remaining period
    from 23 August to 19 October 2004, he held that Mr Holland had been
    guilty of misfeasance and breach of duty in relation to each company in
    causing the payment to its shareholders of the unlawful dividends, and that
    it would not be a proper exercise of the power under section 727 to relieve
    him of that liability: [2009] Bus LR 1, paras 236–237. He ordered an
    assessment of the amount that Mr Holland was liable to contribute to the
G   companies' assets, but he limited this amount to the HRCT that the
    companies had failed to provide for to meet the claims of HMRC in respect
    of their trading during that period.
    4   The Court of Appeal allowed Mr Holland's appeal against the orders
    which the deputy judge made against him, dismissed the originating
    applications and dismissed a cross appeal by HMRC as the points that it
    sought to raise were no longer in issue. Had it been necessary to decide them
H   it would, by a majority (Rimer LJ dissenting), have dismissed HMRC's
    appeal against the deputy judge's decisions to allow Mr Holland a period of
    grace from 19 to 22 August 2004 and as to the amount that he was liable to
    contribute to the assets of the companies, its contention being that he should
    have been ordered to repay the full amount of the unlawful dividends. In the

appeal by HMRC to this court all of these points are in issue, although if
Mr Holland succeeds on the question whether he was a de facto director the
other issues will become academic.

*A*

### The corporate structure

5   From about June 1997 to February 1999 Mr and Mrs Holland ran a
company called Paycheck Services Ltd ("Paycheck"), whose function, in
return for a fee, was to administer the business and tax affairs of
contractors who did not want to go to the trouble of setting up and running
their own companies. Each contractor who joined the scheme became an
employee of Paycheck and was allotted a non-voting share in the company.
This entitled him to dividends as well as a salary. Paycheck's income was
derived from charging the contractor's clients for his services.   Most
contractors did not pay higher rate income tax, and the bulk of their
income from Paycheck was by way of a dividend. It soon became apparent,
however, that the income of Paycheck was likely to exceed the limit for the
small companies' rate of corporation tax of £300,000, which was between
19% and 21% during the relevant period.  So Mr and Mrs Holland, with
the help of a number of professional advisers, set about devising a new
structure which would enable them to expand their business while avoiding
corporation tax at the higher rate, which during the relevant period was
between 30% and 33%.

*B*

*C*

*D*

6   The new structure was established in February 1999.  It operated
until 13 October 2004, when all the companies went into administration
and later into liquidation. Under this structure Mr and Mrs Holland each
held 50% of the issued shares in, and were directors of, a new company
called Paycheck Services Ltd ("Paycheck Services"). Paycheck Services held
100% of the issued shares in, and Mr and Mrs Holland were appointed as
directors of two further new companies called Paycheck (Directors Services)
Ltd ("Paycheck Directors") and Paycheck (Secretarial Services) Ltd
("Paycheck Secretarial").   Paycheck Directors and Paycheck Secretarial
were incorporated to act respectively as the sole director and secretary of
42 trading companies ("the composite companies"), each of which had
similar names distinguished only by a number. Their names were Paycheck
Services 3 Ltd, Paycheck Services 4 Ltd, and so on.

*E*

*F*

7   Each of the composite companies had a single voting "A" share and
50 non-voting shares, each of a separate class (B1, B2, C1, C2, etc). The
A share was held by yet another new company called Paycheck Services
Trustee Ltd ("Paycheck Trustee"), of which Mr and Mrs Holland were each
directors and in which they each held 50% of the issued share capital. The
A share was held by Paycheck Trustee pursuant to a trust deed of which
Mr Holland was the settlor, which provided that each A share was held
for the benefit of the members of the composite companies. The non-voting
shares were, in the case of each composite company, held by about 50
shareholders/employees, each of whom held one each of the separate classes
of shares in the company.

*G*

*H*

8   Article 8(b)(i) of the articles of association of the composite
companies provided:

"each class of non-voting shares shall carry the right to the receipt of
such dividends payable on each such class of shares, in such amounts, at

2799

A    such frequency, at such times as, on the recommendation of the directors,
the holder of the 'A' share shall, in general meeting, resolve in accordance
with the following: (aa) subject to the provisions of the Act and to the
following provisions of this article, the company may, by ordinary
resolution passed at a general meeting upon the recommendation of the
directors, declare a dividend for any class of the non-voting shares . . .

B    (ee) when paying interim dividends, the directors may make payments of
interim dividends to one or more classes of non-voting shares to the
exclusion of one or more other classes of non-voting shares on the same
basis that final dividends may be paid by the company to each class of
non-voting shares in accordance with the foregoing; (ff) regulations 102
and 103 of Table A shall be read and construed accordingly with the
foregoing provisions of this article."

C
9  As had been the case under the previous structure, the services of the
shareholders/employees were contracted out, typically through employment
agencies. Under the new structure this was done by the composite companies
which, out of the income they received, made the following payments:
(i) a fee to Paycheck Services for its administrative services; (ii) a salary to
each shareholder/employee, typically limited to the national minimum wage

D    and the associated PAYE tax and national insurance contributions; and
(iii) after making provision for the payment of corporation tax at the small
companies' rate, a dividend to each shareholder/employee.

10  The dividends were paid on a regular basis. The
shareholders/employees put in timesheets for the work that they had done.
The relevant figures were entered into Paycheck Services' computer, and

E    the accountancy software thereon then calculated the dividend payable
after making provision for the items listed in the previous paragraph.
The computer programme then generated a document purporting to be a
minute of a directors' meeting of the relevant composite company.
It recorded as present "M Holland Paycheck (Director Services) Ltd,
LM Holland Paycheck (Secretarial Services) Ltd" and that it had been
resolved that a dividend of a specified amount be distributed to the specified

F    shareholder/employee. The computer generated on the minute a copy
of Mr Holland's signature, beneath which appeared the words "for and on
behalf of Paycheck (Director Services) Ltd". This was the only authority
for payment by the composite company of the relevant dividend.

*The corporation tax problem*

G    11  As already noted, it was crucial to the commercial viability of the
scheme that the composite companies should have annual taxable profits of
no more than £300,000, so as to get the benefit of the small companies' rate
of corporation tax. There was, however, a flaw in the structure which, as
Rimer LJ said in para 16, was not spotted when the structure was
established. Section 13(3) of the 1988 Act limited the benefit of the small
companies' rate by providing that where a company had two or more

H    associated companies during an accounting period they would have to share
a single £300,000 limit. Mr Holland was the settlor of the trust under which
Paycheck Trustee held the A shares in each of the composite companies. The
effect of section 417(3) of the 1988 Act was that Mr Holland was regarded
as in control of all the composite companies, so they were "associated"

within the meaning of section 13 of that Act. Their collective profits all had    A
to be aggregated, and they had to be treated for the purposes of the small
companies' rate of corporation tax as a single company.

12   It had been thought by Mr and Mrs Holland and their advisers that
an escape from this consequence was provided by Extra Statutory
Concession C9 ("ESC C9"). Its effect was believed to be that the composite
companies would not be regarded as "associated". It was not appreciated    B
when the new structure was established that the fact that Mr Holland was
the common settlor of the A shares in each company meant that he fell to be
regarded as being in control of each of the companies, with the result that
ESC C9 did not apply. But, as Rimer LJ observed in the Court of Appeal,
[2010] Bus LR 259, para 18, the advice that Mr and Mrs Holland received
that the companies would not be regarded as "associated" was not
unqualified.    C

13   The risk of HMRC attacking the scheme was recognised in written
advice given by tax counsel on 22 January 1999. The deputy judge
commented that the advice contained a number of apparent contradictions:
see [2008] EWHC 2200 (Ch) at [44]. Mr Holland's solicitor advised in
February 1999 that the two trading companies then in existence should
restrict their profits to £150,000 each. In March 2001 the composite    D
companies' accountants received an informal telephone enquiry about the
arrangements from an official at the Wrexham 1 tax office. This was
followed by a letter in relation to three of the composite companies in which
a detailed profit and loss account, with notes to indicate whether the
companies were grouped or associated, was requested. The accountants and
the solicitor repeated their advice to Mr Holland about restricting profits of
each of the two companies to £150,000.    E

14   Subsequent contacts with HMRC are described in detailed findings
made by the deputy judge: see paras 55 and following. He found that the
accountants, and through them Mr Holland, were led to believe in March
2001 that HMRC would treat the matter as covered by ESC C9 and that it
was content, in the light of an explanation common to all the composite
companies, that there was no association between them: see para 66. But he    F
added that it would have been open to HMRC at any time to take the point
on the effect of section 417(3) of the 1988 Act and of Mr Holland's position
as the settlor of the A shares that was not, in fact, taken until over three years
later: see para 67. On 24 April 2002 Mr Williams of HMRC wrote to say
that in his view the companies were associated. Throughout the rest of
2002 and most of 2003 there was what Rimer LJ called "sporadic and
inconclusive" correspondence between HMRC and the composite    G
companies' advisers: see [2010] Bus LR 259, para 25. Mr Williams was
dissatisfied with the arrangements but he failed to identify its crucial flaw.
It was not at this stage suggested to Mr Holland by his advisers that he
should cease trading or consider not continuing to cause the composite
companies to pay dividends without making provision for HRCT.

15   On 4 December 2003 HMRC opened a formal inquiry into the    H
claims for the small companies' rate made for all the composite companies
for the year ended 31 July 2002. On 8 December 2003 it issued closure
notices for the years ended 31 July 2000 and 2002 and assessments in
relation to the year ended 31 July 2001 on the basis that the composite
companies were liable to HRCT. At a meeting of professional advisers on

2801
[2010] 1 WLR                    Revenue and Customs Comrs v Holland (SC(E))
Lord Hope of Craighead DPSC

A    24 February 2004 the corporation tax deficit, if HMRC were to succeed,
was estimated at £2m. Nevertheless it was decided that the composite
companies should continue to trade and continue to pay dividends without
making any reservation for HRCT.

16    There was a meeting with HMRC on 21 June 2004 at which officials
raised the issue of the composite companies' solvency. On 25 June 2004
B    Mr Russell (who had taken over HMRC's file from Mr Williams) wrote
expressing the view that the structure was an avoidance scheme and
identifying the common settlor point under section 417(3) of the 1988 Act.
This was the first time that HMRC had taken this point. Mr Holland's
solicitor sought advice from counsel whose advice had been taken when
the scheme was set up. Neither of them identified the importance of the
common settlor point raised by HMRC, but on 6 August 2004 another
C    tax counsel advised on the telephone that it "blows our scheme out of the
water". In written advice he recommended that the composite companies
should cease trading or that the structure should be substantially revised as
soon as practicable. He also proposed an alternative structure that would
avoid the "association" problem and suggested that it might be possible to
persuade HMRC not to pursue a claim for periods up to 31 July 2004 if it
was adopted. It was decided to take a second opinion from leading counsel,
D    and a conference with Mr John Tallon QC in London was arranged for
18 August 2004. He advised that, although HMRC had dealt with the issue
badly and that leave for judicial review might well be granted, the composite
companies would ultimately lose if such an application were made. He
agreed that the new corporate structure that had been suggested was
basically sound and that a letter should be sent requesting a meeting with
E    HMRC in the hope that it might be possible to achieve a favourable
settlement.

17    A discussion took place between Mr Holland and his advisers on the
train back from London to Colwyn Bay after the conference. In the light
of Mr Tallon's advice Mr Holland's solicitor advised him that he and
Mrs Holland might be unlawfully trading and that trading should not
continue if there was no reasonable prospect of avoiding insolvent
F    liquidation. But Mr Holland was not, for reasons that the deputy judge
regarded as understandable, in any mood to engage properly in this
discussion: see [2008] EWHC 2200 (Ch) at [160]. His solicitor did not
repeat the advice that he gave on the train, nor was there any evidence that
Mr Holland sought, or was given, advice as to the propriety of continuing to
pay dividends.

G    18    The letter which Mr Tallon had settled was sent to HMRC, and a
meeting took place on 4 October 2004 with a view to attempting a
settlement. HMRC were told for the first time of the intention to transfer the
business to a new structure. Mr Holland's advisers proposed to HMRC that
they should accept that ESC C9 did apply to the existing companies to the
end of October on the basis that they would cease to trade, then pay all
outstanding corporation tax at the small companies' rate and then be
H    dissolved. It was suggested that the pot available to HMRC would be less
if the composite companies were forced to cease trading and go into
insolvency. HMRC rejected this proposal. By a letter dated 5 October
2004, which was received on 13 October 2004 and forwarded at once to
Mr Holland, Mr Russell made it clear that HRCT was still being sought

from 2002. Mr Holland was advised that there was now no prospect of a    A
deal with HMRC and that no further dividends should be declared.
No dividends were declared after 13 October 2004. On 19 October 2004
administrators were appointed to the composite companies and the various
service contracts were transferred to the new companies. The composite
companies were left with a total deficiency of about £3·5m in respect of
unpaid corporation tax.
                                                                         B

*The issues*

19  The first issue, which lies at the heart of this appeal, is whether
Mr Holland was a de facto director of the composite companies. If he was,
a number of further issues arise concerning the nature and scope of the
remedy. As set out in the agreed statement of facts and issues, they are as
follows:                                                                 C

"(2) Whether Mr Holland's liability for payment of unlawful dividends
is strict or whether it is necessary to show that he was negligent (in breach
of his common law duty of care). (3) Whether the correct remedy for any
breach of Mr Holland's duties as a director not to cause the companies
to make unlawful payments of dividends is damages or equitable
compensation for the net loss sustained by the company as a result of the    D
breach, or restitution or restoration of the amount of the unlawful
dividends without an inquiry into the loss sustained. (4) The scope of the
discretion under section 212 of the Insolvency Act 1986. In particular:
(a) whether the discretion is wide enough to allow the court to reduce the
award to nil or some other sum (as Mr Holland contends) . . . or
(b) whether it is more circumscribed as HMRC contends . . . so that the    E
judge did not have power to limit Mr Holland's liability to the amount of
HRCT that fell due during the relevant period (approximately £144,000).
(5) Whether, in the light of the judge's findings as to whether Mr Holland
acted reasonably from 18 August 2004 onwards, there was jurisdiction
under section 727 of the Companies Act 1985 to allow Mr Holland a 'few
days grace' between 18 and 23 August 2004. (6) Whether the judge    F
should have relieved Mr Holland of liability under section 727 in respect
of the period from 23 August 2004 onwards."

*The first issue: was Mr Holland a de facto director?*

*(a) Background*

20  An examination of this issue must start with some of the basic
elements of company law. A company is, of course, an artificial entity, a    G
creature of statute. So it can act only through human beings. Inevitably it is
human beings who must take the decisions, and give effect to them by
actions, if the company is to do anything at all: see *Palmer's Company Law*,
looseleaf ed, vol 2, para 8.101; *Gower & Davies, Principles of Modern
Company Law*, 8th ed, (2008), para 7-1. A company is formed by one or
more persons subscribing their names to a memorandum of association and
complying with the requirements of the Act as to registration: Companies    H
Act 1985, section 1; see now Companies Act 2006, section 7. Among the
requirements for registration is a statement of the company's proposed
officers, including the required particulars of the person or persons who are
to be the first director or directors of the company: Companies Act 1985,

2803
[2010] 1 WLR          Revenue and Customs Comrs v Holland (SC(E))
                              Lord Hope of Craighead DPSC

A section 10(2); see now Companies Act 2006, section 12(1). The expression "director" is not defined in the Companies Acts. All section 741(1) of the 1985 Act says is: "In this Act, 'director' includes any person occupying the position of director, by whatever name called": see now the 2006 Act, section 250. In *In re Lo-Line Electric Motors Ltd* [1988] Ch 477, 489 Sir Nicolas Browne-Wilkinson V-C, noting that this definition was inclusive and not exhaustive, said that its meaning had to be derived from the words of the Act as whole.

B

   21 The definition extends, of course, to persons who are validly appointed as directors. Persons who are not directors de jure may nevertheless be treated as directors de facto. Sir Nicolas Browne-Wilkinson said that in his judgment it was not possible to treat a de facto director as a "director" for all the purposes of the Companies Act 1985. But it is not in dispute that de factos directors are within section 212 of the Insolvency Act 1986. That section, as amended by section 248 of and paragraph 18 of Schedule 17 to the Enterprise Act 2002, provides so far as relevant:

C

   "(1) This section applies if in the course of the winding up of a company it appears that a person who— (a) is or has been an officer of the company, (b) has acted as liquidator or administrative receiver of the company, or (c) not being a person falling within paragraph (a) or (b), is or has been concerned, or has taken part, in the promotion, formation or management of the company, has misapplied or retained, or become accountable for, any money or other property of the company, or been guilty of any misfeasance or breach of any fiduciary or other duty in relation to the company."

D

   "(3) The court may, on the application of the official receiver or the liquidator, or of any creditor or contributory examine into the conduct of the person falling within subsection (1) and compel him— (a) to repay, restore or account for the money or property or any part of it, with interest at such rate as the court thinks just, or (b) to contribute such sum to the company's asset by way of compensation in respect of the misfeasance or breach of fiduciary or other duty as the court thinks just."

E

F

Section 251 of the Insolvency Act 1986, as amended, provides that "officer", in relation to a body corporate, includes a director, manager or secretary. Mr Knox QC for Mr Holland accepted that, as section 212 of the 1986 Act was concerned with the conduct of directors and their liability for actions or decisions in relation to the company, de facto directors must be assumed to be covered by this expression and treated as directors. As he put in his written case, this is to ensure that the persons with real directorial control but who, for whatever reason, lack a formal appointment are held responsible in law for their conduct of the affairs of the company.

G

   22 There is a third type of director, known as a "shadow director". Section 741(2) of the Companies Act 1985 (see now sections 251(1) and (2) of the Companies Act 2006) provided:

H

   "In relation to a company, 'shadow director' means a person in accordance with whose directions or instructions the directors of the company are accustomed to act. However, a person is not deemed a shadow director by reason only that the directors act on advice given by him in a professional capacity."

But, as Rimer LJ observed in [2010] Bus LR 259, para 57, it has not been     A
asserted in this case that Mr Holland was a shadow director of the composite
companies. Section 214 of the Insolvency Act 1986, which provides a
remedy in relation to a person who is or has been a director of a company
for wrongful trading, is extended to shadow directors expressly by
subsection (7). But HMRC do not rely on that section. Section 212, under
which a summary remedy is sought in this case, applies to a person who is or     B
has been an "officer" of the company. It does not apply to shadow directors
because, unlike section 214, the statute does not provide for this.

23    There is another feature of company law that must be taken into
account in the examination of the question whether Mr Holland was a de
facto director of the composite companies. As has already been noted,
Paycheck Directors and Paycheck Secretarial were incorporated to act
respectively as the sole director and secretary of 42 trading companies. The     C
19th century company law statutes made no provision for corporate
directors. The question whether a company could act as the director of
another company does not appear to have been raised in any reported case
until *In re Bulawayo Market and Offices Co Ltd* [1907] 2 Ch 458.
Objection was taken by a minority of the shareholders to the appointment of
a limited company as the company's sole manager. Warrington J dismissed
the application without calling on the respondents. He said, at p 463, that     D
there was nothing in the Companies Act 1862 (25 & 26 Vict c 89) which
made it incumbent on a company to have directors who were individual
persons and responsible as individuals to the shareholders.

24    The Companies Act 1929 was the first statute to recognise in terms
that a company could be a director: see sections 144, 145; see also sections
176, 178 and 201 of the Companies Act 1948. Section 282(3) of the     E
Companies Act 1985, which was the Act in force in February 1999 when the
new corporate structure was established, provided that every private
company shall have at least one director. Section 283(4)(b) provided that no
company shall have as sole director of the company "a corporation the sole
director of which is secretary to the company". Section 305(1) provided that
a company which stated the name of any of its directors on any business
letter had to state the name of every director who was an individual "and     F
the corporate name of every corporate director". Section 155(1) of the
Companies Act 2006 now provides that a company must have at least one
director who is a natural person. But no such requirement was in force
during the events that gave rise to the claim in this case. The position then
was that the Companies Act 1985 allowed a company to have a corporation
as its sole director, so long as its sole director was not the secretary to the     G
company.

25    The new corporate structure was created on the assumption that it
was open to the composite companies to have, as their sole de jure director,
Paycheck Directors of which Mr and Mrs Holland were the directors.
Mr Holland and his advisers cannot be criticised for doing so, as this was
expressly permitted by the statute. Drawing on the reasoning in *Salomon v
A Salomon & Co Ltd* [1897] AC 22, Mr Knox submitted that the separate     H
legal personality of Paycheck Directors from that of its directors had to be
respected. I do not think that he needed the authority of *Salomon's* case for
that proposition. *Salomon's* case was concerned with the different question
whether, as Lord Macnaghten put it at p 51, a body corporate could lose its

2805
[2010] 1 WLR                    Revenue and Customs Comrs v Holland (SC(E))
                                             Lord Hope of Craighead DPSC

A    individuality by issuing the bulk of its capital to one person. The deputy
     judge acknowledged that it was not alleged by HMRC that Paycheck
     Directors was a pure shell or a façade. Nor was it asserted that Mr Holland
     acted outside his authority as a director of Paycheck Directors in directing
     the affairs of the composite companies: see [2009] Bus LR 1, para 172;
     see also Rimer LJ, [2010] Bus LR 259, para 47. The question whether
B    Mr Holland was acting as de facto director of the composite companies so as
     to impose on him fiduciary duties in relation to those companies when the
     purported directors' meetings were held on his direction at which the
     relevant dividends were declared must be approached on the basis that
     Paycheck Directors and Mr Holland were in law separate persons, each with
     their own separate legal personality.

C    *(b) De facto directors: the authorities*

     26   The expression "de facto director" has been in use for a long time,
     as Robert Walker LJ observed in *In re Kaytech International plc* [1999]
     2 BCLC 351, 420. It was used by Sir George Jessel MR in *In re Canadian
     Land Reclaiming and Colonising Co (Coventry and Dixon's case)* (1880)
     14 Ch D 660, where the question was whether two individuals who had been
D    appointed and acted as directors while they were ineligible were directors
     or other officers liable to a summons for misfeasance. The test which he
     applied, at pp 664–665, was whether a man who had assumed a position
     could be allowed to deny in court that he was really entitled to occupy it.
     But it is not easy to identify a simple and reliable test for determining
     whether a person in Mr Holland's position was acting as de facto director of
     a company whose sole director was a company of which he was a director de
E    jure. There are a number of first instance cases which offer some assistance.
     But I do not think that they provide a clear and simple solution to the
     problem, as the facts which can give rise to it are so variable.

     27   In *In re Lo-Line Electric Motors Ltd* [1988] Ch 477 it was accepted
     that Mr Browning, against whom the disqualification proceedings were
     brought and who had not actually been appointed a director, de facto ran
F    one of the companies which he allowed to trade after his retirement
     as a director de jure knowing it to be insolvent. Sir Nicolas Browne-
     Wilkinson V-C held that the court had to have regard to his conduct as
     director whether validly appointed or invalidly appointed or merely de facto
     acting as a director. He said, at p 490:

          "the plain intention of Parliament in section 300 was to have regard to
G         the conduct of a person acting as a director, whether validly appointed,
          invalidly appointed, or just assuming to act as director without any
          appointment at all."

     But he did not need to explore what was needed to determine whether an
     individual could properly be held to be acting de facto as a director of a
     company in a case such as this, where a corporate director was interposed
H    between him and the subject company and his actions could be attributed
     entirely to the position which he occupied de jure as a director of the
     corporate director.

     28   That question was however in issue in *In re Hydrodam (Corby) Ltd*
     [1994] 2 BCLC 180. That was a company which had only two directors,
     which were two Channel Islands companies. It went into compulsory

liquidation, and its liquidator brought claims for wrongful trading under section 214 of the Insolvency Act 1986 against 14 defendants who included two of the directors of Eagle Trust plc of which Hydrodam was, by several removes, an indirect subsidiary. It was alleged that they were responsible for the wrongful trading of Hydrodam from the date when they were appointed to be directors of Eagle Trust. But, as Millett J observed at p 183, the Channel Islands companies were Hydrodam's titular directors and there was nothing pleaded in the points of claim to suggest that there were, in addition to the titular directors, any other persons who claimed to be directors of the company at all. The case was argued on the basis that sufficient facts had been pleaded to justify the inference that Eagle Trust acted as a shadow director of the company, and that as directors of the shadow director its directors were collectively responsible for Eagle Trust's conduct in relation to the company as its de facto or shadow directors.

29   Millett J held that the liquidator had failed to plead or adduce any evidence to support the allegation that the directors of Eagle Trust were at any material time directors of Hydrodam, and the proceedings were struck out. There are significant differences between that case and this. It is not alleged here that Mr Holland was a shadow director and section 212 of the Insolvency Act 1986, unlike section 214, does not extend to shadow directors. But it is of interest because of what Millett J said in the course of his judgment about what is needed to establish that a person is a de facto director. At pp 182–183 he said:

"I would interpose at this point by observing that in my judgment an allegation that a defendant acted as de facto or shadow director, without distinguishing between the two, is embarrassing. It suggests—and counsel's submissions to me support the inference—that the liquidator takes the view that de facto or shadow directors are very similar, that their roles overlap, and that it may not be possible to determine in any given case whether a particular person was a de facto or a shadow director. I do not accept that at all. The terms do not overlap. They are alternatives, and in most and perhaps all cases are mutually exclusive. A de facto director is a person who assumes to act as a director. He is held out as a director by the company, and claims and purports to be a director, although never actually or validly appointed as such. To establish that a person was a de facto director of a company it is necessary to plead and prove that he undertook functions in relation to the company which could properly be discharged only by a director. It is not sufficient to show that he was concerned in the management of the company's affairs or undertook tasks in relation to its business which can properly be performed by a manager below board level. A de facto director, I repeat, is one who claims to act and purports to act as director, although not validly appointed as such. A shadow director, by contrast, does not claim or purport to act as director. On the contrary, he claims not to be a director. He lurks in the shadows, sheltering behind others who, he claims, are the only directors of the company to the exclusion of himself. He is not held out as a director by the company."

Here too, as in *In re Lo-Line Electric Motors Ltd*, the test which is being suggested is whether the individual assumed office as a director. But Millett J added these words [1994] 2 BCLC 180, 184:

2807

A
"The liquidator submitted that where a body corporate is a director of
a company, whether it be a de jure, de facto or shadow director, its own
directors must ipso facto be shadow directors of the company. In my
judgment that simply does not follow. Attendance at board meetings
and voting, with others, may in certain limited circumstances expose a
director to personal liability to the company of which he is a director or
its creditors. But it does not, without more, constitute him a director of
any company of which his company is a director."

B

The words "without more" are important. They indicate that the mere fact
of acting as a director of a corporate director will not be enough for that
individual to become a de facto director of the subject company.

30   In *In re Richborough Furniture Ltd* [1996] 1 BCLC 507 the
C question was raised whether one of the three respondents, who was not a
director of the company de jure, was nevertheless a director of the company
de facto and as such liable under section 6 of the Company Directors
Disqualification Act 1986 to be disqualified. Asking himself what is a de
facto director, Timothy Lloyd QC (sitting as a deputy High Court judge)
said, at p 524:

D
"It seems to me that for someone to be made liable to disqualification
under section 6 as a de facto director, the court would have to have clear
evidence that he had been either the sole person directing the affairs of the
company (or acting with others all equally lacking in a valid appointment,
as in *Morris v Kanssen* [1946] AC 459) or, if there were others who were
true directors, that he was acting on an equal footing with the others in
directing the affairs of the company. It also seems to me that, if it is
E unclear whether the acts of the person in question are referable to an
assumed directorship, or to some other capacity such as shareholder or, as
here, consultant, the person in question must be entitled to the benefit of
the doubt."

He held that the individual in question, who was a business consultant
providing computer and other management services to the company, was
F not a de facto director despite having undertaken negotiations with creditors
and performed some of the functions of a finance director.

31   In *Secretary of State for Trade and Industry v Tjolle* [1998]
1 BCLC 333 Jacob J was referred to what was said in *In re Hydrodam
(Corby) Ltd* [1994] 2 BCLC 180, including a passage at p 182 where
Millett J pointed to the purpose of any test as being to impose liability for
G wrongful trading on those persons who were in a position to prevent
damage to creditors by taking steps to protect their interests, and to
*In re Richborough Furniture Ltd* [1996] 1 BCLC 507. He said [1998]
1 BCLC 333, 343–344:

"For myself I think it may be difficult to postulate any one decisive test.
I think what is involved is very much a question of degree. The court
takes into account all the relevant factors. Those factors include at least
H whether or not there was a holding out by the company of the individual
as a director, whether the individual used the title, whether the individual
had proper information (e g management accounts) on which to base
decisions, and whether the individual had to make major decisions and so
on. Taking all these factors into account, one asks 'was this individual

part of the corporate governing structure', answering it as a kind of jury   *A*
question. In deciding this, one bears very much in mind why one is asking
the question. That is why I think the passage I quoted from Millett J is
important. There would be no justification for the law making a person
liable to misfeasance or disqualification proceedings unless they were
truly in a position to exercise the powers and discharge the functions of a
director. Otherwise they would be made liable for events over which they
had no real control, either in fact or law."                                 *B*

In that case the individual in question was given the courtesy title of deputy
managing director but did not form part of the real corporate governance of
the company. There was no function that she performed that could only be
properly discharged by a director.

32  In *In re Kaytech International plc* [1999] 2 BCLC 351, 423–424    *C*
Robert Walker LJ said that he saw much force in what Jacob J said in the
*Tjolle* case when he declined to formulate a single test. Referring to the
passage which I have just quoted, he added this observation:

"I do not understand Jacob J, in the first part of that passage, to be
enumerating tests which must all be satisfied if de facto directorship is to
be established. He is simply drawing attention to some (but not all)        *D*
of the relevant factors, recognising that the crucial issue is whether the
individual in question has assumed the status and functions of a company
director so as to make himself responsible under the 1986 Act as if he
were a de jure director."

Here again the word "assumed" is used. But, as Lewison J said in *In re Mea
Corpn Ltd* [2007] 1 BCLC 618, para 83, in considering whether a person    *E*
"assumes to act as a director" what is important is not what he calls himself
but what he did: see also *Secretary of State for Trade and Industry v Hollier*
[2007] Bus LR 352, para 66.

33  The question whether a director of a corporate director could,
through his control of the corporate director, be held to be a de facto
director of the subject company which was in issue in *In re Hydrodam
(Corby) Ltd* [1994] 2 BCLC 180 was raised again in *Secretary of State for   *F*
Trade and Industry v Hall* [2009] BCC 190. The first respondent to those
proceedings for disqualification, Mr Hall, did not respond, did not appear
and was not represented. The question which the court had to consider was
whether the second respondent, Mr Nuttall, was a de facto director of the
subject company by reason of the fact that he owned and controlled and was
the sole director of its corporate director. The case against him failed       *G*
because he had not, either individually or through his control of the
corporate director, taken any step which indicated that either he or his
company had assumed the status and functions of a director of the subject
company. It was accepted by the Secretary of State that Mr Nuttall did not
fit the description of a de facto director which emerged from Millett J's
judgment in *In re Hydrodam*. This was because that description required
positive action by an individual which showed that he was acting as if he was   *H*
a director. It was contended that it was sufficient that he was in a position to
exercise the powers and discharge the functions of a director of the subject
company, even if he did not actually do anything. But Evans-Lombe J said
that he could not accept that argument: see para 30.

*A*    34    Among the reasons which Evans-Lombe J gave for coming to that conclusion in that paragraph were the following:

"(ii) In the *Hydrodam* case . . . Millett J finds that the director of a corporate director is not, without more, constituted a director, whether shadow or de facto, of a subject company. However I do not read his judgment as saying that this can never happen. I can well accept that an

*B*    individual through his control of a corporate director can constitute himself a de facto director of a subject company. It seems to me that whether or not he does so will depend on what that individual procures the corporate director to do. In theory I am not bound by the judgment of Millett J in the *Hydrodam* case. Even putting on one side the authority of that judge in this and other fields of the law, I would need convincing

*C*    reasons for not following it. I can find none. (iii) It seems to me that in order to be constituted a de facto director of a subject company, a director of a corporate de jure director must cause the corporate director to take actions with relation to the subject company as would have constituted it a de facto director of that company were it not already a director de jure. (iv) In addition the degree of control which the

*D*    director of the corporate director exercises over that company will be of relevance. In the present case Mr Nuttall's control was absolute but the situation may be substantially different where the corporate director is controlled by a board with a number of members with different responsibilities.    Equally the shareholder control of the corporate director may be relevant."

*E*    35    The deputy judge was impressed by para (iii) in this list of reasons. He said that applying that test to Mr Holland's case would clearly lead to the conclusion that he was a de facto director of the composite companies in that he, in so far as he is properly to be regarded as having acted on behalf of Paycheck Directors, clearly caused it to act in such a way as would have caused the latter to be treated as a de facto director were it not already a de jure director: see [2009] Bus LR 1, para 176. This left for consideration Mr Knox's argument that to make that finding would

*F*    involve piercing the corporate veil which, on the authority of *Salomon v A Salomon & Co Ltd* [1897] AC 22, was contrary to principle. He was not persuaded that arguments as to separate corporate personality were of assistance or relevant to the issue. He said that as a matter of fact Mr Holland did, by what he actually did, direct the affairs of the composite companies and that it was beside the point whether he purported to do so

*G*    on his own account or as agent for Paycheck Directors: see para 177. As the corporate veil point was the only point taken on behalf of Mr Holland, he found that it necessarily followed that he was a de facto director of the composite companies.

36    In the Court of Appeal Rimer LJ (with whom Ward and Elias LJJ agreed on this aspect of the case) reached the opposite conclusion. He accepted that the critical issue was, as Robert Walker LJ put it in

*H*    *In re Kaytech International plc* [1999] 2 BCLC 351, 423, whether the individual assumed the status and function of a company director so as to make himself responsible as if he were a de jure director and that it mattered not what the individual called himself but what he did: see [2010] Bus LR 259, para 65. He concluded, I think rightly, that the only authorities that

lent any assistance on the question posed by this case were *In re Hydrodam*   A
*(Corby) Ltd* [1994] 2 BCLC 180 and *Secretary of State for Trade and
Industry v Hall* [2009] BCC 190. Recalling that the essence of Millett J's
reasoning in *In re Hydrodam* was that membership of the board of a
corporate director will not, without more, make such member a shadow or
de facto director of any company, he said that he did not find anything in
that judgment to suggest that the "requisite more" would be satisfied merely   B
by the active participation of the board member in the making of board
decisions by the corporate director in relation to the actions of the subject
company: see [2010] Bus LR 259, para 66. As for the test suggested by
Evans-Lombe J in para 30(iii) of his judgment in the *Hall* case which had
impressed the judge, he said that it appeared to him to be somewhat artificial
and that it was wrong in principle. He saw no reason why a director of a   C
corporate director who is doing no more than discharging his duties as such
should thereby become a de facto director of the subject company: see
para 70.

37   In para 74 Rimer LJ added these comments:

"I emphasise that nothing that I have said is intended to suggest that
there can never be circumstances in which a director of a corporate
director can or will so act as to cause himself to be regarded as a de facto   D
director of the subject company. But something more will be required
than the mere performance by him of his duties as a de jure director of the
corporate director. On the facts accepted by the judge, there was nothing
more in the present case."

*(c) Mr Holland's case*
                                                                              E
38   The remedy that is provided by section 212 of the Insolvency Act
1986 may be sought only against persons to whom that section applies, as
described in section 212(1). The description that applies to this case is
that set out in para (a) of the subsection: "is or has been an officer of the
company." The word "officer" includes a director, but it is accepted that
the section does not apply to shadow directors because the statute does   F
not provide for this. It follows that HMRC must plead and prove
against Mr Holland that he was a de facto director of the composite
companies.

39   How is this to be done? It is plain from the authorities that the
circumstances vary widely from case to case. Jacob J declined to formulate a
single decisive test in *Secretary of State for Trade and Industry v Tjolle*
[1998] 1 BCLC 333, as he saw the question very much as one of fact   G
and degree. He was commended by Robert Walker LJ in *In re Kaytech
International plc* [1999] 2 BCLC 351, 423 for not doing so, and
I respectfully agree that there is much force in Jacob J's observation. All one
can say, as a generality, is that all the relevant factors must be taken into
account. But it is possible to obtain some guidance by looking at the purpose
of the section. As Millett J said in *In re Hydrodam (Corby) Ltd* [1994]   H
2 BCLC 180, 182, the liability is imposed on those who were in a position to
prevent damage to creditors by taking proper steps to protect their interests.
As he put it, those who assume to act as directors and who thereby exercise
the powers and discharge the functions of a director, whether validly
appointed or not, must accept the responsibilities of the office. So one must

A   look at what the person actually did to see whether he assumed those
responsibilities in relation to the subject company.

40   The problem that is presented by this case, however, is that
Mr Holland was doing no more than discharging his duties as the director of
the corporate director of the composite companies. Everything that he did
was done under that umbrella. Mr Green QC for HMRC was unable to
B   point to anything that he did which could not be said to have been done by
him in his capacity as a director of the corporate director. When asked what
it was that lay outside his performance of that role, he said that it was simply
the quality of his acts. He did everything. He was the decision maker, and
he was the person who gave effect to those decisions. In *In re Hydrodam*,
at p 184, Millett J rejected the proposition that, where a body corporate is a
director of a company, whether it be de jure, de facto or shadow director, its
C   own directors must ipso facto be shadow directors of the subject company.
He said that attendance at board meetings and voting with others did not,
without more, constitute him a director of any company of which his
company is a director. That would not be a fair description of what
Mr Holland did in this case. But in a later paragraph, on p 184, Millett J said:

D        "It is possible (although it is not so alleged) that the directors of Eagle
Trust as a collective body gave directions to the directors of the company
and that the directors of the company were accustomed to act in
accordance with such directions. But if they did give such directions as
directors of Eagle Trust, acting as the board of Eagle Trust, they did so as
agents for Eagle Trust (or more accurately as the appropriate organ of
Eagle Trust) and the result is to constitute Eagle Trust, but not themselves,
E        shadow directors of the company."

This passage indicates that the "without more" requirement that Millett J
had in mind would not be satisfied by evidence that the individual director
of the body corporate was actually giving instructions in that capacity to
the subject company and the subject company was accustomed to act in
accordance with those directions. That would not be enough to prove
F   that the individual director assumed a role in the management of the
subject company which imposed responsibility on him for misuse of
the subject company's assets.

41   The facts of this case do not precisely match those in *In re Hydrodam*.
But I think, with respect, that Rimer LJ put his finger on the way the
question in this case should be answered. In para 67 of his judgment [2010]
G   Bus LR 259 he referred to the "principle" that emerges from Millett J's
judgment. In para 70 he said that the proposition that Evans-Lombe J set
out in para 30(iii) of his judgment in *Secretary of State for Trade and
Industry v Hall* [2009] BCC 190 was "wrong in principle". He rejected the
argument that the mere fact that an individual has been acting as a director of
the corporate director can, or may, result in his also becoming a director
of the subject company. He expressed the principle that he had in mind in
H   these words, at para 68:

         "The relevant act in relation to the affairs of the subject company is an
act directed by the corporate director, not one directed by the latter
company's individual board members. That may be regarded as a
distinction of some technicality. But so long as we have a system of

company law which recognises the difference between a company and its *A* directors, it is a distinction that must be recognised and respected."

42 This was, I think, the point that Mr Knox was seeking to make when he referred to the speeches in *Salomon v A Salomon & Co Ltd* [1897] AC 22. As Lord Davey said at p 54, the intention of the legislature must be collected from the language of its enactments. One can properly say, as Lord Macnaghten did about the company and its subscribers at p 51, that a *B* company is at law a different person from its directors and that it is the intention of the enactment that this distinction should be recognised. I do not think that one can overcome this distinction by pointing, as Mr Green seeks to do, simply to the quality of the acts done by the director and asking whether he was the guiding spirit of the subject company or had a real influence over its affairs. As a test, that would create far too much *C* uncertainty. Those who act as directors of a corporate director are entitled to know what it is that they can and cannot do when they are procuring acts by the corporate director. That is as true of a case such as this, where the affairs of the corporate director are effectively in the hands of one individual, as it is where there is a board comprised of several directors who always act collectively. As Lord Collins of Mapesbury JSC says (see paras 53 and 95, *D* below), the question is one of law and it is a question of principle. I think that the guiding principle can be expressed in this way, unless and until Parliament provides otherwise. So long as the relevant acts are done by the individual entirely within the ambit of the discharge of his duties and responsibilities as a director of the corporate director, it is to that capacity that his acts must be attributed.

43 It is, of course, right to bear in mind the interests of the creditors. *E* Their protection lies in the remedies that are available for breach of the fiduciary duty that rests on the shoulder of every director. But the essential point, which Millett J was at pains to stress in *In re Hydrodam* [1994] 2 BCLC 180, is that for a creditor of the subject company to obtain those remedies the individual must be shown to have been a director, not just of the corporate director but of the subject company too. I agree with Rimer LJ *F* that, on the facts accepted by the deputy judge, it has not been shown that Mr Holland was acting as de facto director of the composite companies so as to make him responsible for the misuse of their assets. I also agree with the reasons that Lord Collins JSC gives for reaching this conclusion.

*The other issues*

44 On the view that I take on the first issue, the points raised about the *G* extent of the liability do not require to be decided. But I would offer these brief comments on some of them, as these points were fully and carefully argued by counsel on both sides.

45 First, there is the question whether the liability for the payment of unlawful dividends is strict or depends on a degree of fault being established. There are two lines of authority on this issue. On the one hand there are cases in which it has been said without qualification that directors are under *H* a duty not to cause an unlawful and ultra vires payment of a dividend: see *In re Exchange Banking Co (Flitcroft's case)* (1882) 21 Ch D 519; *In re Lands Allotment Co* [1894] 1 Ch 616, 638; *Selangor United Rubber Estates Ltd v Cradock (No 3)* [1968] 1 WLR 1555, 1575; *Belmont Finance Corpn v*

2813

[2010] I WLR                           Revenue and Customs Comrs v Holland (SC(E))
                                                              Lord Hope of Craighead DPSC

A    *Williams Furniture Ltd (No 2)* [1980] I All ER 393, 404 and *In re Loquitur
     Ltd* [2003] 2 BCLC 442, 471–472. On the other there is a line of authority
     to the effect that a director is only liable if he makes a misapplication of a
     company's assets if he knew or ought reasonably to have known that it was a
     misapplication: see *In re County Marine Insurance Co (Rance's case)* (1870)
     LR 6 Ch App 104, 118; *In re Kingston Cotton Mill Co (No 2)* [1896] I Ch
     331, 345–348; *Dovey v Cory* [1901] AC 477, 489–490 and *In re City
B    Equitable Fire Insurance Co Ltd* [1925] Ch 407, 426, per Romer J.

     46    The trend of modern authority supports the view that a director who
     causes a misapplication of a company's assets is in principle strictly liable to
     make good the misapplication, subject to his right to make good, if he can,
     a claim to relief under section 727 of the Companies Act 1985. The
     authorities that favour the contrary view really come to an end with *Dovey v
C    Cory* [1901] AC 477, as the later judgment of Romer J in *In re City Equitable
     Fire Insurance Co Ltd* [1925] Ch 407 can be read, at least in relation to
     dividends, as supporting strict liability. Furthermore, the whole point of
     introducing the right to claim relief under section 727 was to enable the
     court to mitigate the potentially harsh effect of being held strictly liable.
     That relief was introduced by section 32 of the Companies Act 1907, so it
     was not available when most of the cases in this line of authority were being
D    decided.

     47    It is not necessary to express a definite view on this issue in this case.
     As counsel for HMRC pointed out in their written case, there has been no
     challenge to the finding by the deputy judge that as from 18 August 2004 all
     the dividends were unlawful, and it is accepted that the relief available
     by way of a defence under section 727 of the 1985 Act would have been
E    available if Mr Holland could show that he acted reasonably. So the issue is
     academic here, and it was no doubt for this reason that it was not thought to
     be necessary to develop the point fully in oral argument. But the better view
     seems to me that in cases such as this, where it is accepted that the payment
     of dividends was unlawful, a director who causes their payment is strictly
     liable, subject of course to his right to claim relief under the statute.

F    48    Then there is the question whether the correct remedy for any breach
     of the duties of a director not to make unlawful payments of dividends
     is damages or equitable compensation for the net loss sustained by the
     company, or restitution or restoration of the amount of the unlawful
     dividends without any inquiry into the loss sustained. The deputy judge held
     that the established remedy was to require the director to reinstate the
     amount of the payment without any inquiry as to the loss suffered by the
G    company as a result of the breach of duty: see [2009] Bus LR 1, para 218.
     But he declined to make an order in these terms. What he did, having
     refused relief under section 727 for this period as he held that Mr Holland
     had not acted reasonably in paying the dividend without taking all
     appropriate advice and properly informing himself, was to order him to pay
     the amount of HRCT that the companies had not provided for in the period
     of trading from 23 August 2004. He said that he was doing this in the
H    exercise of his discretion under section 212 of the Insolvency Act 1986: see
     para 274.

     49    I agree with the Court of Appeal that the obligation is to restore
     the moneys wrongfully paid out. This, as the deputy judge accepted, is
     the established remedy. Where dividends have been paid unlawfully, the

directors' obligation is to account to the company for the full amount      A
of those dividends: see *Bairstow v Queens Moat Houses plc* [2001] 2 BCLC
531, para 54, per Robert Walker LJ.   But there is a discretion under
section 212 that it is open to the judge to exercise.   This is indicated by the
use of the word "may" in subsection (3).   Rimer LJ said that the judge's order
should have reflected the wrong that had actually been committed and the
fact that he had refused relief under section 727 of the 1985 Act in respect of    B
it.   Elias LJ, at [2010] Bus LR 259, paras 133–134, and Ward LJ, at para 143,
disagreed.   In their view it was open to the deputy judge to limit the amount
that Mr Holland should pay to what HMRC had lost from his unlawful
conduct.   Had it been necessary to reach a view on this point, I would have
agreed with the majority.   HMRC is the only creditor.   There is no evidence
that anyone would have been disadvantaged by limiting the liability in
this way.   It would have been a different matter if the deputy judge had    C
misdirected himself as to the extent of the obligation.   That plainly is not so.
As he made clear in para 274 of his judgment ([2009] Bus LR 1), he
proceeded on the basis that, while restoration is the established remedy, he
had a discretion under section 212 of the 1986 Act to limit the award to
what was required to make up the deficiency of a particular creditor where
the claim was made by a party other than the liquidator.   In my opinion it    D
was open to him to exercise his discretion in this way, and I do not think that
he can be faulted for doing so in this case.

50   Lastly, there are the questions about relief under section 727 of the
Companies Act 1985.   There are two points.   First, there is the decision by
the deputy judge that Mr Holland was entitled to a few days grace after the
events of 18 August 2004 to enable him to take stock.   Rimer LJ thought the
deputy judge was in error in giving Mr Holland this grace period: see [2010]    E
Bus LR 259, para 88.   He said that Mr Holland had not conducted himself so
as to deserve it and that there was no factual basis for the decision.   Here too
Elias LJ, at para 128, and Ward LJ, at para 138, disagreed.   Elias LJ said that
there was evidence justifying the deputy judge's analysis.   I respectfully agree
with the majority on this point too.   It seems to me that the judge provided a
sufficient explanation for his decision in [2009] Bus LR 1, paras 269 and
270, and that his was a decision with which an appellate court could not    F
properly interfere.

51   The second question is whether, as Mr Knox submitted, the judge
should have gone further and relieved Mr Holland from the obligation to
pay anything at all.   He suggested that account should have been taken of the
fact that, as he put it, the course taken by Mr Holland was the least bad of
all the alternatives.   I do not see how, on the facts found by the deputy    G
judge, this argument can be supported.   He found that Mr Holland acted
unreasonably because he did not take appropriate advice or inform himself
as to the merits of what he was doing.   But there is a more fundamental
point.   Mr Knox submitted that the discretion under section 212 was wide
enough to allow the court to reduce the award to nil even if it declined
relief under section 727 of the 1985 Act.   I agree with Rimer LJ that the    H
discretion under section 212(3), which is essentially procedural in nature, is
a discretion as to amount only once liability has been established.   It is not so
wide as to allow the judge, having determined that the section applies, to
decline to make any order at all: see paras 108–110.   The discretion which he
is given by section 212(3) is as to the order that would be appropriate once

A liability has been established, not to grant relief against liability. It is a discretion as to how much the director should be ordered to pay, so as to do what is just in all the circumstances: see *In re Loquitur Ltd* [2003] 2 BCLC 442, para 245, per Etherton J. The deputy judge was right to reject this argument.

*Conclusion*

B
52   As I agree with the Court of Appeal that it has not been shown that when he was directing payment by the composite companies of the unlawful dividends Mr Holland was acting as their de facto director, I would dismiss the appeal.

**LORD COLLINS OF MAPESBURY JSC**

C
*Introduction*

53   I agree with Lord Hope of Craighead DPSC that the appeal should be dismissed, and write to set out my own approach on the main issue. In my judgment what divides this court is not simply a matter of appreciation of the facts, namely whether what Mr Holland did in fact was sufficient to make him a de facto director of the composite companies, but a question of
D law and a question of principle. The question is whether fiduciary duties can be imposed, in relation to a company whose sole director is a corporate director, on a director of that corporate director when all of his relevant acts were done as a director of the corporate director and can be attributed in law solely to the activities of the corporate director.

54   My reasons will require some elaboration, particularly because they
E involve examination of older case law which was not cited in argument, but can be summarised in this way. Mr Holland is sought to be made liable for breach of fiduciary duty as a de facto director of the composite companies. For almost 150 years de facto directors in English law were persons who had been appointed as directors, but whose appointment was defective, or had come to an end, but who acted or continued to act as directors. There was a
F striking judicial innovation in *In re Lo-Line Electric Motors Ltd* [1988] Ch 477 and *In re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180 (endorsed by the Court of Appeal in *In re Kaytech International plc* [1999] 2 BCLC 351) by which (at the risk of over-simplification) persons who were held to be part of the corporate governance of a company, even though not directors, could be treated as directors for the purposes of statutory provisions relating to such matters as wrongful trading by, and disqualification of, directors. To
G extend that line of authority so as to impose fiduciary duties on Mr Holland in relation to the composite companies, when all of his acts can be attributed in law solely to the activities of Paycheck Directors would be an unjustifiable judicial extension of the concept of de facto director, and best left to the legislature, given that it was as recently as 2006 that it intervened to require that at least one director of a company be a natural person: Companies Act
H 2006, section 155(1).

55   The issue is whether Mr Holland can be made liable, pursuant to the Insolvency Act 1986, section 212 (as amended), to account for the funds paid out by the insolvent composite companies on the basis that they have been misapplied by him, or he is accountable for them, or has been guilty of misfeasance or breach of any fiduciary or other duty in relation to the funds.

It is common ground that (a) a de facto director is covered by section 212;    *A*
(b) "shadow" directors (ie "a person in accordance with whose directions
or instructions the directors of the company are accustomed to act":
Companies Act 1985, section 741(2); Companies Act 2006, section 251(1))
are not within section 212; and (c) section 212 is a procedural provision
which does not create any substantive obligations, and consequently for a
person to be made liable under section 212, that person must be guilty of
breach of an independent duty: *In re Canadian Land Reclaiming and*    *B*
*Colonising Co (Coventry and Dixon's case)* (1880) 14 Ch D 660; *In re City*
*Equitable Fire Insurance Co Ltd* [1925] Ch 407.

56    In this case the basis of the relevant independent duty is significant.
The only basis on which liability is sought to be placed on Mr Holland is that
as a de facto director of the composite companies he was in breach of his
fiduciary duty not to misapply their funds by paying unlawful dividends.    *C*
Directors are accountable for breach of fiduciary duty to a company for
unlawful distributions paid in contravention of what is now the Companies
Act 2006, section 830: see eg *Bairstow v Queens Moat Houses plc* [2001]
2 BCLC 531. In *In re Exchange Banking Co (Flitcroft's case)* (1882)
21 Ch D 519 the liquidator of an insolvent banking company issued a
summons against five former directors who had been concerned in paying
dividends at a time when they knew the company had no distributable    *D*
profits. The Court of Appeal held the directors jointly and severally liable
for the amount of the dividends. The principle was put by Sir George
Jessel MR, at p 534: "It follows then that if directors who are quasi trustees
for the company improperly pay away the assets to the shareholders,
they are liable to replace them." It is not suggested that (in the absence of
dishonesty) persons who facilitate the payment of unlawful dividends are    *E*
responsible for knowing assistance in a breach of trust.

57    In my judgment the decision of the House of Lords in *Standard*
*Chartered Bank v Pakistan National Shipping Corpn (Nos 2 and 4)* [2003]
1 AC 959 is of no assistance in the solution of the problem raised on this
appeal. The basis of that decision is that a director who makes fraudulent
representations is liable in deceit irrespective of whether he makes the    *F*
representations on behalf of a company. The decision of the Court of
Appeal, which was reversed by the House of Lords and which had held that
he was not liable because he had been acting on behalf of the company,
was plainly wrong (although I used more diplomatic language in *Daido Asia*
*Japan Co Ltd v Rothen* [2002] BCC 589). But in the present case there can
be no suggestion that Mr Holland is not responsible because the corporate    *G*
director is responsible. He will be responsible if what he did was unlawful.
The question, to which it is now necessary to turn, is whether he was himself
in breach of duty.

*The development of the law relating to de facto directors*

  *Validity of acts of de facto directors*

58    Most of the early cases are about the validity of the acts of de facto    *H*
directors, but they are relevant to the question of principle, namely what
makes a person a de facto director. The first mention in the case law of de
facto directors appears to have been in *Mangles v Grand Collier Dock Co*
(1840) 10 Simons 519, a case involving the formation of a dock company by

A private Act of Parliament. Sir Lancelot Shadwell V-C said, at p 535, that the Act assumed that persons by whom a call was made had to be directors de facto, and that all that Parliament meant was that, if the call were made by persons appearing to be directors, it should not be necessary to prove their appointment. The first full discussion of the de facto director was in the famous case of *Foss v Harbottle* (1843) 2 Hare 461, which was of course

B concerned with the right of shareholders in a company incorporated by Act of Parliament to sue for wrongs alleged to have been done to the company, a matter which has no relevance to the present appeal. The shareholders claimed that the extinction of the board of directors by the bankruptcy and consequent disqualification of three of them, and the want of any clerk or officer, effectually prevented the due convening of a general meeting of shareholders competent to secure the remaining property of the company,

C and provide for its due application. That argument was rejected on the basis that the continued existence of a board of directors de facto must be intended; and that the possibility of convening a general meeting of shareholders capable of controlling the acts of the existing board was not excluded by the allegations of the bill; that in such circumstances there was nothing to prevent the company from obtaining redress in its corporate character in respect of the matters complained of. Sir James Wigram V-C

D held, at p 496, that shareholders could serve a notice requiring an extraordinary general meeting at the place where "the board of directors de facto, whether qualified or not, carry on the business of the company at a given place". He said, at p 498:

E "Whatever the bill may say of the *illegal* constitution of the board of directors, because the individual directors are not duly qualified, it does not anywhere suggest that there has not been during the whole period, and that there was not when the bill was filed, a board of directors de facto, acting in and carrying on the affairs of the corporation, and whose acting must have been acquiesced in by the body of proprietors; at least, ever since the illegal constitution of the board of directors became known, and the acts in question were discovered. But if there has been or is a

F board de facto, their acts may be valid, although the persons so acting may not have been duly qualified."

59 The concept of de facto directors is used in that case to validate acts which might otherwise have been invalid, and most of the early cases are not only about persons who purported to be directors but whose appointment was defective, but they are also mainly concerned with whether the acts of

G those persons were legally valid or effective. Several of the cases are also applications of the principle in the Companies Acts or in articles of association that, notwithstanding that it might be afterwards discovered that there was some defect or error in the appointment of the directors, any acts of those directors were to be valid: see from the Companies Clauses Consolidation Act 1845 (8 & 9 Vict c 16), section 99, and the Joint Stock Companies Act 1856 (19 & 20 Vict c 47), Schedule, Table B, regulation 60,

H through to the Companies Act 2006, section 161, and the Companies (Tables A to F) Regulations 1985 (SI 1985/805), Schedule 1, Table A, regulation 92.

60 The question in *In re County Life Assurance Co* (1870) LR 5 Ch App 288 was whether a claim under a policy could be admitted in the liquidation

of an insurance company. The directors who were named in the articles, *A* and signed the memorandum of association, refused to act and passed a resolution that the company should not carry on business or allot shares. Notwithstanding this resolution, Mr Preston, the promoter of the company, and one of the shareholders carried on business and allotted shares and appointed directors. A stranger effected a policy at the company's office which was signed by three of the de facto directors, and sealed with what *B* purported to be the seal of the company. It was held to be binding because, per Sir GM Giffard LJ, at p 293:

"The company is bound by what takes place in the usual course of business with a third party where that third party deals bona fide with persons who may be termed de facto directors, and who might, so far as he could tell, have been directors de jure."

*C*

61   In *Murray v Bush* (1873) LR 6 HL 37, the first of three decisions of the House of Lords dealing with de facto directors, the question concerned the validity of a share transfer and whether the purported transferee was a contributory. Its articles of association required (inter alia) that the directors at a board meeting had to certify their approval of the proposed transferee. Bush was a shareholder and a director. The articles also required directors to *D* have a share qualification. The transfer was approved at a board meeting, but it was claimed that three of the directors were not duly appointed because they had not executed a deed binding themselves to obey the regulations of the company. Section 30 of the Joint Stock Companies Act 1844 (7 & 8 Vict c 110) provided that notwithstanding that it might be afterwards discovered that there was some defect or error in the appointment of the directors, any acts of those directors were to be valid. The House of Lords was equally *E* divided on the outcome of the appeal (which was from a decision of Lord Hatherley LC, who also sat on the appeal) and therefore the appeal was dismissed. Lord Cairns and Lord Hatherley decided that the transfer was to be treated as valid because of section 30 and because the company itself had approved the transfer. Lord Hatherley (at pp 76–77) referred to directors to whom section 30 applied as directors de facto. This case concerned persons *F* who acted in all respects as if they were directors.

62   In the second decision of the House of Lords, *Mahony v East Holyford Mining Co Ltd* (1875) LR 7 HL 869, it was held that bankers who held funds of a company could lawfully honour the cheques of the directors without being bound to inquire whether the persons pretending to sign as directors had been duly appointed in conformity with the provisions of the memorandum and articles of association. The persons purporting to act *G* as directors had not been appointed, as required by the articles, by the subscribers to the memorandum. Lord Cairns LC, Lord Hatherley and Lord Penzance considered that the case was covered by the normal validating provision in the articles that acts done by the board or by a committee of directors should, notwithstanding that it be afterwards discovered that there was some defect in the appointment be as valid as if every such person had *H* been duly appointed, and was qualified to be a director.

63   Lord Cairns said, at p 888, that the House of Lords:

"should now hold that there having been de facto directors of the company, who were suffered and permitted by the majority of those who

*A*  signed the articles of association to occupy the position of and act as directors, and the bankers having, in the full belief that these persons were directors, as they were represented to be, honoured the cheques drawn by them, the payment of these cheques is an answer to the action of the liquidator of the company . . ."

**64**  Lord Penzance said, at pp 900–901:

*B*  "In the present case, from the time when the East Holyford Mining Co came into existence, that is after the registration of the memorandum and articles of association, three persons usurped the position of directors (I say 'usurped', because they do not seem to have been regularly appointed) and another person usurped the office of secretary. This they did in the face of the subscribers to and shareholders in the company, as well as of persons dealing with the company; and both before the company was legally formed, and after it was formed, they publicly advertised themselves in the prospectus as directors and secretary respectively. They occupied the offices designated in the prospectus, and they opened an account with the bank therein named. During the six months following that assumed, to the exclusion of all others, the executive functions of the company; no subscribers, nor shareholders, nor strangers dealt with any one else, and no one questioned their authority. Therefore, during the whole of the time that this company was acting as a company, these individuals were ostensibly directors and secretary respectively, and they were the de facto directors and secretary . . . It seems to me, therefore, my Lords, that we have here the case of three individuals being de facto directors, and one being de facto secretary."

*C*

*D*

*E*

**65**  Slade J, in *Rama Corpn Ltd v Proved Tin and General Investments Ltd* [1952] 2 QB 147, considered that the point in the *Mahony* case was whether the bank was entitled to treat the persons who were described in the mandate as directors. They were directors de facto, and whether they were directors de jure depended on whether the provisions in the articles relating to the appointment of directors had been complied with. This was a matter of internal management into which the bank was not bound to inquire: *Royal British Bank v Turquand* (1856) 6 E & B 327. In *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2 QB 480, 507, Diplock LJ said that the basis of the decision in the *Mahony* case was that the conduct of those who were entitled to appoint the directors was relied on as a representation that they had been appointed.

*F*

*G*

**66**  The issue in *John Morley Building Co v Barras* [1891] 2 Ch 386 was whether an action was properly brought by de facto directors on behalf of the company to restrain the defendants from holding themselves out as directors. The persons who had brought the action were persons who had been appointed directors by a document which had been signed by only seven of the subscribers instead of all of them. It claimed that because they were de facto directors under the articles at the first ordinary meeting after the registration of the company they retired from office after that as "vacating" directors, they continued in office until the ordinary meeting in the next year. It was held that the provision did not apply to persons who were only de facto directors. It applied only to those directors who had been

*H*

validly appointed in pursuance of the articles. De facto directors did not    *A*
derive any authority from that clause as against directors duly appointed.
The defendants were validly appointed and the action was not properly
brought.

67   In *Channel Collieries Trust Ltd v Dover, St Margaret's and Martin
Mill Light Railway Co* [1914] 2 Ch 506 the sole remaining director
purported to fill vacancies on the board, even though there was no quorum.    *B*
It was held that "their acts as de facto directors" were validated by section 99
of the Companies Clauses Consolidation Act 1845. Swinfen Eady LJ
approved, at pp 514–515, the way in which it was put in the then current
edition of *Buckley on the Companies Acts*, 9th ed (1909), p 169 in relation
to the equivalent provision in the Companies (Consolidation) Act 1908,
section 74: "Endangering accuracy for the sake of brevity, it may be said that
the effect of this section is that, as between the company and persons having    *C*
no notice to the contrary, directors etc de facto are as good as directors etc
de jure."

68   The third decision of the House of Lords on de facto directors,
*Morris v Kanssen* [1946] AC 459, was concerned with the validation
provision in section 143 of the Companies Act 1929. It was held that the
appointment of X as a director at a board meeting attended by A and B, and    *D*
the allotment of shares to X, were not validated by the section in a case
where A and B had falsely claimed that B had been duly appointed a director,
and where A had ceased to be a director in accordance with the company's
articles because no general meeting had been held in the relevant year. Lord
Simonds said, at p 475, that there was no authority for the proposition that
a director or de facto director could invoke the rule so as to validate a
transaction which was in fact irregular and unauthorised. The decision    *E*
raises difficulties which are not relevant on this appeal: see *Gower & Davies,
Principles of Modern Company Law*, 8th ed (2008), para 7-15, and the
Companies Act 2006, section 161.

69   All of the cases discussed thus far concerned persons who actually
acted as directors, and all are about the authority of de facto directors or the
validity of their acts. There was an invalid appointment in all of them,
except *Foss v Harbottle* 2 Hare 461 (where there had been a valid    *F*
appointment, but the directors had ceased to hold office), and in *Morris v
Kanssen* [1946] AC 459, where two de facto directors were involved, one of
whom had ceased to hold office and the other had been invalidly appointed.

*The liability of de facto directors*

70   The only cases touching on the liability of de facto directors before    *G*
the modern developments in the law are *Gibson v Barton* (1875) LR 10
QB 329, *In re Canadian Land Reclaiming and Colonising Co (Coventry and
Dixon's case)* (1880) 14 Ch D 660, *In re New Par Consols Ltd* [1898]
1 QB 573, and *R v Lawson* [1905] 1 KB 541.

71   Like the cases on the validity of directors' acts, both *In re Canadian
Land Reclaiming and Colonising Co (Coventry and Dixon's case)* and
*In re New Par Consols Ltd* were about individuals who had been appointed    *H*
directors: in the former case, the appointment of the two directors was
defective, and in the latter case the defendant had ceased to be a director
through an act of bankruptcy. Neither *Gibson v Barton* nor *R v Lawson*
directly involved de facto directors. In each of those cases the question was

2821
[2010] 1 WLR                    Revenue and Customs Comrs v Holland (SC(E))
                                                    Lord Collins of Mapesbury JSC

A   whether a person who had acted as a manager of a company could be treated
    as a manager for the purposes, in the former case, of a predecessor of the
    Insolvency Act 1986, section 212 and in the latter case, of the Larceny Act
    1861 (24 & 25 Vict c 96), even though he had not been appointed as such.
    *Gibson v Barton* deals obiter with the position of directors.

        72  *Gibson v Barton* LR 10 QB 329 is the first case in which the liability
B   of a de facto director is considered (but again in the context of a director
    whose appointment is invalid), and the first case in which the analogy of
    executor de son tort is employed. The issue was whether a penalty under
    the Companies Act 1862 (25 & 26 Vict c 89) for failure to file an annual
    return could be imposed under a section which imposed the penalty on the
    company and on "every director and manager of the company who shall
    knowingly and wilfully authorise or permit such default". The appellant
C   was held to have been rightly convicted because he had been permitted by
    the board to manage the company generally, just as if he had been legally
    appointed to act as manager. Blackburn J also dealt with the position of
    directors, but he also was plainly thinking of a director whose appointment
    was defective, or, as he put it, "illegally elected." He said, at pp 338–339:

        "There are many instances in which a person who de facto exercises an
D       office cannot defend himself by saying, when he is called upon to bear
        liability in consequence of his acting, 'I am not rightfully in the office,
        there is another man who may turn me out'. An executor de son tort is an
        instance in which a man incurs all the liabilities of an executor as to third
        persons, and he is not permitted to say, 'I am not executor; there is
        another man who may take out probate'. The answer is, 'Your liability as
E       to a third person rests upon your being executor de son tort; you have
        usurped the office and must bear the liabilities' . . . So, if a director were
        to set up in answer to a penalty under section 27, that he was not a
        director, that he was illegally elected, the answer would be, 'You have
        acted as director, and were a director in your own wrong'. I think there
        was evidence to justify the Lord Mayor in drawing the conclusion that the
F       appellant was de facto manager. No doubt the appellant is called
        secretary, but was he a person to whom the whole management had been
        delegated, probably improperly delegated, by the board of directors, and
        who had taken upon himself to act as sole manager? He himself says in
        the minutes, 'The secretary', that is himself, 'reported that, in order to
        comply with the requirement of the Joint Stock Companies Acts he had
        called a general meeting of the shareholders', etc . . . That is evidence
G       upon which the Lord Mayor might find that he had taken on himself the
        management of the company; he has of his own authority done an act
        which was to be done only by the directors. So, again, in the letter he tells
        the directors he will call a meeting. I do not say he had power to call a
        meeting. I think he had not, but I think that is evidence that he had
        assumed to act for the directors, and had taken the management of the
H       company on himself. The Lord Mayor rightly drew the inference that the
        appellant was, by his own wrong, manager of the company."

        73  An executor de son tort is a person who has not been lawfully
    appointed executor or administrator who by reason of his intrusion upon the
    affairs of the deceased is treated for some purposes as having assumed the

executorship: *Williams, Mortimer & Sunnucks, Executors, Administrators*    A
*and Probate*, 19th ed (2008), para 8-16.

74  The analogy with an executor de son tort was taken up in
*In re Canadian Land Reclaiming and Colonising Co (Coventry and Dixon's*
*case)* 14 Ch D 660, which is the authority for the proposition that de facto
directors are directors for the purposes of what is now the Insolvency Act
1986, section 212, but it too (like all of the older cases) is a case about    B
persons who were appointed as, and acted as, directors, but whose
appointment was defective. Coventry and Dixon were appointed, and for
some time acted, as directors of a company in which the qualification for a
director was the holding of a hundred shares. Neither of them was the
holder of any shares. In the course of the winding up the liquidator applied
under section 165 of the Companies Act 1862 (a predecessor of section 212
of the Insolvency Act 1986) to charge them for misfeasance in acting as      C
directors without qualification.

75  In the Court of Appeal it was held, reversing the judgment of
Sir George Jessel MR, that section 165 created no right and merely provided
a summary mode of calling directors to account for acts of impropriety, and
that to make a person liable under it he must be shown to have been guilty of
some misconduct by which the company had suffered loss. But there was no    D
disagreement on the concept of de facto directors.

76  Sir George Jessel MR, in a passage which was not affected by the
reversal of his decision, said, at pp 664–665:

"No doubt they were not properly elected, and were, therefore, not de
jure directors of the company; but that they were de facto directors of the
company is equally beyond all question. The point I have to consider is    E
whether the person who acts as de facto director is a director within the
meaning of this section, or whether he can afterwards be allowed to deny
that he was a director within the meaning of this section. I think he
cannot. We are familiar in the law with a great number of cases in which
a man who assumes a position cannot be allowed to deny in a court of
justice that he really was entitled to occupy that position. The most
familiar instance is that of executor de son tort. In like manner, it seems    F
to me, in an application under this section, the de facto director is a
director for the purposes of this section."

77  James LJ said, at p 670:

"It was admitted by the appellants that these persons, as de facto
directors, would be liable for any act of commission or any omission on
their part in the same manner and to the same extent as if they had been    G
de jure as well as de facto directors. They were, so to say, directors de son
tort, and liable in that character, but not otherwise, and you must shew
something that they did which resulted in loss to the company, and for
which, if they had been duly appointed directors of the company, the
company would have been entitled to a remedy against them."

78  Bramwell LJ said, at p 673: "If he has done anything wrong as a de    H
facto director, no doubt he can be got at under the clause."

79  In *In re Western Counties Steam Bakeries and Milling Co* [1897]
1 Ch 617, 630, AL Smith LJ said in a phrase which is the only one in the
older cases to foreshadow the modern development of the law: "When

2823
[2010] 1 WLR        **Revenue and Customs Comrs v Holland (SC(E))**
Lord Collins of Mapesbury JSC

A   examined, *Coventry and Dixon's case* is only the case of *Gibson v Barton* over again. I agree that doing the work of a director may make a person a de facto director . . ."

    80   In *In re New Par Consols Ltd* [1898] 1 QB 573 Mr Gregory was a director of the company, and continued to act as such until it was wound up on 14 August 1897. He was adjudicated bankrupt in October 1896, having committed an act of bankruptcy on 3 August 1896. The articles provided
B   that the office of director be vacated if he became a bankrupt. The bankruptcy dated back to the act of bankruptcy in August 1896 and he took the point that he was not bound to submit a statement of affairs because he had ceased to be a director of the company more than one year before the winding up. It is hardly surprising that the argument was rejected. Lord Russell of Killowen CJ said, at p 576, that the object of the legislation (the
C   Companies (Winding-up) Act 1890 (53 & 54 Vict c 63), section 7) was to get at the persons who had the information which the court required, and accordingly:

    "even if he had properly and legally ceased to be a director, but was de facto acting as a director within the prescribed period of a year, he was a director within the meaning of the section, and subject to the obligation
D   to prepare and sign the accounts which are required by that section."

    81   *Gibson v Barton* was applied in *R v Lawson* [1905] 1 KB 541. The Larceny Act 1861, section 84, made it a misdemeanour for "any director, manager, or public officer of any body corporate or public company" to publish false statements with intent to deceive or defraud. It was held that it applied to a person who, without having been appointed an officer of the
E   company, had in fact acted throughout as the manager of the affairs of the company.

*The modern law*

    82   It seems that there is not a single case prior to the 1980s in which the term de facto director was applied to anyone other than one who had been appointed a director, but whose appointment was defective, or one
F   who had been, but had ceased to be, a director. Consequently the extension of statutory provisions relating to disqualification of directors and wrongful trading by directors to persons who had not been appointed as directors but who took part in management was a judicial innovation, first fully articulated in *In re Lo-Line Electric Motors Ltd* [1988] Ch 477 by Sir Nicolas Browne-Wilkinson V-C.

G     83   Prior to that decision, in *In re Eurostem Maritime Ltd* [1987] PCC 190, there was a disqualification application under the Companies Act 1985, section 300 (now the Company Directors Disqualification Act 1986, section 6). The application related to the respondent's association with seven companies. He was a director of four of them. Mervyn Davies J held that the respondent was actively concerned in the administration of all seven companies and that section 300 applied to de facto directors.
H     84   The relevant facts in *In re Lo-Line Electric Motors Ltd* [1988] Ch 477 were that the respondent had been a director of company A; he resigned as a director but continued as production manager; after the sole remaining director had absconded to the United States, the respondent took over the running of the company, but was not appointed as a director; the

respondent also acted as a director of company B, although he was never *A* appointed as such. Sir Nicolas Browne-Wilkinson V-C held that for the purposes of a disqualification order under the 1985 Act, in considering whether a person was unfit to be a director, only his conduct "as director" was relevant and that, as a matter of construction, "director" in section 300 included a person de facto acting as a director, though not appointed as such. It is apparent from the report of the argument that the *B* respondent did not dispute that he had run the companies. The only argument relevant to the present case is that, relying on *Morris v Kanssen* [1946] AC 459, it was suggested that a de facto director was a director whose purported appointment was invalid, and not a person who had never been appointed. Sir Nicolas Browne-Wilkinson V-C rejected this argument [1988] Ch 477, 490:

*C*

"[Counsel for the respondent] sought to draw a distinction between two types of de facto director, viz (a) a person who has been appointed director, but invalidly and (b) a person who has never been appointed director at all. He submitted that if, contrary to his primary submission, section 300 of the 1985 Act permitted regard to be paid to the conduct of a director who was invalidly appointed, the section did not extend to the conduct of a person who had never been appointed a director at all. He *D* relied on *Morris v Kanssen* [1946] AC 459, 471, in which the House of Lords drew exactly that distinction in holding that the statutory predecessor of section 285 of the 1985 Act (validation of acts of directors) did not validate the acts of a person who had never been appointed a director at all. I do not accept this submission. For the reasons I have given the plain intention of Parliament in section 300 was to have regard to the conduct of a person acting as a director, whether validly appointed, *E* invalidly appointed, or just assuming to act as director without any appointment at all. In this context, there is no logic in drawing the distinction put forward by [counsel]. *Morris v Kanssen* was dealing with quite a different section which validated the acts of a director 'notwithstanding any defect that may afterwards be discovered in his appointment or qualification'. In that case, both the words of the *F* section and the common sense of the matter pointed to the section being concerned only with the acts of a person who had been invalidly appointed a director."

85 The most discussed modern authority is *In re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180. Hydrodam had two corporate directors, which were companies incorporated in the Channel Islands. It was a subsidiary *G* of Eagle Trust plc. The liquidator commenced proceedings against Eagle Trust plc (the ultimate parent company of Hydrodam through two other subsidiaries) and all of Eagle Trust's directors, alleging that they were liable as de facto or shadow directors of Hydrodam under section 214 of the Insolvency Act 1986 for wrongful trading. The decision concerned an application by two of the directors to strike out the proceedings. It was *H* alleged that as directors of Eagle Trust they were, with the other directors, collectively responsible for the conduct of Eagle Trust in relation to Hydrodam. The proceedings were struck out because the liquidator had neither pleaded nor adduced evidence to support any allegation that either of the respondents was a director of Hydrodam.

2825
[2010] 1 WLR          Revenue and Customs Comrs v Holland (SC(E))
Lord Collins of Mapesbury JSC

A    86    Millett J accepted that the liability for wrongful trading imposed by
section 214 extended to de facto directors as well as to de jure and shadow
directors. He said, at p 183:

"A de facto director is a person who assumes to act as a director. He is
held out as a director by the company, and claims and purports to be a
director, although never actually or validly appointed as such.    To
B    establish that a person was a de facto director of a company it is necessary
to plead and prove that he undertook functions in relation to the
company which could properly be discharged only by a director. It is not
sufficient to show that he was concerned in the management of the
company's affairs or undertook tasks in relation to its business which can
properly be performed by a manager below board level. A de facto
C    director, I repeat, is one who claims to act and purports to act as a
director, although not validly appointed as such."

87    Millett J, in a much debated passage, dealt with the question whether
the directors of a corporate director of a company must ipso facto be what
he described as shadow directors (by which he probably also meant to
include de facto directors) of the company. His answer was, at p 184:

D    "Attendance of board meetings and voting, with others, may in certain
limited circumstances expose a director to personal liability to the
company of which he is a director or its creditors. But it does not, without
more, constitute him a director of any company of which his company is a
director."

88    On the facts Millett J held that the liquidator had neither pleaded
E    nor adduced evidence that either of the directors was a director of
Hydrodam. As regards one of them, Dr Hardwick, he had never acted as a
director, and as regards the other, Mr Thomas, it was not alleged that he
acted in any way in relation to the company's affairs.

89    Since the decision in In re Hydrodam there have been many decisions
on de facto directors, most of which have been in disqualification cases
F    at first instance. Many of the cases have involved a textual analysis of
Millett J's judgment (which was, according to the report, a reserved
judgment delivered on the day following the oral hearing). The most notable
developments have been in In re Richborough Furniture Ltd [1996]
1 BCLC 507 (Timothy Lloyd QC), and Secretary of State for Trade and
Industry v Tjolle [1998] 1 BCLC 333 (Jacob J), and in the decision of the
Court of Appeal in In re Kaytech International plc [1999] 2 BCLC 351,
G    which contains a valuable analysis by Robert Walker LJ.

90    The decisions have treated In re Hydrodam as a starting point. But
although in In re Hydrodam Millett J used expressions such as "held out as a
director" and "claims and purports to be a director", it has been held that
although these were relevant factors, they were not necessary factors, and he
could not have meant that the label "director" had to have been attached to
H    the person or that he be held out as a director: see In re Moorgate Metals Ltd
[1995] 1 BCLC 503 (Warner J); In re Richborough Furniture Ltd [1996]
1 BCLC 507 (Timothy Lloyd QC) and cf Secretary of State for Trade and
Industry v Tjolle [1998] 1 BCLC 333, 343.

91    Once the concept of de facto director was divorced from the
unlawful holding of office, there were two consequences.    The first

A consequence was that the distinction between de facto directors and shadow directors was eroded. A shadow director is "a person in accordance with whose directions or instructions the directors of the company are accustomed to act": see Companies Act 1985, section 741(2); Companies Act 2006, section 251(1). In *In re Hydrodam* [1994] 2 BCLC 180, 183, Millett J said that de facto and shadow directorship "do not overlap. They are alternatives, and in most and perhaps all cases are mutually exclusive".

B But the distinction was impossible to maintain with the extension of the concept of de facto directorship and the consideration of such matters as the taking of major decisions by the individual, which might be through instructions to the de jure directors, and the evaluation of his real influence in the affairs of the company: see *In re Kaytech International plc* [1999] 2 BCLC 351, 424, per Robert Walker LJ. The second consequence is that the courts were confronted with the very difficult problem of identifying what functions were in essence the sole responsibility of a director or board of directors. A number of tests have been suggested of which the following are the most relevant. First, whether the person was the sole person directing the affairs of the company (or acting with others equally lacking in a valid appointment), or if there were others who were true directors, whether he was acting on an equal footing with the others in directing its affairs: *In re Richborough Furniture Ltd* [1996] 1 BCLC 507. Second, whether there was a holding out by the company of the individual as a director, and whether the individual used the title: *Secretary of State for Trade and Industry v Tjolle* [1998] 1 BCLC 333. Third, taking all the circumstances into account, whether the individual was part of "the corporate governing structure": see *Secretary of State for Trade and Industry v Tjolle*, at pp 343–344, approved in *In re Kaytech International plc* [1999] 2 BCLC 351, 423, where Robert Walker LJ also approved the way in which Jacob J in the *Tjolle* case had declined to formulate a single test. He also said, at p 424 that the concepts of shadow director and de facto director had in common "that an individual who was not a de jure director is alleged to have exercised real influence (otherwise than as a professional adviser) in the corporate governance of a company". See also especially *In re Mea Corpn Ltd* [2007] 1 BCLC 618 (Lewison J); *Ultraframe (UK) Ltd v Fielding (No 2)* [2006] FSR 293 (Lewison J); *Secretary of State for Trade and Industry v Hollier* [2007] Bus LR 352 (Etherton J). In fact it is just as difficult to define "corporate governance" as it is to identify those activities which are essentially the sole responsibility of a director or board of directors, although perhaps the most quoted definition is that of the Cadbury Report: "Corporate governance is the system by which companies are directed and controlled" (Report of the Committee on the Financial Aspects of Corporate Governance, 1992, para 2.5).

92 Other common law jurisdictions have had to deal with similar problems, and they have also imposed liabilities not only on irregularly appointed directors or persons who, without being appointed as directors, have been held out as directors, but also on persons who perform the functions of directors with any appointment, irregular or otherwise, and without any holding out: for Australia see the Corporations Act 2001, section 9, and e g *Gebo Investments (Labuan) Ltd v Signatory Investments Pty Ltd* [2005] NSWSC 544; *Chameleon Mining NL v Murchison Metals Ltd* [2010] FCA 1129; for Canada, contrast *Wheeliker v Canada*

2827
[2010] I WLR          Revenue and Customs Comrs v Holland (SC(E))
                                      Lord Collins of Mapesbury JSC

A  (1999) 172 DLR (4th) 708, 716, para 19 (remedies available against persons
   "who act as directors or who are held out by the company as directors
   although they lack the required qualification or authority") with *Scavuzzo v
   The Queen* [2006] 2 CTC 2429, para 32 ("a person must have some
   semblance of qualification as director and must hold himself . . . out as a
   director"); in the United States de facto director still connotes a person who,
   without being a director, claims to be one (e g *Osler Institute Inc v Forde*
B  (2003) 333 F 3d 832), but the courts impose fiduciary duties on other
   persons who, without being directors, are "control persons" (e g *In re
   Parmalat Securities Litigation* (2010) 684 F Supp 2d 453, 475–476).
       93  It does not follow that "de facto director" must be given the same
   meaning in all of the different contexts in which a "director" may be liable.
   It seems to me that in the present context of the fiduciary duty of a director
C  not to dispose wrongfully of the company's assets, the crucial question is
   whether the person assumed the duties of a director. Both Sir Nicolas
   Browne-Wilkinson V-C in *In re Lo-Line Electric Motors Ltd* [1988] Ch 477,
   490, and Millett J in *In re Hydrodam* [1994] 2 BCLC 180, 183, referred to
   the assumption of office as a mark of a de facto director. In *Fayers Legal
   Services Ltd v Day* (unreported) 11 April 2001, a case relating to breach of
   fiduciary duty, Patten J, rejecting a claim that the defendant was a de facto
D  director of the company and had been in breach of fiduciary duty, said that
   in order to make him liable for misfeasance as a de facto director the person
   must be part of the corporate governing structure, and the claimants had to
   prove that he assumed a role in the company sufficient to impose on him a
   fiduciary duty to the company and to make him responsible for the misuse of
   its assets. It seems to me that that is the correct formulation in a case of
E  the present kind. See also *Primlake Ltd v Matthews Associates* [2007]
   1 BCLC 666, para 284.

   *Conclusion*

       94  It follows that I do not consider that the answer to the question on
   this appeal lies in considering what Millett J meant by the words "without
   more," and then attempting to catalogue what Mr Holland did. If the
F  question is, as I believe, whether Mr Holland was part of the corporate
   governing structure of the composite companies and whether he assumed
   a role in those companies which imposed on him the fiduciary duties of a
   director, then I would answer that he was not.
       95  This is not simply a question of fact, since it raises the question of
   principle of the effects of acts done by a director of a corporate director in
G  that capacity. The sole director of the composite companies was Paycheck
   Directors. From the time of the decision in *In re Bulawayo Market and
   Offices Co Ltd* [1907] 2 Ch 458 that a company could have a sole corporate
   director and its statutory recognition from the Companies Act 1929,
   sections 144 and 145, until the requirement in the Companies Act 2006,
   section 155(1), that a company have at least one director who is a natural
   person, the corporate structure of the type in this case was perfectly lawful.
H      96  There is no material to suggest that Mr Holland was doing anything
   other than discharging his duties as the director of the corporate director of
   the composite companies. It does not follow from the fact that he was taking
   all the relevant decisions that he was part of the corporate governance of the
   composite companies or that he assumed fiduciary duties in respect of them.

2828
**Revenue and Customs Comrs v Holland (SC(E))**                    [2010] 1 WLR
**Lord Collins of Mapesbury JSC**

If he was a de facto director of the composite companies simply because he     A
was the guiding mind behind their sole corporate director, then that would
be so in the case of every company with a sole corporate director. The
development of the law of de facto directors from *In re Lo-Line* [1988]
Ch 477 and *In re Hydrodam* [1994] 2 BCLC 180 onwards was a significant
judicial innovation given that for some 150 years de facto directors meant
individuals who had actually been appointed, or purportedly appointed, as     B
directors. As has been seen, in two of the three older cases which dealt with
the liability of de facto directors, an analogy was drawn with executors de
son tort: *Gibson v Barton* (1875) LR 10 QB 329 and *In re Canadian Land
Reclaiming and Colonising Co (Coventry and Dixon's case)* (1880) 14 Ch D
660. That suggests strongly that the basis of liability was the assumption of
responsibility. The legislature has already intervened in the 2006 Act to
ensure that there is a natural person to whom responsibility is attributed.    C
The purpose of what became Companies Act 2006, section 155(1), was to
ensure that every company would have at least one individual who could, if
necessary, be held to account for the company's actions: see Department of
Trade and Industry, *Company Law Reform* (Cm 6456) (2005), para 3.3.
For the court to hold that every significant decision of individual directors of
a corporate director is to be regarded as being taken as if they were directors
of the company of which it is the corporate director goes considerably        D
beyond the law as it has been developed at first instance and by the Court of
Appeal in the modern de facto director cases, and beyond what I would
regard as the function of the court. I would not wish to question the modern
judicial development of the de facto director concept, and I well understand
the policy reasons why in such a case as this a person in the position
of Mr Holland should be liable, although those reasons may not be as         E
powerful as they were prior to the enactment of the Companies Act 2006,
section 155(1). The legislature could have intervened to require that
all directors be natural persons, as under the Corporations Act 2001,
section 201B (Australia), the Canada Business Corporations Act 1985,
section 105(1)(c), the New York Business Corporation Law, section 701,
and the Delaware General Corporate Law, section 141(b). But it did not,
and in my judgment the proposed extension which is inherent in HMRC's        F
case is a matter for the legislature and not for this court.

**LORD SAVILLE OF NEWDIGATE**

97    To my mind the Revenue's case necessarily involves substantial
inroads into the long established principle that although a company is an
artificial entity and can only act through natural persons, it is to be treated as   G
a legal personality separate and distinct from its directors and members.

98    It is the case that Mr Holland was the guiding mind behind the sole
corporate director of the composite companies. He was the natural person
who decided that the composite companies should pay the dividends in
question. But he did so in the course of directing the corporate director, not
by acting or purporting to act as a director of the composite companies.
In my judgment, it does not follow from the fact that Mr Holland caused the    H
corporate director to make decisions in relation to the composite companies
that he was accordingly a de facto director of the composite companies.
To suggest that he was is to ignore or bypass the separate legal personality of the
corporate director and instead to treat Mr Holland as though he, rather than

2829
[2010] 1 WLR                    Revenue and Customs Comrs v Holland (SC(E))
                                                    Lord Saville of Newdigate

A  the corporate director, was the legal personality running the composite
companies.

99  As Lord Collins of Mapesbury JSC has pointed out in para 96 of his
judgment, if this were the law, then in the case of every company with a sole
corporate director, the natural person or persons who caused the corporate
director to make decisions relating to the company would necessarily be de
facto directors of that company. Such a state of affairs would lie awkwardly
B  with the fact that in 2006 Parliament enacted that a company must have at
least one director who is a natural person; hardly necessary if the natural
person or persons who were the guiding minds behind the corporate
director's decisions relating to the company were ipso facto to be treated as
de facto directors of the company.

100  I accordingly agree that for the reasons given by Lord Hope of
C  Craighead DPSC and Lord Collins of Mapesbury JSC, this appeal should be
dismissed.

LORD WALKER OF GESTINGTHORPE JSC
101  I am unable to agree with the reasoning and conclusions of the
majority on the first issue in this appeal. The court's decision will, I fear,
make it easier for risk-averse individuals to use artificial corporate structures
D  in order to insulate themselves against responsibility to an insolvent's
company's unsecured creditors.

102  I gratefully adopt Lord Hope of Craighead DPSC's summary of the
relevant facts. I would add only that the specimen of the standard form
computer-generated document purporting to be a minute of a meeting of the
board of directors of the composite company does not specify whether the
E  dividend to be paid is an interim dividend or a final dividend.

103  This last point is potentially of some importance because
article 8(b)(i) of the articles of each of the composite companies, part of
which is set out in para 8 of Lord Hope DPSC's judgment, makes the
payment of dividends a matter for the decision of the company in general
meeting acting on the recommendation of the directors. Article 8(b)(i)(ee)
F  and (ff) provide as follows:

"(ee) when paying interim dividends, the directors may make payments
of interim dividends to one or more classes of non-voting shares to the
exclusion of one or more other classes of non-voting shares on the same
basis that final dividends may be paid by the company to each class of
non-voting shares in accordance with the foregoing; (ff) regulations 102
and 103 of Table A shall be read and construed accordingly with the
G  foregoing provisions of this article."

104  Rather surprisingly, the question whether the dividends
purportedly paid by the composite companies were interim or final
dividends seems not to have been considered in the courts below. Nor was it
raised in argument in this court. It may have been assumed that every single
dividend paid by any of the composite companies was an interim dividend
H  payment of which was a decision for the corporate director alone. But for a
company to pay an endless stream of interim dividends, with no final
dividend ever recommended by the directors and approved by the company
in general meeting, could not be a proper exercise of the powers conferred
by the article. That conclusion is reinforced by the opening words of

article 8(b)(i) ("such dividends payable on each such class of shares in such    *A*
amounts, at such frequency, at such times as, on the recommendation of the
directors, the holder of the A share shall, in general meeting, resolve . . .").

105   The holder of the A share in each of the composite companies was
of course Paycheck Services Trustee Ltd, the directors and shareholders of
which were Mr and Mrs Holland. Paycheck Services Trustee Ltd held each
A share on the trusts of a settlement made by Mr Holland. The beneficiaries    *B*
were the other shareholders in the composite company in questions.
Clause 3.1 of the form of settlement expressly provided for how the voting
control conferred by the A share was to be exercised:

"In the exercise by the trustees of their duties hereunder and of the
voting rights attached to the 'A' share the trustees shall act at all times in
the best interests of the [relevant composite company] and the members    *C*
and the company's employees."

*The authorities*

106   In the courts below counsel for Mr Holland relied heavily on
the decision of Millett J in *In re Hydrodam (Corby) Ltd* [1994]
2 BCLC 180. That company ("Hydrodam") had two corporate directors,    *D*
both incorporated in the Channel Islands. Millett J commented, at p 183:

"That fact alone may be sufficient to justify an inference that they were
accustomed to act in accordance with the directions of others; in which
case there were shadow directors of the company. But there is nothing
pleaded in the points of claim to suggest that there were, in addition to the
titular directors, any other persons who claimed to be directors of the
company at all."    *E*

Millett J went on to explain in detail why the pleaded case was so deficient.
Hydrodam's liquidator had made claims for wrongful trading against
numerous respondents including two individuals who were (with six or
seven co-directors) directors of Eagle Trust plc ("Eagle") of which
Hydrodam was (at two removes) an indirect subsidiary. The pleaded case    *F*
against the two individuals was that they were "collectively responsible" for
decisions taken by Eagle in relation to Hydrodam. In that case, the judge
said, it was Eagle, not two members of its fairly large board, who should be
regarded as a shadow director, at p 184:

"But if all they have done is to act in their capacity as directors of the
ultimate holding company, in passing resolutions at board meetings, then
in my judgment the holding company is the shadow director of the    *G*
subsidiary, and they are not."

To put the point another way, in the statutory definition of "shadow
director", the context in which "person" is used does not permit the singular
to include the plural.

107   In striking out the defective pleading as against the two directors of
Eagle, Millett J, was, if I may respectfully say so, obviously right. But he    *H*
also made some general observations which have been much quoted and
discussed, and not accepted without some qualification, in later cases. The
key passage, at pp 182–183 is set out in para 29 of Lord Hope DPSC's
judgment and I need not repeat it.

A   108   Later authority, at first instance and in the Court of Appeal, has
qualified some of Millett J's propositions and developed others.  It is
unnecessary to embark on a lengthy discussion of all the first instance
authorities.  There are three main points of qualification.  First, Millett J said
that a de facto director "assumes" to act as such, is "held out" as such, and
"claims and purports" to be a director.  That is true of some of the early cases
B   in which an apparently de jure director had been disqualified by failing to
obtain the requisite share qualification, or by bankruptcy: see for instance
the cases mentioned by Sir Nicolas Browne-Wilkinson V-C in *In re Lo-Line
Electric Motors Ltd* [1988] Ch 477, 489–490.  But it is not required in every
case.  The Vice-Chancellor's view was, at p 490:

"the plain intention of Parliament in section 300 [of the Companies Act
C   1985, the predecessor of the Company Directors Disqualification Act
1986] was to have regard to the conduct of a person acting as a director,
whether validly appointed, invalidly appointed, or just assuming to act as
director without any appointment at all."

Here the context shows that "assuming" was used in a neutral sense,
simply drawing attention to what the individual in question actually did.
D   To the same effect are the observations of Etherton J in *Secretary of State
for Trade and Industry v Hollier* [2007] Bus LR 352, para 66 (but compare
para 81(4)).  This analysis is supported by the observations of Lewison J in
*In re Mea Corpn Ltd* [2007] 1 BCLC 618, paras 83 and 84, citing Jacob J
in *Secretary of State for Trade and Industry v Tjolle* [1998] 1 BCLC 333,
343–344.  Lewison J said, "In considering whether a person 'assumes to
E   act as a director' what is important is not what he calls himself, but what
he did".

109   Secondly (though not directly relevant in this appeal), it is not
necessary that a shadow director should be someone who "lurks in the
shadows".  He may do so, especially if he has a bad commercial reputation
(or has actually been disqualified from acting as a director).  But he may be
the chief executive of a group of companies who openly gives directions to
F   the board of a subsidiary company on which he does not sit.  This point has
been made by the Court of Appeal in *In re Kaytech International plc* [1999]
2 BCLC 351, 424 (Robert Walker LJ) and in *Secretary of State for Trade and
Industry v Deverell* [2001] Ch 340, para 36 (Morritt LJ).  Indeed, Millett J
could be said to have recognised it himself in the example that he gave in a
later paragraph in *In re Hydrodam* [1994] 2 BCLC 180, 184F.

110   Thirdly (following on from the first two points) it is not the case
G   that the concepts of de facto director and shadow director are fundamentally
different, and always, or nearly always, to be regarded as mutually exclusive
categories.  This point has been made in *In re Kaytech* [1999] 2 BCLC 351,
424.  It was left open in the *Deverell* case [2001] Ch 340, para 36, but in the
*In re Mea* [2007] 1 BCLC 618, para 89 Lewison J has taken the *Deverell* case
as leading to the same conclusion:

H   "Now that Morritt LJ has explained that the role of a shadow director
does not necessarily extend over the whole range of the company's
activities, it seems to me that there is no conceptual difficulty in
concluding that a person can be both a shadow director and a de facto
director simultaneously . . .  In each case, it is necessary to examine the

facts, bearing in mind that, as Morritt LJ explained ([2001] Ch 340, 354,     *A*
the purpose of the legislation is to 'identify those, other than professional
advisers, with real influence in the corporate affairs of the company'."

111   Subject to these qualifications (which are in my opinion correct and
necessary) *In re Hydrodam* still provides valuable guidance especially in
emphasising, at p 183, that "to establish that a person was a de facto director
of a company it is necessary to plead and prove that he undertook functions     *B*
in relation to the company which could properly be discharged only by a
director." This essential feature has been further explained and developed in
*In re Kaytech* [1999] 2 BCLC 351, 423–424 (citing the *Tjolle* case [1998]
1 BCLC 333), in the *Hollier* case [2007] Bus LR 352, paras 66–81, and in
*In re Mea* [2007] 1 BCLC 618, paras 82–83.

*"Something more"*                                                              *C*

112   In *In re Hydrodam* [1994] 2 BCLC 180, 184, Millett J added some
further observations to the passage already referred to:

     "Attendance of board meetings and voting, with others, may in certain
     limited circumstances expose a director to personal liability to the
     company of which he is a director or its creditors. But it does not, without   *D*
     more, constitute him a director of any company of which his company is a
     director."

The theme that "something more" is required has been repeated in later
cases, including the judgment of Rimer LJ in this case [2010] Bus LR 259,
para 66. Rimer LJ did not take from *In re Hydrodam* (and I entirely
agree)                                                                          *E*

     "that the requisite more would be satisfied merely by the active
     participation of the board member in the making of board decisions by
     the corporate director in relation to the actions of the subject company."

113   In a section of his judgment headed "Mr Holland's case" (there is
no parallel section considering the revenue's case) Lord Hope DPSC
observes at para 41, "the facts of this case do not precisely match those of     *F*
*In re Hydrodam*". That is, with respect, a considerable understatement.
In *In re Hydrodam*, as already noted, each of the individuals in question was
one of about eight persons who made up the board of directors of Eagle, of
which Hydrodam was a sub-sub-subsidiary. The pleaded case was that the
Eagle directors were "collectively responsible". Being a de facto director is a
matter of what the individual himself does on his own initiative, not simply     *G*
as part of a process of collective decision making.

114   Mr Holland was (with his professional advisers, who took their
instructions from Mr Holland, and whose function was simply to give
advice) the founder and guiding spirit of the whole Paycheck empire. With
the concurrence of his wife (whose responsibilities were no more than
secretarial) he was the only active director of both Paycheck Directors and
Paycheck Secretarial; he was the original holder of all the A shares which      *H*
carried voting control of the composite companies, and he was the only
active director of the corporate trustee which held the A shares under
settlements which he had created. He took the decision (after receiving the
advice of leading counsel at the consultation on 18 August 2004) that

2833

A composite companies should continue trading, and should continue to pay dividends without reserving for higher rate corporation tax.

115   If those facts did not amount to the "something more" referred to in the authorities, it is hard to imagine circumstances that would do so. The repeated assertion that everything that Mr Holland did was done in his capacity as a director of Paycheck Directors, and was within his authority as
B a director of that company, is no doubt not "pure sham" but it is, in my view, the most arid formalism. In my view Mr Holland was acting both as a de jure director of Paycheck Directors and as a de facto director of the composite companies. A de facto director is not formally invested with office, but if what he actually does amounts to taking all important decisions affecting the relevant company, and seeing that they are carried out, he is acting as a director of that company. It makes no difference that he is also
C acting as the only active de jure director of a corporate director of the company.

116   I reach that conclusion without reference to the point, raised earlier in this judgment, about the status of the payments as interim dividends. The court heard no argument on the point, and it would not be right to place any reliance on it. But Mr Holland's apparent disregard for the provisions of
D articles tailor-made for his own purposes makes his reliance on formalities even less convincing.

*The Standard Chartered case*

117   Mr Green, for HMRC, relied strongly on the decision of the House of Lords in *Standard Chartered Bank v Pakistan National Shipping Corpn (Nos 2 and 4)* [2003] 1 AC 959. In that case Mr Mehra had made fraudulent
E misrepresentations on behalf of a company called Oakprime, of which he was a director. The Court of Appeal accepted the argument that he was not personally liable for deceit because he had been acting solely on behalf of Oakprime. The House of Lords trenchantly exposed the fallacy of this reasoning. The most important passages are paras 20–23 in the opinion of Lord Hoffmann and paras 35–41 in the opinion of Lord Rodger of
F Earlsferry.

118   These passages in their entirety call for careful study, but I will limit quotation to para 41 of Lord Rodger's opinion:

"The Court of Appeal sought support for their view that Mr Mehra should not be held personally liable in the speech of Lord Steyn in *Williams v Natural Life Health Foods Ltd* [1998] 1 WLR 830, 834–835.
G In truth it provides no such support. The issue in that case related to the personal liability of a director for a misleading projection, prepared in large part by him and issued by the company, as to the profits which the plaintiffs might earn by opening a health food shop under a franchise. Lord Steyn, with whom the other members of the House concurred, said ([1998] 1 WLR 830, 835B–C): 'But in order to establish personal liability under the principle of *Hedley Byrne & Co Ltd v Heller & Partners Ltd*
H [1964] AC 465, which requires the existence of a special relationship between plaintiff and tortfeasor, it is not sufficient that there should have been a special relationship with the principal. There must have been an assumption of responsibility such as to create a special relationship with the director or employee himself.' Since the plaintiffs had failed to show a

special relationship with the director himself, the House held that he was   A
not liable. Lord Steyn was dealing with the tort of negligence where a
claimant must establish that the defendant owed him a duty of care.
There is no such requirement in the case of deceit. Liability for deceit is so
self-evident that we do not consider it as resulting from a breach of duty
(Tony Weir, *Tort Law* (2002), p 30). Mr Mehra set out by his fraudulent
acts to make Standard Chartered pay under the letter of credit. He           B
succeeded. He is accordingly personally liable for the loss which he
thereby caused them."

119 Mr Knox, for Mr Holland, summarily dismissed this case as
irrelevant on the ground that it was a claim in deceit. So it was, and there has
never been any pleading or finding of dishonesty against Mr Holland.
Nevertheless there is to my mind a significant parallel between liability for   C
deceit (which is in Lord Rodger's words "so self-evident that we do not
consider it as resulting from a breach of duty") and the unqualified statutory
prohibition in section 263 of the Companies Act 1985 on payment of a
dividend otherwise than out of available profits. Contravention of this
prohibition is a statutory wrong giving rise to strict liability, and anyone
who is in a position to contravene it is likely to be in a fiduciary position: see
further below. Mr Holland was the human cause of (and apart from his         D
wife's secretarial assistance, the only human being who took any part in) the
payment of unlawful dividends. They were, as Rimer LJ said, at [2010]
Bus LR 259, para 112, payments which should never have been made.
Mr Holland is liable for the payments because he deliberately made them. His
liability has nothing to do with limited liability of shareholders, or with
*Salomon v A Salomon & Co Ltd* [1897] AC 22.                                  E

120 I have carefully considered the judgment of Lord Collins of
Mapesbury JSC. It contains a very full analysis of the early cases and the
development of the law relating to de facto directors. It notes that *In re
Lo-Line Electric Motors Ltd* [1988] Ch 477 was a striking judicial
innovation. But its innovation has been followed and developed in many
decisions at first instance and in the Court of Appeal.                      F

121 I agree with Lord Collins JSC that section 212 is procedural in
nature, and that for liability to arise under the section, a breach of some
identifiable duty must be established. I also agree that assumption of
responsibility is the appropriate test, so long as that expression is understood
as focusing on what the individual in question did, rather than what he was
called: see the authorities mentioned in para 108 above. In this case the
assumption of responsibility equates with the fiduciary duty that a company   G
director owes to his company not to make an unauthorised distribution of
capital. But in the circumstances of this case I think that there would be
some element of putting the cart before the horse in looking for a fiduciary
duty before looking at what Mr Holland did, because it is what he did that
demonstrates that he was undertaking responsibility and exposing himself to
a claim for breach of fiduciary duty.                                        

122 Lord Collins JSC makes a modest reference to his own monumental   H
first instance judgment in *Primlake Ltd v Matthews Associates* [2007]
1 BCLC 666. It would be inappropriate, in a dissenting judgment, to go far
into that decision, which was not cited to the court. But it is to my mind a
striking example, comparable on its facts to this case, of an individual held

A to be a de facto director, and to be liable for breach of fiduciary duty, because of what he did: see the summary at para 311 of the judgment.

123   Lord Saville of Newdigate's brief judgment overlooks the important difference between a multiplicity of human directors participating in the collective governance of a single corporate director (as is common and as was the case, indirectly, in *In re Hydrodam* [1994] 2 BCLC 180), and a single individual director who is the guiding mind of a single corporate
B director, as Mr Holland was in this case.

### Other issues

124   On the other issues I agree with Rimer LJ in the Court of Appeal. The discretion conferred by section 212(3) of the Insolvency Act 1986 is not a wide discretion. It does not replicate or extend the court's power to grant
C relief under section 727 of the Companies Act 1985. What it does is to enable the court to adjust the remedy to the circumstances of the particular case (some examples are given by Dillon LJ in *West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250).

125   For these reasons I would for my part have allowed the appeal and restored the order of the deputy judge but without the restriction on
D Mr Holland's liability imposed by para 2 of the judge's order.

### LORD CLARKE OF STONE-CUM-EBONY JSC

126   I agree with Lord Walker of Gestingthorpe JSC that this appeal should be allowed for the reasons he gives. I state the principal considerations which have led me to that conclusion because others take a different view.

E 127   I entirely agree with Lord Walker JSC's analysis of and qualifications to the decision and reasoning of Millett J in *In re Hydrodam (Corby) Ltd* [1994] 2 BCLC 180. In particular, I agree that, as Lewison J said in *In re Mea Corpn Ltd* [2007] 1 BCLC 618, para 89 (in the passage quoted by Lord Walker JSC), there is no conceptual difficulty in holding that a person can be both a shadow director and a de facto director simultaneously
F and that the real purpose of each is to identify those, other than professional advisers, with real influence in the corporate affairs of the company.

128   As I read the judgments in the present case, it is accepted in them all that, in order to establish that a person was a de facto director, it is necessary to plead and prove that he undertook functions in relation to a company which could properly be carried out only by a director and that he must have done "something more" than merely participate in decisions by the
G corporate director in relation to the actions of the subject company. This requirement was not satisfied in *In re Hydrodam* because each of the individuals alleged to be de facto directors was, as Lord Walker JSC describes it, one of about eight people who made up the board of Eagle, of which Hydrodam was a sub-sub-subsidiary. The allegation was that the directors of Eagle were collectively responsible. I agree with Lord Walker JSC that being a de facto director depends upon what the individual
H does on his own initiative.

129   The question in each case is whether the individual did something more than participate in a collective decision. In this case the question is whether Mr Holland did an act which was a directorial act of each composite company. I agree with Lord Walker JSC that it does not follow from the fact

2836
Revenue and Customs Comrs v Holland (SC(E))                    [2010] 1 WLR
Lord Clarke of Stone-cum-Ebony JSC

that he did the act in his capacity as a director of Paycheck Directors, which    A
was the corporate director of each composite company, that he did not also
do it as a de facto director of each composite company. There is no reason in
principle why it cannot be held as a matter of fact that Mr Holland decided
to pay the dividends both as a de jure director of Paycheck Directors and as a
de facto director of each composite company.

130    Section 263(1) of the Companies Act 1985 provides: "A company    B
shall not make a distribution except out of profits available for the purpose."
As Lord Hope of Craighead DPSC observes at para 47, it was held by the
deputy judge that, as from 18 August 2004, all the dividends were unlawful
and it is accepted that the relief available under section 727 of that Act
would have been available to Mr Holland if he could show that he acted
reasonably. It is thus accepted that, if Mr Holland was a de facto director
of the composite companies, his position is the same as that of the de jure    C
director of those companies, namely Paycheck Directors. The de jure
director would be liable, subject to section 727, because it procured the
payment of unlawful dividends and, if Mr Holland was a de facto director,
he would be liable on the same basis.

131    It is in this regard that I agree with Lord Walker that assistance is to
be found in the reasoning of the House of Lords in *Standard Chartered*
*Bank v Pakistan National Shipping Corpn (Nos 2 and 4)* [2003] 1 AC 959.    D
If Mr Holland was a de facto director of the composite companies, he is
liable because, as a matter of fact, he procured the unlawful payment of the
dividends to the shareholders and because he cannot show that he acted
reasonably so as to enable him to seek relief under section 727. In the
*Standard Chartered Bank* case Mr Mehra was liable "not because he was a
director but because he committed a fraud": see per Lord Hoffmann at    E
para 22. In the extract from para 41 of the speech of Lord Rodger quoted by
Lord Walker JSC (at para 118 above) he said: "Mr Mehra set out by his
fraudulent acts to make Standard Chartered pay under the letter of credit.
He succeeded. He is accordingly personally liable for the loss that he thereby
caused them."    As I see it, the position is essentially the same here.
If Mr Holland is a de facto director of the composite companies, it is because    F
he personally procured the payment of the unlawful dividends and is liable
to restore them just as the de jure director is.

132    Mr Michael Green submitted that if agency and therefore capacity
are irrelevant to the question whether an individual has committed a tort,
as was held in the *Standard Chartered Bank* case, then so capacity should
be irrelevant to the question whether an individual is a de facto director.
I would accept that submission. In both cases the answer to the question    G
depends upon what the individual did, not upon the capacity in which he
did it.

133    Lord Collins of Mapesbury JSC has expressed the view that what
divides the court is not simply a matter of the facts, namely whether what
Mr Holland did was in fact sufficient to make him a de facto director of the
composite companies, but a question of law and a question of principle.
He formulates the question at para 53 as being whether fiduciary duties can    H
be imposed, in relation to a company whose sole director is a corporate
director, on a director of that corporate director when all of his relevant
acts were done as a director of the corporate director and can be attributed
in law solely to the activities of the corporate director. That appears to me to

2837

[2010] 1 WLR                    Revenue and Customs Comrs v Holland (SC(E))
Lord Clarke of Stone-cum-Ebony JSC

A  be a similar principle to that stated by Lord Hope DPSC at para 42 that, so
long as the relevant acts are done by the individual entirely within the ambit
of the discharge of a person's duties and responsibilities as a director of a
corporate director, it is to that capacity that his acts must be attributed.

134   As I understand it, those propositions are advanced as propositions
of law. However, no authority is cited for them and, for my part, I would
not accept them. I recognise of course that, as Lord Collins JSC points out at
B  para 95, until section 155(1) of the Companies Act 2006 was enacted, it was
perfectly lawful for a company to have a corporate director as a sole
director. I also recognise that Mr Holland was a director of Paycheck
Directors. However, as I see it, it does not follow as a matter of law that he
cannot be a de facto director of the composite companies. Whether he was
or not is a question of fact.

C  135   Lord Collins JSC says at para 93 that in the present context the
crucial question is whether Mr Holland assumed the duties of a director. He
then approves the test stated by Patten J in the unreported case of *Fayers
Legal Services Ltd v Day* 11 April 2001, where the question was whether the
defendant was a de facto director of a company and liable for misfeasance
or breach of fiduciary duty. The test stated by Patten J was whether the
defendant was part of the corporate governing structure; the claimant had to
D  prove that he assumed a role in the company sufficient to impose upon him a
fiduciary duty to the company and make him responsible for the misuse of its
assets.

136   I do not think that either Patten J or Lord Collins JSC can have
intended that the question whether a person is a de facto director always
depends upon whether he owed a fiduciary duty. In most cases, it is logical
E  and, to my mind, correct in principle to ask the single question whether he is
a de facto director. If he is, it follows that he owes fiduciary duties. If he is
not, it equally follows that he does not. It may have been appropriate to ask
a rolled up question in the *Fayers Legal Services* case because the issue there
was whether what the alleged director did amounted to acting in a
directorial manner on the facts. It was held by Patten J, at para 73, that his
F  acts were essentially managerial and not directorial. It may well have been
relevant to the issue in that case to ask whether the acts performed by him
were of a kind which might be expected to give rise to a fiduciary duty and
thus to be the acts of a de facto director.

137   The two questions posed by Lord Collins JSC in para 94 are
whether the alleged de facto director assumed the duties of a director and
whether he was part of the governing structure. I agree that those are
G  relevant questions to ask but I also agree with Lord Walker JSC that they are
questions of fact. So too are other questions identified in the authorities.
Examples include those given by Lord Collins JSC in para 91 including the
following: whether the individual was taking the major decisions, which
might be through instructions to the de jure directors, and what was real
influence in the affairs of the company (see *In re Kaytech International plc*
H  [1999] 2 BCLC 351, per Robert Walker LJ at p 424); whether he was the sole
person directing the affairs of the company or whether there were others
who were the true directors and whether he was acting on an equal footing
with the others (see *In re Richborough Furniture Ltd* [1996] 1 BCLC 507);
and whether he exercised real influence, otherwise than as a professional
adviser, in the corporate governance of the company: see *In re Kaytech*

2838
Revenue and Customs Comrs v Holland (SC(E))                    [2010] 1 WLR
Lord Clarke of Stone-cum-Ebony JSC

at p 424. As Lord Collins JSC has observed at para 91 in a quotation from    *A*
the Cadbury Report, corporate governance is the system by which businesses
are directed and controlled.

138   In my opinion all those questions are questions of fact. For my
part, I do not see how they can be questions of law when the question is
whether someone who is not a de jure director is a de facto director. That
question depends ultimately on the answer to the question what Mr Holland    *B*
did.

139   The question is thus one of fact. What did Mr Holland do? There
can be no doubt that the decision to pay dividends was a directorial act and
not a mere managerial act. It seems to me that, if (as the deputy judge has
held), Mr Holland in fact deliberately procured the payment of the dividends
by the directors of Paycheck Directors and had the de facto power to do so,
he was a de facto director. As such, he owed a fiduciary duty to the company    *C*
and the procuring of the payment of the dividends was a breach of fiduciary
duty and, on the deputy judge's findings of fact, an unlawful act. He is
accordingly liable to restore the dividends.

140   I agree with Lord Walker JSC that such a liability has nothing to do
with the limited liability of shareholders or with *Salomon v A Salomon & Co
Ltd* [1897] AC 22. The conclusion that Mr Holland was a de facto director
does not involve the piercing of the corporate veil but simply the application    *D*
of the principles identified in the modern cases to the facts of this case.

141   On the detailed facts, again I agree with Lord Walker JSC. As he
explains, and is not in dispute, all the decisions were made by Mr Holland.
Each decision by Mr Holland to procure Paycheck Directors to pay the
dividends without reserving for the relevant composite company's liability
to tax was a decision to commit an unlawful act. Each decision was, as    *E*
I see it, a decision to carry out the underlying decision previously made by
Mr Holland, who was then wearing a number of hats, that none of the
composite companies would reserve for higher rate tax. When each decision
to pay a particular dividend was made, he was thus acting, both as a de jure
director of Paycheck Directors and as a de facto director of the particular
composite company. Moreover, he was not acting merely as a director of
Paycheck Directors, but pursuant to a decision he had already made wearing    *F*
all his hats.

142   In these circumstances, it is in my opinion artificial and wrong to
hold that he was doing no more than merely discharging his duties as a de
jure director of Paycheck Directors, as Rimer LJ suggested at [2010] Bus LR
259, paras 70–72 and 74. There is no reason in principle why a person may
not act in more than one capacity. The question is again one of fact. On the    *G*
deputy judge's findings of fact, Mr Holland was not merely discharging his
duties as a director of the corporate director. He was in fact acting as a
director of the composite companies by deciding (after taking leading
counsel's advice) that the composite companies should both continue
trading and continue paying dividends without reserving for higher rate
corporation tax and by procuring the directors of Paycheck Directors as a
director of the composite companies to pay the unlawful dividends. The    *H*
specific decision in each case was no more than an implementation of the
scheme which he had devised (as described by Lord Walker JSC) by entering
the particular figures in the computer programme and authorising payments
to the particular shareholders/employees.

-03635-jpm   Doc 173-4   Filed 01/13/17   Entered 01/13/17 22:34:28   Ex. C par
Pg 435 of 461

2839
[2010] 1 WLR                          Revenue and Customs Comrs v Holland (SC(E))
                                              Lord Clarke of Stone-cum-Ebony JSC

A    **143**  If Mr Holland had not been a director of Paycheck Directors but had simply directed other directors of Paycheck Directors to make those payments as a director of the relevant composite company, there could, as I see it, be no doubt that Mr Holland was acting as a de facto director of the composite companies, simply on the basis of what he actually did. Suppose, for example, his wife was the sole director of Paycheck Directors and he had instructed her to pay the dividends and she had done so without giving

B    independent thought to the matter, he would surely have been doing so as inter alia a de facto director of the composite companies. The fact that he was a director of Paycheck Services to my mind would make no difference.

     **144**  On the facts the answers to the various questions posed above are clear. He was part of the governing structure because he in fact made every decision as to the payment of dividends. He thus assumed the duties of a

C    director because paying dividends is what directors do. He was taking the major decisions through instructions to the de jure director of the composite companies. His real influence on the affairs of the companies was total. Indeed, he was the sole person directing the affairs of the company. There were no others who were taking decisions other than in accordance with his directions. In short, he exercised real influence, otherwise than as a professional adviser, in the corporate governance of the company. In so

D    concluding I use the expression corporate governance in the sense used in the Cadbury Report as being the system by which the composite companies businesses were directed and controlled. They were directed and controlled by Mr Holland.

     **145**  In all the circumstances I would hold that Mr Holland was a de facto director of the composite companies on the ground that he in fact made

E    directorial decisions with regard to them.

     **146**  As to the other issues, like Lord Walker JSC, I agree with the views of Rimer LJ in the Court of Appeal. For the reasons I have given I would allow the appeal and make the order proposed by Lord Walker JSC.

                                                          *Appeal dismissed with costs.*

F                                                                        J B S

G

H

TAB 64

*Robins v National Trust Co* [1927] AC 515,
Privy Council on appeal from the Supreme Court of Ontario

**A. C.**          AND PRIVY COUNCIL.                    515

[PRIVY COUNCIL.]

ROBINS . . . . . . . . . . . APPELLANT ;          J. C.*

AND                                      1927

NATIONAL TRUST COMPANY, LIMITED,⎰          Feb. 7.
AND OTHERS . . . . . . . .⎱ RESPONDENTS.

ON APPEAL FROM THE SUPREME COURT OF ONTARIO,
APPELLATE DIVISION.

*Privy Council Practice—Concurrent Findings—Authority of Decision of
Appellate Court of Colony.*

> The rule of practice of the Judicial Committee that concurrent findings
> of fact will not be interfered with, in the absence of very definite and
> explicit grounds, applies from whatever Court in the Empire the appeal
> is made.
> A decision of the appellate Court in a Colony which is regulated by
> English law is not assumed by the Judicial Committee to be wrong
> because it conflicts with a decision of the Court of Appeal in England ;
> it is otherwise if the conflict is with a decision of the House of Lords
> or of the Privy Council.
> Judgment of the Appellate Division affirmed.

APPEAL (No. 122 of 1925) from a judgment of the Supreme
Court of Ontario, Appellate Division (April 3, 1925), affirming
a judgment of Mowat J.

The appellant brought an action in the Supreme Court
of Ontario against the respondents to set aside the will of
E. C. Walker, deceased, dated February 27, 1914, alleging
want of testamentary capacity in the testator, also that the
will was obtained by fraud and undue influence. The
respondents were the executors, trustees and principal
beneficiaries under the will.

The trial judge (Mowat J.) found against both the above
allegations, and dismissed the action. The Appellate Division
unanimously affirmed the decision by a judgment delivered
by Orde J.A., the other members of the Court (Latchford C.J.,
Middleton J.A. and Masten J.A.) concurring.

* *Present :* VISCOUNT FINLAY, VISCOUNT DUNEDIN, LORD PARMOOR,
LORD DARLING, and LORD WARRINGTON OF CLYFFE.

J. C.          1926. Nov. 25, 28, 29. *Stuart Bevan K.C.*, *Fleming K.C.*
1927        and *Sir Robert Aske* for the appellant.

ROBINS          *Osler K.C.* and *Rodd K.C.* for the respondents the National
*v.*        Trust Co.
NATIONAL
TRUST CO.        *Hellmuth K.C.* for the other respondents.

1927. Feb. 7. The judgment of their Lordships was delivered by

VISCOUNT DUNEDIN. The late Edward Chandler Walker was at first senior partner of the firm of Walker & Sons, and thereafter when that firm was changed into a limited company was president of Walker & Sons, Ld., whiskey distillers, in Walkerville, Ontario. He was a very wealthy man, married, but with no children, and he died on March 11, 1915, leaving a widow. He left a will of date February 27, 1914, and the respondents are the trustees and the principal beneficiaries under the said will. The said will revoked all prior wills. The testator had made a prior will on December 21, 1901, under which the appellant is a beneficiary. The present action is at the instance of the appellant to set aside the will of 1914, and restore the will of 1901. The grounds on which he seeks to set aside the will of 1914 are : (1.) Want of testamentary capacity in the testator on the date of the execution of the said will ; (2.) Fraud or undue influence by which the testator's brothers obtained the execution of the said will.

The appellant was manager of the company, both as a firm and afterwards as a limited company, for a long period, and was on terms of great intimacy with the testator. The appellant left Walkerville in 1914, and went to England. He alleges that he only came to know of the will of 1901 under which he was a beneficiary, and of the state of affairs as at the date of the will of 1914, in April, 1922. On June 23, 1923, he raised the present action against the executors, and the beneficiaries were afterwards added as defendants.

The action was tried before Mowat J. without a jury. Evidence was read on both sides. The evidence was voluminous and contradictory, and the trial lasted six or seven days. The learned judge found that no testamentary incapacity

of the testator had been made out, and that it had not been
shown that the execution of the will was induced by fraud
or undue influence, and he dismissed the action. Appeal
was taken to the Appellate Division of the Supreme Court
of Ontario, and that Court unanimously affirmed the judg-
ment of the trial judge. Appeal has now been taken to the
King in Council, and the appellant has sought to induce
their Lordships who sat on this Board to examine and revise
the evidence and to come to the conclusion that the result
arrived at by the trial judge and the Appellate Division
was wrong.

J. C.
1927
ROBINS
*v.*
NATIONAL
TRUST Co.

This raises in a quite distinct way the question of whether
their Lordships will examine the evidence in order to interfere
with the concurrent findings of two Courts on a pure question
of fact. Whether a man at the time of making his will had
testamentary capacity, whether a will was the result of his
own wish and act or was procured from him by means of
fraud or circumvention or undue influence, are pure questions
of fact. The rule as to concurrent findings is not a rule
based on any statutory provision. It is rather a rule of
conduct which the Board has laid down for itself. As such
it has gradually developed. The judicature which has given
greatest occasion for its development has undoubtedly been
the judicature of India, but the principle is not in any way
limited in its application to Indian legislation or Indian law,
be it Hindu or Moslem, as such. Indeed it is obvious that
if such a rule is a good rule to be applied to the findings of
the Courts in India, there could be no reason for suggesting
that the findings of the Courts of our great self-governing
Dominions should be entitled to less consideration. Their
Lordships wish it to be clearly understood that the rule of
conduct is a rule of conduct for the Empire, and will be
applied to all the various judicatures whose final tribunal is
this Board.

Being, as has been said, a rule of conduct, and not a
statutory provision, the rule is not cast iron ; but it would
avail little to try to give a definition which should at once
be exhaustive and accurate, of the exceptions which may

J. C.

1927

ROBINS

*v.*

NATIONAL

TRUST CO.

arise. It will be sufficient to quote what has been said on this subject in the past :—

In *Moung Tha Hnyeen* v. *Moung Pan Nyo* (1) Lord Hobhouse, delivering the judgment of a Board which included Lord Macnaghten and Lord Lindley, said : " There has been nothing to show that there has been a miscarriage of justice, or that any principles of law or of procedure have been violated in the Courts below. This case is one which very decidedly falls within the valuable principle recognised here and commonly observed in second Courts of Appeal, that such a Court will not interfere with concurrent judgments of the Courts below on matters of fact, unless very definite and explicit grounds for that interference are assigned."

In *Rani Srimati* v. *Khajendra Narayan Singh* (2) Lord Lindley repeated the view : " The appellants have failed to show any miscarriage of justice, or the violation of any principle of law or procedure. Their Lordships, therefore, see no reason for departing from the usual practice of this Board of declining to interfere with two concurrent findings on pure questions of fact."

There was a faint attempt made in the present case to argue that what the appellant considered a quite inadequate appreciation and an unjustifiable belittling of a certain witness whom he regarded as all important would amount to a miscarriage of justice. The expression means no such thing. It means such departure from the rules which permeate all judicial procedure as to make that which happened not in the proper use of the word judicial procedure at all. There is, however, also another way of preventing the application of the rule. If it can be shown that the finding of one of the Courts is so based on an erroneous proposition of law that if that proposition be corrected the finding disappears, then in that case it is no finding at all. Such an attempt was made with great skill and pertinacity by Mr. Bevan for the appellant in the present case. He laid stress on the law as it had been authoritatively settled in England, and in Ontario in such matters the law of England

(1) (1900) L. R. 27 I. A. 166, 167.        (2) (1904) L. R. 31 I. A. 127, 131.

**A. C.**          AND PRIVY COUNCIL.                      519

rules. Now the English Courts have gone what some might          J. C.
think pretty far on the question of what duty lies on those        1927
who propound a will. Those who propound a will must       Robins
show that the will of which probate is sought is the will of    *v.*
the testator, and that the testator was a person of testa-    National
Trust Co.
mentary capacity. In ordinary cases if there is no suggestion
to the contrary any man who is shown to have executed a
will in ordinary form will be presumed to have testamentary
capacity, but the moment the capacity is called in question
then at once the onus lies on those propounding the will to
affirm positively the testamentary capacity. Moreover, if
a will is only proved in common and not in solemn form, the
same rule applies, even though the action is to attack a
probate which has been granted long ago.

These propositions will be found to be settled by the
following cases : *Barry* v. *Butlin* (1) ; *Cross* v. *Cross* (2) ;
*Tyrrell* v. *Painton.* (3)

Now their Lordships will assume that these cases are
right. The reason for this form of expression is that the
appellant represented that the Appellate Division of the
Supreme Court of Ontario in the case of *Larocque* v. *Landry* (4)
had taken another view, in that it held that once probate
was granted, though only in common form, the onus was
on him who sought to set it aside, and the Court in this case
held itself bound by that case. It is questionable whether
that is the result of the decision. But assuming that it is,
when an appellate Court in a colony which is regulated by
English law differs from an appellate Court in England, it is
not right to assume that the Colonial Court is wrong. It is
otherwise if the authority in England is that of the House of
Lords. That is the supreme tribunal to settle English law,
and that being settled, the Colonial Court, which is bound
by English law, is bound to follow it. Equally, of course,
the point of difference may be settled so far as the Colonial
Court is concerned by a judgment of this Board. But in the
present case their Lordships do not consider it necessary to

(1) (1838) 2 Moo. P. C. 480.          (3) [1894] P. 151.
(2) (1864) 3 Sw. & Tr. 292.           (4) (1922) 52 Ont. L. R. 479.

J. C.
1927
ROBINS
*v.*
NATIONAL
TRUST CO.

settle which of the two possible views as to the onus is right ; they will assume, for the purposes of this discussion, that the English rule is right. But given the law the appellant in their Lordships' opinion fails in its application to the facts.

Their Lordships cannot help thinking that the appellant takes rather a wrong view of what is truly the function of the question of onus in such cases. Onus is always on a person who asserts a proposition or fact which is not self-evident. To assert that a man who is alive was born requires no proof. The onus is not on the person making the assertion, because it is self-evident that he had been born. But to assert that he was born on a certain date, if the date is material, requires proof ; the onus is on the person making the assertion. Now, in conducting any inquiry, the determining tribunal, be it judge or jury, will often find that the onus is sometimes on the side of one contending party, sometimes on the side of the other, or as it is often expressed, that in certain circumstances the onus shifts. But onus as a determining factor of the whole case can only arise if the tribunal finds the evidence pro and con so evenly balanced that it can come to no such conclusion. Then the onus will determine the matter. But if the tribunal, after hearing and weighing the evidence, comes to a determinate conclusion, the onus has nothing to do with it, and need not be further considered.

That seems to their Lordships the case here. After reviewing the evidence as to capacity the learned trial judge says : " The result of this evidence pieced together, dovetailed together, combined and considered as a whole does not make me think that there was anything which would affect the mind or which would show the incapacity of the late E. C. Walker to make his will when he did." The Appellate Division first stated the grounds put forward by the appellant for the reversal of the judgment of the trial judge thus : " That the evidence established that the testator was not mentally capable of making a will at the time when the alleged will was executed " ; and after examining the evidence the judgment concludes thus : " The plaintiff

clearly fails upon the first of his grounds for the reversal of the judgment."

There is a passage at the beginning of the trial judge's judgment which shows that on the question of onus he agreed with what had been laid down by the Court of Ontario, and the appellant argued that the learned judges of the Appellate Division must be presumed to have had the same views, and that, consequently, the whole judgment was vitiated by this wrong view as to onus. But, as has been already explained, there was no question of onus in the determination as it came to be made. It was a considered result of the evidence, and onus as a determining factor never arose, for the learned judges could, and did, come to a positive conclusion on the evidence laid. Learned counsel laid stress on the fact that the trial judge expressed the result of his view in a negative fashion : " The evidence does not make me think that there was any-thing which would show the incapacity of the testator." And he argued that that was no positive finding of capacity as the authorities require. The learned judge was not dealing with onus. He was stating a result in ordinary English, and to say that the above sentence was not a positive finding of capacity seems to their Lordships as out of the question as to say that if one said of a man that he was not dead on a certain date there was no finding that he was alive.

Their Lordships therefore think that the attempt to avoid the effect of the concurrent finding rule fails. Much was sought to be made of the unfair way in which the appellant argued the trial judge had treated the evidence of a certain Dr. Shurly. Some of the criticisms he made do not particu-larly recommend themselves to their Lordships, but in the end he came to his result on a consideration of the whole evidence. That the Court of Appeal looked at the evidence in rather a different way matters not, for the rule is a rule as to concurrent findings, and not a rule as to concurrent reasons. Thus in *Ram Anugra Narain Singh* v. *Chowdhry Hanuman Sahai* (1) the judgment of their Board states: "The rule (as to concurrent findings) is none the less applicable

J. C.
1927

Robins
*v.*
National
Trust Co.

(1) (1902) L. R. 30 I. A. 41, 43.

**522**                          HOUSE OF LORDS                     [1927]

<div style="float:left">

J. C.

1927

ROBINS

*v.*

NATIONAL

TRUST CO.

</div>

because the Courts may not have taken precisely the same view of the weight to be attached to each particular item of evidence." No question of this sort arises as to the procuring of the will by fraud or undue influence, because it is admitted that in that case the onus is always on the person who attacks the will : see *Craig* v. *Lamoureux.* (1)

In their Lordships' opinion the rule as to concurrent findings clearly applies in this case, and the appeal falls to be dismissed. A petition was lodged for the admission of new evidence. This application had been made to the Court of Appeal and refused. Their Lordships will be slow indeed to interfere with the decision of the local Court on what is really a question of discretion and procedure. This petition therefore falls to be dismissed with costs.

Their Lordships will humbly advise His Majesty in accordance with the above opinion. The appellant will pay the costs of the appeal.

Solicitors for appellant : *Collyer-Bristow & Co.*

Solicitors for respondents : *Blake & Redden ; Freshfields, Leese & Munns.*

<div style="text-align:center">(1) [1920] A. C. 349.</div>

TAB 65

*Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378,
Privy Council on appeal from the Court of Appeal of Brunei

endorsed in *Reg. v. Mandair* [1995] 1 A.C. 208. Also a quite separate    A
appeal against sentence which was not before the House will fall to be
considered if the occasion demands.

LORD SLYNN OF HADLEY. My Lords, for the reasons given by my
noble and learned friend, Lord Mustill, whose speech I have had the
advantage of reading in draft, I, too, would allow this appeal and remit
the matter as he proposes.                                                B

*Appeal allowed.*

Solicitors: *Crown Prosecution Service, Headquarters; Edward Harte &
Co., Brighton.*

C

J. A. G.

D

[PRIVY COUNCIL]

ROYAL BRUNEI AIRLINES SDN. BHD.    .    .    .    APPELLANT
                            AND                                            E
PHILIP TAN KOK MING    .    .    .    .    .    .    RESPONDENT

[APPEAL FROM THE COURT OF APPEAL OF BRUNEI DARUSSALAM]

1995  March 22;                     Lord Goff of Chieveley, Lord Ackner,
      May 24                        Lord Nicholls of Birkenhead, Lord Steyn
                                                    and Sir John May    F

*Trusts—Constructive    trust—Dishonesty—Controlling    director    of
company dishonestly assisting in breach of trust by company—
Whether director liable to beneficiary for resulting loss*

The plaintiff airline appointed as its agent in a particular area
for the sale of passenger and cargo transportation a company of    G
which the defendant was the managing director and principal
shareholder. Under the agreement the company was to hold in
trust for the airline money received from such sale until it was
accounted for by the company to the airline. With the defendant's
knowledge and assistance the company paid the money into its
current bank account instead of into a separate account, and in
breach of trust the company used that money for its own business
purposes. The company failed to pay to the airline sums due    H
within the time specified by the agreement. The airline terminated
the agreement and, the company having become insolvent,
commenced proceedings against the defendant to recover the
money owed by the company. The judge held that the defendant

2 A.C.                        **Royal Brunei Airlines v. Tan (P.C.)**

A    was liable as constructive trustee to pay that amount to the airline. On appeal the Court of Appeal of Brunei Darussalam reversed that decision, holding that the defendant could not be so liable because it had not been established that the company was guilty of fraud or dishonesty in relation to the money held in trust for the airline.

On the airline's appeal to the Judicial Committee:—

B    *Held*, allowing the appeal, that where a third party dishonestly assisted a trustee to commit a breach of trust or procured him to do so, the third party would be liable to the beneficiary for the loss occasioned by the breach of trust, even though the third party had received no trust property and irrespective of whether the trustee had been dishonest or fraudulent; that in the context of such accessory liability honesty was to be judged objectively and acting dishonestly, or with a lack of probity, which was synonymous, meant not acting as an honest person would act in

C    the circumstances and could usually be equated with conscious impropriety as distinct from inadvertent or negligent conduct or carelessness, although a third party might be acting dishonestly if he recklessly disregarded the rights of others; that the third party's conduct had to be assessed on the basis of his actual knowledge at the time not what a reasonable person would have known or appreciated, and regard could be had to his personal attributes

D    including experience and intelligence and the reason for him acting in that way; and that, accordingly, since the defendant had caused or permitted the company to commit a breach of trust by using in the conduct of its business money held in trust for the airline when he knew that the company was not authorised to do so by the terms of the trust, the defendant had acted dishonestly, and was, therefore, liable to the airline for the amount owed to it by the company (post, pp. 385A–B, 389C–D, 390G, 391B, 392F–G,

E    393B).

Dictum of Lord Selborne L.C. in *Barnes v. Addy* (1874) L.R. 9 Ch.App. 244, 251–252 and *Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250, C.A. considered.

*Semble.* Although mere negligence by a third party acting for or dealing with trustees would not normally render him liable to the beneficiaries in respect of losses resulting from a breach of

F    trust, there might be cases where, in the light of particular facts, an honest third party will owe a duty of care to the beneficiaries in respect of the conduct of the trustees (post, p. 392B–C).

Decision of the Court of Appeal of Brunei Darussalam reversed.

The following cases are referred to in the judgment of their Lordships:

G    *Agip (Africa) Ltd. v. Jackson* [1990] Ch. 265; [1989] 3 W.L.R. 1367; [1992] 4 All E.R. 385
*Attorney-General v. Corporation of Leicester* (1844) 7 Beav. 176
*Baden v. Société Générale pour Favoriser le Développement du Commerce et de l'Industrie en France S.A. (Note)* [1993] 1 W.L.R. 509; [1992] 4 All E.R. 161
*Barnes v. Addy* (1874) L.R. 9 Ch.App. 244

H    *Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250; [1978] 3 W.L.R. 712; [1979] 1 All E.R. 118, C.A.
*Carl Zeiss Stiftung v. Herbert Smith & Co. (No. 2)* [1969] Ch. 276; [1969] 2 W.L.R. 427; [1969] 2 All E.R. 367, C.A.
*Cowan de Groot Properties Ltd. v. Eagle Trust Plc.* [1992] 4 All E.R. 700

Royal Brunei Airlines v. Tan (P.C.)                    [1995]

*D.P.C. Estates Pty. Ltd. v. Grey and Consul Development Pty. Ltd.* [1974]   A
    1 N.S.W.L.R. 443; sub nom. *Consul Development Pty. Ltd. v. D.P.C.*
    *Estates Pty. Ltd.* (1975) 132 C.L.R. 373
*Eagle Trust Plc. v. S.B.C. Securities Ltd.* [1993] 1 W.L.R. 484; [1992] 4 All
    E.R. 488
*Eaves v. Hickson* (1861) 30 Beav. 136
*Equiticorp Industries Group Ltd. v. Hawkins* [1991] 3 N.Z.L.R. 700
*Fyler v. Fyler* (1841) 3 Beav. 550                                          B
*Karak Rubber Co. Ltd. v. Burden (No. 2)* [1972] 1 W.L.R. 602; [1972] 1 All
    E.R. 1210
*Marr v. Arabco Traders Ltd.* (1987) 1 N.Z.B.L.C. 102,732
*Marshall Futures Ltd. v. Marshall* [1992] 1 N.Z.L.R. 316
*Montagu's Settlement Trusts, In re* [1987] Ch. 264; [1987] 2 W.L.R. 1192;
    [1992] 4 All E.R. 308
*Nimmo v. Westpac Banking Corporation* [1993] 3 N.Z.L.R. 218
*Polly Peck International Plc. v. Nadir (No. 2)* [1992] 4 All E.R. 769, C.A.    C
*Powell v. Thompson* [1991] 1 N.Z.L.R. 597
*Reg. v. Ghosh* [1982] Q.B. 1053; [1982] 3 W.L.R. 110; [1982] 2 All E.R. 689,
    C.A.
*Selangor United Rubber Estates Ltd. v. Cradock (No. 3)* [1968] 1 W.L.R.
    1555; [1968] 2 All E.R. 1073
*Springfield Acres Ltd. v. Abacus (Hong Kong) Ltd.* [1994] 3 N.Z.L.R. 502
*Westpac Banking Corporation v. Savin* [1985] 2 N.Z.L.R. 41                    D

The following additional cases were cited in argument:

*Gathergood v. Blundell & Brown Ltd.* [1992] 3 N.Z.L.R. 643
*Lion Breweries Ltd. v. Scarrot* (1986) 2 B.C.R. 242
*Reg. v. Sinclair* [1968] 1 W.L.R. 1246; [1968] 3 All E.R. 241, C.A.
*Savin & Boyle v. De Vere* (1983) 1 B.C.R. 545                                E

APPEAL (No. 52 of 1994) with leave of the Court of Appeal of Brunei
Darussalam by the plaintiff airline, Royal Brunei Airlines Sdn. Bhd., from
the judgment of the Court of Appeal of Brunei Darussalam (Fuad P.,
Cons and Kempster, Judicial Commissioners) given on 2 June 1994
allowing an appeal by the defendant, Philip Tan Kok Ming, from the
judgment of Roberts C.J. delivered on 14 October 1993 in the High Court   F
of Brunei Darussalam at Bandar Seri Begawan, whereby he had ordered
the defendant to pay the airline the amount which was owed by Borneo
Leisure Travel Sdn. Bhd. to the airline. The Chief Registrar of the High
Court on 14 December 1993 had assessed the damages to which the airline
was entitled as amounting to B.\$335,160 with interest.

The facts are stated in the judgment of their Lordships.           G

*Michael Beloff Q.C., Raymond Lam* (of the Brunei Bar) and *Murray
Hunt* for the airline. Where a controlling director of a company assists in
a deliberate, as opposed to inadvertent or negligent, breach of trust by the
company of which ex hypothesi he has actual knowledge his behaviour is
unconscionable and he is liable as a constructive trustee.

The airline had to prove (1) the existence of a trust; (2) breach of trust   H
by the company; (3) dishonesty (lack of probity) in the breach of trust by
the company; (4) assistance by the defendant in the breach of trust; and
(5) knowledge of the foregoing by the defendant. The first and second

2 A.C.                    Royal Brunei Airlines v. Tan (P.C.)

A    requirements were rightly conceded, and the fourth and fifth were self-evidently established since the company acted through the defendant in all material respects. If dishonesty by the company was proved, it is indisputable that the defendant had knowledge of it. The company was dishonest, or acted with lack of probity, in that it deliberately used trust moneys for its own purposes and without the authority of the airline. The principles stated by Lord Selborne L.C. in *Barnes v. Addy* (1874) L.R. 9
B    Ch.App. 244, 251–252 apply. Strangers to a trust will not be at risk if they are innocent.

The test as to whether a third party is liable to account in equity for knowingly assisting a trustee to commit a breach of trust is to be found in *Baden v. Société Générale pour Favoriser le Développement du Commerce et de l'Industrie en France S.A. (Note)* [1993] 1 W.L.R. 509. [Reference
C    was also made to *Savin & Boyle v. De Vere* (1983) 1 B.C.R. 545; *Westpac Banking Corporation v. Savin* [1985] 2 N.Z.L.R. 41; *Lion Breweries Ltd. v. Scarrot* [1986] 2 B.C.R. 242 and *Gathergood v. Blundell & Brown Ltd.* [1992] 3 N.Z.L.R. 643.] If a trustee takes a risk with trust property knowing that he has no right to take that risk, that is sufficient to constitute fraud or dishonesty on the part of the trustee. The Court of Appeal erred in law in holding that the company had not acted
D    fraudulently or dishonestly in relation to the amounts which it held in trust for the airline, and so the defendant is liable as constructive trustee and the judge's order should be restored.

*Daljit Singh Sandhu* and *Geoffrey Sim* (both of the Brunei Bar) for the defendant. For the defendant to be liable as constructive trustee the airline had to prove that the company had acted fraudulently or dishonestly with
E    regard to the sums which it held in trust for the airline, and that the defendant had knowingly assisted the company to commit that breach of trust. The Court of Appeal was entitled to conclude that fraud or dishonesty by the company had not been established. The Court of Appeal applied the proper test. The test in the *Baden* case [1993] 1 W.L.R. 509 is correct and the four elements stated therein must be established. One of the four elements is that there must be a dishonest and fraudulent design
F    on the part of the trustee in order to hold a stranger liable as a constructive trustee. [Reference was made to *Reg. v, Sinclair* [1968] 1 W.L.R. 1246 and *Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250.]

*Beloff Q.C.* replied.

G                                                          *Cur. adv. vult.*

24 May.  The judgment of their Lordships was delivered by LORD NICHOLLS OF BIRKENHEAD.

The proper role of equity in commercial transactions is a topical question. Increasingly plaintiffs have recourse to equity for an effective remedy when the person in default, typically a company, is insolvent.
H    Plaintiffs seek to obtain relief from others who were involved in the transaction, such as directors of the company, or its bankers, or its legal or other advisers. They seek to fasten fiduciary obligations directly onto the company's officers or agents or advisers, or to have them held

Royal Brunei Airlines v. Tan (P.C.)                              [1995]

personally liable for assisting the company in breaches of trust or fiduciary          A
obligations.

This is such a case. An insolvent travel agent company owed money to
an airline. The airline seeks a remedy against the travel agent's principal
director and shareholder. Its claim is based on the much-quoted dictum of
Lord Selborne L.C., sitting in the Court of Appeal in Chancery, in *Barnes
v. Addy* (1874) L.R. 9 Ch.App. 244, 251–252:

B

"[The responsibility of a trustee] may no doubt be extended in equity
to others who are not properly trustees, if they are found . . . actually
participating in any fraudulent conduct of the trustee to the injury of
the cestui que trust. But . . . strangers are not to be made constructive
trustees merely because they act as the agents of trustees in
transactions within their legal powers, transactions, perhaps of which
a court of equity may disapprove, unless those agents receive and          C
become chargeable with some part of the trust property, or unless
they assist with knowledge in a dishonest and fraudulent design on
the part of the trustees."

In the conventional shorthand, the first of these two circumstances in
which third parties (non-trustees) may become liable to account in equity
is "knowing receipt," as distinct from the second, where liability arises          D
from "knowing assistance." Stated even more shortly, the first limb of
Lord Selborne L.C.'s formulation is concerned with the liability of a
person as a *recipient* of trust property or its traceable proceeds. The
second limb is concerned with what, for want of a better compendious
description, can be called the liability of an *accessory* to a trustee's breach
of trust. Liability as an accessory is not dependent upon receipt of trust
property. It arises even though no trust property has reached the hands of          E
the accessory. It is a form of secondary liability in the sense that it only
arises where there has been a breach of trust. In the present case the
plaintiff airline relies on the accessory limb. The particular point in issue
arises from the expression "a dishonest and fraudulent design on the part
of the trustees."

F

*The proceedings*

The essential facts are these. In 1986 the plaintiff airline, Royal Brunei
Airlines Sdn. Bhd., appointed Borneo Leisure Travel Sdn. Bhd. ("B.L.T.")
to act, in various places in Sabah and Sarawak, as its general travel agent
for the sale of passenger and cargo transportation. The terms of the
appointment were set out in a written agreement of 1 April 1986. B.L.T.          G
was required to account to the airline for all amounts received from sales
of tickets. For its services it was to be paid a sales commission. The
agreement was expressed to be subject to the regulations of the
International Air Transport Association, one of which provided:

"All moneys collected by the agent for transportation and ancillary
services sold under this agreement, including applicable commissions
which the agent is entitled to claim thereunder, shall be the property          H
of the carrier and shall be held by the agent in trust for the carrier or
on behalf of the carrier until satisfactorily accounted for to the carrier
and settlement made. . . . Unless otherwise instructed by the carrier

**2 A.C.**                **Royal Brunei Airlines v. Tan (P.C.)**

A      the agent shall be entitled to deduct from remittances the applicable
       commission to which it is entitled hereunder."

       It was common ground that the effect of this provision was to constitute
       B.L.T. a trustee for the airline of the money it received from the sale of
       passenger and cargo transportation for the airline.
           In practice what happened was that money received by B.L.T. on
B      behalf of the airline was not paid into a separate bank account. It was
       paid into B.L.T.'s ordinary, current account with its bank. By a standing
       arrangement with the bank, any balance in its current account in excess
       of a stated amount was transferred to a fixed deposit account of B.L.T.
       or, at times, of the defendant, Philip Tan Kok Ming. The defendant had
       founded B.L.T. He was managing director and principal shareholder. He
C      was effectively in charge and control of B.L.T. The other director and
       shareholder was his wife. Nothing turns on these transfers of money to
       other accounts because, with one immaterial exception, all the transferred
       money eventually found its way back to B.L.T.'s current account.
           B.L.T. was required to pay the airline within 30 days, but at various
       times from 1988 onwards it was in arrears. In August 1992 the airline
       terminated the agreement. In January 1993 the airline commenced this
D      action against the defendant in respect of the unpaid money. The
       defendant was not himself a party to the agency agreement, although he
       had signed it on behalf of B.L.T.
           At the trial held in October 1993 Roberts C.J. rejected a claim by the
       airline that the defendant had orally guaranteed payment of the money.
       Roberts C.J. also rejected a claim that the defendant had diverted the
       money to his own use. Roberts C.J. upheld a claim that the defendant
E      was liable as a constructive trustee, under the accessory limb of Lord
       Selborne L.C.'s formulation in *Barnes v. Addy*, L.R. 9 Ch.App. 244, 251–
       252. Although not particularised, this issue was pleaded explicitly and
       unequivocally. The defendant knew there was an express trust of the
       money. The money appeared to have been used by B.L.T. for its ordinary
       business purposes, paying salaries, overheads and other expenses, and
F      keeping down its bank overdraft. It must be assumed that the defendant
       authorised the use of the money for these purposes. That was sufficient to
       make him liable. A fraudulent and dishonest design is not confined to
       personal gain. It is sufficient if the stranger knowingly assists in the use of
       trust property in a way which is not permitted by the trust. Judgment was
       entered for the airline for B.$335,160.
           The Court of Appeal of Brunei Darussalam allowed the defendant's
G      appeal. Counsel for the defendant conceded that a trust of the money had
       been created, and that there had been a breach of that trust in which the
       defendant had assisted with actual knowledge. The issue was whether a
       dishonest and fraudulent design on the part of B.L.T. had been established.
       The court held that the evidence revealed a sorry tale of mismanagement
       and broken promises, but that it was not established that B.L.T. was
H      guilty of fraud or dishonesty in relation to the amounts it held in trust for
       the airline. Delivering the judgment of the court, Fuad P. stated:

           "As long standing and high authority shows, conduct which may
           amount to a breach of trust, however morally reprehensible, will not

Royal Brunei Airlines v. Tan (P.C.)                    [1995]

render a person who has knowingly assisted in the breach of trust    A
liable as a constructive trustee if that conduct falls short of
dishonesty."

This view of the state of the law has the support of the (English) Court
of Appeal. In *Selangor United Rubber Estates Ltd. v. Cradock (No. 3)*
[1968] 1 W.L.R. 1555, 1591, Ungoed-Thomas J. held that the expression
"dishonest and fraudulent design" was to be understood according to the    B
principles of a court of equity. That approach was emphatically rejected
by the Court of Appeal in *Belmont Finance Corporation Ltd. v. Williams
Furniture Ltd.* [1979] Ch. 250. Buckley L.J. observed, at p. 267, that the
rule as formulated by Lord Selborne L.C. had stood for more than 100
years, and that to depart from it would introduce an undesirable degree
of uncertainty to the law over what degree of unethical conduct would    C
suffice if dishonesty was not to be the criterion. Goff L.J., at p. 274,
agreed that it would be dangerous and wrong to depart from "the safe
path of the principle as stated by Lord Selborne L.C. to the uncharted sea
of something not innocent . . . but still short of dishonesty."
In short, the issue on this appeal is whether the breach of trust which
is a prerequisite to accessory liability must itself be a dishonest and
fraudulent breach of trust by the trustee.    D

*The honest trustee and the dishonest third party*

It must be noted at once that there is a difficulty with the approach
adopted on this point in the *Belmont* case [1979] Ch. 250. Take the simple
example of an honest trustee and a dishonest third party. Take a case
where a dishonest solicitor persuades a trustee to apply trust property in    E
a way the trustee honestly believes is permissible but which the solicitor
knows full well is a clear breach of trust. The solicitor deliberately conceals
this from the trustee. In consequence, the beneficiaries suffer a substantial
loss. It cannot be right that in such a case the accessory liability principle
would be inapplicable because of the innocence of the trustee. In ordinary
parlance, the beneficiaries have been defrauded by the solicitor. If there is
to be an accessory liability principle at all, whereby in appropriate    F
circumstances beneficiaries may have direct recourse against a third party,
the principle must surely be applicable in such a case, just as much as in
a case where both the trustee and the third party have been dishonest.
Indeed, if anything, the case for liability of the dishonest third party seems
stronger where the trustee is innocent, because in such a case the third
party alone was dishonest and that was the cause of the subsequent    G
misapplication of the trust property.
The position would be the same if, instead of *procuring* the breach, the
third party dishonestly *assisted* in the breach. Change the facts slightly.
A trustee is proposing to make a payment out of the trust fund to a
particular person. He honestly believes he is authorised to do so by the
terms of the trust deed. He asks a solicitor to carry through the
transaction. The solicitor well knows that the proposed payment would be    H
a plain breach of trust. He also well knows that the trustee
mistakenly believes otherwise. Dishonestly he leaves the trustee under his
misapprehension and prepares the necessary documentation. Again, if the

A accessory principle is not to be artificially constricted, it ought to be applicable in such a case.

These examples suggest that what matters is the state of mind of the third party sought to be made liable, not the state of mind of the trustee. The trustee will be liable in any event for the breach of trust, even if he acted innocently, unless excused by an exemption clause in the trust instrument or relieved by the court. But *his* state of mind is essentially

B irrelevant to the question whether the *third party* should be made liable to the beneficiaries for the breach of trust. If the liability of the third party is fault-based, what matters is the nature of his fault, not that of the trustee. In this regard dishonesty on the part of the third party would seem to be a sufficient basis for his liability, irrespective of the state of mind of the trustee who is in breach of trust. It is difficult to see why, if the third

C party dishonestly assisted in a breach, there should be a further prerequisite to his liability, namely that the trustee also must have been acting dishonestly. The alternative view would mean that a dishonest third party is liable if the trustee is dishonest, but if the trustee did not act dishonestly that of itself would excuse a dishonest third party from liability. That would make no sense.

D
*Earlier authority*

The view that the accessory liability principle cannot be restricted to fraudulent breaches of trust is not to be approached with suspicion as a latter-day novelty. Before the accessory principle donned its *Barnes v. Addy,* L.R. 9 Ch.App. 244 strait-jacket, judges seem not to have

E regarded the principle as confined in this way. In *Fyler v. Fyler* (1841) 3 Beav. 550, 568, Lord Langdale M.R. expressed the view that, if trustees invested in an unauthorised investment, solicitors who knowingly procured that to be done for their own benefit "ought to be considered as partakers in the breach of trust" even though the trustees intended in good faith that the investment would be beneficial to the life tenant and not prejudicial to the beneficiaries with interests in capital. The same judge,

F Lord Langdale M.R., in *Attorney-General v. Corporation of Leicester* (1844) 7 Beav. 176, 179, stated:

> "it cannot be disputed that, if the agent of a trustee, whether a corporate body or not, knowing that a breach of trust is being committed, interferes and assists in that breach of trust, he is personally answerable, although he may be employed as the agent of

G > the person who directs him to commit that breach of trust."

In *Eaves v. Hickson* (1861) 30 Beav. 136 trustees, acting in good faith, paid over the fund to William Knibb's adult children on the strength of a forged marriage certificate produced to them by William Knibb. Sir John Romilly M.R. held that William Knibb was liable to replace the fund, to the extent that it was not recovered from his children, and to do so in

H priority to the liability of the trustees. Far from this being a case of fraud by the trustees, Sir John Romilly M.R., at p. 141, described it as a very hard case on the trustees, who were deceived by a forgery which would have deceived anyone who was not looking out for forgery or fraud.

Royal Brunei Airlines v. Tan (P.C.)                    [1995]

This point did not arise in *Barnes v. Addy*, L.R. 9 Ch.App. 244. There    A
the new sole trustee was engaged in a dishonest and fraudulent design. He
intended to misapply the trust fund as soon as it reached his hands. The
two solicitors were held not liable because there was no evidence that
either of them had any knowledge or suspicion of this.

What has gone wrong? Their Lordships venture to think that the
reason is that, ever since the *Selangor* case [1968] 1 W.L.R. 1555
highlighted the potential uses of equitable remedies in connection with    B
misapplied company funds, there has been a tendency to cite and interpret
and apply Lord Selborne L.C.'s formulation in *Barnes v. Addy,* L.R. 9
Ch.App. 244, 251–252, as though it were a statute. This has particularly
been so with the accessory limb of Lord Selborne L.C.'s apothegm. This
approach has been inimical to analysis of the underlying concept. Working
within this constraint, the courts have found themselves wrestling with the    C
interpretation of the individual ingredients, especially "knowingly" but
also "dishonest and fraudulent design on the part of the trustees," without
examining the underlying reason why a third party who has received no
trust property is being made liable at all. One notable exception is the
judgment of Thomas J. in *Powell v. Thompson* [1991] 1 N.Z.L.R. 597,
610–615. On this point he observed, at p. 613:

> "Once a breach of trust has been committed, the commission of    D
> which has involved a third party, the question which arises is one as
> between the beneficiary and that third party. If the third party's
> conduct has been unconscionable, then irrespective of the degree of
> impropriety in the trustee's conduct, the third party is liable to be
> held accountable to the beneficiary as if he or she were a trustee."

To resolve this issue it is necessary to take an overall look at the    E
accessory liability principle. A conclusion cannot be reached on the nature
of the breach of trust which may trigger accessory liability without at the
same time considering the other ingredients including, in particular, the
state of mind of the third party. It is not necessary, however, to look even
more widely and consider the essential ingredients of recipient liability.
The issue on this appeal concerns only the accessory liability principle.    F
Different considerations apply to the two heads of liability. Recipient
liability is restitution-based; accessory liability is not.

*No liability*

The starting point for any analysis must be to consider the extreme
possibility: that a third party who does not receive trust property ought    G
never to be liable directly to the beneficiaries merely because he assisted
the trustee to commit a breach of trust or procured him to do so. This
possibility can be dismissed summarily. On this the position which the law
has long adopted is clear and makes good sense. Stated in the simplest
terms, a trust is a relationship which exists when one person holds
property on behalf of another. If, for his own purposes, a third party
deliberately interferes in that relationship by assisting the trustee in    H
depriving the beneficiary of the property held for him by the trustee, the
beneficiary should be able to look for recompense to the third party as
well as the trustee. Affording the beneficiary a remedy against the third

A    party serves the dual purpose of making good the beneficiary's loss should
the trustee lack financial means and imposing a liability which will
discourage others from behaving in a similar fashion.

The rationale is not far to seek. Beneficiaries are entitled to expect that
those who become trustees will fulfil their obligations. They are also
entitled to expect, and this is only a short step further, that those who
become trustees will be permitted to fulfil their obligations without
B    deliberate intervention from third parties. They are entitled to expect that
third parties will refrain from intentionally intruding in the trustee-
beneficiary relationship and thereby hindering a beneficiary from receiving
his entitlement in accordance with the terms of the trust instrument. There
is here a close analogy with breach of contract. A person who knowingly
procures a breach of contract, or knowingly interferes with the due
C    performance of a contract, is liable to the innocent party. The underlying
rationale is the same.

### Strict liability

The other extreme possibility can also be rejected out of hand. This is
the case where a third party deals with a trustee without knowing, or
D    having any reason to suspect, that he is a trustee. Or the case where a
third party is aware he is dealing with a trustee but has no reason to know
or suspect that their transaction is inconsistent with the terms of the trust.
The law has never gone so far as to give a beneficiary a remedy against a
non-recipient third party in such circumstances. Within defined limits,
proprietary rights, whether legal or equitable, endure against third parties
who were unaware of their existence. But accessory liability is concerned
E    with the liability of a person who has not received any property. His
liability is not property-based. His only sin is that he interfered with the
due performance by the trustee of the fiduciary obligations undertaken by
the trustee. These are personal obligations. They are, in this respect,
analogous to the personal obligations undertaken by the parties to a
contract. But ordinary, everyday business would become impossible if
F    third parties were to be held liable for *unknowingly* interfering in the due
performance of such personal obligations. Beneficiaries could not
reasonably expect that third parties should deal with trustees at their peril,
to the extent that they should become liable to the beneficiaries even when
they received no trust property and even when they were unaware and
had no reason to suppose that they were dealing with trustees.

G

### Fault-based liability

Given, then, that in some circumstances a third party may be liable
directly to a beneficiary, but given also that the liability is not so strict
that there would be liability even when the third party was wholly unaware
of the existence of the trust, the next step is to seek to identify the
touchstone of liability. By common accord dishonesty fulfils this role.
H    Whether, in addition, negligence will suffice is an issue on which there has
been a well-known difference of judicial opinion. The *Selangor* decision
[1968] 1 W.L.R. 1555 in 1968 was the first modern decision on this point.
Ungoed-Thomas J., at p. 1590, held that the touchstone was whether the

third party had knowledge of circumstances which would indicate to "an    A
honest, reasonable man" that the breach in question was being committed
or would put him on inquiry. Brightman J. reached the same conclusion
in *Karak Rubber Co. Ltd. v. Burden (No. 2)* [1972] 1 W.L.R. 602. So did
Peter Gibson J. in 1983 in *Baden v. Société Générale pour Favoriser le
Développement du Commerce et de.l'Industrie en France S.A. (Note)* [1993]
1 W.L.R. 509. In that case the judge accepted a five-point scale of    B
knowledge which had been formulated by counsel.

Meanwhile doubts had been expressed about this test by Buckley and
Goff L.JJ. in the *Belmont* case [1979] Ch. 250, 267, 275. Similar doubts
were expressed in Australia by Jacobs P. in *D.P.C. Estates Pty. Ltd.
v. Grey and Consul Development Pty. Ltd.* [1974] 1 N.S.W.L.R. 443, 459.
When that decision reached the High Court of Australia, the doubts were
echoed by Barwick C.J., Gibbs and Stephen JJ.: see *Consul Development*    C
*Pty. Ltd. v. D.P.C. Estates Pty. Ltd.* (1975) 132 C.L.R. 373, 376, 398, 412.

Since then the tide in England has flowed strongly in favour of the test
being one of dishonesty: see, for instance, Sir Robert Megarry V.-C. in
*In re Montagu's Settlement Trusts* [1987] Ch. 264, 285, and Millett J. in
*Agip (Africa) Ltd. v. Jackson* [1990] Ch. 265, 293. In *Eagle Trust Plc.
v. S.B.C. Securities Ltd.* [1993] 1 W.L.R. 484, 495, Vinelott J. stated that
it could be taken as settled law that want of probity was a prerequisite to    D
liability. This received the imprimatur of the Court of Appeal in *Polly
Peck International Plc. v. Nadir (No. 2)* [1992] 4 All E.R. 769, 777, *per*
Scott L.J.

Judicial views have diverged also in New Zealand. In *Westpac Banking
Corporation v. Savin* [1985] 2 N.Z.L.R. 41, 70, Sir Clifford Richmond
preferred the approach in *Belmont Finance Corporation Ltd. v. Williams*    E
*Furniture Ltd.* [1979] Ch. 250, as did Tompkins J. in *Marr v. Arabco
Traders Ltd.* (1987) 1 N.Z.B.L.C. 102,732, 102,762. In *Powell v. Thompson*
[1991] 1 N.Z.L.R. 597, 612, 613, 615, Thomas J. considered that the
suggestion that negligence is not enough to found liability is to be resisted.
The test is one of unconscionable behaviour. This, and knowledge to
match, whether actual or constructive, will suffice to herald a visit from
equity. In *Equiticorp Industries Group Ltd. v. Hawkins* [1991] 3 N.Z.L.R.    F
700, 728, Wylie J. disagreed. He adhered to the concept of want of probity
as the standard by which unconscionability was to be measured. In
*Marshall Futures Ltd. v. Marshall* [1992] 1 N.Z.L.R. 316, 325, Tipping J.
was concerned about the difficulty of identifying as unconscionable
conduct which was less reprehensible than conduct which can be described
as dishonest. He would, he said, at p. 325, prefer the herald of equity to    G
be wearing more distinctive clothing than that suggested by Thomas J. In
*Nimmo v. Westpac Banking Corporation* [1993] 3 N.Z.L.R. 218, 228,
Blanchard J. preferred a test of dishonesty. Most recently, in *Springfield
Acres Ltd. v. Abacus (Hong Kong) Ltd.* [1994] 3 N.Z.L.R. 502, 510, Henry J.
observed that the law in New Zealand could not be regarded as settled.

Most, but not all, commentators prefer the test of dishonesty: see,
among others, Peter Birks, "Misdirected funds: restitution from the    H
recipient" (1989) L.M.C.L.Q. 296; M. J. Brindle and R. J. A. Hooley,
"Does constructive knowledge make a constructive trustee?" (1987) 61
A.L.J. 281; Charles Harpum, "The stranger as constructive trustee" (1986)

2 A.C.                    Royal Brunei Airlines v. Tan (P.C.)

A    102 L.Q.R. 114, 267; *Birks, The Frontiers of Liability* (1994), vol. 1, p. 9;
Patricia Loughlan, "Liability for assistance in a breach of fiduciary duty"
(1989) 9 O.J.L.S. 260; *Parker and Mellows, The Modern Law of Trusts,*
6th ed. (1994), p. 253; *Pettit, Equity and the Law of Trusts,* 7th ed. (1993),
p. 172; Philip Sales, "The tort of conspiracy and civil secondary liability"
(1990) 49 C.L.J. 491; *Snell's Equity,* 29th ed. (1990), p. 194; and *Underhill's
Law of Trusts and Trustees,* 14th ed. (1987), p. 355 and noter-up.

B

*Dishonesty*

Before considering this issue further it will be helpful to define the
terms being used by looking more closely at what dishonesty means in
this context. Whatever may be the position in some criminal or other
contexts (see, for instance, *Reg. v. Ghosh* [1982] Q.B. 1053), in the context
C    of the accessory liability principle acting dishonestly, or with a lack of
probity, which is synonymous, means simply not acting as an honest
person would in the circumstances. This is an objective standard. At first
sight this may seem surprising. Honesty has a connotation of subjectivity,
as distinct from the objectivity of negligence. Honesty, indeed, does have
a strong subjective element in that it is a description of a type of conduct
D    assessed in the light of what a person actually knew at the time, as distinct
from what a reasonable person would have known or appreciated. Further,
honesty and its counterpart dishonesty are mostly concerned with
advertent conduct, not inadvertent conduct. Carelessness is not dishonesty.
Thus for the most part dishonesty is to be equated with conscious
impropriety. However, these subjective characteristics of honesty do not
mean that individuals are free to set their own standards of honesty in
E    particular circumstances. The standard of what constitutes honest conduct
is not subjective. Honesty is not an optional scale, with higher or lower
values according to the moral standards of each individual. If a person
knowingly appropriates another's property, he will not escape a finding of
dishonesty simply because he sees nothing wrong in such behaviour.

In most situations there is little difficulty in identifying how an honest
F    person would behave. Honest people do not intentionally deceive others
to their detriment. Honest people do not knowingly take others' property.
Unless there is a very good and compelling reason, an honest person does
not participate in a transaction if he knows it involves a misapplication of
trust assets to the detriment of the beneficiaries. Nor does an honest
person in such a case deliberately close his eyes and ears, or deliberately
not ask questions, lest he learn something he would rather not know, and
G    then proceed regardless. However, in the situations now under
consideration the position is not always so straightforward. This can best
be illustrated by considering one particular area: the taking of risks.

*Taking risks*

All investment involves risk. Imprudence is not dishonesty, although
H    imprudence may be carried recklessly to lengths which call into question
the honesty of the person making the decision. This is especially so if the
transaction serves another purpose in which that person has an interest of
his own.

This type of risk is to be sharply distinguished from the case where a   A
trustee, with or without the benefit of advice, is aware that a particular
investment or application of trust property is outside his powers, but
nevertheless he decides to proceed in the belief or hope that this will be
beneficial to the beneficiaries or, at least, not prejudicial to them. He takes
a risk that a clearly unauthorised transaction will not cause loss. A risk of
this nature is for the account of those who take it. If the risk materialises
and causes loss, those who knowingly took the risk will be accountable   B
accordingly. This is the type of risk being addressed by Peter Gibson J. in
the *Baden* case [1993] 1 W.L.R. 509, 574, when he accepted that fraud
includes taking "a risk to the prejudice of another's rights, which risk is
known to be one which there is no right to take."

This situation, in turn, is to be distinguished from the case where there
is genuine doubt about whether a transaction is authorised or not. This   C
may be because the trust instrument is worded obscurely, or because there
are competing claims, as in *Carl Zeiss Stiftung v. Herbert Smith & Co.
(No. 2)* [1969] 2 Ch. 276, or for other reasons. The difficulty here is that
frequently the situation is neither clearly white nor clearly black. The
dividing edge between what is within the trustee's powers and what is not
is often not clear-cut. Instead there is a gradually darkening spectrum
which can be described with labels such as clearly authorised, probably   D
authorised, possibly authorised, wholly unclear, probably unauthorised
and, finally, clearly unauthorised.

The difficulty here is that the differences are of degree rather than of
kind. So far as the trustee himself is concerned the legal analysis is
straightforward. Honesty or lack of honesty is not the test for his liability.
He is obliged to comply with the terms of the trust. His liability is strict.   E
If he departs from the trust terms he is liable unless excused by a provision
in the trust instrument or relieved by the court. The analysis of the
position of the accessory, such as the solicitor who carries through the
transaction for him, does not lead to such a simple, clear-cut answer in
every case. He is required to act honestly; but what is required of an
honest person in these circumstances? An honest person knows there is
doubt. What does honesty require him to do?   F

The only answer to these questions lies in keeping in mind that honesty
is an objective standard. The individual is expected to attain the standard
which would be observed by an honest person placed in those
circumstances. It is impossible to be more specific. Knox J. captured the
flavour of this, in a case with a commercial setting, when he referred to a
person who is "guilty of commercially unacceptable conduct in the   G
particular context involved:" see *Cowan de Groot Properties Ltd. v. Eagle
Trust Plc.* [1992] 4 All E.R. 700, 761. Acting in reckless disregard of
others' rights or possible rights can be a tell-tale sign of dishonesty. An
honest person would have regard to the circumstances known to him,
including the nature and importance of the proposed transaction, the
nature and importance of his role, the ordinary course of business, the
degree of doubt, the practicability of the trustee or the third party   H
proceeding otherwise and the seriousness of the adverse consequences to
the beneficiaries. The circumstances will dictate which one or more of the
possible courses should be taken by an honest person. He might, for

A    instance, flatly decline to become involved. He might ask further questions. He might seek advice, or insist on further advice being obtained. He might advise the trustee of the risks but then proceed with his role in the transaction. He might do many things. Ultimately, in most cases, an honest person should have little difficulty in knowing whether a proposed transaction, or his participation in it, would offend the normally accepted standards of honest conduct.

B    Likewise, when called upon to decide whether a person was acting honestly, a court will look at all the circumstances known to the third party at the time. The court will also have regard to personal attributes of the third party, such as his experience and intelligence, and the reason why he acted as he did.

Before leaving cases where there is real doubt, one further point should

C    be noted. To inquire, in such cases, whether a person dishonestly assisted in what is later held to be a breach of trust is to ask a meaningful question, which is capable of being given a meaningful answer. This is not always so if the question is posed in terms of "knowingly" assisted. Framing the question in the latter form all too often leads one into tortuous convolutions about the "sort" of knowledge required, when the truth is that "knowingly" is inapt as a criterion when applied to the

D    gradually darkening spectrum where the differences are of degree and not kind.

### Negligence

It is against this background that the question of negligence is to be addressed. This question, it should be remembered, is directed at whether

E    an honest third party who receives no trust property should be liable if he procures or assists in a breach of trust of which he would have become aware had he exercised reasonable diligence. Should he be liable to the beneficiaries for the loss they suffer from the breach of trust?

The majority of persons falling into this category will be the hosts of people who act for trustees in various ways: as advisers, consultants, bankers and agents of many kinds. This category also includes officers

F    and employees of companies in respect of the application of company funds. All these people will be accountable to the trustees for their conduct. For the most part they will owe to the trustees a duty to exercise reasonable skill and care. When that is so, the rights flowing from that duty form part of the trust property. As such they can be enforced by the beneficiaries in a suitable case if the trustees are unable or unwilling to do

G    so. That being so, it is difficult to identify a compelling reason why, in addition to the duty of skill and care vis-à-vis the trustees which the third parties have accepted, or which the law has imposed upon them, third parties should also owe a duty of care directly to the beneficiaries. They have undertaken work for the trustees. They must carry out that work properly. If they fail to do so, they will be liable to make good the loss suffered by the trustees in consequence. This will include, where

H    appropriate, the loss suffered by the trustees, being exposed to claims for breach of trust.

Outside this category of persons who owe duties of skill and care to the trustees, there are others who will deal with trustees. If they have not

accepted, and the law has not imposed upon them, any such duties in    A
favour of the trustees, it is difficult to discern a good reason why they
should nevertheless owe such duties to the beneficiaries.

There remains to be considered the position where third parties are
acting for, or dealing with, dishonest trustees. In such cases the trustees
would have no claims against the third party. The trustees would suffer
no loss by reason of the third party's failure to discover what was going
on. The question is whether in this type of situation the third party owes    B
a duty of care to the beneficiaries to, in effect, check that a trustee is not
misbehaving. The third party must act honestly. The question is whether
that is enough.

In agreement with the preponderant view, their Lordships consider
that dishonesty is an essential ingredient here. There may be cases where,
in the light of the particular facts, a third party will owe a duty of care to    C
the beneficiaries. As a general proposition, however, beneficiaries cannot
reasonably expect that all the world dealing with their trustees should owe
them a duty to take care lest the trustees are behaving dishonestly.


### Unconscionable conduct

Mention, finally, must be made of the suggestion that the test for    D
liability is that of unconscionable conduct. Unconscionable is a word of
immediate appeal to an equity lawyer. Equity is rooted historically in the
concept of the Lord Chancellor, as the keeper of the Royal Conscience,
concerning himself with conduct which was contrary to good conscience.
It must be recognised, however, that unconscionable is not a word in
everyday use by non-lawyers. If it is to be used in this context, and if it is
to be the touchstone for liability as an accessory, it is essential to be clear    E
on what, *in this context*, unconscionable *means*. If unconscionable means
no more than dishonesty, then dishonesty is the preferable label. If
unconscionable means something different, it must be said that it is not
clear what that something different is. Either way, therefore, the term is
better avoided in this context.

                                                                          F

### The accessory liability principle

Drawing the threads together, their Lordships' overall conclusion is
that dishonesty is a necessary ingredient of accessory liability. It is also a
sufficient ingredient. A liability in equity to make good resulting loss
attaches to a person who dishonestly procures or assists in a breach of
trust or fiduciary obligation. It is not necessary that, in addition, the
trustee or fiduciary was acting dishonestly, although this will usually be so    G
where the third party who is assisting him is acting dishonestly.
"Knowingly" is better avoided as a defining ingredient of the principle,
and in the context of this principle the *Baden* [1993] 1 W.L.R. 509 scale of
knowledge is best forgotten.


### Conclusion                                                            H

From this statement of the principle it follows that this appeal
succeeds. The money paid to B.L.T. on the sale of tickets for the airline
was held by B.L.T. upon trust for the airline. This trust, on its face,

**2 A.C.**　　　　　**Royal Brunei Airlines v. Tan (P.C.)**

A  conferred no power on B.L.T. to use the money in the conduct of its business. The trust gave no authority to B.L.T. to relieve its cash flow problems by utilising for this purpose the rolling 30-day credit afforded by the airline. Thus B.L.T. committed a breach of trust by using the money instead of simply deducting its commission and holding the money intact until it paid the airline. The defendant accepted that he knowingly assisted in that breach of trust. In other words, he caused or permitted his

B  company to apply the money in a way he knew was not authorised by the trust of which the company was trustee. Set out in these bald terms, the defendant's conduct was dishonest. By the same token, and for good measure, B.L.T. also acted dishonestly. The defendant was the company, and his state of mind is to be imputed to the company.

　　The Court of Appeal held that it was not established that B.L.T. was

C  guilty of fraud or dishonesty in relation to the amounts it held for the airline. Their Lordships understand that by this the Court of Appeal meant that it was not established that the defendant intended to defraud the airline. The defendant hoped, maybe expected, to be able to pay the airline, but the money was lost in the ordinary course of a poorly-run business with heavy overhead expenses. These facts are beside the point. The defendant had no right to employ the money in the business at all.

D  That was the breach of trust. The company's inability to pay the airline was the consequence of that breach of trust.

　　The Court of Appeal observed that it would have been unrealistic to expect B.L.T. to keep the money in a separate bank account and not use any of the money in the conduct of the business, particularly as B.L.T. was also the ticketing agent for a number of other airlines. Their Lordships

E  express no view on this, or on what the parties are to be taken to have intended would happen in practice when the company's current bank account was overdrawn. It is possible that in certain circumstances these points might sustain an argument that, although there was a failure to pay, there was no breach of trust. They do not arise in this case because of the defendant's acceptance that there was a breach of trust.

　　Their Lordships will report their advice to His Majesty The Sultan and

F  Yang Di-Pertuan that this appeal should be allowed, the order of the Court of Appeal set aside and the order of Roberts C.J. restored. The defendant must pay the airline's costs before their Lordships' Board and before the Court of Appeal.

　　*Solicitors: Norton Rose; Denton Hall.*

G

　　　　　　　　　　　　　　　　　　　　　　　　　　S. S.

H